# UNITED STATES DISTRICT COURT

# DISTRICT OF CONNECTICUT

THE STATE OF CONNECTICUT; THE STATE OF
ALASKA; THE STATE OF ARIZONA; THE STATE
OF ARKANSAS; THE STATE OF CALIFORNIA;
THE STATE OF COLORADO; THE STATE OF
DELAWARE; THE DISTRICT OF COLUMBIA; THE
STATE OF FLORIDA; THE STATE OF GEORGIA;
THE TERRITORY OF GUAM; THE STATE OF
HAWAII; THE STATE OF IDAHO; THE STATE OF
ILLINOIS; THE STATE OF INDIANA; THE STATE
OF IOWA; THE STATE OF KANSAS; THE
COMMONWEALTH OF KENTUCKY; THE STATE
OF LOUISIANA; THE STATE OF MAINE; THE
STATE OF MARYLAND; THE COMMONWEALTH
OF MASSACHUSETTS; THE STATE OF
MICHIGAN; THE STATE OF MINNESOTA; THE
STATE OF MISSISSIPPI; THE STATE OF
MISSOURI; THE STATE OF MONTANA; THE
STATE OF NEBRASKA; THE STATE OF NEVADA;
THE STATE OF NEW HAMPSHIRE; THE STATE
OF NEW JERSEY; THE STATE OF NEW MEXICO;
THE STATE OF NEW YORK; THE STATE OF
NORTH CAROLINA; THE STATE OF NORTH
DAKOTA; THE COMMONWEALTH OF THE
NORTHERN MARIANA ISLAND; THE STATE OF
OHIO; THE STATE OF OKLAHOMA; THE STATE
OF OREGON; THE COMMONWEALTH OF
PENNSYLVANIA; THE COMMONWEALTH OF
PUERTO RICO; THE STATE OF RHODE ISLAND;
THE STATE OF SOUTH CAROLINA; THE STATE
OF TENNESSEE; THE STATE OF UTAH; THE
STATE OF VERMONT; THE COMMONWEALTH
OF VIRGINIA; THE STATE OF WASHINGTON;
THE STATE OF WEST VIRGINIA; THE STATE OF
WISCONSIN; and U.S. VIRGIN ISLANDS

v.

SANDOZ, INC.; ACTAVIS HOLDCO US, INC.;
ACTAVIS ELIZABETH LLC; ACTAVIS PHARMA,

No. 3:20-cv-00820 (MPS)

INC.; AMNEAL PHARMACEUTICALS, INC.;
AMNEAL PHARMACEUTICALS, LLC; ARA
APRAHAMIAN; AUROBINDO PHARMA U.S.A.,
INC.; BAUSCH HEALTH AMERICAS, INC.;
BAUSCH HEALTH US, LLC; MITCHELL
BLASHINSKY; DOUGLAS BOOTHE; FOUGERA
PHARMACEUTICALS INC.; GLENMARK
PHARMACEUTICALS INC., USA; JAMES (JIM)
GRAUSO; GREENSTONE LLC; G&W
LABORATORIES, INC.; WALTER KACZMAREK;
ARMANDO KELLUM; LANNETT COMPANY,
INC.; LUPIN PHARMACEUTICALS, INC.;
MALLINCKRODT INC.; MALLINCKRODT LLC;
MALLINCKRODT plc; MYLAN INC.; MYLAN
PHARMACEUTICALS INC.; KURT ORLOFSKI;
MICHAEL PERFETTO; PERRIGO NEW YORK,
INC.; PFIZER INC.; SUN PHARMACEUTICAL
INDUSTRIES, INC.; TARO PHARMACEUTICALS
USA, INC.; TELIGENT, INC.; ERIKA VOGEL-
BAYLOR; JOHN WESOLOWSKI; and
WOCKHARDT USA LLC

## RULING ON MOTION TO DISMISS STATE-LAW CLAIMS

The Defendants, thirty-six makers of generic drugs, have moved under Fed. R. Civ. P.

12(b)(6) to dismiss state-law claims asserted by the Plaintiffs, the Attorneys General of most of

the States and certain U.S. Territories, in this sprawling action alleging price-fixing, market

allocation, and bid rigging in the sale of generic drugs for skin ailments.  For the reasons set forth

below, I grant in part and deny in part the Defendants' motion.

## I.  Introduction

### A.  Procedural Background

This is one of three cases in which the Attorneys General of the States and territories have

sued scores of generic drug makers for alleged antitrust violations and unfair trade practices.  All

three cases were originally filed in this Court but were transferred to the Eastern District of

Pennsylvania (the "MDL Court"), which was designated by the Judicial Panel on Multi-district

Litigation (the "JPMDL) to preside over these and other similar cases brought by private parties

in a consolidated proceeding.  ECF No. 9.[1]  In April, the JPMDL remanded these three cases to

this Court, and they were assigned to me.  ECF No. 11.

### B.  Allegations

The operative complaint in this case, the September 9, 2021 amended complaint (ECF

No. 196 on this Court's docket), spans 609 pages and includes 2,123 numbered paragraphs.  It

alleges collusion in the pricing, market allocation, and bidding for generic drugs for

dermatological applications.  (The parties refer to it as the "the Dermatology Complaint.")  The

complaint describes a series of conspiracies, and an overarching conspiracy, between makers of

generic dermatological drug-related products to collude on price, market allocation, and bids for

the business of customers.  For example, the complaint alleges that generic drug makers "had

long-standing agreements over the course of several years not to compete for each other's

customers and to follow each other's price increases" and that "to maintain these unlawful

agreements, the competitors stayed in nearly constant communication—meeting regularly at

trade shows and customer conferences and communicating frequently by phone and text message

to reinforce their understandings."  ECF No. 196 at 15.  The complaint claims that these

agreements were endemic in the generic drug industry as a whole: "For many years, the larger

generic pharmaceutical industry has operated pursuant to an overarching understanding to avoid

competing with each other and to instead settle for what these competitors refer to as their 'fair

---

[1] Unless otherwise indicated, all ECF numbers in this ruling refer to entries on the docket of this case, not the same case when it was before the MDL court, and each page number refers to the page number shown on the ECF stamp on the top of the cited page, not the page of the relevant brief or pleading designated by the parties.

share.'  This understanding has permeated every segment of the industry, and the purpose of the agreement was to avoid competition among generic manufacturers that would normally result in lower prices and greater savings to the ultimate consumer."  *Id*. at 16.  The complaint goes on to discuss the structure of the industry and to allege in detail a myriad of specific communications between competitors in the segment concerning skin products.  *See also In re Generic Pharms. Pricing Antitrust Litig.*, No. 16-md-2724, 2023 WL 2244685, at *1 (E.D. Pa. Feb. 27, 2023) (briefly summarizing allegations in Dermatology Complaint).  Because the factual details of the alleged agreements are not critical to this ruling for reasons I explain below, however, I do not further summarize the complaint here.

## C.  Rule 12(b)(6)

While the Defendants have filed previous motions attacking the federal antitrust claims in this case, this motion targets only the States' state-law claims and, as discussed below, only certain portions of those claims.  In federal court, each complaint must include "a short and plain statement of the claim showing that the pleader is entitled to relief," Fed. R. Civ. 8(a)(2), and if the complaint "fail[s] to state a claim upon which relief can be granted," Fed. R. Civ. P. 12(b)(6), the court must dismiss it.  In deciding the Defendants' motion to dismiss under Rule 12(b)(6), I must determine whether the States have alleged "enough facts to state a claim to relief that is plausible on its face."  *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007).  "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).  I must accept as true the complaint's factual allegations, *id.*, and must "draw all reasonable inferences in favor of the non-moving party," *Vietnam Ass'n for Victims of Agent Orange v. Dow Chem. Co.*, 517 F.3d 104, 115 (2d Cir. 2008), but "threadbare recitals of the

elements of a cause of action, supported by mere conclusory statements, do not suffice" to survive a motion to dismiss. *Mastafa v. Chevron Corp.*, 770 F.3d 170, 177 (2d Cir. 2014) (citation omitted).

For the most part, however, the Defendants' motion does not involve the application of these standards—making it an unusual Rule 12(b)(6) motion. Most of the motion does not argue that the States' allegations under state antitrust and unfair and deceptive practice statutes "fail[]" to state a claim upon which relief can be granted," Fed. R. Civ. P. 12(b)(6), or that the price-fixing, bid-rigging, and market allocation allegations do not "plausib[ly]" plead violations of those statutes. Instead, the bulk of the motion asks me to foreclose the States from pursuing particular types of *relief*—such as "parens patriae" damages and disgorgement—under state law.

Saying that a State cannot recover parens patriae damages under its antitrust statute, however, is quite different from saying that the State has "fail[ed] to state a claim upon which [*some*] relief can be granted." Fed. R. Civ. P. 12(b)(6). This explains why several courts have held that the prayer for relief is not even pertinent on a Rule 12(b)(6) motion, noting that the requirement of "a short and plain statement of the claim showing that the pleader is entitled to relief" is set forth in a separate subparagraph of Rule 8 from the requirement of a prayer for relief - or "demand for judgment." *See* Fed. R. Civ. P. 8(a)(2)–(3); Wright & Miller, 5 Federal Practice & Procedure § 1255 at 1 nn. 6–7 (4th ed.) (citing cases); *Alevsky v. GC Services Limited Partnership*, No. 13-cv-6793, 2014 WL 1711682, at *1 (E.D.N.Y. Apr. 30, 2014) ("[A]s a general matter, damages are not an element of a cause of action. A Rule 12(b)(6) motion therefore cannot challenge the demand for relief, since that motion tests the legal sufficiency of allegations . . . , not the request for relief . . . ."). But some courts have disagreed, addressing the

propriety of specific types of relief at the pleadings stage. *See Constellation Brands, Inc. v. Keste, LLC*, No. 14-cv-6272, 2014 WL 6065776, at *4 (W.D.N.Y. Nov. 13, 2014) ("The Court is . . . aware of decisions in which courts have dismissed damages claims under Rule 12(b)(6), as well as decisions of the Second Circuit . . . affirming such dismissals, that do not hint at the alleged procedural bar upon which Plaintiff relies.") (citing cases). Further, the States have not raised this procedural argument, and I appreciate that there might be practical value in clarifying the forms of relief available in anticipation of settlement discussions.

Still, the Defendants' request for a ruling on the pleadings about the availability of particular forms of relief remains a tall order. A court is generally not in a position to assess what relief might suit a particular case until after liability is established, usually at trial. Indeed, the Federal Rules require courts to maintain flexibility in fashioning relief—even relief that the plaintiff did not request—until the time comes to enter final judgment. *See* Fed. R. Civ. P. 54(c) ("Every other final judgment [i.e., other than a default judgment] should grant the relief to which each party is entitled, even if the party has not demanded that relief in its pleadings.").

These procedural concerns notwithstanding, I attempt in this ruling to address the parties' arguments, while keeping in mind that there will be later stages of this case in which I might be in a better position to decide some of these issues. More specifically, only where I find the relevant State's law to foreclose particular types of relief in clear terms will I "dismiss" a particular claim for relief.

## II. Discussion

For ease of reference, I organize the analysis of the Defendants' motion alphabetically by State below.

I begin by denying the motion to dismiss Alabama's and Louisiana's state-law claims as moot. After the Defendants filed the motion to dismiss, Louisiana and Alabama voluntarily dismissed their claims. ECF Nos. 388, 409. Although the States' opposition brief discusses Wyoming, ECF No. 367-1 at 69, Wyoming is not a party to this action and so I do not address it. *See* ECF No. 367-2 at 54 n.26.

I have granted the parties an extension for supplemental briefing regarding Tennessee's state-law claims; I will address those claims in a supplemental order.

### A. Alaska and California

The Defendants argue that the Alaska Superior Court has exclusive jurisdiction over claims under Alaska antitrust and consumer protection statutes, Alaska Stat. §§ 45.50.582 & 45.50.501(a). ECF No. 367 at 27–28. Similarly, the Defendants argue that the California Attorney General is authorized to bring a parens patriae action only "in the superior court of any county which has jurisdiction of a defendant." Cal. Bus. & Prof. Code § 16760(a)(1); *see also id.* § 16760(e)(1). ECF Nos. 367 at 28, 367-2 at 20 (California's parens patriae claims should be dismissed because those claims were not properly filed in "the superior court of any county which has jurisdiction of a defendant").

The motion to dismiss as to Alaska and California is denied. "[I]n any civil action of which the district courts have original jurisdiction," they also have "supplemental jurisdiction over all other claims that are so related to claims in the action within such original jurisdiction that they form part of the same case or controversy." 28 U.S.C. § 1367(a). The Defendants do not contest that the state claims are related and acknowledge that state laws cannot restrict federal jurisdiction. *Griffith v. Bank of N.Y.*, 147 F.2d 899, 904 (2d Cir. 1945) ("[I]t is well settled that state statutes cannot limit the jurisdiction . . . of the federal courts."); *Hindes v. FDIC*,

137 F.3d 148, 168 n.15 (3d Cir. 1998) (holding that "a state statute cannot be applied so as to limit a federal court's supplemental jurisdiction."); *Williams v. Duke Energy Int'l, Inc*., 681 F.3d 788, 798 (6th Cir. 2012) ("The jurisdiction of the federal courts 'cannot be limited or taken away by state statutes.'").

"In determining jurisdiction, district courts of the United States must look to the sources of their power, Article III of the United States Constitution and Congressional statutory grants of jurisdiction, not to the acts of state legislatures." *Duchek v. Jacobi*, 646 F.2d 415, 419 (9th Cir. 1981). "However extensive their power to create and define substantive rights, the states have no power directly to enlarge or contract federal jurisdiction." *Id.* "The right to assert jurisdiction over state claims through the doctrine of pendent jurisdiction is a law of the United States, and, as such, under the supremacy clause of the Constitution, Article VI, this law has precedence over any contrary state law." *Thompkins v. Stuttgart Sch. Dist. No. 22*, 787 F.2d 439, 441 (8th Cir. 1986).

> To allow a state legislature to limit the pendent jurisdiction of the federal courts would in many cases defeat the purpose of pendent jurisdiction; expediency, efficiency, and fairness to the parties, [*United Mine Workers of Am. v. Gibbs*, 383 U.S. 715, 726 (1966)]. If a claimant cannot raise his pendent state issue in federal court he has a choice of either going through the expense and ordeal of two separate, but related, trials, or of bringing all of his claims in the state court. One choice denies efficiency and expediency, and the other is unfair because it discourages him from presenting his federal claims in federal court. If the federal claim must be brought in federal court, then the claimant would have no choice but to bring two separate suits to resolve his related claims.

*Id.* at 442; *see also Davet v. City of Cleveland*, 456 F.3d 549, 553–54 (6th Cir. 2006) (plaintiff's argument that under state statute only state court had jurisdiction to hear counterclaim failed because federal court had supplemental jurisdiction).

Confronted with these well-established principles barring state-law erosion of federal jurisdiction, the Defendants next argue that "the problem is not the federal courts' jurisdiction to hear [the States'] claims, but rather [the States'] lack of authority under state law to bring such claims in federal court." ECF No. 367-2 at 20. But this argument would allow States to do what the Defendants concede they may not do—limit the jurisdiction of a federal court—merely by recasting state-law designations of jurisdiction for state-law claims as limits on the state's (or the state attorney general's) authority, rather than the federal court's authority. However the argument is characterized, the impact on the federal court's jurisdiction is the same, and so I reject the argument.

Because the Defendants' motion to dismiss the claims of these and other States (discussed below) on the basis of state statutes specifying state courts as the forum for certain state-law claims runs afoul of 28 U.S.C. § 1367, I deny it.

### B. Colorado

The Defendants move to dismiss Colorado's claim for actual or treble damages under the Colorado Consumer Protection Act ("CCPA"), Colo. Rev. Stat. § 6-1-113, because that statute does not authorize Colorado to recover damages on behalf of itself, state agencies, or consumers. ECF No. 367 at 43. The motion to dismiss as to Colorado is denied as moot. Colorado has clarified that "the Colorado Attorney General seeks only equitable relief—including but not limited to restitution for Colorado state entities and consumers—under § 6-1-110." ECF No. 367-1 at 20.

