PUBLIC REDACTED VERSION

# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF CONNECTICUT

THE STATE OF CONNECTICUT, *et al.*,

       *Plaintiffs*,

    v.

SANDOZ INC., *et al.*,

       *Defendants*.

**Case No. 3:20-cv-00802-MPS**

November 22, 2024

## DEFENDANTS' MEMORANDUM IN SUPPORT OF THEIR JOINT MOTION FOR SUMMARY JUDGMENT ON <u>OVERARCHING CONSPIRACY CLAIMS</u>

Highly Confidential – Subject to Protective Order

## TABLE OF CONTENTS

**Page**

INTRODUCTION ................................................................................................................1

FACTUAL BACKGROUND ...............................................................................................3

    A.    The States' Amorphous Overarching Conspiracy Theory.........................3

    B.    The Defendants and Products Involved in the Alleged Overarching Conspiracy .....................................................................................................6

    C.    Procedural History ....................................................................................8

LEGAL STANDARD...........................................................................................................9

ARGUMENT .....................................................................................................................12

I.     THE OVERARCHING CONSPIRACY IS IMPLAUSIBLE ...........................13

II.    THE RECORD DOES NOT SUPPORT THE ALLEGED OVERARCHING CONSPIRACY ................................................................................................15

    A.    There Is No Direct Evidence of an Overarching Conspiracy ................15

        1.    No Witness Testified to the Existence of an Overarching Agreement ..................................................................................16

        2.    The DPAs Are Not Evidence of an Overarching Conspiracy...................20

        3.    No Documentary Evidence Shows an Overarching Conspiracy ..............22

    B.    The Circumstantial Evidence Does Not Create a Genuine Dispute of Fact Concerning the Overarching Conspiracy Claim ....................................24

        1.    The Undisputed Market Share Evidence Contradicts the States' Overarching Conspiracy Claim.................................................24

        2.    "Fair Share" is not Evidence of an Overarching Agreement....................30

            a.    The States Cannot Show that Industry Participants Ever Had a Common Understanding of the Term "Fair Share".............30

            b.    "Fair Share" Does Not Refer to an Agreement But is a Common Performance Benchmarking Term Used in Many Industries................................................................................33

        3.    The Record Does Not Support Other Basic Elements of an Overarching Conspiracy ..........................................................35

Highly Confidential – Subject to Protective Order

|  |  | a. | There is No Evidence of How, When, or Where the Conspiracy Was Formed | 35 |

a. There is No Evidence of How, When, or Where the Conspiracy Was Formed...................................................35

b. There is no Evidence of an Enforcement Mechanism ..................37

c. Generic Manufacturers Face Significant Barriers to Entering New Markets and Would Thus Not Benefit from the Alleged Overarching Conspiracy................................................38

4. No "Plus Factors" Raise the Inference of an Overarching Conspiracy ...................................................................................39

III. INDIVIDUAL CONSPIRACIES DO NOT CONSTITUTE AN OVERARCHING CONSPIRACY ........................................................................................................42

A. The States Cannot Show Interdependence.............................................43

B. The Alleged Overarching Conspiracy Has No Common Goal.............................44

C. The States Cannot Show Overlap Across the Markets for Nearly One-Hundred Drugs........................................................................................46

CONCLUSION.........................................................................................................48

Highly Confidential – Subject to Protective Order

## <u>TABLE OF AUTHORITIES</u>

**Page(s)**

CASES

*AD/SAT Div. of Skylight, Inc. v. Associated Press*,
181 F.3d 216 (2d Cir. 1999) .................................................................................................15

*Anderson News, L.L.C. v. Am. Media, Inc.*,
899 F.3d 87 (2d Cir. 2018) ................................................................................10, 15, 30, 39

*Apex Oil Co. v. DiMauro*,
822 F.2d 246 (2d Cir. 1987) .................................................................................................39

*Brooke Grp. Ltd. v. Brown & Williamson Tobacco Corp.*,
509 U.S. 209 (1993) ..............................................................................................................33

*Capital Imaging Assocs., P.C. v. Mohawk Valley Med. Assocs., Inc.*,
996 F.2d 537 (2d Cir. 1993) .................................................................................................40

*City of Moundridge v. Exxon Mobil Corp.*,
2009 WL 5385975 (D.D.C. Sept. 30, 2009) ........................................................................26

*Cleary v. Philip Morris Inc.*,
656 F.3d 511 (7th Cir. 2011) ................................................................................................48

*Connecticut v. Sandoz Inc.*,
No. 3:20-cv-00802 (D. Conn. Sept. 16, 2024) .......................................................8, 14, 20, 22

*Dahl v. Bain Cap. Partners, LLC*,
937 F. Supp. 2d 119 (D. Mass. 2013) .......................................................................... *passim*

*H.L. Hayden Co. of N.Y., Inc. v. Siemens Med. Sys., Inc.*,
879 F.2d 1005 (2d Cir. 1989) ...............................................................................................12

*Hinds Cnty. v. Wachovia Bank N.A.*,
620 F. Supp. 2d 499 (S.D.N.Y. 2009) .............................................................................12, 20

*In re Auto. Parts Antitrust Litig.*,
2016 WL 8200512 (E.D. Mich. Apr. 13, 2016) ...................................................................44

*In re Auto. Parts Antitrust Litig.*,
2018 WL 1138422 (E.D. Mich. Jan. 16, 2018) ...................................................................44

*In re Baby Food Antitrust Litig.*,
166 F.3d 112 (3d Cir. 1999) ..............................................................................................9, 41

*In re Broiler Chicken Antitrust Litig.*,
 2023 WL 7220170 (N.D. Ill. Nov. 2, 2023) ...................................................48

*In re Chocolate Confectionary Antitrust Litig.*,
 801 F.3d 383 (3d Cir. 2015)............................................................ *passim*

*In re Citric Acid Litig.*,
 996 F. Supp. 951 (N.D. Cal. 1998), *aff'd*, 191 F.3d 1090 (9th Cir. 1999) .......................19, 28

*In re Domestic Airline Travel Antitrust Litig.*,
 691 F. Supp. 3d 175 (D.D.C. 2023) ...................................................26

*In re Ethylene Propylene Diene Monomer (EPDM) Antitrust Litig.*,
 681 F. Supp. 2d 141 (D. Conn. 2009)...................................................39

*In re Flat Glass Antitrust Litig.*,
 385 F.3d 350 (3d Cir. 2004)...................................................10, 40

*In re Generic Pharms. Pricing Antitrust Litig.*,
 No. 2:16-md-02724-CMFR (E.D. Pa.) ...................................................9, 48

*In re Generic Pharms. Pricing Antitrust Litig.*,
 2023 WL 2244685 (E.D. Pa. Feb. 27, 2023) ...................................................3, 44

*In re Ins. Brokerage Antitrust Litig.*,
 618 F.3d 300 (3d Cir. 2010)...................................................11, 42, 44

*In re Interest Rate Swaps Antitrust Litig.*,
 261 F. Supp. 3d 430 (S.D.N.Y. 2017)...................................................21

*In re Iowa Ready-Mix Concrete Antitrust Litig.*,
 768 F. Supp. 2d 961 (N.D. Iowa 2011)............................................ *passim*

*In re Mylan N.V. Secs. Litig.*,
 666 F. Supp. 3d 266 (S.D.N.Y. 2023)...................................................10, 11, 21, 41

*In re Optical Disk Drive Antitrust Litig.*,
 2011 WL 3894376 (N.D. Cal. Aug. 3, 2011) ...................................................41

*In re Packaged Seafood Prods. Antitrust Litig.*,
 2023 WL 3046073 (S.D. Cal. Apr. 21, 2023)...................................................21

*In re Processed Egg Prods. Antitrust Litig.*,
 821 F. Supp. 2d 709 (E.D. Pa. 2011)...................................................21

*In re Suboxone Antitrust Litig.*,
 2017 WL 4642285 (E.D. Pa. Oct. 17, 2017)...................................................48

Highly Confidential – Subject to Protective Order

*In re Text Messaging Antitrust Litig.*,
    782 F.3d 867 (7th Cir. 2015) ................................................................33

*In re Vitamins Antitrust Litig.*,
    320 F. Supp. 2d 1 (D.D.C. 2004) ..........................................................33

*Kleen Prods. LLC v. Int'l Paper*,
    276 F. Supp. 3d 811 (N.D. Ill. 2017), *aff'd sub nom. Kleen Prods. LLC v.
    Georgia-Pac. LLC*, 910 F.3d 927 (7th Cir. 2018) ................................38

*Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*,
    475 U.S. 574 (1986).................................................................9, 10, 24

*Mayor & City Council of Balt. v. Citigroup, Inc.*,
    709 F.3d 129 (2d Cir. 2013).................................................................9, 39

*Monsanto Co. v. Spray-Rite Serv. Corp.*,
    465 U.S. 752 (1984)...............................................................................10

*Moore v. Boating Indus. Assos.*,
    819 F.2d 693 (7th Cir. 1987) ................................................................40

*PepsiCo, Inc. v. Coca-Cola Co.*,
    315 F.3d 101 (2d Cir. 2002)....................................................................9

*Petruzzi's IGA Supermarkets, Inc. v. Darling-Delaware Co.*,
    998 F.2d 1224 (3d Cir. 1993)...........................................................37, 40

*Precision Assocs., Inc. v. Panalpina World Transp., (Holding) Ltd.*,
    2013 WL 6481195 (E.D.N.Y. Sept. 20, 2013), *adopted by*,
    2014 WL 298594 (E.D.N.Y. Jan. 28, 2014) ........................................21

*Precision Assocs., Inc. v. Panalpina World Transp. Ltd.*,
    2011 WL 7053807 (E.D.N.Y. Jan. 4, 2011), *report & recommendation
    adopted*, 2012 WL 3307486 (E.D.N.Y. Aug. 13, 2012)............11, 21, 42, 45, 46

*Ross v. Citigroup, Inc.*,
    630 F. App'x 79 (2d Cir. 2015) .............................................................39

*Simsbury-Avon Preservation Club, Inc. v. Metacon Gun Club, Inc.*,
    575 F.3d 199 (2d Cir. 2009)....................................................................9

*Tunica Web Advertising v. Tunica Casino Operators Ass'n, Inc.*,
    496 F.3d 403 (5th Cir. 2007) ..................................................................9

*United States v. Kemp*,
    500 F.3d 257 (3d Cir. 2007)..................................................................43

Highly Confidential – Subject to Protective Order

*United States v. Macchia*,
  35 F.3d 662 (2d Cir. 1994)................................................................................43

*United States v. Portela*,
  167 F.3d (1st Cir. 1999) ...................................................................................43

*United States v. Sargent Elec. Co.*,
  785 F.2d 1123 (3d Cir. 1986).............................................................................45

*United States v. Smith*,
  82 F.3d 1261 (3d Cir. 1996)...............................................................................43

*Valspar Corp. v. E.I. du Pont de Nemours & Co.*,
  873 F.3d 185 (3d Cir. 2017)..........................................................10, 11, 39, 41

*Williamson Oil Co. v. Phillip Morris USA*,
  346 F.3d 1287 (11th Cir. 2003) ...................................................................28, 29

*Zenith Radio Corp. v. Matsushita Elec. Indus. Co.*,
  513 F. Supp. 1100 (E.D. Pa. 1981), *aff'd in part, rev'd in part sub nom. In re
  Japanese Elec. Prod. Antitrust Litig.*, 723 F.2d 238 (3d Cir. 1983), *rev'd sub
  nom. Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574 (1986).....................35

## RULES

Fed. R. Civ. P. 56(a) ..........................................................................................9

Fed. R. Evid. 403 .............................................................................................17

Highly Confidential – Subject to Protective Order

## INDEX OF EXHIBITS[1]

| Exhibit | Description of Exhibits |
|---------|------------------------|
| 1 | Excerpt from Aleksey Likvornik Deposition Transcript, dated November 30, 2022 (Taro) |
| 2 | Excerpts from Napoleon Clark (Actavis 30(b)(6)) Deposition Transcripts, dated June 28 and 29, 2023 (Vols. 1-2) |
| 3 | Excerpt from Anand Shah (Taro 30(b)(6)) Deposition Transcript, dated July 18, 2023 (Vol. 1) |
| 4 | Excerpts from Anand Shah Deposition Transcript, dated October 13, 2021 (Taro) |
| 5 | Excerpts from Anand Shah (Sun 30(b)(6)) Deposition Transcripts, dated July 25 and 26, 2023 (Vols. 1-2) |
| 6 | Excerpts from Andrew Boyer Deposition Transcript, dated August 3, 2023 (Vol. 2) (Actavis) |
| 7 | Excerpts from Anthony Thomassey ("CW-6") Deposition Transcripts, dated July 18-21 and 24, 2023 and August 10, 2023 (Vols. 1-6) (Aurobindo, Fougera) |
| 8 | Excerpts from Barbara Purcell Deposition Transcripts, dated September 28-29, 2022 (Vols. 1-2) (Bausch) |
| 9 | Excerpts from Billy Seiden Deposition Transcript, dated June 21, 2022 (Taro) |
| 10 | Excerpts from Carol Patterson (Greenstone 30(b)(6)) Deposition Transcript, dated May 10, 2023 |
| 11 | Excerpts from Christopher Bihari ("CW-3") Deposition Transcripts, dated May 31, June 1, June 6, and June 8, 2023 (Vols. 1-2, 4-5) (Fougera/Sandoz) |
| 12 | Excerpts from David Berthold Deposition Transcripts, dated November 17-18, 2021 (Vols. 1-2) (Lupin) |
| 13 | Excerpts from David Myers Jr. Deposition Transcript, dated May 15, 2023 (Actavis) |
| 14 | Excerpts from David Workman Deposition (Mylan 30(b)(6)) Transcript, dated August 3, 2023 |
| 15 | Excerpts from Della Lubke ("CW-4") Deposition Transcripts, dated May 16 and 19, 2023 (Vols. 1 and 3) (Fougera/Sandoz) |

---

[1] Unless otherwise indicated, all exhibits are those attached to the Statement of Undisputed Material Facts in Support of Defendants' Joint Motion for Summary Judgment on Overarching Conspiracy Claims ("SUMF").

Highly Confidential – Subject to Protective Order

| Exhibit | Description of Exhibits |
|---|---|
| 16 | Excerpts from Dmitrey Kuznetsov (Glenmark 30(b)(6)) Deposition Transcripts, dated September 14-15, 2023 (Vols. 1-2) |
| 17 | Excerpts from Douglas Boothe Deposition Transcripts, dated June 29-30, 2023 (Vols. 1-2) (Perrigo, Actavis) |
| 18 | Excerpts from Pierre-Yves Cremieux, Ph.D. Deposition Transcript, dated October 7, 2024 (Defendants' Expert)[2] |
| 19 | Excerpts from Edward Allen Lowther Deposition Transcript, dated October 27, 2021 (Mylan, Amneal) |
| 20 | Excerpts from Elizabeth Guerrero Deposition Transcript, dated May 11, 2023 (Taro, West-Ward) |
| 21 | Excerpt from Erika Vogel-Baylor Deposition Transcript, dated September 3, 2021 (Vol. 2) (G&W) |
| 22 | Excerpts from Frederick Warren-Boulton, Ph.D. Deposition Transcripts, dated April 15-16, 2024 (Vols. 1-2) (States' Expert) |
| 23 | Excerpts from Frederick Warren-Boulton, Ph.D. Deposition Transcript, dated October 22, 2024 (States' Expert) |
| 24 | Excerpt from Gregory Bell, Ph.D. Deposition Transcript, dated July 16, 2024 (Lannett Expert) |
| 25 | Excerpts from Gurpartap "G.P." Singh Sachdeva Deposition Transcript, dated March 2, 2021 (Vol. 1) (In re: Allergan Generic Drug Pricing Securities Litigation, Civil Action No. 2:16-9449) (KSH) (CLW)) [AGN-MDL00012482] (Sun) |
| 26 | Excerpts from James Booydegraaff Deposition Transcript, dated August 12, 2021 (Perrigo) |
| 27 | Excerpts from James Grauso Deposition Transcripts, dated May 4-5, 2023 (Vols. 1-2) (G&W, Aurobindo, Glenmark) |
| 28 | Excerpt from James Josway Deposition Transcript, dated June 1, 2023 (Vol. 1) (Taro) |
| 29 | Excerpts from James Luce Deposition Transcript, dated May 2, 2023 (Amneal) |
| 30 | Excerpts from Jason Gensburger (Lupin 30(b)(6)) Deposition Transcript, dated May 22 2023 (Vol. 1) |

---

[2] Defendants will provide complete expert reports at the Court's request.

