**PUBLIC REDACTED VERSION**

# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF CONNECTICUT

|  |  |
|---|---|
| THE STATE OF CONNECTICUT, *et al.,* *Plaintiffs*, <br><br> v. <br><br> SANDOZ INC., *et al.*, *Defendants*. | Case No. 3:20-CV-00802-MPS <br> Hon. Michael P. Shea <br><br><br> November 22, 2024 |

## STATEMENT OF UNDISPUTED MATERIAL FACTS IN SUPPORT OF DEFENDANTS' JOINT MOTION FOR SUMMARY JUDGMENT ON <u>OVERARCHING CONSPIRACY CLAIMS</u>

Pursuant to Local Rule 56(a)(1), Defendants[1] respectfully submit this Statement of

Undisputed Material Facts in connection with their Motion for Summary Judgment on Plaintiffs'[2]

Overarching Conspiracy Claims in the Bellwether Complaint.

---

[1] Defendants are 26 corporate entities encompassing 16 distinct generic pharmaceutical manufacturers: Actavis Holdco US, Inc., Actavis Elizabeth LLC, and Actavis Pharma, Inc. (collectively, "Actavis"); Amneal Pharmaceuticals, Inc. and Amneal Pharmaceuticals, LLC (collectively, "Amneal"); Aurobindo Pharma U.S.A., Inc. ("Aurobindo"), Bausch Health, Americas, Inc. and Bausch Health US, LLC (collectively, "Bausch"); G&W Laboratories, Inc. ("G&W"); Glenmark Pharmaceuticals Inc., USA ("Glenmark"); Lannett Company, Inc. ("Lannett"); Lupin Pharmaceuticals, Inc. ("Lupin"); Mallinckrodt Inc., Mallinckrodt LLC, and Mallinckrodt plc (collectively, "Mallinckrodt"); Mylan Inc. and Mylan Pharmaceuticals Inc. (collectively, "Mylan"); Perrigo New York, Inc. ("Perrigo"); Pfizer Inc. and Greenstone LLC; Sandoz Inc., which acquired Fougera Pharmaceuticals Inc. and at all times relevant was part of the Novartis group of companies (for purposes of this brief, "Sandoz"); Sun Pharmaceutical Industries, Inc and Taro Pharmaceuticals USA, Inc. (collectively "Taro"); Teligent, Inc. ("Teligent"); and Wockhardt USA LLC ("Wockhardt").  (Compl. ¶¶ 29-71, Dkt. 196.)

[2] Plaintiffs are the States of Connecticut, Alabama, Alaska, Arizona, Arkansas, California, Colorado, Delaware, Florida, Georgia, Hawaii, Idaho, Illinois, Indiana, Iowa, Kansas, Louisiana, Maine, Maryland, Michigan, Minnesota, Mississippi, Missouri, Montana, Nebraska, Nevada, New Hampshire, New Jersey, New Mexico, New York, North Carolina, North Dakota, Ohio, Oklahoma, Oregon, Rhode Island, South Carolina, Tennessee, Utah, Vermont, Washington, West Virginia, Wisconsin, the Commonwealths of Kentucky, Massachusetts, the Northern Mariana Islands, Pennsylvania, Puerto Rico, and Virginia, the Territory of Guam, the District of Columbia and U.S. Virgin Islands. (Amended Complaint ("Compl."), 1, Dkt. 196.). Alabama, Arkansas, Territory of Guam, Hawaii, and Louisiana have voluntarily dismissed their claims in this litigation.

HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

## A.    Defendants and Drug Characteristics

### *Variation Among Defendants and the Drugs at Issue*

1.      The States allege that 26 corporate Defendants agreed to participate in an overarching conspiracy involving 98 separate drug products.[3] (Dermatology Complaint, Dkt. 196 ("Compl."); Ex. 65, ¶ 7.)

2.      The States' overarching conspiracy alleges 38 unique combinations of corporate Defendants.  (Ex. 67, ¶ 114.)

3.      The Hatch-Waxman Act requires generic manufacturers to submit an Abbreviated New Drug Application ("ANDA") when seeking FDA approval to make and sell a generic drug product.  (Ex. 67, ¶ 28.)  For the FDA to approve an ANDA, the generic manufacturer must show that its product is bioequivalent to the brand–name product.  (*Id*.)

4.      None of the Defendants in this case has an ANDA for all 98 Drugs at Issue.  (*Id.* ¶ 133 & fig. 3.)

5.      No Defendant sold every Drug at Issue (*Id.* ¶ 133 & fig. 3.), and each Defendant varies in terms of the number of Drugs at Issue for which each is alleged to have participated.  (Id. ¶ 133 & fig. 3.)

---

[3] The States' expert has acknowledged that there are 98 separate drug products at issue in the Complaint. (Ex. 65 ¶ 7.) The Complaint "often does not indicate specific forms or strengths in its allegations, and when the different forms and strengths are considered, there are ninety-eight drugs captured by the States' eighty product-specific conspiracies." (Ex. 67, ¶ 12, n.11.)

HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER



6.     Three Defendants sold only one of the 98 Drugs at Issue: Amneal, Lannett, and Teligent.  (*Id.*)

7.     Nine Defendants are alleged to have engaged in misconduct regarding five or fewer Drugs at Issue: Amneal (1), Lannett (1), Teligent (1), Lupin (2), Valeant/Bausch (2), Wockhardt (2), Mallinckrodt (4), Mylan (4), and Aurobindo (5).  (*Id.*)  Notably, the count of 98 Drugs at Issue is based on unique form-strength combinations for each molecule, meaning that even these single-digit numbers overstate the number of drug molecules specifically alleged against each Defendant in the Complaint (*e.g.,* two, rather than five, for Aurobindo; and one, rather than two, for Lupin).  (*Id.* fn. 134.)

8.     Lannett and Amneal sold only one Drug at Issue apiece, and each were capsules to treat non-dermatological conditions like epilepsy or glaucoma. (Compl. ¶¶ 802, 892.)

***Variation Among Drugs at Issue***

9.     Each Drug at Issue varied in terms of its FDA classification, intended effect, and formulation.  For example, at least 28 of the 98 Drugs at Issue, or 29%, are not classified as topical drugs by the FDA.  (Ex. 67, ¶ 112.)

3

    a.    Twenty-three Drugs at Issue are oral solids such as acetazolamide, carbamazepine, and cefpodoxime proxetil. (Compl. ¶¶ 801, 201, 1190.) Five Drugs at Issue are suppositories such as hydrocortisone acetate and promethazine hydrochloride. (*Id.* ¶¶ 1475, 1506.)

    b.    None of the Drugs at Issue for Mylan—phenytoin sodium ER capsules, bromocryptine mesylate tablets, and pioglitazone HCL metformin HCL tablets—is a topical product. (Compl. ¶¶ 892, 1026, 1205.)

    c.    Likewise, none of the Drugs at Issue for Aurobindo—cefpodoxime proxetil and metformin hydrochloride— is a topical product. (*Id.* ¶¶ 1190, 1205.) Indeed, the States have admitted that "during the [r]elevant [t]ime [p]eriod, Aurobindo did not sell [t]opical [p]roducts" or "[d]ermatological [p]roducts" at all. (Ex. 73, RFA Nos. 3-4.)

    d.    Similarly, the only Drug At Issue for Lannett—acetazolamide—is not a topical product. (Compl. ¶ 801.)

10.    The 98 Drugs at Issue treat different conditions—including non-dermatological ailments. For instance, latanoprost treats high blood pressure inside the eye due to glaucoma. (Compl. ¶ 1353.) Promethazine HCL is an antihistamine used to treat allergies, nausea, and vomiting. (*Id.* ¶ 1506.) Ciclopirox cream is used to treat skin infections such as athlete's foot and ringworm. (*Id.* ¶ 1535.)

11.    The 98 Drugs at Issue come in different dosage strengths. For example, methylphenidate HCL tablets come in dosage strengths including 5mg, 10mg, 20mg, and Extended Release 20mg. (Ex. 65, Appendix C, Table 1.) Carbamazepine extended-release tablets come in dosage strengths including 100mg, 200mg, and 400mg. (*Id.*)

HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

12.    In some cases, a Defendant may manufacture one dosage of a Drug at Issue, but not the others.  For instance, Lannett only manufactures the 250mg strength of acetazolamide but does not make or sell the 125mg strength.  (Ex. 65, Appendix C, Table 2.)  Glenmark only manufactures the 0.25% strength of desoximetasone ointment and does not make or sell the 0.05% strength.  (*Id.*)

13.    The Drugs at Issue are also administered in different forms ranging from creams, lotions, and gels to ointments, tablets, and solutions.  For example, clobetasol is sold as an emollient cream, cream, gel, ointment, and solution.  (Ex. 65, Appendix C, Table 1.)  Triamcinolone acetonide is sold in a cream, ointment, and paste, each of which have varying strengths. (*Id.*) Methylphenidate HCL takes the form of tablets in 5, 10, and 20mg strengths. (*Id.*)

***Drug Markets at Issue Are Oligopolies***

14.    The Drugs at Issue compete in a variety of different markets.  According to the States' expert, Dr. Frederick Warren-Boulton, each individual drug constitutes a separate, unique product market with distinct, varying participants. (Ex. 65, ¶ 12, Appendix D Figures 18-115.) Each product varied in terms of the number of competitors that made or sold the Drug at Issue. (Ex. 67, ¶ 110.)

15.    For all Drugs at Issue, there were 10 or fewer competitors throughout the Relevant Time Period.  On average, the Drugs at Issue each had three competitors during the alleged conduct period.    (Ex.    65,    Appendix    G,    Table    2);    Ex.    67,    ¶    50.)

HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER



16.     In 88% of the drug markets, there were "never [] more than five competitors and more than half never had more than three competitors throughout the alleged conduct period." (Ex. 67, ¶ 50.)

17.     The markets for the Drugs at Issue were oligopolies, *i.e.,* concentrated markets with few competitors.  (Ex. 22, 31:16-21 Ex. 18, 37:3-7.)

18.     In oligopolies, prices can be higher than prices in markets with perfect competition. (Ex. 22, 33:2-17; Ex. 23, 247:17-248:12; Ex. 66, ¶¶ 7, 37.)

19.     In oligopolies, "firms have expectations about how their rivals are going to behave if they do something" and so firms "take the expected response of those rivals into account."  (Ex. 23, 249:25-250:4.)  Thus, firms may choose to forego additional profitable sales in the absence of a conspiracy, and firms do not "simply go out there and maximize their market share." (*Id.*, 246:12-14; *see also* Ex. 140, ¶ 43.)

