**Public Redacted Version**

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF CONNECTICUT**

<table>
<tr><td>

THE STATE OF CONNECTICUT, *et al.*,

            *Plaintiffs*,

v.

SANDOZ INC., *et al.*,

            *Defendants*.

</td><td>

**Case No. 3:20-cv-00802-MPS**

[February 20, 2025]

</td></tr>
</table>

**LOCAL RULE 56(a)2 STATEMENT OF FACTS IN OPPOSITION TO DEFENDANTS'**
**JOINT MOTION FOR SUMMARY JUDGMENT ON**
**<u>OVERARCHING CONSPIRACY CLAIMS</u>**

Pursuant to Local Rule 56(a)2, Plaintiffs submit this Statement of Facts in Opposition to Defendants' Joint Motion for Summary Judgment on Overarching Conspiracy Claims. No admissions are intended herein except for those made explicitly. To the extent any purported fact in Defendants' Statement may be deemed admitted under Local Rule 56(a)1, any such admission is "solely for purposes of the motion," and Plaintiffs reserve the right to object to and/or controvert such fact at trial. Plaintiffs further reserve the right to object to the admission of any purported evidence relied on by Defendants on any grounds available under the Federal Rules of Evidence, the Federal Rules of Civil Procedure, and/or the Local Rules.

**Public Redacted Version**

## I.      RESPONSE TO DEFENDANTS' L.R. 56(a)1 STATEMENT

*1. The States allege that 26 corporate Defendants agreed to participate in an overarching conspiracy involving 98 separate drug products. (Dermatology Complaint, Dkt. 196 ("Compl."); Ex. 65, ¶ 7.)*

**Response:**  Plaintiffs object to ¶1 as not directed to any "material fact," including because Defendants' characterization of the allegations in this case is not a "fact." Plaintiffs further object to ¶ 1 as lacking foundation in admissible evidence as both the Complaint (Dkt. 196) and the Warren-Bolton Report (Defs. Ex. 65) are inadmissible hearsay.  Plaintiffs further object to the extent Defendants' characterization of the Complaint differs from the allegations in the Complaint.  *See* Dkt. 196 at ¶¶ 124-176.  Subject to and without waiving the foregoing, it is undisputed that Plaintiffs allege that at least all of the Defendants participated in an overarching conspiracy, which involved at least all of the 98 drug products identified in the Complaint.

*2. The States' overarching conspiracy alleges 38 unique combinations of corporate Defendants. (Ex. 67, ¶ 114.)*

**Response:**  Plaintiffs object to ¶2 as not "material to the decision of the motion," L.R. 56(a)1, because Defendants do not cite ¶2 in their memorandum of law.  Further, ¶ 2 is not directed to a "material fact" because Dr. Rubinfeld's opinion about the allegations in this case is not a "fact." Plaintiffs further object to ¶ 2 as lacking foundation in admissible evidence as the Rubinfeld Report (Defs. Ex. 67) is inadmissible hearsay, and Dr. Rubinfeld is not expected to testify at trial in this matter.  Plaintiffs further object to ¶2 as vague and ambiguous in that "unique combinations of corporate Defendants" has unclear meaning.  Plaintiffs further object to ¶2 to the extent Defendants' characterization differs from the allegations of the Complaint. *See* Dkt. 196 at ¶¶ 124-176. Subject to and without waiving the foregoing: Disputed. The complaint

alleges an overarching conspiracy which spans the twenty-six (26) corporate Defendants and at least ninety-eight (98) different drugs. *See supra* ¶ 1.

*3. The Hatch-Waxman Act requires generic manufacturers to submit an Abbreviated New Drug Application ("ANDA") when seeking FDA approval to make and sell a generic drug product. (Ex. 67, ¶ 28.) For the FDA to approve an ANDA, the generic manufacturer must show that its product is bioequivalent to the brand-name product. (Id.)*

**Response:** Plaintiffs object to ¶3 as not "material to the decision of the motion," L.R. 56(a)1, because Defendants do not cite ¶3 in their memorandum of law.  Further, ¶3 is not directed to a "material fact" because it contains conclusions of law that are not "facts."  Plaintiffs further object to ¶3 as lacking foundation in admissible evidence because the Rubinfeld Report (Defs. Ex. 67) is inadmissible hearsay and Dr. Rubinfeld is not expected to testify in this matter. Further, experts are generally not permitted to present legal opinions.  Subject to and without waiving the foregoing: it is undisputed that (1) a showing of bioequivalence (as the FDA defines it) is required for the FDA to approve an ANDA, and (2) that a generic manufacturer needs an approved ANDA to sell a generic drug product in the United States.  However, manufacturers do not necessarily need to "submit" an ANDA because a generic manufacturer may acquire an already-approved ANDA. *See* SUMF ¶ 67(h).  An approved ANDA is not required to "make … a generic drug product."  *See* 21 U.S.C. § 355(a).

*4. None of the Defendants in this case has an ANDA for all 98 Drugs at Issue. (Id. ¶ 133 & fig. 3.)*

**Response:**  Undisputed.

*5. No Defendant sold every Drug at Issue (Id. ¶ 133 & fig. 3.), and each Defendant varies in terms of the number of Drugs at Issue for which each is alleged to have participated. (Id. ¶ 133 & fig. 3.)*



**Response:** Plaintiffs object to ¶5 as immaterial as, *e.g.*, whether all Defendants sold the same number of Drugs at Issue is not relevant. Subject to and without waiving the foregoing: it is undisputed that no Defendant sold every Drug at Issue and that different Defendants sold different numbers of Drugs at Issue.  Disputed in that several Defendants sold the same number of Drugs at Issue as each other.  *E.g.*, SUMF ¶ 5.

*6. Three Defendants sold only one of the 98 Drugs at Issue: Amneal, Lannett, and Teligent. (Id.)*

**Response:** Undisputed.

*7. Nine Defendants are alleged to have engaged in misconduct regarding five or fewer Drugs at Issue: Amneal (1), Lannett (1), Teligent (1), Lupin (2), Valeant/Bausch (2), Wockhardt (2), Mallinckrodt (4), Mylan (4), and Aurobindo (5). (Id.) Notably, the count of 98 Drugs at Issue is based on unique form-strength combinations for each molecule, meaning that even these single-digit numbers overstate the number of drug molecules specifically alleged against each*

*Defendant in the Complaint (e.g., two, rather than five, for Aurobindo; and one, rather than two, for Lupin). (Id. fn. 134.)*

**Response:** Plaintiffs object to ¶7 as being immaterial as a Defendant no less participates in the overarching conspiracy by only implementing it in five or fewer drug-specific conspiracies. Plaintiffs further object to ¶7 as immaterial in that the number of "drug molecules" (i.e., active pharmaceutical ingredients) used in any Defendants' drug products at issue is immaterial. ¶7 is also misleading in comparing the number of "drug molecules" in any Defendants' Drugs at Issue and the total number of Drugs at Issue (rather than the total number of "drug molecules"). Subject to and without waiving the foregoing:  undisputed as to the numbers of Drugs at Issue for each Defendants.  Further undisputed that the number of drug products any Defendant is alleged to have sold may or may not be greater than the number of "drug molecules," depending on whether they sold more than one drug product having the same active pharmaceutical ingredient.

*8. Lannett and Amneal sold only one Drug at Issue apiece, and each were capsules to treat non-dermatological conditions like epilepsy or glaucoma. (Compl. ¶¶ 802, 892.)*

**Response:**  Plaintiffs object to ¶8 as being duplicative of ¶6 and incorporate their response to ¶6 as if fully set forth herein.  Plaintiffs further object to ¶8 as being immaterial as the indications for which a drug product was sold have no bearing on Defendants' participation in the overarching conspiracy.  Plaintiffs further object to ¶8 as lacking foundation in admissible evidence as the Complaint is inadmissible hearsay.  Subject to and without waiving the foregoing:  Lannett sold acetazolamide tablets (not capsules), which are indicated for the treatment of glaucoma, epilepsy, altitude sickness, periodic paralysis, and heart failure. Amneal

5

sold phenytoin sodium extended release capsules, which are indicated for the prevention and treatment of seizures.

9. *Each Drug at Issue varied in terms of its FDA classification, intended effect, and formulation. For example, at least 28 of the 98 Drugs at Issue, or 29%, are not classified as topical drugs by the FDA. (Ex. 67, ¶ 112.)*

*a. Twenty-three Drugs at Issue are oral solids such as acetazolamide, carbamazepine, and cefpodoxime proxetil. (Compl. ¶¶ 801, 201, 1190.) Five Drugs at Issue are suppositories such as hydrocortisone acetate and promethazine hydrochloride. (Id. ¶¶ 1475, 1506.)*

*b. None of the Drugs at Issue for Mylan—phenytoin sodium ER capsules, bromocryptine mesylate tablets, and pioglitazone HCL metformin HCL tablets—is a topical product. (Compl. ¶¶ 892, 1026, 1205.)*

*c. Likewise, none of the Drugs at Issue for Aurobindo—cefpodoxime proxetil and metformin hydrochloride— is a topical product. (Id. ¶¶ 1190, 1205.) Indeed, the States have admitted that "during the [r]elevant [t]ime [p]eriod, Aurobindo did not sell [t]opical [p]roducts" or "[d]ermatological [p]roducts" at all. (Ex. 73, RFA Nos. 3-4.)*

*d. Similarly, the only Drug At Issue for Lannett—acetazolamide—is not a topical product. (Compl. ¶ 801.)*

**Response:** Plaintiffs object to ¶9 as being immaterial as the FDA classification, intended effect, and formulation of the Drugs at Issue have no bearing on a Defendant's participation in the overarching conspiracy.  Subject to and without waiving the foregoing: undisputed.

10. *The 98 Drugs at Issue treat different conditions—including non-dermatological ailments. For instance, latanoprost treats high blood pressure inside the eye due to glaucoma. (Compl. ¶ 1353.) Promethazine HCL is an antihistamine used to treat allergies, nausea, and vomiting. (Id.*

*¶ 1506.) Ciclopirox cream is used to treat skin infections such as athlete's foot and ringworm. (Id. ¶ 1535.)*

**Response:** Plaintiffs object to ¶10 as immaterial as the Drugs at Issue being used for the treatment of different conditions is not material to the Defendants' participation in the overarching conspiracy. Plaintiffs further object to ¶10 as lacking foundation in admissible evidence as the Complaint is inadmissible hearsay. Subject to and without waiving the foregoing: at least promethazine HCL and ciclopirox cream can be used to treat dermatological ailments (allergic skin reactions and "skin infections," respectively). Otherwise, undisputed.

11. *The 98 Drugs at Issue come in different dosage strengths. For example, methylphenidate HCL tablets come in dosage strengths including 5mg, 10mg, 20mg, and Extended Release 20mg. (Ex. 65, Appendix C, Table 1.) Carbamazepine extended-release tablets come in dosage strengths including 100mg, 200mg, and 400mg. (Id.)*

**Response:** Plaintiffs object to ¶11 as whether the Drugs at Issue have different dosage strengths is immaterial. Subject to and without waiving the foregoing: it is undisputed that certain (but not all) of the 98 Drugs at Issue have more than one dosage strength.

12. *In some cases, a Defendant may manufacture one dosage of a Drug at Issue, but not the others. For instance, Lannett only manufactures the 250mg strength of acetazolamide but does not make or sell the 125mg strength. (Ex. 65, Appendix C, Table 2.) Glenmark only manufactures the 0.25% strength of desoximetasone ointment and does not make or sell the 0.05% strength. (Id.)*

**Response:** Plaintiffs object to ¶12 because whether a Defendant manufactures every dosage strength of a Drug at Issue is immaterial. Subject to and without waiving the foregoing: undisputed.

*13. The Drugs at Issue are also administered in different forms ranging from creams, lotions, and gels to ointments, tablets, and solutions. For example, clobetasol is sold as an emollient cream, cream, gel, ointment, and solution. (Ex. 65, Appendix C, Table 1.) Triamcinolone acetonide is sold in a cream, ointment, and paste, each of which have varying strengths. (Id.) Methylphenidate HCL takes the form of tablets in 5, 10, and 20mg strengths. (Id.)*

**Response:** Plaintiffs object to ¶13 as whether the Drugs at Issue are administered in "different forms" is immaterial. Subject to and without waiving the foregoing: undisputed.

14. *The Drugs at Issue compete in a variety of different markets. According to the States' expert, Dr. Frederick Warren-Boulton, each individual drug constitutes a separate, unique product market with distinct, varying participants. (Ex. 65, ¶ 12, Appendix D Figures 18-115.) Each product varied in terms of the number of competitors that made or sold the Drug at Issue. (Ex. 67, ¶ 110.)*

**Response:** Plaintiffs object to ¶14 as immaterial, including because the alleged conduct is a *per se* violation that does not require market definition. Plaintiffs object to ¶14 as Defendants' characterization of Dr. Warren-Boulton's opinion is not a "material fact." Plaintiffs further object to the extent Defendants' characterization differs from Dr. Warren-Boulton's opinions. Plaintiffs object to ¶14 as the number of participants in any drug-specific conspiracy (implementing the overarching conspiracy) is immaterial. Plaintiffs further object to the use of "Drugs at Issue compete" in ¶14 as vague and ambiguous. Subject to and without waiving the foregoing: Disputed as to the Defendants' self-characterization as "competitors" as they frequently did not compete with respect to the Drugs at Issue. *See* SAMF*, ¶¶* 1-2, 5-14, 17-28, 30-31, 33-35, 38, 43-44, 46-47, 49, 52-61. Undisputed that each Drug at Issue was sold by the companies that sold that drug; these companies may have been (but were not always) different

**Public Redacted Version**

from the companies that sold a different drug. Undisputed that, at any point in time, a certain number of companies sold each Drug at Issue; the number may have been different (but was not always) from the number of companies selling a different drug.

15. *For all Drugs at Issue, there were 10 or fewer competitors throughout the Relevant Time Period. On average, the Drugs at Issue each had three competitors during the alleged conduct period. (Ex. 65, Appendix G, Table 2); Ex. 67, ¶ 50.)*

**Appendix G Table 2 – Market Concentration Characteristics**

| Characteristic | Average | Minimum | Maximum |
|---|---|---|---|
| Number of firms, Drugs at Issue | 3.0 | 1.0 | 10.0 |

**Response:** Plaintiffs object to ¶15 as there being 10 or fewer, or an average of 3, generic manufacturers for each Drug at Issue is immaterial. Plaintiffs object to ¶15 to the extent Defendants' characterization of Dr. Warren-Boulton's Report differs from his opinions. Subject to and without waiving the foregoing: Disputed as to the characterization of Defendants as "competitors." *See supra* ¶ 14. Otherwise, undisputed.

16. *In 88% of the drug markets, there were "never [] more than five competitors and more than half never had more than three competitors throughout the alleged conduct period." (Ex. 67, ¶ 50.)*

**Response:** Plaintiffs object to ¶16 there being five or fewer, or three of fewer, manufacturers selling a Drug at Issue is immaterial. Subject to and without waiving the foregoing: Disputed

as to the characterization of Defendants as "competitors." *See supra* ¶ 14. Otherwise, undisputed.

17. *The markets for the Drugs at Issue were oligopolies, i.e., concentrated markets with few competitors. (Ex. 22, 31:16-21 Ex. 18, 37:3-7.)*

**Response:** Plaintiffs object to ¶17 as not "material to the decision of the motion," L.R. 56(a)(1), because Defendants do not cite ¶17 in their memorandum of law. Subject to and without waiving the foregoing: Undisputed that the markets for most of the Drugs at Issue can generally be characterized as oligopolies.

18. *In oligopolies, prices can be higher than prices in markets with perfect competition. (Ex. 22, 33:2-17; Ex. 23, 247:17-248:12; Ex. 66, ¶¶ 7, 37.)*

**Response:** Plaintiffs object to ¶18 because the theoretical possibility of higher prices in oligopolies compared to perfectly competitive markets is immaterial. Plaintiffs object to ¶18 as vague and ambiguous to the extent that is uses the undefined term "perfect competition." Subject to and without waiving the foregoing: undisputed.

19. *In oligopolies, "firms have expectations about how their rivals are going to behave if they do something" and so firms "take the expected response of those rivals into account." (Ex. 23, 249:25-250:4.) Thus, firms may choose to forego additional profitable sales in the absence of a conspiracy, and firms do not "simply go out there and maximize their market share." (Id., 246:12-14; see also Ex. 140, ¶ 43.)*

**Response:** Plaintiffs object to ¶19 as speculative and conjectural to the extent it purports to describe the mental state and/or behavior of any particular firm in the markets for the Drugs at Issue and as immaterial otherwise. Plaintiffs further object to ¶19 as immaterial as what firms "may choose" in the abstract has no bearing on the Defendants' actual participation in the

overarching conspiracy. Subject to and without waiving the foregoing: Undisputed that the phrases in quotation marks are accurate quotations of the cited deposition testimony. Further undisputed that, in general, firms in oligopolies may have expectations about their rivals' behavior and may take their rivals' expected responses into account in determining their own actions. Further undisputed that firms may choose to forego certain profitable sales, whether pursuant to a conspiracy or in the absence of one.  Disputed that, in general, firms do not try to maximize their market shares, SAMF ¶¶ 18, 20, 58, 62-63; undisputed that firms may sacrifice their interest in increasing market share to further other interests, including pursuant to a conspiracy (*e.g.*, to allocate markets).

*20. In oligopolies, firms can also raise prices significantly over time even in the absence of an agreement. (Ex. 23, 246:19-247:3 ("[t]acit coordination is a process in an oligopoly in which an oligopoly can raise prices significantly over time with a particular pattern without express agreement."); Ex. 66, ¶ 37 ("I agree (and say repeatedly) that in a model of a repeat game, the price under oligopolistic competition can approach the monopoly price through an extended process of multiple price increases (and decreases) along the way."); Ex. 18, 37:10-17 (describing oligopolistic coordination).)*

**Response:** Plaintiffs object to ¶20 as not "material to the decision of the motion," L.R. 56(a)(1), because Defendants do not cite ¶20 in their memorandum of law. Plaintiffs object to ¶20 as the theoretical possibility of firms raising prices in the absence of an agreement is immaterial. Plaintiffs further object to the term "significantly over time" as vague and ambiguous. Subject to and without waiving the foregoing: undisputed that, in general, firms in oligopolies can raise prices, whether or not pursuant to an agreement. Disputed that prices in oligopolistic markets prices will, in general, exceed an "oligopolistic equilibrium" that reflects the conditions of that

market; price increases over and above oligopolistic equilibrium prices can reflect collusion. *See* Pl. Ex. 134, ¶ 158, n.250.

*21. Glenmark's Paul Dutra confirmed that dermatological products were typically a "good place to start raising prices" because they generally "had less competition than solid oral products," and therefore price increases were "more likely to stick." (Ex. 47, 691:6-692:6.)*

**Response:** Plaintiffs object to ¶21 as not "material to the decision of the motion," L.R. 56(a)(1), because Defendants do not cite ¶21 in their memorandum of law. Plaintiffs further object to the terms "confirmed" and "good" as vague and ambiguous.  Subject to and without waiving the foregoing: undisputed that the quoted phrases are accurate quotations from the deposition testimony of Paul Dutra. Undisputed that the Drugs at Issue were subject to less competition than other drugs (including because of collusion with respect to the Drugs at Issue).  Undisputed that the lack of competition caused by collusion with respect to the Drugs at Issue is a reason why price increases were "more likely to stick" with respect to the Drugs at Issue.  To the extent another meaning is intended by the use of vague terms, Plaintiffs reserve the right to dispute such meaning.

