**UNITED STATES DISTRICT COURT**
**DISTRICT OF CONNECTICUT**

| | |
|---|---|
| THE STATE OF CONNECTICUT, *et al.*, | |
| *Plaintiffs*, | |
| | Case No. 3:20-cv-00802-MPS |
| v. | |
| | November 22, 2024 |
| SANDOZ, INC., *et al.*, | |
| *Defendants*. | |

**DEFENDANTS' MEMORANDUM OF LAW IN SUPPORT OF MOTION**
**FOR SUMMARY JUDGMENT ON STATE-LAW EQUITABLE CLAIMS,**
**CIVIL PENALTIES AND FINES, EXTRATERRITORIAL ENFORCEMENT OF**
**STATE LAW, GENERAL ECONOMY DAMAGES, AND STATE ANTITRUST CLAIMS**

# Table of Contents

**Page**

Preliminary Statement ......................................................................................................... 1

Summary Judgment Standard ............................................................................................. 2

I.     The Court Should Grant Summary Judgment on Disgorgement, Restitution, and Unjust Enrichment Because State Plaintiffs Have Adequate Remedies at Law ......................................... 3

II.    The Court Should Grant Summary Judgment on State Plaintiffs' Request to Base Civil Penalties and Fines on the Number of Sales by Pharmacists ......................................... 7

III.   The Dormant Commerce Clause Prohibits Imposing Civil Penalties ............................... 10

and Fines Under Laws of States Where a Defendant Made No Sales .......................................... 10

IV.    The Due Process and Full Faith and Credit Clauses Prohibit Imposing Civil Penalties and Fines Where Defendants' Alleged Conspiratorial Conduct Occurred Outside the State ........... 17

   A.     State Laws Conflict ....................................................................................... 18

   B.     Most States Lack Any Contacts to the Asserted Conduct ................................... 19

V.     The Court Should Grant Summary Judgment on "General Economy" Damages ........... 21

   A.     "General Economy" Damages are not Recognized by California, Puerto Rico, and the Virgin Islands ............................................................................................... 22

   B.     No Evidence Exists of "General Economy" Damages Under Connecticut Law .. 22

      1.     Deadweight Loss Does Not Measure "General Economy" Damages Under Connecticut Law ....................................................................................... 23

      2.     Overcharges to Consumers Are Not "General Economy" Damages Under Connecticut Law ....................................................................................... 24

VI.    State Plaintiffs Lack Antitrust Standing for Monetary Relief Under State Laws ............. 25

   A.     The Alleged Injuries to State Plaintiffs And Their Citizens Are Indirect ............. 27

   B.     Other Entities Are More Direct Purported Victims of the Alleged Conspiracy ... 30

   C.     State Plaintiffs' Claims for Damages Are Highly Speculative ............................. 31

   D.     The Monetary Relief Claims are Duplicative and Difficult to Apportion ........... 32

Conclusion ........................................................................................................................ 36

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Adler v. Altsleep, LLC*,
  No. 2:22-cv-05854-JLS-KS, 2023 WL 3080757 (C.D. Cal. Feb. 7, 2023) ...............................6

*Allstate Ins. Co. v. Hague*,
  449 U.S. 302 (1981)..........................................................................................................18

*In re Aluminum Warehousing Antitrust Litig.*,
  520 F. Supp. 3d 455 (S.D.N.Y. 2021)...............................................................................35

*In re Aluminum Warehousing Antitrust Litig.*,
  No. 21-643, 2023 WL 7180648 (2d Cir. Nov. 1, 2023) ...............................................30, 31

*In re Am. Express Anti-Steering Rules Antitrust Litig.*,
  19 F.4th 127 (2d Cir. 2021) ..........................................25, 26, 27, 30, 31, 32, 33 36

*In re Am. Express Anti-Steering Rules Antitrust Litig.*,
  433 F. Supp. 3d 395 (E.D.N.Y. 2020), *aff'd*, 19 F.4th 127 (2d Cir. 2021)............................6

*In re Am. Med. Collection Agency, Inc. Customer Data Sec. Breach Litig.*,
  Civ. No. 19-md-2904, 2023 WL 8540911 (D.N.J. May 5, 2023)............................................4

*Amtec Int'l of N.Y. Corp. v. Polish Folklore Import Co.*,
  20-CV-3 (LDH) (PK), 2023 WL 2734642 (E.D.N.Y. March 31, 2023) ...............................10

*In re AOG Entm't*
  *; Inc.*; Nos. 16-11090, 16-01074, 2016 Bankr. LEXIS 4514 (Bankr. S.D.N.Y.
  Dec. 30, 2016)...................................................................................................................14

*Ass'n for Accessible Meds. v. Ellison*,
  704 F. Supp. 3d 947 (D. Minn. 2023).......................................................................10, 15, 16

*Ass'n for Accessible Meds. v. Frosh*,
  887 F.3d 664 (4th Cir. 2018) ..............................................................................11, 12, 13, 15

*Associated General Contractors of California, Inc. v. California State Council of
  Carpenters*,
  459 U.S. 519 (1983).......................................................................................26, 29, 32, 33

*Association for Accessible Medicines v. Bonta*,
  No. 2:20-cv-01708-TLN-DB, 2022 WL 463313 (E.D. Cal. Feb. 15, 2022) ..........................15

*Barnett v. Bank of Am., N.A.*,
  No. 3:20-cv-272-RJC-DSC, 2021 WL 2187950 (W.D.N.C. 2021)........................................16

*Blue Cross of Cal. v. SmithKline Beecham Clinical Lab'ys, Inc.*,
  108 F. Supp. 2d 116 (D. Conn. 2000) .......................................................................5

*In re Brand Name Prescription Drugs Antitrust Litig.*,
  123 F.3d 599 (7th Cir. 1997) ................................................................................11

*Carefirst of Maryland, Inc. v. Johnson & Johnson*,
  No. 2:23-cv-629, 2024 WL 3858249 (E.D. Va. Aug. 16, 2024) ...........................27

*In re Cattle and Beef Antitrust Litig.*,
  687 F. Supp. 3d 828 (D. Minn. 2023) ...............................................................26, 27

*Clark v. Am. Honda Motor Co.*,
  528 F. Supp. 3d 1108 (C.D. Cal. 2021) .................................................................5

*Clark v. Eddie Bauer LLC*,
  No. 21-35334, 2024 WL 177755 (9th Cir. Jan. 17, 2024) .....................................5

*Clark v. Eddie Bauer LLC*,
  No. C20-1106-JCC, 2021 WL 1222521 (W.D. Wash. Apr. 1, 2021), *aff'd in
  relevant part*, 2024 WL 177755 (9th Cir. Jan. 17, 2024) ......................................4

*Daniel v. Am. Bd. of Emergency Med.*,
  428 F.3d 408 (2d Cir. 2005) ................................................................................26

*Davis v. Angelcare USA, LLC*,
  No. 3:23-cv-119 (VAB), --- F. Supp. 3d ---, 2024 WL 1344666 (D. Conn.
  Mar. 29, 2024) (Bolden, J.) ................................................................................4, 5

*Davis v. Gap, Inc.*,
  246 F.3d 152 (2d Cir. 2001) ..................................................................................3

*Edgar v. MITE Corp.*,
  457 U.S. 624 (1982) ............................................................................................10

*Ehrlich v. Am. Airlines, Inc.*,
  360 F.3d 366 (2d Cir. 2004) ..................................................................................3

*In re Electronic Books Antitrust Litig.*,
  11-MD-2293 (DLC), 2014 WL 2535112 (S.D.N.Y. June 5, 2014) ..........................8

*In re Electronic Books Antitrust Litigation*,
  11-MD-2293 (DLC), 2013 WL 12212117 (S.D.N.Y. Sept. 25, 2013) .....................8

*Franklin v. Gwinnett Cnty. Pub. Sch.*,
  503 U.S. 60 (1992) ................................................................................................4

*Gannon v. United Parcel Serv.*,
  529 F. App'x 102 (2d Cir. 2013) ............................................................................3

*Gatt Commc'ns, Inc. v. PMC Assocs., L.L.C.*,
  711 F.3d 68 (2d Cir. 2013) ..................................................................................26

*Gelboim v. Bank of Am. Corp.*,
    823 F.3d 759 (2d Cir. 2016)........................................................................26, 30, 31

*In re Generic Pharms. Pricing Antitrust Litig.*,
    394 F. Supp. 3d 509 (E.D. Pa. 2019)..............................................................30

*In re Generic Pharms. Pricing Antitrust Litig.*,
    605 F. Supp. 3d 672 (E.D. Pa. 2022)................................................................3

*In re Generic Pharms. Pricing Antitrust Litig.*,
    No. 16-MD-2724, 2023 WL 2466622 (E.D. Pa. Mar. 9, 2023).............................30

*In re Generic Pharms. Pricing Antitrust Litig.*,
    No. 16-MD-2724, 2024 WL 4508950 (E.D. Pa. Oct. 15, 2024)...........................31

*Gorss Motels, Inc. v. Eric Ryan Corp.*,
    461 F. Supp. 3d 5 (D. Conn. 2020)................................................................2, 3

*Healthcare Distrib. All. v. Zucker*,
    353 F. Supp. 3d 235 (S.D.N.Y. 2018), *rev'd on other grounds sub nom. Ass'n*
    *for Accessible Meds. v. James*, 974 F.3d 216 (2d Cir. 2020)....................................11

*Hernandez v. Off. of the Comm'r of Baseball*,
    No. 18-cv-9035 (JPO), 2019 WL 3034841 (S.D.N.Y. July 11, 2019) ....................18

*Herrera v. Michelin North America, Inc.*,
    Civil No. B–07–114, 2009 WL 700645 (S.D. Tex. Mar. 16, 2009) ........................20

*Hersh v. CKE Rest. Holdings, Inc.*,
    571 F. Supp. 3d 1046 (E.D. Mo. 2021), *aff'd sub nom. Estate of I.E.H. v. CKE*
    *Rest., Holdings, Inc.*, No. 22-1488, 2023 WL 2620251 (8th Cir. Mar. 24,
    2023) *(per curiam)*.......................................................................................18

*In re Intel Corp.*,
    No. 3:18-md-2828-SI, 2021 WL 1198299 (D. Or. Mar. 29, 2021) .........................4

*Intimate Bookshop v. Barnes & Noble, Inc.*,
    No. 98 CIV. 5564 (WHP), 2003 WL 22251312 (S.D.N.Y. Sept. 30, 2003) ...........3

*IQ Dental Supply, Inc. v. Henry Schein, Inc.*,
    924 F.3d 57 (2d Cir. 2019).............................................................................32

*Johannessohn v. Polaris Indus., Inc.*,
    450 F. Supp. 3d 931 (D. Minn. 2020)..............................................................19

*In re Lorazepam & Clorazepate Antitrust Litig.*,
    295 F. Supp. 2d 30 (D.D.C. 2003)..................................................................11

*In re Mallinckrodt*
    *; et al.*; No. 20-12522-JTD (Bankr. D. Del. Mar. 2; 2022), ECF No. 6660 ¶¶
    210-11 .......................................................................................................14

*Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*,
    475 U.S. 574 (1986).......................................................................................3

*Metalizing Tech. Servs., LLC v. Berkshire Hathaway Specialty Ins. Co.*,
    653 F. Supp. 3d 1241 (S.D. Fla. 2023) .................................................................36

*Midwest Title Loans, Inc. v. Mills*,
    593 F.3d 660 (7th Cir. 2010) .............................................................................16

*In re Mississippi Medicaid Pharmacy Average Wholesale Price Litigation*,
    1190 So.3d 829 (Miss. 2015) ............................................................................8, 9

*Nat'l Shooting Sports Found. v. Bonta*,
    718 F. Supp. 3d 1244 (S.D. Cal. 2024) ...........................................................10, 16

*National Pork v. Ross*,
    598 U.S. 356 (2023) ...........................................................................................10

*New England Leather Co. v. Feuer Leather Corp.*,
    942 F.2d 253 (4th Cir. 1991) .............................................................................20

*Owens Corning v. R.J. Reynolds Tobacco Co.*,
    868 So.2d 331 (Miss. 2004) ...............................................................................26

*Paycom Billing Servs., Inc. v. Mastercard Int'l, Inc.*,
    467 F.3d 283 (2d Cir. 2006) ..........................................................................27, 30

*Perfect Fit Indus., Inc. v. Acme Quilting Co.*,
    646 F.2d 800 (2d Cir. 1981) ................................................................................4

*Pharm. Rsch & Mfrs. of Am. v. D.C.*,
    406 F. Supp. 2d 56 (D.D.C. 2005) ..............................................................11, 12, 13

*Phillips Petroleum Co. v. Shutts*,
    472 U.S. 797 (1985) .......................................................................17, 18, 19, 20

*In re Platinum & Palladium Antitrust Litig.*,
    61 F.4th 242 (2d Cir. 2023), *cert. denied sub nom. BASF Metals Ltd. v. KPFF
    Inv., Inc.*, 144 S. Ct. 681 (2024) .......................................................25, 26, 31, 32, 33

*R.I. Truck Ctr., LLC v. Daimler Trucks N. Am., LLC*,
    92 F.4th 330 (1st Cir. 2024) ...............................................................................11

*Richmond v. Home Partners Holdings LLC*,
    No. 22-5704-DGE-RJB, 2024 WL 3276576 (W.D. Wash. 2024) ...................................4, 5, 7

*Rios v. Cabrera*,
    No. 3:10-CV-636, 2010 WL 5111411 (M.D. Pa. 2010) ...........................................16

*Schwab Short-Term Bond Mkt. Fund v. Lloyds Banking Grp. PLC*,
    22 F.4th 103 (2d Cir. 2021) ...............................................25, 26, 27, 28, 29, 30, 33

*SEC v. Jarkesy*,
    144 S. Ct. 2117 (2024) .........................................................................................6

*Shaffer v. Heitner*,
    433 U.S. 186 (1977) ...........................................................................................16

*Smallman v. MGM Resorts Int'l*,
    638 F. Supp. 3d 1175 (D. Nev. 2022) ..................................................................................4

*Sonner v. Premier Nutrition Corp.*,
    971 F.3d 834 (9th Cir. 2020) ....................................................................................4, 5, 6, 7

*Southard v. Visa USA Inc.*,
    734 N.W.2d 192 (Iowa 2007) .................................................................................................26

*State by Humphrey v. Alpine Air Products, Inc.*, 490 N.W.2d 888, 896 (Minn.
    App. 1992) ("for each violation"), *aff'd* 500 N.W.2d 788 (Minn. 1993) .................................9

*State v. Abbott Laboratories*,
    816 N.W.2d 145 (Wis. 2012) ...................................................................................................9

*State v. Marsh & McLennan Cos.*,
    944 A.2d 315 (Conn. 2008) ..............................................................................................22, 23

*State v. Minn. School of Bus., Inc.*,
    No. 27-CV-14-12558, 2017 WL 4220967 (Minn. Dist. Ct. Jan. 4, 2017)...............................9

