# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF CONNECTICUT

THE STATE OF CONNECTICUT, *et al.*,

*Plaintiffs*,

v.

SANDOZ, INC., *et al.*,

*Defendants.*

Case No. 3:20-cv-00802-MPS

February 20, 2025

**STATE PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT ON STATE LAW EQUITABLE CLAIMS, CIVIL PENALTIES AND FINES, EXTRATERRITORIAL ENFORCEMENT OF STATE LAW, GENERAL ECONOMY DAMAGES, AND STATE ANTITRUST CLAIMS**

# TABLE OF CONTENTS

**Page**

INTRODUCTION ..................................................................................................... 1

STATEMENT OF FACTS ........................................................................................ 1

    I.      The Alleged Conspiracy ......................................................................... 1

    II.     Defendants' Profits from the Alleged Conspiracy ................................... 2

    III.    Overcharges Were Passed Through, Resulting in Damages to State
           Plaintiffs Claiming Such. ....................................................................... 2

ARGUMENT .......................................................................................................... 4

    I.      Antitrust Standing Analysis is Inapplicable to State Attorneys General,
          But All States Satisfy It Regardless ........................................................ 4

          A.     *AGC* Applies to Private Plaintiffs, Not Public Enforcers ............. 4

          B.     Antitrust Standing Analysis Must Align with the Remedies
                Sought and the Specific Laws that Authorize Them ...................... 6

          C.     State Plaintiffs Have Antitrust Standing to Seek Disgorgement,
                Restitution, and Civil Penalties .................................................... 7

          D.     All States and Territories Seeking Damages Have *Illinois Brick*
                Repealers ..................................................................................... 9

          E.     State Plaintiffs Satisfy Any Relevant *AGC* Factors for Damages 10

                1.    State Plaintiffs' Injuries Are of the Type the Antitrust
                        Laws Are Meant to Prevent ............................................ 10

                2.    State Plaintiffs' Injuries Are Direct and Foreseeable ...... 11

          F.     State Plaintiffs Are Motivated Enforcers ..................................... 14

           G.     State Plaintiffs' Damages Are Grounded in Economic Evidence 15

          H.     Damages Are Neither Duplicative nor Difficult to Apportion .... 16

    II.     State Laws Provide State Attorneys General with Broad and Flexible
          Remedies for Violation of State Antitrust and Consumer Protection Laws.
          ................................................................................................................. 18

          A.     The States' Damages and Penalties Claims Are Not Adequate
                Remedies Displacing Disgorgement or Restitution ..................... 18

          B.     Determining Civil Penalties and Fines on the Number of Sales by
                Pharmacists Is Permitted and, Regardless, is Premature Prior to a
                Merits Finding ........................................................................... 21

                1.    The Little FTC Acts Broadly Prohibit Unfair and
                        Deceptive Business Acts, and Awarding Penalties Per Sale
                        of Price-Fixed Drug is Appropriate ............................... 22

                2.    Calculating Penalties for Any State Statute is Premature 25

          C.     Certain States and Territories May Recover Deadweight Loss ... 26

**TABLE OF CONTENTS**
**(continued)**

**Page**

1. Defendants Misconstrue California's and the Virgin Islands' Claims...................................................26

2. Deadweight Loss is an Appropriate Measure of Damages in Suits by Attorneys General ............................27

3. Offsetting "Benefits" to Consumers Resulting from Defendants' Anticompetitive Conduct Is Inappropriate..29

4. Deadweight Losses Are Non-Duplicative General Economy Damages ........................................31

5. Connecticut's Remaining General Economy Damages are Non-Duplicative.............................................31

III. The Challenged Applications of State Antitrust Laws Do Not Violate the Constitution..............................................................32

    A. The Dormant Commerce Clause Allows State Laws Forbidding Antitrust Conspiracies That Cause Significant Harm to their Residents ......................................................34

    B. The Full Faith and Credit Clause Does Not Bar States from Obtaining Penalties for Sales Occurring in Their State. .............37

Conclusion .....................................................................40

# TABLE OF AUTHORITIES

**Page**

CASES

*Am. Ad Mgmt., Inc. v. General Tel. Co. of Cal.*
190 F.3d 1051 (9th Cir. 1999) ....................................................................10

*Apple Inc. v. Pepper*
139 S. Ct. 1514 (2019)................................................................................13

*Arcell v. Google LLC*
2024 WL 3738422 (N.D. Cal. Aug. 9, 2024) ...............................................5

*Ass'n for Accessible Meds. v. Bonta*
2025 U.S. Dist. LEXIS 26470 (E.D. Cal. Feb. 13, 2025)............................36

*Ass'n for Accessible Meds. v. Ellison*
704 F. Supp. 3d 947 (D. Minn. 2023)..........................................................36

*Ass'n for Accessible Meds. v. Frosh*
887 F.3d 664 (4th Cir. 2018) ......................................................................36

*Associated General Contractors of California, Inc. v. California State Council of Carpenters*
459 U.S. 519 (1983)............................................................................ *passim*

*Baldwin v. G.A.F. Seelig, Inc.*
294 U.S. 511 (1935)..............................................................................35, 36

*Bd. of Regents of University of Oklahoma v. Nat'l Collegiate Athletic Ass'n*
707 F.2d 1147 (10th Cir. 1983) ..................................................................28

*Brown v. Stanton*
617 F.2d 1224 (7th Cir.1980) .....................................................................19

*Brown-Forman Distillers Corp. v. New York State Liquor Auth.*
476 U.S. 573 (1986)....................................................................................35

*California v. ARC Am. Corp.*
490 U.S. 93 (1989)..........................................................................5, 16, 33

*Carefirst of Maryland, Inc. v. Johnson & Johnson*
2024 WL 3858249 (E.D. Va. 2024).............................................................9

# TABLE OF AUTHORITIES
## (continued)

Page

*Cargill, Inc. v. Monfort of Colo., Inc.*
479 U.S. 104 (1986) ................................................................................6, 10

*Clayworth v. Pfizer, Inc.*
49 Cal. 4th 758 (2010) ..................................................................................27

*Comes v. Microsoft Corp.*
646 N.W.2d 440 (Iowa 2002) .......................................................................17

*Connecticut v. Sandoz*
2024 WL 4753308 (D. Conn. Nov. 12, 2024) ................................................8

*Daniel v. Am. Bd. of Emergency Med.*
428 F.3d 408 (2d Cir. 2005).................................................................6, 7, 14

*DIRECTV, LLC v. Nexstar Media Grp., Inc.*
724 F. Supp. 3d 268 (S.D.N.Y. 2024).........................................................10

*Edgar v. MITE Corp.*
457 U.S. 624 (1982)......................................................................................36

*Elgindy v. AGA Service Co.*
2021 WL 1176535 (N.D. Cal. 2021) ............................................................21

*Exxon Corp. v. Maryland*
437 U.S. 117 (1978).......................................................................................33

*Freeman Indus., LLC v. Eastman Chem. Co.*
172 S.W.3d 512 (Tenn. 2005)........................................................................17

*Gatt Commc'ns, Inc. v. PMC Assocs., L.L.C.*
711 F.3d 68 (2d Cir. 2013)..............................................................................5

*Gov't of United States Virgin Islands v. Takata Corp.*
67 V.I. 316 (V.I. Super. 2017) .......................................................................22

*Hanover Shoe, Inc. v. United Shoe Mach. Corp.*
392 U.S. 481 (1968)......................................................................................30

*Healy v. Beer Inst.*
491 U.S. 324 (1989)......................................................................................35

**TABLE OF AUTHORITIES**
**(continued)**

Page

*Herrera v. Michelin N. Am., Inc.*
   2009 WL 700645 (S.D. Tex. Mar. 16, 2009)...................................................39

*Houston Cmty. Coll. Sys. v. Wilson*
   595 U.S. 468 (2022)........................................................................................34

*Iadanza v. Mather*
   820 F. Supp. 1371 (D. Utah 1993)..................................................................22

*In re Actos End–Payor Antitrust Litig.*
   848 F.3d 89 (2d Cir. 2017)..............................................................................13

*In re Aluminum Warehousing Antitrust Litig.,*
   2023 WL 7180648 (2d Cir. Nov. 1, 2023)......................................................14

*In re Am. Express Anti-Steering Rules Antitrust Litig.*
   19 F.4th 127 (2d Cir. 2021) .......................................................................5, 14

*In re Brand Name Prescription Drugs Antitrust Litig.*
   123 F.3d 599 (7th Cir. 1997) ..........................................................................33

*In re Broiler Chicken Antitrust Litig.*
   290 F. Supp. 3d 772 (N.D. Ill. 2017) ...............................................................9

*In re Capacitors Antitrust Litig.*
   154 F. Supp. 3d 918 (N.D. Cal. 2015) ............................................................12

*In re Delta/AirTran Baggage Fee Antitrust Litig.*
   317 F.R.D. 675 (N.D. Ga. 2016)......................................................................30

*In re Disposable Contact Lens Antitrust*
   329 F.R.D. 336 (M.D. Fla. 2018)......................................................................11

*In re Domestic Drywall Antitrust Litig.*
   2020 WL 1695434 (E.D. Pa. 2020) .................................................................30

*In re Elec. Books Antitrust Litig.*
   2013 WL 12212117 (S.D.N.Y. 2013)..........................................................23, 25

*In re Elec. Books Antitrust Litig.*
   2014 WL 2535112 (S.D.N.Y. 2014).................................................................20

# TABLE OF AUTHORITIES
## (continued)

Page

*In re Foreign Exch. Benchmark Rates Antitrust Litig.*
2016 WL 5108131 (S.D.N.Y. Sept. 20, 2016).................................................................11

*In re Foreign Exch. Benchmark Rates Antitrust Litig.*
74 F. Supp. 3d 581 (S.D.N.Y. 2015)..............................................................................11

*In re Lithium Ion Batteries Antitrust Litig.*
2014 WL 4955377 (N.D. Cal. Oct. 2, 2014)............................................................12, 17

*In re Mississippi Medicaid Pharm. Average Wholesale Price Litig.*
190 So.3d 829 (Miss. 2015).......................................................................................24, 25

*In re NASDAQ Market–Makers Antitrust Litig.*
169 F.R.D. 493 (S.D.N.Y. 1996) ....................................................................................18

*In re Publ'n Paper Antitrust Litig.*
690 F.3d 51 (2d Cir. 2012)..............................................................................................12

*In re Suboxone Antitrust Litig.*
64 F. Supp. 3d 665 (E.D. Pa. 2014) ...................................................................9, 11, 15

*In re TFT-LCD (Flat Panel) Antitrust Litig.*
586 F. Supp. 2d 1109 (N.D. Cal. 2008) ...................................................................9, 12

*IQ Dental Supply, Inc. v. Henry Schein, Inc.*
924 F.3d 57 (2d Cir. 2019)...............................................................................14, 15, 16

*Johannessohn v. Polaris Indus., Inc.*
450 F. Supp. 3d 931 (D. Minn. 2020)............................................................................38

*Kansas v. Nebraska*
574 U.S. 445 (2015)........................................................................................................20

*LaChance v. U.S. Smokeless Tobacco Co.*
931 A.2d 571 (N.H. 2007) ..............................................................................................22

*Leopold v. Baccarat, Inc.*
239 F.3d 243 (2d Cir. 2001)............................................................................................30

*Lexmark Int'l, Inc. v. Static Control Components, Inc.*
572 U.S. 118 (2014)........................................................................................................16

**TABLE OF AUTHORITIES**
(continued)

Page

*Loeb Indus., Inc. v. Sumitomo Corp.*
306 F.3d 469 (7th Cir. 2002) .......................................................................18

*Lorix v. Crompton Corp.*
736 N.W.2d 619 (Minn. 2007)......................................................................14

*Ly v. Nystrom*
615 N.W.2d 302 (Minn. 2000).......................................................................22

*Marsteller v. Butterfield 8 Stamford LLC*
2017 WL 5769903 (D. Conn. Nov. 27, 2017) ...............................................32

*Maryland v. Louisiana*
451 U.S. 725 (1981).......................................................................................18

*Montreal Trading, Ltd. v. Amax, Inc.*
661 F.2d 864 (10th Cir. 1981) .......................................................................28

*Mr. Dee's Inc. v. Inmar, Inc.*
2022 WL 3576962 (M.D.N.C. Aug. 19, 2022)...............................................30

*Nationwide Biweekly Admin., Inc. v. Superior Court of Alameda Cnty.*
9 Cal.5th 279 (2020) ......................................................................................20

*New England Leather Co. v. Feuer Leather Corp.*
942 F.2d 253 (4th Cir. 1991) .........................................................................39

