**UNITED STATES DISTRICT COURT**
**DISTRICT OF CONNECTICUT**

| | |
|---|---|
| STATE OF CONNECTICUT, et al., | |
| *Plaintiffs,* | No. 3:16-cv-02056-MPS |
| v. | |
| AUROBINDO PHARMA USA, INC., et al., | |
| *Defendants.* | |
| STATE OF CONNECTICUT, et al., | |
| *Plaintiffs,* | No. 3:19-cv-00710-MPS |
| v. | |
| TEVA PHARMACEUTICALS USA, INC. et al., | |
| *Defendants.* | |
| STATE OF CONNECTICUT, et al., | No. 3:20-cv-00802-MPS |
| *Plaintiffs,* | |
| v. | |
| SANDOZ, INC., et al., | July 2, 2025 |
| *Defendants.* | |

**CERTAIN STATES' OPPOSITION TO THE AMENDED MOST FAVORED
NATIONS CLAUSE IN THE SETTLEMENT AGREEMENT BETWEEN FLORIDA
AND SANDOZ INC.**

## I.    INTRODUCTION AND BACKGROUND

Florida and Sandoz ("Settling Parties") are before this Court asking, for a second time, that

it bless a fundamentally unfair and litigation-prolonging settlement agreement. They make this

request through their Renewed Consent Motion to Dismiss with Prejudice ("Renewed Mtn") all of

Florida's claims against defendants Sandoz Inc., Fougera Pharmaceuticals Inc., Sandoz AG,

Novartis AG, Armando Kellum and Walt Kaczmarek ("Settling Defendants") in the above-

captioned cases[1]—actions brought jointly by over 47 states, provinces, districts, commonwealths, and territories against some of the most well-funded defendants in the world. Having again reviewed the full text of the amended settlement agreement, the objecting States hereby file this Opposition.[2]

As indicated in the States' first opposition, the States emphasize their respect for another sovereign's right to settle its own claims and do not oppose the fact of Florida's settlement. As delineated below, the States' concerns here again relate to the scope of the same one discrete provision of the amended settlement agreement—paragraph 6 of the Amended Settlement Agreement, titled "Payment Adjustment" and otherwise known as a Most Favored Nation ("MFN") Clause (hereinafter the "Amended MFN").

The Settling Parties' first motion to dismiss culminated in a hearing on May 1, 2025.[3] There, the Court questioned the Settling Parties' attorneys at length, drilling down on the ways in which the MFN clause would impede settlements for the other states. [TR at pp. 28-32, 36-40, 51-53]. The Court found that dismissing Florida's claims, and giving effect to the MFN, would "make it less likely that Sandoz would actually reach settlements with the States, for example, whose populations are smaller than Florida's, unless those States were willing to walk away for sums that pale in comparison to previous resolutions by Sandoz with the federal government." [TR at p. 54, lines 18-25]. The Court agreed with the non-settling States that the MFN would require them to make a choice: "either try the case, win it, and successfully defend the appeal, a very lengthy process most likely, or accept an amount that has effectively, effectively, been dictated by Florida and Sandoz, or something less than that amount." [TR at p. 55, lines 3-9].

---

[1]  3:16-cv-02056-MPS, ECF No. 820 (the "Heritage" action); 3:19-cv-00710-MPS, ECF No. 704 (the "Teva" action); and 3:20-cv-00802-MPS, ECF No. 750 (the "Derm" or "Sandoz" action).
[2] The Plaintiff States joining this motion (the "States") include: Alaska, California, Colorado, Connecticut, Delaware, District of Columbia, Illinois, Kansas, Maine, Maryland, Massachusetts, Michigan, Minnesota, New Jersey, New Mexico, North Dakota, Oregon, Pennsylvania, Rhode Island, Vermont, U.S. Virgin Islands, and Washington.
[3] The States include the transcript of the May 1 hearing as Exhibit A and cite it as "TR" in this Opposition.

The Court's findings articulated the MFN's settlement-throttling impact on the other states' potential negotiations with Sandoz. And nothing in the Amended MFN changes that dynamic because, as the Court recognized, the "context matters here." [TR at p. 55, line 2]. That context presents the States—especially small-population states—with the Hobson's choice of settling for an inadequate amount "dictated by Florida and Sandoz," or spending years trying the case and defending an appeal. The Amended MFN does not change that choice.

