# UNITED STATES DISTRICT COURT
## DISTRICT OF CONNECTICUT

THE STATE OF CONNECTICUT; THE STATE OF
ALASKA; THE STATE OF ARIZONA; THE
STATE OF ARKANSAS; THE STATE OF
CALIFORNIA; THE STATE OF COLORADO;
THE STATE OF DELAWARE; THE DISTRICT OF
COLUMBIA; THE STATE OF FLORIDA; THE
STATE OF GEORGIA; THE TERRITORY OF
GUAM; THE STATE OF HAWAII; THE STATE
OF IDAHO; THE STATE OF ILLINOIS; THE
STATE OF INDIANA; THE STATE OF IOWA;
THE STATE OF KANSAS; THE
COMMONWEALTH OF KENTUCKY; THE
STATE OF LOUISIANA; THE STATE OF MAINE;
THE STATE OF MARYLAND; THE
COMMONWEALTH OF MASSACHUSETTS;
THE STATE OF MICHIGAN; THE STATE OF
MINNESOTA; THE STATE OF MISSISSIPPI; THE
STATE OF MONTANA; THE STATE OF
NEBRASKA; THE STATE OF NEVADA; THE
STATE OF NEW HAMPSHIRE; THE STATE OF
NEW JERSEY; THE STATE OF NEW MEXICO;
THE STATE OF NEW YORK; THE STATE OF
NORTH CAROLINA; THE STATE OF NORTH
DAKOTA; THE COMMONWEALTH OF THE
NORTHERN MARIANA ISLAND; THE STATE
OF OHIO; THE STATE OF OKLAHOMA; THE
STATE OF OREGON; THE COMMONWEALTH
OF PENNSYLVANIA; THE COMMONWEALTH
OF PUERTO RICO; THE STATE OF RHODE
ISLAND; THE STATE OF SOUTH CAROLINA;
THE STATE OF TENNESSEE; THE STATE OF
UTAH; THE STATE OF VERMONT; THE
COMMONWEALTH OF VIRGINIA; THE STATE
OF WASHINGTON; THE STATE OF WEST
VIRGINIA; THE STATE OF WISCONSIN; and
U.S. VIRGIN ISLANDS,

No. 3:20-cv-00802-MPS

    *Plaintiffs*,

    v.

1

SANDOZ, INC.; ACTAVIS HOLDCO US, INC.;
ACTAVIS ELIZABETH LLC; ACTAVIS
PHARMA, INC.; AMNEAL
PHARMACEUTICALS, INC.; AMNEAL
PHARMACEUTICALS, LLC; ARA
APRAHAMIAN; AUROBINDO PHARMA U.S.A.,
INC.; BAUSCH HEALTH AMERICAS, INC.;
BAUSCH HEALTH US, LLC; MITCHELL
BLASHINSKY; DOUGLAS BOOTHE; FOUGERA
PHARMACEUTICALS INC.; GLENMARK
PHARMACEUTICALS INC., USA; JAMES (JIM)
GRAUSO; GREENSTONE LLC; G&W
LABORATORIES, INC.; WALTER
KACZMAREK; ARMANDO KELLUM; LANNETT
COMPANY, INC.; LUPIN PHARMACEUTICALS,
INC.; MALLINCKRODT INC.; MALLINCKRODT
LLC; MALLINCKRODT plc; MYLAN INC.;
MYLAN PHARMACEUTICALS INC.; KURT
ORLOFSKI; MICHAEL PERFETTO; PERRIGO
NEW YORK, INC.; PFIZER INC.; SUN
PHARMACEUTICAL INDUSTRIES, INC.; TARO
PHARMACEUTICALS USA, INC.; TELIGENT,
INC.; ERIKA VOGEL-BAYLOR; JOHN
WESOLOWSKI; and WOCKHARDT USA LLC,

    *Defendants*.

## RULING ON MOTION FOR SUMMARY JUDGMENT

The plaintiffs, the Attorneys General of most of the States and several U.S. territories ("the States"), have moved under Federal Rule of Civil Procedure 56 for partial summary judgment as to liability related to four claims asserted against three of the thirty-six defendants in this sprawling action alleging price-fixing, market allocation, and bid rigging in the sale of generic drugs for skin ailments. The motion seeks summary judgment only on a single element—referred to as the violation or liability element, or "*per se* liability"—of antitrust claims against Sandoz Inc. ("Sandoz"), Taro Pharmaceuticals USA, Inc. ("Taro"), and Hector Armando Kellum (collectively, "Defendants"), related to a limited number of generic drugs during limited periods of time. For the reasons set forth below, I grant the States' motion.

2

## I. FACTUAL AND PROCEDURAL BACKGROUND

### A. Procedural Background

This is one of three cases in which the Attorneys General of the States and territories have sued scores of defendants in the generic drug industry for alleged antitrust violations and unfair trade practices. All three cases were originally filed in this Court but were transferred to the Eastern District of Pennsylvania (the "MDL Court"), which was designated by the Judicial Panel on Multi-district Litigation (the "JPMDL) to preside over these and other cases brought by private parties involving similar allegations in a consolidated proceeding. ECF No. 9.[1] In April 2024, these three cases were remanded to this Court by the JPMDL and assigned to me. ECF No. 11.

The operative complaint in this case, the September 9, 2021 Amended Complaint (ECF No. 196 on this Court's docket), spans 609 pages and includes 2,123 numbered paragraphs. It alleges collusion in the pricing, market allocation, and bidding for generic drugs for dermatological applications. (The parties refer to it as the "the Dermatology Complaint.") Its allegations have been summarized in various rulings by the MDL Court, *see, e.g.*, *In re Generic Pharms. Pricing Antitrust Litig.,* 338 F.Supp.3d 404, 411–34. (E.D. Pa. 2018); *In re Generic Pharms. Pricing Antitrust Litig.*, 394 F. Supp. 3d 509, 514–24 (2019); and I adopt those summaries by reference. Essentially, the complaint describes a series of conspiracies, and an overarching conspiracy, between makers of generic dermatological drugs to collude on price and market allocation and to rig bids for the business of customers.

