# UNITED STATES DISTRICT COURT
## DISTRICT OF CONNECTICUT

THE STATE OF CONNECTICUT; THE STATE OF
ALASKA; THE STATE OF ARIZONA; THE
STATE OF ARKANSAS; THE STATE OF
CALIFORNIA; THE STATE OF COLORADO;
THE STATE OF DELAWARE; THE DISTRICT OF
COLUMBIA; THE STATE OF FLORIDA; THE
STATE OF GEORGIA; THE TERRITORY OF
GUAM; THE STATE OF HAWAII; THE STATE
OF IDAHO; THE STATE OF ILLINOIS; THE
STATE OF INDIANA; THE STATE OF IOWA;
THE STATE OF KANSAS; THE
COMMONWEALTH OF KENTUCKY; THE
STATE OF LOUISIANA; THE STATE OF MAINE;
THE STATE OF MARYLAND; THE
COMMONWEALTH OF MASSACHUSETTS;
THE STATE OF MICHIGAN; THE STATE OF
MINNESOTA; THE STATE OF MISSISSIPPI; THE
STATE OF MONTANA; THE STATE OF
NEBRASKA; THE STATE OF NEVADA; THE
STATE OF NEW HAMPSHIRE; THE STATE OF
NEW JERSEY; THE STATE OF NEW MEXICO;
THE STATE OF NEW YORK; THE STATE OF
NORTH CAROLINA; THE STATE OF NORTH
DAKOTA; THE COMMONWEALTH OF THE
NORTHERN MARIANA ISLAND; THE STATE
OF OHIO; THE STATE OF OKLAHOMA; THE
STATE OF OREGON; THE COMMONWEALTH
OF PENNSYLVANIA; THE COMMONWEALTH
OF PUERTO RICO; THE STATE OF RHODE
ISLAND; THE STATE OF SOUTH CAROLINA;
THE STATE OF TENNESSEE; THE STATE OF
UTAH; THE STATE OF VERMONT; THE
COMMONWEALTH OF VIRGINIA; THE STATE
OF WASHINGTON; THE STATE OF WEST
VIRGINIA; THE STATE OF WISCONSIN; and
U.S. VIRGIN ISLANDS,

    *Plaintiffs*,

v.

No. 3:20-cv-00802-MPS

SANDOZ, INC.; ACTAVIS HOLDCO US, INC.;
ACTAVIS ELIZABETH LLC; ACTAVIS
PHARMA, INC.; AMNEAL
PHARMACEUTICALS, INC.; AMNEAL
PHARMACEUTICALS, LLC; ARA
APRAHAMIAN; AUROBINDO PHARMA U.S.A.,
INC.; BAUSCH HEALTH AMERICAS, INC.;
BAUSCH HEALTH US, LLC; MITCHELL
BLASHINSKY; DOUGLAS BOOTHE; FOUGERA
PHARMACEUTICALS INC.; GLENMARK
PHARMACEUTICALS INC., USA; JAMES (JIM)
GRAUSO; GREENSTONE LLC; G&W
LABORATORIES, INC.; WALTER
KACZMAREK; ARMANDO KELLUM; LANNETT
COMPANY, INC.; LUPIN PHARMACEUTICALS,
INC.; MALLINCKRODT INC.; MALLINCKRODT
LLC; MALLINCKRODT plc; MYLAN INC.;
MYLAN PHARMACEUTICALS INC.; KURT
ORLOFSKI; MICHAEL PERFETTO; PERRIGO
NEW YORK, INC.; PFIZER INC.; SUN
PHARMACEUTICAL INDUSTRIES, INC.; TARO
PHARMACEUTICALS USA, INC.; TELIGENT,
INC.; ERIKA VOGEL-BAYLOR; JOHN
WESOLOWSKI; and WOCKHARDT USA LLC,

      *Defendants*.

## RULING ON MOTION FOR SUMMARY JUDGMENT

The Defendants, thirty-six pharmaceutical companies and executives, have moved for summary judgment on statutes of limitations and laches grounds against the Plaintiffs, the Attorneys General of most of the States and several U.S. territories ("the States"), in this sprawling action alleging price fixing, market allocation, and bid rigging in the sale of generic drugs for skin ailments. The motion seeks summary judgment (a) on laches grounds with respect to the States' federal claims for injunctive relief; and (b) on statute of limitations grounds with respect to most of the States' state-law claims. ECF No. 617.

For the reasons set forth below, I DENY the Defendants' motion for summary judgment as to all claims except for proprietary claims brought under Kansas law.

# I.  PROCEDURAL AND FACTUAL BACKGROUND

## A.  Procedural Background

This is one of three cases in which the Attorneys General of the States have sued scores of defendants in the generic drug industry for alleged antitrust violations and unfair trade practices. All three cases were originally filed in this Court but were transferred to the Eastern District of Pennsylvania (the "MDL Court"), which was designated by the Judicial Panel on Multidistrict Litigation (the "JPMDL") to preside over these and other cases brought by private parties involving similar allegations in a consolidated proceeding.  ECF No. 9.[1]  In April 2024, these three cases were remanded to this Court by the JPMDL and assigned to me.  ECF No. 11.

The operative complaint in this case, the September 9, 2021 Amended Complaint (ECF No. 196), spans 609 pages and includes 2,123 numbered paragraphs.  It alleges collusion in the pricing, market allocation, and bidding for generic drugs, chiefly for dermatological applications. (The parties refer to it as "the Dermatology complaint.")  Its allegations have been summarized in various rulings by the MDL Court, *see, e.g.*, *In re Generic Pharms. Pricing Antitrust Litig.*, 338 F. Supp. 3d 404, 411–34 (E.D. Pa. 2018); *In re Generic Pharms. Pricing Antitrust Litig.*, 394 F. Supp. 3d 509, 514–24 (E.D. Pa. 2019); and I adopt those summaries by reference.  Essentially, the complaint describes a series of eighty single-drug conspiracies, as well as an overarching conspiracy, to collude on price and market allocation and to rig bids for the business of customers.

In this case, the States bring federal antitrust claims under Section 1 of the Sherman Act, 15 U.S.C. § 1, as well as claims under various state antitrust and consumer protection laws.  The

---

[1] Unless otherwise indicated, all ECF numbers in this ruling refer to entries on the docket of this case, not the same case when it was before the MDL Court, and each page number refers to the page number shown on the ECF stamp on the top of the cited page, not the page of the relevant brief or pleading designated by the parties.

States seek injunctive and other types of equitable relief, as well as damages, civil penalties, and restitution.

The Defendants argue that the vast majority of the claims are time-barred because the States took too long to bring this case after learning of the alleged violations. With this motion, the Defendants collectively seek summary judgment as to the Sherman Act claims under the doctrine of laches and as to state-law claims on statute of limitations grounds. Thus, the issues for me to determine are when the States' claims accrued and whether any statutes of limitations were tolled.

### B. Factual Background

The following relevant facts are drawn from the parties' Local Rule 56(a)2 Statement of Facts, ECF No. 619-1, unless otherwise noted.

On August 9, 2012, *The New York Times* published an article headlined "Soaring Ointment Prices Are a Dermatologic Mystery" that reported "recent, mysterious and rapid" price increases for generic dermatologic products, including two of the drugs at issue in this case. *Id.* ¶ 11. The Office of the New York Attorney General ("NYAG") was aware of the article. *Id.* ¶ 12. On September 7, 2012, the NYAG sent letters to four Defendants—Actavis, Fougera, Perrigo, and Taro—seeking an explanation for recent price increases for at least five drugs at issue. *Id.* ¶ 13–14. In response, Taro disclosed that the price increases were a result of an attempt to boost profit, and not the result of an increase in the cost of the drugs' active ingredient.[2] *Id.* ¶ 15. Taro also asserted that its prices for the drugs listed in the NYAG letters were mostly lower than those of its competitors and that Medicare set its own maximum reimbursement limits, which were often below Taro's prices, meaning that Taro did not realize its posted prices for the products. *See* ECF

_____

[2] New York has withheld file memoranda related to these letters and responses on work-product grounds. ECF No. 619-1 ¶ 15.

No. 681-1 at 545–47.  Taro acknowledged that for a few of these drugs, it increased its prices after its generic competitors did so.  *Id.* at 546–47.  For its part, Perrigo cited a changing cost structure, including the need to identify and qualify new component suppliers after its former suppliers left the market; increased component and packaging costs; increased compliance and quality demands by the FDA; and investments in new equipment.  *Id.* at 550.  Perrigo also cited increased demand due to other generic suppliers exiting the market.  *Id.*  Fougera's response stated that it had been losing money on one product and so chose to raise prices in order to continue supplying it.  *Id.* at 554.  For another product, it cited a price increase by a competitor as the rationale for its price increase.  *Id.*  Actavis similarly cited the need for specific products to remain profitable in order to continue manufacturing them as the basis for its price increases.  *Id.* at 557–58.  All of these explanations were reasonably detailed and specific.  The NYAG did not follow up on the responses, and the record does not indicate that the NYAG took any further steps to investigate the price increases until 2014.  ECF No. 619-1 ¶ 16.

From December 2013 to January 2014, at least two more major news outlets, *Bloomberg Businessweek* and the *San Francisco Chronicle*, published articles about "spikes" in prices of generic drugs.  *Id.* ¶¶ 18–19.  A week after the Chronicle published its article, the National Community Pharmacists Association ("NCPA") sent a letter to Congress noting "huge upswings in generic drug prices" and requesting "an oversight hearing to examine what factors may have led to these unmanageable spikes in generic drugs."  *Id.* ¶ 20.

Later in January 2014, the Office of the Ohio Attorney General invited others in the National Association of Attorneys General's Pharmaceutical Industry Working Group ("PIWG") to attend a conference call on February 3, 2014 with an agenda that included, among other items, "[n]early 100 generics [that] have doubled in price over the last year."  *Id.* ¶ 21.  The PIWG met

regularly to "identif[y] potential cases, coordinate[] investigations of anti-competitive practices and monitor[] developments in the pharmaceutical industry. *Id.* ¶ 7.

On July 8, 2014, in an article headlined "Rapid Price Increases for Some Generic Drugs Catch Users by Surprise," *The New York Times* reported that the drug Digoxin—which is not a drug at issue in this case—"provides a telling case study" of price increases for drugs, and that the "Federal Trade Commission has been examining anticompetitive practices in the generic drug industry." *Id.* ¶ 23. The agenda for PIWG's conference call scheduled for July 21, 2014 included a "Brown Bag" discussion about "Drug Pricing" and included a copy of the *New York Times* article. *Id.* ¶ 29.

That same month, the Connecticut Office of the Attorney General ("CTAG") initiated an investigation into price increases for Digoxin and sent subpoenas and interrogatories to three companies. *Id.* ¶ 24–25. One interrogatory asked whether the companies had previously been investigated or prosecuted for price-fixing conduct for drugs beyond Digoxin. *Id.* ¶ 25. Although the initial subpoenas indicated that the CTAG was investigating potential price fixing and market allocation for "pharmaceutical drugs," the CTAG did not issue any subpoenas focused on any drug at issue in this case before 2016.[3] Id. ¶¶ 26–27.

On October 2, 2014, Senator Bernie Sanders and Representative Elijah Cummings announced a congressional "investigation into soaring generic drug prices." *Id.* ¶ 32. As part of the investigation, several Defendant companies received letters from Congress seeking information "to determine the factors contributing to these price increases." *Id.*

On November 6, 2014, Defendant Lannett filed a Form 10-Q with the U.S. Securities and

---

[3] The States contend that the CTAG sent its first open-ended subpoena—i.e., a subpoena that was not limited to specific drugs—to Defendant Taro in September 2016. *Id.* at 44 ¶ 5 (States' Additional Material Facts).

Exchange Commission ("SEC") disclosing that a senior vice president had received a grand jury subpoena related to a "federal investigation of the generic pharmaceutical industry" into possible Sherman Act violations; the 10-Q said that the subpoena "requests corporate documents of the company relating to communications or correspondence with competitors regarding the sale of generic prescription medications, but is not specifically directed to any particular product and is not limited to any particular time period." *See id.* ¶ 37 (quoting ECF No. 681-2 at 221). Four days later, *The Wall Street Journal* reported on the DOJ's subpoenas to Lannett and another non-party company. *Id.* ¶¶ 36, 38. As the States note, however, the DOJ never brought any action against or entered into any settlement with Lannett. *Id.* at 49 ¶ 35.

The agenda for a PIWG call on November 17, 2014 listed "Drug Pricing and Legislation" as the top item on the agenda and noted the DOJ subpoenas, congressional inquiry, and related news articles. *Id.* ¶ 40.

On November 18, 2014, Joan Marshall, a former prosecutor in the DOJ's Antitrust Division, authored a blog post in which she suggested that, based on the DOJ and CTAG subpoenas, the SEC filings, and the congressional inquiry, the DOJ's Antitrust Division was "taking a hard look at the generic pharmaceutical industry." *Id.* ¶ 41.

On November 20, 2014, a Senate subcommittee held a hearing titled "Why Are Some Generic Drugs Skyrocketing in Price," at which Senator Sanders noted that Medicare and Medicaid data indicated that "over 1,200 generic drugs, nearly 10 percent of all generic drugs, more than doubled in price" between 2013 and 2014, and that this represented a "trend in the industry, where a number of drugs are going up at extraordinary rates." *Id.* ¶¶ 42–43. Also at the hearing, a member of the NCPA reported that "[s]eventy-seven percent of pharmacists reported 26 or more instances of a large upswing in a generic drug's acquisition price over the past 6 months,"

with one drug at issue in this case, Nystatin Triamcinolone, among those "most frequently cited." *Id.* ¶ 44.  And a statement from Dr. Aaron Kesselheim, a professor of health economics at the Harvard School of Public Health, called for intervention from the Federal Trade Commission ("FTC") "to ensure that price changes do not stem from anticompetitive behavior."  *Id.* ¶ 45.[4]

On December 8, 2014, Lannett filed a Form 8-K with the SEC disclosing that the "company was served with a grand jury subpoena related to the continuing federal investigation of the generic pharmaceutical industry into possible violations of the Sherman Act."  *Id.* ¶ 47.

On December 11, 2014, the PIWG hosted a "Brown Bag" teleconference, which thirty-five States were invited to attend, concerning "Recent Generic Price Spikes, Their Possible Causes and Investigatory Suggestions."  *Id.* ¶ 48.  In advance of the Brown Bag, California's Department of Justice retained Geoffrey Joyce, a professor of pharmaceutical economics at the University of Southern California, to advise the States "on the price spikes, what might be causes for them, and investigative suggestions for looking into them with an eye toward possible litigation."[5]  *Id.* ¶ 49.  A representative of the Delaware attorney general's office described the Brown Bag as a "brainstorming session" that included "potential consumer or antitrust violations."  *Id.* ¶ 52.

Following the December Brown Bag, antitrust attorneys for 14 states formed the Generic Drug Price Spike Working Group ("PSWG").[6]  *Id.* ¶ 54.  From December 2014 to September 2016, the PSWG examined potential causes of increases in prices of generic drugs.  *Id.* ¶¶ 55–56.  Among the drugs that the PSWG focused on was one of the drugs at issue in this case, Clobetasol

---

[4] A week earlier, the *New England Journal of Medicine* published an article co-authored by Dr. Kesselheim in which the authors noted that price increases could have various causes, including fluctuations in demand, or "improper business practices" that "may reduce competition artificially."  *Id.* ¶ 39.

[5] California, citing the work-product privilege, instructed Dr. Joyce not to answer questions during his deposition about opinions he provided at the Brown Bag.  *Id.* ¶ 49.

[6] Not every state joined at the same time or had the same role or involvement.  *Id.* ¶ 54 & n.30.

Propionate.[7]  *Id.* ¶ 58.  The work of the PSWG included collecting complaints, tracking drug prices, and reviewing public data.  *Id.* ¶¶ 57, 59.  Other than actions the CTAG took in connection with the investigation it began in 2014, the States participating in the PSWG did not issue subpoenas, interview witnesses, or request to participate in the DOJ's criminal investigation.  *Id.* ¶ 60.  The PSWG often reported its findings to the wider group of states in PIWG conference calls.  *Id.* ¶ 61.  Among these reports were news that the DOJ had subpoenaed three companies, all of whom the CTAG had already subpoenaed.  *Id.*

In March 2015, a leading antitrust official at the Florida Office of the Attorney General asked subordinates what Florida was doing about the reports of price hikes beyond contributing to the working group, noting that "the DOJ has a grand jury looking into this conduct as there are some of these [hikes] that are not explainable . . . at least not yet, according to Bill Baer," the then-Assistant Attorney General for the DOJ's Antitrust Division.  *Id.* ¶ 62.  Florida did not thereafter issue subpoenas or civil investigation demands.  *Id.*

In August 2015, Defendant Actavis disclosed that the DOJ had served it with a subpoena in June 2015 seeking information about its marketing and pricing of drugs and communications with competitors.  *Id* ¶ 65.

In October 2015, the Antitrust Division of the Massachusetts Attorney General's Office consulted with Dr. Kesselheim in connection with its ongoing investigation into generic drug price

---

[7] The States have not produced many documents related to the PSWG's investigations.  The MDL Court upheld the States' work-product assertions because "the primary motivating purpose behind the creation of the document[s] was to aid in possible future litigation."  *Id.* ¶ 59 (citing *In re: Generic Pharm. Pricing Antitrust Litig.*, No. 16-md-2724 (E.D. Pa. 2016), ECF No. 2824 at 4).  As to the Defendants' argument that this shows that the States were on inquiry notice as of the time they created these documents, I disagree.  As discussed below, there is no evidence the States knew about the antitrust violations about the specific drugs at issue in this case at the time they created those documents.

increases, which was not limited to any specific drug.  *Id.* ¶ 66.

The Defendants contend that no alleged anticompetitive conduct relating to the drugs at issue in this case occurred after January 23, 2016.  *Id.* ¶ 69.  The States dispute this assertion, citing alleged conduct "[in]to 2018 and beyond."  *Id.*; *see also id.* ¶¶ 1–5.

On March 2, 2016, a private plaintiff brought a purported class action against Defendants Lannett and Mylan, among other companies, in the Eastern District of Pennsylvania, alleging price fixing and market allocation related to the generic drugs Digoxin and Doxycycline, which are not at issue in this case.  *Id.* ¶ 68.  On September 15, 2016, another private plaintiff brought a purported class action against five Defendants, among other companies, in the Southern District of New York, alleging price fixing related to Clobetasol, a drug at issue in this case.  *Id.* ¶ 70.  The complaint cited publicly available information, such as the congressional hearings.  *Id.*

On September 28, 2016, the CTAG gave a presentation on its investigation into generic drug price increases to other States at a NAAG meeting in San Francisco.  *Id.* ¶ 71.  The record does not indicate whether the presentation involved any of the Defendants or drugs at issue in this case.  *See id.*

On December 15, 2016, Connecticut and 19 other States filed the first of the three cases alleging antitrust conspiracies that are now before me, *Connecticut v. Aurobindo Pharma USA, Inc.*, No. 3:16-cv-2056, which the parties refer to as the "Heritage" action.  *Id.* ¶ 73.  The initial Heritage complaint alleged conspiracies related to only two generic drugs: Doxycycline and Glyburide, neither of which are at issue in this case.  *Id.*  A CTAG press release indicated that the States "have evidence of widespread participation in illegal conspiracies across the generic drug industry," beyond those addressed in the Heritage complaint, and that the States "intend to pursue this and other enforcement actions aggressively."  *Id.* ¶ 74.

On December 27, 2016, a private plaintiff filed against certain Defendants four purported class actions, each alleging price fixing, market allocation, and bid rigging for one of four drugs at issue in this case: Desonide, Clobetasol, Fluocinonide and Econazole.  *Id.* ¶ 75.

On June 18, 2018, the States amended their complaint in the Heritage action to include conspiracies related to 15 generic drugs, as well as an overarching conspiracy which was, like the overarching conspiracy alleged in this case, "part of a larger, overarching understanding about how generic manufacturers fix prices and allocated markets to suppress competition."[8] *Id.* ¶ 76.

On May 10, 2019, the States filed the second case now before me, *Connecticut v. Teva Pharmaceuticals USA, Inc.*, No. 3:19-cv-710 (the "*Teva*" action), which named, among other defendants, twelve corporate and three individual defendants that are also Defendants in this case. *Id.* ¶ 77.

The States filed the initial complaint in this case (the "Dermatology" action, or "*Sandoz*") on June 10, 2020.  *Id.* ¶ 78.

The facts in this paragraph are drawn from the States' Statement of Additional Material Facts: the CTAG issued twelve subpoenas to Defendants in this action between June 2017 and August 2019.  ECF No. 619-1 at 44–45 ¶ 9.  The "CTAG issued 239 subpoenas to phone carriers requesting phone records for potentially relevant individuals" between February 2017 and February 2020, which reflected "more than 11 million call records from hundreds of individuals." *Id.* at 45 ¶ 12; *see also id.* at 46 ¶ 17.  The CTAG began analyzing the data in April 2017.  *Id.* at 45 ¶ 14.  The States signed cooperation agreements with former employees of the Defendants

---

[8] The States note that the Heritage complaint alleged that Lannett had engaged in a conspiracy related to Doxycycline, and that the DOJ "never brought action against, charged, or settled with Lannett."  *Id.* at 49 ¶¶ 34–35.

between January and September 2019.  *Id.* at 46 ¶¶ 20–26.

## II.  LEGAL STANDARD

"Summary judgment is appropriate only if the movant shows that there is no genuine issue as to any material fact and the movant is entitled to judgment as a matter of law."  *Tolan v. Cotton*, 572 U.S. 650, 656–57 (2014) (internal quotation marks and citations omitted).  In reviewing the summary judgment record, a court must "construe the facts in the light most favorable to the non-moving party and must resolve all ambiguities and draw all reasonable inferences against the movant."  *Caronia v. Philip Morris USA, Inc.*, 715 F.3d 417, 427 (2d Cir. 2013).  "A genuine dispute of material fact exists for summary judgment purposes where the evidence, viewed in the light most favorable to the nonmoving party, is such that a reasonable jury could decide in that party's favor."  *Zann Kwan v. Andalex Grp. LLC*, 737 F.3d 834, 843 (2d Cir. 2013).  The moving party bears the burden of demonstrating that no genuine issue exists as to any material fact.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 323–25 (1986).  If the moving party carries its burden, "the opposing party must come forward with specific evidence demonstrating the existence of a genuine dispute of material fact."  *Brown v. Eli Lilly & Co.*, 654 F.3d 347, 358 (2d Cir. 2011).  "Where no rational finder of fact could find in favor of the nonmoving party because the evidence to support its case is so slight, summary judgment must be granted."  *Id.* (internal quotation marks omitted).

## III.  LACHES DISCUSSION

### A.  Nature of Claims

The States seek injunctive relief for their federal claims pursuant to Section 16 of the Clayton Act, 15 U.S.C. § 26, which provides a private cause of action for violations of the Sherman Act.  *See* ECF No. 196 ¶ 24.  States are treated as private parties when they invoke Section 16. *See In re Google Digital Advert. Antitrust Litig.*, 627 F. Supp. 3d 346, 405 (S.D.N.Y. 2022) (citing

*New York v. Facebook, Inc.*, 549 F. Supp. 3d 6, 20 (D.D.C. 2021), *aff'd sub nom.*, *New York v. Meta Platforms, Inc.*, 66 F.4th 288 (D.C. Cir. 2023)). Because Section 16 does not include its own limitations period, the equitable doctrine of laches applies to federal antitrust claims for injunctive relief. *Id.* at 404. The doctrine of laches "bars a plaintiff from maintaining a suit if he unreasonably delays in filing a suit and as a result harms the defendant." *Nat'l R.R. Passenger Corp. v. Morgan*, 536 U.S. 101, 121 (2002).

"For a [S]ection 16 claim, courts use the Clayton Act's four-year limitations period for money-damages claims as a 'guideline'" in applying laches. *In re Google Digital Advert. Antitrust Litig.*, 627 F. Supp. 3d at 404. Although "the starting presumption . . . is that . . . a Section 16 plaintiff . . . must file its lawsuit within four years from the accrual of the claim," *id.*, the ultimate "determination of whether laches bars a plaintiff from equitable relief is entirely within the discretion of the trial court," *Tri-Star Pictures, Inc. v. Leisure Time Prods., B.V.*, 17 F.3d 38, 44 (2d Cir. 1994); *Fed. Treasury Enter. Sojuzplodoimport v. Spirits Int'l B.V.*, 809 F.3d 737, 746 (2d Cir. 2016).[9]

> When a suit is brought within the time fixed by the analogous statute, the burden is on the defendant to show . . . circumstances exist which require the application of the doctrine of laches. On the other hand, when the suit is brought after the statutory

---

[9] The Defendants suggest that "[l]aches for federal antitrust claims for injunctive relief operates . . . the same way as a four-year statute of limitations period for federal antitrust claims for damages." ECF No. 617 at 23. This ignores the court's discretion in the final decision. Further, contrary to the Defendants' argument (ECF No. 621 at 17), in exercising this discretion and balancing the equities—after using the Clayton Act statute of limitations as a "guideline"—I may consider that the action was brought by the States rather than by a private litigant. *See In re Google Digital Advert. Antitrust Litig.*, 627 F. Supp. at 407 & n.28 (citing *New York v. Facebook, Inc.*, 549 F. Supp. 3d at 40 ("The Court does not mean to suggest that the presence of state plaintiffs has zero effect on the analysis. Laches is an equitable doctrine, and in the balancing of the equities, it is of course relevant that this suit is brought not by a competitor hoping to seriously interfere with a rival's business operations, but rather by many of the states of the Union.")). As I discussed at oral argument, it would not be good public policy for States to use their sovereign prelitigation subpoena authority to issue industry-wide subpoenas in a shotgun approach at the first wisp of wrongdoing with regard to a single drug. *See* ECF No. 870 at 61–62.

time has elapsed, the burden is on the complainant to aver and prove the circumstances making it inequitable to apply laches to his case. . . . Therefore, prior to the running of the most closely analogous . . . statute of limitations there is no presumption of laches and the burden remains on the defendant to prove the defense. Alternatively, once the analogous statute has run, a presumption of laches will apply and plaintiff must show why the laches defense ought not be applied in the case.

*Conopco, Inc. v. Campbell Soup Co.*, 95 F.3d 187, 191 (2d Cir. 1996). The limitations periods for most state-law claims, meanwhile, are fixed by statute.[10]  *See, e.g.*, Conn. Gen. Stat. § 35-40 (barring state antitrust claims "unless commenced within four years after the cause of action shall have accrued"). Before I can apply the doctrine of laches to the federal-law claim or the statutes of limitations to the state-law claims, I must determine when the claims accrued.

## B.  Accrual

For claims under the Clayton Act, as well as many of the state statutes of limitations, the "injury-occurrence" rule applies to determine when claims accrue. Under the injury-occurrence rule, "a cause of action accrues and the statute begins to run when a defendant commits an act that injures a plaintiff's business," which means that once "a plaintiff feels the adverse impact of an antitrust conspiracy on a particular date, a cause of action immediately accrues to him." *Zenith Radio Corp. v. Hazeltine Rsch., Inc.*, 401 U.S. 321, 338–39 (1971). The States allege that they were injured when they (or their residents) paid prices for specific drugs that had been fixed by agreement by the Defendants. At the earliest, then, the four-year limitations period would have begun to run when a purchaser first bought a drug that was subject to a price-fixing conspiracy. *See id.*; *Berkey Photo, Inc. v. Eastman Kodak Co.*, 603 F.2d 263, 295 (2d Cir. 1979) ("[T]he purchaser's claim cannot accrue until it actually pays the overcharge."). In addition, the States argue that "a new cause of action accrued with a new limitations period" with "each sale at an

---

[10] The parties have not raised any issues regarding whether equitable doctrines such as laches may apply to equitable claims under state law.

inflated price," and that their claims are timely as long as they were brought, for each sale, within the new limitations periods. ECF No. 619 at 6. I agree with the States that, under the continuing violation doctrine as construed in the Second Circuit, their claims alleging price fixing are timely.

### 1. Continuing Violation Doctrine

To restart the accrual clock, the States invoke the continuing violation doctrine, under which a new cause of action accrues separately for each overt act the Defendant commits within the limitations period.

> Antitrust law provides that, in the case of a "continuing violation," say, a price-fixing conspiracy that brings about a series of unlawfully high priced sales over a period of years, each overt act that is part of the violation and that injures the plaintiff, *e.g., each sale to the plaintiff*, starts the statutory period running again, regardless of the plaintiff's knowledge of the alleged illegality at much earlier times.

*US Airways, Inc. v. Sabre Holdings Corp.*, 938 F.3d 43, 67 (2d Cir. 2019) (quoting *Klehr v. A.O. Smith Corp.*, 521 U.S. 179, 189 (1997)) (emphasis added); *see also In re Generic Pharms. Pricing Antitrust Litig.*, No. 16-md-2724, 2025 WL 2483981, at *17 (E.D. Pa. Aug. 27, 2025) ("[T]he nature of [a price-fixing] conspiracy is that it brings about higher prices over a period of years. Under antitrust law, each sale to a customer at the post-conspiracy price is an injury to the purchaser."). The Defendants narrowly define the dates of their alleged "overt act[s]" as the dates they allegedly had express communications with each other about coordinating prices—the most recent of which fell before the four-year limitations period.[11] *See* ECF No. 681-4 at 612–21. The States argue that each later sale "at inflated, conspiracy-resulting prices," which continued into 2018 and beyond, constitutes an overt act and sets a new accrual date. ECF No. 619 at 6. Under

---

[11] The States quibble with a few of these dates and offer evidence of some Defendants' later general alleged collusive conduct, but they do not offer alternatives for dates on which the parties communicated with each other in efforts to "fix" prices that fall within four years of the filing of the complaint. *See* ECF No. 620-1 nn.1–4.

the circumstances here, the States are correct.

