# UNITED STATES DISTRICT COURT
## DISTRICT OF CONNECTICUT

THE STATE OF CONNECTICUT; THE STATE OF
ALASKA; THE STATE OF ARIZONA; THE
STATE OF ARKANSAS; THE STATE OF
CALIFORNIA; THE STATE OF COLORADO;
THE STATE OF DELAWARE; THE DISTRICT OF
COLUMBIA; THE STATE OF FLORIDA; THE
STATE OF GEORGIA; THE TERRITORY OF
GUAM; THE STATE OF HAWAII; THE STATE
OF IDAHO; THE STATE OF ILLINOIS; THE
STATE OF INDIANA; THE STATE OF IOWA;
THE STATE OF KANSAS; THE
COMMONWEALTH OF KENTUCKY; THE
STATE OF LOUISIANA; THE STATE OF MAINE;
THE STATE OF MARYLAND; THE
COMMONWEALTH OF MASSACHUSETTS;
THE STATE OF MICHIGAN; THE STATE OF
MINNESOTA; THE STATE OF MISSISSIPPI; THE
STATE OF MONTANA; THE STATE OF
NEBRASKA; THE STATE OF NEVADA; THE
STATE OF NEW HAMPSHIRE; THE STATE OF
NEW JERSEY; THE STATE OF NEW MEXICO;
THE STATE OF NEW YORK; THE STATE OF
NORTH CAROLINA; THE STATE OF NORTH
DAKOTA; THE COMMONWEALTH OF THE
NORTHERN MARIANA ISLAND; THE STATE
OF OHIO; THE STATE OF OKLAHOMA; THE
STATE OF OREGON; THE COMMONWEALTH
OF PENNSYLVANIA; THE COMMONWEALTH
OF PUERTO RICO; THE STATE OF RHODE
ISLAND; THE STATE OF SOUTH CAROLINA;
THE STATE OF TENNESSEE; THE STATE OF
UTAH; THE STATE OF VERMONT; THE
COMMONWEALTH OF VIRGINIA; THE STATE
OF WASHINGTON; THE STATE OF WEST
VIRGINIA; THE STATE OF WISCONSIN; and
U.S. VIRGIN ISLANDS,

     *Plaintiffs*,

v.

No. 3:20-cv-00802-MPS

SANDOZ, INC.; ACTAVIS HOLDCO US, INC.;
ACTAVIS ELIZABETH LLC; ACTAVIS
PHARMA, INC.; AMNEAL
PHARMACEUTICALS, INC.; AMNEAL
PHARMACEUTICALS, LLC; ARA
APRAHAMIAN; AUROBINDO PHARMA U.S.A.,
INC.; BAUSCH HEALTH AMERICAS, INC.;
BAUSCH HEALTH US, LLC; MITCHELL
BLASHINSKY; DOUGLAS BOOTHE; FOUGERA
PHARMACEUTICALS INC.; GLENMARK
PHARMACEUTICALS INC., USA; JAMES (JIM)
GRAUSO; GREENSTONE LLC; G&W
LABORATORIES, INC.; WALTER
KACZMAREK; ARMANDO KELLUM; LANNETT
COMPANY, INC.; LUPIN PHARMACEUTICALS,
INC.; MALLINCKRODT INC.; MALLINCKRODT
LLC; MALLINCKRODT plc; MYLAN INC.;
MYLAN PHARMACEUTICALS INC.; KURT
ORLOFSKI; MICHAEL PERFETTO; PERRIGO
NEW YORK, INC.; PFIZER INC.; SUN
PHARMACEUTICAL INDUSTRIES, INC.; TARO
PHARMACEUTICALS USA, INC.; TELIGENT,
INC.; ERIKA VOGEL-BAYLOR; JOHN
WESOLOWSKI; and WOCKHARDT USA LLC,

    *Defendants*.

