# UNITED STATES DISTRICT COURT
## DISTRICT OF CONNECTICUT

THE STATE OF CONNECTICUT; THE STATE OF
ALASKA; THE STATE OF ARIZONA; THE
STATE OF ARKANSAS; THE STATE OF
CALIFORNIA; THE STATE OF COLORADO;
THE STATE OF DELAWARE; THE DISTRICT OF
COLUMBIA; THE STATE OF FLORIDA; THE
STATE OF GEORGIA; THE TERRITORY OF
GUAM; THE STATE OF HAWAII; THE STATE
OF IDAHO; THE STATE OF ILLINOIS; THE
STATE OF INDIANA; THE STATE OF IOWA;
THE STATE OF KANSAS; THE
COMMONWEALTH OF KENTUCKY; THE
STATE OF LOUISIANA; THE STATE OF MAINE;
THE STATE OF MARYLAND; THE
COMMONWEALTH OF MASSACHUSETTS;
THE STATE OF MICHIGAN; THE STATE OF
MINNESOTA; THE STATE OF MISSISSIPPI; THE
STATE OF MONTANA; THE STATE OF
NEBRASKA; THE STATE OF NEVADA; THE
STATE OF NEW HAMPSHIRE; THE STATE OF
NEW JERSEY; THE STATE OF NEW MEXICO;
THE STATE OF NEW YORK; THE STATE OF
NORTH CAROLINA; THE STATE OF NORTH
DAKOTA; THE COMMONWEALTH OF THE
NORTHERN MARIANA ISLAND; THE STATE
OF OHIO; THE STATE OF OKLAHOMA; THE
STATE OF OREGON; THE COMMONWEALTH
OF PENNSYLVANIA; THE COMMONWEALTH
OF PUERTO RICO; THE STATE OF RHODE
ISLAND; THE STATE OF SOUTH CAROLINA;
THE STATE OF TENNESSEE; THE STATE OF
UTAH; THE STATE OF VERMONT; THE
COMMONWEALTH OF VIRGINIA; THE STATE
OF WASHINGTON; THE STATE OF WEST
VIRGINIA; THE STATE OF WISCONSIN; and
U.S. VIRGIN ISLANDS,

    *Plaintiffs*,

v.

No. 3:20-cv-00802-MPS

SANDOZ, INC.; ACTAVIS HOLDCO US, INC.;
ACTAVIS ELIZABETH LLC; ACTAVIS
PHARMA, INC.; AMNEAL
PHARMACEUTICALS, INC.; AMNEAL
PHARMACEUTICALS, LLC; ARA
APRAHAMIAN; AUROBINDO PHARMA U.S.A.,
INC.; BAUSCH HEALTH AMERICAS, INC.;
BAUSCH HEALTH US, LLC; MITCHELL
BLASHINSKY; DOUGLAS BOOTHE; FOUGERA
PHARMACEUTICALS INC.; GLENMARK
PHARMACEUTICALS INC., USA; JAMES (JIM)
GRAUSO; GREENSTONE LLC; G&W
LABORATORIES, INC.; WALTER
KACZMAREK; ARMANDO KELLUM; LANNETT
COMPANY, INC.; LUPIN PHARMACEUTICALS,
INC.; MALLINCKRODT INC.; MALLINCKRODT
LLC; MALLINCKRODT plc; MYLAN INC.;
MYLAN PHARMACEUTICALS INC.; KURT
ORLOFSKI; MICHAEL PERFETTO; PERRIGO
NEW YORK, INC.; PFIZER INC.; SUN
PHARMACEUTICAL INDUSTRIES, INC.; TARO
PHARMACEUTICALS USA, INC.; TELIGENT,
INC.; ERIKA VOGEL-BAYLOR; JOHN
WESOLOWSKI; and WOCKHARDT USA LLC,

      *Defendants*.

## RULING ON MOTION FOR SUMMARY JUDGMENT

In this action, the Plaintiffs, the Attorneys General of most of the States and several U.S.

territories ("the States"), allege that twenty-six pharmaceutical companies ("the Defendants")

participated in an overarching conspiracy to fix prices, allocate markets, and rig bids in the sale of

generic drugs for skin ailments, and are thus jointly and severally liable for violations of federal

and state antitrust and unfair and deceptive practices laws. The Defendants have moved for

summary judgment on the grounds that no overarching conspiracy existed.[1] ECF No. 609. For

the reasons set forth below, I DENY the Defendants' motion for summary judgment.

---

[1] Nine of the ten individual Defendants named in this action (for the most part employees and executives of the corporate Defendants) also join the Motion, though they contend that the States do not raise overarching conspiracy allegations against them. ECF No. 609-1 at 66 n.33. The

## I.  BACKGROUND

The following facts are drawn from the parties' Local Rule 56 Statements of Facts, including the States' Statement of Additional Material Facts ("SAMF"), ECF No. 612-1, and the record, and are undisputed unless otherwise noted.

### A.  Procedural Background

This is one of three cases in which the Attorneys General of the States have sued scores of defendants in the generic drug industry for alleged antitrust violations and unfair trade practices. All three cases were originally filed in this Court but were transferred to the Eastern District of Pennsylvania (the "MDL Court"), which was designated by the Judicial Panel on Multidistrict Litigation (the "JPMDL") to preside over these and other similar cases brought by private parties in a consolidated proceeding.  ECF No. 9.[2]  In April 2024, these three cases were remanded to this Court by the JPMDL and assigned to me.  ECF No. 11.

The operative complaint in this case, ECF No. 196, alleges collusion in the pricing, market allocation, and bidding for some eighty generic drugs, chiefly for dermatological applications.  The parties refer to it as "the Dermatology complaint."

### B.  Defendants and Drugs at Issue

The States' expert has classified the eighty drugs that are the subject of the complaint into ninety-eight separate drug products (*e.g.*, counting separately Acetazolamide tablets of 125 milligrams and 250 milligrams, and Triamcinolone Acetonide cream in strengths of 0.025%, 0.1%,

---

States did not dispute this in their opposition brief and confirmed at oral argument that they were not seeking to hold the individuals jointly and severally liable.  *See* ECF Nos. 612, 1093 at 38.

[2] Unless otherwise indicated, all ECF numbers in this ruling refer to entries on the docket of this case, not the same case when it was before the MDL Court, and each page number refers to the page number shown on the ECF stamp on the top of the cited page, not the page of the relevant brief or pleading designated by the parties.  References to page numbers of documents that were filed under seal refer to the page number of the PDF file.

and 0.5%).  ECF No. 612-1 ¶ 1; ECF No. 684-2 at 479–80 (listing the classifications).  I will refer to these ninety-eight classifications of drug products as the "Drugs at Issue."  The Drugs at Issue come in various forms—most are topical products, such as creams, ointments, or lotions; others are solids, such as capsules, tablets, and suppositories.  ECF No. 612-1 ¶¶ 9, 13.  They also differ in their intended purpose, though nearly all are dermatology-related.[3]  *Id.* ¶ 10.

None of the Defendants here sold all of the ninety-eight Drugs at Issue.[4]  *Id.* ¶ 4.  The most frequent players are Sandoz (76 drug products), Taro (47), Perrigo (36), G&W (22), and Actavis (16).  The other Defendants each sold fewer than ten Drugs at Issue; Amneal, Lannett, and Teligent sold one each, while Lupin, Bausch, and Wockhardt sold two each.  *Id.* ¶¶ 5–6.

### C.  The Alleged Overarching Conspiracy

The States allege that each corporate Defendant is jointly and severally liable for anticompetitive conduct related to all of the Drugs at Issue, regardless of whether the Defendant ever sold or manufactured a certain drug, because they each had an "overarching understanding to avoid competing with each other and to instead settle for what these competitors refer to as their 'fair share'" of a given drug market.  ECF No. 196 ¶ 5.  In the present motion, the Defendants

---

[3] The Defendants highlight three drugs, Latanoprost solution, Promethazine Hydrochloride suppositories, and Ciclopirox cream as treating "non-dermatological ailments."  ECF No. 612-1 ¶ 10.  The States note that at least Promethazine and Ciclopirox can be used to treat dermatological ailments.  *Id.*; *see also* ECF No. 196 ¶ 177 (alleging in complaint that "[a]lthough topical products are mostly dermatology-related, they can also be used to treat . . . pain and allergies.").

[4] The parties do not dispute that the twenty-six corporate Defendants facing joint and several liability represent "sixteen unique corporate families."  ECF No. 609-1 at 21 n.2.  The corporate families that the States allege formed the overarching conspiracy are: Actavis, Amneal, Aurobindo, Bausch, G&W, Glenmark, Greenstone (including its former parent company Pfizer), Lannett, Lupin, Mallinckrodt, Mylan, Perrigo, Sandoz (including its subsidiary Fougera), Taro (including Sun, which merged with Taro in 2024), Teligent, and Wockhardt.  Because the Defendants do not argue that members of the same family corporate family should be treated differently for the purposes of this motion, I will consider allegations and evidence against a given Defendant as applying to all other Defendants that are members of its corporate family.

argue that the States have failed to provide evidence upon which a reasonable jury could find that there was an overarching conspiracy that encompassed all Defendants and all ninety-eight Drugs at Issue.  ECF No. 609 at 1.

> As part of the "fair share" understanding, the States allege,
>
> it was generally understood that when a competitor increased prices, the other competitors in the same drug market would either decline to bid for the business or would bid high so as not to take advantage of the price increase [by seeking to increase market share].  Typically, the competitor would then follow with a comparable price increase of its own.

ECF No. 196 ¶ 7.  The States do not allege that each manufacturer agreed on how "fair share" should be allocated for each Drug at Issue, but rather that the "shared objective" of all competitors was "to attain a state of equilibrium, where no competitors are incentivized to compete for additional market share by eroding price."  *Id.* ¶ 135.

More broadly, the States allege the Defendants' targeting of their "fair share" of a drug market was one tactic by which they abided by the "rules of engagement" between generic drug manufacturers, *id.* ¶ 130.  These rules of engagement also allegedly included a general understanding to refrain from disrupting markets in other ways, such as by pursuing increased market share when a competitor experienced supply issues.  *Id.* ¶ 139.  The States allege that manufacturers who abided by the "rules of engagement" were viewed as "playing nice in the sandbox," and referred to as "responsible" or "rational" competitors, *id.* ¶ 142, while those who did not follow the rules were viewed as "irresponsible" and as firms that might need to "be spoken to by competitors," *id.* ¶ 145.

Allegedly as a result of this "fair share" understanding and adherence to the "rules of engagement," prices of generic drugs "skyrocketed," and costs to consumers "doubled, tripled, or even increased by 1,000% or more" in 2013 and 2014.  *Id.* ¶ 8.

The Defendants contend that there was no "fair share" understanding or agreement to

follow the "rules of engagement" applicable to the wider generic drug industry. Rather, the Defendants argue that for each Drug at Issue, manufacturers "*independently* assessed whether (and to what extent) to seek additional business and the prices at which to do so in response to [requests] from customers," and "could mitigate a reduction in profitability by *independently* giving up some business to new entrants instead of undercutting new entrants to maintain market shares." ECF No. 612-1 ¶¶ 41–42 (emphases added). The Defendants also suggest that, at most, the States have shown a few bilateral conspiracies. ECF No. 609 at 34.

### D. The Generic Drug Industry

To market and sell a generic drug, a manufacturer must submit an Abbreviated New Drug Application ("ANDA") to the U.S. Food and Drug Administration ("FDA"). ECF No. 612-1 ¶ 3. To obtain FDA approval, the generic manufacturer must show that its product is "bioequivalent" to the brand-name product. *Id.* In other words, in the eyes of the FDA, all competitors marketing a given generic drug product sell identical goods. *See* ECF No. 684-1 at 285 ("generics are commodities"). The Defendants, however, had different sources for obtaining the drugs' Active Pharmaceutical Ingredients ("API"), or the finished drug itself, and so their manufacturing costs differed. ECF No. 612-1 ¶¶ 22–24.

