# UNITED STATES DISTRICT COURT
## DISTRICT OF CONNECTICUT

THE STATE OF CONNECTICUT; THE STATE OF
ALASKA; THE STATE OF ARIZONA; THE
STATE OF ARKANSAS; THE STATE OF
CALIFORNIA; THE STATE OF COLORADO;
THE STATE OF DELAWARE; THE DISTRICT OF
COLUMBIA; THE STATE OF FLORIDA; THE
STATE OF GEORGIA; THE TERRITORY OF
GUAM; THE STATE OF HAWAII; THE STATE
OF IDAHO; THE STATE OF ILLINOIS; THE
STATE OF INDIANA; THE STATE OF IOWA;
THE STATE OF KANSAS; THE
COMMONWEALTH OF KENTUCKY; THE
STATE OF LOUISIANA; THE STATE OF MAINE;
THE STATE OF MARYLAND; THE
COMMONWEALTH OF MASSACHUSETTS;
THE STATE OF MICHIGAN; THE STATE OF
MINNESOTA; THE STATE OF MISSISSIPPI; THE
STATE OF MONTANA; THE STATE OF
NEBRASKA; THE STATE OF NEVADA; THE
STATE OF NEW HAMPSHIRE; THE STATE OF
NEW JERSEY; THE STATE OF NEW MEXICO;
THE STATE OF NEW YORK; THE STATE OF
NORTH CAROLINA; THE STATE OF NORTH
DAKOTA; THE COMMONWEALTH OF THE
NORTHERN MARIANA ISLAND; THE STATE
OF OHIO; THE STATE OF OKLAHOMA; THE
STATE OF OREGON; THE COMMONWEALTH
OF PENNSYLVANIA; THE COMMONWEALTH
OF PUERTO RICO; THE STATE OF RHODE
ISLAND; THE STATE OF SOUTH CAROLINA;
THE STATE OF TENNESSEE; THE STATE OF
UTAH; THE STATE OF VERMONT; THE
COMMONWEALTH OF VIRGINIA; THE STATE
OF WASHINGTON; THE STATE OF WEST
VIRGINIA; THE STATE OF WISCONSIN; and
U.S. VIRGIN ISLANDS,

    *Plaintiffs*,

v.

No. 3:20-cv-00802-MPS

SANDOZ, INC.; ACTAVIS HOLDCO US, INC.;
ACTAVIS ELIZABETH LLC; ACTAVIS
PHARMA, INC.; AMNEAL
PHARMACEUTICALS, INC.; AMNEAL
PHARMACEUTICALS, LLC; ARA
APRAHAMIAN; AUROBINDO PHARMA U.S.A.,
INC.; BAUSCH HEALTH AMERICAS, INC.;
BAUSCH HEALTH US, LLC; MITCHELL
BLASHINSKY; DOUGLAS BOOTHE; FOUGERA
PHARMACEUTICALS INC.; GLENMARK
PHARMACEUTICALS INC., USA; JAMES (JIM)
GRAUSO; GREENSTONE LLC; G&W
LABORATORIES, INC.; WALTER
KACZMAREK; ARMANDO KELLUM; LANNETT
COMPANY, INC.; LUPIN PHARMACEUTICALS,
INC.; MALLINCKRODT INC.; MALLINCKRODT
LLC; MALLINCKRODT plc; MYLAN INC.;
MYLAN PHARMACEUTICALS INC.; KURT
ORLOFSKI; MICHAEL PERFETTO; PERRIGO
NEW YORK, INC.; PFIZER INC.; SUN
PHARMACEUTICAL INDUSTRIES, INC.; TARO
PHARMACEUTICALS USA, INC.; TELIGENT,
INC.; ERIKA VOGEL-BAYLOR; JOHN
WESOLOWSKI; and WOCKHARDT USA LLC,

       *Defendants*.

## RULING ON MOTION FOR SUMMARY JUDGMENT

In this action, the Attorneys General of most of the States and several U.S. territories ("the States") allege that thirty-six pharmaceutical companies and executives ("the Defendants") each participated in a series of conspiracies, as well as an overarching conspiracy, to fix prices, allocate markets, and rig bids in the sale of dozens of generic drug products.  Defendant Aurobindo Pharma USA, Inc. ("Aurobindo") has moved for summary judgment on all claims alleging that it participated in any product-specific or overarching conspiracy.  ECF No. 1033; *see also* ECF No. 1008 (Defendants' Joint Memoranda in Support of Defendant-Specific Motions for Summary Judgment).

For the reasons set forth below, I **GRANT IN PART AND DENY IN PART** Aurobindo's

1

motion for summary judgment. I deny the motion for summary judgment with respect to Pioglitazone HCL Metformin HCL ("Pio Met"), Cefpodoxime Proxetil ("Cefpo"), and the overarching conspiracy, and grant it with respect to Oxacillin Sodium and Nafcillin Sodium.

## I. BACKGROUND

### A. Procedural Background

This is one of three cases in which the Attorneys General of the States have sued scores of defendants in the generic drug industry for alleged antitrust violations and unfair trade practices. All three cases were originally filed in this Court but were transferred to the Eastern District of Pennsylvania (the "MDL Court"), which was designated by the Judicial Panel on Multidistrict Litigation (the "JPMDL") to preside over these and other similar cases brought by private parties in a consolidated proceeding. ECF No. 9.[1] In April 2024, these three cases were remanded to this Court by the JPMDL and assigned to me. ECF No. 11. The operative complaint in this case, ECF No. 196, alleges collusion in the pricing, market allocation, and bidding for some eighty generic drugs, chiefly for dermatological applications. The parties refer to it as "the Dermatology complaint."

In a previous ruling, I denied the Defendants' Joint Motion for Summary Judgment on Overarching Conspiracy Claims, ECF No. 609, because I found that there is evidence in the record from which a reasonable jury could find that the alleged overarching conspiracy exists. *Connecticut v. Sandoz, Inc.*, No. 20-cv-802, 2025 WL 3470502 (D. Conn. Dec. 3, 2025). In

---

[1] Unless otherwise indicated, all ECF numbers in this ruling refer to entries on the docket of this case, not the same case when it was before the MDL Court, and each page number refers to the page number shown on the ECF stamp on the top of the cited page, not the page of the relevant brief or pleading designated by the parties. References to page numbers of documents that were filed under seal refer to the page number of the PDF file.

reaching this conclusion, however, I did not determine whether each corporate Defendant was a member of the overarching conspiracy.[2] Shortly before I issued that ruling, most Defendants filed additional, Defendant-specific summary judgment motions, many of which include challenges about whether a particular Defendant joined the overarching conspiracy. This ruling addresses Aurobindo's Defendant-specific motion for summary judgment.

The Defendants have also filed a Joint Memorandum that addresses the pertinent legal standard and argues that the Defendants are entitled to summary judgment on particular state-law claims. ECF No. 1008. This ruling will address arguments made in the Joint Memorandum where they are applicable to Aurobindo.

### B. Factual Background

In the overarching conspiracy ruling, I discussed the evidence underpinning the States' claims against all corporate Defendants, and I incorporate that description here. *Sandoz, Inc.*, 2025 WL 3470502, at *2–14. I now address the evidence specific to Aurobindo's participation in the alleged conspiracy. The following facts are drawn from the parties' Local Rule 56 Statements of Facts, ECF Nos. 1042-1, 1060-1, as well as Statements of Facts related to the Defendants' Joint Memoranda, ECF No. 1054-1, and the record. The facts are undisputed unless otherwise noted.

At this stage of the litigation, the States argue that Defendant Aurobindo acted

---

[2] As noted in the previous ruling, "[w]hether a particular Defendant was a member is a distinct issue from the issue whether a conspiracy existed at all." *Sandoz, Inc.*, 2025 WL 3470502, at *16 (citing 4 Sand et al., Modern Federal Jury Instructions–Civil ¶ 79-8 ("[Y]ou should first determine . . . whether the conspiracy existed. If you conclude that the conspiracy did exist, you should next determine whether each defendant was a knowing member of the conspiracy."); *id.* ¶ 79-6 ("In order to prove the [price-fixing] conspiracy, . . . [t]he plaintiff does not have to show that . . . all of the persons alleged to have been members of the claimed conspiracy were in fact members.")). The States do not seek to hold the individual Defendants (for the most part employees and executives of the corporate Defendants) jointly and severally liable for their participation in the alleged overarching conspiracy. *Id.* at *1 n.1.

anticompetitively with respect to two of its drugs: Pio Met and Cefpo.  ECF No. 1060-1 ¶ 3. Neither Pio Met nor Cefpo is a dermatological drug; during the relevant time, Aurobindo "focused on oral solids."  *Id.* ¶¶ 7-8.  Aurobindo did not enter into a Deferred Prosecution Agreement ("DPA") with the Department of Justice, and no Aurobindo employee has invoked her Fifth Amendment privilege against self-incrimination in this case.  *Id.* ¶¶ 28–29; ECF No. 1049-1 at 312 (letter from DOJ informing Aurobindo's counsel that it no longer considered Aurobindo a target).

