## THE UNITED STATES DISTRICT COURT
## DISTRICT OF CONNECTICUT

| | |
|---|---|
| STATE OF CONNECTICUT, et al., | No. 3:16-cv-02056-MPS |
| *Plaintiffs,* | |
| v. | |
| AUROBINDO PHARMA USA, INC., et al., | |
| *Defendants.* | |
| STATE OF CONNECTICUT, et al., | No. 3:19-cv-00710-MPS |
| *Plaintiffs*, | |
| v. | |
| TEVA PHARMACEUTICALS USA, INC. et al., | |
| *Defendants*. | |
| STATE OF CONNECTICUT, et al., | No. 3:20-cv-00802-MPS |
| *Plaintiffs*, | |
| v. | |
| SANDOZ, INC., et al., | |
| *Defendants*. | |
| | February 2, 2026 |

## MEMORANDUM OF LAW IN SUPPORT OF PLAINTIFF STATES' MOTION FOR PRELIMINARY APPROVAL OF SETTLEMENTS WITH BAUSCH AND LANNETT AND FOR ALLOCATION OF SETTLEMENT FUNDS

i

# TABLE OF CONTENTS

I.     INTRODUCTION ................................................................................................................ 1

II.    PROCEDURAL BACKGROUND ..................................................................................... 3

III.   SETTLEMENT TERMS ..................................................................................................... 3

   A.   Injunctive Relief ............................................................................................................ 3

      1.    Bausch Settlement ............................................................................................... 3

      2.    Lannett Settlement .............................................................................................. 4

   B.   Monetary Relief ............................................................................................................. 5

      1.    Bausch Settlement ............................................................................................... 5

      2.    Lannett Settlement .............................................................................................. 6

   C.   Cooperation .................................................................................................................... 7

      1.    Bausch Settlement ............................................................................................... 7

      2.    Lannett Settlement .............................................................................................. 8

   D.   Release and Covenant Not to Sue ................................................................................. 8

      1.    Bausch Settlement ............................................................................................... 8

      2.    Lannett Settlement .............................................................................................. 9

   E.   Preliminary and Final Court Approval .......................................................................... 9

   F.   Exclusions .................................................................................................................... 10

   G.   Supplemental Agreements ........................................................................................... 11

IV.    THE STATES' AUTHORITY .......................................................................................... 11

V.     ARGUMENT .................................................................................................................... 15

   A.   Standard for Preliminary Approval of *Parens Patriae* Settlements ............................ 15

   B.   The Settlements Meet the Standard for Preliminary Approval .................................... 16

      1.    Procedural Analysis Factors Support Preliminary Approval ............................ 17

        i.    The States Have Adequately – and Zealously – Represented Consumers ............................ 18

        ii.   The Settlements Were Negotiated at Arm's Length by Experienced Counsel ........................ 18

        iii.  The States Have Obtained a Sufficient Understanding of the Case ........................................ 19

      2.    Substantive Analysis Factors Support Preliminary Approval .......................... 20

        i.    The Settlements Provide Adequate Relief ............................................................................. 21

        ii.   The Cooperation from Settling Defendants Adds Value to the Settlements ........................... 23

iii.   The Settlements are Reasonable Considering the Costs, Risks, and Delay of Trial and Appeal. ...............................................................................................................24

iv.   The Monetary Payment to the States is Fair and Reasonable and the Settlements Do Not Contain Any Additional Agreement that Affects the Fairness of the Settlements. ...............26

v.   An Allocation and Distribution Plan is not Currently before the Court. ................................27

VI.   HUNTINGTON BANK AS ESCROW AGENT ......................................................................27

VII.   THE CONSUMER NOTICE PLAN ........................................................................................28

VIII.   NOTICE TO CORPORATE ENTITIES ..................................................................................31

IX.   ALLOCATION AND DISTRIBUTION OF SETTLEMENT FUNDS.....................................32

A.   Allocation of Settlement Proceeds between the Restitution Account and Cost Account and Distribution of the Cost Accounts. .........................................................................................33

B.   Allocation of Restitution Account Between Consumers and State Entities...................................34

1.   Heritage Settlement ..............................................................................................................34

2.   Bausch Settlement ................................................................................................................35

3.   Lannett Settlement ................................................................................................................35

C.   Allocation and Distribution of Consumer Restitution...................................................................35

D.   Allocation and Distribution to Corporate Entities.......................................................................36

X.   CONCLUSION .........................................................................................................................36

## I.  INTRODUCTION

Plaintiff States[1] (the "States") have reached two settlement agreements ("collectively "Settlements") with Defendants Bausch Health US, LLC and Bausch Health Americas, Inc. ("Bausch") and Defendant Lannett Company, Inc. ("Lannett") (collectively "Settling Defendants") resolving the States' claims against Settling Defendants for their participation in an unlawful conspiracy to fix prices and allocate markets for generic pharmaceuticals. *Exhibits 1-2.* The Settlements resolve and release all the States' claims against the Settling Defendants based on conduct alleged in *Connecticut et al. v. Aurobindo Pharma USA, Inc.*, *et al.*, 3:16-cv-02056, *Connecticut et al. v. Teva Pharmaceuticals USA, Inc*., *et al.,* 3:19-cv-00710, and *Connecticut et al. v. Sandoz, Inc*., *et al.,* 3:20-cv-00802 (collectively referred to as the "States' Actions")[2].

As a matter of law[3] and policy, the States seek the Court's preliminary approval of the Settlements, as they resolve the States' claims against Settling Defendants in the States' Actions, and a notice plan ("Notice Plan") for providing notice to Eligible Consumers in the Lannett Settlement and Consumers in the Bausch Settlement (together referred to as "Consumers"), as described in this motion, and to corporate entities in Idaho and Washington ("Corporate Entities Notice").  A minority of the state laws obligate the attorney general to provide Consumers with

---

[1]Plaintiff States means Connecticut, Alaska, Arizona, California, Colorado, District of Columbia, Delaware, Florida, Georgia, Idaho, Illinois, Indiana, Iowa, Kansas, Kentucky, Maine, Maryland, Massachusetts, Michigan, Minnesota, Mississippi, Montana, Nebraska, Nevada, New Hampshire, New Jersey, New Mexico, New York, North Carolina, North Dakota, Northern Mariana Islands, Ohio, Oklahoma, Oregon, Pennsylvania, Puerto Rico, Rhode Island, South Carolina, South Dakota, Tennessee, U.S. Virgin Islands, Utah, Vermont, Virginia, Washington, West Virginia, Wisconsin, and Wyoming. In addition to the States that are Plaintiffs in this Action, the settling Plaintiff States also include attorneys general who are Plaintiffs in the related States' action, and who are releasing their claims against Settling Defendants that they could have brought in any of the States' Actions. Plaintiff States include every remaining plaintiff in the States' Actions.
[2] Capitalized terms are defined terms in the Settlements and are used here with the same meaning.
[3] *See, e.g., Shepherd Park Citizens Ass'n v. Gen. Cinema Beverages of Washington, D.C.,* 584 A.2d 20 (D.C. 1990); D.C. Code § 28-4507); Idaho Code § 48-108(3); Nev. Rev. Stat. 598.0975(3)(b); ORS 646.775(2), (3), (4), and (5).  For citations of the authority pursuant to which each State is acting, see footnote 8 *infra.*

notice of settlements, including an opportunity to opt out of and object to or comment on the Settlements. All States are providing those opportunities to Consumers. Similarly, only a few state laws require court approval of a settlement of consumer claims after a notice plan is implemented. Nonetheless, all States will seek the Court's final approval after the Notice Plan has been implemented. The States' proposed Notice Plan builds on the notice plans implemented as part of the previously approved settlement with Defendants Heritage Pharmaceuticals Inc., Emcure Pharmaceuticals Ltd., and Satish Mehta ("Heritage Settlement"), ECF No. 767 (3:16-cv-02056-MPS), No. 635 (3:19-cv-00710-MPS), and No. 602 (3:20-cv-00802-MPS) and Defendant Apotex Corp. ("Apotex Settlement"), ECF No. 875 (3:16-cv-02056-MPS), No. 760 (3:19-cv-00710-MPS), and No. 835 (3:20-cv-00802-MPS). States Declaration in Support of The States' Motion for Preliminary Approval of Settlements with Bausch and Lannett ("*State Decl.*") ¶ 20.

The States are also seeking preliminary approval of the division and allocation of payments received under the terms of the Settlements (the "Settlement Funds") between the States Consumers and State Entities (including Medicaid agencies and non-Medicaid state agencies), allocating 30% to costs and fees (referred to as "Cost Accounts") and 70% to Consumers and State Entities (referred to as "Restitution Accounts"). Further, the States seek approval to distribute and use the balance of the Cost Accounts, after financing the administration of the Settlements and potential future settlements, to fund continued litigation against the remaining defendants for such purposes as are set forth in ¶ I.B of the Lannett Settlement and ¶ I.V.3 of the Bausch Settlement, including attorney fees. Additionally, the States are seeking preliminary approval of a division and allocation of the Restitution Accounts from the Heritage,[4] Bausch, and Lannett settlements between Consumers and State Entities, and a distribution of the State Entities'

---

[4] Approved by the Court on April 1, 2025, ECF No. 767 (3:16-cv-02056-MPS), No. 635 (3:19-cv-00710-MPS), and No. 602 (3:20-cv-00802-MPS).

share to the States to be divided among the States at their discretion. Lastly, the States request that the Court establish a deadline for opting out or objecting to the Settlements ("Opt-Out Deadline") and a date for a final approval hearing.

## II. PROCEDURAL BACKGROUND

The States brought three actions against generic drug manufacturers alleging that they conspired to fix prices and allocate markets for many generic drugs in violation of federal antitrust laws and state antitrust and consumer protection laws. *See supra*. In each of the actions, the States also allege an overarching conspiracy for the drugs and anticompetitive acts in that action. Even if the States did not bring claims against all Settling Defendants in all three of the States' Actions, the Settlements, if approved, will resolve and release all claims that the States brought or could have brought against Settling Defendants in all three States' Actions.

