# EXHIBIT 2

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

THE STATE OF CONNECTICUT;
THE STATE OF ALASKA;
THE STATE OF ARIZONA;
THE STATE OF CALIFORNIA;
THE STATE OF COLORADO;
THE STATE OF DELAWARE;
THE DISTRICT OF COLUMBIA;
THE STATE OF FLORIDA;
THE STATE OF GEORGIA;
THE STATE OF IDAHO;
THE STATE OF ILLINOIS;
THE STATE OF INDIANA;
THE STATE OF IOWA;
THE STATE OF KANSAS;
THE COMMONWEALTH OF KENTUCKY;
THE STATE OF LOUISIANA;
THE STATE OF MAINE;
THE STATE OF MARYLAND
THE COMMONWEALTH OF MASSACHUSETTS;
THE STATE OF MICHIGAN;
THE STATE OF MINNESOTA;
THE STATE OF MISSISSIPPI;
THE STATE OF MISSOURI;
THE STATE OF MONTANA;
THE STATE OF NEBRASKA;
THE STATE OF NEVADA;
THE STATE OF NEW HAMPSHIRE;
THE STATE OF NEW JERSEY;
THE STATE OF NEW MEXICO;
THE STATE OF NEW YORK;
THE STATE OF NORTH CAROLINA;
THE STATE OF NORTH DAKOTA;
THE COMMONWEALTH OF THE NORTHERN MARIANA ISLANDS;
THE STATE OF OHIO;
THE STATE OF OKLAHOMA;
THE STATE OF OREGON;
THE COMMONWEALTH OF PENNSYLVANIA;
THE COMMONWEALTH OF PUERTO RICO;
THE STATE OF RHODE ISLAND;
THE STATE OF SOUTH CAROLINA;
THE STATE OF TENNESSEE;
THE STATE OF UTAH;
THE STATE OF VERMONT;
THE COMMONWEALTH OF VIRGINIA;
THE STATE OF WASHINGTON;
THE STATE OF WEST VIRGINIA;

**MDL 2724**
**16-MD-2724**
**HON. CYNTHIA M. RUFE**

**Civil Action No. 2:20-CV-03539**

**HIGHLY CONFIDENTIAL**

**Second Amended Expert Report of Frederick R. Warren-Boulton, Ph.D.**

**February 20, 2024**

THE STATE OF WISCONSIN; and
U.S. VIRGIN ISLANDS

Plaintiffs,

v.

SANDOZ, INC.;
ACTAVIS HOLDCO US, INC.;
ACTAVIS ELIZABETH LLC;
ACTAVIS PHARMA, INC.;
AMNEAL PHARMACEUTICALS, INC.;
AMNEAL PHARMACEUTICALS, LLC;
ARA APRAHAMIAN;
AUROBINDO PHARMA U.S.A., INC.;
BAUSCH HEALTH AMERICAS, INC.;
BAUSCH HEALTH US, LLC;
MITCHELL BLASHINSKY;
DOUGLAS BOOTHE;
FOUGERA PHARMACEUTICALS INC.;
GLENMARK PHARMACEUTICALS INC., USA;
JAMES (JIM GRAUSO;
GREENSTONE LLC;
G&W LABORATORIES, INC.;
WALTER KACZMAREK;
ARMANDO KELLUM;
LANNETT COMPANY, INC.;
LUPIN PHARMACEUTICALS, INC.;
MALLINCKRODT INC.;
MALLINCKRODT LLC;
MALLINCKRODT plc;
MYLAN INC.;
MYLAN PHARMACEUTICALS INC.;
KURT ORLOFSKI;
MICHAEL PERFETTO;
PERRIGO NEW YORK, INC.;
PFIZER INC.;
SUN PHARMACEUTICAL INDUSTRIES, INC.;
TARO PHARMACEUTICALS USA, INC.;
TELIGENT, INC.;
ERIKA VOGEL-BAYLOR;
JOHN WESOLOWSKI; and
WOCKHARDT USA LLC

Defendants.

**Table of Contents**

I. Qualifications, Scope and Assignment ..... 1
A. Qualifications ..... 1
B. Scope ..... 1
C. Assignment ..... 3
II. Summary and Conclusions ..... 3
III. The Pharmaceutical Industry and the Economics of Generic Pharmaceuticals ..... 5
A. Background ..... 5
i. FDA Approval ..... 5
ii. The Generic Pharmaceutical Supply Chain ..... 6
B. Market Definition ..... 9
i. Applying the DOJ/FTC Merger Guidelines and Cellophane to Market Definition under Collusion ..... 9
ii. Product and Geographic Market Conditions for Generic Drugs ..... 11
iii. Recognition of Generic Drug Product Markets ..... 13
IV. Collusive Behavior in the Markets for Generic Drugs: Types of Conduct ..... 14
A. Price Fixing ..... 15
B. Bid Rigging ..... 18
C. Market Division ..... 20
D. Market Share (Fair Share) Agreements and the Overarching Agreement ..... 21
i. Fundamentals of an MSA ..... 21
ii. MSAs and Price Fixing ..... 22
iii. MSAs and Lingering Effects ..... 26
iv. Accommodating Entry with an MSA ..... 27
V. Prices for the Drugs at Issue ..... 29
A. Generic Drug Pricing and Price Measures ..... 29
B. Average Price for All Drugs at Issue ..... 33

C. Pricing by Defendant ........ 38

D. Pricing by Type of Collusive Conduct ........ 40

VI. The Effect of Collusion on the Prices for Drugs at Issue - Quantification of Anti-Competitive Price Increases ........ 43

A. Background ........ 43

B. Benchmark Pre-Conduct Period for the Drugs at Issue ........ 45

C. Multivariate Regression ........ 45

D. Before and After Model ........ 46

i. Base Model ........ 46

ii. Additional Explanatory Variables ........ 49

iii. Before and After Model Regression Results ........ 57

E. Difference in Difference Model ........ 59

i. Base Model ........ 59

ii. Correcting for Possible Endogeneity ........ 61

F. Intra-API Effects ........ 64

G. Lingering Effects ........ 67

H. New Generic Drugs ........ 70

i. New Generics with Price Increases ........ 71

ii. New Generics with Price Falls ........ 73

I. Scope of the Conspiracy – Beyond Defendants Charged ........ 75

VII. Distinguishing Collusion from Oligopolistic Coordination ........ 77

A. Oligopoly Models ........ 79

B. Indicators of Collusion ........ 81

i. Price Tests for Individual Drugs at Issue ........ 81

ii. Market Tests for Market Share Agreements ........ 85

iii. Market Tests for Price Fixing by Drug ........ 92

VIII. Disgorgement ........ 92

A. Background ... 92

B. Increase in Revenues ... 93

i. Estimation of the Percentage Increase in Net Revenues ... 93

ii. Total Net Sales ... 101

C. Decreases in Costs ... 103

i. Medicaid Rebates ... 103

ii. Difference between As-Is and But-For Quantities Sold ... 105

iii. Other Adjustments ... 108

D. Net Disgorgement ... 108

E. Reasonableness of the Disgorgement Calculation ... 109

F. Disgorgement to Date ... 109

G. Interest ... 112

H. Total Disgorgement ... 114

I. State-Specific Disgorgement Estimates ... 114

# I. Qualifications, Scope and Assignment

## A. Qualifications

1. My name is Frederick R. Warren-Boulton. I am an economist and a Principal at MiCRA, (Microeconomics Consulting and Research Associates), as well as a Managing Director at BRG (the Berkeley Research Group), both economics consulting and research firms located in Washington, D.C. I received a B.A. degree from Yale University, an M.P.A. from the Woodrow Wilson School of Princeton University, and a Ph.D. in Economics from Princeton University. From 1972 to 1983, I was an Assistant and then Associate Professor of Economics at Washington University in St. Louis. From 1983 to 1989, I served as the chief economist of the Antitrust Division of the U.S. Department of Justice, first as Director of its Economic Policy Office and then as the first Deputy Assistant Attorney General for Economic Analysis.

2. Since leaving the government, I have served as a Resident Scholar at the American Enterprise Institute; a Visiting Lecturer of Public and International Affairs at the Woodrow Wilson School at Princeton University; a Research Associate Professor of Psychology at American University in Washington, D.C.; a founder and a continuing Principal of Microeconomics Consulting and Research Associates (MiCRA), and a Managing Director of the Berkeley Research Group (BRG).

3. I have published numerous articles on the subjects of industrial organization and antitrust. I have particular expertise in the economics of vertical restraints. I have served as an expert witness and consultant for private parties and for various government agencies on a number of cases, including for the Department of Justice in U.S. v. AT&T, U.S. v. Microsoft, and U.S. v. H&R Block, and for the Federal Trade Commission in FTC v. Staples and Office Depot and FTC v. Ardagh Group et al.

4. A copy of my CV is attached as Appendix A.

## B. Scope

5. The Plaintiff States by and through their respective Attorney General's Offices (SAGs) filed their first Complaint in this proceeding (the "Heritage Complaint") in December 2016, followed by a second Complaint in May 2019 (the "Teva Complaint"), and finally a third Complaint in June 2020 (the "Derm Complaint", focused primarily on a set of generic dermatological drugs). I understand that the Derm Complaint[1] (henceforth, "Complaint") has been chosen by the Court as the bellwether Complaint for the SAGs for this proceeding.

[1] Amended 9/9/2021.

6. The Complaint alleges that Defendants engaged in anticompetitive behavior, most notably "schemes to fix and maintain prices, allocate customers, and otherwise thwart competition,"[2] henceforth referred to as Defendants' "Conduct." This Conduct includes (based on the Complaint), "engag[ing] in contracts, combinations, and conspiracies that had the effect of unreasonably restraining trade, artificially inflating and maintaining prices, and reducing competition in the generic pharmaceutical industry throughout the United States, including but not limited to the markets for at least 80 different generic drugs."[3] and "participat[ing] in an overarching conspiracy, the effect of which was to minimize if not thwart competition across the generic drug industry."[4]

7. With respect to the Overarching Conspiracy claim, the SAGs allege that such an agreement was "effectuated by a series of conspiracies that affected and continue to affect the market for the generic drugs identified in this Complaint."[5] Given that the SAG's claims reference certain alleged drug-specific conspiracies, as well as an Overarching Conspiracy covering the same drugs affected by the drug-specific allegations, I refer to these drugs collectively as the "Drugs at Issue." Based on my review of the allegations with respect to the Drugs at Issue, I have been able to identify 98 separate drug products pertaining to the Drugs at Issue.[6]

8. The Complaint includes specific information about what evidence the SAGs were able to uncover relating to communications on each Drug at Issue. Additional evidence of Defendants' Conduct has been produced in discovery (*e.g.*, in additional documents and through cooperating witness testimony). For clarity, in this Report, I refer to the period prior to the first instance of communication (or indication that communications were occurring) in the Complaint with respect to a given Drug at Issue as the "Pre-Conduct Period" for that Drug.[7] The "Post-Conduct Period" for each Drug is divided into two parts, the "Conduct Period", which extends from the date of first communication on that Drug until (roughly) the filing of the SAG's initial Heritage Complaint in December 2016, and the "Lingering Effects Period" which extends from that date until any collusive effects on that Drug

---

[2] Complaint, ¶ 22.

[3] Complaint, ¶ 19.

[4] Complaint, ¶ 20.

[5] Complaint, ¶ 20.

[6] See Appendix C Table 1 for a list of the 98 Drugs at Issue.

[7] To the extent that there is evidence that communications preceded this date, this approach (using the dates from the Complaint) is likely to be conservative.

has dissipated (including possibly to the present).[8] I refer to the period from the first communication on any Drug in 2009 to the filing of the Heritage Complaint in 2016 as the "Conspiracy Period".

### C. Assignment

9. I have been asked by the Plaintiff States Attorneys General (SAGs) to render an opinion regarding Defendants' conduct surrounding the pricing, marketing, and sale of the of generic drugs as specified in the Complaint (the "Drugs at Issue"). Specifically, based on established economic principles and the qualitative and quantitative evidence collected in this matter, I have been asked to render an opinion as to:

- whether the observed pricing and behavior in the markets for each Drug at Issue is inconsistent with oligopolistic behavior and cannot be explained in that way;
- the effect of collusion on the prices for Drugs at Issue; and
- Defendants' excess profits, defined as the increase in revenues due to the bad acts, plus any increase/decrease in costs associated with the implementation and execution of those bad acts.

10. A full list of materials considered is attached hereto as Appendix B. Should additional information or reports be produced subsequent to my Report, I reserve the right to consider such information in finalizing my opinions and may modify or expand my analyses if appropriate. MiCRA is being compensated for my time on this report and any further work on this matter at $700/hr. Any such payments do not depend on the outcome of this case.

11. I submitted an Initial Report in this matter on November 1, 2023. I have now been asked to submit an Amended Report that reflects updates made to my processing of Defendants' transactional data based on comments received from Defendants since my Initial Report was filed.

## II. Summary and Conclusions

12. Based on my review of the evidence in this matter:

[8] The SAG's Complaint alleges ongoing effects at the time of filing. "Consequently, they have suffered substantial injury in their business and property in that, inter alia, they have paid more and continue to pay more for the various generic drugs identified herein than they would have paid in an otherwise competitive market." (Complaint, ¶ 1609). In addition, each Complaint count against the Defendants alleges ongoing conspiracy (the actions "still affect interstate commerce", see, *e.g.*, Complaint, ¶ 1616).

- The relevant markets in this case are the 98 individual combinations of API, Form, and Strength (the Drugs at Issue) and an overall relevant market for all Drugs at Issue.
- The record contains extensive direct evidence of communication and other collusive conduct by all Defendants across the Drugs at Issue, followed by price increases and entry accommodation.
- A number of structural characteristics or indicia that are regarded as facilitating collusion, as opposed to oligopolistic coordination, are present in the markets for the Drugs at Issue.
- The direct evidence in the record of collusive conduct is confirmed empirically by its effect on prices, *i.e.*, a finding of prices that are significantly higher (the 'Overcharge') during the post-communication period than in the "but-for world" absent collusion, both after controlling for other factors in a Before-and-After regression and when other generic drugs are used as a control in a Difference-in-Difference regression - effects which cannot be explained by greater oligopolistic coordination.
- Additional conduct characteristics, such as a fall in the pass-through rate on costs and greater stability of market shares are also consistent with collusion as opposed to greater coordination.
- The direct evidence in the record of an overarching "fair share" or "market share" agreement is supported by evidence of changes in the distribution and stability of market shares during the collusive period.
- Prices by Defendants for Drugs at Issue on which they have not been implicated in the SAGs' Complaint were also significantly higher than their but-for levels during Post-Conduct periods.
- The price effects from collusion lingered well after the investigation became public knowledge, potentially even up to the present for some Drugs at Issue.
- Based on regressions specific to each Defendant and Drug at Issue, the estimated net disgorgement amounts through 2018 on the Drugs at Issue by Defendant range from $1.9 million to $2.0 billion, totaling approximately $5.9 to $6.0 billion for all Drugs at Issue.
- Based on the decline in the overcharges as estimated using publicly available data, the estimated net disgorgement amounts from 2019 to 2021 due to ongoing lingering effects total $441 million.
- Using an appropriate discount rate, the net estimated disgorgement amounts for all Drugs at Issue at time of trial would total $10.1 to $10.5 billion.

# III. The Pharmaceutical Industry and the Economics of Generic Pharmaceuticals

## A. Background

### *i. FDA Approval*

13. Generic pharmaceutical (and indeed all pharmaceutical) sales in the United States are regulated by the U.S. Food and Drug Administration (FDA). In this role, the FDA requires that each drug manufacturer meet certain consumer health and safety standards before a drug can be sold in the U.S. For innovator (branded) drugs, this process involves the submission of a new drug application (NDA) that demonstrates that the drug meets those standards.[9] Sales of branded drugs are typically covered by patents obtained by the manufacturer, as provided by the Federal Food, Drug, and Cosmetic Act, which grants the branded drug manufacturer the exclusive right to sell that drug without direct competition for a certain period of time, in order to allow the manufacturer to recoup its (potentially significant) research and development costs.[10] Once this patent expires, the branded manufacturer may be subject to competition from "generic" manufacturers of the drug. The FDA defines generic drugs as "comparable to an innovator drug product in dosage form, strength, route of administration, quality, performance characteristics, and intended use."[11]

14. Generic drugs are not subject to the same FDA standard for NDAs as branded drugs. Generic drugs obtain approval through an alternate, abbreviated new drug application (ANDA), which requires that the manufacturer "scientifically demonstrate that their product performs in the same manner as the innovator drug."[12] This process is generally less costly than a full NDA, and typically relies on

---

[9] The FDA specifically decides:

- "Whether the drug is safe and effective in its proposed use(s), and whether the benefits of the drug outweigh the risks.
- Whether the drug's proposed labeling (package insert) is appropriate, and what it should contain.
- Whether the methods used in manufacturing the drug and the controls used to maintain the drug's quality are adequate to preserve the drug's identity, strength, quality, and purity."

U.S. FDA. "New Drug Application (NDA)." https://www.fda.gov/drugs/types-applications/new-drug-application-nda, visited 7/18/2023.

[10] See, e.g., U.S. Food & Drug Administration, "Small Business Assistance: Frequently Asked Questions for New Drug Product Exclusivity," February 11, 2016, https://www.fda.gov/drugs/cder-small-business-industry-assistance-sbia/small-business-assistance-frequently-asked-questions-new-drug-product-exclusivity.

[11] U.S. FDA. "Abbreviated New Drug Application (ANDA)." https://www.fda.gov/drugs/types-applications/abbreviated-new-drug-application-anda, visited 8/2/2023.

[12] U.S. FDA. "Abbreviated New Drug Application (ANDA)." https://www.fda.gov/drugs/types-applications/abbreviated-new-drug-application-anda, visited 8/2/2023.

establishing bioequivalence to the branded drug.[13] Once bioequivalence has been established and the ANDA is approved, the generic drug manufacturer may generally enter the market and compete with the branded drug.[14]

15. There are two exceptions to the generic drug entry process described above. First, the branded manufacturer can explicitly authorize a generic drug manufacturer to enter the market using its NDA ("authorized generics").[15] In this case, the generic drug is identical to the branded drug (*i.e.,* while generic drugs may have minor differences, such as inactive ingredients, from the brand-name drug, an authorized generic is the exact same drug product).[16] Second, a drug manufacturer with an authorized ANDA may choose to market the drug under a proprietary name as opposed to the name of the generic drug molecule ("branded generics").[17]

### *ii. The Generic Pharmaceutical Supply Chain*

16. Pharmaceutical products are distributed and dispensed to consumers through a complex supply chain. Drug manufacturers sell their products to wholesalers and large retail pharmacies (direct purchasers). Wholesalers then sell that product to other pharmacies (indirect purchasers). Pharmacies then dispense that product to consumers. Figure 1 below shows an example of this product flow.

---

[13] See, e.g., Scott Morton, Fiona M. 1997. "Entry Decisions in the Generic Pharmaceutical Industry." *NBER Working Paper Series,* Working Paper 6190: pp. 1-35, at p. 4; U.S. FDA. "Abbreviated New Drug Application (ANDA)." https://www.fda.gov/drugs/types-applications/abbreviated-new-drug-application-anda, visited 8/2/2023; Reiffen, David, and Ward, Michael R. 2007. "'Branded Generics' as a Strategy to Limit Cannibalization of Pharmaceutical Markets," Managerial and Decision Economics, 28(4/5): pp. 1-37, at p. 2.

[14] Id.

[15] U.S. FDA. "FDA List of Authorized Generic Drugs." https://www.fda.gov/drugs/abbreviated-new-drug-application-anda/fda-list-authorized-generic-drugs, visited 7/21/2023; Federal Trade Commission. 2011. "Authorized Generic Drugs: Short-Term Effects and Long-Term Impacts." P. 1, available at: https://www.ftc.gov/sites/default/files/documents/reports/authorized-generic-drugs-short-term-effects-and-long-term-impact-report-federal-trade-commission/authorized-generic-drugs-short-term-effects-and-long-term-impact-report-federal-trade-commission.pdf; Latwal, Bharti and Chandra, Amrish. 2020. "Authorized Generics vs. Branded Generics: A Perspective." *Journal of Generic Medicines* 17(1), pp. 5-9, at p. 1.

[16] Id.

[17] See *e.g.*, Branded Institute. "Branded Generics: Differentiating Your Generic Drug Product with a Strong Brand Name." https://www.brandinstitute.com/branded-generics-differentiating-your-generic-drug-product-with-a-strong-brand-name/, visited 10/9/2023; Latwal, Bharti and Chandra, Amrish. 2020. "Authorized Generics vs. Branded Generics: A Perspective." *Journal of Generic Medicines* 17(1), pp. 5-9, at p. 7.

**Figure 1 - Flow of Goods and Financial Transactions Among Players in the U.S. Commercial Pharmaceutical Supply Chain**[18]




17. Wholesalers enter into contracts and purchase products from drug manufacturers at prices often negotiated off of Wholesale Acquisition Cost (WAC).[19] These contracts may specify that the wholesaler is entitled to volume and prompt pay discounts, or rebates based on market share.[20] Large

---

[18] Kaiser Family Foundation. "Follow the Pill: Understanding the U.S. Commercial Pharmaceutical Supply Chain." March 2005, p. 3. Available at: https://www.kff.org/wp-content/uploads/2013/01/follow-the-pill-understanding-the-u-s-commercial-pharmaceutical-supply-chain-report.pdf.

[19] See, e.g., Gensberger Dep. 30:22-24, May 22, 2023 ("So the WAC is kind of a – a placeholder, so to speak, where the wholesaler would purchase the product at that WAC price."); Clark Dep. 39:4-8, June 29, 2023 ("WAC refers to the Wholesaler Acquisition Cost. It's considered a list price. This is the price that the wholesaler purchases directly from Actavis for the product.")

[20] Kaiser Family Foundation. "Follow the Pill: Understanding the U.S. Commercial Pharmaceutical Supply Chain." March 2005, p. 3. Available at: https://www.kff.org/wp-content/uploads/2013/01/follow-the-pill-understanding-the-u-s-commercial-pharmaceutical-supply-chain-report.pdf., pp. 14, 17, 18.

pharmacies who purchase directly from the manufacturer often negotiate these types of discounts from the manufacturers.[21]

18. Pharmacies who purchase pharmaceuticals indirectly through wholesalers either negotiate a price with the wholesaler (or pay list price) or contract directly with the drug manufacturer.[22] Smaller retail pharmacies may also participate in Group Purchasing Organizations (GPOs) that band together and combine their purchasing volume to negotiate discounts from the drug manufacturer.[23] If the pharmacy negotiates a (lower) price directly with the drug manufacturer, the wholesaler "charges back" any difference between the (lower) pharmacy-negotiated price, and the (higher) wholesaler price to the drug manufacturer.[24] Because wholesalers generally perform only a reseller/distribution function, and either purchase the drug and pass through increases in cost based on a percentage markup, or simply administer the pharmacy-manufacturer negotiated prices, the wholesalers may be indifferent to, or even benefit from, increases in prices.[25]

19. Customers that contract with generic drug manufacturers typically obtain their initial contract price through an auction-like process of soliciting bids for a long-term contract to purchase that generic drug. From that initial price, prices can change monthly or yearly, depending on the customer.[26] If a customer is unhappy with his or her price, the customer can re-bid the auction by issuing a request for quotation ("RFQ" or "RFP") to all potential suppliers or solicit a bid from one or more competing suppliers.[27] RFQ's often involve multiple products, while the more informal bid process may focus

---

[21] Ibid, pp. 2, 19.

[22] Kaiser Family Foundation. "Follow the Pill: Understanding the U.S. Commercial Pharmaceutical Supply Chain." March 2005, p. 9, 19. Available at: https://www.kff.org/wp-content/uploads/2013/01/follow-the-pill-understanding-the-u-s-commercial-pharmaceutical-supply-chain-report.pdf; United States Government Accountability Office, "The Number, Role, and Ownership of Pharmacy Services Administrative Organizations," January 2013, https://www.gao.gov/assets/gao-13-176.pdf, pp. 7-8, visited 9/30/2023.

[23] Kaiser Family Foundation. "Follow the Pill: Understanding the U.S. Commercial Pharmaceutical Supply Chain." March 2005, pp. 19-20. Available at: https://www.kff.org/wp-content/uploads/2013/01/follow-the-pill-understanding-the-u-s-commercial-pharmaceutical-supply-chain-report.pdf; United States Government Accountability Office, "The Number, Role, and Ownership of Pharmacy Services Administrative Organizations," January 2013, https://www.gao.gov/assets/gao-13-176.pdf, p. 24, visited 9/30/2023.

[24] Kaiser Family Foundation. "Follow the Pill: Understanding the U.S. Commercial Pharmaceutical Supply Chain." March 2005, p. 19. Available at: https://www.kff.org/wp-content/uploads/2013/01/follow-the-pill-understanding-the-u-s-commercial-pharmaceutical-supply-chain-report.pdf.

[25] As discussed in Appendix G, the fact that the direct purchaser benefits from higher prices and thus has no incentive to resist price increases or detect and punish collusion reduces the risk of engaging in collusion, especially from large and sudden price increases with pretextual explanations.

[26] Gensburger Dep. 125:3-126:10.

[27] See, *e.g.*, McMahon Dep. 480:18-482:6.

on a single or smaller set of drugs.[28] If this process results in a customer receiving a better offer from one of the incumbent's competitors, the customer often gives the incumbent a "right of first refusal" to match the competitor's price and retain the business.[29]

### B. Market Definition

20. In an antitrust case, an economist will typically begin by defining the relevant markets. I understand, however, that Defendants' Conduct in this matter is likely to be viewed as *per se* illegal under the United States antitrust laws and any applicable State claims,[30] and thus there is no need to define a market to evaluate that conduct for purposes of liability. I therefore provide only a brief discussion below of market definition for the generic Drugs at Issue.

#### *i. Applying the DOJ/FTC Merger Guidelines and Cellophane to Market Definition under Collusion*

21. A relevant market has two components: (1) the relevant product market, which identifies the product and services viewed as sufficiently substitutable by the consumers; and (2) the relevant geographic market, which identifies the geographic area within which competition in the relevant product market occurs.[31] Although market definition is often a critical issue in competition-related litigation (especially mergers), defining the relevant markets in this case is relatively straightforward, as described below.

22. The 2010 DOJ/FTC Merger Guidelines ("*Guidelines*") lay out a "hypothetical monopolist" test to determine a relevant product market in a merger case.[32] The hypothetical monopolist test involves specifying a set of products or services that is broad enough such that a hypothetical monopolist of the product(s) or service(s) would find it profitable to implement at least a small but significant and

---

[28] McMahon Dep. 482:7-483:7.

[29] See, e.g., Complaint, ¶ 781, TARO_000155874; ¶ Complaint, 1531, GWCT-HHR-000011077.

[30] See, e.g. "Under the per se rule, certain categories of agreements are presumed to violate antitrust laws, regardless of other factors such as business purpose or competitive benefits. The only relevant question under the per se rule is whether an agreement falls into one of these categories. Examples of categories held to be per se illegal are agreements to fix prices or output and agreements to divide territories or customers." Thomson Reuters Practical Law. "Glossary: Per Se Rule," available at: https://content.next.westlaw.com/practical-law/document/I03f4d78ceee311e28578f7ccc38dcbee/Per-Se-Rule?viewType=FullText&transitionType=Default&contextData=(sc.Default), visited 10/9/2023.

[31] Tucker, Darren S. 2017. "Antitrust Law and Developments: Eighth Edition". Chicago, Illinois: ABA Section of Antitrust Law, p. 579.

[32] U.S. Department of Justice and the Federal Trade Commission. 2010. "Horizontal Merger Guidelines." Available at: https://www.justice.gov/sites/default/files/atr/legacy /2010/08/19/hmg-2010.pdf.

non-transitory increase in the price (SSNIP) for at least one of the products or services.[33] A SSNIP is typically defined as a price increase of at least five percent.[34] In a merger case, the benchmark or reference price is the current price (or the price expected absent the merger), since the concern is that the merger could increase the price above its current level (which may be above the "perfectly competitive" price).[35] In a monopolization case, however, the reference price is the competitive price, since the question is whether that firm already has monopoly power.[36] The relevant product(s) for the determination of monopoly power are thus those where the putative monopolist (or cartel) is able to set a price that is at least a SSNIP above the competitive level.[37]

23. Given the structural conditions in the markets for the Drugs at Issue (See Appendix G), I would not expect the markets for the Drugs at Issue to be "perfectly competitive" as that term is used in economics (*i.e.*, price is equal to marginal cost) even prior to any Defendant Conduct. Hence, for purposes of this report, I define the "competitive", or reference, price for the Drugs at Issue as the "non-collusive" price (*i.e.,* the price that would have prevailed absent the Defendants' collusive behavior and any associated impact on prices).

24. As discussed in Section V below, Defendants successfully increased prices by far more than a SSNIP for the vast majority of the Drugs at Issue, and often by several orders of magnitude.[38] Defendants' ability to do so at the individual Drug level indicates that each individual Drug satisfies the test for a separate relevant market. Thus, the relevant product markets are the generic versions of each combination of molecule (or Active Pharmaceutical Ingredient ("API"), formulation, and strength).[39]

---

[33] "[T]he test requires that a hypothetical profit-maximizing firm [or a hypothetical profit-maximizing cartel], not subject to price regulation, that was the only present and future seller of those products ('hypothetical monopolist') likely would impose at least a small but significant and non-transitory increase in price ('SSNIP') on at least one product in the market, including at least one product sold by one of the merging firms. …." *2010 Horizontal Merger Guidelines, §* 4.1.1.

[34] *2010 Horizontal Merger Guidelines*, § 4.1.2.

[35] *2010 Horizontal Merger Guidelines*, §1, 4.1.2.

[36] Nelson, Phillip, "Monopoly Power, Market Definition, And The Cellophane Fallacy," March 2007, https://www.justice.gov/sites/default/files/atr/legacy/2007/03/27/222008.pdf, pp. 6-9, visited 9/30/2023.

[37] Glasner, David, and Sean Sullivan (2020). "The Logic of Market Definition." *Antitrust Law Journal*, 83(2), pp. 293-345, at p. 314.

[38] My analysis of prices for each Drug at Issue (Appendix C Exhibit 13) finds increases of prices of at least five percent according to at least one disgorgement model for all of the Drugs at Issue.

[39] "Formulation" typically refers to the form of the drug (e.g., tablet, or capsule for oral medications, and cream, ointment, or lotion for dermatological drugs). The form is also often specific to the route of administration (*e.g.*, suppositories vs. tablets). The strength refers to how much of the API is included in each unit of the formulation. *See* National Center for Biotechnology Information, "Pharmaceutical Formulation," https://www.ncbi.nlm.nih.gov/books/NBK562239/, visited 10/2/2023; Verywell Health, "What Is an Active

Other conditions specific to generic drugs that support this product market definition are discussed in the next subsection.

### *ii. Product and Geographic Market Conditions for Generic Drugs*

25. Physicians write prescriptions that are specific to each combination of API, formulation, and strength.[40] The prescription may be written for the branded or generic version of the drug. When both branded and generic versions of a particular drug are available, health payors may require that the generic version be dispensed as a condition of most insurance coverage.[41] Once the prescription is written by the physician, the pharmacy cannot substitute an alternative drug form or strength unless specifically authorized by the physician.[42] Such substitution is relatively infrequent, and typically occurs only in response to large changes in relative prices.[43]

26. Branded drugs are not in any of the markets relevant to this enquiry. Absent collusion, and with two or more competing suppliers of the generic product, the price of the generic will be significantly (i.e., by much more than a SSNIP) below the branded price[44] and demand for the generic tends to be highly inelastic at that price.[45] Thus, the branded drug is not in the relevant markets for an enquiry with

---

Pharmaceutical Ingredient (API)?" July 28, 2023, https://www.verywellhealth.com/api-active-pharmaceutical-ingredient-2663020, visited 10/2/2023.

[40] Verywell Health, "How to Read Your Healthcare Provider's Prescription," https://www.verywellhealth.com/my-doctors-prescription-how-do-i-read-it-1124042, pp. 18-20, visited 10/2/2023.

[41] Kreling, David H., "Cost Control for Prescription Drug Programs: Pharmacy Benefit Manager (PBM) Efforts, Effects, and Implications," prepared for the Department of Health and Human Services' Conference on Pharmaceutical Pricing Practices, Utilization and Costs, August 8-9, 2000, https://aspe.hhs.gov/cost-control-prescription-drug-programs-pharmacy-benefit-manager-pbm-efforts-effects-implications, visited 10/11/2023.

[42] Socal, Mariana P, Cordeiro, Thomas, Anderson, Gerard F., and Bai, Ge, "Estimating Savings Opportunities From Therapeutic Substitutions of High-Cost Generic Medications," JAMA Netw Open. 2022 Nov; 5(11): e2239868, https://www.ncbi.nlm.nih.gov/pmc/articles/PMC9631106/, visited 10/11/2023. "In addition, the highest cost generic may have a different strength, dosage form, or different active ingredient than a lower-cost generic option. Substitutions between products of different active ingredient, different strength, or different dosage form may not be performed by a pharmacy without a new prescription from a health care practitioner."

[43] The Complaint includes a discussion among Defendants about patient substitution away from their dual API Nystatin/Triamcinolone product to single API versions in response to their large price increases:

"Around this same time, K.S., a policy executive at Taro, actually sent an internal e-mail to J.J., Perfetto, and Aprahamian asking whether there had 'been any appreciable increase in demand in single ingredient nystatin and triamcinolone' because 'we have all heard stories of patients combining the two products on their own to save money.' J.J. replied that Kaiser had begun 'dispensing a tube of each with instructions to mix' in order to provide some financial relief to its patients." (Complaint, ¶ 685);

[44] See discussion in Section VI.D.ii below for the effects of additional generic competitors.

[45] Price elasticity for generic drugs is discussed in Section VIII.C.ii.

respect to collusion by generic drug manufacturers.[46] In other words, each generic supplier's pricing is constrained by the prices of the other generic suppliers but not by the price of the branded product.[47]

27. Several of the Drugs at Issue involve collusion between authorized generic or branded generic manufacturers and other generic manufacturers.[48] The FDA does not distinguish between authorized or branded generics and their generic counterparts in terms of function or substitution.[49] In addition, the fact that the Defendants included the authorized or branded generic manufacturers in some their discussions over price increases indicates that those Defendants believed that suppliers of authorized and branded generics needed to be included in the agreement to effectuate those collusive prices.

28. As a regulated product, the relevant geographic market for the sale and purchase of generic pharmaceuticals is no larger than the United States and its territories. Except in rare instances,[50] a foreign manufacturer who has not obtained FDA approval (an ANDA) cannot import and sell its product in the United States. Direct customers (wholesalers and large retail pharmacies) tend to be nationwide, and I have seen no evidence of the ability of manufacturers being able to price discriminate on a regional basis.[51]

---

[46] The discussions described in the complaint about increasing the price of a drug did not include the branded drug manufacturers except in rare instances, e.g., where the generic drug manufacturers shared the same parent organization. As an example, for Carbamazepine ER, Sandoz (the generic supplier) and Novartis (the branded supplier) were both owned by Novartis Group (Complaint, ¶ 204).

[47] The branded product would not be in the relevant market even if a cartel raised the price of generics to the point where significant substitution toward the branded version could be expected if generic prices were increased even further. Such an assertion would be an example of the Cellophane fallacy. As noted by Posner (1976), "Reasonable interchangeability at the current price but not at a competitive price level, far from demonstrating absence of monopoly power, might well be a symptom of that power." (Posner, Richard A. 1976. *Antitrust Law: An Economic Perspective.* Chicago, Illinois: The University of Chicago Press, at p. 128.)

[48] These include Carbamazepine ER, Fluocinonide 0.1% Cream, Adapalene Cream, Calcipotriene Betamethasone Dipropionate Ointment, Tacrolimus Ointment, Pioglitazone HCL Metformin HCL Tablets, and Ethambutol HCL Tablets (see Complaint).

[49] See, e.g., Reiffen, David, and Ward, Michael R., "'Branded Generics' as a Strategy to Limit Cannibalization of Pharmaceutical Markets," *Managerial and Decision Economics*, 28, (4/5), Economic and Policy Issues in the Pharmaceutical Industry (Jun. - Aug., 2007), pp. 251-265, at pp. 251-252.

[50] Congressional Research Service. "Prescription Drug Importation." https://crsreports.congress.gov/product/pdf/IF/IF11056, visited 8/9/2023.

[51] The national distribution capabilities of these customers suggest that those customers could defeat such an attempt through arbitrage. Even if regional markets could be specified under the Guidelines for a given drug, nationwide sales of that Drug would still be a relevant geographic market.

29. While each generic drug comprises a relevant product market, when evaluating the Defendants' conduct with respect to an overarching conspiracy, a relevant "cluster" market can be defined that is at least as large as the group of drugs on which the Defendants communicated.[52]

### *iii. Recognition of Generic Drug Product Markets*

30. My definition of the relevant geographic and product markets for generic drugs is consistent with how others have defined the product market in other contexts. For example, a recent study by the FDA defines a "product" as the "ingredient, route of administration, dosage form, and strength."[53] The United States Federal Trade Commission (FTC) has defined "generic-only" product markets for individual drugs, including markets at specific dosage levels.[54] The FTC has also examined drug prices at the "active ingredient(s), strength, and dosage form".[55] Others (e.g., Tenn and Wendling (2014)) use the combination of the molecule, dosage form, strength, and therapeutic class to specify the relevant product.[56]

31. My definition of the relevant geographic and product markets for generic drugs has also been accepted by courts. Private litigations have resulted in the recognition of generic versions of drug APIs and forms as relevant markets.[57]

---

[52] U.S. Department of Justice and the Federal Trade Commission. 2023. "Draft: Merger Guidelines." Available at https://www.justice.gov/d9/2023-07/2023-draft-merger-guidelines_0.pdf, at Appendix 3.B.4. "A relevant antitrust market is generally a group of products that are substitutes for each other. However, when the competitive conditions for multiple antitrust markets are reasonably similar, it may be appropriate to aggregate the products in these markets into a 'cluster market' for analytic convenience, even though not all products in the cluster are substitutes for each other…. The Agencies need not separately analyze market definition for each product included in the cluster market, and market shares will typically be calculated for the cluster market as a whole."

[53] Conrad, R., and Lutter, R. (2019). "Generic Competition and Drug Prices: New Evidence Linking Greater Generic Competition and Lower Generic Drug Prices." December 2019, p. 6. Available at: https://www.fda.gov/media/133509/download.

[54] Morse, M. Howard (2003). "Product Market Definition in the Pharmaceutical Industry." *Antitrust Law Journal*, *71*(2), pp. 633-676, at p. 649; American Bar Association, "Market Definition in Antitrust," pp. 332-333.

[55] Federal Trade Commission. (2009). "Authorized Generics: An Interim Report." p. 5. Available at: https://www.ftc.gov/sites/default/files/documents/reports/authorized-generics-interim-report-federal-trade-commission/p062105authorizedgenericsreport.pdf.

[56] Tenn, S. and Wendling, B.W. (2014). "Entry Threats and Pricing in the Generic Drug Industry." *The Review of Economics and Statistics*, *96*(2), pp. 214-228, at p. 216.

[57] These include *Geneva Pharmaceutical Technology v. Barr Laboratories*, where the Second Circuit found the relevant market to be the generic versions of warfarin sodium. Additionally, in *In re Lorazepam & Clorazepate Antitrust Litigation*, the court determined that a reasonable jury could find the relevant markets to be generic Lorazepam tablet manufacturers and generic Clorazepate tablet manufacturers, respectively. American Bar Association, 2012. "Market Definition in Antitrust," pp. 333-334.

# IV. Collusive Behavior in the Markets for Generic Drugs: Types of Conduct

32. In its appeal to the public for information relating to potential criminal antitrust violations,[58] the Department of Justice (DOJ) classifies anti-competitive agreements into three groups: price fixing, bid rigging and market division. The conduct alleged in the Complaint and the evidence in the record spans all three of these modalities, often in combination. I discuss the basic principles of each in the Sections below, as well as some of the evidence in the record of each.

33. I note first that, in the context of this MDL, several Defendants have pleaded guilty to antitrust violations and have settled with the Department of Justice on one or more drugs. Defendant Taro has entered into a deferred prosecution agreement for Clobetasol, Desonide Ointment, and Nystatin Triamcinolone Cream.[59] Defendant Sandoz has entered into a deferred prosecution agreement for Clobetasol, Desonide Ointment, and Nystatin Triamcinolone Cream.[60] Individual named-Plaintiffs have pleaded guilty or have been indicted on Clobetasol, Carbamazepine ER, Clotrimazole Cream, Desonide Ointment, Fluocinonide Gel and Fluocinonide Ointment, Lidocaine Ointment, Nystatin Triamcinolone Cream, and Nystatin Triamcinolone Ointment.[61]

34. The broadest allegations in the Complaint (at least in terms of the scope of the Drugs at Issue) involve Sandoz (Fougera)[62] and Taro.[63] While these firms appear in the SAGs' Complaint and in much of the

---

[58] Antitrust Division of the Department of Justice.2005. "Price Fixing, Bid Rigging and Market Allocation Schemes: What They are and What to Look For: An Antitrust Primer." Available at: https://www.justice.gov/d9/pages/attachments/2016/01/05/211578.pdf.

[59] The Deferred Prosecution Agreement between Taro and the United States Department of Justice ("DPA") also covers Etodolac, Etodolac ER, and Carbamazepine (non-ER) Tablets from the SAGs Teva Complaint. *See* Deferred Prosecution Agreement, United States of America v. Taro Pharmaceuticals U.S.A. Criminal Number 20cr213, July 23, 2020, https://www.justice.gov/atr/case-document/file/1307141/download.

[60] The Sandoz DPA also includes Benazepril HCTZ and Tobramycin from the SAG's Teva Complaint. *See* Deferred Prosecution Agreement, United States of America v. Sandoz Inc., Criminal No. 20-CR-111, March 2, 2020, https://www.justice.gov/atr/case-document/file/1256306/download.

[61] Defendant Armando Kellum pleaded guilty with respect to Clobetasol and Nystatin Triamcinolone cream, *see* Plea Agreement, United States of America v. Hector Armando Kellum, Criminal No. 20-065, https://www.justice.gov/media/1096581/dl?inline, and Defendant Aprahamian was indicted for his conduct relating to Clobetasol, Carbamazepine ER, Clotrimazole Cream, Desonide Ointment, Fluocinonide Gel, Fluocinonide Ointment, Lidocaine Ointment and Nystatin Triamcinolone Cream, among other drugs that are part of the SAGs' Teva Complaint. *See* Indictment, Count One, United States of America v. Ara Aprahamian, Case 2:20-cr-00064, February 4, 2020, https://www.justice.gov/media/1098986/dl?inline.

[62] Fougera was acquired by Sandoz in 2012 (Complaint, ¶ 30). Here, and elsewhere in this Report, I use "Sandoz" to refer to both Sandoz and Fougera.

[63] Sun Pharmaceuticals acquired a majority stake in Taro in 2010 (*See* e.g., Taro Pharmaceuticals Industries Ltd. "History". Available at: https://www.taro.com/history, visited 10/20/2023). While the two companies market drugs under different labeler codes, given the nature of Sun's controlling stake in Taro after 2010, I combine the two companies together wherever possible in my quantitative analyses below.

evidence cited below, there is discussion of the other Defendants' roles in the alleged conspiracy throughout the Complaint, and I make no effort to ensure that my discussion below specifically includes each Defendant.

### A. Price Fixing

35. As defined by the DOJ, "price fixing" includes any agreement to fix prices, establish or adhere to price discounts, hold price firm, eliminate or reduce a discount, adopt a standard formula for computing prices, maintain certain price differentials between different types, sizes, or quantities of products, agree to a minimum fee or price schedule, fix credit terms or not advertise prices.[64] The Complaint asserts that the Defendants in this case routinely communicated with the express purpose of implementing or maintaining higher prices or to prevent those prices from falling due to entry.[65]

36. In the case of implementing and maintaining higher prices, the Complaint lists individual evidence relating to Defendants' attempts to increase prices on 85 of the 98 Drugs at Issue.[66] These communications could focus only on one Drug/API or could involve groups of Drugs and/or Defendants. However, regardless of the scope of the allegation in terms of the number of Drugs or the Defendants involved, I observe a pattern of non-transitory increases in prices following communication between Defendants.

37. Several witnesses have testified that these communications were made for the express purpose of increasing prices,[67] and several other witnesses have invoked their Fifth Amendment right against self-incrimination when asked about these communications.[68] Individuals implicated have challenged

---

[64] Antitrust Division of the Department of Justice. 2005. "Price Fixing, Bid Rigging and Market Allocation Schemes: What They are and What to Look For: An Antitrust Primer." Available at: https://www.justice.gov/d9/pages/attachments/2016/01/05/211578.pdf, p. 2.

[65] See *e.g.*, Complaint, ¶ 159, Complaint, ¶ 727, and Complaint, ¶ 734.

[66] This includes the 81 of the 84 "Price Increase" Drugs discussed in Section VI, below, plus the four New Generic Drugs listed in Table 12.

[67] See, *e.g.*, Thomassey Dep. 50:4 – 54:11, , 89:13-90:8, 111:3-6, 157:5-10, 174:4-9, 176:23-177:10, 209:7-9, 296:12-19, 359:3-8; Bihari Dep. 115:3 – 14, 263:9 – 264:20, 614:9-21, 618:22-620:7, 706:8-20, 716:6-717:3; Dutra Dep. 31:10-25, 76:12-15, 98:20-99:5, 164:25-165:6, 179:5-13, 299:8-21, 340:12-341:2, 353:23-354:3, 380:3-12; Vezza Dep. 985:19-986:13, 1132:14-1133:7. Regarding a general agreement to fix prices, see Thomassey Dep. 179:6-16; Vezza Dep. at 228:15 – 233:15 (Vezza's high level discussion with Patel regarding price increases); Bihari Dep. 195:23 – 199:9 (general discussion of communicating with competitors about competitively sensitive information); Krauthauser Dep. 462:6-466:10 (general discussion of communicating with competitors about competitively sensitive information); Krauthauser Dep. 473:16 – 24 (discussing price increases).

[68] At least 9 individuals have asserted the Fifth Amendment across the board to all questions relating to their conduct in the generic drug industry, including drugs at issue in the SAGs Dermatology Complaint: Michael Aigner (Mylan), Ara Aprahamian (Taro), Jim Brown (Glenmark), Jessica Cangemi (Glenmark), Armando Kellum (Sandoz), Howard Marcus (Taro), Jim Nesta (Mylan), Connie Pak (Sandoz) and Doug Statler (Taro).

whether these communications occurred for the express purpose of increasing prices, (or more accurately, they assert that they have no recollection of any such conversation or of any such purpose).[69] Nonetheless, to my knowledge, Defendants have failed to identify any business, personal, or colloquial justification for the express communications that surrounded the implementation of those price increases, nor have they offered any justification for the increased number of those communications that surround each.[70] Indeed, based on the SAGs' review of cell phone records in this case, the personnel communicating around the time of the price increase might even (a) never have called one another beforehand, or (b) never call each other ever again afterward.[71]

38. Perhaps the clearest evidence of the above pattern (price increases following communications) relates to price increases driven by Taro in 2013 and 2014. According to the Complaint, the Taro "May 2013" price increases involved discussions among competitors over twelve products and six competitors.[72] In order to assure that its price increases would be successful, Taro communicated with its five competitors to ensure these firms knew which drugs to expect price increases on.[73] In fact, two former employees of one such competitor testified that there was an agreement between Taro and Sandoz that Sandoz would follow Taro's price increases and would refrain from pursuing Taro's customers.[74] One former senior-level executive at Glenmark testified that there was a similar agreement between Glenmark and Taro to raise prices and not pursue each other's customers.[75] According to the Complaint, such efforts were successful.[76] Following its success on their price

[69] See, *e.g.*, Berthold Dep. 180:1-180:9, 213:21-219:8, Nailor Dep. 46:15-21, 56:15-58:13, 59:24-60:10, 62:1-92:20; Strzeminski Dep. 71:22-74:12, 85:22-89:8; Kaczmarek Dep. 45:10-47:12 (denying any knowledge that his subordinates were communicating with competitors about pricing or market allocation); but see Thomassey Dep. 367:20-372:7 (testifying that Kaczmarek was "100% lying" when he denied any knowledge of Thomassey's collusion, stating that "[h]e was directing me at every turn").

[70] See *e.g.,* Berthold Dep. 211:13-212:11 (no social relationship with Defendant Vogel-Baylor that would explain communications). 249:13-22 (no explanation for communications with Teva on day of price increase); 307:5-308:7 (no explanation for calls placed to competitors on the day of 5 different price increases),

[71] See *e.g.,* Complaint, ¶ 1539 and Complaint, ¶ 1573.

[72] Complaint, ¶¶ 726-727. The competitors involved were Defendants Taro, Sandoz, Perrigo, Actavis, Mylan, and Glenmark.

[73] Complaint, ¶ 728; Bihari-000257. Complaint, ¶ 731; MYL-000007649 and MYL-000007653, an email and an attachment between two Mylan employees on 4/8/2013 referencing an upcoming "Taro Price Increase" on Clomipramine. Complaint, ¶ 734; Bihari-000263.

[74] Bihari Dep. 794:9 – 798:17; Vezza Dep. 360:19 – 361:363:16.

[75] Dutra Dep. 183:13-183:24; 347:3-348:15.

[76] See *e.g.*, Complaint, ¶ 746; SDZCTAG-01598507, and Complaint, ¶ 748; SDZCTAG-01596352-SDZCTAG-01596353.

increases, Taro pursued further "June 2014" price increases involving a further 17 products and eight competitors.[77]

39. According to the Complaint, while most of the evidence uncovered by the SAGs represent attempts to immediately increase existing prices, Defendants also developed a strategy of "exit and re-entry" (also called, by Sandoz, the "Taro Strategy") whereby a Defendant would temporarily exit the market for a Drug, allowing the incumbent Defendant to raise prices, only for the exiting Defendant to re-enter at higher than pre-exit prices.[78] Under normal conditions, such re-entry would be expected to lower prices to their pre-entry level within a reasonable time period, but Defendants had safeguards in place (communications) to prevent that from occurring for the Drugs at Issue. Hence, this is an example of Defendants' conduct that both led to a price increase and prevented prices from falling.

40. According to the Complaint, Defendants also communicated expressly and took coordinated action to prevent prices from falling. This behavior most often occurred in the context of entry into a particular Drug by a Defendant. As discussed below in the discussion of market share agreements (MSAs), all else equal, entry (and the resulting increase in competition) in a Drug market is likely to result in lower prices. Defendants were particularly interested in preventing this price erosion, and communications increased in the time surrounding entry.[79] This collusive behavior most often took the form of providing pricing information and designating customers to be approached by the entrant and relinquished by the incumbent, which minimizes any effect on prices. As with the price

[77] Complaint, ¶ 851. The competitors in this case were Defendants Sandoz, Actavis, Perrigo, Wockhardt, Amneal, and Mylan and Non-Defendants (at least with respect to this Report) Teva and Hi-Tech. Multiple witnesses have testified that there were agreements between Taro, Sandoz and others to raise prices on these products which included Clobetasol and Carbamazepine ER, among others. See Bihari Dep. 1110:11-1112:10, 1113:18-1114:8; Vezza Dep. 1275:16-1276:24.

[78] Complaint, ¶ 161; SDZCTAG-01536040. Witnesses have testified that during this time period there was an ongoing agreement between Sandoz and Taro that was not limited to any one drug. See Vezza Dep 446:16-449:14, 458:7-58:20, 1277:11-1280:22; Bihari Dep. 288:23-289:22, 620:4-7, 633:19-22, 770:8-12. As such, Sandoz would have felt comfortable creating a "Taro strategy," knowing that upon re-entry it would obtain its target market share at a new, higher price. There is evidence in the record of a number of other agreements between sets of competitors. See, e.g., Vezza Dep. 630:4-631:16; 859:12-862:5 (Sandoz/Perrigo); 862:6-865:3 (Sandoz/Teva); Bihari Dep. 676:17-21, 691:9-13, 1264:12-1265:21 (Sandoz/Perrigo); 665:17-21; 710:17-21; 1377:6-10 (Sandoz/Glenmark); 675:6-9, 731:1-5 (Sandoz/Actavis); Thomassey Dep. 195:2-17, 252:22-253:1, 363:9-13 (Fougera/Perrigo); 375:1-381:6, 474:14-18 (Fougera/G&W).

[79] See, *e.g.*, Complaint, ¶¶ 243-254; Thomassey Dep. 115:1-120:19. (Communications surrounding the Imiquimod Cream market).

increases, all indications are Defendants' efforts were successful in mitigating price erosion from entry.[80]

### B. Bid Rigging

41. Bid rigging includes bid suppression, complementary bidding, bid rotation and subcontracting.[81] In the context of generic drugs, the Defendants' bid-rigging conduct generally took place within the customer Request for Quotation ("RFQ") or Request for Proposal ("RFP") process. Through this process, a customer would approach alternative suppliers to tender a bid to supply one or more generic drugs at a lower price than their incumbent supplier. As with price fixing, there is extensive evidence in the record of Defendants rigging bids in auction settings (most often RFQs) for some of the largest drug wholesalers, retailers, and GPOs. This took the form of both complementary bids as well as refusals to respond to these solicitations.[82]

42. One of many examples of refusals to bid occurred in the market for Clotrimazole Betamethasone Dipropionate Cream. Following price increases in 2011 by Actavis,[83] Sandoz, and Taro,[84] Walmart requested a bid from Fougera, to which a Fougera executive stated internally "we definitely do not want to upset this apple cart."[85] To this, a Fougera employee asked internally: "Do we bid high or tell

---

[80] See, e.g., Complaint, ¶ 255; SDZCTAG-05403437, referencing an email to Fougera personnel on Imiquimod Cream, "[w]e are VERY pleased with where the price is today . . .. With three additional generic players in addition to us in the market today its amazing the price is holding as high as it is." There is extensive evidence in the record of successful agreements to allocate markets upon entry. *See, e.g.*, Thomassey Dep. 115:1-17 (agreement to allocate market for Imiquimod Cream); 194:4-194:18. (agreement to allocate market for Metronidazole Cream and Lotion); Bihari Dep. 840:5-841:15 (agreement to allocate market for Lidocaine Ointment), 865:19-866:14 (agreement to allocate the market for Cefpodoxime Proxetil), 877:22-878:24 (agreement to allocate the market for Pioglitazone HCL Metformin HCL), 937:14-938:16 (agreement to allocate the market for Desonide Ointment), 956:19-957:18 (agreements to allocate the market for Nystatin Cream), 974:18-975:19 (agreement to allocate the market for Adapalene Cream), 985:10-18, 994:18-996:7 (agreements to allocate the market for Halobetasol Cream); 1015:21-25, 1018:24-1020:2 (agreement to allocate the market for Calcipotriene Betamethasone Dipropionate Ointment); 1040:7-1041:7 (agreement to allocate the market for Tacrolimus Ointment), 1054:17-1055:10 (agreement to allocate the market for Methazolamide), 1069:12-1070:6 (agreement to allocate market for Griseofulvin Microsize Tablets).

[81] Antitrust Division of the Department of Justice.2005. "Price Fixing, Bid Rigging and Market Allocation Schemes: What They are and What to Look For: An Antitrust Primer." Available at: https://www.justice.gov/d9/pages/attachments/2016/01/05/211578.pdf, pp. 2-3

[82] Defendants recognized that these RFQs (viewed in isolation) represented opportunities to increase Defendants' profits (see *e.g.*, Complaint, ¶ 146; TARO_0003000006. "Can we pick up this extra volume at McKesson? No adjustment to pricing! Easy win for Taro!")

[83] Complaint, ¶ 295; ACTAVIS_GX_MDL_000013428; ACTAVIS_GX_MDL_000030589; ACTAVIS_GX_MDL_000030600.

[84] Complaint, ¶¶ 298-299; SDZCTAG-05306556; ACTAVIS_GX_MDL_003488209; SDZCTAG-06630196.

[85] Complaint, ¶ 301; SDZCTAG-05423124-05423125, at SDZCTAG-05423124.

them we can't supply?"[86] Fougera then refused to bid.[87] In May 2012, McKesson requested a bid from Actavis, which they refused.[88] In October 2012, MMCAP requested a bid from Taro, to which they did not even respond.[89] After Taro increased its price in February 2013, a Sandoz executive stated: "we do not want to send offers."[90]

43. While the above example shows Defendant Fougera (Sandoz) deciding between submitting a complementary bid ("bid high") and refusing to bid ("can't supply") and settling on the latter, there are numerous examples of complementary bids by the Defendants for Drugs at Issue. One such example was in the Griseofulvin Microsize Tablet market. In October 2013, in response to a request to bid from McKesson, Rising submitted a high bid, which McKesson deemed not competitive and awarded its business to Sandoz.[91] Rising behaved similarly in response to a request to bid from CVS.[92] Former Sandoz and Rising employees have admitted to coordinating to ensure Sandoz obtained its "fair share" of the Griseofulvin Microsize Tablet market without significantly eroding prices.[93] As another example, in June 2013, Rite Aid requested a bid for Mometasone Furoate from Glenmark. In an internal email, Glenmark executives stated: "We don't want this. Bid high,"[94] an apparent instruction to submit a complementary bid.[95] This practice (complementary bidding) was commonplace in many of the Drugs at Issue.[96]

---

[86] Id.

[87] A former Fougera employee later testified that Taro and Fougera had an agreement that they would not "cannibalize" each other's Clotrimazole Betamethasone Dipropionate Cream business. Thomassey Dep. 80:4-84:15. See also Marcus Dep. 70:5 – 123:13 and Statler Dep. 111:3 – 112:15 (invoking 5th Amendment when asked about Clotrimazole Betamethasone Dipropionate Cream).

[88] Complaint, ¶ 306; ACTAVIS_GX_MDL_003845528.

[89] Complaint, ¶ 309; TARO_000117329.

[90] Complaint, ¶ 312; SDZCTAG-01767819-01767821, SDZCTAG-01767819.

[91] Complaint, ¶¶ 1235-1237; SDZMDL-003701196-SDZMDL003701199; SDZCTAG-01908406; SDZCTAG-01908409; RISING-DOJ-0347830; RISING-DOJ-0356113; RISING-DOJ-0007503; SDZCTAG-01907078.

[92] Complaint, ¶¶ 1238-1240; SDZMDL-003235215; SDZMDL-001153365; RISING-DOJ-0021063; RISING-DOJ-0022864; RISING-DOJ-0339058; SDZMDL-001159096.

[93] Krauthauser Dep. 638:18 – 641:19; Bihari Dep. 1069:12-1070:6.

[94] Complaint, ¶¶ 1553-1554; GMK-MDL-000273397.

[95] A former senior executive at Glenmark has admitted that there was an ongoing agreement between Glenmark and G&W to "raise prices and not take each other's customers" for Mometasone Furoate. Dutra Dep. 82:10-15; 86:11-87:1; 95:10-14; 98:4-99:5; 104:16-20; 110:4-111:25 (2012); 136:3-24; 161:19-24; 175:18-25; 348:17-364:9; 377:16-380:12.

[96] See, e.g., Bihari Dep. 957:19 – 975:19 (Adapalene-Cream 0.1%), 730:3-24, (Betamethasone Valerate Ointment 0.01%), 706:3-24, (Desoximetasone Ointment 0.25%), 840:5-841:15 ( Lidocaine Ointment 5%), 674:5 – 676:21 (%, Ciclopirox Shampoo 1%), 618: 22 – 620:3 (Nystatin Triamcinolone Acetonide Cream). Dutra Dep. 216:2-217:1

44. While inability to supply was a common excuse given to customers seeking bids from Defendants, the evidence suggests that this excuse was largely pretextual. For example, after increasing the price for Acetazolamide Tablets in late 2013, Taro wrote to a customer in response to an RFQ "[w]e will not be able to supply at this time, receiving multiple requests for this product today. If the inventory situation changes, I will let you know."[97] However, Acetazolamide was not listed on Taro's backorder reports,[98] and a Taro executive seemed to affirm that Taro could supply.[99]

45. As another example, when deciding whether to bid for Triamcinolone Acetonide, Defendant Walter Kaczmarek, a Sandoz executive, wrote "[w]e will NOT bid this. Don't even bother asking Joyce"[100] to check whether Sandoz could supply.

### C. Market Division

46. Market division (as defined by the DOJ) includes agreements in which competing firms allocate specific customers or types of customers, products, or territories.[101] Market division, also referred to as market allocation, would include market share agreements (MSAs), or, as referred to by Defendants,[102] adherence to "fair share" (*i.e.*, a fair share agreement ("FSA")). MSAs can be both drug-specific and "overarching" (*i.e.*, an overarching agreement to establish and comply with MSAs on multiple individual products). These types of agreements can be reinforced with other conduct on a drug-specific basis as necessary to help initiate, monitor, or enforce MSA price increases.

("Bid to lose is to bid a high price so that you wouldn't win the bid"). Vezza 1605:21-1607:11 (Sandoz bidding high to avoid winning an award)

[97] Complaint, ¶ 820; TARO_000427295.

[98] TARO_000427643.

[99] TARO_000171584.

[100] Complaint, ¶ 264; SDZCTAG-00331469.

[101] Antitrust Division of the Department of Justice. 2005. "Price Fixing, Bid Rigging and Market Allocation Schemes: What They are and What to Look For: An Antitrust Primer." Available at: https://www.justice.gov/d9/pages/attachments/2016/01/05/211578.pdf, p. 3.

[102] Thomassey Dep. 43:6 – 44:8; Krauthauser Dep. 141:11 – 142:22; Lubke Dep. 79:7 - 80:21; Vezza 431:23 – 434:11.

## D. Market Share (Fair Share) Agreements and the Overarching Agreement

### *i. Fundamentals of an MSA*

47. In its simplest form, an MSA is an agreement in which each participant agrees to maintain a specified target share of the market.[103] Whenever the market share of a firm in an MSA exceeds its target share, that firm should increase its price or take other actions so as to lose enough sales to its competitor(s) to return the firm to its target market share. If the firm with the excess market share fails to comply, the firm with the deficit is free to lower its price to facilitate the share transfer, effectively initiating a limited price war that leaves both parties worse off.[104]

48. Take, for example, a market with 10 firms, each with a 10% share and each charging a "competitive" price. The firms enter into an MSA, using current shares as the allocated "fair shares". If any one firm now raises its price, its market share will fall below 10%, which means that the collective market shares of the remaining firms rise above 90%, and shares for one or more of those firms rise above 10%. Under the MSA, each of those firms with shares above 10% must now increase their prices until their shares fall back to 10%. This process can continue until no one firm wants a higher price, so that prices can rise to, or even exceed, the price that maximizes joint profits. Any one firm can move the entire set of firms to any higher price, as long as all firms comply with the terms of the MSA, although that process may require repeated rounds of price increases, absent communications with respect to an initial large price increase.

49. The above example assumes a homogeneous product where share can be easily shifted by raising or lowering relative prices rapidly. Reallocating shares in bid markets such as those for generic drugs may require more direct actions, such as communications over which customers to transfer to the deficit supplier.[105] This is because in the market for generic drugs, customers make large purchases over extended periods under long-term contracts. As a result, if attempting to fix prices, a firm cannot instantaneously change its price, but must go through the rebidding process with an eye towards devising an allocation such that that process will result in the target market shares. In addition, under the MSA procedure for accommodating entry, the incumbent must designate the customers for the

---

[103] Carlton, Dennis P., and Perloff, Jeffrey M. 2005. "Modern Industrial Organization." (4th edition), p. 141; Stigler, George, "A Theory of Oligopoly," *Journal of Political Economy*, Vol. 72, No. 1 (Feb. 1964), pp. 44-61, at p. 46.

[104] Id.

[105] See, e.g., Bihari Deposition at 957:19 - 975:19 (Adapalene-Cream 0.1%), 730:3-24 (Betamethasone Valerate Ointment Eq 0.01% Base), 706:3-24 (, Desoximetasone Ointment 0.25%), 840:5-841:15 (Lidocaine Ointment 5%), 674:5 – 676:21 (Ciclopirox Shampoo 1%), 618: 22 – 620:3 (Nystatin Triamcinolone Acetonide Cream).

entrant to bid on, and there may be customer-specific reasons for particular allocations, such groups with similar characteristics or personal contacts/history.

50. The hallmark of an MSA is thus the greater stability of market shares during the period when the MSA is effective.[106] The evidence as it relates to market share stability and fair shares is discussed in Section VII.B.ii. As noted by (Judge) Richard Posner (1971):[107]

> If the major firms in a market have maintained identical or nearly identical market shares relative to each other for a substantive period of time, there is good reason to believe that they have divided the market (whether by fixing geographical zones or sales quotas or by an assignment of customers), and thereby eliminated competition, among themselves. Under competition, market shares will fluctuate as now one firm, now another, pulls ahead of its rivals in the struggle for customers and sales. Divisions of markets have figured in many Sherman Act cases; but it has not always been recognized that proof of that market shares have been abnormally stable can in itself constitute evidence that the market has been divided.

51. As Posner also notes, "much serious price fixing may escape detection altogether because overt communication is required to establish an attempt but may not always be necessary to effectuate price fixing."[108]

### *ii. MSAs and Price Fixing*

52. An MSA can be used, by itself or in combination with other conduct, to coordinate an initial price increase or to ensure that prices are maintained at a supra-competitive level in the face of shocks such as changes in demand, supply, or entry.[109] In principle, an MSA can be powerful enough to initiate a collusive price increase without suppliers having to agree on specific prices or even communicate regularly with each other.[110] Once the understanding of what constitutes a "fair share" of the market is reached amongst the participants, the mechanism by which each firm is required to maintain that share ensures that any one participant can unilaterally force all the other participants to raise their prices to whatever level is desired by that firm. In practice, however, even when an overarching MSA

---

[106] Kovacic, William E., Marshall, Robert C., Marx, Leslie M., and White, Halbert L., 2011. "Plus Factors and Agreement in Antitrust Law," *Michigan Law Review*, Vol. 110:393, at pp. 421-423.

[107] Posner., Richard A 1976. *Antitrust Law: An Economic Perspective.* Chicago, Illinois: The University of Chicago Press, at p. 62.

[108] Ibid, p. 40.

[109] Kovacic, William E., Marshall, Robert C., Marx, Leslie M., and White, Halbert L., 2011. "Plus Factors and Agreement in Antitrust Law," *Michigan Law Review*, Vol. 110:393, at pp. 393, 416-420, 422.

[110] Posner, Richard A. 1976. "Antitrust Law: An Economic Perspective," Chicago, Illinois: The University of Chicago Press, at p. 62.

is present, at least some direct communication is usually required to initiate the price increase, particularly when the price increase is large and gradual adjustment is difficult.

53. An overarching MSA (i.e., an MSA covering multiple drugs), however, can facilitate a large initial price increase. An MSA allows the cartel to move to the joint profit-maximizing equilibrium while preserving "equity" (i.e., preserving each firm's market share) and ensuring that each cartel participant is better off as a result of the cartel. In contrast, if firms agree only to fix or raise prices, some of those firms could even find themselves with no sales or a share that is too small for them to remain in the cartel, especially if the price increase is large. Thus, an overarching MSA can be necessary for an initial price increase under conditions where other forms of agreement cannot stand alone.

54. In most cases of which I am aware,[111] the parties to a discovered MSA have been unable to fully comply without some ongoing direct communications to assist in monitoring and enforcing the agreement. MSAs and other types of conduct are thus complementary: an MSA can facilitate a price increase initiated through direct communication and ensure that those initial price increases are maintained with minimal conduct that might trigger discovery. [112]

55. An overarching MSA can thus mitigate or even solve a critical problem for colluding firms who are concerned that extensive direct communication to initiate a price increase could expose them to

[111] Vitamins: Connor, J.M.2006. "Effectiveness of Antitrust Sanctions on Modern International Cartels." *Journal of Industry, Competition and Trade*, 6, pp. 195-223: Marshall, R.C., Marx, L.M., and Raiff, M.E. 2008. "Cartel Price Announcements: The Vitamins Industry." *International Journal of Industrial Organization*, 26(3), pp. 762-802;

Connor, John M. 2008. "The Great Global Vitamins Conspiracies, 1985-1999." Available at SSRN: https://ssrn.com/abstract=1120936 or http://dx.doi.org/10.2139/ssrn.1120936;

German Cement: Hüschelrath, K., Müller, K., and Veith, T. 2013. "Concrete Shoes for Competition: The Effect of the German Cement Cartel on Market Price." *Journal of Competition Law and Economics*, 9(1), pp. 97-123;

Friederiszick, H.W., and Röller, L.H. 2010. "Quantification of Harm in Damages Actions for Antitrust Infringements: Insights from German Cartel Cases." *Journal of Competition Law and Economics,* 6(3), pp. 595-618.

[112] *See, e.g.,* Krauthauser Dep. 513:19-517:23 (once it was understood that he was dealing with a "rational" competitor, Taro, detailed discussions were not necessary because "the general understandings are already in place" and it was only about determining price), 519:1-527:10 (after leaving Sandoz, Krauthauser knew he could communicate with former Sandoz colleagues but they generally did not need to have detailed discussions because they had worked together and both understood the "rules of engagement", so further elaboration was not necessary), 764:23-766:11 (Krauthauser confirmed that Rekenthaler understood the rules of engagement and that provided a foundation for their discussions. They did not need to have detailed discussions because they worked together previously at Teva and had similar experiences with the tactics employed in the generics market), 766:12-768:4 (did not have to have detailed discussions with Kevin Green because they had worked together previously and both understood the rules of engagement, which provided a foundation for future discussions); 469:17-472:22 (Krauthauser tried to "minimize the paper trail" by not putting collusive information in writing, adhering to the mantra "if you don't put it in an email . . . it didn't happen"; in-person communications with competitors were often at industry events and occasionally at social gatherings).

detection, but who realize that tacit coordination is likely to be erratic, slow and ineffective, as described in literature such as the following.[113] As one study of the retail gasoline market in Perth, Australia noted:[114]

> The challenge for any model of collusion that incorporates collusion initiation is the complexity of collusive agreements. At a minimum, an agreement must stipulate when and how to raise prices, who initiates price increases, and how quickly rivals must follow. In addition, an agreement must also specify how firms should respond to demand and cost fluctuations, what constitutes a violation of that agreement, how violations are detected and verified, and what actions to take if a violation occurs. Further, successful collusion requires a mutual understanding among firms with regard to these elements of an agreement. (Harrington, 2017)
>
> It is hard to imagine how firms could arrive at such a mutual understanding without explicit communication. As such, theories of collusion presume collusive agreements are initiated through explicit communication.[115]

56. In principle, an overarching MSA can solve each of these problems without requiring direct communication. Each firm can initiate a price increase at any time. All other firms must follow rapidly enough to preserve market shares. Any firm can alter the market price in response to demand or cost changes that change the target price. [116]

57. Effective monitoring of an MSA does require that individual market shares be known in a timely fashion by the participating firms. Accurate and timely market share information need not, however, require inter-firm communication: for the German cement cartel, for example, individual market shares for that relatively homogeneous product (or data sufficient to calculate individual market shares) were calculated and distributed by an industry association that dealt with each firm

[113] *See also* Bourveau, Thomas and She, Guoman and Zaldokas, Alminas, 2020. "Corporate Disclosure as a Tacit Coordination Mechanism: Evidence from Cartel Enforcement Regulations," *Journal of Accounting Research*, 58(2), Available at SSRN: https://ssrn.com/abstract=3622557.

[114] While eventually effective, coordination in this market involved a complicated strategy of tacit coordination, with repeated price jumps as well as declines by the market leader to signal focal points for prices at different days of the week. Even though information as to each firm's prices and costs was available to all the firms, it still took some three years for coordination without communications to achieve a 50% increase in margins (and a much lower increase in prices). (Byrne, D.P., De Roos, N., Lewis, M.S., Marx, L.M., and Wu, X.A. (2023). "Asymmetric Information Sharing in Oligopoly: A Natural Experiment in Retail Gasoline.")

[115] Id.

[116] The evidence in this case confirms that such agreements existed between competitors to follow each other's price increases, and not take each other's customers after an increase. *See, e.g.,* Vezza Tr. 853:12-856:20, 919:9-923:23; 1277:11-1280:22 (Sandoz/Taro); 630:4-631:16; 859:12-862:5 (Sandoz/Perrigo); 862:6-865:3 (Sandoz/Teva); Bihari Tr. 288:23-289:22, 620:4-7, 633:19-22, 770:8-12 (Sandoz/Taro); 676:17-21, 691:9-13, 1264:12-1265:21 (Sandoz/Perrigo); 665:17-21; 710:17-21; 1377:6-10 (Sandoz/Glenmark); 675:6-9, 731:1-5 (Sandoz/Actavis); Thomassey Tr. 195:2-17, 252:22-253:1, 363:9-13 (Fougera/Perrigo); 375:1-381:6, 474:14-18 (Fougera/G&W).

individually.[117] For generic drugs, market share information is publicly available through IQVIA and other sources.[118] The identity and size of large wholesalers such as AmerisourceBergen and McKesson are also well known, and oftentimes customers willingly provide the identity of their current supplier to try to solicit a lower price.[119] If these direct customers maintain stable shares of purchases, customer allocation can be used to calibrate and maintain market shares.[120]

58. If market share information is available in an accurate and timely manner, trust is high and all participants can be expected to comply with the rules, there may be no need to incur the risk of detection due to additional but more visible forms of collusion such as ongoing communications on prices. An MSA can be effective without any discoverable conduct, or at least far less conduct than would normally be sufficient to infer an agreement, even with a large number of participants.[121] In contrast, the risks and costs of formulating, monitoring and enforcing an agreement on prices through direct communications rise exponentially with the number of participants.

59. An MSA provides a decentralized way to maintain monopoly pricing after the initial price increase even if some or all participants never engage in any further visible conduct. Those firms may justify continued adherence to the MSA as motivated by a desire for "equity" or "fairness" but continuing to adhere to MSA rules remains against self-interest. A firm acting in its own self-interest may respond to a price increase by its rivals by also raising its price to some degree but would also be expected to take advantage of the rival's price increase to increase its output and market share. Thus, continued participation in a MSA may be inferred if a firm instead responds by matching that price increase and refusing to bid (or providing a complementary bid) to customers of that rival, even if there is no direct evidence of communication or other collusive actions by that firm.

---

[117] Harrington, Joseph E., Huschelrath, Kai, Laitenberger, Ulrich, and Smuda, Florian. 2014. "The Discontent Cartel Member and Cartel Collapse: The Case of the German Cement Cartel." *ZEW Discussion Papers, No. 14-084,* pp. 1-26 at pp. 7-9.

[118] See, *e.g.*, Berthold Dep. 117:16-118:11, Gensburger Dep. 173:7-175:20, Rosa Dep. 127:4-14.

[119] See, e.g., Lubke Dep at 127:4-21 (in which a Sandoz witness confirmed they solicited product pricing information from Rite Aid, who was a customer); Complaint, ¶ 1544. See e.g., GWCT-HHR-0000063070.

[120] Complaint, ¶ 138. See e.g., SDZCTAG-05337955; SDZCTAG-05330839; SDZCTAG-1011740; GNSTCT00001241.

[121] Posner, Richard A. 1976. *Antitrust Law: An Economic Perspective.* Chicago, Illinois: The University of Chicago Press, at p. 40.

60. There is extensive evidence in the record of the existence of and adherence to MSA rules.[122] Defendant drug manufacturers would commonly utilize terms such as "fair share" and "playing nice in the sandbox" when describing the reasoning and justifications for many of their pricing and marketing decisions.[123] The allocation of market shares underlying the MSA was memorialized in the Defendants' documents in the ordinary course of business. As noted above in the discussion of bid rigging, in accordance with fair share principles, it was common for Defendants to refuse to pursue additional sales and customers in order to maintain that allocation.

### *iii. MSAs and Lingering Effects*

61. The lingering effects of an overarching MSA can also help explain why post-conspiracy prices could be expected to fall only gradually once collusion was detected. As Harrington (2004) notes, (colluding) firms have a strategic incentive to continue to price above the non-collusive price level during the litigation period.[124] A large fall in price after detection is an indicator of collusion that can be used to establish liability as well as to estimate damages. Given that many damage experts use the price fall after the detection of the conspiracy as a measure of the overcharge, defendants have a strong incentive to minimize or at least delay the price fall after detection until any litigation is concluded.[125] This implies that disgorgement amounts (or damages) should continue to be assessed over the post-detection period, at least until litigation has ended.

62. Formulating and implementing an explicit agreement to slow or prevent a price fall post-discovery through direct communication would be difficult and dangerous. However, an MSA can continue to be effective post-discovery even absent any direct communication. Simply continuing a fair share agreement could slow or prevent an adjustment to pre-collusion levels without any need for direct communications. Evidence of a continued general acceptance of the fair share rule as an industry

---

[122] *See, e.g.,* Krauthauser Dep. 513:23-517:23, 636:10-641:19 (the generics industry has certain unwritten "rules of engagement" that "rational" companies follow, which are based on principles of "fair share" and dividing a market evenly); Thomassey Dep. 41:22-44:19, 50:13-61:9 (general understanding in the industry about what "fair share" meant; it was common for competitors to discuss fair share and reach agreements based on those principles).

[123] Complaint, ¶ 147. See e.g., SDZCTAG-05404650; Thomassey Dep. 43:6 – 44:19, 54:24 – 57:18, 57:20 – 60:7, 60:17 – 61:9, 63:5 – 64:9. Krauthauser Dep. 140:11-24 (defining "rational" competitor); 141:11-142:22 (defining "fair share"); 513:23 – 514:18 (discussing "rational" and "fair share"); Vezza Dep. 203:17 – 205:22 (describing fair share); Lubke Dep. 79:11 – 80:21 (fair share).

[124] For a discussion of the lingering effects of the Graphite Electrode cartel, where prices were maintained at about 20% above their pre-cartel level for two years after detection, and remained above that level for another two years, see Harrington, J.E. (2004). "Post-Cartel Pricing During Litigation." *The Journal of Industrial Economics*, *52*(4), pp. 517-533.

[125] Harrington, J.E. (2004). "Post-Cartel Pricing During Litigation." *The Journal of Industrial Economics*, *52*(4), pp. 517-533.

norm should thus be taken to indicate a continuing agreement, even in the absence of any direct communication.[126] Firms do not forget the mechanisms by which co-conspirators could threaten punishment even if explicit collusion ends.[127]

63. This implies that restitution amounts (or damages) should continue to be assessed over the post-detection period not only until litigation has ceased but until prices have fallen to their pre-collusion level. Defendants may argue that absent evidence of post-detection communication, those higher prices are the result of learning or other changes during the conduct period that made oligopolistic coordination more effective. However, even if this were correct, those higher prices, even if sustained indefinitely rather than just lingering, could not have occurred absent the initial collusive conduct.

#### ***iv. Accommodating Entry with an MSA***

64. MSAs can be particularly effective when dealing with entry, since an overarching MSA provides a default value for the entrant's "fair share". For all parties to agree on that share and comply with the agreement, the profits to both incumbents and the entrant must be higher at MSA prices and shares than they would have been with whatever prices and shares would be expected if entry is not accommodated. An overarching agreement that specifies the "fair share" for the entrant increases the probability that the parties will come to an agreement.

65. The entrant manufacturer can be expected to set a price that is initially slightly lower than the incumbent suppliers' prices so as to acquire its fair share with minimal price erosion, with the incumbent suppliers at least refusing to match the entrant's lower prices and possibly even increasing their (offered) prices to customers that are to be switched to the entrant. This initial price maneuvering or customer allocation requires communication between participants so as to minimize disruption. As noted by Defendant Sandoz, "[a] lot of times, the buyers do not want to change, and, for only a 10% reduction in price, it is not worth changing."[128] Hence, in the case of generic drugs, some combination of entrant discount and incumbent price increase may be necessary to effectuate the agreement.

---

[126] I note that communications between the Individual Defendants continued for about two years after the Heritage Complaint was filed (Complaint, ¶ 1597-1599).

[127] Kovacic, Willliam E., Marshall, Robert C., Marx, Leslie M., and Raiff, Matthew E. 2007. "Lessons for Competition Policy from the Vitamins Cartel," Chapter 6, *Contributions to Economic Analysis*, Volume 282, Elsevier, at pp. 150-151.

[128] Complaint, ¶ 959; SDZCTAG-05181353.

66. Information on which customers the incumbent is willing to relinquish and the prices currently being charged to those customers allows the entrant to submit a 'competitive' offer to the designated customers that is just low enough to trigger a right of first refusal by the incumbent, secure in the knowledge that the incumbent will not respond to a bid request from those customers.[129] In return, the incumbent is allowed to maintain its remaining market share without concern as to any further share loss to the entrant.

67. Once the agreed upon market share is reached, collusion can be sustained by an agreement to maintain market shares at the new level. For example, as shown in Figure 2 below for Betamethasone Valerate Cream 0.1%, market shares began as somewhat disparate prior to the API-communication date, and then remained stable at close to 33 percent for each firm from the API date throughout the Conduct Period, until the Heritage Complaint was filed in December 2016, when they began to diverge, a pattern consistent with an MSA that continued throughout the Conduct Period. As a result, as shown in Figure, the parties were able to sustain a significant overcharge throughout the Conduct period.

**Figure 2 – Market Shares and Net Price for Betamethasone Valerate Cream (0.1%)**

[redacted]

Sources: Defendants Transactional, AMP, IQVIA, and NADAC Data Sets.

[129] See, e.g., Krauthauser Dep. at 638:18 – 641:17 (coordination between Rising and Sandoz to accommodate Sandoz's entry into Griseofulvin market while preventing price erosion); Thomassey Dep. 109:5 – 111:6 (coordination between Fougera and Perrigo to accommodate Perrigo's entry into Imiquimod Cream market while maintaining high prices); Thomassey Dep. 170:8 - 177:10 (coordination between Fougera and Perrigo to accommodate Perrigo's entry into Adapalene Cream market while maintaining high prices).

68. Similarly, as shown in Figure 3 below for Terconazole Cream 0.8%, market shares began as somewhat disparate prior to the communication date, and then remained stable at close to 50 percent for each firm from the communication date until Actavis' exit in 2016, a pattern consistent with an MSA that continued throughout the Conduct Period. As a result, as shown in the Figure, the parties were able to sustain a significant overcharge (and prices similar to the monopoly price after Actavis' exit) throughout the Conduct Period.

**Figure 3 – Market Shares and Net Price for Terconazole Cream (0.8%)**

[redacted]

Sources: Defendants Transactional, AMP, IQVIA, and NADAC Data Sets.

## V. Prices for the Drugs at Issue

### A. Generic Drug Pricing and Price Measures

69. As discussed above, pharmaceuticals are distributed and sold via a complex supply chain that involves payments at several different levels between numerous market participants. Some of these payment amounts (and associated prices) are tracked and reported by public sources, and some are confidential and only known to the parties involved. For example, list prices (e.g., Wholesale Acquisition Cost, or "WAC") are published by a set of drug pricing compendia such as Red Book and First Databank. In addition, public information on transaction prices is reported by several public and

private organizations through surveys and other collection methods. Certain government agencies report information on amounts reimbursed by the government (e.g., amounts reimbursed under state Medicaid programs are published via CMS's State Drug Utilization Data ("SDUD")). Finally, as part of the MDL, third parties, including State Medicaid agencies, purchasers, and resellers at each stage of the supply chain, have produced transactional data for their purchases and sales of the Drugs at Issue. Table 1 below lists a set of relevant price and quantity data sources used for my analysis.

**Table 1 – Available Data Sources for Price and Quantity of Drugs at Issue**

| Data Source | Publisher/Source | Reflects Actual Transaction Prices Received by the Manufacturer | Includes Information on Quantity Sold/Purchased | Other Deficiencies |
|---|---|---|---|---|
| Net Price | Defendants' Data Production | Y | Y | |
| AMP | CMS (via Defendants) | Y | N | Reflects only prices paid by retail pharmacies |
| IQVIA | IQVIA Survey | Y | Y | Does not include off-invoice adjustments (rebates) |
| WAC | Pricing Compendia | N | N | Only reflects list prices |
| Medicaid/SDUD | CMS (Medicaid) | N | Y | |
| NADAC | CMS (Medicaid) | Y | N | Does not include off-invoice adjustments (rebates), Limited to prices paid by retail pharmacies, only available after 2/2013 |
| Other | Third Parties in the MDL | N | Y | |

70. Prices in these data sources are typically reported for each National Drug Code (NDC). The NDC identifies the labeler who is marketing the drug, the drug characteristics (API, form, and route of administration), and the package size being sold (*e.g.*, a bottle of 1000 tablets).

71. The primary data source I use for my analysis is the net price received by the Defendants for their drugs. Net prices include proceeds received from direct sales, minus any chargeback amounts and direct and indirect rebates paid, as well as other adjustment amounts such as returns.[130] Net prices

[130] Other adjustments include shelf stock adjustments, expired products, billbacks, and failure to supply penalties. See, e.g., Greenblatt Dep. 205:12-20 (stating that net price is gross price minus discounts, rebates, or anything that would be deducted from the gross price to determine the amount ultimately retained); McMahon Dep. 146:21-149:8

best reflect the actual net earnings for each Defendant manufacturer.[131] As noted by several of the Defendants, net prices are the measure that is most similar to profitability for their Drugs at Issue,[132] and form an important measure for evaluating their generic drugs' performance.[133] A breakdown of these amounts for Drugs at Issue is provided below in Figure 4.[134] As shown in the Figure, over the 2008 to 2018 period for which the Defendants produced data,[135] net revenue received by the Defendants equated to 42 percent of gross revenue.[136]

**Figure 4 – Net Revenue and Adjustments as Percentage of Gross Revenue**




72. Average Manufacturer Price, or AMP, reflects "[T]he average price paid to a manufacturer by wholesalers for drugs distributed to retail pharmacies. AMP was a benchmark created by Congress in 1990 in calculating Medicaid rebates" and is not available to the general public.[137] For the

(in which an Aurobindo witness stated the net price is the amount after applying all rebates, fees, or other amounts paid to the customer).

131 For purposes of my analysis, I exclude Medicaid rebates and other amounts paid to government agencies. I discuss these additional adjustments to revenue in Section VIII.C, below.

132 See, e.g., Shah Dep. 126:10-126:19. "The net sales price is used by finance for accruals and reporting of revenue. It includes all the deductions that you just mentioned like rebates, chargebacks, billbacks, make whole incentives, fees, discounts. But it also includes some noncommercial deductions and fees that we pay outside that is not -- that is not part of the commercial contract here."

133 Rosa Dep. 163:7-15 (stating that Amneal looks at net price when comparing across the industry).

134 Certain Defendants did not separately provide information by adjustment type either for certain periods of time or for their entire production. Those data points with missing information are excluded from this analysis.

135 As I understand it, for each Drug at Issue, Defendants were obligated to produce data from the two years preceding the first evidence of Conduct for that drug through the end of 2018.

136 Gross revenue is equal to the amount paid by direct customers, before any rebates or adjustments.

137 Kaiser Family Foundation. "Follow the Pill: Understanding the U.S. Commercial Pharmaceutical Supply Chain." March 2005, p. 28. Available at: https://www.kff.org/wp-content/uploads/2013/01/follow-the-pill-understanding-the-u-s-commercial-pharmaceutical-supply-chain-report.pdf.

manufacturer's drugs to be eligible for reimbursement under Medicaid, the manufacturer must report its AMP to CMS on a monthly and quarterly basis.[138] The formula for the AMP does include the discounts and price concessions given to the retail pharmacies, including rebates. Hence, while AMP reflects an actual transaction price for those retail pharmacies, it does not track prices paid by other customers in the market.

73. IQVIA (formerly IMS Health) is the market leader in analytics for the pharmaceutical market. IQVIA sells a product called National Sales Perspectives, which "[m]easures dollar and unit sales for pharmaceutical products across multiple distribution channels, including retail, mail, and non-retail. Data is collected from a panel of wholesalers, distributors and pharmaceutical manufacturers representing 90% of the pharmaceutical market and projected to a national total."[139] Hence, IQVIA sells a product that covers prices paid by the vast majority of the market. However, the IQVIA data do not include "off-invoice" adjustments such as rebates.[140] I have obtained and utilized data from IQVIA that covers the January 2006 to April 2020 period.

74. As mentioned above, WAC represents the list price for each drug, which is publicly available through several pricing compendia. These data list the date of the WAC price publication/change as well as the resulting WAC price. I obtain my WAC data from a vendor named AnalySource.

75. The Centers for Medicaid and Medicare Services (CMS) publishes two databases containing price and volume information by drug over time. The first, National Average Drug Acquisition Cost (NADAC), has been published since 2013. NADAC is a survey of retail community pharmacies and consists of the average unit price paid by these pharmacies based on their invoices.[141] The federal

---

[138] See e.g., "In general, for a manufacturer's covered outpatient drugs to be eligible for Federal Medicaid funding under the program, the manufacturer must enter into a rebate agreement with CMS and pay quarterly rebates to the States. Under the program, manufacturers are required to report monthly and quarterly to CMS the AMP for each covered outpatient drug (section 1927(b)(3)(A)(i)(I)). CMS uses the AMP to calculate a unit rebate amount for each covered outpatient drug." Department of Health and Human Services Office of Inspector General. 2014. "Average Manufacturer Price Determinations by Selected Drug Manufacturers Generally Were Consistent with Federal Requirements." June 2014, p. i. Available at: https://oig.hhs.gov/oas/reports/region6/61300014.pdf.

[139] IQVIA. "Available IQVIA Data." https://www.iqvia.com/insights/the-iqvia-institute/available-iqvia-data

[140] IQVIA and other invoice-based measures of prices may also include a markup at the wholesale level. Certain studies indicate that the wholesale markup for generics could be as high as 19%. (Sood, N., Shih, T., Van Nuys, K., and Goldman, D. 2017. "The Flow of Money Through the Pharmaceutical Distribution System." USC Schaeffer, June 2017, Figure 1. Available at: https://pharmaceutical.report/Resources/Whitepapers/4d3550b8-f007-4bef-9770-83b338b5a704_USC%20Schaeffer_Flow%20of%20Money_2017.pdf.)

[141] Centers for Medicare & Medicaid Services. (2023). "Methodology for Calculating the National Average Drug Acquisition Cost (NADAC) for Medicaid Covered Outpatient Drugs." p. 11. Available at: https://www.medicaid.gov/medicaid-chip-program-information/by-topics/prescription-drugs/ful-nadac-downloads/nadacmethodology.pdf.

government collects the results of this survey and publishes the result for each NDC. Notably, for purposes of the NADAC survey, CMS computes an average price for each generic drug (*i.e.*, across all manufacturers) instead of a manufacturer specific price, and reports that price for each NDC pertaining to that generic drug, regardless of the manufacturer.

76. CMS also publishes a database of information (State Drug Utilization Data, "SDUD") which contains data on Medicaid drug reimbursements by NDC by year. However, this dataset contains information about drug reimbursements, rather than prices received by the drug manufacturer, and hence is less useful for purposes of my analysis.

77. Finally, I understand that certain entities, including the State Medicaid Agencies and other third parties, have produced data covering purchases of Drugs at Issue at each level of the pharmaceutical supply chain, across the United States and its Territories. I have reviewed and incorporated such information to apportion Defendants' sales of the Drugs at Issue by State and Territory for purposes of my disgorgement calculations, as discussed below.

### B. Average Price for All Drugs at Issue

78. For purposes of my analysis, I compute prices at the same level of aggregation as my relevant product market (i.e., at the manufacturer, API, form, and strength level).[142] This allows me to test for the effects of Defendants' conduct on each affected market (*i.e.*, on each Drug at Issue). Further, certain data sources (i.e., IQVIA) are available only to me at the API, Form, and Strength level, so I do not have the option of evaluating their prices at a more granular level of detail. To compute prices across package sizes for each Drug at Issue, I convert the number of units (packages) sold into the number of extended units (e.g. tablets, grams of cream, etc.).

79. For all price measures, I evaluate prices at the quarterly level. Pharmaceutical sales are characterized by a series of direct sales, indirect chargebacks, and direct and indirect rebate events, all of which do not occur concurrently. Because the Defendant sales data do not generally allow each of these measures to be tracked back to the direct sale, aggregating to the quarterly level is more likely to match sales and with the associated rebates than might occur if I computed prices at a more granular

[142] The primary difference between this approach and evaluating prices at the NDC level is that the NDC includes information on the package size (*e.g.*, the difference between a 100-pill bottle and a 500 pill bottle). While I would generally expect that a larger package size would correspond to a lower per-extended unit price, I am unaware of any specific trend in purchases of smaller or larger package sizes of the Drugs at Issue that could confound my analysis.

level of aggregation.[143] I note, however, that my results are robust to calculating prices on a more aggregated basis.[144]

80. To provide an overview of the pricing of the alleged conduct in the complaint, Figure 5 below presents the average price for Drugs at Issue for all Defendants in the Complaint, computed from each of the four data sources discussed above that provide actual transactions prices. As shown in the Figure, the average prices for the Drugs at Issue increased dramatically over the Conspiracy Period, peaking at roughly four or five times the prices prior to the Conspiracy Period, before continuing to fall for several years after the conspiracy was discovered.[145]

**Figure 5 – Average Prices for Drugs at Issue**

[redacted]

Source: Defendants Transactional, AMP, IQVIA, and NADAC Data Sets.

81. This simple average does not control for the changes over time in the mix of drugs, particularly given that Defendants were obligated to produce information for each Drug at Issue for different periods of time.[146] In other words, the average price could change over time both as additional drugs are

[143] This is consistent with the way Medicaid computes AMP, though AMP is calculated using a 12-month moving average. (Centers for Medicare & Medicaid Services. 2007. "Medicaid Drug Pricing Regulation: A Summary." July 6, 2007. Available at: https://www.cms.gov/newsroom/fact-sheets/medicaid-drug-pricing-regulation-summary.)

[144] Specifically, I utilize a 3-quarter moving average. See backup materials to this report.

[145] The jump in average net price in 2010Q1 appears to be due to Sandoz's introduction of the generic form of Imiquimod Cream in February 2010.

[146] It is my understanding that Defendants were obligated to produce transactional data from at least 2 years prior to the alleged conduct on each specific Drug, with continuing production through 2018.

introduced and because the production of data on a particular Drug at Issue commences. Figure 6 provides an index of prices for all drugs and defendants that is derived from a hedonic regression that controls for product-mix.[147] While the index values differ somewhat from the "unadjusted" prices in Figure 6, they show the same pattern of increased prices, with prices falling around the time the conspiracy was discovered.

**Figure 6 – Price Indices for Drugs at Issue (2018Q4 = 100)**

[redacted]

Source: Defendants Transactional, AMP, IQVIA, and NADAC Data Sets.

82. This pattern of prices sharply contrasts with the prices of generic drugs that are not subject to inquiry in the MDL. As shown in Figure 7, below, prices for non-MDL drugs have effectively flat prices over time compared with the Drugs at Issue.

[147] The hedonic price is the exponentiated quarter coefficients from regressing logarithm of price on quarter fixed effects along with product (API-form-strength) fixed effects. See, for example, Pakes, A. 2003. "A Reconsideration of Hedonic Price Indexes with an Application to PC's." *American Economic Review*, 93(5): pp. 1578-1596.

**Figure 7 – Price Index for Non-MDL Drugs**

[redacted]

Source: IQVIA.

83. As shown in Table 2 and Table 3, the Defendants' average net price (Table 2) and the price index (Table 3) are highly correlated with AMP and IQVIA, and somewhat less correlated with NADAC.[148]

**Table 2 – Correlation Between Defendants' Average Net Prices and Alternative Price Measures**

[redacted]

*Sources: Defendant Transactional Data, AMP, IQVIA, and NADAC.*

[148] As noted above, NADAC prices are reported collectively for each Drug at Issue (*i.e.,* are not specific to a particular manufacturer), and cover a much more limited time period than the other data sources.

**Table 3 – Correlation Between Defendant Net Price Index and Alternative Price Indices**

[redacted]

*Sources: Defendant Transactional Data, AMP, IQVIA, and NADAC.*

84. Prices from the two non-public data sources (the Defendants' net prices and AMP) begin to diverge, however, from the public data sources around early 2013. This divergence coincides with increased chargeback volume over time, as depicted in Figure 8 below. As shown in the Figure, chargebacks have increased from under 20% of gross sales in 2011-2012 to over 50% by the end of 2018, while net sales have declined from over 50% of gross price to less than 30% by 2018.[149] The widening gap between gross and net sales over time further reinforces the need to calculate and utilize Defendants' net prices instead of gross prices, which over time, resemble less and less the actual prices paid in the market. In other words, if I was to analyze only gross prices (WAC), I would likely obtain a larger price increase than if I use net prices (where higher gross prices were offset somewhat by increases in adjustments).

**Figure 8 – Chargebacks and Net Sales as Percentage of Gross Sales over Time**




[149] This analysis includes only information on Drugs at Issue, and excludes Defendants with inconsistent chargeback productions (Actavis, Sun, and Taro).

85. Though my analysis focuses primarily on net sales prices from the Defendants' production, (because disgorgement values should be based on the Defendants' net prices and profits[150]), I do use other data sources as necessary. For example, IQVIA includes data prior to the period of Defendants' production (which is limited, for each drug, to from at least 2 years prior to initial Conduct on that drug through the end of 2018), data from the pre- and post-Conspiracy periods, and for where certain portions of individual Defendant's productions are missing or lacking.

86. As discussed below, I also utilize IQVIA price data on non-Drugs at Issue to benchmark prices for the Drugs at Issue. To the extent that these prices do not reflect the changing mix of chargebacks over time, using these prices as a benchmark is conservative. This is because the IQVIA prices which I use to estimate the "but-for" path of prices for the Drugs at Issue are likely higher (particularly the later in the Conspiracy periods) than they would be when calculated using actual net prices for those Drugs.

87. In the body of this Report, whenever possible, I present the results using Defendants' net prices, but I also include the results using the alternative price measures in Appendix E. The results in Appendix E are similar to the results I include in the body of this Report, providing further support for the conclusions I draw based on Defendants' net prices.

88. A full discussion of how I processed Defendants' data and a discussion of the various issues and problems I have found with each Defendants' transactional data production is included in Appendix F to this Report.

### C. Pricing by Defendant

89. While the above plots of prices of Drugs at Issue are useful for examining the general trend of prices over time, the effects of the conspiracy can be seen in each of the Defendants' prices for the Drugs at Issue. For purposes of this analysis, I compute a separate price index for each Defendant using the Defendant net price data, using hedonic regressions with product fixed effects to control for changes in product mix. The price indices for Sandoz and Taro, the two largest (by revenue) manufacturers for Drugs at Issue, are presented in Figure 9 and Figure 10 below. Those Figures show that the net price for the Drugs at Issue for Sandoz and Taro increased from the early part of the Conduct Period to around 2015, by a multiple of 6 (Taro) or a multiple of 7 (Sandoz), and then began falling, either

[150] Profits are the relevant measure because I understand that unjust enrichment is based on the principle that "[a] person is not permitted to profit by his own wrong." McCamus, John D. "The Restatement (Third) of Restitution and Unjust Enrichment." *Canadian Bar Review*, 90(2): pp. 439-467, at p. 446.

around the time of the Heritage Complaint (Sandoz) or earlier (Taro).[151] Figure 9 shows that the ratio of Sandoz peak price in the 2014-2015 period compared with 2009 is 7.0, a price increase of 600%. Similarly, Figure 10 shows a similar price increase for Taro.

90. The full set of plots for each of the Defendants is provided in Appendix D Figures 1 to 17. The ratio of the peak average price to the base price ranges from 1.50 (a 50% price increase) for Mylan and 2.60 (a 160% price increase) for Amneal up to around 7.00 (*i.e.,* a 600% price increase) for Sandoz.[152]

**Figure 9 – Sandoz Price Index for Drugs at Issue**




Source: Defendants Transactional Data.

[151] I note that there may have been some awareness by some Defendants of a pending investigation into generic drug pricing prior to the Heritage Complaint.

[152] I note that the interpretation of these charts (at least in terms of calculating the percentage increase in prices over time) can be difficult because at any one point in time (prior to 2016), the Drugs at Issue may be comprised of both Drugs on which Defendants were already communicating as well as Drugs for which communications had not yet begun.

**Figure 10 – Taro USA Price Index for Drugs at Issue**




Source: Defendants Transactional Data.

## D. Pricing by Type of Collusive Conduct

91. As discussed above, Defendants' conduct can be assessed both in terms of the DOJ antitrust classifications (price fixing, bid rigging, and market allocation) and in the broader context of an overarching MSA. Since the different types of conduct alleged can be expected to generate different effects, I group the Drugs at Issue into two categories:[153]

- Drugs with sufficient sales history[154] where there is evidence of communications about increasing prices or surrounding an impending price increase (e.g., communications about following a price increase) and/or where there is evidence of accommodating entry with fair share agreements or other market allocation behavior[155] (henceforth "Price Increase Drugs", or "PI Drugs") - 84 Drugs with Defendant net revenues of more than $8.9 billion (81% of total net Defendant revenue); and

[153] In my Initial Report, I grouped the Drugs at Issue into three categories, Price Increase Drugs, New Generics, and Accommodating Entry drugs. Since my Initial Report was filed, the SAGs have asked that I remove six injectable Drugs at Issue from my analysis, all of which were Accommodating Entry Drugs. This would have resulted in the "Accommodating Entry" group having only three Drugs at Issue, hence, for purposes of this report and this discussion the three remaining drugs are grouped with the Price Increase Drugs.

[154] At least one year of pre-communication sales.

[155] I note that the absence of evidence of specific discussions about price in the Complaint (and only communications about accommodating entry) does not necessarily mean that there were no such communications about increasing prices. For example, see the discussion of intra-API effects in Section VI.F, below. Many communications were done in person, and witnesses have testified regarding efforts to avoid putting evidence of

- Drugs where there is evidence of the Defendants discussing prices or market allocation at the time of launch of the generic drug[156] (i.e., when the drug comes off patent) ("New Generic drugs", or "NG Drugs") - 14 Drugs comprising total net Defendant revenues of $2.1 billion (19% of total net Defendant revenues).[157]

92. Appendix C Table 1 provides a list of Drugs at Issue in each category as well as a summary of the evidence from the Complaint, including the date at which Defendants' alleged conduct began. Appendix C Table 2 provides a list of the Drugs at Issue for each Defendant.

93. Price indices for each of these two drug classes are shown in Figure 11 to Figure 12, below. Price plots for each of the 98 Drugs at Issue are provided in Appendix D Figure 18 to Appendix D Figure 115.

94. As shown in Figure 11, below, Price Increase Drugs are characterized by large increases in price as each Drug becomes subject to collusive behavior, with the largest increase occurring in early 2013.[158] Prices begin to fall even before the conspiracy is detected[159] but do not return to their pre-conduct level by the end of the Defendants' data production.

---

communications in writing. See also, e.g., Krauthauser Dep. 469:17-472:22 (Krauthauser tried to "minimize the paper trail" by not putting collusive information in writing, adhering to the mantra "if you don't put it in an email . . . it didn't happen"; in-person communications with competitors were often at industry events and occasionally at social gatherings), 821-825 (if he did report information in writing, he was less likely to divulge details of his communications with competitors, and might say "I've heard of" or "I've become aware of"), 873-880 (in-person communication between competitors at NACDS trade show), 1066-1070 (competitors getting together in 2016 at a cabin in the Poconos in 2016 that one defendant referred to as "collusion cabin"),; Bihari Dep. 536:9-14 (approached by a competitor at NACDS suggesting "we're going to make a lot of money together"), 545:25-547:6 (observing a competitor openly talking about drug pricing at Morris & Dickson trade show); Thomassey Dep. 46:4-49:20 (agreeing that it was a "common occurrence" for competitors to communicate about competitively sensitive information while at trade shows and customer conferences; testifying that he personally communicated and reached agreements with competitors while at trade shows and social gatherings).

[156] For purposes of classification, I use the date at which the Drug first appears in the IQVIA data for the date of generic launch.

[157] For purposes of this classification, I define New Generics as drugs where the alleged conduct begins within a year of the first sale of that generic.

[158] In this Figure, the price increases can be gradual despite large price increases on individual drugs because the set of drugs subject to collusion grows over time. In other words, initially, the drugs subject to collusive effects form a smaller percentage of total sales of PI drugs than in later time periods. As the percentage of the total subject to collusive effects grows and those price increases become effective, the overall price index increases.

[159] Notably, Connecticut's investigation commenced well before the Complaint was filed, so some attrition in prices would be expected.

**Figure 11 – Price Index for Price Increase Drugs**




95. Figure 12 below presents the pattern of prices for New Generic Drugs. Since there is no initial (pre-collusive) price to use as a reference, the price path for NG drugs does not exhibit the pattern observed for PI Drugs, i.e., a large price increase followed by a gradual decrease that continues through the post-discovery period. Thus, as discussed in Section VIII.B.i below, these Drugs require a somewhat different analysis to measure the effect of conspiracy (if any) than for PI Drugs.

**Figure 12 – Price Index for New Generic Drugs**




# VI. The Effect of Collusion on the Prices for Drugs at Issue - Quantification of Anti-Competitive Price Increases

## A. Background

96. As discussed above, for the PI Drugs at Issue, Defendants' behavior can broadly be separated into two categories by the expected effect on net prices of that behavior. For drugs where Defendants communicated to implement a price increase, the actual observed change in prices over time should approximate the overcharge due to collusion absent other events that could be expected to have affected prices in the "but for" world, such as changes in cost, demand, or competitive conditions (e.g., in the number of suppliers, through entry or exit). For drugs where Defendants attempted to accommodate entry, however, the overcharge will include the difference between the observed price increase or decrease and a "but for" price that also takes into account the expected effect of entry in a competitive market.

97. My goal is to estimate the increases in net prices received by the Defendants through their collusive behavior and to calculate the appropriate amount of disgorgement. I begin by comparing the net price for each individual Drug at Issue over the year prior to the date of direct evidence of communication

or cooperation to the prices during the subsequent years.[160,161] As shown in Figure 13, below, the average unadjusted prices for PI drugs remained elevated above the base price for at least five years after the initial communications.[162]

**Figure 13 – Average Prices for PI Drugs by Year Relative to Pre-Conduct Levels**




Source: Defendants Transactional Data Sets.

98. As noted above, the average price may be affected by changes in the mix of drugs as well as changes in costs and the number of suppliers (i.e., by entry or exit). To adjust for those factors, I use an econometric technique called multiple (multivariate) regression to estimate what prices would have been "but-for" Defendants' conduct for each category of conduct and Drug at Issue.[163]

---

[160] See subsection below regarding benchmark periods for a discussion of alternatives to the one-year period shown in the Figures.

[161] The average increase for PI Drugs based on the one year pre-Conduct period vs. the entire post-Conduct period was 173%.

[162] When estimating the amount of disgorgement, the relevant period would be the entire period during which collusive effects continue. However, another indicator of the presence of collusion is likely to be the size and statistical significance of the price increase during the one-year period immediately following that first communication. The very large initial price increases shown in Figure 14 confirms the causal link between the collusive conduct and higher prices.

[163] Calculating overcharges, which are the difference between actual and but-for prices, is a commonly used method of estimating damages in price-fixing matters. Rubinfeld, Daniel L. 2012. "Modern Methods for Measuring Antitrust Damages." *Research Handbook on the Economics of Antitrust Law*: pp. 379-385.

### B. Benchmark Pre-Conduct Period for the Drugs at Issue

99. For purposes of my analysis, here I utilize a pre-Conduct benchmark period comprised of the first period for which I have Defendant data for that Drug and ending at the date of first conduct for a drug with the same API.[164] As an example, for Clindamycin Phosphate, the date of first communication for the Solution is 2010Q4, and the date of first communication for the Lotion is 2012Q4. For the Solution, I utilize the period from when I first have data (2008Q1) to 2010Q3 as my benchmark. For the Lotion, I use the period from when I first have data (2009Q1) to 2010Q3 as my benchmark. The period between 2010Q4 and 2012Q3 for Clindamycin Phosphate Lotion is then the "API Period" for the Drug (See Section VI.F below for a discussion of intra-API effects).

100. To the extent possible, I exclude quarters at the beginning or end of the candidate benchmark period where only one manufacturer makes the drug. For these drugs, I consider the period of time where the Drug was under competition to be a better benchmark of the prices that would have prevailed "but-for" Defendants' Conduct (*i.e.*, would have prevailed under competitive conditions). I also exclude periods of time where a Drug experiences a large price increase from my benchmark period.[165] In addition, I limit the pre-Conduct period for certain Drugs (Ciclopirox Cream and Ciclopirox Shampoo) to the period where I have data for at least two Defendant firms in the market.[166]

### C. Multivariate Regression

101. At its simplest, a regression model is a statistical technique used to study the relationship between two variables.[167] Multiple regression analysis involves estimating the relationship between a variable of interest (the "dependent" variable) and two or more other factors ("independent" variables).[168] In this case, I use multiple regression analysis to control for factors other than Defendants' conduct that might influence prices. Regression analysis allows me to hold constant for those (competitive)

---

[164] If insufficient data (defined as under one year of data) for that Drug are available prior to date of API conduct, I utilize all data prior to communication on that Drug for my benchmark period.

[165] This adjustment affects both strengths of Ethambutol Hydrochloride and all forms/strengths of Betamethasone Valerate. The benchmark period for Ethambutol Hydrochloride ends in 2012Q2, and the benchmark period for all forms of Betamethasone Valerate ends in 2010Q4 (the API period begins 2011Q1 and runs until the date of first communication on each Drug).

[166] This adjustment also excludes a period during which there appears to be an outlier price.

[167] Wooldridge, Jeffrey M., "Introductory Econometrics: A Modern Approach," 4th Edition, 2009, pp. 22-23, 68-72.

[168] Ibid, pp. 68-72.

factors, and test for whether Defendants' conduct resulted in prices higher than they would have been in the "but-for" world.

102. In antitrust analysis, it is common to compare the prices that prevailed immediately prior to some event with the prices that prevailed for some period of time after that event.[169] Econometric analysis allows me to test what is called the null hypothesis[170] (*e.g.*, whether or not prices are significantly higher in the Conduct Period than in the Pre-Conduct Period for Drugs at Issue).

103. I employ two separate techniques to test this null hypothesis. The first is called a "before and after" (differences) model and the second is called a "difference-in-differences" model ("DiD"). A before and after model estimates how much prices differ between a benchmark period (before) and a treatment period (after) after controlling for any explanatory variables that might otherwise explain the difference between the treatment and the benchmark periods.[171] In other words, the before and after model measures any unexplained difference between the benchmark and treatment periods and attributes that change to the Conduct. I discuss the second technique ("difference-in-differences") in Section VI.E.i below.

104. There are a variety of econometric techniques that can be used to estimate a regression model. For purposes of this report, I discuss three different techniques. The first, Ordinary Least Squares ("OLS"),[172] is the most commonly used technique. Weighted Least Squares ("WLS")[173] is also commonly used, particularly in the context of damages and disgorgement calculations. Finally, Instrumental Variables ("IV") is used for applications where there is concern about endogeneity of the independent variable(s).

## D. Before and After Model

### *i. Base Model*

105. For PI Drugs, I estimate, as a first approximation, a before and after model to estimate the change in net prices for each individual Drug between the benchmark period for that Drug and the entire post-Conduct period for which I have data. I include drug fixed effects to control for product mix (as

[169] Rubinfeld, Daniel L. 2012. "Modern Methods for Measuring Antitrust Damages." *Research Handbook on the Economics of Antitrust Law*: pp. 379-385.

[170] Wooldridge, Jeffrey M., "Introductory Econometrics: A Modern Approach," 4th Edition, 2009, pp. 121-124.

[171] Ibid, pp. 381-385.

[172] Ibid, pp. 27-32.

[173] Ibid, pp. 276-293.

in the hedonic index discussed above) as well as indicator variables for each year following the initial communication. The results are depicted in Figure 14 below.

**Figure 14 –Price Index for (PI) Drugs Relative to the Benchmark Period**




Source: Defendants Transactional Data Sets.

106. To provide an estimate of the average price increase over the entire conspiracy period, I estimate the following model:

$$\ln(P_{i,d,t}) = \beta_0 + \beta_1 \text{Post First Communication}_{i,t} + \gamma_i i + \epsilon_{i,d,t}$$

where $P_{i,t}$ represents the Defendant net price for Defendant *d* for drug *i* at time *t*. $\text{Post First Communication}_{i,t}$ represents an indicator variable that takes the value of 1 if the date (t) occurs after the date of first communication on drug *i*. $\gamma_i$ denotes the drug fixed effects, which as mentioned above, control for any change in overall product mix over time, and $\epsilon_{i,d,t}$ is an error term. The results of this model are depicted in Table 4 below.

**Table 4 – Econometric Estimates of the Change in Prices for PI Drugs Pre- and Post-Conduct**

| **Price Increase %** | **252%** |
|---|---|
| | |
| Post First Communication | 1.2594*** |
| | [0.0250] |
| Constant | -2.0538*** |
| | [0.0204] |
| | |
| Observations | 5,371 |
| R-squared | 0.673 |
| Drug (API-Form-Strength) Fixed Effect | Yes |

Standard errors are clustered by API
*** p<0.01, ** p<0.05, * p<0.1
Notes:
[1] Dependent variable is natural logarithm of Defendants net price.
[2] Price Increase % is calculated as: Exp(Post Communication Coefficient) - 1.
*Source: Defendants Transactional Data.*

107. As shown in the table, prices for PI drugs increased on average by 252%[174] after the initial communications. This change in price is statistically significant at the 99% level of confidence.

108. I next consider whether the prices for Drugs at Issue could have changed between the Pre-Period and the Conduct Period for reasons other than Defendants' conduct. To adjust for changes in factors post-Conduct other than collusion that could have affected prices, I add additional explanatory variables that economic theory indicates are likely to affect prices. This model is then used to estimate the price changes associated with Defendants' Conduct.

109. As noted by Defendants, generic drug prices are influenced by a number of factors. A witness from Sandoz described price being influenced by the WAC price, relevant market share, number of other competitors, forecasted sales, cost margins, contractual factors like failure to supply provisions, price protection provisions, MFN clauses, patient impacts, and the ability to supply the marketplace.[175] I discuss several of these factors below that I have data for to incorporate in my regression analyses.

[174] The percentage increase (252%) is calculated as the coefficient 1.2594, exponentiated, minus one.

[175] Bonagura Dep. 62:12-63:17.

### *ii. Additional Explanatory Variables*

*a. Demand*

110. I control for $\text{Demand}_{i,t}$, which measures the total quantity of Drug *i* sold in period *t,* as measured by total extended unit quantities in IQVIA.[176] Since my model already includes drug fixed effects, this variable captures the effects of increasing or decreasing demand for the individual drug, as opposed to differences in the level of demand across drugs. Several deponents in this matter have listed demand as an important factor in determining prices.[177]

*b. Cost*

111. A second factor that economic theory indicates should influence prices, at least under competitive conditions, is the variable cost of manufacturing. As costs go up (or down), the corresponding prices would also go up (or down), to an extent depending on market structure. The ratio of the increase in price to the increase in cost is called the "pass-through rate".

112. For purposes of this analysis, I have reviewed the Defendants' production of ordinary course documents as well as net profitability reports produced in discovery to locate cost data on the Drugs at Issue. These sources often provide what each manufacturer refers to as the cost of goods sold, or "COGS", or, alternatively, "Total Cost." While these measures are not quite equal to true variable costs, COGS typically includes the costs of manufacturing and distributing the product (materials and labor) and may include some fixed costs such as overhead.[178]

113. To be useful for my analysis, COGS had to be specific to the individual Drug at Issue, and available for a sufficient time period to be included in my regression model. I located usable cost information for Amneal, Aurobindo, Greenstone, Mylan, Perrigo, Sandoz, Taro, Wockhardt, and Bausch/Valeant/Oceanside. A description of these cost data and the methodology for computing COGS is included in Appendix F. If available, I apply each manufacturer's cost to that manufacturer's drugs (*i.e.*, Taro's costs matched with Taro's prices). If costs for a Drug at Issue were unavailable for that manufacturer, I applied the average cost for that Drug at Issue for other manufacturers that did produce cost information (i.e., the average cost of Sandoz and Taro's cost

---

[176] While Defendants' sales represent the vast majority of sales of the Drugs at Issue, certain other manufacturers sold Drugs at Issue over the relevant period. IQVIA data include sales by both Defendant and non-Defendant manufacturers.

[177] See, *e.g.*, McMahon 221:19-223:7.

[178] See, *e.g.,* Fang Dep. 102:23-105:5 (discussing categories of COGS), 106:22-107:7 (indirect labor costs included in overhead).

could be matched with to Actavis' prices).[179] These data cover 94 of the Drugs at Issue and 85% of observations over the 2009 to 2018 period.

*c. Cost Interacted with Conspiracy Period*

114. A number of studies have found that passthrough rates will be lower during periods of collusion than during non-collusive periods, as can be expected since prices under collusion are fixed by agreement, rather than determined by costs. A reduction in the pass-through rate is thus a hallmark of collusion.[180] In my regression (see Table 7 below), I therefore interact Defendants costs with the conspiracy period. I note, however, that calculating the change in prices due to the Conspiracy requires taking into account the difference in the pass-through rates, in addition to any other unexplained difference between the benchmark and treatment periods. To avoid this complication, I transform the cost variables to be the de-meaned cost in the pre- and post-Conspiracy period.[181]

*d. Shortages and Capacity Utilization*

115. Changes in available capacity or supply shifts such as those associated with shortages could also result in increased prices for reasons other than collusion. Several studies (including those by the FDA) have noted that drug shortages often result in elevated prices.[182] Hence, to evaluate whether any supply event could have occurred with respect to the Drugs at Issue, I focus on drug shortages at either the manufacturer or market level.

---

[179] While each manufacturer's costs are not likely to be identical, I would expect that certain costs (such as procurement of the API) would be correlated across manufacturers.

[180] As Posner (1976) notes, "There is some basis in economic theory for believing both that a monopolist (or cartel) will react to cost or demand changes by smaller percentage changes in price than the sellers in a competitive but otherwise identical market, and that a cartel will change price less frequently than competitive firms would, because of the difficulty and legal risk in negotiating the cartel price." Posner, Richard A. 1976. *Antitrust Law: An Economic Perspective.* Chicago, Illinois: The University of Chicago Press, p.68; For more recent empirical work on this issue, see Abrantes-Metz, R.M., Froeb, L.M., Geweke, J., and Taylor, C.T. (2006). "A Variance Screen for Collusion." *International Journal of Industrial Organization*, 24(3), pp. 467-486; Athey, S., Bagwell, K., and Sanchirico, C. (2004). "Collusion and Price Rigidity." *The Review of Economic Studies*, 71(2), pp. 317-349; Doane, M.J., Froeb, L.M., Werden, G.J., and Zimmer, D.M. (2013). "Predicting Price Effects from Retail Mergers." *Vanderbilt Owen Graduate School of Management Research Paper No. 2034464*.

[181] This transformation ensures that the derivative of price with respect to the Conduct Period is a function only of the post-communication dummy variable and not a function of cost and can easily be interpreted as the effect of the conspiracy.

[182] See, *e.g.*, Tessema et al. 2020. "Generic But Expensive: Why Prices Can Remain High for Off-Patent Drugs." Hastings Law Journal, 71(4): pp. 1019-1052, p.1029. "Apart from niche markets and consolidation, sudden drug shortages can also lead to market conditions that enable generic price increases. In times of shortage, demand remains constant as supply diminishes; such conditions allow manufacturers to increase prices as shortages begin and persist, often keeping prices elevated even after the shortage resolves. Other settings, such as market discontinuation of a competitor with sizeable market share, can lead to shortages of other drugs in the short-term, as supply can no longer keep up with demand."

116. The phenomenon of drug shortages resulting in higher prices is well-known by market participants. Indeed, as discussed above, the Defendants in this action relied upon pretextual drug shortages to camouflage their price increases and used shortages as an explanation for their complementary bids or refusals to bid. Some temporary shortages may have occurred, notably due to delays in qualifying new API sources.[183] In order to explain elevated prices over a significant time period, however, the shortage must be sustained for an extended period. Shortages of this type are tracked and reported by the FDA on its website.[184] Defendants also considered the information from the FDA in making decisions about how much to bid and whether to respond to a bid.[185]

117. I have obtained historical versions of the FDA's shortages list for each quarter dating from June 2009 through December 2018 from archive.org. The data show that during that time frame, 302 API/form combinations experienced a shortage,[186] including two of the API/forms for Drugs at Issue. The applicable APIs/forms and associated shortage dates are listed in Table 5, below.

**Table 5 – Shortage Dates for Drugs at Issue**

| Drug API and Form | Shortage Dates |
|---|---|
| Methazolamide Tablets[187] | 2012Q3-2014Q3 |
| Methylphenidate HCL Tablets (Regular and Extended Release) | 2011Q2-2012Q2, 2013Q2-2016Q1 |

118. To control for the effects of shortages, I include an indicator variable in my regression for the period of time a Drug (either in my control sample or in the Drugs at Issue) is listed by the FDA as being on shortage. In addition, I also include a separate indicator variable for the period(s) of time the Drug at Issue was listed as being on shortage.[188]

[183] See *e.g.,* PER-MDL-00673639- PER-MDL-00673640.

[184] US Food and Drug Administration. "FDA Drug Shortages." Available at: https://www.accessdata.fda.gov/scripts/drugshortages/default.cfm.

[185] McMahon Dep. 483:24-484:24.

[186] This includes only APIs and product forms that I was able to locate in the IQVIA database.

[187] The FDA shortages data does not indicate that Methazolamide was on shortage in 2014Q2, but the effects of the shortage were still likely incorporated into prices.

[188] To the extent that the coefficient on this variable is positive (indicating higher price increases for Drugs at Issue while on shortage), including this indicator variable is likely to be conservative, particularly if the conspiracy enhanced Defendants' ability to increase prices during shortage periods.

### *e. Branded Generics*

119. As noted above, I include "fixed effects" to control for differences between Drugs in my regression model. I understand, however, that some of the Drugs at Issue involve branded generics. The very nature of branded generics suggests that these drugs should command a higher price – the manufacturers believe that attaching a proprietary name to the product will command loyalty from consumers.[189] Hence, in my regression model, I include an indicator variable for whether the Drug is a branded generic version.[190]

### *f. Effects of Entry*

120. In addition to the above factors, it is widely recognized that the higher the degree of competition in the market for generic drugs, the lower are their prices.[191] This has been recognized by market participants (including the Defendants) and is confirmed by academic studies and by my own econometric study of the effects of generic competition.

- *Studies in the Economics Literature*

121. Studies in the economics literature of the impact of competition in the market for generic pharmaceuticals are nearly universal in concluding that greater competition results in lower generic drug pricing. A recent study by the FDA[192] confirmed that increases in the number of generic producers resulted in decreases in both IQVIA prices and AMP (see Figure 15, below). As shown in the Figure, generic drugs with two generic drug manufacturers have a price that is approximately 25 percent lower than generic drugs with only one manufacturer.[193] Adding a third manufacturer leads to prices that are a further 21 percent lower.[194] While the incremental effects of additional entry tend to fall off as more and more manufacturers enter the market, there are sizable price reductions associated with a larger number of suppliers at up to 6 generic manufacturers.

---

[189] While I expect a price difference between generics and branded generics, I do not expect prices for authorized generics to differ from regular generics, as there is no brand loyalty.

[190] I use information from AnalySource and IQVIA to distinguish branded generics from generics.

[191] Nguyen, Xyan Nguyen, et al. 2022. "Effect of Competition on Generic Drug Prices," *Applied Health Economics and Health Policy*, 20(2): pp. 243-253. Available at https://pubmed.ncbi.nlm.nih.gov/34904207/.

[192] Conrad, R., and Lutter, R. (2019). "Generic Competition and Drug Prices: New Evidence Linking Greater Generic Competition and Lower Generic Drug Prices." December 2019, pp. 1-9. Available at: https://www.fda.gov/media/133509/download.

[193] Equals 0.45 / 0.6.

[194] Equals 0.75 - (0.325 / 0.6) = 0.208.

**Figure 15 – Empirical Estimates of the Effects of Generic Entry (Conrad and Lutter (2019))**

[redacted]

122. Similarly, Berndt et al. (2007) find significant price-reducing effects of entry up to 3 or 4 generic manufacturers.[195] Other government studies find brand/generic price ratios after generic entry in the same neighborhood as the other studies (see Figure 16, below).[196]

[195] Berndt, E.R., Mortimer, R., Bhattacharjya, A., Parece, A. and Tuttle, E. (2007). "Authorized Generic Drugs, Price Competition, and Consumers' Welfare." *Health Affairs*, *26*(1), p. 792.

[196] Office of the Assistant Secretary for Planning and Evaluation (ASPE) et al. (2010). "Expanding the Use of Generic Drugs." December 1, 2010. Available at: https://aspe.hhs.gov/reports/expanding-use-generic-drugs-0.

**Figure 16 - Empirical Estimates of the Effects of Generic Entry (ASPE (2010))**




123. The academic literature on generic entry also discusses whether these studies could suffer from an endogeneity problem. As Olson and Wendling (2013) describe, "Estimating the causal relationship between price and the number of competitors is difficult since entry decisions by generic competitors may be correlated with unobserved determinants of price."[197] While the studies referenced above do not include a correction for endogeneity, I address this concern in my empirical results below.

- *Market Recognition of the Effects of Competition*

124. While competition-related decreases in prices are widely recognized, market participants, including the Defendants themselves, clearly understood and planned around the phenomenon. In fact, the same chart depicted above from the ASPE was utilized in internal presentations at Defendant Greenstone.[198] From the annotated chart, Greenstone acknowledged "Higher Pricing" at 1-4 competitors, and "Commoditized Pricing" beginning at 5 competitors. Across the record in this matter, Defendants acknowledge that the number of competitors is an important factor they account for in making pricing decisions.[199] This recognition, combined with the academic studies listed above, make it clear that the market structure for each of the generic Drugs at Issue is an important factor to control for in my analysis.

---

[197] Olson, L., and Wendling, B.W. (2013). "The Effect of Generic Drug Competition on Generic Drug Prices During the Hatch-Waxman 180-Day Exclusivity Period." Federal Trade Commission, Bureau of Economics, Working Paper No. 317. April 20, 2013, p. 2.

[198] GNSTCT00004853.

[199] See, *e.g.*, Bonagura Dep. 62:12-63:17.

HIGHLY CONFIDENTIAL: SUBJECT TO PROTECTIVE ORDER

**Figure 17 – Greenstone/Pfizer and the Effects of Competition**




- *Empirical Estimates of the Effects of Competition*

125. While recognition of the effects of generic competition is widespread, my own analysis of the effects of competition is consistent with the literature and market recognition. For purposes of my analysis, I have analyzed data from IQVIA[200] to estimate the incremental price-reducing impact of adding an additional competing generic drug manufacturer for generic drugs[201] over the 2006 to 2020 time period. For purposes of this analysis, I consider a manufacturer to be a competitor in a given drug in a given period if (a) the manufacturer is not a known repackager, and (b) the manufacturer

[200] Net price and AMP information is unavailable for drugs not included in the MDL and has not been produced as part of discovery.

[201] Excluding all drugs in the MDL, including Drugs at Issue.

had at least a one percent share of sales[202] in that quarter.[203] Manufacturers of branded generics (as classified by IQVIA) are not included as competitors.[204]

126. For my analysis, I begin by estimating the following regression model:

$$\ln(P_{i,m,t}) = \beta_0 + \beta_1 \ln(\text{Demand}_{i,t}) + \sum_{j=2}^{5+} \delta_j \text{ Number of Competitors} = j_{i,t} + \beta_2 \text{Shortage}_{i,t} + \beta_3 \text{Branded Generic}_{i,m} + \theta_t t + \gamma_i i + \epsilon_{i,t}$$

where $P_{i,m,t}$ is the IQVIA price for Drug i, for manufacturer m, at time t, and Demand, Shortage, Branded Generic and $\gamma_i i$ are as explained above. The variables "$\text{Number of Competitors} = j_{i,t}$" measures the effect of having two, three, four, or five or more competitors in drug i at time t compared with only having one firm in the market. Finally, $\theta_t t$ represents a series of year-quarter fixed effects capturing the general increase/decrease in generic drug prices over time.

127. Table 6 below shows the result of that OLS regression. As shown in the Table, the incremental effect of adding additional competitors would suggest a much lower incremental effect of generic entry than the studies discussed above: a 3 percent reduction in prices for the entry of the second competitor, a 6 percent reduction for the third firm, an 8 percent reduction for the fourth firm, and an 11 percent reduction for the fifth firm.

128. My sample of drugs from IQVIA includes both generics coming off of patent, as well as drugs that have been generic for a long period of time, whereas the other authors (e.g., Conrad and Lutter (2019)) focus on the former.[205] Hence, this finding (lower effects from entry) may be the result of my sample of drugs differing from the other authors. Further, my time series study captures the incremental effect of adding an additional competitor to each drug, while the cross-sectional study done by Conrad and Lutter (2019) focuses on the cross-sectional difference between drugs with

---

[202] Based on my review of the IQVIA data, there are oftentimes sales values listed for manufacturers/corporations that do not manufacture/produce the listed drug (*i.e.*, they could be re-labelers, despite not being coded as such). Implementing this screen prevents these firms from being included as a competitor for that drug.

[203] To control for temporary reductions in production (i.e., not true exit), if a manufacturer with at least a one percent share falls below one percent in a subsequent quarter before returning to a one percent share within a year, the manufacturer is still considered a competitor even in quarters where their share fell below one percent.

[204] My results are not sensitive to whether branded generics are included in the competitor counts.

[205] Conrad, R., and Lutter, R. (2019). "Generic Competition and Drug Prices: New Evidence Linking Greater Generic Competition and Lower Generic Drug Prices." December 2019, pp. 1-9. Available at: https://www.fda.gov/media/133509/download.

different numbers of competitors. As discussed below, however, I believe that the primary explanation lies in the endogeneity of the number of suppliers.

**Table 6 – OLS Econometric Estimates of the Effects of Entry (Absent Collusion)**

[redacted]

*Sources: IQVIA.*

### *iii. Before and After Model Regression Results*

129. After constructing these additional variables for the Drugs at Issue, I begin by estimating the following OLS regression model:

$$\ln(\mathrm{P}_{\mathrm{i,d,t}}) = \beta_0 + \beta_1 \mathrm{PostFirstCommunication}_{\mathrm{i,t}} + \beta_2 \ln(\mathrm{Cost}_{\mathrm{i,d,t}}) + \beta_3 \ln(\mathrm{Cost}_{\mathrm{i,d,t}}) * \mathrm{PostFirstCommunication}_{\mathrm{i,t}} + \beta_4 \ln(\mathrm{Demand}_{\mathrm{i,t}}) + \beta_5 \mathrm{Shortage}_{\mathrm{i,t}} + \beta_6 \mathrm{BrandedGeneric}_{\mathrm{i,d}} + \sum_{j=2}^{5+} \delta_{\mathrm{j}} \text{ Number of CompetiItors} = \mathrm{j}_{\mathrm{i,t}} + \gamma_{\mathrm{i}} \mathrm{i} + \epsilon_{i,t}$$

**Table 7 – OLS Before and After Model Regression Results**

| | |
|---|---|
| **Overcharge %** | **185%** |
| | |
| Drugs at Issue x (Post First Communication) | 1.0484*** |
| | [0.1272] |
| Log(Total Annual Quantity of Drug) | 0.0586 |
| | [0.1238] |
| Number of Competitors = 2 | -0.7087*** |
| | [0.1770] |
| Number of Competitors = 3 | -0.8524*** |
| | [0.1828] |
| Number of Competitors = 4 | -1.0340*** |
| | [0.2011] |
| Number of Competitors = 5 | -1.0742*** |
| | [0.2599] |
| Drug in FDA's Shortage List | 0.7450*** |
| | [0.0719] |
| Drug is Branded Generic = Yes | 0.9504*** |
| | [0.1849] |
| Log(COGS) | 0.5847*** |
| | [0.0944] |
| Log(COGS) * Post First Communication | -0.3015*** |
| | [0.1038] |
| Constant | -0.5824 |
| | [2.0684] |
| | |
| Observations | 4,600 |
| R-squared | 0.731 |
| Drug (API-Form-Strength) Fixed Effect | Yes |
| Year-Quarter Fixed Effect | Yes |

Standard errors are clustered by API
*** p<0.01, ** p<0.05, * p<0.1
Notes:
[1] Dependent variable is natural logarithm of Defendants net price.
[2] Price Increase % is calculated as: Exp(Post Communication Coefficient) - 1.
*Sources: Defendants Transactional and Cost Data.*

130. As shown in the Table, after accounting for other factors, prices for PI drugs increased by 185%, between the benchmark and the entire Post-Conduct period. Again, these results are statistically significant at the 99% level.[206] The coefficient on Demand is not statistically significant at accepted levels but the coefficients on Cost, Cost*Conduct, Branded Generic, and Shortages all have the expected sign and are statistically significant.[207]

[206] Here and elsewhere in this report, I report robust standard errors clustered at drugs' API level.

[207] While this model was run using the prices of individual Defendants, the results are robust to aggregating prices at the Drug (as opposed to Drug-manufacturer) level. See backup materials to this Report.

## E. Difference in Difference Model

### *i. Base Model*

131. The before and after model above compared the difference in prices in a benchmark period with prices in a treatment period, after controlling for variables that economic theory predicts can impact prices in the two periods. In this Section, I discuss a second technique, "difference-in-differences" ("DiD") which estimates by how much prices changed for a treatment group (the Drugs at Issue) as compared with a control group (drugs that are assumed to be unaffected by collusion).[208] The assumption underlying such models is that, all else equal, prices in the treatment group in the but-for world would have behaved similarly to the control group. I also include in the model certain explanatory variables that might explain any divergence between the treatment and the control group. This allows me to test the null hypothesis that, all else equal, prices for Drugs at Issue increased significantly relative to the control group (drugs not alleged to be part of the conspiracy) during the Conduct Period. I again use this model to estimate how much Defendants' Conduct increased prices during the Post-Conduct Period.

132. For purposes of the difference-in-difference analysis, I combine quarterly net price data from the Defendants for the Drugs at Issue with IQVIA price data. Ideally, I would utilize information from the same source for both the control and treatment group, but I do not have access to net price information for drugs that were not included in MDL-related data productions. In addition, as mentioned earlier, to rule out any bias introduced by splicing the data in this manner, in Appendix E, I present the results when I utilize IQVIA prices for the Drugs at Issue as the treatment group alongside IQVIA prices for the control group.[209]

133. For my difference-in-difference analysis, I start with the same control variables as in the before and after model specifications listed above. However, cost is not included in this model because I do not possess cost information for non-MDL drugs (the control). Specifically, I estimate the following model:

---

[208] This is conservative to the extent that there is any collusion in the control group by Defendants or others.

[209] A similar difference-in-difference approach has been suggested in Clark, Robert, Christopher Fabiilli, and Laura Lasio. (2022). "Collusion in the US generic drug industry." *International Journal of Industrial Organization*, 85. However, Clark et al. (2022) attempts to utilize a more limited control sample of control drugs based on therapeutic class. As noted by the authors, "Ideally, we would not include a drug in the control group if its manufacturer were under investigation for the alleged cartel in any other market. Unfortunately, due to the extent of the agreement, this condition is never met: at least one of the manufacturers in each drug market is cited in the courts documents." Given that the Defendants' shares in the same therapeutic class as the Drugs at Issue is high (see *e.g.*, Complaint, ¶ 180; SDZCTAG-01011631), I opt for a broader control sample that is less likely to have been affected by collusion.

$$
\begin{aligned}
\ln\left(\mathrm{P}_{\mathrm{i,m,t}}\right) = {} & \beta_0 + \beta_1 \mathrm{PostFirstCommunication}_{\mathrm{i,t}} + \beta_{2\mathrm{C}} \ln\left(\mathrm{Demand}_{\mathrm{i,t}}\right) + \beta_{2\mathrm{D}} \ln\left(\mathrm{Demand}_{\mathrm{i,t}}\right) \\
& + \beta_{3\mathrm{C}} \mathrm{Shortage}_{\mathrm{i,t}} + \beta_{3\mathrm{D}} \mathrm{Shortage}_{\mathrm{i,t}} + \beta_{4\mathrm{C}} \mathrm{BrandedGeneric}_{\mathrm{i,m}} \\
& + \beta_{4\mathrm{D}} \mathrm{BrandedGeneric}_{\mathrm{i,m}} + \sum_{j=2}^{5+} \delta_{\mathrm{jC}} \text{ Number of Competitors} = \mathrm{j}_{\mathrm{i,t}} \\
& + \sum_{j=2}^{5+} \delta_{\mathrm{jD}} \text{ Number of Competitors} = \mathrm{j}_{\mathrm{i,t}} + \gamma_{\mathrm{i}} \mathrm{i} + \theta_{\mathrm{t}} \mathrm{t} + \epsilon_{i,t}
\end{aligned}
$$

$\theta_t t$ is a set of year-quarter fixed effects that capture the average change in drug prices over time. Coefficients with a subscript C are separately estimated for the control group, and coefficients with a subscript D are separately estimated for the Drugs at Issue.

134. The results from this regression model are shown in Table 8 below. After controlling for demand, market structure, and the changes in price of the control drugs, all else equal, Defendants' prices for Drugs at Issue were 276% higher for PI Drugs. This estimate is statistically significant at the 99 percent level of confidence.

**Table 8 – OLS Difference-In-Difference Regression Results**

| **Overcharge %** | | **276%** |
|---|---|---|
| | **Control Drugs (IQVIA)** | **Drugs at Issue (Defendant Data)** |
| Drugs at Issue x (Post First Communication) | | 1.3239*** |
| | | [0.1419] |
| Log(Total Annual Quantity of Drug) | [redacted] | 0.0345 |
| | | [0.0295] |
| Number of Competitors = 2 | | -0.2866* |
| | | [0.1723] |
| Number of Competitors = 3 | | -0.4108** |
| | | [0.1719] |
| Number of Competitors = 4 | | -0.5991*** |
| | | [0.1891] |
| Number of Competitors = 5 | | -0.5472** |
| | | [0.2527] |
| Drug in FDA's Shortage List | | 0.6656*** |
| | | [0.0879] |
| Drug is Branded Generic = Yes | | 1.0001*** |
| | | [0.1744] |
| Constant | 1.1632*** | |
| | [0.1876] | |
| | | |
| Observations | 427,749 | |
| R-squared | 0.859 | |
| Drug (API-Form-Strength) Fixed Effect | Yes | |
| Year-Quarter Fixed Effect | Yes | |

Standard errors are clustered by API
*** p<0.01, ** p<0.05, * p<0.1
Notes:
[1] Dependent variable is natural logarithm of Defendants net price or IQVIA price.
[2] Price Increase % is calculated as: Exp(Post Communication Coefficient) - 1.
*Sources: Defendants Transactional Data and IQVIA.*

135. As shown in the Table, the coefficient on Demand for the Drugs at Issue is 0.0345 and is not statistically significant, compared to the coefficient for the control drugs -0.12. The effect of market structure is negative, statistically significant, and increasing in the number of entrants for both the control sample and the Drugs at Issue. The coefficients on shortages and branded generics are positive and significant for both the control group and the Drugs at Issue.[210]

### *ii. Correcting for Possible Endogeneity*

136. In the academic literature surrounding entry and generic pharmaceuticals, researchers have commonly considered whether prices and entry are jointly determined. In other words, can higher prices induce additional entry and/or does additional entry result in lower prices. In economic terms, this type of simultaneous relationship creates what is called an endogeneity problem.[211] In econometric models, the presence of endogeneity can result in regression coefficients that can be biased.[212] This issue is particularly acute as it relates to a conspiracy to increase prices, as it becomes important to consider whether the conspiracy (and high prices) may have induced additional entry that would not have occurred in the "but-for" world.[213]

137. While economists often note the presence of a possible problem with endogeneity in generic drug markets, the literature is mixed on whether it is important to control and adjust for it. Certain studies simply assume that the relationship between price and entry is exogenous and make no adjustment. Others acknowledge that properly adjusting for endogeneity is difficult, while still others present complex econometric models that they assert make the adjustment. As noted by Tenn and Wendling (2014), who do make such an adjustment:[214]

> Our analysis thus far has made the implicit assumption that entry by generic firms is exogenous, which is the approach taken in much of the prior literature. Some researchers defend this assumption by appealing to institutional features specific to the regulatory approval of generic drugs (…). Since it typically takes several years for the FDA to approve an ANDA, they argue that observed entry is largely unrelated to current factors that influence price. Alternatively, some believe that in the absence of strong and truly exogenous instruments, it is better to treat entry as exogenous instead of using potentially invalid instruments (Granlund, 2010). For these,

[210] My results are also robust to using weighted least squares using either extended unit quantities or total prescriptions. See backup materials to this Report.

[211] Wooldridge, Jeffrey M. "Introductory Econometrics: A Modern Approach." 4th Edition, 2009: pp. 546-552.

[212] Ibid, pp. 550-552.

[213] Complaint, ¶¶ 366-378; ACTAVIS_GX_MDL_000685941.

[214] Tenn, S. and Wendling, B.W. (2014). "Entry Threats and Pricing in the Generic Drug Industry." *The Review of Economics and Statistics*, *96*(2): p. 225.

and perhaps other, reasons the number of entrants is assumed exogenous in many studies of generic entry (…).

138. While the literature is inconsistent as to whether any possible bias with respect to the endogeneity of entry is significant,[215] in this section I consider whether my results are sensitive to the assumption inherent in my difference-in-difference model above that entry is exogenous. A common method for dealing with endogeneity is to employ an "Instrumental Variables" regression model – a two-stage model where the independent variable that is potentially endogenous (*e.g.*, the number of firms) is modeled as a function of certain explanatory "instrumental" variables that affect the endogenous variable but not the dependent variable (price),[216] and the results (the fitted values) from that first stage are then used in the second stage. When properly constructed, these models are capable of eliminating the potential bias associated with endogeneity. These types of models have been used extensively in the economic literature, including several notable applications to generic drugs and pharmaceuticals.[217]

139. For purposes of this analysis, I utilize information from the FDA's Orange Book regarding ANDA applications.[218] This database includes information on the date on which each application was approved and can be linked via application number to the FDA's NDC database. From this database, I can compute at any point in time the number of approved ANDAs for any given drug (*i.e.*, a combination of API/Form/Strength). I also compute (using information from AnalySource) how many of the approved ANDAs are being marketed in each quarter (*i.e.*, have active NDCs). These two variables are used as instruments in an IV regression.

140. My two-stage model has at least one desirable property for purposes of estimating the increase in prices for the Drugs at Issue. The model implicitly accounts for any entry that may have occurred as a result of Defendants' higher prices. This is because the type of short-term entry that would be attracted by higher prices would not necessarily increase the number of approved or marketed ANDAs, since the ANDA process is typically expensive and lengthy. Because information on higher

---

[215] The extent of any possible bias depends crucially on the model being estimated. Hence, a finding by one researcher that his or her results are not sensitive to the assumption of exogenous entry does not imply that another researcher's results would not be.

[216] Specifically, these variables should be correlated with the endogenous independent variable but not the error term of the ordinary least squares (OLS) regression.

[217] See *e.g.*, Frank, R. and Salkever, D. 1997. "Generic Entry and the Pricing of Pharmaceuticals." *Journal of Economics & Management Strategy*, 6(1): pp. 75-90; Tenn, S. and Wendling, B.W. (2014). "Entry Threats and Pricing in the Generic Drug Industry." *The Review of Economics and Statistics*, *96*(2): p. 225.

[218] U.S. FDA. "Orange Book Data Files." Available at: https://www.fda.gov/drugs/drug-approvals-and-databases/orange-book-data-files.

prices is not used in the first stage, the predicted values used in the second stage do not reflect any additional entry from increased prices.

141. The results of this study are shown in Table 9 below. As shown in the Table, my overall overcharge estimates are not changed significantly after correcting for possible endogeneity (column 3). The instruments used both come in as statistically significant.[219] In addition, the coefficients on firm counts for the Control group are larger than the OLS model (*i.e.*, without the correction), and are more consistent with estimates from the literature. In addition, the coefficients on firm counts for the Drugs at Issue are no longer statistically distinguishable from zero. In other words, for the Drugs at Issue, consistent with the fair share understanding, entry into the Drugs at Issue did not result in prices falling.

**Table 9 - Results of Instrumental Variables Regression**

| | (1) OLS Regression | | (2) First Stage | (3) IV Regression | |
|---|---|---|---|---|---|
| **Overcharge %** | | **276%** | | | **252%** |
| | **Control Drugs (IQVIA)** | **Drugs at Issue (Defendant Data)** | **All Drugs (IQVIA)** | **Control Drugs (IQVIA)** | **Drugs at Issue (Defendant Data)** |
| Dependent Variable | Log(Price per Ext. Unit) | | Number of Competitors | Log(Price per Ext. Unit) | |
| Drugs at Issue x (Post First Communication) | | 1.3239*** | | | 1.2585*** |
| | [redacted] | [0.1419] | [redacted] | [redacted] | [0.1432] |
| Log(Total Annual Quantity of Drug) | [redacted] | 0.0345 | [redacted] | [redacted] | 0.0439 |
| | [redacted] | [0.0295] | [redacted] | [redacted] | [0.0364] |
| Number of Competitors = 2 | [redacted] | -0.2866* | [redacted] | [redacted] | 0.2289 |
| | [redacted] | [0.1723] | [redacted] | [redacted] | [0.2047] |
| Number of Competitors = 3 | [redacted] | -0.4108** | [redacted] | [redacted] | -0.2899 |
| | [redacted] | [0.1719] | [redacted] | [redacted] | [0.3087] |
| Number of Competitors = 4 | [redacted] | -0.5991*** | [redacted] | [redacted] | -0.3211 |
| | [redacted] | [0.1891] | [redacted] | [redacted] | [0.4651] |
| Number of Competitors = 5 | [redacted] | -0.5472** | [redacted] | [redacted] | -0.5867 |
| | [redacted] | [0.2527] | [redacted] | [redacted] | [0.5026] |
| Drug in FDA's Shortage List | [redacted] | 0.6656*** | [redacted] | [redacted] | 0.5635*** |
| | [redacted] | [0.0879] | [redacted] | [redacted] | [0.1384] |
| Drug is Branded Generic = Yes | [redacted] | 1.0001*** | [redacted] | [redacted] | 0.8869*** |
| | [redacted] | [0.1744] | [redacted] | [redacted] | [0.1471] |
| Approved ANDAs | | | [redacted] | [redacted] | |
| Marketed ANDAs | | | [redacted] | | |
| Constant | [redacted] | | [redacted] | [redacted] | |
| | [redacted] | | [redacted] | [redacted] | |
| Observations | [redacted] | | [redacted] | [redacted] | |
| R-squared | [redacted] | | [redacted] | [redacted] | |
| API-Form-Strength Fixed Effect | Yes | | Yes | Yes | |
| Year-Quarter Fixed Effect | Yes | | Yes | Yes | |

Standard errors are clustered by API
*** p<0.01, ** p<0.05, * p<0.1
Notes:
[1] Dependent variable is natural logarithm of Defendants net price.
[2] Price Increase % is calculated as: Exp(Post Communication Coefficient) - 1.
[3] Firm count is the dependent variable in the first stage regression. IV regression (2nd stage regression) uses predicted values of the first stage.
*Sources: Defendants Transactional Data and IQVIA.*

142. Given that the overcharge estimates are similar for the OLS and the IV models, for ease of computation, in the Sections that follow, I report only the coefficients from the OLS model.

---

[219] I also perform several tests to confirm the validity of these instruments. For example, I reject the null hypothesis (that my instruments are weak) using the Cragg-Donald test. Similarly, the Kleibergen-Paap statistic also rejects the null hypothesis that my instruments are weak. See the workpapers in the backup to this report for these tests.

### F. Intra-API Effects

143. It is possible that Defendants' conduct was not limited only to the Drugs at Issue or that all collusive communications and behaviors were uncovered in the SAGs' investigation. Further, since the same manufacturers may produce multiple formulations of the same API (*e.g.,* a manufacturer of the 100 MG tablet may also produce the 200 MG tablet),[220] it is also possible that the Defendants' actions may have spilled over to alternative formulations within the same API.

144. In addition, I note that in several instances in the Complaint, a Defendant may be the only supplier of a drug during the conspiracy period, as, for example, for Acetazolamide Tables (125 MG)[221] and Triamcinolone Acetonide Ointment (0.5%).[222] However, while Taro may be the only supplier of Acetazolamide Tablets (125 MG), Taro and Lannett followed a pattern of matching each other's WAC price increases on the 250 MG formulation between 2010 and 2013.[223] Lannett celebrated at least one of these price increases.[224] Similarly, Perrigo began communicating with Sandoz (then Fougera) on other formulations of Triamcinolone Acetonide Ointment and Cream in July 2010.[225]

145. As noted in the Complaint, the pricing patterns for the "sole supplier" formulations and the formulations where there is evidence of collusive behavior are remarkably similar. As shown in Figure 18 and Figure 19, below, at the time of the alleged conduct, the "sole supplier" (monopoly) formulations exhibit the same large price increases as the affected formulations. While Perrigo asserted it had an API cost increase on Triamcinolone,[226] to my knowledge Taro did not face some kind of cost increase on Acetazolamide. Since there is no indication that Taro or Perrigo experienced any shortage or major shift in demand for those products,[227] or a cost increase that could explain a

---

[220] Indeed, the ANDA process is specifically designed to allow the same manufacturer to enter into multiple formulations within the same API. A single ANDA application can enable a manufacturer to enter into all available versions of the same formulation (e.g., tablet) – API combination that are not subject to exclusivity. (U.S. FDA. "Variations in Drug Products that May Be Included in a Single ANDA." https://www.fda.gov/media/71497/download, visited 8/9/2023.)

[221] See, e.g., Complaint, ¶ 802. IQVIA data confirm that Taro is the only supplier until around 2017 (see Appendix D Figure 18).

[222] While the Complaint does not specifically note that Perrigo was the only supplier of Triamcinolone Acetonide Ointment (0.5%), IQVIA data confirm that Perrigo is the only supplier. See Appendix D Figure 120.

[223] Complaint, ¶¶ 803-804; AnalySource.

[224] Complaint, ¶ 806; LANNETT-CT-0688227.

[225] Complaint, ¶¶ 259-264; culminating in a refusal to bid (SDZCTAG-00331469).

[226] PER-MDL-00673639- PER-MDL-00673640.

[227] See discussion of Acetazolamide in Section IV.B, above.

300 to 400 percent price increase, the only economic explanation for the increase in prices on the sole supplier formulation is that these increases were the result of collusion.

**Figure 18 – Defendant Prices for Acetazolamide Tablets**




Source: Defendants Transactional Data.

**Figure 19 – Defendant Prices for Triamcinolone Acetonide Ointment**




Source: Defendants Transactional Data.

146. To allow for these effects, I modify the above regression specification to allow for potential intra-API effects.[228] Specifically, I introduce an additional indicator variable that measures the effect of collusion on a Drug in the same API commencing prior to communications on the Drug in question. For example, for Betamethasone Dipropionate Lotion, Sandoz (Fougera) and Perrigo began communicating about the lotion in December 2010[229] leading to increased prices in January 2011.[230] In comparison, Sandoz and Taro began communicating on Betamethasone Dipropionate Cream in July 2013.[231] This variable would then capture any increase in prices on the Cream during the period between communication on Betamethasone Dipropionate Lotion in December 2010 and the Cream in July 2013. The results from this regression are shown depicted in Table 10 below.

**Table 10 – Econometric Estimates of the Change in Prices for PI Drugs Allowing for Intra-API Effects**

| | Before and After Regression | Difference-in-Difference Regression | |
|---|---|---|---|
| | (1) | (2) | |
| **API Overcharge %** | **36%** | | **56%** |
| **Drug Overcharge %** | **189%** | | **266%** |
| | **Drugs at Issue (Defendant Data)** | **Control Drugs (IQVIA)** | **Drugs at Issue (Defendant Data)** |
| Drugs at Issue x Post First Communication Only on API | 0.3097 | | 0.4424 |
| | [0.3115] | | [0.3255] |
| Drugs at Issue x Post First Communication Only on Drug | 1.0597*** | | 1.2972*** |
| | [0.1262] | [redacted] | [0.1418] |
| Log(Total Annual Quantity of Drug) | 0.0331 | | 0.0233 |
| | [0.1175] | | [0.0338] |
| Number of Competitors = 2 | -0.8298*** | | -0.4223** |
| | [0.2083] | | [0.1744] |
| Number of Competitors = 3 | -0.9828*** | | -0.5481*** |
| | [0.2043] | | [0.1748] |
| Number of Competitors = 4 | -1.1608*** | | -0.7502*** |
| | [0.2235] | | [0.1888] |
| Number of Competitors = 5 | -1.2016*** | | -0.6957*** |
| | [0.2892] | | [0.2463] |
| Drug in FDA's Shortage List | 0.7652*** | | 0.6910*** |
| | [0.0839] | | [0.1021] |
| Drug is Branded Generic = Yes | 0.9983*** | | 1.0345*** |
| | [0.1220] | | [0.1412] |
| Log(COGS) | 0.5790*** | | |
| | [0.0867] | | |
| Log(COGS) * Post First Communication | -0.2926*** | | |
| | [0.0922] | [redacted] | |
| Constant | -0.0159 | | |
| | [1.9488] | | |
| | | | |
| Observations | 4,843 | | |
| R-squared | 0.726 | | |
| Drug (API-Form-Strength) Fixed Effect | Yes | Yes | |
| Year-Quarter Fixed Effect | Yes | Yes | |

Standard errors are clustered by API
*** p<0.01, ** p<0.05, * p<0.1
Notes:
[1] Dependent variable is natural logarithm of Defendants net price.
[2] Price Increase % is calculated as: Exp(Price Increase Coefficient) - 1.
*Sources: Defendants Transactional Data and IQVIA.*

---

228 I note that my models already properly calculate overcharges for the two drugs referenced above as I utilized the conduct dates for the non-sole supplier formulations for these drugs.

229 Complaint, ¶ 285.

230 Complaint, ¶¶ 286-287 – SDZCTAG-05176999.

231 Complaint, ¶ 755; Bihari-000299.

147. As my regression model shows, prior collusion beginning in the same API tends to result in increased prices during periods during which communications have not specifically been discovered for the Drug in question. I note, however, that these results are not statistically significant. This suggests that the conspiracy could have had effects that are not included in my estimates of disgorgement.

### G. Lingering Effects

148. In a price-fixing case, it is often necessary to determine not only when the conduct ended but also how long the effects of that conduct persisted. In this matter, a reasonable date whereby the Defendants would have realized that their collusion might be discovered (and likely faced legal action) would be when the State Attorney General of Connecticut filed its initial complaint against Heritage and other generic manufacturers in December 2016.[232] However, as discussed above, significant overcharges can be expected to linger for some time after a conspiracy is discovered due not only to ongoing contracts but also to concerns that a large and rapid price fall could be used both as evidence of collusion during the Conduct Period as well as to estimate the overcharge and thus the amount of damages or disgorgement.[233] As discussed above, those lingering effects can be expected to be even more pronounced when an MSA is present because continued communication or other overt conduct is not necessary for the MSA to continue to be effective.

149. As shown in Figure 5 and Figure 6 above, the Defendants' prices for the Drugs at Issue continued to fall after December 2016 but were still well above their pre-conspiracy prices by late 2018, the end of the period for which I have Defendant data. I can, however, examine publicly available data to determine whether prices for the Drugs at Issue continued to decrease after that date. As shown in Figure 20, below, the NADAC average prices and price indices for the Drugs at Issue continued to decline after 2018, and at a more rapid rate than for non-MDL Drugs, up to the present (2022Q3).

[232] As noted above in my discussion of the Taro price index (Figure 10), there may have been some awareness among some of the Defendants of a pending investigation prior to the filing of the Heritage Complaint.

[233] See Harrington, J.E. (2004). "Post-Cartel Pricing During Litigation." *The Journal of Industrial Economics*, 52(4). For an empirical evaluation of lingering effects from the Vitamins MSA cartel, see Kovacic et al. "Lessons for Competition Policy from the Vitamins Cartel" *Contributions to Economic Analysis* Volume 282, 2007, pp. 149-176.

**Figure 20 – NADAC Prices Indices for Drugs at Issue and Control Drugs (2023Q1 = 100)**




Source: NADAC Data Set.
Note: The price index is based on a regression that controls for drug mix, NDC.

150. While these figures provide ample evidence that prices in the Lingering Effects Period continued to be elevated above Pre-Conspiracy levels, to further demonstrate the effects of Defendants' Conduct, I utilize information on Defendants' net prices in 2018 and IQVIA prices in 2019/2020 to calculate how much prices were higher during these periods compared with the Pre-Conduct benchmark period. I utilize the same difference-in-difference regression specification employed above (Section VI.D.iii) using the change in prices for IQVIA's non-MDL drugs as a control.

151. The results of this regression are presented in Table 11 below. As shown in the Table, prices for PI Drugs increased by 159 percent between the benchmark period and 2018. Similarly, using data from IQVIA, prices for PI Drugs increased by 163 percent between the Pre-Conduct period and 2020.

**Table 11 – OLS Econometric Estimates of the Increase in Prices for Drugs at Issue between the Pre-Conduct Period and 2018/2020**

| | (1) | | (2) | |
|---|---|---|---|---|
| **Overcharge %** | | **159%** | | **163%** |
| | **Control Drugs (IQVIA)** | **Drugs at Issue (Defendant Data)** | **Control Drugs (IQVIA)** | **Drugs at Issue (IQVIA)** |
| Drugs at Issue x (Year = 2018) | | 0.9528*** | | |
| | | [0.1554] | | |
| Drugs at Issue x (2019Q2-2020Q1 Period) | | | | [redacted] |
| | [redacted] | | [redacted] | |
| Log(Total Annual Quantity of Drug) | | 0.0494 | | |
| | | [0.0472] | | |
| Number of Competitors = 2 | | -0.5262 | | |
| | | [0.3938] | | |
| Number of Competitors = 3 | | -0.6790* | | |
| | | [0.4030] | | |
| Number of Competitors = 4 | | -1.0945** | | |
| | | [0.4353] | | |
| Number of Competitors = 5 | | -0.7618 | | |
| | | [0.4836] | | |
| Drug in FDA's Shortage List | | 0.5354** | | |
| | | [0.2171] | | |
| Drug is Branded Generic = Yes | | 0.6942*** | | |
| | | [0.2495] | | |
| Constant | 1.8737*** | | 2.0811*** | |
| | [0.3576] | | [0.3589] | |
| | | | | |
| Observations | 120,215 | | 123,148 | |
| R-squared | 0.857 | | 0.860 | |
| Drug (API-Form-Strength) Fixed Effect | Yes | | Yes | |
| Year-Quarter Fixed Effect | Yes | | Yes | |

Standard errors are clustered by API
*** p<0.01, ** p<0.05, * p<0.1
Notes:
[1] Dependent variable is natural logarithm of Defendants net price or IQVIA price.
[2] Price Increase % is calculated as: Exp(Price Increase Coefficient) - 1.
*Sources: Defendants Transactional Data and IQVIA.*

152. My preference for estimating the effects of Defendants' conduct is to use Defendant net price data. However, given the limitation of Defendants' production in this matter, I must rely on alternative data sources to estimate price declines after 2018.[234] I have access to IQVIA data through the beginning of 2020, and NADAC data through 2023Q1. NADAC prices for the Drugs at Issue for each of the drug classes are presented in Figure 21, below. As shown in the Figure, price declines are more pronounced for NG Drugs compared to PI Drugs.

[234]Defendants did not provide data after 2018 that would allow me to take into account any difference in the relative rate of decline in Defendants' net prices.

**Figure 21 – Price Index for Drugs at Issue and Control Drugs – NADAC Data**




Source: NADAC Data.

153. As shown in the Figure, price declines for both PI and NG Drugs (relative to non-MDL drugs) have continued through 2023. While this does yet not control for factors such as demand, cost, or entry into either the Drugs at Issue or the non-MDL Drugs, it suggests that the Lingering Effects Period has continued beyond 2018, and perhaps to the present.

### H. New Generic Drugs

154. The second category of Drugs (in addition to PI Drugs) I analyze are New Generic Drugs (*i.e.*, drugs for which the branded drug's patent/exclusivity period has expired and a generic manufacturer is poised to enter via an ANDA). As noted in the Complaint, the Defendants often exchanged communications about market allocation and/or pricing either shortly before or in the immediate period following entry of the first generic manufacturer into the drug. Hence, there is no competitive (non-collusive) benchmark (*i.e.*, there is little or no "pre-conspiracy" period data) which I can use to determine whether the prices that initially prevailed exceeded the prices that would have prevailed

but-for Defendants' Conduct. A list of the 14 NG Drugs, as well as the generic launch date and the date of first conduct that I analyze is provided below in Table 12.[235]

**Table 12 – List of New Generic Drugs at Issue**

| Drug Name | Earliest Conduct Date | Generic First Sale Date | Communication/Intent to Increase Prices |
|---|---|---|---|
| ADAPALENE-CREAM-0.1% | 10/25/2010 | 7/1/2010 | |
| BETAMETHASONE DIPROPIONATE; CALCIPOTRIENE-OINTMENT-0.064%;0.005% | 3/21/2014 | 3/1/2014 | |
| CARBAMAZEPINE-TABLET, EXTENDED RELEASE-100MG | 3/1/2009 | 1/1/2016[236] | Yes[237] |
| CARBAMAZEPINE-TABLET, EXTENDED RELEASE-200MG | 3/1/2009 | 5/1/2009 | Yes |
| CARBAMAZEPINE-TABLET, EXTENDED RELEASE-400MG | 3/1/2009 | 5/1/2009 | Yes |
| DESOXIMETASONE-OINTMENT-0.05% | 9/28/2012 | 5/1/2012 | |
| FLUOCINONIDE-CREAM-0.1% | 1/31/2014 | 1/1/2014 | |
| FLUTICASONE PROPIONATE-LOTION-0.05% | 12/3/2012 | 3/1/2012 | |
| IMIQUIMOD-CREAM-5% | 4/16/2010 | 2/1/2010 | Yes[238] |
| METFORMIN HYDROCHLORIDE; PIOGLITAZONE HYDROCHLORIDE-TABLET-500MG;EQ15MGBASE | 2/13/2013 | 7/1/2012 | |
| METFORMIN HYDROCHLORIDE; PIOGLITAZONE HYDROCHLORIDE-TABLET-850MG;EQ15MGBASE | 2/13/2013 | 7/1/2012 | |
| METRONIDAZOLE-GEL-1% | 7/1/2014 | 7/1/2013 | |
| TACROLIMUS-OINTMENT-0.03% | 11/19/2014 | 11/1/2014 | |
| TACROLIMUS-OINTMENT-0.1% | 11/19/2014 | 11/1/2014 | |

### *i. New Generics with Price Increases*

155. While most, if not all, of these drugs involve Defendant conduct from the onset of generic entry, the Complaint also notes several instances (most notably Carbamazepine ER tablets) where the

[235] Desoximetasone Ointment 0.05% and Metronidazole Gel 1% are not specifically identified as newly launched generics in the Complaint.

[236] The Complaint alleges communication on Carbamazepine ER between Sandoz and Taro at the time of generic launch between March and June 2009 (Complaint, ¶¶ 202-206), ostensibly on the 200MG and 400MG strengths. Both Sandoz and Taro subsequently launched the 100MG strength in 1/2016.

[237] See, e.g., Complaint, ¶ 737-745; Bihari-00257, Bihari Dep. 89:11-90:7 .

[238] Complaint, ¶ 216; Thomassey 91:15-92:3.

Defendants engaged in subsequent conversations to increase Defendants' existing prices. For example, prices for Carbamazepine ER 400 MG tablets are shown below in Figure 22.[239] As shown in the Figure, prices for Carbamazepine tablets increased sharply as part of Taro's May 2013 price increases. While it is also likely that the prices for Carbamazepine ER were inflated by Sandoz and Taro's coordination from the generic launch date (*i.e.*, toward the beginning of the Conspiracy Period), Defendants were able to establish even higher prices through their direct communications in and after 2013.[240]

**Figure 22 – Defendant Prices for Carbamazepine ER 400 MG Tablets**




156. Just as with PI Drugs, I can compare the prices for Carbamazepine ER prior to the first price-increase communication with the prices that prevailed afterwards, controlling for factors that might have influenced prices. The results of this regression are reported in Table 13, below. The results show a 92% increase in Carbamazepine ER's prices compared with the control drugs.

[239] Plots for the 100MG and 200MG Tablets are reported in Appendix D Figure 36 and 37.

[240] I note that prices for Carbamazepine did not fall when a second firm (Sandoz) entered in June 2009.

**Table 13 – Regression Results for Carbamazepine ER**

[redacted]

*Sources: Defendants Transactional Data and IQVIA.*

### *ii. New Generics with Price Falls*

157. As noted in the discussion of Figure 21, above, prices for NG Drugs have fallen at a larger and more rapid rate than for both the other Drugs at Issue and the non-MDL Drugs. For NG Drugs, I do not have a pre-Conduct period to use as a benchmark, as in the analysis of Lingering Effects above, so I must use a period at the end rather than the beginning of the alleged Conduct as my base period.

158. I use the base model from Section VI.E.i, to compare Defendant net prices data for NG drugs for 2018 to Defendant net prices from generic launch date to 2017 to determine if prices declined to that date (even though prices in 2018 may still have been elevated). The results of this model are shown below. As shown in Table 14, prices for NG Drugs fell by 35 percent between those two periods.[241]

[241] This result is significant at the 99% level of confidence.

**Table 14 – Effects of Collusion on the Prices for NG Drugs (2018 as Benchmark Period)**

| **New Drugs Price Difference %** | | **35%** |
|---|---|---|
| | **Control Drugs (IQVIA)** | **Drugs at Issue (Defendant Data)** |
| PI Drugs x (Post First Communicaiton and Before 2018) | | 0.2661*** |
| | | [0.0635] |
| New Drugs x (Post First Communication and Before 2018) | | 0.2997** |
| | [redacted] | [0.1170] |
| Log(Total Annual Quantity of Drug) | | 0.0521** |
| | | [0.0206] |
| Number of Competitors = = 2 | | -0.1339* |
| | | [0.0745] |
| Number of Competitors = = 3 | | -0.2569*** |
| | | [0.0868] |
| Number of Competitors = = 4 | | -0.3719*** |
| | | [0.1118] |
| Number of Competitors = = 5 | | -0.6652*** |
| | | [0.1468] |
| Drug in FDA's Shortage List | | 0.5903*** |
| | | [0.0215] |
| Drug is Branded Generic = Yes | | 1.0503*** |
| | | [0.2679] |
| | | |
| Constant | [redacted] | |
| | | |
| Observations | | |
| R-squared | | |
| Drug (API-Form-Strength) Fixed Effect | | Yes |
| Year-Quarter Fixed Effect | | Yes |

Standard errors are clustered by API
*** p<0.01, ** p<0.05, * p<0.1
Notes:
[1] Dependent variable is natural logarithm of Defendants net price or IQVIA price.
[2] Price Difference % is calculated as: Exp(Post Communication Coefficient) - 1.
*Sources: Defendants Transactional Data and IQVIA.*

159. While I do not possess Defendant net prices for New Generics after 2018, I can utilize IQVIA and NADAC data to estimate what the price fall was for New Generics between the Conduct Period (through 2018) and later time periods for which I have data from those sources. The results of this model are presented in Table 15, below. As shown in the table, prices for NG Drugs fell by 38% between the Post-Conduct Period (through 2018) and 2019Q3-2020Q2 (the latest period I have IQVIA data). The price decline is even more pronounced when I use the NADAC data for a later time period, with a decline of 50% between the Conduct Period (through 2018) and the 2022Q1-2022Q4 period.

**Table 15 – Effects of Collusion on the Prices for NG Drugs with 2019/2020 or 2022 as Benchmark Periods**[242]

| | (1) | | (2) |
|---|---|---|---|
| | IQVIA | | NADAC |
| Benchmark Period >> | 2019Q3-2020Q2 | | 2022Q1-2022Q4 |
| **Overcharge on New Drugs %** | **38%** | | **50%** |
| New Drugs * Post First Communication and Before 2019Q3 | [redacted] | | |
| New Drugs * Post First Communication and and Before 2022Q1 | | | 0.4031*** |
| | | | [0.0259] |
| Log(Total Annual Quantity of Drug) | | -0.1429*** | 0.2436*** |
| | | [0.0019] | [0.0229] |
| Number of Competitors = 2 | | -0.0918*** | 0.2704** |
| | | [0.0061] | [0.1371] |
| Number of Competitors = 3 | | -0.1833*** | 0.0308 |
| | | [0.0065] | [0.1380] |
| Number of Competitors = 4 | | -0.2474*** | -0.0592 |
| | | [0.0067] | [0.1412] |
| Number of Competitors = 5 | | -0.3505*** | 0.1918 |
| | | [0.0067] | [0.1413] |
| Drug is Branded Generic = Yes | | | |
| Constant | | | 1.5434*** |
| | | | [0.0287] |
| Observations | | | 294,573 |
| R-squared | | | 0.971 |
| NDC Fixed Effect | No | | Yes |
| Drug (API-Form-Strength) Fixed Effect | Yes | | No |
| Year-Quarter Fixed Effect | Yes | | Yes |

Standard errors in brackets
*** p<0.01, ** p<0.05, * p<0.1
Notes:
[1] Dependent variable is natural logarithm of NADAC or IQVIA price.
*Sources: NADAC and IQVIA.*

## I. Scope of the Conspiracy – Beyond Defendants Charged

160. Up to this point, my analysis has been focused on the Drugs at Issue and only on the manufacturers/Defendants of each Drug at Issue identified by the SAGs in the Complaint.[243] I next consider Defendants' prices for Drugs at Issue where the SAGs did not list specific evidence of conduct by that Defendant on that Drug. Within that sample, I find price increases consistent with collusion even for Defendants who were not specifically charged.[244] This most often involves a situation where communications commence for a particular Drug at Issue for certain Defendant manufacturers, and another Defendant manufacturer enters the market for that Drug at some later date

[242] For purposes of the NADAC analysis, I calculate firm counts (labelers with share greater than one percent) using the SDUD data (which is available to me through 2022). I do not include a variable for branded generic because my sample of NADAC prices does not include any branded generics.

[243] For reference, the Drugs at Issue for each Defendant are listed in the "Counts" Section of the Complaint.

[244] Posner, *supra* notes 107, 108.

with no discovered communications by the Entrant. For purposes of this Section, I refer to these manufacturer/Drug combinations as "Defendant Not Implicated on that Drug", or "DNID".

161. While the SAGs have not specifically identified communications involving these Defendants, I note that, as discussed earlier, under an MSA, entry could have been accommodated without any communication specific to that drug. Alternatively, the entrant or that firm may simply have entered at a price somewhat below the incumbent firm's prices, but not so much as to instigate a price war, acting in its own self-interest (sometimes called "umbrella pricing").

162. Hence, it can be instructive to analyze the prices of the DNIDs to see if they too are significantly greater than the non-collusive level. Regardless of whether those higher prices were the result of a unilateral decision by that Defendant or through collusion, those higher prices would not have prevailed in the "but-for" world. For purposes of this model, I rely on Defendant net price data, which Defendants were obliged to produce for all MDL drugs, regardless of whether they were implicated on a particular Drug.

163. I again rely on the models specified above but introduce a separate interaction variable that captures the prices for DNIDs during the period of time after which communications began on that Drug. The coefficient (in each model) on this variable measures the difference between the pre-conspiracy average price for the Drug, compared with the DNID price charged after communications began. The results of these regressions are reported in Table 16, below.

**Table 16 – Regression Results for Defendants Not Implicated on that Drug**

| | Difference-in-Difference Regressions (1) | | Before and After Regression (2) | |
|---|---|---|---|---|
| **Overcharge %** | | **263%** | | **190%** |
| **Overcharge on Defendant Not Implicated %** | | **138%** | | **66%** |
| | **Control Drugs (IQVIA)** | **Drugs at Issue (Defendant Data)** | **Defendant Not Implicated (Defendant Data)** | **Defendant Implicated (Defendant Data)** |
| Drugs at Issue x (Post First Communication) | | 1.2879*** | | 1.0647*** |
| | | [0.1406] | | [0.1255] |
| Defendant Not Implicated * Drugs at Issue * (Post first communication) | | 0.8652*** | | 0.5078*** |
| | [redacted] | [0.2306] | | [0.1127] |
| Log(Total Annual Quantity of Drug) | | -0.1329*** | 0.0597 | 0.0530 |
| | | [0.0191] | [0.1434] | [0.1276] |
| Number of Competitors = 2 | | -0.4131** | -0.0739 | -0.7039*** |
| | | [0.1950] | [0.9072] | [0.1661] |
| Number of Competitors = 3 | | -0.4848*** | -0.0802 | -0.8333*** |
| | | [0.1854] | [0.9855] | [0.1746] |
| Number of Competitors = 4 | | -0.6127*** | -0.6481 | -0.9967*** |
| | | [0.2080] | [0.9494] | [0.1932] |
| Number of Competitors = 5 | | -0.5863** | -0.5794 | -1.0483*** |
| | | [0.2584] | [0.9349] | [0.2425] |
| Drug in FDA's Shortage List | | 0.6830*** | | 0.7335*** |
| | | [0.0877] | | [0.0758] |
| Drug is Branded Generic = Yes | | 0.9082*** | 2.0014*** | 0.9226*** |
| | | [0.1955] | [0.2173] | [0.2329] |
| Log(COGS) | | | 0.5326*** | |
| | | | [0.1040] | |
| Log(COGS) * Post First Communication | | | -0.3009*** | |
| | | | [0.1039] | |
| Constant | [redacted] | | -0.7077 | |
| | | | [2.1092] | |
| | | | | |
| Observations | | | 5,408 | |
| R-squared | | | 0.718 | |
| Drug (API-Form-Strength) Fixed Effect | Yes | | Yes | |
| Year-Quarter Fixed Effect | Yes | | No | |

Standard errors are clustered by API
*** p<0.01, ** p<0.05, * p<0.1
Notes:
[1] Dependent variable is natural logarithm of Defendants net price or IQVIA price.
[2] Price Increase % is calculated as: Exp(Post Communication Coefficient) - 1.
*Sources: Defendants Transactional Data and IQVIA.*

164. As shown in the Table, Defendants/Drug observations involving a DNID show a lower but still positive and statistically significant overcharge compared to implicated Defendants on the Drugs at Issue. This provides a strong indication that, at a minimum, Defendants' Conduct (on Drugs for which communications have been discovered) allowed for elevated prices by other Defendants and provides further support for the existence of the Overarching Conspiracy.

# VII. Distinguishing Collusion from Oligopolistic Coordination

165. I understand that some Defendants may assert that the higher prices for some of their generic drugs during the conduct period could be the result of "more effective oligopolistic coordination" as opposed to collusion. Oligopolistic coordination (also referred to as tacit coordination, tacit collusion, or parallel pricing in the economics literature) is described in the legal literature as "'follow the

leader's pricing", "conscious parallelism", and coordinated pricing "without an actual agreement to do so."[245] In the economics literature, conscious parallelism is described as:[246]

> …when supracompetitive prices are achieved without express communication. A common example is two adjacent gasoline stations in which one station raises its price to a supracompetitive level and the other station matches the price hike. While there may be mutual understanding regarding the underlying mechanism that stabilizes those supracompetitive prices (for example, any price undercutting results in a return to competitive prices), this understanding was not reached through express communication.

166. Other sources have described oligopolistic coordination as:[247]

> Price elevation arising from strategic conduct. We say that a firm acts strategically when in setting prices, the firm takes into account how it expects that its rivals will respond as one would expect firms to do when those responses would be strong and likely to matter to buyers. In short, when high prices persist because firms are discouraged from cutting price by the anticipated responses of their rivals, we term the outcome coordinated.

167. I note at the onset that the direct evidence of competitor communications and interactions referenced above and obtained through discovery in this matter is on its face inconsistent with Defendants' higher prices being the result of unilateral conduct. In several recent cases,[248] however,

---

[245] In re Text Messaging Antitrust Litigation, 782 F.3d 867, 874 (7th Cir. 2015).

[246] Harrington, J.E. (2012). "A Theory of Tacit Collusion." Department of Economics, The Johns Hopkins University, Working Paper, No. 588, pp. 1-33, at pp. 2-3. Available at: https://www.tse-fr.eu/sites/default/files/medias/stories/SEMIN_11_12/ECONOMIC_THEORY/harrington.pdf.

[247] Baker, J., and Farrell, J. (2020). "Oligopoly Coordination, Economic Analysis and the Prophylactic Role of Horizontal Merger Enforcement." *University of Pennsylvania Law Review*, *168*, pp. 1985-2018, at p. 1988. See also Farrell, J. (2000). "Renegotiation In Repeated Oligopoly Interaction." *Incentives, Organization, and Public Economics*: pp. 303-322; Harrington, J.E. (2012). "A Theory of Tacit Collusion." Department of Economics, The Johns Hopkins University, Working Paper, No. 588, pp. 1-33. Available at: https://www.tse-fr.eu/sites/default/files/medias/stories/SEMIN_11_12/ECONOMIC_THEORY/harrington.pdf.

[248] *See* Pletcher, A.T., Moen, Kelse, and Gonzalez, J. 2023. "Why Economics Matters in Criminal Antitrust Cases." American Bar Association Antitrust Law Section, Spring 7(2).

United States v. Penn, CRIMINAL 20-cr-00152-PAB (D. Colo.) (charging price-fixing of broiler chickens) where an economist argued that outcomes related to the episodes of alleged collusion were not consistent with what economics would expect to find in the presence of price fixing/bid-rigging agreements. The testimony was allowed on the basis that the proposed opinion went to the theory that there was no agreement to fix prices, not that there was a justifiable agreement.

United States v. Davita Inc., CRIMINAL 1:21-cr-00229-RBJ (D. Colo.) (charging agreement among kidney dialysis companies not to hire each other's employees) where Dr. Cremieux testified that his tests of turnover rates and salaries relative to benchmark values showed that the alleged conduct with respect to certain limitations on recruiting and hiring senior-level employees was consistent with SCA's independent self-interest and could not be used to infer the existence of a labor market allocation agreement with the purpose of stifling competition for labor. The judge rejected the DOJ's argument that every no-hire or no-poach agreement should be treated as a per se violation of the antitrust law. Instead, it ruled that the DOJ needed to prove "beyond a reasonable doubt that defendants entered into an agreement with the purpose of allocating the market," and to demonstrate that the agreement led to the "cessation of 'meaningful competition' in the allocated market." (United States v. Davita Inc.,

defendant economists have testified that the defendants' conduct or market performance was consistent with oligopolistic coordination and inconsistent with collusion, or at least effective collusion.[249] Thus, in this section I turn to 'indirect' evidence that Defendants' behavior was not simply the result of oligopolistic coordination.

### A. Oligopoly Models

168. The primary policy application of oligopoly theories has been to merger policy, where the concern is that a merger could facilitate an increase in oligopolistic coordination that would lead to higher prices that (in contrast to price increases due to collusion) cannot be prevented by other means.[250] The Cournot Model, first proposed by Augustine Cournot in 1887,[251] remains the most widely used oligopoly model for homogeneous products, and is the oligopoly theory underlying the safe-harbor HHI (Herfindahl – Hirschman Index) thresholds in the US DOJ/FTC Merger

---

CRIMINAL 1:21-cr-00229-RBJ (D. Colo. Jan. 28, 2022; Mar. 25, 2022)). It then ruled that Dr. Cremieux was entitled to opine that, as a matter of economics, the existence of these facts is inconsistent with the DOJ's allegations that a market allocation agreement existed in this case, and that his opinions were relevant to whether a labor market allocation agreement existed, and to whether the alleged conspirators acted with a purpose to allocate markets.

United States v. Lischewski, Case No. 18-cr-00203-EMC-1 (N.D. Cal.) (charging price-fixing of tuna) where the Judge excluded testimony that the net prices the tuna companies charged their customers were consistent with competitive activity, but allowed economic evidence that explains the pricing behavior for a reason other than conspiracy.

*See also* United States v. Surgical Care Affiliates LLC et al., Case No. 21-cr-00011-L (N.D. Texas) (alleged co-conspirators of defendants charged in DaVita). The judge excluded testimony as to alleged procompetitive effects, or the lack of harm, arising out of a means of price fixing, or testimony attempting to suggest why the alleged conspirators acted as they did, since that would be an impermissible attempt to testify as to state of mind. United States v. Akshay Aiyer, Case No. 18-cr-00333 (S.D.N.Y.) (charging price-fixing in foreign exchange markets).

In each of these cases, defendants called (or have disclosed that they intend to call) economists at trial to provide testimony rebutting government evidence that defendants entered into a conspiracy in violation of the antitrust laws. The DOJ argued that, because a per se violation does not require actual effects to be illegal, economic evidence is irrelevant and should be inadmissible. In general, judges have excluded testimony as to alleged procompetitive effects, or the lack of harm, from price fixing, or testimony attempting to suggest why the alleged conspirators acted as they did, since that would be an impermissible attempt to testify as to state of mind.

[249] For discussions of the role of economists in criminal antitrust cases, see Johnson (2023), Tubach (2023), St. Matthew-Daniel and Evans (2023) and Cremieux (2023), all prepared for American Bar Association Spring Meetings March 2023 panel "Does Economics Matter in Criminal Antitrust Cases?"; Pletcher, A.T., Moen, Kelse, and Gonzalez, J. 2023. "Why Economics Matters in Criminal Antitrust Cases." American Bar Association Antitrust Law Section, Spring 7(2); McEvoy, D.A., and M.R. Ginsberg (2014). "The Use of Expert Witnesses for Penalty Determinations in Criminal Antitrust Cases: A Study of United States v. AU Optronics." *Antitrust*, *28*(3), pp. 95-100. (in which the DOJ affirmatively called an economic expert witness as part of their primary case).

[250] "Bertrand and Cournot models are also used, for instance, in antitrust damages proceedings to help inform an economic expectation of harm following a cartel infringement." (Klein, T. (n.d.). "Cournot (Nash) Equilibrium." Concurrences: Antitrust Publications & Events. Available at: https://www.concurrences.com/en/dictionary/cournot-nash-equilibrium.)

[251] Cournot, A.A. 1897. *Researches Into the Mathematical Principles of the Theory of Wealth*. New York: The Macmillan Company.

Guidelines.[252] In the one-period Cournot model, the oligopoly profit margin percentage (the Lerner Index) is a function of prices, costs, and market shares, or, equivalently, the Herfindahl-Hirschman Index and the elasticity of demand.[253]

169. The Cournot equilibrium is the result of a one-period "game". Models that allow for repeated interactions over a long period can give rise to non-collusive prices that are well above the one-period Cournot level,[254] especially if discount rates are relatively low. However, my focus in analyzing Defendants' behavior is strictly on explaining price increases that are usually both large and sudden, rather than explaining prices or margins prior to the conduct period. While multi-period oligopolistic coordination could affect the level of prices both pre- and post-conspiracy, I use the Cournot model only to identify structural changes or events that could affect prices during the Conduct Period.

170. The Cournot model would imply screening for increases or decreases in costs or capacity, an increase or decrease in the number of suppliers (entry or exit), an increase in the dispersion of firm shares, or a fall in the elasticity of demand for the product. Absent an observable change in these conditions immediately prior to the beginning of the conduct period, the price observed during the benchmark period can be used as the initial "but-for" price for estimating the price increase due to collusion during the conduct period. If a structural change occurs during the Conduct Period that could change the "but-for" oligopoly equilibrium, e.g., entry, exit or a change in costs (unless these are a result of the conspiracy), then I adjust for those changes in two ways: first, I hold constant for some changes, such as a change in costs, by incorporating them as an independent variable in my

[252] U.S. Department of Justice and the Federal Trade Commission. 2010. "Horizontal Merger Guidelines." August 19, 2010. Available at: https://www.justice.gov/sites/default/files/atr/legacy /2010/08/19/hmg-2010.pdf. ("DOJ/FTC (2010)"). Although the focus in the 2010 Guidelines has shifted more toward to evaluating the unilateral effects from a merger, the HHI and concern as to oligopolistic interdependence remains.

[253] The Lerner index is calculated as: $Lerner\ Index = \sum_{i=1}^{N} \frac{P_i - C_i}{P_i} * s_i = \frac{HHI}{e}$, where:

$P_i$ = price of firm $i$

$C_i$ = marginal costs

e = elasticity of demand for the product

HHI = Herfindahl-Hirschman index = sum of squares of firm shares ($\sum_{i=1}^{N} s_i^2$).

= 1/N + share variance *(N-1), where N = number of firms.

*See* Brown, Donald M. and Warren-Boulton, Frederick R. 1988. "Testing the Structure-Competition Relationship on Cross-Sectional Firm Data." *Economic Analysis Group 88-6*. Washington, D.C: U.S. Department of Justice, Antitrust Division.

Thus, the smaller the number of firms or the more unequal the shares, the higher the HHI.

[254] Baker, J., and Farrell, J. 2020. "Oligopoly Coordination, Economic Analysis and the Prophylactic Role of Horizontal Merger Enforcement." *University of Pennsylvania Law Review*, *168*, pp. 1985-2018, at p. 1993, 1997.

multiple regression analysis. Second, where there are indications of accommodating entry through an FSA or direct communication, I use my estimates (as opposed to those in the economics literature which are higher) to control for the effect of entry absent collusion.

### B. Indicators of Collusion

171. Appendix G provides a list of the large number of structural characteristics that have been proposed by the courts or in the academic literature as either facilitating or indicating oligopolistic coordination or collusion, either at a market level or for individual firms in that market.[255] Some are qualitative, while others are quantitative. Some are consistent with just collusion, some with just oligopolistic coordination, and some with both oligopolistic coordination and collusion. As detailed in the Appendix, the conditions conducive to or indicating collusion are overwhelmingly satisfied in the markets for the Drugs at Issue.

172. In this Section, my focus is on conduct or performance (*i.e.*, prices and market shares) that is consistent only with collusion and where I can conduct a statistical test for collusive behavior. Some of these tests are performed individually for each of the Drugs at Issue, while others are performed across the Drugs at Issue (or for certain subsets of Drugs at Issue).

#### *i. Price Tests for Individual Drugs at Issue*

173. My econometric model from Section VI and the model used to estimate disgorgement in Section VIII.B.i below show a large positive and statistically significant elevation of prices for the Drugs at Issue combined. While this represents the best estimate of the effect of Defendants' conduct over all the Drugs at Issue, it does not provide an independent test of the effect of Defendants' conduct for each individual Drug at Issue.[256] In this Section, I propose a series of extensions of my above models

---

[255] See Harrington, J.E., and Skrzypacz, A. (2011). "Private Monitoring and Communication in Cartels: Explaining Recent Collusive Practices." *American Economic Review*, 101(6), pp. 2425-2429; Kovacic, W.E., Marshall, R.C., Marx, L.M., and White, H.L. (2011). "Plus Factors and Agreement in Antitrust Law." *Michigan Law Review*, 110(3), pp. 393-436; Leslie, C.R. (2011). "The Probative Synergy of Plus Factors in Price-Fixing Litigation." *Northwestern Law Review*, 115; Levenstein, M.C., and Suslow, V.Y. (2006). "What Determines Cartel Success?" *Journal of Economic Literature*, 44(1), pp. 43-95; Page, W.H. (2008). "Facilitating Practices and Concerted Action under Section 1 of the Sherman Act." *Encyclopedia of Law and Economics*; Posner, Richard A. 2001. "Antitrust Law: An Economic Perspective, Second Edition," Chicago, Illinois: The University of Chicago Press.

[256] In statistical terms, the overcharge estimates presented in these other Sections represent "pooled" overcharge estimates, either across drugs with similar conduct types or across Defendants. While these estimates are a reliable basis for damages and disgorgement across the Drugs at Issue, in this Section, I test whether and to what degree Defendants were able to increase prices for each Drug at Issue. These estimates can also be used to generate an aggregate disgorgement figure, which I also offer in Section VIII.B .

that test, for each Drug at Issue, whether Defendants' conduct resulted in prices above non-collusive levels.

174. As noted above, the primary indicator of collusion is a large increase in price that is not explained by a change in market or structural conditions. This change in price could occur immediately (i.e., at the point where communications have been discovered), could occur at some later point during the conspiracy period, and may be sustained or could be diminished over that period. Hence, I take the econometric model specified in Section VI and make certain modifications to test whether I observe a statistically significant increase in prices either (a) over the entire conspiracy period, or (b) over the one-year period immediately following the first evidence of collusive behavior listed in the Complaint.[257,258] Next, I test whether the Defendants increased their list prices (i.e., WAC) in the one-year period immediately following the onset of communications. Finally, using publicly available sources of prices for the period after the conspiracy was discovered, I test whether the Drugs at Issue experienced a decline in prices at the end of the conspiracy period.[259]

*a. Increase in Prices over the Entire Conduct Period*

175. An unexplained large and statistically significant increase in price, beginning when communications between the Defendants commence, sustained over the Conduct Period, represents a strong indicator that those communications were effective at increasing prices. Hence, I modify the DiD specification utilized in Section VI to estimate a coefficient for each Drug at Issue that measures the difference between that drug's prices over the benchmark period prior to communications commencing and the prices over the remaining period for which we have data:

$$\ln(\mathrm{P}_{\mathrm{i,m,t}}) = \alpha + \beta_{\mathrm{i}}\text{Post First Communication}_{\mathrm{i,t}} + \sigma_3\ln(\text{Demand}_{\mathrm{i,t}}) + \sum_{j=2}^{5+} \delta_{\mathrm{j}}\text{ Number of Competitors} = \mathrm{j}_{\mathrm{i,t}} + \theta_{\mathrm{t}}\mathrm{t} + \gamma_{\mathrm{i}}\mathrm{i} + \epsilon_{i,t}$$

[257] As noted in this Section, this analysis controls for changes in market conditions. Hence, the price changes estimated by the model are a measure of the "unexplained" change in prices.

[258] To be conservative, I do not include any "intra-API" effects in this analysis.

[259] Of the tests listed, only the price decline at the end of the conspiracy can be applied to New Generic Drugs. In addition, WAC price decreases are relatively infrequent even when competition increases, hence it is likely that the "but-for" WAC and the "as-is" WAC would be the same for drugs where only accommodation of entry occurred. (Scott, C., Sabot, E., and Kirk, K. (2020). "The Myth of Skyrocketing Drug Prices: A Closer Look at The US Gross to Net Problem." PharmExec.com. Available at: https://www.pharmexec.com/view/myth-skyrocketing-drug-prices-closer-look-us-gross-net-problem.)

176. The results of this regression are reported in Appendix C Table 3, Column 1. The coefficient estimates on the variables of interest (drug-specific price increases) from that regression are reported in Appendix C Table 4, Column 1. As shown in the Table, there were positive and statistically significant increases in prices for 75 of the 84 Drugs at Issue that I tested for a price increase.[260]

*b. Increase in Prices over the One-Year Period Following Communications*

177. I can also use the specification above, but limit the data used to the one year immediately preceding communications and the one-year period afterwards. A large and statistically significant increase in the average price for the latter one-year period is a strong indicator that prices were increased by Defendants' behavior. The results of this test are reported in Appendix C Table 3, Column 2. The coefficient estimates on the variables of interest (drug-specific price increases) are reported in Appendix C Table 4, Column 2. As shown in the Table, there were positive and statistically significant increases in prices for 72 of the 81 Drugs at Issue that I tested for a 1-year price increase. Across both tests (entire period or 1-year), 79 of the 84 drugs that I test for price increases had a statistically significant and positive increase in prices using at least one test.

*c. Increase in List Prices in the One-Year Period Following the Onset of Communications*

178. While not necessarily an indicator of conduct resulting in harm to consumers or increased profits to manufacturers, in the context of the Overarching Conspiracy, list prices can be an important signal of compliance with the terms of the agreement. As shown at length in the Complaint, Defendants constantly monitored each other's list prices and celebrated list price increases as indicative of other Defendants complying and following on with their other price increases.[261]

179. Using publicly available WAC list price data for Defendants' NDCs for the Drugs at Issue, I test for whether the list prices for the Drugs at Issue increased by comparing the one-year period prior to communications with the following one-year period. The results of this test are summarized in Appendix C Table 5. Of the 83 drugs that I study, 64 had statistically significant WAC price increases.[262]

---

[260] Economists and statisticians commonly use 90% or 95% levels of confidence to determine whether a result or finding could have been obtained by random chance.

[261] See, e.g., Complaint, ¶ 806; Complaint, ¶ 228; Complaint, ¶ 1047; Complaint, ¶ 1050.

[262] I note that statistical significance in the case of WAC price increases may not be estimable, as list prices tend to change and stay constant for several quarters and/or years. Hence, while each observation represents the list price in that quarter, there is little to no variation quarter-to-quarter unless the manufacturer affirmatively changes the list price.

*d. Decrease in Prices Once Conspiracy is Discovered*

180. As discussed in Section V.B, Defendants' data show that prices for the Drugs at Issue have declined since the States' first Complaint was filed in December 2016, and by even more from their peak values in 2015-2016. Information from public sources, including NADAC, indicate that prices have continued to fall, potentially to the present. Just as a large and statistically significant price *increase* can be a strong indicator of collusion commencing, a large and statistically significant *decrease* in prices once the conspiracy is discovered, or from their peak levels, also indicates that prices during the conspiracy period were above the "but-for" level.

181. For purposes of this analysis, I utilize the most recent data available to me from NADAC to compare the NADAC price for Drugs at Issue during the peak of collusive pricing (2015/2016) with NADAC prices for the two most recent full years available (2021Q2-2023Q1). I again rely on the difference-in-difference approach used earlier, employing the change in NADAC prices for other generic Drugs over the same time period as a control. I also create similar explanatory variables (demand and the number of competitors) for the two time periods.[263]

182. The regression results of this test are shown in Appendix C Table 6, and the coefficients on the variables of interest (drug-specific price decreases) are reported in Appendix C Table 7. As shown in Appendix C Table 7, 50 of the Drugs at Issue exhibited a statistically significant decrease in price between 2015-2016 and 2021Q2-2023Q1.

*e. Summary – Drug Specific Tests*

183. A summary of the results of the four tests above for the 98 Drugs at issue is reported in Appendix C Table 8. As shown in Table, Defendants were able to increase prices significantly above competitive levels for 80 of 84 PI Drugs. The remaining 4 Drugs at Issue are Ciclopirox Cream 0.77%, Griseofulvin Microsize Tablets 500MG, Mometasone Furoate Cream 0.1%, and Triamcinolone Acetonide Paste 0.1%. I note, however, that I obtain a positive disgorgement estimate at the drug level for each of these Drugs as well (See Appendix C Table 13).

184. Of the New Generic drugs, my test of a significant decrease in price at the end of the Post-Conduct Period indicated elevated prices for 7 of the 14 NG Drugs. I note generally that the remaining New Generic drugs are those which I would not expect to observe a price increase since

[263] The IQVIA data I utilized in Section VI are not available to me after 2020. Hence, I utilize the SDUD data to compute the number of competitors for the Drugs at Issue, as well as to compute the total quantity of the drug demanded in the market.

the initial prices already likely reflected the effects of collusion.[264] However, I also note my disgorgement estimates for all 14 New Generics are positive (see Appendix C Table 12).

#### *ii. Market Tests for Market Share Agreements*

185. There are several "markers" at the market level that indicate the presence of collusion. The first relates to individual market shares of firms. In addition to market shares being more stable than under competition, as discussed in Section IV.D above, an MSA can be expected to change relative shares. In particular, market shares for the largest suppliers may be lower than in similar markets or for that Drug during the Conduct Period, and may fall by more following entry if the leader, as the primary beneficiary of the agreement, is more willing to give up share to reach and maintain an agreement and the expectation by its rivals is that the leading firm should designate its own customers for relinquishment.[265]

##### *a. Effects of Collusion on Leading Firm Share*

186. I first compute the average leader share in two-firm markets based on IQVIA data,[266] for both the Drugs at Issue and for non-MDL drugs. Based on this analysis, over the entire post-Conduct period the market leader for the Drugs at Issue obtained a 65% market share when two firms were in the market, compared to a 71% market share for non-MDL drugs with two firms. Figure 23, below, shows first that during the period after communications occurred,[267] the leader's market share for Drugs at Issue is much more skewed towards the "fair share" as memorialized in Defendants' documents, and second, the sharp drop in the number of "dominant" leader firms (*i.e.*, those with 80 percent or more market shares).[268]

---

[264] Of these 7, 3 API-Form-Strengths are related to Carbamazepine ER Tablets, where there is a marked increase in prices associated with bilateral communications in May 2013.

[265] Bihari Dep. 190:22-191:24. Also, while it may not have necessarily been the largest firm that would shed market share/customers, the size of a customer was at least a consideration in determining who should give up share. (Bihari Dep. 142:18-143:10.)

[266] I note that the IQVIA data are incapable of properly calculating the number of competitors for extended release vs. non-extended-release formulations using the product form fields. In the IQVIA data, information on extended/non-extended release are captured in the "product_sum" field, which also may differ for branded and other generics. For the Drugs at Issue, where possible, I have separated ER and non-ER forms using the "product_sum" field.

[267] For purposes of this chart, I utilize 2016Q1, which is both after communication for each of the Drugs at Issue and prior to the filing of the Heritage Complaint.

[268] A further test, the Kolmogorov-Smirnov (K-S) test (see https://www.stata.com/manuals/rksmirnov.pdf) for whether the two distributions could be drawn from the same population confirms that the two distributions are different. An equality of distributions test is a test of the null hypothesis that two or more samples have been drawn from the same distribution. If the two distributions are the same, then their means are also the same.

**Figure 23 – Market Shares for Drugs at Issue vs. Non-MDL Generic Drug Markets in 2016Q1 (2 Firms)**

[redacted]

Source: IQVIA data.

187. According to Defendant Taro, fair share in a two firm market should be around 60% for the original entrant and 40% for the second entrant.[269]

**Figure 24 –Taro's Fair Share Table[270]**

**Market Share - Fair Unit Share assumptions**
Order of Entry Grid
Number of Competitors

| Order of Entry | Number of Competitors | 1 | 2 | 3 | 4 | 5 | 6 | 7 |
|---|---|---|---|---|---|---|---|---|
| | 1 | 100% | 60% | 45% | 35% | 30% | 30% | 30% |
| | 2 | | 40% | 35% | 30% | 25% | 25% | 25% |
| | 3 | | | 20% | 20% | 20% | 20% | 20% |
| | 4 | | | | 15% | 15% | 15% | 15% |
| | 5 | | | | | 10% | 10% | 10% |
| | 6 | | | | | | 10% | 10% |
| | 7 | | | | | | | 10% |
| Total | | 100% | 100% | 100% | 100% | 100% | 100% | 100% |

188. In Figure 23 above, I observe that the leader firm in approximately 70% (= 47% + 23%) of the Drugs at Issue has a market share of between 50 and 70 percent, compared to 42% (= 21% + 21%) of the non-MDL Drugs. Further, less than 15% of the Drugs at Issue have a leader with 80 percent or more, compared with 40% for the non-MDL Drugs.

[269] Complaint, ¶ 133; TARO_000224150.

[270] Ibid.

189. I note that the above analysis compares Drugs at Issue with non-MDL drugs, and hence does not control for differences between Drugs that might result in leader share differences between Drugs at Issue and non-MDL Drugs for reasons other than the MSA. Hence, in Figure 25, for Drugs at Issue in 2008Q1 and 2016Q1, I have plotted the same distribution for the market share leader in two firm markets. As shown in the Figure, two firm markets for Drugs at Issue in 2016 were again characterized by leader shares skewed more towards "fair shares" (60%), with a noted decrease in dominant firm markets.[271]

**Figure 25 - Market Shares for Drugs at Issue – 2008Q1 vs. 2016Q1 (2 Firms)**

[redacted]

Source: IQVIA data.

190. A similar phenomenon occurs in the markets for Drugs at Issue with 3 competitors. In these markets, the leader obtained a share of 55%, compared to 61% in non-MDL markets over the post-Conduct period. As in the two-firm example above, the leader's market share in the Drug at Issue markets in 2016Q1 is more skewed towards the "fair share" for a three-firm market (45%) than in non-MDL markets (see Figure 26, below). [272] However, for three firm markets, there are about the same number of "dominant" leader markets as for the non-MDL markets.

[271]Note that the K-S test for equality of the distributions in the two individual quarters (2008Q1 and 2016Q1) does not reject the null hypothesis of equality, but a test of the full year (2008 vs. 2016) confirms that the two are not drawn from the same population because the means of the samples are different.

[272] The K-S test confirms that the two distributions are not drawn from the same population and do not have the same mean.

**Figure 26 – Market Shares for Drugs at Issue vs. Other Generic Drug Markets in 2016Q1 (3 Firms)**

[redacted]

Source: IQVIA data.

191. Again, I can compare the distribution of leader market shares in three-firm markets for the Drugs at Issue in 2008Q1 to the same distribution in 2016Q1 (see Figure 27, below). During the Conduct Period (2016Q1), I observe clustering of leader shares around the "fair share" (45%), and a somewhat reduced number of dominant leader firms.[273]

**Figure 27 - Market Shares for Drugs at Issue – 2008Q1 vs. 2016Q1 (3 Firms)**

[redacted]

Source: IQVIA data.

[273] Again, the Kolmogorov-Smirnov test for equality of the distributions fails to reject the null for the two quarter sample, but does reject the null when expanded to full years (2008 vs. 2016).

192. Similarly, for four-firm markets, over the entire post-Conduct period, the leader firm for Drugs at Issue obtained a share of 47%, compared to 52% in non-MDL markets. As above, the leader's market share in the Drug at Issue markets is more skewed towards the "fair share" for a four-firm market (35%) than in non-MDL markets (see Figure 28, below). This difference persists when I compare 2008Q1 to 2016Q1 (see Figure 29, below).[274]

**Figure 28 - Market Shares for Drugs at Issue vs. Other Generic Drug Markets in 2016Q1 (4 Firms)**

[redacted]

Source: IQVIA data.

[274] The Kolmogorov-Smirnov test for equality of the distributions rejects equality of the Drugs at Issue vs. Non-MDL 4-firm samples but does not reject equality for the 4-firm 2016Q1 vs. 2008Q1 or 2008 vs. 2016 samples.

**Figure 29 - Market Shares for Drugs at Issue – 2008Q1 vs. 2016Q1 (4 Firms)**

[redacted]

Source: IQVIA data.

*b. Market Share Stability*

193. In addition to a lower leader share, market shares for the Drugs at Issue subject to an MSA would tend to be more stable (1) during the Conduct Period than during the Pre/Post Periods, and (2) compared to non-MDL drugs. In Figure 2 and Figure 3, above for Betamethasone Valerate Cream and Terconazole Cream, and in Appendix D for several other Drugs at Issue,[275] market share stability is associated with higher overcharges. Defendants' shares in the Pre-Conduct period for both Latanoprost Solution 0.05% and Clobetasol Propionate Solution (0.05%) begin as quite disparate, before becoming more equal, and then become more unequal after the Heritage Complaint was filed.

[275] See Betamethasone Dipropionate Lotion Augmented EQ 0.05% Base, Betamethasone Dipropionate Clotrimazole Cream Eq 0.05% Base; 1%, Bromocriptine Mesylate Tablet EQ 2.4 MG Base, Clindamycin Phosphate Gel EQ 1% Base, Halobetasol Proprionate Ointment 0.05%, Methylphenidate HCL Tablet 10 MG, Metronidazole Cream 0.75%, Oxacillin Sodium Injectable EQ 2GMB Base/Vial, Terconazole Cream 0.8%, Triamcinolone Acetonide Ointment 0.025%, Triamcinolone Acetonide Ointment 1%, Betamethasone Valerate Lotion EQ 0.1% Base, and Desonide Ointment 0.05% in Appendix D.

[redacted]

Sources: Defendants Transactional, AMP, IQVIA, and NADAC Data Sets.

**Figure 31 – Market Shares for Clobetasol Propionate Solution (0.05%)**

[redacted]

Sources: Defendants Transactional, AMP, IQVIA, and NADAC Data Sets.

194. These are but two examples of the Drugs at Issue. To test whether the variance of market shares is different across the two groups (Drugs at Issue and non-MDL Drugs), I employ a statistical technique referred to as the "Levene Test." The Levene Test is a statistical method that compares the variance of certain groups, allowing for differences in the mean for each group. Thus, as in the above

analysis, I can control for differences in the average share of the leader firm (lower in Drugs at Issue compared to non-MDL Drugs), and then analyze whether changes in market share around that mean, tend to be larger for non-MDL Drugs than for Drugs at Issue. The test confirms that the variance in market shares for the Drugs at Issue are lower than the Control group, and variance of market shares during the Conduct period are lower than prior to Conduct.[276]

#### *iii. Market Tests for Price Fixing by Drug*

195. As can be seen in Table 7, the decline in the pass-through rate during the Post-Conduct Period is both large and statistically significant. The pass-through rate falls by 0.30, from 0.58 during the pre-conduct period, to 0.28 during the Conduct period. As discussed above (Section VI.D.ii.c), a fall in the pass-through rate is an indicator of collusion.

## VIII. Disgorgement

### A. Background

196. The State Attorneys General have asked me to perform a calculation of the additional profits Defendants were able to collect as a result of their Conduct. As background, I understand that, under their State law claims, certain states are entitled to seek the disgorgement of "unjust enrichment" or "ill-gotten gains" from a Defendant in lieu of damages, where that remedy is deemed inadequate.[277] Though I do not provide a legal opinion on the adequacy of these claims, the SAGs have asked me to calculate these increased net profits on both a nationwide basis and by individual state.

197. In economics, profits can be measured either at the gross or net level. Gross profits generally refer to the total revenues of the business less variable costs, while net profits generally refer to total revenues less all costs. Variable costs commonly pertain to the costs of production (e.g., materials and labor costs), whereas net profits generally account for additional costs such as overhead. In the context of a disgorgement calculation, fixed costs (e.g., overhead) would have been incurred both in the "as-is" and "but-for" worlds and are hence not relevant to such an analysis.

198. Given that fixed costs would have been incurred in both the actual and the counterfactual, there are two specific direct elements to a disgorgement calculation involving net profits: (1) the increase in revenues due to the bad acts (all of which goes directly to profits), plus (2) any increase/decrease in

[276] See my backup workpapers for the results of this test.

[277] I understand that the State Attorneys General have also retained another expert, Dr. Hal Singer, to opine on the amounts of damages each State/Territory has incurred.

costs associated with the implementation and execution of those bad acts. I have seen no evidence of any higher costs due to collusion,[278] apart from a reduction to revenue due to higher payments to Medicaid, which I discuss and quantify below.

199. However, the literature also discusses a third element that may or may not be relevant to a disgorgement calculation, notably whether:[279]

> The economic circumstances of each defendant must be evaluated to determine if there are any losses that should be applied to offset the benefits the defendant received as a result of the fraud. … Neither courts nor legal scholars typically refer to "offsetting" or "net- ting" per se in the disgorgement context. Courts, nevertheless, have considered "net gain" calculations of a defendant's "ill-gotten gains" when persuaded to do so by the defense.

I interpret the "offset" above to mean any benefit the Defendants forewent as a result of their Conduct. The only benefit of which I am aware would be profits lost due to a decrease in the quantity sold as a result of the higher prices from collusion. It is unclear, however, whether such lost sales constitute losses as contemplated by the authors above. It also appears that the Defendants were not overly concerned about possible volume reductions, despite very large price increases. Nonetheless, below I present my best estimate of this possible offset, in the event that the finders of fact determine that the circumstances of this case justify such an offset.

## B. Increase in Revenues

### *i. Estimation of the Percentage Increase in Net Revenues*

#### *a. Defendant-Specific Overcharge Estimates*

200. The primary focus of a revenue analysis as it applies to disgorgement should be to obtain the best estimate of the increase in revenues to each Defendant across the Drugs at Issue. For purposes of this calculation, I slightly modify both regression specifications (before-and-after and difference-in-difference discussed in Section VI.D.iii and VI.E above) to separately measure each Defendant's increase in prices relative to their own pre-Conduct prices. Specifically, I replace the variable $\beta * \text{PostFirstCommunication}_{\text{i,t}}$ with $\beta_{\text{m}}\text{Post FirstCommunication}_{i,t}$, where $\beta_{\text{m}}$ represents a manufacturer-specific overcharge across all Drugs at Issue for manufacturer m.[280] In addition, I interact each manufacturer with the Drug fixed effects.

[278] On the other hand, if collusion also resulted in, for example, lower prices paid to suppliers, I will have underestimated disgorgement.

[279] Buckberg, Elaine, and Dunbar, Frederick C. 2008. "Disgorgement: Punitive Demands and Remedial Offers." *The Business Lawyer*, 63(2): pp. 356-357.

[280] This model is likely conservative because it does not allow for the intra-API effects above.

201. These models depart somewhat from the previous models, in that instead of comparing the average post-conspiracy prices for the Drugs at Issue with the average prices that prevailed pre-communication, I instead compare each manufacturer's prices with that manufacturer's prices (for the same drug) pre-conspiracy. This is the most appropriate process for estimating disgorgement as it represents the amount that a Defendant was able to increase its own prices. The coefficient estimates ($\beta_m$), and associated overcharge percentages from the two models, are reported in Table 17, below.

**Table 17 – Overcharge Estimates by Defendant (Relative to Own Pre-Conspiracy Prices)**

| Defendant | Before and After Model Coefficient Estimate | Before and After Model Increase in Net Revenues (%)[281] | DiD Coefficient Estimate | DiD Increase in Net Revenues (%) |
|---|---|---|---|---|
| Actavis | 0.7750*** | 117% | 1.2150*** | 237% |
| Amneal[282] | -0.1678 | -15% | 0.5300*** | 70% |
| Aurobindo | 1.4501*** | 326% | 0.9802*** | 166% |
| G&W | 1.1672*** | 221% | 1.2060*** | 234% |
| Glenmark | 0.4103 | 51% | 0.3532* | 42% |
| Greenstone | 0.8562*** | 135% | 0.4281*** | 53% |
| Lannett | 0.4672*** | 60% | 0.8622*** | 137% |
| Lupin | | | 1.6582*** | 425% |
| Mallinckrodt | 1.4556*** | 329% | 1.8702*** | 549% |
| Mylan | 0.4031 | 50% | 0.6672*** | 95% |
| Perrigo | 0.5932*** | 81% | 0.8946*** | 145% |
| Sandoz | 1.4366*** | 321% | 1.6214*** | 406% |
| Sun | 0.0345 | 4% | 0.5829*** | 79% |
| Taro | 1.1987*** | 232% | 1.4964*** | 347% |
| Teligent | 1.0123*** | 175% | 1.4511*** | 327% |
| Valeant/Bausch | 0.3981** | 49% | -0.2323*** | -21% |
| Wockhardt | 1.1522*** | 217% | 1.3717*** | 294% |

*, **, *** *denote significance at the 90, 95, and 99 percent levels, respectively*

281 Percent increase in net revenues is calculated as $e^{\beta_m}-1$.

282 Note that under the formal disgorgement model described below, both Amneal and Sun have positive disgorgement estimates. Also, Sun's overcharge is based on only one Drug (Phenytoin Sodium).

202. This model provides a direct test of the effects of each Defendant's conduct by comparing its own conspiracy-period prices with its own Pre-Conduct prices across all Drugs at Issue, whereas the market liability tests for the average overcharge by Drug compares the average conspiracy-period prices for each Drug at issue with the average prices for those same Drugs during the pre-Conduct Period. Since the model requires each manufacturer to have at least one observation in the benchmark Period and during the Conspiracy Period, this limits the sample used in estimation of the coefficients listed above to those Defendants making sales of each Drug in both periods.

203. As shown in the Table, using the before and after model, 12 of the 17 Defendants increased prices at a highly statistically significant level of confidence across the Drugs at Issue relative to their own prices pre-conspiracy, and a further 3 increased prices.[283] These increases ranged from -15 percent (Amneal) to 329 percent (Mallinckrodt).

204. Using the difference-in-difference model, 16 out of 17 of the Defendants have a positive and statistically significant increase in prices for the Drugs at Issue. The increases range from -21% (Valeant/Bausch) to 549% (Mallinckrodt).

205. Since not all Defendants had pre-Conduct prices for the Drugs at Issue, I also report in Table 18, below, the overcharge for each Defendant relative to the average price for that Drug pre-Conduct.[284] Again, this analysis shows statistically significant increases in prices for all 17 Defendants. The overcharges range from 8% (Amneal) to 1210% (Teligent).

**Table 18 – Overcharge Estimates by Defendant (Relative to Average Pre-Conspiracy Prices)**

| Defendant | DiD Coefficient Estimate | DiD Increase in Net Revenues (%) |
|---|---|---|
| Actavis | 1.3478*** | 285% |
| Amneal | 0.0813* | 8% |
| Aurobindo | 0.5815*** | 79% |
| G&W | 1.4512*** | 327% |
| Glenmark | 0.7972*** | 122% |
| Greenstone | 1.1224*** | 207% |
| Lannett | 1.6002*** | 395% |
| Lupin | 1.6578*** | 425% |

[283] Lupin did not have cost data, hence is excluded in this analysis.

[284] For this model, I do not interact Defendants with the Drug fixed effects.

| | | |
|---|---|---|
| Mallinckrodt | 1.9601*** | 610% |
| Mylan | 0.7578*** | 113% |
| Perrigo | 1.1612*** | 219% |
| Sandoz | 1.5315*** | 363% |
| Sun | 1.2725*** | 257% |
| Taro | 1.3506*** | 286% |
| Teligent | 2.5726*** | 1210% |
| Valeant/Bausch | 0.8406*** | 132% |
| Wockhardt | 1.3035*** | 268% |

**, **, *** denote significance at the 90, 95, and 99 percent levels, respectively*

*b. Calculation of Disgorgement Percentages by Drug and Defendant for PI Drugs*

206. For expositional convenience, the above overcharges (and increases in net revenues) are presented at the Defendant level as evidence of the impact and significance of the impact of the Conspiracy on each Defendants' net prices across the Drugs at Issue. However, to obtain the most precise estimate of the revenue increases due to Defendants' conduct for each Drug at Issue, I instead employ a hierarchical approach. For each Defendant and Drug at Issue, I first calculate (if possible) an overcharge specific to that Drug and Defendant (*i.e.*, relative to that Defendants' own price for that Drug pre-conspiracy, as in Table 17 above) using both the before and after and DiD models. These overcharges are reported in Appendix C Table 9.

207. In the event that such a comparison cannot be made (*e.g.*, for an entrant manufacturer), I first ask whether the same overcharge percentage can be calculated using the DiD model using an alternative transactional data source (AMP or IQVIA).[285] If so, I rely on that overcharge estimate for purposes of disgorgement.[286] If not, I instead rely on the estimated post-conspiracy increase in price for that manufacturer relative to the average price for each Drug pre-conspiracy from the DiD model.[287] These overcharges (*i.e.*, calculated relative to average Defendant prices pre-conspiracy) are reported in Appendix C Table 10.

[285] This appears to be possible for Hydrocortisone Acetate-Suppository-25MG.

[286] Adjusting for the relationship between net overcharges and AMP/IQVIA overcharges.

[287] I use the DiD model to ensure that the regression properly measures the difference between that manufacturer's prices and the average market price, *i.e.*, including the manufacturers for which I could not locate usable cost information.

208. Finally, there are some Defendant-Drug combinations for which overcharges cannot be estimated using the above methodologies, the majority of which involve New Generic Drugs. For these PI Defendant-Drug combinations, I apply the average overcharge for other PI Drugs to these observations. The overcharges used for NG Drugs are reported in the next subsection. The steps outlined above are presented in Table 19 below, and the results of the above hierarchical process are reported in Appendix C, Table 11.

**Table 19 – Order of Preference for Disgorgement Estimates**

| Order of Preference | "Before and After" Disgorgement | DiD Disgorgement |
|---|---|---|
| 1 | Own-Price Estimate (Before and After Model) | Own-Price Estimate (DiD Model) |
| 2 | Own-Price Estimate (DiD Model) | Average-Price Estimate (DiD Model) |
| 3 | Average-Price Estimate (DiD Model) | AMP Average-Price Estimate (DiD Model) |
| 4 | AMP Average-Price Estimate (DiD Model) | IQVIA Average-Price Estimate (DiD Model) |
| 5 | IQVIA Average-Price Estimate (DiD Model) | Average OC (PI Drugs, DiD Model) |
| 6 | Average OC (PI Drugs, Before and After Model) | |

*c. Estimating Disgorgement Amounts and Percentages for New Generic Drugs*

209. The calculation of the disgorgement percentages above requires either (1) both a pre- and post-communication price for each Defendant, or (2) a post-communication price for each Defendant that can be paired with at least one pre-communication price. For New Generic Drugs, I have neither. I do, however, have an estimate of the price increase for the three strengths of Carbamazepine ER (Section VI.H.i) that reflects the effects of communications in May 2013, but does not reflect the effects of any previous communications. To be conservative, I limit the overcharge to this estimate for all three Carbamazepine ER forms/strengths. The estimates used for disgorgement for the remaining 11 NG drugs are discussed below.

210. To calculate disgorgement amounts for the remaining NG Drugs, I first locate the two-quarter period where prices are lowest for each Drug during the period for which I have Defendant net price data. This two-period average serves as the benchmark period for my analysis of NG drugs.[288] As noted in the Section addressing price declines, the fact that prices for NG Drugs have declined over

[288] To the extent that this two-quarter period includes lingering effects, this approach is likely to be conservative.

time dictates that this period typically occurs towards the end of Defendants' net price data production (*i.e.*, in 2018).

211. Using a sample of non-MDL Drugs that first appear in the IQVIA data between 2006 and 2016, I then estimate a multiple-regression model which explains, for each Drug coming off of patent, the price for that drug based on characteristics of the market post-generic entry. Specifically, I estimate the following model:[289]

$$\ln(P_{i,t}) = \alpha + \beta_1 \mathrm{QtrsSinceLaunch}_{i,t} + \beta_2 \mathrm{QtrsSinceLaunch}_{i,t}{}^2 + \beta_3 \mathrm{QtrsSinceLaunch}_{i,t} * \mathrm{Number\ of\ Competitors}_{i,t} + \sum_{j=2}^{15} \delta_j \,\mathrm{Number\ of\ Competitors} = j_{i,t} + \beta_4 \mathrm{BrandedGeneric}_i$$

where $\mathrm{QtrsSinceLaunch}_{i,t}$ represents the number of quarters that have passed since the generic drug was first sold.[290] I include both quarters since launch and quarters since launch squared, as I expect the time trend for each new generic drug to be non-linear. I also interact quarters since launch with the number of competitors (as a continuous variable), since I expect the impact of an additional entrant to be lower the more mature the market. The results of this regression are presented in Table 20, below.

[289] For purposes of estimating this model, I exclude all Drugs included in the MDL.

[290] Based on IQVIA sales data.

**Table 20 – Results from Non-MDL New Generic Regression**

[redacted]

Source: IQVIA Data

212. As shown in the Table, prices for New Generic drugs generally decrease over time, but at a decreasing rate. Entry is again important, but more important (as shown by the coefficient of -0.0045*** on the interaction term), entry has a larger effect, the earlier it occurs.

213. I then utilize this regression to predict the "but-for" price path for the NG Drugs at Issue, beginning at the benchmark period for each Drug at Issue referenced above. An example of this projection is shown below for Pioglitazone-Metformin 850MG/15MG Tablets.

**Figure 32 – Actual and Predicted Prices for Metformin HCL; Pioglitazone HCL Tablets 850MG/15MG**




214. The implied overcharges and increases in net revenues for New Generics are reported in Appendix C, Table 12. The overcharges range from 27 percent (Fluocinonide Cream 0.1%) to 647 percent (Imiquimod Cream).

*d. Disgorgement Results*

215. A summary of the complete disgorgement calculation is presented below in Table 21. For purposes of comparison, I present both the overcharge as calculated using the liability model (overcharges calculated by Drug), and the disgorgement models (before and after/DiD).[291] As shown in the Table, the increase in Defendants' net revenues ranged from -17 percent (Valeant/Bausch) and 6 percent (for Amneal) to 433 percent for Wockhardt and 577 percent (for Mallinckrodt).

[291] Disgorgement amounts for NG Drugs (generated using the approach described above) are assumed to be the same for both models.

**Table 21 – Overcharge Estimates by Defendant and Defendant-Drug**

| Defendant | Increase in Net Revenues (%), Disgorgement Analysis – Before and After Model | Increase in Net Revenues (%), Disgorgement Analysis – DiD Model | Increase in Net Revenues (%), Liability Analysis |
|---|---|---|---|
| Actavis | 284% | 341% | 325% |
| Amneal | 6% | 70% | 88% |
| Aurobindo | 199% | 166% | 76% |
| G&W | 329% | 322% | 127% |
| Glenmark | 24% | 26% | 34% |
| Greenstone | 207% | 161% | 141% |
| Lannett | 68% | 138% | 199% |
| Lupin | 242% | 242% | 271% |
| Mallinckrodt | 395% | 577% | 367% |
| Mylan | 48% | 78% | 93% |
| Perrigo | 87% | 115% | 118% |
| Sandoz | 230% | 234% | 219% |
| Sun/Taro | 211% | 251% | 262% |
| Teligent | 264% | 312% | 981% |
| Valeant/Bausch | 11% | -17% | 13% |
| Wockhardt | 236% | 314% | 433% |
| **Total** | **181%** | **200%** | **186%** |

### *ii. Total Net Sales*

216. For the most part, the same data that I use to derive net sales prices can also be used to calculate net revenues either by manufacturer or by Drug at Issue. However, I note that certain manufacturers were deficient in their production either with respect to certain Drugs at Issue,[292] or with respect to certain periods of time.[293] To correct these deficiencies, I first verified that each manufacturer actually sold each drug in significant quantities during the missing period using sales information from

[292] Most notably, G&W did not produce transactional data for Betamethasone Valerate (1%) Lotion, Calcipotriene Solution 0.005%, Ciclopirox Cream and Solution, Ethambutol Hydrochloride, Fluocinolone Acetonide Cream, Mometasone Furoate Cream, and Prochlorperazine Suppositories.

[293] Actavis was acquired by Teva in 2016. Actavis did not include sales after 2017 in its production. Teva did not produce sales information for the Actavis drugs (post-acquisition) in its production.

IQVIA. I next estimate the net sales corresponding to those IQVIA sales using a relationship I estimate between net sales and IQVIA sales.[294] Using this relationship, I convert the IQVIA sales data into an estimate of the missing net sales data.

217. Table 22 below reports my estimates of each Defendant's total sales during the Conduct Period. The Table also includes my estimates of the additional net revenues that the Defendants were able to collect as a result of their conduct, using the Disgorgement models described above, and the corresponding estimate of the Defendants' net sales in the "but-for" world. As shown in the Table, Defendants were able to increase their net revenues on actual sales by approximately $6.1 billion over the period from initial communication through 2018 under the before and after disgorgement model and $6.3 billion under the difference in difference model. My estimates of increases in net revenues from the before and after model range from a low of $2.0 million (Amneal) to a high of $2.1 billion (Sandoz). My estimates from the difference-in-difference model range from -$24.8 million (Valeant/Bausch) to a high of $2.1 billion (Sandoz).

**Table 22 – Actual Increase in Net Revenues (Conduct through 2018) by Defendant**

| Defendant | Actual Revenues ($ millions) | But-For Revenues (Before and After Model) ($ millions) | Increase in Net Revenues (Before and After Model ($ millions) | But-For Revenues (DiD Model) ($ millions) | Increase in Net Revenues (DiD Model ($ millions) |
|---|---|---|---|---|---|
| Actavis | $331.3 | $86.3 | $245.0 | $75.1 | $256.3 |
| Amneal | $35.4 | $33.4 | $2.0 | $20.9 | $14.5 |
| Aurobindo | $57.9 | $19.4 | $38.5 | $21.8 | $36.1 |
| G&W | $656.8 | $153.0 | $503.8 | $155.8 | $501.0 |
| Glenmark | $101.1 | $81.4 | $19.8 | $80.2 | $20.9 |
| Greenstone | $649.1 | $211.2 | $437.9 | $249.0 | $400.1 |
| Lannett | $97.9 | $58.4 | $39.5 | $41.1 | $56.8 |
| Lupin | $5.0 | $1.5 | $3.5 | $1.5 | $3.5 |
| Mallinckrodt | $662.2 | $133.8 | $528.4 | $97.7 | $564.4 |
| Mylan | $98.8 | $66.7 | $32.1 | $55.5 | $43.3 |
| Perrigo | $1,543.4 | $827.4 | $716.0 | $716.3 | $827.1 |
| Sandoz | $3,022.6 | $915.4 | $2,107.3 | $905.6 | $2,117.0 |
| Sun/Taro | $1,900.3 | $612.0 | $1,288.4 | $540.9 | $1,359.4 |
| Teligent | $100.9 | $27.7 | $73.2 | $24.5 | $76.4 |
| Valeant/Bausch | $121.4 | $109.1 | $12.4 | $146.2 | -$24.8 |
| Wockhardt | $26.1 | $7.8 | $18.4 | $6.3 | $19.8 |

[294] For this analysis, I regress ln(net sales) on ln(IQVIA sales) and year fixed effects.

| | | | | | |
|---|---|---|---|---|---|
| **Total** | **$9,410.5** | **$3,344.4** | **$6,066.1** | **$3,138.5** | **$6,272.0** |

218. My estimates of the additional net revenues for each individual Drug at Issue are reported in Appendix C Table 13. As shown in that table, the increase in Defendant net revenues is largest for Clindamycin Gel 1% ($318 million) and Lidocaine Ointment 5% ($299 million to $319 million).

### C. Decreases in Costs

219. My analysis of net prices compares the net prices that prevailed in the benchmark period prior to Defendants' conduct with net prices in the Post-Conduct period, controlling for increases in cost/demand and industrywide trends in pharmaceutical pricing. Because rebates and chargebacks are included in my measure of net price, any increase/decrease in direct or indirect rebates and/or chargebacks that resulted from Defendants' price increases would already be reflected in those post-conduct net prices, and thus there is no need to explicitly control for these measures in a disgorgement calculation.

#### *i. Medicaid Rebates*

220. I am aware of certain price-related payments that manufacturers make that are not included in my measure of net price. The largest of these payments are rebates paid to state Medicaid programs.[295] As mentioned above, these rebates are paid based on a formula that uses AMP and Medicaid quantities purchased as inputs. For generic drugs, prior to 2017, the unit rebate amount was equal to 13 percent of the AMP price.[296] Beginning in 2017, the unit rebate amount became equal to AMP times 13 percent plus a CPI-based adjustment meant to limit the amounts by which AMP could be increased by the drug manufacturers.[297] To be conservative, I assume that Medicaid rebate amounts were equal to AMP times 13 percent at all times during the relative period.

221. I assume that AMP was inflated by the same percentage as Defendants' net prices. Hence, the difference between "as-is" and "but-for" Medicaid rebates can be calculated as 13% $* AMP_i * Q_i *$

[295] Based on my review of Defendants' production, some manufacturers did include these Medicaid rebate payments as separate line items in their transactional data. However, this treatment was not uniform across manufacturers (some manufacturers did not produce the rebate payments in their data) and was not consistent over time. Hence, I treat these payments separately in my disgorgement analysis.

[296] Centers for Medicare & Medicaid Services (n.d.). "Unit Rebate Amount Calculation for Non-innovator Multiple Source Drugs." Available at: https://www.medicaid.gov/medicaid/prescription-drugs/medicaid-drug-rebate-program/unit-rebate-calculation/unit-rebate-amount-calculation-for-non-innovator-multiple-source-drugs/index.html.

[297] Id.

$OC_i$ where $OC_i$ represents the percentage increase in price for drug i and $Q_i$ represents the quantity of drug i purchased by the Medicaid drug program.[298]

222. AMP information was produced by some but not all Defendants.[299] When AMP data is unavailable, I convert net prices to AMP using the ratio of AMP to net prices for other Drugs at Issue in the same quarter.[300] Finally, I obtain the total quantity reimbursed by Medicaid programs for the Drugs at Issue from the Defendants from the SDUD data. The resulting difference between the as-is and but-for Medicaid rebate payments, based on the Defendant-specific and drug-specific overcharges is reported in Table 23, below.

**Table 23 – Difference between "As-Is" and "But-For" Medicaid Rebate Payments through 2018**

| Defendant | Medicaid Rebate Savings from Before and After Model ($ millions) | Medicaid Rebate Savings from DiD Model ($ millions) |
|---|---|---|
| Actavis | $5.7 | $6.0 |
| Amneal | $0.1 | $0.4 |
| Aurobindo | $0.2 | $0.2 |
| G&W | $3.8 | $3.9 |
| Glenmark | $0.2 | $0.3 |
| Greenstone | $10.6 | $10.4 |
| Lannett | $0.8 | $1.2 |
| Lupin | $0.1 | $0.1 |
| Mallinckrodt | $10.2 | $10.9 |
| Mylan | $0.1 | $0.2 |
| Perrigo | $16.8 | $19.3 |
| Sandoz | $42.3 | $43.5 |
| Sun/Taro | $30.5 | $32.2 |
| Teligent | $1.4 | $1.5 |
| Valeant/Bausch | $0.0 | -$0.3 |
| Wockhardt | $0.3 | $0.3 |
| **Total** | **$123.1** | **$130.1** |

298 I note that this amount is not an actual "savings" to the State Medicaid programs. The programs themselves still bore approximately 87 percent of the price increase (depending on the passthrough rate). I understand that Dr. Singer calculates in his report an actual passthrough rate for the State Medicaid programs for the purposes of calculating damages to those agencies.

299 G&W and Sun did not produce AMP information.

300 For any remaining Drugs at Issue without reference prices and non-zero Medicaid quantity, I apply the average difference between the as-is and but-for rebate as a percentage of total Medicaid Expenditure for drugs for which I have reference prices.

### *ii. Difference between As-Is and But-For Quantities Sold*

223. It is generally accepted that the price-elasticity of demand for generic drugs is low. To the extent that Defendants would have sold additional units but-for the conspiracy, however, the lost profits on those units could be treated as an offset to disgorgement.[301]

#### *a. Summary of Empirical Estimates of Price Elasticity of Demand for Generic Drugs*

224. Conceptually, the price elasticity of demand (which I refer to more simply as the "elasticity") reflects the degree to which the quantity demanded of a good changes in response to a change in the price of that good. A good is deemed to have inelastic demand (i.e., the elasticity of demand is less than one) if the quantity demanded for that good changes less than proportionally to the price of that good, so that an increase in price results in an increase in revenue. A good is highly inelastic, or equivalently has a very low elasticity, if the quantity demanded of that good does not change substantially when its price changes.

225. A number of studies in the economic literature have found that demand for medications, and prescription medications in particular, is highly inelastic.[302] Estimates of elasticity vary by study, likely because the elasticity of demand can vary due to a variety of factors, including patients' cost sharing arrangements and the availability of economic substitutes[303] (which itself can depend on the price of the drug, as noted above in the discussion of the *Cellophane* Fallacy).[304]

#### *b. Quantification of Any Decrease in Quantity for Drugs at Issue*

226. While it would be possible to apply the above estimates of the price elasticity of demand to Defendants' sales of the Drugs at Issue to obtain an estimated "but-for" quantity sold, it is also possible for me to calculate an estimate of the actual change in quantity supplied for Drugs at Issue

---

[301] It is my understanding that should the Court rule in favor of nationwide disgorgement under Pennsylvania law, such an offset would not be required. However, the offset may be required in other jurisdictions should the court order disgorgement on a state-by-state basis to the extent permitted under those State's laws.

[302] Ringel, Jeanne S., Hosek, Susan D., Vollard, Ben A., and Mahnovski, Sergej. 2002. "The Elasticity of Demand for Health Care." National Defense Research Institute, RAND Health, p. 35 (finding an elasticity for prescription drugs of -0.05 to -0.08); Gatwood, Justin, Gibson, Teresa B., Cherney, Michael E., Farr, Amanda M., Vogtmann, Emily, and Fendrick, A. Mark. 2014. "Price Elasticity and Medication Use: Cost Sharing Across Multiple Clinical Conditions." *Journal of Managed Care & Specialty Pharmacy*, 20(11), pp. 1102-1107, at 1102.

[303] Gatwood, Justin, Gibson, Teresa B., Cherney, Michael E., Farr, Amanda M., Vogtmann, Emily, and Fendrick, A. Mark. 2014. "Price Elasticity and Medication Use: Cost Sharing Across Multiple Clinical Conditions." *Journal of Managed Care & Specialty Pharmacy*, 20(11): pp. 1102-1107, at 1102.

[304] Note that estimates of elasticity conducted on products subject to collusion will thus overestimate the elasticity in the but-for competitive world.

using information from IQVIA. Specifically, since I have information on the quantity supplied of Drugs at Issue both "pre" and "post" price increase,[305] I can estimate the associated change in quantity associated with the price increases.

227. The actual trend in extended units sold (based on IQVIA data[306]) of Drugs at Issue is depicted in Figure 33, below. As shown, total units sold gradually increase over the 2006 to 2011 time period, and then remained somewhat flat for 2012 to 2016, before increasing again between 2017 and 2020. Even though quantities increase as prices begin to fall after detection, the magnitude of that increase in units is generally small.

**Figure 33 – Total Units Sold of Drugs at Issue**




228. As a more direct estimate of the change in quantity for the Drugs at Issue, I focus only on the Price Increase Drugs,[307] and on the one year prior to communications and the three year period afterwards.[308] I estimate a regression model on extended units sold[309] that includes Drug fixed effects, which capture the average quantity sold of that drug in each quarter, and an indicator variable for the

[305] For Price Increase Drugs.

[306] I use IQVIA data for this purpose because it includes both Defendant and Non-Defendant sales of Drugs at Issue.

[307] As shown above, this is the largest group of Drugs at Issue and the Drugs for which the price increase is most acute.

[308] I choose these time periods to allow sufficient time to elapse for consumers to adjust their purchasing patterns downstream. For example, patients on existing prescriptions may find it difficult to get their providers to switch to an alternative in the short term.

[309] More accurately, my dependent variable is ln(extended units sold).

3 year period after communications commence on that Drug. The regression results show that quantities of Drugs at Issue fell by approximately 3.9 percent after Conduct.[310] I can then use this change in quantity, combined with the price increase for PI Drugs, to calculate the aggregate price elasticity of Demand for Drugs at Issue.

229. The price increase for PI Drugs post-Conduct is 173 percent.[311] This implies that the price elasticity of demand for Drugs at Issue is -0.023 (-3.9% / 173%). Hence, my overcharge estimate (across all Drugs at Issue) of 181% to 200% corresponds to a reduction in quantity of approximately 4 to 5 percent from their but-for level. Based on Defendants' but-for revenues of $3.1-$3.3 billion from my disgorgement model (see Table 22), this would translate into an additional $138 to $143 million in sales of Drugs at Issue.

230. Using this "but-for" revenue increase, I then apply Defendants' pre-conspiracy profit margin to transform those sales into the incremental profits that Defendants would have received from those sales in the "but-for" world. Using information on Defendants' net prices and costs, I calculate that Defendants' average pre-Conspiracy profit margin was 68.5 percent. Hence, the additional $138 to $143 million in revenues would translate into approximately $91 million to $95 million in additional profits.[312] I assume that these profits would be distributed among the Defendants according to revenue increases. The resulting increase in profits (the offset to disgorgement amounts) for each Defendant are depicted in Table 24, below.

**Table 24 – Estimates of Additional Profits for Defendants in the But-For World through 2018**

| Defendant | Additional Profits – Before and After Model ($ millions) | Additional Profits – DiD Model ($ millions) |
|---|---|---|
| Actavis | $3.7 | $3.9 |
| Amneal | $0.0 | $0.2 |
| Aurobindo | $0.6 | $0.5 |
| G&W | $7.6 | $7.6 |
| Glenmark | $0.3 | $0.3 |
| Greenstone | $6.6 | $6.1 |
| Lannett | $0.6 | $0.9 |
| Lupin | $0.1 | $0.1 |
| Mallinckrodt | $7.9 | $8.6 |

310 3.9 percent is the regression coefficient (-.0403), exponentiated, minus one.

311 See Table 4 workpapers.

312 This calculation also nets out Medicaid rebate payments. According to SDUD and Defendants' data, Medicaid accounts for approximately 21% of total quantities sold. Hence, I estimate Medicaid rebates as 2.7% of net sales (=21% * 13%).

| | | |
|---|---|---|
| Mylan | $0.5 | $0.7 |
| Perrigo | $10.8 | $12.6 |
| Sandoz | $31.6 | $32.2 |
| Sun/Taro | $19.3 | $20.7 |
| Teligent | $1.1 | $1.2 |
| Valeant/Bausch | $0.2 | -$0.4 |
| Wockhardt | $0.3 | $0.3 |
| **Total** | **$91.1** | **$95.4** |

#### *iii. Other Adjustments*

231. I am not aware of other costs or revenues that would have been affected by increases in the net sales price due to collusion. If Defendants or their experts posit other payments/costs that the Defendants would not have made, I reserve the right to amend my disgorgement calculation.

### D. Net Disgorgement

232. As noted above, any cost savings (or payments not incurred) in the "but for" world should be netted out of the gross disgorgement totals to arrive at a net disgorgement total. Hence, in Table 25, below, I report the net disgorgement for each Defendant after taking account of the Medicaid rebate savings and additional quantities sold listed above. As shown in the table, Defendant net disgorgement under the before and after model equals $5.9 billion, and Defendant net disgorgement under the DiD model totals $6.0 billion. Individual Defendant totals range from -$24.2 million (Valeant Bausch under the DiD model) to $2.0 billion (Sandoz).

**Table 25 – Net Disgorgement by Defendant through 2018**

| Defendant | Net Disgorgement – Before and After Model ($ million) | Net Disgorgement – DiD Model ($ million) |
|---|---|---|
| Actavis | $235.6 | $246.4 |
| Amneal | $1.9 | $13.9 |
| Aurobindo | $37.8 | $35.4 |
| G&W | $492.4 | $489.5 |
| Glenmark | $19.2 | $20.4 |
| Greenstone | $420.8 | $383.6 |
| Lannett | $38.1 | $54.8 |
| Lupin | $3.4 | $3.4 |
| Mallinckrodt | $510.2 | $545.0 |
| Mylan | $31.5 | $42.4 |
| Perrigo | $688.5 | $795.2 |

| | | |
|---|---|---|
| Sandoz | $2,033.3 | $2,041.3 |
| Sun/Taro | $1,238.5 | $1,306.5 |
| Teligent | $70.7 | $73.8 |
| Valeant/Bausch | $12.1 | -$24.2 |
| Wockhardt | $17.8 | $19.2 |
| **Total** | **$5,851.9** | **$6,046.5** |

### E. Reasonableness of the Disgorgement Calculation

233. In any disgorgement calculation, it is important to ensure that the Defendant would have remained profitable under the calculated but-for prices. In other words, it is important to analyze whether the "but-for" Defendant firm would have exited, or would have exited earlier absent collusion, had their profits been lower. For a number of reasons, I find exit by any of the Defendant drug manufacturers from any one of Drugs at Issue in the "but-for" world to be unlikely.[313]

234. As noted in the previous Section, based on my calculations, Defendants earned a profit margin of around 68.5 percent on the sales of generic drugs prior to the onset of communications.[314] This profit margin increased to around 79 percent after communications commenced. While there is mention in the record by certain Defendants that certain individual Drugs at Issue were unprofitable for them,[315] there is no indication that this profit margin would have forced any Defendant to exit from one of the Drugs at Issue.

### F. Disgorgement to Date

235. I understand that the State Attorneys General are alleging ongoing effects of Defendants' Conduct beyond the end of the Period for which Defendants produced data (*i.e.*, beyond 2018). Based on my review of the produced data, my analysis confirms that prices for the Drugs at Issue remained elevated due to Defendants Conduct in 2018 (see Section VI.G). In this Section, I discuss the additional amounts that are subject to disgorgement due to these ongoing effects.

[313] I understand that certain Defendants have either sold their generics business or have gone bankrupt since the Complaint was filed.

[314] For purposes of this analysis, if costs for a Drug at Issue were unavailable for a manufacturer, I applied the average cost for that Drug at Issue for other manufacturers that did produce cost information (e.g., Taro's cost could be matched with to Greenstone's prices).

[315] For instance, Ron Greenblatt, CEO of G&W during the relevant time period, testified that G&W increased price on two drugs—Ciclopirox in 2013 and Mometasone in 2015—because the drugs "[were] not profitable at the time at the prevailing price". G&W 30(b)(6) Dep. Tr. 105:1 – 106:10, August 16, 2023.

236. As shown in Figure 20 above, the NADAC data indicate that prices for the Drugs at Issue have continued to decrease relative to non-MDL Drugs through the beginning of 2023. While prices may still not have returned to pre-conspiracy levels, it can be illustrative to use this decline in prices to examine whether Defendants continue to benefit from elevated prices to this day.

237. In Figure 34, below, I estimate the relationship between my overcharge percentage (estimated across the Drugs at Issue by quarter) and the abnormal decrease in the NADAC prices for the Drugs at Issue, and project that relationship forward to 2023.[316] As shown in the Figure, the NADAC price decline suggests that prices continued to fall in 2019 before leveling out somewhat in 2020, before falling again in 2021. This would suggest elevated prices through at least 2021. To be conservative,[317] I utilize the estimated predicted price declines through 2021 to estimate disgorgement beyond 2018.

**Figure 34 – Actual and Predicted Quarterly Overcharge Percentages Based on NADAC Price Fall**




[316] This approach implicitly assumes that all overcharges had dissipated by 2023Q1.

[317] In addition to assuming that prices in 2023 were non-collusive, the above approach seems to understate disgorgement amounts in 2018, implying that the estimates in 2019 are also likely to understate the overcharges during that period.

238. While I possess Defendant net sales data through 2018, I do not have Defendant net sales data for the 2019-2021 period.[318] Hence, to calculate disgorgement for the Drugs at Issue in this period, I first calculate total net Disgorgement in 2018 using the average overcharge in 2018 (approximately 200%). I then assume that this amount would decline (1) as a function of the overcharge percentage decline, and (2) based on the percentage of net to gross Disgorgement.[319] In other words, for each Defendant d, at quarter t, I estimate the following:

$$Disgorgement_{d,t} = \frac{Disgorgement_{d,2018}}{4} * \frac{OC_{d,t}}{OC_{2018}} * \frac{Net\ Disgorgement}{Gross\ Disgorgement}$$

239. The results of this model for each Defendant are depicted in Table 26, below. As shown in the Table, Defendants' profits increased in 2019-2021 by a combined $441 million.

**Table 26 – Net Disgorgement by Defendant for 2019 - 2021**

| **Defendant** | **Net Disgorgement ($ million)** |
|---|---|
| ACTAVIS | $13.0 |
| AMNEAL | $3.3 |
| AUROBINDO | $4.4 |
| G&W | $45.2 |
| GLENMARK | $6.4 |
| GREENSTONE | $45.4 |
| LANNETT | $0.9 |
| LUPIN | -- |
| MALLINCKRODT | $25.9 |
| MYLAN | $0.0 |
| PERRIGO | $70.9 |
| SANDOZ | $111.6 |
| SUN/MUTUAL/TARO | $91.8 |
| TELIGENT | $6.0 |
| VALEANT/BAUSCH | $13.7 |
| WOCKHARDT | $2.1 |
| **Total** | **$440.9** |

[318] To the extent that Defendants produce this information at some later date, I reserve the right to supplement my analysis. The approach in this Section represents my best estimate at this time of the ongoing effects of Defendants' Conduct.

[319] This component includes both the Medicaid revenue adjustment and the elasticity based-quantity adjustment.

### G. Interest

240. I understand that certain States may be entitled to, and the Court may award, prejudgment interest on the above disgorgement amounts. In the context of my calculations, Defendants have benefitted by significantly increasing their profits during the Conduct Period and from the use of such profits in each year from the time when such profit was booked to the present. Hence, the relevant question for determining prejudgment interest in a disgorgement calculation is what benefit Defendants were able to derive from holding those additional profits during that period.[320]

241. I understand that the rate most often applied by the courts in disgorgement cases involving the Securities and Exchange Commission (SEC) is the IRS underpayment rate.[321] As noted in an article on the subject:[322]

> The SEC consistently requests prejudgment interest when it seeks disgorgement, which courts typically grant. Prejudgment interest is intended to capture the time value of money - i.e., the return defendants could have earned by investing funds to be disgorged between the date the funds were received and the date of judgment - and can add vast sums to the defendant's liability. The majority of courts apply the IRS underpayment rate, though they are by no means bound to do so. On occasion, some courts have utilized their discretion to apply a different rate.

While the SAGs and the SEC represent different government entities, I see no reason why a rate that is applicable in SEC proceedings would not be appropriate for this matter. The IRS rate is also consistent with economic principles in this case, as opposed to the risk-free rate. Hence, for purposes of computing prejudgment interest on my disgorgement estimate, I use the lowest IRS underpayment

---

[320] I also note that individual State law may prescribe a particular interest rate to utilize for purposes of calculating prejudgment interest on disgorgement amounts. Particularly with respect to the individual State disgorgement claims below, I reserve the right to supplement my calculation to incorporate these interest rates as appropriate.

[321] Note that should the court award nationwide disgorgement under the Pennsylvania UTPCPL, I understand that the PA statutory interest rate is 6%. See:

Reference in any law or document enacted or executed heretofore or hereafter to “legal rate of interest” and reference in any document to an obligation to pay a sum of money “with interest” without specification of the applicable rate shall be construed to refer to the rate of interest of six per cent per annum. 41 P.S. § 202

[322] Buckberg, Elaine, and Dunbar, Frederick C. 2008. “Disgorgement: Punitive Demands and Remedial Offers.” *The Business Lawyer*, 63(2): pp. 356-357.

rate (5 percent) for the relevant period,[323] compounded quarterly.[324] I utilize the corporate tax rate for underpayments, which I note is lower than the corporate rate for large underpayments.[325]

242. The prejudgment interest amounts as of the expected date of trial[326] associated with Disgorgement through 2018 for Drugs at Issue, as well as projected interest for the 2019-2021 period are shown in Table 27, below.

**Table 27 – Prejudgment Interest Amounts at Date of Trial – Disgorgement through 2018**

| Defendant | Prejudgment Interest – Before and After Model ($ million) through 2018 | Prejudgment Interest – DiD Model ($ million) through 2018 | Prejudgment Interest (2019-2021) |
|---|---|---|---|
| Actavis | $195.8 | $205.2 | $4.3 |
| Amneal | $1.2 | $8.3 | $1.1 |
| Aurobindo | $23.5 | $22.1 | $1.4 |
| G&W | $312.4 | $310.4 | $14.7 |
| Glenmark | $11.4 | $12.2 | $2.1 |
| Greenstone | $294.9 | $267.2 | $14.8 |
| Lannett | $26.6 | $38.2 | $0.3 |
| Lupin | $2.8 | $2.8 | $0.0 |
| Mallinckrodt | $344.3 | $367.3 | $8.4 |
| Mylan | $22.9 | $29.9 | $0.0 |
| Perrigo | $515.5 | $596.5 | $23.0 |
| Sandoz | $1,472.2 | $1,474.2 | $36.3 |
| Sun/Taro | $863.2 | $905.9 | $29.8 |
| Teligent | $45.6 | $47.6 | $2.0 |
| Valeant/Bausch | $8.4 | -$18.3 | $4.5 |
| Wockhardt | $11.0 | $11.9 | $0.8 |
| **Total** | **$4,151.8** | **$4,281.4** | **$143.4** |

[323] See U.S. Customs and Border Protection, Department of Homeland Security, "Quarterly IRS Interest Rates Used in Calculating Interest on Overdue Accounts and Refunds of Customs Duties," January 18, 2023, https://www.federalregister.gov/documents/2023/01/18/2023-00836/quarterly-irs-interest-rates-used-in-calculating-interest-on-overdue-accounts-and-refunds-of-customs, visited 10/26/2023.

[324] Internal Revenue Service, "Interest rates increase for the fourth quarter 2023," August 25, 2023, https://www.irs.gov/newsroom/interest-rates-increase-for-the-fourth-quarter-2023, visited 10/26/2023.

[325] Ibid.

[326] I have been asked to assume that trial will occur in October 2025.

### H. Total Disgorgement

243. Table 28 below reports the total net disgorgement, including estimated disgorgement for 2019 to 2021, including interest through the date of trial.

**Table 28 – Total Disgorgement by Defendant**

| Defendant | Total Disgorgement – Before and After Model ($ million) | Total Disgorgement – DiD Model ($ million) |
|---|---|---|
| Actavis | $435.7 | $455.9 |
| Amneal | $4.2 | $23.3 |
| Aurobindo | $62.7 | $58.9 |
| G&W | $819.5 | $814.5 |
| Glenmark | $32.7 | $34.7 |
| Greenstone | $730.5 | $665.5 |
| Lannett | $65.0 | $93.2 |
| Lupin | $6.2 | $6.2 |
| Mallinckrodt | $862.9 | $920.7 |
| Mylan | $54.4 | $72.3 |
| Perrigo | $1,227.0 | $1,414.8 |
| Sandoz | $3,541.8 | $3,551.7 |
| Sun/Taro | $2,131.5 | $2,242.2 |
| Teligent | $118.3 | $123.4 |
| Valeant/Bausch | $25.0 | -$38.0 |
| Wockhardt | $29.6 | $31.9 |
| **Total** | **$10,147.1** | **$10,471.2** |

### I. State-Specific Disgorgement Estimates

244. In addition to the national disgorgement estimate presented above, I have been asked to calculate state-specific estimates of disgorgement for States and Territories which provide for disgorgement as a remedy. I note that for certain states, the issue as to whether a statute of limitations applies to their claims for certain drugs and/or time periods remains before the Court. To the extent that the Court rules in a manner unfavorable to the States on these claims, my State-specific disgorgement approach described below can easily be modified to incorporate such a decision by removing any disgorgement amounts for the States and periods in question.

245. As background, the Defendant drug manufacturers earn profits from the distribution of their products to each Plaintiff State/Territory/District and make sales to consumers in each jurisdiction. While these profits may be "earned" at the corporate headquarters, and costs incurred only in certain

localities, in this case, it is most appropriate to focus a state-specific disgorgement inquiry on where sales were made and revenue obtained as opposed to profits booked. Because the disgorgement estimate is driven principally by a change in net prices, it is by nature an increase in net revenues at the customer level.

246. Hence, for purposes of my state-specific disgorgement analysis, I focus on where Defendants' Drugs at Issue were distributed. For this analysis, I utilize information from PBMs produced in this litigation, to determine what percentage of Defendants' sales of Drugs at Issue were made to each disgorgement-eligible State and Territory.[327] I also compute a similar share based on population size for each disgorgement-eligible State and Territory.[328] Since I expect that the primary determinant of generic pharmaceuticals sold in each state to be its population size, this would also form a reasonable basis for computing disgorgement by State and Territory.

247. The corresponding state-specific disgorgement shares and amounts are reported below in Table 29. As shown in the Table, states with disgorgement claims represent approximately 86%-87% of total purchases of the Drugs at Issue. I note also that five States have settled with Defendant Actavis.[329] Of these States, four - Florida, Kentucky, Louisiana, and Mississippi, are included as disgorgement-eligible. If I do not calculate disgorgement for Actavis for these States, my total state-specific disgorgement is reduced by between $43 m to $46 m.[330]

**Table 29 – State-Specific Total Disgorgement Amounts – PBM Shares**

| State | **Share of PBM Quantity Purchased for Defendants' Drugs at Issue** | **State/Territory-Specific Total Disgorgement – Before and After Model** | **State/Territory-Specific Total Disgorgement – DiD Model** |
|---|---|---|---|
| AK | 0.14% | $13,734,538 | $14,173,254 |
| AZ | 1.46% | $147,806,541 | $152,527,852 |

[327] I exclude the Medicaid line of business from this analysis.

[328] I compute population shares based on the average population for each state from the US Census Bureau for 2010-2019 (https://www.census.gov/data/tables/time-series/demo/popest/2010s-state-total.html). For the Northern Mariana Islands and the US Virgin Islands, I compute shares using the simple average population sizes in 2010 and 2020 from the US Census (https://www.census.gov/newsroom/press-releases/2022/2020-island-areas-northern-mariana.html).

[329] Arkansas, Florida, Kentucky, Louisiana, and Mississippi.

[330] I further understand that Florida did not release consumer claims in its settlement with Actavis. I also understand that Dr. Singer calculates that consumer damages represent roughly 27% of total damages (see Singer Report Table 25). Assuming this same percentage applies to disgorgement, consumer claims against Actavis in Florida for disgorgement would represent between $7.3 and $8.5 million. The net reduction in disgorgement would then be $36 to $38 million for the four disgorgement States.

| | | | |
|---|---|---|---|
| CA | 8.56% | $868,870,827 | $896,624,742 |
| CO | 1.10% | $111,258,180 | $114,812,045 |
| CT | 1.41% | $143,316,134 | $147,894,011 |
| DC | 0.29% | $29,770,484 | $30,721,428 |
| DE | 0.33% | $33,032,036 | $34,087,162 |
| FL | 6.97% | $707,698,198 | $730,303,854 |
| GA | 3.06% | $310,109,678 | $320,015,359 |
| IA | 0.99% | $100,699,205 | $103,915,791 |
| ID | 0.36% | $36,904,765 | $38,083,596 |
| IL | 4.04% | $409,570,885 | $422,653,607 |
| IN | 1.71% | $173,215,961 | $178,748,914 |
| KS | 0.79% | $80,281,362 | $82,845,750 |
| KY | 1.24% | $126,302,654 | $130,337,078 |
| LA | 1.11% | $113,025,730 | $116,636,055 |
| MA | 2.70% | $273,615,507 | $282,355,473 |
| MD | 2.32% | $235,605,772 | $243,131,612 |
| MI | 3.72% | $377,417,699 | $389,473,367 |
| MN | 1.74% | $176,885,921 | $182,536,101 |
| MO | 1.94% | $196,349,106 | $202,620,989 |
| MP | 0.00% | $251,366 | $259,395 |
| MS | 0.73% | $74,159,508 | $76,528,349 |
| NC | 3.23% | $327,380,000 | $337,837,339 |
| ND | 0.21% | $20,887,445 | $21,554,643 |
| NE | 0.53% | $53,682,019 | $55,396,757 |
| NH | 0.45% | $45,190,479 | $46,633,976 |
| NJ | 3.66% | $370,908,521 | $382,756,270 |
| NM | 0.46% | $46,746,988 | $48,240,204 |
| NV | 0.73% | $74,192,183 | $76,562,068 |
| NY | 10.95% | $1,110,770,010 | $1,146,250,792 |
| OH | 3.68% | $373,839,935 | $385,781,320 |
| OK | 0.94% | $95,269,758 | $98,312,913 |
| OR | 0.93% | $94,416,509 | $97,432,409 |
| PA | 4.42% | $448,970,064 | $463,311,294 |
| PR | 0.55% | $56,180,620 | $57,975,170 |
| RI | 0.40% | $40,184,418 | $41,468,009 |
| SD | 0.24% | $24,766,891 | $25,558,008 |
| TN | 1.81% | $183,165,433 | $189,016,197 |
| UT | 0.56% | $57,165,394 | $58,991,400 |
| VA | 2.48% | $251,174,003 | $259,197,131 |
| VI | 0.01% | $1,211,642 | $1,250,344 |
| VT | 0.19% | $19,363,920 | $19,982,452 |

| | | | |
|---|---|---|---|
| WA | 1.92% | $194,608,229 | $200,824,505 |
| WI | 1.74% | $176,588,164 | $182,228,833 |
| WV | 0.62% | $62,613,025 | $64,613,043 |
| **Total** | **87.41%** | **$8,869,157,707** | **$9,152,460,865** |

**Table 30 – State-Specific Net Disgorgement Amounts – Population Size**

| State | Share of US Population | State/Territory-Specific Net Disgorgement – Before and After Model | State/Territory-Specific Net Disgorgement – DiD Model |
|---|---|---|---|
| AK | 0.23% | $23,021,164 | $23,756,517 |
| AZ | 2.11% | $213,862,329 | $220,693,629 |
| CA | 11.96% | $1,213,672,412 | $1,252,440,155 |
| CO | 1.67% | $169,808,918 | $175,233,041 |
| CT | 1.11% | $112,594,216 | $116,190,758 |
| DC | 0.21% | $20,856,143 | $21,522,341 |
| DE | 0.29% | $29,430,123 | $30,370,195 |
| FL | 6.23% | $631,995,048 | $652,182,556 |
| GA | 3.14% | $318,909,478 | $329,096,247 |
| IA | 0.96% | $97,718,053 | $100,839,413 |
| ID | 0.51% | $52,110,072 | $53,774,598 |
| IL | 3.97% | $402,973,365 | $415,845,346 |
| IN | 2.05% | $207,533,064 | $214,162,191 |
| KS | 0.90% | $91,012,742 | $93,919,917 |
| KY | 1.37% | $138,810,806 | $143,244,772 |
| LA | 1.43% | $145,545,301 | $150,194,383 |
| MA | 2.09% | $212,360,416 | $219,143,741 |
| MD | 1.84% | $186,961,333 | $192,933,348 |
| MI | 3.08% | $312,157,564 | $322,128,660 |
| MN | 1.69% | $171,955,645 | $177,448,340 |
| MO | 1.88% | $190,614,335 | $196,703,035 |
| MP | 0.02% | $1,590,419 | $1,641,221 |
| MS | 0.92% | $93,761,883 | $96,756,873 |
| NC | 3.10% | $314,532,447 | $324,579,403 |
| ND | 0.23% | $22,955,062 | $23,688,305 |
| NE | 0.58% | $59,212,450 | $61,103,844 |
| NH | 0.41% | $41,992,705 | $43,334,057 |
| NJ | 2.74% | $278,405,106 | $287,298,064 |
| NM | 0.65% | $65,609,350 | $67,705,077 |
| NV | 0.89% | $89,928,582 | $92,801,127 |
| NY | 6.06% | $614,750,195 | $634,386,860 |

| | | | |
|---|---|---|---|
| OH | 3.60% | $364,839,402 | $376,493,288 |
| OK | 1.20% | $121,822,000 | $125,713,300 |
| OR | 1.24% | $126,160,139 | $130,190,011 |
| PA | 3.96% | $401,474,648 | $414,298,756 |
| PR | 1.08% | $109,226,001 | $112,714,954 |
| RI | 0.33% | $33,185,540 | $34,245,569 |
| SD | 0.26% | $26,769,818 | $27,624,913 |
| TN | 2.04% | $206,764,056 | $213,368,619 |
| UT | 0.92% | $93,534,037 | $96,521,749 |
| VA | 2.58% | $261,305,860 | $269,652,626 |
| VI | 0.03% | $3,041,410 | $3,138,560 |
| VT | 0.19% | $19,648,480 | $20,276,101 |
| WA | 2.21% | $224,724,421 | $231,902,683 |
| WI | 1.78% | $180,889,022 | $186,667,072 |
| WV | 0.57% | $57,692,463 | $59,535,305 |
| **Total** | **86.31%** | **$8,757,718,024** | **$9,037,461,520** |



February 20, 2024

Frederick R. Warren-Boulton

# Appendix A

Appendix A

Curriculum Vitae

MiCRA *Microeconomic Consulting & Research Associates, Inc.*


# FREDERICK R. WARREN-BOULTON, Ph.D.

PRINCIPAL
Microeconomic Consulting & Research Associates, Inc. (MiCRA)
3306 Connecticut Avenue, N.W.,
Washington, D.C. 20008
www.micradc.com

Direct: (202) 210-1155 rwb@micradc.com


**November 1, 2023**

## CURRICULUM VITAE

**Education**

**EDUCATION**

| | |
|---|---|
| Ph.D., Economics | Princeton University |
| M.A., Economics | Princeton University |
| M.P.A. | Woodrow Wilson School of Public & International Affairs, Princeton University |
| B.A., Economics | Yale University |

**Professional History**

- Principal, MiCRA: Microeconomic Consulting and Research Associates, Inc., Washington, D.C.; August 1991 – present
- Managing Director, Berkeley Research Group, 2021 – present.
- Senior Managing Director, Ankura Consulting Group LLC, 2018-2021
- Managing Director, Navigant Economics, Washington, D.C., 2015 – 2018
- Visiting Lecturer of Public and International Affairs, Woodrow Wilson School of Public and International Affairs, Princeton University, Princeton, NJ; Spring Semester, 1991.
- Resident Scholar, American Enterprise Institute for Public Policy Research, Washington, D.C.; May 1989 - April 1990, Adjunct Scholar from May 1990.
- Senior Vice President, ICF Consulting Associates, Inc., Washington, D.C.; November 1989 - August 1991.
- Research Associate Professor of Psychology, The American University, Washington, D.C.; September 1983 - 1990.
- Deputy Assistant Attorney General for Economic Analysis, Antitrust Division, U.S. Department of Justice, Washington, D.C.; October 1985 - May 1989.

- Director, Economic Policy Office, Antitrust Division, U.S. Department of Justice, Washington, D.C.; September 1983 - September 1985.

- Research Associate, Center for the Study of American Business, Washington University in St. Louis; July 1978 - June 1985.

- Associate Professor, Department of Economics, Washington University in St. Louis; July 1978 - June 1985. Chairman, Graduate Committee, 1978 - 1980. Chairman, Undergraduate Committee, 1980 - 1983.

- Assistant Professor, Department of Economics, Washington University in St. Louis; September1972 - June 1978.

- Assistant in Instruction, Woodrow Wilson School of Public and International Affairs, Princeton University, Princeton, N.J.; 1969 - 1971.

- Research Consultant, Ford Foundation, Kingston, Jamaica, W.I.; Summer, 1969.

**Publications**

- Prices, Market Definition and the Effects of Mergers: Staples, Office Depot, and Office Max (1997, 2015, 2016)," in *The Antitrust Revolution: Economics, Competition and Policy*, Seventh Edition, John E. Kwoka Jr. and Lawrence J. White, eds.; Oxford University Press, July 2018, with Serdar Dalkir.

- "Platforms and Innovation," *Global Antitrust Economics*, Concurrences, 2017.

- "US v. H&R Block: Market Definition in Court since the 2010 Merger Guidelines," *The Antitrust Bulletin 59*, September 2014, 599-618, with Marc Remer.

- "Market Definition and the Price Effects of Mergers: Staples-Office Depot (1997)," in *The Antitrust Revolution: Economics, Competition and Policy*, John E. Kwoka and Lawrence J. White, eds.; Oxford University Press, Third Edition, 1999; Fourth Edition; Case 7, Fifth Edition, 2009; Sixth Edition, 2014, Case 6; with Serdar Dalkir.

- "From Structure to Effects: The Economics of Merger Control," *Global Competition Review*, June 2008 with R.S. Khemani and R. Duplantis.

- "On Loss Aversion in Capuchin Monkeys," *Journal of the Experimental Analysis of Behavior*, 89 (March 2008) with A. Silberberg, P. Roma, M. Huntsberry, T. Sakagami, A. Ruggiero and S. Suomi.

- "The Contribution of the Merger Guidelines to the Analysis of Non-Horizontal Mergers," 20th Anniversary of the 1982 Merger Guidelines: The Contribution of the Merger Guidelines to the Evolution of Antitrust Doctrine, May 21, 2002, on http://www.usdoj.gov/atr/hmerger.htm#papers.

- "Optimizing in Choice When a Token Deposit is the Operant," *Journal of the Experimental Analysis of Behavior*, 2002, with J. J. Widholm, A. Silberberg, S.R. Hursh, and A.A. Iman.

- "Staples and Office Depot: An Event-Probability Case Study," *Review of Industrial Organization*, 19: 469-481, 2001, with Serdar Dalkir.

- "Unilateral Price Effects: Staples and Office Depot," in *The M&A Lawyer*, June 1998, Vol. 2, No. 3, with Serdar Dalkir. Available in revised form as "How Do You Know an Office Superstore? Staples and Office Depot," on http://www.antitrust.org/cases/**.**

- "Resale Price Maintenance Reexamined: Monsanto v. Spray-Rite (1984)," in *The Antitrust Revolution: Economics, Competition and Policy*, John E. Kwoka and Lawrence J. White, eds.; Oxford University Press, Case 14, Second Edition, 1994; Third Edition, 1999.

- "Exclusionary Behavior in the Market for Operating System Software: The Case of Microsoft," in *Opening Networks to Competition: the Regulation and Pricing of Access*, David Gabel and David F. Weiman, eds.; Kluwer Academic Publishers, 1998, with Kenneth C. Baseman and Glenn A. Woroch.

- "Riding the Wave: Exclusionary Practices in Markets for Microprocessors Used in IBM-Compatible Personal Computers," Conference and Festschrift in Honor of Merton J. Peck, Yale University, September 30, 1994, and *International Journal of the Economics of Business* 2-2 (July 1995), pp. 241-262, with Robert W. Wilson.

- "The Economics of Intellectual Property Protection for Software: The Proper Role for Copyright," American Council on Interoperable Systems, Washington, D.C., June 1994, and *StandardView : ACM Perspectives on Standardization* 3-2 (June 1995), pp.68-78, with Kenneth C. Baseman and Glenn A. Woroch.

- "Microsoft Plays Hardball: Use of Nonlinear Pricing and Technical Incompatibility to Exclude Rivals in the Market for Operating Software," *The Antitrust Bulletin* 40-2 (Summer 1995), pp.265-315, with Kenneth C. Baseman and Glenn F. Woroch.

- "Copyright Protection of Software Can Make Economic Sense," *The Computer Lawyer,* 12 (February 1995), pp. 10, 18-28, with Kenneth C. Baseman and Glenn A. Woroch.

- "Exclusionary Practices in High-Technology Industries," *The St. Louis Bar Journal*, 16 (Summer 1994), pp. 28-34.

- "Monsanto v. Spray-Rite: Resale Price Maintenance Reexamined," in *The Antitrust Revolution: The Role of Economics*, John E. Kwoka and Lawrence J. White, eds.; Scott, Foresman and Company, Glenview, Illinois, second edition, 1994.

- "A Commentary on the 1992 U.S. Merger Guidelines," *International Merger Law*, 22 (June 1992), pp. 14-19.

- "The Use of Stock Market Returns in Antitrust Analysis of Mergers," *Review of Industrial Organization*, 7-1 (1992), pp. 1-11, and *Economic Analysis Group Discussion Paper #88-1*, January 1988, with Robert H. McGuckin and Peter Waldstein.

- "Implications of U.S. Experience with Horizontal Mergers and Takeovers for Canadian Competition Policy," in *The Law and Economics of Competition Policy*, Frank Mathewson, Michael Trebilcock and Michael Walker, eds.; The Fraser Institute, Vancouver, B.C., 1990.

- "Maricopa and Maximum-Price Agreements: Time for a New Legal Standard?" *Journal of Health Economics*, 7 (June 1988), pp. 185-190.

- "Maximizing Present Value: A Model to Explain Why Moderate Response Rates Obtain on Variable-Interval Schedules," *Journal of the Experimental Analysis of Behavior*, 49 (May 1988), pp. 331-338, with Alan Silberberg and Toshio Asano.

- "Sources of the 'Crisis' in Liability Insurance: An Economic Analysis," in *Yale Journal of Regulation*, 5 (Summer 1988), pp. 367-395; *Economic Analysis Group Discussion Paper* #88-2, February 1988; and *An Update on the Liability Crisis: Tort Policy Working Group*, U.S. Government Printing Office: 181-487:60075, March 1987, with Richard N. Clark and David D. Smith.

- "State and Federal Regulation in the Market for Corporate Control," *The Antitrust Bulletin*, 32 (Fall 1987), pp. 661-691, and *Economic Analysis Group Discussion Paper* #86-4*, January 1986, with Margaret E. Guerin-Calvert and Robert H. McGuckin.

- "Income and Choice Between Different Goods," *Journal of the Experimental Analysis of Behavior*, 48 (September 1987), pp. 263-275, with Alan Silberberg and David Shurtleff.

- "Inferior-Good and Giffen-Good Effects in Monkey Choice Behavior," *Journal of Experimental Psychology: Animal Behavior Processes*, 13 (1987), pp. 292-301, with Alan Silberberg and Toshio Asano.

- "Efficiencies, Failing Firms, and Alternatives to Merger: A Policy Synthesis," *The Antitrust Bulletin*, 31 (Summer 1986), pp. 431-450, and *Economic Analysis Group Discussion Paper* #86-14, August 1986, with John Kwoka.

- *Oil Pipeline Deregulation: Report of the U.S. Department of Justice*, U.S. Government Printing Office: 1986, 491-510:40159, May 1986, with Charles J. Untiet.

- "Merger Policy and Enforcement at the Antitrust Division: The Economist's View," *Antitrust Law Journal*, 54 (Spring 1985), pp. 109-115.

- "Reanalysis of the Equation for Simple Action," *Journal of the Experimental Analysis of Behavior*, 43 (March 1985), pp. 265-277, with Alan Silberberg, Michael Gray and Randolph Ollom.

- "Considering the Effects of Financial Incentive and Professional Ethics on 'Appropriate' Medical Care," *Journal of Health Economics*, 3 (December 1984), pp. 223-237, with Robert Woodward.

- Deficits and Dollars: The Effects of Government Deficits in an International Economy. Center for the Study of American Business, Contemporary Series 3, 1982.

- "Physician Productivity, Remuneration Method, and Supplier-Induced Demand," in *Issues in Physician Reimbursement*, N.T. Greenspan (ed.), HCFA, 1981, pp. 115-134, with Robert Woodward.

- "Paying the Doctor: A Model of Work-Leisure Decisions under Alternative Remunerations," *Proceedings of the American Statistical Association*, 1979, with Robert Woodward.

- Vertical Control of Markets: Business and Labor Practices. Ballinger Publishing Company, Cambridge, Mass., 1978.

- "Vertical Control by Labor Unions," *American Economic Review*, 67 (June 1977), pp. 309-322. Reprinted as Publication Number 17, Center for the Study of American Business, November 1977.

- "Vertical Control with Variable Proportions," *Journal of Political Economy*, 82 (July - August 1974), pp. 783-802.

- *Preliminary Survey of Jamaican Management Manpower: Resources and Requirements.* Jamaican Institute of Management, 1969.

**Conference, Seminar, Working and Discussion Papers**

- American Bar Association, "*Apple Inc. V. Robert Pepper, et al*: Pass-through and *Illinois Brick*, December 21, 2018.

- American Bar Association 2018 Spring Meeting, "Mock Daubert Hearing of Plaintiff's Expert Witness"

- American Antitrust Institute, 2016, "Mergers in Bid Markets: US v Staples and Office Depot"
- International Bar Association, "The Economics of Leniency" Rio de Janeiro, March 6, 2016
- American Bar Association, "Fundamentals of Market Definition" April 15, 2015
- American Bar Association, "Impact of *Microsoft* on Firm Conduct and Conduct Cases," June 5, 2015. With Randall Weinsten, Harry First, Andrew Gavil, M J Moltenbrey, and William Page.
- American Bar Association, "Antitrust Economics and Econometrics for In-House Attorneys", Chicago, 2014
- Canadian Bar Association, 2014 "Structural Approaches vs. Competitive Effects" CBA/CB Meet the Economists Roundtable, April 3, 2014, Gatineau, Quebec.
- Northeastern University, "Mergers in Bid Markets", March 12, 2014
- Canadian Bar Association, "Working with Economic Experts in Antitrust Matters" March 22, 2011
- "Advanced Topics in Merger Analysis." Canadian Bar Association, 2010 Fall Competition Law Conference, Gatineau QC, October 1, 2010.
- "Upward Pricing Pressure in the Merger Guidelines" Canadian Bar Association Teleconference, March 10, 2010.
- "Competition Issues in the Air Transport Sector in India." National Conference, State of Competition in the Indian Economy (Competition Commission of India, World Bank, FIAS and DFID), New Delhi, India, June 12, 2009.
- "Price-Fixing, Bid-Rigging, and Mergers; The Shift from Structure to Effects." Minnesota Bar Association, October 13, 2009.
- "Demand-Side and Supply-Side Linkages in the Antitrust Analysis of Aftermarkets." 57th Antitrust Law Spring Meeting, American Bar Association Section of Antitrust Law, "Aftermarkets and Tying: The Legacy of *Kodak*" Session, March 26, 2009
- "Have Big Deal Contracts Prevented Entry by Small Publishers of Academic Journals?" International Industrial Organization Conference, Washington, DC, May 17, 2008, with S. Silberman, D. Haar and R. Lipstein.
- "Collusion: Price-fixing and Bid-rigging." (IFC/World Bank), Bangladesh, April 15, 2008.
- "Open Access Policies, Net Neutrality and Incentives for Innovation in the Telecommunications Industry" 19th Annual Western Conference, Advanced Workshop in Regulation and Competition, Center for Research in Regulated Industries, Rutgers Business School, Rutgers University, June 29, 2006, with Michael Pelcovits.
- Department of Justice/Federal Trade Commission Section 2 Hearings on Single Firm Conduct: Predatory Buying Panel. Washington, DC, June 22, 2006
- "Market Share Discounts: Collusion and Exclusion." International Industrial Organization Conference, Boston, April 9, 2006, with Daniel Haar.
- "On Using Economists as Expert Witnesses." 54th Antitrust Law Spring Meeting, American Bar Association Section of Antitrust Law, "Economic Experts Speak" Session, March 29, 2006

- "Mergers Without Markets: Do Mergers Among Publishers of Academic Journals Affect Prices?" MiCRA Working Paper No. 2, November 4, 2005, with Renee Duplantis, Daniel Haar, Steve Silberman and Hal Van Gieson, available at www.micradc.com.

- "Antitrust Issues in Agriculture," National Agricultural Council Global Agrifood Forum 2005, Mexico City, June 10, 2005.

- "The Economics of Vertical Restraints," ABA Economics Committee, Economics for Lawyers, April 20, 2005. See www.micradc.com

- "On Using an Economist as an Expert Witness." DOJ / FTC Trial Strategy Program, Airlie House, January 29, 2004

- Presentation at the ABA Session on *Dentsply*, November 4, 2003

- Presentation at the ABA Antitrust Meetings in San Francisco, August 11, 2003

- "The Contribution of the Merger Guidelines to the Analysis of Non-Horizontal Mergers," 20th Anniversary of the 1982 Merger Guidelines: The Contribution of the Merger Guidelines to the Evolution of Antitrust Doctrine, May 21, 2002, on http://www.usdoj.gov/atr/hmerger.htm#papers.

- "Congestion Pricing at Airports," ACI-NA 11th Annual Conference, Salt Lake City, November 12, 2002; 2001 FAA Commercial Aviation Forecast Conference, Washington, D.C., March 14, 2001; ACI-NA 9th Annual Conference, New York City, October 3, 2000.

- FTC Workshop: Competition Policy in the World of B2B Electronic Marketplaces, June 30, 2000.

- FTC Workshop: Slotting Allowances, June 1, 2000.

- "Consumers, Consolidation, and Concentration: Policy Issues,": at the ERS of the USDA conference, The American Consumer and the Changing Structure of Food System, May 4, 2000.

- "Design and Implementation of Competition Law and Policy" and "Mergers, Acquisitions and Other Structural Arrangements." Competition Law and Policy: Cross-country Approaches Experiences. World Bank Institute, Singapore Trade Development Board, and Organization for Economic Co-operation and Development May 14-May 20, 2000.

- "The Case Against an Agrarian Antitrust Policy," 2000 USDA Agriculture Outlook Forum. February 24, 2000.

- "Is Structure Still Enough", 25th Anniversary of the EPO/EAG, November 4, 1998

- "Proving Damages in a Business Case," Business Litigation Seminar, Business Law Section of the Florida Bar, November 20 (Tampa) - 21 (Miami), 1997.

- "Basic Economics for Lawyers," Section of Antitrust Law, American Bar Association, New York, N.Y., October 3-4, 1996.

- "Vertical Control in the Entertainment Industry," Chair's Showcase Program: The Integration, Disintegration and Reintegration of the Entertainment Industry, American Bar Association, Section of Antitrust Law, 44th Annual Antitrust Spring Meeting, Washington D.C., March 28, 1996.

- "Privatization and Regulation in the Restructuring of Electric Utilities in Eastern Europe," IBRD Conference on the Privatization of Electric Utilities, Prague, The Czech Republic, September 1993.

- "Implications of the United States Experience with Regulation and Antitrust for Competition Policy in Countries in Transition from Centrally Planned Economies to Market Economies," IBRD/EDI/USAID Seminar on Microeconomics, Vienna, Austria, July 1993.

- "The Economics of Punitive Damages." Punitive Damages after TXO: American Bar Association Antitrust Section Meeting, New York, August, 1993.

- "Regulatory Alternatives for FERC Following the Energy Policy Act of 1992," The Federal Energy Bar Association Mid-Year Meeting, Washington, D.C., November 19, 1992.

- "The Economics of Credit Card Interest Rate Caps," Seminars at the Economic Analysis Group, U.S. Department of Justice, September 29, 1992; the Board of Governors of the Federal Reserve System, October 7, 1992; and the D.C. Bar Association, November 19, 1992.

- "Straws in the Bottleneck: A Proposal for Efficient Network Interconnection," presented at the Tenth Biennial Conference of the International Telecommunications Society, Cannes, France, June 1992; *Journal of Regulatory Economics* Editors' Conference, San Diego, October 1992, with John Woodbury and Glenn Woroch.

- "Economic Principles of Penalties for Antitrust Violations, and the Role of the Economist in Corporate Sentencing," Corporate Sentencing Under the Federal Sentencing Guidelines for An Antitrust Defendant, The Federal Bar Association, Antitrust and Trade Regulation Section, May 1992.

- "The State of Antitrust in 1991: A Kinder, Gentler Antitrust?" The CATO Institute Conference, 1991, with Steve Calkins.

- "Economic Analysis and Policy Implications of the Financial Interest and Syndication Rule," Telecommunications Policy Research Conference, October 1990, with John Woodbury.

- "Regulation and the Partially Monopolized Network: Lessons from Telecommunications," American Enterprise Institute conference on Policy Approaches to the Deregulation of Network Industries, October 1990, with Roger Noll.

- "Price Regulation and Common Carrier Regulation," AEI Conference on Oil Pipeline Deregulation, American Enterprise Institute.

- "Regulation of New Crude-Oil Pipelines: Natural Monopoly and Information Externalities," AEI Conference on Oil Pipeline Deregulation, American Enterprise Institute.

- "Economic Theory as the Missing Link in the Merger Guidelines," American Bar Association Antitrust Section Spring Meeting, March 1990.

- "The Design and Evaluation of Competitive Rules Joint Ventures for Mergers and Natural Monopolies," American Enterprise Institute conference on Policy Approaches to the Deregulation of Network Industries, October 1990, and at the American Economic Association Meetings, December 1989, with John Woodbury.

- "Deterring Criminal Antitrust Behavior: Sanctions versus Structure," Stanford University Conference, June 1987.

- "Do Successful Tender Offers Benefit Bondholders?" Southern Economic Association Meetings, November 1986, with Catherine Benham, Donald M. Brown and Susan E. Woodward.

- "Deregulation of Electric Power Generation," New Mexico State University Conference, September 1986, and Edison Electric Institute, April 1987.

- "Professional Ethics and Financial Incentives: 'Appropriate' Medical Care," *Washington University Department of Economics Working Paper #40*, May 1982, with Robert Woodward.

- "Hospital Care Expenditure Inflation: Crisis or Consumption?" *Washington University Department of Economics Working Paper #43*, December 1982, with Robert Woodward and Walter Chien.

- "Transfer Pricing within U.S. Corporations," Sixth U.S.-Soviet Economic Symposium; Alma-Ata, Kazakhstan, U.S.S.R., May - June, 1981.

- "The Impact of Automobile Mileage Standards," Western Economic Association Meetings, 1979, with Michael Smirlock.

- "The Effect of Factor-Augmenting Technical Change on Factory Demand, and the Response by Factor Suppliers," Western Economic Association Meetings, October 1977.

- "Vertical Integration in Telecommunications," Telecommunications Policy Research Conference, April 1974.

### Other Papers

- "On Rethinking the Goals of Antitrust", Festschrift (Liber Amicorum) for Judge Douglas H. Ginsburg.

- Brief of Amici Curiae of Economics Professors and Scholars in Support of Petitioner, Supreme Court of the United States, *Leegin Creative Leather Products, Inc. v. PSKS Inc. (d.b.a. Kay's Kloset…Kay's Shoes),* No. 06-480, January 2007.

- Brief of Amici Curiae of Economics Professors in Support of Respondent, Supreme Court of the United States, *Verizon Communications, Inc. v. Law Offices of Curtis v. Trinko, LLP*, No. 02-682, July 25, 2003.

- Brief Amici Curiae of Economics Professors and Scholars in Support of Respondent, Supreme Court of the United States, *Lotus Development Corp. v. Borland International, Inc*., No. 94-2003, December 1995.

- "Implementing Competitive Rules Joint Ventures for Railroads," IBRD (World Bank), April, 1995.

- "Critical Loss and Critical Elasticity: Their Derivation and Use in Market Definition for Mergers," November 1994.

- "When Nominally Monopolistically-Competitive Firms are Really Perfectly Competitive: Going First-Class on the Paris Metro," July 1986.

- "Mandatory Energy Performance Standards and Residential Energy Demand," 1981, with Alan Rockwood and Richard Adams.

- "The Effects of Endogenous Quality Change on Demand and Costs," October 1977.

### Testimony

- TEC: *Philips Medical Systems v. TEC Holdings*, CA #3:20-cv-00021-MOC-DCK. Expert Report July 1, 2021, testimony April 20, 2023

- Her Majesty the Queen: *Her Majesty the Queen in Right of Canada Represented by the Minister of Agriculture and Agri-Food v. Van Well Nursery and Monson Fruit Company*, Report, April 29, 2022, Deposition, June 29, 2022

- Chase Manufacturing: *Chase Manufacturing v. Johns Manville Corporation* CA1:19-cv-00872-MEH, Expert Report, September 1, 2020.

- SkyVenture International Ltd.: *SkyVenture International Ltd. V. SkyVenture VWT Singapore, PTE,* In Arbitration Before the London Court of International Arbitration, in London, England, LCIA Case No. 184092, Witness Statement June 10, 2019, testimony July 31-August 1, 2019.

- Okaya, Shinyei, Soshin, and Taitsu (Film-only defendants): In Re Capacitors Antitrust Litigation, US District Court, Northern District of California, San Francisco Division, Case No. 17-md-02801-JD. Expert Report, February 22, 2019, Deposition June 4, 2019.

- Pro-Sys Consultants Ltd. And Neil Godfrey: Pro-Sys Consultants Ltd. And Neil Godfrey and Microsoft Corporation and Microsoft Canada Co./Microsoft Canada CIE, Supreme Court of British Columbia, Vancouver Registry No. L043175, Affidavit #3 March 20, 2017.

- Zack Ward and Thomas Buchar: Zack Ward and Thomas Buchar v. Apple, Inc., United States District Court for the Northern District of California, Oakland Division, 4:12-cv-05404 YGR, Expert Declaration February 16, 2016, Supplemental Expert Declaration September 30, 2016.

- iPic-Gold Class Entertainment, LLC: iPic Gold Class Entertainment, LLC and iPic Texas, LLC, v. Regal Entertainment Group, AMC Entertainment Holdings, Inc., AMC Entertainment, Inc., and American Multi-Cinema, Inc., District Court of Harris County, Texas, No. 2015-68745. Deposition January 4, 2016, Trial Testimony (TI), January 24, 2016: T.I. January 25, 2016. Opinion, Court of Appeals for the First District of Texas, September 29, 2016. Deposition, February 8, 2017.

- Bosai Minerals Group Co. Ltd: Resco Products, Inc. v. Bosai Minerals Group Co. Ltd & CMP Tianjin Co., Ltd., United States District Court for the Western District of Pennsylvania, 2:06-cv-235-JFC, Expert Report November 14, 2014; Supplemental Expert Report January 9, 2015.

- Federal Trade Commission: Ardagh Group S.A. and Saint-Gobain Containers, United States District Court for the District of Columbia, 1:13-cv-01021 (RMC). Expert Report August 28, 2013. Deposition, September 13, 2013.

- Tokyo Marine MOL Presentation to EU DG4 in Brussels.

- Reed Construction Data, Inc.: Reed Construction Data, Inc. v. The McGraw-Hill Companies, Inc. et al., United States District Court, Southern District of New York, Case No. 09-cv-8578 (JPO). Expert Liability Report and Expert Damages Report, September 7, 2012. Liability deposition, February 6, 2013. Damages deposition, March 12, 2013, Supplemental Report Deposition, June 19, 2013.

- Graco: Graco Inc. and Graco Minnesota Inc. v. PMC Global, Inc. et al., United States District Court, District of New Jersey. Case No.: 08-CIV-1304 (FLW) (JJH). Reply Report, February 1, 2011. Deposition May 17, 2011. Second Reply Report, August 29, 2012. Deposition, October 2, 2012.

- NCA: In Re: Air Cargo Shipping Services Antitrust Litigation, United States District Court Eastern District of New York, 06-MD-1775 (JG) (VVP). Declaration, May 25, 2012, Deposition, July 20, 2012.

- U.S. Department of Justice, Antitrust Division: Expert witness in U.S. v. H&R Block, Inc.; 2SS Holdings, Inc.; and TA IX L.P., United States District Court for the District of Columbia, Civil Action No. 11-00948. Expert Report, July 25, 2011. Expert Reply Report, August 18, 2011. Deposition, August 31, 2011. Trial Testimony September 8, 9 & 20, 2011. See Memorandum Opinion, Judge Beryl A. Howell, November 10, 2011.

- Novell: In Re: Microsoft Corp. Antitrust Litigation, United States District Court, District of Maryland, MDL Docket No. 1332. Expert Report, May 1, 2009. Rebuttal Report, July 27, 2009. Deposition, August 13, 2009. Trial testimony, November 16-17, 2011.

- State of New York: State of New York, by Attorney General Andrew M. Cuomo v. Intel Corporation, United States District Court for the District of Delaware. Expert Report, July 25, 2011. Deposition, October 4-6, 2011.

- Mylan Pharmaceuticals, Inc: Schering Corporation and MSP Singapore Corporation LLC v. Mylan Pharmaceuticals Inc., United States District Court for the District of New Jersey, Civil Action No. 2:09-cv-06383 and 2:10-cv-3085. Expert Report, August 16, 2011.

- Western Coal Traffic League: Verified Statement on Competition in the Railroad Industry before the Surface Transportation Board, STB Ex Parte 705, April 12, 2011 (with Kenneth C. Baseman).

- Ethypharm: Ethypharm S.A. France v. Abbott Laboratories, United States District Court for the District of Delaware, Case No. 08-126-SLR; Expert Report January 31, 2011. Reply Report March 28, 2011. Deposition May 3, 2011

- Neon: Neon Enterprise Software, LLC v. International Business Machines Corporation, United States District Court, Western District of Texas, Case No. A09CA896JN; Expert Report, February 10, 2011.

- Commonwealth of Pennsylvania:

  (a) Commonwealth of Pennsylvania v. Bristol-Myers Squibb Company, et al.; Expert Report July 20, 2010. Supplemental Report August 9, 2010. Testimony August 25, 2010. See http://www.leagle.com/xmlResult.aspx?page=124&xmldoc=In%20PACO%2020110831460.xml&docbase=CSLWAR3-2007-CURR&SizeDisp=7 See also Opinion re Post-Trial Motions of the Commonwealth of Pennsylvania and Bristol-Myers Squibb Company Defendants, Filed: August 31, 2011;

  (b) Commonwealth of Pennsylvania v. Johnson & Johnson Services Inc., et al., Supplemental Report September 30, 2010. Testimony November 3, 2010. See Opinion re Post-Trial Motions of the Commonwealth of Pennsylvania and Johnson & Johnson Defendants, Filed: August 31, 2011;P

  (c) Commonwealth of Pennsylvania v. Pfizer Inc., et al., Supplemental Report, February 11, 2011.

  (d) Commonwealth of Pennsylvania v. TAP Pharmaceutical Products, Inc., et al., Commonwealth Court of Pennsylvania, Case No. 212 MD 2004;

- Fairmont Designs: Economic Analysis of the AFMC's "Pay-to-Play" Agreements, Appendix A to White Paper submitted to the United States Department of Justice by Fairmont Designs, November 2, 2010

- L-3: L-3 Communications Integrated Systems, LP v. Lockheed Martin Corporation, United States District Court for the Northern District of Texas, Dallas Division, Civil Action Number 3:07-CV-0341-B, Expert Report, September 21, 2009. Deposition, November 10, 2009.

- AT&T: In Re: Universal Service Fund Telephone Billing Practice Litigation, United States District Court, District of Kansas, Case No. 02-md-1468-JWL, Expert Report and Deposition, July-August 2008. Trial testimony, November 2008.

- Entergy: Entergy Arkansas, Inc. and Entergy Services, Inc. v. Union Pacific Railroad Company and Missouri & Northern Arkansas Railroad Company, Inc., Surface Transportation Board, Docket No. 42104, Verified Statement (with John Kwoka), July 2008; Rebuttal Statement (with John Kwoka), September 2008.

- Joe Comes, et.al.: Joe Comes, Riley Paint, Inc., an Iowa Corporation; Skeffington's Formal Wear of Iowa, an Iowa Corporation; and Patricia Anne Larson v. Microsoft Corporation, a Washington Corporation, Iowa District Court for Polk County, Case No. CL82311. Expert Report, June 2, 2006; Deposition July 28, 2006; Rebuttal Report September 29, 2006; Deposition November 2, 2006.

- Secure Data in Motion, Inc.: PostX Corporation v. Secure Data in Motion, Inc. et al., United States District Court, Northern District of California, Case Nos. C02-04483 SI and C03-0521. Expert Report, Deposition, and Declaration, April-July, 2005, Testimony March, 2006.

- MAN Roland, Inc.: MAN Roland Inc. and MAN Roland Druckmachinen AG v. Heidelberg Web Systems, Inc. and Heidelberger Druckmachinen AG, United States District Court for the District of New Hampshire, Civil Action No. C-03-513-SM. Expert Report. Deposition, December 13, 2005.

- 21st Services: Coventry First LLC v. 21st Services, United States District Court for the Eastern District of Pennsylvania, Civil Action No. 04-05239-PBT. Expert Report November 11, 2005. Deposition, December 1, 2005.

- State of Alaska: "Competitive Effects of Producer Ownership of The Proposed Alaska Natural Gas Pipeline," Testimony, March 23, 2005.

- Attorneys General of the Commonwealth of Pennsylvania and other States: Fatemah Azizian, et al. v. Federated Department Stores, Inc., et al., Declaration September 10, 2004.

- Oldcastle, Inc.: The State of Utah v. Oldcastle Inc and Oldcastle Materials, Inc. U.S. District Court, District of Utah Central Division. Civil No. 2 02 CV-5165. Testimony

- NLG-Locke, Inc: In the Mater of Certain Ceramic Post Insulators from Japan, United States International Trade Commission, Testimony, October 29, 2003.

- Material Technologies, Inc.: Material Technologies, Inc. and Net Shape LLC v. Carpenter Technology Corporation and Vallourec, SA. United States District Court for the District of New Jersey, Civil Action No. 01-CV-2965 (SRC). Expert Report, April 14, 2003, and deposition.

- Six West Retail Acquisition Inc.: Six West Retail Acquisition, Inc. v. Sony Theater Management Corporation et. al., U.S. District Court, Southern District on New York, 97 Civ. 5499 (LAP) (JCF). Expert Report, December 23, 2002; Rebuttal Report, February 19, 2003, Deposition, February 25, 2003.

- In Re. Microsoft Corp. Antitrust Litigation: U.S. District Court, District of Maryland, MDL Docket No. 1332, Liability Report, August 26, 2002, Rebuttal Report, November 4, 2002, Deposition, February 20-21, 2003.

- Southwest Recreational Industries:

  (a) Expert witness in Southwest Recreational Industries v. FieldTurf, Inc. Trial testimony November 28, 2000;

  (b) Southwest Recreational Industries, Inc. v. Field Turf, Inc. US District Court, Eastern District of Kentucky, Civil Action No. 00-12. Expert reports, May 4, 2001 and Nov. 1, 2002.

- Brown & Williamson Tobacco Corporation: Declaration and deposition of Frederick R. Warren-Boulton, in R.J. Reynolds Tobacco Company v. Philip Morris, Inc., Lorillard Tobacco Company v. Philip Morris, Inc., Brown & Williamson Tobacco Corp., v. Philip Morris, Inc., U.S. District Court, Middle District of North Carolina. Civil Action Nos. 1:99CV185, 1:99CV207, and 1:99CV232.

- Menasha Corporation: Expert and supplemental report and deposition in Menasha Corporation v. News America Marketing In-Store, et al., U.S. District Court, Northeastern District of Illinois Eastern Division, Civil Action No. 00C-1895.

- European Consumers: In Support of Statement of Objections Allegations, Case No. IV/C-3/37.345 Microsoft, Expert Report and Presentation 2001.

- Power Mosfet Technologies, L.L.C. Expert witness in Power Mosfet Technologies, L.L.C. v. Infineon Technologies Corp., et al, U.S. District Court, Eastern District of Texas, Marshall Division, Cause No. 2-99-CV00168-DF. Expert Report; Deposition August 11, 2001; Trial testimony August 29, 2001.

- J. Paul Getty Trust: In Re. Auction Houses Antitrust Litigation, U.S. District Court, Southern District of New York. Civ. 0648 (LAK), Expert Report, Jan. 12, 2001.

- AT&T:

  (a) Testimony in Fibercomm, L.C., *et al* v. AT&T Communications of the Midwest, Inc., before the Iowa Utilities Board, December 20, 2000;

  (b) Affidavit, supplemental affidavit and deposition in AT&T Corporation v. Business Telecom, Inc., Federal Communication Commission. File No. EB-01-MD-002, January - March 2000;

  (c) Expert Report in Advamtel, LLC, et al, v. AT&T Corp.

  (d) Direct and Rebuttal Testimony in AT&T Communications of the Southwest Inc., Missouri Case No. TO-97-40;

  (e) Testimony in MGC Communications, Inc. v. AT&T Corporation, Federal Communications Commission: trial testimony June 28, 1999;

  (f) Direct testimony in Southwestern Bell Telephone Company of Kansas' Compliance with Section 271 of the Federal Telecommunications of 1996, The State Corporation Commission of the State of Kansas. Docket No. 97-SWBT-411-GIT, May 12, 1998;

  (g) Declaration in Implementation of the Pay Telephone Reclassification and Compensation Provisions of the Telecommunications Act 1996, Federal Communications Commission, CC Docket No. 96-128, September 9, 1997;

  (h) Application of Ernest G. Johnson, Director of the Public Utility Division Oklahoma Corporation Commission to Explore The Requirements of Section 271 of the Telecommunications Act of 1996, Cause No. PUD 970000064;

  (i) Rebuttal Testimony in Kansas Corporation Commission Docket No. 190, 492-U, July 15, 1996;

  (j) Comments on the Position Papers on Docket No. 94-07-02. State of Connecticut, Department of Public Utility Control, November 1994;

  (k) Position paper on Docket No. 94-07-02: Development of the Assumptions, Tests, Analysis and Review to Govern Telecommunications Service Reclassifications in Light of the 8 Criteria Set Forth in Section 8 of Public Act 94-83. State of Connecticut, Department of Public Utility Control, October 1994;

  (l) Direct testimony and deposition in State of Indiana, Indiana Utility Regulatory Commission, Cause No. 397051994, April 1994;

- Ventana Medical Systems: Report and testimony, Department of Energy, March 8, 2000.

- MCI:

  (a) Declaration and supplemental declaration in Joint Applications of MCI WorldCom, Inc. and Sprint Corporation for Consent to Transfer Control, CC Docket No. 99-333, March 2000 and June 2000.

(b) Direct testimony in Southwestern Bell Telephone Company of Kansas' Compliance with Section 271 of the Federal Telecommunications of 1996, The State Corporation Commission of the State of Kansas. Docket No. 97-SWBT-411-GIT, May 12, 1998;

(c) Declaration in Application of BellSouth Corporation, BellSouth Telecommunications, Inc. and BellSouth Long Distance, Inc. for Provision of In-Region, InterLATA Services in South Carolina. FCC Docket No. 97-208, October 17, 1997 (with Kenneth C. Baseman);

(d) Depreciation and Capital Recovery Issues, "Response to Professor Hausman," with K. Baseman and S. Woodward, FCC Docket No. 96-98, July 1996;

- Anthony D. Viazis: Expert witness in Anthony D. Viazis v. American Association of Orthodontists. U.S. District Court, Eastern District of Texas, Sherman Division. Civil Action No. 4:98-CV-245, Expert report (with David Eisenstadt), July 13, 2000. Trial testimony, November 9, 2000.

- State of Alaska: Testimony before the Alaska State legislature on the acquisition of ARCO by BP, January 19, 2000.

- State of New York, et al., and U.S. Department of Justice: Expert witness in United States of America v. Microsoft Corporation, and State of New York ex rel. v. Microsoft Corporation. C.A. No. 98-1232 (TPJ) and CA. No. 98-1233 (TTPJ). Declaration May 15, 1998, Report September 3, 1998, Deposition September 26, 1998, Direct Testimony and Trial Testimony November 19 - December 1, 1998.

- Brunswick Corporation: Expert witness in Concord Boat Co. et al. v. Brunswick Corporation. U.S. District Court, Eastern District of Arkansas, Western Division. Trial testimony June 11, 1998. Depositions February 2-4, 1998.

- Bepco, Inc.: Deposition in Bepco, Inc. et al. v. Allied Signal, Inc. and Allied Signal Truck Brake System Company, U.S. District Court for the Middle District of North Carolina Winston-Salem Division. C.A. No. 6:96CV00274, November 25-26, 1998.

- St. Louis Convention and Visitors Commission: Declaration in St. Louis Convention and Visitors Commission v. National Football League, et al.; U.S. District Court, Eastern District of Missouri, Eastern Division, C.A. No. 4:95CV02443 JCH, September 12, 1997.

- Federal Trade Commission: Expert witness in FTC v. Staples and Office Depot; U.S. District Court, District of Columbia, Trial Testimony, May 1997.

- Leo One USA: Affidavit in Amendment of Part 25 of the Commission's Rules to Establish Rules and Policies Pertaining to the Second Processing Round of the Non-Voice, Non-Geostationary Mobile Satellite Service, FCC Docket No. 96-220, December 20, 1996.

- Florida Panthers Hockey Club: Expert witness in Florida Panthers Hockey Club v. Miami Sports and Exhibition Authority and The City of Miami; U.S. District Court, Southern District of Florida Miami Division, Case No. 96-21 68-CIV. Trial Testimony, August, 1996.

- ADM: "An Evaluation of The Cost to U.S. Animal-Feed Manufactures of an Alleged Price-Fixing Conspiracy by Lysine Manufactures 1992-1995," Report, August 1996.

- K-2, Rossignol, Salomon, Tecnica, Skis Dynastar, Marker and The Ski Market: Expert witness in Sports Investment Co. vs. The Ski Market, Ltd., Inc., *et al*, U.S. District Court, District of Rhode Island, C.A. No. 95-097T. Deposition, December 1995.

- U.S. Department of Justice, Antitrust Division: Expert witness in United States of America v. Engelhard Corporation, Floridin Company, U.S. Borax Inc., U.S. Silica Inc. Case No. 6:96-CV-45 (WLS), Depositions, Trial Testimony August 1995.

- U.S. Department of Justice, Antitrust Division: Declaration in United States of America v. Dairy Farmer of America, Inc., et al.

- City of Los Angeles: Declaration in Air Transport Association of America, *et al.*, v. City of Los Angeles, City of Los Angeles Department of Airports and Los Angeles Board of Airport Commissioners, Docket No. 50176, March 1995, and Supplemental Declaration, April 1995.

- The Bon-Ton Stores, Inc.: Declaration in The Bon-Ton Stores, Inc. v. The May Department Stores Company, McCurdy & Company, Inc., and Wilmorite, Inc., Civil Action No. 94-CV-6454L, November 1994.

- Cyrix Corporation: Deposition in Cyrix Corporation v. Intel Corporation, December 1993.

- Thermadyne Industries: Deposition in Thermadyne Industries, Inc. and Coyne Cylinder Co. v. K.C. Cylinder *et al.*, December 1993.

- IBRD (World Bank): (a) Privatization and Regulation in the Restructuring of Electric Utilities in Eastern Europe, Prague, September 1993; (b) Implications of the United States Experience with Regulation and Antitrust for Competition Policy in Countries in Transition from Centrally Planned Economies to Market Economies, July 1993.

- Credit Card Coalition: "The Economics of Credit Card Interest Rate Caps," 1993, with Laurence H. Meyer.

- Coalition to Preserve the Financial Interest and Syndication Rule:

  (a) Testimony before the Federal Communications Commission, December 7, 1990, in the matter of Evaluation of the Syndication and Financial Interest Rules, MM Docket No. 90-162;

  (b) Submitted reports: "Economic Analysis and Policy Implications of the Financial Interest and Syndication Rule," June 14, 1990; "Reply Comments," August 1, 1990; "Economic Analysis and Policy Implications of the Financial Interest and Syndication Rule," January 24, 1991, with John Woodbury;

  (c) Declaration of Frederick R. Warren-Boulton, August 7, 1992, Exhibit 7, Comments of the Coalition to Preserve the Financial Interest and Syndication Rule on Proposed Modification of Network Consent Decrees. In United States of America v. CBS, Inc. Civil No. 74-3599-RJK, United States of America v. American Broadcasting Companies, Inc. Civil No. 74-3600-RJK, and United States of America v. National Broadcasting Company, Inc. Civil No. 74-3601-RJK.

- California Public Utility Commission, Division of Ratepayer Advocacy: Proposed merger of Southern California Edison Company and San Diego Gas and Electric Company, July 1990.

- Altai, Inc.: Expert witness in Computer Associates, Inc. v. Altai, Inc., April 1990.

- NFL Players Association: Deposition in Marvin Powell v. National Football League, September 1989.

- U.S. Department of Justice, Antitrust Division: Regulation of oil pipelines, August 1983;

- Consolidated Aluminum Corporation: Deposition in Indal, Inc. v. Consolidated Aluminum Corp., April 1983.

- U.S. Department of Justice, Antitrust Division: Expert witness in U.S. v. AT&T, 1981

- Battelle, Pacific Northwest Laboratories. Analyses of bidding for offshore oil leases and of the effects of Building Energy Performance Standards on energy demand, September 1979 -1981.

- U.S. Senate Commerce Committee, Senator Danforth presiding: Testimony on corporate average fuel economy (CAFÉ) standards, November 15, 1979.

- State of Missouri, Office of the Public Counsel: Expert witness on electric utility rate structures, 1978.

- Federal Trade Commission: Study on Vertical Distribution Arrangements, January 1, 1977 - August 1, 1978.

## Fields Taught

- Graduate: Industrial Organization, Economic Development and Planning, Microeconomic Theory, International Trade, International Finance, Economic Theories of Behavior, Applied Microeconomics.

- Undergraduate: Government and Business, Industrial Organization, International Trade, International Finance, Economic Development, Intermediate Microeconomic Theory, Intermediate Macroeconomic Theory, Introductory Microeconomic Theory, Introductory Macroeconomic Theory.

## Grants

- National Science Foundation. Grant title: "Income Maximizing in Choice and Rate Effects," 1988 - 1991.

- National Science Foundation. Grant title: "Application of Economic Theory to Operant Schedule Effects," 1985 - 1987.

- National Science Foundation. Grant title: "Income and Choice," 1983 - 1985.

## Professional Activities

- Referee, *American Economic Review, The Bell Journal of Economics/Rand Journal, Economic Inquiry, Industrial Organization Review, Journal of Industrial Economics, Journal of Law and Economics, Journal of Political Economy, Quarterly Journal of Economics, Southern Economic Journal.*

- Member, Editorial Boards, *International Journal of the Economics of Business, Journal of Forensic Economics.*

- Member, American Bar Association, American Economic Association.

| **Appendix B<br>Materials Considered** |
|---|
| **Legal Documents** |
| Amended Complaint, Civil Action No. 2:20-CV-03539, September 9, 2021 ("Complaint"). |
| Complaint, December 14, 2016 ("Heritage Complaint"). |
| Complaint, May 10, 2019 ("Teva Complaint"). |
| Deferred Prosecution Agreement, United States of AmA7:A28erica v. Taro Pharmaceuticals U.S.A. Criminal No. 20cr213, July 23, 2020. |
| Deferred Prosecution Agreement, United States of America v. Sandoz Inc., Criminal No. 20-CR-111, March 2, 2020. |
| Deposition of Anand Sha, July 18, 19, 25 and 26, 2023 and Exhibits |
| Deposition of Anthoney Thomassey, dated July 18, 19, and 20, August 10, 2023 and Exhibits. |
| Deposition of Ara Aprahamian, September 27, 2023 and Exhibits. |
| Deposition of Christopher Bihari, May 31, 2023, June 1, 5, 6, and 8, 2023 and Exhibits. |
| Deposition of Dave Berthold, November 17 and 18, 2021 and Exhibits. |
| Deposition of Della Lubke, May 16, 17, 19, 22, 23, and 25, 2023 and Exhibits. |
| Deposition of Donald Rogers, September 21, 2023 and Exhibits. |
| Deposition of Douglas D. Statler, November 16, 2022 and Exhibits. |
| Deposition of Douglas Statler, November 16, 2022 and Exhibits. |
| Deposition of Douglas Steven Boothe, June 29, 2023 and Exhibits. |
| Deposition of Hector Armando Kellum, dated September 21 and 22, 2023 and Exhibits. |
| Deposition of Howard Marcus, July 27, 2023 and Exhibits. |
| Deposition of James Grauso, May 4, 2023 and Exhibits. |
| Deposition of James Nesta, September 19 and 29, 2022 and Exhibits. |
| Deposition of Jason Gensburger, May 22 and 23, 2023 and Exhibits. |
| Deposition of Jill Nailor, June 29, 2023, and Exhibits. |
| Deposition of John Wesolowski, November 17, 2023 and Exhibits. |
| Deposition of Kurt Orlofski, January 11, 2023 and Exhibits. |
| Deposition of Lisa Glazer, June 27, 2023 and Exhibits. |
| Deposition of Michael Perfetto, June 29, 2022 and Exhibits. |
| Deposition of Michael Vezza, May 1, 2, 3, 8, 9, and 11, 2023 and Exhibits. |
| Deposition of Napolean D. Clark, June 28 and 29, 2023 and Exhibits. |
| Deposition of Paul Dutra, August 28, 29, 30, and 31, 2023 and Exhibits. |
| Deposition of Paul Krauthauser, July 31, August 1, 3 and 4, 2023 and Exhibits. |
| Deposition of Paul McMahon, August 8 and 9, 2023 and Exhibits. |
| Deposition of Robert Rieping, June 13, 2023 and Exhibits. |
| Deposition of Robin Hatosy Strzeminski, August 17 and 18, 2021 and Exhibits. |
| Deposition of Ronald Greenblatt, August 16, 2023 and Exhibits. |
| Deposition of Sarah Hudson, August 29, 2023 and Exhibits. |
| Deposition of Toby Bonagura, dated August 28, 2023 and Exhibits. |
| Deposition of Tony Fang, August 20, 2023 and Exhibits. |
| Deposition of Tony Rosa, dated May 16 and 17, 2023 and Exhibits. |
| Deposition of Walter J. Kaczmarek, October 12 and 13, 2022 and Exhibits. |
| Hawaii v. Standard Oil Co., 405 U.S. 251. |
| Illinois Brick Co. v. Illinois, 431 U.S. 720 (1977), at 732-733. |
| Indictment, Count One, United States of America v. Ara Aprahamian, Case 2:20-cr-00064, February 4, 2020. |
| Plea Agreement, United States of America v. Hector Armando Kellum, Criminal No. 20-065. |
| *United States v. 1. Davita Inc.* , Criminal 1:21-cr-00229-RBJ (D. Colo. Mar. 25, 2022) |
| *United States v. Davita Inc.* , CRIMINAL 1:21-cr-00229-RBJ (D. Colo. Jan. 28, 2022) |
| **Public Documents** |
| Abrantez-Metz, Rosa M., and Metz, Albert D. 2019. "The Future of Cartel Deterrence and Detection." *CPI Antitrust Chronicle* : pp. 1-8. |

| Appendix B<br>Materials Considered |
|---|
| **Legal Documents** |
| Abrantez-Metz, Rosa M., Froeb, Luke M., Geweke, John F., and Taylor, Christopher T. 2006. "A Variance Screen for Collusion." *International Journal of Industrial Organization* , May 24(3): pp. 467-486. |
| Aghadadashli, Hamid and Legros, Patrick. 2020. "Let's Collude." CEPR Discussion Paper, No. DP15241: pp. 1-31. |
| Amato, Jeffrey L. and Neuner, Thomas J. 2022. "Antitrust 101: Tacit Collusion." Wintson & Strawn, *available at* https://www.winston.com/en/blogs-and-podcasts/competition-corner/antitrust-101-tacit-collusion. |
| American Bar Association. 2012. *Market Definition in Antitrust: Theory and Case Studies.* ABA Booking Publishers. |
| AmerisourceBergen Corporation, Annual Report (10-K) (2014). |
| Antitrust Division of the Department of Justice. 2005. "Price Fixing, Bid Rigging and Market Allocation Schemes: What they are and what to look for: An Antitrust Primer." pp. 1-6. Available at: https://www.justice.gov/atr/file/810261/download. |
| Aparicio, Diego, Zachary Metzman, and Roberto Rigobon. 2021. "The Pricing Strategies of Online Grocery Retailers." *National Bureau of Economic Research Working Paper Series* ,Working Paper No. 28639: pp. 1-31. |
| Arcidiacono, Peter and Ellickson, Paul B. and Landry, Peter and Ridley, David B. 2013. "Pharmaceutical Followers." *International Journal of Industrial Organization* , 31(5): pp. 538-553. |
| Aryal, Gaurab, Campbell, Dennis J., Ciliberto, Federico, and Khmelnitskaya, Ekaterina. 2020. "Common Subcontracting and Multimarket Contact in the Airline Industry.": pp. 1-35. |
| Athey, Susan, Bagwell, Kyle and Sanchirico, Chris William. 1998. "Collusion and Price Rigidity," *MIT Department of Economics Working Paper,* No. 98-23. |
| Awaya, Yu and Krishna, Vijay. 2016. "On Communication and Collusion." *American Economic Review* ,106(2): pp. 285-315. |
| Awaya, Yu and Krishna, Vijay. 2020. "Information Exchanges in Cartels," *The RAND Journal of Economics,* Summer 51(2): pp. 421-446. |
| Baker, J., and Farrell, J. 2020. "Oligopoly Coordination, Economic Analysis and the Prophylactic Role of Horizontal Merger Enforcement." *University of Pennsylvania Law Review* , 168: pp. 1985-2020. |
| Berndt, E.R., Mortimer, R., Bhattacharjya, A., Parece, A. and Tuttle, E. 2007. "Authorized Generic Drugs, Price Competition, and Consumers' Welfare*." Health Affairs* , 26(3): pp. 790-799. |
| Berndt, Ernst R., Conti, Rena M. and Murray, Stephen J. 2017. "Consumer Learning and the Entry of Generic Pharmaceuticals." *NBER Working Paper Series* , Working Paper 23662: pp. 1-49. |
| Berndt, Ernst, Conti, Rena M., Murphy, Stephen J. 2017. "The Landscape of US Generic Prescription Drug Markets, 2004-2016." *NBER Working Paper Series* , Working Paper 23640: pp. 1-63. |
| Bernheim, Douglas R. and Whinston, Michael D. 1990. "Multimarket Contact and Collusive Behavior." *The RAND Journal of Economics,* Spring 21(1): pp. 1-26. |
| Bolotava, Yuliya, Connor, John M. and Miller, Douglas J. 2008. "The Impact of Collusion on Price Behavior: Empirical Results from Two Recent Cases," *International Journal of Industrial Organization,* November 26(6): pp. 1290-1307. |
| Bos, Iwan and Harrington Jr., Joseph E. 2010. "Endogenous Cartel Formation with Heterogenous Firms." *RAND Journal of Economics* , 41(1): pp. 92-117. |
| See also Bourveau, Thomas and She, Guoman and Zaldokas, Alminas, 2020. "Corporate Disclosure as a Tacit Coordination Mechanism: Evidence from Cartel Enforcement Regulations," Journal of Accounting Research, 58(2), Available at SSRN: https://ssrn.com/abstract=3622557. |
| Boyer, Marcel and Rachidi, Kotchoni. 2011. "The Econometrics of Cartel Overcharges." *Scientific Series* : pp. 1-57. |
| Bradshaw, Ben et al. 2020. "DOJ's Prosecution Of Generic Drug Companies Continues as it Announces Price-Fixing Charges Against Glenmark Pharmaceuticals, Inc." O'Melveny, available at https://www.omm.com/insights/alerts-publications/doj-s-prosecution-of-generic-drug-companies-continues-as-it-announces-price-fixing-charges-against-glenmark-pharmaceuticals-inc/. |
| Branded Institute. "Branded Generics: Differentiating Your Generic Drug Product with a Strong Brand Name." https://www.brandinstitute.com/branded-generics-differentiating-your-generic-drug-product-with-a-strong-brand-name/. |

| **Appendix B**<br>**Materials Considered** |
|---|
| **Legal Documents** |
| Brown, Donald M. and Warren-Boulton, Frederick R. 1988. "Testing the Structure-Competition Relationship on Cross-Sectional Firm Data." *Economic Analysis Group, 88-6* . Washington, D.C: U.S. Department of Justice, Antitrust Division. |
| Brown, Zach Y. and MacKay, Alexander. 2023. "Collusion and Coercion with Naïve Rivals.": pp. 1-30, available at https://ssrn.com/abstract=4380895. |
| Buckberg, Elaine, and Dunbar, Frederick C. 2008. "Disgorgement: Punitive Demands and Remedial Offers." *The Business Lawyer* , 63(2): pp. 356-357. |
| Buiten, Miriam C. 2019. "The Ambivalent Effect of Antitrust Damages on Deterrence." *CPI Antitrust Chronicle* : pp. 1-9. |
| Byford, Martin C. and Gans, Joshua S. 2014. "Collusion at the Extensive Margin." *International Journal of Industrial Organization,* November, 47: pp. 75-83. |
| Byrne, D.P. and De Roos, N. 2019. "Learning to Coordinate: A Study in Retail Gasoline." *American Economic Review* , February 109(2): pp. 591-619. |
| Byrne, D.P., De Roos, N., Lewis, M.S., Marx, L.M., and Wu, X.A. 2023. "Asymmetric Information Sharing in Oligopoly: A Natural Experiment in Retail Gasoline." Available at SSRN: https://ssrn.com/abstract=4513435 or http://dx.doi.org/10.2139/ssrn.4513435 |
| Campbell, Neil and Pinsonnault, Guy. 2020. "First Step Analysis: Cartel Regulation in Canada." Lexology, available at https://www.lexology.com/library/detail.aspx?g=41d6d 945-0f6 e-487e-aa82-71fcbed417b9. |
| Cardinal Health, Inc., Annual Report (10-K) (2014). |
| Carlton, Dennis P., and Perloff, Jeffrey M. 2005. "Modern Industrial Organization." 4th Edition. |
| Castanheira, Micael, Ornaghi, Carmine, Siotis, Georges & de Frutos, Marie-Angeles. 2017. "The Unexpected Consequences of Asymmetric Competition. An Application to Big Pharma." *Center for Economic Policy Research* , Discussion Paper DP11813. |
| Centers for Medicare & Medicaid Services. 2007. "Medicaid Drug Pricing Regulation: A Summary." July 6, 2007. Available at: https://www.cms.gov/newsroom/fact-sheets/medicaid-drug-pricing-regulation-summary. |
| Centers for Medicare & Medicaid Services 2023. "Methodology for Calculating the National Average Drug Acquisition Cost (NADAC) for Medicaid Covered Outpatient Drugs." January 2023, p. 11. Available at: https://www.medicaid.gov/medicaid-chip-program-information/by-topics/prescription-drugs/ful-nadac-downloads/nadacmethodology.pdf. |
| Centers for Medicare & Medicaid Services (n.d.). "Unit Rebate Amount Calculation for Non-innovator Multiple Source Drugs." Available at: https://www.medicaid.gov/medicaid/prescription-drugs/medicaid-drug-rebate-program/unit-rebate-calculation/unit-rebate-amount-calculation-for-non-innovator-multiple-source-drugs/index.html. |
| Ciliberto, F. and Williams, J. W. 2014. "Does Multimarket Contact Facilitate Tacit Collusion? Inference on Conduct Parameters in the Airline Industry." *The RAND Journal of Economics* , February 45(4). |
| Clark, Robert, Christopher Fabiilli, and Laura Lasio. 2022. "Collusion in the US generic drug industry." *International Journal of Industrial Organization* , 85. |
| Congressional Research Service. "Prescription Drug Importation." https://crsreports.congress.gov/product/pdf/IF/IF11056, visited 8/9/2023. |
| Connor, J.M. 2006. "Effectiveness of Antitrust Sanctions on Modern International Cartels." *Journal of Industry, Competition and Trade* , 6, pp. 195-223. |
| Connor, John M. 2005. "Price-Fixing Overcharges: Legal and Economic Evidence." Available at https://papers.ssrn.com/sol3/papers.cfm?abstract_id=787924. |
| Connor, John M. 2006. "The Great Global Vitamins Conspiracy: Sanctions and Deterrence." *AAI Working Papers* , Working Paper No. 06-02. |
| Connor, John M. 2014. "Price-Fixing Overcharges: Revised 3rd Edition." |
| Connor, John M., and Dan P. Werner. April 2019. "New Research on the Effectiveness of Bidding Rings: Implications for Competition Policies." *CPI Antitrust Chronicle* : pp. 1-10. |
| Conrad, R., and Lutter, R. 2019. "Generic Competition and Drug Prices: New Evidence Linking Greater Generic Competition and Lower Generic Drug Prices." Available at: https://www.fda.gov/media/133509/download. |

**Appendix B**
**Materials Considered**

**Legal Documents**


Cournot, A.A. 1897. *Researches Into the Mathematical Principles of the Theory of Wealth.* New York: The Macmillan Company.

De Lamirande, Patrick, Guigou, Jean-Daniel and Lovat, Bruno. 2011. "Strategic Delegation and Collusion: Do Incentive Schemes Matter?" *LSF Research Working Paper Series* , No. 11-02.

Department of Health and Human Services Office of Inspector General. 2014. “Average Manufacturer Price Determinations by Selected Drug Manufacturers Generally Were Consistent with Federal Requirements.” June 2014, p. i. Available at: https://oig.hhs.gov/oas/reports/region6/61300014.pdf.

Department of Health. "Understanding Recent Trends in Generic Drug Prices." Available at: https://aspe.hhs.gov/sites/default/files/migrated_legacy_files//141996/GenericsDrug paperr.pdf.

Department of Justice: Antitrust Division. 2007. “Monopoly Power, Market Definition, And The Cellophane Fallacy.” Available at: https://www.justice.gov /atr/monopoly-power-market-definition-and-cellophane-fallacy.

Department of Justice: Office of Public Affairs. "Pharmaceutical Company Admits to Price Fixing in Violation of Antitrust Law Resolves Related False Claims Act Violations." Available at: https://www.justice.gov/opa/pr/pharmaceutical-company-admits-price-fixing-violation-antitrust-law-resolves-related-false.

Doane, Michael J. and Froeb, Luke M. and Werden, Gregory J. and Zimmer, David M. 2013. “Predicting Price Effects from Retail Mergers”. *Vanderbilt Owen Graduate School of Management Research Paper* No. 2034464.

Edwards, C. 1955. "Conglomerate Bigness as a Source of Power." Universities – National Bureau Committee for Economic Research, *Business Concentration and Price Policy.* Princeton University Press.

Esposito, F., Ferrero, M. 2006. "Variance Screens for Detecting Collusion: An Application to Two Cartel Cases in Italy." *Italian Competition Authority, Working Paper* .

Evans, W. N. and Kessides, I. N. 1994. "Living by the "Golden Rule": Multimarket Contact in the US Airline Industry." *The Quarterly Journal of Economics* , May 109(2): pp. 341-366.

Farrell, Joseph. 2000. “Renegotiation In Repeated Oligopoly Interaction.” *Incentives, Organization, and Public Economics* : pp. 303-322.

Federal Trade Commission. 2009. “Authorized Generics: An Interim Report.” Available at: https://www.ftc.gov/sites/default/files/documents/reports/authorized-generics-interim-report-federal-trade-commission/p062105authorizedgenericsreport.pdf.

Federal Trade Commission. 2011. “Authorized Generic Drugs: Short-Term Effects and Long-Term Impacts.” Available at: https://www.ftc.gov/sites/default/files/documents/reports/authorized-generic-drugs-short-term-effects-and-long-term-impact-report-federal-trade-commission/authorized-generic-drugs-short-term-effects-and-long-term-impact-report-federal-trade-commission.pdf.

Federal Trade Commission. (n.d.). “Spotlight on Trade Associations.” Available at: https://www.ftc.gov/advice-guidance/competition-guidance/guide-antitrust-laws/dealings-competitors/spotlight-trade-associations.

First, Harry. 2019. "Excessive Drug Pricing as an Antitrust Violation." *82* Antitrust *Law Journal,* 701.

Frank, R. and Salkever, D. 1997. “Generic Entry and the Pricing of Pharmaceuticals.” *Journal of Economics & Management Strategy,* 6(1): pp. 75-90.

Gatwood, Justin, Gibson, Teresa B., Cherney, Michael E., Farr, Amanda M., Vogtmann, Emily, and Fendrick, A. Mark. 2014. “Price Elasticity and Medication Use: Cost Sharing Across Multiple Clinical Conditions.” *Journal of Managed Care & Specialty Pharmacy,* 20(11): pp. 1102-1107.

Glasner, David, and Sullivan, Sean. 2020. “The Logic of Market Definition.” *Antitrust Law Journal,* 83(2).

Greenberg, Scott. 2015. "Five Years Later: ACA's Branded Prescription Drug Fee May Have Contributed to Rising Drug Prices." Available at: https://taxfoundation.org/blog/five -years-later-aca-s-branded-prescription-drug-fee-may-have-contributed-rising-drug-prices/.

Guha, Rahul. 2016. "AHLA ABA Antitrust in Healthcare: Generics Drugs Price Fixing Litigation." Cornerstone Research.

Ha, S., Ma, F., and Zaldokas, A. 2021. “CEO Compensation and Product Market Collusion.” Competition Policy International. May 23, 2021. Available at: https://www.pymnts.com/cpi_posts/ceo-compensation-and-product-market-collusion/.

| Appendix B<br>Materials Considered |
|---|
| **Legal Documents** |
| Han, Martjin A., Schinkel, Maarten Peter and Tuinstra, Jan. 2009. "The Overcharge as a Measure for Antitrust Damages." *Amsterdam Center for Law & Economics* , Working Paper No. 2008-08. |
| Hao, Yu and Al´e-Chilet, Jorge. 2023. "Building Trust: A Dynamic Game of Collusive Price-fixing in the Chilean Pharmaceutical Retail Industry. " |
| Harrington Jr., Joseph E. 2004. "Post-Cartel Pricing during Litigation." *The Journal of Industrial Economics* , 52(4): pp. 517-533. |
| Harrington Jr., Joseph E. 2005. "Detecting Cartels." *The Johns Hopkins University Department of Economics* , Working Paper No. 526. |
| Harrington Jr., Joseph E. 2008. "Optimal Corporate Leniency Programs." *The Journal of Industrial Economics* , 56(2): pp. 215-246. |
| Harrington Jr., Joseph E. 2011. "Posted Pricing as a Plus Factor." *Journal of Competition Law & Economics* , March 7(1): pp. 1-35. |
| Harrington Jr., Joseph E. 2012. "A Theory of Tacit Collusion." *The Johns Hopkins University Department of Economics* , Working Paper No. 588, pp. 1-33. |
| Harrington Jr., Joseph E. and Ye, Lixin. 2019. "Collusion Through Coordination of Announcements.*" The Journal of Industrial Economics* , 67(2): pp. 209-241. |
| Harrington Jr., Joseph E., and Andrea Skrzypacz. 2011. "Private Monitoring and Communication in Cartels: Explaining Recent Collusive Practices." *American Economic Review* , October 101(6): pp. 2425-2449. |
| Harrington, Joseph E., Huschelrath, Kai, Laitenberger, Ulrich, and Smuda, Florian. 2014. "The Discontent Cartel Member and Cartel Collapse: The Case of the German Cement Cartel." ZEW Discussion Papers, No. 14-084, pp. 1-26. |
| Haucap, Justin and Heldman, Christina. 2022. "The Sociology of Cartels." *CESifo Working Paper,* No. 9914. |
| Hay, George A. 2013. "Anti-Competitive Agreements: The Meaning of 'Agreement'." *Cornell Law Faculty Working Papers* , 105: pp. 1-26. |
| Higgins, Richard S. and Perelman, Mark. 2012. "Coordinated Conduct: A Review of Preconditions for Profitability and Stability." |
| Huschelrath, Kai and Kathrin Muller, Tobias Keith. 2013. "Concrete Shoes for Competition: The Effect of the German Cement Cartel on Market Price." Journal of Competition Law and Economics, 9(1), pp. 97-123. |
| Hüschelrath, Kai and Veith, Tobias. 2011. "The Impact of Cartelization on Pricing Dynamics - Evidence from the German Cement Industry." *ZEW - Centre for European Economic Research Discussion Paper* No. 11-067. |
| Hylton, Keith N. 2018. "Oligopoly Pricing and Richard Posner." *The Antitrust Source,* 18(2). |
| Internal Revenue Service, "Interest rates increase for the fourth quarter 2023," August 25, 2023, https://www.irs.gov/newsroom/interest-rates-increase-for-the-fourth-quarter-2023, visited 10/26/2023. |
| Janssen, Aljoscha. 2022. "Price Dynamics of Swedish Pharmaceuticals." *Quantitative Marketing and Economics* , 20(4): pp. 313-351. |
| Kaplow, Louis. 2011. "An Economic Approach to Price Fixing." *Harvard Law and Economics* , Discussion Paper No. 694. |
| Kaplow, Louis. 2011. "Direct versus Communications-Based Prohibitions on Price Fixing." *Journal of Legal Analysis* , Winter 3(2): pp. 449-538. |
| Kaplow, Louis. 2011. "On the Meaning of Horizontal Agreements in Competition Law." *California Law Review* , June 99(3). |
| Kiaser Family Foundation. "Follow the Pill: Understanding the U.S. Commercial Pharmaceutical Supply Chain." Available at: https://www.kff.org/wp-content/uploads/2013/01/follow-the-pill-understanding-the-u-s-commercial-pharmaceutical-supply-chain-report.pdf. |
| Kim, Minhae, Mansley, R., Miller, N H., Remer, M. and Weinberg, M. C. 2022. "Price Fixing Allegations in the Canned Tuna Industry: A Look at the Data." *Georgetown McDonough School of Business Research Paper,* No. 279625. |
| Klein, T., "Cournot (Nash) Equilibrium.*" Concurrences: Antitrust Publications & Events.* Available at: https://www.concurrences.com/en/dictionary/cournot-nash-equilibrium |

| **Appendix B<br>Materials Considered** |
|---|
| **Legal Documents** |
| Klevorich, Alvin K. and Kohler-Hausmann, Issa. 2010. "The Plausibility of Twombly: Proving Horizontal Agreements after Twombly." Elhauge, R. Einer, *Research Handbook on the Economics of Antitrust Law* . Edward Elgar Publishing. |
| Knittel, C.R. and Stango, V. 2003. "Price ceilings as focal points for tacit collusion: Evidence from credit cards." *American Economic Review* , December 93(5): pp. 1703-1729. |
| Knowledge at Wharton. "Why Consumers Lose in the Big Pharma Wars." Available at: https://knowledge.wharton.upenn.edu/podcast/knowledge-at-wharton-podcast/why-consumers-lose-in-the-big-pharma-wars/. |
| Kovacic, William E. 2012. "Kovacic on Robert C. Marshall & Leslie M. Marx, The Economics of Collusion – Cartels and Bidding Rings." Available at: https://lawprofessors.typepad.com/antitrustprof_blog/2012/08/bill-kovacic-on-robert-c-marshall-leslie-m-marx-the-onomics-of-collusion-cartels-and-bidding-rings.html. |
| Kovacic, William E., Marshall, Robert C., Leslie M. Marx, Leslie M., and White, Halbert L. 2011. "Plus Factors and Agreement in Antitrust Law." *Michigan Law Review,* December 110(3): pp. 393-436. |
| Kovacic, Willliam E., Marshall, Robert C., Marx, Leslie M., and Raiff, Matthew E. 2007. "Lessons for Competition Policy from the Vitamins Cartel," *Chapter 6, Contributions to Economic Analysis* , Volume 282, Elsevier. |
| Kreling, David H. 2000. "Cost Control for Prescription Drug Programs: Pharmacy Benefit Manager (PBM) Efforts, Effects, and Implications," prepared for the Department of Health and Human Services' Conference on Pharmaceutical Pricing Practices, Utilization and Costs, available at https://aspe.hhs.gov/cost-control-prescription-drug-programs-pharmacy-benefit-manager-pbm-efforts-effects-implications, visited 10/11/2023. |
| Kreling, David H. 2000. "Cost Control for Prescription Drug Programs: Pharmacy Benefit Manager (PBM) Efforts, Effects, and Implications." Department of Health and Human Services' Conference on Pharmaceutical Pricing Practices, Utilization and Costs. Available at: https://aspe.hhs.gov/cost-control-prescription-drug-programs-pharmacy-benefit-manager-pbm-efforts-effects-implications. |
| Kurs, Michael. 2018. "Out from under the Brick - A Long Road to a "New" Antitrust Remedy for Connecticut Consumers." *Connecticut Bar Association,* 29(1): pp. 16-19. |
| Landes, W. and Posner, R. 1979. "Should Indirect Purchasers Have Standing to Sue Under the Antitrust Laws? An Economic Analysis of the Rule of Illinois Brick." *The University of Chicago Law Review,* 46(602). pp. 602-635. |
| Latwal, Bharti and Chandra, Amrish. 2020. "Authorized Generics vs. Branded Generics: A Perspective." Journal of Generic Medicines 17(1), pp. 5-9. |
| Leslie, Christopher R. 2021. "The Probative Synergy of Plus Factors in Price-Fixing Litigation." *Northwestern University Law Review* ,115(6): pp. 1581-1648. |
| Levenstein, Margaret C. and Suslow, Valerie Y. 2006. "What determines cartel success?" *Journal of Economic Literature* , 44(1): pp. 43-95. |
| Levenstein, Margaret C., and Suslow, Valerie Y. 2015. "Price-Fixing Hits Home: An Empirical Study of U.S. Price Fixing Conspiracies." *Review of Industrial Organization,* 48(4): pp. 361-379. |
| Lewis, M.S. 2015. "Odd Prices at Retail Gasoline Stations: Focal Point Pricing and Tacit Collusion." *Journal of Economics and Management Strategy,* Fall 24(3): pp. 664-685. |
| Li, Xuelim, Lo, Andrew W., and Thakor, Richard T. 2021. "Paying off the Competition: Market Power and Innovation Incentives." *National Bureau of Economic Research,Working Paper,* No. 28964. |
| Madio, Leonardo and Pignataro, Aldo. 2022. "Collusion Sustainability with a Capacity Constrained Firm." *CESifo Working Paper,* No. 10170. |
| Marshall, Robert and Leslie M. Marx. 2012. *The Economics of Collusion: Cartels and Bidding Rings* . The MIT Press. |
| Marshall, Robert C., Marx, Leslie M., and Raiff, Matthew E. 2008. "Cartel Price Announcements: The Vitamins Industry." International Journal of Industrial Organization, 26(3), pp. 762-802. |
| McCamus, John D. 2011. "The Restatement (Third) of Restitution and Unjust Enrichment." *Canadian Bar Review* , 90(2): pp. 439-467. |
| McEvoy, D.A., and Ginsberg, M.R. 2014. "The Use of Expert Witnesses for Penalty Determinations in Criminal Antitrust Cases: A Study of United States v. AU Optronics." *Antitrust Magazine* , Summer 28(3). |

| Appendix B<br>Materials Considered |
| --- |
| **Legal Documents** |
| McKesson Corporation, Annual Report (10-K) (2014). |
| Miller, N. H., Sheu, G., and Weinberg, M. C. 2021. "Oligopolistic Price Leadership and Mergers: The United States Beer Industry." *American Economic Review* , 111(10): pp. 3123-3159. |
| Moorthy, Sridhar and Winter, Ralph A. 2006. "Price-Matching Guarantees." *The RAND Journal of Economics* , 37(2): pp. 449-465. |
| Moresi, Serge, Reitman, David, Salop, Steven C., and Sarafidi, Yianis. 2011. "Gauging Parallel Accommodating Conduct Concerns with the CPPI." |
| Morse, M. Howard. 2003. "Product Market Definition in the Pharmaceutical Industry." *Antitrust Law Journal* , 71(2): pp. 633-676. |
| Mouraviev, Igor and Rey, Patrick. 2011. "Collusion and Leadership." *International Journal of Industrial Organization* , December 29(6): pp. 705-717. |
| Murray, Michael P. 1994. "A Drunk and Her Dog: An Illustration of Cointegration and Error Correction." *The American Statistician* , February 48(1): pp. 37-39. |
| National Center for Biotechnology Information, "Pharmaceutical Formulation," https://www.ncbi.nlm.nih.gov/books/NBK562239/, visited 10/2/2023. |
| Nelson, Phillip. 2007. "Monopoly Power, Market Definition, And The Cellophane Fallacy," Available at: https://www.justice.gov/sites/default/files/atr/legacy/2007/03/27/222008.pdf. |
| Nguyen, Xyan Nguyen, et al. 2022. "Effect of Competition on Generic Drug Prices," *Applied Health Economics and Health Policy,* 20(2): pp. 243-253. Available at: https://pubmed.ncbi.nlm.nih.gov/34904207/. |
| Office of the Assistant Secretary for Planning and Evaluation (ASPE) et al. 2010. "Expanding the Use of Generic Drugs." December 1, 2010. Available at: https://aspe.hhs.gov/reports/expanding-use-generic-drugs-0. |
| Olson, L., and Wendling, B.W. 2013. "The Effect of Generic Drug Competition on Generic Drug Prices During the Hatch-Waxman 180-Day Exclusivity Period." Federal Trade Commission, Bureau of Economics, Working Paper No. 317. April 20, 2013, p. 2. |
| Page, William H. 2008. "Facilitating Practices and Concerted Action Under Section 1 of the Sherman Act." *Antitrust Law and Economics* . |
| Pakes, A. 2003. "A Reconsideration of Hedonic Price Indexes with an Application to PC's.*" American Economic Review* , 93(5): pp. 1578-1596. |
| Panner, Aaron M. July 2018. "Sorting the Collusive Goats from the Consciously Parallel Sheep." *CPI Antitrust Chronicle* : pp. 1-5. |
| Parker, Philip M. and Roller, Lars-Hendrick. 1997. "Collusive Conduct in Duopolies: Multimarket Contact and Cross-Ownership in the Mobile Telephone Industry." *The RAND Journal of Economics* , Summer 28(2): pp. 304-322. |
| Pepall, Lynne, Richards, Daniel and Norman, George. 1999. "Industrial Organization: Contemporary Theory and Practice." St. Paul, MN: South-Western College Pub. |
| Pletcher, A.T., Moen, Kelse, and Gonzalez, J. 2023. "Why Economics Matters in Criminal Antitrust Cases." *American Bar Association Antitrust Law Section* , Spring 7(2). |
| Porter, Robert H. 2005. "Detecting Collusion." *Review of Industrial Organization* , February 26(2): pp. 147-167. |
| Posner, Richard A. 1976. "Antitrust Law: An Economic Perspective," Chicago, Illinois: The University of Chicago Press. |
| Posner, Richard A. 2001. "Antitrust Law: An Economic Perspective, Second Edition," Chicago, Illinois: The University of Chicago Press. |
| Reiffen, David, and Ward, Michael R. 2007. "'Branded Generics' as a Strategy to Limit Cannibalization of Pharmaceutical Markets," *Managerial and Decision Economics,* 28(4/5): pp. 1-37. |
| Ringel, Jeanne S., Hosek, Susan D., Vollard, Ben A., and Mahnovski, Sergej. 2002. "The Elasticity of Demand for Health Care." National Defense Research Institute, RAND Health. |
| Rubinfeld, Daniel L. 2012. "Modern Methods for Measuring Antitrust Damages." *Research Handbook on the Economics of Antitrust Law* : pp. 379-385. |
| Schmitt, Nicolas and Rolf, Weder. 1998. "Sunk Costs and Cartel Formation: Theory and Application to the Dyestuff Industry." *Journal of Economic Behavior & Organization* , Vol. 36(2): pp. 197-220. |

| Appendix B<br>Materials Considered |
|---|
| **Legal Documents** |
| Schuldt, R.F., and Taylor, J.E. 2017. “Cartel Attributes and Cartel Performance: The Impact of Trade Associations.” The Journal of Industrial Economics, 66(1), pp. 1-29. |
| Scott Morton, Fiona M. 1997. “Entry Decisions in the Generic Pharmaceutical Industry.” *NBER Working Paper Series,* Working Paper 6190: pp. 1-35. |
| Scott, Chance, Sabot, Erik and Kirk, Kathryne. 2020. "The Myth of Skyrocketing Drug Prices: A Closer Look at the US Gross to Net Problem.” Available at: https://www.pharmexec.com/view/myth-skyrocketing-drug-prices-closer-look-us-gross-net-problem. |
| Socal, Mariana P, Cordeiro, Thomas, Anderson, Gerard F., and Bai, Ge. 2022. “Estimating Savings Opportunities From Therapeutic Substitutions of High-Cost Generic Medications,” *JAMA Network Open* , 5(11). |
| Sood, N., Shih, T., Van Nuys, K., and Goldman, D. 2017. “The Flow of Money Through the Pharmaceutical Distribution System.” Available at: https://pharmaceutic al.report/Resources/Whitepapers/4d3550b8-f007-4bef-9770-83b338b5a704_USC%20 Schaeffer_Flow%20of%20Money_2017.pdf. |
| Spagnolo, G. 2000. “Stock-Related Compensation and Product-Market Competition.” RAND Journal of Economics, 31(1), pp. 22-42 |
| Spagnolo, G. 2004. “Managerial Incentives and Collusive Behavior.” Centre for Economic Policy Research Discussion Paper No. 4506, pp. 1-29. |
| Spagnolo, Giancarlo. 2005. "Managerial Incentives and Collusive Behavior." *European Economic Review,* 49(6): pp. 1501-1523. |
| Stenner, Shane P., et al. 2016. “ePrescribing: Reducing Costs Through In-Class Therapeutic Interchange,” *Applied Clinical Informatics* , 7(4): 1168–1181. |
| Stigler, George. 1964. “A Theory of Oligopoly,” *Journal of Political Economy* , 72(1): pp. 44-61. |
| Taro Pharmaceuticals Industries Ltd. “History”. Available at: https://www.taro.com/history. |
| Tenn, S. and Wendling, B.W. 2014. “Entry Threats and Pricing in the Generic Drug Industry.” *The Review of Economics and Statistics* , 96(2): pp. 214-228. |
| Tessema et al. 2020. “Generic But Expensive: Why Prices Can Remain High for Off-Patent Drugs.” *Hastings Law Journal,* 71(4). |
| The Sedona Conference. 2006. “Commentary on the Role of Economics in Antitrust Law.” *The Sedona Conference Journal* , 7. |
| Thomson Reuters Practical Law. “Glossary: Per Se Rule,” available at: https://content.next.westlaw.com/practical-law/document/I03f4d78ceee311e28578f7ccc38dcbee/Per-Se-Rule?viewType=FullText&transitionType=Default&contextData=(sc.Default), visited 10/9/2023. |
| Trost, Michael Markus. 2021. “The Collusive Efficacy of Competition Clauses in Bertrand Markets with Capacity-Constrained Retailers.” |
| Tucker, Darren S. 2017. *Antitrust Law and Developments* : *Eighth Edition.* Chicago, Illinois: ABA Section of Antitrust Law. |
| U.S. Customs and Border Protection, Department of Homeland Security, "Quarterly IRS Interest Rates Used in Calculating Interest on Overdue Accounts and Refunds of Customs Duties," January 18, 2023, https://www.federalregister.gov/documents/2023/01/18/2023-00836/quarterly-irs-interest-rates-used-in-calculating-interest-on-overdue-accounts-and-refunds-of-customs, visited 10/26/2023. |
| U.S. Department of Justice and the Federal Trade Commission. 2010. “Horizontal Merger Guidelines.” Available at: https://www.justice.gov/sites/default/files/atr/legacy /2010/08/19/hmg-2010.pdf. |
| U.S. Department of Justice and the Federal Trade Commission. 2023. “Draft: Merger Guidelines.” Available at https://www.justice.gov/d9/2023-07/2023-draft-merger-guidelines_0.pdf, at Appendix 3.B.4. |
| U.S. Department of Justice. (2022). “Preventing And Detecting Bid Rigging, Price Fixing, And Market Allocation In Post-Disaster Rebuilding Projects.” December 1, 2022. Available at: https://www.justice.gov/atr/preventing-and-detecting-bid-rigging-price-fixing-and-market-allocation-post-disaster-rebuilding. |
| U.S. FDA. “Variations in Drug Products that May Be Included in a Single ANDA.” https://www.fda.gov/media/71497/download, visited 8/9/2023. |

| **Appendix B**<br>**Materials Considered** |
|---|
| **Legal Documents** |
| U.S. Food & Drug Administration, "Small Business Assistance: Frequently Asked Questions for New Drug Product Exclusivity," February 11, 2016, https://www.fda.gov/drugs/cder-small-business-industry-assistance-sbia/small-business-assistance-frequently-asked-questions-new-drug-product-exclusivity. |
| U.S. Food & Drug Administration, "FDA Drug Shortages." Available at: https://www.accessdata.fda.gov/scripts/drugshortages/default.cfm. |
| U.S. Food & Drug Administration. "Abbreviated New Drug Application (ANDA)." https://www.fda.gov/drugs/types-applications/abbreviated-new-drug-application-anda, visited 8/2/2023. |
| U.S. Food & Drug Administration. "FDA List of Authorized Generic Drugs." https://www.fda.gov/drugs/abbreviated-new-drug-application-anda/fda-list-authorized-generic-drugs, visited 7/21/2023. |
| U.S. Food & Drug Administration. "Generic Drug Facts." Available at: https://www.fda.gov/drugs/generic-drugs/generic-drug-facts. |
| U.S. Food & Drug Administration. "New Drug Application (NDA)." https://www.fda.gov/drugs/types-applications/new-drug-application-nda, visited 7/18/2023. |
| United States Census Bureau, "2020 Island Areas Censuses Data on Demographic, Social, Economic and Housing Characteristics Now Available for the Commonwealth of the Northern Mariana Islands," October 20, 2022, https://www.census.gov/newsroom/press-releases/2022/2020-island-areas-northern-mariana.html. |
| United States Census Bureau, "State Population Totals and Components of Change: 2010-2019," https://www.census.gov/data/tables/time-series/demo/popest/2010s-state-total.html. |
| United States Government Accountability Office, "The Number, Role, and Ownership of Pharmacy Services Administrative Organizations," January 2013, https://www.gao.gov/assets/gao-13-176.pdf, pp. 7-8, visited 9/30/2023. |
| Van Wegberg, M., Van Witteloostuijn, A., and Abbing, M.R. 1994. "Multimarket and Multiproject Collusion: Why European Integration May Reduce Intra-Community Competition." De Economist, 142(3), pp. 253-285. |
| Verywell Health, "How to Read Your Healthcare Provider's Prescription," https://www.verywellhealth.com/my-doctors-prescription-how-do-i-read-it-1124042, pp. 18-20, visited 10/2/2023. |
| Verywell Health, "What Is an Active Pharmaceutical Ingredient (API)?" July 28, 2023, https://www.verywellhealth.com/api-active-pharmaceutical-ingredient-2663020, visited 10/2/2023. |
| Walker, Schonette, Scannell, Stephen and Wood, Abigail. 2021. "Bridging the Gorge: States Prevent Retention of Ill-Gotten Profits Through Disgorgement." *CPI Antitrust Chronicle* : pp. 1-8. |
| Weikard, Hans-Peter. May 2005. "Cartel Stability under an Optimal Sharing Rule." *The Manchester School,* 77(5): pp. 575- |
| Wooldridge, Jeffrey M. 2009. "Introductory Econometrics: A Modern Approach," 4th Edition. |
| Yoo, Kwanghyuk. 2019. "Pharmacy Benefit Managers and Generic Pharmaceuticals Pricing Conspiracy: Unveiling Lock-In Mechanisms, Structural Shortcomings and Antitrust Evidence." *South Dakota Law Review* , 43. |
| **Case Data** |
| Defendant Transactional Data Production (As Cited in Backup) |
| Defendant Cost Data Production (As Cited in Backup) |
| Defendant AMP Data Production (As Cited in Backup) |
| PBM and Retailer Data Production |
| Sandoz KE30 Databases (As Cited in Backup) |
| **Public Data** |
| IQVIA National Sales Perspectives Data |
| IQVIA SMART Launch Data (1992-2020) |
| AnalySource Data (As of 3/2020) |
| FDA NDC Database (Extracted 10/07/2020 and 04/28/2023) |
| FDA Orange Book (as of 3/2023) |
| National Average Drug Acquisition Cost (2014-2023) |
| Medicaid State Drug Utilization Data (2011-2022) |
| **Bates Numbered Documents** |

| **Appendix B<br>Materials Considered** |
| --- |
| **Legal Documents** |
| All Bates numbered documents referenced in the draft. |

HIGHLY CONFIDENTIAL: SUBJECT TO PROTECTIVE ORDER

# Appendix C Table 1
## Drug Classifications, Conduct Dates, and Net Revenues for Drugs at Issue

| # | Drug | Drug Classification | Earliest Conduct Date (Drug) | Earliest Conduct Date (API) | Disgorgement Period End Date | Affected Defendant Net Revenues |
|---|---|---|---|---|---|---|
| 1 | Acetazolamide-Tablet-125Mg | Price Increase | 12/6/2010 | 12/6/2010 | -- | $20,000,402 |
| 2 | Acetazolamide-Tablet-250Mg | Price Increase | 12/6/2010 | 12/6/2010 | -- | $158,098,505 |
| 3 | Adapalene-Cream-0.1% | New Generic | 10/25/2010 | 10/25/2010 | -- | $171,488,170 |
| 4 | Alclometasone Dipropionate-Cream-0.05% | Price Increase | 5/1/2013 | 5/1/2013 | -- | $14,478,947 |
| 5 | Alclometasone Dipropionate-Ointment-0.05% | Price Increase | 6/10/2013 | 5/1/2013 | -- | $11,900,214 |
| 6 | Ammonium Lactate-Cream-Eq12%Base | Price Increase | 5/1/2013 | 5/1/2013 | -- | $54,281,022 |
| 7 | Ammonium Lactate-Lotion-Eq12%Base | Price Increase | 5/1/2013 | 5/1/2013 | -- | $53,828,308 |
| 8 | Betamethasone Dipropionate-Cream-Eq0.05%Base | Price Increase | 5/1/2013 | 1/4/2011 | -- | $105,142,000 |
| 9 | Betamethasone Dipropionate-Lotion, Augmented-Eq0.05%Base | Price Increase | 1/4/2011 | 1/4/2011 | -- | $38,879,803 |
| 10 | Betamethasone Dipropionate-Lotion-Eq0.05%Base | Price Increase | 1/4/2011 | 1/4/2011 | -- | $29,354,134 |
| 11 | Betamethasone Dipropionate; Calcipotriene-Ointment-0.064%;0.005% | New Generic | 3/21/2014 | 3/21/2014 | -- | $177,534,930 |
| 12 | Betamethasone Dipropionate; Clotrimazole-Cream-Eq0.05%Base;1% | Price Increase | 3/25/2011 | 3/25/2011 | -- | $283,825,162 |
| 13 | Betamethasone Dipropionate; Clotrimazole-Lotion-Eq0.05%Base;1% | Price Increase | 4/4/2011 | 3/25/2011 | -- | $56,620,052 |
| 14 | Betamethasone Valerate-Cream-Eq0.1%Base | Price Increase | 5/1/2013 | 12/22/2011 | -- | $30,965,903 |
| 15 | Betamethasone Valerate-Lotion-Eq0.1%Base | Price Increase | 12/22/2011 | 12/22/2011 | -- | $29,660,306 |
| 16 | Betamethasone Valerate-Ointment-Eq0.1%Base | Price Increase | 2/15/2013 | 12/22/2011 | -- | $21,755,843 |
| 17 | Bromocriptine Mesylate-Tablet-Eq2.5Mgbase | Price Increase | 4/5/2013 | 4/5/2013 | -- | $62,500,860 |
| 18 | Calcipotriene-Solution-0.005% | Price Increase | 11/18/2011 | 11/18/2011 | -- | $16,317,552 |
| 19 | Carbamazepine-Tablet, Extended Release-100Mg | New Generic | 3/1/2009 | 3/1/2009 | -- | $12,140,930 |
| 20 | Carbamazepine-Tablet, Extended Release-200Mg | New Generic | 3/1/2009 | 3/1/2009 | -- | $218,929,786 |
| 21 | Carbamazepine-Tablet, Extended Release-400Mg | New Generic | 3/1/2009 | 3/1/2009 | -- | $230,535,885 |
| 22 | Cefpodoxime Proxetil-For Suspension-Eq100Mgbase/5Ml | Price Increase | 1/11/2013 | 1/9/2013 | -- | $1,858,143 |
| 23 | Cefpodoxime Proxetil-Tablet-Eq100Mgbase | Price Increase | 1/9/2013 | 1/9/2013 | -- | $13,269,540 |
| 24 | Cefpodoxime Proxetil-Tablet-Eq200Mgbase | Price Increase | 1/9/2013 | 1/9/2013 | -- | $67,220,675 |
| 25 | Ciclopirox-Cream-0.77% | Price Increase | 3/19/2012 | 3/19/2012 | 12/31/2016 | $25,196,863 |
| 26 | Ciclopirox-Shampoo-1% | Price Increase | 12/3/2012 | 3/19/2012 | -- | $27,291,208 |
| 27 | Ciclopirox-Solution-8% | Price Increase | 5/7/2013 | 3/19/2012 | -- | $37,271,520 |
| 28 | Clindamycin Phosphate-Cream-Eq2%Base | Price Increase | 10/19/2012 | 11/2/2010 | -- | $89,338,106 |
| 29 | Clindamycin Phosphate-Gel-Eq1%Base | Price Increase | 6/1/2012 | 11/2/2010 | -- | $386,541,991 |
| 30 | Clindamycin Phosphate-Lotion-Eq1%Base | Price Increase | 10/19/2012 | 11/2/2010 | -- | $338,889,136 |
| 31 | Clindamycin Phosphate-Solution-Eq1%Base | Price Increase | 11/2/2010 | 11/2/2010 | -- | $126,679,504 |
| 32 | Clobetasol Propionate Emollient-Cream-0.05% | Price Increase | 6/1/2014 | 6/1/2014 | -- | $20,555,462 |
| 33 | Clobetasol Propionate-Cream-0.05% | Price Increase | 6/1/2014 | 6/1/2014 | -- | $164,885,632 |
| 34 | Clobetasol Propionate-Gel-0.05% | Price Increase | 6/1/2014 | 6/1/2014 | -- | $2,740,968 |
| 35 | Clobetasol Propionate-Ointment-0.05% | Price Increase | 6/1/2014 | 6/1/2014 | -- | $252,644,989 |
| 36 | Clobetasol Propionate-Solution-0.05% | Price Increase | 6/1/2014 | 6/1/2014 | -- | $87,670,954 |
| 37 | Clotrimazole-Cream-1% | Price Increase | 1/29/2015 | 1/29/2015 | 12/31/2016 | $23,199,314 |
| 38 | Desonide-Cream-0.05% | Price Increase | 5/1/2013 | 6/1/2009 | -- | $148,886,991 |
| 39 | Desonide-Lotion-0.05% | Price Increase | 6/1/2009 | 6/1/2009 | -- | $208,313,076 |
| 40 | Desonide-Ointment-0.05% | Price Increase | 5/1/2013 | 6/1/2009 | -- | $93,427,384 |
| 41 | Desoximetasone-Ointment-0.05% | New Generic | 9/28/2012 | 9/28/2012 | -- | $35,120,476 |
| 42 | Desoximetasone-Ointment-0.25% | Price Increase | 9/28/2012 | 9/28/2012 | 12/31/2016 | $61,830,064 |
| 43 | Econazole Nitrate-Cream-1% | Price Increase | 7/24/2014 | 7/24/2014 | -- | $141,904,828 |
| 44 | Eplerenone-Tablet-25Mg | Price Increase | 6/2/2014 | 6/2/2014 | 12/31/2016 | $37,418,476 |
| 45 | Eplerenone-Tablet-50Mg | Price Increase | 6/2/2014 | 6/2/2014 | 12/31/2016 | $26,174,397 |
| 46 | Erythromycin-Solution-2% | Price Increase | 12/19/2011 | 12/19/2011 | -- | $20,864,501 |
| 47 | Ethambutol Hydrochloride-Tablet-100Mg | Price Increase | 12/18/2012 | 12/18/2012 | 6/30/2014 | $452,143 |
| 48 | Ethambutol Hydrochloride-Tablet-400Mg | Price Increase | 12/18/2012 | 12/18/2012 | 6/30/2014 | $5,186,248 |
| 49 | Fluocinolone Acetonide-Cream-0.01% | Price Increase | 12/22/2011 | 12/22/2011 | -- | $14,504,907 |
| 50 | Fluocinolone Acetonide-Cream-0.025% | Price Increase | 12/22/2011 | 12/22/2011 | -- | $17,106,517 |
| 51 | Fluocinolone Acetonide-Ointment-0.025% | Price Increase | 12/22/2011 | 12/22/2011 | -- | $19,287,969 |
| 52 | Fluocinonide-Cream-0.1% | New Generic | 1/31/2014 | 5/10/2011 | -- | $206,538,561 |

HIGHLY CONFIDENTIAL: SUBJECT TO PROTECTIVE ORDER

| # | Drug | Drug Classification | Earliest Conduct Date (Drug) | Earliest Conduct Date (API) | Disgorgement Period End Date | Affected Defendant Net Revenues |
|---|---|---|---|---|---|---|
| 53 | Fluocinonide-Gel-0.05% | Price Increase | 11/23/2015 | 5/10/2011 | -- | $12,601,781 |
| 54 | Fluocinonide-Ointment-0.05% | Price Increase | 2/12/2013 | 5/10/2011 | -- | $42,662,346 |
| 55 | Fluocinonide-Solution-0.05% | Price Increase | 5/10/2011 | 5/10/2011 | -- | $106,994,634 |
| 56 | Fluticasone Propionate-Lotion-0.05% | New Generic | 12/3/2012 | 12/3/2012 | -- | $12,993,282 |
| 57 | Griseofulvin Microsize-Tablet-500Mg | Price Increase | 10/2/2013 | 10/2/2013 | 12/31/2016 | $15,049,536 |
| 58 | Halobetasol Propionate-Cream-0.05% | Price Increase | 9/28/2012 | 9/28/2012 | -- | $34,998,335 |
| 59 | Halobetasol Propionate-Ointment-0.05% | Price Increase | 9/28/2012 | 9/28/2012 | -- | $89,669,578 |
| 60 | Hydrocortisone Acetate-Suppository-25Mg | Price Increase | 7/9/2013 | 7/9/2013 | -- | $198,215,379 |
| 61 | Hydrocortisone Acetate-Suppository-30Mg | Price Increase | 7/9/2013 | 7/9/2013 | -- | $15,854,738 |
| 62 | Hydrocortisone Valerate-Cream-0.2% | Price Increase | 8/1/2013 | 8/1/2013 | -- | $95,585,029 |
| 63 | Imiquimod-Cream-5% | New Generic | 4/16/2010 | 4/16/2010 | -- | $285,032,821 |
| 64 | Ketoconazole-Cream-2% | Price Increase | 6/15/2015 | 6/15/2015 | -- | $343,852,392 |
| 65 | Latanoprost-Solution/Drops-0.005% | Price Increase | 4/3/2012 | 4/3/2012 | 12/31/2016 | $347,168,262 |
| 66 | Lidocaine-Ointment-5% | Price Increase | 12/22/2011 | 12/22/2011 | -- | $389,439,216 |
| 67 | Metformin Hydrochloride; Pioglitazone Hydrochloride-Tablet-500Mg;Eq15Mgbase | New Generic | 2/13/2013 | 2/13/2013 | -- | $42,671,722 |
| 68 | Metformin Hydrochloride; Pioglitazone Hydrochloride-Tablet-850Mg;Eq15Mgbase | New Generic | 2/13/2013 | 2/13/2013 | -- | $72,934,448 |
| 69 | Methazolamide-Tablet-25Mg | Price Increase | 12/5/2014 | 12/5/2014 | -- | $9,128,142 |
| 70 | Methazolamide-Tablet-50Mg | Price Increase | 12/5/2014 | 12/5/2014 | -- | $36,382,419 |
| 71 | Methylphenidate Hcl-Tablet, Extended Release-20Mg | Price Increase | 3/8/2013 | 3/8/2013 | -- | $291,100,335 |
| 72 | Methylphenidate Hcl-Tablet-10Mg | Price Increase | 3/8/2013 | 3/8/2013 | -- | $205,548,377 |
| 73 | Methylphenidate Hcl-Tablet-20Mg | Price Increase | 3/8/2013 | 3/8/2013 | -- | $201,327,188 |
| 74 | Methylphenidate Hcl-Tablet-5Mg | Price Increase | 3/8/2013 | 3/8/2013 | -- | $75,355,714 |
| 75 | Metronidazole-Cream-0.75% | Price Increase | 7/22/2011 | 7/22/2011 | -- | $151,250,032 |
| 76 | Metronidazole-Gel-0.75% | Price Increase | 2/17/2012 | 7/22/2011 | -- | $60,368,783 |
| 77 | Metronidazole-Gel-1% | New Generic | 7/1/2014 | 7/22/2011 | -- | $164,044,820 |
| 78 | Metronidazole-Lotion-0.75% | Price Increase | 7/22/2011 | 7/22/2011 | -- | $53,703,533 |
| 79 | Mometasone Furoate-Cream-0.1% | Price Increase | 5/16/2013 | 5/16/2013 | -- | $34,833,956 |
| 80 | Mometasone Furoate-Ointment-0.1% | Price Increase | 5/16/2013 | 5/16/2013 | -- | $11,193,658 |
| 81 | Mometasone Furoate-Solution-0.1% | Price Increase | 5/16/2013 | 5/16/2013 | 12/31/2016 | $1,679,571 |
| 82 | Nystatin-Ointment-100,000Units/Gm | Price Increase | 6/1/2011 | 6/1/2011 | -- | $62,456,578 |
| 83 | Nystatin; Triamcinolone Acetonide-Cream-100,000Units/Gm;0.1% | Price Increase | 2/12/2013 | 2/12/2013 | -- | $289,452,126 |
| 84 | Nystatin; Triamcinolone Acetonide-Ointment-100,000Units/Gm;0.1% | Price Increase | 2/12/2013 | 2/12/2013 | -- | $75,047,000 |
| 85 | Phenytoin Sodium-Capsule-100Mgextended | Price Increase | 6/2/2014 | 6/2/2014 | -- | $169,119,406 |
| 86 | Prochlorperazine-Suppository-25Mg | Price Increase | 3/19/2013 | 3/19/2013 | -- | $43,535,395 |
| 87 | Promethazine Hydrochloride-Suppository-12.5Mg | Price Increase | 10/8/2012 | 10/8/2012 | -- | $23,769,925 |
| 88 | Promethazine Hydrochloride-Suppository-25Mg | Price Increase | 10/8/2012 | 10/8/2012 | -- | $92,488,868 |
| 89 | Tacrolimus-Ointment-0.03% | New Generic | 11/19/2014 | 11/19/2014 | -- | $63,508,534 |
| 90 | Tacrolimus-Ointment-0.1% | New Generic | 11/19/2014 | 11/19/2014 | -- | $261,752,446 |
| 91 | Terconazole-Cream-0.8% | Price Increase | 5/1/2013 | 5/1/2013 | -- | $40,422,014 |
| 92 | Triamcinolone Acetonide-Cream-0.025% | Price Increase | 7/1/2010 | 7/1/2010 | -- | $22,750,400 |
| 93 | Triamcinolone Acetonide-Cream-0.1% | Price Increase | 7/1/2010 | 7/1/2010 | -- | $137,547,596 |
| 94 | Triamcinolone Acetonide-Cream-0.5% | Price Increase | 7/1/2010 | 7/1/2010 | 12/31/2016 | $36,764,619 |
| 95 | Triamcinolone Acetonide-Ointment-0.025% | Price Increase | 7/1/2010 | 7/1/2010 | -- | $16,541,807 |
| 96 | Triamcinolone Acetonide-Ointment-0.1% | Price Increase | 7/1/2010 | 7/1/2010 | -- | $124,200,847 |
| 97 | Triamcinolone Acetonide-Ointment-0.5% | Price Increase | 7/1/2010 | 7/1/2010 | -- | $21,326,021 |
| 98 | Triamcinolone Acetonide-Paste-0.1% | Price Increase | 10/16/2013 | 7/1/2010 | -- | $27,649,196 |
| | Total | | | | | $9,410,482,063 |

HIGHLY CONFIDENTIAL: SUBJECT TO PROTECTIVE ORDER

# Appendix C Table 2
List of Defendants and Drugs at Issue with Alleged Conduct

| # | Defendant | Drug | Drug Classification | Disgorgement Period End Date | Affected Defendant Net Revenues |
|---|---|---|---|---|---|
| 1 | SUN/MUTUAL/TARO | Acetazolamide-Tablet-125Mg | Price Increase | -- | $20,000,402 |
| 2 | LANNETT | Acetazolamide-Tablet-250Mg | Price Increase | -- | $97,916,491 |
| 3 | SUN/MUTUAL/TARO | Acetazolamide-Tablet-250Mg | Price Increase | -- | $60,182,013 |
| 4 | PERRIGO | Adapalene-Cream-0.1% | New Generic | -- | $106,793,500 |
| 5 | SANDOZ | Adapalene-Cream-0.1% | New Generic | -- | $64,694,670 |
| 6 | GLENMARK | Alclometasone Dipropionate-Cream-0.05% | Price Increase | -- | $7,389,798 |
| 7 | SANDOZ | Alclometasone Dipropionate-Cream-0.05% | Price Increase | -- | $2,760,960 |
| 8 | SUN/MUTUAL/TARO | Alclometasone Dipropionate-Cream-0.05% | Price Increase | -- | $4,328,190 |
| 9 | GLENMARK | Alclometasone Dipropionate-Ointment-0.05% | Price Increase | -- | $4,224,961 |
| 10 | SANDOZ | Alclometasone Dipropionate-Ointment-0.05% | Price Increase | -- | $3,209,467 |
| 11 | SUN/MUTUAL/TARO | Alclometasone Dipropionate-Ointment-0.05% | Price Increase | -- | $4,465,786 |
| 12 | ACTAVIS | Ammonium Lactate-Cream-Eq12%Base | Price Increase | -- | $874,545 |
| 13 | PERRIGO | Ammonium Lactate-Cream-Eq12%Base | Price Increase | -- | $43,844,436 |
| 14 | SUN/MUTUAL/TARO | Ammonium Lactate-Cream-Eq12%Base | Price Increase | -- | $9,562,041 |
| 15 | ACTAVIS | Ammonium Lactate-Lotion-Eq12%Base | Price Increase | -- | $942,053 |
| 16 | PERRIGO | Ammonium Lactate-Lotion-Eq12%Base | Price Increase | -- | $43,427,042 |
| 17 | SUN/MUTUAL/TARO | Ammonium Lactate-Lotion-Eq12%Base | Price Increase | -- | $9,459,213 |
| 18 | SANDOZ | Betamethasone Dipropionate-Cream-Eq0.05%Base | Price Increase | -- | $62,865,670 |
| 19 | SUN/MUTUAL/TARO | Betamethasone Dipropionate-Cream-Eq0.05%Base | Price Increase | -- | $42,276,330 |
| 20 | SANDOZ | Betamethasone Dipropionate-Lotion, Augmented-Eq0.05%Base | Price Increase | -- | $14,563,279 |
| 21 | SUN/MUTUAL/TARO | Betamethasone Dipropionate-Lotion, Augmented-Eq0.05%Base | Price Increase | -- | $24,316,524 |
| 22 | PERRIGO | Betamethasone Dipropionate-Lotion-Eq0.05%Base | Price Increase | -- | $18,508,440 |
| 23 | SANDOZ | Betamethasone Dipropionate-Lotion-Eq0.05%Base | Price Increase | -- | $10,845,695 |
| 24 | SUN/MUTUAL/TARO | Betamethasone Dipropionate-Lotion-Eq0.05%Base | Price Increase | -- | $0 |
| 25 | PERRIGO | Betamethasone Dipropionate; Calcipotriene-Ointment-0.064%;0.005% | New Generic | -- | $96,951,292 |
| 26 | SANDOZ | Betamethasone Dipropionate; Calcipotriene-Ointment-0.064%;0.005% | New Generic | -- | $80,583,637 |
| 27 | ACTAVIS | Betamethasone Dipropionate; Clotrimazole-Cream-Eq0.05%Base;1% | Price Increase | -- | $77,668,316 |
| 28 | SANDOZ | Betamethasone Dipropionate; Clotrimazole-Cream-Eq0.05%Base;1% | Price Increase | -- | $128,040,330 |
| 29 | SUN/MUTUAL/TARO | Betamethasone Dipropionate; Clotrimazole-Cream-Eq0.05%Base;1% | Price Increase | -- | $78,116,516 |
| 30 | SANDOZ | Betamethasone Dipropionate; Clotrimazole-Lotion-Eq0.05%Base;1% | Price Increase | -- | $15,954,981 |
| 31 | SUN/MUTUAL/TARO | Betamethasone Dipropionate; Clotrimazole-Lotion-Eq0.05%Base;1% | Price Increase | -- | $40,665,071 |
| 32 | SANDOZ | Betamethasone Valerate-Cream-Eq0.1%Base | Price Increase | -- | $23,149,234 |
| 33 | SUN/MUTUAL/TARO | Betamethasone Valerate-Cream-Eq0.1%Base | Price Increase | -- | $7,816,669 |
| 34 | G&W | Betamethasone Valerate-Lotion-Eq0.1%Base | Price Increase | -- | $10,313,328 |
| 35 | SANDOZ | Betamethasone Valerate-Lotion-Eq0.1%Base | Price Increase | -- | $19,346,978 |
| 36 | ACTAVIS | Betamethasone Valerate-Ointment-Eq0.1%Base | Price Increase | -- | $12,092,392 |
| 37 | SANDOZ | Betamethasone Valerate-Ointment-Eq0.1%Base | Price Increase | -- | $9,663,451 |
| 38 | MYLAN | Bromocriptine Mesylate-Tablet-Eq2.5Mgbase | Price Increase | -- | $8,684,420 |
| 39 | PERRIGO | Bromocriptine Mesylate-Tablet-Eq2.5Mgbase | Price Increase | -- | $27,943,828 |
| 40 | SANDOZ | Bromocriptine Mesylate-Tablet-Eq2.5Mgbase | Price Increase | -- | $25,872,612 |
| 41 | G&W | Calcipotriene-Solution-0.005% | Price Increase | -- | $14,629,977 |
| 42 | SANDOZ | Calcipotriene-Solution-0.005% | Price Increase | -- | $1,687,575 |
| 43 | SANDOZ | Carbamazepine-Tablet, Extended Release-100Mg | New Generic | -- | $6,978,140 |
| 44 | SUN/MUTUAL/TARO | Carbamazepine-Tablet, Extended Release-100Mg | New Generic | -- | $5,162,791 |
| 45 | SANDOZ | Carbamazepine-Tablet, Extended Release-200Mg | New Generic | -- | $90,941,407 |
| 46 | SUN/MUTUAL/TARO | Carbamazepine-Tablet, Extended Release-200Mg | New Generic | -- | $127,988,379 |
| 47 | SANDOZ | Carbamazepine-Tablet, Extended Release-400Mg | New Generic | -- | $93,381,202 |
| 48 | SUN/MUTUAL/TARO | Carbamazepine-Tablet, Extended Release-400Mg | New Generic | -- | $137,154,683 |
| 49 | AUROBINDO | Cefpodoxime Proxetil-For Suspension-Eq100Mgbase/5Ml | Price Increase | -- | $38,328 |
| 50 | SANDOZ | Cefpodoxime Proxetil-For Suspension-Eq100Mgbase/5Ml | Price Increase | -- | $1,819,815 |
| 51 | AUROBINDO | Cefpodoxime Proxetil-Tablet-Eq100Mgbase | Price Increase | -- | $4,554,363 |
| 52 | SANDOZ | Cefpodoxime Proxetil-Tablet-Eq100Mgbase | Price Increase | -- | $8,715,177 |
| 53 | AUROBINDO | Cefpodoxime Proxetil-Tablet-Eq200Mgbase | Price Increase | -- | $24,119,744 |
| 54 | SANDOZ | Cefpodoxime Proxetil-Tablet-Eq200Mgbase | Price Increase | -- | $43,100,930 |
| 55 | G&W | Ciclopirox-Cream-0.77% | Price Increase | 12/31/2016 | $12,585,386 |
| 56 | GLENMARK | Ciclopirox-Cream-0.77% | Price Increase | 12/31/2016 | $4,817,242 |
| 57 | PERRIGO | Ciclopirox-Cream-0.77% | Price Increase | 12/31/2016 | $7,794,235 |
| 58 | ACTAVIS | Ciclopirox-Shampoo-1% | Price Increase | -- | $9,099,113 |
| 59 | PERRIGO | Ciclopirox-Shampoo-1% | Price Increase | -- | $14,950,066 |
| 60 | SANDOZ | Ciclopirox-Shampoo-1% | Price Increase | -- | $3,242,029 |
| 61 | G&W | Ciclopirox-Solution-8% | Price Increase | -- | $20,553,701 |
| 62 | PERRIGO | Ciclopirox-Solution-8% | Price Increase | -- | $16,166,789 |
| 63 | SANDOZ | Ciclopirox-Solution-8% | Price Increase | -- | $551,030 |

HIGHLY CONFIDENTIAL: SUBJECT TO PROTECTIVE ORDER

| # | Defendant | Drug | Drug Classification | Disgorgement Period End Date | Affected Defendant Net Revenues |
|---|---|---|---|---|---|
| 64 | GREENSTONE | Clindamycin Phosphate-Cream-Eq2%Base | Price Increase | -- | $54,857,935 |
| 65 | SANDOZ | Clindamycin Phosphate-Cream-Eq2%Base | Price Increase | -- | $34,480,171 |
| 66 | GREENSTONE | Clindamycin Phosphate-Gel-Eq1%Base | Price Increase | -- | $169,732,602 |
| 67 | SANDOZ | Clindamycin Phosphate-Gel-Eq1%Base | Price Increase | -- | $216,809,389 |
| 68 | GREENSTONE | Clindamycin Phosphate-Lotion-Eq1%Base | Price Increase | -- | $180,130,073 |
| 69 | SANDOZ | Clindamycin Phosphate-Lotion-Eq1%Base | Price Increase | -- | $158,759,063 |
| 70 | GREENSTONE | Clindamycin Phosphate-Solution-Eq1%Base | Price Increase | -- | $60,333,140 |
| 71 | PERRIGO | Clindamycin Phosphate-Solution-Eq1%Base | Price Increase | -- | $34,459,565 |
| 72 | SANDOZ | Clindamycin Phosphate-Solution-Eq1%Base | Price Increase | -- | $23,836,233 |
| 73 | SUN/MUTUAL/TARO | Clindamycin Phosphate-Solution-Eq1%Base | Price Increase | -- | $8,050,566 |
| 74 | SANDOZ | Clobetasol Propionate Emollient-Cream-0.05% | Price Increase | -- | $10,236,113 |
| 75 | SUN/MUTUAL/TARO | Clobetasol Propionate Emollient-Cream-0.05% | Price Increase | -- | $10,319,350 |
| 76 | SANDOZ | Clobetasol Propionate-Cream-0.05% | Price Increase | -- | $89,285,616 |
| 77 | SUN/MUTUAL/TARO | Clobetasol Propionate-Cream-0.05% | Price Increase | -- | $75,600,016 |
| 78 | SANDOZ | Clobetasol Propionate-Gel-0.05% | Price Increase | -- | $2,168,135 |
| 79 | SUN/MUTUAL/TARO | Clobetasol Propionate-Gel-0.05% | Price Increase | -- | $572,834 |
| 80 | SANDOZ | Clobetasol Propionate-Ointment-0.05% | Price Increase | -- | $146,745,906 |
| 81 | SUN/MUTUAL/TARO | Clobetasol Propionate-Ointment-0.05% | Price Increase | -- | $105,899,083 |
| 82 | SANDOZ | Clobetasol Propionate-Solution-0.05% | Price Increase | -- | $44,488,651 |
| 83 | SUN/MUTUAL/TARO | Clobetasol Propionate-Solution-0.05% | Price Increase | -- | $20,670,193 |
| 84 | WOCKHARDT | Clobetasol Propionate-Solution-0.05% | Price Increase | -- | $22,512,109 |
| 85 | SANDOZ | Clotrimazole-Cream-1% | Price Increase | 12/31/2016 | $14,755,936 |
| 86 | SUN/MUTUAL/TARO | Clotrimazole-Cream-1% | Price Increase | 12/31/2016 | $8,443,378 |
| 87 | PERRIGO | Desonide-Cream-0.05% | Price Increase | -- | $79,506,918 |
| 88 | SUN/MUTUAL/TARO | Desonide-Cream-0.05% | Price Increase | -- | $69,380,074 |
| 89 | ACTAVIS | Desonide-Lotion-0.05% | Price Increase | -- | $55,762,468 |
| 90 | SANDOZ | Desonide-Lotion-0.05% | Price Increase | -- | $152,550,607 |
| 91 | PERRIGO | Desonide-Ointment-0.05% | Price Increase | -- | $44,186,915 |
| 92 | SANDOZ | Desonide-Ointment-0.05% | Price Increase | -- | $31,263,741 |
| 93 | SUN/MUTUAL/TARO | Desonide-Ointment-0.05% | Price Increase | -- | $17,976,728 |
| 94 | SUN/MUTUAL/TARO | Desoximetasone-Ointment-0.05% | New Generic | -- | $35,120,476 |
| 95 | GLENMARK | Desoximetasone-Ointment-0.25% | Price Increase | 12/31/2016 | $8,100,107 |
| 96 | SANDOZ | Desoximetasone-Ointment-0.25% | Price Increase | 12/31/2016 | $16,056,648 |
| 97 | SUN/MUTUAL/TARO | Desoximetasone-Ointment-0.25% | Price Increase | 12/31/2016 | $37,673,308 |
| 98 | PERRIGO | Econazole Nitrate-Cream-1% | Price Increase | -- | $29,983,448 |
| 99 | SANDOZ | Econazole Nitrate-Cream-1% | Price Increase | -- | $3,531,003 |
| 100 | SUN/MUTUAL/TARO | Econazole Nitrate-Cream-1% | Price Increase | -- | $7,487,831 |
| 101 | TELIGENT | Econazole Nitrate-Cream-1% | Price Increase | -- | $100,902,546 |
| 102 | GREENSTONE | Eplerenone-Tablet-25Mg | Price Increase | 12/31/2016 | $27,069,369 |
| 103 | SANDOZ | Eplerenone-Tablet-25Mg | Price Increase | 12/31/2016 | $10,349,107 |
| 104 | GREENSTONE | Eplerenone-Tablet-50Mg | Price Increase | 12/31/2016 | $20,318,354 |
| 105 | SANDOZ | Eplerenone-Tablet-50Mg | Price Increase | 12/31/2016 | $5,856,044 |
| 106 | PERRIGO | Erythromycin-Solution-2% | Price Increase | -- | $16,226,689 |
| 107 | SANDOZ | Erythromycin-Solution-2% | Price Increase | -- | $1,023,727 |
| 108 | WOCKHARDT | Erythromycin-Solution-2% | Price Increase | -- | $3,614,084 |
| 109 | G&W | Ethambutol Hydrochloride-Tablet-100Mg | Price Increase | 6/30/2014 | $0 |
| 110 | LUPIN | Ethambutol Hydrochloride-Tablet-100Mg | Price Increase | 6/30/2014 | $452,143 |
| 111 | G&W | Ethambutol Hydrochloride-Tablet-400Mg | Price Increase | 6/30/2014 | $625,056 |
| 112 | LUPIN | Ethambutol Hydrochloride-Tablet-400Mg | Price Increase | 6/30/2014 | $4,561,191 |
| 113 | G&W | Fluocinolone Acetonide-Cream-0.01% | Price Increase | -- | $8,574,815 |
| 114 | SANDOZ | Fluocinolone Acetonide-Cream-0.01% | Price Increase | -- | $5,930,093 |
| 115 | G&W | Fluocinolone Acetonide-Cream-0.025% | Price Increase | -- | $11,797,691 |
| 116 | SANDOZ | Fluocinolone Acetonide-Cream-0.025% | Price Increase | -- | $5,308,826 |
| 117 | G&W | Fluocinolone Acetonide-Ointment-0.025% | Price Increase | -- | $13,214,878 |
| 118 | SANDOZ | Fluocinolone Acetonide-Ointment-0.025% | Price Increase | -- | $6,073,092 |
| 119 | GLENMARK | Fluocinonide-Cream-0.1% | New Generic | -- | $54,102,709 |
| 120 | PERRIGO | Fluocinonide-Cream-0.1% | New Generic | -- | $96,296,167 |
| 121 | SANDOZ | Fluocinonide-Cream-0.1% | New Generic | -- | $6,871,435 |
| 122 | SUN/MUTUAL/TARO | Fluocinonide-Cream-0.1% | New Generic | -- | $16,443,103 |
| 123 | VALEANT/BAUSCH | Fluocinonide-Cream-0.1% | New Generic | -- | $32,825,148 |
| 124 | G&W | Fluocinonide-Gel-0.05% | Price Increase | -- | $1,216,530 |
| 125 | SANDOZ | Fluocinonide-Gel-0.05% | Price Increase | -- | -$170,227 |
| 126 | SUN/MUTUAL/TARO | Fluocinonide-Gel-0.05% | Price Increase | -- | $11,555,479 |
| 127 | SANDOZ | Fluocinonide-Ointment-0.05% | Price Increase | -- | $969,191 |
| 128 | SUN/MUTUAL/TARO | Fluocinonide-Ointment-0.05% | Price Increase | -- | $41,693,154 |
| 129 | ACTAVIS | Fluocinonide-Solution-0.05% | Price Increase | -- | $14,784,456 |
| 130 | SANDOZ | Fluocinonide-Solution-0.05% | Price Increase | -- | $47,434,538 |
| 131 | SUN/MUTUAL/TARO | Fluocinonide-Solution-0.05% | Price Increase | -- | $44,775,641 |

HIGHLY CONFIDENTIAL: SUBJECT TO PROTECTIVE ORDER

| # | Defendant | Drug | Drug Classification | Disgorgement Period End Date | Affected Defendant Net Revenues |
|---|---|---|---|---|---|
| 132 | GLENMARK | Fluticasone Propionate-Lotion-0.05% | New Generic | -- | $5,529,293 |
| 133 | PERRIGO | Fluticasone Propionate-Lotion-0.05% | New Generic | -- | $2,627,839 |
| 134 | SANDOZ | Fluticasone Propionate-Lotion-0.05% | New Generic | -- | $4,836,149 |
| 135 | SANDOZ | Griseofulvin Microsize-Tablet-500Mg | Price Increase | 12/31/2016 | $15,049,536 |
| 136 | G&W | Halobetasol Propionate-Cream-0.05% | Price Increase | -- | $27,722,245 |
| 137 | PERRIGO | Halobetasol Propionate-Cream-0.05% | Price Increase | -- | -$2,723,792 |
| 138 | SANDOZ | Halobetasol Propionate-Cream-0.05% | Price Increase | -- | $9,396,694 |
| 139 | SUN/MUTUAL/TARO | Halobetasol Propionate-Cream-0.05% | Price Increase | -- | $603,189 |
| 140 | G&W | Halobetasol Propionate-Ointment-0.05% | Price Increase | -- | $52,372,255 |
| 141 | PERRIGO | Halobetasol Propionate-Ointment-0.05% | Price Increase | -- | $35,795,165 |
| 142 | SUN/MUTUAL/TARO | Halobetasol Propionate-Ointment-0.05% | Price Increase | -- | $1,502,158 |
| 143 | G&W | Hydrocortisone Acetate-Suppository-25Mg | Price Increase | -- | $147,843,001 |
| 144 | PERRIGO | Hydrocortisone Acetate-Suppository-25Mg | Price Increase | -- | $50,372,378 |
| 145 | PERRIGO | Hydrocortisone Acetate-Suppository-30Mg | Price Increase | -- | $15,854,738 |
| 146 | PERRIGO | Hydrocortisone Valerate-Cream-0.2% | Price Increase | -- | $38,817,622 |
| 147 | SUN/MUTUAL/TARO | Hydrocortisone Valerate-Cream-0.2% | Price Increase | -- | $56,767,407 |
| 148 | PERRIGO | Imiquimod-Cream-5% | New Generic | -- | $159,041,431 |
| 149 | SANDOZ | Imiquimod-Cream-5% | New Generic | -- | $97,017,115 |
| 150 | SUN/MUTUAL/TARO | Imiquimod-Cream-5% | New Generic | -- | $28,974,275 |
| 151 | G&W | Ketoconazole-Cream-2% | Price Increase | -- | $137,006,965 |
| 152 | SANDOZ | Ketoconazole-Cream-2% | Price Increase | -- | $90,771,522 |
| 153 | SUN/MUTUAL/TARO | Ketoconazole-Cream-2% | Price Increase | -- | $116,073,905 |
| 154 | GREENSTONE | Latanoprost-Solution/Drops-0.005% | Price Increase | 12/31/2016 | $136,673,248 |
| 155 | SANDOZ | Latanoprost-Solution/Drops-0.005% | Price Increase | 12/31/2016 | $121,886,687 |
| 156 | VALEANT/BAUSCH | Latanoprost-Solution/Drops-0.005% | Price Increase | 12/31/2016 | $88,608,327 |
| 157 | SANDOZ | Lidocaine-Ointment-5% | Price Increase | -- | $270,880,708 |
| 158 | SUN/MUTUAL/TARO | Lidocaine-Ointment-5% | Price Increase | -- | $118,558,508 |
| 159 | AUROBINDO | Metformin Hydrochloride; Pioglitazone Hydrochloride-Tablet-500Mg;Eq15Mgbase | New Generic | -- | $9,978,266 |
| 160 | MYLAN | Metformin Hydrochloride; Pioglitazone Hydrochloride-Tablet-500Mg;Eq15Mgbase | New Generic | -- | $20,336,305 |
| 161 | SANDOZ | Metformin Hydrochloride; Pioglitazone Hydrochloride-Tablet-500Mg;Eq15Mgbase | New Generic | -- | $12,357,151 |
| 162 | AUROBINDO | Metformin Hydrochloride; Pioglitazone Hydrochloride-Tablet-850Mg;Eq15Mgbase | New Generic | -- | $19,230,479 |
| 163 | MYLAN | Metformin Hydrochloride; Pioglitazone Hydrochloride-Tablet-850Mg;Eq15Mgbase | New Generic | -- | $35,467,227 |
| 164 | SANDOZ | Metformin Hydrochloride; Pioglitazone Hydrochloride-Tablet-850Mg;Eq15Mgbase | New Generic | -- | $18,236,742 |
| 165 | PERRIGO | Methazolamide-Tablet-25Mg | Price Increase | -- | $8,060,744 |
| 166 | SANDOZ | Methazolamide-Tablet-25Mg | Price Increase | -- | $1,067,398 |
| 167 | PERRIGO | Methazolamide-Tablet-50Mg | Price Increase | -- | $31,057,985 |
| 168 | SANDOZ | Methazolamide-Tablet-50Mg | Price Increase | -- | $5,324,434 |
| 169 | ACTAVIS | Methylphenidate Hcl-Tablet, Extended Release-20Mg | Price Increase | -- | $0 |
| 170 | MALLINCKRODT | Methylphenidate Hcl-Tablet, Extended Release-20Mg | Price Increase | -- | $288,223,971 |
| 171 | SANDOZ | Methylphenidate Hcl-Tablet, Extended Release-20Mg | Price Increase | -- | $2,876,364 |
| 172 | ACTAVIS | Methylphenidate Hcl-Tablet-10Mg | Price Increase | -- | $20,986,115 |
| 173 | MALLINCKRODT | Methylphenidate Hcl-Tablet-10Mg | Price Increase | -- | $160,698,564 |
| 174 | SANDOZ | Methylphenidate Hcl-Tablet-10Mg | Price Increase | -- | $12,632,235 |
| 175 | SUN/MUTUAL/TARO | Methylphenidate Hcl-Tablet-10Mg | Price Increase | -- | $11,231,463 |
| 176 | ACTAVIS | Methylphenidate Hcl-Tablet-20Mg | Price Increase | -- | $24,849,275 |
| 177 | MALLINCKRODT | Methylphenidate Hcl-Tablet-20Mg | Price Increase | -- | $151,481,426 |
| 178 | SANDOZ | Methylphenidate Hcl-Tablet-20Mg | Price Increase | -- | $14,474,406 |
| 179 | SUN/MUTUAL/TARO | Methylphenidate Hcl-Tablet-20Mg | Price Increase | -- | $10,522,081 |
| 180 | ACTAVIS | Methylphenidate Hcl-Tablet-5Mg | Price Increase | -- | $7,758,441 |
| 181 | MALLINCKRODT | Methylphenidate Hcl-Tablet-5Mg | Price Increase | -- | $61,766,864 |
| 182 | SANDOZ | Methylphenidate Hcl-Tablet-5Mg | Price Increase | -- | $1,663,301 |
| 183 | SUN/MUTUAL/TARO | Methylphenidate Hcl-Tablet-5Mg | Price Increase | -- | $4,167,108 |
| 184 | ACTAVIS | Metronidazole-Cream-0.75% | Price Increase | -- | $14,754,081 |
| 185 | G&W | Metronidazole-Cream-0.75% | Price Increase | -- | $66,511,367 |
| 186 | SANDOZ | Metronidazole-Cream-0.75% | Price Increase | -- | $69,984,584 |
| 187 | G&W | Metronidazole-Gel-0.75% | Price Increase | -- | $25,986,635 |
| 188 | SANDOZ | Metronidazole-Gel-0.75% | Price Increase | -- | $11,299,243 |
| 189 | SUN/MUTUAL/TARO | Metronidazole-Gel-0.75% | Price Increase | -- | $23,082,905 |
| 190 | SANDOZ | Metronidazole-Gel-1% | New Generic | -- | $99,974,565 |
| 191 | SUN/MUTUAL/TARO | Metronidazole-Gel-1% | New Generic | -- | $64,070,255 |
| 192 | ACTAVIS | Metronidazole-Lotion-0.75% | Price Increase | -- | $9,975,291 |
| 193 | SANDOZ | Metronidazole-Lotion-0.75% | Price Increase | -- | $43,728,242 |
| 194 | G&W | Mometasone Furoate-Cream-0.1% | Price Increase | -- | $24,371,804 |
| 195 | GLENMARK | Mometasone Furoate-Cream-0.1% | Price Increase | -- | $10,462,153 |
| 196 | G&W | Mometasone Furoate-Ointment-0.1% | Price Increase | -- | $4,546,484 |
| 197 | GLENMARK | Mometasone Furoate-Ointment-0.1% | Price Increase | -- | $6,647,173 |
| 198 | G&W | Mometasone Furoate-Solution-0.1% | Price Increase | 12/31/2016 | $1,803,780 |
| 199 | GLENMARK | Mometasone Furoate-Solution-0.1% | Price Increase | 12/31/2016 | -$124,209 |

HIGHLY CONFIDENTIAL: SUBJECT TO PROTECTIVE ORDER

| # | Defendant | Drug | Drug Classification | Disgorgement Period End Date | Affected Defendant Net Revenues |
|---|---|---|---|---|---|
| 200 | ACTAVIS | Nystatin-Ointment-100,000Units/Gm | Price Increase | -- | $17,855,635 |
| 201 | PERRIGO | Nystatin-Ointment-100,000Units/Gm | Price Increase | -- | $33,049,178 |
| 202 | SANDOZ | Nystatin-Ointment-100,000Units/Gm | Price Increase | -- | $11,551,765 |
| 203 | SANDOZ | Nystatin; Triamcinolone Acetonide-Cream-100,000Units/Gm;0.1% | Price Increase | -- | $110,194,078 |
| 204 | SUN/MUTUAL/TARO | Nystatin; Triamcinolone Acetonide-Cream-100,000Units/Gm;0.1% | Price Increase | -- | $179,258,048 |
| 205 | SANDOZ | Nystatin; Triamcinolone Acetonide-Ointment-100,000Units/Gm;0.1% | Price Increase | -- | $24,235,956 |
| 206 | SUN/MUTUAL/TARO | Nystatin; Triamcinolone Acetonide-Ointment-100,000Units/Gm;0.1% | Price Increase | -- | $50,811,044 |
| 207 | AMNEAL | Phenytoin Sodium-Capsule-100Mgextended | Price Increase | -- | $35,400,723 |
| 208 | MYLAN | Phenytoin Sodium-Capsule-100Mgextended | Price Increase | -- | $34,312,729 |
| 209 | SUN/MUTUAL/TARO | Phenytoin Sodium-Capsule-100Mgextended | Price Increase | -- | $99,405,954 |
| 210 | G&W | Prochlorperazine-Suppository-25Mg | Price Increase | -- | $22,801,221 |
| 211 | PERRIGO | Prochlorperazine-Suppository-25Mg | Price Increase | -- | $20,734,174 |
| 212 | ACTAVIS | Promethazine Hydrochloride-Suppository-12.5Mg | Price Increase | -- | $7,940,257 |
| 213 | G&W | Promethazine Hydrochloride-Suppository-12.5Mg | Price Increase | -- | $12,538,625 |
| 214 | PERRIGO | Promethazine Hydrochloride-Suppository-12.5Mg | Price Increase | -- | $3,291,043 |
| 215 | ACTAVIS | Promethazine Hydrochloride-Suppository-25Mg | Price Increase | -- | $40,089,598 |
| 216 | G&W | Promethazine Hydrochloride-Suppository-25Mg | Price Increase | -- | $39,797,634 |
| 217 | PERRIGO | Promethazine Hydrochloride-Suppository-25Mg | Price Increase | -- | $12,601,637 |
| 218 | PERRIGO | Tacrolimus-Ointment-0.03% | New Generic | -- | $43,932,631 |
| 219 | SANDOZ | Tacrolimus-Ointment-0.03% | New Generic | -- | $19,575,903 |
| 220 | PERRIGO | Tacrolimus-Ointment-0.1% | New Generic | -- | $159,273,469 |
| 221 | SANDOZ | Tacrolimus-Ointment-0.1% | New Generic | -- | $102,478,978 |
| 222 | ACTAVIS | Terconazole-Cream-0.8% | Price Increase | -- | $15,911,979 |
| 223 | SANDOZ | Terconazole-Cream-0.8% | Price Increase | -- | $0 |
| 224 | SUN/MUTUAL/TARO | Terconazole-Cream-0.8% | Price Increase | -- | $24,510,035 |
| 225 | PERRIGO | Triamcinolone Acetonide-Cream-0.025% | Price Increase | -- | $11,110,176 |
| 226 | SANDOZ | Triamcinolone Acetonide-Cream-0.025% | Price Increase | -- | $11,640,224 |
| 227 | PERRIGO | Triamcinolone Acetonide-Cream-0.1% | Price Increase | -- | $103,341,292 |
| 228 | SANDOZ | Triamcinolone Acetonide-Cream-0.1% | Price Increase | -- | $34,206,304 |
| 229 | PERRIGO | Triamcinolone Acetonide-Cream-0.5% | Price Increase | 12/31/2016 | $22,277,710 |
| 230 | SANDOZ | Triamcinolone Acetonide-Cream-0.5% | Price Increase | 12/31/2016 | $14,486,909 |
| 231 | PERRIGO | Triamcinolone Acetonide-Ointment-0.025% | Price Increase | -- | $12,435,234 |
| 232 | SANDOZ | Triamcinolone Acetonide-Ointment-0.025% | Price Increase | -- | $4,106,573 |
| 233 | PERRIGO | Triamcinolone Acetonide-Ointment-0.1% | Price Increase | -- | $84,106,478 |
| 234 | SANDOZ | Triamcinolone Acetonide-Ointment-0.1% | Price Increase | -- | $40,094,369 |
| 235 | PERRIGO | Triamcinolone Acetonide-Ointment-0.5% | Price Increase | -- | $21,326,021 |
| 236 | SUN/MUTUAL/TARO | Triamcinolone Acetonide-Paste-0.1% | Price Increase | -- | $27,649,196 |
| | Total | Total | | | $9,410,482,063 |

HIGHLY CONFIDENTIAL: SUBJECT TO PROTECTIVE ORDER

# Appendix C Table 3

## Regression Results - Liability Models

[redacted]

Standard errors are clustered by API
*** p<0.01, ** p<0.05, * p<0.1

Notes:
[1] Dependent variable is natural logarithm of Defendants net price or IQVIA price.
[2] Price Increase % is calculated as: Exp(Post Communication Coefficient) - 1.
*Sources: Defendants Transactional Data and IQVIA.*

HIGHLY CONFIDENTIAL: SUBJECT TO PROTECTIVE ORDER

# Appendix C Table 4

## Regression Results for Drugs at Issue

## Liability Models - Entire Period and 1-Year Overcharge Models

| # | Drug | Drug Classification | (1) Coefficient Estimate (Entire Period) | (2) Coefficient Estimate (1 Year Post) |
|---|---|---|---|---|
| 1 | Acetazolamide-Tablet-125Mg | Price Increase | 1.5099*** | 0.2949*** |
| 2 | Acetazolamide-Tablet-250Mg | Price Increase | 1.0955*** | 0.1568*** |
| 3 | Adapalene-Cream-0.1% | New Generic | | |
| 4 | Alclometasone Dipropionate-Cream-0.05% | Price Increase | 1.0732*** | 1.2568*** |
| 5 | Alclometasone Dipropionate-Ointment-0.05% | Price Increase | 1.1860*** | 0.7636*** |
| 6 | Ammonium Lactate-Cream-Eq12%Base | Price Increase | 0.5386*** | 0.6034*** |
| 7 | Ammonium Lactate-Lotion-Eq12%Base | Price Increase | 0.7438*** | 0.5977*** |
| 8 | Betamethasone Dipropionate-Cream-Eq0.05%Base | Price Increase | 3.0557*** | 0.1055*** |
| 9 | Betamethasone Dipropionate-Lotion, Augmented-Eq0.05%Base | Price Increase | 1.1284*** | 0.6657*** |
| 10 | Betamethasone Dipropionate-Lotion-Eq0.05%Base | Price Increase | 1.9120*** | 2.2666*** |
| 11 | Betamethasone Dipropionate; Calcipotriene-Ointment-0.064%;0.005% | New Generic | | |
| 12 | Betamethasone Dipropionate; Clotrimazole-Cream-Eq0.05%Base;1% | Price Increase | 1.5296*** | 1.5378*** |
| 13 | Betamethasone Dipropionate; Clotrimazole-Lotion-Eq0.05%Base;1% | Price Increase | 2.1598*** | 1.8145*** |
| 14 | Betamethasone Valerate-Cream-Eq0.1%Base | Price Increase | 2.1246*** | 0.1205*** |
| 15 | Betamethasone Valerate-Lotion-Eq0.1%Base | Price Increase | 2.4870*** | 1.0638*** |
| 16 | Betamethasone Valerate-Ointment-Eq0.1%Base | Price Increase | 2.3082*** | -0.0942 |
| 17 | Bromocriptine Mesylate-Tablet-Eq2.5Mgbase | Price Increase | 0.5001*** | 0.5617*** |
| 18 | Calcipotriene-Solution-0.005% | Price Increase | 0.4220*** | 0.6555*** |
| 19 | Carbamazepine-Tablet, Extended Release-100Mg | New Generic | | |
| 20 | Carbamazepine-Tablet, Extended Release-200Mg | New Generic | | |
| 21 | Carbamazepine-Tablet, Extended Release-400Mg | New Generic | | |
| 22 | Cefpodoxime Proxetil-For Suspension-Eq100Mgbase/5Ml | Price Increase | 0.5187*** | 0.7819*** |
| 23 | Cefpodoxime Proxetil-Tablet-Eq100Mgbase | Price Increase | 0.3093*** | -0.0235 |
| 24 | Cefpodoxime Proxetil-Tablet-Eq200Mgbase | Price Increase | 0.4508*** | 0.0295 |
| 25 | Ciclopirox-Cream-0.77% | Price Increase | -0.2199*** | -0.2826*** |
| 26 | Ciclopirox-Shampoo-1% | Price Increase | 0.3505*** | 0.3444 |
| 27 | Ciclopirox-Solution-8% | Price Increase | 0.6179*** | 1.1089*** |
| 28 | Clindamycin Phosphate-Cream-Eq2%Base | Price Increase | 0.9673*** | 1.1472*** |
| 29 | Clindamycin Phosphate-Gel-Eq1%Base | Price Increase | 1.7485*** | 0.9753*** |
| 30 | Clindamycin Phosphate-Lotion-Eq1%Base | Price Increase | 1.6229*** | 1.5001*** |
| 31 | Clindamycin Phosphate-Solution-Eq1%Base | Price Increase | 1.7837*** | 0.9078*** |
| 32 | Clobetasol Propionate Emollient-Cream-0.05% | Price Increase | 2.4016*** | 1.8586*** |
| 33 | Clobetasol Propionate-Cream-0.05% | Price Increase | 2.7826*** | 2.2718*** |
| 34 | Clobetasol Propionate-Gel-0.05% | Price Increase | 2.5994*** | 2.5913*** |
| 35 | Clobetasol Propionate-Ointment-0.05% | Price Increase | 3.3528*** | 2.5912*** |
| 36 | Clobetasol Propionate-Solution-0.05% | Price Increase | 1.6665*** | 1.4420*** |
| 37 | Clotrimazole-Cream-1% | Price Increase | 0.5778*** | 0.8368*** |
| 38 | Desonide-Cream-0.05% | Price Increase | 2.7463*** | 1.7305*** |

HIGHLY CONFIDENTIAL: SUBJECT TO PROTECTIVE ORDER

| # | Drug | Drug Classification | Coefficient Estimate (Entire Period) | Coefficient Estimate (1 Year Post) |
|---|---|---|---|---|
| 39 | Desonide-Lotion-0.05% | Price Increase | 2.2431*** | 1.0780*** |
| 40 | Desonide-Ointment-0.05% | Price Increase | 2.4142*** | 1.9206*** |
| 41 | Desoximetasone-Ointment-0.05% | New Generic | | |
| 42 | Desoximetasone-Ointment-0.25% | Price Increase | 0.3601*** | 0.1663 |
| 43 | Econazole Nitrate-Cream-1% | Price Increase | 2.3802*** | 2.4442*** |
| 44 | Eplerenone-Tablet-25Mg | Price Increase | -0.0192 | 0.4185*** |
| 45 | Eplerenone-Tablet-50Mg | Price Increase | 0.0100 | 0.3192*** |
| 46 | Erythromycin-Solution-2% | Price Increase | 1.7220*** | 1.7750*** |
| 47 | Ethambutol Hydrochloride-Tablet-100Mg | Price Increase | 1.8337*** | 1.6015*** |
| 48 | Ethambutol Hydrochloride-Tablet-400Mg | Price Increase | 1.2706*** | 1.1978*** |
| 49 | Fluocinolone Acetonide-Cream-0.01% | Price Increase | 1.2848*** | 0.4949*** |
| 50 | Fluocinolone Acetonide-Cream-0.025% | Price Increase | 1.6521*** | 0.9579*** |
| 51 | Fluocinolone Acetonide-Ointment-0.025% | Price Increase | 1.5907*** | 0.8955*** |
| 52 | Fluocinonide-Cream-0.1% | New Generic | | |
| 53 | Fluocinonide-Gel-0.05% | Price Increase | 2.1503*** | -0.0157 |
| 54 | Fluocinonide-Ointment-0.05% | Price Increase | 2.0257*** | 0.2376*** |
| 55 | Fluocinonide-Solution-0.05% | Price Increase | 2.0051*** | 0.8977*** |
| 56 | Fluticasone Propionate-Lotion-0.05% | New Generic | | |
| 57 | Griseofulvin Microsize-Tablet-500Mg | Price Increase | -0.0820 | |
| 58 | Halobetasol Propionate-Cream-0.05% | Price Increase | 1.3886*** | 0.6817*** |
| 59 | Halobetasol Propionate-Ointment-0.05% | Price Increase | 1.4757*** | 0.8959*** |
| 60 | Hydrocortisone Acetate-Suppository-25Mg | Price Increase | 0.2960*** | |
| 61 | Hydrocortisone Acetate-Suppository-30Mg | Price Increase | 0.0771 | |
| 62 | Hydrocortisone Valerate-Cream-0.2% | Price Increase | 2.0292*** | 1.0657*** |
| 63 | Imiquimod-Cream-5% | New Generic | | |
| 64 | Ketoconazole-Cream-2% | Price Increase | 1.2478*** | 0.2527* |
| 65 | Latanoprost-Solution/Drops-0.005% | Price Increase | 0.0850 | 0.4038*** |
| 66 | Lidocaine-Ointment-5% | Price Increase | 1.9089*** | 0.4434*** |
| 67 | Metformin Hydrochloride; Pioglitazone Hydrochloride-Tablet-500Mg;Eq15Mgbase | New Generic | | |
| 68 | Metformin Hydrochloride; Pioglitazone Hydrochloride-Tablet-850Mg;Eq15Mgbase | New Generic | | |
| 69 | Methazolamide-Tablet-25Mg | Price Increase | 1.3740*** | 0.6709*** |
| 70 | Methazolamide-Tablet-50Mg | Price Increase | 1.9132*** | 0.9938*** |
| 71 | Methylphenidate Hcl-Tablet, Extended Release-20Mg | Price Increase | 1.9381*** | 1.0250*** |
| 72 | Methylphenidate Hcl-Tablet-10Mg | Price Increase | 1.2590*** | 1.3588*** |
| 73 | Methylphenidate Hcl-Tablet-20Mg | Price Increase | 1.4316*** | 1.2915*** |
| 74 | Methylphenidate Hcl-Tablet-5Mg | Price Increase | 1.2008*** | 1.0745*** |
| 75 | Metronidazole-Cream-0.75% | Price Increase | 1.4143*** | 1.5498*** |
| 76 | Metronidazole-Gel-0.75% | Price Increase | 1.6629*** | 1.1681*** |
| 77 | Metronidazole-Gel-1% | New Generic | | |
| 78 | Metronidazole-Lotion-0.75% | Price Increase | 1.2017*** | 1.2566*** |
| 79 | Mometasone Furoate-Cream-0.1% | Price Increase | 0.0089 | -0.0590*** |
| 80 | Mometasone Furoate-Ointment-0.1% | Price Increase | 0.5903*** | 0.7304*** |
| 81 | Mometasone Furoate-Solution-0.1% | Price Increase | -0.1215*** | 0.0924*** |
| 82 | Nystatin-Ointment-100,000Units/Gm | Price Increase | 1.6290*** | 1.6655*** |
| 83 | Nystatin; Triamcinolone Acetonide-Cream-100,000Units/Gm;0.1% | Price Increase | 3.5708*** | 0.9043*** |

HIGHLY CONFIDENTIAL: SUBJECT TO PROTECTIVE ORDER

| # | Drug | Drug Classification | Coefficient Estimate (Entire Period) | Coefficient Estimate (1 Year Post) |
|---|---|---|---|---|
| 84 | Nystatin; Triamcinolone Acetonide-Ointment-100,000Units/Gm;0.1% | Price Increase | 3.3225*** | 0.8723*** |
| 85 | Phenytoin Sodium-Capsule-100Mgextended | Price Increase | 0.6332*** | 0.9419*** |
| 86 | Prochlorperazine-Suppository-25Mg | Price Increase | 0.5643*** | 0.8804*** |
| 87 | Promethazine Hydrochloride-Suppository-12.5Mg | Price Increase | 1.5278*** | 1.3957*** |
| 88 | Promethazine Hydrochloride-Suppository-25Mg | Price Increase | 1.3075*** | 1.3572*** |
| 89 | Tacrolimus-Ointment-0.03% | New Generic | | |
| 90 | Tacrolimus-Ointment-0.1% | New Generic | | |
| 91 | Terconazole-Cream-0.8% | Price Increase | 0.7116*** | 0.7304*** |
| 92 | Triamcinolone Acetonide-Cream-0.025% | Price Increase | 0.6044*** | 0.4052*** |
| 93 | Triamcinolone Acetonide-Cream-0.1% | Price Increase | 0.5217*** | 0.7781*** |
| 94 | Triamcinolone Acetonide-Cream-0.5% | Price Increase | 0.8136*** | 0.7487*** |
| 95 | Triamcinolone Acetonide-Ointment-0.025% | Price Increase | 0.7502*** | 0.7612*** |
| 96 | Triamcinolone Acetonide-Ointment-0.1% | Price Increase | 0.7916*** | 0.7251*** |
| 97 | Triamcinolone Acetonide-Ointment-0.5% | Price Increase | 0.8938*** | 0.8495*** |
| 98 | Triamcinolone Acetonide-Paste-0.1% | Price Increase | 0.0615 | -0.5664*** |

HIGHLY CONFIDENTIAL: SUBJECT TO PROTECTIVE ORDER

# Appendix C Table 5
## Regression Results for Drugs at Issue
## WAC Price Regression

| # | Drug | Drug Classification | Coefficient Estimate (1 Year Post) |
|---|---|---|---|
| 1 | Acetazolamide-Tablet-125Mg | Price Increase | 0.52** |
| 2 | Acetazolamide-Tablet-250Mg | Price Increase | 0.17 |
| 3 | Adapalene-Cream-0.1% | New Generic | |
| 4 | Alclometasone Dipropionate-Cream-0.05% | Price Increase | 0.79*** |
| 5 | Alclometasone Dipropionate-Ointment-0.05% | Price Increase | 0.41*** |
| 6 | Ammonium Lactate-Cream-Eq12%Base | Price Increase | 0.15 |
| 7 | Ammonium Lactate-Lotion-Eq12%Base | Price Increase | 0.18* |
| 8 | Betamethasone Dipropionate-Cream-Eq0.05%Base | Price Increase | 0.10 |
| 9 | Betamethasone Dipropionate-Lotion, Augmented-Eq0.05%Base | Price Increase | 0.06 |
| 10 | Betamethasone Dipropionate-Lotion-Eq0.05%Base | Price Increase | 1.78*** |
| 11 | Betamethasone Dipropionate; Calcipotriene-Ointment-0.064%;0.005% | New Generic | |
| 12 | Betamethasone Dipropionate; Clotrimazole-Cream-Eq0.05%Base;1% | Price Increase | 0.82*** |
| 13 | Betamethasone Dipropionate; Clotrimazole-Lotion-Eq0.05%Base;1% | Price Increase | 0.52*** |
| 14 | Betamethasone Valerate-Cream-Eq0.1%Base | Price Increase | 0.34*** |
| 15 | Betamethasone Valerate-Lotion-Eq0.1%Base | Price Increase | 1.29*** |
| 16 | Betamethasone Valerate-Ointment-Eq0.1%Base | Price Increase | 0.04 |
| 17 | Bromocriptine Mesylate-Tablet-Eq2.5Mgbase | Price Increase | 0.72*** |
| 18 | Calcipotriene-Solution-0.005% | Price Increase | 0.52*** |
| 19 | Carbamazepine-Tablet, Extended Release-100Mg | New Generic | |
| 20 | Carbamazepine-Tablet, Extended Release-200Mg | New Generic | |
| 21 | Carbamazepine-Tablet, Extended Release-400Mg | New Generic | |
| 22 | Cefpodoxime Proxetil-For Suspension-Eq100Mgbase/5Ml | Price Increase | 0.36*** |
| 23 | Cefpodoxime Proxetil-Tablet-Eq100Mgbase | Price Increase | 0.19 |
| 24 | Cefpodoxime Proxetil-Tablet-Eq200Mgbase | Price Increase | 0.17 |
| 25 | Ciclopirox-Cream-0.77% | Price Increase | -0.04 |
| 26 | Ciclopirox-Shampoo-1% | Price Increase | -0.04 |
| 27 | Ciclopirox-Solution-8% | Price Increase | 0.40*** |
| 28 | Clindamycin Phosphate-Cream-Eq2%Base | Price Increase | 0.35*** |
| 29 | Clindamycin Phosphate-Gel-Eq1%Base | Price Increase | 0.45*** |
| 30 | Clindamycin Phosphate-Lotion-Eq1%Base | Price Increase | 0.57*** |
| 31 | Clindamycin Phosphate-Solution-Eq1%Base | Price Increase | 0.21** |
| 32 | Clobetasol Propionate Emollient-Cream-0.05% | Price Increase | 1.74*** |

| # | Drug | Drug Classification | Coefficient Estimate (1 Year Post) |
|---|---|---|---|
| 33 | Clobetasol Propionate-Cream-0.05% | Price Increase | 2.24*** |
| 34 | Clobetasol Propionate-Gel-0.05% | Price Increase | 2.47*** |
| 35 | Clobetasol Propionate-Ointment-0.05% | Price Increase | 2.29*** |
| 36 | Clobetasol Propionate-Solution-0.05% | Price Increase | 1.90*** |
| 37 | Clotrimazole-Cream-1% | Price Increase | -0.02 |
| 38 | Desonide-Cream-0.05% | Price Increase | 1.87*** |
| 39 | Desonide-Lotion-0.05% | Price Increase | 0.35*** |
| 40 | Desonide-Ointment-0.05% | Price Increase | 1.45*** |
| 41 | Desoximetasone-Ointment-0.05% | New Generic | |
| 42 | Desoximetasone-Ointment-0.25% | Price Increase | 0.17* |
| 43 | Econazole Nitrate-Cream-1% | Price Increase | 1.53*** |
| 44 | Eplerenone-Tablet-25Mg | Price Increase | 0.06 |
| 45 | Eplerenone-Tablet-50Mg | Price Increase | 0.08 |
| 46 | Erythromycin-Solution-2% | Price Increase | 0.34** |
| 47 | Ethambutol Hydrochloride-Tablet-100Mg | Price Increase | -0.04 |
| 48 | Ethambutol Hydrochloride-Tablet-400Mg | Price Increase | -0.04 |
| 49 | Fluocinolone Acetonide-Cream-0.01% | Price Increase | 2.29*** |
| 50 | Fluocinolone Acetonide-Cream-0.025% | Price Increase | 2.02*** |
| 51 | Fluocinolone Acetonide-Ointment-0.025% | Price Increase | 2.02*** |
| 52 | Fluocinonide-Cream-0.1% | New Generic | |
| 53 | Fluocinonide-Gel-0.05% | Price Increase | 0.01 |
| 54 | Fluocinonide-Ointment-0.05% | Price Increase | 0.31*** |
| 55 | Fluocinonide-Solution-0.05% | Price Increase | 0.83*** |
| 56 | Fluticasone Propionate-Lotion-0.05% | New Generic | |
| 57 | Griseofulvin Microsize-Tablet-500Mg | Price Increase | |
| 58 | Halobetasol Propionate-Cream-0.05% | Price Increase | 0.26*** |
| 59 | Halobetasol Propionate-Ointment-0.05% | Price Increase | 0.36*** |
| 60 | Hydrocortisone Acetate-Suppository-25Mg | Price Increase | 0.97*** |
| 61 | Hydrocortisone Acetate-Suppository-30Mg | Price Increase | 0.95*** |
| 62 | Hydrocortisone Valerate-Cream-0.2% | Price Increase | 1.43*** |
| 63 | Imiquimod-Cream-5% | New Generic | |
| 64 | Ketoconazole-Cream-2% | Price Increase | 0.84*** |
| 65 | Latanoprost-Solution/Drops-0.005% | Price Increase | 0.19* |
| 66 | Lidocaine-Ointment-5% | Price Increase | 0.63*** |
| 67 | Metformin Hydrochloride; Pioglitazone Hydrochloride-Tablet-500Mg;Eq15Mgbase | New Generic | |
| 68 | Metformin Hydrochloride; Pioglitazone Hydrochloride-Tablet-850Mg;Eq15Mgbase | New Generic | |
| 69 | Methazolamide-Tablet-25Mg | Price Increase | 0.59*** |
| 70 | Methazolamide-Tablet-50Mg | Price Increase | 0.84*** |
| 71 | Methylphenidate Hcl-Tablet, Extended Release-20Mg | Price Increase | 0.43*** |

HIGHLY CONFIDENTIAL: SUBJECT TO PROTECTIVE ORDER

| # | Drug | Drug Classification | Coefficient Estimate (1 Year Post) |
|---|---|---|---|
| 72 | Methylphenidate Hcl-Tablet-10Mg | Price Increase | 1.42*** |
| 73 | Methylphenidate Hcl-Tablet-20Mg | Price Increase | 1.20*** |
| 74 | Methylphenidate Hcl-Tablet-5Mg | Price Increase | 1.13*** |
| 75 | Metronidazole-Cream-0.75% | Price Increase | 1.12*** |
| 76 | Metronidazole-Gel-0.75% | Price Increase | 0.97*** |
| 77 | Metronidazole-Gel-1% | New Generic | |
| 78 | Metronidazole-Lotion-0.75% | Price Increase | 1.01*** |
| 79 | Mometasone Furoate-Cream-0.1% | Price Increase | -0.03 |
| 80 | Mometasone Furoate-Ointment-0.1% | Price Increase | -0.03 |
| 81 | Mometasone Furoate-Solution-0.1% | Price Increase | 0.26** |
| 82 | Nystatin-Ointment-100,000Units/Gm | Price Increase | 1.06*** |
| 83 | Nystatin; Triamcinolone Acetonide-Cream-100,000Units/Gm;0.1% | Price Increase | 2.29*** |
| 84 | Nystatin; Triamcinolone Acetonide-Ointment-100,000Units/Gm;0.1% | Price Increase | 1.19*** |
| 85 | Phenytoin Sodium-Capsule-100Mgextended | Price Increase | 0.58*** |
| 86 | Prochlorperazine-Suppository-25Mg | Price Increase | 0.92*** |
| 87 | Promethazine Hydrochloride-Suppository-12.5Mg | Price Increase | 0.98*** |
| 88 | Promethazine Hydrochloride-Suppository-25Mg | Price Increase | 0.88*** |
| 89 | Tacrolimus-Ointment-0.03% | New Generic | |
| 90 | Tacrolimus-Ointment-0.1% | New Generic | |
| 91 | Terconazole-Cream-0.8% | Price Increase | 0.11 |
| 92 | Triamcinolone Acetonide-Cream-0.025% | Price Increase | 0.99*** |
| 93 | Triamcinolone Acetonide-Cream-0.1% | Price Increase | 1.03*** |
| 94 | Triamcinolone Acetonide-Cream-0.5% | Price Increase | 1.08*** |
| 95 | Triamcinolone Acetonide-Ointment-0.025% | Price Increase | 1.07*** |
| 96 | Triamcinolone Acetonide-Ointment-0.1% | Price Increase | 1.03*** |
| 97 | Triamcinolone Acetonide-Ointment-0.5% | Price Increase | 0.97*** |
| 98 | Triamcinolone Acetonide-Paste-0.1% | Price Increase | 0.08 |

HIGHLY CONFIDENTIAL: SUBJECT TO PROTECTIVE ORDER

# Appendix C Table 6

## Regression Results - NADAC Fall in Prices

Study Period: 2014 - 2023Q3

| | Control Drugs | Drugs at Issue |
|---|---|---|
| Log(Total Annual Quantity of Drug) | -0.1463*** | -0.0646*** |
| | [0.0025] | [0.0107] |
| Number of Competitors = 2 | -0.1239*** | 0.0418 |
| | [0.0081] | [0.0840] |
| Number of Competitors = 3 | -0.2214*** | 0.0116 |
| | [0.0085] | [0.0864] |
| Number of Competitors = 4 | -0.2810*** | -0.0560 |
| | [0.0087] | [0.0877] |
| Number of Competitors = 5 | -0.3649*** | -0.1312 |
| | [0.0087] | [0.0881] |
| Post Period * Drugs at Issue | Reported in Table 7 | |
| | | |
| Constant | 1.6762*** | |
| | [0.0375] | |
| | | |
| Observations | 171,061 | |
| R-squared | 0.976 | |
| NDC Fixed Effect | Yes | |
| Year-Quarter Fixed Effect | Yes | |

Standard errors in brackets

*** p<0.01, ** p<0.05, * p<0.1

Notes:

[1] Dependent variable is natural logarithm of NADAC price.

*Sources: NADAC.*

HIGHLY CONFIDENTIAL: SUBJECT TO PROTECTIVE ORDER

# Appendix C Table 7
## Regression Results for Drugs at Issue
## NADAC Price Decline

| # | Drug | Drug Classification | Coefficient Estimate (Post) |
|---|---|---|---|
| 1 | Acetazolamide-Tablet-125Mg | Price Increase | -1.0608*** |
| 2 | Acetazolamide-Tablet-250Mg | Price Increase | -0.9800*** |
| 3 | Adapalene-Cream-0.1% | New Generic | 0.3118*** |
| 4 | Alclometasone Dipropionate-Cream-0.05% | Price Increase | 0.0137 |
| 5 | Alclometasone Dipropionate-Ointment-0.05% | Price Increase | 0.0469 |
| 6 | Ammonium Lactate-Cream-Eq12%Base | Price Increase | 0.2970*** |
| 7 | Ammonium Lactate-Lotion-Eq12%Base | Price Increase | 0.3591*** |
| 8 | Betamethasone Dipropionate-Cream-Eq0.05%Base | Price Increase | -0.2414*** |
| 9 | Betamethasone Dipropionate-Lotion, Augmented-Eq0.05%Base | Price Increase | -0.1023 |
| 10 | Betamethasone Dipropionate-Lotion-Eq0.05%Base | Price Increase | 0.2394*** |
| 11 | Betamethasone Dipropionate; Calcipotriene-Ointment-0.064%;0.005% | New Generic | 0.0881 |
| 12 | Betamethasone Dipropionate; Clotrimazole-Cream-Eq0.05%Base;1% | Price Increase | -0.6489*** |
| 13 | Betamethasone Dipropionate; Clotrimazole-Lotion-Eq0.05%Base;1% | Price Increase | 0.1756* |
| 14 | Betamethasone Valerate-Cream-Eq0.1%Base | Price Increase | 0.1577** |
| 15 | Betamethasone Valerate-Lotion-Eq0.1%Base | Price Increase | 0.2095** |
| 16 | Betamethasone Valerate-Ointment-Eq0.1%Base | Price Increase | 0.4237*** |
| 17 | Bromocriptine Mesylate-Tablet-Eq2.5Mgbase | Price Increase | -0.1638** |
| 18 | Calcipotriene-Solution-0.005% | Price Increase | -0.6319*** |
| 19 | Carbamazepine-Tablet, Extended Release-100Mg | New Generic | 0.0023 |
| 20 | Carbamazepine-Tablet, Extended Release-200Mg | New Generic | 0.0512 |
| 21 | Carbamazepine-Tablet, Extended Release-400Mg | New Generic | 0.1371** |
| 22 | Cefpodoxime Proxetil-For Suspension-Eq100Mgbase/5Ml | Price Increase | |
| 23 | Cefpodoxime Proxetil-Tablet-Eq100Mgbase | Price Increase | -0.0123 |
| 24 | Cefpodoxime Proxetil-Tablet-Eq200Mgbase | Price Increase | -0.0418 |
| 25 | Ciclopirox-Cream-0.77% | Price Increase | -0.0752 |
| 26 | Ciclopirox-Shampoo-1% | Price Increase | -0.2996*** |
| 27 | Ciclopirox-Solution-8% | Price Increase | -0.2976*** |
| 28 | Clindamycin Phosphate-Cream-Eq2%Base | Price Increase | 0.3600*** |
| 29 | Clindamycin Phosphate-Gel-Eq1%Base | Price Increase | -0.2315** |
| 30 | Clindamycin Phosphate-Lotion-Eq1%Base | Price Increase | 0.1290 |
| 31 | Clindamycin Phosphate-Solution-Eq1%Base | Price Increase | -0.7422*** |
| 32 | Clobetasol Propionate Emollient-Cream-0.05% | Price Increase | -0.3531*** |

HIGHLY CONFIDENTIAL: SUBJECT TO PROTECTIVE ORDER

| # | Drug | Drug Classification | Coefficient Estimate (Post) |
|---|---|---|---|
| 33 | Clobetasol Propionate-Cream-0.05% | Price Increase | -1.3160*** |
| 34 | Clobetasol Propionate-Gel-0.05% | Price Increase | -0.7124*** |
| 35 | Clobetasol Propionate-Ointment-0.05% | Price Increase | -1.6274*** |
| 36 | Clobetasol Propionate-Solution-0.05% | Price Increase | -0.9050*** |
| 37 | Clotrimazole-Cream-1% | Price Increase | -0.5246*** |
| 38 | Desonide-Cream-0.05% | Price Increase | -0.9168*** |
| 39 | Desonide-Lotion-0.05% | Price Increase | -0.2253*** |
| 40 | Desonide-Ointment-0.05% | Price Increase | -0.5111*** |
| 41 | Desoximetasone-Ointment-0.05% | New Generic | -0.0301 |
| 42 | Desoximetasone-Ointment-0.25% | Price Increase | -1.6566*** |
| 43 | Econazole Nitrate-Cream-1% | Price Increase | -2.0478*** |
| 44 | Eplerenone-Tablet-25Mg | Price Increase | -0.3730*** |
| 45 | Eplerenone-Tablet-50Mg | Price Increase | -0.2492*** |
| 46 | Erythromycin-Solution-2% | Price Increase | 0.0901 |
| 47 | Ethambutol Hydrochloride-Tablet-100Mg | Price Increase | |
| 48 | Ethambutol Hydrochloride-Tablet-400Mg | Price Increase | -0.1029* |
| 49 | Fluocinolone Acetonide-Cream-0.01% | Price Increase | 0.1109 |
| 50 | Fluocinolone Acetonide-Cream-0.025% | Price Increase | 0.1998* |
| 51 | Fluocinolone Acetonide-Ointment-0.025% | Price Increase | 0.1476** |
| 52 | Fluocinonide-Cream-0.1% | New Generic | -2.9826*** |
| 53 | Fluocinonide-Gel-0.05% | Price Increase | -0.0244 |
| 54 | Fluocinonide-Ointment-0.05% | Price Increase | -0.9156*** |
| 55 | Fluocinonide-Solution-0.05% | Price Increase | -0.4263*** |
| 56 | Fluticasone Propionate-Lotion-0.05% | New Generic | -0.0518 |
| 57 | Griseofulvin Microsize-Tablet-500Mg | Price Increase | 0.6242*** |
| 58 | Halobetasol Propionate-Cream-0.05% | Price Increase | -0.8905*** |
| 59 | Halobetasol Propionate-Ointment-0.05% | Price Increase | -0.1788** |
| 60 | Hydrocortisone Acetate-Suppository-25Mg | Price Increase | |
| 61 | Hydrocortisone Acetate-Suppository-30Mg | Price Increase | |
| 62 | Hydrocortisone Valerate-Cream-0.2% | Price Increase | -0.8929*** |
| 63 | Imiquimod-Cream-5% | New Generic | -1.3594*** |
| 64 | Ketoconazole-Cream-2% | Price Increase | -0.3385*** |
| 65 | Latanoprost-Solution/Drops-0.005% | Price Increase | 0.1188* |
| 66 | Lidocaine-Ointment-5% | Price Increase | -2.2944*** |
| 67 | Metformin Hydrochloride; Pioglitazone Hydrochloride-Tablet-500Mg;Eq15Mgbase | New Generic | -0.6464*** |
| 68 | Metformin Hydrochloride; Pioglitazone Hydrochloride-Tablet-850Mg;Eq15Mgbase | New Generic | -0.8736*** |
| 69 | Methazolamide-Tablet-25Mg | Price Increase | 0.1698 |
| 70 | Methazolamide-Tablet-50Mg | Price Increase | 0.0612 |
| 71 | Methylphenidate Hcl-Tablet, Extended Release-20Mg | Price Increase | -1.2030*** |

HIGHLY CONFIDENTIAL: SUBJECT TO PROTECTIVE ORDER

| # | Drug | Drug Classification | Coefficient Estimate (Post) |
|---|---|---|---|
| 72 | Methylphenidate Hcl-Tablet-10Mg | Price Increase | -0.9179*** |
| 73 | Methylphenidate Hcl-Tablet-20Mg | Price Increase | -1.0118*** |
| 74 | Methylphenidate Hcl-Tablet-5Mg | Price Increase | -0.9530*** |
| 75 | Metronidazole-Cream-0.75% | Price Increase | -0.4824*** |
| 76 | Metronidazole-Gel-0.75% | Price Increase | -0.7552*** |
| 77 | Metronidazole-Gel-1% | New Generic | -0.5426*** |
| 78 | Metronidazole-Lotion-0.75% | Price Increase | 0.1506* |
| 79 | Mometasone Furoate-Cream-0.1% | Price Increase | 0.5986*** |
| 80 | Mometasone Furoate-Ointment-0.1% | Price Increase | -0.1167* |
| 81 | Mometasone Furoate-Solution-0.1% | Price Increase | 0.7065*** |
| 82 | Nystatin-Ointment-100,000Units/Gm | Price Increase | -0.0183 |
| 83 | Nystatin; Triamcinolone Acetonide-Cream-100,000Units/Gm;0.1% | Price Increase | -1.3565*** |
| 84 | Nystatin; Triamcinolone Acetonide-Ointment-100,000Units/Gm;0.1% | Price Increase | -1.7155*** |
| 85 | Phenytoin Sodium-Capsule-100Mgextended | Price Increase | -0.0829* |
| 86 | Prochlorperazine-Suppository-25Mg | Price Increase | 0.1845** |
| 87 | Promethazine Hydrochloride-Suppository-12.5Mg | Price Increase | -0.2436*** |
| 88 | Promethazine Hydrochloride-Suppository-25Mg | Price Increase | -0.2971*** |
| 89 | Tacrolimus-Ointment-0.03% | New Generic | -0.4413*** |
| 90 | Tacrolimus-Ointment-0.1% | New Generic | -0.3425*** |
| 91 | Terconazole-Cream-0.8% | Price Increase | 0.3422*** |
| 92 | Triamcinolone Acetonide-Cream-0.025% | Price Increase | 0.3295*** |
| 93 | Triamcinolone Acetonide-Cream-0.1% | Price Increase | 0.2262*** |
| 94 | Triamcinolone Acetonide-Cream-0.5% | Price Increase | -0.0098 |
| 95 | Triamcinolone Acetonide-Ointment-0.025% | Price Increase | 0.3256*** |
| 96 | Triamcinolone Acetonide-Ointment-0.1% | Price Increase | 0.2706*** |
| 97 | Triamcinolone Acetonide-Ointment-0.5% | Price Increase | 0.2085 |
| 98 | Triamcinolone Acetonide-Paste-0.1% | Price Increase | -0.1434 |

HIGHLY CONFIDENTIAL: SUBJECT TO PROTECTIVE ORDER

**Appendix C Table 8**

Summary of Liability Tests for Drugs at Issue

| # | Drug | Drug Classification | Significant Positive Overcharge Estimate (Entire Period) | Significant Positive Overcharge Estimate (1-Year Before/After) | Significant Increase in WAC Price (1-Year Before/After) | Significant Decrease in Price at End Of Conspiracy | Satisfies Any Price Increase/Decrease Test |
|---|---|---|---|---|---|---|---|
| 1 | Acetazolamide-Tablet-125Mg | Price Increase | X | X | X | X | X |
| 2 | Acetazolamide-Tablet-250Mg | Price Increase | X | X | | X | X |
| 3 | Adapalene-Cream-0.1% | New Generic | | | | | |
| 4 | Alclometasone Dipropionate-Cream-0.05% | Price Increase | X | X | X | | X |
| 5 | Alclometasone Dipropionate-Ointment-0.05% | Price Increase | X | X | X | | X |
| 6 | Ammonium Lactate-Cream-Eq12%Base | Price Increase | X | X | | | X |
| 7 | Ammonium Lactate-Lotion-Eq12%Base | Price Increase | X | X | X | | X |
| 8 | Betamethasone Dipropionate-Cream-Eq0.05%Base | Price Increase | X | X | | X | X |
| 9 | Betamethasone Dipropionate-Lotion, Augmented-Eq0.05%Base | Price Increase | X | X | | | X |
| 10 | Betamethasone Dipropionate-Lotion-Eq0.05%Base | Price Increase | X | X | X | | X |
| 11 | Betamethasone Dipropionate; Calcipotriene-Ointment-0.064%;0.005% | New Generic | | | | | |
| 12 | Betamethasone Dipropionate; Clotrimazole-Cream-Eq0.05%Base;1% | Price Increase | X | X | X | X | X |
| 13 | Betamethasone Dipropionate; Clotrimazole-Lotion-Eq0.05%Base;1% | Price Increase | X | X | X | | X |
| 14 | Betamethasone Valerate-Cream-Eq0.1%Base | Price Increase | X | X | X | | X |
| 15 | Betamethasone Valerate-Lotion-Eq0.1%Base | Price Increase | X | X | X | | X |
| 16 | Betamethasone Valerate-Ointment-Eq0.1%Base | Price Increase | X | | | | X |
| 17 | Bromocriptine Mesylate-Tablet-Eq2.5Mgbase | Price Increase | X | X | X | X | X |
| 18 | Calcipotriene-Solution-0.005% | Price Increase | X | X | X | X | X |
| 19 | Carbamazepine-Tablet, Extended Release-100Mg | New Generic | | | | | |
| 20 | Carbamazepine-Tablet, Extended Release-200Mg | New Generic | | | | | |
| 21 | Carbamazepine-Tablet, Extended Release-400Mg | New Generic | | | | | |
| 22 | Cefpodoxime Proxetil-For Suspension-Eq100Mgbase/5Ml | Price Increase | X | X | X | | X |
| 23 | Cefpodoxime Proxetil-Tablet-Eq100Mgbase | Price Increase | X | | | | X |
| 24 | Cefpodoxime Proxetil-Tablet-Eq200Mgbase | Price Increase | X | | | | X |
| 25 | Ciclopirox-Cream-0.77% | Price Increase | | | | | |
| 26 | Ciclopirox-Shampoo-1% | Price Increase | X | | | X | X |
| 27 | Ciclopirox-Solution-8% | Price Increase | X | X | X | X | X |
| 28 | Clindamycin Phosphate-Cream-Eq2%Base | Price Increase | X | X | X | | X |
| 29 | Clindamycin Phosphate-Gel-Eq1%Base | Price Increase | X | X | X | X | X |
| 30 | Clindamycin Phosphate-Lotion-Eq1%Base | Price Increase | X | X | X | | X |
| 31 | Clindamycin Phosphate-Solution-Eq1%Base | Price Increase | X | X | X | X | X |
| 32 | Clobetasol Propionate Emollient-Cream-0.05% | Price Increase | X | X | X | X | X |
| 33 | Clobetasol Propionate-Cream-0.05% | Price Increase | X | X | X | X | X |
| 34 | Clobetasol Propionate-Gel-0.05% | Price Increase | X | X | X | X | X |
| 35 | Clobetasol Propionate-Ointment-0.05% | Price Increase | X | X | X | X | X |
| 36 | Clobetasol Propionate-Solution-0.05% | Price Increase | X | X | X | X | X |
| 37 | Clotrimazole-Cream-1% | Price Increase | X | X | | X | X |
| 38 | Desonide-Cream-0.05% | Price Increase | X | X | X | X | X |
| 39 | Desonide-Lotion-0.05% | Price Increase | X | X | X | X | X |
| 40 | Desonide-Ointment-0.05% | Price Increase | X | X | X | X | X |
| 41 | Desoximetasone-Ointment-0.05% | New Generic | | | | | |
| 42 | Desoximetasone-Ointment-0.25% | Price Increase | X | | X | X | X |
| 43 | Econazole Nitrate-Cream-1% | Price Increase | X | X | X | X | X |
| 44 | Eplerenone-Tablet-25Mg | Price Increase | | X | | X | X |
| 45 | Eplerenone-Tablet-50Mg | Price Increase | | X | | X | X |
| 46 | Erythromycin-Solution-2% | Price Increase | X | X | X | | X |
| 47 | Ethambutol Hydrochloride-Tablet-100Mg | Price Increase | X | X | | | X |
| 48 | Ethambutol Hydrochloride-Tablet-400Mg | Price Increase | X | X | | X | X |
| 49 | Fluocinolone Acetonide-Cream-0.01% | Price Increase | X | X | X | | X |
| 50 | Fluocinolone Acetonide-Cream-0.025% | Price Increase | X | X | X | | X |
| 51 | Fluocinolone Acetonide-Ointment-0.025% | Price Increase | X | X | X | | X |
| 52 | Fluocinonide-Cream-0.1% | New Generic | | | | X | X |
| 53 | Fluocinonide-Gel-0.05% | Price Increase | X | | | | X |
| 54 | Fluocinonide-Ointment-0.05% | Price Increase | X | X | X | X | X |
| 55 | Fluocinonide-Solution-0.05% | Price Increase | X | X | X | X | X |
| 56 | Fluticasone Propionate-Lotion-0.05% | New Generic | | | | | |

HIGHLY CONFIDENTIAL: SUBJECT TO PROTECTIVE ORDER

| # | Drug | Drug Classification | Significant Positive Overcharge Estimate (Entire Period) | Significant Positive Overcharge Estimate (1-Year Before/After) | Significant Increase in WAC Price (1-Year Before/After) | Significant Decrease in Price at End Of Conspiracy | Satisfies Any Price Increase/Decrease Test |
|---|---|---|---|---|---|---|---|
| 57 | Griseofulvin Microsize-Tablet-500Mg | Price Increase | | | | | |
| 58 | Halobetasol Propionate-Cream-0.05% | Price Increase | X | X | X | X | X |
| 59 | Halobetasol Propionate-Ointment-0.05% | Price Increase | X | X | X | X | X |
| 60 | Hydrocortisone Acetate-Suppository-25Mg | Price Increase | X | | X | | X |
| 61 | Hydrocortisone Acetate-Suppository-30Mg | Price Increase | | | X | | X |
| 62 | Hydrocortisone Valerate-Cream-0.2% | Price Increase | X | X | X | X | X |
| 63 | Imiquimod-Cream-5% | New Generic | | | | X | X |
| 64 | Ketoconazole-Cream-2% | Price Increase | X | X | X | X | X |
| 65 | Latanoprost-Solution/Drops-0.005% | Price Increase | | X | X | | X |
| 66 | Lidocaine-Ointment-5% | Price Increase | X | X | X | X | X |
| 67 | Metformin Hydrochloride; Pioglitazone Hydrochloride-Tablet-500Mg;Eq15Mgbase | New Generic | | | | X | X |
| 68 | Metformin Hydrochloride; Pioglitazone Hydrochloride-Tablet-850Mg;Eq15Mgbase | New Generic | | | | X | X |
| 69 | Methazolamide-Tablet-25Mg | Price Increase | X | X | X | | X |
| 70 | Methazolamide-Tablet-50Mg | Price Increase | X | X | X | | X |
| 71 | Methylphenidate Hcl-Tablet, Extended Release-20Mg | Price Increase | X | X | X | X | X |
| 72 | Methylphenidate Hcl-Tablet-10Mg | Price Increase | X | X | X | X | X |
| 73 | Methylphenidate Hcl-Tablet-20Mg | Price Increase | X | X | X | X | X |
| 74 | Methylphenidate Hcl-Tablet-5Mg | Price Increase | X | X | X | X | X |
| 75 | Metronidazole-Cream-0.75% | Price Increase | X | X | X | X | X |
| 76 | Metronidazole-Gel-0.75% | Price Increase | X | X | X | X | X |
| 77 | Metronidazole-Gel-1% | New Generic | | | | X | X |
| 78 | Metronidazole-Lotion-0.75% | Price Increase | X | X | X | | X |
| 79 | Mometasone Furoate-Cream-0.1% | Price Increase | | | | | |
| 80 | Mometasone Furoate-Ointment-0.1% | Price Increase | X | X | | X | X |
| 81 | Mometasone Furoate-Solution-0.1% | Price Increase | | X | X | | X |
| 82 | Nystatin-Ointment-100,000Units/Gm | Price Increase | X | X | X | | X |
| 83 | Nystatin; Triamcinolone Acetonide-Cream-100,000Units/Gm;0.1% | Price Increase | X | X | X | X | X |
| 84 | Nystatin; Triamcinolone Acetonide-Ointment-100,000Units/Gm;0.1% | Price Increase | X | X | X | X | X |
| 85 | Phenytoin Sodium-Capsule-100Mgextended | Price Increase | X | X | X | X | X |
| 86 | Prochlorperazine-Suppository-25Mg | Price Increase | X | X | X | | X |
| 87 | Promethazine Hydrochloride-Suppository-12.5Mg | Price Increase | X | X | X | X | X |
| 88 | Promethazine Hydrochloride-Suppository-25Mg | Price Increase | X | X | X | X | X |
| 89 | Tacrolimus-Ointment-0.03% | New Generic | | | | X | X |
| 90 | Tacrolimus-Ointment-0.1% | New Generic | | | | X | X |
| 91 | Terconazole-Cream-0.8% | Price Increase | X | X | | | X |
| 92 | Triamcinolone Acetonide-Cream-0.025% | Price Increase | X | X | X | | X |
| 93 | Triamcinolone Acetonide-Cream-0.1% | Price Increase | X | X | X | | X |
| 94 | Triamcinolone Acetonide-Cream-0.5% | Price Increase | X | X | X | | X |
| 95 | Triamcinolone Acetonide-Ointment-0.025% | Price Increase | X | X | X | | X |
| 96 | Triamcinolone Acetonide-Ointment-0.1% | Price Increase | X | X | X | | X |
| 97 | Triamcinolone Acetonide-Ointment-0.5% | Price Increase | X | X | X | | X |
| 98 | Triamcinolone Acetonide-Paste-0.1% | Price Increase | | | | | |
| | | **Total** | **75** | **72** | **64** | **50** | **87** |

HIGHLY CONFIDENTIAL: SUBJECT TO PROTECTIVE ORDER

**Appendix C Table 9**

Overcharge Estimates from Own-Price Disgorgement Models

| # | Drug | Defendant | Overcharge (%), Net Price Data, Before and After Model | Overcharge (%), Net Price Data, DiD Model | Overcharge (%), AMP Data | Overcharge (%), IQVIA Data |
|---|---|---|---|---|---|---|
| 1 | ACETAZOLAMIDE-TABLET-125MG | TARO | 156.0% | 311.9% | 226.5% | 328.5% |
| 2 | ACETAZOLAMIDE-TABLET-250MG | LANNETT | 67.6% | 138.3% | 169.5% | 154.5% |
| 3 | ACETAZOLAMIDE-TABLET-250MG | TARO | 126.4% | 190.8% | 193.9% | 196.4% |
| 4 | ALCLOMETASONE DIPROPIONATE-CREAM-0.05% | GLENMARK | 185.7% | 166.8% | 68.4% | 98.2% |
| 5 | ALCLOMETASONE DIPROPIONATE-CREAM-0.05% | SANDOZ | 363.9% | 345.4% | 79.8% | 132.8% |
| 6 | ALCLOMETASONE DIPROPIONATE-CREAM-0.05% | TARO | 39.0% | 29.8% | 82.0% | 71.1% |
| 7 | ALCLOMETASONE DIPROPIONATE-OINTMENT-0.05% | GLENMARK | -- | -- | -- | 18.6% |
| 8 | ALCLOMETASONE DIPROPIONATE-OINTMENT-0.05% | SANDOZ | 94.4% | 84.9% | 23.7% | 21.0% |
| 9 | ALCLOMETASONE DIPROPIONATE-OINTMENT-0.05% | TARO | 416.0% | 332.7% | 351.5% | 134.3% |
| 10 | AMMONIUM LACTATE-CREAM-EQ12%BASE | ACTAVIS | 49.1% | 70.1% | 39.9% | 35.9% |
| 11 | AMMONIUM LACTATE-CREAM-EQ12%BASE | PERRIGO | 71.3% | 104.5% | 42.5% | 65.0% |
| 12 | AMMONIUM LACTATE-CREAM-EQ12%BASE | TARO | 39.2% | 68.5% | 188.6% | 84.6% |
| 13 | AMMONIUM LACTATE-LOTION-EQ12%BASE | ACTAVIS | -24.9% | 7.1% | 37.2% | -13.2% |
| 14 | AMMONIUM LACTATE-LOTION-EQ12%BASE | PERRIGO | 71.5% | 157.7% | 86.0% | 104.7% |
| 15 | AMMONIUM LACTATE-LOTION-EQ12%BASE | TARO | 53.4% | 153.7% | 220.2% | 118.0% |
| 16 | BETAMETHASONE DIPROPIONATE-CREAM-EQ0.05%BASE | SANDOZ | 2327.6% | 2801.5% | 3101.3% | 404.4% |
| 17 | BETAMETHASONE DIPROPIONATE-CREAM-EQ0.05%BASE | TARO | 1602.2% | 1868.8% | 1604.9% | 578.9% |
| 18 | BETAMETHASONE DIPROPIONATE-LOTION, AUGMENTED-EQ0.05%BASE | SANDOZ | 90.1% | 135.2% | 36.2% | 73.2% |
| 19 | BETAMETHASONE DIPROPIONATE-LOTION, AUGMENTED-EQ0.05%BASE | TARO | 233.4% | 302.7% | 198.7% | 141.5% |
| 20 | BETAMETHASONE DIPROPIONATE-LOTION-EQ0.05%BASE | PERRIGO | 306.4% | 395.4% | 284.3% | 510.2% |
| 21 | BETAMETHASONE DIPROPIONATE-LOTION-EQ0.05%BASE | SANDOZ | 609.5% | 821.1% | 546.5% | 48.6% |
| 22 | BETAMETHASONE DIPROPIONATE; CLOTRIMAZOLE-CREAM-EQ0.05%BASE;1% | ACTAVIS | 236.5% | 364.5% | 499.1% | 154.6% |
| 23 | BETAMETHASONE DIPROPIONATE; CLOTRIMAZOLE-CREAM-EQ0.05%BASE;1% | SANDOZ | 268.6% | 403.9% | 2090.6% | 242.1% |
| 24 | BETAMETHASONE DIPROPIONATE; CLOTRIMAZOLE-CREAM-EQ0.05%BASE;1% | TARO | 242.0% | 313.5% | 537.6% | 276.7% |
| 25 | BETAMETHASONE DIPROPIONATE; CLOTRIMAZOLE-LOTION-EQ0.05%BASE;1% | SANDOZ | 632.9% | 914.6% | 360.7% | 367.3% |
| 26 | BETAMETHASONE DIPROPIONATE; CLOTRIMAZOLE-LOTION-EQ0.05%BASE;1% | TARO | 512.5% | 585.2% | 827.6% | 315.4% |
| 27 | BETAMETHASONE VALERATE-CREAM-EQ0.1%BASE | SANDOZ | 547.2% | 834.6% | 857.9% | 842.8% |
| 28 | BETAMETHASONE VALERATE-CREAM-EQ0.1%BASE | TARO | 392.7% | 580.0% | 488.1% | 779.7% |
| 29 | BETAMETHASONE VALERATE-LOTION-EQ0.1%BASE | G&W | -- | -- | -- | -- |
| 30 | BETAMETHASONE VALERATE-LOTION-EQ0.1%BASE | SANDOZ | -- | 1193.1% | 625.8% | 417.1% |
| 31 | BETAMETHASONE VALERATE-OINTMENT-EQ0.1%BASE | ACTAVIS | -- | 945.1% | 708.6% | 912.6% |
| 32 | BETAMETHASONE VALERATE-OINTMENT-EQ0.1%BASE | SANDOZ | -- | 785.5% | 540.4% | 610.0% |
| 33 | BROMOCRIPTINE MESYLATE-TABLET-EQ2.5MGBASE | MYLAN | 186.1% | 161.8% | -- | 127.6% |
| 34 | BROMOCRIPTINE MESYLATE-TABLET-EQ2.5MGBASE | PERRIGO | 2.6% | -14.9% | 69.2% | 110.3% |
| 35 | BROMOCRIPTINE MESYLATE-TABLET-EQ2.5MGBASE | SANDOZ | 122.6% | 68.4% | 128.4% | 68.4% |
| 36 | CALCIPOTRIENE-SOLUTION-0.005% | G&W | -- | -- | -- | 1.2% |
| 37 | CALCIPOTRIENE-SOLUTION-0.005% | SANDOZ | 119.2% | 58.6% | 6.8% | 25.1% |
| 38 | CEFPODOXIME PROXETIL-FOR SUSPENSION-EQ100MGBASE/5ML | AUROBINDO | 271.3% | 43.8% | 27.6% | 23.5% |
| 39 | CEFPODOXIME PROXETIL-FOR SUSPENSION-EQ100MGBASE/5ML | SANDOZ | 258.8% | 109.6% | -2.1% | 52.5% |
| 40 | CEFPODOXIME PROXETIL-TABLET-EQ100MGBASE | AUROBINDO | 321.6% | 254.6% | -5.2% | 17.5% |
| 41 | CEFPODOXIME PROXETIL-TABLET-EQ100MGBASE | SANDOZ | 125.8% | 28.2% | -14.8% | -2.2% |
| 42 | CEFPODOXIME PROXETIL-TABLET-EQ200MGBASE | AUROBINDO | 498.2% | 287.5% | -5.5% | 12.9% |
| 43 | CEFPODOXIME PROXETIL-TABLET-EQ200MGBASE | SANDOZ | 181.3% | 45.6% | 9.7% | -2.0% |
| 44 | CICLOPIROX-CREAM-0.77% | GLENMARK | -19.8% | -8.6% | -35.6% | 14.2% |
| 45 | CICLOPIROX-CREAM-0.77% | G&W | -- | -- | -- | -- |
| 46 | CICLOPIROX-CREAM-0.77% | PERRIGO | -30.3% | -20.2% | -19.3% | 0.5% |
| 47 | CICLOPIROX-SHAMPOO-1% | ACTAVIS | -9.7% | 17.6% | 89.1% | 3.8% |
| 48 | CICLOPIROX-SHAMPOO-1% | PERRIGO | 24.2% | 60.8% | 83.1% | 17.7% |
| 49 | CICLOPIROX-SHAMPOO-1% | SANDOZ | -- | -- | -- | -- |
| 50 | CICLOPIROX-SOLUTION-8% | G&W | -- | -- | -- | 178.8% |
| 51 | CICLOPIROX-SOLUTION-8% | PERRIGO | 128.8% | 109.3% | 98.3% | 113.9% |
| 52 | CICLOPIROX-SOLUTION-8% | SANDOZ | 86.3% | 23.1% | 36.0% | -4.7% |
| 53 | CLINDAMYCIN PHOSPHATE-CREAM-EQ2%BASE | GREENSTONE | -- | -- | -- | 64.4% |
| 54 | CLINDAMYCIN PHOSPHATE-CREAM-EQ2%BASE | SANDOZ | -- | 178.4% | 99.5% | 115.0% |
| 55 | CLINDAMYCIN PHOSPHATE-GEL-EQ1%BASE | GREENSTONE | -- | -- | -- | 259.6% |
| 56 | CLINDAMYCIN PHOSPHATE-GEL-EQ1%BASE | SANDOZ | -- | 479.9% | 233.6% | 342.8% |
| 57 | CLINDAMYCIN PHOSPHATE-LOTION-EQ1%BASE | GREENSTONE | -- | -- | -- | 229.8% |
| 58 | CLINDAMYCIN PHOSPHATE-LOTION-EQ1%BASE | SANDOZ | -- | 454.2% | 201.1% | 232.3% |
| 59 | CLINDAMYCIN PHOSPHATE-SOLUTION-EQ1%BASE | GREENSTONE | -- | -- | -- | 334.3% |
| 60 | CLINDAMYCIN PHOSPHATE-SOLUTION-EQ1%BASE | PERRIGO | -- | -- | -- | -- |
| 61 | CLINDAMYCIN PHOSPHATE-SOLUTION-EQ1%BASE | SANDOZ | 438.3% | 576.7% | 356.0% | 475.4% |
| 62 | CLINDAMYCIN PHOSPHATE-SOLUTION-EQ1%BASE | TARO | 489.5% | 598.2% | 959.3% | 532.3% |
| 63 | CLOBETASOL PROPIONATE EMOLLIENT-CREAM-0.05% | SANDOZ | 634.0% | 791.6% | 681.6% | 432.8% |
| 64 | CLOBETASOL PROPIONATE EMOLLIENT-CREAM-0.05% | TARO | 556.6% | 729.6% | 826.7% | 426.0% |
| 65 | CLOBETASOL PROPIONATE-CREAM-0.05% | SANDOZ | 1216.3% | 1755.6% | 1609.1% | 639.2% |
| 66 | CLOBETASOL PROPIONATE-CREAM-0.05% | TARO | 237.1% | 408.5% | 649.7% | 594.1% |
| 67 | CLOBETASOL PROPIONATE-GEL-0.05% | SANDOZ | 1761.9% | 1862.9% | 1080.9% | 188.3% |
| 68 | CLOBETASOL PROPIONATE-GEL-0.05% | TARO | 739.2% | 852.6% | 651.3% | 433.6% |
| 69 | CLOBETASOL PROPIONATE-OINTMENT-0.05% | SANDOZ | 2018.5% | 2864.5% | 2243.5% | 1193.8% |

HIGHLY CONFIDENTIAL: SUBJECT TO PROTECTIVE ORDER

| # | Drug | Defendant | Overcharge (%), Net Price Data, Before and After Model | Overcharge (%), Net Price Data, DiD Model | Overcharge (%), AMP Data | Overcharge (%), IQVIA Data |
|---|---|---|---|---|---|---|
| 70 | CLOBETASOL PROPIONATE-OINTMENT-0.05% | TARO | 708.2% | 1078.1% | 1143.3% | 961.5% |
| 71 | CLOBETASOL PROPIONATE-SOLUTION-0.05% | SANDOZ | 449.3% | 628.1% | 737.8% | 201.8% |
| 72 | CLOBETASOL PROPIONATE-SOLUTION-0.05% | TARO | 173.3% | 263.1% | 331.2% | 184.6% |
| 73 | CLOBETASOL PROPIONATE-SOLUTION-0.05% | WOCKHARDT | 240.5% | 336.5% | 317.8% | 383.2% |
| 74 | CLOTRIMAZOLE-CREAM-1% | SANDOZ | 14.3% | 49.3% | 222.4% | -44.5% |
| 75 | CLOTRIMAZOLE-CREAM-1% | TARO | -29.7% | 2.1% | 25.9% | -27.1% |
| 76 | DESONIDE-CREAM-0.05% | PERRIGO | -- | -- | -- | 913.6% |
| 77 | DESONIDE-CREAM-0.05% | TARO | 1323.9% | 1570.3% | 2527.9% | 1773.1% |
| 78 | DESONIDE-LOTION-0.05% | ACTAVIS | -- | -- | -- | -- |
| 79 | DESONIDE-LOTION-0.05% | SANDOZ | -- | 882.0% | 339.6% | 695.7% |
| 80 | DESONIDE-OINTMENT-0.05% | PERRIGO | -- | -- | -- | 911.2% |
| 81 | DESONIDE-OINTMENT-0.05% | SANDOZ | 992.9% | 1512.5% | 911.0% | 1465.8% |
| 82 | DESONIDE-OINTMENT-0.05% | TARO | 232.1% | 307.6% | 341.4% | 1531.3% |
| 83 | DESOXIMETASONE-OINTMENT-0.25% | GLENMARK | -- | -- | -- | -- |
| 84 | DESOXIMETASONE-OINTMENT-0.25% | SANDOZ | -- | -- | -- | -- |
| 85 | DESOXIMETASONE-OINTMENT-0.25% | TARO | 109.4% | 90.9% | 46.5% | 24.3% |
| 86 | ECONAZOLE NITRATE-CREAM-1% | PERRIGO | 122.7% | 179.7% | -15.1% | 319.3% |
| 87 | ECONAZOLE NITRATE-CREAM-1% | SANDOZ | 204.9% | 240.2% | 864.3% | 256.5% |
| 88 | ECONAZOLE NITRATE-CREAM-1% | TARO | 460.0% | 576.6% | 351.8% | 271.8% |
| 89 | ECONAZOLE NITRATE-CREAM-1% | TELIGENT | 264.1% | 312.3% | -- | 251.2% |
| 90 | EPLERENONE-TABLET-25MG | GREENSTONE | 121.6% | 81.6% | 46.6% | -9.5% |
| 91 | EPLERENONE-TABLET-25MG | SANDOZ | 25.9% | -6.8% | 2.8% | -4.7% |
| 92 | EPLERENONE-TABLET-50MG | GREENSTONE | 121.0% | 72.7% | 54.6% | -9.6% |
| 93 | EPLERENONE-TABLET-50MG | SANDOZ | 74.6% | 6.5% | 7.1% | -8.8% |
| 94 | ERYTHROMYCIN-SOLUTION-2% | PERRIGO | -- | -- | -- | -- |
| 95 | ERYTHROMYCIN-SOLUTION-2% | SANDOZ | -- | 704.5% | 295.6% | 236.6% |
| 96 | ERYTHROMYCIN-SOLUTION-2% | WOCKHARDT | -- | 212.7% | 495.6% | 146.5% |
| 97 | ETHAMBUTOL HYDROCHLORIDE-TABLET-100MG | G&W | -- | -- | -- | 22.2% |
| 98 | ETHAMBUTOL HYDROCHLORIDE-TABLET-100MG | LUPIN | -- | 513.6% | 18.3% | 16.4% |
| 99 | ETHAMBUTOL HYDROCHLORIDE-TABLET-400MG | G&W | -- | -- | -- | 16.8% |
| 100 | ETHAMBUTOL HYDROCHLORIDE-TABLET-400MG | LUPIN | -- | 228.1% | 0.7% | 2.7% |
| 101 | FLUOCINOLONE ACETONIDE-CREAM-0.01% | G&W | -- | -- | -- | -- |
| 102 | FLUOCINOLONE ACETONIDE-CREAM-0.01% | SANDOZ | -- | 440.0% | 185.2% | 166.9% |
| 103 | FLUOCINOLONE ACETONIDE-CREAM-0.025% | G&W | -- | -- | -- | -- |
| 104 | FLUOCINOLONE ACETONIDE-CREAM-0.025% | SANDOZ | -- | 683.6% | 248.4% | 170.9% |
| 105 | FLUOCINOLONE ACETONIDE-OINTMENT-0.025% | G&W | -- | -- | -- | -- |
| 106 | FLUOCINOLONE ACETONIDE-OINTMENT-0.025% | SANDOZ | -- | 494.7% | 240.3% | 173.2% |
| 107 | FLUOCINONIDE-GEL-0.05% | G&W | -- | -- | -- | -- |
| 108 | FLUOCINONIDE-GEL-0.05% | SANDOZ | -- | -- | -- | -- |
| 109 | FLUOCINONIDE-GEL-0.05% | TARO | 340.7% | 334.7% | 855.7% | 482.1% |
| 110 | FLUOCINONIDE-OINTMENT-0.05% | SANDOZ | -- | -- | -- | 197.3% |
| 111 | FLUOCINONIDE-OINTMENT-0.05% | TARO | 565.5% | 617.6% | 318.7% | 484.9% |
| 112 | FLUOCINONIDE-SOLUTION-0.05% | ACTAVIS | -- | -- | -- | 325.8% |
| 113 | FLUOCINONIDE-SOLUTION-0.05% | SANDOZ | 1071.1% | 1247.7% | 525.9% | 721.1% |
| 114 | FLUOCINONIDE-SOLUTION-0.05% | TARO | 320.8% | 376.4% | 251.7% | 602.3% |
| 115 | GRISEOFULVIN MICROSIZE-TABLET-500MG | SANDOZ | -- | -- | -- | -- |
| 116 | HALOBETASOL PROPIONATE-CREAM-0.05% | G&W | 211.4% | 163.6% | -- | 221.0% |
| 117 | HALOBETASOL PROPIONATE-CREAM-0.05% | PERRIGO | 274.3% | 236.4% | 192.2% | 275.8% |
| 118 | HALOBETASOL PROPIONATE-CREAM-0.05% | SANDOZ | -- | -- | -- | 73.0% |
| 119 | HALOBETASOL PROPIONATE-CREAM-0.05% | TARO | 1174.2% | 948.8% | 883.5% | 190.8% |
| 120 | HALOBETASOL PROPIONATE-OINTMENT-0.05% | G&W | 353.8% | 312.8% | -- | 291.3% |
| 121 | HALOBETASOL PROPIONATE-OINTMENT-0.05% | PERRIGO | 280.6% | 258.7% | 204.4% | 316.5% |
| 122 | HALOBETASOL PROPIONATE-OINTMENT-0.05% | TARO | 516.5% | 569.2% | 1039.6% | 200.2% |
| 123 | HYDROCORTISONE ACETATE-SUPPOSITORY-25MG | G&W | -- | -- | -- | 1763.7% |
| 124 | HYDROCORTISONE ACETATE-SUPPOSITORY-25MG | PERRIGO | -- | -- | -- | 1798.3% |
| 125 | HYDROCORTISONE ACETATE-SUPPOSITORY-30MG | PERRIGO | -- | -- | -- | 489.2% |
| 126 | HYDROCORTISONE VALERATE-CREAM-0.2% | PERRIGO | 572.5% | 566.2% | 546.5% | 447.8% |
| 127 | HYDROCORTISONE VALERATE-CREAM-0.2% | TARO | 679.8% | 742.0% | 794.7% | 488.5% |
| 128 | KETOCONAZOLE-CREAM-2% | G&W | -- | -- | -- | -- |
| 129 | KETOCONAZOLE-CREAM-2% | SANDOZ | 40.1% | 104.2% | 160.6% | 165.0% |
| 130 | KETOCONAZOLE-CREAM-2% | TARO | 136.8% | 237.8% | 136.1% | 170.5% |
| 131 | LATANOPROST-SOLUTION/DROPS-0.005% | GREENSTONE | 59.1% | 15.3% | -14.5% | 3.1% |
| 132 | LATANOPROST-SOLUTION/DROPS-0.005% | SANDOZ | 127.9% | 48.3% | 8.8% | 35.3% |
| 133 | LATANOPROST-SOLUTION/DROPS-0.005% | VALEANT/BAUSCH | 6.4% | -26.4% | 13.3% | 40.9% |
| 134 | LIDOCAINE-OINTMENT-5% | SANDOZ | 317.2% | 434.8% | 393.9% | 333.1% |
| 135 | LIDOCAINE-OINTMENT-5% | TARO | 356.1% | 489.9% | 315.2% | 211.7% |
| 136 | METHAZOLAMIDE-TABLET-25MG | PERRIGO | -22.9% | -4.8% | -- | 96.5% |
| 137 | METHAZOLAMIDE-TABLET-25MG | SANDOZ | 409.3% | 444.7% | 332.7% | 450.2% |
| 138 | METHAZOLAMIDE-TABLET-50MG | PERRIGO | 27.5% | 25.1% | -- | 96.4% |
| 139 | METHAZOLAMIDE-TABLET-50MG | SANDOZ | 919.4% | 805.9% | 401.7% | 491.9% |
| 140 | METHYLPHENIDATE HCL-TABLET, EXTENDED RELEASE-20MG | MALLINCKRODT | 342.3% | 594.7% | 273.3% | -- |
| 141 | METHYLPHENIDATE HCL-TABLET, EXTENDED RELEASE-20MG | SANDOZ | 212.7% | 207.7% | 168.1% | -- |
| 142 | METHYLPHENIDATE HCL-TABLET-10MG | ACTAVIS | 186.5% | 264.4% | 320.4% | 241.8% |
| 143 | METHYLPHENIDATE HCL-TABLET-10MG | MALLINCKRODT | 415.4% | 554.5% | 207.5% | 351.6% |

HIGHLY CONFIDENTIAL: SUBJECT TO PROTECTIVE ORDER

| # | Drug | Defendant | Overcharge (%), Net Price Data, Before and After Model | Overcharge (%), Net Price Data, DiD Model | Overcharge (%), AMP Data | Overcharge (%), IQVIA Data |
|---|---|---|---|---|---|---|
| 144 | METHYLPHENIDATE HCL-TABLET-10MG | SANDOZ | 96.6% | 157.6% | 198.5% | 174.1% |
| 145 | METHYLPHENIDATE HCL-TABLET-10MG | SUN | -- | -- | -- | -- |
| 146 | METHYLPHENIDATE HCL-TABLET-20MG | ACTAVIS | 234.6% | 258.4% | 333.4% | 263.7% |
| 147 | METHYLPHENIDATE HCL-TABLET-20MG | MALLINCKRODT | 527.9% | 585.4% | 215.6% | 419.8% |
| 148 | METHYLPHENIDATE HCL-TABLET-20MG | SANDOZ | 276.9% | 335.0% | 188.1% | 179.5% |
| 149 | METHYLPHENIDATE HCL-TABLET-20MG | SUN | -- | -- | -- | -- |
| 150 | METHYLPHENIDATE HCL-TABLET-5MG | ACTAVIS | 156.8% | 244.3% | 311.7% | 79.5% |
| 151 | METHYLPHENIDATE HCL-TABLET-5MG | MALLINCKRODT | 363.7% | 543.0% | 162.4% | 321.2% |
| 152 | METHYLPHENIDATE HCL-TABLET-5MG | SANDOZ | 77.2% | 149.1% | 315.9% | 165.8% |
| 153 | METHYLPHENIDATE HCL-TABLET-5MG | SUN | -- | -- | -- | -- |
| 154 | METRONIDAZOLE-CREAM-0.75% | ACTAVIS | -- | 180.0% | 231.4% | 194.0% |
| 155 | METRONIDAZOLE-CREAM-0.75% | G&W | -- | 263.2% | -- | 330.0% |
| 156 | METRONIDAZOLE-CREAM-0.75% | SANDOZ | -- | 311.1% | 258.4% | 232.9% |
| 157 | METRONIDAZOLE-GEL-0.75% | G&W | -- | -- | -- | -- |
| 158 | METRONIDAZOLE-GEL-0.75% | SANDOZ | 336.8% | 698.8% | 337.8% | 205.9% |
| 159 | METRONIDAZOLE-GEL-0.75% | TARO | 292.7% | 357.5% | 82.1% | 176.8% |
| 160 | METRONIDAZOLE-LOTION-0.75% | ACTAVIS | -- | 136.0% | 23.7% | 190.4% |
| 161 | METRONIDAZOLE-LOTION-0.75% | SANDOZ | -- | 250.0% | 128.8% | 130.8% |
| 162 | MOMETASONE FUROATE-CREAM-0.1% | GLENMARK | -- | 1.7% | 20.8% | 12.2% |
| 163 | MOMETASONE FUROATE-CREAM-0.1% | G&W | -- | -- | -- | 59.0% |
| 164 | MOMETASONE FUROATE-OINTMENT-0.1% | GLENMARK | 24.1% | 39.8% | 7.5% | -18.6% |
| 165 | MOMETASONE FUROATE-OINTMENT-0.1% | G&W | -- | -- | -- | -15.8% |
| 166 | MOMETASONE FUROATE-SOLUTION-0.1% | GLENMARK | 13.9% | -11.4% | -32.9% | -6.2% |
| 167 | MOMETASONE FUROATE-SOLUTION-0.1% | G&W | -- | -- | -- | 23.0% |
| 168 | NYSTATIN-OINTMENT-100,000UNITS/GM | ACTAVIS | -- | -- | -- | 320.0% |
| 169 | NYSTATIN-OINTMENT-100,000UNITS/GM | PERRIGO | 216.0% | 263.9% | 198.6% | 249.2% |
| 170 | NYSTATIN-OINTMENT-100,000UNITS/GM | SANDOZ | 243.6% | 481.4% | 322.4% | 407.6% |
| 171 | NYSTATIN; TRIAMCINOLONE ACETONIDE-CREAM-100,000UNITS/GM;0.1% | SANDOZ | 2596.9% | 3097.6% | 2520.4% | 4013.4% |
| 172 | NYSTATIN; TRIAMCINOLONE ACETONIDE-CREAM-100,000UNITS/GM;0.1% | TARO | 2139.6% | 2451.6% | 2285.7% | 2599.4% |
| 173 | NYSTATIN; TRIAMCINOLONE ACETONIDE-OINTMENT-100,000UNITS/GM;0.1% | SANDOZ | 3003.8% | 3361.5% | 3046.3% | 3461.4% |
| 174 | NYSTATIN; TRIAMCINOLONE ACETONIDE-OINTMENT-100,000UNITS/GM;0.1% | TARO | 1477.8% | 1636.2% | 1687.5% | 2212.4% |
| 175 | PHENYTOIN SODIUM-CAPSULE-100MGEXTENDED | AMNEAL | 6.0% | 69.5% | 86.6% | 23.8% |
| 176 | PHENYTOIN SODIUM-CAPSULE-100MGEXTENDED | MYLAN | -5.0% | 39.5% | -- | 10.6% |
| 177 | PHENYTOIN SODIUM-CAPSULE-100MGEXTENDED | SUN | 21.3% | 71.5% | -- | 71.5% |
| 178 | PHENYTOIN SODIUM-CAPSULE-100MGEXTENDED | TARO | 114.3% | 192.1% | 215.1% | 133.3% |
| 179 | PROCHLORPERAZINE-SUPPOSITORY-25MG | G&W | -- | -- | -- | 206.3% |
| 180 | PROCHLORPERAZINE-SUPPOSITORY-25MG | PERRIGO | -- | 68.2% | 112.6% | 319.4% |
| 181 | PROMETHAZINE HYDROCHLORIDE-SUPPOSITORY-12.5MG | ACTAVIS | -- | 732.6% | 440.9% | 527.1% |
| 182 | PROMETHAZINE HYDROCHLORIDE-SUPPOSITORY-12.5MG | G&W | -- | -- | -- | 540.0% |
| 183 | PROMETHAZINE HYDROCHLORIDE-SUPPOSITORY-12.5MG | PERRIGO | -- | 190.2% | 154.3% | 396.3% |
| 184 | PROMETHAZINE HYDROCHLORIDE-SUPPOSITORY-25MG | ACTAVIS | -- | 604.3% | 502.3% | 527.8% |
| 185 | PROMETHAZINE HYDROCHLORIDE-SUPPOSITORY-25MG | G&W | -- | -- | -- | 541.3% |
| 186 | PROMETHAZINE HYDROCHLORIDE-SUPPOSITORY-25MG | PERRIGO | -- | 169.0% | 100.9% | 406.2% |
| 187 | TERCONAZOLE-CREAM-0.8% | ACTAVIS | 199.1% | 162.5% | 190.1% | 113.3% |
| 188 | TERCONAZOLE-CREAM-0.8% | SANDOZ | -- | -- | -- | -- |
| 189 | TERCONAZOLE-CREAM-0.8% | TARO | 121.8% | 105.5% | 97.9% | 119.5% |
| 190 | TRIAMCINOLONE ACETONIDE-CREAM-0.025% | PERRIGO | 24.7% | 101.0% | 62.6% | 93.9% |
| 191 | TRIAMCINOLONE ACETONIDE-CREAM-0.025% | SANDOZ | -- | -- | -- | 176.1% |
| 192 | TRIAMCINOLONE ACETONIDE-CREAM-0.1% | PERRIGO | -8.6% | 62.9% | 34.4% | 56.2% |
| 193 | TRIAMCINOLONE ACETONIDE-CREAM-0.1% | SANDOZ | -- | -- | -- | 151.0% |
| 194 | TRIAMCINOLONE ACETONIDE-CREAM-0.5% | PERRIGO | 98.9% | 125.2% | 88.4% | 160.9% |
| 195 | TRIAMCINOLONE ACETONIDE-CREAM-0.5% | SANDOZ | -- | -- | -- | 241.7% |
| 196 | TRIAMCINOLONE ACETONIDE-OINTMENT-0.025% | PERRIGO | 34.0% | 113.7% | 77.6% | 107.3% |
| 197 | TRIAMCINOLONE ACETONIDE-OINTMENT-0.025% | SANDOZ | -- | -- | -- | 209.1% |
| 198 | TRIAMCINOLONE ACETONIDE-OINTMENT-0.1% | PERRIGO | 20.2% | 122.7% | 78.1% | 97.9% |
| 199 | TRIAMCINOLONE ACETONIDE-OINTMENT-0.1% | SANDOZ | -- | -- | -- | 168.9% |
| 200 | TRIAMCINOLONE ACETONIDE-OINTMENT-0.5% | PERRIGO | 41.1% | 102.6% | 99.6% | 145.9% |
| 201 | TRIAMCINOLONE ACETONIDE-PASTE-0.1% | TARO | 42.5% | 15.0% | -1.9% | 4.2% |

HIGHLY CONFIDENTIAL: SUBJECT TO PROTECTIVE ORDER

# Appendix C Table 10
## Overcharge Estimates from Own vs. Average Price Models

| # | Drug | Defendant | Overcharge (%), Net Price Data | Overcharge (%), AMP Data | Overcharge (%), IQVIA Data |
|---|---|---|---|---|---|
| 1 | ACETAZOLAMIDE-TABLET-125MG | TARO | 312.6% | 225.2% | 329.3% |
| 2 | ACETAZOLAMIDE-TABLET-250MG | LANNETT | 272.6% | 247.9% | 145.2% |
| 3 | ACETAZOLAMIDE-TABLET-250MG | TARO | 157.5% | 173.4% | 206.6% |
| 4 | ALCLOMETASONE DIPROPIONATE-CREAM-0.05% | GLENMARK | 104.3% | 33.9% | 75.3% |
| 5 | ALCLOMETASONE DIPROPIONATE-CREAM-0.05% | SANDOZ | 268.4% | 118.4% | 142.1% |
| 6 | ALCLOMETASONE DIPROPIONATE-CREAM-0.05% | TARO | 61.8% | 80.1% | 75.7% |
| 7 | ALCLOMETASONE DIPROPIONATE-OINTMENT-0.05% | GLENMARK | 314.4% | 216.7% | 121.6% |
| 8 | ALCLOMETASONE DIPROPIONATE-OINTMENT-0.05% | SANDOZ | 108.4% | 50.4% | 16.0% |
| 9 | ALCLOMETASONE DIPROPIONATE-OINTMENT-0.05% | TARO | 298.9% | 286.8% | 135.4% |
| 10 | AMMONIUM LACTATE-CREAM-EQ12%BASE | ACTAVIS | 25.8% | 97.9% | 41.9% |
| 11 | AMMONIUM LACTATE-CREAM-EQ12%BASE | PERRIGO | 75.4% | 76.6% | 69.9% |
| 12 | AMMONIUM LACTATE-CREAM-EQ12%BASE | TARO | 93.2% | 137.5% | 77.8% |
| 13 | AMMONIUM LACTATE-LOTION-EQ12%BASE | ACTAVIS | 14.5% | 46.7% | 18.1% |
| 14 | AMMONIUM LACTATE-LOTION-EQ12%BASE | PERRIGO | 140.2% | 75.5% | 84.4% |
| 15 | AMMONIUM LACTATE-LOTION-EQ12%BASE | TARO | 159.1% | 224.2% | 127.3% |
| 16 | BETAMETHASONE DIPROPIONATE-CREAM-EQ0.05%BASE | SANDOZ | 2784.4% | 2658.1% | 521.5% |
| 17 | BETAMETHASONE DIPROPIONATE-CREAM-EQ0.05%BASE | TARO | 1806.4% | 1832.7% | 430.5% |
| 18 | BETAMETHASONE DIPROPIONATE-LOTION, AUGMENTED-EQ0.05%BASE | SANDOZ | 262.3% | 89.2% | 60.7% |
| 19 | BETAMETHASONE DIPROPIONATE-LOTION, AUGMENTED-EQ0.05%BASE | TARO | 185.8% | 128.8% | 155.3% |
| 20 | BETAMETHASONE DIPROPIONATE-LOTION-EQ0.05%BASE | PERRIGO | 478.0% | 349.3% | 139.3% |
| 21 | BETAMETHASONE DIPROPIONATE-LOTION-EQ0.05%BASE | SANDOZ | 560.4% | 371.8% | 257.9% |
| 22 | BETAMETHASONE DIPROPIONATE; CLOTRIMAZOLE-CREAM-EQ0.05%BASE;1% | ACTAVIS | 365.6% | 785.2% | 178.8% |
| 23 | BETAMETHASONE DIPROPIONATE; CLOTRIMAZOLE-CREAM-EQ0.05%BASE;1% | SANDOZ | 435.5% | 788.1% | 228.7% |
| 24 | BETAMETHASONE DIPROPIONATE; CLOTRIMAZOLE-CREAM-EQ0.05%BASE;1% | TARO | 300.1% | 643.6% | 244.1% |
| 25 | BETAMETHASONE DIPROPIONATE; CLOTRIMAZOLE-LOTION-EQ0.05%BASE;1% | SANDOZ | 883.3% | 472.6% | 363.4% |
| 26 | BETAMETHASONE DIPROPIONATE; CLOTRIMAZOLE-LOTION-EQ0.05%BASE;1% | TARO | 606.0% | 642.2% | 319.7% |
| 27 | BETAMETHASONE VALERATE-CREAM-EQ0.1%BASE | SANDOZ | 1035.5% | 975.0% | 895.7% |
| 28 | BETAMETHASONE VALERATE-CREAM-EQ0.1%BASE | TARO | 491.2% | 442.0% | 729.6% |
| 29 | BETAMETHASONE VALERATE-LOTION-EQ0.1%BASE | G&W | -- | -- | 497.0% |
| 30 | BETAMETHASONE VALERATE-LOTION-EQ0.1%BASE | SANDOZ | 1193.5% | 629.1% | 417.3% |
| 31 | BETAMETHASONE VALERATE-OINTMENT-EQ0.1%BASE | ACTAVIS | 957.4% | 772.6% | 814.7% |
| 32 | BETAMETHASONE VALERATE-OINTMENT-EQ0.1%BASE | SANDOZ | 776.4% | 490.8% | 689.9% |
| 33 | BROMOCRIPTINE MESYLATE-TABLET-EQ2.5MGBASE | MYLAN | 23.8% | -- | 137.1% |
| 34 | BROMOCRIPTINE MESYLATE-TABLET-EQ2.5MGBASE | PERRIGO | 158.4% | 89.2% | 78.9% |
| 35 | BROMOCRIPTINE MESYLATE-TABLET-EQ2.5MGBASE | SANDOZ | 25.5% | 110.3% | 90.9% |
| 36 | CALCIPOTRIENE-SOLUTION-0.005% | G&W | -- | -- | 13.6% |
| 37 | CALCIPOTRIENE-SOLUTION-0.005% | SANDOZ | 58.3% | 6.2% | 22.8% |
| 38 | CEFPODOXIME PROXETIL-FOR SUSPENSION-EQ100MGBASE/5ML | AUROBINDO | 24.1% | 21.8% | 19.5% |
| 39 | CEFPODOXIME PROXETIL-FOR SUSPENSION-EQ100MGBASE/5ML | SANDOZ | 115.4% | -1.4% | 59.5% |
| 40 | CEFPODOXIME PROXETIL-TABLET-EQ100MGBASE | AUROBINDO | -1.9% | -5.9% | 0.9% |
| 41 | CEFPODOXIME PROXETIL-TABLET-EQ100MGBASE | SANDOZ | 77.1% | -15.1% | 14.3% |
| 42 | CEFPODOXIME PROXETIL-TABLET-EQ200MGBASE | AUROBINDO | 16.4% | -2.6% | 2.8% |
| 43 | CEFPODOXIME PROXETIL-TABLET-EQ200MGBASE | SANDOZ | 91.9% | 8.0% | 8.2% |
| 44 | CICLOPIROX-CREAM-0.77% | GLENMARK | -22.3% | -29.7% | 21.6% |
| 45 | CICLOPIROX-CREAM-0.77% | G&W | -- | -- | 141.1% |
| 46 | CICLOPIROX-CREAM-0.77% | PERRIGO | -4.7% | -26.8% | -5.0% |

HIGHLY CONFIDENTIAL: SUBJECT TO PROTECTIVE ORDER

| # | Drug | Defendant | Overcharge (%), Net Price Data | Overcharge (%), AMP Data | Overcharge (%), IQVIA Data |
|---|---|---|---|---|---|
| 47 | CICLOPIROX-SHAMPOO-1% | ACTAVIS | 19.9% | 78.6% | -1.4% |
| 48 | CICLOPIROX-SHAMPOO-1% | PERRIGO | 60.4% | 91.4% | 26.2% |
| 49 | CICLOPIROX-SHAMPOO-1% | SANDOZ | 144.9% | 101.9% | 23.8% |
| 50 | CICLOPIROX-SOLUTION-8% | G&W | -- | -- | 191.9% |
| 51 | CICLOPIROX-SOLUTION-8% | PERRIGO | 64.5% | 44.5% | 109.1% |
| 52 | CICLOPIROX-SOLUTION-8% | SANDOZ | 41.5% | 56.9% | -4.6% |
| 53 | CLINDAMYCIN PHOSPHATE-CREAM-EQ2%BASE | GREENSTONE | 165.1% | 144.3% | 78.6% |
| 54 | CLINDAMYCIN PHOSPHATE-CREAM-EQ2%BASE | SANDOZ | 178.2% | 99.5% | 94.3% |
| 55 | CLINDAMYCIN PHOSPHATE-GEL-EQ1%BASE | GREENSTONE | 443.8% | 269.3% | 270.4% |
| 56 | CLINDAMYCIN PHOSPHATE-GEL-EQ1%BASE | SANDOZ | 480.1% | 233.3% | 330.4% |
| 57 | CLINDAMYCIN PHOSPHATE-LOTION-EQ1%BASE | GREENSTONE | 335.8% | 196.4% | 233.8% |
| 58 | CLINDAMYCIN PHOSPHATE-LOTION-EQ1%BASE | SANDOZ | 454.7% | 201.2% | 228.7% |
| 59 | CLINDAMYCIN PHOSPHATE-SOLUTION-EQ1%BASE | GREENSTONE | 469.1% | -- | 326.6% |
| 60 | CLINDAMYCIN PHOSPHATE-SOLUTION-EQ1%BASE | PERRIGO | 549.7% | 423.6% | 348.6% |
| 61 | CLINDAMYCIN PHOSPHATE-SOLUTION-EQ1%BASE | SANDOZ | 603.7% | 386.3% | 459.5% |
| 62 | CLINDAMYCIN PHOSPHATE-SOLUTION-EQ1%BASE | TARO | 564.9% | 874.0% | 575.8% |
| 63 | CLOBETASOL PROPIONATE EMOLLIENT-CREAM-0.05% | SANDOZ | 633.9% | 625.9% | 360.7% |
| 64 | CLOBETASOL PROPIONATE EMOLLIENT-CREAM-0.05% | TARO | 857.5% | 875.2% | 506.3% |
| 65 | CLOBETASOL PROPIONATE-CREAM-0.05% | SANDOZ | 1511.9% | 1398.8% | 527.1% |
| 66 | CLOBETASOL PROPIONATE-CREAM-0.05% | TARO | 481.4% | 734.5% | 726.6% |
| 67 | CLOBETASOL PROPIONATE-GEL-0.05% | SANDOZ | 1643.4% | 987.3% | 173.5% |
| 68 | CLOBETASOL PROPIONATE-GEL-0.05% | TARO | 947.1% | 701.9% | 462.7% |
| 69 | CLOBETASOL PROPIONATE-OINTMENT-0.05% | SANDOZ | 2047.1% | 1678.6% | 975.0% |
| 70 | CLOBETASOL PROPIONATE-OINTMENT-0.05% | TARO | 1477.8% | 1478.3% | 1226.8% |
| 71 | CLOBETASOL PROPIONATE-SOLUTION-0.05% | SANDOZ | 482.3% | 556.2% | 293.5% |
| 72 | CLOBETASOL PROPIONATE-SOLUTION-0.05% | TARO | 307.6% | 375.0% | 194.4% |
| 73 | CLOBETASOL PROPIONATE-SOLUTION-0.05% | WOCKHARDT | 380.6% | 403.7% | 253.0% |
| 74 | CLOTRIMAZOLE-CREAM-1% | SANDOZ | 280.4% | 136.7% | -42.6% |
| 75 | CLOTRIMAZOLE-CREAM-1% | TARO | -8.4% | 29.6% | -29.3% |
| 76 | DESONIDE-CREAM-0.05% | PERRIGO | 869.3% | 1365.0% | 899.2% |
| 77 | DESONIDE-CREAM-0.05% | TARO | 1566.8% | 2491.8% | 1833.4% |
| 78 | DESONIDE-LOTION-0.05% | ACTAVIS | 837.2% | 446.1% | 562.2% |
| 79 | DESONIDE-LOTION-0.05% | SANDOZ | 877.3% | 337.5% | 696.3% |
| 80 | DESONIDE-OINTMENT-0.05% | PERRIGO | 968.0% | 856.0% | 898.3% |
| 81 | DESONIDE-OINTMENT-0.05% | SANDOZ | 1439.0% | 934.6% | 1386.4% |
| 82 | DESONIDE-OINTMENT-0.05% | TARO | 313.5% | 339.3% | 1666.2% |
| 83 | DESOXIMETASONE-OINTMENT-0.25% | GLENMARK | -18.7% | 4.7% | -14.9% |
| 84 | DESOXIMETASONE-OINTMENT-0.25% | SANDOZ | 61.3% | 37.6% | 17.8% |
| 85 | DESOXIMETASONE-OINTMENT-0.25% | TARO | 89.8% | 45.7% | 24.6% |
| 86 | ECONAZOLE NITRATE-CREAM-1% | PERRIGO | 74.5% | -29.3% | 251.4% |
| 87 | ECONAZOLE NITRATE-CREAM-1% | SANDOZ | 240.6% | 822.2% | 300.7% |
| 88 | ECONAZOLE NITRATE-CREAM-1% | TARO | 575.5% | 416.6% | 280.2% |
| 89 | ECONAZOLE NITRATE-CREAM-1% | TELIGENT | 1173.6% | -- | 412.4% |
| 90 | EPLERENONE-TABLET-25MG | GREENSTONE | -14.1% | -5.7% | -8.0% |
| 91 | EPLERENONE-TABLET-25MG | SANDOZ | 18.0% | 17.1% | -6.0% |
| 92 | EPLERENONE-TABLET-50MG | GREENSTONE | -11.9% | -6.5% | -10.3% |
| 93 | EPLERENONE-TABLET-50MG | SANDOZ | 28.7% | 22.2% | -7.4% |
| 94 | ERYTHROMYCIN-SOLUTION-2% | PERRIGO | 431.0% | 339.7% | 162.2% |
| 95 | ERYTHROMYCIN-SOLUTION-2% | SANDOZ | 605.2% | 370.8% | 208.1% |
| 96 | ERYTHROMYCIN-SOLUTION-2% | WOCKHARDT | 361.3% | 253.1% | 167.3% |
| 97 | ETHAMBUTOL HYDROCHLORIDE-TABLET-100MG | G&W | -- | -- | 17.1% |
| 98 | ETHAMBUTOL HYDROCHLORIDE-TABLET-100MG | LUPIN | 516.6% | 19.1% | 20.6% |
| 99 | ETHAMBUTOL HYDROCHLORIDE-TABLET-400MG | G&W | -- | -- | 12.9% |
| 100 | ETHAMBUTOL HYDROCHLORIDE-TABLET-400MG | LUPIN | 225.5% | 1.0% | 26.2% |
| 101 | FLUOCINOLONE ACETONIDE-CREAM-0.01% | G&W | 220.0% | -- | 177.0% |
| 102 | FLUOCINOLONE ACETONIDE-CREAM-0.01% | SANDOZ | 439.4% | 185.6% | 167.4% |

HIGHLY CONFIDENTIAL: SUBJECT TO PROTECTIVE ORDER

| # | Drug | Defendant | Overcharge (%), Net Price Data | Overcharge (%), AMP Data | Overcharge (%), IQVIA Data |
|---|---|---|---|---|---|
| 103 | FLUOCINOLONE ACETONIDE-CREAM-0.025% | G&W | 346.4% | -- | 188.9% |
| 104 | FLUOCINOLONE ACETONIDE-CREAM-0.025% | SANDOZ | 679.5% | 247.4% | 171.7% |
| 105 | FLUOCINOLONE ACETONIDE-OINTMENT-0.025% | G&W | 372.3% | -- | 172.4% |
| 106 | FLUOCINOLONE ACETONIDE-OINTMENT-0.025% | SANDOZ | 490.6% | 238.7% | 174.3% |
| 107 | FLUOCINONIDE-GEL-0.05% | G&W | 768.7% | -- | 206.3% |
| 108 | FLUOCINONIDE-GEL-0.05% | SANDOZ | -- | -- | -- |
| 109 | FLUOCINONIDE-GEL-0.05% | TARO | 397.7% | 691.2% | 514.4% |
| 110 | FLUOCINONIDE-OINTMENT-0.05% | SANDOZ | 422.4% | 164.0% | 193.2% |
| 111 | FLUOCINONIDE-OINTMENT-0.05% | TARO | 620.9% | 320.2% | 486.8% |
| 112 | FLUOCINONIDE-SOLUTION-0.05% | ACTAVIS | 798.0% | 651.5% | 297.4% |
| 113 | FLUOCINONIDE-SOLUTION-0.05% | SANDOZ | 741.9% | 320.4% | 622.7% |
| 114 | FLUOCINONIDE-SOLUTION-0.05% | TARO | 511.4% | 328.4% | 744.7% |
| 115 | GRISEOFULVIN MICROSIZE-TABLET-500MG | SANDOZ | -- | -- | -- |
| 116 | HALOBETASOL PROPIONATE-CREAM-0.05% | G&W | 301.8% | -- | 202.6% |
| 117 | HALOBETASOL PROPIONATE-CREAM-0.05% | PERRIGO | 193.0% | 186.8% | 244.1% |
| 118 | HALOBETASOL PROPIONATE-CREAM-0.05% | SANDOZ | 372.8% | 392.8% | 103.7% |
| 119 | HALOBETASOL PROPIONATE-CREAM-0.05% | TARO | 699.5% | 898.2% | 233.6% |
| 120 | HALOBETASOL PROPIONATE-OINTMENT-0.05% | G&W | 433.6% | -- | 299.4% |
| 121 | HALOBETASOL PROPIONATE-OINTMENT-0.05% | PERRIGO | 195.1% | 228.5% | 278.5% |
| 122 | HALOBETASOL PROPIONATE-OINTMENT-0.05% | TARO | 530.7% | 905.8% | 259.3% |
| 123 | HYDROCORTISONE ACETATE-SUPPOSITORY-25MG | G&W | -- | -- | 1737.1% |
| 124 | HYDROCORTISONE ACETATE-SUPPOSITORY-25MG | PERRIGO | -- | -- | 1834.0% |
| 125 | HYDROCORTISONE ACETATE-SUPPOSITORY-30MG | PERRIGO | -- | -- | 490.8% |
| 126 | HYDROCORTISONE VALERATE-CREAM-0.2% | PERRIGO | 574.8% | 582.3% | 427.3% |
| 127 | HYDROCORTISONE VALERATE-CREAM-0.2% | TARO | 715.6% | 721.5% | 520.3% |
| 128 | KETOCONAZOLE-CREAM-2% | G&W | 447.0% | -- | 180.6% |
| 129 | KETOCONAZOLE-CREAM-2% | SANDOZ | 106.1% | 144.7% | 138.3% |
| 130 | KETOCONAZOLE-CREAM-2% | TARO | 237.6% | 147.6% | 199.5% |
| 131 | LATANOPROST-SOLUTION/DROPS-0.005% | GREENSTONE | 8.6% | 0.2% | 22.3% |
| 132 | LATANOPROST-SOLUTION/DROPS-0.005% | SANDOZ | 11.5% | 11.5% | 15.4% |
| 133 | LATANOPROST-SOLUTION/DROPS-0.005% | VALEANT/BAUSCH | -10.2% | -4.8% | 40.3% |
| 134 | LIDOCAINE-OINTMENT-5% | SANDOZ | 685.1% | 507.3% | 379.7% |
| 135 | LIDOCAINE-OINTMENT-5% | TARO | 340.7% | 250.2% | 185.9% |
| 136 | METHAZOLAMIDE-TABLET-25MG | PERRIGO | 444.6% | 561.7% | 240.1% |
| 137 | METHAZOLAMIDE-TABLET-25MG | SANDOZ | 354.1% | 334.7% | 268.7% |
| 138 | METHAZOLAMIDE-TABLET-50MG | PERRIGO | 710.5% | 708.6% | 264.4% |
| 139 | METHAZOLAMIDE-TABLET-50MG | SANDOZ | 643.9% | 404.3% | 276.5% |
| 140 | METHYLPHENIDATE HCL-TABLET, EXTENDED RELEASE-20MG | MALLINCKRODT | 594.7% | 406.0% | -12.6% |
| 141 | METHYLPHENIDATE HCL-TABLET, EXTENDED RELEASE-20MG | SANDOZ | 210.4% | 142.6% | -- |
| 142 | METHYLPHENIDATE HCL-TABLET-10MG | ACTAVIS | 245.9% | 296.8% | 214.4% |
| 143 | METHYLPHENIDATE HCL-TABLET-10MG | MALLINCKRODT | 538.5% | 246.1% | 319.4% |
| 144 | METHYLPHENIDATE HCL-TABLET-10MG | SANDOZ | 154.2% | 190.8% | 211.3% |
| 145 | METHYLPHENIDATE HCL-TABLET-10MG | SUN | 254.1% | -- | 103.8% |
| 146 | METHYLPHENIDATE HCL-TABLET-20MG | ACTAVIS | 269.5% | 295.9% | 211.7% |
| 147 | METHYLPHENIDATE HCL-TABLET-20MG | MALLINCKRODT | 669.8% | 256.7% | 397.6% |
| 148 | METHYLPHENIDATE HCL-TABLET-20MG | SANDOZ | 249.8% | 193.3% | 240.4% |
| 149 | METHYLPHENIDATE HCL-TABLET-20MG | SUN | 392.7% | -- | 132.7% |
| 150 | METHYLPHENIDATE HCL-TABLET-5MG | ACTAVIS | 236.5% | 364.9% | 72.9% |
| 151 | METHYLPHENIDATE HCL-TABLET-5MG | MALLINCKRODT | 532.6% | 269.5% | 219.2% |
| 152 | METHYLPHENIDATE HCL-TABLET-5MG | SANDOZ | 133.4% | 184.5% | 208.8% |
| 153 | METHYLPHENIDATE HCL-TABLET-5MG | SUN | 248.8% | -- | 109.5% |
| 154 | METRONIDAZOLE-CREAM-0.75% | ACTAVIS | 210.9% | 243.5% | 236.0% |
| 155 | METRONIDAZOLE-CREAM-0.75% | G&W | 264.0% | -- | 241.0% |
| 156 | METRONIDAZOLE-CREAM-0.75% | SANDOZ | 282.2% | 249.4% | 270.4% |
| 157 | METRONIDAZOLE-GEL-0.75% | G&W | 338.7% | -- | 55.0% |
| 158 | METRONIDAZOLE-GEL-0.75% | SANDOZ | 956.7% | 291.6% | 217.8% |

HIGHLY CONFIDENTIAL: SUBJECT TO PROTECTIVE ORDER

| # | Drug | Defendant | Overcharge (%), Net Price Data | Overcharge (%), AMP Data | Overcharge (%), IQVIA Data |
|---|---|---|---|---|---|
| 159 | METRONIDAZOLE-GEL-0.75% | TARO | 234.1% | 98.2% | 167.2% |
| 160 | METRONIDAZOLE-LOTION-0.75% | ACTAVIS | 124.7% | 57.8% | 135.7% |
| 161 | METRONIDAZOLE-LOTION-0.75% | SANDOZ | 263.4% | 84.6% | 172.6% |
| 162 | MOMETASONE FUROATE-CREAM-0.1% | GLENMARK | 2.1% | 21.1% | 28.6% |
| 163 | MOMETASONE FUROATE-CREAM-0.1% | G&W | -- | -- | 44.1% |
| 164 | MOMETASONE FUROATE-OINTMENT-0.1% | GLENMARK | 41.0% | 7.7% | -15.1% |
| 165 | MOMETASONE FUROATE-OINTMENT-0.1% | G&W | -- | -- | -17.4% |
| 166 | MOMETASONE FUROATE-SOLUTION-0.1% | GLENMARK | -11.4% | -32.9% | 36.1% |
| 167 | MOMETASONE FUROATE-SOLUTION-0.1% | G&W | -- | -- | -4.9% |
| 168 | NYSTATIN-OINTMENT-100,000UNITS/GM | ACTAVIS | 437.0% | 368.4% | 293.7% |
| 169 | NYSTATIN-OINTMENT-100,000UNITS/GM | PERRIGO | 315.5% | 232.7% | 291.1% |
| 170 | NYSTATIN-OINTMENT-100,000UNITS/GM | SANDOZ | 396.6% | 265.2% | 360.6% |
| 171 | NYSTATIN; TRIAMCINOLONE ACETONIDE-CREAM-100,000UNITS/GM;0.1% | SANDOZ | 3592.2% | 2800.8% | 3651.8% |
| 172 | NYSTATIN; TRIAMCINOLONE ACETONIDE-CREAM-100,000UNITS/GM;0.1% | TARO | 2219.9% | 2118.7% | 2821.2% |
| 173 | NYSTATIN; TRIAMCINOLONE ACETONIDE-OINTMENT-100,000UNITS/GM;0.1% | SANDOZ | 3086.8% | 2394.1% | 2829.9% |
| 174 | NYSTATIN; TRIAMCINOLONE ACETONIDE-OINTMENT-100,000UNITS/GM;0.1% | TARO | 1709.1% | 1928.6% | 2637.3% |
| 175 | PHENYTOIN SODIUM-CAPSULE-100MGEXTENDED | AMNEAL | -10.4% | 35.8% | 26.7% |
| 176 | PHENYTOIN SODIUM-CAPSULE-100MGEXTENDED | MYLAN | 107.5% | -- | 57.0% |
| 177 | PHENYTOIN SODIUM-CAPSULE-100MGEXTENDED | SUN | 92.0% | -- | 42.8% |
| 178 | PHENYTOIN SODIUM-CAPSULE-100MGEXTENDED | TARO | 154.0% | 259.6% | 89.3% |
| 179 | PROCHLORPERAZINE-SUPPOSITORY-25MG | G&W | -- | -- | 257.8% |
| 180 | PROCHLORPERAZINE-SUPPOSITORY-25MG | PERRIGO | 67.7% | 112.6% | 257.0% |
| 181 | PROMETHAZINE HYDROCHLORIDE-SUPPOSITORY-12.5MG | ACTAVIS | 750.5% | 535.0% | 520.3% |
| 182 | PROMETHAZINE HYDROCHLORIDE-SUPPOSITORY-12.5MG | G&W | -- | -- | 598.0% |
| 183 | PROMETHAZINE HYDROCHLORIDE-SUPPOSITORY-12.5MG | PERRIGO | 185.8% | 144.6% | 361.2% |
| 184 | PROMETHAZINE HYDROCHLORIDE-SUPPOSITORY-25MG | ACTAVIS | 589.4% | 602.4% | 530.8% |
| 185 | PROMETHAZINE HYDROCHLORIDE-SUPPOSITORY-25MG | G&W | -- | -- | 604.9% |
| 186 | PROMETHAZINE HYDROCHLORIDE-SUPPOSITORY-25MG | PERRIGO | 169.5% | 93.6% | 361.6% |
| 187 | TERCONAZOLE-CREAM-0.8% | ACTAVIS | 141.9% | 170.1% | 100.3% |
| 188 | TERCONAZOLE-CREAM-0.8% | SANDOZ | -- | -- | -- |
| 189 | TERCONAZOLE-CREAM-0.8% | TARO | 104.1% | 109.0% | 133.6% |
| 190 | TRIAMCINOLONE ACETONIDE-CREAM-0.025% | PERRIGO | 100.9% | 62.2% | 110.0% |
| 191 | TRIAMCINOLONE ACETONIDE-CREAM-0.025% | SANDOZ | -- | -- | 154.1% |
| 192 | TRIAMCINOLONE ACETONIDE-CREAM-0.1% | PERRIGO | 62.2% | 34.3% | 64.4% |
| 193 | TRIAMCINOLONE ACETONIDE-CREAM-0.1% | SANDOZ | -- | -- | 136.7% |
| 194 | TRIAMCINOLONE ACETONIDE-CREAM-0.5% | PERRIGO | 125.2% | 88.3% | 179.3% |
| 195 | TRIAMCINOLONE ACETONIDE-CREAM-0.5% | SANDOZ | -- | -- | 219.2% |
| 196 | TRIAMCINOLONE ACETONIDE-OINTMENT-0.025% | PERRIGO | 113.8% | 77.0% | 220.8% |
| 197 | TRIAMCINOLONE ACETONIDE-OINTMENT-0.025% | SANDOZ | -- | -- | 101.6% |
| 198 | TRIAMCINOLONE ACETONIDE-OINTMENT-0.1% | PERRIGO | 123.7% | 78.3% | 90.9% |
| 199 | TRIAMCINOLONE ACETONIDE-OINTMENT-0.1% | SANDOZ | -- | -- | 179.1% |
| 200 | TRIAMCINOLONE ACETONIDE-OINTMENT-0.5% | PERRIGO | 103.0% | 98.7% | 146.5% |
| 201 | TRIAMCINOLONE ACETONIDE-PASTE-0.1% | TARO | 15.1% | -1.8% | 4.4% |

HIGHLY CONFIDENTIAL: SUBJECT TO PROTECTIVE ORDER

**Appendix C Table 11**
Overcharge Estimates by Defendant and Drug at Issue (PI Drugs)

| | | | | Before and After Disgorgement | | | Difference in Difference Disgorgement | | |
|---|---|---|---|---|---|---|---|---|---|
| # | Defendant | Drug | Affected Defendant Net Revenues | Overcharge (%) | But-For Revenues | Increase in Net Revenues | Overcharge (%) | But-For Revenues | Increase in Net Revenues |
| 1 | SUN/MUTUAL/TARO | ACETAZOLAMIDE-TABLET-125MG | $20,000,402 | 156.0% | $7,812,714 | $12,187,688 | 311.9% | $4,856,181 | $15,144,221 |
| 2 | LANNETT | ACETAZOLAMIDE-TABLET-250MG | $97,916,491 | 67.6% | $58,405,788 | $39,510,704 | 138.3% | $41,096,172 | $56,820,319 |
| 3 | SUN/MUTUAL/TARO | ACETAZOLAMIDE-TABLET-250MG | $60,182,013 | 126.4% | $26,577,727 | $33,604,287 | 190.8% | $20,692,546 | $39,489,468 |
| 4 | GLENMARK | ALCLOMETASONE DIPROPIONATE-CREAM-0.05% | $7,389,798 | 185.7% | $2,586,745 | $4,803,053 | 166.8% | $2,769,870 | $4,619,928 |
| 5 | SANDOZ | ALCLOMETASONE DIPROPIONATE-CREAM-0.05% | $2,760,960 | 363.9% | $595,222 | $2,165,738 | 345.4% | $619,947 | $2,141,013 |
| 6 | SUN/MUTUAL/TARO | ALCLOMETASONE DIPROPIONATE-CREAM-0.05% | $4,328,190 | 39.0% | $3,112,883 | $1,215,306 | 29.8% | $3,334,255 | $993,934 |
| 7 | GLENMARK | ALCLOMETASONE DIPROPIONATE-OINTMENT-0.05% | $4,224,961 | 314.4% | $1,019,600 | $3,205,361 | 314.4% | $1,019,600 | $3,205,361 |
| 8 | SANDOZ | ALCLOMETASONE DIPROPIONATE-OINTMENT-0.05% | $3,209,467 | 94.4% | $1,650,874 | $1,558,593 | 84.9% | $1,735,343 | $1,474,124 |
| 9 | SUN/MUTUAL/TARO | ALCLOMETASONE DIPROPIONATE-OINTMENT-0.05% | $4,465,786 | 416.0% | $865,494 | $3,600,292 | 332.7% | $1,032,048 | $3,433,738 |
| 10 | ACTAVIS | AMMONIUM LACTATE-CREAM-EQ12%BASE | $874,545 | 49.1% | $586,460 | $288,086 | 70.1% | $514,196 | $360,350 |
| 11 | PERRIGO | AMMONIUM LACTATE-CREAM-EQ12%BASE | $43,844,436 | 71.3% | $25,596,300 | $18,248,136 | 104.5% | $21,437,631 | $22,406,805 |
| 12 | SUN/MUTUAL/TARO | AMMONIUM LACTATE-CREAM-EQ12%BASE | $9,562,041 | 39.2% | $6,868,881 | $2,693,160 | 68.5% | $5,674,039 | $3,888,002 |
| 13 | ACTAVIS | AMMONIUM LACTATE-LOTION-EQ12%BASE | $942,053 | -24.9% | $1,254,210 | -$312,157 | 7.1% | $879,683 | $62,370 |
| 14 | PERRIGO | AMMONIUM LACTATE-LOTION-EQ12%BASE | $43,427,042 | 71.5% | $25,314,626 | $18,112,416 | 157.7% | $16,850,534 | $26,576,509 |
| 15 | SUN/MUTUAL/TARO | AMMONIUM LACTATE-LOTION-EQ12%BASE | $9,459,213 | 53.4% | $6,167,473 | $3,291,740 | 153.7% | $3,729,183 | $5,730,030 |
| 16 | SANDOZ | BETAMETHASONE DIPROPIONATE-CREAM-EQ0.05%BASE | $62,865,670 | 2327.6% | $2,589,592 | $60,276,079 | 2801.5% | $2,166,689 | $60,698,981 |
| 17 | SUN/MUTUAL/TARO | BETAMETHASONE DIPROPIONATE-CREAM-EQ0.05%BASE | $42,276,330 | 1602.2% | $2,483,645 | $39,792,684 | 1868.8% | $2,147,335 | $40,128,995 |
| 18 | SANDOZ | BETAMETHASONE DIPROPIONATE-LOTION, AUGMENTED-EQ0.05%BASE | $14,563,279 | 90.1% | $7,662,231 | $6,901,048 | 135.2% | $6,192,898 | $8,370,381 |
| 19 | SUN/MUTUAL/TARO | BETAMETHASONE DIPROPIONATE-LOTION, AUGMENTED-EQ0.05%BASE | $24,316,524 | 233.4% | $7,294,029 | $17,022,495 | 302.7% | $6,038,503 | $18,278,021 |
| 20 | PERRIGO | BETAMETHASONE DIPROPIONATE-LOTION-EQ0.05%BASE | $18,508,440 | 306.4% | $4,554,550 | $13,953,889 | 395.4% | $3,736,416 | $14,772,024 |
| 21 | SANDOZ | BETAMETHASONE DIPROPIONATE-LOTION-EQ0.05%BASE | $10,845,695 | 609.5% | $1,528,624 | $9,317,070 | 821.1% | $1,177,470 | $9,668,224 |
| 22 | SUN/MUTUAL/TARO | BETAMETHASONE DIPROPIONATE-LOTION-EQ0.05%BASE | $0 | 392.2% | $0 | $0 | 440.7% | $0 | $0 |
| 23 | ACTAVIS | BETAMETHASONE DIPROPIONATE; CLOTRIMAZOLE-CREAM-EQ0.05%BASE;1% | $77,668,316 | 236.5% | $23,081,869 | $54,586,447 | 364.5% | $16,722,371 | $60,945,945 |
| 24 | SANDOZ | BETAMETHASONE DIPROPIONATE; CLOTRIMAZOLE-CREAM-EQ0.05%BASE;1% | $128,040,330 | 268.6% | $34,734,912 | $93,305,418 | 403.9% | $25,410,063 | $102,630,267 |
| 25 | SUN/MUTUAL/TARO | BETAMETHASONE DIPROPIONATE; CLOTRIMAZOLE-CREAM-EQ0.05%BASE;1% | $78,116,516 | 242.0% | $22,839,729 | $55,276,787 | 313.5% | $18,889,411 | $59,227,105 |
| 26 | SANDOZ | BETAMETHASONE DIPROPIONATE; CLOTRIMAZOLE-LOTION-EQ0.05%BASE;1% | $15,954,981 | 632.9% | $2,176,833 | $13,778,148 | 914.6% | $1,572,507 | $14,382,474 |
| 27 | SUN/MUTUAL/TARO | BETAMETHASONE DIPROPIONATE; CLOTRIMAZOLE-LOTION-EQ0.05%BASE;1% | $40,665,071 | 512.5% | $6,639,718 | $34,025,353 | 585.2% | $5,934,421 | $34,730,650 |
| 28 | SANDOZ | BETAMETHASONE VALERATE-CREAM-EQ0.1%BASE | $23,149,234 | 547.2% | $3,576,776 | $19,572,459 | 834.6% | $2,476,786 | $20,672,448 |
| 29 | SUN/MUTUAL/TARO | BETAMETHASONE VALERATE-CREAM-EQ0.1%BASE | $7,816,669 | 392.7% | $1,586,386 | $6,230,283 | 580.0% | $1,149,536 | $6,667,133 |
| 30 | G&W | BETAMETHASONE VALERATE-LOTION-EQ0.1%BASE | $10,313,328 | 497.0% | $1,727,544 | $8,585,784 | 497.0% | $1,727,544 | $8,585,784 |
| 31 | SANDOZ | BETAMETHASONE VALERATE-LOTION-EQ0.1%BASE | $19,346,978 | 1193.1% | $1,496,211 | $17,850,767 | 1193.1% | $1,496,211 | $17,850,767 |
| 32 | ACTAVIS | BETAMETHASONE VALERATE-OINTMENT-EQ0.1%BASE | $12,092,392 | 945.1% | $1,157,053 | $10,935,339 | 945.1% | $1,157,053 | $10,935,339 |
| 33 | SANDOZ | BETAMETHASONE VALERATE-OINTMENT-EQ0.1%BASE | $9,663,451 | 785.5% | $1,091,279 | $8,572,172 | 785.5% | $1,091,279 | $8,572,172 |
| 34 | MYLAN | BROMOCRIPTINE MESYLATE-TABLET-EQ2.5MGBASE | $8,684,420 | 186.1% | $3,035,058 | $5,649,362 | 161.8% | $3,317,232 | $5,367,189 |
| 35 | PERRIGO | BROMOCRIPTINE MESYLATE-TABLET-EQ2.5MGBASE | $27,943,828 | 2.6% | $27,248,442 | $695,386 | -14.9% | $32,821,912 | -$4,878,084 |
| 36 | SANDOZ | BROMOCRIPTINE MESYLATE-TABLET-EQ2.5MGBASE | $25,872,612 | 122.6% | $11,620,665 | $14,251,947 | 68.4% | $15,360,280 | $10,512,332 |
| 37 | G&W | CALCIPOTRIENE-SOLUTION-0.005% | $14,629,977 | 1.2% | $14,460,100 | $169,877 | 1.2% | $14,460,100 | $169,877 |
| 38 | SANDOZ | CALCIPOTRIENE-SOLUTION-0.005% | $1,687,575 | 119.2% | $769,890 | $917,685 | 58.6% | $1,063,742 | $623,833 |
| 39 | AUROBINDO | CEFPODOXIME PROXETIL-FOR SUSPENSION-EQ100MGBASE/5ML | $38,328 | 271.3% | $10,322 | $28,006 | 43.8% | $26,647 | $11,681 |
| 40 | SANDOZ | CEFPODOXIME PROXETIL-FOR SUSPENSION-EQ100MGBASE/5ML | $1,819,815 | 258.8% | $507,243 | $1,312,572 | 109.6% | $868,085 | $951,730 |
| 41 | AUROBINDO | CEFPODOXIME PROXETIL-TABLET-EQ100MGBASE | $4,554,363 | 321.6% | $1,080,135 | $3,474,229 | 254.6% | $1,284,264 | $3,270,099 |
| 42 | SANDOZ | CEFPODOXIME PROXETIL-TABLET-EQ100MGBASE | $8,715,177 | 125.8% | $3,859,223 | $4,855,953 | 28.2% | $6,796,895 | $1,918,281 |
| 43 | AUROBINDO | CEFPODOXIME PROXETIL-TABLET-EQ200MGBASE | $24,119,744 | 498.2% | $4,031,872 | $20,087,872 | 287.5% | $6,224,734 | $17,895,010 |
| 44 | SANDOZ | CEFPODOXIME PROXETIL-TABLET-EQ200MGBASE | $43,100,930 | 181.3% | $15,319,777 | $27,781,154 | 45.6% | $29,593,199 | $13,507,731 |
| 45 | G&W | CICLOPIROX-CREAM-0.77% | $17,444,796 | 141.1% | $5,220,473 | $7,364,913 | 141.1% | $5,220,473 | $7,364,913 |
| 46 | GLENMARK | CICLOPIROX-CREAM-0.77% | $5,430,213 | -19.8% | $6,003,254 | -$1,186,012 | -8.6% | $5,270,376 | -$453,133 |
| 47 | PERRIGO | CICLOPIROX-CREAM-0.77% | $8,768,654 | -30.3% | $11,175,058 | -$3,380,823 | -20.2% | $9,762,849 | -$1,968,615 |
| 48 | ACTAVIS | CICLOPIROX-SHAMPOO-1% | $9,099,113 | -9.7% | $10,079,230 | -$980,118 | 17.6% | $7,738,260 | $1,360,852 |
| 49 | PERRIGO | CICLOPIROX-SHAMPOO-1% | $14,950,066 | 24.2% | $12,037,367 | $2,912,699 | 60.8% | $9,300,012 | $5,650,054 |
| 50 | SANDOZ | CICLOPIROX-SHAMPOO-1% | $3,242,029 | 144.9% | $1,324,056 | $1,917,974 | 144.9% | $1,324,056 | $1,917,974 |
| 51 | G&W | CICLOPIROX-SOLUTION-8% | $20,553,701 | 178.8% | $7,372,097 | $13,181,604 | 178.8% | $7,372,097 | $13,181,604 |
| 52 | PERRIGO | CICLOPIROX-SOLUTION-8% | $16,166,789 | 128.8% | $7,065,749 | $9,101,040 | 109.3% | $7,722,662 | $8,444,127 |
| 53 | SANDOZ | CICLOPIROX-SOLUTION-8% | $551,030 | 86.3% | $295,772 | $255,258 | 23.1% | $447,640 | $103,390 |
| 54 | GREENSTONE | CLINDAMYCIN PHOSPHATE-CREAM-EQ2%BASE | $54,857,935 | 165.1% | $20,696,132 | $34,161,802 | 165.1% | $20,696,132 | $34,161,802 |
| 55 | SANDOZ | CLINDAMYCIN PHOSPHATE-CREAM-EQ2%BASE | $34,480,171 | 178.4% | $12,384,980 | $22,095,192 | 178.4% | $12,384,980 | $22,095,192 |
| 56 | GREENSTONE | CLINDAMYCIN PHOSPHATE-GEL-EQ1%BASE | $169,732,602 | 443.8% | $31,209,554 | $138,523,048 | 443.8% | $31,209,554 | $138,523,048 |
| 57 | SANDOZ | CLINDAMYCIN PHOSPHATE-GEL-EQ1%BASE | $216,809,389 | 479.9% | $37,386,833 | $179,422,556 | 479.9% | $37,386,833 | $179,422,556 |
| 58 | GREENSTONE | CLINDAMYCIN PHOSPHATE-LOTION-EQ1%BASE | $180,130,073 | 335.8% | $41,337,878 | $138,792,195 | 335.8% | $41,337,878 | $138,792,195 |
| 59 | SANDOZ | CLINDAMYCIN PHOSPHATE-LOTION-EQ1%BASE | $158,759,063 | 454.2% | $28,648,117 | $130,110,946 | 454.2% | $28,648,117 | $130,110,946 |
| 60 | GREENSTONE | CLINDAMYCIN PHOSPHATE-SOLUTION-EQ1%BASE | $60,333,140 | 469.1% | $10,601,352 | $49,731,788 | 469.1% | $10,601,352 | $49,731,788 |
| 61 | PERRIGO | CLINDAMYCIN PHOSPHATE-SOLUTION-EQ1%BASE | $34,459,565 | 549.7% | $5,304,134 | $29,155,430 | 549.7% | $5,304,134 | $29,155,430 |
| 62 | SANDOZ | CLINDAMYCIN PHOSPHATE-SOLUTION-EQ1%BASE | $23,836,233 | 438.3% | $4,428,260 | $19,407,973 | 576.7% | $3,522,626 | $20,313,607 |

HIGHLY CONFIDENTIAL: SUBJECT TO PROTECTIVE ORDER

| # | Defendant | Drug | Affected Defendant Net Revenues | Overcharge (%) | But-For Revenues | Increase in Net Revenues | Overcharge (%) | But-For Revenues | Increase in Net Revenues |
|---|---|---|---|---|---|---|---|---|---|
| 63 | SUN/MUTUAL/TARO | CLINDAMYCIN PHOSPHATE-SOLUTION-EQ1%BASE | $8,050,566 | 489.5% | $1,365,666 | $6,684,900 | 598.2% | $1,152,971 | $6,897,595 |
| 64 | SANDOZ | CLOBETASOL PROPIONATE EMOLLIENT-CREAM-0.05% | $10,236,113 | 634.0% | $1,394,620 | $8,841,493 | 791.6% | $1,148,116 | $9,087,997 |
| 65 | SUN/MUTUAL/TARO | CLOBETASOL PROPIONATE EMOLLIENT-CREAM-0.05% | $10,319,350 | 556.6% | $1,571,642 | $8,747,708 | 729.6% | $1,243,862 | $9,075,488 |
| 66 | SANDOZ | CLOBETASOL PROPIONATE-CREAM-0.05% | $89,285,616 | 1216.3% | $6,783,142 | $82,502,474 | 1755.6% | $4,811,652 | $84,473,964 |
| 67 | SUN/MUTUAL/TARO | CLOBETASOL PROPIONATE-CREAM-0.05% | $75,600,016 | 237.1% | $22,429,039 | $53,170,977 | 408.5% | $14,868,673 | $60,731,344 |
| 68 | SANDOZ | CLOBETASOL PROPIONATE-GEL-0.05% | $2,168,135 | 1761.9% | $116,445 | $2,051,689 | 1862.9% | $110,457 | $2,057,678 |
| 69 | SUN/MUTUAL/TARO | CLOBETASOL PROPIONATE-GEL-0.05% | $572,834 | 739.2% | $68,258 | $504,576 | 852.6% | $60,135 | $512,699 |
| 70 | SANDOZ | CLOBETASOL PROPIONATE-OINTMENT-0.05% | $146,745,906 | 2018.5% | $6,926,832 | $139,819,074 | 2864.5% | $4,950,074 | $141,795,832 |
| 71 | SUN/MUTUAL/TARO | CLOBETASOL PROPIONATE-OINTMENT-0.05% | $105,899,083 | 708.2% | $13,103,595 | $92,795,488 | 1078.1% | $8,988,865 | $96,910,218 |
| 72 | SANDOZ | CLOBETASOL PROPIONATE-SOLUTION-0.05% | $44,488,651 | 449.3% | $8,099,758 | $36,388,894 | 628.1% | $6,110,656 | $38,377,995 |
| 73 | SUN/MUTUAL/TARO | CLOBETASOL PROPIONATE-SOLUTION-0.05% | $20,670,193 | 173.3% | $7,563,944 | $13,106,249 | 263.1% | $5,692,177 | $14,978,016 |
| 74 | WOCKHARDT | CLOBETASOL PROPIONATE-SOLUTION-0.05% | $22,512,109 | 240.5% | $6,612,444 | $15,899,665 | 336.5% | $5,157,507 | $17,354,602 |
| 75 | SANDOZ | CLOTRIMAZOLE-CREAM-1% | $14,021,507 | 14.3% | $12,911,849 | $1,844,087 | 49.3% | $9,884,278 | $4,871,658 |
| 76 | SUN/MUTUAL/TARO | CLOTRIMAZOLE-CREAM-1% | $20,290,637 | -29.7% | $12,004,511 | -$3,561,133 | 2.1% | $8,269,570 | $173,808 |
| 77 | PERRIGO | DESONIDE-CREAM-0.05% | $79,506,918 | 869.3% | $8,202,541 | $71,304,376 | 869.3% | $8,202,541 | $71,304,376 |
| 78 | SUN/MUTUAL/TARO | DESONIDE-CREAM-0.05% | $69,380,074 | 1323.9% | $4,872,464 | $64,507,610 | 1570.3% | $4,153,701 | $65,226,373 |
| 79 | ACTAVIS | DESONIDE-LOTION-0.05% | $55,762,468 | 837.2% | $5,950,058 | $49,812,410 | 837.2% | $5,950,058 | $49,812,410 |
| 80 | SANDOZ | DESONIDE-LOTION-0.05% | $152,550,607 | 882.0% | $15,535,013 | $137,015,594 | 882.0% | $15,535,013 | $137,015,594 |
| 81 | PERRIGO | DESONIDE-OINTMENT-0.05% | $44,186,915 | 968.0% | $4,137,239 | $40,049,676 | 968.0% | $4,137,239 | $40,049,676 |
| 82 | SANDOZ | DESONIDE-OINTMENT-0.05% | $31,263,741 | 992.9% | $2,860,679 | $28,403,062 | 1512.5% | $1,938,780 | $29,324,961 |
| 83 | SUN/MUTUAL/TARO | DESONIDE-OINTMENT-0.05% | $17,976,728 | 232.1% | $5,412,862 | $12,563,866 | 307.6% | $4,410,015 | $13,566,713 |
| 84 | GLENMARK | DESOXIMETASONE-OINTMENT-0.25% | $8,220,562 | -18.7% | $9,963,987 | -$1,863,880 | -18.7% | $9,963,987 | -$1,863,880 |
| 85 | SANDOZ | DESOXIMETASONE-OINTMENT-0.25% | $16,180,784 | 61.3% | $9,952,492 | $6,104,156 | 61.3% | $9,952,492 | $6,104,156 |
| 86 | SUN/MUTUAL/TARO | DESOXIMETASONE-OINTMENT-0.25% | $38,407,332 | 109.4% | $17,987,046 | $19,686,262 | 90.9% | $19,730,227 | $17,943,081 |
| 87 | PERRIGO | ECONAZOLE NITRATE-CREAM-1% | $29,983,448 | 122.7% | $13,465,697 | $16,517,751 | 179.7% | $10,721,440 | $19,262,008 |
| 88 | SANDOZ | ECONAZOLE NITRATE-CREAM-1% | $3,531,003 | 204.9% | $1,158,101 | $2,372,902 | 240.2% | $1,037,778 | $2,493,225 |
| 89 | SUN/MUTUAL/TARO | ECONAZOLE NITRATE-CREAM-1% | $7,487,831 | 460.0% | $1,337,068 | $6,150,763 | 576.6% | $1,106,696 | $6,381,135 |
| 90 | TELIGENT | ECONAZOLE NITRATE-CREAM-1% | $100,902,546 | 264.1% | $27,714,484 | $73,188,062 | 312.3% | $24,475,073 | $76,427,473 |
| 91 | GREENSTONE | EPLERENONE-TABLET-25MG | $42,571,595 | 121.6% | $12,214,244 | $14,855,125 | 81.6% | $14,905,090 | $12,164,278 |
| 92 | SANDOZ | EPLERENONE-TABLET-25MG | $14,408,503 | 25.9% | $8,221,891 | $2,127,216 | -6.8% | $11,107,275 | -$758,167 |
| 93 | GREENSTONE | EPLERENONE-TABLET-50MG | $30,890,597 | 121.0% | $9,192,837 | $11,125,517 | 72.7% | $11,766,124 | $8,552,229 |
| 94 | SANDOZ | EPLERENONE-TABLET-50MG | $8,447,750 | 74.6% | $3,353,063 | $2,502,981 | 6.5% | $5,499,594 | $356,450 |
| 95 | PERRIGO | ERYTHROMYCIN-SOLUTION-2% | $16,226,689 | 431.0% | $3,055,849 | $13,170,841 | 431.0% | $3,055,849 | $13,170,841 |
| 96 | SANDOZ | ERYTHROMYCIN-SOLUTION-2% | $1,023,727 | 704.5% | $127,244 | $896,484 | 704.5% | $127,244 | $896,484 |
| 97 | WOCKHARDT | ERYTHROMYCIN-SOLUTION-2% | $3,614,084 | 212.7% | $1,155,622 | $2,458,462 | 212.7% | $1,155,622 | $2,458,462 |
| 98 | G&W | ETHAMBUTOL HYDROCHLORIDE-TABLET-100MG | $0 | 22.2% | $0 | $0 | 22.2% | $0 | $0 |
| 99 | LUPIN | ETHAMBUTOL HYDROCHLORIDE-TABLET-100MG | $452,143 | 513.6% | $73,692 | $378,451 | 513.6% | $73,692 | $378,451 |
| 100 | G&W | ETHAMBUTOL HYDROCHLORIDE-TABLET-400MG | $625,056 | 16.8% | $535,322 | $89,735 | 16.8% | $535,322 | $89,735 |
| 101 | LUPIN | ETHAMBUTOL HYDROCHLORIDE-TABLET-400MG | $4,561,191 | 228.1% | $1,390,111 | $3,171,080 | 228.1% | $1,390,111 | $3,171,080 |
| 102 | G&W | FLUOCINOLONE ACETONIDE-CREAM-0.01% | $8,574,815 | 220.0% | $2,679,498 | $5,895,317 | 220.0% | $2,679,498 | $5,895,317 |
| 103 | SANDOZ | FLUOCINOLONE ACETONIDE-CREAM-0.01% | $5,930,093 | 440.0% | $1,098,164 | $4,831,928 | 440.0% | $1,098,164 | $4,831,928 |
| 104 | G&W | FLUOCINOLONE ACETONIDE-CREAM-0.025% | $11,797,691 | 346.4% | $2,642,971 | $9,154,719 | 346.4% | $2,642,971 | $9,154,719 |
| 105 | SANDOZ | FLUOCINOLONE ACETONIDE-CREAM-0.025% | $5,308,826 | 683.6% | $677,511 | $4,631,315 | 683.6% | $677,511 | $4,631,315 |
| 106 | G&W | FLUOCINOLONE ACETONIDE-OINTMENT-0.025% | $13,214,878 | 372.3% | $2,798,108 | $10,416,770 | 372.3% | $2,798,108 | $10,416,770 |
| 107 | SANDOZ | FLUOCINOLONE ACETONIDE-OINTMENT-0.025% | $6,073,092 | 494.7% | $1,021,189 | $5,051,902 | 494.7% | $1,021,189 | $5,051,902 |
| 108 | G&W | FLUOCINONIDE-GEL-0.05% | $1,216,530 | 768.7% | $140,044 | $1,076,486 | 768.7% | $140,044 | $1,076,486 |
| 109 | SANDOZ | FLUOCINONIDE-GEL-0.05% | -$170,227 | 392.2% | -$34,583 | -$135,645 | 440.7% | -$31,484 | -$138,743 |
| 110 | SUN/MUTUAL/TARO | FLUOCINONIDE-GEL-0.05% | $11,555,479 | 340.7% | $2,622,058 | $8,933,420 | 334.7% | $2,657,962 | $8,897,517 |
| 111 | SANDOZ | FLUOCINONIDE-OINTMENT-0.05% | $969,191 | 422.4% | $185,538 | $783,653 | 422.4% | $185,538 | $783,653 |
| 112 | SUN/MUTUAL/TARO | FLUOCINONIDE-OINTMENT-0.05% | $41,693,154 | 565.5% | $6,264,739 | $35,428,415 | 617.6% | $5,809,747 | $35,883,408 |
| 113 | ACTAVIS | FLUOCINONIDE-SOLUTION-0.05% | $14,784,456 | 798.0% | $1,646,376 | $13,138,080 | 798.0% | $1,646,376 | $13,138,080 |
| 114 | SANDOZ | FLUOCINONIDE-SOLUTION-0.05% | $47,434,538 | 1071.1% | $4,050,542 | $43,383,996 | 1247.7% | $3,519,611 | $43,914,926 |
| 115 | SUN/MUTUAL/TARO | FLUOCINONIDE-SOLUTION-0.05% | $44,775,641 | 320.8% | $10,641,530 | $34,134,111 | 376.4% | $9,399,573 | $35,376,068 |
| 116 | SANDOZ | GRISEOFULVIN MICROSIZE-TABLET-500MG | $22,081,586 | 392.2% | $3,057,386 | $11,992,151 | 440.7% | $2,783,464 | $12,266,072 |
| 117 | G&W | HALOBETASOL PROPIONATE-CREAM-0.05% | $27,722,245 | 211.4% | $8,903,417 | $18,818,827 | 163.6% | $10,515,340 | $17,206,905 |
| 118 | PERRIGO | HALOBETASOL PROPIONATE-CREAM-0.05% | -$2,723,792 | 274.3% | -$727,694 | -$1,996,099 | 236.4% | -$809,794 | -$1,913,998 |
| 119 | SANDOZ | HALOBETASOL PROPIONATE-CREAM-0.05% | $9,396,694 | 372.8% | $1,987,262 | $7,409,432 | 372.8% | $1,987,262 | $7,409,432 |
| 120 | SUN/MUTUAL/TARO | HALOBETASOL PROPIONATE-CREAM-0.05% | $603,189 | 300.9% | $150,450 | $452,739 | 300.9% | $150,450 | $452,739 |
| 121 | G&W | HALOBETASOL PROPIONATE-OINTMENT-0.05% | $52,372,255 | 353.8% | $11,541,820 | $40,830,435 | 312.8% | $12,688,258 | $39,683,998 |
| 122 | PERRIGO | HALOBETASOL PROPIONATE-OINTMENT-0.05% | $35,795,165 | 280.6% | $9,403,790 | $26,391,375 | 258.7% | $9,980,297 | $25,814,868 |
| 123 | SUN/MUTUAL/TARO | HALOBETASOL PROPIONATE-OINTMENT-0.05% | $1,502,158 | 516.5% | $243,656 | $1,258,502 | 569.2% | $224,474 | $1,277,684 |
| 124 | G&W | HYDROCORTISONE ACETATE-SUPPOSITORY-25MG | $147,843,001 | 1763.7% | $7,932,730 | $139,910,270 | 1763.7% | $7,932,730 | $139,910,270 |
| 125 | PERRIGO | HYDROCORTISONE ACETATE-SUPPOSITORY-25MG | $50,372,378 | 1798.3% | $2,653,505 | $47,718,873 | 1798.3% | $2,653,505 | $47,718,873 |
| 126 | PERRIGO | HYDROCORTISONE ACETATE-SUPPOSITORY-30MG | $15,854,738 | 489.2% | $2,690,826 | $13,163,912 | 489.2% | $2,690,826 | $13,163,912 |
| 127 | PERRIGO | HYDROCORTISONE VALERATE-CREAM-0.2% | $38,817,622 | 572.5% | $5,771,744 | $33,045,878 | 566.2% | $5,826,837 | $32,990,785 |
| 128 | SUN/MUTUAL/TARO | HYDROCORTISONE VALERATE-CREAM-0.2% | $56,767,407 | 679.8% | $7,279,501 | $49,487,906 | 742.0% | $6,742,039 | $50,025,368 |
| 129 | G&W | KETOCONAZOLE-CREAM-2% | $137,006,965 | 447.0% | $25,046,442 | $111,960,523 | 447.0% | $25,046,442 | $111,960,523 |
| 130 | SANDOZ | KETOCONAZOLE-CREAM-2% | $90,771,522 | 40.1% | $64,783,154 | $25,988,368 | 104.2% | $44,449,139 | $46,322,382 |
| 131 | SUN/MUTUAL/TARO | KETOCONAZOLE-CREAM-2% | $116,073,905 | 136.8% | $49,015,036 | $67,058,869 | 237.8% | $34,364,605 | $81,709,300 |
| 132 | GREENSTONE | LATANOPROST-SOLUTION/DROPS-0.005% | $173,565,135 | 59.1% | $85,926,564 | $50,746,684 | 15.3% | $118,485,788 | $18,187,459 |
| 133 | SANDOZ | LATANOPROST-SOLUTION/DROPS-0.005% | $167,010,198 | 127.9% | $53,484,496 | $68,402,191 | 48.3% | $82,203,002 | $39,683,685 |
| 134 | VALEANT/BAUSCH | LATANOPROST-SOLUTION/DROPS-0.005% | $130,222,541 | 6.4% | $83,273,123 | $5,335,205 | -26.4% | $120,448,930 | -$31,840,602 |
| 135 | SANDOZ | LIDOCAINE-OINTMENT-5% | $270,880,708 | 317.2% | $64,934,465 | $205,946,243 | 434.8% | $50,651,991 | $220,228,717 |
| 136 | SUN/MUTUAL/TARO | LIDOCAINE-OINTMENT-5% | $118,558,508 | 356.1% | $25,995,061 | $92,563,446 | 489.9% | $20,099,734 | $98,458,774 |
| 137 | PERRIGO | METHAZOLAMIDE-TABLET-25MG | $8,060,744 | -22.9% | $10,448,996 | -$2,388,252 | -4.8% | $8,470,639 | -$409,894 |
| 138 | SANDOZ | METHAZOLAMIDE-TABLET-25MG | $1,067,398 | 409.3% | $209,595 | $857,802 | 444.7% | $195,954 | $871,444 |
| 139 | PERRIGO | METHAZOLAMIDE-TABLET-50MG | $31,057,985 | 27.5% | $24,365,202 | $6,692,784 | 25.1% | $24,830,083 | $6,227,902 |
| 140 | SANDOZ | METHAZOLAMIDE-TABLET-50MG | $5,324,434 | 919.4% | $522,310 | $4,802,124 | 805.9% | $587,726 | $4,736,707 |

HIGHLY CONFIDENTIAL: SUBJECT TO PROTECTIVE ORDER

| # | Defendant | Drug | Affected Defendant Net Revenues | Overcharge (%) | But-For Revenues | Increase in Net Revenues | Overcharge (%) | But-For Revenues | Increase in Net Revenues |
|---|---|---|---|---|---|---|---|---|---|
| 141 | ACTAVIS | METHYLPHENIDATE HCL-TABLET, EXTENDED RELEASE-20MG | $0 | 392.2% | $0 | $0 | 440.7% | $0 | $0 |
| 142 | MALLINCKRODT | METHYLPHENIDATE HCL-TABLET, EXTENDED RELEASE-20MG | $288,223,971 | 342.3% | $65,159,483 | $223,064,488 | 594.7% | $41,489,395 | $246,734,576 |
| 143 | SANDOZ | METHYLPHENIDATE HCL-TABLET, EXTENDED RELEASE-20MG | $2,876,364 | 212.7% | $919,824 | $1,956,540 | 207.7% | $934,940 | $1,941,424 |
| 144 | ACTAVIS | METHYLPHENIDATE HCL-TABLET-10MG | $20,986,115 | 186.5% | $7,325,497 | $13,660,618 | 264.4% | $5,758,408 | $15,227,707 |
| 145 | MALLINCKRODT | METHYLPHENIDATE HCL-TABLET-10MG | $160,698,564 | 415.4% | $31,178,549 | $129,520,014 | 554.5% | $24,552,909 | $136,145,655 |
| 146 | SANDOZ | METHYLPHENIDATE HCL-TABLET-10MG | $12,632,235 | 96.6% | $6,425,998 | $6,206,238 | 157.6% | $4,904,494 | $7,727,742 |
| 147 | SUN/MUTUAL/TARO | METHYLPHENIDATE HCL-TABLET-10MG | $11,231,463 | 254.1% | $3,171,546 | $8,059,918 | 254.1% | $3,171,546 | $8,059,918 |
| 148 | ACTAVIS | METHYLPHENIDATE HCL-TABLET-20MG | $24,849,275 | 234.6% | $7,425,564 | $17,423,711 | 258.4% | $6,933,943 | $17,915,332 |
| 149 | MALLINCKRODT | METHYLPHENIDATE HCL-TABLET-20MG | $151,481,426 | 527.9% | $24,125,347 | $127,356,079 | 585.4% | $22,101,888 | $129,379,539 |
| 150 | SANDOZ | METHYLPHENIDATE HCL-TABLET-20MG | $14,474,406 | 276.9% | $3,840,805 | $10,633,601 | 335.0% | $3,327,702 | $11,146,704 |
| 151 | SUN/MUTUAL/TARO | METHYLPHENIDATE HCL-TABLET-20MG | $10,522,081 | 392.7% | $2,135,447 | $8,386,634 | 392.7% | $2,135,447 | $8,386,634 |
| 152 | ACTAVIS | METHYLPHENIDATE HCL-TABLET-5MG | $7,758,441 | 156.8% | $3,020,678 | $4,737,763 | 244.3% | $2,253,493 | $5,504,948 |
| 153 | MALLINCKRODT | METHYLPHENIDATE HCL-TABLET-5MG | $61,766,864 | 363.7% | $13,321,337 | $48,445,527 | 543.0% | $9,605,800 | $52,161,064 |
| 154 | SANDOZ | METHYLPHENIDATE HCL-TABLET-5MG | $1,663,301 | 77.2% | $938,666 | $724,635 | 149.1% | $667,714 | $995,587 |
| 155 | SUN/MUTUAL/TARO | METHYLPHENIDATE HCL-TABLET-5MG | $4,167,108 | 248.8% | $1,194,732 | $2,972,375 | 248.8% | $1,194,732 | $2,972,375 |
| 156 | ACTAVIS | METRONIDAZOLE-CREAM-0.75% | $14,754,081 | 180.0% | $5,269,944 | $9,484,137 | 180.0% | $5,269,944 | $9,484,137 |
| 157 | G&W | METRONIDAZOLE-CREAM-0.75% | $66,511,367 | 263.2% | $18,310,467 | $48,200,900 | 263.2% | $18,310,467 | $48,200,900 |
| 158 | SANDOZ | METRONIDAZOLE-CREAM-0.75% | $69,984,584 | 311.1% | $17,024,866 | $52,959,718 | 311.1% | $17,024,866 | $52,959,718 |
| 159 | G&W | METRONIDAZOLE-GEL-0.75% | $25,986,635 | 338.7% | $5,923,825 | $20,062,810 | 338.7% | $5,923,825 | $20,062,810 |
| 160 | SANDOZ | METRONIDAZOLE-GEL-0.75% | $11,299,243 | 336.8% | $2,586,837 | $8,712,406 | 698.8% | $1,414,584 | $9,884,659 |
| 161 | SUN/MUTUAL/TARO | METRONIDAZOLE-GEL-0.75% | $23,082,905 | 292.7% | $5,877,270 | $17,205,635 | 357.5% | $5,045,982 | $18,036,923 |
| 162 | ACTAVIS | METRONIDAZOLE-LOTION-0.75% | $9,975,291 | 136.0% | $4,226,233 | $5,749,057 | 136.0% | $4,226,233 | $5,749,057 |
| 163 | SANDOZ | METRONIDAZOLE-LOTION-0.75% | $43,728,242 | 250.0% | $12,493,321 | $31,234,921 | 250.0% | $12,493,321 | $31,234,921 |
| 164 | G&W | MOMETASONE FUROATE-CREAM-0.1% | $24,371,804 | 59.0% | $15,326,071 | $9,045,733 | 59.0% | $15,326,071 | $9,045,733 |
| 165 | GLENMARK | MOMETASONE FUROATE-CREAM-0.1% | $10,462,153 | 1.7% | $10,287,857 | $174,296 | 1.7% | $10,287,857 | $174,296 |
| 166 | G&W | MOMETASONE FUROATE-OINTMENT-0.1% | $4,546,484 | -15.8% | $5,398,634 | -$852,149 | -15.8% | $5,398,634 | -$852,149 |
| 167 | GLENMARK | MOMETASONE FUROATE-OINTMENT-0.1% | $6,647,173 | 24.1% | $5,354,791 | $1,292,382 | 39.8% | $4,753,075 | $1,894,099 |
| 168 | G&W | MOMETASONE FUROATE-SOLUTION-0.1% | $3,541,944 | 23.0% | $1,466,991 | $336,789 | 23.0% | $1,466,991 | $336,789 |
| 169 | GLENMARK | MOMETASONE FUROATE-SOLUTION-0.1% | -$124,209 | 13.9% | -$109,023 | -$15,185 | -11.4% | -$140,213 | $16,004 |
| 170 | ACTAVIS | NYSTATIN-OINTMENT-100,000UNITS/GM | $17,855,635 | 437.0% | $3,324,832 | $14,530,803 | 437.0% | $3,324,832 | $14,530,803 |
| 171 | PERRIGO | NYSTATIN-OINTMENT-100,000UNITS/GM | $33,049,178 | 216.0% | $10,457,262 | $22,591,915 | 263.9% | $9,081,112 | $23,968,065 |
| 172 | SANDOZ | NYSTATIN-OINTMENT-100,000UNITS/GM | $11,551,765 | 243.6% | $3,362,007 | $8,189,757 | 481.4% | $1,986,826 | $9,564,939 |
| 173 | SANDOZ | NYSTATIN; TRIAMCINOLONE ACETONIDE-CREAM-100,000UNITS/GM;0.1% | $110,194,078 | 2596.9% | $4,085,905 | $106,108,173 | 3097.6% | $3,446,100 | $106,747,978 |
| 174 | SUN/MUTUAL/TARO | NYSTATIN; TRIAMCINOLONE ACETONIDE-CREAM-100,000UNITS/GM;0.1% | $179,258,048 | 2139.6% | $8,003,880 | $171,254,169 | 2451.6% | $7,025,359 | $172,232,689 |
| 175 | SANDOZ | NYSTATIN; TRIAMCINOLONE ACETONIDE-OINTMENT-100,000UNITS/GM;0.1% | $24,235,956 | 3003.8% | $780,857 | $23,455,099 | 3361.5% | $700,149 | $23,535,808 |
| 176 | SUN/MUTUAL/TARO | NYSTATIN; TRIAMCINOLONE ACETONIDE-OINTMENT-100,000UNITS/GM;0.1% | $50,811,044 | 1477.8% | $3,220,426 | $47,590,618 | 1636.2% | $2,926,519 | $47,884,525 |
| 177 | AMNEAL | PHENYTOIN SODIUM-CAPSULE-100MGEXTENDED | $35,400,723 | 6.0% | $33,382,515 | $2,018,209 | 69.5% | $20,882,934 | $14,517,790 |
| 178 | MYLAN | PHENYTOIN SODIUM-CAPSULE-100MGEXTENDED | $34,312,729 | -5.0% | $36,111,681 | -$1,798,952 | 39.5% | $24,599,261 | $9,713,468 |
| 179 | SUN/MUTUAL/TARO | PHENYTOIN SODIUM-CAPSULE-100MGEXTENDED | $77,603,383 | 114.3% | $36,205,499 | $41,397,884 | 192.1% | $26,568,094 | $51,035,289 |
| 180 | SUN/MUTUAL/TARO | PHENYTOIN SODIUM-CAPSULE-100MGEXTENDED | $21,802,571 | 21.3% | $17,975,827 | $3,826,744 | 71.5% | $12,713,036 | $9,089,535 |
| 181 | G&W | PROCHLORPERAZINE-SUPPOSITORY-25MG | $22,801,221 | 206.3% | $7,443,925 | $15,357,296 | 206.3% | $7,443,925 | $15,357,296 |
| 182 | PERRIGO | PROCHLORPERAZINE-SUPPOSITORY-25MG | $20,734,174 | 68.2% | $12,329,358 | $8,404,816 | 68.2% | $12,329,358 | $8,404,816 |
| 183 | ACTAVIS | PROMETHAZINE HYDROCHLORIDE-SUPPOSITORY-12.5MG | $7,940,257 | 732.6% | $953,654 | $6,986,603 | 732.6% | $953,654 | $6,986,603 |
| 184 | G&W | PROMETHAZINE HYDROCHLORIDE-SUPPOSITORY-12.5MG | $12,538,625 | 540.0% | $1,959,038 | $10,579,587 | 540.0% | $1,959,038 | $10,579,587 |
| 185 | PERRIGO | PROMETHAZINE HYDROCHLORIDE-SUPPOSITORY-12.5MG | $3,291,043 | 190.2% | $1,133,947 | $2,157,096 | 190.2% | $1,133,947 | $2,157,096 |
| 186 | ACTAVIS | PROMETHAZINE HYDROCHLORIDE-SUPPOSITORY-25MG | $40,089,598 | 604.3% | $5,691,745 | $34,397,852 | 604.3% | $5,691,745 | $34,397,852 |
| 187 | G&W | PROMETHAZINE HYDROCHLORIDE-SUPPOSITORY-25MG | $39,797,634 | 541.3% | $6,206,137 | $33,591,497 | 541.3% | $6,206,137 | $33,591,497 |
| 188 | PERRIGO | PROMETHAZINE HYDROCHLORIDE-SUPPOSITORY-25MG | $12,601,637 | 169.0% | $4,683,879 | $7,917,757 | 169.0% | $4,683,879 | $7,917,757 |
| 189 | ACTAVIS | TERCONAZOLE-CREAM-0.8% | $15,911,979 | 199.1% | $5,319,462 | $10,592,517 | 162.5% | $6,062,197 | $9,849,782 |
| 190 | SANDOZ | TERCONAZOLE-CREAM-0.8% | $0 | 392.2% | $0 | $0 | 440.7% | $0 | $0 |
| 191 | SUN/MUTUAL/TARO | TERCONAZOLE-CREAM-0.8% | $24,510,035 | 121.8% | $11,050,577 | $13,459,458 | 105.5% | $11,926,736 | $12,583,299 |
| 192 | PERRIGO | TRIAMCINOLONE ACETONIDE-CREAM-0.025% | $11,110,176 | 24.7% | $8,912,559 | $2,197,617 | 101.0% | $5,527,090 | $5,583,086 |
| 193 | SANDOZ | TRIAMCINOLONE ACETONIDE-CREAM-0.025% | $11,640,224 | 176.1% | $4,215,944 | $7,424,280 | 176.1% | $4,215,944 | $7,424,280 |
| 194 | PERRIGO | TRIAMCINOLONE ACETONIDE-CREAM-0.1% | $103,341,292 | -8.6% | $113,107,311 | -$9,766,019 | 62.9% | $63,436,349 | $39,904,943 |
| 195 | SANDOZ | TRIAMCINOLONE ACETONIDE-CREAM-0.1% | $34,206,304 | 151.0% | $13,629,298 | $20,577,006 | 151.0% | $13,629,298 | $20,577,006 |
| 196 | PERRIGO | TRIAMCINOLONE ACETONIDE-CREAM-0.5% | $25,161,499 | 98.9% | $11,203,056 | $11,074,654 | 125.2% | $9,891,607 | $12,386,103 |
| 197 | SANDOZ | TRIAMCINOLONE ACETONIDE-CREAM-0.5% | $16,850,667 | 241.7% | $4,239,575 | $10,247,334 | 241.7% | $4,239,575 | $10,247,334 |
| 198 | PERRIGO | TRIAMCINOLONE ACETONIDE-OINTMENT-0.025% | $12,435,234 | 34.0% | $9,279,744 | $3,155,491 | 113.7% | $5,819,032 | $6,616,202 |
| 199 | SANDOZ | TRIAMCINOLONE ACETONIDE-OINTMENT-0.025% | $4,106,573 | 209.1% | $1,328,723 | $2,777,849 | 209.1% | $1,328,723 | $2,777,849 |
| 200 | PERRIGO | TRIAMCINOLONE ACETONIDE-OINTMENT-0.1% | $84,106,478 | 20.2% | $69,957,198 | $14,149,280 | 122.7% | $37,765,032 | $46,341,446 |
| 201 | SANDOZ | TRIAMCINOLONE ACETONIDE-OINTMENT-0.1% | $40,094,369 | 168.9% | $14,908,942 | $25,185,426 | 168.9% | $14,908,942 | $25,185,426 |
| 202 | PERRIGO | TRIAMCINOLONE ACETONIDE-OINTMENT-0.5% | $21,326,021 | 41.1% | $15,111,076 | $6,214,945 | 102.6% | $10,524,732 | $10,801,288 |
| 203 | SUN/MUTUAL/TARO | TRIAMCINOLONE ACETONIDE-PASTE-0.1% | $27,649,196 | 42.5% | $19,406,278 | $8,242,917 | 15.0% | $24,044,268 | $3,604,928 |
| | **Total** | **Total** | **$7,644,166,442** | **238.0%** | **$2,261,900,552** | **$5,193,354,701** | **271.8%** | **$2,056,028,804** | **$5,399,226,449** |

HIGHLY CONFIDENTIAL: SUBJECT TO PROTECTIVE ORDER

## Appendix C Table 12
Overcharge Estimates by Defendant and Drug at Issue (New Generic Drugs)

| # | Defendant | Drug | Affected Defendant Net Revenues | Both Disgorgement Models: Overcharge (%) | Both Disgorgement Models: But-For Revenues | Both Disgorgement Models: Increase in Net Revenues |
|---|---|---|---|---|---|---|
| 1 | SANDOZ | ADAPALENE-CREAM-0.1% | $64,694,670 | 32.3% | $48,902,956 | $15,791,714 |
| 2 | PERRIGO | ADAPALENE-CREAM-0.1% | $106,793,500 | 32.3% | $80,725,627 | $26,067,873 |
| 3 | PERRIGO | BETAMETHASONE DIPROPIONATE; CALCIPOTRIENE-OINTMENT-0.064%;0.005% | $96,951,292 | 56.2% | $62,084,990 | $34,866,302 |
| 4 | SANDOZ | BETAMETHASONE DIPROPIONATE; CALCIPOTRIENE-OINTMENT-0.064%;0.005% | $80,583,637 | 56.2% | $51,603,586 | $28,980,052 |
| 5 | SANDOZ | CARBAMAZEPINE-TABLET, EXTENDED RELEASE-100MG | $6,978,140 | 92.0% | $3,634,539 | $3,343,600 |
| 6 | SUN/MUTUAL/TARO | CARBAMAZEPINE-TABLET, EXTENDED RELEASE-100MG | $5,162,791 | 92.0% | $2,689,021 | $2,473,769 |
| 7 | SANDOZ | CARBAMAZEPINE-TABLET, EXTENDED RELEASE-200MG | $90,941,407 | 92.0% | $47,366,509 | $43,574,898 |
| 8 | SUN/MUTUAL/TARO | CARBAMAZEPINE-TABLET, EXTENDED RELEASE-200MG | $127,988,379 | 92.0% | $66,662,293 | $61,326,086 |
| 9 | SANDOZ | CARBAMAZEPINE-TABLET, EXTENDED RELEASE-400MG | $93,381,202 | 92.0% | $48,637,268 | $44,743,935 |
| 10 | SUN/MUTUAL/TARO | CARBAMAZEPINE-TABLET, EXTENDED RELEASE-400MG | $137,154,683 | 92.0% | $71,436,530 | $65,718,153 |
| 11 | SUN/MUTUAL/TARO | DESOXIMETASONE-OINTMENT-0.05% | $35,120,476 | 54.1% | $22,785,899 | $12,334,577 |
| 12 | VALEANT/BAUSCH | FLUOCINONIDE-CREAM-0.1% | $32,825,148 | 27.3% | $25,789,600 | $7,035,548 |
| 13 | GLENMARK | FLUOCINONIDE-CREAM-0.1% | $54,102,709 | 27.3% | $42,506,654 | $11,596,054 |
| 14 | SUN/MUTUAL/TARO | FLUOCINONIDE-CREAM-0.1% | $16,443,103 | 27.3% | $12,918,786 | $3,524,317 |
| 15 | PERRIGO | FLUOCINONIDE-CREAM-0.1% | $96,296,167 | 27.3% | $75,656,616 | $20,639,550 |
| 16 | SANDOZ | FLUOCINONIDE-CREAM-0.1% | $6,871,435 | 27.3% | $5,398,652 | $1,472,783 |
| 17 | GLENMARK | FLUTICASONE PROPIONATE-LOTION-0.05% | $5,529,293 | 46.2% | $3,782,319 | $1,746,974 |
| 18 | PERRIGO | FLUTICASONE PROPIONATE-LOTION-0.05% | $2,627,839 | 46.2% | $1,797,577 | $830,263 |
| 19 | SANDOZ | FLUTICASONE PROPIONATE-LOTION-0.05% | $4,836,149 | 46.2% | $3,308,173 | $1,527,976 |
| 20 | SUN/MUTUAL/TARO | IMIQUIMOD-CREAM-5% | $28,974,275 | 647.7% | $3,875,111 | $25,099,165 |
| 21 | PERRIGO | IMIQUIMOD-CREAM-5% | $159,041,431 | 647.7% | $21,270,701 | $137,770,730 |
| 22 | SANDOZ | IMIQUIMOD-CREAM-5% | $97,017,115 | 647.7% | $12,975,374 | $84,041,741 |
| 23 | AUROBINDO | METFORMIN HYDROCHLORIDE; PIOGLITAZONE HYDROCHLORIDE-TABLET-500MG;EQ15MGBASE | $9,978,266 | 49.7% | $6,663,462 | $3,314,804 |
| 24 | SANDOZ | METFORMIN HYDROCHLORIDE; PIOGLITAZONE HYDROCHLORIDE-TABLET-500MG;EQ15MGBASE | $12,357,151 | 49.7% | $8,252,076 | $4,105,075 |
| 25 | MYLAN | METFORMIN HYDROCHLORIDE; PIOGLITAZONE HYDROCHLORIDE-TABLET-500MG;EQ15MGBASE | $20,336,305 | 49.7% | $13,580,536 | $6,755,769 |
| 26 | AUROBINDO | METFORMIN HYDROCHLORIDE; PIOGLITAZONE HYDROCHLORIDE-TABLET-850MG;EQ15MGBASE | $19,230,479 | 153.0% | $7,600,124 | $11,630,355 |
| 27 | SANDOZ | METFORMIN HYDROCHLORIDE; PIOGLITAZONE HYDROCHLORIDE-TABLET-850MG;EQ15MGBASE | $18,236,742 | 153.0% | $7,207,387 | $11,029,355 |
| 28 | MYLAN | METFORMIN HYDROCHLORIDE; PIOGLITAZONE HYDROCHLORIDE-TABLET-850MG;EQ15MGBASE | $35,467,227 | 153.0% | $14,017,089 | $21,450,138 |
| 29 | SUN/MUTUAL/TARO | METRONIDAZOLE-GEL-1% | $64,070,255 | 55.5% | $41,192,630 | $22,877,625 |
| 30 | SANDOZ | METRONIDAZOLE-GEL-1% | $99,974,565 | 55.5% | $64,276,555 | $35,698,009 |
| 31 | PERRIGO | TACROLIMUS-OINTMENT-0.03% | $43,932,631 | 36.8% | $32,110,213 | $11,822,418 |
| 32 | SANDOZ | TACROLIMUS-OINTMENT-0.03% | $19,575,903 | 36.8% | $14,307,962 | $5,267,941 |
| 33 | PERRIGO | TACROLIMUS-OINTMENT-0.1% | $159,273,469 | 66.3% | $95,797,141 | $63,476,327 |
| 34 | SANDOZ | TACROLIMUS-OINTMENT-0.1% | $102,478,978 | 66.3% | $61,637,341 | $40,841,637 |
| | Total | Total | $1,955,226,810 | 80.6% | $1,082,451,297 | $872,775,514 |

# Appendix C Table 13
Overcharge Estimates by Drug at Issue

| | | | Before and After Disgorgement | | | Difference in Difference Disgorgement | | |
|---|---|---|---|---|---|---|---|---|
| # | Drug | Defendant Affected Net Revenues | Overcharge (%) | But-For Revenues | Increase in Net Revenues | Overcharge (%) | But-For Revenues | Increase in Net Revenues |
| 1 | ACETAZOLAMIDE-TABLET-125MG | $20,000,402 | 156.0% | $7,812,714 | $12,187,688 | 311.9% | $4,856,181 | $15,144,221 |
| 2 | ACETAZOLAMIDE-TABLET-250MG | $158,098,505 | 86.0% | $84,983,514 | $73,114,990 | 155.9% | $61,788,718 | $96,309,787 |
| 3 | ADAPALENE-CREAM-0.1% | $171,488,170 | 32.3% | $129,628,582 | $41,859,587 | 32.3% | $129,628,582 | $41,859,587 |
| 4 | ALCLOMETASONE DIPROPIONATE-CREAM-0.05% | $14,478,947 | 130.0% | $6,294,850 | $8,184,098 | 115.3% | $6,724,072 | $7,754,875 |
| 5 | ALCLOMETASONE DIPROPIONATE-OINTMENT-0.05% | $11,900,214 | 236.5% | $3,535,968 | $8,364,246 | 214.2% | $3,786,990 | $8,113,223 |
| 6 | AMMONIUM LACTATE-CREAM-EQ12%BASE | $54,281,022 | 64.2% | $33,051,641 | $21,229,381 | 96.5% | $27,625,865 | $26,655,157 |
| 7 | AMMONIUM LACTATE-LOTION-EQ12%BASE | $53,828,308 | 64.4% | $32,736,309 | $21,091,999 | 150.8% | $21,459,400 | $32,368,908 |
| 8 | BETAMETHASONE DIPROPIONATE-CREAM-EQ0.05%BASE | $105,142,000 | 1972.5% | $5,073,237 | $100,068,763 | 2337.2% | $4,314,024 | $100,827,976 |
| 9 | BETAMETHASONE DIPROPIONATE-LOTION, AUGMENTED-EQ0.05%BASE | $38,879,803 | 160.0% | $14,956,261 | $23,923,542 | 217.9% | $12,231,401 | $26,648,402 |
| 10 | BETAMETHASONE DIPROPIONATE-LOTION-EQ0.05%BASE | $29,354,134 | 382.5% | $6,083,175 | $23,270,959 | 497.4% | $4,913,886 | $24,440,248 |
| 11 | BETAMETHASONE DIPROPIONATE; CALCIPOTRIENE-OINTMENT-0.064%;0.005% | $177,534,930 | 56.2% | $113,688,576 | $63,846,354 | 56.2% | $113,688,576 | $63,846,354 |
| 12 | BETAMETHASONE DIPROPIONATE; CLOTRIMAZOLE-CREAM-EQ0.05%BASE;1% | $283,825,162 | 251.9% | $80,656,509 | $203,168,653 | 365.1% | $61,021,846 | $222,803,317 |
| 13 | BETAMETHASONE DIPROPIONATE; CLOTRIMAZOLE-LOTION-EQ0.05%BASE;1% | $56,620,052 | 542.2% | $8,816,551 | $47,803,501 | 654.2% | $7,506,928 | $49,113,124 |
| 14 | BETAMETHASONE VALERATE-CREAM-EQ0.1%BASE | $30,965,903 | 499.7% | $5,163,162 | $25,802,742 | 753.9% | $3,626,322 | $27,339,581 |
| 15 | BETAMETHASONE VALERATE-LOTION-EQ0.1%BASE | $29,660,306 | 820.1% | $3,223,755 | $26,436,551 | 820.1% | $3,223,755 | $26,436,551 |
| 16 | BETAMETHASONE VALERATE-OINTMENT-EQ0.1%BASE | $21,755,843 | 867.6% | $2,248,333 | $19,507,511 | 867.6% | $2,248,333 | $19,507,511 |
| 17 | BROMOCRIPTINE MESYLATE-TABLET-EQ2.5MGBASE | $62,500,860 | 49.2% | $41,904,165 | $20,596,695 | 21.4% | $51,499,424 | $11,001,436 |
| 18 | CALCIPOTRIENE-SOLUTION-0.005% | $16,317,552 | 7.1% | $15,229,990 | $1,087,562 | 5.1% | $15,523,841 | $793,710 |
| 19 | CARBAMAZEPINE-TABLET, EXTENDED RELEASE-100MG | $12,140,930 | 92.0% | $6,323,560 | $5,817,370 | 92.0% | $6,323,560 | $5,817,370 |
| 20 | CARBAMAZEPINE-TABLET, EXTENDED RELEASE-200MG | $218,929,786 | 92.0% | $114,028,802 | $104,900,984 | 92.0% | $114,028,802 | $104,900,984 |
| 21 | CARBAMAZEPINE-TABLET, EXTENDED RELEASE-400MG | $230,535,885 | 92.0% | $120,073,798 | $110,462,087 | 92.0% | $120,073,798 | $110,462,087 |
| 22 | CEFPODOXIME PROXETIL-FOR SUSPENSION-EQ100MGBASE/5ML | $1,858,143 | 259.0% | $517,565 | $1,340,578 | 107.7% | $894,732 | $963,410 |
| 23 | CEFPODOXIME PROXETIL-TABLET-EQ100MGBASE | $13,269,540 | 168.6% | $4,939,358 | $8,330,182 | 64.2% | $8,081,159 | $5,188,381 |
| 24 | CEFPODOXIME PROXETIL-TABLET-EQ200MGBASE | $67,220,675 | 247.4% | $19,351,649 | $47,869,026 | 87.7% | $35,817,934 | $31,402,741 |
| 25 | CICLOPIROX-CREAM-0.77% | $25,196,863 | 12.5% | $22,398,785 | $2,798,078 | 24.4% | $20,253,698 | $4,943,165 |
| 26 | CICLOPIROX-SHAMPOO-1% | $27,291,208 | 16.4% | $23,440,653 | $3,850,555 | 48.6% | $18,362,328 | $8,928,880 |
| 27 | CICLOPIROX-SOLUTION-8% | $37,271,520 | 153.0% | $14,733,619 | $22,537,901 | 139.8% | $15,542,399 | $21,729,121 |
| 28 | CLINDAMYCIN PHOSPHATE-CREAM-EQ2%BASE | $89,338,106 | 170.1% | $33,081,112 | $56,256,994 | 170.1% | $33,081,112 | $56,256,994 |
| 29 | CLINDAMYCIN PHOSPHATE-GEL-EQ1%BASE | $386,541,991 | 463.5% | $68,596,387 | $317,945,604 | 463.5% | $68,596,387 | $317,945,604 |
| 30 | CLINDAMYCIN PHOSPHATE-LOTION-EQ1%BASE | $338,889,136 | 384.2% | $69,985,995 | $268,903,141 | 384.2% | $69,985,995 | $268,903,141 |
| 31 | CLINDAMYCIN PHOSPHATE-SOLUTION-EQ1%BASE | $126,679,504 | 483.8% | $21,699,413 | $104,980,091 | 515.5% | $20,581,084 | $106,098,420 |
| 32 | CLOBETASOL PROPIONATE EMOLLIENT-CREAM-0.05% | $20,555,462 | 593.0% | $2,966,262 | $17,589,201 | 759.4% | $2,391,977 | $18,163,485 |
| 33 | CLOBETASOL PROPIONATE-CREAM-0.05% | $164,885,632 | 464.4% | $29,212,181 | $135,673,451 | 737.8% | $19,680,324 | $145,205,308 |
| 34 | CLOBETASOL PROPIONATE-GEL-0.05% | $2,740,968 | 1384.0% | $184,703 | $2,556,265 | 1506.7% | $170,592 | $2,570,377 |
| 35 | CLOBETASOL PROPIONATE-OINTMENT-0.05% | $252,644,989 | 1161.3% | $20,030,427 | $232,614,562 | 1712.5% | $13,938,939 | $238,706,050 |
| 36 | CLOBETASOL PROPIONATE-SOLUTION-0.05% | $87,670,954 | 293.6% | $22,276,145 | $65,394,808 | 416.9% | $16,960,340 | $70,710,614 |
| 37 | CLOTRIMAZOLE-CREAM-1% | $23,199,314 | -6.9% | $24,916,360 | -$1,717,046 | 27.8% | $18,153,848 | $5,045,466 |
| 38 | DESONIDE-CREAM-0.05% | $148,886,991 | 1038.7% | $13,075,005 | $135,811,986 | 1105.0% | $12,356,242 | $136,530,749 |
| 39 | DESONIDE-LOTION-0.05% | $208,313,076 | 869.6% | $21,485,072 | $186,828,004 | 869.6% | $21,485,072 | $186,828,004 |
| 40 | DESONIDE-OINTMENT-0.05% | $93,427,384 | 652.8% | $12,410,780 | $81,016,603 | 791.0% | $10,486,034 | $82,941,350 |
| 41 | DESOXIMETASONE-OINTMENT-0.05% | $35,120,476 | 54.1% | $22,785,899 | $12,334,577 | 54.1% | $22,785,899 | $12,334,577 |
| 42 | DESOXIMETASONE-OINTMENT-0.25% | $61,830,064 | 63.1% | $37,903,525 | $23,926,539 | 56.0% | $39,646,707 | $22,183,357 |
| 43 | ECONAZOLE NITRATE-CREAM-1% | $141,904,828 | 224.9% | $43,675,350 | $98,229,477 | 280.0% | $37,340,987 | $104,563,841 |
| 44 | EPLERENONE-TABLET-25MG | $37,418,476 | 83.1% | $20,436,135 | $16,982,341 | 43.8% | $26,012,365 | $11,406,111 |
| 45 | EPLERENONE-TABLET-50MG | $26,174,397 | 108.6% | $12,545,900 | $13,628,497 | 51.6% | $17,265,718 | $8,908,679 |
| 46 | ERYTHROMYCIN-SOLUTION-2% | $20,864,501 | 380.9% | $4,338,714 | $16,525,786 | 380.9% | $4,338,714 | $16,525,786 |
| 47 | ETHAMBUTOL HYDROCHLORIDE-TABLET-100MG | $452,143 | 513.6% | $73,692 | $378,451 | 513.6% | $73,692 | $378,451 |
| 48 | ETHAMBUTOL HYDROCHLORIDE-TABLET-400MG | $5,186,248 | 169.4% | $1,925,433 | $3,260,815 | 169.4% | $1,925,433 | $3,260,815 |
| 49 | FLUOCINOLONE ACETONIDE-CREAM-0.01% | $14,504,907 | 284.0% | $3,777,662 | $10,727,245 | 284.0% | $3,777,662 | $10,727,245 |
| 50 | FLUOCINOLONE ACETONIDE-CREAM-0.025% | $17,106,517 | 415.2% | $3,320,483 | $13,786,034 | 415.2% | $3,320,483 | $13,786,034 |
| 51 | FLUOCINOLONE ACETONIDE-OINTMENT-0.025% | $19,287,969 | 405.0% | $3,819,297 | $15,468,673 | 405.0% | $3,819,297 | $15,468,673 |
| 52 | FLUOCINONIDE-CREAM-0.1% | $206,538,561 | 27.3% | $162,270,308 | $44,268,253 | 27.3% | $162,270,308 | $44,268,253 |
| 53 | FLUOCINONIDE-GEL-0.05% | $12,601,781 | 362.0% | $2,727,520 | $9,874,261 | 355.5% | $2,766,522 | $9,835,259 |

HIGHLY CONFIDENTIAL: SUBJECT TO PROTECTIVE ORDER

| # | Drug | Defendant Affected Net Revenues | Overcharge (%) | But-For Revenues | Increase in Net Revenues | Overcharge (%) | But-For Revenues | Increase in Net Revenues |
|---|---|---|---|---|---|---|---|---|
| 54 | FLUOCINONIDE-OINTMENT-0.05% | $42,662,346 | 561.4% | $6,450,278 | $36,212,068 | 611.6% | $5,995,285 | $36,667,061 |
| 55 | FLUOCINONIDE-SOLUTION-0.05% | $106,994,634 | 554.9% | $16,338,447 | $90,656,187 | 634.6% | $14,565,560 | $92,429,074 |
| 56 | FLUTICASONE PROPIONATE-LOTION-0.05% | $12,993,282 | 46.2% | $8,888,069 | $4,105,212 | 46.2% | $8,888,069 | $4,105,212 |
| 57 | GRISEOFULVIN MICROSIZE-TABLET-500MG | $15,049,536 | 392.2% | $3,057,386 | $11,992,151 | 440.7% | $2,783,464 | $12,266,072 |
| 58 | HALOBETASOL PROPIONATE-CREAM-0.05% | $34,998,335 | 239.3% | $10,313,435 | $24,684,900 | 195.5% | $11,843,258 | $23,155,078 |
| 59 | HALOBETASOL PROPIONATE-OINTMENT-0.05% | $89,669,578 | 323.2% | $21,189,267 | $68,480,312 | 291.7% | $22,893,028 | $66,776,550 |
| 60 | HYDROCORTISONE ACETATE-SUPPOSITORY-25MG | $198,215,379 | 1772.4% | $10,586,235 | $187,629,143 | 1772.4% | $10,586,235 | $187,629,143 |
| 61 | HYDROCORTISONE ACETATE-SUPPOSITORY-30MG | $15,854,738 | 489.2% | $2,690,826 | $13,163,912 | 489.2% | $2,690,826 | $13,163,912 |
| 62 | HYDROCORTISONE VALERATE-CREAM-0.2% | $95,585,029 | 632.4% | $13,051,245 | $82,533,784 | 660.5% | $12,568,876 | $83,016,153 |
| 63 | IMIQUIMOD-CREAM-5% | $285,032,821 | 647.7% | $38,121,186 | $246,911,636 | 647.7% | $38,121,186 | $246,911,636 |
| 64 | KETOCONAZOLE-CREAM-2% | $343,852,392 | 147.7% | $138,844,631 | $205,007,761 | 231.1% | $103,860,186 | $239,992,206 |
| 65 | LATANOPROST-SOLUTION/DROPS-0.005% | $347,168,262 | 55.9% | $222,684,183 | $124,484,079 | 8.1% | $321,137,720 | $26,030,543 |
| 66 | LIDOCAINE-OINTMENT-5% | $389,439,216 | 328.3% | $90,929,526 | $298,509,689 | 450.4% | $70,751,725 | $318,687,491 |
| 67 | METFORMIN HYDROCHLORIDE; PIOGLITAZONE HYDROCHLORIDE-TABLET-500MG;EQ15MGBASE | $42,671,722 | 49.7% | $28,496,074 | $14,175,647 | 49.7% | $28,496,074 | $14,175,647 |
| 68 | METFORMIN HYDROCHLORIDE; PIOGLITAZONE HYDROCHLORIDE-TABLET-850MG;EQ15MGBASE | $72,934,448 | 153.0% | $28,824,600 | $44,109,849 | 153.0% | $28,824,600 | $44,109,849 |
| 69 | METHAZOLAMIDE-TABLET-25MG | $9,128,142 | -14.4% | $10,658,591 | -$1,530,449 | 5.3% | $8,666,592 | $461,550 |
| 70 | METHAZOLAMIDE-TABLET-50MG | $36,382,419 | 46.2% | $24,887,512 | $11,494,907 | 43.1% | $25,417,810 | $10,964,609 |
| 71 | METHYLPHENIDATE HCL-TABLET, EXTENDED RELEASE-20MG | $291,100,335 | 340.5% | $66,079,307 | $225,021,028 | 586.2% | $42,424,335 | $248,676,000 |
| 72 | METHYLPHENIDATE HCL-TABLET-10MG | $205,548,377 | 327.3% | $48,101,590 | $157,446,787 | 435.5% | $38,387,356 | $167,161,021 |
| 73 | METHYLPHENIDATE HCL-TABLET-20MG | $201,327,188 | 436.5% | $37,527,162 | $163,800,026 | 483.6% | $34,498,979 | $166,828,208 |
| 74 | METHYLPHENIDATE HCL-TABLET-5MG | $75,355,714 | 307.9% | $18,475,414 | $56,880,301 | 449.2% | $13,721,739 | $61,633,976 |
| 75 | METRONIDAZOLE-CREAM-0.75% | $151,250,032 | 272.5% | $40,605,277 | $110,644,755 | 272.5% | $40,605,277 | $110,644,755 |
| 76 | METRONIDAZOLE-GEL-0.75% | $60,368,783 | 319.6% | $14,387,931 | $45,980,852 | 387.5% | $12,384,392 | $47,984,392 |
| 77 | METRONIDAZOLE-GEL-1% | $164,044,820 | 55.5% | $105,469,185 | $58,575,634 | 55.5% | $105,469,185 | $58,575,634 |
| 78 | METRONIDAZOLE-LOTION-0.75% | $53,703,533 | 221.2% | $16,719,554 | $36,983,979 | 221.2% | $16,719,554 | $36,983,979 |
| 79 | MOMETASONE FUROATE-CREAM-0.1% | $34,833,956 | 36.0% | $25,613,927 | $9,220,029 | 36.0% | $25,613,927 | $9,220,029 |
| 80 | MOMETASONE FUROATE-OINTMENT-0.1% | $11,193,658 | 4.1% | $10,753,425 | $440,233 | 10.3% | $10,151,708 | $1,041,950 |
| 81 | MOMETASONE FUROATE-SOLUTION-0.1% | $1,679,571 | 23.7% | $1,357,967 | $321,604 | 26.6% | $1,326,778 | $352,793 |
| 82 | NYSTATIN-OINTMENT-100,000UNITS/GM | $62,456,578 | 264.3% | $17,144,102 | $45,312,476 | 333.9% | $14,392,770 | $48,063,808 |
| 83 | NYSTATIN; TRIAMCINOLONE ACETONIDE-CREAM-100,000UNITS/GM;0.1% | $289,452,126 | 2294.2% | $12,089,784 | $277,362,342 | 2664.2% | $10,471,459 | $278,980,667 |
| 84 | NYSTATIN; TRIAMCINOLONE ACETONIDE-OINTMENT-100,000UNITS/GM;0.1% | $75,047,000 | 1775.6% | $4,001,284 | $71,045,717 | 1969.3% | $3,626,668 | $71,420,333 |
| 85 | PHENYTOIN SODIUM-CAPSULE-100MGEXTENDED | $169,119,406 | 36.7% | $123,675,522 | $45,443,884 | 99.5% | $84,763,324 | $84,356,082 |
| 86 | PROCHLORPERAZINE-SUPPOSITORY-25MG | $43,535,395 | 120.2% | $19,773,283 | $23,762,112 | 120.2% | $19,773,283 | $23,762,112 |
| 87 | PROMETHAZINE HYDROCHLORIDE-SUPPOSITORY-12.5MG | $23,769,925 | 487.4% | $4,046,639 | $19,723,286 | 487.4% | $4,046,639 | $19,723,286 |
| 88 | PROMETHAZINE HYDROCHLORIDE-SUPPOSITORY-25MG | $92,488,868 | 457.8% | $16,581,762 | $75,907,107 | 457.8% | $16,581,762 | $75,907,107 |
| 89 | TACROLIMUS-OINTMENT-0.03% | $63,508,534 | 36.8% | $46,418,174 | $17,090,360 | 36.8% | $46,418,174 | $17,090,360 |
| 90 | TACROLIMUS-OINTMENT-0.1% | $261,752,446 | 66.3% | $157,434,482 | $104,317,964 | 66.3% | $157,434,482 | $104,317,964 |
| 91 | TERCONAZOLE-CREAM-0.8% | $40,422,014 | 146.9% | $16,370,039 | $24,051,975 | 124.7% | $17,988,933 | $22,433,081 |
| 92 | TRIAMCINOLONE ACETONIDE-CREAM-0.025% | $22,750,400 | 73.3% | $13,128,503 | $9,621,897 | 133.5% | $9,743,033 | $13,007,366 |
| 93 | TRIAMCINOLONE ACETONIDE-CREAM-0.1% | $137,547,596 | 8.5% | $126,736,609 | $10,810,987 | 78.5% | $77,065,647 | $60,481,949 |
| 94 | TRIAMCINOLONE ACETONIDE-CREAM-0.5% | $36,764,619 | 138.1% | $15,442,632 | $21,321,987 | 160.2% | $14,131,182 | $22,633,437 |
| 95 | TRIAMCINOLONE ACETONIDE-OINTMENT-0.025% | $16,541,807 | 55.9% | $10,608,467 | $5,933,340 | 131.4% | $7,147,755 | $9,394,052 |
| 96 | TRIAMCINOLONE ACETONIDE-OINTMENT-0.1% | $124,200,847 | 46.3% | $84,866,140 | $39,334,707 | 135.8% | $52,673,974 | $71,526,872 |
| 97 | TRIAMCINOLONE ACETONIDE-OINTMENT-0.5% | $21,326,021 | 41.1% | $15,111,076 | $6,214,945 | 102.6% | $10,524,732 | $10,801,288 |
| 98 | TRIAMCINOLONE ACETONIDE-PASTE-0.1% | $27,649,196 | 42.5% | $19,406,278 | $8,242,917 | 15.0% | $24,044,268 | $3,604,928 |
| | Total | $9,410,482,063 | 181.4% | $3,344,351,849 | $6,066,130,214 | 199.8% | $3,138,480,100 | $6,272,001,963 |

# Appendix D Figure 1

## Defendant Net Prices Index for Drugs at Issue

ACTAVIS




Source: Defendants Transactional Data.

# Appendix D Figure 2

## Defendant Net Prices Index for Drugs at Issue

AMNEAL




Source: Defendants Transactional Data.

Appendix D Figure 3

Defendant Net Prices Index for Drugs at Issue

AUROBINDO




Source: Defendants Transactional Data.

# Appendix D Figure 4

## Defendant Net Prices Index for Drugs at Issue

GLENMARK




Source: Defendants Transactional Data.

Appendix D Figure 5

Defendant Net Prices Index for Drugs at Issue

GREENSTONE




Source: Defendants Transactional Data.

# Appendix D Figure 6

## Defendant Net Prices Index for Drugs at Issue

G_W




Source: Defendants Transactional Data.

Appendix D Figure 7

Defendant Net Prices Index for Drugs at Issue

LANNETT




Source: Defendants Transactional Data.

## Appendix D Figure 8

### Defendant Net Prices Index for Drugs at Issue

LUPIN




Source: Defendants Transactional Data.

# Appendix D Figure 9

## Defendant Net Prices Index for Drugs at Issue

MALLINCKRODT




Source: Defendants Transactional Data.

## Appendix D Figure 10

### Defendant Net Prices Index for Drugs at Issue

MYLAN




Source: Defendants Transactional Data.

# Appendix D Figure 11

## Defendant Net Prices Index for Drugs at Issue

PERRIGO




Source: Defendants Transactional Data.

# Appendix D Figure 12

## Defendant Net Prices Index for Drugs at Issue

SANDOZ




Source: Defendants Transactional Data.

# Appendix D Figure 13

## Defendant Net Prices Index for Drugs at Issue

SUN




Source: Defendants Transactional Data.

# Appendix D Figure 14

## Defendant Net Prices Index for Drugs at Issue

TARO




Source: Defendants Transactional Data.

# Appendix D Figure 15

## Defendant Net Prices Index for Drugs at Issue

TELIGENT




Source: Defendants Transactional Data.

# Appendix D Figure 16

## Defendant Net Prices Index for Drugs at Issue

VALEANT_BAUSCH




Source: Defendants Transactional Data.

Appendix D Figure 17

Defendant Net Prices Index for Drugs at Issue

WOCKHARDT




Source: Defendants Transactional Data.

# Appendix D Figure 18
# ACETAZOLAMIDE-TABLET-125MG

Drug First Communication Date: 06December2010

API First Communication Date: 06December2010

## Prices for Drugs at Issue by Data Source

[redacted]

## Defendants' Market Shares and Average Net Prices for Drugs at Issue

[redacted]

Sources: Defendants Transactional, AMP, IQVIA, and NADAC Data Sets.

# Appendix D Figure 19
## ACETAZOLAMIDE-TABLET-250MG

Drug First Communication Date: 06December2010

API First Communication Date: 06December2010

### Prices for Drugs at Issue by Data Source

[redacted]

### Defendants' Market Shares and Average Net Prices for Drugs at Issue

[redacted]

# Appendix D Figure 20
## ADAPALENE-CREAM-0.1%

Drug First Communication Date: 25October2010

API First Communication Date: 25October2010

### Prices for Drugs at Issue by Data Source

[redacted]

### Defendants' Market Shares and Average Net Prices for Drugs at Issue

[redacted]

Sources: Defendants Transactional, AMP, IQVIA, and NADAC Data Sets.

# Appendix D Figure 21
## ALCLOMETASONE DIPROPIONATE-CREAM-0.05%

Drug First Communication Date: 01May2013

API First Communication Date: 01May2013

### Prices for Drugs at Issue by Data Source

[redacted]

### Defendants' Market Shares and Average Net Prices for Drugs at Issue

[redacted]

Sources: Defendants Transactional, AMP, IQVIA, and NADAC Data Sets.

# Appendix D Figure 22
# ALCLOMETASONE DIPROPIONATE-OINTMENT-0.05%

Drug First Communication Date: 10June2013

API First Communication Date: 01May2013

## Prices for Drugs at Issue by Data Source

[redacted]

## Defendants' Market Shares and Average Net Prices for Drugs at Issue

[redacted]

Sources: Defendants Transactional, AMP, IQVIA, and NADAC Data Sets.

# Appendix D Figure 23
## AMMONIUM LACTATE-CREAM-EQ12%BASE

Drug First Communication Date: 01May2013

API First Communication Date: 01May2013

### Prices for Drugs at Issue by Data Source

[redacted]

### Defendants' Market Shares and Average Net Prices for Drugs at Issue

[redacted]

Sources: Defendants Transactional, AMP, IQVIA, and NADAC Data Sets.

# Appendix D Figure 24
## AMMONIUM LACTATE-LOTION-EQ12%BASE

Drug First Communication Date: 01May2013

API First Communication Date: 01May2013

### Prices for Drugs at Issue by Data Source

[redacted]

### Defendants' Market Shares and Average Net Prices for Drugs at Issue

[redacted]

Sources: Defendants Transactional, AMP, IQVIA, and NADAC Data Sets.

# Appendix D Figure 25
# BETAMETHASONE DIPROPIONATE-CREAM-EQ0.05%BASE

Drug First Communication Date: 01May2013

API First Communication Date: 04January2011

## Prices for Drugs at Issue by Data Source

[redacted]

## Defendants' Market Shares and Average Net Prices for Drugs at Issue

[redacted]

Sources: Defendants Transactional, AMP, IQVIA, and NADAC Data Sets.

# Appendix D Figure 26
# BETAMETHASONE DIPROPIONATE-LOTION, AUGMENTED-EQ0.05%BASE

Drug First Communication Date: 04January2011

API First Communication Date: 04January2011

## Prices for Drugs at Issue by Data Source

[redacted]

## Defendants' Market Shares and Average Net Prices for Drugs at Issue

[redacted]

Sources: Defendants Transactional, AMP, IQVIA, and NADAC Data Sets.

# Appendix D Figure 27
## BETAMETHASONE DIPROPIONATE-LOTION-EQ0.05%BASE

Drug First Communication Date: 04January2011

API First Communication Date: 04January2011

### Prices for Drugs at Issue by Data Source

[redacted]

### Defendants' Market Shares and Average Net Prices for Drugs at Issue

[redacted]

Sources: Defendants Transactional, AMP, IQVIA, and NADAC Data Sets.

# Appendix D Figure 28
## BETAMETHASONE DIPROPIONATE; CALCIPOTRIENE-OINTMENT-0.064%;0.005%

Drug First Communication Date: 21March2014

API First Communication Date: 21March2014

### Prices for Drugs at Issue by Data Source

[redacted]

Sources: Defendants Transactional, AMP, IQVIA, and NADAC Data Sets.

# Appendix D Figure 29
## BETAMETHASONE DIPROPIONATE; CLOTRIMAZOLE-CREAM-EQ0.05%BASE;1%

Drug First Communication Date: 25March2011

API First Communication Date: 25March2011

Prices for Drugs at Issue by Data Source

[redacted]

[redacted]

Sources: Defendants Transactional, AMP, IQVIA, and NADAC Data Sets.

# Appendix D Figure 30
## BETAMETHASONE DIPROPIONATE; CLOTRIMAZOLE-LOTION-EQ0.05%BASE;1%

Drug First Communication Date: 04April2011

API First Communication Date: 25March2011

### Prices for Drugs at Issue by Data Source

[redacted]

### Defendants' Market Shares and Average Net Prices for Drugs at Issue

[redacted]

Sources: Defendants Transactional, AMP, IQVIA, and NADAC Data Sets.

# Appendix D Figure 31
# BETAMETHASONE VALERATE-CREAM-EQ0.1%BASE

Drug First Communication Date: 01May2013

API First Communication Date: 22December2011

## Prices for Drugs at Issue by Data Source

[redacted]

## Defendants' Market Shares and Average Net Prices for Drugs at Issue

[redacted]

# Appendix D Figure 32
## BETAMETHASONE VALERATE-LOTION-EQ0.1%BASE

Drug First Communication Date: 22December2011

API First Communication Date: 22December2011

### Prices for Drugs at Issue by Data Source

[redacted]

### Defendants' Market Shares and Average Net Prices for Drugs at Issue

[redacted]

Sources: Defendants Transactional, AMP, IQVIA, and NADAC Data Sets.

# Appendix D Figure 33
# BETAMETHASONE VALERATE-OINTMENT-EQ0.1%BASE

Drug First Communication Date: 15February2013

API First Communication Date: 22December2011

## Prices for Drugs at Issue by Data Source

[redacted]

## Defendants' Market Shares and Average Net Prices for Drugs at Issue

[redacted]

Sources: Defendants Transactional, AMP, IQVIA, and NADAC Data Sets.

## Appendix D Figure 34
## BROMOCRIPTINE MESYLATE-TABLET-EQ2.5MGBASE

Drug First Communication Date: 05April2013

API First Communication Date: 05April2013

### Prices for Drugs at Issue by Data Source

[redacted]

### Defendants' Market Shares and Average Net Prices for Drugs at Issue

[redacted]

Sources: Defendants Transactional, AMP, IQVIA, and NADAC Data Sets.

# Appendix D Figure 35
## CALCIPOTRIENE-SOLUTION-0.005%

Drug First Communication Date: 18November2011

API First Communication Date: 18November2011

### Prices for Drugs at Issue by Data Source

[redacted]

### Defendants' Market Shares and Average Net Prices for Drugs at Issue

[redacted]

Sources: Defendants Transactional, AMP, IQVIA, and NADAC Data Sets.

Appendix D Figure 36
CARBAMAZEPINE-TABLET, EXTENDED RELEASE-100MG

Drug First Communication Date: 01March2009

API First Communication Date: 01March2009

Prices for Drugs at Issue by Data Source

[redacted]

Defendants' Market Shares and Average Net Prices for Drugs at Issue

[redacted]

Sources: Defendants Transactional, AMP, IQVIA, and NADAC Data Sets.

# Appendix D Figure 37
## CARBAMAZEPINE-TABLET, EXTENDED RELEASE-200MG

Drug First Communication Date: 01March2009

API First Communication Date: 01March2009

### Prices for Drugs at Issue by Data Source

[redacted]

### Defendants' Market Shares and Average Net Prices for Drugs at Issue

[redacted]

Sources: Defendants Transactional, AMP, IQVIA, and NADAC Data Sets.

# Appendix D Figure 38
## CARBAMAZEPINE-TABLET, EXTENDED RELEASE-400MG

Drug First Communication Date: 01March2009

API First Communication Date: 01March2009

### Prices for Drugs at Issue by Data Source

[redacted]

### Defendants' Market Shares and Average Net Prices for Drugs at Issue

[redacted]

Sources: Defendants Transactional, AMP, IQVIA, and NADAC Data Sets.

# Appendix D Figure 39
## CEFPODOXIME PROXETIL-FOR SUSPENSION-EQ100MGBASE/5ML

Drug First Communication Date: 11January2013

API First Communication Date: 09January2013

### Prices for Drugs at Issue by Data Source

[redacted]

### Defendants' Market Shares and Average Net Prices for Drugs at Issue

[redacted]

Sources: Defendants Transactional, AMP, IQVIA, and NADAC Data Sets.

# Appendix D Figure 40
## CEFPODOXIME PROXETIL-TABLET-EQ100MGBASE

Drug First Communication Date: 09January2013

API First Communication Date: 09January2013

### Prices for Drugs at Issue by Data Source

[redacted]

### Defendants' Market Shares and Average Net Prices for Drugs at Issue

[redacted]

Sources: Defendants Transactional, AMP, IQVIA, and NADAC Data Sets.

# Appendix D Figure 41
## CEFPODOXIME PROXETIL-TABLET-EQ200MGBASE

Drug First Communication Date: 09January2013

API First Communication Date: 09January2013

### Prices for Drugs at Issue by Data Source

[redacted]

### Defendants' Market Shares and Average Net Prices for Drugs at Issue

[redacted]

Sources: Defendants Transactional, AMP, IQVIA, and NADAC Data Sets.

# Appendix D Figure 42
## CICLOPIROX-CREAM-0.77%

Drug First Communication Date: 19March2012

API First Communication Date: 19March2012

[redacted]

Defendants' Market Shares and Average Net Prices for Drugs at Issue

[redacted]

Sources: Defendants Transactional, AMP, IQVIA, and NADAC Data Sets.

# Appendix D Figure 43
## CICLOPIROX-SHAMPOO-1%

Drug First Communication Date: 03December2012

API First Communication Date: 19March2012

### Prices for Drugs at Issue by Data Source

[redacted]

### Defendants' Market Shares and Average Net Prices for Drugs at Issue

[redacted]

Sources: Defendants Transactional, AMP, IQVIA, and NADAC Data Sets.

# Appendix D Figure 44
# CICLOPIROX-SOLUTION-8%

Drug First Communication Date: 07May2013

API First Communication Date: 19March2012

## Prices for Drugs at Issue by Data Source

[redacted]

## Defendants' Market Shares and Average Net Prices for Drugs at Issue

[redacted]

Sources: Defendants Transactional, AMP, IQVIA, and NADAC Data Sets.

# Appendix D Figure 45
## CLINDAMYCIN PHOSPHATE-CREAM-EQ2%BASE

Drug First Communication Date: 19October2012

API First Communication Date: 02November2010

### Prices for Drugs at Issue by Data Source

[redacted]

### Defendants' Market Shares and Average Net Prices for Drugs at Issue

[redacted]

Sources: Defendants Transactional, AMP, IQVIA, and NADAC Data Sets.

# Appendix D Figure 46
## CLINDAMYCIN PHOSPHATE-GEL-EQ1%BASE

Drug First Communication Date: 01June2012

API First Communication Date: 02November2010

Prices for Drugs at Issue by Data Source

[redacted]

Defendants' Market Shares and Average Net Prices for Drugs at Issue

[redacted]

Sources: Defendants Transactional, AMP, IQVIA, and NADAC Data Sets.

# Appendix D Figure 47
# CLINDAMYCIN PHOSPHATE-LOTION-EQ1%BASE

Drug First Communication Date: 19October2012

API First Communication Date: 02November2010

## Prices for Drugs at Issue by Data Source

[redacted]

## Defendants' Market Shares and Average Net Prices for Drugs at Issue

[redacted]

Sources: Defendants Transactional, AMP, IQVIA, and NADAC Data Sets.

# Appendix D Figure 48
# CLINDAMYCIN PHOSPHATE-SOLUTION-EQ1%BASE

Drug First Communication Date: 02November2010

API First Communication Date: 02November2010

## Prices for Drugs at Issue by Data Source

[redacted]

[redacted]

Sources: Defendants Transactional, AMP, IQVIA, and NADAC Data Sets.

# Appendix D Figure 49
## CLOBETASOL PROPIONATE EMOLLIENT-CREAM-0.05%

Drug First Communication Date: 01June2014

API First Communication Date: 01June2014

### Prices for Drugs at Issue by Data Source

[redacted]

### Defendants' Market Shares and Average Net Prices for Drugs at Issue

[redacted]

Sources: Defendants Transactional, AMP, IQVIA, and NADAC Data Sets.

# Appendix D Figure 50
## CLOBETASOL PROPIONATE-CREAM-0.05%

Drug First Communication Date: 01June2014

API First Communication Date: 01June2014

### Prices for Drugs at Issue by Data Source

[redacted]

### Defendants' Market Shares and Average Net Prices for Drugs at Issue

[redacted]

Sources: Defendants Transactional, AMP, IQVIA, and NADAC Data Sets.

# Appendix D Figure 51
# CLOBETASOL PROPIONATE-GEL-0.05%

Drug First Communication Date: 01June2014

API First Communication Date: 01June2014

## Prices for Drugs at Issue by Data Source

[redacted]

[redacted]

Sources: Defendants Transactional, AMP, IQVIA, and NADAC Data Sets.

# Appendix D Figure 52
## CLOBETASOL PROPIONATE-OINTMENT-0.05%

Drug First Communication Date: 01June2014

API First Communication Date: 01June2014

### Prices for Drugs at Issue by Data Source

[redacted]

### Defendants' Market Shares and Average Net Prices for Drugs at Issue

[redacted]

Sources: Defendants Transactional, AMP, IQVIA, and NADAC Data Sets.

# Appendix D Figure 53
# CLOBETASOL PROPIONATE-SOLUTION-0.05%

Drug First Communication Date: 01June2014

API First Communication Date: 01June2014

## Prices for Drugs at Issue by Data Source

[redacted]

## Defendants' Market Shares and Average Net Prices for Drugs at Issue

[redacted]

Sources: Defendants Transactional, AMP, IQVIA, and NADAC Data Sets.

# Appendix D Figure 54
## CLOTRIMAZOLE-CREAM-1%

Drug First Communication Date: 29January2015

API First Communication Date: 29January2015

### Prices for Drugs at Issue by Data Source

[redacted]

### Defendants' Market Shares and Average Net Prices for Drugs at Issue

[redacted]

Sources: Defendants Transactional, AMP, IQVIA, and NADAC Data Sets.

# Appendix D Figure 55
## DESONIDE-CREAM-0.05%

Drug First Communication Date: 01May2013

API First Communication Date: 01June2009

### Prices for Drugs at Issue by Data Source

[redacted]

### Defendants' Market Shares and Average Net Prices for Drugs at Issue

[redacted]

# Appendix D Figure 56
## DESONIDE-LOTION-0.05%

Drug First Communication Date: 01June2009

API First Communication Date: 01June2009

### Prices for Drugs at Issue by Data Source

[redacted]

### Defendants' Market Shares and Average Net Prices for Drugs at Issue

[redacted]

Sources: Defendants Transactional, AMP, IQVIA, and NADAC Data Sets.

# Appendix D Figure 57
## DESONIDE-OINTMENT-0.05%

Drug First Communication Date: 01May2013

API First Communication Date: 01June2009

### Prices for Drugs at Issue by Data Source

[redacted]

### Defendants' Market Shares and Average Net Prices for Drugs at Issue

[redacted]

Sources: Defendants Transactional, AMP, IQVIA, and NADAC Data Sets.

# Appendix D Figure 58
# DESOXIMETASONE-OINTMENT-0.05%

Drug First Communication Date:28September2012

API First Communication Date: 28September2012

## Prices for Drugs at Issue by Data Source

[redacted]

## Defendants' Market Shares and Average Net Prices for Drugs at Issue

[redacted]

Sources: Defendants Transactional, AMP, IQVIA, and NADAC Data Sets.

# Appendix D Figure 59
# DESOXIMETASONE-OINTMENT-0.25%

Drug First Communication Date:28September2012

API First Communication Date: 28September2012

## Prices for Drugs at Issue by Data Source

[redacted]

## Defendants' Market Shares and Average Net Prices for Drugs at Issue

[redacted]

Sources: Defendants Transactional, AMP, IQVIA, and NADAC Data Sets.

# Appendix D Figure 60
## ECONAZOLE NITRATE-CREAM-1%

Drug First Communication Date: 24July2014

API First Communication Date: 24July2014

### Prices for Drugs at Issue by Data Source

[redacted]

### Defendants' Market Shares and Average Net Prices for Drugs at Issue

[redacted]

Sources: Defendants Transactional, AMP, IQVIA, and NADAC Data Sets.

Appendix D Figure 61
EPLERENONE-TABLET-25MG

Drug First Communication Date: 02June2014

API First Communication Date: 02June2014

Prices for Drugs at Issue by Data Source

[redacted]

Defendants' Market Shares and Average Net Prices for Drugs at Issue

[redacted]

# Appendix D Figure 62
# EPLERENONE-TABLET-50MG

Drug First Communication Date: 02June2014

API First Communication Date: 02June2014

## Prices for Drugs at Issue by Data Source

[redacted]

## Defendants' Market Shares and Average Net Prices for Drugs at Issue

[redacted]

Sources: Defendants Transactional, AMP, IQVIA, and NADAC Data Sets.

# Appendix D Figure 63
# ERYTHROMYCIN-SOLUTION-2%

Drug First Communication Date: 19December2011

API First Communication Date: 19December2011

## Prices for Drugs at Issue by Data Source

[redacted]

## Defendants' Market Shares and Average Net Prices for Drugs at Issue

[redacted]

Sources: Defendants Transactional, AMP, IQVIA, and NADAC Data Sets.

# Appendix D Figure 64
## ETHAMBUTOL HYDROCHLORIDE-TABLET-100MG

Drug First Communication Date: 18December2012

API First Communication Date:  18December2012

### Prices for Drugs at Issue by Data Source

[redacted]

### Defendants' Market Shares and Average Net Prices for Drugs at Issue

[redacted]

Sources: Defendants Transactional, AMP, IQVIA, and NADAC Data Sets.

# Appendix D Figure 65
# ETHAMBUTOL HYDROCHLORIDE-TABLET-400MG

Drug First Communication Date: 18December2012

API First Communication Date: 18December2012

## Prices for Drugs at Issue by Data Source

[redacted]

## Defendants' Market Shares and Average Net Prices for Drugs at Issue

[redacted]

Sources: Defendants Transactional, AMP, IQVIA, and NADAC Data Sets.

# Appendix D Figure 66
# FLUOCINOLONE ACETONIDE-CREAM-0.01%

Drug First Communication Date: 22December2011

API First Communication Date: 22December2011

## Prices for Drugs at Issue by Data Source

[redacted]

## Defendants' Market Shares and Average Net Prices for Drugs at Issue

[redacted]

Sources: Defendants Transactional, AMP, IQVIA, and NADAC Data Sets.

# Appendix D Figure 67
# FLUOCINOLONE ACETONIDE-CREAM-0.025%

Drug First Communication Date: 22December2011

API First Communication Date: 22December2011

## Prices for Drugs at Issue by Data Source

[redacted]

## Defendants' Market Shares and Average Net Prices for Drugs at Issue

[redacted]

Appendix D Figure 68
FLUOCINOLONE ACETONIDE-OINTMENT-0.025%

Drug First Communication Date: 22December2011

API First Communication Date: 22December2011

Prices for Drugs at Issue by Data Source

[redacted]

Defendants' Market Shares and Average Net Prices for Drugs at Issue

[redacted]

# Appendix D Figure 69
## FLUOCINONIDE-CREAM-0.1%

Drug First Communication Date: 31January2014

API First Communication Date: 10May2011

### Prices for Drugs at Issue by Data Source

[redacted]

### Defendants' Market Shares and Average Net Prices for Drugs at Issue

[redacted]

Sources: Defendants Transactional, AMP, IQVIA, and NADAC Data Sets.

# Appendix D Figure 70
# FLUOCINONIDE-GEL-0.05%

Drug First Communication Date: 23November2015

API First Communication Date: 10May2011

## Prices for Drugs at Issue by Data Source

[redacted]

[redacted]

Sources: Defendants Transactional, AMP, IQVIA, and NADAC Data Sets.

# Appendix D Figure 71
## FLUOCINONIDE-OINTMENT-0.05%

Drug First Communication Date: 12February2013

API First Communication Date: 10May2011

### Prices for Drugs at Issue by Data Source

[redacted]

### Defendants' Market Shares and Average Net Prices for Drugs at Issue

[redacted]

Sources: Defendants Transactional, AMP, IQVIA, and NADAC Data Sets.

# Appendix D Figure 72
# FLUOCINONIDE-SOLUTION-0.05%

Drug First Communication Date: 10May2011

API First Communication Date: 10May2011

## Prices for Drugs at Issue by Data Source

[redacted]

## Defendants' Market Shares and Average Net Prices for Drugs at Issue

[redacted]

Sources: Defendants Transactional, AMP, IQVIA, and NADAC Data Sets.

# Appendix D Figure 73
## FLUTICASONE PROPIONATE-LOTION-0.05%

Drug First Communication Date: 03December2012

API First Communication Date: 03December2012

### Prices for Drugs at Issue by Data Source

[redacted]

### Defendants' Market Shares and Average Net Prices for Drugs at Issue

[redacted]

Sources: Defendants Transactional, AMP, IQVIA, and NADAC Data Sets.

# Appendix D Figure 74
## GRISEOFULVIN MICROSIZE-TABLET-500MG

Drug First Communication Date: 02October2013

API First Communication Date: 02October2013

### Prices for Drugs at Issue by Data Source

[redacted]

### Defendants' Market Shares and Average Net Prices for Drugs at Issue

[redacted]

Sources: Defendants Transactional, AMP, IQVIA, and NADAC Data Sets.

# Appendix D Figure 75
# HALOBETASOL PROPIONATE-CREAM-0.05%

Drug First Communication Date:28September2012

API First Communication Date: 28September2012

## Prices for Drugs at Issue by Data Source

[redacted]

## Defendants' Market Shares and Average Net Prices for Drugs at Issue

[redacted]

Sources: Defendants Transactional, AMP, IQVIA, and NADAC Data Sets.

## Appendix D Figure 76
## HALOBETASOL PROPIONATE-OINTMENT-0.05%

Drug First Communication Date:28September2012

API First Communication Date: 28September2012

### Prices for Drugs at Issue by Data Source

[redacted]

### Defendants' Market Shares and Average Net Prices for Drugs at Issue

[redacted]

Sources: Defendants Transactional, AMP, IQVIA, and NADAC Data Sets.

# Appendix D Figure 77
## HYDROCORTISONE ACETATE-SUPPOSITORY-25MG

Drug First Communication Date: 09July2013

API First Communication Date: 09July2013

### Prices for Drugs at Issue by Data Source

[redacted]

### Defendants' Market Shares and Average Net Prices for Drugs at Issue

[redacted]

Sources: Defendants Transactional, AMP, IQVIA, and NADAC Data Sets.

# Appendix D Figure 78
## HYDROCORTISONE ACETATE-SUPPOSITORY-30MG

Drug First Communication Date: 09July2013

API First Communication Date: 09July2013

### Prices for Drugs at Issue by Data Source

[redacted]

### Defendants' Market Shares and Average Net Prices for Drugs at Issue

[redacted]

Sources: Defendants Transactional, AMP, IQVIA, and NADAC Data Sets.

# Appendix D Figure 79
## HYDROCORTISONE VALERATE-CREAM-0.2%

Drug First Communication Date: 01August2013

API First Communication Date: 01August2013

### Prices for Drugs at Issue by Data Source

[redacted]

### Defendants' Market Shares and Average Net Prices for Drugs at Issue

[redacted]

# Appendix D Figure 80
## IMIQUIMOD-CREAM-5%

Drug First Communication Date: 16April2010

API First Communication Date: 16April2010

### Prices for Drugs at Issue by Data Source

[redacted]

### Defendants' Market Shares and Average Net Prices for Drugs at Issue

[redacted]

Sources: Defendants Transactional, AMP, IQVIA, and NADAC Data Sets.

# Appendix D Figure 81
## KETOCONAZOLE-CREAM-2%

Drug First Communication Date: 15June2015

API First Communication Date: 15June2015

### Prices for Drugs at Issue by Data Source

[redacted]

### Defendants' Market Shares and Average Net Prices for Drugs at Issue

[redacted]

# Appendix D Figure 82
# LATANOPROST-SOLUTION/DROPS-0.005%

Drug First Communication Date: 03April2012

API First Communication Date: 03April2012

## Prices for Drugs at Issue by Data Source

[redacted]

## Defendants' Market Shares and Average Net Prices for Drugs at Issue

[redacted]

Sources: Defendants Transactional, AMP, IQVIA, and NADAC Data Sets.

# Appendix D Figure 83
# LIDOCAINE-OINTMENT-5%

Drug First Communication Date: 22December2011

API First Communication Date: 22December2011

## Prices for Drugs at Issue by Data Source

[redacted]

## Defendants' Market Shares and Average Net Prices for Drugs at Issue

[redacted]

Sources: Defendants Transactional, AMP, IQVIA, and NADAC Data Sets.

# Appendix D Figure 84
# METFORMIN HYDROCHLORIDE; PIOGLITAZONE HYDROCHLORIDE-TABLET-500MG;EQ15MGBASE

Drug First Communication Date: 13February2013

API First Communication Date: 13February2013

## Prices for Drugs at Issue by Data Source

[redacted]

## Defendants' Market Shares and Average Net Prices for Drugs at Issue

[redacted]

Sources: Defendants Transactional, AMP, IQVIA, and NADAC Data Sets.

## Appendix D Figure 85
## METFORMIN HYDROCHLORIDE; PIOGLITAZONE HYDROCHLORIDE-TABLET-850MG;EQ15MGBASE

Drug First Communication Date: 13February2013

API First Communication Date: 13February2013

### Prices for Drugs at Issue by Data Source

[redacted]

[redacted]

Sources: Defendants Transactional, AMP, IQVIA, and NADAC Data Sets.

# Appendix D Figure 86
## METHAZOLAMIDE-TABLET-25MG

Drug First Communication Date: 05December2014

API First Communication Date: 05December2014

### Prices for Drugs at Issue by Data Source

[redacted]

### Defendants' Market Shares and Average Net Prices for Drugs at Issue

[redacted]

Sources: Defendants Transactional, AMP, IQVIA, and NADAC Data Sets.

# Appendix D Figure 87
## METHAZOLAMIDE-TABLET-50MG

Drug First Communication Date: 05December2014

API First Communication Date: 05December2014

### Prices for Drugs at Issue by Data Source

[redacted]

### Defendants' Market Shares and Average Net Prices for Drugs at Issue

[redacted]

Sources: Defendants Transactional, AMP, IQVIA, and NADAC Data Sets.

# Appendix D Figure 88
## METHYLPHENIDATE HCL-TABLET, EXTENDED RELEASE-20MG

Drug First Communication Date: 08March2013

API First Communication Date: 08March2013

### Prices for Drugs at Issue by Data Source

[redacted]

### Defendants' Market Shares and Average Net Prices for Drugs at Issue

[redacted]

Sources: Defendants Transactional, AMP, IQVIA, and NADAC Data Sets.

# Appendix D Figure 89
## METHYLPHENIDATE HCL-TABLET-10MG

Drug First Communication Date: 08March2013

API First Communication Date: 08March2013

### Prices for Drugs at Issue by Data Source

[redacted]

### Defendants' Market Shares and Average Net Prices for Drugs at Issue

[redacted]

Sources: Defendants Transactional, AMP, IQVIA, and NADAC Data Sets.

## Appendix D Figure 90
## METHYLPHENIDATE HCL-TABLET-20MG

Drug First Communication Date: 08March2013

API First Communication Date: 08March2013

### Prices for Drugs at Issue by Data Source

[redacted]

### Defendants' Market Shares and Average Net Prices for Drugs at Issue

[redacted]

Sources: Defendants Transactional, AMP, IQVIA, and NADAC Data Sets.

# Appendix D Figure 91
## METHYLPHENIDATE HCL-TABLET-5MG

Drug First Communication Date: 08March2013

API First Communication Date: 08March2013

### Prices for Drugs at Issue by Data Source

[redacted]

### Defendants' Market Shares and Average Net Prices for Drugs at Issue

[redacted]

Sources: Defendants Transactional, AMP, IQVIA, and NADAC Data Sets.

# Appendix D Figure 92
## METRONIDAZOLE-CREAM-0.75%

Drug First Communication Date: 22July2011

API First Communication Date: 22July2011

### Prices for Drugs at Issue by Data Source

[redacted]

### Defendants' Market Shares and Average Net Prices for Drugs at Issue

[redacted]

# Appendix D Figure 93
## METRONIDAZOLE-GEL-0.75%

Drug First Communication Date: 17February2012

API First Communication Date: 22July2011

### Prices for Drugs at Issue by Data Source

[redacted]

### Defendants' Market Shares and Average Net Prices for Drugs at Issue

[redacted]

Sources: Defendants Transactional, AMP, IQVIA, and NADAC Data Sets.

Appendix D Figure 94
METRONIDAZOLE-GEL-1%

Drug First Communication Date: 01July2014

API First Communication Date: 22July2011

Prices for Drugs at Issue by Data Source

[redacted]

Defendants' Market Shares and Average Net Prices for Drugs at Issue

[redacted]

# Appendix D Figure 95
# METRONIDAZOLE-LOTION-0.75%

Drug First Communication Date: 22July2011

API First Communication Date: 22July2011

## Prices for Drugs at Issue by Data Source

[redacted]

## Defendants' Market Shares and Average Net Prices for Drugs at Issue

[redacted]

Sources: Defendants Transactional, AMP, IQVIA, and NADAC Data Sets.

# Appendix D Figure 96
# MOMETASONE FUROATE-CREAM-0.1%

Drug First Communication Date: 16May2013

API First Communication Date: 16May2013

## Prices for Drugs at Issue by Data Source

[redacted]

## Defendants' Market Shares and Average Net Prices for Drugs at Issue

[redacted]

Sources: Defendants Transactional, AMP, IQVIA, and NADAC Data Sets.

# Appendix D Figure 97
## MOMETASONE FUROATE-OINTMENT-0.1%

Drug First Communication Date: 16May2013

API First Communication Date: 16May2013

### Prices for Drugs at Issue by Data Source

[redacted]

### Defendants' Market Shares and Average Net Prices for Drugs at Issue

[redacted]

Sources: Defendants Transactional, AMP, IQVIA, and NADAC Data Sets.

# Appendix D Figure 98
## MOMETASONE FUROATE-SOLUTION-0.1%

Drug First Communication Date: 16May2013

API First Communication Date: 16May2013

### Prices for Drugs at Issue by Data Source

[redacted]

### Defendants' Market Shares and Average Net Prices for Drugs at Issue

[redacted]

Sources: Defendants Transactional, AMP, IQVIA, and NADAC Data Sets.

# Appendix D Figure 99
## NYSTATIN-OINTMENT-100,000UNITS/GM

Drug First Communication Date: 01June2011

API First Communication Date: 01June2011

### Prices for Drugs at Issue by Data Source

[redacted]

### Defendants' Market Shares and Average Net Prices for Drugs at Issue

[redacted]

Sources: Defendants Transactional, AMP, IQVIA, and NADAC Data Sets.

# Appendix D Figure 100
## NYSTATIN; TRIAMCINOLONE ACETONIDE-CREAM-100,000UNITS/GM;0.1%

Drug First Communication Date: 12February2013

API First Communication Date: 12February2013

### Prices for Drugs at Issue by Data Source

[redacted]

### Defendants' Market Shares and Average Net Prices for Drugs at Issue

[redacted]

Sources: Defendants Transactional, AMP, IQVIA, and NADAC Data Sets.

# Appendix D Figure 101
## NYSTATIN; TRIAMCINOLONE ACETONIDE-OINTMENT-100,000UNITS/GM;0.1%

Drug First Communication Date: 12February2013

API First Communication Date: 12February2013

### Prices for Drugs at Issue by Data Source

[redacted]

### Defendants' Market Shares and Average Net Prices for Drugs at Issue

[redacted]

Sources: Defendants Transactional, AMP, IQVIA, and NADAC Data Sets.

# Appendix D Figure 102
## PHENYTOIN SODIUM-CAPSULE-100MGEXTENDED

Drug First Communication Date: 02June2014

API First Communication Date: 02June2014

### Prices for Drugs at Issue by Data Source

[redacted]

### Defendants' Market Shares and Average Net Prices for Drugs at Issue

[redacted]

Sources: Defendants Transactional, AMP, IQVIA, and NADAC Data Sets.

# Appendix D Figure 103
## PROCHLORPERAZINE-SUPPOSITORY-25MG

Drug First Communication Date: 19March2013

API First Communication Date: 19March2013

### Prices for Drugs at Issue by Data Source

[redacted]

### Defendants' Market Shares and Average Net Prices for Drugs at Issue

[redacted]

Sources: Defendants Transactional, AMP, IQVIA, and NADAC Data Sets.

# Appendix D Figure 104
## PROMETHAZINE HYDROCHLORIDE-SUPPOSITORY-12.5MG

Drug First Communication Date: 08October2012

API First Communication Date: 08October2012

### Prices for Drugs at Issue by Data Source

[redacted]

### Defendants' Market Shares and Average Net Prices for Drugs at Issue

[redacted]

Sources: Defendants Transactional, AMP, IQVIA, and NADAC Data Sets.

# Appendix D Figure 105
## PROMETHAZINE HYDROCHLORIDE-SUPPOSITORY-25MG

Drug First Communication Date: 08October2012

API First Communication Date: 08October2012

### Prices for Drugs at Issue by Data Source

[redacted]

### Defendants' Market Shares and Average Net Prices for Drugs at Issue

[redacted]

Sources: Defendants Transactional, AMP, IQVIA, and NADAC Data Sets.

# Appendix D Figure 106

## TACROLIMUS-OINTMENT-0.03%

Drug First Communication Date: 19November2014

API First Communication Date: 19November2014

### Prices for Drugs at Issue by Data Source

[redacted]

### Defendants' Market Shares and Average Net Prices for Drugs at Issue

[redacted]

## Appendix D Figure 107
## TACROLIMUS-OINTMENT-0.1%

Drug First Communication Date: 19November2014

API First Communication Date: 19November2014

### Prices for Drugs at Issue by Data Source

[redacted]

### Defendants' Market Shares and Average Net Prices for Drugs at Issue

[redacted]

Sources: Defendants Transactional, AMP, IQVIA, and NADAC Data Sets.

# Appendix D Figure 108
## TERCONAZOLE-CREAM-0.8%

Drug First Communication Date: 01May2013

API First Communication Date: 01May2013

### Prices for Drugs at Issue by Data Source

[redacted]

### Defendants' Market Shares and Average Net Prices for Drugs at Issue

[redacted]

Sources: Defendants Transactional, AMP, IQVIA, and NADAC Data Sets.

# Appendix D Figure 109
# TRIAMCINOLONE ACETONIDE-CREAM-0.025%

Drug First Communication Date: 01July2010

API First Communication Date: 01July2010

## Prices for Drugs at Issue by Data Source

[redacted]

## Defendants' Market Shares and Average Net Prices for Drugs at Issue

[redacted]

Sources: Defendants Transactional, AMP, IQVIA, and NADAC Data Sets.

# Appendix D Figure 110
# TRIAMCINOLONE ACETONIDE-CREAM-0.1%

Drug First Communication Date: 01July2010

API First Communication Date: 01July2010

## Prices for Drugs at Issue by Data Source

[redacted]

## Defendants' Market Shares and Average Net Prices for Drugs at Issue

[redacted]

Sources: Defendants Transactional, AMP, IQVIA, and NADAC Data Sets.

# Appendix D Figure 111
## TRIAMCINOLONE ACETONIDE-CREAM-0.5%

Drug First Communication Date: 01July2010

API First Communication Date: 01July2010

### Prices for Drugs at Issue by Data Source

[redacted]

### Defendants' Market Shares and Average Net Prices for Drugs at Issue

[redacted]

Sources: Defendants Transactional, AMP, IQVIA, and NADAC Data Sets.

# Appendix D Figure 112
## TRIAMCINOLONE ACETONIDE-OINTMENT-0.025%

Drug First Communication Date: 01July2010

API First Communication Date: 01July2010

### Prices for Drugs at Issue by Data Source

[redacted]

### Defendants' Market Shares and Average Net Prices for Drugs at Issue

[redacted]

Sources: Defendants Transactional, AMP, IQVIA, and NADAC Data Sets.

# Appendix D Figure 113
## TRIAMCINOLONE ACETONIDE-OINTMENT-0.1%

Drug First Communication Date: 01July2010

API First Communication Date: 01July2010

### Prices for Drugs at Issue by Data Source

[redacted]

### Defendants' Market Shares and Average Net Prices for Drugs at Issue

[redacted]

Sources: Defendants Transactional, AMP, IQVIA, and NADAC Data Sets.

# Appendix D Figure 114
## TRIAMCINOLONE ACETONIDE-OINTMENT-0.5%

Drug First Communication Date: 01July2010

API First Communication Date: 01July2010

### Prices for Drugs at Issue by Data Source

[redacted]

### Defendants' Market Shares and Average Net Prices for Drugs at Issue

[redacted]

Sources: Defendants Transactional, AMP, IQVIA, and NADAC Data Sets.

# Appendix D Figure 115
## TRIAMCINOLONE ACETONIDE-PASTE-0.1%

Drug First Communication Date: 16October2013

API First Communication Date: 01July2010

### Prices for Drugs at Issue by Data Source

[redacted]

### Defendants' Market Shares and Average Net Prices for Drugs at Issue

[redacted]

**Appendix E Table 1 – Econometric Estimates of the Change in Prices for PI and AE Drugs Using Defendants AMP**

| | Before and After Regression | Difference-in-Difference Regression | |
|---|---|---|---|
| | (1) | (2) | |
| **Overcharge %** | **229%** | | **320%** |
| | **Drugs at Issue (Defendant AMP Data)** | **Control Drugs (IQVIA)** | **Drugs at Issue (Defendant AMP Data)** |
| Drugs at Issue x (Post First Communication) | 1.1895*** | | 1.4353*** |
| | [0.1473] | [redacted] | [0.1656] |
| Log(Total Annual Quantity of Drug) | -0.0028 | | -0.0020 |
| | [0.1276] | | [0.0333] |
| Number of Competitors = 2 | -0.4686* | | -0.1435 |
| | [0.2454] | | [0.1783] |
| Number of Competitors = 3 | -0.5603** | | -0.2278 |
| | [0.2447] | | [0.1735] |
| Number of Competitors = 4 | -0.6331** | | -0.2993 |
| | [0.2697] | | [0.1897] |
| Number of Competitors = 5 | -0.6943** | | -0.2248 |
| | [0.3157] | | [0.2484] |
| Drug in FDA's Shortage List | 0.6119*** | | 0.5382*** |
| | [0.0896] | | [0.0537] |
| Drug is Branded Generic = Yes | 0.4803 | | 1.0206*** |
| | [0.4098] | | [0.2268] |
| Log(COGS) | 0.5623*** | | |
| | [0.1003] | | |
| Log(COGS) * Post First Communication | -0.3882*** | [redacted] | |
| | [0.1208] | | |
| Constant | 0.0622 | | |
| | [2.1574] | | |
| | | | |
| Observations | 4,169 | | |
| R-squared | 0.771 | | |
| Drug (API-Form-Strength) Fixed Effect | Yes | Yes | |
| Year-Quarter Fixed Effect | No | Yes | |

Standard errors are clustered by API
*** p<0.01, ** p<0.05, * p<0.1
Notes:
[1] Dependent variable is natural logarithm of Defendants AMP.
[2] Price Increase % is calculated as: Exp(Price Increase Coefficient) - 1.
*Sources: Defendants Transactional Data and IQVIA.*

**Appendix E Table 2 – Econometric Estimates of the Change in Prices for PI and AE Drugs Using Defendants IQVIA Price**

[redacted]

Notes:
[1] Dependent variable is natural logarithm of IQVIA price.
[2] Price Increase % is calculated as: Exp(Price Increase Coefficient) - 1.

*Sources: Defendants Transactional Data and IQVIA.*

# Appendix F - Notes on Data Sources and Data Processing

## I. Overview

### A. Introduction

1. For purposes of this Report, I have relied upon Defendants' production of transactional sales data, both at the direct and the indirect customer level. As mentioned in the body of this Report, the primary focus of my analysis is on the net sales prices received by the Defendants at the API-Form-Strength level, both because that is the measure that is most appropriate for a disgorgement estimate since it is most closely tied to profits, and because that is an economic measure that Defendants would most consider when deciding to engage in anticompetitive conduct.

2. The purpose of this Appendix is to detail the decisions made in processing Defendants' data, as well as noting any inconsistencies in such productions. When possible, my priority was to preserve and utilize Defendants' data in its entirety; however, circumstances sometimes required a deviation from that directive. While the full backup (detailing the steps taken from taking the raw input files from Defendants to the analyses contained in the body of this Report) to this report is being produced simultaneously, I provide this Appendix to provide a summary of those steps.

### B. Defendants' Transactional Data Productions

#### *i. Overview*

3. As part of my review of the transactional data in this matter, I have reviewed the direct, indirect, and adjustments data for each Defendant, as well as any correspondence between the Plaintiffs and Defendants discussing these data. To assist in my review, the SAGs have asked other Plaintiff Groups to identify responsive transactional data and to process that data in a manner that retains all indirect/direct sales by customer, as well as any calculable rebates, returns and/or other credits and debits associated with those sales.[1] While I have relied upon their work product and output, I and my staff have reviewed their calculations, and any errors in such processing I accept as my own. All workpapers relied upon are incorporated in my backup materials.

[1] My staff were responsible for processing the Mallinckrodt data for purposes of my Report.

# II. Data Preparation Methodology

## A. Drugs at Issue

4. I begin my analysis by first identifying the universe of NDCs (National Drug Codes) associated with API-form-strength combinations that were agreed upon as being included in the MDL. My NDC list was populated from a review of AnalySource, IQVIA, the FDA NDC database, SDUD, and Medicaid Fraud data, as well as through collaboration with the Defendants and other Plaintiffs groups. It is my understanding that this list of NDCs was used for purposes of Defendant and Third-Party data productions.

5. The next step was to identify drug API-form-strength combinations as listed in the Complaint ("Drugs at Issue"). When the conduct listed was specific to a particular strength and/or form (*e.g.*, Fluocinonide 0.1% Cream), only NDCs associated with that molecule, strength and form were included. If the Conduct was less specific (*e.g.*, Methylphenidate HCL Tablets), all MDL strengths for that particular molecule/form were included. Finally, for each drug molecule-form-strength, I separately identified the manufacturers of that Drug who are alleged to have participated in Conduct for that drug.[2] A list of identified NDCs associated with MDL and Drugs at Issue are included in the backup materials to this report.

## B. Global Changes Made to Defendants' Processed Transactional Data

### *i. Categories of Adjustments*

6. Defendants' data productions were not uniform in the information it contained. Certain manufacturers provided detailed information on direct sales and adjustments (and specifically what those adjustments were), others provided direct sales and aggregate adjustments, and still others provided only their own calculations of gross and net prices. To assure uniformity in the adjustments used to calculate net price across Defendant datasets, I first categorize the sales data into gross sales revenues and quantities (*i.e.*, at the direct customer level), rebates and adjustments (both to direct and indirect customers), and returns. The rebates and adjustments were assigned to categories, such as chargebacks and administrative fees. As discussed below, certain adjustment categories were excluded from my calculation of net price. Finally, these categories were aligned across the Defendant data productions, to the extent possible.

---

[2] See Amended Complaint, Civil Action No. 2:20-CV-03539, September 9, 2021, ¶¶1613-1731. (Henceforth, "Complaint"). The Drugs at Issue for each Defendant are listed in the "Counts" Section of the Complaint.

*ii. Aggregation*

7. For purposes of my analysis, the data were first aggregated to the customer-NDC-quarter level. I note, however, that pharmaceutical sales occur through a complicated supply chain of direct and indirect prices, with rebates and other indirect adjustments being paid periodically. In addition, for many Defendants, the transactional data were not produced in a way such that all indirect sales and adjustments could be linked to the associated (original) direct sale. Hence, the prices at the customer level may or may not accurately reflect the net sales amount received by the manufacturer for a sale to that customer.

8. For this reason, I then aggregate the data to the to the NDC-quarter level. The NDC contains information on (1) the manufacturer/marketer of the product (the "labeler code"), (2) the product being sold, and (3) the package size being sold. Finally, I re-aggregate to the API-Form-Strength-Manufacturer-quarter level.

*iii. Adjustment Categories Not Included*

9. As part of my data processing, the following categories of transactions/payments/adjustments were not included in my computation of net prices:

- Medicaid and other government rebates
- Bona-fide Admin Fees
- Quantity variables pertaining to chargebacks, rebates, credits, and other adjustments[3]
- Taxes
- Non-Sales
- Costs
- Private Label Rebates
- Transactions with Quantities and No Amounts
- Transactions with Missing NDCs
- Donations/Samples
- Intercompany Sales
- Non-US Transactions
- ITI Exclusions

10. As noted in the disgorgement section in the report, the Defendants participated in the Medicaid drug rebate program whereby the Defendants paid rebate amounts to the State Medicaid agencies based on AMP and drug utilization. These rebates were not consistently included in Defendants' data productions – certain manufacturers did not include them in the transactional data at all, and others

[3] Quantities for returns were kept and are used in the calculation of net quantity and net sales price.

included these payments only for certain periods. Hence, for consistency, I exclude all government and Medicaid rebates.[4]

11. When possible, I separate any administrative fees paid into bona-fide and non-bona-fide administrative fees. A bona-fide service fee is defined as "Fees paid by a manufacturer to an entity, that represent fair market value for a bona fide, itemized service actually performed on behalf of the manufacturer that the manufacturer would otherwise perform (or contract for) in the absence of the service arrangement, and that are not passed on in whole or in part to a client or customer of an entity, whether or not the entity takes title to the drug."[5] As these fees are not directly related to the sale and transfer of pharmaceuticals from the manufacturer to the customer, these should not be included in the calculation of net prices.

*iv. Dates*

12. When available, transactional sales were assigned to the date of the invoice. Chargeback dates were determined by the debit memo submission date, payment date, the wholesaler invoice date, the settled date, or the accrual date where available. Dates applied to adjustments varied by Defendant and adjustment type. For certain manufacturers, the settled date was used. For others, the memo date or the payment date was used. For chargebacks and/or other adjustments embedded in direct sales data where no chargeback or other adjustment date variables were present, I applied the invoice date to these transactions.

*v. Calculated vs. Standalone Chargebacks*

13. Certain Defendants produced chargeback information that included both the chargeback as calculated by the manufacturer, as well as the difference between the direct and the indirect price. While the difference between the direct and the indirect price is typically equal to the chargeback amount, on rare occasions, the two amounts in the Defendants' data may differ slightly. When conflicts occur, I rely on the chargeback amount as calculated by the manufacturer.

*vi. Outlier Screens*

14. In my regression models, I exclude any price observation falling in the 1st or 99th percentile of Defendant net prices.

---

[4] See my Report for a discussion of government/Medicaid rebates and their role in the calculation of net prices.

[5] Code of Federal Regulations, Title 42 § 414.802. Available at: https://www.ecfr.gov/current/title-42/chapter-IV/subchapter-B/part-414/subpart-J/section-414.802.

*vii. Observations Relating to Other Manufacturers*

15. Observations relating to other manufacturers (*i.e*. that were not the producing manufacturer's NDC) were excluded.

## C. Defendant-Specific Notes

*i. Actavis*

16. Actavis produced sales information only through 2017. Adjustments in 2017 exceed gross sales. Sales for 2018 were imputed for purposes of disgorgement.

*ii. Amneal*

17. While Amneal's data contains returns, it does not include the quantities associated with those returns.

18. Amneal provided two different types of adjustment (chargebacks, rebates, discounts, etc.) data, one of which I used, the other I did not (using both would be duplicative). The adjustments data I used are found in the direct sales data. In these data, each observation represents a unique sales transaction with an actual gross sales amount (gross_sales) and also includes for each observation the following accrual-based adjustments: chargebacks, rebates, billbacks, returns, cash discounts, administrative fees, redistribution fees, Medicaid fees, and other.

19. With the exception of shelf stock adjustments (which are not included as adjustments in the direct sales data), I did not utilize Amneal's standalone adjustment data because these adjustments are sparsely populated and generally cannot be reliably matched with the direct sales data. Further, the adjustment data that I do use (from the direct sales data) are larger than the adjustments recorded in the standalone adjustment data.

20. I understand that Amneal's counsel has taken the position that certain adjustment types from the standalone adjustments file should be included in my calculation of net prices.[6] Notwithstanding the observation above that the standalone adjustments are duplicative of the adjustments in the direct sales file, the categories of adjustments identified by Amneal's counsel tend to be costs and should not be included in a calculation of net prices.[7]

---

[6] E-mail from Kasia Hebda to Joseph Betsko, "RE: [ EXTERNAL ] Re: MDL 2724: Connecticut et al. v. Sandoz Inc. et al., No. 2:20-CV-03539 (E.D. Pa.) - Plaintiff States Expert Report - Dr. Frederick R. Warren-Boulton", January 5, 2024.

[7] For example, "Advertising" (one of the adjustment categories identified by Amneal's counsel) is a cost and should not be treated as an adjustment to net revenue or net prices.

*iii. G&W*

21. I understand that STI Pharmaceuticals took over the marketing responsibility for Ethambutol Hydrochloride from G&W in April 2013.[8] Hence I end the damages period for G&W for Ethambutol HCL after 2013Q2.

22. G&W did not produce transactional data for several drugs at issue, including Betamethasone Valerate Lotion, Calcipotriene Solution, Ciclopirox Cream, Ciclopirox Solution, Ethambutol HCL Tablets, Hydrocortisone Acetate, Mometasone Furoate Cream, Ointment, and Solution, Prochlorperazine Suppositories, and Promethazine HCL Suppositories. G&W apparently said that it would produce this information, but has not done so to date.[9]

23. G&W did not produce separate rebate information for 2010-2012. G&W did not produce structured AMP data. Further, I understand that G&W's production of adjustment data may be incomplete and may not include all credits, debit, discounts, rebates, returns, and/or other adjustments. I understand that several of the adjustments recorded in G&W's productions represent estimates and may not always equal the actual amount ultimately paid by G&W.[10]

*iv. Greenstone*

24. For two particular NDCs at Issue, "59762033301" and "59762033302", I found that Greenstone produced anomalous direct sales data in its productions of its RCS and RAS databases. In certain monthly periods, the prices recorded for these NDCs grossly exceeded publicly available WAC prices and in many instances exceeded WAC by 2-3x. In some periods, the prices recorded in the RCS database were significantly higher than the contemporaneous prices for the same NDC in the RAS database. In other periods, certain "Sold By" prices in the RCS database were significantly higher than prices associated with other "Sold By" values and/or prices found in the RAS database. I removed the gross amounts and quantities associated with these abnormally high prices from my analyses. Any adjustments associated with these NDCs occurring during the periods where I removed these sales were linearly scaled down by the total remaining gross amount in sales relative to the total

[8] Complaint ¶ 1572.

[9] *See* Letter from Daniel J. Blackman, Latham & Watkins LLP, to Candace Enders, Berger Montague PC. (February 17, 2023).

[10] *See* Letter from Daniel J. Blackman, Latham & Watkins LLP, to Candace Enders, Berger Montague PC. (February 17, 2023); Letter from Daniel J. Blackman, Latham & Watkins LLP, to Zachary D. Caplan, Berger Montague PC. (November 6, 2019).

gross amounts prior to removal. For periods where there were no separate transaction sources unaffected by this abnormal data, all records are removed.

*v. Glenmark*

25. The Glenmark data show chargebacks making up an abnormally high percentage of gross sales (~70-90%) in 2017 and 2018. Glenmark's data did not include separate rebate information prior to 2016.

*vi. Mallinckrodt*

26. Included in Mallinckrodt's transactional data production are a set of "sales tracings" files.[11] These files only contain one type of transaction.[12] Mallinckrodt was vague in its responses as to what this transaction type refers to, how the data should be processed, and how the files relate to Mallinckrodt's other produced files. However, Mallinckrodt's counsel did specifically indicate that the inclusion of these files was necessary to obtain a complete and accurate picture of Mallinckrodt's net sales prices.[13] As a result, I reviewed and included these files in my analyses. Given the features of these data, Mallinckrodt's responses to data questions, and the fact that prices are similar to those found in Mallinckrodt's other transactional data, I categorized all transactions in these data as either sales or returns.[14] I understand that the amounts, quantities, and prices recorded in this data come from distributors and may not represent purely gross amounts, quantities, and prices.

*vii. Sandoz/Fougera*

27. Sandoz/Fougera did not produce sales or AMP information for any Triamcinolone Acetonide formulation, though Sandoz/Fougera did produce sales information for Nystatin/Triamcinolone formulations.

*viii. Sun*

28. Sun did not produce AMP information, nor did they produce cost information. The only transaction-level data Sun produced comes from its SAP system, which begins in April of 2016. Sun's

[11] *See* MNK_GX2685149 - MNK_GX2685158.

[12] The transaction type can be found in the "Order Type" field. All records in the sales tracing files have a transaction type of "SH". According to Mallinckrodt, transaction types of "SH" correspond to "Distributor Sales History Feed". *See* Email from William T. Davidson, Ropes & Gray LLP, to Adam J. Pessin, Fine, Kaplan and Black, R.P.C, and Candice Enders, Berger Montague PC. (August 4, 2022): pp. 1-5, at p. 4.

[13] Email from William T. Davidson, Ropes & Gray LLP, to Adam J. Pessin, Fine, Kaplan and Black, R.P.C, and Candice Enders, Berger Montague PC. (August 4, 2022): pp. 1-5, at p. 2.

[14] Mallinckrodt's other transactional data are contained in the files MNK_GX2685141 - MNK_GX2685148.

productions covering data prior to April 2016, which are fiscal year based, are only available in various aggregated forms: either monthly, quarterly, or annually. Several of these files only provide net or "realized" amounts and quantities and completely lack chargebacks, returns, and other forms of adjustments. For records belonging to non-monthly aggregated files, I expand the data to a monthly level and distribute the recorded gross amounts, returns, chargebacks, adjustments, and/or net amounts and quantities across their corresponding monthly periods.[15]

*ix. Taro*

29. Taro included in its productions transaction-level, monthly, and quarterly data. Where available, I rely solely on the monthly data, which is based on Taro's financial reports and which I found to be the most accurate and complete record of Taro's sales and adjustments. When Taro's Monthly sales data is not available, I instead rely on Taro's quarterly data, which contains both gross and net amounts and quantities, and spans from Q4 2016 through Q3 2018. When neither the monthly nor the quarterly sources are available, I rely on the transactional data. I add in gross amounts and quantities from the transactional chargebacks data in instances where the gross amount recorded in the transactional or monthly data is missing or zero (on a monthly basis). Without supplementing the gross amounts in the data with those from the chargebacks files, numerous monthly-NDC records for Drugs at Issue would be included in my analysis that contain large amounts of chargebacks and/or other adjustments, but no gross or net sales amounts.

[15] I do this by dividing annualized records by 12 and quarterly records by 3.

# Appendix G – Structural Indicia for Collusion

## I. Introduction

1. In the body of this Report, I discuss conduct and performance characteristics or indicators[1] that are consistent only with collusion and where a statistical test could be carried out to indicate collusion, using primarily data on prices and market shares. In this Appendix, I review the structural characteristics that are often considered to be either consistent with or indicative of collusion.

2. Structural conditions are properties of the product being sold, the employees and/or firms selling the product, and competitive conditions (e.g., concentration) in the market for that product. Each of these conditions may relate to either the market for a drug or to the individual firms in that market.

3. Appendix G Table 1 below provides a list of structural characteristics that are commonly referenced as being consistent with or facilitating collusion. For each characteristic, I designate whether it is consistent with oligopolistic coordination, with collusion, or with both; whether it is an indicator of collusion in the market for a drug or by an individual firm in that market (or both); whether the evidence is qualitative (e.g., from documents) or can be evaluated quantitatively; and references to the literature or cases as well as to the text.

[1] The traditional causal paradigm in the Industrial Organization literature is from Structure to Conduct to Performance.

**Appendix G Table 1 – Structural Characteristics Consistent with Oligopolistic Coordination and/or Collusion**

| CHARACTERISTIC | OF MARKET OR FIRM | CONSISTENT WITH COLLUSION, COORDINATION, OR BOTH | QUANTIFIABLE |
|---|---|---|---|
| Small number of firms | Market | Both | Yes |
| High HHI | Market | Both | Yes |
| Share of market held by Defendants | Market | Collusion | Yes |
| Delta HHI: Increase in HHI with collusion or merger. | Market | Collusion | Yes |
| Low elasticity of demand | Market | Both | Yes |
| Standardized product (homogeneity) | Market | Both | |
| Social connections, trade associations, legitimate business contacts | Market or firm | Both | |
| Barriers to entry | Market | Both | |
| Defendants are present in multiple product markets with overlapping membership | Market or Firm | Both | Yes |
| Direct customers are tacitly or explicitly part of agreement | Market | Collusion | |
| Compensation to colluding individuals is based on profits rather than salary | Firm | Both | |
| Firms in that market collude in other generic drug markets | Market and Firm | Collusion | Yes |
| Colluding individuals moving from one (colluding) company to another (not yet colluding) supplier, followed by collusion by that company. | Market and firm | Collusion | Yes |

***Market Concentration***

4. A cartel agreement that involves relatively few firms that account for a large share of the market is easier to organize, implement, monitor and enforce, is more difficult for customers to avoid by switching to a non-colluding manufacturer, and is less likely to be detected.[2]

[2] See, for example, Posner, R.A. (2001). "Antitrust Law" (2nd edition). Chicago: The University of Chicago Press, or Leslie, C.R. (2021). "The Probative Synergy of Plus Factors in Price-Fixing Litigation." *Northwestern University Law Review*, 115(6), pp. 1581-1648, at 1590.

For empirical evidence from case studies of cartels, see Levenstein, M.C., and Suslow, V.Y. (2006). "What Determines Cartel Success?" *Journal of Economic Literature*, 44(1), pp. 43-95, at 58, which found that most cartels were in "relatively concentrated industries," and that "most contemporary international cartels are in highly concentrated industries with a few very large multinational firms that compete with one another in many geographical and product markets."

5. These characteristics can be quantified using the number of firms in the market, the percentage of the market supplied by the defendants, or by the Hirschman-Herfindahl Index (HHI). In addition, the effective increase in the HHI if all of the defendants merged or colluded (the "Delta HHI") provides an indica of the incentive to collude and its potential effects. In the Cournot model discussed in the text (Section VII.A), the increase in the margin (the Lerner Index) due to successful collusion would be directly proportional to the increase in the effective HHI.

6. As shown in Appendix G Table 2, below, number of firms in the markets for the Drugs at Issue ranged from 1 to 10 during the Conduct period, averaging 3.0 suppliers.[3] The HHI during the Conduct Period for the 98 Drugs at issue averaged 4,465 and ranged from 2,310 to 10,000 – all but 6 are above the 2,500 level for "highly concentrated" markets in the 2010 FTC/ DOJ Guidelines (*Guidelines)* now reduced to 1,800 in the 2023 Draft *Guidelines*. [4]

7. For context, I can compare the values of these metrics for the Drugs at Issue with those for the Control group of non-collusive drugs. The non-MDL Drugs had number of firms ranging from 1.0 to 13, with an average of 2.1. The non-MDL Drugs had an HHI of about 7,298, with a minimum of 1,038 and a maximum of 10,000.

8. The combined share for the Defendants ranged from 32% to 100%, with an average value of 91%. The increase in the effective HHI under collusion ranged from 0 to 7,205, with an average value of 4,327.

[3] Source: IQVIA Data. Competitors defined as firms supplying at least one percent of the Drug market. Note that the IQVIA data available to me are incapable of distinguishing between extended-release forms and non-extended release forms (*i.e.* that information is not included in the product form). This is likely to result in overestimates of the number of firms in these markets.

[4] See *2010 Horizontal Merger Guidelines*, § 5.3; *2023 Draft Merger Guidelines*, § II.1.

**Appendix G Table 2 – Market Concentration Characteristics**

[redacted]

*Source: IQVIA*

***Demand Characteristics: Low Price Elasticity and Stable Demand***

9. Both coordination and collusion are likely to be more profitable when demand is inelastic and there are fewer close substitutes to which customers could turn to in response to a price increase.[5] In addition, collusion that results in very large price increases is less noticeable if it does not result in large changes in output. Cartel agreements are also easier to enforce when demand is relatively stable. Sudden demand shocks can make it difficult to monitor an agreement and may induce defections if the fall is severe. A number of authors have argued that markets are more susceptible to cartelization when demand is relatively inelastic,[6] and empirical research generally supports that expectation.[7]

10. As discussed in the Report, it is generally accepted that the price-elasticity of demand for generic drugs is very low, and this is consistent with my estimate for the Drugs at Issue. In addition, in the

---

[5] In the Cournot model, both the margin (the Lerner Index), and the increase in that margin under collusion is a function of the inverse of the elasticity of demand.

[6] See Posner, R.A. (2001). "Antitrust Law" (2nd edition). Chicago: The University of Chicago Press; Levenstein, M.C., and Suslow, V.Y. (2006). "What Determines Cartel Success?" *Journal of Economic Literature*, 44(1), pp. 43-95, at 64; Leslie, C.R. (2021). "The Probative Synergy of Plus Factors in Price-Fixing Litigation." *Northwestern University Law Review*, 115(6), pp. 1581-1648, at 1590. See also, Connor, J.M. (2006). "Effectiveness of Antitrust Sanctions on Modern International Cartels." *Journal of Industry, Competition and Trade*, 6, pp. 195-223; Marshall, R.C., Marx, L.M., and Raiff, M.E. (2008). "Cartel Price Announcements: The Vitamins Industry." *International Journal of Industrial Organization*, 26(3), pp. 762-802; Baker, J.B., and Farrell, J. (2019). "Oligopoly Coordination, Economic Analysis, and the Prophylactic Role of Horizontal Merger Enforcement." *University of Pennsylvania Law Review*, 168.

[7] See Levenstein and Suslow (2006).

near term, demand for generic drugs is relatively stable, with demand changing over the lifecycle of the drug as patient switch to newer treatments.[8]

***Standardized Product (Homogeneity)***

11. Several authors have argued that markets for homogenous products are more susceptible to cartelization.[9] Market share agreements, in particular, are easier to formulate, monitor and enforce when the product is homogeneous, since shares for such products can be based on either quantity or revenue data. Given that generics have been deemed bioequivalent by the US FDA, generic drug products (branded generic, authorized generic, and generic drugs) are homogenous across manufacturers for a given generic drug.[10]

***Social Connections, Trade Associations, Legitimate Business Contacts***

12. Trade associations are a common meeting place for cartel members.[11] The DOJ asserts that "[c]ollusion is more likely if the competitors know each other well, through social connections, trade

---

[8] McMahon Dep. 222:3-222:16 "Is that typically -- do you typically see demand for a given product change across all customers at the same time, or is it specific to a given customer at any given time? A. Generally, it's across all customers. These -- the products have a lifecycle, typically in certain categories where, you know, it could be some old line treatment and there's been innovation within that therapeutic area and more and more patients are moving off -- or moving off (sic) those old line treatments to maybe newer, more effective treatments."

[9] See, for example, Leslie, C.R. (2021). "The Probative Synergy of Plus Factors in Price-Fixing Litigation." *Northwestern University Law Review*, 115(6), pp. 1581-1648, at 1590. Citing the example of a 1950s electrical equipment cartel, Levenstein and Suslow (2006) found that "collusion was easier for standardized products in which the management of the cartel could be fairly decentralized."

See also, Connor, J.M. (2006). "Effectiveness of Antitrust Sanctions on Modern International Cartels." *Journal of Industry, Competition and Trade*, 6, pp. 195-223; Marshall, R.C., Marx, L.M., and Raiff, M.E. (2008). "Cartel Price Announcements: The Vitamins Industry." *International Journal of Industrial Organization*, 26(3), pp. 762-802; Baker, J.B., and Farrell, J. (2019). "Oligopoly Coordination, Economic Analysis, and the Prophylactic Role of Horizontal Merger Enforcement." *University of Pennsylvania Law Review*, 168; Hüschelrath, K., Müller, K., and Veith, T. (2013). "Concrete Shoes for Competition: The Effect of the German Cement Cartel on Market Price." *Journal of Competition Law and Economics*, 9(1), pp. 97-123.

[10] See Section III.A.

[11] Leslie (2021) reports that "Many illegal cartels have, in fact, spontaneously commenced and grown from innocent encounters among rivals, such as trade-association meetings or social functions." Levenstein and Suslow (2006) find that 25-50 percent of cartels in U.S. cross-section studies report the involvement of trade associations. Schuldt and Taylor [Schuldt, R.F., and Taylor, J.E. (2017). "Cartel Attributes and Cartel Performance: The Impact of Trade Associations." *The Journal of Industrial Economics*, 66(1), pp. 1-29.] find that U.S. industries with trade associations were more successful in achieving collusion via output reductions or price increases than those without. Kovacic et al. [Kovacic, W.E., Marshall, R.C., Marx, L.M., and White, H.L. (2011). "Plus Factors and Agreement in Antitrust Law." *Michigan Law Review*, 110(3), pp. 393-436, at 424.] note that cartels may use trade associations to convey information on market share allocations among themselves.

associations, [or] legitimate business contacts".[12] The FTC warns that trade association activities done without adequate safeguards may pose an antitrust risk, and notes that it is illegal to use a trade association to control or suggest prices of members, as well as to use information-sharing programs or other disguised means of price-fixing.[13]

13. The Defendants in this case frequently attended industry trade shows, some of which are specifically for generic drug manufacturers, including those of the National Association of Chain Drug Stores (NACDS), the Efficient Collaborative Retail Marketing Company, LLC (ECRM), and the Generic Pharmaceutical Association (GPhA) (now the Association for Accessible Medicines).[14] Between February 20, 2013 and December 20, 2013, there were at least forty-four different trade shows or conferences where Defendants had the opportunity to meet in person.[15]

### *Barriers to Entry*

14. Barriers to entry that are at least sufficient to prevent "hit and run" entry are generally regarded as essential to both oligopolistic coordination and collusion, although covert agreements can be effective even absent any significant barriers to entry if potential entrants are unaware of the profitability of entry or are also involved in the agreement.

15. In the economics literature (and the *Guidelines)* the primary barrier to entry is the presence of significant sunk costs.[16] For generic drugs, the largest sunk cost is the requirement that the entrant first acquire an ANDA. Firms that have acquired the ANDA for a particular generic drug may be able to begin competing on contracts to supply that drug, even before beginning production. Such firms are referred to as "uncommitted entrants" or "rapid entrants" in the *Guidelines* and are counted as being in the relevant market even if not a current supplier.

16. The ability of a firm that already has an ANDA to enter the market with minimal additional sunk cost provides a basis for using the number of firms with ANDAs as an instrumental variable to predict the

---

[12] U.S. Department of Justice. (2022). "Preventing And Detecting Bid Rigging, Price Fixing, And Market Allocation In Post-Disaster Rebuilding Projects." December 1, 2022. Available at: https://www.justice.gov/atr/preventing-and-detecting-bid-rigging-price-fixing-and-market-allocation-post-disaster-rebuilding.

[13] Federal Trade Commission. (n.d.). "Spotlight on Trade Associations." Available at: https://www.ftc.gov/advice-guidance/competition-guidance/guide-antitrust-laws/dealings-competitors/spotlight-trade-associations.

[14] Complaint, ¶ 112.

[15] This averages to approximately 1 tradeshow or conference per week. Complaint, ¶ 127; DRR-CT0411768; DRR-CT0816109.

[16] See Carlton, Dennis P., and Perloff, Jeffrey M. 2005. "Modern Industrial Organization." (4th edition), p. 104; *2010 Horizontal Merger Guidelines*, § 5.1 and 9.

effective number of competitors under competitive conditions (See Section VI.E.ii.). It also implies that collusion is more likely to be effective in a market where the current suppliers compete (or could compete) with those potential or uncommitted entrants in other markets where retaliation is less expensive.

***Multimarket contact***

17. The extensive multimarket contacts among the defendants would have facilitated the formulation, monitoring and enforcement of a collusive agreement.[17] For example, Defendants Sandoz and Taro appear to have coordinated price increases and/or market share allocation on at least 37 different Drugs at Issue.[18] Likewise, Defendants Perrigo and Sandoz appear to have coordinated price increases and/or market share allocation on at least 24 different Drugs at Issue.[19]

***Participation (Tacit or Explicit) by Direct Customers***

18. Direct customers are usually regarded as in the best position to detect and deter collusion. This is the justification for the *Illinois Brick* decision, which rewards the direct customer with the entire damages (trebled) for price fixing, even if those higher prices were almost entirely passed on to the next level.[20]

19. The direct customers for the Drugs at issue, however, appear to gain from and even welcome higher prices. For example, McKesson's 2014 10-K filling, reported that:[21]

> A significant portion of our distribution arrangements with the manufacturers provides us compensation based on a percentage of our purchases. In addition, we have certain distribution arrangements with pharmaceutical manufacturers that include an inflation-based compensation component whereby we benefit when the manufacturers increase their prices as we sell our

---

[17] According to Leslie (2021), many cartels must fix multiple prices on multiple products.[17] Levenstein and Suslow (2006) find that most contemporary international cartels are in highly concentrated industries with a few very large multinational firms competing in many geographical and product markets.[17]

Bernheim et al. (1990) finds that multimarket contact "has the potential to improve firms' abilities to sustain collusive outcomes." Bernheim, B.D., and Whinston, M.D. (1990). "Multimarket Contact and Collusive Behavior." *RAND Journal of Economics*, 21(1), pp. 1-26, at 2. Van Wegberg et al. (1994) explain that fear of retaliation may induce multimarket firms to collude across markets. Van Wegberg, M., Van Witteloostuijn, A., and Abbing, M.R. (1994). "Multimarket and Multiproject Collusion: Why European Integration May Reduce Intra-Community Competition." *De Economist*, 142(3), pp. 253-285.

[18] Complaint Counts and NDC list backup materials.

[19] Complaint Counts and NDC list backup materials.

[20] Illinois Brick Co. v. Illinois, 431 U.S. 720 (1977), at 732-733. W. Landes and R. Posner (1979) "Should Indirect Purchasers Have Standing to Sue Under the Antitrust Laws? An Economic Analysis of the Rule of *Illinois Brick*." The University of Chicago Law Review. p 602-635.

[21] McKesson Corporation, Annual Report (10-K) (2014), p. 14.

> existing inventory at the new higher prices. For these manufacturers, a reduction in the frequency and magnitude of price increases, as well as restrictions in the amount of inventory available to us, could have a material adverse impact on our gross profit margin.

Similarly, Cardinal's 2014 10-K filling reported that: [22]

> Prices for generic pharmaceuticals generally decline over time. But at times, some generic products experience price appreciation, which positively impacts our margins.

Finally, AmerisourceBergen's (ABC) 2014 10-K filling reported that: [23]

> If the frequency or rate of branded and generic pharmaceutical price increases slows, our results of operations could be adversely affected.

20. In most markets, a sudden and unexplained very large price increase could be expected to generate at least concern if not also suspicion from direct customers. The understanding that their direct customers gained from and even welcomed higher prices may help explain why the instigators of the collusive price increases for the Drugs at Issue seemed unconcerned about dramatic price increases that would normally trigger an adverse reaction from their direct customers.

### *Profit-Based Compensation*

21. The structure and magnitude of executive compensation can be a significant factor in encouraging collusive behavior. According to Kovacic et al. (2011), "cartel firms will often change the incentives of their sales force to comply with 'price before volume'", rewarding them for maintaining high prices instead of gaining market share.[24] According to De Lamirande et al. (2011), managerial compensation based on firm profits and sales is more conducive to collusion than that based on relative performance evaluation, i.e., firm performance relative to its competitors.[25]

22. For the Defendants, compensation for the executive staff involved in pricing decisions was not just linked to profits and/or revenues, it was directly linked in those executives' contracts and

[22] Cardinal Health, Inc., Annual Report (10-K) (2014), p. 7.

[23] AmerisourceBergen Corporation, Annual Report (10-K) (2014), p. 8.

[24] Kovacic, W.E., Marshall, R.C., Marx, L.M., and White, H.L. (2011). "Plus Factors and Agreement in Antitrust Law." *Michigan Law Review*, 110(3), pp. 393-436, at 421-422.

[25] De Lamirande, P., Jean-Daniel, G., and Lovat, B. (2011). "Strategic Delegation and Collusion: Do Incentive Schemes Matter?" *LSF Research Working Paper Series No. 11-02*, pp. 1-13, at 10.

compensation structures.[26] Defendants also specifically awarded bonuses linked to price increases on generic drugs.[27]

***Firms in the market collude in other generic drug markets***

23. Another factor facilitating collusion is the presence of firms that have previously participated in collusive agreements. Prior price-fixing by a group of defendants in a given market shows that the market is vulnerable to cartelization, and firms which once participated in a cartel can more easily re-form a collusive agreement in the that or other markets.[28] Historically, industries in which collusion has occurred often experience collusion again.[29]

24. One major barrier to cartel formation is gaining trust that each firm will uphold their portion of the agreement.[30] Prior collusion is associated with repeated collusion because prior collusion establishes a group of firms' motivation and willingness to collude, and it establishes credibility that rivals are trustworthy co-conspirators.[31] Prior collusion can show intent, motive, and the method of a conspiracy provided that there is a logical relationship between the prior conspiracy and current conspiracy.[32]

25. In this case, collusion over the Drugs at Issue was reinforced via the agreements on other Drugs in the MDL. I understand that non-Defendants (at least with respect to this bellwether case) Apotex and Teva have pleaded guilty on certain non-At Issue Drugs in the MDL. Defendants in this proceeding have also plead guilty on other non-At Issue Drugs (see discussion in Section IV). All else equal, these other (possibly related) conspiracies could be expected to foster collusion in the Drugs at Issue.

---

[26] Berthold Dep. 53:8-55:20, Perfetto Dep. 72:13-79:19, Wesolowski Dep. 62:14-64:20, Orlofski Dep. 57:24-65:10.

[27] Lubke Dep 592:14-20 (testifying that she received a bonus of $1000 in recognition of her role in the nitrofurantoin price increase)

[28] Leslie, C.R. (2021). "The Probative Synergy of Plus Factors in Price-Fixing Litigation." *Northwestern University Law Review*, 115(6), pp. 1581-1648, at 1613.

[29] Id. *See also* Levenstein, M.C., and Suslow, V.Y. (2006). "What Determines Cartel Success?" *Journal of Economic Literature*, 44(1), pp. 43-95, at 58.

[30] Levenstein, M.C., and Suslow, V.Y. (2006). "What Determines Cartel Success?" *Journal of Economic Literature*, 44(1), pp. 43-95, at 58.

[31] Leslie, C.R. (2021). "The Probative Synergy of Plus Factors in Price-Fixing Litigation." *Northwestern University Law Review*, 115(6), pp. 1581-1648, at 1613-1614.

[32] Leslie, C.R. (2021). "The Probative Synergy of Plus Factors in Price-Fixing Litigation." *Northwestern University Law Review*, 115(6), pp. 1581-1648, at 1614, citing Ross v. Am. Express Co., 35 F. Supp. 3d 407, 449 (S.D.N.Y. 2014).

***Colluding individuals move from one (colluding) company to another (not yet colluding) supplier, leading to collusion by that company***

26. The DOJ states that collusion is more likely if the competitors know each other well through "shifting employment from one company to another."[33]

27. For example, in December 2011, Defendant Grauso moved from G&W to Aurobindo.[34] In June 2012, Defendant Blashinsky moved from Taro to Glenmark. In January 2013, Defendants Boothe and Perfetto moved from Actavis to Perrigo and Taro[35], respectively. In March 2013, Defendant Aprahamian moved from Actavis to Taro.[36] In November 2012, Defendant Kaczmarek moved from Fougera to Mallinckrodt.[37]

---

[33] U.S. Department of Justice. (2022). "Preventing And Detecting Bid Rigging, Price Fixing, And Market Allocation In Post-Disaster Rebuilding Projects." December 1, 2022. Available at: https://www.justice.gov/atr/preventing-and-detecting-bid-rigging-price-fixing-and-market-allocation-post-disaster-rebuilding.

[34] Grauso Dep. 54:8-10 and 71:8-11.

[35] Boothe Dep. 45:19-20 and 98:4 – 12; Perfetto Dep. 56: 19 – 21.

[36] Aprahamian Dep. 165:13 - 172:1.

[37] Kaczmarek Dep. 478:12 – 479:11.