# EXHIBIT 3

**IN THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF CONNECTICUT**

THE STATE OF CONNECTICUT, *et al*.,

*Plaintiffs*,

v.

SANDOZ, INC., *et al*.,

Case No. 3:20-cv-00802-MPS

Hon. Michael P. Shea

**Reply Report of Frederick Warren-Boulton, Ph.D.**

**August 26, 2024**

***I. Qualifications and Assignment......................................................................................... 3***

***II. Introduction............................................................................................................................. 3***

**A. My Opinion that Oligopolistic Coordination Cannot Explain the Price Increases on the Drugs at Issue Following Direct Evidence of Collusion, and that Collusion Is therefore the Most Plausible Explanation for those Higher Prices, Has Not Changed.................................................. 3**

**B. My Opinion that Collusion in the Market for the Drugs at Issue Is Facilitated by the Presence of Structural Characteristics and Contracting Practices, and by Both Fair Share Agreements on Individual Drugs and an Overarching Fair Share Agreement, Has Not Changed. 5**

***III. Qualitative Errors in Defendant Experts' Reports............................................................ 8***

**A. Defendant Experts Err When They Assert that I use the Term "Agreement" to Mean an Illegal Agreement.......................................................................................................................... 8**

**B. Defendant Experts' Errors Relating to Theories of Oligopolistic Competition...................... 10**

i. Defendant Experts' Assertions that I Am Trying to Explain Oligopoly Price Levels Rather than Price Changes ........................................................................................................................................10

ii. Defendant Experts Ignore the Direct Evidence of the First Communication as a Precipitating Factor . 12

iii. Defendant Experts Assert that the Kind of Price Increases that I Observe Here Resemble, and Cannot Be Distinguished from, the Price Increases that Could Be Expected in the Course of a Repeat Oligopoly Game. 13

iv. The Only Oligopoly Model that Could Generate the Kind of Large and Sudden Price Increases Observed for the Drugs at Issue Would Be the Edgeworth Cycles Model, But It Does Not Fit the Facts Here. 17

v. Oligopolistic Coordination Cannot Explain the Prices Falling After the Heritage Complaint. .............18

vi. Dr. Gilbert's Argument that It Can Be Consistent with Unilateral Self-Interest to Accommodate an Entrant by Declining to Defend a Position at a Customer Is Irrelevant. ..........................................................20

vii. Dr. Gilbert's Assertion that a Collusive Price Increase Must Be Carried Out Simultaneously by All Participants In a Collusive Arrangement Is Wrong. ..........................................................................20

viii. While It Is Unlikely Capacity Constraints Explain the Price Increases For the Drugs At Issue, Unlike Defendant Experts, I Test This. ..........................................................................................................20

**C. Contrary to Defendant Experts' Assertions, Structural Characteristics and Contract Provisions, Along with Fair Share Agreements on Individual Drugs and an Overarching Fair Share Agreements Facilitate and Can Explain the Increase in Prices Following Direc Evidence of Communications.................................................................................................................. 22**

i. Defendant Experts Mischaracterize My Analysis of Structural Characteristics, which I Note can Facilitate Collusion, Not that they are Indicative of Collusion...........................................................23

ii. Contract Provisions Cited by Dr. Gilbert as Facilitating Oligopolistic Coordination are Relevant in Explaining the Success of the Defendants In Imposing and Maintaining Large Collusive Price Increases. ......25

iii. Defendant Experts' Assertions that the Evidence Is Inconsistent with the Existence of Fair Share Agreements on Individual Drugs at Issue Are Incorrect.....................................................................29

iv. Defendant Experts Argue that an Overarching Fair Share Agreement Is Implausible Due to the Limited Value and High Cost of Such an Agreement. ....32

***IV. Defendant Experts' Econometric and Statistical Critiques Fail to Establish that My Models Are Unreliable* .... *34***

**A. Introduction .... 34**

**B. My Selection of the Benchmark Period(s) for "But-For" Prices for the Drugs at Issue Is Appropriate .... 35**

i. Exclusion of the "Intra-API" Period from the Benchmark Period Is Justified....36

ii. Dr. Jena Fails to Provide Sufficient Justification for Excluding Pre-Conduct Data from the Benchmark Period 43

**C. My Regressions Do Not Suffer from Omitted Variable Bias .... 47**

i. Background....47

ii. Claimed Omitted Variables Do Not Bias My Conclusions....51

**D. The Variables in My Model Are Properly Specified.... 61**

i. I Correctly Utilize a Common Model ....61

ii. Defendant Experts' Assertions that My Measure of Demand Is Improperly Specified Is Incorrect, and After Correcting for Their Claimed Flaw My Results Are Fundamentally Unchanged ....69

**E. Criticisms Specific to Individual Models .... 73**

i. Defendant Experts' Criticisms of My Before and After Model Are Wrong....73

ii. Defendant Experts' Criticisms of My Difference in Difference Model Are Incorrect ....84

iii. New Generics....106

**F. Differences in the Overcharge Estimates in the Regressions Estimated for Disgorgement Are Not an Indication of Their "Unreliability" .... 114**

i. Different Price Measures and Different Methodologies ....114

ii. Defendants' Reporting of the Comparability of Overcharge Percentages Greatly Overstates the Differences in Disgorgement Between Models ....115

**G. Hierarchal Approach .... 116**

i. Overview ....116

ii. Ordering of the Hierarchical Approach ....117

iii. Using Information from Other Sources to Compute Overcharges Is Also Appropriate ....118

**H. The Relevance of Statistical Significance to Liability and Disgorgement.... 119**

**I. Negative Net "But-For" Margins for Certain Defendant-Drugs .... 121**

i. Overview ....121

ii. Negative Margins Generally....122

iii. The Available Cost Data Are Limited and at Most Indicative of General Trends in Costs Across the Drugs at Issue ....122

iv. Addressing Cost Increases in the Drugs at Issue ....... 123

**J. Other Criticisms of My Net Disgorgement Calculation ....... 127**

i. Net Disgorgement ....... 127

ii. Lingering Effects ....... 128

iii. Pre-Judgement Interest ....... 129

***V. Revised Estimates of Disgorgement ....... 130***

i. Updates to Data ....... 130

ii. Accepted Modifications to Defendants' Critiques ....... 130

iii. Revised Estimates of Liability Models and Disgorgement ....... 131

# I. Qualifications and Assignment

1. My name is Frederick R. Warren-Boulton. My qualifications are laid out in my Original Report.[1] A copy of my CV is attached as Appendix A.

2. I submitted my operative report ("Report") in this matter on February 20, 2024 ("Initial Report" or "Report").[2] On April 26th, Defendants submitted no less than eight Expert Reports that responded to my Initial Report.[3] I have been asked by the Plaintiff States Attorneys General (SAGs) to review and respond to the criticisms made by Defendant Experts in those reports. A full list of additional materials considered for this Reply Report is attached hereto as Appendix B.

# II. Introduction

## A. My Opinion that Oligopolistic Coordination Cannot Explain the Price Increases on the Drugs at Issue Following Direct Evidence of Collusion, and that Collusion Is therefore the Most Plausible Explanation for those Higher Prices, Has Not Changed.

3. My initial econometric analysis addressed the key question of what would explain the increase in prices for the Drugs at Issue sold by Defendants during the Conduct Period, i.e., the period from

---

[1] Expert Report of Frederick R. Warren-Boulton, Ph.D., November 1, 2023.

[2] The report submitted on that date was my Second Amended Report, which is the operative version.

[3] Expert Report of Gregory K. Bell, Ph.D., April 26, 2024 (hereafter "Bell Report"); Expert Report of Professor Richard J. Gilbert, Ph.D., April 26, 2024 (hereafter "Gilbert Report"); Expert Report of Dr. Anupam B. Jena, M.D., Ph.D., April 26, 2024 (hereafter "Jena Report"); Expert Report of Daniel L. Rubinfeld, April 26, 2024 (hereafter "Rubinfeld Report"); Expert Report of Celeste C. Saravia, Ph.D., April 26, 2024 (hereafter "Saravia Report"); Expert Report of Lauren J. Stiroh, Ph.D., April 26, 2024 (hereafter "Stiroh Report"); Expert Report of Christopher Stomberg, Ph.D., April 26, 2024 (hereafter "Stomberg Report"); Expert Report of Catherine Tucker, Ph.D., April 26, 2024 (hereafter "Tucker Report").

the first communication among Defendants on that drug until the Complaint filed on December 14, 2016 (hereafter "Heritage Complaint"). Considering the evidence in the record, the economics literature on collusion and oligopolistic coordination, and my econometric analysis, I concluded that the very large and sudden increases in Defendant's prices immediately or shortly after that first communication could not plausibly be explained by changes in the price level under oligopolistic coordination.

4. After reviewing the evidence in the record and the economics literature, I identified key control variables that could have an impact on generic drug pricing. I then conducted both "Before/After" and "Difference in Difference" modeling to control for the effects of changes in other key variables that could explain changes in pricing of the Drugs at Issue during the Conduct period. Changes in demand, costs, the number of suppliers or market-wide shortages were controlled for in the Before and After Model, and in addition any industry-wide changes in common with non-MDL drugs were controlled for in my Difference in Difference Model (though that model did not include cost).

5. My econometric analysis allowed me to conclude, with a high degree of confidence, that after allowing for the effects expected from changes in the observed levels of variables such as costs, demand, shortages and the number of competitors, that prices were elevated by collusion for 80 of the 84 Price-Increase Drugs at Issue, and that collusion could not be ruled out for the remaining Drugs at Issue. That opinion has not changed.

6. After reviewing the Defendant experts' critiques of my econometric modeling, particularly Dr. Jena's - one of the few to quantify whether their critique would have an impact on my overcharges - that opinion has not changed. Even after comprehensively testing the Defendant Experts' econometric modeling and incorporating any valid suggestions, my review of the economic evidence and my modeling indicates that collusion is the most plausible explanation for the overcharges seen in this case.

7. The recognition of interdependence by firms in an oligopoly market would be expected to have resulted in prices above the competitive level during the period prior to the first communication. But the same conditions that facilitate a higher oligopoly price during that period would also be present in a "But-For" world without collusion following that first communication. Thus, oligopolistic coordination cannot explain the price <u>increases</u> after that first communication in markets where the effects of oligopolistic interdependence are <u>already</u> reflected in the prices during the period prior to the first communication.

### B. My Opinion that Collusion in the Market for the Drugs at Issue Is Facilitated by the Presence of Structural Characteristics and Contracting Practices, and by Both Fair Share Agreements on Individual Drugs and an Overarching Fair Share Agreement, Has Not Changed.

8. There are structural characteristics and contracting practices in the U.S. generic drug industry that would increase the Defendants' incentives and ability to collude on the Drugs at Issue. Provisions such as the Right of First Refusal, for example, can facilitate monitoring and enforcement of a collusive agreement. However, to be clear, I do not conclude that the presence of those structural characteristics or contracting terms alone indicate the presence of collusion.

9. That a market share agreement in combination with communications on specific Drugs at Issue facilitates collusion is entirely consistent with the economic literature and my experience as an economic expert. In addition, an "overarching" fair share agreement can make the initiation of those drug-specific agreements easier by serving as a set of default rules or templates for suppliers considering a collusive price increase on an individual drug. There is less need for continuous or even frequent communications when companies like the Defendants can already expect that the other parties will not exceed a reasonable or "fair" market share following even a very large price increase and will not threaten the market shares of its rivals by competing for their customers.

10. As an experienced expert in antitrust matters, it is my understanding that it is the expert's responsibility to examine the record both for sufficient evidence that would support their analysis and (especially) for facts or evidence that would invalidate that analysis. An economics expert cannot, as Dr. Gilbert asserts he should, simply ignore direct evidence of collusive behavior such as communications, and base his analysis exclusively on economic theories as to what is possible, however improbable.

11. As an expert, I would not opine that if collusion is offered in the economic literature as a <u>possible</u> explanation of price changes that collusion is then the only explanation for the price changes by the Defendants for the Drugs at Issue. Nor would I opine that since in some economic models oligopolistic prices <u>can</u> theoretically reach the monopoly level over an extended period of time via repeated independent action, the price changes observed for the Drugs at Issue <u>were</u> the result of independent behavior. That is particularly true here, where there is no evidence and no analysis from the Defendant experts establishing that "repeat" interactions <u>have</u> led to sudden price increases on non-MDL generic drugs.

12. As for the quantitative critiques of my econometric models, Dr. Jena's and other Defendant Experts ignore the following core principles of my analysis:

- Utilizing "clean" control groups (benchmark periods and control groups) that are free from the risk of potential contamination from the conspiracy is preferable to using controls that are more subject to possible contamination. For both the Before and After and the Difference-In-Difference models, this means not including Periods when the Defendants had already started communicating on Drugs with the same active pharmaceutical ingredient in the Pre-Conduct benchmark period. For the Difference-In-Difference model, this means preferring a broad set of "control drugs" where the risk of spill-over effects from Defendants' Conduct would be minimal.

- An economic analysis should maximize the use of available pricing data to isolate the effects of economic factors (including the effects of collusion) on the prices for the Drugs at Issue. Following this principle, I rely on all the data Defendants produced (including all pre-Conduct data relevant to my analysis) and use a common model for all of the Drugs at Issue. To isolate the effects of collusion, I control for manufacturer costs (in the Before and After Model) and for industrywide trends (in the Difference-in-Difference model) among other factors. That both models generate significant positive overcharge estimate increases my confidence in the robustness of both models.

13. Criticisms by the Defendant Experts' that my models are statistically unreliable suffer from fatal deficiencies, including:

- Claiming that certain variables are "omitted" without demonstrating how these allegedly omitted variables bias my overcharge estimate. When I control for the allegedly omitted variables that I can quantify, the conclusions from my original models are unchanged.

- Using flawed statistical tests to assert that both my Difference-in-Difference models and my Before and After models suffer from specification errors that, when corrected, show that my models are correctly specified.

- Falsely claiming that certain factors indicate the "unreliability" of my model, including assertions with respect to the explanatory power of my models, the hierarchical approach used for my disgorgement estimates, and the difference between the overcharge estimates generated from the Before and After and Difference-in-Difference models. None of these supposed criticisms demonstrates unreliability in any respect.

14. Defendant Experts' specific criticisms of my Initial Report are numerous and far-reaching, but their qualitative criticisms of my work can be summarized as follows:

**Qualitative Errors Alleged:**

- That the purpose of my Initial Report was to ascertain whether an illegal agreement existed between defendants, which is not a permissible role for an economist;
- That when applying my models to the Drugs at Issue, I was attempting to ascertain appropriate oligopoly price levels for the Drugs at Issue rather than changes in those levels;
- That I used structural characteristics of the market to ascertain whether an illegal agreement existed; and,
- That I ignore the role of oligopolistic game theory in explaining price increases in the Drugs at Issue.

**Econometric and Statistical Errors Alleged**

15. Similarly, Defendant Experts' criticisms regarding my econometric and statistical analyses can be summarized as follows:

- That I selected an inappropriate benchmark period;
- That I omitted variables in my regression models;
- That I improperly used a common model to determine disgorgement;
- That my models violate certain econometric principles;
- That the application of my regression models generates inconsistent and implausible but-for prices and disgorgement amounts; and,
- That I made errors in my adjustments to gross disgorgement, including in the application of Medicaid rebate payments, as well as in my calculation of the appropriate price elasticity of demand, the amount of any lingering effects, and the amount of pre-judgment interest.

16. I address each alleged error below. If there are specific Defendant critiques or assumptions that I do not address here, it is because they are not relevant to the opinions I have formed, or are similar to the critiques and assumptions I explicitly respond to here, not necessarily because I agree with the critique or assumption. They also do not substantively change my opinion. When

the critiques offered are applied in an econometrically sound manner, the impact on the overcharges and disgorgement in my modeling is minimal.

# III. Qualitative Errors in Defendant Experts' Reports

17. Defendant Experts repeatedly mischaracterize my analysis of the conduct at issue in the matter and fail to analyze the economic and record evidence discussed in my Report. My Initial Report covers the economically plausible explanations for an elevation or change by Defendants' prices following a first collusive communication. The prices for the Drugs at Issue prior to their first communication will have already reflected the limited number of suppliers at that time, i.e., those prices were oligopoly equilibrium prices. There is no rigorous analysis by Defendant Experts explaining why a new (higher or lower) oligopolistic pricing equilibrium that happened to follow a collusive communication is a more plausible explanation than collusion for the price changes I observed in the Drugs at Issue.

18. The fact that economic models of oligopolistic competition can generate prices as high as the monopoly level without direct communication does not mean that those models are relevant to this matter. If they were, I would expect to see leading firms implementing small but frequent price increases; and for prices to collapse periodically if those increases do not hold, rather than the large and sudden price increases observed in the record. Neither economic theory nor the evidence in the record provide any support for the assertion that oligopolistic coordination could provide a plausible explanation for the magnitude of the price increases seen here.

19. Other factors that Defendant Experts identify, such as capacity constraints and shortages, cannot explain the elevated prices for the Drugs at Issue observed in the record. In contrast, the use of "overarching" and drug-specific fair share agreements, especially when combined with industry contracting practices that facilitate collusion, provide the defendants with both the incentive and ability to collude.

## A. Defendant Experts Err When They Assert that I use the Term "Agreement" to Mean an Illegal Agreement

20. Dr. Gilbert and other Defendant experts repeatedly mischaracterize my testimony by asserting or implying that in my initial Report I was attempting to ascertain the existence of an illegal agreement between defendants, which is not the role of an expert economist.

21. Nothing could be further from the truth. The purpose of my Initial Report was to show that very large and statistically significant price increases following communications between defendants could not plausibly be explained by a change in the oligopolistic equilibrium. It is not the

province of an economist to ascertain whether the antitrust laws have been violated or that an agreement or understanding between defendants is illegal. However, it is the province of economists to ascertain that certain developments in the marketplace cannot plausibly be explained by established economic theories of non-collusive oligopolistic behavior, but are consistent with collusion or an "agreement" as the term is used by economists outside of a legal context.[4] Moreover, while an economist may not be able to infer the existence of an illegal agreement, economic evidence may be useful to the finder of fact in determining, along with direct evidence of communications, whether the behavior is indeed the result of an illegal agreement.

22. Nevertheless, Dr. Gilbert and other Defendant experts persist in alleging or implying that I am trying to establish the existence of an illegal agreement, and that my statements or opinions are therefore invalid. Dr. Gilbert quotes from several economics articles that refer to an "agreement" to argue that economists in general, and thus myself, use the term in the legal sense, as an illegal agreement. In those articles, however, the authors are referring to or discussing an agreement in the legal sense, i.e., an illegal agreement. Nowhere does Dr. Gilbert qualify his use of the term "agreement" to make it clear that he is using the term in its legal versus its ordinary sense, as I am.

23. Statements and criticisms made by Dr. Gilbert that assume that I am using the term in the legal sense are irrelevant to my Report, since I never refer to or make any statements with respect to distinguishing oligopolistic coordination from an illegal agreement. Dr. Gilbert appears to be systematically conflating the legal and ordinary use of the term to attack statements and propositions that I never make by claiming or implying that I am referring to an illegal agreement. In contrast, when I use the term "agreement", I use it in the ordinary, non-legal sense.

24. It is my understanding that it is up to the finder of fact to determine whether Defendants have reached an illegal agreement. In that determination, the finder of fact may decide the extent to

---

[4] I use the term "agreement" in its non-legal sense as "an arrangement as to a course of action, harmony of opinion, action, or character" (Merriam-Webster) or "a decision or arrangement between two or more people or groups to do something or to obey the same rules" (Cambridge Dictionary). I use "collusion" to mean an anticompetitive agreement. Like Dr. Gilbert, when I use the term oligopolistic coordination, I mean the same economic phenomenon that is sometimes referred to as oligopolistic interdependence, conscious parallelism, or tacit collusion (Gilbert Report footnote 4). My terminology is thus consistent with Dr. Harrington's, i.e., "Collusion is when firms coordinate their behavior to suppress competition through such activities as raising prices, allocating markets, and bid rigging." (Harrington, J. (2017). "A Theory of Collusion with Partial Mutual Understanding," *Research in Economics*, 71(1): pp. 140-158, at p. 140.)

which evidence of economic effects that establishes that the price increases in question cannot be explained by oligopolistic competition is helpful or probative.

### B. Defendant Experts' Errors Relating to Theories of Oligopolistic Competition

#### *i. Defendant Experts' Assertions that I Am Trying to Explain Oligopoly Price Levels Rather than Price Changes*

25. As I stated repeatedly in my Report and at my Deposition, I am not trying to determine if a given price level is above the competitive level due to either collusion, oligopolistic coordination, or both. To be conservative, I assume that the price level during the benchmark period prior to the first communication ("FC") for a drug is a non-collusive but oligopolistic equilibrium price.[5] To the extent that the pre-FC price has been affected by collusion, I will have underestimated the effects of collusion.

26. To be precise, I am asking whether a large and statistically significant price increase immediately or shortly after a first communication (my first test) or during the Conduct Period (my second test) that cannot be explained by changes in underlying factors (notably costs, demand and the number of suppliers) implies that I can rule out, with a high degree of confidence, that the price increase (or "overcharge") is due to a change in the oligopolistic equilibrium.

27. Dr. Gilbert does overstate somewhat the limitations of economic theory and evidence in determining whether an oligopoly price level is affected by a conspiracy or agreement. Economics does not provide much guidance in determining whether a given price level is the result of oligopolistic interdependence or collusion, but, as discussed below, economists, largely at the urging of the antitrust agencies, have over the past two decades developed behavioral (as opposed to structural) "screens" for collusion, with some success, especially in bid markets.[6]

---

[5] In the case of Drugs with Intra-API effects, I rely on the period prior to first communication on any Drug with the same active pharmaceutical ingredient.

[6] Abrantes-Metz, R.M., and Metz, A. (2019) define a "screen" as "an empirical analysis based on a statistical model or hypothesis and a theory of the alleged illegal behavior. It is designed to (i) identify whether collusion, manipulation, or any other type of cheating may exist in a particular market; (ii) who may be involved; and (iii) how long it may have lasted." (Abrantes-Metz, R.M., and A. Metz. (2019). "Why Screening is a "Must Have" Tool for Effective Antitrust Compliance Programs," *CPI Antitrust Chronical*: pp.1-13, at p. 2). For examples, see Kawai, K., Nakabayashi, J., Ortner, J.M. and Chassang, S. (2023). "Using Bid Rotation and Incumbency to Detect Collusion: A Regression Discontinuity Approach," *The Review of Economic Studies,* 90(1): pp. 376-403 (milk auctions in the US and municipal procurement auctions in Japan); DeBernardis, A.V., Ashby, E. (2021). "Antitrust Division Praises Early Success and Heralds New Endeavors for Procurement Collusion Strike Force," Westlaw; Doane, M.J., Froeb,

Thus if Dr. Gilbert is asserting that economists cannot provide any assistance in determining whether prices in a relevant market exceed the competitive level due to oligopolistic coordination or collusion, he is incorrect, or at least out of date.

28. I note that Dr. Gilbert supports the use of evidence based on structural characteristics to infer that a given price level or increase cannot be the result of collusion. That is, however, not always correct, especially in bid markets.

29. Once I dismiss statements that either assume I am discussing an illegal agreement, or are expounding on the difficulty of determining price levels in an oligopoly, very little of Dr. Gilbert's Report is left.

30. Similarly, Dr. Rubinfeld also notes that "oligopolistic coordination, where firms independently decide to adopt a similar set of strategies without any agreement" can result in "a relatively high price" (i.e., presumably relative to the competitive level or the one-period oligopoly game level), with market shares consistent with a fair share distribution.[7] I would agree, though I note that "repeated interactions" over a lengthy period are critical for price to rise to above the competitive or one-period oligopoly level absent collusion, but that the price increases that I observe here bear no resemblance to the higher prices derived though oligopolistic coordination (See Figure 1, Figure 2, Figure 16 and Figure 17 below).

31. Critically, the same strategies and factors that could facilitate prices in an oligopoly rising to a high level prior to the first FC would have affected prices similarly after the first communication in the but-for world without collusion. Economists can and should control for changes in factors that might affect that equilibrium (e.g., changes in costs, demand, or number of competitors) but the mere existence of higher prices due to oligopolistic competition, or the presence of facilitating practices such as a Right of First Refusal provisions in customer contracts (discussed below) that are already present prior to the first communication cannot explain the extent and magnitude of the prices increases I observe for the Drugs at Issue after the first communication.

---

L.M. Sibley, D. and Pinto, B.P. (2013). "Screening for Collusion as a Problem of Inference," *Oxford Handbook on International Antitrust Economics,* Roger D. Blair and Danil Sokol (eds.). For an example of a successful prosecution initiated on the base of statistical screens, see, Imhof, D., Karagök, Y. and Rutz, S. (2018). "Screening for Bid Rigging – Does it Work?," *Journal of Competition Law and Economics*, 14(2): pp. 235-261.

[7] Rubinfeld Report ¶¶ 16-18.

32. Finally, neither Dr. Gilbert nor Dr. Rubinfeld ever offer an opinion that any of the price increases I see during the Conduct Period for any of the Drugs at Issue were actually due to a change in the oligopolistic equilibrium. They only opine that despite the evidence in my Report, they are not convinced that the price increases could not be the results of a change in the oligopolistic equilibrium.

#### *ii. Defendant Experts Ignore the Direct Evidence of the First Communication as a Precipitating Factor*

33. Dr. Gilbert argues that he has a duty to consider only the economic evidence and to ignore Direct Evidence of collusion in the record, even though he acknowledges, and does not "discredit," the deferred prosecution agreements and guilty pleas.[8] That is not my understanding of the role and duties of an expert economist. It has always been my understanding that an economist acting as an expert in litigation has a duty to review the record to establish that there is nothing in that record that conflicts with his opinions, and at least some evidence in support of those opinions.

34. Dr. Gilbert's refusal to consider any Direct Evidence is important because it allows him to hide two critical assumptions. First, by looking only at evidence of economic effect for liability, he is assuming that Plaintiffs are attempting to prove liability on the basis of Effects Evidence alone, rather than, as I explained in my Report, using Effects Evidence to corroborate the Direct Evidence. Second, and more important, it allows him to ignore the precipitating factor for the price increase, i.e., the first communication on that Drug. Throughout, Dr. Gilbert treats price increases as if they appeared exogenously out of the blue and argues that any of those price increases could be due to a change in the oligopolistic equilibrium.

35. However, that is not the relevant question. I am not talking about an otherwise unexplained price increase happening at any time or in any context over an indefinite period. Rather, I am asking whether a large and statistically significant price increase immediately or shortly after the first communication on a Drug at Issue, that cannot be explained by changes in underlying factors, implies that I can rule out, with a high degree of confidence, that that price increase is due to a change in the oligopolistic equilibrium.

[8] Gilbert Report ¶¶ 18-23.

36. By ignoring Direct Evidence of causation, Dr. Gilbert is replacing the relevant question discussed above with one that I are not asking, i.e., whether a significant increase in the oligopoly equilibrium price is <u>ever</u> possible at any time.

***iii. Defendant Experts Assert that the Kind of Price Increases that I Observe Here Resemble, and Cannot Be Distinguished from, the Price Increases that Could Be Expected in the Course of a Repeat Oligopoly Game.***

37. I agree (and say repeatedly) that in a model of a repeat game, the price under oligopolistic competition can approach the monopoly price through an extended process of multiple price increases (and decreases) along the way. However, the kind of price increases that could be expected in the course of a repeat oligopoly game do not resemble the kind of price increases that I observe here.

38. Although I have data for many of the Drugs at Issue for only the two years prior to the first communication on that drug, I understand that all of the Drugs at Issue except for the New Generics had been on the market for an extended period prior to that first communication, by which time the Defendants would have had had plenty of time to play out a repeat game and raise the price to its oligopoly equilibrium level.

39. Defendant Experts suggest that the precipitating factor for a large price increase might have been an abnormally low margin prior to the price increase or a shortage or capacity problem that appeared at that time, and that these factors could have precipitated the large price increase rather than the first communication.

40. With respect to low pre-FC margins, the only support offered for low pre-FC margins as a precipitating factor for a price increase was the statement by Mr. Wesolowski of Perrigo. When explaining that Perrigo had a choice between discontinuing a low margin product or, instead, increasing its price to make it a viable product:

> So we were in an either raise price mode too see if we could get a <u>slight</u> price increase or discontinue the product because it didn't make financial sense to use up machine time for those products [emphasis added].[9]

In other words, Mr. Wesolowski is asserting that a "slight" price increase could be the result of a very low pre-FC margin or, more precisely, if the opportunity cost for this product had been too

---

[9] Deposition of John Wesolowski, November 17, 2022 (hereafter "Wesolowski Deposition") 335:6-335:10.

high. A "slight" price increase, however, does not resemble the much larger and statistically significant price increases that we observe for the Drugs at Issue.

41. Similarly, with respect to shortages, it is not clear why shortages would happen coincidentally with a FC, unless the argument is that shortages resulted in a communication. In any event (see Section IV.C.ii.b), I do adjust the but-for price during the Conduct period to account for the effects of FDA shortages on the price increases at issue. I also test for any effect from the less severe shortages claimed by the Defendants, using either documentary evidence relating to shortages (as detailed in Defendant Experts' reports) or payment of a failure to supply penalty as the indicator of their existence. While these shortages are correlated with a price increase, albeit much smaller than that associated with an FDA shortage, these shortages do not explain the larger and statistically price increases that I observe for the Drugs at Issue.

42. Absent evidence of some other precipitating factor, I am left with the possibility that another round of a repeat game happened to begin at the time of the first communication. But in that case, the effects would not be sudden. Repeat games take a lot of time. The example in my report of successful oligopolistic coordination (gas stations in Western Australia) took something like 5 years to reach a 60% higher price. Repeat games are also punctuated by sudden price falls, as the lead firm usually needs to periodically discipline the smaller firms. The only way that these price falls could be avoided is by a collusive agreement such as a fair share agreement.

43. Consistent with a repeat game failing to explain the large and sudden price increases at issue, I do not see price increases similar to those of the Drugs at Issue in the control group (see Figure 16). Defendant Experts suggest that a preferable control would be therapeutically similar drugs, but do not perform an analysis of oligopolistic price increases in Drugs with similar therapeutic classes. I have performed such an analysis, and the results are as expected – even Drugs within the same therapeutic class do not exhibit price increases like those in the Drugs at Issue (see Figure 17). Defendant Experts do point to differences between the Drugs at Issue and the non-MDL drugs in the control. But critically, Defendant Experts have not offered any reason why the Defendants in the Drugs at Issue, compared to supplier of "control drugs" which are also supplied in oligopoly markets, would be so much more successful in raising the oligopoly equilibrium price by so much over such a short time.

44. In contrast to the price increases one would expect to see at each stage of a repeat game:

- The prices of the Drugs at Issue increased dramatically and suddenly after the first communication or during the Conduct Period;

- There are no multiple repeated interactions that allow learning or trust to develop (apart from interactions with respect to other Drugs at Issue); and
- With few exceptions, prices declined rapidly and precipitously after discovery (i.e., when the Heritage Complaint was filed).

45. An example from another well-known successful price-fixing cartel prosecuted by the United States Department of Justice helps illustrate this point.[10] Figure 1 below, reproduces the actual and estimated but-for price from the Vitamin C cartel. It looks remarkably like the corresponding pricing plots for many of the Drugs at Issue. But the cartel pricing pattern shown in Figure 1 bears no resemblance to the price path for even the very successful repeat game resulting in oligopoly price increases by the gasoline stations in Australia, shown in Figure 2.

**Figure 1 – Actual and But-For Prices for the Vitamins Cartel**




[10] As Connor (2006) notes, "When they were discovered in 1999, the 16 Vitamins cartels were probably the largest, most harmful, and harshest sanctioned international cartels of the late 20th century." Connor, J. M. (2006). "The Great Global Vitamins Conspiracy: Sanctions and Deterrence." *AAI Working Paper No. 06-02,* at p. 2; See also, Kovacic, William et al. (2007). "Lessons for the Competition Policy from the Vitamins Cartel," *Contributions to Economic Analysis,* 282, pp.149-176; See also, Expert Report of B. Douglas Bernheim, *In Re Vitamins Antitrust Litigation, MDL No. 1285,* U.S. District Court for the District of Columbia (May 24, 2002).

**Figure 2 – Price Changes under Price Leadership Models**[11]




As described by Byrne and de Roos:

> In the gradual, three-year equilibrium transition that we uncover, dominant firms use price leadership to create focal points that facilitate price coordination and enhance profit margins. Further, we find that price leaders use price experiments to test rivals' willingness to coordinate, to signal their intentions, and to create a mutual understanding of a coordinated pricing strategy among rivals.[12]

46. As can be seen in Figure 2, the price path shows multiple attempts over nine years to increase the oligopoly price, usually by relatively small amounts, periodically interrupted by price falls before resuming its upward climb, with a major breakdown when the prices had risen by about 60%, followed by a 4-year return to the previous peak.

---

[11] Byrne, D.P., and de Roos, N. (2019). "Learning to Coordinate: A Study in Retail Gasoline," *American Economic Review*, 109(2): pp. 591-619, at p. 599.

[12] See Byrne, D.P., and de Roos, N. (2019). "Learning to Coordinate: A Study in Retail Gasoline," *American Economic Review*, 109(2): pp. 591-619, at p. 592.

47. Thus, a simplest response to the assertion that the price increases I observe for the Drugs at Issue could be due to an increase in the oligopoly equilibrium price would be the classic "Who do you want to believe, me or your own two eyes?"

#### *iv. The Only Oligopoly Model that Could Generate the Kind of Large and Sudden Price Increases Observed for the Drugs at Issue Would Be the Edgeworth Cycles Model, But It Does Not Fit the Facts Here.*

48. Dr. Rubinfeld never refers to oligopolistic coordination models such as the Edgeworth model that generate cycles or repeated price increases and decreases that could resemble the price increases observed for the Drugs at Issue. Dr. Gilbert does reference the Edgeworth model as a potential explanation for the sudden price increases on the Drugs at Issue, but does not discuss the necessary pre-conditions for an Edgeworth Cycle. In the absence of evidence that these conditions apply or that the price falls associated with an Edgeworth cycle are present in this matter, it would be highly speculative to conclude that such models could explain the price increases at issue.

49. The conditions for an Edgeworth Cycle in its simplest form are that a leading firm has a very large share in a market with a fixed total capacity. As demand grows, the leading firm can find it profitable at some point to let its rivals increase their output to full capacity. Once it knows that those smaller rivals will not be able to increase capacity in response, it raises its price dramatically, especially if demand is inelastic. Over time, prices drift down back to marginal cost as those rivals expand their capacity.

50. In his footnote citing Maskin and Tirole (1988), however, Dr. Gilbert raises the possibility of an "Edgeworth cycle" explaining the price pattern observed during the Conduct Period:

> "There are other dynamic models of repeated interaction that results in large price increases. For example, "[i]n the Edgeworth cycle story, firms undercut each other successively to increase their market share (price war phase) until the war becomes too costly, at which point some firm increases its price. The other firms then follow suit (relenting phase), after which price cutting begins again." (The Edgeworth cycle does not involve agreement.)"[13]

51. But in his deposition, the only condition that Dr. Gilbert identified as required for Edgeworth Cycle was an "initial price rise that is driven by a lack of profitability."[14] He then notes that he

---

[13] Gilbert Report footnote 241, citing Maskin, E., and Tirole, J. (1988). "A Theory of Dynamic Oligopoly, II: Price Competition, Kinked Demand Curves, and Edgeworth Cycles," *Econometrica*, 56(3): pp. 571–599, at p. 571.

[14] Deposition of Richard J. Gilbert, Ph.D., July 11, 2024 (hereafter "Gilbert Deposition") 302:9-302:10.

cannot identify any product, including any of the drugs at Issue or even any in the non-MDL set of drugs, where he has observed an Edgeworth Cycle. He then asserts, however, that several of the Drugs at Issue were experiencing low profitability during period prior to their first communication, which could serve as the impetus for a price increase similar to the beginning of an Edgeworth cycle.[15]

52. The Edgeworth Cycle model presented by Maskin and Tirole is a highly theoretical dynamic model in which:

> "[F]irms undercut each other successively until the price reaches the competitive level, *p(0)*, at which point some firm eventually reverts to the high price *p(5)*. Market dynamics thus consist of a price war followed by a relenting phase."[16]

53. But critically, neither the authors nor Dr. Gilbert offer any way to determine if a pattern of a steep increase in price followed by slow declines is an "Edgeworth Cycle." Dr. Gilbert just proposes that any price increase by a firm with a very low margin could be the start of an Edgeworth Cycle. Given that some of the Drugs at Issue exhibit negative margins over a sustained period, and yet had not generated an Edgeworth Cycle to Dr. Gilbert's or anyone else's knowledge, the probability that an Edgeworth cycle would have been generated during the Conduct Period for one of the three (unspecified) Drugs at Issue referred to by Dr. Gilbert in his deposition seems remote.

#### v. *Oligopolistic Coordination Cannot Explain the Prices Falling After the Heritage Complaint.*

54. Dr. Gilbert does not dispute that generic drug prices generally fall as market entry occurs. As my Initial Report observed, and consistent with the industry literature, the prices for many of the Drugs at Issue begin to decline with the entry of non-Defendants or DNIDs. However, Dr. Gilbert offers no plausible explanation for major price falls seen in the drugs at issue around the time the Heritage complaint was filed. There is no oligopolistic coordination explanation for a sudden price fall other than a punishment phase in the form of a price war. In contrast, based on my experience as an economics expert and the literature on price-fixing, market allocation, and bid-

---

[15] "[A]t least one, maybe two or three -- I have lost track. I would have to look at the report -- drugs for which profitability was a major reason for a price increase" (Gilbert Deposition 304:3-304:9).

[16] Maskin, E., and Tirole, J. 1988. "A Theory of Dynamic Oligopoly, II: Price Competition, Kinked Demand Curves, and Edgeworth Cycles," *Econometrica*, 56(3): pp. 571-599, at p. 576.

rigging, lingering effects on the Drugs at Issue is perfectly plausible and is demonstrated in my quantitative analysis.

55. Contrary to Dr. Gilbert's assertion, I do not use the price fall after the Heritage complaint was filed to estimate the effects of collusion. The fall in the price after collusion is discovered is indeed often used to estimate damages, especially when the initial increase cannot be estimated reliably, usually because data are not available for the period prior to the initiation of the conspiracy. However, to the extent that there are still lingering effects at the time of the filing of the Heritage Complaint, an estimate of the fall in the price following the discovery of collusion will underestimate the total collusive price increase.

56. Thus, while a significant fall in the price after discovery can be used as a sufficient condition to establish collusion, it is not a necessary condition. The price fall should also not be used to estimate disgorgement if the price increase due to collusion can be estimated reliably using pre-conduct prices. Indeed, a significant price increase during the Conduct Period, with no fall after discovery could simply indicate that collusion is continuing unabated.

57. Dr. Gilbert appears to believe that it is possible, even likely, that the price fall observed after the Heritage Complaint was filed could have been the result of a price war that happened to break out between non-colluding suppliers who also happened to have dramatically increased their prices during the Control Period due to a change in the oligopoly equilibrium. The intent of the supplier initiating that price war would have been to punish a non-cooperative rival in the expectation that prices would rise again once discipline has been restored. However, as discussed above, prices on several drugs were already dropping prior to the Heritage Complaint due to entry of non-Defendant companies. Cutting prices to punish fellow Defendants or companies that are not Defendants or to punish fellow Defendants while prices are already dropping due to non-Defendant entry would make no sense in that context.

58. Not surprisingly, Dr. Gilbert does not offer a single drug as an example in this matter for this possibility. The underlying error, as discussed above, is the assertion that there is no need for an expert economist to review or credit the Direct Evidence. This allows him to ignore not only the first communication as a precipitating factor, but also the effect of the filing of the Heritage Complaint. He thus effectively replaces the (minute) probability that a sudden price drop would by chance occur immediately after the Heritage complaint was filed with the (probably quite high) probability that a price war among oligopolists could break out at some point over an indefinitely extended time period.

#### *vi. Dr. Gilbert's Argument that It Can Be Consistent with Unilateral Self-Interest to Accommodate an Entrant by Declining to Defend a Position at a Customer Is Irrelevant.*

59. The normal pattern in oligopoly markets is for incumbents to reduce their prices in response to entry by a new firm, but not by so much as to force the entrant to exit (i.e., a predatory price cut). I discuss at length in my Report the empirical evidence in the literature that entry into generic drugs in presumably non-collusive markets results in price reductions. Dr. Gilbert provides a similar review of the literature and comes to the same conclusion. I also, however, independently estimate the effect of entry on prices in the generic drug markets.

60. The relevant issue, however, is not whether the incumbent will react to entry by reducing its price, but rather whether the effect on prices of the Drugs at Issue with accommodating entry by firms participating in a fair share agreement is less than would be expected in a non-collusive oligopoly market. Given that the price effect of entry into a non-collusive market can vary significantly, I do not compare the observed price fall with the estimates in the literature for the average price fall for that number of firms. Rather, I allow for the expected effect of entry (or exit) in the but-for world by including the change in the number of firms as an explanatory variable in the overcharge regressions. Dr. Gilbert does not provide any criticism of the choice of those variables.

#### *vii. Dr. Gilbert's Assertion that a Collusive Price Increase Must Be Carried Out Simultaneously by All Participants In a Collusive Arrangement Is Wrong.*

61. Dr. Gilbert seems to believe that a collusive price increase must be carried out simultaneously by all participants in a collusive arrangement. He does not explain why this should be the case. Moreover, given that collusion is illegal, and can be subject to large penalties if detected, a very large public and otherwise unexplained simultaneous price increase (specifically, an increase in the WAC) by all the major suppliers of a product would seem to be both unnecessary and reckless and thus unlikely.

#### *viii. While It Is Unlikely Capacity Constraints Explain the Price Increases For the Drugs At Issue, Unlike Defendant Experts, I Test This.*

62. Dr. Gilbert notes that a firm may be limited in its ability to respond to a competitor's price increase due to capacity constraints, and thus cannot increase output by as much as it would like. This is relevant for liability because, as I explained in my Deposition, one indicator of a fringe firm's non-participation in a collusive agreement or at least non-compliance would be an increase in its market share after a large price increase that exceeded that firm's expected fair share and

continues to rise.[17] Similarly, a fringe firm's limiting its share increase to its "fair share" would be consistent with its being party to and complying with a collusive agreement, unless that firm had been prevented from doing so by capacity constraints.

63. Capacity is not a relevant issue, of course, for the firms initiating the price increase, since their output would remain constant or fall after the price increase. The presence of capacity constraints would also not affect the estimate of the overcharge by an individual firm, or the amount of disgorgement. Further, a capacity constraint cannot explain why a fringe firm would not proceed to increase its market share beyond its fair share once the capacity constraint ceased to be binding.

64. Moreover, establishing that a "capacity shortage" actually exists for an individual drug may not be easy, since it would need to apply to all of the capacity that could be used to produce that drug, as Dr. Gilbert, perhaps inadvertently, establishes by quoting Mr. McMahon of Aurobindo as saying:

> "[A]s the manufacturer, we have multiple facilities, all of which are FDA registered and regulated. And there's finite capacity across our whole network of production facilities, that is an ever-present consideration that we built into how we're going to market and decisions that we make on products in the market. Because for every product, commitment, or what have you, that occupies manufacturing space, there is the opportunity cost and the trade-off of other products that may or may not be able to be run or produced in that finite capacity."[18]

65. The relevant capacity to produce each Drug at Issue thus includes not only the capacity currently used to produce that drug and any unused capacity, but all of the compatible capacity currently used by that firm to produce other drugs. If the compatible capacity is not idle, but is being used to produce some other products, switching that capacity to the Drugs at Issue may be delayed and require a larger price increase for the Drugs at Issue than would otherwise be the case. As that capacity is switched, however, the fringe firm would be expected to raise the price and reduce the quantity of those other products, since the opportunity cost of those products has increased in the same proportion as the Drug at Issue. The failure to do so could be used as one indicator of participation in the collusive agreement.

---

[17] To be clear, this does not necessarily imply that this firm was not part of any illegal agreement – the firm may simply be cheating or not fully complying with that agreement.

[18] Gilbert Report footnote 296, quoting Deposition of Paul McMahon, 163:5-7.

66. How much of that capacity actually would be switched to the Drugs at Issue would depend on the time frame (i.e., any contract commitments for the other drug), any switching cost, and the increase in the relative price of the Drug at Issue. For the relatively small fluctuations in relative prices that I normally observe in a non-collusive oligopoly market, or if collusion has resulted in only a small increase in the price of the Drug at Issue, only some or even none of that other capacity may be switched to the Drug at Issue. But since I are only interested in firms supplying Drugs at Issue that have passed our collusion screen at the drug level, i.e., drugs where I have found a large and statistically significant price increase for the Drug at Issue, it would be reasonable to expect a fringe firm to try to shift as much as possible of the relevant capacity to production of the Drug at Issue.

67. These considerations would seem to make it less likely that capacity constraints would have resulted in any significantly higher prices during the Control Period. However, since I cannot rule out the possibility that the response of some firms to a collusive price increase was constrained by their available capacity, I identified each example of a capacity constraint mentioned by any of the Defendant Experts, and tested to see if it had any effect on either the estimated overcharge for that Drug or the disgorgement percentage for an individual firm. As shown below (Section IV.C.ii.b) including an indicator variable for a period of alleged capacity shortage did not significantly affect either the estimated overcharge for that Drug or the disgorgement percentage for an individual firm.

68. Dr. Gilbert provides us with no examples of a capacity shortage, other than a statement that Greenstone's lead time to increase production on one Drug at Issue was on the order of 6 to 16 weeks.[19] The high collusive prices for the cited Drugs at Issue (all forms of Clindamycin Phosphate), however, lasted far longer than just 6 to 16 weeks.

### C. Contrary to Defendant Experts' Assertions, Structural Characteristics and Contract Provisions, Along with Fair Share Agreements on Individual Drugs and an Overarching Fair Share Agreements Facilitate and Can Explain the Increase in Prices Following Direct Evidence of Communications.

69. Defendants' discussion of both the structural characteristics and contracting practices of the U.S. generic drug industry and the use of an "overarching" fair share agreement in combination with drug-specific fair share agreements is misguided. All these characteristics and practices reduce

---

[19] Gilbert Report footnote 298.

colluding firms' need to directly communicate. Defendant firms do not need to frequently communicate and update each other on specific price points on specific customers for specific drugs. Instead, they can be confident that price increases will hold based on a shared understanding between colluding firms that they will all benefit from the price increase if they keep to their "fair share." As described above, some of these characteristics and practices facilitate the punishment of cheating on such an agreement without imposing costs on other firms.

#### *i. Defendant Experts Mischaracterize My Analysis of Structural Characteristics, which I Note can Facilitate Collusion, Not that they are Indicative of Collusion.*

70. I do not use "plus factors" or other structural characteristics to distinguish between oligopolistic interdependence and an illegal agreement. Indeed, I never discuss an illegal agreement. I do not even use "plus factors" or other structural characteristics to identify or distinguish between oligopolistic interdependence and an agreement in the ordinary sense of the term. I do ask whether the presence of "plus factors" or other structural characteristics could be expected to facilitate collusion or an agreement or both, and focus on four structural characteristics that can be expected to facilitate collusion but not facilitate higher prices in an oligopolistic equilibrium. None of those characteristics are used to determine which firms are party to an illegal agreement, or to determine the amount of disgorgement.

71. This is clearly stated in the relevant Conclusion in my Report[20]:

> A number of structural characteristics or indicia <u>that are regarded as facilitating collusion</u>, as opposed to oligopolistic coordination, are present in the markets for the Drugs at Issue.

72. As I said in my Deposition, these factors are not <u>indicative</u> of collusion, i.e., used to predict collusion, but are factors that <u>facilitate</u> or incentivize collusion or make a higher price under collusion more likely, but not that they can be used as an i<u>ndicator</u> of collusion or to <u>predict</u> collusion.[21] Nevertheless, Dr. Rubinfeld repeatedly states that these factors do not "serve as an indicator of collusion" as if that were a criticism.[22] For example, the size of the Delta HHI does not serve as an indicator of collusion. However, the size of the Delta provides a guide to the

---

[20] Report ¶ 12.

[21] See, *e.g.,* Deposition of Frederick R. Warren-Boulton Deposition, Ph.D., April 16, 2024 (hereafter "Warren-Boulton Deposition") 635:13-635:18; 635:18-637:3.

[22] Rubinfeld Report ¶ 94.

percentage price increase expected from collusion. A high Delta makes collusion more profitable and thus, all else equal, would make collusion more likely.

73. In addition, the Complaint[23] tracks a pattern of colluding individuals moving from one (colluding) company to another (not yet colluding) supplier, followed by collusion at that company. That has also been my experience in prior cases. While, as Dr. Gilbert points out, managers not involved in collusion moving among firms in the same market may also facilitate a higher oligopoly price level, a movement specifically of individuals allegedly involved in collusion on these drugs would be relevant only to an allegation of collusion.

74. I also agree that direct customers use percentage-based pricing, and therefore gain (as they admit) from higher prices for the Drugs at Issue,[24] and thus have less or no incentive to monitor Defendants for collusion. This does not imply, as Dr. Gilbert asserts, that I believe that there are conspiracies in all generic-drug markets. Nor does it provide any indication as to the extent to which this results in higher prices for the Drugs at Issue due to oligopolistic interdependence.

75. As is the case for the facilitating practices or contracts discussed below, while strategic blindness on the part of immediate buyers may facilitate higher prices due to either oligopolistic interdependence or collusion, prices for the Drugs at Issue prior to the FC would fully reflect any such effects on the oligopoly price. However, the presence (both prior to and after the FC) of that strategic blindness could facilitate a larger collusive price increase after the FC.

76. The difference between their response to a price increase due to collusion and their response to a price increase due to an increase in oligopolistic coordination is that, while the direct customers using percentage markups gain to the same extent by an X% higher price due to oligopolistic competition or an X% higher prices due to collusion, there is nothing that the direct customers can do about an X% higher price due to oligopolistic coordination. Normally, however, a direct purchaser (who is usually in the best position to detect collusion) would have an incentive to detect collusion, both to lower its costs and perhaps for treble damages.

---

[23] Amended Complaint, Civil Action No. 2:20-CV-03539, September 9, 2021 (hereafter "Complaint").

[24] Percentage markups result in a pass-through rate greater than one, and thus an increase in a firm's profit margin when its costs increase. For example, if the wholesaler markup is 20 percent and the price the wholesaler pays is $10 the wholesaler's dollar profit margin is $2.00. If prices then increase by $10 (to $20), the wholesaler's dollar profit margin increases to $4.00.

77. As is clear from the conclusions in my Report and from my Deposition, I do not infer collusion (and obviously not an illegal agreement), from the presence of any of these characteristics. Indeed, my purpose was to show that, despite the very number of "plus characteristics" that have been suggested for collusion, I consider the structural characteristics discussed above as the only characteristics that would generally be consistent only with a greater likelihood or incentive for collusion but not a higher oligopolistic equilibrium price level.

#### *ii. Contract Provisions Cited by Dr. Gilbert as Facilitating Oligopolistic Coordination are Relevant in Explaining the Success of the Defendants In Imposing and Maintaining Large Collusive Price Increases.*

78. Drs. Gilbert and Rubinfeld discuss four contract provisions that can be described as facilitating practices or devices, i.e., contract provisions that facilitate reaching a higher price through oligopolistic coordination or collusion. Dr. Gilbert includes his discussion of these "contract provisions" in his background discussion of the U.S. generic drug industry generally but then asserts that "they might lead firms to independently choose to raise price, relinquish customers, or decline to bid for additional business."[25]

79. However, none of these provisions can help explain why or how these facilitating practices could facilitate an increase in the oligopoly equilibrium price that happened to coincide with the first collusive communication unless those contract provisions were first put into place just prior to the large price increase on the Drugs at Issue. I have seen no such evidence, nor have any of the Defendant Experts asserted that there is any such evidence, or even provided an example of these contract provisions being implemented on a specific drug just prior to the Conduct Period. In contrast, however, these contract provisions are highly relevant as facilitating practices that help explain the success of the Defendants in imposing and maintaining very large collusive price increases on the Drugs at Issue.

80. Dr. Gilbert discusses price protection clauses, right of first refusal, and most favored nation agreements as facilitating practices. Dr. Rubinfeld adds "focal points." I discuss all of them below, since all have the following characteristics in common:

- All four can facilitate both oligopolistic coordination and collusion.

[25] Gilbert Report ¶ 524.

- To the extent that they facilitated collusion prior to the FC, my use of the pre-FC period as the benchmark will result in the underestimate of the overcharge.

- As noted above, none of these provisions help explain the price increase during the Conduct Period unless those contract provisions were first put into place just prior to the initial large price increase

- These contract provisions and related activities help explain the success of the Defendants in imposing and maintaining very large collusive price increases, and thus all are worth discussing.

a. *Price-protection clauses*[26]

81. Dr. Gilbert asserts that:

> A price protection clause between a customer and a manufacturer provides the customer with a limited offsetting benefit after the manufacturer enacts an increase in the customers' contract price.[27]

While a price-protection clause may benefit an individual customer, price-protection clauses can result in higher prices to all customers by facilitating either oligopolistic coordination or collusion. A 45 day "price-protection clause" allows the firm that proposes a price increase - whether as part of a collusive agreement or to test the waters for a move to a higher equilibrium price – allows the colluding firm to wait until it is clear whether or not its rivals will also commit to raising their prices. If yes, it can maintain the higher price. If not, it can withdraw the higher prices, providing a lesson to its rivals at no cost to itself.

82. But a price-protection clause has a very different implication with respect to the size of any price increase under collusion. Under collusion, the initiating firm can implement a very large price increase that normally would be expected to result in a major loss of customers, secure in the knowledge that if its rivals fail to comply with the collusive arrangement, it can withdraw with no loss to itself and, importantly, no gain to its rivals.

b. *Right of First Refusal (RoFR) clauses*[28]

---

[26] Gilbert Report § IV.E.1.

[27] Gilbert Report ¶ 66.

[28] Gilbert Report § IV.E.2.

83. Requiring or inducing a customer to provide the manufacturer with a right of first refusal (RoFR) facilitates collusion in several ways. First, it increases the ability of colluding firms to monitor compliance with the agreement because it provides the customer with an incentive to give the incumbent notice that another firm is bidding and thus alerts the incumbent to any attempt by its rivals to steal its customers. The incumbent firm can then decide whether to retain that customer or cede that customer to the rival.

84. Second, it facilitates enforcement of a collusive agreement. If the rival is a member of the collusive group, and has been allocated that customer as part of its fair share, then the incumbent will not offer a revised bid when contacted. If the rival is not a member or is a member who would not be entitled to that customer under a fair share agreement, the incumbent can reply with a lower bid. If the rival then responds with an even lower bid, the incumbent can respond again, ultimately either preventing the rival from acquiring that customer, or selectively driving down the price received by the rival from that customer, i.e., without having to reduce its prices to its other customers. In effect, for suppliers not party to the agreement or who might not comply, the incumbent's RoFR transforms the bidding process from a one-shot request for a proposal, where the competing supplier can surprise the incumbent and win the contract, into a repeat auction that it cannot win.

85. Third, widespread use of RoFRs will deter firms that are not part of the collusive group (i.e., those who cannot expect their entry to be accommodated) from entering. In effect the entrant is foreclosed from that share of the market covered by a RoFR because a non-colluding firm knows it faces a repeat auction that the incumbent supplier can win without lowering its prices to other customers.

86. If, as Dr. Gilbert asserts, RoFR and price protection clauses are widespread among suppliers of the Drugs at Issue who are potential members of the collusive group, that would help explain the remarkable success of collusion on the Drugs at Issue.

c. *Most Favored Nation (MFN) clauses*[29]

[29] Gilbert Report § IV.E.4.

87. There is an extensive literature in economics on the competitive effects of MFN provisions.[30] MFNs are one type of agreement (along with tying arrangements and deep discounts based on market share) that have been referred to as "contracts that reference rivals" and that can raise competitive concerns. The concern with MFNs is that they impose a penalty on a supplier with customers with MFN provisions in their contracts if it reduces the price to another customer to below that of the most-favored customer. It thus increases the cost of selective price cuts by suppliers interested in competing rather than colluding, and blunts the ability of purchaser firms with bargaining power to negotiate lower prices.[31] As an example, Baker and Morton (2018) assert that MFNs are likely to have facilitated coordination between General Electric and Westinghouse in the sale of electrical equipment and among DuPont and other sellers of gasoline additives.[32]

d. *Focal points*[33]

88. Dr. Rubinfeld asserts that focal points facilitate higher oligopolistic equilibrium prices. Schelling defines a focal point as a "qualitatively identifiable and fairly unambiguous signal that can be read in the situation itself."[34] For example, if told to meet someone in New York but provided only with the date, most New Yorkers would choose to be at Grand Central Station at noon.

89. However, this concept would seem to apply just as well to a higher collusive price. Once again, however, if a focal point facilitated a higher oligopoly price, it would have done so prior to the first collusive communication and thus would not explain the increase in price after that first communication. Indeed, if the pre-FC oligopoly price is a focal point, that would seem to make it

---

[30] That literature has been reviewed and summarized in Baker, J., and Chevalier, J. (2013). "The Competitive Consequences of Most-Favored-Nation Provisions," *Antitrust Magazine*, 27(2), pp. 20-26, focusing on economic theories; Salop, S., and Morton, F.S. (2013). "Developing an Administrable MFN Enforcement Policy," *Antitrust Magazine*, 27(2), pp. 15-19, which provides a review of the antitrust cases involving MFNs; and Baker, J. and Morton, F.S. (2018). "Antitrust Enforcement Against Platform MFNs," *The Yale Law Journal*, 127(2) pp. 2176-2202. I am not aware of any literature that discusses MFNs specifically for drugs.

[31] See Baker, J., and Chevalier, J. (2013). "The Competitive Consequences of Most-Favored-Nation Provisions," *Antitrust Magazine*, 27(2), pp. 20-26, at pp. 22-24.

[32] See Baker, J. and Morton, F.S. (2018). "Antitrust Enforcement Against Platform MFNs," *The Yale Law Journal*, 127(2), pp. 2176-2202.

[33] For a discussion of focal points and tacit coordination, see Scherer, F.M. and Ross, D. (1990). *Industrial Market Structure and Economic Performance*, Third Edition, pp. 265-268.

[34] Schelling, T. (1960). *The Strategy of Conflict*. Pickle Partners Publishing, at p. 96.

even more difficult to raise the price without direct communication. Moreover, a focal point of the desired collusive price could make it easier to establish or maintain that price.

#### *iii. Defendant Experts' Assertions that the Evidence Is Inconsistent with the Existence of Fair Share Agreements on Individual Drugs at Issue Are Incorrect.*

90. Dr. Rubinfeld seems to believe that it is important (or at least that I believe that it is important) for all participants in a fair share agreement to have the same understanding of what an FSA would look like for each drug.[35] But that is not necessary. What is necessary is that the participants at each individual drug eventually come to the same understanding. For Drug A that may be 50-50, while for Drug B that may be 60-40 or 80-20, but a mere divergence in expectations among the initial participants would not doom the fair share agreement. Obviously, there is no problem if the leading firm thinks the shares should be 50-50 and the following firm thinks the shares should be 60-40 - "overoptimism" (i.e., the sum of the expected shares exceeds one) is the only requirement for conflict. If there are disagreements, those disputes can be (and have been) resolved through direct communications.

91. The record contains extensive evidence of direct communications. However, even without direct communications, each party has an incentive to compromise and accept what it may believe is less than its "fair share" if the alternative is a collapse of the agreement. The relevant issue is whether the parties can arrive at a consistent understanding of the fair shares for each Drug at Issue at some point reasonably soon after the initial price increase, however different that may be across the Drugs at Issue, not whether they had a very similar understanding of those fair shares prior to the initial price increase.

92. If the parties cannot come to an agreement on fair shares within some reasonable period following the initial price increase, then presumably at least one firm will continue to try to increase its market share. The remaining participants then have a choice between either accommodating that firm until it stops trying to increase its market share or accept the collapse of the agreement and the resulting fall in prices back to the prior level.

93. There is an extensive theoretical and empirical literature in industrial organization on the distribution of market shares.[36] That literature does not predict equal shares in a world with

---

[35] Rubinfeld Report ¶ 21.

[36] Scherer, F.M., and Ross, D. (1990). *Industrial Market Structure and Economic Performance*, Third Edition, pp. 141-146.

uncertainty. Only in a Cournot model with equal and constant costs and no uncertainty would theory predict equal shares. Once I allow for uncertainty and random shocks, the long-run market share distribution will approach some variance of the log normal distribution, even with equal and constant costs. Taro's depiction of a Fair Share Distribution, for example, is consistent with that result. But whether I start with the competitive distribution (e.g., log normal) or the initial shares (which is especially likely when each party has a fixed capacity), and then agree to raise prices while preserving market share, all parties gain from the agreement.

94. Dr. Rubinfeld objects to my assertion that one way to determine what each participant regards as its fair share is to observe those shares during periods of very high collusive prices and see if they remain stable while maintaining those high prices.[37] As I noted above, those may not be the shares that each participant thought was their fair share at the time of the initial price increase. But if a participant stops trying to increase its share when those additional sales would be highly profitable, it has tacitly accepted their current share as one that either it believes to be fair, or that it believes that the other firms believe is its fair share, and that other firms would react to if it increased its share much beyond that point. If that is not the case, I would expect (and often observe in this case) that the initial collusive price increase cannot be sustained for very long.

95. Dr. Rubinfeld specifically refers to the difficulties of framing, maintaining and enforcing a cartel agreement where there are a large number of heterogenous participants, and repeats my statement that a price-fixing cartel that includes a large number of participants is generally regarded as more difficult to form, maintain and enforce. He does so without noting the context – that those difficulties are far less when the agreement takes the form of a fair share agreement rather than a simple price-fixing agreement. With a fair share agreement, there is no need to agree on the initial price increase since any party can initiate even a large price increase, secure in the knowledge that, at least with respect to members of the agreement, it will be followed and that no other firm will "poach" any of its customers.

96. This stability is reinforced by the facilitating practices discussed above, notably RoFRs, which can be used to discipline any member of the agreement or a non-member who tries to enter in response to the collusive price increase. And if Dr. Rubinfeld's concern is the need to

---

[37] Rubinfeld Report ¶ 22.

communicate among a large number of participants, a market share agreement is largely (or at least relatively) self-enforcing without the need for communications that can result in detection.[38]

97. Perhaps as important, under a price-fixing agreement, a rogue supplier has a strong incentive to cheat. Cheating on a price-fixing agreement is relatively difficult to detect since often other participants cannot be certain what price the cheater is offering, or why he is cutting his price, whereas market share information is generally freely and rapidly available. For generic drugs, market share information is available from IQVIA.

98. Similarly, it can be difficult to determine whether some disciplining action, such as a sharp decrease in price, is necessary. In a price-fixing agreement, it can be difficult to determine if a lower price by one firm is due to cheating or because of some factor like lower costs that would justify a lower price. In contrast, in a market share agreement, each firm knows that any cheating will result in lower prices for all, since a higher share for the rogue firm necessarily results in a lower share for its rivals. Firms under a fair share agreement can punish the rogue firm by reducing their prices until the rogue firm's share returns to its prior level, albeit at a lower price and in doing so will be acting in their individual self-interest. Although firms not a party to the agreement can be expected to try to increase their share, that does not lead to the collapse of an agreement based on relative fair share of the participating suppliers, just a gradual reduction in its effectiveness.

99. As several Defendant Experts have noted, market shares for some drugs have fluctuated during the Conduct Period.[39] In addition, shares have not always moved closer to a likely fair-share distribution immediately after the first communication on that drug. But, as discussed above, while both a movement toward a fair share distribution coincident with the collusive price increase, and a fall in the variability of shares among the Defendants during the Conduct Period, are consistent with and would be expected with a market share agreement. The same movement toward a fair share distribution is not implied by a price-fixing agreement or an agreement to simply follow and match the leading firm's prices.

---

[38] Dr. Rubinfeld also makes a rather surprising argument on this point, i.e., that the reduced need for direct communication under a fair share agreement is "in stark tension" with the extensive record evidence of direct communication (Rubinfeld Report ¶ 131).

[39] See, e.g., Saravia Report ¶¶ 73-85; Stomberg Report ¶¶ 234-235.

100. I can still infer that if I do see a movement toward a fair share distribution around the first communication, and stable shares during the Conduct Period, the agreement is likely to be a fair share agreement rather than a price-fixing agreement. But neither a movement toward a fair share distribution coincident with the collusive price increase or a fall in the variability of shares among the Defendants during the Conduct Period can be used as a necessary or sufficient condition to infer collusion for any individual Drug at Issue or Defendant, nor would it be relevant in estimating Disgorgement. Thus, while a deeper analysis of the fair share agreement process may be of interest, it is unnecessary for our purposes.

#### *iv. Defendant Experts Argue that an Overarching Fair Share Agreement Is Implausible Due to the Limited Value and High Cost of Such an Agreement.*

101. Dr. Rubinfeld argues that Defendant behavior and incentives are inconsistent with the existence of an overarching fair share agreement due to the limited value and high cost of such an agreement. This understates the benefit to firms considering a fair share agreement on an individual drug from being party to an overarching agreement. The “added value” of an overarching agreement entered into prior to an understanding or conspiracy over an individual drug is substantial because the overarching agreement provides a default agreement or general understanding of the terms for a fair share agreement on an individual drug.

102. With an overarching fair share agreement in place, the initiating firm can initially raise its price by far more than he could absent such an understanding. In a multi-period oligopoly game we do not observe dramatic price increases that, absent some assurances that they will be followed, would result in a complete loss of share. As discussed above, increasing prices under a repeat game is a delicate process of incremental offers to coordinate at higher prices that requires that the expected incremental gains from each price increase be greater than the expected incremental loss. This does not result in sudden, large, and isolated price increases, but rather in a cautious process of step by step signal and response. An overarching FSA, however, allows that initial step to be a final step - the initiating firm can raise prices in one step to a level that otherwise would be completely reckless, safe in the understanding that other parties to the overarching agreement will follow without taking advantage of the initiating firm.

103. Absent an overarching agreement that provides such a template, firms would need to arrive *de novo* at a mutually beneficial and acceptable set of prices and shares when they initiate a drug-specific agreement. An overarching agreement provides that template.

104. Defendants may argue that a set of firms rather than colluding could simply have observed the pattern of shares and price increases on other drugs and sought to copy the behavior of those firms without any communication with each other, or any need for an overarching agreement. But if that were the case, I should observe market share agreements appearing at random in our control group. It also ignores the direct evidence that these firms did communicate and that these agreements appeared among firms where their current employees had or were currently colluding.

105. Contrary to Dr. Rubinfeld's assertion, an overarching agreement does not involve "substantial costs" associated with entering, maintaining and enforcing that agreement.[40] Dr. Rubinfeld is combining the overarching agreement with the individual drug-specific fair share agreements. The benefit from the overarching agreement is in facilitating the initiation of an agreement on an individual drug by providing assurance that the initial price increase will be followed, and in resolving conflicting expectations that could lead to the rapid collapse of the higher price. There are no "costs" involved in an overarching fair share agreement. The drug-specific fair share agreement that follows could involve some cost to formulate, monitor and enforce to the extent that default values under the overarching agreement are not fully accepted. But there is no cost from being party to an overarching agreement that does not lead to a drug-specific agreement. It's as if the tickets are checked only after the overture.

106. Contrary to Dr. Rubinfeld's apparent belief, an overarching FSA in this case does not require an agreement among all 16 defendants at the same time. As long as each defendant is aware of the common goals of the overarching agreement and reaches an agreement with another defendant, that brings them within the same overarching conspiracy. In this case, that would be an awareness of the goal of establishing fair share understandings that can facilitate further agreements on specific drugs.

107. Dr, Rubinfeld argues that the fact that the 98 Drugs at Issue differ in a number of competitive conditions, most notably in the conditions for which they are prescribed, makes an overarching agreement less likely. The Drugs at Issue do often (but not always) differ in terms of the number and identity of the suppliers, which can be considered a "competitive condition." But the Drugs at Issue share one common competitive condition – that all participants or potential participants

[40] Rubinfeld Report ¶ 101.

believe that an agreement to raise and maintain prices on that drug would be in their collective and individual interest.

108. Dr. Rubinfeld also argues that it would not be economically rational for a profit-maximizing defendant supplying only one or a few of the 98 Drugs at Issue to be a party to an Overarching Agreement that could expose it to joint and several liability if discovered.[41] Dr Rubinfeld specifically refers to Lupin, Wockhardt and Amneal as defendants supplying only two or a few of the Drugs at Issue, with net revenues that are a very small share of the net revenues affected by the conspiracy.[42]

109. Without offering an opinion on an individual firm's liability, I agree that participating in a conspiracy that could expose a firm to enormous joint and several liability in return for a relatively small immediate reward would not appear to be a management decision that would benefit shareholders. Yet managers enter into collusive agreements (or other risky bets, e.g., the London Whale) that shareholders of those firms would reject. It is individual managers or management at firms that make decisions. Managers may have an incentive to engage in such risky behavior to the extent that they are rewarded for the resulting increase in profits but would not bear the full costs if and when that behavior is discovered. Given that such agreements must be covert, the firm's participation would not be detected by the shareholders, who would have to bear most of that cost.[43]

110. There are a number of other issues raised in the Defendant Experts' Reports that are primarily quantitative, and to which I now turn.

# IV. Defendant Experts' Econometric and Statistical Critiques Fail to Establish that My Models Are Unreliable

## A. Introduction

[41] Rubinfeld Report ¶ 135.

[42] Rubinfeld Report ¶ 134.

[43] For deposition evidence regarding rewards for colluding, see, e.g. Deposition of Michael Perfetto, June 29, 2022 (hereafter "Perfetto Deposition") 63:1-70:18 and Exhibit 2659; Deposition of Deborah Chase, January 22, 2021 (hereafter "Chase Deposition") 30:1-31:4; Deposition of Robin Hatosy Strzeminski, August 18, 2021 (hereafter "Hatosy Deposition") 51:1-18; Wesolowski Deposition 62:14-64:20. For similar concerns with respect to the incentives for public procurement officials to detect and prosecute bid rigging in public procurement in the EU, see Heimler, A. (2023). "Cartels in Public Procurement: A Reassessment," *CPI Antitrust Chronicle,* pp. 1-9, who suggests career enhancement for the reporting official and allowing the saving for cartel enforcement to be kept by that reporting official agency.

111. Defendants raise various criticisms of my econometric and statistical models, most of which are misplaced. I note first that, except for Dr. Jena, Defendant Experts' criticisms are anecdotal in nature – none provide analyses showing the effect accepting them would have on either my liability or disgorgement estimates. None provide alternative reliable estimates of disgorgement.[44] While each suggest their criticisms "could" result in my models overestimating price increases for the Drugs at Issue, they provide no empirical support for this claimed bias.[45] Such speculation is insufficient to undermine my analyses. I address the most substantial criticisms in this section of my report.

### B. My Selection of the Benchmark Period(s) for "But-For" Prices for the Drugs at Issue Is Appropriate

112. Dr. Jena's criticisms that I selected inappropriate benchmark period(s) are unfounded. *First,* there is good reason to believe there were intra-API effects for many of the Drugs at Issue, including unexplained elevated prices during these periods, indicating that the use of these periods as a benchmark is inappropriate. *Second*, the periods I selected were sufficiently proximate to the conduct periods to offer meaningful, representative *competitive* benchmarks. Dr. Jena's proposed changes are inappropriate and likely to result in biased overcharge estimates.

113. In my Initial Report,[46] I discuss how I select the benchmark period(s) for each Drug at Issue. Specifically, I defined the pre-Conduct benchmark period as "the first period for which I have Defendant data for that Drug and ending at the date of first conduct for a drug with the same API."[47] The period ends at the date of the first communication for Drugs at Issue with the same API because, based on my analysis and my review of the record, there is evidence of "spillover" effects from communications on individual drugs to other drugs with the same API.[48] I also explain why periods when a generic drug faced competition (i.e., there were at least two firms in

---

[44] It is my understanding that Dr. Jena offered his quantitative criticisms only as test of the reliability of my model and did not offer them as an alternative estimate of the overcharge or the amount of disgorgement.

[45] As a general matter (in statistics), bias can refer to either a measure that is either an underestimate or an overestimate of its true value. In the context of responding to Defendant Experts' Reports, I define "bias" as a characteristic of my model that would (all else equal) decrease the estimate of the increase in prices for the Drugs at Issue (*i.e.*, "biases" the calculation against the Defendants).

[46] Report ¶¶ 99-100.

[47] Report ¶ 99.

[48] See below for a discussion of this evidence.

the market competing for sales) provide a more appropriate benchmark for the "but-for" prices than monopoly periods.[49]

114. Dr. Jena asserts, first, that I have no justification for excluding the intra-API period, and second, that I have used an inappropriately long benchmark period for each of the Drugs at Issue.[50] In addition to these broad criticisms, Dr. Jena presents (in both Section V.C.1.c and in his "preferred" models) results based on his selection of alternative benchmark periods comprised of the one-year period prior to communication.[51] As I explain below, Dr. Jena's selected benchmark periods are flawed, and are likely to result in biased estimates.

#### *i. Exclusion of the "Intra-API" Period from the Benchmark Period Is Justified*

##### a. *Background*

115. Dr. Jena asserts that my exclusion of the Intra-API period from the benchmark period is "inappropriate" and "has a substantial impact on [my] estimated overcharges."[52] Whether or not it is appropriate to include the Intra-API period depends on whether (or not) prices during that period were representative of the prices that would have prevailed absent the alleged conduct. If prices were elevated because of the conduct, the answer is no, and so these periods should not be included in my benchmark.[53]

116. Rather than directly addressing this question, Dr. Jena offers two criticisms of my exclusion of these periods from the benchmark period: first, that this approach is "inconsistent with [my] market definition,"[54] and second, that my statistical analysis does not provide sufficient support for treating the Intra-API period as potentially affected (*i.e.*, that I have provided insufficient evidence for increases in prices due to alleged collusion during this period). The second assertion is the prototypical "red herring," either prices increased during the intra-API period due to collusion (in which case they shouldn't be included in the benchmark), or they did not (in which

---

[49] Report ¶ 100.

[50] Jena Report Section V.C.1.

[51] Jena Report ¶¶ 110 and 153.

[52] Jena Report p. 64.

[53] Note that inclusion of potentially impacted periods in the benchmark would result in two errors – it would reduce the disgorgement estimate because disgorgement amounts would not be calculated for that period, and, far more serious, would bias downward the estimate of disgorgement over the Post-Conduct period for the Drugs at Issue.

[54] Jena Report ¶ 97.

case they should be placed in the benchmark, but would have no effect on the overcharge estimates because their prices did not increase.[55]

117. As to the first assertion, Dr. Jena ignores the basic principles of collusive behavior. As to the second, Dr. Jena ignores the quantitative and qualitative record in this case that supports treating the Intra-API period as potentially impacted by the alleged collusion at issue here. Empirical results presented in the next subsection show Dr. Jena's criticism is misplaced.

b. *Coordinated Behavior and Intra-API Effects*

118. Demand-side substitutability is not the only mechanisms through which price effects could occur in the Intra-API context, contrary to Dr. Jena's assertions that a conspiracy that increased the price of an individual Drug at Issue could not affect the price of another Drug at Issue.[56] While under normal conditions, the degree of substitutability of one Drug for another would determine how much prices in the second Drug would respond to a large increase in the price of the first, the existence (or non-existence) of substitution is not necessary in an analysis of coordinated behavior. As discussed below, the Defendants who are allegedly colluding in Drug A can be the same participants in Drug B for which I have not yet observed communications between the Defendants. However, having succeeded in increasing the prices for Drug A, those manufacturers would also be highly likely to succeed in raising prices for Drug B even absent any direct evidence of communications on Drug B.

119. That there can be Intra-API price effects regardless of the demand-side substitutability is confirmed by the nature of the conduct here. While often the conduct is specific to an individual drug, in many cases the same communications allegedly spanned multiple drugs, and led to price increases on several of those drugs.[57] Indeed, the example of Betamethasone Dipropionate 0.05% Cream that Dr. Jena provides illustrates the point,[58] as it was discussed as a candidate for a price

---

[55] In fact, as is the case here, the prices for a several of the Drugs at Issue actually declined during the Intra-API period, meaning that if these observations were included in the benchmark, all else equal, the disgorgement estimate would <u>increase</u>.

[56] "It is unclear why Dr. Warren-Boulton assumes that alleged 'indication of conduct' on one Drug would affect the price of a second Drug that has the same API but is in a separate relevant market" (Jena Report ¶ 97).

[57] The Taro "May 2013" price increases are but one example of this phenomenon. See e.g., Complaint ¶¶ 727-744.

[58] Jena Report ¶ 103 and Figure 5.

increase along with all the Drugs in that API after communications on Betamethasone Dipropionate Lotion.[59]

120. The possibility of Intra-API price effects is further supported by the identity of the manufacturers for many drugs. As discussed at length in the Complaint, the Defendants in this case overlapped on a number of Drugs at Issue. The economics literature (see also Appendix G to my Report, discussing multi-market contact) suggests coordinated behavior is more likely when firms overlap in multiple different product markets. The same is true of collusive behavior, but even more so if the contact is among individuals who have previously been involved in collusion at the same firm. If a Defendant were faced with that same partner in a different market, it is entirely reasonable that the collusive behavior could influence pricing decisions in the second even without communications, especially because the fair share rules provide a template for collusion in other markets.[60]

c. *Contrary to Dr. Jena's Claims, the Intra-API Period Is Associated with Significant Price Increases*

121. Some of the Drugs at Issue showed a large, unexplained increase in price in the Intra-API period, supporting the need to exclude that period from the benchmarks. In my Report, I showed the results of a regression analysis examining price increases of the Drugs at Issue that were potentially subject to Intra-API effects during the Intra-API period as a group.[61] While the coefficient was not statistically significant, the magnitude of the increase across these Drugs was economically significant (corresponding to an average 36 percent to 55 percent increase). This should have prompted Dr. Jena to ask "why" these Drugs increased in price so much on average during the Intra-API period. The absence of any statistical or documentary evidence that the

---

[59] Defendant Kaczmarek of Fougera writes in an email titled "FW: Beta Dip Lotion (not augmented)": "Let's add this one to the beta party! Current WAC is $6.50, that will need to go up significantly. Thinking $40 or so." (SDZCTAG-00486176 at SDZCTAG-00486177-179.)

Mr. Thomassey testified that he had likely spoken to Tony Polman at Perrigo about raising the price of betamethasone dipropionate lotion. (Deposition of Anthony Thomassey, July 19, 2023 (hereafter "Thomassey Deposition") 236:21-237:14.)

While it is unclear what Mr. Kaczmarek is referring to as far as the "beta party," this is an example of a communication on one Drug at Issue followed by price increases on all forms of the API.

[60] This would occur because the parties' expectations of how a partner in the second market would react to a price increase in that market are influenced by the coordination in the first market.

[61] Report Table 10.

increases were caused by factors other than the alleged agreement should have raised concerns about including the Intra-API periods.

122. At my Deposition, I testified that the 16 Drugs with Intra-API periods displayed a bi-modal distribution.[62] In other words, the Intra-API Drugs could be segmented into two groups, those eleven which experienced a significant increase in price, and those five that did not. Figure 3 shows the price increase during the Intra-API period for each of the Drugs at Issue. As shown in the Figure, the price increases that are not explained by any of the explanatory variables in my regression are statistically significant and positive for 11 of the 16 Intra-API Drugs.[63] Thus, there is strong quantitative empirical support for the existence of intra-API effects for those 11, and, at a minimum those periods should be excluded from the benchmark periods for those Drugs at Issue.

[62] Warren-Boulton Deposition 566:17-567:15.

[63] The price increase for Metronidazole Gel 0.75% is positive and statistically significant under the Difference-in-Difference model but not the Before and After Model.

**Figure 3 - Estimates of the Increase in Price for Drugs at Issue During the Intra-API Period**




*** $p < 0.01$, ** $p < 0.05$, * $p < 0.10$.

123. As discussed above, the composition of the markets that I analyze for Intra-API effects can be an important consideration as far as the expected magnitude of any Intra-API effects. In other words, given two Drugs (1 and 2), the size and potential of Intra-API effects on Drug 2 that stem from communications between Defendants A and B on Drug 1 should be a function of the combined share of Defendants A and B in Drug 2. I have calculated this share for each of the 16 Drugs at Issue subject to Intra-API effects and have reported each in Figure 4 below. As shown in the Figure, in eight of the Drugs at Issue, Defendants that allegedly communicated on the first Drug in the API accounted for 100 percent of the market for Drugs subject to Intra-API effects. In an additional four markets, the Defendants accounted for more than 70 percent of sales.[64]

[64] I note anecdotally that several of the Drugs at Issue with small or negative intra-API effects are also Drugs for which the Defendants have less than 100% share (see *e.g.*, Ciclopirox Shampoo and Solution and Metronidazole).

Thus, there is sufficient basis to expect that Intra-API effects may be present in the Drugs at Issue.

**Figure 4 - Shares of Communicating Defendant Manufacturers in Drugs with the Same API During the Intra-API Period**[65]

[redacted]

Source: IQVIA Data.

d. *The Intra-API Period Should Be Excluded* *Because* *of Potential Bias*

124. Dr. Jena claims that my exclusion of the Intra-API period from the benchmark generates an "upward bias."[66] While he is correct that exclusion increases the estimated overcharge, that is a correction, not an "upward bias." Inclusion would bias the estimate down because it would taint the benchmark period with the very effects of collusion that I am attempting to estimate. As an economist and scientist that is presumably well versed in experimental design,[67] Dr. Jena would

[65] Communicating Defendants identified as those alleged to have conspired on the first Drug in the API to become affected. The reported share in this chart is then the combined share of the communicating Defendants in the Drugs at Issue with the same API up until the date of First Communication for those Drugs. For example, since Sandoz and Taro were alleged to have conspired on Betamethasone Dipropionate Lotion in January 2011, I would calculate Sandoz and Taro's combined share of Betamethasone Dipropionate Cream in the period between January 2011 and May 2013 (the alleged date of First Communication for the cream).

[66] Jena Report ¶¶ 103-104.

[67] Jena Report ¶¶ 1-3.

be aware of the potential perils of confounding effects that would be caused by a "tainted" benchmark period.

125. Nevertheless, Dr. Jena argues that a time period with a possible positive bias should be preferred to[68] (or included alongside)[69] information from more distant time periods.[70] As discussed below, the potential bias of including these periods, particularly when Dr. Jena has provided no alternative explanation for the increases in price, justifies their exclusion.

e. *Excluding Intra-API Periods Was Extremely Conservative in Favor of Defendants*

126. As discussed in my Report, my decision not to calculate disgorgement for the Intra-API period was based on the lack of statistical significance for the overcharge during the API period for the 16 Intra-API Drugs combined. At the time, I noted that this decision was extremely conservative.[71] However, given the above results, it would seem appropriate to include disgorgement for intra-API periods where the increase during the Intra-API Period was statistically significant.

127. For the 11 Drugs with positive statistically significant price increases during the intra-API period, I have calculated gross disgorgement amounts that total between $96 million and $100 million during the Intra-API period (see Table 1 below).

---

[68] As with his 1-year benchmark period in his preferred model (described in Jena Report ¶ 153).

[69] Jena Report Figure 7.

[70] Jena Report ¶¶ 100-102.

[71] Report ¶ 147.

**Table 1 – Gross Disgorgement Amounts for Intra-API Periods**

| Drug | Before and After Overcharge | Difference-in-Difference Overcharge | Gross Disgorgement During API Period (Before and After) | Gross Disgorgement During API Period (Difference-in-Difference) |
|---|---|---|---|---|
| BETAMETHASONE DIPROPIONATE-CREAM-EQ0.05%BASE | 1669.7%*** | 1656.8%*** | $28,833,557 | $28,820,905 |
| BETAMETHASONE VALERATE-CREAM-EQ0.1%BASE | 474.5%*** | 572.0%*** | $9,284,306 | $9,568,275 |
| BETAMETHASONE VALERATE-LOTION-EQ0.1%BASE | 364.4%*** | 364.4%*** | $794,249 | $794,249 |
| BETAMETHASONE VALERATE-OINTMENT-EQ0.1%BASE | 680.2%*** | 680.2%*** | $6,477,268 | $6,477,268 |
| CLINDAMYCIN PHOSPHATE-GEL-EQ1%BASE | 19.5%*** | 19.5%*** | $3,117,599 | $3,117,599 |
| DESONIDE-CREAM-0.05% | 123.1%*** | 105.9%*** | $17,234,455 | $16,065,054 |
| DESONIDE-OINTMENT-0.05% | 64.3%*** | 49.3%*** | $5,425,622 | $4,578,802 |
| FLUOCINONIDE-GEL-0.05% | 196.2%*** | 189.3%*** | $6,670,225 | $6,589,726 |
| FLUOCINONIDE-OINTMENT-0.05% | 167.4%*** | 171.2%*** | $6,856,021 | $6,913,765 |
| METRONIDAZOLE-GEL-0.75% | | 44.7%*** | | $699,400 |
| TRIAMCINOLONE ACETONIDE-PASTE-0.1% | 146.8%** | 97.4%** | $15,116,763 | $12,543,762 |
| ***Total - Intra-API Drugs During the API Period*** | | | ***$99,810,063*** | ***$96,168,804*** |

**, **, *** denote statistical significance at the 90%, 95%, and 99% levels of confidence, respectively.*

128. To be consistent, I have also considered the effect of including the Intra-API period in the benchmark for the five Drugs above with insignificant price increases (or decreases). Not surprisingly (since the drugs did not have large price increases during the Intra-API period), the effect on gross disgorgement is negligible.[72]

### *ii. Dr. Jena Fails to Provide Sufficient Justification for Excluding Pre-Conduct Data from the Benchmark Period*

129. My regressions used appropriate benchmarks that were relatively close in time to the conduct period, and (when possible) appropriately focused on periods of competition (opposed to monopoly). Dr. Jena's criticism of my use of a "inappropriate pre-conduct period that for most Drugs begins, and for some Drugs *ends*, many years before the start of the alleged Conduct for that Drug,"[73] therefore misses the mark. Dr. Jena cites to a reference from the ABA that suggests that the underlying assumption of equality of the pre and post periods of before and after models

[72] See backup materials.

[73] Jena Report ¶ 95.

*can* fail to hold over lengthy time periods,[74] but fails to show that is the case here. Dr. Jena then goes on to modify my model to use only a one-year pre-communication period for each Drug at Issue, which he claims reduces disgorgement by $165 million.[75]

130. I note first that Dr. Jena's criticism combines two separate arguments – first that I utilize a lengthy time period consisting of both proximate and non-proximate historical data as a benchmark, and second, that in the case of Intra-API periods, I have preferred non-proximate data to what I consider to be potentially tainted proximate data. As to the latter, as discussed above, it is fundamentally inappropriate to rely on data from a period that was potentially impacted by the conduct at issue.[76] As to the former, Dr. Jena provides insufficient justification for excluding any of the data produced for the Drugs at Issue.

131. Dr. Jena has greatly overstated the extent of the alleged deficiency in my model. As Dr. Jena testified at his deposition, there is nothing fundamentally wrong with any of the data that I utilized for my benchmark period, including the data that he claims is non-proximate.[77] Moreover, as shown in Figure 5, below, excluding Drugs with Intra-API periods, the average time elapsed between the pre-Conduct benchmark period (as measured by the midpoint) and the date of first communication is approximately 2 years.[78] Thus, I am not utilizing information that is decades old, where Dr. Jena's concerns could be justified.

---

[74] Jena Report ¶ 94 citing to American Bar Association. (2017). *Proving Antitrust Damages: Legal and Economic Issues*, Third Edition, ABA Book Publishing, pp. 229.

[75] Jena Report ¶ 110.

[76] Our estimate is already potentially biased downward by the assumption of no collusive effects during the Pre-Conduct Period. Including an API with collusion effects would further bias these downward. In contrast, excluding five Intra-API periods with no collusive effects might reduce the statistical significance of the overcharge, but would not bias the overcharge estimate.

[77] Deposition of Anupam B. Jena, MD, July 16, 2024 (hereafter "Jena Deposition") 313:5-8.

[78] If drugs with Intra-API periods are included, the average midpoint increases to 2.34 years.

**Figure 5 - Average Length between Midpoint of Pre-Conduct Periods and the Date of First Communication**




Source: Backup Materials.

132. Dr. Jena has not cited any literature in economics suggesting that relying on information in a before and after or difference in difference model that averages only two years away from the beginning of the Conduct period is unreliable, nor am I aware of any literature that would support that conclusion. It is worth pointing out that the source[79] that Dr. Jena relies upon for his assertion with respect to selecting "narrow" time periods with "minimal gaps in time"[80] does not refer to changes in prices over time (due to changes in underlying factors such as costs or the number of competitors that are accounted for in the model), but rather to structural changes in the

[79] American Bar Association. (2017). *Proving Antitrust Damages: Legal and Economic Issues*, Third Edition, ABA Book Publishing, pp. 227-228.

[80] Jena Report ¶ 94.

coefficients of the model. Yet, as also discussed below (Section D.i.d), Dr. Jena testified that he performed no tests for structural changes (e.g. tests for pooling) in any of his analyses.[81] Thus Dr. Jena has not performed the "test" that his source prescribes for testing his hypothesis.

133. The problem with Dr. Jena's critique is that Dr. Jena's correction eliminates important data points needed to accurately estimate the overcharges at issue. The pre-Conduct period must contain sufficient information on the independent variables so as to reliably estimate the impact of each covariate on price (the same "structure" that is referred to in Dr. Jena's citation to the ABA). In a complex model (such as the regressions run in my Report) with such brief Pre-Conduct Periods, that is not possible, and it is thus necessary to rely on information over a longer time period (or information from other Drugs) to obtain enough variation in each independent variable to properly measure the effect of each variable on price.

134. Dr. Jena also fails to consider that there may be non-competitive periods (which may be a poor proxy for but-for prices) in the one year preceding the conduct. For example, Dr. Jena presents two examples (Fluocinolone Acetonide Cream 0.01%[82] and Nystatin: Triamcinolone Acetonide Cream[83]) that he claims demonstrate pre-Conduct shifts in prices that are "unexplained" by my model. For Nystatin Triamcinolone Acetonide Cream, Dr. Jena's chart supports my original methodology. As Dr. Jena notes, for this Drug, "Taro's net prices began to increase as Sandoz exited the market"[84] and Taro was the only remaining supplier. This phenomenon is precisely why I preferred time periods informed by "oligopoly" prices as opposed to monopoly prices when constructing my benchmark.[85] If I were instead to rely (as Dr. Jena suggests) on the one-year period prior to the first communication for this Drug, prices in 2017 and 2018 (in the Post-Conduct Period) would be significantly below Dr. Jena's preferred benchmark, implying that collusion resulted in a fall in prices over those years. As shown in Figure 6 below, this demonstrates that my reliance on the data during which this Drug faced some competition (instead of the 1-year period prior to Conduct) was justified.

[81] Jena Deposition 91:12-21.

[82] Jena Report ¶ 108 and Figure 8.

[83] Jena Report ¶ 109 and Figure 9.

[84] Jena Report ¶ 109.

[85] Report ¶ 100.

**Figure 6 – Comparison of Pre-Conduct Benchmark Prices with Conduct and Post-Conduct Period Prices (Nystatin: Triamcinolone Acetonide Cream)**




Note:
1. *See* Jena Report ¶ 153.

Source: Defendants Transactional Data.

## C. My Regressions Do Not Suffer from Omitted Variable Bias

### *i. Background*

a. *Omitted Variable Bias*

135. My regressions include all the quantifiable variables that I could control for that might affect prices of the Drugs at Issue, making them reliable. Defendant Experts' arguments to the contrary are unavailing. Several of the Defendant Experts assert that my regression models (both Before and After and Difference in Difference) fail to capture important changes in factors that could have (although they never assert did) affect prices for the Drugs at Issue. Failure to control for a factor that influences the dependent variable (commonly referred to as the "omitted variable

problem"[86]) can lead to coefficient estimates (in particular, the coefficient on the variable of interest) to be biased, i.e., not reflect its true impact on the dependent variable.[87]

136. As a general matter, in applied econometrics, including every potential explanatory variable in a model is not possible. Economists cannot construct a parallel universe, so a regression model always leaves some portion of the dependent variable unexplained.[88] Some variables may not be quantifiable and data on others may be unavailable in whole or in part.

137. Omission of a variable, therefore, generally will not be considered fatal to a model unless it meets certain criteria. Particularly in the context of expert testimony, these criteria are as follows: the variable must be correlated with the variable of interest; the variable must be important; and the variable must be quantifiable.[89] With respect to the first, in order to cast serious doubt on the results of a regression analysis based on whether or not particular variables have been included, the variable in question must affect the variable of interest. As to the second (importance), the omitted variable must be expected to have a significant impact on the dependent variable. As noted above, "something" is omitted in every regression model, and there should be at least some basis in economic theory for inclusion of that variable. Finally, the omitted variable must be

---

[86] Wooldridge, J.M. (2016). *Introductory Econometrics: A Modern Approach,* Sixth Edition. Cengage Learning, at pp. 78-81.

[87] Hayashi, F. (2000). *Econometrics*. Princeton University Press, Princeton, at p. 238. (As a consequence of ignoring a factor that influences the dependent variable "the OLS coefficient estimate can be asymptotically biased for all the included regressors. This phenomenon is called the **omitted variable bias.")**

[88] In fact, this unexplained variation is explicitly allowed for in the error term of the regression. See, Hayashi, F. (2000). *Econometrics*. Princeton University Press, Princeton, at p. 4. ("The error term represents the part of the dependent variable left unexplained by the regressors.")

See also, Gujarati, D.N., and C.D. Porter. (2009). *Basic Econometrics*, Fifth Edition. New York: McGraw-Hill, at pp. 73-75.

[89] Rubinfeld, D.L. (2011). "Reference Guide on Multiple Regression." In *Reference Manual on Scientific Evidence*, J.P. Kassirer and Gladys Kessler (eds), Third Edition, Washington, DC: The National Academies Press, at p. 314. ("The importance of omitting a relevant variable depends on the strength of the relationship between the omitted variable and the dependent variable and the strength of the correlation between the omitted variable and the explanatory variables of interest. Other things being equal, the greater the correlation between the omitted variable and the variable of interest, the greater the bias caused by the omission. As a result, the omission of an important variable may lead to inferences made from regression analyses that do not assist the trier of fact.")

quantifiable in order to allow an economist to test whether the omission of the variable actually affected (biased) the coefficient of interest.[90]

138. In the regression models in my Report, the primary coefficient of interest is the coefficient for the increase in the price of the Drugs at Issue during the Conduct and Post-Conduct periods, holding constant for other factors that economic theory would predict would affect prices.[91] In addition to the specific economic factors that I would expect to influence prices for the Drugs at Issue, the Difference-in-Difference model also holds constant for changes over time in the prices of other non-MDL generic Drugs, and the Before and After model also holds constant for changes in the costs of the Drugs at Issue over time.

139. Both regression models rely on an assumption of "causal inference," i.e., after controlling for other factors, the remaining increase in price between the pre- and post- communication periods is assumed to be due to collusion. Defendants' claims of omitted variables thus can be reduced to a criticism that what I claim to have measured as the effects of Defendants' conduct can be explained, either in whole, or in part, by some other variable that I have not included in my model, and hence, the assumption of causal inference is violated. For this to be a problem for computing damages or disgorgement, however, it would require that inclusion of that variable would be expected to have a significant effect (increase or decrease the estimated overcharge coefficients) and hence its exclusion could arguably bias the estimate.

140. Defendants have suggested several variables that are not included in my models that they claim could be correlated with the increase in the prices for the Drugs at Issue. However, none of the Defendant Experts, except for Dr. Jena, even attempt to demonstrate through statistical analysis that any of the "omitted" variables result in bias, nor do they quantify the amount of the claimed "bias." Several of their posited omitted variables would not be expected to cause a change in prices at all. Others are not applicable to all the Drugs at Issue, and none of the variables could be expected to explain much of the extraordinarily large price increases observed in the data.

---

[90] Note that the Manual (Rubinfeld, D.L. (2011). "Reference Guide on Multiple Regression." In *Reference Manual on Scientific Evidence*, J.P. Kassirer and Gladys Kessler (eds), Third Edition, Washington, DC: The National Academies Press, at p. 315) states that omitted variables may be addressed qualitatively as opposed to quantitively ("Nonetheless, it is possible for the expert to account for bias qualitatively if the expert has knowledge (even if not quantifiable) about the relationship between the omitted variable and the explanatory variable.")

[91] My Before and After model also included a variable which represented an interaction between the Conduct Period and cost. It is my understanding that Defendants' concerns about omitted variables are principally with respect to the coefficient on the Conduct/Post-Conduct period.

Nevertheless, I discuss each claimed omitted variable in any of the Defendant reports, beginning with the variables that would not be expected to influence prices.

b. *"Explanatory Power" Does Not Provide a Basis for Claims of Omitted Variable Bias*

141. Dr. Stomberg's suggestion that my regressions are not reliable because they do not explain a sufficient amount of the variation in the prices for the Drugs at Issue is wrong. In Dr. Stomberg's Report, he claims that after controlling for cross-sectional variation in prices (differences between Drugs that are captured by the Drug fixed effects and in some part by the branded generic indicator variable), my Price Increase Drug Models (Before and After and Difference in Difference) and the New Generic model have relatively low explanatory power.[92] Dr. Stomberg's conclusion from this analysis is that my regression models are unlikely to satisfy the "*ceteris paribus*" assumption discussed above with respect to omitted variables.[93]

142. I note first that Dr. Stomberg does not dispute that my models each explain a significant amount of the total variation of prices (ranging from 73 percent to 86 percent),[94] which is typically measured using a regression statistic called the R-squared or adjusted R-squared statistic. R-squared statistics typically indicate the amount of variation in the dependent variable that is explained by an independent variable.[95] However, whether a model has a high or low R-squared is not in and of itself a measure of the reliability (or unreliability) of the model. A very good (and properly specified) model can have a very low R-squared, and a very bad (and improperly specified) model can have a very high R-squared. There is no minimum "within R-squared" (the measure of variation not explained by Drug fixed effects) for a model to be reliable.

143. Dr. Stomberg's analysis is largely uninformative, as he does not provide statistical analysis showing any bias from omitted variables. Dr. Stomberg does not provide any quantitative analysis of the impact of any claimed omitted variables that would allow him to come to any

---

[92] Stomberg Report ¶¶ 132-134 (New Generics) and ¶¶ 158-159 (Difference in Difference).

[93] Stomberg Report ¶ 160-165.

[94] Stomberg Report ¶¶ 133 and 160.

[95] Wooldridge, J.M. (2016). *Introductory Econometrics: A Modern Approach*, Sixth Edition. Cengage Learning, at p. 35 ("*R*2 is the ratio of the explained variation compared to the total variation; thus, it is interpreted as the *fraction of the sample variation in y [dependent variable] that is explained by x [independent variable]*.")

conclusion about the actual effects of any bias.[96] Nevertheless, I discuss the specific qualitative factors Dr. Stomberg claims are omitted below.

***ii. Claimed Omitted Variables Do Not Bias My Conclusions***

144. Defendant Experts propose a series of additional variables that they claim have been omitted, but, upon consideration, none have caused me to change the opinions I offered in my Report. In my Report I identified four factors where a change could result in a change in the equilibrium non-collusive price, *i.e.*, an increase or decrease in marginal costs or capacity, an increase or decrease in the number of suppliers (entry or exit), an increase in the dispersion of firm shares, or a fall in the elasticity of demand for the product, of which the first two (costs and the number of suppliers) are the most important and can be controlled for empirically. I have controlled for changes in these factors hence they are not "omitted variables."

145. While there might be other (known or unknown) factors where a change would affect the oligopoly equilibrium prices for some of the Drugs at Issue, to the extent that changes in these factors would affect the prices of the non-MDL Drugs similarly, the effect of changes in these factors on prices would have already been captured in my Difference-in-Difference model by using the price of the non-MDL drugs as a control.

146. Nevertheless, Defendant experts have identified several factors that they argue could have affected the non-collusive equilibrium price during the Control and Post-Conduct periods that they believe I have not sufficiently allowed for. The most important of these are shortages for the Drugs at Issue. The Defendant Experts, however, do not show empirically whether any of those factors affect my overcharge estimates. Nonetheless, I discuss each below.

a. *Capacity Constraints and the Opportunity Cost of Limited Short-Run Capacity*

147. Dr. Stomberg and Dr. Tucker each suggest that economic factors relating to capacity constraints and the opportunity cost of production may be omitted,[97] but they fail to show meaningful shifts in these factors and I am not aware of any during the relevant time periods. As discussed above (Section III.B.viii), capacity constraints and opportunity costs of production are both factors that would be expected to influence the <u>level</u> of prices, but absent some shift in either a firm's

---

[96] Indeed, as with Dr. Stomberg's suggested modification to my New Generic model for the presence of Authorized Generics, his suggested "omitted" variable actually results in an increase in disgorgement.

[97] Stomberg Report ¶ 113-114 (capacity constraints); Stomberg Report ¶ 87 and Tucker Report ¶ 49 (opportunity costs).

capacity or its opportunity costs of production, neither would be expected to cause a change in the prices for the Drugs at Issue. As discussed in my Report, I am unaware of any changes in capacity or sudden changes in the opportunity cost of production that would explain large increases in the prices for the Drugs at Issue, and neither Dr. Stomberg nor Dr. Tucker have presented any evidence to the contrary. Accordingly, no modification to my model is necessary to address their concerns.

b. *Shortages/Disruptions in Supply*

148. I previously controlled for the most drastic supply disruptions and shortages, finding that they had only a modest effect on prices, suggesting that Defendant Experts' assertions that these shortages could explain the price increases in the Drugs at Issue are unfounded. In the regression models in my Report, I included an indicator variable for whether each Drug was listed on the FDA's publicly available shortages list in that quarter. As discussed in my Report, a drug shortage for a particular manufacturer is one factor that might be expected to (at least temporarily) increase prices.[98] Defendant Experts do not challenge the validity or accuracy of the FDA's list of drug shortages. However, across their reports, Defendant Experts have claimed that I have failed to account for shortages and supply disruptions that do not rise to the level of the FDA's drug shortages list (since these are not reported to or tracked by the FDA).[99]

149. As a preliminary matter, there are no public sources for smaller supply shortages and disruptions (as are those claimed by the Defendants). As far as I am aware, the shortages claimed by the Defendants were not captured by any public drug shortage database. With the exception of Dr. Jena, none of the Defendant Experts suggested any alternative public data source that would show whether a Drug at Issue was experiencing a shortage of the type claimed by those Experts.[100] Thus, the only potential source for information on these shortages would be information produced in the record in this case.[101] As discussed in my Report, Defendants would commonly make

[98] Report ¶¶ 115-116.

[99] See, e.g., Jena Report ¶ 64, Saravia Report ¶¶ 119-136, 190-197, Stiroh Report ¶¶ 29-30, Tucker Report ¶ 62.

[100] At Deposition, Dr. Jena testified that a marker of a potential drug shortage would be a decrease in the total number of prescriptions written for a Drug. (Jena Deposition 161:2-14.)

[101] I note that this would not contain any information on shortages for Drugs that are not At Issue.

pretextual claims about shortages in order to disguise a complementary bid (or refusal to bid).[102] Thus, the materials in the Record may be of questionable value.

150. The FDA's shortages list tracks shortages that tend to be severe or extreme.[103] At deposition, Dr. Jena acknowledged that the disruptions tracked by the FDA tended to be more extreme and longer lasting than the types of shortages he claimed were omitted from my analysis.[104] The events tracked by the FDA would thus be expected to have larger effects on prices than shortages that were less extreme or shorter in duration. The regression analysis in my Report showed that an FDA shortage was associated with a relatively modest increase in prices in the control sample (approximately 12 percent).[105] In other words, when significant shortages occur in non-collusive markets, prices increase somewhat, but increase by nowhere near the magnitude that prices went up for the Drugs at Issue.

151. None of Defendant Experts attempted to come up with their own alternative estimate of the effects of their claimed omitted shortages, instead preferring to speculate that these types of price increases *could* explain some or all of what I measured as the price increases for the Drugs at Issue. Given the above empirical result from my Report (extreme shortages result in modest price increases), it would thus seem unnecessary to test Defendants' assertions with respect to less severe shortages. Nonetheless, below I incorporate the evidence of shortages included in Defendants' Reports and in the Defendants' data production into my regression model and demonstrate that Defendants' claims of bias are unfounded.

152. One plausible alternative indication of a drug shortage that would be reflected in Defendants' transactional data are payments of "failure to supply" penalties.[106] As discussed by several of Defendant Experts,[107] a supply shortage could result in a Defendant being forced to pay a "failure

---

[102] Report ¶ 43.

[103] See *e.g.,* "[s]hortages that are expected to be resolved quickly or which involve only a particular strength or package size, which has a substitute strength(s) and package size(s), are not usually the focus of the Drug Shortage web page." *See* U.S. Food and Drug Administration, "Frequently Asked Questions about Drug Shortages," October 11, 2023, *available at* https://www.fda.gov/drugs/drug-shortages/frequently-asked-questions-about-drug-shortages.

[104] Jena Deposition 155:3-156:8.

[105] I note that the effect of shortages in the Drugs at Issue was considerably larger (95 percent). However, it is possible that this effect was magnified by the effects of the alleged conspiracy.

[106] Stomberg Report ¶¶ 240-244.

[107] Gilbert Report ¶¶ 79-87; Tucker Report ¶¶ 50-51; Saravia Report ¶¶ 42-43; Bell Report ¶ 20; Rubinfeld ¶ 45.

to supply" penalty in the event that they were unable to fulfill their contractual obligation to a customer that would cover the customer's additional cost of procurement from another manufacturer. Failure to supply penalties do appear as separate adjustments in the transactional data for some of the Defendants,[108] and thus I can use the Defendants transactional data to track when these manufacturers experienced supply shortages that resulted in any failure to supply penalties. The periods of failure to supply penalties for the Drugs at Issue from this analysis are reported in Appendix D Table 1. I refer to these shortages as "temporary" to distinguish these shortages from those on the FDA's list. [109]

153. In addition, these failure to supply penalties appear to be small in magnitude relative to total net sales (see Figure 7, below), indicating that while these failure to supply penalties may exist, that they do not impact the profits of the Defendants in a significant manner.

[108] I identified failure to supply adjustments, both in the form of shortages and failure to supply penalties, for the following manufacturers: Aurobindo, Greenstone, Lannett, Mallinckrodt, Mylan, Perrigo, Sandoz, Teligent, and Valeant/Bausch. Transactions were categorized as FTS penalties based on my review of various transaction type fields (*e.g.,* "order reason," "strategy," "rebate type") as well as both the sign and relative amounts and quantities associated with these transactions.

[109] I note that Defendant Experts have provided conflicting information about whether these types of shortages could have only temporary or lasting effects on prices. For example, Dr. Jena testified that he expected that these events would be associated with temporary increases in prices, whereas Dr. Saravia (Saravia Report ¶ 149) claims that the shortages could have lasting impacts.

See Jena Deposition 154:15 – 155:9 (emphasis added):

"Q. Well, there's -- there's -- you haven't identified any actual, real-life shortages in these drugs that aren't accounted for in Doctor Warren-Boulton's model. So, you know, hypothetically there could be shortages that -- 20 that we don't know about.

Are you saying that those hypothetical shortages are having some sort of impact on the price of -- of drugs?

A. I'd say the following: They are likely supplied as -- just based on what the FDA says is how they define the shortage in that list.

Q. Uh-huh.

A. And we're talking about a lot of different products over many, many different quarters. So lot of time. I would expect that there would be supply issues that wouldn't be codified in that list. Supply disruptions would be expected to have an impact on price, **at least in the quarter or so when those supply disruptions are occurring**."

**Figure 7 – Failure to Supply Penalties as a Percentage of Net Revenue**[110]




Source: Defendants Transactional Data.

Note: Blue bars represent the failure to supply penalties as a percentage of net revenues for the same Drugs and Defendants that experienced those failure to supply penalties in that time period.

154. I then reviewed Defendant Experts' Reports and tabulated the Drugs and time periods covered by assertions in their reports of a claimed temporary shortage (see Appendix D Table 2).

155. I test the effect of these additional variables on my model. To do so, I use the results from both Tables to add two additional indicator variables to each of the models from my Report in order to capture any effects of temporary drug shortages for the Drugs at Issue. I include both a variable that captures the contemporaneous effects of a temporary shortage and a variable that measures if the Drug was on temporary shortage in the previous quarter. I also similarly modify the FDA variable utilized in my Report to allow for both contemporaneous and lagging effects of FDA shortages.

156. The results of this test show that the ability of these shortages to explain the price increases we see in the Drugs at Issue is limited. As reported in Table 2, the overcharge estimates, after

[110] Failure to supply adjustments, both in the form of shortages and failure to supply penalties, were identified for the following manufacturers: Aurobindo, Greenstone, Lannett, Mallinckrodt, Mylan, Perrigo, Sandoz, Teligent, and Valeant/Bausch. Transactions were categorized as FTS penalties based on my review of various transaction type fields (*e.g.,* "order reason," "strategy," "rebate type") as well as both the sign and relative amounts and quantities associated with these transactions.

controlling for the additional temporary shortage variables, are very similar to those from the base models in my Report (Table 7 and Table 8). While temporary shortages are associated with modest increases in prices (around 10 percent), they do not explain the increase in prices during the Conduct Period. In addition, for FDA shortages, the concurrent FDA shortage variable for non-MDL Drugs in the Difference-in-Difference model is positive but not statistically significant, which indicates that a FDA shortage has a delayed impact. In comparison, temporary shortages for the Drugs at Issue tend to have an immediate impact.

## Table 2 - DiD and Before-and-After Models with Additional Controls for Shortages

| | (1) | (2) |
|---|---|---|
| | **DiD Model** | **B&A Model** |
| Overcharge as Percent of Revenue >> | **72.9%** | **64.2%** |
| Overcharge % >> | **268.9%** | **179.3%** |
| | | |
| Drugs at Issue x (Post First Communication) | 1.3054*** | 1.0272*** |
| | [0.1372] | [0.1232] |
| Log(Total Annual Quantity of Drug) x Control Drug | -0.1199*** | |
| | [0.0114] | |
| Log(Total Annual Quantity of Drug) x Drug at Issue | 0.0424 | 0.0645 |
| | [0.0282] | [0.1241] |
| Number of Competitors = 2 x Control Drug | -0.0323 | |
| | [0.0345] | |
| Number of Competitors = 3 x Control Drug | -0.0993** | |
| | [0.0467] | |
| Number of Competitors = 4 x Control Drug | -0.1918*** | |
| | [0.0507] | |
| Number of Competitors = 5 x Control Drug | -0.3306*** | |
| | [0.0558] | |
| Number of Competitors = 2 x Drug at Issue | -0.2854* | -0.7162*** |
| | [0.1732] | [0.1760] |
| Number of Competitors = 3 x Drug at Issue | -0.3984** | -0.8495*** |
| | [0.1726] | [0.1818] |
| Number of Competitors = 4 x Drug at Issue | -0.5774*** | -1.0231*** |
| | [0.1897] | [0.2003] |
| Number of Competitors = 5 x Drug at Issue | -0.5179** | -1.0539*** |
| | [0.2527] | [0.2593] |
| Drug is Branded Generic = Yes x Control Drug | 0.8503*** | |
| | [0.0856] | |
| Drug is Branded Generic = Yes x Drug at Issue | 1.0018*** | 0.9511*** |
| | [0.1751] | [0.1862] |
| Drug in FDA's Shortage List x Control Drug | **0.0404** | |
| | [0.0263] | |
| Drug in FDA's Shortage List x Drug at Issue | **0.6091*** ** | **0.6786*** ** |
| | [0.0499] | [0.0473] |
| Drug with Temporary Shortage x Drug at Issue | **0.1009*** ** | **0.0816** ** |
| | [0.0369] | [0.0325] |
| Drug in FDA's Shortage List-Lagged x Control Drug | **0.0991*** ** | |
| | [0.0252] | |
| Drug in FDA's Shortage List-Lagged x Drug at Issue | **0.0659** | **0.0795* ** |
| | [0.0539] | [0.0461] |
| Drug with Temporary Shortage-Lagged x Drug at Issue | **0.0897** ** | **0.0805** ** |
| | [0.0434] | [0.0395] |
| Log(COGS) | | 0.5718*** |
| | | [0.0957] |
| Log(COGS) * Post First Communication | | -0.2924*** |
| | | [0.1035] |
| Constant | 1.1617*** | -0.7463 |
| | [0.1874] | [2.0771] |
| | | |
| Observations | 427,749 | 4,600 |
| R-squared | 0.859 | 0.732 |
| **Drug FE** | **Yes** | **Yes** |
| **Year-Quarter FE** | **Yes** | **No** |

Robust standard errors in brackets
*** p<0.01, ** p<0.05, * p<0.1

c. *Primary/Secondary Drug Purchases*

157. As I control for situations where Defendants experienced supply shortages above, it is unnecessary to separately control for situations where Defendants sold under "secondary" contract rates because they experienced supply shortages. Dr. Tucker notes that prices for the Drugs at Issue in an oligopolistic equilibrium (*e.g.* prior to the Conduct Period) could also differ across customers, which is also possible, and Dr. Tucker suggests in particular that prices may change by a different amount if a customer was purchasing at "secondary," as opposed to "primary" contract rates.[111] Dr. Tucker discusses the example of Latanoprost Solution, where Akorn was experiencing a supply shortage, and hence certain customers were making purchases under secondary contracts (which carry higher prices than primary contracts).[112]

158. While primary and secondary contracts certainly could command different prices, it is unclear why a customer would purchase under a secondary contract unless there was an issue procuring the product from its primary supplier. As discussed above (Section IV.C.ii.b), I have already accounted for periods where a manufacturer was experiencing a disruption in supply, and hence any effects of (higher) secondary contract purchases would already be controlled for in my models.

d. *Branded Drug Price*

159. Dr. Stomberg and Dr. Saravia both claim that an important determinant of the generic price is the branded drug price.[113] While the branded drug price is certainly an important factor in determining the price that a generic manufacturer can charge when first entering the market, it is unclear what if any effect a subsequent change in the price of the branded product would have on the generic price. I noted in my discussion of the relevant markets in my Report that, given a large price decrease with the first generic, and the fact that generics are (almost) homogeneous, the relevant generic market would not include the branded product, i.e. generics would compete primarily or exclusively with other generics, particularly in mature markets.[114]

---

[111] Tucker Report ¶¶ 58-60.

[112] Tucker Report ¶ 60.

[113] Stomberg Report ¶¶ 104-105, Saravia Report ¶¶ 119, 138-140.

[114] On entry of the generic, the lower price point of the generic drives substitution away from the branded drug. Thus the lower the price charged by the initial generic relative to the brand, the more substitution from the branded drug. The effect of initial or subsequent generic entry on prices and quantities of the branded drug, however is not relevant to this inquiry.

160. Nonetheless, to allow for the suggested possibility that the branded drugs' prices would affect the prices of corresponding generic drugs (and on the overcharge estimates in my Difference-In-Difference and Before and After models), I added the price of the corresponding branded drug as a separate independent variable.[115,116] The results from this regression are reported in Table 3, below. As shown in the Table, the effect of the branded drug's price on the generic price is not statistically significant, and the inclusion of the branded drug's price does not affect the overcharge estimates (the addition of the branded drug price increases the overcharge estimates slightly). Accordingly, I conclude the addition of a branded drug price variable is unnecessary.

[115] Note that not all Drugs at Issue and Control Drugs had concurrent brand sales over this time period, and hence those observations could not be used in the regression model. Hence, this regression analysis is run only on a subset of the Drugs in my original models.

[116] It is possible that the branded drug price and the generic drug price are simultaneously determined, which could cause an econometric problem called endogeneity.

**Table 3 - DiD and Before-and-After Model with Branded Price as an Additional Control Variable**

| | (1) | (2) |
|---|---|---|
| | **DiD Model** | **B&A Model** |
| Overcharge as Percent of Revenue >> | **74.0%** | **63.9%** |
| Overcharge % >> | **284.2%** | **176.7%** |
| Drugs at Issue x (Post First Communication) | 1.3461*** | 1.0179*** |
| | [0.2233] | [0.1718] |
| Log(Total Annual Quantity of Drug) * Control Drugs | -0.1763*** | |
| | [0.0252] | |
| Log(Total Annual Quantity of Drug) * Drugs at Issue | 0.0836 | 0.2195 |
| | [0.1672] | [0.1658] |
| Number of Competitors = 2 * Control Drugs | 0.0918 | |
| | [0.0579] | |
| Number of Competitors = 3 * Control Drugs | -0.0032 | |
| | [0.0629] | |
| Number of Competitors = 4 * Control Drugs | -0.1287** | |
| | [0.0648] | |
| Number of Competitors = 5 * Control Drugs | -0.2666*** | |
| | [0.0700] | |
| Number of Competitors = 2 * Drugs at Issue | -0.7724*** | -0.9159*** |
| | [0.2405] | [0.2273] |
| Number of Competitors = 3 * Drugs at Issue | -0.8187*** | -0.9469*** |
| | [0.2087] | [0.2130] |
| Number of Competitors = 4 * Drugs at Issue | -1.0273*** | -1.1636*** |
| | [0.2614] | [0.2725] |
| Number of Competitors = 5 * Drugs at Issue | -0.7532*** | -1.0212*** |
| | [0.2387] | [0.3155] |
| Drug in FDA's Shortage List * Control Drugs | 0.1950*** | |
| | [0.0732] | |
| Drug in FDA's Shortage List * Drugs at Issue | 0.5749*** | 0.5942*** |
| | [0.0927] | [0.0712] |
| Drug is Branded Generic = Yes * Control Drugs | 1.3648*** | |
| | [0.3109] | |
| Drug is Branded Generic = Yes * Drugs at Issue | 0.9398*** | 0.9664*** |
| | [0.1220] | [0.1151] |
| Log(Brand Price) * Control Drugs | **0.0622** | |
| | [0.0519] | |
| Log(Brand Price) * Drugs at Issue | **-0.0396** | **-0.1748** |
| | [0.1465] | [0.1234] |
| Log(COGS) | | 0.6380*** |
| | | [0.1519] |
| Log(COGS) * Post First Communication | | -0.3716** |
| | | [0.1614] |
| Constant | 2.3794*** | -2.8409 |
| | [0.4192] | [2.8467] |
| Observations | 221,189 | 1,973 |
| R-squared | 0.838 | 0.736 |
| **Drug FE** | **Yes** | **Yes** |
| **Year-Quarter FE** | **Yes** | **No** |

Robust standard errors in brackets
*** p<0.01, ** p<0.05, * p<0.1

e. *Consolidation Among Customers*

161. Dr. Stomberg also dedicates a section of his Report to the effects of consolidation of purchasers during the time of the alleged conspiracy.[117] It is my understanding that, to the extent that Dr. Stomberg discusses the formation of large buyers, he postulates that larger buyers are able to secure greater price concessions from the Defendants.[118]

162. However, to the extent that this factor (bargaining leverage created by larger customers over time) was omitted from my analysis, it would bias the calculation in the Defendants' favor – if purchaser power increased over time, it would also lead to lower prices over time. If this factor was indeed omitted, all else equal, my disgorgement estimates would be lower, since the purchaser power would have had a larger negative impact on prices during the Post-Conduct Period than it did during the Pre-Conduct Period. Further, to the extent that purchaser power and buyer consolidation affected all generic drugs, my Difference-in-Difference model would have already accounted for the change through the non-MDL control group.

## D. The Variables in My Model Are Properly Specified

### *i. I Correctly Utilize a Common Model*

#### a. *Background*

163. In econometric analysis, data from multiple products and from multiple time periods can be combined into a "common" model for purposes of measuring the effects of economic factors that would be expected to influence both products (and all time periods). In such a model, it is possible to control for differences between products, while also benefitting from richer data to more precisely estimate how those products respond to changes in the independent variables included in the model.

164. Many of Defendant Experts criticize my decision to estimate a "common" model for the Drugs at Issue (*i.e.*, combining all 98 Drugs into a single model, or, as in the case of the Difference in Difference model, combining the 98 with a set of non-MDL control Drugs from IQVIA).[119] The primary basis for this criticism is an observation that the Drugs at Issue are heterogenous[120] and

[117] Stomberg Report ¶ 78.

[118] Stomberg Report ¶ 79.

[119] See, *e.g.,* Jena Report ¶¶ 63 and 66.

[120] See, *e.g.*, Stomberg Report ¶ 164.

have different characteristics (*i.e.*, treat different conditions, affect different sets of patients, and face different market conditions).[121]

165. In addition, Defendant Experts criticize my regression analysis because I estimate a common effect of each economic variable on the Drugs at Issue as a group.[122] In econometric terms, Defendant Experts appear to be asserting that certain Drugs at Issue or that certain subgroups follow different regression functions (see the example in the next paragraph). In general, the question of whether regression observations have the same regression function is commonly called a "pooling" problem.[123] If two sets of observations have regression functions that significantly differ from one another, combining or "pooling" those observations in a single regression model can create biased coefficient estimates.

166. To provide a hypothetical example, the entry of an additional competitor in Drug "A" (Drug Group I) could have a 40% reduction in price, and the entry of an additional competitor in Drug "B" (Drug Group II) could only reduce prices by 20%. Defendant Experts assert that the differences between Drug Groups (I vs. II) explain the difference in the two groups' response to the effects of an additional competitor.

167. I first note that Defendant Experts appear to conflate differences in product characteristics (which can be controlled for in a regression analysis and do not cause a pooling problem) with claimed differences in how the Drugs at Issue respond to different economic factors. Defendant Experts provide insufficient (or no) qualitative or quantitative analysis to support their claims. In addition, the Drugs at Issue do share common characteristics that suggest that the Drugs at Issue would respond similarly to the changes in economic factors, and hence a common model would be appropriate.

b. *The Drugs at Issue Share Common Economic Characteristics Which Justify the Use of a Common Model*

168. It is worth noting that the Drugs at Issue have similar economic characteristics that would on their own suggest that a pooled analysis of their prices would be justified. First, these Drugs share the same (Defendant) manufacturers. It would seem reasonable then that the manufacturers would

---

[121] See, *e.g.*, Jena Report ¶ 66.

[122] See, *e.g.*, Jena Report ¶ 66 and Stomberg Report ¶ 164.

[123] See, *e.g.*, Wooldridge, J. M. (2016). *Introductory Econometrics: A Modern Approach,* Sixth Edition, Cengage Learning, at pp. 221-222.

react similarly to, say, a change in competition. Second, some of the factors relevant to the Drugs at Issue (*e.g.*, a low elasticity of demand at competitive price levels) suggest that the response to economic factors would be expected to be similar across the Drugs at Issue.

c. *Product Heterogeneity Does Not Require Separate Models*

169. While a regression model can include many heterogenous products, those products can be combined into a single regression model provided that the model controls for differences among products, as I did here. As noted in my Report, I do not dispute that different Drugs have different characteristics that would cause the prices for those Drugs to be different from one another. That is why I included drug fixed effects in my regression models that capture the degree to which the prices differ among drugs.[124] For purposes of my analysis, it is not important to determine *why* those prices are different – the drug fixed effects effectively capture he relevant factors that cause differences in relevant prices. Then, using economic theory, I identified other economic factors that would cause a *change* in that price, and included those factors as variables in my regression models. Thus, any argument that the Drugs at Issue are clinically different (treat different conditions or have different patient bases) is not relevant unless those clinical conditions change (for example, if a Drug is approved for treatment of another condition), which I address below.

170. Further, even if there was such a shift in the clinical conditions for an individual Drug, there are two possibilities as to why my model would not control for that change. The first is that the economic variables included are not affected by the change (and thus my model would suffer from an omitted variable). This possibility is discussed at length above. The second possibility is that my model does account for the effects of that clinical shift, but does so in a way such that the estimated effect (from the regression model) does not accurately predict the effect of that change on the individual Drug. This is the "pooling" problem discussed above, which I discuss in the Section below.

d. *Common Effects*

171. Defendant Experts, and Dr. Jena in particular, seem to suggest that unless Drugs are clinical substitutes (or are sufficiently clinically similar), it would be impossible or unlikely that they could be placed into a pooled regression model that would be capable of estimating the effects of the alleged conduct.[125] Other experts suggest that the effects of some of the economic variables in

[124] See, e.g., Report ¶ 105.

[125] Jena Report ¶ 20.

my model could be different for different Drugs at Issue.[126] This criticism (differential effects) is not, on its face, unreasonable. As discussed in my Report, in my Difference-in-Difference model, I already estimate separate regression coefficients for the economic variables of interest for the Drugs at Issue and the non-MDL drugs for precisely this reason.[127] However, as discussed above the Drugs at Issue share several common economic characteristics that would suggest that my decision to pool them into a common model is justified. Finally, none of the Defendant Experts provides sufficient quantitative justification to reject a common model.

172. Econometric analysis requires sufficient data, and in particular sufficient variation in data to be able to measure the effects of a change in an independent variable on the dependent variable. In certain instances, sufficient observations for a single product may be available to allow reliable estimation of single product models (e.g., if there was a sufficiently long period of historical data). However, in many instances, sufficient information for individual products is unavailable, and thus pooling observations from heterogenous products into a single model becomes necessary.

173. In this case, given the data available to me, a common model is justified. First, there are relatively short pre-Conduct time periods for many of the Drugs at Issue.[128] Thus it would be unlikely that there would be sufficient data for any individual Drug at Issue to estimate my model, which would require that each Drug experience a shortage, a change in demand, as well as a shift in the number of competitors between one to two, two to three, three to four, and four to five, over the period for which I have data. Since each Drug is unlikely to satisfy this requirement individually, at least some form of common model is required. Thus, Defendant Experts' criticism can more accurately be characterized as a belief that certain subgroups of the Drugs at Issue respond differently to these factors than others.

174. For example, Dr. Jena specifically identifies demand as a factor that might have different effects on different Drugs,[129] and then uses Clobetasol as an example of a drug that experienced a change in demand over the relevant period.[130] However, while Dr. Jena demonstrates that Clobetasol

[126] See, e.g. Stomberg Report ¶ 164.

[127] Report ¶¶ 133-134.

[128] Or none at all in the case of New Generics.

[129] Jena Report ¶ 71.

[130] Jena Report ¶¶ 72-76.

experienced a shift in demand due to possible industrywide shifts (such as a larger share of the population being insured) and a change in prescribing patterns,[131] Dr. Jena's analysis provides scant discussion of why a shift in demand would affect Clobetasol differently than for other Drugs at Issue.[132] Indeed, Dr. Jena testified that he had not even performed a test of whether the alleged deficiency (shifts in prescribing patterns for Clobetasol) made any difference to the conclusions from my models.[133]

175. At deposition, Dr. Jena provided one example of why he believed that certain drugs would react differently to changes in demand: differences in patient populations (percentage of the population that has commercial insurance versus Medicare/Medicaid).[134] Dr. Jena's hypothesis was that

---

[131] Jena Report ¶ 76.

[132] Dr. Jena's discussion of my demand variable also includes a criticism of the way that my demand variable is specified, which I discuss in Section IV.D.ii, below.

[133] Jena Deposition 121:21-122:1.

"Q. Okay. So you can't tell me whether the change in prescribing patterns for clobetasol had a material impact on disgorgement, can you?

A. I have not analyzed that -- that example in a drug by drug -- drug-specific way for clobetasol."

[134] See, e.g., Jena Deposition 106:13-108:13.

"Q. You would agree that there are market factors that are universal to all of the drugs at issue in this case; correct?

A. I would say the following: There are factors that might -- and this is an empirical question. You've got to -- you've got to look at it. There are -- there are factors that might empirically have effects on demand that move in the same direction but the impact of which might vary by drug.

So, for example, suppose we are talking about insurance.

…

So I -- I talk about ACA, Affordable Care Act, expansions here, and I -- I mention them elsewhere as well. But here is, sort of, a -- to think about your question, if there's something like an insurance expansion, an insurance expansion might increase the demand for medical products generally, right, but the question is not whether or not the direction of the effect is the same across all products, which it -- it might be -- but whether or not the magnitude of effect is the same across all products.

Because when Doctor Warren-Boulton does his model, this sort of common model where he crams everything into one model, not on a drug-by-drug basis, he's assuming that. So he's assuming that something like insurance expansion or anything -- or the year-quarter fixed effects, anything that effects demand -- does so uniformly across all of the different drugs at issue.

And, you know, that doesn't make a lot of sense. I mean, I could -- there are certain diseases, for example, that effect certain types of people, older or younger. If you're on Medicare versus Medicaid or commercial insurance, the prevalence of disease in certain types of diseases varies across those places.

So if you expand insurance in one of those domains, you would not expect to have the exact same demand increase across all the drugs that people in those different buckets are -- are, sort of, using because of the diseases that they have."

these differences in patient populations would cause a different reaction ("different demand effects") to changes in industrywide factors (such as the Affordable Care Act and Medicaid expansion).[135] Here again, Dr. Jena conflates *changes* in demand with the *effects* of changes in demand. If the "demand" variable in the model for each of the Drugs at Issue were to increase differently in response to industrywide factors such as the ACA, there is no reason *a priori* that a common model would be unable to properly account for differential changes in demand between Drugs at Issue. The total quantity sold (the demand measure used in my Report) is an example of a demand variable that would pick up the effects of the differential shifts in demand that Dr. Jena suggests.

176. Similarly, Dr. Stomberg makes a three-pronged argument related to pooling, but incorrectly concludes that the concerns he raises result in an upward bias. I discuss each argument in turn below and show why there is no bias. His first argument is:

> First, if any product market fails to follow the *average* patterns of competition implied by Dr. Warren-Boulton's model, then that failure is likely to result in claimed overcharges.[136]

Dr. Stomberg's statement is both speculative and incorrect as a matter of econometrics. The failure of any product market to follow the average patterns of competition is equally likely to result in an underestimate of the overcharge as it is to result in an overestimate. The only reason that a claimed failure would result in claimed overcharges would be if the average pattern of competition either (a) understated the true impact of competition, and there was a reduction in competition during the Post-Conduct period, or (b) overstated the true impact of competition, and there was an increase in competition during the Post-Conduct period.[137]

177. His second statement is equally speculative:

> Second, an average effect may only be correct *on average*, but never for any specific product. This "watering down" of the true underlying competitive dynamic can also result in the

---

[135] Jena Deposition 108:14-109:17.

[136] Stomberg Report ¶ 164.

[137] To provide an example, suppose hypothetically, the model provided an estimate of the average effect of an additional competitor (30%) that was an underestimate of the true effects of competition (50%) for the Perrigo Drugs at Issue. In the event of a reduction in competition during the Post-Conduct period in the Perrigo Drugs, the regression might attribute the difference (20%) to the estimated overcharge for the Perrigo Drugs. Similarly, if the model provided an average estimate of the effect of an additional competitor (70%) that was an underestimate of the true effects of competition (50%) for the Perrigo Drugs, in the event of an increase in competition during the Post-Conduct period in the Perrigo Drugs, the regression might attribute the failure of prices to fall by 20% (*i.e.*, the fact that prices only fell by 50% as opposed to the expected 70%) to the effects of the conspiracy for the Perrigo Drugs.

> emergence of a "default" inference of causation from the correlated timing of the alleged conspiracy and increased prices for any particular product. This is because there is no mechanism within Dr. Warren-Boulton's model that would reliably pick up the full price effect of, for example, a supply disruption. [138]

Again, Dr. Stomberg argues (incorrectly) that imperfectly measured effects result in positive bias ("default inference of causation"). As with the above, any possibly "imperfectly measured" effects are equally likely to result in positive or negative bias. As to his specific example of what could cause a positive bias (a supply disruption), that discussion appears to relate to an omitted variable as opposed to a supposedly mis-measured coefficient.

178. Finally, Dr. Stomberg makes another overly broad statement for which he provides no support:

> Third, by pooling information across the many heterogeneous products included in the models, Dr. Warren-Boulton also cross-pollutes results from one market with results from other entirely unrelated products and markets.[139]

It is unclear what "cross-pollution" Dr. Stomberg is referring to (or which variables he is claiming are impacted), nor does Dr. Stomberg provide any justification for why pooling is inappropriate.

179. Dr. Stomberg does however provide a discussion for one of his claimed mis-specified variables,[140] the number of competitors for the Perrigo Drugs at Issue. Dr. Stomberg claims that:

> The first is that only a small number of the Perrigo Drugs at Issue have more than three competitors at any point in time [...]. Most have only one or two competitors. [...] [T]his is the part of the competitive spectrum that is both most likely to have large (and highly variable) price responses related to entry and exit. The fact that Dr. Warren- Boulton's models (e.g., the benchmark and DiD models) are unable to fully track even average price changes as real-world shifts in competitor counts occur is yet more reason to dismiss the results from Dr. Warren-Boulton's DiD model. The figure below also highlights how, particularly in the later parts of the period at issue, some of these products faced competition from non-defendants, some of which were new entrants. [141]

Dr. Stomberg appears to be arguing that the expected effects of competition in the Perrigo Drugs at Issue (particularly in single and dual-firm markets) are more variable than in other markets, and, ostensibly, should be larger for the Perrigo Drugs at Issue. Dr. Stomberg then goes on to highlight that the Perrigo Drugs at Issue experienced increased competition over the Post-

---

[138] Stomberg Report ¶ 164.

[139] Stomberg Report ¶ 164.

[140] Dr. Stomberg also claims that my model does not properly account for costs. See Stomberg Report ¶ 108.

[141] Stomberg Report ¶ 171.

Conduct period. However, the very criticism that Dr. Stomberg is attempting to make would likely result in an underestimate of overcharges; as discussed above, an underestimate of the effects of competition would result in a reduction in the overcharge if competition increased during the Post-Conduct period.

180. Other Defendant Experts make similar claims as Drs. Jena and Stomberg. For example, Dr. Stiroh claims that I have provided "no analysis to justify why the level of demand (among other predictors) should have the same effect on prices for all Defendants and all Price Increase Drugs,"[142] including Phenytoin and Bromocriptine. However, the inverse is also true, Defendant Experts (including Dr. Stiroh) have provided no analysis to demonstrate that the assumption of common effects in my regression model is not justified, nor do they perform any kind of analysis to demonstrate that the model biases the overcharge and liability analysis to the detriment of the Defendants.

181. Dr. Jena's therapeutic class analysis comes closest to providing a "test" for whether different subgroups of Drugs at Issue respond similarly to the economic factors in my regression. However, as discussed in Section IV.E.ii.e(c)(ii), that analysis is sufficiently flawed as to be unreliable. Further, even though Dr. Jena views the results from that model as indicating the need for a drug-by-drug analysis,[143] he failed to perform or even see the relevance of the various statistical tests that would support his hypotheses.[144]

---

[142] Stiroh Report ¶ 30.

[143] Dr. Jena testified at deposition, describing his analyses (of which the therapeutic class is one), that the reduction in overcharges was "illuminative" of the failure to analyze the Drugs at Issue on a drug-by-drug basis:

"Q: Did you -- after you took that step back -- did you perform any statistical testing to prove your hypothesis that we've been talking about?

A: I would describe that second set of analysis as the statistical analysis to -- just to, sort of, show that the failure to do things in a drug-by-drug way, to recognize the details of these products, what did they either compete with or might be used as alternatives, the failure to do that is illuminating the problem." Jena Deposition 91:1-91:11.

[144] See, e.g., Jena Deposition 91:12-21:

"Q: Did you perform any tests for pooling?

A. For pulling?

Q. Pooling, p-o-o-l-i-n-g.

A. What do you mean by "pooling"?

#### ii. *Defendant Experts' Assertions that My Measure of Demand Is Improperly Specified Is Incorrect, and After Correcting for Their Claimed Flaw My Results Are Fundamentally Unchanged*

a. *Background*

182. In addition to criticisms of my model with respect to pooling the Drugs at Issue into a common model, Defendant Experts also criticize the measure of demand I utilized in my regression models as an independent variable.[145] In particular, they claim that including this variable (total annual quantity of the Drug) in a regression model involving price as the dependent variable meets the "textbook" violation of an endogenous variable,[146] which can cause bias in a regression model. In addition, they claim that my chosen demand variable is incapable of distinguishing between shifts in demand and supply, each of which would be expected to have opposite impacts on the dependent variable (price).[147]

183. In economic terms, the relationship between price and quantity sold is generally accepted to be endogenous (or simultaneously determined).[148] In other words, a decision to set a higher price would affect the quantity sold, just as a decision to sell a higher quantity would result in a lower price. In econometric analysis, this type of simultaneous relationship can result in what is called "endogeneity bias," whereby the coefficients of an ordinary least squares regression involving

---

Q. Did you perform a Chow test?

A. Are you talking about a particular statistical test?

Q. Yes.

A. I'd have to look at the backup, but I don't know that would be relevant for this here."

[145] See, *e.g.*, Stiroh Report ¶ 34; Jena Report ¶¶ 20, 61, 64 and Section V.B.; Gilbert Report Section X.E; Stomberg Report Section IV.C and IV.D.

[146] Jena Deposition 105:11-17.

[147] See, *e.g.,* Jena Report ¶¶ 20 and 64.

[148] Varian, H.R. (2010). *Intermediate Microeconomics: A Modern Approach,* Eighth Edition. New York: W.W. Norton & Company, at p. 295. ("[I]n the general case the equilibrium price and the equilibrium quantity are jointly determined by the demand and supply curves.")

See also, Greene, W.H. (2003). *Econometric Analysis*, Fifth Edition, Pearson Education, at p. 8 ("in a market, price and quantity *are* determined at the same time") and at p. 379 ("the model is one of the joint determination of price and quantity, they are labeled **jointly dependent** or **endogenous** variables.")

See also, Gujarati, D.N., and Porter, C.D. (2009). *Basic Econometrics*, Fifth Edition. New York: McGraw-Hill, at p. 2. ("[E]conomic theory postulates a negative or inverse relationship between the price and quantity demanded of a commodity.")

both price and quantity may be biased. I note that, as elsewhere in Defendant Experts' Reports, there is no discussion of the actual effects of such bias on the overcharge estimates.

184. In a related argument, Defendant Experts claim that total quantity sold may reflect shifts in both demand and supply. In economic terms, an outwards shift in demand (that results in a shift "out" in the demand curve facing a particular supplier) would result in an increase in price, whereas an outward shift in supply (that results in a shift "out" in the supply curve) would result in a decrease in price. Thus, in a reduced form model, the effects of a shift in demand and a shift in supply could effectively offset, resulting in a coefficient on the demand variable that reflects neither.

b. *Annual Quantity Sold Is an Appropriate Measure of Demand*

185. In response to Defendant Experts' criticisms, I first note that my measure of demand does not meet the "textbook" definition of the endogenous relationship between price and demand. In my Report, I include as a right-hand side variable the total annual quantity purchased,[149] and not the contemporaneous quarterly quantity supplied by that manufacturer in that quarter. Since this measure is not simultaneous to individual manufacturer quarterly price decisions, there is less reason to expect a problem with endogeneity. Defendant Experts largely ignore this transformation.

c. *Differences Between Shifts in Demand and Shifts in Supply*

186. The models included in my Report can generally be described as "reduced form" models. In economic terms, these models reduce more complicated separate models of demand and supply into a single model, which can have important economic and econometric implications.

187. While my coefficient could thus in theory be picking up shifts in both demand and supply, I note that shifts in supply of the Drugs at Issue appear to be uncommon. Apart from drug shortages, which I discuss at length above and control for in my models, I am unaware of any manufacturer-specific increases or decreases in capacity that would affect the supply curves for the Drugs at Issue. Hence, any remaining changes in the quantity of the Drugs at Issue would be due to change in demand.

d. *Instrumenting for Changes in Demand or Supply Shows that the Results in My Report Are Unbiased by the Use of My Demand Variable*

[149] As measured using the IQVIA data.

188. As with the instrumental variable approach that I used in my Report to account for endogeneity in the number of competitors, two stage least squares (Instrumental Variables regression) can be used to deal with the identification problem asserted by the Defendant Experts. If there exist appropriate instrumental variables that affect supply but not demand (or vice versa), including these variables in a two-stage model would allow me to separate the effects of demand and supply changes. Potential instruments for the two-stage model would include any factor that impacts price but not demand, or demand but not price.

189. One factor that economic theory suggests would affect price but not demand would be the incremental cost of production (the variable cost) for each Drug. Demand for a drug would not be impacted by a change in a manufacturer's costs. Thus, I use the estimate of cost of goods sold (COGS), as an instrument for the variation in the supply curve to separately identify the demand curve for the Drugs at Issue.[150]

190. For purposes of this analysis, I used the COGS data for the Drugs at Issue to estimate a quarterly cost index for the Drugs at Issue that controls for changes in mix through drug fixed effects. I then use this cost index in a first-stage regression to predict variation in the total annual quantity for each drug. As expected, the coefficients for both cost and shortage, have the expected values (i.e., both are negative). In other words, the higher the cost, the higher the inward shift of supply curve and lower the quantity. Similarly, the presence of a shortage is associated with lower quantity.

---

[150] Berry and Haile (2021) provide a discussion of this procedure (pp. 41-42), as well as the use of cost as an instrument (p. 24-25).

"A classic type of (excluded) instrument for estimating demand is an exogenous shifter of marginal cost, such as exogenous material costs, a tax, or tariff. In most models of supply, variation in marginal costs will be "passed through" to some extent. As long as these cost shifters are (mean) independent of latent demand shocks […], they can serve as appropriate instruments. Many natural cost shifters will vary across time and operate at the firm level; these will be most useful in applications where firms operate in few markets or when variation in "markets" has a substantial temporal component.

[…]

Noisy measures of a producer's actual cost shifters can also serve as instruments. For example, the average wage level in a producer's labor market may not perfectly track the producers' labor costs but is nonetheless likely to be highly correlated with those costs. Thus, such wage measures can serve as instruments as long as they are uncorrelated with demand shocks conditional on the exogenous variables and consumer-specific measures (e.g., income and education) included in the demand model."

Berry, S. and Haile, P. (2021). "Foundations of Demand Estimation." *The Handbook of Industrial Organization,* Ho, Kate, Hortacsu, Ali and Lizzeri, Alessandro (eds.), pp. 1-62, at pp. 24-25.

191. Once the first-stage regression model has isolated the effects of changes in supply (using changes in cost and shortages) on quantity sold, what then remains is then the effects of changes in demand. Hence, in the second stage regression I include the instrumented (predicted) values for annual quantity. As reported below, the predicted total quantity variable for the Drugs at Issue is statistically significant and has the expected negative sign.[151]

192. In Table 4 below, I report the results of the Difference in Difference model from my Initial Report where I used a reduced form model (column 3) versus the results using the two-stage least squares regression (columns 1 and 2), which isolate the effects of demand and supply shifts. As shown in the table, the results from my reduced form model and the instrumental variable regression are very similar to each other. This analysis shows that my reduced form model does not suffer from the endogeneity bias as suggested by Defendant Experts and hence their criticisms (which come with no empirical support) are unfounded.

[151] With the cost instrument included, the expected sign of quantity in the second stage is negative because I am estimating the slope of the demand curve.

**Table 4: Base DiD Model with Annual Quantity Instrumented by COGS Index**

| | (1) | (2) | (3) |
|---|---|---|---|
| | **First Stage Regression** | **IV DiD Model** | **Base DiD Model** |
| Dependent Variable >> | **Log(Total Annual Quantity)** | **Log(Net Price)** | **Log(Net Price)** |
| Overcharge as Percent of Revenue >> | | **68.4%** | **73.4%** |
| Overcharge % >> | | **216.6%** | **276.3%** |
| Drugs at Issue x (Post First Communication) | | 1.1524*** | 1.3253*** |
| | | [0.1371] | [0.1412] |
| Log(**Predicted** Total Annual Quantity of Drug) x Control Drugs | | **0.8938** | |
| | | [0.9416] | |
| Log(**Predicted** Total Annual Quantity of Drug) x Drugs at Issue | | **-2.8907*** ** | |
| | | [1.1140] | |
| Log(Total Annual Quantity of Drug) x Control Drugs | | | -0.1099*** |
| | | | [0.0110] |
| Log(Total Annual Quantity of Drug) x Drugs at Issue | | | 0.0440 |
| | | | [0.0271] |
| Number of Competitors = 2 x Control Drugs | | -0.0586* | -0.0076 |
| | | [0.0328] | [0.0331] |
| Number of Competitors = 3 x Control Drugs | | -0.1018** | -0.0402 |
| | | [0.0455] | [0.0454] |
| Number of Competitors = 4 x Control Drugs | | -0.1898*** | -0.1198** |
| | | [0.0506] | [0.0505] |
| Number of Competitors = 5 x Control Drugs | | -0.3148*** | -0.2423*** |
| | | [0.0570] | [0.0563] |
| Number of Competitors = 2 x Drugs at Issue | | -0.3159* | -0.2897 |
| | | [0.1754] | [0.1766] |
| Number of Competitors = 3 x Drugs at Issue | | -0.4594** | -0.4071** |
| | | [0.1828] | [0.1754] |
| Number of Competitors = 4 x Drugs at Issue | | -0.6590*** | -0.5749*** |
| | | [0.2031] | [0.1923] |
| Number of Competitors = 5 x Drugs at Issue | | -0.6272** | -0.5106** |
| | | [0.2781] | [0.2578] |
| Drug is Branded Generic = Yes x Control Drugs | | 0.8777*** | 0.8914*** |
| | | [0.0976] | [0.0975] |
| Drug is Branded Generic = Yes x Drugs at Issue | | 0.9944*** | 0.9887*** |
| | | [0.1844] | [0.1874] |
| Drug in FDA's Shortage List | **-0.1140** ** | 0.1798 | 0.0748** |
| | [0.0464] | [0.1151] | [0.0316] |
| Log(Quarterly Cost Index) * Before First Communication | **-0.3346*** ** | | |
| | [0.0556] | | |
| Log(Quarterly Cost Index) * Post First Communication | **-0.0333** | | |
| | [0.1804] | | |
| Constant | 16.0033*** | -14.4729 | 1.0161*** |
| | [0.0143] | [15.3408] | [0.1774] |
| | | | |
| Observations | 437,062 | 372,613 | 372,613 |
| R-squared | 0.943 | 0.864 | 0.865 |
| **Drug FE** | **Yes** | **Yes** | **Yes** |
| **Year-Quarter FE** | **Yes** | **Yes** | **Yes** |

Robust standard errors in brackets
*** p<0.01, ** p<0.05, * p<0.1
Note: Second stage standard errors are not corrected.

## E. Criticisms Specific to Individual Models

### *i. Defendant Experts' Criticisms of My Before and After Model Are Wrong*

a. *Overview*

193. Dr. Jena and Dr. Saravia claim that I have failed to control for certain unspecified omitted factors that may have changed over time in my Before and After Model.[152] Dr. Saravia also presents an

[152] See, e.g., Jena Report ¶ 113, Saravia Report ¶¶ 169-173.

analysis that purports to show that prices over the Pre-Conduct period for Drugs that had yet to be affected by Defendants' conduct were increasing over time.[153]

194. Dr. Jena also claims that because I deemed that controlling for factors common to both control drugs and the Drugs at Issue was necessary in my Difference-In-Difference Model, that I acknowledge that these factors must be omitted from the Before and After Model.[154] Dr. Jena then claims that I "offer no justification for this choice" (*i.e.*, to not account for changes in prices over time that were not associated with the alleged Conduct).[155] As discussed in my Report,[156] I do not possess cost data for the non-MDL control drugs used in my Difference-In-Difference Model, and hence cannot simply combine the two approaches into a single model.

195. Dr. Jena then proposes two modifications to my model to account for the alleged omitted variable: the addition of "Year-Quarter Fixed Effects"[157] and the addition of the Non-MDL Drug Index as a right-hand side variable. [158] Both suggested approaches suffer from econometric flaws that render any of Dr. Jena's conclusions that rely on these models unreliable. At deposition, Dr. Jena seemed to claim that any statistical flaw that was introduced in his revised models was the fault of the original model.[159] In the case of the types of flaws that are associated with his chosen modifications to the model, however, these flaws cannot be associated with my model.

---

[153] Saravia Report ¶ 173 and Exhibit 22.

[154] Jena Report ¶¶ 113-114.

[155] Jena Report ¶ 113.

[156] Report ¶ 133.

[157] Jena Report ¶¶ 115-117.

[158] Jena Report ¶¶ 118-120.

[159] Jena Deposition 226:15-228:3.

"Q. Okay. So let's -- let's treat this as a hypothetical, then, so that you don't have to keep saying, assuming that this is, you know, being run with all the proper variables.

Assuming that it was run properly, assuming that it's showing that the addition of a second competitor is causing the -- the price to be 11 percent higher, would you consider that to be a reasonable coefficient?

A. It depends on what's going on in the market. So -- for the following reason: If you think that in general -- not always -- but if you think in general as there's more competition that has an impact on price, that is a causal relationship that you're thinking about.

b. *Increasing Prices over the Pre-Conduct Period*

196. Dr. Saravia constructs a price index comprised of the Drugs at Issue in the pre-Conduct benchmark period prior to the start of the alleged Conduct, which purportedly shows the "increase in aggregate price [that] is unrelated to the alleged collusion."[160] She then argues that the general upwards trend shows that my "control variables do not and cannot control for all price changes that are unrelated to the alleged collusion," and that I cannot separate the effects of the alleged collusion from "the general upward trend in prices of MDL drugs."[161]

197. However, Dr. Saravia's analysis makes an important modification to my model that leads her to overstate the finding of an upwards trend. Instead of utilizing all observations in my regression model to estimate her price index, Dr. Saravia limits her regression model to only include "MDL drugs' observations prior to the first communication date by API, up to or before 2014Q1."[162] The decision to not utilize the full sample of observations from my original model has a material impact on both the computed index for untreated Drugs and on the other "control" variables in the model.

198. In Figure 8 below, I compute a price index for the untreated Drugs at Issue using a methodology similar to Dr. Saravia. However, instead of restricting the model to those observations for the Drugs at Issue prior to treatment, I utilize all the data from my original Before and After model.[163] As shown in Figure 8, simply modifying Dr. Saravia's model to make it consistent

---

Now, if you look at a coefficient like this and you say why is that coefficient positive and not negative, then the question is is there something else that might be missing in the analysis that can generate that problem?

So that's not an issue of power, by the way. That's an issue of missingness -- something being omitted in the data, which is a point I've been making this whole time. When you do a, sort of, aggregate level analysis, which Doctor Warren-Boulton is doing, and I'm simply operating in his sandbox now by saying all right, break that aggregate level analysis down and simply control for drugs -- that's all I'm doing right here -- that doesn't mean that the model is now all of a sudden reliable.

So if you see problems with his model, I'm assuming that this is his model and my adjustments to his model. If you see problems with his model in the coefficients, that's not reflective of a problem with my, quote/unquote, model 'cause it's not my model. It's his model. It means that something might be missing in the observations or in the data when you get counterintuitive results."

[160] Saravia Report ¶ 173.

[161] Saravia Report ¶ 173.

[162] Saravia Report Exhibit 22.

[163] Adding the remainder of the data allows for more precise estimation of the control variables, while still allowing the model to separately calculate a price index for untreated Drugs.

with the model that I actually estimated lessens the upwards trend that she claims to identify. The price level in the corrected index is more similar in later periods to what the index was initially.

**Figure 8 - Price Indices for the Pre-Conduct Period Using the Full Sample**




Source: Defendants Transactions Data.

Note: Price indices reflect the change in prices over the pre-Conduct period for the Drugs at Issue that have yet to be become treated (i.e. prior to first communication) using the Before and After Model.

c. *Addition of Year-Quarter Fixed Effects*

199. The first of Dr. Jena's flawed additions is the addition of year-quarter fixed effects to the Before and After model. Since the Before and After Model relies critically on changes in prices over time (and in particular an indicator variable for the Post-Conduct period), an econometrician should be especially wary of adding additional time-varying indicator variables because of the potential for collinearity with the variable of interest.[164] This collinearity is exactly what I was wary of when I testified about the potential addition of year-quarter fixed effects at my deposition.[165]

---

[164] Multicollinearity in regression analysis often results in estimators with high variances, making accurate estimation difficult. This issue broadens confidence intervals and increases the likelihood of wrongly accepting that the true population coefficient is zero. Furthermore, estimators and their standard errors can be very sensitive to minor changes in the data. See, Gujarati, D.N., and Porter, C.D. (2009). *Basic Econometrics*, Fifth Edition. New York: McGraw-Hill, at p. 327.

[165] Warren-Boulton Deposition 314:18-325:6.

200. Nonetheless, Dr. Jena proceeds to add year-quarter fixed effects to the model which he claims "parse out the effect of time-varying factors unrelated to the alleged conduct that affect the prices of all Drugs at Issue in the same way."[166] However, further examination of Dr. Jena's model indicates that he has misunderstood what his model actually estimates. Because Dr. Jena includes both year-quarter fixed effects and an indicator variable for the Post-Conduct Period, he has created perfect collinearity between the two variables after 2015Q2 (the last date that all Drugs at Issue became subject to alleged conduct), thus all of the data from 2015Q3 to 2018Q4 period is completely ignored for estimating the overcharge.[167] Since the purpose of the model is to estimate the effects of Defendants' Conduct on prices over the entire Post-Conduct period (and not just a subset of that period) for all of the Drugs at Issue (and not just a subset of those Drugs), Dr. Jena's model is invalid.

201. In other words, Dr. Jena has created what is called a "staggered" difference-in-difference model,[168] whereby Drugs that enter the Post-Conduct Period are compared against a control group of Drugs at Issue during their pre-Conduct period. Since 2015Q2 is the last time period when a Drug is in its Pre-Conduct period, his difference in difference model has no valid control for prices thereafter. Thus, his model only estimates an overcharge over the period from the beginning of Conduct through 2015Q2 and does not measure any overcharge for the Ketoconazole, the last drug to become subject to alleged conduct (in 2015Q2).[169]

202. At deposition, Dr. Jena appeared completely unaware that he had created a staggered difference-in-difference model, and seemed unaware of the time period for which his model estimated an overcharge.[170]

203. Perhaps inadvertently, however, what Dr. Jena's analysis does do is provide additional support for my Difference-in-Difference model. In the recent literature on staggered difference-in-

[166] Jena Report ¶ 116.

[167] To demonstrate the perfect collinearity, I estimate an alternative regression where the post indicator variable in Dr. Jena's B&A model is set to zero after 2015Q2. Not surprisingly, this results in exactly the same coefficient estimates for Dr. Jena's B&A model. In other words, econometrically, Dr. Jena's year-quarter fixed effects and post indicator variable after 2015Q2 are perfectly collinear. See Backup Materials to this Report.

[168] See Callaway, B., and Sant'Anna, P.H.C. (2021). "Differences-in-differences with multiple time periods," Journal of Econometrics, 225(2): pp. 200-230.

[169] Note that Fluocinonide Gel has a later first communication date, but also had potential intra-API effects prior to that time period.

[170] Jena Deposition 190:11-25.

difference, it is suggested that one way to test whether the estimates from a simple difference-in-difference model are reliable is to use observations (products) that have yet to become treated (*e.g.*, Drugs at Issue in their Pre-Conduct Period) as a control. If the results from this staggered difference in difference approach are similar, it suggests that the simple difference-in-difference model is reliable and, more importantly, that the control group in the simple model is valid.[171]

204. To demonstrate, in Figure 9 below, I report two quarterly overcharge estimates. The estimates shown as blue bars show the quarterly overcharge estimates from my base Difference in Difference model (i.e., roughly equivalent to Table 8 in my Report). The estimates shown as red bars show the quarterly overcharge estimates from Dr. Jena's Before and After model with year quarter fixed effects. As shown in the Figure, while the estimates of the overcharge can vary between models (some higher, some lower), the overcharge estimates from the two models are sufficiently similar in magnitude, which represents a test for the reliability of the Difference in Difference model. A t-test of similarity of the overcharge estimates for the common period shows that I cannot reject the null hypothesis (i.e. the two quarterly overcharge estimates are statistically similar).

---

[171] See, *e.g.,* Faghani Dermi, H. and VanOmmeren, S. (2024). "Staggered Difference in Differences Estimation for Antitrust Analysis: A Review of Literature and Recommendations for Practitioners." SSRN Online Journal, pp. 1-54, at pp. 31-32; Carlton et al. (2019). "Are Legacy Airline Mergers Pro-or-Anti-Competitive? Evidence from recent U.S. airline mergers." *International Journal of Industrial Organization,* 62, pp. 58-95.

**Figure 9 – Quarterly Overcharge Estimates using the Staggered Difference-in-Difference Model (Jena) and My Difference-In-Difference Model**[172]




Source: Dr. Warren-Boulton Backup.

d. *Non-MDL Index*

205. The second flawed addition Dr. Jena makes to my Before and After Model is the addition of the non-MDL price index as an additional right hand side variable. Dr. Jena believes that this captures "broader industry trends or events influenc[ing] generic drug prices in a common way over time."[173] Unlike with the year-quarter fixed effects, there is no reason *a priori* to argue with Dr. Jena's decision to add the price index of non-MDL Drugs as an explanatory variable. However, I note that, to the extent that changes in costs are a primary driver of price increases in non-MDL drugs, those cost increases are already accounted for in my Before and After Model, which includes cost as an independent variable.

206. Further, as with any regression model, it is important, if not mandatory, that any practitioner examine the coefficient estimates for all the independent variables to ensure that each coefficient

---

[172] Quarterly overcharge estimates are estimated by interacting the post-conduct indicator variable with each quarter (2010Q4 – 2014Q1). Overcharge estimates for Dr. Jena are only reported through 2014Q1 due to dwindling numbers of pre-FC Drugs at Issue.

[173] Jena Report ¶ 118.

estimate has the appropriate sign and a magnitude that is consistent with economic theory. It is here where Dr. Jena commits a fundamental econometric error.

207. Dr. Jena's addition of the non-MDL index to the Before and After regression model generates a coefficient estimate of 0.0458 on the non-MDL index variable.[174] In other words, an increase of one unit (i.e., a one percent increase from 100 to 101) in the non-MDL index causes an approximately 46% increase in prices for the Drugs at Issue. This result is on its face nonsensical – it would be impossible for industry trends or common factors influencing price to increase prices for the Drugs at Issue compared to Non-MDL Drugs at a rate of 46 to 1. For reference, in the Difference in Difference model, the relationship is assumed to be 1 to 1, that is a 10% increase in the non-MDL drugs results in a predicted 10% increase in the Drugs at Issue, or equivalently, a 1% change in the non-MDL index should result in a 1% increase in the Drugs at Issue.

208. When faced with a non-sensical coefficient estimate, econometrics textbooks suggest that the researcher should search for reasons that could cause such results, and, if necessary, make changes to the model to make the results consistent with their prior expectations.[175] If Dr. Jena had performed this check, it would have become clear why the non-MDL index had decreased the overcharge. As shown in Figure 7 of my Report, (reproduced as Figure 10 below), the non-MDL index generally shows an inverted U-shaped pattern.

[174] Dr. Jena's model is run as "log-linear" or "log-lin", where the dependent variable is the natural logarithm of price and the independent variable is included in linear form. The interpretation of the coefficients in such a model is that a one unit increase in the independent variable (the non-MDL index) results in a percentage change in the dependent variable equal to the coefficient estimate. For e.g., Gujarati, D.N., and Porter, C.D. (2009). *Basic Econometrics*, Fifth Edition. New York: McGraw-Hill, at pp. 162-163. ("[A] model in which the regressand is logarithmic will be called a **log–lin model.** [.] In this model the slope coefficient measures the constant proportional or relative change in [the dependent variable] for a given absolute change in the value of the [independent variable]. [.] That is, 100 times [the coefficient] gives the growth rate in [the dependent variable]; [this] is known in the literature as the semielasticity of [the dependent variable] with respect to [the independent variable].")

[175] See, e.g. Kennedy, P. (2002). "Oh No! I Got the Wrong Sign! What Should I Do?" Simon Fraser University Department of Economics Discussion Papers, Available at: http://www.stat.columbia.edu/~gelman/stuff_for_blog/oh_no_I_got_the_wrong_sign.pdf.

**Figure 10 – Price Index for Non-MDL Drugs (Report Figure 7)**

[redacted]

Source: IQVIA.

209. What Dr. Jena fails to recognize is that the general pattern of conspiratorial price increase also exhibits an inverted U-shaped pattern – prices increase at the beginning of the conspiracy reaching a peak, before falling after detection. The problem with introducing an independent variable that has the same pattern as the alleged conspiratorial price increase is a problem econometricians call "multicollinearity." In this case, the econometric problem is that the overcharge is "correlated" with the non-MDL price index (and not because the increase in non-MDL drug prices has "caused" increases in the Drugs at Issue), which causes a problematic amount of multicollinearity in Dr. Jena's model. A primary indicator of this type of multicollinearity is the presence of non-sensical coefficient estimates.[176] Another econometric

---

[176] Greene, W.H. (2003). *Econometric Analysis*, 5th Edition, Pearson Education, at pp. 56-57 (emphasis added). ("The problem faced by applied researchers when regressors are highly, although not perfectly, correlated include the following symptoms: Small changes in the data produce wide swings in the parameter estimates. · Coefficients may have very high standard errors and low significance levels even though they are jointly significant and the $R2$ for the regression is quite high. · Coefficients may have the "wrong" sign or **implausible magnitudes.**")

indicator of harmful multicollinearity are various diagnostic measures such as variance inflation factors, all of which suggest (to a much greater degree than my original Before and After model) that Dr. Jena's model is problematic.[177]

210. Dr. Jena appears to be focused on one statistic alone: the net impact (reduction) of each of his modifications on gross disgorgement. Dr. Jena does not report the results from a single regression (not even a single regression coefficient, much less the full results) in his Report or Exhibits, and instead relegates these results to his backup materials.[178]

211. Dr. Jena testified at his deposition that he or his staff had reviewed the coefficient estimates for the regressions that he included in his Report.[179] However, he could not recall what the coefficient was on the non-MDL Index, nor could he recall anything problematic about it. Instead, he attempted to blame any possible problematic result on the original model, as opposed to his addition that had created the problem.[180]

212. What Dr. Jena *could* have done when faced with such a non-sensical result is to change his model in a way that would allow it to more accurately align with economic theory and reality. Since I do not dispute the fundamental premise of Dr. Jena's argument (that the non-MDL Drugs as a group may contain information on industrywide trends that might influence prices for the Drugs at Issue), I present a much more reasonable alternative below.

---

See also, Verbeek, M. (2004). *A Guide to Modern Econometrics*. Second Edition, Chichester: John Wiley & Sons Inc. ISBN 0-470-85773-0, at p. 44. ("In summary, high correlations between (linear combinations of) explanatory variables may result in multicollinearity problems. If this happens, one or more parameters we are interested in are estimated highly inaccurately.")

[177] I have calculated the variance inflation factors (VIF) both for my original Before and After Model and Dr. Jena's modified model that includes the Non-MDL index. In my Before and After model, the largest variance inflation factor was 10 (on the ln(COGS) variable. In contrast, the VIF for Dr. Jena's non-MDL index is over 70 (indicating harmful multicollinearity). For e.g., see Gujarati, D.N., and Porter, C.D. (2009). *Basic Econometrics*, Fifth Edition. New York: McGraw-Hill, at p. 328 ("The speed with which variances and covariances increase can be seen with the variance-inflating factor (VIF) [.] VIF shows how the variance of an estimator is *inflated* by the presence of multicollinearity.")

[178] The closest Dr. Jena comes to reporting a regression coefficient is when he reports the overcharge estimates for individual Drug-Defendants, which represent a transformed regression coefficient, along with the associated coefficient estimate. However, this again is an indication of Dr. Jena's results-oriented approach, as he is presenting only these selected coefficient estimates as evidence of his model's reduction in the overcharges.

[179] Jena Deposition 212:4-23.

[180] Jena Deposition 326:3-328:4.

213. First, for ease of exposition, I modify Dr. Jena's model to allow for a proportional response by computing and utilizing the natural logarithm of the non-MDL Index. The coefficient on the non-MDL index is then the percentage change in the prices for the Drugs at Issue resulting from a one percent change in the non-MDL Index.[181] As can be seen in the coefficient on the non-MDL index (4.1056), Dr. Jena's model implies that a 1% increase in the price index of non-MDL drugs results in a highly implausible 4.1% increase in the prices of the Drugs at Issue.

214. I then estimate a constrained regression model for the Drugs at Issue which would be consistent with economic theory and reality, where (as in my Difference in Difference model) the model assumes a one-to-one price relationship between prices of the non-MDL Drugs and the Drugs at Issue. In other words, under this assumption, a 10% increase in the non-MDL price index is assumed to result in a 10% price increase in the Drugs at Issue. As reported in Table 5 below, the overcharge estimates of the constrained model where there is a one-to-one relation between non-MDL price index and the Drugs at Issue price, is similar to the overcharge estimates of my original Before and After Model. There is thus no support for the proposition that there is some other "omitted" variable (i.e., in addition to cost) that could be affecting both the Drugs at Issue and the non-MDL control Drugs.

[181] The point estimates of the other independent variables are very similar to the comparable coefficients in Dr. Jena's model where he uses non-MDL price index level as opposed to the natural logarithm as I used here.

**Table 5 - Before and After Model with non-MDL Drug Price Index Added as an Independent Variable**

| | (1) Dr. Warren-Boulton's Before and After Model | (2) Dr. Jena's Before and After Model | (3) Dr. Jena's Before and After Model Constrained |
|---|---|---|---|
| Overcharge as Percent of Revenue >> | **65.1%** | **56.0%** | **63.1%** |
| Overcharge % >> | **186.5%** | **127.1%** | **170.7%** |
| Drugs at Issue x (Post First Communication) | 1.0524*** | 0.8203*** | 0.9959*** |
| | [0.1268] | [0.1216] | [0.1275] |
| Number of Competitors = 2 | -0.7208*** | -0.7165*** | -0.7198*** |
| | [0.1853] | [0.2218] | [0.1935] |
| Number of Competitors = 3 | -0.8658*** | -0.8869*** | -0.8710*** |
| | [0.1927] | [0.2335] | [0.2016] |
| Number of Competitors = 4 | -1.0452*** | -0.9992*** | -1.0340*** |
| | [0.2119] | [0.2463] | [0.2189] |
| Number of Competitors = 5 | -1.0851*** | -1.0105*** | -1.0669*** |
| | [0.2724] | [0.2890] | [0.2759] |
| Drug in FDA's Shortage List | 0.7570*** | 0.5109*** | 0.6970*** |
| | [0.0669] | [0.0692] | [0.0617] |
| Drug is Branded Generic = Yes | 0.9554*** | 0.9469*** | 0.9533*** |
| | [0.1884] | [0.1955] | [0.1901] |
| Log(COGS) | 0.5747*** | 0.5089*** | 0.5587*** |
| | [0.0910] | [0.0886] | [0.0903] |
| Log(COGS) * Post First Communication | -0.2997*** | -0.2509** | -0.2878*** |
| | [0.1027] | [0.0955] | [0.1013] |
| Log(non-MDL Drug Price Index) | | **4.1056*** ** | **1.0000** |
| | | [0.7193] | [0.0000] |
| Constant | 0.3918 | -18.7852*** | -5.0223*** |
| | [0.2895] | [3.3338] | [0.2428] |
| Observations | 4,600 | 4,600 | 4,600 |
| R-squared | 0.731 | 0.747 | |
| **Drug FE** | **Yes** | **Yes** | **Yes** |
| **Year-Quarter FE** | **No** | **No** | **No** |

Robust standard errors in brackets
*** p<0.01, ** p<0.05, * p<0.1
Note: R-Square statistic is not applicable to a constrained regression.

### *ii. Defendant Experts' Criticisms of My Difference in Difference Model Are Incorrect*

a. *Overview of Defendants' Criticisms*

215. As discussed in my Report, I utilized a technique called Difference in Difference to estimate:

> [B]y how much prices changed for a treatment group (the Drugs at Issue) as compared with a control group (drugs that are assumed to be unaffected by collusion). The assumption underlying such models is that, all else equal, prices in the treatment group [Drugs at Issue] in the but-for world would have behaved similarly to the control group. I also include in the model certain explanatory variables that might explain any divergence between the treatment and the control group. This allows me to test the null hypothesis that, all else equal, prices for Drugs at Issue increased significantly relative to the control group (drugs not alleged to be part of the conspiracy) during the Conduct Period.[182]

[182] Report ¶ 131.

Several Defendant Experts criticize my selection of the non-MDL drugs as the control group I use for this exercise.[183] Defendants' criticisms of this model can be summarized as either (a) the selected control group fails to account for certain trends that would be expected to impact the Drugs at Issue or would be expected to impact the Drugs at Issue differently or (b) the variables included to explain the divergence between the treatment and control groups are insufficient to explain the difference.

216. As a preliminary matter, based on my review of Defendants' Reports and testimony at Deposition, it is my understanding that the Defendant Experts do not dispute the overall premise that there may be common industry trends that affect the prices of all generic drugs, including the Drugs at Issue and the non-MDL drugs I use as a control. While Defendant Experts assert that certain changes may have impacted certain Drugs at Issue to a different degree than did others,[184] Defendant Experts do not provide any analysis that shows any differential impact of industrywide changes on the Drugs at Issue. Thus, the Defendant Experts' criticisms must relate to an omitted variable that affects prices for the Drugs at Issue but not (or to a lesser degree) the prices of the control group (and vice versa). The presence of such omitted variables would then suggest that using the non-MDL generic drugs as a control would not be appropriate or sufficient.

b. *My Difference in Difference Model Satisfies All Econometric Criteria for Difference-in-Difference Analysis*

217. As discussed in my Report, the fundamental assumption underlying a difference in difference model is that "all else equal, prices in the treatment group in the but-for world would have behaved similarly to the control group."[185] Hence, as noted by the Defendant Experts, a plausibility check on whether prices for the Drugs at Issue would be expected to behave similarly to those in the control group in the Post-Conduct Period would be whether they behaved similarly during the pre-Conduct period.[186] This check is referred to as the "parallel trends" assumption, and is commonly referenced across the economic literature surrounding difference in difference analysis.[187]

---

[183] Jena Report ¶ 24; Gilbert Report ¶ 499; Saravia Report ¶ 19.

[184] Jena Deposition 106:13-108:13.

[185] Report ¶ 131.

[186] See, *e.g.,* Jena Report ¶ 122.

[187] See, for example, references in Jena Report footnotes 219-222.

218. Dr. Jena's insistence that the Drugs at Issue and the control group must exhibit parallel trends prior to the Conduct Period in order to be able to perform a reliable difference-in-difference analysis is, however, incorrect.[188] As noted in the economic literature, there is no pre-treatment similarity requirement for a valid difference-in-difference analysis, primarily because the question at issue (*i.e.*, whether the Drugs at Issue would have followed the path of the control group in the but-for world) is an untestable hypothesis.[189] While a test for parallel trends might provide some support for the validity of the control (see Dr. Jena's reference to parallel trends providing a "plausibility" check), the satisfaction of the test itself is not a requirement for difference-in-difference analysis.[190] Indeed, the literature even discusses whether difference-in-difference models can be valid even if the parallel trends assumption is violated (particularly in the case of large datasets).[191]

219. Rather, the economics literature sets out a much broader set of requirements for difference-in-difference analysis:

> In order to interpret a difference in difference estimate as a policy effect there are three key conditions. First, that the estimated regression is the correct conditional expectation. In particular, this requires that all trends and interactions are properly included. Second, that the

---

[188] Jena Report Appendix F.

[189] See, *e.g*., Cunningham, S. (2020). *Causal Inference: The Mixtape (V. 1.8),* Yale University Press*,* at pp. 267-268. ("[K]ey identifying assumption in DD strategies – the parallel trends assumption. This is simply an untestable assumption [..] Empiricists faced with this untestable assumption have chosen, therefore, to use deduction as a second best for checking the assumption. [..] empiricists will reason that if the pre-treatment trends were parallel between the two groups, then wouldn't it stand to reason that the post-treatment trends would have too? Notice, this is not a test of the assumption; rather, this is a test of a possible corollary of the assumption: checking the pre-treatment trends. [..] given we see that the pre-treatment trends evolved similarly, it does give some confidence that the post-treatment would've too (absent some unobserved group specific time shock).")

[190] See, *e.g.,* Kahn-Lang, A., and Lang, K. (2020). "The Promise and Pitfalls of Differences-in-Differences: Reflections on 16 and Pregnant and Other Applications," *Journal of Business & Economic Statistics,* 38, p. 618. "While the absence of a pre-trend is neither a necessary nor a sufficient condition for the absence of divergence in the counterfactual, it would be foolish to suggest that establishing that there is no pre-trend lends no support to the null hypothesis."

[191] Roth, J., Sant'Anna, P.H.C., Bilinski, A., and Poe, J. (2023). "What's Trending in Difference-in-Differences? A Synthesis of the Recent Econometrics Literature." *Journal of Econometrics,* 235(2), at p. 2234. "A final issue with the current practice of pre-trends testing relates to what happens if we do detect a significant pre-trend. In this case, the pre-trends test suggests that parallel trends is likely not to hold exactly, but researchers may still wish to learn something about the treatment effect of interest. Indeed, it seems likely that with enough precision, we will nearly always reject that the parallel trends assumption holds exactly in the pre-treatment period. Nevertheless, we may still wish to learn something about the treatment effect, especially if the violation of parallel trends is ''small'' in magnitude. However, the conventional approach does not make clear how to proceed in this case."

> policy is exogenous – it satisfies conditional independence. Third, there are no other relevant unincluded factors coincident with the policy change.[192]

My Difference in Difference model satisfies these requirements. My conditional expectation is that, after controlling for relevant economic variables, the Drugs at Issue would experience an increase in price relative to a broad group of control drugs. In addition, I have included all other quantifiable economic variables available to me to control for potentially unincluded factors that may have changed after the first communication.

c. *Defendant Experts Claimed Tests for Parallel Trends Are Flawed*

220. While I discuss above how my Difference-in-Difference model properly follows recommended practice for difference-in-difference analysis, that same literature does suggest that establishing parallel trends is a desirable feature for a difference-in-difference model. However, while I note that the econometric literature discusses the concept of parallel trends in general, the definition of parallel trends and the mechanism to test for their presence varies in the academic literature. Generally, 'parallel trends' suggest that, after accounting for control variables, the treatment and control groups would have experienced parallel outcomes on average, but-for the treatment.[193]

221. In their Reports, Dr. Jena and Dr. Saravia present two analyses that they claim show that the prices for the Drugs at Issue do not move in parallel with the control group during the Pre-Conduct period. First, in a variation of Dr. Saravia's criticism of my Before and After model (see Section IV.E.i.b, above), Dr. Saravia plots her calculated price index for Drugs at Issue prior to becoming treated against the price index for non-MDL Drugs.[194] Dr. Jena describes a Drug by Drug analysis for parallel trends, and concludes that "pre-trends for the Drugs at Issue are generally not parallel to the control group, indicating that Dr. Warren-Boulton's difference-in-differences model is unreliable."[195] Dr. Jena presents the results for two Defendant-Drugs at Issue in his Appendix F.[196]

(a) *Dr. Saravia's Price Index for Non-Treated Drugs at Issue Is Biased*

---

[192] Hansen, B.E. (2021). *Econometrics*. Princeton, NJ: Princeton University Press, at p. 654.

[193] See, *e.g.*, Callaway, B., and Sant'Anna, P.H.C. (2021). "Difference-in-Differences with Multiple Time Periods," *Journal of Econometrics*, 225(2): pp. 200-230, at pp. 204-205.

[194] Saravia Report ¶ 179 and Exhibit 23.

[195] Jena Report ¶ 125.

[196] Jena Report Appendix F.

222. As discussed above (Section IV.E.i.b), Dr. Saravia fails to estimate her price index for untreated Drugs at Issue (*i.e.*, Drugs at Issue that had yet to be affected by the alleged Conduct) using a regression model that includes all observations from my Report.[197] Instead, she relies on a more limited set of observations to estimate her regression model (*i.e.*, only those during the pre-Conduct period). When I re-estimated Dr. Saravia's indices using the full dataset, I found that by limiting the data used in her analysis, Dr. Saravia greatly understates the pre-Conduct trend for the non-MDL control group.

223. In Figure 11, below, I plot my modified price index for untreated Drugs at Issue calculated using the full regression sample against the price index of the control Drugs. As shown in the Figure below, after correcting Dr. Saravia's indices to conform to my original model, the prices for the untreated Drugs at Issue do in fact follow a similar pattern as the non-MDL control Drugs over the more recent (2011 to 2013) time period,[198] suggesting that the non-MDL Drugs do form a valid control group in my Difference-in-Difference Model.

---

[197] See Saravia Report Exhibit 23: "For the MDL drugs, […] I limit the sample to the period before the first communication date by API. The regression sample for both price indices is limited to 2014 Q1 and earlier."

[198] As noted previously, the data on the Drugs at Issue are not uniform with respect to time. Some Drugs at Issue have data beginning in 2008, while others have data which begins considerably later. Hence, changes in the index at earlier points in time may represent changes in prices of a smaller sample of Drugs at Issue, whereas changes in the index in later time periods may reflect changes in more of the Drugs at Issue (as opposed to a subset). This could potentially explain some of the variation in prices in the early time period.

**Figure 11 - Comparison of Price Indices for Untreated Drugs at Issue and Non-MDL Drugs**

[redacted]

Sources: Defendants Transactional Data and IQVIA.

Note: Price indices reflect the change in prices over the pre-Conduct period for the Drugs at Issue that have yet to be become treated (i.e. prior to first communication) using the Difference in Difference Model.

*(b) Dr. Jena's Test for Parallel Trends Is Overly Restrictive and Fatally Flawed*

224. Dr. Jena reports the results of many "event studies" for individual Drug-Defendant combinations that he conducted by "adding indicators for each corresponding quarter relative to the first alleged communication date ('the event') for each Drug-Defendant combination, interacted with an indicator for each Drug-Defendant at Issue."[199] Dr. Jena claims that these coefficients represent the "difference between the net Drug-Defendant price and the average of prices of the control drugs in each quarter leading up to and following the start of alleged conduct, controlling for the explanatory variables in Dr. Warren-Boulton's regression."[200] He then asserts that "If [the] Drug Defendant combination had parallel trends with the control drugs in the pre-conduct period, the points before the alleged conduct would include zero in the 95 percent confidence interval." [201]

225. Dr. Jena's claimed test for parallel trends on an individual Drug-Defendant basis is overly restrictive and his findings are extremely sensitive to the variance of Drug-Defendant prices

[199] Jena Report Appendix F ¶ 2.

[200] Jena Report Appendix F ¶ 2.

[201] Jena Report Appendix F ¶ 2.

during the pre-Conduct period for the Drugs at Issue. As discussed by Dr. Jena, each of his "event studies" is contingent on a comparison of the prices in each pre-Conduct quarter to the price that prevailed in the single quarter prior to the event date (*i.e.*, the start of the alleged conduct). In the event of an increase (or decrease) in price in that quarter, his entire "test" is biased towards a finding of non-parallel trends.

226. Dr. Jena's entire parallel trends analysis is an exercise in small numbers. As shown in Figure 12 below, even in his Drug-level models (which have more price observations for the reference quarter because that quarter includes the prices for multiple Defendants), more than 55 percent of the point estimates that Dr. Jena attempts to make are based on zero or one observation: estimates based on zero observations (*i.e.*, his model makes no point estimate) account for around 25 percent of his sample, and estimates based on one observation account for 30 percent.[202] As discussed at length in the statistics literature, comparisons based on small sample sizes can be prone to error due to random variation in the data.[203]

[202] Jena Backup Materials.

[203] Wooldridge, J.M. (2016). *Introductory Econometrics: A Modern Approach,* Sixth Edition. Cengage Learning, at p. 85. ("[A] small sample size can lead to large sampling variances.")

See also, Green, M.D., Freedman, M., and Gordis, L. (2011). "Reference Guide on Epidemiology". In *Reference Manual on Scientific Evidence*, J.P. Kassirer and Gladys Kessler (eds), Third Edition, Washington, DC: The National Academies Press, at p. 573. ("[A]ssociation is not statistically significant because of the potential for random error given a small sample size.")

See also, Deaton, A. (1997). *The Analysis of Household Surveys: A Microeconometric Approach to Development Policy,* The Johns Hopkins University Press, Baltimore, at p. 130. ("As the sample size increases, and provided we are using a consistent estimation procedure, our estimates will be closer to the truth, and less dispersed around it, so that discrepancies that are undetectable with small sample size will lead to rejection in large samples.")

**Figure 12 – Number of Observations Used to Make Conclusions from Dr. Jena's Parallel Trend Event Study**




Sources: Dr. Jena's Backup Materials.

227. To provide an example, Dr. Jena presents the results of his parallel trend test for two Defendant Drugs at Issue, Alclometasone Dipropionate 0.05% Cream (Glenmark) and Calcipotriene 0.005% Solution (Sandoz). I reproduced Dr. Jena's Figure F.1 for Alclometasone Dipropionate 0.05% Cream (Glenmark) below. As shown in the Figure, the seven point estimates (corresponding to quarters two through eight pre-Conduct) range from roughly 2.25 to 2.75, indicating that prices in those quarters were, all else equal, 850 percent to 1460 percent higher than in the reference period (one quarter before Conduct).

**Figure 13 – Replication of Jena Report Figure F.1**




228. Observing seven price observations that are all higher priced than the prices in the reference quarter but relatively flat is not a test for parallel trends. Indeed, if Dr. Jena had simply examined the net prices for Glenmark's Alclometasone Dipropionate 0.05% Cream over time, he would have seen why his test that relied on Glenmark's prices one quarter pre-Conduct would be inappropriate. As shown in Figure 14, below, Glenmark's prices for Alclometasone Dipropionate 0.05% Cream fell from around $0.30 per extended unit in 2012Q4 (two quarters prior to conduct) to almost zero in 2013Q1 (the quarter prior to the first communication). A price decrease in a single quarter is not a "trend" and thus Dr. Jena's analysis does not provide a valid test for the presence of a trend.

**Figure 14 – Glenmark Prices for Alclometasone Dipropionate Cream 0.05%**




d. *The Drugs at Issue Do Exhibit Parallel Trends Using Generally Accepted Tests*

*(a) A More Robust Test of Parallel Trends Confirms that the Collective Pre-Conduct Trend in the Drugs at Issue Is Parallel to My Control Group*

229. As discussed above, it is Defendant Experts' contention that my Difference in Difference model does not satisfy the parallel trend assumption. While I did not formally report the test for the parallel trend assumption for the model in my Report, in the Sections below, I present the results of more appropriate parallel trends tests for my Difference-in-Difference model.

230. For purposes of this analysis, I construct an event study across the Drugs at Issue that is similar to Dr. Jena's individual Drug-Defendant event studies. However, since it is estimated across the Defendants and Drugs at Issue, the data are less subject to fluctuations than the individual Drug-Defendant data. Each point estimate in Figure 15 represents the relative prices of Drugs at Issue compared to control drugs for all non-MDL Drugs combined at quarters prior to or after the date of first communication. Hence, the point estimate at -1 represents the relative price of Drugs at Issue one quarter before their date of first communication compared to the control group price during that same time period. The vertical line around each point estimate shows the 99 percent confidence interval for each point estimate. When the confidence interval includes zero, the two prices can be described as statistically similar.

**Figure 15 – Parallel Trends for the Drugs at Issue Pre and Post-Conduct**




Sources: Dr. Jena's and Dr. Warren-Boulton's Backup.

Note: Red dots represent the estimated difference in ln(price) relative to the reference quarter. Error bars represent the 99% confidence interval.

231. As shown in the Figure, except for the first point estimate, which is a price comparison that is more than two years prior to the first communication between the Drugs at Issue and the control drugs, the more proximate quarters to the first communication date have point estimates that show no statistical difference between the ratio for the Drugs at Issue and the control drugs. [204] As also shown in the Figure, however, the two drug groups do experience significantly different price paths after the first communication dates.

232. Finally, as noted above, Dr. Jena's staggered difference-in-difference model can serve as a test for the validity of the control group. As discussed, the similarity of the overcharge estimates between that model and my difference-in-difference model demonstrates the legitimacy of my control group.

e. *Control Group Not Sufficiently Similar*

*(a) Overview of Defendant Experts' Arguments*

[204] Using the 99th percent confidence interval.

233. As discussed in my Report, in my Difference in Difference Model, I utilize a set of non-MDL generic control drugs to control for industrywide changes in generic prices over time. In addition to the criticism above with respect to parallel trends, Defendant Experts also criticize my use of such a broad control group, asserting generally that the control group is comprised of Drugs that are unlikely to be similar to the Drugs at Issue, and hence the industry-wide trend would not be expected to approximate the "but-for" prices of the Drugs at Issue. In particular, Dr. Jena argues that the estimated effects would have been lower if I had used a set of Drugs within the same Anatomical Therapeutic Chemical (ATC) classification (and specifically as measured by the level 3 code, or "ATC-3") as a control for each of the Drugs at Issue.[205] Dr. Saravia suggests that Drugs with topical and dermatological applications (as defined by either the product form or the first digit of the ATC classification) would provide a better guide to on "the presence of non-collusive supply or demand factors, including but not limited to, the challenges associated with their manufacturing."[206]

*(b) The Use of My Broad Control Group Is Justified*

234. Dr. Jena suggests that there are (at least) two elements that are essential for choosing a valid control group.[207] First,

> [T]here should be an economic basis to believe that the prices of these drugs are affected by similar factors as the Drugs at Issue.[208]

Second,

> [I]t is critical that the prices of the control group have similar trends to the prices of the Drugs at Issue during the pre-conduct period-that is, they must exhibit parallel pre-trends-at the level at which the model is estimating overcharges.[209]

235. In my Report, I discussed my economic justifications (Dr. Jena's first principle) for using a broad control sample. The first economic rationale for using a broad control group is that it would accurately measure industrywide trends in generic drug prices common to both the Drugs at Issue and the control group. As Defendant Experts repeatedly point out, there were broad industrywide

---

205 Jena Report ¶ 126–131.

206 Saravia Report ¶ 183.

207 Jena Report ¶ 122.

208 Jena Report ¶ 122.

209 Jena Report ¶ 122.

changes over the Pre and Post-Conduct Periods that would have impacted generic drug prices over time (*e.g.*, the Affordable Care Act,[210] the Generic Drug User Fee Amendments,[211] and consolidation of wholesalers,[212] amongst others). These factors would be expected to affect both the Drugs at Issue and the control drugs.

236. The second economic argument I offered in my Report for using a broad control group was that the overall prices for the control group were (more or less) unaffected by the effects of the alleged Conduct.[213] As Dr. Jena suggests, a central assumption in a difference-in-difference approach is that "**in the absence of the alleged conduct**, the Drugs at Issue would have trended in the same way as the control group drugs."[214] If the control group were affected in any way by the alleged Conduct (e.g., if their prices had been increased by collusion), they would be an improper control because they would no longer represent a proxy for what prices would have been absent the alleged conduct and, if used as a control would bias the disgorgement estimate downwards. These two economic arguments (that the Drugs at Issue and the control drugs would be expected to react to industrywide trends and that the broader control group would be less subject to the effects of the alleged conduct) provide sufficient justification *a priori* for my control group.

237. As I explained in my Report, these non-MDL Drugs are not a "perfect" control – if they were, I would not need to introduce any explanatory variables to control for economic factors that might cause a divergence between the prices of the control group and the Drugs at Issue.[215] This does not mean that my selection of the broad control group was in any way invalid – the control is entirely appropriate for measuring broad industrywide trends in the prices of generic drugs. Thus, Defendants' criticisms boil down to claims that variables included in my difference-in-difference model are insufficient to adequately control for differences between the path of the control group and the "but-for" prices of the Drugs at Issue.[216]

---

[210] See, *e.g.*, Gilbert Report Section IV.G.1.

[211] See, *e.g.*, Gilbert Report Section IV.G.2.

[212] See, *e.g.*, Gilbert Report Section IV.G.1 to IV. G.2; Jena Report ¶¶52-53 (discussing Affordable Care Act and Generic Drug User Fee Act); Stomberg Report ¶ 78 (discussing wholesalers).

[213] Report footnote 209.

[214] Jena Report ¶ 122, emphasis added.

[215] Report ¶ 131.

[216] Saravia Report ¶¶ 175-178.

238. As shown above (Section IV.E.ii.d), however, the broad control group I utilize in my difference-in-difference analysis does exhibit a parallel trend to the Drugs at Issue after controlling for other economic factors that might impact the Drugs at Issue. This satisfies Dr. Jena's second test to demonstrate that a control is valid, and thus serves as "a natural plausibility check" for the legitimacy of the control.[217]

#### *(c) Dr. Jena and Dr. Saravia Fail to Provide Sufficient Justification for Their Alternative Controls*

##### (i) Dr. Jena and Dr. Saravia's Posited Controls Suffer from Unacceptable Potential Bias

239. As discussed above, both Dr. Jena and Dr. Saravia suggest groups of drugs that they believe would serve as more adequate controls for the Drugs at Issue. I discuss each of their posited control groups as well as the potential bias of each in this subsection.

240. As a general matter, both Dr. Saravia's and Dr. Jena's control groups contain an improper number of drugs manufactured by the Defendants. As discussed by the authors of the Clark et. al. article and as cited in my report:[218]

> Ideally, we would not include a drug in the control group if its manufacturer were under investigation for the alleged cartel in any other market. Unfortunately, due to the extent of the agreement, this condition is never met: at least one of the manufacturers in each drug market is cited in the court's documents.[219]

241. When asked at deposition, Dr. Jena testified that he believed that similarity of the control group (in terms of reactions to factors affecting prices of the control group and the Drugs at Issue) is more important than possible pollution of the control group.[220] I disagree. As discussed above, if the control group were affected in any way by the alleged conduct, the fundamental assumption of the difference-in-difference model would be violated and the disgorgement estimate would be biased.

---

[217] Jena Report ¶ 122.

[218] Report footnote 207.

[219] Clark, R., Fabiilli, C., and Lasio, L. (2022). "Collusion in the US generic drug industry." *International Journal of Industrial Organization*, 85, p. 10.

[220] Jena Deposition 167:21-168:25.

242. As mentioned in my Report, the overwhelming share of the non-MDL Drugs in the same therapeutic class as the Drugs at Issue are manufactured by the Defendants.[221] Dr. Gilbert claims that I have not provided sufficient evidence that Defendants have large shares in these alternate drugs.[222] In fact, however, his claim is false – the Defendants do account for an overwhelming share of both the therapeutic class of the Drugs at Issue as well as the associated product forms asserted by Dr. Saravia.

**Table 6 - Defendants' Share in the Therapeutic Class and Product Form of the Drugs at Issue**

| Similarity Measure | Minimum | Average | Maximum |
|---|---|---|---|
| ATC4 | 6.8% | 55.7% | 99.6% |
| Product Form | 0.1% | 47.8% | 94.3% |

Notes:
[1] Average represents the weighted average (by number of Drugs at Issue) across therapeutic classes or product forms for the Drugs at Issue.
[2] Defendants in non-MDL drugs identified using the field "corporation" in the IQVIA data.
[3] Product form is defined by the IQVIA field "Prod_Form3".
[4] Study period: 2008-2018.

243. Thus, as discussed by Clark et. al., the inclusion of other drugs in the same therapeutic class and with the same product form would lead to a downwards bias in the overcharge estimate for the Drugs at Issue. While this is notable in the Clark et. al. study, I note that their model and mine differ in one important aspect – I include in my regression model variables that would impact the Drugs at Issue but not the control, whereas Clark et. al. do not attempt to control for any differences between their control group and the Drugs they analyzed.

(ii) Dr. Jena's Use of Therapeutic Classes as a Control Group Is Inappropriate Both in Terms of Sample Design and as a Matter of Economics

244. Dr. Jena proceeds to estimate the effects of the alleged conduct on the Drugs at Issue in a flawed regression that uses non-MDL drugs in the same ATC-3 therapeutic class as a control. Dr. Jena's analysis differs from mine (and Clark et. al.'s) in two important respects that render his model unreliable. First, he includes in his "control" sample for the Drugs at Issue other drugs manufactured by the same Defendants implicated in this case, and second, his "control" sample includes Drugs that are potential substitutes for the Drugs at Issue. Dr. Jena claims that his results provide an indictment of my Difference in Difference model. However, as discussed by

[221] Report footnote 209.

[222] Gilbert Report ¶ 524.

Clark et. al., his inappropriate choice of data results in a negative bias, and thus Dr. Jena's results cannot be used to argue that my Difference in Difference model is invalid. [223] His results do not allow for any kind of inference that the control used in my difference-in-difference model is invalid.

245. For his control sample, Dr. Jena simply assumed (without testing) that all non-MDL drugs (within the same ATC-3 therapeutic class as the Drugs at Issue) could be used as a control for each of the Drugs at Issue within the same ATC-3 class. While these drugs "could" be subject to similar supply and demand conditions as the Drugs at Issue,[224] Dr. Jena provides no evidence (other than a claimed reduction in overcharges) that demonstrates that these similar demand and supply conditions are the reason that overcharges are reduced.[225]

246. For example, Drugs within the same ATC-3 therapeutic class include Drugs with different Active Therapeutic Ingredients (APIs) than the Drugs at Issue. Hence, an increase in price due to an increase in the cost of those APIs for alternative non-MDL Drugs would not reflect the expected cost of the APIs for the Drugs at Issue (and hence the "but-for" paths for the Drugs at Issue).

247. Holding aside whether Dr. Jena's ATC-3 "control" sample could possibly approximate the "but-for" prices for the Drugs at Issue, Dr. Jena's analysis suffers from two other important flaws. The first, as he testified at deposition, Dr. Jena did not apply Clark et. al.'s approach for determining the appropriate control group for the Drugs at Issue. Second, Dr. Jena asserts that each ATC-3 therapeutic class (comprised of control and Drugs at Issue) can reliably be separated into 23 different regressions to estimate overcharges. Both approaches inflate the claimed "reduction" in disgorgement under his models.

248. As discussed in their article, Clark et. al. apply a decision-tree based approach whereby suitable control drugs are selected based on the following criteria:

> Specifically, we select molecules to be part of the control group if they meet the following three criteria: (C1) they are comparable but not direct competitors of the treatment drugs; (C2)

---

[223] While the latter bias is true of the Clark et. al. study, the authors acknowledge that the former is an undesirable but necessary condition of their model due to the strict assumption of comparability of the treatment and control groups (with no explanatory variables that would control for differences between the control and treatment groups).

[224] Jena Report ¶ 24.

[225] Dr. Saravia similarly assumes (without analysis) that the trends in allegedly similar topical/dermatological Drugs would best approximate the trend in prices for the Drugs at Issue without investigating the reason for the underlying change in prices of non-MDL topical/dermatological drugs (see Saravia Report ¶¶ 182-183).

> they are not under investigation for the alleged price conspiracy; (C3) they do not compete directly with other drugs that are under investigation. We define competition based on the WHO ATC classification and consider direct competitors all those molecules that belong to the same level 4 ATC class (ATC-4).[226]

Dr. Jena's analysis based on similar ATC-3 therapeutic classes also violates principles C1 and C3. Dr. Jena includes in his control group even those Drugs within the same ATC-4 control group that Clark et. al. would consider direct competitors for the Drugs at Issue. At deposition, Dr. Jena testified [why] he thought his methodology for identifying the control group for each Drug at Issue was appropriate, but did not agree with Clark et. al.'s approach.[227]

249. Dr. Jena also proposes that the effects of the alleged conduct can be measured using no less than 23 different regressions corresponding to the 23 different ATC-3 therapeutic classes of the Drugs at Issue. Dr. Jena does not report the coefficient estimates of these 23 different regressions anywhere in his Report.[228]

250. As discussed above, regressions that rely on small sample sizes have less statistical power compared to those with larger sample sizes, raising concerns about the reliability of the estimates.[229] His 23 separate therapeutic class regressions rely on between 71 and 17,948 observations.[230] It is unlikely that a sample of 71 observations could reliably estimate the effects of the various economic factors in my model. Moreover, as shown in Dr. Jena's backup materials,

---

[226] Clark, R., Fabiilli, C., and Lasio, L. (2022). "Collusion in the US generic drug industry." *International Journal of Industrial Organization*, 85: pp. 9-10.

[227] Jena Deposition 200:17-204:2.

[228] Jena Deposition 211:4-15, 262:9-16.

[229] Gujarati, D.N., and Porter C.D. (2009). *Basic Econometrics*, Fifth Edition. New York: McGraw-Hill, at p. 447. ("as a general principle that whenever we use an estimator in place of its true value, the estimated OLS coefficients may have the usual optimum properties asymptotically, that is, in large samples. [.] In small samples, therefore, one has to be careful in interpreting the estimated results.")

See also, Kaye, D.H. and Freedman, D.A. (2011). "Reference Guide on Statistics." In *Reference Manual on Scientific Evidence*, J.P. Kassirer and Gladys Kessler (eds), Third Edition, Washington, DC: The National Academies Press, at p. 255. ("Small samples may be unreliable, with large standard errors, broad confidence intervals, and tests having low power.") and Rubinfeld, D.L. (2011). "Reference Guide on Multiple Regression." In *Reference Manual on Scientific Evidence*, J.P. Kassirer and Gladys Kessler (eds), Third Edition, Washington, DC: The National Academies Press, at p. 319. ("[I]f data limitations are such that only 3 or 4 years of preinfringement sales are known, the difference between but-for sales and actual sales during the period of alleged infringement could be practically significant but statistically insignificant. Alternatively, with only 3 or 4 data points, the expert would be unable to detect an effect, even if one existed.")

[230] Jena Backup Materials.

the regression is incapable of estimating the effects of any of the economic factors in my original model (except for drug fixed effects).[231]

251. This error is compounded by Dr. Jena's decision to allow for his coefficient estimates to differ between the Drugs at Issue and the control drugs within the same therapeutic class across his 23 regression models. For example, his regression for ATC-3 class ("STOMATOLOGICALS", ATC-3 "A01A") relies on 1 Drug at Issue and 21 "control" drugs. Despite his claim that the 21 control Drugs would exhibit similar responses to one Drug at Issue in terms of the economic variables in my model, he proceeds to estimate separate effects for the Drugs at Issue compared to the allegedly similar control group.

252. Not surprisingly, his reduced sample size creates several problems, notably that the coefficient estimates in many of his 23 regressions do not make economic sense. For example, in his therapeutic class analysis for ATC-3 class "A01A", above, the regression results (again only reported in Dr. Jena's backup materials) show that the effect of going from one competitor to two competitors would result in a price <u>increase</u> of around 21% for the Drugs at Issue. As discussed in my Report, markets with more competitors should have <u>lower</u> prices than markets with fewer competitors. These types of inconsistent coefficients are indicative of a problem with small sample sizes, which can result in one coefficient (*e.g.*, the effect of entry on prices) biasing estimates of the other coefficients in the model (*e.g.*, the increase in the prices for the Drugs at Issue).[232]

253. In addition, Dr. Jena includes as "control" drugs many non-MDL drugs that are in the same ATC-4 class as the Drugs at Issue, which Clark et. al. assert are direct economic competitors to the Drugs at Issue. If, as Clark et. al. assert, these drugs are direct competitors for the Drugs at Issue, an increase in the prices for the Drugs at Issue may be expected to also increase prices for the direct competitors of these drugs.[233] As the authors note, removing the non-MDL drugs that are potentially direct competitors (*i.e.*, those that are in the same ATC-4 class), would result in ATC-

---

[231] The results cited in this example are for ATC-3 Class G01C (GYNAECOLOG ANTIBACTERIALS).

[232] Kaye, D.H. and Freedman, D.A. (2011). "Reference Guide on Statistics." In *Reference Manual on Scientific Evidence*, J.P. Kassirer and Gladys Kessler (eds), Third Edition, Washington, DC: The National Academies Press, at p. 255. ("Small samples may be unreliable, with large standard errors, broad confidence intervals, and tests having low power.")

[233] See Clark, R., Fabiilli, C., and Lasio, L. (2022). "Collusion in the US generic drug industry." *International Journal of Industrial Organization*, 85.

3 "control" drugs with very few observations.[234] If I apply the same restriction to Dr. Jena's sample, I find that for most of the ATC-3 classes analyzed by Dr. Jena the control group would be comprised of fewer than 5 control drugs.[235] For example, ATC-3 classification D07A (TOP.CORTICOSTEROIDS COMB) contains 35 of the Drugs at Issue. Dr. Jena's control group includes 54 non-MDL drugs. However, 49 out of 54 non-MDL drugs in his control group have the same ATC-4 value as the Drugs at Issue, and hence would be considered direct competitors to the Drugs at Issue according to Clark et al.

254. In other words, Dr. Jena's analysis consists of similar drugs within the same ATC-3 therapeutic class that are potentially direct substitutes for the Drugs at Issue, and his regression results that show reduced prices for the Drugs at Issue are characterized by low sample sizes that cannot reliably estimate the effect of economic variables on the Drugs at Issue. These results are unreliable.

##### *(d) The Large Price Increases Surrounding Communications Are Not Matched by Price Increases in Any Posited Control*

255. In large part, Defendants' criticisms of my use of a control group can be reduced to an assumption that (a more appropriately chosen set of) control group drugs could have reacted similarly to price increases in the Drugs at Issue, and hence that those price increases would serve as evidence that some other factor (other than the communications between Defendants) could have caused those price increases (in whole or in part). As discussed below and as shown in Figure 16, even when measured on a relatively short event horizon of one year, the Drugs at Issue experienced price increases that were anomalous for Drugs that were not alleged to be impacted by collusion (*i.e.*, the non-MDL drugs).[236]

256. In Figure 16, I show the change in the price during a one-year event window following the first communication of each drug for the 84 Price Increase Drugs at Issue (red bars) and for control drugs in that same time period (blue bars). In other words, the change in price for each Drug at Issue is compared with the change in the price of the control drugs during the same time period.

---

[234] See Clark, R., Fabiilli, C., and Lasio, L. (2022). "Collusion in the US generic drug industry." *International Journal of Industrial Organization*, 85.

[235] See backup materials to this Report.

[236] In a sense, the use of a relatively short event window obviates the need for a control, since there tends to be less changes over time that would need to be controlled for.

The difference between the average change in price across PI drugs (250%) and that of the control (13%) is highly significant.

**Figure 16 – Distribution of Price Changes During a One Year Event Window (Drugs at Issue vs. Control Drugs)**

[redacted]

Source: Defendants Transactional and IQVIA Data.

257. For my control to be biased, Defendant Experts must assert that there exists a more limited set of control Drugs (e.g., drugs within the same therapeutic class) that exhibit a price pattern similar to the price increases for the Drugs at Issue for that same time period. To my knowledge, only Dr. Jena offers such an alternative.

258. Following Dr. Jena's suggestion, in Figure 17, I compare the prices for the Drugs at Issue to only those Drugs in the same therapeutic class.[237] The results are indistinguishable from those depicted in Figure 16. On examination, there is no basis for any speculation by Defendant Experts that a control group based on a therapeutic class would be more accurate or even different from the results with a control based on the much larger number of non-MDL drugs.

[237] See Section IV.E.ii.e(e) below for a discussion of the construction of the therapeutic class control.

**Figure 17 - Distribution of Price Changes During a One Year Event Window (Drugs at Issue vs. Therapeutic Class Control Drugs)**

[redacted]

Source: Defendants Transactional and IQVIA Data.

*(e) A More Appropriately Designed Control Group (though Nonetheless Flawed) Demonstrates that the Claimed Bias by Defendant Experts Is Incorrect*

259. At my Deposition, I testified that I had reviewed the results of an alternative difference in difference therapeutic class control regression, and that the results of that regression had resulted in reduced overcharges for the Drugs at Issue in the neighborhood of 10 percent.[238] As I described in my Report, due to the characteristics of the Drugs included as controls in this regression (specifically the high share of Defendants in the same therapeutic class), I would not expect the results of this model to provide a reliable estimate of the increases in prices for the Drugs at Issue.

260. Similar to Clark et. al., I implemented a hierarchical approach based on ATC classifications to identify drugs in therapeutic classifications similar to those of the Drugs at Issue, but also remove the direct competitors for the Drugs at Issue that Clark et al. suggest would bias the overcharge estimate. Specifically, I implemented the following steps to identify my therapeutic class control:

[238] Warren-Boulton Deposition 288:22-289:6.

- I first drop non-MDL drug(s) that are in the same ATC-4 group.[239]

- Within each ATC-3 class, I then review the number of non-MDL drugs, and, if sufficient non-MDL drugs are identified (more than 5), these drugs form my therapeutic class (TC) control group. If insufficient non-MDL drugs are located, I expand the control group to other drugs within the same ATC-2 classification.

261. Finally, unlike Dr. Jena, I estimate the overcharge using a single regression model (as opposed to the 23 proposed by Dr. Jena), controlling for either (a) overall changes in the common ATC-3 classifications identified using the hierarchical approach discussed above[240] or (b) assuming that the year-quarter trend for each similar therapeutic class would provide the pattern of "but-for" prices for the Drugs at Issue.[241]

262. In Table 7, below, I present the results of my therapeutic class regression. Column (2) reports the results of the model when I assume a common trend across the control groups comprising similar therapeutic classifications and Column (3) reports the results of a model where the prices for the Drugs at Issue are compared to the pattern of prices for each individually identified similar therapeutic class control group.

263. The first overcharge estimate, in Column 2, is very similar to my base Difference in Difference model (*i.e.*, 68.3 percent vs. 67.9 percent). The estimate from the second model is slightly lower than from my base Difference in Difference model but is close to the overcharge estimates from the B&A model.

---

[239] This step follows Clark et.al. (2020), which is motivated by the observation that drugs within the same ATC-4 level may be direct competitors. This is in contrast to Dr. Jena's therapeutic class model. See Clark, R., Fabiilli, C., and Lasio, L. (2022). "Collusion in the US generic drug industry." *International Journal of Industrial Organization*, 85.

[240] In other words, the average change in prices over time for these similar drugs.

[241] In other words, similar to Dr. Jena's 23 models and Dr. Saravia's suggested modified control group based on topical/dermatological forms, the trend in prices for each identified comparable class of drugs is allowed to vary individually.

**Table 7 - DiD Model Using Therapeutic Class Control Drugs**

| | (1) | (2) | (3) |
|---|---|---|---|
| | **Base DiD Model** | **Pooled Trend for Drugs in Similar Therapeutic Classes** | **Separate Trends for Drugs in Each Similar Therapeutic** |
| Overcharge as Percent of Revenue >> | **68.3%** | **67.9%** | **65.9%** |
| Overcharge % >> | **215.2%** | **211.8%** | **192.9%** |
| **PI Drugs x (Post First Communication)** | **1.1481*** ** | **1.1372*** ** | **1.0746*** ** |
| | [0.1371] | [0.1391] | [0.0484] |
| Log(Predicted Total Annual Quantity of Drug) x Control Drugs | 1.0193 | 1.0994 | -0.5211 |
| | [0.8892] | [0.9665] | [0.3702] |
| Log(Predicted Total Annual Quantity of Drug) x Drugs at Issue | -2.1931* | -2.1908* | -0.9037 |
| | [1.1917] | [1.3146] | [0.5683] |
| Firm # = 2 x Control Drugs | -0.0585* | -0.0643 | -0.0553*** |
| | [0.0328] | [0.0601] | [0.0097] |
| Firm # = 3 x Control Drugs | -0.1016** | -0.1006 | -0.0919*** |
| | [0.0455] | [0.0793] | [0.0111] |
| Firm # = 4 x Control Drugs | -0.1896*** | -0.1566* | -0.1466*** |
| | [0.0506] | [0.0880] | [0.0120] |
| Firm # = 5 x Control Drugs | -0.3146*** | -0.2826*** | -0.2600*** |
| | [0.0570] | [0.0932] | [0.0124] |
| Firm # = 2 x Drugs at Issue | -0.3141* | -0.3123* | -0.3896*** |
| | [0.1756] | [0.1758] | [0.0671] |
| Firm # = 3 x Drugs at Issue | -0.4493** | -0.4491** | -0.5339*** |
| | [0.1821] | [0.1821] | [0.0693] |
| Firm # = 4 x Drugs at Issue | -0.6445*** | -0.6380*** | -0.7290*** |
| | [0.2028] | [0.2027] | [0.0768] |
| Firm # = 5 x Drugs at Issue | -0.6093** | -0.6018** | -0.6737*** |
| | [0.2759] | [0.2749] | [0.0820] |
| Drug is Branded Generic = Yes | 0.8777*** | 0.9260*** | 0.9426*** |
| | [0.0976] | [0.1928] | [0.0101] |
| Drug is Branded Generic = Yes | 0.9993*** | 0.9970*** | 1.0151*** |
| | [0.1822] | [0.1825] | [0.0935] |
| Drug in FDA's Shortage List * Drugs at Issue | 0.3192* | 0.4476*** | 0.5370*** |
| | [0.1841] | [0.1216] | [0.1411] |
| Drug in FDA's Shortage List | 0.1729 | 0.0925 | -0.0342 |
| | [0.1320] | [0.0853] | [0.0352] |
| Drug with Temporary Shortage | -0.0717 | -0.0746 | 0.0359 |
| | [0.0951] | [0.1031] | [0.0506] |
| Drug in FDA's Shortage List-Lagged | 0.0273 | 0.0663*** | 0.0627*** |
| | [0.0412] | [0.0251] | [0.0186] |
| Drug in FDA's Shortage List-Lagged | 0.0901 | -0.0197 | 0.0606 |
| | [0.0572] | [0.0308] | [0.1327] |
| Drug with Temporary Shortage-Lagged | -0.0976 | -0.1005 | 0.0130 |
| | [0.1070] | [0.1157] | [0.0540] |
| Constant | -16.6558 | -17.4873 | 8.0579 |
| | [14.4690] | [15.9089] | [6.0900] |
| | | | |
| Observations | 372,613 | 204,521 | 204,521 |
| R-squared | 0.864 | 0.846 | 0.850 |
| **Drug FE** | **Yes** | **Yes** | **Yes** |
| **Year-Quarter FE** | **Yes** | **Yes** | **Yes** |

Robust standard errors in brackets
*** p<0.01, ** p<0.05, * p<0.1
Note: Second stage reported standard errors are uncorrected.

### *iii. New Generics*

a. *Background*

264. In addition to their criticisms of my models for estimating overcharges for Price Increase Drugs, Defendant Experts also criticize both the model I used to test for liability with respect to the New Generic Drugs and the model I used to estimate disgorgement for these Drugs. Dr. Jena criticizes the New Generic with Price Falls study I performed to test for liability, and both Dr. Jena and Dr. Stomberg criticize the model which I used to estimate disgorgement for the New Generics.

b. *New Generic Model Used for Disgorgement*

265. As described in my Report, obtaining a benchmark price for the New Generic Drugs at Issue is difficult because competitive pre-communication prices for the New Generics largely do not exist.[242] Hence, I developed a regression model that estimated the relationship between prices and various economic factors for a set of non-MDL new generic drugs over the period 2006 to 2016.[243] Then, I located the two-quarter period during which prices were lowest for each NG Drug at Issue, and used this period as the benchmark period for those Drugs.[244] I then use the non-MDL new generic regression model to predict the "but-for" prices for the those Drugs in other periods.[245] The disgorgement amount is the difference between the actual and "but-for" revenues.

266. Dr. Jena and Dr. Stomberg offer several criticisms of my NG model. First, both Dr. Jena and Dr. Stomberg assert that the model generates false positives for a high share of the control sample (as well as individual control drugs).[246] Second, Dr. Stomberg notes that my NG model results in lower overcharges when run on IQVIA prices for the Perrigo Drugs at Issue.[247] Third, Dr. Jena argues I should have included two additional variables (shortages and demand) that I included in my PI Drug models. Fourth, Dr. Stomberg asserts that my NG model should have accounted for the effects of simultaneous generic entry for authorized generics.[248] Finally, Dr. Stomberg objects to my use of the lowest-price two quarter period as the benchmark, and presents calculations based on alternative price points for the Drugs at Issue.[249] I discuss each of these opinions below.

*(a) False Positives and the Use of the Lowest Two-Quarter Benchmark Period*

267. Dr. Jena and Dr. Stomberg both take the parameter estimates from my NG regression model and use the same methodology as I applied to the NG Drugs; *i.e.*, they identify the lowest-price two-quarter period and use the parameter estimates from the NG regression to predict prices for the

[242] Report ¶ 209.

[243] Report ¶ 211.

[244] Report ¶ 210. As noted in Report footnote 288, to the extent that this two-quarter period also includes lingering effects, this approach is likely to be conservative.

[245] Report ¶ 213.

[246] Stomberg Report ¶ 139 and Jena Report ¶ 141.

[247] Stomberg Report ¶ 150.

[248] Stomberg Report ¶ 148.

[249] Stomberg Report ¶¶ 144-146.

other time periods) and apply that methodology to the non-MDL drugs.[250] Both conclude that my model generates false positive overcharges for 73 percent to 75 percent of the control sample, and Dr. Stomberg calculates an average "false positive" overcharge of around 22.5 percent.[251] I note that their estimates of the rate of "false positives" are artificially high either because they make modifications to my model (Dr. Jena) or exclude certain Drugs from the analysis (Dr. Stomberg).[252] When I calculate the false positive rate using the full control sample,[253] I find that only 67 percent of the control sample has a positive overcharge.

268. Both Dr. Jena's and Dr. Stomberg's analyses rely on a false construct with respect to the non-MDL control sample. As discussed in my Report, the use of the lowest two-quarter period of prices is appropriate because it represents the prices that are closest to the "but-for" level of non-collusive prices. With respect to the control drugs, there are numerous examples besides the lowest two-quarter period that would reflect non-collusive prices. An analysis of the "false positive" rate based on non-collusive prices should also include projections made from alternative "non-collusive" periods.

269. As Dr. Stomberg notes:

> If Dr. Warren-Boulton's model properly characterized competition, there would be no reason to suspect the lowest prices on this curve are any more representative of competition than the others. The results of his arbitrary method may be equally attributable to anomalous dips in prices owing to some exogenous shock in the market or calculation anomaly, as to purported collusive conduct.[254]

I agree with Dr. Stomberg as to the control drugs. However, for the Drugs at Issue, it is not equally likely that an anomalous dip in price is likely due to an exogenous shock as to a reduction in the effects of collusion. On the other hand, assuming that collusion is not present in the non-

---

[250] Jena Report ¶ 141 and Stomberg Report ¶¶ 138-139.

[251] Jena Report ¶ 141 and Stomberg Report ¶¶ 138-139. Dr. Jena also presents a calculation that, among the benchmark Drugs with false positive overcharges, the average overcharge is 81 percent. I note first that Dr. Jena's estimate is biased since he does not follow the methodology I follow in my Report of assuming zero disgorgement in periods where there is one firm in the market (see Jena Report footnote 262). Second, calculating the average overcharge over only those Drugs with positive overcharges is an inappropriately biased calculation.

[252] Dr. Stomberg limits his analysis to drugs with at least four years' worth of IQVIA data (Stomberg Report Figure 15).

[253] Since the regression was estimated using all observations, I also calculate the false positive rate for the full sample.

[254] Stomberg Report ¶ 144.

MDL control drugs, deviations in the prices of the control group must be due to some exogenous shock. This would suggest that any of the prices for the control drugs could be used as a benchmark, whereas the only benchmark price for the Drugs at Issue used to generate the but-for price should be the lowest price.

270. If instead of the minimum price, I utilize the median price for the control drugs, the false positive rate for the control drugs falls from 67 percent to 49 percent.[255] If I use the highest price, the false positive rate for the control drugs falls to 26 percent. [256] These results suggest that, when applying the model from a range of potentially competitive prices from all of the control drugs, that my model is not biased towards finding an overcharge (as Defendant Experts claim).

271. The results just discussed differ in an important dimension from Dr. Stomberg's analysis since he asserts that the NG model projection applied to the Drugs at Issue could be based on either the "average" or the maximum price (as opposed to the lowest price).[257] My decision to use the period of the lowest two-quarter price was not "arbitrary" (as Dr. Stomberg suggests in his discussion of these alternate benchmarks):[258] in markets where prices were allegedly inflated by the effects of the collusion, these prices represent the prices that would be closest to the non-collusive level. The use of other (higher) prices, that might well reflect the effects of collusion (as Dr. Stomberg suggests with his alternative benchmarks), would inappropriately bias disgorgement in Defendants' favor.

*(b) The Model Generates Lower Results when Estimated Using IQVIA Prices*

272. Dr. Stomberg also notes that if the NG methodology is applied to IQVIA prices (as opposed to net prices) the model generates lower overcharges for Perrigo's Drugs at Issue than when applied (as I did in my Report) to net prices.[259] He notes that my model was estimated using price data from IQVIA as opposed to net prices, a this decision made out of necessity as I do not possess net

[255] See backup materials to this Report.

[256] See backup materials to this Report.

[257] Stomberg Report ¶¶ 145-146 and Table 3.

[258] Stomberg Report ¶ 146.

[259] Stomberg ¶ 150-152.

price data for the control drugs in the IQVIA data, and claims that this "improper use of information" can be expected to lead to more error (since the two data sources differ).[260]

273. I note first that the net prices, not the IQVIA prices, determine the profits that Defendants earn. Dr. Stomberg provides no analysis that distinguishes between (1) an overcharge that happens to be larger because the model was estimated using net prices as opposed to IQVIA prices and (2) differences between IQVIA and net prices that result in changes in the parameter estimates of the regression model. As discussed in my Report, correlations between net prices and IQVIA prices for the Drugs at Issue are very high.[261] While the trends in prices for Perrigo's Drugs at Issue are not identical (as shown in Dr. Stomberg's lower disgorgement estimates), the change in net prices is more reflective of the actual change in Perrigo's revenues.

*(c) Omitted Control Variables*

274. Both Dr. Jena and Dr. Stomberg suggest that important variables omitted from my NG regression model. Dr. Jena suggests, not unreasonably, that I should have included variables for shortages and demand (the same measures I included in my PI model) in the New Generic regression model.[262] However, I note that none of the NG Drugs were listed on the FDA's shortages list, hence the exclusion of the shortages variable would only affect the coefficient estimates estimated using the control sample. Dr. Stomberg also asserts that my NG regression model should have included an allowance for the effects of simultaneous entry for authorized generics.[263]

275. To address Dr. Jena and Dr. Stomberg's concerns, I have added the suggested variables to my NG regression model.[264] Specifically, I have added the same FDA shortage indicator using in the Before and After and Difference in Difference models to the New Generic regression on non-MDL new generic drugs. In addition, since Dr. Stomberg asserts that prices in markets with authorized generics might behave differently than markets without authorized generics, I have interacted the three variables relating to the change in prices over time (quarters since entry,

---

[260] Stomberg ¶ 149.

[261] Report ¶ 83, Table 2.

[262] Jena Report ¶ 140.

[263] Stomberg Report ¶ 148.

[264] Since Defendant Experts claim that my original measure of demand may be endogenous, for purposes of the updated NG model, I do not incorporate the suggested change here.

quarters since entry squared, and quarters since entry interacted the number of firms) [265] with the presence of an authorized generic in the market.[266] The results of this regression are reported in Table 8. The coefficients on each of the authorized generic interactions are statistically significant, but the effects of shortages are not. When I apply these updated regression coefficients to the Drugs at Issue, the estimated overcharge for the New Generics increases by over $100 million.[267]

[265] At deposition, Dr. Stomberg testified that the pattern of pricing for an authorized generic could be different due to factors such as contracts with the brand and costs (Deposition of Christopher P. Stomberg, Ph.D., July 10, 2024 (hereafter "Stomberg Deposition") 224:22-225:14).

"Q. More broadly, how does an authorized generic contract impact generic drug pricing?

A. So the authorized generic contract, I mean they vary noticeably from contract to contract and manufacturer to manufacturer. Because the authorized generic is authorized by the brand, the brand may put various constraints on the operation of that generic seller in the marketplace. And the decision in fact whether or not to launch an authorized generic may be the result of an internal analysis at the brand whether or not to do that. And so as it affects, as it affects competition during the period of time when the authorized generic may be competing with other ANDA generics, it may be in a different position in terms of its cost, for example licensing fees, and that may impact the prices and the contracts that it can accept profitably."

[266] Identified using information on whether an NDC is associated with an authorized generic from AnalySource. Authorized generic markets are defined as those where the authorized generic NDC represents at least one percent of the generic market.

[267] Backup materials to this Report.

**Table 8 - Updated New Generic Regression Results (Non-MDL Control Drugs)**

[redacted]

Source: IQVIA Data

c. *New Generics with Price Falls*

276. As discussed in my Report, it would be inappropriate to rely on the degree of price fall as an estimate for disgorgement. Nonetheless, Dr. Jena appears to do exactly that, and modifies my New Generic with Price Falls regression to estimate disgorgement for 11 of the 14 NG Drugs.[268]

[268] Jena Report ¶¶ 143-144.

This analysis requires that prices for the NG Drugs have fallen to the "competitive" level that would have prevailed absent Defendants' conduct. For reasons I discussed in my Report, this assumption is unlikely to have occurred.

d. *Margins for New Generics are Consistent with those on Collusive PI Drugs*

277. Both Dr. Jena and Dr. Stomberg present models that they claim show that the prices of the NG Drugs at Issue (either as a group (Dr. Jena's Price Falls analysis) or for Perrigo's NG Drugs (as in Dr. Stomberg's various analyses) were not significantly elevated above but-for levels. Therefore, to further demonstrate that the NG Drugs show patterns consistent with elevated prices, I have compared the margins that Defendants earned on the 11 NG Drugs included in the NG Disgorgement model.

278. I note first that prices may be expected to vary widely across the Drugs at Issue due to reasons not associated with the alleged Conduct. To account for this difference, I use the COGS information provided by Defendants to analyze the net margin for each manufacturer of the NG Drugs. I separate the Drugs at Issue into three groups: (1) PI Drugs during the Pre-Conduct period, (2) PI Drugs during the Post-Conduct Period, and (3) NG Drugs during the Post-Conduct period. Each Defendants' net margins across the Drugs at Issue during each time period is depicted in Figure 18, below.

**Figure 18 – Pre and Post Conspiracy Margins for the Manufacturers Making New Generics**




279. As shown in the Figure, with the exception of Sandoz, Taro, and Aurobindo, the margin each earned on the NG Drugs exceeded the "competitive" margin each earned on PI Drugs during the Pre-Conduct Period. These elevated margins are consistent with the Defendants earning supra-competitive margins on the NG Drugs at Issue.

### F. Differences in the Overcharge Estimates in the Regressions Estimated for Disgorgement Are Not an Indication of Their "Unreliability"

#### *i. Different Price Measures and Different Methodologies*

280. Dr. Jena and Dr. Stomberg both claim that the two models that I utilize in my disgorgement estimates, namely the Before and After regressions and the Difference in Difference regressions, generate inconsistent results, and hence are unreliable.[269] Dr. Jena also argues that the wide range

[269] Jena Report ¶ 87 and Stomberg Report ¶ 181.

of estimates of overcharges generated from different price measures than net prices (e.g., IQVIA or AMP prices) is a further indicator or unreliability.[270]

281. As discussed in my Initial Report, I estimated two separate regressions both for liability and disgorgement (a Before and After regression and a Difference-in-Difference regression). Because I did not possess cost data for the non-MDL Drugs, I could not include the cost in my Difference-in-Difference regression that controlled for industry wide trends (including costs) that may have impacted generic drug pricing. Further, because individual Drug cost information was not available for all Drugs at Issue and Defendants, it was not feasible to estimate a regression that included costs for certain individual Drugs at Issue, and hence I had to rely on the Difference-in-Difference model. In addition, for certain Drugs at Issue, the Defendants data productions were lacking and I had to rely on alternative data sources (IQVIA and AMP) for my estimates of the overcharge.

282. However, each of the regression models offer certain benefits vis a vis the other – the Difference in Difference model has the benefit of comparing the changes in the prices of the Drugs at Issue against a "control" group which adjusts for industrywide changes in all factors, including costs, while the Before and After model is able to control for changes in costs for individual Drugs at Issue. There is no reason to expect that the two models would generate identical results – they each serve as independent estimates from two models with two differing sets of assumptions.

283. Dr. Jena's further assertion that different data sources generate differing overcharges in any way is an indictment of the models estimated on net prices is completely unfounded. IQVIA, AMP and net prices are fundamentally different measures of prices for the Drugs at Issue, and there is no reason to expect the overcharges using each measure to be the same. As stated in my report, I believe that net prices are the best measure for analysis and hence I rely on the net price regressions wherever possible. Only in the event of missing or lacking data, often from the Defendants, do I rely on the alternative estimates.

### *ii. Defendants' Reporting of the Comparability of Overcharge Percentages Greatly Overstates the Differences in Disgorgement Between Models*

284. The primary basis for Dr. Jena's claims that the different regressions produce very different overcharges is that the differences in the overcharge <u>percentages</u> from each model are different in

[270] Jena Report ¶ 87.

magnitude (often to a great degree).[271] However, the use of the overcharge percentages as a metric greatly overstates the differences between the models, especially at high levels of overcharge percentages. While in percentage terms these differences in the overcharge may seem extremely large, in reality, the dollar difference in disgorgement between the models can be small.

285. For background, the disgorgement estimate is equal to:

$$Disgorgement = As\ Is\ Revenues - \frac{As\ Is\ Revenues}{1 + OC\%}$$

In percentage terms, disgorgement as a percentage of revenue is:

$$\frac{Disgorgement}{As\ Is\ Revenues} = 1 - \frac{1}{1 + OC\%}$$

286. Take, for example, a hypothetical overcharge of 500% in the Before and After model and an overcharge of 1000% in the Difference in Difference model. The Before and After Model (500%) would calculate disgorgement as a percent of revenue of 83.3%.[272] The DiD model (1000%) would calculate disgorgement as a percent of revenue of 90.9%,[273] a difference of only 7 percentage points in terms of the disgorgement amount, even though there was a difference of 500% in the overcharge percentage.

287. Hence, here and elsewhere in this Report, I provide both the overcharge percentage (as in my Initial Report) and the overcharge expressed as a percentage of revenue.

## G. Hierarchal Approach

### *i. Overview*

288. Defendant Experts also claim that the "hierarchical approach" to my various regression models to obtain the disgorgement estimates in each of the Difference in Difference and the Before and After Models is inappropriately implemented.[274] In particular, Defendant Experts[275] claim that I have misapplied the order of preference I described in my Report.[276] In addition, Dr. Stomberg

[271] Jena Report ¶ 87.

[272] (=1 – 1/6).

[273] (=1 – 1/11).

[274] Report ¶¶ 206-207 and Table 19.

[275] See, *e.g.*, Saravia Report ¶ 209-215, Jena Report ¶ 132-135, Stomberg Report ¶ 172.

[276] Report ¶¶ 206-207.

criticizes the hierarchical approach for in some cases "failing to generate any statistically meaningful results" and, in other cases, "inappropriately borrowing an explanation from other Drugs at Issue".[277]

### *ii. Ordering of the Hierarchical Approach*

289. In my Report, I provided two (admittedly conflicting) descriptions of the order of preference for the regressions used to calculate disgorgement under the Difference in Difference and the Before and After Models. In the text of the Report, I describe the approach for a Defendant-Drug whose overcharge could not be computed by comparing that manufacturer's net price to its own net price as:

> In the event that such a comparison cannot be made (e.g., for an entrant manufacturer), **I first ask whether the same overcharge percentage can be calculated using the DiD model using an alternative transactional data source (AMP or IQVIA).** If so, I rely on that overcharge estimate for purposes of disgorgement. If not, I instead rely on the estimated post-conspiracy increase in price for that manufacturer relative to the average price for each Drug pre-conspiracy from the DiD model.[278]

However, in Table 19 of my Report (reproduced below), I detail a different order of preference, one in which net prices are preferred over AMP/IQVIA prices. As shown in the Table, for the third estimate relied upon for the Before and After Model and for the second estimate relied upon for the Difference in Difference Model, I rely on the "Average-Price Estimate" before turning to information from IQVIA.

**Table 9 - Order of Preference for Disgorgement Estimates (Table 19 of Report)[279]**

| Order of Preference | "Before and After" Disgorgement | DiD Disgorgement |
|---|---|---|
| 1 | Own-Price Estimate (Before and After Model) | Own-Price Estimate (DiD Model) |
| 2 | Own-Price Estimate (DiD Model) | **Average-Price Estimate (DiD Model)** |
| 3 | **Average-Price Estimate (DiD Model)** | AMP Average-Price Estimate (DiD Model) |
| 4 | AMP Average-Price Estimate (DiD Model) | IQVIA Average-Price Estimate (DiD Model) |
| 5 | IQVIA Average-Price Estimate (DiD Model) | Average OC (PI Drugs, DiD Model) |

[277] Stomberg Report ¶ 173.

[278] Report ¶ 207.

[279] Report Table 19, emphasis added.

| | | |
|---|---|---|
| 6 | Average OC (PI Drugs, Before and After Model) | |

290. Table 19 of Report accurately describes the hierarchical approach I applied for my disgorgement estimates, whereas the description in the text does not. However, as discussed in my Report, my strong preference is to rely on net price information, since that is the measure which best approximates the actual net earnings for the Defendants.[280] This preference is reflected in the hierarchical approach I actually applied in my Report (Table 19).

291. An examination of the underlying data provides further support for my decision to rely on net prices. The vast majority of the Drugs for which this ordering makes a difference are Drugs for which the cited Defendant exited the market, only to re-enter during the Post-Conduct Period. Since IQVIA tracks prices historically and Defendants were only required to turn over information on net prices for a more limited time period, the IQVIA data often has more distant pre-Conduct price information for the drug where I do not possess any pre-Conduct prices for that Defendant. This explains why an own-price versus own-price comparison could be performed using the IQVIA data but not when using the net price data. Thus, Dr. Jena's "preferred" hierarchical approach used for his modification to my disgorgement model actually uses even less proximate data than my hierarchical approach, which is the very criticism Dr. Jena asserts with respect to my choice of benchmark periods.[281]

292. In my opinion, overcharges calculated using net price data (when available from the Defendant) are likely to be more reliable than calculations using other sources, and thus the hierarchical approach as calculated and performed in my Report is appropriate for calculating disgorgement for the Drugs at Issue.

***iii. Using Information from Other Sources to Compute Overcharges Is Also Appropriate***

293. Dr. Stomberg also criticizes the hierarchical approach for the same "ordering" issue discussed above, but also asserts that the model "borrows an explanation" from other Drugs at Issue, and that the model fails to generate results using certain price measures (*i.e.*, net prices).[282] It is not clear what Dr. Stomberg means when he says that I borrow an explanation from other Drugs at

---

[280] Report ¶ 71.

[281] Compare Jena Report ¶ 135 with Jena Report ¶ 107-108.

[282] Stomberg Report ¶ 173.

Issue. Except in the rare case where my models fail to generate any estimate of an overcharge at all,[283] each overcharge is calculated by comparing each manufacturer's price to a benchmark price (either that manufacturer's own price or the prices of other manufacturers) for that same Drug at Issue. Thus, my models neither "estimate[s] results at the drug level alone" as Dr. Stomberg suggests,[284] nor does the overcharge for one Perrigo Drug at Issue rely on the overcharges for other Drugs at Issue.

294. Finally, Dr. Stomberg criticizes me for using IQVIA price information on Hydrocortisone Acetate Suppositories (instead of net prices) without "further examination of the underlying causes for such a failure."[285] In the case of Hydrocortisone Acetate Suppositories, I fully utilized the only information available to me (IQVIA) to estimate the pre-Conduct benchmark price. Since Perrigo provided insufficient information on its pre-Conduct net sales, and G&W (Perrigo's alleged co-conspirator on Hydrocortisone Acetate Suppositories) provided no net sales information on Hydrocortisone Acetate Suppositories, I have no net sales price for the pre-Conduct period to rely on. In face of this issue, I made the reasonable decision to estimate an overcharge from the IQVIA data to apply to Perrigo's sales during the Post-Conduct period.[286] Thus, the problem lies not with my model, but in the absence of data from the Defendants.

### H. The Relevance of Statistical Significance to Liability and Disgorgement

295. In addition to Dr. Jena's assertions regarding potential biases in my econometric models used for disgorgement (discussed above), he also criticizes my computation of disgorgement for Drug-Defendant combinations where the price increase was not statistically significant. In particular, Dr. Jena claims that:

> Reporting and accounting for the statistical significance of the overcharge estimates is critical. If an overcharge estimate is statistically significant at conventional significance levels, the estimate is unlikely to occur simply due to chance. The converse is true for statistically insignificant estimates, which are not typically viewed as strong evidence that an effect is different from zero.[287]

---

[283] As discussed in my Report ¶ 208, in these cases I apply the average overcharge for PI Drugs.

[284] Stomberg Report ¶ 173.

[285] Stomberg Report ¶ 173.

[286] As described in my Report, I adjust (reduce) the IQVIA overcharge by the average relationship between IQVIA and net price overcharges.

[287] Jena Report ¶ 148.

Dr. Jena then argues that if a Drug-Defendant observation did not exhibit a statistically significant price increase and, "if the trier of fact determines that there should be no disgorgement for these Drug and Defendant combinations" that it should not be included in my disgorgement estimate.[288] Dr. Gilbert asserts similar claims with respect to my liability analyses.[289]

296. As a preliminary matter, I obviously agree with Dr. Jena's last point – if the trier of fact determines that there should be no disgorgement from any individual Defendant on a Drug at Issue, they should not be included in my overall disgorgement estimate.

297. I offer both my liability and disgorgement regressions as "Effects Evidence" – I test for whether the prices for the Drugs at Issue or the prices for specific Drug-Defendants increased after the alleged first communication. The results of those tests stand on their own – they are either statistically significant and positive, positive but statistically insignificant, or negative but statistically insignificant.[290] In the case of statistically significant and positive increases in prices under these models, an economist might testify that these results (and the associated level of confidence in those estimates[291]) might serve alongside Direct Evidence to determine liability (as I assert with respect to my Drug-specific liability models).

298. In the context of my disgorgement calculation, I offer the results from my disgorgement regressions as my best estimate of the amount by which the Defendants were able to increase their net revenues (and hence profits). If the trier of fact were solely relying on these estimates to establish the fact that prices were elevated as a result of each Defendants' Conduct, statistical significance might be a factor that the trier of fact would consider. As noted in the ABA's guide to Proving Antitrust Damages:

> While proving the existence of antitrust injury may be an exacting task, "a lesser level of proof is needed to support the amount of damages[.]" [.] "[.] it will be enough if the evidence shows

[288] Jena Report ¶ 149.

[289] Gilbert Report ¶ 511-512.

[290] As discussed in the Reference Manual on Scientific Evidence, a fourth possibility (practical significance) exists "if data limitations are such that only 3 or 4 years of preinfringement sales are known, the difference between but-for sales and actual sales during the period of alleged infringement could be practically significant but statistically insignificant. Alternatively, with only 3 or 4 data points, the expert would be unable to detect an effect, even if one existed." Rubinfeld, D.L. (2011). "Reference Guide on Multiple Regression." In *Reference Manual on Scientific Evidence*, J.P. Kassirer and Gladys Kessler (eds), Third Edition, Washington, DC: The National Academies Press.

[291] As measured by statistical significance.

> the extent of the damages as a matter of just and reasonable inference [.]" "[.] make a "just and reasonable" estimate of the damages based on either direct or inferential proof.[292]

299. Thus, it is my understanding that the standard for calculating damages (and hence disgorgement) once the trier of fact has determined the fact of injury would be "a just and reasonable" estimate of the damage, which I interpret to mean the "best" estimate of the damage. The best estimate of damages or injury may or may not be statistically significant, or may have no proof of significance attached (the most common example of this in damages analysis are accounting methods to estimate damages or injury).

300. In this case, Dr. Jena has criticized my estimates as being "biased" – "leading to incorrect inferences regarding the size of the alleged overcharges."[293] I discussed these criticisms at length above and disagree with Dr. Jena's claims of bias. If a regression model is not biased, under the assumptions of the Ordinary Least Squares regression model, each coefficient represents what is called the "Best Linear Unbiased Estimator."[294] While Dr. Jena can dispute the validity of the underlying assumption (of an unbiased model), he generally agreed with this principle at his deposition.[295] Thus, even in the absence of statistical significance, should the trier of fact determine the fact of antitrust injury, my estimate of the disgorgement amount serves as the best estimate of the amount of that increase in profits.

## I. Negative Net "But-For" Margins for Certain Defendant-Drugs

### *i. Overview*

301. Defendant Experts (Dr. Jena and Dr. Stomberg) also claim that my estimates of disgorgement are unreliable because they generate negative net "but-for" margins for certain Defendant-Drug combinations.[296] Dr. Jena calculates that 59 Drug-Defendant combinations in my Before and After Model and 63 Drug-Defendant combinations in my Difference-in-Difference Model have

---

[292] American Bar Association. (2017). *Proving Antitrust Damages: Legal and Economic Issues*, Third Edition, ABA Book Publishing, pp. 87-88.

[293] Jena Report ¶ 146.

[294] See, e.g., Wooldridge, J. M. (2016). *Introductory Econometrics: A Modern Approach,* Sixth Edition. Cengage Learning, at p. 92. ("Under the Gauss-Markov assumptions (MLR.1 through MLR.5), the OLS estimators are the best linear unbiased estimators (BLUEs).")

[295] Jena Deposition 256:10-257:21.

[296] Jena Report ¶¶ 163-166 and Stomberg Report ¶ 187.

estimated negative "but-for" profit margins.[297] Dr. Stomberg calculates that my model implies negative "but-for" profit margins for four Perrigo Drugs at Issue.[298]

#### *ii. Negative Margins Generally*

302. As Defendant Experts themselves acknowledge, negative net prices and negative margins do occur in the generic pharmaceutical industry.[299] In fact, across the Drugs at Issue, three Drugs[300] and eleven Drug-Defendants appear to have negative margins in the pre-Conduct period.

303. In the context of this Report, negative margins are most relevant with respect to the decision whether to continue with existing prices or increase price (see Section III.B.iii, above), or, as a last resort, to exit the market altogether (discussed below). As acknowledged in my Report, both concerns are relevant to the "but-for" world, as too low "but-for" margins could lead either to higher prices or exit.

#### *iii. The Available Cost Data Are Limited and at Most Indicative of General Trends in Costs Across the Drugs at Issue*

304. As discussed in my Report, the availability of usable cost data varied greatly across the manufacturers. Some manufacturers supplied no usable cost data, and others provided cost information that could not be used to identify costs for a specific Drug at Issue. To maximize the coverage of the cost information available to me, in certain cases where cost information was unavailable for a manufacturer, I assumed that the cost information for other manufacturers could reasonably approximate the costs for the manufacturer with the missing cost information.

305. The cost data that I utilized can show large variances over time (see, for example, for 12.5 MG Promethazine Hydrochloride Suppositories, where costs vary from roughly $0.25 to over $10.00, the latter of which occurs during a period where prices were only $0.60)[301]. Thus, applying the cost data literally can lead to wild swings in profitability.[302] In my opinion, the cost data are best

---

[297] Jena Report ¶ 165.

[298] Stomberg ¶ 187 and Figure 25. The four Perrigo Drugs at Issue are Clindamycin Phosphate Solution 1%, Econazole Nitrate Cream 1%, Halobetasol Propionate Ointment 0.05%, and Hydrocortisone Valerate Cream 0.2%.

[299] See, e.g., Stiroh Report ¶ 31, Stomberg Report footnote 156 with respect to negative net prices.

[300] These are Ammonium Lactate Cream 12%, Ammonium Lactate Lotion 12%, and Mometasone Furoate Cream 0.1%.

[301] Report ¶¶ 112-113, Appendix F.

[302] To address some of these concerns, I applied a "reasonable" screen to exclude costs from my margins analysis that were in excess of 150% of net prices.

utilized for the same purpose that I used them for – they are indicative of the general trend in costs for the Drugs at Issue. While I performed an analysis of net margins in my Report, it was performed only at an aggregate level.

306. As an example, Dr. Jena claims that my "but-for" prices indicate that Aurobindo would sell all of the Drugs at Issue at a loss.[303] This is a primary example of why the Defendants' cost data as calculated for and used in my Report should not be used literally to determine but-for margins. For example, Aurobindo's costs for both formulations of its New Generic Drugs at Issue[304] are on average double or triple the costs for the other Defendants for the same Drugs at Issue.[305] Such variation in costs casts doubt on whether the cost data can be used to reliably calculate but-for net profit margins.

#### *iv. Addressing Cost Increases in the Drugs at Issue*

307. In my Report, I calculated that Defendants had increased their net margins from 68.5 percent during the pre-Conduct Period for each Drug at Issue to 79 percent after communications commenced,[306] demonstrating that Defendants' prices increases did lead to higher profit margins. In addition, as noted in my Report, a 68.5 percent profit margin for the Drugs at Issue as a whole would indicate that Defendants' wholesale exit from the markets for the Drugs at Issue was unlikely.[307]

308. In my Report, I estimated what is called the "pass-through rate" for the Drugs at Issue, which is the rate at which cost increases are passed through to final prices.[308] In economic terms, pass-through rates can vary, from zero to passthrough rates that are larger than 1.[309] Based on historical

[303] Jena Report ¶¶ 31-32.

[304] Metformin Hydrochloride/Pioglitazone Hydrochloride Tablet 500mg/15gm and Metformin Hydrochloride/Pioglitazone Hydrochloride Tablet 850mg/15mg.

[305] See backup materials to this report.

[306] Report ¶ 234.

[307] Report ¶ 234.

[308] Report ¶ 114.

[309] Defendants acknowledge that the passthrough rate is likely to be below one. See, *e.g.* Deposition of Jason Gensburger, May 22, 2023, 161:12-162:10.

data for the Drugs at Issue, I used my Before and After Model to estimate the passthrough elasticity specific to the Drugs at Issue. This passthrough elasticity was used to calculate the "but-for" prices under the Before and After model.

309. After reviewing Dr. Jena and Dr. Stomberg's criticisms related to negative margins, I have identified a set of 10 PI Drugs at Issue with unusually large cost increases (defined as dollar cost increases that exceeded the pre-Conduct net dollar margin) and one New Generic with a large cost decrease[310] that resulted in a negative but-for margin (Imiquimod Cream).[311] Across these 11 drugs, I find that eight had predicted negative but-for margins (seven PI Drugs and one NG Drug). This would indicate that the but-for passthrough rate for these Drugs at Issue would have been higher than the average passthrough rate used to calculate disgorgement, since sustained negative but-for gross margins would likely lead to exit.

310. The seven PI Drugs are summarized in Table 10 below. As shown in the Table, while each Drug experienced a large increase in costs, six of the seven also exhibit a significant increase in the dollar margin per extended unit. This would indicate that, in the "as is" world, prices went up for these Drugs by more than costs. Assuming that the "but-for" passthrough rate was equal to or less than one, this would indicate that there was an increase in prices for these Drugs that was unexplained by an increase in costs.

---

"Q. But there's no rule or guideline whereby there's some kind of threshold set if cost goes up by X percent, then we're going to raise price by Y percent? There is no guidance like that at Lupin?

A. No. I mean, you know, just because our -- the costs are going up doesn't mean that we're always going to do an increase. It doesn't mean that we can always do an increase.

You know, any time we understand that the costs are going up, we – we may evaluate the potential and we may make a decision that, you know, we can't make -- we can't increase the price. You know, there might be some times where we might say, okay, we can. But there's not a threshold to say, oh, our costs go up more than X percent, then, you know, we have to do an increase or an increase has to occur."

[310] Since my New Generic model largely uses prices in the Post-Conduct Period as a benchmark, a large cost decrease that resulted in (all else equal) lower Post-Conduct prices could artificially decrease the benchmark price (and hence the "but-for" price), just as an increase in cost for the PI Drugs at Issue that may not have been fully passed through would decrease the "but-for" price.

[311] As discussed above, I estimate margins at the Drug level, and not at the Drug-Defendant level as calculated by Dr. Jena. Given the nature and availability of the cost data in this matter (as discussed above), I believe this level of aggregation is appropriate for evaluating large cost increases.

**Table 10 – PI Drugs with Large Cost Increases and Low Regression-Predicted "But-For" Margins**

| | Pre-Conduct Period | | Post-Conduct Period | | | |
|---|---|---|---|---|---|---|
| Drug | Average Cost | Average Dollar Margin | Average Cost | Average Dollar Margin | Increase in Cost | Increase in Dollar Margin |
| ALCLOMETASONE DIPROPIONATE-CREAM-0.05% | $0.13 | $0.11 | $0.33 | $0.22 | $0.20 | $0.11 |
| ALCLOMETASONE DIPROPIONATE-OINTMENT-0.05% | $0.13 | $0.20 | $0.38 | $0.46 | $0.25 | $0.26 |
| CLOBETASOL PROPIONATE-GEL-0.05% | $0.07 | $0.09 | $0.20 | $1.51 | $0.13 | $1.42 |
| HALOBETASOL PROPIONATE-CREAM-0.05% | $0.15 | $0.07 | $0.49 | $0.48 | $0.34 | $0.41 |
| HALOBETASOL PROPIONATE-OINTMENT-0.05% | $0.15 | $0.09 | $0.70 | $0.53 | $0.55 | $0.44 |
| HYDROCORTISONE VALERATE-CREAM-0.2% | $0.08 | $0.08 | $0.65 | $0.45 | $0.57 | $0.37 |
| MOMETASONE FUROATE-OINTMENT-0.1% | $0.05 | $0.03 | $0.20 | -$0.02 | $0.15 | -$0.04 |

*All costs and margins are reported per extended unit.*

311. Since my model does not account for dynamic exit decisions in the "but-for" world, I make an adjustment to the predictions from my disgorgement models for the eight Drugs with negative net margins. For the seven PI Drugs with large cost increases and negative margins, I first calculate the dollar margin (net price minus estimated cost) for each Drug at Issue during the Pre-Conduct Period. Then, for each quarter where my regression models infer that the Defendants would have earned a negative "but-for" margin, I instead assume that the Defendants would have earned the same dollar margin during that quarter as in the Pre-Conduct Period (allowing for the cost increase to be fully passed through to but-for prices). This assumption is likely conservative, in that it assumes that the passthrough rate for a cost increase is one, whereas all that would be necessary to ensure that a firm would not exit would be a zero dollar margin.

312. Across the seven PI Drugs, this results in a net fall in gross disgorgement of between $100 million (Difference in Difference) and $105 million (Before and After).

313. For Imiquimod Cream, as shown in Figure 19 below, costs decreased from around $6 per extended unit in 2011 to around $1 per extended unit by 2018.[312] Since costs were not accounted for in my New Generic Model (since I do not possess cost information for the control sample to determine at what rate cost changes are passed through to final prices of new generic drugs), I discuss a modification to my New Generic model for Imiquimod below.

314. For Imiquimod, as discussed generally in my Report, the reference price was calculated as the lowest two-quarter price for which I have data ($0.35), which occurred during 2017Q2. During that period, the calculated cost for Imiquimod was $0.63, meaning the "as-is" net margin implied

[312] Dr. Stomberg notes that for this drug Perrigo (as the authorized generic) had to pay substantial royalties to the branded Drug. (Stomberg Report ¶ 102.)

by Defendants' cost data was -$0.28. Since this "as-is" net margin is negative, it likely does not represent a valid indicator of the long-run dollar margin that would not result in exit, hence I calculate the minimum annual positive dollar margin for Imiquimod over the period for which I have data ($0.33) as a reference point for my analysis.

315. My New Generics regression model estimated the rate at which prices declined over time (all else equal) for comparable new generic drugs. Under the (perhaps strong) assumption that other new generics did not also have decreased costs over time,[313] this model can also be used to model the upper bound for how much the dollar margin would have changed from the launch of the new generic to the period of reference price. For example, if prices decreased from $1 to $0.50 over the five years since launch, and the cost remained at $0.30, the dollar margin would have decreased from $0.70 at generic launch to $0.20 during the reference period.

316. Using this upper bound but-for dollar margin for Imiquimod, I then compute the but-for price in each quarter for Imiquimod (depicted in Figure 19 below). As shown in the Figure, this results in large overcharges during the period when Defendants noted "[w]e are VERY pleased with where the price is today. … With three additional generic players in addition to us in the market today it [is] amazing the price is holding as high as it is."[314], and relatively low overcharges elsewhere. This results in a reduction of the disgorgement for Imiquimod from $247 million to $146 million.

---

[313] It would not be uncommon for products in nascent industries to have lower long-run costs than initial costs due to scale economies or learning effects (e.g., improvements in production technologies). McEachern, W.A. (2006). *Economics: A Contemporary Introduction*, Seventh Edition. South-Western. at p. 152. ("If a firm experiences **economies of scale,** long-run average cost falls as output expands. [.] A larger scale of operation allows a firm to use larger, more efficient machines and to assign workers to more specialized tasks.")

[314] SDZCTAG-05403437 and Complaint ¶ 255.

**Figure 19 – Prices, Costs and But-For Prices for Imiquimod Cream**




## J. Other Criticisms of My Net Disgorgement Calculation

### *i. Net Disgorgement*

317. Dr. Jena also offers criticisms of the methodology I used to calculate the offset amounts to gross disgorgement that were used to calculate net disgorgement.[315] In particular, Dr. Jena claims that I should have accounted for changes in the Medicaid rebate program that included an inflationary component beginning in 2017.[316] In addition, Dr. Jena claims that I have made several mistakes in my calculations of the offsets to gross disgorgement, namely (1) I double count some of Defendants' sales transactions, (2) I incorrectly impute missing AMP data so that AMP is negative for certain transactions, (3) I apply negative overcharge estimates when calculating

---

[315] As discussed in my Report (¶ 232), offsets to gross disgorgement represent "costs" to the Defendants that would not have been incurred in the but-for world.

[316] Jena Report ¶ 174.

rebates, and (4) I mistakenly impute AMP data for Sun/Taro. In addition, Dr. Jena claims that my methodology for calculating the price elasticity of demand is flawed.

a. *Calculations of Offsets to Gross Disgorgement*

318. The overall impact of Dr. Jena's modifications is generally small. Hence, while I would dispute Dr. Jena's proposed alternative estimate of the price elasticity of demand,[317] for purposes of this Reply Report, I adopt Dr. Jena's proposed modifications for purposes of my calculations of net disgorgement.

***ii. Lingering Effects***

319. In addition, Dr. Jena presents a critique of my Lingering Effect analysis, claiming that because I estimate a "single average overcharge" for the Drugs at Issue, I "ignore[s] the possibility that for some Drug and Defendants there were no 'lingering effects.'"[318] Dr. Jena then suggests a model that calculates separate Drug-Defendant overcharges for each Drug at Issue for each quarter. [319] He then asserts that if the Drug-Defendant-Quarter overcharge fails to be positive or statistically significant in any quarter, that the effects of the Conspiracy must have ended for that Drug-Defendant.[320]

320. Dr. Jena's analysis above shows a flawed understanding of how the overcharge estimates from my model are estimated. For the overcharge estimates that are used for disgorgement, I test for whether the prices for each Drug at Issue were still elevated (relative to the benchmark period) during the 2017-2018 period. If the Drug at Issue's prices were not elevated, I limited the disgorgement period to the period following first communication and the Heritage Complaint (at the end of 2016).

321. Dr. Jena then claims that for the Drugs at Issue that had returned to Pre-Conduct benchmark prices I should have examined the pattern of prices prior to the Heritage Complaint to determine precisely when prices had fallen to pre-Conduct levels. As a preliminary matter, this adjustment is unnecessary – to the extent that, for example, the regression observes an average price increase

---

[317] As discussed in my Report (¶ 228) I chose a 3-year "post" time horizon for each of the Drugs at Issue so that there would be less potential confounding effects. Dr. Jena's proposed elasticity model includes a time period that is potentially longer than three years.

[318] Jena Report ¶ 181.

[319] Jena Report ¶¶ 181-184.

[320] Jena Report ¶ 184.

for a Drug at Issue between 2013 and 2015 of say, 50%, and a 0% price increase in 2016, the regression would estimate an average overcharge of 37.5% (= 50% for three years, and 0% for one year, an average of 37.5%). In other words, the estimated disgorgement percentage already accounts for the possibility that prices had already returned to competitive levels.

322. In addition, Dr. Jena's "statistically insignificant or negative" criteria for identifying the alleged end of the effects for each Drug-Defendant is overly restrictive. If it were the case that prices for a Drug-Defendant were to fluctuate for reasons unassociated with the conspiracy (e.g., because of mis-timed rebates), under Dr. Jena's approach, disgorgement would be terminated even if prices in the subsequent quarter were above Pre-Conduct benchmark levels. For this reason, it was appropriate to test (as I did for my disgorgement estimate) whether elevated prices for the Drugs At Issue in 2018 had ceased by the end of the Conduct Period (the date of the Heritage Complaint).

***iii. Pre-Judgement Interest***

323. In my Report, I utilized a representative interest rate, five percent, which was derived from the IRS underpayment interest rate over the relevant period.[321] I applied this interest rate in order to simplify the calculation and to be conservative (since recent interest rates have increased). Dr. Jena asserts that I did not use the minimum statutory interest rate used by the IRS for underpayments over the relevant period (three percent) and hence, "prejudgment interest would be lower as well."[322] While Dr. Jena's calculation would be correct for the periods in which those rates were lower, over the entire period, underpayment rates would be expected to be similar to the rate I actually applied (five percent).

324. Dr. Jena also states that the interest rate would be even lower than what he proposed had I applied a similar pre-judgement interest rate (the risk free 1-year treasury constant maturity yield ) as utilized by Dr. Singer in his damages analysis.[323] Dr. Jena provides no discussion of the difference between damages and disgorgement .[324] Nonetheless, for purposes of my revised

[321] Report ¶¶ 241-242.

[322] Jena Report ¶ 195.

[323] Jena Report ¶ 196.

[324] See Report ¶ 241. "While the SAGs and the SEC represent different government entities, I see no reason why a rate that is applicable in SEC proceedings would not be appropriate for this matter. The IRS rate is also consistent with economic principles in this case, as opposed to the risk-free rate."

estimates of disgorgement, I apply the minimum IRS underpayment rate as calculated by Dr. Jena (3 percent).[325]

## V. Revised Estimates of Disgorgement

### *i. Updates to Data*

325. In Defendant Experts' Reports (largely Dr. Saravia's Report), Defendant Experts criticize my processing of the transactional data supplied by Defendants. Dr. Saravia claims that I have included some number of intra-company sales in my estimates of net revenues for Greenstone,[326] and that the manner in which I have deduplicated Greenstone's rebates may be inappropriate.[327] Since my Report, I have thus modified the way that I treat Greenstone's intra-company sales. However, based on my review of Dr. Saravia's criticism relating to the deduplication of rebates, I do not find necessary to make any adjustments to my methodology.

326. In addition, Defendants have made updates to their data productions and made responses to questions about their data since I filed my Report. I have noted these productions and clarifications and have made several corresponding modifications to the underlying data processing used to calculate net prices in my Report. The effects of these changes are relatively minor in scale.

### *ii. Accepted Modifications to Defendants' Critiques*

327. As discussed above, Defendant Experts have advanced several critiques of the original disgorgement model used in my Report, some of which I have considered and incorporated into my analysis. These include:

- Using a two-stage least squares model to instrument for demand to allow for separate effects of demand and supply shifts (see Section IV.D.ii.d);
- Adding additional periods of claimed shortages identified using failure to supply penalties and documents cited by Defendant Experts in their Reports (see Section IV.C.ii.b);

[325] Jena Report ¶¶ 41, 195.

[326] Saravia Report ¶ 222.

[327] Saravia Report Footnote 382.

- For 7 Drugs that have negative estimated but-for margins and large increases in cost, utilizing the pre-Conduct dollar margin for these Drugs and the actual cost data to estimate their "but-for" prices. (see Section IV.I.iv);[328]
- For Imiquimod Cream, utilizing the approach described in Section IV.I.iv to adjust the overcharge estimate for reductions in cost;
- For Carbamazepine, utilizing an estimated overcharge from both the Difference in Difference Model and the Before and After Model;[329]
- Correcting the methodology that I use to de-mean the cost variable used in the Before and After Model (see Jena Report footnote 281);
- Updating the New Generic Regression Model to include additional explanatory variables (see Section IV.E.iii.b(c));
- Updating my net disgorgement calculation to account for adjustments to Medicaid rebates in 2017 and the imputation of AMP data for Taro (see Jena Report ¶¶ 171-174);
- Using Dr. Jena's estimate of the price elasticity of demand, which he estimates using the entire Post-Conduct time period as opposed to the three years following Conduct. (See Jena Report ¶ 176);
- Updating my estimate for the relevant prevailing pre-judgement interest rate.

### *iii. Revised Estimates of Liability Models and Disgorgement*

#### a. *Summary Regression Results for the Drugs at Issue Under the Modified Model*

328. In Table 11, below, I report the summary results of my updated Difference in Difference and Before and After models for Price Increase Drugs at Issue.

---

[328] These Drugs are also excluded from my calculations relating to lingering effects.

[329] See Report ¶¶ 154-156. In my Initial Report, I estimated the overcharge for Carbamazepine separately using only the Difference-in-Difference model and applied that overcharge in both my Before and After and Difference-in-Difference disgorgement estimates. I now separately compute an overcharge for Carbamazepine using the Before and After and Difference-in-Difference models.

## Table 11 – Updated Before and After and Difference in Difference Models

| | (1) | (2) | (3) |
|---|---|---|---|
| | **First Stage Regression** | **Difference-in-Difference** | **Before and After** |
| Dependent Variable >> | **Log(Total Annual Quantity)** | **Log(Net Price)** | **Log(Net Price)** |
| Overcharge as Percent of Revenue >> | | **68.3%** | **64.4%** |
| Overcharge % >> | | **215.2%** | **180.6%** |
| Drugs at Issue x (Post First Communication) | | 1.1481*** | 1.0318*** |
| | | [0.1371] | [0.1259] |
| Log(Predicted Total Annual Quantity of Drug) x Control Drugs | | 1.0193 | |
| | | [0.8892] | |
| Log(Predicted Total Annual Quantity of Drug) x Drugs at Issue | | -2.1931* | -1.8806** |
| | | [1.1917] | [0.8043] |
| Number of Competitors = 2 x Control Drugs | | -0.0585* | |
| | | [0.0328] | |
| Number of Competitors = 3 x Control Drugs | | -0.1016** | |
| | | [0.0455] | |
| Number of Competitors = 4 x Control Drugs | | -0.1896*** | |
| | | [0.0506] | |
| Number of Competitors = 5 x Control Drugs | | -0.3146*** | |
| | | [0.0570] | |
| Number of Competitors = 2 x Drugs at Issue | | -0.3141* | -0.7442*** |
| | | [0.1756] | [0.1862] |
| Number of Competitors = 3 x Drugs at Issue | | -0.4493** | -0.8823*** |
| | | [0.1821] | [0.1947] |
| Number of Competitors = 4 x Drugs at Issue | | -0.6445*** | -1.0590*** |
| | | [0.2028] | [0.2144] |
| Number of Competitors = 5 x Drugs at Issue | | -0.6093** | -1.0924*** |
| | | [0.2759] | [0.2746] |
| Drug is Branded Generic = Yes x Control Drugs | | 0.8777*** | |
| | | [0.0976] | |
| Drug is Branded Generic = Yes x Drugs at Issue | | 0.9993*** | 0.9514*** |
| | | [0.1822] | [0.1941] |
| Drug in FDA's Shortage List * Drugs at Issue | | 0.3192* | 0.4128*** |
| | | [0.1841] | [0.1280] |
| Drug in FDA's Shortage List x Control Drugs | | **0.1729** | |
| | | [0.1320] | |
| Drug with Temporary Shortage x Drugs at Issue | | **-0.0717** | **-0.0531** |
| | | [0.0951] | [0.0684] |
| Drug in FDA's Shortage List-Lagged x Control Drugs | | **0.0273** | |
| | | [0.0412] | |
| Drug in FDA's Shortage List-Lagged x Drugs at Issue | | **0.0901** | **0.1352*** ** |
| | | [0.0572] | [0.0405] |
| Drug with Temporary Shortage-Lagged x Drugs at Issue | | **-0.0976** | **-0.0672** |
| | | [0.1070] | [0.0688] |
| Log(Quarterly Cost Index) * Before First Communication | -0.3351*** | | |
| | [0.0557] | | |
| Log(Quarterly Cost Index) * Post First Communication | -0.0150 | | |
| | [0.1908] | | |
| Drug in FDA's Shortage List | **-0.1436*** ** | | |
| | [0.0410] | | |
| Drug with Temporary Shortage | **-0.0645** | | |
| | [0.0689] | | |
| Drug in FDA's Shortage List-Lagged | **0.0412** | | |
| | [0.0315] | | |
| Drug with Temporary Shortage-Lagged | **-0.0728** | | |
| | [0.0685] | | |
| Log(COGS) | | | 0.5363*** |
| | | | [0.0935] |
| Log(COGS) * Post First Communication | | | -0.2747*** |
| | | | [0.1001] |
| Constant | 16.0034*** | -16.6558 | 32.1968** |
| | [0.0142] | [14.4690] | [13.6323] |
| Observations | 437,062 | 372,613 | 4,593 |
| R-squared | 0.943 | 0.864 | 0.733 |
| **Drug FE** | **Yes** | **Yes** | **Yes** |
| **Year-Quarter FE** | **Yes** | **Yes** | **No** |

Robust standard errors in brackets
*** p<0.01, ** p<0.05, * p<0.1
Note: Second stage reported standard errors are uncorrected.

### b. *Liability Models*

329. The updated liability results (after incorporating the above changes are reported in Appendix C Table 3 through Appendix C Table 8. As shown in the Tables, the results of my liability analyses are fundamentally unchanged, and are summarized below. For Test 1 (Increase in Prices over the Entire Conduct Period),[330] I find positive and statistically significant increases for 72 of the 84 Drugs at Issue that I tested for a price increase (compared to 75 in my Report). For Test 2 (Increase in Prices over the One-Year Period Following Communications), I still find statistically significant and positive increases in prices for 65 of the 81 Drugs at Issue that I tested for a price increase (compared to 72 in my Report).[331] Across both tests (one year and full period), I find at least one positive and statistically significant result for 76 of the 84 PI Drugs at Issue. The results from the remaining liability tests (WAC price increases and NADAC price falls) have not changed since my Report.[332]

330. In summary, as shown in Appendix C Table 8, Defendants were able to increase prices significantly above competitive levels for 80 of 84 PI Drugs. The remaining 4 PI Drugs at Issue are Ciclopirox Cream 0.77%, Griseofulvin Microsize Tablets 500MG, Mometasone Furoate Cream 0.1%, and Triamcinolone Acetonide Paste 0.1%. I note, however, that I obtain at least one positive disgorgement estimate at the drug level for each of these Drugs as well (See Appendix C Table 13).

c. *Gross Disgorgement*

331. As in my Report, in Table 12 and Table 13 below, I separately calculate the average increase in prices for each Defendant across the Drugs at Issue either relative to each Defendants' pre-Conduct prices (Table 12) or relative to average pre-Conduct prices (Table 13).[333]

**Table 12 – Updated Overcharge Estimates by Defendant (Relative to Own Pre-Conspiracy Prices)**

| Defendant | Before and After Model Coefficient Estimate | Before and After Model Increase in Net Revenues (%) | DiD Coefficient Estimate | DiD Increase in Net Revenues (%) |
|---|---|---|---|---|
| Actavis | 0.7644*** | 115% | 1.0664*** | 190% |

[330] Report ¶¶ 175-176.

[331] Report ¶ 177.

[332] Report ¶ 178-182.

[333] These correspond to Tables 17 and 18 in my Report.

| | | | | |
|---|---|---|---|---|
| Amneal[334] | -0.0920 | -9% | 0.5272*** | 69% |
| Aurobindo | 1.4595*** | 330% | 0.9295*** | 153% |
| G&W | 1.1926*** | 230% | 1.0899*** | 197% |
| Glenmark | 0.5698** | 77% | 0.3055 | 36% |
| Greenstone | 0.8905*** | 144% | 0.4163* | 52% |
| Lannett | 0.6245*** | 87% | 0.8995*** | 146% |
| Lupin | | | 1.5930*** | 392% |
| Mallinckrodt | 1.4936*** | 345% | 1.8247*** | 520% |
| Mylan | 0.3671 | 44% | 0.5144** | 67% |
| Perrigo | 0.5772*** | 78% | 0.7365*** | 109% |
| Sandoz | 1.4080*** | 309% | 1.4420*** | 323% |
| Sun | -0.0093 | -1% | 0.3852** | 47% |
| Taro | 1.1614*** | 219% | 1.3115*** | 271% |
| Teligent | 1.1861*** | 227% | 1.5910*** | 391% |
| Valeant/Bausch | 0.4709** | 60% | -0.2662** | -23% |
| Wockhardt | 1.2424*** | 246% | 1.3456*** | 284% |

*, **, *** denote significance at the 90, 95, and 99 percent levels, respectively

**Table 13 – Updated Overcharge Estimates by Defendant (Relative to Average Pre-Conspiracy Prices)**

| Defendant | DiD Coefficient Estimate | DiD Increase in Net Revenues (%) |
|---|---|---|
| Actavis | 1.1878*** | 228% |
| Amneal | -0.0730 | -7% |
| Aurobindo | 0.4905*** | 63% |
| G&W | 1.2661*** | 255% |
| Glenmark | 0.6676** | 95% |
| Greenstone | 0.9288*** | 153% |
| Lannett | 1.4331*** | 319% |
| Lupin | 1.5919*** | 391% |

[334] Note that under the formal disgorgement model described below, both Amneal and Sun have positive disgorgement estimates. Also, Sun's overcharge is based on only one Drug (Phenytoin Sodium).

| | | |
|---|---|---|
| Mallinckrodt | 1.8280*** | 522% |
| Mylan | 0.5896*** | 80% |
| Perrigo | 0.9829*** | 167% |
| Sandoz | 1.3531*** | 287% |
| Sun | 1.1251*** | 208% |
| Taro | 1.1698*** | 222% |
| Teligent | 2.4373*** | 1044% |
| Valeant/Bausch | 0.7486*** | 111% |
| Wockhardt | 1.1359*** | 211% |

*, **, *** denote significance at the 90, 95, and 99 percent levels, respectively

332. A summary of the complete disgorgement calculation is presented below in Table 14. For purposes of comparison, I present both the overcharge as calculated using the liability model (overcharges calculated by Drug), and the disgorgement model (before and after/DiD).[335] As shown in the Table, the increase in Defendants' net revenues ranged from -16 percent (Valeant/Bausch) to 820 percent for Teligent and 609 percent (for Mallinckrodt) in the DiD and liability models.

[335] Disgorgement amounts for NG Drugs (generated using the approach described above) are assumed to be the same for both models.

**Table 14 – Updated Overcharge Estimates by Defendant and Defendant-Drug**

| Defendant | Increase in Net Revenues (%), Disgorgement Analysis – Before and After Model | Increase in Net Revenues (%), Disgorgement Analysis – DiD Model | Increase in Net Revenues (%), Liability Analysis |
|---|---|---|---|
| Actavis | 271% | 277% | 253% |
| Amneal | 29% | 66% | 55% |
| Aurobindo | 194% | 165% | 60% |
| G&W | 255% | 255% | 108% |
| Glenmark | 35% | 34% | 59% |
| Greenstone | 186% | 145% | 123% |
| Lannett | 110% | 156% | 158% |
| Lupin | 218% | 218% | 229% |
| Mallinckrodt | 433% | 609% | 309% |
| Mylan | 54% | 67% | 78% |
| Perrigo | 99% | 103% | 110% |
| Sandoz | 225% | 215% | 188% |
| Sun/Taro | 187% | 203% | 227% |
| Teligent | 287% | 337% | 820% |
| Valeant/Bausch | 21% | -16% | 5% |
| Wockhardt | 288% | 308% | 373% |
| **Total** | **180%** | **180%** | **163%** |

333. In Table 15 below, I have updated my estimates of the additional net revenues that the Defendants were able to collect as a result of their alleged conduct, using the updated Disgorgement models described above. As shown in the Table, Defendants were able to increase their net revenues on actual sales by approximately $6.0 billion over the period from initial communication through 2018 under the before and after disgorgement model and $6.0 billion under the difference in difference model. My estimates of increases in net revenues from the before and after model range from a low of $3.4 million (Lupin) to a high of $2.1 billion (Sandoz). My estimates from the difference-in-difference model range from -$22.7 million (Valeant/Bausch) to a high of $2.1 billion (Sandoz).

**Table 15 – Actual Increase in Net Revenues (Conduct through 2018) by Defendant**

| Defendant | Actual Revenues ($ millions) | But-For Revenues (Before and After Model) ($ millions) | Increase in Net Revenues (Before and After Model ($ millions) | But-For Revenues (DiD Model) ($ millions) | Increase in Net Revenues (DiD Model ($ millions) |
|---|---|---|---|---|---|
| Actavis | $331.3 | $89.3 | $242.1 | $88.0 | $243.4 |

| | | | | | |
|---|---|---|---|---|---|
| Amneal | $35.4 | $27.5 | $7.9 | $21.3 | $14.1 |
| Aurobindo | $61.3 | $20.9 | $40.4 | $23.1 | $38.2 |
| G&W | $645.5 | $181.9 | $463.6 | $181.9 | $463.6 |
| Glenmark | $92.4 | $68.7 | $23.7 | $69.0 | $23.4 |
| Greenstone | $595.6 | $208.3 | $387.3 | $242.7 | $352.8 |
| Lannett | $99.7 | $47.5 | $52.2 | $39.0 | $60.7 |
| Lupin | $5.0 | $1.6 | $3.4 | $1.6 | $3.4 |
| Mallinckrodt | $662.2 | $124.2 | $537.9 | $93.5 | $568.7 |
| Mylan | $98.8 | $64.2 | $34.6 | $59.2 | $39.6 |
| Perrigo | $1,525.2 | $767.2 | $758.0 | $750.9 | $774.3 |
| Sandoz | $3,017.0 | $928.3 | $2,088.7 | $957.2 | $2,059.8 |
| Sun/Taro | $1,888.6 | $659.0 | $1,229.6 | $623.9 | $1,264.7 |
| Teligent | $100.9 | $26.1 | $74.8 | $23.1 | $77.8 |
| Valeant/Bausch | $121.4 | $100.5 | $20.9 | $144.1 | -$22.7 |
| Wockhardt | $26.1 | $6.7 | $19.4 | $6.4 | $19.7 |
| **Total** | **$9,306.5** | **$3,321.9** | **$5,984.6** | **$3,325.0** | **$5,981.5** |

334. My estimates of the additional net revenues for each individual Drug at Issue are reported in Appendix C Table 13. As shown in that table, the increase in Defendant net revenues is largest for Clindamycin Gel 1% ($300 million) and Lidocaine Ointment 5% ($311 million to $319 million).

d. *Net Disgorgement*

335. In addition, as discussed above, I have recalculated my estimates of the offsets to gross disgorgement, including Medicaid rebates and adjustments for higher profits due to increased quantities. The resulting difference between the as-is and but-for Medicaid rebate payments, based on the Defendant-specific and drug-specific overcharges is reported in Table 16, below. The adjustment for higher "but-for" quantities is reported in Table 17.

**Table 16 – Difference between "As-Is" and "But-For" Medicaid Rebate Payments through 2018**

| Defendant | Medicaid Rebate Savings from Before and After Model ($ millions) | Medicaid Rebate Savings from DiD Model ($ millions) |
|---|---|---|
| Actavis | $11.2 | $10.9 |
| Amneal | $0.4 | $0.7 |
| Aurobindo | $0.2 | $0.2 |
| G&W | $7.8 | $7.8 |
| Glenmark | $0.1 | $0.1 |
| Greenstone | $11.1 | $10.9 |

| | | |
|---|---|---|
| Lannett | $1.1 | $1.3 |
| Lupin | $0.1 | $0.1 |
| Mallinckrodt | $6.1 | $6.4 |
| Mylan | $0.4 | $0.5 |
| Perrigo | $17.4 | $17.7 |
| Sandoz | $49.6 | $50.0 |
| Sun/Taro | $41.4 | $43.2 |
| Teligent | $1.5 | $1.6 |
| Valeant/Bausch | $0.1 | -$0.3 |
| Wockhardt | $0.6 | $0.6 |
| **Total** | **$149.0** | **$151.7** |

**Table 17 – Estimates of Additional Profits for Defendants in the But-For World through 2018**

| Defendant | Additional Profits – Before and After Model ($ millions) | Additional Profits – DiD Model ($ millions) |
|---|---|---|
| Actavis | $6.3 | $6.4 |
| Amneal | $0.2 | $0.4 |
| Aurobindo | $1.0 | $1.0 |
| G&W | $12.0 | $12.2 |
| Glenmark | $0.6 | $0.6 |
| Greenstone | $10.0 | $9.3 |
| Lannett | $1.4 | $1.6 |
| Lupin | $0.1 | $0.1 |
| Mallinckrodt | $13.9 | $14.9 |
| Mylan | $0.9 | $1.0 |
| Perrigo | $19.7 | $20.3 |
| Sandoz | $54.2 | $54.1 |
| Sun/Taro | $31.9 | $33.2 |
| Teligent | $1.9 | $2.0 |
| Valeant/Bausch | $0.5 | -$0.6 |
| Wockhardt | $0.5 | $0.5 |
| **Total** | **$155.2** | **$157.1** |

336. In Table 18, below, I report my updated estimate of total net disgorgement by Defendant. As shown in the table, Defendant net disgorgement under the before and after model equals $5.7 billion, and Defendant net disgorgement under the DiD model totals $5.7 billion. Individual Defendant totals range from -$21.8 million (Valeant Bausch under the DiD model) to $2.0 billion (Sandoz).

**Table 18 – Net Disgorgement by Defendant through 2018**

| Defendant | Net Disgorgement – Before and After Model ($ million) | Net Disgorgement – DiD Model ($ million) |
|---|---|---|
| Actavis | $224.6 | $226.1 |
| Amneal | $7.3 | $13.0 |
| Aurobindo | $39.2 | $37.0 |
| G&W | $443.8 | $443.7 |
| Glenmark | $22.9 | $22.7 |
| Greenstone | $366.1 | $332.7 |
| Lannett | $49.8 | $57.9 |
| Lupin | $3.2 | $3.2 |
| Mallinckrodt | $517.9 | $547.3 |
| Mylan | $33.3 | $38.0 |
| Perrigo | $721.0 | $736.2 |
| Sandoz | $1,984.9 | $1,955.7 |
| Sun/Taro | $1,156.3 | $1,188.3 |
| Teligent | $71.4 | $74.2 |
| Valeant/Bausch | $20.3 | -$21.8 |
| Wockhardt | $18.3 | $18.6 |
| **Total** | **$5,680.4** | **$5,672.7** |

337. I have also updated my calculations of ongoing effects (lingering effects) and prejudgment interest. My estimates of net disgorgement due to lingering effects is shown below (Table 19) and my calculations of prejudgment interest are shown below (Table 20).

**Table 19 – Net Disgorgement by Defendant for 2019 - 2021**

| Defendant | Net Disgorgement ($ million) |
|---|---|
| ACTAVIS | $11.4 |
| AMNEAL | $2.9 |
| AUROBINDO | $4.1 |
| G&W | $38.3 |
| GLENMARK | $3.8 |
| GREENSTONE | $39.6 |
| LANNETT | $0.9 |
| LUPIN | -- |

| | |
|---|---|
| MALLINCKRODT | $22.6 |
| MYLAN | $0.0 |
| PERRIGO | $68.2 |
| SANDOZ | $97.7 |
| SUN/MUTUAL/TARO | $78.6 |
| TELIGENT | $5.3 |
| VALEANT/BAUSCH | $12.0 |
| WOCKHARDT | $1.9 |
| **Total** | **$387.2** |

**Table 20 – Prejudgment Interest Amounts at Date of Trial – Disgorgement through 2018**

| Defendant | Prejudgment Interest – Before and After Model ($ million) through 2018 | Prejudgment Interest – DiD Model ($ million) through 2018 | Prejudgment Interest ($ million) (2019-2021) |
|---|---|---|---|
| Actavis | $100.8 | $101.3 | $2.1 |
| Amneal | $2.4 | $4.3 | $0.5 |
| Aurobindo | $13.1 | $12.4 | $0.8 |
| G&W | $163.3 | $162.2 | $7.0 |
| Glenmark | $9.7 | $9.4 | $0.7 |
| Greenstone | $137.0 | $123.5 | $7.3 |
| Lannett | $18.4 | $21.4 | $0.2 |
| Lupin | $1.4 | $1.4 | $0.0 |
| Mallinckrodt | $185.5 | $195.7 | $4.2 |
| Mylan | $12.9 | $14.5 | $0.0 |
| Perrigo | $285.4 | $291.6 | $12.5 |
| Sandoz | $763.2 | $750.5 | $18.0 |
| Sun/Taro | $442.6 | $454.6 | $14.5 |
| Teligent | $24.8 | $25.8 | $1.0 |
| Valeant/Bausch | $7.4 | -$9.0 | $2.2 |
| Wockhardt | $6.2 | $6.3 | $0.3 |
| **Total** | **$2,174.3** | **$2,165.9** | **$71.2** |

338. Table 21 below reports the total net disgorgement, including estimated disgorgement for 2019 to 2021, including interest through the date of trial. In addition, my updated estimates of state-specific disgorgement totals are reported in Table 22 and Table 23, below.

**Table 21 – Total Disgorgement by Defendant**

| Defendant | Total Disgorgement – Before and After Model ($ million) | Total Disgorgement – DiD Model ($ million) |
|---|---|---|
| Actavis | $327.5 | $329.4 |
| Amneal | $10.3 | $17.9 |
| Aurobindo | $53.1 | $50.2 |
| G&W | $614.1 | $612.9 |
| Glenmark | $33.4 | $32.8 |
| Greenstone | $510.5 | $463.5 |
| Lannett | $68.3 | $79.4 |
| Lupin | $4.6 | $4.6 |
| Mallinckrodt | $707.6 | $747.2 |
| Mylan | $46.2 | $52.5 |
| Perrigo | $1,019.0 | $1,040.4 |
| Sandoz | $2,766.1 | $2,724.1 |
| Sun/Taro | $1,613.4 | $1,657.3 |
| Teligent | $97.2 | $100.9 |
| Valeant/Bausch | $29.9 | -$28.6 |
| Wockhardt | $24.8 | $25.2 |
| **Total** | **$7,926.0** | **$7,909.8** |

**Table 22 – State-Specific Total Disgorgement Amounts – PBM Shares**

| State | Share of PBM Quantity Purchased for Defendants' Drugs at Issue | State/Territory-Specific Total Disgorgement – Before and After Model | State/Territory-Specific Total Disgorgement – DiD Model |
|---|---|---|---|
| AK | 0.14% | $10,728,190 | $10,706,326 |
| AZ | 1.46% | $115,453,221 | $115,217,922 |
| CA | 8.56% | $678,684,011 | $677,300,822 |
| CO | 1.10% | $86,904,918 | $86,727,802 |
| CT | 1.41% | $111,945,718 | $111,717,567 |
| DC | 0.29% | $23,254,034 | $23,206,641 |
| DE | 0.33% | $25,801,666 | $25,749,081 |
| FL | 6.97% | $552,790,399 | $551,663,787 |
| GA | 3.06% | $242,229,884 | $241,736,209 |
| IA | 0.99% | $78,657,193 | $78,496,886 |
| ID | 0.36% | $28,826,695 | $28,767,945 |
| IL | 4.04% | $319,920,065 | $319,268,053 |

| | | | |
|---|---|---|---|
| IN | 1.71% | $135,300,783 | $135,025,034 |
| KS | 0.79% | $62,708,604 | $62,580,801 |
| KY | 1.24% | $98,656,312 | $98,455,246 |
| LA | 1.11% | $88,285,569 | $88,105,639 |
| MA | 2.70% | $213,723,909 | $213,288,330 |
| MD | 2.32% | $184,034,111 | $183,659,041 |
| MI | 3.72% | $294,804,877 | $294,204,052 |
| MN | 1.74% | $138,167,426 | $137,885,835 |
| MO | 1.94% | $153,370,322 | $153,057,747 |
| MP | 0.00% | $196,344 | $195,944 |
| MS | 0.73% | $57,926,761 | $57,808,703 |
| NC | 3.23% | $255,719,912 | $255,198,743 |
| ND | 0.21% | $16,315,400 | $16,282,148 |
| NE | 0.53% | $41,931,582 | $41,846,123 |
| NH | 0.45% | $35,298,751 | $35,226,811 |
| NJ | 3.66% | $289,720,491 | $289,130,028 |
| NM | 0.46% | $36,514,557 | $36,440,139 |
| NV | 0.73% | $57,952,283 | $57,834,174 |
| NY | 10.95% | $867,633,970 | $865,865,693 |
| OH | 3.68% | $292,010,249 | $291,415,118 |
| OK | 0.94% | $74,416,196 | $74,264,532 |
| OR | 0.93% | $73,749,714 | $73,599,409 |
| PA | 4.42% | $350,695,171 | $349,980,439 |
| PR | 0.55% | $43,883,265 | $43,793,829 |
| RI | 0.40% | $31,388,465 | $31,324,494 |
| SD | 0.24% | $19,345,676 | $19,306,248 |
| TN | 1.81% | $143,072,419 | $142,780,831 |
| UT | 0.56% | $44,652,482 | $44,561,478 |
| VA | 2.48% | $196,194,618 | $195,794,764 |
| VI | 0.01% | $946,426 | $944,497 |
| VT | 0.19% | $15,125,359 | $15,094,533 |
| WA | 1.92% | $152,010,506 | $151,700,701 |
| WI | 1.74% | $137,934,846 | $137,653,728 |
| WV | 0.62% | $48,907,683 | $48,808,007 |
| **Total** | **87.41%** | **$6,927,791,032** | **$6,913,671,880** |

**Table 23 – State-Specific Net Disgorgement Amounts – Population Size**

| State | Share of US Population | State/Territory-Specific Net Disgorgement – Before and After Model | State/Territory-Specific Net Disgorgement – DiD Model |
|---|---|---|---|
| AK | 0.23% | $17,982,070 | $17,945,421 |
| AZ | 2.11% | $167,050,083 | $166,709,627 |
| CA | 11.96% | $948,012,103 | $946,080,011 |
| CO | 1.67% | $132,639,507 | $132,369,181 |
| CT | 1.11% | $87,948,509 | $87,769,266 |
| DC | 0.21% | $16,290,950 | $16,257,748 |
| DE | 0.29% | $22,988,174 | $22,941,323 |
| FL | 6.23% | $493,657,884 | $492,651,787 |
| GA | 3.14% | $249,103,499 | $248,595,815 |
| IA | 0.96% | $76,328,584 | $76,173,023 |
| ID | 0.51% | $40,703,717 | $40,620,761 |
| IL | 3.97% | $314,766,673 | $314,125,165 |
| IN | 2.05% | $162,106,228 | $161,775,848 |
| KS | 0.90% | $71,090,996 | $70,946,110 |
| KY | 1.37% | $108,426,560 | $108,205,582 |
| LA | 1.43% | $113,686,943 | $113,455,244 |
| MA | 2.09% | $165,876,923 | $165,538,858 |
| MD | 1.84% | $146,037,436 | $145,739,805 |
| MI | 3.08% | $243,829,509 | $243,332,573 |
| MN | 1.69% | $134,316,337 | $134,042,594 |
| MO | 1.88% | $148,890,833 | $148,587,387 |
| MP | 0.02% | $1,242,293 | $1,239,761 |
| MS | 0.92% | $73,238,379 | $73,089,116 |
| NC | 3.10% | $245,684,555 | $245,183,839 |
| ND | 0.23% | $17,930,437 | $17,893,894 |
| NE | 0.58% | $46,251,459 | $46,157,196 |
| NH | 0.41% | $32,800,937 | $32,734,087 |
| NJ | 2.74% | $217,465,115 | $217,021,911 |
| NM | 0.65% | $51,248,144 | $51,143,698 |
| NV | 0.89% | $70,244,148 | $70,100,987 |
| NY | 6.06% | $480,187,751 | $479,209,106 |
| OH | 3.60% | $284,979,839 | $284,399,037 |
| OK | 1.20% | $95,156,427 | $94,962,494 |
| OR | 1.24% | $98,544,993 | $98,344,154 |

| | | | |
|---|---|---|---|
| PA | 3.96% | $313,596,010 | $312,956,887 |
| PR | 1.08% | $85,317,562 | $85,143,681 |
| RI | 0.33% | $25,921,569 | $25,868,740 |
| SD | 0.26% | $20,910,182 | $20,867,566 |
| TN | 2.04% | $161,505,548 | $161,176,392 |
| UT | 0.92% | $73,060,406 | $72,911,505 |
| VA | 2.58% | $204,108,717 | $203,692,734 |
| VI | 0.03% | $2,375,677 | $2,370,835 |
| VT | 0.19% | $15,347,631 | $15,316,352 |
| WA | 2.21% | $175,534,575 | $175,176,828 |
| WI | 1.78% | $141,294,291 | $141,006,326 |
| WV | 0.57% | $45,064,181 | $44,972,338 |
| **Total** | **86.31%** | **$6,840,744,341** | **$6,826,802,594** |

August 26, 2024

Frederick R. Warren-Boulton

## Appendix A - Curriculum Vitae

MiCRA Microeconomic Consulting & Research Associates, Inc.


# FREDERICK R. WARREN-BOULTON, Ph.D.

PRINCIPAL
Microeconomic Consulting & Research Associates, Inc. (MiCRA)
3306 Connecticut Avenue, N.W.,
Washington, D.C. 20008
www.micradc.com

Direct: (202) 210-1155 rwb@micradc.com


**August 26, 2024**

**CURRICULUM VITAE**

**Education**

### EDUCATION

| | |
|---|---|
| Ph.D., Economics | Princeton University |
| M.A., Economics | Princeton University |
| M.P.A. | Woodrow Wilson School of Public & International Affairs, Princeton University |
| B.A., Economics | Yale University |

### Professional History

- Principal, MiCRA: Microeconomic Consulting and Research Associates, Inc., Washington, D.C.; August 1991 – present
- Managing Director, Berkeley Research Group, 2021 – June 1, 2024.
- Senior Managing Director, Ankura Consulting Group LLC, 2018-2021
- Managing Director, Navigant Economics, Washington, D.C., 2015 – 2018
- Visiting Lecturer of Public and International Affairs, Woodrow Wilson School of Public and International Affairs, Princeton University, Princeton, NJ; Spring Semester, 1991.
- Resident Scholar, American Enterprise Institute for Public Policy Research, Washington, D.C.; May 1989 - April 1990, Adjunct Scholar from May 1990.
- Senior Vice President, ICF Consulting Associates, Inc., Washington, D.C.; November 1989 - August 1991.
- Research Associate Professor of Psychology, The American University, Washington, D.C.; September 1983 - 1990.

- Deputy Assistant Attorney General for Economic Analysis, Antitrust Division, U.S. Department of Justice, Washington, D.C.; October 1985 - May 1989.

- Director, Economic Policy Office, Antitrust Division, U.S. Department of Justice, Washington, D.C.; September 1983 - September 1985.

- Research Associate, Center for the Study of American Business, Washington University in St. Louis; July 1978 - June 1985.

- Associate Professor, Department of Economics, Washington University in St. Louis; July 1978 - June 1985. Chairman, Graduate Committee, 1978 - 1980. Chairman, Undergraduate Committee, 1980 - 1983.

- Assistant Professor, Department of Economics, Washington University in St. Louis; September1972 - June 1978.

- Assistant in Instruction, Woodrow Wilson School of Public and International Affairs, Princeton University, Princeton, N.J.; 1969 - 1971.

- Research Consultant, Ford Foundation, Kingston, Jamaica, W.I.; Summer, 1969.

## Publications

- Prices, Market Definition and the Effects of Mergers: Staples, Office Depot, and Office Max (1997, 2015, 2016)," in *The Antitrust Revolution: Economics, Competition and Policy*, Seventh Edition, John E. Kwoka Jr. and Lawrence J. White, eds.; Oxford University Press, July 2018, with Serdar Dalkir.

- "Platforms and Innovation," *Global Antitrust Economics*, Concurrences, 2017.

- "US v. H&R Block: Market Definition in Court since the 2010 Merger Guidelines," *The Antitrust Bulletin 59*, September 2014, 599-618, with Marc Remer.

- "Market Definition and the Price Effects of Mergers: Staples-Office Depot (1997)," in *The Antitrust Revolution: Economics, Competition and Policy*, John E. Kwoka and Lawrence J. White, eds.; Oxford University Press, Third Edition, 1999; Fourth Edition; Case 7, Fifth Edition, 2009; Sixth Edition, 2014, Case 6; with Serdar Dalkir.

- "From Structure to Effects: The Economics of Merger Control," *Global Competition Review*, June 2008 with R.S. Khemani and R. Duplantis.

- "On Loss Aversion in Capuchin Monkeys," *Journal of the Experimental Analysis of Behavior*, 89 (March 2008) with A. Silberberg, P. Roma, M. Huntsberry, T. Sakagami, A. Ruggiero and S. Suomi.

- "The Contribution of the Merger Guidelines to the Analysis of Non-Horizontal Mergers," 20th Anniversary of the 1982 Merger Guidelines: The Contribution of the Merger Guidelines to the Evolution of Antitrust Doctrine, May 21, 2002, on http://www.usdoj.gov/atr/hmerger.htm#papers.

- "Optimizing in Choice When a Token Deposit is the Operant," *Journal of the Experimental Analysis of Behavior*, 2002, with J. J. Widholm, A. Silberberg, S.R. Hursh, and A.A. Iman.

- "Staples and Office Depot: An Event-Probability Case Study," *Review of Industrial Organization*, 19: 469-481, 2001, with Serdar Dalkir.
- "Unilateral Price Effects: Staples and Office Depot," in *The M&A Lawyer*, June 1998, Vol. 2, No. 3, with Serdar Dalkir. Available in revised form as "How Do You Know an Office Superstore? Staples and Office Depot," on http://www.antitrust.org/cases/.
- "Resale Price Maintenance Reexamined: Monsanto v. Spray-Rite (1984)," in *The Antitrust Revolution: Economics, Competition and Policy*, John E. Kwoka and Lawrence J. White, eds.; Oxford University Press, Case 14, Second Edition, 1994; Third Edition, 1999.
- "Exclusionary Behavior in the Market for Operating System Software: The Case of Microsoft," in *Opening Networks to Competition: the Regulation and Pricing of Access*, David Gabel and David F. Weiman, eds.; Kluwer Academic Publishers, 1998, with Kenneth C. Baseman and Glenn A. Woroch.
- "Riding the Wave: Exclusionary Practices in Markets for Microprocessors Used in IBM-Compatible Personal Computers," Conference and Festschrift in Honor of Merton J. Peck, Yale University, September 30, 1994, and *International Journal of the Economics of Business* 2-2 (July 1995), pp. 241-262, with Robert W. Wilson.
- "The Economics of Intellectual Property Protection for Software: The Proper Role for Copyright," American Council on Interoperable Systems, Washington, D.C., June 1994, and *StandardView : ACM Perspectives on Standardization* 3-2 (June 1995), pp.68-78, with Kenneth C. Baseman and Glenn A. Woroch.
- "Microsoft Plays Hardball: Use of Nonlinear Pricing and Technical Incompatibility to Exclude Rivals in the Market for Operating Software," *The Antitrust Bulletin* 40-2 (Summer 1995), pp.265-315, with Kenneth C. Baseman and Glenn F. Woroch.
- "Copyright Protection of Software Can Make Economic Sense," *The Computer Lawyer,* 12 (February 1995), pp. 10, 18-28, with Kenneth C. Baseman and Glenn A. Woroch.
- "Exclusionary Practices in High-Technology Industries," *The St. Louis Bar Journal*, 16 (Summer 1994), pp. 28-34.
- "Monsanto v. Spray-Rite: Resale Price Maintenance Reexamined," in *The Antitrust Revolution: The Role of Economics*, John E. Kwoka and Lawrence J. White, eds.; Scott, Foresman and Company, Glenview, Illinois, second edition, 1994.
- "A Commentary on the 1992 U.S. Merger Guidelines," *International Merger Law*, 22 (June 1992), pp. 14-19.
- "The Use of Stock Market Returns in Antitrust Analysis of Mergers," *Review of Industrial Organization*, 7-1 (1992), pp. 1-11, and *Economic Analysis Group Discussion Paper #88-1*, January 1988, with Robert H. McGuckin and Peter Waldstein.
- "Implications of U.S. Experience with Horizontal Mergers and Takeovers for Canadian Competition Policy," in *The Law and Economics of Competition Policy*, Frank Mathewson, Michael Trebilcock and Michael Walker, eds.; The Fraser Institute, Vancouver, B.C., 1990.
- "Maricopa and Maximum-Price Agreements: Time for a New Legal Standard?" *Journal of Health Economics*, 7 (June 1988), pp. 185-190.

- "Maximizing Present Value: A Model to Explain Why Moderate Response Rates Obtain on Variable-Interval Schedules," *Journal of the Experimental Analysis of Behavior*, 49 (May 1988), pp. 331-338, with Alan Silberberg and Toshio Asano.

- "Sources of the 'Crisis' in Liability Insurance: An Economic Analysis," in *Yale Journal of Regulation*, 5 (Summer 1988), pp. 367-395; *Economic Analysis Group Discussion Paper* #88-2, February 1988; and *An Update on the Liability Crisis: Tort Policy Working Group*, U.S. Government Printing Office: 181-487:60075, March 1987, with Richard N. Clark and David D. Smith.

- "State and Federal Regulation in the Market for Corporate Control," *The Antitrust Bulletin*, 32 (Fall 1987), pp. 661-691, and *Economic Analysis Group Discussion Paper* #86-4*, January 1986, with Margaret E. Guerin-Calvert and Robert H. McGuckin.

- "Income and Choice Between Different Goods," *Journal of the Experimental Analysis of Behavior*, 48 (September 1987), pp. 263-275, with Alan Silberberg and David Shurtleff.

- "Inferior-Good and Giffen-Good Effects in Monkey Choice Behavior," *Journal of Experimental Psychology: Animal Behavior Processes*, 13 (1987), pp. 292-301, with Alan Silberberg and Toshio Asano.

- "Efficiencies, Failing Firms, and Alternatives to Merger: A Policy Synthesis," *The Antitrust Bulletin*, 31 (Summer 1986), pp. 431-450, and *Economic Analysis Group Discussion Paper* #86-14, August 1986, with John Kwoka.

- *Oil Pipeline Deregulation: Report of the U.S. Department of Justice*, U.S. Government Printing Office: 1986, 491-510:40159, May 1986, with Charles J. Untiet.

- "Merger Policy and Enforcement at the Antitrust Division: The Economist's View," *Antitrust Law Journal*, 54 (Spring 1985), pp. 109-115.

- "Reanalysis of the Equation for Simple Action," *Journal of the Experimental Analysis of Behavior*, 43 (March 1985), pp. 265-277, with Alan Silberberg, Michael Gray and Randolph Ollom.

- "Considering the Effects of Financial Incentive and Professional Ethics on 'Appropriate' Medical Care," *Journal of Health Economics*, 3 (December 1984), pp. 223-237, with Robert Woodward.

- Deficits and Dollars: The Effects of Government Deficits in an International Economy. Center for the Study of American Business, Contemporary Series 3, 1982.

- "Physician Productivity, Remuneration Method, and Supplier-Induced Demand," in *Issues in Physician Reimbursement*, N.T. Greenspan (ed.), HCFA, 1981, pp. 115-134, with Robert Woodward.

- "Paying the Doctor: A Model of Work-Leisure Decisions under Alternative Remunerations," *Proceedings of the American Statistical Association*, 1979, with Robert Woodward.

- Vertical Control of Markets: Business and Labor Practices. Ballinger Publishing Company, Cambridge, Mass., 1978.

- "Vertical Control by Labor Unions," *American Economic Review*, 67 (June 1977), pp. 309-322. Reprinted as Publication Number 17, Center for the Study of American Business, November 1977.

- "Vertical Control with Variable Proportions," *Journal of Political Economy*, 82 (July - August 1974), pp. 783-802.

- *Preliminary Survey of Jamaican Management Manpower: Resources and Requirements.* Jamaican Institute of Management, 1969.

## Conference, Seminar, Working and Discussion Papers

- "On Rethinking the Goals of Antitrust", Festschrift (Liber Amicorum) for Judge Douglas H. Ginsburg.
- American Bar Association, "*Apple Inc. V. Robert Pepper, et al*: Pass-through and *Illinois Brick*, December 21, 2018.
- American Bar Association 2018 Spring Meeting, "Mock Daubert Hearing of Plaintiff's Expert Witness"
- American Antitrust Institute, 2016, "Mergers in Bid Markets: US v Staples and Office Depot"
- International Bar Association, "The Economics of Leniency" Rio de Janeiro, March 6, 2016
- American Bar Association, "Fundamentals of Market Definition" April 15, 2015
- American Bar Association, "Impact of *Microsoft* on Firm Conduct and Conduct Cases," June 5, 2015. With Randall Weinsten, Harry First, Andrew Gavil, M J Moltenbrey, and William Page.
- American Bar Association, "Antitrust Economics and Econometrics for In-House Attorneys", Chicago, 2014
- Canadian Bar Association, 2014 "Structural Approaches vs. Competitive Effects" CBA/CB Meet the Economists Roundtable, April 3, 2014, Gatineau, Quebec.
- Northeastern University, "Mergers in Bid Markets", March 12, 2014
- Canadian Bar Association, "Working with Economic Experts in Antitrust Matters" March 22, 2011
- "Advanced Topics in Merger Analysis." Canadian Bar Association, 2010 Fall Competition Law Conference, Gatineau QC, October 1, 2010.
- "Upward Pricing Pressure in the Merger Guidelines" Canadian Bar Association Teleconference, March 10, 2010.
- "Competition Issues in the Air Transport Sector in India." National Conference, State of Competition in the Indian Economy (Competition Commission of India, World Bank, FIAS and DFID), New Delhi, India, June 12, 2009.
- "Price-Fixing, Bid-Rigging, and Mergers; The Shift from Structure to Effects." Minnesota Bar Association, October 13, 2009.
- "Demand-Side and Supply-Side Linkages in the Antitrust Analysis of Aftermarkets." 57th Antitrust Law Spring Meeting, American Bar Association Section of Antitrust Law, "Aftermarkets and Tying: The Legacy of *Kodak*" Session, March 26, 2009
- "Have Big Deal Contracts Prevented Entry by Small Publishers of Academic Journals?" International Industrial Organization Conference, Washington, DC, May 17, 2008, with S. Silberman, D. Haar and R. Lipstein.

- "Collusion: Price-fixing and Bid-rigging." (IFC/World Bank), Bangladesh, April 15, 2008.
- "Open Access Policies, Net Neutrality and Incentives for Innovation in the Telecommunications Industry" 19th Annual Western Conference, Advanced Workshop in Regulation and Competition, Center for Research in Regulated Industries, Rutgers Business School, Rutgers University, June 29, 2006, with Michael Pelcovits.
- Department of Justice/Federal Trade Commission Section 2 Hearings on Single Firm Conduct: Predatory Buying Panel. Washington, DC, June 22, 2006
- "Market Share Discounts: Collusion and Exclusion." International Industrial Organization Conference, Boston, April 9, 2006, with Daniel Haar.
- "On Using Economists as Expert Witnesses." 54th Antitrust Law Spring Meeting, American Bar Association Section of Antitrust Law, "Economic Experts Speak" Session, March 29, 2006
- "Mergers Without Markets: Do Mergers Among Publishers of Academic Journals Affect Prices?" MiCRA Working Paper No. 2, November 4, 2005, with Renee Duplantis, Daniel Haar, Steve Silberman and Hal Van Gieson, available at www.micradc.com.
- "Antitrust Issues in Agriculture," National Agricultural Council Global Agrifood Forum 2005, Mexico City, June 10, 2005.
- "The Economics of Vertical Restraints," ABA Economics Committee, Economics for Lawyers, April 20, 2005. See www.micradc.com
- "On Using an Economist as an Expert Witness." DOJ / FTC Trial Strategy Program, Airlie House, January 29, 2004
- Presentation at the ABA Session on *Dentsply*, November 4, 2003
- Presentation at the ABA Antitrust Meetings in San Francisco, August 11, 2003
- "The Contribution of the Merger Guidelines to the Analysis of Non-Horizontal Mergers," 20th Anniversary of the 1982 Merger Guidelines: The Contribution of the Merger Guidelines to the Evolution of Antitrust Doctrine, May 21, 2002, on http://www.usdoj.gov/atr/hmerger.htm#papers.
- "Congestion Pricing at Airports," ACI-NA 11th Annual Conference, Salt Lake City, November 12, 2002; 2001 FAA Commercial Aviation Forecast Conference, Washington, D.C., March 14, 2001; ACI-NA 9th Annual Conference, New York City, October 3, 2000.
- FTC Workshop: Competition Policy in the World of B2B Electronic Marketplaces, June 30, 2000.
- FTC Workshop: Slotting Allowances, June 1, 2000.
- "Consumers, Consolidation, and Concentration: Policy Issues,": at the ERS of the USDA conference, The American Consumer and the Changing Structure of Food System, May 4, 2000.
- "Design and Implementation of Competition Law and Policy" and "Mergers, Acquisitions and Other Structural Arrangements." Competition Law and Policy: Cross-country Approaches Experiences. World Bank Institute, Singapore Trade Development Board, and Organization for Economic Co-operation and Development May 14-May 20, 2000.

- "The Case Against an Agrarian Antitrust Policy," 2000 USDA Agriculture Outlook Forum. February 24, 2000.
- "Is Structure Still Enough", 25th Anniversary of the EPO/EAG, November 4, 1998
- "Proving Damages in a Business Case," Business Litigation Seminar, Business Law Section of the Florida Bar, November 20 (Tampa) - 21 (Miami), 1997.
- "Basic Economics for Lawyers," Section of Antitrust Law, American Bar Association, New York, N.Y., October 3-4, 1996.
- "Vertical Control in the Entertainment Industry," Chair's Showcase Program: The Integration, Disintegration and Reintegration of the Entertainment Industry, American Bar Association, Section of Antitrust Law, 44th Annual Antitrust Spring Meeting, Washington D.C., March 28, 1996.
- "Privatization and Regulation in the Restructuring of Electric Utilities in Eastern Europe," IBRD Conference on the Privatization of Electric Utilities, Prague, The Czech Republic, September 1993.
- "Implications of the United States Experience with Regulation and Antitrust for Competition Policy in Countries in Transition from Centrally Planned Economies to Market Economies," IBRD/EDI/USAID Seminar on Microeconomics, Vienna, Austria, July 1993.
- "The Economics of Punitive Damages." Punitive Damages after TXO: American Bar Association Antitrust Section Meeting, New York, August, 1993.
- "Regulatory Alternatives for FERC Following the Energy Policy Act of 1992," The Federal Energy Bar Association Mid-Year Meeting, Washington, D.C., November 19, 1992.
- "The Economics of Credit Card Interest Rate Caps," Seminars at the Economic Analysis Group, U.S. Department of Justice, September 29, 1992; the Board of Governors of the Federal Reserve System, October 7, 1992; and the D.C. Bar Association, November 19, 1992.
- "Straws in the Bottleneck: A Proposal for Efficient Network Interconnection," presented at the Tenth Biennial Conference of the International Telecommunications Society, Cannes, France, June 1992; *Journal of Regulatory Economics* Editors' Conference, San Diego, October 1992, with John Woodbury and Glenn Woroch.
- "Economic Principles of Penalties for Antitrust Violations, and the Role of the Economist in Corporate Sentencing," Corporate Sentencing Under the Federal Sentencing Guidelines for An Antitrust Defendant, The Federal Bar Association, Antitrust and Trade Regulation Section, May 1992.
- "The State of Antitrust in 1991: A Kinder, Gentler Antitrust?" The CATO Institute Conference, 1991, with Steve Calkins.
- "Economic Analysis and Policy Implications of the Financial Interest and Syndication Rule," Telecommunications Policy Research Conference, October 1990, with John Woodbury.
- "Regulation and the Partially Monopolized Network: Lessons from Telecommunications," American Enterprise Institute conference on Policy Approaches to the Deregulation of Network Industries, October 1990, with Roger Noll.
- "Price Regulation and Common Carrier Regulation," AEI Conference on Oil Pipeline Deregulation, American Enterprise Institute.

- "Regulation of New Crude-Oil Pipelines: Natural Monopoly and Information Externalities," AEI Conference on Oil Pipeline Deregulation, American Enterprise Institute.

- "Economic Theory as the Missing Link in the Merger Guidelines," American Bar Association Antitrust Section Spring Meeting, March 1990.

- "The Design and Evaluation of Competitive Rules Joint Ventures for Mergers and Natural Monopolies," American Enterprise Institute conference on Policy Approaches to the Deregulation of Network Industries, October 1990, and at the American Economic Association Meetings, December 1989, with John Woodbury.

- "Deterring Criminal Antitrust Behavior: Sanctions versus Structure," Stanford University Conference, June 1987.

- "Do Successful Tender Offers Benefit Bondholders?" Southern Economic Association Meetings, November 1986, with Catherine Benham, Donald M. Brown and Susan E. Woodward.

- "Deregulation of Electric Power Generation," New Mexico State University Conference, September 1986, and Edison Electric Institute, April 1987.

- "Professional Ethics and Financial Incentives: 'Appropriate' Medical Care," *Washington University Department of Economics Working Paper #40*, May 1982, with Robert Woodward.

- "Hospital Care Expenditure Inflation: Crisis or Consumption?" *Washington University Department of Economics Working Paper #43*, December 1982, with Robert Woodward and Walter Chien.

- "Transfer Pricing within U.S. Corporations," Sixth U.S.-Soviet Economic Symposium; Alma-Ata, Kazakhstan, U.S.S.R., May - June, 1981.

- "The Impact of Automobile Mileage Standards," Western Economic Association Meetings, 1979, with Michael Smirlock.

- "The Effect of Factor-Augmenting Technical Change on Factory Demand, and the Response by Factor Suppliers," Western Economic Association Meetings, October 1977.

- "Vertical Integration in Telecommunications," Telecommunications Policy Research Conference, April 1974.

**Other Papers**

- Brief of Amici Curiae of Economics Professors and Scholars in Support of Petitioner, Supreme Court of the United States, *Leegin Creative Leather Products, Inc. v. PSKS Inc. (d.b.a. Kay's Kloset…Kay's Shoes),* No. 06-480, January 2007.

- Brief of Amici Curiae of Economics Professors in Support of Respondent, Supreme Court of the United States, *Verizon Communications, Inc. v. Law Offices of Curtis v. Trinko, LLP*, No. 02-682, July 25, 2003.

- Brief Amici Curiae of Economics Professors and Scholars in Support of Respondent, Supreme Court of the United States, *Lotus Development Corp. v. Borland International, Inc*., No. 94-2003, December 1995.

- "Implementing Competitive Rules Joint Ventures for Railroads," IBRD (World Bank), April, 1995.
- "Critical Loss and Critical Elasticity: Their Derivation and Use in Market Definition for Mergers," November 1994.
- "When Nominally Monopolistically-Competitive Firms are Really Perfectly Competitive: Going First-Class on the Paris Metro," July 1986.
- "Mandatory Energy Performance Standards and Residential Energy Demand," 1981, with Alan Rockwood and Richard Adams.
- "The Effects of Endogenous Quality Change on Demand and Costs," October 1977.

**Testimony**

- State Attorneys General: *The State of Connecticut, et al. v. Sandoz, Inc., et al.,* Case No. 3:20-cv-00802-MPS, Expert Report, November 1, 2023; Deposition, April 15-16, 2024.
- Chase Manufacturing: *Chase Manufacturing v. Johns Manville Corporation* CA1:19-cv-00872-MEH, Expert Report, September 1, 2020, November 29, 2021; testimony February 11, 2022; Order February 22, 2022; trial, May 25,2024.
- TEC: *Philips Medical Systems v. TEC Holdings*, CA #3:20-cv-00021-MOC-DCK. Expert Report July 1, 2021; testimony April 20, 2023.
- Her Majesty the Queen: *Her Majesty the Queen in Right of Canada Represented by the Minister of Agriculture and Agri-Food v. Van Well Nursery and Monson Fruit Company*, Report, April 29, 2022, Deposition, June 29, 2022
- SkyVenture International Ltd.: *SkyVenture International Ltd. V. SkyVenture VWT Singapore, PTE,* In Arbitration Before the London Court of International Arbitration, in London, England, LCIA Case No. 184092, Witness Statement June 10, 2019, testimony July 31-August 1, 2019.
- Okaya, Shinyei, Soshin, and Taitsu (Film-only defendants): In Re Capacitors Antitrust Litigation, US District Court, Northern District of California, San Francisco Division, Case No. 17-md-02801-JD. Expert Report, February 22, 2019, Deposition June 4, 2019.
- Pro-Sys Consultants Ltd. And Neil Godfrey: Pro-Sys Consultants Ltd. And Neil Godfrey and Microsoft Corporation and Microsoft Canada Co./Microsoft Canada CIE, Supreme Court of British Columbia, Vancouver Registry No. L043175, Affidavit #3 March 20, 2017.
- Zack Ward and Thomas Buchar: Zack Ward and Thomas Buchar v. Apple, Inc., United States District Court for the Northern District of California, Oakland Division, 4:12-cv-05404 YGR, Expert Declaration February 16, 2016, Supplemental Expert Declaration September 30, 2016.
- iPic-Gold Class Entertainment, LLC: iPic Gold Class Entertainment, LLC and iPic Texas, LLC, v. Regal Entertainment Group, AMC Entertainment Holdings, Inc., AMC Entertainment, Inc., and American Multi-Cinema, Inc., District Court of Harris County, Texas, No. 2015-68745. Deposition January 4, 2016, Trial Testimony (TI), January 24, 2016: T.I. January 25, 2016. Opinion, Court of Appeals for the First District of Texas, September 29, 2016. Deposition, February 8, 2017.
- Bosai Minerals Group Co. Ltd: Resco Products, Inc. v. Bosai Minerals Group Co. Ltd & CMP Tianjin Co., Ltd., United States District Court for the Western District of Pennsylvania, 2:06-cv-235-JFC, Expert Report November 14, 2014; Supplemental Expert Report January 9, 2015.

- Federal Trade Commission: Ardagh Group S.A. and Saint-Gobain Containers, United States District Court for the District of Columbia, 1:13-cv-01021 (RMC). Expert Report August 28, 2013. Deposition, September 13, 2013.

- Tokyo Marine MOL Presentation to EU DG4 in Brussels.

- Reed Construction Data, Inc.: Reed Construction Data, Inc. v. The McGraw-Hill Companies, Inc. et al., United States District Court, Southern District of New York, Case No. 09-cv-8578 (JPO). Expert Liability Report and Expert Damages Report, September 7, 2012. Liability deposition, February 6, 2013. Damages deposition, March 12, 2013, Supplemental Report Deposition, June 19, 2013.

- Graco: Graco Inc. and Graco Minnesota Inc. v. PMC Global, Inc. et al., United States District Court, District of New Jersey. Case No.: 08-CIV-1304 (FLW) (JJH). Reply Report, February 1, 2011. Deposition May 17, 2011. Second Reply Report, August 29, 2012. Deposition, October 2, 2012.

- NCA: In Re: Air Cargo Shipping Services Antitrust Litigation, United States District Court Eastern District of New York, 06-MD-1775 (JG) (VVP). Declaration, May 25, 2012, Deposition, July 20, 2012.

- U.S. Department of Justice, Antitrust Division: Expert witness in U.S. v. H&R Block, Inc.; 2SS Holdings, Inc.; and TA IX L.P., United States District Court for the District of Columbia, Civil Action No. 11-00948. Expert Report, July 25, 2011. Expert Reply Report, August 18, 2011. Deposition, August 31, 2011. Trial Testimony September 8, 9 & 20, 2011. See Memorandum Opinion, Judge Beryl A. Howell, November 10, 2011.

- Novell: In Re: Microsoft Corp. Antitrust Litigation, United States District Court, District of Maryland, MDL Docket No. 1332. Expert Report, May 1, 2009. Rebuttal Report, July 27, 2009. Deposition, August 13, 2009. Trial testimony, November 16-17, 2011.

- State of New York: State of New York, by Attorney General Andrew M. Cuomo v. Intel Corporation, United States District Court for the District of Delaware. Expert Report, July 25, 2011. Deposition, October 4-6, 2011.

- Mylan Pharmaceuticals, Inc: Schering Corporation and MSP Singapore Corporation LLC v. Mylan Pharmaceuticals Inc., United States District Court for the District of New Jersey, Civil Action No. 2:09-cv-06383 and 2:10-cv-3085. Expert Report, August 16, 2011.

- Western Coal Traffic League: Verified Statement on Competition in the Railroad Industry before the Surface Transportation Board, STB Ex Parte 705, April 12, 2011 (with Kenneth C. Baseman).

- Ethypharm: Ethypharm S.A. France v. Abbott Laboratories, United States District Court for the District of Delaware, Case No. 08-126-SLR; Expert Report January 31, 2011. Reply Report March 28, 2011. Deposition May 3, 2011

- Neon: Neon Enterprise Software, LLC v. International Business Machines Corporation, United States District Court, Western District of Texas, Case No. A09CA896JN; Expert Report, February 10, 2011.

- Commonwealth of Pennsylvania:

  (a) Commonwealth of Pennsylvania v. Bristol-Myers Squibb Company, et al.; Expert Report July 20, 2010. Supplemental Report August 9, 2010. Testimony August 25, 2010. See http://www.leagle.com/xmlResult.aspx?page=124&xmldoc=In%20PACO%2020110831460.xml&docbase=CSLWAR3-2007-CURR&SizeDisp=7 See also Opinion re Post-Trial Motions of the Commonwealth of Pennsylvania and Bristol-Myers Squibb Company Defendants, Filed: August 31, 2011;

(b) Commonwealth of Pennsylvania v. Johnson & Johnson Services Inc., et al., Supplemental Report September 30, 2010. Testimony November 3, 2010. See Opinion re Post-Trial Motions of the Commonwealth of Pennsylvania and Johnson & Johnson Defendants, Filed: August 31, 2011;P

(c) Commonwealth of Pennsylvania v. Pfizer Inc., et al., Supplemental Report, February 11, 2011.

(d) Commonwealth of Pennsylvania v. TAP Pharmaceutical Products, Inc., et al., Commonwealth Court of Pennsylvania, Case No. 212 MD 2004;

- Fairmont Designs: Economic Analysis of the AFMC's "Pay-to-Play" Agreements, Appendix A to White Paper submitted to the United States Department of Justice by Fairmont Designs, November 2, 2010

- L-3: L-3 Communications Integrated Systems, LP v. Lockheed Martin Corporation, United States District Court for the Northern District of Texas, Dallas Division, Civil Action Number 3:07-CV-0341-B, Expert Report, September 21, 2009. Deposition, November 10, 2009.

- AT&T: In Re: Universal Service Fund Telephone Billing Practice Litigation, United States District Court, District of Kansas, Case No. 02-md-1468-JWL, Expert Report and Deposition, July-August 2008. Trial testimony, November 2008.

- Entergy: Entergy Arkansas, Inc. and Entergy Services, Inc. v. Union Pacific Railroad Company and Missouri & Northern Arkansas Railroad Company, Inc., Surface Transportation Board, Docket No. 42104, Verified Statement (with John Kwoka), July 2008; Rebuttal Statement (with John Kwoka), September 2008.

- Joe Comes, et.al.: Joe Comes, Riley Paint, Inc., an Iowa Corporation; Skeffington's Formal Wear of Iowa, an Iowa Corporation; and Patricia Anne Larson v. Microsoft Corporation, a Washington Corporation, Iowa District Court for Polk County, Case No. CL82311. Expert Report, June 2, 2006; Deposition July 28, 2006; Rebuttal Report September 29, 2006; Deposition November 2, 2006.

- Secure Data in Motion, Inc.: PostX Corporation v. Secure Data in Motion, Inc. et al., United States District Court, Northern District of California, Case Nos. C02-04483 SI and C03-0521. Expert Report, Deposition, and Declaration, April-July, 2005, Testimony March, 2006.

- MAN Roland, Inc.: MAN Roland Inc. and MAN Roland Druckmachinen AG v. Heidelberg Web Systems, Inc. and Heidelberger Druckmachinen AG, United States District Court for the District of New Hampshire, Civil Action No. C-03-513-SM. Expert Report. Deposition, December 13, 2005.

- 21st Services: Coventry First LLC v. 21st Services, United States District Court for the Eastern District of Pennsylvania, Civil Action No. 04-05239-PBT. Expert Report November 11, 2005. Deposition, December 1, 2005.

- State of Alaska: "Competitive Effects of Producer Ownership of The Proposed Alaska Natural Gas Pipeline," Testimony, March 23, 2005.

- Attorneys General of the Commonwealth of Pennsylvania and other States: Fatemah Azizian, et al. v. Federated Department Stores, Inc., et al., Declaration September 10, 2004.

- Oldcastle, Inc.: The State of Utah v. Oldcastle Inc and Oldcastle Materials, Inc. U.S. District Court, District of Utah Central Division. Civil No. 2 02 CV-5165. Testimony

- NLG-Locke, Inc: In the Mater of Certain Ceramic Post Insulators from Japan, United States International Trade Commission, Testimony, October 29, 2003.

- Material Technologies, Inc.: Material Technologies, Inc. and Net Shape LLC v. Carpenter Technology Corporation and Vallourec, SA. United States District Court for the District of New Jersey, Civil Action No. 01-CV-2965 (SRC). Expert Report, April 14, 2003, and deposition.

- Six West Retail Acquisition Inc.: Six West Retail Acquisition, Inc. v. Sony Theater Management Corporation et. al., U.S. District Court, Southern District on New York, 97 Civ. 5499 (LAP) (JCF). Expert Report, December 23, 2002; Rebuttal Report, February 19, 2003, Deposition, February 25, 2003.

- In Re. Microsoft Corp. Antitrust Litigation: U.S. District Court, District of Maryland, MDL Docket No. 1332, Liability Report, August 26, 2002, Rebuttal Report, November 4, 2002, Deposition, February 20-21, 2003.

- Southwest Recreational Industries:

  (a) Expert witness in Southwest Recreational Industries v. FieldTurf, Inc. Trial testimony November 28, 2000;

  (b) Southwest Recreational Industries, Inc. v. Field Turf, Inc. US District Court, Eastern District of Kentucky, Civil Action No. 00-12. Expert reports, May 4, 2001 and Nov. 1, 2002.

- Brown & Williamson Tobacco Corporation: Declaration and deposition of Frederick R. Warren-Boulton, in R.J. Reynolds Tobacco Company v. Philip Morris, Inc., Lorillard Tobacco Company v. Philip Morris, Inc., Brown & Williamson Tobacco Corp., v. Philip Morris, Inc., U.S. District Court, Middle District of North Carolina. Civil Action Nos. 1:99CV185, 1:99CV207, and 1:99CV232.

- Menasha Corporation: Expert and supplemental report and deposition in Menasha Corporation v. News America Marketing In-Store, et al., U.S. District Court, Northeastern District of Illinois Eastern Division, Civil Action No. 00C-1895.

- European Consumers: In Support of Statement of Objections Allegations, Case No. IV/C-3/37.345 Microsoft, Expert Report and Presentation 2001.

- Power Mosfet Technologies, L.L.C. Expert witness in Power Mosfet Technologies, L.L.C. v. Infineon Technologies Corp., et al, U.S. District Court, Eastern District of Texas, Marshall Division, Cause No. 2-99-CV00168-DF. Expert Report; Deposition August 11, 2001; Trial testimony August 29, 2001.

- J. Paul Getty Trust: In Re. Auction Houses Antitrust Litigation, U.S. District Court, Southern District of New York. Civ. 0648 (LAK), Expert Report, Jan. 12, 2001.

- AT&T:

  (a) Testimony in Fibercomm, L.C., *et al* v. AT&T Communications of the Midwest, Inc., before the Iowa Utilities Board, December 20, 2000;

  (b) Affidavit, supplemental affidavit and deposition in AT&T Corporation v. Business Telecom, Inc., Federal Communication Commission. File No. EB-01-MD-002, January - March 2000;

  (c) Expert Report in Advamtel, LLC, et al, v. AT&T Corp.

  (d) Direct and Rebuttal Testimony in AT&T Communications of the Southwest Inc., Missouri Case No. TO-97-40;

  (e) Testimony in MGC Communications, Inc. v. AT&T Corporation, Federal Communications Commission: trial testimony June 28, 1999;

(f) Direct testimony in Southwestern Bell Telephone Company of Kansas' Compliance with Section 271 of the Federal Telecommunications of 1996, The State Corporation Commission of the State of Kansas. Docket No. 97-SWBT-411-GIT, May 12, 1998;

(g) Declaration in Implementation of the Pay Telephone Reclassification and Compensation Provisions of the Telecommunications Act 1996, Federal Communications Commission, CC Docket No. 96-128, September 9, 1997;

(h) Application of Ernest G. Johnson, Director of the Public Utility Division Oklahoma Corporation Commission to Explore The Requirements of Section 271 of the Telecommunications Act of 1996, Cause No. PUD 970000064;

(i) Rebuttal Testimony in Kansas Corporation Commission Docket No. 190, 492-U, July 15, 1996;

(j) Comments on the Position Papers on Docket No. 94-07-02. State of Connecticut, Department of Public Utility Control, November 1994;

(k) Position paper on Docket No. 94-07-02: Development of the Assumptions, Tests, Analysis and Review to Govern Telecommunications Service Reclassifications in Light of the 8 Criteria Set Forth in Section 8 of Public Act 94-83. State of Connecticut, Department of Public Utility Control, October 1994;

(l) Direct testimony and deposition in State of Indiana, Indiana Utility Regulatory Commission, Cause No. 397051994, April 1994;

- Ventana Medical Systems: Report and testimony, Department of Energy, March 8, 2000.

- MCI:

(a) Declaration and supplemental declaration in Joint Applications of MCI WorldCom, Inc. and Sprint Corporation for Consent to Transfer Control, CC Docket No. 99-333, March 2000 and June 2000.

(b) Direct testimony in Southwestern Bell Telephone Company of Kansas' Compliance with Section 271 of the Federal Telecommunications of 1996, The State Corporation Commission of the State of Kansas. Docket No. 97-SWBT-411-GIT, May 12, 1998;

(c) Declaration in Application of BellSouth Corporation, BellSouth Telecommunications, Inc. and BellSouth Long Distance, Inc. for Provision of In-Region, InterLATA Services in South Carolina. FCC Docket No. 97-208, October 17, 1997 (with Kenneth C. Baseman);

(d) Depreciation and Capital Recovery Issues, "Response to Professor Hausman," with K. Baseman and S. Woodward, FCC Docket No. 96-98, July 1996;

- Anthony D. Viazis: Expert witness in Anthony D. Viazis v. American Association of Orthodontists. U.S. District Court, Eastern District of Texas, Sherman Division. Civil Action No. 4:98-CV-245, Expert report (with David Eisenstadt), July 13, 2000. Trial testimony, November 9, 2000.

- State of Alaska: Testimony before the Alaska State legislature on the acquisition of ARCO by BP, January 19, 2000.

- State of New York, et al., and U.S. Department of Justice: Expert witness in United States of America v. Microsoft Corporation, and State of New York ex rel. v. Microsoft Corporation. C.A. No. 98-1232 (TPJ) and CA. No. 98-1233 (TTPJ). Declaration May 15, 1998, Report September 3, 1998, Deposition September 26, 1998, Direct Testimony and Trial Testimony November 19 - December 1, 1998.

- Brunswick Corporation: Expert witness in Concord Boat Co. et al. v. Brunswick Corporation. U.S. District Court, Eastern District of Arkansas, Western Division. Trial testimony June 11, 1998. Depositions February 2-4, 1998.

- Bepco, Inc.: Deposition in Bepco, Inc. et al. v. Allied Signal, Inc. and Allied Signal Truck Brake System Company, U.S. District Court for the Middle District of North Carolina Winston-Salem Division. C.A. No. 6:96CV00274, November 25-26, 1998.

- St. Louis Convention and Visitors Commission: Declaration in St. Louis Convention and Visitors Commission v. National Football League, et al.; U.S. District Court, Eastern District of Missouri, Eastern Division, C.A. No. 4:95CV02443 JCH, September 12, 1997.

- Federal Trade Commission: Expert witness in FTC v. Staples and Office Depot; U.S. District Court, District of Columbia, Trial Testimony, May 1997.

- Leo One USA: Affidavit in Amendment of Part 25 of the Commission's Rules to Establish Rules and Policies Pertaining to the Second Processing Round of the Non-Voice, Non-Geostationary Mobile Satellite Service, FCC Docket No. 96-220, December 20, 1996.

- Florida Panthers Hockey Club: Expert witness in Florida Panthers Hockey Club v. Miami Sports and Exhibition Authority and The City of Miami; U.S. District Court, Southern District of Florida Miami Division, Case No. 96-21 68-CIV. Trial Testimony, August, 1996.

- ADM: "An Evaluation of The Cost to U.S. Animal-Feed Manufactures of an Alleged Price-Fixing Conspiracy by Lysine Manufactures 1992-1995," Report, August 1996.

- K-2, Rossignol, Salomon, Tecnica, Skis Dynastar, Marker and The Ski Market: Expert witness in Sports Investment Co. vs. The Ski Market, Ltd., Inc., *et al*, U.S. District Court, District of Rhode Island, C.A. No. 95-097T. Deposition, December 1995.

- U.S. Department of Justice, Antitrust Division: Expert witness in United States of America v. Engelhard Corporation, Floridin Company, U.S. Borax Inc., U.S. Silica Inc. Case No. 6:96-CV-45 (WLS), Depositions, Trial Testimony August 1995.

- U.S. Department of Justice, Antitrust Division: Declaration in United States of America v. Dairy Farmer of America, Inc., et al.

- City of Los Angeles: Declaration in Air Transport Association of America, *et al.*, v. City of Los Angeles, City of Los Angeles Department of Airports and Los Angeles Board of Airport Commissioners, Docket No. 50176, March 1995, and Supplemental Declaration, April 1995.

- The Bon-Ton Stores, Inc.: Declaration in The Bon-Ton Stores, Inc. v. The May Department Stores Company, McCurdy & Company, Inc., and Wilmorite, Inc., Civil Action No. 94-CV-6454L, November 1994.

- Cyrix Corporation: Deposition in Cyrix Corporation v. Intel Corporation, December 1993.

- Thermadyne Industries: Deposition in Thermadyne Industries, Inc. and Coyne Cylinder Co. v. K.C. Cylinder *et al.*, December 1993.

- IBRD (World Bank): (a) Privatization and Regulation in the Restructuring of Electric Utilities in Eastern Europe, Prague, September 1993; (b) Implications of the United States Experience with Regulation and Antitrust for Competition Policy in Countries in Transition from Centrally Planned Economies to Market Economies, July 1993.

- Credit Card Coalition: "The Economics of Credit Card Interest Rate Caps," 1993, with Laurence H. Meyer.

- Coalition to Preserve the Financial Interest and Syndication Rule:

  (a) Testimony before the Federal Communications Commission, December 7, 1990, in the matter of Evaluation of the Syndication and Financial Interest Rules, MM Docket No. 90-162;

  (b) Submitted reports: "Economic Analysis and Policy Implications of the Financial Interest and Syndication Rule," June 14, 1990; "Reply Comments," August 1, 1990; "Economic Analysis and Policy Implications of the Financial Interest and Syndication Rule," January 24, 1991, with John Woodbury;

  (c) Declaration of Frederick R. Warren-Boulton, August 7, 1992, Exhibit 7, Comments of the Coalition to Preserve the Financial Interest and Syndication Rule on Proposed Modification of Network Consent Decrees. In United States of America v. CBS, Inc. Civil No. 74-3599-RJK, United States of America v. American Broadcasting Companies, Inc. Civil No. 74-3600-RJK, and United States of America v. National Broadcasting Company, Inc. Civil No. 74-3601-RJK.

- California Public Utility Commission, Division of Ratepayer Advocacy: Proposed merger of Southern California Edison Company and San Diego Gas and Electric Company, July 1990.

- Altai, Inc.: Expert witness in Computer Associates, Inc. v. Altai, Inc., April 1990.

- NFL Players Association: Deposition in Marvin Powell v. National Football League, September 1989.

- U.S. Department of Justice, Antitrust Division: Regulation of oil pipelines, August 1983;

- Consolidated Aluminum Corporation: Deposition in Indal, Inc. v. Consolidated Aluminum Corp., April 1983.

- U.S. Department of Justice, Antitrust Division: Expert witness in U.S. v. AT&T, 1981

- Battelle, Pacific Northwest Laboratories. Analyses of bidding for offshore oil leases and of the effects of Building Energy Performance Standards on energy demand, September 1979 -1981.

- U.S. Senate Commerce Committee, Senator Danforth presiding: Testimony on corporate average fuel economy (CAFÉ) standards, November 15, 1979.

- State of Missouri, Office of the Public Counsel: Expert witness on electric utility rate structures, 1978.

- Federal Trade Commission: Study on Vertical Distribution Arrangements, January 1, 1977 - August 1, 1978.

## Fields Taught

- Graduate: Industrial Organization, Economic Development and Planning, Microeconomic Theory, International Trade, International Finance, Economic Theories of Behavior, Applied Microeconomics.

- Undergraduate: Government and Business, Industrial Organization, International Trade, International Finance, Economic Development, Intermediate Microeconomic Theory, Intermediate Macroeconomic Theory, Introductory Microeconomic Theory, Introductory Macroeconomic Theory.

## Grants

- National Science Foundation. Grant title: "Income Maximizing in Choice and Rate Effects," 1988 - 1991.

- National Science Foundation. Grant title: "Application of Economic Theory to Operant Schedule Effects," 1985 - 1987.

- National Science Foundation. Grant title: "Income and Choice," 1983 - 1985.

## Professional Activities

- Referee, *American Economic Review, The Bell Journal of Economics/Rand Journal, Economic Inquiry, Industrial Organization Review, Journal of Industrial Economics, Journal of Law and Economics, Journal of Political Economy, Quarterly Journal of Economics, Southern Economic Journal.*

- Member, Editorial Boards, *International Journal of the Economics of Business, Journal of Forensic Economics.*

- Member, American Bar Association, American Economic Association.

**Appendix B**
**Materials Considered**

| |
|---|
| **Legal Documents** |
| Amended Complaint, Civil Action No. 2:20-CV-03539, September 9, 2021 ("Complaint"). |
| Complaint, December 14, 2016 ("Heritage Complaint"). |
| **Expert Reports** |
| Expert Report of B. Douglas Bernheim, May 24, 2002. |
| Expert Report of Catherine Tucker, Ph.D., April 26, 2024. |
| Expert Report of Celeste C. Saravia, Ph.D., April 26, 2024. |
| Expert Report of Christopher Stomberg, Ph.D., April 26, 2024. |
| Expert Report of Daniel L. Rubinfeld, April 26, 2024. |
| Expert Report of Dr. Anupam B. Jena, M.D., Ph.D., April 26, 2024. |
| Expert Report of Gregory K. Bell, Ph.D., April 26, 2024. |
| Expert Report of Lauren J. Stiroh, Ph.D., April 26, 2024. |
| Expert Report of Professor Richard J. Gilbert, Ph.D., April 26, 2024. |
| **Depositions** |
| Deposition of Anthony Thomassey, July 19, 2023. |
| Deposition of Anupam B. Jena, MD, July 16, 2024. |
| Deposition of Christopher P. Stomberg, Ph.D., July 10, 2024. |
| Deposition of Deborah Chase, January 22, 2021. |
| Deposition of Frederick R. Warren-Boulton Deposition, Ph.D., April 16, 2024. |
| Deposition of Jason Gensburger Deposition, May 22, 2023. |
| Deposition of John Wesolowski, November 17, 2022. |
| Deposition of Michael Perfetto, June 29, 2022. |
| Deposition of Paul McMahon, 30(b)(6) Aurobindo, August 8, 2023. |
| Deposition of Richard J. Gilbert, Ph.D., July 11, 2024. |
| Deposition of Robin Hatosy Strzeminski, August 18, 2021. |
| Deposition of Gregory K. Bell, July 16, 2024. |
| Deposition of Catherine Tucker, Ph.D., July 9, 2024. |
| Deposition of Celeste C. Saravia, July 2,2024. |
| Deposition of Lauren J. Stiroh, June 25, 2024. |
| **Public Documents** |
| Abrantes-Metz, R.M., and A. Metz. (2019). “Why Screening is a “Must Have” Tool for Effective Antitrust Compliance Programs,” CPI Antitrust Chronical. |
| American Bar Association. (2017). Proving Antitrust Damages: Legal and Economic Issues, Third Edition, ABA Book Publishing. |
| Baker, J. and Morton, F.S. (2018). “Antitrust Enforcement Against Platform MFNs,” The Yale Law Journal, 127(2). |
| Baker, J., and Chevalier, J. (2013). “The Competitive Consequences of Most-Favored-Nation Provisions,” Antitrust Magazine, 27(2). |
| Berry, S. and Haile, P. (2021). “Foundations of Demand Estimation.” The Handbook of Industrial Organization, Ho, Kate, Hortacsu, Ali and Lizzeri, Alessandro (eds). |
| Byrne, D.P., and de Roos, N. (2019). “Learning to Coordinate: A Study in Retail Gasoline,” American Economic Review, 109(2). |
| Callaway, B., and Sant’Anna, P.H.C. (2021). “Difference-in-Differences with Multiple Time Periods,” Journal of Econometrics, 225(2). |
| Carlton et al. (2019). “Are Legacy Airline Mergers Pro-or-Anti-Competitive? Evidence from recent U.S. airline mergers.” International Journal of Industrial Organization, 62. |
| Clark, R., Fabiilli, C., and Lasio, L. (2022). “Collusion in the US Generic Drug Industry,” International Journal of Industrial Organization, 85. |
| Connor, J. M. (2006). “The Great Global Vitamins Conspiracy: Sanctions and Deterrence.” AAI Working Paper No. 06-02. |

| **Appendix B<br>Materials Considered** |
|---|
| Cunningham, S. (2020). Causal Inference: The Mixtape (V. 1.8), Yale University Press. |
| Deaton, A. (1997). *The Analysis of Household Surveys: A Microeconometric Approach to Development Policy* , The Johns Hopkins University Press, Baltimore. |
| DeBernardis, A.V., Ashby, E. (2021). "Antitrust Division Praises Early Success and Heralds New Endeavors for Procurement Collusion Strike Force," West Law. |
| Doane, M.J., Froeb, L.M. Sibley, D. and Pinto, B.P. (2013). "Screening for Collusion as a Problem of Inference," Oxford Handbook on International Antitrust Economics, Roger D. Blair and Danil Sokol (eds.). |
| Faghani Dermi, H. and VanOmmeren, S. (2024). "Staggered Difference in Differences Estimation for Antitrust Analysis: A Review of Literature and Recommendations for Practitioners." SSRN Online Journal. |
| Green, M.D., Freedman, M., and Gordis, L. (2011). "Reference Guide on Epidemiology." In Reference Manual on Scientific Evidence, J.P. Kassirer and Gladys Kessler (eds), Third Edition, Washington, DC: The National Academies Press. |
| Greene, W.H. (2003). *Econometric Analysis* , Fifth Edition, Pearson Education. |
| Gujarati, D.N., and Porter, C.D. (2009). *Basic Econometrics* , Fifth Edition. New York: McGraw-Hill, W.W. Norton & Company. |
| Hansen, B.E. (2021). Econometrics. Princeton, NJ: Princeton University Press. |
| Harrington, J. (2017). "A Theory of Collusion with Partial Mutual Understanding," Research in Economics, 71(1). |
| Hayashi, F. (2000). Econometrics. Princeton University Press, Princeton. |
| Heimler, A., (2023). "Cartels in Public Procurement: A Reassessment," CPI Antitrust Chronicle. |
| Imhof, D., Karagök, Y. and Rutz, S. (2018). "Screening for Bid Rigging – Does it Work?," Journal of Competition Law and Economics, 14(2). |
| Kahn-Lang, A., and Lang, K. (2020). "The Promise and Pitfalls of Differences-in-Differences: Reflections on 16 and Pregnant and Other Applications," Journal of Business & Economic Statistics, 38. |
| Kawai, K., Nakabayashi, J., Ortner, J.M. and Chassang, S. (2023). "Using Bid Rotation and Incumbency to Detect Collusion: A Regression Discontinuity Approach," The Review of Economic Studies, 90(1). |
| Kaye, D.H. and Freedman, D.A. (2011). "Reference Guide on Statistics." In Reference Manual on Scientific Evidence, J.P. Kassirer and Gladys Kessler (eds), Third Edition, Washington, DC: The National Academies Press. |
| Kennedy, P. (2002). "Oh No! I Got the Wrong Sign! What Should I Do?" Simon Fraser University Department of Economics Discussion Papers. |
| Kovacic, William et al. (2007). "Lessons for the Competition Policy from the Vitamins Cartel," Contributions to Economic Analysis, 282. |
| Maskin, E., and Tirole, J. (1988). "A Theory of Dynamic Oligopoly, II: Price Competition, Kinked Demand Curves, and Edgeworth Cycles," Econometrica, 56(3). |
| McEachern, W.A. (2006). Economics: A Contemporary Introduction, Seventh Edition. South-Western. |
| Roth, J., Sant'Anna, P.H.C., Bilinski, A., and Poe, J. (2023). "What's Trending in Difference-in-Differences? A Synthesis of the Recent Econometrics Literature." Journal of Econometrics, 235(2). |
| Rubinfeld, D.L. (2011). "Reference Guide on Multiple Regression." In Reference Manual on Scientific Evidence, J.P. Kassirer and Gladys Kessler (eds), Third Edition, Washington, DC: The National Academies Press. |
| Salop, S., and Morton, F.S. (2013). "Developing an Administrable MFN Enforcement Policy," Antitrust Magazine, 27(2). |
| Schelling, T. (1960). The Strategy of Conflict. Pickle Partners Publishing. |
| Scherer, F.M., and Ross, D. (1990). Industrial Market Structure and Economic Performance, Third Edition. |
| U.S. Food and Drug Administration, "Frequently Asked Questions about Drug Shortages," October 11, 2023, available at https://www.fda.gov/drugs/drug-shortages/frequentlyasked-questions-about-drug-shortages. |
| Varian, H.R. (2010). *Intermediate Microeconomics: A Modern Approach* , Eighth Edition. New York: W.W. Norton & |
| Verbeek, M. (2004). *A Guide to Modern Econometrics.* Second Edition, Chichester: John Wiley & Sons Inc. ISBN 0-470-85773-0. |
| Wooldridge, J.M. (2016). Introductory Econometrics: A Modern Approach, Sixth Edition. Cengage Learning. |
| **Case Data** |
| Defendant Transactional Data Production (As Cited in Backup) |

| Appendix B<br>Materials Considered |
|---|
| Defendant Cost Data Production (As Cited in Backup) |
| Defendant AMP Data Production (As Cited in Backup) |
| PBM and Retailer Data Production |
| Sandoz KE30 Databases (As Cited in Backup) |
| **Public Data** |
| IQVIA National Sales Perspectives Data |
| IQVIA SMART Launch Data (1992-2020) |
| AnalySource Data (As of 3/2020) |
| FDA NDC Database (Extracted 10/07/2020 and 04/28/2023) |
| FDA Orange Book (as of 3/2023) |
| National Average Drug Acquisition Cost (2014-2023) |
| Medicaid State Drug Utilization Data (2011-2022) |
| **Bates Numbered Documents** |
| All Bates numbered documents referenced in my Report. |
| All other Material cited in my Report or used in my backup. |

HIGHLY CONFIDENTIAL: SUBJECT TO PROTECTIVE ORDER

# Appendix C Table 1

## Drug Classifications, Conduct Dates, and Updated Net Revenues for Drugs at Issue

| # | Drug | Drug Classification | Earliest Conduct Date (Drug) | Earliest Conduct Date (API) | Disgorgement Period End Date | Affected Defendant Net Revenues |
|---|---|---|---|---|---|---|
| 1 | Acetazolamide-Tablet-125Mg | Price Increase | 12/6/2010 | 12/6/2010 | -- | $20,000,402 |
| 2 | Acetazolamide-Tablet-250Mg | Price Increase | 12/6/2010 | 12/6/2010 | -- | $159,891,884 |
| 3 | Adapalene-Cream-0.1% | New Generic | 10/25/2010 | 10/25/2010 | -- | $171,488,170 |
| 4 | Alclometasone Dipropionate-Cream-0.05% | Price Increase | 5/1/2013 | 5/1/2013 | -- | $14,478,947 |
| 5 | Alclometasone Dipropionate-Ointment-0.05% | Price Increase | 6/10/2013 | 5/1/2013 | -- | $11,900,214 |
| 6 | Ammonium Lactate-Cream-Eq12%Base | Price Increase | 5/1/2013 | 5/1/2013 | -- | $54,281,022 |
| 7 | Ammonium Lactate-Lotion-Eq12%Base | Price Increase | 5/1/2013 | 5/1/2013 | -- | $53,828,308 |
| 8 | Betamethasone Dipropionate-Cream-Eq0.05%Base | Price Increase | 5/1/2013 | 1/4/2011 | -- | $105,142,000 |
| 9 | Betamethasone Dipropionate-Lotion, Augmented-Eq0.05%Base | Price Increase | 1/4/2011 | 1/4/2011 | -- | $38,879,803 |
| 10 | Betamethasone Dipropionate-Lotion-Eq0.05%Base | Price Increase | 1/4/2011 | 1/4/2011 | -- | $29,354,134 |
| 11 | Betamethasone Dipropionate; Calcipotriene-Ointment-0.064%;0.005% | New Generic | 3/21/2014 | 3/21/2014 | -- | $177,534,930 |
| 12 | Betamethasone Dipropionate; Clotrimazole-Cream-Eq0.05%Base;1% | Price Increase | 3/25/2011 | 3/25/2011 | -- | $283,823,101 |
| 13 | Betamethasone Dipropionate; Clotrimazole-Lotion-Eq0.05%Base;1% | Price Increase | 4/4/2011 | 3/25/2011 | -- | $56,620,052 |
| 14 | Betamethasone Valerate-Cream-Eq0.1%Base | Price Increase | 5/1/2013 | 12/22/2011 | -- | $30,965,903 |
| 15 | Betamethasone Valerate-Lotion-Eq0.1%Base | Price Increase | 12/22/2011 | 12/22/2011 | -- | $29,770,091 |
| 16 | Betamethasone Valerate-Ointment-Eq0.1%Base | Price Increase | 2/15/2013 | 12/22/2011 | -- | $21,756,137 |
| 17 | Bromocriptine Mesylate-Tablet-Eq2.5Mgbase | Price Increase | 4/5/2013 | 4/5/2013 | -- | $62,500,860 |
| 18 | Calcipotriene-Solution-0.005% | Price Increase | 11/18/2011 | 11/18/2011 | -- | $16,454,257 |
| 19 | Carbamazepine-Tablet, Extended Release-100Mg | New Generic | 3/1/2009 | 3/1/2009 | -- | $12,140,930 |
| 20 | Carbamazepine-Tablet, Extended Release-200Mg | New Generic | 3/1/2009 | 3/1/2009 | -- | $218,929,786 |
| 21 | Carbamazepine-Tablet, Extended Release-400Mg | New Generic | 3/1/2009 | 3/1/2009 | -- | $230,535,885 |
| 22 | Cefpodoxime Proxetil-For Suspension-Eq100Mgbase/5Ml | Price Increase | 1/11/2013 | 1/9/2013 | -- | $1,859,825 |
| 23 | Cefpodoxime Proxetil-Tablet-Eq100Mgbase | Price Increase | 1/9/2013 | 1/9/2013 | -- | $13,849,894 |
| 24 | Cefpodoxime Proxetil-Tablet-Eq200Mgbase | Price Increase | 1/9/2013 | 1/9/2013 | -- | $68,815,222 |
| 25 | Ciclopirox-Cream-0.77% | Price Increase | 3/19/2012 | 3/19/2012 | 12/31/2016 | $25,277,896 |
| 26 | Ciclopirox-Shampoo-1% | Price Increase | 12/3/2012 | 3/19/2012 | -- | $27,291,011 |
| 27 | Ciclopirox-Solution-8% | Price Increase | 5/7/2013 | 3/19/2012 | -- | $37,264,539 |
| 28 | Clindamycin Phosphate-Cream-Eq2%Base | Price Increase | 10/19/2012 | 11/2/2010 | -- | $89,395,620 |
| 29 | Clindamycin Phosphate-Gel-Eq1%Base | Price Increase | 6/1/2012 | 11/2/2010 | -- | $386,864,764 |
| 30 | Clindamycin Phosphate-Lotion-Eq1%Base | Price Increase | 10/19/2012 | 11/2/2010 | -- | $339,105,500 |
| 31 | Clindamycin Phosphate-Solution-Eq1%Base | Price Increase | 11/2/2010 | 11/2/2010 | -- | $127,070,392 |
| 32 | Clobetasol Propionate Emollient-Cream-0.05% | Price Increase | 6/1/2014 | 6/1/2014 | -- | $20,555,462 |
| 33 | Clobetasol Propionate-Cream-0.05% | Price Increase | 6/1/2014 | 6/1/2014 | -- | $164,885,632 |
| 34 | Clobetasol Propionate-Gel-0.05% | Price Increase | 6/1/2014 | 6/1/2014 | -- | $2,740,968 |
| 35 | Clobetasol Propionate-Ointment-0.05% | Price Increase | 6/1/2014 | 6/1/2014 | -- | $252,644,989 |
| 36 | Clobetasol Propionate-Solution-0.05% | Price Increase | 6/1/2014 | 6/1/2014 | -- | $87,670,954 |
| 37 | Clotrimazole-Cream-1% | Price Increase | 1/29/2015 | 1/29/2015 | 12/31/2016 | $23,199,314 |
| 38 | Desonide-Cream-0.05% | Price Increase | 5/1/2013 | 6/1/2009 | -- | $148,886,991 |
| 39 | Desonide-Lotion-0.05% | Price Increase | 6/1/2009 | 6/1/2009 | -- | $208,314,074 |
| 40 | Desonide-Ointment-0.05% | Price Increase | 5/1/2013 | 6/1/2009 | -- | $93,427,384 |
| 41 | Desoximetasone-Ointment-0.05% | New Generic | 9/28/2012 | 9/28/2012 | -- | $35,120,476 |
| 42 | Desoximetasone-Ointment-0.25% | Price Increase | 9/28/2012 | 9/28/2012 | 12/31/2016 | $61,830,064 |
| 43 | Econazole Nitrate-Cream-1% | Price Increase | 7/24/2014 | 7/24/2014 | -- | $141,905,730 |
| 44 | Eplerenone-Tablet-25Mg | Price Increase | 6/2/2014 | 6/2/2014 | 12/31/2016 | $37,471,021 |
| 45 | Eplerenone-Tablet-50Mg | Price Increase | 6/2/2014 | 6/2/2014 | 12/31/2016 | $26,217,227 |
| 46 | Erythromycin-Solution-2% | Price Increase | 12/19/2011 | 12/19/2011 | -- | $20,864,501 |
| 47 | Ethambutol Hydrochloride-Tablet-100Mg | Price Increase | 12/18/2012 | 12/18/2012 | 6/30/2014 | $452,143 |
| 48 | Ethambutol Hydrochloride-Tablet-400Mg | Price Increase | 12/18/2012 | 12/18/2012 | 6/30/2014 | $5,197,993 |
| 49 | Fluocinolone Acetonide-Cream-0.01% | Price Increase | 12/22/2011 | 12/22/2011 | -- | $14,504,907 |
| 50 | Fluocinolone Acetonide-Cream-0.025% | Price Increase | 12/22/2011 | 12/22/2011 | -- | $17,234,165 |
| 51 | Fluocinolone Acetonide-Ointment-0.025% | Price Increase | 12/22/2011 | 12/22/2011 | -- | $19,287,969 |
| 52 | Fluocinonide-Cream-0.1% | New Generic | 1/31/2014 | 5/10/2011 | -- | $206,538,561 |
| 53 | Fluocinonide-Gel-0.05% | Price Increase | 11/23/2015 | 5/10/2011 | -- | $12,601,781 |
| 54 | Fluocinonide-Ointment-0.05% | Price Increase | 2/12/2013 | 5/10/2011 | -- | $42,662,346 |
| 55 | Fluocinonide-Solution-0.05% | Price Increase | 5/10/2011 | 5/10/2011 | -- | $106,995,774 |

| # | Drug | Drug Classification | Earliest Conduct Date (Drug) | Earliest Conduct Date (API) | Disgorgement Period End Date | Affected Defendant Net Revenues |
|---|---|---|---|---|---|---|
| 56 | Fluticasone Propionate-Lotion-0.05% | New Generic | 12/3/2012 | 12/3/2012 | -- | $12,993,282 |
| 57 | Griseofulvin Microsize-Tablet-500Mg | Price Increase | 10/2/2013 | 10/2/2013 | 12/31/2016 | $15,049,536 |
| 58 | Halobetasol Propionate-Cream-0.05% | Price Increase | 9/28/2012 | 9/28/2012 | -- | $34,998,335 |
| 59 | Halobetasol Propionate-Ointment-0.05% | Price Increase | 9/28/2012 | 9/28/2012 | -- | $89,669,578 |
| 60 | Hydrocortisone Acetate-Suppository-25Mg | Price Increase | 7/9/2013 | 7/9/2013 | -- | $197,491,551 |
| 61 | Hydrocortisone Acetate-Suppository-30Mg | Price Increase | 7/9/2013 | 7/9/2013 | -- | $15,854,738 |
| 62 | Hydrocortisone Valerate-Cream-0.2% | Price Increase | 8/1/2013 | 8/1/2013 | -- | $95,585,029 |
| 63 | Imiquimod-Cream-5% | New Generic | 4/16/2010 | 4/16/2010 | -- | $285,032,821 |
| 64 | Ketoconazole-Cream-2% | Price Increase | 6/15/2015 | 6/15/2015 | -- | $343,852,392 |
| 65 | Latanoprost-Solution/Drops-0.005% | Price Increase | 4/3/2012 | 4/3/2012 | 12/31/2016 | $292,545,944 |
| 66 | Lidocaine-Ointment-5% | Price Increase | 12/22/2011 | 12/22/2011 | -- | $389,439,216 |
| 67 | Metformin Hydrochloride; Pioglitazone Hydrochloride-Tablet-500Mg;Eq15Mgbase | New Generic | 2/13/2013 | 2/13/2013 | -- | $43,124,347 |
| 68 | Metformin Hydrochloride; Pioglitazone Hydrochloride-Tablet-850Mg;Eq15Mgbase | New Generic | 2/13/2013 | 2/13/2013 | -- | $73,678,881 |
| 69 | Methazolamide-Tablet-25Mg | Price Increase | 12/5/2014 | 12/5/2014 | -- | $9,128,142 |
| 70 | Methazolamide-Tablet-50Mg | Price Increase | 12/5/2014 | 12/5/2014 | -- | $36,382,419 |
| 71 | Methylphenidate Hcl-Tablet, Extended Release-20Mg | Price Increase | 3/8/2013 | 3/8/2013 | -- | $291,100,335 |
| 72 | Methylphenidate Hcl-Tablet-10Mg | Price Increase | 3/8/2013 | 3/8/2013 | -- | $205,530,586 |
| 73 | Methylphenidate Hcl-Tablet-20Mg | Price Increase | 3/8/2013 | 3/8/2013 | -- | $201,298,508 |
| 74 | Methylphenidate Hcl-Tablet-5Mg | Price Increase | 3/8/2013 | 3/8/2013 | -- | $75,350,300 |
| 75 | Metronidazole-Cream-0.75% | Price Increase | 7/22/2011 | 7/22/2011 | -- | $151,250,032 |
| 76 | Metronidazole-Gel-0.75% | Price Increase | 2/17/2012 | 7/22/2011 | -- | $60,368,783 |
| 77 | Metronidazole-Gel-1% | New Generic | 7/1/2014 | 7/22/2011 | -- | $164,044,820 |
| 78 | Metronidazole-Lotion-0.75% | Price Increase | 7/22/2011 | 7/22/2011 | -- | $53,703,533 |
| 79 | Mometasone Furoate-Cream-0.1% | Price Increase | 5/16/2013 | 5/16/2013 | 12/31/2016 | $19,699,004 |
| 80 | Mometasone Furoate-Ointment-0.1% | Price Increase | 5/16/2013 | 5/16/2013 | 12/31/2016 | $6,546,850 |
| 81 | Mometasone Furoate-Solution-0.1% | Price Increase | 5/16/2013 | 5/16/2013 | 12/31/2016 | $1,684,835 |
| 82 | Nystatin-Ointment-100,000Units/Gm | Price Increase | 6/1/2011 | 6/1/2011 | -- | $62,458,378 |
| 83 | Nystatin; Triamcinolone Acetonide-Cream-100,000Units/Gm;0.1% | Price Increase | 2/12/2013 | 2/12/2013 | -- | $289,452,126 |
| 84 | Nystatin; Triamcinolone Acetonide-Ointment-100,000Units/Gm;0.1% | Price Increase | 2/12/2013 | 2/12/2013 | -- | $75,047,000 |
| 85 | Phenytoin Sodium-Capsule-100Mgextended | Price Increase | 6/2/2014 | 6/2/2014 | -- | $169,081,577 |
| 86 | Prochlorperazine-Suppository-25Mg | Price Increase | 3/19/2013 | 3/19/2013 | -- | $43,518,563 |
| 87 | Promethazine Hydrochloride-Suppository-12.5Mg | Price Increase | 10/8/2012 | 10/8/2012 | -- | $23,801,303 |
| 88 | Promethazine Hydrochloride-Suppository-25Mg | Price Increase | 10/8/2012 | 10/8/2012 | -- | $92,480,617 |
| 89 | Tacrolimus-Ointment-0.03% | New Generic | 11/19/2014 | 11/19/2014 | -- | $63,508,534 |
| 90 | Tacrolimus-Ointment-0.1% | New Generic | 11/19/2014 | 11/19/2014 | -- | $261,752,446 |
| 91 | Terconazole-Cream-0.8% | Price Increase | 5/1/2013 | 5/1/2013 | -- | $40,422,014 |
| 92 | Triamcinolone Acetonide-Cream-0.025% | Price Increase | 7/1/2010 | 7/1/2010 | -- | $22,860,047 |
| 93 | Triamcinolone Acetonide-Cream-0.1% | Price Increase | 7/1/2010 | 7/1/2010 | 12/31/2016 | $113,284,456 |
| 94 | Triamcinolone Acetonide-Cream-0.5% | Price Increase | 7/1/2010 | 7/1/2010 | 12/31/2016 | $36,889,570 |
| 95 | Triamcinolone Acetonide-Ointment-0.025% | Price Increase | 7/1/2010 | 7/1/2010 | -- | $16,577,461 |
| 96 | Triamcinolone Acetonide-Ointment-0.1% | Price Increase | 7/1/2010 | 7/1/2010 | -- | $124,373,303 |
| 97 | Triamcinolone Acetonide-Ointment-0.5% | Price Increase | 7/1/2010 | 7/1/2010 | -- | $21,326,021 |
| 98 | Triamcinolone Acetonide-Paste-0.1% | Price Increase | 10/16/2013 | 7/1/2010 | 12/31/2016 | $16,023,215 |
| | Total | | | | | $9,306,542,337 |

HIGHLY CONFIDENTIAL: SUBJECT TO PROTECTIVE ORDER

**Appendix C Table 2**

List of Defendants and Drugs at Issue with Alleged Conduct

| # | Defendant | Drug | Drug Classification | Disgorgement Period End Date | Affected Defendant Net Revenues |
|---|---|---|---|---|---|
| 1 | SUN/MUTUAL/TARO | Acetazolamide-Tablet-125Mg | Price Increase | -- | $20,000,402 |
| 2 | LANNETT | Acetazolamide-Tablet-250Mg | Price Increase | -- | $99,709,870 |
| 3 | SUN/MUTUAL/TARO | Acetazolamide-Tablet-250Mg | Price Increase | -- | $60,182,013 |
| 4 | PERRIGO | Adapalene-Cream-0.1% | New Generic | -- | $106,793,500 |
| 5 | SANDOZ | Adapalene-Cream-0.1% | New Generic | -- | $64,694,670 |
| 6 | GLENMARK | Alclometasone Dipropionate-Cream-0.05% | Price Increase | -- | $7,389,798 |
| 7 | SANDOZ | Alclometasone Dipropionate-Cream-0.05% | Price Increase | -- | $2,760,960 |
| 8 | SUN/MUTUAL/TARO | Alclometasone Dipropionate-Cream-0.05% | Price Increase | -- | $4,328,190 |
| 9 | GLENMARK | Alclometasone Dipropionate-Ointment-0.05% | Price Increase | -- | $4,224,961 |
| 10 | SANDOZ | Alclometasone Dipropionate-Ointment-0.05% | Price Increase | -- | $3,209,467 |
| 11 | SUN/MUTUAL/TARO | Alclometasone Dipropionate-Ointment-0.05% | Price Increase | -- | $4,465,786 |
| 12 | ACTAVIS | Ammonium Lactate-Cream-Eq12%Base | Price Increase | -- | $874,545 |
| 13 | PERRIGO | Ammonium Lactate-Cream-Eq12%Base | Price Increase | -- | $43,844,436 |
| 14 | SUN/MUTUAL/TARO | Ammonium Lactate-Cream-Eq12%Base | Price Increase | -- | $9,562,041 |
| 15 | ACTAVIS | Ammonium Lactate-Lotion-Eq12%Base | Price Increase | -- | $942,053 |
| 16 | PERRIGO | Ammonium Lactate-Lotion-Eq12%Base | Price Increase | -- | $43,427,042 |
| 17 | SUN/MUTUAL/TARO | Ammonium Lactate-Lotion-Eq12%Base | Price Increase | -- | $9,459,213 |
| 18 | SANDOZ | Betamethasone Dipropionate-Cream-Eq0.05%Base | Price Increase | -- | $62,865,670 |
| 19 | SUN/MUTUAL/TARO | Betamethasone Dipropionate-Cream-Eq0.05%Base | Price Increase | -- | $42,276,330 |
| 20 | SANDOZ | Betamethasone Dipropionate-Lotion, Augmented-Eq0.05%Base | Price Increase | -- | $14,563,279 |
| 21 | SUN/MUTUAL/TARO | Betamethasone Dipropionate-Lotion, Augmented-Eq0.05%Base | Price Increase | -- | $24,316,524 |
| 22 | PERRIGO | Betamethasone Dipropionate-Lotion-Eq0.05%Base | Price Increase | -- | $18,508,440 |
| 23 | SANDOZ | Betamethasone Dipropionate-Lotion-Eq0.05%Base | Price Increase | -- | $10,845,695 |
| 24 | SUN/MUTUAL/TARO | Betamethasone Dipropionate-Lotion-Eq0.05%Base | Price Increase | -- | $0 |
| 25 | PERRIGO | Betamethasone Dipropionate; Calcipotriene-Ointment-0.064%;0.005% | New Generic | -- | $96,951,292 |
| 26 | SANDOZ | Betamethasone Dipropionate; Calcipotriene-Ointment-0.064%;0.005% | New Generic | -- | $80,583,637 |
| 27 | ACTAVIS | Betamethasone Dipropionate; Clotrimazole-Cream-Eq0.05%Base;1% | Price Increase | -- | $77,666,255 |
| 28 | SANDOZ | Betamethasone Dipropionate; Clotrimazole-Cream-Eq0.05%Base;1% | Price Increase | -- | $128,040,330 |
| 29 | SUN/MUTUAL/TARO | Betamethasone Dipropionate; Clotrimazole-Cream-Eq0.05%Base;1% | Price Increase | -- | $78,116,516 |
| 30 | SANDOZ | Betamethasone Dipropionate; Clotrimazole-Lotion-Eq0.05%Base;1% | Price Increase | -- | $15,954,981 |
| 31 | SUN/MUTUAL/TARO | Betamethasone Dipropionate; Clotrimazole-Lotion-Eq0.05%Base;1% | Price Increase | -- | $40,665,071 |
| 32 | SANDOZ | Betamethasone Valerate-Cream-Eq0.1%Base | Price Increase | -- | $23,149,234 |
| 33 | SUN/MUTUAL/TARO | Betamethasone Valerate-Cream-Eq0.1%Base | Price Increase | -- | $7,816,669 |
| 34 | G&W | Betamethasone Valerate-Lotion-Eq0.1%Base | Price Increase | -- | $10,423,113 |
| 35 | SANDOZ | Betamethasone Valerate-Lotion-Eq0.1%Base | Price Increase | -- | $19,346,978 |
| 36 | ACTAVIS | Betamethasone Valerate-Ointment-Eq0.1%Base | Price Increase | -- | $12,092,686 |
| 37 | SANDOZ | Betamethasone Valerate-Ointment-Eq0.1%Base | Price Increase | -- | $9,663,451 |
| 38 | MYLAN | Bromocriptine Mesylate-Tablet-Eq2.5Mgbase | Price Increase | -- | $8,684,420 |
| 39 | PERRIGO | Bromocriptine Mesylate-Tablet-Eq2.5Mgbase | Price Increase | -- | $27,943,828 |
| 40 | SANDOZ | Bromocriptine Mesylate-Tablet-Eq2.5Mgbase | Price Increase | -- | $25,872,612 |
| 41 | G&W | Calcipotriene-Solution-0.005% | Price Increase | -- | $14,766,682 |
| 42 | SANDOZ | Calcipotriene-Solution-0.005% | Price Increase | -- | $1,687,575 |
| 43 | SANDOZ | Carbamazepine-Tablet, Extended Release-100Mg | New Generic | -- | $6,978,140 |
| 44 | SUN/MUTUAL/TARO | Carbamazepine-Tablet, Extended Release-100Mg | New Generic | -- | $5,162,791 |
| 45 | SANDOZ | Carbamazepine-Tablet, Extended Release-200Mg | New Generic | -- | $90,941,407 |
| 46 | SUN/MUTUAL/TARO | Carbamazepine-Tablet, Extended Release-200Mg | New Generic | -- | $127,988,379 |
| 47 | SANDOZ | Carbamazepine-Tablet, Extended Release-400Mg | New Generic | -- | $93,381,202 |
| 48 | SUN/MUTUAL/TARO | Carbamazepine-Tablet, Extended Release-400Mg | New Generic | -- | $137,154,683 |
| 49 | AUROBINDO | Cefpodoxime Proxetil-For Suspension-Eq100Mgbase/5Ml | Price Increase | -- | $40,010 |
| 50 | SANDOZ | Cefpodoxime Proxetil-For Suspension-Eq100Mgbase/5Ml | Price Increase | -- | $1,819,815 |
| 51 | AUROBINDO | Cefpodoxime Proxetil-Tablet-Eq100Mgbase | Price Increase | -- | $5,134,717 |
| 52 | SANDOZ | Cefpodoxime Proxetil-Tablet-Eq100Mgbase | Price Increase | -- | $8,715,177 |
| 53 | AUROBINDO | Cefpodoxime Proxetil-Tablet-Eq200Mgbase | Price Increase | -- | $25,714,292 |
| 54 | SANDOZ | Cefpodoxime Proxetil-Tablet-Eq200Mgbase | Price Increase | -- | $43,100,930 |
| 55 | G&W | Ciclopirox-Cream-0.77% | Price Increase | 12/31/2016 | $12,666,419 |
| 56 | GLENMARK | Ciclopirox-Cream-0.77% | Price Increase | 12/31/2016 | $4,817,242 |
| 57 | PERRIGO | Ciclopirox-Cream-0.77% | Price Increase | 12/31/2016 | $7,794,235 |
| 58 | ACTAVIS | Ciclopirox-Shampoo-1% | Price Increase | -- | $9,098,916 |
| 59 | PERRIGO | Ciclopirox-Shampoo-1% | Price Increase | -- | $14,950,066 |
| 60 | SANDOZ | Ciclopirox-Shampoo-1% | Price Increase | -- | $3,242,029 |
| 61 | G&W | Ciclopirox-Solution-8% | Price Increase | -- | $20,546,720 |
| 62 | PERRIGO | Ciclopirox-Solution-8% | Price Increase | -- | $16,166,789 |
| 63 | SANDOZ | Ciclopirox-Solution-8% | Price Increase | -- | $551,030 |
| 64 | GREENSTONE | Clindamycin Phosphate-Cream-Eq2%Base | Price Increase | -- | $54,915,449 |
| 65 | SANDOZ | Clindamycin Phosphate-Cream-Eq2%Base | Price Increase | -- | $34,480,171 |
| 66 | GREENSTONE | Clindamycin Phosphate-Gel-Eq1%Base | Price Increase | -- | $170,055,375 |

HIGHLY CONFIDENTIAL: SUBJECT TO PROTECTIVE ORDER

| # | Defendant | Drug | Drug Classification | Disgorgement Period End Date | Affected Defendant Net Revenues |
|---|---|---|---|---|---|
| 67 | SANDOZ | Clindamycin Phosphate-Gel-Eq1%Base | Price Increase | -- | $216,809,389 |
| 68 | GREENSTONE | Clindamycin Phosphate-Lotion-Eq1%Base | Price Increase | -- | $180,346,437 |
| 69 | SANDOZ | Clindamycin Phosphate-Lotion-Eq1%Base | Price Increase | -- | $158,759,063 |
| 70 | GREENSTONE | Clindamycin Phosphate-Solution-Eq1%Base | Price Increase | -- | $60,724,029 |
| 71 | PERRIGO | Clindamycin Phosphate-Solution-Eq1%Base | Price Increase | -- | $34,459,565 |
| 72 | SANDOZ | Clindamycin Phosphate-Solution-Eq1%Base | Price Increase | -- | $23,836,233 |
| 73 | SUN/MUTUAL/TARO | Clindamycin Phosphate-Solution-Eq1%Base | Price Increase | -- | $8,050,566 |
| 74 | SANDOZ | Clobetasol Propionate Emollient-Cream-0.05% | Price Increase | -- | $10,236,113 |
| 75 | SUN/MUTUAL/TARO | Clobetasol Propionate Emollient-Cream-0.05% | Price Increase | -- | $10,319,350 |
| 76 | SANDOZ | Clobetasol Propionate-Cream-0.05% | Price Increase | -- | $89,285,616 |
| 77 | SUN/MUTUAL/TARO | Clobetasol Propionate-Cream-0.05% | Price Increase | -- | $75,600,016 |
| 78 | SANDOZ | Clobetasol Propionate-Gel-0.05% | Price Increase | -- | $2,168,135 |
| 79 | SUN/MUTUAL/TARO | Clobetasol Propionate-Gel-0.05% | Price Increase | -- | $572,834 |
| 80 | SANDOZ | Clobetasol Propionate-Ointment-0.05% | Price Increase | -- | $146,745,906 |
| 81 | SUN/MUTUAL/TARO | Clobetasol Propionate-Ointment-0.05% | Price Increase | -- | $105,899,083 |
| 82 | SANDOZ | Clobetasol Propionate-Solution-0.05% | Price Increase | -- | $44,488,651 |
| 83 | SUN/MUTUAL/TARO | Clobetasol Propionate-Solution-0.05% | Price Increase | -- | $20,670,193 |
| 84 | WOCKHARDT | Clobetasol Propionate-Solution-0.05% | Price Increase | -- | $22,512,109 |
| 85 | SANDOZ | Clotrimazole-Cream-1% | Price Increase | 12/31/2016 | $14,755,936 |
| 86 | SUN/MUTUAL/TARO | Clotrimazole-Cream-1% | Price Increase | 12/31/2016 | $8,443,378 |
| 87 | PERRIGO | Desonide-Cream-0.05% | Price Increase | -- | $79,506,918 |
| 88 | SUN/MUTUAL/TARO | Desonide-Cream-0.05% | Price Increase | -- | $69,380,074 |
| 89 | ACTAVIS | Desonide-Lotion-0.05% | Price Increase | -- | $55,763,467 |
| 90 | SANDOZ | Desonide-Lotion-0.05% | Price Increase | -- | $152,550,607 |
| 91 | PERRIGO | Desonide-Ointment-0.05% | Price Increase | -- | $44,186,915 |
| 92 | SANDOZ | Desonide-Ointment-0.05% | Price Increase | -- | $31,263,741 |
| 93 | SUN/MUTUAL/TARO | Desonide-Ointment-0.05% | Price Increase | -- | $17,976,728 |
| 94 | SUN/MUTUAL/TARO | Desoximetasone-Ointment-0.05% | New Generic | -- | $35,120,476 |
| 95 | GLENMARK | Desoximetasone-Ointment-0.25% | Price Increase | 12/31/2016 | $8,100,107 |
| 96 | SANDOZ | Desoximetasone-Ointment-0.25% | Price Increase | 12/31/2016 | $16,056,648 |
| 97 | SUN/MUTUAL/TARO | Desoximetasone-Ointment-0.25% | Price Increase | 12/31/2016 | $37,673,308 |
| 98 | PERRIGO | Econazole Nitrate-Cream-1% | Price Increase | -- | $29,983,448 |
| 99 | SANDOZ | Econazole Nitrate-Cream-1% | Price Increase | -- | $3,531,003 |
| 100 | SUN/MUTUAL/TARO | Econazole Nitrate-Cream-1% | Price Increase | -- | $7,487,831 |
| 101 | TELIGENT | Econazole Nitrate-Cream-1% | Price Increase | -- | $100,903,448 |
| 102 | GREENSTONE | Eplerenone-Tablet-25Mg | Price Increase | 12/31/2016 | $27,121,914 |
| 103 | SANDOZ | Eplerenone-Tablet-25Mg | Price Increase | 12/31/2016 | $10,349,107 |
| 104 | GREENSTONE | Eplerenone-Tablet-50Mg | Price Increase | 12/31/2016 | $20,361,183 |
| 105 | SANDOZ | Eplerenone-Tablet-50Mg | Price Increase | 12/31/2016 | $5,856,044 |
| 106 | PERRIGO | Erythromycin-Solution-2% | Price Increase | -- | $16,226,689 |
| 107 | SANDOZ | Erythromycin-Solution-2% | Price Increase | -- | $1,023,727 |
| 108 | WOCKHARDT | Erythromycin-Solution-2% | Price Increase | -- | $3,614,084 |
| 109 | G&W | Ethambutol Hydrochloride-Tablet-100Mg | Price Increase | 6/30/2014 | $0 |
| 110 | LUPIN | Ethambutol Hydrochloride-Tablet-100Mg | Price Increase | 6/30/2014 | $452,143 |
| 111 | G&W | Ethambutol Hydrochloride-Tablet-400Mg | Price Increase | 6/30/2014 | $636,801 |
| 112 | LUPIN | Ethambutol Hydrochloride-Tablet-400Mg | Price Increase | 6/30/2014 | $4,561,191 |
| 113 | G&W | Fluocinolone Acetonide-Cream-0.01% | Price Increase | -- | $8,574,815 |
| 114 | SANDOZ | Fluocinolone Acetonide-Cream-0.01% | Price Increase | -- | $5,930,093 |
| 115 | G&W | Fluocinolone Acetonide-Cream-0.025% | Price Increase | -- | $11,925,339 |
| 116 | SANDOZ | Fluocinolone Acetonide-Cream-0.025% | Price Increase | -- | $5,308,826 |
| 117 | G&W | Fluocinolone Acetonide-Ointment-0.025% | Price Increase | -- | $13,214,878 |
| 118 | SANDOZ | Fluocinolone Acetonide-Ointment-0.025% | Price Increase | -- | $6,073,092 |
| 119 | GLENMARK | Fluocinonide-Cream-0.1% | New Generic | -- | $54,102,709 |
| 120 | PERRIGO | Fluocinonide-Cream-0.1% | New Generic | -- | $96,296,167 |
| 121 | SANDOZ | Fluocinonide-Cream-0.1% | New Generic | -- | $6,871,435 |
| 122 | SUN/MUTUAL/TARO | Fluocinonide-Cream-0.1% | New Generic | -- | $16,443,103 |
| 123 | VALEANT/BAUSCH | Fluocinonide-Cream-0.1% | New Generic | -- | $32,825,148 |
| 124 | G&W | Fluocinonide-Gel-0.05% | Price Increase | -- | $1,216,530 |
| 125 | SANDOZ | Fluocinonide-Gel-0.05% | Price Increase | -- | -$170,227 |
| 126 | SUN/MUTUAL/TARO | Fluocinonide-Gel-0.05% | Price Increase | -- | $11,555,479 |
| 127 | SANDOZ | Fluocinonide-Ointment-0.05% | Price Increase | -- | $969,191 |
| 128 | SUN/MUTUAL/TARO | Fluocinonide-Ointment-0.05% | Price Increase | -- | $41,693,154 |
| 129 | ACTAVIS | Fluocinonide-Solution-0.05% | Price Increase | -- | $14,785,595 |
| 130 | SANDOZ | Fluocinonide-Solution-0.05% | Price Increase | -- | $47,434,538 |
| 131 | SUN/MUTUAL/TARO | Fluocinonide-Solution-0.05% | Price Increase | -- | $44,775,641 |
| 132 | GLENMARK | Fluticasone Propionate-Lotion-0.05% | New Generic | -- | $5,529,293 |
| 133 | PERRIGO | Fluticasone Propionate-Lotion-0.05% | New Generic | -- | $2,627,839 |
| 134 | SANDOZ | Fluticasone Propionate-Lotion-0.05% | New Generic | -- | $4,836,149 |
| 135 | SANDOZ | Griseofulvin Microsize-Tablet-500Mg | Price Increase | 12/31/2016 | $15,049,536 |
| 136 | G&W | Halobetasol Propionate-Cream-0.05% | Price Increase | -- | $27,722,245 |
| 137 | PERRIGO | Halobetasol Propionate-Cream-0.05% | Price Increase | -- | -$2,723,792 |

| # | Defendant | Drug | Drug Classification | Disgorgement Period End Date | Affected Defendant Net Revenues |
|---|---|---|---|---|---|
| 138 | SANDOZ | Halobetasol Propionate-Cream-0.05% | Price Increase | -- | $9,396,694 |
| 139 | SUN/MUTUAL/TARO | Halobetasol Propionate-Cream-0.05% | Price Increase | -- | $603,189 |
| 140 | G&W | Halobetasol Propionate-Ointment-0.05% | Price Increase | -- | $52,372,255 |
| 141 | PERRIGO | Halobetasol Propionate-Ointment-0.05% | Price Increase | -- | $35,795,165 |
| 142 | SUN/MUTUAL/TARO | Halobetasol Propionate-Ointment-0.05% | Price Increase | -- | $1,502,158 |
| 143 | G&W | Hydrocortisone Acetate-Suppository-25Mg | Price Increase | -- | $147,119,173 |
| 144 | PERRIGO | Hydrocortisone Acetate-Suppository-25Mg | Price Increase | -- | $50,372,378 |
| 145 | PERRIGO | Hydrocortisone Acetate-Suppository-30Mg | Price Increase | -- | $15,854,738 |
| 146 | PERRIGO | Hydrocortisone Valerate-Cream-0.2% | Price Increase | -- | $38,817,622 |
| 147 | SUN/MUTUAL/TARO | Hydrocortisone Valerate-Cream-0.2% | Price Increase | -- | $56,767,407 |
| 148 | PERRIGO | Imiquimod-Cream-5% | New Generic | -- | $159,041,431 |
| 149 | SANDOZ | Imiquimod-Cream-5% | New Generic | -- | $97,017,115 |
| 150 | SUN/MUTUAL/TARO | Imiquimod-Cream-5% | New Generic | -- | $28,974,275 |
| 151 | G&W | Ketoconazole-Cream-2% | Price Increase | -- | $137,006,965 |
| 152 | SANDOZ | Ketoconazole-Cream-2% | Price Increase | -- | $90,771,522 |
| 153 | SUN/MUTUAL/TARO | Ketoconazole-Cream-2% | Price Increase | -- | $116,073,905 |
| 154 | GREENSTONE | Latanoprost-Solution/Drops-0.005% | Price Increase | 12/31/2016 | $82,050,929 |
| 155 | SANDOZ | Latanoprost-Solution/Drops-0.005% | Price Increase | 12/31/2016 | $121,886,687 |
| 156 | VALEANT/BAUSCH | Latanoprost-Solution/Drops-0.005% | Price Increase | 12/31/2016 | $88,608,327 |
| 157 | SANDOZ | Lidocaine-Ointment-5% | Price Increase | -- | $270,880,708 |
| 158 | SUN/MUTUAL/TARO | Lidocaine-Ointment-5% | Price Increase | -- | $118,558,508 |
| 159 | AUROBINDO | Metformin Hydrochloride; Pioglitazone Hydrochloride-Tablet-500Mg;Eq15Mgbase | New Generic | -- | $10,430,891 |
| 160 | MYLAN | Metformin Hydrochloride; Pioglitazone Hydrochloride-Tablet-500Mg;Eq15Mgbase | New Generic | -- | $20,336,305 |
| 161 | SANDOZ | Metformin Hydrochloride; Pioglitazone Hydrochloride-Tablet-500Mg;Eq15Mgbase | New Generic | -- | $12,357,151 |
| 162 | AUROBINDO | Metformin Hydrochloride; Pioglitazone Hydrochloride-Tablet-850Mg;Eq15Mgbase | New Generic | -- | $19,974,912 |
| 163 | MYLAN | Metformin Hydrochloride; Pioglitazone Hydrochloride-Tablet-850Mg;Eq15Mgbase | New Generic | -- | $35,467,227 |
| 164 | SANDOZ | Metformin Hydrochloride; Pioglitazone Hydrochloride-Tablet-850Mg;Eq15Mgbase | New Generic | -- | $18,236,742 |
| 165 | PERRIGO | Methazolamide-Tablet-25Mg | Price Increase | -- | $8,060,744 |
| 166 | SANDOZ | Methazolamide-Tablet-25Mg | Price Increase | -- | $1,067,398 |
| 167 | PERRIGO | Methazolamide-Tablet-50Mg | Price Increase | -- | $31,057,985 |
| 168 | SANDOZ | Methazolamide-Tablet-50Mg | Price Increase | -- | $5,324,434 |
| 169 | ACTAVIS | Methylphenidate Hcl-Tablet, Extended Release-20Mg | Price Increase | -- | $0 |
| 170 | MALLINCKRODT | Methylphenidate Hcl-Tablet, Extended Release-20Mg | Price Increase | -- | $288,223,971 |
| 171 | SANDOZ | Methylphenidate Hcl-Tablet, Extended Release-20Mg | Price Increase | -- | $2,876,364 |
| 172 | ACTAVIS | Methylphenidate Hcl-Tablet-10Mg | Price Increase | -- | $20,982,125 |
| 173 | MALLINCKRODT | Methylphenidate Hcl-Tablet-10Mg | Price Increase | -- | $160,698,564 |
| 174 | SANDOZ | Methylphenidate Hcl-Tablet-10Mg | Price Increase | -- | $12,632,235 |
| 175 | SUN/MUTUAL/TARO | Methylphenidate Hcl-Tablet-10Mg | Price Increase | -- | $11,217,662 |
| 176 | ACTAVIS | Methylphenidate Hcl-Tablet-20Mg | Price Increase | -- | $24,840,513 |
| 177 | MALLINCKRODT | Methylphenidate Hcl-Tablet-20Mg | Price Increase | -- | $151,481,426 |
| 178 | SANDOZ | Methylphenidate Hcl-Tablet-20Mg | Price Increase | -- | $14,474,406 |
| 179 | SUN/MUTUAL/TARO | Methylphenidate Hcl-Tablet-20Mg | Price Increase | -- | $10,502,162 |
| 180 | ACTAVIS | Methylphenidate Hcl-Tablet-5Mg | Price Increase | -- | $7,759,547 |
| 181 | MALLINCKRODT | Methylphenidate Hcl-Tablet-5Mg | Price Increase | -- | $61,766,864 |
| 182 | SANDOZ | Methylphenidate Hcl-Tablet-5Mg | Price Increase | -- | $1,663,301 |
| 183 | SUN/MUTUAL/TARO | Methylphenidate Hcl-Tablet-5Mg | Price Increase | -- | $4,160,588 |
| 184 | ACTAVIS | Metronidazole-Cream-0.75% | Price Increase | -- | $14,754,081 |
| 185 | G&W | Metronidazole-Cream-0.75% | Price Increase | -- | $66,511,367 |
| 186 | SANDOZ | Metronidazole-Cream-0.75% | Price Increase | -- | $69,984,584 |
| 187 | G&W | Metronidazole-Gel-0.75% | Price Increase | -- | $25,986,635 |
| 188 | SANDOZ | Metronidazole-Gel-0.75% | Price Increase | -- | $11,299,243 |
| 189 | SUN/MUTUAL/TARO | Metronidazole-Gel-0.75% | Price Increase | -- | $23,082,905 |
| 190 | SANDOZ | Metronidazole-Gel-1% | New Generic | -- | $99,974,565 |
| 191 | SUN/MUTUAL/TARO | Metronidazole-Gel-1% | New Generic | -- | $64,070,255 |
| 192 | ACTAVIS | Metronidazole-Lotion-0.75% | Price Increase | -- | $9,975,291 |
| 193 | SANDOZ | Metronidazole-Lotion-0.75% | Price Increase | -- | $43,728,242 |
| 194 | G&W | Mometasone Furoate-Cream-0.1% | Price Increase | 12/31/2016 | $15,421,193 |
| 195 | GLENMARK | Mometasone Furoate-Cream-0.1% | Price Increase | 12/31/2016 | $4,277,811 |
| 196 | G&W | Mometasone Furoate-Ointment-0.1% | Price Increase | 12/31/2016 | $2,453,067 |
| 197 | GLENMARK | Mometasone Furoate-Ointment-0.1% | Price Increase | 12/31/2016 | $4,093,783 |
| 198 | G&W | Mometasone Furoate-Solution-0.1% | Price Increase | 12/31/2016 | $1,809,044 |
| 199 | GLENMARK | Mometasone Furoate-Solution-0.1% | Price Increase | 12/31/2016 | -$124,209 |
| 200 | ACTAVIS | Nystatin-Ointment-100,000Units/Gm | Price Increase | -- | $17,857,436 |
| 201 | PERRIGO | Nystatin-Ointment-100,000Units/Gm | Price Increase | -- | $33,049,178 |
| 202 | SANDOZ | Nystatin-Ointment-100,000Units/Gm | Price Increase | -- | $11,551,765 |
| 203 | SANDOZ | Nystatin; Triamcinolone Acetonide-Cream-100,000Units/Gm;0.1% | Price Increase | -- | $110,194,078 |
| 204 | SUN/MUTUAL/TARO | Nystatin; Triamcinolone Acetonide-Cream-100,000Units/Gm;0.1% | Price Increase | -- | $179,258,048 |
| 205 | SANDOZ | Nystatin; Triamcinolone Acetonide-Ointment-100,000Units/Gm;0.1% | Price Increase | -- | $24,235,956 |
| 206 | SUN/MUTUAL/TARO | Nystatin; Triamcinolone Acetonide-Ointment-100,000Units/Gm;0.1% | Price Increase | -- | $50,811,044 |
| 207 | AMNEAL | Phenytoin Sodium-Capsule-100Mgextended | Price Increase | -- | $35,400,723 |
| 208 | MYLAN | Phenytoin Sodium-Capsule-100Mgextended | Price Increase | -- | $34,312,729 |

HIGHLY CONFIDENTIAL: SUBJECT TO PROTECTIVE ORDER

| # | Defendant | Drug | Drug Classification | Disgorgement Period End Date | Affected Defendant Net Revenues |
|---|---|---|---|---|---|
| 209 | SUN/MUTUAL/TARO | Phenytoin Sodium-Capsule-100Mgextended | Price Increase | -- | $99,368,125 |
| 210 | G&W | Prochlorperazine-Suppository-25Mg | Price Increase | -- | $22,784,389 |
| 211 | PERRIGO | Prochlorperazine-Suppository-25Mg | Price Increase | -- | $20,734,174 |
| 212 | ACTAVIS | Promethazine Hydrochloride-Suppository-12.5Mg | Price Increase | -- | $7,942,307 |
| 213 | G&W | Promethazine Hydrochloride-Suppository-12.5Mg | Price Increase | -- | $12,567,953 |
| 214 | PERRIGO | Promethazine Hydrochloride-Suppository-12.5Mg | Price Increase | -- | $3,291,043 |
| 215 | ACTAVIS | Promethazine Hydrochloride-Suppository-25Mg | Price Increase | -- | $40,091,069 |
| 216 | G&W | Promethazine Hydrochloride-Suppository-25Mg | Price Increase | -- | $39,787,911 |
| 217 | PERRIGO | Promethazine Hydrochloride-Suppository-25Mg | Price Increase | -- | $12,601,637 |
| 218 | PERRIGO | Tacrolimus-Ointment-0.03% | New Generic | -- | $43,932,631 |
| 219 | SANDOZ | Tacrolimus-Ointment-0.03% | New Generic | -- | $19,575,903 |
| 220 | PERRIGO | Tacrolimus-Ointment-0.1% | New Generic | -- | $159,273,469 |
| 221 | SANDOZ | Tacrolimus-Ointment-0.1% | New Generic | -- | $102,478,978 |
| 222 | ACTAVIS | Terconazole-Cream-0.8% | Price Increase | -- | $15,911,979 |
| 223 | SANDOZ | Terconazole-Cream-0.8% | Price Increase | -- | $0 |
| 224 | SUN/MUTUAL/TARO | Terconazole-Cream-0.8% | Price Increase | -- | $24,510,035 |
| 225 | PERRIGO | Triamcinolone Acetonide-Cream-0.025% | Price Increase | -- | $11,110,176 |
| 226 | SANDOZ | Triamcinolone Acetonide-Cream-0.025% | Price Increase | -- | $11,749,871 |
| 227 | PERRIGO | Triamcinolone Acetonide-Cream-0.1% | Price Increase | 12/31/2016 | $85,128,868 |
| 228 | SANDOZ | Triamcinolone Acetonide-Cream-0.1% | Price Increase | 12/31/2016 | $28,155,588 |
| 229 | PERRIGO | Triamcinolone Acetonide-Cream-0.5% | Price Increase | 12/31/2016 | $22,277,710 |
| 230 | SANDOZ | Triamcinolone Acetonide-Cream-0.5% | Price Increase | 12/31/2016 | $14,611,860 |
| 231 | PERRIGO | Triamcinolone Acetonide-Ointment-0.025% | Price Increase | -- | $12,435,234 |
| 232 | SANDOZ | Triamcinolone Acetonide-Ointment-0.025% | Price Increase | -- | $4,142,227 |
| 233 | PERRIGO | Triamcinolone Acetonide-Ointment-0.1% | Price Increase | -- | $84,106,478 |
| 234 | SANDOZ | Triamcinolone Acetonide-Ointment-0.1% | Price Increase | -- | $40,266,825 |
| 235 | PERRIGO | Triamcinolone Acetonide-Ointment-0.5% | Price Increase | -- | $21,326,021 |
| 236 | SUN/MUTUAL/TARO | Triamcinolone Acetonide-Paste-0.1% | Price Increase | 12/31/2016 | $16,023,215 |
| | Total | Total | | | $9,306,542,337 |

HIGHLY CONFIDENTIAL: SUBJECT TO PROTECTIVE ORDER

# Appendix C Table 3

## Updated Regression Results - Liability Models

Study Period: 2006 - 2018

[redacted]

HIGHLY CONFIDENTIAL: SUBJECT TO PROTECTIVE ORDER

[redacted]

Standard errors are clustered by API
*** p<0.01, ** p<0.05, * p<0.1
Notes:
[1] Dependent variable is natural logarithm of Defendants net price or IQVIA price.
[2] Price Increase % is calculated as: Exp(Post Communication Coefficient) - 1.
*Sources: Defendants Transactional Data and IQVIA.*

HIGHLY CONFIDENTIAL: SUBJECT TO PROTECTIVE ORDER

# Appendix C Table 4
## Updated Regression Results for Drugs at Issue
## Liability Models - Entire Period and 1-Year Overcharge Models

| # | Drug | Drug Classification | (1) Coefficient Estimate (Entire Period) | (2) Coefficient Estimate (1 Year Post) |
|---|---|---|---|---|
| 1 | Acetazolamide-Tablet-125Mg | Price Increase | 1.2993*** | 0.1952* |
| 2 | Acetazolamide-Tablet-250Mg | Price Increase | 0.9479*** | 0.2085*** |
| 3 | Adapalene-Cream-0.1% | New Generic | | |
| 4 | Alclometasone Dipropionate-Cream-0.05% | Price Increase | 0.9141*** | 0.6212*** |
| 5 | Alclometasone Dipropionate-Ointment-0.05% | Price Increase | 0.9633*** | 0.1498*** |
| 6 | Ammonium Lactate-Cream-Eq12%Base | Price Increase | 0.4087*** | 0.0791** |
| 7 | Ammonium Lactate-Lotion-Eq12%Base | Price Increase | 0.6126*** | 0.0622 |
| 8 | Betamethasone Dipropionate-Cream-Eq0.05%Base | Price Increase | 2.7901*** | 0.0439** |
| 9 | Betamethasone Dipropionate-Lotion, Augmented-Eq0.05%Base | Price Increase | 0.8879*** | -0.0388 |
| 10 | Betamethasone Dipropionate-Lotion-Eq0.05%Base | Price Increase | 1.6387*** | 0.6653*** |
| 11 | Betamethasone Dipropionate; Calcipotriene-Ointment-0.064%;0.005% | New Generic | | |
| 12 | Betamethasone Dipropionate; Clotrimazole-Cream-Eq0.05%Base;1% | Price Increase | 1.3500*** | 1.0643*** |
| 13 | Betamethasone Dipropionate; Clotrimazole-Lotion-Eq0.05%Base;1% | Price Increase | 1.9562*** | 0.7978*** |
| 14 | Betamethasone Valerate-Cream-Eq0.1%Base | Price Increase | 1.8488*** | 0.0967*** |
| 15 | Betamethasone Valerate-Lotion-Eq0.1%Base | Price Increase | 2.3070*** | 0.4305*** |
| 16 | Betamethasone Valerate-Ointment-Eq0.1%Base | Price Increase | 1.9041*** | 0.1247*** |
| 17 | Bromocriptine Mesylate-Tablet-Eq2.5Mgbase | Price Increase | 0.3238*** | 0.0740* |
| 18 | Calcipotriene-Solution-0.005% | Price Increase | 0.2647*** | 0.5957*** |
| 19 | Carbamazepine-Tablet, Extended Release-100Mg | New Generic | | |
| 20 | Carbamazepine-Tablet, Extended Release-200Mg | New Generic | | |
| 21 | Carbamazepine-Tablet, Extended Release-400Mg | New Generic | | |
| 22 | Cefpodoxime Proxetil-For Suspension-Eq100Mgbase/5Ml | Price Increase | 0.3064*** | 0.1210 |
| 23 | Cefpodoxime Proxetil-Tablet-Eq100Mgbase | Price Increase | 0.1612 | 0.1407** |
| 24 | Cefpodoxime Proxetil-Tablet-Eq200Mgbase | Price Increase | 0.2851*** | 0.2012*** |
| 25 | Ciclopirox-Cream-0.77% | Price Increase | -0.3220*** | -0.1405*** |
| 26 | Ciclopirox-Shampoo-1% | Price Increase | 0.0842 | 0.2908*** |
| 27 | Ciclopirox-Solution-8% | Price Increase | 0.4066*** | 0.0571* |
| 28 | Clindamycin Phosphate-Cream-Eq2%Base | Price Increase | 0.6874*** | -0.0299 |
| 29 | Clindamycin Phosphate-Gel-Eq1%Base | Price Increase | 1.4978*** | 0.1564*** |
| 30 | Clindamycin Phosphate-Lotion-Eq1%Base | Price Increase | 1.3566*** | 0.1458*** |
| 31 | Clindamycin Phosphate-Solution-Eq1%Base | Price Increase | 1.5704*** | 0.5418*** |
| 32 | Clobetasol Propionate Emollient-Cream-0.05% | Price Increase | 2.2449*** | 0.9751*** |
| 33 | Clobetasol Propionate-Cream-0.05% | Price Increase | 2.6333*** | 1.5546*** |
| 34 | Clobetasol Propionate-Gel-0.05% | Price Increase | 2.4380*** | 1.2370*** |
| 35 | Clobetasol Propionate-Ointment-0.05% | Price Increase | 3.2020*** | 1.7918*** |
| 36 | Clobetasol Propionate-Solution-0.05% | Price Increase | 1.5618*** | 0.6617*** |
| 37 | Clotrimazole-Cream-1% | Price Increase | 0.4514*** | 0.4508*** |
| 38 | Desonide-Cream-0.05% | Price Increase | 2.5151*** | 1.1269*** |
| 39 | Desonide-Lotion-0.05% | Price Increase | 1.9587*** | 0.5292*** |

HIGHLY CONFIDENTIAL: SUBJECT TO PROTECTIVE ORDER

| # | Drug | Drug Classification | Coefficient Estimate (Entire Period) | Coefficient Estimate (1 Year Post) |
|---|---|---|---|---|
| 40 | Desonide-Ointment-0.05% | Price Increase | 2.0977*** | 0.8516*** |
| 41 | Desoximetasone-Ointment-0.05% | New Generic | | |
| 42 | Desoximetasone-Ointment-0.25% | Price Increase | 0.1810 | 0.6723*** |
| 43 | Econazole Nitrate-Cream-1% | Price Increase | 2.2194*** | 1.5274*** |
| 44 | Eplerenone-Tablet-25Mg | Price Increase | -0.1059 | -0.0998* |
| 45 | Eplerenone-Tablet-50Mg | Price Increase | -0.0754 | -0.0649 |
| 46 | Erythromycin-Solution-2% | Price Increase | 1.5122*** | 0.6288*** |
| 47 | Ethambutol Hydrochloride-Tablet-100Mg | Price Increase | 1.7217*** | 1.5905*** |
| 48 | Ethambutol Hydrochloride-Tablet-400Mg | Price Increase | 1.1524*** | 0.8820*** |
| 49 | Fluocinolone Acetonide-Cream-0.01% | Price Increase | 1.1597*** | 0.4546*** |
| 50 | Fluocinolone Acetonide-Cream-0.025% | Price Increase | 1.5064*** | 0.5541*** |
| 51 | Fluocinolone Acetonide-Ointment-0.025% | Price Increase | 1.4614*** | 0.4565*** |
| 52 | Fluocinonide-Cream-0.1% | New Generic | | |
| 53 | Fluocinonide-Gel-0.05% | Price Increase | 1.6703*** | 0.5057*** |
| 54 | Fluocinonide-Ointment-0.05% | Price Increase | 1.7670*** | 0.5460*** |
| 55 | Fluocinonide-Solution-0.05% | Price Increase | 1.7895*** | 0.7122*** |
| 56 | Fluticasone Propionate-Lotion-0.05% | New Generic | | |
| 57 | Griseofulvin Microsize-Tablet-500Mg | Price Increase | -0.0542** | -0.0466* |
| 58 | Halobetasol Propionate-Cream-0.05% | Price Increase | 1.1893*** | 0.2992 |
| 59 | Halobetasol Propionate-Ointment-0.05% | Price Increase | 1.2542*** | 0.5642*** |
| 60 | Hydrocortisone Acetate-Suppository-25Mg | Price Increase | 0.2585*** | 0.2295*** |
| 61 | Hydrocortisone Acetate-Suppository-30Mg | Price Increase | 0.0351 | -0.0088 |
| 62 | Hydrocortisone Valerate-Cream-0.2% | Price Increase | 1.8168*** | 0.3765*** |
| 63 | Imiquimod-Cream-5% | New Generic | | |
| 64 | Ketoconazole-Cream-2% | Price Increase | 1.1656*** | 0.0789 |
| 65 | Latanoprost-Solution/Drops-0.005% | Price Increase | -0.1002 | 0.0964*** |
| 66 | Lidocaine-Ointment-5% | Price Increase | 1.7560*** | 0.9783*** |
| 67 | Metformin Hydrochloride; Pioglitazone Hydrochloride-Tablet-500Mg;Eq15Mgbase | New Generic | | |
| 68 | Metformin Hydrochloride; Pioglitazone Hydrochloride-Tablet-850Mg;Eq15Mgbase | New Generic | | |
| 69 | Methazolamide-Tablet-25Mg | Price Increase | 1.2285*** | -0.7206*** |
| 70 | Methazolamide-Tablet-50Mg | Price Increase | 1.7707*** | -0.3702*** |
| 71 | Methylphenidate Hcl-Tablet, Extended Release-20Mg | Price Increase | 1.7536*** | 0.2871 |
| 72 | Methylphenidate Hcl-Tablet-10Mg | Price Increase | 1.1459*** | 0.5645*** |
| 73 | Methylphenidate Hcl-Tablet-20Mg | Price Increase | 1.3243*** | 0.4907*** |
| 74 | Methylphenidate Hcl-Tablet-5Mg | Price Increase | 1.0953*** | 0.4150*** |
| 75 | Metronidazole-Cream-0.75% | Price Increase | 1.2322*** | 0.7707*** |
| 76 | Metronidazole-Gel-0.75% | Price Increase | 1.5165*** | 1.1313*** |
| 77 | Metronidazole-Gel-1% | New Generic | | |
| 78 | Metronidazole-Lotion-0.75% | Price Increase | 1.0264*** | 0.7473*** |
| 79 | Mometasone Furoate-Cream-0.1% | Price Increase | -0.1639 | -0.3550*** |
| 80 | Mometasone Furoate-Ointment-0.1% | Price Increase | 0.4350*** | 0.3481*** |
| 81 | Mometasone Furoate-Solution-0.1% | Price Increase | -0.1734* | -0.3457*** |
| 82 | Nystatin-Ointment-100,000Units/Gm | Price Increase | 1.4427*** | 0.7284*** |
| 83 | Nystatin; Triamcinolone Acetonide-Cream-100,000Units/Gm;0.1% | Price Increase | 3.3185*** | 1.2375*** |
| 84 | Nystatin; Triamcinolone Acetonide-Ointment-100,000Units/Gm;0.1% | Price Increase | 3.0723*** | 1.0108*** |
| 85 | Phenytoin Sodium-Capsule-100Mgextended | Price Increase | 0.4387*** | 0.0966 |
| 86 | Prochlorperazine-Suppository-25Mg | Price Increase | 0.3883*** | 0.1404*** |

HIGHLY CONFIDENTIAL: SUBJECT TO PROTECTIVE ORDER

| # | Drug | Drug Classification | Coefficient Estimate (Entire Period) | Coefficient Estimate (1 Year Post) |
|---|---|---|---|---|
| 87 | Promethazine Hydrochloride-Suppository-12.5Mg | Price Increase | 1.3856*** | 0.9521*** |
| 88 | Promethazine Hydrochloride-Suppository-25Mg | Price Increase | 1.1648*** | 0.5945*** |
| 89 | Tacrolimus-Ointment-0.03% | New Generic | | |
| 90 | Tacrolimus-Ointment-0.1% | New Generic | | |
| 91 | Terconazole-Cream-0.8% | Price Increase | 0.5087*** | 0.0270 |
| 92 | Triamcinolone Acetonide-Cream-0.025% | Price Increase | 0.3544*** | 0.0996** |
| 93 | Triamcinolone Acetonide-Cream-0.1% | Price Increase | 0.3152*** | 0.3873*** |
| 94 | Triamcinolone Acetonide-Cream-0.5% | Price Increase | 0.5614*** | 0.8994*** |
| 95 | Triamcinolone Acetonide-Ointment-0.025% | Price Increase | 0.5224*** | 0.2354*** |
| 96 | Triamcinolone Acetonide-Ointment-0.1% | Price Increase | 0.5719*** | 0.3548*** |
| 97 | Triamcinolone Acetonide-Ointment-0.5% | Price Increase | 0.6124*** | 0.5057*** |
| 98 | Triamcinolone Acetonide-Paste-0.1% | Price Increase | -0.1842 | -0.2875*** |

HIGHLY CONFIDENTIAL: SUBJECT TO PROTECTIVE ORDER

# Appendix C Table 5
## Regression Results for Drugs at Issue
## WAC Price Regression

| # | Drug | Drug Classification | Coefficient Estimate (1 Year Post) |
|---|---|---|---|
| 1 | Acetazolamide-Tablet-125Mg | Price Increase | 0.52** |
| 2 | Acetazolamide-Tablet-250Mg | Price Increase | 0.17 |
| 3 | Adapalene-Cream-0.1% | New Generic | |
| 4 | Alclometasone Dipropionate-Cream-0.05% | Price Increase | 0.79*** |
| 5 | Alclometasone Dipropionate-Ointment-0.05% | Price Increase | 0.41*** |
| 6 | Ammonium Lactate-Cream-Eq12%Base | Price Increase | 0.15 |
| 7 | Ammonium Lactate-Lotion-Eq12%Base | Price Increase | 0.18* |
| 8 | Betamethasone Dipropionate-Cream-Eq0.05%Base | Price Increase | 0.10 |
| 9 | Betamethasone Dipropionate-Lotion, Augmented-Eq0.05%Base | Price Increase | 0.06 |
| 10 | Betamethasone Dipropionate-Lotion-Eq0.05%Base | Price Increase | 1.78*** |
| 11 | Betamethasone Dipropionate; Calcipotriene-Ointment-0.064%;0.005% | New Generic | |
| 12 | Betamethasone Dipropionate; Clotrimazole-Cream-Eq0.05%Base;1% | Price Increase | 0.82*** |
| 13 | Betamethasone Dipropionate; Clotrimazole-Lotion-Eq0.05%Base;1% | Price Increase | 0.52*** |
| 14 | Betamethasone Valerate-Cream-Eq0.1%Base | Price Increase | 0.34*** |
| 15 | Betamethasone Valerate-Lotion-Eq0.1%Base | Price Increase | 1.29*** |
| 16 | Betamethasone Valerate-Ointment-Eq0.1%Base | Price Increase | 0.04 |
| 17 | Bromocriptine Mesylate-Tablet-Eq2.5Mgbase | Price Increase | 0.72*** |
| 18 | Calcipotriene-Solution-0.005% | Price Increase | 0.52*** |
| 19 | Carbamazepine-Tablet, Extended Release-100Mg | New Generic | |
| 20 | Carbamazepine-Tablet, Extended Release-200Mg | New Generic | |
| 21 | Carbamazepine-Tablet, Extended Release-400Mg | New Generic | |
| 22 | Cefpodoxime Proxetil-For Suspension-Eq100Mgbase/5Ml | Price Increase | 0.36*** |
| 23 | Cefpodoxime Proxetil-Tablet-Eq100Mgbase | Price Increase | 0.19 |
| 24 | Cefpodoxime Proxetil-Tablet-Eq200Mgbase | Price Increase | 0.17 |
| 25 | Ciclopirox-Cream-0.77% | Price Increase | -0.04 |
| 26 | Ciclopirox-Shampoo-1% | Price Increase | -0.04 |
| 27 | Ciclopirox-Solution-8% | Price Increase | 0.40*** |
| 28 | Clindamycin Phosphate-Cream-Eq2%Base | Price Increase | 0.35*** |
| 29 | Clindamycin Phosphate-Gel-Eq1%Base | Price Increase | 0.45*** |
| 30 | Clindamycin Phosphate-Lotion-Eq1%Base | Price Increase | 0.57*** |
| 31 | Clindamycin Phosphate-Solution-Eq1%Base | Price Increase | 0.21** |
| 32 | Clobetasol Propionate Emollient-Cream-0.05% | Price Increase | 1.74*** |
| 33 | Clobetasol Propionate-Cream-0.05% | Price Increase | 2.24*** |
| 34 | Clobetasol Propionate-Gel-0.05% | Price Increase | 2.47*** |

HIGHLY CONFIDENTIAL: SUBJECT TO PROTECTIVE ORDER

| # | Drug | Drug Classification | Coefficient Estimate (1 Year Post) |
|---|---|---|---|
| 35 | Clobetasol Propionate-Ointment-0.05% | Price Increase | 2.29*** |
| 36 | Clobetasol Propionate-Solution-0.05% | Price Increase | 1.90*** |
| 37 | Clotrimazole-Cream-1% | Price Increase | -0.02 |
| 38 | Desonide-Cream-0.05% | Price Increase | 1.87*** |
| 39 | Desonide-Lotion-0.05% | Price Increase | 0.35*** |
| 40 | Desonide-Ointment-0.05% | Price Increase | 1.45*** |
| 41 | Desoximetasone-Ointment-0.05% | New Generic | |
| 42 | Desoximetasone-Ointment-0.25% | Price Increase | 0.17* |
| 43 | Econazole Nitrate-Cream-1% | Price Increase | 1.53*** |
| 44 | Eplerenone-Tablet-25Mg | Price Increase | 0.06 |
| 45 | Eplerenone-Tablet-50Mg | Price Increase | 0.08 |
| 46 | Erythromycin-Solution-2% | Price Increase | 0.34** |
| 47 | Ethambutol Hydrochloride-Tablet-100Mg | Price Increase | -0.04 |
| 48 | Ethambutol Hydrochloride-Tablet-400Mg | Price Increase | -0.04 |
| 49 | Fluocinolone Acetonide-Cream-0.01% | Price Increase | 2.29*** |
| 50 | Fluocinolone Acetonide-Cream-0.025% | Price Increase | 2.02*** |
| 51 | Fluocinolone Acetonide-Ointment-0.025% | Price Increase | 2.02*** |
| 52 | Fluocinonide-Cream-0.1% | New Generic | |
| 53 | Fluocinonide-Gel-0.05% | Price Increase | 0.01 |
| 54 | Fluocinonide-Ointment-0.05% | Price Increase | 0.31*** |
| 55 | Fluocinonide-Solution-0.05% | Price Increase | 0.83*** |
| 56 | Fluticasone Propionate-Lotion-0.05% | New Generic | |
| 57 | Griseofulvin Microsize-Tablet-500Mg | Price Increase | |
| 58 | Halobetasol Propionate-Cream-0.05% | Price Increase | 0.26*** |
| 59 | Halobetasol Propionate-Ointment-0.05% | Price Increase | 0.36*** |
| 60 | Hydrocortisone Acetate-Suppository-25Mg | Price Increase | 0.97*** |
| 61 | Hydrocortisone Acetate-Suppository-30Mg | Price Increase | 0.95*** |
| 62 | Hydrocortisone Valerate-Cream-0.2% | Price Increase | 1.43*** |
| 63 | Imiquimod-Cream-5% | New Generic | |
| 64 | Ketoconazole-Cream-2% | Price Increase | 0.84*** |
| 65 | Latanoprost-Solution/Drops-0.005% | Price Increase | 0.19* |
| 66 | Lidocaine-Ointment-5% | Price Increase | 0.63*** |
| 67 | Metformin Hydrochloride; Pioglitazone Hydrochloride-Tablet-500Mg;Eq15Mgbase | New Generic | |
| 68 | Metformin Hydrochloride; Pioglitazone Hydrochloride-Tablet-850Mg;Eq15Mgbase | New Generic | |
| 69 | Methazolamide-Tablet-25Mg | Price Increase | 0.59*** |
| 70 | Methazolamide-Tablet-50Mg | Price Increase | 0.84*** |
| 71 | Methylphenidate Hcl-Tablet, Extended Release-20Mg | Price Increase | 0.43*** |
| 72 | Methylphenidate Hcl-Tablet-10Mg | Price Increase | 1.42*** |
| 73 | Methylphenidate Hcl-Tablet-20Mg | Price Increase | 1.20*** |
| 74 | Methylphenidate Hcl-Tablet-5Mg | Price Increase | 1.13*** |
| 75 | Metronidazole-Cream-0.75% | Price Increase | 1.12*** |

| # | Drug | Drug Classification | Coefficient Estimate (1 Year Post) |
|---|---|---|---|
| 76 | Metronidazole-Gel-0.75% | Price Increase | 0.97*** |
| 77 | Metronidazole-Gel-1% | New Generic | |
| 78 | Metronidazole-Lotion-0.75% | Price Increase | 1.01*** |
| 79 | Mometasone Furoate-Cream-0.1% | Price Increase | -0.03 |
| 80 | Mometasone Furoate-Ointment-0.1% | Price Increase | -0.03 |
| 81 | Mometasone Furoate-Solution-0.1% | Price Increase | 0.26** |
| 82 | Nystatin-Ointment-100,000Units/Gm | Price Increase | 1.06*** |
| 83 | Nystatin; Triamcinolone Acetonide-Cream-100,000Units/Gm;0.1% | Price Increase | 2.29*** |
| 84 | Nystatin; Triamcinolone Acetonide-Ointment-100,000Units/Gm;0.1% | Price Increase | 1.19*** |
| 85 | Phenytoin Sodium-Capsule-100Mgextended | Price Increase | 0.58*** |
| 86 | Prochlorperazine-Suppository-25Mg | Price Increase | 0.92*** |
| 87 | Promethazine Hydrochloride-Suppository-12.5Mg | Price Increase | 0.98*** |
| 88 | Promethazine Hydrochloride-Suppository-25Mg | Price Increase | 0.88*** |
| 89 | Tacrolimus-Ointment-0.03% | New Generic | |
| 90 | Tacrolimus-Ointment-0.1% | New Generic | |
| 91 | Terconazole-Cream-0.8% | Price Increase | 0.11 |
| 92 | Triamcinolone Acetonide-Cream-0.025% | Price Increase | 0.99*** |
| 93 | Triamcinolone Acetonide-Cream-0.1% | Price Increase | 1.03*** |
| 94 | Triamcinolone Acetonide-Cream-0.5% | Price Increase | 1.08*** |
| 95 | Triamcinolone Acetonide-Ointment-0.025% | Price Increase | 1.07*** |
| 96 | Triamcinolone Acetonide-Ointment-0.1% | Price Increase | 1.03*** |
| 97 | Triamcinolone Acetonide-Ointment-0.5% | Price Increase | 0.97*** |
| 98 | Triamcinolone Acetonide-Paste-0.1% | Price Increase | 0.08 |

HIGHLY CONFIDENTIAL: SUBJECT TO PROTECTIVE ORDER

# Appendix C Table 6

## Regression Results - NADAC Fall in Prices

Study Period: 2014 - 2023Q3

| | Control Drugs | Drugs at Issue |
|---|---|---|
| Log(Total Annual Quantity of Drug) | | |
| | | |
| Number of Competitors = 2 | | |
| | | |
| Number of Competitors = 3 | | |
| | | |
| Number of Competitors = 4 | | |
| | | |
| Number of Competitors = 5 | | |
| | | |
| Post Period * Drugs at Issue | | |
| | | |
| Constant | | |
| | | |
| | | |
| Observations | | |
| R-squared | | |
| NDC Fixed Effect | | |
| Year-Quarter Fixed Effect | | |

Standard errors in brackets
*** p<0.01, ** p<0.05, * p<0.1
Notes:
[1] Dependent variable is natural logarithm of NADAC price.
*Sources: NADAC.*

HIGHLY CONFIDENTIAL: SUBJECT TO PROTECTIVE ORDER

# Appendix C Table 7
## Regression Results for Drugs at Issue
## NADAC Price Decline

| # | Drug | Drug Classification | Coefficient Estimate (Post) |
|---|---|---|---|
| 1 | Acetazolamide-Tablet-125Mg | Price Increase | -1.0608*** |
| 2 | Acetazolamide-Tablet-250Mg | Price Increase | -0.9800*** |
| 3 | Adapalene-Cream-0.1% | New Generic | 0.3118*** |
| 4 | Alclometasone Dipropionate-Cream-0.05% | Price Increase | 0.0137 |
| 5 | Alclometasone Dipropionate-Ointment-0.05% | Price Increase | 0.0469 |
| 6 | Ammonium Lactate-Cream-Eq12%Base | Price Increase | 0.2970*** |
| 7 | Ammonium Lactate-Lotion-Eq12%Base | Price Increase | 0.3591*** |
| 8 | Betamethasone Dipropionate-Cream-Eq0.05%Base | Price Increase | -0.2414*** |
| 9 | Betamethasone Dipropionate-Lotion, Augmented-Eq0.05%Base | Price Increase | -0.1023 |
| 10 | Betamethasone Dipropionate-Lotion-Eq0.05%Base | Price Increase | 0.2394*** |
| 11 | Betamethasone Dipropionate; Calcipotriene-Ointment-0.064%;0.005% | New Generic | 0.0881 |
| 12 | Betamethasone Dipropionate; Clotrimazole-Cream-Eq0.05%Base;1% | Price Increase | -0.6489*** |
| 13 | Betamethasone Dipropionate; Clotrimazole-Lotion-Eq0.05%Base;1% | Price Increase | 0.1756* |
| 14 | Betamethasone Valerate-Cream-Eq0.1%Base | Price Increase | 0.1577** |
| 15 | Betamethasone Valerate-Lotion-Eq0.1%Base | Price Increase | 0.2095** |
| 16 | Betamethasone Valerate-Ointment-Eq0.1%Base | Price Increase | 0.4237*** |
| 17 | Bromocriptine Mesylate-Tablet-Eq2.5Mgbase | Price Increase | -0.1638** |
| 18 | Calcipotriene-Solution-0.005% | Price Increase | -0.6319*** |
| 19 | Carbamazepine-Tablet, Extended Release-100Mg | New Generic | 0.0023 |
| 20 | Carbamazepine-Tablet, Extended Release-200Mg | New Generic | 0.0512 |
| 21 | Carbamazepine-Tablet, Extended Release-400Mg | New Generic | 0.1371** |
| 22 | Cefpodoxime Proxetil-For Suspension-Eq100Mgbase/5Ml | Price Increase | |
| 23 | Cefpodoxime Proxetil-Tablet-Eq100Mgbase | Price Increase | -0.0123 |
| 24 | Cefpodoxime Proxetil-Tablet-Eq200Mgbase | Price Increase | -0.0418 |
| 25 | Ciclopirox-Cream-0.77% | Price Increase | -0.0752 |
| 26 | Ciclopirox-Shampoo-1% | Price Increase | -0.2996*** |
| 27 | Ciclopirox-Solution-8% | Price Increase | -0.2976*** |
| 28 | Clindamycin Phosphate-Cream-Eq2%Base | Price Increase | 0.3600*** |
| 29 | Clindamycin Phosphate-Gel-Eq1%Base | Price Increase | -0.2315** |
| 30 | Clindamycin Phosphate-Lotion-Eq1%Base | Price Increase | 0.1290 |
| 31 | Clindamycin Phosphate-Solution-Eq1%Base | Price Increase | -0.7422*** |
| 32 | Clobetasol Propionate Emollient-Cream-0.05% | Price Increase | -0.3531*** |
| 33 | Clobetasol Propionate-Cream-0.05% | Price Increase | -1.3160*** |
| 34 | Clobetasol Propionate-Gel-0.05% | Price Increase | -0.7124*** |

HIGHLY CONFIDENTIAL: SUBJECT TO PROTECTIVE ORDER

| # | Drug | Drug Classification | Coefficient Estimate (Post) |
|---|---|---|---|
| 35 | Clobetasol Propionate-Ointment-0.05% | Price Increase | -1.6274*** |
| 36 | Clobetasol Propionate-Solution-0.05% | Price Increase | -0.9050*** |
| 37 | Clotrimazole-Cream-1% | Price Increase | -0.5246*** |
| 38 | Desonide-Cream-0.05% | Price Increase | -0.9168*** |
| 39 | Desonide-Lotion-0.05% | Price Increase | -0.2253*** |
| 40 | Desonide-Ointment-0.05% | Price Increase | -0.5111*** |
| 41 | Desoximetasone-Ointment-0.05% | New Generic | -0.0301 |
| 42 | Desoximetasone-Ointment-0.25% | Price Increase | -1.6566*** |
| 43 | Econazole Nitrate-Cream-1% | Price Increase | -2.0478*** |
| 44 | Eplerenone-Tablet-25Mg | Price Increase | -0.3730*** |
| 45 | Eplerenone-Tablet-50Mg | Price Increase | -0.2492*** |
| 46 | Erythromycin-Solution-2% | Price Increase | 0.0901 |
| 47 | Ethambutol Hydrochloride-Tablet-100Mg | Price Increase | |
| 48 | Ethambutol Hydrochloride-Tablet-400Mg | Price Increase | -0.1029* |
| 49 | Fluocinolone Acetonide-Cream-0.01% | Price Increase | 0.1109 |
| 50 | Fluocinolone Acetonide-Cream-0.025% | Price Increase | 0.1998* |
| 51 | Fluocinolone Acetonide-Ointment-0.025% | Price Increase | 0.1476** |
| 52 | Fluocinonide-Cream-0.1% | New Generic | -2.9826*** |
| 53 | Fluocinonide-Gel-0.05% | Price Increase | -0.0244 |
| 54 | Fluocinonide-Ointment-0.05% | Price Increase | -0.9156*** |
| 55 | Fluocinonide-Solution-0.05% | Price Increase | -0.4263*** |
| 56 | Fluticasone Propionate-Lotion-0.05% | New Generic | -0.0518 |
| 57 | Griseofulvin Microsize-Tablet-500Mg | Price Increase | 0.6242*** |
| 58 | Halobetasol Propionate-Cream-0.05% | Price Increase | -0.8905*** |
| 59 | Halobetasol Propionate-Ointment-0.05% | Price Increase | -0.1788** |
| 60 | Hydrocortisone Acetate-Suppository-25Mg | Price Increase | |
| 61 | Hydrocortisone Acetate-Suppository-30Mg | Price Increase | |
| 62 | Hydrocortisone Valerate-Cream-0.2% | Price Increase | -0.8929*** |
| 63 | Imiquimod-Cream-5% | New Generic | -1.3594*** |
| 64 | Ketoconazole-Cream-2% | Price Increase | -0.3385*** |
| 65 | Latanoprost-Solution/Drops-0.005% | Price Increase | 0.1188* |
| 66 | Lidocaine-Ointment-5% | Price Increase | -2.2944*** |
| 67 | Metformin Hydrochloride; Pioglitazone Hydrochloride-Tablet-500Mg;Eq15Mgbase | New Generic | -0.6464*** |
| 68 | Metformin Hydrochloride; Pioglitazone Hydrochloride-Tablet-850Mg;Eq15Mgbase | New Generic | -0.8736*** |
| 69 | Methazolamide-Tablet-25Mg | Price Increase | 0.1698 |
| 70 | Methazolamide-Tablet-50Mg | Price Increase | 0.0612 |
| 71 | Methylphenidate Hcl-Tablet, Extended Release-20Mg | Price Increase | -1.2030*** |
| 72 | Methylphenidate Hcl-Tablet-10Mg | Price Increase | -0.9179*** |
| 73 | Methylphenidate Hcl-Tablet-20Mg | Price Increase | -1.0118*** |
| 74 | Methylphenidate Hcl-Tablet-5Mg | Price Increase | -0.9530*** |
| 75 | Metronidazole-Cream-0.75% | Price Increase | -0.4824*** |

HIGHLY CONFIDENTIAL: SUBJECT TO PROTECTIVE ORDER

| # | Drug | Drug Classification | Coefficient Estimate (Post) |
|---|---|---|---|
| 76 | Metronidazole-Gel-0.75% | Price Increase | -0.7552*** |
| 77 | Metronidazole-Gel-1% | New Generic | -0.5426*** |
| 78 | Metronidazole-Lotion-0.75% | Price Increase | 0.1506* |
| 79 | Mometasone Furoate-Cream-0.1% | Price Increase | 0.5986*** |
| 80 | Mometasone Furoate-Ointment-0.1% | Price Increase | -0.1167* |
| 81 | Mometasone Furoate-Solution-0.1% | Price Increase | 0.7065*** |
| 82 | Nystatin-Ointment-100,000Units/Gm | Price Increase | -0.0183 |
| 83 | Nystatin; Triamcinolone Acetonide-Cream-100,000Units/Gm;0.1% | Price Increase | -1.3565*** |
| 84 | Nystatin; Triamcinolone Acetonide-Ointment-100,000Units/Gm;0.1% | Price Increase | -1.7155*** |
| 85 | Phenytoin Sodium-Capsule-100Mgextended | Price Increase | -0.0829* |
| 86 | Prochlorperazine-Suppository-25Mg | Price Increase | 0.1845** |
| 87 | Promethazine Hydrochloride-Suppository-12.5Mg | Price Increase | -0.2436*** |
| 88 | Promethazine Hydrochloride-Suppository-25Mg | Price Increase | -0.2971*** |
| 89 | Tacrolimus-Ointment-0.03% | New Generic | -0.4413*** |
| 90 | Tacrolimus-Ointment-0.1% | New Generic | -0.3425*** |
| 91 | Terconazole-Cream-0.8% | Price Increase | 0.3422*** |
| 92 | Triamcinolone Acetonide-Cream-0.025% | Price Increase | 0.3295*** |
| 93 | Triamcinolone Acetonide-Cream-0.1% | Price Increase | 0.2262*** |
| 94 | Triamcinolone Acetonide-Cream-0.5% | Price Increase | -0.0098 |
| 95 | Triamcinolone Acetonide-Ointment-0.025% | Price Increase | 0.3256*** |
| 96 | Triamcinolone Acetonide-Ointment-0.1% | Price Increase | 0.2706*** |
| 97 | Triamcinolone Acetonide-Ointment-0.5% | Price Increase | 0.2085 |
| 98 | Triamcinolone Acetonide-Paste-0.1% | Price Increase | -0.1434 |

## Appendix C Table 8
Summary of Updated Liability Tests for Drugs at Issue

| # | Drug | Drug Classification | Significant Positive Overcharge Estimate (Entire Period) | Significant Positive Overcharge Estimate (1-Year Before/After) | Significant Increase in WAC Price (1-Year Before/After) | Significant Decrease in Price at End Of Conspiracy | Satisfies Any Price Increase/Decrease Test |
|---|---|---|---|---|---|---|---|
| 1 | Acetazolamide-Tablet-125Mg | Price Increase | X | X | X | X | X |
| 2 | Acetazolamide-Tablet-250Mg | Price Increase | X | X | | X | X |
| 3 | Adapalene-Cream-0.1% | New Generic | | | | | |
| 4 | Alclometasone Dipropionate-Cream-0.05% | Price Increase | X | X | X | | X |
| 5 | Alclometasone Dipropionate-Ointment-0.05% | Price Increase | X | X | X | | X |
| 6 | Ammonium Lactate-Cream-Eq12%Base | Price Increase | X | X | | | X |
| 7 | Ammonium Lactate-Lotion-Eq12%Base | Price Increase | X | | X | | X |
| 8 | Betamethasone Dipropionate-Cream-Eq0.05%Base | Price Increase | X | X | | X | X |
| 9 | Betamethasone Dipropionate-Lotion, Augmented-Eq0.05%Base | Price Increase | X | | | | X |
| 10 | Betamethasone Dipropionate-Lotion-Eq0.05%Base | Price Increase | X | X | X | | X |
| 11 | Betamethasone Dipropionate; Calcipotriene-Ointment-0.064%;0.005% | New Generic | | | | | |
| 12 | Betamethasone Dipropionate; Clotrimazole-Cream-Eq0.05%Base;1% | Price Increase | X | X | X | X | X |
| 13 | Betamethasone Dipropionate; Clotrimazole-Lotion-Eq0.05%Base;1% | Price Increase | X | X | X | | X |
| 14 | Betamethasone Valerate-Cream-Eq0.1%Base | Price Increase | X | X | X | | X |
| 15 | Betamethasone Valerate-Lotion-Eq0.1%Base | Price Increase | X | X | X | | X |
| 16 | Betamethasone Valerate-Ointment-Eq0.1%Base | Price Increase | X | X | | | X |
| 17 | Bromocriptine Mesylate-Tablet-Eq2.5Mgbase | Price Increase | X | X | X | X | X |
| 18 | Calcipotriene-Solution-0.005% | Price Increase | X | X | X | X | X |
| 19 | Carbamazepine-Tablet, Extended Release-100Mg | New Generic | | | | | |
| 20 | Carbamazepine-Tablet, Extended Release-200Mg | New Generic | | | | | |
| 21 | Carbamazepine-Tablet, Extended Release-400Mg | New Generic | | | | | |
| 22 | Cefpodoxime Proxetil-For Suspension-Eq100Mgbase/5Ml | Price Increase | X | | X | | X |
| 23 | Cefpodoxime Proxetil-Tablet-Eq100Mgbase | Price Increase | | X | | | X |
| 24 | Cefpodoxime Proxetil-Tablet-Eq200Mgbase | Price Increase | X | X | | | X |
| 25 | Ciclopirox-Cream-0.77% | Price Increase | | | | | |
| 26 | Ciclopirox-Shampoo-1% | Price Increase | | X | | X | X |
| 27 | Ciclopirox-Solution-8% | Price Increase | X | X | X | X | X |
| 28 | Clindamycin Phosphate-Cream-Eq2%Base | Price Increase | X | | X | | X |
| 29 | Clindamycin Phosphate-Gel-Eq1%Base | Price Increase | X | X | X | X | X |
| 30 | Clindamycin Phosphate-Lotion-Eq1%Base | Price Increase | X | X | X | | X |
| 31 | Clindamycin Phosphate-Solution-Eq1%Base | Price Increase | X | X | X | X | X |
| 32 | Clobetasol Propionate Emollient-Cream-0.05% | Price Increase | X | X | X | X | X |
| 33 | Clobetasol Propionate-Cream-0.05% | Price Increase | X | X | X | X | X |
| 34 | Clobetasol Propionate-Gel-0.05% | Price Increase | X | X | X | X | X |
| 35 | Clobetasol Propionate-Ointment-0.05% | Price Increase | X | X | X | X | X |
| 36 | Clobetasol Propionate-Solution-0.05% | Price Increase | X | X | X | X | X |
| 37 | Clotrimazole-Cream-1% | Price Increase | X | X | | X | X |
| 38 | Desonide-Cream-0.05% | Price Increase | X | X | X | X | X |
| 39 | Desonide-Lotion-0.05% | Price Increase | X | X | X | X | X |
| 40 | Desonide-Ointment-0.05% | Price Increase | X | X | X | X | X |
| 41 | Desoximetasone-Ointment-0.05% | New Generic | | | | | |
| 42 | Desoximetasone-Ointment-0.25% | Price Increase | | X | X | X | X |
| 43 | Econazole Nitrate-Cream-1% | Price Increase | X | X | X | X | X |
| 44 | Eplerenone-Tablet-25Mg | Price Increase | | | | X | X |
| 45 | Eplerenone-Tablet-50Mg | Price Increase | | | | X | X |
| 46 | Erythromycin-Solution-2% | Price Increase | X | X | X | | X |
| 47 | Ethambutol Hydrochloride-Tablet-100Mg | Price Increase | X | X | | | X |
| 48 | Ethambutol Hydrochloride-Tablet-400Mg | Price Increase | X | X | | X | X |
| 49 | Fluocinolone Acetonide-Cream-0.01% | Price Increase | X | X | X | | X |
| 50 | Fluocinolone Acetonide-Cream-0.025% | Price Increase | X | X | X | | X |
| 51 | Fluocinolone Acetonide-Ointment-0.025% | Price Increase | X | X | X | | X |
| 52 | Fluocinonide-Cream-0.1% | New Generic | | | | X | X |
| 53 | Fluocinonide-Gel-0.05% | Price Increase | X | X | | | X |
| 54 | Fluocinonide-Ointment-0.05% | Price Increase | X | X | X | X | X |
| 55 | Fluocinonide-Solution-0.05% | Price Increase | X | X | X | X | X |
| 56 | Fluticasone Propionate-Lotion-0.05% | New Generic | | | | | |
| 57 | Griseofulvin Microsize-Tablet-500Mg | Price Increase | | | | | |
| 58 | Halobetasol Propionate-Cream-0.05% | Price Increase | X | | X | X | X |
| 59 | Halobetasol Propionate-Ointment-0.05% | Price Increase | X | X | X | X | X |
| 60 | Hydrocortisone Acetate-Suppository-25Mg | Price Increase | X | X | X | | X |

HIGHLY CONFIDENTIAL: SUBJECT TO PROTECTIVE ORDER

| # | Drug | Drug Classification | Significant Positive Overcharge Estimate (Entire Period) | Significant Positive Overcharge Estimate (1-Year Before/After) | Significant Increase in WAC Price (1-Year Before/After) | Significant Decrease in Price at End Of Conspiracy | Satisfies Any Price Increase/Decrease Test |
|---|---|---|---|---|---|---|---|
| 61 | Hydrocortisone Acetate-Suppository-30Mg | Price Increase | | | X | | X |
| 62 | Hydrocortisone Valerate-Cream-0.2% | Price Increase | X | X | X | X | X |
| 63 | Imiquimod-Cream-5% | New Generic | | | | X | X |
| 64 | Ketoconazole-Cream-2% | Price Increase | X | | X | X | X |
| 65 | Latanoprost-Solution/Drops-0.005% | Price Increase | | X | X | | X |
| 66 | Lidocaine-Ointment-5% | Price Increase | X | X | X | X | X |
| 67 | Metformin Hydrochloride; Pioglitazone Hydrochloride-Tablet-500Mg;Eq15Mgbase | New Generic | | | | X | X |
| 68 | Metformin Hydrochloride; Pioglitazone Hydrochloride-Tablet-850Mg;Eq15Mgbase | New Generic | | | | X | X |
| 69 | Methazolamide-Tablet-25Mg | Price Increase | X | | X | | X |
| 70 | Methazolamide-Tablet-50Mg | Price Increase | X | | X | | X |
| 71 | Methylphenidate Hcl-Tablet, Extended Release-20Mg | Price Increase | X | | X | X | X |
| 72 | Methylphenidate Hcl-Tablet-10Mg | Price Increase | X | X | X | X | X |
| 73 | Methylphenidate Hcl-Tablet-20Mg | Price Increase | X | X | X | X | X |
| 74 | Methylphenidate Hcl-Tablet-5Mg | Price Increase | X | X | X | X | X |
| 75 | Metronidazole-Cream-0.75% | Price Increase | X | X | X | X | X |
| 76 | Metronidazole-Gel-0.75% | Price Increase | X | X | X | X | X |
| 77 | Metronidazole-Gel-1% | New Generic | | | | X | X |
| 78 | Metronidazole-Lotion-0.75% | Price Increase | X | X | X | | X |
| 79 | Mometasone Furoate-Cream-0.1% | Price Increase | | | | | |
| 80 | Mometasone Furoate-Ointment-0.1% | Price Increase | X | X | | X | X |
| 81 | Mometasone Furoate-Solution-0.1% | Price Increase | | | X | | X |
| 82 | Nystatin-Ointment-100,000Units/Gm | Price Increase | X | X | X | | X |
| 83 | Nystatin; Triamcinolone Acetonide-Cream-100,000Units/Gm;0.1% | Price Increase | X | X | X | X | X |
| 84 | Nystatin; Triamcinolone Acetonide-Ointment-100,000Units/Gm;0.1% | Price Increase | X | X | X | X | X |
| 85 | Phenytoin Sodium-Capsule-100Mgextended | Price Increase | X | | X | X | X |
| 86 | Prochlorperazine-Suppository-25Mg | Price Increase | X | X | X | | X |
| 87 | Promethazine Hydrochloride-Suppository-12.5Mg | Price Increase | X | X | X | X | X |
| 88 | Promethazine Hydrochloride-Suppository-25Mg | Price Increase | X | X | X | X | X |
| 89 | Tacrolimus-Ointment-0.03% | New Generic | | | | X | X |
| 90 | Tacrolimus-Ointment-0.1% | New Generic | | | | X | X |
| 91 | Terconazole-Cream-0.8% | Price Increase | X | | | | X |
| 92 | Triamcinolone Acetonide-Cream-0.025% | Price Increase | X | X | X | | X |
| 93 | Triamcinolone Acetonide-Cream-0.1% | Price Increase | X | X | X | | X |
| 94 | Triamcinolone Acetonide-Cream-0.5% | Price Increase | X | X | X | | X |
| 95 | Triamcinolone Acetonide-Ointment-0.025% | Price Increase | X | X | X | | X |
| 96 | Triamcinolone Acetonide-Ointment-0.1% | Price Increase | X | X | X | | X |
| 97 | Triamcinolone Acetonide-Ointment-0.5% | Price Increase | X | X | X | | X |
| 98 | Triamcinolone Acetonide-Paste-0.1% | Price Increase | | | | | |
| | | **Total** | **72** | **65** | **64** | **50** | **87** |

HIGHLY CONFIDENTIAL: SUBJECT TO PROTECTIVE ORDER

**Appendix C Table 9**
Updated Overcharge Estimates from Own-Price Disgorgement Models

| # | Drug | Defendant | Overcharge (%), Net Price Data, Before and After Model | Overcharge (%), Net Price Data, DiD Model | Overcharge (%), AMP Data | Overcharge (%), IQVIA Data |
|---|---|---|---|---|---|---|
| 1 | ACETAZOLAMIDE-TABLET-125MG | TARO | 163.8% | 256.1% | 144.2% | 226.9% |
| 2 | ACETAZOLAMIDE-TABLET-250MG | LANNETT | 109.9% | 155.7% | 115.4% | 100.3% |
| 3 | ACETAZOLAMIDE-TABLET-250MG | TARO | 117.6% | 141.5% | 127.5% | 150.0% |
| 4 | ALCLOMETASONE DIPROPIONATE-CREAM-0.05% | GLENMARK | 171.1% | 146.7% | 52.2% | 76.0% |
| 5 | ALCLOMETASONE DIPROPIONATE-CREAM-0.05% | SANDOZ | 333.6% | 285.2% | 49.9% | 93.0% |
| 6 | ALCLOMETASONE DIPROPIONATE-CREAM-0.05% | TARO | 31.0% | 13.5% | 51.3% | 50.7% |
| 7 | ALCLOMETASONE DIPROPIONATE-OINTMENT-0.05% | GLENMARK | -- | -- | -- | -- |
| 8 | ALCLOMETASONE DIPROPIONATE-OINTMENT-0.05% | SANDOZ | 63.8% | 48.7% | -6.9% | -3.6% |
| 9 | ALCLOMETASONE DIPROPIONATE-OINTMENT-0.05% | TARO | 331.2% | 265.1% | 280.9% | 98.0% |
| 10 | AMMONIUM LACTATE-CREAM-EQ12%BASE | ACTAVIS | 73.5% | 72.9% | 41.1% | 30.6% |
| 11 | AMMONIUM LACTATE-CREAM-EQ12%BASE | PERRIGO | 98.1% | 94.0% | 32.6% | 51.0% |
| 12 | AMMONIUM LACTATE-CREAM-EQ12%BASE | TARO | 55.3% | 48.6% | 152.7% | 59.3% |
| 13 | AMMONIUM LACTATE-LOTION-EQ12%BASE | ACTAVIS | -4.8% | 8.3% | 36.4% | -20.1% |
| 14 | AMMONIUM LACTATE-LOTION-EQ12%BASE | PERRIGO | 118.0% | 145.4% | 78.1% | 94.3% |
| 15 | AMMONIUM LACTATE-LOTION-EQ12%BASE | TARO | 97.7% | 125.2% | 183.7% | 91.3% |
| 16 | BETAMETHASONE DIPROPIONATE-CREAM-EQ0.05%BASE | SANDOZ | 2210.2% | 2209.9% | 2482.3% | 332.0% |
| 17 | BETAMETHASONE DIPROPIONATE-CREAM-EQ0.05%BASE | TARO | 1498.3% | 1464.6% | 1247.2% | 450.0% |
| 18 | BETAMETHASONE DIPROPIONATE-LOTION, AUGMENTED-EQ0.05%BASE | SANDOZ | 86.9% | 92.6% | 4.4% | 41.6% |
| 19 | BETAMETHASONE DIPROPIONATE-LOTION, AUGMENTED-EQ0.05%BASE | TARO | 220.7% | 224.2% | 134.4% | 95.4% |
| 20 | BETAMETHASONE DIPROPIONATE-LOTION-EQ0.05%BASE | PERRIGO | 270.0% | 272.6% | 182.9% | 371.1% |
| 21 | BETAMETHASONE DIPROPIONATE-LOTION-EQ0.05%BASE | SANDOZ | 581.9% | 618.4% | 384.4% | 29.9% |
| 22 | BETAMETHASONE DIPROPIONATE; CLOTRIMAZOLE-CREAM-EQ0.05%BASE;1% | ACTAVIS | 260.2% | 293.3% | 426.5% | 154.8% |
| 23 | BETAMETHASONE DIPROPIONATE; CLOTRIMAZOLE-CREAM-EQ0.05%BASE;1% | SANDOZ | 289.8% | 330.9% | 1890.5% | 229.4% |
| 24 | BETAMETHASONE DIPROPIONATE; CLOTRIMAZOLE-CREAM-EQ0.05%BASE;1% | TARO | 227.3% | 249.1% | 446.4% | 237.7% |
| 25 | BETAMETHASONE DIPROPIONATE; CLOTRIMAZOLE-LOTION-EQ0.05%BASE;1% | SANDOZ | 632.9% | 727.9% | 279.1% | 302.5% |
| 26 | BETAMETHASONE DIPROPIONATE; CLOTRIMAZOLE-LOTION-EQ0.05%BASE;1% | TARO | 448.8% | 472.6% | 700.8% | 250.5% |
| 27 | BETAMETHASONE VALERATE-CREAM-EQ0.1%BASE | SANDOZ | 590.3% | 644.5% | 645.2% | 575.5% |
| 28 | BETAMETHASONE VALERATE-CREAM-EQ0.1%BASE | TARO | 410.8% | 440.1% | 340.7% | 603.7% |
| 29 | BETAMETHASONE VALERATE-LOTION-EQ0.1%BASE | G&W | -- | -- | -- | -- |
| 30 | BETAMETHASONE VALERATE-LOTION-EQ0.1%BASE | SANDOZ | -- | 977.7% | 525.2% | 406.3% |
| 31 | BETAMETHASONE VALERATE-OINTMENT-EQ0.1%BASE | ACTAVIS | -- | 592.0% | 419.8% | 672.3% |
| 32 | BETAMETHASONE VALERATE-OINTMENT-EQ0.1%BASE | SANDOZ | -- | 474.9% | 303.8% | 462.5% |
| 33 | BROMOCRIPTINE MESYLATE-TABLET-EQ2.5MGBASE | MYLAN | 159.3% | 123.6% | -- | 100.7% |
| 34 | BROMOCRIPTINE MESYLATE-TABLET-EQ2.5MGBASE | PERRIGO | -8.6% | -24.5% | 43.4% | 95.4% |
| 35 | BROMOCRIPTINE MESYLATE-TABLET-EQ2.5MGBASE | SANDOZ | 83.7% | 42.5% | 87.3% | 42.2% |
| 36 | CALCIPOTRIENE-SOLUTION-0.005% | G&W | -- | -- | -- | -- |
| 37 | CALCIPOTRIENE-SOLUTION-0.005% | SANDOZ | 99.1% | 39.2% | -9.6% | 13.4% |
| 38 | CEFPODOXIME PROXETIL-FOR SUSPENSION-EQ100MGBASE/5ML | AUROBINDO | 103.2% | 24.1% | 4.9% | 5.9% |
| 39 | CEFPODOXIME PROXETIL-FOR SUSPENSION-EQ100MGBASE/5ML | SANDOZ | 109.8% | 65.1% | -26.0% | 19.9% |
| 40 | CEFPODOXIME PROXETIL-TABLET-EQ100MGBASE | AUROBINDO | 346.7% | 263.1% | -20.9% | 31.0% |
| 41 | CEFPODOXIME PROXETIL-TABLET-EQ100MGBASE | SANDOZ | 83.2% | 9.3% | -35.8% | -16.6% |
| 42 | CEFPODOXIME PROXETIL-TABLET-EQ200MGBASE | AUROBINDO | 407.6% | 264.9% | -22.6% | -5.0% |
| 43 | CEFPODOXIME PROXETIL-TABLET-EQ200MGBASE | SANDOZ | 103.4% | 23.3% | -14.1% | -16.1% |
| 44 | CICLOPIROX-CREAM-0.77% | GLENMARK | -6.8% | -12.8% | -46.9% | 5.5% |
| 45 | CICLOPIROX-CREAM-0.77% | G&W | -- | -- | -- | -- |
| 46 | CICLOPIROX-CREAM-0.77% | PERRIGO | -18.3% | -22.6% | -28.0% | -6.1% |
| 47 | CICLOPIROX-SHAMPOO-1% | ACTAVIS | -25.2% | -13.7% | 34.8% | -7.6% |
| 48 | CICLOPIROX-SHAMPOO-1% | PERRIGO | -2.3% | 14.1% | 28.6% | -0.7% |
| 49 | CICLOPIROX-SHAMPOO-1% | SANDOZ | -- | -- | -- | -- |
| 50 | CICLOPIROX-SOLUTION-8% | G&W | -- | -- | -- | -- |
| 51 | CICLOPIROX-SOLUTION-8% | PERRIGO | 131.0% | 84.9% | 65.3% | 107.0% |
| 52 | CICLOPIROX-SOLUTION-8% | SANDOZ | 62.1% | 5.0% | 7.0% | -19.3% |
| 53 | CLINDAMYCIN PHOSPHATE-CREAM-EQ2%BASE | GREENSTONE | -- | -- | -- | -- |
| 54 | CLINDAMYCIN PHOSPHATE-CREAM-EQ2%BASE | SANDOZ | -- | 114.1% | 44.1% | 70.2% |
| 55 | CLINDAMYCIN PHOSPHATE-GEL-EQ1%BASE | GREENSTONE | -- | -- | -- | -- |
| 56 | CLINDAMYCIN PHOSPHATE-GEL-EQ1%BASE | SANDOZ | -- | 356.9% | 147.1% | 261.2% |
| 57 | CLINDAMYCIN PHOSPHATE-LOTION-EQ1%BASE | GREENSTONE | -- | -- | -- | -- |
| 58 | CLINDAMYCIN PHOSPHATE-LOTION-EQ1%BASE | SANDOZ | -- | 336.0% | 121.8% | 168.6% |
| 59 | CLINDAMYCIN PHOSPHATE-SOLUTION-EQ1%BASE | GREENSTONE | -- | -- | -- | -- |
| 60 | CLINDAMYCIN PHOSPHATE-SOLUTION-EQ1%BASE | PERRIGO | -- | -- | -- | -- |
| 61 | CLINDAMYCIN PHOSPHATE-SOLUTION-EQ1%BASE | SANDOZ | 419.7% | 450.0% | 267.2% | 405.9% |
| 62 | CLINDAMYCIN PHOSPHATE-SOLUTION-EQ1%BASE | TARO | 442.4% | 452.0% | 629.1% | 412.1% |
| 63 | CLOBETASOL PROPIONATE EMOLLIENT-CREAM-0.05% | SANDOZ | 648.3% | 696.7% | 613.7% | 368.8% |
| 64 | CLOBETASOL PROPIONATE EMOLLIENT-CREAM-0.05% | TARO | 571.1% | 624.6% | 717.1% | 351.1% |
| 65 | CLOBETASOL PROPIONATE-CREAM-0.05% | SANDOZ | 1396.5% | 1596.9% | 1538.9% | 591.7% |
| 66 | CLOBETASOL PROPIONATE-CREAM-0.05% | TARO | 277.4% | 351.5% | 552.5% | 504.8% |
| 67 | CLOBETASOL PROPIONATE-GEL-0.05% | SANDOZ | 1517.2% | 1616.7% | 993.6% | 207.1% |
| 68 | CLOBETASOL PROPIONATE-GEL-0.05% | TARO | 766.0% | 748.6% | 564.7% | 362.1% |
| 69 | CLOBETASOL PROPIONATE-OINTMENT-0.05% | SANDOZ | 2331.5% | 2597.5% | 2105.9% | 1092.8% |
| 70 | CLOBETASOL PROPIONATE-OINTMENT-0.05% | TARO | 792.7% | 936.7% | 960.2% | 880.0% |
| 71 | CLOBETASOL PROPIONATE-SOLUTION-0.05% | SANDOZ | 609.1% | 594.3% | 717.9% | 129.3% |
| 72 | CLOBETASOL PROPIONATE-SOLUTION-0.05% | TARO | 253.7% | 243.3% | 295.9% | 159.6% |

HIGHLY CONFIDENTIAL: SUBJECT TO PROTECTIVE ORDER

| # | Drug | Defendant | Overcharge (%), Net Price Data, Before and After Model | Overcharge (%), Net Price Data, DiD Model | Overcharge (%), AMP Data | Overcharge (%), IQVIA Data |
|---|---|---|---|---|---|---|
| 73 | CLOBETASOL PROPIONATE-SOLUTION-0.05% | WOCKHARDT | 313.0% | 340.2% | 342.3% | 244.5% |
| 74 | CLOTRIMAZOLE-CREAM-1% | SANDOZ | 48.9% | 58.5% | 253.9% | -41.9% |
| 75 | CLOTRIMAZOLE-CREAM-1% | TARO | -14.2% | -4.9% | 5.7% | -37.7% |
| 76 | DESONIDE-CREAM-0.05% | PERRIGO | -- | -- | -- | -- |
| 77 | DESONIDE-CREAM-0.05% | TARO | 1197.9% | 1240.5% | 1719.0% | 1511.1% |
| 78 | DESONIDE-LOTION-0.05% | ACTAVIS | -- | -- | -- | -- |
| 79 | DESONIDE-LOTION-0.05% | SANDOZ | -- | 634.6% | 237.3% | 555.9% |
| 80 | DESONIDE-OINTMENT-0.05% | PERRIGO | -- | -- | -- | -- |
| 81 | DESONIDE-OINTMENT-0.05% | SANDOZ | 921.6% | 1020.5% | 547.2% | 1032.6% |
| 82 | DESONIDE-OINTMENT-0.05% | TARO | 192.2% | 210.2% | 195.1% | 1162.7% |
| 83 | DESOXIMETASONE-OINTMENT-0.25% | GLENMARK | -- | -- | -- | -- |
| 84 | DESOXIMETASONE-OINTMENT-0.25% | SANDOZ | -- | -- | -- | -- |
| 85 | DESOXIMETASONE-OINTMENT-0.25% | TARO | 95.4% | 60.5% | 26.6% | 20.6% |
| 86 | ECONAZOLE NITRATE-CREAM-1% | PERRIGO | 119.9% | 171.2% | -25.5% | 243.3% |
| 87 | ECONAZOLE NITRATE-CREAM-1% | SANDOZ | 157.1% | 180.1% | 723.0% | 197.3% |
| 88 | ECONAZOLE NITRATE-CREAM-1% | TARO | 399.4% | 471.1% | 254.9% | 199.2% |
| 89 | ECONAZOLE NITRATE-CREAM-1% | TELIGENT | 287.1% | 336.9% | -- | 284.8% |
| 90 | EPLERENONE-TABLET-25MG | GREENSTONE | 154.9% | 100.4% | 60.7% | 0.4% |
| 91 | EPLERENONE-TABLET-25MG | SANDOZ | 24.2% | -15.0% | -18.1% | -15.6% |
| 92 | EPLERENONE-TABLET-50MG | GREENSTONE | 144.4% | 89.7% | 71.7% | 0.6% |
| 93 | EPLERENONE-TABLET-50MG | SANDOZ | 59.1% | -2.8% | -14.7% | -18.6% |
| 94 | ERYTHROMYCIN-SOLUTION-2% | PERRIGO | -- | -- | -- | -- |
| 95 | ERYTHROMYCIN-SOLUTION-2% | SANDOZ | -- | 563.2% | 243.2% | 187.5% |
| 96 | ERYTHROMYCIN-SOLUTION-2% | WOCKHARDT | -- | 182.0% | 444.5% | 86.1% |
| 97 | ETHAMBUTOL HYDROCHLORIDE-TABLET-100MG | G&W | -- | -- | -- | -- |
| 98 | ETHAMBUTOL HYDROCHLORIDE-TABLET-100MG | LUPIN | -- | 474.3% | 5.9% | 5.0% |
| 99 | ETHAMBUTOL HYDROCHLORIDE-TABLET-400MG | G&W | -- | -- | -- | -- |
| 100 | ETHAMBUTOL HYDROCHLORIDE-TABLET-400MG | LUPIN | -- | 204.7% | -13.5% | -9.4% |
| 101 | FLUOCINOLONE ACETONIDE-CREAM-0.01% | G&W | -- | -- | -- | -- |
| 102 | FLUOCINOLONE ACETONIDE-CREAM-0.01% | SANDOZ | -- | 392.0% | 178.3% | 185.4% |
| 103 | FLUOCINOLONE ACETONIDE-CREAM-0.025% | G&W | -- | -- | -- | -- |
| 104 | FLUOCINOLONE ACETONIDE-CREAM-0.025% | SANDOZ | -- | 610.6% | 252.5% | 193.2% |
| 105 | FLUOCINOLONE ACETONIDE-OINTMENT-0.025% | G&W | -- | -- | -- | -- |
| 106 | FLUOCINOLONE ACETONIDE-OINTMENT-0.025% | SANDOZ | -- | 414.1% | 214.4% | 181.2% |
| 107 | FLUOCINONIDE-GEL-0.05% | G&W | -- | -- | -- | -- |
| 108 | FLUOCINONIDE-GEL-0.05% | SANDOZ | -- | -- | -- | -- |
| 109 | FLUOCINONIDE-GEL-0.05% | TARO | 169.5% | 163.3% | 497.6% | 311.9% |
| 110 | FLUOCINONIDE-OINTMENT-0.05% | SANDOZ | -- | -- | -- | -- |
| 111 | FLUOCINONIDE-OINTMENT-0.05% | TARO | 497.3% | 470.2% | 194.8% | 358.9% |
| 112 | FLUOCINONIDE-SOLUTION-0.05% | ACTAVIS | -- | -- | -- | -- |
| 113 | FLUOCINONIDE-SOLUTION-0.05% | SANDOZ | 1071.9% | 1000.7% | 415.2% | 628.7% |
| 114 | FLUOCINONIDE-SOLUTION-0.05% | TARO | 323.9% | 292.1% | 171.3% | 503.6% |
| 115 | GRISEOFULVIN MICROSIZE-TABLET-500MG | SANDOZ | -- | -- | -- | -- |
| 116 | HALOBETASOL PROPIONATE-CREAM-0.05% | G&W | 169.0% | 131.9% | -- | 161.8% |
| 117 | HALOBETASOL PROPIONATE-CREAM-0.05% | PERRIGO | 245.6% | 198.4% | 168.5% | 257.9% |
| 118 | HALOBETASOL PROPIONATE-CREAM-0.05% | SANDOZ | -- | -- | -- | -- |
| 119 | HALOBETASOL PROPIONATE-CREAM-0.05% | TARO | 885.4% | 768.2% | 705.4% | 151.4% |
| 120 | HALOBETASOL PROPIONATE-OINTMENT-0.05% | G&W | 315.5% | 265.7% | -- | 239.3% |
| 121 | HALOBETASOL PROPIONATE-OINTMENT-0.05% | PERRIGO | 246.9% | 211.2% | 169.7% | 278.7% |
| 122 | HALOBETASOL PROPIONATE-OINTMENT-0.05% | TARO | 421.6% | 428.0% | 739.0% | 121.1% |
| 123 | HYDROCORTISONE ACETATE-SUPPOSITORY-25MG | G&W | -- | -- | -- | -- |
| 124 | HYDROCORTISONE ACETATE-SUPPOSITORY-25MG | PERRIGO | -- | -- | -- | -- |
| 125 | HYDROCORTISONE ACETATE-SUPPOSITORY-30MG | PERRIGO | -- | -- | -- | -- |
| 126 | HYDROCORTISONE VALERATE-CREAM-0.2% | PERRIGO | 418.7% | 426.5% | 414.2% | 353.6% |
| 127 | HYDROCORTISONE VALERATE-CREAM-0.2% | TARO | 523.1% | 585.7% | 626.1% | 383.7% |
| 128 | KETOCONAZOLE-CREAM-2% | G&W | -- | -- | -- | -- |
| 129 | KETOCONAZOLE-CREAM-2% | SANDOZ | 73.0% | 97.0% | 149.2% | 153.0% |
| 130 | KETOCONAZOLE-CREAM-2% | TARO | 199.6% | 230.3% | 116.9% | 149.4% |
| 131 | LATANOPROST-SOLUTION/DROPS-0.005% | GREENSTONE | 40.7% | -6.2% | -26.2% | -6.8% |
| 132 | LATANOPROST-SOLUTION/DROPS-0.005% | SANDOZ | 112.9% | 39.9% | -2.9% | 26.5% |
| 133 | LATANOPROST-SOLUTION/DROPS-0.005% | VALEANT/BAUSCH | 7.6% | -29.6% | 2.6% | 28.8% |
| 134 | LIDOCAINE-OINTMENT-5% | SANDOZ | 416.4% | 386.6% | 359.4% | 268.5% |
| 135 | LIDOCAINE-OINTMENT-5% | TARO | 470.5% | 431.7% | 267.9% | 196.1% |
| 136 | METHAZOLAMIDE-TABLET-25MG | PERRIGO | 6.1% | 14.4% | -- | 38.5% |
| 137 | METHAZOLAMIDE-TABLET-25MG | SANDOZ | 412.0% | 387.3% | 300.2% | 414.2% |
| 138 | METHAZOLAMIDE-TABLET-50MG | PERRIGO | 65.5% | 50.1% | -- | 44.0% |
| 139 | METHAZOLAMIDE-TABLET-50MG | SANDOZ | 820.8% | 697.3% | 354.7% | 448.6% |
| 140 | METHYLPHENIDATE HCL-TABLET, EXTENDED RELEASE-20MG | MALLINCKRODT | 349.4% | 751.2% | 317.0% | -- |
| 141 | METHYLPHENIDATE HCL-TABLET, EXTENDED RELEASE-20MG | SANDOZ | 201.2% | 167.5% | 130.7% | -- |
| 142 | METHYLPHENIDATE HCL-TABLET-10MG | ACTAVIS | 248.0% | 240.8% | 312.8% | 145.4% |
| 143 | METHYLPHENIDATE HCL-TABLET-10MG | MALLINCKRODT | 491.6% | 515.9% | 201.2% | 332.4% |
| 144 | METHYLPHENIDATE HCL-TABLET-10MG | SANDOZ | 138.2% | 134.6% | 184.6% | 155.9% |
| 145 | METHYLPHENIDATE HCL-TABLET-10MG | SUN | -- | -- | -- | -- |
| 146 | METHYLPHENIDATE HCL-TABLET-20MG | ACTAVIS | 281.4% | 234.7% | 321.9% | 171.2% |
| 147 | METHYLPHENIDATE HCL-TABLET-20MG | MALLINCKRODT | 587.4% | 546.7% | 215.0% | 404.1% |
| 148 | METHYLPHENIDATE HCL-TABLET-20MG | SANDOZ | 338.1% | 302.7% | 179.3% | 178.6% |
| 149 | METHYLPHENIDATE HCL-TABLET-20MG | SUN | -- | -- | -- | -- |

HIGHLY CONFIDENTIAL: SUBJECT TO PROTECTIVE ORDER

| # | Drug | Defendant | Overcharge (%), Net Price Data, Before and After Model | Overcharge (%), Net Price Data, DiD Model | Overcharge (%), AMP Data | Overcharge (%), IQVIA Data |
|---|---|---|---|---|---|---|
| 150 | METHYLPHENIDATE HCL-TABLET-5MG | ACTAVIS | 219.5% | 220.0% | 296.5% | 49.7% |
| 151 | METHYLPHENIDATE HCL-TABLET-5MG | MALLINCKRODT | 467.2% | 512.6% | 158.5% | 311.9% |
| 152 | METHYLPHENIDATE HCL-TABLET-5MG | SANDOZ | 121.2% | 131.3% | 309.9% | 139.3% |
| 153 | METHYLPHENIDATE HCL-TABLET-5MG | SUN | -- | -- | -- | -- |
| 154 | METRONIDAZOLE-CREAM-0.75% | ACTAVIS | -- | 149.7% | 206.0% | 168.9% |
| 155 | METRONIDAZOLE-CREAM-0.75% | G&W | -- | 210.7% | -- | 295.4% |
| 156 | METRONIDAZOLE-CREAM-0.75% | SANDOZ | -- | 241.6% | 188.4% | 176.9% |
| 157 | METRONIDAZOLE-GEL-0.75% | G&W | -- | -- | -- | -- |
| 158 | METRONIDAZOLE-GEL-0.75% | SANDOZ | 466.4% | 615.7% | 311.7% | 214.5% |
| 159 | METRONIDAZOLE-GEL-0.75% | TARO | 364.3% | 300.2% | 58.6% | 163.4% |
| 160 | METRONIDAZOLE-LOTION-0.75% | ACTAVIS | -- | 109.9% | 7.2% | 167.0% |
| 161 | METRONIDAZOLE-LOTION-0.75% | SANDOZ | -- | 190.2% | 85.8% | 94.7% |
| 162 | MOMETASONE FUROATE-CREAM-0.1% | GLENMARK | -- | -14.9% | -5.0% | -1.3% |
| 163 | MOMETASONE FUROATE-CREAM-0.1% | G&W | -- | -- | -- | -- |
| 164 | MOMETASONE FUROATE-OINTMENT-0.1% | GLENMARK | 87.6% | 64.0% | 12.5% | -18.7% |
| 165 | MOMETASONE FUROATE-OINTMENT-0.1% | G&W | -- | -- | -- | -- |
| 166 | MOMETASONE FUROATE-SOLUTION-0.1% | GLENMARK | 15.9% | -12.3% | -43.0% | -12.4% |
| 167 | MOMETASONE FUROATE-SOLUTION-0.1% | G&W | -- | -- | -- | -- |
| 168 | NYSTATIN-OINTMENT-100,000UNITS/GM | ACTAVIS | -- | -- | -- | -- |
| 169 | NYSTATIN-OINTMENT-100,000UNITS/GM | PERRIGO | 257.6% | 204.8% | 148.5% | 211.1% |
| 170 | NYSTATIN-OINTMENT-100,000UNITS/GM | SANDOZ | 291.0% | 386.2% | 250.6% | 342.4% |
| 171 | NYSTATIN; TRIAMCINOLONE ACETONIDE-CREAM-100,000UNITS/GM;0.1% | SANDOZ | 2218.0% | 2408.6% | 1987.7% | 3214.3% |
| 172 | NYSTATIN; TRIAMCINOLONE ACETONIDE-CREAM-100,000UNITS/GM;0.1% | TARO | 1778.0% | 1937.7% | 1826.6% | 2063.9% |
| 173 | NYSTATIN; TRIAMCINOLONE ACETONIDE-OINTMENT-100,000UNITS/GM;0.1% | SANDOZ | 2698.9% | 2674.9% | 2467.2% | 2844.8% |
| 174 | NYSTATIN; TRIAMCINOLONE ACETONIDE-OINTMENT-100,000UNITS/GM;0.1% | TARO | 1287.5% | 1304.1% | 1355.3% | 1738.4% |
| 175 | PHENYTOIN SODIUM-CAPSULE-100MGEXTENDED | AMNEAL | 28.8% | 66.0% | 80.7% | 57.5% |
| 176 | PHENYTOIN SODIUM-CAPSULE-100MGEXTENDED | MYLAN | 1.7% | 21.8% | -- | -6.7% |
| 177 | PHENYTOIN SODIUM-CAPSULE-100MGEXTENDED | SUN | 22.5% | 40.8% | -- | 39.2% |
| 178 | PHENYTOIN SODIUM-CAPSULE-100MGEXTENDED | TARO | 116.0% | 146.4% | 153.1% | 89.5% |
| 179 | PROCHLORPERAZINE-SUPPOSITORY-25MG | G&W | -- | -- | -- | -- |
| 180 | PROCHLORPERAZINE-SUPPOSITORY-25MG | PERRIGO | -- | 42.9% | 78.2% | 252.3% |
| 181 | PROMETHAZINE HYDROCHLORIDE-SUPPOSITORY-12.5MG | ACTAVIS | -- | 663.0% | 414.5% | 465.9% |
| 182 | PROMETHAZINE HYDROCHLORIDE-SUPPOSITORY-12.5MG | G&W | -- | -- | -- | -- |
| 183 | PROMETHAZINE HYDROCHLORIDE-SUPPOSITORY-12.5MG | PERRIGO | -- | 150.4% | 127.1% | 375.6% |
| 184 | PROMETHAZINE HYDROCHLORIDE-SUPPOSITORY-25MG | ACTAVIS | -- | 555.9% | 490.7% | 442.7% |
| 185 | PROMETHAZINE HYDROCHLORIDE-SUPPOSITORY-25MG | G&W | -- | -- | -- | -- |
| 186 | PROMETHAZINE HYDROCHLORIDE-SUPPOSITORY-25MG | PERRIGO | -- | 136.4% | 85.2% | 369.7% |
| 187 | TERCONAZOLE-CREAM-0.8% | ACTAVIS | 177.1% | 127.9% | 151.9% | 65.2% |
| 188 | TERCONAZOLE-CREAM-0.8% | SANDOZ | -- | -- | -- | -- |
| 189 | TERCONAZOLE-CREAM-0.8% | TARO | 95.5% | 73.0% | 59.3% | 77.2% |
| 190 | TRIAMCINOLONE ACETONIDE-CREAM-0.025% | PERRIGO | 40.5% | 61.2% | 33.0% | 64.6% |
| 191 | TRIAMCINOLONE ACETONIDE-CREAM-0.025% | SANDOZ | -- | -- | -- | -- |
| 192 | TRIAMCINOLONE ACETONIDE-CREAM-0.1% | PERRIGO | 24.2% | 45.2% | 14.6% | 43.2% |
| 193 | TRIAMCINOLONE ACETONIDE-CREAM-0.1% | SANDOZ | -- | -- | -- | -- |
| 194 | TRIAMCINOLONE ACETONIDE-CREAM-0.5% | PERRIGO | 90.4% | 79.2% | 50.0% | 122.1% |
| 195 | TRIAMCINOLONE ACETONIDE-CREAM-0.5% | SANDOZ | -- | -- | -- | -- |
| 196 | TRIAMCINOLONE ACETONIDE-OINTMENT-0.025% | PERRIGO | 65.6% | 76.8% | 43.9% | 79.5% |
| 197 | TRIAMCINOLONE ACETONIDE-OINTMENT-0.025% | SANDOZ | -- | -- | -- | -- |
| 198 | TRIAMCINOLONE ACETONIDE-OINTMENT-0.1% | PERRIGO | 51.6% | 84.7% | 42.5% | 71.6% |
| 199 | TRIAMCINOLONE ACETONIDE-OINTMENT-0.1% | SANDOZ | -- | -- | -- | -- |
| 200 | TRIAMCINOLONE ACETONIDE-OINTMENT-0.5% | PERRIGO | 56.3% | 64.7% | 53.5% | 91.6% |
| 201 | TRIAMCINOLONE ACETONIDE-PASTE-0.1% | TARO | 28.1% | -15.9% | -23.0% | 1.4% |

HIGHLY CONFIDENTIAL: SUBJECT TO PROTECTIVE ORDER

## Appendix C Table 10
Updated Overcharge Estimates from Own vs. Average Price Models

| # | Drug | Defendant | Overcharge (%), Net Price Data | Overcharge (%), AMP Data | Overcharge (%), IQVIA Data |
|---|---|---|---|---|---|
| 1 | ACETAZOLAMIDE-TABLET-125MG | TARO | 256.9% | 148.1% | 228.5% |
| 2 | ACETAZOLAMIDE-TABLET-250MG | LANNETT | 232.1% | 178.8% | 101.9% |
| 3 | ACETAZOLAMIDE-TABLET-250MG | TARO | 125.9% | 117.3% | 152.4% |
| 4 | ALCLOMETASONE DIPROPIONATE-CREAM-0.05% | GLENMARK | 81.5% | 10.7% | 50.6% |
| 5 | ALCLOMETASONE DIPROPIONATE-CREAM-0.05% | SANDOZ | 227.0% | 87.5% | 108.6% |
| 6 | ALCLOMETASONE DIPROPIONATE-CREAM-0.05% | TARO | 43.6% | 52.7% | 54.6% |
| 7 | ALCLOMETASONE DIPROPIONATE-OINTMENT-0.05% | GLENMARK | 245.0% | 161.8% | 87.4% |
| 8 | ALCLOMETASONE DIPROPIONATE-OINTMENT-0.05% | SANDOZ | 72.7% | 18.4% | -3.2% |
| 9 | ALCLOMETASONE DIPROPIONATE-OINTMENT-0.05% | TARO | 230.0% | 220.0% | 97.7% |
| 10 | AMMONIUM LACTATE-CREAM-EQ12%BASE | ACTAVIS | 19.4% | 88.7% | 33.4% |
| 11 | AMMONIUM LACTATE-CREAM-EQ12%BASE | PERRIGO | 60.5% | 55.9% | 51.2% |
| 12 | AMMONIUM LACTATE-CREAM-EQ12%BASE | TARO | 76.3% | 113.0% | 57.7% |
| 13 | AMMONIUM LACTATE-LOTION-EQ12%BASE | ACTAVIS | 8.5% | 36.0% | 5.4% |
| 14 | AMMONIUM LACTATE-LOTION-EQ12%BASE | PERRIGO | 119.9% | 56.6% | 60.1% |
| 15 | AMMONIUM LACTATE-LOTION-EQ12%BASE | TARO | 136.7% | 198.6% | 96.9% |
| 16 | BETAMETHASONE DIPROPIONATE-CREAM-EQ0.05%BASE | SANDOZ | 2210.2% | 2166.7% | 426.8% |
| 17 | BETAMETHASONE DIPROPIONATE-CREAM-EQ0.05%BASE | TARO | 1426.9% | 1485.8% | 349.6% |
| 18 | BETAMETHASONE DIPROPIONATE-LOTION, AUGMENTED-EQ0.05%BASE | SANDOZ | 195.0% | 48.7% | 31.1% |
| 19 | BETAMETHASONE DIPROPIONATE-LOTION, AUGMENTED-EQ0.05%BASE | TARO | 133.1% | 82.5% | 108.8% |
| 20 | BETAMETHASONE DIPROPIONATE-LOTION-EQ0.05%BASE | PERRIGO | 348.5% | 245.2% | 155.7% |
| 21 | BETAMETHASONE DIPROPIONATE-LOTION-EQ0.05%BASE | SANDOZ | 411.5% | 261.5% | 285.6% |
| 22 | BETAMETHASONE DIPROPIONATE; CLOTRIMAZOLE-CREAM-EQ0.05%BASE;1% | ACTAVIS | 299.5% | 707.4% | 190.9% |
| 23 | BETAMETHASONE DIPROPIONATE; CLOTRIMAZOLE-CREAM-EQ0.05%BASE;1% | SANDOZ | 354.7% | 699.8% | 200.3% |
| 24 | BETAMETHASONE DIPROPIONATE; CLOTRIMAZOLE-CREAM-EQ0.05%BASE;1% | TARO | 238.5% | 564.0% | 213.3% |
| 25 | BETAMETHASONE DIPROPIONATE; CLOTRIMAZOLE-LOTION-EQ0.05%BASE;1% | SANDOZ | 716.9% | 382.5% | 297.0% |
| 26 | BETAMETHASONE DIPROPIONATE; CLOTRIMAZOLE-LOTION-EQ0.05%BASE;1% | TARO | 486.2% | 528.2% | 259.2% |
| 27 | BETAMETHASONE VALERATE-CREAM-EQ0.1%BASE | SANDOZ | 800.9% | 737.2% | 669.8% |
| 28 | BETAMETHASONE VALERATE-CREAM-EQ0.1%BASE | TARO | 369.0% | 318.5% | 541.5% |
| 29 | BETAMETHASONE VALERATE-LOTION-EQ0.1%BASE | G&W | -- | -- | -- |
| 30 | BETAMETHASONE VALERATE-LOTION-EQ0.1%BASE | SANDOZ | 985.3% | 540.9% | 408.8% |
| 31 | BETAMETHASONE VALERATE-OINTMENT-EQ0.1%BASE | ACTAVIS | 609.5% | 516.0% | 607.8% |
| 32 | BETAMETHASONE VALERATE-OINTMENT-EQ0.1%BASE | SANDOZ | 477.0% | 309.0% | 534.0% |
| 33 | BROMOCRIPTINE MESYLATE-TABLET-EQ2.5MGBASE | MYLAN | 7.4% | -- | 106.9% |
| 34 | BROMOCRIPTINE MESYLATE-TABLET-EQ2.5MGBASE | PERRIGO | 123.4% | 57.3% | 55.2% |
| 35 | BROMOCRIPTINE MESYLATE-TABLET-EQ2.5MGBASE | SANDOZ | 8.3% | 76.3% | 65.3% |
| 36 | CALCIPOTRIENE-SOLUTION-0.005% | G&W | -- | -- | -- |
| 37 | CALCIPOTRIENE-SOLUTION-0.005% | SANDOZ | 39.0% | -9.9% | 13.3% |
| 38 | CEFPODOXIME PROXETIL-FOR SUSPENSION-EQ100MGBASE/5ML | AUROBINDO | 6.6% | -4.4% | -5.0% |
| 39 | CEFPODOXIME PROXETIL-FOR SUSPENSION-EQ100MGBASE/5ML | SANDOZ | 71.2% | -24.6% | 23.7% |
| 40 | CEFPODOXIME PROXETIL-TABLET-EQ100MGBASE | AUROBINDO | -4.4% | -26.6% | -15.9% |
| 41 | CEFPODOXIME PROXETIL-TABLET-EQ100MGBASE | SANDOZ | 52.9% | -34.7% | -7.3% |
| 42 | CEFPODOXIME PROXETIL-TABLET-EQ200MGBASE | AUROBINDO | 5.9% | -23.9% | -16.6% |
| 43 | CEFPODOXIME PROXETIL-TABLET-EQ200MGBASE | SANDOZ | 64.0% | -14.2% | -13.6% |
| 44 | CICLOPIROX-CREAM-0.77% | GLENMARK | -26.3% | -41.2% | 12.0% |
| 45 | CICLOPIROX-CREAM-0.77% | G&W | -- | -- | -- |
| 46 | CICLOPIROX-CREAM-0.77% | PERRIGO | -8.0% | -37.0% | -11.9% |
| 47 | CICLOPIROX-SHAMPOO-1% | ACTAVIS | -11.2% | 37.0% | -11.6% |
| 48 | CICLOPIROX-SHAMPOO-1% | PERRIGO | 16.6% | 44.1% | 8.7% |
| 49 | CICLOPIROX-SHAMPOO-1% | SANDOZ | 84.0% | 57.8% | 11.0% |
| 50 | CICLOPIROX-SOLUTION-8% | G&W | -- | -- | -- |
| 51 | CICLOPIROX-SOLUTION-8% | PERRIGO | 38.9% | 11.3% | 82.4% |
| 52 | CICLOPIROX-SOLUTION-8% | SANDOZ | 23.3% | 29.6% | -14.4% |
| 53 | CLINDAMYCIN PHOSPHATE-CREAM-EQ2%BASE | GREENSTONE | 105.4% | 82.3% | 57.5% |
| 54 | CLINDAMYCIN PHOSPHATE-CREAM-EQ2%BASE | SANDOZ | 115.8% | 47.6% | 71.5% |

HIGHLY CONFIDENTIAL: SUBJECT TO PROTECTIVE ORDER

| # | Drug | Defendant | Overcharge (%), Net Price Data | Overcharge (%), AMP Data | Overcharge (%), IQVIA Data |
|---|---|---|---|---|---|
| 55 | CLINDAMYCIN PHOSPHATE-GEL-EQ1%BASE | GREENSTONE | 332.8% | 182.0% | 213.9% |
| 56 | CLINDAMYCIN PHOSPHATE-GEL-EQ1%BASE | SANDOZ | 361.1% | 153.8% | 265.0% |
| 57 | CLINDAMYCIN PHOSPHATE-LOTION-EQ1%BASE | GREENSTONE | 245.3% | 123.2% | 174.8% |
| 58 | CLINDAMYCIN PHOSPHATE-LOTION-EQ1%BASE | SANDOZ | 339.9% | 127.8% | 171.0% |
| 59 | CLINDAMYCIN PHOSPHATE-SOLUTION-EQ1%BASE | GREENSTONE | 375.9% | -- | 279.4% |
| 60 | CLINDAMYCIN PHOSPHATE-SOLUTION-EQ1%BASE | PERRIGO | 418.6% | 286.7% | 271.6% |
| 61 | CLINDAMYCIN PHOSPHATE-SOLUTION-EQ1%BASE | SANDOZ | 475.4% | 277.1% | 372.0% |
| 62 | CLINDAMYCIN PHOSPHATE-SOLUTION-EQ1%BASE | TARO | 433.1% | 639.6% | 466.0% |
| 63 | CLOBETASOL PROPIONATE EMOLLIENT-CREAM-0.05% | SANDOZ | 549.4% | 543.9% | 293.0% |
| 64 | CLOBETASOL PROPIONATE EMOLLIENT-CREAM-0.05% | TARO | 751.8% | 771.0% | 420.7% |
| 65 | CLOBETASOL PROPIONATE-CREAM-0.05% | SANDOZ | 1365.2% | 1277.2% | 464.8% |
| 66 | CLOBETASOL PROPIONATE-CREAM-0.05% | TARO | 424.0% | 650.6% | 634.4% |
| 67 | CLOBETASOL PROPIONATE-GEL-0.05% | SANDOZ | 1430.8% | 881.4% | 187.7% |
| 68 | CLOBETASOL PROPIONATE-GEL-0.05% | TARO | 836.9% | 620.3% | 389.6% |
| 69 | CLOBETASOL PROPIONATE-OINTMENT-0.05% | SANDOZ | 1845.7% | 1507.6% | 848.7% |
| 70 | CLOBETASOL PROPIONATE-OINTMENT-0.05% | TARO | 1320.9% | 1303.2% | 1122.4% |
| 71 | CLOBETASOL PROPIONATE-SOLUTION-0.05% | SANDOZ | 462.0% | 533.0% | 205.9% |
| 72 | CLOBETASOL PROPIONATE-SOLUTION-0.05% | TARO | 291.1% | 349.5% | 127.4% |
| 73 | CLOBETASOL PROPIONATE-SOLUTION-0.05% | WOCKHARDT | 360.8% | 383.5% | 171.9% |
| 74 | CLOTRIMAZOLE-CREAM-1% | SANDOZ | 255.7% | 109.1% | -49.5% |
| 75 | CLOTRIMAZOLE-CREAM-1% | TARO | -13.9% | 10.2% | -36.6% |
| 76 | DESONIDE-CREAM-0.05% | PERRIGO | 681.5% | 930.0% | 733.7% |
| 77 | DESONIDE-CREAM-0.05% | TARO | 1246.2% | 1736.8% | 1518.4% |
| 78 | DESONIDE-LOTION-0.05% | ACTAVIS | 610.6% | 340.1% | 417.2% |
| 79 | DESONIDE-LOTION-0.05% | SANDOZ | 637.1% | 248.1% | 559.7% |
| 80 | DESONIDE-OINTMENT-0.05% | PERRIGO | 708.8% | 565.2% | 633.3% |
| 81 | DESONIDE-OINTMENT-0.05% | SANDOZ | 1055.6% | 608.0% | 1005.7% |
| 82 | DESONIDE-OINTMENT-0.05% | TARO | 212.1% | 200.3% | 1191.9% |
| 83 | DESOXIMETASONE-OINTMENT-0.25% | GLENMARK | -33.2% | -14.3% | -19.8% |
| 84 | DESOXIMETASONE-OINTMENT-0.25% | SANDOZ | 33.6% | 17.1% | 12.9% |
| 85 | DESOXIMETASONE-OINTMENT-0.25% | TARO | 60.2% | 26.6% | 20.4% |
| 86 | ECONAZOLE NITRATE-CREAM-1% | PERRIGO | 52.4% | -49.8% | 176.6% |
| 87 | ECONAZOLE NITRATE-CREAM-1% | SANDOZ | 203.7% | 726.1% | 228.0% |
| 88 | ECONAZOLE NITRATE-CREAM-1% | TARO | 491.2% | 332.3% | 200.6% |
| 89 | ECONAZOLE NITRATE-CREAM-1% | TELIGENT | 1019.8% | -- | 373.7% |
| 90 | EPLERENONE-TABLET-25MG | GREENSTONE | -18.1% | -22.3% | -13.6% |
| 91 | EPLERENONE-TABLET-25MG | SANDOZ | 12.8% | 0.2% | -11.4% |
| 92 | EPLERENONE-TABLET-50MG | GREENSTONE | -16.5% | -23.9% | -17.4% |
| 93 | EPLERENONE-TABLET-50MG | SANDOZ | 22.7% | 4.6% | -13.8% |
| 94 | ERYTHROMYCIN-SOLUTION-2% | PERRIGO | 335.9% | 266.5% | 117.2% |
| 95 | ERYTHROMYCIN-SOLUTION-2% | SANDOZ | 507.3% | 332.3% | 174.1% |
| 96 | ERYTHROMYCIN-SOLUTION-2% | WOCKHARDT | 272.9% | 183.5% | 116.8% |
| 97 | ETHAMBUTOL HYDROCHLORIDE-TABLET-100MG | G&W | -- | -- | -- |
| 98 | ETHAMBUTOL HYDROCHLORIDE-TABLET-100MG | LUPIN | 477.9% | 6.5% | 5.3% |
| 99 | ETHAMBUTOL HYDROCHLORIDE-TABLET-400MG | G&W | -- | -- | -- |
| 100 | ETHAMBUTOL HYDROCHLORIDE-TABLET-400MG | LUPIN | 202.4% | -13.4% | -9.4% |
| 101 | FLUOCINOLONE ACETONIDE-CREAM-0.01% | G&W | 177.6% | -- | 177.8% |
| 102 | FLUOCINOLONE ACETONIDE-CREAM-0.01% | SANDOZ | 393.2% | 181.0% | 185.7% |
| 103 | FLUOCINOLONE ACETONIDE-CREAM-0.025% | G&W | 265.2% | -- | 186.2% |
| 104 | FLUOCINOLONE ACETONIDE-CREAM-0.025% | SANDOZ | 609.2% | 253.2% | 192.8% |
| 105 | FLUOCINOLONE ACETONIDE-OINTMENT-0.025% | G&W | 305.1% | -- | 176.4% |
| 106 | FLUOCINOLONE ACETONIDE-OINTMENT-0.025% | SANDOZ | 413.0% | 215.1% | 181.1% |
| 107 | FLUOCINONIDE-GEL-0.05% | G&W | 454.8% | -- | 131.1% |
| 108 | FLUOCINONIDE-GEL-0.05% | SANDOZ | -- | -- | -- |
| 109 | FLUOCINONIDE-GEL-0.05% | TARO | 209.1% | 427.4% | 347.5% |
| 110 | FLUOCINONIDE-OINTMENT-0.05% | SANDOZ | 346.9% | 107.6% | 155.0% |
| 111 | FLUOCINONIDE-OINTMENT-0.05% | TARO | 476.2% | 200.7% | 361.6% |
| 112 | FLUOCINONIDE-SOLUTION-0.05% | ACTAVIS | 638.8% | 498.3% | 402.0% |
| 113 | FLUOCINONIDE-SOLUTION-0.05% | SANDOZ | 605.7% | 243.6% | 488.2% |

HIGHLY CONFIDENTIAL: SUBJECT TO PROTECTIVE ORDER

| # | Drug | Defendant | Overcharge (%), Net Price Data | Overcharge (%), AMP Data | Overcharge (%), IQVIA Data |
|---|---|---|---|---|---|
| 114 | FLUOCINONIDE-SOLUTION-0.05% | TARO | 411.3% | 248.7% | 586.6% |
| 115 | GRISEOFULVIN MICROSIZE-TABLET-500MG | SANDOZ | -- | -- | -- |
| 116 | HALOBETASOL PROPIONATE-CREAM-0.05% | G&W | 243.9% | -- | 163.6% |
| 117 | HALOBETASOL PROPIONATE-CREAM-0.05% | PERRIGO | 155.3% | 151.1% | 205.7% |
| 118 | HALOBETASOL PROPIONATE-CREAM-0.05% | SANDOZ | 304.0% | 326.0% | 183.2% |
| 119 | HALOBETASOL PROPIONATE-CREAM-0.05% | TARO | 574.6% | 783.6% | 200.0% |
| 120 | HALOBETASOL PROPIONATE-OINTMENT-0.05% | G&W | 357.7% | -- | 237.8% |
| 121 | HALOBETASOL PROPIONATE-OINTMENT-0.05% | PERRIGO | 150.3% | 169.9% | 217.1% |
| 122 | HALOBETASOL PROPIONATE-OINTMENT-0.05% | TARO | 436.4% | 754.1% | 203.0% |
| 123 | HYDROCORTISONE ACETATE-SUPPOSITORY-25MG | G&W | -- | -- | -- |
| 124 | HYDROCORTISONE ACETATE-SUPPOSITORY-25MG | PERRIGO | -- | -- | -- |
| 125 | HYDROCORTISONE ACETATE-SUPPOSITORY-30MG | PERRIGO | -- | -- | -- |
| 126 | HYDROCORTISONE VALERATE-CREAM-0.2% | PERRIGO | 445.0% | 450.6% | 336.5% |
| 127 | HYDROCORTISONE VALERATE-CREAM-0.2% | TARO | 558.6% | 564.7% | 413.5% |
| 128 | KETOCONAZOLE-CREAM-2% | G&W | 432.0% | -- | 161.8% |
| 129 | KETOCONAZOLE-CREAM-2% | SANDOZ | 99.7% | 124.9% | 120.5% |
| 130 | KETOCONAZOLE-CREAM-2% | TARO | 227.8% | 128.4% | 178.9% |
| 131 | LATANOPROST-SOLUTION/DROPS-0.005% | GREENSTONE | -11.8% | -12.1% | 6.4% |
| 132 | LATANOPROST-SOLUTION/DROPS-0.005% | SANDOZ | 4.8% | -0.8% | 0.2% |
| 133 | LATANOPROST-SOLUTION/DROPS-0.005% | VALEANT/BAUSCH | -15.5% | -17.1% | 22.4% |
| 134 | LIDOCAINE-OINTMENT-5% | SANDOZ | 599.9% | 452.0% | 335.0% |
| 135 | LIDOCAINE-OINTMENT-5% | TARO | 294.5% | 215.2% | 159.7% |
| 136 | METHAZOLAMIDE-TABLET-25MG | PERRIGO | 391.7% | 492.0% | 302.8% |
| 137 | METHAZOLAMIDE-TABLET-25MG | SANDOZ | 318.3% | 299.2% | 352.0% |
| 138 | METHAZOLAMIDE-TABLET-50MG | PERRIGO | 632.7% | 628.2% | 355.6% |
| 139 | METHAZOLAMIDE-TABLET-50MG | SANDOZ | 575.8% | 355.1% | 378.7% |
| 140 | METHYLPHENIDATE HCL-TABLET, EXTENDED RELEASE-20MG | MALLINCKRODT | 683.0% | 411.4% | -- |
| 141 | METHYLPHENIDATE HCL-TABLET, EXTENDED RELEASE-20MG | SANDOZ | 178.0% | 117.2% | -- |
| 142 | METHYLPHENIDATE HCL-TABLET-10MG | ACTAVIS | 224.8% | 289.7% | 128.3% |
| 143 | METHYLPHENIDATE HCL-TABLET-10MG | MALLINCKRODT | 488.3% | 228.2% | 297.8% |
| 144 | METHYLPHENIDATE HCL-TABLET-10MG | SANDOZ | 136.7% | 181.3% | 192.9% |
| 145 | METHYLPHENIDATE HCL-TABLET-10MG | SUN | 225.2% | -- | 89.2% |
| 146 | METHYLPHENIDATE HCL-TABLET-20MG | ACTAVIS | 247.1% | 286.8% | 136.8% |
| 147 | METHYLPHENIDATE HCL-TABLET-20MG | MALLINCKRODT | 611.4% | 240.5% | 376.7% |
| 148 | METHYLPHENIDATE HCL-TABLET-20MG | SANDOZ | 228.3% | 186.7% | 231.3% |
| 149 | METHYLPHENIDATE HCL-TABLET-20MG | SUN | 355.2% | -- | 120.4% |
| 150 | METHYLPHENIDATE HCL-TABLET-5MG | ACTAVIS | 215.9% | 353.7% | 42.7% |
| 151 | METHYLPHENIDATE HCL-TABLET-5MG | MALLINCKRODT | 486.3% | 253.3% | 194.4% |
| 152 | METHYLPHENIDATE HCL-TABLET-5MG | SANDOZ | 119.7% | 176.7% | 186.7% |
| 153 | METHYLPHENIDATE HCL-TABLET-5MG | SUN | 222.0% | -- | 91.5% |
| 154 | METRONIDAZOLE-CREAM-0.75% | ACTAVIS | 177.3% | 218.5% | 206.1% |
| 155 | METRONIDAZOLE-CREAM-0.75% | G&W | 208.2% | -- | 185.6% |
| 156 | METRONIDAZOLE-CREAM-0.75% | SANDOZ | 221.6% | 186.4% | 207.3% |
| 157 | METRONIDAZOLE-GEL-0.75% | G&W | 285.4% | -- | 48.6% |
| 158 | METRONIDAZOLE-GEL-0.75% | SANDOZ | 839.5% | 266.1% | 216.0% |
| 159 | METRONIDAZOLE-GEL-0.75% | TARO | 194.4% | 76.2% | 160.9% |
| 160 | METRONIDAZOLE-LOTION-0.75% | ACTAVIS | 98.3% | 39.6% | 115.0% |
| 161 | METRONIDAZOLE-LOTION-0.75% | SANDOZ | 205.0% | 51.3% | 132.3% |
| 162 | MOMETASONE FUROATE-CREAM-0.1% | GLENMARK | -14.7% | -5.1% | -1.1% |
| 163 | MOMETASONE FUROATE-CREAM-0.1% | G&W | -- | -- | -- |
| 164 | MOMETASONE FUROATE-OINTMENT-0.1% | GLENMARK | 64.2% | 12.1% | -18.6% |
| 165 | MOMETASONE FUROATE-OINTMENT-0.1% | G&W | -- | -- | -- |
| 166 | MOMETASONE FUROATE-SOLUTION-0.1% | GLENMARK | -12.5% | -43.7% | -12.6% |
| 167 | MOMETASONE FUROATE-SOLUTION-0.1% | G&W | -- | -- | -- |
| 168 | NYSTATIN-OINTMENT-100,000UNITS/GM | ACTAVIS | 357.5% | 309.0% | 308.4% |
| 169 | NYSTATIN-OINTMENT-100,000UNITS/GM | PERRIGO | 252.1% | 185.5% | 245.0% |
| 170 | NYSTATIN-OINTMENT-100,000UNITS/GM | SANDOZ | 311.6% | 200.9% | 294.8% |
| 171 | NYSTATIN; TRIAMCINOLONE ACETONIDE-CREAM-100,000UNITS/GM;0.1% | SANDOZ | 2835.9% | 2239.6% | 2881.3% |
| 172 | NYSTATIN; TRIAMCINOLONE ACETONIDE-CREAM-100,000UNITS/GM;0.1% | TARO | 1749.3% | 1716.1% | 2232.4% |

HIGHLY CONFIDENTIAL: SUBJECT TO PROTECTIVE ORDER

| # | Drug | Defendant | Overcharge (%), Net Price Data | Overcharge (%), AMP Data | Overcharge (%), IQVIA Data |
|---|---|---|---|---|---|
| 173 | NYSTATIN; TRIAMCINOLONE ACETONIDE-OINTMENT-100,000UNITS/GM;0.1% | SANDOZ | 2479.0% | 1953.2% | 2219.1% |
| 174 | NYSTATIN; TRIAMCINOLONE ACETONIDE-OINTMENT-100,000UNITS/GM;0.1% | TARO | 1371.4% | 1594.7% | 2050.2% |
| 175 | PHENYTOIN SODIUM-CAPSULE-100MGEXTENDED | AMNEAL | -22.8% | 9.8% | 14.3% |
| 176 | PHENYTOIN SODIUM-CAPSULE-100MGEXTENDED | MYLAN | 78.7% | -- | 41.8% |
| 177 | PHENYTOIN SODIUM-CAPSULE-100MGEXTENDED | SUN | 64.7% | -- | 28.6% |
| 178 | PHENYTOIN SODIUM-CAPSULE-100MGEXTENDED | TARO | 118.9% | 208.1% | 72.4% |
| 179 | PROCHLORPERAZINE-SUPPOSITORY-25MG | G&W | -- | -- | -- |
| 180 | PROCHLORPERAZINE-SUPPOSITORY-25MG | PERRIGO | 43.3% | 78.4% | 253.4% |
| 181 | PROMETHAZINE HYDROCHLORIDE-SUPPOSITORY-12.5MG | ACTAVIS | 662.0% | 502.8% | 456.2% |
| 182 | PROMETHAZINE HYDROCHLORIDE-SUPPOSITORY-12.5MG | G&W | -- | -- | -- |
| 183 | PROMETHAZINE HYDROCHLORIDE-SUPPOSITORY-12.5MG | PERRIGO | 150.1% | 118.4% | 378.3% |
| 184 | PROMETHAZINE HYDROCHLORIDE-SUPPOSITORY-25MG | ACTAVIS | 526.1% | 594.5% | 447.7% |
| 185 | PROMETHAZINE HYDROCHLORIDE-SUPPOSITORY-25MG | G&W | -- | -- | -- |
| 186 | PROMETHAZINE HYDROCHLORIDE-SUPPOSITORY-25MG | PERRIGO | 139.0% | 76.5% | 364.0% |
| 187 | TERCONAZOLE-CREAM-0.8% | ACTAVIS | 107.6% | 131.4% | 52.8% |
| 188 | TERCONAZOLE-CREAM-0.8% | SANDOZ | -- | -- | -- |
| 189 | TERCONAZOLE-CREAM-0.8% | TARO | 72.0% | 71.6% | 90.3% |
| 190 | TRIAMCINOLONE ACETONIDE-CREAM-0.025% | PERRIGO | 61.5% | 34.9% | 64.9% |
| 191 | TRIAMCINOLONE ACETONIDE-CREAM-0.025% | SANDOZ | -- | -- | -- |
| 192 | TRIAMCINOLONE ACETONIDE-CREAM-0.1% | PERRIGO | 45.4% | 17.0% | 43.9% |
| 193 | TRIAMCINOLONE ACETONIDE-CREAM-0.1% | SANDOZ | -- | -- | -- |
| 194 | TRIAMCINOLONE ACETONIDE-CREAM-0.5% | PERRIGO | 80.1% | 53.0% | 123.3% |
| 195 | TRIAMCINOLONE ACETONIDE-CREAM-0.5% | SANDOZ | -- | -- | -- |
| 196 | TRIAMCINOLONE ACETONIDE-OINTMENT-0.025% | PERRIGO | 76.9% | 45.6% | 79.9% |
| 197 | TRIAMCINOLONE ACETONIDE-OINTMENT-0.025% | SANDOZ | -- | -- | -- |
| 198 | TRIAMCINOLONE ACETONIDE-OINTMENT-0.1% | PERRIGO | 86.3% | 45.7% | 72.5% |
| 199 | TRIAMCINOLONE ACETONIDE-OINTMENT-0.1% | SANDOZ | -- | -- | -- |
| 200 | TRIAMCINOLONE ACETONIDE-OINTMENT-0.5% | PERRIGO | 64.8% | 55.5% | 92.3% |
| 201 | TRIAMCINOLONE ACETONIDE-PASTE-0.1% | TARO | -15.5% | -21.3% | 1.8% |

HIGHLY CONFIDENTIAL: SUBJECT TO PROTECTIVE ORDER

**Appendix C Table 11**

Updated Overcharge Estimates by Defendant and Drug at Issue (PI Drugs)

| | | | | Before and After Disgorgement | | | Difference in Difference Disgorgement | | |
|---|---|---|---|---|---|---|---|---|---|
| # | Defendant | Drug | Affected Defendant Net Revenues | Overcharge (%) | But-For Revenues | Increase in Net Revenues | Overcharge (%) | But-For Revenues | Increase in Net Revenues |
| 1 | SUN/MUTUAL/TARO | ACETAZOLAMIDE-TABLET-125MG | $20,000,402 | 163.8% | $7,580,297 | $12,420,105 | 256.1% | $5,616,184 | $14,384,218 |
| 2 | LANNETT | ACETAZOLAMIDE-TABLET-250MG | $99,709,870 | 109.9% | $47,496,911 | $52,212,960 | 155.7% | $39,000,118 | $60,709,752 |
| 3 | SUN/MUTUAL/TARO | ACETAZOLAMIDE-TABLET-250MG | $60,182,013 | 117.6% | $27,662,384 | $32,519,629 | 141.5% | $24,915,087 | $35,266,926 |
| 4 | GLENMARK | ALCLOMETASONE DIPROPIONATE-CREAM-0.05% | $7,389,798 | 171.1% | $5,950,781 | $1,439,017 | 146.7% | $5,978,662 | $1,411,136 |
| 5 | SANDOZ | ALCLOMETASONE DIPROPIONATE-CREAM-0.05% | $2,760,960 | 333.6% | $2,223,318 | $537,642 | 285.2% | $2,233,734 | $527,225 |
| 6 | SUN/MUTUAL/TARO | ALCLOMETASONE DIPROPIONATE-CREAM-0.05% | $4,328,190 | 31.0% | $3,485,361 | $842,829 | 13.5% | $3,501,690 | $826,499 |
| 7 | GLENMARK | ALCLOMETASONE DIPROPIONATE-OINTMENT-0.05% | $4,224,961 | 245.0% | $2,888,106 | $1,336,855 | 245.0% | $2,846,835 | $1,378,126 |
| 8 | SANDOZ | ALCLOMETASONE DIPROPIONATE-OINTMENT-0.05% | $3,209,467 | 63.8% | $2,193,933 | $1,015,534 | 48.7% | $2,162,582 | $1,046,885 |
| 9 | SUN/MUTUAL/TARO | ALCLOMETASONE DIPROPIONATE-OINTMENT-0.05% | $4,465,786 | 331.2% | $3,052,730 | $1,413,056 | 265.1% | $3,009,106 | $1,456,680 |
| 10 | ACTAVIS | AMMONIUM LACTATE-CREAM-EQ12%BASE | $874,545 | 73.5% | $504,014 | $370,531 | 72.9% | $505,832 | $368,714 |
| 11 | PERRIGO | AMMONIUM LACTATE-CREAM-EQ12%BASE | $43,844,436 | 98.1% | $22,134,729 | $21,709,707 | 94.0% | $22,604,473 | $21,239,963 |
| 12 | SUN/MUTUAL/TARO | AMMONIUM LACTATE-CREAM-EQ12%BASE | $9,562,041 | 55.3% | $6,155,840 | $3,406,201 | 48.6% | $6,434,674 | $3,127,367 |
| 13 | ACTAVIS | AMMONIUM LACTATE-LOTION-EQ12%BASE | $942,053 | -4.8% | $989,660 | -$47,607 | 8.3% | $870,059 | $71,994 |
| 14 | PERRIGO | AMMONIUM LACTATE-LOTION-EQ12%BASE | $43,427,042 | 118.0% | $19,917,173 | $23,509,869 | 145.4% | $17,698,543 | $25,728,499 |
| 15 | SUN/MUTUAL/TARO | AMMONIUM LACTATE-LOTION-EQ12%BASE | $9,459,213 | 97.7% | $4,785,494 | $4,673,719 | 125.2% | $4,200,020 | $5,259,193 |
| 16 | SANDOZ | BETAMETHASONE DIPROPIONATE-CREAM-EQ0.05%BASE | $62,865,670 | 2210.2% | $2,721,274 | $60,144,396 | 2209.9% | $2,721,546 | $60,144,124 |
| 17 | SUN/MUTUAL/TARO | BETAMETHASONE DIPROPIONATE-CREAM-EQ0.05%BASE | $42,276,330 | 1498.3% | $2,645,149 | $39,631,181 | 1464.6% | $2,702,095 | $39,574,235 |
| 18 | SANDOZ | BETAMETHASONE DIPROPIONATE-LOTION, AUGMENTED-EQ0.05%BASE | $14,563,279 | 86.9% | $7,792,044 | $6,771,235 | 92.6% | $7,559,486 | $7,003,793 |
| 19 | SUN/MUTUAL/TARO | BETAMETHASONE DIPROPIONATE-LOTION, AUGMENTED-EQ0.05%BASE | $24,316,524 | 220.7% | $7,582,600 | $16,733,924 | 224.2% | $7,501,148 | $16,815,376 |
| 20 | PERRIGO | BETAMETHASONE DIPROPIONATE-LOTION-EQ0.05%BASE | $18,508,440 | 270.0% | $5,001,945 | $13,506,495 | 272.6% | $4,967,054 | $13,541,386 |
| 21 | SANDOZ | BETAMETHASONE DIPROPIONATE-LOTION-EQ0.05%BASE | $10,845,695 | 581.9% | $1,590,531 | $9,255,163 | 618.4% | $1,509,786 | $9,335,908 |
| 22 | SUN/MUTUAL/TARO | BETAMETHASONE DIPROPIONATE-LOTION-EQ0.05%BASE | $0 | 360.3% | $0 | $0 | 364.8% | $0 | $0 |
| 23 | ACTAVIS | BETAMETHASONE DIPROPIONATE; CLOTRIMAZOLE-CREAM-EQ0.05%BASE;1% | $77,666,255 | 260.2% | $21,561,749 | $56,104,506 | 293.3% | $19,749,356 | $57,916,899 |
| 24 | SANDOZ | BETAMETHASONE DIPROPIONATE; CLOTRIMAZOLE-CREAM-EQ0.05%BASE;1% | $128,040,330 | 289.8% | $32,849,788 | $95,190,542 | 330.9% | $29,717,773 | $98,322,557 |
| 25 | SUN/MUTUAL/TARO | BETAMETHASONE DIPROPIONATE; CLOTRIMAZOLE-CREAM-EQ0.05%BASE;1% | $78,116,516 | 227.3% | $23,864,727 | $54,251,789 | 249.1% | $22,374,043 | $55,742,473 |
| 26 | SANDOZ | BETAMETHASONE DIPROPIONATE; CLOTRIMAZOLE-LOTION-EQ0.05%BASE;1% | $15,954,981 | 632.9% | $2,177,051 | $13,777,930 | 727.9% | $1,927,206 | $14,027,775 |
| 27 | SUN/MUTUAL/TARO | BETAMETHASONE DIPROPIONATE; CLOTRIMAZOLE-LOTION-EQ0.05%BASE;1% | $40,665,071 | 448.8% | $7,410,290 | $33,254,782 | 472.6% | $7,101,241 | $33,563,830 |
| 28 | SANDOZ | BETAMETHASONE VALERATE-CREAM-EQ0.1%BASE | $23,149,234 | 590.3% | $3,353,692 | $19,795,543 | 644.5% | $3,109,188 | $20,040,046 |
| 29 | SUN/MUTUAL/TARO | BETAMETHASONE VALERATE-CREAM-EQ0.1%BASE | $7,816,669 | 410.8% | $1,530,292 | $6,286,377 | 440.1% | $1,447,385 | $6,369,284 |
| 30 | G&W | BETAMETHASONE VALERATE-LOTION-EQ0.1%BASE | $10,423,113 | 360.3% | $2,264,236 | $8,158,878 | 364.8% | $2,242,605 | $8,180,508 |
| 31 | SANDOZ | BETAMETHASONE VALERATE-LOTION-EQ0.1%BASE | $19,346,978 | 977.7% | $1,795,236 | $17,551,743 | 977.7% | $1,795,236 | $17,551,743 |
| 32 | ACTAVIS | BETAMETHASONE VALERATE-OINTMENT-EQ0.1%BASE | $12,092,686 | 592.0% | $1,747,526 | $10,345,161 | 592.0% | $1,747,526 | $10,345,161 |
| 33 | SANDOZ | BETAMETHASONE VALERATE-OINTMENT-EQ0.1%BASE | $9,663,451 | 474.9% | $1,680,768 | $7,982,683 | 474.9% | $1,680,768 | $7,982,683 |
| 34 | MYLAN | BROMOCRIPTINE MESYLATE-TABLET-EQ2.5MGBASE | $8,684,420 | 159.3% | $3,348,561 | $5,335,860 | 123.6% | $3,883,865 | $4,800,556 |
| 35 | PERRIGO | BROMOCRIPTINE MESYLATE-TABLET-EQ2.5MGBASE | $27,943,828 | -8.6% | $30,572,360 | -$2,628,533 | -24.5% | $37,002,902 | -$9,059,074 |
| 36 | SANDOZ | BROMOCRIPTINE MESYLATE-TABLET-EQ2.5MGBASE | $25,872,612 | 83.7% | $14,081,825 | $11,790,787 | 42.5% | $18,153,892 | $7,718,720 |
| 37 | G&W | CALCIPOTRIENE-SOLUTION-0.005% | $14,766,682 | 360.3% | $3,207,799 | $11,558,884 | 364.8% | $3,177,154 | $11,589,528 |
| 38 | SANDOZ | CALCIPOTRIENE-SOLUTION-0.005% | $1,687,575 | 99.1% | $847,633 | $839,942 | 39.2% | $1,212,025 | $475,550 |
| 39 | AUROBINDO | CEFPODOXIME PROXETIL-FOR SUSPENSION-EQ100MGBASE/5ML | $40,010 | 103.2% | $19,687 | $20,324 | 24.1% | $32,231 | $7,779 |
| 40 | SANDOZ | CEFPODOXIME PROXETIL-FOR SUSPENSION-EQ100MGBASE/5ML | $1,819,815 | 109.8% | $867,218 | $952,597 | 65.1% | $1,102,009 | $717,806 |
| 41 | AUROBINDO | CEFPODOXIME PROXETIL-TABLET-EQ100MGBASE | $5,134,717 | 346.7% | $1,149,497 | $3,985,220 | 263.1% | $1,414,145 | $3,720,573 |
| 42 | SANDOZ | CEFPODOXIME PROXETIL-TABLET-EQ100MGBASE | $8,715,177 | 83.2% | $4,757,232 | $3,957,945 | 9.3% | $7,972,243 | $742,933 |
| 43 | AUROBINDO | CEFPODOXIME PROXETIL-TABLET-EQ200MGBASE | $25,714,292 | 407.6% | $5,065,977 | $20,648,315 | 264.9% | $7,046,612 | $18,667,680 |
| 44 | SANDOZ | CEFPODOXIME PROXETIL-TABLET-EQ200MGBASE | $43,100,930 | 103.4% | $21,192,442 | $21,908,489 | 23.3% | $34,954,408 | $8,146,522 |
| 45 | G&W | CICLOPIROX-CREAM-0.77% | $17,533,293 | 360.3% | $2,751,554 | $9,914,865 | 364.8% | $2,725,268 | $9,941,151 |
| 46 | GLENMARK | CICLOPIROX-CREAM-0.77% | $5,430,213 | -6.8% | $5,170,150 | -$352,907 | -12.8% | $5,526,207 | -$708,964 |
| 47 | PERRIGO | CICLOPIROX-CREAM-0.77% | $8,768,654 | -18.3% | $9,535,144 | -$1,740,909 | -22.6% | $10,065,204 | -$2,270,969 |
| 48 | ACTAVIS | CICLOPIROX-SHAMPOO-1% | $9,098,916 | -25.2% | $12,172,207 | -$3,073,292 | -13.7% | $10,540,819 | -$1,441,903 |
| 49 | PERRIGO | CICLOPIROX-SHAMPOO-1% | $14,950,066 | -2.3% | $15,307,084 | -$357,018 | 14.1% | $13,106,597 | $1,843,469 |
| 50 | SANDOZ | CICLOPIROX-SHAMPOO-1% | $3,242,029 | 84.0% | $1,761,559 | $1,480,470 | 84.0% | $1,761,559 | $1,480,470 |
| 51 | G&W | CICLOPIROX-SOLUTION-8% | $20,546,720 | 360.3% | $4,463,409 | $16,083,311 | 364.8% | $4,420,769 | $16,125,951 |
| 52 | PERRIGO | CICLOPIROX-SOLUTION-8% | $16,166,789 | 131.0% | $6,999,643 | $9,167,147 | 84.9% | $8,741,301 | $7,425,488 |
| 53 | SANDOZ | CICLOPIROX-SOLUTION-8% | $551,030 | 62.1% | $339,981 | $211,049 | 5.0% | $524,890 | $26,140 |
| 54 | GREENSTONE | CLINDAMYCIN PHOSPHATE-CREAM-EQ2%BASE | $54,915,449 | 105.4% | $26,738,239 | $28,177,210 | 105.4% | $26,738,239 | $28,177,210 |
| 55 | SANDOZ | CLINDAMYCIN PHOSPHATE-CREAM-EQ2%BASE | $34,480,171 | 114.1% | $16,101,049 | $18,379,123 | 114.1% | $16,101,049 | $18,379,123 |
| 56 | GREENSTONE | CLINDAMYCIN PHOSPHATE-GEL-EQ1%BASE | $170,055,375 | 332.8% | $39,288,196 | $130,767,179 | 332.8% | $39,288,196 | $130,767,179 |
| 57 | SANDOZ | CLINDAMYCIN PHOSPHATE-GEL-EQ1%BASE | $216,809,389 | 356.9% | $47,456,741 | $169,352,648 | 356.9% | $47,456,741 | $169,352,648 |
| 58 | GREENSTONE | CLINDAMYCIN PHOSPHATE-LOTION-EQ1%BASE | $180,346,437 | 245.3% | $52,225,958 | $128,120,479 | 245.3% | $52,225,958 | $128,120,479 |
| 59 | SANDOZ | CLINDAMYCIN PHOSPHATE-LOTION-EQ1%BASE | $158,759,063 | 336.0% | $36,411,612 | $122,347,451 | 336.0% | $36,411,612 | $122,347,451 |
| 60 | GREENSTONE | CLINDAMYCIN PHOSPHATE-SOLUTION-EQ1%BASE | $60,724,029 | 375.9% | $12,760,309 | $47,963,720 | 375.9% | $12,760,309 | $47,963,720 |
| 61 | PERRIGO | CLINDAMYCIN PHOSPHATE-SOLUTION-EQ1%BASE | $34,459,565 | 418.6% | $6,645,146 | $27,814,419 | 418.6% | $6,645,146 | $27,814,419 |
| 62 | SANDOZ | CLINDAMYCIN PHOSPHATE-SOLUTION-EQ1%BASE | $23,836,233 | 419.7% | $4,586,452 | $19,249,781 | 450.0% | $4,333,636 | $19,502,597 |
| 63 | SUN/MUTUAL/TARO | CLINDAMYCIN PHOSPHATE-SOLUTION-EQ1%BASE | $8,050,566 | 442.4% | $1,484,299 | $6,566,267 | 452.0% | $1,458,549 | $6,592,017 |
| 64 | SANDOZ | CLOBETASOL PROPIONATE EMOLLIENT-CREAM-0.05% | $10,236,113 | 648.3% | $1,367,962 | $8,868,151 | 696.7% | $1,284,824 | $8,951,289 |
| 65 | SUN/MUTUAL/TARO | CLOBETASOL PROPIONATE EMOLLIENT-CREAM-0.05% | $10,319,350 | 571.1% | $1,537,597 | $8,781,753 | 624.6% | $1,424,215 | $8,895,135 |

HIGHLY CONFIDENTIAL: SUBJECT TO PROTECTIVE ORDER

| # | Defendant | Drug | Affected Defendant Net Revenues | Overcharge (%) | But-For Revenues | Increase in Net Revenues | Overcharge (%) | But-For Revenues | Increase in Net Revenues |
|---|---|---|---|---|---|---|---|---|---|
| 66 | SANDOZ | CLOBETASOL PROPIONATE-CREAM-0.05% | $89,285,616 | 1396.5% | $5,966,380 | $83,319,236 | 1596.9% | $5,261,628 | $84,023,988 |
| 67 | SUN/MUTUAL/TARO | CLOBETASOL PROPIONATE-CREAM-0.05% | $75,600,016 | 277.4% | $20,032,511 | $55,567,505 | 351.5% | $16,745,951 | $58,854,065 |
| 68 | SANDOZ | CLOBETASOL PROPIONATE-GEL-0.05% | $2,168,135 | 1517.2% | $383,346 | $1,784,789 | 1616.7% | $384,013 | $1,784,122 |
| 69 | SUN/MUTUAL/TARO | CLOBETASOL PROPIONATE-GEL-0.05% | $572,834 | 766.0% | $101,282 | $471,551 | 748.6% | $101,458 | $471,375 |
| 70 | SANDOZ | CLOBETASOL PROPIONATE-OINTMENT-0.05% | $146,745,906 | 2331.5% | $6,035,161 | $140,710,745 | 2597.5% | $5,440,128 | $141,305,778 |
| 71 | SUN/MUTUAL/TARO | CLOBETASOL PROPIONATE-OINTMENT-0.05% | $105,899,083 | 792.7% | $11,862,553 | $94,036,530 | 936.7% | $10,215,300 | $95,683,783 |
| 72 | SANDOZ | CLOBETASOL PROPIONATE-SOLUTION-0.05% | $44,488,651 | 609.1% | $6,274,126 | $38,214,526 | 594.3% | $6,407,916 | $38,080,735 |
| 73 | SUN/MUTUAL/TARO | CLOBETASOL PROPIONATE-SOLUTION-0.05% | $20,670,193 | 253.7% | $5,843,867 | $14,826,326 | 243.3% | $6,021,839 | $14,648,354 |
| 74 | WOCKHARDT | CLOBETASOL PROPIONATE-SOLUTION-0.05% | $22,512,109 | 313.0% | $5,450,751 | $17,061,359 | 340.2% | $5,114,366 | $17,397,744 |
| 75 | SANDOZ | CLOTRIMAZOLE-CREAM-1% | $14,021,507 | 48.9% | $9,909,020 | $4,846,916 | 58.5% | $9,307,732 | $5,448,204 |
| 76 | SUN/MUTUAL/TARO | CLOTRIMAZOLE-CREAM-1% | $20,290,637 | -14.2% | $9,838,296 | -$1,394,917 | -4.9% | $8,880,719 | -$437,341 |
| 77 | PERRIGO | DESONIDE-CREAM-0.05% | $79,506,918 | 681.5% | $10,173,070 | $69,333,848 | 681.5% | $10,173,070 | $69,333,848 |
| 78 | SUN/MUTUAL/TARO | DESONIDE-CREAM-0.05% | $69,380,074 | 1197.9% | $5,345,739 | $64,034,335 | 1240.5% | $5,175,830 | $64,204,244 |
| 79 | ACTAVIS | DESONIDE-LOTION-0.05% | $55,763,467 | 610.6% | $7,846,903 | $47,916,564 | 610.6% | $7,846,903 | $47,916,564 |
| 80 | SANDOZ | DESONIDE-LOTION-0.05% | $152,550,607 | 634.6% | $20,767,648 | $131,782,959 | 634.6% | $20,767,648 | $131,782,959 |
| 81 | PERRIGO | DESONIDE-OINTMENT-0.05% | $44,186,915 | 708.8% | $5,463,167 | $38,723,747 | 708.8% | $5,463,167 | $38,723,747 |
| 82 | SANDOZ | DESONIDE-OINTMENT-0.05% | $31,263,741 | 921.6% | $3,060,135 | $28,203,606 | 1020.5% | $2,790,049 | $28,473,692 |
| 83 | SUN/MUTUAL/TARO | DESONIDE-OINTMENT-0.05% | $17,976,728 | 192.2% | $6,151,390 | $11,825,338 | 210.2% | $5,795,478 | $12,181,250 |
| 84 | GLENMARK | DESOXIMETASONE-OINTMENT-0.25% | $8,220,562 | -33.2% | $12,117,822 | -$4,017,715 | -33.2% | $12,117,822 | -$4,017,715 |
| 85 | SANDOZ | DESOXIMETASONE-OINTMENT-0.25% | $16,180,784 | 33.6% | $12,015,807 | $4,040,842 | 33.6% | $12,015,807 | $4,040,842 |
| 86 | SUN/MUTUAL/TARO | DESOXIMETASONE-OINTMENT-0.25% | $38,407,332 | 95.4% | $19,277,755 | $18,395,553 | 60.5% | $23,470,677 | $14,202,632 |
| 87 | PERRIGO | ECONAZOLE NITRATE-CREAM-1% | $29,983,448 | 119.9% | $13,635,075 | $16,348,373 | 171.2% | $11,054,587 | $18,928,861 |
| 88 | SANDOZ | ECONAZOLE NITRATE-CREAM-1% | $3,531,003 | 157.1% | $1,373,253 | $2,157,751 | 180.1% | $1,260,845 | $2,270,158 |
| 89 | SUN/MUTUAL/TARO | ECONAZOLE NITRATE-CREAM-1% | $7,487,831 | 399.4% | $1,499,421 | $5,988,410 | 471.1% | $1,311,117 | $6,176,714 |
| 90 | TELIGENT | ECONAZOLE NITRATE-CREAM-1% | $100,903,448 | 287.1% | $26,064,236 | $74,839,212 | 336.9% | $23,093,798 | $77,809,650 |
| 91 | GREENSTONE | EPLERENONE-TABLET-25MG | $42,732,625 | 154.9% | $10,639,165 | $16,482,749 | 100.4% | $13,534,501 | $13,587,413 |
| 92 | SANDOZ | EPLERENONE-TABLET-25MG | $14,408,503 | 24.2% | $8,331,973 | $2,017,134 | -15.0% | $12,173,972 | -$1,824,865 |
| 93 | GREENSTONE | EPLERENONE-TABLET-50MG | $30,951,412 | 144.4% | $8,329,724 | $12,031,459 | 89.7% | $10,730,931 | $9,630,252 |
| 94 | SANDOZ | EPLERENONE-TABLET-50MG | $8,447,750 | 59.1% | $3,680,594 | $2,175,449 | -2.8% | $6,027,150 | -$171,106 |
| 95 | PERRIGO | ERYTHROMYCIN-SOLUTION-2% | $16,226,689 | 335.9% | $3,722,730 | $12,503,959 | 335.9% | $3,722,730 | $12,503,959 |
| 96 | SANDOZ | ERYTHROMYCIN-SOLUTION-2% | $1,023,727 | 563.2% | $154,363 | $869,365 | 563.2% | $154,363 | $869,365 |
| 97 | WOCKHARDT | ERYTHROMYCIN-SOLUTION-2% | $3,614,084 | 182.0% | $1,281,509 | $2,332,575 | 182.0% | $1,281,509 | $2,332,575 |
| 98 | G&W | ETHAMBUTOL HYDROCHLORIDE-TABLET-100MG | $0 | 360.3% | $0 | $0 | 364.8% | $0 | $0 |
| 99 | LUPIN | ETHAMBUTOL HYDROCHLORIDE-TABLET-100MG | $452,143 | 474.3% | $78,728 | $373,415 | 474.3% | $78,728 | $373,415 |
| 100 | G&W | ETHAMBUTOL HYDROCHLORIDE-TABLET-400MG | $636,801 | 360.3% | $138,334 | $498,467 | 364.8% | $137,012 | $499,789 |
| 101 | LUPIN | ETHAMBUTOL HYDROCHLORIDE-TABLET-400MG | $4,561,191 | 204.7% | $1,496,881 | $3,064,310 | 204.7% | $1,496,881 | $3,064,310 |
| 102 | G&W | FLUOCINOLONE ACETONIDE-CREAM-0.01% | $8,574,815 | 177.6% | $3,089,253 | $5,485,561 | 177.6% | $3,089,253 | $5,485,561 |
| 103 | SANDOZ | FLUOCINOLONE ACETONIDE-CREAM-0.01% | $5,930,093 | 392.0% | $1,205,314 | $4,724,779 | 392.0% | $1,205,314 | $4,724,779 |
| 104 | G&W | FLUOCINOLONE ACETONIDE-CREAM-0.025% | $11,925,339 | 265.2% | $3,265,019 | $8,660,320 | 265.2% | $3,265,019 | $8,660,320 |
| 105 | SANDOZ | FLUOCINOLONE ACETONIDE-CREAM-0.025% | $5,308,826 | 610.6% | $747,045 | $4,561,780 | 610.6% | $747,045 | $4,561,780 |
| 106 | G&W | FLUOCINOLONE ACETONIDE-OINTMENT-0.025% | $13,214,878 | 305.1% | $3,262,335 | $9,952,542 | 305.1% | $3,262,335 | $9,952,542 |
| 107 | SANDOZ | FLUOCINOLONE ACETONIDE-OINTMENT-0.025% | $6,073,092 | 414.1% | $1,181,244 | $4,891,848 | 414.1% | $1,181,244 | $4,891,848 |
| 108 | G&W | FLUOCINONIDE-GEL-0.05% | $1,216,530 | 454.8% | $219,282 | $997,248 | 454.8% | $219,282 | $997,248 |
| 109 | SANDOZ | FLUOCINONIDE-GEL-0.05% | -$170,227 | 360.3% | -$36,979 | -$133,249 | 364.8% | -$36,626 | -$133,602 |
| 110 | SUN/MUTUAL/TARO | FLUOCINONIDE-GEL-0.05% | $11,555,479 | 169.5% | $4,288,168 | $7,267,311 | 163.3% | $4,388,378 | $7,167,101 |
| 111 | SANDOZ | FLUOCINONIDE-OINTMENT-0.05% | $969,191 | 346.9% | $216,884 | $752,307 | 346.9% | $216,884 | $752,307 |
| 112 | SUN/MUTUAL/TARO | FLUOCINONIDE-OINTMENT-0.05% | $41,693,154 | 497.3% | $6,979,916 | $34,713,238 | 470.2% | $7,312,147 | $34,381,007 |
| 113 | ACTAVIS | FLUOCINONIDE-SOLUTION-0.05% | $14,785,595 | 638.8% | $2,001,413 | $12,784,182 | 638.8% | $2,001,413 | $12,784,182 |
| 114 | SANDOZ | FLUOCINONIDE-SOLUTION-0.05% | $47,434,538 | 1071.9% | $4,047,707 | $43,386,831 | 1000.7% | $4,309,624 | $43,124,914 |
| 115 | SUN/MUTUAL/TARO | FLUOCINONIDE-SOLUTION-0.05% | $44,775,641 | 323.9% | $10,562,017 | $34,213,624 | 292.1% | $11,418,836 | $33,356,805 |
| 116 | SANDOZ | GRISEOFULVIN MICROSIZE-TABLET-500MG | $22,081,586 | 360.3% | $3,269,244 | $11,780,293 | 364.8% | $3,238,012 | $11,811,524 |
| 117 | G&W | HALOBETASOL PROPIONATE-CREAM-0.05% | $27,722,245 | 169.0% | $16,662,350 | $11,059,894 | 131.9% | $16,961,651 | $10,760,593 |
| 118 | PERRIGO | HALOBETASOL PROPIONATE-CREAM-0.05% | -$2,723,792 | 245.6% | -$1,637,125 | -$1,086,667 | 198.4% | -$1,666,532 | -$1,057,260 |
| 119 | SANDOZ | HALOBETASOL PROPIONATE-CREAM-0.05% | $9,396,694 | 304.0% | $5,647,847 | $3,748,847 | 304.0% | $5,749,298 | $3,647,396 |
| 120 | SUN/MUTUAL/TARO | HALOBETASOL PROPIONATE-CREAM-0.05% | $603,189 | 228.5% | $362,545 | $240,645 | 228.5% | $369,057 | $234,132 |
| 121 | G&W | HALOBETASOL PROPIONATE-OINTMENT-0.05% | $52,372,255 | 315.5% | $33,694,994 | $18,677,261 | 265.7% | $33,949,713 | $18,422,542 |
| 122 | PERRIGO | HALOBETASOL PROPIONATE-OINTMENT-0.05% | $35,795,165 | 246.9% | $23,029,710 | $12,765,455 | 211.2% | $23,203,804 | $12,591,361 |
| 123 | SUN/MUTUAL/TARO | HALOBETASOL PROPIONATE-OINTMENT-0.05% | $1,502,158 | 421.6% | $966,451 | $535,707 | 428.0% | $973,757 | $528,401 |
| 124 | G&W | HYDROCORTISONE ACETATE-SUPPOSITORY-25MG | $147,119,173 | 360.3% | $31,959,019 | $115,160,154 | 364.8% | $31,653,709 | $115,465,464 |
| 125 | PERRIGO | HYDROCORTISONE ACETATE-SUPPOSITORY-25MG | $50,372,378 | 360.3% | $10,942,502 | $39,429,877 | 364.8% | $10,837,966 | $39,534,412 |
| 126 | PERRIGO | HYDROCORTISONE ACETATE-SUPPOSITORY-30MG | $15,854,738 | 360.3% | $3,444,159 | $12,410,579 | 364.8% | $3,411,257 | $12,443,482 |
| 127 | PERRIGO | HYDROCORTISONE VALERATE-CREAM-0.2% | $38,817,622 | 418.7% | $25,854,975 | $12,962,647 | 426.5% | $25,834,031 | $12,983,592 |
| 128 | SUN/MUTUAL/TARO | HYDROCORTISONE VALERATE-CREAM-0.2% | $56,767,407 | 523.1% | $37,810,659 | $18,956,748 | 585.7% | $37,780,030 | $18,987,377 |
| 129 | G&W | KETOCONAZOLE-CREAM-2% | $137,006,965 | 432.0% | $25,752,501 | $111,254,464 | 432.0% | $25,752,501 | $111,254,464 |
| 130 | SANDOZ | KETOCONAZOLE-CREAM-2% | $90,771,522 | 73.0% | $52,454,472 | $38,317,049 | 97.0% | $46,087,677 | $44,683,845 |
| 131 | SUN/MUTUAL/TARO | KETOCONAZOLE-CREAM-2% | $116,073,905 | 199.6% | $38,742,109 | $77,331,796 | 230.3% | $35,146,572 | $80,927,333 |
| 132 | GREENSTONE | LATANOPROST-SOLUTION/DROPS-0.005% | $118,667,739 | 40.7% | $58,331,377 | $23,719,553 | -6.2% | $87,465,125 | -$5,414,196 |
| 133 | SANDOZ | LATANOPROST-SOLUTION/DROPS-0.005% | $167,010,198 | 112.9% | $57,259,400 | $64,627,287 | 39.9% | $87,094,333 | $34,792,354 |
| 134 | VALEANT/BAUSCH | LATANOPROST-SOLUTION/DROPS-0.005% | $130,222,541 | 7.6% | $82,329,200 | $6,279,128 | -29.6% | $125,917,363 | -$37,309,036 |
| 135 | SANDOZ | LIDOCAINE-OINTMENT-5% | $270,880,708 | 416.4% | $52,450,954 | $218,429,753 | 386.6% | $55,666,500 | $215,214,208 |
| 136 | SUN/MUTUAL/TARO | LIDOCAINE-OINTMENT-5% | $118,558,508 | 470.5% | $20,780,324 | $97,778,184 | 431.7% | $22,298,214 | $96,260,294 |
| 137 | PERRIGO | METHAZOLAMIDE-TABLET-25MG | $8,060,744 | 6.1% | $7,595,879 | $464,865 | 14.4% | $7,043,505 | $1,017,239 |
| 138 | SANDOZ | METHAZOLAMIDE-TABLET-25MG | $1,067,398 | 412.0% | $208,467 | $858,931 | 387.3% | $219,023 | $848,374 |
| 139 | PERRIGO | METHAZOLAMIDE-TABLET-50MG | $31,057,985 | 65.5% | $18,766,173 | $12,291,812 | 50.1% | $20,698,391 | $10,359,595 |
| 140 | SANDOZ | METHAZOLAMIDE-TABLET-50MG | $5,324,434 | 820.8% | $578,224 | $4,746,210 | 697.3% | $667,782 | $4,656,652 |
| 141 | ACTAVIS | METHYLPHENIDATE HCL-TABLET, EXTENDED RELEASE-20MG | $0 | 360.3% | $0 | $0 | 364.8% | $0 | $0 |
| 142 | MALLINCKRODT | METHYLPHENIDATE HCL-TABLET, EXTENDED RELEASE-20MG | $288,223,971 | 349.4% | $64,138,054 | $224,085,917 | 751.2% | $33,860,118 | $254,363,853 |
| 143 | SANDOZ | METHYLPHENIDATE HCL-TABLET, EXTENDED RELEASE-20MG | $2,876,364 | 201.2% | $954,877 | $1,921,487 | 167.5% | $1,075,114 | $1,801,250 |
| 144 | ACTAVIS | METHYLPHENIDATE HCL-TABLET-10MG | $20,982,125 | 248.0% | $6,028,938 | $14,953,187 | 240.8% | $6,157,500 | $14,824,625 |
| 145 | MALLINCKRODT | METHYLPHENIDATE HCL-TABLET-10MG | $160,698,564 | 491.6% | $27,162,310 | $133,536,254 | 515.9% | $26,092,041 | $134,606,522 |
| 146 | SANDOZ | METHYLPHENIDATE HCL-TABLET-10MG | $12,632,235 | 138.2% | $5,302,360 | $7,329,876 | 134.6% | $5,383,571 | $7,248,664 |

HIGHLY CONFIDENTIAL: SUBJECT TO PROTECTIVE ORDER

| # | Defendant | Drug | Affected Defendant Net Revenues | Overcharge (%) | But-For Revenues | Increase in Net Revenues | Overcharge (%) | But-For Revenues | Increase in Net Revenues |
|---|---|---|---|---|---|---|---|---|---|
| 147 | SUN/MUTUAL/TARO | METHYLPHENIDATE HCL-TABLET-10MG | $11,217,662 | 225.2% | $3,449,363 | $7,768,299 | 225.2% | $3,449,363 | $7,768,299 |
| 148 | ACTAVIS | METHYLPHENIDATE HCL-TABLET-20MG | $24,840,513 | 281.4% | $6,512,842 | $18,327,671 | 234.7% | $7,420,719 | $17,419,794 |
| 149 | MALLINCKRODT | METHYLPHENIDATE HCL-TABLET-20MG | $151,481,426 | 587.4% | $22,037,885 | $129,443,541 | 546.7% | $23,424,044 | $128,057,382 |
| 150 | SANDOZ | METHYLPHENIDATE HCL-TABLET-20MG | $14,474,406 | 338.1% | $3,304,159 | $11,170,247 | 302.7% | $3,594,777 | $10,879,629 |
| 151 | SUN/MUTUAL/TARO | METHYLPHENIDATE HCL-TABLET-20MG | $10,502,162 | 355.2% | $2,307,307 | $8,194,855 | 355.2% | $2,307,307 | $8,194,855 |
| 152 | ACTAVIS | METHYLPHENIDATE HCL-TABLET-5MG | $7,759,547 | 219.5% | $2,428,379 | $5,331,168 | 220.0% | $2,424,497 | $5,335,050 |
| 153 | MALLINCKRODT | METHYLPHENIDATE HCL-TABLET-5MG | $61,766,864 | 467.2% | $10,889,152 | $50,877,712 | 512.6% | $10,082,155 | $51,684,709 |
| 154 | SANDOZ | METHYLPHENIDATE HCL-TABLET-5MG | $1,663,301 | 121.2% | $752,018 | $911,284 | 131.3% | $719,071 | $944,231 |
| 155 | SUN/MUTUAL/TARO | METHYLPHENIDATE HCL-TABLET-5MG | $4,160,588 | 222.0% | $1,291,955 | $2,868,633 | 222.0% | $1,291,955 | $2,868,633 |
| 156 | ACTAVIS | METRONIDAZOLE-CREAM-0.75% | $14,754,081 | 149.7% | $5,908,664 | $8,845,417 | 149.7% | $5,908,664 | $8,845,417 |
| 157 | G&W | METRONIDAZOLE-CREAM-0.75% | $66,511,367 | 210.7% | $21,403,894 | $45,107,473 | 210.7% | $21,403,894 | $45,107,473 |
| 158 | SANDOZ | METRONIDAZOLE-CREAM-0.75% | $69,984,584 | 241.6% | $20,484,633 | $49,499,951 | 241.6% | $20,484,633 | $49,499,951 |
| 159 | G&W | METRONIDAZOLE-GEL-0.75% | $25,986,635 | 285.4% | $6,742,174 | $19,244,461 | 285.4% | $6,742,174 | $19,244,461 |
| 160 | SANDOZ | METRONIDAZOLE-GEL-0.75% | $11,299,243 | 466.4% | $1,994,784 | $9,304,459 | 615.7% | $1,578,754 | $9,720,489 |
| 161 | SUN/MUTUAL/TARO | METRONIDAZOLE-GEL-0.75% | $23,082,905 | 364.3% | $4,971,851 | $18,111,054 | 300.2% | $5,768,386 | $17,314,519 |
| 162 | ACTAVIS | METRONIDAZOLE-LOTION-0.75% | $9,975,291 | 109.9% | $4,753,167 | $5,222,124 | 109.9% | $4,753,167 | $5,222,124 |
| 163 | SANDOZ | METRONIDAZOLE-LOTION-0.75% | $43,728,242 | 190.2% | $15,068,315 | $28,659,928 | 190.2% | $15,068,315 | $28,659,928 |
| 164 | G&W | MOMETASONE FUROATE-CREAM-0.1% | $24,354,082 | 360.3% | $3,349,979 | $12,071,213 | 364.8% | $3,317,976 | $12,103,216 |
| 165 | GLENMARK | MOMETASONE FUROATE-CREAM-0.1% | $10,462,153 | -14.9% | $5,025,080 | -$747,269 | -14.9% | $5,025,080 | -$747,269 |
| 166 | G&W | MOMETASONE FUROATE-OINTMENT-0.1% | $4,560,693 | 360.3% | $2,987,691 | -$534,624 | 364.8% | $2,987,691 | -$534,624 |
| 167 | GLENMARK | MOMETASONE FUROATE-OINTMENT-0.1% | $6,647,173 | 87.6% | $4,985,986 | -$892,203 | 64.0% | $4,985,986 | -$892,203 |
| 168 | G&W | MOMETASONE FUROATE-SOLUTION-0.1% | $3,553,820 | 360.3% | $392,983 | $1,416,061 | 364.8% | $389,228 | $1,419,816 |
| 169 | GLENMARK | MOMETASONE FUROATE-SOLUTION-0.1% | -$124,209 | 15.9% | -$107,175 | -$17,034 | -12.3% | -$141,650 | $17,442 |
| 170 | ACTAVIS | NYSTATIN-OINTMENT-100,000UNITS/GM | $17,857,436 | 357.5% | $3,903,291 | $13,954,145 | 357.5% | $3,903,291 | $13,954,145 |
| 171 | PERRIGO | NYSTATIN-OINTMENT-100,000UNITS/GM | $33,049,178 | 257.6% | $9,242,355 | $23,806,823 | 204.8% | $10,842,750 | $22,206,427 |
| 172 | SANDOZ | NYSTATIN-OINTMENT-100,000UNITS/GM | $11,551,765 | 291.0% | $2,954,231 | $8,597,534 | 386.2% | $2,376,047 | $9,175,718 |
| 173 | SANDOZ | NYSTATIN; TRIAMCINOLONE ACETONIDE-CREAM-100,000UNITS/GM;0.1% | $110,194,078 | 2218.0% | $4,753,795 | $105,440,283 | 2408.6% | $4,392,696 | $105,801,382 |
| 174 | SUN/MUTUAL/TARO | NYSTATIN; TRIAMCINOLONE ACETONIDE-CREAM-100,000UNITS/GM;0.1% | $179,258,048 | 1778.0% | $9,545,085 | $169,712,963 | 1937.7% | $8,797,137 | $170,460,911 |
| 175 | SANDOZ | NYSTATIN; TRIAMCINOLONE ACETONIDE-OINTMENT-100,000UNITS/GM;0.1% | $24,235,956 | 2698.9% | $865,920 | $23,370,036 | 2674.9% | $873,399 | $23,362,557 |
| 176 | SUN/MUTUAL/TARO | NYSTATIN; TRIAMCINOLONE ACETONIDE-OINTMENT-100,000UNITS/GM;0.1% | $50,811,044 | 1287.5% | $3,662,016 | $47,149,028 | 1304.1% | $3,618,696 | $47,192,348 |
| 177 | AMNEAL | PHENYTOIN SODIUM-CAPSULE-100MGEXTENDED | $35,400,723 | 28.8% | $27,476,532 | $7,924,191 | 66.0% | $21,326,112 | $14,074,611 |
| 178 | MYLAN | PHENYTOIN SODIUM-CAPSULE-100MGEXTENDED | $34,312,729 | 1.7% | $33,734,343 | $578,386 | 21.8% | $28,180,110 | $6,132,619 |
| 179 | SUN/MUTUAL/TARO | PHENYTOIN SODIUM-CAPSULE-100MGEXTENDED | $21,764,742 | 22.5% | $17,762,533 | $4,002,210 | 40.8% | $15,455,908 | $6,308,834 |
| 180 | SUN/MUTUAL/TARO | PHENYTOIN SODIUM-CAPSULE-100MGEXTENDED | $77,603,383 | 116.0% | $35,931,380 | $41,672,002 | 146.4% | $31,491,291 | $46,112,092 |
| 181 | G&W | PROCHLORPERAZINE-SUPPOSITORY-25MG | $22,784,389 | 360.3% | $4,949,503 | $17,834,887 | 364.8% | $4,902,219 | $17,882,170 |
| 182 | PERRIGO | PROCHLORPERAZINE-SUPPOSITORY-25MG | $20,734,174 | 42.9% | $14,506,303 | $6,227,871 | 42.9% | $14,506,303 | $6,227,871 |
| 183 | ACTAVIS | PROMETHAZINE HYDROCHLORIDE-SUPPOSITORY-12.5MG | $7,942,307 | 663.0% | $1,040,919 | $6,901,388 | 663.0% | $1,040,919 | $6,901,388 |
| 184 | G&W | PROMETHAZINE HYDROCHLORIDE-SUPPOSITORY-12.5MG | $12,567,953 | 360.3% | $2,730,164 | $9,837,789 | 364.8% | $2,704,082 | $9,863,871 |
| 185 | PERRIGO | PROMETHAZINE HYDROCHLORIDE-SUPPOSITORY-12.5MG | $3,291,043 | 150.4% | $1,314,169 | $1,976,874 | 150.4% | $1,314,169 | $1,976,874 |
| 186 | ACTAVIS | PROMETHAZINE HYDROCHLORIDE-SUPPOSITORY-25MG | $40,091,069 | 555.9% | $6,112,608 | $33,978,461 | 555.9% | $6,112,608 | $33,978,461 |
| 187 | G&W | PROMETHAZINE HYDROCHLORIDE-SUPPOSITORY-25MG | $39,787,911 | 360.3% | $8,643,215 | $31,144,696 | 364.8% | $8,560,645 | $31,227,267 |
| 188 | PERRIGO | PROMETHAZINE HYDROCHLORIDE-SUPPOSITORY-25MG | $12,601,637 | 136.4% | $5,329,869 | $7,271,768 | 136.4% | $5,329,869 | $7,271,768 |
| 189 | ACTAVIS | TERCONAZOLE-CREAM-0.8% | $15,911,979 | 177.1% | $5,742,945 | $10,169,034 | 127.9% | $6,981,559 | $8,930,420 |
| 190 | SANDOZ | TERCONAZOLE-CREAM-0.8% | $0 | 360.3% | $0 | $0 | 364.8% | $0 | $0 |
| 191 | SUN/MUTUAL/TARO | TERCONAZOLE-CREAM-0.8% | $24,510,035 | 95.5% | $12,536,979 | $11,973,056 | 73.0% | $14,163,704 | $10,346,331 |
| 192 | PERRIGO | TRIAMCINOLONE ACETONIDE-CREAM-0.025% | $11,110,176 | 40.5% | $7,907,894 | $3,202,282 | 61.2% | $6,893,379 | $4,216,797 |
| 193 | SANDOZ | TRIAMCINOLONE ACETONIDE-CREAM-0.025% | $11,749,871 | 360.3% | $2,552,450 | $9,197,421 | 364.8% | $2,528,066 | $9,221,805 |
| 194 | PERRIGO | TRIAMCINOLONE ACETONIDE-CREAM-0.1% | $103,341,292 | 24.2% | $68,543,337 | $16,585,531 | 45.2% | $58,625,292 | $26,503,576 |
| 195 | SANDOZ | TRIAMCINOLONE ACETONIDE-CREAM-0.1% | $34,467,309 | 360.3% | $6,116,300 | $22,039,288 | 364.8% | $6,057,870 | $22,097,718 |
| 196 | PERRIGO | TRIAMCINOLONE ACETONIDE-CREAM-0.5% | $25,161,499 | 90.4% | $11,699,974 | $10,577,736 | 79.2% | $12,433,403 | $9,844,307 |
| 197 | SANDOZ | TRIAMCINOLONE ACETONIDE-CREAM-0.5% | $16,981,886 | 360.3% | $3,174,166 | $11,437,694 | 364.8% | $3,143,843 | $11,468,017 |
| 198 | PERRIGO | TRIAMCINOLONE ACETONIDE-OINTMENT-0.025% | $12,435,234 | 65.6% | $7,509,988 | $4,925,246 | 76.8% | $7,031,738 | $5,403,496 |
| 199 | SANDOZ | TRIAMCINOLONE ACETONIDE-OINTMENT-0.025% | $4,142,227 | 360.3% | $899,825 | $3,242,402 | 364.8% | $891,229 | $3,250,998 |
| 200 | PERRIGO | TRIAMCINOLONE ACETONIDE-OINTMENT-0.1% | $84,106,478 | 51.6% | $55,488,933 | $28,617,545 | 84.7% | $45,544,214 | $38,562,264 |
| 201 | SANDOZ | TRIAMCINOLONE ACETONIDE-OINTMENT-0.1% | $40,266,825 | 360.3% | $8,747,250 | $31,519,575 | 364.8% | $8,663,686 | $31,603,139 |
| 202 | PERRIGO | TRIAMCINOLONE ACETONIDE-OINTMENT-0.5% | $21,326,021 | 56.3% | $13,648,477 | $7,677,543 | 64.7% | $12,951,712 | $8,374,309 |
| 203 | SUN/MUTUAL/TARO | TRIAMCINOLONE ACETONIDE-PASTE-0.1% | $27,649,196 | 28.1% | $12,511,380 | $3,511,835 | -15.9% | $19,057,079 | -$3,033,864 |
| | **Total** | **Total** | **$7,594,829,766** | **237.0%** | **$2,253,491,637** | **$5,096,626,832** | **230.0%** | **$2,301,661,679** | **$5,048,456,790** |

HIGHLY CONFIDENTIAL: SUBJECT TO PROTECTIVE ORDER

## Appendix C Table 12

Updated Overcharge Estimates by Defendant and Drug at Issue (New Generic Drugs)

| # | Defendant | Drug | Affected Defendant Net Revenues | Both Disorgement Models: Overcharge (%) | Both Disorgement Models: But-For Revenues | Both Disorgement Models: Increase in Net Revenues |
|---|---|---|---|---|---|---|
| 1 | PERRIGO | ADAPALENE-CREAM-0.1% | $106,793,500 | 50.3% | $71,039,368 | $35,754,132 |
| 2 | SANDOZ | ADAPALENE-CREAM-0.1% | $64,694,670 | 50.3% | $43,035,095 | $21,659,575 |
| 3 | SANDOZ | BETAMETHASONE DIPROPIONATE; CALCIPOTRIENE-OINTMENT-0.064%;0.005% | $80,583,637 | 88.3% | $42,801,989 | $37,781,649 |
| 4 | PERRIGO | BETAMETHASONE DIPROPIONATE; CALCIPOTRIENE-OINTMENT-0.064%;0.005% | $96,951,292 | 88.3% | $51,495,666 | $45,455,626 |
| 5 | SUN/MUTUAL/TARO | CARBAMAZEPINE-TABLET, EXTENDED RELEASE-100MG | $5,162,791 | 90.2% | $2,714,689 | $2,448,102 |
| 6 | SANDOZ | CARBAMAZEPINE-TABLET, EXTENDED RELEASE-100MG | $6,978,140 | 90.2% | $3,669,232 | $3,308,908 |
| 7 | SUN/MUTUAL/TARO | CARBAMAZEPINE-TABLET, EXTENDED RELEASE-200MG | $127,988,379 | 90.2% | $67,298,603 | $60,689,777 |
| 8 | SANDOZ | CARBAMAZEPINE-TABLET, EXTENDED RELEASE-200MG | $90,941,407 | 90.2% | $47,818,635 | $43,122,772 |
| 9 | SUN/MUTUAL/TARO | CARBAMAZEPINE-TABLET, EXTENDED RELEASE-400MG | $137,154,683 | 90.2% | $72,118,411 | $65,036,272 |
| 10 | SANDOZ | CARBAMAZEPINE-TABLET, EXTENDED RELEASE-400MG | $93,381,202 | 90.2% | $49,101,524 | $44,279,679 |
| 11 | SUN/MUTUAL/TARO | DESOXIMETASONE-OINTMENT-0.05% | $35,120,476 | 53.3% | $22,907,383 | $12,213,093 |
| 12 | SANDOZ | FLUOCINONIDE-CREAM-0.1% | $6,871,435 | 80.3% | $3,812,032 | $3,059,403 |
| 13 | PERRIGO | FLUOCINONIDE-CREAM-0.1% | $96,296,167 | 80.3% | $53,421,745 | $42,874,422 |
| 14 | SUN/MUTUAL/TARO | FLUOCINONIDE-CREAM-0.1% | $16,443,103 | 80.3% | $9,122,058 | $7,321,045 |
| 15 | GLENMARK | FLUOCINONIDE-CREAM-0.1% | $54,102,709 | 80.3% | $30,014,290 | $24,088,418 |
| 16 | VALEANT/BAUSCH | FLUOCINONIDE-CREAM-0.1% | $32,825,148 | 80.3% | $18,210,244 | $14,614,904 |
| 17 | SANDOZ | FLUTICASONE PROPIONATE-LOTION-0.05% | $4,836,149 | 107.7% | $2,327,922 | $2,508,227 |
| 18 | PERRIGO | FLUTICASONE PROPIONATE-LOTION-0.05% | $2,627,839 | 107.7% | $1,264,933 | $1,362,906 |
| 19 | GLENMARK | FLUTICASONE PROPIONATE-LOTION-0.05% | $5,529,293 | 107.7% | $2,661,572 | $2,867,721 |
| 20 | SANDOZ | IMIQUIMOD-CREAM-5% | $97,017,115 | 104.4% | $47,465,176 | $49,551,939 |
| 21 | PERRIGO | IMIQUIMOD-CREAM-5% | $159,041,431 | 104.4% | $77,810,287 | $81,231,144 |
| 22 | SUN/MUTUAL/TARO | IMIQUIMOD-CREAM-5% | $28,974,275 | 104.4% | $14,175,531 | $14,798,745 |
| 23 | MYLAN | METFORMIN HYDROCHLORIDE; PIOGLITAZONE HYDROCHLORIDE-TABLET-500MG;EQ15MGBASE | $20,336,305 | 52.0% | $13,375,094 | $6,961,211 |
| 24 | SANDOZ | METFORMIN HYDROCHLORIDE; PIOGLITAZONE HYDROCHLORIDE-TABLET-500MG;EQ15MGBASE | $12,357,151 | 52.0% | $8,127,241 | $4,229,910 |
| 25 | AUROBINDO | METFORMIN HYDROCHLORIDE; PIOGLITAZONE HYDROCHLORIDE-TABLET-500MG;EQ15MGBASE | $10,430,891 | 52.0% | $6,860,349 | $3,570,542 |
| 26 | MYLAN | METFORMIN HYDROCHLORIDE; PIOGLITAZONE HYDROCHLORIDE-TABLET-850MG;EQ15MGBASE | $35,467,227 | 157.3% | $13,782,432 | $21,684,795 |
| 27 | SANDOZ | METFORMIN HYDROCHLORIDE; PIOGLITAZONE HYDROCHLORIDE-TABLET-850MG;EQ15MGBASE | $18,236,742 | 157.3% | $7,086,730 | $11,150,012 |
| 28 | AUROBINDO | METFORMIN HYDROCHLORIDE; PIOGLITAZONE HYDROCHLORIDE-TABLET-850MG;EQ15MGBASE | $19,974,912 | 157.3% | $7,762,177 | $12,212,736 |
| 29 | SANDOZ | METRONIDAZOLE-GEL-1% | $99,974,565 | 55.8% | $64,165,197 | $35,809,367 |
| 30 | SUN/MUTUAL/TARO | METRONIDAZOLE-GEL-1% | $64,070,255 | 55.8% | $41,121,265 | $22,948,990 |
| 31 | SANDOZ | TACROLIMUS-OINTMENT-0.03% | $19,575,903 | 97.2% | $9,925,031 | $9,650,872 |
| 32 | PERRIGO | TACROLIMUS-OINTMENT-0.03% | $43,932,631 | 97.2% | $22,273,952 | $21,658,680 |
| 33 | SANDOZ | TACROLIMUS-OINTMENT-0.1% | $102,478,978 | 176.7% | $37,036,194 | $65,442,784 |
| 34 | PERRIGO | TACROLIMUS-OINTMENT-0.1% | $159,273,469 | 176.7% | $57,561,885 | $101,711,584 |
| | Total | Total | $1,956,423,869 | 91.2% | $1,023,363,929 | $933,059,939 |

HIGHLY CONFIDENTIAL: SUBJECT TO PROTECTIVE ORDER

## Appendix C Table 13
Updated Overcharge Estimates by Drug at Issue

| # | Drug | Defendant Affected Net Revenues | Before and After Disgorgement: Overcharge (%) | Before and After Disgorgement: But-For Revenues | Before and After Disgorgement: Increase in Net Revenues | Difference in Difference Disgorgement: Overcharge (%) | Difference in Difference Disgorgement: But-For Revenues | Difference in Difference Disgorgement: Increase in Net Revenues |
|---|---|---|---|---|---|---|---|---|
| 1 | ACETAZOLAMIDE-TABLET-125MG | $20,000,402 | 163.8% | $7,580,297 | $12,420,105 | 256.1% | $5,616,184 | $14,384,218 |
| 2 | ACETAZOLAMIDE-TABLET-250MG | $159,891,884 | 112.7% | $75,159,295 | $84,732,588 | 150.2% | $63,915,205 | $95,976,679 |
| 3 | ADAPALENE-CREAM-0.1% | $171,488,170 | 50.3% | $114,074,463 | $57,413,707 | 50.3% | $114,074,463 | $57,413,707 |
| 4 | ALCLOMETASONE DIPROPIONATE-CREAM-0.05% | $14,478,947 | 24.2% | $11,659,460 | $2,819,488 | 23.6% | $11,714,087 | $2,764,860 |
| 5 | ALCLOMETASONE DIPROPIONATE-OINTMENT-0.05% | $11,900,214 | 46.3% | $8,134,769 | $3,765,445 | 48.4% | $8,018,523 | $3,881,691 |
| 6 | AMMONIUM LACTATE-CREAM-EQ12%BASE | $54,281,022 | 88.5% | $28,794,583 | $25,486,439 | 83.7% | $29,544,979 | $24,736,043 |
| 7 | AMMONIUM LACTATE-LOTION-EQ12%BASE | $53,828,308 | 109.5% | $25,692,327 | $28,135,981 | 136.4% | $22,768,622 | $31,059,686 |
| 8 | BETAMETHASONE DIPROPIONATE-CREAM-EQ0.05%BASE | $105,142,000 | 1859.3% | $5,366,423 | $99,775,577 | 1838.6% | $5,423,641 | $99,718,359 |
| 9 | BETAMETHASONE DIPROPIONATE-LOTION, AUGMENTED-EQ0.05%BASE | $38,879,803 | 152.9% | $15,374,644 | $23,505,159 | 158.2% | $15,060,635 | $23,819,168 |
| 10 | BETAMETHASONE DIPROPIONATE-LOTION-EQ0.05%BASE | $29,354,134 | 345.3% | $6,592,476 | $22,761,658 | 353.2% | $6,476,840 | $22,877,294 |
| 11 | BETAMETHASONE DIPROPIONATE; CALCIPOTRIENE-OINTMENT-0.064%;0.005% | $177,534,930 | 88.3% | $94,297,655 | $83,237,275 | 88.3% | $94,297,655 | $83,237,275 |
| 12 | BETAMETHASONE DIPROPIONATE; CLOTRIMAZOLE-CREAM-EQ0.05%BASE;1% | $283,823,101 | 262.6% | $78,276,264 | $205,546,837 | 295.1% | $71,841,172 | $211,981,929 |
| 13 | BETAMETHASONE DIPROPIONATE; CLOTRIMAZOLE-LOTION-EQ0.05%BASE;1% | $56,620,052 | 490.6% | $9,587,340 | $47,032,712 | 527.1% | $9,028,446 | $47,591,605 |
| 14 | BETAMETHASONE VALERATE-CREAM-EQ0.1%BASE | $30,965,903 | 534.0% | $4,883,984 | $26,081,920 | 579.6% | $4,556,573 | $26,409,330 |
| 15 | BETAMETHASONE VALERATE-LOTION-EQ0.1%BASE | $29,770,091 | 633.3% | $4,059,471 | $25,710,620 | 637.3% | $4,037,841 | $25,732,251 |
| 16 | BETAMETHASONE VALERATE-OINTMENT-EQ0.1%BASE | $21,756,137 | 534.6% | $3,428,294 | $18,327,844 | 534.6% | $3,428,294 | $18,327,844 |
| 17 | BROMOCRIPTINE MESYLATE-TABLET-EQ2.5MGBASE | $62,500,860 | 30.2% | $48,002,746 | $14,498,114 | 5.9% | $59,040,658 | $3,460,202 |
| 18 | CALCIPOTRIENE-SOLUTION-0.005% | $16,454,257 | 305.7% | $4,055,432 | $12,398,825 | 274.9% | $4,389,179 | $12,065,078 |
| 19 | CARBAMAZEPINE-TABLET, EXTENDED RELEASE-100MG | $12,140,930 | 60.4% | $7,569,162 | $4,571,768 | 90.2% | $6,383,920 | $5,757,010 |
| 20 | CARBAMAZEPINE-TABLET, EXTENDED RELEASE-200MG | $218,929,786 | 60.4% | $136,489,961 | $82,439,825 | 90.2% | $115,117,238 | $103,812,548 |
| 21 | CARBAMAZEPINE-TABLET, EXTENDED RELEASE-400MG | $230,535,885 | 60.4% | $143,725,687 | $86,810,198 | 90.2% | $121,219,934 | $109,315,951 |
| 22 | CEFPODOXIME PROXETIL-FOR SUSPENSION-EQ100MGBASE/5ML | $1,859,825 | 109.7% | $886,904 | $972,921 | 64.0% | $1,134,240 | $725,585 |
| 23 | CEFPODOXIME PROXETIL-TABLET-EQ100MGBASE | $13,849,894 | 134.5% | $5,906,729 | $7,943,165 | 47.6% | $9,386,388 | $4,463,506 |
| 24 | CEFPODOXIME PROXETIL-TABLET-EQ200MGBASE | $68,815,222 | 162.1% | $26,258,418 | $42,556,804 | 63.8% | $42,001,020 | $26,814,202 |
| 25 | CICLOPIROX-CREAM-0.77% | $25,277,896 | 44.8% | $17,456,847 | $7,821,049 | 38.0% | $18,316,678 | $6,961,218 |
| 26 | CICLOPIROX-SHAMPOO-1% | $27,291,011 | -6.7% | $29,240,851 | -$1,949,840 | 7.4% | $25,408,976 | $1,882,035 |
| 27 | CICLOPIROX-SOLUTION-8% | $37,264,539 | 215.7% | $11,803,032 | $25,461,507 | 172.3% | $13,686,961 | $23,577,578 |
| 28 | CLINDAMYCIN PHOSPHATE-CREAM-EQ2%BASE | $89,395,620 | 108.7% | $42,839,288 | $46,556,333 | 108.7% | $42,839,288 | $46,556,333 |
| 29 | CLINDAMYCIN PHOSPHATE-GEL-EQ1%BASE | $386,864,764 | 346.0% | $86,744,937 | $300,119,827 | 346.0% | $86,744,937 | $300,119,827 |
| 30 | CLINDAMYCIN PHOSPHATE-LOTION-EQ1%BASE | $339,105,500 | 282.6% | $88,637,570 | $250,467,930 | 282.6% | $88,637,570 | $250,467,930 |
| 31 | CLINDAMYCIN PHOSPHATE-SOLUTION-EQ1%BASE | $127,070,392 | 398.8% | $25,476,205 | $101,594,187 | 404.3% | $25,197,639 | $101,872,753 |
| 32 | CLOBETASOL PROPIONATE EMOLLIENT-CREAM-0.05% | $20,555,462 | 607.5% | $2,905,559 | $17,649,904 | 658.8% | $2,709,039 | $17,846,423 |
| 33 | CLOBETASOL PROPIONATE-CREAM-0.05% | $164,885,632 | 534.2% | $25,998,891 | $138,886,741 | 649.2% | $22,007,579 | $142,878,054 |
| 34 | CLOBETASOL PROPIONATE-GEL-0.05% | $2,740,968 | 465.6% | $484,628 | $2,256,340 | 464.6% | $485,471 | $2,255,497 |
| 35 | CLOBETASOL PROPIONATE-OINTMENT-0.05% | $252,644,989 | 1311.6% | $17,897,714 | $234,747,275 | 1513.8% | $15,655,428 | $236,989,561 |
| 36 | CLOBETASOL PROPIONATE-SOLUTION-0.05% | $87,670,954 | 399.0% | $17,568,743 | $70,102,210 | 399.7% | $17,544,121 | $70,126,833 |
| 37 | CLOTRIMAZOLE-CREAM-1% | $23,199,314 | 17.5% | $19,747,315 | $3,451,999 | 27.5% | $18,188,450 | $5,010,863 |
| 38 | DESONIDE-CREAM-0.05% | $148,886,991 | 859.4% | $15,518,809 | $133,368,183 | 870.0% | $15,348,900 | $133,538,091 |
| 39 | DESONIDE-LOTION-0.05% | $208,314,074 | 628.0% | $28,614,551 | $179,699,523 | 628.0% | $28,614,551 | $179,699,523 |
| 40 | DESONIDE-OINTMENT-0.05% | $93,427,384 | 536.7% | $14,674,692 | $78,752,692 | 565.0% | $14,048,694 | $79,378,690 |
| 41 | DESOXIMETASONE-OINTMENT-0.05% | $35,120,476 | 53.3% | $22,907,383 | $12,213,093 | 53.3% | $22,907,383 | $12,213,093 |
| 42 | DESOXIMETASONE-OINTMENT-0.25% | $61,830,064 | 42.4% | $43,411,384 | $18,418,680 | 29.9% | $47,604,306 | $14,225,758 |
| 43 | ECONAZOLE NITRATE-CREAM-1% | $141,905,730 | 233.3% | $42,571,984 | $99,333,746 | 286.4% | $36,720,347 | $105,185,383 |
| 44 | EPLERENONE-TABLET-25MG | $37,471,021 | 97.5% | $18,971,138 | $18,499,883 | 45.8% | $25,708,473 | $11,762,548 |
| 45 | EPLERENONE-TABLET-50MG | $26,217,227 | 118.3% | $12,010,318 | $14,206,909 | 56.4% | $16,758,081 | $9,459,146 |
| 46 | ERYTHROMYCIN-SOLUTION-2% | $20,864,501 | 304.5% | $5,158,602 | $15,705,898 | 304.5% | $5,158,602 | $15,705,898 |
| 47 | ETHAMBUTOL HYDROCHLORIDE-TABLET-100MG | $452,143 | 474.3% | $78,728 | $373,415 | 474.3% | $78,728 | $373,415 |
| 48 | ETHAMBUTOL HYDROCHLORIDE-TABLET-400MG | $5,197,993 | 217.9% | $1,635,215 | $3,562,778 | 218.1% | $1,633,894 | $3,564,099 |
| 49 | FLUOCINOLONE ACETONIDE-CREAM-0.01% | $14,504,907 | 237.8% | $4,294,567 | $10,210,340 | 237.8% | $4,294,567 | $10,210,340 |
| 50 | FLUOCINOLONE ACETONIDE-CREAM-0.025% | $17,234,165 | 329.6% | $4,012,064 | $13,222,101 | 329.6% | $4,012,064 | $13,222,101 |
| 51 | FLUOCINOLONE ACETONIDE-OINTMENT-0.025% | $19,287,969 | 334.1% | $4,443,579 | $14,844,390 | 334.1% | $4,443,579 | $14,844,390 |
| 52 | FLUOCINONIDE-CREAM-0.1% | $206,538,561 | 80.3% | $114,580,369 | $91,958,193 | 80.3% | $114,580,369 | $91,958,193 |
| 53 | FLUOCINONIDE-GEL-0.05% | $12,601,781 | 181.9% | $4,470,471 | $8,131,310 | 175.7% | $4,571,034 | $8,030,747 |
| 54 | FLUOCINONIDE-OINTMENT-0.05% | $42,662,346 | 492.8% | $7,196,800 | $35,465,545 | 466.6% | $7,529,031 | $35,133,315 |
| 55 | FLUOCINONIDE-SOLUTION-0.05% | $106,995,774 | 544.1% | $16,611,137 | $90,384,637 | 503.5% | $17,729,873 | $89,265,901 |
| 56 | FLUTICASONE PROPIONATE-LOTION-0.05% | $12,993,282 | 107.7% | $6,254,427 | $6,738,855 | 107.7% | $6,254,427 | $6,738,855 |

HIGHLY CONFIDENTIAL: SUBJECT TO PROTECTIVE ORDER

| # | Drug | Defendant Affected Net Revenues | Overcharge (%) | But-For Revenues | Increase in Net Revenues | Overcharge (%) | But-For Revenues | Increase in Net Revenues |
|---|---|---|---|---|---|---|---|---|
| 57 | GRISEOFULVIN MICROSIZE-TABLET-500MG | $15,049,536 | 360.3% | $3,269,244 | $11,780,293 | 364.8% | $3,238,012 | $11,811,524 |
| 58 | HALOBETASOL PROPIONATE-CREAM-0.05% | $34,998,335 | 66.4% | $21,035,617 | $13,962,718 | 63.4% | $21,413,474 | $13,584,861 |
| 59 | HALOBETASOL PROPIONATE-OINTMENT-0.05% | $89,669,578 | 55.4% | $57,691,155 | $31,978,423 | 54.3% | $58,127,274 | $31,542,304 |
| 60 | HYDROCORTISONE ACETATE-SUPPOSITORY-25MG | $197,491,551 | 360.3% | $42,901,521 | $154,590,030 | 364.8% | $42,491,675 | $154,999,876 |
| 61 | HYDROCORTISONE ACETATE-SUPPOSITORY-30MG | $15,854,738 | 360.3% | $3,444,159 | $12,410,579 | 364.8% | $3,411,257 | $12,443,482 |
| 62 | HYDROCORTISONE VALERATE-CREAM-0.2% | $95,585,029 | 50.1% | $63,665,634 | $31,919,395 | 50.3% | $63,614,060 | $31,970,969 |
| 63 | IMIQUIMOD-CREAM-5% | $285,032,821 | 104.4% | $139,450,994 | $145,581,827 | 104.4% | $139,450,994 | $145,581,827 |
| 64 | KETOCONAZOLE-CREAM-2% | $343,852,392 | 194.0% | $116,949,083 | $226,903,309 | 221.4% | $106,986,751 | $236,865,641 |
| 65 | LATANOPROST-SOLUTION/DROPS-0.005% | $292,545,944 | 47.8% | $197,919,977 | $94,625,967 | -2.6% | $300,476,821 | -$7,930,877 |
| 66 | LIDOCAINE-OINTMENT-5% | $389,439,216 | 431.8% | $73,231,278 | $316,207,937 | 399.5% | $77,964,714 | $311,474,502 |
| 67 | METFORMIN HYDROCHLORIDE; PIOGLITAZONE HYDROCHLORIDE-TABLET-500MG;EQ15MGBASE | $43,124,347 | 52.0% | $28,362,684 | $14,761,663 | 52.0% | $28,362,684 | $14,761,663 |
| 68 | METFORMIN HYDROCHLORIDE; PIOGLITAZONE HYDROCHLORIDE-TABLET-850MG;EQ15MGBASE | $73,678,881 | 157.3% | $28,631,339 | $45,047,542 | 157.3% | $28,631,339 | $45,047,542 |
| 69 | METHAZOLAMIDE-TABLET-25MG | $9,128,142 | 17.0% | $7,804,346 | $1,323,796 | 25.7% | $7,262,528 | $1,865,614 |
| 70 | METHAZOLAMIDE-TABLET-50MG | $36,382,419 | 88.1% | $19,344,397 | $17,038,022 | 70.3% | $21,366,173 | $15,016,247 |
| 71 | METHYLPHENIDATE HCL-TABLET, EXTENDED RELEASE-20MG | $291,100,335 | 347.2% | $65,092,931 | $226,007,404 | 733.3% | $34,935,232 | $256,165,103 |
| 72 | METHYLPHENIDATE HCL-TABLET-10MG | $205,530,586 | 390.0% | $41,942,970 | $163,587,616 | 400.3% | $41,082,475 | $164,448,111 |
| 73 | METHYLPHENIDATE HCL-TABLET-20MG | $201,298,508 | 489.2% | $34,162,193 | $167,136,314 | 447.8% | $36,746,847 | $164,551,661 |
| 74 | METHYLPHENIDATE HCL-TABLET-5MG | $75,350,300 | 390.5% | $15,361,503 | $59,988,797 | 419.0% | $14,517,677 | $60,832,623 |
| 75 | METRONIDAZOLE-CREAM-0.75% | $151,250,032 | 216.4% | $47,797,191 | $103,452,842 | 216.4% | $47,797,191 | $103,452,842 |
| 76 | METRONIDAZOLE-GEL-0.75% | $60,368,783 | 340.4% | $13,708,809 | $46,659,974 | 328.5% | $14,089,313 | $46,279,470 |
| 77 | METRONIDAZOLE-GEL-1% | $164,044,820 | 55.8% | $105,286,462 | $58,758,357 | 55.8% | $105,286,462 | $58,758,357 |
| 78 | METRONIDAZOLE-LOTION-0.75% | $53,703,533 | 170.9% | $19,821,481 | $33,882,051 | 170.9% | $19,821,481 | $33,882,051 |
| 79 | MOMETASONE FUROATE-CREAM-0.1% | $19,699,004 | 135.2% | $8,375,059 | $11,323,944 | 136.1% | $8,343,056 | $11,355,947 |
| 80 | MOMETASONE FUROATE-OINTMENT-0.1% | $6,546,850 | -17.9% | $7,973,677 | -$1,426,827 | -17.9% | $7,973,677 | -$1,426,827 |
| 81 | MOMETASONE FUROATE-SOLUTION-0.1% | $1,684,835 | 489.5% | $285,808 | $1,399,028 | 580.5% | $247,578 | $1,437,257 |
| 82 | NYSTATIN-OINTMENT-100,000UNITS/GM | $62,458,378 | 287.9% | $16,099,876 | $46,358,502 | 264.8% | $17,122,088 | $45,336,290 |
| 83 | NYSTATIN; TRIAMCINOLONE ACETONIDE-CREAM-100,000UNITS/GM;0.1% | $289,452,126 | 1924.3% | $14,298,880 | $275,153,246 | 2094.5% | $13,189,833 | $276,262,293 |
| 84 | NYSTATIN; TRIAMCINOLONE ACETONIDE-OINTMENT-100,000UNITS/GM;0.1% | $75,047,000 | 1557.4% | $4,527,936 | $70,519,065 | 1570.6% | $4,492,095 | $70,554,905 |
| 85 | PHENYTOIN SODIUM-CAPSULE-100MGEXTENDED | $169,081,577 | 47.1% | $114,904,788 | $54,176,790 | 75.3% | $96,453,421 | $72,628,157 |
| 86 | PROCHLORPERAZINE-SUPPOSITORY-25MG | $43,518,563 | 123.7% | $19,455,806 | $24,062,757 | 124.2% | $19,408,522 | $24,110,041 |
| 87 | PROMETHAZINE HYDROCHLORIDE-SUPPOSITORY-12.5MG | $23,801,303 | 368.0% | $5,085,252 | $18,716,051 | 370.5% | $5,059,170 | $18,742,133 |
| 88 | PROMETHAZINE HYDROCHLORIDE-SUPPOSITORY-25MG | $92,480,617 | 360.4% | $20,085,693 | $72,394,925 | 362.3% | $20,003,122 | $72,477,495 |
| 89 | TACROLIMUS-OINTMENT-0.03% | $63,508,534 | 97.2% | $32,198,982 | $31,309,552 | 97.2% | $32,198,982 | $31,309,552 |
| 90 | TACROLIMUS-OINTMENT-0.1% | $261,752,446 | 176.7% | $94,598,079 | $167,154,368 | 176.7% | $94,598,079 | $167,154,368 |
| 91 | TERCONAZOLE-CREAM-0.8% | $40,422,014 | 121.1% | $18,279,925 | $22,142,089 | 91.2% | $21,145,263 | $19,276,751 |
| 92 | TRIAMCINOLONE ACETONIDE-CREAM-0.025% | $22,860,047 | 118.5% | $10,460,344 | $12,399,703 | 142.6% | $9,421,445 | $13,438,601 |
| 93 | TRIAMCINOLONE ACETONIDE-CREAM-0.1% | $113,284,456 | 51.7% | $74,659,637 | $38,624,819 | 75.1% | $64,683,162 | $48,601,294 |
| 94 | TRIAMCINOLONE ACETONIDE-CREAM-0.5% | $36,889,570 | 148.0% | $14,874,140 | $22,015,430 | 136.8% | $15,577,246 | $21,312,325 |
| 95 | TRIAMCINOLONE ACETONIDE-OINTMENT-0.025% | $16,577,461 | 97.1% | $8,409,813 | $8,167,648 | 109.2% | $7,922,967 | $8,654,494 |
| 96 | TRIAMCINOLONE ACETONIDE-OINTMENT-0.1% | $124,373,303 | 93.6% | $64,236,183 | $60,137,120 | 129.4% | $54,207,900 | $70,165,403 |
| 97 | TRIAMCINOLONE ACETONIDE-OINTMENT-0.5% | $21,326,021 | 56.3% | $13,648,477 | $7,677,543 | 64.7% | $12,951,712 | $8,374,309 |
| 98 | TRIAMCINOLONE ACETONIDE-PASTE-0.1% | $16,023,215 | 28.1% | $12,511,380 | $3,511,835 | -15.9% | $19,057,079 | -$3,033,864 |
| | Total | $9,306,542,337 | 180.2% | $3,321,919,285 | $5,984,623,053 | 179.9% | $3,325,025,608 | $5,981,516,729 |

# Appendix D Table 1

## Periods of Failure to Supply Penalties by Drug At-Issue

| # | At-Issue Drug | Quarter With FTS/Shortages Adjustments |
|---|---|---|
| 1 | ACETAZOLAMIDE-TABLET-250MG | 2008Q1 |
| 2 | ACETAZOLAMIDE-TABLET-250MG | 2008Q2 |
| 3 | ACETAZOLAMIDE-TABLET-250MG | 2010Q2 |
| 4 | ACETAZOLAMIDE-TABLET-250MG | 2010Q4 |
| 5 | ACETAZOLAMIDE-TABLET-250MG | 2011Q1 |
| 6 | ACETAZOLAMIDE-TABLET-250MG | 2011Q2 |
| 7 | ACETAZOLAMIDE-TABLET-250MG | 2011Q3 |
| 8 | ACETAZOLAMIDE-TABLET-250MG | 2012Q4 |
| 9 | ACETAZOLAMIDE-TABLET-250MG | 2013Q1 |
| 10 | ACETAZOLAMIDE-TABLET-250MG | 2013Q3 |
| 11 | ACETAZOLAMIDE-TABLET-250MG | 2013Q4 |
| 12 | ACETAZOLAMIDE-TABLET-250MG | 2014Q1 |
| 13 | ACETAZOLAMIDE-TABLET-250MG | 2014Q3 |
| 14 | ACETAZOLAMIDE-TABLET-250MG | 2014Q4 |
| 15 | ACETAZOLAMIDE-TABLET-250MG | 2015Q1 |
| 16 | ACETAZOLAMIDE-TABLET-250MG | 2015Q2 |
| 17 | ACETAZOLAMIDE-TABLET-250MG | 2016Q1 |
| 18 | ACETAZOLAMIDE-TABLET-250MG | 2016Q2 |
| 19 | ACETAZOLAMIDE-TABLET-250MG | 2016Q3 |
| 20 | ACETAZOLAMIDE-TABLET-250MG | 2016Q4 |
| 21 | ACETAZOLAMIDE-TABLET-250MG | 2017Q1 |
| 22 | ACETAZOLAMIDE-TABLET-250MG | 2017Q2 |
| 23 | ACETAZOLAMIDE-TABLET-250MG | 2018Q1 |
| 24 | ACETAZOLAMIDE-TABLET-250MG | 2018Q2 |
| 25 | ACETAZOLAMIDE-TABLET-250MG | 2018Q3 |
| 26 | ACETAZOLAMIDE-TABLET-250MG | 2018Q4 |
| 27 | ADAPALENE-CREAM-0.1% | 2013Q2 |
| 28 | ADAPALENE-CREAM-0.1% | 2015Q3 |
| 29 | ADAPALENE-CREAM-0.1% | 2015Q4 |
| 30 | AMMONIUM LACTATE-CREAM-EQ12%BASE | 2011Q1 |
| 31 | AMMONIUM LACTATE-CREAM-EQ12%BASE | 2011Q2 |
| 32 | AMMONIUM LACTATE-CREAM-EQ12%BASE | 2011Q3 |
| 33 | AMMONIUM LACTATE-CREAM-EQ12%BASE | 2011Q4 |
| 34 | AMMONIUM LACTATE-LOTION-EQ12%BASE | 2011Q1 |
| 35 | AMMONIUM LACTATE-LOTION-EQ12%BASE | 2011Q2 |
| 36 | AMMONIUM LACTATE-LOTION-EQ12%BASE | 2011Q3 |
| 37 | AMMONIUM LACTATE-LOTION-EQ12%BASE | 2011Q4 |
| 38 | BETAMETHASONE DIPROPIONATE-CREAM-EQ0.05%BASE | 2014Q2 |
| 39 | BETAMETHASONE DIPROPIONATE-CREAM-EQ0.05%BASE | 2014Q3 |
| 40 | BETAMETHASONE DIPROPIONATE-CREAM-EQ0.05%BASE | 2015Q1 |
| 41 | BETAMETHASONE DIPROPIONATE-CREAM-EQ0.05%BASE | 2018Q4 |
| 42 | BETAMETHASONE DIPROPIONATE-LOTION, AUGMENTED-EQ0.05%BASE | 2013Q2 |
| 43 | BETAMETHASONE DIPROPIONATE-LOTION, AUGMENTED-EQ0.05%BASE | 2014Q1 |
| 44 | BETAMETHASONE DIPROPIONATE-LOTION, AUGMENTED-EQ0.05%BASE | 2018Q3 |
| 45 | BETAMETHASONE DIPROPIONATE-LOTION-EQ0.05%BASE | 2009Q2 |
| 46 | BETAMETHASONE DIPROPIONATE-LOTION-EQ0.05%BASE | 2010Q4 |
| 47 | BETAMETHASONE DIPROPIONATE-LOTION-EQ0.05%BASE | 2012Q2 |
| 48 | BETAMETHASONE DIPROPIONATE-LOTION-EQ0.05%BASE | 2012Q4 |
| 49 | BETAMETHASONE DIPROPIONATE-LOTION-EQ0.05%BASE | 2013Q2 |
| 50 | BETAMETHASONE DIPROPIONATE-LOTION-EQ0.05%BASE | 2013Q4 |
| 51 | BETAMETHASONE DIPROPIONATE-LOTION-EQ0.05%BASE | 2014Q1 |
| 52 | BETAMETHASONE DIPROPIONATE-LOTION-EQ0.05%BASE | 2015Q1 |
| 53 | BETAMETHASONE DIPROPIONATE-LOTION-EQ0.05%BASE | 2015Q2 |
| 54 | BETAMETHASONE DIPROPIONATE-LOTION-EQ0.05%BASE | 2015Q4 |
| 55 | BETAMETHASONE DIPROPIONATE-LOTION-EQ0.05%BASE | 2016Q1 |
| 56 | BETAMETHASONE DIPROPIONATE-LOTION-EQ0.05%BASE | 2016Q3 |
| 57 | BETAMETHASONE DIPROPIONATE-LOTION-EQ0.05%BASE | 2017Q1 |

# Appendix D Table 1

Periods of Failure to Supply Penalties by Drug At-Issue

| # | At-Issue Drug | Quarter With FTS/Shortages Adjustments |
|---|---|---|
| 58 | BETAMETHASONE DIPROPIONATE-LOTION-EQ0.05%BASE | 2017Q2 |
| 59 | BETAMETHASONE DIPROPIONATE-LOTION-EQ0.05%BASE | 2017Q4 |
| 60 | BETAMETHASONE DIPROPIONATE-LOTION-EQ0.05%BASE | 2018Q1 |
| 61 | BETAMETHASONE DIPROPIONATE-LOTION-EQ0.05%BASE | 2018Q2 |
| 62 | BETAMETHASONE DIPROPIONATE; CALCIPOTRIENE-OINTMENT-0.064%;0.005% | 2015Q2 |
| 63 | BETAMETHASONE DIPROPIONATE; CALCIPOTRIENE-OINTMENT-0.064%;0.005% | 2016Q1 |
| 64 | BETAMETHASONE DIPROPIONATE; CALCIPOTRIENE-OINTMENT-0.064%;0.005% | 2017Q1 |
| 65 | BETAMETHASONE DIPROPIONATE; CLOTRIMAZOLE-CREAM-EQ0.05%BASE;1% | 2013Q3 |
| 66 | BETAMETHASONE DIPROPIONATE; CLOTRIMAZOLE-CREAM-EQ0.05%BASE;1% | 2013Q4 |
| 67 | BETAMETHASONE DIPROPIONATE; CLOTRIMAZOLE-CREAM-EQ0.05%BASE;1% | 2014Q4 |
| 68 | BETAMETHASONE DIPROPIONATE; CLOTRIMAZOLE-CREAM-EQ0.05%BASE;1% | 2015Q1 |
| 69 | BETAMETHASONE DIPROPIONATE; CLOTRIMAZOLE-CREAM-EQ0.05%BASE;1% | 2015Q4 |
| 70 | BETAMETHASONE VALERATE-CREAM-EQ0.1%BASE | 2013Q1 |
| 71 | BETAMETHASONE VALERATE-CREAM-EQ0.1%BASE | 2015Q1 |
| 72 | BETAMETHASONE VALERATE-CREAM-EQ0.1%BASE | 2015Q4 |
| 73 | BETAMETHASONE VALERATE-CREAM-EQ0.1%BASE | 2018Q4 |
| 74 | BETAMETHASONE VALERATE-LOTION-EQ0.1%BASE | 2013Q2 |
| 75 | BETAMETHASONE VALERATE-LOTION-EQ0.1%BASE | 2014Q4 |
| 76 | BETAMETHASONE VALERATE-LOTION-EQ0.1%BASE | 2018Q2 |
| 77 | BETAMETHASONE VALERATE-LOTION-EQ0.1%BASE | 2018Q3 |
| 78 | BETAMETHASONE VALERATE-OINTMENT-EQ0.1%BASE | 2014Q1 |
| 79 | BETAMETHASONE VALERATE-OINTMENT-EQ0.1%BASE | 2015Q1 |
| 80 | BETAMETHASONE VALERATE-OINTMENT-EQ0.1%BASE | 2015Q4 |
| 81 | BROMOCRIPTINE MESYLATE-TABLET-EQ2.5MGBASE | 2009Q1 |
| 82 | BROMOCRIPTINE MESYLATE-TABLET-EQ2.5MGBASE | 2010Q4 |
| 83 | BROMOCRIPTINE MESYLATE-TABLET-EQ2.5MGBASE | 2013Q1 |
| 84 | BROMOCRIPTINE MESYLATE-TABLET-EQ2.5MGBASE | 2013Q2 |
| 85 | BROMOCRIPTINE MESYLATE-TABLET-EQ2.5MGBASE | 2013Q3 |
| 86 | BROMOCRIPTINE MESYLATE-TABLET-EQ2.5MGBASE | 2014Q1 |
| 87 | BROMOCRIPTINE MESYLATE-TABLET-EQ2.5MGBASE | 2014Q2 |
| 88 | BROMOCRIPTINE MESYLATE-TABLET-EQ2.5MGBASE | 2014Q3 |
| 89 | BROMOCRIPTINE MESYLATE-TABLET-EQ2.5MGBASE | 2015Q2 |
| 90 | BROMOCRIPTINE MESYLATE-TABLET-EQ2.5MGBASE | 2016Q2 |
| 91 | BROMOCRIPTINE MESYLATE-TABLET-EQ2.5MGBASE | 2016Q3 |
| 92 | BROMOCRIPTINE MESYLATE-TABLET-EQ2.5MGBASE | 2016Q4 |
| 93 | BROMOCRIPTINE MESYLATE-TABLET-EQ2.5MGBASE | 2017Q1 |
| 94 | BROMOCRIPTINE MESYLATE-TABLET-EQ2.5MGBASE | 2017Q2 |
| 95 | BROMOCRIPTINE MESYLATE-TABLET-EQ2.5MGBASE | 2017Q3 |
| 96 | BROMOCRIPTINE MESYLATE-TABLET-EQ2.5MGBASE | 2018Q1 |
| 97 | BROMOCRIPTINE MESYLATE-TABLET-EQ2.5MGBASE | 2018Q2 |
| 98 | CALCIPOTRIENE-SOLUTION-0.005% | 2011Q1 |
| 99 | CARBAMAZEPINE-TABLET, EXTENDED RELEASE-200MG | 2014Q3 |
| 100 | CARBAMAZEPINE-TABLET, EXTENDED RELEASE-200MG | 2016Q3 |
| 101 | CARBAMAZEPINE-TABLET, EXTENDED RELEASE-400MG | 2016Q4 |
| 102 | CARBAMAZEPINE-TABLET, EXTENDED RELEASE-400MG | 2017Q2 |
| 103 | CARBAMAZEPINE-TABLET, EXTENDED RELEASE-400MG | 2017Q4 |
| 104 | CEFPODOXIME PROXETIL-TABLET-EQ200MGBASE | 2010Q3 |
| 105 | CEFPODOXIME PROXETIL-TABLET-EQ200MGBASE | 2014Q1 |
| 106 | CEFPODOXIME PROXETIL-TABLET-EQ200MGBASE | 2014Q2 |
| 107 | CEFPODOXIME PROXETIL-TABLET-EQ200MGBASE | 2014Q4 |
| 108 | CICLOPIROX-CREAM-0.77% | 2010Q2 |
| 109 | CICLOPIROX-CREAM-0.77% | 2010Q3 |
| 110 | CICLOPIROX-CREAM-0.77% | 2010Q4 |
| 111 | CICLOPIROX-CREAM-0.77% | 2011Q1 |
| 112 | CICLOPIROX-CREAM-0.77% | 2011Q2 |
| 113 | CICLOPIROX-CREAM-0.77% | 2011Q3 |
| 114 | CICLOPIROX-CREAM-0.77% | 2011Q4 |

# Appendix D Table 1
## Periods of Failure to Supply Penalties by Drug At-Issue

| # | At-Issue Drug | Quarter With FTS/Shortages Adjustments |
|---|---|---|
| 115 | CICLOPIROX-CREAM-0.77% | 2012Q1 |
| 116 | CICLOPIROX-CREAM-0.77% | 2012Q2 |
| 117 | CICLOPIROX-CREAM-0.77% | 2012Q4 |
| 118 | CICLOPIROX-CREAM-0.77% | 2013Q3 |
| 119 | CICLOPIROX-CREAM-0.77% | 2013Q4 |
| 120 | CICLOPIROX-CREAM-0.77% | 2014Q1 |
| 121 | CICLOPIROX-CREAM-0.77% | 2014Q3 |
| 122 | CICLOPIROX-CREAM-0.77% | 2014Q4 |
| 123 | CICLOPIROX-CREAM-0.77% | 2015Q1 |
| 124 | CICLOPIROX-CREAM-0.77% | 2015Q4 |
| 125 | CICLOPIROX-CREAM-0.77% | 2016Q1 |
| 126 | CICLOPIROX-CREAM-0.77% | 2016Q2 |
| 127 | CICLOPIROX-CREAM-0.77% | 2016Q4 |
| 128 | CICLOPIROX-CREAM-0.77% | 2018Q1 |
| 129 | CICLOPIROX-CREAM-0.77% | 2018Q2 |
| 130 | CICLOPIROX-CREAM-0.77% | 2018Q3 |
| 131 | CICLOPIROX-CREAM-0.77% | 2018Q4 |
| 132 | CICLOPIROX-SHAMPOO-1% | 2011Q1 |
| 133 | CICLOPIROX-SHAMPOO-1% | 2011Q3 |
| 134 | CICLOPIROX-SHAMPOO-1% | 2012Q4 |
| 135 | CICLOPIROX-SHAMPOO-1% | 2013Q2 |
| 136 | CICLOPIROX-SHAMPOO-1% | 2013Q3 |
| 137 | CICLOPIROX-SHAMPOO-1% | 2013Q4 |
| 138 | CICLOPIROX-SHAMPOO-1% | 2014Q1 |
| 139 | CICLOPIROX-SHAMPOO-1% | 2014Q2 |
| 140 | CICLOPIROX-SHAMPOO-1% | 2014Q3 |
| 141 | CICLOPIROX-SHAMPOO-1% | 2014Q4 |
| 142 | CICLOPIROX-SHAMPOO-1% | 2015Q1 |
| 143 | CICLOPIROX-SHAMPOO-1% | 2015Q2 |
| 144 | CICLOPIROX-SHAMPOO-1% | 2015Q3 |
| 145 | CICLOPIROX-SHAMPOO-1% | 2015Q4 |
| 146 | CICLOPIROX-SHAMPOO-1% | 2016Q1 |
| 147 | CICLOPIROX-SHAMPOO-1% | 2016Q2 |
| 148 | CICLOPIROX-SHAMPOO-1% | 2016Q3 |
| 149 | CICLOPIROX-SHAMPOO-1% | 2016Q4 |
| 150 | CICLOPIROX-SHAMPOO-1% | 2017Q1 |
| 151 | CICLOPIROX-SHAMPOO-1% | 2017Q2 |
| 152 | CICLOPIROX-SHAMPOO-1% | 2017Q3 |
| 153 | CICLOPIROX-SHAMPOO-1% | 2017Q4 |
| 154 | CICLOPIROX-SHAMPOO-1% | 2018Q1 |
| 155 | CICLOPIROX-SOLUTION-8% | 2009Q2 |
| 156 | CICLOPIROX-SOLUTION-8% | 2011Q1 |
| 157 | CICLOPIROX-SOLUTION-8% | 2011Q3 |
| 158 | CICLOPIROX-SOLUTION-8% | 2012Q1 |
| 159 | CICLOPIROX-SOLUTION-8% | 2012Q4 |
| 160 | CICLOPIROX-SOLUTION-8% | 2013Q3 |
| 161 | CICLOPIROX-SOLUTION-8% | 2013Q4 |
| 162 | CICLOPIROX-SOLUTION-8% | 2014Q1 |
| 163 | CICLOPIROX-SOLUTION-8% | 2015Q2 |
| 164 | CICLOPIROX-SOLUTION-8% | 2017Q3 |
| 165 | CICLOPIROX-SOLUTION-8% | 2017Q4 |
| 166 | CICLOPIROX-SOLUTION-8% | 2018Q4 |
| 167 | CLINDAMYCIN PHOSPHATE-CREAM-EQ2%BASE | 2012Q4 |
| 168 | CLINDAMYCIN PHOSPHATE-CREAM-EQ2%BASE | 2013Q1 |
| 169 | CLINDAMYCIN PHOSPHATE-CREAM-EQ2%BASE | 2013Q2 |
| 170 | CLINDAMYCIN PHOSPHATE-CREAM-EQ2%BASE | 2013Q3 |
| 171 | CLINDAMYCIN PHOSPHATE-CREAM-EQ2%BASE | 2013Q4 |

# Appendix D Table 1

## Periods of Failure to Supply Penalties by Drug At-Issue

| # | At-Issue Drug | Quarter With FTS/Shortages Adjustments |
|---|---|---|
| 172 | CLINDAMYCIN PHOSPHATE-CREAM-EQ2%BASE | 2014Q3 |
| 173 | CLINDAMYCIN PHOSPHATE-CREAM-EQ2%BASE | 2017Q3 |
| 174 | CLINDAMYCIN PHOSPHATE-CREAM-EQ2%BASE | 2018Q2 |
| 175 | CLINDAMYCIN PHOSPHATE-GEL-EQ1%BASE | 2012Q4 |
| 176 | CLINDAMYCIN PHOSPHATE-GEL-EQ1%BASE | 2013Q2 |
| 177 | CLINDAMYCIN PHOSPHATE-GEL-EQ1%BASE | 2013Q3 |
| 178 | CLINDAMYCIN PHOSPHATE-GEL-EQ1%BASE | 2014Q1 |
| 179 | CLINDAMYCIN PHOSPHATE-GEL-EQ1%BASE | 2014Q2 |
| 180 | CLINDAMYCIN PHOSPHATE-GEL-EQ1%BASE | 2014Q3 |
| 181 | CLINDAMYCIN PHOSPHATE-GEL-EQ1%BASE | 2014Q4 |
| 182 | CLINDAMYCIN PHOSPHATE-GEL-EQ1%BASE | 2015Q4 |
| 183 | CLINDAMYCIN PHOSPHATE-GEL-EQ1%BASE | 2016Q4 |
| 184 | CLINDAMYCIN PHOSPHATE-GEL-EQ1%BASE | 2017Q2 |
| 185 | CLINDAMYCIN PHOSPHATE-GEL-EQ1%BASE | 2018Q2 |
| 186 | CLINDAMYCIN PHOSPHATE-GEL-EQ1%BASE | 2018Q3 |
| 187 | CLINDAMYCIN PHOSPHATE-LOTION-EQ1%BASE | 2013Q2 |
| 188 | CLINDAMYCIN PHOSPHATE-LOTION-EQ1%BASE | 2013Q4 |
| 189 | CLINDAMYCIN PHOSPHATE-LOTION-EQ1%BASE | 2014Q2 |
| 190 | CLINDAMYCIN PHOSPHATE-LOTION-EQ1%BASE | 2014Q3 |
| 191 | CLINDAMYCIN PHOSPHATE-LOTION-EQ1%BASE | 2014Q4 |
| 192 | CLINDAMYCIN PHOSPHATE-LOTION-EQ1%BASE | 2015Q4 |
| 193 | CLINDAMYCIN PHOSPHATE-LOTION-EQ1%BASE | 2016Q1 |
| 194 | CLINDAMYCIN PHOSPHATE-LOTION-EQ1%BASE | 2017Q1 |
| 195 | CLINDAMYCIN PHOSPHATE-LOTION-EQ1%BASE | 2017Q2 |
| 196 | CLINDAMYCIN PHOSPHATE-LOTION-EQ1%BASE | 2018Q1 |
| 197 | CLINDAMYCIN PHOSPHATE-LOTION-EQ1%BASE | 2018Q3 |
| 198 | CLINDAMYCIN PHOSPHATE-LOTION-EQ1%BASE | 2018Q4 |
| 199 | CLINDAMYCIN PHOSPHATE-SOLUTION-EQ1%BASE | 2012Q4 |
| 200 | CLINDAMYCIN PHOSPHATE-SOLUTION-EQ1%BASE | 2013Q1 |
| 201 | CLINDAMYCIN PHOSPHATE-SOLUTION-EQ1%BASE | 2013Q2 |
| 202 | CLINDAMYCIN PHOSPHATE-SOLUTION-EQ1%BASE | 2013Q3 |
| 203 | CLINDAMYCIN PHOSPHATE-SOLUTION-EQ1%BASE | 2013Q4 |
| 204 | CLINDAMYCIN PHOSPHATE-SOLUTION-EQ1%BASE | 2014Q2 |
| 205 | CLINDAMYCIN PHOSPHATE-SOLUTION-EQ1%BASE | 2014Q4 |
| 206 | CLINDAMYCIN PHOSPHATE-SOLUTION-EQ1%BASE | 2015Q1 |
| 207 | CLINDAMYCIN PHOSPHATE-SOLUTION-EQ1%BASE | 2015Q2 |
| 208 | CLINDAMYCIN PHOSPHATE-SOLUTION-EQ1%BASE | 2015Q3 |
| 209 | CLINDAMYCIN PHOSPHATE-SOLUTION-EQ1%BASE | 2015Q4 |
| 210 | CLINDAMYCIN PHOSPHATE-SOLUTION-EQ1%BASE | 2016Q1 |
| 211 | CLINDAMYCIN PHOSPHATE-SOLUTION-EQ1%BASE | 2016Q2 |
| 212 | CLINDAMYCIN PHOSPHATE-SOLUTION-EQ1%BASE | 2017Q1 |
| 213 | CLINDAMYCIN PHOSPHATE-SOLUTION-EQ1%BASE | 2017Q2 |
| 214 | CLINDAMYCIN PHOSPHATE-SOLUTION-EQ1%BASE | 2017Q3 |
| 215 | CLINDAMYCIN PHOSPHATE-SOLUTION-EQ1%BASE | 2018Q1 |
| 216 | CLINDAMYCIN PHOSPHATE-SOLUTION-EQ1%BASE | 2018Q2 |
| 217 | CLINDAMYCIN PHOSPHATE-SOLUTION-EQ1%BASE | 2018Q4 |
| 218 | CLOBETASOL PROPIONATE EMOLLIENT-CREAM-0.05% | 2013Q3 |
| 219 | CLOBETASOL PROPIONATE EMOLLIENT-CREAM-0.05% | 2014Q3 |
| 220 | CLOBETASOL PROPIONATE EMOLLIENT-CREAM-0.05% | 2015Q4 |
| 221 | CLOBETASOL PROPIONATE EMOLLIENT-CREAM-0.05% | 2016Q1 |
| 222 | CLOBETASOL PROPIONATE-CREAM-0.05% | 2013Q3 |
| 223 | CLOBETASOL PROPIONATE-CREAM-0.05% | 2016Q1 |
| 224 | CLOBETASOL PROPIONATE-CREAM-0.05% | 2016Q4 |
| 225 | CLOBETASOL PROPIONATE-CREAM-0.05% | 2017Q1 |
| 226 | CLOBETASOL PROPIONATE-CREAM-0.05% | 2018Q4 |
| 227 | CLOBETASOL PROPIONATE-GEL-0.05% | 2015Q2 |
| 228 | CLOBETASOL PROPIONATE-GEL-0.05% | 2015Q4 |

# Appendix D Table 1
Periods of Failure to Supply Penalties by Drug At-Issue

| # | At-Issue Drug | Quarter With FTS/Shortages Adjustments |
|---|---|---|
| 229 | CLOBETASOL PROPIONATE-GEL-0.05% | 2016Q1 |
| 230 | CLOBETASOL PROPIONATE-GEL-0.05% | 2017Q2 |
| 231 | CLOBETASOL PROPIONATE-GEL-0.05% | 2017Q4 |
| 232 | CLOBETASOL PROPIONATE-GEL-0.05% | 2018Q1 |
| 233 | CLOBETASOL PROPIONATE-GEL-0.05% | 2018Q2 |
| 234 | CLOBETASOL PROPIONATE-GEL-0.05% | 2018Q3 |
| 235 | CLOBETASOL PROPIONATE-GEL-0.05% | 2018Q4 |
| 236 | CLOBETASOL PROPIONATE-OINTMENT-0.05% | 2013Q4 |
| 237 | CLOBETASOL PROPIONATE-OINTMENT-0.05% | 2014Q1 |
| 238 | CLOBETASOL PROPIONATE-OINTMENT-0.05% | 2014Q2 |
| 239 | CLOBETASOL PROPIONATE-OINTMENT-0.05% | 2014Q4 |
| 240 | CLOBETASOL PROPIONATE-OINTMENT-0.05% | 2015Q4 |
| 241 | CLOBETASOL PROPIONATE-OINTMENT-0.05% | 2016Q1 |
| 242 | CLOBETASOL PROPIONATE-OINTMENT-0.05% | 2016Q4 |
| 243 | CLOBETASOL PROPIONATE-OINTMENT-0.05% | 2017Q1 |
| 244 | CLOBETASOL PROPIONATE-SOLUTION-0.05% | 2018Q2 |
| 245 | CLOBETASOL PROPIONATE-SOLUTION-0.05% | 2018Q3 |
| 246 | CLOTRIMAZOLE-CREAM-1% | 2013Q3 |
| 247 | CLOTRIMAZOLE-CREAM-1% | 2013Q4 |
| 248 | DESONIDE-CREAM-0.05% | 2011Q1 |
| 249 | DESONIDE-CREAM-0.05% | 2011Q2 |
| 250 | DESONIDE-CREAM-0.05% | 2011Q4 |
| 251 | DESONIDE-CREAM-0.05% | 2012Q2 |
| 252 | DESONIDE-CREAM-0.05% | 2013Q1 |
| 253 | DESONIDE-CREAM-0.05% | 2013Q2 |
| 254 | DESONIDE-CREAM-0.05% | 2013Q3 |
| 255 | DESONIDE-CREAM-0.05% | 2013Q4 |
| 256 | DESONIDE-CREAM-0.05% | 2014Q2 |
| 257 | DESONIDE-CREAM-0.05% | 2015Q1 |
| 258 | DESONIDE-CREAM-0.05% | 2015Q4 |
| 259 | DESONIDE-CREAM-0.05% | 2018Q1 |
| 260 | DESONIDE-LOTION-0.05% | 2014Q2 |
| 261 | DESONIDE-LOTION-0.05% | 2016Q1 |
| 262 | DESONIDE-OINTMENT-0.05% | 2011Q1 |
| 263 | DESONIDE-OINTMENT-0.05% | 2011Q4 |
| 264 | DESONIDE-OINTMENT-0.05% | 2012Q2 |
| 265 | DESONIDE-OINTMENT-0.05% | 2012Q4 |
| 266 | DESONIDE-OINTMENT-0.05% | 2013Q3 |
| 267 | DESONIDE-OINTMENT-0.05% | 2015Q1 |
| 268 | DESONIDE-OINTMENT-0.05% | 2015Q2 |
| 269 | DESONIDE-OINTMENT-0.05% | 2015Q4 |
| 270 | DESONIDE-OINTMENT-0.05% | 2016Q1 |
| 271 | DESONIDE-OINTMENT-0.05% | 2017Q2 |
| 272 | DESOXIMETASONE-OINTMENT-0.25% | 2015Q4 |
| 273 | DESOXIMETASONE-OINTMENT-0.25% | 2016Q3 |
| 274 | DESOXIMETASONE-OINTMENT-0.25% | 2017Q1 |
| 275 | DESOXIMETASONE-OINTMENT-0.25% | 2017Q3 |
| 276 | DESOXIMETASONE-OINTMENT-0.25% | 2017Q4 |
| 277 | DESOXIMETASONE-OINTMENT-0.25% | 2018Q1 |
| 278 | ECONAZOLE NITRATE-CREAM-1% | 2012Q1 |
| 279 | ECONAZOLE NITRATE-CREAM-1% | 2012Q4 |
| 280 | ECONAZOLE NITRATE-CREAM-1% | 2013Q1 |
| 281 | ECONAZOLE NITRATE-CREAM-1% | 2013Q2 |
| 282 | ECONAZOLE NITRATE-CREAM-1% | 2013Q3 |
| 283 | ECONAZOLE NITRATE-CREAM-1% | 2013Q4 |
| 284 | ECONAZOLE NITRATE-CREAM-1% | 2014Q1 |
| 285 | ECONAZOLE NITRATE-CREAM-1% | 2014Q2 |

# Appendix D Table 1

Periods of Failure to Supply Penalties by Drug At-Issue

| # | At-Issue Drug | Quarter With FTS/Shortages Adjustments |
|---|---|---|
| 286 | ECONAZOLE NITRATE-CREAM-1% | 2014Q4 |
| 287 | ECONAZOLE NITRATE-CREAM-1% | 2015Q1 |
| 288 | ECONAZOLE NITRATE-CREAM-1% | 2015Q2 |
| 289 | ECONAZOLE NITRATE-CREAM-1% | 2015Q3 |
| 290 | ECONAZOLE NITRATE-CREAM-1% | 2015Q4 |
| 291 | ECONAZOLE NITRATE-CREAM-1% | 2016Q1 |
| 292 | ECONAZOLE NITRATE-CREAM-1% | 2016Q3 |
| 293 | ECONAZOLE NITRATE-CREAM-1% | 2016Q4 |
| 294 | ECONAZOLE NITRATE-CREAM-1% | 2017Q1 |
| 295 | ECONAZOLE NITRATE-CREAM-1% | 2017Q3 |
| 296 | ECONAZOLE NITRATE-CREAM-1% | 2017Q4 |
| 297 | ECONAZOLE NITRATE-CREAM-1% | 2018Q2 |
| 298 | ECONAZOLE NITRATE-CREAM-1% | 2018Q3 |
| 299 | ECONAZOLE NITRATE-CREAM-1% | 2018Q4 |
| 300 | EPLERENONE-TABLET-25MG | 2013Q2 |
| 301 | EPLERENONE-TABLET-25MG | 2013Q4 |
| 302 | EPLERENONE-TABLET-25MG | 2015Q1 |
| 303 | EPLERENONE-TABLET-25MG | 2015Q4 |
| 304 | EPLERENONE-TABLET-25MG | 2016Q4 |
| 305 | EPLERENONE-TABLET-25MG | 2017Q1 |
| 306 | EPLERENONE-TABLET-25MG | 2018Q1 |
| 307 | EPLERENONE-TABLET-25MG | 2018Q2 |
| 308 | EPLERENONE-TABLET-25MG | 2018Q4 |
| 309 | EPLERENONE-TABLET-50MG | 2010Q3 |
| 310 | EPLERENONE-TABLET-50MG | 2011Q3 |
| 311 | EPLERENONE-TABLET-50MG | 2013Q2 |
| 312 | ERYTHROMYCIN-SOLUTION-2% | 2014Q2 |
| 313 | ERYTHROMYCIN-SOLUTION-2% | 2015Q2 |
| 314 | ERYTHROMYCIN-SOLUTION-2% | 2015Q3 |
| 315 | ERYTHROMYCIN-SOLUTION-2% | 2015Q4 |
| 316 | ERYTHROMYCIN-SOLUTION-2% | 2017Q3 |
| 317 | FLUOCINOLONE ACETONIDE-CREAM-0.01% | 2014Q2 |
| 318 | FLUOCINOLONE ACETONIDE-OINTMENT-0.025% | 2013Q4 |
| 319 | FLUOCINOLONE ACETONIDE-OINTMENT-0.025% | 2015Q1 |
| 320 | FLUOCINONIDE-CREAM-0.1% | 2016Q1 |
| 321 | FLUOCINONIDE-CREAM-0.1% | 2017Q1 |
| 322 | FLUOCINONIDE-CREAM-0.1% | 2017Q4 |
| 323 | FLUOCINONIDE-CREAM-0.1% | 2018Q2 |
| 324 | FLUOCINONIDE-CREAM-0.1% | 2018Q3 |
| 325 | FLUOCINONIDE-CREAM-0.1% | 2018Q4 |
| 326 | FLUOCINONIDE-SOLUTION-0.05% | 2013Q2 |
| 327 | FLUOCINONIDE-SOLUTION-0.05% | 2013Q4 |
| 328 | FLUOCINONIDE-SOLUTION-0.05% | 2018Q2 |
| 329 | FLUOCINONIDE-SOLUTION-0.05% | 2018Q3 |
| 330 | FLUTICASONE PROPIONATE-LOTION-0.05% | 2013Q4 |
| 331 | FLUTICASONE PROPIONATE-LOTION-0.05% | 2015Q4 |
| 332 | FLUTICASONE PROPIONATE-LOTION-0.05% | 2016Q1 |
| 333 | FLUTICASONE PROPIONATE-LOTION-0.05% | 2016Q2 |
| 334 | FLUTICASONE PROPIONATE-LOTION-0.05% | 2018Q4 |
| 335 | HALOBETASOL PROPIONATE-CREAM-0.05% | 2010Q3 |
| 336 | HALOBETASOL PROPIONATE-CREAM-0.05% | 2010Q4 |
| 337 | HALOBETASOL PROPIONATE-CREAM-0.05% | 2011Q1 |
| 338 | HALOBETASOL PROPIONATE-CREAM-0.05% | 2011Q4 |
| 339 | HALOBETASOL PROPIONATE-CREAM-0.05% | 2012Q2 |
| 340 | HALOBETASOL PROPIONATE-CREAM-0.05% | 2013Q4 |
| 341 | HALOBETASOL PROPIONATE-CREAM-0.05% | 2017Q4 |
| 342 | HALOBETASOL PROPIONATE-CREAM-0.05% | 2018Q2 |

# Appendix D Table 1
Periods of Failure to Supply Penalties by Drug At-Issue

| # | At-Issue Drug | Quarter With FTS/Shortages Adjustments |
|---|---|---|
| 343 | HALOBETASOL PROPIONATE-CREAM-0.05% | 2018Q3 |
| 344 | HALOBETASOL PROPIONATE-CREAM-0.05% | 2018Q4 |
| 345 | HALOBETASOL PROPIONATE-OINTMENT-0.05% | 2010Q1 |
| 346 | HALOBETASOL PROPIONATE-OINTMENT-0.05% | 2010Q2 |
| 347 | HALOBETASOL PROPIONATE-OINTMENT-0.05% | 2010Q3 |
| 348 | HALOBETASOL PROPIONATE-OINTMENT-0.05% | 2010Q4 |
| 349 | HALOBETASOL PROPIONATE-OINTMENT-0.05% | 2011Q1 |
| 350 | HALOBETASOL PROPIONATE-OINTMENT-0.05% | 2011Q2 |
| 351 | HALOBETASOL PROPIONATE-OINTMENT-0.05% | 2011Q3 |
| 352 | HALOBETASOL PROPIONATE-OINTMENT-0.05% | 2011Q4 |
| 353 | HALOBETASOL PROPIONATE-OINTMENT-0.05% | 2012Q2 |
| 354 | HALOBETASOL PROPIONATE-OINTMENT-0.05% | 2012Q4 |
| 355 | HALOBETASOL PROPIONATE-OINTMENT-0.05% | 2017Q1 |
| 356 | HALOBETASOL PROPIONATE-OINTMENT-0.05% | 2017Q2 |
| 357 | HALOBETASOL PROPIONATE-OINTMENT-0.05% | 2017Q3 |
| 358 | HALOBETASOL PROPIONATE-OINTMENT-0.05% | 2017Q4 |
| 359 | HALOBETASOL PROPIONATE-OINTMENT-0.05% | 2018Q1 |
| 360 | HALOBETASOL PROPIONATE-OINTMENT-0.05% | 2018Q2 |
| 361 | HALOBETASOL PROPIONATE-OINTMENT-0.05% | 2018Q3 |
| 362 | HALOBETASOL PROPIONATE-OINTMENT-0.05% | 2018Q4 |
| 363 | HYDROCORTISONE ACETATE-SUPPOSITORY-25MG | 2014Q2 |
| 364 | HYDROCORTISONE ACETATE-SUPPOSITORY-25MG | 2017Q1 |
| 365 | HYDROCORTISONE ACETATE-SUPPOSITORY-25MG | 2018Q4 |
| 366 | HYDROCORTISONE VALERATE-CREAM-0.2% | 2009Q2 |
| 367 | HYDROCORTISONE VALERATE-CREAM-0.2% | 2009Q4 |
| 368 | HYDROCORTISONE VALERATE-CREAM-0.2% | 2010Q2 |
| 369 | HYDROCORTISONE VALERATE-CREAM-0.2% | 2011Q1 |
| 370 | HYDROCORTISONE VALERATE-CREAM-0.2% | 2011Q4 |
| 371 | HYDROCORTISONE VALERATE-CREAM-0.2% | 2013Q1 |
| 372 | HYDROCORTISONE VALERATE-CREAM-0.2% | 2013Q2 |
| 373 | HYDROCORTISONE VALERATE-CREAM-0.2% | 2013Q4 |
| 374 | HYDROCORTISONE VALERATE-CREAM-0.2% | 2014Q1 |
| 375 | HYDROCORTISONE VALERATE-CREAM-0.2% | 2014Q2 |
| 376 | HYDROCORTISONE VALERATE-CREAM-0.2% | 2014Q3 |
| 377 | HYDROCORTISONE VALERATE-CREAM-0.2% | 2014Q4 |
| 378 | HYDROCORTISONE VALERATE-CREAM-0.2% | 2015Q1 |
| 379 | HYDROCORTISONE VALERATE-CREAM-0.2% | 2015Q2 |
| 380 | HYDROCORTISONE VALERATE-CREAM-0.2% | 2016Q1 |
| 381 | HYDROCORTISONE VALERATE-CREAM-0.2% | 2016Q2 |
| 382 | HYDROCORTISONE VALERATE-CREAM-0.2% | 2016Q3 |
| 383 | HYDROCORTISONE VALERATE-CREAM-0.2% | 2016Q4 |
| 384 | HYDROCORTISONE VALERATE-CREAM-0.2% | 2017Q1 |
| 385 | HYDROCORTISONE VALERATE-CREAM-0.2% | 2017Q2 |
| 386 | HYDROCORTISONE VALERATE-CREAM-0.2% | 2017Q3 |
| 387 | HYDROCORTISONE VALERATE-CREAM-0.2% | 2017Q4 |
| 388 | HYDROCORTISONE VALERATE-CREAM-0.2% | 2018Q1 |
| 389 | HYDROCORTISONE VALERATE-CREAM-0.2% | 2018Q2 |
| 390 | HYDROCORTISONE VALERATE-CREAM-0.2% | 2018Q3 |
| 391 | HYDROCORTISONE VALERATE-CREAM-0.2% | 2018Q4 |
| 392 | IMIQUIMOD-CREAM-5% | 2011Q3 |
| 393 | IMIQUIMOD-CREAM-5% | 2013Q3 |
| 394 | IMIQUIMOD-CREAM-5% | 2014Q3 |
| 395 | IMIQUIMOD-CREAM-5% | 2015Q4 |
| 396 | IMIQUIMOD-CREAM-5% | 2016Q2 |
| 397 | IMIQUIMOD-CREAM-5% | 2016Q3 |
| 398 | IMIQUIMOD-CREAM-5% | 2016Q4 |
| 399 | IMIQUIMOD-CREAM-5% | 2017Q1 |

# Appendix D Table 1
Periods of Failure to Supply Penalties by Drug At-Issue

| # | At-Issue Drug | Quarter With FTS/Shortages Adjustments |
|---|---|---|
| 400 | IMIQUIMOD-CREAM-5% | 2017Q2 |
| 401 | IMIQUIMOD-CREAM-5% | 2017Q3 |
| 402 | IMIQUIMOD-CREAM-5% | 2017Q4 |
| 403 | IMIQUIMOD-CREAM-5% | 2018Q1 |
| 404 | IMIQUIMOD-CREAM-5% | 2018Q2 |
| 405 | IMIQUIMOD-CREAM-5% | 2018Q3 |
| 406 | IMIQUIMOD-CREAM-5% | 2018Q4 |
| 407 | KETOCONAZOLE-CREAM-2% | 2016Q1 |
| 408 | KETOCONAZOLE-CREAM-2% | 2018Q4 |
| 409 | LATANOPROST-SOLUTION/DROPS-0.005% | 2012Q4 |
| 410 | LATANOPROST-SOLUTION/DROPS-0.005% | 2013Q1 |
| 411 | LATANOPROST-SOLUTION/DROPS-0.005% | 2013Q2 |
| 412 | LATANOPROST-SOLUTION/DROPS-0.005% | 2014Q2 |
| 413 | LATANOPROST-SOLUTION/DROPS-0.005% | 2014Q3 |
| 414 | LATANOPROST-SOLUTION/DROPS-0.005% | 2015Q1 |
| 415 | LATANOPROST-SOLUTION/DROPS-0.005% | 2015Q2 |
| 416 | LATANOPROST-SOLUTION/DROPS-0.005% | 2016Q1 |
| 417 | LATANOPROST-SOLUTION/DROPS-0.005% | 2016Q2 |
| 418 | LATANOPROST-SOLUTION/DROPS-0.005% | 2016Q3 |
| 419 | LATANOPROST-SOLUTION/DROPS-0.005% | 2017Q2 |
| 420 | LATANOPROST-SOLUTION/DROPS-0.005% | 2017Q3 |
| 421 | LATANOPROST-SOLUTION/DROPS-0.005% | 2017Q4 |
| 422 | LATANOPROST-SOLUTION/DROPS-0.005% | 2018Q1 |
| 423 | LATANOPROST-SOLUTION/DROPS-0.005% | 2018Q2 |
| 424 | LATANOPROST-SOLUTION/DROPS-0.005% | 2018Q3 |
| 425 | LATANOPROST-SOLUTION/DROPS-0.005% | 2018Q4 |
| 426 | LIDOCAINE-OINTMENT-5% | 2013Q3 |
| 427 | LIDOCAINE-OINTMENT-5% | 2013Q4 |
| 428 | LIDOCAINE-OINTMENT-5% | 2015Q3 |
| 429 | METFORMIN HYDROCHLORIDE; PIOGLITAZONE HYDROCHLORIDE-TABLET-500MG;EQ15MGBASE | 2013Q4 |
| 430 | METFORMIN HYDROCHLORIDE; PIOGLITAZONE HYDROCHLORIDE-TABLET-500MG;EQ15MGBASE | 2015Q3 |
| 431 | METFORMIN HYDROCHLORIDE; PIOGLITAZONE HYDROCHLORIDE-TABLET-500MG;EQ15MGBASE | 2016Q1 |
| 432 | METFORMIN HYDROCHLORIDE; PIOGLITAZONE HYDROCHLORIDE-TABLET-500MG;EQ15MGBASE | 2016Q2 |
| 433 | METFORMIN HYDROCHLORIDE; PIOGLITAZONE HYDROCHLORIDE-TABLET-500MG;EQ15MGBASE | 2016Q4 |
| 434 | METFORMIN HYDROCHLORIDE; PIOGLITAZONE HYDROCHLORIDE-TABLET-850MG;EQ15MGBASE | 2015Q2 |
| 435 | METFORMIN HYDROCHLORIDE; PIOGLITAZONE HYDROCHLORIDE-TABLET-850MG;EQ15MGBASE | 2015Q3 |
| 436 | METFORMIN HYDROCHLORIDE; PIOGLITAZONE HYDROCHLORIDE-TABLET-850MG;EQ15MGBASE | 2016Q1 |
| 437 | METFORMIN HYDROCHLORIDE; PIOGLITAZONE HYDROCHLORIDE-TABLET-850MG;EQ15MGBASE | 2016Q2 |
| 438 | METHAZOLAMIDE-TABLET-25MG | 2015Q1 |
| 439 | METHAZOLAMIDE-TABLET-50MG | 2014Q4 |
| 440 | METHAZOLAMIDE-TABLET-50MG | 2015Q4 |
| 441 | METHYLPHENIDATE HCL-TABLET, EXTENDED RELEASE-20MG | 2011Q1 |
| 442 | METHYLPHENIDATE HCL-TABLET, EXTENDED RELEASE-20MG | 2011Q2 |
| 443 | METHYLPHENIDATE HCL-TABLET, EXTENDED RELEASE-20MG | 2011Q3 |
| 444 | METHYLPHENIDATE HCL-TABLET, EXTENDED RELEASE-20MG | 2011Q4 |
| 445 | METHYLPHENIDATE HCL-TABLET, EXTENDED RELEASE-20MG | 2012Q1 |
| 446 | METHYLPHENIDATE HCL-TABLET, EXTENDED RELEASE-20MG | 2012Q2 |
| 447 | METHYLPHENIDATE HCL-TABLET, EXTENDED RELEASE-20MG | 2012Q3 |
| 448 | METHYLPHENIDATE HCL-TABLET, EXTENDED RELEASE-20MG | 2012Q4 |
| 449 | METHYLPHENIDATE HCL-TABLET, EXTENDED RELEASE-20MG | 2013Q1 |
| 450 | METHYLPHENIDATE HCL-TABLET, EXTENDED RELEASE-20MG | 2013Q2 |
| 451 | METHYLPHENIDATE HCL-TABLET, EXTENDED RELEASE-20MG | 2013Q3 |
| 452 | METHYLPHENIDATE HCL-TABLET, EXTENDED RELEASE-20MG | 2013Q4 |
| 453 | METHYLPHENIDATE HCL-TABLET, EXTENDED RELEASE-20MG | 2014Q1 |
| 454 | METHYLPHENIDATE HCL-TABLET, EXTENDED RELEASE-20MG | 2014Q2 |
| 455 | METHYLPHENIDATE HCL-TABLET, EXTENDED RELEASE-20MG | 2014Q3 |
| 456 | METHYLPHENIDATE HCL-TABLET, EXTENDED RELEASE-20MG | 2015Q1 |

# Appendix D Table 1

## Periods of Failure to Supply Penalties by Drug At-Issue

| # | At-Issue Drug | Quarter With FTS/Shortages Adjustments |
|---|---|---|
| 457 | METHYLPHENIDATE HCL-TABLET, EXTENDED RELEASE-20MG | 2015Q2 |
| 458 | METHYLPHENIDATE HCL-TABLET, EXTENDED RELEASE-20MG | 2016Q1 |
| 459 | METHYLPHENIDATE HCL-TABLET, EXTENDED RELEASE-20MG | 2016Q3 |
| 460 | METHYLPHENIDATE HCL-TABLET, EXTENDED RELEASE-20MG | 2017Q1 |
| 461 | METHYLPHENIDATE HCL-TABLET-10MG | 2011Q1 |
| 462 | METHYLPHENIDATE HCL-TABLET-10MG | 2011Q2 |
| 463 | METHYLPHENIDATE HCL-TABLET-10MG | 2011Q3 |
| 464 | METHYLPHENIDATE HCL-TABLET-10MG | 2011Q4 |
| 465 | METHYLPHENIDATE HCL-TABLET-10MG | 2012Q1 |
| 466 | METHYLPHENIDATE HCL-TABLET-10MG | 2012Q2 |
| 467 | METHYLPHENIDATE HCL-TABLET-10MG | 2012Q3 |
| 468 | METHYLPHENIDATE HCL-TABLET-10MG | 2012Q4 |
| 469 | METHYLPHENIDATE HCL-TABLET-10MG | 2013Q1 |
| 470 | METHYLPHENIDATE HCL-TABLET-10MG | 2013Q2 |
| 471 | METHYLPHENIDATE HCL-TABLET-10MG | 2013Q3 |
| 472 | METHYLPHENIDATE HCL-TABLET-10MG | 2014Q1 |
| 473 | METHYLPHENIDATE HCL-TABLET-10MG | 2014Q2 |
| 474 | METHYLPHENIDATE HCL-TABLET-10MG | 2014Q4 |
| 475 | METHYLPHENIDATE HCL-TABLET-10MG | 2015Q1 |
| 476 | METHYLPHENIDATE HCL-TABLET-10MG | 2015Q2 |
| 477 | METHYLPHENIDATE HCL-TABLET-10MG | 2016Q1 |
| 478 | METHYLPHENIDATE HCL-TABLET-10MG | 2016Q4 |
| 479 | METHYLPHENIDATE HCL-TABLET-10MG | 2017Q1 |
| 480 | METHYLPHENIDATE HCL-TABLET-10MG | 2017Q2 |
| 481 | METHYLPHENIDATE HCL-TABLET-20MG | 2011Q1 |
| 482 | METHYLPHENIDATE HCL-TABLET-20MG | 2011Q3 |
| 483 | METHYLPHENIDATE HCL-TABLET-20MG | 2011Q4 |
| 484 | METHYLPHENIDATE HCL-TABLET-20MG | 2012Q1 |
| 485 | METHYLPHENIDATE HCL-TABLET-20MG | 2012Q2 |
| 486 | METHYLPHENIDATE HCL-TABLET-20MG | 2012Q3 |
| 487 | METHYLPHENIDATE HCL-TABLET-20MG | 2012Q4 |
| 488 | METHYLPHENIDATE HCL-TABLET-20MG | 2013Q1 |
| 489 | METHYLPHENIDATE HCL-TABLET-20MG | 2013Q2 |
| 490 | METHYLPHENIDATE HCL-TABLET-20MG | 2013Q3 |
| 491 | METHYLPHENIDATE HCL-TABLET-20MG | 2014Q1 |
| 492 | METHYLPHENIDATE HCL-TABLET-20MG | 2014Q2 |
| 493 | METHYLPHENIDATE HCL-TABLET-20MG | 2015Q1 |
| 494 | METHYLPHENIDATE HCL-TABLET-20MG | 2015Q2 |
| 495 | METHYLPHENIDATE HCL-TABLET-20MG | 2016Q1 |
| 496 | METHYLPHENIDATE HCL-TABLET-20MG | 2016Q2 |
| 497 | METHYLPHENIDATE HCL-TABLET-20MG | 2016Q4 |
| 498 | METHYLPHENIDATE HCL-TABLET-20MG | 2017Q1 |
| 499 | METHYLPHENIDATE HCL-TABLET-5MG | 2011Q1 |
| 500 | METHYLPHENIDATE HCL-TABLET-5MG | 2011Q2 |
| 501 | METHYLPHENIDATE HCL-TABLET-5MG | 2011Q3 |
| 502 | METHYLPHENIDATE HCL-TABLET-5MG | 2011Q4 |
| 503 | METHYLPHENIDATE HCL-TABLET-5MG | 2012Q1 |
| 504 | METHYLPHENIDATE HCL-TABLET-5MG | 2012Q2 |
| 505 | METHYLPHENIDATE HCL-TABLET-5MG | 2012Q3 |
| 506 | METHYLPHENIDATE HCL-TABLET-5MG | 2012Q4 |
| 507 | METHYLPHENIDATE HCL-TABLET-5MG | 2013Q1 |
| 508 | METHYLPHENIDATE HCL-TABLET-5MG | 2013Q2 |
| 509 | METHYLPHENIDATE HCL-TABLET-5MG | 2013Q3 |
| 510 | METHYLPHENIDATE HCL-TABLET-5MG | 2013Q4 |
| 511 | METHYLPHENIDATE HCL-TABLET-5MG | 2014Q1 |
| 512 | METHYLPHENIDATE HCL-TABLET-5MG | 2014Q3 |
| 513 | METHYLPHENIDATE HCL-TABLET-5MG | 2014Q4 |

# Appendix D Table 1
Periods of Failure to Supply Penalties by Drug At-Issue

| # | At-Issue Drug | Quarter With FTS/Shortages Adjustments |
|---|---|---|
| 514 | METHYLPHENIDATE HCL-TABLET-5MG | 2015Q1 |
| 515 | METHYLPHENIDATE HCL-TABLET-5MG | 2015Q2 |
| 516 | METHYLPHENIDATE HCL-TABLET-5MG | 2016Q1 |
| 517 | METHYLPHENIDATE HCL-TABLET-5MG | 2017Q1 |
| 518 | METRONIDAZOLE-CREAM-0.75% | 2013Q3 |
| 519 | METRONIDAZOLE-CREAM-0.75% | 2017Q2 |
| 520 | METRONIDAZOLE-CREAM-0.75% | 2018Q4 |
| 521 | METRONIDAZOLE-GEL-0.75% | 2009Q1 |
| 522 | METRONIDAZOLE-GEL-0.75% | 2014Q2 |
| 523 | METRONIDAZOLE-GEL-0.75% | 2015Q1 |
| 524 | METRONIDAZOLE-GEL-1% | 2017Q4 |
| 525 | METRONIDAZOLE-LOTION-0.75% | 2013Q4 |
| 526 | METRONIDAZOLE-LOTION-0.75% | 2015Q1 |
| 527 | METRONIDAZOLE-LOTION-0.75% | 2015Q4 |
| 528 | MOMETASONE FUROATE-CREAM-0.1% | 2011Q1 |
| 529 | MOMETASONE FUROATE-CREAM-0.1% | 2011Q2 |
| 530 | MOMETASONE FUROATE-CREAM-0.1% | 2012Q2 |
| 531 | MOMETASONE FUROATE-CREAM-0.1% | 2013Q2 |
| 532 | MOMETASONE FUROATE-CREAM-0.1% | 2014Q3 |
| 533 | MOMETASONE FUROATE-CREAM-0.1% | 2015Q2 |
| 534 | MOMETASONE FUROATE-CREAM-0.1% | 2016Q1 |
| 535 | MOMETASONE FUROATE-CREAM-0.1% | 2016Q2 |
| 536 | MOMETASONE FUROATE-CREAM-0.1% | 2016Q4 |
| 537 | MOMETASONE FUROATE-CREAM-0.1% | 2017Q1 |
| 538 | MOMETASONE FUROATE-CREAM-0.1% | 2017Q2 |
| 539 | MOMETASONE FUROATE-CREAM-0.1% | 2018Q2 |
| 540 | MOMETASONE FUROATE-CREAM-0.1% | 2018Q3 |
| 541 | MOMETASONE FUROATE-CREAM-0.1% | 2018Q4 |
| 542 | MOMETASONE FUROATE-OINTMENT-0.1% | 2011Q2 |
| 543 | MOMETASONE FUROATE-OINTMENT-0.1% | 2012Q2 |
| 544 | MOMETASONE FUROATE-OINTMENT-0.1% | 2012Q4 |
| 545 | MOMETASONE FUROATE-OINTMENT-0.1% | 2014Q1 |
| 546 | MOMETASONE FUROATE-OINTMENT-0.1% | 2014Q2 |
| 547 | MOMETASONE FUROATE-OINTMENT-0.1% | 2014Q3 |
| 548 | MOMETASONE FUROATE-OINTMENT-0.1% | 2015Q3 |
| 549 | MOMETASONE FUROATE-OINTMENT-0.1% | 2015Q4 |
| 550 | MOMETASONE FUROATE-OINTMENT-0.1% | 2016Q1 |
| 551 | MOMETASONE FUROATE-OINTMENT-0.1% | 2016Q3 |
| 552 | MOMETASONE FUROATE-OINTMENT-0.1% | 2018Q1 |
| 553 | MOMETASONE FUROATE-OINTMENT-0.1% | 2018Q4 |
| 554 | MOMETASONE FUROATE-SOLUTION-0.1% | 2009Q2 |
| 555 | MOMETASONE FUROATE-SOLUTION-0.1% | 2012Q1 |
| 556 | MOMETASONE FUROATE-SOLUTION-0.1% | 2013Q4 |
| 557 | MOMETASONE FUROATE-SOLUTION-0.1% | 2014Q1 |
| 558 | MOMETASONE FUROATE-SOLUTION-0.1% | 2014Q2 |
| 559 | MOMETASONE FUROATE-SOLUTION-0.1% | 2015Q1 |
| 560 | MOMETASONE FUROATE-SOLUTION-0.1% | 2016Q2 |
| 561 | MOMETASONE FUROATE-SOLUTION-0.1% | 2018Q2 |
| 562 | MOMETASONE FUROATE-SOLUTION-0.1% | 2018Q4 |
| 563 | NYSTATIN-OINTMENT-100,000UNITS/GM | 2009Q2 |
| 564 | NYSTATIN-OINTMENT-100,000UNITS/GM | 2010Q3 |
| 565 | NYSTATIN-OINTMENT-100,000UNITS/GM | 2010Q4 |
| 566 | NYSTATIN-OINTMENT-100,000UNITS/GM | 2011Q1 |
| 567 | NYSTATIN-OINTMENT-100,000UNITS/GM | 2011Q2 |
| 568 | NYSTATIN-OINTMENT-100,000UNITS/GM | 2011Q4 |
| 569 | NYSTATIN-OINTMENT-100,000UNITS/GM | 2012Q1 |
| 570 | NYSTATIN-OINTMENT-100,000UNITS/GM | 2012Q2 |

# Appendix D Table 1
## Periods of Failure to Supply Penalties by Drug At-Issue

| # | At-Issue Drug | Quarter With FTS/Shortages Adjustments |
|---|---|---|
| 571 | NYSTATIN-OINTMENT-100,000UNITS/GM | 2012Q3 |
| 572 | NYSTATIN-OINTMENT-100,000UNITS/GM | 2012Q4 |
| 573 | NYSTATIN-OINTMENT-100,000UNITS/GM | 2013Q3 |
| 574 | NYSTATIN-OINTMENT-100,000UNITS/GM | 2013Q4 |
| 575 | NYSTATIN-OINTMENT-100,000UNITS/GM | 2014Q2 |
| 576 | NYSTATIN-OINTMENT-100,000UNITS/GM | 2014Q3 |
| 577 | NYSTATIN-OINTMENT-100,000UNITS/GM | 2014Q4 |
| 578 | NYSTATIN-OINTMENT-100,000UNITS/GM | 2015Q1 |
| 579 | NYSTATIN-OINTMENT-100,000UNITS/GM | 2015Q2 |
| 580 | NYSTATIN-OINTMENT-100,000UNITS/GM | 2015Q4 |
| 581 | NYSTATIN-OINTMENT-100,000UNITS/GM | 2016Q1 |
| 582 | NYSTATIN-OINTMENT-100,000UNITS/GM | 2016Q2 |
| 583 | NYSTATIN-OINTMENT-100,000UNITS/GM | 2017Q1 |
| 584 | NYSTATIN-OINTMENT-100,000UNITS/GM | 2017Q2 |
| 585 | NYSTATIN-OINTMENT-100,000UNITS/GM | 2018Q3 |
| 586 | NYSTATIN; TRIAMCINOLONE ACETONIDE-CREAM-100,000UNITS/GM;0.1% | 2014Q2 |
| 587 | NYSTATIN; TRIAMCINOLONE ACETONIDE-CREAM-100,000UNITS/GM;0.1% | 2014Q3 |
| 588 | NYSTATIN; TRIAMCINOLONE ACETONIDE-CREAM-100,000UNITS/GM;0.1% | 2014Q4 |
| 589 | NYSTATIN; TRIAMCINOLONE ACETONIDE-CREAM-100,000UNITS/GM;0.1% | 2015Q1 |
| 590 | NYSTATIN; TRIAMCINOLONE ACETONIDE-CREAM-100,000UNITS/GM;0.1% | 2015Q4 |
| 591 | NYSTATIN; TRIAMCINOLONE ACETONIDE-CREAM-100,000UNITS/GM;0.1% | 2016Q1 |
| 592 | NYSTATIN; TRIAMCINOLONE ACETONIDE-CREAM-100,000UNITS/GM;0.1% | 2018Q3 |
| 593 | NYSTATIN; TRIAMCINOLONE ACETONIDE-CREAM-100,000UNITS/GM;0.1% | 2018Q4 |
| 594 | NYSTATIN; TRIAMCINOLONE ACETONIDE-OINTMENT-100,000UNITS/GM;0.1% | 2015Q1 |
| 595 | NYSTATIN; TRIAMCINOLONE ACETONIDE-OINTMENT-100,000UNITS/GM;0.1% | 2015Q4 |
| 596 | NYSTATIN; TRIAMCINOLONE ACETONIDE-OINTMENT-100,000UNITS/GM;0.1% | 2016Q1 |
| 597 | NYSTATIN; TRIAMCINOLONE ACETONIDE-OINTMENT-100,000UNITS/GM;0.1% | 2018Q4 |
| 598 | PHENYTOIN SODIUM-CAPSULE-100MGEXTENDED | 2013Q2 |
| 599 | PHENYTOIN SODIUM-CAPSULE-100MGEXTENDED | 2013Q4 |
| 600 | PHENYTOIN SODIUM-CAPSULE-100MGEXTENDED | 2014Q1 |
| 601 | PHENYTOIN SODIUM-CAPSULE-100MGEXTENDED | 2014Q2 |
| 602 | PHENYTOIN SODIUM-CAPSULE-100MGEXTENDED | 2014Q4 |
| 603 | PHENYTOIN SODIUM-CAPSULE-100MGEXTENDED | 2015Q1 |
| 604 | PHENYTOIN SODIUM-CAPSULE-100MGEXTENDED | 2015Q2 |
| 605 | PHENYTOIN SODIUM-CAPSULE-100MGEXTENDED | 2015Q3 |
| 606 | PHENYTOIN SODIUM-CAPSULE-100MGEXTENDED | 2016Q1 |
| 607 | PHENYTOIN SODIUM-CAPSULE-100MGEXTENDED | 2016Q4 |
| 608 | PHENYTOIN SODIUM-CAPSULE-100MGEXTENDED | 2017Q1 |
| 609 | PHENYTOIN SODIUM-CAPSULE-100MGEXTENDED | 2017Q2 |
| 610 | PHENYTOIN SODIUM-CAPSULE-100MGEXTENDED | 2017Q3 |
| 611 | PROCHLORPERAZINE-SUPPOSITORY-25MG | 2015Q2 |
| 612 | PROCHLORPERAZINE-SUPPOSITORY-25MG | 2018Q1 |
| 613 | PROCHLORPERAZINE-SUPPOSITORY-25MG | 2018Q2 |
| 614 | PROCHLORPERAZINE-SUPPOSITORY-25MG | 2018Q3 |
| 615 | PROMETHAZINE HYDROCHLORIDE-SUPPOSITORY-12.5MG | 2010Q4 |
| 616 | PROMETHAZINE HYDROCHLORIDE-SUPPOSITORY-12.5MG | 2012Q2 |
| 617 | PROMETHAZINE HYDROCHLORIDE-SUPPOSITORY-12.5MG | 2013Q2 |
| 618 | PROMETHAZINE HYDROCHLORIDE-SUPPOSITORY-12.5MG | 2014Q3 |
| 619 | PROMETHAZINE HYDROCHLORIDE-SUPPOSITORY-12.5MG | 2015Q1 |
| 620 | PROMETHAZINE HYDROCHLORIDE-SUPPOSITORY-12.5MG | 2015Q2 |
| 621 | PROMETHAZINE HYDROCHLORIDE-SUPPOSITORY-25MG | 2010Q2 |
| 622 | PROMETHAZINE HYDROCHLORIDE-SUPPOSITORY-25MG | 2010Q4 |
| 623 | PROMETHAZINE HYDROCHLORIDE-SUPPOSITORY-25MG | 2011Q1 |
| 624 | PROMETHAZINE HYDROCHLORIDE-SUPPOSITORY-25MG | 2011Q2 |
| 625 | PROMETHAZINE HYDROCHLORIDE-SUPPOSITORY-25MG | 2011Q3 |
| 626 | PROMETHAZINE HYDROCHLORIDE-SUPPOSITORY-25MG | 2012Q2 |
| 627 | PROMETHAZINE HYDROCHLORIDE-SUPPOSITORY-25MG | 2013Q3 |

## Appendix D Table 1

Periods of Failure to Supply Penalties by Drug At-Issue

| # | At-Issue Drug | Quarter With FTS/Shortages Adjustments |
|---|---|---|
| 628 | PROMETHAZINE HYDROCHLORIDE-SUPPOSITORY-25MG | 2015Q4 |
| 629 | PROMETHAZINE HYDROCHLORIDE-SUPPOSITORY-25MG | 2016Q3 |
| 630 | TACROLIMUS-OINTMENT-0.03% | 2015Q2 |
| 631 | TACROLIMUS-OINTMENT-0.03% | 2018Q2 |
| 632 | TACROLIMUS-OINTMENT-0.03% | 2018Q3 |
| 633 | TACROLIMUS-OINTMENT-0.1% | 2015Q2 |
| 634 | TACROLIMUS-OINTMENT-0.1% | 2015Q4 |
| 635 | TACROLIMUS-OINTMENT-0.1% | 2016Q1 |
| 636 | TACROLIMUS-OINTMENT-0.1% | 2016Q2 |
| 637 | TACROLIMUS-OINTMENT-0.1% | 2017Q2 |
| 638 | TACROLIMUS-OINTMENT-0.1% | 2018Q3 |
| 639 | TACROLIMUS-OINTMENT-0.1% | 2018Q4 |
| 640 | TRIAMCINOLONE ACETONIDE-CREAM-0.025% | 2009Q2 |
| 641 | TRIAMCINOLONE ACETONIDE-CREAM-0.025% | 2009Q4 |
| 642 | TRIAMCINOLONE ACETONIDE-CREAM-0.025% | 2010Q2 |
| 643 | TRIAMCINOLONE ACETONIDE-CREAM-0.025% | 2010Q3 |
| 644 | TRIAMCINOLONE ACETONIDE-CREAM-0.025% | 2010Q4 |
| 645 | TRIAMCINOLONE ACETONIDE-CREAM-0.025% | 2014Q2 |
| 646 | TRIAMCINOLONE ACETONIDE-CREAM-0.025% | 2016Q1 |
| 647 | TRIAMCINOLONE ACETONIDE-CREAM-0.025% | 2018Q2 |
| 648 | TRIAMCINOLONE ACETONIDE-CREAM-0.025% | 2018Q3 |
| 649 | TRIAMCINOLONE ACETONIDE-CREAM-0.025% | 2018Q4 |
| 650 | TRIAMCINOLONE ACETONIDE-CREAM-0.1% | 2009Q2 |
| 651 | TRIAMCINOLONE ACETONIDE-CREAM-0.1% | 2009Q3 |
| 652 | TRIAMCINOLONE ACETONIDE-CREAM-0.1% | 2009Q4 |
| 653 | TRIAMCINOLONE ACETONIDE-CREAM-0.1% | 2010Q1 |
| 654 | TRIAMCINOLONE ACETONIDE-CREAM-0.1% | 2010Q2 |
| 655 | TRIAMCINOLONE ACETONIDE-CREAM-0.1% | 2010Q3 |
| 656 | TRIAMCINOLONE ACETONIDE-CREAM-0.1% | 2010Q4 |
| 657 | TRIAMCINOLONE ACETONIDE-CREAM-0.1% | 2011Q1 |
| 658 | TRIAMCINOLONE ACETONIDE-CREAM-0.1% | 2011Q2 |
| 659 | TRIAMCINOLONE ACETONIDE-CREAM-0.1% | 2011Q3 |
| 660 | TRIAMCINOLONE ACETONIDE-CREAM-0.1% | 2011Q4 |
| 661 | TRIAMCINOLONE ACETONIDE-CREAM-0.1% | 2012Q1 |
| 662 | TRIAMCINOLONE ACETONIDE-CREAM-0.1% | 2012Q2 |
| 663 | TRIAMCINOLONE ACETONIDE-CREAM-0.1% | 2012Q4 |
| 664 | TRIAMCINOLONE ACETONIDE-CREAM-0.1% | 2013Q2 |
| 665 | TRIAMCINOLONE ACETONIDE-CREAM-0.1% | 2013Q3 |
| 666 | TRIAMCINOLONE ACETONIDE-CREAM-0.1% | 2014Q1 |
| 667 | TRIAMCINOLONE ACETONIDE-CREAM-0.1% | 2014Q2 |
| 668 | TRIAMCINOLONE ACETONIDE-CREAM-0.1% | 2014Q3 |
| 669 | TRIAMCINOLONE ACETONIDE-CREAM-0.1% | 2014Q4 |
| 670 | TRIAMCINOLONE ACETONIDE-CREAM-0.1% | 2015Q1 |
| 671 | TRIAMCINOLONE ACETONIDE-CREAM-0.1% | 2015Q2 |
| 672 | TRIAMCINOLONE ACETONIDE-CREAM-0.1% | 2015Q3 |
| 673 | TRIAMCINOLONE ACETONIDE-CREAM-0.1% | 2015Q4 |
| 674 | TRIAMCINOLONE ACETONIDE-CREAM-0.1% | 2016Q1 |
| 675 | TRIAMCINOLONE ACETONIDE-CREAM-0.1% | 2016Q2 |
| 676 | TRIAMCINOLONE ACETONIDE-CREAM-0.1% | 2016Q3 |
| 677 | TRIAMCINOLONE ACETONIDE-CREAM-0.1% | 2016Q4 |
| 678 | TRIAMCINOLONE ACETONIDE-CREAM-0.1% | 2017Q1 |
| 679 | TRIAMCINOLONE ACETONIDE-CREAM-0.1% | 2017Q2 |
| 680 | TRIAMCINOLONE ACETONIDE-CREAM-0.1% | 2017Q3 |
| 681 | TRIAMCINOLONE ACETONIDE-CREAM-0.1% | 2017Q4 |
| 682 | TRIAMCINOLONE ACETONIDE-CREAM-0.1% | 2018Q1 |
| 683 | TRIAMCINOLONE ACETONIDE-CREAM-0.1% | 2018Q2 |
| 684 | TRIAMCINOLONE ACETONIDE-CREAM-0.1% | 2018Q3 |

# Appendix D Table 1

## Periods of Failure to Supply Penalties by Drug At-Issue

| # | At-Issue Drug | Quarter With FTS/Shortages Adjustments |
|---|---|---|
| 685 | TRIAMCINOLONE ACETONIDE-CREAM-0.1% | 2018Q4 |
| 686 | TRIAMCINOLONE ACETONIDE-CREAM-0.5% | 2009Q2 |
| 687 | TRIAMCINOLONE ACETONIDE-CREAM-0.5% | 2009Q4 |
| 688 | TRIAMCINOLONE ACETONIDE-CREAM-0.5% | 2010Q2 |
| 689 | TRIAMCINOLONE ACETONIDE-CREAM-0.5% | 2010Q4 |
| 690 | TRIAMCINOLONE ACETONIDE-CREAM-0.5% | 2011Q4 |
| 691 | TRIAMCINOLONE ACETONIDE-CREAM-0.5% | 2012Q1 |
| 692 | TRIAMCINOLONE ACETONIDE-CREAM-0.5% | 2012Q3 |
| 693 | TRIAMCINOLONE ACETONIDE-CREAM-0.5% | 2013Q2 |
| 694 | TRIAMCINOLONE ACETONIDE-CREAM-0.5% | 2013Q3 |
| 695 | TRIAMCINOLONE ACETONIDE-CREAM-0.5% | 2013Q4 |
| 696 | TRIAMCINOLONE ACETONIDE-CREAM-0.5% | 2014Q2 |
| 697 | TRIAMCINOLONE ACETONIDE-CREAM-0.5% | 2014Q4 |
| 698 | TRIAMCINOLONE ACETONIDE-CREAM-0.5% | 2015Q1 |
| 699 | TRIAMCINOLONE ACETONIDE-CREAM-0.5% | 2015Q2 |
| 700 | TRIAMCINOLONE ACETONIDE-CREAM-0.5% | 2017Q1 |
| 701 | TRIAMCINOLONE ACETONIDE-CREAM-0.5% | 2017Q2 |
| 702 | TRIAMCINOLONE ACETONIDE-OINTMENT-0.025% | 2009Q2 |
| 703 | TRIAMCINOLONE ACETONIDE-OINTMENT-0.025% | 2011Q1 |
| 704 | TRIAMCINOLONE ACETONIDE-OINTMENT-0.025% | 2013Q3 |
| 705 | TRIAMCINOLONE ACETONIDE-OINTMENT-0.025% | 2014Q1 |
| 706 | TRIAMCINOLONE ACETONIDE-OINTMENT-0.025% | 2014Q2 |
| 707 | TRIAMCINOLONE ACETONIDE-OINTMENT-0.025% | 2017Q1 |
| 708 | TRIAMCINOLONE ACETONIDE-OINTMENT-0.025% | 2017Q2 |
| 709 | TRIAMCINOLONE ACETONIDE-OINTMENT-0.025% | 2018Q3 |
| 710 | TRIAMCINOLONE ACETONIDE-OINTMENT-0.1% | 2008Q3 |
| 711 | TRIAMCINOLONE ACETONIDE-OINTMENT-0.1% | 2009Q2 |
| 712 | TRIAMCINOLONE ACETONIDE-OINTMENT-0.1% | 2009Q3 |
| 713 | TRIAMCINOLONE ACETONIDE-OINTMENT-0.1% | 2009Q4 |
| 714 | TRIAMCINOLONE ACETONIDE-OINTMENT-0.1% | 2010Q1 |
| 715 | TRIAMCINOLONE ACETONIDE-OINTMENT-0.1% | 2010Q2 |
| 716 | TRIAMCINOLONE ACETONIDE-OINTMENT-0.1% | 2010Q3 |
| 717 | TRIAMCINOLONE ACETONIDE-OINTMENT-0.1% | 2010Q4 |
| 718 | TRIAMCINOLONE ACETONIDE-OINTMENT-0.1% | 2011Q1 |
| 719 | TRIAMCINOLONE ACETONIDE-OINTMENT-0.1% | 2011Q2 |
| 720 | TRIAMCINOLONE ACETONIDE-OINTMENT-0.1% | 2011Q3 |
| 721 | TRIAMCINOLONE ACETONIDE-OINTMENT-0.1% | 2011Q4 |
| 722 | TRIAMCINOLONE ACETONIDE-OINTMENT-0.1% | 2012Q1 |
| 723 | TRIAMCINOLONE ACETONIDE-OINTMENT-0.1% | 2012Q2 |
| 724 | TRIAMCINOLONE ACETONIDE-OINTMENT-0.1% | 2012Q4 |
| 725 | TRIAMCINOLONE ACETONIDE-OINTMENT-0.1% | 2013Q4 |
| 726 | TRIAMCINOLONE ACETONIDE-OINTMENT-0.1% | 2014Q1 |
| 727 | TRIAMCINOLONE ACETONIDE-OINTMENT-0.1% | 2014Q2 |
| 728 | TRIAMCINOLONE ACETONIDE-OINTMENT-0.1% | 2014Q3 |
| 729 | TRIAMCINOLONE ACETONIDE-OINTMENT-0.1% | 2014Q4 |
| 730 | TRIAMCINOLONE ACETONIDE-OINTMENT-0.1% | 2015Q1 |
| 731 | TRIAMCINOLONE ACETONIDE-OINTMENT-0.1% | 2015Q3 |
| 732 | TRIAMCINOLONE ACETONIDE-OINTMENT-0.1% | 2015Q4 |
| 733 | TRIAMCINOLONE ACETONIDE-OINTMENT-0.1% | 2016Q1 |
| 734 | TRIAMCINOLONE ACETONIDE-OINTMENT-0.1% | 2016Q3 |
| 735 | TRIAMCINOLONE ACETONIDE-OINTMENT-0.1% | 2016Q4 |
| 736 | TRIAMCINOLONE ACETONIDE-OINTMENT-0.1% | 2017Q1 |
| 737 | TRIAMCINOLONE ACETONIDE-OINTMENT-0.1% | 2017Q2 |
| 738 | TRIAMCINOLONE ACETONIDE-OINTMENT-0.1% | 2018Q1 |
| 739 | TRIAMCINOLONE ACETONIDE-OINTMENT-0.1% | 2018Q3 |
| 740 | TRIAMCINOLONE ACETONIDE-OINTMENT-0.1% | 2018Q4 |
| 741 | TRIAMCINOLONE ACETONIDE-OINTMENT-0.5% | 2008Q2 |

# Appendix D Table 1

Periods of Failure to Supply Penalties by Drug At-Issue

| # | At-Issue Drug | Quarter With FTS/Shortages Adjustments |
|---|---|---|
| 742 | TRIAMCINOLONE ACETONIDE-OINTMENT-0.5% | 2009Q2 |
| 743 | TRIAMCINOLONE ACETONIDE-OINTMENT-0.5% | 2009Q3 |
| 744 | TRIAMCINOLONE ACETONIDE-OINTMENT-0.5% | 2010Q2 |
| 745 | TRIAMCINOLONE ACETONIDE-OINTMENT-0.5% | 2012Q1 |
| 746 | TRIAMCINOLONE ACETONIDE-OINTMENT-0.5% | 2014Q2 |
| 747 | TRIAMCINOLONE ACETONIDE-OINTMENT-0.5% | 2014Q4 |
| 748 | TRIAMCINOLONE ACETONIDE-OINTMENT-0.5% | 2016Q4 |
| 749 | TRIAMCINOLONE ACETONIDE-OINTMENT-0.5% | 2017Q1 |
| 750 | TRIAMCINOLONE ACETONIDE-OINTMENT-0.5% | 2018Q2 |

HIGHLY CONFIDENTIAL: SUBJECT TO PROTECTIVE ORDER

## Appendix D Table 2

List of Shortages Identified in Defendant Expert Reports

| Defendant Expert | Page Number | Paragraph | Manufacturer Identified | API Identified | API_Form_Strength | Start Date | End date |
|---|---|---|---|---|---|---|---|
| Gilbert | 83 | 293 | Perrigo | Ciclopirox | CICLOPIROX-SHAMPOO-1% | 2012Q4 | |
| Gilbert | 84 | 295 | Sandoz | Methazolamide | | 2014Q2 | |
| Gilbert | 84 | 296 | Amneal | Phenytoin Sodium | PHENYTOIN SODIUM-CAPSULE-100MGEXTENDED | 2014Q2 | |
| Saravia | 67 | 124 | Greenstone | Clindamycin | CLINDAMYCIN PHOSPHATE-SOLUTION-EQ1%BASE | 2011Q1 | 2014Q4 |
| Saravia | 69 | 126 | Greenstone | Clindamycin | CLINDAMYCIN PHOSPHATE-SOLUTION-EQ1%BASE | 2012Q3 | |
| Saravia | 69 | 126 | Sandoz | Clindamycin | CLINDAMYCIN PHOSPHATE-SOLUTION-EQ1%BASE | 2012Q3 | |
| Saravia | 69 | 126 | Sandoz | Clindamycin | CLINDAMYCIN PHOSPHATE-LOTION-EQ1%BASE | 2012Q3 | |
| Saravia | 72 | 131 | Sandoz | Clindamycin | CLINDAMYCIN PHOSPHATE-SOLUTION-EQ1%BASE | 2013Q3 | |
| Saravia | 73 | 132 | Greenstone | Clindamycin | CLINDAMYCIN PHOSPHATE-GEL-EQ1%BASE | 2012Q2 | |
| Saravia | 73 | 132 | Greenstone | Clindamycin | CLINDAMYCIN PHOSPHATE-GEL-EQ1%BASE | 2012Q4 | |
| Saravia | 82 | 151 | Greenstone | Clindamycin | CLINDAMYCIN PHOSPHATE-SOLUTION-EQ1%BASE | 2011Q2 | 2011Q3 |
| Saravia | 83 | 151 | Greenstone | Clindamycin | | 2012Q2 | 2012Q4 |
| Saravia | 106 | 192 | Greenstone | Clindamycin | CLINDAMYCIN PHOSPHATE-GEL-EQ1%BASE | 2012Q3 | 2012Q4 |
| Saravia | 106 | 193 | Greenstone | Clindamycin | | 2012Q3 | |
| Saravia | 74 | 133 | Greenstone | Eplerenone | EPLERENONE-TABLET-25MG | 2013Q3 | 2015Q4 |
| Saravia | 74 | 133 | Greenstone | Eplerenone | EPLERENONE-TABLET-50MG | 2013Q1 | 2016Q4 |
| Saravia | 74 | 133 | Sandoz | Eplerenone | EPLERENONE-TABLET-25MG | 2013Q3 | 2015Q4 |
| Saravia | 74 | 133 | Sandoz | Eplerenone | EPLERENONE-TABLET-50MG | 2013Q1 | 2016Q4 |
| Saravia | 74 | 135 | Sandoz | Eplerenone | | 2015Q1 | |
| Saravia | 77 | 136 | Greenstone | Latanaprost | LATANOPROST-SOLUTION/DROPS-0.005% | 2012Q1 | |
| Saravia | 77 | 136 | Greenstone | Latanoprost | LATANOPROST-SOLUTION/DROPS-0.005% | 2012Q1 | |
| Stiroh | 19 | 31 | Mylan | Bromocriptine | BROMOCRIPTINE MESYLATE-TABLET-EQ2.5MGBASE | 2012Q4 | 2013Q2 |
| Stiroh | 32 | 47 | Mylan | Bromocriptine | BROMOCRIPTINE MESYLATE-TABLET-EQ2.5MGBASE | 2011Q4 | |
| Stiroh | 53 | 104 | Mylan | Bromocriptine | BROMOCRIPTINE MESYLATE-TABLET-EQ2.5MGBASE | 2012Q3 | 2013Q2 |
| Stiroh | 18 | 30 | Mylan | Phenytoin Sodium | PHENYTOIN SODIUM-CAPSULE-100MGEXTENDED | 2014Q1 | 2014Q4 |
| Stiroh | 49 | 94 | Mylan | Phenytoin Sodium | PHENYTOIN SODIUM-CAPSULE-100MGEXTENDED | 2014Q2 | 2014Q3 |
| Stomberg | 149 | 323 | Sandoz | Adapalene Cream | ADAPALENE-CREAM-0.1% | 2012Q4 | |
| Stomberg | 149 | 324 | Fougera | Adapalene Cream | ADAPALENE-CREAM-0.1% | 2010Q3 | 2010Q4 |
| Stomberg | 150 | 325 | Fougera | Adapalene Cream | ADAPALENE-CREAM-0.1% | 2010Q3 | 2010Q4 |
| Stomberg | 149-150 | 324 | Fougera | Adapalene Cream | ADAPALENE-CREAM-0.1% | 2010Q2 | |
| Stomberg | 37 | 92 | Perrigo | Triamcinolone | TRIAMCINOLONE ACETONIDE-CREAM-0.025% | 2010Q1 | 2010Q4 |
| Stomberg | 37 | 92 | Perrigo | Triamcinolone | TRIAMCINOLONE ACETONIDE-CREAM-0.1% | 2010Q1 | 2010Q4 |
| Stomberg | 37 | 92 | Perrigo | Triamcinolone | TRIAMCINOLONE ACETONIDE-CREAM-0.5% | 2010Q1 | 2010Q4 |
| Stomberg | 37 | 92 | Perrigo | Triamcinolone | TRIAMCINOLONE ACETONIDE-OINTMENT-0.025% | 2010Q1 | 2010Q4 |
| Stomberg | 37 | 92 | Perrigo | Triamcinolone | TRIAMCINOLONE ACETONIDE-OINTMENT-0.1% | 2010Q1 | 2010Q4 |
| Stomberg | 37 | 92 | Perrigo | Triamcinolone | TRIAMCINOLONE ACETONIDE-OINTMENT-0.5% | 2010Q1 | 2010Q4 |
| Stomberg | 46 | 116 | Perrigo | Triamcinolone | | 2010Q1 | 2010Q4 |
| Stomberg | 105 | 236 | Perrigo | Triamcinolone | TRIAMCINOLONE ACETONIDE-CREAM-0.1% | 2010Q1 | 2010Q4 |
| Stomberg | 105 | 236 | Perrigo | Triamcinolone | TRIAMCINOLONE ACETONIDE-OINTMENT-0.1% | 2010Q1 | 2010Q4 |
| Stomberg | 106 | 238 | Fougera | Triamcinolone | TRIAMCINOLONE ACETONIDE-CREAM-0.025% | 2010Q1 | 2011Q4 |
| Stomberg | 106 | 238 | Fougera | Triamcinolone | TRIAMCINOLONE ACETONIDE-CREAM-0.1% | 2010Q1 | 2011Q4 |
| Stomberg | 106 | 238 | Fougera | Triamcinolone | TRIAMCINOLONE ACETONIDE-CREAM-0.5% | 2010Q1 | 2011Q4 |
| Stomberg | 110 | 246 | Perrigo | Triamcinolone | TRIAMCINOLONE ACETONIDE-CREAM-0.025% | 2011Q1 | 2011Q4 |
| Stomberg | 110 | 246 | Perrigo | Triamcinolone | TRIAMCINOLONE ACETONIDE-CREAM-0.1% | 2011Q1 | 2011Q4 |
| Stomberg | 110 | 246 | Perrigo | Triamcinolone | TRIAMCINOLONE ACETONIDE-CREAM-0.5% | 2011Q1 | 2011Q4 |
| Tucker | 33 | 51 | Sandoz | Latanoprost | LATANOPROST-SOLUTION/DROPS-0.005% | 2011Q1 | 2011Q4 |
| Tucker | 41 | 60 | Akorn | Latanoprost | LATANOPROST-SOLUTION/DROPS-0.005% | 2013Q1 | 2014Q4 |

**Notes:**

[1] For identified Drugs at Issue that are associated with more than one associated strength, all strengths are included.

[2] When no specific form and strength was identified, only the API is listed.