# EXHIBIT B

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF CONNECTICUT

| | |
|---|---|
| ------------------------------------------ | ) |
| THE STATE OF CONNECTICUT, | ) |
| et al., | ) |
| Plaintiffs, | ) Case No. |
| vs. | ) 3:20-CV-00802-MPS |
| SANDOZ, INC., et al., | ) |
| Defendants. | ) |
| ------------------------------------------ | ) |

DEPOSITION OF FREDERICK WARREN-BOULTON, Ph.D.
WASHINGTON, D.C.
OCTOBER 22, 2024

REPORTED BY: Tina Alfaro, RPR, CRR, RMR

Videotaped deposition of FREDERICK WARREN-BOULTON, Ph.D., held at the offices of:

Dechert, LLP
1900 K Street, NW
Washington, D.C.

Taken pursuant to notice before Tina M. Alfaro, a Notary Public within and for the District of Columbia.

APPEARANCES:

ON BEHALF OF THE PLAINTIFF STATES:
OFFICE OF THE ATTORNEY GENERAL
STATE OF CALIFORNIA
BY: JOHN OHANESIAN, ESQ.
JOHN.OHANESIAN@DOJ.CA.GOV

ON BEHALF OF THE PLAINTIFF STATES:
OFFICE OF THE ATTORNEY GENERAL
STATE OF FLORIDA
BY: GENEVIEVE HALL, ESQ.
GENEVIEVE.HALL@MYFLORIDALEGAL.COM

ON BEHALF OF SANDOZ AND FOUGERA:
PROSKAUER ROSE
BY: KYLE CASAZZA, ESQ.
JUSTIN COHEN, ESQ. (remote)
NICOLE SWANSON, ESQ. (remote)
KCASAZZA@PROSKAUER.COM

ON BEHALF OF AUROBINDO:
WIGGIN AND DANA
BY: BENJAMIN DIESSEL, ESQ.
BDIESSEL@WIGGIN.COM

APPEARANCES: (cont'd)

ON BEHALF OF LANNETT COMPANY:

DECHERT, LLP

BY: GEORGE GORDON, ESQ.
JULIA CHAPMAN, ESQ.
FOREST LOVETT, ESQ.
GEORGE.GORDON@DECHERT.COM
JULIA.CHAPMAN@DECHERT.COM
FOREST.LOVETT@DECHERT.COM

ON BEHALF OF PERRIGO:

MORGAN LEWIS

BY: FRANK REN, ESQ.
FRANK.REN@MORGANLEWIS.COM

ON BEHALF OF BAUSCH:

NORTON ROSE FULBRIGHT

BY: MARK ANGLAND, ESQ.
MARK.ANGLAND@NORTONROSEFULBRIGHT.COM

ON BEHALF OF PFIZER AND GREENSTONE:

DLA PIPER

BY: DAVID JOSEFOVITS, ESQ.
DAVID.JOSEFOVITS@DLAPIPER.COM

APPEARANCES: (cont'd)

ON BEHALF OF GLENMARK:
MORRISON FOERSTER
BY: ROBERT MANOSO, ESQ.
RMANOSO@MOFO.COM

ON BEHALF OF JOHN WESOLOWSKI:
FAEGRE DRINKER
BY: CHARLES LEEPER, ESQ. (remote)
CHARLES.LEEPER@FAEGREDRINKER.COM

ON BEHALF OF WALTER KACZMAREK:
COLE SCHOTZ
BY: JEFFREY SAUER, ESQ. (remote)
MICHAEL KLAUDER, ESQ. (remote)
JSAUER@COLESCHOTZ.COM
MKLAUDER@COLESCHOTZ.COM

ON BEHALF OF APOTEX:
FOLEY LARDNER
BY: KATY KOSKI, ESQ. (remote)
KKOSKI@FOLEY.COM

APPEARANCES: (cont'd)

ON BEHALF OF MYLAN:
HOGAN LOVELLS
BY: MICHAEL GENDALL, ESQ. (remote)
MIKE.GENDALL@HOGANLOVELLS

ON BEHALF OF SUN AND TARO:
BAKER BOTTS
BY: MICHAEL MUNOZ, ESQ. (remote)
MICHAEL.MUNOZ@BAKERBOTTS.COM

ON BEHALF OF ACTAVIS:
KASOWITZ BENSON TORRES
BY: SETH MOSKOWITZ, ESQ. (remote)
SMOSKOWITZ@KASOWITZ.COM

ON BEHALF OF TEVA:
MORGAN LEWIS
BY: WILLIAM McENROE, ESQ. (remote)
WILLIAM.MCENROE@MORGANLEWIS.COM

I N D E X

EXAMINATION


| WITNESS | PAGE |
|---|---|
| FREDERICK WARREN-BOULTON, PH.D. | |
| By Mr. Casazza | 10 |
| By Ms. Chapman | 176 |
| By Mr. Diessel | 254 |
| By Mr. Casazza | 277 |


