**UNITED STATES DISTRICT COURT**
**DISTRICT OF CONNECTICUT**

THE STATE OF CONNECTICUT; THE STATE OF
ALASKA; THE STATE OF ARIZONA; THE
STATE OF ARKANSAS; THE STATE OF
CALIFORNIA; THE STATE OF COLORADO;
THE STATE OF DELAWARE; THE DISTRICT OF
COLUMBIA; THE STATE OF FLORIDA; THE
STATE OF GEORGIA; THE TERRITORY OF
GUAM; THE STATE OF HAWAII; THE STATE
OF IDAHO; THE STATE OF ILLINOIS; THE
STATE OF INDIANA; THE STATE OF IOWA;
THE STATE OF KANSAS; THE
COMMONWEALTH OF KENTUCKY; THE
STATE OF LOUISIANA; THE STATE OF MAINE;
THE STATE OF MARYLAND; THE
COMMONWEALTH OF MASSACHUSETTS;
THE STATE OF MICHIGAN; THE STATE OF
MINNESOTA; THE STATE OF MISSISSIPPI; THE
STATE OF MONTANA; THE STATE OF
NEBRASKA; THE STATE OF NEVADA; THE
STATE OF NEW HAMPSHIRE; THE STATE OF
NEW JERSEY; THE STATE OF NEW MEXICO;
THE STATE OF NEW YORK; THE STATE OF
NORTH CAROLINA; THE STATE OF NORTH
DAKOTA; THE COMMONWEALTH OF THE
NORTHERN MARIANA ISLAND; THE STATE
OF OHIO; THE STATE OF OKLAHOMA; THE
STATE OF OREGON; THE COMMONWEALTH
OF PENNSYLVANIA; THE COMMONWEALTH
OF PUERTO RICO; THE STATE OF RHODE
ISLAND; THE STATE OF SOUTH CAROLINA;
THE STATE OF TENNESSEE; THE STATE OF
UTAH; THE STATE OF VERMONT; THE
COMMONWEALTH OF VIRGINIA; THE STATE
OF WASHINGTON; THE STATE OF WEST
VIRGINIA; THE STATE OF WISCONSIN; and
U.S. VIRGIN ISLANDS,

    *Plaintiffs*,

v.

No. 3:20-cv-00802-MPS

SANDOZ, INC.; ACTAVIS HOLDCO US, INC.;
ACTAVIS ELIZABETH LLC; ACTAVIS
PHARMA, INC.; AMNEAL
PHARMACEUTICALS, INC.; AMNEAL
PHARMACEUTICALS, LLC; ARA
APRAHAMIAN; AUROBINDO PHARMA U.S.A.,
INC.; BAUSCH HEALTH AMERICAS, INC.;
BAUSCH HEALTH US, LLC; MITCHELL
BLASHINSKY; DOUGLAS BOOTHE; FOUGERA
PHARMACEUTICALS INC.; GLENMARK
PHARMACEUTICALS INC., USA; JAMES (JIM)
GRAUSO; GREENSTONE LLC; G&W
LABORATORIES, INC.; WALTER
KACZMAREK; ARMANDO KELLUM; LANNETT
COMPANY, INC.; LUPIN PHARMACEUTICALS,
INC.; MALLINCKRODT INC.; MALLINCKRODT
LLC; MALLINCKRODT plc; MYLAN INC.;
MYLAN PHARMACEUTICALS INC.; KURT
ORLOFSKI; MICHAEL PERFETTO; PERRIGO
NEW YORK, INC.; PFIZER INC.; SUN
PHARMACEUTICAL INDUSTRIES, INC.; TARO
PHARMACEUTICALS USA, INC.; TELIGENT,
INC.; ERIKA VOGEL-BAYLOR; JOHN
WESOLOWSKI; and WOCKHARDT USA LLC,

     *Defendants*.

## RULING ON MOTION FOR SUMMARY JUDGMENT

In this action, the Plaintiffs, the Attorneys General of most of the States and several U.S. territories ("the States"), allege that thirty-six pharmaceutical companies and executives ("the Defendants") each participated in a series of conspiracies, as well as an overarching conspiracy, to fix prices, allocate markets, and rig bids in the sale of dozens of generic drug products. Defendants Amneal Pharmaceuticals LLC and Amneal Pharmaceuticals Inc. (referenced singularly as "Amneal") have moved for summary judgment on all claims alleging that Amneal participated in any product-specific or overarching conspiracy. ECF No. 1003; *see also* ECF No. 1008 (Defendants' Joint Memoranda in Support of Defendant-Specific Motions for Summary Judgment).

1

For the reasons set forth below, I **GRANT IN PART AND DENY IN PART** Amneal's motion for summary judgment. I deny the motion with respect to Amneal's participation in an individual conspiracy regarding Phenytoin, and I grant the motion with respect to Amneal's participation in the overarching conspiracy.

## I. BACKGROUND

### A. Procedural Background

This is one of three cases in which the Attorneys General of the States have sued scores of defendants in the generic drug industry for alleged antitrust violations and unfair trade practices. All three cases were originally filed in this Court but were transferred to the Eastern District of Pennsylvania (the "MDL Court"), which was designated by the Judicial Panel on Multidistrict Litigation (the "JPMDL") to preside over these and other similar cases brought by private parties in a consolidated proceeding. ECF No. 9.[1] In April 2024, these three cases were remanded to this Court by the JPMDL and assigned to me. ECF No. 11. The operative complaint in this case, ECF No. 196, alleges collusion in pricing, market allocation, and bidding for some eighty generic drugs, chiefly for dermatological applications. The parties refer to it as "the Dermatology complaint."

In a previous ruling, I denied the Defendants' Joint Motion for Summary Judgment on Overarching Conspiracy Claims, ECF No. 609, because I found that there is evidence in the record from which a reasonable jury could find that the alleged overarching conspiracy exists. *Connecticut v. Sandoz, Inc.*, No. 20-cv-802, 2025 WL 3470502 (D. Conn. Dec. 3, 2025). In reaching this conclusion, however, I did not determine whether each corporate Defendant was a

---

[1] Unless otherwise indicated, all ECF numbers in this ruling refer to entries on the docket of this case, not the same case when it was before the MDL Court, and each page number refers to the page number shown on the ECF stamp on the top of the cited page, not the page of the relevant brief or pleading designated by the parties. References to page numbers of documents that were filed under seal refer to the page number of the PDF file.

member of the overarching conspiracy.[2]  Shortly before I issued that ruling, most Defendants filed additional, Defendant-specific summary judgment motions, many of which include challenges about whether a particular Defendant joined the overarching conspiracy.  This ruling addresses Amneal's Defendant-specific motion for summary judgment.[3]

The Defendants have also filed a Joint Memorandum that addresses the pertinent legal standard and argues that the Defendants are entitled to summary judgment on particular state-law claims.  ECF No. 1008.  This ruling will address arguments made in the Joint Memorandum where they are applicable to Amneal.

## B.  Factual Background

In the overarching conspiracy ruling, I discussed the evidence underpinning the States' claims against all corporate Defendants, and I incorporate that description here.  *See Sandoz, Inc.*, 2025 WL 3470502, at *2–14.  I now address the evidence specific to Amneal's participation in the alleged conspiracy.  The following facts are drawn from the parties' Local Rule 56 Statements of Facts, including the States' Statement of Additional Material Facts ("SAMF"), ECF Nos. 1005, 1259, as well as Statements of Facts related to the Defendants' Joint Memoranda, ECF No. 1054-1, and the record.  The facts are undisputed unless otherwise noted.