### C. Connecticut

The Defendants move to dismiss Connecticut's claim for damages under Conn. Gen. Stat. § 35-32(c)(2) because those damages are "duplicative of" parens patriae claims on behalf of state citizens.  ECF No. 367 at 29.

The motion to dismiss is denied because the Defendants' argument relating to the "potentially duplicative nature of the damages and injuries pleaded" is premature at the pleadings stage of this litigation.  *State v. Marsh & McLennan Companies, Inc.*, 944 A.2d 315, 328 (Conn. 2008) (noting that "defendants' arguments with respect to the potentially duplicative nature of the damages and injuries pleaded in the state's complaint implicate potential problems of proof rather than pleading").

**D.  Delaware**

The Defendants seek to dismiss claims for monetary recovery under the Delaware Antitrust Act, Del. Code tit. 6, § 2101 et. seq, on behalf of "indirect" purchasers brought by the State of Delaware because they are precluded by the U.S. Supreme Court's decision in *Illinois Brick Co. v. Illinois*, 431 U.S. 720 (1977).  ECF No. 367 at 37.

The Supreme Court's decision in *Illinois Brick* "established a bright-line rule that authorizes suits [for damages in anti-trust cases] by *direct* purchasers but bars [such] suits by *indirect* purchasers."  *Apple Inc. v. Pepper*, 587 U.S. 273, 279 (2019).  "The bright-line rule of *Illinois Brick* . . . means that indirect purchasers who are two or more steps removed from the antitrust violator in a distribution chain may not sue."  *Id.* at 280.  The *Illinois Brick* direct purchaser rule bars damages claims brought by indirect purchases under federal antitrust laws.

Delaware responds that it is not seeking parens patriae damages on behalf of its residents but is instead seeking civil penalties, disgorgement, and injunctive relief under Del. Code tit. 6, §

2107.  This relief, Delaware contends, is not barred by *Illinois Brick*, a contention the Defendants do not contest.  ECF Nos. 367-1 at 23, 367-2 at 23.[2]  The motion to dismiss is denied.

### E.  Florida

The Defendants argue that Florida may not seek relief based on indirect purchases under its state antitrust statute, Florida Antitrust Act, Section 542.18.  ECF No. 367 at 37.

The motion to dismiss is denied.  Florida has clarified that it has not asserted indirect purchaser claims under its antitrust statute.  ECF No. 367-1 at 23-24.  Rather, Florida has brought its state law antitrust claims under the Florida Antitrust Act as a direct purchaser by assignment.  *See* ECF No. 196 ¶ 1860.  Florida has also brought indirect purchaser claims under the Florida Unfair and Deceptive Trade Practices Act, Fla. Stat. § 501.201 et seq., which, according to the Florida courts, does afford relief to indirect purchasers.  ECF No. 367-1 at 23. *See Mack v. Bristol-Myers Squibb Co.*, 673 So. 2d 100, 108 (Fla. Dist. Ct. App. 1996) ("We read subsections 501.202(2), 501.211(2), and 501.204(1) of [FDUTPA] as a clear statement of legislative policy to protect consumers through the authorization of such indirect purchaser actions.").

### F.  Indiana

The Defendants move to dismiss Indiana's parens patriae damages claim under its consumer protection statute, its indirect purchaser claims other than those brought on behalf of governmental entities, and its claim under its consumer protection statute.  The motion is granted in part and denied in part as follows.

---

[2] I note, however, that with respect to some other States, the Defendants have argued that allowing a disgorgement remedy where the "victims" were indirect purchasers would undermine the *Illinois Brick* direct purchaser rule.  The Defendants do not make that argument with respect to Delaware, and so I do not address it here.

The Defendants first argue that Indiana's Attorney General does not have the authority to seek parens patriae monetary damages under Indiana's Deceptive Consumer Sales Act ("IDCPA"), Ind. Code § 24-5-0.5-4(c).  ECF No. 367-2 at 66.

The IDCPA sets forth the authority of the Attorney General to seek remedies under the Act as follows:

> (c) The attorney general may bring an action to enjoin a deceptive act . . . .  In addition, the court may:
>     (1) issue an injunction;
>     (2) order the supplier to make payment of the money unlawfully received from the aggrieved consumers to be held in escrow for distribution to aggrieved consumers;
>     (3) for a knowing violation against a senior consumer, increase the amount of restitution ordered under subdivision (2) in any amount up to three (3) times the amount of damages incurred or value of property or assets lost;
>     (4) order the supplier to pay to the state the reasonable costs of the attorney general's investigation and prosecution related to the action;
>     (5) provide for the appointment of a receiver; . . .
>     (6) order the department of state revenue to suspend the supplier's registered retail merchant certificate . . . .

Ind. Code § 24-5-0.5-4(c).

By its terms, the IDCPA does not authorize the Attorney General to bring a parens patriae action for *damages* on behalf of consumers.  Nor does Indiana point to any case law recognizing such authority.  Indiana nonetheless argues that sections 4(c)(2) and (3) authorize the Attorney General to seek parens patriae damages.  ECF No. 367-1 at 24.

But Indiana's interpretation of these provisions is not persuasive.  Section 4(c)(2) provides that the Attorney General may bring an action to enjoin deceptive practices, and that the court "may . . . order the supplier" to provide restitution.  Ind. Code § 24-5-0.5-4(c)(2).  Section 4(c)(3) states that in actions brought by the Attorney General, where there is "a knowing violation against a senior consumer," the court can "increase the amount of restitution ordered

under subdivision (2) in any amount up to three (3) times the amount of damages incurred or value of property or assets lost." Ind. Code § 24-5-0.5-4(c)(3).  Indiana argues that the latter provision's use of the term "damages" "cements the Attorney General's authority to seek damages on behalf of Indiana consumers."  ECF No. 367-3 at 15.  I disagree.  According to the statute, the court may order restitution in cases brought by the Attorney General.  Indiana courts have held that restitution is an equitable remedy that differs from damages.  *See Cmty. Care Centers, Inc. v. Sullivan*, 701 N.E.2d 1234, 1239 (Ind. Ct. App. 1998) ("We believe the equitable concept of unjust enrichment necessarily inheres any time the remedy of restitution is sought by a litigant . . . . [W]e have characterized the concepts of restitution and unjust enrichment as synonymous"); *Rollings v. Smith*, 716 N.E.2d 502, 507 (Ind. Ct. App. 1999) ("As distinct from damages, restitution is an award made to remedy defendant's unjust enrichment rather than plaintiff's loss. . . .  Stated differently, restitution measures the remedy by the defendant's gain and seeks to force disgorgement of that gain."); *see also In re Lehman Bros. Holdings Inc.*, 855 F.3d 459, 480 n.29 (2d Cir. 2017) ("Restitution . . . provides for a measure of recovery that is analytically distinct from that of damages.").

Indiana's textual argument fails and it offers no other authority to support its interpretation of the statute.  The Defendants' motion to dismiss Indiana's claim for parens patriae damages under the IDCSA is granted.[3]

The Defendants next argue that under its antitrust statute, Indiana is not authorized to sue on behalf of indirect purchasers other than governmental entities, citing Ind. Code § 24-1-1-5.1 ("The attorney general may bring an action on behalf of the state or a political subdivision . . . for

---

[3]As I have noted elsewhere in this ruling, the impact of a finding that damages are not available but restitution is may turn out to be insignificant in this case.

injuries or damages sustained directly or indirectly as a result of a violation of this chapter."); and § 24-1-2-7(b) ("The attorney general may bring an action under this section on behalf of the state or a political subdivision if the state or political subdivision has been directly or indirectly injured by a violation of this section.")  ECF No. 367 at 25.

In its opposition, Indiana clarifies that it does not seek "indirect" purchaser damages under Ind. Code § 24-1-2-7(a) but does seek "indirect" purchaser damages for government entities, relief that the Defendants do not contest that Indiana may seek.[4]  ECF No. 367-1 at 25. So the Defendants' motion is denied as moot as to this issue.

The Defendants' final argument is that Indiana's IDCSA claim should be dismissed because the IDSCA does not apply to anticompetitive conduct.  ECF No. 367 at 45.

"The [I]DCSA is a remedial statute and it 'shall be liberally construed and applied to promote its purposes and policies.'" *Bank v. Huizar*, 178 N.E.3d 326, 337 (Ind. Ct. App. 2021) (quoting Ind. Code § 24-5-0.5-1(a)).  The IDCSA's "purposes and policies" are to:

> (1) simplify, clarify, and modernize the law governing deceptive and unconscionable consumer sales practices;
> (2) protect consumers from suppliers who commit deceptive and unconscionable sales acts; and
> (3) encourage the development of fair consumer sales practices.

*Id.* § 24-5-0.5-1(b).

Under section 3(a) of the IDSCA, a "supplier may not commit an unfair, abusive, or deceptive act, omission, or practice in connection with a consumer transaction.  Such an act, omission, or practice by a supplier is a violation of this chapter whether it occurs before, during,

---

[4] I invited supplemental briefing on an amendment to Indiana's statute adopted after this lawsuit and this motion were filed.  ECF No. 463.  Indiana responded that the "amendment is not retroactive" and does not affect the claims in this case.  ECF No. 474 at 1.  In addition, Indiana reiterated that it is simply seeking damages on behalf of itself and its political subdivisions, including for indirect purchases.  *Id.* at 2.

or after the transaction.  An act, omission, or practice prohibited by this section includes both

implicit and explicit misrepresentations."  Ind. Code § 24-5-0.5-3(a).  The IDCSA "does not

define 'unfair,' 'abusive,' or 'deceptive.'" *Crum v. SN Servicing Corp.*, No. 19-cv-2045, 2021

WL 3514153, at *2 (S.D. Ind. Aug. 10, 2021).  Section 3(a) is a "catch-all" provision.  *Gasbi,*

*LLC v. Sanders*, 120 N.E.3d 614, 619 (Ind. Ct. App. 2019).  "Without limiting the scope of"

Section 3(a), Section 3(b) of the IDSCA contains a non-exhaustive list of acts and

representations that are considered deceptive.  Ind. Code § 24-5-0.5-3(b).

The Defendants argue that Indiana's consumer protection claim fails because the

allegations "do not match any of the prohibited practices discussed in the statute" and because

"Indiana courts have rejected IDCSA claims based on allegations similar to those here."  ECF

No. 367 at 45 (citing *Berghausen v. Microsoft Corp.*, 765 N.E.2d 592 (Ind. Ct. App. 2002)).

The Defendants' argument is not persuasive.  That the allegations do not fit into an

enumerated category set forth in section 3(b) of the statute is not dispositive.  Given the breadth

of the "catch-all provision" of section 3(a), the statute's remedial purpose, and the requirement

that it be "liberally construed," Indiana's allegations that the Defendants colluded to restrain

competition in violation of the Indiana Antitrust Act do not clearly fall outside section 3(a)'s

ambit of an "unfair, abusive, or deceptive act, omission, or practice."  *See Gasbi, LLC*, 120

N.E.3d at 620 (holding that section 3(a) could encompass conduct "prohibited elsewhere in the

Indiana Code"); *Crum*, 2021 WL 3514153, at *2 (court would "follow the lead of the state courts

by reading 'unfair, abusive, or deceptive act' broadly to include any act that is misleading to

consumers or otherwise prohibited at law").

Nor does *Berghausen* preclude Indiana's claim.  In *Berghausen*, the plaintiff alleged that

Microsoft illegally tied its Internet Explorer browser to its Windows 98 operating system and that

this conduct violated the IDSCA because Microsoft "implicitly represented to consumers that its prices were fair and competitive when in fact the prices were supra-competitive, monopolist prices that far exceeded the prices consumers would have paid if Microsoft had not engaged in the aforesaid conduct." 765 N.E.2d at 598. The plaintiff alleged that Microsoft violated two enumerated provisions of the IDSCA. The first defined a deceptive act as a representation that a "specific price advantage exists as to such subject of a consumer transaction, if it does not and if the supplier knows or should reasonably know that it does not." *Id.* The court dismissed this claim because the plaintiff failed to allege "any such oral or written representations" or explain why Microsoft's "'implicit representations' would fit within the definition of deceptive acts." *Id.* at 598–99. The second enumerated provision of IDSCA on which the plaintiff relied dealt with soliciting a person to enter into certain agreements. The court dismissed this claim because the plaintiff's complaint failed "to allege the type of solicitation to enter into a contract or agreement that the statute explicitly requires." *Id.* at 599. *Berghausen* does not hold that anticompetitive conduct cannot constitute a violation of IDSCA. And insofar as the Defendants assert that *Berghausen* is authority that implicit representations do not fall within the statute, the statute was amended in 2014 specifically to encompass implicit representations. Ind. Code § 24-5-0.5-3(a); *see Gasbi, LLC*, 120 N.E.3d at 619. In the absence of clear authority from Indiana's highest court demonstrating that Indiana's consumer protection claim is foreclosed by the statute, I decline to dismiss Indiana's consumer protection claim.

### G. Kentucky

The Defendants move to dismiss Kentucky's claims for restitution and disgorgement under its consumer protection statute, Ky. Stat. Ann. § 367.200, arguing that Kentucky is not entitled to seek such relief under state law on behalf of indirect purchasers. ECF No. 367-2 at

26.  They argue that privity is required and cite as support *Federal Trade Commission v. Mylan Laboratories, Inc.*, 62 F. Supp. 2d 25, 46–47 (D.D.C. 1999).

In *Mylan*, the court dismissed Kentucky's claims for disgorgement and restitution brought on behalf of indirect purchasers under § 367.200, noting that "[n]o provision in the Kentucky Consumer Protection Act gives the state express authority to bring such a suit [i.e., a suit seeking damages, restitution, or disgorgement on behalf of indirect purchasers], and state case law is divided on the issue" of whether privity is required.  *Id.* at 46.

But, as Kentucky points out, there is countervailing authority that holds that privity of contract is not required for the Kentucky Attorney General to bring consumer-protection suits under § 367.200, and the Kentucky cases on which *Mylan* relied dealt with suits by private parties under § 367.220, not suits by the Attorney General under § 367.200.  See ECF No. 367-3 at 17–18 (discussing cases).  In *Commonwealth of Kentucky v. Marathon Petroleum Co., LP*, 191 F. Supp. 3d 694 (W.D. Ky. 2016), the district court held that privity of contract is not required for actions brought by the Attorney General under § 367.200.  *Id.* at 706; *see also Kentucky Laborers Dist. Council Health and Welfare Jr. Fund v. Hill & Knowlton, Inc.*, 24 F. Supp. 2d 755, 773 (W.D. Ky. 1998) ("In context, § 367.200 seems intended to permit a court to order relief for the consumers on whose behalf the Attorney General has successfully brought suit.")

Because Kentucky's claims for restitution and disgorgement are not clearly foreclosed under state law, the motion to dismiss is denied.

### H.  Maine

The parties dispute whether Maine has the authority to seek monetary relief for alleged antitrust violations as parens patriae.  The Defendants contend that parens patriae suits are available only where the State has some "quasi-sovereign interest separate and apart from the

interest of its citizens."  ECF No. 367-2 at 28 (internal quotation marks omitted).  Their argument

relies on *Maine v. M/V Tamano*, in which the court held that "in order to maintain a parens

patriae suit, [Maine] must show a direct interest of its own and not merely seek recovery for the

benefit of individuals who are the real parties in interest."  357 F. Supp. 1097, 1100 (D. Me.

1973).

As Maine argues and as explained in *Federal Trade Commission v. Mylan Laboratories,*

*Inc.*, however, *M/V Tamano* was "based on an interpretation of federal common law, and

therefore would not appear to bind [courts] addressing questions of state law."  99 F. Supp. 2d 1,

7 (D.D.C. 1999).  The Maine Supreme Court has held that Maine's Attorney General "may, in the

absence of some express legislative restriction to the contrary, exercise all such power and

authority as public interests may, from time to time require, and may institute, conduct, and

maintain all such actions and proceedings as he deems necessary for the enforcement of the laws

of the State, the preservation of order, and the protection of public rights."  *Lund ex rel. Wilbur v.*

*Pratt*, 308 A.2d 554, 558 (Me. 1973).  This "suggests that the powers of the Maine Attorney

General [under state law] are sufficiently broad to encompass a parens patriae action on behalf of

indirect purchasers."  *Mylan Lab'ys, Inc.*, 99 F. Supp. 2d at 7.  While the language in the *Lund*

case is admittedly somewhat vague, it is the only authority the parties cite from Maine's highest

court and the parties have pointed to no more recent or specific authority.  Because Maine's

claim for damages is not clearly barred under state law, I decline to dismiss it at this stage of the

proceedings.