Highly Confidential – Subject to Protective Order

| Exhibit | Description of Exhibits |
|---------|------------------------|
| 31 | Excerpts from Jeffrey Johnson Deposition Transcript, dated June 16, 2023 (Glenmark) |
| 32 | Excerpts from Jill Nailor Deposition Transcripts, dated June 30 and July 1, 2022 (Vols. 2-3) (Greenstone) |
| 33 | Excerpts from John Wesolowski Deposition Transcript, dated November 17, 2022 (Vol. 1) (Perrigo) |
| 34 | Excerpt from Jolene Rae McGalliard Deposition Transcript, dated January 26, 2023 (Lannett, Glenmark, Sun) |
| 35 | Excerpt from Joseph Niemi Deposition Transcript, dated February 17, 2023 (Wockhardt) |
| 36 | Excerpt from Karen Andrus Deposition Transcript, dated June 30, 2021 (Wockhardt) |
| 37 | Excerpts from Kathryn McCormack Deposition Transcript, dated July 29, 2021 (Perrigo) |
| 38 | Excerpt from Kevin McElfresh Deposition Transcript, dated August 25, 2021 (Mylan) |
| 39 | Excerpts from Kevin Smith Deposition Transcripts, dated September 12-13, 2023 (Vols. 1-2) (Lannett) |
| 40 | Excerpts from Kian Kazemi Deposition Transcript, dated November 10, 2022 (Sandoz) |
| 41 | Excerpts from Kurt Orlofski Deposition Transcript, dated January 11, 2023 (Vol 1) (G&W) |
| 42 | Excerpts from Lance Wyatt Deposition Transcript, dated November 2, 2022 (Mylan) |
| 43 | Excerpts from Lisa Glazer (Bausch 30(b)(6)) Deposition Transcripts, dated June 27 and 28, 2023 (Vols. 1-2) |
| 44 | Excerpts from Mary Saharyan Deposition Transcript, dated June 8, 2022 (Bausch) |
| 45 | Excerpt from Matthew Whitt (Mylan 30(b)(6)) Deposition Transcript, dated August 1, 2023 [Mylan30(b)(6)] |
| 46 | Excerpts from Michael Vezza ("CW-1") Deposition Transcripts, dated May 1, 2, 9 and 11, 2023 (Vols. 1-2, 5-6) (Sandoz) |
| 47 | Excerpts from Paul Dutra ("CW-5") Deposition Transcripts, dated August 29-31, 2023 (Vols. 2-4) (Glenmark) |
| 48 | Excerpts from Paul Hoeksema Deposition Transcript, dated September 2, 2021 (Perrigo) |

Highly Confidential – Subject to Protective Order

| Exhibit | Description of Exhibits |
|---------|------------------------|
| 49 | Excerpts from Paul Krauthauser ("CW-2") Deposition Transcripts, dated July 31, August 1, and August 3, 2023 (Vols. 1-3) (Sandoz, Rising) |
| 50 | Excerpts from Paul McMahon (Aurobindo 30(b)(6)) Deposition Transcripts, dated August 8-9, 2023 (Vols. 1-2) |
| 51 | Excerpts from Paul McMahon (30(b)(1)) Deposition Transcripts, dated March 29 and 30, 2022 (Vols. 1-2) (Aurobindo) |
| 52 | Excerpts from Robert Cunard Deposition Transcript, dated June 21, 2023 (Aurobindo) |
| 53 | Excerpts from Robert Foley Deposition Transcript, dated June 2, 2021 (Lannett) |
| 54 | Excerpt from Ronald Greenblatt (G&W 30(b)(6)) Deposition Transcript, dated August 16, 2023 |
| 55 | Excerpt from Scott Brick Deposition Transcript, dated May 10, 2023 (Taro) |
| 56 | Excerpts from Scott Koenig Deposition Transcript, dated May 5, 2023 (Vol. 2) (Wockhardt) |
| 57 | Excerpts from Shannon Rivero Deposition Transcript, dated August 11, 2022 (Amneal) |
| 58 | Excerpts from Terrance Coughlin Deposition Transcript, dated July 13, 2023 (Glenmark) |
| 59 | Excerpt from Timothy Gustafson Deposition Transcript, dated August 23, 2022 (Aurobindo) |
| 60 | Excerpts from Tony Rosa (Amneal 30(b)(6)) Deposition Transcripts, dated May 16 and 17, 2023 (Vols. 1-2) |
| 61 | Excerpts from Tracy Sullivan Deposition Transcript, dated September 21, 2023 (Vol. 2) (Lannett) |
| 62 | Excerpts from Carol Patterson Deposition Transcript, dated May 11, 2023 (Greenstone) |
| 63 | Excerpts from Michael Perfetto Deposition Transcripts, dated June 29 and 30, 2022 (Vols. 1-2) (Taro, Actavis) |
| 64 | Excerpts from Robert Watson Deposition Transcript, dated December 15, 2023 (Wockhardt) |
| 65 | Excerpts from Second Amended Expert Report of Frederick R. Warren-Boulton, Ph.D., dated February 20, 2024 |
| 66 | Excerpts from Expert Reply Report of Frederick Warren-Boulton, Ph.D., dated August 26, 2024 |

Highly Confidential – Subject to Protective Order

| Exhibit | Description of Exhibits |
|---------|------------------------|
| 67 | Excerpts from Expert Report of Daniel L. Rubinfeld, dated April 26, 2024 |
| 68 | Excerpts from Expert Report of Gregory K. Bell, Ph.D., dated April 26, 2024 |
| 69 | Excerpts from Experts Report of Lauren J. Stiroh, Ph.D., dated April 26, 2024 |
| 70 | Excerpts from Expert Report of Pierre-Yves Cremieux, Ph.D., dated October 24, 2024 |
| 71 | Excerpts from Responses and Objections of Actavis Elizabeth, LLC, Actavis Holdco U.S. and Actavis Pharma, Inc. to Plaintiffs' Second Set of Interrogatories Directed to Defendants, dated October 16, 2020 |
| 72 | Excerpts from Lannett Company, Inc.'s First Supplemental Responses and Objections to Plaintiffs' First Set of Interrogatories Directed to Defendants, dated August 10, 2018 |
| 73 | Excerpts from Responses and Objections to Defendant Aurobindo Pharma USA, Inc.'s First Set of Requests for Admissions to Plaintiff States |
| 74 | Excerpts from Responses and Objections to Bausch's First Set of Requests for Admission Directed to Plaintiff States, dated October 31, 2023 |
| 75 | Excerpts from Responses and Objections to Actavis Holdco US, Inc., Actavis Elizabeth LLC, and Actavis Pharma, Inc's Second Set of Request for Admissions to the State of Connecticut, dated October 7, 2024 |
| 76 | Safeway Presentation re. "Medco Opportunity" dated June 1, 2012 [ALB-RXGEN-000224893-900] |
| 77 | Email from D. Salemi to C. Stacey et al., re: "DM & Catalina excess of $500K NOW…", dated November 9, 2011 [ALB-RXGEN-000358594-98] |
| 78 | Letter from K. Belton to D. Hill re: Aurobindo Pharma USA's price proposal on Pioglitazone HCL and Metformin products to Cardinal, dated February 8, 2013 [APUSA-003521100-01] |
| 79 | Barbara Purcell Deposition Exhibit D-0002, Handwritten notes from the Journal of Barbara Purcell [VALMDL-000773285] |
| 80 | Email from P. Dutra to M. Blashinsky; J. Cangemi; J. Brown re: "Fluticasone @ ABC - ROFR," dated January 9, 2013 [GMK-MDL-000153121] |
| 81 | Email from J. Brown to P. Dutra re: "Optisource Fluticasone ROFR," dated September 20, 2013 [GMK-MDL-000283639] |

Highly Confidential – Subject to Protective Order

| Exhibit | Description of Exhibits |
|---------|------------------------|
| 82 | Taro Presentation titled "Taro Analysis of Sun Portfolio: Products where share can be increased and/or prices adjusted" [TARO_000224150] |
| 83 | Email from P. Dutra to J. Brown re: "Fluticasone," dated July 31, 2013 (Dutra Dep. Def. Ex. 8) [GMK-MDL-000334246] |
| 84 | Email from M. Blashinsky to P. Dutra re: "Dermis," dated April 3, 2013 (Dutra Dep. Def. Ex 32) [GMK-MDL-000427917] |
| 85 | Spreadsheet titled "MarketShare_Price elasticity 4-3-2013.xlsx" attached to Ex. 84, April 3, 2013 email from M. Blashinsky to P.Dutra [GMK-MDL-000427918 (Dutra Dep. Exhibit 32A)] [GMK-MDL-000427918 (Dutra Depo Exhibit 32A)] |
| 86 | Email from M. Blashinsky to P. Dutra re: "Meeting with Taro regarding OTC opportunities," dated March 1, 2013 [GMK-MDL-000427945] |
| 87 | Email from M. Blashinsky to P. Birdy re: "Derm price increases in Q4…," dated February 18, 2013 [GMK-MDL-000993735] |
| 88 | Current Report (SEC Form 8-K) of Impax Labooratories, Inc., dated November 3, 2014 [GENERICS-FL-000012333] |
| 89 | Email from S. Picca to P. Dutra re: "Golf Things," dated August 29, 2012 [GMK-MDL-001033977] |
| 90 | Email from M. Perfetto to M. Blashinsky re: "Calcitrene," dated July 12, 2013 [GMK-MDL-001290958] |
| 91 | Email from J. Lefebvre to P. Dutra re: "what time/where do you want to meet?" dated September 19, 2012 [GMK-MDL-001708634] |
| 92 | Email from J. Lefebvre to P. Dutra et al. re: "Pre CPhl Old Head Site Visit," dated September 18, 2012 [GMK-MDL-001708651] |
| 93 | Email from P. Dutra to M. Falkin re: "Golf," dated April 17, 2013 [GMK-MDL-001724395] |
| 94 | Document Titled "Manufacturer FAQs to support Walgreens Boots Alliance Development GmbH Group Purchasing Agreement" [GMK-MDL-001978957] |
| 95 | Credit Suisse report titled "Oral Contraceptives-how generics have performed so far?" dated April 3, 2012 by A. Aggarwal [GMK-MDL-002531698] |

Highly Confidential – Subject to Protective Order

| Exhibit | Description of Exhibits |
|---|---|
| 96 | Email from W. Kennally to C. Patterson re: "Price Increase for Clinda Phosphate," dated November15, 2012 [GNST-005765557] |
| 97 | Email from R. Sanderson to S. Khanna and C. Patterson re: "Unsolicited bid," dated December 8, 2011 [GNST-006116804] |
| 98 | Email from A. Greenblatt to E. Mittleberg and K. Orlofski re: "G&W Follow up," dated April 11, 2014 [GWCT-HHR-0000094300] |
| 99 | Excerpts from Luis Jorge Deposition Transcript, dated May 24, 2022 (Sandoz) |
| 100 | Kroger presentation titled "Drug/GM 2013 Collaborative Planning: L'Oreal Paris," dated October 2012 [KRG-RXGEN-000851142-67] |
| 101 | Kroger Co. presentation titled "Drug/GM Collaborative Planning 2011" [KRG-RXGEN-000861413-23] |
| 102 | Kroger Management/ASP Performance Excellence Discussion for L. Lutz, 2012 Fiscal Year [KRG-RXGEN-001497633-37] |
| 103 | Email from R. Canole to A. Slizewski re: "Latanoprost-Strategy," dated August 15, 2011 [PER-MDL-000322398] |
| 104 | Email from S. Kochan to J. Papa, re: "Paddock ANDA for Latanoprost Ophthalmic approval; Files petition on Fenofibrate," dated July 21, 2011 [PER-MDL-000361454] |
| 105 | Sandoz Presentation titled "Improving Sales and Profitability at Sandoz: Growth Opportunities Presentation," dated December 2, 2013 [SDZCTAG-01489454] |
| 106 | Email from N. Greenberger to I. Moller and P. Goldschmidt re: "McKinsey KAM deck," dated September 21, 2013 [SDZMDL-007771836] |
| 107 | Sandoz Presentation titled "Walgreens Account Plan," dated September 18, 2013 [SDZMDL-007771851] |
| 108 | Email from S. Kirk to J. Kedrowski re: "Divestitures / Canada," dated August 28, 2012 [SMT-008180967] |
| 109 | Email from C. Akyempon to B. Seiden re: "Taro Pharma Proposal," dated September 7, 2012 [SMT-008317249] |
| 110 | Email from P. Venugopal to D. Berman re: "ANDA divestment process," dated July 20, 2014 [SMT-008620033] |

Highly Confidential – Subject to Protective Order

| Exhibit | Description of Exhibits |
|---|---|
| 111 | Email from P. Venugopal to K. Orlofski re: "Revised offer," dated February 1, 2015 [SMT-008626997] |
| 112 | Email from A. Davis to P. Venugopal re: "Introduction," dated July 23, 2014 [SMT-008645357] |
| 113 | Email from J. Glazer to P. Venugopal re: "Sun/Ranbaxy," dated November 26, 2014 [SMT-008657182] |
| 114 | Marketing and Distribution Agreement between Glenmark Generics Ltd, Glenmark Generics Inc., USA and Taro Pharmaceuticals U.S.A., dated May 5, 2010 [SMT-009511610] |
| 115 | Product Development and Commercialization Collaboration Agreement between Elan Pharma International Limited and Taro Pharmaceuticals North America, Inc., dated February 19, 2014 [SMT-009886020] |
| 116 | Email from K. Sundaram to M. Perfetto re: "Integration," dated August 22, 2014 [SMT-010240122] |
| 117 | Email from P. Venugopal to V. Soni re: "Products to be divested as per FTC & CCI by Sun pharma & Ranbaxy post Merger," dated February 2, 2015 [SMT-010306536] |
| 118 | Email from A. Aprahamian to K. Orlofski re: "ANDA Review," dated June 26, 2013 [SMT-010499255] |
| 119 | Email from A. Aprahamian to S. Cline re: "Feverall divesture opportunity," dated July 4, 2013 [SMT-010499846] |
| 120 | Email from A. Aprahamian to K. Ostrander re: "Taro / Sandoz BD Follow Up," dated November 14, 2014 [SMT-010541792] |
| 121 | Email from A. Aprahamian to J. Eaton re: "Taro Forecast - Revised ( December 2015 Units )," dated August 27, 2015 [SMT-010718205] |
| 122 | Email from M. Perfetto to T. Coughlin, re: "Phone Call," dated August 27, 2013 [SMT-010947583] |
| 123 | Email from M. Perfetto to K. Orlofski, re: "Conversation Follow-Up," dated February 28, 2013 [SMT-010952347] |
| 124 | Email from M. Perfetto to D. Boothe re: "Otc person," dated June 18, 2013 [SMT-010958132] |
| 125 | Email from A. Likvornik to A. Aprahamian re: "Divestitures - Mutual CDA," dated April 18, 2014 [SMT-011577287] |

Highly Confidential – Subject to Protective Order

| Exhibit | Description of Exhibits |
|---------|------------------------|
| 126 | Email from J. Eaton to B. Purcell re: "Accepted: CONFIRMED: Conf Call Valeant/Perrigo re Latest Developments with Fenofibrate Agreement and Ethypharma," dated December 1, 2015 [VALMDL-000004599] |
| 127 | Email from A. Greenblatt to B. Purcell and E. Vogel-Baylor re: "Meeting on Tuesday - CDA," dated March 30, 2014 [VALMDL-001537695] |
| 128 | Email from M. Saharyan to J. Grauso re: "I'm sorry your team lost Uncle Jimmie," dated November 15, 2010 [VALMDL-001757498] |
| 129 | Image attached to Ex. 128 (Email from M. Saharyan to J. Grauso, dated November 15, 2010) [VALMDL-001757499] |
| 130 | Exclusive License, Marketing and Distribution Agreement between Perrigo New York, Inc. and Valeant Pharmaceuticals Ireland, dated September 30, 2013 [VALMDL-000377455] |
| 131 | Mylan Presentation titled, "Opportunity Analysis Workshop Presentation," dated August 18, 2014 [MYLGP0001251856] |
| 132 | Mylan Pricing & Contracts Department New Employee Training Handbook [MYLGP0002696599] |
| 133 | Email from B. Purcell to D. Jorn Re: "Actavis/ Acyclovir," dated April 8, 2014 [VALMDL-001532816] |
| 134 | Email from K. Andrus to M. Craney and S. Koenig re: "Taro dramatic price increase on Clobet effective today," dated June 3, 2014 [Wockhardt-CB-000000263434] |
| 135 | Email from S. Koenig to K. Andrus re: "Clobetasol," dated August 6, 2014 [Wockhardt-CB-000001418980] |
| 136 | McKinsey & Co. Presentation titled "Corporate Center Redesign" prepared for Sun Pharmaceutical Industres LTD and Taro Pharmaceutical Industries Ltd., dated July 15, 2011 [SMT-008169416] |
| 137 | Article titled "Pharma's first-to-market advantage" by M. Cha and F. Yu, McKinsey & Company, published September 1, 2024 at https://www.mckinsey.com/industries/life-sciences/our-insights/pharmas-first-to-market-advantage |
| 138 | Excerpts from Marc Falkin Deposition Transcript, dated October 20, 2022 (Vol. 3) (Actavis) |

Highly Confidential – Subject to Protective Order

| Exhibit | Description of Exhibits |
|---------|------------------------|
| 139 | Email from B. Purcell to R. Strzeminski Re: "Matt's Resume," dated March 7, 2012 (Barbara Purcell Deposition Exhibit D-0001) [VALMDL-000780182] |
| 140 | Declaration of Hector Armando Kellum, dated November 20, 2024 (Sandoz) |
| 141 | Sandoz August 2014 IMS NSP - Market Share Report, dated August 2014 [SDZCTAG-06074516] |
| 142 | Sandoz January 2015 IMS NSP - Market Share Report, dated January 2015 [SDZCTAG-00319522] |
| 143 | Email from T. Wohn to A. Kellum et. Al re: "Pricing Committee Meeting Charter" dated August 31, 2012 [SDZCTAG-02128397] with attachment, Sandoz Presentation titled "Sandoz Pricing Committee," dated August 2012 [SDZCTAG-02128398] |
| 144 | Email from D. Herbig to S. Koenig Re: "Daily Allocation Report," dated Nov. 17, 2014 [WOCKHARDT-CB-000001410669] |
| 145 | Email from K. Andrus to J. Lopez re: "Clobetasol TOPICAL MOD 08 14 2014 KAJL," dated August 14, 2014 [Wockhardt-CB-000000364443] |
| 146 | Email from J. Bowles to S. Koenig and Karen Andrus Re: "EES Supply," dated April 5, 2011 [Wockhardt-CB-000003154314-15] |
| 147 | Letter from K. Andrus to R. Meehan dated April 12, 2011 [Wockhardt-CB-000003139547] |
| 148 | Email from A. Hathaway to J. Dean re: "CVS Ex Phenytoin Sodium OA 6.18.14," dated June 19, 2014 [MYLGP0001239248] |
| 149 | Email from G. Freed to U. Makkuni et al. re: "Walmart Ex Phenytoin OA 7.10.14," dated July 11, 2014 [MYLGP0010496591] |
| 150 | Email from T. Bebout to T. Fournier, re: "Walgreens Ex Phenytoin Sodium OA 4.28.14-UPDATED USAGES," dated May 14, 2014 [MYLGP0008573041] |
| 151 | Email from K. Andrus to S. Koenig Re: "Clobetasol Termination," dated Sept. 2, 2014 [Wockhardt-CB-000001676637] |
| 152 | Email from J. Grauso to S. Blake Re: "Ceph Products for Re-Introduction 4-1-13," dated April 1, 2013 [Wockhardt-CB-000003131335] |

Highly Confidential – Subject to Protective Order

| Exhibit | Description of Exhibits |
|---------|------------------------|
| 153 | CVS Caremark Corporation Generic Pharmaceuticals Business Standards effective Sept. 1, 2007 [APUSA-001945343] |
| 154 | Red Oak Sourcing, LLC Generic Pharmaceuticals Business Standards, dated 2014 [Wockhardt-CB-000002149954] |
| 155 | Promotion Agreement between Valeant Pharmaceuticals North America LLC, Valeant International Bermuda, and Watson Laboratories, Inc. dated April 4, 2013 [VALMDL-001532817] |
| 156 | Excerpts from John Lopez Deposition Transcript, dated June 22, 2023 (Wockhardt) |
| 157 | Excerpts from Gopalakrishnan Venkatesan (Wockhardt 30(b)(6)) Deposition Transcripts, dated September 20, 2023 (Vol. 1) |
| 158 | Excerpts from Jay Albanese, Ph.D. Deposition Transcript, dated January 4, 2024 (States' Expert) |
| 159 | Expert Report of Bonnie Levin, Ph.D., dated April 26, 2024 |
| 160 | Blogpost titled "What's Your Fair Share: Using Market Analysis to Help Banks Prioritize Tiers of Transformations across Their Branch Networks", by Sean Keathley, dated October 17, 2019 (Warren-Boulton Dep. Def. Ex. 18) |
| 161 | Article Titled "Is Your Hotel Getting Its Fair Share?" from RevenueHub.com (2024) (Warren-Boulton Dep. Def. Ex. 19) |
| 162 | Email from A. Kellum to B. Christensen re: "Desonide," dated November 6, 2012 |
| 163 | Excerpt from Wayne Fallis Deposition Transcript, dated June 23, 2021 (Sun) |
| 164 | Email from R. Sanderson to C. Versichele et al. re: "McKesson OneStop Generics Newsletter: Retail Edition," dated December 22, 2011 [GNST-006361580] |
| 165 | Excerpt from Alicia Evolga (Lannett 30(b)(6)) Deposition Transcript, dated October 25, 2023 |
| 166 | Excerpt from Supplemental Reply Report of Fredrick Warren-Boulton Ph.D., dated November 19, 2024 |

Highly Confidential – Subject to Protective Order

## INTRODUCTION

In their Amended Complaint, the States promised to establish an overarching conspiracy using "many thousands of documents produced by dozens of companies and individuals throughout the generic pharmaceutical industry," "11 million telephone call records from hundreds of individuals," and "information provided by several confidential cooperating witnesses who were directly involved in the conduct alleged herein." Compl. ¶ 18. That has turned out to be an empty promise.