20.     In oligopolies, firms can also raise prices significantly over time even in the absence of an agreement.  (Ex. 23, 246:19-247:3 ("[t]acit coordination is a process in an oligopoly in which an oligopoly can raise prices significantly over time with a particular pattern without express

HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

agreement."); Ex. 66, ¶ 37) ("I agree (and say repeatedly) that in a model of a repeat game, the price under oligopolistic competition can approach the monopoly price through an extended process of multiple price increases (and decreases) along the way."); Ex. 18, 37:10-17 (describing oligopolistic coordination).)

21.    Glenmark's Paul Dutra confirmed that dermatological products were typically a "good place to start raising prices" because they generally "had less competition than solid oral products," and therefore price increases were "more likely to stick."  (Ex. 47, 691:6-692:6.)

*Drug Production Processes Varied Among Defendants*

22.    Defendants relied on different sources for obtaining Active Pharmaceutical Ingredients ("API"), even in instances where competitors sold the same finished product.  Some Defendants relied primarily on a parent company to manufacture API, while other companies purchased API from an unrelated supplier.   (*See* Ex. 50, 389:1-392:15 (Aurobindo's parent company manufactured the vast majority of the API Aurobindo sold); Ex. 60, 63:19-64:12; 81:23-82:18; Ex. 71, Rog Interrogatory. Nos. 1-2 (Amneal and Actavis typically sourced API from a supplier); Ex. 47, 499:16-500:17 (Glenmark both manufactured its own API and purchased API from third-party suppliers); Ex. 16, 244:3-13.)

23.    Because each Defendant had a different process for acquiring API, Defendants also varied in terms of their manufacturing costs and the role such costs played in determining prices for the Drugs at Issue.  (Ex. 47, 500:6-17 ("[T]he price of raw material would affect the total cost of goods of any product."); Ex. 43, 146:7-12 ("[T]he cost and supply of API could be a factor in Bausch's pricing of the generic drug products.").)

24.    Some Defendants did not acquire API at all, but instead purchased the drug as a finished product.  (Ex. 72, Response to Interrogatory 1 ("Lannett receives the product [digoxin] as

HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

a finished good and does not require the API for this product.").)

***Pricing and Bidding Authority and Processes Varied Among Defendants***

25.　　The policies and procedures for approving pricing and bidding decisions varied by manufacturer.  For example, Sandoz[4] established a pricing committee in 2012, so no single person had the unilateral authority to implement price increases, and instead any price increase required unanimous approval from the committee.  (Ex. 143, SDZCTAG-02128398; Ex. 140, ¶¶ 25, 27, 29, 32, 34.)  The Sandoz pricing committee considered the following non-exhaustive factors:  demand forecasting based on publicly available information, customer information, and other competitive intelligence; profitability analyses, including the effect of price protection provisions; the impact a price increase on one drug would have on the portfolio as a whole given price-protection commitments; and consideration of financial targets set by Novartis.  (Ex. 143, SDZCTAG-02128398; Ex. 140, ¶¶ 29-36; Ex. 15, 176:24-177:6; *see also, e.g.*, Ex. 30, 70:13-71:11; 83:3-22 (At Lupin, no one person had the authority to approve price changes to drugs.); Ex. 5, 453:7-454:6 (At Sun, G.P. Singh "had the final authority."); Ex. 165, 182:18-183:20 (At Lannett, Kevin Smith was the primary decision-maker on pricing.); Ex. 46, 129:22-131:22; Ex. 14, 41:3-8; Ex. 60, 142:8-21 (Amneal and Mylan had pricing committees.); Ex. 58, 48:16-49:7 (At Glenmark, several departments were involved in pricing decisions.).)

26.　　Bidding practices also varied among Defendants. For example, when evaluating new sales opportunities, Mylan's Pricing and Contracts department, with support from its

---

[4] During the relevant period, Sandoz Inc., was part of the Novartis group of companies, a division responsible for generics.  In 2012, Sandoz continued its long history of acquisitions through the acquisition of Fougera Pharmaceuticals Inc.  (*See* Novartis, 2012 Annual Report at 3, 48-49 (available at https://www.novartis.com/investors/reporting-and-transparency-hub/reporting-archive)).  As of October 4, 2023, Novartis spun off Sandoz, which as of that date became an independent, publicly-traded company.  (*See* Novartis, 2023 Annual Report at 21-22 (available at https://www.novartis.com/investors/reporting-and-transparency-hub#annual-report-form-20f).

HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

manufacturing and supply chain teams, employed an "Opportunity Analysis Process," which involved conducting pricing and supply analyses based on consideration of various factors including, among other things, expected volume, profitability, and inventory assessments. (Ex. 14, 102:22-103:13; Ex. 132, MYLGP0002696599 at 649-653; Ex. 131, MYLGP0001251856 at Slides 5, 7.) In addition to the analyses above, Mylan often considered the customer relationship, its incumbent status, and likelihood of success for its RFPs. (Ex. 14, 213:21-214:13); *see also*, *e.g.*, Ex. 16, 347:1-23 (explaining that at Glenmark, "a number of people" were involved in "deciding when to bid on an RFP or other pricing request from a customer").)

**B.    Testimony Regarding the Alleged Overarching Conspiracy**

27.    The States have obtained the cooperation of several former employees of Aurobindo, Fougera, Glenmark, Rising, and Sandoz.

| Witness (Complaint Identifier) | Relevant Former Employer(s) |
|---|---|
| Michael Vezza (CW-1) | Sandoz |
| Paul Krauthauser (CW-2) | Sandoz, Rising |
| Christopher Bihari (CW-3) | Fougera, Sandoz |
| Della Lubke (CW-4) | Sandoz |
| Paul Dutra (CW-5) | Glenmark |
| Anthony Thomassey (CW-6) | Fougera, Aurobindo |

(*See* Ex. 46, 45:4-10; Ex. 49, 24:23-25:2; Ex. 11, 25:6-9; Ex. 15, 24:4-25:21; Ex. 47, 868:4-6; Ex. 7, 18:11-17.)

28.    None of the States' cooperating witnesses testified to an overarching conspiracy as alleged by the States.

a.    Michael Vezza, who was at Sandoz during the relevant period, testified that he could not recall any "overarching conspiracy with all of the companies" or "one big agreement among all of those companies." (Ex. 46, 703:10-704:10.) Vezza further testified that "every product has its own story or

HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

nuance," (*Id.*, 1575:23-1577:8), and that "every product had a unique situation." (*Id.*, 1971:3-1973:3.)

b.    Paul Krauthauser, who was at Rising during the relevant period, testified that he was unaware of any overarching agreement to fix prices or allocate market share. (Ex. 49, 451:15-452:21.)

c.    Christopher Bihari, who was at Sandoz during the relevant period, did not testify that there was an overarching conspiracy.  Instead, he testified that any agreements were "product-by-product" and "situation by situation." (Ex. 11, 1264:12-1265:21.)

d.    Della Lubke, who was at Sandoz during the relevant period, denied any "larger overarching agreement among all of those companies."  (Ex. 15, 527:9-528:4.)

e.    Paul Dutra, who served as Glenmark's Executive Vice President until April 2014, did not testify to any overarching conspiracy.  (Ex. 47, 933:19-24.)

f.    When Anthony Thomassey, who was at Fougera during the relevant period, referred to an "overarching agreement," (Ex. 7, 924:14-15), he was in fact describing three separate bilateral agreements between his former employer (Fougera) and one other Defendant (Perrigo, Taro, or G&W), (*Id.*, 919:16-925:20, *see also* Ex. 7, 1192:15-19, 1196:10-1199:16 (Perrigo); 1203:19-23 (Taro); 1206:5-9 (G&W).)  He did not testify that each Defendant entered into an agreement regarding "fair share."  (*See, e.g.*, Ex. 7, 924:9-19.)  For example, an alleged agreement between Fougera and Perrigo was "on a product-by-product basis to make an agreement on that product[.]" (*Id.*,

925:16-20.)

29.     The cooperating witnesses were not aware of any conspiracy or improper agreement, whether overarching or otherwise, concerning many of the Defendants.  (Ex. 46, 698:15-708:6; Ex. 15, 512:2-528:4; Ex. 11, 1588:19-23, 1603:7-1610:19; Ex. 49, 403:23-432:15; Ex. 7, 1243:10-21; Ex. 47, 933:19-24.)

30.     Witnesses from other Defendants did not have agreements with competitors, as alleged by the States:

a.      **Actavis**: Andy Boyer testified that he was "not [] aware of" Actavis "ever mak[ing] any decision to pursue or not pursue specific customers or market share based on an agreement with a competitor."  (Ex. 6, 369:4-9.)  Marc Falkin likewise explained that he never agreed to coordinate with competitors concerning the price Actavis charged or which customers it would target.  (Ex. 138, 758:11-759:12.)

b.      **Amneal**: Shannon Rivero testified that she was "unaware of any agreements" between Amneal and any competitor regarding "the pricing of any generic product[]" or "coordinating on customers or bids for any generic product[.]"  (Ex. 57, 483:15-484:1.)

c.      **Aurobindo**: James Grauso testified that "Aurobindo never had any agreements with any other competitors on customers or pricing of any product."  (Ex. 27, 439:15-440:1.)

d.      **Bausch**: Barbara Purcell testified that Bausch "did not "ever agree[] with a Bausch competitor regarding the price," "about coordinating in any way the bidding," or "regarding which customers Bausch would supply and which

HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

customers a competitor would supply." (Ex. 8, 582:8-582:12; 580:19-586:7.) Mary Saharyan likewise denied any awareness that anyone at Bausch "ever reached an agreement with a competitor about which customers Bausch would supply or which customers a competitor would supply."). (Ex. 44, 321:6-321:19.)

e. **Glenmark**: James Grauso testified that he "might have been speaking to [his] friends, who happened to work for other manufacturers," but "[n]o agreements on products, customers, or pricing was ever reached – ever made." (Ex. 27, 469:9-21.) Jeff Johnson likewise testified that he was not aware "of any agreements between Glenmark and any other manufacturer of generic drugs on coordinating the bids for any product." (Ex. 31, 320:2-6; 322:5-8.)

f. **Greenstone**: Jill Nailor and Carol Patterson both testified that they never formed, and were not aware of, any agreements with employees of competitor companies regarding the pricing or allocation of any customer for any generic drug product. (Ex. 32, 1019:5-1020:9; Ex. 62, 277:8-278:6.)

g. **Lannett**: Kevin Smith testified that he never reached an agreement with any competitor of Lannett with respect to Lannett's pricing or market share of any generic drug. (Ex. 39, 791:13-794:9.) Smith answered "[a]bsolutely not" when asked if he "ever reach[ed] an agreement with any competitor of Lannett with respect to whether or not to respond to a customer's [Request for Proposal ("RFP")]." (*Id.*, 787:13-21.)