*22. Defendants relied on different sources for obtaining Active Pharmaceutical Ingredients ("API"), even in instances where competitors sold the same finished product. Some Defendants relied primarily on a parent company to manufacture API, while other companies purchased API from an unrelated supplier. (See Ex. 50, 389:1-392:15 (Aurobindo's parent company manufactured the vast majority of the API Aurobindo sold); Ex. 60, 63:19-64:12; 81:23-82:18; Ex. 71, Interrogatory. Nos. 1-2 (Amneal and Actavis typically sourced API from a supplier); Ex. 47, 499:16-500:17 (Glenmark both manufactured its own API and purchased API from third-party suppliers); Ex. 16, 244:3-13.)*

**Response:** Plaintiffs object to ¶21 as not "material to the decision of the motion," L.R. 56(a)(1), because Defendants do not cite ¶21 in their memorandum of law. Plaintiffs object to ¶22 because where/how Defendants sourced Active Pharmaceutical Ingredients is immaterial. Subject to and without waiving the foregoing: undisputed.

23. *Because each Defendant had a different process for acquiring API, Defendants also varied in terms of their manufacturing costs and the role such costs played in determining prices for the Drugs at Issue. (Ex. 47, 500:6-17 ("[T]he price of raw material would affect the total cost of goods of any product."); Ex. 43, 146:7-12 ("[T]he cost and supply of API could be a factor in Bausch's pricing of the generic drug products.").)*

**Response:** Plaintiffs object to ¶23 as Defendants' having different processes for acquiring API and having different manufacturing costs is immaterial. Plaintiffs further object to ¶23 because of its vague and ambiguous use of the terms "[b]ecause," "different," "role," and "determining." Subject to and without waiving the foregoing: undisputed that costs associated with acquiring API are included in costs of goods sold for pharmaceutical products. Disputed that changes in manufacturing costs accounted for the changes in the prices of the Drugs at Issue during the conduct period, including because overcharge estimates in this case take costs into account. *See* Pl. Ex. 134, ¶ 98 (discussing adjustment for cost in overcharge calculation).

24. *Some Defendants did not acquire API at all, but instead purchased the drug as a finished product. (Ex. 72, Response to Interrogatory 1 ("Lannett receives the product [digoxin] as a finished good and does not require the API for this product.").)*

**Response:** Plaintiffs object to ¶24 as whether Defendants acquired finished drug product as opposed to API is immaterial. Subject to and without waiving the foregoing: undisputed that Defendants could and did, in certain instances, purchase the Drugs at Issue as finished products.

25. *The policies and procedures for approving pricing and bidding decisions varied by manufacturer. For example, Sandoz established a pricing committee in 2012, so no single person had the unilateral authority to implement price increases, and instead any price increase required unanimous approval from the committee. (Ex. 143, SDZCTAG-02128398; Ex. 140, ¶¶ 25, 27, 29, 32, 34.) The Sandoz pricing committee considered the following non-exhaustive factors: demand forecasting based on publicly available information, customer information, and other competitive intelligence; profitability analyses, including the effect of price protection provisions; the impact a price increase on one drug would have on the portfolio as a whole given price-protection commitments; and consideration of financial targets set by Novartis. (Ex. 143, SDZCTAG-02128398; Ex. 140, ¶¶ 29-36; Ex. 15, 176:24-177:6; see also, e.g., Ex. 30, 70:13-71:11; 83:3-22 (At Lupin, no one person had the authority to approve price changes to drugs.); Ex. 5, 453:7-454:6 (At Sun, G.P. Singh "had the final authority."); Ex. 165, 182:18-183:20 (At Lannett, Kevin Smith was the primary decision-maker on pricing.); Ex. 46, 129:22-131:22; Ex. 14, 41:3-8; Ex. 60, 142:8-21 (Amneal and Mylan had pricing committees.); Ex. 58, 48:16-49:7 (At Glenmark, several departments were involved in pricing decisions.).)*

**Response:** Plaintiffs object to ¶25 as the variation in "policies and procedures" among Defendants is immaterial. Whether a "single person had unilateral authority to implement price increases" is also immaterial. Subject to and without waiving the foregoing: undisputed that Defendants had policies or procedures for implementing price changes that were not identical from Defendant to Defendant. Disputed to the extent ¶25 is meant to imply that all of the "non-exhaustive factors" Sandoz considered were considered in every case or that Sandoz did not consider agreements with other manufacturers (or competitively sensitive information exchanged pursuant to such agreements) in connection with price increases. Defendants did

14

consider such information and had policies and procedures for masking such information, including by labelling it information derived from customers even when that would have been impossible because, *e.g.*, the relevant customer would have had no way to know the subject information at the time of communication. SAMF ¶¶ 19-20, 22.

26. *Bidding practices also varied among Defendants. For example, when evaluating new sales opportunities, Mylan's Pricing and Contracts department, with support from its manufacturing and supply chain teams, employed an "Opportunity Analysis Process," which involved conducting pricing and supply analyses based on consideration of various factors including, among other things, expected volume, profitability, and inventory assessments. (Ex. 14, 102:22-103:13; Ex. 132, MYLGP0002696599 at 649-653; Ex. 131, MYLGP0001251856 at Slides 5, 7.) In addition to the analyses above, Mylan often considered the customer relationship, its incumbent status, and likelihood of success for its RFPs. (Ex. 14, 213:21-214:13); see also, e.g., Ex. 16, 347:1-23 (explaining that at Glenmark, "a number of people" were involved in "deciding when to bid on an RFP or other pricing request from a customer").)*

**Response:** Plaintiffs object to ¶26 as whether "bidding practices" varied among Defendants is immaterial. Plaintiffs object to the terms "[b]idding practices" and "often" as vague and ambiguous. Subject to and without waiving the foregoing: undisputed that Defendant firms had practices relating to bidding practices, which (depending on the Defendant) could have been similar to or different from the practices of other Defendants (or were in some respects similar and other respects different). Disputed to the extent that ¶26 is meant to imply that Mylan's bidding practices were not informed by agreements with other Defendants, including agreements about market and allocation and agreements to fix prices. *See e.g.*, SAMF, ¶ 22, 25, 43, 54.

*27. The States have obtained the cooperation of several former employees of Aurobindo, Fougera, Glenmark, Rising, and Sandoz.*

| *Witness (Complaint Identifier)* | *Relevant Former Employer(s)* |
|---|---|
| *Michael Vezza (CW-1)* | *Sandoz* |
| *Paul Krauthauser (CW-2)* | *Sandoz, Rising* |
| *Christopher Bihari (CW-3)* | *Fougera, Sandoz* |
| *Della Lubke (CW-4)* | *Sandoz* |
| *Paul Dutra (CW-5)* | *Glenmark* |
| *Anthony Thomassey (CW-6)* | *Fougera, Aurobindo* |

*(See Ex. 46, 45:4-10; Ex. 49, 24:23-25:2; Ex. 11, 25:6-9; Ex. 15, 24:4-25:21; Ex. 47, 868:4-6; Ex. 7, 18:11-17.)*

**Response:** Plaintiffs object to ¶27 as not "material to the decision of the motion," L.R. 56(a)(1), because Defendants do not cite ¶27 in their memorandum of law. Plaintiffs further object to ¶27 as misleading to the extent that it seeks to imply any cooperation beyond the obligations of any such agreements. Subject to and without waiving the foregoing: undisputed.

*28. None of the States' cooperating witnesses testified to an overarching conspiracy as alleged by the States.*

*a. Michael Vezza, who was at Sandoz during the relevant period, testified that he could not recall any "overarching conspiracy with all of the companies" or "one big agreement among all of those companies." (Ex. 46, 703:10-704:10.) Vezza further testified that "every product has its own story or nuance," (Id., 1575:23-1577:8), and that "every product had a unique situation." (Id., 1971:3-1973:3.)*

*b. Paul Krauthauser, who was at Rising during the relevant period, testified that he was unaware of any overarching agreement to fix prices or allocate market share. (Ex. 49, 451:15-452:21.)*

Public Redacted Version

*c. Christopher Bihari, who was at Sandoz during the relevant period, did not testify that there was an overarching conspiracy. Instead, he testified that any agreements were "product-by-product" and "situation by situation." (Ex. 11, 1264:12-1265:21.)*

*d. Della Lubke, who was at Sandoz during the relevant period, denied any "larger overarching agreement among all of those companies." (Ex. 15, 527:9-528:4.)*

*e. Paul Dutra, who served as Glenmark's Executive Vice President until April 2014, did not testify to any overarching conspiracy. (Ex. 47, 933:19-24.)*

*f. When Anthony Thomassey, who was at Fougera during the relevant period, referred to an "overarching agreement," (Ex. 7, 924:14-15), he was in fact describing three separate bilateral agreements between his former employer (Fougera) and one other Defendant (Perrigo, Taro, or G&W), (Id., 919:16-925:20, see also Ex. 7, 1192:15-19, 1196:10-1199:16 (Perrigo); 1203:19-23 (Taro); 1206:5-9 (G&W).) He did not testify that each Defendant entered into an agreement regarding "fair share." (See, e.g., Ex. 7, 924:9-19.) For example, an alleged agreement between Fougera and Perrigo was "on a product-by-product basis to make an agreement on that product[.]" (Id., 925:16-20.)*

**Response:** Plaintiffs object to ¶28 as not "material to the decision of the motion," L.R. 56(a)(1), because Defendants do not cite ¶28 in their memorandum of law. Plaintiffs object to ¶28 as misleading to the extent that it purports to characterize the overarching conspiracy differently than in the Second Amended Complaint. *See* Dkt. 196, ¶¶ 124-176. Subject to and without waiving the foregoing: disputed as to whether the above-referenced cooperating witnesses testified to the presence of an overarching conspiracy. *See e.g.*, SAMF ¶¶ 2, 9, 10, 15, 18, 22, 24-25, 44 (Vezza); SAMF ¶¶ 1-3, 5, 22, 38, 44, 47, 49, 53 (Krauthauser); SAMF ¶¶ 2, 5, 17, 18, 20, 22-25, 27-28, 35, 37-38, 44, 46-47, 49, 53 (Bihari); SAMF ¶ 2, 9, 12, 19, 21-22, 25, 44, 49,

52 (Lubke); Pl. Ex. 138 at 41:17-57:9 (Dutra); SAMF ¶ 2, 9, 13-15, 17, 19-20, 22, 24-29, 38, 44, 49, 52-53, 55, 57, 59-60 (Thomassey).

*29. The cooperating witnesses were not aware of any conspiracy or improper agreement, whether overarching or otherwise, concerning many of the Defendants. (Ex. 46, 698:15-708:6; Ex. 15, 512:2-528:4; Ex. 11, 1588:19-23, 1603:7-1610:19; Ex. 49, 403:23-432:15; Ex. 7, 1243:10-21; Ex. 47, 933:19-24.)*

**Response:** Plaintiffs object to ¶29 as not "material to the decision of the motion," L.R. 56(a)(1), because Defendants do not cite ¶29 in their memorandum of law. Plaintiffs object to the phrase "concerning many of the Defendants" as vague and ambiguous.  Subject to and without waiving the foregoing: Disputed that the cited testimony supports the proposition.  For example, Defendants cite testimony in which Vezza does not recall entering bilateral agreements with various companies, or which Bihari does not recall exchanging competitively sensitive information with certain companies.  However, participation in the overarching conspiracy did not require entering into drug-specific (typically bi- or trilateral) agreements or exchanging competitively sensitive information with every other participant.  Contrary to Defendants' assertion, cooperating witnesses testimony supports the existence of the overarching conspiracy. *See supra* ¶ 28.

*30. Witnesses from other Defendants did not have agreements with competitors, as alleged by the States:*

*a. **Actavis**: Andy Boyer testified that he was "not [] aware of" Actavis "ever mak[ing] any decision to pursue or not pursue specific customers or market share based on an agreement with a competitor." (Ex. 6, 369:4-9.) Marc Falkin likewise explained that he never agreed to*

*coordinate with competitors concerning the price Actavis charged or which customers it would target. (Ex. 138, 758:11-759:12.)*

b. **Amneal***: Shannon Rivero testified that she was "unaware of any agreements" between Amneal and any competitor regarding "the pricing of any generic product[]" or "coordinating on customers or bids for any generic product[.]" (Ex. 57, 483:15-484:1.)*

c. **Aurobindo***: James Grauso testified that "Aurobindo never had any agreements with any other competitors on customers or pricing of any product." (Ex. 27, 439:15-440:1.)*

d. **Bausch***: Barbara Purcell testified that Bausch "did not "ever agree[] with a Bausch competitor regarding the price," "about coordinating in any way the bidding," or "regarding which customers Bausch would supply and which customers a competitor would supply." (Ex. 8, 582:8-582:12; 580:19-586:7.) Mary Saharyan likewise denied any awareness that anyone at Bausch "ever reached an agreement with a competitor about which customers Bausch would supply or which customers a competitor would supply."). (Ex. 44, 321:6-321:19.)*

e. **Glenmark***: James Grauso testified that he "might have been speaking to [his] friends, who happened to work for other manufacturers," but "[n]o agreements on products, customers, or pricing was ever reached – ever made." (Ex. 27, 469:9-21.) Jeff Johnson likewise testified that he was not aware "of any agreements between Glenmark and any other manufacturer of generic drugs on coordinating the bids for any product." (Ex. 31, 320:2-6; 322:5-8.)*

f. **Greenstone***: Jill Nailor and Carol Patterson both testified that they never formed, and were not aware of, any agreements with employees of competitor companies regarding the pricing or allocation of any customer for any generic drug product. (Ex. 32, 1019:5-1020:9; Ex. 62, 277:8-278:6.)*

**Public Redacted Version**

g. ***Lannett****: Kevin Smith testified that he never reached an agreement with any competitor of Lannett with respect to Lannett's pricing or market share of any generic drug. (Ex. 39, 791:13-794:9.) Smith answered "[a]bsolutely not" when asked if he "ever reach[ed] an agreement with any competitor of Lannett with respect to whether or not to respond to a customer's [Request for Proposal ("RFP")]." (Id., 787:13-21.)*

h. ***Lupin****: David Berthold testified that he "did not" "ever enter an agreement to fix prices on [competitor] calls." (Ex. 12, 795:19-796:14.)*

i. ***Mylan****: Lance Wyatt denied ever entering into any agreement with a competitor regarding prices for generic drugs. (Ex. 42, 176:15-22.)*

j. ***Perrigo****: Douglas Boothe testified that, to his knowledge, Perrigo never made any decisions "to pursue or not to pursue specific customers for market share based on any agreement with a competitor." (Ex. 17, 524:13-17.) Boothe also denied ever sharing pricing information with competitors or reaching agreements with competitors about pricing or "which customers Perrigo would supply and which customers the competitor would supply." (Id., 522:20-24, 524:3-7.) Katie McCormack denied ever reaching agreements with employees of competitors regarding the pricing for generic drug products, or the customers that each company would supply. (Ex. 37, 285:2-286:4, 287:13-288:16.)*

k. ***Sandoz****: Armando Kellum was "unaware of any overarching, industrywide conspiracy with respect to generic drugs," "did not participate in an overarching industrywide conspiracy with respect to generic drugs," and was "unaware of any Sandoz employee participating in an overarching, industrywide conspiracy with respect to generic drugs." (Ex. 140, ¶ 57.)*

l. ***Sun****: Anand Shah testified that Sun did not "talk to competitors for price increases." (Ex. 3, 214:11-16.) Jolene McGalliard also denied ever sharing pricing information with a competitor*

*or participating in any agreement to coordinate price increases or market share. (Ex. 34, 297:11-331:14.)*

*m. **Taro***: *Aleksey Likvornik testified that "there were no agreements on any of [Taro's] products." (Ex. 1, 256:4-21.) Elizabeth Guerrero denied having conversations with competitors about pricing or bids "whether they [were] friends or not" (Ex. 20, 98:2-19), and Jim Josway similarly denied reaching any agreement with a competitor to allocate customers or raise prices). (Ex. 28, 271:2-272:24.)*

*n. **Wockhardt***: *Scott Koenig testified that he never reached an agreement with anyone at a competitor concerning pricing or "about which customers Wockhardt would supply and which customers a competitor would supply." (Ex. 56, 513:9-515:11; Ex. 64, 266:13-268:18 (same); Ex. 157, 160:10-163:18 (same).)*

**Response:** Plaintiffs object to ¶30 as not "material to the decision of the motion," L.R. 56(a)(1), because Defendants do not cite ¶30 in their memorandum of law. Plaintiffs further object to ¶30 as to the phrase "other Defendants" as vague and ambiguous. Subject to and without waiving the foregoing: undisputed that the individuals referenced in ¶30 testified as they did. Disputed as to whether the companies for which the witnesses worked for had agreements with their competitors. *See e.g.*, SAMF ¶ 4-5, 19, 22-23, 38, 40, 43, 47, 57 (Actavis); Pl. Ex. 138 at 164:10-165:11  (Amneal); SAMF ¶ 22, 38, 43, 53 (Aurobindo); Pl. Ex. 107 at 562:11-17; (Bausch); SAMF ¶ 22-23, 25, 38, 43, 46-47 (Glenmark); Pl. Ex. 105 at 835:11- 836:18 (Greenstone); ¶ 19, 33, 43, 50 (Lannett); Grauso Depo. Tr. 101:5-23 (Lupin); ¶ 22, 25, 43 (Mylan); ¶ 22-23, 25, 27, 38, 40, 43, 53 (Perrigo); ¶ 11, 17-18, 22-23, 25, 27, 35, 38, 43 (Sandoz); SUN-CTOAG_0020440 (discussing the "friendship" each other has and they have a few things they would like to discuss

21

but to do so "on the phone.") (Sun); ¶ 4-5, 16-18, 22-23, 25, 27, 31, 36, 38, 43, 46-47, 52 (Taro);

Pl. Ex. 106 492:13-22, 545:25-548:4, 680:11-682:12 (Wockhardt).

31. *When a generic manufacturer begins selling a new product, it typically sets a Wholesale Acquisition Cost ("WAC") that is below the branded version's WAC and is publicly available. (See, e.g., Ex. 3, 75:8-77:5; Ex. 43, 92:3-93:3; Ex. 9, 75:13-76:13; Ex. 2, 190:2-195:1 (discussing calculation of discount from branded WAC upon new generic product launch).)*

**Response:** Plaintiffs object to ¶31 as immaterial. Plaintiffs object to the use of "typically" as vague and ambiguous. Plaintiffs further object to ¶31 as conjectural with respect to any particular Drug-at-Issue. Subject to and without waiving the foregoing: undisputed.