*Supreme Auto Transp., LLC v. Arcelor Mittal USA, Inc.*,
    902 F.3d 735 (7th Cir. 2018) ...........................................................................................27, 33

*United States v. Bornstein*,
    423 U.S. 303 (1976)...................................................................................................................9

*Victorino v. FCA US LLC*,
    326 F.R.D. 282 (S.D. Cal. 2018) ...........................................................................................19

*West Val Pharmacy v. Actavis Holdco U.S., Inc.*,
    No. 18-cv-2533 (E.D. Pa.) ......................................................................................................30

*Windman v. Am. Book-Stratford Press; Inc.*, No. 89-cv-1037-CSH; 1989 WL
    107275 (S.D.N.Y. Sept. 15; 1989)..........................................................................................14

*In re ZF-TRW Airbag Control Units Products Liab. Litig.*,
    601 F. Supp. 3d 625 (C.D. Cal. 2022) ......................................................................................5

**Rules and Statutes**

73 Pa. Stat. Ann. .........................................................................................................................7

4 N. Mar. I. CMC § 5121 ............................................................................................................7

11 V.I.C. § 1507(4) ......................................................................................................................8

Ala. Unfair Trade Pracs. Act § 45.50.578(b).............................................................................7

Antimonopoly Law, V.I. Code tit. 11, § 1501 *et seq.*...............................................................22

AR Code § 23-92-505(c) ...........................................................................................................29

Cal. Bus. & Prof. Code § 17206 ............................................................................................7, 18

Cartwright Act,
   Cal. Bus. & Prof. Code § 16720 *et seq.* ...................................................................22

Colo. Antitrust Act § 6-4-112(1) ...................................................................................7, 19

Conn. Gen. Stat. § 35-32(c) ................................................................................................22

Conn. Gen. Stat. §35-32(c)(2)............................................................................................25

Conn. Unfair Trade Pracs. Act § 42-110b ......................................................................7, 18

Cons. Stat. Ann. § 201-8(b) ..................................................................................................7

Consumer Fraud and Deceptive Business Practices Act, V.I. Code tit. 12A, § 301
   *et seq.* ..............................................................................................................................22

Fed. R. Civ. P. 56(a) .........................................................................................................2, 3

Fla. Stat. § 501.2075 .........................................................................................................7, 18

Idaho Competition Act § 48-108(d)..............................................................................8, 18, 19

Ind. Code § 24-5-0.5-4(g) .....................................................................................................7

Iowa Code § 714.16(7) .........................................................................................................19

Ky. Rev. Stat. §§ 367.110 ..................................................................................................7, 18

Mass. Gen. L. c. 93A, § 4 ......................................................................................................7

Mich. Comp. Laws 445.771 ...................................................................................................7

Miss. Code Ann. §75-21-7 ....................................................................................................7

Missouri Rev. Stat. § 407.100(6) ..........................................................................................7

Mo. Rev. Stat. § 407.010 .....................................................................................................18

Mont. Code Ann. § 30-14-142(2) .........................................................................................7

N.C. Unfair and Deceptive Trade Practices Act § 75-15.2......................................................7

N.D.C.C. §51-08.1.-07 ..........................................................................................................7

N.H. Consumer Prot. Act § 358-A.........................................................................................7

N.J.S.A. 56:8-13....................................................................................................................18

N.J.S.A. 56:9-10(c)...............................................................................................................7

N.M. Stat. Ann. § 57-1-7 ......................................................................................................7

Neb. Rev. Stat. § 59-1614 .....................................................................................................7

Nev. Deceptive Trade Pracs. Act § 598.0999(2) .................................................................7

North Carolina Debt Collection Act ..............................................................................16

P.R. Laws. tit. 10, § 257 *et seq.* ..................................................................................22

Pennsylvania Unfair Trade Practices and Consumer Protection Law
    73 P.S. § 201-1 et seq.........................................................................................16

R.I. Gen. Laws § 6-36-10(c) .........................................................................................7

S.C. Code § 39-5-110(b) ...............................................................................................7

State Antitrust Act § 44-1407 ..................................................................................7, 19

Unfair Competition Law, Cal. Bus. & Prof. Code § 17200 *et seq.* ...........................22

Utah Code § 76-10-3108(2) .....................................................................................7, 19

Va. Code § 59.1-9.11 ...............................................................................................8, 19

**Other Authorities**

"Follow the Pill: Understanding the U.S. Commercial Pharmaceutical Supply
    Chain," The Henry J. Kaiser Family Foundation, March 2005, available at
    https://www.kff.org/wp-content/uploads/2013/01/follow-the-pill-
    understanding-the-u-s-commercial-pharmaceutical-supply-chain-report.pdf ......................29

Medicaid and CHIP Payment and Access Commission, *Types of Managed Care
    Arrangements* (June 4, 2020), https://www.macpac.gov/subtopic/types-of-
    managed-care-arrangements/ .....................................................................................34

Medicaid and CHIP Payment and Access Commission, *Understanding Managed
    Care Procurement Practices Across States* (Apr. 8, 2022),
    https://www.macpac.gov/wp-content/uploads/2022/04/Understanding-
    Medicaid-Managed-Care-Procurement.pdf ...............................................................35

Rachel Dolan & Marina Tian, *Pricing and Payment for Medicaid Prescription
    Drugs*, KAISER FAMILY FOUNDATION (Jan. 23, 2020),
    https://www.kff.org/medicaid/issue-brief/pricing-and-payment-for-medicaid-
    prescription-drugs/ ....................................................................................................34

Defendants[1] submit this memorandum of law in support of their motion for summary judgment on (1) State Plaintiffs' equitable remedies under state laws, (2) State Plaintiffs' method for calculating potential civil penalties and fines for "each violation," (3) the extraterritorial imposition of civil penalties and fines, (4) the request for damages to the general economies by four State Plaintiffs, and (5) the requests for monetary relief under state laws.

## PRELIMINARY STATEMENT

State Plaintiffs claim entitlement to various remedies under state laws, including disgorgement, restitution, unjust enrichment, civil penalties and fines, damages to the general economies of four sovereigns, and monetary relief under state laws. This Court should grant summary judgment because they are not entitled to the remedies they seek.

*First*, State Plaintiffs are not entitled to restitution, disgorgement, or unjust enrichment under any state law. Their requests for restitution and disgorgement under federal law were dismissed, yet they continue to seek restitution and disgorgement under state laws. Six State Plaintiffs also assert unjust enrichment claims. Restitution, disgorgement, and unjust enrichment are equitable remedies. Where a plaintiff seeks equitable remedies under state law in federal court, the plaintiff must prove that it does not have an adequate remedy at law. State Plaintiffs seek or could have sought legal remedies that are adequate. Therefore, the Court should grant summary judgment on the equitable claims.

---

[1] "Defendants" are Sandoz, Inc. and Fougera Pharmaceuticals Inc. (together, "Sandoz"); Actavis Holdco US, Inc., Actavis Elizabeth LLC, and Actavis Pharma, Inc. (collectively, "Actavis"); Amneal Pharmaceuticals, Inc. and Amneal Pharmaceuticals, LLC (together, "Amneal"); Ara Aprahamian; Aurobindo Pharma U.S.A., Inc. ("Aurobindo"); Bausch Health Americas, Inc. and Bausch Health US, LLC (together, "Bausch"); Mitchell Blashinsky; Douglas Boothe; Glenmark Pharmaceuticals Inc., USA ("Glenmark"); James Grauso; Greenstone LLC ("Greenstone"); G&W Laboratories, Inc. ("G&W"); Walter Kaczmarek; Armando Kellum; Lannett Company, Inc. ("Lannett"); Lupin Pharmaceuticals, Inc. ("Lupin"); Mallinckrodt Inc., Mallinckrodt LLC, and Mallinckrodt plc (collectively, "Mallinckrodt"); Mylan Inc and Mylan Pharmaceuticals Inc. (together, "Mylan"); Kurt Orlofski; Michael Perfetto; Perrigo New York, Inc. ("Perrigo"); Pfizer Inc. ("Pfizer"); Sun Pharmaceutical Industries, Inc. ("Sun"); Taro Pharmaceuticals USA, Inc. ("Taro"); Erika Vogel-Baylor; John Wesolowski; and Wockhardt USA LLC ("Wockhardt").

1

*Second*, State Plaintiffs' attempts to inflate civil penalties and fines by multiple orders of magnitude by counting every dispensing of a drug at issue by a pharmacist as a "violation" of a state statute is wrong as a matter of law. Thirty-one State Plaintiffs seek to have the Court assess civil penalties and fines against Defendants under state laws that authorize civil penalties and fines for each "violation." The state statutes at issue permit civil penalties or fines only for a "violation," which is determined by examining the behavior of a defendant, not a non-party pharmacist. The dispensing of drugs by pharmacists (the events State Plaintiffs seek to count as "violations") were not "violations" of the relevant statutes. To the extent any "violation" occurred, which Defendants deny, civil penalties and fines must be calculated based on specific acts by Defendants, not other parties.

*Third*, a State may not regulate activity outside its borders, even if the extraterritorial activity has effects within the State. Yet, State Plaintiffs seek to impose civil penalties and fines against Defendants for acts taken wholly outside states whose laws are invoked. Such claims should be resolved against State Plaintiffs as a matter of law.

*Fourth*, claims for damages to the "general economy" asserted by California, Connecticut, Puerto Rico, and the U.S. Virgin Islands fail because (1) no cognizable legal claim exists for "general economy" damages under the laws of California, Puerto Rico, or the Virgin Islands, and (2) no evidence exists of damages to the "general economy" of Connecticut.

*Fifth*, State Plaintiffs lack antitrust standing for their monetary relief requests because their claims are too indirect, too speculative, and duplicative.

## SUMMARY JUDGMENT STANDARD

"A motion for summary judgment shall be granted 'if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law.'" *Gorss Motels, Inc. v. Eric Ryan Corp.*, 461 F. Supp. 3d 5, 10 (D. Conn. 2020) (quoting Fed. R.

Civ. P. 56(a)).  To defeat a summary judgment motion, the nonmoving party "must do more than simply show that there is some metaphysical doubt as to the material facts."  *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986).  Rather, it "must present specific evidence demonstrating a genuine dispute." *Gorss Motels*, 461 F. Supp. 3d at 10 (quoting *Gannon v. United Parcel Serv.*, 529 F. App'x 102, 103 (2d Cir. 2013)).  This same standard governs motions for summary judgment concerning a plaintiff's remedies.  *See, e.g., Davis v. Gap, Inc.*, 246 F.3d 152, 172 (2d Cir. 2001) (affirming summary judgment barring various damages); *Ehrlich v. Am. Airlines, Inc.*, 360 F.3d 366, 401 (2d Cir. 2004) (same); *Intimate Bookshop v. Barnes & Noble, Inc.*, No. 98 CIV. 5564 (WHP), 2003 WL 22251312, at *5, *10 (S.D.N.Y. Sept. 30, 2003) (granting summary judgment because plaintiff was unable to "show that it is entitled to either monetary damages or injunctive relief").

## I.    The Court Should Grant Summary Judgment on Disgorgement, Restitution, and Unjust Enrichment Because State Plaintiffs Have Adequate Remedies at Law

The MDL Court previously dismissed State Plaintiffs' claims for disgorgement and restitution under federal law.  *See In re Generic Pharms. Pricing Antitrust Litig.*, 605 F. Supp. 3d 672, 679 (E.D. Pa. 2022) ("The motion to dismiss will be granted to the extent that the States claim monetary disgorgement or restitution under § 16 of the Clayton Act.").  Most State Plaintiffs continue to seek equitable relief under state laws.[2] Compl. Prayer ¶¶ D ("Award to Plaintiff States disgorgement … and any other equitable relief … for violations of federal law or state antitrust

---

[2] The Amended Complaint includes a prayer for restitution for "States that seek it" and lists six State Plaintiffs with unjust enrichment claims—Kentucky, Minnesota, New Hampshire, New Mexico, Pennsylvania, and Utah.  Compl. ¶¶ 1914, 1948, 1981, 1990, 2062, 2090; Prayer ¶ G. However, it is unclear whether any State Plaintiff seeks restitution or unjust enrichment independent of disgorgement, which is itself "a form of restitution."  *In re Generic Pharms.*, 605 F. Supp. 3d at 676.  State Plaintiffs previously indicated that their restitution and unjust enrichment claims would be addressed in expert reports, but they have produced no report addressing those remedies. *See* Defs.' Statement of Material Fact ¶¶ 1-10 ("SMF").

and consumer protection laws"), ¶ G ("Award restitution to the Plaintiff States that seek it").  State Plaintiffs cannot meet their burden to prove that their legal remedies are inadequate.

Under the equitable-remedial-rights doctrine, "the traditional principles governing equitable remedies in federal courts, including the requisite inadequacy of legal remedies, apply when a party requests" equitable remedies under state law.  *Sonner v. Premier Nutrition Corp.*, 971 F.3d 834, 844 (9th Cir. 2020) (affirming dismissal of state-law restitution claims for failure to "establish that [plaintiff] lacks an adequate remedy at law" even though plaintiff did not seek damages); *see also Franklin v. Gwinnett Cnty. Pub. Sch.*, 503 U.S. 60, 75–76 (1992) (when "remedies are equitable in nature, . . . it is axiomatic that a court should determine the adequacy of a remedy in law before resorting to equitable relief"); *Perfect Fit Indus., Inc. v. Acme Quilting Co. Inc.*, 646 F.2d 800, 806 (2d Cir. 1981) ("State law does not govern the scope of the equity powers of the federal court; and this is so even when state law supplies the rule of decision.").

Applying this doctrine, courts routinely dismiss or grant summary judgment on state-law equitable claims when adequate legal remedies exist.  *See, e.g., Davis v. Angelcare USA, LLC*, No. 3:23-cv-119 (VAB), --- F. Supp. 3d ---, 2024 WL 1344666, at *40 (D. Conn. Mar. 29, 2024) (Bolden, J.) (dismissing equitable claims); *In re Am. Med. Collection Agency, Inc. Customer Data Sec. Breach Litig.*, Civ. No. 19-md-2904, 2023 WL 8540911, at *10 (D.N.J. May 5, 2023) (dismissing equitable claims); *Smallman v. MGM Resorts Int'l*, 638 F. Supp. 3d 1175, 1197–98 (D. Nev. 2022) (dismissing unjust enrichment claim); *In re Intel Corp.*, No. 3:18-md-2828-SI, 2021 WL 1198299, at *11 (D. Or. Mar. 29, 2021) (same); *Clark v. Eddie Bauer LLC*, No. C20-1106-JCC, 2021 WL 1222521, at *4 & n.1 (W.D. Wash. Apr. 1, 2021), *aff'd in relevant part*, 2024 WL 177755 (9th Cir. Jan. 17, 2024) (affirming dismissal of disgorgement and restitution claims); *Richmond v. Home Partners Holdings LLC*, No. 22-5704-DGE-RJB, 2024 WL 3276576, at *13

(W.D. Wash. 2024) (granting summary judgment on rescission, restitution, and disgorgement claims for failure to prove inadequate remedies at law).[3] Dismissal for failure to demonstrate inadequacy of legal remedies is warranted even if the state law authorizing equitable relief does not contain an express inadequate-remedy-at-law requirement. *Davis*, 2024 WL 1344666, at *40.