*Office of the Atty. Gen., State of Florida, Dept. of Legal Affairs v. Top Movers Inc*
2022 WL 22784348 (Fla. Cir. Ct. May 20, 2022) .........................................23

*Oliver v. Am. Express Co.*
2024 WL 100848 (E.D.N.Y. Jan. 9, 2024) ....................................................18

*Paycom Billing Servs., Inc. v. Mastercard Int'l, Inc.*
467 F.3d 283 (2d Cir. 2006)............................................................................5

*People ex rel. Kennedy v. Beaumont Inv., Ltd.*
111 Cal. App. 4th 102 (2003) ..................................................................22, 25

*People v. Ashford University, LLC*
319 Cal. Rptr. 3d 132 (Cal. 2024)...................................................................7

**TABLE OF AUTHORITIES**
(continued)

Page

*People v. Nat'l Ass'n of Realtors*
  155 Cal. App. 3d 578 (Cal. Ct. App. 1984) ............................................................22, 23

*People v. Pac. Land Rsch. Co.*
  20 Cal. 3d 10 (1977) ..................................................................................................19

*People v. Superior Ct. (Olson)*
  96 Cal. App. 3d 181 (Ct. App. 1979).........................................................................23

*Pharm. Rsch. & Mfrs. of Am. v. District of Columbia*
  406 F. Supp. 2d 56 (D.D.C. 2005) ............................................................................36

*Phillips Petroleum Co. v. Shutts*
  472 U.S. 797 (1985)..............................................................................................37, 38

*Pike v. Bruce Church, Inc.*
  397 U.S. 137 (1970)....................................................................................................35

*Port Dock & Stone Corp. v. Oldcastle Northeast, Inc.*
  507 F.3d 117 (2d Cir. 2007)..........................................................................................5

*Porter v. Warner Holding Co.*
  328 U.S. 395 (1946)....................................................................................................19

*R.J. Reynolds Tobacco Co. v. Eighth Jud. Dist. Ct. in and for County of
  Clark*
  138 Nev. 585 (Nev. 2022)...........................................................................................22

*Redwood Theatres, Inc. v. Festival Enter., Inc.*
  908 F.2d 477 (9th Cir. 1990) ................................................................................34, 35

*Schaghticoke Tribal Nation v. Kempthorne*
  587 F. Supp. 2d 389 (D.Conn. 2008).........................................................................40

*Schwab Short-Term Bond Mkt. Fund v. Lloyds Banking Grp. PLC*
  22 F.4th 103 (2d Cir. 2021) ........................................................................4, 14, 15, 16

*SEC v. First City Financial Corp. (First City)*
  890 F.2d 1215 (D.C. Cir. 1989)................................................................................7, 8

*SEC v. Fischbach Corp.*
  133 F.3d 170 (2d Cir. 1997)......................................................................................7, 19

**TABLE OF AUTHORITIES**
(continued)

Page

*SEC v. Teo* (*Teo*)
    746 F.3d 90 (3d Cir. 2014)............................................................................7, 8

*Sonner v. Premier Nutrition Corp.*
    971 F.3d 834 (9th Cir. 2020) ...................................................................20, 21

*State ex rel. Nixon v. Estes*
    108 S.W.3d 795 (Mo. App. 2003) .................................................................22

*State ex rel. Wilson v. Ortho-McNeil-Janssen Pharms., Inc.*
    414 S.C. 33 (S.C. 2015)............................................................................22, 23

*State of Connecticut v. Levi Strauss & Co.*
    471 F.Supp. 363 (D. Conn. 1979).................................................................29

*State v. Abbott Lab'ys*
    816 N.W. 2d at 170 ...............................................................................23, 25

*State v. Macko*
    2016 WL 4268383 (Conn. Super. Ct. Aug. 1, 2016).......................................22

*State v. Marsh & McLennan Cos.*
    286 Conn. 454 (Conn. 2008).........................................................................31

*State v. Minnesota School of Bus., Inc.*
    2017 WL 4220967 (Minn. Dist. Ct. Jan. 04, 2017) ...........................22, 24, 25

*Strassheim v. Daily*
    221 U.S. 280 (1911).....................................................................................38

*Truesdell v. Friedlander*
    80 F.4th 762 (6th Cir. 2023) .........................................................................35

*U.S. v. Kaplan*
    490 F.3d 110 (2d Cir. 2007)..........................................................................37

*U.S. v. Keyspan Corp.*
    763 F.Supp.2d 633 (S.D.N.Y. 2011)..............................................................20

*U.S. v. Socony-Vacuum Oil Co.*
    310 U.S. 150 (1940).................................................................................37, 39

## TABLE OF AUTHORITIES
### (continued)

Page

*Victorino v. FCA US LLC*
    326 F.R.D. 282 (S.D. Cal. 2018) ...................................................................38

*Ward v. United Airlines, Inc.*
    986 F.3d 1234 (9th Cir. 2021) .....................................................................36

*Zeiger v. WellPet LLC*
    526 F.Supp.3d 652 (N.D. Cal. 2021) ...........................................................21

*Zenith Radio Corp. v. Hazeltine Rsch.*
    401 U.S. 321 (1971) ....................................................................................14

*Zenith Radio Corp. v. Hazeltine Rsch., Inc.*
    395 U.S. 100 (1969) ....................................................................................12

STATUTES

740 ILCS 10/7(2) ............................................................................................17

42 U.S.C.A.
    § 1396r-8(a) & (b)(1)(A) ...............................................................................2

15 U.S.C.
    § 15a ...............................................................................................................5

28 U.S.C.
    § 636 (b)(1)(A)..............................................................................................32

Cal. Bus. & Prof. Code
    § 16750...........................................................................................................16
    § 16754.5........................................................................................................20
    § 16760..................................................................................................*passim*
    § 17205...........................................................................................................20

Colo. Rev. Stat. Ann.
    § 6-1-112(1)(a)...............................................................................................23
    § 6-4-113 .......................................................................................................25

Conn. Gen. Stat. § 35-32.............................................................................27, 31

# TABLE OF AUTHORITIES
## (continued)

Page

**COURT RULES**

Fed. R. Civ. Proc.
 8(a) .................................................................................................32
 801(d)(2) ..........................................................................................19
 802(6) ...............................................................................................37
 1006(b) .............................................................................................37

Fed. R. Evid.
 801(d)(2) ..........................................................................................19
 802(6) ...............................................................................................37
 1006(b) .............................................................................................37


**OTHER AUTHORITIES**

Wright & Miller, 8B Fed. Prac. & Proc. Civ.
 § 2180 (3d ed.) ................................................................................19

A.B.A., PROVING ANTITRUST DAMAGES: LEGAL AND ECONOMIC ISSUES, §
 III.8.H (3d. ed, 2017) ......................................................................27

Carolyn L. Carter & Jonathan Sheldon, *Unfair and Deceptive Acts and
Practices*, § 2.1.4 (7th ed. 2009) ......................................................22

Christopher R. Leslie, *Antitrust Damages and Deadweight Loss,*
 51 ANTITRUST BULL. 521 (2006) ................................................28, 29


William M. Landes, *Optimal Sanctions for Antitrust Violations*,
 50 U. CHI. L. REV. 652  (1983) ......................................................28

## INTRODUCTION

Defendants' Motion for Summary Judgment makes three fundamental mistakes, rendering all its arguments irredeemably flawed. First, Defendants conflate the role of State Attorneys General with private plaintiffs. Because of this error, they apply the prudential doctrine of antitrust standing to make the untenable argument that the chief antitrust enforcers of each of the Plaintiff States lack standing to enforce their own state antitrust laws. Second, Defendants disregard the broad and flexible nature of state antitrust and consumer protection statutes, particularly when being enforced by State Attorneys General. As a result, they argue that the Plaintiff States cannot seek remedies that the Plaintiff States are expressly authorized by their state laws to recover. Finally, Defendants ignore the lengthy history of states permissibly applying their antitrust laws to out-of-state conduct causing in-state effects, rendering constitutional concerns absent. Defendants' Motion for Summary Judgment should be denied.

## STATEMENT OF FACTS

### I. THE ALLEGED CONSPIRACY

Defendants conspired to fix prices and allocate markets on the drugs at issue in the complaint (the "Drugs at Issue"). As detailed more fully in the States' opposition to Defendants' Overarching Conspiracy motion, which is incorporated here by reference, this was accomplished both by specific agreements with regard to specific drugs, but also through a common understanding that each Defendant manufacturing a drug was entitled to a "fair share."

Defendants implemented these agreements by regularly communicating with one another at industry events, as well as by phone. The industry events at which Defendants met and communicated to further these agreements occurred in many of the Plaintiff States. Plaintiffs' Statement of Additional Material Fact ("SAF") ¶¶ 30-32. The Defendants' agreements were

national in scope and were intended to fix prices and allocate market share across the United States.

Moreover, although Defendants did not sell directly to consumers in each State, they knew that the drug prices they were fixing would apply in all the States. In particular, Defendants knew they were selling to national distributors and wholesalers, and many maintained teams expressly meant to service these "national accounts." SAF ¶¶ 26-29. Further, by law, Defendants were required to reach rebate agreements that covered every State to sell to the Medicaid agency in each State. *See* 42 U.S.C.A. § 1396r-8(a) & (b)(1)(A).

## II.    DEFENDANTS' PROFITS FROM THE ALLEGED CONSPIRACY

Defendants earned substantial profits due to their illegal conduct. Dr. Warren-Boulton used regression analyses to measure the elevation in Defendants' prices caused by their conspiratorial conduct. SAF ¶ 1. He then estimated the increased net profits due to the conspiracy as a measure of disgorgement, offsetting increased costs Defendants may have incurred because of the conspiracy. SAF ¶ 2. In sum, Dr. Warren-Boulton estimates between $5.67 – $5.68 billion in disgorgement through 2018, and an additional $387 million in disgorgement from 2019-2021 due to lingering effects of the conspiracy. SAF ¶ 3. Dr. Warren-Boulton also breaks these sums down by State based on proportional sales of the Drugs at Issue or share of population, including interest. SAF ¶ 4. The fact that these profits are calculated based on overcharges does not, as discussed below, affect the Plaintiff States' entitlement to them for disgorgement purposes.

## III.    OVERCHARGES WERE PASSED THROUGH, RESULTING IN DAMAGES TO STATE PLAINTIFFS CLAIMING SUCH.

While Dr. Warren-Boulton measured the amount by which manufacturers were able to increase their own prices because of the conspiracy, which is relevant to disgorgement, Dr. Singer looked at whether those price increases were "passed-through" the distribution chain, thus

resulting in damages to those States claiming such. SAF ¶ 5.

Dr. Singer measures pass-through empirically in two ways: (1) by examining actual data on transactions by wholesalers, retailers, and PBMs to determine whether a cost increase—such as an overcharge by Defendants—results in a price increase at that level of the distribution chain, and (2) by directly measuring the relationship between manufacturer's price and for each type of end-payor plaintiff. SAF ¶ 6.

Importantly, downstream firms do not respond differently to an increase in costs due to upstream collusion than they do to any other increase in cost. SAF ¶ 7. Therefore, Dr. Singer measures the mark-ups employed by intermediaries in the real world, since they would be the same in the "but for" world where Defendants had not been engaged in a conspiracy. SAF ¶ 8. Dr. Singer finds that in all cases, pass-through is substantial and statistically significant. In his single-stage analysis, he finds that between 57% and 92% of cost increases were passed-through to end-payors. SAF ¶ 10. In his multi-stage analysis, he finds a cumulative pass-through rate of 50%. SAF ¶ 11. Notably, every wholesaler, retailer, and PBM whose data Dr. Singer analyzed had positive and statistically significant pass-through rates. SAF ¶ 12. Although Defendants' experts propose a range of "corrections" to Dr. Singer's models, none of them drive the estimated pass-through rates to zero. SAF ¶ 14.

Dr. Singer also examined whether Managed Care Organizations ("MCOs") pass-through costs increased, which they are statutorily required to do using an actuarially sound methodology. Dr. Singer examined data from large health insurers generally, as well as data for the specific Drugs at Issue here from California's and Massachusetts's actual actuarial calculations and concluded MCOs pass-through at least 100% of costs to end-payors. SAF ¶ 15.

Dr. Singer uses these pass-through rates and the overcharges calculated by Dr. Warren-

Boulton to calculate damages attributable to the conspiracy, finding that the conspiracy caused between $1.62 and $1.64 billion in damages through 2018 to indirect purchasers in the 24 States and Territories seeking damages, and $192 million from 2019-2021. SAF ¶ 21.