As was true of the original MFN, the Amended MFN not only allows Florida, late in the litigation game and at no additional risk or cost, to greatly benefit from the continued work of the other states, but it also provides Sandoz with a powerful incentive to undervalue its exposure to other states and meaningfully hinders settlements. For a period of two years, no subsequent settlements can consider only an individual state's economic harm or entitlement to civil penalties; and for a period of four years, no multistate settlement can consider only the aggregated value of the settling states' economic harm or entitlement to civil penalties. All settlements must also account for the *additional* amounts that Sandoz will be required to pay Florida, and those amounts remain prohibitively large under the Amended MFN. As the Court stated at the May 1 hearing, applying the terms of the Amended MFN to a settlement with Oregon for $10 million would require Sandoz to pay Florida *quadruple* that amount—"a very substantial payment that Sandoz has to make." [TR at p. 29, lines 17-18]. It is impossible to imagine Sandoz agreeing to spend $50 million to make a $10 million problem go away, especially when that same calculation is multiplied by the number of states in situations similar to Oregon's. The mathematical realities of the Amended MFN unnecessarily undermine the fair, efficient, and cost-effective resolution of these multistate cases and directly counter the purposes of Federal Rules 1 and 41.

The Court observed the intractable problems presented by the Settling Parties' MFN operating in the present context. After considering the relevant factors, the Court "refus[ed] to lend

[its] imprimatur to a motion that would carry out a settlement agreement that contains terms that . . . violate the policy behind Federal Rule 41 and Federal Rule 1" because the agreement would not "foster the just, speedy, and inexpensive determination of the action . . . ."[4]

Nothing in the Settling Parties' renewed motion, nor any of the amendments they made to Paragraph 6, should change the Court's conclusions. The Settling Parties recycle legal arguments the Court has already dispensed with, and the Amended MFN visits the same prejudice on all the other states that the original MFN did. The Court should therefore deny the Settling Parties' renewed motion to dismiss.

## II. THE COURT REJECTED THE SETTLING PARTIES' "PLAIN LEGAL PREJUDICE" ARGUMENT

The Settling Parties renew their argument that the States have failed to meet Rule 41(a)(2)'s "plain legal prejudice" standard. [Renewed Mtn at pp. 2-4]. The cases they principally rely on— *Camilli v. Grimes*[5] and *New York v. De Blasio*[6]—are the exact cases they relied on to support their original motion.[7]  The Court directly addressed each case during the May 1 hearing, along with several others that the Settling Parties cited in their first set of briefs, and rejected them all. [TR at pp. 56-58]. The Court found *Camilli* "so far afield procedurally and factually" that it did not bear further discussion. [TR at p. 57, lines 17-18]. With respect to *De Blasio*, the Court noted that it (a) was "not a precedential ruling"; and (b) though it involved Rule 41, some of the relevant language was "qualified with 'ordinarily' and 'generally' and the like" such that the case was not persuasive. [TR at p. 57, lines 2-5].

While the Court expressed appreciation that the Settling Parties brought the *Camilli* and

---

[4] *See* TR at p. 58, lines 6-11.
[5] 436 F.3d 120 (2nd Cir. 2006).
[6] No. 24-695, 2025 WL 857338 (2d. Cir. March 19, 2025) (unpublished).
[7] The Settling Parties cite only one new authority: *Kwan v. Schlein*, 634 F.3d 224 (2d. Cir. 2011). The facts and legal questions in that case are even more "far afield" from those present in the instant motion than were the ones in the *Camilli* case. [TR at p. 57, lines 15-18]. *Kwan* did not involve a co-plaintiff objecting to a dismissal based on an MFN. Just as with *Camilli*, the Court need not consider *Kwan* any further.

*De Blasio* cases to its attention—along with the others the Settling Parties have now jettisoned from their arguments supporting their renewed motion—it found that "those cases" did not "actually govern this situation" and concluded that it had the required discretion to consider whether the MFN imposed an improper term under the standards set forth in Rule 41(a)(2) and Rule 1. [TR at p. 57, lines 23-25; TR at p. 58, line 1]. Exercising that discretion, the Court concluded that the MFN, as written, violated the policies those rules were designed to promote and protect. [TR at p. 58, lines 2-12].

The *Camilli* and *De Blasio* cases are no more apposite today than they were on May 1 when the Court denied the Settling Parties' motion to dismiss. The Court can quickly dispense with the Settling Parties' renewed "formal legal prejudice" argument for the same reasons it did two months ago. It has the discretion today, just as it did when it considered the Parties' original motion to dismiss, to consider whether the Amended MFN imposes a term that would frustrate the "just, speedy, and inexpensive determination of the action." [TR at p. 58, lines 10-11].