This motion seeks summary judgment on one element of the antitrust claims under Count

---

[1] Unless otherwise indicated, all ECF numbers in this case refer to entries on the docket of this case, not the same case when it was before the MDL Court, and each page number refers to the page number shown on the ECF stamp on the top of the cited page, not the page of the relevant brief or pleading designated by the parties.

One (against Sandoz), Count Two (against Taro), Count Twenty-Three (against Kellum), and Twenty-Eight (state-law claims against Sandoz, Taro, and Kellum) of the Amended Complaint. Although the Amended Complaint alleges conspiracies related to the markets of eighty generic drugs, the motion seeks partial summary judgment only as to conspiracies on three: clobetasol (in its cream, emollient cream, gel, ointment, and solution formulations) ("clobetasol"), desonide ointment, and nystatin triamcinolone cream. The States allege that clobetasol is a corticosteroid used to treat eczema, contact dermatitis, seborrheic dermatitis, and psoriasis; that desonide ointment is a topical steroid used to treat eczema, dermatitis, allergies, and rash; and that nystatin triamcinolone cream is used to treat cutaneous candidiasis, such as yeast infections and thrush. ECF No. 196 ¶¶ 655, 833, 869.

Specifically, the States argue that there is no genuine issue of material fact to as to whether Sandoz and Taro conspired from March 2013 until December 2015 to fix prices and allocate customers for clobetasol, desonide ointment, and nystatin triamcinolone cream.[2] The States also argue that there is no genuine issue of material fact as to whether Kellum (a former Sandoz employee) conspired from March 2013 to June 2015 to fix prices and allocate customers for clobetasol and nystatin triamcinolone cream.

**B. Admissions**

The States' motion rests entirely on whether the Defendants have each admitted to the conspiracies, either through (1) Sandoz and Taro's deferred prosecution agreements ("DPA" or DPAs") and Kellum's plea agreement in the face of federal criminal charges; or (2) through the

---

[2] It is undisputed that Sandoz and Taro were competitors in the manufacturing, marketing, and sale of certain generic drugs from March 2013 until December 2015, and that each sold clobetasol, desonide ointment, and nystatin triamcinolone cream. ECF Nos 555-1 ¶ 6–7 and 559-1 ¶ 6–7.

Defendants' Rule 36 responses to Requests for Admission, which adopted language from the criminal agreements.

        1.  <u>Sandoz and Taro</u>

In 2020, Sandoz and Taro both entered into DPAs with the United States Department of Justice ("DOJ"). ECF Nos. 555-1 at 17, 559-1 at 16. In these agreements, Sandoz and Taro each accepted responsibility for the conduct described in a criminal information the DOJ had filed against it and admitted to facts in an accompanying Statement of Facts. *Id.* Sandoz and Taro also each agreed not to make any public statement "in litigation or otherwise" that contradicted the acceptance of responsibility or any of the facts for a term of three years. *Id.* Specifically, Sandoz's DPA states:

> Sandoz acknowledges that, under United States law, it is responsible for the acts of its officers, directors, employees, and agents that give rise to the charges in the Information. Sandoz admits, accepts, and acknowledges that the facts set forth in the Statement of Facts are true and accurate. Should the United States pursue the prosecution that is deferred by this Agreement, Sandoz agrees that it will neither contest the admissibility of, nor contradict, any of the facts set forth in the Statement of Facts in any such proceeding, including any guilty plea or sentencing proceeding. Neither this Agreement nor the criminal Information is a final adjudication of the matters addressed in such documents.

ECF No. 549-3 ¶ 2. Taro's DPA includes identical language, aside from the name of the company.

ECF No. 549-5 ¶ 2. The Statement of Facts accompanying Sandoz's DPA reads, in relevant part:

> From in or about March 2013 and continuing until in or about December 2015, Sandoz Inc. ("Sandoz"), a corporation organized and existing under the laws of Colorado with its principal place of business in Princeton, New Jersey, was engaged in the acquisition, licensing, production, marketing, sale, and distribution of generic drugs.
>
> From in or about March 2013 and continuing until in or about December 2015 ("the relevant period"), Sandoz, through certain of its officers and employees, including an individual within high-level personnel, conspired with other persons and entities engaged in the production and sale of generic drugs to suppress and eliminate competition by allocating customers, rigging bids, and increasing and/or maintaining prices for certain generic drugs sold in the United States. Sandoz, through certain of its officers and employees, including an individual within high-

level personnel, engaged in discussions with co-conspirators involved in the production and sale of certain generic drugs that competed with Sandoz products. During these discussions, agreements were reached with co-conspirators to allocate customers, rig bids, and/or stabilize, maintain, and fix the prices of certain generic drugs sold in the United States. Sandoz's sales of generic drugs affected by these conspiracies totaled more than $500,000,000. Specifically:

From in or about March 2013 and continuing until in or about December 2015, Sandoz conspired to suppress and eliminate competition by agreeing to allocate customers and rig bids for, and/or stabilize, maintain, and fix prices of, certain generic drugs, including clobetasol (cream, emollient cream, gel, ointment, and solution), desonide ointment, and nystatin triamcinolone cream, with Company A, a generic drug company with its principal place of business in New York. Generic drugs sold by Sandoz and its co-conspirators, as well as payments for affected generic drugs, traveled in interstate commerce. The business activities of Sandoz and its co-conspirators in connection with the production and sale of generic drugs affected by this conspiracy were within the flow of, and substantially affected, interstate trade and commerce. Generic drugs affected by the activities of Sandoz and its co-conspirators were sold to customers in this District.

ECF No. 549-3 at 20–21. The Statement of Facts accompanying Taro's DPA reads, in relevant

part:

From in or about March 2013 and continuing until in or about December 2015 ("the relevant period"), Taro Pharmaceuticals U.S.A., Inc. ("Taro U.S.A."), a corporation organized and existing under the laws of New York with its principal place of business in Hawthorne, New York, was engaged in the manufacturing, marketing, and sale of generic drugs.