The States' conspiracy allegations fit the example the Supreme Court provided in *Klehr* and the Second Circuit adopted in *US Airways*.[12]  In *US Airways*, the plaintiff airline contracted with defendant Sabre in both 2006 and 2011 to pay Sabre fees for its booking services.  938 F.3d at 51.  US Airways filed its complaint in 2011, alleging that anticompetitive clauses in the two contracts inflated the fees paid.  *Id.*  In the periods following each contract, "each allegedly supracompetitive price that Sabre charged US Airways was pursuant to either the 2006 or 2011 contract—agreements binding the parties."  *Id.* at 68.  The district court concluded at summary judgment that claims arising out of the 2006 contract were barred by the four-year statute of limitations.  *Id.* at 67.  US Airways appealed, contending that the court misapplied the continuing violation rule because it continued to pay those prices into the limitations period.  *Id.*

As set forth in the excerpt of the decision quoted above, the Second Circuit recognized that a price-fixing conspiracy stretching over several years is "a continuing violation" in which "each sale to the plaintiff" is an overt act that restarts the accrual clock for damages flowing from that act.  But in the case before it, "by contrast, each allegedly supracompetitive price that Sabre charged US Airways was pursuant to either the 2006 or 2011 contract," and so each price charged "was not an overt act of its own, but a manifestation of the prior overt act of entering into the [] contract."  *Id.* at 68–69.  The case before me involves an alleged price-fixing conspiracy between competitors stretching over several years, not prices stemming from an illegal clause in a single contract with a single customer.  The prices the States and their residents allegedly paid reflected

---

[12] *Klehr* was a RICO case in which the Supreme Court explained the antitrust "continuing violations" rule to contrast it with the situation before the Court.  The Second Circuit cited *Klehr* while exploring whether the conduct alleged in *US Airways*, an antitrust case, constituted an "overt act."

unlawful and secret collusion by third parties and did not result from their own behavior in entering

into a contract. Even if contracts to purchase the drugs are taken into account, they only underscore

the distinction between this case and *US Airways*: the Defendants' drug sales in the limitations

period were not limited to those controlled by an earlier contract with consumers; rather, the

Defendants continued to sell drugs to both new customers and to existing customers pursuant to

new agreements.[13]  The pertinent overt act was each sale at a supracompetitive price because it

was the Defendant's sale—not the alleged underlying act of fixing the price—that injured the

purchaser. *See Berkey Photo, Inc.*, 603 F.2d at 295–96 ("It is only when the [Defendant] . . . enjoys

the spoils of its [anticompetitive conduct] by boosting its price to excessive levels that a purchaser

'feels the adverse impact' of the violation. . . . We hold . . . that a purchaser suing a monopolist

for overcharges paid within the previous four years may satisfy the conduct prerequisite to

recovery by pointing to anticompetitive actions taken before the limitations period.").  The date

upon which the Defendants' allegedly coordinated price increases became effective only indicates

the earliest date upon which a plaintiff could have been harmed; it is irrelevant to determining later

dates on which claims might accrue in a continuing violation.

The Defendants are also incorrect that "there is no evidence (or allegation) that any

Defendant sold any drug at a 'fixed' price . . . within the limitations period."  ECF No. 621 at 8.

The States bring claims on behalf of all consumers who "have been injured in their business or

---

[13] In the generic drugs industry, the prices in customer agreements "can change monthly or yearly,
depending on the customer," and are subject to requests for quotation, a process by which a drug
manufacturer's customers can solicit bids from competing suppliers.  ECF No. 711 at 15 ¶ 19
(States' expert report, citing depositions of Defendants' executives).  The Defendants do not argue
that every price charged to consumers for the drugs at issue in the limitations period was set
pursuant to an agreement before the limitations period, as was the case in *US Airways*.  *See* ECF
No. 870 at 20 (defense counsel describing the markets for generic drugs as "bidding markets,"
"where the contracts are put out to bid either in a formal bidding process or . . . bids are submitted
and there's a request for a bid from another company").

property because they have had to purchase . . . numerous generic drugs, including those identified herein, at supra-competitive prices."  ECF No. 196 ¶ 1618.  The States' expert, Dr. Frederick Warren-Boulton, analyzed both public and non-public pricing data to demonstrate what consumers paid for the drugs at issue during the limitations period.  *See, e.g.*, ECF No. 711 at 36–50.  As discussed in greater depth below, Dr. Warren-Boulton asserts that these prices remained supracompetitive into the limitations period.  *See id.* at 74–77, 116–18.[14]  The States allege that these prices constitute evidence that the Defendants continued their price-fixing conspiracy into the limitations period.

The Defendants argue that, without evidence that they were continuing to actively communicate about the conspiracies to fix prices or allocate markets within the limitations period, any supracompetitive sales from that period cannot constitute an "overt act that is *part of the violation*."  *US Airways*, 938 F.3d at 67 (emphasis added).  That is, the Defendants contend that later sales could not have been in furtherance of any conspiracy because all such conspiracies had ended when communications stopped.  ECF No. 621 at 8.  The Defendants are wrong.  As the Eighth Circuit has pointed out, under a similar theory, "two parties could agree to divide markets for the purpose of raising prices, wait four years to raise prices, then reap the profits of their illegal agreement with impunity because any antitrust claims would be time barred.  That is not the law."  *In re Wholesale Grocery Prods. Antitrust Litig.*, 752 F.3d 728, 736 (8th Cir. 2014) (citing *Klehr*, 521 U.S. at 189); *see also United States v. A-A-A Elec. Co.*, 607 F. Supp. 266, 268 (E.D.N.C. 1985)

---

[14] The fact that the States' expert refers to overcharges in the limitations period as "lingering effects" of the underlying anticompetitive conduct is irrelevant.  Dr. Warren-Boulton, who is not a legal expert, used the term to distinguish prices within the period of communications from prices after express communications between the Defendants had stopped.  He did not—and could not, under Federal Rule of Evidence 702—use the term to suggest that the alleged conspiracy stopped when the express communications did.

(finding payoffs to conspirators "in return for participation in a scheme to rig bids are overt acts in the furtherance of the conspiracy" because such payments "have an adverse effect on competition . . . and encourage further violations of the Sherman Act"). There is no significant difference here, where the States have provided evidence from which a reasonable juror could infer that the Defendants expressly agreed to fix prices as late as 2015, then continued to abide by those agreements for years (despite cutting off their scrutinized communications), and, more than four years later, continued to reap profits that were the product of an illegal conspiracy.

Any argument that conspiracies for specific drugs were "completed" before the limitations period does not warrant summary judgment because the States have raised a genuine factual dispute about whether multiple Defendants continued to conduct business in accordance with the "fair share" scheme established by the earlier alleged collusion to avoid erosion of the supracompetitive prices. *See* ECF No. 620-1 at 3 n.1.[15] For example, the States have presented evidence suggesting that Taro's board of directors participated in a "fair share review" in July 2016, ECF No. 701-7 at 820; that competitors gathered in October 2016 and prior years at a home in the Poconos that Defendant Kellum referred to as "Collusion Cabin," ECF No. 701-7 at 901–03;[16] that Greenstone as of January 2017 would "push" on drugs only in markets where it had less than "fair share," ECF No. 711 at 750; and that Sandoz instructed employees to use terms such as "underdeveloped" rather than "Fair Share terminology" when documenting the topic, *id.* at 829.[17]

---

[15] The Defendants' reply brief also takes many of the States' comments out of context to suggest that the States admitted that the anticompetitive conduct stopped before the limitations period. ECF No. 621 at 8 n.5, 9 n.6. The citations do not support the conclusion that "all the purported conspiracies were concluded by 'early 2016.'" *Id.* at 9 n.6.

[16] At oral argument, the Defendants argued that Kellum's reference to "Collusion Cabin" was not related to the competitors' 2016 meeting at the cabin. ECF No. 898 at 18. Whether the competitors colluded at the cabin in any given year presents a genuine dispute of material fact.

[17] The States also provide evidence that multiple Defendants continued to internally track their "fair share" in markets for a given drug to inform their decisions on whether to pursue bids or price

Even though the majority of this evidence (aside from the evidence about "Collusion Cabin") indicates that Defendants' decisions to "play fair" by this stage were made internally, as opposed to in response to the frequent intercompany communications that occurred in the pre-limitations period, it still suggests that the Defendants were acting in furtherance of prior price-fixing and market-allocation agreements by abiding by the "rules of engagement" established years earlier by the alleged conspiracies. *See* ECF No. 196 ¶ 130; ECF No. 711 at 33 & n.122. Standing alone, this evidence could reflect lawful, unilateral action by a firm; but it does not stand alone. Rather, it fits the earlier pattern of conduct described in the complaint and documented in the record of Defendants refraining to bid or submitting non-competitive bids to customers, and using coded language when discussing competitors. *See, e.g.*, ECF No. 196 ¶ 301; ECF No. 619-1 at 47 ¶ 28 & nn. 46, 48; ECF No. 864. When ambiguities in the record are construed in favor of the States, a reasonable juror could interpret this evidence to support a finding that the Defendants continued to further the bid-rigging conspiracies after communications ended.

Moreover, the Defendants do not argue that any Defendant ever withdrew from the alleged conspiracies. *See United States v. Berger*, 224 F.3d 107, 118 (2d. Cir. 2000) ("mere cessation of activity" insufficient to meet burden of establishing withdrawal from conspiracy). The absence of withdrawals, combined with the breadth of alleged conspiracies, suggests that each competitor's abiding by the conspiracies' earlier-established "rules of engagement" was foreseeable to the Defendants. "[F]oreseeable acts of one co-conspirator in furtherance of the conspiracy are

---

increases through at least 2017. *See, e.g.*, ECF No. 711 at 694–99, 913–14. At oral argument, the Defendants argued that the term "fair share" is "frequently used across many different industries" and "is taught in schools, business schools, as a method for assessing positions in market." ECF No. 870 at 17. Even if true, the fact that companies may use the term "fair share" in conducting lawful business does not rule out the States' theory that the Defendants' uses of the term in the record are evidence of continuing conspiracies, as evidenced, for example, by Sandoz's instruction to use alternative terms. The question is best left to the jury.

attributable to all co-conspirators." *United States v. Milstein*, 401 F.3d 53, 72 (2d Cir. 2005).

This later conduct also fits the States' expert's opinion that a market share agreement ("MSA") "can be effective without any discoverable conduct," including any "visible forms of collusion such as ongoing communications on prices," at least where, as here, "market share information is available in an accurate and timely manner, trust is high and all participants can be expected to comply with the rules." ECF No. 711 at 32 ¶ 58.

> Those firms may justify continued adherence to the MSA as motivated by a desire for 'equity' or 'fairness[,]' but continuing to adhere to MSA rules remains against self-interest. . . . [C]ontinued participation in a MSA may be inferred if a firm instead responds by matching that price increase and refusing to bid (or providing a complementary bid) to customers of that rival, even if there is no direct evidence of communication or other collusive actions by that firm.

*Id.* at 32 ¶ 59.

Thus, even if the Defendants stopped expressly communicating with each other to "fix" prices before the limitations period, the States have raised a genuine dispute of fact about whether the conspiracies continued in a new form—silent adherence to the "fair share" scheme—into the limitations period.[18] The States' evidence of these acts in furtherance of the conspiracies is sufficient to raise genuine disputes of fact about whether some of the States' price-fixing claims accrued within the limitations period.

The Defendants also argue that the continuing violation doctrine would not save the bid-

---

[18] Nothing in the record indicates that ongoing communication was necessary for competitors to adhere to prior agreements. To the contrary, the record includes evidence, from which I may draw an inference adverse to the Defendants, that Defendants continued to follow market-allocation agreements made with competitors after the individuals with whom they had previously communicated had left their positions. *See, e.g.*, ECF No. 701-8 at 465 (Kellum pleading the Fifth Amendment in deposition in response to the States' question: "Even though Mr. Aprahamian had left Actavis at this point, was Actavis still following the agreement between Sandoz and Actavis to allocate customers [for Betamethasone Valerate ointment]?"); *Baxter v. Palmigiano*, 425 U.S. 308, 318 (1976) ("the Fifth Amendment does not forbid adverse inferences against parties to civil actions when they refuse to testify in response to probative evidence offered against them").

rigging and market-allocation claims because, they assert, "the last allegedly allocated customer contract was awarded" before the limitations period. ECF No. 617-4; ECF No. 621 at 7. The Defendants rely on *City of El Paso v. Darbyshire Steel Co.*, 575 F.2d 521, 523 (5th Cir. 1978) to argue that these "claims accrued when the allegedly allocated business was awarded." But the case is inapposite. *El Paso* does not establish a general rule that, in a bid-rigging conspiracy, the cause of action runs from when the business is awarded. At most, the general rule it establishes is that the cause of action accrues once the damage has occurred and is provable. *See Kaiser Aluminum & Chem. Sales, Inc. v. Avondale Shipyards, Inc.*, 677 F.2d 1045, 1053 (5th Cir. 1982) (noting that *El Paso* established "the principle that the continuing benefits aspect of the antitrust statute of limitations was not applicable to those situations where antitrust damages were not speculative or unprovable"). Further, the facts in *El Paso* involved a one-off bid rather than, as here, a series of allegedly rigged bids. Thus, as with the price-fixing claims, the States have raised a genuine dispute of fact as to whether the conspiracy to rig bids and allocate markets continued into the limitations period by way of the Defendants' adherence to their earlier agreements.

In any event, the States allege that the general purpose of the Defendants' conduct in rigging bids and allocating markets was to raise the price of drugs across all sellers. *See, e.g.*, ECF No. 196 ¶¶ 303, 369. The resulting injuries from all these claims—higher prices paid by the States and their residents—are therefore the same. The States' market-allocation and bid-rigging claims, then, are at minimum intertwined with the price-fixing claims. For this reason, even if I were to find that the States' proffered evidence of Defendants' conduct in furtherance of market allocation and bid rigging after January 2016 was insufficient to create a genuine dispute of fact, I still would not grant summary judgment to the Defendants as to any claim on this basis.

2. Accrual Dates

As I have found, the States provided evidence demonstrating that the Defendants took overt

acts as part of the alleged conspiracies beyond January 23, 2016. I will now discuss the last possible accrual dates supported by the evidence under the continuing violation doctrine and before considering arguments related to fraudulent concealment.

As discussed above, the most recent overt acts consisted of sales of the drugs at issue at supracompetitive prices, which the States argue lasted "through 2018 and beyond, likely through at least 2021." ECF No. 619 at 6. To find a more precise date drug prices ceased to be supracompetitive, I will consider the report of the States' expert, Dr. Warren-Boulton, which analyzed the amount of "overcharge due to collusion absent other events that could be expected to have affected prices in the 'but for' world, such as changes in cost, demand, or competitive conditions (e.g., in the number of suppliers, through [market] entry or exit)."[19] ECF No. 711 at 50 ¶ 96. Dr. Warren-Boulton's report indicates that the price index for drugs not at issue in this case ("the control") was relatively flat both during and after the limitations period. *Id.* at 35–36 ¶ 82. The price index for the drugs at issue here, however, rose sharply from 2011 to 2015 before beginning to fall. *Id.* at 41–42 ¶ 81, 45–46 ¶ 89. Prices for the drugs at issue with a sales history prior to the alleged price-fixing conduct ("price increase drugs") had not returned to their pre-conduct level by the end of the data supplied by the Defendants at the end of 2018.[20] *Id.* at 47–48 ¶¶ 91, 94. Price indices for the drugs at issue introduced to the market during the alleged illegal conduct ("new generic drugs") were well above even the indices for price increase drugs. *Id.* at

---

[19] Although Defendants have filed a *Daubert* motion seeking to exclude certain opinions of Dr. Warren-Boulton, that motion does not target his opinions with respect to overcharges that I discuss here. *See* ECF No. 658-1 at 6, 9.

[20] Dr. Warren-Boulton's report explains that the Defendants' net price begins to diverge from the public data sources in 2013, and that this "widening gap between gross and net sales over time further reinforces the need to calculate and utilize Defendants' net prices instead of gross prices, which over time, resemble less and less the actual prices paid in the market." ECF No. 711 at 44 ¶ 84.

49–50 ¶ 95, 76–77 ¶ 152.  Prices of new generic drugs fell steadily and at a greater rate than price increase drugs after 2015.  *Id.* at 76–77 ¶ 152, 81 ¶ 159.  Public data sources for drug prices after 2018 showed that price indices for price increase drugs and new generic drugs continued to decline through the first quarter of 2023.  *Id.* at 74–75 ¶ 149, 76–77 ¶ 152, 117 ¶ 236.

Using this pricing data, Dr. Warren-Boulton calculated "the additional profits Defendants were able to collect as a result of their Conduct," for the purposes of calculating disgorgement claims, by comparing the prices for the drugs at issue to a prediction of the "'but-for' price path." *Id.* at 99 ¶ 196.  The report concludes that analysis of data produced by the Defendants (for the period through 2018) shows that "prices for the Drugs at Issue remained elevated" in 2018 "due to Defendants['] Conduct" in previous years.  *Id.* at 116 ¶ 235.  Moreover, his analysis of public data available after 2018 "suggests that prices continued to fall in 2019 before leveling out somewhat in 2020, before falling again in 2021.  This would suggest elevated prices through at least 2021."  *Id.* at 117 ¶ 237.

Dr. Warren-Boulton's conclusions, and the supporting price data, raise a genuine dispute of fact about whether the continued elevated prices for the drugs at issues were the product of continuing conspiratorial conduct by the Defendants even beyond the filing of the complaint.  As explained in the previous section, any new purchase at such inflated prices creates a new accrual date for price-fixing claims under the continuing violation doctrine.  Thus, the States' claims are timely to the extent they are related to any drug for which Dr. Warren-Boulton does not indicate an end date for inflated prices.

In Appendix C to his report, however, Dr. Warren-Boulton lists end dates for inflated prices for a handful of drugs.  He breaks down the increase in net revenues that he attributes to the Defendants' anticompetitive conduct for each drug product at issue, and he further breaks down

that increased net revenue by each Defendant company. *Id.* at 641–46. Of the 98 drug products analyzed, the report lists a "Disgorgement Period End Date" for only 15 products, including different formulation strengths for the same drug. *Id.* at 641–42. Thus, there is no evidence that the Defendants took any overt acts in the form of sales at supracompetitive prices for the following drugs past these dates:

| Drug | Last Overt Act |
|---|---|
| Ciclopirox (cream only) | December 31, 2016 |
| Clotrimazole | December 31, 2016 |
| Eplerenone | December 31, 2016 |
| Ethambutol Hydrochloride | June 30, 2014 |
| Griseofulvin | December 31, 2016 |
| Latanoprost | December 31, 2016 |
| Mometasone Furoate (cream, ointment and solution) | December 31, 2016 |
| Triamcinolone Acetonide (paste only) | December 31, 2016 |

Under the injury-occurrence rule, claims related to these drugs accrued on the above dates, which means that the accrual date for claims relating to Ethambutol Hydrochloride ("Ethambutol"), falls more than four years before this action was filed.[21]

　　　To be clear, nothing in this ruling should be read as endorsing Dr. Warren-Boulton's report, methodology, or conclusions. I cite it solely because it constitutes evidence to support the States' claims that the Defendants sold prices at inflated, conspiracy-driven prices up to and beyond the date the complaint was filed.

**C. Application to Claims**

　　　I have found that the States have raised genuine disputes about whether at least some of their claims under the Clayton Act accrued within the four-year limitations period prior to the

---

[21] Dr. Warren-Boulton's report also notes that some companies received zero or negative net revenue on specific drug products, ECF No. 711 at 643–46. A lack of net revenue, however, does not indicate that these companies did not sell these products at supracompetitive prices (and still lost money or broke even) or take other overt acts in assisting competitors in fixing prices. Thus, I decline to find an earlier accrual date related to those claims.

filing of this lawsuit, with the exception of those related to Ethambutol. The burden is thus on the Defendants to show that laches applies to these claims except for those related to Ethambutol, for which the burden is on the States "to prove the circumstances making it inequitable to apply laches to [this] case." *Conopco, Inc.*, 95 F.3d at 191. "The elements of a traditional laches defense are: (1) lack of diligence by the party against whom the defense is asserted, and (2) prejudice to the party asserting the defense." *Fed. Ins. Co. v. United States*, 882 F.3d 348, 365 (2d Cir. 2018) (internal quotations omitted).

I find that the Defendants have not met their burden of demonstrating at the summary judgment stage that the States lacked diligence in pursuing their investigation into the drugs at issue. Once the States had reason to believe that the Defendants had engaged in anticompetitive conduct related to the drugs at issue,[22] the States subpoenaed hundreds of phone records and reviewed "more than 11 million call records from hundreds of individuals" necessary to identify the Defendants and the drugs at issue. ECF 620-1 at 45 ¶ 12. *See also* ECF No. 870 at 61–62 (discussing at oral argument that it would not be good public policy for the States to use their sovereign prelitigation subpoena authority to issue industry-wide subpoenas in a shotgun approach at the first wisp of wrongdoing with regard to a single drug). Because there is at least a genuine dispute about whether the States exercised due diligence, laches does not apply to Clayton Act claims for which the accrual date is within the four-year limitations period.

As noted, however, claims relating to Ethambutol accrued before the limitations period. The allegations in the complaint describe efforts between employees at Lupin and G&W to collude on raising the price of Ethambutol while other competitors were experiencing supply issues. ECF

---

[22] As discussed in depth in Section IV.B, *infra*, the various news reports and investigations into mysterious price spikes across the generic drug industry were insufficient to provide inquiry notice of a potential conspiracy specifically related to the drugs at issue.

No. 196 ¶ 1558.  These efforts reportedly lasted from November 2012 to April 15, 2013, at which point the Lupin and G&W employees involved "would *never* communicate by phone again, according to the phone records available to the Plaintiff States."  *Id.* ¶ 1573.  As noted above, Dr. Warren-Boulton determined that the disgorgement period for Ethambutol ended on June 30, 2014. ECF No. 711 at 641.  At this point, then, nearly six years before the States filed their complaint, there is no evidence in the record to which the States have pointed that Lupin and G&W were actively working to fix prices or allocate the Ethambutol market or charging supracompetitive prices for Ethambutol.  Thus, the burden is on the States "to aver and prove the circumstances making it inequitable to apply laches" to their claims related to Ethambutol.  *Conopco, Inc.*, 95 F.3d at 191 (2d Cir. 1996).

The States argue that any purported delay in commencing suit was a result of the Defendants' "pervasive concealment of their illegal activity."  ECF No. 619 at 11.  A finding that a defendant concealed a plaintiff's cause of action precludes the application of laches.  *Gordon v. Amadeus IT Grp., S.A.*, 194 F. Supp. 3d 236, 251–52 (S.D.N.Y. 2016) (citing *Hermes Int. v. Lederer de Paris Fifth Ave., Inc.*, 219 F.3d 104, 107 (2d Cir. 2000)).  To prove concealment, "the plaintiff can either: (1) identify affirmative steps taken by the defendant to conceal the plaintiff's claim; or (2) show that the defendant's misconduct was inherently self-concealing."  *Phhhoto Inc. v. Meta Platforms, Inc.*, 123 F.4th 592, 604–05 (2d Cir. 2024) (internal quotation marks omitted). "A collusive bid purporting to reflect genuine competition" is "an inherently self-concealing fraud" because "a bid-rigging conspiracy is the kind of enterprise that . . . must remain concealed from the victim of the collusive bids."  *New York v. Hendrickson Bros., Inc.*, 840 F.2d 1065, 1083 (2d Cir. 1988).  Later acts in furtherance of the conspiracy "may in themselves amount to affirmative acts of concealment."  *Id.*  I find that, under *Hendrickson*, the Defendants' conduct was

self-concealing,[23] although, as I discuss below, the States have also submitted evidence of affirmative acts of concealment.  *See infra* section IV.C.

In addition, although Ethambutol is the only drug at issue made by Lupin, there is no indication, and the Defendants do not argue, that Lupin or any other Defendant ever withdrew from the overarching conspiracy.  "To withdraw from a conspiracy, a defendant must show: (1) "[a]ffirmative acts inconsistent with the object of the conspiracy," that are (2) "communicated in a manner reasonably calculated to reach co-conspirators."  *United States v. U.S. Gypsum Co.*, 438 U.S. 422, 464–65 (1978).  "Mere cessation of activity is not enough."  *United States v. Borelli,* 336 F.2d 376, 388 (2d Cir. 1964).  Rather, a defendant must take an affirmative action "to disavow or defeat the purpose of the conspiracy."  *United States v. Nerlinger,* 862 F.2d 967, 974 (2d Cir. 1988).  "Until affirmative evidence of withdrawal has been produced, a defendant's participation in the conspiracy is presumed to continue until the last overt act by any of the conspirators."  *Drug Mart Pharmacy Corp. v. Am. Home Prods. Corp.*, 288 F. Supp. 2d 325, 329 (E.D.N.Y. 2003) (citing *United States v. Panebianco*, 543 F.2d 447, 453 (2d Cir. 1976)).  As I have found, the States have raised a genuine dispute of fact about whether the Defendants committed overt acts in furtherance of the overarching conspiracy each time they sold any drug at issue at inflated, conspiracy-driven prices.  Thus, even if Lupin itself did not commit any overt acts in furtherance of the overarching conspiracy after 2014, without affirmative evidence of Lupin's withdrawal, I must presume that its "participation in the conspiracy . . . continue[d] until the last overt act by any of the conspirators."  *Id.*  Therefore, I decline, at the summary judgment stage, to grant summary judgment to Lupin with respect to Ethambutol.

---

[23] *Hendrickson* applies only to the States' federal-law claims.  The standard for fraudulent concealment related to state-law claims is different and is addressed below.

# IV. STATUTE OF LIMITATIONS DISCUSSION

The Defendants also seek summary judgment as to the States' claims brought under dozens of state and territorial antitrust and consumer protections laws. Under the *Erie* doctrine, the limitations periods and accrual dates for state-law claims are substantive rather than procedural, and thus are governed by state law. *Cantor Fitzgerald Inc. v. Lutnick*, 313 F.3d 704, 710 (2d Cir. 2002) ("A state's rules providing for the start and length of the statute of limitations is substantive law."); *Lynch v. Suffolk Cnty. Police Dep't, Inc.*, 348 F. App'x 672, 675–76 (2d Cir. 2009) ("the accrual date of a state common law cause of action is a question of state law"). Many of the state laws at issue apply the same injury-occurrence rule that I addressed in the previous section on the federal claims. Many also recognize methods by which new accrual dates may be set that are analogous to the continuing violation doctrine. For these, I can apply the same analysis described above in the section on laches. Other laws, however, apply the "discovery rule," under which a claim accrues once a plaintiff is on "inquiry notice"—when a plaintiff discovers, or has reason to discover, the cause of action. Because the state laws vary in their limitations periods, the accrual rules, the applicability of the continuing violation doctrine, and rules on fraudulent concealment, I will address each state's law separately. First, though, I will address common legal arguments and disputes of fact.

## A. Rules of Accrual and the Continuing Violation Doctrine

The States argue that for causes of action brought under a state law that applies the injury-occurrence rule, either the "continuing violation doctrine" or the Defendants' fraudulent concealment permits them to recover damages beyond the limitations period. Where the continuing violation doctrine applies, I must also determine whether the doctrine permits recovery for injuries stemming from all of the Defendants' alleged illegal acts or merely creates separate

accrual periods for acts committed within the limitations period. Because the application of the continuing violation doctrine varies in different contexts, I will use distinct terms to identify these disparate accrual theories.[24] In most instances, the States argue for what I will call the "*entirety rule*"—that the serial nature of the alleged antitrust violations over a period of years renders timely their claims related to the entire alleged conspiracy if *any* overt act was committed within the limitations period. The entirety rule applies most often in the context of hostile work environment claims, where no single act may be found to be actionable but where the alleged conduct as a whole may be sufficient to state a cause of action. *See Morgan*, 536 U.S. at 115 ("Hostile environment claims are different in kind from discrete acts."). The Defendants argue instead for a "*separate accrual*" rule—that the States may seek relief only for injuries suffered, e.g., purchases made at conspiracy-driven prices, within the limitations period, even where the alleged conduct (and injuries) began before the limitations period. The separate accrual rule applies most often in the federal antitrust context when each injury is separately actionable, i.e., each overcharge stemming from a price-fixing conspiracy inflicts an actionable injury on the plaintiff. *See US Airways*, 938 F.3d at 67; *Klehr*, 521 U.S. at 189.

For both the purposes of determining the accrual date of claims brought under state laws that apply the discovery rule and for the possibility of tolling any injury-occurrence claim based on fraudulent concealment, I must determine whether there is a point at which I can find that the States, as a matter of law, had notice of their cause of action. *See, e.g.*, *Donner v. Nicklaus*, 197 F. Supp. 3d 1314, 1330 (D. Utah 2016) ("The goals of [a] statutory discovery rule . . . and the fraudulent concealment equitable discovery rule for causes of action that do not have a statutory

---

[24] The Defendants view their "separate accrual" theory as an alternative to the continuing violation doctrine, rather than a subset of it. *See* ECF No. 621 at 9–10. I use the terms "entirety rule" and "separate accrual" to minimize confusion.

discovery rule are equivalent.").  Because the discovery-rule analysis and fraudulent concealment both turn on when the States knew or should have known of their claims, I will not, in most instances, analyze the availability of tolling for concealment where the discovery rule applies.  As to the issue of how far back in time the States' damages claims may reach, the Defendants concede that if the discovery rule applies, the separate accrual rule does not apply.  ECF No. 621 at 3 n.3 (citing *Warner Chappell Music, Inc. v. Nealy*, 601 U.S. 366, 371–73 (2024)).[25]  Thus, if the claims are timely, the States may seek relief for the entirety of the alleged conduct under any state law that applies the discovery rule.

### B.  Inquiry Notice

The term "inquiry notice" describes "[n]otice attributed to a person when the information would lead an ordinarily prudent person to investigate the matter further; esp., the time at which the victim of an alleged . . . fraud became aware of facts that would have prompted a reasonable person to investigate."  Notice, Black's Law Dictionary (12th ed. 2024).  The standards for determining whether a plaintiff is on inquiry notice vary under state laws.  But because the basic principles are similar, and because many state laws instruct that their antitrust laws should be

---

[25] In *Warner Chappell*, the Supreme Court held that a three-year limitations period to bring infringement claims under the Copyright Act "establishes no separate three-year period for recovering damages,"  and that "[i]f any time limit on damages exists, it must come from the Act's remedial sections."  601 U.S. at 372.  Because "[t]he Copyright Act contains no separate time-based limit on monetary recovery," the Court held that a plaintiff who brought suit within three years of discovering the infringing conduct could obtain damages for infringements going back ten years.  *Id.* at 374.  Similarly, here, where the state law at issue has no separate time-based limit on recovery, there is no basis to limit relief to the limitations period.  To be clear, *Warner Chappell* is a discovery-rule case and does not apply to federal antitrust claims; nor is it persuasive authority for state-law claims that apply the injury-occurrence rule.

viewed in harmony with federal law,[26] I will begin with some general analysis of inquiry notice based on the record in this case.