## RULING ON CERTAIN *DAUBERT* MOTIONS RELATED
## TO THE STATES' OVERARCHING CONSPIRACY CLAIM

Before me are motions to exclude certain expert opinions from economists Dr. Pierre-Yves

Crémieux (replacing Dr. Daniel L. Rubinfeld[1]), Dr. Gregory Bell, and Dr. Lauren Stiroh

(Defendants' experts[2]) and Dr. Frederick Warren-Boulton (States' expert).  Broadly speaking,

these experts offer opinions concerning whether the Defendants' conduct amounted to unlawful

---

[1] Dr. Rubinfeld withdrew from the case, and Dr. Crémieux replaced him.  ECF No. 666 at 1 n.1.
Dr. Crémieux agreed with and adopted Dr. Rubinfeld's opinions and analyses and offered some of
his own.  *See* Crémieux Report ¶ 11, ECF No. 741.
[2] Defendant Lannett retained Dr. Bell, and Defendant Mylan retained Dr. Stiroh.  *See* ECF No.
666 at 1.  For ease of reference and with that understanding I refer to the Defendants as a collective
throughout this ruling, except where distinction is necessary.

conspiratorial behavior or lawful oligopolistic behavior. And because the experts are responsive to each other in various ways, I consider these motions together.

I deny both motions except in one limited respect. The Defendants' motion to exclude certain opinions of Dr. Warren-Boulton, ECF No. 658, is denied. The States' motion to exclude certain opinions of Drs. Crémieux, Rubinfeld, Bell, and Stiroh, ECF No. 665, is granted in part and denied in part—the motion is denied except with respect to one of Dr. Crémieux's opinions. In what follows, I assume the parties' familiarity with the operative Complaint and the relevant briefing.

## I.    LEGAL STANDARD

Rule 702 of the Federal Rules of Evidence allows qualified experts to testify "in the form of an opinion" if "(a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue; (b) the testimony is based on sufficient facts or data; (c) the testimony is the product of reliable principles and methods; and (d) the expert's opinion reflects a reliable application of the principles and methods to the facts of the case." Fed. R. Evid. 702. Admissibility of expert testimony falls under the district court's gatekeeper function, *see Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579, 597 (1993), and it is the proponent's burden to show that the expert's testimony meets the requirements for admissibility, Fed. R. Evid. 702. *See also Nimely v. City of New York*, 414 F.3d 381, 395–96 (2d Cir. 2005).

Addressing reliability, "[t]he Supreme Court has identified a number of factors . . . district courts may consider, such as (1) whether a theory or technique 'can be (and has been) tested,' . . . ; (2) 'whether the theory or technique has been subjected to peer review and publication,' . . . ; (3) a technique's 'known or potential rate of error,' and 'the existence and maintenance of standards

controlling the technique's operation,' . . . ; and (4) whether a particular technique or theory has gained 'general acceptance' in the relevant scientific community." *Amorgianos v. Nat'l R.R. Passenger Corp.*, 303 F.3d 256, 266 (2d Cir. 2002) (quoting *Daubert*, 509 U.S. at 593–94). But these factors are only instructive, and the inquiry is "flexible." *Daubert*, 509 U.S. at 594; *see also Kumho Tire Co. v. Carmichael,* 526 U.S. 137, 150 (1999).

Apart from these canonical *Daubert* requirements, the Defendants underscore Congress's 2023 amendment to Rule 702. ECF No. 658-1 at 8; Fed. R. Evid. 702, advisory committee's note to 2023 amendment. That amendment made clear that: (1) a preponderance of the evidence standard applies to questions of admissibility under Rule 702; and (2) expert testimony "must stay within the bounds of what can be concluded from a reliable application of the expert's basis and methodology." Fed. R. Evid. 702, advisory committee's note to 2023 amendment.

## II.    DISCUSSION

As previewed above, I find most of the arguments for exclusion unpersuasive. I note up front that while the parties quibble with certain experts' qualifications to give certain opinions, *see, e.g.*, ECF No. 658-1 at 4–5 ("Dr. Warren-Boulton . . . lacks expertise in and experience with distinguishing between oligopolistic coordination and conspiracy."), ECF No. 666 at 17 ("Dr. Bell is not qualified  . . . to give such a broad opinion."), neither the Defendants nor the States press any serious argument that these experts are unqualified. And if they do intend to press those arguments, I find them unpersuasive.