The parties agree that the drug markets can be characterized as "oligopolies, i.e., concentrated markets with few competitors." *Id.* ¶ 17. Although the number of competitors changed over time as sellers entered and left particular drug markets, for the ninety-eight Drugs at Issue, half had three or fewer competitors during the period (between 2009 and 2016) in which the Defendants allegedly communicated to fix prices and allocate markets; and 88 percent of the Drugs at Issue had five competitors or fewer. *Id.* ¶¶ 15–16.

As in any industry, the number of competitors and available supply of a generic drug impact

the price that suppliers charge customers. Customers of generic drug manufacturers—typically large pharmacy retailers and wholesalers—solicit bids from suppliers to find the best price. ECF No. 693-7 at 35; ECF No. 684-2 at 600–01. The prices in customer agreements "can change monthly or yearly, depending on the customer." ECF No. 693-7 at 35. If a customer is unhappy with a price, it may issue a request for quotation ("RFQ" or "RFP") to its incumbent supplier and competing suppliers. *Id.* The bidding process frequently involves communications between the customer and sales representatives of the competing manufacturers. *See, e.g.*, ECF No. 693-2 at 31–32. Often, the customer may afford the incumbent supplier a right of first refusal ("ROFR"), which involves the customer's informing the supplier that it risks losing the business for a given product if it does not match a competitor's lower price. ECF No. 693-7 at 36, 367; ECF No. 684-2 at 600–01; *see, e.g.*, ECF No. 693-2 at 25. Through this process, it is common for suppliers to learn of their competitors' price changes from customers. ECF No. 612-1 ¶ 36.

In sum, the market for any given Drug at Issue features identical products, a limited number of competing suppliers, and regular opportunities for suppliers to negotiate with customers to increase their market share by obtaining their competitors' business.

In this landscape, whenever one supplier raises its price on a particular drug, the competing suppliers must decide whether they should increase their own prices. If a competing supplier "follows" the initial price increase, it may make greater profits with its existing customers, but it likely forgoes the opportunity to add to its market share. *See id.* ¶ 37 ("When a competitor increases price, manufacturers can improve profitability by following the first competitor with their own price increases, including by sometimes obtaining the same amount of business at a higher price."). On the other hand, if a supplier declines to follow an initial price increase in an attempt to increase its market share, it risks triggering a "race to the bottom" in which prices erode

as suppliers compete for customers. *Id.* ¶ 39. As one witness testified, "[t]he worst thing that you could possibly do in a commodity market is chase lots and lots of market share because there's competition and you only end up [racing] your price to the bottom. Because everyone is going to be circulating looking for more share, more share, more share, lowering the price, lowering the price, lowering the price." ECF No. 684-1 at 285; *see also id.* at 619 ("[a]s more and more people enter [a drug market], you have more and more activity, bidding activity, and it inevitably causes price erosion"). One Glenmark executive testified that dermatological products were a "good place to start raising prices" because they generally "had less competition than solid oral products," and therefore price increases were "more likely to stick." ECF No. 612-1 ¶ 21 (quoting ECF No. 684-1 at 1492–93).

Thus, price increases entail risk: if any competitor declines to follow an increase, those that raised their prices might have to reverse their decisions to retain their customers and might lose business in the process. *See id.* ¶ 40 ("The worst-case scenario occurs when the manufacturer lowers its price but fails to gain market share . . . ."), ¶ 44 ("If the incumbent manufacturer tried lowering prices to keep a customer, it risked its overall profit."). Because of this risk, the States contend, a supplier might "not take a price increase if they felt that they could not depend on their competitors to follow." SAMF ¶ 11 (citing witness testimony at ECF No. 694-5 at 490–91).

Factors beyond price also impacted suppliers' decisions about whether to bid to retain or increase their market share. ECF No. 612-1 ¶ 34. For instance, some supplier-customer contracts included failure-to-supply penalties, which imposed financial penalties on generic drug makers when they could not meet a customer's quantity needs and might restrain a supplier's ability to submit a bid for new business when a competing supplier raised the price. *Id.* ¶ 35. The States, however, contend that "'failure-to-supply penalties' in customer contracts were not and had never

been a reason to raise prices of generic drugs." SAMF ¶ 59. Supply interruptions, too, at times imposed such restraints. ECF No. 612-1 ¶ 35. And although the Defendants frequently entered, exited, and reentered markets for the Drugs at Issue, SAMF ¶ 40, even when a competitor exited a market, suppliers might still decline an opportunity to increase market share where the profit margins on the product were low. ECF No. 612-1 ¶ 45. In fact, the Defendants cite some evidence suggesting that the profitability of some of the Drugs at Issue declined as compared to the period before the alleged collusion took place. *Id.* ¶ 49.

### E. Independent Action v. Overarching Conspiracy

The parties point to different parts of the record to support their arguments. The Defendants rely heavily on the market dynamics of an oligopoly, while the States point principally to testimony of their cooperating witnesses—former employees of some of the Defendants—to contend that what the Defendants call oligopolistic behavior was really collusion.[5] A summary of the key evidence on which the parties rely is set forth below.

#### 1. Market Dynamics

The Defendants argue that market shares for the Drugs at Issue "fluctuated in a manner that is inconsistent with the existence of the alleged overarching conspiracy." ECF No. 609 at 42. The States' expert, Dr. Frederick Warren-Boulton, wrote in his report that "[t]he hallmark of an MSA [Market Share Agreement] is . . . the greater stability of market shares during the period when the MSA is effective." ECF No. 693-7 at 49. Similarly, the Defendants' expert, Dr. Pierre-Yves Crémieux, testified that "if there is an overarching conspiracy, we should observe some market stability . . . . If the answer is no . . . there can't be an underlying overarching conspiracy

---

[5] Multiple witnesses who were not cooperating with the States testified that their companies never entered into any price-fixing or market-allocation agreement with a competitor. ECF No. 612-1 ¶ 30 (collecting denials from representatives of Actavis, Amneal, Aurobindo, Bausch, Glenmark, Greenstone, Lannett, Lupin, Mylan, Perrigo, Sandoz, Sun, Taro, and Wockhardt).

because the economic evidence directly contradicts it."  ECF No. 612-1 ¶ 58.

Yet for approximately thirty percent of the Drugs at Issue, the market share leader at the beginning of each alleged period of collusive conduct lost its market leader position just two quarters later.  ECF No. 612-1 ¶ 40.  And for eighty-eight percent of the Drugs at Issue that have had between two and five competitors, competitors did not maintain their market share positions throughout the alleged conspiracy period.  *Id.* ¶ 59.  For example, in the market for Latanoprost solution, the market share leader among four competitors changed twice between 2012 and 2016, and the share of the leading supplier at the start of the period went from fifty percent to less than twenty percent.  *Id.* ¶ 60(d) (citing ECF No. 687-1 at 401 & fig.30).  For Clobetasol Emollient cream, after Sandoz followed Taro's price increase, its 68.5 percent market share fell to 5.4 percent within six months, while another competitor's share rose from 1.3 percent to twenty-two percent. *Id.* ¶ 56.

Firms with "a relatively high market share . . . could afford to lose some of that market share in order to charge a higher price for the product."  *Id.* ¶ 36.  Such decisions, the Defendants contend, were made for "several independent reasons, including as part of a regular portfolio review, after [a Defendant] conclud[ed] that it could sell at a higher price and profit to fewer customers, in response to supply challenges, or in response to other price increases."  *Id.*  The States dispute this as speculation that contradicts testimony that the Defendants increased prices in concert with each other.  *Id.* (citing SAMF ¶¶ 14, 28, 30).

The Defendants also contend that, no matter how a Defendant understood "fair share" to apply in a particular drug market, the data do not support the alleged goal of "attain[ing] a state of equilibrium" in the Drugs at Issue, ECF No. 196 ¶ 135, because for about thirty percent of Drugs at Issues in two-competitor markets, the market share leader had between seventy and ninety-nine

percent of the market, i.e., more than the States' alleged equilibrium would suggest.  ECF No. 612-1 ¶ 51.

### 2. Rules of Engagement

The States allege that the Defendants formed an overarching conspiracy to follow the "rules of engagement" in any market in which they competed, including by allocating a "fair share" to each competitor.  Among the States' cooperating witnesses, Paul Krauthauser, a former Sandoz executive, testified during his deposition that the "rules of engagement" are, "[i]n their simplest form, tactics that are utilized by another pharma company to ultimately preserve market value in the markets that they're in."  SAMF ¶ 63 (quoting ECF No. 693-5 at 48).  According to Krauthauser, "if shares are evenly or more or less evenly distributed based on fair share," the rules of engagement dictated "that when you take your price increase, you leave customers that you don't have alone, meaning that you don't poach."  ECF No. 693-5 at 49.  He also testified that manufacturers were considered "rational" when they "fall in line with those types of tactics."  ECF No. 693-5 at 48.  He testified that Taro, for example, was a "rational" company with which he did not need to have "detailed discussions" about a price increase on a particular drug because "[t]he general understandings are already in place."  *Id.* at 50.

Other witnesses both corroborated Krauthauser's testimony and described other terms they used to describe conduct by competitors that was consistent with the rules of engagement.  SAMF ¶ 2.  Anthony Thomassey,[6] who worked for Fougera and later Aurobindo, testified that the terms

---

[6] The States have filed a motion to preclude the opinions of Dr. Levin, a neuropsychologist who questions the reliability of Thomassey's memory due to a medical condition.  ECF No. 659.  Although the Defendants say that the question of the admissibility of Dr. Levin's opinions should be reserved for trial, they suggest in a footnote that I should somehow discount Thomassey's testimony on summary judgment because Levin's opinions show that his testimony is "misleading" and suffers from "admissibility concerns."  ECF No. 674 at 6 & n.10.  I am skeptical that a neuropsychologist who does not treat and has not examined Thomassey, and whose opinions are based primarily on review of his medical records and video of his deposition testimony, will

"rational," "responsible," and "playing nice in the sandbox" all "fall into the concept of fair share," *id.* at 125, and that most generic manufacturers understood what the terms meant in the "fair share" context, *id.* at 126; *see also id.* at 125 ("These are code words that everyone in the industry is aware of."). Conversely, a competitor that was "hogging the market" by seeking to exceed its fair share would be viewed by competitors as "irrational," he said. *Id.* at 123–24.

Michael Vezza of Sandoz testified similarly, describing a "rational competitor" as one who "would know what fair share meant" and "would . . . give up share if they were the majority supplier." *Id.* at 457. He also testified that the term "responsible" was similar to "rational" in the fair share context. *Id.* at 457–58; *see also* ECF No. 684-1 at 569 (Della Lubke of Sandoz testifying that she discussed with a competitor "that our companies acted in a responsible way. We . . . didn't tank product price to get market share.") Christopher Bihari, who worked for Fougera and later Sandoz, testified that Fougera was "rational," in that it would follow price increases: "And even with new product launches, Fougera was methodical in their market share goals. They weren't -- they understood that if they're the third entrant, 30, 35 percent market share, they didn't try to exceed that. So in that sense, that's what I mean by rational." ECF No. 693-5 at 650. Bihari further testified that, when he communicated with Taro executive Ara Aprahamian about product launches, Aprahamian would tell him "don't be stupid," which Bihari understood to mean:

> Either price it appropriately, you know, follow the customers or the plan -- the customers that they're willing to relinquish, or if it's a Taro price increase, for Sandoz to follow, you know, a similar price point. Don't take my market share, meaning don't be stupid, don't take my share. Things like that. It was a phrase he would use often.