Two Aurobindo employees play central roles in the States' allegations against Aurobindo: Anthony Thomassey and James Grauso.  ECF No. 1060-1 ¶¶ 14, 23; ECF No. 1049-1 at 18. Thomassey worked at Aurobindo for nine months, having moved to Aurobindo after working at Fougera (now Sandoz) for around eight years.  ECF No. 1060-1 ¶¶ 13, 15.  Thomassey testified in this case for the States as a cooperating witness.[3]  The parties dispute whether Thomassey was a senior employee with decision-making authority: Aurobindo refers to Thomassey as a "non-senior employee who lacked unilateral authority" to make relevant decisions, but the States cite Thomassey's deposition testimony, in which he describes himself as "not a senior *executive*," and as someone who managed national accounts.  *Id.* ¶ 104 (emphasis added); ECF No. 1049-1 at 18. Thomassey, for his part, testified that he did not have authority to decide drug pricing at Aurobindo.  ECF No. 1049-1 at 18.  When asked how Aurobindo decided pricing, Thomassey testified, "I have no idea what Aurobindo did.  They were so screwed up they could have just been throwing darts at a wall.  I really don't know."  *Id.*  After a sudden medical event, Thomassey stopped working at Aurobindo on May 16, 2013.  ECF No. 1060-1 ¶ 19.

---

[3] As I noted in the overarching conspiracy ruling, although the Defendants assert that Thomassey suffers from some memory deficits due to a medical event, the deposition transcripts in the summary judgment record raise no concerns about his memory or his competence as a witness. *Sandoz, Inc.*, 2025 WL 3470502, at *6 n.6.

No party to this motion disputes Thomassey's testimony that he shared sensitive competitive information while working at Fougera. *Id.* ¶ 16. As to Aurobindo, however, the record is mixed. Thomassey testified that he did not independently recall sharing sensitive competitive information during his nine-month tenure there. *Id.* ¶ 17; ECF No. 1049-1 at 9. But when he was shown phone logs evidencing calls between him and competitors, and contemporaneous internal emails with Grauso, he testified it was "definitely" likely he was discussing such information with competitors. ECF No. 965-1 at 459.

James Grauso, to whom Thomassey reported, worked at Aurobindo from December 19, 2011, to December 21, 2013, first as Vice President of Sales and Marketing (until March 19, 2013), and then as Vice President of Commercial Marketing. ECF No. 1060-1 ¶ 23; ECF No. 1049-1 at 9 (Thomassey testifying that he reported to Grauso), 18 (same). Grauso testified that he did not "recall exchanging confidential information with a competitor at any time." ECF No. 1049-1 at 281; ECF No. 1060-1 ¶ 26. As with Thomassey, the parties disagree about Grauso's authority in his position. ECF No. 1060-1 ¶ 23. The States contend that Grauso, when presented with his résumé, agreed that his responsibilities included sales and sales management, pricing, contracts, forecasts, marketing, and customer service. ECF No. 1049-1 at 279. When asked to expound on his involvement with pricing, Grauso testified that there were "people who did the day-[t]o-day pricing. If they had any things out of the ordinary, they would bring them to my attention and I'd just oversee that: all of our requests for pricing, requests for RFPs, requests for one-time buys, requests for right of first refusals were being handled in a timely manner to support the sales team." *Id.* Still, Grauso testified that he'd have to obtain approval from his supervisor, Bob Cunard, "if the pricing that we were going to submit or any change we were going to make were out of the ordinary that we had been seeing in the current market." *Id.*

### 1. Pio Met

Pio Met is an "oral solid" drug intended for non-dermatological uses. ECF No. 1060-1 ¶¶ 7–9. In February 2013, Mylan, the first-to-file generic manufacturer, supplied fifty-two percent of the generic Pio Met market, and non-Defendant Teva, which was authorized by the brand-name supplier to sell a generic version of Pio Met, supplied the balance (forty-eight percent). ECF No. 1060-1 (SAMF) ¶ 1.

After an initial exclusivity period ended, Aurobindo and another non-Defendant, Torrent,[4] entered the market, and Sandoz followed in April 2013. *Id.* ¶¶ 10, 12; ECF No. 1060-1 ¶ 69. During the alleged conduct period, Mylan and Teva lost share to the new entrants. By the time of the filing of the Heritage complaint in late 2016, Aurobindo had the highest market share at around forty percent, followed by Mylan at around thirty-five percent, with the non-Defendants having less share and Sandoz out of the market altogether. ECF No. 959-1 at 679–80. With the new entrants in the market, the average net price of Pio Met went up briefly in the third quarter of 2013 but then began to drop, and in 2016 was lower than when the alleged conduct period began in 2013. *Id.*

Before Aurobindo entered the market in February 2013, Aurobindo's Thomassey and Mylan's James (Jim) Nesta exchanged phone calls. Over two days in January (January 29 and 30, 2013), Mylan's Nesta exchanged "a flurry of calls" with three potential competitors: Anthony Thomassey at Aurobindo, Kevin Green at Teva, and Tim Gustafson at non-Defendant Ranbaxy. ECF No. 1060-1 (SAMF) ¶¶ 2–5.

On January 29, 2013, Thomassey called Nesta at 1:36 p.m. *Id.* ¶ 2. Nesta called

---

[4] Neither Teva nor Torrent is a Defendant in this action. While Teva is a Defendant in one of the other generic pharmaceutical cases currently before me, No. 3:19-cv-710, the States have not alleged any wrongdoing by Torrent in this or any other action.

Thomassey back within the hour at 2:21 p.m., and they spoke for one minute and forty-eight seconds. *Id.* At 2:26 p.m., Thomassey called Nesta for thirty-seven seconds. *Id.* Three minutes later, Nesta called Thomassey, and they spoke for ten minutes and fifty-four seconds. *Id.* At 3:06 p.m., Nesta called Green, and they spoke for six minutes and four seconds. *Id.* At 3:18 p.m., Nesta called Gustafson, who then called Nesta back. *Id.* At 4:14 p.m., Nesta called Gustafson again, and they spoke for three minutes and thirty-seven seconds. *Id.*

On January 29, at 4:46 p.m., Nesta sent an email to his Mylan colleagues: "Guys, Just find out if Torrent or Watson have any offers out there. As of now only hearing Auribindo [sic] coming, Ranbaxy is not." *Id.* ¶ 3. Two minutes after sending that email, Nesta called Green, and they spoke for nine minutes and nine seconds. *Id.* At 4:58 p.m., Nesta called Thomassey, who called Nesta back at 5:18 p.m. *Id.* At 5:36 p.m., Nesta called Green, and they spoke for eight minutes and fifty-three seconds. *Id.*

The next morning, January 30, at 8:49 a.m., Nesta's subordinate informed him, via email, that Rite Aid had heard from both Aurobindo and Ranbaxy about supplying Pio Met. *Id.* ¶ 4. Responding six minutes later, Nesta wrote, "Great update. Ranbaxy is not coming. . . . Only one I heard coming is Auribindo [sic]. So and they are looking for a 20 [percent] share on this. I am hearing of no others out there. If you do advise this will be critical information so we can maintain 3 player pricing." *Id.* One minute later, Nesta's subordinate responded, confirming Rite Aid mentioned Ranbaxy, and said "perhaps [Nesta's Rite Aid contact] was mistaken." *Id.* One minute after that, Nesta spoke with Thomassey for two minutes and thirty-two seconds. *Id.* Right after that call, at 9:00 a.m., Nesta wrote back to his subordinate, "He was [mistaken]. Auribindo [sic] only one coming." *Id.* Throughout the rest of the day on January 30, Nesta called Thomassey and Green, and vice versa. *Id.*¶ 5.

Closer to the February 2013 sunsetting of Mylan's exclusivity window, on February 8, 2013, at 1:39 p.m., Nesta sent another intrafirm email about Pio Met. *Id.* ¶ 6.  At 1:55 p.m., Nesta called Thomassey, who called him back at 2:04 p.m., at which point the two spoke for three minutes. *Id.* At 2:06 p.m., right after the call with Nesta, Thomassey called his boss, Grauso. *Id.* During a later call (3:27 p.m.) between Nesta and Thomassey, Grauso forwarded Thomassey an email with information about Cardinal Health's Pio Met monthly usage. *Id.* On February 8, at 3:36 p.m., Thomassey called Grauso and spoke with him for two minutes. *Id.* ¶ 7.  Right after, Thomassey called Nesta, and they then spoke for one minute. *Id.* At 3:44 p.m., Nesta and Green spoke for around eleven minutes. *Id.* At 3:59 p.m., Thomassey spoke with Grauso for four minutes. *Id.* Then, at 4:09 p.m., Nesta called Thomassey, and they spoke for four minutes. *Id.* Thomassey then again called Grauso, and the two spoke for five minutes. *Id.* At 4:14 p.m., Nesta called Green, and that call lasted six minutes. *Id.* After Thomassey ended his call with Grauso, Thomassey called Nesta at 4:19 p.m., and they spoke for one minute. *Id.* At 4:21 p.m., Green called Grauso, and they spoke for eleven minutes. *Id.* Grauso then called Thomassey, and they spoke for twenty-four minutes. *Id.* While on that call, Thomassey forwarded Grauso an email with Teva's and Mylan's list pricing for Pio Met and emailed a Pio Met bid to Cardinal. *Id.*

Thomassey testified that the email bid he sent to the Cardinal buyer reflected an offer on Pio Met for the primary source position, and that he sent it while on the February 8 twenty-four-minute call with Grauso.  ECF No. 1049-1 at 12.  Thomassey testified that, considering the pattern of the calls, the bid to Cardinal Heath was something he would have discussed with Nesta. *Id.* Nesta, when asked about these calls with Thomassey, invoked his Fifth Amendment right against self-incrimination. *Id.* at 358–62.