## III. SETTLEMENT TERMS

The Settlements provide different categories of terms and relief, including (A) Injunctive Relief, (B) Monetary Payment, (C) Cooperation, (D) Release and Covenant Not to Sue, (E) Court Approval, (F) Exclusions, and (G) Supplemental Agreements. *Exhibit 1-2.*

### A. Injunctive Relief

#### 1. Bausch Settlement

As part of the Bausch Settlement, Bausch covenants that it shall not, for four years from the execution of the agreement, engage in any unlawful price-fixing, bid-rigging, or market allocation as to any Generic Pharmaceutical Product in violation of Section 1 of the Sherman Act. *Bausch Settlement* ¶ VI.A. Bausch will implement and shall continue to maintain for a period of four years, a written "Antitrust Compliance Policy," on which all current Bausch employees responsible for the pricing, sale, bidding, or marketing of generic pharmaceuticals in the United

States, including those in a management or employee capacity, will be trained. *Id. at* ¶ VI.B. Each such Bausch employee will also be required to sign an acknowledgment form stating that they have read, and will abide by, the Antitrust Compliance Policy. *Id*. Also, for a period of four years, Bausch will conduct annual antitrust training for all its employees responsible, in a managerial or employee capacity, for the pricing, sale, bidding, or marketing of generic pharmaceuticals in the United States. *Id*. Said training will be conducted by an attorney with experience in antitrust law and with a record kept at each annual training session, including participation, to ensure that all such employees receive such training. *Id*. Bausch will appoint its General Counsel and/or Chief Compliance Officer (or equivalent thereof) to oversee such training and serve as an additional contact, in coordination with Bausch's established corporate policies, for employees to report any conduct that may violate the antitrust laws. *Id*. Bausch shall notify the States within one year following final court approval that Bausch has complied with the provisions of Paragraph VI.B. *Id*. If Bausch breaches Paragraph VI.B, it shall have 21 days to cure such breach, and if it fails to do so, then Bausch's obligations in Paragraph VI.B shall be extended by one additional year. *Id*.

## 2. Lannett Settlement

Lannett has agreed to abide by certain injunctive terms during a 10-year period from the execution of the Lannett settlement agreement, referred to as the "Enforcement Period." *Lannett Settlement* ¶ I.G. Lannett covenants that it, along with its current directors, officers, and employees shall not, directly or indirectly, maintain, solicit, suggest, advocate, discuss, or carry out any unlawful agreement with any actual or potential competitor in the generic pharmaceutical industry to: (a) fix prices for generic pharmaceuticals; (b) submit courtesy, cover, or otherwise non-competitive, bids or proposals for the supply, distribution, or sale of generic pharmaceuticals; (c) refrain from bidding on, or submitting proposals for, the supply, distribution, or sale of generic

pharmaceuticals; or (d) allocate customers for the sale of generic pharmaceuticals for the Enforcement Period. *Id. at* ¶ X.A. Lannett represents it has implemented, and shall continue to maintain during the Enforcement Period, a written "Antitrust Compliance Manual," on which all current Lannett employees have been trained, including its employees engaged in activities relating to the pricing or sale of generic pharmaceuticals. *Id. at* ¶ X.C. During the Enforcement Period, Lannett (1) will conduct periodic antitrust training sessions for its employees at least once per year, and (2) appoint and maintain a Chief Compliance Officer, who serves to enforce Lannett's Antitrust Compliance Manual and monitor Lannett's employees to ensure that there are no further violations of the antitrust laws. *Id. at* ¶ X.D.  Lannett will provide an annual report to the States as to its compliance program. *Id. at* ¶ X.E.

### B. Monetary Relief

#### 1. Bausch Settlement

Bausch will pay a total sum of $4,080,000 to the States (the "Bausch Settlement Payment"). *Bausch Settlement* ¶ I.V; $2,880,000 of the Bausch Settlement Payment shall constitute restitution to Consumers and State Entities that are State Releasors to compensate them for any alleged harm resulting from the conduct alleged in the States' Actions. *Id. at* ¶ II.A; $80,000 shall be considered restitution for Corporate Entities for which the Attorneys General of Idaho and Washington have asserted exclusive claims[5] in the States' Actions. *Id.* The Bausch Settlement allocates the remaining $1,200,000 to the States to be placed in escrow and used to pay the expenses for notice and settlement administration and, upon final approval, to pay for the costs of litigating the States' claims both collectively or individually. *Id. at* ¶ I.V (3), II, IX. Bausch will make the Bausch

---

[5] Under the state laws of Idaho and Washington, only the attorney general can bring antitrust claims for monetary relief on behalf of Corporate Entities that are injured indirectly; thus, such claims are not included in any class action pending in the MDL in Pennsylvania, *In re Generic Pharmaceuticals Pricing Antitrust Litigation*, MDL No. 2724 (E.D. Pa.).

Settlement Payment to the States within the later of: (1) sixty (60) calendar days after the date of the Preliminary Approval Order or (2) thirty (30) calendar days after receiving written payment instructions from the States. *Id. at* ¶ II.

          2.  Lannett Settlement

Lannett shall pay to the States $13,500,000, plus $270,000 for Eligible Corporate Entities, for a total of $13,770,000 (the "Lannett Settlement Payment"). *Lannett Settlement* ¶ III. The Lannett Settlement Payment shall be paid in equal annual installments over a period of six (6) years (each, an "Annual Payment"). *Id. at* ¶ III.A. The first Annual Payment shall be due thirty (30) days after entry of the Preliminary Approval Order, and each subsequent Annual Payment shall be due on the later of (i) the anniversary of the first payment date or (ii) the anniversary of the date of the Final Approval Order. *Id.* The Annual Payments and the Interest Payments shall be deposited into escrow. *Id. at* ¶ III.B. 70% of the $13,500,000 and 100% of the $270,000 for Eligible Corporate Entities shall be deposited into a Restitution Account (for Eligible Consumers, Eligible Corporate Entities, Medicaid state agencies, and non-Medicaid state agencies), and the remainder shall be deposited into a Cost Account. *Id.* The Restitution Account shall be held in escrow and will only be distributed according to a distribution plan submitted to and approved by the District Court. *Id. at* ¶ III.D. Upon final Court approval, the funds in the Costs Account may be distributed to the States to pay Settlement Administration Costs and the past and future costs of litigating the States' claims, including attorney fees. *Id.* In addition to the principal amount, Lannett shall pay interest on the outstanding balance at an annual rate of 8%. *Id. at* ¶ III.C. "Interest" shall be the amount calculated by multiplying the remaining unpaid balance by 0.08 at the time of each year's Annual Payment *Id.* The Interest so calculated shall be added to the Annual Payment each year. *Id.*

Both Settlements further provide that, to the extent that monies allocated to the Cost Account are not used to offset costs of litigating in the States' Actions, any remaining funds may be used for any of the following: (1) deposit into a state antitrust or consumer protection account (e.g., revolving account, trust account) for use in accordance with the laws governing the account; (2) deposit into a fund exclusively dedicated to assisting any state to defray the costs of experts, economists, and consultants in multistate antitrust investigations and litigations, including healthcare related investigations and litigation; (3) antitrust or consumer protection enforcement, including healthcare-related enforcement, by an individual State or multiple States; or (4) for any other use permitted by state law at the sole discretion of that State's Attorney General. *Bausch Settlement* ¶ I.V (3); *Lannett Settlement* ¶ III.D.

### C. Cooperation

#### 1. Bausch Settlement

Bausch agrees to provide: (a) reasonable efforts to assist the States to understand data produced by Bausch, including consulting with technical personnel to address questions posed by the States' respective data consultants, and to provide any additional information or data reasonably necessary to understand or clarify the data produced by Bausch or otherwise render it admissible, and to provide additional data as may be reasonably necessary; and (b) reasonable efforts to provide information necessary to authenticate and admit up to 75 documents produced by Bausch, by affidavit, if permitted by the court or, if required by the court, by witness testimony. *Bausch Settlement* ¶ VII.D. Bausch and the States will in good faith consider reasonable requests from each other for additional assistance that does not impose an undue burden. *Id*. at ¶ VII.E.

### 2.  Lannett Settlement

Lannett agrees to provide reasonable cooperation to the States in connection with the prosecution of the States' Actions against other defendants. *Lannett Settlement* ¶ VII. The reasonable cooperation includes (A) Reasonable efforts to assist the States to understand data produced by Lannett, (B) Reasonable efforts to authenticate and lay the foundation to admit documents for use in the Action, (C) Identification of persons who are or were working for Lannett who are likely to have relevant information; (D) attorney proffers on Lannett, and current and former employees' knowledge and roles in the conduct alleged in the Action; (E) reasonable efforts to provide access to persons identified in (C) and (G) for interviews, (F) Production of witnesses identified in (C) and (G) for testimony at trial; (G) identification of persons who are likely to have relevant information concerning Lannett's pricing information contained in other defendants' documents, and the accuracy of this information, for drugs named in the States' Actions; and (H) identification of price increases implemented during the relevant time period for each drug named in the States' Actions, as to which States allege Lannett entered into a product-specific conspiracy. *Id*.

### D.  Release and Covenant Not to Sue

### 1.  Bausch Settlement

In consideration of Bausch's obligations under the settlement, the States agreed to release, acquit, and forever discharge the Bausch Releasees from all Released Claims. *Bausch Settlement* ¶ V.A. The States also covenant not to bring, file, or otherwise assert any Released Claim, or to cause or assist to be brought, filed, or otherwise asserted any Released Claim, or to otherwise seek to establish liability for any Released Claim against any Bausch Releasee in any forum whatsoever,

whether on their own behalf or on behalf of any other natural person or entity, to the fullest extent permitted by law. *Id. at* ¶ V.E.

 2.  Lannett Settlement

In consideration of Lannett's obligations under the settlement, and as permitted by law, the States have agreed to release the Released Parties in the Lannett Settlement from any and all claims that the States brought or could have brought against them (except on behalf of Local Entities) or any other defendant in the States' Actions relating to the drugs specified based on the conduct alleged, including but not limited to antitrust, consumer protection, fraud or false claims act, "overarching conspiracy," unjust enrichment and disgorgement claims through and including the date of the Release. *Lannett Settlement* ¶IV.A. Each State covenants and agrees that it shall not sue or otherwise seek to establish or impose liability on any of the Released Claims. *Id.* at ¶ IV.B. Released Claims do not include claims unrelated to competition.  *Id.* at ¶ IV.C. Lannett's sales of drugs specified in the States' Actions shall, to the extent permitted or authorized by law, remain against other defendants as a potential basis for restitution and other monetary claims and shall be asserted as a part of any joint and several liability claims against other defendants in the States' Actions or against other persons other than the Released Parties. *Id.* at ¶ IV.D.