EXHIBITS


| DEPOSITION EXHIBITS | PAGE |
|---|---|
| Exhibit 0020 Errata | 14 |
| Exhibit 0021 Errata | 14 |
| Exhibit 0022 Reply report | 17 |
| Exhibit 0023 Expert report of Anupam Jena | 139 |
| Exhibit 0024 Spreadsheet | 168 |

THE VIDEOGRAPHER: Good morning. We are going on the record at 9:33 a.m. on October 22, 2024. Please note that the microphones are sensitive and may pick up whispering and private conversations. Please mute your phones at this time. Audio and video recording will continue to take place unless all parties agree to go off the record.

This is media unit 1 of the video-recorded deposition of Dr. Frederick Warren-Boulton in the matter of In Re Generic Pharmaceuticals Pricing Antitrust Litigation filed in the United States District Court for the Eastern District of Pennsylvania, Case No. MDL-2724.

My name is Orson Braithwaite representing Veritext Legal Solutions, and I'm the videographer. The court reporter is Tina Alfaro from the firm Veritext Legal Solutions.

Counsel will now state their appearances and affiliations for the record.

MR. CASAZZA: Kyle Casazza from Proskauer Rose for Sandoz and Fougera.

MR. GORDON: George Gordon from Dechert, LLP for Lannett.

MS. CHAPMAN: Julia Chapman, Dechert, LLP

and one has a low demand, which one I would expect the higher margin on?
Q. I'm asking whether you did anything, literally anything to study what was driving demand for new generics.
MR. OHANESIAN: Objection, form.
MR. CASAZZA: Did you do anything to study what was driving margins on new generic drugs for any company, sir?
A. I didn't look at anything specific with respect to the drugs. I mean, this is a straightforward statistical analysis. I didn't ask the question were there special events or anything at Sandoz or Aurobindo. This is -- these are numbers.
Q. Let's take a look at paragraph 304 of your reply. In the first sentence you write that "The availability of usable cost data vary greatly across the manufacturers"; do you see that?
A. Yes.
Q. It's your opinion that the cost data provided by the Defendants in this case should not be used literally; do I have that right?
A. I think you have to be -- you have to be careful when using the cost data not to come to

conclusions that might be based on incorrect cost data or in some situations where we have no cost data and we have to use proxies for cost. So it's an imperfect world and that's particularly true for the cost data. So you simply have to be careful in using it.

Q. Paragraph 305, toward the end of the third line of that paragraph you observe that "Applying the cost data literally can lead to wild swings in profitability"; do you see that?

A. Yes.

Q. Paragraph 306, second sentence you write "This is a primary example of why the Defendants' cost data as calculated for and used in my report should not be used literally to determine but-for margins"; do you see that?

A. Yes.

Q. You note that because Aurobindo's costs for both formulations of its new generic drugs at issue are on average double or triple the costs for the other Defendants for the same drugs at issue, you believe that's evidence that the Defendant cost data is not reliable, right?

MR. OHANESIAN: Objection, form.

A. I'm saying that if Aurobindo's costs are

reported as triple the cost for the other Defendants, one possibility is simply that the cost data is in error because I know of no reason why Aurobindo's costs would be three times that of the other Defendants. So either Aurobindo for some reason has very, very high costs or one possibility is we're talking about a very small quantity for this to be meaningful or it's a data error.

Q. But you write in the last sentence of paragraph 306 that "That variation from Aurobindo's cost data casts doubt on whether the cost data can be used to reliably calculate but-for net profit margins," right?

A. It creates problems for estimating and I'm not saying that you don't use the cost data. You use what cost data you have. All I'm saying is that -- all I'm saying is that when you -- when you use the cost data that we have you just have to be careful because if there are errors in the cost, then that could create a problem for your results. So you just have to be -- you have to be cognizant of the kind of problem that it could create. I'm not saying you don't use the cost data. It's the only cost data we have.

MR. OHANESIAN: Dr. Warren-Boulton, can

you keep your hands --
THE WITNESS: Sure.
MR. OHANESIAN: -- away from your microphone.
THE WITNESS: And it's the Defendants' cost data.
Q. You did not use the Defendants' cost data to calculate but-for net profit margins because you thought that data was unreliable, right?
MR. OHANESIAN: Objection, form.
A. I'm saying that -- that paragraph says basically that what Dr. Jena did is he used the cost data and he looked at it and he says using those cost data I'm generating a lot of negative net margins, and I say when I -- when I look at his examples what I see is cases, for example, where during the pre-conduct period there are enormous negative margins which are -- the negative margins are so low as to make me obviously raise the question, which is, you know, how is that possible that the prices are so much less than the reported costs, and one possibility is, you know, as that reported net margin gets larger, more and more negative, the possibility that we really are dealing with a data error rather than a very, very

unprofitable firm goes up. I mean, I have no information that tells me that Aurobindo is grossly inefficient or has a really terrible source of supply.