---

[2] As noted in the previous ruling, "[w]hether a particular Defendant was a member is a distinct issue from the issue whether a conspiracy existed at all."  ECF No. 1123 at 30 (citing 4 Sand et al., Modern Federal Jury Instructions–Civil ¶ 79-8 ("[Y]ou should first determine . . . whether the conspiracy existed.  If you conclude that the conspiracy did exist, you should next determine whether each defendant was a knowing member of the conspiracy."); *id.* ¶ 79-6 ("In order to prove the [price-fixing] conspiracy, . . . [t]he plaintiff does not have to show that . . . all of the persons alleged to have been members of the claimed conspiracy were in fact members.")).

[3] I have previously ruled on individual motions for summary judgment by Mylan, *Connecticut v. Sandoz, Inc.*, No. 20-cv-802, 2026 WL 75851, at *16 (D. Conn. Jan. 9, 2026), and Aurobindo, *Connecticut v. Sandoz, Inc.*, No. 20cv802, 2026 WL 75853 (D. Conn. Jan. 9, 2026).  *See also* ECF No. 1139 (addressing Mylan's and Aurobindo's motions for reconsideration of these orders).  Because in what follows I discuss my orders concerning the Mylan and Aurobindo motions for summary judgment, I assume the parties' familiarity with both.

3

Amneal is a global generic pharmaceutical manufacturer. ECF No. 1259 ¶ 1. Amneal's drug at issue here, Phenytoin Sodium Extended-Release ("Phenytoin"), is an oral capsule used to treat epileptic seizures. *Id.* ¶ 19. As of January 2014, Amneal was producing Phenytoin, and Amneal employees considered Phenytoin to be a "premium" product. *Id.* ¶¶ 22, 26; ECF No. 1228-2 at 160. During the relevant time, manufacturers in the generic market for Phenytoin included Amneal, Mylan, Taro, and Sun. ECF No. 1228-2 at 309.

Phenytoin is described as a narrow therapeutic index ("NTI") drug, which is a type of drug "where small differences in dose or blood concentration may lead to serious therapeutic failures and/or adverse drug reactions that are life-threatening or result in persistent or significant disability or incapacity." ECF No. 1228-2 at 158; ECF No. 1259 ¶ 20. Because of this, absent good reason, prescribers are reluctant to switch patients from one manufacturer's product to another's. ECF No. 1259 ¶ 21. As it relates to pricing, Amneal's 30(b)(6) witness testified that the fact that a drug is an NTI drug "[p]otentially" impacts Amneal's pricing of that drug. ECF No. 1228-2 at 95 ("What's happening in the market, ability to supply, all those other characteristics that we looked at would also have an impact.").

Amneal considered Phenytoin to be a "complex" product to manufacture because of the particularities of the manufacturing process. ECF No. 1259 ¶ 24. These particularities led to Amneal experiencing supply issues with respect to Phenytoin. *Id.* ¶¶ 25, 27; ECF No. 1228-2 at 92 (Amneal's 30(b)(6) witness testifying that Phenytoin is "a difficult product to make" and "always is in and out of supply" from Amneal). For example, on March 27, 2014, Amneal's Shannon Rivero emailed the sourcing director at the Walgreens Boots Alliance Development

("WBAD").[4]  ECF No. 1259 ¶ 28; ECF No. 1228-2 at 179.  In that email, Rivero wrote, referring to Phenytoin, "I would move it if I were you.  Or let us take a major price increase [to] get rid of all our other customers and just supply you guys.  Our supply is horrible and the margins are low . . . and we have to invest in this [m]illion dollar machine."  ECF No. 1228-2 at 179; *see also id.* at 290 (Rivero expressing a similar sentiment to a WBAD executive on March 18, 2014, stating "honestly we are probably going to discontinue [Phenytoin] due to low margin").

Those supply issues resulted in "Failure-to-Supply" ("FTS") penalties.  ECF No. 1259 ¶ 33; ECF No. 1228-2 at 96 (Amneal's 30(b)(6) witness testifying that, in the spring of 2014, Amneal was "taking on significant [FTS] penalties").  These penalties are the consequence of FTS clauses in customer contracts, which impose financial penalties on suppliers when they cannot meet customer demand, and they affected Amneal's decision on "[w]hether and how to bid."  ECF No. 1228-2 at 31 (Amneal executive James Luce testifying that Amneal "would . . . want to be absolutely sure [it] could supply before [it] would bid").  Twice in 2014, Amneal declined Phenytoin business to avoid undersupplying and incurring FTS penalties.  ECF No. 1259 ¶ 34; *see* ECF No. 1228-2 at 282–84 (in June 2014, Amneal declining Publix's request for a bid after "Taro [took] the price up on Phenytoin" due to "supply constraints").

Drug prices relevant to Amneal's pricing and bidding decisions were set on a case-by-case basis, and the analysis was multi-factorial.  ECF No. 1259 ¶ 10; ECF No. 1228-2 at 77–78.  Pricing variables included the number of competitors in the market, the timing of Amneal's entry in the market, supply limitations, cost and availability of raw materials, shipping considerations, and the customer's fees and contractual clauses.  ECF No. 1228-2 at 15–16, 29–30, 77–78; *id.* at 32 (Luce

---

[4] WBAD is "a Group Purchasing Organization ('GPO') that negotiates contracts and relationships with manufacturers on behalf of Walgreens."  ECF No. 1003-1 at 5.

testifying that a generic pharmaceutical manufacturer's new entry in the market would impact how Amneal would "react in the marketplace"). Amneal also considered each competitor's WAC and AWP prices, which were public information, when making pricing and bidding decisions. *Id.* at 35. Amneal's 30(b)(6) witness explained that customers share "price intelligence" with Amneal "all the time." *Id.* at 85.

With respect to market share generally, Luce testified that it was Amneal's "strategy to want to be at fair share plus a little." ECF No. 1259 ¶ 8; ECF No. 1228-2 at 13; *see also Sandoz, Inc.*, 2025 WL 3470502, at *2–3 (discussing the "fair share" concept in the generic pharmaceutical industry). "A little" depended on the product. ECF No. 1228-2 at 11; *see also id.* ("It was a general goal; not an absolute and not for all products. But that was our general goal, was to have approximately our fair share plus a little."); *id.* at 26 (same). Luce testified that "fair share" itself is just a "data point." *Id.* at 26. James Brown, who worked at competitor Glenmark, testified that he "always considered . . . Amneal to be very, very aggressive when it came to market share." *Id.* at 72; ECF No. 1259 ¶ 9.

Amneal used pricing committees to help set product prices. ECF No. 1228-2 at 6 (Luce testifying). From 2010 through 2016, members of the pricing committees included Luce, Stephen Rutledge, Edward Allen Lowther, Rivero, and Marty Ross. *Id.* at 6, 56. Phone records reflect that some of these Amneal pricing committee members communicated with competitors during the relevant time. For example, Lowther, Amneal's Director of Commercial Generics Strategy,[5] who previously worked at Mylan, communicated with Jim Nesta of Mylan. ECF No. 1228-2 at 43–45, 52–53, 66–67; ECF No. 1259 ¶¶ 15, 66. Rivero, Amneal's Senior Director, Pricing and Analytics, previously worked at Walgreens, and she communicated with Mylan employees Jim Nesta and

---

[5] His title is sometimes referred to as "Director of Pricing." SAMF ¶ 14.