### I.    Michigan

The Defendants argue that Michigan has failed to state a claim under the Michigan

Consumer Protection Act ("MICPA"), Mich. Comp. Laws § 445.901, et seq.  ECF No. 367 at 46.

They explain that § 445.910 of the MICPA—which authorizes the "[t]he attorney general [to] bring a class action on behalf of persons residing in or injured in this state for the actual damages caused by . . . [a] method, act, or practice in trade or commerce declared by a circuit court of appeals or the supreme court of the United States to be an unfair or deceptive act or practice within the meaning of section 5(a)(1) of the [F]ederal [T]rade [C]ommission [A]ct," *id.* § 445.910(1)—does not apply "[b]ecause this is not a class action."  ECF No. 367-2 at 29.

The MICPA does not define the term "class action."  *See* § 445.902.  But courts interpreting § 445.910 have found that the actions authorized by this statute are distinct from traditional class actions—that is, actions governed by Federal Rule of Civil Procedure ("FRCP") 23, similar state court rules, and the Class Action Fairness Act ("CAFA"), 28 U.S.C. § 1332(d). *See Nessel ex rel. Michigan v. Amerigas Partners, L.P.*, 421 F. Supp. 3d 507, 510–13 (E.D. Mich. 2019), *aff'd*, 954 F.3d 831 (6th Cir. 2020) (explaining that FRCP 23, Michigan class action rule, and CAFA did not apply to actions brought by the Michigan Attorney General under § 445.910). While traditional class actions are brought by "one or more members of a class . . . on behalf of the [rest of] the class, . . . the Michigan Attorney General is quite clearly not a member of the class for whom [s]he seeks relief when bringing suit under section 445.910 of the M[I]CPA." *Id.* at 511.  Applying traditional class action requirements like adequacy and numerosity to actions under § 445.910 would therefore be improper, as it would "require [courts] to perform inquiries inconsistent with the Attorney General's statutory prerogative under the M[I]CPA." *Id.*  That the present action does not comport with the requirements of Rule 23—or make any allegations aimed at satisfying those requirements—thus does not bar Michigan's MICPA claims.

The Defendants further argue that "the M[I]CPA is a narrowly circumscribed statute that does not encompass price fixing allegations."  ECF No. 367-2 at 29.  But the cases the

Defendants cite in support of this proposition address § 445.903 of the MICPA, not § 445.910.
*See In re Packaged Seafood Prod. Antitrust Litig.*, 242 F. Supp. 3d 1033, 1076–77 (S.D. Cal.
2017) (dismissing the claims of some plaintiffs under § 445.903); *In re K-Dur Antitrust Litig.*,
No. 01-1652 (JAG), 2008 WL 2660783, at *9 (D.N.J. Mar. 19, 2008) (Special Master Report)
(explaining that § 445.903 of MICPA "forbids only itemized unfair, unconscionable, or deceptive
methods, acts or practices," "does not contain a harmonization provision, and is not modeled
directly on the FTC Act" (internal quotation marks and citation omitted)); *In re New Motor
Vehicles Canadian Exp. Antitrust Litig.*, 350 F. Supp. 2d 160, 189 (D. Me. 2004) (concluding that
Plaintiffs' allegations "do not fit any of the . . . itemized proscribed practices" in § 445.903);
*Sheet Metal Workers Local 441 Health & Welfare Plan v. GlaxoSmithKline, PLC*, 737 F. Supp.
2d 380, 412 (E.D. Pa. 2010) (explaining that § 445.903 provides "an exclusive list of offenses
that constitute [unfair, unconscionable or deceptive business] practices" (internal quotation
marks omitted)).  And § 445.910 allows the Attorney General to challenge *both* (1) "method[s],
act[s], or practice[s] . . . defined as unlawful under [§ 445.903]," *and* (2) "method[s], act[s], or
practice[s] declared . . . to be an unfair or deceptive act or practice within the meaning of section
5(a)(1) of the [FTC Act], 15 U.S.C. 45(a)(1)."  As it is well-established that price fixing can
constitute an unfair practice within the meaning of the FTC Act, *see, e.g.*, *Eugene Dietzgen Co. v.
F.T.C.*, 142 F.2d 321, 331–32 (7th Cir. 1944); *United States v. St. Regis Paper Co.*, 285 F.2d 607,
610 n.4 (2d Cir. 1960) ("[A]ny violation of the Sherman and Clayton Acts [is] also a violation of
§ 5 of the Federal Trade Commission Act."), Michigan may assert these allegations under §
445.910.

The Defendants also claim that Michigan informed them that it was "drop[ping] its
proprietary claims on behalf of state agencies," and stated in a supplement to its interrogatory

responses that it was seeking only "civil penalties, disgorgement, and fees and costs in an enforcement capacity, and not damages or parens patriae relief." ECF No. 367 at 46 n.20. They argue that, "[t]o the extent that Michigan attempts to revitalize its claims for damages and/or monetary recovery in a parens patriae capacity, [it] should not be permitted to do so." *Id.* The Defendants have attached to their motion the supplemental interrogatory in question, *see id.* at 122–33, including an exhibit in which Michigan indicates that the forms of monetary relief it is seeking are civil penalties, disgorgement, and fees and costs, *id.* at 132 ("Exhibit D").

It is difficult to square Michigan's supplemental interrogatory response with its claims under the MICPA. Because the Attorney General can seek only "actual damages" under § 445.910 of the MICPA, and because the class action authorized by § 445.910 is virtually indistinguishable from a parens patriae action, a promise not to pursue damages or parens patriae relief under § 445.910 of the MICPA would effectively amount to a promise not to pursue a claim under this provision at all—and yet Michigan relies on that provision in its opposition brief. *See* ECF No. 367-1 at 29.

But it is not clear from the interrogatory whether Michigan, when responding to the question of what monetary remedies it was seeking, was describing the remedies sought under the Michigan Antitrust Reform Act ("MIARA") alone or those sought under *both* the MIARA and the MICPA. Exhibit D of the interrogatory does not specify the statutory basis of the claims. *See* ECF No. 367 at 132. And though Michigan's claims under the MIARA are the only ones referenced in the rest of the interrogatory, *see id.* at 126–27, it is likewise ambiguous whether these statements are meant to encompass all of Michigan's claims or are limited to those under MIARA. The interrogatory also references other documents that have not been provided to the Court. *See id.* at 127 ("Michigan supplements and restates prior information provided in Exhibit

C to the Second MI Supplement"—which has not been provided to the Court—"with the information provided in Exhibit D . . . to encompass claims asserted in the Plaintiff States' Complaint.").  My understanding is that—at least at minimum—Michigan is not pursuing damages and/or monetary recovery in a parens patriae capacity under the MIARA, and is instead seeking only civil penalties, disgorgement, and fees and costs under this statute.  But further clarification of Michigan's position is required with respect to its claims under the MICPA.

**Within seven (7) days of this order**, Michigan shall file a statement on the docket explaining (1) whether it is pursuing its claims under the MICPA and, if so, under which MICPA provisions, (2) if it is pursuing these claims, what relief it is seeking under the MICPA, and (3) if it is seeking parens patriae relief under MICPA—including "actual damages" "on behalf of persons residing in or injured in Michigan" under § 445.910—why this relief was not referenced in the interrogatory provided by the Defendants.  (If the Court is mistaken about Michigan's intention not to pursue damages or parens patriae relief under the MIARA, Michigan shall also (1) correct the Court, and (2) explain why these forms of monetary relief were not denoted on the interrogatory.)  The Defendants may respond to Michigan's statement **within seven (7) days of its filing**.  Michigan's statement and the Defendants' response shall be no more than **seven (7) pages** each, and no further briefing is permitted.  In the meantime, I deny without prejudice the Defendants' motion to dismiss Michigan's claims.

### J.  Mississippi

Mississippi seeks "relief, including but not limited to injunctive relief, damages, restitution, disgorgement, civil penalties, costs, [and] attorney fees" under the Mississippi Antitrust Act ("MSAA"), Miss. Code Ann. § 75-21-1, et seq., and the Mississippi Consumer Protection Act ("MSCPA"), Miss. Code Ann. § 75-24-1, et seq.  ECF No. 196 ¶ 1952.

Defendants contend that Mississippi may not seek monetary recovery for injured parties other than the state. ECF No. 367 at 30. Their argument relies primarily on *Mississippi ex rel. Hood v. AU Optronics, Corp.*, in which the Fifth Circuit explained that "no provision of the M[S]CPA gives the State authority to enforce claims for injuries *suffered by others*," and "the M[S]AA allows the State to sue for injunctive relief and civil penalties, but not for restitution for injuries suffered by parties other than the State." 701 F.3d 796, 801 (5th Cir. 2012), *rev'd and remanded*, 571 U.S. 161 (2014) (citation omitted). As noted by another district court, *AU Optronics* "is a curious . . . case[] in which to anchor an argument," because it was reversed by the Supreme Court. *Mississippi ex rel. Hood v. Entergy Mississippi, Inc.*, No. 8-cv-780, 2019 WL 1433772, at *1 (S.D. Miss. Mar. 30, 2019). But the Defendants argue that the reversal was based "on other grounds," and so the Fifth Circuit's holdings regarding the MSCPA and MSAA remain good law. ECF No. 367-2 at 30.

The question before the Fifth Circuit in *AU Optronics* was whether Mississippi's parens patriae suit under the MSCPA and the MSAA constituted a "class action" or "mass action" under the Class Action Fairness Act ("CAFA"), 28 U.S.C. § 1332(d). 701 F.3d at 798. Whether the action qualified as a mass action hinged on "whether the suit involve[d] the claims of 100 or more persons." *Id.* at 799 (internal quotation marks omitted). Though Mississippi was the only plaintiff in the case, the Fifth Circuit concluded that the "real parties in interest [were] numerous—far in excess of 100," because they included both "the State (as a purchaser of [the] products [at issue]) and individual citizens who purchased the products within Mississippi." *Id.* at 800. The court's conclusion that individual consumers were parties in interest to the suit was based in part on its finding that the MSCPA and the MSAA do not authorize "public collection of private damages." *Id.* at 800–01.

The Supreme Court did not address the relief available under the MSCPA and the MSAA in its ruling reversing the Fifth Circuit's decision. 571 U.S. at 164. Rather, its framing of the question presented suggests that it assumed that parens patriae monetary relief was available under the two statutes: "The question presented is whether a suit filed by a State as the sole plaintiff constitutes a 'mass action' under CAFA where it includes a claim for restitution based on injuries suffered by the State's citizens." *Id.* The Court concluded that it did not, explaining that that the statute's "100 or more persons" requirement "refers to actual, named parties," not "unnamed real parties in interest, who by definition are never plaintiffs." *Id.* at 164, 176.

That the Supreme Court "[did] not disput[e] the state's authority to seek recovery for its citizens" under the MSCPA and the MSAA does not mean that it disagreed with the Fifth Circuit's interpretation of these statutes. ECF No. 367-3 at 20. It is possible that the Court sought simply to avoid a "[n]eedless decision[] of state law." *Gibbs*, 383 U.S. at 726. But this same principle—that "federal courts should, in general, avoid needless decisions of state law," *Love Grace, Inc. v. Santos*, No. 19-cv-4029, 2023 WL 3742326, at *3 (E.D.N.Y. Apr. 26, 2023), *report and recommendation adopted*, 2023 WL 3742357 (E.D.N.Y. May 31, 2023) (internal quotation marks omitted)—weighs against dismissing Mississippi's claims for parens patriae monetary relief at this time in the absence of clear direction from Mississippi's highest court, as resolution of these state law questions may ultimately be unnecessary to resolving this case.[5]

---

[5] The only state court decisions cited by the parties with respect to this issue indicate that the Mississippi Attorney General *is* authorized to seek parens patriae monetary recovery. *See Hood ex rel. State v. BASF Corp.*, No. 56863, 2006 WL 308378, at *3-*4 (Miss. Ch. Jan. 17, 2006) (concluding that the Attorney General is authorized by the MSAA and common law to represent consumers in Mississippi as parens patriae); *State ex rel. Allain v. Mississippi Pub. Serv. Comm'n*, 418 So. 2d 779, 782 (Miss. 1982) ("Paramount to all of [the Attorney General's] duties . . . is his duty to protect the interest of the general public."); *see also Entergy Mississippi, Inc.*, 2019 WL 1433772, at *1 (explaining that "Mississippi law . . . is not favorable to

Accordingly, I decline to dismiss Mississippi's parens patriae claims for monetary recovery under the MSCPA and MSAA.

The Defendants levy two additional arguments against Mississippi's claims under the MSCPA, neither of which is persuasive.  ECF No. 367 at 42.  First, they contend that the State is limited to injunctive relief.  *Id.*  They argue that the statute authorizes the Attorney General only to bring actions "to restrain by temporary or permanent injunction the use of [unlawful] method[s], act[s] or practice[s]," Miss. Code Ann. § 75-24-9, and that under *AMG Cap. Mgmt. LLC v. F.T.C.*, 593 U.S. 67 (2021) and *F.T.C. v. Abbvie Inc.*, 976 F.3d 327 (3d Cir. 2020), statutes that authorize injunctive relief do not also authorize equitable monetary relief like disgorgement and restitution.  *Id.*  As Mississippi notes, however, these cases addressed the availability of monetary relief under Section 13(b) of the Federal Trade Commission ("FTC") Act—not the MSCPA—and their reasoning hinged on "the text and structure of the statutory scheme at issue." *AMG Cap. Mgmt. LLC*, 593 U.S. at 79, 82; *Abbvie Inc.*, 976 F.3d at 376–77 (allowing disgorgement under Section 13(b) of the FTC Act "would undermine the FTC Act's statutory scheme").  Further, other provisions of the MSCPA authorize non-injunctive remedies.  *See, e.g.*, Miss. Code Ann. § 75-24-11 (authorizing courts to "make such additional orders or judgments, including restitution, as may be necessary to restore to any person in interest any monies or property, real or personal, which may have been acquired by means of any practice prohibited by [the MSCPA]"); *id.* § 75-24-19(1)(b) (authorizing the Attorney General "upon petition to the court, [to] recover on behalf of the state a civil penalty in a sum not to exceed Ten Thousand Dollars ($10,000.00) per violation" in cases of willful violations); *see also BASF Corp.*, 2006

---

[Defendant's] position" that "the Attorney General of Mississippi cannot pursue monetary damages on behalf of Mississippi consumers").

WL 308378, at *11-*12 (citing § 75-24-11 of the MSCPA and stating that "this Court has the ability to order the Defendant to restitute any and all monies to the State for its purchases and the purchases of its citizens").  And Mississippi courts have awarded the State non-injunctive relief for violations of the MSCPA.  *See In re Mississippi Medicaid Pharm. Average Wholesale Price Litig.*, 190 So. 3d 829, 847 (Miss. 2015) (affirming the lower court's award of civil penalties under the MSCPA); *Watson Lab'ys, Inc. v. State*, 241 So. 3d 573, 577, 592–93 (Miss. 2018) (noting the lower court's award of civil penalties for defendant's violations of the MSCPA; also declining to award compensatory damages under § 75-24-11 because the issue was not presented and rejected by the lower court, but not suggesting that such relief was not available to the Attorney General under this provision).