The States cannot proffer any direct evidence of the claimed overarching conspiracy. Even the States' cooperating witnesses—the witnesses who, if any overarching conspiracy existed, could be expected to say so in clear, definitive, and unequivocal terms—rejected the notion that any overarching conspiracy existed. Those witnesses also testified that there were independent reasons to engage in the conduct that the States attribute to conspiracy. Nor can the States point to circumstantial evidence from which any overarching conspiracy involving all Defendants and ninety-eight drugs could be inferred. To the contrary, the undisputed evidence shows that market share for the Drugs at Issue fluctuated in ways that are inconsistent with the alleged overarching conspiracy.

This lack of evidence—direct or otherwise—should not be surprising. On its face, the States' allegations are, to put it mildly, implausible. The States allege that each of the sixteen manufacturers participated in one or more of ninety-eight different alleged conspiracies, involving different alleged co-conspirators, different time frames, and different drugs.[1] They then assert that

---

[1]    The Complaint refers to eighty alleged individual conspiracies, but the States' expert counts different strengths and formulations of each drug at issue, resulting in ninety-eight different products. *See* SUMF ¶ 1 & n.1; Ex. 65 ¶ 7; *see also* Ex. 67 ¶ 12, n.11 (complaint "often does not indicate specific forms or strengths in its allegations," and when the different forms and

Highly Confidential – Subject to Protective Order

those individual conspiracies comprise a single, overarching conspiracy to allocate market share for all ninety-eight Drugs at Issue.  But they lack evidence of an allocation agreement.  Instead, they cling to scattered references to the term "fair share" in documents—even though the record shows that Defendants had no common understanding of what that term means and the States' expert conceded that the references do not prove the alleged overarching conspiracy.

Further, neither the States nor their experts attempt to reconcile the broad overarching conspiracy they allege with the facts that the Drugs at Issue had distinct uses, different demand and supply factors, and were sold by vastly differently situated Defendants, the majority of whom manufactured only a handful of the Drugs at Issue.  At bottom, the States are attempting to use a baseless overarching conspiracy claim to threaten each Defendant with massive joint and several liability for every alleged individual conspiracy.

Despite years of discovery, the States cannot create a triable issue as to even the most basic elements of their alleged overarching conspiracy.  For example, the States have no evidence of the terms to which Defendants supposedly agreed when they entered the alleged overarching conspiracy.  The States claim that Defendants agreed to allocate market share based on some ever-changing, undefined principle of "fair share."  But the undisputed evidence shows that Defendants did not even have a shared common understanding of what constitutes a "fair share" (an inherently vague concept) in any particular market.  Indeed, the States' own economist, Frederick Warren-Boulton, conceded that "fair share . . . is in the eye of the beholder."  Without a common understanding of how the alleged conspiracy was supposed to operate, the overarching conspiracy

---

strengths are considered, there are ninety-eight Drugs at Issue).  These alleged individual conspiracies will be the subject of later summary judgment motions.

Highly Confidential – Subject to Protective Order

claim fails.  That actual market shares varied wildly from the States' (shifting) concept of allocation confirms the lack of any conscious commitment by any Defendant.

The States' overarching conspiracy claim cannot survive summary judgment because it lacks support in the millions of documents, terabytes of data, and hundreds of depositions that comprise the record in this case.  The record—including testimony from the States' own economic expert and "cooperating witnesses"—shows that there was no overarching conspiracy.  The States simply draw a circle around over two dozen disparate Defendants and allege individual conspiracies across dozens of different products that serve different markets in a haphazard effort to conjure a purported industry-wide conspiracy.  The overarching conspiracy claim should be dismissed so that the Court and the parties can turn their attention where it belongs—charting a path forward for addressing the individual conspiracy claims.

## FACTUAL BACKGROUND

### A.    The States' Amorphous Overarching Conspiracy Theory

The States allege that twenty-six corporate[2] and ten individual Defendants entered into conspiracies to "unreasonably restrain[] trade, artificially inflat[e] and maintain[] prices, and

---

[2]    Of the twenty-six corporate defendants, there are sixteen unique corporate families.  For example, the Complaint names three corporate entities for Actavis including Actavis Holdco, Actavis Pharma, Inc., and Actavis Elizabeth LLC.  *See* Compl. ¶¶ 32-35.  Additionally, the Complaint names multiple entities for Amneal (*See* Compl. ¶¶ 36-38), Bausch (Compl. ¶¶ 41-43), Mallinckrodt (Compl. ¶¶ 56-58), and Mylan (Compl. ¶¶ 60-62).  The Complaint collectively refers to Greenstone and Pfizer, Greenstone's former parent company, as "Greenstone" on the theory that the Greenstone is Pfizer's alter ego, *id.* ¶¶ 49-51, which is a theory the MDL Court dismissed at the pleading stage, *see In re Generic Pharms. Pricing Antitrust Litig.*, 2023 WL 2244685, at *7 (E.D. Pa. Feb. 27, 2023).  The Complaint also collectively refers to Fougera and Sandoz as "Sandoz" because Fougera is a wholly owned subsidiary of Sandoz, which in turn was part of the Novartis group of companies during the relevant period.  *See* Compl. ¶¶ 29-31.  Additionally, in June 2024, Sun Pharma completed a merger with Taro Pharmaceuticals.  If counted once, there are sixteen unique corporate Defendants.  In this brief, references to the sixteen corporate defendants refer to all twenty-six corporate entities.

Highly Confidential – Subject to Protective Order

reduc[e] competition in the generic pharmaceutical industry throughout the United States, including but not limited to the markets for at least 80 different generic drugs." Compl. ¶ 19. The States do not allege that any one Defendant participated in every individual conspiracy because no Defendant participated in every market, and most participated in relatively few.

This motion focuses on a specific aspect of the Complaint: The States have manufactured an "overarching conspiracy" claim in an attempt to hold every corporate defendant jointly and severally liable for all of the purported damages arising out of the alleged individual conspiracies. Although the States' pleadings, discovery responses, and expert reports are inconsistent in describing the alleged overarching conspiracy, the Complaint essentially alleges that the overarching conspiracy is reflected by this graphic representation:



Compl. ¶ 133. No evidence exists that this document was shared with or seen by any Defendant other than Taro.

The States have since distanced themselves from the allegation that Defendants shared a common understanding of what constitutes a "fair share." Their expert on the alleged overarching conspiracy, Dr. Warren-Boulton, conceded that the internal Taro document was not a blueprint for the alleged overarching conspiracy but instead reflected "Taro's understanding of what the fair share agreement is." Ex. 22 at 575:12-20; *see also id.* at 562:10-563:10. Warren-Boulton further

Highly Confidential – Subject to Protective Order

acknowledged that there is no evidence that any other Defendant adopted that understanding or that Taro ever shared its matrix with any other Defendant. *Id.* Nor is there evidence that decisionmakers at Taro abided by the percentages listed in the document, or that any other Defendant agreed with the share division described in the Taro document. To the contrary, Warren-Boulton testified that there was not necessarily any consensus among Defendants on what constitutes "fair share"; that the understanding of the phrase could differ by market and by Defendant; and that he was not opining that Defendants entered into an overarching "fair share" conspiracy. *See id.* at 517:8-14, 528:7-531:01.

Warren-Boulton retreated even further in his two reply reports. First, he opined that Defendants did not agree on any allocation for any individual drug market until *after* the first price increase in that market. Ex. 66 ¶ 90 ("What is necessary is that the participants at each individual drug *eventually* come to the same understanding." (emphasis added)). In other words, the States' expert conceded that there was no pre-existing overarching agreement concerning shares for any particular market prior to the formation of each alleged individual conspiracy. Warren-Boulton further opined that, within the individual drug markets, the alleged allocation "agreement" was reached by each Defendant not by express agreement, but "tacitly," by accepting an amount of business that each independently believed other participants felt would likely be proper. *Id.* ¶ 94. Then, in his latest reply report, he opined that "it is not appropriate to use" the Taro document "to limit all fair share agreements to the particular shares listed in that document." Ex. 166 ¶ 8.

Warren-Boulton further diluted the claimed overarching conspiracy in his recent testimony, stating that the supposed overarching conspiracy did not involve any agreement on specific market shares or any agreement on what constitutes a "fair share." *See* Ex. 23 at 180:5-181:7, 185:11-20. Instead, he explained, each Defendant supposedly had a loose, "implicit"

Highly Confidential – Subject to Protective Order

understanding that it should respond to a price increase in an individual drug market by not taking too much additional market share because that might cause the price increase to be rescinded. *Id.* at 177:23-178:8. But Warren-Boulton could not identify how much share a competitor might view as "fair" in any particular market because (as he conceded) each Defendant had a different understanding of what "fair share" entails. *Id.* at 238:4-22. According to Warren-Boulton, "fair share . . . is in the eye of the beholder." *Id.* at 195:18-19. Notably, Warren-Boulton conceded that it might be rational for each Defendant to follow a price increase in the absence of any conspiracy. *Id.* at 199:8-200:4.

The other supposed basis for the alleged overarching conspiracy is testimony from "cooperating witnesses," *i.e.*, former employees of a select few Defendants "who were directly involved in the conduct alleged," Compl. ¶¶ 18, 75, and who are now cooperating with the States in this litigation. While their testimony is disputed in many respects, there is one common and undisputed fact: Each cooperating witness who was asked about the States' alleged overarching conspiracy denied its existence. *See* Point II(A)(1), *infra*. No cooperating witness testified in a way that supports the States' theory. And the States ultimately asked a number of witnesses (none of whom had admitted the existence of an overarching conspiracy) about their understanding of the general term "fair share." Those witnesses' responses demonstrated that they each had their own different understanding of that term. *See id.*

### B.    The Defendants and Products Involved in the Alleged Overarching Conspiracy

The States' "overarching conspiracy" claim alleges a single agreement among all sixteen Defendants concerning all ninety-eight Drugs at Issue. Compl. ¶¶ 19, 20; Ex. 65 ¶ 7; SUMF ¶ 1. These drugs compete in different markets, treat a variety of conditions, come in different dosage strengths, are administered in different forms (e.g., creams, lotions, gels, ointments, drops,

Highly Confidential – Subject to Protective Order

capsules, tablets, and solutions), and the price for any given drug does not depend on the pricing of others. *See* SUMF ¶¶ 9-14; Ex. 65 ¶ 7.[3]  Neither the States nor their experts have demonstrated any connection among the prices or market shares for these distinct products that do not treat the same health conditions.  Many of these products do not treat dermatological conditions, which are the products at the core of the States' alleged overarching conspiracy.  *See, e.g.*, SUMF ¶ 10.

There are also significant differences among the sixteen corporate defendants, including with respect to their pricing and bidding policies, their means of manufacturing or obtaining the Drugs at Issue, and their shares and positions in their respective markets.  *Id.* ¶¶ 4-8, 22-26.  Defendants also vary widely in terms of the number of Drugs at Issue they sold during the relevant time periods:



---

[3]    For example, Carbamazepine ER Tablets are an oral medication that prevents and controls seizures, relieves nerve pain, and treats mental and mood disorders such as bipolar disorder and schizophrenia.  Compl. ¶ 201.  Imiquimod Cream, by contrast, treats actinic keratosis or precancerous growths on the skin.  *Id.* ¶ 212.  And Latanoprost Drops are eyedrops that treat ocular hypertension.  *Id.* ¶ 1353.

Highly Confidential – Subject to Protective Order

Ex. 67 ¶ 133 & fig. 3;[4] SUMF ¶ 5.  Three Defendants—Amneal (Phenytoin Sodium ER), Lannett (Acetazolamide), and Teligent (Econazole Nitrate)— sold only *one* of the ninety-eight Drugs at Issue and are named in only a single alleged individual conspiracy.  Ex. 67 ¶ 133 & fig. 3; SUMF ¶ 6.  Nine Defendants are alleged to have participated in drug-specific conspiracies involving five or fewer Drugs at Issue.  Ex. 67 ¶ 133 & fig. 3 (the three single drug companies, plus Lupin (2), Bausch (2), Wockhardt (2), Mallinckrodt (4), Mylan (4), and Aurobindo (5)).  Only three Defendants sold more than thirty of the Drugs at Issue, and all but one sold fewer than half.[5]  Ex. 67 ¶ 133 & fig. 3; SUMF ¶ 5.  Neither the States nor their experts developed evidence during discovery indicating that any Defendant coordinated with any other Defendant regarding the dozens of drugs it did not sell (or suggesting that any Defendant had an incentive to do so).

### C.    Procedural History

The States filed this action, which they call the "Dermatology Action," on June 10, 2020.  The case was transferred to the Eastern District of Pennsylvania as part of a broader multi-district litigation ("MDL").  *See* Docket No. 3:20-cv-00802-MPS (D. Conn.), ECF No. 9.

On September 9, 2021, the States filed an Amended Complaint.  *See* Docket No. 2:20-cv-03539-CMR (E.D. Pa.), ECF No. 62 ("Compl.").  Although the Dermatology Action was the last of three similar actions filed by the States, then-presiding Judge Rufe selected it as a "bellwether"

---

[4]    With leave of Court, Defense expert Pierre-Yves Cremieux replaced Daniel Rubinfeld as Defendants' expert. ECF No. 396.  On October 24, 2024, Cremieux issued a report adopting the opinions and analyses disclosed in the Rubinfeld Report in full and offered additional opinions rebutting the Warren-Boulton reply report. Ex. 70.

[5]    These numbers are based on the States' expert's approach of treating different forms and dosages as different drugs.  *See* n.1, *supra.*  Mylan, for example, only has three products at issue with unique active pharmaceutical ingredients, while Aurobindo only has two.

case to move forward first. *See In re Generic Pharmaceuticals Pricing Antitrust Litigation*, Docket No. 2:16-md-02724-CMFR (E.D. Pa.) (hereinafter "MDL Dkt."), ECF No. 1769.

On January 31, 2024, the Dermatology Action and the States' other actions were remanded to this District. *See In re: Generic Pharmaceuticals Pricing Antitrust Litigation*, MDL 2724, 16-md-2724 (E.D. Pa. June 10, 2020) (hereinafter "MDL Dkt").

## <u>LEGAL STANDARD</u>

A court may grant summary judgment if "there is no genuine issue as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). Where, as here, the nonmovant bears the burden of proof at trial, the movant may demonstrate the absence of any genuine issue by "point[ing] to a lack of evidence to go to the trier of fact on an essential element of the nonmovant's claim." *Simsbury-Avon Preservation Club, Inc. v. Metacon Gun Club, Inc.*, 575 F.3d 199, 204 (2d Cir. 2009). A court may grant summary judgment if the nonmovant fails to "come forward with admissible evidence sufficient to raise a genuine issue of fact." *Id.*

An antitrust plaintiff may defeat summary judgment by proffering direct evidence of a conspiracy—evidence that "is explicit and requires no inferences to establish the proposition or conclusion being asserted." *In re Baby Food Antitrust Litig.*, 166 F.3d 112, 118 (3d Cir. 1999); *see also Mayor & City Council of Balt. v. Citigroup, Inc.*, 709 F.3d 129, 136 (2d Cir. 2013). In the absence of direct evidence, a plaintiff must resort to circumstantial evidence, which is "evidence [that] requires additional inferences in order to support a claim of conspiracy." *Tunica Web Advertising v. Tunica Casino Operators Ass'n, Inc.*, 496 F.3d 403, 409 (5th Cir. 2007). Antitrust law "limits the range of permissible inferences" from circumstantial evidence, however. *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 588 (1986); *see also PepsiCo, Inc. v. Coca-Cola Co.*, 315 F.3d 101, 104 (2d Cir. 2002) (summary judgment is "particularly favored" in antitrust cases "because of the concern that protracted litigation will chill

pro-competitive market forces"). To overcome summary judgment, any circumstantial evidence must "tend[] to exclude the possibility that the alleged conspirators acted independently," *Matsushita*, 475 U.S. at 588. "[A]mbiguous evidence—that is, evidence that is equally consistent with independent conduct as with illegal conspiracy"—is insufficient to create a genuine dispute of fact on a conspiracy claim. *Anderson News*, *L.L.C. v. Am. Media, Inc.*, 899 F.3d 87, 98 (2d Cir. 2018). If the evidence is "in equipoise, then summary judgment must be granted against the plaintiff." *Id.*; *see also Monsanto Co. v. Spray-Rite Serv. Corp.*, 465 U.S. 752, 763-64 (1984).