h. **Lupin**: David Berthold testified that he "did not" "ever enter an agreement

HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

to fix prices on [competitor] calls." (Ex. 12, 795:19-796:14.)

i.  **Mylan**: Lance Wyatt denied ever entering into any agreement with a competitor regarding prices for generic drugs. (Ex. 42, 176:15-22.)

j.  **Perrigo**: Douglas Boothe testified that, to his knowledge, Perrigo never made any decisions "to pursue or not to pursue specific customers for market share based on any agreement with a competitor." (Ex. 17, 524:13-17.) Boothe also denied ever sharing pricing information with competitors or reaching agreements with competitors about pricing or "which customers Perrigo would supply and which customers the competitor would supply." (*Id.*, 522:20-24, 524:3-7.) Katie McCormack denied ever reaching agreements with employees of competitors regarding the pricing for generic drug products, or the customers that each company would supply. (Ex. 37, 285:2-286:4, 287:13-288:16.)

k.  **Sandoz**: Armando Kellum was "unaware of any overarching, industrywide conspiracy with respect to generic drugs," "did not participate in an overarching industrywide conspiracy with respect to generic drugs," and was "unaware of any Sandoz employee participating in an overarching, industrywide conspiracy with respect to generic drugs." (Ex. 140, ¶ 57.)

l.  **Sun**: Anand Shah testified that Sun did not "talk to competitors for price increases." (Ex. 3, 214:11-16.) Jolene McGalliard also denied ever sharing pricing information with a competitor or participating in any agreement to coordinate price increases or market share. (Ex. 34, 297:11-331:14.)

m. **Taro**: Aleksey Likvornik testified that "there were no agreements on any of

HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

[Taro's] products." (Ex. 1, 256:4-21.)  Elizabeth Guerrero denied having conversations with competitors about pricing or bids "whether they [were] friends or not" (Ex. 20, 98:2-19), and Jim Josway similarly denied reaching any agreement with a competitor to allocate customers or raise prices).  (Ex. 28, 271:2-272:24.)

n.   **Wockhardt**: Scott Koenig testified that he never reached an agreement with anyone at a competitor concerning pricing or "about which customers Wockhardt would supply and which customers a competitor would supply." (Ex. 56, 513:9-515:11; Ex. 64, 266:13-268:18 (same); Ex. 157, 160:10-163:18 (same).)

## C.   Unilateral Reasons for Pricing and Bidding Decisions

### *Generic Drug Pricing*

31.   When a generic manufacturer begins selling a new product, it typically sets a Wholesale Acquisition Cost ("WAC")[5] that is below the branded version's WAC and is publicly available.  (*See, e.g.,* Ex. 3, 75:8-77:5; Ex. 43, 92:3-93:3; Ex. 9, 75:13-76:13; Ex. 2, 190:2-195:1 (discussing calculation of discount from branded WAC upon new generic product launch).)

32.   Because WAC does not reflect discounts, rebates, or other reductions in price that are commonly negotiated with customers, most customers do not pay WAC, and many pay different prices for the same drug.  (Ex. 5, 69:6-23; Ex. 3, 135:24-141:21; Ex. 40, 218:11-24; Ex. 4, 77:7-80:11, Ex. 5, 541:15-544:23; Ex. 2, 140:3-141:14; Ex 60, 158:18-158:22.)

---

[5] WAC is defined as "the manufacturer's list price for the drug or biological to wholesalers or direct purchasers in the United States, not including prompt pay or other discounts, rebates, or reductions in price, for the most recent month for which the information is available, as reported in wholesale price guides or other publications of drug or biological pricing data."  42 U.S.C. § 1395w-3a(c)(6)(B)).

HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

33.     Customer contracts include certain distinct terms, such as long-term pricing, shelf stock adjustments, and other price-protection provisions, that control the effect of any change in manufacturer pricing.  (*See* Ex. 67, ¶¶ 42-45; Ex. 47, 451:22-455:14; Ex. 58, 218:23-219:18; 220:17-221:21.)

34.     Various contract terms may apply to a particular customer.  These terms include, but are not limited to, failure-to-supply penalties, price protection penalties, WAC increase penalties, and shelf stock adjustment penalties, among others, generic manufacturers consider these terms in pricing and bidding considerations.  (Ex. 31, 321:9-322:4; Ex. 32, 592:4-13; Ex. 2, 109:7-118:23; Ex. 69, ¶¶ 102-108; Ex. 145, Wockhardt-CB-000000364443-44; Ex. 60, 98:6-15, 47:18-48:1, 118:19-23, 156:20-159:14, 159:20-161:6, 161:8-13, 162:11-168:7; Ex. 49, 96:6-97:2; Ex. 68, ¶¶ 18-20; Ex. 56, 347:20-356:8, 435:15-436:4, 496:6-497:17; Ex. 140 ¶ 35.)

35.     The ability to supply customers was also a factor that manufacturers considered when determining whether and how to approach customers, whether as a new entrant or as an incumbent.  (*See, e.g.*, Ex. 27, 591:21-592:4, 609:8-14; Ex. 12, 414:11-416:20; Ex. 26, 64:18-65:18; Ex. 33, 396:3-397:19; Ex. 163, 65:16-67:4; Ex. 153, APUSA-001945343; Ex. 69, ¶ 75; Ex. 47, 458:18-460:5 (share goal at launch depended on supply); 669:5-12 (consequences of failure to supply penalties).)

        a.     For example, Mylan could not bid on CVS, Walgreens, and Walmart for its phenytoin business due to an extended period of supply disruptions which left Mylan with low inventory and limited ability to fulfill even existing customer requests.  (Ex. 69, ¶¶ 94-95; Ex. 148, MYLGP0001239248 (CVS); Ex. 149, MYLGP0010496591 (Walgreens); Ex. 150, MYLGP0008573041 (Walmart).)

HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

b.  Similarly, Wockhardt was unable to bid on erythromycin when Fougera had a supply interruption because Wockhardt had its own supply interruption. Wockhardt had a limited quantity of API to manufacture the product, it needed to change its API supplier, and the dauber on the product needed to be changed.  As a result of these problems, Wockhardt placed the product on long-term backorder.  (Ex. 146, Wockhardt-CB-000003154314-15; Ex. 147, Wockhardt-CB-000003139547; Ex. 64, 162:23-163:22, 259:19-261:8.)

***Independent Reasons to Increase Price***

36.  Manufacturers can increase WAC or contract prices on one drug, or a group of drugs, for several independent reasons, including as part of a regular portfolio review, after concluding that it could sell at a higher price and profit to fewer customers, in response to supply challenges, or in response to other price increases.  (*See* Ex. 58, 328:10-329:8  (Glenmark made decisions on "matching prices" based on profitability and supply); *see also* Ex. 16, 47:3-49:2, 87:2-88:24 (explaining that in addition to specific "triggering [market] events," portfolio reviews for potential increases occurred on a "regular basis."); Ex. 85, 0032A; Ex. 47, 682:21-683:24 ("because Glenmark had a relatively high market share, it could afford to lose some of that market share in order to charge a higher price for the product"), 654:3-654:15 (explaining that if Glenmark stopped selling products it was losing money on, profits could improve.).)

a.  Supply challenges at one company present opportunities to raise prices. Lupin, for example, raised its price for ethambutol HCL in December 2012 after learning VersaPharm was leaving the market entirely and Teva was experiencing temporary issues. (Ex. 30, 281:1-282:2, 282:22-283:10; Ex. 27, 591:21-592:4, 609:8-14.)

16

HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

    b.    Manufacturers may also evaluate a price increase based on customer feedback. At Bausch and Fougera, it was "very typical" to learn about price increases in the market from its customers and then evaluate whether a price increase made sense for them. (Ex. 44, 85:12-86:10; 39:16-40:14; Ex. 40, 175:2-10; Ex. 8, 537:17-537:23.)

***Independent Reasons to Limit Share Following Competitor Price Increase***

37.    When a competitor increases price, manufacturers can improve profitability by following the first competitor with their own price increases, including by sometimes obtaining the same amount of business at a higher price. (Ex. 8, 538:3-13; Ex. 145, Wockhardt-CB-000000364443; Ex. 74, RFA No. 4 ("it is possible for a market participant's decision to refuse to reduce its price and lose some business to be more profitable than reducing its price.").)

38.    If one generic manufacturer raises its price, another manufacturer also must assess whether failing to follow that increase would lead to increased demand for their product, which would potentially result in a failure-to-supply penalty. (Ex. 64, 257:14-258:16; Ex. 56, 337:4-338:1; Ex. 35, 92:5-93:3; Ex. 11, 116:1-19.)

    a.    Wockhardt, for example, raised its clobetasol prices to avoid these failure-to-supply penalties that could cost "years and years of profits or millions of dollars for a one-month supply issue." (Ex. 56, 337:4-338:1; *see also id.*, 494:9-495:21, 496:6-497:17, 498:4-500:7, 500:14-505:18; Ex. 35, 92:6-93:3; Ex. 64, 257:14-258:16; Ex. 145, 83:18-90:3, 139:5-140:5; Ex. 145, Wockhardt-CB-000000364443-44; Ex. 151, Wockhardt-CB-000001676637-39; Ex. 152, Wockhardt-CB-000003131335; Ex. 144, Wockhardt-CB-000001410669, 71; Ex. 154, Red Oak Sourcing, LLC Generic Pharmaceuticals Business Standards, 2014.)

HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

b.    In seeking approval for a price increase, Greenstone's employees explained
that an increase was necessary to enable the company to properly manage
inventory for existing customers, as customer orders had already increased
in response to Sandoz's price increase while Greenstone's price remained
below the market.  (Ex. 96, GNST-005765557.)

39.    Manufacturers also have an independent interest in avoiding undermining a price
increase to gain market share because doing so could trigger a "race to the bottom," resulting in
lower prices and reduced profits for a particular drug.  (*See, e.g.*, Ex. 8, 247:24-248:20, 285:12-
286:11; Ex. 56, 515:12-517:7; Ex. 64, 138:7-139:3, 147:9-23; Ex. 43, 351:8-352:4; Ex. 40, 191:9-
192:6; Ex. 13, 66:4-67:1; Ex. 50, 526:19-527:18; Ex. 15, 795:15-22;  Ex. 7, 697:3-698:2; *see also*
Ex. 8, 353:2-354:10 (testifying when a competitor raised prices on a generic product, Bausch
would consider whether it would be more advantageous to follow the competitor's price increase
or seek market share by lowering price); Ex. 24, 145:12-146:9; Ex. 16, 264:4-265:23 (explaining
that there are a "number of reasons that go into why [Glenmark] would or would not pick up a
customer . . . One . . . is do you have the ability to supply. Number two, you have to look at the
overall number of players that are in the product, you have to look at the potential for price erosion
that could occur . . . as more and more people enter, you have more and more activity, bidding
activity, and it inevitably causes price erosion so [Glenmark has] to be very conscious of trying to
make sure that [Glenmark's] products are well positioned and have some reasonable level of
profitability.").)