32. *Because WAC does not reflect discounts, rebates, or other reductions in price that are commonly negotiated with customers, most customers do not pay WAC, and many pay different prices for the same drug. (Ex. 5, 69:6-23; Ex. 3, 135:24-141:21; Ex. 40, 218:11-24; Ex. 4, 77:7-80:11, Ex. 5, 541:15-544:23; Ex. 2, 140:3-141:14; Ex 60, 158:18-158:22.)*

**Response:** Plaintiffs object to ¶32 as immaterial, including because Plaintiffs' experts (Drs. Warren-Boulton and Singer) rely on Defendants' net pricing, not WAC. Plaintiffs object to the use of "commonly," "most," "many" and "different" in ¶ 32 as vague and ambiguous. Subject to and without waiving the foregoing: undisputed.

33. *Customer contracts include certain distinct terms, such as long-term pricing, shelf stock adjustments, and other price-protection provisions, that control the effect of any change in manufacturer pricing. (See Ex. 67, ¶¶ 42-45; Ex. 47, 451:22-455:14; Ex. 58, 218:23-219:18; 220:17-221:21.)*

**Response:** Plaintiffs object to ¶33 as immaterial to Defendants' participation in the alleged overarching conspiracy. Plaintiffs object to the use of "certain distinct terms," "other price-

Public Redacted Version

protection provisions," and "control" as vague and ambiguous. Subject to and without waiving the foregoing: undisputed that some contracts between a generic manufacturer and its customers may include terms such as long-term pricing, shelf stock adjustments, and other provisions relating to changes in price. Disputed that such terms "control the effect of any change in manufacturer pricing." *See e.g., supra* ¶¶ 14, 28, 30.

34. *Various contract terms may apply to a particular customer. These terms include, but are not limited to, failure-to-supply penalties, price protection penalties, WAC increase penalties, and shelf stock adjustment penalties, among others, generic manufacturers consider these terms in pricing and bidding considerations. (Ex. 31, 321:9-322:4; Ex. 32, 592:4-13; Ex. 2, 109:7-118:23; Ex. 69, ¶¶ 102-108; Ex. 145, Wockhardt-CB-000000364443-44; Ex. 60, 98:6-15, 47:18-48:1, 118:19-23, 156:20-159:14, 159:20-161:6, 161:8-13, 162:11-168:7; Ex. 49, 96:6-97:2; Ex. 68, ¶¶ 18-20; Ex. 56, 347:20-356:8, 435:15-436:4, 496:6-497:17; Ex. 140 ¶ 35.)*

**Response:** Plaintiffs object to ¶31 as immaterial to whether Defendants participated in the alleged overarching conspiracy. Plaintiffs object to the use of "various," "may," "include, but are not limited to," "generic manufacturers," and "considering … in … considerations" as vague and ambiguous. Subject to and without waiving the foregoing: undisputed that a contract between any Defendant and any customer may include one or more terms, potentially including terms which may be characterized as belonging to the listed categories. Undisputed that generic manufacturers may consider the terms of their contracts with customers in making pricing and bidding decisions, though disputed as to any specific considerations as applied to any particular decision. Further disputed to the extent that the list of terms in ¶34 omits influential pricing and bidding considerations. *See, e.g., supra* ¶¶ 14, 28, 30.

35. *The ability to supply customers was also a factor that manufacturers considered when determining whether and how to approach customers, whether as a new entrant or as an incumbent. (See, e.g., Ex. 27, 591:21-592:4, 609:8-14; Ex. 12, 414:11-416:20; Ex. 26, 64:18-65:18; Ex. 33, 396:3-397:19; Ex. 163, 65:16-67:4; Ex. 153, APUSA-001945343; Ex. 69, ¶ 75; Ex. 47, 458:18-460:5 (share goal at launch depended on supply); 669:5-12 (consequences of failure to supply penalties).)*

a. *For example, Mylan could not bid on CVS, Walgreens, and Walmart for its phenytoin business due to an extended period of supply disruptions which left Mylan with low inventory and limited ability to fulfill even existing customer requests. (Ex. 69, ¶¶ 94-95; Ex. 148, MYLGP0001239248 (CVS); Ex. 149, MYLGP0010496591 (Walgreens); Ex. 150, MYLGP0008573041 (Walmart).)*

b. *Similarly, Wockhardt was unable to bid on erythromycin when Fougera had a supply interruption because Wockhardt had its own supply interruption. Wockhardt had a limited quantity of API to manufacture the product, it needed to change its API supplier, and the dauber on the product needed to be changed. As a result of these problems, Wockhardt placed the product on long-term backorder. (Ex. 146, Wockhardt-CB-000003154314-15; Ex. 147, Wockhardt-CB-000003139547; Ex. 64, 162:23-163:22, 259:19-261:8.)*

**Response:** Plaintiffs object to the use of "ability," "factor," and "considered when determining whether and how to approach customers" as vague and ambiguous. Subject to and without waiving the foregoing: undisputed that supply capabilities may factor into business decisions. Disputed that Mylan "could not bid" as, *e.g.*, Mylan could have pursued additional supply capabilities but elected not to, and additionally was in communication with other Defendants regarding re-entry to the phenytoin market during their supply troubles. *See* SAMF, ¶ 54. Similarly disputed that Wockhardt was "unable to bid." Further disputed that Defendants

24

would have encountered or been constrained by putative supply problems if they had actually been competing with one another.

36. *Manufacturers can increase WAC or contract prices on one drug, or a group of drugs, for several independent reasons, including as part of a regular portfolio review, after concluding that it could sell at a higher price and profit to fewer customers, in response to supply challenges, or in response to other price increases. (See Ex. 58, 328:10-329:8 (Glenmark made decisions on "matching prices" based on profitability and supply); see also Ex. 16, 47:3-49:2, 87:2-88:24 (explaining that in addition to specific "triggering [market] events," portfolio reviews for potential increases occurred on a "regular basis."); Ex. 85, 0032A; Ex. 47, 682:21-683:24 ("because Glenmark had a relatively high market share, it could afford to lose some of that market share in order to charge a higher price for the product"), 654:3-654:15 (explaining that if Glenmark stopped selling products it was losing money on, profits could improve.).)*

a. *Supply challenges at one company present opportunities to raise prices. Lupin, for example, raised its price for ethambutol HCL in December 2012 after learning VersaPharm was leaving the market entirely and Teva was experiencing temporary issues. (Ex. 30, 281:1-282:2, 282:22-283:10; Ex. 27, 591:21-592:4, 609:8-14.)*

b. *Manufacturers may also evaluate a price increase based on customer feedback. At Bausch and Fougera, it was "very typical" to learn about price increases in the market from its customers and then evaluate whether a price increase made sense for them. (Ex. 44, 85:12-86:10; 39:16-40:14; Ex. 40, 175:2-10; Ex. 8, 537:17-537:23.)*

**Response:** Plaintiffs object to ¶36 as the hypothetical possibility of a manufacturer increasing a price for any reason is immaterial. Plaintiffs object to ¶36 as speculative to the extent it purports to provide a reason for any particular price increase of a Drug at Issue. Plaintiffs object to the

use of "independent reasons," "supply challenges," "opportunities," "very typical," and "learn … from" as vague and ambiguous. Subject to and without waiving the foregoing: undisputed that firms *can* increase prices for one or more reasons; disputed that such reasons are "independent" from one another or that the presence of a non-collusive reasons for a firm to increase prices makes a collusive price increase (subject of communications among competitors) "independent." The record evidence shows that Defendants increased prices as a result of concerted action. *See supra* ¶¶ 14, 28, 30. Further disputed that manufacturers "typically" learned for the first time about price increases from customers and that evaluation of any price increase was "based on customer feedback." SAMF ¶ 19, 20, 22.

37. *When a competitor increases price, manufacturers can improve profitability by following the first competitor with their own price increases, including by sometimes obtaining the same amount of business at a higher price. (Ex. 8, 538:3-13; Ex. 145, Wockhardt-CB-000000364443; Ex. 74, RFA No. 4 ("it is possible for a market participant's decision to refuse to reduce its price and lose some business to be more profitable than reducing its price.").)*

**Response:** Plaintiffs object to ¶37 as immaterial because it present a theoretical possibility. Plaintiffs further object to ¶37 as vague in that it does not specify whether the price-leader and -follower coordinated the price increase in advance. Plaintiffs further object to the use of "including by sometimes" as vague and ambiguous. Subject to and without waiving the foregoing: undisputed that a firm may be more profitable if it can raise prices and nonetheless retain the same market share; disputed to the extent that the record evidence shows that Defendants increased prices as a result of concerted action. *See supra* ¶¶ 14, 28, 30.

38. *If one generic manufacturer raises its price, another manufacturer also must assess whether failing to follow that increase would lead to increased demand for their product, which would*

*potentially result in a failure-to-supply penalty. (Ex. 64, 257:14-258:16; Ex. 56, 337:4-338:1; Ex. 35, 92:5-93:3; Ex. 11, 116:1-19.)*

*a. Wockhardt, for example, raised its clobetasol prices to avoid these failure-to-supply penalties that could cost "years and years of profits or millions of dollars for a one-month supply issue." (Ex. 56, 337:4-338:1; see also id., 494:9-495:21, 496:6-497:17, 498:4-500:7, 500:14-505:18; Ex. 35, 92:6-93:3; Ex. 64, 257:14-258:16; Ex. 145, 83:18-90:3, 139:5-140:5; Ex. 145, Wockhardt-CB-000000364443-44; Ex. 151, Wockhardt-CB-000001676637-39; Ex. 152, Wockhardt-CB-000003131335; Ex. 144, Wockhardt-CB-000001410669, 71; Ex. 154, Red Oak Sourcing, LLC Generic Pharmaceuticals Business Standards, 2014.)*

*b. In seeking approval for a price increase, Greenstone's employees explained that an increase was necessary to enable the company to properly manage inventory for existing customers, as customer orders had already increased in response to Sandoz's price increase while Greenstone's price remained below the market. (Ex. 96, GNST-005765557.)*

**Response:** Plaintiffs object to ¶38 as vague and ambiguous in its use of "one generic manufacturer," "another manufacturer," "must assess," "potentially result," "to avoid," and "these failure-to-supply penalties." Plaintiffs further object to ¶38 as misleading to the extent that Greenstone *could* have increased supply to satisfy demand for that drug; The cited evidence appears to assume that manufacturers would not increase supply to pursue the share of another manufacturer that raised prices, reflecting the common acceptance of the conspiracy to allocate markets. Subject to and without waiving the foregoing: disputed that "another manufacturer ***must***" do anything, though undisputed that a manufacturer may consider the impact of another manufacturer's price increase on its business.  Disputed that manufacturers were unable to increase supply to match demand. SAMF ¶ 19, Disputed that manufacturers

27

could not use an allocation process or other similar procedures to respond to periods of increased demand. SAMF ¶ 22, 25 (noting that Defendants communicated directly about customer allocation plans to limit competition). Undisputed that Wockhardt raised its clobetasol price.  Disputed that avoiding failure-to-supply penalties is the sole reason for such increase. SAMF ¶ 59. Undisputed that Greenstone employees referred to inventory management in connection with their justification for seeking a price increase on clindamycin phosphate**.**

39. *Manufacturers also have an independent interest in avoiding undermining a price increase to gain market share because doing so could trigger a "race to the bottom," resulting in lower prices and reduced profits for a particular drug. (See, e.g., Ex. 8, 247:24-248:20, 285:12-286:11; Ex. 56, 515:12-517:7; Ex. 64, 138:7-139:3, 147:9-23; Ex. 43, 351:8-352:4; Ex. 40, 191:9-192:6; Ex. 13, 66:4-67:1; Ex. 50, 526:19-527:18; Ex. 15, 795:15-22; Ex. 7, 697:3-698:2; see also Ex. 8, 353:2-354:10 (testifying when a competitor raised prices on a generic product, Bausch would consider whether it would be more advantageous to follow the competitor's price increase or seek market share by lowering price); Ex. 24, 145:12-146:9; Ex. 16, 264:4-265:23 (explaining that there are a "number of reasons that go into why [Glenmark] would or would not pick up a customer . . . One . . . is do you have the ability to supply. Number two, you have to look at the overall number of players that are in the product, you have to look at the potential for price erosion that could occur . . . as more and more people enter, you have more and more activity, bidding activity, and it inevitably causes price erosion so [Glenmark has] to be very conscious of trying to make sure that [Glenmark's] products are well positioned and have some reasonable level of profitability.").)*

**Response:** Plaintiffs object to ¶39 as vague and ambiguous in its use of "independent interest," "avoiding undermining a price increase," "could," "lower prices," "reduced profits," and "particular drug. Subject to and without waiving the foregoing: undisputed that firms have an interest in avoiding price erosion; disputed that firms considered such interest "independent" as opposed to a collective interest. Avoiding price erosion was, for example, a motivation to collude. SAMF ¶ 17. Further disputed that firms could not profitably capture additional share of a particular drug market in response to another participant's price increase. Pl. Ex. 134, ¶¶ 47-60 (discussing the necessity of all firms in a market share agreement to increase price or the remaining firms exceed their market share and can result in capture of the increasing firm's market share). Plaintiffs further dispute ¶39 because the price increases for the Drugs at Issue were the result of concerted and collusive conduct, not the avoidance of a "race to the bottom." *See supra* ¶¶ 14, 28, 30.

40. *The worst-case scenario occurs when the manufacturer lowers its price but fails to gain market share, leaving it worse off than if it had raised prices and lost customers. (Ex. 8, 285:12-286:11; Ex. 56, 515:12-517:7; Ex. 64, 138:7-139:7, 147:9-23; Ex. 43, 351:8-352:4; Ex. 40, 191:9-192:6; Ex. 60, 131:1-16.)*

**Response:** Plaintiffs object to ¶40 as vague and ambiguous in its use of the terms "worst case scenario" and "the manufacturer." Plaintiffs further object to as speculative and conjectural as, *e.g.*, in a competitive market, a manufacturer may be forced to lower price to maintain share; such competition is typical, not a "worst case scenario." Subject to and without waiving the foregoing: undisputed that maintaining market share at a lower price on a particular drug would generate less sales revenue for that particular drug, assuming the market stays the same size.

**Public Redacted Version**

41. *Manufacturers independently assessed whether (and to what extent) to seek additional business and the prices at which to do so in response to RFPs from customers. (Ex. 87, GMK-MDL-000993735; Ex. 47, 800:14-801:17; Ex. 62, 136:8-137:6; Ex. 36, 66:3-68:19; Ex. 134, Wockhardt-CB-000000263434; Ex. 135, Wockhardt-CB-000001418980; Ex. 53, 382:4-21 (reasons why Lannett would not bid on RFPs, such as lack of capacity, lack of manufacturing supply, cost of goods, etc.).)*

**Response:** Plaintiffs object to ¶41 and its use of the undefined term of "independently assessed" as misleading and mischaracterizing the evidence contained in the operative Complaint. Plaintiffs further object to ¶41 as vague and ambiguous to the extent that is uses the undefined term "additional business." Subject to and without waiving the foregoing: disputed, because there is witness testimony that Defendants made decisions about whether to bid on customer RFPs in light of their anticompetitive agreements with their competitors. SAMF, ¶¶ 18-19, 23, 29. Further disputed, because witnesses testified that they would not voluntarily cede market share absent a competitive agreement. SAMF, ¶ 58. Further disputed, because witnesses testified to having declined to bid or provided sham bids in response to customer RFPs because of their anticompetitive agreements with competitors. SAMF, ¶ 18-19, 23, 29.

42. *Manufacturers could mitigate a reduction in profitability by independently giving up some business to new entrants instead of undercutting new entrants to maintain market shares. (Ex. 63, 698:15-703:7; Ex. 50, 525:1-526:2, 528:1-528:8; Ex. 43, 349:3-351:20; see also Ex. 104, PER-MDL-000361454; Ex. 103, PER-MDL-000322398 (reflecting Perrigo subsidiary Paddock's 2011 decision to divest latanoprost solution rather than enter the market after realizing there would fiercer competition than originally anticipated).)*

**Public Redacted Version**

**Response:** Plaintiffs object to ¶42 as vague and ambiguous as "could mitigate a reduction"

fails to precisely identify a fact at question; Plaintiffs object to ¶42 as "material to the decision

of the motion," L.R. 56(a)(1). Subject to and without waiving the foregoing: disputed to the

extent that this assumes that the new entrant would not compete on price for more market

share absent an agreement. Pl. E. 134, ¶¶ 47-60 (discussing the necessity of all firms in a

market share agreement to increase price or the remaining firms exceed their market share and

can result in capture of the increasing firm's market share).

43. *Similarly, incumbent manufacturers furthered their independent interests by maintaining*

*their higher prices with fewer customers. (Ex. 43, 349:3-351:20; Ex. 9, 67:23-69:12*

*(explaining that when a new competitor comes to market and offers a Taro customer a price,*

*"[i]f we don't yield that market share," and the competitor "gets no share," then they will*

*"yield some market share initially" to "maintain its prices in the market place.").) Thomassey*

*explained the "independent business interest" behind incumbent firms "giv[ing] up market*

*share" to new entrants because if they did not, new entrants would approach multiple*

*customers and "each time the price will ratchet lower and lower . . . And so if [the incumbent*

*firms] don't give up share you'll just drive the price into the ground." (Ex. 7, 1172:15-1173:4.)*

**Response:** Plaintiffs object to ¶43 as misleading in its use of the phrase "independent

interest." Subject to and without waiving the foregoing: undisputed to the extent that one

witness testified that "if you don't give up share you'll just drive the price into the ground."

Otherwise, disputed, because, without further context, maintaining price with fewer customers

on a particular drug generates less sales revenue. Further disputed, because the term

"independent interests" is ambiguous, and witnesses testified that defendants did not always

want to give up market share, SAMF, ¶¶ 62-63, and would not have given up market share in the absence of an agreement. SAMF, ¶ 58.

44. *If the incumbent manufacturer tried lowering prices to keep a customer, it risked its overall profit. Put differently, a company is more profitable selling 100 drugs at $20 each than 200 drugs at $9 each and selling 100 drugs at $20 each than selling 100 drugs at $9 each. (Ex. 40, 191:9-192:6; Ex. 43, 349:3-351:20; Ex. 29, 360:2-17; Ex. 9, 67:23-69:12; Ex. 47, 528:11-529:14 (noting that failing to give market share to new entrant would "not be a smart decision").) Examples of this include the following:*

*a. Perrigo, Taro, and Aurobindo responded to new market entrants threatening profitability by prioritizing profitable customers and moving on from less profitable relationships. (Ex. 33, 223:24-225:11; Ex. 9, 67:23-69:12; Ex. 50, 526:19-527:18.)*

*b. Likewise, in January 2013, Glenmark responded to a new entrant in the fluticasone market by analyzing its customer base to focus on the more profitable customers and opportunities. (See Ex. 80, GMK-MDL-000153121.) It did the same thing for a second entrant in that market later in 2013. (See Ex. 83, GMK-MDL-000334246; Ex. 84, GMK-MDL-000427917; Ex. 85, GMK-MDL-000427918; Ex. 81, GMK-MDL-000283639.)*

*c. Similarly, in December 2011, McKesson informed Greenstone of the fact that Sandoz was bidding at a lower price for eplerenone than the one at which Greenstone was supplying. (Ex. 164, GNST-006361580.) Greenstone declined to match Sandoz's bid because: "We [Greenstone] have 94% [market share]; Sandoz has 4%. Unclear on future risk to Sandoz ability to supply. If legitimate (and I have no reason to believe that it is not), we should release some share. I cannot see my way clear to lowering the price to such levels only to see the competition attack us elsewhere." (Ex. 97, GNST-006116804.)*

**Response:** Plaintiffs object to ¶44 as immaterial as hypothetical pricing practices is not "material to the decision of the motion," L.R. 56(a)(1). Undisputed that when generic drug companies compete for a customer's business on a particular generic drug, the price of that drug tends to decrease. Plaintiffs further object to ¶44 as vague and ambiguous in its use of the undefined term "a company." Subject to and without waiving the foregoing: undisputed.