Federal courts have applied the equitable-remedial-rights doctrine to dismiss equitable claims under the laws of numerous State Plaintiffs seeking relief in this litigation, including Arizona, California, Colorado, Connecticut, Florida, Illinois, Kentucky, Maryland, Massachusetts, Michigan, Minnesota, Missouri, Montana, Nevada, New Jersey, New York, North Carolina, Oklahoma, Pennsylvania, South Carolina, South Dakota, Tennessee, Utah, Virginia, Washington, and Wisconsin. *See, e.g.*, *Davis*, 2024 WL 1344666 at *40; *In re ZF-TRW Airbag Control Units Products Liab. Litig.*, 601 F. Supp. 3d 625, 768–70 & n. 25 (C.D. Cal. 2022); *Clark v. Am. Honda Motor Co.*, 528 F. Supp. 3d 1108, 1113, 1121–22 (C.D. Cal. 2021).

Each State Plaintiff has the burden to "establish that [it] lacks an adequate remedy at law before securing equitable restitution for past harm." *Sonner*, 971 F.3d at 844; *see also Richmond v. Home Partners Holdings LLC*, No. 22-5704-DGE-RJB, 2024 WL 3276576, at *13 (W.D. Wash. 2024) (granting summary judgment on rescission, restitution, and disgorgement claims because plaintiff failed to prove inadequate remedies at law); *Clark v. Eddie Bauer LLC*, No. 21-35334, 2024 WL 177755, at *2 (9th Cir. Jan. 17, 2024) (affirming dismissal of disgorgement and restitution claims because "complaint contains no allegations as to why [a plaintiff] lacks an adequate remedy at law for her disgorgement and restitution claims").

Here, State Plaintiffs cannot establish that they lack an adequate remedy at law because they base their claims for disgorgement, restitution, and unjust enrichment on the same purported

---

[3] "[C]laims for 'unjust enrichment' are considered 'equitable' rather than 'legal' causes of action." *E.g. Blue Cross of Cal. v. SmithKline Beecham Clinical Lab'ys, Inc*., 108 F. Supp. 2d 116, 124 (D. Conn. 2000).

antitrust conspiracies for which they seek compensatory damages. *See* Compl. ¶¶ 1822–2123. For instance, they seek disgorgement of "the additional profits Defendants were able to collect as a result of" the purported conspiracy. SMF ¶ 17. But that is also what they seek to recover in damages on behalf of state agencies, consumers, and businesses that purchased or paid for generic pharmaceutical products at allegedly inflated prices. Specifically, State Plaintiffs seek as damages "the difference between the total dollars the end-payor actually reimbursed and the lower but-for total dollars the end-payor would have reimbursed absent the Challenged Conduct." Compl. ¶ 100. While Defendants do not believe State Plaintiffs are entitled to any recovery, success on these claims for legal damages would provide adequate compensatory relief.

That some State Plaintiffs chose not to seek damages does not matter. *See, e.g.*, *Sonner*, 971 F.3d at 844 (dismissal warranted even though plaintiff chose not to pursue legal remedies). In any event, nearly all State Plaintiffs seek at least one form of legal remedy, including civil penalties or fines. *See* Compl. ¶¶ 1822–2123; *see SEC v. Jarkesy*, 144 S. Ct. 2117, 2129 (2024) (civil penalties intended "to punish the defendant rather than to restore the victim . . . are legal rather than equitable" remedies).

Although State Plaintiffs summarily allege that they "do not have an adequate remedy at law" (Compl. ¶ 1611), that conclusory allegation lacks any factual support. Nothing in the Complaint "suggests that compensatory damages are necessarily inadequate or incomplete here, such as would justify seeking equitable" remedies. *See Adler v. Altsleep, LLC*, No. 2:22-cv-05854-JLS-KS, 2023 WL 3080757, at *7 (C.D. Cal. Feb. 7, 2023) (dismissing restitution and unjust enrichment claims). The Complaint contains only the one conclusory allegation quoted above and it is "a simple, formulaic recitation," *see id.*, which is inadequate to satisfy State Plaintiffs' burden, *see Sonner*, 971 F.3d at 844. Because State Plaintiffs have no evidence proving an inadequate

6

remedy at law, their conclusory allegation to the contrary does not create an issue of material fact. *See Richmond*, 2024 WL 3276576 at *13 (granting summary judgment on rescission, restitution, and disgorgement claims because plaintiffs failed to "establish that they lack an adequate remedy at law").

## II.    The Court Should Grant Summary Judgment on State Plaintiffs' <u>Request to Base Civil Penalties and Fines on the Number of Sales by Pharmacists</u>

Thirty-one of the 43 State Plaintiffs seeking civil penalties or fines propose calculating civil penalties and fines by multiplying (a) the number of prescriptions of each drug at issue filled and sold in a state by (b) the statutory civil penalty or fine amount. *See* SMF ¶¶ 14.[4]  The Court should grant summary judgment on any claim seeking to base civil penalties or fines on the number of prescriptions filled.

The statutes under which State Plaintiffs seek civil penalties or fines authorize them to seek such penalties or fines "for each violation" or similar language.  *See, e.g.,* Ariz. Unif. State Antitrust Act § 44-1407 ("for each violation"); Cal. Bus. & Prof. Code § 17206 ("for each violation"); Colo. Antitrust Act § 6-4-112(1) ("for each such violation").[5]  Thus, only a "violation"

---

[4] State Plaintiffs seeking a civil penalty or fine for each sale within the state are: Alaska, Arizona, California, Colorado, Connecticut, Florida, Idaho, Indiana, Kentucky, Massachusetts, Michigan, Minnesota, Mississippi, Missouri, Montana, Nebraska, Nevada, New Hampshire, New Jersey, New Mexico, North Carolina, North Dakota, Northern Mariana Islands, Pennsylvania, Puerto Rico, Rhode Island, South Carolina, Utah, Virginia, and the U.S. Virgin Islands.  SMF ¶ 12.

[5] *See also* Ala. Unfair Trade Pracs. Act § 45.50.578(b) ("against a person who violates"); Conn. Unfair Trade Pracs. Act § 42-110o(b) ("for each violation"); Fla. Stat. § 501.2075 ("for each such violation"); Idaho Competition Act § 48-108(d) ("per violation"); Ind. Code § 24-5-0.5-4(g) ("per violation"); Ky. Rev. Stat. § 367.110 ("per violation"); Mass. Gen. L. c. 93A, § 4 ("for each such violation"); Mich. Comp. Laws 445.777 ("for each violation"); *State by Humphrey v. Alpine Air Products, Inc.*, 490 N.W.2d 888, 896 (Minn. App. 1992) ("for each violation"), *aff'd* 500 N.W.2d 788 (Minn. 1993); Miss. Code Ann. §75-21-7 ("violating any of the provisions"); Mo. Rev. Stat. § 407.100(6) ("per violation"); Mont. Code Ann. § 30-14-142(2) ("for each violation"); Neb. Rev. Stat. § 59-1614 ("person who violates"); Nev. Deceptive Trade Pracs. Act § 598.0999(2) ("for each violation"); N.H. Consumer Prot. Act § 358-A(4) ("for each violation this chapter"); N.J.S.A. 56:9-10(c) ("for each and every day of said violation"); N.M. Stat. Ann. § 57-1-7 (person "who violates"); N.C. Unfair and Deceptive Trade Practices Act § 75-15.2 ("for each violation"); N.D.C.C. §51-08.1.-07 ("for each violation of this chapter"); 4 N. Mar. I. CMC § 5121 ("any person who violates any provision"); 73 Pa. Stat. Ann. and Cons. Stat. Ann. § 201-8(b) ("per violation"); R.I. Gen. Laws § 6-36-10(c) ("for each violation"); S.C. Code § 39-5-110(b) ("per violation"); Utah Code § 76-10-3108(2) ("for each

7

by a Defendant can count toward penalties, not downstream third-party actions like retail pharmacy sales, which were not actions taken by a Defendant and therefore do not constitute a violation of antitrust or consumer-protection statutes. The sale of a pharmaceutical product by a pharmacy occurred *after* any alleged violation of law by Defendants.

*In re Electronic Books Antitrust Litigation* is instructive. There, the court determined that "to the extent a statute mandates a penalty 'per violation,' [a defendant's] involvement in the price fixing conspiracy constitutes a single violation." *See, e.g.*, *In re Electronic Books Antitrust Litig.*, 11-MD-2293 (DLC), 2014 WL 2535112, at *3 (S.D.N.Y. June 5, 2014); *see also In re Electronic Books Antitrust Litigation*, 11-MD-2293 (DLC), 2013 WL 12212117, at *2 (S.D.N.Y. Sept. 25, 2013) ("To the extent that a state statute set forth in Appendix A mandates a penalty 'per violation,' Apple's conspiracy to engage in *per se* price fixing with Publisher Defendants shall be treated as a single violation."). In *Electronic Books*, twenty-six states sought "civil penalties under various state antitrust, consumer protection, and deceptive trade practice statutes" based on a conspiracy. 2014 WL 2535112 at *1. The court interpreted the "per violation" requirement of the various state laws to refer to the conspiracy and not some other type of event like a retail sale. *Id*. at *3. This Court should do likewise.

*Electronic Books* is not an outlier. State Plaintiffs have argued in other lawsuits that civil penalties and fines "per violation" should be based on the number of prescriptions filled by, or payments made to, pharmacists. Courts have repeatedly rejected State Plaintiffs' position.

For example, in *In re Mississippi Medicaid Pharmacy Average Wholesale Price Litigation*, the Mississippi Supreme Court held that fines "per violation" should be based on the violator's conduct—not on the number of inflated Medicaid payments to pharmacies. 1190 So.3d 829, 847

---

violation"); Va. Code § 59.1-9.11 ("for each willful or flagrant violation"); 11 V.I.C. § 1507(4) ("for the doing . . . of any act herein declared illegal").

(Miss. 2015); *see also State v. Minn. School of Bus., Inc.*, No. 27-CV-14-12558, 2017 WL 4220967 at *1, *3 (Minn. Dist. Ct. Jan. 4, 2017) (only violations of the statute should be counted "for each violation" fines, not each instance a student was affected by those violations).

Similarly, in *State v. Abbott Laboratories*, the Wisconsin Supreme Court rejected the state's proposed "theory that [the defendant] violated the Medicaid fraud statute every time the state overpaid for a drug on the basis of an inflated" price. 816 N.W.2d 145, 172 (Wis. 2012). As the court concluded, by the time the overcharges were incurred, "[a]ny fraudulent 'statements' had already been communicated and the alleged fraud was complete." *Id.* at 174. Thus, "[t]he number of times pharmacies were overpaid [was] merely a consequence of the alleged fraud, not the fraudulent conduct itself." *Id.* The court explained that to conclude that the state Medicaid fraud statute was violated "every time the state overpaid for a drug" would "fl[y] in the face of the statute's plain language." *Id.* at 173. Both *Mississippi Medicaid* and *Abbott* grounded their reasoning on *United States v. Bornstein*, 423 U.S. 303, 313 (1976), which held that penalties under the federal False Claims Act should be calculated based on the defendant's actions, not those of third parties.

The same reasoning applies here: Civil penalties should be based only on Defendants' alleged violations of the antitrust and consumer protection statutes—not on subsequent sales by third party pharmacies. State Plaintiffs' proposed calculations, which would count each retail sale as a violation for determining civil penalties and fines, conflicts with the text of the statutes and precedent. Any pharmacy-level overpayment was simply a downstream effect of Defendants' alleged conduct, not an independent "violation" by Defendants of a state statute.

### III.    The Dormant Commerce Clause Prohibits Imposing Civil Penalties and Fines Under Laws of States Where a Defendant Made No Sales

The dormant Commerce Clause "precludes the application of a state statute to commerce that takes place wholly outside of the State's borders, whether or not the commerce has effects within the State." *Edgar v. MITE Corp.,* 457 U.S. 624, 642–43 (1982) (Illinois takeover statute could not govern Delaware corporation's tender offer to shareholders throughout United States for Illinois's company stock).  Courts have therefore consistently held that state laws attempting to regulate out-of-state transactions solely due to downstream in-state effects are unconstitutional. *See, e.g.*, *Nat'l Shooting Sports Found. v. Bonta*, 718 F. Supp. 3d 1244, 1254–56 (S.D. Cal. 2024) (California statute creating a cause of action against manufacturers and retailers for out-of-state firearm sales that cause harm in California "plainly contravene[d] the dormant Commerce Clause" even though the "regulated 'commerce ha[d] effects within the state' of California"); *Amtec Int'l of N.Y. Corp. v. Polish Folklore Import Co.*, 20-CV-3 (LDH) (PK), 2023 WL 2734642, at *3 (E.D.N.Y. March 31, 2023) ("effort to prosecute Defendant for violation of" state alcohol distribution laws where sale of products occurred outside the state was prohibited because "the dormant Commerce Clause operates to preclude a state from regulating wholly extraterritorial commerce, even where the commerce may have effects within the state."); *Ass'n for Accessible Meds. v. Ellison*, 704 F. Supp. 3d 947, 953–54 (D. Minn. 2023) (statute that prohibited generic drug manufacturers from imposing "excessive increased price" outside the state violated dormant Commerce Clause).[6]

Despite this constitutional limitation, State Plaintiffs nevertheless seek to impose civil fines

---

[6] The Supreme Court issued a dormant Commerce Clause opinion in 2023, but the case did not involve a state law used to govern transactions outside the state.  *See National Pork v. Ross,* 598 U.S. 356 (2023).  Instead, the law "regulate[d] in-state actors who engage[d] in in-state conduct."  *See Ellison*, 704 F. Supp. 3d at 955-56.  Unlike in *National Pork*, State Plaintiffs here, like the state in *Ellison*, "attempt to impose liability on out-of-state actors for engaging in out-of-state conduct."  *Id.* at 955.  The constitutional bar on applying a state law to extraterritorial transactions remains.  *Id.* at 953; *see also Nat'l Shooting*, 718 F. Supp. 3d at 1256.

and penalties against Defendants based on extraterritorial sales.  *See* SMF ¶¶ 54-83.  Such enforcement is prohibited by the dormant Commerce Clause.  *See, e.g.*, *R.I. Truck Ctr., LLC v. Daimler Trucks N. Am., LLC*, 92 F.4th 330, 354 (1st Cir. 2024) (affirming summary judgment where enforcement would "have the effect of extraterritorially regulating conduct in [another state]").