## ARGUMENT

### I.   ANTITRUST STANDING ANALYSIS IS INAPPLICABLE TO STATE ATTORNEYS GENERAL, BUT ALL STATES SATISFY IT REGARDLESS

The prudential doctrine of antitrust standing, which is meant to ensure private plaintiffs are fit to carry out the role of "private attorneys general," does not apply to State Plaintiffs, who are the chief public enforcers of their state antitrust laws. The doctrine also does not apply to claims for disgorgement or restitution, as the factors analyzed for standing are irrelevant to those claims. Finally, even assuming antitrust standing applies to State Plaintiffs' damages claims, the evidence shows all relevant factors favor antitrust standing for State Plaintiffs here.

### A.   *AGC* Applies to Private Plaintiffs, Not Public Enforcers

State Attorneys General act as public enforcers under their own antitrust laws, rendering inapplicable the antitrust standing framework of *Associated General Contractors of California, Inc. v. California State Council of Carpenters* ("*AGC*"), 459 U.S. 519 (1983). That framework was designed to limit private plaintiffs' ability to recover under antitrust laws, ensuring each is "a proper party to perform the office of a private attorney general." *Schwab Short-Term Bond Mkt. Fund v. Lloyds Banking Grp. PLC*, 22 F.4th 103, 115 (2d Cir. 2021) (quoting *Gelboim v. Bank of Am. Corp*, 823 F.3d 759, 780 (2nd Cir. 2016).) By contrast, State Attorneys General are not private parties—they are the proper and designated enforcers of their respective state antitrust and consumer protection laws. Defendants cite no authority applying *AGC* to State Attorneys General, and State Plaintiffs are aware of none. Thus, the *AGC* framework does not apply.

Antitrust standing requirements were developed to limit private plaintiffs, not public enforcers. In *AGC*, the Supreme Court evaluated whether the private plaintiff was the proper party to "vindicate the public interest in antitrust enforcement" and "perform the office of a private attorney general." 459 U.S. 519, 542 (1983). The Second Circuit has repeatedly emphasized that "the doctrine of antitrust standing prevents *private plaintiffs*" from recovering damages under antitrust laws. *Gatt Commc'ns, Inc. v. PMC Assocs., L.L.C.*, 711 F.3d 68, 76 (2d Cir. 2013); *Port Dock & Stone Corp. v. Oldcastle Northeast, Inc.*, 507 F.3d 117, 121 (2d Cir. 2007) ("[A]ntitrust standing for a *private plaintiff* requires a showing… ."); *Paycom Billing Servs., Inc. v. Mastercard Int'l, Inc.*, 467 F.3d 283, 290 (2d Cir. 2006) ("[P]*rivate plaintiffs* must demonstrate antitrust standing.") (emphases added for all). The Attorney General acts in a governmental capacity, and Congress authorized such suits under federal antitrust laws separate and apart from any cause of action for private plaintiffs. *Compare* 15 U.S.C. § 15a *with* § 15. Courts have consistently recognized that "while the United States is authorized to sue anyone violating the federal antitrust laws, a private plaintiff must demonstrate 'standing.'" *In re Am. Express Anti-Steering Rules Antitrust Litig.*, 19 F.4th 127, 138 (2d Cir. 2021) (quoting *Daniel v. Am. Bd. of Emergency Med.*, 428 F.3d 408, 436 (2d Cir. 2005)); *Arcell v. Google LLC*, 2024 WL 3738422, at *1 (N.D. Cal. Aug. 9, 2024). No reason exists to distinguish state enforcers from their federal counterparts. All public enforcers are thus excluded from the *AGC* framework.

Defendants may argue that under federal law, State Attorneys General are treated as private plaintiffs, meaning that they must also be treated as such under state law. Federal antitrust statutes treat states as if they are private plaintiffs for purposes of carrying out enforcement actions under federal law such as enjoining mergers. *See California v. ARC Am. Corp.*, 490 U.S. 93, 101-02 (1989). By contrast, just as the United States is designated as the

primary enforcer under *federal* law such that no standing requirements apply, state antitrust laws designate their own Attorneys General as the primary enforcers such that antitrust standing requirements should not apply. *See* Appendix B. As leading antitrust scholars explain, "when a state is enforcing its own antitrust provision, it is acting as a government enforcer rather than as a private party—in sum, it has largely the same status as the Justice Department's Antitrust Division or the FTC has in a federal case." Phillip Areeda & Herbert Hovenkamp, ANTITRUST LAW: AN ANALYSIS OF ANTITRUST PRINCIPLES AND THEIR APPLICATION, § 2412c (2024). Defendants also rely on harmonization provisions to argue that the AGC framework applies to state antitrust laws. *See* Mot. at 27 n.13. Even assuming that is correct—which it is not[1]—such harmonization provisions would equally incorporate the principle that the primary public enforcer of each law is excluded from *AGC*'s prudential standing requirements. Defendants' selective application of harmonization is both inconsistent and legally flawed.

**B.    Antitrust Standing Analysis Must Align with the Remedies Sought and the Specific Laws that Authorize Them**

The antitrust standing inquiry must align with the specific laws at issue and the remedies sought by State Plaintiffs—damages, disgorgement, and civil penalties—each of which serves a distinct purpose and requires different proof. The Supreme Court has recognized that standing analysis under antitrust law is flexible and varies depending on the remedies pursued. *See Cargill, Inc. v. Monfort of Colo., Inc.*, 479 U.S. 104, 110 n.6 (1986) (explaining that antitrust standing analysis under different statutes "will not always be identical," finding that "because standing under § 16 raises no threat of multiple lawsuits or duplicative recoveries, some of the factors other than antitrust injury that are appropriate to a determination of standing under § 4 are

---

[1] Although not necessary for purpose of deciding this Motion, State Plaintiffs dispute whether the *AGC* analysis applies to private plaintiff claims under state antitrust and consumer protection laws of many states and territories, including through harmonization provisions. Plaintiffs' Appendix A corrects Defendants' misleading assertions in their Appendix A.

not relevant under § 16."). Defendants acknowledge this principle, citing *Daniel v. American Bd. of Emergency Medicine*, where the Second Circuit explained that "the weight to be given the various factors will necessarily vary with the circumstances of particular cases." 428 F.3d at 443; *see* Mot. at 26. These remedies are not interchangeable. Defendants' motion, however, conflates these distinct remedies and purports to apply a one-size-fits-all *AGC* analysis. Instead, to properly evaluate standing, the Court must consider the specific state laws at issue, the elements of proof required for each remedy under that law, and whether the *AGC* factors are implicated. The Court should reject Defendants' overbroad application of *AGC*.

### C.    State Plaintiffs Have Antitrust Standing to Seek Disgorgement, Restitution, and Civil Penalties

The *AGC* framework does not apply to equitable remedies like disgorgement and restitution, nor to civil penalties. Defendants cite no case law where antitrust standing has been applied to disgorgement, restitution, or civil penalties, and State Plaintiffs are aware of none.

These remedies aim to deter unlawful conduct and deprive defendants of ill-gotten gains and secure compliance with law, not compensate victims. *See SEC v. Fischbach Corp.*, 133 F.3d 170, 175 (2d Cir. 1997) ("The primary purpose of disgorgement orders is to deter violations of the laws by depriving violators of their ill-gotten gains."); *Nationwide Biweekly Admin., Inc. v. Superior Court of Alameda Cnty.*, 9 Cal.5th 279, 326 (Cal. 2020) (Civil penalties "may have a punitive or deterrent aspect, [but] their primary purpose is to secure obedience to statutes and regulations imposed to assure important public policy objectives. . . .")(citation omitted). Unlike private damages claims, no proof of injury or causation is needed. *See SEC v. Teo* (*Teo*), 746 F.3d 90, 105 (3d Cir. 2014) (holding to recover disgorgement plaintiff need only establish a reasonable approximation of profits causally connected to the violation); *SEC v. First City Financial Corp.* (*First City*), 890 F.2d 1215, 1231 (D.C. Cir. 1989) (same); *People v. Ashford*

*University, LLC*, 319 Cal. Rptr. 3d 132, 164 (Cal. 2024) ("[H]arm is not an element of an action

for civil penalties. . . ."). This makes analysis of the nature of the injury and its "directness or

indirectness" inapposite. Mot at 25-26 (quoting *In re Platinum & Palladium Antitrust Litig.*, 61

F.4th 242, 258-59 (2d Cir. 2023). Similarly, analysis focused on the "victims" is irrelevant where

remedies are not compensatory. *Id.* And only public enforcers like State Plaintiffs can recover

disgorgement and civil penalties, so there is no other "identifiable class of persons" here. *Id.*

    Nor are there valid concerns about whether these remedies are "duplicative." *Id.* Civil

penalties serve a separate punitive function, ensuring accountability in addition to any

compensatory remedies. They are, by design, in addition to any compensation. Similarly,

disgorgement targets profits, not damages owed to victims. And if those profits have already

gone towards compensating victims, the Court has already recognized it can apportion

disgorgement and other monetary relief using its equitable powers *after* a judgment of liability.

*See Connecticut v. Sandoz*, 2024 WL 4753308, at *2, 19 (D. Conn. Nov. 12, 2024).

    Concerns about recovery being "highly speculative" are equally misplaced when applied

to these remedies. Civil penalties are grounded in statutory or judicially determined frameworks,

eliminating the need for complex economic modeling. *See* Argument.II.B. Disgorgement,

likewise, requires only a reasonable approximation of profits *Defendants* derived from their

violation. *See First City*, 890 F.2d at 1231; *Teo*, 746 F.3d at, 105. It does not implicate any

analysis concerning "intermediaries;" the only reason Defendants cite for damages being

allegedly speculative here. *See* Mot. at 31-32.

    Applying *AGC* to these remedies would undermine their deterrent and punitive purposes

and diminish State Plaintiffs' roles as public enforcers. The States may pursue them.

### D.    All States and Territories Seeking Damages Have *Illinois Brick* Repealers

Only 24 States and Territories seek damages under their respective antitrust laws, none of which follow *Illinois Brick*'s direct purchaser rule.[2] *See* Appendix C. Defendants' attempt to apply the *AGC* framework rigidly to these claims ignores these states' policy choices. The Supreme Court's *AGC* decision was informed by concerns about duplicative recovery and complex apportionment of damages between direct and indirect purchasers. 459 U.S. at 544-45. However, states with *Illinois Brick* repealers expressly reject these concerns in favor of ensuring indirect purchaser recovery. Based on this reasoning, courts have concluded that *AGC* should not be applied at all to those states. *See, e.g.*, *In re Broiler Chicken Antitrust Litig.*, 290 F. Supp. 3d 772, 816 (N.D. Ill. 2017) ("The Court finds that any state with an *Illinois Brick* repealer would reject application of *AGC* . . . ."). Other courts have held *AGC* must be applied more flexibly, informed by these policy considerations. *See, e.g., In re Suboxone Antitrust Litig.*, 64 F. Supp. 3d 665, 698 (E.D. Pa. 2014) (finding that "directness must be analyzed more generously than under federal law"); *Carefirst of Maryland, Inc. v. Johnson & Johnson*, 2024 WL 3858249, at *20 (E.D. Va. 2024) ("[T]he Court will apply the *AGC* factors but will keep in mind that states that have enacted an *Illinois Brick* repealer statute have taken action to differentiate their antitrust law from their federal counterpart."); *In re TFT-LCD (Flat Panel) Antitrust Litig.*, 586 F. Supp. 2d 1109, 1123 (N.D. Cal. 2008) (holding the *AGC* test should not be broadly applied without clear guidance from the states). The presence of *Illinois Brick* repealers demonstrates a clear

---

[2] Puerto Rico respectfully disagrees with the Court's prior holding that *Illinois Brick* applies under Puerto Rico law, ECF 478, and reserves the right to challenge that decision on appeal following final judgment. For purposes of this motion, however, State Plaintiffs acknowledge that holding precludes recovery of deadweight loss or indirect purchaser damages under Puerto Rico law, but expressly reserve the right to dispute Defendants' arguments on deadweight loss and antitrust standing for damages if it is reversed.

legislative intent to ensure indirect purchasers can enforce antitrust laws effectively, and standing analysis under these statutes must reflect that intent.

Because these 24 States and Territories have rejected *Illinois Brick* and authorized indirect purchaser claims, they have standing to recover damages under their laws. The *AGC* framework cannot override these legislative and judicial determinations. To hold otherwise undermines the purpose of repealer statutes. Accordingly, Defendants' standing argument fails.

### E.    State Plaintiffs Satisfy Any Relevant *AGC* Factors for Damages

Assuming *arguendo* the *AGC* framework applies, which it does not, it still provides a flexible, fact-driven standard for evaluating antitrust standing. It considers whether a plaintiff's injuries are of the type that the antitrust laws were intended to prevent, whether the injuries are not too remote, whether damages can be reliably calculated, and whether concerns about duplicative recovery or complex apportionment of damages weigh against standing. As discussed below, each *AGC* factor supports a finding of standing for State Plaintiffs, who have demonstrated direct and foreseeable injuries, a strong economic and statutory incentive to enforce the law, and a damages methodology grounded in real-world data that can be used to apportion damages, if necessary.