## III.    THE AMENDED MFN IS STILL A "STRAITJACKET" ON OTHER STATES

A. The methodology in the Amended MFN leads to supplemental payments that are grossly prejudicial to the States and antithetical to the public policies Federal Rule 41(a)(2) and Federal Rule 1 are designed to promote and protect.

The Settling Parties insist the Court is limited under Rule 41(a)(2) to determining whether an MFN impairs the States' contractual rights or forecloses their presentation of evidence. [Renewed Mtn at p. 3]. But the Court, reading Rule 41(a)(1) and Rule 1 together, has expressly rejected that argument. [TR at pp. 53-58]. At the same time, in denying the Settling Parties' motion to dismiss without prejudice, the Court implicitly invited them to rework their MFN and try again. The Settling Parties technically complied, but the results are substantively the same. The supplemental payment calculations required by the Amended MFN would effectively foreclose any chance the States, individually or collectively, have to settle with Sandoz during

the next two to four years, respectively, for an amount that reflects Sandoz's exposure to an award of civil penalties, disgorgement, damages, costs, and attorney's fees under state law.

In their renewed motion, the Settling Parties do not challenge the Court's observation during the May 1 hearing that there is a "spectrum" onto which a mandatory MFN supplemental payment will fall, and that on that spectrum there is a line that separates an enforceable MFN term from an unenforceable one.[8]  Unenforceable MFN terms create a "straitjacketing" effect on non-settling plaintiffs during negotiations and impede the "just, speedy, and inexpensive" resolution of the case.[9]

The Amended MFN places the States in exactly the type of straitjacket that was warned against in the *In re Chicken Antitrust Litig.* case. The Amended MFN, like the original, uses a population-based—or per capita—methodology to calculate the supplemental payment. The Court noted the unfairness of a population-based MFN methodology during the May 1 hearing; that kind of methodology ignores actual state expenditures or harm, which may be higher than a population-based model suggests. [TR at p. 47, lines 10-22; TR at p. 54, lines 18-25]. The Settling Parties assert that this methodology does nothing more than create "parity" between Florida and a state (or the multistate) that might subsequently settle with Sandoz. [Renewed Mtn to Dismiss at pp. 3-4]. It does

---

[8] *See* TR at p. 38, line 5. Attorneys for both Florida and Sandoz agreed that such a line of demarcation exists. *See* TR at p. 28, lines 8-23 and p. 29, lines 1-6, 22-25 (Florida's attorney acknowledging that a line exists across which Florida would get a "windfall" and the states would be "handcuffed" in their negotiations with Sandoz). *See also* TR at p. 50, lines 1-4 (Sandoz' attorney acknowledging he could envision "punitive" applications of an MFN).

[9] The Amended MFN—which settles the claims of a single plaintiff—gives Sandoz unfair leverage in settlement negotiations with the remaining States, who are also victims of its conduct. As a policy matter, giving Sandoz the right to set limits or conditions on the ability of its victims to recover for its own wrongdoing is inappropriate. *See, e.g., In re Chicken Antitrust Litig.*, 560 F. Supp. 943, 946-47 (N.D. Ga. 1979) ("Because plaintiffs are 'strait-jacketed' by their most-favored-nations agreements with certain prior settling defendants, the strong public policies favoring complete settlement of litigation of this type are being frustrated"); *Cintech Indus. Coatings v. Bennett Indus.*, 85 F.3d 1198, 1203 (6th Cir. 1996) (affirming order that MFN had not been triggered but noting "the disfavored status of most favored nation clauses because they often inhibit compromise and settlement," which "can be particularly disruptive in the orderly disposition of such complex litigation as antitrust class actions, which by their nature involve multiple defendants"). Courts have recognized the potential for MFN provisions to impede the rights of other litigants and frustrate the resolution of multi-party cases. The Manual for Complex Litigation recognizes that MFNs may sometimes be an "obstacle to later settlements," and may be rejected or limited where "enforcement becomes inequitable." Manual for Complex Litigation, Fourth § 13.23; s*ee also JP Morgan Chase Bank, N.A. v. DataTreasury Corp.*, 79 F. Supp. 3d 643, 656 (E.D. Tex. 2015) ("The judge may have to consider voiding or limiting them if enforcement becomes inequitable"); *In re Enron Corp. Secs., Derivative & "ERISA" Litig.*, No. CIV.A. H-01- 3624, 2008 WL 2566867, at *2 n.4 (S.D. Tex. June 24, 2008) (same).

not.