During the relevant period, Taro U.S.A., through certain of its officers and employees, including Ara Aprahamian, Taro U.S.A.'s Vice President of Rx Marketing, and beginning in April 2014, Taro U.S.A.'s Vice President of Sales and Marketing, conspired with other individuals and entities engaged in the manufacture and sale of generic drugs to suppress and eliminate competition by agreeing to allocate customers and rig bids for, and/or stabilize, maintain, and fix prices of certain generic drugs sold in the United States in violation of the Sherman Antitrust Act, 15 U.S.C. § 1. Taro U.S.A.'s sales of generic drugs affected by these conspiracies totaled at least $524,625,555. Specifically:

From in or about March 2013 and continuing until in or about December 2015, Taro U.S.A. conspired to suppress and eliminate competition by agreeing to allocate customers and rig bids for, and stabilize, maintain, and fix prices of, certain generic drugs in the United States, including clobetasol (cream, emollient cream, gel, ointment, and solution), desonide ointment, and nystatin triamcinolone cream, with Sandoz Inc. ("Sandoz"), a generic drug company with its principal place of business in New Jersey; Armando Kellum, Sandoz's Senior Director of Pricing and

Contracts, and beginning in November 2013, Sandoz's Vice President of Contracting and Business Analytics; and other individuals. Between in or about March 2013 and December 2015, the generic drugs sold by Taro U.S.A. and Sandoz that were affected by this conspiracy, as well as payments for the affected generic drugs, traveled in interstate trade and commerce. The business activities of Taro U.S.A. and its co-conspirators in connection with the manufacture and sale of generic drugs affected by this conspiracy were within the flow of, and substantially affected, interstate trade and commerce. Generic drugs affected by the activities of Taro U.S.A. and its co-conspirators were sold to customers located in various states in the United States . . . .

ECF No. 549-5 at 20–21.

In the criminal cases brought against Sandoz and Taro, the District Court of the Eastern District of Pennsylvania approved these DPAs for the purpose of tolling the Speedy Trial Act, as required by 18 U.S.C. § 3161(h)(2).[3] At the end of the three-year term, the Court dismissed the criminal informations.[4]

Before the terms, expired, however, the States served, and the Defendants responded to, Requests for Admission ("RFAs") as part of discovery under Rule 36 in this case, while it was before the MDL Court. The RFAs sought to have Sandoz and Taro admit the same facts as those in the language quoted above from their DPAs' Statement of Facts and used identical language. ECF Nos. 549-4 ¶¶ 7–8, 11 (Sandoz), 559-2 ¶¶ 5–6, 8 (Taro).[5] Sandoz and Taro both admitted to these statements in their RFA responses.[6]

---

[3] *See United States v. Sandoz Inc.*, No. 2:20-cr-111, ECF No. 9 (E.D. Pa. Mar. 6, 2020); *United States v. Taro Pharmaceuticals U.S.A., Inc.*, No. 2:20-cr-214, ECF No. 5 (E.D. Pa. July 24, 2020).
[4] *United States v. Sandoz Inc.*, No. 2:20-cr-111, ECF No. 14 (E.D. Pa. Mar. 23, 2023); *United States v. Taro Pharmaceuticals U.S.A., Inc.*, No. 2:20-cr-214, ECF No. 5 (E.D. Pa. Aug. 22, 2023).
[5] Taro's initial and first-amended RFA responses generally confirmed that Taro had admitted the information in the DPA's Statement of Facts for purposes of the DPA. *See* ECF No. 549-6. Dissatisfied with these responses, and wanting unqualified admissions, the MDL Plaintiffs filed a letter motion to compel. Following litigation in the MDL Court, Taro on February 2, 2022 served its Second Amended Objections and Responses to the RFAs. ECF No. 559-2; *see* ECF No. 540 ¶¶ 12–13.
[6] Taro admitted the statements "[s]ubject to the General, Definitional, and Instructional Objections" stated at the outset of its response. ECF No. 559-2 ¶¶ 5–6, 8. These objections included that the requests were premature while discovery was ongoing, and as such "Taro lack[ed]

More than a year after Taro's DPA expired in July 2023, Taro moved the MDL Court to withdraw and amend its responses to the RFAs.[7]  The discovery dispute was referred to the Hon. Lawrence F. Stengel, the Special Discovery Master in both the MDL Court and the cases before me.[8]  After the States served this motion and the Defendants served their opposition briefs, Special Master Stengel recommended denying Taro's motion, finding that "allowing Taro leave to withdraw and amend its RFA responses would not subserve the presentation of this case on the merits . . . [and] would prejudice the Plaintiffs."  ECF No. 540 ¶ 27.  He also found that Taro "failed to show good cause for its substantial delay in seeking to withdraw and amend its admissions."  *Id.*  Specifically, Special Master Stengel found that the States had "provided numerous compelling examples of [other] evidence that is consistent with Taro's admissions."  *Id.* ¶¶ 22–24.

On February 28, 2025, I overruled Taro's objections and adopted Special Master Stengel's Report and Recommendation.  ECF No. 579.

### 2. Kellum

On February 14, 2020, Kellum pled guilty to one count of conspiracy to restrain trade in violation of the Sherman Act.  ECF No. 554 ¶ 25.  Paragraph 4(d) of his plea agreement states that from March 2013 to June 2015, during his employment as Sandoz's Senior Director of Pricing and Contracts and Vice President of Contracting and Business Analytics, Kellum

> participated in a conspiracy with Company A, Company B, Individual-1, and
> various other individuals and entities to rig bids and allocate customers for, and

---

[7] direct knowledge of the actual evidence regarding certain factual allegations underlying these Requests."  It raises these objections again in its opposition brief to the present motion.  *See* ECF No. 559 at 18.  Sandoz's response did not contain similar objections.

[7] Neither Sandoz nor Kellum similarly moved to withdraw their RFA responses.