As an initial matter, Rule 56 of the Federal Rules of Civil Procedure governs the standard for summary judgment in federal courts "regardless of contrary state law." *Com/Tech Commc'n Techs., Inc. v. Wireless Data Sys., Inc.*, 163 F.3d 149, 150–51 (2d Cir. 1998). In applying Rule 56, "a majority of the circuits" has held "that the issue of when a plaintiff is on 'notice' of his claim is a question of fact for the jury" and thus, "as a general rule, the issue of when a plaintiff in the exercise of due diligence should have known of the basis for his claims is not an appropriate question for summary judgment." *Allen v. Dairy Farmers of Am., Inc.*, No. 5:09-CV-230, 2014 WL 2610613, at *23 (D. Vt. June 11, 2014) (quoting *Morton's Mkt., Inc. v. Gustafson's Dairy, Inc.*, 198 F.3d 823, 834 (11th Cir. 1999), *amended in part*, 211 F.3d 1224 (11th Cir. 2000)). But summary judgment may be appropriate where "it is beyond dispute that plaintiff should have known [or] indeed, actually knew the critical facts of his claim." *Guccione v. United States*, 670 F. Supp. 527, 537 (S.D.N.Y. 1987).

The Defendants argue that the media reports, congressional investigation, and DOJ subpoenas regarding price hikes across the generic pharmaceutical industry—described in the factual background section above—put the States on inquiry notice "as early as mid-2012 and no later than late 2014." ECF No. 617 at 11. I disagree. State standards for determining inquiry notice vary, as I discuss below. But under any of these standards, the need for the States to identify

---

[26] *See, e.g.*, Conn. Gen. Stat. § 35-44b ("the courts of this state shall be guided by interpretations given by the federal courts to federal antitrust statutes"); Idaho Code § 48-102(3) ("The provisions of [the Idaho Competition Act] shall be construed in harmony with federal judicial interpretations of comparable federal antitrust statutes . . . .").

each member of the conspiracy and each product involved before making an antitrust claim precludes a determination at summary judgment that the States were on inquiry notice by 2014.

The Defendants' argument depends on two erroneous assumptions: first, that unexplained price increases across multiple generic drugs constitute strong evidence of anticompetitive conduct, and second, that evidence of collusion in the market for one drug must indicate collusion in the markets for others. In short, the Defendants argue that where there is smoke emanating from a few houses, I must find as a matter of law that a plaintiff must act as if the whole town is on fire. The strength of this argument, though, necessarily depends on the amount of smoke. *See, e.g.*, *Mathews v. Kidder, Peabody & Co.*, 260 F.3d 239, 255 (3d Cir. 2001) ("[T]o determine what constitutes 'reasonable' due diligence, we must consider the magnitude of the existing storm warnings. The more ominous the warnings, the more extensive the expected inquiry."). And in the generic drug industry—where even in 2012 pricing was already considered "murky and often illogical," ECF No. 681-1 at 528, and where "numerous factors may cause price increases . . . , including drug shortages, supply disruptions, and consolidations," ECF No. 681-2 at 258—it is unlikely that the first wisp of smoke would set off any fire alarms.[27] More importantly, because the alleged single-drug conspiracies required the buy-in of all competitors to "play nice in the sandbox," *see* ECF No. 196 at 142–45, these conspiracies could only function in highly concentrated, oligopolistic markets. But—as the Defendants take pains to argue in their pending motion for summary judgment as to the State's overarching conspiracy claims (*see* ECF No. 611 at 28–29, 51–58)—"rational, independent actions taken by oligopolists can be nearly

---

[27] Even the initial *New York Times* article identified by the Defendants described the possibility that the increases were the result of natural market forces. *See* ECF No. 681-1 at 529 (noting that some drug makers left the market when prices got so low that "they couldn't make any money at it," then returned once prices rose in their absence, at which point prices dropped again).

indistinguishable from horizontal price fixing." *Valspar Corp. v. E.I. du Pont de Nemours & Co.*, 873 F.3d 185, 191 (3d Cir. 2017); *see also In re Ethylene Propylene Diene Monomer (EPDM) Antitrust Litig.*, 681 F. Supp. 2d 141, 166 (D. Conn. 2009) ("In an oligopolistic market, . . . 'conscious parallelism' or 'tacit collusion' to raise or maintain prices is not *per se* unlawful because it could be the result of permissible, independent parallel conduct."). And as another district court in this Circuit noted, "the issue is not whether plaintiffs knew that the prices paid were higher than they should have been, rather, the primary issue is whether the . . . plaintiffs . . . knew of the alleged conspiracy." *Merced Irrigation Dist. v. Barclays Bank PLC*, 165 F. Supp. 3d 122, 136 (S.D.N.Y. 2016) (finding article in trade publication speculating on Defendants' trading positions insufficient to provide notice of misconduct). The first reports of unexplained "price spikes" in 2012 were, therefore, insufficient to put the States on inquiry notice of their cause of action for antitrust violations. The 2012 letters sent by the NYAG in response to these reports are also insufficient because, as described above, the Defendants responded with plausible explanations for the spikes, ranging from increased costs to natural market fluctuations, that provided no indication of unlawful conduct.

But as time passed, there was more smoke. Following more reports on price increases from various media, *The New York Times* reported in July 2014 that the "Federal Trade Commission has been examining anticompetitive practices in the generic drug industry." ECF No. 619-1 ¶ 23. According to an article co-authored by Dr. Kesselheim in the *New England Journal of Medicine* ("NEJM") and provided by the Defendants, the FTC "will not intervene without evidence of a conspiracy among competitors or other anticompetitive actions that sustain [] increased price[s]."

ECF No. 681-2 at 258.[28]   The agenda for the States' PIWG conference that month included discussion of the *Times* article.  ECF No. 619-1 ¶ 29.  Then, in November 2014, the DOJ began serving subpoenas "relating to a federal investigation of the generic pharmaceutical industry into possible violations of the Sherman Act."  *Id.* ¶ 37.  This was again reported by the media and included in the PIWG agenda.  *Id.* ¶¶ 38, 40.  The Defendants argue that the States "chose to sit back and wait" while other bodies such as the FTC, DOJ, and Congress—or Connecticut alone— looked into the price increases.  ECF No. 617 at 11.

The FTC's investigation provides the earliest suggestion of the Defendants' potential involvement in anticompetitive conduct, but a genuine dispute of fact remains as to whether this put the States on inquiry notice of their cause of action.  There was no indication that the FTC was investigating conduct related to the drugs at issue in this case; rather, the *New York Times* report focused on Digoxin, a heart medication not at issue in this case but that was also the subject of the CTAG's initial 2014 investigation.  *Id.* ¶¶ 23–24.  As noted in my ruling denying summary judgment for improper claim-splitting, I credit the States' representations that the overarching conspiracy here is distinct from those alleged in the other two cases based on the "pharmacological nature of the drugs at issue (in this case, dermatology drugs) and the identities of the Defendants named in the Complaint."  ECF No. 839 at 3.  Evidence that in 2014 the FTC (and later Congress, the CTAG, and DOJ) investigated prices of drugs not at issue here or generally investigated a Defendant (in this instance, Lannett) does not provide evidence sufficient for me to find as a matter of law that the States were on inquiry notice of anticompetitive conduct related to any of the drugs

---

[28] The States object that media reports are hearsay.  Because the Defendants do not offer these articles for their truth but rather to indicate the effect that they may have had on the States' notice of their claims, they are not hearsay.  *See* Fed. R. Evid. 804.

at issue here.[29]  To the contrary, a jury could reasonably infer from the fact that the DOJ never brought action against Lannett (*see* ECF No. 619-1 at 49 ¶ 35) that the DOJ investigation revealed no evidence of anticompetitive conduct, and thus would not have provided notice of a cause of action.[30]

The States admit that the CTAG "stead[il]y expan[ded] its investigatory efforts" as it "followed the evidence."  ECF No. 619 at 28.  These efforts included issuing subpoenas to pharmaceutical companies beginning in January 2015.  ECF No. 619-1 at 44 ¶¶ 2–4.  All of these subpoenas, however, were issued only to (1) companies who are not Defendants in this case, or (2) Defendants but limited to specific drugs not at issue here.  *Id.*; ECF No. 619-1 ¶¶ 3–6.  Although the Defendants contend that their responses to these limited subpoenas may have indirectly provided a reason to investigate anticompetitive conduct related to drugs at issue, thereby providing inquiry notice, a reasonable juror could disagree.  Similarly, it is possible that a jury could find that responses to some or all of these subpoenas, or even the CTAG's decision to issue them—when considered in conjunction with the wealth of public reporting and ongoing FTC, DOJ, and congressional investigations—may have provided a reason for the States to investigate the

---

[29] The CTAG's July 2014 interrogatory to Lannett asking if the company had ever *previously* been investigated or prosecuted for anticompetitive conduct related to any drug—for which inquiry notice might have already existed—does not indicate that the CTAG was investigating other conduct that had not yet been the subject of investigation or prosecution. *See* ECF No. 619-1 ¶ 25.

[30] At most, the CTAG's investigation of Lannett with regard to Digoxin *may have* led the CTAG to begin investigating the company's conduct related to drugs at issue here, but there is no evidence that a wider investigation had begun by November 2014.  The investigation widened over the course of the next four years, until the CTAG and other States amended their *Heritage* complaint in 2018 to include claims against Lannett.  *See* No. 3:16-cv-2056, ECF No. 473.  But even then, that complaint only identified alleged anticompetitive conduct involving one drug, Doxycycline Monohydrate, that is not at issue here.  *Id.* ¶ 520.  Further, the 2016 class action suit against Lannett was related only to Digoxin and Doxycycline, and thus similarly did not provide notice a cause of action related to the drugs at issue here.  The earliest evidence of an investigation of Lannett in relation to drugs in this case is the States' subpoenas to phone carriers for two Lannett employees' records, both dated February 3, 2017.  ECF No. 699-4 at 319–22, 331–35.

drugs at issue.  But the question at summary judgment is whether a reasonable juror could reach the opposite conclusion after all reasonable inferences are drawn in the States' favor.  Again, I find that a reasonable juror could disagree that the States were on inquiry notice of their causes of action in this case based on the CTAG's subpoenas that were narrowly targeted to specific drugs not at issue here.

The earliest time for which there is no genuine dispute that the States had notice of potential anticompetitive conduct related to any of the drugs at issue is **May 2017**.[31]  By then, the CTAG had received the first responses—from Taro, Aurobindo, and Perrigo—to the first open-ended subpoenas, i.e., subpoenas that, for the first time, were not limited by the names of specific drugs. ECF No. 701-7 at 6–7 ¶¶ 19, 22, 25.  I can infer from the CTAG's shift from drug-specific to open-ended subpoenas that the smoke had reached a critical mass—that the States, which had filed the Heritage complaint six months earlier, now knew or should have known that the "fair share" conduct underlying each alleged conspiracy was potentially so widespread that it warranted investigation beyond the limited drugs that the CTAG had previously investigated.  The Defendants' responses created the grounds for the investigation that followed over the next several years.

Although it does not follow from these subpoenas alone that the States had inquiry notice by this time as to each specific Defendant or each specific drug that makes up the overarching conspiracy, it is clear from the existence of the multistate investigation that began after the CTAG's

---

[31] As noted, this general finding does not apply to any State whose law has set a low bar to find that a plaintiff had inquiry notice.  I discuss the law of each State below.

presentation to other state attorneys general's offices later in September 2016,[32] and from the States' general descriptions of the pharmaceutical industry in the Heritage complaint filed on December 15, 2016,[33] that the States had broadening and well-founded suspicions that their cause of action may extend to all of the other dermatological products for which the States eventually brought suit. The CTAG press release announcing the Heritage complaint made this explicit by noting that the CTAG had "evidence of widespread participation in illegal conspiracies across the generic drug industry," and that the States "intend to pursue this and other enforcement actions aggressively." ECF No. 619-1 ¶ 74. The Defendants argue that under some states' laws, mere suspicion may be sufficient to start the limitations period running. But even if the States had notice by September or December 2016 of alleged "conspiracies across the generic drug industry," there is still no indication that they had any suspicions about any of the drugs at issue in this action, as opposed to those involved in later amendments to the Heritage complaint or in the 2019 *Teva* action. Thus, for most state laws, a genuine dispute of fact exists about whether the States had inquiry notice as to claims related to the drugs at issue until the CTAG received responses to its open-ended subpoenas and significant progress in analyzing the phone log data was possible. This time came no earlier than May 2017.

---

[32] *See, e.g.*, ECF No. 681-6 at 111–12 ("[California] joined the multistate group following Connecticut's presentation and were part of it for the investigation of Heritage, Teva, and [D]ermatology.").

[33] The initial Heritage complaint indicates, for example, that the States understood the frequency and methods of communications between competitors in the generic pharmaceutical industry, No. 3:16-cv-2056, ECF No. 1 ¶¶ 60–63, and that companies expected competitors to "play fair" across multiple drug markets, *id.* ¶¶ 113–15.

### C. Fraudulent Concealment

Because the undisputed facts in the record suggest that the States were on inquiry notice no earlier than May 2017, the States' claims are timely under state laws with a limitations period of four years or more. The States allege fraudulent concealment, but concealment cannot toll the limitations period once the States were on notice, making it unnecessary to analyze fraudulent concealment to determine whether any State's claims were timely. Concealment, however, is still pertinent to determining whether the States may recover damages in an injury-occurrence rule jurisdiction for any alleged conduct of the Defendants that occurred before the accrual date. In such a jurisdiction, a finding that the Defendants fraudulently concealed their unlawful conduct would permit the States to seek relief for injuries incurred through the period of concealment in addition to injuries incurred through the limitations period. In States where the discovery rule applies, however, it is unnecessary to analyze fraudulent concealment because it has no impact: once a State was on inquiry notice, it could no longer benefit from fraudulent concealment tolling.

As with inquiry notice, requirements of concealment vary by state law, which I will address below. But because the parties make arguments common to the same set of facts, a brief summary is warranted. In their Statement of Additional Material Facts, the States identify dozens of exhibits, including deposition testimony, that they contend show affirmative acts of concealment. ECF No. 620-1 at 47 ¶ 28 nn.45–48; ECF No. 864. According to the States, "[t]his concealment included: making misleading or untrue statements to customers and the public; submitting non-competitive bids to customers; concealing or misrepresenting the true sources of information; communicating orally to avoid putting incriminating information in writing; and using code words to conceal the true reason for actions." ECF No. 620-1 at 47 ¶ 28.

The States provided substantial evidence that Defendants across multiple companies—and in regard to multiple drugs—regularly informed customers that they could not bid on drugs at issue because of supply issues. The States allege that these false excuses coincided with ongoing conversations between competitors and were meant to avoid raising suspicions about the Defendants' anticompetitive conduct.

One deponent, Della Lubke, testified that when Sandoz was not interested in bidding for a customer, "we would give an excuse[;] . . . usually the excuse was supply, and so a customer couldn't really argue. If there wasn't supply, then they weren't going to be upset that we didn't give them a bid." ECF No. 701-8 at 39; *see also* ECF No. 701-7 at 837–39 (another deponent, Paul Krauthauser, testifying that Sandoz would blame supply in part to maintain a relationship with a customer despite Sandoz declining to bid on a particular drug). This "blame supply" tactic also permitted Sandoz to follow competitors' price increases with increases of its own. Lubke said that if a customer informed Sandoz that an incumbent supplier had raised its price, Sandoz would blame supply because "we might want to follow that price increase" and "we didn't want to discourage price increases. So we wouldn't want to take a competitor's customer and punish them for having a price increase." *Id.* at 40. Another deponent, Chris Bihari, said he witnessed Sandoz taking steps to avoid disrupting a competitor's price increase:

> So when a competitor raised, we would often see—you know, have contact or emails or calls from our customers asking for Sandoz to provide a competitive offer. Well, Sandoz knew of the price increase, did not want to be disruptive, and they would then not respond [to requests for bid]. [Or] they would . . . say—the common term was, you know, supply issues. We can't support your volume. And what it really meant was Sandoz was evaluating their own price increase.

ECF No. 701–8 at 578–79.

Lubke also said it "was normal" for Sandoz executives—beyond simply lying about supply issues—to give instructions to *reduce* supply by allocating products after Sandoz obtained

information that a competitor might have implemented a price increase.  *Id.* at 40–41; *see also* ECF No. 701-8 at 580-81 (Bihari testifying that "[Sandoz] put inventory on strict allocation. . . . And they would [then] evaluate the timing of a price increase.  Could be soon.  Could be months out.").

In one instance in April 2013, after grocery chain Publix asked Sandoz to bid on Betamethasone Dipropionate lotion in the wake of Taro's price increase, Defendant Kellum told Lubke via email, "I'm not inclined to do anything here as these may be opportunities for us.  We can blame supply if these are in fact opps for us."  ECF No. 701-10 at 294; *see also* ECF No. 701-8 at 80–81, 155–56 (Lubke testimony about the email).  Lubke confirmed that Sandoz would have provided such a response to Publix regardless of whether Sandoz could actually supply the customer.  ECF No. 701-8 at 156.  When asked about this email in her deposition, another Sandoz employee, Connie Pak, invoked her right against self-incrimination under the Fifth Amendment, including to a question as to whether Sandoz declined to bid to give Sandoz and Taro additional time to coordinate on pricing.  ECF No. 701-8 at 258–59.

In another instance in May 2013, Pak informed colleagues that Sandoz could supply multiple drugs at issue to CVS.  Kellum, however, responded, "Guys – we do not want to pursue the products with CVS right now.  We'll need to figure out good explanation etc…."  ECF No. 701-11 at 25–27.  When asked about this email in his deposition, Kellum repeatedly invoked the Fifth Amendment, including to a question as to whether "good explanation" meant that Kellum "needed to figure out an explanation that . . . didn't reveal the fact that [Sandoz] had an agreement to fix prices with your competitors on these products."  ECF No. 701-8 at 465–471.

A summary of other evidence in the record supporting this "blame supply" practice among the Defendants follows.  Again, the timing of these incidents coincides with allegations in the

complaint that the Defendants were communicating with competitors to fix prices, allocate markets, and rig bids related to the drugs at issue.

- In April 2011, Defendant Kaczmarek instructed a colleague to tell Rite-Aid that Fougera could not supply Clotrimazole and Betamethasone products. ECF No. 701-11 at 74 ("Tell them cant supply - right now. Try to leave it somewhat open.").

- In July 2011, after Actavis raised prices on Metronidazole cream and lotion, grocery chain Meijer asked Fougera to bid. Fougera responded that it "cannot take on the volume." ECF No. 701-11 at 71.

- In March 2012, Rite Aid invited Sandoz to bid on Metronidazole. When Sandoz did not reply, Rite Aid followed up a week later. In response to this second email, Lubke immediately emailed Kellum, asking, "We aren't bidding, correct?" Kellum responded, "Correct – let's blame supply." ECF No. 701-10 at 289. Eleven minutes later, Lubke told Rite Aid: "Finally heard . . . we are unable to supply. Sorry for the delay but Demand Planning was trying to make it work." ECF No. 701-11 at 64.

- In April 2012, Kellum instructed Sandoz not to accept Walgreens's invitation to bid on Latanoprost, writing "I don't want to bid this right now. Can you blame supply?" ECF No. 701-11 at 22.

- In July 2013, a division of the Minnesota State Department of Administration asked Sandoz to add Fluocinonide to its contract. Bihari of Sandoz responded, "Sorry, Sandoz cannot add to the contract due to supply constraints." ECF No. 701-11 at 94.

- In November 2013, after Meijer asked Taro to bid on Acetazolamide, the company responded, "We will not be able to supply at this time, receiving multiple requests for this product today. If the inventory situation changes, I will let you know." ECF No. 701-11 at 126.

- In June 2014, in declining to make a bid on Halobetasol, a G&W director told a colleague: "We are going to have to hold off . . . right now. Don't want to upset market, Tell [the customer] we are just at capacity with this product right now." ECF No. 701-10 at 349.

- In June 2014, Kellum instructed Sandoz colleagues not to accept Cardinal Health's invitation to bid on Clobetasol products, writing "we DO NOT want to pursue this. We have a very large opportunity of our own as a result of this price increase which we hope to implement next month. I suggest we reference supply constraint and pass." ECF No. 701-11 at 9–10.

- Also in June 2014, Kellum instructed a Sandoz co-worker to inform Walmart that "we are not currently in position to supply" Carbamazepine but provided an alternative reason for "internal info only." ECF No. 701-10 at 253.

- Also in June 2014, McKesson asked Sandoz to review its pricing on Clobetasol and Fluocinonide. A Sandoz executive director responded, "I do know that there are some constraints on some of these products. We need to run the requests through our supply chain to see if we can squeeze additional volume." Kellum then emailed his colleagues, writing, "I do not want to pursue these. Let's run thru the process but these are the products that Taro took very large price increases on and we have opportunity ourselves." The executive director responded to Kellum, writing, "This is why I brought up the 'supply constraint' theme . . . to have our out option." ECF No. 701-11 at 105–107.

- By June 2014, this practice was apparently used so often at Sandoz that an executive director cautioned against "blaming supply" because competitors were waiting "to capitalize on Sandoz's chronic supply issues." In response to this advice, Sandoz's associate director of pricing suggested the rationale provided to the customer be "frame[d] as more of a 'managing inventory tightly as the market adjusts on this product family.'" ECF No. 701-10 at 249.

- In August 2014, in instructing a G&W colleague to decline customer McKesson's invitation to bid on Promethazine, Defendant Vogel-Baylor wrote, "Yes, I would say we have the bulk of the market share and can't take on anymore from a capacity standpoint." ECF No. 701-10 at 371.

The record also shows that some Defendants, as an alternative to declining to bid at all, would instead submit uncompetitive bids, thereby permitting competitors to continue charging customers inflated prices. Again, the States allege that the following incidents were motivated by the Defendants' efforts to conceal their collusive conduct, as described in the complaint.

- In February 2012, Defendant Vogel-Baylor of G&W was preparing to submit pricing information for three drugs to McKesson. In doing so, Vogel-Baylor told Defendant Orlofski which competitors were currently supplying those products to the customer. Orlofski responded, "Please either don't bid or bid very high the Perrigo and Taro items," but that it was "OK to bid Mometasone Ointment aggressively," as that product was currently provided by Glenmark. ECF No. 701-10 at 356.

- In November 2012, customer AAP inquired with G&W about potential pricing for Halobetasol. Vogel-Baylor told the colleague who was fielding

the request, "We cannot take this from Perrigo so I will give you pricing so that it looks like you are making an attempt to bid." ECF No. 701-10 at 361.

- In December 2012, grocery chain Hannaford invited Glenmark to bid on Adapalene products then supplied by Taro. Jim Brown of Glenmark instructed his colleague the following month, "We are not targeting any Taro customers on Adapalene, unless there is a specific need. If you need to bid to 'save face', send something very high." ECF No. 701-10 at 186.

- In June 2013, Rite Aid asked Glenmark to bid on Mometasone cream and ointment after incumbent supplier G&W raised its prices. Glenmark executive Paul Dutra told colleagues, "We don't want this. Bid high." Brown responded, "I was aware this was coming. I'm on it." In response to a colleague's pricing model, Brown wrote, "I will confirm that is high enough, but I'm sure it's fine." ECF No. 701-10 at 321–22. Brown later gave another colleague prices to provide to Rite Aid for Mometasone. In response to the colleague's questions, Brown wrote, "Whatever – we are bidding high; we don't want it." *Id.* at 218–19. At his deposition, Brown later invoked the Fifth Amendment when asked about these exchanges, including to questions about whether, when he said he would "confirm" if Glenmark's bid was "high enough," that he was, based on phone logs, in fact checking Glenmark's bid with its competitor, incumbent supplier G&W. *Id.* at 22–26.

The record also shows that some Defendants appeared to falsely blame increased prices on increases in material costs. For example, in November 2013, wholesaler AmerisourceBergen asked Lannett for a reason behind a price increase on Acetazolamide. In internal emails, the recipient of the customer's email, Lannett's director of national accounts, asked a colleague, "What are you telling your customers? Increase in costs? Or a change in market dynamics?" The colleague responded, "Hmm ... haven't concocted a story yet." ECF No. 699-10 at 184. Then, after consulting internally with others, the colleague responded, "the reason for the increase is due to 'increased production costs.'" The original recipient of the customer's email responded simply, "Oy." *Id.* at 187. By December 2013, another customer, Econdisc, also asked about the Acetazolamide price increase, and Lannett responded: "Our testing requirements to bring

Acetazolamide to the market have increased, which has impacted our cost and capacity to manufacture it."  ECF No. 699-10.

Actavis also frequently blamed costs for increased prices.  Such incidents include:

- an Actavis employee instructing a colleague in March 2011 to inform a customer that the company's price increase on Hydrocortisone valerate cream was "due to significant increase in API cost and overall cost . . . Be strong."  ECF No. 710-10 at 336.

- defendant Aprahamian instructing in April 2011 that a response to a customer regarding a price increase on Clotrimazole "[n]eed[s] to reference in the email that increase was due to significant increase in ingredient cost."  ECF No. 701-10 at 206.

A jury could reasonably infer that all of the evidence detailed above either represents or led to false or misleading statements to customers that were designed to conceal the alleged conspiracies to fix prices, allocate markets, and rig bids related to the drugs at issue.  If so, the jury could then also reasonably infer that these statements could have precluded the customers, and thereby the States who represent their interests, from learning of the conspiracy.

The Defendants argue that no misrepresentations "were made by Defendants directly, specifically, and expressly to the Attorney General" of any state.  *See* ECF No. 617-5 at 37–53. This is mostly true, *see infra* note 34, but I find that it is immaterial.  When all inferences from the evidence of concealment are drawn in favor of the States, the Defendants' lies about "supply" were aimed not only at their customers but also at sovereign antitrust enforcers.  Price fixing and bid rigging are felonies under federal law and the laws of some states, and it is therefore reasonable to infer that the Defendants' alleged misleading of their customers in bidding situations was aimed, first and foremost, at avoiding disclosing a criminal conspiracy to any outsiders.  The Defendants cite no cases where a court has found that, in an enforcement action, fraudulent concealment of criminal conduct requires specific misrepresentations to a sovereign entity and ignores instances of fraud upon immediate victims who might have reported the conduct to sovereign enforcement

authorities. And in light of the important public policy animating antitrust laws—promoting competition—it seems unlikely that any court would adopt a rule that would afford a longer tolling period for claims by customers than for sovereign enforcement claims. Thus, any false statement or misrepresentation made to a customer may support a finding of fraudulent concealment of the States' claims.[34]

The Defendants also argue that the States could have subpoenaed phone records years earlier or issued additional subpoenas to nonparties to confirm whether reports of supply shortages were true, and thus that the States were not precluded from learning that "blame supply" statements were false before they had the phone logs and cooperation agreements in 2019. ECF No. 621 at 17–18. Subpoenas to suppliers may have confirmed whether supply problems existed at a given time. But the existence of supply problems would not have conclusively determined whether the Defendants falsely cited supply problems to conceal their alleged collusion. The evidence identified above indicates the Defendants blamed supply without regard to the truth. *See, e.g.*, ECF No. 701-8 at 156. The States thus could not have seen through any concealment simply by subpoenaing suppliers. In any event, it is easy, in hindsight, to point to actions the States could have taken to ferret out the Defendants' alleged lies. In the absence of evidence that the States knew or should have known that Defendants' statements about their own inventories were implausible or untrue when made, the States' failure to issue subpoenas targeting such statements does not suggest a lack of diligence.

---

[34] As I find below, many of the States' proprietary claims are not treated the same as sovereign claims. But the States have raised a genuine dispute of material fact as to whether the Defendants made at least one instance of a misrepresentation directly to a state entity. ECF No. 701-11 at 94. For this reason, and because of the overlapping nature of the States' overarching conspiracy claims, I decline to foreclose a finding of fraudulent concealment as to any proprietary claim.

Because a reasonable juror could find that (1) the Defendants' "blaming supply," making uncompetitively high bids, and falsely citing production costs for increased prices were aimed at concealing their alleged conspiracy, and (2) the States diligently pursued an investigation in spite of such concealment, fraudulent concealment tolling is a question for the jury, not appropriate for summary judgment. In the next section, I will discuss whether any state law precludes a finding of concealment based on these facts.

### D.  Application of State Laws

As an initial matter, I note that a number of claims raised in the operative complaint are not at issue here. First, the Defendants concede that under the doctrine of *nullum tempus occurrit regi*, which prohibits time-based defenses from being asserted against sovereign claims, there is no limitations period for claims under the Arizona and Iowa Consumer Fraud Acts and none for claims brought under Pennsylvania law. ECF No. 617-6 at 6 & n.8; ECF No. 621-2 at 1, 4. To the extent the Defendants seek summary judgment on these claims, *see* ECF No. 617 at 12, the motion is DENIED. Second, I have previously dismissed claims under the Michigan Consumer Protection Act, ECF No. 489, and all claims under Missouri law, ECF No. 679. The motion for summary judgment as to those claims is therefore DENIED as moot. Third, I note that Alabama, Arkansas, Guam, Hawaii, and Louisiana previously dismissed their state-law claims, s*ee* ECF No. 621-2 at 1 n.1, and Georgia brought no state-law claims, *see* ECF No. 196.

The term "injuries" below refers to (1) purchases made at any price allegedly fixed pursuant to the alleged conspiracy, or (2) harms attributable to the Defendants' bid-rigging or market-allocation conduct, including adherence to the "rules of engagement" of the alleged conspiracy after bids were awarded.

1.  <u>Alaska</u>

Alaska brings claims under both its antitrust and unfair trade practices statues.  I address each in turn.

a.   Alaska Restraint of Trade Act

The Defendants argue that the limitations period for all types of relief under the Alaska Restraint of Trade Act ("ARTA") is four years under Alaska Stat. § 45.50.588;[35] the States argue that the period for civil penalties is six years under Alaska Stat. § 09.10.120, under which "an action brought in the name of or for the benefit of the state, any political subdivision, or public corporation may be commenced only within six years after the date of accrual of the cause of action."  I agree with the Defendants.  Section 45.50.578 of the Alaska Restraint of Trade Act authorizes the Attorney General to bring claims for civil penalties.  Section 45.50.588 specifically limits claims brought under Section 45.50.578 to four years, creating an exception to the blanket six-year rule for claims brought by the State in Section 09.10.120, which the Alaska legislature enacted thirteen years before ARTA.  *Allen v. Alaska Oil & Gas Conservation Comm'n*, 147 P.3d 664, 668 (Alaska 2006) ("In general, if two statutes conflict, then the later in time controls over the earlier, and the specific controls over the general."); *cf. City of Fairbanks v. Amoco Chem. Co.*, 952 P.2d 1173, 1180–81 (Alaska 1998) (holding that § 09.10.120 trumped later limitations provision in unfair trade practices act that "fail[ed] to define the term 'persons'" to include state entities covered by § 09.10.120).  It is clear that the Alaska legislature intended to subject civil penalty claims brought under Section 45.50.578 to the four-year limitations provision in Section 45.50.588.