I move now to the substance of the motions, starting with the Defendants' motion to exclude Dr. Warren-Boulton.

### A.  Dr. Warren-Boulton

The Defendants move to exclude Dr. Warren-Boulton's opinions related to his "statistical tests for collusive behavior," including his market tests (*i.e.*, Market Share Stability and Leading Firm Share Tests), price tests, and cost pass-through rate tests.  ECF No. 658-1 at 9–12 (cleaned up).  The Defendants offer various reasons why those tests are "unreliable and excludable," including that they are "fundamentally flawed" and would "confuse the issues and mislead the factfinder."  *Id.* at 6-7, 16.

One of the Defendants' principal complaints about Dr. Warren-Boulton's market tests is that his definition of "fair share" is too amorphous to be falsifiable.  *Id.* at 17-18.  In the Defendants' view, Dr. Warren-Boulton must identify the "terms of the alleged conspiratorial agreements" or else "his 'tests' simply observe market shares."  *Id.* at 17, 20.

Nothing in the law suggests that this degree of precision is required, and I disagree that the Defendants are functionally prevented from "meaningfully cross examining him on the basis of his opinions" without these terms.  *Id.* at 20.  Nor do the Defendants explain why market share distributions across *all* 98 drug markets (*i.e.*, the number of Drugs at Issue) must be substantially identical to support a conclusion that market share stability in *each* of those markets is an indicator of collusion.  The States explain how Dr. Warren-Boulton's market share tests are derived from his informed view that greater stability in market shares is indicative of unlawful collusive behavior.  ECF No. 677 at 16.  To test that view, Dr. Warren-Boulton employs the "Levene Test," which tests variances between comparator groups: here, (1) MDL drugs during the Conduct Period (*i.e.*, the period of alleged collusion), (2) MDL drugs during the Pre-Conduct period, and (3) non-MDL drugs during the Conduct Period.  *Id.* at 16–17.  Market shares of these groups are analyzed

against each other—not, as the Defendants argue, against an amorphous figure representing "fair share." *Id.* at 18. The Defendants are free to address their criticisms on cross-examination.

I am not convinced that the Defendants' other criticisms require exclusion, either. The Defendants contend, for example, that factors beyond those that Dr. Warren-Boulton discussed may impact market share stability and thus Dr. Warren-Boulton's test relies on a flawed premise. ECF No. 658-1 at 20–22. The Defendants add that his opinion is "[u]ndercut by his own results and explanations." *Id.* at 22. These contentions, too, are proper for cross-examination.

The Defendants also maintain that the market share stability test cannot distinguish between lawful and unlawful behavior. *Id.* at 20–21. But I agree with the States that the law does not require that an expert "definitively distinguish between lawful and unlawful conduct." ECF No. 677 at 23. For support, the Defendants cite *In re Text Messaging Antitrust Litig.*, 782 F.3d 867 (7th Cir. 2015), in which the Seventh Circuit recognized that "inflexibility of the market leaders' market shares over time, suggesting a possible agreement among them not to alter prices, since such an alteration would tend to cause market shares to change" is circumstantial evidence that is "consistent with tacit as well as express collusion; [the] absence would tend to negate both, but [the] presence would not point unerringly to express collusion." *Id.* at 876. I do not read *In re Text Messaging* to require exclusion of Dr. Warren-Boulton's testimony about market share stability. As the Seventh Circuit recognized, "[a]greement [to collude] can be proved by circumstantial evidence." *Id.* at 879. While market share stability (if shown) cannot itself prove anticompetitive behavior, it is circumstantial evidence that may, together with other evidence, support such a finding.