---

assist the trier of fact in this case, but I will reserve ruling on whether a jury may hear Dr. Levin's opinions until the time of trial. For today's purposes, it suffices to say that the deposition transcripts of Thomassey in the summary judgment record raise no concerns about his memory or his competence as a witness. I therefore DENY the States' motion without prejudice to renewing it at the time for filing motions in limine.

*Id.* at 648.

The States also contend that "the term fair share referred to an anti-competitive agreement," citing testimony from Thomassey.[7]  The Defendants, however, dispute that the term "fair share" *always* refers to an allocation agreement between competitors, pointing to instances in the record where customers and consultants instead used the term "fair share" in ways to describe performance in drug markets.  ECF No. 612–1 ¶¶ 65–66.  They also point to the States' response to a discovery request in which the States conceded that "in the absence of any other evidence or context, use of the term 'fair share' in the abstract may or may not be indicative that a generic pharmaceutical supplier has entered into an agreement with a competitor." *Id.* ¶ 61.

The Defendants also contend that, even when "fair share" was used in the context of an agreement between competitors, testimony from the Defendants' employees and former employees, as well as the States's expert, show that generic manufacturers had different understandings of what the term meant.  *Id.* ¶¶ 62–64.  For Greenstone, "'fair share' was a 'mathematical calculation that divided a market by the number of active players within that market . . . evenly,'" *id.* ¶ 64(e), while a Taro document suggested earlier entrants should retain a greater-

---

[7] Thomassey's testimony on this point came during a portion of his deposition in which the States' counsel asked him to disavow various statements he had made in an earlier affidavit. *See* ECF No. 693-5 at 100.  The passage in question reads:

> Q. And then I just want to focus on the last sentence of paragraph 9, it says, "The term fair share does not refer to any kind of anti-competitive agreement."
>
> Do you see that?
>
> A. Yes.
>
> Q. Is that statement true and accurate?
>
> A. That sentence is false.

*Id.* at 107–08 (form objection omitted).  Thomassey also agreed that "the concept of fair share was a consideration in" "the agreements" he "reached with competitors" during his time in the industry. *Id.* at 108.

than-even share, *id.* ¶ 46.[8]  For Glenmark, "'fair share' may have been interpreted as 'reasonable share' based on a manufacturer's ability to supply or number of competitors in a market."  *Id.* ¶ 64(d).[9]  The States contend that, despite these differences, "[w]itnesses across Defendants described the concept of 'fair share' in the same mathematical way—as roughly an even split of the market that can account for circumstances including supply and order of entry in the market."  SAMF ¶ 15.

### 3.  Broad Agreements Between Competitors

Citing testimony from cooperating witnesses, the States contend that the alleged "overarching agreement was implemented by later subsidiary agreements that would be structured around 'fair share' principles as modified by the particulars of a given market."  SAMF ¶ 21.  The witnesses described two types of subsidiary agreements: (1) those specific to individual drugs, *see id.* ¶ 22(b) (listing testimony related to agreements for "dozens of generic drugs at issue"), and (2) "bilateral agreements between defendants [that] transcended any particular drug," *id.* ¶ 25.  *See id.* ¶ 24 ("Witnesses testified that their agreements with their co-conspirators to fix prices and allocate the market were not limited to any particular drugs.").  Because the multiple-drug agreements between specific competitors described by the cooperating witnesses share many of the same features as the overarching conspiracy alleged by the States, I will describe the witnesses'

---

[8] According to the Defendants, other market analyses also fail to support a "fair share" distribution of a market under Taro's purported definition.  ECF No. 612-1 ¶ 52 ("nearly 65% of the market leaders in 2016 Q1 had shares of either below 40% or above 50%, not the 45% share in the Taro document"), ¶ 53 (for Drugs at Issue with "between two and five competitors, the market share of at least one competitor was not within ten percentage points of the market shares specified in the Taro document during the alleged conduct period"), ¶ 54 ("Sixty-five percent of the Drugs at Issue that have between two and five competitors did not follow a pattern where the first entrant has the highest share, the second entrant the second highest share, and so on.").

[9] The Defendants also point to instances in the record where customers and consultants used the term "fair share" in ways to describe performance, rather than to describe an agreement between competitors.  ECF No. 612–1 ¶¶ 65–66.

testimony about these agreements in more detail.

> a. Anthony Thomassey

From 2004 to 2012, Thomassey worked for Fougera, a "generic creams and ointments provider," as a national accounts executive. ECF No. 693-5 at 92–93. When Sandoz acquired Fougera, Thomassey accepted a similar position at Aurobindo, "an oral solids manufacturer," where he worked for nine months. *Id.* at 93. Thomassey testified that he communicated regularly with competitors about pricing, customer allocation, and product launches "[t]o secure fair share and establish higher market pricing," *id.* at 115–16, and that these communications resulted in both specific pricing agreements about particular drugs, *id.* at 118–19, as well as "higher overarching agreements" between competitors applicable to any "cross competing products." *Id.* at 225, 340. Specifically, Thomassey testified that while at Fougera, he communicated with representatives of Defendants Perrigo, Taro, G&W, and Greenstone about pricing and market allocation. *Id.* at 135–37. Thomassey also testified that he was aware of communications and agreements between both of his employers and Actavis "regarding the pricing [and] allocation of generic drugs." *Id.* at 101, 104.

Although Thomassey testified that he reached agreements with competitors on a "product-by-product" basis, he also said Fougera had a "higher overarching agreement" with his counterparts at Perrigo, Taro, *id.* at 225, 340, and he described a similar "understanding" with his counterpart at G&W, *id.* at 237.

- With Perrigo, Thomassey said, "there was the higher overarching agreement that, yeah, we were going to call. There was -- they were going to call us, I was going to call them when a [product] launch was happening, when we knew we were going to have product X, Y, or Z." *Id.* at 340. This agreement—to call each other and "discuss the product and the customers and figure out allocations and pricing"—applied when either Fougera or Perrigo planned to enter any market for "cross competing products." *Id.* at 335, 340–41. "At a high level it would be on all products where we cross competed. But then there would be specific conversations regarding each

product when that situation arose." *Id.* at 336. "If Perrigo has an item and I'm launching -- entering the market[,] I would call Tony [at Perrigo] and say, hey, we're launching, who should I go after and where are you at, roughly, or vice versa." *Id.* at 337; *see also id.* at 339 ("[T]here was definitely the expectation that calls would be made. . . . [F]rom a launch standpoint it was definite.").

- Under the Taro agreement, when "either one of us . . . took a price increase, the other would follow and we would not cannibalize or take the other's market share when the product got bid out due to the increase." *Id.* at 225. For instance, when Taro entered the market for Imiquimod cream, one of the Drugs at Issue, Thomassey first recommended to his superior to let the customer go to Taro. *Id.* at 173. Thomassey then had multiple phone calls with his counterpart at Taro "[t]o coordinate the pricing and/or market share being allocated." *Id.* at 179. Thomassey also testified that similar calls, followed by immediate reports to his superiors for approval, were a consistent patten at Fougera. *Id.* at 147.

- Under the G&W agreement, Fougera "would let [G&W] know who we were targeting and where -- what price we were going in at and vice versa. And just do all we could to keep the market price up and not erode each other's market share." *Id.* at 374. Thomassey testified that he had an "understanding" with his counterpart at G&W, Jim Grauso, "[t]hat we would be responsible in the marketplace and we would divvy up -- share appropriately and agree on what we were doing and who we were targeting." *Id.* at 237. The understanding also covered pricing: "if one or the other raised the price, when that product got put out to bid, the other manufacturer would decline to bid the product." *Id.* at 237–38.

- Thomassey also testified that the Fougera-G&W agreement sometimes also involved the other competitors in a given drug market. For instance, in one market in which Fougera and G&W also competed with Actavis, all three firms reached an agreement "[t]o allocate market share and keep the price as high as possible" after Actavis led a price increase. *Id.* at 246–54.

Thomassey also testified that he and Grauso, his G&W contact, would serve as intermediaries for other competitors even when their own employers did not sell a particular drug. *Id.* at 255–59 (Thomassey, while working for Aurobindo, acting as a "conduit" for G&W and Perrigo to share competitively sensitive information between); *id.* at 293–97 (Grauso, after leaving G&W, acting as intermediary for Fougera and G&W). Thomassey testified that he acted as a "conduit" for competitors "[b]ecause as the competitors shared information, it was building

goodwill for when I needed the information. . . . Because especially at Aurobindo, seeing as how I did not have oral solid contacts, I needed them. And I might be able to call in a favor at a later point." *Id.* at 262–63.

### b. Christopher Bihari

Bihari worked for Fougera prior to Sandoz's acquisition of the company, and he continued with Sandoz in a similar role as director of national accounts. *Id.* at 610. Before the acquisition, Bihari testified, "Sandoz was always a big question mark for everybody in the industry," and "did whatever [it] wanted." *Id.* at 649, 711. Sandoz was a behemoth in the industry with 1,400 drug products, according to Bihari, and thus "many manufacturers feared Sandoz because of their size." *Id.* at 711–12 (noting that Sandoz "swung a pretty big bat"). Sandoz's competitors, however "needed Sandoz to be a . . . participant" in agreements to fix prices and allocate markets, Bihari said. *Id.* at 711 ("The smaller manufacturers like Taro or Perrigo in particular, . . . they were heavily dependent on price increases."). Bihari testified, however, that Sandoz quickly changed tactics upon its acquisition of Fougera: "With the acquisition of Fougera and, of course, now there's more overlap between Sandoz and Taro in the derm market, it started -- it started right after the acquisition and after each price increase or new product launch, there was cooperation." *Id.* at 1249. The change, Bihari said, occurred after Taro shared pricing information that allowed Sandoz to be "successful in some launches." *Id.* at 1250.

Specifically, Bihari testified about agreements that Sandoz had with Taro and Perrigo that encompassed multiple drug products.

- Bihari described the scope of Sandoz's agreement with Taro as: "encompass[ing] any product where Sandoz and Taro overlapped as well as any new product launches that Sandoz -- where Sandoz entered the market or where Taro may have entered the market." *Id.* at 1247. The arrangement was not a one-size-fits-all that covered every product; Bihari said "it was almost, I guess you could say [a la] carte." *Id.* "In each instance, it was understood that when Sandoz launched a product and Taro was in the

market, there would be pricing shared and customer allocation and in the cases where there are price increases, it was also -- it was understood as part of the overall agreement that Sandoz would fire -- follow a price increase at some point." *Id.* at 1247–48.

- Similarly, Bihari described Sandoz's agreement with Perrigo as: "Essentially Tony Polman [of Perrigo] would provide pricing information as needed with the expectation that I would share that with Sandoz. And if it's a price increase, they would follow the price increase to the same levels, if Sandoz is launching a product, that Sandoz would be diligent in their market share and their pricing, and if Perrigo and Sandoz were launching at the same time, you know, they would launch at similar price points so as not to create disruption in the market and to allocate or split the customers accordingly." ECF No. 684-1 at 406–07.

- Bihari also testified that communicating with competitors about price increases was not only the practice of Fougera or Sandoz, but rather that "everybody in the industry in my opinion seemed to be doing it." ECF No. 693-5 at 1201. "[W]hen I started as Sandoz, everybody seemed to be very interested in befriending me and talking to me and, you know, there was a lot of pressure to -- on me and everybody at Sandoz to meet their internal goals. So it just seemed that it was not right but it was accepted because . . . a lot of people in the industry were communicating." *Id.* at 1202.