When deposed, Thomassey described his relationship with Nesta as "social friends," but

not the sort who would get dinner together.  *Id.* at 9.  He testified to being certain that his calls with Nesta in early February 2013 were not social calls.  *Id.* at 11 ("[y]es, they absolutely were not social calls").

Thomassey testified that Grauso was aware that Thomassey was communicating about competitively sensitive information with Nesta, and that Grauso in fact directed Thomassey to do so.  *Id.* at 11.  Thomassey testified that Grauso directed him to communicate with Nesta "[t]o make sure that we split the market share appropriately and keep the -- keep the price as high as possible."  *Id.* at 12.  He added that, given the pattern of calls on February 8, it was likely that he had been speaking to Nesta about Aurobindo's bid for Cardinal Health, which was then a Mylan customer.  ECF No. 1060-1 ¶ 48; ECF No. 965-1 at 460.

On February 11, 2013, at 1:00 p.m., Thomassey called Nesta.  ECF No. 1060-1 (SAMF) ¶ 9.  A minute after that, Thomassey emailed Grauso, writing "I spoke with Dale [the buyer at Cardinal Health].  He said it will be a couple of days before they have an answer.  The right of first refusal has been sent off to Mylan."  *Id.* ¶ 9; ECF No. 1049-1 at 12.  Grauso called Thomassey a minute later, and the two spoke for ten minutes.  ECF No. 1060-1 (SAMF) ¶ 9.  Nesta called Thomassey at 2:06 p.m., and Thomassey called Grauso after that.  *Id.*  Asked about the topic of discussion with Nesta on February 11, Thomassey testified, "[i]t would have been about whether they're going to give up Cardinal or not."  ECF No. 965-1 at 461.  Thomassey then said there was an agreement between Mylan and Aurobindo "that [Mylan] would walk and [Aurobindo] would . . . get the award at Cardinal."  *Id.* at 462.  Nesta, when asked about these calls with Thomassey, invoked his Fifth Amendment right against self-incrimination.  ECF No. 1060-1 ¶ 53.

On February 12, 2013, the same day that Aurobindo secured Cardinal as a customer, it also secured the business of another customer, Harvard, at a contract price of $131.95.  ECF No. 1060-

1 ¶ 61; ECF No. 1049-1 at 83-84.    The Federal Drug Administration ("FDA") approved Aurobindo's Pio Met application on February 13.  ECF No. 1060-1 (SAMF) ¶ 10.  Green called Grauso that day at 2:53 p.m., and Grauso then exchanged calls with another Teva employee, Teri Mouro-Sherman.  *Id.*  On February 14—after the calls between Grauso and Teva's Green and Mouro-Sherman and after Teva offered Harvard a lower price[5]—Aurobindo matched Teva's offer to retain the customer.  ECF No. 1060-1 ¶ 61; ECF No. 1049-1 at 424.  The following day, February 15, Torrent offered Harvard a contract price of $90 to supply Pio Met, which Aurobindo again matched to retain the customer.  ECF No. 1060-1 ¶¶ 62–63; ECF No. 1049-1 at 407.

On the same day, Cardinal requested "a cost adjustment" from Aurobindo, also seeking a $90 price.  ECF No. 1060-1 ¶¶ 64–65; ECF No. 1049-1 at 410.  In his deposition, Thomassey testified that "a nickname for Torrent that they had in the industry was 'torch it,' because they were so bad at eroding prices.  That's why I said, 'maybe the morons will stop.'"  ECF No. 1049-1 at 21 (referring to an email Thomassey sent Grauso, in which Thomassey wrote, "I suggest we walk . . . maybe the morons will stop").  Aurobindo offered a reduced price of $115.30, which Cardinal accepted.  ECF No. 1060-1 ¶ 65.

On February 19, 2013, Thomassey spoke with Christopher Bihari[6] (of Sandoz) three times.  ECF No. 1060-1 (SAMF) ¶ 11.  Bihari took contemporaneous notes of these calls.  *Id.* ¶ 13.  Bihari testified that he and Thomassey spoke about Torrent driving down prices and Aurobindo being "at Cardinal currently."  ECF No. 964-1 at 919.  Thomassey and Bihari continued to communicate into April, when they allegedly exchanged non-public contract pricing.  ECF No. 1060-1 (SAMF) ¶¶ 13–14; ECF No. 964-1 at 919–20.  Bihari testified that this exchange of information "allowed

---

[5] The parties seemingly dispute whether Teva's offer was $134.51 or $122.  ECF No. 1060-1 ¶ 61.
[6] Bihari also testified as a cooperating witness in this matter.

Sandoz to appropriately price [Pio Met] in the market upon launch and to target these customers." ECF No. 964-1 at 920.

Bihari also testified that Sandoz and Aurobindo had an agreement on Pio Met, in which Sandoz executives Kellum and Mike Vezza participated, to "ensure that Sandoz keeps their pricing high in the market upon entry and to target certain customers." ECF No. 964-1 at 920. Kellum invoked his Fifth Amendment right against self-incrimination when asked whether Pio Met competitors, including Aurobindo, had an agreement to fix prices and allocate customers, and whether Sandoz and Aurobindo had a broader agreement not to compete on pricing in generic drug markets in which they overlapped. *Id.* at 3386.

On April 16, 2013, the FDA approved Sandoz's Pio Met application. ECF No. 1060-1 (SAMF) ¶ 12. On April 17, 2013, Thomassey called Bihari twice. *Id.* ¶ 13. Thomassey called Bihari again the next day (April 18) at 3:40 p.m., after which, at 3:49 p.m., Bihari called Vezza (of Sandoz). *Id.* At 4:13 p.m., Vezza called Bihari, and, at 4:21 p.m., Bihari called Vezza. *Id.* Bihari took notes during these April 18 calls, during which they again allegedly discussed Aurobindo's contract pricing for Pio Met. *Id.* ¶ 14; ECF No. 947-1 at 50–52 (Bihari's notes).

Bihari testified that he shared the information in these notes with Kellum and Vezza. ECF No. 964-1 at 919–20.

### 2. Cefpo

Like Pio Met, Cefpo is an "oral solid" drug intended for non-dermatological uses. ECF No. 1060-1 ¶¶ 7–9. Cefpo has various formulations, and States' allegations concern two: tabs and oral suspension. In January 2013, Sandoz was the exclusive generic producer of Cefpo. ECF No. 964-1 at 913; ECF No. 949-1 at 179.

Thomassey testified that Aurobindo was entering the market for Cefpo in early January 2013, a drug he testified that he "vaguely" recalled. ECF No. 1060-1 ¶¶ 7–9; ECF No. 1049-1 at

185–87.  On January 3, 2013, Bihari called Thomassey at 3:55 p.m.  ECF No. 1060-1 (SAMF) ¶ 16.  The next day, January 4, Thomassey called Bihari first at 4:03 p.m., and then at 4:43 p.m.  *Id.* ¶ 17.  Bihari then called Kellum at 4:57 p.m., and the two spoke for nine minutes.  *Id.*

Asked about these exchanges, Bihari testified that on these calls he learned from Thomassey information about Aurobindo's entry into the Cefpo market, and he provided that information to Kellum.  ECF No. 964-1 at 913.  Kellum, within minutes of his call with Bihari at 5:09 p.m., sent an intrafirm email that he "[j]ust heard that Aurobindo is likely to launch [Cefpo] (trying to find out if this is tabs or suspension or both) in the near future.  I had planned on taking price increase in January.  We are currently exclusive on both."  ECF No. 949-1 at 179.

On January 7, 2013, Bihari and Thomassey spoke at 9:44 a.m. and 9:47 a.m.  ECF No. 1060-1 (SAMF) ¶ 19.  These calls, Bihari testified, occurred during the week of Aurobindo's launch into the Cefpo market (as is reflected in Bihari's notes).  ECF No 964-1 at 914.  Bihari's notes—titled that day as "Aurobindo launch – wk of 1/7"—include what follows:

- "Cefdinir caps – Sandoz 18% MS – will not approach"

- "Cefdinir OS – Sandoz 3% MS – will not approach"

- "Cefpodoxime Prox OS – Sandoz 94% – we anticipate 20% price inc"

- "Cefpo Prox Tabs – Sandoz 100% – we anticipate a 20% price inc – looking for 40% share"

ECF No. 947-1 at 7.  Below the above, Bihari's note lists customers with pricing information, and beneath those customers includes: "start there follow the plan  . . . will be reasonable."  *Id.*

When asked what "will not approach" means, Bihari testified those were "Thomassey's words, indicating that upon Aurobindo's launch, they would not send an offer to a Sandoz customer."  ECF No. 964-1 at 914-15.  When asked about "will be reasonable," Bihari testified "[t]hat was directly from . . . Thomassey.  He was indicating they will be reasonable with market

share and with pricing, . . . reasonable with the market share that they're seeking . . . But those are his words.  He used that, will be reasonable."  *Id.* at 915.  When asked about "follow the plan," Bihari testified it meant to "relinquish share as needed.  Follow the plan.  You know, the bullets that we discussed.  Share it with those internal with Sandoz and to ensure that they also follow the plan as he says."  *Id.*  Bihari testified that he did share this information with Kellum, "[t]o ensure that they do follow this plan, which enables Sandoz to keep the price high on other customers and not deteriorate the pricing market."  *Id.* at 915–16.