**E.  Preliminary and Final Court Approval**

The  Settlements provide that the States shall file a motion for a Preliminary Approval Order, including their proposed notice and notice plan to inform Consumers, Eligible Corporate Entities in the Lannett Settlement and Corporate Entities in the Bausch Settlement (hereinafter collectively referred to as "Corporate Entities"), and anyone else for whom notice is required, of their right (i) to object to the Settlements or (ii) to file a timely and valid request for exclusion. *Bausch Settlement* ¶ III.A; *Lannett Settlement* ¶ V, I.N. After preliminary approval and the court's

approval of the allocation plans, notice, and notice plan, the States shall implement their Notice Plan. *Bausch Settlement* ¶ III.C; *Lannett Settlement* ¶ V. Costs for the notice will be paid from the State Escrow but shall be limited to $250,000. *Bausch Settlement* ¶ III.D, IX. Following the conclusion of the Notice Period or as directed by the court, the States shall file a Motion for a Final Approval Order. *Bausch Settlement* ¶ III.E; *Lannett Settlement* ¶ V. As part of the proposed court orders to be submitted to the court with the motion for final approval under the Settlements, the States shall dismiss with prejudice all claims against Bausch and Lannett in the States' Actions. *Lannett Settlement* ¶ I.I., II.B.; *Bausch Settlement* ¶ V.G.

### F. Exclusions

Subject to court approval, any Consumer or Corporate Entity in Idaho[6] may seek to be excluded from the settlement by submitting a valid and timely request for exclusion. *Bausch Settlement* ¶ IV.A; *Lannett Settlement* ¶ I.N. The States, State Entities identified on Appendix A of the Bausch Settlement, and other State Entities that accept a distribution of settlement proceeds from the Attorneys General's settlement of the States' Actions are bound by the Settlements upon execution and have no right to seek exclusion. *Bausch Settlement* ¶ IV.A. Any Consumer or Corporate Entity in Idaho who submits a valid and timely request for exclusion will not be eligible to receive a distribution of any portion of the Settlement Funds and will not have any rights with respect to the Settlements. *Bausch Settlement* ¶ IV.A.

The States shall, within ten (10) calendar days of the deadline for submitting a request for exclusion (the "Opt-Out Deadline"), provide Bausch with a list of, and copies of, all requests for exclusion, and shall file with their Motion for Final Approval a list of all persons and entities that timely and validly requested exclusion. *Bausch Settlement* ¶ IV.D. Bausch or the States may

---

[6] Although Washington also asserts an exclusive claim on behalf of Corporate Entities in the States' Actions, Washington law does not provide a right to exclusion from a settlement for Corporate Entities.

dispute an exclusion request, in which case they shall, if possible, seek to resolve the disputed exclusion request by agreement within thirty (30) calendar days of the Opt-Out Deadline. If necessary, Bausch and the States will seek court approval of any such resolutions. If Bausch and the States are unable to resolve any such disputes, they will submit such unresolved disputes to the court for decision. *Bausch Settlement* ¶ IV.E.

### G. Supplemental Agreements

The Bausch Settlement includes a Supplemental Agreement between Bausch and the Attorneys General of Delaware, Georgia, Idaho, Maryland, Mississippi, New Mexico, and Pennsylvania regarding potential claims for contribution under state law against Bausch by any alleged co-conspirator(s). *Exhibit 1.* The Lannett Settlement includes a Confession of Judgment and Stipulated Entry of Judgment. *Exhibit 2.* In the event of a Default, Lannett irrevocably authorizes any attorney to appear in any court of competent jurisdiction and confess judgment against Lannett in favor of the States, or enter the stipulated entry of judgment, for the full remaining amount due under the Lannett Settlement. *Id.*

## IV. THE STATES' AUTHORITY

The Settlements are presented to the Court for preliminary approval by the States in their sovereign and proprietary capacities and in their capacity as *parens patriae* or similar authority under federal and state laws[7] to bring claims and to obtain important redress for harm caused by

---

[7] *E.g.*, Conn. Gen. Stat. § 35-32(c); Alaska Stat. §§ 45.50.580; 45.50.577(b); Ariz. Rev. Stat. §§ 44-1407, 44-1408(A), 44-1528(A); Cal. Bus. & Prof. Code § 16760; Col. Rev. Stat. § 6-4-111: D.C. Code §§ 28-4507, 28–3909; Del. Code Ann. tit. 6, § 2101, *et seq.*; Del. Code Ann. tit. 29, §§ 2520 and 2522; Fla. Stat. § 542.22(22); Ga. Code Ann. § 10-1-397(b)**;** Idaho Code Ann. § 48-108; 740 Ill. Comp. Stat. 10/7(2); Ind. Code § 24-1-2-5; *Bd. of Comm'rs of Howard Cty. v. Kokomo City Plan Comm'n*, 263 Ind. 282, 295 (1975); *Bd. of Comm'rs of Union City v. McGuinness*, 80 N.E.3d 164, 170 (Ind. 2017); Ind. Code § 24-5-0.5-4(c); *FTC v. Sperry & Hutchinson Co.*, 405 U.S. 233 (1972); Iowa Code § 553.12; Kan. Stat. Ann. § 50-103(a)(8); Ky. Rev. Stat. Ann § 15.020, 367.110 through 367.990, and 518.020; *Com. ex. rel. Conway v. Thompson,* 300 S.W.3d 152 (Ky. 2010); *Com. ex rel. Beshear v. ABAC Pest Control Inc.*, 621 S.W.2d 705

Settling Defendants' conduct. State attorneys general are politically accountable representatives of their states and have authority under state law to recover (1) for Consumers and Corporate Entities to the extent permitted by state laws; (2) for public purchasers, including state agencies to the extent permitted by state laws; and (3) for the state, in the form of disgorgement, civil penalties, costs, and fees.[8] The States, based on their authority to bring actions and seek relief for violations of federal law and state antitrust and consumer protection laws as to the facts in their complaints,[9] are authorized by state law to enter into the Settlements with Settling Defendants to

---

(Ky. 1981); *State v. Bordens, Inc.*, 684 So.2d 1024, 1026 (La.Ct.App.1996); *Lund ex rel. Wilbur v. Pratt*, 308 A.2d 554 (Me.1973); Md. Com. Law Code Ann., § 11-209; MGL c. 93A § 4; *State v. Detroit Lumberman's Association*, 1979-2 Trade Cas. (CCH) ¶ 62,990, 1979 WL 18703 (Mich. Cir. Ct. 1979); *Minnesota v. Standard Oil Co.*, 568 F. Supp. 556, 563 (D. Minn. 1983); Miss. Code Ann. §§ 7-5-1; *Clark Oil & Ref Corp. v. Ashcroft*, 639 S.W.2d 594, 596 (Mo. 1982); S*tate ex rel. Olsen v. Public Service Comm'n*, 283 P.2d 594 (Mont. 1955); Neb. Rev. Stat. § 84-212; Nev. Rev. Stat. § 598A.160(1) (1999); Nev. Rev. Stat. 598.0963 (2023); N.H. Rev. Stat. Ann. § 356:4-a; State v. City of Dover, 153 N.H. 181 (N.H. 2006); N.J. Stat. Ann. § 56:9-12.b; N.M. Stat. Ann. § 57-1-3(A), (B) (1979); *New Mexico v. Scott & Fetzer Co.*, 1981-2 Trade Cas. ¶ 64,439, 1981 WL 2167 (D.N.M. 1981); N.Y. Exec. Law § 63(12) and N.Y. Gen. Bus. Law §§ 340-342-a; N.C. Gen. Stat. §§ 75-15, 75-16; *Hyde v. Abbott Labs, Inc.*, 473 S.E.2d 680 (N.C. Ct. App. 1996); *FTC v. Mylan Labs*, 99 F. Supp. 2d 1 (D.D.C. 1999); N. D. Cent. Code §§ 51-08.1-07, -08(2); N. D. Cent. Code § 51-15-07; 4 CMC §§ 5107, 5121(b), 5206(b); Ohio Rev. Code § 109.81; *Ohio v. United Transp. Inc.,* 506 F. Supp. 1278, 1280-81 (S.D. Ohio 1981); 79 O.S. § 205 (A)(1); Or. Rev. Stat. § 646.775(1); 71 Pa. Stat. Ann. § 732-204(c); P.R. Laws Ann. tit. 32, §§ 3341–3344; R.I. Gen. Laws § 6-36-12; S.C. Code Ann. § 39-5-50(b); *State ex rel. Condon v. Hodges*, 349 S.C. 232, 562 S.E. 2d 623 (2002); S.D. Codified Laws § 37-1-23; *State v. Heath*, 806 S.W.2d 535, 537 (Tenn. Ct. App. 1990); Tenn. Code Ann. § 8-6-109; *In re Cardizem CD Antitrust Litig.*, 391 F.3d 812 (6th Cir. 2004); *In re Lorazepam & Clorazepate Antitrust Litig.*, 205 F.R.D. 369 (D.D.C. 2002); *Connecticut v. Mylan Labs, Inc.*, No. 1:98cv2114, 2001 WL 765466 (D.D.C. Apr. 27, 2001); *Government of Virgin Islands by and through Encarnacion v. Health Quest, LLC,* 2023 WL 7214673, at *4 (Superior Ct. V.I. Oct. 31, 2023) (*citing Mathes v. Century Alumina Co.*, 2008 U.S. Dist. LEXIS 90087, at *29 (D.V.I. 2008)); Utah Code Ann. §§ 76-10-3106(3), 76-10-3108(1), 13-11-17; *Utah Division of Consumer Protection v. Stevens*, 398 F.Supp.3d 1139, 1150 (D. Utah Aug. 19, 2019); Vermont Stat. Ann. 9 V.S.A. § 2458; Va. Code Ann. §§ 59.1-9.15; Rev. Code Wash. § 19.86.080; *Washington v. Chimei Innolux Corp.*, 659 F.3d 842, 847 (9th Cir. 2011); W. Va. Code § 47-18-17; Wis. Stat. Ann. §§ 133.16 – 133.17(1); Wy. Stat. §§ 40–12–105, 40–12–106, 40–12–107, 40-12-112 and 40-12-113; *Alfred L. Snapp & Son, Inc. v. Puerto Rico*, 458 U.S. 592 (1982).
[8] *See* footnote 10, *infra*.
[9] *E.g.,* Conn. Gen. Stat. §§ 35-34, 35-38, 42-110o, and 42-110m; Alaska Stat. §§ 45.50.576-.578, 45.50.501, .531, and .537; Arizona State Uniform Antitrust Act, Ariz. Rev. Stat. §§ 44-1407, 44-1408, 44-1528, and 44-1531; Cal. Bus. & Prof. Code §§ 16750, et seq., 17200, et seq., 17500, et seq., 17206, 17536, 17206.1, 16750, 16754, and 16754.5; Cal. Civil Code § 3345; Colo. Rev. Stat. § 6-4-101, et seq.; D.C. Code §§ 28-4507 and 28-4509; Del. Code Ann. tit. 6 § 2101, et seq.; Del. Code Ann. tit. 29, §§ 2520 and 2522; Fla. Stat. §§ 501.201, et seq, and 501.204; Idaho Code §§ 48-104, 48-108, and 48-112; 740 ILCS 10/1 et seq.;

obtain injunctive relief and to recover for the States' Consumers, State Entities, and Corporate

Entities, on whose behalf they assert claims.