Q. You did not use the Defendants' cost data to calculate but-for net profit margins, did you?

A. I'm saying that it should not be used literally to determine but-for margins.

Q. You did not use the Defendants' cost data to calculate but-for net profit margins, did you?

A. Oh, I'm sorry. I was -- I wasn't following.

Did I use them to calculate net -- I used the cost data to -- given the cost data, you find negative net margins. I mean, we all sort of agree on that. The question is why do you find it and what do you do about it. And I think that was -- Dr. Jena's point was that there were negative cost margins in situations where costs had increased rapidly and as an economist -- I think he is -- that would sort of indicate that perhaps our adjustment factor for cost increases was -- could be improved and I thoroughly agree with that.

Q. But your view as an economist is that here you should not use the Defendants' cost data to

A. That's it, yep.
Q. And so having had your recollection refreshed, you understand that Dr. Jena concluded that your but-for prices indicate that Aurobindo would have sold all of its drugs at issue for a loss under your model, right?
A. That's what this says, yes.
Q. And do you understand that Aurobindo's drugs at issue -- we went over this before I think -- are pio met and cefpo?
A. And a third.
Q. What third do you have in mind, sir?
A. I'm sorry. I have a recollection of three, but sure, pio met and I can never pronounce these things correctly.
Q. Let me try again. As you sit here now, does it conform with your -- conform with your recollection that Aurobindo's drugs at issue are pio met and cefpo?
A. Sure. That's fine.
Q. But you didn't perform a modified disgorgement analysis on either of those drugs at issue, right?
MR. OHANESIAN: Objection, form.
A. I did not adjust the -- adjust the

response to the cost increase for those -- for those two drugs.

Q. Well, specifically you neither included cefpo in your modified disgorgement model for the price increase drugs, nor did you include pio met in your modified analysis for new generic drugs, right?

MR. OHANESIAN: Objection, form.

A. I mean, I describe here the procedure that I went through. I identified ten drugs that had unusually large cost increases and of those I then asked how many of them had overall negative net margins, and the two drugs that you're talking about did not fit into that category.

Q. Yeah. Maybe just to break this down and make sure we're not ships passing in the same night -- that we're not ships passing. Pardon me. It's getting late in the day.

With respect to the price increase drugs for which you performed your modified disgorgement analysis, you conducted that analysis on the seven drugs that are listed in table 10, correct?

A. For seven drugs I decided that it was -- that the cost increase was such that I should change the estimate of the disgorgement.

Q. Yeah. My question is just a very simple one of identification. Among the seven drugs for which you performed the modified disgorgement analysis for, price increase drugs were not any of the Aurobindo drugs at issue, correct?
A. That's correct.
Q. And then the other analysis we talked about that you performed for imiquimod, that analysis you also did not perform for the Aurobindo drugs at issue, right?
A. Aurobindo's drugs were not among -- as is clear from the table was not one of the seven drugs where I thought refining the estimate was desirable. Are you asking me if there was a -- what other analysis did you perform?
Q. Sir, do you recall a moment ago we went over a separate disgorgement analysis that you undertook in your reply report for imiquimod? Do you recall that?
A. I'm saying for imiquimod? I think -- you know, I think that we needed to make an additional refinement because the cost increases were so large and led to significant negative margins.
Q. And my only question -- again, just one of identification. You did not undertake that same

Q. It's actually 59 --
A. Okay.
Q. -- before and after and 63 for the difference-in-difference; isn't that correct?
A. I'd have to check.
Q. Okay. But in any event, you don't dispute Dr. Jena's calculation that applying your models to the cost data that Defendants produced leads to estimated negative but-for margins for dozens of drugs at issue, right?
MR. OHANESIAN: Objection, form.
A. I think that -- you know, using the cost data and estimating but-for prices based on the average pass-through rate generates a net margin in many cases which is negative over the entire period. Mine actually was 40, but it may well have been higher.
Q. And you understand that Dr. Jena did that analysis and prepared a list and in your reply report you don't quibble with what that list is based on Dr. Jena's calculations, right?
MR. OHANESIAN: Objection, form.
A. I have no reason to believe that he made an arithmetical error there.
Q. And you -- and you don't dispute