Mike Aigner, whom she knew from her time at Walgreens. ECF No. 1228-2 at 57–61; ECF No. 1259 ¶ 65. Rivero also communicated with Ara Aprahamian of Taro, whom she also knew from working at Walgreens. ECF No. 1228-2 at 61–62; ECF No. 1259 ¶ 67. Rivero also communicated with Sun's Wayne Fallis. ECF No. 1228-2 at 457; ECF No. 1259 ¶ 68.

Rutledge testified that when he was on a pricing committee at Amneal, he "had input," but he "wasn't the sole answer by any means." ECF No. 1228-2 at 75, 76 (explaining that on a pricing committee at Amneal, the members "were presented with scenarios and gave [their] opinion on what [they] thought could be successful based on [their] history"). Amneal's co-CEOs were the only people who could unilaterally make product pricing decisions. *Id.* at 75; ECF No. 1259 ¶ 11.

During the relevant time, Walgreens and Walmart were Amneal's two largest Phenytoin customers. ECF No. 1259 ¶ 41. The parties disagree about whether, considering the supply issues, Amneal intended to keep both Walgreens and Walmart as customers. Amneal submits that it "implemented its strategy to terminate its business with Walgreens or Walmart and keep the other at an improved price by, first, issuing an official price increase notice to Walgreens." *Id.* ¶ 42. Amneal's 30(b)(6) witness testified that "one way to mitigate [Amneal's] risk from [FTS] penalties is to terminate our product-specific award with certain customers . . . you can do that by issuing notice. You could also do that in effect by issuing a price increase. By issuing a price increase, generally a customer's first step is to pulse the market and see what other options are available." ECF No. 1228-2 at 97–98. The States, however, submit that Amneal "colluded with Taro, Mylan and Sun to keep both Walgreens and Walmart as customers at an increased price." ECF No. 1259 ¶ 42.

Record evidence shows that, because of Amneal's supply issues and the concern about FTS penalties, the co-CEOs of Amneal considered discontinuing its manufacture of Phenytoin. ECF

7

No. 1259 ¶ 39.  In a May 1, 2014 email, CEO Chirag Patel emailed others asking when Phenytoin's "continuous back orders" would be "permanently resolved" because of the resulting "heavy[]" FTS penalties.  *Id.*; ECF No. 1228-2 at 269.  He was told that "Phenytoin is complicated to predict." ECF No. 1228-2 at 269.  Amneal's Vice President of Sales Operations Marty Ross responded, "should we look at giving up some customers on Phenytoin?"  *Id.* at 268.  CEO Chintu Patel wrote, "I had already communicated this to [Rutledge] [a] few months back.  We do not mind giving up [the] entire product."  *Id.* at 302.  Chirag Patel responded, "[y]es and adjust the pricing as this is a tough product to make."  *Id.*  Rutledge then emailed Ross on a separate thread and copied Rivero, saying, "Marty we are already working to [lose] Walgreens or Walmart.  Our plans are to keep one at a[n] improved price.  We have pricing in front of Walgreens now and based on what they tell us will [sic] actuate the next steps."  *Id.* at 267.  Ross replied to Rutledge, "Awesome!"  *Id.*  Back on the original thread, Chirag Patel wrote to Rutledge, "[p]lease discontinue the product slowly without penalties."  *Id.* at 302.  Rutledge emailed him back, writing:

> we have a process in place to get out of a position.  I hope to have this done next week.  One of the stake holders is out [until] the 5th and said they would let us know the answer which will guide us to the next account.  We are trying to lose one and keep one with improved pricing.

*Id.* at 301.

An earlier email between Rivero and Amneal National Account Manager Dave Hardin corroborates this plan.  ECF No. 1259 ¶ 42.  On April 24, 2014, Rivero forwarded Hardin an email she sent to Walgreens executives with the subject line, "WAG Phenytoin."[6]  ECF No. 1228-2 at 338.  Hardin responded to Rivero on April 25, 2014, writing, "Ok thanks Shannon… It has been sent to both.  Are we looking to lose it based on the substantial price increase and to help our supply ??"  *Id.* at 337.  Rivero responded, "Either them or Walmart."  *Id.*

---

[6] "WAG" refers to Walgreens.

8

Meanwhile, a few weeks before, on April 7, 2014, Taro listed Phenytoin among several drugs for which it wanted to increase prices.  SAMF ¶ 3; ECF No. 952-1 at 54–58.  On April 10, 2014, Aprahamian and Mylan's Aigner spoke twice.  SAMF ¶ 4; ECF No. 952-1 at 34.  Around that time, in an April 16, 2014, email, Aprahamian emailed his colleagues at Taro that Walgreens was looking for Taro to "take on" some of its Phenytoin business.  ECF No. 1228-2 at 297.  Aprahamian wrote to his colleagues, "Josh, please run me market share on this… They are saying amneal 48%, mylan 33%[,] and us at 16% share… which isn't consistent with what I have in our IMS[.]"  *Id.*  On April 24, 2014, a Mylan pricing specialist similarly emailed her colleagues about an opportunity for Mylan to supply Phenytoin for Walgreens.  *Id.* at 299, 345.

From April 22 to April 30, 2014, Mylan's Nesta and Amneal's Rivero exchanged fifteen calls and text messages.  SAMF ¶ 9.  From April 26 to April 29, 2014, executives from Amneal, Taro, Mylan, and Sun attended the National Association of Chain Drug Stores ("NACDS") annual meeting.  *Id.* ¶ 8.  Attendees included Aprahamian, Nesta, and Rivero.  *Id.*  On April 29, 2014, during the event, Aprahamian emailed a Taro colleague with the subject line "phenytoin er" asking his colleague to "send [him] the current pricing that is loaded for all on this product."  ECF No. 952-1 at 60.  The next day, an internal Mylan document indicated a "[p]otential Amneal price increase" for Phenytoin.  SAMF ¶ 10.

On May 29, 2014, Mylan's Aigner and Amneal's Rivero exchanged six calls within an hour.  *Id.* ¶ 12; ECF No. 945-1 at 78.  The next day, an internal Mylan email again indicated there was a potential Amneal price increase.  SAMF ¶ 12.

On June 2, 2014, a Walgreens representative forwarded Rivero an email from Taro noticing an increase of Taro's WAC and AWP prices on various drugs, including Phenytoin.  ECF No. 1259 ¶¶ 45, 48; ECF No. 1228-2 at 363–66.  That same day, Taro sent OmniCare a similar price

increase notice.  ECF No. 1259 ¶ 46; ECF No. 1228-2 at 368–69.  Also on the same day, an OptiSource representative emailed an Amneal representative to say that Taro "doubled [its] AWPs on Phenytoin ER."  ECF No. 1259 ¶¶ 46, 48; ECF No. 1228-2 at 372.  That email was forwarded to Rutledge and Rivero.  ECF No. 1228-2 at 371.  Rivero then forwarded the email to Lowther that afternoon, writing, "[h]ope Mylan sees this."  *Id.*

At around that same time, Rivero called Aigner and Nesta six times.  The first call to Aigner took place at 4:46 p.m., and the first call to Nesta took place at 4:47 p.m.[7]  SAMF ¶ 15; ECF No. 946-1 at 5.  Each of the calls was less than a minute long.  ECF No. 946-1 at 5.