The Defendants also argue that Mississippi has not stated a plausible claim under the MSCPA.  ECF No. 367 at 46.  They argue that the State's allegations do not match any of the prohibited practices specified in the statute and that no Mississippi court has held that the alleged conduct results in liability under the MSCPA.  *Id.*  This argument lacks merit.  Though § 75-24-5 of the MSCPA lists several examples of unfair or deceptive trade practices, it makes clear that these examples do not "limit[] the scope of [its prohibition against unfair methods of competition and unfair or deceptive trade practices]."  Miss. Code Ann. § 75-24-5(2).  That Mississippi's allegations do not match any of the prohibited practices specified in § 75-24-5(2) thus does not bar the State's claims.  Further, the MSCPA states that, "in construing what constitutes unfair or deceptive trade practices . . . courts will be guided by the interpretations given by . . . the federal courts to Section 5(a)(1) of the Federal Trade Commission Act," *id*. § 75-24-3(c), and it is well-established that antitrust violations, including price fixing, may constitute an unfair practice within the meaning of § 5 of the FTC Act, *see, e.g.*, *Eugene Dietzgen Co.*, 142 F.2d at 331–32;

*St. Regis Paper Co.*, 285 F.2d at 610 n.4 (2d Cir. 1960) ("[A]ny violation of the Sherman and

Clayton Acts [is] also a violation of § 5 of the Federal Trade Commission Act.").  Finally, the

Defendants have not cited a single case that holds or even suggests that the alleged antitrust

violations in this case cannot also constitute "unfair methods of competition affecting commerce

[or] unfair or deceptive trade practices in or affecting commerce," *id.* § 75-24-5(1), under

Mississippi law.

For the foregoing reasons, I deny the Defendants' motion to dismiss Mississippi's state-

law claims.

### K. Missouri

Missouri seeks "an injunction, disgorgement, civil penalties and any other relief

available" under the Missouri Antitrust Law ("Antitrust Law"), Missouri Rev. Stat. §§ 416.011,

et seq., and Missouri's Merchandising Practices Act ("MMPA"), Missouri Rev. Stat. §§ 407.010,

et seq.  ECF No. 196 ¶ 1954.  The parties' disputes over the validity of these claims for relief

appear to be largely academic, with few practical implications for this case.

For instance, the Defendants contend that Missouri cannot obtain parens patriae damages

under the MMPA.  ECF No. 367 at 30.  Though they acknowledge that § 407.100 of the MMPA

authorizes "order[s] of restitution, payable to the state, as may be necessary to restore to any

person who has suffered any ascertainable loss . . . any moneys . . . which may have been

acquired by means of a violation," Mo. Rev. Stat. § 407.100(4),[6] they argue that restitution

awards are distinct from parens patriae damages.  ECF No. 367 at 43; ECF No. 367-2 at 32–33.

The Defendants are correct that damages and restitution are distinct legal concepts, *see In re*

---

[6] The attorney general must "distribute such funds to those persons injured" by violations of the
MMPA.  Mo. Rev. Stat. § 407.100(4).  Courts may also "award to the state a civil penalty of not
more than one thousand dollars per violation."  *Id.* § 407.100(6).

*Gartenberg*, 636 F.2d 16, 17 (2d Cir. 1980) ("Restitution is a remedy distinct from damages and requiring different proof."), although Section 407.100(4) blurs somewhat the line between the two concepts, as the awards it authorizes are tied to injured parties' losses.  *See Connecticut v. Moody's Corp.*, 664 F. Supp. 2d 196, 202 (D. Conn. 2009) ("Damages are measured by a plaintiff's losses.  By contrast, restitution is measured by a defendant's unjust gain, rather than by a plaintiff's loss." (internal quotation marks, alterations, and citations omitted)).  But in any event, injuries to Missouri consumers will be captured by any award under this provision, and a plaintiff "may not recover twice for the same injury."  *Phelan v. Loc. 305 of United Ass'n of Journeymen, & Apprentices of Plumbing & Pipefitting Indus. of U.S. & Canada*, 973 F.2d 1050, 1063 (2d Cir. 1992).  Thus, while I will dismiss any claim for parens patriae damages under the MMPA, Missouri will still be able to recover on behalf of Missouri consumers under § 407.100(4).

Similarly, the Defendants argue that neither the MMPA nor the Antitrust Law authorizes the Attorney General to seek disgorgement.  ECF No. 367 at 43.  Missouri maintains that disgorgement is authorized by (1) § 407.100 of the MMPA, which authorizes courts to "make such orders or judgments as may be necessary to prevent . . . person[s] from employing or continuing to employ, or to prevent the recurrence of" practices prohibited by the MMPA, and by (2) § 416.071 of the Antitrust Law, which authorizes courts to grant "prohibitory injunctions and other restraints as it deems expedient to deter . . . defendant[s] from, and secure against . . . future violation[s]" of the Antitrust Law, as well as "such mandatory relief as is reasonably necessary to restore or preserve fair competition in the trade or commerce affected by the violation," *id.* § 416.071(2).  The State contends that disgorgement falls within the scope of both provisions because of its deterrent effect.  ECF No. 367-1 at 35.  I do not find this persuasive, but the

Defendants have not met their burden of showing that such relief is clearly foreclosed by Missouri law.  Accordingly, I decline to dismiss Missouri's claims for disgorgement at this time.  Ultimately, however, it is unclear whether this ruling will affect Missouri's ability to recover from the Defendants, since restitution is expressly authorized by the MMPA and may cover the same amounts as an order of disgorgement would.

The Defendants also argue that Missouri cannot obtain monetary relief for indirect purchasers under the Antitrust Law.  ECF No. 367 at 39.  Missouri does not dispute this point and states that it is not seeking relief for indirect purchasers under the Antitrust Law, but rather under § 407.100(4) of the MMPA.  ECF No. 367-1 at 34; ECF No. 367-3 at 23–24.  As Missouri notes, the *Illinois Brick* rule does not apply to claims under the MMPA.  *See In re Lithium Ion Batteries Antitrust Litig.* No. 13-md-2420, 2014 WL 4955377, at *19 (N.D. Cal. Oct. 2, 2014) ("[Plaintiffs'] indirect-purchaser status alone presents no bar to their bringing a claim under the MMPA."); *In re Generic Pharms. Pricing Antitrust Litig.*, 368 F. Supp. 3d 814, 841 (E.D. Pa. 2019) ("*Illinois Brick* does not bar [plaintiffs'] claims under . . . the Missouri Merchandising Practices Act . . . .").  Accordingly, I conclude that Missouri has stated a plausible claim for restitution for indirect purchasers, insofar as it is being raised under the MMPA.

In sum, I grant the Defendants' motion to dismiss Missouri's claim for parens patriae damages under the MMPA but deny it as to the State's claims for disgorgement and its claim for restitution on behalf of indirect purchasers under the MMPA.

### L.  Nevada

The Defendants seek to dismiss Nevada's claims for monetary recovery under the State's consumer protection statute, the Nevada Deceptive Trade Practices Act ("DTPA"), Nev. Rev. Stat. § 598.0903, et seq.  ECF No. 196 ¶¶ 1971–72.  They argue that § 598.0963 of the DTPA

limits the Attorney General to injunctive relief and does not authorize actions for equitable

monetary relief like disgorgement and restitution.  ECF No. 367 at 42.

　　　After the Defendants' motion to dismiss was filed, the Nevada legislature amended the

DTPA to add the italicized portions of the following text:

> If the Attorney General has reason to believe that a person has engaged or is
> engaging in a deceptive trade practice, the Attorney General may bring an action in
> the name of the State of Nevada against that person to obtain a temporary
> restraining order, a preliminary or permanent injunction, or other appropriate relief,
> *including, without limitation, the recovery of a civil penalty, disgorgement,*
> *restitution or the recovery of damages: (a) As parens patriae of the persons residing*
> *this State, with respect to damages sustained directly or indirectly by such persons,*
> *or, alternatively, if the court finds in its discretion that the interests of justice so*
> *require, as a representative of a class or classes consisting of persons residing in*
> *this State who have been damaged directly or indirectly; or (b) As parens patriae,*
> *with respect to direct or indirect damages to the general economy of the State of*
> *Nevada or any agency or political subdivision thereof.*

2023 Nevada Laws Ch. 205 (A.B. 373).  I directed the parties to file supplemental briefs

addressing the impact of this amendment on Nevada's state-law claims.  ECF No. 462.  The

Defendants' supplemental brief does not address Nevada's claims for disgorgement and

restitution, and instead argues for the first time that Nevada's claim for parens patriae damages

should be dismissed.  *See* ECF No. 477; *see also* ECF Nos. 367 (not addressing the availability

of parens patriae damages under the DTPA), 367-2 (same).  On the other hand, Nevada's

supplemental brief defends its claims for disgorgement and restitution but does not address the

statute's new language regarding parens patriae damages and nowhere suggests that the State is

seeking that relief.  *See* ECF No. 476.  Because the complaint does not seek parens patriae

damages, *see* ECF No. 196 ¶ 1973, and because there is no indication in Nevada's response,

surreply, or supplemental brief that it intends to seek such relief, I assume that Nevada is not

seeking parens patriae damages and will address only the State's claims for disgorgement and restitution.

Nevada argues that A.B. 373 does not undermine its disgorgement and restitution claims and instead only confirms that such relief was already available under the DTPA. ECF No. 476. I agree. As explained in Nevada's initial briefing, other provisions of the DTPA indicate that the phrase "other appropriate relief" included monetary recovery even before § 598.0963 was amended. For example, even at the time this case was filed, § 598.0975 addressed how "[m]oney collected for restitution ordered" in actions brought by the Attorney General should be deposited and distributed. *See* 2015 Nevada Laws Ch. 528 (A.B. 481). This—along with the phrasing of both the old and new versions of § 598.0963—suggests that the language added to § 598.0963 regarding disgorgement and restitution served merely to clarify that these remedies were already available. "Statutory amendments that clarify the intent of a previous statute generally apply retroactively." *Segovia v. Eighth Jud. Dist. Ct. in & for Cnty. of Clark*, 407 P.3d 783, 787 (Nev. 2017). Further, the new language regarding disgorgement and restitution is remedial, i.e., it does not change the scope of conduct regulated by the statute but affects only the types of relief available; remedial changes likewise apply retroactively under Nevada law. *Madera v. State Indus. Ins. Sys.*, 956 P.2d 117, 120 (Nev. 1998) ("[T]he general rule against retrospective construction of a statute does not apply to statutes relating merely to remedies and modes of procedure." (internal quotation marks omitted)). Accordingly, I conclude that Nevada has stated a plausible claim for disgorgement and restitution under the DTPA.

The Defendants also move to dismiss Nevada's claim for civil penalties under § 598.0973 of the DTPA, which permits a court to impose additional penalties on a defendant who "the court finds . . . [has] engaged in a deceptive trade practice directed toward an elderly person or a

person with a disability." Nev. Rev. Stat. Ann. § 598.0973.[7] The Defendants argue that the State

has failed to state a claim under this provision because "[t]here are no allegations in the

Amended Third Complaint regarding elderly or disabled persons." ECF No. 367 at 42 n.17. But

the statute's requirement that the court make a "find[ing]" before this provision may operate

suggests that the nature of the victim is a proof requirement, rather than a pleading requirement.

And even if it could be assessed at the pleadings stage, I would not dismiss Nevada's "claim"

under this provision. Though the complaint alleges only that "Defendants' conduct was and is

directed at consumers nationwide, including in Nevada," ECF No. 196 ¶ 1970, I must, as noted

elsewhere in this opinion, draw all reasonable inferences in favor of Nevada, and it is a

reasonable inference that at least some of the Nevada consumers at whom "Defendants' conduct

was . . . directed" were individuals with disabilities and elderly persons.

Finally, the Defendants argue that Nevada has failed to state a claim for monetary relief

under the Nevada Unfair Trade Practices Act, Nev. Rev. Stat. § 598A, et seq. ("UTPA"). ECF

No. 367-2 at 34. Though the Defendants acknowledge that § 598A.070 of the UTPA was

amended in October 2021 "to enumerate restitution and disgorgement as remedies for violations

of the Nevada UTPA," they contend that this amendment does not apply retroactively back to the

time this lawsuit was filed. *Id.* Section 598A.070 was amended to add the italicized portions of

the following text:

> The Attorney General shall . . . [i]nstitute proceedings on behalf of the State, its
> agencies, political subdivisions, districts or municipal corporations, or as parens

---

[7] At the time this motion to dismiss was filed, § 598.0973 authorized civil penalties of up to
$12,500 per violation. 2021 Nevada Laws Ch. 256 (A.B. 61). However, the statute was
amended on July 1, 2023 to allow civil penalties of up to $15,000 for deceptive trade practices
directed towards a person with a disability and up to $25,000 for those directed towards an
elderly person. 2023 Nevada Laws Ch. 205 (A.B. 373). As Nevada explains in its supplemental
brief, ECF No. 476 at 9–10, this amendment is also remedial in nature, and so the ordinary
presumption against retroactivity does not apply. *See Madera,* 956 P.2d at 120.

> patriae of the persons residing in the State for: (1) Injunctive relief to prevent and restrain a violation of any provision of this chapter, *including, without limitation, a temporary restraining order, preliminary injunction or permanent injunction*[;] (2) Civil penalties for violations of the provisions of this chapter[;] (3) Criminal penalties for violations of the provisions of this chapter[;] *(4) Other equitable relief for violations of the provisions of this chapter, including, without limitation, disgorgement or restitution.*

2021 Nevada Laws Ch. 77 (A.B. 47). Like the changes to § 598.0963 of the DTPA, this amendment affects only the types of relief available under UTPA, not the scope of conduct that gives rise to liability under the statute, and so the "general rule against retrospective construction" does not apply. *Madera*, 956 P.2d at 120. Accordingly, I conclude that Nevada has stated a valid claim for monetary recovery under the UTPA as well.

For the foregoing reasons, I deny the Defendants' motion to dismiss Nevada's state-law claims.

### M. New Jersey

The Defendants seek to dismiss New Jersey's claims for disgorgement under the New Jersey Antitrust Act ("NJATA"), N.J.S.A. 56:9-1, et seq., and the New Jersey Consumer Fraud Act ("NJCFA"), N.J.S.A. 56:8-1, et seq.[8] ECF No. 367-2 at 35. In opposition, New Jersey invokes language in Section 56:9-7 of the NJATA that permits a court to grant "other appropriate relief." But when read as a whole and in the context of other provisions of the NJATA, Section 56:9-7 will not bear the freight New Jersey tries to foist upon it. The statute provides that "[u]pon a violation of this act by any corporation or association organized under the laws of this State . . . the Attorney General may institute proper proceedings in a court of competent

---

[8] The Defendants initially moved to dismiss New Jersey's claim for monetary relief for indirect purchasers, ECF No. 367 at 39, but New Jersey clarified that it was not seeking such relief, ECF No. 367-1 at 38, and did not request such relief in its complaint, ECF No. 196 ¶¶ 1984–85.

jurisdiction for the forfeiture of charter rights, franchises, privileges and powers, and for the

dissolution of the corporation or association, or for the suspension of the privilege to conduct

business within the State." N.J.S.A. 56:9-7. It then adds: "The court . . . may order the

dissolution, suspend the privilege to conduct business for a specific period, deny such relief, or

provide other appropriate relief." *Id*. New Jersey contends that the phrase "other appropriate

relief" includes disgorgement. ECF No. 367-1 at 39. As the Defendants note, however, this

provision addresses a very specific type of proceeding—one in which the Attorney General seeks

to dissolve a corporation or association or to suspend a certain privilege or license afforded to

such an entity. ECF No. 367-2 at 35. There is no indication in the complaint or in New Jersey's

briefs that the State is seeking such relief in this case, i.e., that by bringing this case New Jersey

meant to "institute [a] proceeding[] . . . for the forfeiture of charter rights." This provision does

not apply here.

Even if New Jersey had sought the relief set forth in § 56:9-7, basic principles of

statutory construction counsel against its proposed interpretation that "other appropriate relief"

encompasses disgorgement. In the context of the NJATA as a whole, § 56:9-7 is a narrow

provision authorizing a very specific type of relief and does not appear to be the source of most

of the Attorney General's authority to enforce the statute. Next to § 56:9-7 lies a similar

provision, which authorizes proceedings against foreign corporations and associations for

remedies that are similarly narrow in scope. N.J.S.A. 56:9-8 ("Upon a violation of this act by a

foreign corporation or association exercising the privilege of conducting business within this

State, . . . the Attorney General may institute appropriate proceedings for the revocation or

suspension of franchises, privileges, and powers connected with doing business within the

State."). Meanwhile, the provisions of the NJATA that authorize the attorney general to seek

broader and more conventional forms of relief—like injunctions, civil penalties, and damages—begin at § 56:9-10.  *See id.* 56:9-10 (attorney general may seek injunctive relief and civil penalties); *id.* 56:9-11 (criminal charges and penalties); *id.* 56:9-12 (injured persons, including the Attorney General on behalf of the state and political subdivisions, may seek treble damages, attorneys' fees and costs).  If the New Jersey legislature intended to authorize disgorgement, it is unlikely that it would have placed the authorizing language in § 56:9-7, rather than among these broader sources of authority.