Additional considerations apply where, as here, the markets at issue are oligopolies.[6] Oligopolistic companies are "interdependent," meaning that a company making a decision "must take into account the anticipated reaction of" the other companies. *In re Flat Glass Antitrust Litig.*, 385 F.3d 350, 359-60 (3d Cir. 2004).[7] For example, if a company in an oligopoly announces a price increase, each of its competitors will decide whether it is better off following the price increase after considering, unilaterally, the anticipated reactions of the oligopolists, including the first mover. *Valspar Corp. v. E.I. du Pont de Nemours & Co*., 873 F.3d 185, 191-92 (3d Cir. 2017); *see also see In re Mylan N.V. Secs. Litig.*, 666 F. Supp. 3d 266, 318 (S.D.N.Y. 2023) ("Oligopolies pose a special problem under § 1 because rational independent actions taken by oligopolists can be nearly indistinguishable from horizontal price fixing," resulting from

---

[6]   The ninety-eight drugs at issue were sold in markets involving an average of three competitors per quarter during the time periods at issue. *See* SUMF ¶ 15; Ex. 65 at Appendix G, Table 2. The vast majority of those markets—88%—"never had more than five competitors and more than half never had more than three competitors throughout the alleged conduct period." *See* Ex. 67 ¶ 50; SUMF ¶ 16.

[7]   The States' expert economist, Dr. Warren-Boulton, concedes these points. Ex. 22 at 98:17-99:1 (acknowledging that firms in oligopolies "will always try to take into account what they expect their rivals to do"); Ex. 23 at 245:23-246:14 ("firms are expected to and do respond to a price increase by acting in their individual self-interest taking into account what they expect of their rivals").

interdependence, which occurs because "any rational decision [in an oligopoly] must take into account the anticipated reaction of the other firms").

Each competitor will also recognize that, if others do not follow the price increase, the first company could simply revoke the increase, leaving market shares the same but eliminating an opportunity to increase prices and therefore profits.  *Id.*  "The upshot is oligopolists may maintain supracompetitive prices through rational, interdependent decision-making, as opposed to unlawful concerted action, if the oligopolists independently conclude that the industry as a whole would be better off by raising prices." *In re Chocolate Confectionary Antitrust Litig.*, 801 F.3d 383, 397 (3d Cir. 2015).[8]   Evidence of such parallel conduct can give rise to an inference of conspiracy sufficient to survive summary judgment only if it is "so unusual" that "no reasonable firm would have engaged in it" even within an oligopolistic market.  *Valspar*, 873 F.3d at 193, 195; *see also Mylan*, 666 F. Supp. 3d at 318 ("Summary judgment against plaintiffs is warranted if a court finds it difficult to hold that the parallel acts tend to exclude the possibility of independent action." (internal quotations omitted)).

A plaintiff alleging that defendants engaged in an "overarching conspiracy" based on a series of alleged individual conspiracies must show more than simply the existence of multiple individual conspiracies to survive summary judgment.  *See, e.g.*, *In re Ins. Brokerage Antitrust Litig.*, 618 F.3d 300, 348-51 (3d Cir. 2010) (affirming dismissal of alleged "industry-wide conspiracy"); *Precision Assocs., Inc. v. Panalpina World Transp. Ltd.*, 2011 WL 7053807, *27-30 (E.D.N.Y. Jan. 4, 2011), *report & recommendation adopted*, 2012 WL 3307486 (E.D.N.Y.

---

[8]   The States' expert agrees.  Ex. 22 at 96:7-102:9; Ex. 23 at 227:3-9 (agreeing that market participants can unilaterally come to a "shared understanding"); *id.* at 245:23-246:14 ("firms are expected to and do respond to a price increase by acting in their individual self-interest taking into account what they expect of their rivals," including by choosing not to seek greater market share).

Aug. 13, 2012) ("ten local conspiracies" were "'parallel' conduct" that, absent more, could not prove an overarching conspiracy). Instead, a plaintiff must point to evidence that "establish[es] a 'larger picture from which inferences of a wider conspiracy can be drawn.'" *Dahl v. Bain Cap. Partners, LLC*, 937 F. Supp. 2d 119, 135 (D. Mass. 2013) (quoting *In re Iowa Ready-Mix Concrete Antitrust Litig.*, 768 F. Supp. 2d 961, 975 (N.D. Iowa 2011)). Accordingly, courts consider whether the record shows: "(1) a common goal, (2) interdependence among the participants, and (3) overlap among the participants." *Id.* If it does not, an overarching conspiracy claim fails at summary judgment. *Id.*

Finally, an antitrust plaintiff cannot shortcut its evidentiary burden by pointing to evidence involving only some defendants. In other words, a court may not infer that all defendants consciously committed to a conspiracy merely because some defendants did. *See, e.g.*, *Hinds Cnty. v. Wachovia Bank N.A.*, 620 F. Supp. 2d 499, 514 (S.D.N.Y. 2009) (investigations into one defendant resulting in financial penalty for that defendant did not "make an antitrust claim plausible as to" any other defendant); *cf. H.L. Hayden Co. of N.Y., Inc. v. Siemens Med. Sys., Inc*., 879 F.2d 1005, 1016-17 (2d Cir. 1989) (affirming summary judgment on § 1 overarching conspiracy claim where "boycott proposals in a trade publication, one of nineteen anonymous responses to a questionnaire," were "not connected to any defendant").

## <u>ARGUMENT</u>

Despite years of extensive discovery,[9] no direct evidence shows the existence of an overarching conspiracy allegedly involving sixteen defendants to allocate market share for ninety-

---

[9]   To date, Defendants have produced tens of millions of documents and 3.2 terabytes of data. The parties collectively have exchanged thousands of written discovery requests and taken 275 party and third-party depositions, including of cooperating witnesses. *See* Joint Status Report, 3:16-cv-02056-MPS, ECF No. 447 (May 17, 2024) at 8.

Highly Confidential – Subject to Protective Order

eight different drugs.  To the contrary, each of the witnesses who would have had knowledge of an overarching conspiracy denied knowing anything about an overarching agreement or otherwise failed to offer evidence supporting the existence of the alleged overarching conspiracy.  And not a single document supports the existence of an overarching conspiracy.

Likewise, the circumstantial evidence is insufficient to raise an inference of an overarching conspiracy.  The undisputed evidence shows that market shares for the ninety-eight Drugs at Issue fluctuated significantly during the alleged overarching conspiracy period in ways that are inconsistent with the alleged conspiracy.  What's more, the States' expert conceded that Defendants did not even share a common understanding of what constitutes a "fair" market share for any particular drug.  That concession is fatal to the States' claim that the sixteen Defendants agreed to divide up each of the ninety-eight drug markets at issue based on each participant's "fair share."

To the extent the States attempt to knit together their allegations of ninety-eight individual conspiracies into an overarching conspiracy, that effort fails because they cannot proffer any evidence of a shared common goal among the sixteen alleged conspirators; interdependence among the alleged individual conspiracies; or overlap among the participants.  In later briefing, Defendants will address the States' individual conspiracy claims.  But for purposes of this motion, summary judgment is warranted on the overarching conspiracy claim because the States cannot stitch their allegations of individual conspiracies into a single overarching claim.

## I.    THE OVERARCHING CONSPIRACY IS IMPLAUSIBLE.

An overarching, multi-product conspiracy is implausible where, as here, the products at issue compete in different markets, the conspiracy includes dozens of products that any given defendant did not sell, and it is "not clear how all of the defendants *could* compete" in each market

Highly Confidential – Subject to Protective Order

allegedly subject to the overarching conspiracy. *In re Iowa Ready-Mix Concrete Antitrust Litig.*, 768 F. Supp. 2d 961, 976 (N.D. Iowa 2011). Under those circumstances, no defendant would have an incentive to enter a conspiracy involving products it did not manufacture and markets in which it did not participate. *Id.*

Here, the record shows that the ninety-eight Drugs at Issue differ from each other and are sold in separate markets. *See e.g.*, SUMF ¶¶ 9-14; Ex. 65 ¶ 29 (stating that "each generic drug comprises a relevant product market"). The States try to gloss over those differences by alleging that all of the drugs are "generic topical products." *See* Compl. ¶ 1. But simply because drugs are topical products does not make them substitutable. In any event, "a substantial fraction of the Drugs at Issue—at least 28 of the 98—are not topical products." Ex. 67 ¶ 112 ("23 of the 98 Drugs at Issue are oral solids and 5 are suppositories."); SUMF ¶ 9. Some Defendants produced few, if any, topical products during the relevant period. *See* Ex. 69 ¶ 7. For example, Mylan sold three products at issue, none of which are topical products used to treat dermatological conditions, *id.* ¶ 8; Lannett and Amneal sold only one drug apiece, and each were capsules to treat non-dermatological conditions like epilepsy or glaucoma, Compl. ¶¶ 801-02, 892-93; and Aurobindo's two Drugs at Issue were oral medicines used to treat bacterial infections and diabetes, respectively, not dermatological conditions. *Id.* ¶¶ 1163, 1190, 1205; *see also* SUMF ¶ 9. Accordingly, the alleged overarching conspiracy is not "focused primarily on collusion in generic topical product markets." *Contra* Memo. of Law In Support of Plaintiffs' Motion for Partial Summary Judgment at 3, *Connecticut v. Sandoz Inc.*, 3:20-CV-00802 (D. Conn. Sept. 16, 2024). Instead, the alleged overarching conspiracy covers a wide variety of drugs that compete in different markets, treat different conditions, are administered differently, and have different dosages and strengths. SUMF ¶¶ 9-15. More significantly, the factors that influence prices and market share are distinct for many

Highly Confidential – Subject to Protective Order

of the Drugs at Issue. *Id.* ¶¶ 14, 18-19, 25-26, 33-36, 42-45.

Most Defendants sold only a few of the ninety-eight Drugs at Issue, and there is no evidence that any Defendant had any interest in the markets in which it did not participate. For instance, nine Defendants sold five or fewer of the Drugs at Issue, and three Defendants sold only one.[10] The States have not developed any evidence that these or any other Defendants involved themselves in any of the dozens of drug markets in which they did not participate. There would be no logical reason for those Defendants to join such a conspiracy. Nor would it make sense for any Defendant to join an overarching conspiracy involving only some of the drugs they manufactured, but not others.

These sorts of facts make an alleged overarching, multi-product conspiracy implausible. *See Ready-Mix Concrete*, 768 F. Supp. 2d at 976. Where an alleged overarching conspiracy is implausible, a plaintiff can survive summary judgment only by presenting "strong direct or circumstantial evidence" that tends to exclude the possibility of independent action. *Anderson News*, *L.L.C. v. Am. Media, Inc.*, 899 F.3d 87, 99 (2d Cir. 2018); *see also AD/SAT Div. of Skylight, Inc. v. Associated Press*, 181 F.3d 216, 235 (2d Cir. 1999) (if an alleged agreement "simply makes no economic sense," then a plaintiff "must come forward with more persuasive evidence to support [its] claim than would otherwise be necessary"). The States cannot meet their burden here.

## II. THE RECORD DOES NOT SUPPORT THE ALLEGED OVERARCHING CONSPIRACY.

### A. There Is No Direct Evidence of an Overarching Conspiracy.

No direct evidence shows that Defendants entered an overarching conspiracy. *First*, no

---

[10]   The companies selling five or fewer are Amneal, Lannett, Teligent, Lupin, Bausch, Wockhardt, Mallinckrodt, Mylan, and Aurobindo. *See* SUMF ¶¶ 6-7; Ex. 67 ¶ 133. Amneal (Phenytoin Sodium ER), Lannett (Acetazolamide), and Teligent (Econazole Nitrate) each sold only one.

Highly Confidential – Subject to Protective Order

witness testified that an overarching agreement to allocate market share existed. Even the States' cooperating witnesses testified that it *did not* exist. *Second*, no deferred prosecution agreement or guilty plea provides direct evidentiary support because, at most, they concern (*i*) a limited subset of individual drug conspiracies; (*ii*) a limited time period; and (*iii*) a limited number of alleged conspirators.[11] They do not establish the existence of a decade-long overarching market-share agreement involving ninety-eight drugs and sixteen manufacturers; in fact, they say nothing about an alleged overarching conspiracy. *Third*, no document even suggests the existence of an overarching conspiracy.

### 1. *No Witness Testified to the Existence of an Overarching Agreement.*

No witness testimony substantiates the existence of the alleged overarching "fair share" agreement. Even the States' "cooperating witnesses" denied the overarching conspiracy claim. The States settled with six witnesses for fractions of pennies on the alleged dollar. Those cooperating witnesses were supposedly the key facilitators of the alleged overarching agreement. Compl. ¶¶ 75, 76. Yet not one of them testified to the existence of the alleged overarching agreement. Instead, they testified that they had no knowledge of the overarching agreement alleged by the States.[12] For example:

- Cooperating witness Michael Vezza, who was at Sandoz during the relevant period and is identified as "CW-1" in the Complaint, testified that he was unaware of any "overarching conspiracy with all of the companies" or "one big agreement among all of those companies." Ex. 46 at 703:10-704:10.

- Cooperating witness Della Lubke, identified as "CW-4" in the Complaint, who was at Sandoz, testified that she did not know of a "larger overarching agreement among all of

---

[11]   While a limited amount of other generic manufacturers entered DPAs, only two of those DPAs (1) concern Drugs at Issue (and only a limited subset of such drugs); and (2) were entered by Defendants in this case.

[12]   The cooperating witnesses' testimony is disputed in other respects that are not relevant to this motion.

those companies." Ex. 15 at 527:9-528:4.

- Cooperating witness Paul Krauthauser, identified in the Complaint as "CW-2" and a former Director of National Accounts for Sandoz and Senior Vice President of Sales & Marketing for Rising (who was allegedly involved in individual agreements spanning twenty-five different products), testified that he was not aware of any overarching agreement involving all Defendants. Ex. 49 at 451:15-452:22.

- Cooperating witness Paul Dutra, or "CW-5," a former Executive Vice President of North American Generics for Glenmark, never testified to an overarching agreement.

Cooperating witnesses also testified to facts contrary to an overarching conspiracy. For instance:

- Cooperating witness Christopher Bihari, or "CW-3" in the Complaint, a National Accounts Executive for Fougera who later joined, and hid his misconduct from, Sandoz, testified that an alleged agreement with one other Defendant was "a la carte" and that any discussions were on a "product-by-product basis and situation-by-situation." Ex. 11 at 1264:12-1265:21.

- Cooperating witness Michael Vezza similarly testified that "every product has its own story or nuance," Ex. 46 at 1575:23-1577:8, and that "every product had a unique situation." *Id.* at 1971:3-1973:3.

- Cooperating witness Anthony Thomassey, identified as "CW-6" in the Complaint and Director of National Accounts for Fougera and later Aurobindo, was allegedly involved in individual conspiracies involving thirty products while at Fougera and two while at Aurobindo.[13] He testified that during his time at Fougera, any alleged agreement with one other Defendant was "on a product-by-product basis to make an agreement on that product[.]" Ex. 7 at 925:16-20. Any nominal references by Thomassey in his deposition to an "overarching agreement" merely describe separate alleged bilateral agreements that he claimed were reached between his former employer (Fougera) and *one* of the other Defendants, not an industry-wide, all-encompassing conspiracy or one covering all drugs and Defendants in the Complaint. *Id.* at 919:16-925:20, 1192:15-19, 1196:10-1199:19; 1203:19-23; 1206:5-9.[14]

---

[13]  When asked by the States about any improprieties during his brief nine-month stint at Aurobindo, Thomassey testified that he had no recollection of "communicat[ing] with competitors about competitively sensitive information." Ex. 7 at 563:23-564:2.

[14]  Not only does Thomassey's testimony fail to create a genuine dispute of fact as to the overarching conspiracy claim, but the testimony on that point is inadmissible under Federal Rule of Evidence 403. █████████████████████████████████████████████████████████████████████████████████████████████████████

Highly Confidential – Subject to Protective Order

Other fact witnesses have denied that any overarching agreement existed. For example:

- **Actavis**: Ex. 6 at 369:4-9 ("Q. To your knowledge, did Actavis ever make any decision to pursue or not pursue specific customers or market share based on an agreement with a competitor? A. No, not that I'm aware of.")

- **Amneal**: Ex. 57 at 483:15-484:1 ("Q. Are you aware of any agreements between Amneal and any competitor about the pricing of any generic product? A: No. I am unaware of any agreements regarding pricing of drugs. Q. Are you aware of any agreements between Amneal and any competitor about coordinating on customers or bids for any generic product? A. No, I am unaware of any agreements regarding that.").

- **Aurobindo**: Ex. 27 at 439:15-440:1 ("[W]e never had any agreements with any other competitors on customers or pricing of any product.").

- **Bausch**: Ex. 8 at 580:19-586:7 (We did not "ever agree[] with a Bausch competitor regarding the price," "about coordinating in any way the bidding," or "regarding which customers Bausch would supply and which customers a competitor would supply").

- **Fougera**: Ex. 40 at 179:8-180:15 (Kazemi testified that, to his knowledge, Fougera did not ever make "any decisions with respect to pricing based on any agreement reached with a competitor," and that he did not ever communicate with competitors about contract pricing or market allocation.)

- **Glenmark**: Ex. 27 at 469:10-21 (Grauso's testimony that he "might have been speaking to [his] friends, who happened to work for other manufacturers," but "[n]o agreements on products, customers, or pricing w[ere] ever reached – ever made."); *see also* Ex. 31 at 320:2-6, 322:5-8 (Johnson testified that he was not aware "of any agreements between Glenmark and any other manufacturer of generic drugs on coordinating the bids for any product," and that he did not ever communicate with competitors about pricing)

- **Greenstone**: Ex. 32 at 1020:4-9 ("Q. Did you ever form any agreement with any employee of any of these companies regarding the allocation of any market or customer of any drug product? A. No, I did not.").