40.    The worst-case scenario occurs when the manufacturer lowers its price but fails to
gain market share, leaving it worse off than if it had raised prices and lost customers.  (Ex. 8,
285:12-286:11; Ex. 56, 515:12-517:7; Ex. 64, 138:7-139:7, 147:9-23; Ex. 43, 351:8-352:4; Ex. 40,

HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

191:9-192:6; Ex. 60, 131:1-16.)

41.    Manufacturers independently assessed whether (and to what extent) to seek additional business and the prices at which to do so in response to RFPs from customers.  (Ex. 87, GMK-MDL-000993735; Ex. 47, 800:14-801:17; Ex. 62, 136:8-137:6; Ex. 36, 66:3-68:19; Ex. 134, Wockhardt-CB-000000263434; Ex. 135, Wockhardt-CB-000001418980; Ex. 53, 382:4-21 (reasons why Lannett would not bid on RFPs, such as lack of capacity, lack of manufacturing supply, cost of goods, etc.).)

***Independent Reasons to Give Up Market Share to a New Entrant***

42.    Manufacturers could mitigate a reduction in profitability by independently giving up some business to new entrants instead of undercutting new entrants to maintain market shares. (Ex. 63, 698:15-703:7; Ex. 50, 525:1-526:2, 528:1-528:8; Ex. 43, 349:3-351:20; *see also* Ex. 104, PER-MDL-000361454; Ex. 103, PER-MDL-000322398 (reflecting Perrigo subsidiary Paddock's 2011 decision to divest latanoprost solution rather than enter the market after realizing there would fiercer competition than originally anticipated).)

43.    Similarly, incumbent manufacturers furthered their independent interests by maintaining their higher prices with fewer customers.  (Ex. 43, 349:3-351:20; Ex. 9, 67:23-69:12 (explaining that when a new competitor comes to market and offers a Taro customer a price, "[i]f we don't yield that market share," and the competitor "gets no share," then they will "yield some market share initially" to "maintain its prices in the market place.").)  Thomassey explained the "independent business interest" behind incumbent firms "giv[ing] up market share" to new entrants because if they did not, new entrants would approach multiple customers and "each time the price will ratchet lower and lower . . . And so if [the incumbent firms] don't give up share you'll just drive the price into the ground."  (Ex. 7, 1172:15-1173:4.)

44.    If the incumbent manufacturer tried lowering prices to keep a customer, it risked

its overall profit.  Put differently, a company is more profitable selling 100 drugs at $20 each than

200 drugs at $9 each and selling 100 drugs at $20 each than selling 100 drugs at $9 each.  (Ex. 40,

191:9-192:6; Ex. 43, 349:3-351:20; Ex. 29, 360:2-17; Ex. 9, 67:23-69:12; Ex. 47, 528:11-529:14

(noting that failing to give market share to new entrant would "not be a smart decision").)

Examples of this include the following:

a.      Perrigo, Taro, and Aurobindo responded to new market entrants threatening

profitability by prioritizing profitable customers and moving on from less

profitable relationships.  (Ex. 33, 223:24-225:11; Ex. 9, 67:23-69:12; Ex.

50, 526:19-527:18.)

b.      Likewise, in January 2013, Glenmark responded to a new entrant in the

fluticasone market by analyzing its customer base to focus on the more

profitable customers and opportunities. (*See* Ex. 80, GMK-MDL-

000153121.)  It did the same thing for a second entrant in that market later

in 2013. (*See* Ex. 83, GMK-MDL-000334246; Ex. 84, GMK-MDL-

000427917;  Ex.  85,  GMK-MDL-000427918;  Ex.  81,  GMK-MDL-

000283639.)

c.      Similarly, in December 2011, McKesson informed Greenstone of the fact

that Sandoz was bidding at a lower price for eplerenone than the one at

which  Greenstone  was  supplying.  (Ex.  164,  GNST-006361580.)

Greenstone declined to match Sandoz's bid because: "We [Greenstone]

have 94% [market share]; Sandoz has 4%. Unclear on future risk to Sandoz

ability to supply. If legitimate (and I have no reason to believe that it is not),

we should release some share. I cannot see my way clear to lowering the

HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

price to such levels only to see the competition attack us elsewhere." (Ex. 97, GNST-006116804.)

***Independent Reasons to Limit Share Upon Competitor Exit***

45.     Upon a competitor's exit from the market, the remaining manufacturers may decide not to pursue additional market share for several reasons:

a.      The desire to supply more of a product could depend on the profitability of the product, based on demand or the costs of production.  For example, Teva's exit from the betamethasone dipropionate lotion market presented an opportunity for Perrigo to increase market share; but because betamethasone dipropionate lotion was a very low margin product, Perrigo had to decide whether it made financial sense to devote more manufacturing time to cover increased orders for betamethasone dipropionate lotion or to simply discontinue the product.  (*See* Ex. 33, 334:14-335:10; *see also* Ex. 99, 55:16-56:11; Ex. 11, 312:14-314:19 (testifying it was an opportune time to raise the price on desonide when Actavis exited the market); Ex. 69, ¶¶ 31, 102-108 (explaining Mylan's API issues caused them to withdraw from the market leading to Sandoz making an increase on WAC).)

b.      The ability to increase share in response to a competitor exit would similarly require a manufacturer to have capacity to increase production or otherwise expand sales without creating supply issues for current customers, whether for that particular product or other products with the same API.   (*See* Ex. 61, 619:23-620:16.)

**D.     Market Outcomes Do Not Comport with the Overarching "Fair Share" Conspiracy**

46.     Pursuant to the Taro document that the States have at times adopted to illustrate

their alleged "fair share" agreement, reprinted below, in a two-firm market, the first entrant would acquire roughly 60% share of the market while the second entrant would acquire roughly 40% share. (Compl. ¶ 133; Ex. 65, ¶ 187.)  In a three-firm market, the "fair share" should be around 45% for the first entrant, 35% for the second entrant, and 20% for the third entrant. (Ex. 65, fig. 24.)

| Market Share - Fair Unit Share assumptions | | | | | | | |
|---|---|---|---|---|---|---|---|
| Order of Entry Grid | | | | | | | |
| Number of Competitors | | | | | | | |
| Number of Competitors | 1 | 2 | 3 | 4 | 5 | 6 | 7 |
| Order of Entry 1 | 100% | 60% | 45% | 35% | 30% | 30% | 30% |
| 2 | | 40% | 35% | 30% | 25% | 25% | 25% |
| 3 | | | 20% | 20% | 20% | 20% | 20% |
| 4 | | | | 15% | 15% | 15% | 15% |
| 5 | | | | | 10% | 10% | 10% |
| 6 | | | | | | 10% | 10% |
| 7 | | | | | | | 10% |
| Total | 100% | 100% | 100% | 100% | 100% | 100% | 100% |

47.    The Taro document was for internal use only so that Taro and Sun, its parent company, "knew what [Taro] was doing" with its products; there is no evidence it was circulated outside of Taro or that the same benchmarks were used by other companies. (Ex. 25, 80:4-19, (AGN-MDL00012482).) Instead, it was used to create general targets that Taro employed for pricing, and actual outcomes could differ.  (Ex. 25, 78:1-19, 80:4-19, 81:3-19, 71:20 ("This is an analysis.") ("[T]he fair share may be 20 percent [in the chart], but the first year you may only get 5 percent, but in the second year we may target 25 percent," because "when you are entering the market and [competitors are] already there, everybody is going to protect their market share.").)[6]

48.    The internal Taro document was not a blueprint for any conspiracy. Although according to the States' expert it showed "Taro's understanding of what the fair share agreement

---

[6] G.P. Singh Sachdeva, who was the president of Sun Pharmaceutical Industries, Inc. ("Sun"), received this Taro document via email from Sun's CEO, who at the time was also the CEO of Taro's parent company, Taro Pharmaceutical Industries Ltd. (Ex. 25, 10:15-11:14, 69:6-70:16.)

HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

is," there is no evidence any other Defendant adopted that understanding. (Ex. 22, 575:12-20.)

***No Economic Incentives to Enter the Overarching Conspiracy***

49.    For some Defendants, profitability across their Drugs at Issue declined during the alleged conspiracy period.  For example, during the alleged conspiracy period, Mylan's average profits for its four Drugs at Issue fell from approximately $17.9 million per quarter before the alleged conspiracies began to approximately $3.6 million per quarter during the alleged conduct periods.  (Ex. 69, ¶¶ 48, 51.)

50.    It would not have been economically rational for a firm supplying a few of the 98 Drugs at Issue to join the alleged overarching conspiracy involving all 98 Drugs at Issue because they "would have risked exposing themselves to joint and several liability for all 98 Drugs at Issue, including the potential for substantial damages associated with drugs they never sold."  (Ex. 67, ¶¶ 129, 134, 135; Ex. 66, ¶ 109 ("Without offering an opinion on an individual firm's liability, I agree that participating in a conspiracy that could expose a firm to enormous joint and several liability in return for a relatively small immediate reward would not appear to be a management decision that would benefit shareholders.").)

***Defendants' Market Shares for the Drugs at Issue***

51.    For approximately ▮ of the Drugs at Issue sold in two-firm markets, the market leader in 2016 Q1 (i.e., the largest supplier) had a ▮ to ▮ share, neither a pro-rata ▮ share nor the ▮ share in the Taro document. (Ex. 65, ¶ 185, fig. 23.)

52.    In three-firm markets, nearly 65% of the market leaders in 2016 Q1 had shares of either below ▮ or above ▮, not the ▮ share in the Taro document. (Ex. 65, ¶ 190 & fig. 26.)

53.    For *all* Drugs at Issue with available IQVIA data that have between two and five competitors, the market share of at least one competitor was not within ten percentage points of

HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

the market shares specified in the Taro document during the alleged conduct period.  (Ex. 70, ¶ 62 & fig. 2.)



54.    Sixty-five percent of the Drugs at Issue that have between two and five competitors did not follow a pattern where the first entrant has the highest share, the second entrant the second highest share, and so on.  (Ex. 67, ¶ 167 & fig. 9.)

HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER



55.     Market shares fluctuated and varied among market leaders for many Drugs at Issue. (Ex. 67, ¶ 203 & fig. 17.) For roughly 30% of the Drugs at Issue, the market share leader at the beginning of each alleged conduct period had lost its market leader position just two quarters later. (*Id.* ¶ 215 & fig. 18.)

56.     For example, for the three-firm drug clobetasol emollient cream, in August 2014, shortly after Sandoz and Akorn followed price increases implemented by Taro, Sandoz led the market with ▮▮▮▮ market share and Akorn had ▮▮▮. By January 2015, Sandoz's share had fallen to ▮▮ and Akorn's had grown to ▮▮. (Ex. 141, SDZCTAG-06074516; Ex. 142, SDZCTAG-00319522.)

57.     When expanding to eight quarters beyond the start of the alleged conduct period, roughly 40% of the Drugs at Issue had a change in market share leader position. (Ex. 67, ¶ 215 & fig. 18.)

HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER



58. Dr. Cremieux testified that "if there is an overarching conspiracy, we should observe some market stability . . . If the answer is no . . . there can't be an underlying overarching conspiracy because the economic evidence directly contradicts it." (Ex. 18, 262:24-263:5.) In this case, Dr. Cremieux testified that his "conclusion is the economic evidence is not consistent with the existence of an overarching conspiracy." (*Id.*, 262:20-265:5.)

59. For 88% percent of the Drugs at Issue with available IQVIA data that have between two and five competitors, competitors did not maintain their market share positions throughout the alleged conspiracy period. (Ex. 70, ¶ 72 & fig. 5.)

HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER



Figure 5[135]
Percent of Drugs at Issue For Which Competitors
Do Not Maintain Their Relative Market Share Positions
Throughout the Alleged Conduct Period

60.    For example:

a.    Betamethasone Valerate Lotion EQ0.1% Base ("Betamethasone"): For
betamethasone, while Sandoz was the market leader at the beginning of the
alleged conduct period, G&W had a greater market share than Sandoz
several times during the relevant period of 2011 and 2016.  (Ex. 65,
Appendix D, fig. 32.)

HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

b.    <u>Desonide Cream 0.05% ("Desonide")</u>: The alleged misconduct in connection with desonide began in 2013 with incumbents, Perrigo and Taro, with the highest market shares, but they were soon surpassed by Actavis and G&W, who had both newly entered the market. Actavis and G&W captured over █ of the market at various times during the alleged conspiracy period. (Ex. 65, Appendix D, fig. 55.)

c.    <u>Desoximetasone Ointment 0.25% ("Desoximetasone")</u>: The alleged misconduct regarding desoximetasone began in 2012 with Taro, the first entrant, capturing most of the market, but Taro ended 2016 having one of the lowest market shares. Over much of this period, Taro was surpassed by Glenmark, who captured approximately █ of the market even though it was the third entrant. (Ex. 65, Appendix D, fig. 59.)

d.    <u>Latanoprost Solution 0.005% ("Latanoprost")</u>: The alleged misconduct regarding latanoprost began in 2012 with Greenstone, the manufacturer with the highest market share in 2012, with around █ of market share, but it ended 2016 with Greenstone having the lowest market share at less than █ share. (Ex. 65, fig. 30.) The firm leading the market also changed twice; with Greenstone losing its initial lead to Bausch at the beginning of the alleged misconduct and Sandoz overtaking the lead just two years later, nearly doubling its share to approximately █ by 2016. (*Id*.)

## E.    Understanding and Use of the Term "Fair Share" Among Defendants

61.    The States have admitted that "in the absence of any other evidence or context, use of the term 'fair share' in the abstract *may or may not be indicative that a generic pharmaceutical supplier has entered into an agreement with a competitor*." (Ex. 74, RFA No. 6.) (emphasis added).

HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

62.    Dr. Warren-Boulton likewise admitted that he was "not saying everybody has the same understanding" of what constituted a fair share, (Ex. 22, 543:9-16), and that each alleged participant's understanding of "fair share" could have "differ[ed] significantly" depending on the "individual drug "and the "individual" firm."  (*Id.,* 528:14, 529:13.)

63.    Dr. Warren-Boulton also explained that "fair share . . . is in the eye of the beholder," (Ex. 23, 195:18-19), and that he did not "worry about [Defendants] communicating to formulate it" because "[i]t's like one of the Ten Commandments . . . nothing happens until somebody does something bad." (*Id.*, 205:3-206:14.)

64.    Generics manufacturers had differing understandings of what "fair share" meant— including employees at the same manufacturer—as well as assigned differing weight to its role, if any, in making pricing and bidding decisions:

a.    **Actavis**: According to Actavis's Andrew Boyer, "[e]verybody has their own definition of what they think their target market share should be.". (*See, e.g.*, Ex. 6, 259:9-17.)  Meanwhile Actavis's David Myers, "fair share" was based on a "mathematical equation" and was just one component of determining Actavis' "target share."  (Ex. 13, 58:1-66:14, 79:7-81:3.)

b.    **Amneal**: Amneal's former Vice President of Pricing and Analytics, Shannon Rivero, thought "fair share" did not "mean a whole lot" because it was just a "mathematical starting point" from which to begin calculating a price.  (Ex. 57, 409:12-410:3, 414:12-16 (explaining "[y]ou would have to ask individuals in the generic industry of their definitions and how they view it" and that she had "heard many throughout [her] tenure and career.").) According to Amneal's James Luce, while "fair share" is a data

HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

point used in every industry and an economic term, it is ultimately 100 percent divided by the number of suppliers in the market. (Ex. 29, 99:6-99:9.) Amneal's Allen Lowther learned about fair share in college and business school in the context of "looking at the number of players in the market and . . . what that market share looks like and then the different theories and concepts that apply to potentially going after. . . new share . . ." (Ex. 19, 156:14-21, 158:15-160:22.)

c.    **G&W**: According to Ronald Greenblatt, G&W "didn't have a use of fair share" and that "if other people used ['fair share'], that doesn't mean it was a G&W term or a word that we would apply." (Ex. 54, 270:9-19.)

d.    **Glenmark:** "Fair share" could refer to the reasonable amount of share a manufacturer targets based on several factors including, but not limited to, current supply capability, number of competitors in the market, and those competitors' prior market behavior. (*See* Ex. 16, 268:17-271:12; Ex. 31, 88:5-89:16 (explaining that "fair share" may have been interpreted as "reasonable share" based on a manufacturer's ability to supply or number of competitors in a market).) For Terrance Coughlin, the concept of a fair share "mean(t) that if there are two suppliers, in concept, each company should be about 50% market share. If there are four viable suppliers, in theory each company should have about 25% market share. If there are 10 players, each company in theory would have about 10% market share." (Ex. 58, 99:7-100:10.)

e.    **Greenstone**: For Greenstone, "fair share" was a "mathematical calculation

30

that divided a market by the number of active players within that market . . . evenly."  (Ex. 10, 241:18-242:19.) According to Greenstone's corporate representative, "fair share" was "more of, like, a marker . . . just to understand really how many players were in the market."  (*Id.*)

f.   **Lannett**: To Kevin Smith, fair share was simply a unilaterally determined estimate of what share Lannett should aim for in a given market, which differed by market and product depending on a host of different product-specific variables.  (Ex. 39, 111:8-14 ("My definition of fair share varied on each and every product that I sold. My definition of fair share was by product. And it had many different variables that were associated with what I thought fair share might be.").)  For others at Lannett, fair share meant 100% divided by the number market participants.  (*See* Ex. 53, 101:7-15, 381:3-22.)  To Robert Foley, the number of competitors divided by 100 was "just a general rule of thumb" from which Lannett would deviate depending on "competitive advantages" and "capacity constraints."  (*Id.* 100:17-102:13.)

g.   **Lupin**: "Fair share" referred to what Lupin forecasts or anticipates their market share might be, based on several facts, when analyzing and planning for entry into a particular market. (Ex. 30, 225:2-226:4.)

h.   **Mylan**: Mylan's corporate witness testified that he was "not familiar" with a "fair market share" term. (*See* Ex. 45, 94:22-25.) A former Mylan employee, Kevin McElfresh, testified that Mylan used a completely different term—"targeted market share"—to determine "how much market

HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

share they [] feel like they can obtain based on the production." (*See* Ex. 38, 62:2-12.)  He explained that "you would have 50,000 bottles to go out and get market share on . . . and you'd have to figure out which customers could help you make up that 50,000 bottles." (*Id.*, 62:16-19.)

i.    **Perrigo**: Douglas Boothe and Katie McCormack did not ever recall using the term "fair share" to refer to any sort of agreement with a competitor to divide markets or allocate customers.  (Ex. 17, 525:3-7; Ex. 37, 288:17-289:8.)

j.    **Sandoz**: Della Lubke, who was at Sandoz during the relevant period, thought "fair share" was an even split.  (Ex. 15, 79:16-80:1.)

k.    **Fougera**: Anthony Thomassey, who was at Fougera during the relevant period, thought the phrase "fair share" meant 55%-45% or an even split in a two-player market, and in larger markets, one over X, where X is the number of competitors in the market for any given generic drug.  (Ex. 7, 41:10-20, 43:18-44:8.)  To Armando Kellum, "fair share" was "shorthand for dividing the size of a market for a generic drug by the number of suppliers for that particular generic drug." (Ex. 140, ¶ 37.)

l.    **Taro**: Taro's Chief Commercial Officer, Billy Seiden, thought "fair share" meant an even split of the market no matter how many competitors entered it. (Ex. 9, 110:8-19.)  Calculating Taro's fair share was "[n]ot in [his] mind" when it came to marketing or strategies. (*Id.,* 115:17-23.)

65.    Customers of generic manufacturers also regularly used the term "fair share" to describe their own performance but did not use the term to suggest an agreement among

HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

competitors.  (Ex. 29, 303:21-304:8 (former wholesaler employee testifying to use of "fair share" at Bergen Brunswig, where they "looked at market share and how the industry was growing" and what to "expect on growth there and fair share . . .").)

    a.    In December 2013, wholesaler AmerisourceBergen ("ABC") used the term "fair share" to describe its method for handling Walgreens priority for shortage products in answering questions about the Walgreens Boots Alliance Development GmbH Group Purchasing Agreement. (Ex. 94, GMK-MDL-001978957 at 8959 ("ABC will continue to follow its 'Fair share distribution' practice that is in place for all customers and is based upon historical usage").)

    b.    In June 2012, grocery store chain Safeway discussed ways to obtain more than its "fair share" of pharmacy and grocery customers.  (Ex. 76, ALB-RXGEN-000224893 at 895.)

    c.    In an October 2010 document describing its 2011 projections, employees of grocery store chain Kroger discussed how Kroger was capturing more than its "fair share" of the counter card business.  (Ex. 101, KRG-RXGEN-000861413 at 19.)

    d.    In November 2011, drug store chain Supervalu compared its actual market share of prescriptions to its "fair share." (Ex. 77, ALB-RXGEN-000358594 at 94.)

    e.    In an October 2012 document describing its 2013 projections, Kroger discussed its goal to capture its "fair share" of certain cosmetic product launches in 2013.  (Ex. 100, KRG-RXGEN-000851142 at 50.)