45. *Upon a competitor's exit from the market, the remaining manufacturers may decide not to pursue additional market share for several reasons:*

*a. The desire to supply more of a product could depend on the profitability of the product, based on demand or the costs of production. For example, Teva's exit from the betamethasone dipropionate lotion market presented an opportunity for Perrigo to increase market share; but because betamethasone dipropionate lotion was a very low margin product, Perrigo had to decide whether it made financial sense to devote more manufacturing time to cover increased orders for betamethasone dipropionate lotion or to simply discontinue the product. (See Ex. 33, 334:14-335:10; see also Ex. 99, 55:16-56:11; Ex. 11, 312:14-314:19 (testifying it was an opportune time to raise the price on desonide when Actavis exited the market); Ex. 69, ¶¶ 31, 102-108 (explaining Mylan's API issues caused them to withdraw from the market leading to Sandoz making an increase on WAC).)*

*b. The ability to increase share in response to a competitor exit would similarly require a manufacturer to have capacity to increase production or otherwise expand sales without creating supply issues for current customers, whether for that particular product or other products with the same API. (See Ex. 61, 619:23-620:16.)*

**Response:** The Plaintiffs object to ¶45 as lacking foundation in admissible evidence as the Stiroh Report (Defs. Ex. 69) is inadmissible hearsay. Plaintiffs object to ¶45 as immaterial as

hypothetical conjecture is not "material to the decision of the motion," L.R. 56(a)(1). Subject to and without waiving the foregoing: undisputed.

*46. Pursuant to the Taro document that the States have at times adopted to illustrate their alleged "fair share" agreement, reprinted below, in a two-firm market, the first entrant would acquire roughly 60% share of the market while the second entrant would acquire roughly 40% share. (Compl. ¶ 133; Ex. 65, ¶ 187.) In a three-firm market, the "fair share" should be around 45% for the first entrant, 35% for the second entrant, and 20% for the third entrant. (Ex. 65, fig. 24.)*

| | | Market Share - Fair Unit Share assumptions | | | | | | |
| | | Order of Entry Grid | | | | | | |
| | | Number of Competitors | | | | | | |
| Number of Competitors | | 1 | 2 | 3 | 4 | 5 | 6 | 7 |
| Order of Entry | 1 | 100% | 60% | 45% | 35% | 30% | 30% | 30% |
| | 2 | | 40% | 35% | 30% | 25% | 25% | 25% |
| | 3 | | | 20% | 20% | 20% | 20% | 20% |
| | 4 | | | | 15% | 15% | 15% | 15% |
| | 5 | | | | | 10% | 10% | 10% |
| | 6 | | | | | | 10% | 10% |
| | 7 | | | | | | | 10% |
| | Total | 100% | 100% | 100% | 100% | 100% | 100% | 100% |

**Response:** Plaintiffs object to ¶46 as not directed to any "material fact," including because Defendants do not cite ¶46 in their memorandum of law. Plaintiffs further object to ¶46 as the phrase "would acquire" assumes that Defendants always ended up with the "fair unit share assumptions" in the Taro document. Plaintiffs object to ¶46 as misleading to the extent it seeks to illustrate the Defendants' "fair share" agreement in a manner that diverges from the Complaint (Dkt. 196) or the formulization of Plaintiffs' expert Rick Warren-Boulton. Subject to and without waiving the foregoing: disputed as witnesses testified that the "fair share"

market shares resulting from Defendants' collusive agreements depended on product-by-product circumstances. SAMF, ¶ 16, 21, 29.

47. *The Taro document was for internal use only so that Taro and Sun, its parent company, "knew what [Taro] was doing" with its products; there is no evidence it was circulated outside of Taro or that the same benchmarks were used by other companies. (Ex. 25, 80:4-19, (AGN-MDL00012482).) Instead, it was used to create general targets that Taro employed for pricing, and actual outcomes could differ. (Ex. 25, 78:1-19, 80:4-19, 81:3-19, 71:20 ("This is an analysis.") ("[T]he fair share may be 20 percent [in the chart], but the first year you may only get 5 percent, but in the second year we may target 25 percent," because "when you are entering the market and [competitors are] already there, everybody is going to protect their market share.").*

**Response:** Plaintiffs object to Para 47 as the phrase "the same benchmarks" is vague and ambiguous; and to the extent it seeks to undermine the Defendants' common understanding of "fair share." Subject to and without waiving the foregoing: disputed, because there is witness testimony that the idea of "fair share" was not algorithmic, SAMF, ¶¶ 16, 21, 29, and that Taro used "fair share" to make anticompetitive agreements to allocate the market. SAMF, ¶¶ 18, 22-23, 25, 27, 36.

48. *The internal Taro document was not a blueprint for any conspiracy. Although according to the States' expert it showed "Taro's understanding of what the fair share agreement is," there is no evidence any other Defendant adopted that understanding. (Ex. 22, 575:12-20.)*

**Response:** Plaintiffs object to ¶48 as lacking foundation in admissible evidence as the Warren-Bolton Report (Defs. Ex. 65) is inadmissible hearsay. Plaintiffs object to ¶48 as misleading to the extent it attempts to represent the Taro document could not have been used for any

Public Redacted Version

conspiracy involving Taro or other Defendants. Subject to and without waiving the foregoing: disputed because witnesses from many defendants testified to an understanding of "fair share" that is similar to the principles expressed in this chart. SAMF, ¶¶ 13, 15. Further disputed because there is documentary evidence from many defendants using the term fair share in accordance with the principles expressed in this chart. SAMF, ¶¶ 16, 18-19. In fact, there is evidence that the term "fair share" referred to an anticompetitive agreement. SAMF, ¶¶ 14, 18-19, 21. Further disputed because there is witness testimony that Taro used "fair share" to make anticompetitive agreements to allocate the market. SAMF, ¶¶ 18, 22-23, 25, 27, 36.

*49. For some Defendants, profitability across their Drugs at Issue declined during the alleged conspiracy period. For example, during the alleged conspiracy period, Mylan's average profits for its four Drugs at Issue fell from approximately $17.9 million per quarter before the alleged conspiracies began to approximately $3.6 million per quarter during the alleged conduct periods. (Ex. 69, ¶¶ 48, 51.)*

**Response:** Plaintiffs object to ¶49 as not directed to any "material fact," including because Defendants do not cite ¶49 in their memorandum of law. Plaintiffs further object to ¶49 as lacking foundation in admissible evidence as the Stiroh Report (Defs. Ex. 69) is inadmissible hearsay. Plaintiffs further object to ¶49 as vague and ambiguous in its use of the phrase "average profits." Plaintiffs object to ¶49 as misleading to the extent it seeks to represent that market dynamics for one firm could be imputed to the whole or others involved in the overarching conspiracy. Plaintiffs further object to ¶49 as vague and ambiguous in its use of the undefined term "total cost" and "profitability." Subject to and without waiving the foregoing: disputed as Defendants collusive agreements resulted in exorbitant profits. SAMF ¶ 28; Pl. Ex. 134, ¶ 230, Table 24.

36

**Public Redacted Version**

*50. It would not have been economically rational for a firm supplying a few of the 98 Drugs at Issue to join the alleged overarching conspiracy involving all 98 Drugs at Issue because they "would have risked exposing themselves to joint and several liability for all 98 Drugs at Issue, including the potential for substantial damages associated with drugs they never sold." (Ex. 67, ¶¶ 129, 134, 135; Ex. 66, ¶ 109 ("Without offering an opinion on an individual firm's liability, I agree that participating in a conspiracy that could expose a firm to enormous joint and several liability in return for a relatively small immediate reward would not appear to be a management decision that would benefit shareholders.").)*

**Response:**  Plaintiffs object to ¶50 as not directed to any "material fact," including because Defendants do not cite ¶50 in their memorandum of law. Plaintiffs further object to ¶50 as lacking foundation in admissible evidence as the Rubinfeld Report (Defs. Ex. 67) is inadmissible hearsay. Plaintiffs further object to ¶50 as misleading and conjecture in its use of the phrase "economically rational."  Subject to and without waiving the foregoing: disputed, because there is testimony that joining the overarching conspiracy helped Defendants raise their prices and maximize profits. SAMF, ¶¶ 9, 17, 22, 28. Further disputed because there is testimony that Defendants joined the overarching conspiracy to feel more confident that their price increases would "stick." SAMF, ¶¶ 34. Further disputed because there is testimony that smaller defendants did, in fact, agree to fix prices and allocate the market. SAMF, ¶¶ 1-6, 9-12, 14, 17-28, 35, 38, 43-49, 52-55, 57-58, 60. Further disputed because there is evidence to support a network of conspiracies that reflect the same terms as the agreements made by smaller defendants. SAMF, ¶¶ 22-26, 30, 35, 41, 43-44, 47-49, 54, 57. Further disputed, because there is testimony that Defendants depended on *all* their co-conspirators to uphold the overarching conspiracy agreement. SAMF, ¶ 11. Further disputed that Defendants were each

aware of the extent of the liability associated with joining the overarching conspiracy, SAMF, ¶¶ 32, 52, or that joint-and-several liability was a consideration when deciding whether to join an overarching agreement. SAMF, ¶¶ 32, 51; *see also* SAMF ¶¶ 9, 17-18, 22, 24 (evidence that the intent of the concerted conduct was to maximize profits).

51. *For approximately 30% of the Drugs at Issue sold in two-firm markets, the market leader in 2016 Q1 (i.e., the largest supplier) had a* ███████████*, neither a pro-rata 50% share nor the 60% share in the Taro document. (Ex. 65, ¶ 185, fig. 23.)*

**Response:** Plaintiffs object to ¶51 as lacking foundation in admissible evidence as the Warren-Bolton Report (Defs. Ex. 65) is inadmissible hearsay. Plaintiffs further object to ¶51 as vague and ambiguous in its use of "market leader," and "share." Plaintiffs further object to ¶51 to the extent that it differs from the opinions articulated by Dr. Warren-Boulton in his reports and testimony. Subject to and without waiving the foregoing:  disputed, because witnesses testified to allocating the market pursuant to the concept of "fair share." SAMF, ¶¶ 1-2, 13-21. Further disputed because Plaintiffs' expert witness testified that data supports the existence of the overarching conspiracy. *See* Pl. Ex. 134, Section II; Pl. Ex. 135, ¶ 13 (detailing unchanged conclusions); Pl. Ex. 82  ¶ 3.

52. *In three-firm markets, nearly 65% of the market leaders in 2016 Q1 had shares of either below* ███ *or above* ███*, not the 45% share in the Taro document. (Ex. 65, ¶ 190 & fig. 26.)*

**Response:** Plaintiffs object to ¶52 as lacking foundation in admissible evidence as the Warren-Bolton Report (Defs. Ex. 65) is inadmissible hearsay. Plaintiffs further object to ¶51 to the extent that it differs from the opinions articulated by Dr. Warren-Boulton in his reports and testimony. Plaintiffs further object to ¶51 as vague and ambiguous in its use of the terms "market leaders" and "shares."  Subject to and without waiving the foregoing:   disputed,

because witnesses testified to allocating the market pursuant to the concept of "fair share." SAMF, ¶¶ 1-2, 13-21. Further disputed because Plaintiffs' expert witness testified that data supports the existence of the overarching conspiracy. *See* Pl. Ex. 134, Section II; Pl. Ex. 135, ¶ 13 (detailing unchanged conclusions); Pl. Ex. 82, ¶ 3.

53. *For all Drugs at Issue with available IQVIA data that have between two and five competitors, the market share of at least one competitor was not within ten percentage points of the market shares specified in the Taro document during the alleged conduct period. (Ex. 70, ¶ 62 & fig. 2.)*



**Figure 2[123]**
**Percent of Drugs at Issue For Which at Least One Competitor's Market Share in a Quarter of the Alleged Conduct Period Deviates by More Than Ten Percentage Points From Its Corresponding Market Share in "Taro's Fair Share Table" When Competitors Are Ranked According to Their Order of Entry**

**Response:** Plaintiffs object to ¶53 as lacking foundation in admissible evidence as the Cremieux Report (Defs. Ex. 70) is inadmissible hearsay. Plaintiffs object to ¶53 as vague and ambiguous in its use of the undefined term "alleged conduct period." Subject to and without waiving the foregoing: disputed because witnesses testified to allocating the market pursuant to the concept of "fair share." SAMF, ¶¶ 1-2, 13-21. Further disputed, because Plaintiffs'

expert witness testified that data supports the existence of the overarching conspiracy. *See* Pl. Ex. 134, Section II; Pl. Ex. 135, ¶ 13 (detailing unchanged conclusions); Pl. Ex. 82, ¶ 3.

54. *Sixty-five percent of the Drugs at Issue that have between two and five competitors did not follow a pattern where the first entrant has the highest share, the second entrant the second highest share, and so on. (Ex. 67, ¶ 167 & fig. 9.)*



**Response:** Plaintiffs object to ¶54 as lacking foundation in admissible evidence as the Rubinfeld Report (Defs. Ex. 67) is inadmissible hearsay. Plaintiffs further object to ¶54 as immaterial as market shares following a "pattern" is not "material to the decision of the motion," L.R. 56(a)(1). Plaintiffs further object to ¶54 as misleading as the data reflects only Q1 2016, one small subsegment of the time period covered by the complaint, and is therefore not representative of the complaint as a whole. Plaintiffs further object to ¶54 as vague and ambiguous in its use of the terms "highest share," "competitors," "pattern," and "entrant." Subject to and without waiving the foregoing:   disputed, because witnesses testified to allocating the market pursuant to the concept of "fair share." SAMF, ¶¶ 1-2, 13-21. Further

disputed to the extent that Defendants seek to classify themselves as "competitors," as they frequently did not compete with respect to the Drugs at Issue. *See supra* ¶14. Further disputed because Plaintiffs' expert witness testified that data supports the existence of the overarching conspiracy. *See* Pl. Ex. 134, Section II; Pl. Ex. 135, ¶ 13 (detailing unchanged conclusions); Pl. Ex. 82, ¶ 3.

55. *Market shares fluctuated and varied among market leaders for many Drugs at Issue. (Ex. 67, ¶ 203 & fig. 17.) For roughly 30% of the Drugs at Issue, the market share leader at the beginning of each alleged conduct period had lost its market leader position just two quarters later. (Id. ¶ 215 & fig. 18.)*

**Response:** Plaintiffs object to ¶55 as vague and overbroad as "many Drugs at Issue" is unclear and does not assert a "fact." Plaintiffs object to ¶55 as lacking foundation in admissible evidence as the Rubinfeld Report (Defs. Ex. 67) is inadmissible hearsay. Plaintiffs further object to ¶55 as vague and ambiguous as "market shares," "market leaders," "many," "roughly," "lost," and "position" are unclear in their meaning. Subject to and without waiving the foregoing: disputed because Plaintiffs' expert witness testified that data supports the existence of the overarching conspiracy. *See* Pl. Ex. 134, Section II; Pl. Ex. 135, ¶ 13 (detailing unchanged conclusions); Pl. Ex. 82, ¶ 3.

56. *For example, for the three-firm drug clobetasol emollient cream, in August 2014, shortly after Sandoz and Akorn followed price increases implemented by Taro, Sandoz led the market with █████ market share and Akorn had █████ By January 2015, Sandoz's share had fallen to █████ and Akorn's had grown to █████ (Ex. 141, SDZCTAG-06074516; Ex. 142, SDZCTAG-00319522.)*

**Response:** Plaintiffs object to ¶56 as misleading to the extent that ¶56 does not establish the proposition that Defendants attempt to propose as a "fact" in ¶56. (specifically, that "many Drugs at Issue" market share leaders varied and fluctuated). Subject to and without waiving the foregoing: undisputed.

57. *When expanding to eight quarters beyond the start of the alleged conduct period, roughly 40% of the Drugs at Issue had a change in market share leader position. (Ex. 67, ¶ 215 & fig. 18.)*



**Response:** Plaintiffs object to ¶57 as lacking foundation in admissible evidence as the Rubinfeld Report (Defs. Ex. 67) is inadmissible hearsay. Plaintiffs further object to ¶57 as immaterial as the "change in market share leader position" is not material to the decision of the motion," L.R. 56(a)(1). Plaintiffs further object to ¶57 as vague and ambiguous in its use of the undefined term "alleged conduct period," "change," "market share leader position," and "roughly." Subject to and without waiving the foregoing:  disputed because Plaintiffs' expert

witness testified that data supports the existence of the overarching conspiracy. *See* Pl. Ex. 134, Section II; Pl. Ex. 135, ¶ 13 (detailing unchanged conclusions); Pl. Ex. 82, ¶ 3.

58. *Dr. Cremieux testified that "if there is an overarching conspiracy, we should observe some market stability . . . If the answer is no . . . there can't be an underlying overarching conspiracy because the economic evidence directly contradicts it." (Ex. 18, 262:24-263:5.) In this case, Dr. Cremieux testified that his "conclusion is the economic evidence is not consistent with the existence of an overarching conspiracy." (Id., 262:20-265:5.)*

**Response:** Plaintiffs object to ¶58 as vague and ambiguous in its use of the undefined term "market stability" and "economic evidence." Plaintiffs object to ¶58 as inadmissible as it is premised on unreliable expert testimony that is not based on any reliable and reproduceable methodological principles of economics. Plaintiffs further object to ¶58 as Dr. Cremieux's opinions are reliable and consistent with the factual record. *See* Pls.' Br. at B(i)(a). Subject to and without waiving the foregoing: undisputed that this is an accurate representation of Defendants' expert testimony. Dispute as Dr. Warren-Boulton's interpretation of the data is that the Defendants engaged in the alleged collusive conduct regarding the Drugs at Issue. Pl. Ex. 134, Section II; Pl. Ex. 135, ¶ 13 (detailing unchanged conclusions); Pl. Ex. 82, ¶ 3.