Federal courts have repeatedly rejected efforts to enforce state laws against pharmaceutical manufacturers for out-of-state transactions.  *See, e.g.*, *Ass'n for Accessible Meds. v. Frosh*, 887 F.3d 664, 671–72 (4th Cir. 2018) (barring civil fines against pharmaceutical manufacturers for out-of-state sales); *In re Brand Name Prescription Drugs Antitrust Litig.*, 123 F.3d 599, 613 (7th Cir. 1997) (state antitrust law could not be enforced against pharmaceutical manufacturers for sales made out-of-state as it would "exceed[] the constitutional scope of the [state] antitrust law" because "[a] state cannot regulate sales that take place wholly outside it"); *Healthcare Distrib. All. v. Zucker*, 353 F. Supp. 3d 235, 261–65 (S.D.N.Y. 2018) (a statute "violates the Commerce Clause's prohibition on extraterritorial state legislation" where it subjects pharmaceutical manufacturers to civil fines if increased prices from out-of-state sales are passed on to in-state consumers), *rev'd on other grounds sub nom. Ass'n for Accessible Meds. v. James*, 974 F.3d 216 (2d Cir. 2020)[7]; *Pharm. Rsch & Mfrs. of Am. v. D.C.*, 406 F. Supp. 2d 56, 68 (D.D.C. 2005) (Commerce Clause precluded enforcement of D.C. statute for acts by pharmaceutical manufacturers to distributors outside D.C. that caused prices of drugs sold in D.C. to be "excessive"); *In re Lorazepam & Clorazepate Antitrust Litig.*, 295 F. Supp. 2d 30, 48 (D.D.C. 2003) ("Applying an Illinois statute to sales [of pharmaceuticals] that take place wholly outside the state, whether or not the commerce has an effect within the state, would violate the Commerce Clause.").  These cases confirm that states

---

[7] New York did not appeal the dormant Commerce Clause part of the district court's decision.  974 F.3d at 218.

may not penalize pharmaceutical companies that make out-of-state sales solely because they indirectly affect prices or sales within the state.

*Frosh* is particularly instructive.  There, the Fourth Circuit analyzed whether the Commerce Clause prohibited Maryland from imposing a civil fine on pharmaceutical manufacturers that sold generic drugs to distributors at "an 'unconscionable' price in the initial sale of a drug, which occur[red] outside Maryland's borders."  *Frosh*, 887 F.3d at 671–73.  The court explained that the generic pharmaceutical manufacturers at issue "typically s[old] their products to wholesale pharmaceutical distributors, none of which [were] based in Maryland."  *Id*. at 667 (emphasis omitted).  Because liability arose from sales made outside the state, Maryland "effectively s[ought] to compel manufacturers and wholesalers to act in accordance with Maryland law outside of Maryland.  This it cannot do."  *Id.* 671–72.

Similarly, the court in *Pharmaceutical Research* held that the dormant Commerce Clause barred the District of Columbia from enforcing a statute against pharmaceutical manufacturers that sold products to wholesalers and large retail chains out-of-state "that result[ed] in the prescription drug being sold in the District [of Columbia] for an excessive price."  406 F. Supp. 2d at 68 (emphasis omitted).  The dormant Commerce Clause prohibited the enforcement of that law because the drug manufacturers sold their products "in out-of-state transactions to wholesalers or large retail chains that maintain their own warehousing and retail distribution system[s]."  *Id*.  Even though liability was not triggered until a retail sale was made at an "excessive" price within the District of Columbia, using "an in-state hook to affect out-of-state conduct" is "an impermissible exercise of state power in violation of the Interstate Commerce Clause."  *Id*.  Because the D.C. statute "applied to sales between out-of-state [pharmaceutical] manufacturers . . . and other out-of-state entities," the statute had "a *per se* invalid extraterritorial reach in violation of the

Commerce Clause." *Id*. at 71.

Like the plaintiffs in *Frosh* and *Pharmaceutical Research*, State Plaintiffs seek to impose state civil penalties and fines to sales that Defendants made to distributors and large retail chains outside the states in violation of the dormant Commerce Clause. The chart below identifies, for those State Plaintiffs seeking civil penalties or fines, the states that State Plaintiffs have identified as being where Defendants acted to sell products allegedly as a part of conspiracies or where other evidence shows the states where the Defendants sold products that were allegedly part of conspiracies.

| **Defendant** | **States/Territories With Sales of Alleged Conspiracy Products**[1] | **States/Territories Where Claims Should be Dismissed** |
|---|---|---|
| **Actavis** (SMF ¶ 54) Ara Aprahamian Douglas Boothe Michael Perfetto | AZ; CA; CT; FL; ID; IL; IA; IN; KS; KY; ME; MD; MI; MN; MO; NE; NV; NJ; NY; NC; ND; OH; PA; PR; RI; SC; VT; VA; WA; WI | AK; CO; DE; MA; MS; MT; NH; NM; MP; OR; UT; VI; WV |
| **Amneal** (SMF ¶ 55) | CA; DE; FL; ID; IL; KY; MA; MI; MN; NJ; NY; OH; PA; RI; SC; VT; VA; WI; PR | AK; AZ; CO; CT; IA; IN; KS; MD; ME; MO; MS; MT; NC; ND; NE; NH; NM; NV; OR; UT; VI; MP; WA; WV |
| **Aurobindo** (SMF ¶¶ 56-57) James Grauso | AZ; CA; CO; FL; IL; IN; KA; MA; MI; MN; MO; NC; NJ; NY; OH; PA; RI; UT; VA; WA; WV | CT; DE; ID; IA; KS; KY; ME; MD; MS; MT; NE; NH; ND; NV; MP; OR; PR; SC; VI; VT; WI |
| **Bausch** (SMF ¶ 56) | CA; FL; ID; MI; MN; MO; NC; NJ; NY; ND; OH; PR; RI; WA | AK; AZ; CO; CT; DE; IL; IN; IA; KS; KY; ME; MD; MA; MS; MT; NE; NH; NM; NV; MP; OR; PA; SC; UT; VT; VA; WI; WV; VI |
| **Glenmark** (SMF ¶¶ 59-65) James Grauso Mitchell Blashinsky | AZ; CA; CO; FL; IL; IN; KY; ME; MI; MN; MO; NC; NJ; NV; NY; OH; PA; PR; RI; SC; VT; WI | AK; CT; DE; ID; IA; KS; MD; MA; MS; MT; ND; NE; NH; NM; OR; UT; VI; VA; WA; WV |
| **Greenstone** (SMF ¶ 66) | CA; CT; IL; IA; KY; ME; MD; MI; MN; MO; NJ; NY; NC; OH; PA; RI; SC; WI | AK; AZ; CO; DE; FL; ID; IN; KS; MA; MP; MS; MT; NE; NV; NH; NM; ND; OR; PR; UT; VI; VT; VA; WA; WV |

---

[1] Although Defendants include states in this column that have been identified by State Plaintiffs in answers to interrogatories for purposes of this motion, Defendants do not agree that the Defendant listed actually made sales into each state and reserve all rights to contest State Plaintiffs' interrogatory answers at trial.

| | | |
|---|---|---|
| **G&W**<br>(SMF ¶ 67)<br>Kurt Orlofski<br>Erika Vogel-Baylor<br>James Grauso | PA; RI; OH; IL; FL; MN; NJ; NY; MO; WI; MI | AK; AZ; CA; CO; CT; DE; ID; IN; IA; KS; KY; ME; MD; MA; MS; MT; MP; NE; NH; NV; NC; NM; ND; OR; PR; SC; UT; VT; VA; WA; WV; VI |
| **Lannett**<br>(SMF ¶ 68) | CA; FL; IL; KY; MI; MN; NC; NJ; NY; OH; PA; PR; SC | AK; AZ; CO; CT; DE; ID; IN; IA; KS; ME; MD; MA; MS; MO; MT; NE; NV; NH; NM; ND; OR; RI; UT; VT; VA; WA; WV; WI; MP; VI |
| **Lupin**<br>(SMF ¶ 69) | AZ; CA; CO; FL; IL; KY; MI; MN; MO; NJ; NY; NC; OH; PA; PR; RI; SC; VT; WI | AK; CT; DE; ID; IA; IN; KS; ME; MD; MA; MS; MT; ND; NE; NH; NM; NV; MP; OR; UT; VI; VA; WA; WV |
| **Mallinckrodt**[2]<br>(SMF ¶ 70)<br>Walter Kaczmarek | AZ; CA; FL; ID; IL; KY; MI; MN; MO; NC; NJ; NY; OH; OR; PA; PR; SC; VT; WI | AK; CO; CT; DE; IN; IA; KS; MA; MD; ME; MP; MS; MT; ND; NE; NH; NM; NV; RI; VI; UT; VA; WA; WV |
| **Mylan**<br>(SMF ¶¶ 71-75) | AK; AZ; CA; CO; CT; FL; IA; IL; IN; KY; MA; MD; MI; MN; MO; MS; NC; ND; NE; NH; NJ; NV; NY; OH; OR; PA; PR; SC; UT; VA; VT; WA; WI | ID; RI; DE; KS; ME; MT; NM; MP; WV |
| **Perrigo**<br>(SMF ¶ 76)<br>Douglas Boothe<br>John Wesolowski | AZ; CA; CO; FL; IL; KY; ME, MD; MA; MI; MN; MO; NE, NV; NJ; NY; NC; OH; PA; RI; WA; WI | AK; CT; DE; IA; ID; IN; KS; MS; MT; ND; NH; NM; MP; OR; PR; SC; VI; UT; VA; VT; WV |
| **Pfizer**<br>(SMF ¶ 77) | None | All states |
| **Sandoz/Fougera**<br>(SMF ¶ 78)<br>Walter Kaczmarek<br>Armando Kellum | AZ; CA; CT; FL; ID; IL; IA; KY; ME; MA; MI; MN; MS; MO; NE; NV; NJ; NY; NC; ND; OH; PA; PR; RI; SC; UT; VT; VA; WA; WI | AK; CO; DE; IN; KS; MD; MP; MT; NH; NM; OR; VI; WV |
| **Sun**<br>(SMF ¶¶ 79-80) | AZ; CA; CO; CT; FL; IL; IN; IA; KS; KY; ME; MD; MA; MI; MN; MS; MO; NE; NH; NJ; NM; NY; NC; ND; OH; OR; PA; PR; UT; VA; WA; WV; WI | AK; DE; ID; MT; NV; MP; RI; SC; VT; VI |

[2] In 2020; Mallinckrodt and certain of its affiliates filed for Chapter 11 reorganization in the United States Bankruptcy Court for the District of Delaware. In 2022, that court confirmed Mallinckrodt's Chapter 11 reorganization plan, discharging all claims against Mallinckrodt. *See In re Mallinckrodt; et al.*; No. 20-12522-JTD (Bankr. D. Del. Mar. 2; 2022), ECF No. 6660 ¶¶ 210-11. Claims against Mallinckrodt, including claims for monetary relief and remedies at issue in this motion, have therefore been discharged as a result of the Chapter 11 proceedings. *See id.* The bankruptcy discharge provides an independent basis for granting this motion as to Mallinckrodt. *See; e.g.*, *Windman v. Am. Book-Stratford Press; Inc.*, No. 89-cv-1037-CSH; 1989 WL 107275, at *1 (S.D.N.Y. Sept. 15; 1989); *In re AOG Entm't; Inc.*; Nos. 16-11090, 16-01074, 2016 Bankr. LEXIS 4514, at *35 (Bankr. S.D.N.Y. Dec. 30, 2016) ("The California Petition sought affirmative monetary relief in the nature of disgorgement and damages for breach of fiduciary duty; but those claims have been discharged under the Plan." (cleaned up)).

14

| **Taro**<br>(SMF ¶¶ 81-82)<br>Ara Aprahamian<br>Michael Perfetto<br>Mitchell<br>Blashinsky | AZ; CA; CO; CT; FL; ID; IL; IN;<br>IA; KS; KY; ME; MD; MA; MI;<br>MN; MS; MO; NE; NV; NH; NJ;<br>NM; NY; NC; ND; OH; OR; PA;<br>PR; RI; SC; UT; VT; VA; WA;<br>WI | AK; DE; ID; MT; MP; UT; WV; VI |
| **Wockhardt**<br>(SMF ¶ 83) | CA: FL; KY: MI; MN; MO; NC;<br>OH; PA; PR; NJ; NY; RI; WA | AK; AZ; CO; CT; DE; ID; IL; IN; IA;<br>KS; MD; ME; MA; MS; MT; NE; NV;<br>NM; NH; ND; MP; OR; SC; UT; VT;<br>VA; WV; WI; VI |

Although these products may later have been distributed to retail locations nationwide, the distribution was controlled by third parties—not Defendants. *See* SMF ¶¶ 33-34. Thus, State Plaintiffs' theory, which attempts to regulate Defendants' conduct based on third-party sales into the states, mirrors the extraterritorial reach that courts have repeatedly struck down. *See, e.g.*, *Frosh*, 887 F.3d at 671–72.

State Plaintiffs have suggested that Defendants' out-of-state actions are subject to in-state regulation because Defendants placed their drugs in the stream of commerce, ultimately leading to in-state sales. States have made this kind of argument previously, and courts have consistently rejected it. For instance, in *Ellison*, the Minnesota Attorney General argued that a Minnesota statute could be applied to extraterritorial action because "manufacturers know that their drugs will eventually be distributed in Minnesota." 704 F. Supp. 3d at 955.[8] The *Ellison* court rejected this argument, reasoning that it "[could] not find any support for the notion that the dormant Commerce Clause permits Minnesota to directly regulate a sale that occurs in another state simply because the product eventually makes its way into Minnesota." *Id*. at 954; *see also Association for Accessible Medicines v. Bonta*, No. 2:20-cv-01708-TLN-DB, 2022 WL 463313, at *3 (E.D. Cal. Feb. 15, 2022) (prohibiting enforcement of California statute because challenged conduct occurred

---

[8] The court explained that the generic manufacturers "sell most of their products in bulk via negotiated multi-drug contracts and do not control where the drugs are resold." *Ellison*, 704 F. Supp. 3d at 955.

outside the state even though the state argued the challenged conduct was "in connection with the sale of pharmaceutical products in California").  The *Ellison* court held that an out-of-state act does not "*acquire* a sufficient connection to [the state] when someone else (even someone far down the supply chain, acting outside of the control or knowledge of the manufacturer or the distributor to whom the manufacturer sold the drug) sells, dispenses, or delivers the drug to any consumer in [the state]." *Ellison*, 704 F. Supp. 3d at 953-54 (emphasis original); *see also Nat'l Shooting*, 718 F. Supp. 3d at 1256 (explaining that even where "it was reasonably foreseeable that" the product would be used in the state, the Commerce Clause prohibits the application of a state statute to sales that are wholly outside the state); *see also Midwest Title Loans, Inc. v. Mills*, 593 F.3d 660, 669 (7th Cir. 2010) (affirming injunction against enforcement of state's consumer credit code that prohibited loans made out-of-state at high interest rates to in-state consumers).

This prohibition applies even if Defendants are headquartered or otherwise do business in the state and the sales occur "'wholly outside of the State's borders, whether or not the commerce has effects within the State.'"  *See Rios v. Cabrera*, No. 3:10-CV-636, 2010 WL 5111411, at *3 (M.D. Pa. 2010) (denying leave to amend as futile to add a claim under the Pennsylvania Unfair Trade Practices and Consumer Protection Law for conduct occurring outside Pennsylvania) (quoting *Shaffer v. Heitner,* 433 U.S. 186, 197 (1977)); *see also Barnett v. Bank of Am., N.A.*, No. 3:20-cv-272-RJC-DSC, 2021 WL 2187950, at *6 (W.D.N.C. 2021) (granting summary judgment on North Carolina Debt Collection Act "because Plaintiff has not presented evidence upon which a reasonable jury could conclude that the actions in question occurred within North Carolina" even though the company's principal place of business was in the state).