### 1.    State Plaintiffs' Injuries Are of the Type the Antitrust Laws Are Meant to Prevent

The first *AGC* factor—whether the injury is of the type that the antitrust laws are meant to prevent—is the most important consideration and, in some cases, sufficient on its own to establish antitrust standing. As the Supreme Court has held, this showing is "necessary, but not always sufficient to establish standing. . . ." *Cargill*, 479 U.S. at 110 n.5. Accordingly, courts give "great weight to the nature of the plaintiff's alleged injury," and this factor alone can support antitrust standing. *Am. Ad Mgmt., Inc. v. General Tel. Co. of Cal.*, 190 F.3d 1051, 1055 (9th Cir. 1999).

Overcharges from *per se* conspiracies are the quintessential antitrust injury. In *In re DDAVP Direct Purchaser Antitrust Litig.*, the court found "purchasers of… product who allege being forced to pay supra-competitive prices" suffer an injury "plainly... 'of the type the antitrust laws were intended to prevent.'" 585 F.3d 677, 688 (2d Cir. 2009) (quoting *Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc.*, 429 U.S. 477, 489 (1977)); *see also DIRECTV, LLC v. Nexstar Media Grp., Inc.*, 724 F. Supp. 3d 268, 278 (S.D.N.Y. 2024) ("[A]ntitrust harm that flows from horizontal price fixing is the payment of supracompetitive prices."); *In re Foreign Exch. Benchmark Rates Antitrust Litig.*, 74 F. Supp. 3d 581, 596 (S.D.N.Y. 2015) (higher prices from price-fixing is a prototypical antitrust injury); *In re Disposable Contact Lens Antitrust*, 329 F.R.D. 336, 402 (M.D. Fla. 2018) (Indirect purchasers paying higher prices is "exactly the type of injury… antitrust laws were intended to prevent."). Defendants concede all this. *See* Mot. at 25 n.10. Given this, the first *AGC* factor strongly supports antitrust standing.

### 2.    State Plaintiffs' Injuries Are Direct and Foreseeable

Defendants argue State Plaintiffs lack antitrust standing under state laws explicitly permitting indirect purchaser claims because they did not purchase the price-fixed products directly from Defendants. *See* Mot. at 28. But "[t]he antitrust laws do not require a plaintiff to have purchased directly from a defendant in order to have antitrust standing." *In re Foreign Exch. Benchmark Rates Antitrust Litig.*, 2016 WL 5108131, at *9 (S.D.N.Y. Sept. 20, 2016).

Courts consistently hold indirect purchasers have antitrust standing under state laws with *Illinois Brick* repealers. In *In re Propranolol Antitrust Litigation*, the court found standing for indirect purchasers of the drug propranolol, reasoning the pharmaceutical distribution chain—like the one here—is "short, direct, and well-understood," and that "[p]rice increases can be directly traced throughout this distribution chain." 249 F. Supp. 3d 712, 724-26 (S.D.N.Y. 2017). Similarly, in *In re Suboxone Antitrust Litigation*, the court held end-payors who alleged

overcharges due to monopolistic conduct had sufficiently direct claims to satisfy *AGC*. 64 F. Supp. 3d at 697-98. And in *In re Interior Molded Doors Antitrust Litig.*, indirect purchasers who bought doors through intermediaries were found to have antitrust standing under *AGC*. 2019 WL 4478734, at *10 (E.D. Va. Sept. 18, 2019).

Courts have found antitrust standing even for indirect purchasers in cases involving more complex distribution chains, where only components of the product ultimately purchased were price-fixed. In *In re TFT–LCD (Flat Panel) Antitrust Litig.*, 586 F. Supp. 2d 1109, the court allowed purchasers of televisions and laptops containing price-fixed LCD panels to proceed, finding overcharges were passed through the distribution chain. Similarly, in *In re Lithium Ion Batteries Antitrust Litig.*, 2014 WL 4955377 (N.D. Cal. Oct. 2, 2014), and *In re Capacitors Antitrust Litig.*, 154 F. Supp. 3d 918 (N.D. Cal. 2015), courts found standing for indirect purchasers of products containing price-fixed components. Here, by contrast, Plaintiffs purchased the very products Defendants price-fixed. SAF ¶ 20. If courts have found standing for those purchasers, State Plaintiffs' claims must proceed.

The evidence establishes overcharges were passed through each level of the distribution chain, which suffices to show injury. *See Zenith Radio Corp. v. Hazeltine Rsch., Inc.*, 395 U.S. 100, 114 n.9 (1969) (Antitrust plaintiffs need only provide "proof of some damage flowing from the unlawful conspiracy."); *see also In re Publ'n Paper Antitrust Litig.*, 690 F.3d 51, 66-67 (2d Cir. 2012). Dr. Singer's analysis confirms overcharges at the manufacturer level were passed through by all intermediaries to end-payors, including State Plaintiffs. His multi-stage analysis reveals a statistically significant cumulative pass-through rate of 50%. SAF ¶ 11. This analysis includes the incorporation of overcharges into the payments made by state Medicaid agencies to MCOs to cover the elevated prices of the Drugs at Issue. SAF ¶ 15. Contrary to the Defendants'

assertions, Dr. Singer's analysis does not analyze the cost to state Medicaid agencies of providing *all* covered medical services to Medicaid patients. His analysis specifically maps out what MCOs pay for the generic drugs affected by price fixing, market allocation, and bid rigging; and in turn what the state Medicaid agencies paid those MCOs for those generic drugs. SAF ¶ 17. This evidence demonstrates State Plaintiffs' injuries flow directly from Defendants' conduct, satisfying the directness requirement of antitrust standing.

Defendants assert independent pricing decisions by intermediaries like PBMs sever the causal chain. But antitrust injury requires only that the alleged illegality be a "material" and "but-for" cause of injury, not the sole cause. *See In re Actos End–Payor Antitrust Litig.*, 848 F.3d 89, 97 (2d Cir. 2017). Defendants' expert acknowledges intermediaries' prices correlate with costs over time, and that cost increases—like those from Defendants' overcharges—factor into their pricing decisions. SAF ¶ 19. Even if intermediaries increased markups "independently," their decisions amplify, rather than break, the causal chain. *See Apple Inc. v. Pepper*, 139 S. Ct. 1514, 1521-24 (2019) (holding that consumers could sue Apple despite app developers independently setting prices where Apple's commissions were passed on by developers in their pricing). Such decisions do not disrupt proximate causation.

Similarly, state Medicaid agencies incorporated and paid the elevated costs of the Drugs at Issue, including via payments to MCOs. Defendants do not offer an affirmative opinion that MCOs do not pass through elevated costs. SAF ¶ 18. Instead, they speculate that state Medicaid agencies should have switched providers or rejected all managed care providers solely due to increased generic drug costs attributable to the Defendants' conduct. Such speculation does not sever the causal chain. State Medicaid agencies are required to cover medically necessary services for their enrollees, including prescription drugs. SAF ¶ 16. Defendants' conduct did not

change the cost of providing medically necessary services outside of the Drugs at Issue, such that state Medicaid payments for unrelated medical costs would have been different in a but-for world. The Defendants' conduct and pricing is the only difference in what the state Medicaid agencies paid MCOs.

Finally, an antitrust injury occurs "when a purchaser is overcharged as a result of anticompetitive conduct," but a plaintiff need not suffer an overcharge immediately after Defendants elevate prices. *Lorix v. Crompton Corp.*, 736 N.W.2d 619, 633 (Minn. 2007). A temporal lag is invariably present as intermediaries purchase price-fixed goods and re-sell them. *See* SAF ¶ 9. Courts also commonly recognize damages from the lingering effects of conspiratorial conduct. *Cf. Zenith Radio Corp. v. Hazeltine Rsch.*, 401 U.S. 321, 339-40 (1971) (discussing recovery of damages from multi-year effects of conspiratorial conduct). A temporal lag does not defeat causation.

Defendants' reliance on cases like *Schwab Short-Term Bond Mkt. Fund v. Lloyds Banking Grp. PLC*, 22 F.4th 103 (2d Cir. 2021), *In re Aluminum Warehousing Antitrust Litig.*,., 2023 WL 7180648 (2d Cir. Nov. 1, 2023), and *In re Am. Express Anti-Steering Rules Antitrust Litig.*, 19 F.4th 127 is misplaced. Mot. at 30-31. None of those cases involve sales of defendants' products ultimately purchased by plaintiffs.

### F.    State Plaintiffs Are Motivated Enforcers

The second *AGC* factor evaluates whether there is an identifiable class of potential plaintiffs whose self-interest would normally motivate them to enforce the antitrust laws. *See AGC*, 459 U.S. at 542. While Defendants incorrectly conflate this factor with the directness inquiry, the second factor examines the relative incentives and capabilities of different plaintiffs. *See Daniel*, 428 F.3d at, 444; *IQ Dental Supply, Inc. v. Henry Schein, Inc.*, 924 F.3d 57, 66 (2d Cir. 2019).

While direct purchasers are often viewed as motivated enforcers, Dr. Singer's analysis demonstrates here that they passed on much of Defendants' overcharges, insulating them from the full impact of Defendants' conduct while increasing their profits. *See SAF ¶ 10-12.* This diminishes their financial incentive to vigorously pursue these claims. In contrast, State Plaintiffs, as end-payors, had no ability to pass on overcharges, giving them strong incentive to seek redress. Additionally, State Plaintiffs have a statutory mandate to enforce antitrust laws, ensuring violations are deterred and public harm is remedied.

State indirect and direct purchaser claims serve complementary purposes under *Illinois Brick* repealer statutes, which were enacted to address enforcement gaps left by the direct purchaser rule. These statutes expressly empower indirect purchasers like State Plaintiffs to recover for overcharges passed through the distribution chain. *See In re Suboxone*, 64 F. Supp. 3d at 696-98. In sum, State Plaintiffs' clear financial incentives, coupled with their public enforcement mandate, make them the most motivated enforcers, fully satisfying the second *AGC* factor.

### G.    State Plaintiffs' Damages Are Grounded in Economic Evidence

Defendants argue State Plaintiffs' damages are speculative because intermediaries like PBMs made "independent" pricing decisions. However, there is no need to speculate about those decisions; they are reflected in the transactional data Dr. Singer analyzed. His empirical analysis demonstrates overcharges imposed by Defendants were passed through the distribution chain to end-payors. *See SAF ¶ 10-12.* This real-world data provides a reliable basis for calculating damages.

Defendants offer no explanation—much less evidence—for why these "independent" pricing decisions would have occurred differently absent Defendants' conduct. In *Schwab*, the plaintiffs and third parties incorporated a price-fixed benchmark into their own independent

contracts but were not required to do so. 22 F.4th at 117. Calculating damages in such a case "would require the court to speculate about how the third-party sellers would have factored a non-suppressed [benchmark] into the transaction." *Id.* at 119. Similarly, *IQ Dental Supply, Inc.* involved allegations of a boycott of the plaintiff, orchestrated by the defendant in that case. 924 F.3d at 61-62. To calculate damages, the court would have needed to determine, absent this conduct, how many additional agreements a third-party with which the plaintiff had contracted would have secured, what terms those agreements would have included, and how many customers would have purchased products under those hypothetical agreements. *Id.* at 67. Unlike *Schwab* and *IQ Dental*, the decisions of third-party intermediaries here, such as PBMs and wholesalers, are reflected in their transactional data. *See* SAF ¶ 13. Defendants' experts do not opine that price increases on the Drugs at Issue were not reflected in the transactional data produced by state agencies or were not passed on by MCOs to State Plaintiffs. SAF ¶ 18. The real-world data here eliminates the need for speculation.

In any event, the Supreme Court has noted that the "potential difficulty in ascertaining and apportioning damages is not . . . an *independent* basis for denying standing where it is adequately alleged that a defendant's conduct has proximately injured an interest of the plaintiff's that the statute protects." *Lexmark Int'l, Inc. v. Static Control Components, Inc.*, 572 U.S. 118, 135 (2014) (emphasis in original).