First, neither version of the MFN accounts for the significant fees and costs that the other states will incur between now and trial. The Amended MFN continues to contain a punishing duration: two years with respect to settlements states might enter into individually, and *four* years for a multistate settlement. Far from parity, the Amended MFN will provide Florida with the lopsided benefit of the value added to the case by the States' additional work and expenditures over the course of these significant periods of time. Florida will receive this benefit without bearing risk or contributing anything further to the effort but will stand to receive a proportionate share of funds secured through settlement for the purpose of reimbursing the costs and fees incurred by the states who are actually doing the work. This is not parity.

Second, Sandoz and Florida have valued Sandoz's aggregate liability to all states at $150 million. As the Court's questions highlighted during the May 1 hearing, the inadequacy of that number is demonstrated by the fact that Sandoz assessed its liability to the federal government at an amount two-and-a-half times that suggested by Florida's settlement. [TR at p. 42, lines 11-18]. Moreover, the States' experts have calculated a Sandoz disgorgement number of over $2 billion. A settlement with a value greater than Florida's will necessarily reflect one of two things, or both: Sandoz and Florida grossly undervalued Sandoz's liability; and/or the non-settling states' work between now and a future settlement significantly increased the case's value. Under this framework, far from ensuring parity, the Amended MFN would convey a windfall[10] made possible only because of the non-settling states' past work (grossly undervalued by Sandoz and Florida), and/or the non-settling states' continuing work (which Florida will not be contributing to).

Third, the Amended MFN completely ignores the value of the non-settling states' claims for

---

[10] Florida conceded that MFNs can result in a windfall [TR at p. 29, line 3] and that "those scenarios" can "handcuff[] the ability of the parties to negotiate." [TR at p. 28, lines 21-23].

civil penalties. A significant number of states have pled *only* claims for penalties and disgorgement, not damages.[11] And for many smaller states, penalties (which may not be tethered to the amount of harm caused and serve a deterrent purpose) make up the bulk of Sandoz's exposure. For those states, being tethered to an MFN that is concerned *only* with relative population eviscerates their ability to settle for an amount that comes anywhere close to the true value of their claims.[12] Alaska provides a good example on civil penalties alone.

Alaska's Restraint of Trade Act ("ARTA") mirrors the Sherman Act.[13] Price fixing, collusion, and market allocation are ARTA violations. A single violation subjects a violator to a civil penalty of up to $50 million.[14] Sandoz's conduct included multiple violations, but even if it comprised only one, its exposure to Alaska is $50 million, plus an award of full attorney's fees and costs. Under the Settling Parties' Amended MFN, if Alaska were to settle with Sandoz for $25 million—less than half of Sandoz's exposure for a single violation—Sandoz would have to pay Florida $729,773,367.30, an amount every bit as punitive as the Oregon example discussed during the May 1 hearing and that the Settling Parties' attorneys assured the Court was not their intended result.[15] [TR at p. 29, lines 1-6, 22-25; TR at p.50, lines 1-4]. Here, the Settling Parties no longer can claim less-than-optimal drafting for the absurd result: it is simply a fact that, under their Amended MFN, it would cost Sandoz three quarters of a *billion* dollars to settle with Alaska for less than half

---

[11] This is not to say that only a few states have pursued damages claims.

[12] Civil penalties are not calculated on the basis of a state's population. They are calculated based on a violator's conduct. A single violation will expose a defendant to civil penalties whether that violation harms many people, one person, or in some cases, no one. *See, e.g., State v. O'Neil*, 609 P.2d 520, 534-35 (Alaska 1980) (interpreting Alaska's consumer protection act and holding that actual injury as a result of deception is not required, intent to deceive need not be proved, and only a showing that the acts and practices were capable of being interpreted in a misleading way subjects a defendant to liability for civil penalties).

[13] Alaska Stat. § 45.50.562 ("Every contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce is unlawful."); *Alakayak v. B.C. Packers, Ltd.*, 48 P.3d 432, 449-50 (Alaska 2002) ("We use federal law as a guide when considering claims brought under AS 45.50.562.").

[14] Alaska Stat. § 45.50.578(b)(2).