[8] Although the Motion was filed in the MDL Court, Special Master Stengel found that the matter "genuinely overlaps with" both the MDL and the cases before me, and so he filed his Report and Recommendation contemporaneously in this action and in the MDL.  *See* ECF No. 540 ¶ 7.

stabilize, maintain, and fix prices of, generic drugs sold in the United States. In furtherance of the conspiracy, the defendant [Kellum] entered into, directed, ratified, and approved communications and agreements reached between and among the defendant and other co-conspirators on behalf of Company A, and Individual-1 on behalf of Company B. The defendant and his co-conspirators discussed the allocation of and agreed to allocate customers in connection with launches of generic drugs; provided and received specific non-public prices paid by allocated customers to their existing suppliers; communicated regarding the timing and specific amount of prospective price increases; and submitted bids and offers to, and declined requests to submit bids and offers from, customers in accordance with the agreement reached between the co-conspirators. The defendant's participation in the conspiracy affected generic drugs, including, but not limited to, clobetasol and nystatin triamcinolone cream. The defendant was a manager or supervisor in the conspiracy, which involved at least five participants.

ECF No. 549-7 at 5. Kellum has also acknowledged that in the preceding paragraph, "Company A" refers to Sandoz, "Company B" refers to Taro, and "Individual-1" refers to Ara Aprahamian, Taro U.S.A.'s Vice President of Rx Marketing and a co-defendant in the present case. ECF No. 554 ¶ 8.

Like Sandoz and Taro, Kellum also submitted responses to RFAs in this case. ECF No. 549-8. In his responses, Kellum admitted that the "all of the facts alleged in paragraphs 4(a) through 4(f) of the Plea Agreement are true." *Id.* at 10. He also admitted that he and his co-conspirators took part in all of the antitrust violations referred to in Paragraph 4(d) of the Plea Agreement, including entering into an agreement to allocate customers and rig bids, and that this conduct affected the markets for clobetasol and nystatin triamcinolone cream. *Id.* at 13–14.

## II. LEGAL STANDARD

"Summary judgment is appropriate only if the movant shows that there is no genuine issue as to any material fact and the movant is entitled to judgment as a matter of law." *Tolan v. Cotton*, 572 U.S. 650, 656–57 (2014) (internal quotation marks and citations omitted). In reviewing the summary judgment record, a court must "construe the facts in the light most favorable to the non-moving party and must resolve all ambiguities and draw all reasonable inferences against the

movant." *Caronia v. Philip Morris USA, Inc*., 715 F.3d 417, 427 (2d Cir. 2013). "A genuine dispute of material fact exists for summary judgment purposes where the evidence, viewed in the light most favorable to the nonmoving party, is such that a reasonable jury could decide in that party's favor." *Zann Kwan v. Andalex Grp. LLC*, 737 F.3d 834, 843 (2d Cir. 2013). The moving party bears the burden of demonstrating that no genuine issue exists as to any material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323–25 (1986). If the moving party carries its burden, "the opposing party must come forward with specific evidence demonstrating the existence of a genuine dispute of material fact. More specifically, it must do more than simply show that there is some metaphysical doubt as to the material facts, and may not rely on conclusory allegations or unsubstantiated speculation." *Brown v. Eli Lilly & Co*., 654 F.3d 347, 358 (2d Cir. 2011). "Where no rational finder of fact could find in favor of the nonmoving party because the evidence to support its case is so slight, summary judgment must be granted." *Id.* (internal quotation marks omitted).

"[S]ummary judgment may be requested not only as to an entire case but also as to a claim, defense, or part of a claim or defense." *King v. Strawberry Park Resort Campground, Inc.*, No. 3:20-CV-01905 (JCH), 2023 WL 2265948, at *22 (D. Conn. Feb. 28, 2023). Further, "[i]f the court does not grant all the relief requested by the motion, it may enter an order stating any material fact . . . that is not genuinely in dispute and treating the fact as established in the case." Fed. R. Civ. P. 56(g).

## III.  DISCUSSION

### A.  Scope

#### 1.  *Elements of Antitrust Claims at Issue*

I begin by clarifying the scope of the States' motion and this ruling. The States' federal

antitrust claims require three elements: "(1) a violation of antitrust law; (2) injury and causation; and (3) damages." *Cordes & Co. Fin. Servs. v. A.G. Edwards & Sons, Inc.*, 502 F.3d 91, 105 (2d Cir. 2007). The States' motion seeks partial summary judgment as to *only* the violation element of the States' federal antitrust claims in Counts One, Two, and Twenty-Three, and the state-law claims in Count Twenty-Eight, which are analogous to the federal claims. Even then, the motion seeks partial summary judgment on this single element only as to the three drugs at issue during the time periods covered by Sandoz's and Taro's DPAs and Kellum's plea agreement.

Although the States' motion does not make this scope explicit, it is apparent from the title of the motion, which seeks "partial summary judgment as to liability," ECF No. 549 at 1, and from the omission in the States' brief of any discussion of injury, causation, or damages. The Defendants pointed out these omissions in their opposition briefs and suggested that I deny the motion on account of the States' failure to state explicitly that the motion sought judgment on only one element of liability under their antitrust claims.

I do not find the States' failure to state explicitly the limitations of its motion to be grounds for denying it, and in any event, the States have clarified the scope of their motion in their reply brief to Kellum's opposition brief,[9] noting that "liability" in this context "is a term of art used by antitrust practitioners in this context to refer to the violation element of an antitrust claim." ECF No. 558 at 8. Thus, the States make crystal clear that they seek summary judgment only as to the Defendants' "*per se* liability"—the violation element—for their antitrust claims. *Id.* at 5–9. As such, this ruling covers only the violation element of the States' antitrust claims. To recover complete relief on each claim, the States will eventually have to prove the other elements, too, and

---

[9] The States split up their replies based on common arguments made by all three defendants, rather than addressing the overlapping arguments of each defendant separately. *See, e.g.*, ECF No. 558 at 4.

also overcome the Defendants' affirmative defenses.