---

[35] The statute reads, in relevant part: "An action to enforce a claim arising under AS 45.50.562–45.50.596 is barred unless commenced within four years after the claim accrues . . . .  For the purpose of this section, a claim for a continuing violation is considered to accrue at any time during the period of the violation."

The injury-occurrence and separate accrual rules apply to ARTA claims. *See Alakayak v. B.C. Packers, Ltd.*, 48 P.3d 432, 461–62 & 462 n.25 (Alaska 2002).[36]  The Alaska Supreme Court has made clear that although the language in Section 45.50.588 permits tolling of the accrual date, it "does not . . . require that recovery be granted going all the way back to the initial transgression," and thus that Section 45.50.588 "limits recovery for damages to four years prior to the time at which the suit was filed." *Id.* at 461.  The States may thus seek relief, including civil penalties, for injuries incurred on or after June 10, 2016.  Whether they can seek relief for injuries incurred *before* this date depends on a finding of equitable estoppel, a doctrine that includes fraudulent concealment under Alaska law.

Alaska courts hold that a defendant may be equitably estopped from invoking the statute of limitations "[w]hen a defendant's wrongful conduct 'lull[s] [a plaintiff] into inaction' or otherwise induces him to delay filing a claim until the limitations period has run." *Kaiser v. Umialik Ins.*, 108 P.3d 876, 880 (Alaska 2005).  Although the protection of equitable estoppel ends "[o]nce a plaintiff discovers or reasonably should discover that evidence has been fraudulently concealed," "a party should be charged with knowledge of the fraudulent misrepresentation or concealment only when it would be utterly unreasonable for the party not to be aware of the deception."  *Palmer v. Borg-Warner Corp.*, 838 P.2d 1243, 1251 (Alaska 1992).  "The determination of when a fraudulent misrepresentation or concealment should have been discovered is a question of fact for the trial court to decide." *Id.*  Through the evidence summarized above,

---

[36] *Alakayak* held that ARTA claims for continuing violations apply the separate accrual rule, but the ruling did not directly discuss whether the injury-occurrence rule or the discovery rule applies to ARTA claims.  But it noted that there was "evidence in the legislative history that the Alaska Antitrust Act was adopted to be parallel with federal law," under which antitrust "suit[s] must commence within the applicable statute of limitations measured from the injurious act."  48 P.3d at 462 & n.25.

including apparently misleading or untrue statements to customers, the States have raised a genuine dispute of fact as to whether the Defendants induced the States to delay filing their claims, and, if so, whether the States discovered or should have discovered the Defendants' conduct before the limitations period for earlier injuries had run.

For these reasons, the motion for summary judgment on claims under the Alaska Restraint of Trade Act is DENIED.

### b. Alaska Unfair Trade Practices Act

The parties agree that the six-year statute of limitations for claims brought in the name of the State applies to Alaska's claims under the Alaska Unfair Trade Practices Act ("UTPA"). Alaska Stat. § 09.10.120(a); *see City of Fairbanks*, 952 P.2d at 1180–81 (holding that § 09.10.120 trumps the UTPA's limitations provision for claims brought by municipal corporation). While the parties also agree that the discovery rule applies, they disagree on how.

In analyzing whether a plaintiff has inquiry notice, the Alaska Supreme Court has noted that "the legislature's purpose in enacting section .120 was to give public entities a longer limitations period to vindicate public interests. That purpose is more consistent with requiring *actual notice of the facts* of a fraud than imposing a duty of diligent inquiry." *City of Fairbanks*, 952 P.2d at 1178 (emphasis added). The court has also held that the analysis turns on whether "a reasonable inquiry would have produced knowledge of the cause of action." *Gefre v. Davis Wright Tremaine, LLP*, 306 P.3d 1264, 1275 (Alaska 2013). "[I]f a reasonable inquiry was made, the limitations period is tolled until the plaintiff either: (1) received actual knowledge of the facts giving rise to the cause of action; or (2) received new information which would prompt a reasonable person to inquire further." *Id.* (internal quotations marks omitted). For the reasons described above, I find that the States made a reasonable inquiry by September 2016, when the CTAG first issued an open-ended subpoena. As such, the limitations period is tolled until the

States received actual knowledge of the facts. The States have raised a genuine dispute of fact as to whether, based in part on the Defendants' concealment, they had inquiry notice before May 2017, when the CTAG received responses to its first open-ended subpoenas, or—because Alaska's inquiry notice standard "is more consistent with requiring actual notice," *City of Fairbanks*, 952 P.2d at 1178—even until after cooperation agreements were signed in 2019.

As the Defendants concede that the separate accrual rule does not apply when claims accrue upon discovery, ECF No. 621 at 3 n.3, the States may seek relief for the entirety of the alleged conduct under the Alaska Unfair Trade Practices Act if they can prove that their lawsuit was timely.

For these reasons, the motion for summary judgment as to claims under the Alaska Unfair Trade Practices Act is DENIED.

2. Arizona

Arizona brings claims under the Arizona Consumer Fraud Act ("ACFA") and the Arizona Uniform State Antitrust Act ("AUSAA").

No statutory limitations period applies to ACFA claims or AUSAA claims for injunctive relief brought by the state. Ariz. Rev. Stat. §§ 12-510, -543; *State ex rel. Dep't of Health Servs. v. Cochise Cnty.*, 800 P.2d 578, 581 (Ariz. 1990) ("[T]he sovereign is not bound by a statute of general application . . . unless named expressly or included by necessary inference."). Arizona noted in an appendix to its opposition brief that it is not seeking "proprietary damages," ECF No. 619-8 at 2, which would, like Arizona's claim for civil penalties, be subject to a four-year limitations period running from accrual of the cause of action. *See* Ariz. Rev. Stat. §§ 44-1408, 44-1410. The Defendants viewed this statement on "proprietary damages" as Arizona "clarif[ying] that [it] is not pursuing any non-sovereign claims." ECF No. 621-2 at 1 n.5. Arizona objected, noting that while it is not seeking "proprietary damages" under its antitrust law, it is seeking

"restitution via disgorgement" under the ACFA and there is no statute of limitations applicable to this claim. ECF No. 858-1 at 1. At oral argument, defense counsel did not take issue with this. ECF No. 870 at 89–90.

As to AUSAA claims for non-injunctive relief, the parties dispute whether the injury-occurrence rule or the discovery rule applies. The highest court in the state has not directly addressed the issue, and federal courts have provided only minimal analysis of the issue. *Compare Daisy Mountain Fire Dist. V. Microsoft Corp.*, 547 F. Supp. 2d 475, 479 (D. Md. 2008) (applying the injury-occurrence rule to AUSAA claims), *with In re Interior Molded Doors Antitrust Litig.*, No. 3:18-CV-00718-JAG, 2019 WL 4478734, at *23 (E.D. Va. Sept. 18, 2019) (noting that the plaintiffs could not rely on a common-law discovery rule to support their claims under various state laws because they did not exercise reasonable diligence). The AUSAA, however, contains a "uniformity" provision, Ariz. Rev. Stat. § 44-1412, which indicates that "[i]t is the intent of the legislature that in construing this article, the courts may use as a guide interpretations given by the federal courts to comparable federal antitrust statutes." As noted above, federal antitrust statutes apply the injury-occurrence rule. *Zenith Radio Corp*, 401 U.S. at 338–39. Thus, in keeping with the uniformity provision, I find that Arizona courts would likely apply the injury-occurrence rule to AUSAA claims.

The States do not dispute that the separate accrual rule applies. ECF No. 858-4 at 1; *see also Daisy Mountain Fire Dist.*, 547 F. Supp. 2d at 479 ("unless the statute of limitations was tolled, A.R.S. § 44–1410 would bar all overcharge claims for the period before July 24, 2003 because those purchases occurred, and the claims based on them accrued, more than four years before plaintiff filed its original complaint"). As I found above, injuries occurred each time consumers purchased the Defendants' products at allegedly inflated, conspiracy-driven prices.

Thus, claims stemming from purchases that occurred more than four years before the filing of the complaint are time-barred, absent a finding of fraudulent concealment.

Arizona courts recognize that fraudulent concealment "tolls the applicable statute of limitations until the plaintiff discovers or was put on reasonable notice" of the cause of action. *Anson v. Am. Motors Corp.*, 747 P.2d 581, 589 (Ariz. Ct. App. 1987); *see also Morrison v. Acton,* 198 P.2d 590, 596 (Ariz. 1948) ("Fraud practiced to conceal a cause of action will prevent the running of the statute of limitations until its discovery."). Once "fraudulent concealment is established, . . . the statute of limitations is tolled until such concealment is discovered, or reasonably should have been discovered." *Walk v. Ring*, 44 P.3d 990, 999 (Ariz. 2002). As already discussed, the States have identified a genuine dispute of fact about whether the Defendants concealed their cause of action by making false or misleading claims to customers. A genuine dispute of fact also exists about whether the States reasonably should have discovered their cause of action until May 2017. Thus, a jury finding of fraudulent concealment would permit the States to seek non-injunctive relief under the AUSAA for purchases that otherwise would have accrued before June 10, 2016.

For these reasons, the motion for summary judgment as to claims under Arizona law is DENIED.

### 3.  California

The States bring claims under both California's antitrust statute (the Cartwright Act) and its Unfair Competition Law ("UCL"). The parties agree that four-year statutes of limitations apply to all claims. *See* Cal. Bus. & Prof. Code §§ 16750.1 (Cartwright Act), 17208 (UCL).

#### a.  Cartwright Act

Under California law, the common law of accrual follows the "last element rule," where a claim accrues "'when [it] is complete with all of its elements'—those elements being wrongdoing,

harm, and causation." *Pooshs v. Philip Morris USA, Inc.*, 250 P.3d 181, 187 (Cal. 2011). The discovery rule, "under which accrual is postponed until the plaintiff discovers, or has reason to discover, the cause of action," is an exception to the common law rule. *Id.* (internal quotation marks omitted).

The parties agree that the discovery rule exception applies to California's Cartwright Act claims. *See Aryeh v. Canon Bus. Sols., Inc.*, 292 P.3d 871, 877 (Cal. 2013) (rejecting the theory that Cartwright Act claims must, like Sherman Act claims, be subject to the injury-occurrence rule); *In re California Bail Bond Antitrust Litig.*, No. 19-CV-00717-JST, 2020 WL 3041316, at *18 (N.D. Cal. Apr. 13, 2020).

> [I]n order to employ the discovery rule to delay accrual of a cause of action, a potential plaintiff who suspects that an injury has been wrongfully caused must conduct a reasonable investigation of all potential causes of that injury. If such an investigation would have disclosed a factual basis for a cause of action, the statute of limitations begins to run on that cause of action when the investigation would have brought such information to light.

*Fox v. Ethicon Endo-Surgery, Inc.*, 110 P.3d 914, 921 (Cal. 2005). As I found above, a genuine dispute of fact exists as to whether the States, despite conducting a reasonable investigation, had reason to discover their cause of action related to the drugs at issue before May 2017, which is within the four-year limitations period. Thus, I cannot find as a matter of law that the statute of limitations bars claims under the Cartwright Act. As the Defendants concede that the separate accrual rule does not apply when claims accrue upon discovery, ECF No. 621 at 3 n.3, the States may seek relief for the entirety of the alleged conduct under the Cartwright Act if they can prove that their lawsuit was timely.[37]

---

[37] Confusingly, the Defendants concede that the separate accrual rule is inapplicable while also disputing that the Cartwright Act allows recovery for the entire period of alleged wrongdoing. ECF No. 621-2 at 1 & n.6. The Defendants cite no authority suggesting that the separate accrual—or any other time limit on damages—applies in a jurisdiction in which accrual depends on discovery. In *Aryeh*, the California Supreme Court applied the separate accrual rule to UCL claims

b.  Unfair Competition Law

The parties disagree on whether the discovery rule similarly applies to California's UCL claims.  As the California Supreme Court has noted, "the UCL is a chameleon," in that it permits exceptions to the common-law "last element" accrual rule, including the discovery rule, depending on "the nature of the right sued upon."  *Aryeh*, 292 P.3d at 878.  "[T]he *Aryeh* court held that the discovery rule might be appropriate for UCL claims based on allegations of fraud, but the discovery rule does not apply to UCL claims based purely on allegations of unfair competition."  *Ryan v. Microsoft Corp.*, 147 F. Supp. 3d 868, 894 (N.D. Cal. 2015).  Federal district courts have found that "the discovery rule does not apply to UCL claims based purely on alleged anticompetitive conduct because an allegation purely of anticompetitive conduct is not an allegation based on fraud or misrepresentation.  *Id.* (citing *In re Animation Workers Antitrust Litig.*, 87 F. Supp. 3d 1195, 1210–11 (N.D.Cal.2015)).  The price-fixing and bid-rigging allegations here are purely anticompetitive conduct; thus, the discovery rule does not apply.

The States, however, may rely upon a different exception to the common-law accrual rule: fraudulent concealment, which "tolls the statute of limitations where a defendant, through deceptive conduct, has caused a claim to grow stale."  *Aryeh*, 292 P.3d at 875.  California recognizes that "a conspiracy to fix prices in violation of antitrust law is a secret act whose effects are public.  Only through discovery or chance disclosure can an antitrust plaintiff learn about the actions leading to the observable effects."  *Union Carbide Corp. v. Superior Court*, 679 P.2d 14, 21 (Cal. 1984).  A genuine dispute of fact exists as to whether the Defendants took affirmative steps to conceal anticompetitive conduct by making false or misleading statements to customers, as described above.  A reasonable juror could find that these misrepresentations prevented the

---

only after finding that the discovery rule did not apply in that instance.  292 P.3d at 879.  The entirety rule applies here.

States, despite exercising reasonable diligence, from discovering their claims if, for instance, such statements misled the States into believing that the unexplained price hikes were a result of legitimate market forces.  A finding by the jury of fraudulent concealment would permit the States to seek relief for purchases made before June 10, 2016.

Absent a finding of fraudulent concealment, however, the separate accrual rule would apply to the UCL claims.  California recognizes a doctrine of "continuous accrual," under which "a series of wrongs or injuries may be viewed as each triggering its own limitations period, such that a suit for relief may be partially time-barred as to older events but timely as to the applicable limitations."  *Aryeh*, 292 P.3d at 875.  This is analogous to the "separate accrual" rule under the federal continuing violation doctrine analyzed above.  Perhaps confusingly, California's own "continuing violation doctrine" has the opposite effect—it "aggregates a series of wrongs or injuries for purposes of the statute of limitations, treating the limitations period as accruing for all of them upon commission or sufferance of the last of them."  *Id.*  This is similar to what I have termed the "entirety rule."  The States argue that I should apply this entirety rule, citing *In re Glumetza Antitrust Litigation*, 611 F. Supp. 3d 848, 867 (N.D. Cal. 2020).  In that case, the District Court noted that "California permits antitrust recovery for actions that take place outside the limitations period if these actions are sufficiently linked to unlawful conduct within the limitations period."  *Id.* (citing *Richards v. CH2M Hill*, 29 P.3d 175, 183, 186 (Cal. 2001)).  But the cases cited for this assertion did not involve the Cartwright Act, and the *Glumetza* court found that analysis of the state antitrust claims "merge[d] with the federal-claim," after the parties failed to cite a distinction between federal and state law.  *Id.  Glumetza* thus offers no insight into whether the separate accrual rule or the entirety rule applies to UCL claims.  Meanwhile, in *Aryeh*, the California Supreme Court distinguished between the two doctrines and applied the doctrine of

continuous accrual (the separate accrual rule) to UCL claims that, like this one, involved "a series of discrete, independently actionable alleged wrongs." 292 P.3d at 879–81. I conclude that, if presented with the question, the California Supreme Court would treat this case like *Aryeh*. Thus, the States are not entitled to recover for all purchases made at conspiracy-driven prices, but only for those made within the limitations period. Because of the availability of tolling based on a finding of fraudulent concealment, however, I cannot determine as a matter of law when the limitations period began.

For these reasons, the motion for summary judgment as to claims under California law are DENIED.

### 4. Colorado

Colorado brings claims under the Colorado Antitrust Act and the Colorado Consumer Protection Act ("CCPA"). ECF No. 196 ¶ 1851.

#### a. Colorado Antitrust Act

The Colorado Antitrust Act has a limitations period of four years. Colo. Rev. Stat. § 6-4-119(1).[38] The parties agree that when this action was filed the operative version of the Act specified that the discovery rule applied. Colo. Rev. Stat. § 6-4-118(1) (1992) ("a cause of action accrues when the circumstances giving rise to the cause of action are discovered or should have been discovered in the exercise of reasonable diligence"). I found above that the earliest that the States, in exercising reasonable diligence, had indisputable notice of potential anticompetitive

---

[38] The States argue that subsection (3) of this provision provides a "broad statutory tolling provision." ECF No. 619-8 at 3. This subsection, like a corresponding provision in the Clayton Act, 15 U.S.C. § 16(i), suspends the running of related actions when the Attorney General brings an action. But the States identify no related action that the Colorado Attorney General brought that would have tolled their claims here. To the extent they are arguing that this provision somehow extends the period for the Attorney General to bring a claim beyond the four-year limitations period, they offer no support. Colo. Rev. Stat. § 6-4-119(3) has no bearing on the timeliness of the claims here.

conduct related to any of the drugs at issue was May 2017. Thus, a genuine dispute of fact exists as to whether claims filed in June 2020 are timely.

### b. Colorado Consumer Protection Act

The CCPA has a limitations period of three years and specifies that the discovery rule applies. Colo. Rev. Stat. § 6-1-115 ("All actions brought under this article must be commenced within three years after the date on which the false, misleading, or deceptive act or practice occurred or the date on which the last in a series of such acts or practices occurred or within three years after the consumer discovered or in the exercise of reasonable diligence should have discovered the occurrence of the false, misleading, or deceptive act or practice."). Because I have found that the States should have discovered their claims by May 2017—more than three years before the filing of the complaint—they must rely on a finding of fraudulent concealment for their CCPA claim to be timely.[39]

The same CCPA provision extends the three-year limitations period by one year for fraudulent concealment, which arises "if the plaintiff proves that failure to timely commence the action was caused by the defendant engaging in conduct calculated to induce the plaintiff to refrain from or postpone the commencement of the action." *Id.* As explained above, a genuine dispute exists as to whether the Defendants made false or misleading statements to customers, such as those "blaming supply," to cover anticompetitive conduct. A reasonable juror could find that these misrepresentations induced the States to delay the filing of their claims. Because a finding that

---

[39] The States suggest in their brief that Colorado recognizes other types of equitable tolling outside of fraudulent concealment. ECF No. 619-5 at 3 (citing *Damian v. Mountain Parks Elec., Inc.*, 310 P.3d 242, 252 (Colo App. 2012)). But Colorado confirmed at oral argument that the equitable tolling alleged in this case was fraudulent concealment, and that I should thus look to the portion of Section 6-1-115 setting a specific one-year tolling period for fraudulent concealment. ECF No. 870 at 82–83. I thus limit my analysis to fraudulent concealment.

such inducement extended the statute of limitations for one year would bring the States' claims within the limitations period, I cannot find that claims under the CCPA are untimely at this stage.

As the Defendants concede that the separate accrual rule does not apply when claims accrue upon discovery, ECF No. 621 at 3 n.3, the States may seek relief for the entirety of the alleged conduct under Colorado law if they can prove that their lawsuit was timely.

For these reasons, the motion for summary judgment as to claims brought under Colorado law is DENIED.

### 5. Connecticut

Connecticut brings claims under the Connecticut Antitrust Act and the Connecticut Unfair Trade Practices Act ("CUTPA"). ECF No. 196 ¶¶ 1823–26.

The Connecticut Antitrust Act specifies four-year limitations periods for claims arising under § 35-34 (injunctive relief) and § 35-35 (treble damages for injuries to business or property), but it is silent as to any limitations period for *parens patriae* claims brought by the Attorney General under § 35-32 and claims for civil penalties under § 35-38. At oral argument, Connecticut clarified that it is not seeking proprietary damages under § 35-35. ECF No. 870 at 79. Because Connecticut can also seek injunctive relief through § 35-32, it does not bring any claim that is subject to the Act's statute of limitations provision.

CUTPA has separate provisions for private actions (Conn. Gen. Stat. § 42-110g) and for sovereign enforcement actions brought by the State (§§ 42-110m, 42-110o). While the private action provision includes a three-year statute of limitations, § 42-110g(f), the sovereign action provisions do not specify any limitations period. In the complaint, Connecticut listed only claims under the sovereign enforcement provisions. Moreover, the Connecticut Supreme Court has held that "statutory language generally purporting to affect rights and liabilities of all persons will not be deemed to apply to the state in the absence of an express statutory reference to the state." *State*

*v. Lombardo Bros. Mason Contractors*, 307 Conn. 412, 439–40 (2012) (emphasis removed).  The

statute of limitations provision uses only general language, and in any event refers only to Section

110g.  *See* Conn. Gen. Stat. § 42-110g(f) ("An action under this section may not be brought more

than three years after the occurrence of a violation of this chapter.").  Thus, the State is not subject

to CUTPA's statute of limitations.

For these reasons, the motion for summary judgment as to claims brought under

Connecticut law is DENIED.

### 6.  Delaware

The Delaware Antitrust Act has a four-year limitations period for all types of claims.  Del.

Code tit. 6 § 2111 ("Any action to enforce this chapter shall be forever barred unless commenced

within 4 years after the cause of action accrued.").

The parties dispute whether the injury-occurrence rule or the discovery rule applies.  The

Delaware Antitrust Act requires that the law "be construed in harmony with ruling judicial

interpretations of comparable federal antitrust statutes."  Del. Code tit. 6 § 2113.  As noted, the

injury-occurrence rule applies to federal antirust claims.  Delaware, however, also recognizes "the

doctrine of inherently unknowable injuries, sometimes referred to as the 'discovery rule,'" under

which "a statute of limitations will not run where it would be practically impossible for a plaintiff

to discover the existence of a cause of action."  *Vichi v. Koninklijke Philips Elecs.*, N.V., 85 A.3d

725, 788–89. (Del. Ch. 2014).  In *Vichi*, the Delaware Chancery Court recognized that price-fixing

schemes are inherently self-concealing.  *Id.* at 797.  But *Vichi* was a fraud case and did not analyze

claims under the Delaware Antitrust Act, and so the court was not required to determine an accrual

rule under that statute.  In the absence of any case law in which Delaware courts have applied the

discovery rule to claims under the Delaware Antitrust Act, I find that the harmonization language

of Section 2113 requires that the injury-occurrence rule apply.  As I found above, injuries occurred

each time consumers purchased the Defendants' products at allegedly inflated, conspiracy-driven prices. Thus, claims stemming from purchases that occurred more than four years before the filing of the complaint are time-barred, absent a finding of fraudulent concealment.

The States argue that they may seek to recover for the entirety of the alleged conduct because the Antitrust Act provides that a "continuing violation is deemed to accrue at any time during the period of such violation." Del. Code tit. 6 § 2111. But the States do not indicate how the Delaware continuing violation doctrine differs from the federal doctrine, and Section 2113 requires harmonization. Under the federal continuing violation doctrine, as discussed, the separate accrual rule applies. As I found above, each purchase at an allegedly inflated, conspiracy-driven price was a discrete act. So the separate accrual rule applies, and the States may recover only for purchases made within the limitations period.

To recover damages under the Delaware Antitrust Act for claims accruing before June 10, 2016, Delaware must rely on fraudulent concealment. Fraudulent concealment tolls the limitations period "only until the plaintiff discovers (or [by] exercising reasonable diligence should have discovered) his injury." *Pomeranz v. Museum Partners, LP*, 2005 WL 217039, at *3 (Del. Ch. Jan. 24, 2005). "Mere silence is insufficient to establish fraudulent concealment. Rather, the evidence must show that the defendant engaged in some sort of 'actual artifice' to toll the running of the limitations period." *Krahmer v. Christie's Inc.*, 911 A.2d 399, 407 (Del. Ch. 2006). Through the allegations summarized above—that the Defendants made misleading or untrue statements to customers to cover anticompetitive conduct—the States have raised a genuine dispute of fact as to whether the Defendants engaged in "actual artifice" sufficient to toll the statute of limitations. A finding by the jury of fraudulent concealment would toll the limitations period for a period equal to the duration of the concealment.

For these reasons, the motion for summary judgment as to claims brought under the Delaware Antitrust Act is DENIED.

### 7. District of Columbia

The States argue that D.C.'s *nullum tempus* doctrine applies to all of their claims under the District of Columbia Antitrust Act; the Defendants dispute that the doctrine applies to claims for damages—proprietary or *parens patriae*. Under D.C.'s *nullum tempus* doctrine, "a sovereign . . . is exempt from the operation of statutes of limitations . . . unless the sovereign expressly provides that its claim shall be barred if not pursued within a stated period of time." *Stonewall Constr. Co. v. McLaughlin*, 151 A.2d 535, 536 (D.C. 1959). The D.C. Antitrust Act expressly subjects all damages claims brought by the Attorney General to a four-year limitations period. "An action under section 28-4507 . . . to recover damages is barred if the action is not commenced within four (4) years after the cause of action accrues." D.C. Code § 28-4511(b). Section 28-4507 applies both when "the District government is injured in its business or property by a violation of this chapter," D.C. Code § 28-4507(a), and to *parens patriae* actions, D.C. Code § 28-4507(b). The statute of limitations does not mention claims for civil penalties, however, and so I agree with the States that such claims are not subject to any time bar.

The plain language of the statute notwithstanding, the States argue that the Attorney General is exempt from all statutes of limitations "when it sues to vindicate public rights." *D.C. v. Owens-Corning Fiberglas Corp.*, 572 A.2d 394, 406 (D.C. 1989) (in suit brought by District to recover removal costs for asbestos, applying "common-law municipal immunity from the effects of the statutes of limitations and repose" when District sued in its "municipal capacity" under generally applicable wrongful death statute with generally applicable statute of limitations "to vindicate public rights"). Simply put, the States suggest I should ignore the specific language of the Act in question to apply a general doctrine. I decline to do so. Section 28-4511 "expressly

provides that [the sovereign's] claim shall be barred if not pursued within a stated period of time." *Stonewall Constr. Co.*, 151 A.2d at 536; *see also Ford v. ChartOne, Inc.*, 834 A.2d 875, 881 (D.C. 2003) ("[W]hen a statute of broad general application . . . is inconsistent with a more specific provision . . . the latter provision 'must govern or control, as a clearer and more definite expression of the legislative will." (internal quotation mark omitted)); *George Wash. Univ. v. District of Columbia Bd. of Zoning Adjustment*, No. 02–AA–172, 831 A.2d 921, 944 n. 18 (D.C. 2003) ("This court has often recognized the well-settled rule of statutory construction that a special statute covering a particular subject matter is controlling over a general statutory provision covering the same and other subjects in general terms."). Accordingly, the Attorney General's claims for damages under the D.C. Antitrust Act are subject to the Act's four-year limitations period.

The parties also disagree on when the damages claims accrue. The statute is silent as to whether the injury-occurrence rule or discovery rule applies. The Defendants argue that the injury-occurrence rule applies, as it does to federal antitrust statutes, because the D.C. Antitrust Act contains a provision noting "the intent of the Council of the District of Columbia that in construing this chapter, a court of competent jurisdiction may use as a guide interpretations given by federal courts to comparable antitrust statutes." D.C. Code § 28-4515. Again, the States urge me instead to recognize "the broad applicability of the discovery rule to claims under District law," and in particular tort and fraud claims. ECF No. 619-4 (citing *Farris v. Compton*, 652 A.2d 49, 54 (D.C. 1994); *Doe v. Medlantic Health Care Grp., Inc.*, 814 A.2d 939, 945 (D.C. 2003)). But they do not cite any case involving the D.C. Antitrust Act. Just as I found with Delaware, in the absence of any case law in which D.C. courts have applied the discovery rule to claims under D.C.'s Antitrust Act, I find that the injury-occurrence rule applies under Section 28-4515. Here, injuries occurred each time consumers purchased the Defendants' products at allegedly inflated, conspiracy-driven

prices, and the separate accrual rule applies. Thus, claims for damages stemming from purchases that occurred more than four years before the filing of the complaint are time-barred, absent a finding of fraudulent concealment.

In the District of Columbia, statutes of limitations are tolled if there is evidence of affirmative acts of concealment or of a self-concealing conspiracy. *Lewis v. Denison*, 2 App.D.C. 387, 393 (D.C. 1894). "A mere failure to disclose pertinent information, however, is not sufficient to toll the statute of limitations unless there has been some affirmative act of concealment." *Drake v. McNair*, 993 A.2d 607, 619 (D.C. 2010). But "any statement, word or act which tends to suppress the truth raises the suppression to th[e] level" of an affirmative act. *William J. Davis, Inc. v. Young*, 412 A.2d 1187, 1192 (D.C. 1980). A genuine dispute of fact exists as to whether the Defendants made false or misleading statements to customers to cover anticompetitive conduct. A reasonable juror could find that such a statement "tends to suppress the truth," *id.*, and thus that it was an affirmative act of concealment. Because the States have raised a genuine dispute of fact about whether the Defendants fraudulently concealed the cause of action, I cannot find that the D.C. Antitrust Act claims for purchases before June 10, 2016, are untimely at this stage.

For these reasons, the motion for summary judgment as to claims brought under District of Columbia law is DENIED.

### 8. Florida

Florida brings claims under the Florida Deceptive & Unfair Trade Practices Act ("FDUTPA") and the Florida Antitrust Act. The parties agree that four-year statutes of limitations apply to all types of relief under both laws. Fla. Stat. §§ 501.207(5); 542.26(1). The parties also agree that the FDUTPA claims accrue upon injury occurrence, but they dispute when Florida Antitrust Act claims accrue.

The States argue for the discovery rule on the grounds that the Florida Antitrust Act parallels federal antitrust law. But as I have already found, the injury-occurrence rule applies to federal antitrust claims. The States point to the Seventh Circuit's application of the discovery rule to federal antitrust claims in *In re Copper Antitrust Litigation,* 436 F.3d 782, 789 (7th Cir. 2006), in which the court held that "in the absence of a contrary directive from Congress [the injury-occurrence] rule is qualified by the discovery rule, which 'postpones the beginning of the limitations period from the date when the plaintiff is wronged to the date when he discovers he has been injured.'" *Id.* (quoting *Cada v. Baxter Healthcare Corp.,* 920 F.2d 446, 450 (7th Cir. 1990)). I decline to adopt that holding in light of the "clear U.S. Supreme Court authority and the overwhelming majority of Circuits [that] have explicitly held that antitrust claims are subject to a pure injury rule, not a discovery rule." *In re Animation Workers Antitrust Litig.*, 87 F. Supp. 3d 1195, 1209–10 (N.D. Cal. 2015) (declining to adopt *In re Copper*, citing, *inter alia*, *Johnson v. Nyack Hosp.,* 86 F.3d 8, 11 (2d Cir. 1996) ("An antitrust cause of action accrues as soon as there is injury to competition.")).