I reach the same result with respect to the Defendants' criticisms of Dr. Warren-Boulton's Leading Firm Share Test. ECF No. 658-1 at 22–24. As the States explain, the Leading Firm Share

Test evaluates the shares of market leaders in MDL drugs versus non-MDL drugs to test Dr. Warren-Boulton's hypothesis that the leading firm's share would be lower for MDL drugs than non-MDL drugs due to the leading firm's surrendering share to junior participants to incentivize them to collude on price. ECF No. 677 at 20-21. The qualms that the Defendants raise with that test, including that it "ignores the order in which firms entered a given drug market and analyzes the market leader only in the last quarter in the alleged conduct period," go to weight and not admissibility. ECF No. 658-1 at 22. The Defendants also overstate the degree to which Dr. Warren-Boulton's conclusions—and, more broadly, the States' theory of an overarching conspiracy—rely on a Taro document setting forth one vision of "fair share" in generic drug markets. Dr. Warren-Boulton's Leading Firm Share test does not hinge on that document, and, in any event, the Defendants are free to explore the degree of his reliance on that document in cross-examination.

As for the Defendants' argument that Dr. Warren-Boulton's market share tests use flawed control groups, rendering the tests methodologically unreliable with inapt comparisons, I do not find that exclusion is necessary. ECF No. 658-1 at 24-26. The Defendants assert that the drugs Dr. Warren-Boulton chose as a control group are unfit comparators, but they do nothing to explain why. Simply because a set of generic drugs different from the drugs at issue in this case was chosen as a control group does not, by itself, show that the comparison was invalid. For this attack to gain a real foothold—even on cross-examination—the Defendants will likely need expert testimony of their own to show why, for the drugs at issue in this case, the choice of a control group consisting of different generic drugs was inapt. The States argue that Dr. Warren-Boulton worked to select what they call "clean" control groups with drugs unaffected by the alleged conspiracy. ECF No. 677 at 29-30. These arguments are for a jury to assess.

Regarding Dr. Warren-Boulton's "price tests" for individual drugs, the Defendants say the tests fatally cannot distinguish between unlawful collusion and lawful oligopolistic behavior. ECF No. 658-1 at 26. Price increases themselves, the Defendants argue, are not indicative of anticompetitive agreements, and the Defendants lean on the Eleventh Circuit's decision in *Williamson Oil* for support. *Id.* at 22–23; *Williamson Oil Co., Inc. v. Philip Morris USA*, 346 F.3d 1287, 1300 (11th Cir. 2003). In *Williamson Oil*, the district court excluded the expert's opinions about an allegedly illegal price fixing conspiracy where the opinions "did not differentiate between lawful, conscious parallelism and collusive price fixing." *Id.* at 1322. But that expert literally "defined 'collusion' to include conscious parallelism," which meant that his opinions elided the distinction between legal and illegal conduct *Id.* at 1322–23 (internal citation omitted). Here, however, Dr. Warren-Boulton appreciated the distinction and analyzed pricing increases relative to certain events (*e.g.*, calls between competitors) and decreases relative to others (*e.g.*, the filing of the Heritage complaint). ECF No. 677 at 25-26. In other words, contrary to the Defendants' argument, Dr. Warren-Boulton relied on the *timing* of price increases rather than the increases themselves. A price increase in an oligopoly is not by itself significant under antitrust law; but a price increase immediately following communications between oligopolists is. I find *Williamson Oil* inapposite and the Defendants' arguments for exclusion unpersuasive.

Last, the Defendants call Dr. Warren-Boulton's cost pass-through rate tests unreliable and "refuted by established law." ECF No. 658–1 at 30-31. Through these tests, Dr. Warren-Boulton considered that pass-through rates, which are the ratio of the increase in the price to the increase in the cost, "will be lower during periods of collusion than during non-collusive periods" because "prices under collusion are fixed by agreement, rather than determined by costs." ECF No. 677 at 28–29. Seeking exclusion of this testimony, the Defendants again cite *In re Text Messaging*,

which recognized that rising prices against the backdrop of lowered costs is not necessarily evidence of collusion.  782 F.3d at 871.  But again, Dr. Warren-Boulton did not rely on the change in the pass-through rate alone.  When paired with the timing of communications between the Defendants, the drop in pass-through rates becomes circumstantial evidence of collusion.  *In re Text Messaging* does not suggest otherwise.