- Sandoz also reached agreements related to Drugs at Issue that involved more than a single competitor, Bihari testified. For instance, for ketoconazole cream, he described a three-firm agreement in which both "Taro and G&W would eventually follow [Sandoz's] price increase and keep the price high and to not poach or take anyone else's share." *Id.* at 1159. Bihari also described simultaneous, identical agreements that Sandoz had with multiple competitors on multiple Drugs at Issue. With Nystatin cream, for example, Taro "agreed to relinquish a customer or customers to Sandoz in order to keep the price as high as possible," while Perrigo also "would relinquish certain customers," to ensure that Sandoz had a "successful launch." *Id.* at 1034–35. Other Drugs at Issue for which Sandoz reached agreements with multiple competitors included Ciclopirox shampoo (Actavis and Perrigo, including phone calls to both competitors on the same day, *id.* at 827–36), Desoximetasone ointment (agreement with Taro and later new entrant Glenmark, *id.* at 849–61), Desonide ointment (Perrigo and Taro, *id.* at 1011–23), and Halobetasol cream (Perrigo and G&W, *id.* at 1048–59).

- Bihari also testified that Aprahamian, an executive who moved from Actavis to Taro in 2013, brokered a deal between Actavis and Sandoz five months after joining Taro. *Id.* at 781–86. Bihari said that when he needed to obtain information from Actavis, "I didn't speak to anybody at Actavis, and I knew [Aprahamian] still had contacts at Actavis, so I called him

regarding desonide lotion." *Id.* at 781–82; *see also id.* at 1225 ("I had conversations with Ara Aprahamian about the desonide lotion relaunch, and then he would speak to someone at [Actavis]."); *id.* at 1226 ("It was my understanding that he was facilitating or brokering Actavis's relaunch in the market, helping them out on their behalf."). Bihari said he told Aprahamian told "Sandoz would relinquish the appropriate share or customers that [Actavis] is asking." *Id.* at 1228.

### c. Michael Vezza

Vezza, another Sandoz employee, testified that Sandoz "had collusive relationships with competitors," including Perrigo and Taro, which "gave us the confidence . . . that a particular price increase would be more successful." *Id.* at 417; *see also id.* at 417–18 ("[W]e knew that that was more financially beneficial to Sandoz, to -- I mean, we tried to follow the increase. We did lead a few along the way. But it was good to know. . . . I would say it was good to know, you know, those were helpful relationships.")*.

- Vezza testified that Sandoz agreed with Taro to fix prices and allocate customers for Clobetasol, Desonide ointment, and Nystatin Triamcinolone cream—all Drugs at Issue—but that the agreement with Taro was not limited to those three drugs. *Id.* at 467–68, 479. Rather, Sandoz and Taro had an "understanding" to give up market share when the other entered a given market, and to generally abide by "fair share" principles. *Id.* at 496–97.

- Sandoz, Taro, and Perrigo all consistently acted in accordance with their agreements when one company launched a product, Vezza testified. *Id.* at 575–76 ("[Bihari] was communicating with Taro and Perrigo on a regular basis. So, you know, on product launches, you know, getting share, or, you know, [Bihari] would communicate [internally], you know, price points from Taro . . . . And we would use those price points to award -- get guidance on what customers to go for or who to avoid. And then we would do that and then -- to launch our products. And then when they were launching into ours, we gave them price points. You know, when it came to price increases, you know, they knew that we would do everything that we could to follow as quickly as possible. Some months we -- some increases we could follow quickly and other ones took a month or -- some time. But, you know, the goal was to just follow the price increases and launch products and be as profitable as possible."). This pattern, Vezza said, resulted in "higher prices for both . . . price increases and for product launches." *Id.* at 576–77.

- Sandoz's goal with these agreements, Vezza said, was "to avoid fighting or avoid -- you know. Many times if we launch a product into somebody that maybe doesn't want us to get that award, they defend. And then you have to go to somewhere else at a lower price. And this arrangement avoids all that, where you get guidance on where you want to go, the price you need to beat. So then you know what price you have to go -- you go below that price, you get the award and then you move on as quickly as possible to the next topic." *Id.* at 577.

Vezza also testified that Sandoz feared retaliation from Taro if it took action that was inconsistent with their agreement. *See id.* at 509. Any such retaliation could come in a different drug market in which the manufacturers both competed. *Id.* at 513 (reading email stating "we were afraid of any potential 'retaliation' of Taro on other market[s] where Sandoz and Taro compete").

When asked whether Sandoz was in "an overarching conspiracy" described as "[o]ne big agreement among all of [the Defendants]," however, Vezza responded, "[n]ot that I recall." ECF No. 684-1 at 1399.

### d. Della Lubke

Della Lubke, another director of national accounts at Sandoz, testified that "a big part of our job was getting competitive intelligence. I had rather limited resources to do that, yet we were expected to get the information that we were asked to get. And sometimes I was asked specifically." ECF No. 693-5 at 1316. She testified that she obtained such competitive intelligence from Defendants Taro, Mylan, and Bausch, as well as other non-Defendant firms, and that she also provided competitive intelligence to G&W. *Id.* at 1288.

- Lubke described a meeting with Doug Statler, a Taro representative, at a trade conference, where they talked "about how some manufacturers acted. And I don't know what words we used, but we both agreed that our companies acted in a responsible way. We looked for the easiest market share with the highest prices, didn't tank product prices to get market share." *Id.* at 1335. They discussed "responsible behavior in one marketplace," which included "[f]ollowing price increases" and "not poaching another's market share." *Id.* at 1336. After Sandoz acquired

19

Fougera, leading to more direct competition with Taro, Lubke said she and Statler "discussed again, you know, the traits of a responsible supplier," meaning "[s]omeone that would follow price increases, not discourage them, not take market share if there were price increases, not tank the market by extremely low prices in order to gain market share." *Id.* at 1339, 1342. Lubke said Statler then served as a "resource" with whom she could "exchange[] competitive information that helped both our companies." *Id.* at 1338–39. She also warned him when Sandoz was preparing to take actions contrary to the principles they had discussed because "I wanted him to know what we were doing when he started seeing activity in the marketplace." *Id.* at 1340–41.

- Lubke also testified that she had a similar agreement with a Mylan employee to share competitively sensitive information, including about Bromocriptine Mesylate, a Drug at Issue. *Id.* at 1323–24, 1332–33. Lubke said that she and her Mylan contact both "understood how we were to use the information that we exchanged. . . . They didn't like . . . other competitors coming after their customers. If you come after our customers, we will come after yours. He said prices should be kept high. So there was definitely an understanding that I would use the information not to hurt Mylan." *Id.* at 1377. Lubke also testified that she would have stopped sharing sensitive information if Mylan ever used that information to harm Sandoz. *Id.* at 1324.

Lubke, however, also testified that she had no "personal knowledge of an overarching conspiracy" between Sandoz and all of the other Defendants "in which each company would get its fair share of particular generic markets." ECF No. 684-1 at 569.

e.    Paul Krauthauser

Krauthauser, a former Sandoz executive who later worked at Rising, a non-Defendant generics manufacturer, testified that he reached out to a contact at Taro as well as his former colleagues at Sandoz, including Bihari and Vezza, to obtain competitive information related to pricing and market share. ECF No. 693-5 at 14–17, 25–26. These conversations, he said, would occur when one competitor took a price increase, or a new competitor entered the market. *Id.* at 20–21. He testified: "When providing information to someone in my channel or network, the expectation was that that would be reciprocated, obviously, on the existing discussion, but that in the future that channel would be utilized as well for other events that come along." *Id.* at 29.

Krauthauser also testified that once he had established that Taro was a "rational" company, that he no longer had to have detailed discussions about price increases for specific drugs, including about Drugs at Issue such as Triamcinolone Acetonide. *Id.* at 49–51. ("With Taro being a, quote/unquote, rational player, the expectation would be that -- for me, that if I basically relayed that Rising is going to take a price increase, same share, have room to raise the price, if you follow them, both parties benefit. . . . I didn't have to go into details around all the specifics."). Similarly, Krauthauser said that he did not need to have detailed discussions with Bihari because he knew that Sandoz was a rational competitor that followed the rules of engagement. *Id.* at 55–56.

Krauthauser, however, said he was not aware of an overarching agreement between all generic pharmaceutical manufacturers to fix prices or allocate market shares. ECF No. 684-1 at 1594–95 ( "Not in the absolute, no.").

### f.   Paul Dutra

Paul Dutra, who served as Glenmark's Executive Vice President until April 2014, also cooperated with the States to provide testimony. ECF No. 612-1 ¶¶ 27–28. Dutra testified that Glenmark had agreements with (at least) G&W, Taro, Amneal, and Teva Pharmaceuticals, the last of which is not a Defendant in this action but is a Defendant in one of the States' other cases before me, *Connecticut v. Teva Pharmaceuticals USA, Inc.*, No. 19-cv-710. ECF No. 693-7 at 576–77, 599–610.

In 2020, Glenmark was indicted by the U.S. Department of Justice's antitrust division for price-fixing related to Pravastatin, a cholesterol medication that is not a Drug at Issue here. *See United States v. Glenmark Pharmaceuticals Inc., USA*, No. 2:20-cr-200-RBS, ECF No. 14 (July 14, 2020 E.D. Pa.). Glenmark and Teva entered into deferred prosecution agreements ("DPA"), in which they admitted that each conspired with the other, as well as Apotex and others to increase and maintain the price of Pravastatin. No. 2:20-cr-200-RBS, ECF No. 186, 188 (Aug. 21, 2023

E.D. Pa.).  During his deposition in this case, Dutra acknowledged that he was personally involved in the Pravastatin conspiracy, but that his communications and agreement with a contact at Teva were not limited to that drug.  ECF No. 693-7 at 576.  Rather, he confirmed that he told his Teva contact that Glenmark planned to raise prices on multiple drugs.  *Id.*  Specifically, Dutra testified that he had an agreement with Nisha Patel at Teva "to raise prices and not take each other's customers."  *Id.* at 599–600.

Although Teva is not a defendant in this action, Dutra testified that he spoke with Patel about planned price increases on the same day that he and other Glenmark employees were communicating with other competitors about price increases for Drugs at Issue.  Dutra testified that on May 2, 2013, Glenmark held an internal teleconference to discuss price increases on a range of products, including at least three Drugs at Issue: Adapalene, Ciclopirox cream and Mometasone.  *Id.* at 601, 606.  Immediately after the teleconference, Dutra called Patel at Teva, and he called his contact at G&W later on the same day.  *Id.* at 601.  Dutra testified that Glenmark and G&W had an agreement by that date to raise prices on Ciclopirox cream and Mometasone, and that it was "very likely" that he communicated Glenmark's plans for future price increases to both Teva and G&W.  *Id.*  at 601–02.

Phone records also show that another Glenmark employee, Mitchell Blashinsky, had two calls with Doug Statler at Taro the day before the teleconference, and that Glenmark's Jim Brown called Shannon Rivero at Amneal after the teleconference.  *Id.* at 603–04.  Dutra testified that Glenmark was competing with both Taro and Amneal on drugs that were discussed on the teleconference regarding future price increases, *id.*, that Glenmark had agreements with Taro and Amneal, *id.* at 605, and that the purpose of these calls was "[t]o ensure that the price increases stuck and that no one would raid their customers," *id.*

4.  Other Communications

As in the Glenmark example above, the States point to "volumes of phone records showing myriad communications" between employees of multiple Defendants, including the above cooperating witnesses, which, the States contend, were contemporaneous with a competitor's change in price or market position related to a Drug at Issue.  *See* ECF No. 612 at 24–25; SAMF ¶¶ 43–44.  The Defendants contend that the frequent communications between competitors are not indicative of an overarching conspiracy but merely illustrative of the "personal relationships" and friendships between employees at rival firms.  ECF No. 612-1 ¶¶ 68–69.  Thomassey testified that he was likely discussing competitively sensitive information whenever he spoke with his contact at Perrigo, but that when he was speaking to his counterparts at Taro or at G&W, the communications might be about topics unrelated to work.  ECF No. 693-5 at 137–38, 235.