On January 7, 2013, after their call, Bihari and Thomassey then called their bosses, with Bihari calling Kellum at 9:53 a.m. and speaking for seven minutes, and Thomassey calling Grauso at 9:53 a.m. and speaking for one minute.  ECF No. 1060-1 (SAMF) ¶ 19; ECF No. 964-1 at 914; ECF No. 965-1 at 455.  Thomassey testified that he called Grauso because he "believe[d] . . . [he] was passing along the information that the pricing . . . what we were going to do, as far as . . . [with] being just us and Sandoz."  ECF No. 965-1 at 456.  Bihari then called Thomassey at 10:00 a.m., and the two spoke for two minutes.  ECF No. 964-1 at 914.  At 10:11 a.m., Grauso called Thomassey, and they spoke for fourteen minutes.  ECF No. 965-1 at 455.  When asked about these exchanges, Kellum invoked his Fifth Amendment right against self-incrimination.  ECF No. 964-1 at 3383–84.

When asked by the States' counsel whether he had any reason to doubt Bihari's testimony that Thomassey called Bihari to discuss Aurobindo's entry into the Cefpo market, Thomassey testified that he did not.  ECF No. 1049-1 at 10.  Neither did Thomassey doubt Bihari's notes of that call, which, according to Bihari, reflected that Thomassey told Bihari that Aurobindo wanted 40 percent market share for Cefpo.  *Id.*  And Thomassey also did not doubt Bihari's testimony that Thomassey told Bihari that Aurobindo "will be reasonable" as it entered the market for Cefpo

products.  *Id.*

A couple days later, on January 9, 2013, Bihari called Thomassey at 4:39 p.m., and the call lasted seven minutes.  ECF No. 1060-1 (SAMF) ¶ 18; ECF No. 1049-1 at 431.  This call was just before an internal Sandoz call to discuss Cefpo pricing.  ECF No. 1060-1 (SAMF) ¶ 21.  Bihari testified that he and Thomassey discussed the Cefpo price increases on this call.  ECF No. 1049-1 at 431.  Bihari called Kellum at 4:47 p.m., after his call with Thomassey.  *Id.* ¶ 19.  Bihari testified that he called Kellum to inform Kellum of his conversation with Thomassey about Cefpo.  ECF No. 1049-1 at 431.

Sandoz increased its Cefpo price on January 11, 2013.  ECF No. 1060-1 (SAMF) ¶ 22.  On that day, Thomassey had calls intermittently with Bihari and Grauso—he first spoke with Bihari, then twice with Grauso, then again with Bihari, before ending with Grauso.  *Id.*

From February 24–27, 2013, Thomassey, Grauso, Kellum, Bihari, and Paul Krauthauser (another cooperating witness, who worked for Sandoz) attended (on behalf of their respective firms) ECRM's annual Retail Pharmacy Generic Pharmaceuticals Conference.  *Id.* ¶ 24.  On February 26, while in attendance, Krauthauser emailed Kellum that he "heard at ECRM that Aurobindo will be coming back with Cefpodoxime in about a month."  *Id.* ¶ 25.

Aurobindo's launch was delayed until March 27, 2013, because of manufacturing issues. *Id.* ¶ 23.  After the launch, the exchange of calls continued.  On April 17, 2013, Thomassey called Bihari, and Bihari called him back within the hour.  *Id.* ¶ 26.  Thomassey called Bihari again the next day, April 18, and Aurobindo launched Cefpo at Sandoz's increased Wholesale Acquisition Cost ("WAC") pricing that day.  *Id.*; ECF No. 1060-1 ¶ 35.

On April 30, 2013, Thomassey called Bihari at 9:36 a.m.  ECF No. 1060-1 (SAMF) ¶ 27. Bihari then called Thomassey at 9:38 a.m., and they spoke for three minutes.  *Id.*; ECF No. 1049-

1 at 431 (using U.T.C. time). Bihari then called Kellum at 9:42 a.m. ECF No. 1060-1 (SAMF) ¶ 27; ECF No. 1049-1 at 431 (using U.T.C. time). Thomassey then called Bihari at 9:45 a.m., and they spoke again for two minutes. ECF No. 1060-1 (SAMF) ¶ 27; ECF No. 1049-1 at 431 (using U.T.C. time). Later that day, Bihari called Kellum at 4:06 p.m., 5:36 p.m., and 5:49 p.m. ECF No. 1060-1 (SAMF) ¶ 27.

Bihari took notes of his calls with Thomassey on April 30, 2013, and these notes, Bihari explained, indicate that Aurobindo sought a 40 to 50 percent market share of Cefpo. ECF No. 1049-1 at 432; ECF No. 947-1 at 52 (Bihari's notes). The notes list six customers, with information about market share. ECF No. 1049-1 at 432. Bihari testified that, after his conversation with Thomassey, he shared the information with Kellum and Vezza, "and a decision was made after that." *Id.* at 437. Bihari clarified then that he did not specifically recall sharing the notes, but "that was [his] practice." *Id.* Bihari testified that this information was useful to have because "[t]his is the information that was being relayed to Armando Kellum regarding launch, and the pricing that Aurobindo would be sending to these customers to, one, ensure that that price point is good enough, is going to stick, and also because it's on a per tab basis, for Armando to check it, to make sure it will work. That was for plan price -- offer prices." *Id.* at 432.

Bihari testified that there was an agreement between Aurobindo and Sandoz on Cefpo. *Id.* Bihari could not recall the conversation during which the agreement was made, but he believed it would have been in April or May of 2013 because Thomassey left Aurobindo May 16, 2013. *Id.* at 438; ECF No. 1060-1 (SAMF) ¶ 28. Bihari testified that the terms were "[e]ssentially Sandoz would relinquish market share upon their entry and that the pricing would be kept high in the market and Aurobindo would not approach any additional customers." ECF No. 1049-1 at 438; *see also id.* at 432 (Q: "And what was the agreement?" A: "To relinquish market share upon

Aurobindo's entrance into the market and to ensure that the pricing stayed high in the market for both Sandoz and Aurobindo."). Kellum, when asked about this agreement, invoked his Fifth Amendment right against self-incrimination. ECF No. 964-1 at 3384.

Aurobindo submitted bids to three Sandoz customers: CVS (on May 22, 2013), AmerisourceBergen Corporation ("ABC") (on August 29, 2013), and Walmart (on September 18, 2013). In August 2013, Sandoz employees complained internally about Aurobindo, with Vezza writing on August 23, 2013, "I think Aurobindo is on the attack." ECF No. 1049-1 at 572. And when Ahold (a customer) wrote to another Sandoz employee on September 12, 2013, about an offer from Aurobindo asking for parity from Sandoz, that Sandoz employee wrote to others, "Looks like Aurobindo is all over the place. Can you please evaluate and advise if we can retain the primary position on these at Ahold[]?" *Id.* at 578. On September 13, 2013, OptiSource (another customer) emailed Bihari asking Sandoz to respond to an Aurobindo bid—Vezza advised Bihari that OptiSource "should move the product if [OptiSource] needs to capture this value." *Id.* at 588–89. Bihari replied, "[h]e's not going to move it. Will revert to secondary. Can we do a small PSR to make our price competitive with Aurobindo?" *Id.* at 588. Vezza declined. *Id.*

In the interim, on September 9, 2013, when an Aurobindo employee asked Grauso about putting together a Cefpo bid to Walmart, Grauso wrote, "I thought we had our share on [Cefpo]?" *Id.* at 550. When the employee responded "I thought you wanted to get additional share considering the only other market player is Sandoz. We currently hold 22% share," Grauso wrote, "Ok." *Id.*

## II. LEGAL STANDARD

### A. Summary Judgment

"Summary judgment is appropriate only if the movant shows that there is no genuine issue

as to any material fact and the movant is entitled to judgment as a matter of law." *Tolan v. Cotton*, 572 U.S. 650, 656–57 (2014) (internal quotation marks and citations omitted).  In reviewing the summary judgment record, a court must "construe the facts in the light most favorable to the non-moving party and must resolve all ambiguities and draw all reasonable inferences against the movant." *Caronia v. Philip Morris USA, Inc.*, 715 F.3d 417, 427 (2d Cir. 2013).  "A genuine dispute of material fact exists for summary judgment purposes where the evidence, viewed in the light most favorable to the nonmoving party, is such that a reasonable jury could decide in that party's favor." *Zann Kwan v. Andalex Grp. LLC*, 737 F.3d 834, 843 (2d Cir. 2013).  The moving party bears the burden of demonstrating that no genuine issue exists as to any material fact.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 323–25 (1986).  If the moving party carries its burden, "the opposing party must come forward with specific evidence demonstrating the existence of a genuine dispute of material fact." *Brown v. Eli Lilly & Co.*, 654 F.3d 347, 358 (2d Cir. 2011).  "Where no rational finder of fact could find in favor of the nonmoving party because the evidence to support its case is so slight, summary judgment must be granted." *Id.* (internal quotation marks omitted).