A.  **The States' _Parens Patriae_ Authority to Represent Consumers in their States.**

The States bring claims for monetary relief for Consumers pursuant to state antitrust and

consumer protection laws, which build on the common law doctrine of _parens patriae_. States

have long-standing authority to bring _parens patriae_ actions. The term _parens patriae_ means

"parent of the country." _Alfred L. Snapp & Son, Inc. v. Puerto Rico,_ 458 U.S. 592, 600, n.8 (1982)

(quoting BLACK'S LAW DICTIONARY 1003 (5th ed. 1979)). The doctrine originated under

the English common law, which recognized the King as the guardian of "'all charitable uses in

the kingdom.'" _Hawaii v. Standard Oil Co. of Cal.,_ 405 U.S. 251, 257 (1972) (quoting 3 William

Blackstone, Commentaries, 47-48 (1794)). In _Hawaii v. Standard Oil Co_., the court affirmed "the

right of a State to sue as parens patriae to prevent or repair harm to its 'quasi-sovereign' interests."

405 U.S. at 258. The _parens patriae_ doctrine has evolved to encompass a wide range of actions

---

10/7(1), 7(2), and 7(4); Ind. Code. §§ 24-1-2-5, 24-1-1-2, and § 24-5-0.5-4; Iowa Code §§ 553.12, 553.13, 714.16; Kan. Stat. Ann. §§ 50-103, 50-108, 50-160, 50-161, and 50-162; Ky. Rev. Stat. Ann. 367.110 et seq.; LSA-R.S. 51:1407, and 51:1408; 10 M.R.S. § 1104, 5 M.R.S. § 209; Md. Com. Law Code Ann. § 11-209; MGL c. 93A, § 4; Mich. Comp. Laws § 445.771, et seq. and § 445.901 et seq.; Minn. Stat. §§ 325D.43, 325D.45, 325D.49, 325D.56, 325D.57, 325D.58, and 325D.66; Minn. Stat. Ch. 8; Miss. Code Ann. §§ 75-24-1, et seq., and 75-21-1 et seq.; Missouri Rev. Stat. §§ 416.011 et seq., 407.010 et seq., 15 CSR 60-8.010 et seq., 15 CSR 60-9.01 et seq.; Mont. Code Ann. §30-14-111(4), §30-14-131, §30-14-142(2), and § 30-14-222; Neb. Rev. Stat. §§ 59-803, 59-819, 59-821, 59-1608, 59-1609, 59-1614, and 84-212; Nev. Rev. Stat. §§ 598.0963, 598.0973, 598.0999, 598A.160, 598A.170, 598A.200 and 598A.250; N.H. RSA 356:4 et seq.; N.H. RSA 358-A:1 et seq.; N.J.S.A. 56:9-1 et seq.; N.J.S.A. 56:8-1 et seq.; N.M. Stat. Ann. §§ 57-1-3, -7, -8; N.M. Stat. Ann. § 57-12-8, -10, -11; N.Y. Gen. Bus. Law §§ 340-342c; N.Y. Executive Law § 63(12); N.C. Gen. Stat. § 75-1 et seq.; N.D.C.C. §§ 51-08.1-01 et seq. and 51-15-01 et seq.; 4 CMC §§ 5101 et. seq.; 4 CMC §§ 5201 et. seq.; Ohio Rev. Code § 109.81 and Ohio Rev. Code §§ 1331.01 et seq.; 79 O.S. § 201 et seq.; 79 O.S. § 205; ORS 646.760, ORS 646.770, ORS 646.775, and ORS 646.780; 73 P.S. §§ 201-4, 201-4.1, and 201-8 (b); 10 P.R. Laws Ann. §§ 257 et seq.; 32 P.R. Laws Ann. § 3341; R.I. Gen. L. §§ 6-36-1, et. seq.; South Carolina Code of Laws §§ 39-5-50, 39-5-110, 39-5-140, and 1-7-85; S.D. Codified Laws Chapters 37-1 and 37-24; Tenn. Code Ann. §§ 47-25-101 et seq.; 11 V.I.C. § 1507; 12A V.I.C. § 328; Utah Code §§ 76-10-3101 through 76-10-3118; 9 V.S.A. §§ 2458, 2461 and 2465; Virginia Code Section 59.1-9.15; Wash Rev. Code 19.86.080 and 19.86.140; West Virginia Code § 47–18–1 et seq.; Wis. Stat. §§ 133.03, 133.14, 133.16, 133.17, and 133.18; Wyoming Statutes § 40-12-101 et seq.

to protect the health and safety of a state's citizens. *See, e.g., Georgia v. Tennessee Copper Co.,* 206 U.S. 230 (1907) (interstate air pollution); *Kansas v. Colorado,* 185 U.S. 125 (1902) (water diversion); *Louisiana v. Texas,* 176 U.S. 1 (1899) (communicable disease).

State authority to bring a *parens patriae* action for federal antitrust law violations was first recognized by the U.S. Supreme Court in *Georgia v. Pennsylvania Railroad Co.,* 324 U.S. 439 (1945). Since *Georgia,* federal courts have routinely recognized the right of state attorneys general to bring *parens patriae* actions to redress consumer deception and antitrust violations.[10] The States have, and have used, *parens patriae* authority to recover monetary damages for consumers for antitrust violations. *E.g.,* 15 U.S.C. § 15c; *In re Electronic Book Antitrust Litig.,* 14 F. Supp. 3d 525, 531 (S.D.N.Y. 2014). States have built on federal *parens patriae* authority with state law, including the provisions exercised here. Those state laws are sometimes constitutional, statutory, including both competitionspecific statutes and general statutes that apply to competition issues, common law, and case law.[11] States are enforcing those laws here to fill gaps in federal law and otherwise strive to further the public interest.

## B. Fundamental Differences Between *Parens Patriae* Claims and Rule 23 Claims

*Parens patriae* claims differ from Rule 23 class action claims substantively and procedurally, and *parens patriae* actions are not directly governed by Rule 23 of the Federal Rules of Civil Procedure. *Purdue Pharma L.P. v. Kentucky,* 704 F.3d 208, 217 (2nd Cir. 2013). While *parens patriae* authority derives from the states' interest as sovereigns, *Georgia,* 324 U.S. at 449,

---

[10] *See e.g. In re Electronic Book Antitrust Litig.,* 2014 WL 3798764 (S.D.N.Y. Aug. 1, 2014) (conspiracy to raise eBook prices); *New York v. Reebok Int'l, Ltd.*, 903 F. Supp. 532, 535 (S.D.N.Y. 1995), *aff'd,* 96 F.3d 44 (2d Cir. 1996) (conspiracy to fix, raise, maintain, or stabilize retail prices of shoes); *In re Mid-Atl. Toyota Antitrust Litig.*, 541 F. Supp. 62 (D. Md. 1981) (alleged conspiracy to fix artificially high price for "polyglycoat" finish applied to certain automobiles); *California v. Infineon Technologies AG,* 531 F.Supp.2d 1124 (N.D. Cal 2007) (alleged horizontal price-fixing conspiracy in market for dynamic random access memory (DRAM)).
[11] *See* footnotes 8 and 10 *supra.*

class action representation is developed to more efficiently and effectively manage private litigation asserting claims for many businesses or consumers. *See American Pipe & Const. Co. v. Utah*, 414 U.S. 538, 553 (1974). Because of its sovereign nature and political accountability, *parens patriae* authority is exercised as soon as a state attorney general files an action. In contrast, representation by class counsel under Rule 23 requires court appointment and class certification, even in the settlement context. Fed. R. Civ. P. 23. Additionally, a class action requires the ascertainability of class members. Fed. R. Civ. P 23(b)(3).

## V.     ARGUMENT

Preliminary approval of the Settlements is warranted and appropriate based on the substantive terms of the Settlements and the process by which the Settlements were negotiated.

### A.  Standard for Preliminary Approval of *Parens Patriae* Settlements

*Parens patriae* settlements will be approved if they are fair, reasonable, and adequate. *State of N.Y. by Vacco v. Rebook Intern. Ltd*., 903 F. Supp. 532, 535 (S.D.N.Y. 1995). Although States' *parens patriae* actions are distinct from class actions, courts in this circuit and elsewhere generally look to the standards used in approving class action settlements when evaluating what a *parens patriae* settlement delivers. *See Id.; In re Toys 'R' Us Antitrust Litig.*, 191 F.R.D. 347, 351 (E.D.N.Y. 2000); *New York v. Salton, Inc.*, 265 F. Supp. 2d 310, 313 (S.D.N.Y. 2003); *New York. v. Nintendo of America, Inc.*, 775 F. Supp. 676, 680 (S.D.N.Y. 1991). The *parens patriae* settlement approval process generally applies a two-step approach: (1) preliminary approval and (2) final approval. *See In re GSE Bonds Antitrust Litigation*, 414 F. Supp. 3d 686, 691-92 (S.D.N.Y 2019); *In re Payment Card Interchange Fee and Merchant Discount Antitrust Litig.,* 330 F.R.D. 11, 28 (E.D.N.Y. 2019).

The preliminary approval process is governed by a "likelihood standard"—requiring the

Court to assess whether the parties have shown that "the court *will likely* be able to grant final approval…." *In re Payment Card*, 330 F.R.D. at 28 n.21 (emphasis in original). Preliminary approval of a settlement "is at most a determination that there is what might be termed 'probable cause' to submit the proposal to … [consumers] and hold a full-scale hearing as to its fairness." *Menkes v. Stolt-Nielsen S.A.*, 270 F.R.D. 80, 101 (D. Conn. 2010) (citing *In re Traffic Executive Association–Eastern Railroads,* 627 F.2d 631, 634 (2d Cir.1980)). "Because Rule 23(e)(2) sets forth the factors that a court must consider when weighing *final* approval, it follows that courts must assess at the preliminary approval stage whether the parties have shown that the court will *likely* find that the factors weigh in favor of final settlement approval." *In re Payment Card,* 330 F.R.D. at 28.