Lowther replied to Rivero's email at 6:22 p.m., writing, "They will follow[.]"  ECF No. 1259 ¶ 49; ECF No. 1228-2 at 371.  The record shows that Lowther then called Nesta twice on the evening of June 2, with the second call at 7:43 p.m. lasting for forty-five seconds.  SAMF ¶ 15; ECF No. 946-1 at 5.

During his deposition, Lowther testified that he did not recall what was discussed on his calls with Nesta, but he added that he knew it was not business because he and Nesta "never did discuss business."  ECF No. 1228-2 at 43–44, 44–45 (testifying that the calls could have been about Lowther's move to Pittsburgh, with which Nesta was familiar), 52–53 (same).  When asked how he knew Mylan would "follow," Lowther testified that his statement was based on his appreciation of Mylan's "protocol or typical business sense" from his time working there.  ECF No. 1228-2 at 45 (adding that he was not responsible for pricing decisions when he worked at Mylan).

On June 3, 2014, Taro's new WAC pricing went into effect.  SAMF ¶ 16.  Between June

---

[7] Unless stated otherwise, all calls and messages are in eastern time.

3 and June 11, 2014, Amneal, Taro, and Mylan employees continued to communicate through phone calls[8] and text messages. *Id*. ¶ 17.

- On June 3, 2014, Amneal's Rivero emailed her colleague Lowther with the subject line "Pheny Price increase." ECF No. 945-1 at 5–6. That same morning, Lowther and Mylan's Nesta called each other six times. ECF No. 944-1 at 264. The first call from Nesta to Lowther occurred at 11:05 a.m., and lasted for two seconds. *Id.* Lowther called Nesta back three times at 11:12 a.m. (a fourth call was incomplete), and each call lasted for five seconds or less. *Id.*

- On June 4, 2014, Lowther emailed Rivero back at 9:46 a.m. with an attachment; he noted in the body of the email, "Updated the Phenytoin summary. Matched the new Taro AWP and WAC. Had nets around levels discussed from WAG and Walmart and built out from there." ECF No. 945-1 at 5. At 1:21 p.m., Rivero called Mylan's Aigner, and the call lasted eight minutes. ECF No. 945-1 at 80. Half an hour later, Aigner called Rivero, and the call lasted a minute. *Id.* Taro's Aprahamian called Aigner later that day, and the call lasted a minute. *Id.*

- On June 5, 2014, Rivero called Mylan's Aigner at 1:47 p.m., and the call lasted two seconds. *Id.* Rivero also called Mylan's Nesta at 1:47 p.m., and the call lasted seventeen seconds. ECF No. 946-1 at 7. Nesta called Rivero at 3:49 p.m., and the call lasted five seconds. *Id.* Nesta texted Rivero twice at 3:50 p.m. *Id.* Nesta and Rivero spoke at 5:36 p.m. in a call lasting three minutes and thirty-three seconds. *Id.* Nesta then called Amneal's Lowther at 5:41 p.m., and the call lasted seven seconds. *Id.* Lowther called Nesta back at 5:44 p.m., and the call lasted two seconds. *Id.*

- On June 6, 2014, Mylan's Aigner called Taro's Aprahamian, and the call lasted two minutes. ECF No. 945-1 at 80. Later that day, Aprahamian called Aigner, and the call lasted nine minutes. *Id.*

- On June 9, 2014, Aigner called Aprahamian, and the call lasted four minutes. *Id.*

- On June 11, 2014, Mylan's Nesta called Amneal's Rivero at 10:44 a.m., and the call lasted twenty-nine seconds. ECF No. 946-1 at 7. Nesta then called Amneal's Lowther at 10:50 a.m., and the call lasted three seconds. *Id.* at 8. Rivero called Nesta at 10:52 a.m., and the call lasted eight seconds. *Id.* She almost immediately called him again, and the call lasted eleven minutes. *Id.* Then, at 11:03 a.m., Lowther called Nesta, and the call lasted twelve seconds. *Id.*

Also on June 11, 2014, Walgreens accepted Amneal's Phenytoin price increase. ECF No. 1228-2 at 356–59.

---

[8] I include here only completed calls (as opposed to ones marked "not complete").

On June 12, 2014, Sun's Susan Knoblauch emailed other Sun representatives, writing "Taro has raised pricing on Phenytoin 100mg Tablets . . . Amneal out of stock, no ship date." ECF No. 945-1 at 200. Knoblauch emailed again later that day to say "[e]veryone but [Sun][9] raised prices (except amneal) . . . amneal has no stock." *Id.* at 202. On June 15, 2014, a Sun employee emailed another employee, "Amneal is out of the market. We need to see how soon plant can get us more product so we can capitalize on this short term opportunity and lock up business long term." ECF No. 1228-2 at 442.

On June 18, 2014, an internal email shows Nesta approved increases to Mylan's Phenytoin WAC and AWP prices; as stated in the email, these changes were instigated by "[c]hanging market dynamics; both the brand and Taro raised [prices] in June." ECF No. 946-1 at 12, 14.

From June 13, 2014, to July 2, 2014, phone records show that the competitors continued to contact each other:

- On June 13, 2014, Mylan's Nesta called Amneal's Rivero, and the call lasted twenty-two seconds. *Id.* at 10. Immediately after, Nesta called Amneal's Lowther, and the call lasted two minutes and fifty-six seconds. *Id.* Just under an hour later, Rivero called Nesta, and the call lasted five seconds. *Id.*

- On June 16, 2014, Rivero called Nesta, and the call lasted two minutes and thirteen seconds. *Id.* That day, Rivero also called Wayne Fallis of Sun three times, and the calls lasted for fourteen seconds, twenty-nine seconds, and three seconds, respectively. ECF No. 945-1 at 226.

- On June 17, 2014, Sun's Fallis called Amneal's Rivero at 10:30 a.m., and the call lasted two minutes and twenty-six seconds. *Id.* Around 5 p.m., Amneal's Lowther called Mylan's Nesta, and the call lasted twenty-nine seconds. ECF No. 946-1 at 10. Nesta then called Lowther, and the call lasted six minutes and twenty-six seconds. *Id.*

- On June 18, 2014, Lowther called Nesta, and the call lasted twenty-eight seconds. *Id.* Immediately after, Nesta called Lowther twice, and the calls lasted for two seconds and then for one minute and forty-nine seconds. *Id.*

---

[9] The States represent that Sun was doing business as Caeaco (referred to as "Caraco" in the email). SAMF ¶ 19.

- On June 20, 2014, Rivero called Nesta, and the call lasted five minutes and thirty-nine seconds. *Id.*

On June 23, 2014, Rivero emailed her colleagues Rutledge and Lowther that Amneal's Phenytoin price would increase as follows: "New AWP effective 7/1/2014 . . . New WAC effective 9/1/2014 . . . Net contract effective 9/1/2014[.]" ECF No. 1228-2 at 288. That day, Lowther forwarded that email with "increase notices" "for approval" to Rutledge, Luce, and Ross. *Id.* at 287. When Ross responded on June 24, 2014, asking how those increases compared to the branded product, Lowther replied the next day (June 25) with the figures and added "[w]e are matching Taro's new AWP and WAC and expect Mylan to do the same." *Id.* at 286; ECF No. 1259 at ¶ 51. Also on June 25, Amneal's Rivero and Mylan's Aigner exchanged three calls, and the final one lasted over eight minutes. ECF No. 945-1 at 228.

The calls continued in the days leading up to and following Amneal's notification to customers on July 1, 2014, that it was increasing its Phenytoin prices. ECF No. 1259 ¶ 52; SAMF ¶ 25.