The *ejusdem generis* canon of construction likewise supports a narrow reading of the phrase "other appropriate relief" in § 56:9-7.  *See Stryker Corp. v. Dir., Div. of Tax'n*, 773 A.2d 674, 684 (N.J. 2001) (defining *ejusdem generis* as the principle that "when general words follow specific words in a statutory enumeration, the general words are construed to embrace only the objects similar in nature to those objects enumerated by the preceding specific words").  As a form of monetary relief, disgorgement is wholly dissimilar to dissolution of a corporation or suspension of the privilege to conduct business—that is, the remedies enumerated before the phrase "other appropriate relief" in § 56:9-7.  Accordingly, I decline to construe the phrase so broadly.

New Jersey has also failed to show that the NJCFA authorizes disgorgement in this case. The NJCFA bars "unconscionable commercial practice[s], deception, fraud, false pretense[s], false promise[s], misrepresentation[s], [and] the knowing, concealment, suppression, or omission of any material fact with intent that others rely upon such concealment, suppression or omission, in connection with the sale or advertisement of any merchandise or real estate, or with the subsequent performance of such person as aforesaid."  *Id.* 56:8-2.  A New Jersey appellate court has held that allegations of antitrust violations, such as price-fixing, do not state a claim under

this statute. *Sickles v. Cabot Corp.*, 877 A.2d 267, 276–77 (N.J. App. Div. 2005). Rather, plaintiffs must allege that "defendants used deception, fraud or misrepresentation or concealed material facts" concerning the products at issue. *Id.* at 276. "Capacity to mislead is the prime ingredient of deception or an unconscionable commercial practice." *Id.* (internal quotation marks and alteration omitted). And "there is nothing inherently misleading in . . . alleged acts of controlling the supply and overcharging for the price-fixed products." *Id.* at 277. New Jersey does not point to any allegations describing fraudulent or misleading conduct by the Defendants, and I decline to scour the 600-page complaint to try to find one. In reading the complaint, I saw no allegations suggesting that the Defendants' conduct "lured [New Jersey consumers] into, or even influenced, [their] decision to purchase" these products. *Sickles*, 877 A.2d at 276–77. Accordingly, I conclude that New Jersey has failed to state a claim for disgorgement under the NJCFA.

In sum, I dismiss New Jersey's claims for disgorgement under both the NJATA and the NJCFA.

## N.  New Mexico

The Defendants contend that New Mexico may not seek parens patriae damages on behalf of injured persons under the New Mexico Antitrust Act ("NMATA"), N.M. Stat. Ann. § 57-1-1, et seq. ECF No. 367 at 30–31. In support of this argument, they cite *California v. Infineon Technologies AG*, in which the court concluded that there was "[no] authority specifically indicating or implying that the New Mexico Attorney General's suit for damages [under the NMATA could] go forward in a parens patriae capacity on behalf of natural persons." 531 F. Supp. 2d 1124, 1168 (N.D. Cal. 2007). I agree with the *Infineon* court.

New Mexico argues that I should not follow *Infineon* because it "overlook[ed] the suite of statutory provisions that give the New Mexico Attorney General the power to seek damages on behalf of the State's residents."  ECF No. 367-1 at 41–42.  Specifically, New Mexico contends that N.M. Stat. Ann. § 8-5-2(J)—which authorizes "the attorney general [to] . . . represent and . . . be heard on behalf of the state when, in his judgment, the public interest of the state requires such action or when requested to do so by the governor"—allows the Attorney General to bring parens patriae actions to enforce antitrust laws on behalf of the state's citizens. *Id.* at 41.  But this statute—which is not part of the NMATA—just sets forth general duties and authorities of the New Mexico Attorney General, and it says nothing about proceeding parens patriae to recover damages on behalf of injured New Mexico residents.  New Mexico also relies on *New Mexico v. Scott & Fetzer Co.*, No. 81-054-JB, 1981 WL 2167 (D.N.M. Dec. 22, 1981) and *In re Lorazepam & Clorazepate Antitrust Litig.*, 205 F.R.D. 369 (D.D.C. 2002) ("*Lorazepam*").  But neither of these cases addresses the Attorney General's authority under state law to sue parens patriae *for damages* on behalf of injured residents.  In *Scott & Fetzer Company*, the New Mexico Attorney General sued under federal antitrust law—15 U.S.C.A. § 15C—which expressly authorizes "[a]ny attorney general of a State [to] bring a civil action in the name of such State, as parens patriae on behalf of natural persons residing in such State." 1981 WL 2167 at *1.  In *Lorazepam*, the court cited §§ 57-1-7 and 57-1-8 of the NMATA, alongside § 8-5-2, in concluding, based on *Scott & Fetzer Company*, that New Mexico's statutory provisions had been interpreted to "effectively grant parens patriae authority" to the Attorney General.  205 F.R.D. at 386–87.  Like § 8-5-2, however, §§ 57-1-7 and 51-7-8 of the NMATA say nothing about the Attorney General's authority to sue as parens patriae for damages. Section 51-1-7 authorizes the Attorney General to seek civil penalties, while § 51-1-7 authorizes

him to seek injunctive relief.  And especially given these and other specific grants of authority

the NMATA bestows on the Attorney General to enforce its provisions, *see also* N.M. Stat. Ann.

§ 51-7-3 (allowing attorney general to sue on behalf of state or political subdivision that suffers

injury as result of antitrust violation)[9]; *id.* § 57-1-5 (granting attorney general subpoena

authority); *id.* § 51-7-10 (permitting attorney general to delegate enforcement authority to district

attorneys), it is even less plausible that New Mexico's legislature meant to include a separate

grant of authority to seek *damages* parens patriae for antitrust violations in the generic

description of the attorney general's duties in § 8-5-2.

    The Defendants also seek to dismiss New Mexico's claims for monetary recovery other

than restitution under the New Mexico Unfair Practices Act ("NMUPA"), N.M. Stat. Ann. § 57-

12-1, et seq.  ECF No. 367 at 43.  New Mexico does not dispute that damages are not available

under the NMUPA, but correctly notes that the statute authorizes civil penalties under certain

circumstances.  ECF No. 367-1 at 42; *see* N.M. Stat. Ann. § 57-12-11 ("[I]f the court finds that a

person is willfully using or has willfully used a method, act or practice declared unlawful by the

Unfair Practices Act, the attorney general, upon petition to the court, may recover, on behalf of

the state of New Mexico, a civil penalty of not exceeding five thousand dollars ($5,000) per

violation.").

    Accordingly, I deny the Defendants' motion to dismiss as to New Mexico's claims for

civil penalties under the NMUPA but grant it to the extent that New Mexico seeks monetary

recovery other than restitution and civil penalties under that statute.  I also grant the Defendants'

motion to dismiss as to New Mexico's claim for parens patriae damages under the NMATA.

---

[9] Contrary to New Mexico's assertions, this provision nowhere suggests that the attorney general
may sue for damages on behalf of injured persons.  Nor does the general harmonization
provision of the NMATA.  *See* § 57-1-15.

**O.  New York**

New York "seeks relief, including but not limited to damages, for New York consumers and New York state entities that paid for one or more of the drugs identified in [the operative complaint]" under New York Executive Law § 63(12) and the Donnelly Act, New York Gen. Bus. Law §§ 340-342c.[10]  ECF No. 196 ¶¶ 1993–94.  The Defendants argue that the State is not authorized to bring claims on behalf of "unnamed government entities" under either statute. ECF No. 367 at 24–25.  They rely primarily on *In re Dynamic Random Access Memory Antitrust Litigation* ("*DRAM*"), in which the court dismissed New York's claims under both Executive Law § 63 and § 342-b of the Donnelly Act because "the government entities on whose behalf plaintiff sue[d were] not identified in the complaint," and neither statute "vest[s] the State Attorney General with authority to bring representative claims on behalf of unnamed government entities."  No. M 02-1486 PJH, 2007 WL 2517851, at *7–*8, *12 (N.D. Cal. Aug. 31, 2007).

New York appears to concede that it cannot bring claims on behalf of unidentified government entities under § 342-b of the Donnelly Act.  *See* ECF No. 367-1 at 44 (explaining that caselaw regarding § 342-b was inapposite because the Attorney General seeks restitution and damages on behalf of state entities under § 63 of the Executive Law, not § 342-b)  But New York maintains that its claims under the Executive Law should not be dismissed—both because it has identified the names of the state agencies on behalf of which it brings this claim in discovery and because "[i]dentifying the specific victims of the illegality in the pleadings is not required under section 63(12)."  *Id.* at 44–45.  In support of the latter argument, the State argues that the *DRAM* court improperly extended *New York v. Cedar Park Concrete Corporation*—in

---

[10] New York also seeks "civil penalties, injunctive relief, other equitable relief (including but not limited to disgorgement), and fees and costs."  ECF No. 196 ¶ 1994.  These claims are not addressed by the Defendants' motion to dismiss.

which the court dismissed the State's claims on behalf of "unidentified state subdivisions" under § 342-b of the Donnelly Act, 665 F. Supp. 238, 242 (S.D.N.Y. 1987)—to § 63 of the Executive Law despite important differences between § 342-b and § 63(12).  ECF No. 367-3 at 27–28; *see also* ECF No. 367-1 at 44.  It notes that unlike § 342-b, which authorizes representative claims for non-state public authorities, § 63(12) authorizes a claim for relief on behalf of all victims of fraudulent or illegal acts.  *Id.; see* N.Y. Exec. Law § 63(12) ("[T]he attorney general may apply, in the name of the people of the state of New York, . . . for an order enjoining the continuance of [fraudulent or illegal] business activity . . . , [and] directing restitution and damages . . . .").  And "[n]either the language of section 63(12) nor the state or New York federal cases construing [the provision], exclude specific types of victims from recovery.  If state actors are victims, the Attorney General can seek relief for those victims."  ECF No. 367-1 at 27 (citations omitted).

I agree that New York has stated a valid claim on behalf of New York state entities under § 63(12).  Both the statutory text and New York caselaw regarding § 63 indicate that the Attorney General has broad authority to seek relief on behalf of *all victims* of fraudulent or illegal acts under § 63(12).  *See, e.g.*, *New York v. Feldman*, 210 F. Supp. 2d 294, 302–03 (S.D.N.Y. 2002) ("courts have consistently held that section 63(12) authorizes the New York Attorney General to recover for non-residents injured by wrongdoing that occurred in New York," and "[t]he damages available under the Donnelly Act are irrelevant when proceeding under section 63(12)"); *People ex rel. Cuomo v. Coventry First LLC*, 13 N.Y.3d 108, 114 (2009) (concluding that an arbitration agreement between the defendants and alleged victims of their fraudulent and anticompetitive conduct did not limit the Attorney General's "statutory authority to serve the public interest by seeking both injunctive and victim-specific relief" under § 63(12)); *State by Abrams v. Camera Warehouse, Inc.*, 496 N.Y.S.2d 659, 660 (Sup. Ct. 1985) ("[T]he plain

meaning of the language of § 63(12) Executive Law indicates that the Legislature intended that all consumers be protected from illegal practices regardless of their residency and that the Attorney General of this State [is] mandated to take necessary action as provided in the statute to protect all of these consumers."); *see also Lorazepam*, 205 F.R.D. at 386 (noting that § 63(12) provides the Attorney General with "the functional equivalent of parens patriae" authority); *New York ex rel. Schneiderman v. Intel Corp.*, No. 09-cv-827-LPS, 2011 WL 6100446, at *6 (D. Del. Dec. 7, 2011) ("[T]he Executive Law permits New York to recover compensatory damages for harm to individuals arising from repeated violations of the Donnelly Act.").  There is little question that individual consumers need not be named in the pleadings.  *See, e.g.*, *Lorazepam*, 205 F.R.D. at 402 (*approving a settlement agreement that involved claims under Executive Law § 63(12) and identified individual consumers through a notice and claims process).  And there is no statutory basis for applying different pleading standards to certain types of victims, like government entities.  I thus respectfully decline to follow *DRAM*'s holding regarding § 63 of the Executive Law.

Defendants also contend that New York's claims under § 63 can be brought only in state court.  ECF No. 367 at 32.  This argument lacks merit.  As explained already with regards to Alaska and California's claims, district courts have "supplemental jurisdiction over all other claims that are so related to claims in the action within such original jurisdiction that they form part of the same case or controversy," 28 U.S.C. § 1367(a), and state laws cannot limit federal courts' jurisdiction.

Defendants further argue that New York cannot seek damages on behalf of New York consumers under § 342 of the Donnelly Act and is limited under that provision to injunctive relief and civil penalties.  ECF No. 367 at 31–32.  New York effectively concedes this point.  *See*

ECF No. 367-1 at 43, 45 ("The New York Attorney General is seeking monetary relief for New York consumers and New York public entities under N.Y. Exec. Law § 63(12) . . . . The Court need not address any New York law other than section 63(12) here."); ECF No. 367-3 at 27–29 (defending its claims under § 63 of the Executive Law but not § 342 of the Donnelly Act). Because New York does not dispute that its claims for damages under § 342 of the Donnelly Act and its claims on behalf of New York state entities under § 342-b are foreclosed, I grant the Defendants' motion to dismiss as to these claims. *See Goodman by Goodman v. Bremby*, No. 16-cv-665 (MPS), 2017 WL 4169427, at *12 (D. Conn. Sept. 20, 2017) ("When a plaintiff's specific claim is attacked in a motion to dismiss, a plaintiff must rebut the defendant's argument against that claim or it shall be deemed abandoned." (internal quotation marks omitted)).  For the foregoing reasons, however, I deny the Defendants' motion to dismiss New York's claims under § 63 of the Executive Law.

### P.  North Carolina

The Defendants contend that North Carolina is seeking damages on behalf of North Carolina citizens and that such relief is not authorized by law.  ECF No. 367 at 32; ECF No. 367-2 at 40.  North Carolina counters that it has not made any claims for damages—rather, "its requested relief is limited to penalties, disgorgement, and attorneys' fees and costs."  ECF No. 367-1 at 44–45; *see also* ECF No. 367-3 at 29.

As North Carolina notes, the complaint states that North Carolina is "entitled to relief pursuant to N.C. Gen. Stat. § 75-1 *et seq*., including recovery of its costs and attorneys' fees pursuant to N.C. Gen. Stat. § 75-16.1."  ECF No. 196 ¶ 2006.  Though the complaint describes how North Carolina and its citizens were harmed by the Defendants' alleged misconduct, and though the State maintains that § 75-15 provides it with "express authority to seek damages as

parens patriae," North Carolina has stated clearly that it "is not seeking damages in this case, either directly or as parens patriae." ECF No. 367-1 at 44–45; *see also* ECF No. 367-3 at 29. To the extent the complaint may be construed as stating a claim for damages under § 75-1 et seq., I conclude that North Carolina has abandoned that claim and grant the motion to dismiss to the extent North Carolina is seeking damages. *See Bremby*, 2017 WL 4169427, at *12. But because North Carolina has not defended its claim for damages, and because the Defendants' motion does not address the forms of relief that North Carolina does request, I decline to evaluate any other aspects of the Defendants' arguments with respect to North Carolina.