---

*See* Ex. 159 ¶¶ 25-30. Defendants' expert, neuropsychologist Dr. Bonnie Levin of the University of Miami Medical School, ████████████████████████████████
████████████████████████████████████████████████████████
████████████████████████████████████████████████████████
█████████████████████████████████████ *Id.* ¶¶ 13, 61. The States have not rebutted this expert testimony. Nor can they. For the reasons explained by Dr. Levin, ████████████████████████████████████████████████████████████
██████████████████████████████████████████████████

- **Lannett**: Ex. 39 at 787:13-21 ("Q. Mr. Smith, did you ever reach an agreement with any competitor of Lannett with respect to whether or not to respond to a customer's RFP? A: Absolutely not.").

- **Lupin**: Ex. 12 at 795:19-796:14 ("Q. Did you ever enter an agreement to fix prices on these calls? A. No, I did not.").

- **Mylan**: Ex. 42 at 176:15-22 (denying entering into any agreement with a competitor regarding prices for generic drugs).

- **Perrigo**: Ex. 17 at 522:20-24 (Q: "Have you ever agreed with a competitor regarding the price that either your company or the competitor company would charge for a generic drug?" A: "No.").

- **Sandoz**: Ex. 140 ¶ 57 ("I am unaware of any overarching, industrywide conspiracy with respect to generic drugs.  I did not participate in an overarching industrywide conspiracy with respect to generic drugs and am unaware of any Sandoz employee participating in an overarching, industrywide conspiracy with respect to generic drugs."); *see also* Ex. 99 at 213:3-214:1 (Jorge's testimony that he was unaware of any agreement with competitors).

- **Taro**: Ex. 1 at 256:4-256:21 ("To my knowledge, there were no agreements on any of our products.").

- **Wockhardt**: Ex. 56 at 515:2-11 ("Q. Have you ever reached an agreement with anyone at a competitor about which customers Wockhardt would supply and which customers a competitor would supply? A. No.").

Where, as here, alleged co-conspirators all deny the existence of the alleged conspiracy, courts have granted summary judgment in defendants' favor.  *See, e.g.*, *In re Citric Acid Litig.*, 996 F. Supp. 951, 955-56 (N.D. Cal. 1998) (granting summary judgment in defendant's favor, relying in part on testimony from alleged conspirator denying the existence of the alleged conspiracy), *aff'd*, 191 F.3d 1090 (9th Cir. 1999).  Dismissal is particularly warranted here because the cooperating witnesses and others repeatedly testified that ceding market share to new competitors, declining to bid in response to competitor price increases, and, for certain drugs, raising prices—the conduct underlying the States' alleged "fair share" conspiracy—was the product of independent action.  *See, e.g.*, SUMF ¶¶ 31-45; Ex. 140 ¶ 30 ("During the time I served

on the Pricing Committee, every recommendation was based on an evaluation of Sandoz's independent self-interest and backed by market analysis.").  The States cannot identify any witness, cooperating or otherwise, to support their characterization of this behavior as evidence of the alleged overarching conspiracy.

### 2.    The DPAs Are Not Evidence of an Overarching Conspiracy.

Two corporate Defendants entered deferred prosecution agreements ("DPAs") and one individual Defendant entered a guilty plea related to certain Drugs at Issue, but neither the DPAs nor the plea support the existence of the alleged overarching conspiracy.[15]  In fact, none of these documents discusses or contains admissions concerning the alleged overarching conspiracy.

The Department of Justice's ("DOJ") investigation into the generic industry was wide reaching.[16]  But, in the end, the relevant DPAs describe only bilateral agreements between two Defendants involving a small handful of drugs.  Plaintiffs' Motion for Partial Summary Judgment Exs. A, C, *Connecticut v. Sandoz Inc.*, No. 3:20-cv-00802 (D. Conn. Sept. 16, 2024).  The relevant DPAs do not include a claim for overarching conspiracy and involve no Defendant other than Sandoz and Taro.  *Id.*  A jury could not infer that sixteen Defendants consciously committed to an overarching conspiracy involving ninety-eight drugs merely because two Defendants signed DPAs concerning a limited subset of the Drugs at Issue.  *See Hinds Cnty. v. Wachovia Bank N.A.*, 620 F.

---

[15]   The States recognized this point when they recently limited their motion for partial summary judgment to the specific facts contained in the DPAs and guilty plea and did not even suggest that such evidence constituted direct evidence of an overarching conspiracy.  *See* States' MSJ at 21 (limiting motion to what is at issue in the DPA).  The States' partial motion for summary judgment, though limited in scope, is flawed, and the relevant Defendants will oppose the motion under the schedule established by the Court.

[16]   For example, the subpoena to one generic manufacturer broadly requested documents and grand jury testimony concerning "any communication or correspondence with any competitor or an employee of any competitor in the sale of generic prescription medications." Ex. 88.

Supp. 2d 499, 514 (S.D.N.Y. 2009) (allegations of investigation into single defendant were "too general to make an antitrust claim plausible as to any specific Defendant other than" the one being investigated); *cf. In re Interest Rate Swaps Antitrust Litig.*, 261 F. Supp. 3d 430, 478 (S.D.N.Y. 2017) (evidence of conspiracy must be assessed as to each defendant individually).

The States must prove that *each* "individual defendant actually joined and participated in the conspiracy." *In re Processed Egg Prods. Antitrust Litig.*, 821 F. Supp. 2d 709, 719-20 (E.D. Pa. 2011). Courts have held that admitting participation in a conspiracy during one period of time is "not direct evidence that Defendants entered into a conspiracy before" that period. *In re Packaged Seafood Prods. Antitrust Litig.*, 2023 WL 3046073, at *10 (S.D. Cal. Apr. 21, 2023). And admitting participation in a conspiracy involving "certain drugs" is not evidence of participation in a different conspiracy involving different drugs. *In re Mylan NV Sec. Litig.*, 666 F. Supp. 3d at 322 n.22. The DPAs therefore do not support a finding that Sandoz or Taro entered the alleged overarching conspiracy, and they do not show that the fourteen other corporate Defendants did, either.

*Precision Associates, Inc. v. Panalpina World Transport (Holding) Ltd.* is instructive. 2011 WL 7053807 (E.D.N.Y. Jan. 4, 2011), *adopted by*, 2012 WL 3307486 (E.D.N.Y. Aug. 13, 2012). There, the government "chose to charge individual conspiracies, some of which [were] similar to the local conspiracies in the Complaint, [but] not a global conspiracy." *Id*. at *30 & n.24. The plaintiffs argued that guilty pleas regarding the individual conspiracies rendered an overarching conspiracy plausible. *Id.* The court disagreed, holding that pleas involving individual conspiracies do not support a "finding of a global conspiracy." *Id.*;[17] *see also Ready-Mix Concrete*,

---

[17] The court subsequently reaffirmed this reasoning. *See Precision Associates, Inc. v. Panalpina World Transport, (Holding) Ltd.*, 2013 WL 6481195, at *41 (E.D.N.Y. Sept. 20, 2013), *adopted by*, 2014 WL 298594 (E.D.N.Y. Jan. 28, 2014).

Highly Confidential – Subject to Protective Order

768 F. Supp. 2d at 975 (refusing to infer overarching conspiracy from plea related only to "certain bilateral agreements"). The same holds true here. The fact that certain Defendants signed a DPA discussing bilateral agreements involving certain drugs does not create a triable issue as to whether any Defendant entered into an overarching conspiracy.[18]

### 3.    No Documentary Evidence Shows an Overarching Conspiracy.

Despite Defendants' production of tens of millions of documents and 3.2 terabytes of data, the States rely on a single document to support their overarching conspiracy claim: an internal Taro document titled "Market Share—Fair Unit Share assumptions" that was never circulated outside of Taro. Compl. ¶ 133 (citing Ex. 82); *see also* Ex. 22 at 520:4 (calling the document his "favorite one"). The States alleged in the Complaint that this document contains a "graphic representation of [the] industry-wide understanding" of the supposed industry-wide fair-share agreement. Compl. ¶ 133.

The document at issue contains two charts. The first shows percentages labeled "ratio of generic net price to brand WAC."

---

[18]    For the same reasons, former Sandoz employee Armando Kellum's guilty plea is not probative of the alleged overarching conspiracy. Kellum's plea encompasses even narrower conduct than the DPAs. *See* Plaintiffs' Motion for Partial Summary Judgment Ex. E at 3-5, *Connecticut v. Sandoz Inc.*, No. 3:20-cv-00802 (D. Conn. Sept. 16, 2024) (limited to facilitating agreement with Taro as to clobetasol and nystatin triamcinolone cream between March 2013 and June 2015). Kellum himself has denied the existence of an overarching conspiracy. Ex. 140 ¶ 57.

Highly Confidential – Subject to Protective Order

| | | Price Discount - Ratio of Generic Net Price to Brand WAC | | | | | | |
|---|---|---|---|---|---|---|---|---|
| | | Order of Entry Grid | | | | | | |
| | | Number of Competitors | | | | | | |
| Number of Competitors | | 1 | 2 | 3 | 4 | 5 | 6 | 7 |
| Order of Entry | 1 | 75% | 65% | 65% | 40% | 13% | 13% | 13% |
| | 2 | | 65% | 65% | 40% | 13% | 13% | 13% |
| | 3 | | | 50% | 40% | 13% | 13% | 13% |
| | 4 | | | | 40% | 13% | 13% | 13% |
| | 5 | | | | | 13% | 13% | 13% |
| | 6 | | | | | | 13% | 13% |
| | 7 | | | | | | | 13% |

The second shows percentages labeled "fair unit share assumptions" for each of the first through seventh competitors to enter a drug market:

| | | Market Share - Fair Unit Share assumptions | | | | | | |
|---|---|---|---|---|---|---|---|---|
| | | Order of Entry Grid | | | | | | |
| | | Number of Competitors | | | | | | |
| Number of Competitors | | 1 | 2 | 3 | 4 | 5 | 6 | 7 |
| Order of Entry | 1 | 100% | 60% | 45% | 35% | 30% | 30% | 30% |
| | 2 | | 40% | 35% | 30% | 25% | 25% | 25% |
| | 3 | | | 20% | 20% | 20% | 20% | 20% |
| | 4 | | | | 15% | 15% | 15% | 15% |
| | 5 | | | | | 10% | 10% | 10% |
| | 6 | | | | | | 10% | 10% |
| | 7 | | | | | | | 10% |
| | Total | 100% | 100% | 100% | 100% | 100% | 100% | 100% |

Compl. ¶¶ 133-34; Ex. 82. There is no evidence that this document was ever shared with any other Defendant or that any other Defendant ever saw it or agreed with its assumptions.[19]

According to the States, the charts' "fair unit share assumptions" represent "an agreed upon code" that defined the supposed overarching conspiracy. Compl. ¶ 124. But undisputed evidence refutes the States' "code" theory. The undisputed testimony shows that the charts were not blueprints for an overarching conspiracy but instead contained assumptions held by some (but not all) Taro employees about how a market theoretically might behave. *See* Point III(B)(2)(a), *infra*; *see also, e.g.*, SUMF ¶¶ 47-48; Ex. 25 at 75:16-23, 78:1-79:9, 81:3-22 (the meaning varied); Ex.

---

[19]    Nor could they have agreed to it—the documents on which the States rely literally do not "add up": the total share allocations for both 6 and 7 competitors exceed 100%.

9 at 110:8-19,115:11-116:2 ("fair share" was an "academic exercise" rather than "reality" and meant an even split regardless of the number of competitors). Ultimately, even the States' expert economist conceded that the document at most describes "Taro's understanding of what the fair share agreement is" and acknowledged that there is no evidence that any other Defendant adopted that understanding. Ex. 22 at 575:12-20. He further conceded that "it is not appropriate to use" the Taro document "to limit all fair share agreements to the particular shares listed in that document." Ex. 166 ¶ 8.

The Taro document is not evidence of the States' alleged overarching conspiracy. And the fact that the States rely so heavily on a single document only goes to show the dearth of evidence demonstrating the alleged overarching conspiracy.

## B. The Circumstantial Evidence Does Not Create a Genuine Dispute of Fact Concerning the Overarching Conspiracy Claim.

Lacking any direct evidence of an overarching conspiracy, the States' burden is to proffer circumstantial evidence that both makes it more likely than not that Defendants entered the alleged overarching conspiracy and tends to exclude the possibility that Defendants acted independently. *See Matsushita*, 475 U.S. at 588. Because the States cannot meet that burden, summary judgment should be entered in Defendants' favor.

### 1. The Undisputed Market Share Evidence Contradicts the States' Overarching Conspiracy Claim.

The undisputed evidence shows that shares in the markets for the relevant drugs fluctuated in a manner that is inconsistent with the existence of the alleged overarching conspiracy. For example, relying on the Taro document, Warren-Boulton claims that the alleged agreement for a two-firm market was about "60% for the original entrant and 40% for the second entrant." *See*

Ex. 65 ¶ 187.[20]  But Warren-Boulton's analysis concedes that for more than one-third of the Drugs at Issue sold in two-firm markets, the market leader had a 70% to 99% share, not the 60% share supposedly agreed upon.  *Id.*, fig. 23.  The discrepancy is even starker in three-firm markets, where the alleged agreement would supposedly give the original entrant a 45% share.  *Id.*, fig. 26. Warren-Boulton nevertheless found that nearly 70% of the original entrant in three-party markets had shares either below 40% or above 50%.  *Id.* ¶ 190 & fig. 26.  Consistent with Warren-Boulton's findings, Cremieux concluded that, for all the Drugs at Issue, "the market share of at least one competitor is not within ten percentage points of the market shares specified in 'Taro's Fair Share Table' in at least one quarter during the alleged conduct period."  Ex. 70 ¶ 62; *id.* ¶ 65 (for 87% of Drugs at Issue, "at least one Defendant is not within 20 percentage points of the market shares specified in 'Taro's Fair Share Table' in at least one quarter during the alleged conduct period"). The States do not dispute this.

The undisputed evidence further shows that market shares for the ninety-eight Drugs at Issue were volatile during the alleged overarching conspiracy period, further contradicting any claim that Defendants agreed to stifle competition in those markets.  *See* SUMF ¶¶ 51-60; Ex. 65 ¶ 193.  For example, Warren-Boulton's analysis of the market share of Latanoprost demonstrates significant volatility.  There, the alleged conspiracy period of 2012 to 2016 began with Greenstone as the market leader with a ▮▮▮ share but ended with Greenstone tied for the lowest market share with less than ▮▮▮.  During that period, the leading position shifted twice, first to Bausch, then to Sandoz, which nearly doubled its share from about ▮▮▮ at the beginning of the period to about ▮▮▮ by the end.  Ex. 65 ¶ 193 & fig. 30.

---

[20]    Warren-Boulton has since abandoned this theory.  *See* Ex. 166 ¶ 8 ("[I]t is not appropriate to use" the Taro document "to limit all fair share agreements to the particular shares listed in that document.").



This evidence undercuts the suggestion that an alleged agreement existed that purportedly allowed the market share leader to maintain its position. Instead, the evidence adduced by the States' own expert shows that the market share leader did not maintain its position, and the different competitors did not have the market shares of the agreement alleged in the Complaint. *Compare* Compl. ¶ 134 (showing the purported agreed shares by the competitors). This evidence also shows that the alleged overarching conspiracy is illogical because no manufacturer would agree to an arrangement that resulted in its ceding market share to competitors. *See In re Domestic Airline Travel Antitrust Litig.*, 691 F. Supp. 3d 175, 194 (D.D.C. 2023) ("It would be contrary to [the alleged co-conspirators'] economic interests to participate in a conspiracy where [one co-conspirator] could increase production and market share at the expense of other co-conspirators."); *City of Moundridge v. Exxon Mobil Corp.*, 2009 WL 5385975, at *7 (D.D.C. Sept. 30, 2009) (same).

Clobetasol is another example. Warren-Boulton's graph displays comparable volatility

Highly Confidential – Subject to Protective Order

during the 2014-2017 alleged conspiracy period as compared to the preceding period.



In this example, a non-defendant (that has never been alleged to be a co-conspirator) started with the largest share of the market at ███, before sinking to ███ and later recovering to ███. Ex. 65 ¶ 193 & fig. 31.  Another competitor, Sandoz, started with the third-largest share of the market at ███, surpassed the non-defendant for the largest market share in early 2015, and ended with the largest market share at ███.  *Id.*  Meanwhile, a third competitor, Wockhardt, started with the second-largest share of the market at ███, dropped to ███, and later exited.[21]  *Id.*  At bottom, "it makes little sense to posit that [Wockhardt] would continue to participate in a conspiracy that cut [its] market share[] so dramatically," while other alleged co-conspirators captured additional (and

---

[21]    These are only a few examples of changes in market share that are inconsistent with the existence of the overarching conspiracy alleged.  *See also, e.g.*, Ex. 65 at Appendix D fig. 32 (betamethasone valerate mid-period entrant trading market-share lead with incumbent several times throughout the relevant period); *id.* fig. 55 (desonide cream mid-period entrants achieving over ███ of market share in a volatile market at different times); *id.* fig. 59 (mid-period entrant claiming the most market share for much of the relevant period).  The States' opposition must attempt to refute all of them.

Highly Confidential – Subject to Protective Order

substantial) market share. *Williamson Oil Co. v. Phillip Morris USA*, 346 F.3d 1287, 1321 (11th Cir. 2003); *Citric Acid*, 996 F. Supp. at 961 (alleged co-conspirator's capturing of market share made it "impossible to draw an inference of conspiracy").

Applying Warren-Boulton's (and the States') theory, this level of volatility could not reflect a "fair share" agreement because even Warren-Boulton conceded that he would expect to see "stable market shares and stable prices" in a world in which the alleged overarching conspiracy existed. *See* Ex. 22 at 530:19-531:1.

A comprehensive market-share analysis demonstrates substantial *instability* in market shares during the alleged overarching conspiracy period. *See* Ex. 67 ¶ 167 & figs. 8, 9; SUMF ¶¶ 55-60. The alleged "fair share" agreement supposedly rewarded those companies that entered a market earlier with larger shares than those who entered later. *See, e.g.*, Compl. ¶¶ 130-33. But 65% of the markets for Drugs at Issue did not follow the pattern alleged by the States.[22] *See* Ex. 67 ¶¶ 166-67 & figs. 8, 9; *see also* SUMF ¶¶ 51-60.

---

[22]    *See* Ex. 82.