33

f.  In a February 2013 document summarizing the 2012 fiscal year, Kroger discussed "fair share" related to its pharmacy business. (Ex. 102, KRG-RXGEN-001497633 at 34.)

66.  Other industry participants also used the term "fair share" as a way to describe manufacturer performance, and did not use it to describe any agreement among competitors:

a.  For example, in an April 3, 2012 investor report summarizing the financial performance of oral contraceptives, Credit Suisse described Sandoz's market share performance: "Sandoz achieved ~20% market share on most products except Yasmin in first year of launch (fig 1.).  However, in our view, this is still short of a fair share in a three-player generic market."  (Ex. 95, GMK-MDL-002531698.)

b.  McKinsey & Company Consulting ("McKinsey"), retained as a consultant to some generics manufacturers, provided presentations and analyses related to marketing, sales, and market access which helped those manufacturers identify growth opportunities.  (Ex. 140, ¶¶ 37-38; Ex. 106, SDZMDL-007771836; Ex. 107, SDZMDL-007771851; Ex. 136, SMT-008169416.)

c.  In one such presentation to Sandoz in 2013, McKinsey discussed the concept of "fair share" as a simplistic expectation of market share based on the total number of manufacturers in the market.  (Ex. 105, SDZCTAG-01489454 at 9492-93; *see also* Ex. 137, *Pharma's First to Market Advantage*, MCKINSEY & COMPANY, Sept. 1, 2014, https://www.mckinsey.com/industries/life-sciences/our-insights/pharmas-

HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

first-to-market-advantage#/ ("When the first mover is a large pharma company, it has a significant advantage (worth greater than ten market-share points); when the first mover is not a large pharma company, we find that the first mover performs worse than *fair share* of the market . . .) (emphasis added).)

d.    Amneal's James Luce testified that he used the term in his college economics class and in the hotel industry.  (Ex. 29, 302:21-303:5.)  During Luce's tenure working for hotel chain Marriott, Luce testified that one of the metrics they considered was market share relative to "fair share."  (*Id.,* 302:15-19.)

## F.    Communications Among Defendants

67.    Defendants had several actual and explored business relationships during the relevant time period, ranging from marketing and distribution agreements to joint ventures and acquisitions, that were managed by various employees and required communication with their counterparts at other manufacturers:

a.    **Marketing and Distribution Agreement**: Beginning in May 2010, Taro and Glenmark entered into a marketing and distribution agreement for calcipotriene ointment.  Glenmark manufactured and supplied the product for Taro to distribute, market, and sell.  This relationship necessitated ongoing communications between the companies regarding this product.  (*See, e.g.*, Ex. 86, GMK-MDL-000427945; Ex. 90, GMK-MDL-001290958; Ex. 114, SMT-009511610; Ex. 122, SMT-010947583; Ex. 27, 96:14-97:5; Ex. 63, 861:12-862:3.)

b.    **Promotion Agreement**: In April 2013, Bausch entered a promotion

HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

agreement with Actavis related to Acyclovir. This relationship necessitated communications between Bausch and Actavis. (Ex. 133, VALMDL-001532816; Ex. 155, VALMDL-001532817.)

c.    **Joint Development Agreements**: Doug Boothe testified that during his tenure at Perrigo, he was regularly in contact with Taro's Michael Perfetto about a Joint Development Agreement between the two companies. (Ex. 17, 96:16-97:19; *see also* Ex. 63, 856:5-857:23.) The agreement was "related to the specific development of a new potential generic product." (Ex. 17, 96:9-97:19; *see also* Ex. 26, 210:14-211:17; Ex. 37, 212:19-23; Ex. 48, 62:10-22; Ex. 115, SMT-009886020 (February 2014 'Product Development and Commercialization Collaboration Agreement' on February 19, 2014 between Taro and Perrigo); Ex. 124, SMT-010958132 (June 2013 outreach between Perrigo and Taro regarding "2 potential R&D projects (Para IV ANDAs)").)

d.    **Manufacturing Agreement**: Taro had a contract manufacturing agreement with Perrigo to supply Mometasone Furoate Cream and Ointment. (Ex. 121, SMT-010718205.)

e.    **Product Licensing**: In November 2014, Taro met with Sandoz about several business development opportunities including licensing products for the European market, co-promotion of branded products, and acquisition of divested ANDAs. (Ex. 120, SMT-010541792.) In October 2013, Bausch and Perrigo entered an Exclusive License, Marketing, and Distribution Agreement related to Fenofibrate. (Ex. 130, VALMDL-000377455.) This

HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

relationship necessitated communications between the companies about the agreement.  (Ex. 126, VALMDL-000004599.)

f. **ANDA Divestiture Resulting from Mergers**: In August 2011, Taro spoke with Actavis about divestitures resulting from the acquisition of Watson. (*See* Ex. 108, SMT-008180967; Ex. 109, SMT-008317249.)  Similarly, in 2014, Sun engaged in a ANDA divestment process as part of its acquisition of Ranbaxy. Competitors reached out to Sun about participating, including Bausch, Perrigo, Heritage, Glenmark, and Impax.  (*See* Ex. 112, SMT-008645357; Ex. 116, SMT-010240122; Ex. 113, SMT-008657182; Ex. 117, SMT-010306536; Ex. 110, SMT-008620033.)  And in March 2014, Actavis reached out to Ara Aprahamian about Taro's interest in products Actavis was divesting.   (Ex. 125, SMT-011577287.)

g. **Acquisition of Tangible Assets**: In 2015, G&W negotiated with Sun to acquire its facility in Bryan, Ohio.  (*See* Ex. 111, SMT-008626997.)

h. **Unused ANDAs**: Manufacturers often reached out to other manufacturers to acquire unused ANDAs:

- In April 2012, G&W followed up with Taro about "an arrangement whereby G&W brings [Taro's unused] ANDAs to our facility and manufactures them for Taro . . . We have a fair amount of available tech services and manufacturing capacity and we see this as win/win between our companies."  (Ex. 123, SMT-010952347.)  Taro and G&W continued negotiations about unused ANDAs in April and May of 2013.  (Ex. 118, SMT-010499255.)

HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

- In April 2014, G&W met with Bausch about acquiring some of Bausch's intellectual property. (Ex. 127, VALMDL-001537695; Ex. 98, GWCT-HHR-0000094300.) In July 2013, Taro negotiated with Actavis to acquire the Feverall OTC brand. (Ex. 119, SMT-010499846.)

68.     Individuals in the industry frequently engaged socially, developed personal relationships, and kept in touch on issues unrelated to business. (Ex. 20, 230:9-16 ("Did I talk to my friends at other manufacturers? Yes, I talked to my friends at other manufacturers, but not as it pertains to business, pricing, market share."); Ex. 61, 151:16-19 ("I considered a lot of my colleagues in the industry friends."); Ex. 11, 537:2-3 (testifying that he "had a lot of friends in the industry" when he started at Sandoz); Ex. 49, 180:2-6, 180:21-181:1 (testifying that after he left Sandoz, he stayed in touch with some of his former colleagues on a personal level).)

a.     Paul Dutra of Glenmark testified that he had "friends in the industry" and that he had communications with employees of competitors that "involve personal matters . . . friendship, infidelity, things like that." (Ex. 47, 981:1-17.) Dutra arranged golf outings among customer and competitor employees. (*See, e.g.*, Ex. 92, GMK-MDL-001708651; Ex. 89, GMK-MDL-001033977; Ex. 91, GMK-MDL-001708634; Ex. 93, GMK-MDL-001724395.) Dutra also had a sexual relationship with one competitor and attempted to have a sexual relationship with another. (Ex. 47, 933:16-934:14, 936:9-14.)

b.     Anthony Thomassey, former Director of National Accounts at Fougera, had social relationships with people who worked for competitors and would

HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

attend sporting events and have conversations with them about social topics. (Ex. 7, 761:15-762:3; *see also id.*, 47:1-16 (stating that trade show attendees would often bring their spouses and children along as a vacation).) More specifically, he was friends with Chris Bihari and they would get together and play basketball. (*Id.*, 564:8-19.) Thomassey and Jim Grauso knew each other many years before they worked together at Aurobindo, and they were part of a group chat that would joke with each other about sports. (*Id.*, 373:17-25.) When Thomassey was hospitalized, Grauso traveled from New Jersey to Ohio to visit him. (*Id.*, 1178:1-10; Ex. 27, 100:10-14.)

c.    James Grauso—who was an employee of G&W, Glenmark, and Aurobindo at different points during the relevant time period—regularly spoke with former colleagues about a number of subjects beyond work. (*See, e.g.*, Ex. 27, 186:2-6 ("talked to Erika [Vogel-Baylor] all the time," he "talked to Thomassey all the time," he "could have been following up with these people on my new position," and that Kurt [Orlofski] was "checking out how I did."); *id.*, 366:24-367:3 ("Again, I mentioned, Teri [Mouro-Sherman] and Kevin [Green] as friends, talked to them all the time. I don't recall those specific instances."); *id.*, 379:7-14 ("I talked to these people multiple times over the course of months, years. They're friends of mine. To say, you know, I was on the phone with any -- for an hour-plus with Teri Sherman, we were talking about everything in the world other than products for Teva and Aurobindo at that point."); *id.*, 469:17-21 ("I might have been speaking to my friends, who happened to work for other manufacturers. No

39

agreements on products, customers, or pricing was ever reached -- ever made."); *id.*, 483:14-19 ("Mary [Saharyan] was not only a competitor; she was a friend. So I was talking to her on -- about things that friends talk about; not any business, no agreements. They run their business. We would run ours."); *id.*, 594:1-6 ("I believe that the chart shows I had four calls with -- between McMahon and Bob Cunard on the day before Christmas Eve on -- in December of 2015, friends of mine calling the day before Christmas Eve.").)