59. *For 88% percent of the Drugs at Issue with available IQVIA data that have between two and five competitors, competitors did not maintain their market share positions throughout the alleged conspiracy period. (Ex. 70, ¶ 72 & fig. 5.)*



**Figure 5**[135]
**Percent of Drugs at Issue For Which Competitors**
**Do Not Maintain Their Relative Market Share Positions**
**Throughout the Alleged Conduct Period**

**Response:** Plaintiffs object to ¶59 as lacking foundation in admissible evidence as the Cremieux Report (Defs. Ex. 70) is inadmissible hearsay. Plaintiffs further object as vague and ambiguous in its use of the undefined terms "alleged conspiracy period," "between," "maintain," "throughout," and "market share positions." Plaintiffs further object to ¶59 Subject to and without waiving the foregoing: disputed  to the Defendants' self-characterization as "competitors," as they frequently did not compete with respect to the Drugs at Issue. *See supra* ¶14. Further disputed as Dr. Warren-Boulton's interpretation of the data is that the Defendants engaged in the alleged collusive conduct regarding the Drugs at Issue. Pl. Ex. XX at __[Pl. Ex. 134, Section II; Pl. Ex 135, ¶ 13 (detailing unchanged conclusions); Pl. Ex. 82, ¶ 3]. Further disputed that Dr. Cremieux's opinions are reliable and consistent with the factual record. *See* Pls.' Br. at B(i)(a) .

60. *For example:*

*a. Betamethasone Valerate Lotion EQ0.1% Base ("Betamethasone"): For betamethasone, while* ▮▮▮▮ *was the market leader at the beginning of the alleged conduct period,* ▮▮▮▮ *had*

*a greater market share than* ▮▮▮ *several times during the relevant period of 2011 and 2016. (Ex. 65, Appendix D, fig. 32.)*

*b. Desonide Cream 0.05% ("Desonide"): The alleged misconduct in connection with desonide began in 2013 with incumbents,* ▮▮▮▮ *, with the highest market shares, but they were soon surpassed by* ▮▮▮▮ *who had both newly entered the market.* ▮▮▮ ▮▮▮ *captured over* ▮▮ *of the market at various times during the alleged conspiracy period. (Ex. 65, Appendix D, fig. 55.)*

*c. Desoximetasone Ointment 0.25% ("Desoximetasone"): The alleged misconduct regarding desoximetasone began in 2012 with* ▮▮ *the first entrant, capturing most of the market, but* ▮▮ *ended 2016 having one of the lowest market shares. Over much of this period,* ▮▮ *was surpassed by* ▮▮▮ *who captured approximately* ▮▮ *of the market even though it was the third entrant. (Ex. 65, Appendix D, fig. 59.)*

*d. Latanoprost Solution 0.005% ("Latanoprost"): The alleged misconduct regarding latanoprost began in 2012 with* ▮▮▮ *, the manufacturer with the highest market share in 2012, with around* ▮▮ *of market share, but it ended 2016 with* ▮▮▮ *having the lowest market share at less than* ▮▮ *share. (Ex. 65, fig. 30.) The firm leading the market also changed twice; with* ▮▮▮ *losing its initial lead to* ▮▮ *at the beginning of the alleged misconduct and* ▮▮▮ *overtaking the lead just two years later, nearly doubling its share to approximately* ▮▮ *by 2016. (Id.)*

**Response:** Plaintiffs object to ¶60 as inadmissible as lacking foundation because Dr. Warren-Boulton's Second Amended Expert Report is inadmissible hearsay. Plaintiffs object to ¶60 as vague and ambiguous in its use of the undefined phrases "alleged misconduct," "misconduct," "share," "captured," "surpassed," "alleged conduct period," and "market leader." Subject to

and without waiving the foregoing: disputed as to the alleged conspiracy periods. First, Defendants' cited evidence shows that ███████ market share moved higher than ████████ only once, for a steady period between 2013 and 2015. *See* Pl. Ex. 134, Appendix D, fig. 32. Yet, Plaintiffs allege that ████████ and ██████ conspired to fix prices and allocate the market for betamethasone valerate lotion at the end of 2011 and beginning of 2012, Derm. Am. Compl. ¶¶ 456–70, not from 2013 to 2015. Second, the alleged price fixing agreement between ████████████████████, upon ████████ reentry into the desonide cream market in 2013, Derm. Am. Compl. at ¶ 753, did not overlap with ██████████████ surpassing █████ and ██████████ share in 2015 and 2016. *See* Pl. Ex. 134, Appendix D, fig. 55. Third, the alleged conspiracy between ██████████████████████ took place in 2013, Derm. Am. Compl. ¶¶ 1167-73, while Defendants' cited evidence does not show ████████████ surpassing the other two on market share until Q2 2014. *See* Pl. Ex. 134, Appendix D, fig. 59. Further, the alleged agreement between █████████████████████ to fix prices and allocate the market for latanoprost was in May and June of 2012. Derm. Am. Compl. ¶¶ 1353-75. According to Defendants' cited evidence, ████████ did not surpass ██████████████ in market share until Q4 2013. *See* Pl. Ex. 134, Appendix D, fig. 82.

*61. The States have admitted that "in the absence of any other evidence or context, use of the term 'fair share' in the abstract **may or may not be indicative that a generic pharmaceutical supplier has entered into an agreement with a competitor**." (Ex. 74, RFA No. 6.) (emphasis added).*

**Response:** Plaintiffs object to ¶61 as not directed to any "material fact," including because Defendants do not cite ¶61 in their memorandum of law. Plaintiffs object to ¶61 as immaterial as the abstract use or absence of the use of the phrase "fair share" by Defendants is not

determinative of Defendants' participation in the overarching conspiracy. Subject to and without waiving the foregoing: undisputed.

*62. Dr. Warren-Boulton likewise admitted that he was "not saying everybody has the same understanding" of what constituted a fair share, (Ex. 22, 543:9-16), and that each alleged participant's understanding of "fair share" could have "differ[ed] significantly" depending on the "individual drug "and the "individual" firm." (Id., 528:14, 529:13.)*

**Response:** Plaintiffs object to ¶62 as not directed to any "material fact," including because Defendants do not cite ¶62 in their memorandum of law. Plaintiffs object to ¶62 as misleading to the extent that it formulates Dr. Warren-Boulton's testimony as an apparent "admission." Plaintiffs object to ¶62 as misleading to the extent that Defendants' framing of Dr. Warren-Boulton's testimony attempts to undermine his positions outlined in other parts of his testimony and expert reports. Plaintiffs further object to ¶62 because Defendants' paraphrasing of Plaintiffs' expert is incomplete, disconnected from the whole testimony, and making misleading assumptions. Plaintiffs object to ¶62 to the extent that Defendants attempt to present legal conclusions or expert opinion as "fact" in the present matter. Subject to and without waiving the foregoing: disputed as to the *actual* and *representative* testimony of Dr. Warren-Boulton. Defs. Ex. 22, 528:13-17, 528:22-529:3, 529:9-13, 543:15-16. Otherwise, undisputed.

*63. Dr. Warren-Boulton also explained that "fair share . . . is in the eye of the beholder," (Ex. 23, 195:18-19), and that he did not "worry about [Defendants] communicating to formulate it" because "[i]t's like one of the Ten Commandments . . . nothing happens until somebody does something bad." (Id., 205:3-206:14.)*

**Response:** Plaintiffs object to ¶63 as not directed to any "material fact," including because Defendants do not cite ¶63 in their memorandum of law. Plaintiffs object to ¶63 as misleading to the extent that Defendants' framing of Dr. Warren-Boulton's testimony attempts to undermine his positions outlined in other parts of his testimony and expert reports. Subject to and without waiving the foregoing: disputed as to the *actual* and *representative* testimony of Dr. Warren-Boulton. Defs. Ex. 23 195:14-23. Otherwise, undisputed.

64. *Generics manufacturers had differing understandings of what "fair share" meant—including employees at the same manufacturer—as well as assigned differing weight to its role, if any, in making pricing and bidding decisions:*

*a. **Actavis**: According to Actavis's Andrew Boyer, "[e]verybody has their own definition of what they think their target market share should be.". (See, e.g., Ex. 6, 259:9-17.) Meanwhile Actavis's David Myers, "fair share" was based on a "mathematical equation" and was just one component of determining Actavis' "target share." (Ex. 13, 58:1-66:14, 79:7-81:3.)*

*b. **Amneal**: Amneal's former Vice President of Pricing and Analytics, Shannon Rivero, thought "fair share" did not "mean a whole lot" because it was just a "mathematical starting point" from which to begin calculating a price. (Ex. 57, 409:12-410:3, 414:12-16 (explaining "[y]ou would have to ask individuals in the generic industry of their definitions and how they view it" and that she had "heard many throughout [her] tenure and career.").) According to Amneal's James Luce, while "fair share" is a data point used in every industry and an economic term, it is ultimately 100 percent divided by the number of suppliers in the market. (Ex. 29, 99:6-99:9.) Amneal's Allen Lowther learned about fair share in college and business school in the context of "looking at the number of players in the market and . . . what that market share looks like*

*and then the different theories and concepts that apply to potentially going after. . . new share . . .” (Ex. 19, 156:14-21, 158:15-160:22.)*

c. **G&W***: According to Ronald Greenblatt, G&W “didn't have a use of fair share” and that “if other people used [‘fair share’], that doesn't mean it was a G&W term or a word that we would apply.” (Ex. 54, 270:9-19.)*

d. **Glenmark:** *“Fair share” could refer to the reasonable amount of share a manufacturer targets based on several factors including, but not limited to, current supply capability, number of competitors in the market, and those competitors' prior market behavior. (See Ex. 16, 268:17-271:12; Ex. 31, 88:5-89:16 (explaining that “fair share” may have been interpreted as “reasonable share” based on a manufacturer's ability to supply or number of competitors in a market).) For Terrance Coughlin, the concept of a fair share “mean(t) that if there are two suppliers, in concept, each company should be about 50% market share. If there are four viable suppliers, in theory each company should have about 25% market share. If there are 10 players, each company in theory would have about 10% market share.” (Ex. 58, 99:7-100:10.)*

e. **Greenstone***: For Greenstone, “fair share” was a “mathematical calculation that divided a market by the number of active players within that market . . . evenly.” (Ex. 10, 241:18-242:19.) According to Greenstone's corporate representative, “fair share” was “more of, like, a marker . . . just to understand really how many players were in the market.” (Id.)*

f. **Lannett***: To Kevin Smith, fair share was simply a unilaterally determined estimate of what share Lannett should aim for in a given market, which differed by market and product depending on a host of different product-specific variables. (Ex. 39, 111:8-14 (“My definition of fair share varied on each and every product that I sold. My definition of fair share was by*

49

**Public Redacted Version**

*product. And it had many different variables that were associated with what I thought fair share might be.").) For others at Lannett, fair share meant 100% divided by the number market participants. (See Ex. 53, 101:7-15, 381:3-22.) To Robert Foley, the number of competitors divided by 100 was "just a general rule of thumb" from which Lannett would deviate depending on "competitive advantages" and "capacity constraints." (Id. 100:17-102:13.)*

g. ***Lupin****: "Fair share" referred to what Lupin forecasts or anticipates their market share might be, based on several facts, when analyzing and planning for entry into a particular market. (Ex. 30, 225:2-226:4.)*

h. ***Mylan****: Mylan's corporate witness testified that he was "not familiar" with a "fair market share" term. (See Ex. 45, 94:22-25.) A former Mylan employee, Kevin McElfresh, testified that Mylan used a completely different term—"targeted market share"—to determine "how much market share they [] feel like they can obtain based on the production." (See Ex. 38, 62:2-12.) He explained that "you would have 50,000 bottles to go out and get market share on . . . and you'd have to figure out which customers could help you make up that 50,000 bottles." (Id., 62:16-19.)*

i. ***Perrigo****: Douglas Boothe and Katie McCormack did not ever recall using the term "fair share" to refer to any sort of agreement with a competitor to divide markets or allocate customers. (Ex. 17, 525:3-7; Ex. 37, 288:17-289:8.)*

j. ***Sandoz****: Della Lubke, who was at Sandoz during the relevant period, thought "fair share" was an even split. (Ex. 15, 79:16-80:1.)*

k. ***Fougera****: Anthony Thomassey, who was at Fougera during the relevant period, thought the phrase "fair share" meant 55%-45% or an even split in a two-player market, and in larger*

Public Redacted Version

*markets, one over X, where X is the number of competitors in the market for any given generic drug. (Ex. 7, 41:10-20, 43:18-44:8.) To Armando Kellum, "fair share" was "shorthand for dividing the size of a market for a generic drug by the number of suppliers for that particular generic drug." (Ex. 140, ¶ 37.)*

l. **Taro***: Taro's Chief Commercial Officer, Billy Seiden, thought "fair share" meant an even split of the market no matter how many competitors entered it. (Ex. 9, 110:8-19.) Calculating Taro's fair share was "[n]ot in [his] mind" when it came to marketing or strategies. (Id., 115:17-23.)*

**Response:** Plaintiffs object to ¶64 as misleading to the extent that Defendants present varied understandings of "fair share" to undermine Defendants' participation in the overarching conspiracy. Plaintiffs object to ¶64 as immaterial as a non-uniform definition of "fair share" is not material to Defendants' participation in the overarching conspiracy. Subject to and without waiving the foregoing: disputed because Defendants' cited evidence arguably shows that Defendants had nearly *the same* understanding of "fair share." According to Defendants' cited evidence, Taro, Fougera, Sandoz, Lannet, Greenstone, Glenmark, Amneal all described fair share as an even split of the market. *See* Defs. Ex. 7; Defs. Ex. 140; Defs. Ex. 9; Defs. Ex. 15; Defs. Ex. 53; Defs. Ex. 58; Defs. Ex. 29. According to Defendants' cited evidence, Actavis, Amneal and Greenstone all described "fair share" as a mathematical starting point, equal to a roughly even split of the market. Defs. Ex.13; Defs. Ex. 57; Defs. Ex. 10. According to Defendants' cited evidence, Actavis, Glenmark, Lannett, Lupin, and Mylan all described "fair share" as target or anticipated share. Defs. Ex. 6; Defs. Ex.13; Defs. Ex. 16; Defs. Ex. 39; Defs. Ex. 30; Defs. Ex. 38. Moreover, none of Defendants' cited evidence is contradictory. Further disputed because other testimony demonstrates that Defendants had a similar

51

**Public Redacted Version**

understanding of "fair share." SAMF, ¶¶ 1-2, 13, 15-22. Further disputed because documentary evidence also shows a consistent use of "fair share." SAMF, ¶¶ 4-5, 16-17, 19-20.

65. *Customers of generic manufacturers also regularly used the term "fair share" to describe their own performance but did not use the term to suggest an agreement among competitors. (Ex. 29, 303:21-304:8 (former wholesaler employee testifying to use of "fair share" at Bergen Brunswig, where they "looked at market share and how the industry was growing" and what to "expect on growth there and fair share . . .").)*

a. *In December 2013, wholesaler AmerisourceBergen ("ABC") used the term "fair share" to describe its method for handling Walgreens priority for shortage products in answering questions about the Walgreens Boots Alliance Development GmbH Group Purchasing Agreement. (Ex. 94, GMK-MDL-001978957 at 8959 ("ABC will continue to follow its 'Fair share distribution' practice that is in place for all customers and is based upon historical usage").)*

b. *In June 2012, grocery store chain Safeway discussed ways to obtain more than its "fair share" of pharmacy and grocery customers. (Ex. 76, ALB-RXGEN-000224893 at 895.)*

c. *In an October 2010 document describing its 2011 projections, employees of grocery store chain Kroger discussed how Kroger was capturing more than its "fair share" of the counter card business. (Ex. 101, KRG-RXGEN-000861413 at 19.)*

d. *In November 2011, drug store chain Supervalu compared its actual market share of prescriptions to its "fair share." (Ex. 77, ALB-RXGEN-000358594 at 94.)*

**Public Redacted Version**

*e. In an October 2012 document describing its 2013 projections, Kroger discussed its goal to capture its "fair share" of certain cosmetic product launches in 2013. (Ex. 100, KRG-RXGEN-000851142 at 50.)*

*f. In a February 2013 document summarizing the 2012 fiscal year, Kroger discussed "fair share" related to its pharmacy business. (Ex. 102, KRG-RXGEN-001497633 at 34.)*

**Response:** Plaintiffs object to ¶65 as misleading to the extent that Defendants confound the context of the use of the phrase "fair share" with the meaning of the phrase. Plaintiffs object to ¶65 as immaterial as a non-uniform definition of "fair share" is not material to Defendants' participation in the overarching conspiracy. Plaintiffs further object to ¶65 as immaterial as the business practices of non-Defendant companies is not material as to Defendants' participation in the overarching conspiracy. Subject to and without waiving the foregoing: undisputed as to the content of the specific evidence, except disputed that Defendants' Exhibit 100 at the cited location mentions "fair share." Defs. Ex. 100 at 50.  Disputed that customer use of "fair share" can be deemed "regular" from just these few examples, three of which involve one customer (Kroger); further disputed that this evidence excludes the possibility that "fair share" was agreed upon between competitors. For example, Safeway's assertion that it would "need to have a marketing plan in place to obtain more than [its] fair share of new pharmacy patients," could be referring to an understanding with Safeway's competitors about what its fair share should be.  Defs. Ex. 76 at 4895. Similarly, Kroger's assertion that it was "capturing more than [its] fair share of the counter card business" could indicate an existing agreement with its competitors about what its fair share should be. Ex 101 at 19. Further disputed to the extent that the evidence cited by the defendant does not refer to a customer's generic drug business, and is therefore not acting in the capacity of a "customer[] of generic manufacturers." Ex 100.

66. *Other industry participants also used the term "fair share" as a way to describe manufacturer performance, and did not use it to describe any agreement among competitors:*

a. *For example, in an April 3, 2012 investor report summarizing the financial performance of oral contraceptives, Credit Suisse described Sandoz's market share performance: "Sandoz achieved ~20% market share on most products except Yasmin in first year of launch (fig 1.). However, in our view, this is still short of a fair share in a three-player generic market." (Ex. 95, GMK-MDL-002531698.)*

b. *McKinsey & Company Consulting ("McKinsey"), retained as a consultant to some generics manufacturers, provided presentations and analyses related to marketing, sales, and market access which helped those manufacturers identify growth opportunities. (Ex. 140, ¶¶ 37-38; Ex. 106, SDZMDL-007771836; Ex. 107, SDZMDL-007771851; Ex. 136, SMT-008169416.)*

c. *In one such presentation to Sandoz in 2013, McKinsey discussed the concept of "fair share" as a simplistic expectation of market share based on the total number of manufacturers in the market. (Ex. 105, SDZCTAG-01489454 at 9492-93; see also Ex. 137, Pharma's First to Market Advantage, MCKINSEY & COMPANY, Sept. 1, 2014, https://www.mckinsey.com/industries/life-sciences/our-insights/pharmas-first-to-market-advantage#/ ("When the first mover is a large pharma company, it has a significant advantage (worth greater than ten market-share points); when the first mover is not a large pharma company, we find that the first mover performs worse than fair share of the market . . .) (emphasis added).)*

d. *Amneal's James Luce testified that he used the term in his college economics class and in the hotel industry. (Ex. 29, 302:21-303:5.) During Luce's tenure working for hotel chain*

*Marriott, Luce testified that one of the metrics they considered was market share relative to "fair share." (Id., 302:15-19.)*

**Response:** Plaintiffs object to ¶66 as immaterial as non-Defendants' use and understanding of "fair share" is not determinative of the Defendants' participation in the overarching conspiracy. Plaintiffs object to the statements contained in ¶66 as inadmissible hearsay. Subject to and without waiving the foregoing: disputed to the extent that Exhibits 106, 107 and 136 do not relate to "fair share." Defs. Ex 106; Defs. Ex. 107; Defs. Ex. 136. Further disputed that Defendants' Exhibit 105 or 137, at the cited locations, contain any discussion of the concept of "fair share" as "a simplistic expectation of market share based on the total number of manufacturers in the market." Defs. Ex. 105 at 9492-93; Defs. Ex. 137.  Further disputed that "Marriott" or any other member of the "hotel industry" is an "industry participant" for the purposes of this purported fact. Defs. Ex. 20, 302:21-303:5. Further disputed, because none of Defendants' cited evidence precludes the interpretation of "fair share" in that context as an agreement between competitors. In fact, referring to Sandoz's market share as "less than a fair share in a three-player generic market" assumes that there is some agreement in the industry about what "fair share in a three-player generic market" should be. Ex 95 at 98.