The Court should grant summary judgment for each Defendant with respect to the claims for civil penalties or civil fines under the laws of the states identified in the chart above.

16

**IV.    The Due Process and Full Faith and Credit Clauses**
**Prohibit Imposing Civil Penalties and Fines Where**
**Defendants' Alleged Conspiratorial Conduct Occurred Outside the State**

To the extent State Plaintiffs seek civil penalties or fines under a state's laws where the alleged illegal agreement was formed outside the state's borders, the imposition would violate the Due Process Clause of the Fourteenth Amendment and Article IV's Full Faith and Credit Clause. *See Phillips Petroleum Co. v. Shutts*, 472 U.S. 797, 821 (1985) (a state may not regulate "a transaction with little or no relationship" to the state). Under the Due Process and Full Faith and Credit analysis, the focus is on whether evidence exists that the parties understood, when they entered an agreement that purportedly violates a state statute, that a particular state's law would apply. Here, the wrongful conduct alleged is that Defendants entered conspiratorial agreements to raise prices and allocate markets. Even if State Plaintiffs could prove those allegations (which they cannot), State Plaintiffs do not have evidence that Defendants understood that the laws of states other than the states where the alleged conspiratorial agreements were entered would apply. Under such circumstances, the Due Process and Full Faith and Credit Clauses do not permit the application of the laws of states other than those where the agreements were allegedly entered.

The Supreme Court has prescribed a two-step analysis to assess whether applying a state's law would violate these clauses. *First*, courts examine whether the law "conflicts in any material way with any other law which could apply." *Shutts*, 472 U.S. at 816. *Second*, they assess whether the state whose law is being invoked has "a 'significant contact or significant aggregation of contacts' to the claims asserted . . . to ensure that the choice of [that state's] law is not arbitrary or unfair." *Id*. at 821–22 (quoting *Allstate Ins. Co. v. Hague,* 449 U.S. 302, 312–13 (1981)). Material conflicts exist among the state laws being asserted by State Plaintiffs, and for most State Plaintiffs as identified below, applying their laws to the conduct alleged would be "sufficiently arbitrary and

17

unfair as to exceed constitutional limits" imposed by the Due Process and Full Faith and Credit Clauses, warranting summary judgment on the extraterritorial application of those laws.[9] *Id.*

### A.    State Laws Conflict

A material conflict exists if the potential liability for a defendant is materially larger under one state's law than another. *Shutts*, 472 U.S. at 816–18 (conflict existed where interest rate differences between states "amounted to millions of dollars in liability"); *see also Hernandez v. Off. of the Comm'r of Baseball*, No. 18-cv-9035 (JPO), 2019 WL 3034841, at *3 (S.D.N.Y. July 11, 2019) (conflict existed where punitive damages were available under one state's statute and not under another); *Hersh v. CKE Rest. Holdings, Inc.*, 571 F. Supp. 3d 1046, 1053 (E.D. Mo. 2021) (same), *aff'd sub nom. Estate of I.E.H. v. CKE Rest., Holdings, Inc.*, No. 22-1488, 2023 WL 2620251 (8th Cir. Mar. 24, 2023) (*per curiam*).

Here, potential civil penalties and fines vary greatly across the state laws on which State Plaintiffs base their claims. *See, e.g.*, Mo. Rev. Stat. § 407.100(6) ("not more than one thousand dollars per violation"); KY. Rev. Stat. § 367.638(4) ("not more than two thousand dollars ($2,000) per violation"); Cal. Bus. & Prof. Code § 17206 ("not to exceed two thousand five hundred dollars ($2,500) for each violation"); Conn. Gen. Stat. § 42-110o(b) ("not more than five thousand dollars for each violation"); Fla. Stat. § 501.2075 ("not more than one hundred fifty thousand dollars for each violation"); N.J.S.A. 56:8-13 ("not more than $20,000 for the second and each subsequent offense"); Iowa Code § 714.16(7) ("not to exceed forty thousand dollars per violation"); Idaho Code § 48-108(d) ("up to fifty thousand dollars ($50,000) per violation"); Va. Antitrust Act, Va. Code § 59.1-9.11 ("not more than $100,000 for each willful or flagrant violation"); Ariz. Rev. Stat. § 44-1407 ("not more than $150,000 for each violation"); Colo. Antitrust Act § 6-4-112(1) ("not

---

[9] At this time, Defendants are not asking the Court to determine the law to be applied at trial, but only asking that the Court rule on which laws could be applied consistent with the United States Constitution.

to exceed $250,000 for each such violation"); Utah Code § 76-10-3108(2) ("not more than $500,000 for each violation"); N.Y. Gen. Bus. Law. § 341 ("a fine of not exceeding one million dollars").  These differences amount to material conflicts.  *See, e.g., Shutts*, 472 U.S. at 816-18.

> ### B.    Most States Lack Any Contacts to the Asserted Conduct

As the Supreme Court has explained, only a state's "'significant contact or significant aggregation of contacts' to the claims asserted" ensures that the application of that state's law is "not arbitrary or unfair."  *Shutts*, 472 U.S. at 821–22.  "When considering fairness in this context, an important element is the expectation of the parties."  *Id.* at 822.  In *Shutts*, the Supreme Court ruled that it was unfair to apply Kansas law to acts outside Kansas because there was "no indication" that "the parties had any idea that Kansas law would control," making its application "sufficiently arbitrary and unfair as to exceed constitutional limits."  *Id.*; *see also Johannessohn v. Polaris Indus., Inc.*, 450 F. Supp. 3d 931, 963 (D. Minn. 2020) ("Given the dearth of evidence that the parties expected Minnesota law would apply to the nonresident Plaintiffs' claims against Polaris, Minnesota does not have contacts sufficient to create a state interest, and it would be arbitrary and fundamentally unfair to apply the [Minnesota Consumer Fraud Act] to such claims."); *Victorino v. FCA US LLC*, 326 F.R.D. 282, 297 (S.D. Cal. 2018) (plaintiffs failed to provide evidence required by Due Process Clause that defendant "could reasonably have expected California law to apply").

Where a defendant enters an agreement outside a state to supply products to a distributor, applying the law of an unrelated state raises due process concerns because "a party could lack notice that conduct committed in one state . . . could be the basis for a treble damage award" in another state.  *See New England Leather Co. v. Feuer Leather Corp.*, 942 F.2d 253, 257 (4th Cir. 1991).  In *Feuer Leather*, the Fourth Circuit explained that applying a North Carolina unfair-trade-practices statute would "raise[] constitutional concerns" because the relationship between the

distributor and supplier was "centered" in New York, making it irrelevant that "some of [the distributor's] dissatisfied customers were located in North Carolina." *Id.* at 254, 257. Even where a defendant sells products throughout the United States, "a court must focus on whether a state has a connection to the *specific* transaction or event giving rise to the litigation." *See Herrera v. Michelin North America, Inc*., Civil No. B–07–114, 2009 WL 700645, at \*12 (S.D. Tex. Mar. 16, 2009) (emphasis original) (applying Texas law to tire failure outside of Texas would violate Due Process Clause).

Here, State Plaintiffs have no evidence that Defendants had any expectation or indication that the laws of states beyond those where the alleged conspiratorial agreements were reached would govern their conduct, as required. *See Shutts*, 472 U.S. at 822. Further, most State Plaintiffs lack any connection to the specific transactions underlying their antitrust or consumer protection claims. The transactions involve alleged agreements among Defendants that supposedly constitute conspiracies for which State Plaintiffs seek civil penalties and fines. But as the chart below shows, any alleged conspiracies (assuming any occurred, which Defendants dispute) occurred only in a handful of states—not in every state whose antitrust or consumer-protection laws State Plaintiffs seek to enforce against Defendants. The Court should grant summary judgment on behalf of each Defendant based on the laws of any state other than the ones listed for that Defendant below.

| **Defendant** | **States where Defendant allegedly entered purported conspiracies** |
|---|---|
| **Actavis** (SMF ¶¶ 84-85) Ara Aprahamian Douglas Boothe Michael Perfetto | OH; FL; KY; NJ; NY; PA; WI |
| **Amneal** (SMF ¶¶ 86-98) | AZ; KY; MI; NC; NY; PA |
| **Aurobindo** (SMF ¶¶ 99-106) James Grauso | NJ; OH; NC |

| | |
|---|---|
| **Bausch**<br>(SMF ¶¶ 107-108) | NJ |
| **Glenmark**<br>(SMF ¶¶ 109-120)<br>James Grauso<br>Mitchell Blashinsky | NJ; MA; NY; OH |
| **Greenstone**<br>(SMF ¶ 121-122) | NJ |
| **G&W**<br>(SMF ¶¶ 123-126)<br>Kurt Orlofski<br>Erika Vogel-Baylor<br>James Grauso | NJ |
| **Lannett**<br>(SMF ¶¶ 127-138) | PA; NY; MD; NV |
| **Lupin**<br>(SMF ¶¶ 139-144) | NJ |
| **Mallinckrodt**<br>(SMF ¶¶ 145-149)<br>Walter Kaczmarek | AZ; MO |
| **Mylan**<br>(SMF ¶¶ 150-162) | AZ; NC; OH; PA; WV; KY; NJ; NY |
| **Perrigo**<br>(SMF ¶¶ 163-164)<br>Douglas Boothe<br>John Wesolowski | MI; NY; NJ; OH |
| **Pfizer**<br>(SMF ¶¶ 165-166) | NJ; NY |
| **Sandoz/Fougera**<br>(SMF ¶¶ 167-184)<br>Walter Kaczmarek<br>Armando Kellum | NY; NJ; PA; OH; TN; AZ |
| **Sun/Taro**<br>(SMF ¶¶ 185-203)<br>Ara Aprahamian<br>Michael Perfetto<br>Mitchell Blashinsky | NJ; NY |
| **Wockhardt**<br>(SMF ¶¶ 204-210) | NJ; OH; IL |

## V.    The Court Should Grant Summary Judgment on "General Economy" Damages

Four State Plaintiffs—California, Connecticut, Puerto Rico, and the Virgin Islands (SMF

¶ 19)—seek damages for purported harms to their "general economies," independent of damages

21

they seek on behalf of state agencies, individuals, or businesses.  However, "general economy"

damages are not recognized under the laws of California, Puerto Rico, or the Virgin Islands, and

no evidence supports such damages under Connecticut law.  Summary judgment on these claims

is, therefore, appropriate.

### A.    "General Economy" Damages are not Recognized by California, Puerto Rico, and the Virgin Islands

The statutes on which California, Puerto Rico, and the Virgin Islands base their claims do

not provide for damages to the "general economy."  California asserts claims under its Cartwright

Act, Cal. Bus. & Prof. Code § 16720 *et seq.*, and its Unfair Competition Law, Cal. Bus. & Prof.

Code § 17200 *et seq.*; Puerto Rico asserts claims under its antitrust laws, P.R. Laws. tit. 10, § 257

*et seq.*; and the Virgin Islands asserts claims under its Antimonopoly Law, V.I. Code tit. 11, §

1501 *et seq.*, and its Consumer Fraud and Deceptive Business Practices Act, V.I. Code tit. 12A, §

301 *et seq.  See* Compl. ¶¶ 2070–72, 2112–13, 2115–23.  While these statutes authorize certain

remedies, they do not provide for "general economy" damages, and no court has recognized such

damages as a remedy under those statutes.

### B.    No Evidence Exists of "General Economy" Damages Under Connecticut Law

The Connecticut antitrust statute, by contrast, does allow recovery of "general economy"

damages, but no evidence supports such damages in this case.  *See* Conn. Gen. Stat. § 35-32(c)

("The Attorney General may . . . bring an action . . . with respect to damages to the general

economy of the state.").  The type of "general economy" damages contemplated by section 35-

32(c) involves specific types of harm, such as "less funds to be available to circulate" or the

removal of "mon[ey] from the general economy [of the state] . . . that otherwise could have and

would have been used by . . . consumers" in Connecticut.  *See State v. Marsh & McLennan Cos*.,

944 A.2d 315, 328 (Conn. 2008).  State Plaintiffs, however, have no evidence that Defendants'

alleged conspiracies caused less funds to circulate in, or money to be removed from, Connecticut's economy.

### 1. Deadweight Loss Does Not Measure "General Economy" Damages Under Connecticut Law

State Plaintiffs rely on expert testimony from two experts who calculated an irrelevant economic measure called deadweight loss, which State Plaintiffs have labeled "general economy damages." SMF ¶ 20. Deadweight loss purports to measure "the purchases that would have been made if the price had been the competitive price . . . that is the number of sales that households, individuals, chose not to make because the price was higher than they were willing or able to pay." SMF ¶ 21, ¶ 22 ("we're talking about transactions that did not occur").

While deadweight loss is an established economic concept, it does not measure harm to a state's economy. The reason is simple: consumers who forgo purchases in response to price increases retain their money to use in other ways that benefit the economy. SMF ¶ 23.

For example, if a consumer chose not to buy a drug priced at $20 instead of its original $10, the $10 that the consumer did not spend on the drug (the deadweight loss) could be redirected to other local activities, such as dining at a local restaurant or buying a product made in the state. Those redirected expenditures would not result in "less funds to be available to circulate" or the removal of money "that otherwise could have and would have been used" by consumers in Connecticut, as the Connecticut Supreme Court has characterized "general economy" damages. *See Marsh*, 944 A.2d at 328. To the contrary, as Connecticut's expert admitted, these "forgone" transactions can increase the "funds available to circulate" in Connecticut, since a consumer who forgoes purchasing a drug that is manufactured by firms outside the state could use the savings to purchase goods made in Connecticut, which would benefit the state. *See* SMF ¶ 24.

According to Connecticut's expert, assessing whether Connecticut's economy suffered an injury because of its residents' alleged refusal to pay the purportedly increased prices for generic pharmaceutical products requires "a holistic analysis" of "where do the benefits go" and "what are the costs." SMF ¶ 25. State Plaintiffs have not done that analysis and have no evidence of how the purported deadweight loss funds were redirected. SMF ¶ 26. "[I]f the money [saved from not purchasing allegedly overcharged products] is spent on activities that are specific to and located within Connecticut," Connecticut would be in the same position absent the alleged conduct. SMF ¶ 27. Similarly, it would "be a benefit for Connecticut's economy compared to that Connecticut resident buying pharmaceuticals that were manufactured outside of the state" "if that Connecticut resident spent that ten dollars that had been saved by not buying products in this case because of the price increase and the[n] used that ten dollars to purchase products made in Connecticut." SMF ¶ 28. State Plaintiffs "have no information on" what "the Connecticut residents who refused to purchase the allegedly overcharged or improperly overpriced generic pharmaceutical products" did with the money they saved by not purchasing the products. SMF ¶ 29. As a result, State Plaintiffs have no evidence that the claimed misconduct caused "less funds" to circulate in Connecticut or any other state. *Id*. Therefore, summary judgment should be entered on Connecticut's claim for general economy damages. The same reasoning would apply to California, Puerto Rico, or the Virgin Islands if their state laws permitted the recovery of general economy damages.