**H.    Damages Are Neither Duplicative nor Difficult to Apportion**

Defendants incorrectly suggest State Plaintiffs' claims are duplicative of those brought by class representatives in the MDL. However, *parens patriae* actions are independent mechanisms for enforcing antitrust laws. These actions are distinct from private class actions and reflect the legislative intent to provide multiple layers of enforcement, often with distinct methods of proof. *See California v. ARC Am. Corp.*, 490 U.S. 93, 101 (1989) (holding state antitrust laws are

complementary to federal laws and not preempted, even if they permit recovery by indirect purchasers); *compare* Cal. Bus. & Prof. Code § 16750 (allowing for suits by persons injured) *with* Cal. Bus. & Prof. Code § 16760 (allowing for *parens patriae* suits by Attorney General). Additionally, some state laws only allow for recovery by indirect plaintiffs through *parens patriae* actions by the Attorney General. *See, e.g.*, 740 ILCS 10/7(2) ("[N]o person shall be authorized to maintain a class action … for indirect purchasers asserting claims under this Act, with the sole exception of this State's Attorney General, who may maintain an action parens patriae."). Moreover, the class plaintiffs thus far have *not* sought to certify litigation classes that include natural persons who were consumers or state agencies. *See, e.g.*, Resp. to SMF ¶ 45.

In any event, Defendants' concern about complex apportionment of damages does not bar antitrust standing. Courts have repeatedly held that the potential complexity of apportioning damages is not a basis for dismissing indirect purchaser claims. *See Freeman Indus., LLC v. Eastman Chem. Co.*, 172 S.W.3d 512, 520 (Tenn. 2005) (rejecting the argument that complex apportionment justifies barring indirect purchaser claims); *Comes v. Microsoft Corp.*, 646 N.W.2d 440, 451 (Iowa 2002); *see also Batteries*, 2014 WL 4955377, at *15-16. The mere presence of multiple levels in a distribution chain does not preclude reasonable damage calculations. Rather, state law can and does address such overlap through offsets. *See, e.g.*, Cal. Bus. & Prof. Code § 16760(a)(1) ("The court shall exclude from the amount of monetary relief awarded in the action any amount of monetary relief . . . which duplicates amounts which have been awarded for the same injury.").

Finally, Dr. Singer's expert analysis demonstrates that overcharges can be reliably traced through the distribution chain and aggregate damages can be estimated without requiring a transaction-by-transaction breakdown. Courts have held that aggregate damages are permissible

in antitrust cases, even where pass-through effects must be analyzed. *See Oliver v. Am. Express Co.*, 19-CV-566 (NGG) (SJB), 2024 WL 100848, at *10 (E.D.N.Y. Jan. 9, 2024); *In re NASDAQ Market–Makers Antitrust Litig.*, 169 F.R.D. 493, 523 (S.D.N.Y. 1996) ("Neither a variety of prices nor negotiated prices is an impediment ... if it appears that plaintiffs may be able to prove at trial that ... the price range was affected generally."); *Loeb Indus., Inc. v. Sumitomo Corp.,* 306 F.3d 469, 493 (7th Cir. 2002) ("[I]n complicated antitrust cases plaintiffs are permitted to use estimates and analysis to calculate a reasonable approximation of their damages."); *see also* Cal. Bus. & Prof. Code § 16760(d). Notably, Dr. Singer provides pass-through rates at each level of the distribution chain, making it feasible to apportion damages after liability has been established. *See* SAF ¶ 12.

## II. STATE LAWS PROVIDE STATE ATTORNEYS GENERAL WITH BROAD AND FLEXIBLE REMEDIES FOR VIOLATION OF STATE ANTITRUST AND CONSUMER PROTECTION LAWS.

### A. The States' Damages and Penalties Claims Are Not Adequate Remedies Displacing Disgorgement or Restitution

Disgorgement or restitution are available to the State Plaintiffs; neither damages nor penalties are adequate remedies at law because each type of remedy serves a distinct purpose. Moreover, the disgorgement sought here is much greater than the damages sought, reflecting the magnitude of Defendants' nationwide conduct that inflated their profits on generic drugs important to public health, including lifesaving pharmaceuticals. Penalties, likewise, are awarded in addition to any disgorgement or damages to deter similar conduct in the future.

State Plaintiffs, acting through each of their Attorneys General, are not ordinary private plaintiffs seeking to be made whole. Rather, the claims brought by the State Attorneys General serve three distinct purposes: (1) proprietary claims seeking compensation for state agencies, (2) *parens patriae* claims seeking compensation for consumers within a state, and (3) law enforcement claims seeking to punish and deter Defendants' unlawful conduct. *See Maryland v.*

*Louisiana*, 451 U.S. 725, 737-38 (1981) (holding that states may bring actions as representatives of the public to protect the interests of citizens); *Brown v. Stanton*, 617 F.2d 1224, 1232 n.14 (7th Cir.1980) ("In general, a state Attorney General may institute such suits as he deems necessary for ... the protection of public rights."), *vacated and remanded on other grounds*, 453 U.S. 917, (1981); *People v. Pac. Land Rsch. Co.*, 20 Cal. 3d 10, 17 (1977) ("An action filed by the People. . . is fundamentally a law enforcement action designed to protect the public and not to benefit private parties."). Defendants ignore this last purpose.

The law enforcement tools available to State Attorneys General are not so limited as the Defendants suggest. Restitution[3] and disgorgement are necessary law enforcement tools to punish and deter unlawful conduct. *Porter v. Warner Holding Co.*, 328 U.S. 395, 400 (1946) ("Future compliance may be more definitely assured if one is compelled to restore one's illegal gains."); *SEC v. Fischbach Corp.*, 133 F.3d 170, 175 (2d Cir. 1997) ("[T]he primary purpose of disgorgement orders is to deter violations of the [ ] laws by depriving violators of their ill-gotten gains.").

The factual record in this case proves that damages alone are an inadequate remedy for the law enforcement purposes of this action.[4] The damages in this case, as calculated by Dr. Singer, are significantly lower than the Defendants' ill-gotten profits, as calculated by Dr. Warren-Boulton. *Compare* SAF ¶ 21 (around $1.6 billion) *with* SAF ¶ 3 (around $5.7 billion). This

---

[3] In some states, compensatory claims may also be styled as restitution, but for those states the amounts sought are encompassed by State Plaintiffs' estimates of damages, not disgorgement, and so are not relevant to Defendants' motion.

[4] In support of their motion, Defendants offer as evidence interrogatory responses or other similar litigation materials, *see, e.g.*, SMF ¶¶ 6-7, 47, but those are hearsay except when "offered against an opposing party" other than the one that "made" the statement, and so would not be admissible at trial. *See* Fed. R. Civ. Proc. 801(d)(2); *see also* Wright & Miller, 8B Fed. Prac. & Proc. Civ. § 2180 (3d ed.) ("[I]nterrogatory answers of one [party] are, therefore, not admissible as against another [party], unless they fall within some exception to the hearsay rule.").

reflects both that only certain States allow recovery by indirect purchasers, but also that Defendants' ill-gained profits far exceed the damages to the end-consumer, as various intermediaries absorbed some of the overcharges. Relying on damages alone would permit Defendants to continue to profit from their illegal conduct, rewarding conduct that harms both the health of the States' markets for generic drugs, and the wellbeing of consumers who need them.

Nor are penalties an adequate remedy in lieu of disgorgement. Penalties are also not compensatory, and their primary purpose is deterrence and securing compliance. *See, e.g.*, *Nationwide Biweekly Admin., Inc. v. Superior Court of Alameda Cnty.*, 9 Cal.5th 279, 326 (2020). To serve these purposes, they must be awarded *in addition to* any compensatory damages and disgorgement, as state law recognizes. *See, e.g.*, Cal. Bus. & Prof. Code § 17205 ("[R]emedies or penalties provided by this chapter are cumulative to each other and to the remedies or penalties available under all other laws of this state."); *see also In re Elec. Books Antitrust Litig.*, 2014 WL 2535112, at *1 (S.D.N.Y. 2014) ("[C]ivil penalties will be assessed… and imposed in addition to any treble damages that might be awarded").

*Sonner v. Premier Nutrition Corp.*, 971 F.3d 834 (9th Cir. 2020), and its progeny, relied upon by Defendants, are distinguishable. Mot. at 4-6. All these cases involved private plaintiffs, not State Attorneys General, meaning they involved no law enforcement aspect. On the other hand, the Court's "equitable authority to grant remedies is at its apex when public rights and obligations are [] implicated." *Kansas v. Nebraska*, 574 U.S. 445, 463 (2015). Second, none of Defendants' cited cases involved antitrust claims, where equitable remedies may (as here) be necessary to restore competition. *See, e.g.*, Cal. Bus. & Prof. Code § 16754.5 (authorizing courts to "grant such mandatory injunctions as may be reasonably necessary to restore and preserve fair

competition in the trade or commerce affected by the violation"). Finally, none of Defendants'

cited cases involve a situation where, like here, damages alone would leave the defendants with a

net profit. *See U.S. v. Keyspan Corp.*, 763 F.Supp.2d 633, 638–41 (S.D.N.Y. 2011). In contrast,

*Sonner* involved a situation where equitable remedies were equivalent to damages. *Sonner*, 971

F.3d at 844. That is not the case here, as disgorgement addresses the broad distortion of

competition resulting from the Defendants' conduct by eliminating any excess profits they

earned as a result, in order to deter future conduct rather than compensate, while damages merely

seek to compensate particular plaintiffs. *See Zeiger v. WellPet LLC*, 526 F.Supp.3d 652, 687

(N.D. Cal. 2021) (holding there is no adequate remedy at law where equitable remedies "serve

different purposes and remedy different harms than retrospective monetary damages"); *see also*

*Elgindy v. AGA Service Co.*, 2021 WL 1176535, at *15 (N.D. Cal. 2021) (holding damages for

common-law fraud claims inadequate substitutes for disgorgement and restitution under the

UCL). The fact that overcharges serve as a starting point for calculating both net profits and

damages does not change anything, as the greater amount of restitution sought reflects the

nationwide harm caused by Defendants' conduct, and serves primarily a deterrent, law-

enforcement purpose, not a compensatory one.

### B. Determining Civil Penalties and Fines on the Number of Sales by Pharmacists Is Permitted and, Regardless, is Premature Prior to a Merits Finding.

Defendants' motion asks the Court to narrowly interpret the scope of thirty-one different

state statutes permitting penalties, such that each conspiracy proven by the State Plaintiffs at trial

will only constitute a single "violation" of each. This ignores the broad language of these

statutes, cherry picks case law out of context, and disregards that these are thirty-one different

statutes, with different statutory language and different bodies of state case law.

1.    **The Little FTC Acts Broadly Prohibit Unfair and Deceptive Business Acts, and Awarding Penalties Per Sale of Price-Fixed Drug is Appropriate**

Of the thirty-one penalty-seeking Plaintiff States addressed by Defendants' motion, twenty-eight are seeking penalties pursuant to their state versions of the FTC Act (or "Little FTC Acts") or other similar consumer protection statutes. *See* Appendix D. While the exact wording of these statutes varies, all are broadly worded and prohibit "unfair" and "deceptive" business practices. Little FTC Acts are "remedial," meaning that they "must be liberally construed," a rule that applies "to the scope sections of [such Acts] just as much as to [their] substantive provisions." Carolyn L. Carter & Jonathan Sheldon, *Unfair and Deceptive Acts and Practices*, § 2.1.4, at 10 (7th ed. 2009).[5]

Given the broad wording and liberal construction of these statutes, it is left "to the courts to determine appropriate penalties on a case-by-case basis." *People ex rel. Kennedy v. Beaumont Inv., Ltd.*, 111 Cal. App. 4th 102, 127-28 (2003), *as modified on denial of reh'g* (Sept. 9, 2003); *see also, e.g.*, *State v. Minnesota School of Bus., Inc.*, 2017 WL 4220967, at *3 (Minn. Dist. Ct. Jan. 04, 2017) (where the State "has pursued civil penalties under its parens patriae authority," the number of violations should be based on what the state "proved at trial"); *State v. Macko*, No. HHDCV126031858S, 2016 WL 4268383, at *12 (Conn. Super. Ct. Aug. 1, 2016) (quoting *State v. Cardwell*, 246 Conn. at 742). However, there is considerable support for calculating penalties

---

[5] *See also, e.g.*, *People v. Nat'l Ass'n of Realtors*, 155 Cal. App. 3d 578, 586 (Cal. Ct. App. 1984) (holding determination of the number of violations must "reasonably relate to the gain or opportunity for gain achieved by the unlawful acts"); *Ly v. Nystrom*, 615 N.W.2d 302, 308 (Minn. 2000); *State ex rel. Nixon v. Estes*, 108 S.W.3d 795, 799 (Mo. App. 2003); *R.J. Reynolds Tobacco Co. v. Eighth Jud. Dist. Ct. in and for County of Clark*, 138 Nev. 585, 590-93 (Nev. 2022); *LaChance v. U.S. Smokeless Tobacco Co.*, 931 A.2d 571, 578-79 (N.H. 2007); *State ex rel. Wilson v. Ortho-McNeil-Janssen Pharms., Inc.*, 414 S.C. 33, 56-57 (S.C. 2015); *Iadanza v. Mather*, 820 F. Supp. 1371, 1377-80 (D. Utah 1993); *Gov't of United States Virgin Islands v. Takata Corp.*, 67 V.I. 316, 400 (V.I. Super. 2017).

on a "per sale" basis. Colorado's statute, for example, specifically states that "a violation of any provision shall constitute a separate violation with respect to each consumer or transaction involved." Colo. Rev. Stat. Ann. § 6-1-112(1)(a). Numerous other states have case law applying these statutes to award penalties on a "per sale," "per consumer" or similar basis. *See, e.g.*, *Office of the Atty. Gen., State of Florida, Dept. of Legal Affairs v. Top Movers Inc*, 2022 WL 22784348, at *18 (Fla. Cir. Ct. May 20, 2022) (ordering penalty per each consumer transaction); *People v. Superior Ct. (Olson)*, 96 Cal. App. 3d 181, 197-98 (Ct. App. 1979) (holding each reader of newspaper containing false representation constituted separate violation for calculating penalties); *Nat'l Ass'n of Realtors*, 155 Cal. App. 3d at 586 ("[M]ultiple violations occur where multiple persons are affected by separate acts although pursuant to a single scheme."); *Ortho-McNeil-Janssen Pharms., Inc.*, 414 S.C. at 79 (2015) ("Indeed, the language of SCUTPA itself contemplates that an unlawful method, act, or practice may result in multiple statutory violations…" and the Court treated each sample box bearing false label and each deceptive letter to prescribing physicians as a separate violation for purpose of penalties).