[15] Using the 2020 Census numbers, Alaska's percentage of the U.S. population is 0.22. The Settling Parties' Amended MFN formula, as applied to a settlement between Sandoz and Alaska for $25 million, operates like this: ((25,000,000/0.22) - 1,536,000) * 6.51 = 729,773,367.30.

of its (very conservatively estimated) exposure.

The supplemental payments required by the Amended MFN are prohibitive, even for settlement proposals at fractions of Sandoz's exposure. If Alaska were to settle with Sandoz for $1 million—less than 2 percent of Sandoz's exposure—Sandoz would have to pay Florida over $19 million. In other words, it would cost Sandoz $20 million to settle with Alaska for $1 million. Alaska, and any other state similarly situated, would be naive to think that Sandoz would not rely on a passionate assertion of its inability to settle with it for a reasonable amount, relative to its exposure, because of how expensive that settlement quickly becomes.

Moreover, the Amended MFN effectively caps any settlement Alaska could negotiate with Sandoz at $1.95 million. As discussed above, the maximum penalty for a single ARTA violation (excluding attorney's fees and costs) is $50 million. A $1.95 million settlement with Alaska would require Sandoz to pay Florida $47,702,912.73, which, when added to Alaska's $1.95 million totals just under $50 million, Sandoz's maximum exposure for a single ARTA violation. Thus, if one assumes (reasonably) that Sandoz would not settle for more than its exposure for a single ARTA violation, the Amended MFN operates to place $48 million of Alaska's statutorily-imposed $50 million penalty—96 percent—off limits to Alaskan citizens if Alaska settles its claims with Sandoz. But the $48 million doesn't just go away—if it ends up going anywhere, it goes to Florida.

The Amended MFN simply does not create parity in the civil penalties context, let alone any other context. Instead, it creates another windfall for Florida and a settlement barrier for other states. In practice, it creates conditions under which many Attorneys General simply *cannot* settle because to do so would abrogate their duty to enforce and vindicate their states' laws. The only alternative is, as the Court observed during the May 1 hearing, to bring the case to trial and defend the inevitable appeal. [TR at p. 55, lines 2-9]. The Amended MFN is as inimical to the public policies promoted and protected by Rule 41(a)(2) and Rule 1 as the original MFN that the Court has already rejected.

B.   <u>The Amended MFN is still a boon to Sandoz.</u>

During the May 1 hearing, Sandoz's attorney offered that "MFNs don't serve to protect Sandoz. They serve to protect the State that we've settled with." [TR at p. 38, lines 11-12]. The Court did not buy it, responding: "But it seems to me it's in Sandoz's interest just as much, if not more, because Sandoz is dealing with – I don't know how many other States are still left. Let's say 49 other States and some Territories just for argument. And [Sandoz] need[s] to send a message – or let's put it this way: It's beneficial to Sandoz to send a message [to the states] that [says] 'Hey, look, we're going to enter into settlement negotiations with you, but you've got to understand something. Our hands are a little bit – you know, we have some room for you, but we don't want to invoke this MFN and so we've got to negotiate below that number.'" [TR at p. 38, lines 16-25 and p. 39, line 1].

The Court is right. If the Amended MFN becomes operative, Sandoz will have every incentive to use it to its negotiating advantage. Settlements that reflect an amount anywhere within the range of Sandoz's exposure, discounted by the risk to a plaintiff state, or the states collectively, of an adverse verdict, will be very difficult to reach, if reachable at all. Florida and Sandoz have created the valuation-universe within which all settlement negotiations in the foreseeable future would have to take place if the Amended MFN becomes operative, and as the Court itself intimated, that universe is dramatically smaller than the one, for example, created by Sandoz and the federal government. [TR at p. 42, lines 14-18]. Far from promoting the speedy, inexpensive, and just resolution of these cases, the Amended MFN will give Sandoz every incentive and excuse to say "no" to future settlement proposals that do not place a value similar to Florida's on the other states' claims.

## IV.    THE COURT RETAINS SUBJECT MATTER JURISDICTION

The Settling Parties argue in their renewed motion that their agreement has extinguished any justiciable case or controversy between them and thus deprived the Court of subject matter

10

jurisdiction. [Renewed Mtn at pp. 1, 4-7]. This argument is specious. The Settling Parties are themselves invoking the Court's jurisdiction by asking it to dismiss Florida's claims. The Court has already expressly ruled that it has jurisdiction to decide the Settling Parties' motion to dismiss. [TR at p. 56, lines 20-22]. And the Settling Parties' argument that this Court lacks subject matter jurisdiction, if correct, would mean that any time parties reach a settlement the requirements of Rule 41(a)(2) are effectively nullified.