Rule 56 expressly permits the Court to enter summary judgment as to a part of a claim, *see* Fed. R. Civ. P. 56(a),(g), and I do not find that the violation element is so intertwined with the rest of the claims that it would be improper to address it separately. To the contrary, the violation element is straightforward because "horizontal agreements among competitors to fix prices or to divide markets" are "[r]estraints that are *per se* unlawful," *Leegin Creative Leather Prods. v. PSKS, Inc.*, 551 U.S. 877, 886 (2007). The ultimate scope of the conspiracies, including the full roster of co-conspirators, duration, and whether these conspiracies support the States' claims of an overarching conspiracy, may be decided later based on more evidence. My only concern in deciding this motion is whether the undisputed facts, and, in particular, the Sandoz and Taro DPAs, Kellum's guilty plea, and the RFA responses support a finding that these three have violated Section 1 of the Sherman Act and analogous provisions of state antitrust laws.[10]

## 2. The State-Law Claims

As for the state-law claims under Count 28, it is clear that the motion seeks judgment only as to the antitrust state-law claims identified in Count 28; it seeks no adjudication of the violation element of the consumer protection, unjust enrichment or any other types of claims raised in the operative complaint. This ruling is therefore limited to those specific paragraphs in the Amended Complaint referenced in the States' appendix to its motion, ECF No. 549-1 at 25–30, less any

---

[10] For the same reasons, I also reject Sandoz's argument that this ruling will not streamline this litigation. *See* ECF No. 555 at 20–24. In *New York v. Amfar Asphalt Corp.*, 1986 WL 27582 (E.D.N.Y. Nov. 20, 1986), the Court denied a similar motion for partial summary judgment as to a subset of defendants because the plaintiffs would have needed to introduce much of the same evidence at trial involving the other defendants. In contrast, the limited, defendant-specific evidence in the summary judgment record here is unlikely to create a basis for liability as to any other defendant.

claims that have been subsequently dismissed since the States served their motion. *See, e.g.*, ECF No. 478 (dismissing some state-law claims), ECF No. 679 (dismissing Missouri's claims).

## B. Civil Admissions

The States argue that Sandoz, Taro, and Kellum are each bound by admissions in the DPAs and guilty plea and the RFAs. For the following reasons, I find that the Defendants are bound by their admissions in the RFAs, and that these admissions permit a finding that the Defendants violated Section 1 of the Sherman Act and state antitrust laws. I therefore do not address the effect of the DPAs and guilty plea themselves.

### 1. Effect of admissions

Section 1 of the Sherman Act, the foundational antitrust law of the United States, outlaws "[e]very contract, combination . . . , or conspiracy[] in restraint of trade." 15 U.S.C. § 1. The States bring this action under Section 4 of the Clayton Act, which provides that "[a]ny person who shall be injured in his business or property by reason of anything forbidden in the antitrust laws may sue therefor . . . ." 15 U.S.C. § 15. As noted in the previous section, the first element required for civil claims for restraint of trade—and the only element at issue here—is that each Defendant violated the Sherman Act. *Cordes*, 502 F.3d at 105.

To establish a Section 1 violation a plaintiff must show (1) "a combination or some form of concerted action between at least two legally distinct economic entities" that, (2) "constituted an unreasonable restraint of trade either *per se* or under the rule of reason." *Capital Imaging Assocs., P.C. v. Mohawk Valley Med. Assocs.*, 996 F.2d 537, 542 (2d Cir. 1993). "[H]orizontal agreements among competitors to fix prices or to divide markets" are "[r]estraints that are per se unlawful." *Leegin*, 551 U.S. at 886 (citations omitted). "The *per se* rule, treating categories of restraints as necessarily illegal, eliminates the need to study the reasonableness of an individual

restraint in light of the real market forces at work." *Id.* "Because price fixing is a per se violation of the Sherman Act, an admission by the defendants that they agreed to fix their prices is all the proof a plaintiff needs." *In re High Fructose Corn Syrup Antitrust Litig.*, 295 F.3d 651, 654 (7th Cir. 2002) (Posner, J.) (cited by *In re Publ'n Paper Antitrust Litig.*, 690 F.3d 51, 63 (2d Cir. 2012)); *see also United States v. Apple Inc.*, 952 F. Supp. 2d 638, 689 (S.D.N.Y. 2013), *aff'd*, 791 F.3d 290, 328 (2d Cir. 2015).

Each of the Defendants admitted, in their responses to the States' RFAs, to *per se* violations of Section 1 of the Sherman Act and specifically to violations during the time and related to the three drugs at issue in the States' motion. ECF Nos. 549-4 ¶¶ 7–9, 11 (Sandoz); 559-2 ¶¶ 5–6, 8 (Taro); 549-8 ¶¶ 20–26 (Kellum). Sandoz admitted to conspiring "to suppress and eliminate competition by agreeing to allocate customers and rig bids for, and/or stabilize, maintain, and fix prices of, certain generic drugs, including clobetasol (cream, emollient cream, gel, ointment, and solution), desonide ointment, and nystatin triamcinolone cream, with Taro" from March 2013 to December 2015. ECF No. 549-4 ¶ 11. Taro admitted to conspiring with Sandoz and Kellum, among others, during the same period "to suppress and eliminate competition by agreeing to allocate customers and rig bids for, and stabilize, maintain, and fix prices of, certain generic drugs in the United States, including clobetasol (cream, emollient cream, gel, ointment, and solution), desonide ointment, and nystatin triamcinolone cream." ECF No. 559-2 ¶ 8. Both companies also admitted the drugs they sold were affected by the identified conspiracies, and that the affected drugs and customers' payments traveled in interstate commerce. ECF Nos. 549-4 ¶ 11; 559-2 ¶ 8. Kellum, meanwhile, admitted to "participating in a conspiracy with [Sandoz], [Taro], [Aprahamian], and various other individuals and entities to rig bids and allocate customers for, and stabilize, maintain, and fix prices of, generic drugs sold in the United States." ECF No. 549-

8 ¶ 20.  And he admitted that his participation in the conspiracy "affected generic drugs including, but not limited to, clobetasol and nystatin triamcinolone cream," *id.* ¶ 26, and that the affected drugs and customers' payments traveled in interstate commerce, *id.* ¶¶ 27–28.