For all their Florida claims, the States seek to recover for all of the alleged conduct under the entirety rule. Although Florida recognizes the rule, the cases the States cite do not support departing from the federal separate accrual rule, application of which is supported by the harmonization provision in Florida's antitrust statute, Fla. Stat. § 542.32, and Florida case law. *See, e.g.*, *Maralago Cay Homeowners Assoc., Inc. v. MHC Op. Ltd. P'ship*, No. 21-80049-CV, 2021 WL 6135181, at *4 (S.D. Fla. Aug. 5, 2021) (in Florida Antitrust Act case, "each sale or payment constitutes a new 'act' that starts the running of the statute of limitations"). As I found above, injuries occurred each time consumers purchased the Defendants' products at allegedly

inflated, conspiracy-driven prices.  Because the sales represent discrete acts, the entirety rule does not apply.

The Defendants argue that the States are further precluded from seeking relief for injuries incurred outside the limitations period because Florida's tolling statute does not include fraudulent concealment as a basis for tolling statutes of limitations.  *See* Fla. Stat. § 95.051; *Hearndon v. Graham*, 767 So. 2d 1179, 1185 (Fla. 2000) ("[T]he tolling statute specifically precludes application of any tolling provision not specifically provided therein.")  But Florida law does recognize the doctrine of equitable estoppel, which "operate[s] to prevent a defendant from benefitting from a limitations defense where it bore responsibility for the late filing." *In re TFT-LCD (Flat Panel) Antitrust Litig.*, No. M 07-1827 SI, 2011 WL 4387812, at *3 (N.D. Cal. Sept. 20, 2011) (citing *Major League Baseball v. Morsani*, 790 So.2d 1071 (Fla. 2001)).  Based on that underlying purpose, another federal district court, analyzing this issue in an antitrust action with FDUTPA claims, found that the Florida Supreme Court "suggested that fraudulent concealment would be sufficient to estop application of the statute of limitations" and concluded that "the Florida Supreme Court would recognize the doctrine of fraudulent concealment." *Id.* at *4.  I adopt that analysis here.

Because the Florida Supreme Court would likely find that fraudulent concealment is available, and because the States have raised a genuine dispute of fact as to whether the Defendants concealed the cause of action through false or misleading statements to customers, the States are not precluded from seeking relief under Florida law for injuries incurred before June 10, 2016.

For these reasons, the motion for summary judgment as to claims brought under Florida law is DENIED.

9. <u>Idaho</u>

The parties agree that a four-year limitations period applies to all claims under the Idaho Competition Act.  Idaho Code § 48-115(1) ("Any action brought by the attorney general pursuant to this chapter is barred if it is not commenced within four (4) years after the cause of action accrues.").  The Act also requires that it "shall be construed in harmony with federal judicial interpretations of comparable federal antitrust statutes."  Idaho Code § 48-102(3).  As noted, the injury-occurrence rule applies to federal antitrust claims.  The separate accrual rule applies because each sale at allegedly inflated, conspiracy-driven prices represents a discrete act that is separately actionable.

The Idaho Competition Act also expressly recognizes the fraudulent concealment doctrine.  Idaho Code § 48-115(3) ("The foregoing statute of limitations shall be tolled during any period when the defendant in any action fraudulently concealed the events upon which the cause of action is based.").  "The statute does not begin to run until the plaintiff knew or reasonably should have known of the facts constituting the fraud."  *McCorkle v. Nw. Mut. Life Ins. Co.*, 112 P.3d 838, 842 (Idaho Ct. App. 2005).  The States have raised a genuine dispute of fact as to whether the Defendants made false or misleading statements to customers, and a reasonable juror could find that these statements prevented the States from learning of the facts of the case until at least May 2017.  A finding by the jury of fraudulent concealment would permit the States to seek relief for a period before June 10, 2016.

For these reasons, the motion for summary judgment as to claims brought under Idaho law is DENIED.

10. <u>Illinois</u>

The parties agree that the Illinois Antitrust Act has a four-year limitations period, 740 Ill. Comp. Stat. 10/7, but disagree on when claims under the Act accrue.  The Defendants cite *Austin*

*v. House of Vision, Inc.*, 243 N.E.2d 297, 299 (Ill. App. Ct. 1968), an antitrust case in which the

Illinois appellate court applied the injury-occurrence rule.[40]   The States argue for the discovery

rule, noting that the Illinois Supreme Court recognized the discovery rule in a tort case in the year

following *Austin*.   *Rozny v. Marnul*, 250 N.E.2d 656, 665–66 (Ill. 1969) ("We accordingly hold,

in keeping with the more recent authorities and the legislative policy manifested by our General

Assembly, that the statute of limitations does not bar plaintiffs' recovery, because their cause of

action 'accrued' when they knew or should have known of the defendant's error . . . .").   Although

the States cite three post-*Rozny* cases in which, they contend, the court has applied the discovery

rule to Illinois Antitrust Act claims, these rulings offer only limited support for their position.   *See*

*Dvorak v. St. Clair County*, No. 14-CV-1119-SMY-RJD, 2018 WL 1532793, at *4 (S.D. Ill. Mar.

29, 2018) (relying on Seventh Circuit precedent analyzing federal claims that has not been adopted

by other jurisdictions; *see supra* Florida section); *State of Illinois v. Hitachi, Ltd.*, No. 2012-CH-

35266, 2014 WL 12999107, at *4 (Ill. Cir. Ct. Mar. 18, 2014) (noting only that the court had

previously found the discovery rule applied); *Bueker v. Madison County*, 61 N.E. 3d 237, 253 (Ill.

App. Ct. 2016) (noting, in ruling on class certification, that "an issue that will need to be

determined" was whether "the plaintiffs' invocation of the discovery rule in their pleadings would

result in individual [statute of limitations] inquiries").   These cases did not analyze the accrual rule

in light of the Act's harmonization provision, under which courts generally "use the construction

of the federal law by the federal courts as a guide in construing this Act."   740 Ill. Comp. Stat.

10/11.   And none of the cases, nor any of the parties' summary judgment briefing here, indicate

how I should construe the differing language in the Act governing damages and civil penalties, the

---

[40] The Defendants also cite *Conway v. Bulk Petroleum Corp.*, 545 F. Supp. 398, 400 (N.D. Ill. 1982).  That ruling (and the rulings it cites) discussed the standard for tolling in instances of alleged fraudulent concealment, not the discovery rule.

latter of which, at least, clearly points to the injury-occurrence rule. *Compare* 740 Ill. Comp. Stat. 10/7(2) ("Any action for damages under this subsection is forever barred unless commenced within 4 years after the cause of action accrued[.]") *with* 740 Ill. Comp. Stat. 10/7(4) ("The [civil penalties] action must be brought within 4 years after the commission of the act upon which it is based."). Thus, I decline to adopt any of these cases as clear precedent abrogating *Austin*'s application of the injury-occurrence rule to claims under the Illinois Antitrust Act.

The States argue that the entirety rule should apply under Illinois's "continuing tort" doctrine. *See Feltmeier v. Feltmeier*, 798 N.E.2d 75, 89 (Ill. 2003) (tort case relying on *Pavlik v. Kornhaber*, 761 N.E.2d 175 (Ill App. Ct. 2001)). In *Pavlik*, another tort case, the appellate court rejected the Defendant's argument that each act accrues separately because "it [wa]s impossible to pinpoint the specific moment when enough conduct has occurred to become actionable." 761 N.E.2d at 187–88. Here, as I found above, the States were harmed by each sale of the Defendants' products at inflated, conspiracy-driven prices. Because each of these sales is in itself actionable, the rationale for continuous accrual outlined in *Pavlik* does not apply. I find instead that claims for each sale accrued separately; thus, the States may recover only for injuries from sales made within the limitations period, absent a finding of fraudulent concealment.

"Fraudulent concealment stops the running of the limitations period until the cause of action is discovered." *Henderson Square Condo. Ass'n v. LAB Townhomes, L.L.C.*, 16 N.E.3d 197, 215 (Ill. App. Ct. 2014), *aff'd*, 46 N.E.3d 706 (Ill. 2016). "To assert that a defendant engaged in fraudulent concealment, plaintiffs must show an affirmative misrepresentation or, in the absence of an affirmative misrepresentation, deceptive conduct resulting in an act of concealment." *Id.* at 216. A genuine dispute of fact exists as to whether the Defendants made affirmative misrepresentations to customers to cover anticompetitive conduct. A reasonable juror could find

that such statements constituted "deceptive conduct resulting in an act of concealment." *Id.* Thus, the States are not precluded from seeking damages for injuries incurred outside of the limitations period.

For these reasons, the motion for summary judgment as to claims under Illinois law is DENIED.

11. Indiana

Indiana brings claims under the Indiana Antitrust Act and the Indiana Deceptive Consumer Sales Act ("IDCSA").

a.  Indiana Antitrust Act

The States argue that Indiana's *nullum tempus* doctrine applies to all of their claims under the Indiana Antitrust Act; the Defendants dispute that the doctrine applies to proprietary claims.[41] The parties appear to agree that Indiana's recognition of the *nullum tempus* doctrine stems from *Board of Commissioners of Dearborn County v. Lods*, 36 N.E. 772 (Ind. Ct. App. 1894), in which the court held:

> The statute of limitations cannot be invoked against a state in purely governmental matters; but when the government comes into a court asserting the same right as a private individual, and comes in contact with its citizens in an effort to recover mere dollars and cents, it goes divested of its sovereignty, and the reason for the maxim no longer applies.

*Id.* at 774; *see* ECF No. 619-3 at 4; No. 621-2 at 3 n.16.  Unlike in Kansas, discussed *infra*, Indiana courts do not appear to have analyzed what types of claims qualify as "purely governmental matters" under the Indiana Antitrust Act.  *Lods* is clear, however, that the States' proprietary

_____

[41] The Indiana Antitrust Act was amended in 2023, after the States filed their complaint.  The States conceded earlier in this action that the amendment did not apply retroactively and clarified that it was seeking damages only on behalf of itself and its political subdivisions.  *See Connecticut v. Sandoz, Inc.*, 2024 WL 4753308, at *6 n.4  (D. Conn. Nov. 12, 2024).  Thus, the States have waived *parens patriae* claims under the Indiana Antitrust Act, and I do not address the arguments related to potential limitations on *parens patriae* relief.

claims—"effort[s] to recover mere dollars and cents"—are not shielded by the *nullum tempus* doctrine.

The Indiana Antitrust Act does not contain its own limitations provision. The Defendants argue for a two-year limitations period "for a forfeiture of penalty given by statute," as applied in *Gibson v. Miami Valley Milk Producers, Inc.*, 299 N.E.2d 631, 637 (Ind. Ct. App. 1973); *see also Sandidge v. Rogers*, 167 F. Supp. 553, 556 (S.D. Ind. 1958) (noting that the Indiana's antitrust law is "molded upon" the Sherman Act, and "conclud[ing] that the Indiana Courts would regard an action for treble damages and attorney's fees under [the Sherman Act] to be an action for a statutory penalty within the meaning of the two-year limitation statute of Indiana"). The successor to the limitations statute cited in *Gibson* states that "[a]n action for . . . a forfeiture of penalty given by statute[] must be commenced within two (2) years after the cause of action accrues." Ind. Code § 34-11-2-4. As such, I find that the two-year limitation period for "a forfeiture of penalty given by statute" applies to the States' proprietary claims for treble damages under Ind. Code 24-1-2-7. But the States' proprietary claim for *actual* damages does not seek to impose a penalty. *See* Ind. Code §§ 24-1-1-5.2, 24-1-2-5.1 (2008) (both authorizing proprietary claims for "injuries or damages"). Thus, the general limitations period for statutory penalties in Ind. Code § 34-11-2-4 does not apply to these claims. In the absence of any other applicable statute of limitations suggested by the Defendants, I cannot find that these claims are time-barred as a matter of law.

I must still determine when Indiana's claims for treble damages accrued. The States rely on the Indiana Supreme Court's general application of the discovery rule to tort claims. *Wehling v. Citizens Nat. Bank*, 586 N.E.2d 840, 843 (Ind. 1992). The Defendants argue the injury-occurrence rule applies because the Indiana Antitrust Act was modeled on and has been interpreted in accordance with the Sherman Act. *See Rumple v. Bloomington Hosp.*, 422 N.E.2d 1309, 1315

(Ind. Ct. App. 1981); *Sandidge v. Rogers*, 167 F. Supp. 553, 556 (S.D. Ind. 1958).  In the absence of any Indiana court applying the discovery rule to antitrust claims, I agree with the Defendants that Indiana Antitrust Act claims accrue upon injury occurrence, as they do in the federal antitrust context, and the separate accrual rule applies.  As I found above, injuries occurred each time consumers purchased the Defendants' products at allegedly inflated, conspiracy-driven prices, and the States have submitted evidence that such purchases took place as late as the filing of the complaint, which means that there is at least a genuine dispute of fact as to whether the States' claims for treble damages are timely.  Thus, there is a genuine dispute about whether the States may seek treble damages under the Indiana Antitrust Act for purchases made within two years of the June 10, 2020 complaint.

In Indiana, the fraudulent concealment doctrine is statutory.  "If a person liable to an action conceals the fact from the knowledge of the person entitled to bring the action, the action may be brought at any time within the period of limitation after the discovery of the cause of action."  Ind. Code § 34-11-5-1.

> Usually, to invoke the protection provided by this statute, the wrongdoer must have actively concealed the cause of action and the plaintiff is charged with the responsibility of exercising due diligence to discover the claims.  The affirmative acts of concealment must be calculated to mislead and hinder a plaintiff from obtaining information by the use of ordinary diligence, or to prevent inquiry or elude investigation.  There must be some trick or contrivance intended by the defrauder to exclude suspicion and prevent inquiry.

*Alldredge v. Good Samaritan Home, Inc.*, 9 N.E.3d 1257, 1262 (Ind. 2014) (internal quotation marks and citations omitted).  Fraudulent concealment will not extend the recovery period here for treble damages claims, however, because concealment cannot toll the limitations period once the States had inquiry notice of their claims.  And as I found above, the States indisputably had inquiry notice of their claims in this case by May 2017, which is more than two years before the filing of the complaint.

b.   Indiana Deceptive Consumer Sales Act

Under the IDCSA, a two-year limitations period applies to claims for damages, and a five-year limitations period applies to claims for injunctive relief and civil penalties.[42]  *See* Ind. Code § 24-5-0.5-5(b).  The parties agree that the injury-occurrence and separate accrual rules apply.  *See id.*; *Emley v. Wal-Mart Stores, Inc.*, No. 1:17-CV-2350, 2019 WL 2642842, at *9 (S.D. Ind. June 27, 2019) ("this is an occurrence statute of limitations to which the discovery rule does not apply").  Claims for damages stemming from purchases that occurred more than two years before the filing of the complaint are time-barred and, like Indiana's antitrust claims, cannot be extended by a finding of fraudulent concealment because the States had inquiry notice by May 2017.

A finding of fraudulent concealment is available for civil penalties under the IDCSA, for which the limitations period is five years.  A genuine dispute exists as to whether the Defendants made false or misleading statements to customers to cover anticompetitive conduct.  A reasonable juror could find that these misrepresentations were calculated "to exclude suspicion and prevent inquiry" into potential anticompetitive conduct and mislead the States (or their residents), despite exercising due diligence, into believing that the unexplained price hikes were a result of ordinary market forces.  Thus, the States are not precluded at this stage from seeking civil penalties for conduct that occurred outside of the limitations period.

For these reasons, the motion for summary judgment as to claims under Indiana law is DENIED.

12. Iowa

Iowa brings claims for injunctive relief and civil penalties under the Iowa Competition Law, as well as for disgorgement, restitution, and other equitable relief under the Iowa Consumer

---

[42] I previously granted Defendants' motion to dismiss *parens patriae* claims under the IDCSA. *Connecticut v. Sandoz, Inc.*, 2024 WL 4753308, at *6.

Fraud Act.  Iowa clarified that it is not pursuing any proprietary or *parens patriae* claims under

Section 714H of the Iowa Consumer Fraud Act.  ECF No. 619-3 at 5; ECF No. 858-1 at 4.

Under Iowa's *nullum tempus* doctrine, "it is well recognized that a statute of limitations

does not run against the state unless specifically provided by statute."  *Fennelly v. A-1 Mach. &*

*Tool Co.*, 728 N.W.2d 163, 168 (Iowa 2006). The Defendants concede that Iowa's claims under

the Consumer Fraud Act are not subject to a limitations period but contend that the Competition

Law's four-year limitations period applies to the claims brought by the State.  Iowa agrees that it

is subject to the limitations period for civil penalties under Iowa Code § 553.16(1) but not for

injunctive relief.

The injury-occurrence rule applies to claims under the Iowa Competition Law, which

requires that it shall be construed to complement and be harmonized with the applied laws of the

United States which have the same or similar purpose.  Iowa Code § 553.2; *see Max 100 L.C. v.*

*Iowa Realty Co.*, 621 N.W.2d 178, 182 (Iowa 2001) ("[S]ection 553.2 explicitly requires us to

consider federal cases construing applicable sections of the Sherman Act when interpreting our

own antitrust statute.").  As noted, claims under federal antitrust law accrue upon injury

occurrence.  I have already found that the most recent overt act occurred within the limitations

period, and so the claims are not time-barred as a matter of law.

Iowa argues that it is permitted to seek civil penalties for the entirety of the alleged conduct

under the entirety rule.  I disagree.  The Iowa Supreme Court has repeatedly found that "[r]ecovery

is limited to those actions accruing during the statutory period . . . preceding the inception of the

current action for damages."  *Hegg v. Hawkeye Tri-Cnty. REC*, 512 N.W.2d 558, 559 (Iowa 1994);

*see also Hallett Constr. Co. v. Meister*, 713 N.W.2d 225, 233 (Iowa 2006) ("Of course, any

recovery under this count would necessarily be limited to sums payable in the five-year period

preceding [the filing of the counterclaim].").  The States cite *Denver Sunset Nursing Home v. City of Denver*, 940 N.W.2d 788 (Iowa Ct. App. 2019), which distinguished those Iowa Supreme Court cases because the plaintiffs had knowledge of the earlier violations, and held that earlier damages could only be obtained when the plaintiff lacked knowledge.  Here, however, the claims accrued upon injury, not discovery.  As a discovery rule case, *Denver Sunset* is inapposite.  The separate accrual rule applies.

To seek civil penalties for violations that occurred before the limitations period, Iowa must rely on fraudulent concealment.  The Iowa Competition Law provides that "[s]uit[s] by the state to assess a civil penalty . . . must be commenced within four years after the cause of action accrues or, if there is fraudulent concealment of this cause of action, within four years after the cause of action becomes known, whichever period is later."  Iowa Code § 553.16.

> To establish whether fraudulent concealment estops a defendant from asserting the statute of limitations, the plaintiff must show by a clear and convincing preponderance of the evidence: (1) [t]he defendant has made a false representation or has concealed material facts; (2) the plaintiff lacks knowledge of the true facts; (3) the defendant intended the plaintiff to act upon such representations; and (4) the plaintiff did in fact rely upon such representations to his [or her] prejudice.

*Skadburg v. Gately*, 911 N.W.2d 786, 798 (Iowa 2018).  Again, a genuine dispute exists as to whether the Defendants made false representations to customers to conceal anticompetitive conduct.  A reasonable juror could find that these false representations prevented the States from discovering their claims if, for instance, such statements misled the States into believing that the unexplained price hikes were a result of normal market behavior.  Thus, the States have raised a genuine dispute of fact as to whether the Defendants fraudulently concealed their conduct until at least May 2017, when the States received responses to their first open-ended subpoenas.  Because I cannot foreclose a finding of fraudulent concealment at the summary judgment stage, the States

are not precluded at this stage from seeking civil penalties for violations that occurred before the limitations period.

For these reasons, the motion for summary judgment as to claims under Iowa law is DENIED.

13. Kansas

Kansas brings proprietary and *parens patriae* claims under its antitrust law. ECF No. 196 ¶ 1899. The Kansas Restraint of Trade Act has a three-year statute of limitations. Kan. Stat. § 60–512(2) ("The following actions shall be brought within three (3) years: . . . An action upon a liability created by statute other than a penalty or forfeiture."); *McCue v. Franklin*, 131 P.2d 704, 707–08 (Kan. 1942). The States, however, argue that the limitations period does not run against the Attorney General, citing *KPERS v. Reimer & Koger Assocs., Inc.*, 941 P.2d 1321, 1333 (Kan. 1997) ("The statute does not run against the state unless expressly so provided, and all doubts as to whether it does so run are to be resolved in favor of the state."). The Defendants concede that the *nullum tempus* doctrine applies to "sovereign" claims, but they argue that the doctrine does not extend to "proprietary or parens patriae relief." ECF No. 621-2 at 4; *see* Kan. Stat. § 60-521 ("As to any cause of action accruing to the state, any political subdivision, or any other public body, which cause of action arises out of any proprietary function or activity, the limitations prescribed in this article shall apply to . . . such public body in the same manner as to actions by private parties."). So Kansas's proprietary claims—those it brings "on behalf of itself and its agencies," ECF No. 196 ¶ 1899—are subject to the three-year limitations period. The remaining question is whether its *parens patriae* claims "arise[] out of any proprietary function or activity," as described in Kan. Stat. § 60-521.

> Governmental functions are those performed for the general public with respect to the common welfare for which no compensation or particular benefit is received. Proprietary functions, on the other hand, are exercised when an enterprise is

> commercial in character or is usually carried on by private individuals or is for the profit, benefit, or advantage of the governmental unit conducting the activity.

*State ex rel. Stovall v. Meneley*, 22 P.3d 124, 146 (Kan. 2001). Kansas courts have found that when the Attorney General brings an action that "arises out of the duty of the attorney general to enforce the Kansas Consumer Protection Act," the state is performing a governmental function, not a proprietary function. *State ex rel. Stephan v. Bhd. Bank & Tr. Co.*, 649 P.2d 419, 423 (Kan. Ct. App. 1982), *review denied,* 232 Kan. 876 (1982). In that case, the court noted "the attorney general is required to enforce the KCPA throughout the state and receive and act on complaints." *Id.* (citing Kan. Stat. § 50-628 ("The attorney general shall . . . [e]nforce this act throughout the state."). The Kansas Restraint of Trade Act has an identical requirement. *See* Kan. Stat. § 50-109 ("The attorney general shall . . . [e]nforce this act throughout the state."). Because the cause of action here arises out of the duty of the Attorney General to enforce the Kansas Consumer Protection Act, the *parens patriae* claims are of a governmental nature. Thus, the claims here are not subject to the statute of limitations.

The parties agree that the discovery rule applies. As I found above, the States indisputably had inquiry notice of their claims by May 2017, which is more than three years before the complaint was filed. Fraudulent concealment is not available once the plaintiff is on inquiry notice. Thus, Kansas's proprietary claims are time-barred as a matter of law.

For these reasons, the motion for summary judgment as to claims under Kansas law is GRANTED as to proprietary claims and DENIED as to *parens patriae* claims.

14. <u>Kentucky</u>

The States argue that the Commonwealth of Kentucky is exempt from the limitations period to bring claims for common-law unjust enrichment as well as claims under the Kentucky Consumer Protection Act ("KCPA").

76

a.   Kentucky Consumer Protection Act

The Kentucky Consumer Protection Act's provisions granting powers to the Attorney General to pursue injunctive relief under Ky. Rev. Stat. § 367.190 and equitable monetary relief under Section 367.200[43] do not refer to a limitations period—unlike the provision for private party actions in Section 367.220.  The question, then, is whether the absence of a limitations period from the Attorney General provisions indicates that no limitations period applies to the Commonwealth's KCPA claims, or whether instead the Commonwealth is subject to the catch-all five-year limitations period in Section 413.120(2) for "[a]n action upon a liability created by statute, when no other time is fixed by the statute creating the liability."

By statute, Kentucky does not generally recognize a *nullum tempus* doctrine.  Ky. Rev. Stat. § 413.150 ("The limitations prescribed in this chapter ["Limitations of Actions"] shall apply to actions brought by or in the name of the Commonwealth the same as to actions by private persons, except where a different time is prescribed by statute.").  Instead, the States point to the language of the KCPA enabling the Attorney General to seek injunctions: "*Whenever* the Attorney General has reason to believe that any person is using, has used, or is about to use any method, act or practice declared by [the KCPA] to be unlawful, and that proceedings would be in the public interest, he may *immediately* move in the name of the Commonwealth" for injunctive relief.  Ky. Rev. Stat. § 367.190 (emphasis added).  I disagree that this language indicates that the Attorney General is not subject to a limitations period.  The States focus on the word "whenever" but ignore

---

[43] *See Com. ex rel. Beshear v. ABAC Pest Control, Inc.*, 621 S.W.2d 705, 706–07 (Ky. Ct. App. 1981) ("the legislature, in enacting KRS 367.200, intended to vest the Attorney General with the authority to seek restitution on behalf of defrauded consumers, and that the authority may be exercised concurrently with his authority to maintain an action for injunctive relief under KRS 367.190").

the word "immediately."[44]  If anything, the language indicates that the Attorney General has a duty to move promptly to seek injunctive relief when he has reason to believe a violation has occurred; this would suggest that Kentucky had to file its claims shortly after the States had inquiry notice, which I have found occurred by May 2017.  Because I disagree that Section 367.190 removes all time limits on actions by the Attorney General and because Kentucky does not recognize *nullum tempus*, I find that the general five-year statute of limitations in Section 413.120(2) applies.

In Kentucky, "the statute begins to run on the date of the discovery of the injury, or from the date it should, in the exercise of ordinary care and diligence, have been discovered." *Hackworth v. Hart*, 474 S.W.2d 377, 379 (Ky. 1971); *see also Hazel v. General Motors Corp.*, 863 F. Supp. 435, 438 (W.D. Ky. 1994) ("Under [Kentucky's] 'discovery rule,' a cause of action will not accrue until the plaintiff discovers, or in the exercise of reasonable diligence should have discovered, not only that he has been injured but also that his injury may have been caused by the defendant's conduct.").  As I found above, because the States have raised a genuine dispute of fact about whether they should have discovered their claims before May 2017, I cannot find on summary judgment that their claims filed in June 2020 were untimely.  And as the Defendants concede that the separate accrual rule does not apply when claims accrue upon discovery, ECF No. 621 at 3 n.3, the States may seek relief for the entirety of the alleged conduct under the KCPA if they can prove that their lawsuit was timely.

---

[44] The Defendants cite *Illinois v. Tri-Star Indus. Lighting, Inc.*, No. 99 C 8156, 2000 U.S. Dist. LEXIS 14948, at *7 (N.D. Ill. 2000), in which the court found that the use of the term "whenever" in Illinois's consumer fraud statute indicated "that there is no statute of limitations on Consumer Fraud Act claims filed by the State."  But whatever the merits of that court's analysis, the statute before it did not instruct the AG to move "immediately."

b.  Unjust enrichment

"An action for relief or damages on the ground of fraud or mistake," including unjust enrichment claims, has a five-year limitations period.  Ky. Rev. Stat. §§ 413.120(11), .150.  The parties agree that the discovery rule applies. *See EQT Prod. Co. v. Big Sandy Co.*, 590 S.W.3d 275, 287 (Ky. Ct. App. 2019).  Thus, for the same reasons discussed for the KCPA, a genuine dispute of fact thus exists as to whether claims filed in June 2020 were timely, and the States may seek relief for the entirety of the alleged conduct.

For these reasons, the motion for summary judgment as to claims under Kentucky law is DENIED.

15. Maine

Maine brings proprietary and *parens patriae* claims under the Maine Monopolies & Profiteering Law ("MMPL").[45]

The Defendants argue that the States' claims under the MMPL are subject to general limitations periods of (1) two years for civil penalties, Me. Rev. Stat. tit. 14, § 858, and (2) six years for other types of relief for its proprietary and *parens patriae* claims, Me. Rev. Stat. tit. 14, § 752.  *See In re Pre-Filled Propane Tank Antitrust Litig.*, No. 14-02567-MD-W-GAF, 2019 WL 4796528, at *6 (W.D. Mo. Aug. 21, 2019) (applying general limitations statutes to private antitrust actions).  The States respond that the Maine Attorney General is exempt from all limitations periods under the state's *nullum tempus* doctrine.  Under this doctrine, "[a] statute of limitations does not apply against the State unless the State is expressly named therein, or in some manner it is specifically so stated."  *State v. Crommett*, 116 A.2d 614, 616 (Me. 1955) (citing *Topsham v.*

---

[45] The parties do not dispute for the purposes of this motion that Maine has the authority to bring *parens patriae* claims under the MMPL, and so I do not address the issue here.  Earlier in this case, I declined to dismiss Maine's *parens patriae* claims after finding they were not clearly barred under state law.  *Connecticut v. Sandoz, Inc.*, 2024 WL 4753308, at *8.

*Blondell*, 19 A. 93, 94 (Me. 1889)).  "In the absence of express words *most explicitly requiring it*, the court cannot hold that the legislature intended to subject the sovereign state to such liabilities." *Id.*

> Maine's general limitations provision governing penal claims states:
>
> Actions for any penalty or forfeiture on a penal statute, brought by a person to whom the penalty or forfeiture is given in whole or in part, shall be commenced within one year after the commission of the offense. *If no person so prosecutes*, it may be recovered by civil action, indictment or information in the name and for the use of the State at any time within 2 years after the commission of the offense, and not afterwards.

Me. Rev. Stat. tit. 14, § 858 (emphasis added).[46]  The MMPL only authorizes civil penalties in claims brought by the Attorney General.  Me. Rev. Stat. tit. 10, § 1104.  The States argue that the phrase "[i]f no person so prosecutes" indicates that the statute only applies "to claims brought by the State on behalf of persons who themselves did not prosecute a claim to a penalty or forfeiture," and not to "penalties claims held by and brought by the State in its own right."  ECF No 619-3.  I agree.  The second sentence—the only one that would purport to impose a limitations period on the State in non-proprietary matters—is plainly conditional on another person's—not the state's— decision not to prosecute.  As a result, I find that Section 858 does not apply to actions for civil penalties brought by the Attorney General, and that the State's *nullum tempus* doctrine applies instead.