For those reasons, I deny the Defendants' motion to exclude certain opinions of Dr. Frederick Warren-Boulton, ECF No. 658.

### B.  Dr. Crémieux

Moving to the States' motion to exclude the Defendants' experts, I start with the States' arguments for exclusion of certain opinions of Dr. Crémieux.  ECF No. 666 at 6–16.

The States move to exclude Dr. Crémieux's opinion in limited respects, the first of which relates to what's referred to as the "Taro Fair Share Table."  *Id.* at 6–7.  As background, Dr. Crémieux opines that the economic evidence here is inconsistent with an overarching conspiracy, and he relies on two tests to reach that conclusion.  *Id.*  These tests—referred to as Test 1 and Test 2—are meant to evaluate "whether actual observed market shares are consistent with an overarching conspiracy."  ECF No. 666 at 4 (quoting Crémieux Report ¶ 58).  Test 1 analyzes whether "Defendants' market shares are reasonably close to the agreed-upon market shares throughout the alleged conduct period."  *Id.* (quoting Crémieux Report ¶ 58).  Test 2 analyzes whether "Defendants maintain their relative market share positions throughout the alleged conduct period for each Drug at Issue irrespective of the magnitude of their share."  *Id.* (quoting Crémieux Report ¶ 58).

The States move to exclude Dr. Crémieux's opinion as to Test 1 for four distinct reasons, but I need only address one.  *Id.* at 6.  The issue with Test 1 stems from an apparent

misunderstanding of the States' theory of the case:  Dr. Crémieux describes the States' conspiracy

allegations as, in relevant part, "'specif[ying] market shares for each successive entrant [. . .]

depending on the number of competitors,' with the 'specified' shares being those listed in 'Taro's

Fair Share Table.'"  *Id.* at 7 (quoting Crémieux Report ¶¶ 45, 47).  The States argue that this

summary, however, is inaccurate because the States included the Taro Fair Share Table in the

Complaint not as proof positive of what constitutes "fair share" in all drug markets, but instead as

only as an example of "Taro's fair share assumptions in the abstract."[3]  *Id.*  Dr. Crémieux's analysis

rigidly relies on that Table, and the States argue that reliance warrants exclusion because his

analysis will confuse the factfinder.

On this point, I agree with the States.  From my view, Dr. Crémieux's opinion about the

"Taro Fair Share Table" is premised on a misunderstanding, and, when borne out, this

misunderstanding would likely confuse the factfinder.  Thus, it does not fit the facts of the

case.  *See Daubert,* 509 U.S. at 591 (recognizing that expert testimony must "fit" in that it relates

---

[3] Admittedly, the Complaint is somewhat ambiguous on this point.  It includes a graphic showing the Taro Table, alleging that "Defendant Taro created a graphic representation of this *industry-wide understanding*, considering both the number of competitors and their order of entry to estimate what its 'fair share' should be in any given market."  ECF No. 196 ¶ 133 (emphasis added).  The Table itself lists market shares by number of competitors and order of market entry, e.g., 2 competitors / 60% / 40%; 3 competitors / 45% / 35% / 20%; etc.  *Id.*  If the allegations stopped there, Dr. Crémieux's interpretation—that the specific shares in the Table define the States' alleged overarching "fair share" conspiracy—would be reasonable.  But the Complaint goes on to allege that "*Taro* used these principles to guide its behavior when communicating with its competitors regarding specific drugs," *id.* ¶ 134 (emphasis added), and then alleges as follows: "Although these general parameters are well-known, there is no precise method for apportioning 'fair share.'  This is because market share is ultimately determined by either winning or maintaining the business of various customers, which is inherently variable in any given year and must be revised when there are new entrants.  The shared objective, however, is to attain a state of equilibrium, where no competitors are incentivized to compete for additional market share by eroding price."  *Id.* ¶ 135.  These latter allegations support the States' argument that under their theory the Taro Table is just one example of one Defendant's conception of "fair share"—and one that was just an ideal or model rather than a durable description of market realities.  The States will be bound by that interpretation at trial.