5.  Expert Testimony

The States' expert, Dr. Warren-Boulton, opined in his report that the sharp rise in prices of the Drugs at Issue during the period (2009 through 2016) in which the Defendants were in frequent communication "are ***not*** the result of independent conduct, and that they ***are*** the result of drug-specific agreements . . . because the price increases follow evidence of communication, and price decreases follow the Heritage complaint," the earliest-filed action before me (see *Connecticut v. Aurobindo Pharma USA, Inc.*, No. 16-cv-2056).  ECF No. 693-4 at 35.  The Defendants' expert, Dr. Crémieux, took the position that "Dr. Warren-Boulton, despite his four reports, has shed no light on whether the observed pattern of prices and market shares are the result of independent conduct, drug-specific agreements, or an overarching conspiracy."  *Id.* (quoting ECF No. 742 at 11).  According to Dr. Warren-Boulton, however, evidence that the Defendants acted independently in setting a price or allocating a market for a particular Drug at Issue does not controvert evidence that an overarching conspiracy existed because the alleged drug-specific

agreements and an overarching agreement were "complementary." *Id.* Critical to Dr. Warren-Boulton's theory is his opinion that "'independent conduct' (including oligopolistic coordination) was present **before** the communications that preceded the large and rapid price increases and thus cannot explain the sudden change in the 'observed pattern of prices absent some change in the underlying determinants of that non-collusive equilibrium price." *Id.*

During his deposition, Dr. Warren-Boulton testified that the alleged overarching market share agreement explains the across-the-board increased prices that occurred during the period of the Defendants' frequent communications:

> So my issue is what was it that changed everybody's expectation as to what would happen if there was a price increase, and the change that's being proposed here is a change in what is the appropriate reaction to a price increase. And what a fair -- overarching fair share agreement does is it represents that shared understanding that in turn results in a drug fair share agreement, but it doesn't really matter whether it results in one or two or three. . . . [S]omething must change for the parties to initiate a price increase and believe that it will be maintained and a general understanding that as of now but not at some point in the past is that if a firm initiates a very large price increase that their rivals would behave according to a rule book which will allow that price increase to be sustained and will not behave in their own self-interest which would result in the price increase being rescinded. Something must be happening that is initiating. There must be a change in those expectations. . . .
>
> [T]he rivals must have, if you like, agreed prior to the initiation of the price increase that they would behave in a way differently from the way they used to behave or would have behaved. . . . And that difference is some kind of an overarching agreement.

ECF No. 693-7 at 9–11. Dr. Warren-Boulton testified that the overarching agreement permitted the companies to "believe that that drug-specific agreement is going to be effective[,] . . . that if they react to maintain fair shares that the price fixing -- price increase will be sustained." *Id.* at 11.

Dr. Crémieux contended that the Defendants "would not have had any incentive to participate" in an overarching conspiracy because "they would have received no incremental value over and above drug-specific agreements." ECF No. 684-2 at 654. In his supplemental report

responding to Dr. Crémieux, Dr. Warren-Boulton explained:

> [I]t is the overarching agreement that facilitates the individual implementations by which it is carried out.  . . .  In other words, were it not for the overarching agreement, the individual agreements would be much harder to reach and maintain, and many of them likely would not have occurred.  By the same token, the ability to enter (and facilitation of entry) into various drug-specific agreements – and thus realize supra-competitive profits with a minimum of added negotiation costs, risk of detection, or attendant business risk – provides more than enough incentive for manufacturers to participate in the overarching conspiracy.

ECF No. 693-4 at 40.  As the overarching agreement was designed to facilitate the single-drug agreements, Dr. Warren-Boulton opined, it could leave open details such as "specific market shares for each drug-specific agreement."  *Id.* at 44.  "For example, agreeing in advance that the participants will agree on 'fair shares' may not dictate what the exact 'fair shares' will be, but it does greatly facilitate an eventual drug-specific agreement by providing a common point over which the later drug-specific agreement can be formed."  *Id.*

## II.  LEGAL STANDARD

### A.  Summary Judgment

"Summary judgment is appropriate only if the movant shows that there is no genuine issue as to any material fact and the movant is entitled to judgment as a matter of law."  *Tolan v. Cotton*, 572 U.S. 650, 656–57 (2014) (internal quotation marks and citations omitted).  In reviewing the summary judgment record, a court must "construe the facts in the light most favorable to the non-moving party and must resolve all ambiguities and draw all reasonable inferences against the movant."  *Caronia v. Philip Morris USA, Inc*., 715 F.3d 417, 427 (2d Cir. 2013).  "A genuine dispute of material fact exists for summary judgment purposes where the evidence, viewed in the light most favorable to the nonmoving party, is such that a reasonable jury could decide in that party's favor."  *Zann Kwan v. Andalex Grp. LLC*, 737 F.3d 834, 843 (2d Cir. 2013).  The moving party bears the burden of demonstrating that no genuine issue exists as to any material fact.  *Celotex*

*Corp. v. Catrett*, 477 U.S. 317, 323–25 (1986).  If the moving party carries its burden, "the opposing party must come forward with specific evidence demonstrating the existence of a genuine dispute of material fact." *Brown v. Eli Lilly & Co.*, 654 F.3d 347, 358 (2d Cir. 2011).  "Where no rational finder of fact could find in favor of the nonmoving party because the evidence to support its case is so slight, summary judgment must be granted." *Id.* (internal quotation marks omitted).

## B.  Sherman Act

The Sherman Act bans "[e]very contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce among the several States."  15 U.S.C. § 1.  "The crucial question in a Section 1 case is therefore whether the challenged conduct stems from independent decision or from an agreement, tacit or express." *Starr v. Sony BMG Music Entm't*, 592 F.3d 314, 321 (2d Cir. 2010) (internal quotation marks omitted).  At the summary judgment stage, "to raise a genuine issue of material fact as to an antitrust conspiracy, the plaintiff must present direct or circumstantial evidence that 'tends to exclude the possibility that the alleged conspirators acted independently.'" *Anderson News, L.L.C. v. Am. Media, Inc.*, 899 F.3d 87, 98 (2d Cir. 2018) (quoting *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 588 (1986)).  "The quality of evidence required to satisfy the 'tends to exclude' standard 'varies with the economic 'plausibility' of the alleged agreement." *In re Foreign Exch. Benchmark Rates Antitrust Litig.*, No. 13 CIV. 7789 (LGS), 2022 WL 294118, at *5 (S.D.N.Y. Feb. 1, 2022).  "[T]he tends to exclude standard is more easily satisfied when[] the conspiracy is economically sensible for the alleged conspirators to undertake and the challenged activities could not reasonably be perceived as procompetitive." *Anderson News*, 899 F.3d at 99 (quoting *In re Publ'n Paper Antitrust Litig.*, 690 F.3d 51, 63 (2d Cir. 2012)).  A plaintiff need not "disprove all nonconspiratorial explanations for the defendants' conduct; rather the evidence need be sufficient

only to allow a reasonable fact finder to infer that the conspiratorial explanation is more likely than not." *Id.* (internal quotation marks omitted). "[I]f the evidence is in equipoise, then summary judgment must be granted against the plaintiff." *Id.*

"Oligopolies pose a special problem under § 1 [of the Sherman Act] because rational independent actions taken by oligopolists can be nearly indistinguishable from horizontal price fixing," as "any rational decision [in an oligopoly] must take into account the anticipated reaction of the other firms." *In re Mylan N.V. Secs. Litig.*, 666 F. Supp. 3d 266, 318 (S.D.N.Y. 2023). "Consequently, parallel conduct allegations must be placed in a context that raises a suggestion of a preceding agreement, not merely parallel conduct that could just as well be independent action." *Mayor & City Council of Balt. v. Citigroup, Inc.*, 709 F.3d 129, 137 (2d Cir. 2013). "Since mere parallel behavior can be consistent with independent conduct, courts have held that a plaintiff must show the existence of additional circumstances, often referred to as 'plus' factors, which, when viewed in conjunction with the parallel acts, can serve to allow a fact-finder to infer a conspiracy." *Apex Oil Co. v. DiMauro*, 822 F.2d 246, 253 (2d Cir. 1987). But because "such factors in a particular case could lead to an equally plausible inference of mere interdependent behavior, i.e., actions taken by market actors who are aware of and anticipate similar actions taken by competitors, but which fall short of a tacit agreement," *id.*, these circumstances "must still lead to an inference of conspiracy." *Mayor & City Council of Balt. v. Citigroup, Inc.*, 709 F.3d at 137.

## III.  DISCUSSION

For purposes of this ruling, the critical issue is not whether the Defendants' actions, as reflected in the record, are more consistent with lawful parallel conduct by oligopolists or with illegal collusion by co-conspirators. The States have submitted ample evidence to show that at least some Defendants communicated with each other to allocate customers, rig bids, and fix

prices; the cooperating witnesses' testimony alone is enough to raise a genuine dispute of fact on that score. Instead, the real question is whether the States have submitted evidence from which a reasonable juror could find that there was a single, overarching conspiracy among the Defendants, or at least some of them, to engage in these activities or at least to engage in conduct that facilitated them—or whether the States' evidence demonstrates, at most, a series of bilateral conspiracies between a few Defendants.

"Whether the government has proved a single or multiple other independent conspiracies is a question of fact for a properly instructed jury." *United States v. Sureff*, 15 F.3d 225, 229 (2d Cir. 1994) (internal quotation marks omitted). Still, where no reasonable juror could find that a single conspiracy existed, the court may grant summary judgment on this issue.

"To prove a single conspiracy, 'the government must show that each alleged member agreed to participate in what he knew to be a collective venture directed toward a common goal.'" *Id.* (quoting *United States v. Maldonado-Rivera*, 922 F.2d 934, 963 (2d Cir. 1990)). "[A] single conspiracy may be found where there is mutual dependence and assistance among the participants, a common aim or purpose . . . or a permissible inference, from the nature and scope of the operation, that each actor was aware of his part in a larger organization where others performed similar roles equally important to the success of the venture." *United States v. Vanwort*, 887 F.2d 375, 383 (2d Cir. 1989); *see also United States v. Berger*, 224 F.3d 107, 115 (2d Cir. 2000) ("even where there are multiple groups within an alleged conspiracy, a single conspiracy exists where the groups share a common goal and depend upon and assist each other"). "The coconspirators need not have agreed on the details of the conspiracy, so long as they agreed on the essential nature of the plan." *Maldonado-Rivera*, 922 F.2d at 963.

In determining whether a single conspiracy exists, non-exhaustive factors that a court may

consider include: "the overriding goal of the conspiracy, whether the same core group led the conspiracy, whether the individual schemes shared common participants, whether individual schemes were interdependent, and whether the participants used means and methods common among the individual operations." *Connecticut v. Aurobindo Pharma USA, Inc.*, No. 3:16-CV-02056 (MPS), 2025 WL 437302, at *3 n.4 (D. Conn. Feb. 7, 2025) (citing *Berger*, 224 F.3d at 114–15 (2d Cir. 2000)); *see also In re Generic Pharms. Pricing Antitrust Litig.*, 394 F. Supp. 3d 509, 527 (E.D. Pa. 2019) (discussing similar factors from *United States v. Kelly*, 892 F.2d 255, 25859 (3d Cir. 1989)); *United States v. Portela*, 167 F.3d 687, 695 (1st Cir. 1999) ("To determine if the evidence supports finding a single conspiracy . . . courts have looked for (1) a common goal, (2) interdependence among the participants, and (3) overlap among the participants.").