**B.  Sherman Act**

The Sherman Act bans "[e]very contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce among the several States."  15 U.S.C. § 1.  "The crucial question in a Section 1 case is therefore whether the challenged conduct stems from independent decision or from an agreement, tacit or express." *Starr v. Sony BMG Music Entm't*, 592 F.3d 314, 321 (2d Cir. 2010) (internal quotation marks omitted).  At the summary judgment stage, "to raise a genuine issue of material fact as to an antitrust conspiracy, the plaintiff must present direct or circumstantial evidence that 'tends to exclude the possibility that the alleged conspirators acted independently.'" *Anderson News, L.L.C. v. Am. Media, Inc.*, 899 F.3d 87, 98

(2d Cir. 2018) (quoting *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 588 (1986)). "The quality of evidence required to satisfy the 'tends to exclude' standard 'varies with the economic 'plausibility' of the alleged agreement." *In re Foreign Exch. Benchmark Rates Antitrust Litig.*, No. 13 CIV. 7789 (LGS), 2022 WL 294118, at *5 (S.D.N.Y. Feb. 1, 2022). "[T]he tends to exclude standard is more easily satisfied when[] the conspiracy is economically sensible for the alleged conspirators to undertake and the challenged activities could not reasonably be perceived as procompetitive." *Anderson News*, 899 F.3d at 99 (quoting *In re Publ'n Paper Antitrust Litig.*, 690 F.3d 51, 63 (2d Cir. 2012)). A plaintiff need not "disprove all nonconspiratorial explanations for the defendants' conduct; rather the evidence need be sufficient only to allow a reasonable fact finder to infer that the conspiratorial explanation is more likely than not." *Id.* (internal quotation marks omitted). "[I]f the evidence is in equipoise, then summary judgment must be granted against the plaintiff." *Id.*

"Oligopolies pose a special problem under § 1 [of the Sherman Act] because rational independent actions taken by oligopolists can be nearly indistinguishable from horizontal price fixing," as "any rational decision [in an oligopoly] must take into account the anticipated reaction of the other firms." *In re Mylan N.V. Secs. Litig.*, 666 F. Supp. 3d 266, 318 (S.D.N.Y. 2023). "Consequently, parallel conduct allegations must be placed in a context that raises a suggestion of a preceding agreement, not merely parallel conduct that could just as well be independent action." *Mayor & City Council of Balt. v. Citigroup, Inc.*, 709 F.3d 129, 137 (2d Cir. 2013). "Since mere parallel behavior can be consistent with independent conduct, courts have held that a plaintiff must show the existence of additional circumstances, often referred to as 'plus' factors, which, when viewed in conjunction with the parallel acts, can serve to allow a fact-finder to infer a conspiracy." *Apex Oil Co. v. DiMauro*, 822 F.2d 246, 253 (2d Cir. 1987). "Such circumstances might include

a common motive to conspire or a high level of interfirm communications." *Id.* at 254. But because "such factors in a particular case could lead to an equally plausible inference of mere interdependent behavior, i.e., actions taken by market actors who are aware of and anticipate similar actions taken by competitors, but which fall short of a tacit agreement," *id.*, these circumstances "must still lead to an inference of conspiracy." *Citigroup*, 709 F.3d at 137.

## III. DISCUSSION

### A. Claims Concerning Oxacillin Sodium and Nafcillin Sodium (Injectables)

To start, the States concede that they are "not pursing liability for damages regarding the sale by Aurobindo for Oxacillin Sodium and Nafcillin Sodium," ECF No. 1055 at 12 n.1; ECF No. 1060-1 ¶ 3, and they have not opposed Aurobindo's motion as to these two drugs in their brief. This is because discovery revealed that Aurobindo never sold either drug. ECF No. 1060-1 ¶ 40. With this revelation, I grant summary judgment for Aurobindo related to the States' claims concerning Oxacillin Sodium and Nafcillin Sodium.

### B. Evidence of Aurobindo's Participation in an Individual Conspiracy Regarding Pio Met and Cefpo[7]

#### 1. Pio Met

The States allege that Aurobindo's Thomassey conspired with Mylan's Nesta when Aurobindo submitted its February 8, 2013, bid to Cardinal concerning Pio Met. For many of the same reasons given in my order denying Mylan's motion for summary judgment,[8] ECF No. 1149, I conclude that there is a genuine dispute of material fact about whether Aurobindo participated in

---

[7] Throughout their motion, Aurobindo criticizes the States for narrowing their claims after discovery. ECF No. 1033-1 at 6, 11, 22, 27. But that refinement, in my view, is an appropriate use of discovery, and does not diminish the credibility of the States' remaining claims or the evidence used to support them.

[8] In its briefing, Aurobindo incorporates by reference the arguments that Mylan made in its summary judgment briefing. ECF No. 1033-1 at 24 n.8.

a conspiracy to fix prices and allocate the market for Pio Met.

The testimony of Aurobindo's Thomassey is direct evidence of Aurobindo's participation in the alleged conspiracy. Thomassey[9] testified that he colluded with Nesta of Mylan "[t]o make sure that we split the market share appropriately and keep the . . . price as high as possible." ECF No. 1049-1 at 12. "[H]orizontal agreements among competitors to fix prices or to divide markets" are "[r]estraints that are per se unlawful." *Leegin Creative Leather Prods., Inc. v. PSKS, Inc.*, 551 U.S. 877, 886 (2007) (citations omitted). "The *per se* rule, treating categories of restraints as necessarily illegal, eliminates the need to study the reasonableness of an individual restraint in light of the real market forces at work." *Id.* "Because price fixing is a *per se* violation of the Sherman Act, an admission by the defendants that they agreed to fix their prices is all the proof a plaintiff needs." *In re High Fructose Corn Syrup Antitrust Litig.*, 295 F.3d 651, 654 (7th Cir. 2002) (cited by *Publ'n Paper*, 690 F.3d at 63 (2d Cir. 2012)).

Aurobindo argues that Thomassey's memory is questionable, which renders his testimony unreliable and inadmissible. ECF No. 1033-1 at 27–28. In my order denying Mylan's motion for summary judgment, I explained why I do not find arguments about Thomassey's memory to be persuasive, and that, even if the States had to jog his memory by showing him emails from the same day, that circumstance would go to the weight of his testimony, not its admissibility. ECF No. 1149 at 27–30. Questions about the weight to be given to testimony based on the witness's "credibility, perception, or memory are, of course, for the jury." *Publ'n Paper*, 690 F.3d at 64 n.8. Here, Thomassey testified that it was "definitely" likely that his calls with Nesta related to an agreement with Mylan to keep prices high on Pio Met, and that, based on the exhibits before him

---

[9] Whether Thomassey, Grauso, and Bihari had unilateral pricing authority is a point of contention between the parties. ECF No. 1033-1 at 9; ECF No. 1115 at 11. I find the testimony about pricing authority to be open to interpretation. *See* ECF No. 1049-1 at 279.

and his recollection of his own business practices, Mylan agreed to give up market share to Aurobindo. ECF No. 1049-1 at 11. At trial, Aurobindo will be able to point out to the jury that Thomassey had no independent, specific recollection of these matters. It will then be for the jury to decide whether or not to credit Thomassey's testimony.