### B.  The Settlements Meet the Standard for Preliminary Approval

The Settlements satisfy the standard for preliminary approval because the court w*ill likely* be able to grant final approval of the Settlements. *See supra, See e.g.*, *In re Toys 'R' Us Antitrust Litig*., 191 F.R.D. at 351; *New York v. Salton, Inc.*, 265 F. Supp. 2d at 313; *State of New York v. Rebook Intern. Ltd*., 903 F. Supp at 535; *New York. v. Nintendo of America, Inc.*, 775 F. Supp. at 680. Final approval of a class action settlement requires courts to consider whether:

A.  the class representatives and class counsel have adequately represented the class;
B.   the proposal was negotiated at arm's length;
C.   the relief provided for the class is adequate, taking into account:
   i.    the costs, risks, and delay of trial and appeal;
   ii.    the effectiveness of any proposed method of distributing relief to the class, including the method of processing class-member claims, if required;
   iii.    the terms of any proposed award of attorney's fees, including timing of payment; and
   iv.    any agreement required to be identified under Rule 23(e)(3); and
D.  the proposal treats class members equitably relative to each other.

F. R. Civ. P Rule 23(e)(2). "Paragraphs (A) and (B) constitute the 'procedural' analysis factors and examine 'the conduct of the litigation and of the negotiations leading up to the proposed

settlement.'" *In re Payment Card,* 330 F.R.D. at 29 (quoting Fed. R. Civ. P. 23 advisory committee's note to 2018 amendment). "Paragraphs (C) and (D) constitute the 'substantive' analysis factors and examine '[t]he relief that the settlement is expected to provide ....'" *Id.* In the Second Circuit, the Rule 23(e)(2) factors are supplemented by the factors set forth in *City of Detroit v. Grinnell Corp.*, 495 F.2d 448 (2d Cir. 1974), when determining whether the Court will likely find that a settlement is fair, reasonable, and adequate, thus warranting preliminary approval. *Id.*; *In re GSE Bonds*, 414 F. Supp. 3d at 692. *Grinnell* set forth nine factors that are referred to as the *Grinnell* factors:

> (1) the complexity, expense and likely duration of the litigation,
> (2) the reaction of the class to the settlement,
> (3) the stage of the proceedings and the amount of discovery completed,
> (4) the risks of establishing liability,
> (5) the risks of establishing damages,
> (6) the risks of maintaining the class action through the trial,
> (7) the ability of the defendants to withstand a greater judgment,
> (8) the range of reasonableness of the settlement fund in light of the best possible recovery, and
> (9) the range of reasonableness of the settlement fund to a possible recovery in light of all the attendant risks of litigation.

495 F.2d at 463 (citations omitted). The States will address both sets of factors.

### 1. Procedural Analysis Factors Support Preliminary Approval

The initial determination of fairness, often called "procedural fairness," focuses on the settlement process itself. Fed. R. Civ. P. 23(e)(2). *See e.g. In re GSE Bonds*, 414 F. Supp. 3d at 693; *Ebbert v. Nassau County*, No. CV 05-5445 (AKT), 2011 WL 6826121, at *7 (E.D.N.Y. Dec. 22, 2011); *Dupler v. Costco Wholesale Corp.*, 705 F. Supp. 2d 231, 238-39 (E.D.N.Y. 2010). Because the Settlements were negotiated at arm's length by experienced litigators and are the result of a good-faith and procedurally fair process, the procedural factors support preliminary approval of the Settlements.

i. <u>The States Have Adequately – and Zealously – Represented Consumers</u>

This first procedural factor requiring adequate representation of the class is not directly applicable to a settlement in a *parens* action brought by the States in the public interest. *See e.g. State of New York v. Reebok International, Ltd.,* 96 F.3d 44,48 (2d Cir. 1996) (noting Attorneys General in *parens* actions are motivated by concern for the public interest). Nonetheless, the States have vigorously represented the interests of their citizens in this action for more than nine years. States Decl. ¶ 12. The States have engaged in extensive discovery and motion practice, zealous prosecution of the States' Actions, and settlement negotiations to obtain a favorable settlement. *Id.* The States represent forty-eight U.S jurisdictions whose interests are aligned in enforcing federal and state laws and vigorously pursuing remedies for their states, their Consumers, State Entities, and Corporate Entities. *Id.* at ¶ 10.

ii. <u>The Settlements Were Negotiated at Arm's Length by Experienced Counsel.</u>

The Settlements were "reached through arm's-length negotiations between experienced, capable counsel knowledgeable in complex … litigation" and "'enjoys a presumption of fairness.'" *In re GSE Bonds*, 414 F.Supp.3d at 693 (*quoting In re Austrian & German Bank Holocaust Litig.,* 80 F. Supp. 2d 164, 173-74 (S.D.N.Y. 2000), *aff'd sub nom.*, *D'Amato v. Deutsche Bank*, 236 F.3d 78 (2d Cir. 2001)); State of *New York v. Reebok Int'l, Ltd.*, 903 F. Supp. at 535. Attorneys representing the parties to the Settlements are experienced and well-informed. Settling Defendants' respective counsels have significant expertise in complex antitrust litigation. The Assistant Attorneys General in the offices of the Attorneys General for Connecticut, New York, California, and Kansas who negotiated the Settlements, individually and collectively, also have extensive experience with antitrust investigations and litigation. States Decl. ¶ 14. "The Attorney Generals have extensive experience in complex antitrust cases brought under their

*parens patriae* powers." *New York v. Nintendo of Am. Inc.*, 775 F. Supp. at 680. Indeed, this action is part of a long and successful tradition of multistate litigation by State Attorneys General.[12]

Courts can place special weight on a settlement being negotiated by government attorneys committed to protecting the public interest. *Wellman v. Dickinson,* 497 F. Supp. 824, 830 (S.D.N.Y. 1980), *aff'd*, 682 F.2d 355 (2d Cir. 1982). The participation of State Attorneys General furnishes extra assurance that consumers' interests are protected. *In re Toys 'R' Us Antitrust Litig.*, 191 F.R.D. at 351. The motivating factor in the States' Actions is the enforcement of antitrust laws by the States acting as *parens patriae* for their citizens. *See New York v. Reebok,* 96 F.3d at 48. The States negotiated at arms-length with Defendants while actively litigating, and forty-eight (48) Attorneys General have approved the settlements on behalf of their states, their Consumers, State Entities, and Corporate Entities, for whom they assert claims. States Decl. ¶¶ 10-12; Exhibit 1 and 2.

### iii.    The States Have Obtained a Sufficient Understanding of the Case

The States were well informed about the issues in this matter and the strengths and weaknesses of the States' Actions when they negotiated the Settlements with Settling Defendants. States Decl. ¶¶ 12-14. The third *Grinnell* factor requires the court to consider the stage of the

---

[12] *See, e.g.*, *California v. ARC Am. Corp.*, 490 U.S. 93 (1989); *Hartford Fire Ins. v. California*, 509 U.S. 764 (1993); *In re Panasonic Consumer Elect. Prod.*, 1989-1 Trade Cas. (CCH) ¶ 68, 613 (CCH), 1989 WL 63240, (S.D.N.Y. June 5, 1989); *Colorado v. Airline Tariff Publ's Co.*, 1995-2 Trade Cas. (CCH) ¶ 71,231, 1995 WL 792070 (D.D.C. May 10, 1995); *In re Mid-Atl. Toyota Antitrust Litig.,* 605 F. Supp. 440 (D.Md.1984); State of *New York v. Reebok International, Ltd.,* 96 F.3d 44 (2d Cir. 1996); *In re Electronic Book Antitrust Litig.,* 2014 WL 3798764 (S.D.N.Y. Aug. 1, 2014); *In re Coordinated Pretrial Proceedings in Antibiotic Antitrust Actions*, 410 F. Supp 706 (D. Minn.1975); *U.S. v. Apple Inc.,* 952 F.Supp.2d 638 (S.D.N.Y 2013); *In re Compact Disk Minimum Advertised Price Antitrust Litig.,* 216 F.R.D. 197 (D. Me. 2003); *State of New York, et al. v. Cephalon, Inc.*, No. 16-4234 (E.D. Pa. 2016); *State of Wisconsin, et al. v. Indivior Inc., et al.*, 16-cv-5073 (E.D. Pa. 2016); *See also*, *State of Utah et al. v. Google LLC et al.*, Case No. 3:21-cv-05227-JD (N.D. Cal.).

proceedings and amount of discovery completed. *In re GSE Bonds*, 414 F. Supp. 3d at 699. "The relevant inquiry 'is whether the plaintiffs have obtained a sufficient understanding of the case to gauge the strengths and weaknesses of their claims and the adequacy of the settlement.'" *Id.* (quoting *In re AOL Time Warner, Inc.*, No. 02 Civ. 5575 (SWK), 2006 WL 903236, at *10 (S.D.N.Y. Apr. 6, 2006)). The State of Connecticut has been investigating some claims since July 2014, and most States have been litigating some of the claims in the States' Actions since December 2016. The lengthy and extensive litigation has provided an excellent foundation to understand the facts and legal issues, as did this Court's and the MDL Court's opinions and orders. The States understand what Consumers, State Entities, and Corporate Entities have overpaid for generic pharmaceuticals manufactured by Settling Defendants and the other defendants ("Drugs at Issue"), and the challenged conduct's price effects on generic pharmaceuticals, based on data provided by state Medicaid agencies, third parties, other defendants in the States' Actions and the MDL, and expert analysis and reports. The States' investigation and litigation work over the past nine years, including expert discovery and recent summary judgment briefings, has allowed them to obtain an excellent understanding of the case. States Decl. ¶ 12. In summary, because the Settlements were the product of arm's-length negotiations between informed and experienced counsel and were reached after a lengthy investigation and litigation, the procedural factors weigh in favor of preliminary approval.

## 2.   Substantive Analysis Factors Support Preliminary Approval

The second set of Rule 23(e) factors focuses on the substantive terms of the Settlements and the relief that the Settlements are expected to provide. Fed. R. Civ. P. 23(e)(2); *In re Payment Card,* 330 F.R.D. at 29. This inquiry overlaps significantly with several *Grinnell* factors, which help guide the Court's application of Rule 23(e)(2)(C). *In re GSE Bonds,* 414 F. Supp. 3d at 693

(*citing In re Payment Card*, 330 F.R.D. at 36). The substantive factors weigh in favor of preliminary approval because the Settlements provide substantial and guaranteed recovery for Consumers, State Entities, and Corporate Entities, which recovery is fair, reasonable, and adequate given the litigation risks. States Decl. ¶ 27.

Rule 23(e)(2)(C) requires the court to examine whether the "relief … is adequate, taking into account: (i) the costs, risks, and delay of trial and appeal; (ii) the effectiveness of any proposed method of distributing relief; (iii) the terms of any proposed award of attorney's fees, including timing of payment; and (iv) any agreement required to be identified under Rule 23(e)(3)." Further, *Grinnell* factors eight, "the range of reasonableness of the settlement in light of the best possible recovery," and nine, "the range of reasonableness of the settlement fund to a possible recovery in light of all the attendant risks of litigation," are often considered together, *In re GSE Bonds*, 414 F. Supp. 3d at 696 (*quoting In re Payment Card*, 330 F.R.D. at 47-48).