- On June 26, 2014, Amneal's Rivero called Taro's Aprahamian at 2:33 p.m., and the call lasted twenty-nine seconds. ECF No. 945-1 at 230. Aprahamian then called Rivero three times at 3:29 p.m., 3:35 p.m., and 4:19 p.m.—these calls lasted six seconds, four seconds, and ten minutes and forty-six seconds, respectively. *Id.*

- On June 27, 2014, Mylan's Aigner called Amneal's Rivero, and the call lasted fifty-five seconds. *Id.* at 228. Rivero then called Aigner about half an hour later, and the call lasted five minutes and twenty-four seconds. *Id.*

- On July 1, 2014, the day that Amneal notified customers of its price increase, Amneal's Rivero called Mylan's Aigner at 10:09 a.m., and the call lasted nine seconds. *Id.* at 234. At 10:15 a.m., Aigner called Rivero, and the call lasted eight minutes and thirty-nine seconds. *Id.* Rivero then called Taro's Aprahamian at 10:45 a.m., and the call lasted two seconds. *Id.* at 236. Rivero called Mylan's Nesta at 12:06 p.m., and the call lasted four seconds. *Id.* at 232. At 12:18 p.m., Nesta called Rivero back, and the call lasted four seconds. *Id.* Within thirty seconds, Rivero called Nesta, and the call lasted six minutes and twenty-seven seconds. *Id.*

The next day, July 2, 2014, Amneal's Rutledge sent an email, copying Rivero, writing that

13

Amneal's Phenytoin supply had improved and that he had asked CEO Chintu Patel "to see if we could keep both" Walmart and Walgreens. ECF No. 926-2 at 2662. Rutledge reported that Chintu Patel had "committed yes" and said "there will be no [supply] issues." *Id.*; ECF No. 1036-1 ¶ 362. Later on July 2, Mylan's Aigner called Taro's Aprahamian at 3:11 p.m., and the call lasted four minutes. ECF No. 945-1 at 84. Aprahamian then called Amneal's Rivero at 3:15 p.m., and the call lasted five minutes and fourteen seconds. *Id.* at 236. During this call, at 3:18 p.m., Aigner called Aprahamian in a call lasting two minutes. *Id.* at 84. At 3:20 p.m., Aprahamian called Aigner, and the call lasted four minutes. *Id.*

During her deposition, Rivero testified that she recalled speaking with Nesta while working at Amneal, but that she did not recall speaking with him about customers common to both Amneal and Mylan. ECF No. 1228-2 at 57–59. Rivero also testified that she had social calls with Aprahamian, *id.* at 61, but she did not recall discussing business matters with him either. *Id.* at 61–62. She testified that she was not aware of any agreements between Amneal and competitors about drug pricing or coordinating bids. *Id.* at 68–69.

During their depositions, Taro's Aprahamian, Mylan's Aigner and Nesta, and Sun's Knoblauch asserted their Fifth Amendment privilege against self-incrimination when asked about Phenytoin and their communications with Amneal executives. SAMF ¶¶ 7, 22.

On July 1, 2014, Amneal notified Walmart of a Phenytoin contract price increase, as well as a WAC and AWP increase. ECF No. 1228-2 at 393; ECF No. 1259 ¶ 52. Around July 11, 2014, Walmart solicited a bid from Mylan on Phenytoin, ECF No. 1228-2 at 374–76; ECF No. 1259 ¶ 53, and Mylan submitted a bid on July 18, 2014, ECF No. 1228-2 at 398–400; ECF No. 1259 ¶ 55. A senior buyer at Walmart replied, "[n]o thank you." ECF No. 1228-2 at 398–400; ECF No. 1259 ¶ 55. Walmart accepted Amneal's price increase on August 11, 2014. ECF No.

14

1228-2 at 402; ECF No. 1259 ¶ 56.

On July 14, 2014, Sun noticed prices increases on Phenytoin for its customers. ECF No. 1228-2 at 407–24; ECF No. 1259 ¶ 60. On July 15, 2014, Mylan announced increased AWP and WAC prices on certain drugs, including Phenytoin. ECF No. 1228-2 at 426–32; ECF No. 1259 ¶ 61.[10]

## II. LEGAL STANDARD

### A. Summary Judgment

"Summary judgment is appropriate only if the movant shows that there is no genuine issue as to any material fact and the movant is entitled to judgment as a matter of law." *Tolan v. Cotton*, 572 U.S. 650, 656–57 (2014) (internal quotation marks and citations omitted). In reviewing the summary judgment record, a court must "construe the facts in the light most favorable to the non-moving party and must resolve all ambiguities and draw all reasonable inferences against the movant." *Caronia v. Philip Morris USA, Inc.*, 715 F.3d 417, 427 (2d Cir. 2013). "A genuine dispute of material fact exists for summary judgment purposes where the evidence, viewed in the light most favorable to the nonmoving party, is such that a reasonable jury could decide in that party's favor." *Zann Kwan v. Andalex Grp. LLC*, 737 F.3d 834, 843 (2d Cir. 2013). The moving party bears the burden of demonstrating that no genuine issue exists as to any material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323–25 (1986). If the moving party carries its burden, "the opposing party must come forward with specific evidence demonstrating the existence of a genuine dispute of material fact." *Brown v. Eli Lilly & Co.*, 654 F.3d 347, 358 (2d Cir. 2011). "Where no rational finder of fact could find in favor of the nonmoving party because the evidence to support

---

[10] Internal approval of Mylan's Phenytoin price increase occurred about a month earlier on June 18, 2014. ECF No. 946-1 at 12–14.

its case is so slight, summary judgment must be granted." *Id.* (internal quotation marks omitted).

## B. Sherman Act

The Sherman Act bans "[e]very contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce among the several States." 15 U.S.C. § 1. "The crucial question in a Section 1 case is therefore whether the challenged conduct stems from independent decision or from an agreement, tacit or express." *Starr v. Sony BMG Music Entm't*, 592 F.3d 314, 321 (2d Cir. 2010) (internal quotation marks omitted). At the summary judgment stage, "to raise a genuine issue of material fact as to an antitrust conspiracy, the plaintiff must present direct or circumstantial evidence that 'tends to exclude the possibility that the alleged conspirators acted independently.'" *Anderson News, L.L.C. v. Am. Media, Inc.*, 899 F.3d 87, 98 (2d Cir. 2018) (quoting *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 588 (1986)). "The quality of evidence required to satisfy the 'tends to exclude' standard 'varies with the economic 'plausibility' of the alleged agreement." *In re Foreign Exch. Benchmark Rates Antitrust Litig.*, No. 13 CIV. 7789 (LGS), 2022 WL 294118, at *5 (S.D.N.Y. Feb. 1, 2022). "[T]he tends to exclude standard is more easily satisfied when[] the conspiracy is economically sensible for the alleged conspirators to undertake and the challenged activities could not reasonably be perceived as procompetitive." *Anderson News*, 899 F.3d at 99 (quoting *In re Publ'n Paper Antitrust Litig.*, 690 F.3d 51, 63 (2d Cir. 2012)). A plaintiff need not "disprove all nonconspiratorial explanations for the defendants' conduct; rather the evidence need be sufficient only to allow a reasonable fact finder to infer that the conspiratorial explanation is more likely than not." *Id.* (internal quotation marks omitted). "[I]f the evidence is in equipoise, then summary judgment must be granted against the plaintiff." *Id.*