### Q. Ohio

Ohio seeks "an injunction, disgorgement and civil forfeiture pursuant to Ohio Rev. Code § 109.81 and Ohio Rev. Code §§ 1331.01 et seq." ECF No. 196 ¶ 2016. The Defendants seek to dismiss "Ohio's claims for disgorgement and other monetary equitable relief, and its indirect purchaser claims." ECF No. 367 at 61. Ohio Rev. Code § 109.81 permits the Attorney General to act as "attorney at law in any antitrust case . . . as parens patriae for any natural person residing in the state" and to bring "an action for equitable relief or for the recovery of damages." The Valentine Act, Ohio Rev. Code §§ 1331.01 et seq., prohibits agreements that would restrict trade or commerce. Ohio law thus permits the State to seek equitable relief, including disgorgement, for violations of the Valentine Act. *See also F.T.C. v. Vyera Pharms., LLC*, 479 F. Supp. 3d 31, 52 (S.D.N.Y. 2020) (holding that Ohio is "allowed to" seek equitable monetary relief under the Valentine Act).

The Defendants contend that Ohio's claims are not true equitable disgorgement claims but rather indirect purchaser claims for damages because they are "based on purchases and payments made by Ohio individuals and entities," and because "there is no allegation that these

individuals and entities purchased the products at-issue directly from any defendant," meaning, according to the Defendants, that "they are, by definition, indirect purchasers." ECF No. 367-2 at 40. As such, the Defendants say, Ohio's claims are barred by *Illinois Brick*, 431 U.S. 720, under which indirect purchasers lack standing to sue for damages, and which the Ohio Supreme Court has followed in interpreting the Valentine Act. *See Johnson v. Microsoft Corp.*, 834 N.E.2d 791, 798 (Ohio 2005).

There are two problems with this argument. First, it overlooks the basic rule that, on a Rule 12(b)(6) motion, the Court must draw all reasonable inferences in favor of the non-moving party. So, contrary to the Defendants' assertion, the absence of a specific allegation that "these individuals and entities purchased . . . directly from any defendant" does not make them indirect purchasers. *See* ECF No. 367-2 at 40. In fact, because the Defendants point to no language in the complaint suggesting that Ohio is suing only on behalf of indirect purchasers, I must draw the inference that at least some of the "individuals and entities" were direct purchasers. It would be improper to do otherwise at the pleadings stage because it is unlikely that the identities of all Ohio residents injured by the Defendants' conduct will become known until trial.

Second, even if it turns out that the only persons harmed by the Defendants' alleged conduct were indirect purchasers, it is not clear there would be a basis to bar the Attorney General from seeking disgorgement as part of the "equitable relief" he may seek under Ohio Rev. Code § 109.81. That statute, as noted, permits the Attorney General to act as "the attorney at law in any antitrust case . . . as parens patriae, for any natural person residing in the state," and to "bring[] . . . an action for equitable relief or for the recovery of damages." As the Defendants have pointed out, disgorgement is a form of "equitable relief," *Liu v. Sec. & Exch. Comm'n*, 140 S. Ct. 1936, 1940 (2020) ("The Court holds today that a disgorgement award that does not

exceed a wrongdoer's net profits and is awarded for victims is equitable relief," as contemplated

by term "equitable relief" in SEC enforcement statute), and not a form of damages, *see* Citadel

Sec. LLC, Exchange Act Release No. 78340 at *10–11 (July 15, 2016) (SEC Commission

decision explaining differences between civil penalties, disgorgement, and damages, *cited in*

*Lanier v. Bats Exchange, Inc.*, 838 F.3d 139, 150 (2d Cir. 2016); *see also Vyera Pharms., LLC*,

479 F. Supp. 3d at 52 (denying motion to dismiss Ohio Attorney General's claims under the

Valentine Act "to the extent they seek damages" because "the plaintiffs in this action do not seek

damages; they seek equitable monetary relief," which "they are allowed to do.").  And so while

Section 109.81, when read together with the Ohio Supreme Court's adoption of the *Illinois Brick*

rule in *Johnson*, appears to foreclose the Ohio Attorney General from seeking damages as parens

patriae on behalf of indirect purchasers, it does not on its face prevent Ohio from seeking

disgorgement that ends up being awarded to persons whose injuries were incurred as indirect

purchasers.  To be sure, in that event, an additional question would arise: is it "equitable" to

award monetary relief to persons barred by Ohio law (and the rule of *Illinois Brick*) from

obtaining damages?  At least one federal court has determined that allowing states to secure

disgorgement on behalf of indirect purchasers would undermine the double recovery concern

behind *Illinois Brick*, absent express authority for such relief under state law.  *F.T.C. v. Mylan*

*Lab'ys, Inc.*, 62 F. Supp. 2d at 41, 43; *but see also F.T.C. v. Mylan Lab'ys, Inc.*, 99 F. Supp. 2d at

8 (later decision by same court on reconsideration finding that Ohio law authorizes the Attorney

General to seek restitution on behalf of indirect purchasers).  I would likely have to consider the

equities behind both the disgorgement remedy and the rule of *Illinois Brick* in deciding the

issue.  But that issue would likely not arise until after liability was decided at trial and it became

clear who the victims were.  It would be premature to decide that issue at the pleadings stage.

For these reasons, the Defendants' motion to dismiss Ohio's claims is denied.

### R.  Oklahoma

The Defendants seek to dismiss Oklahoma's claims for disgorgement and other monetary equitable relief, its indirect purchaser claims, and its claims asserted under the Oklahoma Antitrust Reform Act.  ECF No. 367 at 61.  Oklahoma argues that it is "not seeking monetary relief based on indirect purchaser compensatory damages," and only seeks to enforce the Oklahoma Antitrust Reform Act through equitable relief, as provided for therein.  ECF No. 367-1 at 47 (citing Okla. Stat. Ann. 79 § 201 et seq.).  The Defendants argue that *Illinois Brick*, which Oklahoma courts have followed in interpreting the Act, precludes Oklahoma from pursuing claims on behalf of indirect purchasers.  ECF No. 367 at 61 (citing *Major v. Microsoft Corp.*, 60 P.3d 511, 512–13 (Okla. Civ. App. 2002)).

The Defendants' arguments against Oklahoma face the same problems as they did against Ohio.  *See supra*.  First, Oklahoma has not alleged whether it is seeking disgorgement on behalf of direct or indirect purchasers, and on a 12(b)(6) motion, I must draw the inference that at least some Oklahoma residents were direct purchasers.  Even if all residents were indirect purchasers, it is not clear that there would be a basis to bar the Oklahoma Attorney General from seeking disgorgement.  On its face, the Act appears to permit Oklahoma to seek equitable relief on behalf of its citizens *regardless* of the availability of monetary damages on behalf of indirect purchasers.  Okla. Stat. Ann. 79 § 205(A)(1) (permitting the Attorney General to "bring an action in the name of the state, as parens patriae on behalf of natural persons residing in the state for appropriate injunctive or other equitable relief *and* to secure monetary damages for injury sustained by such natural persons to their business or property by reason of any violation of this act" (emphasis added)).  As noted previously, disgorgement is a form of equitable relief.

The Defendants cite *Infineon*, 531 F. Supp. 2d at 1149–50, in which the defendants sought to dismiss Oklahoma's Antitrust Reform Act claims "to the extent they seek recovery on behalf of indirect purchasers."  *Id.* at 1149.  The court found that *Illinois Brick*, as incorporated into Oklahoma law by *Major*, 60 P.3d 511, barred the Oklahoma Attorney General from seeking "recovery on behalf of indirect purchasers."  531 F. Supp. 2d at 1149.  The court went further to reject Oklahoma's "suggestion that equitable relief is nonetheless available under the [Oklahoma] Consumer Protection Act," finding that "all indirect purchaser claims, regardless whether they seek monetary or equitable relief, are barred pursuant to Oklahoma's antitrust and consumer protection statutes," 531 F. Supp. 2d at 1149–50.  For this, the court relied only on *Major*, which includes no discussion of equitable relief and which, at least according to the Court of Civil Appeals' opinion, involved a lawsuit seeking "damages" under the Oklahoma antitrust and consumer protection statutes.  *Major*, 60 P.3d at 512.  In addition, there is no attempt in *Infineon* or *Major* to analyze the language of the Oklahoma Antitrust Reform Act allowing the Attorney General to seek *both* "appropriate injunctive or other equitable relief" *and* "monetary damages for injury sustained by . . . natural persons to their business or property."  79 Okla. Stat. Ann. 79 § 205(a)(1).

And it is hard to see why the rule of *Illinois Brick*, which was a case that addressed damages incurred by indirect purchasers and likewise included no discussion of equitable relief, should definitively resolve the separate question whether a state attorney general may seek the equitable remedy of disgorgement, even if the victims to whom the disgorged profits were ultimately paid were indirect purchasers.  Again, if that question ultimately arises in this case, I will have to determine whether awarding disgorged profits to persons who were injured only as indirect purchasers is truly equitable, in light of the duplicative recovery rationale of *Illinois*

*Brick*.  But as I have said, I cannot make that determination at the pleadings stage.  So the motion to dismiss Oklahoma's claims is denied.

### S.  Pennsylvania

Pennsylvania alleges that the Defendants' conduct violates the Pennsylvania Unfair Trade Practices and Consumer Protection Law ("UTPCPL"), 73 P.S. §§ 201 et seq.  The Defendants move to dismiss on three grounds: that Pennsylvania's allegations (1) do not fit any of the specific definitions of "[u]nfair methods of competition" or "unfair or deceptive acts or practices" under the UTPCPL, *id.* § 201-2(4)(i)–(xx); (2) are not fraudulent or deceptive conduct as defined in the UTPCPL's catchall provision, *id.* § 201-2(4)(xxi); and (3) do not identify any victim 60 years or older to seek enhanced civil penalties, *id.* § 201-8(b).[11]  Unlike many of their other arguments, the Defendants' arguments here do fit within the confines of Rule 12(b)(6).  The Defendants are arguing that Pennsylvania has failed to plead facts showing plausibly that the Defendants are liable under the provisions of the UTPCPL.  For the following reasons, the motion to dismiss Pennsylvania's state-law claims is granted in part and denied in part.

### 1.  UTPCPL Section 201-2(4)(i)–(xx)

First, Pennsylvania alleges that the Defendants' conduct violates two specific prohibitions of "unfair methods of competition" or "unfair or deceptive acts or practices," as defined by the UTPCPL, 73 P.S. § 201-2(4):

> (v) Representing that goods or services have sponsorship, approval, characteristics, ingredients, uses, benefits or quantities that they do not have or that a person has a sponsorship, approval, status, affiliation, or connection that he does not have; [and] . . .

---

[11] In a table summarizing its Motion, the Defendants state that they also seek to dismiss "Pennsylvania's claims for monetary recovery" and claims asserted pursuant to Pennsylvania common law.  ECF No. 367 at 61.  The Defendants do not otherwise support or explain these objections.  As such, I decline to dismiss these claims at this stage of the proceedings.

(vii) Representing that goods or services are of a particular standard, quality or grade, or that goods are of a particular style or model, if they are of another[.]

ECF No. 196 ¶ 2050.  Pennsylvania fails to state a claim under either of these provisions.

Pennsylvania alleges the Defendants violated section (v) by "not disclos[ing] their market allocation and price-fixing agreements to Pennsylvania victims prior to their purchasing generic drugs."  ECF No. 367-1 at 53.  The Defendants argue that section (v) prohibits false advertising, not market allocation and price-fixing agreements.  ECF No. 367 at 48 (citing *Baker v. Family Credit Counseling Corp*, 440 F. Supp. 2d 392, 412 (E.D Pa. 2006)).  Although the Pennsylvania Supreme Court has found that section (v) is "not limited to claims based on advertising," *Commonwealth by Shapiro v. Golden Gate Nat'l Senior Care LLC*, 194 A.3d 1010, 1028–29 (Pa. 2018), even under a broader interpretation of the statute, Pennsylvania still fails to state a claim under section (v).  Pennsylvania does not explain how the pricing of goods or market allocations—let alone "not disclos[ing]" those activities—can fairly be characterized as representing that "goods or services have sponsorship, approval, characteristics, ingredients, uses, benefits or quantities that they do not have."  An undisclosed agreement to fix prices or allocate markets is not a "represent[ation]" of anything, and it is a far cry from a false statement about the qualities or sponsorship of a good.  Reading section (v) to include the conduct alleged in the complaint would strain the plain language of the statute, and I decline to do so.

Pennsylvania's claim under section (vii) fares no better.  Pennsylvania alleges that the Defendants violated section (vii) by "represent[ing] to Pennsylvania victims that, in marketing generic drugs, the generic drugs were competitively priced or otherwise concealed the true nature or premium of such pricing due to the market allocation and price-fixing."  ECF No. 367-1 at 53.  The Defendants argue that allegations of market allocation and price-fixing agreements cannot "reasonably be considered representations about the standard, quality, grade, style, or model of

the pharmaceutical products Defendants sold." ECF No. 367 at 48. I agree. Pennsylvania fails

to explain how concealing the presence of market allocation and price-fixing agreements can be

considered representations—even representations through omission—about the drug's standard,

quality, grade, style, or model, under section (vii). Again, I decline to broaden the statute beyond

its plain meaning, and so Pennsylvania's claims under section (vii) fail.

### 2. Section 201-2(4)(xxi), the Catchall Provision

Pennsylvania also invokes a "catchall provision" in the UTPCPL, P.S. §§ 201-2(4)(xxi),

which adds to the list of specific "unfair methods of competition" or "unfair or deceptive acts or

practices" the following: "[e]ngaging in any other fraudulent or deceptive conduct which creates

a likelihood of confusion or of misunderstanding," *id.* § 201-2(4). While I find this to be

something of a close call, I conclude that Pennsylvania has adequately stated a claim under this

provision.

A plain language reading of the statute seems to favor the Defendants' arguments here.

The definition of "unfair methods of competition" and "unfair or deceptive acts or practices" lists

twenty, quite specific practices that satisfy the definition, most of which involve false or

deceptive representations or trademark-like violations. That list is followed by the catchall

phrase quoted above. *Id.* Application of the principle *ejusdem generis*, "which provides that

general expressions in a statute are restricted to things and persons similar to those specifically

enumerated in the language preceding the general expression," *Commonwealth v. Karetny*, 880

A.2d 505, 516 (Pa. 2005), suggests that the "other fraudulent or deceptive conduct which creates

a likelihood of confusion or of misunderstanding," should resemble the specifically enumerated

"unfair methods of competition" and "unfair or deceptive practices." Nothing in the specific list

in § 201-2(4) resembles price fixing, market allocation, or any other antitrust violation, and as

the parties acknowledge, an intermediate appellate court in Pennsylvania has held that "the UTPCPL is not designed to render *all* antitrust violations actionable and . . . the scope of actionable antitrust behavior under the UTPCPL is narrower than under federal antitrust law." *Anadarko Petroleum Corp. v. Commonwealth*, 206 A.3d 51, 60 (Pa. Commw. Ct. 2019).

But I am not writing on a clean slate, and this is not a Pennsylvania court. As Pennsylvania points out, while the court in *Anadarko* held that price fixing and market allocation agreements do not intrinsically violate the UTPCPL, it allowed an additional count "regarding Appellants' allegedly disingenuous and misleading behavior" to proceed under section (xxi), *id.* at 60–61[12]—a count that made allegations similar to those Pennsylvania makes here. In *Anadarko*, the court found that Pennsylvania had "articulated a legally viable UTPCPL claim" by alleging that the defendant gas company "deceived and acted unfairly towards private landowners by giving them misleading information, and/or failing to disclose information, regarding the open market's true appetite for subsurface mineral rights leases, as well as whether the terms of the agreed-to leases were competitive and fair." *Id.* at 61 (internal quotation marks omitted); *see also id.* at 66 (Covey, J., concurring in part and dissenting in part) (noting that the complaint alleged UTPCPL violations for "[e]ach time a[n Appellant] failed to disclose the existence of the joint venture agreement, the market allocation agreement and the option of the other [Appellant] to acquire an interest in the lease in the course of negotiating an oil and gas lease"). It is also true, as Pennsylvania notes, that the Pennsylvania Supreme Court has used

---

[12] The Pennsylvania Supreme Court reviewed the appellate court's decision in *Anadarko* and reversed this claim on the grounds, not at issue here, that Section 201-2(3) of the UTPCPL did not support a claim to regulate buyers' conduct, rather than that of sellers. *Commonwealth v. Chesapeake Energy Corp.*, 247 A.3d 934, 949–50 (2021). The court did not reach whether antitrust remedies are cognizable under the UTPCPL and thus did not analyze Section 201-2 (4)(xxi). *Id.* at 950.

broad language in describing the sweep of the UTPCPL.  *See Golden Gate*, 194 A.3d at 1023

("An act or a practice is deceptive or unfair if it has the capacity or tendency to deceive, and

neither the intention to deceive nor actual deception must be proved; rather, it need only be

shown that the acts and practices are capable of being interpreted in a misleading way." (internal

quotation marks and alterations omitted)).