Highly Confidential – Subject to Protective Order



Ex. 67 ¶ 167 & fig. 9.  For roughly one-third of the Drugs at Issue, the market share leader at the beginning of the alleged overarching conspiracy period had lost its market leader position just two quarters later.  *Id.* ¶ 215; *see also* SUMF ¶¶ 55-56.  And for roughly 40% of the Drugs at Issue, the market share leader at the beginning of the alleged overarching conspiracy period had lost its market leader position eight quarters later.  *See* Ex. 67 ¶¶ 213-15; *see also* SUMF ¶ 57.

This undisputed market share data eviscerates the States' theory that Defendants entered an overarching agreement to allocate an agreed-upon market share based on the manufacturers' order of entry.  The evidence shows that Defendants were not divvying up market share by entry order.  Instead, they were competing in a manner that caused fluctuations in market share that are inconsistent with the States' overarching conspiracy claim.  Such competition, and the resulting volatile market shares held by Defendants in various markets, would be "wholly inexplicable" if the alleged overarching agreement existed.  *Williamson Oil*, 346 F.3d at 1321.

Highly Confidential – Subject to Protective Order

### 2. *"Fair Share" is not Evidence of an Overarching Agreement.*

The States largely base their implausible overarching conspiracy claim on scattered references to the term "fair share" in documents. But discovery shows (*i*) there was no commonly accepted or understood definition or meaning of "fair share" among Defendants (something that Warren-Boulton claims is necessary but ultimately concedes is lacking here); and (*ii*) "fair share" is not a conspiratorial code word but rather a loose term of art used in a variety of industries as a rule-of-thumb performance benchmark. With no common understanding, there could be no agreement.

### a. The States Cannot Show that Industry Participants Ever Had a Common Understanding of the Term "Fair Share."

If Defendants did not share a common understanding of what constitutes a "fair share," they could not have reached an agreement to allocate the markets for ninety-eight different drugs. *See, e.g.*, *Anderson News*, 899 F.3d at 97-98 (actionable conspiracy claim requires "a unity of purpose or a common design and understanding, or a meeting of minds in an unlawful arrangement."). As both sides' experts agree, an overarching conspiracy can work only if there is "at least some consistent understanding" of how it will work. Ex. 22 at 523:4-22; *see also* Ex. 67 ¶ 119 (feasibility of a conspiracy "depends critically on a shared understanding of the parameters that are being agreed to"). As the States' expert testified, the alleged overarching conspiracy's "foundational assumption is that the entrant and the incumbent have the same expectation as to a fair share," both for themselves and for their counterpart. Ex. 22 at 527:2-5; *id.* at 563:5-10 (emphasizing need for "consistency" of fair-share understanding "within any one drug" market).[23]

---

[23]  Ex. 22 at 523:16-22 ("[I]f the expectations" of what constituted a fair share "differed significantly," the conspiracy would be "difficult to coordinate," leading to a "breakdown" as each entrant thought it "deserve[d] more customers" than the other alleged participants thought were warranted.).

Highly Confidential – Subject to Protective Order

The States' overarching conspiracy claim is therefore not viable because the undisputed record shows that Defendants had no common understanding of "fair share." As discussed above, the Taro document cited by the States says that a "fair share" in a two-manufacturer market means 60% share for the incumbent and 40% for the later entrant. Compl. ¶ 134; Ex. 67 ¶ 122; Ex. 65 ¶ 187 & fig. 24. Witnesses from other Defendants described different views of what constitutes a fair share in a two-player market, however. *See, e.g.*, SUMF ¶ 64; Ex. 15 at 79:16-80:1 (Sandoz employee testifying fair share, to her, "was based on . . . mathematics. If there were two competitors in the market, you would expect roughly 50 share. If there were three, 33 percent, and so on"); Ex. 7 at 41:10-20, 43:18-44:8 (Fougera employee testifying to 55/45 split in a two-player market and, in larger markets, "1 over X, where X is the number of competitors in the market for any given generic drug"); Ex. 57 at 409:12-410:3 (Amneal VP of pricing and analytics testifying that "fair share" did not "mean a whole lot" because it was just a "mathematical start point").

Notably, any reference to "fair share" in the testimonial record is discussion of the concept generally—no witness testified as to any "fair share" agreement. *See* Point II(A)(1), *supra*. Even within Taro, the company that authored the document on which Warren-Boulton and the States rely, there was no generally accepted understanding of the term, and different Defendants had different ideas of what the phrase means. *Compare* Ex. 9 at 110:8-19 (Taro Chief Commercial Officer's testimony that "fair share" meant evenly splitting the market regardless of the number of competitors); *id.* at 115:11-13 ("fair share [was] an academic exercise, . . . not reality"); *and id.* at. 115:17-23 (calculating Taro's fair share was not relevant to informing business decisions), *with* Ex. 25 at 75:16-23, 78:1-79:9, 81:3-22 (meaning of the term "fair share" varied).[24]

---

[24]    This lack of a consistent definition within a single Defendant is not unique or surprising. *Compare, e.g.*, Ex. 39 at 111:8-14 (Lannett's Kevin Smith: "My definition of fair share varied

Moreover, the evidence establishes that employees of some Defendants were not familiar with the term "fair share," and other Defendants never used the term in their business. For example, Matthew Whitt from Mylan testified that he was "not familiar" with a "fair market share" term. Ex. 45 at 94:22-25. Similarly, Ronald Greenblatt from G&W stated that G&W "didn't have a use of fair share" and "[i]f other[s] used [fair share], that doesn't mean it was a G&W term or a word that [G&W] would apply." Ex. 54 at 270:5-19.

Given the conflicting views of the various Defendants, the States' expert was forced to concede that Defendants did not share a common understanding of "fair share." Instead, he pivoted, asserting that "fair share . . . is in the eye of the beholder." Ex. 23. at 195:18-19; Ex. 22 at 528:7-529:20 (conceding that Defendants' individual understanding could have "differ[ed] significantly" depending on the "individual drug" and the "individual" firm). That concession defeats the States' overarching conspiracy claim. There could be no "fair share" agreement without a generally accepted meaning of "fair share" because, without it, the alleged co-conspirators would have had no way of knowing to what they were agreeing.

Warren-Boulton acknowledged this point. *Id.* at 528:22-529:6; *see also* Ex. 23 at 177:13-15; Ex. 66 ¶ 90. As a result, he was forced to alter the States' theory of the supposed "fair share" agreement. Instead of claiming that Defendants entered into a single agreement to allocate the market shares for ninety-eight drugs, Warren-Boulton asserted at his recent deposition that a "fair share" agreement did not arise until an individual alleged conspiracy was formed. *See* Ex. 23 at 177:12-22 (the "terms" of the "fair share" agreement are "if you enter into a drug-specific

---

on each and every product that I sold. My definition of fair share was by product. And it had many different variables that were associated with what I thought fair share might be."), *with* Ex. 53 at 101:7-111:15; 381:3-22 (another Lanett employee's testimony that fair share meant 100 percent divided by the number of market participants).

agreement or once you start a drug-specific agreement that you will basically follow the fair share understanding" forged within the individual conspiracy).  According to this newly articulated "fair share" theory, market participants would observe "stable market shares and stable prices"; then individually determine what they thought others would think is an appropriate market share; and finally "tacitly" agree to accepting that share.  Ex. 66 ¶ 94; Ex. 22 at 529:7-531:1.

This type of conduct—observing the market and making an independent decision "tacitly"—does not constitute an unlawful agreement that violates antitrust law.  *See, e.g.*, *Brooke Grp. Ltd. v. Brown & Williamson Tobacco Corp.*, 509 U.S. 209, 227 (1993) ("Tacit collusion, sometimes called oligopolistic price coordination or conscious parallelism, describes the process, not in itself unlawful, by which firms in a concentrated market might in effect share monopoly power, setting their prices at a profit-maximizing, supracompetitive level by recognizing their shared economic interests and their interdependence with respect to price and output decisions."); *In re Chocolate Confectionary*, 801 F.3d 383, 397 (3d Cir. 2015) ("[O]ligopolists may maintain supracompetitive prices through rational, interdependent decision-making, as opposed to unlawful concerted action, if the oligopolists independently conclude that the industry as a whole would be better off by raising prices."); *In re Text Messaging Antitrust Litig.*, 782 F.3d 867, 879 (7th Cir. 2015) ("Tacit collusion … does not violate section 1 of the Sherman Act.").  Regardless, what Warren-Boulton now describes could (if proven through evidence) at most constitute ninety-eight separate conspiracies, not a single overarching conspiracy among sixteen Defendants to allocate market share in ninety-eight different markets.

> **b.**     **"Fair Share" Does Not Refer to an Agreement But is a Common Performance Benchmarking Term Used in Many Industries.**

Even setting aside the fundamentally different views on what the term meant, a commonly used phrase like "fair share" does not give rise to the inference of conspiracy.  *Cf. In re Vitamins*

*Antitrust Litig.*, 320 F. Supp. 2d 1, 20 (D.D.C. 2004) (defendants' use of the word "club" to refer to a group of vitamin producers did not establish "knowledge of or participation in an all-vitamins conspiracy" because it likely referred to defendants merely discussing strategic approaches beneficial to the vitamin industry). The States themselves conceded in discovery responses that "in the absence of any other evidence or context, use of the term 'fair share' in the abstract may or *may not be* indicative that a generic pharmaceutical supplier has entered into an agreement with a competitor." Ex. 74 at 8 (emphasis added).[25]

Moreover, any such evidence has no probative value here because "fair share" was a common term used by customers and other participants in the generics industry, as well as in other industries. SUMF ¶¶ 65-66. It was not some secret code for a conspiracy. For example, Defendants' customers used the phrase "fair share" when setting strategy and making business decisions. *See, e.g.*, *id.* ¶ 65.[26] At Sandoz, the term was used by consultants like McKinsey and Co. when advising generics manufacturers. *See, e.g.*, *id.* ¶ 66; Ex. 105 at 9492-93 (McKinsey prepared presentation included "Fair Share, %" for Sandoz. The term also frequently appears in literature discussing businesses other than the generics industry, some of which were explored with Warren-Boulton at his deposition. *See* Ex. 160; Ex. 161.

---

[25]   The State leading this litigation, Connecticut, acknowledged that its own definition of a "fair share" conspiracy is vague and overbroad. Ex. 75 at 6 (Connecticut's objection that the definition of "Fair Share" in discovery requests was "vague, ambiguous, circular, overbroad, and disproportionate to the needs of the case" even though the definition was taken word for word from the States' Complaint).

[26]   *See also* Ex. 76 at 895 (Safeway discussing ways to obtain more than its "fair share" of pharmacy and grocery customers); Ex. 101 at 19 (Kroger discussing how it is capturing more than its "fair share" of the counter card business); Ex. 77 at 94 (Supervalu comparing its current market share of prescriptions to its "fair share"); Ex. 100 at 50 (Kroger seeking to capture its "fair share" of certain cosmetic product launches in 2013); Ex. 102 at 34 (Kroger discussing "fair share" relating to its pharmacy business).

Highly Confidential – Subject to Protective Order

When faced with publicly available articles using the term "fair share," Warren-Boulton conceded that "fair share" is not unique to the generic pharmaceutical industry. Ex. 22 at 679:15-683:13. He further acknowledged that there was not "anything strange" about business leaders using that phrase and that it offered "no indication these people are colluding." *Id.* at 680:20-21. Referring to one article, Warren-Boulton described the term as "trying to ask, can we calculate for individual firms what share they could reasonably be expected to achieve, and if they're achieving less than that, they perhaps should do something about it." *Id.* at 680:15-19.

### 3.    *The Record Does Not Support Other Basic Elements of an Overarching Conspiracy.*

The circumstantial evidence cannot establish basic aspects of the alleged overarching conspiracy, including how and when the alleged overarching conspiracy was formed and how it was monitored and enforced. That is a further reason why summary judgment is warranted.

### a.    <u>There is No Evidence of How, When, or Where the Conspiracy Was Formed.</u>

No evidence establishes the time, place, or setting in which *any* Defendant entered into the supposed overarching agreement—let alone all sixteen of them. The failure to discover such evidence suggests the absence of conspiracy. *See, e.g.*, *Zenith Radio Corp. v. Matsushita Elec. Indus. Co.*, 513 F. Supp. 1100, 1310 (E.D. Pa. 1981) ("We have looked for evidence of when this conspiracy began and when the various parties entered it, but again we have found none. That is, we suppose, because there is no evidence of agreement or of concerted action."), *aff'd in part, rev'd in part sub nom. In re Japanese Elec. Prod. Antitrust Litig.*, 723 F.2d 238 (3d Cir. 1983), *rev'd sub nom. Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574 (1986); *see also Chocolate Confectionary*, 999 F. Supp. 2d 777, 805 (M.D. Pa. 2014) ("Despite diligent efforts on the part of plaintiffs' counsel and nearly unfettered access to defendants' records, plaintiffs are before the court with nothing more than speculation as to the who, what, when, where, and how of

Highly Confidential – Subject to Protective Order

the communications that allegedly facilitated the parallel price increases.  Nothing scandalous or improper has been discovered within our borders, and no evidence permits a reasonable inference of a price-fixing agreement."), *aff'd*, 801 F.3d 383 (3d Cir. 2015).  In the only relevant testimony on this point, the States' cooperating witness Krauthauser testified that he was not aware "of any meeting or conversation at which the companies" agreed to the fair-share agreement described by Warren-Boulton.  Ex. 49 at 1091:12-19.

In fact, the testimony of the cooperating witnesses shows that there was no "fair share" agreement, and instead manufacturers made decisions independently.  For example, Krauthauser testified that if a competitor increased prices, it would be in the independent business interest of a rational company to "follow that price increase rather than chase market share" when possible. Ex. 49 at 1079:23-1080:8.  He further testified that "price increases . . . according to rational manufacturers is a gift," *id.* at 951:12-15, because others will often follow the increase.  *See also id.* at 1080:23-1081:4 ("Q. It is rational and usually profit maximizing for a company to independently decide to follow a price increase. Correct? . . . A. Correct."); *id.* at 1092:1-6 ("Q. When a company acts consistently with the rules of engagement, you're describing behaviors consistent with basic economic principles. Correct?" . . . A. "Yes.").  Following a price increase is not illegal behavior; it is rational behavior in an oligopoly.  *See, e.g.*, *Chocolate Confectionary*, 801 F.3d at 397.

Further, Thomassey testified that it was in the "independent business interest" of incumbent firms to "give up market share" to new entrants because, if they did not, new entrants would approach multiple customers and "each time the price will ratchet lower and lower, . . . driv[ing] the price into the ground." Ex. 7 at 1172:15-1173:4; *see also* Ex. 63 at 698:15-703:7 (testifying that independently deciding to sacrifice business to new entrants would mitigate profit reduction);

Ex. 43 at 349:3-351:20 (same); Ex. 140 ¶ 43 ("There are many circumstances where a company should decline (and where Sandoz did, in fact, decline) to pursue all of the market share available for a given drug because doing so would not serve its unilateral interests."); *see also* SUMF ¶¶ 42-44.

### b.    There is no Evidence of an Enforcement Mechanism.

The States cannot proffer evidence establishing that Defendants had a mechanism to monitor or enforce the alleged overarching conspiracy. Because "the incentives to cheat are too great, . . . a cartel cannot survive absent some enforcement mechanism"; accordingly, the absence of evidence showing how an overarching agreement could be enforced strongly suggests that no overarching agreement existed. *Petruzzi's IGA Supermarkets, Inc. v. Darling-Delaware Co.*, 998 F.2d 1224, 1233 (3d Cir. 1993).

The States' expert agreed that the alleged overarching conspiracy needed an enforcement mechanism. *See* Ex. 65 ¶ 62 (recognizing "mechanisms by which co-conspirators could threaten punishment" are important to maintaining collusion); Ex. 22 at 534:13-535:5 (firms in a conspiracy must "go to the mattresses" to punish cheating); Ex. 23 at 210:20-24 (observing that "agreements need to be not only formulated but monitored," and that "there must be some way of enforcing that agreement"). Yet, he "failed to put forward an economic evaluation of any mechanism" for enforcing any such agreement. Ex. 67 ¶ 126. Instead, he later changed his position and opined that no enforcement mechanism was necessary for the overarching conspiracy because there were no terms to enforce prior to formation of an individual drug conspiracy. Ex. 66 at 205:5-206:14. But that is just another way of saying that there was no overarching agreement. A hypothetical threat of some unexplained enforcement mechanism that is unknown "until somebody does something bad," *id.*, is not evidence of an agreement.

No fact witness testified to the existence of any enforcement mechanism.  To the contrary, the President of Sun Pharma USA ("Sun"), G.P. Singh, was asked if there was anything "preventing [a] last entrant from exceeding" the market share supposedly allotted to it.  Ex. 25 at 81:23-82:2.  He responded that "absolutely nothing" was in place to prevent a new market entrant from seeking to claim whatever market share it determined was in its self-interest.  *Id.*  That testimony was unrebutted.  Where, as here, the evidence reveals "no punishment, or even a mechanism to punish, the inference tends toward no agreement." *Kleen Prods. LLC v. Int'l Paper,* 276 F. Supp. 3d 811, 842 (N.D. Ill. 2017), *aff'd sub nom. Kleen Prods. LLC v. Georgia-Pac. LLC*, 910 F.3d 927 (7th Cir. 2018).

### c.    Generic Manufacturers Face Significant Barriers to Entering New Markets and Would Thus Not Benefit from the Alleged Overarching Conspiracy.

Significant barriers to entry existed for Defendants to enter new generic drug markets, meaning that an alleged co-conspirator could not easily enter a new market and reap the benefits of the purported conspiracy.  As a result, there would have been little incentive for a Defendant to enter an agreement to protect shares in markets in which it did not participate.

For example, Lannett has no experience developing or manufacturing dermatological creams, ointments, lotions, or other topical formulations.  *See* Ex. 68 ¶ 26; SUMF ¶ 8.  Thus, Lannett could not easily start manufacturing such topical treatments.  Ex. 68 ¶ 26.  Even if it could, Lannett—like any manufacturer seeking to manufacture a new drug—would need to complete the burdensome FDA regulatory approval process.  Ex. 67 ¶ 111; Ex. 65 ¶¶ 13-15 (acknowledging FDA approval process); SUMF ¶ 3.  The same would be true even for Defendants that manufactured some dermatological products because it costs millions of dollars and requires a lengthy regulatory process to receive approval to enter new dermatological drug markets.  *See* Ex. 67 ¶ 29.  The States have developed no evidence that any of the Defendants was even a potential

Highly Confidential – Subject to Protective Order

competitor for drugs that they never manufactured.