69.    Numerous witnesses had longstanding relationships with Defendants and communicated with them about matters that were unrelated to work, including the following examples:

| Witnesses | Relationship/Contents of Communications |
|---|---|
| David Berthold (Lupin) Kurt Orlofski (G&W) | Orlofski officiated Berthold's wedding and the two are best friends. (Ex. 12, 208:1-11; Ex. 41, 260:2-23.) |
| David Berthold (Lupin) Kevin Green (Teva) | Kevin Green and Berthold were "very good friend[s] overall…" (Ex. 12, 165:13-20.) |
| David Berthold (Lupin) James Grauso (Glenmark) | Grauso was one of Berthold's best friends and had "a lot of social interaction with him." (Ex. 12, 300:9-16.) |
| Barbara Purcell (Bausch) Robin Strzeminski (Greenstone) | Purcell discussed job opportunities with Stzeminski. (*See* Ex. 8, 119:3-119:10, 534:2-535:6, 535:8-536:2; Ex. 139, VALMDL-000780182; Ex. 79.) |
| Mary Saharyan (Bausch) James Grauso (Glenmark) | Grauso visited Saharyan and her family at her beach house, shared baby pictures, and discussed job opportunities. (*See* Ex. 27, 483:21-484:9; Ex. 128, VALMDL-001757498; Ex. 129, VALMDL-001757499, VALMDL-000773285.) |
| Robert Cunard (Aurobindo) James Grauso (Glenmark) | Cunard had conversations with Grauso after Grauso left Aurobindo for Glenmark because he considers "him a personal friend, and continue[s] to speak with him in a personal regard." (Ex. 52, 72:12-15.) |

40

HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

| | |
|---|---|
| Robert Cunard (Aurobindo)<br>Chris Schneider (Perrigo/Mayne)<br>Rich Tremonte (Sandoz)<br>Marc Falkin (Actavis/Teva) | Cunard communicated about "industry issues as well as some social things if we would play golf or the like," was "personal friends" with and "mentor" to various individuals.  (Ex. 52, 62:19-21; *see also id.*, 63:21-22 (Mayne/Perrigo employee Chris Schneider); *id.*, 68:11-69:10 (Sandoz/AmerisourceBergen employee Rich Tremonte); *id.*, 317:17-318:2 (Marc Falkin of Actavis/Teva).) |
| Tim Gustafson (Aurobindo) | Gustafson spoke with former co-workers after he left "on a fairly regular basis because [he] used to work with these people, they were [his] friends."  (Ex. 59, 120:22-24.) |
| Paul McMahon (Aurobindo)<br>David Berthold (Lupin) | In addition to being "friends and acquaintances for a long time" with Berhold, McMahon was "courting or pursuing him to come join" Aurobindo and would talk about many different things. (Ex. 50, 130:12-15, 132:9-15.) |
| Paul McMahon (Aurobindo)<br>James Grauso (Glenmark) | McMahon and Grauso "talked on a fairly regular basis" as they were "personal friends."  (Ex. 51, 307:8-11, 416:23-417:10.) |
| Douglas Boothe (Perrigo)<br>Michael Perfetto (Taro) | Boothe's wife and Perfetto's wife were friends.  (Ex. 63, 383:3-5.)  Perfetto and Boothe "worked together a long time" and talked "all the time.  We were friends.  We had business relationships. We had business development with Perrigo."  (*Id.*, 856:5-857:23.)  They'd ask each other about their families as "[h]e had a child that was sick with cancer.  He would give me updates on that. And then he went through a marital problem.  I went through that with him." (*Id.*, 857:17-20, 872:15-873:4.) |
| Michael Perfetto (Taro)<br>Jim Grauso (Glenmark) | In addition to carrying out Glenmark and Taro's commercial relationships while at those companies, Perfetto and Grauso were friends and Perfetto knew Grauso's wife and two daughters.  (Ex. 63, 256:3-12.) |
| Scott Brick (Taro)<br>Scott Koenig (Wockhardt) | Brick and Koenig were friends, Koenig went to Brick's wedding, and they kept in contact talking about "family, life in general, you know, stuff like that."  (Ex. 55, 106:17-107:12, 108:7-109:24.) |
| Michael Perfetto<br>(Actavis & Taro)<br>Michell Blashinsky<br>(Taro & Glenmark) | While Perfetto was at Actavis and Blashinsky was at Taro, they were "really good friends" and they "talked about careers and personal issues."  (Ex. 63, 180:17-181:15, 184:24-185:18.) And when Perfetto was at Taro and Blashinsky was at Glenmark, they "were friendly" beyond administering commercial relationships between the two companies.  (*Id.*, 861:12-862:13.) |

HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

Dated: November 22, 2024

/s/ Christopher Ondeck
Christopher Ondeck
PROSKAUER ROSE LLP
1001 Pennsylvania Ave., NW
Suite 600 South
Washington, DC 20004
Tel: (202) 416-5865
Fax: (202) 416-6899
condeck@proskauer.com

Grant Esposito
David Fioccola
PROSKAUER ROSE LLP
Eleven Times Square
New York, NY 10036
Tel: (212) 969-3000
Fax: (212) 969-2900
gesposito@proskauer.com
dfioccola@proskauer.com

Thomas D. Goldberg
Jeffrey Mueller
DAY PITNEY LLP
Goodwin Square 225 Asylum Street
Hartford, CT 06103
Telephone: (860) 275-0164
Facsimile: (860) 881-2625

*Counsel for Defendants Sandoz Inc. and Fougera Pharmaceuticals Inc.*

HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

*/s/ Sheron Korpus*
Sheron Korpus
Seth A. Moskowitz
Seth Davis
KASOWITZ BENSON TORRES LLP
633 Broadway
New York, New York 10019
Telephone: (212) 506-1700
skorpus@kasowitz.com
smoskowitz@kasowitz.com
sdavis@kasowitz.com

*Counsel for Defendants Actavis Elizabeth,
LLC, Actavis Holdco U.S., Inc., and
Actavis Pharma, Inc.*


*/s/ Robin P. Sumner*
Robin P. Sumner
Michael J. Hartman
Melissa O'Donnell
TROUTMAN PEPPER HAMILTON
SANDERS LLP
3000 Two Logan Square
Eighteenth and Arch Streets
Philadelphia, PA 19103-2799
Tel. (215) 981-4000
Fax. (215) 981-4750
robin.sumner@troutman.com
michael.hartman@troutman.com
melissa.odonnell@troutman.com

*/s/ Bennet J. Moskowitz*
Bennet J. Moskowitz
TROUTMAN PEPPER HAMILTON
SANDERS LLP
875 Third Avenue
New York, NY 10022
Tel. (212) 704-6087
Fax. (212) 704-8370
bennet.moskowitz@troutman.com

*Counsel for Defendants Amneal
Pharmaceuticals, Inc. and Amneal
Pharmaceuticals LLC*

*/s/ Whitney Cloud*
Whitney Cloud
Ilana H. Eisenstein
Ben C. Fabens-Lassen
DLA PIPER LLP (US)
1650 Market Street, Suite 5000
Philadelphia, PA 19103
Telephone: (215) 656-3300
whitney.cloud@dlapiper.com
ilana.eisenstein@dlapiper.com
ben.fabens-lassen@dlapiper.com

Carlton E. Wessel
DLA PIPER LLP (US)
500 Eighth Street, NW
Washington, DC 20004
Telephone: (202) 799-4000
carlton.wessel@us.dlapiper.com

James O. Craven
James I. Glasser
WIGGIN & DANA
One Century Tower
265 Church Street
New Haven, CT 06510
Telephone: 203-498-4361
jcraven@wiggin.com
jglasser@wiggin.com

*Counsel for Defendants Pfizer Inc. and
Greenstone LLC*

HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

_/s/ Robin D. Adelstein_
Robin D. Adelstein
Mark A. Robertson
Kimberly Fetsick
Abigail Schwarz
NORTON ROSE FULBRIGHT US LLP
1301 Avenue of the Americas
New York, NY 10019-6022
Telephone: (212) 318-3000
Facsimile: (212) 408-5100
robin.adelstein@nortonrosefulbright.com
mark.robertson@nortonrosefulbright.com
kimberly.fetsick@nortonrosefulbright.com
abigail.schwarz@nortonrosefulbright.com

Mark Angland
NORTON ROSE FULBRIGHT US LLP
779 9th Street NW, Suite 1000
Washington, DC 20001
Telephone: (202) 662-0200
Facsimile: (202) 662-4643
mark.angland@nortonrosefulbright.com

Alex Cummings
Dewey Jude Gonsoulin, III
NORTON ROSE FULBRIGHT US LLP
1550 Lamar Street, Suite 2000
Houston, Texas 77010
Telephone: (713) 651-5151
Facsimile: (713) 651-5246
alex.cummings@nortonrosefulbright.com
dewey.gonsoulin@nortonrosefulbright.com

Jeffrey J. Mirman
HINCKLEY, ALLEN, & SNYDER LLP
20 Church Street
Hartford, CT 06103
Telephone: (860) 725-6200
Facsimile:  (860) 278-3802
jmirman@hinckleyallen.com

_Counsel for Defendants Bausch Health_
_Americas, Inc. and Bausch Health US LLC_

_/s/ Benjamin H. Diessel_
Benjamin H. Diessel
Ariela C. Anhalt
Emmett Gilles
WIGGIN AND DANA LLP
One Century Tower
265 Church Street
New Haven, CT 06510
Tel: (203) 498-4400
Fax: (203) 782-2889
bdiessel@wiggin.com
aanhalt@wiggin.com
egilles@wiggin.com

Nathan E. Denning
Chloe S. Booth
WIGGIN AND DANA LLP
437 Madison Avenue, 35th Floor
New York, NY 10022
Tel: (212) 551-2600
Fax (212) 551-2888
ndenning@wiggin.com
cbooth@wiggin.com

Christopher Bailes
WIGGIN AND DANA LLP
50 S. 16th Street, Suite 2925
Philadelphia, PA 19102
Tel: (215) 998-8318
Fax: (215) 988-8384
cbailes@wiggin.com

_Counsel for Defendant Aurobindo_
_Pharma USA, Inc._

HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

*/s/ Darrell Prescott*
Darrell Prescott
DARRELL PRESCOTT
LAW OFFICE P.C.
104 Charlton St., 1-W
New York, NY 10014
Tel: (917) 510-3165
Fax: (866) 233-5869
dp@darrellprescott.com

James D. Bailey
BAILEY DUQUETTE P.C.
104 Charlton St., 1-W
New York, NY 10014
Tel: (212) 658-1946
Fax: (866) 233-5869
james@baileyduquette.com

Stephan Matanovic BAILEY
DUQUETTE P.C.
21 S. 11th Street, 2nd Floor
Philadelphia, PA 19107
Tel: (215) 660-7600
Fax: (866) 233-5869
stephan@baileyduquette.com