*67. Defendants had several actual and explored business relationships during the relevant time period, ranging from marketing and distribution agreements to joint ventures and acquisitions, that were managed by various employees and required communication with their counterparts at other manufacturers:*

*a. **Marketing and Distribution Agreement**: Beginning in May 2010, Taro and Glenmark entered into a marketing and distribution agreement for calcipotriene ointment. Glenmark manufactured and supplied the product for Taro to distribute, market, and sell. This*

*relationship necessitated ongoing communications between the companies regarding this product. (See, e.g., Ex. 86, GMK-MDL-000427945; Ex. 90, GMK-MDL-001290958; Ex. 114, SMT-009511610; Ex. 122, SMT-010947583; Ex. 27, 96:14-97:5; Ex. 63, 861:12-862:3.)*

*b. **Promotion Agreement**: In April 2013, Bausch entered a promotion agreement with Actavis related to Acyclovir. This relationship necessitated communications between Bausch and Actavis. (Ex. 133, VALMDL-001532816; Ex. 155, VALMDL-001532817.)*

*c. **Joint Development Agreements**: Doug Boothe testified that during his tenure at Perrigo, he was regularly in contact with Taro's Michael Perfetto about a Joint Development Agreement between the two companies. (Ex. 17, 96:16-97:19; see also Ex. 63, 856:5-857:23.) The agreement was "related to the specific development of a new potential generic product." (Ex. 17, 96:9-97:19; see also Ex. 26, 210:14-211:17; Ex. 37, 212:19-23; Ex. 48, 62:10-22; Ex. 115, SMT-009886020 (February 2014 'Product Development and Commercialization Collaboration Agreement' on February 19, 2014 between Taro and Perrigo); Ex. 124, SMT-010958132 (June 2013 outreach between Perrigo and Taro regarding "2 potential R&D projects (Para IV ANDAs)").)*

*d. **Manufacturing Agreement**: Taro had a contract manufacturing agreement with Perrigo to supply Mometasone Furoate Cream and Ointment. (Ex. 121, SMT-010718205.)*

*e. **Product Licensing**: In November 2014, Taro met with Sandoz about several business development opportunities including licensing products for the European market, co-promotion of branded products, and acquisition of divested ANDAs. (Ex. 120, SMT-010541792.) In October 2013, Bausch and Perrigo entered an Exclusive License, Marketing, and Distribution Agreement related to Fenofibrate. (Ex. 130, VALMDL-000377455.) This*

56

*relationship necessitated communications between the companies about the agreement. (Ex. 126, VALMDL-000004599.)*

*f. **ANDA Divestiture Resulting from Mergers**: In August 2011, Taro spoke with Actavis about divestitures resulting from the acquisition of Watson. (See Ex. 108, SMT-008180967; Ex. 109, SMT-008317249.) Similarly, in 2014, Sun engaged in a ANDA divestment process as part of its acquisition of Ranbaxy. Competitors reached out to Sun about participating, including Bausch, Perrigo, Heritage, Glenmark, and Impax. (See Ex. 112, SMT-008645357; Ex. 116, SMT-010240122; Ex. 113, SMT-008657182; Ex. 117, SMT-010306536; Ex. 110, SMT-008620033.) And in March 2014, Actavis reached out to Ara Aprahamian about Taro's interest in products Actavis was divesting. (Ex. 125, SMT-011577287.)*

*g. **Acquisition of Tangible Assets**: In 2015, G&W negotiated with Sun to acquire its facility in Bryan, Ohio. (See Ex. 111, SMT-008626997.)*

*h. **Unused ANDAs**: Manufacturers often reached out to other manufacturers to acquire unused ANDAs:*

*• In April 2012, G&W followed up with Taro about "an arrangement whereby G&W brings [Taro's unused] ANDAs to our facility and manufactures them for Taro . . . We have a fair amount of available tech services and manufacturing capacity and we see this as win/win between our companies." (Ex. 123, SMT-010952347.) Taro and G&W continued negotiations about unused ANDAs in April and May of 2013. (Ex. 118, SMT-010499255.)*

*• In April 2014, G&W met with Bausch about acquiring some of Bausch's intellectual property. (Ex. 127, VALMDL-001537695; Ex. 98, GWCT-HHR-0000094300.) In July 2013, Taro negotiated with Actavis to acquire the Feverall OTC brand. (Ex. 119, SMT-010499846.)*

**Response:** Plaintiffs object to ¶67 as immaterial as the relationship between a few Defendants regarding drugs *not* at issue is not material and has no bearing on Defendants' participation in the overarching conspiracy concerning the Drugs at Issue. Subject to and without waiving the foregoing: disputed that Defendant communications on these projects were "ongoing," as each project was discrete. For example, Taro and Glenmark's distribution agreement was to terminate after the "seventy-second . . . month after the Launch Date." Defs. Ex. 114, ¶ 10.1. And Ara Aprahamian made clear that, "supplying Perrigo with . . . product" was not an ongoing business proposition but, rather, a "professional courtesy." Defs. Ex. 121. Similarly, divestitures and acquisitions are temporary reasons to communicate. Defs. Ex. 110; Defs. Ex.111; Defs. Ex. 112; Defs. Ex. 113; Defs. Ex. 116; Defs. Ex. 117.

*68. Individuals in the industry frequently engaged socially, developed personal relationships, and kept in touch on issues unrelated to business. (Ex. 20, 230:9-16 ("Did I talk to my friends at other manufacturers? Yes, I talked to my friends at other manufacturers, but not as it pertains to business, pricing, market share."); Ex. 61, 151:16-19 ("I considered a lot of my colleagues in the industry friends."); Ex. 11, 537:2-3 (testifying that he "had a lot of friends in the industry" when he started at Sandoz); Ex. 49, 180:2-6, 180:21-181:1 (testifying that after he left Sandoz, he stayed in touch with some of his former colleagues on a personal level).)*
*a. Paul Dutra of Glenmark testified that he had "friends in the industry" and that he had communications with employees of competitors that "involve personal matters . . . friendship, infidelity, things like that." (Ex. 47, 981:1-17.) Dutra arranged golf outings among customer and competitor employees. (See, e.g., Ex. 92, GMK-MDL-001708651; Ex. 89, GMK-MDL-001033977; Ex. 91, GMK-MDL-001708634; Ex. 93, GMK-MDL-001724395.) Dutra also had*

*a sexual relationship with one competitor and attempted to have a sexual relationship with another. (Ex. 47, 933:16-934:14, 936:9-14.)*

*b. Anthony Thomassey, former Director of National Accounts at Fougera, had social relationships with people who worked for competitors and would attend sporting events and have conversations with them about social topics. (Ex. 7, 761:15-762:3; see also id., 47:1-16 (stating that trade show attendees would often bring their spouses and children along as a vacation).) More specifically, he was friends with Chris Bihari and they would get together and play basketball. (Id., 564:8-19.) Thomassey and Jim Grauso knew each other many years before they worked together at Aurobindo, and they were part of a group chat that would joke with each other about sports. (Id., 373:17-25.) When Thomassey was hospitalized, Grauso traveled from New Jersey to Ohio to visit him. (Id., 1178:1-10; Ex. 27, 100:10-14.)*

*c. James Grauso—who was an employee of G&W, Glenmark, and Aurobindo at different points during the relevant time period—regularly spoke with former colleagues about a number of subjects beyond work. (See, e.g., Ex. 27, 186:2-6 ("talked to Erika [Vogel-Baylor] all the time," he "talked to Thomassey all the time," he "could have been following up with these people on my new position," and that Kurt [Orlofski] was "checking out how I did."); id., 366:24-367:3 ("Again, I mentioned, Teri [Mouro-Sherman] and Kevin [Green] as friends, talked to them all the time. I don't recall those specific instances."); id., 379:7-14 ("I talked to these people multiple times over the course of months, years. They're friends of mine. To say, you know, I was on the phone with any -- for an hour-plus with Teri Sherman, we were talking about everything in the world other than products for Teva and Aurobindo at that point."); id., 469:17-21 ("I might have been speaking to my friends, who happened to work for other manufacturers. No agreements on products, customers, or pricing was ever reached -- ever*

made."); id., 483:14-19 ("Mary [Saharyan] was not only a competitor; she was a friend. So I was talking to her on -- about things that friends talk about; not any business, no agreements. They run their business. We would run ours."); id., 594:1-6 ("I believe that the chart shows I had four calls with -- between McMahon and Bob Cunard on the day before Christmas Eve on -- in December of 2015, friends of mine calling the day before Christmas Eve.").)

**Response:** Plaintiffs object to ¶68 as misleading and mischaracterizing as the communications referenced in ¶68 do not include the communications between Defendants regarding their participation in the overarching conspiracy. Subject to and without waiving the foregoing: undisputed that individuals in the industry frequently engaged socially, developed personal relationships. Undisputed that *some* of the topics individuals in the industry discussed with their friends in the industry were not business-related. Disputed that individuals in the industry kept in touch *solely* on issues unrelated to business. Witnesses testified that they spoke with their industry friends about business, SAMF, ¶¶ 22, 43-54, and that having friends at competitors made colluding easier. SAMF, ¶ 52.

*69. Numerous witnesses had longstanding relationships with Defendants and communicated with them about matters that were unrelated to work, including the following examples:*

| Witnesses | Relationship/Contents of Communications |
|---|---|
| *David Berthold (Lupin) Kurt Orlofski (G&W)* | *Orlofski officiated Berthold's wedding and the two are best friends. (Ex. 12, 208:1-11; Ex. 41, 260:2-23.)* |
| *David Berthold (Lupin) Kevin Green (Teva)* | *Kevin Green and Berthold were "very good friend[s] overall…" (Ex. 12, 165:13-20.)* |
| *David Berthold (Lupin) James Grauso (Glenmark)* | *Grauso was one of Berthold's best friends and had "a lot of social interaction with him." (Ex. 12, 300:9-16.)* |

**Public Redacted Version**

| | |
|---|---|
| *Barbara Purcell (Bausch)* *Robin Strzeminski (Greenstone)* | *Purcell discussed job opportunities with Stzeminski. (See Ex. 8, 119:3-119:10, 534:2-535:6, 535:8-536:2; Ex. 139, VALMDL-000780182; Ex. 79.)* |
| *Mary Saharyan (Bausch)* *James Grauso (Glenmark)* | *Grauso visited Saharyan and her family at her beach house, shared baby pictures, and discussed job opportunities. (See Ex. 27, 483:21-484:9; Ex. 128, VALMDL-001757498; Ex. 129, VALMDL-001757499, VALMDL-000773285.)* |
| *Robert Cunard (Aurobindo)* *James Grauso (Glenmark)* | *Cunard had conversations with Grauso after Grauso left Aurobindo for Glenmark because he considers "him a personal friend, and continue[s] to speak with him in a personal regard." (Ex. 52, 72:12-15.)* |
| *Robert Cunard (Aurobindo)* *Chris Schneider (Perrigo/Mayne)* *Rich Tremonte (Sandoz)* *Marc Falkin (Actavis/Teva)* | *Cunard communicated about "industry issues as well as some social things if we would play golf or the like," was "personal friends" with and "mentor" to various individuals. (Ex. 52, 62:19-21; see also id., 63:21-22 (Mayne/Perrigo employee Chris Schneider); id., 68:11-69:10 (Sandoz/AmerisourceBergen employee Rich Tremonte); id., 317:17-318:2 (Marc Falkin of Actavis/Teva).)* |
| *Tim Gustafson (Aurobindo)* | *Gustafson spoke with former co-workers after he left "on a fairly regular basis because [he] used to work with these people, they were [his] friends." (Ex. 59, 120:22-24.)* |
| *Paul McMahon (Aurobindo)* *David Berthold (Lupin)* | *In addition to being "friends and acquaintances for a long time" with Berhold, McMahon was "courting or pursuing him to come join" Aurobindo and would talk about many different things. (Ex. 50, 130:12-15, 132:9-15.)* |
| *Paul McMahon (Aurobindo)* *James Grauso (Glenmark)* | *McMahon and Grauso "talked on a fairly regular basis" as they were "personal friends." (Ex. 51, 307:8-11, 416:23-417:10.)* |
| *Douglas Boothe (Perrigo)* *Michael Perfetto (Taro)* | *Boothe's wife and Perfetto's wife were friends. (Ex. 63, 383:3-5.) Perfetto and Boothe "worked together a long time" and talked "all the time. We were friends. We had business relationships. We had business development with Perrigo." (Id., 856:5-857:23.) They'd ask each other about their families as "[h]e had a child that was sick with cancer. He would give me updates on that. And then he went through a marital problem. I went through that with him." (Id., 857:17-20, 872:15-873:4.)* |
| *Michael Perfetto (Taro)* *Jim Grauso (Glenmark)* | *In addition to carrying out Glenmark and Taro's commercial relationships while at those companies, Perfetto and Grauso were friends and Perfetto knew Grauso's wife and two daughters. (Ex. 63, 256:3-12.)* |
| *Scott Brick (Taro)* *Scott Koenig (Wockhardt)* | *Brick and Koenig were friends, Koenig went to Brick's wedding, and they kept in contact talking about "family, life in general, you know, stuff like that." (Ex. 55, 106:17-107:12, 108:7-109:24.)* |

61

| | |
|---|---|
| *Michael Perfetto (Actavis & Taro) Michell Blashinsky (Taro & Glenmark)* | *While Perfetto was at Actavis and Blashinsky was at Taro, they were "really good friends" and they "talked about careers and personal issues." (Ex. 63, 180:17-181:15, 184:24-185:18.) And when Perfetto was at Taro and Blashinsky was at Glenmark, they "were friendly" beyond administering commercial relationships between the two companies. (Id., 861:12-862:13.)* |

**Response:** Plaintiffs object to ¶69 as misleading as the relationships and communications referenced in ¶69 are non-exhaustive and fail to include the instances of communications contained in the Complaint which detail Defendants' participation in the overarching conspiracy. Plaintiffs further object to ¶69 as misleading as the frequent stream of inter-firm communication is a plus factor that can be used to infer collusive behavior. Subject to and without waiving the foregoing: undisputed that some witnesses had longstanding relationships with other individuals in the industry. Disputed that individuals in the industry *solely* communicated with competitors about matters that were unrelated to work. Witnesses testified that they spoke with their industry connections about business, and that they leveraged their close relationships for the purposes of collusion. *See supra* ¶68.

## PLAINTIFFS' STATEMENT OF ADDITIONAL MATERIAL FACTS

**The terms of the overarching conspiracy**

1. During the relevant time period, Defendants abided by the generic drug industry "rules of engagement," which are, "[i]n their simplest form, tactics that are utilized by another pharma company to ultimately preserve market value in the markets that they're in." One of those tactics "is fair share. Another is that if a manufacturer raises price, that that is basically considered a gift and that the other manufacturers fall in line. Rational in this instance, means that you fall in line with those types of tactics." Another "piece about rules of engagement is that if shares are evenly or more or less evenly distributed based on fair share, that when you take your price increase, you leave customers that you don't have alone, meaning that you don't poach." (Pl. Ex. 103 at 513:13-515:7).

2. Witnesses testified that Defendants used code words like "responsible" or "rational" and phrases like "playing nice in the sandbox" to describe generic manufacturers who abided by the "rules of engagement" by following price increases and not exceeding their fair share of the market.

      a.    Rational/irrational (Pl. Ex. 104 at 58:4-12; 58:21-59:17 (a competitor is "being irrational when they're hogging the market"); 60:17-61:1 ("if you're rational . . . [y]ou will get your fair share and the price will stay up"); Pl. Ex. 106 at 301:17-302:1 (rational means "take price increases – or follow price increases"); Pl. Ex. 103 at 513:13-515:7 (rational means that they "understand . . . the rules of engagement"); Pl. Ex. 105 at 844:11-21 (rational competitor knows the term "fair share" and "would give up share"))

b.        Responsible (Pl. Ex. 107 at 791:11-23 ("we both agreed that our companies acted in a responsible way. . . . We kind of just came away . . . knowing that our . . . companies operated in a similar manner")); 792:24-792:27 (responsible means "[f]ollowing price increases . . . and not poaching another's market share"); 795:15-22 (same); Pl. Ex. 104 at 375:1-376:2 ("be[ing] responsible in the marketplace" was the "understanding" between Fougera and G&W)).

c.        Playing nice in the sandbox (TPl. Ex. 104 at 380:2-20 ("playing nice in the sandbox" was "the arrangement that . . . you would not take . . . share" and would "give up a certain amount" of share); 1194:15-18 ("playing nice in the sandbox" was a term "used to . . . help describe the allocation of market share")).

3. Defendants' counsel stated that Paul Krauthauser had "testified several times that certain actions taken by you or other companies were consistent with the rules of engagement." (Pl. Ex. 103 at 1091:12-24.)

4. Documentary evidence refers to Defendants' code words for the conspiracy. (Pl. Ex. 130 at 50 ("everyone is playing nicely in the sand box and the price has stayed way above plan"); Pl. Ex. 1 at 05 ("[w]e will need to be responsible" (by relinquishing a customer)); Pl. Ex. 2 at 42 (we hope [relinquishing share] translates to rational behavior going forward"); Pl. Ex. 3 at 71 ("Taro is traditionally rationale[sic] player"); Pl. Ex. 4 at 48 ("Actavis is generally rationale[sic]")).

5. Evidence reveals the reputational impact in the industry of participating in the overarching conspiracy and the rewards (both personal and corporate) that could be realized from being recognized as "responsible" and "rational." Defendants labeled manufacturers who behaved contrary to the terms of the agreement as "irrational" and "irresponsible." Defendants

that behaved "rationally" towards competitors in one drug market, would be able to negotiate agreements in other drug markets, while defendants who exhibited "irrational" behavior were distrusted. Each Defendant was aware that "playing nice in the sandbox" or following the "rules of engagement" with respect to their products would redound to the benefit of all participants. (Pl. Ex. 2 at 42 ("[w]e made this fairly easy for [Taro] . . . which we hope will translate to rational behavior going forward" and "Taro has a good track record in this regard"); Pl. Ex. 106 at 1022:11-25 (Sandoz felt comfortable that Perrigo was the other competitor based on "past launches and price increases"); Pl. Ex. 5 at 89 ("[w]e believe [Actavis] will follow based on past experience"); Pl. Ex. 105 at 851:5-10; 916:10-20; 1491:22-1492:15 (testifying to frustration because "the information [wasn't] very good with Perrigo"); 915:23-916:8; Pl. Ex. 107 at 791:11-23; Pl. Ex. 104 at 57:1-18 (competitor who took more than fair share was a "pig in the market"); 1223:12-1224:17; Pl. Ex. 103 at 513:19-517:23 (collusion was easier once it was understood that he was dealing with a "rational" competitor); Pl. Ex. 131 at 15 ("[y]ou're only as smart as your dumbest competitor"); Bihari Depo. Tr. 1122:21-1123:2 (referring to Pl. Ex. 131: "I was probably referring to a competitor that didn't follow a price increase or potentially took Sandoz's market share"); 420:23-421:5; pl. Ex. 3 at 71 ("Taro is traditionally rationale[sic] player"); Pl. Ex. 4 at 48 ("Actavis is generally rationale[sic] so hopefully they act respectfully"); Pl. Ex. 6 at 45 (not a wise business decision to take customers)).

6. Defendants stopped sharing competitively sensitive information when a manufacturer did not "play nice in the sandbox." (Pl. Ex. 107 at 652:2-19)

7. Defendants operated under the assumption that their competitors could retaliate for "irrational" behavior by taking customers and driving down price. (Pl. Ex. 107 at 1237:6-18

("[i]f you come after our customers, we will come after yours"); Pl. Ex. 105 at 967:5-24 ("there was always the chatter around retaliation if we did something that wasn't . . . agreed to"); 1220:9-19; 1524:22-1525:6.)

8. If a defendant was behaving in a way that its competitors might perceive as a violation of the overarching conspiracy, that defendant would communicate with its competitors to explain. (Pl. Ex. 107 at ; Pl. Ex. 105 at 791:2-8; 920:19-921:13).

**Purpose of the overarching conspiracy**

9. Witnesses testified that Defendants wanted to eliminate competition for generic drugs in order to "maximize profits," to "keep the prices as high as possible," and to "establish higher market pricing." This is what motivated Defendants to share competitively sensitive information and to cede market share to their competitors. (Pl. Ex. 107 at 846:3-8; Pl. Ex. 105 at 804:5-11 ("the point [of communicating with competitors] was to . . . win or retain the award at the best price possible"); 830:13-831:24; 921:15-22; 1068:12-14; 1132:24-1133:7; Pl. Ex. 104 at 50:7-51:15; 1190:9-16; Pl. Ex. 138 at 164:10-165:11).

10. Witnesses felt more confident to launch into new markets and to raise the prices of generic drugs knowing that their competitors were part of the overarching conspiracy. (Pl. Ex. 105 at 791:2-8 (collusive relationships with competitors "gave us the confidence that . . . a particular price increase would be more successful"); Pl. Ex. 106 at 1022:11-25 (it "gave Sandoz comfort in knowing that . . . it would be an easy launch"); Pl. Ex. 7 at 89 (identifying products as "safe products" because Lannett was the other competitor); Pl. Ex. 8 at 94-95 (knew that competitor would match price eventually).

11. Witnesses also testified that Defendants would not take a price increase if they felt that they could not depend on their competitors to follow. (Pl. Ex. 105 at 915:23-916:8 (if

Sandoz believed that a competitor would act irrationally, Sandoz "would avoid. We would not take that price increase").

12. One cooperating witness testified that Defendants were commonly motivated to share competitively sensitive information for the "mutual benefit" of increasing price and preserving market share. (Pl. Ex. 107 at 578:21-579:22).

**Fair share and allocating the market**

13. "Fair share was the belief that, based upon when you entered the market there's a certain amount of share that is deemed to be fair and one that you should not go over. So for example, if it's a two player market, typically the first player to market would get 45 percent share and number two – I'm sorry, number one would get 55 percent share and then number two would get 45. When the third player comes into the market, then those numbers would shift to, you know, 30, 30, 20, or something like that. I think my math was off on that." (Pl. Ex. 104 at 43:18-44:5).

14. The term fair share referred to an anti-competitive agreement. (Pl. Ex. 104 at 42:21-43:4).

15. Witnesses across Defendants described the concept of "fair share" in the same mathematical way—as roughly an even split of the market that can account for circumstances including supply and order of entry in the market. (Pl. Ex. 105 at 841: 11-19 ("other competitors would know what the term fair share was"); Pl. Ex. 104 at 41:10-20; Pl. Ex. 109 at 73:8-21; Pl. Ex. 111 at 98:12-19; Pl. Ex. 110 at 88:23-89:16; Pl. Ex. 112 at 58:1-9; Pl. Ex. 113 at 241:22-242:9; Pl. Ex. 114 at 414;24-415:17).

16. Additional market-specific factors impacted what shares were considered fair in any particular context, highlighting that the same "fair share" principles could lead to different outcomes in different drug-specific markets. Pl. Ex. 103 at 513:13-515:7 (testifying that "fair

share . . . has caveats"); Pl. Ex. 107 at 793:5-11 (fair share "depend[ed] on other circumstances, like supply"); Pl. Ex. 9 at 33 (titled "Dermatology Fair Share Index"); Pl. Ex. 105 at 839:23-840:12; 921:24-922:13 ("there was some products where maybe somebody had 70 and somebody had 30"); 1491:22-1492:15 ("[i]t didn't work out perfectly every time"); Pl. Ex 104 at 41:22-42:19 (takes into account "profitability and the ability to supply current and future customers"); Pl. Ex. 10 at 18 (agreed-upon result in two player market was a 60/40 split); Pl. Ex. 2 at 42 (describing a 70/30 split as a "good result"); Pl. Ex. 11 at 53-54 (Walmart chose not to shift its business despite working agreement between Taro and Sandoz); Pl. Ex. 12 at 13 (Exh 12) (Sandoz experienced supply issues as two competitors entered market)).

17. Defendants were willing to cede market share to each other in order to avoid competing for the purpose of maximizing profits, establishing higher market pricing and "keeping prices as high as possible." (Pl. Ex. 3 at 71 (achieve "minimal price erosion" by ceding two customers); Pl. Ex. 30 at 05 ("Sandoz-Giving us share"); Pl. Ex. 4 at 48; Pl. Ex. 14 at 67; Pl. Ex. 104 at 506:9-507:15 ("we'll have to give them some accounts when they actually get out there" to keep pricing high); Pl. Ex. 15 at 52 ("we have to give up share in order to maintain price integrity"); Pl. Ex. 106 at 619:3-10; 632:22-633:4; 674:11-16; 706:14-20; 730:9-15; 1022:11-25 ("pricing would be kept high").

18. The idea of "fair share" underpinned the anticompetitive practice of refusing to bid (or cover bidding) in order to cede share to a competitor. (Pl. Ex. 106 at 632:22-633:4; 690:11-13; 701:9-706:6 (Sandoz communicated to Taro that it wanted one more customer in order to reach its target 40% share); 1022:11-25 ("the market would be allocated appropriately"); Pl. Ex. 31 at p. 1, row 41 (Taro stopped bidding on new lidocaine ointment business, because it had its fair share). This was done so that Defendants would not seek 100% of the market share.

68

(Pl. Ex. 105 at 844:11-21 (a rational competitor "wouldn't go after 100 percent of the market . . . they would go after a fair share")).

19. Defendants made misrepresentations to their customers about capacity constraints to mask the real reasons for a price increase, refusal to bid, or cover bid—ensuring that all market participants got their "fair share." (Pl. Ex. 104 at 1197:10-1198:24; Pl. Ex. 19 at 29 (despite enough supply, "we do not want to pursue . . . . We'll need to figure out a good explanation"); Pl. Ex. 16 at 16 (suggesting to blame supply); Pl. Ex. 20 at 12 (blaming supply); Pl. Ex. 107 at 866:9-17 (supply was common pretext); Pl. Ex. 17 at 74 (blamed price increase on increase in cost to manufacture, even though change in manufacturing cost was so small); Pl. Ex. 18 at 56 (Lannett emailing internally about "concoct[ing]" a justification for a 275.5% price increase)).

20. Defendants regularly ceded share to their customers pursuant to the rules of engagement. (Pl. Ex. 21 at 91; Pl. Ex. 13 at 13; Pl. Ex. 22 at 69; Pl. Ex. 23 at 16-17; Pl. Ex. 104 at 104:22-105:14; 176:23-177:1 (ceding market share on adapalene); Pl. Ex. 106 at 812:12-814:16); Pl. Ex. 24 at 37; Pl. Ex. 25 at 70 ("[w]e gave up business to let G&W gain some share"); Pl. Ex. 26 at 16 (Fougera "let Walmart go"); Pl. Ex. 27 at 22 ([i]t's for the greater good"; Pl. Ex 28 at 95; Pl. Ex. 29 at 12; Pl. Ex. 1 at 05 ("[w]e will need to be responsible"); Pl. Ex. 10 at 18-19 (ceding customer for griseofulvin); ).

**Implementing the overarching conspiracy**

21. The overarching agreement was implemented by later subsidiary agreements that would be structured around "fair share" principles as modified by the particulars of a given market. (Pl. Ex 104 at 43:6-13; 44:16-19; Pl. Ex. 107 at 287:19-289:7).

22. Plaintiffs sought supra-competitive profits by conspiring to fix or otherwise achieve supra-competitive prices for their products.

69

a.       Witnesses testified that Defendants communicated about competitively sensitive information regarding non-public price and customer allocation and did so in an effort to limit competition. (Pl. Ex. 107 at 565:8-566:18; 646:4-647:23; Pl. Ex. 106 at 97:25-98:7; 492:13-493:3 Pl. Ex. 105 at 808:6-12 (Sandoz would "use that [competitively sensitive] information to win awards"); Pl. Ex. 104 at 40:10-18; 48:17-22; 50:7-51:15; Pl. Ex. 103 at  462:6-19).

b.       Witnesses directly testified to anticompetitive agreements to fix prices and allocate the market for dozens of generic drugs at issue in this complaint. (Pl. Ex. 104 at 145:4-9 (Fougera/Taro: imiquimod cream); 176:10-177:1 (Fougera/Perrigo: adapalene creme); 208:13-209:9 (Fougera/Perrigo: triamcinolone cream and ointment); 338:4-21 (Fougera/Taro: fluocinonide solution); 407:4-13 (Actavis, Fougera, and G&W: metronidazole cream and lotion); 504:15-25 (Fougera/G&W: fluocinolone cream and ointment); 532:12-21 (Fougera/G&W: betamethasone valerate lotion); 595:16-59:3 (Aurobindo/Mylan: pioglitazone HCL metformin HCL tablets); Pl. Ex. 106 at 593:13-594:2 (Sandoz/Actavis/Taro: desonide lotion); 618:22-619:10 (Sandoz/Taro: nystatin triamcinolone cream); 632:16-633:4 (Sandoz/Taro: nystatin triamcinolone ointment); 664:8-18 (Sandoz/Glenmark: fluticasone propionate lotion): 674:5-675:25 (Actavis/Sandoz/Perrigo: ciclopirox shampoo); 690:3-13 (Sandoz/Perrigo: erythromycin solution); 706:8-20 & 709:19-710:10 (Sandoz/Taro/Glenmark: desoximetasone ointment); 716:6-15 (Sandoz/Taro: CBD lotion); 730:3-15 (Sandoz/Actavis: betamethazone valerate 0.01 ointment); 769:4-22 (Sandoz/Taro: fluocinonide ointment); 787:9-19 (Sandoz/Taro: alclometasone dipropionate

Public Redacted Version

cream); 788:19-789:2 (Sandoz/Taro: carbamazepine extended release); 794:9-19 (Sandoz/Taro: clomipramine); 795:18-796:4 (Sandoz/Taro: betamethasone dipropionate lotion); 816:15-24 (Sandoz/Glenmark: alclometasone cream); 840:5-15 (Sandoz/Taro: lidocaine ointment); 865:19-866:4 (Aurobindo/Sandoz: cefpodoxime proxetil); 877:22-878:6 (Sandoz/Aurobindo: pioglitazone HCL metformin HCL); 896:9-21 (Sandoz/Perrigo: bromocriptine tablets); 907:19-24 (Sandoz/Taro: etodolac); 936:8-19 & 937:14-938:1 (Sandoz/Perrigo/Taro: desonide ointment); 956:19-957:18 (Sandoz/Taro/Perrigo: nystatin cream); 974:18-975:10 (Sandoz/Perrigo: adapalene cream); 994:18-995:23 ( Sandoz/Perrigo/G&W: halobetasol cream); 1019:4-13 (Sandoz/Perrigo: calcipotriene betamethasone dipropionate ointment); 1040:7-18 (Sandoz/Perrigo: tacrolimus ointment); 1054:17-1055:1 (Sandoz/Perrigo:methazolamide); 1069:12-18 (Sandoz/Rising: griseofulvin); 1110:11-23 (Sandoz/Taro: clobetasol); 1115:25-1116:5 (Sandoz/Taro: fluocinonide gel); 1160:17-25 & 1174:21-24 (G&W/Sandoz/Taro: ketoconazole cream); 1191:5-14 (Sandoz/Perrigo: fluocinonide 0.1 % cream); 1198:21-1199:4 (Sandoz/Taro: clotrimazole 1% cream); 1217:23-1218:6 (Actavis/Sandoz: methylphenidate immediate release).

23. The terms of Defendants' individual drug conspiracies were nearly identical except for specific prices and dates, and whether it was a price increase or a market entry or both. For example, the agreement as to nystatin triamcinolone cream (Pl. Ex. 106 at 619:3-10 ("[t[hat Taro would cede customers to Sandoz. There was an agreement to relinquish those customers. They agreed that, provided – Taro provided [nonpublic customer] pricing which Sandoz used to price the offer letters to those customers Taro relinquished as high as possible but still

71

generated a right of first refusal, which Taro would decline."")); the agreement as to nystatin triamcinolone ointment (Pl. Ex. 106 at 632:22-633:4); the agreement as to fluticasone propionate lotion (Pl. Ex. 106 at 664:15-18 ("[t]hat Glenmark would relinquish market share when Sandoz entered the market, and Sandoz would follow if there's any price increase")); the agreement as to ciclopirox shampoo (Pl. Ex. 106 at 674:11-16 ("[t]hat Actavis would relinquish certain customers. Pricing was provided. And it was to ensure that pricing was kept high in the market, but still lower than Actavis' [nonpublic customer pricing] to ensure that Sandoz's offer was successful."")); the agreement and Sandoz as to erythromycin solution (Pl. Ex. 106 at 690:11-13 ("Perrigo provided pricing and also agreed to relinquish the award in an RFP. They didn't - either did not bid or bid to lose."")); the agreement as to ketoconazole cream (that "Taro and G&W would eventually follow a price increase and keep the price high and to not poach or take anyone else's share"); the agreement as to desoximetasone ointment (Pl. Ex. 106 at 706:14-20 ("[t]o keep pricing high in the market, an agreement to target specific customers to ensure that market pricing didn't deteriorate so Sandoz – and Sandoz could bid a price as high as possible to trigger a [right of first refusal] but still win the business, and for Taro to keep their market share and keep pricing high"")); the agreement as to desonide ointment (Pl. Ex. 106 at 937:20-938:1 ("[t]o send offers to customers which Taro agreed to relinquish to Sandoz and Taro provided the net pricing . . . in order . . . to keep the price high in the market"")); the agreement as to halobetasol (Pl. Ex. 106 at 994:18-995:23 (that "Perrigo would relinquish a customer. Perrigo provided pricing so that Sandoz could price it appropriately in the market and as high as possible"")); the agreement as to betamethasone valerate (Pl. Ex. 106 at 730:9-15); the agreement as to fluocinolide ointment (Pl. Ex. 106 at 769:11-22); the agreement as to alclometasone dipropionate cream (Pl. Ex. 106 at 787:15-19); the agreement as to

carbamazepine extended release (Pl. Ex. 106 at 789:1-2); the agreement as to clomipramine (Pl. Ex. 106 at 794:16-19); the agreement as to betamethasone dipropionate lotion (Pl. Ex. 106 at 795:25-796:4); the agreement as to betamethasone dipropionate cream (Pl. Ex. 106 at 796:25-797:4)).

24. Witnesses testified that their agreements with their co-conspirators to fix prices and allocate the market were not limited to any particular drugs.  (Pl. Ex. 105 at 860:12-16; 1074:7-10; Pl. Ex. 104 at 1188:22-1189:4; Pl. Ex. 106 at 594:24-595:3; 620:4-7; 633:19-22; 665:17-21; 675:6-9; 691:9-13; 707:1-5; 710:17-21; 717:4-7; 731:1-5; 770:8-12).

25. Witnesses testified that bilateral agreements between defendants transcended any particular drug.

     a.    Fougera and G&W (Pl. Ex. 104 at 375:1-376:2; 379:12-23; 380:2-20; 1204:8-21; 1206:5-9).

     b.    Fougera and Perrigo (Pl. Ex. 104 at 924:9-19; 1184:11-16; 1196:5-16).

     c.    Fougera and Taro (Pl. Ex. 104 at 1199:21-1201:25; 1203:8-23).

     d.    Sandoz and Glenmark (Pl. Ex. 106 at 1371:16-21).

     e.    Sandoz and Mylan (Pl. Ex. 107 at 1237:6-18 (referring to talks with competitors about shared understandings as "philosophy conversations").

     f.    Sandoz and Perrigo (Pl. Ex. 106 at 1245:3-12; Pl. Ex. 105 at 769:7-770:2; 860: 18-862:5; 1132:3-12; 1132:14-22; 1278:21-1279:16).

     g.    Sandoz and Taro (Pl. Ex. 107 at 791:11-23; Pl. Ex. 105 at 854:3-856:4 (agreement between Sandoz and Taro not limited to 3 drugs identified in Sandoz admissions; many other drugs were subject to the ongoing agreement);

866:1-20; 919:9-16; 921:15-22; 922:15-923:1; 1278:12-1280:22; Pl. Ex. 106 at 1404:3-1405:23 (agreement between Sandoz and Taro "would encompass any product where Sandoz and Taro overlapped as well as any new product launches that Sandoz – where Sandoz entered the market or where Taro may have entered the market" and "it was understood that when Sandoz launched a product and Taro was in the market, there would be pricing shared and customer allocation and in the cases where there are price increases, it was also – it was understood as part of the overall agreement that Sandoz would fire – follow a price increase at some point")).

26. Some witnesses used to the term "overarching" to describe the unlimited nature of bi-lateral agreements between defendants.  (Pl. Ex. 104 at 924:9-19; 1206:5-9; 1196:5-16; 1203:8-23).

27. The overarching agreements between subsets of defendants were nearly identical to each other, to the individual drug conspiracies, and to the overarching conspiracy. (Pl. Ex. 104 at 1204:23-1205:3; 1196:11-16 (in the overarching agreement between Fougera and Perrigo, "both sides would agree to, umm, what market share they would give up or what customers they would give up, as well as price points"); Pl. Ex. 106 at 401:11-17 (broad agreement between Sandoz and Taro was "an agreement or understanding that Sandoz would relinquish market share, that Sandoz and Taro were operating with an understanding that both would be smart, diligent in the market, and keep pricing high, relinquish market share where necessary when new entrants came in").

28. Plaintiffs realized supra-competitive profits by conspiring to fix or otherwise achieve supra-competitive prices for their products. (Pl. Ex. 104 at 1190:9-25 (collusive agreements worked)). Witnesses testified that their agreements to fix prices and allocate

customers of particular generic drugs kept prices higher than they would have been in a competitive market. (Pl. Ex. 104 at 177:2-10 (adapalene cream and imiquimod cream); 209:7-13 (triamcinolone acetonide cream and ointment); 408:5-8 (metronidazole cream and lotion); 534:2-12 (betamethasone valerate lotion); Pl. Ex. 106 at 593:13-594:23 (desonide lotion); 619:21-620:3 (nystatin triamcinolone cream); 665:7-16 (fluticasone propionate lotion); 690:24-691:8 (erythromycin solution); 716:21-717:3 (CBD lotion); 788:10-18 (alclometasone dipropionate cream); 795:10-17 (clomipramine); 817:15-23 (alclometasone cream); 841:6-15 (lidocaine ointment); 897:15-24 (bromocriptine tablets); 908:10-20 (etodolac tablets); 937:5-13 (desonide ointment); 1073:4-12 (griseofulvin); 1111:12-22 (clobetasol) .

29. Witnesses testified that the overarching conspiracy needed to be implemented on a product-by-product basis and situation by situation and that every product had a unique situation. Witnesses testified that implementing the overarching conspiracy with respect to any particular drug required understanding and adjusting for the particular features of each drug market.  (Pl. Ex. 103 at 513:13-515:7 ("all of these ["rules of engagement" tactics] have caveats to them based on the actual dynamics in the market"); Pl. Ex. 105 at 839:23-840:12 (discussed how much share, which customers, and which prices points for each launch); 846:2-15; 848:21-848:21-849:17; Pl. Ex. 104 at 55:15-56:18 (common for competitors to reach out to each other to discuss share for launches, exits, and when share was out of balance); 504:7-13; 1197:10-1198:24 ("depending on the product customers would bid out a product. If a price increase was taken, an item automatically goes out to bid to the . . . entire trade, and we needed to make sure that they weren't going to bid or would bid in a non-competitive way. By MR. NIELSEN: Was communicating about each product necessary to keep the prices as high as possible for each specific product? MS. ROGERS: Objection to form. A. Yes."); 1199:9-19).

**Public Redacted Version**

30. Witnesses testified that any small differences in the implementation of individual drug conspiracies did not negate the larger overarching conspiracy.  (Pl. Ex. 106 at 898: 23-897:3 (there was still an agreement despite delay in following price increase).

31. Taro raised its prices on multiple products in June 2014, and, therefore, needed to coordinate those price increases with several of its co-conspirators.  (Pl. Ex. 32 at 46; Pl. Ex. 132 at 1; Pl. Ex. 115 at 491:12-496:19; Pl. Ex. 33 at 74; Pl. Ex. 34 at 1; Pl. Ex. 35 at 1; Pl. Ex. 36 at 84-87.

32. Even while Defendants stood to gain billions of dollars by participating in the overarching conspiracy, they incurred almost no additional costs to do so. (Pl. Ex. 133 at 206:7-14)

33. There is evidence of firms using "market dynamics" as an excuse for collusive price increases in response to customer inquiries. Pl. Ex. 18 at 56 (discussing possibility of using market dynamics as a justification for price increase).

**Core participants**

34. A cooperating witness testified that Sandoz's competitors "needed to collaborate with Sandoz to be a part of an agreement for Sandoz to also follow a price increase to ensure that that price would stick in the market and would not deteriorate" because Sandoz "swung . . . a big bat." (Pl. Ex .106 at 495:24-496:20; 497:5-25).

35. A cooperating witness estimated that the number of competitors that Sandoz was sharing competitively sensitive information was "approaching 20 perhaps." (Pl. Ex. 106 at 124:9-21).

### The generic drug industry

36. Generic drugs are commodities, with price and ability-to-supply as the only two factors differentiating one defendant from another. Pl. Ex. 104 at 160:10-16; Pl. Ex. 134 at ¶¶

11, 14 ("generics have been deemed bioequivalent").   Witnesses testified that the undifferentiated nature of generic drugs played a role in both motivating and facilitating the overarching conspiracy. (Pl. Ex. 104 at 503:22-504:6 ("in a multisource market, if you're raising price and someone's entering the market, you're basically giving up share. Because the moment you raise price, it's automatically bid out to all the other manufacturers, and so you're - you're risking, number one, losing the products, but also because you have a price increase, there's a very good chance you would not get the right of first refusal.")). For example, ammonium lactate had negative margins (Pl. Ex. 37 at 55), but companies could not raise the price absent an agreement without risk of losing business (Pl. Ex. 38 at 36).

37. Defendant firms had structured incentives, like commissions or bonuses based on company sales, which indirectly encouraged collusive behavior. (Pl. Ex. 116 at 53:8-55:20; Pl. Ex. 108 at 63:1-70:18 (collecting market intelligence was part of bonus structure); 72:13-79:19; PL. Ex. 117 at 62:14-64:20, Pl. Ex. 118 at 57:24-65:10; Pl. Ex. 119 at 30:1-31:4; Pl. Ex. 120 at 51:1-18. A cooperating witness testified that he believed that communicating with competitors about competitively sensitive information was "a common practice . . . in the industry." He testified that "it just seemed that it was not right but it was accepted because everybody was doing it in my opinion – not – not everybody. That's obviously – a lot of people in the industry were communicating." (Pl. Ex. 106 at 190:17-23 ("[i]t was a common practice"); 1228:8-12 ("everybody in the industry in my opinion seemed to be doing it"); 1228:16-1229:14 ("everybody was doing it in my opinion")). He testified that discussing competitively sensitive information was so commonplace in the generic drug industry during the relevant time period that employees of Defendants had no compunctions about shouting

collusive questions across a crowded bar or approaching a relative stranger in a restaurant to discuss colluding. (Pl. Ex. 106 at 536:8-18; 547:8-548:4).

38. During the time period in question, many employees who were key to creating and carrying out collusive agreements while working for one defendant moved to another defendant. (Pl. Ex. 121 at 524:11-14 (Grauso: G&W, Aurobindo, and Glenmark); Pl. Ex. 104 at 23:8-21 (Thomassey: Fougera and Aurobindo); Pl. Ex. 39 at 61(Krauthauser: Sandoz and Rising); Pl. Ex. 122 at 386:7-13 (Boothe: Actavis and Perrigo); Pl. Ex. 108 at 391:21-24 (Perfetto: Actavis and Taro); Pl. Ex. 106 at 390:3-11 (Aprahamian: Actavis and Taro.)) Employees who worked for multiple defendants named in this complaint during the relevant time period brought with them their knowledge of the "rules of engagement" and their social connections at former employers. (Pl. Ex. 103 at 466:1-10; 519:1-527:10 (he did not need to have detailed discussions with his former colleague, Bihari, because "we . . . worked together at Sandoz" and "we had been through . . . reinforcement of [the rules of engagement] principles."); Pl. Ex. 106 at 494:16-495:6; 541:15-25; 543:1-544:5; 569:19-570:5; Pl. Ex. 40 at 1 (Tony Thomassey, of Fougera, phone calls Erika Vogel-Baylor of G&W); Pl. Ex. 41 at 1 (Thomassey, after he moved to Aurobindo, phone calls with Vogel-Baylor of G&W)).

39. There is evidence of Defendants buying and selling ANDAs during the time period in question. (Pl. Ex. 139 at 75-76 ("ANDA Acquisition Opportunity"). For example, G&W purchased factory and took over ketoconazole business (Pl. Ex. 42 at 04; Pl. Ex. 123 at 776:3-21).

40. There is evidence that defendants entered and exited markets for the Drugs at Issue frequently during the conduct period. (*e.g.,* Pl. Ex. 128 at 39 (Actavis entered market for nystatin); Pl. Ex. 44 at 52 (Fougera exited market for nystatin); Pl. Ex. 45 at 37 (Fougera re-

78

entered market for nystatin); Pl. Ex. 46 at 04-05 (Sandoz and Perrigo entered market for tacrolimus); Pl. Ex. 47 at 37 (Perrigo entered imiquimod market); Pl. Ex. 48 at 52 (Perrigo enters adapalene market); Pl. Ex. 49 at 75 (Taro reentry into alclometasone market); Pl. Ex. 50 at 54-56 (Sandoz to enter ciclopirox and fluticasone propionate market); Pl. Ex. 100 at 72 (taking advantage of competitor supply issues to enter the market).

41. Highly concentrated markets with fewer competitors are more capable of enforcing and engaging in collusive agreements. (Pl. Ex. 134 at ¶ 58 ("the risks and costs of formulating, monitoring and enforcing an agreement on prices through direct communications rise exponentially with the number of participants"); App'x G ¶ 4; App'x G ¶ 9 ("[b]oth coordination and collusion are likely to be more profitable when demand is inelastic and there are fewer close substitutes to which customers could turn to in response to a price increase")).

42. Before the conduct period, generic drug prices were already oligopolistic. (Pl. Ex. 135 at ¶ 7).

**The industry's vast social network**

43. There are volumes of phone records showing myriad communications among Defendants Employees of one defendant called employees of multiple other defendants who, in turn, called employees of multiple other defendants. (*e.g.,* Pl. Ex. 51 at 1 (Sandoz, Taro); Pl. Ex. 52 at 1 (Taro, Sandoz, Mylan); Pl. EX. 53 at 1 (Mylan, Lupin); Pl. Ex. 54 at 1 (Lupin, Glenmark); Pl. Ex. 55 at 1 (Glenmark, Sandoz); pl. Ex. 56 at 1 (Sandoz, Aurobindo); Pl. Ex. 41 at 1 (Aurobindo, G&W); Pl. Ex. 40 at 1 (G&W, Fougera); Pl. Ex. 57 at 1 (Fougera, Perrigo); Pl. Ex. 58 at 1 (G&W, Perrigo, Taro); Pl. Ex. 59 at 1 (Perrigo, Actavis); Pl. Ex. 60 at 1 (Actavis, Taro); Pl. Ex. 61 at 1 (Taro, Glenmark); Pl. Ex. 62 at 1 (Perrigo, Sandoz); Pl. Ex. 63 at 1 (Sandoz, Greenstone); pl. Ex. 64 at 1 (Sandoz, Rising); Pl. Ex. 65 at 1 (Rising, Taro); Pl. Ex. 66 at 1 (Lannett, Mylan); Pl. Ex. 67 at 1 (Mylan, Sandoz)).

44. Witnesses who made phone calls to each other testified that the purpose of those calls was to perpetuate the overarching agreement among Defendants, including discussing and setting prices and allocating the market for particular drugs. (Pl. Ex. 107 at 565:2-7 (primarily obtained intelligence from competitors over the phone): l. Ex. 106 at 575:11-14; 580:13-19; 780:15-781:15; 668:20-670:10; 779:9-780:3; 811:16-21; 1022:5-10; Pl. Ex. 103 at 506-507; Pl. Ex. 104 at 87:21-90:8 (discussing imiquimod with competitor and then calling Kaczmarek); 98:7-20; 99:21-100:19; 102:10-15; 875:4-877:14; Pl. Ex. 105 at 1092:22-1093:9 (pattern of calls suggests competitively sensitive information was shared)).

45. Other witnesses declined to provide an explanation for their calls with competitors. (Pl. Ex. 116 at 211:13-212:11 (no social relationship with Defendant Vogel-Baylor that would explain communications); 307:5-308:7 (no explanation for calls placed to competitors on the day of 5 different price increases); Pl. Ex. 124 at 224:5-226:18; Pl. Ex. 125 at 613:23-614:4; Pl. Ex. 126 at 86:13-24 (did not recall phone calls with Thomassey about imiquimod); Pl. Ex. 127 at 75:20-76:20).

46. Internal company emails and other documentary evidence reflect the subject matter of Defendants' phone calls with competitors. For example, cooperating witness, Chris Bihari, explained that he took notes regarding the anticompetitive nature of contemporaneous phone calls (Pl. Ex. 68 at 26 (notes from phone call with Mitch Blashinsky noting details of Glenmark's expected launch of alclometasone ointment (Pl. Ex. 106 at 808:5-810:6); Pl. Ex. 68 at 23 (list of drugs written in notebook were Taro price increases and that came from phone call with Ara Aprahamian) (Pl. Ex. 106 at 779:9-780:3)). Also, when G&W was launching into the ketoconazole market, Defendant Aprahamian if Taro sent an internal email the same day

he spoke with Defendant Orlofski of G&W on the phone, warning that Taro would "NOT be taking ANY new business" on ketoconazole (Pl. Ex. 136 at 1; Pl. Ex. 102 at 88).

47. Defendants' calls to each other were more frequent in close proximity a price increase or market entry. For example, Taro's Metronidazole 1% gel launch (Pl. Ex. 69 at 1; Pl. Ex. 70 at 1; Pl. Ex. 71 at 84; Pl. Ex. 72 at 73); Actavis' launch of nystatin (Pl. Ex. 128 at 39; Pl. Ex. 73 at 1); triamcinolone acetonide paste price increase (Pl. Ex. 103 at 501-502; Pl. Ex. 74 at 33; Pl. Ex. 65 at 1); price increase of betamethasone dipropionate cream (Pl. Ex. 75 at 87; Pl. Ex. 76 at 01; Pl. Ex. 106 at 775:19-776:4; Pl. Ex. 77 at 1); price increase of betamethasone valerate (Pl. Ex. 77 at 1; Pl. Ex. 68 at 27; Bihari Depo. Tr. 781:13-15); Glenmark's launch of desoximetasone (Pl. Ex. 78 at 57-58; Pl. Ex. 79 at 1); price increase of imiquimod (Pl. Ex. 80 at 1; Pl. Ex. 81 at 66; Pl. Ex. 83 at 24; Pl. Ex. 84 at 1); price increase of ammonium lactate (Pl. Ex. 85 at 1; Pl. Ex. 86 at 85-86; Pl. Ex. 87 at p. 1, row 2); price increase of latanoprost drops (Pl. Ex. 90 at 96), Pl. Ex. 91 at 1, Pl. Ex. 92 at 1-2); price increase of acetazolamide (Pl. Ex. 93 at 57; Pl. Ex. 94 at 75; Pl. Ex. 95 at 1). Plaintiffs have identified the date of the first communication for every Drug at Issue and shown that the date is closely associated with price increases for those Drugs, respectively. (Pl. E.x 134 at ¶ 67, Figure 2; ¶ 68, Figure 3; ¶ 80, Figure 5; ¶ 81, Figure 6).

48. There were dozens of industry meetings and trade shows each year, where Defendants had the opportunity to meet face-to-face and off-the-record. (Pl. Ex. 104 at 47:18-48:15).

49. Witnesses testified that Defendants discussed competitively sensitive information and colluded with each other at industry meetings and trade shows. (Pl. Ex. 106 at 523:22-

**Public Redacted Version**

524:13; 535:21-538:1; 547:8-548:4; Pl. Ex. 107 at 564:17-565:1; Pl. Ex. 104 46:20-24; 48:17-22; 49:4-20; Pl. Ex. 103 at 472:5-15).

50. During and in-between these industry meetings, Defendants scheduled social meet-ups with each other: golf outings, "Girls Nights Out," and weekend trips. (Pl. Ex. 96 at 94; Pl. Ex. 97 at 77-78; Pl. Ex. 114 at 441:12-442:17).

51. A cooperating witness testified that his cabin in the Poconos, where he invited employees of competitors to hang out together for the weekend, was known as the "Collusion Cabin" by his guests. (Pl. Ex. 103 at 1066:11-1070:17; Pl. Ex. 98 at 94-95).

52. Defendants' employees testified that they became friends with employees of competitors, which encouraged even more frequent communication and facilitated the drug-specific negotiations that implemented the overarching conspiracy. (Pl. Ex. 104 at 80:10-14 (social relationship with Howard Marcus of Taro made it easier to reach out to him to discuss anti-competitive topics); 534:24-535:9; Pl. Ex. 107 at 563:2-7 ("they were all friends of mine")).

53. Defendants connected their contacts at different companies for the purpose of facilitating collusion, and even brokered specific collusive anticompetitive agreements for drugs they did not sell. (Pl. Ex. 106 at 533:7-23; 588:16-589:1; 593:13-21 (Aprahamian brokered an agreement between Sandoz and Actavis while he was working for Taro); 1307:13-1308:9; Pl. Ex. 103 at 466:20-467:15; Pl. Ex. 104 at 51:17-54:11; 376:18-22; 377:15-378:1; 408:25-412:24; 413:14-20; 415:18-416:22 (acted as a conduit between G&W and Perrigo while working for Aurobindo, which did not even sell that particular drug, "[b]ecause as the competitors shared information, it was building goodwill for when I needed the information"); 500:6-22).

**Public Redacted Version**

54. There is evidence that Defendant firms that were not in the market for particular drugs at the time, because of, *e.g.,* supply issues, were still actively communicating with other Defendant firms regarding pricing and entry. (Pl. Ex. 99 at 66).

**Defendants were not acting independently**

55. A cooperating witness testified that it would "[a]bsolutely, 100 percent" require "some level of coordination between competitors" to pull off a price increase at the same time as a competitor entered the market. (Pl. Ex. 104 at 503:22-504:13).

56. Witnesses testified that competitively sensitive information about pricing, customers and product launches could otherwise cause harm to a company in the hands of a competitor. (Pl. Ex. 107 at 652:2-19; 649:9-19).

57. Witnesses testified that knowing that their competitors were a part of the overarching agreement affected Defendants' business decisions. (Pl. Ex. 106 at 420:23-421:5; Pl. Ex. 105 at 916:10-20; Pl. Ex. 104 at 1223:12-1224:17; Pl. Ex. 88 at 06 (Actavis could produce more than fair share but did not want to upset the market).

58. Witnesses testified that they would not independently cede market share to a competitor, absent an agreement. (Pl. Ex. 110 at 89:17-90:9).

59. Witnesses testified that "failure-to-supply penalties" in customer contracts were not and had never been a reason to raise prices of generic drugs. (Pl. Ex. 104 at 1227:21-1228:7).

60. Witnesses testified that keeping a list of customers to concede—especially where the creator of the list did not directly work with the customers listed—was an indication that the concessions were pursuant to an anti-competitive agreement and *not* an indication of independent oligopolistic action. (Pl. Ex. 104 at 173:10-20).

61. Witnesses testified that a delay in one Defendant following another's price increase was not an indication that there was no collusive agreement. (Pl. Ex. 106 at 898: 23-897:3).

**Public Redacted Version**

62. Witnesses testified that Defendants were not always happy about ceding share. (Pl. Ex. 106 at 411:19-412:6; 828:22-829:7; Pl. Ex. 101 at 50 (executive demands urgent explanation for why relinquishing business).

63. A cooperating witness testified that Armando Kellum, a pricing executive at Sandoz during the relevant time period, was "dragging his feet" on ceding share, "because [the drug at issue] was a very valuable product to Sandoz." (Pl. Ex. 106 at 828:22-829:7).