### 2. Overcharges to Consumers Are Not "General Economy" Damages Under Connecticut Law

In addition to deadweight loss, Connecticut seeks to recover alleged overcharges paid by residents as further damages to the general economy, which Connecticut calls "consumer surplus."

SMF ¶ 30. However, Connecticut law does not permit recovery of such damages as general economy damages.

The Connecticut Antitrust Act prohibits the state from recovering "damages to the general economy of the state" where, as here, such damages are "duplicative of those recoverable" by the State as "*parens patriae* for persons residing in the state with respect to damages sustained by such persons." Conn. Gen. Stat. §35-32(c)(2). But that is precisely what Connecticut seeks to do.

Connecticut's general economy damages model includes "Consumer Surplus" damages, which are "overcharges that [Connecticut] consumers paid as a result of the purported antitrust violations in this case." SMF ¶ 31. Connecticut seeks to recover the same alleged overcharges on behalf of Connecticut residents as *parens patriae* damages. SMF ¶ 32. Connecticut's attempt to recover overcharges as both general economy damages and *parens patriae* damages is prohibited by statute. Conn. Gen. Stat. § 35-32(c)(2). Therefore, the Court should grant summary judgment on Connecticut's claims for damages to the general economy.

## VI.    State Plaintiffs Lack Antitrust Standing for Monetary Relief Under State Laws

State Plaintiffs lack antitrust standing to bring their state-law claims. "'To establish antitrust standing, a plaintiff must show . . . that [it] is a proper plaintiff in light of four efficient enforcer factors.'" *In re Platinum & Palladium Antitrust Litig.*, 61 F.4th 242, 258 (2d Cir. 2023) (quoting *Schwab Short-Term Bond Mkt. Fund v. Lloyds Banking Grp. PLC*, 22 F.4th 103, 115 (2d Cir. 2021)), *cert. denied sub nom. BASF Metals Ltd. v. KPFF Inv., Inc.*, 144 S. Ct. 681 (2024); *accord In re Am. Express Anti-Steering Rules Antitrust Litig.*, 19 F.4th 127, 138, 144 (2d Cir. 2021) (affirming dismissal of state and federal antitrust claims).[10] Those factors are:

---

[10] An antitrust plaintiff must also prove "antitrust injury," which "is necessary, but not always sufficient, to establish [antitrust] standing." *Gelboim v. Bank of Am. Corp.*, 823 F.3d 759, 778 (2d Cir. 2016) (quotation marks omitted). Defendants reserve the right to contest the presence of antitrust injury at trial.

(1) the directness or indirectness of the asserted injury;

(2) the existence of more direct victims or the existence of an identifiable class of persons whose self-interest would normally motivate them to vindicate the public interest in antitrust enforcement;

(3) the extent to which the claim is highly speculative; and

(4) the importance of avoiding either the risk of duplicate recoveries on the one hand, or the danger of complex apportionment of damages on the other.

*Platinum*, 61 F.4th at 259. "[T]he weight to be given the various factors will necessarily vary with the circumstances of particular cases." *Daniel v. Am. Bd. of Emergency Med.*, 428 F.3d 408, 443 (2d Cir. 2005). At its core, "[t]he efficient-enforcer test is an elaboration on the proximate cause requirement" set forth by the Supreme Court in *Associated General Contractors of California, Inc. v. California State Council of Carpenters* ("*AGC*"), 459 U.S. 519, 540-45 (1983), but the "inquiry remains, fundamentally, one into proximate cause." *Am. Express*, 19 F.4th at 134, 144; *see also Owens Corning v. R.J. Reynolds Tobacco Co.*, 868 So.2d 331, 337 (Miss. 2004) ("[T]he remoteness doctrine is nothing more than a context specific rule of proximate cause").[11]

Plaintiffs must satisfy the four factors listed above (the "*AGC* factors") for each of their claims, regardless of whether they are brought under federal or state law.[12] *See Am. Express*, 19 F.4th at 144 ("[T]he lack of proximate cause in this case means that the appellants cannot state a claim under the [California] Cartwright Act."); *Schwab*, 22 F.4th at 120 ("California law substantially incorporates the *AGC* factors"); *Gatt Commc'ns, Inc. v. PMC Assocs., L.L.C.*, 711 F.3d 68, 81 (2d Cir. 2013) ("We see no reason . . . to interpret the [New York] Donnelly Act

---

[11] State Plaintiffs, despite being sovereigns, must prove proximate cause just like any other plaintiff. *See, e.g.*, *In re Rezulin Prod. Liab. Litig.*, 524 F. Supp. 2d 436, 441–42 (S.D.N.Y. 2007) (dismissing *parens patriae* claims at summary judgment where state attorney general failed to adduce evidence sufficient to prove proximate cause).

[12] State Plaintiffs cannot circumvent antitrust standing by characterizing their state law antitrust claims as consumer protection or unfair competition claims. *See Am. Express*, 19 F.4th at 144 n.12 ("Because the UCL claim is predicated on violations of the Sherman and Cartwright Acts, we affirm the dismissal of that claim as well."); *In re Cattle and Beef Antitrust Litig.*, 687 F. Supp. 3d 828 (D. Minn. 2023) (dismissing 16 state law consumer protection claims for lack of antitrust standing).

differently than the Sherman Act with regard to antitrust standing."); *Southard v. Visa USA Inc.*, 734 N.W.2d 192, 199 (Iowa 2007) ("Considering the *AGC* factors, we hold the district court properly determined the plaintiff's injuries were too remote to be compensable under Iowa's competition law.").[13]    Plaintiffs must prove antitrust standing regardless of their requested remedies. *See Am. Express*, 19 F.4th at 143 n.10 ("Because the difference in remedies does not affect the proximate cause analysis, we hold that the appellants lack antitrust standing for the request for injunctive relief.").

As shown below, all four factors militate against finding antitrust standing in this case.

## A.    The Alleged Injuries to State Plaintiffs And Their Citizens Are Indirect

"The first efficient-enforcer factor asks whether the violation was a direct or remote cause of the injury.  This factor turns on familiar principles of proximate causation." *Am. Express*, 19 F.4th at 139 (citations and quotations omitted).  "In the context of antitrust standing, proximate cause generally follows the first-step rule," meaning "injuries that happen at the first step following the harmful behavior are considered proximately caused by that behavior." *Id.*  "The first-step rule and traditional proximate cause considerations require drawing a line between those whose injuries resulted from their direct transactions with [Defendants] and those whose injuries stemmed from their deals with third parties." *Schwab*, 22 F.4th at 116; *see also Paycom Billing Servs., Inc. v. Mastercard Int'l, Inc.*, 467 F.3d 283, 293 (2d Cir. 2006) (affirming dismissal of complaint because plaintiff's injury was too remote as it "flowed from the injuries" suffered by other parties); *Gatt*,

---

[13] Although Minnesota courts do not apply *AGC*, *see Lorix v. Crompton Corp.*, 736 N.W.2d 619, 629 (Minn. 2007), they do consider "proximate causation and directness," *Cattle & Beef*, 687 F. Supp. 3d at 841, and those principles dictate the same outcome in this case.  Authority supporting the application of *AGC* under every other state's law is set forth in Appendix A.  Even where a jurisdiction has not explicitly adopted the *AGC* framework, it is applicable because state law antitrust acts are to be construed consistent with the Sherman Act. *See, e.g.*, *Carefirst of Maryland, Inc. v. Johnson & Johnson*, No. 2:23-cv-629, 2024 WL 3858249, at *19 n.23 (E.D. Va. Aug. 16, 2024) ("presence of . . . harmonization provisions" in multiple state antitrust acts "persuade[d] the Court that the application of the *AGC* factors is appropriate").

711 F.3d at 78 ("Directness in the antitrust context means close in the chain of causation."). Failure to prove directness can alone be dispositive of antitrust standing.[14] *See Schwab*, 22 F.4th at 118 (in affirming dismissal of state antitrust claim, the court explained, "the first factor alone furnishes ample justification for affirming the district court").

In this case, all of State Plaintiffs' alleged injuries are multiple steps removed from Defendants' alleged conduct. *See* SMF ¶ 33. There is no evidence that State Plaintiffs (or any of the people or entities on whose behalf they seek relief) purchased product directly from any Defendant.[15] Indeed, the evidence establishes the opposite. *See, e.g.*, SMF ¶ 34. Because State Plaintiffs did not directly purchase generic drugs from manufacturers, any injuries they incurred "stemmed from their deals with third parties." *See Schwab*, 22 F.4th at 116. Those third parties— which for any particular transaction could include wholesalers, pharmacies, pharmacy benefit managers ("PBMs," another set of middlemen between Defendants and State Plaintiffs), and others—made independent pricing decisions that impacted the price State Plaintiffs paid for generic drugs and disrupted the chain of causation. The generics industry is characterized by individualized negotiations at the different levels of the distribution chain—manufacturers to direct purchasers, direct purchasers to pharmacies, PBMs to pharmacies, and PBMs to third-party payors.[16] Some direct purchasers from Defendants had long-term pricing contracts, price-

---

[14] This analysis applies even where states have so-called "*Illinois Brick* repealer statutes." *See Supreme Auto Transp., LLC v. Arcelor Mittal USA, Inc.*, 902 F.3d 735, 744 (7th Cir. 2018) ("It is one thing to say that a state is willing to allow someone other than a direct purchaser to have the opportunity to shoulder the burden of showing proximate causation; it is quite another thing to say that the state has thrown both the direct-purchaser rule *and* proximate causation out the window.").

[15] While Florida purports to be suing on assignment from one direct purchaser, *see* Compl. ¶ 1860, there is no evidence that Florida directly purchased generic drugs from any defendant.

[16] "Follow the Pill: Understanding the U.S. Commercial Pharmaceutical Supply Chain," The Henry J. Kaiser Family Foundation, March 2005, available at https://www.kff.org/wp-content/uploads/2013/01/follow-the-pill-understanding-the-u-s-commercial-pharmaceutical-supply-chain-report.pdf.

protection provisions, and similar mechanisms that enabled them to avoid or delay price increases. SMF ¶ 36.  Vertical integration among certain intermediaries in the relevant period enhanced their ability to exercise significant power over the price of drugs.[17]

The evidence shows that downstream resellers of drugs at issue made independent decisions to increase prices when the resellers' costs did not increase.  SMF ¶ 35.  For instance, various Plaintiff States have determined that PBMs caused increased prices.  New York concluded that PBMs used a mark-up practice called "spread pricing," which occurs when a PBM charges the payor a higher amount than the PBM reimburses the pharmacy for filling a prescription, "to profit off state Medicaid programs."  SMF ¶ 37.  Ohio determined that PBM spreads on generic drugs accounted for 31.4% of Ohio's Medicaid managed care organization's total spending on generic drugs between April 2017 and April 2018.  SMF ¶ 38.  Kentucky found that PBMs retained a spread of $123.5 million in 2018, representing 12.9% of the amount Kentucky's MCOs paid to PBMs for Medicaid beneficiaries.  SMF ¶ 39.  PBM spreads increased during the alleged conspiracy period.  SMF ¶ 40.  Spread pricing has been criticized by federal and state governments, including by some of the State Plaintiffs.  SMF ¶ 41.  Some State Plaintiffs have outlawed spread pricing.  *See, e.g.*, AR Code § 23-92-505(c) ("A pharmacy benefits manager is prohibited from conducting spread pricing in this state.").  State Plaintiffs' expert concedes that PBMs are not constrained to set spread pricing tied to manufacturer prices.  SMF ¶ 42.  "Such independent decisions snap the chain of causation linking Plaintiffs' injury to [Defendants' alleged] misconduct."  *Schwab*, 22 F.4th at 116.

---

[17] Pharmacy Benefit Managers:  The Powerful Middlemen Inflating Drug Costs and Squeezing Main Street Pharmacies, Interim Staff Report, July 2024, U.S. Federal Trade Commission office of Policy Planning, at p. 5.

**B.**     <u>Other Entities Are More Direct Purported Victims of the Alleged Conspiracy</u>

The second factor—"the existence of more direct victims of the alleged conspiracy"—also weighs heavily against antitrust standing. *AGC*, 459 U.S. at 545; *Schwab*, 22 F.4th at 118. "Implicit in the inquiry is recognition that not every victim of an antitrust violation needs to be compensated under the antitrust laws in order for the antitrust laws to be efficiently enforced." *Gelboim*, 823 F.3d at 779. Rather, "the key question is whether barring [plaintiffs'] suits is likely to leave a significant antitrust violation undetected or unremedied." *In re Aluminum Warehousing Antitrust Litig.*, No. 21-643, 2023 WL 7180648, at *2 (2d Cir. Nov. 1, 2023).

The Second Circuit has repeatedly held that antitrust standing is lacking when, as here, other more directly affected plaintiffs have filed claims arising out of the same alleged conduct. *See, e.g.*, *Am. Express*, 19 F.4th at 141 (no antitrust standing where "the merchants who . . . were harmed at the first step . . . have already sued Amex"); *Schwab*, 22 F.4th at 118 (the second factor "clearly weighs against antitrust standing since there is no shortage of other parties in this very case who purchased [the product at issue] directly from the [defendants]"); *Paycom*, 467 F.3d at 294 (no antitrust standing when other plaintiff "addressed the exact violation now asserted").

Here, there is no risk that granting summary judgment against State Plaintiffs for lack of antitrust standing would leave a significant antitrust violation undetected or unremedied. Until this case was remanded to this Court in April 2024, State Plaintiffs' claims were part of a multi-district litigation encompassing more than 80 complaints alleging that Defendants and other generic manufacturers conspired to fix prices, allocate markets, and rig bids for more than 400 generic drugs, including all the drugs at issue in the Complaint. *See generally Generic Pharms. Pricing Antitrust Litig.*, No. 16-MD-2724 (E.D. Pa.). Those complaints include claims brought by direct purchasers, which are—by definition—more direct victims of the conspiracies that Plaintiffs

30

allege.[18,19]  Because direct purchasers have sued for the same alleged conspiracies, the second

factor weighs against antitrust standing.  *See, e.g.*, *Am. Express*, 19 F.4th at 141 (no antitrust

standing where "the merchants who . . . were harmed at the first step . . . have already sued Amex").

Because the first two factors establish the absence of antitrust standing, State Plaintiffs lack

antitrust standing.  *See Platinum*, 61 F.4th at 261-63 (affirming dismissal for lack of antitrust

standing despite third and fourth *AGC* factors weighing in favor of standing); *Aluminum*

*Warehousing*, 2023 WL 7180648 at *3 ("the first two efficient enforcer factors are dispositive"

and declining to address the third and fourth factors).

### C.    State Plaintiffs' Claims for Damages Are Highly Speculative

Courts recognize that "highly speculative damages [are] a sign that a given plaintiff is an

inefficient engine of enforcement."  *Gelboim*, 823 F.3d at 779.  Here, State Plaintiffs claim

damages on behalf of various downstream purchasers of generic pharmaceuticals, including state

agencies, insurance plans, consumers, and businesses.  As explained in Section VI.A and VI.B

above, the prices paid by the downstream purchasers were determined by independent decisions

of numerous intermediaries who may or may not have passed-on price increases that were

allegedly instituted by Defendants.  The factfinder would, accordingly, need to account for those

independent decisions—which can and do vary across intermediaries and across time, affecting

different downstream purchasers differently at different times—to arrive at a reliable estimate of

---

[18] The MDL also includes claims brought by a putative class of independent pharmacies that allege they acquired drugs indirectly through drug wholesalers rather than directly from drug manufacturers.  *See In re Generic Pharms. Pricing Antitrust Litig.*, 394 F. Supp. 3d 509, 514 n.3 (E.D. Pa. 2019) (citing IRP Am. Overarching Compl. ¶¶ 12-16, *West Val Pharmacy v. Actavis Holdco U.S., Inc.*, No. 18-cv-2533 (E.D. Pa.)).  Although the IRP plaintiffs are indirect purchasers and may not have standing, they are more direct victims of the alleged conspiracy than State Plaintiffs.

[19] Although many claims in the MDL remain pending, direct purchasers have recouped over $390 million through court approved class settlements.  *See In re Generic Pharms. Pricing Antitrust Litig.*, No. 16-MD-2724, 2023 WL 2466622, at *3 (E.D. Pa. Mar. 9, 2023) (approving $85 million settlement with direct purchaser class); *In re Generic Pharms. Pricing Antitrust Litig.*, No. 16-MD-2724, 2024 WL 4508950, at *1 (E.D. Pa. Oct. 15, 2024) (approving settlements with direct purchaser class, totaling more than $44 million); MDL Dkt. No. 3020 (preliminarily approving $265,000,000 settlement with direct purchaser class).

damages. That is a challenging and highly speculative task, made more speculative here because State Plaintiffs' experts fail to account for the actions of these numerous intermediaries.[20] SMF ¶ 44a.

In *Schwab*, the Second Circuit found the plaintiffs' damages theory to be "highly speculative" because "it would have required the court to speculate about" the behavior of third parties and to "create an alternative universe based on multiple layers of speculation." 22 F.4th at 119 (cleaned up). The task in this case would be similar. It would require speculating about the behavior of third-party intermediaries and how those intermediaries affected the prices paid by downstream purchasers, including State Plaintiffs and the entities and people on whose behalf they bring *parens patriae* claims, for dozens of drugs over multiple years in the actual world and how those intermediaries would have affected prices paid in the but-for world (what the *Schwab* court called the "alternative universe") in which the alleged conduct by Defendants would not have occurred for dozens of drugs over multiple years. Thus, this factor weighs against finding antitrust standing.

### D.      The Monetary Relief Claims are Duplicative and Difficult to Apportion

"The fourth efficient-enforcer factor stresses the importance of 'avoiding either the risk of duplicate recoveries on the one hand, or the danger of complex apportionment of damages on the other.'" *Am. Express*, 19 F.4th at 142 (quoting *AGC*, 459 U.S. at 543-44). "This factor reflects an administrative concern: 'massive and complex damages litigation not only burdens the courts, but

---

[20] Defendants will serve renewed *Daubert* motions to preclude State Plaintiffs' experts' testimony on or before January 15, 2025, and those motions will be filed on the Court's docket on March 1, 2025, as required by this Court's Order (Dkt. 384). While their methodologies and opinions are unreliable and unhelpful to the trier of fact and should be excluded, even if their overcharge models are admissible, "[t]he derivate nature of Plaintiffs' injuries renders [their] potential recovery highly speculative," *IQ Dental Supply, Inc. v. Henry Schein, Inc.*, 924 F.3d 57, 67 (2d Cir. 2019) (concluding that "[n]o amount of expert testimony can adequately ameliorate the highly speculative nature of IQ's alleged losses"), and weighs against antitrust standing.

also undermines the effectiveness of treble-damages suits.'"  *Id.* (quoting *AGC*, 459 U.S. at 545).
The fourth factor guards against situations where either (1) "the damages to which the plaintiff
lays claim are exactly the same damages other parties could have claimed," *id.* (cleaned up), or
(2) plaintiffs' damages rely upon "pass-on theories that would require a court to divide damages
from the same violation among multiple plaintiffs," *Platinum*, 61 F.4th at 261.  Because both
concerns are present, the fourth factor also weighs against antitrust standing.

     *First*, State Plaintiffs' *parens patriae* claims are exact duplicates of claims being asserted
by putative class representatives in the MDL.  That is not in dispute.  In their motion for leave to
file an amended complaint in the Heritage and Teva actions, in which State Plaintiffs allege similar
conduct about different drugs, State Plaintiffs represented to this Court that California's allegations
concern "the *exact same* factual allegations" and "the *exact same* claims" as asserted in the EPP
Class Action Complaints.  *See* SMF ¶ 45. State Plaintiffs have repeatedly conceded that they have
no plan for alleviating the administrative burden that their duplicative damages claims would
inflict upon this Court and the MDL Court.  SMF ¶ 46.

     *Second*, State Plaintiffs' claims for proprietary damages all turn on "pass-on theories" that
would require this Court and the MDL Court "to divide damages from the same violation among
multiple plaintiffs."  *Platinum*, 61 F.4th at 261; *see also Am. Express*, 19 F.4th at 143 ("While the
fourth factor addresses a 'strong interest . . . in keeping the scope of complex antitrust trials within
judicially manageable limits,' the efficient-enforcer inquiry remains, fundamentally, one into
proximate cause.") (quoting *AGC*, 459 U.S. at 543); *Supreme Auto Transp.*, 902 F.3d at 744; SMF
¶ 44.  The uncertainty exists at multiple levels of the distribution chain.  For example, wholesalers
often do not pay WAC price; their payments are determined instead by various other factors such
as negotiated rebates or discounts and price-protection clauses with different intermediaries, which

would need to be factored into any downstream damages calculation. SMF ¶ 47. And, State Plaintiffs' own expert concedes that it is not possible to trace individual transactions through the complex supply chain. *See* SMF ¶ 48 ("we can't trace the pathway of a particular drug").

      **E.**    **State Plaintiffs Lack Antitrust Standing for Monetary Claims Arising From Increased Premiums Paid to MCOs**

State Plaintiffs' claims that they were injured by allegedly paying increased premiums to MCOs are too remote and therefore beyond the outer bounds of antitrust standing. *See, e.g.*, *Schwab*, 22 F.4th at 119 ("Though simple to articulate, Plaintiffs' damages theory would be difficult to apply because . . . Plaintiffs' theory would require the court to speculate about how the third-party sellers would have [behaved]."); *see also Am. Express*, 19 F.4th at 143 (four-factor *AGC* "inquiry remains, fundamentally, one into proximate cause").

State Plaintiffs' expert attempts to measure damages from the initial purported overcharge by Defendants that allegedly passed through to State Plaintiffs because of increased MCO premiums paid by Medicaid agencies. *See* SMF ¶ 49. According to the expert, the MCOs, which "charge the States a monthly premium to provide enrollees access to healthcare coverage, including prescription drugs," SMF ¶ 50, absorbed the alleged overcharge for prescription drugs and passed on at least 100% of that cost increase in premium calculations, *id.* Where a state contracted with an MCO to manage a Medicaid program, neither the state nor the Medicaid agency purchased the at-issue drugs acquired by that MCO. SMF ¶ 51. Instead, the MCO paid for and distributed the drugs, and then charged the state agency a per-member, per-month premium. SMF ¶ 52.

The premium payment on which State Plaintiffs seek to rely is therefore part of a distinct economic transaction that is separate from the purchase and sale of at-issue drugs. When a State Plaintiff contracts with MCOs to administer Medicaid drug programs, that decision removes the

State Plaintiff from the payment chain for any pharmaceuticals administered under the program. SMF ¶ 52a. State Plaintiffs instead pay per-member premiums to the MCOs, which manage the prescription drug benefits provided to Medicaid enrollees, reimburse pharmacies for prescriptions filled by Medicaid enrollees, and, alongside other entities such as PBMs, stand between the State Plaintiffs and the alleged conspirators in this matter.  These "capitated" premiums are not payments for specific drug purchases.  Instead, they are intended to cover the cost of providing *all* "covered services" to enrollees, including numerous branded and generic drugs not at issue here and other MCO costs unrelated to pharmaceuticals. SMF ¶ 52b. The purported injury to State Plaintiffs is based on premium-setting determined by the separate economic interaction between State Plaintiffs and their MCOs, transactions "over which [D]efendants had no control, in which [D]efendants had no input, and from which [D]efendants did not profit."  *In re Aluminum Warehousing Antitrust Litig.*, 520 F. Supp. 3d 455, 486-87, 497 (S.D.N.Y. 2021) (dismissing claims for want of antitrust standing where "independent decision[s] by non-defendant sellers . . . breaks the chain of causation between defendants' actions and plaintiffs' injury" such that the "alleged harms from paying an inflated [rate] . . . are most proximately attributable to the pricing decisions of third parties . . . , not to defendants' conduct").  Any purported harm in that situation is too speculative and too far-removed from the alleged conduct to support antitrust standing.  *Id.*

The temporal lag between when MCOs allegedly incurred overcharges and when they purportedly, as a result, would have increased premiums charged to State Medicaid agencies increases the remote nature of the alleged harm.  State Plaintiffs' expert Dr. Singer opines:

> To calculate the premium rates, actuaries rely on prior years' utilization data.  The prior years' data are considered "base data," as they form the basis for the premium rate calculation.  The year for which the rate is set is referred to as the "rating period."  Thus, an increase in a drug's price in *prior years* during the base period will be considered in the premium rate calculation for the rating period.

SMF ¶ 53.  Thus, Plaintiffs concede that MCOs did not respond to a pharmaceutical cost increase

with an immediate increase in premiums.  Instead, the MCO would have waited until the next

premium-setting period and then attempted to incorporate the impact of the increased costs into

future premiums charged to State Plaintiffs.  Consequently, in the period between a given alleged

price increase and the next MCO premium increase for an MCO that purchased drugs at issue,

those purchases could not directly impact premiums paid by Plaintiffs.  And, State Plaintiffs could

conceivably have rejected a proposed premium increase and turned to an alternative MCO—or

managed their Medicaid programs without an MCO, as some States did—such that the alleged

overcharge may not result in an increase in premiums paid by State Plaintiffs.[21]  Dr. Singer's theory

of MCO pass-through damages does nothing to account for these potential intervening decisions

or temporal lag and impermissibly "rests on multiple layers of speculation," *Am. Express*, 433 F.

Supp. 3d at 412 (finding lack of antitrust standing), *aff'd*, 19 F.4th 127 (2d Cir. 2021).[22]  State

Plaintiffs should therefore not be permitted to attain this form of relief.

## **CONCLUSION**

For the reasons stated, the Court should grant summary judgment on:  (1) State Plaintiffs'

equitable claims; (2) State Plaintiffs' attempt to inflate civil penalties and fines by counting each

pharmacy retail sale as a statutory "violation"; (3) State Plaintiffs' requests for civil penalties and

---

[21] *See* Medicaid and CHIP Payment and Access Commission, *Understanding Managed Care Procurement Practices Across States*, at 6, 8 (Apr. 8, 2022), https://www.macpac.gov/wp-content/uploads/2022/04/Understanding-Medicaid-Managed-Care-Procurement.pdf (stating "almost all states use competitive procurements to select MCOs" and noting that some states contract with even up to 25 MCOs).

[22] Courts in other contexts have held that "[c]alculations of damages based on insurance premium increases are inherently speculative" because "[i]t is very difficult to reasonably predict what insurance premiums will be, and even more difficult to isolate how much of a prospective increase is attributable to any one factor." *Metalizing Tech. Servs., LLC v. Berkshire Hathaway Specialty Ins. Co.*, 653 F. Supp. 3d 1241, 1267 (S.D. Fla. 2023) (rejecting premium-increase damages theory).  For reasons to be elucidated in a forthcoming *Daubert* motion, Dr. Singer has not reliably isolated the impact of the purported overcharge from other factors that may have influenced premiums.  If his opinions on this issue are excluded, Plaintiffs will have no evidence to support their theory of MCO pass-through damages.

fines under laws of states where the imposition of those penalties or fines would result in the extraterritorial application of those states' laws in violation of the United States Constitution; (4) claims for damages to the "general economy" asserted by California, Connecticut, Puerto Rico, and the U.S. Virgin Islands; and (5) the monetary claims under state laws.

Dated:  November 22, 2024

Respectfully submitted,

*/s/ Robin D. Adelstein* _____

Robin D. Adelstein
Mark A. Robertson
Kimberly Fetsick
Abigail Schwarz
NORTON ROSE FULBRIGHT US LLP
1301 Avenue of the Americas
New York, NY 10019-6022
Telephone: (212) 318-3000
Facsimile: (212) 408-5100
robin.adelstein@nortonrosefulbright.com
mark.robertson@nortonrosefulbright.com
kimberly.fetsick@nortonrosefulbright.com
abigail.schwarz@nortonrosefulbright.com

Mark Angland
NORTON ROSE FULBRIGHT US LLP
779 9th Street NW, Suite 1000
Washington, DC 20001
Telephone: (202) 662-0200
Facsimile: (202) 662-4643
mark.angland@nortonrosefulbright.com

Alex Cummings
Dewey Jude Gonsoulin, III
NORTON ROSE FULBRIGHT US LLP
1550 Lamar, Suite 2000
Houston, TX 77010
Telephone: (713) 651-5151
Facsimile: (713) 651-5246
alex.cummings@nortonrosefulbright.com
dewey.gonsoulin@nortonrosefulbright.com

Jeffrey J. Mirman
HINCKLEY, ALLEN, & SNYDER LLP
20 Church Street
Hartford, CT 06103
Telephone: (860) 725-6200
Facsimile: (860) 278-3802
jmirman@hinckleyallen.com

*Counsel for Defendants Bausch Health*
*Americas, Inc. and Bausch Health US LLC*

*/s/ Benjamin F. Holt* _____

Benjamin F. Holt
Adam K. Levin
Justin W. Bernick
HOGAN LOVELLS US LLP
555 Thirteenth Street, NW
Washington, D.C. 20004
Telephone: (202) 637-5600
benjamin.holt@hoganlovells.com
adam.levin@hoganlovells.com
justin.bernick@hoganlovells.com

Jasmeet K. Ahuja
HOGAN LOVELLS US LLP
1735 Market Street, 23rd Floor
Philadelphia, PA 19103
Telephone: (267) 675-4600
jasmeet.ahuja@hoganlovells.com

Kim E. Rinehart (ct24427)
WIGGIN AND DANA LLP
One Century Tower
265 Church Street
P.O. Box 1832
New Haven, CT 06508-1832
Tel: (203) 498-4400
Fax: (203) 782-2889
krinehart@wiggin.com

Robert M. Langer (ct06305)
WIGGIN AND DANA LLP
20 Church Street
Hartford, CT 06103
Tel: (860) 297-3700
Fax: (860) 525-9380
rlanger@wiggin.com

*Counsel for Defendants Mylan Inc. and Mylan*
*Pharmaceuticals Inc.*

*/s/ Dimitra Doufekias*
Dimitra Doufekias (phv207871)
Megan E. Gerking (phv207878)
Robert W. Manoso (phv207877)
MORRISON & FOERSTER LLP
2100 L Street, NW Suite 900
Washington, DC 20037
Tel.: (202) 887-1500
Fax: (202) 887-0763
ddoufekias@mofo.com
mgerking@mofo.com
rmanoso@mofo.com

Drew Alan Hillier (ct30252)
MORRISON & FOERSTER LLP
12531 High Bluff Drive
San Diego, CA 92130-2040
Phone: (858) 314-7711
Fax: (858) 720-5125
Email: dhillier@mofo.com

Michael B. Miller (phv207479)
MORRISON & FOERSTER LLP
250 W 55th Street
New York, NY 10019
Tel.: (212) 468-8000
Fax: (212) 468-7900
mbmiller@mofo.com

*Counsel for Defendant Glenmark
Pharmaceuticals Inc., USA*

*/s/ George G. Gordon*
George G. Gordon
Julia Chapman
Forrest E. Lovett
DECHERT LLP
2929 Arch Street
Philadelphia, PA 19104
Telephone: (215) 994-4000
Facsimile: (215) 994-4400
george.gordon@dechert.com
julia.chapman@dechert.com
forrest.lovett@dechert.com

Christie Boyden
DECHERT LLP
1900 K Street NW
Washington, DC.
Telephone: (202) 261-3300
Facsimile: (202) 261-3300
scott.proctor@dechert.com
christie.boyden@dechert.com

*Counsel for Defendant Lannett Company, Inc*

*/s/ Sheron Korpus*
Sheron Korpus
Seth A. Moskowitz
Seth Davis
KASOWITZ BENSON TORRES LLP
1633 Broadway
New York, New York 10019
Telephone: (212) 506-1700
skorpus@kasowitz.com
smoskowitz@kasowitz.com
sdavis@kasowitz.com

*Counsel for Defendants Actavis Elizabeth,*
*LLC, Actavis Holdco U.S., Inc., and*
*Actavis Pharma, Inc.*


*/s/ Robin P. Sumner*
Robin P. Sumner
Michael J. Hartman
Melissa O'Donnell
TROUTMAN PEPPER HAMILTON
SANDERS LLP
3000 Two Logan Square
Eighteenth and Arch Streets
Philadelphia, PA 19103-2799
Tel. (215) 981-4000
Fax. (215) 981-4750
robin.sumner@troutman.com
michael.hartman@troutman.com
melissa.odonnell@troutman.com

*/s/ Bennet J. Moskowitz*
Bennet J. Moskowitz
TROUTMAN PEPPER HAMILTON
SANDERS LLP
875 Third Avenue
New York, NY 10022
Tel. (212) 704-6087
Fax. (212) 704-8370
bennet.moskowitz@troutman.com

*Counsel for Defendants Amneal*
*Pharmaceuticals, Inc. and Amneal*
*Pharmaceuticals LLC*


*/s/ Whitney Cloud*
Whitney Cloud
Ilana H. Eisenstein
Ben C. Fabens-Lassen
DLA PIPER LLP (US)
1650 Market Street, Suite 5000
Philadelphia, PA 19103
Telephone: (215) 656-3300
whitney.cloud@dlapiper.com
ilana.eisenstein@dlapiper.com
ben.fabens-lassen@dlapiper.com

Carlton E. Wessel
DLA PIPER LLP (US)
500 Eighth Street, NW
Washington, DC 20004
Telephone: (202) 799-4000
carlton.wessel@us.dlapiper.com

James O. Craven
James I. Glasser
WIGGIN & DANA
One Century Tower
265 Church Street
New Haven, CT 06510
Telephone: 203-498-4361
jcraven@wiggin.com
jglasser@wiggin.com

*Counsel for Defendants Pfizer Inc. and*
*Greenstone LLC*

/s/ J. Clayton Everett, Jr.
J. Clayton Everett, Jr. (phv207964)
William S.D. Cravens (phv207968)
Molly R. Maidman (phv207966)
Y. Frank Ren (phv207981)
MORGAN, LEWIS & BOCKIUS LLP
1111 Pennsylvania Avenue, NW
Washington, DC 20004
Telephone: +1.202.739.3000
Facsimile: +1.202.739.3001
clay.everett@morganlewis.com
william.cravens@morganlewis.com
molly.maidman@morganlewis.com
frank.ren@morganlewis.com

Michael D. Blanchard
MORGAN, LEWIS & BOCKIUS LLP
One State Street
Hartford, CT 06103
Telephone: +1.860.240.2700
Facsimile: +1.860.240.2701
michael.blanchard@morganlewis.com

*Counsel for Defendant Perrigo New York, Inc.*

/s/ Clifford Katz
Clifford Katz
Damon W. Suden
Marisa Lorenzo
KELLEY DRYE WARREN LLP
3 World Trade Center
175 Greenwich Street
New York, NY 10007
Tel: (212) 808-7800
Fax: (212) 808-7897
ckatz@kelleydrye.com
dsuden@kelleydrye.com
mlorenzo@kelleydrye.com

*Counsel for Defendant Wockhardt USA LLC*

/s/ Nathan E. Denning
Nathan E. Denning
Chloe S. Booth
WIGGIN AND DANA LLP
437 Madison Avenue, 35th Floor
New York, NY 10022
Tel: (212) 551-2600
Fax (212) 551-2888
ndenning@wiggin.com
cbooth@wiggin.com

Benjamin H. Diessel
Ariela C. Anhalt
Emmett Gilles
WIGGIN AND DANA LLP
One Century Tower
265 Church Street
New Haven, CT 06510
Tel: (203) 498-4400
Fax: (203) 782-2889
bdiessel@wiggin.com
aanhalt@wiggin.com
egilles@wiggin.com

Christopher Bailes
WIGGIN AND DANA LLP
50 S. 16th Street, Suite 2925
Philadelphia, PA 19102
Tel: (215) 998-8318
Fax: (215) 988-8384
cbailes@wiggin.com

*Counsel for Defendant Aurobindo Pharma
USA, Inc.*

*/s/ Darrell Prescott*
Darrell Prescott
DARRELL PRESCOTT
LAW OFFICE P.C.
104 Charlton St., 1-W
New York, NY 10014
Tel: (917) 510-3165
Fax: (866) 233-5869
dp@darrellprescott.com

James D. Bailey
BAILEY DUQUETTE P.C.
104 Charlton St., 1-W
New York, NY 10014
Tel: (212) 658-1946
Fax: (866) 233-5869
james@baileyduquette.com

Stephan Matanovic
BAILEY DUQUETTE P.C.
21 S. 11th Street, 2nd Floor
Philadelphia, PA 19107
Tel: (215) 660-7600
Fax: (866) 233-5869
stephan@baileyduquette.com

*Counsel for Defendant G&W Laboratories, Inc.*

*/s/ Jane Willis*
Jane E. Willis (PHV25421)
Andrew J. O'Connor (PHV208240)
Phillip Z. Yao (PHV208241)
ROPES & GRAY LLP
800 Boylston Street
Boston, MA 02199-3600
Tel: (617) 951-7000
Fax: (617) 951-7050
jane.willis@ropesgray.com
andrew.oconnor@ropesgray.com
phillip.yao@ropesgray.com

*Counsel for Defendants Mallinckrodt Inc.,*
*Mallinckrodt LLC, and Mallinckrodt plc*

/s/ Colin R. Kass
Colin R. Kass
PROSKAUER ROSE LLP
1001 Pennsylvania Ave, NW
Suite 600 South
Washington, DC 20004
Telephone: (202) 416-6890
Facsimile: (202) 416-6899
ckass@proskauer.com

Bradley I. Ruskin
David A. Munkittrick
Adam Farbiarz
PROSKAUER ROSE LLP
Eleven Times Square
New York, New York 10036
Telephone: (212) 969-3000
Facsimile: (212) 969-2900
bruskin@proskauer.com
dmunkittrick@proskauer.com
afarbiarz@proskauer.com

Meg Slachetka
COMPETITION LAW PARTNERS
1101 Pennsylvania Avenue, NW
Washington, DC 20004
Telephone: (202) 742-4300
meg@competitionlawpartners.com

*Counsel for Defendant Lupin Pharmaceuticals, Inc.*

/s/ John M. Taladay
John M. Taladay
Christopher P. Wilson
JoAnna B. Adkisson
Michael A. Munoz
BAKER BOTTS LLP
700 K Street NW
Washington, DC 20004
Telephone: (202) 639-7700
Facsimile: (202) 639-7890
john.taladay@bakerbotts.com
christopher.wilson@bakerbotts.com
joanna.adkisson@bakerbotts.com
micahel.munoz@bakerbotts.com

Matthew M. Hilderbrand
BAKER BOTTS LLP
401 South 1st Street, Suite 1300
Austin, TX 78704
Telephone: (512) 322-2500
Facsimile: (512) 322-3613
matthew.hilderbrand@bakerbotts.com

Jennifer L. Morgan – ct21751
Marilyn B. Fagelson – ct17202
MURTHA CULLINA LLP
265 Church Street, 9th Floor
New Haven, CT 06510
Telephone: (203) 772-7700
Facsimile: (203) 772-7723
jmorgan@murthalaw.com
mfagelson@murthalaw.com

*Counsel for Defendants Sun Pharmaceutical Industries, Inc. and Taro Pharmaceuticals U.S.A., Inc.*

*/s/ Christopher Ondeck*
Christopher Ondeck
PROSKAUER ROSE LLP
1001 Pennsylvania Ave., NW
Suite 600 South
Washington, DC 20004
Tel: (202) 416-5865
Fax: (202) 416-6899
condeck@proskauer.com

Grant Esposito
David Fioccola
PROSKAUER ROSE LLP
Eleven Times Square
New York, NY 10036
Tel: (212) 969-3000
Fax: (212) 969-2900
gesposito@proskauer.com
dfioccola@proskauer.com

Thomas D. Goldberg
Jeffrey Mueller
DAY PITNEY LLP
Goodwin Square 225 Asylum Street
Hartford, CT 06103
Telephone: (860) 275-0164
Facsimile: (860) 881-2625

*Counsel for Defendants Sandoz Inc. and*
*Fougera Pharmaceuticals Inc.*

*/s/ Guy Petrillo*
Guy Petrillo
Christina Karam
PETRILLO KLEIN & BOXER LLP
655 Third Avenue, 22nd Floor
New York, NY 10017
212-370-0330

*Counsel for Defendant Douglas Boothe*

*/s/ G. Robert Gage, Jr.*
G. Robert Gage, Jr.
GAGE SPENCER & FLEMING LLP
410 Park Avenue
New York, NY 10022
Telephone: (212) 768-4900
grgage@gagespencer.com

Fabien M. Thayamballi
SHAPIRO ARATO BACH LLP
1140 Avenue of the Americas
17th Floor
New York, NY 10036
Tel. (212)-257-4891
fthayamballi@shapiroarato.com

*Counsel for Defendant Ara Aprahamian*

*/s/ Michael Weinstein*
Michael Weinstein
Michael C. Klauder
Jeffery M. Sauer
COLE SCHOTZ P.C.
Court Plaza North
25 Main Street
P.O. Box 800
Hackensack, NJ 07602
201-489-3000
201-489-1536  Facsimile
mweinstein@coleschotz.com
mklauder@coleschotz.com
jsauer@coleschotz.com

*Counsel for Defendant Walter Kaczmarek*

*/s/ Timothy J. Bergère*
Timothy J. Bergère (PA No. 39110)
ARMSTRONG TEASDALE LLP
One Commerce Square
2005 Market Street, 29th Floor
Philadelphia, PA 19103
Telephone: (267) 780-2000
Facsimile: (215) 405-9070
Email: tbergere@atllp.com

*Counsel for Defendant Kurt Orlofski*

/s/ Charles S. Leeper
Charles S. Leeper
Kenneth M. Vorrasi
Alison M. Agnew
FAEGRE DRINKER BIDDLE & REATH LLP
1500 K Street, NW, Suite 1100
Washington, DC 20005
Telephone: 202-842-8800
Facsimile: 202-842-8465
charles.leeper@faegredrinker.com
kenneth.vorrasi@faegredrinker.com
alison.agnew@faegredrinker.com

*Counsel for Defendant John Wesolowski*

/s/ Adam S. Lurie
Adam S. Lurie
LINKLATERS LLP
601 Thirteenth Street NW
Suite 400S
Washington, DC 20005
Telephone: (202) 654-9200
Facsimile: (202) 654-9210
adam.lurie@linklaters.com

Michael Pilcher
LINKLATERS LLP
1290 Avenue of the Americas
New York, New York, 10104
Telephone: (212) 903-9000
Facsimile: (212) 903-9100
michael.pilcher@linklaters.com

*Counsel for Defendant Michael Perfetto*

/s/ Erica S. Weisgerber
Erica S. Weisgerber
DEBEVOISE & PLIMPTON LLP
66 Hudson Boulevard
New York, NY 10001
Telephone: 212-909-6000
Facsimile: 212-909-6836
eweisgerber@debevoise.com

Edward D. Hassi
Leah S. Martin
DEBEVOISE & PLIMPTON LLP
801 Pennsylvania Avenue, N.W.
Washington, DC 20004
Telephone: 202-383-8000
Facsimile: 202-383-8118
thassi@debevoise.com
lmartin@debevoise.com

*Counsel for Defendant Armando Kellum*

/s/ Alexander R. Bilus
Alexander R. Bilus, Esquire
PA No. 203680
SAUL EWING LLP
Centre Square West
1500 Market Street, 38th Floor
Philadelphia, PA 19102-2186
Telephone: (215) 972-7177
alexander.bilus@saul.com

Allison L. Burdette, Esquire
PA No. 316695
SAUL EWING LLP
One PPG Place, Suite 3010
Pittsburgh, PA 15222
Telephone: (412) 209-2500
allison.burdette@saul.com

*Counsel for Defendant Erika Vogel-Baylor*

*/s/ Robert E. Connolly*
Robert E. Connolly
LAW OFFICE OF ROBERT E. CONNOLLY
1735 Market Street, Suite A, #469
Philadelphia, PA 19103
Telephone: (215) 219-4418
bob@reconnollylaw.com

*Counsel for Defendant James Grauso*

*/s/ Michelle N. Lipkowitz*
Michelle N. Lipkowitz
MINTZ, LEVIN, COHN, FERRIS,
GLOVSKY AND POPEO, P.C.
555 12th Street NW, Suite 1100
Washington, DC 20004
Telephone: (202) 434-7448
MNLipkowitz@mintz.com

*Counsel for Defendant Mitchell Blashinsky*