Defendants' reliance on *In re Electronic Books Antitrust Litig.* and *State v. Abbott Lab'ys*, Mot. 8-9, is misplaced. Centrally, Defendants' arguments hinge on interpreting the meaning of a "violation" within the confines of each states' specific statute and factual context. However, their cases are irrelevant to interpreting what a violation is under Little FTC Acts. The court in *Electronic Books* was determining penalties for purposes of state statutes based on Section 1 of the Sherman Act. 11 MD 2293 (DLC), 2013 WL 12212117, at *1 (S.D.N.Y. 2013). The court in *State v. Abbott Lab'ys*, meanwhile, was determining how to define "violation" for purposes of Wisconsin's Medicaid fraud statute. 816 N.W. 2d 145, 172-73 (Wis. 2012) (discussing Wis. Stat. S. 49.49(4m)(b)). Wisconsin's claim for penalties is not at issue in Defendants' motion, Mot. at 7

n.4, n.5. and even if it were, Wisconsin's state law claims in this case are not based on its Medicaid fraud statute.

Defendants cite only two cases involving statutes at issue here: *In re Mississippi Medicaid Pharmaceutical Average Wholesale Price Litigation* and *State v. Minnesota School of Business, Inc.* Mot. at 8-9. Both are distinguishable as neither involved allegations of price fixing or other antitrust violations. *See In re Mississippi Medicaid Pharm. Average Wholesale Price Litig.*, 190 So.3d 829 (Miss. 2015); *Minnesota School of Bus., Inc.*, 2017 WL 4220967. Moreover, neither case offers analysis that would be helpful in the present case. *State v. Minnesota School of Business* is a trial court order, and other than stating that penalties are not meant to be "restitutionary," does not provide further explanation for how it determined what constituted a "violation." 2017 WL 4220967 at *3. As for *In re Mississippi Medicaid Pharmaceutical Average Wholesale Price Litigation*, as Defendants' acknowledge in their motion, that court based its analysis on *United States v. Bornstein*, a case whose analysis is specific to the "statutory language" of the False Claims Act. *See* Mot. at 9 (citing *Bornstein*, 423 U.S. 303, 313 (1976)); *In re Mississippi Medicaid Pharm. Average Wholesale Price Litig.*, 190 So.3d at 847. Defendants provide no explanation for why an opinion of a Mississippi state court that failed to consider the FTC Act or any other state Little FTC Act, and which is out of step with the state authorities cited above, should be used to interpret the statutes of the other Plaintiff States in this litigation. The Court should disregard both of these cases.

Finally, Defendants' argument is contravened by *United States v. Reader's Dig. Ass'n, Inc.*, a case brought under the federal FTC Act, upon which Little FTC Acts are based. 662 F.2d 955 (3d Cir. 1981). There, Defendants argued penalties should be assessed based on each illegal act of "mass mailing," rather than each letter that reached consumers. *Id.* at 966-67. The Third

Circuit concluded, after trial on liability, that "adopting [Defendant's] position that one bulk mailing … comprises only one violation would eviscerate any punitive or deterrent effect of FTC penalty proceedings." *Id.* at 966-67. So too with civil penalties under the similarly remedial Little FTC Acts.

### 2.    Calculating Penalties for Any State Statute is Premature

Given the broad wording and remedial purposes of Little FTC statutes, determining what constitutes a violation requires intensive fact-finding and is therefore inappropriate to decide at the MSJ stage. *See, e.g.*, *People ex rel. Kennedy v. Beaumont Inv., Ltd.*, 111 Cal. App. 4th at 127–28 (2003) ("[Cal. Bus. & Prof. Code] Section[] 17206 … fail[s] to specify what constitutes a single violation, leaving it to the courts to determine appropriate penalties on a case-by-case basis."); Colo. Rev. Stat. § 6-4-113 (1992) (listing facts that determine number of violations); *O'Neill Investigations*, 609 P.2d at 534-35 (same) (quoting *F. T. C. v. Sperry & Hutchinson Co.*, 405 U.S. 233, 244-45 n.5 (1972)); *State v. Minn. School of Business, Inc.*, 2017 WL 4220967, at *3 (Minn. Dist. Ct. Jan. 04, 2017) (where the State "has pursued civil penalties under its parens patriae authority," the number of violations should be based on what the state "proved at trial").

All cases cited by Defendants support this view, as in each case the court conducted its analysis regarding penalties at or after trial and based on the facts that were proven at trial. *See In re Elec. Books Antitrust Litig.*, 2013 WL 12212117 at *1 (merely "set[ting] forth … presumptions" "in advance of the damages trial"); *State v. Abbott Lab'ys*, 816 N.W. 2d at 170; *In re Miss. Medicaid Pharm. Average Wholesale Price Litig.*, 190 So.3d at 835; *State v. Minn. School of Bus., Inc.*, 2017 WL 4220967 at *1. Defendants cite no case suggesting it is appropriate for a court to determine what a "violation" is before trial on liability.[6] Here, there are

---

[6] Of the thirty-one penalty-seeking Plaintiff States addressed by Defendants' motion, only
(continued…)

many issues of disputed fact regarding the scope of the conspiracies alleged. *See generally* Overarching Conspiracy Opposition.

### C.    Certain States and Territories May Recover Deadweight Loss

Deadweight loss is a well-established measure of economic harm, distinct from overcharge damages, and recoverable under the antitrust laws of California, the Virgin Islands, and Connecticut. Defendants' arguments to the contrary mischaracterize deadweight loss and improperly narrow the scope of permissible damages. Deadweight loss addresses lost welfare when prices are set above the competitive level, such as the loss when consumers forego purchases of drugs they need because they cannot afford them. Efforts to diminish these damages through speculative offsets are unsupported by law, would undermine effective enforcement, and are otherwise inappropriate at the summary judgment stage. This Court should reject Defendants' attempts to limit recovery and recognize deadweight loss as an appropriate remedy.

### 1.    Defendants Misconstrue California's and the Virgin Islands' Claims

Defendants claim California and the Virgin Islands seek "general economy damages." *See* Mot. at 22.[7] In fact, they seek to recover deadweight loss, a well-recognized measure of harm under their statutes allowing for recovery of any injury. Deadweight loss quantifies the "total welfare lost in a market that has deviated from its competitive equilibrium." SAF ¶ 22. It arises when inflated prices prevent consumers from purchasing, reducing the quantity sold below the socially efficient level, causing a consumer surplus loss disproportionate to seller's gains. *Id.* By contrast, overcharges measure excess prices paid by purchasers. SAF ¶ 23. Deadweight loss is a distinct injury, and "is in theory a component of the optimal penalty, and… satisfies

_____

Idaho, Michigan, Virginia exclusively seek penalties under a statute tracking the Sherman Act. Defendants similarly provide no sound basis for asking this Court to determine how to calculate penalties under these statutes before trial.
[7] *See supra*, note 2, regarding Puerto Rico's claims.

requirements of causation and antitrust injury." A.B.A., PROVING ANTITRUST DAMAGES: LEGAL AND ECONOMIC ISSUES, § III.8.H (3d. ed, 2017).

### 2.    Deadweight Loss is an Appropriate Measure of Damages in Suits by Attorneys General

The statutory frameworks of California, the Virgin Islands, and Connecticut permit recovery of deadweight loss in actions brought by State Attorneys General. California's Cartwright Act states "only that a party must have been 'injured' by a Cartwright Act violation and may recover the resulting 'damages sustained'; it says nothing about how the injury or damages are to be quantified." *Clayworth v. Pfizer, Inc.*, 49 Cal. 4th 758, 771 (2010) (citing Cal. Bus. & Prof. Code, § 16750(a)); *see also* Cal. Bus. & Prof. Code § 16760(a)(1) (authorizing *parens* actions "to secure monetary relief… for injury sustained"). The Virgin Islands statute similarly provides for recovery of "damages" resulting from any "injury" caused. *See* 11 V.I.C. § 1507. Connecticut law goes further, explicitly permitting recovery for "damages to the general economy," only limiting damages insofar as they must "not be duplicative of those recoverable" in a *parens patriae* action on behalf of consumers. Conn. Gen. Stat. § 35-32. These statutes provide broad remedial authority, encompassing the recovery of deadweight loss as a distinct and permissible measure of economic harm.

Deadweight loss is a critical measure of harm in antitrust enforcement because it captures economic inefficiencies *and* broader societal and equity concerns. As the California Supreme Court has explained, among the Cartwright Act's key goals is "maximizing effective deterrence of antitrust violations." *Clayworth*, 49 Cal. 4th at 763-64. This deterrence goal is best achieved by recognizing damages that "best serve[s] the various goals of antitrust law" and are "most closely in accord with the Legislature's overarching goals." *Id.* at 763-64, 785. Deadweight loss is key in achieving these goals because, unlike overcharges—which represent a transfer of

wealth from consumers to antitrust violators—deadweight loss represents a true societal loss by "misallocation of resources" that reduces overall market efficiency. Christopher R. Leslie, *Antitrust Damages and Deadweight Loss*, 51 ANTITRUST BULL. 521, 535 (2006). By restricting output, cartels cause "a deadweight or efficiency loss… a loss to consumers without an offsetting gain to producers," which is the "standard economic rationale for making a cartel illegal." William M. Landes, *Optimal Sanctions for Antitrust Violations*, 50 U. CHI. L. REV. 652, 653 (1983); *see also Bd. of Regents of University  of Oklahoma v. Nat'l Collegiate Athletic Ass'n*, 707 F.2d 1147, 1151 (10th Cir. 1983) (noting the "allocative efficiency/deadweight loss classically attributed to cartelization"). Deadweight loss reflects the harm suffered by "excluded consumers" who are "more likely to be poor and have fewer alternatives," forcing them to "do without altogether." Leslie, *supra*, at 535. Recognizing deadweight loss as recoverable damages aligns with antitrust law's goals of deterring anticompetitive behavior and restoring competitive market conditions, ensuring a complete remedy for the harm caused by Defendants' conduct.

Deadweight loss is recoverable in a *parens patriae* action because it aligns with antitrust law's broader goals and addresses the state's quasi-sovereign interest in protecting the economic welfare of its residents. Courts have historically declined to allow recovery for deadweight loss in private antitrust actions due to difficulties in identifying non-purchasers suffering injury. *See, e.g.*, *Montreal Trading, Ltd. v. Amax, Inc.*, 661 F.2d 864, 867-68 (10th Cir. 1981) (noting "a conspiracy… may also injure nonpurchasers," but declining to allow suit by a non-purchaser plaintiff because of the difficulties in identifying such entities). However, these concerns are absent in the *parens patriae* context, where the state sues to vindicate its broader economic interests and where Attorneys General can recover damages for natural persons via reasonable approximations that aggregate damages without the requirements of victim-identification that

attend class certification. *See* Leslie, *supra*, at 558 (noting "although deadweight loss can be estimated in the aggregate, the precise amount… is hard to measure for each particular consumer" and that "collective litigation that seeks damages based on the total deadweight loss caused by the violation should not be ruled out"); *see also, e.g.*, Cal. Bus. & Prof. Code § 16760(d) ("[D]amages may be proved and assessed in the aggregate by statistical or sampling methods."); *State of Connecticut v. Levi Strauss & Co.*, 471 F.Supp. 363, 371 (D. Conn. 1979) ("Connecticut is not necessarily limited to evidence of purchases by identifiable buyers… damages could be proved in the aggregate by sampling or other statistical methods, or any other reasonable computation."). Recognizing deadweight loss as a recoverable measure of damages ensures the full economic harm caused by Defendants' conduct is remedied.

California courts have specifically recognized deadweight loss in *parens* actions. For example, in *California v. eBay, Inc.*, the court approved a settlement including damages for "harm to the California economy, including deadweight loss." 2015 WL 5168666, at *3 (N.D. Cal. Sep. 3, 2015). Similarly, in *People v. Samsung SDI, Co., Ltd.*, the court rejected a motion to strike deadweight loss allegations. 2012 WL 12525950, at *1 (Cal. Super. Sep. 5, 2012). Accordingly, deadweight loss is a well-supported and appropriate measure of damages under these state laws.

### 3. Offsetting "Benefits" to Consumers Resulting from Defendants' Anticompetitive Conduct Is Inappropriate

Defendants' argument to offset "benefits" to non-purchasers who redirected their spending to other goods or services should be rejected because such "benefits" are inconsistent with competitive markets, which establish the optimal price and quantity of goods, and with established antitrust law. These offsets are also speculative. Courts consistently disallow offsetting benefits against damages, recognizing that such defenses are impractical and

undermine deterrence. For example, "[c]ourts regularly disallow antitrust defendants from arguing that plaintiffs otherwise benefitted from the alleged conspiracy and that such benefit should be subtracted from the damages calculation." *Mr. Dee's Inc. v. Inmar, Inc.,* 2022 WL 3576962, at *4 (M.D.N.C. Aug. 19, 2022). Indeed, "the nature of price-fixing is such that it would be inappropriate to allow a defendant to rely on alleged benefits of its anticompetitive conduct to reduce any damages it owes." *In re Delta/AirTran Baggage Fee Antitrust Litig.*, 317 F.R.D. 675, 686 (N.D. Ga. 2016). Here, Defendants' proposed offsets would improperly diminish damages, allowing them to undermine the functioning of competitive markets by introducing evidence of benefits from rigged markets, an outcome the antitrust laws do not permit. It would also require speculating about consumer behavior, making it unworkable and inappropriate for summary judgment. The Court should reject this argument and ensure that Defendants are held fully accountable for the harm caused by their anticompetitive conduct.

Even if Defendants were correct that benefits from redirected consumer spending must be considered, they bore the burden of proof of demonstrating a triable issue of material fact and have failed to meet it such that it cannot be considered for purposes of summary judgment. A defendant bears the burden of proving its affirmative defenses. *See Leopold v. Baccarat, Inc.*, 239 F.3d 243, 245 (2d Cir. 2001). In the context of antitrust damages, arguments for offsetting benefits, such as the "pass-on" defense, have been treated as affirmative defenses. *See Hanover Shoe, Inc. v. United Shoe Mach. Corp.*, 392 U.S. 481, 491-494 (1968) (rejecting the pass-on defense due to its speculative and impractical nature); *In re Domestic Drywall Antitrust Litig.*, 2020 WL 1695434, at *16 (E.D. Pa. 2020) (characterizing the pass-through defense as an affirmative defense). Conceptually, Defendants' argument that money saved by consumers who did not purchase drugs should offset deadweight loss damages mirrors the pass-on defense. Yet

Defendants offer no evidence regarding how consumers spent their saved funds, nor whether such spending offset the societal and economic harm captured by deadweight loss. Without such evidence, Defendants fail to meet their burden of proof, and their argument must be rejected.

### 4. Deadweight Losses Are Non-Duplicative General Economy Damages

Deadweight loss is a distinct and recoverable form of harm under Connecticut law because it reflects the loss of consumer surplus caused by reduced market output, which is separate from overcharge damages. Defendants' own expert acknowledges this distinction, conceding deadweight loss addresses harm to consumers who did not purchase drugs, whereas overcharges apply to those who did. SAF ¶ 24.

Defendants' reliance on *State v. Marsh & McLennan Cos.*, 286 Conn. 454 (Conn. 2008), to argue that general economy damages are limited to "specific types of harm" misinterprets the case. Mot. at 22. In *Marsh*, the Connecticut Supreme Court recognized allegations of reduced monetary circulation due to a conspiracy could support general economy damages but nowhere suggested general economy damages were so limited. *Id.* at 327-29. Deadweight loss addresses a societal harm that is neither speculative nor duplicative of overcharge damages. It reflects a reduction in market efficiency and overall economic welfare, a harm Connecticut law is designed to remedy. Accordingly, deadweight loss falls squarely within the statutory framework for general economy damages, and Defendants' arguments to the contrary should be rejected.

### 5. Connecticut's Remaining General Economy Damages are Non-Duplicative

Connecticut did not, and cannot, bring a *parens patriae* damages claim on behalf on consumers for the conduct alleged in this matter. *See* Resp. to SMF ¶ 32; Conn. Gen. Stat. § 35-46a (statute repealing *Illinois Brick* ban on indirect purchaser recovery as to drugs enacted as Section 2 of Public Act 17-241 in 2017). Defendants' claim Connecticut impermissibly seeks to

recover the same "overcharges as both general economy damages and *parens patriae* damages" on behalf of consumers, Mot. at 25, is incorrect. Defendants support their argument by citing a table in the Amended Expert Report of Hal J. Singer. *See id.* (citing "SMF ¶ 32," a Local Rule 56(a)1 Statement paragraph that the States dispute and that cites in support only Singer's amended report as "Ex. 37 at Table 22"). An expert's report, however, does not establish the claims Connecticut has asserted; "it is the complaint that defines the claims." *Marsteller v. Butterfield 8 Stamford LLC*, 2017 , 2017 WL 5769903, at *3 (D. Conn. Nov. 27, 2017) (Miriam, Mag. J.) (unchallenged ruling under 28 U.S.C. § 636 (b)(1)(A)); *see* Fed. R. Civ. P. 8(a). Indeed, Connecticut told Defendants its general economy damages claim was its "sole compensatory claim" in a 2020 interrogatory response. Resp. to SMF ¶ 32. Connecticut has not asserted duplicative claims, so Connecticut's general economy damages claim survives summary judgment.

## III. THE CHALLENGED APPLICATIONS OF STATE ANTITRUST LAWS DO NOT VIOLATE THE CONSTITUTION.

Defendants make two constitutional arguments against the sought-after application of state antitrust laws, first by arguing the dormant commerce clause bars application of the antitrust laws of states where Defendants made no direct sales, Mot. at 10-16, and second, by arguing the due process and full faith and credit clauses prohibit the application of the laws of states other than those where the Defendants conspired, Mot. at 17-21.

Defendants are wrong on both counts, as discussed further below, and demonstrated by the long history of state enforcement of antitrust and unfair competition laws. For over a century, states have protected their residents from the types of business practices prohibited by state antitrust statutes, even if the misconduct has an incidental impact on interstate commerce or if the misconduct occurs in other states. Courts have long acknowledged that these efforts are

constitutional, including against challenges based on similar arguments to those made here.

For example, in *Standard Oil Co. of Kentucky v. Tennessee ex rel. Cates*, the Supreme Court held Tennessee had the power to regulate the defendant, a Kentucky corporation, which had induced Tennessee merchants to rescind contracts from a rival Pennsylvania company and instead purchase from the defendant. 217 U.S. 413, 419-421 (1910). The Tennessee statute in question, the Court concluded, did not impermissibly regulate interstate commerce but instead was directed "against acts of a certain kind that the state disapproves." *Id*. at 422. That there were incidental effects on "commerce among the states as well with the rest [did] not invalidate it." *Id*.

In the modern era, courts have continued to uphold state antitrust statutes, including in cases involving applications to conspiracies, restraints of trade, and other misconduct hatched or carried out across state lines. For example, the U.S. Supreme Court upheld Maryland's prohibition of oil refiners from owning retail service stations within the state, holding the statute did not violate the dormant Commerce Clause even though the affected refiners were out-of-state corporations. *Exxon Corp. v. Maryland*, 437 U.S. 117, 128 (1978); *see also California v. ARC Am. Corp.*, 490 U.S. 93, 101 (1989) ("Given the long history of state common-law and statutory remedies against monopolies and unfair business practices, it is plain that this is an area traditionally regulated by the States.").

Similarly, in *Knevelbaard Dairies v. Kraft Foods, Inc.*, the Ninth Circuit upheld the application of the California's Cartwright Act to anticompetitive conduct occurring in Wisconsin but having effects in California. 232 F.3d 979, 993-94 (9th Cir. 2000). In so holding, the Ninth Circuit rejected defendants' dormant Commerce Clause argument, noting the U.S. Supreme Court has "made clear that neither the Sherman Act nor the Commerce Clause preempts state antitrust laws." *Id*. (citing *ARC Am. Corp.*, 490 U.S. at 93); *see also In re Brand Name*

*Prescription Drugs Antitrust Litig.*, 123 F.3d 599, 613 (7th Cir. 1997), *abrogated on other grounds by Rivet v. Regions Bank of Louisiana*, 522 U.S. 470 (1998) ("[S]tates read their antitrust statutes to reach what is now understood to be interstate commerce… [and that] reading is constitutionally permissible."); *Redwood Theatres, Inc. v. Festival Enter., Inc.*, 908 F.2d 477, 480 (9th Cir. 1990) ("[S]tate antitrust laws retain vitality in dealing with matters which significantly affect local interests, even if they also have interstate aspects.") (quoting *Salveson v. W. States Bankcard Ass'n*, 731 F.2d 1423, 1427 (9th Cir. 1984)).

This long tradition of judicial recognition of states' antitrust enforcement powers counsels strongly against Defendants' challenge. If Defendants' constitutional arguments were accepted, it would mean the states have been acting unconstitutionally in applying their antitrust laws for over a century. This Court should look skeptically on such a far-reaching assertion. *Cf. Houston Cmty. Coll. Sys. v. Wilson*, 595 U.S. 468, 474 (2022) ("When faced with a dispute about the Constitution's meaning or application, [l]ong settled and established practice is a consideration of great weight.") (quotation marks, citations omitted).

### A. The Dormant Commerce Clause Allows State Laws Forbidding Antitrust Conspiracies That Cause Significant Harm to their Residents

Defendants specifically argue State Plaintiffs cannot seek civil penalties and fines against Defendants under their respective state antitrust laws because it would violate the dormant Commerce Clause. In Defendants' view, that doctrine precludes the "regulat[ion of] out-of-state transactions solely due to downstream in-state effects." Mot. at 10. That argument is meritless.

The Supreme Court recently clarified the dormant Commerce Clause imposes no *per se* "extraterritoriality doctrine"—that is, no rule "forbidding enforcement of state laws that have the practical effect of controlling commerce outside the State." *Nat'l Pork Producers*, 598 U.S. at 371 (internal quotation marks omitted). While several earlier Supreme Court decisions had used

such language, *see, e.g.*, *Healy v. Beer Inst.*, 491 U.S. 324 (1989), the Court in *National Pork* unanimously concluded that a "close look" at cases like *Healy* reveals that "each typifies the familiar concern" under the dormant Commerce Clause with "preventing purposeful discrimination against out-of-state economic interests." *Nat'l Pork Producers*, 598 U.S. at 371 (discussing *Healy*, as well as *Brown-Forman Distillers Corp. v. New York State Liquor Auth.*, 476 U.S. 573 (1986) and *Baldwin v. G.A.F. Seelig, Inc.*, 294 U.S. 511 (1935)); *see also Nat'l Pork Producers*, 598 U.S. at 394 (Roberts, C.J., concurring in part and dissenting in part) ("I agree with the Court's view in its thoughtful opinion that [cases like *Healy*] are properly read as invalidating statutes that promoted economic protectionism."). But Defendants do not raise any claims of impermissible discrimination or protectionism. *See* Mot. at 13-15. Nor could they, because the state statutes at issue apply equally to in-state and out-of-state actors and there are no allegations that the laws were motivated by economic protectionism.

Nor do Defendants invoke the balancing test of *Pike v. Bruce Church, Inc.*, 397 U.S. 137, 142 (1970), under which state laws are "upheld unless the burden imposed on [interstate] commerce is clearly excessive in relation to the putative local benefits." "To put things in perspective, the Supreme Court 'has not invalidated a law under *Pike*' in more than 30 years." *Truesdell v. Friedlander*, 80 F.4th 762, 773 (6th Cir. 2023). And given that the state antitrust laws at issue here protect important local interests in safeguarding consumers from excessive prices and related harms, *see, e.g.*, *Redwood Theatres, Inc. v. Festival Enterprises, Inc.*, 908 F.2d 477, 480 (9th Cir. 1990), Defendants could not make any serious argument that the challenged state statutes are invalid under *Pike*.

The principal cases cited by Defendants in support of their dormant Commerce Clause argument predated the Supreme Court's recent clarification in *National Pork* of the *Baldwin-*

*Healy* line of cases.[8] Because those cases turned on a flawed understanding of the *Baldwin-Healy* line, they are no longer good law. Defendants' reliance on *Edgar v. MITE Corp.,* 457 U.S. 624 (1982), is likewise unavailing. *See* Mot. at 10. Defendants invoke a nonprecedential portion of *Edgar* joined by only four justices. 457 U.S. at 642-643. In *National Pork,* a *majority* of the Supreme Court cast doubt on the discussion of extraterritoriality in *Edgar*. *Nat'l Pork Producers,* 598 U.S. at 376 n.1. But even if *Edgar* were precedential, it would at most call into question state laws that "directly regulate transactions which [take] place … wholly outside the [enacting] State and involve[] individuals having no connection with [the enacting State]." *Nat'l Pork Producers,* 598 U.S. at 376 n.1 (quoting *Edgar,* 457 U.S. at 641-643) (internal quotation marks and alterations omitted). The applications of state antitrust laws at issue here have a substantial connection to individuals in the enacting States. As discussed above, Defendants' practices resulted in massive price increases for consumers in the plaintiff states. That substantial connection to legitimate in-state interests easily suffices to eliminate any concerns under the dormant Commerce Clause. *See, e.g.,* *Ward v. United Airlines, Inc.,* 986 F.3d 1234, 1240-1241 (9th Cir. 2021). Indeed, if the law were otherwise, a multitude of routine applications of state law would be invalid—for example, the application of California or New York products liability law to the defective design in Michigan of a vehicle after that vehicle malfunctions and causes substantial harm in California or New York. Defendants cannot show that the applications of state law challenged here are materially distinguishable.[9]

---

[8] *See, e.g.,* *Ass'n for Accessible Meds. v. Frosh,* 887 F.3d 664, 671 (4th Cir. 2018) and *Pharm. Rsch. & Mfrs. of Am. v. District of Columbia,* 406 F. Supp. 2d 56, 67-71 (D.D.C. 2005).

[9] The court's analysis in *Ass'n for Accessible Meds. v. Ellison,* 704 F. Supp. 3d 947 (D. Minn. 2023), is not to the contrary. The court merely concluded that states may "not directly regulate transactions that take place wholly outside the state and have no connection to it." *Id.* at 953. In the court's view, the challenged Minnesota law had that effect because it "unavoidabl[y]" regulated, not just drugs sold in Minnesota, but also "drugs … that will never reach Minnesota." *Id.* at 956; *see also Ass'n for Accessible Meds. v. Bonta,* 2025 U.S. Dist. LEXIS 26470 (E.D. Cal. (continued…)

Finally, assuming *arguendo* Defendants are correct on the law, they overlook that each Defendant is liable for the acts, including the sales, of its co-conspirators. *See U.S. v. Socony-Vacuum Oil Co.,* 310 U.S. 150, 253–54 (1940) ("For a conspiracy is a partnership in crime; and an 'overt act of one partner may be the act of all without any new agreement specifically directed to that act.").act'"). Even accepting Defendants' evidence as true, at least one co-conspirator made sales in nearly every Plaintiff State.[10] And there are numerous disputes on Defendants' evidence. *See* Resp. to SMF 54 - 83. For example, Defendants improperly limited their analysis of "sales" only to where drugs were invoiced, not where they were shipped.[11] *See, e.g.,* Resp. to SMF 55, 68, 69, 78, 79.

### B.    The Full Faith and Credit Clause Does Not Bar States from Obtaining Penalties for Sales Occurring in Their State.

Defendants' argument that both the Full Faith and Credit Clause and Due Process Clause prevent State Plaintiffs from obtaining penalties for sales occurring in their respective states is based on the two-part test laid out in *Phillips Petroleum Co. v. Shutts*, 472 U.S. 797, 821 (1985). Mot. at 17-21. That analysis requires courts to first determine whether the proposed state law "conflicts in any material way with any other law which could apply." *Shutts*, 472 U.S. at 816. If

---

Feb. 13, 2025) (viewing the challenged California law as "regulat[ing] settlement agreements in which none of the parties, the agreement, or the pharmaceutical sales have any connection with California"). Defendants cannot show that any of the antitrust statutes at issue here have a comparable reach.

[10] The only exceptions are Montana, the Virgin Islands, and the Northern Marianas Islands.

[11] Defendants also rely on attorney affidavits regarding their clients' transactional data to establish where sales were made, but these would not be admissible at trial. *See, e.g.,* SMF ¶¶ 54-55, 72, 78-79. As this Court's pretrial preferences note: "Lawyer affidavits are rarely accepted as evidence on disputed issues of fact." In addition to being improper expert evidence, the declarations do not establish the requirements for the business records exception under Fed. R. Civ. Proc. 802(6), for example that the underlying records were "made at or near the time by — or from information transmitted by — someone with knowledge." Nor could they, as the attorneys lack personal knowledge, even if they learned facts through discussions with their clients. *See U.S. v. Kaplan*, 490 F.3d 110, 122 (2d Cir. 2007). In some cases, Defendants also purport to submit summaries without providing State Plaintiffs with the underlying data, as required by Fed. R. Civ. Proc. 1006(b). *See, e.g.,* SMF ¶¶ 57, 68.

so, courts must then ask whether the state whose law is being invoked has "a 'significant contact or significant aggregation of contacts' to the claims asserted… to ensure that the choice of [that state's] law is not arbitrary or unfair." *Id.* at 821-822 (quoting *Allstate Ins. Co. v. Hague*, 449 U.S. 302, 312-13 (1981)). Here, the Plaintiff States do not dispute that there are differences between the laws of the Plaintiff States. The only question is whether the Plaintiff States have sufficient contacts to the claims asserted such that imposing penalties on sales of price-fixed drugs occurring in their states is not barred. The answer is clearly yes.

First, there is no conflict of laws when Plaintiff States impose penalties under their own state law for sales occurring within their respective States. Defendants intentionally sold their price-fixed products into each of the Plaintiff States at issue, either by selling directly to a buyer in the Plaintiff State, or by knowingly selling to national chains or wholesalers servicing the Plaintiff State. SAF ¶¶ 26-29. It is long-established that a State may enforce its laws against "[a]cts done outside [the state], but intended to produce and producing detrimental effects within it… ." *Strassheim v. Daily*, 221 U.S. 280, 285 (1911). Nothing excludes penalties assessed against in-state violations and/or conduct from that bedrock principles.

Indeed, Defendants fail to provide any case law supporting their assertion that the application of a state statute to sales within that state to impose penalties violates either the Due Process or Full Faith and Credit clauses. Rather, each case cited by Defendants is distinguishable. *Shutts* involved an attempt to apply Kansas law to oil leases located outside Kansas. 472 U.S. at 822. *Johannessohn v. Polaris Indus., Inc.*, 450 F. Supp. 3d 931, 961 (D. Minn. 2020), addressed an attempt to apply Minnesota law to the claims of nonresident parties. *Id.* at 961. *Victorino v. FCA US LLC*, 326 F.R.D. 282, 297 (S.D. Cal. 2018), addressed an attempt to certify a *nationwide* class based on California's Song-Beverly Act. These cases might

be relevant if the Plaintiff States sought to apply the laws of one Plaintiff State as to penalties for every sale of the relevant generic drugs, regardless of location. But that is not the case here.

The remaining cases cited by Defendants have even less relevance. Defendants rely on *New England Leather Co. v. Feuer Leather Corp.*, 942 F.2d 253 (4th Cir. 1991), for the proposition that the sale of generic drugs in a Plaintiff State is an insufficient contact for purposes of applying that Plaintiff States statutory law for penalties. Mot. at 19–20. But that case involved a lawsuit between a New York leather supplier and a Massachusetts leather retailer, where the plaintiff retailer sought to apply *North Carolina* law to the transaction. *New England Leather Co.*, 942 F.2d at 256. *Herrera v. Michelin N. Am., Inc.*, 2009 WL 700645, (S.D. Tex. Mar. 16, 2009), meanwhile, was a personal injury and wrongful death case in which the court applied the doctrine of *forum non conveniens*. That is not relevant here.

Second, Defendants concede summary judgment is *not* proper for States in which a specific Defendant allegedly participated in collusive acts. Again, Defendants fail to acknowledge conspirators are liable for the acts of *all* their co-conspirators. *See Socony-Vacuum,* 310 U.S. at 253–54. And since the Plaintiff States allege, and have produced evidence to establish,[12] that each of the Defendants was party to an overarching conspiracy with each other Defendant, then, by Defendants' own logic, each Plaintiff State listed on pages 20-21 of Defendants' motion is entitled to apply their penalty statutes.[13]

Finally, a genuine dispute of material fact exists regarding where Defendants engaged in

---

[12] The Plaintiff States incorporate its arguments made in opposition to Defendants Joint Motion for Summary Judgment on Overarching Conspiracy Claims and the evidence cited in their Rule 56.1 Statement in support of that opposition.

[13] Defendants listed the following Plaintiff States: Ohio, Florida, Kentucky, New Jersey, New York, Pennsylvania, Wisconsin, Arizona, Michigan, North Carolina, Massachusetts, Maryland, Nevada, Missouri, West Virginia, Tennessee, and Illinois.

their collusive conduct.[14] Although Defendants list seventeen Plaintiff States in which they contend collusive conduct allegedly occurred, those states appear to be only those in which certain employees of the Defendants lived or maintained offices.[15] However, the Plaintiff States have alleged that the Defendants' collusive conduct included in-person communications made at industry events throughout the United States. The Plaintiff States' Rule 56.1 Statement cites evidence of Defendants' attendance at numerous in-person meetings in nearly every Plaintiff State at issue. SAF ¶¶ 30-32. Whether Defendants engaged in collusive conduct at those meetings is a triable issue of fact making summary judgment inappropriate.

## CONCLUSION

For the foregoing reasons, Defendants' motion for summary judgment should be denied.

---

[14] In many cases, Defendants submit emails or other materials such as HR files or resumes to show the state of residence or work of conspirators. *See,* SMF ¶¶ 85- 210. But these are plainly hearsay, and so would not be admissible at trial. There is no evidence to show they fall into the business records exception, or any other hearsay exception. *See Schaghticoke Tribal Nation v. Kempthorne*, 587 F. Supp. 2d 389, 397–98 (D.Conn. 2008).

[15] By Defendants' logic, even the Plaintiff States in which Defendants directly sold their price-fixed products, e.g., states in which wholesalers were located, would be constitutionally barred from enforcing their state antitrust statutes. *See* SMF ¶¶54 – 83 (listing states in which it is undisputed that Defendants sold their allegedly price-fixed products).

DATED: February 20, 2025                    Respectfully submitted,


STATE OF CALIFORNIA                         STATE OF CONNECTICUT
ROB BONTA                                   WILLIAM TONG
ATTORNEY GENERAL                            ATTORNEY GENERAL

*/s/ John Ohanesian*[16]                    */s/ Joseph Nielsen*
John Ohanesian                              W. Joseph Nielsen
Daniel Ambar                                Federal Bar No. ct20415
Mathew Simkovits                            Assistant Attorney General
Deputy Attorney General                     Connecticut Office of the Attorney General
Healthcare Rights and Access Section        165 Capitol Ave.
California Office of the Attorney General    Hartford, CT 06106
300 S. Spring Street, Ste. 1702             Tel: (860) 808-5030
Los Angeles, CA 90013-1256                  Fax: (860) 808-5391
Tel: (213) 269-6000                         Joseph.Nielsen@ct.gov
john.ohanesian@doj.ca.gov
daniel.ambar@doj.ca.gov                     *Counsel for the State of Connecticut*
mathew.simkovits@doj.ca.gov


Emilio Varanini
Supervising Deputy Attorney General
Sophia TonNu
Deputy Attorney General
Healthcare Rights and Access Section
California Office of the Attorney General
455 Golden Gate, Suite 11000
San Francisco, CA 94102-7004
Tel: (415) 510-3541
emilio.varanini@doj.ca.gov
sophia.tonnu@doj.ca.gov


*Counsel for the State of California*

---

[16] Counsel for Plaintiff State of California represents the consent of all Plaintiffs in the above-captioned case pursuant to section XI.D. of the Electronic Filing Policies and Procedures.