The Settling Parties could have, but chose not to, condition Sandoz's payment and Florida's dismissal on the Court finding dismissal proper under Rule 41(a)(2). They recognized that the Court's denial of their motion was a possibility—one that would result in Florida continuing to pursue its claims in this Court, pursuant to the Court's subject matter jurisdiction. [TR at p. 39, lines 5-8 (Sandoz's attorney recognizing that if the Court denies the motion to dismiss, "the State of Florida goes back into the multi-state group and continues along")]. The fact that the Settling Parties consummated their agreement before they knew whether the Court would agree that dismissal was proper does not deprive the Court of its subject matter jurisdiction.

None of the Settling Parties' authority stands for the proposition that they can both prevail upon the Court's jurisdiction to dismiss Florida's claims under Rule 41(a)(2) and at the same time assert that the Court lacks jurisdiction to consider whether dismissal is proper. Nor do any of the cases hold that the Court's jurisdiction is limited to the ministerial act of signing off on the dismissal without giving any consideration to whether the terms of dismissal are proper. In fact, only three of the cases involve Rule 41 at all, and they have no relevance to the instant motion. Two of the cases involve court's exercising jurisdiction to rule on a Rule 41(a) motion. *See Shepart v Egan,* 767 F. Supp. 1158, 1165-66 (D. Mass. 1990) (court *exercised its jurisdiction* to rule on Rule 41(a) motion to dismiss); *Sheridan v Fox,* 531 F. Supp. 151, 155 (E.D. Pa. 1982) (court *also exercised its jurisdiction* to rule on Rule 41(a)(2) motion to dismiss). The third case, *People of New York, et al v.*

*De Blasio et al*, 2025 WL 857338 (2d Cir. March 19, 2025), makes another appearance in the Settling Parties' briefing, but neither its facts nor its holding has changed. The Court's determination that the case is "not precedential" and not persuasive is as true today as it was on May 1. [TR at p. 57, lines 2-5].

The Settling Parties' jurisdictional argument is nothing more than a second bite at the apple. The Court rejected this argument when it found that it had the discretion—and jurisdiction—to consider the impact of their MFN on the speedy, inexpensive, and just resolution of the actions. It should reject this second attempt as well. The Settling Parties make this argument while simultaneously giving this Court sole authority over disputes arising out of the Settlement Agreement.[16] Common sense and Rule 41 disagree with the Settling Parties wishful interpretation.

## V. CONCLUSION

For the foregoing reasons, the States respectfully request that the Court deny the motion.

DATED: July 2, 2025

Respectfully submitted,

PLAINTIFF STATE OF ALASKA
TREG TAYLOR
ATTORNEY GENERAL

By: */s/ Jeffrey G. Pickett*
Jeffrey G. Pickett (*appearance pending*)
Senior Assistant Attorney General
Alaska Bar No. 9906022

Alaska Department of Law
1031 W. 4th Avenue, Suite 200
Anchorage, AK 99501
Tel: (907) 269-5275
Fax: (907) 276-3697
jeff.pickett@alaska.gov
margaret.paton-walsh@alaska.gov

---

[16] ECF No. 820-2 ¶ 17.

DAN RAYFIELD
ATTORNEY GENERAL FOR THE
STATE OF OREGON


/s/ *Gina Ko*
Gina Ko, OSB No. 121049
Federal Bar No. phv208277
Assistant Attorney General
Antitrust, False Claims, and Privacy
Section
Oregon Department of Justice
100 SW Market Street,
Portland, Oregon 97201
Telephone: (971) 673-1880
Fax: (503) 378-5017
Email: Gina.Ko@doj.oregon.gov

Counsel for Plaintiff State of Oregon




PLAINTIFF STATE OF
CONNECTICUT
WILLIAM TONG
ATTORNEY GENERAL

/s/ *Allison Frisbee*[17]
Allison C. Frisbee
Federal Bar No. ct30779
Assistant Attorney General Connecticut
Office of the Attorney General
165 Capitol Ave.
Hartford, CT 06106
Tel: (860) 808-5030
Fax: (860) 808-5391
Allison.Frisbee@ct.gov

*Counsel for the State of Connecticut*

---

[17] Counsel for Plaintiff State of Connecticut represents the consent of Certain States in the above-captioned case who are named in footnote 2 pursuant to Section XI.D. of the Electronic Filing Policies and Procedures.

13