These admissions can leave no doubt that Sandoz, Taro, and Kellum entered into a *per se* unlawful conspiracy in violation of Section 1 of the Sherman Act.  The States have therefore satisfied the first element of their antitrust claims in Counts One, Two, and Twenty-Three, which is the entirety of the relief sought by the States on their motion for summary judgment.

2.  <u>Defendants' attempts to nullify or abrogate admissions</u>

Under Federal Rule of Civil Procedure 36, a party may "serve on any other party a written request to admit, for purposes of the pending action only, the truth of any matters within the scope of Rule 26(b)(1) relating to . . . facts, the application of law to fact, or opinions about either." Fed. R. Civ. P. 36(a)(1).  "A matter admitted under [Rule 36] is conclusively established unless the court, on motion, permits the admission to be withdrawn or amended." *Id.* 36(b).  In adopting the Special Master's report and recommendation, I have already rejected Taro's request to withdraw or amend its admissions, ECF No. 579.  Sandoz and Kellum have not moved to withdraw or amend, but even if they had, I would have denied such requests for the same reasons expressed by the Special Master in regard to Taro.  The defendants' admissions in the RFA responses therefore "are conclusively established" under Rule 36(b).[11]

In their Rule 56 Statement of Facts accompanying their opposition briefs, however, each Defendant disputes the same facts to which they admitted in their RFA responses.  *See* ECF Nos.

---

[11] "[A]dmissions made pursuant to Rule 36 may be used to support a motion for summary judgment." *S.E.C. v. Dynasty Fund, Ltd.*, 121 F. App'x 410, 411 (2d Cir. 2005) (citing *Donovan v. Carls Drug Co.*, 703 F.2d 650, 651 (2d Cir.1983)); *CSL Silicones, Inc. v. Midsun Grp. Inc.*, 301 F. Supp. 3d 328, 355 & n.8 (D. Conn. 2018) (Defendant's Rule 36 admission conclusively established facts in summary judgment record).

555-1 ¶¶ 8–9, 14 (Sandoz); 559-1 ¶¶ 12–14 (Taro); 554 ¶¶ 15–20.   Taro goes further in its

opposition brief, including eighteen pages of argument and over a thousand pages of exhibits that

it suggests "reflect independent and unilateral decisionmaking rather than any unlawful

agreement," in an effort to show facts that are at odds with their earlier admissions.  *See* ECF No.

559 at 27–44.  Because the facts in the Rule 36 admissions are conclusively established, these

protests come too late.  *See* Fed. R. Civ. P. 36 advisory committee's note to 1970 amendment.   ("In

form and substance a Rule 36 admission is comparable to an admission in pleadings or a stipulation

drafted by counsel for use at trial, rather than to an evidentiary admission of a party. Unless the

party securing an admission can depend on its binding effect, he cannot safely avoid the expense

of preparing to prove the very matters on which he has secured the admission, and the purpose of

the rule is defeated." (citations omitted)).  A party may not attempt to "create a record contradicting

[Rule 36] admissions in order to blunt the motion for summary judgment on the ground that

genuine issues of fact exist."  *O'Bryant v. Allstate Ins. Co.*, 107 F.R.D. 45, 48 (D. Conn. 1985)

(assessing "the interrelationship of Rules 36 and 56"); *see United States v. Kasuboski*, 834 F.2d

1345, 1350 (7th Cir. 1987) ("a party cannot attack issues of fact established in admissions by

resisting a motion for summary judgment").  Instead, "[o]ne must suppose that when the rule

makers provided that a matter was conclusively established, that was the end of any dispute on

that matter.   When concluded, a matter would not be open for further dispute or contest."

*O'Bryant*, 107 F.R.D. at 48.   To permit the Defendants to abrogate the effect of their RFA

responses by presenting contrary evidence in a summary judgment record would be to ignore Rule

36(b)'s language on effect of an admission as well as its prescribed method for withdrawal or

amendment.[12]

Apparently aware of the possibility that they may be stuck with their admissions to the RFA responses, the Defendants also argue that I should discount the admissions' credibility because the Defendants could not deny them without violating their agreements in the criminal matter. This is nonsense. Deferred prosecution agreements are serious documents presented to a judge, typically as part of a global resolution of criminal charges. No party enters into them lightly. The stakes in a criminal prosecution are generally higher than they are in civil litigation—for the reputational harm to the corporate defendant alone—and there is no more critical time in the justice system to be sober and truthful than when one is asked to admit liability in a criminal case. Given the grave potential consequences of doing so, including debarment from Medicare and Medicaid for a drug company, it is safe to assume that Sandoz and Taro did not do so in the criminal prosecutions against them without carefully investigating the Government's factual allegations. So the notion that the Defendants' hands are now somehow unfairly tied because they must stick by the truth of admissions they made under such circumstances is ridiculous. As for Kellum, he actually stood before a judge, swore an oath, and admitted his responsibility for price fixing, market allocation, and the like under penalties of perjury. He cannot retreat from those admissions

---

[12] I also reject Kellum's argument that if the Rule 36 admissions are conclusively established, "the Court and the parties gain no 'just, speedy, and inexpensive determination,' Fed. R. Civ. P. 1, through an order granting partial summary judgment only on facts already admitted in response to requests for admission." The evidence submitted with the opposition briefs, including Kellum's own declaration, as well as his scheduled deposition (*see* ECF No. 555 at 38–40), belie this stance. The history of this case clearly demonstrates that the Defendants will continue to insist that their admissions are not binding until a court says otherwise. If a conclusive statement on this issue will permit the parties to finally move on and focus on the remaining elements of the claims, then this order serves the purposes of Rule 1. Further, it may be that the States do not need to establish all the remaining elements in order to prevail on some of their state-law civil penalty claims— although I make no findings on this point, which the parties have not briefed in this motion. At the very least, this ruling should shorten the States' proof—if there is a trial—with respect to the three drugs that are the subject of this motion.

now.  *See Adames v. United States*, 171 F. 3d 728, 732 (2d Cir. 1999).

In any event, because it is very common in antitrust matters for criminal proceedings to outpace related civil litigation and reach finality before civil liability is finally determined, the Defendants should have anticipated their current predicament when they signed the DPAs and guilty plea.  The use of admissions in criminal matters in subsequent civil litigation is not novel, as the parties' briefs make clear.  The Defendants were undoubtedly well aware that their DPAs and guilty plea criminal agreements could have consequences in future civil cases.

For these reasons, Taro's accusations of "gamesmanship" by the States in serving the RFAs near the outset of discovery, ECF No. 559 at 10, lack merit.  Although the States were no doubt aware that Sandoz and Taro could not realistically contradict the criminal admissions while the DPA was active, locking the Defendants into civil admissions was a reasonable strategic decision to avoid the possibility that I might find that the Defendants were not estopped from challenging the criminal admissions.  And the Defendants were not without recourse.  Taro, for instance, could have moved to withdraw or amend their admissions under Rule 36(b) the day the term of the DPA expired.  Instead, it waited nearly a year and half before it filed its motion to withdraw, a delay that prejudiced the States.  *See* ECF No. 540 ¶¶ 25–26.  I would not grant any similar motion Sandoz or Kellum might file either.

Finally, Sandoz and Kellum argue that granting summary judgment would be premature before the Court considers any of their affirmative defenses.  *See* ECF No. 553 at 22–33; 555 at 31–38.  None of these defenses affects the present ruling because a finding that the Defendants violated the federal and state antitrust laws is only one element toward a finding on the Defendant's total legal liability.  The time to raise these defenses will be in the Defendants' own motions for summary judgment, which have already been either filed or served on the States.

Therefore, because (1) the Defendants admitted in their Rule 36 admissions to entering into a *per se* unlawful conspiracy, (2) I already rejected Taro's motion to withdraw and similar motions from Sandoz and Taro would be futile, and (3) the Defendants' arguments to discredit the Rule 36 evidence are without merit, I find that as a matter of law, the Defendants violated Section 1 of the Sherman Act.  More specifically, I find, as a matter of law, that (1) from in or about March 2013 and continuing until in or about December 2015, both Sandoz and Taro conspired with the other, and Taro conspired with Kellum, to suppress and eliminate competition by agreeing to allocate customers and rig bids for, and stabilize, maintain, and fix prices of clobetasol (cream, emollient cream, gel, ointment, and solution), desonide ointment, and nystatin triamcinolone cream, and that their conduct substantially affected interstate commerce, *see* ECF Nos. 549-4 at 6, 559-2 at 9; and (2) from in or around March 2013 and continuing until in or around June 2015, Kellum conspired with Sandoz, Taro, and Ara Aprahamian to rig bids and allocate customers for, and stabilize, maintain, and fix prices of clobetasol and nystatin triamcinolone cream, and that this conduct substantially affected interstate commerce, *see* ECF No. 549 at 13–14.  These facts are conclusively established and may not be relitigated, *see* Fed. R. Civ. P. 56(g), although I will reserve for another day the question of how the States may present these facts to the trial jury.

The motion for summary judgment as to the violation element in Counts One, Two, and Twenty-Three, for the limited scope described above, is GRANTED.[13]

### C.  Count Twenty-Eight: State-Law Claims

The States also seek summary judgment on the violation element under the laws of each

---

[13] It is important to note that the Defendants' Rule 36 admissions do not depend on the admissibility of the corporate Defendants' DPAs or Kellum's guilty plea, even though both sets of admissions use the same language.  Even if I were to find the Defendants are correct that the DPAs do not estop them from contesting liability in this case, this would have no effect on the RFAs under Rule 36, which stand on their own.

state.  While they do not provide an analysis of each of the elements of each state's antitrust statutes, they do provide an appendix quoting either relevant language from the statutes or snippets from state cases showing that the respective state courts follow or treat as persuasive authority interpretations of federal antitrust law by the federal courts.  ECF No. 549-1 at 25–30.

If this case involved conduct at the margins of antitrust law or conduct requiring sophisticated economic analysis—such as price discrimination, exclusive dealing, or tying—I would agree with the defendants that the States' shorthand effort to add a request for summary judgment under the laws of all the states was insufficient.  But it is enough here, because this case involves admitted conduct that amounts to paradigmatic antitrust violations: price fixing, market allocation, and bid rigging.  I am unaware of any state or territory in the country whose antitrust statute does not prohibit such conduct, and if there were a state law that permitted such conduct, it would be preempted by federal antitrust law.  Under these circumstances, I agree with the States that it is not necessary to brief in detail the elements of each state's law to show that the Defendants' fixing of prices, allocation of customers, and rigging of bids violated that law.  That should be obvious.  Nonetheless, in the interest of illustrating the obvious, I have explained in the bullet points below why the Defendants' admitted conduct violates the laws of a geographically dispersed sample of five States:

- <u>Connecticut</u>: Under the Connecticut Antitrust Act, "[e]very contract, combination, or conspiracy in restraint of any part of trade or commerce is unlawful" when it is "for the purpose, or ha[s] the effect, of: (a) Fixing, controlling, or maintaining prices, rates, quotations, or fees in any part of trade or commerce; (b) fixing, controlling, maintaining, limiting, or discontinuing the production, manufacture, mining, sale, or supply of any part of trade or commerce; (c) allocating or dividing customers or markets, either functional or geographical, in any part of trade or commerce; or (d) refusing to deal, or coercing, persuading, or inducing third parties to refuse to deal with another person." Conn. Gen. Stat §§ 35-26, 35-28.

  As noted, Sandoz admitted to conspiring "to suppress and eliminate competition by agreeing to allocate customers and rig bids for, and/or stabilize, maintain, and fix

prices of, certain generic drugs." ECF No. 549-4 ¶ 11. Taro admitted to "suppress[ing] and eliminat[ing] competition by agreeing to allocate customers and rig bids for, and stabilize, maintain, and fix prices of, certain generic drugs." ECF No. 559-2 ¶ 8. And Kellum admitted to conspiring "to rig bids and allocate customers for, and stabilize, maintain, and fix prices of, generic drugs." ECF No. 549-8 ¶ 20. Each defendant's civil admissions to fixing and maintaining prices, allocating customers, and rigging bids (i.e., "coercing, persuading, or inducing third parties to refuse" to bid for customers), establish that the defendants' conduct was in violation of the Connecticut Antitrust Act.

- <u>California</u>: California's antitrust statute, the Cartwright Act, prohibits any "combination of capital, skill or acts by two or more persons for any of the following purposes:. . . (e) To make or enter into or execute or carry out any contracts, obligations or agreements of any kind or description, by which they do all or any or any combination of any of the following: (1) Bind themselves not to sell, dispose of or transport any article or any commodity or any article of trade, use, merchandise, commerce or consumption below a common standard figure, or fixed value. (2) Agree in any manner to keep the price of such article, commodity or transportation at a fixed or graduated figure. (3) Establish or settle the price of any article, commodity or transportation between them or themselves and others, so as directly or indirectly to preclude a free and unrestricted competition among themselves, or any purchasers or consumers. . . ." Cal. Bus. & Prof. Code §§ 16720, 16726.

  In the conduct described in the admissions in the Connecticut section above, Sandoz admitted to conspiring with Taro, Taro admitted to conspiring with Sandoz and Kellum, and Kellum admitted to conspiring with Sandoz, Taro, and Aprahamian. Their admitted conspiracies created trusts to allocate markets and rig bids (i.e., "Bind themselves not to sell"), and fix and maintain prices to preclude unrestricted competition among themselves and purchasers or consumers. The admissions thus establish that the defendants' conduct was in violation of the Cartwright Act.

- <u>Minnesota</u>: The Minnesota Antitrust Law of 1971 prohibits any "contract, combination, or conspiracy between two or more persons in unreasonable restraint of trade or commerce," including those "(a) for the purpose or with the effect of affecting, fixing, controlling or maintaining the market price, rate, or fee of any commodity or service; (b) affecting . . . any commodity . . . for the purpose or with the effect of affecting, fixing, controlling, or maintaining the market price, rate, or fee of the commodity; or (c) allocating or dividing customers or markets, functional or geographical, for any commodity or service." Minn. Stat. §§ 325D.51, 325D.53. The Defendants' Rule 36 admissions establish that their conduct in conspiring to fix prices and allocate markets and rig bids for generic drugs violated the Minnesota Antitrust Law.

- <u>Kansas</u>: The Kansas Restraint of Trade Act makes it unlawful "[t]o make or enter into, or execute or carry out, any contract, obligation or agreement of any kind or description by which such person shall . . . (b) agree in any manner to keep the price

of [an] article, commodity or transportation at a fixed or graded figure; (c) in any manner establish or settle the price of any article or commodity or transportation between them or themselves and others to preclude a free and unrestricted competition among themselves or others in . . . sale . . . of any such article or commodity; or (d) agree to pool, combine or unite any interest they may have in connection with the . . . sale . . . of any such article or commodity, that such person's price in any manner is affected." Kan. Stat. Ann. § 50-101.  Again, the Defendants' civil admissions establish that their conduct in conspiring to fix prices and allocate markets and rig bids ("unit[ing] any interest they may have" in the sale of a commodity) violated the Kansas Restraint of Trade Act.

- <u>Mississippi</u>: Under Mississippi's antitrust statute, it is unlawful to "enter into, become a member of, or a party to any trust or combine," the effect of which is "(a) To restrain trade; (b) To limit, increase or reduce the price of a commodity; . . . [or] (d) To hinder competition in the . . . sale or purchase of a commodity[.]" Miss. Code Ann. § 75-21-1. Again, the Defendants' Rule 36 admissions establish that the defendants' conduct in conspiring to fix ("limit") prices and allocate markets and rig bids ("hinder competition") for generic drugs was in violation of Mississippi's antitrust statute.

To be sure, these and the other States' laws may well carry nuances—even in a price-fixing case—when it comes to deciding issues like injury, causation, and damages.  It is also true that geographic scope limitations in some state antitrust statutes—and possibly certain constitutional doctrines—may mean that certain states' antitrust laws do not reach some or all of these Defendants' conduct.  But none of those issues are before me now.  All that I decide now is that the acts to which the Defendants have each admitted under Rule 36 show, as a matter of law, that they have violated the *prohibitions* against price fixing, market allocation, and bid rigging in all of the States' antitrust laws at least to the extent those laws may be applied to out-of-state conduct.

If any Defendant has a good faith belief that the acts to which it or he admitted under Rule 36 do *not* violate the prohibitions in the antitrust laws of a particular state or states, that Defendant may file a motion for reconsideration of this ruling in accordance with this Court's Local Rules.  No such motions should be filed simply to assert geographic scope limitations of a particular state's law (or an account of constitutional provisions) because, as I have just explained, those issues are not before me now.

**D.  Motions to Seal**

The Motions to Seal briefs and exhibits related to this motion for partial summary judgment—ECF Nos. 551, 552, 556, and 557—are all granted, substantially for the reasons set forth in the motions.

## IV. CONCLUSION

For the reasons above, the motion for summary judgment (ECF No. 549) is GRANTED. Specifically, the motion is granted as to the violation element of Counts One, Two, Twenty-Three and Count Twenty-Eight.

I emphasize that I express no opinion in this ruling regarding: (1) whether the plaintiffs can satisfy any injury, causation, and damages elements of federal or any state's antitrust law; (2) in the case of individual state antitrust laws that require proof of in-state conduct or effects (substantial or otherwise), whether the plaintiffs can satisfy any such requirement(s); (3) whether application of the laws of a particular state to the conduct of any of these three Defendants would violate the Due Process or Dormant Commerce Clauses; or (4) any affirmative defenses.  I also express no opinion on whether the Defendants' admitted conduct violates any of the other state statutes or common law precepts on which the States rely in their complaint.

IT IS SO ORDERED.


                                                        /s/
                                            Michael P. Shea, U.S.D.J.


Dated:  Hartford, Connecticut
         July 21, 2025