The Defendants do not point to any case law in which Maine courts have addressed any distinction regarding the applicability of the *nullum tempus* doctrine to proprietary or *parens patriae* claims, or any relevant statute that "most explicitly requir[ed]" the statute of limitations to apply against the State.  *Crommett*, 116 A.2d 614, 616.  Thus, I cannot find that the Maine

---

[46] The MMPL provision covering civil penalties, Me. Rev. Stat. tit. 10 § 1104(3), is a penal statute because "the statutory recovery is not connected to the amount . . . of actual damages."  *Denutte v. U.S. Bank*, N.A., 213 A.3d 619, 625 (Me. 2019).

legislature intended to subject any claims brought by the Attorney General to the statute of limitations.

As none of the States' claims under the MMPL are subject to statutes of limitations, the motion for summary judgment as to claims under Maine law is DENIED.

16. <u>Maryland</u>

The parties agree that a four-year limitations period applies to the States' claims under the Maryland Antitrust Act, Md. Code, Com. Law § 11-209(d)(1), and that the discovery rule applies. *Windesheim v. Larocca*, 116 A.3d 954, 962 (Md. 2015) (discovery rule "generally applicable in all civil actions"). Under the discovery rule, "limitations begin to run when a claimant gains knowledge sufficient to put her on inquiry. As of that date, she is charged with knowledge of facts that would have been disclosed by a reasonably diligent investigation." *Lumsden v. Design Tech Builders, Inc.*, 749 A.2d 796, 801 (Md. 2000). Again, a genuine dispute exists as to whether the States had knowledge of the claims sufficient to put them on inquiry notice before May 2017, when they received responses to their first open-ended subpoenas. Because this is within the four-year limitations period, the claims are not time-barred as a matter of law.

As the Defendants concede that the separate accrual rule does not apply when claims accrue upon discovery, ECF No. 621 at 3 n.3, the States may seek relief for the entirety of the alleged conduct under the Maryland Antitrust Act if they can prove that their lawsuit was timely.

For these reasons, the motion for summary judgment as to claims under Maryland law is DENIED.

17. <u>Massachusetts</u>

A four-year limitations period applies to all claims under the Massachusetts Consumer Protection Act. Mass. Gen. Laws ch. 260, §§ 5A, 18 ("The limitations . . . shall apply to actions brought by or for the commonwealth."). The parties agree that the discovery rule applies.

*Paterson-Leitch Co. v. Mass. Mun. Wholesale Elec. Co.*, 840 F.2d 985, 994 (1st Cir. 1988) ("actions which implicate Mass. Gen. Laws ch. 260, § 5A accrue when plaintiff knows or reasonably should have known of harm attributable to a defendant's conduct"). Again, a genuine dispute exists as to whether the States had knowledge of the claims sufficient to put them on inquiry notice before May 2017, when they received responses to their first open-ended subpoenas. Because this is within the four-year limitations period, the claims are not time-barred as a matter of law.

As the Defendants concede that the separate accrual rule does not apply when claims accrue upon discovery, ECF No. 621 at 3 n.3, the States may seek relief for the entirety of the alleged conduct under the Massachusetts Consumer Protection Act if they can prove that their lawsuit was timely.

For these reasons, the motion for summary judgment as to claims under Massachusetts law is DENIED.

### 18. Michigan

Michigan brings claims for "injunctive relief and other equitable relief (including but not limited to disgorgement), civil penalties, [and] damages," "on behalf of itself, its State Agencies, and as parens patriae on behalf of natural persons" under the Michigan Antitrust Reform Act ("MARA").[47] ECF No. 196 ¶¶ 1930, 1931. A four-year limitations period applies to Michigan's claims. Mich. Comp. Laws § 445.781 (barring actions "if not commenced within 4 years after the claim of relief or cause of action accrues"); *see* ECF No. 619-8 at 4, 858-1 at 7 (Michigan agreeing the statute applies to its MARA claims). The parties agree that the injury-occurrence accrual rule applies. Although in Michigan the rule might be more aptly described as "wrong-occurrence,"

---

[47] As noted, I previously dismissed claims under the Michigan Consumer Protection Act, *see* ECF No. 489, and so I do not address those claims here.

*see Nelson v. Ho*, 564 N.W.2d 482 (Mich. Ct. App. 1997) ("[A] claim accrues at the time the wrong upon which the claim is based was done, regardless of the time damage results." (citing Mich. Comp. Laws § 600.5827)), it makes no difference here because each sale at a conspiracy-driven price is an antitrust violation—a wrong—and coincides with a purchase—an injury.

Michigan no longer recognizes the entirety rule, which Michigan calls the "continuing violations" doctrine. *Garg v. Macomb Cnty. Cmty. Mental Health Servs.*, 696 N.W.2d 646, 662 (Mich. 2005) ("We conclude that the 'continuing violations' doctrine is contrary to the language of § 5805 and has no continued place in the jurisprudence of this state."). The States argue that *Garg* is limited to claims arising under Michigan's general limitations law, Mich. Comp. Laws § 600.5805, but that the doctrine is still available to its claims under MARA, which has its own limitations provisions for claims brought by the Attorney General, § 445.781. I disagree. In *Garg*, the Michigan Supreme Court cited § 600.5827, the same law that provides the rule of accrual here, as the source of the accrual date, and noted that no language in § 600.5805 "permits a plaintiff to recover for injuries outside the limitations period when they are susceptible to being characterized as 'continuing violations.' To allow recovery for such claims is simply to extend the limitations period beyond that which was expressly established by the Legislature." 696 N.W.2d at 658 (2005). The same rationale applies to § 445.781, as MARA does not specify that the limitations period may be extended. The States also argue that MARA should be construed in harmony with the federal antitrust laws, as provided by Mich. Comp. Laws § 445.784. But nothing in the federal antitrust laws indicates that claims of the type here, where each purchase of a Defendant's product at conspiracy-driven prices represents a discrete injury, permits a plaintiff to recover for the entirety of the alleged conduct. The claims here are subject to the separate accrual rule; the States may seek relief only for injuries incurred within the limitations period.

The States also argue that the Defendants' fraudulent concealment tolled the date on which their claims accrued, but I disagree. "Under Michigan law, the statute of limitations will not be tolled absent some proof of conduct constituting fraudulent concealment." *Robinson v. Nat'l Collegiate Athletic Ass'n*, No. 2:24-CV-12355, 2025 WL 2773123, at *12 (E.D. Mich. Sept. 26, 2025 (internal quotation marks omitted). If fraudulent concealment is shown, a plaintiff must file suit within two years from the date he "discovers, or should have discovered, the existence of the claim or the identity of the person who is liable for the claim." Mich. Comp. Laws § 600.5855. Under the statute, "the plaintiff must be held chargeable with knowledge of the facts, which it ought, in the exercise of reasonable diligence, to have discovered." *Barry v. Detroit Terminal R.R. Co.*, 11 N.W.2d 867, 870 (Mich.1943); *see also CH Holding Company v. Miller*, No. 293686, 2011 WL 5008573, at *5 (Mich. Ct. App. Oct. 20, 2011) ("The plaintiff is also charged with the discovery of facts that, with the exercise of reasonable diligence, he ought to have discovered."). I have found that the States, in exercising reasonable diligence, ought to have discovered their claims no later than May 2017, but the complaint was not filed until June 2020. Thus, fraudulent concealment is not available to toll the States' MARA claims; the States may recover damages under MARA only as far back as June 2016.

For these reasons, the motion for summary judgment as to claims under the Michigan Antitrust Reform Act is DENIED.

### 19. Minnesota

Minnesota pursues both proprietary and *parens patriae* claims under the Minnesota Antitrust Law, the Minnesota Uniform Deceptive Trade Practices Act, and the common law of unjust enrichment.

a. Minnesota Antitrust Law

A four-year limitations period applies to claims under the Minnesota Antitrust Law. *See* Minn. Stat. § 325D.64(1) ("An action under [the Act] shall be forever barred unless commenced within four years of the date upon which the cause of action arose."). The parties disagree about when a claim accrues. The States argue that the discovery rule applies because claims "for relief on the ground of fraud" accrue upon "the discovery by the aggrieved party of the facts constituting the fraud." Minn. Stat. § 541.05, subd. 1(6). As the Defendants point out, however, this rule is not specific to antitrust law. *See* ECF No. 621-2 at 6 n.28. And because "Minnesota courts consistently follow federal law in interpreting the Minnesota antitrust statutes," *Am. Computer Tr. Leasing v. Jack Farrell Implement Co.*, 763 F. Supp. 1473, 1491 (D. Minn. 1991), I conclude that claims under the Minnesota Antitrust Law accrue upon injury-occurrence. *See also Lorix v. Crompton Corp.*, 736 N.W.2d 619, 626 (Minn. 2007) ("Minnesota antitrust law is generally interpreted consistently with federal antitrust law," but noting that Minnesota is not required to follow federal antitrust law and departing from federal law with respect to antitrust standing).

For all their Minnesota claims, the States seek to recover for the entirety of the alleged conduct, and the Minnesota Antitrust Law in particular contemplates continuing violations. Minn. Stat. § 325D.64(1) ("For the purpose of this section, a cause of action for a continuing violation is deemed to arise at any time during the period of the violation."). Although the statute recognizes the continuing violation doctrine, it does not specify which version of the doctrine—the separate accrual rule or the entirety rule—is contemplated. Because the statute is generally interpreted consistently with federal antitrust law, I apply the separate accrual rule, which better fits with the injury-occurrence rule in this case, where the alleged injuries occurred each time consumers purchased the Defendants' products at inflated, conspiracy-driven prices. Because the sales represent discrete acts, the entirety rule does not apply.

To recover for injuries incurred before the limitations period, Minnesota must rely on fraudulent concealment to toll the statute of limitations. "Under the doctrine of fraudulent concealment, the statute of limitations does not run while the defendant 'fraudulently conceals from the plaintiff the facts constituting a cause of action.'" *Nerad v. Magnus*, No. A23-0508, 2023 WL 8539599, at *4 (Minn. Ct. App. Dec. 11, 2023) (quoting *Minn. Laborers Health & Welfare Fund v. Granite Re, Inc.*, 844 N.W.2d 509, 514 (Minn. 2014)). "The party claiming fraudulent concealment has the burden of showing that the concealment could not have been discovered sooner by reasonable diligence on her part and was not the result of her own negligence." *Collins v. Johnson*, 374 N.W.2d 536, 541 (Minn. Ct. App. 1985). "[T]he concealment must be fraudulent or intentional." *Id.* As noted above, the States have identified a genuine dispute as to whether the Defendants concealed their cause of action by making false or misleading statements to customers. A finding by the jury of fraudulent concealment would permit the States to seek relief for a period before June 10, 2016.

### b. Minnesota Common Law Unjust Enrichment

A six-year limitations period applies to Minnesota's unjust enrichment claims. Minn. Stat. § 541.05(5); *see Weavewood, Inc. v. S & P Home Inv., LLC*, 821 N.W.2d 576, 581 (Minn. 2012). Although the States argue that these claims accrue upon discovery, case law informs that the limitations period "begins to run when the right of action accrues and when damage occurs." *In re Est. of Herbert*, No. A25-0124, 2025 WL 2304835, at *1 (Minn. Ct. App. Aug. 4, 2025) (*quoting Block v. Litchy*, 428 N.W.2d 850, 854 (Minn. App. 1988)). Here, injuries occurred each time consumers purchased the Defendants' products at allegedly inflated, conspiracy-driven prices. *See Block v. Litchy*, 428 N.W.2d 850, 854 (Minn. Ct. App. 1988) (unjust enrichment plaintiff who made successive overpayments for property "was damaged and had a cause of action for unjust

enrichment when she began overpaying").[48]  As above, however, a finding by the jury of fraudulent concealment would permit the States to seek relief for a period before June 10, 2014.

c.  Minnesota Uniform Deceptive Trade Practices Act

The parties agree that a six-year limitations period applies to claims for damages and injunctive relief under the Minnesota Deceptive Trade Practices Act.  Minn. Stat. § 541.05(2); *see Parkhill v. Minn. Mut. Life Ins. Co.*, 174 F. Supp. 2d 951, 956 (D. Minn. 2000).  They disagree, however, on the limitations period for civil penalties under the Act: the States argue the period is six years, like all other relief available under the act; the Defendants submit that a two-year limitations period applies to claims brought under a "statute for a penalty."  Minn. Stat. § 541.07(2).  The Defendants argue that "Minnesota brings an action to recover civil penalties for each purported statutory violation, regardless of the actual harm suffered by private parties, rendering the claim penal in nature and resulting in the application of the separate two-year limitations period for civil penalties."  ECF No. 621-2 at 6 n.30.  I agree with the Defendants.

The Supreme Court of Minnesota has "identified two important principles to define the term penalty for statute of limitations purposes.  First, a penalty includes punishment for a public offense rather than incident to the redress of a private wrong. . . . Second, . . . a penalty is unrelated to the extent of actual damages."  *McDaniel v. United Hardware Distrib. Co.*, 469 N.W.2d 84, 87 (Minn. 1991) (citing *Freeman v. Q Petroleum Corp.*, 417 N.W.2d 617 (Minn. 1988)).  Both principles apply here.  The complaint alleges that the Defendants violated the Act "[e]ach time" a Defendant failed to disclose an anticompetitive agreement, submitted uncompetitive bids, or provided false or misleading statements.  The Attorney General brought these claims to redress a

---

[48] The language of *Block* suggests that the separate accrual rule may not apply to the unjust enrichment claim, which may run—as to all overpayments—from the date of the first overpayment.  The parties have not specifically briefed this issue, however, and so I decline to address it here.

public wrong.  *See id.* ("whether a statute is penal . . . depends on whether the statute redresses a public or a private wrong").  And the claims seek to punish the Defendants without regard to whether "each" instance of unlawful conduct resulted in actual damages.  Moreover, even though the Act does not set a specific amount of penalty for each statutory violation, any civil penalty that the court imposed would be in addition to any damages.  I find that the States' claims for civil penalties are actions "upon a statute for a penalty," and thus, the two-year limitations period under Minn. Stat. § 541.07(2) applies.

The States' arguments to the contrary are unconvincing.  The case they rely upon, *Estate of Riedel by Mirick v. Life Care Ret. Communities, Inc.*, 505 N.W.2d 78 (Minn. Ct. App. 1993), involved claims other than civil penalties brought by a private party under the Consumer Fraud Law, which "allows recovery only by persons injured by a violation" for non-injunctive relief, and under which "the plaintiff may not recover anything separate from or additional to its damages and costs." *Id.* at 82.  In contrast, the claims here are not to redress a private wrong, and any civil penalty that I imposed would be on top of damages.

I also agree with the Defendants that accrual begins upon injury-occurrence.  *See Curtis v. Altria Grp., Inc.*, 792 N.W.2d 836, 861 (Minn. Ct. App. 2010) (acknowledging the parties agreed that "consumer-protection actions accrue when the violation occurs"), *rev'd on other grounds*, 813 N.W.2d 891 (Minn. 2012).  As before, the separate accrual rule applies, and a finding by the jury of fraudulent concealment would permit the States to seek relief for a period before June 10, 2014 with respect to their claims for damages.  *See id.* ("fraudulent concealment tolls the running of the statute of limitations because the legislature has not expressed intent to the contrary").  The States cannot invoke fraudulent concealment, however, to toll their claims for civil penalties, because

they were on inquiry notice before June 2018, i.e., two years before they filed this action.  The civil penalty claims are limited to violations occurring in the two years before June 10, 2020.

For these reasons, the motion for summary judgment as to claims under Minnesota law is DENIED.

### 20. Mississippi

Mississippi's *nullum tempus* statute reads: "Statutes of limitation in civil cases shall not run against the state, or any subdivision or municipal corporation thereof . . . ."  Miss. Code § 15-1-51.  Unlike the Kansas statute that I analyzed above, Mississippi's statute does not differentiate between types of claims brought by the state.  Rather, as I noted at oral argument, it exempts *any* claim the state brings in a civil suit in which it is a party.  *See* ECF No. 870 at 66–68.  Because Mississippi is not subject to any statute of limitations, the motion for summary judgment as to claims under Mississippi law is DENIED.

### 21. Montana

The Montana legislature recently amended the Montana Unfair Trade Practices & Consumer Protection Act to add: "The department [of justice] may bring an action within 5 years on discovery of the method, act, or practice that is declared unlawful by [the Act]."  Mont. Code § 30-14-111; *see* 2025 Mont. Laws, ch. 199, § 2 (S.B. No. 488).  The amendment went into effect on April 17, 2025.  Montana filed a notice of supplementary authority in which it noted that "Montana law presumes re[tro]active applicability of statutes of limitations in the civil context," citing *Cosgriffe v. Cosgriffe*, 864 P.2d 776, 779 (Mont. 1993).  ECF No. 860 at 2 n.1.  I agree, and the Defendants have not objected or argued otherwise.  Thus, a five-year limitations period applies to the States' claims brought under Montana law.

The parties agree that the discovery rule applies.  Mont. Code § 27-2-102(3) ("The period of limitation does not begin on any claim or cause of action for an injury to person or property

until the facts constituting the claim have been discovered or, in the exercise of due diligence, should have been discovered by the injured party if: (a) the facts constituting the claim are by their nature concealed or self-concealing; or (b) before, during, or after the act causing the injury, the defendant has taken action which prevents the injured party from discovering the injury or its cause.").  As I found above, the earliest that the States, in exercising due diligence, had indisputable notice that they had been injured by alleged anticompetitive conduct related to any of the drugs at issue was in May 2017, when the CTAG received responses to its first open-ended subpoenas.  A genuine dispute exists as to whether the Defendants' false or misleading statements to customers could have prevented the States, despite exercising due diligence, from discovering that the prices paid by residents were a result of anticompetitive conduct, rather than ordinary market forces.  Alternatively, a reasonable juror could also find that the conduct alleged here was self-concealing.  *See Christian*, 358 P.3d at 160 (Wheat, J., concurring in part and dissenting in part) ("The question dispositive to ARCO's defense is whether this information was sufficiently self-concealing, or presented in such a way to persuade the Appellants that they had nothing to fear or had not been injured.  The answer to this question is fact intensive and should be decided by the jury.").  Because the States filed their claim within five years of May 2017, there is at least a genuine dispute of fact as to whether the claims under Montana law are timely.

As the Defendants concede that the separate accrual rule does not apply when claims accrue upon discovery, ECF No. 621 at 3 n.3, the States may seek relief for the entirety of the alleged conduct under the Montana Unfair Trade Practices & Consumer Protection Act if they can prove that their lawsuit was timely.

For these reasons, the motion for summary judgment as to claims brought under Montana law is DENIED.

22. <u>Nebraska</u>

The States bring claims under both the Nebraska Consumer Protection Act and its antitrust law, the Junkin Act.  A four-year limitations period applies to claims brought under both laws.  Neb. Rev. Stat. §§ 25-206, 59-801, 59-1612.

The parties disagree about when claims under either law accrue.  The Nebraska Supreme Court has cabined its application of the discovery rule.  *See, e.g.*, *Mandolfo v. Mandolfo*, 796 N.W.2d 603, 610 (Neb. 2011) (declining to apply discovery rule to case involving negotiable instruments).  The States have not identified a Nebraska case applying the discovery rule to a consumer protection claim or an antitrust claim.  I therefore decline to do so here, and I find that the injury-occurrence rule applies.  The Junkin Act is intended to be harmonized with federal law, Neb. Rev. Stat. § 59-829, which, as discussed above, applies the injury-occurrence rule.  For the same reason, I apply the separate accrual rule, under which the States' claims accrued with each purchase at an inflated, conspiracy-driven price, which for most drugs continued up to the filing of the complaint.  Nebraska can seek relief under the Nebraska Consumer Protection Act for purchases made within four years of the filing of the complaint.

The States argue that the entirety rule applies and allows for recovery for all alleged wrongdoing.  I disagree.  Nebraska recognizes the "continuing tort" doctrine but has specifically categorized it as "rule of separate accrual."  *Alston v. Hormel Foods Corp.*, 730 N.W.2d 383–84 (Neb. 2007) (concluding "that a claim for damages caused by a continuing tort can be maintained for injuries caused by conduct occurring within the statutory limitations period").

Nebraska can rely on fraudulent concealment to recover for injuries incurred before June 10, 2016.  *See Mandolfo*, 796 N.W.2d at 612 (noting that fraudulent concealment may benefit a plaintiff even if the discovery rule does not apply).  Through the evidence summarized above, including statements to customers about "supply," the States have raised a genuine dispute of fact

as to whether the Defendants induced the States to delay filing their claim, and, if so, when the States discovered or should have discovered that evidence had been concealed.

The motion for summary judgment as to claims under Nebraska law is DENIED.

23. <u>Nevada</u>

Four-year limitations periods apply to the States' claims for all types of relief under the Nevada Deceptive Trade Practices Act ("NDTPA") as well as its antitrust act, the Nevada Unfair Trade Practices Act ("NUTPA").  Nev. Rev. Stat. §§ 11.190(2)(d); 598A.220.[49]  These same provisions also indicate that the discovery rule applies.  Under the NDTPA, the claim does not accrue until "the aggrieved party discovers, or by the exercise of reasonable diligence, should have discovered, the facts constituting the deceptive trade practice."  Nev. Rev. Stat. § 11.190(2)(d).  The NUTPA claims here accrue when "the plaintiff discovers, or by the exercise of reasonable diligence, should have discovered the facts relied upon for proof of the conspiracy."  Nev. Rev. Stat. § 598A.220(1).  A genuine dispute exists as to whether the States, despite exercising reasonable diligence, could have discovered the facts they rely on for their claims before May 2017, when they received responses to their first open-ended subpoenas.  Because this is within the four-year limitations period, the claims are not time-barred as a matter of law.

As the Defendants concede that the separate accrual rule does not apply when claims accrue upon discovery, ECF No. 621 at 3 n.3, the States may seek relief for the entirety of the alleged conduct under Nevada law if they can prove that their lawsuit was timely.

---

[49] The Defendants note that the Nevada legislature in 2021 amended the NDTPA to exempt claims brought by the Attorney General from the limitations period, but that the amendment does not apply retroactively.  The States do not dispute this, and so I find that the four-year limitations period applies to the claims here.

For these reasons, the motion for summary judgment as to claims under Nevada law is DENIED.

### 24. New Hampshire

The States bring claims under the New Hampshire Antitrust Act and the New Hampshire Consumer Protection Act as well as common law claims for unjust enrichment.

#### a. New Hampshire Antitrust Act

A four-year limitations period applies to claims brought by the Attorney General under the New Hampshire Antitrust Act. N.H. Rev. Stat. § 356:12. The injury-occurrence rule applies because the Act directs that "[i]n any action or prosecution under this chapter, the courts may be guided by interpretations of the United States' antitrust laws." N.H. Rev. Stat. § 356:14; *see also Minuteman, LLC v. Microsoft Corp.*, 795 A.2d 833, 836 (N.H. 2002) ("While judicial review of our antitrust law is sparse, both we and the United States District Court for the District of New Hampshire have looked to federal law when construing RSA chapter 356."). The New Hampshire Antitrust Act, then, is not silent as to the accrual rule, but instead its reference to accrual of the "cause of action" should be interpreted in accordance with federal antitrust law. And in the absence of any decision by New Hampshire courts applying the discovery rule to the New Hampshire Antitrust Act, I find the injury-occurrence rule applies as it does under federal antitrust law. As I found above, claims accrued with each purchase at an allegedly inflated, conspiracy-driven price, which for most drugs continued up to the filing of the complaint. New Hampshire can seek relief for purchases made within four years of that filing.

New Hampshire may rely on fraudulent concealment to recover for injuries incurred before the limitations period. "[T]he fraudulent concealment rule states that when facts essential to the cause of action are fraudulently concealed, the statute of limitations is tolled until the plaintiff has discovered such facts or could have done so in the exercise of reasonable diligence." *Furbush v.*

*McKittrick*, 821 A.2d 1126, 1130 (N.H. 2003) (quoting *Bricker v. Putnam,* 512 A.2d 1094, 1096 (N.H. 1986)).  The rule does not apply "if the plaintiff knew, or in the exercise of reasonable diligence should have discovered the causal relationship between the defendants' [conduct] and the harm caused." *Beane v. Dana S. Beane & Co., P.C.*, 7 A.3d 1284, 1290 (N.H. 2010) (internal quotation marks omitted).  Through the allegations summarized above, including allegedly misleading or untrue statements to customers, the States have raised a dispute as to whether, despite exercising reasonable diligence, they should have discovered that the Defendants' anticompetitive conduct was the source of their injuries.

### b. New Hampshire Common Law Unjust Enrichment and New Hampshire Consumer Protection Act

I analyze New Hampshire's common law unjust enrichment and Consumer Protection Act claims together because three-year limitations periods apply and each accrues upon *actual* notice. *See* N.H. Rev. Stat. § 508:4-h.  As discussed, the States have raised a genuine dispute of fact about whether they had *inquiry* notice of their claims before May 2017, after the CTAG received responses to its first open-ended subpoenas.  Inquiry notice, however, includes constructive knowledge—it focuses on when the plaintiff obtained information that would reasonably lead him it to investigate potential claims.  Actual notice, on the other hand, "is synonymous with knowledge." *Rosebud LMS Inc. v. Adobe Sys. Inc.*, 812 F.3d 1070, 1074 (Fed. Cir. 2016) (citing 58 Am. Jur. 2d *Notice* § 4 (2015) ("[a]ctual notice rests upon personal information or knowledge while constructive notice is notice that the law imputes to a person not having personal information or knowledge")).  The mere receipt of the Defendants' responses—the details of which are not in the record—does not show that the States knew at that time that they had causes of action against the Defendants for consumer protection violations and unjust enrichment.  The States, meanwhile, argue that they "were unable to learn of their claims until after the States had engaged in extensive

investigatory efforts (including help from cooperating witnesses)", ECF No. 619 at 13, and that

the cooperation agreements were signed between January and September 2019.  Because whether

a party had actual notice is a question of fact, 58 Am. Jur. 2d *Notice* § 38, and the States have

raised a genuine dispute as to whether they had actual notice before 2019, within the three-year

limitations period, I cannot find as a matter of law that the claims are untimely.

The motion for summary judgment as to claims under New Hampshire law is DENIED.

25. New Jersey

The States bring claims under both the New Jersey Antitrust Act and the New Jersey

Consumer Fraud Act.

a.   New Jersey Antitrust Act

The New Jersey Antitrust Act includes a four-year limitations period.  N.J. Stat. § 56:9-14.

The States argue that this limitations period does not specifically override the ten-year limitations

period that applies to actions brought by the State.   The ten-year limitations period applies

"[e]xcept where a limitations provision expressly and specifically applies to actions commenced

by the State."  N.J. Stat. § 2A:14-1.2.  The New Jersey Antitrust Act includes no such express

application to the State, and so I find that the ten-year limitations period applies to actions brought

by the State under the Act.  *See State Dep't of Env't Prot. v. Caldeira*, 794 A.2d 156, 164 (N.J.

2002) (holding that a different statute's limitations period did "not expressly and specifically apply

to the State").

To the extent the States allege they suffered any injuries more than ten years before the

filing of the complaint, *see* ECF No. 196 ¶¶ 1, 8 (alleging Defendants colluded from as early as

2009), claims under the Act accrue upon inquiry notice.  *See Lopez v. Swyer*, 300 A.2d 563, 565–

66 (N.J. 1973) ("[A] cause of action will be held not to accrue until the injured party discovers, or

by an exercise of reasonable diligence and intelligence should have discovered that he [or she]

may have a basis for an actionable claim. . . . [Our decisions] have acknowledged the relevance of the [discovery rule] whenever equity and justice have seemed to call for its application."). The Defendants do not contend the States were on inquiry notice before 2012; thus, claims under the New Jersey Antitrust Act are timely.

### b. New Jersey Consumer Fraud Act

A ten-year limitations period similarly applies to claims under the New Jersey Consumer Fraud Act, which does not specifically provide for a limitations period for actions commenced by the Attorney General. *See* N.J. Stat. § 2A:14-1.2(a). The Defendants argue that claims under the New Jersey Consumer Fraud Act accrue upon injury occurrence, citing *Caride v. Young*, No. A-5419-17T4, 2019 WL 5491347 (N.J. Super. Ct. App. Div. Oct. 25, 2019). I disagree. In *Caride*, the court declined to give "the benefit of the discovery rule" because the state banking commissioner failed to show that use of the discovery rule, which the court described as "a rule of equity," was necessary to avoid "harsh results." *Id.* at *5. But the court did not reject the discovery rule for all types of claims that might arise under the statutes involved in that case. *See id.* I read *Caride* as a decision based on the factual circumstances of that case, rather than demonstrating a rule transferrable to this case. The discovery rule applies. *See, e.g.*, *Catena v. Raytheon Co.*, 145 A.3d 1085, 1092–93 (N.J. App. Div. 2016) (applying discovery rule to claims under Consumer Fraud Act); *Belmont Condo. Ass'n, Inc. v. Geibel*, 74 A.3d 10, 29 (N.J. App. Div. 2013) (same). Thus, for the same reasons as above, the States' claims under the New Jersey Consumer Fraud Act are timely.

As the Defendants concede that the separate accrual rule does not apply when claims accrue upon discovery, ECF No. 621 at 3 n.3, the States may seek relief for the entirety of the alleged conduct under New Jersey law if they can prove that their lawsuit was timely.

The motion for summary judgment as to claims under New Jersey law is DENIED.

26. <u>New Mexico</u>

New Mexico brings claims under the New Mexico Antitrust Act and the New Mexico Unfair Practices Act ("NMUPA") as well as common-law claims for unjust enrichment. The States concede that a four-year limitations period applies to their Antitrust Act claims, *see* N.M. Stat. § 57-1-12, but argue that their NMUPA and common-law claims are not subject to any limitations period. New Mexico recognizes the *nullum tempus* doctrine. *Bd. of Educ., Sch. Dist. 16, Artesia, Eddy Cty. v. Standhardt*, 458 P.2d 795, 801 (N.M. 1969) ("the general rule [is] that statutes of limitations do not run against the state unless the statute expressly includes the state or does so by clear implications"); *see State of N.M. Uninsured Employers' Fund v. Gallegos*, 395 P.3d 533, 542 (N.M. Ct. App. 2017). The NMUPA, unlike the Antitrust Act, does not contain its own limitations period; courts have instead applied the general four-year limitations period for actions for relief upon the ground of fraud under N.M. Stat. § 37-1-4. *See Nance v. L.J. Dolloff Assocs., Inc.*, 126 P.3d 1215, 1220 (N.M. Ct. App. 2005); *Salazar v. Indymac Bank, F.S.B.*, No. 12CV1182, 2013 WL 11955290, at *9 (D.N.M. Feb. 28, 2013) (applying same to unjust enrichment claim). This general limitations period does not explicitly refer to the state; as such, the *nullum tempus* doctrine applies.

The Defendants cite *Meta Platforms, Inc.*, 66 F.4th at 298, in arguing that *nullum tempus* does not apply to New Mexico's claims for proprietary and *parens patriae* relief. I disagree. Unlike the courts in, for example, Kansas, the courts in New Mexico have not distinguished between proprietary actions and sovereign actions. To the contrary, it appears that New Mexico courts apply *nullum tempus* in the absence of a statute of limitations expressly including the State even in proprietary cases. *See In re Bogert's Will*, 329 P.2d 1012, 1026–27 (N.M. 1958) (statute prescribing time for filing claims against probate estate did not run against board of state hospital seeking recovery for costs of care of decedent). Accordingly, New Mexico's *nullum tempus*

doctrine applies to all types of claims under the NMUPA as well as common-law claims for unjust enrichment.

As for the Antitrust Act, the parties agree that the discovery rule applies.  N.M. Stat. § 57-1-12 (Attorney General's claims accrue "after the plaintiff discovered, or by the exercise of reasonable diligence should have discovered, the facts relied upon for proof of the cause of action, whichever is later").  I found above that the earliest that the States, despite exercising reasonable diligence, had indisputable notice of antitrust violations related to any of the drugs at issue was in May 2017, when the CTAG received responses to its first open-ended subpoenas.  Because this is within four years of the filing of the complaint, the States have raised a genuine dispute about whether their claims under the New Mexico Antitrust Act are timely.

As the Defendants concede that the separate accrual rule does not apply when claims accrue upon discovery, ECF No. 621 at 3 n.3, the States may seek relief for the entirety of the alleged conduct under the New Mexico Antitrust Act if they can prove that their lawsuit was timely.

For these reasons, the motion for summary judgment as to claims brought under New Mexico law is DENIED.

### 27. New York

Under New York's antitrust act, the Donnelly Act, a four-year limitations period applies to claims for damages and a three-year limitations period applies to claims for civil penalties.  N.Y. Gen. Bus. Law §§ 340, 342-a.  A six-year limitations period applies to *parens patriae* claims for fraudulent and illegal conduct in violation of New York Executive Law § 63(12).[50]  *See* N.Y. C.P.L.R. § 213(9).

---

[50] I previously dismissed New York's claims for damages under § 342 of the Donnelly Act and its claims on behalf of New York state entities under § 342-b.  *Connecticut v. Sandoz, Inc.*, 2024 WL 4753308, at *18 (D. Conn. Nov. 12, 2024).

The injury-occurrence rule applies under the Donnelly Act (the substantive provisions of which also supply the basis for the claim under Executive Law 63(12)).  *See SL-x IP S.a.r.l. v. Bank of Am. Corp.*, No. 18-CV-10179 (RJS), 2021 WL 4523711, at *8 (S.D.N.Y. Sept. 30, 2021), *aff'd sub nom.*, *SL-x IP S.a.r.l. v. Merrill Lynch, Pierce, Fenner & Smith Inc.*, No. 21-2697, 2023 WL 2620041 (2d Cir. Mar. 24, 2023) ("In the context of a continuing conspiracy to violate the antitrust laws . . . each time a plaintiff is injured by an act of the defendants[,] a cause of action accrues to him . . . [and] the statute of limitations runs from the commission of the act.").  The States cite *People ex rel. Cuomo v. Liberty Mutual Insurance Co.*, 861 N.Y.S.2d 294, 296 (NY App. Div. 2008) to argue that their claims did not accrue until they discovered the conduct and that, as a result, they can recover damages going back to the beginning of the alleged antitrust violations.  *See* ECF No. 619 at 35; ECF No. 619-4 at 14.  But the case does not say that.  It refers to fraudulent concealment, citing a federal case, *State of New York v. Hendrickson Bros., Inc.,* 840 F.2d 1065, 1083 (2d Cir. 1988); as the Defendants note, fraudulent concealment pertains to tolling rather than accrual.

The separate accrual rule applies because the Donnelly Act is generally construed in accordance with federal antitrust law.  *Williams v. Citigroup Inc.*, 659 F.3d 208, 211 n.2 (2d Cir. 2011).  Therefore, absent a finding of fraudulent concealment, the States may seek relief only for purchases made within the limitations period.

Because the damages claim under Executive Law § 63(12) is based on alleged violations of the Donnelly Act, the Defendants might have argued that I should analyze the issue under the four-year statute of limitations under the Donnelly Act rather than the six-year limitations period applicable to the Executive Law § 63(12) claim.  But they have not made that argument, and I do

not address it.  Instead, I assume that the *parens patriae* damages claims under Executive Law § 63(12) based on alleged violations of the Donnelly Act benefit from a six-year limitations period.

To recover damages incurred before June 2014, New York must rely on fraudulent concealment.  New York has appeared to adopt federal fraudulent concealment principles.  *See Liberty Mut. Ins. Co.*, 861 N.Y.S.2d at 296 (relying on Second Circuit's decision in *Hendrickson Bros*, 840 F.2d at 1083, to analyze fraudulent concealment).  Under these principles, bid-rigging conspiracies like the one alleged here are self-concealing.  *Hendrickson Bros*, 840 F.2d at 1084. Further, as noted above, the States have raised a genuine dispute as to whether the Defendants fraudulently concealed their conduct through misleading or false statements to consumers.

As for civil penalties, New York's claims "must be brought within three years after the commission of the act upon which it is based."  N.Y. Gen. Bus. Law § 342-a.  Such acts are any "in, toward or for the making or consummation of any contract, agreement, arrangement or combination herein prohibited."  *Id.*  For the reasons already stated, New York can seek civil penalties at least for the period from June 10, 2017 to the filing of the complaint.  But civil penalty claims are also subject to tolling for fraudulent concealment.  *See Liberty Mut. Ins. Co.*, 861 N.Y.S.2d at 296; *State of N.Y. v. Cedar Park Concrete Corp.*, 130 F.R.D. 16, 23 (S.D.N.Y. 1990) (permitting discovery on fraudulent concealment where state alleged fraudulent concealment to extend its civil penalties claim); *State of N.Y. v. Amfar Asphalt Corp.*, No. CIV. 83-2598, 1986 WL 27582, at *5 (E.D.N.Y. Nov. 20, 1986).  A finding by the jury of fraudulent concealment would permit the States to seek civil penalties for a period before June 10, 2017.

The motion for summary judgment as to claims under New York law is DENIED.

### 28. North Carolina

North Carolina brings claims under the North Carolina Unfair or Deceptive Trade Practices Act ("NCUDTPA") on behalf of both itself and its consumers.  ECF No. 196 ¶¶ 2002–04.

Under North Carolina's *nullum tempus* doctrine, "[i]f the function at issue is governmental, time limitations do not run against the State or its subdivisions unless the statute at issue expressly *includes* the State." *Rowan Cnty. Bd. of Educ. v. U.S. Gypsum Co.*, 418 S.E.2d 648, 653 (N.C. 1992). But "[i]f the function is proprietary, time limitations do run against the State . . . unless the statute . . . expressly *excludes* the state." *Id.* The four-year limitations period in the NCUDTPA applies to "[a]ny civil action" brought under the Act, N.C. Gen. Stat. § 75-16-2, and the Defendants argue that this broad language shows that the limitations period is intended to apply to actions by the State. Because the North Carolina Supreme Court has made clear that the statute must "expressly include[] the State," *Rowan Cnty. Bd. of Educ.*, 418 S.E.2d at 653, I find that it does not apply to North Carolina's claims for civil penalties and attorneys' fees, which are the only clearly sovereign claims for relief it has asserted. *Connecticut v. Sandoz, Inc.*, 2024 WL 4753308, at *18. North Carolina has also represented that it is not asserting either proprietary claims or *parens patriae* damages claims, *id.*, and so I need not address the statute of limitations that might apply to such claims. North Carolina's only other claim is a claim for "disgorgement." *Id.* The parties have not addressed whether such a claim should be considered "sovereign" or "proprietary" (to the extent that it is essentially seeking relief of behalf of North Carolina purchasers). For that matter, they have not addressed whether a disgorgement remedy is available under the NCUDTPA. *See id.* So I decline to address either issue here.

The motion for summary judgment as to claims under North Carolina law is DENIED.

29. North Dakota

Both the North Dakota Consumer Fraud Law and North Dakota Uniform State Antitrust Law have four-year statutes of limitations for all damages. N.D. Cent. Code §§ 51-15-12; 51-08.1-10.

a.  North Dakota Consumer Fraud Law

The discovery rule applies to the Consumer Fraud Law.  N.D. Cent. Code § 51-15-12 ("The period of limitation for a claim for relief may not be deemed to have accrued until the aggrieved party discovers the facts constituting the violation of this chapter.").

> The discovery rule focuses on whether the plaintiff has been apprised of facts which would place a reasonable person on notice that a potential claim exists[.]  . . . Under the discovery rule, the statute of limitations does not begin to run until the plaintiff has incurred some injury or damage.. . . [A] plaintiff's knowledge is ordinarily a question of fact, and summary judgment is rarely appropriate[.]

*Riemers v. Omdahl*, 687 N.W.2d 445, 449 (N.D. 2004).  Because I have found that there is a genuine dispute about whether North Dakota had inquiry notice of the facts central to its claims before May 2017, and because it brought its claims within four years of that time, I cannot find as a matter of law that its claims under the Consumer Fraud Law are untimely.

As the Defendants concede that the separate accrual rule does not apply when claims accrue upon discovery, ECF No. 621 at 3 n.3, the States may seek relief for the entirety of the alleged conduct under the North Dakota Consumer Fraud Law if they can prove that their lawsuit was timely.

### b.   North Dakota Uniform State Antitrust Law

The parties dispute whether the injury-occurrence rule or discovery rule applies to North Dakota's antitrust law.  Although the North Dakota Supreme Court has applied the discovery rule in tort cases generally, *see Hebron Pub. Sch. Dist. No. 13 of Morton Cnty. v. U.S. Gypsum Co.*, 475 N.W.2d 120, 126 (N.D. 1991) (holding that discovery rule applies to various actions with six-year limitations period under N.D. Cent. Code § 28-01-16(1)), the States acknowledge that the North Dakota Supreme Court has not analyzed which rule applies to its antitrust law, *see* ECF No. 858-2 at 11.  The States also note that to decide this issue, North Dakota courts would likely look to federal case law interpreting the Clayton Act's statute of limitation, ECF No. 619-7 at 8 (citing *In re Pre-Filled Propane Tank Antitrust Litigation*, No. 14-02567, 2019 WL 4796528, at *15

(W.D. Mo. Aug. 21, 2019); *State ex re. N.D. Dep't of Labor v. Matrix Props., Corp.*, 770 N.W.2d 290, 293-94 (N.D. 2009)).  As explained above, the Clayton Act applies the injury-occurrence rule. To align the state antitrust law with the federal law, and in the absence of any decision specifically applying the discovery rule to the state law, I find that the North Dakota Supreme Court would likely apply the injury-occurrence rule to claims arising under the North Dakota Uniform State Antitrust Law.  As I found above, injuries occurred each time consumers purchased the Defendants' products at allegedly inflated, conspiracy-driven prices.  So I cannot find on summary judgment that the claims here are untimely.

The States also contend that the entirety rule would allow it to recover for all of the alleged conduct.  I disagree.  Again, the States were harmed by each sale of the Defendants' products at allegedly inflated, conspiracy-driven prices.  Because North Dakota courts would likely look to federal law on this issue, too, and because the sales represent discrete acts, I do not think the entirety rule applies to the North Dakota Uniform State Antirust Law.  *See Fox v. Higgins*, 149 N.W.2d 369, 372 (N.D. 1967) (observing, in tortious interference case, that "[a]s to such separate wrongful acts, the statute of limitations would run from the time of the commission of each wrongful act").  Thus, the States may not seek relief for purchases made more than four years before the filing of the complaint, absent a finding of fraudulent concealment.

The North Dakota fraudulent concealment statute provides that:

When, by fraud or fraudulent concealment, a party against whom a claim for relief exists prevents the person in whose favor such claim for relief exists from obtaining knowledge thereof, the latter may commence an action within one year from the time the claim for relief is discovered by the latter or might have been discovered by the latter in the exercise of diligence.

N.D. Cent. Code § 28-01-24.  Again, a genuine dispute of fact exists as to whether the Defendants made false or misleading statements to customers to cover anticompetitive conduct.  A reasonable juror could find that these misrepresentations prevented the States, despite exercising diligence,

from obtaining knowledge of their claims if, for instance, such statements misled the States into believing that the unexplained price hikes were a result of normal market behavior. But because the statute limits tolling for fraudulent concealment to one year from the time of imputed discovery, the States are precluded from seeking relief for purchases made more than five years before the filing of the complaint.

For these reasons, the motion for summary judgment as to claims brought under North Dakota law is DENIED.

30. <u>Northern Mariana Islands</u>

The States argue that no limitations period applies to claims brought by the Attorney General under either the territory's Consumer Protection Act or its Unfair Business Practices Act. In support, they cite the following territorial statute:

> In all proceedings, the rules of the common law, as expressed in the restatements of the law approved by the American Law Institute and, to the extent not so expressed as generally understood and applied in the United States, shall be the rules of decision in the courts of the Commonwealth, in the absence of written law or local customary law to the contrary; provided, that no person shall be subject to criminal prosecution except under the written law of the Commonwealth.

7 CMC § 3401. The States submit that because the *nullum tempus* doctrine is expressed as common law, the doctrine is applicable to these claims. *See Block v. N. Dakota ex rel. Bd. of Univ. & Sch. Lands*, 461 U.S. 273, 294 (1983) (O'Connor, J., dissenting) ("The common law has long accepted the principle '*nullum tempus occurrit regi*'—neither laches nor statutes of limitations will bar the sovereign."). The Defendants respond that *nullum tempus* is not "generally understood and applied" throughout the United States because multiple states have abrogated its application, and particularly so as to antitrust claims. ECF No. 621-2 at 9 n.44. I disagree. As this ruling shows, the doctrine applies in many States. And where States have limited its application, the

most common thread is that the *nullum tempus* doctrine applies to claims brought by the State *unless* a statute of limitations expressly identifies the State.[51]

The Third Circuit's decision on the application of the doctrine to the territorial law of the U.S. Virgin Islands is also informative. *See In re Hooper's Est.*, 359 F.2d 569, 578 (3d Cir. 1966). In that case, the court held that the Virgin Islands, even if "not sovereign, in the true sense of that term," remained "a body politic." *Id.* As such, the court concluded that "the general principle that claims of the sovereign are not subject to the defenses of laches and the statute of limitations, is applicable to the Territory, unless expressly waived, and is implied in all its enactments." *Id.* The sovereign's immunity, the court found, "is based upon the public policy of protecting the citizens from damage to or loss of their public rights and property through the negligence of public officers." *Id.* (citing *Guaranty Trust Co. of New York v. United States*, 304 U.S. 126, 132 (1938)). The same concerns animate the States' claims here. The *nullum tempus* doctrine applies.

The motion for summary judgment as to claims under Northern Mariana Islands law is DENIED.

### 31. Ohio

Ohio's Valentine Act has a four-year statute of limitations for all types of relief. Ohio Rev. Code § 1331.12(B).

The Defendants are correct that the injury-occurrence rule applies to Valentine Act claims. The Valentine Act was "patterned after the Sherman Antitrust Act, and as a consequence [the Supreme Court of Ohio] has interpreted the statutory language in light of federal judicial construction of the Sherman Act." *Trane U.S. Inc. v. Meehan*, 563 F. Supp. 2d 743, 758 (N.D.

---

[51] *See, e.g.*, discussion in sections on Arizona, Connecticut, District of Columbia, Kansas, Maine, New Mexico, North Carolina, Oregon, Rhode Island, U.S. Virgin Islands. *Cf., e.g.*, W. Va. Code § 55-2-19 ("Every statute of limitation, unless otherwise expressly provided, shall apply to the state."). West Virginia appears to be in the minority.

Ohio 2008) (citing *C.K. & J.K., Inc. v. Fairview Shopping Ctr. Corp.,* 407 N.E.2d 507, 509 (Ohio 1980)).  The States argue that the Ohio Supreme Court has applied the discovery rule to toll statutes of limitations in several different situations when "the discovery rule was necessary to avoid the unconscionable result of barring the plaintiff from recovery before he even knew that he had been injured." *Weidman v. Hildebrant*, 254 N.E.3d 2, 7 (Ohio 2024) (citing *O'Stricker v. Jim Walter Corp.*, 447 N.E.2d 727, 731 (Ohio 1983) (bodily injury)); *see also Oliver v. Kaiser Community Health Found.*, 449 N.E.2d 438, 440–41 (Ohio 1983) (medical malpractice); *Skidmore & Hall v. Rottman*, 450 N.E.2d 684, 685 (Ohio 1983) (legal malpractice); *Harris v. Liston*, 714 N.E.2d 377, 379 (Ohio 1999) (noting application in cases involving wrongful adoption, fraud or conversion, sexual abuse of children, and wrongful death).  The States, however, do not cite any Ohio Supreme Court case in which the discovery rule has been applied to antitrust cases.[52]  In the absence of any such cases, and in consideration of the Ohio Supreme Court's instruction that the Valentine Act should be interpreted in the same light as the Sherman Act, I treat the injury-occurrence rule as the basis for accrual here.

Because the injury-occurrence rule applies, a finding of fraudulent concealment would be required to permit the States to recover for purchases made before June 10, 2016.  "[U]nder certain circumstances[,] Ohio law recognizes that the concealment of a cause of action can toll the statute of limitations." *Phelps v. Lengyel*, 237 F. Supp. 2d 829, 836 (N.D. Ohio 2002) (citing *Baldridge v. Toombs,* 189 N.E.2d 177, 180 (Ohio Ct. C.P. 1962)).  "[T]he statute of limitations may be tolled where there is some conduct of the adverse party, such as a misrepresentation, which excludes

---

[52] The States cite one lower court decision that applied the discovery rule "to toll the applicable statute of limitations." *State ex rel. Dann v. Am. Int'l Group, Inc.*, 2008 Ohio Misc. LEXIS 320, *9 (Cuyahoga Cty. Ct. C.P. 2008).  But the only case *Dann* relied on, a 1983 decision of the Ohio Supreme Court, applied the discovery rule to latent-injury asbestos claims—a classic discovery rule scenario.

suspicion and prevents inquiry." *Id.* (citing *Bryant v. Doe*, 552 N.E.2d 671, 675 (Ohio Ct. App. 1988). The Defendants argue that tolling based on fraudulent concealment is only available where expressly authorized by statute, citing *Richards v. St. Thomas Hosp.*, 492 N.E.2d 821, 824 n.3 (Ohio 1986) ("In many of the States the statute contains a provision, that the fraudulent concealment by the defendants to a cause of action, from the knowledge of any person entitled thereto extends the time of bringing the action . . . But the statute of this State contains no such provision." (quoting *Howk v. Minnick*, 19 Ohio St. 462, 465–66 (1869)).

Since *Richards*, however, the Ohio Supreme Court has analyzed whether equitable estoppel or tolling should apply in instances where the defendants engaged in fraudulent concealment, without regard to whether the statute authorizes tolling based on concealment.[53] *See, e.g.*, *Doe v. Archdiocese of Cincinnati*, 849 N.E.2d 268, 278–80 (Ohio 2006) (holding equitable estoppel did not toll statutes of limitations related to sexual abuse claims because the plaintiff "made no allegations of any misstatements" by the defendant, as is typically required by other jurisdictions to find fraudulent concealment); *Jacobson-Kirsch v. Kaforey*, 2012-Ohio-3553, 2012 WL 3201697, at *3 (Ohio Ct. App. 2012) (analyzing availability of fraudulent concealment under various claims, including civil conspiracy, and noting, "[u]nder the equitable tolling doctrine of fraudulent concealment, the running of a statute of limitations is tolled where the plaintiff demonstrates that the defendant took affirmative steps to conceal the plaintiff's cause of action, and the plaintiff could not have discovered the cause of action within the applicable limitations period despite exercising due diligence." (citing *Campbell v. Upjohn Co.,* 676 F.2d 1122, 1126

---

[53] The Defendants also appear to suggest that *Richards*, a medical malpractice case, applies because where "the 'fraud' complained of is integral to the [cause of action] alleged, the concealment of that cause of action does not independently extend the statute of limitations." 492 N.E.2d at 824. But they offer no support upon which I could find that fraud is an "integral element" of the price-fixing and bid-rigging conspiracy alleged here.

(6th Cir. 1982))); *Perkins v. Falke & Dunphy, L.L.C.*, 2012-Ohio-5799, 2012 WL 6097104, at *3 (Ohio Ct. App. 2012) (in legal malpractice suit, noting "[w]e have held that fraudulent concealment may serve as a ground for equitable tolling, but that such a remedy is only available in compelling cases which justify a departure from established procedure." (internal quotation marks omitted)). Thus, I find that fraudulent concealment is similarly available to toll claims under the Valentine Act.

Here, as I found above, the States have raised a genuine dispute of fact about whether the Defendants concealed the cause of action by making false or misleading statements to customers, thereby preventing the States from "discover[ing] the cause of action within the applicable limitations period despite exercising due diligence." *Jacobson-Kirsch*, 2012-Ohio-3553, at *3. Because a reasonable jury could find that the Defendants fraudulently concealed the States' cause of action, I cannot find as a matter of law that the States are precluded from seeking to recover for purchases made more than four years before the filing of the complaint.

For these reasons, the motion for summary judgment as to claims under the Valentine Act is DENIED.

### 32. Oklahoma

The Oklahoma Antitrust Reform Act's four-year statute of limitations for damages claims runs from when the claim "accrued or was discovered," whichever is later. Okla. Stat. tit. 79, § 205(C). In Oklahoma, the discovery rule "tolls the running of the applicable limitations period until the damaged party knows, or in the exercise of reasonable diligence, should have known of the damage." *California v. Infineon Techs. AG*, 531 F. Supp. 2d 1124, 1161 (N.D. Cal. 2007) (quoting *Lincoln Bank & Tr. Co. v. Neustadt*, 917 P.2d 1005, 1009 (Okla. Ct. App. 1996)). "When facts about the injury's discovery are disputed, the question of when the plaintiff knew or should have known is a question of fact for the jury to decide." *Digital Design Group Inc. v. Information*

*Builders*, 24 P.3d 834, 836 (Okla. 2001). As I found above, the earliest that the States, in exercising reasonable diligence, had indisputable notice that they had been injured by alleged anticompetitive conduct related to any of the drugs at issue was in May 2017. Because this is within four years of the filing of the complaint, the States have raised a genuine dispute about whether their claims under the Oklahoma Antitrust Reform Act are timely.

As the Defendants concede that the separate accrual rule does not apply when claims accrue upon discovery, ECF No. 621 at 3 n.3, the States may seek relief for the entirety of the alleged conduct under the Oklahoma Antitrust Reform Act if they can prove that their lawsuit was timely.

For these reasons, the motion for summary judgment on claims under the Oklahoma Antitrust Reform Act is DENIED.

### 33. Oregon

The Oregon Antitrust Law authorizes the Attorney General to bring claims on behalf of a public body or as *parens patriae* under Or. Rev. Stat. § 646.775. This provision is not included among those listed in the Oregon Antitrust Law's statute of limitations, Or. Rev. Stat. § 646.800, which provides for a four-year limitations periods, or one year after the conclusion of any federal antitrust proceeding that is "in whole or in part on the same matter complained of," whichever is later. Under Oregon law, "the government is not included in a general statute of limitation, unless it is expressly or by necessary implication included." *State Land Bd. v. Lee*, 165 P. 372 (Or. 1917). Thus, the *nullum tempus* doctrine applies to Oregon's claims arising under Or. Rev. Stat. § 646.775. The limitation provision, however, specifically includes claims for civil penalties under Section 646.760 and for treble damages under Section 646.780. Thus, *nullum tempus* does not apply to Oregon's claims for civil penalties and treble damages.

Although Oregon's Antitrust Law notes that federal antitrust law "shall be persuasive authority" in construing the statute, this instruction does not require the application of the injury-

occurrence rule.  Rather, the discovery rule applies because § 646.800 specifically refers to the "accrual" of claims.  *In re Packaged Seafood Prods. Antitrust Litig.*, 242 F. Supp. 3d 1033, 1108 (S.D. Cal. 2017) ("If a statute uses the term 'accrue' then the discovery rule applies." (citing *Rice v. Rabb*, 320 P.3d 554, 557 (Or. 2014))).  In Oregon, to determine whether a plaintiff reasonably should have known of the claims asserted, the "plaintiff must have had sufficient knowledge to excite attention and put a party upon his guard or call for an inquiry notice," and, if so, "it must also appear that a reasonably diligent inquiry would disclose the fraud."  *Clark v. Eddie Bauer LLC*, 770 F. Supp. 3d 1271, 1276 (W.D. Wash. 2025) (citing *Mathies v. Hoeck*, 588 P.2d 1, 3 (Or. 1978) (internal quotation marks omitted)).  But "[a]pplication of the discovery rule presents a factual question for determination by a jury unless the only conclusion that a jury could reach is that the plaintiff knew or should have known the critical facts at a specified time and did not file suit within the requisite time thereafter."  *Id.* (quoting *Kaseberg v. Davis Wright Tremaine, LLP*, 265 P.3d 777, 782 (Or. 2011)).  Because I have found that there is a genuine dispute about whether Oregon had inquiry notice of its claims until May 2017, and because it brought its claims within four years of that date, I cannot find on summary judgment that its claims for civil penalties and treble damages are untimely.

As the Defendants concede that the separate accrual rule does not apply when claims accrue upon discovery, ECF No. 621 at 3 n.3, the States may seek relief for the entirety of the alleged conduct under the Oregon Antitrust Law if they can prove that their lawsuit was timely.

The motion for summary judgment on claims under the Oregon Antitrust Law is DENIED.

### 34. Puerto Rico

Puerto Rico brings its claims under the Puerto Rico Antitrust Act.  *See* 10 L.P.R.A. § 257 and 32 L.P.R.A. § 3341 ("Puerto Rico's Antitrust and Restrictions of Commerce Law"); ECF No. 196 ¶ 2070.  Claims under the Puerto Rico Antitrust Act are subject to a four-year limitations

period.  10 L.P.R.A. § 268(c) ("No action may be brought outside . . . the term of four years after the cause of action accrued.").

The parties disagree on when the limitations period begins.  Puerto Rico's "antitrust law is generally construed 'as essentially embodying the jurisprudence relevant to the parallel federal law.'" *In re Aggrenox Antitrust Litig.*, 94 F. Supp. 3d 224, 252 (D. Conn. 2015) (quoting *Caribe BMW, Inc. v. Bayerische Motoren Werke Aktiengesellschaft,* 19 F.3d 745, 754 (1st Cir. 1994)); *see also Ramallo Bros. Printing v. El Dia, Inc.*, 392 F. Supp. 2d 118, 143 (D.P.R. 2005) ("Puerto Rico's antitrust laws . . . mirror the federal antitrust statutes").  Thus, even though the Act is silent as to accrual, the judicially recognized harmonization principle suggests that the injury-occurrence rule should apply to claims under the Puerto Rico Antitrust Act just as it does under federal antitrust law.

Under the separate accrual rule, the States may recover for harms incurred—including each purchase at an allegedly inflated, conspiracy-driven price—within the limitations period. Although the States argue that the entirety rule should permit them to recover for harms incurred before the limitations period, they point to no case in which the Puerto Rico Supreme Court has applied such a rule to the Puerto Rico Antitrust Act.  *See* ECF No. 858-4 at 10.  Even if courts could apply the entirety rule beyond the employment discrimination context, *see Santiago v. Ríos Alonso*, 156 D.P.R. 181, 192 (2002), in the absence of any specific ruling addressing the Antitrust Act, I decline to expand coverage of the doctrine to include that statute.

To recover damages under the Puerto Rico Antitrust Act for claims accruing before June 10, 2016, Puerto Rico must rely on fraudulent concealment.  Under that doctrine, "[i]f a party correctly and timely alleges that he or she was the victim of fraudulent concealment, it is understood that the statute of limitations does not take effect until such concealment ceases." *See*

111

*COSSEC v. Gonzalez Lopez*, 179 D.P.R. 793, 809 (2010).  Through the allegations summarized above, including allegedly misleading or untrue statements to customers, the States have raised a genuine dispute of fact as to when the Defendants' alleged concealment ceased, and thus when the States discovered or should have discovered their claim.

Puerto Rico also suggests in its submission related to this motion that it is seeking relief for common law unjust enrichment.  ECF No. 619-8 at 5.  The Defendants are correct that Puerto Rico did not identify unjust enrichment as a cause of action in the operative complaint.  *See* ECF No. 196 ¶¶ 2069–72.  At this belated stage of the case, Puerto Rico cannot amend the complaint. The States do not appear to press this issue, and I thus do not analyze it further.

The motion for summary judgment under Puerto Rico law is DENIED, but I note that the States may not pursue claims for common law unjust enrichment under Puerto Rico law.

### 35. Rhode Island

The Rhode Island Antitrust Act ("RIAA") includes a four-year limitations period and specifies that the discovery rule applies.  R.I. Gen. Laws § 6-36-23.  The States argue that the limitations period does not apply here because of the *nullum tempus* doctrine, citing *State v. Lead Industries Association, Inc.*, No. 99-5226, 2001 WL 345830, at *12 (R.I. Super. Ct. Apr. 2, 2001). The Defendants emphasize that the RIAA's limitations period applies to "[a]ny action" brought under the Act.  R.I. Gen. Laws § 6-36-23.

Rhode Island has long recognized the *nullum tempus* doctrine.  *See, e.g.*, *State of Rhode Island v. Pawtuxet Turnpike Co.*, 8 R.I. 521, 524 (1867) (when the Attorney General "deems it his duty to prosecute for a forfeiture, it is not for the court, in the absence of any statutory limitation, to say he is too late").  In *Lead Industries*, the court acknowledged that "to the extent that the State . . . seeks to protect a public right, the doctrine of *nullum tempus* allows the Attorney General to avoid any relevant statute of limitation . . . , unless by its terms the statute expressly includes the

State." *Lead Ind. Assn., Inc.*, 2001 WL 345830, at \*12–\*13. "The policy behind the doctrine has been the preservation of the public rights, revenues, and property from injury or loss, by the negligence of public officers." *Id.* at \*12. The product liability statute in *Lead Industries* included language that "all civil actions" must be commenced within the applicable limitations period, making no mention of the State. *Id.* at \*13 n.14. The court therefore found the doctrine applied to those claims that the State brought in its governmental capacity to preserve a public right. *Id.* at \*12, \*13 n.14.

Analogizing that case to this one, I find that the doctrine of *nullum tempus* also applies to the States' proprietary claims—those that seek "the preservation of the public rights, revenues, and property." *Id.* at \*12. As with the product liability statute in *Lead Industries*, the Rhode Island Antitrust Act directs that "[a]ny action" under the Act must be brought within the specific limitations period. R.I. Gen. Laws § 6-36-23. The limitations provision does not specifically mention the State, and the RIAA is explicit that "[n]o provision of this chapter shall be construed to limit the common law powers of the attorney general." R.I. Gen. Laws § 6-36-15; *see Lead Ind. Assn., Inc.*, 2001 WL 345830, at \*12 (referring to the "common law doctrine of *nullum tempus*"). Thus, the States' proprietary claims are not subject to the statute of limitation under the RIAA.

The *nullum tempus* doctrine, however, does not apply to the States' *parens patriae* claims.[54] *Lead Industries* also indicated that when the States bring claims "alleged to affect

---

[54] It is not clear whether Rhode Island has brought any *parens patriae* claims. The complaint indicates that it seeks "all remedies available under . . . the [RIAA] including, without limitation" relief available under R.I. Gen. Laws § 6-36-10 and -11, but does not specifically mention *parens patriae claims*, which are available under R.I. Gen. Laws § 6-36-12. *See* ECF No. 196 ¶ 2075. Moreover, earlier in this case, Rhode Island did not contest the Defendant's motion to dismiss any claims for disgorgement that Rhode Island made as *parens patriae*, *see Connecticut v. Sandoz, Inc.*, 2024 WL 4753308, at \*26. But since R.I. Gen. Laws § 6-36-12 also authorizes treble damages for *parens patriae* claims, and Rhode Island indicated it seeks relief under the RIAA "without limitation," I assume that this includes *parens patriae* claims for treble damages.

consumers, the general public or residents of the State" that "could have been filed by any private litigant against the defendants," then "the State is not making a claim in its governmental capacity to preserve a public right." 2001 WL 345830, at *12. "Accordingly, the Attorney General may not invoke the *nullum tempus* doctrine for such a purpose." *Id.* Because any *parens patriae* claims brought by the State are similar to those that could have been filed by private litigants, *see* R.I. Gen. Laws § 6-36-12, *nullum tempus* does not apply to these claims.

Claims based on a conspiracy to violate the RIAA accrue "after the plaintiff discovered, or by the exercise of reasonable diligence should have discovered, the facts relied upon for proof of the conspiracy." R.I. Gen. Laws § 6-36-23. As I found above, the States exercised reasonable diligence and were not indisputably on inquiry notice of their claims until May 2017. A genuine dispute of fact thus exists as to whether Rhode Islands *parens patriae* claims filed in June 2020 were timely.

As the Defendants concede that the separate accrual rule does not apply when claims accrue upon discovery, ECF No. 621 at 3 n.3, the States may seek relief for the entirety of the alleged conduct under the RIAA if they can prove that their lawsuit was timely.

The motion for summary judgment as to claims under Rhode Island law is DENIED.

### 36. South Carolina

The parties agree that the South Carolina Unfair Trade Practices Act ("SCUTPA") has a three-year statute of limitations and that the discovery rule applies. S.C. Code § 39-5-150; *State ex rel. Wilson v. Ortho-McNeil-Janssen Pharms., Inc.*, 777 S.E.2d 176 (S.C. 2015). "Under the discovery rule, the three-year clock under the South Carolina Unfair Trade Practices Act (SCUTPA) starts ticking on the date the injured party knows or should have known by exercise of reasonable diligence that a cause of action arises from wrongful conduct." *State ex rel. Wilson v. Ortho-McNeil-Janssen Pharms., Inc.*, 777 S.E.2d 176, 198 (S.C. 2015). Because I have found that

114

the States should have discovered their claims by May 2017—more than three years before the filing of the complaint—they must rely on a finding of fraudulent concealment to toll their SCUTPA claim.

In South Carolina, "when a plaintiff alleges fraudulent concealment of his cause of action by the defendant, the plaintiff seeking equitable tolling must show (1) the defendant pleading the statute of limitations fraudulently concealed facts that are the basis of the plaintiff's claim and (2) the plaintiff failed to discover those facts within the limitations period despite the exercise of due diligence." *Hughes ex rel. Est. of Hughes v. Bank of Am. Nat'l Ass'n*, 898 S.E.2d 102, 114 (S.C. 2024). As already explained, a genuine dispute of fact exists as to whether the Defendants made false or misleading statements to customers to cover anticompetitive conduct. A reasonable juror could find that these misrepresentations prevented the States, despite exercising due diligence, from discovering the facts that are the basis of their claims if, for example, such statements misled the States (or their residents) into believing that the unexplained price hikes were a result of normal market behavior. Because the States have raised a genuine dispute of fact as to whether the Defendants fraudulently concealed facts central to the cause of action, I cannot find that the SCUTPA claims are untimely at this stage.

For these reasons, the motion for summary judgement as to claims under South Carolina law is DENIED.

### 37. Tennessee

Tennessee brings both proprietary and *parens patriae* claims under the Tennessee Trade Practices Act ("TTPA"). ECF No. 196 ¶ 2088. In April 2024, the Tennessee legislature amended the Tennessee Trade Practices Act ("TTPA") to adopt the state's *nullum tempus* doctrine, thereby exempting actions brought by the Attorney General from the statute's three-year limitations period.

Tenn. Code § 47-25-104.[55]   The parties disagree on whether the amendment should apply retroactively to the claims here, which were filed before the amendment.   In an earlier decision in this case, I found that a different amendment to the TTPA, regarding the availability of monetary relief, did not apply retroactively.   *Connecticut v. Sandoz, Inc.*, 2025 WL 1207550, at *5–*6 (D. Conn. Apr. 25, 2025) (declining to dismiss Tennessee's *parens patriae* claims).   As noted in that decision, although Tennessee's constitution prohibits retrospective laws, Tennessee courts recognize an exception for remedial and procedural laws that do not alter any parties' "vested right." *Id.* at 5 (citing *Nutt v. Champion Int'l Corp.*, 980 S.W.2d 365, 368 (Tenn. 1998)).   As the Defendants point out, Tennessee has long recognized that "the right to rely upon the statute [of limitations] as a defense is a vested right that cannot be disturbed by subsequent legislation." *Girdner v. Stephens*, 48 Tenn. 280, 286 (1870).   The Defendants here, however, could not have relied upon the statute of limitations as a defense to Tennessee's claims before the amendment.

Longstanding Tennessee law is clear that "[t]he statute of limitations does not run against the sovereign or the state, or against a county, when seeking to enforce a demand arising out of, or dependent upon, the exercise of its governmental functions as an arm of the state."   *Wood v. Cannon Cnty.*, 166 S.W.2d 399, 401 (Tenn. Ct. App. 1942).[56]   "[T]he Tennessee Supreme Court has explained that 'statutes of limitation are looked upon with disfavor in actions brought by the

---

[55] Before the amendment, the TTPA did not have a limitations provision.   The Defendants suggest, without providing supporting case law, that Tenn. Code § 28-3-105—a general limitations provision that does not distinguish between claims brought by private parties and those brought by the state—applied to private and state claims equally.   Now, Section § 47-25-104 reads: "(a) Section 28-1-113 applies to all actions brought by the attorney general and reporter under this part. (b) Section 28-3-105 applies to all actions brought by any other person under this part."   Section 28-1-113, a general statute of limitations, reads: "This title does not apply to actions brought by the state of Tennessee, unless otherwise expressly provided."

[56] The parties do not dispute, and I therefore do not address, whether Tennessee's proprietary and *parens patriae* claims both qualify as exercises of its governmental functions.

State, and will not be enforced in the absence of clear and explicit statutory authority to do so[.]'" *In re Faye Foods, Inc.*, 766 F. App'x 204, 210 (6th Cir. 2019) (quoting *Hamilton County Board of Education v. Asbestospray Corp.*, 909 S.W.2d 783, 785 (Tenn. 1995)). "[T]his substantive canon of construction has typically been applied in instances where it is unclear *from the text of a statute of limitations itself* whether it applies to the state." *Id.* (quoting *In re Estate of Tanner*, 295 S.W.3d 610, 628 (Tenn. 2009)) (emphasis added).

The Defendants emphasize that general statutory construction law directs that "a change in the language of the statute indicates that a departure from the old language was intended." *Lavin v. Jordon*, 16 S.W.3d 362, 369 (Tenn. 2000). From this general principle, however, it does not necessarily follow that Tennessee's claims were subject to limitations under the prior version of the TTPA. It could be equally true that, as the States argue, the amendment "was a remedial clarification and confirmation of the application of this foundational doctrine to state antitrust actions." ECF No. 619-3 at 11. And, crucially, Tennessee courts have previously found that the common-law *nullum tempus* doctrine can apply in certain situations to other types of claims that rely on Section 28-3-105 to set the statute of limitations for private claims. *Asbestospray*, 909 S.W.2d at 786 (holding "local school board engages in a 'governmental function' when it brings an action to recover the cost of asbestos abatement or removal; therefore, the *nullum tempus* doctrine applies").

For these reasons, I cannot say that there is "clear and explicit statutory authority" that the limitations period was enforceable against the State before the amendment. *See In re Faye Foods, Inc.*, 766 F. App'x at 210. The Defendants' arguments to the contrary rely not on the language "from the text of a statute of limitations itself," *id.* (quoting *In re Estate of Tanner*, 295 S.W.3d at 628), but instead on general interpretation principles. Without "clear and explicit authority" that

the TTPA's limitations period applied to the State before the amendment, I find that the *nullum tempus* doctrine applies to Tennessee's TTPA claims.

The motion for summary judgment as to claims under Tennessee law is DENIED.

### 38. U.S. Virgin Islands

The U.S. Virgin Islands brings this action under the Virgin Islands Monopolies and Restraints of Trade Act and its Consumer Fraud and Deceptive Business Practices Act.  ECF No. 196 ¶ 2112.

#### a.   U.S. Virgin Islands Monopolies and Restraints of Trade Act

The parties agree that a four-year limitations period applies to damages and civil penalties under the antimonopoly law, V.I. Code tit. 11, § 1507; they disagree, however, about the limitations period for equitable relief, including disgorgement, restitution, and injunction.

For claims seeking equitable and injunctive relief, the States argue that the *nullum tempus* doctrine applies, and therefore there is no limitations period for the States' injunctive relief claims. *See* ECF No. 619-3 at 10-11.  As support, the States cite *Magens Point Resort Hotel v. Benjamin*, 58 V.I. 191 (2009), which affirmed that "the Virgin Islands territorial government is not bound by the general statute of limitations unless it gives its consent."  *Id.* at 196.  *Magens Point* cites *In re Hooper's Est.*, 359 F.2d 569, 578 (3d Cir. 1966), in which the Third Circuit confirmed that the Virgin Islands is not subject to a statute of limitations unless "expressly waived," and that this is "implied in all its enactments."  *Id.* at 578.  The Defendants point to 11 V.I.C. § 1507, which sets a four-year limitations period for damages in subsection (2), and for civil penalties in subsection (4), and which also refers to the Attorney General in the same terms as any litigant for standing purposes.  But subsection (1), which permits the Attorney General to seek injunctive and equitable relief, does not establish a limitations period.  Thus, I cannot find as a matter of law that the Virgin Islands has given its consent to be subject to the limitations period for injunctive or equitable relief.

I therefore find that *nullum tempus* applies to the Virgin Islands' claims for injunctive and equitable relief—including disgorgement and restitution.

The parties also disagree as to when claims for damages and civil penalties accrued. The statute is silent on accrual, though it includes a general harmonization provision: "When the language of this chapter is the same or similar to the language of a Federal Antitrust Law, the District Court in constructing this chapter shall follow the construction given to the Federal Law by the Federal Courts." 11 V.I.C. § 1518.

First, I agree with the Defendants that claims for civil penalties accrue upon occurrence of the wrongful act. 11 V.I.C. § 1507(4) ("The action must be brought within four years after the commission of the act upon which it is based."). The language is clear to this effect.

Second, I agree with the Defendants that the federal injury-occurrence rule applies to all other claims for relief. The States cite language from a Virgin Islands court appearing to disclaim the harmonization provision as merely "persuasive authority." *Yearwood Enters., Inc. v. Antilles Gas Corp.*, No. ST-17-CV-77, 2017 WL 2709831, at *3 (V.I. Super. Ct. June 21, 2017).[57] But the States do not point to any ruling analyzing the antimonopoly law that would suggest the discovery rule applies instead.[58] Therefore, regardless of whether Section 1518 is binding or now merely

---

[57] Specifically, the ruling stated:

> since 11 V.I.C. § 1518 was enacted in 1973 when the District Court functioned as the local trial court of the Virgin Islands, prior to the existence of the Superior Court or its forerunner, the Territorial Court, and moreover, prior to the directive that the Superior Court is no longer bound by federal precedent, federal precedent constructing provisions of federal antitrust law that are similar to provisions of the Virgin Islands Antimonopoly Act is merely persuasive authority in the Superior Court.

*Yearwood Enters., Inc.*, 2017 WL 2709831, at *3.

[58] The States' citation to *Burt v. Lockheed Martin Corp.*, 79 V.I. 801, 810 (2024), a personal injury case that applied the discovery rule, is even less persuasive than the instruction in Section 1518, even if that section is now only "persuasive authority."

persuasive, I find that the antimonopoly law should be interpreted in line with federal antitrust law, and thus that the injury-occurrence rule applies.

A finding of fraudulent concealment, however, would permit recovery for conduct that occurred before the limitations period. "Under this doctrine, a statute of limitations is tolled where a defendant's fraudulent concealment prevents a plaintiff from knowing that she has a cause of action." *Warner v. Ross*, No. CV 660/1996, 1999 WL 35792702, at *5 (Terr. V.I. June 15, 1999), *aff'd*, No. D.C.CIV.APP.1999/111, 2004 WL 3413799 (D.V.I. Nov. 23, 2004), *aff'd,* 164 F. App'x 218 (3d Cir. 2006). "[C]onstructive fraud, if proven, is sufficient to toll the running of the statute of limitations until the plaintiff either knows, or through due diligence should have known, of the fraud." *Id.* I found above the States have raised genuine disputes as to whether the Defendants fraudulently concealed their conduct and as to whether the States exercised due diligence.

The States also argue that the entirety rule applies and allows for recovery for all alleged wrongdoing. The Virgin Islands recognizes the rule generally for claims involving "continual unlawful acts." *Codrington v. Steadfast Ins. Co.*, No. 1:19-CV-00026-MEM-EAH, 2023 WL 6627210, at *7 (D.V.I. June 23, 2023) (holding entirety rule did not toll statutes of limitations for claims of, *inter alia*, misrepresentation and for fraudulent conduct, related to the denial of an insurance claim) (quoting *Anthony v. FirstBank Virgin Islands*, 58 V.I. 224, 230 (V.I. 2013) (holding entirety rule did not toll statutes of limitations stemming from one act of misrepresentation), *report and recommendation adopted*, No. CV 1:19-26, 2023 WL 6356674 (D.V.I. Sept. 29, 2023), *aff'd,* No. 23-2949, 2024 WL 3493449 (3d Cir. July 22, 2024)). But the States cite no case in which a court has extended the rule to antitrust law, and I decline to do so here. Moreover, as I found above, the States were harmed by each sale of the Defendants' products at allegedly inflated, conspiracy-driven prices, and these sales are discrete acts. So, especially in

light of the harmonization provision, the separate accrual rule applies, and the States may recover only for purchases made within the limitations period, subject to tolling under the fraudulent concealment doctrine.

### b.  U.S. Virgin Islands Consumer Fraud & Deceptive Business Practices Act

The parties agree that a six-year limitations period applies to claims under the Consumer Fraud & Deceptive Business Practices Act.  12A V.I.C. § 336; 5 V.I.C. § 31(a)(3)(B).

The parties disagree on which accrual rule applies.  Again, I agree with the Defendants that the injury-occurrence rule applies.  *See MRL Dev. I, LLC v. Whitecap Inv. Corp.*, 823 F.3d 195, 209 (3d Cir. 2016) ("The DTPA statute of limitations began running from the date the violation of the statute occurred, not the date the violation was discovered." (internal quotation marks omitted)).[59]  But again, the States may rely on a finding of fraudulent concealment to recover for conduct that occurred outside the limitations period.

The motion for summary judgment as to claims under U.S. Virgin Islands law is DENIED.

### 39.  Utah

Utah brings its actions under the Utah Antitrust Act, the Utah Consumer Sales Protection Act, and the Utah common law doctrine of unjust enrichment, on behalf of itself, Utah governmental entities, and as *parens patriae* on behalf of its residents.  ECF No. 196 ¶ 2090–91.

### a.  Utah Antitrust Act

A four-year limitations period applies to claims under the Utah Antitrust Act.  Utah Code § 76-16-503.  The statute is silent on when claims accrue.  The Defendants argue that the federal

---

[59] Shortly after the Third Circuit decided this case, the Supreme Court of the Virgin Islands "indicated that federal precedent is no longer binding on the Superior Court."  *Yearwood*, 2017 WL 2709831, at *3 (citing *Mosby v. Mullgrav*, 65 V.I. 261, 267 n.2 (2016)).  But even if I were to assume that, since this directive, a Third Circuit opinion analyzing the DTPA is only persuasive authority, I would still be persuaded that the injury-occurrence rule applies.

injury-occurrence rule applies because the Utah Antitrust Act is intended to be harmonized with federal law.  *See* Utah Code § 76-26-502.  ("The Legislature intends that the courts, in construing this part, will be guided by interpretations given by the federal courts to comparable federal antitrust statutes and by other state courts to comparable state antitrust statutes.").  The States, on the other hand, maintain that Utah's general inquiry notice standard applies.  I agree with the Defendants.  Because the Act is explicit that it is meant to be harmonized with federal law, I find that the federal injury-occurrence rule applies.

Under Utah law, "[t]he continuing tort doctrine is an exception to the general rule that 'the statute of limitations begins to run when the cause of action accrues.'"  *Pinder v. Duchesne Cnty. Sheriff*, 478 P.3d 610, 626 (Utah 2020) (quoting *Bingham v. Roosevelt City Corp.*, 235 P.3d 730, 745 (Utah 2010)).  In analyzing the doctrine, Utah courts look at "whether the tortious *act* is continuous."  *Id.* (emphasis in original).  *Pinder* expressly disclaimed the States' reading of the opinion that the statute of limitations is tolled when the *harm* is continuous.  *Id.* ("We do not look to whether the *harm* resulting from the act" is continuous." (internal quotation marks omitted)); *see* ECF No. 619-7 at 8.  In any event, in the absence of any guidance as to whether Utah's continuing tort doctrine would apply to the Utah Antitrust Act, and in light of the harmonization provision, I find that the separate accrual rule applies.  As such, the States may only recover for conduct arising within the limitations period.

Still, the States may rely on Utah's equitable discovery doctrine to toll the limitations period.  "Equitable discovery may be invoked in response to a statute of limitations defense when the plaintiff was unaware of the facts underlying a cause of action because of the defendant's fraudulent concealment."  *Fitzgerald v. Spearhead Invs.,* 493 P.3d 644, 652 (Utah 2021).  "In no case . . . is mere silence or failure to disclose sufficient in itself to constitute fraudulent

concealment." *Ramsay v. Ret. Bd.*, 391 P.3d 1069, 1074 (Utah 2017).  As noted above, the States have raised a genuine dispute of fact as to whether the Defendants fraudulently concealed their cause of action through affirmative acts, such as allegedly false or misleading statements to customers to cover anticompetitive conduct.

b.   Utah Consumer Sales Protection Act

A five-year limitations period applies to claims under the Utah Consumer Sales Protection Act.  Utah Code §§ 13-2-6(6)(b), 1(2)(b).  Here, too, the parties disagree about when the cause of action accrues under the Act, and again I agree with the Defendants that the injury-occurrence rule applies.  The statute specifies that a suit "shall be commenced no later than five years after the day on which the alleged violation occurs."  Utah Code § 13-2-6(6)(b).  As above, the States may rely on the fraudulent concealment doctrine to toll the limitations period.

c.   Utah Common Law Unjust Enrichment

A four-year limitations period applies to Utah common law unjust enrichment claims.  Utah Code § 78B-2-115.  The parties agree that the discovery rule applies to these claims.  *See Hunter v. Fiau*, 545 P.3d 294, 305–06 (Utah Ct. App. 2014).  "Utah law is clear that in every case, all that is required to trigger the statute of limitations is sufficient information to put a plaintiff on notice to make further inquiry."  *Valdez v. Wells Fargo Bank*, No. 1:25-CV-00024-RJS-DPB, 2025 WL 2374354, at *4 (D. Utah Aug. 14, 2025) (citing *Russell Packard Dev., Inc. v. Carson*, 108 P.3d 741, 746 (Utah 2005)) (internal quotation marks omitted).  I found above that the earliest time at which the States had indisputable notice of potential anticompetitive conduct related to any of the drugs at issue was May 2017.  Thus, the claims under the Utah Consumer Sales Protection Act are timely.

As the Defendants concede that the separate accrual rule does not apply when claims accrue upon discovery, ECF No. 621 at 3 n.3, the States may seek relief for the entirety of the alleged

conduct under Utah common law unjust enrichment claims if they can prove that their lawsuit was timely.

For these reasons, the motion for summary judgment as to claims under Utah law is DENIED.

### 40. Vermont

Vermont brings its action under the Vermont Consumer Protection Act.  ECF No. 196 ¶ 2094.  Vermont requires that "[a] civil action . . . [be] commenced within six years after the cause of action accrues."  12 V.S.A. § 511.  These limitations explicitly apply to state-initiated actions.  12 V.S.A. § 461 ("The limitations prescribed in this chapter for the commencement of actions shall apply to the same actions when brought in the name of the State, or otherwise, for the benefit of the State, as in actions brought by citizens.").

The parties agree that the discovery rule applies to claims under the Vermont Consumer Protection Act.  In Vermont, a plaintiff is on inquiry notice when "a plaintiff ha[s] information, or should have obtained information, sufficient to put a reasonable person on notice that a particular defendant may have been liable for the plaintiff's injuries."  *Rodrigue v. VALCO Enters., Inc.*, 726 A.2d 61, 63 (Vt. 1999); *State v. Atl. Richfield Co.*, 148 A.3d 559, 567 (Vt. 2016) (reiterating that "the statute does not run until the plaintiff has or should have discovered both the injury and the fact that it may have been caused by the defendant's negligence or other breach of duty" (internal quotation marks omitted)).  As I found above, the earliest date by which the States had indisputable notice that the Defendants may have been liable for anticompetitive conduct related to any of the drugs at issue in this case was May 2017.  Thus, at least at the summary judgment stage, the claims under the Vermont Consumer Protection Act are timely.

As the Defendants concede that the separate accrual rule does not apply when claims accrue upon discovery, ECF No. 621 at 3 n.3, the States may seek relief for the entirety of the alleged

conduct under the Vermont Consumer Protection Act if they can prove that their lawsuit was timely.

The motion for summary judgment as to claims under Vermont law is DENIED.

41. Virginia

Virginia seeks equitable relief, including disgorgement and restitution, as well as civil penalties. ECF No. 196 ¶ 2098. It is not seeking proprietary damages. *Id.* Under Virginia's *nullum tempus* doctrine, statutes of limitations do not apply to the Commonwealth unless specified by statute. Va. Code § 8.01-231. Under the Virginia Antitrust Act, however, actions by the Attorney General seeking civil penalties must be "commenced within four years after the cause of action accrues." Va. Code § 59.1-9.14. The other relief the Attorney General is seeking under Va. Code § 59.1-9.15 is not so limited.

The injury-occurrence rule applies to Virginia's claims. *See Detrick v. Panalpina, Inc.*, 108 F.3d 529, 543 (4th Cir. 1997) ("Virginia law is clear that the statute of limitations begins to run[] when any injury occurs."); *Blenheim Cap. Holdings Ltd. v. Lockheed Martin Corp.*, 53 F.4th 286, 297 (4th Cir. 2022) (analyzing federal and Virginia state antitrust claims together for purposes of the statutes of limitations).

I agree with the Defendants that the "separate accrual" rule, consistent with the federal continuing violation doctrine, applies because the Virginia Antitrust Act is generally construed in accordance with federal antitrust law. Va. Code § 59.1-9.17 ("This chapter shall be applied and construed to effectuate its general purposes in harmony with judicial interpretation of comparable federal statutory provisions."). As I found above, the States' claims under the injury-occurrence

rule accrued with each purchase at an allegedly inflated, conspiracy-driven price.[60]  Virginia can

seek civil penalties for purchase made within four years of the June 10, 2020 complaint.

Virginia must rely on fraudulent concealment to recover for purchases made before June

10, 2016.  "A plaintiff who seeks to rely upon the tolling provision in [Virginia] Code § 8.01-

229(D) must establish that the defendant undertook an affirmative act designed or intended,

*directly or indirectly*, to obstruct the plaintiff's right to file her action."  *Grimes v. Suzukawa*, 551

S.E.2d 644, 646 (Va. 2001) (emphasis added).  "Concealment of a cause of action preventing the

running of limitations must consist of some trick or *artifice preventing inquiry*, or calculated to

hinder a discovery of the cause of action by the use of ordinary diligence, and mere silence is

insufficient." *Culpeper Nat. Bank v. Tidewater Improvement Co.*, 119 Va. 73, 84 (1916) (emphasis

added).  As noted above, the States have identified a genuine dispute of fact as to whether the

Defendants concealed the cause of action.  Through alleged false or misleading statements made

to customers to cover anticompetitive conduct, a reasonable juror could find that the Defendants

either indirectly obstructed the States' ability to file their action or prevented inquiries.  Either

would be sufficient to support a finding of fraudulent concealment and permit Virginia to seek

relief for injuries incurred before the limitations period.

The motion for summary judgment as to claims under Virginia law is DENIED.

42. <u>Washington</u>

Under the Washington Consumer Protection Act, the limitations period is four years for

actions seeking damages.  Wash. Rev. Code 19.86.090, 19.86.120; *see State v. LG Elecs., Inc.*, 375

P.3d 636, 640 (Wash. 2016) (en banc) ("The CPA's statute of limitations provision bars 'claim[s]

---

[60] The case that the States cite in support of applying the entirety rule, *Moseke v. Miller & Smith, Inc.*, 202 F. Supp. 2d 492 (E.D. Va. 2002), a discrimination case, is inapposite.  That case dealt with the continuing effects of earlier discriminatory acts.

for damages under RCW 19.86.090' if not commenced within four years."). The doctrine of *nullum tempus* applies to *parens patriae* claims under Wash. Rev. Code 19.86.080, including those for injunctive relief and monetary equitable relief, and civil penalties under Wash. Rev. Code 19.86.140; there is no limitations period as to those claims.[61] *See LG Elecs.*, 375 P.3d at 640.

The discovery rule applies to Washington's damages claims. "RCW 4.16.080(4) provides that an action for relief on the ground of fraud is 'not to be deemed to have accrued until the discovery by the aggrieved party of the facts constituting the fraud.'" *Shepard v. Holmes*, 345 P.3d 786, 790 (Wash. Ct. App. 2014). "Where the discovery rule applies, a cause of action accrues when the plaintiff, through the exercise of due diligence, knew or should have known the basis for the cause of action." *Id.* (internal quotation marks omitted). I found above that the earliest time at which the States, despite exercising due diligence, had indisputable notice of potential anticompetitive conduct related to any of the drugs at issue was May 2017. Thus, a genuine dispute of fact exists as to whether claims filed in June 2020 are timely.

As the Defendants concede that the separate accrual rule does not apply when claims accrue upon discovery, ECF No. 621 at 3 n.3, the States may seek relief for the entirety of the alleged conduct under the Washington Consumer Protection Act if they can prove that their lawsuit was timely.

The motion for summary judgment as to claims under Washington law is DENIED.

### 43. West Virginia

A four-year limitations period applies to claims under the West Virginia Antitrust Act. W. Va. Code § 47-18-11; *see also id.* § 55-2-19 ("Every statute of limitation, unless otherwise expressly provided, shall apply to the state."). Under the statute, the discovery rule applies to

---

[61] I previously dismissed Washington's claims for damages as *parens patriae* on behalf of Washington residents. *Connecticut v. Sandoz, Inc.*, 2024 WL 4753308, at *30.

allegations of antitrust conspiracies; the cause of action begins to accrue "within four years after the plaintiff discovered, or by the exercise of reasonable diligence should have discovered the facts relied upon for proof of the conspiracy." *Id.* § 47-18-11. I found above that the earliest that the States, in exercising reasonable diligence, had indisputable notice of potential anticompetitive conduct related to any of the drugs at issue was in May 2017. Thus, a genuine dispute of fact exists as to whether claims filed in June 2020 are timely.

As the Defendants concede that the separate accrual rule does not apply when claims accrue upon discovery, ECF No. 621 at 3 n.3, the States may seek relief for the entirety of the alleged conduct under the West Virginia Antitrust Act if they can prove that their lawsuit was timely.

The motion for summary judgment as to claims under West Virginia law is DENIED.

### 44. Wisconsin

Wisconsin brings this action under Wisconsin's Antitrust Act, which provides for a six-year limitations period for all actions under the Act, no matter the type of relief sought, and specifies that the discovery rule applies. Wis. Stat. Ch. § 133.18(2), (4). In Wisconsin, claims begin to accrue "once a person either discovers the injury or in the exercise of reasonable diligence should have discovered the injury." *Claypool v. Levin*, 562 N.W.2d 582, 589 (Wis. 1997). As I found above, the States exercised reasonable diligence and were not indisputably on inquiry notice of their claims until May 2017. A genuine dispute of fact thus exists as to whether claims filed in June 2020 were timely.

As the Defendants concede that the separate accrual rule does not apply when claims accrue upon discovery, ECF No. 621 at 3 n.3, the States may seek relief for the entirety of the alleged conduct under Wisconsin's Antitrust Act if they can prove that their lawsuit was timely.

For these reasons, the motion for summary judgment as to claims under Wisconsin law is DENIED.

## V.  MOTIONS TO SEAL

The Motions to Seal briefs and exhibits related to this motion for summary judgment—ECF Nos. 694, 700, and 712—are all granted, substantially for the reasons set forth in the motions. The Court reserves judgment on ECF No. 694 as it relates to the Defendants' other Group 2 summary judgment motions until it rules on those motions.

## VI.  CONCLUSION

The Defendants' motion for summary judgment, ECF No. 617, is DENIED except as to Kansas's claim for proprietary damages, which is dismissed.


IT IS SO ORDERED.

_____/s/_____
Michael P. Shea, U.S.D.J.

Dated: Hartford, Connecticut
October 31, 2025