to an issue in the case).  And so, I will not rely on Dr. Crémieux's Test 1 for purposes of deciding the summary judgment motion and will, unless the States try to shift their theory to make the Taro Table a more central part of it (but see footnote 3), also exclude it at trial.

Although the Defendants submit that Dr. Warren-Boulton also relies on the Taro Fair Share Table as definitive, the States explain why that is not accurate.  ECF No. 677 at 17–18; ECF No. 672 at 10–12.  Rather, Dr. Warren-Boulton relies on the Table as illustrative "of what Defendants may have perceived as 'fair share.'"  ECF No. 677 at 17–18.  In all events, I conclude that Dr. Crémieux's opinion about the "Taro Fair Share Table" does not fit the facts of the case and thus would neither help the factfinder nor provide clarity of the issues presented, and I exclude the opinion for that reason.

I disagree, however, with the States' arguments for exclusion of Dr. Crémieux's opinions about Test 2.  As the Defendants put it, Dr. Crémieux devised Test 2 "to account for [the States'] shifting fair-share theories" related to Test 1.  ECF No. 672 at 9; *see also* Crémieux Report ¶ 70 (recognizing Test 2 "ignor[es] the specific market shares from 'Taro's Fair Share Table'").  Again, Test 2 examines "whether Defendants maintained their relative market share positions throughout the alleged conduct period for each Drug at Issue irrespective of the magnitude of their share."  ECF No. 672 at 9–10 (quoting Crémieux Report ¶ 70); ECF No. 666 at 9.

The States make various arguments for exclusion of this testimony, including that Test 2 is "based on the misconception that the alleged overarching conspiracy requires stable market shares over time."  ECF No. 666 at 9.  I find that the States can address each of their criticisms of Test 2 on cross-examination.

First, Dr. Crémieux's testimony about market share stability is responsive to Dr. Warren-Boulton's testimony on the same topic, as discussed above.  ECF No. 672 at 11–12.  Second,

although the States argue that Dr. Crémieux created his test *ad hoc* for this litigation, I agree with the Defendants that their criticisms in this respect and about Dr. Crémieux's lack of citations go to weight and not admissibility. *See Amorgianos*, 303 F.3d at 267; ECF No. 672 at 12. Third, as for whether Dr. Crémieux's Test 2 is based on accepted economic methodology, the Defendants explain that it is founded on the scientific approach, i.e., the testing of case-relevant hypotheses against observable data. ECF No. 672 at 15 (detailing methodology).

Finally, I consider the States' last two arguments together, and I find both to be largely a redux of their merits briefing. ECF No. 666 at 11–12, 14. Related to Test 2, the States argue that Dr. Crémieux's opinions suffer from "logical disconnects," caused in part by his failure to consider record evidence, previous rulings, and causes of "any rank reversal" that are consistent with the States' theory of an overarching conspiracy. *Id.* at 13, 16. I find that the States' criticisms about record evidence and alternative causes go to weight rather than admissibility and are proper fodder for cross-examination. *See In re Keurig Green Mountain Single-Serve Coffee Antitrust Litig.*, No. 14-MD-2542 (VSB), 2025 WL 354671, at *51 (S.D.N.Y. Jan. 30, 2025) (holding that "evidence to the contrary of certain opinions is grounds for cross-examination, not exclusion"). Moreover, I am not convinced that Dr. Crémieux meaningfully ignored Judge Rufe's previous orders. ECF No. 666 at 12–13. Judge Rufe's ruling denying the motion to dismiss was an evaluation of the States' satisfaction of the pleading standing, and to the extent the States believe Dr. Crémieux should address additional purported incentives, that can be raised on cross-examination. *See In re Generic Pharms. Pricing Antitrust Litig.,* No. 16-MD-2724, 2023 WL 2244685, at *4 (E.D. Pa. Feb. 27, 2023).

I therefore grant the motion with respect to Dr. Crémieux only as described above, and I otherwise deny it as to him.

### C.  Dr. Bell

I next address the States' motion to exclude portions of Defendant Lannett's expert Dr. Bell's opinions.  ECF No. 666 at 16–20.

First, the States move to exclude Dr. Bell's opinion to the extent that the Defendants cite it for the proposition that generic manufacturers consider terms such as failure-to-supply penalties in pricing and bidding considerations.  *Id.* at 16 (citing Statement of Undisputed Material Facts ("SUMF") ¶ 34).  The States' qualm with Dr. Bell's opinion in this respect is that Lannett disclosed only Dr. Bell's opinion that generic manufacturers *might* consider such terms.  *Id.*  To my mind, this argument is semantical and is appropriate for cross-examination.

Second, the States move to exclude Dr. Bell's opinion to the extent the Defendants cite it for the proposition that "[m]anufacturers also have an independent interest in avoiding undermining a price increase to gain market share because doing so could trigger a 'race to the bottom,' resulting in lower prices and reduced profits for a particular drug."  *Id.* at 17 (citing SUMF ¶ 39).  The States first challenge the Defendants' cited deposition testimony in support of that statement (which I do not take to be a *Daubert* issue) and second ask for exclusion of Dr. Bell's opinion to the extent that he did testify as such in his deposition.  I again find that this challenge is more appropriate for cross-examination, or, to the extent it deviates from Dr. Bell's report, a motion in limine raised closer to the time of trial.

Third, the States move to exclude Dr. Bell's opinion to the extent the Defendants cite it for the proposition that "Lannett has no experience developing or manufacturing dermatological creams, ointments, lotions, or other topical formulations. Lannett could not easily start manufacturing such topical treatments."  *Id.* (citing Defs' Mem. in Supp. of Joint Mot. for Summ. J. on Overarching Conspiracy Claims ("MSJ Br.") at 38).  The States argue that this opinion was

not disclosed, and that Dr. Bell is unqualified to testify on this point. *Id.* In response, the Defendants point to language in Dr. Bell's report supporting the first sentence. *Id.* at 18. As for whether Dr. Bell is qualified to opine on Lannett's ability to manufacture topical treatments, the Defendants argue that he did so based on his opinion that Lannett had "no demonstrable interest as a potential entrant into any of the other drug products." *Id.* This is not a *Daubert* issue either, and it will have no bearing on my ruling on summary judgment. I deny this portion of the motion without prejudice to States' raising these issues in a motion in limine.

Fourth, the States take exception to the Defendants' reliance on Dr. Bell for the proposition that "no Defendant had an 'incentive or ability to participate in the alleged overarching conspiracy involving' the many dozens of 'drugs that it did not make or sell.'" *Id.* (citing MSJ Br. at 39). I agree with the States that Dr. Bell may testify only about Lannett and that his opinion should be limited in that respect. However, it is not clear to me that Dr. Bell has attempted to opine beyond Lannett, or if instead the Defendants have cited his testimony for a proposition that it does not support.

The States also argue that Dr. Bell did not analyze Lannett's incentives, and thus Dr. Bell's testimony is speculative. *Id.* at 18–19. But Dr. Bell reviewed Lannett's documents and the deposition testimony of its executives, so he has some basis to opine on what the economic incentives of a generic drug manufacturer in Lannett's position would likely be—which I take to be the subject of his opinion. In any event, the States may explore any weaknesses in the data on which he relied on cross-examination.

Neither am I convinced by the States' additional arguments for exclusion of Dr. Bell's testimony. For example, Dr. Bell opined that because Lannett "sold only one Drug-at-Issue," that suggests a lack of incentive to participate in the conspiracy. ECF No. 666 at 19. The States argue

that this opinion is contrary to Judge Rufe's order because, as the States paraphrase, Judge Rufe held that "having sold only one drug at issue does not foreclose Lannett's participation in the overarching conspiracy." *See In re Generic Pharms. Pricing Antitrust Litig.*, 2023 WL 2244685, at \*5. But I do not agree that Dr. Bell's opinion is contrary to Judge Rufe's order because her order does not suggest that Lannett's purported incentives are not relevant to whether it participated in an overarching conspiracy.

In sum, I find none of the States' arguments for exclusion of Dr. Bell's opinions compelling, and I deny the motion in that respect.

### D.  Dr. Stiroh

Last, the States move to exclude certain of Mylan's expert Dr. Stiroh's opinions. ECF No. 666 at 20–23.

To start, the States take issue with the Defendants' citation of Dr. Stiroh's testimony for the contentions that "[s]ome Defendants produced few, if any, topical products during the relevant period" and "Mylan sold three products at issue, none of which are topical products used to treat dermatological conditions." *Id.* at 20–21 (quoting MSJ Br. at 14). I do not agree with the States that the number of Drugs at Issue a particular Defendant sold is irrelevant to the question of whether they more probably than not joined the alleged overarching conspiracy. In any event, as the Defendants note, here Dr. Stiroh is summarizing the allegations rather than offering an opinion. ECF No. 672 at 26. Finally, I disagree with the States' passing argument that Rule 403 of the Federal Rules of Evidence requires exclusion of Dr. Stiroh's testimony about how many topical products Mylan produces and whether those are used to treat dermatological conditions. ECF No. 666 at 21 n.7.

The States next seek to exclude Dr. Stiroh's opinions about the profitability of Mylan's relevant drugs.  *Id.* at 21.  They argue that her analysis is unreliable inasmuch as she compares periods without contending with impactful differences between them (*i.e.*, drug exclusivity).  In particular, the States emphasize that Dr. Stiroh's "use of pre-conduct profits reflecting exclusivity [of one of Mylan's successful drugs] as a stand-in for 'but-for' profits that would not reflect exclusivity renders her opinions unreliable."  *Id.* at 22.  The Defendants respond that the States have inaccurately captured both Dr. Stiroh's analysis and her resulting opinion, and thus their arguments for exclusion are premised on misunderstandings, especially considering that Dr. Stiroh is a rebuttal expert.  ECF No. 672 at 27- 28, 28 n.15.  In all events, I find that the impact of the drug's exclusivity period (including that exclusivity's end during the conduct period) is an issue that goes to weight rather than admissibility, and the States can address it on cross-examination.

And to the States' final argument that Dr. Stiroh failed to consider certain direct evidence, I conclude that goes to weight rather than admissibility, and the States may address it on cross-examination.  ECF No. 666 at 23; ECF No. 672 at 25–26; *see also In re Keurig*, 2025 WL 354671, at *51 (rejecting a similar argument about Dr. Stiroh, and concluding that "objections to the weaknesses in any particular source relied upon by Dr. Stiroh are properly addressed through cross-examination, not the wholesale exclusion of her opinions").

Thus, finding none of the States' arguments for exclusion of Dr. Stiroh's opinions persuasive, I deny the motion with respect to her.

## III.    MOTIONS TO SEAL

The Motions to Seal briefs and exhibits related to these motions, ECF Nos. 667, 736, 746, are granted, substantially for the reasons given by counsel in support of these motions.

**IV.     CONCLUSION**

For those reasons, the Defendants' motion to exclude certain opinions of Dr. Frederick

Warren-Boulton, ECF No. 658, is denied.  The States' motion to exclude certain opinions of Drs.

Crémieux, Rubinfeld, Bell, and Stiroh, ECF No. 665, is granted in part and denied in part.


IT IS SO ORDERED.

_____/s/_____
Michael P. Shea, U.S.D.J.

Dated: Hartford, Connecticut
          November 19, 2025