Deciding whether the States have presented evidence from which a reasonable juror could find that an overarching conspiracy existed does not require me to determine whether each Defendant was a member of the conspiracy. Whether a particular Defendant was a member is a distinct issue from the issue whether a conspiracy existed at all. *See* 4 Sand et al., Modern Federal Jury Instructions–Civil ¶ 79-8 ("[Y]ou should first determine . . . whether the conspiracy existed. If you conclude that the conspiracy did exist, you should next determine whether each defendant was a knowing member of the conspiracy."); *id.* ¶ 79-6 ("In order to prove the [price-fixing] conspiracy, . . . [t]he plaintiff does not have to show that . . . all of the persons alleged to have been members of the claimed conspiracy were in fact members."). The Defendants have recently filed a raft of additional summary judgment motions that address the extent of liability of particular Defendants, including challenges to whether the States have raised a triable issue about whether particular Defendants joined the overarching conspiracy. Rulings on those motions will address whether each Defendant joined an overarching conspiracy.

## A. Defining the Agreement

The Defendants argue that the States have produced no evidence that there was a single agreement that bound together all Defendants and all Drugs at Issue, pointing out that even the cooperating witnesses testified that they were unaware of any such agreement. The Defendants are correct on this score, as nothing in the record suggests that every Defendant joined a single agreement covering every Drug at Issue. The Defendants are also correct to point out that market shares and prices varied across Drugs at Issue—and even within the markets for each Drug at Issue—throughout the alleged conspiracy period, meaning that if there was a single, overarching conspiracy, it did not fix prices or market shares across the board in an enduring way in individual drug markets. For instance, they argue that market shares for the majority of Drugs at Issue did not reflect the allocation outlined in a table reflected in an internal Taro document described in the complaint, ECF No. 612-1 ¶ 46, which, they contend, "is inconsistent with the existence of the alleged overarching conspiracy."[10]  ECF No. 609 at 42. But this is not surprising because the Drugs at Issue were sold in bidding markets, the dynamics of which changed each time a customer solicited new bids and each time a new supplier entered each market. And the States *have* submitted evidence of a general understanding about how each supplier would behave vis-à-vis each other, for example, in response to a new entry into the market for a particular Drug at Issue or a price increase by one firm. In addition, there is evidence that that understanding facilitated the consummation of specific agreements on price and customer allocation for individual Drugs at

---

[10] In my recent ruling on the *Daubert* motions related to the present motion, I explained that while the complaint does suggest at one point that the Taro document illustrates the "industry-wide understanding" of fair share, ECF No. 196 ¶ 133, the complaint also alleges that the Taro table is just one example of one Defendant's conception of "fair share"—and one that was just an ideal or model rather than a durable description of market realities, *id.* ¶¶ 134–35. *See* ECF No. 925 at 9 n.3.

Issue by creating a framework—a set of "rules of engagement"—that made it easier to reach those agreements as new bidding opportunities arose. The Defendants may have implemented this framework differently in their drug-specific agreements, depending on the circumstances of a particular bid, but, as I will explain below, differences in application do not dilute the States' evidence that the drug-specific agreements stemmed from a common framework agreement. And while the States have not pointed to evidence in this record that every Defendant signed onto that general understanding or framework agreement, they did not have to do so on this motion, which, as I have noted, requires me to determine only whether an overarching conspiracy existed, not who its members were.

The States describe the terms of the framework agreement in the complaint. They allege that the Defendants had a "shared objective . . . to attain a state of equilibrium, where no competitors are incentivized to compete for additional market share by eroding price." ECF No. 196 ¶ 135. The Defendants attained an equilibrium, the States allege, by allocating the market based on "fair share," however competitors understood that term to apply in a particular market. *Id.* ¶¶ 135, 137. Upon attaining a market share equilibrium, the Defendants then agreed "on ways to avoid competing on price" where it was economically feasible. *See id.* ¶¶ 137, 153. This agreement was implemented by following a competitor's price increases, avoiding poaching customers, and otherwise avoiding "disrupting the market." *Id.* ¶¶ 137, 152, 156.

The States have marshaled a substantial bulk of evidence to support these allegations. While the States do not present evidence that all the corporate Defendants met together at industry conferences or over the phone to allocate shares or fix prices for the Drugs at Issue, they have produced evidence that at least some of the Defendants had at least a tacit agreement that they would conduct business in accordance with the broadly understood "rules of engagement," which

included following any price increase by a rival firm and avoiding "poaching" each other's customers. *See Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 553 (2007) (unlawful agreements to restrain trade may be tacit as well as express); *Anderson News, L.L.C. v. Am. Media, Inc.*, 680 F.3d 162, 183 (2d Cir. 2012) ("[c]ircumstances must reveal a unity of purpose or a common design and understanding, or a meeting of the minds in an unlawful arrangement" (internal quotation marks omitted)).

The testimony of the States' cooperating witnesses would allow a reasonable juror to infer that their collusive conduct amounted to a general business practice, not an occasional departure from the norm and not limited to dealings with one or two competitors. And because each cooperating witness described his or her conduct and that of their employers in similar terms, a reasonable juror could infer that sharing information with competitors, providing assurances that a generic drug maker would follow price increases, and refraining from poaching customers were widespread practices in the markets for the Drugs at Issue. During his deposition, for example, Thomassey rejected defense counsel's attempt to cabin his general approach to his employer's competitors and described each specific arrangement with each competitor in the same terms. Rebuffing defense counsel's attempts to portray Fougera's arrangement with Perrigo as a series of one-off, bilateral agreements on specific drugs, he testified that "there was the higher overarching agreement that, yeah, we were going to call. There was -- they were going to call us, I was going to call them when a [product] launch was happening." ECF No. 693-5 at 335–41; *see also id.* at 373–74 ("overarching [would] be an appropriate way to describe the agreement between Fougera and Taro" because it "applied to all cross competing drugs"; same for agreement between Fougera and G&W). Vezza similarly testified about his and his employer's general approach toward "the competition," rather than limiting the scheme to one-off arrangements with a few other firms. "[I]t

was beneficial to communicate with the competition . . . so they knew that . . . Sandoz wanted to generally be a fast follower,  that we would make every effort to be a fast follower, that we would not poach . . . the competition's customers." *Id.* at 461–62.  Bihari likewise testified in broad terms about his—and especially Sandoz's, Taro's, and Perrigo's—collusive practices.  *See* ECF No. 684-1 at 406–07 (describing arrangement between Sandoz and Perrigo—in which Perrigo "would provide pricing information as needed with the expectation that I would share it with Sandoz" and the two companies would "launch [products] at similar price points so as not to create disruption in the market"—as "just in general," "[i]t was almost as if it was [a la] carte per product, per situation"); ECF No. 693-5 at 1247–48 (Sandoz's agreement with Taro "encompasses any product where Sandoz and Taro overlapped" as well as any new product launches by either firm); *id.* at 825, 835, 862, 891 (Sandoz's agreements with Glenmark and Actavis not limited to a couple of drugs each); *see also id.* at 49–51 (Krauthauser testifying that he did not need to have "detailed discussions" about specific price increases with Taro once "[t]he general understandings [we]re already in place").  Nor did the cooperating witnesses suggest that colluding to stabilize prices and avoid disrupting the markets for Drugs at Issue was limited to them, their employers, or even just a few firms.  Bihari regarded collusive communications with competitors as widespread in the industry.  He testified that communicating with competitors about pricing was "accepted because everybody in the industry . . . seemed to be doing it."  *Id.* at 1200–01.

All of the cooperating witnesses described terms the States view as evidence of collusion—"rational," "responsible," "playing nice in the sandbox," and "fair share"—in similar ways.  *See, e.g.*, *id.* at 48–51, 115–16, 125–26, 457–58, 496–97, 650.  And they described these understandings as widespread in the industry.  Thomassey testified that terms like "fair share," "rational," "responsible," and "playing nice in the sandbox" are "code words that everyone in the industry is

aware of," and which, "when you hear" them, "you should have the bells ringing in your head." *Id.* at 125. Vezza, discussing communications with competitors about ceding market share, testified that "the other competitors would know what the term fair share was," and that "a rational competitor would be someone that would know all those terms, would know what fair share meant. Would, you know, give up share if they were the majority supplier." *Id.* at 452–58. Indeed, they testified that they discussed these terms with their competitors. *See id.* at 1335 (Lubke, former Sandoz employee, testifying that she and a colleague at Taro met at a conference and "talked about . . . how some manufacturers acted. . . . [W]e both agreed that our companies acted in a responsible way. We . . . didn't tank product prices to get market share."); *id.* at 109 (Thomassey testifying "fair share" was a concept he specifically discussed with competitors).

The Defendants make much of the fact that various witnesses testified to different understandings of the term "fair share." *See* ECF No. 612-1 ¶ 64. The evidence shows, they say, "that Defendants did not even have a shared common understanding of what constitutes a 'fair share' . . . in any particular markets," ECF No. 609 at 20, making it impossible, they say, for there to be an overarching conspiracy. But that objection misses the essential nature of the overarching conspiracy the States have alleged and have submitted evidence to support. The arrangement did not require a single conception of "fair share" or a fixed allocation of shares across each drug market. What it required was a common understanding that each co-conspirator would commit to working with the other to reach what they both regarded as a "fair share," i.e., a customer allocation that fit each of their needs in the market for each Drug at Issue in which they competed. In other words, it required each conspirator to commit to behavior that would avoid "disruption" in the market for each Drug at Issue, for example, by following price increases, surrendering market share to new entrants who were willing to keep prices high, and refraining from "poaching" each

other's customers.  Regardless of the varying conceptions of "fair share" among the Defendants, this commitment to "rules of engagement"—this framework for market behavior—created fertile ground for specific agreements on bids, prices, and market shares in individual Drugs at Issue. Such a framework agreement is contemplated by the States' allegations and finds support in the evidence they have submitted.  See ECF No. 196 ¶ 135 ("[T]here is no precise method for apportioning 'fair share' . . . because market share is ultimately determined by either winning or maintaining business of various customers, which is inherently variable . . . .  The shared objective, however, is to attain a state of equilibrium, where no competitors are incentivized to compete for additional market share by eroding price."); ¶ 151 (G&W executive acknowledging that she would refrain from bidding "due to fear of market disruption"); ¶ 211 (Sandoz declining to "challeng[e] for the business at CVS" for fear that it would "'disrupt' the market and erode pricing"); ¶ 388 (Acatavis executive rejecting a colleague's suggestion to offer a competitive price because he didn't want to reduce the price for the drug and "disrupt the market"); *see also* testimony of Bihari, ECF No. 684-1 at 406–07 (Sandoz's and Perrigo's agreement to coordinate pricing in new product launches was "just in general," "it was [a la] carte, per product, per situation"); Vezza, ECF No. 693-5 at 461–62 (Sandoz sought to communicate with "the competition" to provide assurances that it "would make every effort to be a fast follower" and that it "would not poach . . . the competition's customers"); Thomassey, *id.* at 211 ("At a high level, [the agreement between Fougera and a competitor] would be on all products where we cross competed.  But then there would be specific conversations regarding each product when the situation arose."); Bihari, *id.* at 648–49 (when he called Aprahamian of Taro about Sandoz's intent to enter a market occupied by Taro, Aprahamian would say "don't be stupid"—which Bihari understood to as, "Don't take my market share, meaning don't be stupid, don't take my share.  . . . It was a phrase he would use

often."); Krauthauser, *id.* at 48–49 (describing the "rules of engagement" as including "if a manufacturer raises price . . . the other manufacturers fall in line" and "if shares are more or less evenly distributed based of fair share, that when you take your price increase, you leave customers that you don't have alone, meaning you don't poach").

Additional evidence of a single conspiracy tying together a broad swath of the Defendants and the Drugs at Issue comes from instances in which Defendants that did not make a particular Drug at Issue brokered deals between other Defendants that did. As Thomassey testified, "if I'm person A, if I had to get a messages to person C that I didn't know, but person B did, I would talk with person B to have them act as the intermediary and pass the message along." *Id.* at 117. These conversations resulted in pricing and market allocation agreements, including for products where the intermediary's employer did not manufacture or sell the drug. *Id.* at 117–18. Thomassey testified that, while working for Aurobindo, he acted as a "conduit" for G&W and Perrigo to share competitively sensitive information because he believed doing so "was building goodwill for when I needed the information," and he "might be able to call in a favor at a later point." *Id.* at 255–69, 262–63. In another instance, Thomassey gave Bihari (his former colleague at Fougera) the phone number of Tony Polman at Perrigo so that Sandoz could exchange "pricing information or new product launch information" with Perrigo, as Thomassey had previously done with Polman while at Fougera. *Id.* at 733–34. Elsewhere, Grauso acted an as intermediary for his former colleagues at G&W to exchange competitively sensitive information with Fougera. *Id.* at 293–97 (describing pattern of Grauso calling Fougera and G&W in quick succession to share pricing information for a Drug at Issue). Similarly, Bihari testified that Aprahamian brokered a deal between his former colleagues at Actavis and Sandoz five months after joining Taro. *Id.* at 781–86.

Finally, the States have submitted the report of their expert witness, Dr. Warren-Boulton,

who opines that "[t]he direct evidence in the record of collusive conduct is confirmed empirically by its effects on prices, *i.e.*, a finding of prices that are significantly higher [for all Drugs at Issue] . . . during the post-communication period than in the 'but-for world' absent collusion, both after controlling for other factors in a Before-and-After regression and when other generic drugs are used as a control . . . —effects which cannot be explained by greater oligopolistic coordination." ECF No. 693-7 at 31. More specifically, according to Dr. Warren-Boulton, "the average prices for [all] the Drugs at Issue increased dramatically over the Conspiracy Period, peaking at roughly four or five times the prices prior to the Conspiracy Period, before continuing to fall for several years after the conspiracy was discovered," *id.* at 61, a pattern that "sharply contrasts" with prices of other generic drugs during the same period, which were "effectively flat," *id.* at 62. Dr. Warren-Boulton also found that analysis of market shares across all Drugs at Issue supported the existence of an overarching conspiracy. For example, he found that the shares of market leaders across the Drugs at Issue were significantly lower than they were in markets for other generic drugs, suggesting that market leaders were surrendering share to new entrants, consistent with the "rules of engagement." *Id.* at 112–14.

He also opined that the overarching agreement was "complementary" with the alleged drug-specific agreements, in that "the drug-specific agreements ***implement*** and are ***facilitated by*** the overarching agreement." ECF No. 684-3 at 480–81; *see also* ECF No. 684-2 at 469 (opining that an overarching market share agreement "can facilitate a price increase initiated through direct communication and ensure that those initial price increases are maintained with minimal conduct that might trigger discovery"); ECF No. 693-7 at 11 (testifying that the overarching agreement provided a basis for Defendants to "believe that that drug-specific agreement is going to be effective[,] . . . that if they react to maintain fair shares that the price fixing -- price increase will

37

be sustained").

To be sure, the Defendants challenge Dr. Warren-Boulton's analysis and conclusions, and they submit reports by their own expert, Dr. Crémieux, that opine, based on the same data Dr. Warren-Boulton reviewed, that there is no evidence of an overarching conspiracy. But these opposing expert views just underscore that the record here does not warrant summary judgment on the issue whether there was an overarching conspiracy.

### B. *Per Se* **Illegal**

At oral argument, there was some discussion about whether the type of framework agreement described in this ruling—one that did not itself set prices or market shares across the Drugs at Issue—would constitute a *per se* violation of the antitrust laws, as opposed to an arrangement subject to "rule of reason" analysis. *See* ECF No. 1093 at 46. I find that the overarching agreement suggested by the States' evidence, if proven, would be *per se* illegal under the Sherman Act. The States have submitted evidence from which a reasonable juror, resolving all ambiguities in the record and drawing all reasonable inferences in favor of the States, could find that the purpose of the overarching agreement was to stabilize the markets for Drugs at Issue and avoid the Defendants' competing with each other, and that the Defendants accomplished this purpose by communicating to determine whether and how this agreement should be implemented as to a particular drug product before taking steps like entering the market or increasing the price. "An agreement not to compete between two actual or potential competitors may be *per se* illegal." *Conergy AG v. MEMC Electronic Materials, Inc.*, 651 F.Supp.2d 51, 57 (S.D.N.Y. 2009); *Transource Intern., Inc. v. Trinity Industries, Inc.*, 725 F.2d 274 (5th Cir. 1984) ("agreements not to compete among potential competitors are . . . illegal per se" (citing *Otter Tail Power Co. v. United States,* 410 U.S. 366, 377 (1973))). The purpose of the communications was not a simple

exchange of information with competitors. *Cf. United States v. Citizens & Southern National Bank*, 422 U.S. 86, 113 (1975) (holding, in a case where the trial court found no collusive price fixing, that "the dissemination of price information is not itself a per se violation of the Sherman Act,"). Rather, the purpose was to get and provide assurance that a move would stabilize prices and not disrupt the market—in the case of a price increase, to assure that the increase would be followed, or in the case of a new entrant to the market, that existing competitors would cede market share. On its face, such an agreement is a "naked restraint[] of trade with no purpose except stifling of competition," *White Motor Co. v. United States*, 372 U.S. 253, 263 (1963), and as such is *per se* illegal under the Sherman Act. *Broad. Music, Inc. v. Columbia Broad. Sys., Inc.*, 441 U.S. 1, 19–20 (1979) (a practice is "per se illegal" when "the practice facially appears to be one that would always or almost always tend to restrict competition and decrease output."). Further, the agreement to avoid "poaching" customers in general is really just a commitment to reach specific customer allocations—which are themselves plainly *per se* illegal. *Cont'l Ore Co. v. Union Carbide & Carbon Corp.*, 370 U.S. 690, 708 (1962) (describing "an allocation of customers" as a "per se violation[] under § 1 of the Sherman Act"). Even an agreement to discuss whether two competitors can agree not to poach and to follow a price increase in specific markets is *per se* illegal, because it is just a precursor to bid rigging, price stabilization, and customer allocation and so has "no purpose except stifling of competition." *White Motor Co.*, 372 U.S. at 263; *see United States v. Apple, Inc.*, 791 F.3d 290, 327 (2d Cir. 2015) ("[I]t is well established that *per se* condemnation is not limited to agreements that literally set or restrict prices. Instead, any conspiracy formed for the purpose and with the effect of raising, depressing, fixing, pegging, or stabilizing the price of a commodity . . . is illegal per se . . . ." (internal quotation marks omitted)); *U.S. v. Koppers Co., Inc.*, 652 F.2d 290, 294 (2d Cir. 1981) (same). At a minimum, the States

have alleged, and submitted evidence suggesting, that there was an overarching conspiracy to stabilize prices and avoid market disruption across the Drugs at Issue. That is enough to invoke the *per se* rule.

**C. *Berger* Factors**

How does the States' evidence stack up against the factors courts consider in distinguishing an overarching conspiracy from multiple bilateral conspiracies? As noted above, in the Second Circuit, courts "traditionally examine several factors to determine when a single conspiracy exists, including the overriding goal of the conspiracy, the core group who led the conspiracy, if the individual operations shared common participants, if the individual schemes were independent, and if the participants used distinctive means and methods common among the individual operations." *United States v. Reid*, 475 F. App'x 385, 387 (2d Cir. 2012) (citing *Berger*, 224 F.3d at 115). I examine the States' evidence in light of these factors below.

    1. <u>Overriding Goal</u>

The overriding goal of the scheme supported by the States' evidence was to keep prices high, avoid poaching of customers, and otherwise maintain stability in the markets for the Drugs at Issue. In other words, the overriding goal of the conspiracy was to avoid competing or "disrupting" the market for Drugs at Issue. As shown in the cooperating witnesses' testimony quoted above, this goal informed their conversations with competitors and drove their behavior in these markets.

The Defendants suggest that maintaining high prices and avoiding disruptive battles over customers are not the signature marks of a conspiracy, as the same behavior may stem from "rational" calculations of law-abiding oligopolists. *See* ECF No. 614 at 15 ("companies sometimes considered it to be in their independent best interest to follow a competitor's price increase," because in an oligopoly, "following a price increase is often 'rational' or 'responsible' behavior,

even in the absence of an agreement").  The problem is that the States have submitted evidence that the Defendants *communicated with each other* about these goals to provide assurance that each would follow them.  *See* ECF No. 693-5 at 454 (Vezza testifying that "it was beneficial to communicate with the competition . . . so they knew that . . . Sandoz wanted generally to be a fast follower [and] that [we] would not poach the competition's customers"); *id.* at 648–49 (Bihari testifying that his counterpart at Taro would tell him, when Sandoz was launching into a market Taro was in, "don't be stupid . . . price it appropriately . . . don't take my market share"); *id.* at 125 (Thomassey testifying that "rational," "responsible," and "playing nice in the sandbox" were "code words that everyone in the industry is aware of").

While oligopolists acting independently might have harbored the same or similar goals, the States have submitted evidence that the Defendants (or at least some of them) colluded with each other to reach those goals.

### 2.  Core Group of Leaders and Common Participants

Although the movants represent sixteen corporate families, four stand above the rest in the alleged overarching conspiracy—Sandoz, Taro, Perrigo, and G&W.  At least one of these four companies (or their affiliates, such as Fougera) sold each of the ninety-eight Drugs at Issue.  *See* ECF No. 684-2 at 482–84 (listing the competitors for each Drug at Issue).  The evidence also shows that these four companies entered into bilateral agreements with each other that encompassed several drugs.  ECF No. 684-1 at 235 (Fougera and Perrigo), 246 (Fougera and Taro), 249 (Fougera and G&W); ECF No. 693-5 at 467–68 (Sandoz and Taro), 860 (Sandoz and Perrigo).

Sandoz, which sold seventy-six out of the ninety-eight Drugs at Issue, is the most common denominator.  Many of the cooperating witnesses worked at one time or another for Sandoz or for Fougera before Sandoz acquired it.  As described above, those witnesses consistently described their practices at Sandoz, including communicating with competitors in connection with new

market entry and price increases, following a competitor's price increase, and avoiding poaching a competitor's customers—so much so that a reasonable juror could infer that the practices were, in fact, Sandoz's practices. *See, e.g.*, ECF No. 693-5 at 626 (Bihari testifying that the number of competitors with which he discussed competitive sensitive information as "approaching 20 perhaps"). If I draw that inference on this motion, that would mean that for about three-quarters of the Drugs at Issue, there is evidence that a single major player was consistently engaging in the same anti-competitive practices with the other suppliers in each of the seventy-six markets in which it operated. Meanwhile, the evidence also suggests that Taro was already broadly engaged in such practices even before Sandoz expanded its dermatology business with the acquisition of Fougera in 2012. ECF No. 693-5 at 1249–50.

When comparing these four companies to the other Defendants, many of whom sold only one or two drugs at issue, the States' evidence suggests that Sandoz, Taro, Perrigo, and G&W formed a core group of leaders most responsible for perpetuating the Defendants' collective adherence to the rules of engagement. Their role also helps the States, at least at the summary judgment stage, satisfy the criterion of common participants among the single-drug conspiracies. *See Portela*, 167 F.3d at 695 (under First Circuit's factors for finding single conspiracy, the requirement of "overlap among the participants" "can be satisfied by the pervasive involvement of a single 'core conspirator,' a hub character"). Even a casual glance at the list of competitors for each Drug at Issue shows the same names over and over again, ECF No. 684-2 at 482–84, and the phone record evidence shows "myriad communications among Defendants['] Employees[, where] one defendant called employees of multiple other defendants who, in turn, called employees of multiple other defendants." SAMF ¶ 43. The frequent proximity of these calls to price increases, *id.* ¶ 44, also supports the inference that the overarching conspiracy shared common participants.

Again, whether any of the Defendants who sold only one or two of the drugs at issue were also part of the overarching conspiracy is a distinct question from whether the overarching conspiracy existed. But if their participation was relatively limited, that would not by itself disprove their participation. "[A] defendant's participation in a single transaction can suffice to sustain a charge of knowing participation in an existing conspiracy." *Vanwort*, 887 F.2d at 386 ("That Crown only received cocaine from Vanwort on three occasions and characterized himself as 'a minor, bit player' who received 'leftover' cocaine is of no significance.").

### 3. Interdependence

The States have raised a genuine dispute of fact about whether the success of each of the Defendants' single-drug agreements depended at least in part on the success of other single-drug agreements. "Establishing interdependence among the participants requires determining whether the activities of one aspect of the scheme are necessary or advantageous to the success of another aspect of the scheme." *Portela*, 167 F.3d at 695 (internal quotation marks omitted); *see also In re Generic Pharms. Pricing Antitrust Litig.*, 394 F. Supp. 3d at 529 ("To evaluate interdependence, the court engages in an inquiry focused on the extent to which the success or failure of one conspiracy is independent of a corresponding success or failure by the other." (internal quotation marks omitted)).

### a. Building Trust

The States have submitted evidence that the Defendants' overarching agreement greased the skids for single-drug agreements by establishing a baseline level of trust between Defendants that their co-conspirators were "rational" and "responsible" and understood the "rules of engagement." The ensuing single-drug agreements then built on that trust between the repeat participants, such that each time a deal was struck and adhered to it made the next deal easier. *See, e.g.*, ECF No. 693-5 at 50 (Krauthauser testifying that "detailed discussions" with a competitor

were not necessary once "[t]he general understandings are already in place"); *id.* at 55–56 (Krauthauser agreeing that, after leaving Sandoz, "his understanding with Mr. Bihari about being a rational competitor provide[d] a foundation for [his] communications about competitive intelligence" and noting that his and Bihari's earlier "reinforcement of [rules of engagement] principles" obviated the need for later detailed discussions); *id.* at 417 (Vezza testifying that collusive relationships with competitors "gave [Sandoz] the confidence . . . that a particular price increase would be more successful"). Dr. Warren-Boulton also testified that a higher level of trust reduced the costs involved in formulating, monitoring and enforcing the single-drug agreements. ECF No. 684-1 at 842–45 ("I don't see how something could be costly if you don't have to do anything."). By strengthening the bonds of trust and facilitating future single-drug agreements, each agreement was "advantageous to the success of another aspect of the scheme." *Portela*, 167 F.3d at 695.

The Defendants argue that the phone records showing continuing calls between competitors suggest that there was no overarching conspiracy, because they undermine Dr. Warren-Boulton's theory that such a conspiracy obviated the need for extensive communications between dozens of competitors. ECF No. 609 at 60 n. 29. But the evidence indicates that even when two competitors had established a high level of trust, communications were still required to discuss the details, i.e., the allocation of specific customers or specific prices for a particular drug. For example, Thomassey testified that when Fougera launched a product, that he "would call Tony [at Perrigo] and say, hey, we're launching, who should I go after and where are you at, roughly, or vice versa." ECF No. 693-5 at 337; *see also* ECF No. 684-1 at 211 (Thomassey testifying that "at a high level [the agreement with Taro] would be on all products where we cross competed. But then there would be specific conversations regarding each product when that situation arose.");

ECF No. 693-5 at 1034–35 (Bihari testifying about calls on the same day to counterparts at Taro and Perrigo to determine which customers they would relinquish upon Sandoz's entry into the Nystatin cream market); ECF No. 693-4 at 44 (Dr. Warren-Boulton opining that a facilitating overarching agreement could leave open details such as "specific market shares"). Prior agreements obviated the need to establish why competitive information should be shared or whether a competitor would be receptive to coordinating market behavior. To be "advantageous to the success of another aspect of the scheme," *Portela*, 167 F.3d at 695, earlier agreements did not need to obviate all future communication. *See Berger*, 224 F.3d at 114 ("The coconspirators need not have agreed on the details of the conspiracy, so long as they agreed on the essential nature of the plan.").

        b.  Enforcement

The States have submitted evidence that the Defendants' mutual trust was reinforced by fear of enforcement of their agreement that might come in the form of retaliation for deviations from their market-stabilization scheme. Lubke testified that she would have stopped sharing pricing and other sensitive information with Mylan if it ever used that information to harm Sandoz. ECF No. 693-5 at 1324; *see also id.* at 1304, 1344–45, 1351–52 (testifying that Taro and Sandoz were not concerned that the other would misuse competitively sensitive information because "[w]e understood how we expected the other to use the information we exchanged to not hurt each other but to help each other," and because "I trusted [Taro's Statler] to use the information that I gave him . . . to help each other," primarily by "maximiz[ing] our profits"); *id.* at 46–47 (Krauthauser testifying that, while at Rising, he had "an understanding with [Taro's] Statler that you would use the information . . . to the mutual benefit of Taro and Rising"). Lubke also cited Sandoz's and Mylan's shared understanding that "[i]f you come after our customers, we will come after yours" as a reason for refraining from using Mylan's competitive intelligence to lower prices or target its

market share.  *Id.* at 1377.  Vezza testified that Sandoz had a "concern" that Taro might retaliate "if we did something that wasn't, you know, agreed to," and that Sandoz proposed creating a "database that would track customers and products . . . and their . . . predicted reactions to if we did something, would we get -- would there be retaliation, and somehow tracking that process." *Id.* at 513.  This fear of potential retaliation was not limited to a single drug market but also reached "other market[s] where Sandoz and Taro compete."  *Id.*

The Defendants contend that where the evidence reveals "no punishment, or even a mechanism to punish, the inference tends toward no agreement."  *Kleen Prods. LLC v. Int'l Paper*, 276 F. Supp. 3d 811, 842 (N.D. Ill. 2017), *aff'd sub nom. Kleen Prods. LLC v. Georgia-Pac. LLC*, 910 F.3d 927 (7th Cir. 2018).  But where there is evidence of an enforcement mechanism, it is "circumstantial evidence that an unlawful agreement exists."[11]  *Petruzzi's IGA Supermarkets, Inc. v. Darling-Delaware Co.*, 998 F.2d 1224, 1233 (3d Cir. 1993) (finding evidence that Defendants targeted noncomplying companies by "bidding on their accounts predatorily" was relevant to show the mechanism used by the defendants to enforce their agreement).  Here, as in *Petruzzi's*, there is evidence that Defendants could target the customers of a noncomplying company—even in other markets—in retaliation for failing to abide by the rules of engagement.

### c.  Intermediaries

The evidence of brokering by one Defendant of agreements between other Defendants is also an indication of interdependence.  A reasonable jury could infer that Defendants that did not

---

[11] An enforcement mechanism is not required to find an unlawful agreement.  The Supreme Court has held that the Sherman Act prohibits "plan[s] for the exchange of price information between competitors with the idea of keeping prices reasonably stable and put[ting] an end to cutthroat competition."  *United States v. Container Corp. of Am.*, 393 U.S. 333, 337 n.3 (citing *Am. Column & Lumber Co. v. United States*, 257 U.S. 377 (1921); *United States v. Am. Linseed Oil Co.*, 262 U.S. 371 (1923)).  In *American Column*, the Court later noted, while there "were no sanctions except financial interest and business honor," the agreement was still found to be anticompetitive. *Container Corp.*, 393 U.S. at 337 n.3.

make a particular Drug at Issue connected those that did because they were all part of a larger whole and because they knew that doing so would redound to their benefit in the future as the players involved in the specific agreement would be more inclined to trust them, share information with them, and reach drug-specific deals with them.  In other words, these Defendants recognized that serving as intermediaries in agreements for drugs that they did not manufacture would build trust and pave the way for their own future agreements with competitors.  The evidence of these intermediaries also demonstrates that the Defendants had an incentive to join an overarching agreement that included drugs that they did not sell, and at least raises a genuine dispute about the Defendants' argument that each Defendant did not share a common goal as to "markets in which they did not participate."  ECF No. 609 at 45.  Each time a Defendant served as an intermediary in a single-drug conspiracy, its  conduct was "advantageous to the success of another aspect of the scheme,"  *Portela*, 167 F.3d at 695, i.e., a future single-drug agreement, thereby further demonstrating that single-drug agreements were interdependent.

    4.  <u>Common Means and Methods</u>

Although the Defendants highlight the differences in the drug products and the Defendants themselves, they do not strenuously dispute that the single-drug conspiracies shared common means and methods, other than to suggest that "the States' description of 'similar operations' is simply how [antitrust] plaintiffs routinely claim any run-of-the-mill price fixing or market allocation conspiracy would work."  ECF No. 615 at 33–35.  While this may be true for certain similarities, such as eschewing email and paper trails in favor of phone and in-person communications, *see, e.g.*, ECF No. 693-5 at 23–24, the States have also provided evidence demonstrating similar patterns of conduct across many of the single-drug agreements.  For instance, the evidence shows that Defendants agreed that whenever a price increase or a launch into a new market was imminent, phone calls would be made to competitors to explore the

possibility of working together, i.e., keeping the price high and avoiding poaching each other's business. *E.g.*, ECF No. 693-5 at 340 (Thomassey testifying that "there was the higher overarching agreement that . . . they were going to call us, I was going to call them when a [product] launch was happening"). The States have also supplied phone records that show frequent communications between competitors in close proximity to price increases or a new market entry, and the cooperating witnesses testified the purpose of these calls were to establish a drug-specific agreement. *Compare, e.g.*, ECF No. 693-4 at 28, 83 (showing calls between Thomassey of Fougera and Polman of Perrigo on April 13 and 16, 2010), *with* ECF No. 693-5 at 148 (Thomassey testifying that April 13 call to Polman "[w]as to divide up market share appropriately and ensure that market prices were held at the highest possible level" on Imiquimod cream) *and* ECF No. 693-4 at 31 (Fougera announcing price increase for Imiquimod cream on April 16, 2010); *see also* SAMF ¶ 47 (citing other examples in the record). Other witnesses also described conduct that was substantively identical—they would check in with their contacts at their competitors to avoid a situation where uncoordinated behavior would disrupt prices. ECF No. 693-5 at 577 (Vezza testifying that rather than "fighting" over customer, "this arrangement avoids all that, where you get guidance on where you want to go, the price you need to beat. So then you know what price you have to go -- you go below that price, you get the award and then you move on as quickly as possible to the next topic."). And Dr. Warren-Boulton opined that, across the board, price increases and stabilized market shares for the Drugs at Issues corresponded with the communications period for a given drug. ECF No. 693-7 at 55–56. These similarities go beyond "run-of-the-mill" conspiracies; they paint a picture of how the Defendants conducted business, regardless of which drug they were discussing on a given day.

*     *     *

In sum, consideration of the *Berger* factors suggests at least that the States have raised a genuine dispute about whether an overarching conspiracy existed to stabilize and avoid disruption of the markets for Drugs at Issue.

## IV. MOTIONS TO SEAL

The Motions to Seal briefs and exhibits related to this motion for summary judgment—ECF Nos. 691 and 694—are both granted, substantially for the reasons set forth in the motions. The Court reserves judgment on ECF No. 694 as it relates to the Defendants' final Group 2 summary judgment motion regarding State-Law Claims until it rules on that motion. The Motions to Seal the briefs and exhibits related to the *Daubert* motion to exclude the opinions and testimony of Dr. Levin (*see supra* note 6)—ECF Nos. 661, 725, and 728—are also granted.

## V. CONCLUSION

Because there is evidence from which a reasonable jury could find that the alleged overarching conspiracy exists, the Motion for Summary Judgment is denied.

IT IS SO ORDERED.

_____/s/_____
Michael P. Shea, U.S.D.J.

Dated: Hartford, Connecticut
December 3, 2025