Aurobindo's arguments that Thomassey's testimony was impermissibly led by the States' counsel during his deposition, that it consisted of pure speculation, and that it was not based on personal knowledge are not persuasive. Under Federal Rule of Evidence 611(c), "[l]eading questions should not be used on direct examination except as necessary to develop the witness's testimony." Thomassey was deposed on July 18, 2023. He testified, "I specifically do not remember" when asked "[w]hat were you talking to Mr. Nesta about on February 8, 2013?" ECF No. 965-1 at 459; *see also* ECF No. 1049-1 at 28 (testifying that he did not remember any specific calls with Nesta when asked on cross); ECF No. 1049-1 at 29 (testifying that he did not recall speaking to anyone else at Mylan about Pio Met). But when shown the call logs reflecting calls between him and Nesta in February 2013 and then asked this question by the States' counsel, "Given the context that Aurobindo was entering the market for [Pio Met], do you think it's likely that you were talking to Mr. Nesta about [Pio Met]?", he responded, "Yes, definitely it was" and that he was "certain" that his calls with Nesta were "absolutely not social calls." *Id.*

It is hardly surprising that Thomassey needed his memory refreshed with respect to phone calls that had taken place over a decade earlier. While I agree that the States' "[g]iven the context" question was leading, leading questions may be used to refresh recollection and, in any event, on summary judgment evidence need not be presented in admissible form as long as the evidence *can* be presented in admissible form. *See Figueroa v. Mazza*, 825 F.3d 89, 98 n. 8 (2d Cir. 2016) ("any evidence considered on summary judgment must be reducible to admissible form"); *Bryant v.*

*Farms Ins. Exchange*, 432 F.3d 1114, 1122 (10th Cir. 2005) ("At the summary judgment stage, the parties need not submit evidence in a form admissible at trial; however, the content or the substance of the evidence must be admissible.").  The substance of his response to the leading question is plainly admissible.  Further, after being shown more documents, Thomassey confirmed that he had reached an agreement with Nesta in response to non-leading questions as well.  *See* ECF No. 965-1 at 461–62 ("Q: Did Mylan concede Cardinal to Aurobindo as it was entering the market for [Pio Met]?  A: Yes.  Q: And did that have anything to do with the conversations you were having with Jim Nesta at Mylan?  A: Yes.  Q: Was there an agreement between Aurobindo and Mylan regarding [Pio Met]?  A: Yes.  Q: And what was that agreement?  A: That they would walk and we would … get the award at Cardinal." (objections omitted)).  To the extent this testimony contradicted other answers he gave about his inability to recall particular calls specifically, it is for a jury to resolve any such contradictions.  And I disagree with Aurobindo's claims that this and similar testimony by Thomassey was not based on his personal knowledge.  Thomassey may not have remembered the contents of specific calls, but the States' call logs showed that he participated in the calls and Thomassey had personal knowledge of his own business practices, e.g., after calls with a competitor, he would reach out to his boss to discuss bids and pricing, after which his employer would submit a bid that was more or less in line with prevailing prices in the market.  The pattern he testified to concerning his communications with Nesta closely tracks the one he described repeatedly when testifying about his dealings with other competitors.  *See Sandoz, Inc.*, 2025 WL 3470502, at *8–9.  In short, the substance of his testimony is admissible, and it will be for a jury to decide how much weight, if any, to accord to it.

In any event, the States do not rely on Thomassey's testimony alone to show an Aurobindo-

Mylan agreement on Pio Met.  The volume and timing of frequent interfirm communications also suggest that Aurobindo more likely than not participated in a Pio Met conspiracy.  Aurobindo's Thomassey communicated with Mylan's Nesta immediately after Nesta wrote an internal email about the importance of obtaining competitors' information in efforts to maintain pricing.  Calls with competitors continued as other companies entered the market in February.  Although the phone records do not include the topics of discussion, a reasonable juror could infer that when Thomassey followed at least two calls with Nesta by immediately sending emails about Aurobindo's pursuit of the Pio Met business of Cardinal, Mylan's customer, the prior call with Nesta was likely about whether Mylan or Aurobindo would serve as Cardinal's Pio Met supplier.

There is also evidence that, during this same period in which Thomassey was speaking to Nesta, Thomassey and Grauso were also speaking to Teva and Sandoz about allocating the Pio Met market.  With Sandoz, Bihari's contemporaneous notes show that he and Thomassey exchanged pricing information, which Bihari testified "allowed Sandoz to appropriately price [Pio Met] in the market upon launch and to target these customers."  ECF No. 964-1 at 920.  This exchange was pursuant to an agreement to "ensure Sandoz keeps their pricing high in the market upon entry and to target certain customers."  *Id.*  Meanwhile, Thomassey's boss, Grauso, was exchanging frequent calls with Teva's Green and Mouro-Sherman while pursuing another customer.  Taken together with the evidence discussed above, these communications permit a reasonable inference that Aurobindo had agreements with Sandoz, Teva, Mylan, or all three.  Also supporting this inference is the fact that Thomassey and Grauso expressed frustration at Torrent for failing to maintain high prices, which stands in contrast to their communications about other competitors.

Thomassey also demonstrated a familiarity with the "rules of engagement" that form the

basis of the overarching conspiracy, including that all competitors in a given market are entitled to their "fair share." Thomassey testified that he "act[ed] as a conduit between G&W and Perrigo" because, "especially at Aurobindo, . . . [he] did not have oral solids contacts," and he "might be able to call in a favor at a later point." ECF No. 1049-1 at 7; *id.* (referring to "building goodwill" through these actions). Thomassey also testified that he understood that Grauso directed him to confer with Nesta on pricing "[t]o make sure that we split the market share appropriately and keep the -- keep the price as high as possible." *Id.* at 11–12. Although not termed as "fair share," a reasonable juror could interpret Thomassey's testimony to represent such an understanding and support a finding that Aurobindo adhered to the "rules of engagement" in markets in which it competed with Mylan. As I explained in my overarching conspiracy ruling, a commitment to abide by the rules of engagement, including the allocation of fair share, "facilitated the consummation of specific agreements on price and customer allocation for individual Drugs at Issue . . . [and] made it easier to reach those agreements as new bidding opportunities arose." *Sandoz, Inc.*, 2025 WL 3470502, at *17. In this context, a reasonable juror could infer that Thomassey's calls with Nesta were part of discussions between Aurobindo and Mylan to conspire to maintain high prices in the market.

The invocations of the Fifth Amendment of Nesta and Kellum when confronted with evidence about their communications concerning Aurobindo also support the inference that Aurobindo participated in a Pio Met conspiracy.[10] Nesta invoked the Fifth Amendment in

---

[10] Aurobindo argues that I cannot draw an inference against Aurobindo based on these invocations "[b]ecause courts generally refuse to impute a non-party's invocation of the Fifth Amendment against a party alleged to have been a co-conspirator unless there is 'sufficient, independent proof of a conspiracy between them.'" ECF No. 1033-1 at 23 n.10 (quoting *In re Ethylene Propylene Diene Monomer (EPDM) Antitrust Litig.*, 681 F. Supp. 2d 141, 153 (D. Conn. 2009)). Because, for the reasons explained, I do find such proof, I draw the inference.

response to questions about pricing, market share goals, and dividing the market in calls with

Aurobindo's Thomassey in January and February 2013.  ECF No. 1049-1 at 359–62.    Nesta

invoked the Fifth Amendment when asked the following questions:

- Did you reach an agreement with Anthony Thomassey and Kevin Green about how much market share each company would get for [Pio Met]?

- Did you agree that Mylan would concede other customers to Aurobindo for [Pio Met]?

- Was there an agreement between Mylan, Teva and Aurobindo to minimize competition and keep prices as high as possible for [Pio Met]?

*Id.* at 361–62.  In a similar vein, Kellum invoked the Fifth Amendment when asked the following

questions about Pio Met (among others):

- Did [Bihari] share the internal Aurobindo pricing [on Pio Met] that he received from [Thomassey] with you?

- Was there an understanding with these companies that Sandoz would win its market share from Teva and Mylan and not Aurobindo or Torrent?

- Was there an agreement to fix prices and allocate customers on [Pio Met] from Teva and Mylan and not Aurobindo or Torrent?

ECF No. 964-1 at 3385–86.  When considered alongside the testimony of Thomassey, as well as

the evidence of contemporaneous communications, a reasonable juror could infer from these

invocations that responses to these questions would have been unfavorable to Aurobindo,

including about whether Aurobindo had agreements to fix prices and allocate the market.  *See*

*Baxter v. Palmigiano*, 425 U.S. 308, 318 (1976).

    With this direct and circumstantial evidence of a conspiracy, the fact that Pio Met prices

fell during the alleged period of anticompetitive conduct is not enough to warrant summary

judgment for Aurobindo.  As described above, the evidence shows that price erosion in the Pio

Met market followed the entrance of Torrent, which did not play by the other competitors' "rules

of engagement" or communicate sensitive information, much to the others' chagrin.  *See* ECF No. 1059-1 at 21 (Thomassey referring to Torrent as "morons" because they were "so bad at eroding prices").  As the States' expert, Dr. Warren-Boulton, opined, in a market share agreement ("MSA"), "any one firm can move the entire set of firms to any higher price, as long as all firms comply with the terms of the MSA."  ECF No. 952-1 at 128.  In other words, if one firm does not comply, its competitors cannot move to a higher price because the new price will always be undercut by the noncompliant firm, at least to the extent that the noncompliant firm has the capacity to supply additional customers.  Thus, the price of a drug alone is not evidence against a conspiratorial inference where the market included any firm that did not participate in the conspiracy.

Nor is Pio Met's price erosion evidence that the other competitors did not form agreements among themselves to allocate the market and keep prices high.  A conspiracy to restrain trade does not need to be successful to violate the Sherman Act.  *See High Fructose Corn Syrup*, 295 F.3d at 656 (courts must "distinguish between the existence of a conspiracy and its efficacy"); *United States v. Foley*, 598 F.2d 1323, 1333 (4th Cir. 1979) ("Since the agreement itself, not its performance, is the crime of conspiracy, the partial non-performance of [a defendant] does not preclude a finding that it joined the conspiracy.").

Nor do Aurobindo's initial movements in the Pio Met market suggest the absence of collusion.  As Dr. Warren-Boulton wrote, when first entering a market, an "entrant manufacturer can be expected to set a price that is initially slightly lower than the incumbent suppliers' prices so as to acquire its fair share with minimal price erosion."  ECF No. 952-1 at 134.  If a new entrant did not offer a lower price, the customer would have no incentive to switch away from their incumbent supplier.  *Id.*  Aurobindo's bid supports an inference that the January 2013 calls between

26

Mylan and Aurobindo included discussion of the price point that would incentivize Cardinal to switch suppliers while still minimizing price erosion. *See id.* at 134–35 (Dr. Warren-Boulton: "This initial price maneuvering or customer allocation requires communication between participants so as to minimize disruption. . . . Information on which customers the incumbent is willing to relinquish and the prices currently being charged to those customers allows the entrant to submit a 'competitive' offer to the designated customers that is just low enough to trigger a right of first refusal by the incumbent, secure in the knowledge that the incumbent will not respond to a bid request from those customers."). Thus, it is likely that by communicating with Mylan, Aurobindo was able to offer a higher entry price than if it had acted independently.

Finally, Aurobindo argues that there is no evidence that the alleged conduct caused any injury, because even if Mylan and Aurobindo conspired in setting Aurobindo's offer price to Cardinal, Torrent drove prices lower before the collusion-related pricing went into effect. *See* ECF No. 1019-1 ¶¶ 96–98. To avoid summary judgment, the States "must prove the existence of antitrust injury, which is to say injury of the type the antitrust laws were intended to prevent and that flows from that which makes [Mylan's] acts unlawful." *Warner-Lambert Co. v. Schick U.S.A., Inc.*, 935 F. Supp. 130, 144 (D. Conn. 1996) (quoting *Atlantic Richfield Co. v. USA Petroleum Co.,* 495 U.S. 328, 334 (1990)).

If the price Cardinal ultimately paid Aurobindo was unrelated to prior collusion, the States would not be able to show antitrust injury. The evidence shows that Aurobindo initially contracted with Cardinal to supply Pio Met at a contract price of $143.95, and after Torrent entered the market at $90, Aurobindo offered a reduced price of $115.30, which Cardinal accepted. ECF No. 1060-1 ¶¶ 63–66. This raises the question of why Cardinal would remain with Aurobindo at a price point that was twenty-two percent higher than might have been available from Torrent. Considering the

evidence in the aggregate, a reasonable juror could infer that this difference was not enough to incentivize a switch to Torrent from Aurobindo, with which Cardinal was already contracted. In other words, when drawing all reasonable inferences in the States' favor, a reasonable juror could find that Aurobindo's contract with Cardinal, which began at a conspiracy-related price, still impacted the price Cardinal paid. Although Aurobindo discounted the ultimate price following Torrent's entrance, a reasonable juror could find that it still stemmed from and was affected by Aurobindo's initial price. In a "but-for" world in which Aurobindo had not colluded, its initial price might have been lower than $115.30. *See* ECF No. 952-1 at 206-07 & fig.32 (Dr. Warren-Boulton calculating the "but-for" price for Pio Met 850 mg below the defendant net price throughout the conduct period). Therefore, I cannot find on the summary judgment record before me that Cardinal suffered no antitrust injury.

When considering the testimony of cooperating witnesses, the evidence of contemporaneous phone calls and notes, analysis of the States' expert, and adverse inferences from Nesta and Kellum's Fifth Amendment invocations, a reasonable jury could find that Aurobindo participated in a conspiracy with at least one competitor to set prices and allocate the Pio Met market. Thus, the motion for summary judgment as to Pio Met is DENIED.

### 2. Cefpo

The States argue that Aurobindo's Thomassey conspired with Sandoz's Bihari when Aurobindo entered the Cefpo market; the conspiracy included allocating customers and following Sandoz's pricing to allow Aurobindo a 40 percent market share while keeping prices high. The States allege that the Aurobindo-Sandoz collusion impacted bids with CVS, ABC, and Walmart. For many of the same reasons I explained above, I also deny Aurobindo's motion for summary judgment as to Cefpo.

As before, Aurobindo's arguments attacking Thomassey's and Bihari's testimony are not

a basis for summary judgment.  Aurobindo points to examples of what it says is speculative testimony from Thomassey and Bihari.  This includes Bihari's testimony that the calls in question "would have to be about" Cefpo, but that he could not specifically recall the conversations.  ECF No. 1033-1 at 26–27.  And Aurobindo argues that Thomassey lacked any recall about agreements on Cefpo and thus lacks the personal knowledge necessary to testify.  ECF No. 1115 at 7.

But accepting Aurobindo's argument would require ignoring swaths of the witnesses' testimony.  For example, in reviewing his January 7 notes, Bihari testified those were "Thomassey's words, indicating that upon Aurobindo's launch, they would not send an offer to a Sandoz customer."  ECF No. 964-1 at 914–15.  When asked about "will be reasonable," Bihari testified "[t]hat was directly from . . . Thomassey.  He was indicating they will be reasonable with market share and with pricing, . . . reasonable with the market share that they're seeking . . . But those are his words.  He used that, will be reasonable."  *Id.* at 915.  And, contrary Aurobindo's reading of the record, Bihari testified that there was an agreement between Aurobindo and Sandoz on Cefpo.  ECF No. 1049-1 at 432 (Bihari testifying that there was an "agreement" between Sandoz and Aurobindo on Cefpo "[t]o relinquish market share upon Aurobindo's entrance into the market and to ensure that the pricing stayed high in the market for both Sandoz and Aurobindo.").

And when asked, Thomassey testified that he had no reason to doubt Bihari's testimony that Thomassey called Bihari to discuss Aurobindo's entry into the Cefpo market, *id.* at 10; that Bihari's notes of the call accurately reflected that Thomassey told Bihari that Aurobindo wanted 40% market share for Cefpo, *id.*; and that Bihari testified accurately that Thomassey told Bihari that Aurobindo "will be reasonable" as it entered the market for Cefpo products, *id*.  I decline, then, to ignore Bihari's and Thomassey's testimony, and instead find these criticisms are for the jury to consider.  *See Publ'n Paper*, 690 F.3d at 64 n.8.

And once again, Thomassey's and Bihari's testimony does not stand alone; the States also cite circumstantial evidence that would permit an inference that "tends to exclude the possibility" that Aurobindo "acted independently." *Matsushita Elec. Indus. Co.*, 475 U.S. at 588.

Here, as before, the volume and timing of frequent interfirm communications permit a finding that it is more likely than not that Aurobindo participated in a Cefpo conspiracy. In early January 2013, as Aurobindo prepared to enter the Cefpo market, Thomassey and Bihari began exchanging phone calls, interwoven with calls to their respective bosses. These calls continued (with a similar cadence to those related to Pio Met) through the rest of Thomassey's tenure with Aurobindo. ECF No. 1060-1 (SAMF) ¶ 19–27. Although the content of these calls is not known, a reasonable juror could infer their subject matter based on the proximity to significant events related to Aurobindo's entry in the Cefpo market.

Bihari's contemporaneous notes provide context for these calls, too. On January 7, 2013, during the week of Aurobindo's expected launch into the Cefpo market, Bihari memorialized "Aurobindo launch – wk of 1/7," and wrote notes concerning Sandoz's market share for certain Cefpo formulations and the market share Aurobindo was "looking for." ECF No. 947-1 at 7. He concluded the note with "start there follow the plan . . . will be reasonable," *id.*, which Bihari said meant to "relinquish share as needed. Follow the plan. You know, the bullets that we discussed. Share it with those internal with Sandoz and to ensure that they also follow the plan as he says," ECF No. 964-1 at 915. This is circumstantial evidence from which a reasonable factfinder could conclude that Aurobindo conspired with Sandoz on Cefpo.

Aurobindo argues that the timing does not support the States' theory because Thomassey left Aurobindo on May 16, 2013, and Bihari testified that he could not recall when the agreement was reached. ECF No. 1060-1 ¶ 19. Three days before his departure, Thomassey wrote to a

customer, "[m]arket intel on current price is appreciated – we don't have any share info – we are flying blind.  Please send me your usage on the following [Cefpo] items . . ."  ECF No. 1049-1 at 460.  And, relatedly, Aurobindo argues that Cefpo prices were set by mid-April, 2013, which was well before (it says) the window during which the conspiracy occurred.  ECF No. 1033-1 at 25.

But Bihari suggested in his testimony that, although he could not recall when the agreement was reached, he believed it would have been before Thomassey's departure from Aurobindo in mid-May.  ECF No. 1049-1 at 438; ECF No. 1060-1 (SAMF) ¶ 28.  Bihari testified that the terms were "[e]ssentially Sandoz would relinquish market share upon [Aurobindo's] entry and that the pricing would be kept high in the market and Aurobindo would not approach any additional customers."  ECF No. 1049-1 at 438; *see also id.* at 432 (Q: "And what was the agreement?"  A: "To relinquish market share upon Aurobindo's entrance into the market and to ensure that the pricing stayed high in the market for both Sandoz and Aurobindo.").  A reasonable factfinder considering this testimony could conclude that Thomassey and Bihari entered into this agreement before Thomassey left Aurobindo.  Contrary to Aurobindo's argument, that Aurobindo submitted the three bids at issue after Thomassey stopped working for Aurobindo does not mean the bids were not the product of Bihari's and Thomassey's alleged agreement.

Bihari testified that he shared Cefpo information he learned from Thomassey with Kellum, "[t]o ensure that they do follow this plan, which enables Sandoz to keep the price high on other customers and not deteriorate the pricing market."  ECF No. 964-1 at 915-16.  Kellum, when asked about this agreement, invoked his Fifth Amendment right against self-incrimination, including as to the following questions (among others):

- Did you want [] Bihari to work with [] Thomassey to determine a plan for allocating customers on [Cefpo]?

- Did you ultimately agree that Sandoz would concede to Aurobindo Cardinal, ABC,

Wakefern, Ahold's, Anda, and Harvard?

- Was there an agreement to fix prices and allocate customers on [Cefpo]?

- And did this agreement result in higher prices to customers charged by both Aurobindo and Sandoz?

*Id.* at 3384–85. When considered alongside the testimony of Thomassey and Bihari, as well as the evidence of contemporaneous communications, a reasonable juror could infer from these invocations that responses to these questions would have been unfavorable to Aurobindo. *See Baxter*, 425 U.S. at 318.

Aurobindo's various arguments that Aurobindo's bids undercut Sandoz prices, that Cefpo prices dropped when Aurobindo entered the market, and that evidence of Aurobindo's competitiveness exists in the record do not change this result. Nor does Aurobindo's argument that it could not have supplied the market share it is alleged to have requested. These arguments are all variations of the same theme, and each runs up against the principle that a conspiracy's lack of efficacy is not a defense to Section 1 liability. *See High Fructose Corn Syrup*, 295 F.3d at 656. To the extent these arguments also suggest that Aurobindo did not actually enter into the alleged conspiracy, the jury will have to weigh them against the evidence described above. None of these arguments warrant summary judgment.

In sum, when considering the testimony of cooperating witnesses, the evidence of contemporaneous phone calls and notes, analysis of the States' expert, and adverse inferences from Kellum's Fifth Amendment invocation, a reasonable jury could find that Aurobindo participated in a conspiracy with at least one competitor to set prices in and allocate the Cefpo market. Thus, the motion for summary judgment as to Cefpo is DENIED.

3.    Evidence of Aurobindo's Participation in the Overarching Conspiracy

I have already determined that there is a triable issue about whether an overarching

32

conspiracy existed.  The question now is whether there is a triable issue that Aurobindo was a knowing participant in that conspiracy.  *United States v. Vanwort*, 887 F.2d 375, 386 (2d Cir. 1989) ("[A] defendant's participation in a single transaction can suffice to sustain a charge of knowing participation in an existing conspiracy.").

I acknowledge that it is a close call whether to grant summary judgment as to the States' claim that Aurobindo joined the overarching conspiracy.  As Aurobindo points out, the States' case against it at this point involves only two drugs out of the eighty allegedly involved in the overarching conspiracy, and there is no evidence that Aurobindo reached an agreement with any other firms to decline to enter any of the other seventy-eight drug markets involved in this case. Further, Aurobindo did not make dermatology drugs, which are the focus of the overarching conspiracy claim, and while I do not view this circumstance as dispositive, it is a factor weighing against the notion that Aurobindo joined a scheme focused on such drugs.  And unlike some of the large players in the overarching conspiracy, *see Sandoz, Inc.*, 2025 WL 3470502, at *20 ("Although the movants represent sixteen corporate families, four stand above the rest in the alleged overarching conspiracy—Sandoz, Taro, Perrigo, and G&W.  At least one of these four companies (or their affiliates, such as Fougera) sold each of the ninety-eight Drugs at Issue.  *See* ECF No. 684-2 at 482–84 (listing the competitors for each Drug at Issue)."), Aurobindo did not enter into a DPA with the federal government, and none of its current or former employees pled guilty to a related criminal offense or invoked the Fifth Amendment at a deposition in this case. Further, Aurobindo points to evidence in the record that its competitors sometimes regarded it as a disruptive force in the market—which bucks the profile of a member of the overarching conspiracy.  *Compare* ECF No. 1049-1 at 330 (Teva employee describing Aurobindo as "irresponsible"); *id.* at 326 (Mylan slide showing that it viewed Aurobindo as a competitor that

seldom led or followed price increases); *id.* at 338 (Teva employee commenting in March 2012 that Aurobindo CEO was "not playing nice in the sandbox" by seeking to poach a Teva customer), *with Sandoz, Inc.*, 2025 WL 3470502, at *17–18 (noting that the complaint alleged that the overarching agreement "was implemented by following a competitor's price increases, avoiding poaching customers, and otherwise avoiding 'disrupting the market'" and that Thomassey testified that "fair share", "rational," "responsible", and "playing nice in the sandbox" were "code words that everyone in the industry is aware of" that meant playing by the "rules of engagement", *i.e.*, following price increases and not "poaching" customers).    And even Thomassey viewed Aurobindo's pricing strategy as haphazard, describing it as "throwing darts at a wall."   ECF No. 1049-1 at 18.

Still, Aurobindo employed two individuals—Thomassey and Grauso—who, a reasonable juror could find, not only entered into anticompetitive agreements concerning two drugs—Pio Met and Cefpo—but also brokered anticompetitive agreements between other Defendants.  *See Sandoz, Inc.*, 2025 WL 3470502, at *19 (describing Thomassey's acting as a "conduit" for G&W and Perrigo to share competitively sensitive information" while at Aurobindo and Grauso's acting as intermediary between Fougera and G&W).   As I noted in the overarching conspiracy ruling, evidence of such brokering is suggestive of participation in a larger scheme, because the broker likely expects to receive similar anticompetitive favors and serves as a bridge tying together pairs of bilateral conspirators.  *Id.*; *see also* ECF No. 1049-1 at 7 (Thomassey testifying that he "act[ed] as a conduit between G&W and Perrigo" because "especially at Aurobindo, . . . I did not have oral solid contacts," "[a]nd I might be able to call in a favor at some point"); *see id.* (Thomassey testifying that he was "building goodwill" by brokering, and that this could "potentially help [him] in the future").  Further, the evidence described above suggesting that Aurobindo reached customer

allocation deals with Mylan in Pio Met and Sandoz in Cefpo bears some of the hallmarks of the overarching conspiracy: a flurry of interfirm communications before a new launch or price increase; an agreement to "keep . . . pricing high" and "target certain customers"; and assurances that Aurobindo "will not approach" a particular customer and "will be reasonable." ECF No. 964-1 at 920; *id.* at 914–15.

In addition, Thomassey is obviously a common denominator between Aurobindo and the overarching conspiracy—whatever he might have thought of Aurobindo's pricing strategy overall. As discussed in the overarching conspiracy ruling, communicating with competitors to allocate customers and prevent price erosion and abiding by the "rules of engagement" were his well-established business practices at Fougera, and he was a central player in relationships critical to the overarching conspiracy. *See Sandoz, Inc.*, 2025 WL 3470502, at *8–9 (describing Thomassey's ongoing and extensive anticompetitive arrangements with Perrigo, Taro, and G&W). There is no reason to believe he altered his practices when he moved to Aurobindo; to the contrary, as the evidence discussed above suggests, there is evidence suggesting he continued them. To be sure, his tenure at Aurobindo was brief—9 months—but there is evidence in the record, including his own testimony, that Grauso, his boss and a longer-term Aurobindo employee, approved his anticompetitive practices at Aurobindo. ECF No. 1049-1 at 11-12; *see also* ECF No. 1060-1 (SAMF) ¶ 10 (describing calls between Grauso and Teva around the time that Aurobindo was deciding whether to defend against a Teva offer to Harvard). In fact, Thomassey testified that Grauso had been his contact person when Thomassey worked for Fougera and Grauso worked for G&W, and Thomassey testified that the two had reached a broad understanding at that time that "we would be responsible in the marketplace and we would divvy up – share appropriately and agree on what we were doing and who we were targeting." ECF No. 965-1 at 406. While

Aurobindo is not responsible for any anticompetitive conduct by Grauso at G&W, some of the evidence discussed above suggests that, like Thomassey, Grauso did not change his stripes when he moved to Aurobindo.  When all this evidence is viewed in the light most favorable to the States, I find there is enough here to warrant submitting to a jury the question of whether Aurobindo joined the overarching conspiracy—even if for a short time and even if in a limited role.  So I must DENY the motion for summary judgment with respect to whether Aurobindo joined the alleged overarching conspiracy.

## IV. CONCLUSION

Because there is evidence from which a reasonable jury could find that Aurobindo participated in conspiracies related to Pio Met and Cefpo, as well as the overarching conspiracy, the motion for summary judgment is denied.  The motion for summary is granted with respect to Oxacillin Sodium and Nafcillin Sodium.


IT IS SO ORDERED.


                                                            /s/
                                            Michael P. Shea, U.S.D.J.


Dated: Hartford, Connecticut
January 9, 2026