### i. The Settlements Provide Adequate Relief

When assessing the adequacy of a settlement, courts may need to forecast the likely range of possible recoveries and the likelihood of success in obtaining such results. *In re GSE Bonds*, 414 F. Supp. 3d at 693 (citing *In re Payment Card,* 330 F.R.D. at 36). The court's task is to weigh the settlement figure against the amount of likely recovery. *New York v. Reebok,* 96 F.3d at 49. Courts have held that "[t]he proper measure of damages in a suit concerning a price-fixing conspiracy is 'the difference between the prices actually paid and the prices that would have been paid absent the conspiracy.'" *In re Electronic Books Antitrust Litigation*, 2014 WL 1282293 at *16 (S.D.N.Y., March 28, 2014) (quoting *New York v. Hendrickson Bros., Inc.,* 840 F.2d 1065, 1077 (2d Cir.1988)). Further, monetary relief in antitrust cases "are rarely susceptible of the kind of concrete, detailed proof of injury which is available in other contexts." *J. Truett Payne Co.,*

*Inc. v. Chrysler Motors Corp.*, 451 U.S. 557, 565, 101 S. Ct. 1923, 68 L.Ed.2d 442 (1981)

(quoting *Bigelow v. RKO Pictures, Inc.,* 327 U.S. 251, 264 (1946)).

Based on information and data the States have obtained through investigation and discovery, and analysis provided by the States' experts in the Dermatology Action, the States estimate that the total amount of overcharge associated with sales by Bausch ranges from $29.9 million to -$28.6 million.[13] The States' damages expert Hal Singer determined Bausch caused between $9.8 million and $4.8 million in single damages.[14] Given that the $4.08 million settlement amount to the States is a significant percentage considering the case complexity and litigation risk, it is, therefore, reasonable, adequate, and within the range of possible approval for purposes of the preliminary approval analysis. *See e.g., In re GSE Bonds*, 414 F. Supp. 3d at 697 (13-17% of the best possible recovery considered reasonable); *In re Currency Conversion Fee Antitrust Litig.*, No. 01 MDL 1409, 2006 WL 3247396, at *6 (S.D.N.Y. Nov. 8, 2006) (settlement "representing roughly 10-15% of the credit transaction fees collected by Defendants").

Based on similar information provided by the States' experts in the Dermatology Action relating to Lannett, the States estimate that the total amount of overcharge associated with sales by Lannett ranges between $68.3 million and $79.4 million,[15] and that the single damages caused by Lannett ranges between $9.1 million and $10.3 million.[16] Therefore, the States maintain that a $13.77 million settlement with Lannett is reasonable, adequate, and within the range of possible approval for purposes of the preliminary approval analysis. *Id.*

In addition to monetary relief, the Settlements provide valuable relief through Settling Defendants' commitment to business reform, including establishing or maintaining a compliance

---

[13] Reply Report of Frederick Warren-Boulton, Ph.D. (August 26, 2024), Table 21, page 141
[14] Reply Report of Hal J. Singer, Ph.D. (August 26, 2024) Appendix 7, table 3, page 114
[15] Reply Report of Frederick Warren-Boulton, Ph.D. (August 26, 2024), Table 21, page 141
[16] Reply Report of Hal J. Singer, Ph.D. (August 26, 2024) Appendix 7, table 3, page 114

program and training, and providing reporting to the States as to its compliance program.  *See Bauch Settlement* ¶ V; Lannett Settlement ¶ X.

> ii.    The Cooperation from Settling Defendants Adds Value to the Settlements

Further value is added to the Settlements through Settling Defendants' agreement to provide cooperation to the States in the ongoing litigation against other defendants. *See In re GSE Bonds*, 414 F. Supp. 3d at 697. Successful litigation against Settling Defendants' co-defendants will increase the likelihood of further recovery and additional value to the States, Consumers, State Entities, and Corporate Entities on whose behalf the States assert claims.  Related to this is the seventh *Grinnell* factor, defendants' ability to withstand a greater judgment.  Even if it is determined that Settling Defendants could withstand a greater judgment, "courts have noted that a defendant's cooperation 'tends to offset the fact that they would be able to withstand a larger judgment.'" *In re GSE Bonds*, 414 F. Supp. 3d at 694 (*quoting In re Pressure Sensitive Labelstock Antitrust Litig.*, 584 F. Supp. 2d 697, 702 (M.D. Pa. 2008)).

Settling Defendants' covenant of continued cooperation in this litigation provides considerable value, which supports preliminary approval.  *See e.g.*, *In re Air Cargo Shipping Servs. Antitrust Litig.*, 2009 WL 3077396 at *9 (E.D.N.Y. Sept. 25, 2009) ("the agreement to cooperate with the plaintiffs … adds significant value"); *In re GSE Bonds*, 2019 WL 6842332 at *4 (S.D.N.Y Dec. 16, 2019) ("this cooperation … nonetheless provides some additional value to the GS settlement"); *In re Packaged Ice Antitrust Litig.*, 2010 WL 3070161 at *6 (E.D. Mich. Aug 2, 2010) (where "there is the potential for a significant benefit … in the form of cooperation on the part of the settling Defendant, this Court is reluctant to refuse to consider the very preliminary approval that will trigger that cooperation").

iii.  <u>The Settlements are Reasonable Considering the Costs, Risks, and Delay of Trial and Appeal.</u>

When evaluating the adequacy of the Settlements, the Court should analyze the comparison between the settlement amounts and the full estimated damages in light of the risks of litigation, which determine the likelihood of recovery. As the risks of litigation increase, the range of reasonableness correspondingly decreases. *In re Cendant Corp. Derivative Action Litig.*, 232 F. Supp. 2d 327, 336 (D.N.J. 2002). This analysis overlaps significantly with *Grinnell* factors 1, 4, 5, and 6, which include: the complexity, expense, and likely duration of the litigation (factor 1); the risks of establishing liability (factor 4); the risks of establishing damages (factor 5); and the risks of maintaining the class action through the trial (factor 6).  *Grinnell*, 495 F.2d at 463.

A settlement is a compromise, a yielding of the highest hopes in exchange for certainty and resolution. *Milstein v. Werner*, 57 F.R.D. 515, 524-25 (S.D.N.Y.1972). The Settlements' substantial and guaranteed recovery for the States and its Consumers and State Entities is fair, reasonable, and adequate given the litigation risks inherent in any litigation and more particularly in a complex antitrust case such as this matter.  In addition to analyzing purchases made of Settling Defendants' Drugs at Issue and the damage analysis contained in expert reports submitted in the States' Actions, the States have gathered information necessary to adequately assess their risks of litigation in this matter.

The States have done significant investigation and litigation work to support their belief in their claims, but litigation always includes risks.  Antitrust cases "'are complicated, lengthy, and bitterly fought,'… as well as costly." *In re GSE Bonds,* 414 F.Supp.3d at 697 (quoting *Wal-Mart Stores, Inc., v. Visa U.S.A., Inc*., 396 F.3d 96, 118 (2d Cir. 2005)); *See also In re Vitamin C Antitrust Litig*, No. 06-MD-1738 (BMC), 2012 WL 5289514, at *4 (E.D.N.Y. Oct. 23, 2012). This litigation, which, in addition to federal law claims, also includes state law claims for forty-

one different states,[17] is no exception, particularly given the number of parties, drugs, and alleged conspiracies and the fact that the litigation against Settling Defendants has been ongoing for nine years. *See In re GSE Bonds*, 414 F.Supp.3d at 693. The States' Actions will involve multiple trials, which will be lengthy and complex because of the nationwide scope of the alleged activities, and it has already required lengthy and expensive discovery. *See New York v. Reebok,* 903 F. Supp. at 536. "Courts favor settlement when litigation is likely to be complex, expensive, or drawn out." *In re GSE Bonds*, 414 F.Supp.3d at 693.

Litigating the claims and defenses in this case would necessarily entail some risk with respect to establishing liability and proving damages or other relief sought. "[A]s to liability, establishing the existence and extent of a conspiracy will necessarily be a complex task, and many of the hurdles that plaintiffs have overcome at the pleading stage will raise substantially more difficult issues at the proof stage." *In re LIBOR-Based Fin. Instruments Antitrust Litig*., 327 F.R.D. 483, 494 (S.D.N.Y. 2018) ("*LIBOR*"). Proving violations of antitrust laws is no mean feat, and even if that feat is accomplished, proving remedies and damages is just as difficult. *See LIBOR*, 327 F.R.D. at 494 (plaintiffs' damages models would "unquestionably be challenged and perhaps subject to further *Daubert* motions"); *In re GSE Bonds*, 414 F. Supp. 3d at 697 (even if they prove liability, plaintiffs will still face the difficulties inherent in proving damages). At trial, proof of damages, disgorgement, restitution, and civil penalties would likely be a complex task involving a "battle of the experts." *In re Nasdaq Mkt.-Makers Antitrust Litig*., 187 F.R.D. 465,

---

[17] The States bring claims under the laws of Connecticut, Alaska, Arizona, California, Colorado, District of Columbia, Delaware, Florida, Idaho, Illinois, Indiana, Iowa, Kansas, Kentucky, Maine, Maryland, Massachusetts, Michigan, Minnesota, Mississippi, Montana, Nebraska, Nevada, New Hampshire, New Jersey, New Mexico, New York, North Carolina, North Dakota, Ohio, Oklahoma, Oregon, Pennsylvania, South Carolina, Tennessee, Utah, Vermont, Virginia, Washington, West Virginia, and Wisconsin.

476 (S.D.N.Y. 1998); *See Chatelain* v. *Prudential–Bache Secs., Inc.,* 805 F. Supp. 209, 213 (S.D.N.Y. 1992) (complex issue of establishing damages would require battle of the experts).

This litigation has been ongoing for more than nine years, and considering the risks, costs, and delay involved in an antitrust case of this magnitude, the opportunity for guaranteed relief weighs heavily in favor of approving the Settlements. *See In re GSE Bonds*, 414 F. Supp. 3d at 694 (court should balance immediacy and certainty of recovery against the continued risk of litigation). Recognizing the cooperation that Settling Defendants has agreed to provide, the risks of litigation, and the time value of money, the States believe that the $13.77 million Lannett Settlement and $4.08 million Bausch Settlement are both fair, reasonable and adequate.

    iv.  <u>The Monetary Payment to the States is Fair and Reasonable and the Settlements Do Not Contain Any Additional Agreement that Affects the Fairness of the Settlements.</u>

The Court must also consider the terms of any proposed award of attorney fees, including timing of payment, and any agreement required to be identified under Rule 23(e)(3). Fed. R. Civ. P. 23(e)(2)(C). The Settlements provides that 30% of the Settlement Payments (not including the payment to Corporate Entities), which equals $4,050,000 of the Lannett Settlement and $1,200,000 of the Bausch Settlement, be placed in a Cost Account for use in paying for the expenses of the Notice Plan and administration, and upon final approval of the settlement, for costs of litigating the States' claims both collectively or individually, including to reimburse the States for attorney fees. *Lannett Settlement ¶ I.B; Bausch Settlement ¶ I.V.3.* Further, to the extent that the funds in the Cost Accounts are not needed to offset costs of States litigating in the State Actions, any remaining funds may be used by the States as set forth *supra* in III.B. The Cost Accounts represents statutorily authorized recovery and enforcement remedies, including the costs and expenses of settlement administration, the costs, expenses, and attorney fees incurred by the States in investigating and litigating the States' Actions, and other monetary recovery or

remedies the States may be entitled to pursuant to state law.[18] This payment to the States is fair and reasonable under the circumstances. The States have not entered into any related agreements that affect the fairness of the Settlements. The Settlements so include supplemental agreements as set forth in III.G. *supra.*

v.   An Allocation and Distribution Plan is not Currently before the Court.

The States do not yet propose and submit to the Court a plan for allocation and distribution among Consumers of the Settlement Funds allocated to consumer restitution. The States are requesting that the proposed allocation and distribution plan be deferred until a later date when an allocation and distribution plan has been finalized by the States and presented to the Court for approval.  A plan of allocation and distribution is not required for the Court to grant preliminary approval of the Settlements. *E.g., In re Foreign Exchange Benchmark Rates Antitrust Litig*., 2015 WL 9952596, at *3 (S.D.N.Y. Dec. 15, 2015) (order granting preliminary approval and stating that counsel shall submit for the Court's approval a proposed Plan of Distribution of the Settlement Funds at a later date).

In summary, the factors set forth in Rule 23(e)(2), together with the *Grinnell* factors, demonstrate that the Settlements are fair, reasonable, and adequate, under the circumstances of this case, and that preliminary approval of the Settlements are warranted.

## VI. HUNTINGTON BANK AS ESCROW AGENT

Pursuant to the Settlements, Settling Defendants will pay $17.85 million (the "Settlement Payments") to the States. *Lannett Settlement ¶ III; Bausch Settlement ¶ I.V.* Settling Defendants' payments will be deposited directly into escrow with Huntington Bank and will accrue interest. States Decl. ¶ 16. The States shall hold the Settlement Payments in escrow pending final court

---

[18] See footnote 10, s*upra.*

approval of a distribution. *See Bausch Settlement ¶ II; Lannett Settlement ¶ I.R.* Subject to Court

approval, a state escrow (a "State Escrow") will be established at Huntington Bank with such

bank serving as escrow agent ("Escrow Agent"). *Bausch Settlement ¶ VIII.A; Lannett Settlement*

*¶ VI.A.* Huntington Bank is well qualified to serve as the Escrow Agent, already serving in this

role in previous settlements in the States' Actions and having regularly served in that role in many

other *parens patriae* or class action settlements. States Decl. ¶ 17. Therefore, the States request

that the Court appoint Huntington Bank to serve as Escrow Agent for the purpose of administering

the State Escrow holding the Settlement Funds.

## VII.    THE CONSUMER NOTICE PLAN

The States seek the Court's approval of the proposed Notice Plan set forth in the declaration

of Tiffany Janowicz filed herewith. There are no rigid rules for determining whether a settlement

notice satisfies constitutional requirements. *Charron v. Pinnacle Grp. N.Y. LLC*, 874 F.Supp.2d

179, 191 (S.D.N.Y. 2012), *aff'd sub nom. Charron*, 731 F.3d 241 (2d Cir. 2013). "The standard

for the adequacy of a settlement notice in a class action under either the Due Process Clause or the

Federal Rules is measured by reasonableness." *Fikes Wholesale, Inc. v. HSBC Bank USA, N.A.*, 62

F.4th 704, 727 (2d Cir. 2023) (citing, *Wal-Mart Stores*, 396 F.3d at 113–14). "[N]otice must fairly

apprise the prospective members of the class of the terms of the proposed settlement and of the

options that are open to them in connection with the proceedings." *Wal-Mart Stores*, 396 F.3d at

114 (citation and internal quotation marks omitted).

To ensure compliance with notice requirements under the Settlements, as well as state and

federal laws, the States have retained Rust Consulting, Inc ("Rust"), a nationally recognized

notice and administration company specializing in the design and implementation of notice and

administration programs of all sizes and types in class action settlements and similar matters. *See*

Declaration of Tiffaney Janowicz ("Janowicz Decl.") at ¶¶ 2-3 and Exhibit A.  Rust has extensive experience in state and federal class and *parens patriae* actions.  *Id.*

Relying on the noticing efforts undertaken by the States for the previous settlements in the States' Actions with Heritage and Apotex, which provided notice about the previous settlements, the litigation, and all the defendants and Drugs at Issue, the States propose to take the following actions to effectuate notice to Consumers:

First, on October 30, 2024, Rust established a website at www.AGGenericDrugs.com, which remains active and current. The website informs Consumers about the litigation and Settlement, including basic information about Consumers' rights and options concerning the Settlement, shares helpful documents, and lists "FAQs" to several expected questions Consumers are likely to have. Janowicz Decl. at ¶ 10, 15; Exhibit E. The website also includes a toll-free telephone number and email address where Consumers can seek additional information. Janowicz Decl. at ¶ 10, 16. Upon the granting of preliminary approval, the Home Page on the website will be modified to include overviews of the Bausch and Lannett Settlements along with the Consumers' options and relevant deadlines (when available). Janowicz Decl. at ¶ 11.  Separate links for documents relating to the Bausch and Lannett Settlements will be added to the website's Documents page. *Id.* All documents will be organized by settlement with the settlement name in the link to minimize Consumer confusion. *Id.* The website will also be revised to make clear that a Consumer need only register *once* to receive future information about the States' litigation(s) and receive a claim form when available. *Id.*

The States have drafted a clear, one page notice ("Short Form Notice"), that informs consumers of the Settlements and the litigation, helps consumers determine whether they may be eligible to participate under the Settlements, provides a means by which consumers can register to obtain additional information about the litigation and claims process, and explains the manner and

effect of opting out or objecting to the Settlements. Janowicz Decl. at ¶ 10; Exhibit C. The States will also provide a much longer and more detailed notice ("Long Form Notice"), *see* Exhibit D, available on the website and mailed to consumers upon request. Janowicz Decl. at ¶ 10. The Long Form notice will include additional information about the Settlements. *Id.* The website also has a form allowing Consumers to register to obtain future information about how to file a claim seeking payment (if eligible), and a form for Consumers seeking to be excluded from the Settlement. Janowicz Decl. at ¶ 10, 15.

Second, from the time the first settlement in the States' Actions was announced, Rust has been collecting registrations through the settlement website, by telephone, and by mail. Janowicz Decl. at ¶ 12, 15-17. When possible, Rust will send direct notice to registered consumers by emailing the Short Form Notice to consumers who registered to receive updates concerning the case status. Janowicz Decl. at ¶ 12. For those consumers who did not provide an email address with their registration, Rust will mail the Long Form Notice. *Id.* A note will accompany both types of notices to let consumers know that the notice is being sent as a result of their registration, and they do not need to register again to receive future updates. *Id.*

Third, an earned media program will be implemented that includes press releases issued by the States that provides opportunities for eligible consumers to receive information on the Settlements through traditional media, such as television, radio and newspapers, as well as digital. Janowicz Decl. at ¶ 13. Additionally, the language of the Short Form Notice will be distributed through PR Newswire's US1 Newsline as a nationwide press release across the U.S. reaching approximately 14,500 websites, media outlets, and journalists *Id.* The distribution includes a SocialBoost widget enabling seamless sharing to major platforms (X/Twitter, Facebook,

Instagram, LinkedIn, and WhatsApp). Each button shares an optimized preview including the content link, an image, headline, and suggested social post copy. *Id.*

The objective of the proposed Notice Plan is to provide reasonable notice to eligible consumers who purchased one of the generic drugs specified in the States' Actions; provide them with opportunities to learn about the Settlements and act upon their rights; and ensure that they will be exposed to, see, review, and understand the notices. Janowicz Decl. at ¶ 7. The Notice Plan builds on notice efforts undertaken by the States for previous settlements in this litigation. Janowicz Decl. at ¶ 8. The Notice Plan will "fairly, accurately, and neutrally describe the claims and parties in the litigation, the terms of the proposed settlement, and the identity of persons entitled to participate in it," as well as apprising affected Consumers of their options regarding the proposed Settlements. *In re Marsh ERISA Litig.*, 265 F.R.D. 128, 145 (S.D.N.Y. 2010) (citing *Foe v. Cuomo*, 700 F. Supp. 107, 113 (E.D.N.Y. 1988), *aff'd,* 892 F.2d 196 (2d Cir. 1989)); *Wal-Mart Stores*, 396 F.3d at 114. The States believe the Notice Plan provides reasonable notice to Consumers under the circumstances. The States propose that notice efforts shall begin within 7 days of preliminary approval and provide a deadline of 77 days from the date of the order of preliminary approval for consumers to opt out of, or comment on, or object to the Settlements. The States request that this Court approve the Notice Plan, and order that Notice commence within 7 days after the entry of the Preliminary Approval order.

## VIII.   NOTICE TO CORPORATE ENTITIES

Under the terms of the Settlements, the attorneys general of Idaho and Washington are settling and releasing claims on behalf of Corporate Entities on whose behalf the attorney general has exclusive claims. Under Idaho and Washington state law, only the attorney general may bring antitrust claims for monetary relief on behalf of persons (which includes Corporate Entities) who

are injured indirectly. *See* Idaho Code §§ 48-108(2), 48-113(1); Wash. Rev. Code 19.86.080. The Settlements provide that the States shall provide notice to Corporate Entities in Idaho of the Settlements and their right to exclude themselves from the States' Actions and the Settlements. *See* Idaho Code § 48-108(2)(b), (2)(c), (3). Although Washington also asserts an exclusive claim on behalf of Corporate Entities in the States' Actions, Washington law does not provide a right to exclusion from a settlement for Corporate Entities. *See* Wash. Rev. Code 19.86.080. While Washington law does not require notice, Washington will still give notice to Corporate Entities in Washington through a press release issued by the Washington Attorney General. States' Decl. at ¶ 26. The States propose to give notice to Corporate Entities in Idaho through a press release issued by the Idaho Attorney General. *Id.* Considering that Corporate Entities in Idaho that are injured indirectly do not have a private right of action for their indirect injuries, notice through a press release constitutes sufficient notice. Further, Rust will establish a subpage on the website www.AGGenericDrugs.com at https://www.aggenericdrugs.com/English/CorporateEntities where Corporate Entities in Idaho and Washington can obtain information about the Settlements and register to obtain additional and future information about the litigation and a future claim process. Janowicz Decl. at ¶ 18. Finally, the website will provide Corporate Entities in Idaho an opportunity to exclude themselves from the Settlements. *Id.*

IX.    **ALLOCATION AND DISTRIBUTION OF SETTLEMENT FUNDS**

The States seek preliminary approval of the allocation and distribution of parts of the Settlement Funds received in the States' Actions, including approval of (A) allocation of Settlement Funds between restitution and costs and the distribution to the States of funds allocated to costs (B) allocation of restitution funds between Consumers and State Entities and the distribution to the States of funds allocated to State Entities, (C) a deferral of a plan of allocation

and distribution of consumer restitution funds among Consumers, and (D) a deferral of the allocation and distribution of Corporate Entities Restitution.  The approval of a plan of distribution is within the discretion of the Court. *In re Chicken Antitrust Litig.,* 669 F.2d 228, 238 (5th Cir. 1982)*; West Virginia v. Chas. Pfizer & Co., Inc.,* 440 F.2d 1079, 1085 (2d Cir. 1971); *White v. National Football League,* 822 F. Supp. 1389, 1417 (D. Minn. 1993). The standard for judicial approval of a settlement agreement, that requires a finding that the settlement is fair, adequate and reasonable, "applies with as much force to the review of the allocation agreement as it does to the review of the overall settlement between plaintiffs and defendants." *In re Chicken,* 669 F.2d at 238; *see also In re Citric Acid Antitrust Litig.*, 145 F. Supp, 2d 1152, 1154 (N.D.Cal.2001) (Approving a plan for the allocation of a class settlement fund is governed by the same legal standards that apply to approving the settlement terms: the distribution plan must be "fair, reasonable and adequate").

### A. Allocation of Settlement Proceeds between the Restitution Account and Cost Account and Distribution of the Cost Account.

The Settlements provide that, after subtracting the amount allocated to Corporate Entities, 70% of the Settlement Funds shall be allocated and held in the State Escrow for later distribution to victims of the anticompetitive acts alleged by the States, namely Consumers and State Entities, including Medicaid state agencies, and other state agencies whose claims are being released by the States (Restitution Account).  *Lannett Settlement* ¶ I.R; *Bausch Settlement* ¶ I.V. Further, 30% of the Settlement Funds (after subtracting the amount allocated to Corporate Entities) shall be held in escrow and used to pay for settlement notice and administration costs and, upon final approval of the Settlement Agreement, for costs of litigating the States' claims, including attorney fees (Cost Account). *Lannett Settlement* ¶ I.B.; *Bausch Settlement* ¶ I.V.3. The States request that the Court grant preliminary approval of the proposed 70/30 percentage allocation of Settlement Funds

between the Restitution Account and Cost Account and request approval for the Cost Account to be distributed to the States upon final approval of the Settlements.

### B. Allocation of Restitution Account Between Consumers and State Entities

The Court's final approval of the Apotex Settlement in the States' Actions approved an allocation of the Settlement Funds in the Restitution Account (70% of the Settlement Funds) between Consumers in the amount of $17,624,403.04 and State Entities in the amount of $9,745,596.96. ECF No. 875 (3:16-cv-02056-MPS), ECF No. 760 (3:19-cv-00710-MPS), and ECF No. 835 (3:20-cv-00802-MPS). This approved allocation results in approximately 45% of the Settlement Funds being allocated to Consumers and approximately 25% of the Settlement Funds being allocated to State Entities. The States are seeking preliminary approval of the same allocation percentage between Consumers and State Entities in the Lannett and Bausch Settlements and, also, for the Restitution Account held in escrow from the Heritage Settlement.

#### 1. Heritage Settlement

This Court issued an Order granting final approval of the Heritage Settlement on April 1, 2025, ECF No. 767 (3:16-cv-02056-MPS), No. 635 (3:19-cv-00710-MPS), and No. 602 (3:20-cv-00802-MPS). In accordance with the Court's order for final approval of the settlement with Heritage, $6 million of the $10 million settlement is held in the State Escrow (Restitution Account) for later distribution to eligible consumers, state Medicaid agencies, and non-Medicaid state agencies (State Entities). *Id.* The States propose to split the Restitution Account so that $3,833,997.54 is allocated to Consumers ("Heritage Consumer Fund") and $2,166,002.46 is allocated to State Entities.

### 2.  Bausch Settlement

The settlement with Bausch provides that $2,880,000 of the $4,080,000 Settlement Funds shall be used for restitution. $80,000 is allocated to Corporate Entities for whom Idaho and Washington assert exclusive claims. The settlement allocates $2,800,000 as restitution to Consumers and State Entities (Restitution Account).  The States propose to split the Restitution Account so that $1,803,007.56 is allocated to Consumers ("Bausch Consumer Fund") and $996,992.44 is allocated to State Entities.

### 3.  Lannett Settlement

The Lannett Settlement provides that $9,720,000 of the $13,770,000 ($16,254,000 inclusive of interest) Settlement Funds shall be used for restitution. $270,000 is allocated to Corporate Entities for whom Idaho and Washington assert exclusive claims. The settlement allocates $9,540,000 ($11,375,419.47 inclusive of interest) as restitution to Consumers and State Entities (Restitution Account).  The States propose to split the Restitution Account so that $6,085,800 ($7,343,525.35 inclusive of interest) is allocated to Consumers ("Lannett Consumer Fund") and $3,364,200 ($4,031,894.12 inclusive of interest) is allocated to State Entities.

The States maintain that this allocation between Consumers and State Entities is fair, reasonable, and warrants preliminary approval.  Further, the States request preliminary approval to distribute to the States all Settlement Funds allocated to State Entities, upon final approval of the Settlements, to be further allocated and distributed by the States among themselves at the States' discretion and pursuant to a collective agreement among the States.

### C.  Allocation and Distribution of Consumer Restitution

Based on the foregoing, the States propose that a total of $29,347,208.14 of the Settlement Funds from the Apotex, Heritage, Bausch, and Lannett settlements ("Consumer Restitution

35

Funds") be allocated to consumer restitution and further allocated among Consumers and distributed pursuant to a future allocation and distribution plan for consumer restitution. The States request that a proposed allocation and distribution plan be deferred until a later date. The States are currently working with Rust to develop an allocation and distribution plan, including a claim form. The States expect to seek approval of this plan in the near future.

### D. Allocation and Distribution to Corporate Entities

The Settlements designate $350,000 as restitution for Corporate Entities ("Corporate Entities Restitution") for which the Attorneys General of Idaho and Washington have asserted exclusive claims in the States' Actions. *Bausch Settlement* ¶ I.V; *Lannett Settlement* ¶ III. The States are requesting that further allocation and distribution of Corporate Entities Restitution be deferred until a later appropriate date when it can be part of a plan relating to additional settlements as well.

## X.    CONCLUSION

For the foregoing reasons, the States respectfully request that the Court (1) preliminarily approve the Settlements with Defendants Bausch and Lannett; (2) appoint Huntington Bank as the Escrow Agent; (3) stay the litigation against Defendants Bausch and Lannett until the Court decides whether to grant final approval of the Settlements; (4) appoint Rust Consulting as the Notice and Claims Administrator; (5) approve the Notice Plan for providing notice to Consumers; (6) approve the plan for notice to Corporate Entities in Idaho; (7) preliminary approve the allocation of funds between the Restitution Accounts and Cost Accounts; (8) preliminarily approve a distribution to the States of all funds allocated to the Cost Accounts; (9) preliminarily approve the allocation of the Restitution Accounts between Consumers and State Entities in the Heritage, Lannett and Bausch settlements; (10) preliminarily approve a distribution to the States of all funds

allocated to State Entities; (11) preliminarily approve that all funds allocated to Consumer restitution be held in escrow and that an allocation and distribution plan be deferred until a future appropriate time, upon motion by the States; (12) preliminarily approve the Settlements' allocation of Settlement Funds to Corporate Entities in Idaho and Washington; (13) preliminarily approve that all funds allocated to Corporate Entities restitution be held in the State Escrow and that the distribution be deferred until a future appropriate time; (14) setting an opt out and objection deadline for the Settlements; and (15) setting a date and time for a final approval hearing.

Respectfully submitted this 2nd day of February, 2026.


STATE OF NEW YORK
LETITIA JAMES
ATTORNEY GENERAL

*/s/ Saami Zain*
Saami Zain
Bar No. phv208392
Robert Hubbard
Fed Bar No. ct30195
Assistant Attorneys General
Antitrust Bureau
28 Liberty Street, 20th Floor
New York, NY 10005
Tel: (212) 416-8267
Saami.Zain@ag.ny.gov
Robert.Hubbard@ag.ny.gov

*Attorneys for the State of New York*

STATE OF NORTH DAKOTA
DREW H. WRIGLEY
ATTORNEY GENERAL

*/s/ Elin S. Alm*
Elin S. Alm
Bar No. phv207896
Assistant Attorney General
Director, Consumer Protection & Antitrust Division
Office of Attorney General
1720 Burlington Drive, Suite C
Bismarck, ND 58504-7736
Telephone (701) 328-5570
Facsimile (701) 328-5568
ealm@nd.gov

*Attorney for the State of North Dakota*

STATE OF CONNECTICUT
WILLIAM TONG
ATTORNEY GENERAL

*/s/ Allison C. Frisbee*[19]

Allison C. Frisbee
Federal Bar No. ct30779
Kyle J. Ainsworth
Federal Bar No. ct31785
Cara L. Moody
Federal Bar No. ct31924
Assistant Attorneys General
Office of the Attorney General
165 Capitol Ave.
Hartford, CT 06106
Tel: (860) 808-5030
Fax: (860) 808-5391
Allison.Frisbee@ct.gov
Kyle.Ainsworth@ct.gov
Cara.Moody@ct.gov

---

[19] Counsel for Plaintiff State of Connecticut represents the consent of all Plaintiffs in the above-captioned case pursuant to Section XI.D. of the Electronic Filing Policies and Procedures.

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on February 2, 2026, the foregoing document, together with the accompanying Memorandum, Declarations, and Exhibits, was served by e-mail on all counsel of record in this action by operation of the Court's Electronic Filing System as indicated on the Notice of Electronic Filing. Parties may access this filing through the Court's CM/ECF System.


Dated: February 2, 2026

*/s/ Saami Zain*
Saami Zain
Assistant Attorney General