"Oligopolies pose a special problem under § 1 [of the Sherman Act] because rational

16

independent actions taken by oligopolists can be nearly indistinguishable from horizontal price fixing," as "any rational decision [in an oligopoly] must take into account the anticipated reaction of the other firms." *In re Mylan N.V. Secs. Litig.*, 666 F. Supp. 3d 266, 318 (S.D.N.Y. 2023). "Consequently, parallel conduct allegations must be placed in a context that raises a suggestion of a preceding agreement, not merely parallel conduct that could just as well be independent action." *Mayor & City Council of Balt. v. Citigroup, Inc.*, 709 F.3d 129, 137 (2d Cir. 2013). "Since mere parallel behavior can be consistent with independent conduct, courts have held that a plaintiff must show the existence of additional circumstances, often referred to as 'plus' factors, which, when viewed in conjunction with the parallel acts, can serve to allow a [fact finder] to infer a conspiracy." *Apex Oil Co. v. DiMauro*, 822 F.2d 246, 253 (2d Cir. 1987). "Such circumstances might include a common motive to conspire or a high level of interfirm communications." *Id.* at 254. But because "such factors in a particular case could lead to an equally plausible inference of mere interdependent behavior, i.e., actions taken by market actors who are aware of and anticipate similar actions taken by competitors, but which fall short of a tacit agreement," *id.*, these circumstances "must still lead to an inference of conspiracy." *Citigroup*, 709 F.3d at 137.

## III. DISCUSSION

### A. Evidence of Amneal's Participation in an Individual Conspiracy Regarding Phenytoin

The States allege that Amneal conspired with Taro, Mylan, and Sun to fix the price of Phenytoin and allocate the market. Amneal argues that the evidence shows that its behavior reflected a strategic effort to manage customer relations amid an expensive supply shortage of a complicated drug. Viewing the evidence in the light most favorable to the States, I conclude that there is a genuine dispute of material fact about whether Amneal conspired with at least one competitor to follow price increases and avoid poaching competitors' customers.

17

"[H]orizontal agreements among competitors to fix prices or to divide markets" are "[r]estraints that are *per se* unlawful." *Leegin Creative Leather Prods., Inc. v. PSKS, Inc.*, 551 U.S. 877, 886 (2007) (citations omitted). "The *per se* rule, treating categories of restraints as necessarily illegal, eliminates the need to study the reasonableness of an individual restraint in light of the real market forces at work." *Id.* "Because price fixing is a *per se* violation of the Sherman Act, an admission by the defendants that they agreed to fix their prices is all the proof a plaintiff needs." *In re High Fructose Corn Syrup Antitrust Litig.*, 295 F.3d 651, 654 (7th Cir. 2002) (cited by *Publ'n Paper*, 690 F.3d at 63).

Here, though, the States do not rely on direct evidence to support their claims against Amneal. The States rely instead on circumstantial evidence, including parallel conduct and frequent interfirm communications amongst competitors at times that correspond with price movements. Amneal cites evidence it says supports that it acted independently and made strategic business decisions intended to avoid expensive FTS penalties. These decisions, Amneal submits, included considering discontinuing Phenytoin and both discussing and taking steps toward losing either Walgreens or Walmart as a customer in May 2014. ECF No. 1259 ¶¶ 39–40; ECF No. 1228-2 at 267–302. But, as the States point out, Amneal did not, in the end, lose either Walgreens or Walmart and instead increased pricing while communicating with competitors. This evidence, the States argue, permits an inference that "tends to exclude the possibility" that Amneal "acted independently." *Matsushita Elec. Indus. Co.*, 475 U.S. at 588. Considering the record as a whole and in the light most favorable to the States, I find that a reasonable juror could conclude that it is more likely that Amneal's conduct resulted from collusive rather than lawful conduct.

To start, a reasonable juror could find that the evidence shows parallel conduct, particularly the close-in-time price increases of the Phenytoin producers. The Phenytoin price increases

18

happened as follows: Taro on June 2; Mylan on June 18 (internal approval); Amneal on June 23; and Sun on July 14.    SAMF ¶ 3 (Taro planning price increase on April 7), ECF No. 1259 ¶¶ 45–46 (Taro increased WAC and AWP prices and, for some customers, contract prices in June); SAMF ¶¶ 23, 25 (Amneal deciding on June 23 to increase WAC and AWP prices, and noticing those increases on July 1), 24 (Mylan approving raising its WAC and AWP price on June 18, effective July 16), 26 (Sun noticing price increases July 14); ECF No. 946-1 at 12, 14 (Mylan prices).

Amneal makes some effort to argue that this sequence does not support parallel conduct. *See* ECF No. 1003-1 at 13 n.7.  As I held in the Mylan decision, the Phenytoin competitors' price increases, which happened within a span of six weeks, were close enough in time to demonstrate parallel conduct.  ECF No. 1149 at 44–45 (citing *Mosaic Health, Inc. v. Sanofi-Aventis U.S., LLC*, 156 F.4th 68, 82 (2d Cir. 2025) ("[A]ntitrust plaintiffs need not plead the exact same conduct within a tight timeline to state a claim under Section 1 of the Sherman Act.")).  Amneal separately argues that these price increases were not "uniform," but Amneal does not explain why.  *See* ECF No. 1003-1 at 13 n.7.  Because Amneal has not meaningfully developed that argument, I do not address it.[11]

Together with the evidence of parallel conduct, the volume and timing of interfirm communications between competitors detailed above would allow a reasonable fact finder to conclude that it is more likely than not that Amneal participated in a Phenytoin conspiracy.  *See In re Generic Pharms. Pricing Antitrust Litig.*, No. 16-CM-27241, 2025 WL 2483981, at *14 (E.D. Pa. Aug. 27, 2025) (finding sufficient evidence to establish the interfirm communications plus

---

[11] Moreover, the evidence that Amneal points to in support of this assertion indicates the opposite—that Amneal "[m]atched the new Taro AWP and WAC" as it planned its increase.  ECF No. 1228-2 at 305 (cited at ECF No. 1259 ¶ 57).

factor where "calls occurred immediately before or after pricing decisions, and . . . those calls occurred in tight temporal proximity with calls to and between other representatives").    For example, on June 2, 2014, after Amneal's Rivero learned that Taro intended to increase its WAC and AWP prices on Phenytoin, ECF No. 1259 ¶¶ 45, 46, 48; ECF No. 1228-2 at 363–66, 368–69, Rivero wrote to Lowther that she "[h]ope[s] Mylan sees this," ECF No. 1228-2 at 371.   Around that same time, Rivero called Mylan's Aigner and Nesta six times, SAMF ¶ 15; ECF No. 946-1 at 5.  Lowther replied to Rivero's email to say, "[t]hey will follow[.]"  ECF No. 1259 ¶ 49; ECF No. 1228-2 at 371.  Lowther called Nesta twice later that evening.  SAMF ¶ 15; ECF No. 946-1 at 5.

The next morning, Rivero emailed Lowther with the subject line "Pheny Price increase," ECF No. 945-1 at 5–6, and Lowther and Nesta called each other several times with each call lasting five seconds or less, ECF No. 944-1 at 264.  A day later (June 4), Lowther emailed Rivero noting that, in the attachment, he "[u]pdated the Phenytoin summary.  Matched the new Taro AWP and WAC.  Had nets around levels discussed from WAG and Walmart and built out from there."  ECF No. 945-1 at 5.  Rivero and Mylan's Aigner later spoke for eight minutes, *id.* at 80, and then Aigner called Rivero again, *id.*  Meanwhile, Taro's Aprahamian was also communicating with Mylan's Aigner.  *Id.*  In addition to communications with Mylan and Taro representatives, there is also evidence that Rivero communicated a few times with Sun representatives during the same period. *Id.* at 226 (documenting calls from mid-June 2014).

And these calls between competitors continued over the next month, during the heart of the price increase period, as did the internal emails.  On June 25, 2014, Lowther wrote "[w]e are matching Taro's new AWP and WAC and expect Mylan to do the same."  ECF No. 1228-2 at 286; ECF No. 1259 ¶ 51.  Amneal takes issue with the States' reliance on this email because Amneal says it is based on Lowther's familiarity with Mylan's behavior from his time working there, not

any insider information. That reading is one possible interpretation of the email standing alone, but an inference that it was informed by communications with competitors arises when the document is placed in context. Lowther sent that email in the days following communications between himself and Rivero with Nesta. ECF No. 946-1 at 10 (documenting calls from June 13 to June 20, 2014). At his deposition, Lowther testified that he did not recall these discussions, but that he and Nesta "never did discuss business." ECF No. 1228-2 at 43–45. When asked how he knew Mylan would "follow," Lowther testified that that statement likely stemmed from his understanding of Mylan's typical business practices from his time working there. ECF No. 1228-2 at 45. But the short duration of his back-and-forth calls with Nesta—coming in quick succession just as pricing decisions were being made—are more consistent with efforts to obtain and confirm specific items of basic information—like pricing plans—than a social chat between friends.

Amneal submits that the calls were generally "so short as to be inconsistent with conspiracy," ECF No. 1320 at 13 n.6, but as I just noted and as counsel suggested during Lowther's deposition, a reasonable juror could easily infer just the opposite, ECF No. 1228-2 at 44 (counsel asking, "[w]hat sort of things do you talk about in five-second phone calls, sir, that are not business?"), and could find that it would be odd for two old friends to catch up with each other in staccato bursts consisting of a series of very short calls spread over a few days.

Another flurry of phone calls between Amneal's Rivero, Mylan's Aigner and Nesta, and Taro's Aprahamian occurred on July 1, the day that Amneal informed Walmart and other customers of its price increase. SAMF ¶ 25 (informing customers); ECF No. 945-1 at 232, 234, 236 (call logs). Then, the next day, as Amneal executives changed plans and sought to retain both Walmart and Walgreens as customers, Taro's Aprahamian, Mylan's Aigner, and Amneal's Rivero exchanged back-to-back—and even simultaneous—calls. ECF No. 926-2 at 2662 (Amneal

21

seeking to retain Walmart and Walgreens); ECF No. 945-1 at 84, 236 (call logs).  Again, the "tight temporal proximity" of these interfirm communications to changes in the market supports the States' allegations that Amneal did not act independently in launching Phenytoin.  *Generic Pharms. Pricing*, 2025 WL 2483981, at *14.

Rivero, for her part, testified that she did not recall speaking with Nesta or Aprahamian about customers common to Amneal, Mylan, or Taro.  ECF No. 1228-2 at 57–59, 61–62.  As I held in my decision denying Mylan's motion for summary judgment, the calls between Lowther and Nesta tend to exclude the possibility that Lowther believed Mylan would follow based only on a prediction of Mylan's business practices.  From the timing, a reasonable juror could infer that when Rivero and Lowther called Mylan's Aigner and Nesta, the calls were about whether and how Mylan would follow Taro's price increase.  As I held in the Mylan decision, a reasonable juror could infer that Amneal sought and received assurances from Mylan that it would follow Taro's increase.  ECF No. 1149 at 44.  Moreover, the timing of Aprahamian's July 2 back-to-back calls with Rivero and Aigner strongly suggests that the topic of conversation on those calls was not personal but involved a business matter common to all three competitors.

Amneal relies on several examples of contemporaneous documents that it says show that Amneal's competitors were either wrong or unsure about Amneal's movements in the Phenytoin market.  ECF No. 1320 at 20 (citing examples).  To be sure, this evidence leans against a finding of conspiracy, but it is outweighed, at the summary judgment stage, by the frequent interfirm communications crowded around the price increase announcements.

Taken together with the evidence discussed above, the high level of interfirm communications at critical times permits a reasonable inference that Amneal was reaching agreements with at least Mylan and Taro as to Phenytoin.  (Sun participated in fewer calls and

only with Amneal).  As I held in my order denying Mylan's motion for summary judgment, these June and July 2014 communications go well beyond "sporadic exchanges of shop talk among field sales representatives who lack pricing authority," *In re Baby Food Antitrust Litig.*, 166 F.3d 112, 125 (3d Cir. 1999), and permit an inference that Mylan and Amneal reached an agreement that they would both follow Taro's increase rather than compete for each other's customers at a lower price.

The States also rely on the Fifth Amendment invocations of representatives of Taro (Aprahamian), Mylan (Nesta and Aigner), and Sun (Knoblauch) when asked about Phenytoin. Fifth Amendment invocations, when considered alongside other evidence, can support an adverse inference that the witness's testimony would have been unfavorable.  *See Baxter v. Palmigiano*, 425 U.S. 308, 318 (1976).[12]

Nesta invoked the Fifth Amendment when asked the following questions (among others):

- [Information concerning a potential Amneal price increase on Phenytoin] was information you received from your conversations with Shannon Rivero at Amneal, isn't that right?

- Did you reach an agreement with Shannon Rivero that if Amneal raised its pricing on Phenytoin sodium ER capsules that Mylan would follow that price increase?

- During any calls or messages with Mr. Lowther of Amneal on June 2nd, 2014, did you tell him that Mylan would follow price increase on Phenytoin sodium ER?

- Did you reach an agreement with Amneal that Mylan and Amneal would both follow

---

[12] "The Second Circuit does not preclude drawing an adverse inference against an opposing party from a non-party witness's invocation of the Fifth Amendment privilege against self-incrimination." *In re Ethylene Propylene Diene Monomer (EPDM) Antitrust Litig.*, 681 F. Supp. 2d 141, 153 (D. Conn. 2009) (citing *LiButti v. United States*, 107 F.3d 110, 123–24 (2d Cir. 1997)). In such situations "[w]hen the party and the non-party witness are claimed co-conspirators, generally courts have required there to be sufficient, independent proof of a conspiracy between them before permitting the jury to draw an adverse inference against the party." *Id.*  Here, for the reasons I explained above, I do find such independent proof of a conspiracy, and therefore I would allow the inference.

Taro's price increases on Phenytoin sodium ER?

ECF No. 964-1 at 5139–42.

Aprahamian invoked the Fifth Amendment when asked the following questions about

Phenytoin (among others):

- At the April 2014 NACDS meeting, did you discuss Taro's price increase for phenytoin ER capsules with anyone at Amneal?

- [Regarding a July 2, 2014, call:] Did Rivero agree that Amneal would also increase its prices for phenytoin sodium ER?

- Did you participate in an agreement with Amneal on phenytoin sodium ER capsules?

ECF No. 964-1 at 241–42.

Aigner invoked the Fifth Amendment when asked the following questions about Phenytoin

(among others):

- On the phone calls between you and Shannon Rivero from 6/4 to 6/9/14 did you discuss pricing of phenytoin sodium?

- Did you reach any agreements or understandings with Shannon Rivero concerning pricing for phenytoin sodium?

- Did Mylan agree with Amneal to allocate customers of phenytoin sodium during the relevant time period?

ECF No. 964-1 at 44–47.

Knoblauch invoked the Fifth Amendment when asked the following questions about

Phenytoin (among others):

- Did Sun enter into an agreement to fix pricing for phenytoin sodium with Amneal?

- Did Sun enter into an agreement to allocate customers for phenytoin sodium with Amneal?

ECF No. 964-1 at 3675–77.

Amneal argues that no adverse inference can be drawn from these Fifth Amendment

invocations because there is no "independent evidence of the fact being questioned." ECF No. 1320 at 15 (quoting *Doe ex rel. Rudy-Glanzer v. Glanzer*, 232 F.3d 1258, 1264 (9th Cir. 2000)). But when considered alongside the evidence of interfirm communications and parallel conduct I discussed above, a reasonable juror could infer from these invocations that responses to these questions would have been unfavorable to Amneal, including about whether Amneal had agreements to fix prices and allocate the market. *See Baxter*, 425 U.S. at 318.

To be sure, Amneal has submitted evidence of an alternative explanation for its price increases of Phenytoin, *i.e.*, that supply difficulties led it to search for a way to reduce its Phenytoin output. The strategy it asserts that it settled on, however—raising prices to Walgreens and Walmart in the hope of losing one of them—also happens to coincide with its competitors' price increases and with a flurry of interfirm communications. So even a reasonable juror who credited Amneal's initial *motive* for the price increases could find that Amneal effectuated those price increases through collusion rather than unilateral action.

When considering the evidence of phone calls proximate to significant events related to Phenytoin's pricing, parallel conduct of competitors' price increases within the same time period, and adverse inferences from Nesta, Aprahamian, Aigner, and Knoblauch's Fifth Amendment invocations when questioned about Phenytoin, a reasonable jury could find that Amneal participated in a conspiracy with at least one competitor to set prices and allocate the Phenytoin market.

I therefore DENY Amneal's motion for summary judgment with respect to the Phenytoin individual conspiracy.

### B. Evidence of Amneal's Participation in the Overarching Conspiracy

I have already determined that there is a triable issue about whether an overarching

25

conspiracy existed, and so the question now is whether there is a triable issue that Amneal was a knowing participant in that conspiracy. *See United States v. Vanwort*, 887 F.2d 375, 386 (2d Cir. 1989) ("[A] defendant's participation in a single transaction can suffice to sustain a charge of knowing participation in an existing conspiracy."). For the following reasons, I do not believe there is, and I therefore grant Amneal's summary judgment motion as to Amneal's alleged participation in the overarching conspiracy.

In the context of the alleged overarching conspiracy, I view the alleged anticompetitive conduct of the Defendants in this case as existing on a spectrum. For reference, when I held that a reasonable fact finder could conclude that Aurobindo participated in the alleged overarching conspiracy, I started by acknowledging that the question was a close call. *Sandoz, Inc.*, 2026 WL 75853, at *16. Here, though, I find the States' evidence of Amneal's participation in the overarching conspiracy to be weaker than I did with respect to Aurobindo. Considering the record evidence and viewing it in the light most favorable to the States, I am not persuaded that there is enough evidence to allow a reasonable juror to find that Amneal participated in the overarching conspiracy.

Amneal's posture mirrors Aurobindo's in several ways. Similar to Aurobindo, for example, Amneal's conduct concerns only one drug, which is not a dermatology drug. *Id.* (explaining why that fact is a relevant consideration). And Amneal, like Aurobindo, did not enter into a Deferred Prosecution Agreement ("DPA") with the federal government. *Id.* Nor did Amneal's current or former employees plead guilty to any related offense or invoke the Fifth Amendment in response to questions during depositions in this case. *Id.*

Unlike in the case of Aurobindo, however, no record evidence of which I am aware demonstrates that any of Amneal's current or former employees brokered anticompetitive

26

agreements between other Defendants outside of the Phenytoin conspiracy. I have explained how evidence that a manufacturer's agent brokered agreements related to generic drugs could support a finding that the manufacturer participated in the overarching conspiracy. ECF No. 1123 at 37. Evidence of brokering agreements—whether those efforts are successful or not—is evidence of participation in the overarching conspiracy, and such evidence is lacking as it relates to Amneal. ECF No. 1150 at 35 ("[T]he broker likely expects to receive similar anticompetitive favors and serves as a bridge tying together pairs of bilateral conspirators."). Aurobindo employed Anthony Thomassey, a cooperating witness who admitted that before he worked for Aurobindo, he colluded with several generic drug manufacturers on several different Drugs at Issue in this case. He also testified that he had brokered an anticompetitive agreement while he worked for Aurobindo. No Amneal employee copped to similar conduct.

Neither is there testimony or other evidence from which a reasonable juror could conclude that Amneal adhered to the "rules of engagement" that allegedly drove the unlawful behavior of other Defendants. Rather, the unrebutted testimony here generally suggests that Amneal considered "fair share" to be a starting economic principle, rather than an underlying conspiratorial understanding. Luce, for example, testified that it was Amneal's "strategy to want to be at fair share plus a little," depending on the product, ECF No. 1228-2 at 11, 13, and that "fair share" itself was just a "data point," *id.* at 26. And a competitor at Glenmark testified that he "always considered . . . Amneal to be very, very aggressive when it came to market share." *Id.* at 72. Without evidence that cuts the other way—and the States do not point to any—nothing demonstrates a broader effort by Amneal to further anticompetitive behavior in the context of the overarching conspiracy.

The States argue that a reasonable jury could infer from Taro's DPA with the Department

27

of Justice that the alleged Phenytoin collusion transcended the Phenytoin market and instead was part of a market-wide pattern of collusion and conspiracy. Taro's DPA reflects Taro's agreement that, from approximately March 2013 to December 2015, it "conspir[ed] . . . to suppress and eliminate competition by agreeing to allocate customers and rig bids for, and stabilize, maintain, and fix prices of certain generic drugs." ECF No. 549-5 at 20–21. It is true that those dates overlap with the alleged Phenytoin conspiracy. But Taro's DPA speaks to Taro's anticompetitive behavior, not Amneal's. And neither is the DPA explicit as to Phenytoin. *Id.* at 20 (non-exhaustively listing drugs without mentioning Phenytoin). The States cite no authority that persuades me to apply Taro's DPA so broadly against Amneal.[13]

In sum, viewing the evidence in the light most favorable to the States, I find that no reasonable jury could conclude that it was more likely than not that Amneal participated in the overarching conspiracy. I therefore GRANT Amneal's motion for summary judgment as to the overarching conspiracy.

## IV.    CONCLUSION

Because there is evidence from which a reasonable jury could find that Amneal participated in an individual conspiracy regarding Phenytoin, I deny Amneal's summary judgment in that respect. However, because no reasonable jury could find that Amneal participated in the overarching conspiracy, I grant Amneal's summary judgment motion on that basis.

---

[13] The States also seem to suggest that attendance at an industry event with competitors at which pricing of one drug is allegedly discussed may be evidence of participation in an overarching conspiracy (as opposed to an individual one). ECF No. 1061 at 19. Absent additional evidence to support participation in the overarching conspiracy, I disagree.

IT IS SO ORDERED.

                                             _____/s/_____
                                             Michael P. Shea, U.S.D.J.

Dated: Hartford, Connecticut
April 15, 2026