　　　In addition, Pennsylvania does point to one factual allegation that suggests deception and

false representations: Plaintiffs allege that, "[i]n furtherance of the conspiracy [to fix prices],

[Defendant] Fougera refrained multiple times from taking customers that approached it for bids."

ECF No. 196 ¶ 301.  Defendant Walter Kaczmarek allegedly instructed his Fougera colleagues to

tell Wal-Mart that the reason for not bidding was that Fougera could not supply the goods.  *Id.*

Under section (xxi) and the Pennsylvania Supreme Court's formulation in *Golden Gate*, this

allegation is enough to constitute "deceptive conduct which creates a likelihood of confusion or

of misunderstanding," in that it has the capacity or tendency to deceive.[13] 73 P.S. § 201-

2(4)(xxi); *Golden Gate*, 194 A.3d at 1023.  Admittedly, the allegations here do not reach much

beyond those of pure antitrust violations, but similar allegations were enough for the

Pennsylvania Commonwealth Court in *Anadarko.* 206 A.3d at 61.[14]

---

[13] Pennsylvania's claim is distinguishable from that in *Vyera*, 479 F. Supp. 3d at 50–51, in which
the court dismissed a section (xxi) claim because the Complaint did *not* allege that the conduct
was "'fraudulent,' 'deceptive,' or likely to create 'confusion' or 'misunderstanding.'" *Id.* at 51
(quoting 73 P.S. § 201-2(4)(xxi)).

[14] As both the Pennsylvania Supreme Court and the Third Circuit have made clear, under Section
§ 201-4, the Attorney General need not plead justifiable reliance to bring a cause of action.
*Weinberg v. Sun Co.*, 777 A.2d 442, 446 (2001); *Hunt v. U.S. Tobacco Co.*, 538 F.3d 217, 222 (3d
Cir. 2008), *as amended* (Nov. 6, 2008) (analyzing *Weinberg* and collecting similar Pennsylvania
state cases).  It is also not the case, as the Defendants suggest, that the catchall provision "applies
only to fraudulent conduct."  ECF No. 367-2 at 45 (quoting *Yeager's Fuel, Inc. v. Pa. Power &
Light Co.*, 953 F. Supp. 617, 668 (E.D. Pa. 1997)).  *Yeager's Fuel* applied an earlier version of
section (xxi), before it was amended in 1996 to cover conduct that was "deceptive" as well

I deny the Defendants' motion to dismiss Pennsylvania's claims under section (xxi).[15]

### 3. Section 201-8(b)

Defendants also seek to dismiss Pennsylvania's claims for civil penalties of up to $3,000 per willful violations where the victim is 60 years of age or older, as provided by 73 P.S. § 201-8(b), arguing that Pennsylvania has not alleged any violations against such victims and has not sufficiently described any alleged victims.  ECF Nos. 367 at 48, 367-2 at 46–47.  I deny the motion to dismiss as to this claim.  Pennsylvania brings this action on behalf of Pennsylvania consumers and has not alleged the age group of any of them.  On a Rule 12(b)(6) motion, I must draw the inference that at least some Pennsylvania residents among the alleged victims were age 60 or older.  The alleged victims will be identified through discovery or at trial; it would be premature to decide this issue at the pleadings stage.  *See Commonwealth v. Peoples Benefit Servs., Inc.*, 895 A.2d 683, 690 (Pa. Cmwlth. 2006) (holding that the identities of injured parties in a case brought by the Commonwealth are not needed "to defend against the causes of action," but rather "are evidentiary in nature and, thus, better obtained through discovery and presented at trial"); *Commonwealth of Pennsylvania v. Think Fin., Inc.*, No. 14-cv-7139, 2016 WL 183289, at *22 (E.D. Pa. Jan. 14, 2016) (finding "it is not necessary [on a motion to dismiss] to plead the

---

"fraudulent." *See Gregg v. Ameriprise Fin., Inc.*, 245 A.3d 637, 652 & n.5 (Pa. 2021) (describing the impact of the amendment).

[15] The Pennsylvania Supreme Court's recent decision in *Gregg*, 245 A.3d 637, does not change these findings.  The States sought leave to file a Notice of Supplemental Authority regarding *Gregg*.  ECF No. 367-4.  The Defendants argued that the Notice was improperly filed as the decision was issued thirteen months before the parties filed the briefing to which it relates.  ECF No. 367-5.  I denied leave to file, ECF No. 457, and have denied the present motion to dismiss on unrelated grounds.  Regardless, the holding in *Gregg* has no bearing on the present Motion.  As the dissent in *Gregg* acknowledged, the court had *already* interpreted the UTPCPL, in an enforcement action brought by the Attorney General, as not requiring "proof of intentional conduct on the part of the [Defendant] in order for it to be liable under Section xxi for creating a likelihood of confusion or misunderstanding on the part of the consumers."  245 A.3d at 653–54 (Todd, J., dissenting) (citing *Golden Gate*, 194 A.3d at 1023).

precise identity of consumers harmed by the Defendants nor the precise harm" (internal quotations omitted)).

### T. Puerto Rico

Puerto Rico alleges that the Defendants' conduct violates the Puerto Rico Antitrust Act ("PRAA"), 10 P.R. Laws Ann. §§ 257 et seq.  Puerto Rico seeks remedies as provided by the PRAA and 32 P.R. Laws Ann. § 3341, which provides the Commonwealth parens patriae power to bring suits for damages and injunctive relief.  ECF No. 196 ¶¶ 2069–72.  Specifically, Puerto Rico seeks "injunctive relief, civil penalties and damages for the Commonwealth agencies and entities and any other appropriate monetary and injunctive relief."  *Id.* ¶ 2072.  The Defendants move to dismiss Puerto Rico's "[c]laims for monetary recovery on behalf of indirect purchasers" and "[u]njust enrichment claims."  ECF No. 367 at 61.  But Puerto Rico has not alleged a distinct claim for "unjust enrichment."[16]  And any damages claims for relief Puerto Rico is making on behalf of "indirect purchasers"—a term not used in the portion of the complaint devoted to Puerto Rico's claim under its own law—are apparently limited to damages claims by those indirect purchasers that are also "Commonwealth agencies and entities."  In any event, for the reasons stated below, the motion to dismiss Puerto Rico's antitrust claims for damages on behalf of indirect purchasers is granted.

Puerto Rico has not adopted a statute repealing *Illinois Brick*, 431 U.S. 720, under which indirect purchasers may not sue for damages.  This means that Puerto Rico's claim under its own law runs straight into an *Illinois Brick* wall to the extent it is seeking damages—as opposed to

---

[16] Puerto Rico refers to such a claim in its brief without pointing to any allegation in the complaint that supports it, ECF No. 367-1 at 56; but a party may not amend its complaint by adding claims in a brief opposing a motion to dismiss.

equitable monetary relief[17]—on behalf of Commonwealth entities that were indirect purchasers, unless its own law provides for a different rule.  That is so because most courts, including the First Circuit, the federal court of appeals overseeing Puerto Rico federal courts, presume that state and territorial antitrust laws should be construed in accordance with federal antitrust law, unless there is express language in the state law or an express statement by a state court providing otherwise.[18]  *See Caribe BMW, Inc. v. Bayerische Motoren Werke Aktiengesellschaft*, 19 F.3d 745, 754 (1st Cir. 1994) (in construing antitrust claims under Puerto Rico antitrust law, noting that "courts interpret Puerto Rico's laws as essentially embodying the jurisprudence relevant to the parallel federal law"); *see also Rivera-Muñiz v. Horizon Lines Inc.*, 737 F. Supp. 2d 57, 61 (D.P.R. 2010) (The "PRAA is modeled after federal antitrust statutes.").  Because there is no *Illinois Brick* repealer language in the PRAA and Puerto Rico's territorial courts have not addressed the issue, most courts have concluded that the rule of *Illinois Brick* bars indirect purchaser claims under the PRAA.  *In re Aggrenox Antitrust Litig.*, 94 F. Supp. 3d 224, 252 (D. Conn. 2015) (dismissing indirect purchaser claims under Puerto Rico antitrust law and citing similar cases: "In the absence of a clear decision—by either the legislature or by the jurisdiction's own courts—to allow indirect-purchaser recovery, the antitrust laws of a state (or territory) are interpreted as presumptively consistent with federal law."); *see also In re Digital Music Antitrust Litig.*, 812 F. Supp. 2d 390, 413 (S.D.N.Y. 2011) ("[A]ny state that has not

---

[17] For discussion on the distinction between damages and equitable monetary relief, see the section on Ohio's claims, *supra*.

[18] Following the Supreme Court's *Illinois Brick* decision, multiple states adopted statutes that "expressly allow[ed] indirect purchasers to sue."  *California v. ARC America Corporation*, 490 U.S. 93, 98 & n.3 (1989).  The Supreme Court explained that "[n]othing in *Illinois Brick* suggests that it would be contrary to congressional purposes for States to allow indirect purchasers to recover under their own antitrust laws."  *Id.* at 103.  Accordingly, many states have enacted *Illinois Brick*-repealer legislation.  As noted, Puerto Rico has not.

expressly passed *Illinois Brick* repealer legislation or interpreted its law in such a way as to override the rule of *Illinois Brick* is presumed to have decided to follow federal law, including the *Illinois Brick* limitation on indirect purchaser claims.").

Puerto Rico argues that "the Supreme Court of Puerto Rico has repeatedly rejected the contention that Puerto Rico antitrust law must be construed in harmony with interpretation of federal antitrust law." ECF No. 367-3 at 27. But the case on which it relies—*Pressure Vessels of Puerto Rico, Inc. v. Empire Gas de Puerto Rico*, 137 D.P.R. 497, 520, 1994 P.R.-Eng. 909,547 (P.R. 1994)—held only that "the plaintiff need not establish anything beyond a factual causal relation between the injury and the violation" to establish antitrust injury under the PRAA. The case did not address *Illinois Brick* or the issue of indirect-purchaser standing.[19]

The federal District Court in Puerto Rico has found the statement from *Pressure Vessels* that "the plaintiff need not establish anything beyond a factual causal relation between the injury and the violation" to indicate that the PRAA grants indirect purchasers standing to sue for damages, notwithstanding "federal jurisprudence." *Rivera-Muñiz*, 737 F. Supp. 2d at 61. But the decision contains little analysis and does not address the distinction between antitrust standing, the focus of *Illinois Brick*, and antitrust injury, the focus of *Pressure Vessels*.[20] The

---

[19] It is true that some state courts, even in the absence of *Illinois Brick*-repealer statutes and, in some cases, in the presence of statutory language requiring or encouraging harmonization with federal antitrust law, have found their existing antitrust laws to permit indirect-purchaser standing, notwithstanding the concerns expressed in *Illinois Brick*. *E.g.*, *Freeman Indus., LLC v. Eastman Chem. Co.*, 172 S.W.3d 512, 517 (Tenn. 2005); *Bunker's Glass Co. v. Pilkington PLC*, 75 P.3d 99, 102 (Ariz. 2003); *Comes v. Microsoft Corp.*, 646 N.W.2d 440, 447 (Iowa 2002); *Hyde v. Abbott Lab'ys, Inc.*, 473 S.E.2d 680, 683 (N.C. Ct. App. 1996). Puerto Rico territorial courts, however, have issued no such ruling, and the reasoning of those state court rulings runs counter to that of most federal courts, especially where, as here, there is direction from a court familiar with the territorial laws that they should be harmonized with federal antitrust law. *Caribe BMW, Inc.*, 19 F.3D at 754.

[20] *Illinois Brick* construed Section 4 of the Clayton Act, which provides that "[a]ny person who

---

same judge who authored *Rivera-Muniz* later reached the same conclusion again, noting that several federal district courts had rejected his interpretation but that some others had agreed with it. *See Gov't of Puerto Rico v. Carpenter Co.*, 442 F. Supp. 3d 464, 478 (D.P.R. 2020). For the reasons stated (*see supra* note 20), I find that *Pressure Vessels* simply does not address the rule of *Illinois Brick* or provide any guidance as to what Puerto Rico's highest court would do if confronted with the question whether indirect purchasers may recover damages under the territory's antitrust law. Accordingly, I agree with the many district courts that have found that the analysis in *Pressure Vessels* is *not* an express rejection of the *Illinois Brick* rule. *See, e.g.*, *Aggrenox*, 94 F. Supp. 3d at 252 (collecting cases); *In re Opana ER Antritrust Litig.*, 162 F. Supp. 3d 704, 723 (N.D. Ill. 2016); *In re Broiler Chicken Antitrust Litig.*, No. 16 C 8637, 2020 WL 4032932, at *4 (N.D. Ill. July 15, 2020) ("*Pressure Vessels* is an insufficient authority to find that the PRAA rejects *Illinois Brick* . . . . This Court joins the majority of courts and finds *Rivera-Muniz*'s reliance on *Pressure Vessels* as an *Illinois Brick* repealer unpersuasive.").

---

shall be injured in his business or property by reason of anything forbidden in the antitrust laws may sue therefor . . . ." 431 U.S. 723–26 & 724 n.1 (citing 15 U.S.C. § 15). Specifically, *Illinois Brick* focused on what was required for the person to be "injured in his business or property," which is generally referred to as "antitrust standing." *See, e.g.*, *B & R Supermarket, Inc. v. Visa Inc.*, No. 17-cv-2738, 2024 WL 4334075, at *5 (E.D.N.Y. Sept. 27, 2024) (referring to "*Illinois Brick*'s limitation on antitrust standing"). By contrast, in making the statement on which the *Rivera-Muniz* court relied, *Pressure Vessels* was addressing a distinct requirement—that the injury be "by reason of" conduct that violates the antitrust laws, which is sometimes known as the requirement of antitrust injury. *See* 137 D.P.R. at 509–10 ("A simple reading of [the PRAA's analogue to Section 4 of the Clayton Act] shows that it establishes three requirements . . . : (1) the person must be injured in his business or property (2) by reason of (3) acts . . . forbidden by [the PRAA] . . . . In the past two decades, the *second requirement*, that . . . only requires a factual causal nexus between the injury established and the unlawful acts, has been the object of complex and novel interpretation in the federal sphere." (emphasis added; citing federal cases discussing the antitrust injury requirement). "We hold that the plaintiff need not establish anything beyond a factual causal relation between the injury and the violation *to meet the 'by reason of' requirement* . . . ." *Id.* at 520 (emphasis added). Although *Pressure Vessels* refers at one point to "standing . . . under Clayton Act sec. 4." 137 D.P.R at 519, the case's holding is limited to defining the requirements of antitrust injury under the PRAA.

Puerto Rico's claims under the PRAA are therefore dismissed to the extent they seek damages on behalf of indirect purchasers. Although Puerto Rico has not yet identified whether it is suing on behalf of indirect purchasers, direct purchasers, or both, on a Rule 12(b)(6) motion, I must draw the inference that at least some injured Puerto Rico residents were direct purchasers. Puerto Rico is still permitted to pursue claims for damages on behalf of direct purchasers, as well as injunctive relief and civil penalties on behalf of all purchasers, as provided for by 10 P.R. Laws Ann. §§ 257 et seq. and 32 P.R. Laws Ann. § 3341. Further, as I explained with respect to Ohio, Oklahoma, and Virginia, to the extent Puerto Rico is seeking other "appropriate monetary . . . relief," ECF No. 196 ¶ 2075, on behalf of indirect purchasers—such as disgorgement—it remains to be seen whether granting that relief would be equitable in light of the policies animating the rule of *Illinois Brick*, but I will not dismiss any such claim now.

### U.  Rhode Island

Rhode Island seeks all remedies available under the Rhode Island Antitrust Act ("RIAA"), R.I. Gen. Laws § 6-36-1 et seq., including disgorgement, injunctive relief, civil penalties, costs, and attorney's fees. ECF No. 196 ¶ 2075. The Defendants move to dismiss "Rhode Island's claims asserted as parens patriae for disgorgement, fees, costs, and any other monetary relief." ECF No. 367 at 32–33. As explained below, the motion to dismiss Rhode Island's state-law claims is granted in part and denied in part.

The RIAA permits the Rhode Island attorney general to seek distinct relief under three separate sections: 6-36-10, providing for injunctive relief and civil penalties for violations; 6-36-11(b), permitting "appropriate relief" in enforcement actions on behalf of the state and its subdivisions; and 6-36-12, limiting "monetary relief" in parens patriae actions to "threefold the total damage sustained," costs, and fees. *See* R.I. Gen. Laws § 6-36-10 to -12.

Rhode Island does not contest that it cannot seek disgorgement as parens patriae on behalf of state residents, s*ee* ECF No. 196 ¶ 2075, ECF No. 367-1 at 57–58, and there does not seem to be any basis for it to do so under the RIAA.  *Compare* R.I. Gen. Laws § 6-36-12 (governing actions brought by Attorney General as "parens patriae on behalf of persons residing in this state, to secure monetary relief . . . for injuries sustained by the persons to their property . . . " and making no mention of disgorgement) *with* § 6-36-11(b) (governing actions brought "on behalf of the state of Rhode Island or any of its departments, subdivisions, agencies, or its cities and towns . . . seeking appropriate relief").  To the extent the Defendants are seeking to dismiss a claim for disgorgement parens patriae on behalf of state residents, the motion to dismiss is granted.

Defendants, however, cannot show that Rhode Island is precluded from seeking disgorgement under Section 6-36-11(b), which provides:

> The attorney general shall investigate suspected violations of the provisions of this chapter and if he or she shall conclude that a violation is imminent, is occurring, or has occurred, he or she may institute on behalf of the state of Rhode Island or any of its departments, subdivisions, agencies, or its cities and towns, an action in superior court *seeking appropriate relief.*  The attorney general may bring an action in federal court on behalf of the state of Rhode Island; any of its political subdivisions or agencies; or its cities and towns to recover the damages provided for by the federal antitrust laws, and pursuant to the federal laws may undertake any measures that he or she deems necessary for the successful conduct of the action.

R.I. Gen. Laws § 6-36-11(b) (emphasis added).  The Defendants do not contend that "appropriate relief" under section 6-36-11(b) does not include disgorgement, injunctive relief, civil penalties, costs, or attorney's fees, and the breadth of that formulation suggests that it does.  While the Defendants do contend that this statute authorizes the attorney general to bring RIAA claims only in state court, ECF Nos. 367 at 32, 367-2 at 48, this argument lacks merit.  As explained already with regards to Alaska's and California's claims, district courts have "supplemental jurisdiction

over all other claims that are so related to claims in the action within such original jurisdiction that they form part of the same case or controversy," 28 U.S.C. § 1367(a), and state laws cannot limit federal courts' jurisdiction.  *See supra*.  Rhode Island law permits the attorney general to bring RIAA claims in state court; federal law permits the attorney general to bring RIAA claims together with related federal claims in federal court.  So to the extent the Defendants are seeking to dismiss Rhode Island's claims for disgorgement or any other "appropriate relief" brought "on behalf of the state . . . or any of its departments, subdivisions, agencies, or its cities and towns," the motion to dismiss is denied.

The parties dispute whether injunctive relief under section 6-36-10 includes disgorgement.  ECF Nos. 367-1 at 57–58; 367-2 at 49.  Because I find that disgorgement is available under 6-36-11, I decline to determine if it is also available under section 6-36-10.

### V.  Virgin Islands

The U.S. Virgin Islands seeks injunctive relief and civil penalties under both the Virgin Islands Antimonopoly Law, 11 V.I.C. § 1501 et seq. ("the antitrust act"), and Consumer Fraud and Deceptive Business Practices Act, 12A V.I.C. § 301 et seq. ("the consumer protection act").  ECF No. 196 ¶¶ 2111–13.  The Defendants seek to dismiss the Virgin Islands' "claims for monetary recovery" under both statutes, as well as all claims under the antitrust act, which the Defendants assert are time-barred.  ECF No. 367 at 62.  I address the two statutes in turn.

### 1.  Virgin Islands Antimonopoly Law

The Defendants move to dismiss the Virgin Islands' antitrust claims on two grounds: (1) that the statute does not authorize penalties for each violation, and (2) that claims brought more than four years before the filing of the Third Amended Complaint are time-barred.  I do not find either ground persuasive at this stage.

The antitrust act authorizes the Attorney General to bring an action "against any person [or entity] . . . to recover a penalty in a sum not to exceed $50,000 for the doing in the United States Virgin Islands of any act herein declared illegal."  11 V.I.C. § 1503(4).  Neither the Defendants nor the Virgin Islands has pointed to any court decisions interpreting this language.  The Defendants contend that the provision limits civil penalties to a single award of $50,000 per person or entity, and thus the Virgin Islands' claim for "for *each and every violation*" of the antitrust act (ECF No. 196 ¶¶ 2113) is unauthorized.  ECF No. 367 at 44–45.  But the statute does not say "per person or entity"; it says "for the doing . . . of *any act* . . . ." (emphasis added).  "Any act" could be a single agreement to fix a price for a single drug in a single transaction.  While the issue is not free from all doubt—because the statute does not say "per violation," a phrase the territory's legislature has used in other statutes, *see* 12A V.I.C. §328(b)—the statute's use of the singular "act" suggests that $50,000 is available for each violation.  Moreover, nothing in the statute prevents the Virgin Islands from bringing multiple claims for "*each and every violation*," as it has done here.[21]

The Defendants also contend that the Virgin Islands' antitrust claims under 11 V.I.C. § 1507 are barred by a four-year statute of limitations.  ECF Nos. 367 at 45; 367-2 at 51.  The Defendants argue that the complaint only "alleges antirust violations 'from at least 2009 through early 2016,'" ECF No. 367 at 45 (citing ECF No. 196 ¶ 1), and thus a complaint filed on June 10, 2020, is time-barred.  Before this case was remanded to this District, Judge Rufe denied motions to dismiss the States' federal-law claims based on the same argument.  *In re Generic Pharms.*

---

[21] A party "may join, as independent or alternative claims, as many claims as it has against an opposing party."  Fed. R. Civ. P. 18(a); *see also Gov't of the V.I. v. The ServiceMaster Co., LLC*, 72 V.I. 114, 135 (V.I. Super. Ct. 2019) (noting, in an action seeking the maximum civil penalty for "each and every violation" of the Unfair Trade Practices Act, 12A V.I.C. § 104, that the government "can, of course, bring multiple claims").

*Pricing Antitrust Litig.*, 2023 WL 2244685, at *3.  Judge Rufe noted that the Defendants

"offer[ed] an array of trigger dates," none of which "establishe[d] as a matter of law, from the

face of the Amended Complaint, that the action is untimely," and she decided that "[t]he

question of whether any of Plaintiffs' claims are barred by the asserted statute of limitations

defenses is more appropriate for resolution at a later stage of the proceedings following more

particularized discovery." *Id.*  As in the Third Circuit, dismissal of a claim on statute of

limitations grounds—an affirmative defense—is proper in the Second Cicuit "only if it is clear

on the face of the complaint that the statute of limitations has run." *Reif v. Art Inst. of Chicago*,

703 F. Supp. 3d 427, 433 (S.D.N.Y. 2023).  Especially because the complaint alleges acts of

concealment, that is not the case here.  As such, dismissal on this basis remains premature.

For these reasons, the motion to dismiss the Virgin Islands' claims under the antitrust act

is denied.

### 2.  Consumer Fraud and Deceptive Business Practices Act

Defendants move to dismiss the Virgin Islands' consumer protections claims on two

grounds: (1) that the statute does not authorize the Attorney General to bring claims, and (2) that

claims for each violation are permitted only if the violations were "entered into with the intent to

defraud," which the Virgin Islands fails to allege.  12A V.I.C. §328(b).  I do not find either

ground persuasive.

The consumer protection act provides that "[t]he Department of Licensing and Consumer

Affairs ["DLCA"] shall be responsible for the administration and enforcement of this chapter."

12A V.I.C. § 327; *see also id.* § 328 ("Remedies of the Department of Licensing and Consumer

Affairs").  The Defendants contend that these provisions preclude actions brought by the

Attorney General on behalf of the DLCA.  ECF No. 367 at 48–49.  The Virgin Islands points to 3

V.I.C. § 114(a)(1), which gives the Attorney General the power "to appear for and represent the executive branch of the Government of the Virgin Islands before the courts in all civil proceedings in which the said Government, or any executive department, board, commission, agency, instrumentality or officer thereof is interested."[22]  Even if the consumer protection act creates an exception to this broad authority, as the Defendants contend, ECF No. 367-2 at 52–53, I could simply substitute the DLCA as the named party.  *See* Fed. R. Civ. P. 17(a)(3) ("After . . . substitution, the action proceeds as if it had been originally commenced by the real party in interest.").  I find it unnecessary to do so, however, as the Virgin Islands, in its surreply, submitted a certification from the DLCA Commissioner authorizing the Attorney General to bring claims under the consumer protection act in the present action.  *See* ECF No. 367-3 at 43–44 & Ex. 3.  This notice, though belated, removes any doubt regarding the Attorney General's power to bring these claims.  *See also Servicemaster*, 72 V.I. at 126 (finding "frivolous" a similar argument regarding the Attorney General's ability to bring an action under the Virgin Islands' Unfair Trade Practices Act).

Finally, the Defendants seek dismissal of the Virgin Islands' request for "the maximum civil penalty . . . for each and every violation" of the consumer protection act, ECF No. 196 ¶¶ 2113, because the Territory has not alleged that the Defendants' alleged conduct was "entered into with the intent to defraud."  ECF No. 367 at 49 (citing 12A V.I.C. §328(b)).  But the plain language of the statute does not suggest that the Virgin Islands must *allege* intent to defraud to state a claim.  The statue provides:

> The Department may petition the Superior Court to impose a civil penalty in a sum not to exceed $50,000 against any person found by the court to have engaged in any method, act or practice declared unlawful under this chapter. *If the court finds*

---

[22] The DLCA is "an executive department in the Government of the United States Virgin Islands."  3 V.I.C. § 270(a).

> *the method, act or practice to have been entered into with the intent to defraud*, the court may impose a civil penalty in a sum not to exceed $50,000 per violation.

12A V.I.C. §328(b) (emphasis added).  While the statute is not a model of clarity, as one Virgin Islands court has acknowledged, *Servicemaster*, 72 V.I. at 135 ("Admittedly, the language of the statute is unclear . . . ."), the italicized language suggests that "intent to defraud" is a proof requirement, not a pleading requirement.  *See id.* ("The Consumer Fraud and Deceptive Business Practices Act does require proof of intent to defraud . . . [b]ut 'intent to defraud' is not necessarily an element of the claim.").  The complaint sufficiently alleges violations of the consumer protection act through "unfair methods of competition or unfair or deceptive trade acts or practices in the conduct of any trade or commerce."  12A V.I.C. §304; *see, e.g.*, ECF No. 196 ¶ 301, discussed in the Ohio section, *supra*.  At the pleadings stage, that is all that is required to proceed under the statute.  Evidence of the Defendants' intent may be identified through discovery or at trial.

For these reasons, the motion to dismiss the Virgin Islands' claims under the consumer protection act is denied.

### W. Virginia

Defendants seek to dismiss "Virginia's indirect purchaser claims under the Virginia Antitrust Act," ECF No. 367 at 62.  Virginia responds that it does not seek relief as an indirect purchaser and does not seek to recover damages, but merely "seeks civil penalties pursuant to Virginia Code 59.1-9.11, disgorgement pursuant to Virginia Code 59.1-9.15 and federal antitrust law," plus attorney fees.  ECF No. 367-1 at 67–68.  In their reply, the Defendants accept Virginia's clarification, noting only that I should dismiss any future claims for damages.  ECF No. 327-2 at 54.  Because Virginia has not raised a claim for damages, I decline to evaluate the merits of the Defendants' damages arguments.

The Defendants also urge that Virginia's disgorgement claims should be dismissed because Virginia follows the *Illinois Brick* rule, under which indirect purchasers may not sue for damages. ECF No. 367 at 40 & n.14. The Defendants cite *In re TFT-LCD (Flat Panel) Antitrust Litigation*, 599 F. Supp. 2d 1179 (2009), which relied on *Infineon*, 531 F. Supp. 2d at 1150 (*see* Oklahoma section, *supra*), for the proposition that "indirect purchaser plaintiffs lack standing under the Virginia Antitrust Act." 599 F. Supp. 2d at 1186.

Defendants' arguments face the same problems as they did against Ohio and Oklahoma. *See supra*. First, Virginia has not alleged whether it is seeking disgorgement on behalf of direct or indirect purchasers, and on a 12(b)(6) motion, I must draw the inference that at least some injured Virginia residents were direct purchasers since the complaint does not definitively speak to this issue. Second, even if all injured residents were indirect purchasers, it is not clear there would be a basis to bar the Virginia Attorney General from seeking disgorgement. On its face, the Virginia Antirust Act permits the Attorney General to bring actions on behalf of the state for "injunctive relief, disgorgement, and other forms of equitable monetary relief as the court deems appropriate, and civil penalties for violations." Virginia Code 59.1-9.15(A). *TFT-LCD* is inapposite because it did not address whether Virginia antitrust law permits the Attorney General to seek equitable relief that ends up being awarded to persons whose injuries were incurred as indirect purchasers.

For these reasons, the Defendants' motion to dismiss Virginia's claims is denied.

## X. Washington

Under the Washington Consumer Protection Act ("WCPA"), Wash. Rev. Code § 19.86.010 et seq., Washington seeks "relief, including but not limited to damages, for

Washington consumers and Washington state agencies," as well as injunctive relief, equitable relief (including disgorgement), civil penalties, costs, and fees, ECF No. 196 ¶ 2101. The Defendants seek to dismiss Washington's claims for damages as parens patriae on behalf of persons residing in the state. ECF No. 367 at 33–34, 62. Washington contends that it is only seeking "restitution" as parens patriae and that it is only seeking damages for harm "sustained by the State of Washington, including state agencies," ECF No. 367-1 at 68. Although the complaint states that Washington seeks damages as part of the relief for "Washington consumers," ECF No. 196 ¶ 2010, Washington asserts that it has "has never asserted that it is seeking damages in its capacity as parens patriae." ECF No. 367-3 at 45. As explained below, the motion to dismiss Washington's state-law claims is granted in part and denied in part.

Section 19.86.080 of the WCPA governs the attorney general's power to "bring an action in the name of the state, or as parens patriae on behalf of persons residing in the state, against any person to restrain and prevent" violations of the WCPA. In such actions, "[t]he court may make such additional orders or judgments as may be necessary to restore to any person in interest any moneys or property, real or personal, which may have been acquired by means of any act herein prohibited or declared to be unlawful." Wash. Rev. Code § 19.86.080. The WCPA also provides for civil penalties for violations, *id.* § 19.86.140, and permits Washington to seek "actual damages" on behalf of the state, *id.* § 19.86.090.

The WCPA does not permit Washington to seek damages as parens patriae, and Washington does not argue that it does. But this may be largely academic, because the language quoted above allows the court to "restore to any person in interest any moneys . . . which may have been acquired" by means of a violation. *Id.* § 19.86.080(2). This language supports Washington's request for "restitution" on behalf of injured Washington residents, and the statute

further makes clear that such restitution may be awarded to indirect purchasers when there are antitrust violations.

As such, to the extent Washington seeks *damages* under the WCPA as parens patriae on behalf of Washington residents, the motion to dismiss is granted.  As to all other potential relief permitted by the WCPA, the motion to dismiss is denied.  *Id.* § 19.86.080(3).

### III. Conclusion

For the foregoing reasons, the motion to dismiss is granted in part and denied in part.

IT IS SO ORDERED.

                                              /s/
                                              ———————————————
                                              Michael P. Shea, U.S.D.J

                                              Hartford, Connecticut
                                              November 12, 2024