For these reasons, no Defendant had an "incentive or ability to participate in the alleged overarching conspiracy involving" the many dozens of "drugs that it did not make or sell." Ex. 68 ¶¶ 9(a), 29.

### 4.    No "Plus Factors" Raise the Inference of an Overarching Conspiracy.

The States have no "plus factor" evidence that would enable a jury to conclude that Defendants entered into the alleged overarching fair-share conspiracy. This alone is an independent basis for summary judgment on the overarching conspiracy claim.

In circumstantial-evidence cases, "the plaintiffs must establish certain so-called 'plus' factors, 'which, when viewed in conjunction with the parallel acts, can serve to allow a fact-finder to infer a conspiracy.'" *In re Ethylene Propylene Diene Monomer (EPDM) Antitrust Litig*., 681 F. Supp. 2d 141, 166 (D. Conn. 2009) (quoting *Apex Oil Co. v. DiMauro,* 822 F.2d 246, 253 (2d Cir. 1987)); *see also Anderson News*, 899 F.3d at 104; *Chocolate Confectionary*, 801 F.3d at 398. Plus-factor evidence must "sufficiently tend[] to prove that defendants entered into an agreement to reduce competition." *Anderson News*, 899 F.3d at 103. A non-exhaustive list of plus factors includes: "[1] a common motive to conspire, [2] evidence that shows that the parallel acts were against the apparent individual economic self-interest of the alleged conspirators, and [3] evidence of a high level of interfirm communications." *Ross v. Citigroup, Inc.*, 630 F. App'x 79, 82 (2d Cir. 2015); *Mayor & City Council of Balt. v. Citigroup, Inc.*, 709 F.3d 129, 136 (2d Cir. 2013). While "normally all three plus factors are weighed together, in the case of oligopolies the first two factors are deemphasized." *Valspar v. E.I. du Pont de Nemours & Co*., 873 F.3d 185, 193 (3d Cir. 2017). In an oligopoly case like this one, evidence of the first two "plus factors" does not defeat summary judgment because such evidence is equally consistent with interdependence as with

conspiracy. *See, e.g.*, *In re Flat Glass Antitrust Litig.*, 385 F.3d 350, 361 (3d Cir. 2004).[27]

The States have no evidence of parallel or other coordinated conduct in support of the supposed "fair share" overarching conspiracy. But further, none of the States' alleged "plus factor" evidence would enable a jury to conclude that Defendants entered the alleged overarching conspiracy. In their Complaint, the States allege that Defendants sometimes attended "industry dinners," "trade shows throughout the year," or diversity and inclusion events, such as "girls night out." *See* Compl. ¶¶ 112-23. None of those facts is probative of an overarching conspiracy however, because "[t]he mere opportunity to conspire does not by itself support the inference that such an illegal combination actually occurred. A plaintiff must prove the defendants illegally conspired." *Capital Imaging Assocs., P.C. v. Mohawk Valley Med. Assocs., Inc.*, 996 F.2d 537, 545 (2d Cir. 1993).[28] Evidence of communications suggest an alleged conspiracy only when it leads to the inference that "defendants got together and exchanged assurances of common action or otherwise adopted a common plan." *Chocolate Confectionary,* 801 F.3d at 398.

The States' evidence does not suggest that Defendants discussed the alleged overarching conspiracy, or agreed to enter the alleged overarching conspiracy, at industry meetings or other similar gatherings. Defendants' mere attendance at industry events does not tend to show that an

---

[27] In any event, Defendants did not have a motive to reach conspiracies for products that they did not market. *See* Point III(C), *infra*. And there is no evidence of any Defendant acting contrary to its individual interest.

[28] *See also Chocolate Confectionary*, 801 F.3d at 409 ("[E]vidence . . . that the executives from the [alleged conspirators] were in the same place at the same time . . . is insufficient to support a reasonable inference of concerted activity."); *Petruzzi's*, 998 F.2d at 1235 ("Proof of opportunity to conspire, without more, will not sustain an inference that a conspiracy has taken place." (citation omitted)); *Moore v. Boating Indus. Assos.*, 819 F.2d 693, 712 (7th Cir. 1987) ("Mere membership in a trade association, attendance at trade association meetings and participation in trade association activities are not, in and of themselves, condemned or even discouraged by the antitrust laws.").

Highly Confidential – Subject to Protective Order

overarching conspiracy existed.  *See Valspar*, 873 F.3d at 199-200 (no inference of conspiracy arose from fact that competitors attended the same trade organization meetings because there was "no evidence that there was any discussion of prices during these meeting and certainly no evidence of an agreement"); *In re Optical Disk Drive Antitrust Litig.*, 2011 WL 3894376, at *9 (N.D. Cal. Aug. 3, 2011) (evidence of trade-show attendance was "particularly weak support for the existence of any conspiracy").

The States allege that Defendants communicated by "phone call and text message reports." Compl. ¶ 74.  No evidence exists showing that any of those communications had anything to do with the alleged overarching conspiracy.  While irrelevant, because the States have the burden to show improper agreements, there are legitimate business, social, and other reasons why people in the same industry—even those employed by competitors—communicate with each other.  *See, e.g.*, SUMF ¶¶ 67-69; Ex. 27 at 106:11-107:9 (Grauso and Kevin Green social relationship).  For that reason, courts do not view records of communications without corresponding evidence showing the nature of the communications as evidence of a conspiracy.  *See, e.g.*, *Baby Food*, 166 F.3d at 126 ("[C]ommunications between competitors do not permit an inference of an agreement to fix prices unless 'those communications rise to the level of agreement, tacit or otherwise.'"); *In re Mylan N.V. Secs. Litig.*, 666 F. Supp. 3d 266, 321 (S.D.N.Y. 2023) (logs showing calls between employees of competitors did not create inference of conspiracy).

Armed with these call logs, the States had the burden to develop evidence showing that competitors communicated to form and effectuate the alleged overarching conspiracy.  But as discussed above, the testimony elicited by the States did not uncover any overarching, "fair share" conspiracy or suggest that competitors' communications were related to effectuating the alleged overarching conspiracy.  The existence of such communications therefore does not raise a genuine

Highly Confidential – Subject to Protective Order

dispute of fact concerning the overarching conspiracy claim.[29]

## III. INDIVIDUAL CONSPIRACIES DO NOT CONSTITUTE AN OVERARCHING CONSPIRACY.

To the extent the States cite evidence suggesting the existence of smaller, single-drug conspiracies, that evidence cannot save their sprawling overarching conspiracy claim.[30]  *See In re Ins. Brokerage Antitrust Litig.*, 618 F.3d 300, 348 (3d Cir. 2010).  A plaintiff alleging an overarching conspiracy claim built on constituent conspiracy claims can survive summary judgment only with evidence of a "larger picture from which inferences of a wider conspiracy can be drawn."  *Dahl v. Bain Cap. Partners, LLC*, 937 F. Supp. 2d 119, 135 (D. Mass. 2013) (quoting *Ready-Mix Concrete*, 768 F. Supp. 2d at 975).   Such evidence must demonstrate (*i*) interdependence among the alleged individual conspiracies; (*ii*) a common goal; and (*iii*) overlap among the participants.  *Id.*

Here, none of those factors is present.  The alleged individual conspiracies (even if viable) therefore cannot establish the alleged overarching conspiracy.  *See, e.g.*, *Precision Assocs., Inc.*, 2011 WL 7053807 at *27-30 ("ten local conspiracies" were merely "'parallel' conduct" that, absent more, could not prove an overarching conspiracy).

---

[29]    Ironically, the phone logs actually disprove the alleged overarching conspiracy.  According to Warren-Boulton, the overarching conspiracy existed in part to obviate the need for "extensive direct communications" between dozens of conspirators involved in dozens of separate individual conspiracies.  Ex. 65 ¶¶ 55-56.

[30]    Defendants dispute that the record establishes the existence of these alleged individual conspiracies and will, consistent with the Court's order regarding summary judgment briefing, address the individual conspiracies during the July summary judgment briefing.  *See* ECF No. 369.

Highly Confidential – Subject to Protective Order

A.    The States Cannot Show Interdependence.

Conspiracies are "interdependent" when "the activities of one aspect of the scheme are necessary or advantageous to the success of another aspect of the scheme." *Dahl,* 937 F. Supp. 2d at 135 (quoting *United States v. Portela*, 167 F.3d, 687, 695 (1st Cir. 1999)).    To show interdependence, the States must prove not only that the success of each individual conspiracy depended on the success of the other individual conspiracies, but also that each Defendant *believed* that the different "aspects of the venture [were] interdependent." *Id.* (quoting *Portela*, 167 F.3d at 695).[31]

Here, the States can point to no evidence suggesting that the alleged individual conspiracies depended on one another.    This is unsurprising because the ninety-eight Drugs at Issue are not substitutes for one another, and different Defendants (or groups of Defendants) competed in the ninety-eight different drug markets.    There are distinct markets for pharmaceuticals that treat different indications.    For example, the market for epilepsy medication is different from the market for extra-strength toe fungus medication.    The States' expert concedes that these are not interchangeable products.    *See, e.g.*, Ex. 65 ¶ 29 ("[E]ach generic drug comprises a relevant product market.").    Accordingly, an alleged scheme to allocate market share for one particular drug would not further an alleged scheme to allocate market share for a different drug.    Instead, the success of any alleged individual conspiracy would depend solely on the parties to that specific alleged

---

[31]    *Cf. United States v. Kemp*, 500 F.3d 257, 289 (3d Cir. 2007) ("In evaluating interdependence, we consider how helpful one individual's contribution is to another's goals."); *United States v. Smith*, 82 F.3d 1261, 1271 (3d Cir. 1996) ("[C]o-conspirators in each state derived no benefit, financial or otherwise, from Smith's activities in the other state, nor was the success of the conspiracy in one state contingent on the success of the conspiracy in the other."); *United States v. Macchia*, 35 F.3d 662, 671 (2d Cir. 1994) (relevant inquiry is "the extent to which the success or failure of one conspiracy is independent of a corresponding success or failure by the other").

Highly Confidential – Subject to Protective Order

conspiracy.  *See In re Automotive Parts Antitrust Litig.*, 2016 WL 8200512, at *4 (E.D. Mich. Apr. 13, 2016) (an individual conspiracy involving specific auto parts did not raise an inference that defendants agreed to fix prices across the entire auto parts industry);[32] *Insurance Brokerage*, 618 F.3d at 348 (rejecting overarching global conspiracy claim based on alleged existence of numerous individual conspiracies among brokers).

Not only is there no evidence that the alleged individual conspiracies were interdependent, but there is also no evidence that any Defendant *believed* they were interdependent.  As discussed above, even the cooperating witnesses rejected the notion that an overarching conspiracy existed and testified that their conduct related only to specific products.  *See* Point II(A)(1), *supra*. Agreements supposedly made on a "product-by-product" basis independent of any alleged agreements involving other products are not interdependent.  *See Dahl*, 937 F. Supp. 2d at 135.

## B.    The Alleged Overarching Conspiracy Has No Common Goal.

A "common goal" exists for purposes of establishing an overarching conspiracy where defendants employ individual conspiracies to achieve "one objective, or set of objectives, or an overall objective to be achieved by multiple actions."  *Dahl*, F. Supp. 2d at 135.  The alleged "objective" cannot be overbroad.  For example, a bare assertion that defendants sought "the elimination of price competition whenever and wherever possible" is "meaningless for Sherman

---

[32]    Later decisions in the *Auto Parts* MDL allowed much narrower conspiracy claims to proceed. *See In re Automotive Parts Antitrust Litig.*, 2018 WL 1138422 (E.D. Mich. Jan. 16, 2018) (denying motion to dismiss claim against six defendants for conspiracy on air conditioning parts); *In re Automotive* Parts *Antitrust Litig.*, 2018 WL 2181100 (E.D. Mich. Jan. 31, 2018) (denying motion for summary judgment on claim for conspiracy regarding wire harness products).  Those later decisions involved alleged conspiracies limited to specific products (air conditioning systems and wire harness products, respectively) and were not "overarching" conspiracies in the sense that the States here allege.  The industry-wide conspiracy theory in this case, which spans dozens of different drugs, is akin to the omnibus all-auto-parts overarching theory that was rejected in the 2016 *Auto Parts* decision.

Highly Confidential – Subject to Protective Order

Act purposes." *United States v. Sargent Elec. Co.*, 785 F.2d 1123, 1127 (3d Cir. 1986). Instead, the evidence must tend to show that each defendant was "aware of and committed to" a specific "essential purpose" of the overarching conspiracy. *Precision Assocs.*, 2011 WL 7053807, at *30.

The record here shows that Defendants did not share any common goal. As explained above, the undisputed evidence shows that Defendants did not even agree on what would constitute a "fair share" in any given market. *See* Point II(B)(2)(a), *supra*. Just like a goal of seeking "the elimination of price competition whenever and wherever possible," a goal seeking the division of generic markets by "fair share" when Defendants did not even have a common understanding of what constitutes a "fair share" is so overbroad that it is "meaningless for Sherman Act purposes." *Sargent*, 785 F.2d at 1127. There is simply no evidence that Defendants were "aware of," let alone "committed to," a common goal of allocating market share in dozens of different markets. *Precision Assocs.*, 2011 WL 7053807, at *30. Even if there were evidence of any individual conspiracy, the goal of such a conspiracy would have been to maximize the profits of the manufacturers of the specific Drug at Issue. An individual conspiracy would not establish that all sixteen Defendants shared a common goal with respect to the ninety-eight different Drugs at Issue.

The contrast with *Dahl* is instructive. There, the court rejected the plaintiffs' overbroad overarching conspiracy claim. 937 F. Supp. 2d at 137. The *Dahl* court nevertheless allowed a narrower overarching conspiracy claim to move forward in light of an email suggesting that the defendants had agreed not to competitively bid on each other's proprietary deals and evidence that no such competitive bids were ever proffered. *Id.* at 137-38 (citing email in which one defendant said that another had "agreed not to jump [*i.e.*, competitively bid on] our deal since no one in private equity ever jumps an announced deal"). There is no remotely comparable evidence here showing that Defendants agreed to allocations in ninety-eight different drug markets—including

Highly Confidential – Subject to Protective Order

markets in which they did not participate. And unlike the situation in *Dahl*, the evidence here shows that there was no "fair share" market division for the Drugs at Issue. *See* Point II(B)(1), *supra* (market shares varied significantly among the Drugs at Issue).

### C.      The States Cannot Show Overlap Across the Markets for Nearly One-Hundred Drugs.

The States' overarching conspiracy claim fails for the additional reason that they cannot demonstrate sufficient "overlap" among the individual conspiracies or the Defendants who supposedly participated in those conspiracies. *Dahl*, 937 F. Supp. 2d at 135. To establish overlap, a plaintiff must show that a substantial number of the actors were involved with multiple products or transactions allegedly falling within the overarching conspiracy. *Id.* "While it is not necessary that every defendant participate in every transaction," the "mere overlap of some of the defendants in some of the transactions is, on its own, insufficient to establish an overarching agreement." *Id.*

Here, there is insufficient overlap because the States' individual conspiracies each involved only a handful of Defendants, different drugs, and different markets. No Defendant sold all ninety-eight of the Drugs at Issue, and most sold only a few. That makes it exceedingly unlikely that Defendants would have reached any agreement involving ninety-eight drugs. *See* Ex. 67 ¶ 133 & fig. 3. Courts addressing overarching conspiracy claims have found the absence of overlap under such circumstances. *See Precision Assocs.*, 2011 WL 7053807, at *27 (finding a lack of overlap between alleged conspiracies in geographically and temporally distinct markets for freight forwarding services); *Ready-Mix Concrete*, 768 F. Supp. 2d at 976 (dismissing claims against producers of ready-mix concrete in part because plaintiffs could not allege "any overlap among [defendants'] geographical markets" and it was "not clear how all of the defendants *could* compete").

*Dahl v. Bain Capital Partners* is again instructive. There, the plaintiffs alleged that private equity firms conspired to suppress competition in nineteen leveraged buyouts and eight related transactions. 937 F. Supp. 2d at 123-34. At summary judgment, the plaintiffs tried to knit those twenty-seven transactions together into a broad "overarching conspiracy . . . to allocate the market for large" leveraged buyouts by citing a host of conduct, including the formation of "bidding clubs or consortiums," "quid pro quo" agreements, frequent communications among competitors, agreements to split target companies with losing bidders, agreements to refrain from "'jump[ing]' (or compet[ing] for) each other's proprietary deals during the go-shop period," and evidence of misconduct relating to specific transactions. *Id.* at 124-25, 136-38. The *Dahl* court granted Defendants summary judgment on the overarching conspiracy alleged—which was far narrower than the one alleged here—because the evidence showed a "kaleidoscope of" different characters, with no single defendant linking the underlying conspiracies into a single global conspiracy. *Id.* at 137. The same is true here. Because the vast majority of Defendants did not manufacture most of the Drugs at Issue, there are no Defendants, motives, or facts that can knit each of the ninety-eight alleged individual conspiracies together.

Highly Confidential – Subject to Protective Order

## CONCLUSION[33]

For the foregoing reasons, the Court should grant summary judgment in Defendants' favor on all counts to the extent they allege an overarching conspiracy.[34]

---

[33] The States have asserted the overarching conspiracy claim against the corporate defendants only.  Compl. ¶ 124 ("The overarching conspiracy among generic *manufacturers* . . . ." (emphasis added)).  This distinction is confirmed by the fact that the claim for relief asserted against each corporate defendant includes the following joint and several liability language: "These agreements were part of an overarching conspiracy among all of the *corporate* Defendants named in this Complaint . . . . As participants in the overarching conspiracy, the *corporate* Defendants are jointly and severally liable for any harm caused as a result of the conspiracy." *Id.* ¶ 1654 (emphasis added).  This language is conspicuously absent from the claims asserted against the individual defendants.  *See, e.g.*, *id.* at Count 18.  Without any analysis of these distinctions, in denying one individual defendant's motion to dismiss, Judge Rufe ruled that plaintiffs had alleged an overarching conspiracy claim in which the defendant participated, and thus the Court did not grant dismissal at that time.  MDL Dkt. No. 2374 at 11. The individual Defendants listed in the signature block join this motion in an abundance of caution, without waiving their position that they are not alleged to be liable for any overarching conspiracy.

[34] While the States bring a host of state-law claims, some of which appear to be based on the alleged overarching conspiracy, all of those claims fail when the underlying Sherman Act claim fails.  *See, e.g.*, *In re Broiler Chicken Antitrust Litig.*, 2023 WL 7220170, at *36 (N.D. Ill. Nov. 2, 2023) (defendants who obtained summary judgment on the plaintiffs' Sherman Act claims were entitled to summary judgment as to dozens of state-law claims premised upon the same conduct); *In re Suboxone Antitrust Litig.*, 2017 WL 4642285 at *10-12 (E.D. Pa. Oct. 17, 2017) (similar); *Cleary v. Philip Morris Inc.*, 656 F.3d 511, 517 (7th Cir. 2011) (unjust enrichment claim based on the same "conduct alleged in another claim . . . will be tied to th[e] related claim").

Highly Confidential – Subject to Protective Order

Dated: November 22, 2024

Respectfully submitted,

*s/ Dimitra Doufekias*
Dimitra Doufekias (phv207871)
Megan E. Gerking (phv207878)
Robert W. Manoso (phv207877)
MORRISON & FOERSTER LLP
2100 L Street, NW Suite 900
Washington, DC 20037
Tel.: (202) 887-1500
Fax: (202) 887-0763
ddoufekias@mofo.com
mgerking@mofo.com
rmanoso@mofo.com

Drew Alan Hillier (ct30252)
MORRISON & FOERSTER LLP
12531 High Bluff Drive
San Diego, CA 92130-2040
Phone: (858) 314-7711
Fax: (858) 720-5125
dhillier@mofo.com

Michael B. Miller (phv207479)
MORRISON & FOERSTER LLP
250 W 55th Street
New York, NY 10019
Tel.: (212) 468-8000
Fax: (212) 468-7900
mbmiller@mofo.com

*Counsel for Defendant Glenmark*
*Pharmaceuticals Inc., USA*

*/s/ George G. Gordon*
George G. Gordon
Julia Chapman
Forrest E. Lovett
DECHERT LLP
2929 Arch Street
Philadelphia, PA 19104
Telephone: (215) 994-4000
Facsimile: (215) 994-4400
george.gordon@dechert.com
julia.chapman@dechert.com
forrest.lovett@dechert.com

Christie Boyden
DECHERT LLP
1900 K Street NW
Washington, D.C. 20006
Philadelphia, PA 19104
Telephone: (202) 261-3384
Facsimile: (202) 261-3300
christie.boydon@dechert.com

*Counsel for Defendant Lannett Company, Inc*

Highly Confidential – Subject to Protective Order

*/s/ Christopher Ondeck*

Christopher Ondeck
PROSKAUER ROSE LLP
1001 Pennsylvania Ave., NW
Suite 600 South
Washington, DC 20004
Tel: (202) 416-5865
Fax: (202) 416-6899
condeck@proskauer.com

Grant Esposito
David Fioccola
PROSKAUER ROSE LLP
Eleven Times Square
New York, NY 10036
Tel: (212) 969-3000
Fax: (212) 969-2900
gesposito@proskauer.com
dfioccola@proskauer.com

Thomas D. Goldberg
Jeffrey Mueller
DAY PITNEY LLP
Goodwin Square 225 Asylum Street
Hartford, CT 06103
Telephone: (860) 275-0164
Facsimile: (860) 881-2625

*Counsel for Defendants Sandoz Inc.
and Fougera Pharmaceuticals Inc.*

Highly Confidential – Subject to Protective Order

*/s/ Sheron Korpus*
Sheron Korpus
Seth A. Moskowitz
Seth Davis
KASOWITZ BENSON TORRES LLP
633 Broadway
New York, New York 10019
Telephone: (212) 506-1700
skorpus@kasowitz.com
smoskowitz@kasowitz.com
sdavis@kasowitz.com

*Counsel for Defendants Actavis Elizabeth,
LLC, Actavis Holdco U.S., Inc., and
Actavis Pharma, Inc.*

*/s/ Robin P. Sumner*
Robin P. Sumner
Michael J. Hartman
Melissa O'Donnell
TROUTMAN PEPPER HAMILTON
SANDERS LLP
3000 Two Logan Square
Eighteenth and Arch Streets
Philadelphia, PA 19103-2799
Tel. (215) 981-4000
Fax. (215) 981-4750
robin.sumner@troutman.com
michael.hartman@troutman.com
melissa.odonnell@troutman.com

*/s/ Bennet J. Moskowitz*
Bennet J. Moskowitz
TROUTMAN PEPPER HAMILTON
SANDERS LLP
875 Third Avenue
New York, NY 10022
Tel. (212) 704-6087
Fax. (212) 704-8370
bennet.moskowitz@troutman.com

*Counsel for Defendants Amneal
Pharmaceuticals, Inc. and Amneal
Pharmaceuticals LLC*

*/s/ Whitney Cloud*
Whitney Cloud
Ilana H. Eisenstein
Ben C. Fabens-Lassen
DLA PIPER LLP (US)
1650 Market Street, Suite 5000
Philadelphia, PA 19103
Telephone: (215) 656-3300
whitney.cloud@dlapiper.com
ilana.eisenstein@dlapiper.com
ben.fabens-lassen@dlapiper.com

Carlton E. Wessel
DLA PIPER LLP (US)
500 Eighth Street, NW
Washington, DC 20004
Telephone: (202) 799-4000
carlton.wessel@us.dlapiper.com

James O. Craven
James I. Glasser
WIGGIN & DANA
One Century Tower
265 Church Street
New Haven, CT 06510
Telephone: 203-498-4361
jcraven@wiggin.com
jglasser@wiggin.com

*Counsel for Defendants Pfizer Inc. and
Greenstone LLC*

Highly Confidential – Subject to Protective Order

/s/ Robin D. Adelstein
Robin D. Adelstein
Mark A. Robertson
Kimberly Fetsick
Abigail Schwarz
NORTON ROSE FULBRIGHT US LLP
1301 Avenue of the Americas
New York, NY 10019-6022
Telephone: (212) 318-3000
Facsimile: (212) 408-5100
robin.adelstein@nortonrosefulbright.com
mark.robertson@nortonrosefulbright.com
kimberly.fetsick@nortonrosefulbright.com
abigail.schwarz@nortonrosefulbright.com

Mark Angland
NORTON ROSE FULBRIGHT US LLP
779 9th Street NW, Suite 1000
Washington, DC 20001
Telephone: (202) 662-0200
Facsimile: (202) 662-4643
mark.angland@nortonrosefulbright.com

Alex Cummings
Dewey Jude Gonsoulin, III
NORTON ROSE FULBRIGHT US LLP
1550 Lamar Street, Suite 2000
Houston, Texas 77010
Telephone: (713) 651-5151
Facsimile: (713) 651-5246
alex.cummings@nortonrosefulbright.com
dewey.gonsoulin@nortonrosefulbright.com

Jeffrey J. Mirman
HINCKLEY, ALLEN, & SNYDER LLP
20 Church Street
Hartford, CT 06103
Telephone: (860) 725-6200
Facsimile: (860) 278-3802
jmirman@hinckleyallen.com

*Counsel for Defendants Bausch Health
Americas, Inc. and Bausch Health US LLC*

/s/ Benjamin H. Diessel
Benjamin H. Diessel
Ariela C. Anhalt
Emmett Gilles
WIGGIN AND DANA LLP
One Century Tower
265 Church Street
New Haven, CT 06510
Tel: (203) 498-4400
Fax: (203) 782-2889
bdiessel@wiggin.com
aanhalt@wiggin.com
egilles@wiggin.com

Nathan E. Denning
Chloe S. Booth
WIGGIN AND DANA LLP
437 Madison Avenue, 35th Floor
New York, NY 10022
Tel: (212) 551-2600
Fax (212) 551-2888
ndenning@wiggin.com
cbooth@wiggin.com

Christopher Bailes
WIGGIN AND DANA LLP
50 S. 16th Street, Suite 2925
Philadelphia, PA 19102
Tel: (215) 998-8318
Fax: (215) 988-8384
cbailes@wiggin.com

*Counsel for Defendant Aurobindo
Pharma USA, Inc.*

Highly Confidential – Subject to Protective Order

*/s/ Darrell Prescott*
Darrell Prescott
DARRELL PRESCOTT
LAW OFFICE P.C.
104 Charlton St., 1-W
New York, NY 10014
Tel: (917) 510-3165
Fax: (866) 233-5869
dp@darrellprescott.com

James D. Bailey
BAILEY DUQUETTE P.C.
104 Charlton St., 1-W
New York, NY 10014
Tel: (212) 658-1946
Fax: (866) 233-5869
james@baileyduquette.com

Stephan Matanovic BAILEY
DUQUETTE P.C.
21 S. 11th Street, 2nd Floor
Philadelphia, PA 19107
Tel: (215) 660-7600
Fax: (866) 233-5869
stephan@baileyduquette.com

*Counsel for Defendant G&W Laboratories, Inc.*

*/s/ Jane Willis*
Jane E. Willis (PHV25421)
Andrew J. O'Connor (PHV208240)
Phillip Z. Yao (PHV208241)
ROPES & GRAY LLP
800 Boylston Street
Boston, MA 02199-3600
Tel: (617) 951-7000
Fax: (617) 951-7050
jane.willis@ropesgray.com
andrew.oconnor@ropesgray.com
phillip.yao@ropesgray.com

*Counsel for Defendants Mallinckrodt Inc.,*
*Mallinckrodt LLC, and Mallinckrodt plc*

Highly Confidential – Subject to Protective Order

*/s/ Colin R. Kass*
Colin R. Kass
PROSKAUER ROSE LLP
1001 Pennsylvania Ave, NW
Suite 600 South
Washington, DC 20004
Telephone: (202) 416-6890
Facsimile: (202) 416-6899
ckass@proskauer.com

Bradley I. Ruskin
David A. Munkittrick
Adam Farbiarz
PROSKAUER ROSE LLP
Eleven Times Square
New York, New York 10036
Telephone: (212) 969-3000
Facsimile: (212) 969-2900
bruskin@proskauer.com
dmunkittrick@proskauer.com
afarbiarz@proskauer.com

Meg Slachetka
COMPETITION LAW PARTNERS
1101 Pennsylvania Avenue, NW
Washington, DC 20004
Telephone: (202) 742-4300
meg@competitionlawpartners.com

*Counsel for Defendant Lupin Pharmaceuticals, Inc.*

*/s/ John M. Taladay*
John M. Taladay
Christopher P. Wilson
JoAnna B. Adkisson
Michael A. Munoz
BAKER BOTTS LLP
700 K Street NW
Washington, DC 20004
Telephone: (202) 639-7700
Facsimile: (202) 639-7890
john.taladay@bakerbotts.com
christopher.wilson@bakerbotts.com
joanna.adkisson@bakerbotts.com
micahel.munoz@bakerbotts.com

Matthew M. Hilderbrand
BAKER BOTTS LLP
401 South 1st Street, Suite 1300
Austin, TX 78704
Telephone: (512) 322-2500
Facsimile: (512) 322-3613
matthew.hilderbrand@bakerbotts.com

Jennifer L. Morgan – ct21751
Marilyn B. Fagelson – ct17202
MURTHA CULLINA LLP
265 Church Street, 9th Floor
New Haven, CT 06510
Telephone: (203) 772-7700
Facsimile: (203) 772-7723
jmorgan@murthalaw.com
mfagelson@murthalaw.com

*Counsel for Defendants Sun Pharmaceutical Industries, Inc. and Taro Pharmaceuticals U.S.A., Inc.*

Highly Confidential – Subject to Protective Order

*/s/ Benjamin F. Holt*
Benjamin F. Holt
Adam K. Levin
Justin W. Bernick
HOGAN LOVELLS US LLP
555 Thirteenth Street, NW
Washington, D.C. 20004
Telephone: (202) 637-5600
benjamin.holt@hoganlovells.com
adam.levin@hoganlovells.com
justin.bernick@hoganlovells.com

Jasmeet K. Ahuja
HOGAN LOVELLS US LLP
1735 Market Street, 23rd Floor
Philadelphia, PA 19103
Telephone: (267) 675-4600
jasmeet.ahuja@hoganlovells.com

Kim E. Rinehart (ct24427)
WIGGIN AND DANA LLP
One Century Tower
265 Church Street
P.O. Box 1832
New Haven, CT 06508-1832
Tel: (203) 498-4400
Fax: (203) 782-2889
krinehart@wiggin.com

Robert M. Langer (ct06305)
WIGGIN AND DANA LLP
20 Church Street
Hartford, CT 06103
Tel: (860) 297-3700
Fax: (860) 525-9380
rlanger@wiggin.com

*Counsel for Defendants Mylan Inc. and Mylan
Pharmaceuticals Inc.*

*/s/ Clifford Katz*
Clifford Katz
Damon W. Suden
Marisa Lorenzo
KELLEY DRYE & WARREN LLP
3 World Trade Center
175 Greenwich Street
New York, NY 10007
Tel: (212) 808-7800
Fax: (212) 808-7897
ckatz@kelleydrye.com
dsuden@kelleydrye.com
mlorenzo@kelleydrye.com

*Counsel for Defendant Wockhardt USA LLC*

55

Highly Confidential – Subject to Protective Order

/s/ Guy Petrillo
Guy Petrillo
Christina Karam
PETRILLO KLEIN & BOXER LLP
655 Third Avenue, 22nd Floor
New York, NY 10017
212-370-0330

Counsel for Defendant Douglas Boothe

/s/ Michael Weinstein
Michael Weinstein
Michael C. Klauder
Jeffery M. Sauer
COLE SCHOTZ P.C.
Court Plaza North
25 Main Street
P.O. Box 800
Hackensack, NJ 07602
201-489-3000
201-489-1536  Facsimile
mweinstein@coleschotz.com
mklauder@coleschotz.com
jsauer@coleschotz.com

Counsel for Defendant Walter Kaczmarek

/s/ J. Clayton Everett, Jr.
J. Clayton Everett, Jr. (phv207964)
William S.D. Cravens (phv207968)
Molly R. Maidman (phv207966)
Y. Frank Ren (phv207981)
MORGAN, LEWIS & BOCKIUS LLP
1111 Pennsylvania Avenue, NW
Washington, DC 20004
Telephone:  +1.202.739.3000
Facsimile:  +1.202.739.3001
clay.everett@morganlewis.com
william.cravens@morganlewis.com
molly.maidman@morganlewis.com
frank.ren@morganlewis.com

Michael D. Blanchard
MORGAN, LEWIS & BOCKIUS LLP
One State Street
Hartford, CT 06103
Telephone: +1.860.240.2700
Facsimile: +1.860.240.2701
michael.blanchard@morganlewis.com

Counsel for Defendant Perrigo New
York, Inc.

/s/ Timothy J. Bergère
Timothy J. Bergère
ARMSTRONG TEASDALE LLP
One Commerce Square
2005 Market Street, 29th Floor
Philadelphia, PA 19103
Telephone: (267) 780-2000
Facsimile: (215) 405-9070
tbergere@atllp.com

Counsel for Defendant Kurt Orlofski

Highly Confidential – Subject to Protective Order

/s/ Charles S. Leeper
Charles S. Leeper
Kenneth M. Vorrasi
Alison M. Agnew
FAEGRE DRINKER BIDDLE & REATH LLP
1500 K Street, NW, Suite 1100
Washington, DC  20005
Telephone:  202-842-8800
Facsimile:  202-842-8465
charles.leeper@faegredrinker.com
kenneth.vorrasi@faegredrinker.com
alison.agnew@faegredrinker.com

*Counsel for Defendant John Wesolowski*

/s/ Adam S. Lurie
Adam S. Lurie
LINKLATERS LLP
601 Thirteenth Street NW
Suite 400S
Washington, DC 20005
Telephone: (202) 654-9200
Facsimile: (202) 654-9210
adam.lurie@linkaters.com

Michael Pilcher
LINKLATERS LLP
1290 Avenue of the Americas
New York, NY 10104
Telephone: (212) 903-9000
Facsimile: (212) 903-9100
michael.pilcher@linklaters.com

*Counsel for Defendant Michael Perfetto*

/s/ Erica S. Weisgerber
Erica S. Weisgerber
DEBEVOISE & PLIMPTON LLP
66 Hudson Boulevard
New York, NY 10001
Telephone: 212-909-6000
Facsimile: 212-909-6836
eweisgerber@debevoise.com

Edward D. Hassi
Leah S. Martin
DEBEVOISE & PLIMPTON LLP
801 Pennsylvania Avenue, N.W.
Washington, DC 20004
Telephone: 202-383-8000
Facsimile: 202-383-8118
thassi@debevoise.com
lmartin@debevoise.com

*Counsel for Defendant Armando Kellum*

/s/ Alexander R. Bilus
Alexander R. Bilus, Esquire
PA No. 203680
SAUL EWING LLP
Centre Square West
1500 Market Street, 38th Floor
Philadelphia, PA 19102-2186
Telephone:  (215) 972-7177
alexander.bilus@saul.com

Allison L. Burdette, Esquire
PA No. 316695
SAUL EWING LLP
One PPG Place, Suite 3010
Pittsburgh, PA 15222
Telephone:  (412) 209-2500
allison.burdette@saul.com

*Counsel for Defendant Erika Vogel-Baylor*

Highly Confidential – Subject to Protective Order

_/s/ Robert E. Connolly_
Robert E. Connolly
LAW OFFICE OF ROBERT E. CONNOLLY
1735 Market Street, Suite A, #469
Philadelphia, PA 19103
Telephone: (215) 219-4418
bob@reconnollylaw.com

_Counsel for Defendant James Grauso_

_/s/ Michelle N. Lipkowitz_
Michelle N. Lipkowitz
MINTZ, LEVIN, COHN, FERRIS,
GLOVSKY AND POPEO, P.C.
555 12th Street NW, Suite 1100
Washington, DC 20004
Telephone: (202) 434-7448
MNLipkowitz@mintz.com

_Counsel for Defendant Mitchell Blashinsky_

Highly Confidential – Subject to Protective Order