*Counsel for Defendant G&W Laboratories, Inc.*

*/s/ George G. Gordon*
George G. Gordon
Julia Chapman
Forrest E. Lovett
DECHERT LLP
2929 Arch Street
Philadelphia, PA 19104
Telephone: (215) 994-4000
Facsimile: (215) 994-4400
george.gordon@dechert.com
julia.chapman@dechert.com
forrest.lovett@dechert.com

Christie Boyden
DECHERT LLP
1900 K Street NW
Washington, D.C. 20006
Philadelphia, PA 19104
Telephone: (202) 261-3384
Facsimile: (202) 261-3300
christie.boydon@dechert.com

*Counsel for Defendant Lannett Company, Inc*

*/s/ Jane Willis*
Jane E. Willis (PHV25421)
Andrew J. O'Connor (PHV208240)
Phillip Z. Yao (PHV208241)
ROPES & GRAY LLP
800 Boylston Street
Boston, MA 02199-3600
Tel: (617) 951-7000
Fax: (617) 951-7050
jane.willis@ropesgray.com
andrew.oconnor@ropesgray.com
phillip.yao@ropesgray.com

*Counsel for Defendants Mallinckrodt Inc.,
Mallinckrodt LLC, and Mallinckrodt plc*

HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

<u>/s/ Colin R. Kass</u>
Colin R. Kass
PROSKAUER ROSE LLP
1001 Pennsylvania Ave, NW
Suite 600 South
Washington, DC 20004
Telephone: (202) 416-6890
Facsimile: (202) 416-6899
ckass@proskauer.com

Bradley I. Ruskin
David A. Munkittrick
Adam Farbiarz
PROSKAUER ROSE LLP
Eleven Times Square
New York, New York 10036
Telephone: (212) 969-3000
Facsimile: (212) 969-2900
bruskin@proskauer.com
dmunkittrick@proskauer.com
afarbiarz@proskauer.com

Meg Slachetka
COMPETITION LAW PARTNERS
1101 Pennsylvania Avenue, NW
Washington, DC 20004
Telephone: (202) 742-4300
meg@competitionlawpartners.com

*Counsel for Defendant Lupin Pharmaceuticals, Inc.*

<u>/s/ John M. Taladay</u>
John M. Taladay
Christopher P. Wilson
JoAnna B. Adkisson
Michael A. Munoz
BAKER BOTTS LLP
700 K Street NW
Washington, DC 20004
Telephone: (202) 639-7700
Facsimile: (202) 639-7890
john.taladay@bakerbotts.com
christopher.wilson@bakerbotts.com
joanna.adkisson@bakerbotts.com
micahel.munoz@bakerbotts.com

Matthew M. Hilderbrand
BAKER BOTTS LLP
401 South 1st Street, Suite 1300
Austin, TX 78704
Telephone: (512) 322-2500
Facsimile: (512) 322-3613
matthew.hilderbrand@bakerbotts.com

Jennifer L. Morgan – ct21751
Marilyn B. Fagelson – ct17202
MURTHA CULLINA LLP
265 Church Street, 9th Floor
New Haven, CT 06510
Telephone: (203) 772-7700
Facsimile: (203) 772-7723
jmorgan@murthalaw.com
mfagelson@murthalaw.com

*Counsel for Defendants Sun Pharmaceutical Industries, Inc. and Taro Pharmaceuticals U.S.A., Inc.*

46
HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

*/s/ Benjamin F. Holt*
Benjamin F. Holt
Adam K. Levin
Justin W. Bernick
HOGAN LOVELLS US LLP
555 Thirteenth Street, NW
Washington, D.C. 20004
Telephone: (202) 637-5600
benjamin.holt@hoganlovells.com
adam.levin@hoganlovells.com
justin.bernick@hoganlovells.com

Jasmeet K. Ahuja
HOGAN LOVELLS US LLP
1735 Market Street, 23rd Floor
Philadelphia, PA 19103
Telephone: (267) 675-4600
jasmeet.ahuja@hoganlovells.com

Kim E. Rinehart (ct24427)
WIGGIN AND DANA LLP
One Century Tower
265 Church Street
P.O. Box 1832
New Haven, CT 06508-1832
Tel: (203) 498-4400
Fax: (203) 782-2889
krinehart@wiggin.com

Robert M. Langer (ct06305)
WIGGIN AND DANA LLP
20 Church Street
Hartford, CT 06103
Tel: (860) 297-3700
Fax: (860) 525-9380
rlanger@wiggin.com

*Counsel for Defendants Mylan Inc. and Mylan*
*Pharmaceuticals Inc.*

*/s/ Clifford Katz*
Clifford Katz
Damon W. Suden
Marisa Lorenzo
KELLEY DRYE & WARREN LLP
3 World Trade Center
175 Greenwich Street
New York, NY 10007
Tel: (212) 808-7800
Fax: (212) 808-7897
ckatz@kelleydrye.com
dsuden@kelleydrye.com
mlorenzo@kelleydrye.com

*Counsel for Defendant Wockhardt USA LLC*

*/s/ J. Clayton Everett, Jr.*

*/s/ Dimitra Doufekias*

47

HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

J. Clayton Everett, Jr. (phv207964)
William S.D. Cravens (phv207968)
Molly R. Maidman (phv207966)
Y. Frank Ren (phv207981)
MORGAN, LEWIS & BOCKIUS LLP
1111 Pennsylvania Avenue, NW
Washington, DC 20004
Telephone:  +1.202.739.3000
Facsimile:  +1.202.739.3001
clay.everett@morganlewis.com
william.cravens@morganlewis.com
molly.maidman@morganlewis.com
frank.ren@morganlewis.com

Michael D. Blanchard
MORGAN, LEWIS & BOCKIUS LLP
One State Street
Hartford, CT 06103
Telephone: +1.860.240.2700
Facsimile: +1.860.240.2701
michael.blanchard@morganlewis.com

*Counsel for Defendant Perrigo New York, Inc.*

Dimitra Doufekias (phv207871)
Megan E. Gerking (phv207878)
Robert W. Manoso (phv207877)
MORRISON & FOERSTER LLP
2100 L Street, NW Suite 900
Washington, DC 20037
Tel.: (202) 887-1500
Fax: (202) 887-0763
ddoufekias@mofo.com
mgerking@mofo.com
rmanoso@mofo.com

Drew Alan Hillier (ct30252)
MORRISON & FOERSTER LLP
12531 High Bluff Drive
San Diego, CA 92130-2040
Phone: (858) 314-7711
Fax: (858) 720-5125
dhillier@mofo.com

Michael B. Miller (phv207479)
MORRISON & FOERSTER LLP
250 W 55th Street
New York, NY 10019
Tel.: (212) 468-8000
Fax: (212) 468-7900
mbmiller@mofo.com

*Counsel for Defendant Glenmark Pharmaceuticals Inc., USA*

HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

/s/ Guy Petrillo
Guy Petrillo
Christina Karam
PETRILLO KLEIN & BOXER LLP
655 Third Avenue, 22nd Floor
New York, NY 10017
212-370-0330

*Counsel for Defendant Douglas Boothe*


/s/ Michael Weinstein
Michael Weinstein
Michael C. Klauder
Jeffery M. Sauer
COLE SCHOTZ P.C.
Court Plaza North
25 Main Street
P.O. Box 800
Hackensack, NJ 07602
201-489-3000
201-489-1536  Facsimile
mweinstein@coleschotz.com
mklauder@coleschotz.com
jsauer@coleschotz.com

*Counsel for Defendant Walter Kaczmarek*

/s/ Timothy J. Bergère
Timothy J. Bergère
ARMSTRONG TEASDALE LLP
One Commerce Square
2005 Market Street, 29th Floor
Philadelphia, PA 19103
Telephone: (267) 780-2000
Facsimile: (215) 405-9070
tbergere@atllp.com

*Counsel for Defendant Kurt Orlofski*

HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

*/s/ Charles S. Leeper*
Charles S. Leeper
Kenneth M. Vorrasi
Alison M. Agnew
FAEGRE DRINKER BIDDLE & REATH LLP
1500 K Street, NW, Suite 1100
Washington, DC 20005
Telephone: 202-842-8800
Facsimile: 202-842-8465
charles.leeper@faegredrinker.com
kenneth.vorrasi@faegredrinker.com
alison.agnew@faegredrinker.com

*Counsel for Defendant John Wesolowski*

*/s/ Adam S. Lurie*
Adam S. Lurie
LINKLATERS LLP
601 Thirteenth Street NW
Suite 400S
Washington, DC 20005
Telephone: (202) 654-9200
Facsimile: (202) 654-9210
adam.lurie@linklaters.com

Michael Pilcher
LINKLATERS LLP
1290 Avenue of the Americas
New York, NY 10104
Telephone: (212) 903-9000
Facsimile: (212) 903-9100
michael.pilcher@linklaters.com

*Counsel for Defendant Michael Perfetto*

*/s/ Erica S. Weisgerber*
Erica S. Weisgerber
DEBEVOISE & PLIMPTON LLP
66 Hudson Boulevard
New York, NY 10001
Telephone: 212-909-6000
Facsimile: 212-909-6836
eweisgerber@debevoise.com

Edward D. Hassi
Leah S. Martin
DEBEVOISE & PLIMPTON LLP
801 Pennsylvania Avenue, N.W.
Washington, DC 20004
Telephone: 202-383-8000
Facsimile: 202-383-8118
thassi@debevoise.com
lmartin@debevoise.com

*Counsel for Defendant Armando Kellum*

*/s/ Alexander R. Bilus*
Alexander R. Bilus, Esquire
PA No. 203680
SAUL EWING LLP
Centre Square West
1500 Market Street, 38th Floor
Philadelphia, PA 19102-2186
Telephone: (215) 972-7177
alexander.bilus@saul.com

Allison L. Burdette, Esquire
PA No. 316695
SAUL EWING LLP
One PPG Place, Suite 3010
Pittsburgh, PA 15222
Telephone: (412) 209-2500
allison.burdette@saul.com

*Counsel for Defendant Erika Vogel-Baylor*

HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

<u>/s/ Robert E. Connolly</u>
Robert E. Connolly
LAW OFFICE OF ROBERT E. CONNOLLY
1735 Market Street, Suite A, #469
Philadelphia, PA 19103
Telephone: (215) 219-4418
bob@reconnollylaw.com

*Counsel for Defendant James Grauso*

<u>/s/ Michelle N. Lipkowitz</u>
Michelle N. Lipkowitz
MINTZ, LEVIN, COHN, FERRIS,
GLOVSKY AND POPEO, P.C.
555 12th Street NW, Suite 1100
Washington, DC 20004
Telephone: (202) 434-7448
MNLipkowitz@mintz.com

*Counsel for Defendant Mitchell Blashinsky*

HIGHLY CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER