**UNITED STATES DISTRICT COURT**
**DISTRICT OF CONNECTICUT**

THE STATE OF CONNECTICUT; THE STATE OF ALASKA; THE STATE OF ARIZONA; THE STATE OF ARKANSAS; THE STATE OF CALIFORNIA; THE STATE OF COLORADO; THE STATE OF DELAWARE; THE DISTRICT OF COLUMBIA; THE STATE OF FLORIDA; THE STATE OF GEORGIA; THE TERRITORY OF GUAM; THE STATE OF HAWAII; THE STATE OF IDAHO; THE STATE OF ILLINOIS; THE STATE OF INDIANA; THE STATE OF IOWA; THE STATE OF KANSAS; THE COMMONWEALTH OF KENTUCKY; THE STATE OF LOUISIANA; THE STATE OF MAINE; THE STATE OF MARYLAND; THE COMMONWEALTH OF MASSACHUSETTS; THE STATE OF MICHIGAN; THE STATE OF MINNESOTA; THE STATE OF MISSISSIPPI; THE STATE OF MONTANA; THE STATE OF NEBRASKA; THE STATE OF NEVADA; THE STATE OF NEW HAMPSHIRE; THE STATE OF NEW JERSEY; THE STATE OF NEW MEXICO; THE STATE OF NEW YORK; THE STATE OF NORTH CAROLINA; THE STATE OF NORTH DAKOTA; THE COMMONWEALTH OF THE NORTHERN MARIANA ISLAND; THE STATE OF OHIO; THE STATE OF OKLAHOMA; THE STATE OF OREGON; THE COMMONWEALTH OF PENNSYLVANIA; THE COMMONWEALTH OF PUERTO RICO; THE STATE OF RHODE ISLAND; THE STATE OF SOUTH CAROLINA; THE STATE OF TENNESSEE; THE STATE OF UTAH; THE STATE OF VERMONT; THE COMMONWEALTH OF VIRGINIA; THE STATE OF WASHINGTON; THE STATE OF WEST VIRGINIA; THE STATE OF WISCONSIN; and U.S. VIRGIN ISLANDS,

    *Plaintiffs*,

v.

No. 3:20-cv-00802-MPS

SANDOZ, INC.; ACTAVIS HOLDCO US, INC.; ACTAVIS ELIZABETH LLC; ACTAVIS PHARMA, INC.; AMNEAL PHARMACEUTICALS, INC.; AMNEAL PHARMACEUTICALS, LLC; ARA APRAHAMIAN; AUROBINDO PHARMA U.S.A., INC.; BAUSCH HEALTH AMERICAS, INC.; BAUSCH HEALTH US, LLC; MITCHELL BLASHINSKY; DOUGLAS BOOTHE; FOUGERA PHARMACEUTICALS INC.; GLENMARK PHARMACEUTICALS INC., USA; JAMES (JIM) GRAUSO; GREENSTONE LLC; G&W LABORATORIES, INC.; WALTER KACZMAREK; ARMANDO KELLUM; LANNETT COMPANY, INC.; LUPIN PHARMACEUTICALS, INC.; MALLINCKRODT INC.; MALLINCKRODT LLC; MALLINCKRODT plc; MYLAN INC.; MYLAN PHARMACEUTICALS INC.; KURT ORLOFSKI; MICHAEL PERFETTO; PERRIGO NEW YORK, INC.; PFIZER INC.; SUN PHARMACEUTICAL INDUSTRIES, INC.; TARO PHARMACEUTICALS USA, INC.; TELIGENT, INC.; ERIKA VOGEL-BAYLOR; JOHN WESOLOWSKI; and WOCKHARDT USA LLC,

   *Defendants*.

## **RULING ON MOTION FOR SUMMARY JUDGMENT**

In this action, the Plaintiffs, the Attorneys General of most of the States and several U.S. territories ("the States"), allege that thirty-six pharmaceutical companies and executives ("the Defendants") each participated in a series of conspiracies, as well as an overarching conspiracy, to fix prices, allocate markets, and rig bids in the sale of dozens of generic drug products. Defendant Greenstone LLC ("Greenstone") has moved for summary judgment on all claims alleging that Greenstone participated in any product-specific or overarching conspiracy. ECF No. 977; *see also* ECF No. 1008 (Defendants' Joint Memoranda in Support of Defendant-Specific Motions for Summary Judgment). For the reasons set forth below, I **GRANT IN PART AND DENY IN PART** Greenstone's motion for summary judgment.

I deny Greenstone's motion as to the individual conspiracies related to the 2012 Clindamycin solution, gel, cream, and lotion WAC price increase; the 2014 Clindamycin gel, cream, and lotion WAC price increase; Eplerenone; and Latanoprost.  I also deny Greenstone's motion as to the issue of disgorgement.  I grant Greenstone's motion as to the individual conspiracies related to the 2010 Clindamycin solution WAC price increase; the 2013 Clindamycin solution market allocation; and as to the overarching conspiracy.

## I.  BACKGROUND

### A.  Procedural Background

This is one of three cases in which the Attorneys General of the States have sued scores of defendants in the generic drug industry for alleged antitrust violations and unfair trade practices. All three cases were originally filed in this Court but were transferred to the Eastern District of Pennsylvania (the "MDL Court"), which was designated by the Judicial Panel on Multidistrict Litigation (the "JPMDL") to preside over these and other similar cases brought by private parties in a consolidated proceeding.  ECF No. 9.[1]  In April 2024, these three cases were remanded to this Court by the JPMDL and assigned to me.  ECF No. 11.  The operative complaint in this case, ECF No. 196, alleges collusion in the pricing, market allocation, and bidding for some eighty generic drugs, chiefly for dermatological applications.  The parties refer to it as "the Dermatology complaint."

In a previous ruling, I denied the Defendants' Joint Motion for Summary Judgment on Overarching Conspiracy Claims, ECF No. 609, because I found that there is evidence in the record

---

[1] Unless otherwise indicated, all ECF numbers in this ruling refer to entries on the docket of this case, not the same case when it was before the MDL Court, and each page number refers to the page number shown on the ECF stamp on the top of the cited page, not the page of the relevant brief or pleading designated by the parties.

from which a reasonable jury could find that the alleged overarching conspiracy exists, ECF No. 1123. In reaching this conclusion, however, I did not determine whether each corporate Defendant was a member of the overarching conspiracy.[2] Shortly before I issued that ruling, most Defendants filed additional, Defendant-specific summary judgment motions, many of which include challenges about whether a particular Defendant joined the overarching conspiracy. This ruling addresses Greenstone's Defendant-specific motion for summary judgment. I also will consider the briefs related to Sandoz's motion for summary judgment, ECF No. 977, on which I have not yet ruled, in regard to the drugs in question.

The Defendants have also filed a Joint Memorandum that addresses the pertinent legal standard and argues that the Defendants are entitled to summary judgment on particular state-law claims. ECF No. 1008. This ruling will address arguments made in the Joint Memorandum where they are applicable to Greenstone.

### B. Factual Background

In the overarching conspiracy ruling, I discussed the evidence underpinning the States' claims against all corporate Defendants, and I incorporate that description here. *See* ECF No. 1123 at 3–26. I now address the evidence specific to Greenstone's participation in the alleged conspiracy. The following facts are drawn from the parties' Local Rule 56 Statements of Facts, ECF Nos. 981-1, 1053, as well as Statements of Facts related to the Defendants' Joint Memoranda, ECF No. 1054-1, and the record. The facts are undisputed unless otherwise noted.

---

[2] As noted in the previous ruling, "[w]hether a particular Defendant was a member is a distinct issue from the issue whether a conspiracy existed at all." ECF No. 1123 at 30 (citing 4 Sand et al., Modern Federal Jury Instructions–Civil ¶ 79-8 ("[Y]ou should first determine . . . whether the conspiracy existed. If you conclude that the conspiracy did exist, you should next determine whether each defendant was a knowing member of the conspiracy."); *id.* ¶ 79-6 ("In order to prove the [price-fixing] conspiracy, . . . [t]he plaintiff does not have to show that . . . all of the persons alleged to have been members of the claimed conspiracy were in fact members.")).

From the early 2000s through late 2020, Greenstone was a wholly owned subsidiary of Pfizer. ECF No. 1053 ¶ 1. As such, Greenstone marketed itself as selling Pfizer-branded authorized generic drugs, including the Drugs at Issue here, meaning that Pfizer manufactured the relevant drugs while Greenstone sold them. *Id.* ¶¶ 3, 5, 10. Because of Pfizer's role in manufacturing Greenstone's drugs, Greenstone worked with Pfizer to manage supply and demand. *Id.* ¶¶ 11–12. Pfizer's supply specialists—"Pfizer Global Supply"—sought input from Greenstone's sales team to evaluate planned production versus customer demand. *Id.* Meeting customer demand was particularly important because most of Greenstone's customers' contracts included clauses triggering (sometimes significant) failure-to-supply penalties when Greenstone could not meet demand. *Id.* ¶¶ 13–15.

Three Greenstone employees had primary responsibility for pricing decisions. Carol Patterson worked in pricing at Greenstone for sixteen years, including leading the Greenstone pricing team and overseeing all pricing decisions for most of the time from 2011 to 2016. *Id.* ¶ 30; ECF No. 1218-2 at 116. James (Jim) Cannon worked as Greenstone's general manager, and his approval was required for all price increases at Greenstone. ECF No. 1053 ¶ 33. William (Bill) Kennally, Pfizer's Regional Head of North America Established Products Business Unit, was responsible for approving Greenstone's WAC price increases during the relevant time. *Id.* ¶ 35. Approval of Greenstone's WAC price increases required approval first by Patterson, then by Cannon, and last by Kennally. *Id.* ¶ 37. Approval of Greenstone's contract price increases required approval first by Patterson, and then by Cannon. *Id.* ¶ 38.

Some members of Greenstone's sales team feature prominently in the allegations. *Id.* ¶ 27. Jill Nailor was Greenstone's Senior Director of National Accounts from 2011 to 2019. *Id.* ¶ 43.

4

Robin Strzeminski[3] was a Greenstone National Account Director, and she reported to Nailor beginning in 2011 until Greenstone fired Strzeminski in 2016. *Id.* ¶ 44.

Christine Versichele worked as a Greenstone National Account Director until 2013. *Id.* ¶ 45. At her deposition, Versichele testified that while she was employed, she had personal knowledge that Nailor and Strzeminski were colluding with competitors, including talking with competitors about pricing and dividing up customers. ECF No. 965-1 at 668. For example, Versichele testified as follows:

> Q: Do you recall learning, at least sometime in 2011, that some of your colleagues at Pfizer[4] may have been colluding with competitors?
> A: I did start to recognize that behavior in early 2011, and it escalated throughout that year and continued.
> Q: Was it being discussed openly among your colleagues during that time period?
> A: Yes. There were emails and talking about speaking to other competitors. And then there were meetings that were started by Jill Nailor to go product by product and discuss market share and where we were going to opt to go, what customers we were going to go to and what market share levels we wanted to achieve for a given product.
> Q: And so during conference calls like that there would be discussions about conversations with competitors?
> A: Yes.

*Id.* at 682 (form objections omitted).

Versichele testified that she, having been "going through a master's degree program that was specific to fraud and abuse, collusion, price fixing at the time," believed this conduct to be problematic and complained internally. *Id.* at 668–69. Versichele testified that she reported this conduct multiple times, including to the Pfizer ombudsman twice (first in August 2012 and then

---

[3] During the relevant time, Strzeminski used the last names Strzeminski and Hatosy, and this is reflected in certain of the exhibits. I refer to her only as Strzeminski.
[4] During the deposition, counsel used Pfizer and Greenstone interchangeably because Greenstone was a subsidiary of Pfizer. ECF No. 965-1 at 682.

again in May 2013).  *Id.* at 696–97.  The Pfizer ombudsman was "a neutral place where you can bring up any concerns you might have related to . . . improprieties or things that were happening at the company."  *Id.* at 696.  Versichele testified about notes she took related to the first ombudsman meeting, which notes included discussion points of "[a]greements with competitors regarding allocating markets or customers.  Discussions with customers about pricing costs."  *Id.* at 697.  Apart from the ombudsman, Versichele also testified that she reported this conduct to Kennally and to Pfizer's human resources department.  *Id.* at 688, 701–02.

To her knowledge, no one ever addressed Versichele's complaints with Nailor or Strzeminski.  *Id.* at 703.  However, Versichele testified that after she internally reported this conduct, she experienced retaliation, including "[e]xclusion from calls.  Exclusion from activities.  Accounts taken away from [her], high end accounts."  *Id.*  Greenstone terminated Versichele in November 2013.  ECF No. 1053 ¶ 45.

The States allege that Greenstone conspired with Fougera and Sandoz on three Drugs at Issue: Clindamycin (solution, gel, lotion, and cream); Eplerenone; and Latanoprost.  *Id.* ¶ 6.  I summarize the evidence specific to each below:

      1.  <u>Clindamycin</u>

Clindamycin is a topical antibiotic used to treat acne.  *Id.* ¶ 7.  Its formulations include solutions, gels, lotions, and creams.  *Id.*  The States allege that Greenstone coordinated with competitors Fougera and Sandoz on price increases for multiple formulations of Clindamycin in 2010, 2012, and 2014, and that it conspired to allocate customers as Taro and Perrigo entered the market for Clindamycin solution in 2013.  ECF No. 196 ¶ 1299.

In November 2010, Greenstone and Fougera were the only suppliers in the Clindamycin solution market.  *Id.* ¶ 81.  On November 2, 2010, Fougera raised its WAC price from $9.84 to $31.50.  *Id.* ¶ 82.  At the time, Greenstone's WAC price was $7.36, and Greenstone did not raise

its WAC price until around nine months after Fougera's increase—in July 2011.  *Id.* ¶¶ 83, 88.

Greenstone's market share in the Clindamycin solution market nearly doubled during that time.

*Id.* ¶ 86 (listing customers that left Fougera for Greenstone as Cardinal, Hannaford, Walgreens,

and AmerisourceBergen ("ABC")).

Despite not immediately following Fougera's WAC price increase, Nailor communicated

with Anthony Thomassey,  a national accounts executive at Fougera.  *Id.* ¶¶ 51, 90.  For example,

on November 2, 2010, the same day that Fougera increased its WAC prices, Thomassey testified

that he had an internal meeting with the subject "Clinda solution strategy conference call."  ECF

No. 965-1 at 447–48.  When presented with phone records, he agreed that those records reflected

that he called Nailor less than half an hour before that internal call.  *Id.* at 448.  Thomassey also

testified that he exchanged text messages with Nailor on November 4, 2010.  *Id.* at 449.[5]

At her deposition, Nailor testified that she knew Thomassey "for many years," and they

kept in touch about "industry gossip."  ECF No. 1218-2 at 266.  When asked whether she discussed

Fougera's Clindamycin solution pricing with him, Nailor testified that she did not.  ECF No. 1218-

2 at 267, 270.

On the other hand, Thomassey, a cooperating witness for the States, testified that it was

"very" likely that he was speaking with Nailor on November 2, 2010, because Fougera was having

an internal Clindamycin solution strategy call.  ECF No. 965-1 at 448 ("Q. Why were you calling

Ms. Nailor of Greenstone less than a half an hour before your conference call on Clinda solution

strategy? A. I do not specifically recall.  Q. Do you think it's likely that you were calling her to

discuss Clindamycin solution? A. Very, yes." (form objections omitted)).

---

[5] Some of the exhibits referred to in Thomassey's deposition, including records of the phone calls
and text messages as well as emails, do not appear to have been included in the summary judgment
record.

7

On December 3, 2010, Thomassey wrote to his colleague with the subject line "Clinda Solution 60 ml," "Cardinal called.  They said they are getting inventory.  Greenstone still has not followed us.  Morons."  ECF No. 1218-4 at 74.  At his deposition, Thomassey testified that he called Nailor just before sending this email.  ECF No. 965-1 at 449–50.  He testified that he could not recall the subject of the call, but it was "very likely" that they were discussing Clindamycin solution.  *Id.* at 450.

Also at his deposition, Thomassey discussed an email from January 24, 2011, between himself and a Fougera colleague, with the subject line "Clinda."  *Id.*  In the email, the colleague asked Thomassey, "any news about Greenstone raising prices?"  *Id.*  Thomassey replied that he did not have any such news, but that it was coming.  *Id.*  When his colleague asked how soon, Thomassey responded that he did not know but that he had left a message.  *Id.*  Thomassey testified that, based on the phone records, he exchanged multiple calls with Nailor that day.  *Id.* at 450–51.  Thomassey agreed that he likely called Nailor that day to discuss the Clindamycin solution pricing, and that it was likely that he learned about the coming price increase from Nailor.  *Id.* at 450–52.

On January 31, 2011, Patterson emailed Kennally about a planned WAC price increase for Clindamycin solution, writing "[o]ur WAC increase will be much smaller than that of Fougera (I don't think their high WAC is a viable, long term price since it is currently higher than the brand WAC).").  ECF No. 1218-4 at 76.

Thomassey and Nailor continued to exchange text messages in June 2011.  ECF No. 965-1 at 452 (Thomassey testifying to these text messages).  On July 27, 2011, Greenstone announced to customers that it was increasing its Clindamycin solution WAC price to $11.  ECF No. 1053 ¶ 88; ECF No. 1218-4 at 72 (announcing WAC price to $11 for 60ml).

The next event of significance concerning the Clindamycin formulations happened in 2012.

8

In April and June of 2012, Greenstone lost Clindamycin customers to Fougera because Fougera lowered its pricing.  ECF No. 1053 ¶ 89; ECF No. 1218-6 at 77–78 (emails from April 10, 2012, reflecting that Rite Aid went with Fougera on Clindamycin).

Greenstone considered internally whether to increase its Clindamycin pricing.  ECF No. 1053 (AMF) ¶ 15; ECF No. 952-1 at 569 (internal pricing team presentation considering increase on Clindamycin solution).

Sandoz completed its acquisition of Fougera by August 2012.  *See* ECF No. 1080-1 ¶¶ 6, 471.   That same month, Strzeminski and Sandoz executive Armando Kellum began communicating.  On August 7 and 8, 2012, Strzeminski called and texted with Kellum.  ECF No. 1053 (AMF) ¶ 16; ECF No. 944-1 at 79.  On August 7, 2012, Strzeminski and Nailor spoke on the phone twice.  ECF No. 944-1 at 79.  Strzeminski then texted Kellum four times.  *Id.*  Kellum tried to call Strzeminski, and though she did not answer, she texted him twice.  *Id.*  Kellum called Strzeminski the next morning, and they spoke for almost ten minutes.  *Id.*  Strzeminski then called Nailor, and they spoke for almost five minutes.  *Id.*

Kellum invoked his Fifth Amendment right against self-incrimination when asked about Clindamycin and his calls with Strzeminski.  ECF No. 964-1 at 3233–41.  Although he later withdrew his assertion of the Fifth Amendment in the MDL, he has not sought to do so in this case.[6]  Nevertheless, Greenstone presents as evidence testimony that Kellum gave in the MDL in

---

[6] In a previous ruling, I assumed that Kellum continues to invoke the Fifth Amendment here because he has not sought leave to withdraw his invocation in the cases before me.  *See Connecticut v. Sandoz, Inc.*, No. 20cv802, 2026 WL 75851, at *11 n.8 (D. Conn. Jan. 9, 2026).  Co-defendants Mylan and Aurobindo both objected to this assumption in motions for reconsideration.  ECF Nos. 1164, 1165.  In denying these motions, I noted that my decisions to deny summary judgment did not rest on adverse inferences from Kellum's Fifth Amendment invocations.  ECF No. 1339.  I made no findings as to whether he has withdrawn his invocation because that determination was not required to deny reconsideration.  I make no such findings here either.

2025 in which he was asked about these calls and texts. ECF No. 1218-5 at 15–16. Kellum testified that he did not remember them specifically but wondered whether they related to Greenstone "hiring someone that had worked in the Sandoz contracts group before." *Id.* at 16.

Internal Sandoz emails reflect that Kellum and a colleague considered a price increase on Clindamycin around August 23, 2012. ECF No. 951-1 at 212.

On August 29, 2012, Strzeminski called Kellum on a call lasting just over three minutes. ECF No. 1053 (AMF) ¶ 18; ECF No. 944-1 at 82. Within minutes of that call, Strzeminski called Nailor in a call lasting just over thirty seconds. ECF No. 944-1 at 82. About half an hour later, Nailor called Strzeminski back, and that call lasted around five minutes. *Id.* A few hours later, Nailor and Strzeminski spoke again for about ten minutes. *Id.* That same day, Kellum recommended that Sandoz increase its Clindamycin price. ECF No. 1053 (AMF) ¶ 18; ECF No. 952-1 at 644 (emailing that he is "in favor of recommending [a] price increase on all Clindamycin" formulations). Also on that day, at Greenstone, Strzeminski emailed Nailor, writing, "[w]e are sending out the clinda price increase are we?" ECF No. 1053 (AMF) ¶ 17; ECF No. 944-1 at 84–85. Nailor responded, "Friday……" ECF No. 944-1 at 84. Strzeminski wrote, "I thought we were holding..until we know how much? How much is it." *Id.* Nailor wrote back, "[w]e have to go and not wait." *Id.* The record does not indicate whether Greenstone sent out a price increase to any customer in August 2012.

On September 7, 2012, Kellum emailed colleagues an analysis of "Fougera products that we could raise prices on in the near term," including Clindamycin, for approval by the Sandoz and Fougera pricing committees. ECF No. 970-2 at 388; *see* ECF No. 1080-1 at 78 n.1 (noting that "[f]or an initial period after the acquisition of Fougera by Sandoz, approval for price increases required approval from both the Sandoz Pricing Committee as well as the Fougera Pricing

10

Committee"). The analysis for the proposed Clindamycin price increase assumed a "60% risk" to Sandoz's projected revenue "due [to] Greenstone behavior/market decline." ECF No. 970-2 at 393–94. On September 12, 2012, Kellum wrote to his colleagues (including Michael Vezza, who is one of the States' cooperating witnesses), referring to Clindamycin, "we hope that greenstone will act rationally as they did recently with Latanaprost." ECF No. 1053 (AMF) ¶ 19; ECF No. 948-1 at 225.

On October 8, 2012, Strzeminski emailed a customer in response to an inquiry, "[d]o you think we can revisit the Clindamycin in early November? We are anticipating a market change/shift." ECF No. 1053 (AMF) ¶ 20; ECF No. 944-1 at 88. Asked at her deposition whether "market change/shift" meant a price increase, Strzeminski answered "[a] market change or shift can mean multiple things." ECF No. 1218-3 at 72. Counsel next asked Strzeminski whether her anticipation of a market change meant a Sandoz price increase based on her conversations with Kellum, and Strzeminski denied that. *Id.*

Kellum and Strzeminski exchanged multiple calls in mid-October 2012. ECF No. 1053 (AMF) ¶ 21. Kellum called Strzeminski twice on October 17, 2012. ECF No. 944-1 at 91 (indicating those calls were unanswered). He called her twice the next day, both of which were unanswered, before Strzeminski called back Kellum in a call lasting just over thirty seconds. *Id.* Kellum then called her twice more on October 18, but both calls went unanswered. *Id.* They then exchanged one text each. *Id.* The next day, October 19, 2012, Kellum called Strzeminski, and that call lasted just under four minutes. *Id.*

Also on October 19, 2012, Sandoz significantly increased its WAC and contract pricing for all four Clindamycin formulations. ECF No. 1053 ¶ 91; ECF No. 1218-4 at 91 (Nailor emailing, "[i]t appears that Sandoz has announced a SIGNIFICANT cost increase to their

11

customers."). The parties dispute whether Greenstone learned of those increases from market intelligence before Sandoz's announcement or rather from customers after the fact. ECF No. 1053 ¶¶ 91–92.

On October 22, 2012, after Sandoz announced its increase, Strzeminski wrote to Nailor, "[o]n our call today we need to look at market share for all clinda's and determine if we are going to capitalize on any without pissing them off." ECF No. 1053 (AMF) ¶ 22; ECF No. 944-1 at 93. At her deposition, counsel asked Strzeminski whether she was referring to Sandoz in this email, and whether she "had an understanding with Sandoz that [she] wouldn't do anything irrational that would piss them off?" ECF No. 964-1 at 7066–67. To these questions, Strzeminski responded that she could not recall whether she was referring to Sandoz in that email, and that in any event she did not have such an understanding. *Id.*

Also on October 22, 2012, Strzeminski wrote to Nailor again, this time with the subject "Clindamycin/ABC," "[w]e are going to have to remove from Select if we don't bid at ABC.. They are not happy." ECF No. 1053 (AMF) ¶ 23; ECF No. 944-1 at 95. Nailor responded, "[a]re they happy with Sandoz?" ECF No. 1053 (AMF) ¶ 23; ECF No. 944-1 at 95. Strzeminski responded, "Shut it!! You are funny.. I told them we were not bidding and I got 'why'??????? I said Shawn, we have ample market share.. He said well you will go from 150 -1500 .. Yeah??" ECF No. 1053 (AMF) ¶ 23; ECF No. 944-1 at 95.

Around that time, a prospective customer requested that Greenstone take on its Clindamycin lotion business. ECF No. 1218-4 at 96–98 (email thread spanning October 19 to October 22, 2012). Greenstone declined the new business, and Nailor wrote internally, "This is a HUGE risk to our inventory getting cleaned out!!!" ECF No. 1218-4 at 96. Strzeminski responded, "[t]otal disaster!" ECF No. 1218-4 at 103.

12

The next month, on November 15, 2012, Greenstone approved a WAC and SWP (Suggested Wholesale Price) price increase for the Clindamycin formulations. ECF No. 1218-5 at 5. The WAC price increase took effect on December 27, 2012. ECF No. 1053 ¶ 102.

The parties dispute why Greenstone raised its prices in November 2012. Greenstone submits that it raised its prices to prevent a run on its Clindamycin inventory that would leave Greenstone with financial penalties when it could not meet demand. ECF No. 1053 ¶¶ 100–03. At this time, Greenstone was concerned about failure-to-supply penalties. *Id.* ¶¶ 97–98. Because of Sandoz's price increases, Greenstone feared that existing and new customers may order increased amounts of Greenstone's Clindamycin supply for both present purposes and to stockpile for future needs. *Id.* ¶¶ 93–94. That Greenstone's system lacked an automatic means to limit these purchases compounded Greenstone's concern. *Id.* ¶¶ 94–96. Prospective customers did in fact attempt to purchase Clindamycin supply, and Greenstone denied that request. *Id.* ¶ 95. Greenstone decided to lock down the ordering system to avoid excessive ordering of Clindamycin. *Id.* ¶ 97.

At his deposition in the MDL, Kellum was asked whether he recalled speaking with Strzeminski about the Clindamycin price increases. ECF No. 1218-5 at 15. He testified that he did not. *Id.* At her deposition, Strzeminski was asked to confirm, as reflected in the phone logs, that she did not communicate with Kellum for seventeen months after these exchanges in the fall of 2012. ECF No. 964-1 at 7069. Strzeminski testified that she did not recall any other communications. *Id.*

Versichele testified that in December 2012 she saw Nailor speaking to a competitor about Clindamycin at an industry event. ECF No. 1053 (AMF) ¶ 24; ECF No. 965-1 at 699–700. Both Versichele and Nailor attended this event—the ASHP exhibition—in Las Vegas. ECF No. 965-1 at 699–700. Versichele testified that "[w]e were at our booth. [Nailor] and I began to walk out of

the trade show floor.  And as we were passing by a competitor's booth, [Nailor] said to one of the folks in the booth, I need to talk to you about clindamycin.  We're going to launch it and we need to talk about where the price should be, something to that extent.  And he said don't worry about us.  You need to worry about Amneal.  And she said don't worry about Amneal, I'm close friends with Shannon and I'll take care of that.  I think it was related to price increase."  *Id.* at 700.

The States identify this person as Thomassey.  ECF No. 1053 (AMF) ¶ 24.  At her deposition, counsel asked who she saw Nailor speaking to, and Versichele testified, "[h]e was an industry person.  I believe his name was Tony."  ECF No. 965-1 at 700.  She was then shown a photograph in exhibit 2191, and she identified the person in that photograph as the person to whom Nailor spoke.  *Id*.  Nailor was shown that exhibit during her deposition as well, and Nailor identified the person in the exhibit as Tony Polman, who worked for Perrigo.  ECF No. 1218-2 at 259 (Nailor denying the conversation occurred, but identifying the individual in exhibit 2191 as Tony Polman).

In July 2013, Sandoz exited the Clindamycin solution market because of supply issues, leaving Greenstone as the only market participant.  ECF No. 1053 ¶¶ 106–07.  But in September 2013, Perrigo entered the Clindamycin solution market, followed by Taro in October 2013, causing Greenstone's market share to decrease.  *Id.* ¶¶ 69, 108; *see* ECF No. 1054-1 ¶ 36 ("It was common for generic drug manufacturers to concede a customer when a new competitor entered the market[.]")

By January 2014, Sandoz reentered the Clindamycin solution market.  *Id.* ¶ 109.  An internal Sandoz email reflected that Sandoz sought a 25% market share in the now four-player market.  ECF No. 1218-5 at 23.  On February 10, 2014, Kellum emailed internally at Sandoz, "[b]ecause of the other Clinda's I think we should avoid Greenstone as much as possible despite

14

their large share.  We enjoy a very good and stable situation on the other Clinda products."  ECF No. 1053 (AMF) ¶ 26; ECF No. 952-1 at 676.

On March 18, 2014, Greenstone held a meeting concerning, at least in part, the pricing for some of the Clindamycin formulations, ECF No. 1053 (AMF) ¶ 27; ECF No. 944-1 at 99, and Eplerenone, a drug used to treat high blood pressure or congestive heart failure after a heart attack, ECF No. 1053 ¶ 8.  At that meeting, Greenstone employees, including Patterson and Nailor (but not Strzeminski), selected Eplerenone tablets and Clindamycin gel, lotion, and cream for a WAC price increase with a target effective date of May 1, 2014.  ECF No. 1218-5 at 47; ECF No. 944-1 at 99; ECF No. 1053 ¶ 114.  Greenstone did not yet notify customers of the increase.  ECF No. 1053 ¶ 116.

Also on March 18, 2014, Strzeminski called Nailor three times, with one call lasting almost eight minutes.  ECF No. 1053 (AMF) ¶ 27; ECF No. 944-1 at 97.  After that call, Strzeminski called Kellum and that call lasted thirty-one seconds.  ECF No. 1053 (AMF) ¶ 27; ECF No. 944-1 at 97.  Kellum then called Strzeminski back, and that call lasted seven minutes and thirty-nine seconds.  ECF No. 1053 (AMF) ¶ 27; ECF No. 944-1 at 97.  Asked at her deposition whether the reason she began communicating with Kellum again for the first time since 2012 was "because [she was] talking about another price increase for the clindamycin drugs," Strzeminski testified "[n]ot that I recall."  ECF No. 964-1 at 7069.

Other competitors were also communicating at this time, as between February 14 and March 13, 2014, Taro's Perfetto spoke with Perrigo's Boothe five times, and Sandoz's Bihari spoke with Perrigo's Polman four times.  ECF No. 961-1 at 218.  The States suggest these calls also concerned Clindamycin.  ECF No. 1036-1 (SAMF) ¶ 74; *id.* ¶¶ 72-75.

On April 1, 2014, a Greenstone customer emailed requesting a bid for Clindamycin

solution.  ECF No. 944-1 at 101.  Strzeminski forwarded that email to Nailor, writing "[n]eed to discuss ASAP."  *Id.*  Nailor replied to Strzeminski, "Let me check my list tomorrow am, soln might be excluded from PI, isn't that 3 player now?"  *Id.*  Later that evening, Strzeminski sent Nailor the market share breakdown for Clindamycin solution.  ECF No. 944-1 at 103.  Strzeminski wrote, "Here is the breakdown.. Greenstone 64% . . . Perriogo [*sic*] 24% . . . Taro 10% . . .  Sanodoz [*sic*] - not showing yet but looking for share.. . . . I suggest me [*sic*] at least let Ahold go!"  *Id.*; ECF No. 1053 (AMF) ¶ 28.  At her deposition, counsel asked Strzeminski whether Nailor seemed confused whether Clindamycin solution was subject to the proposed price increase.  ECF No. 964-1 at 7071.  Strzeminski testified that she did not "know if she was confused or just confirming."  *Id.*  Counsel asked how Strzeminski would know that Sandoz was looking for share in the Clindamycin solution market, and Strzeminski testified that she would have estimated based on market data.  *Id.* at 7072.

The day after that email, on April 2, 2014, Strzeminski called Nailor four times, two of which were completed and were not longer than thirty seconds.  ECF No. 944-1 at 105; ECF No. 1053 (AMF) ¶ 30.  Afterwards, Nailor called Kellum, and that call lasted for about seven minutes.  ECF No. 944-1 at 105; ECF No. 1053 (AMF) ¶ 30.  Strzeminski then called Nailor twice, in calls lasting about fifteen minutes and one minute, respectively.  ECF No. 944-1 at 105; ECF No. 1053 (AMF) ¶ 30.  Strzeminski then called Kellum again, and that call lasted three minutes and five seconds.  ECF No. 944-1 at 105; ECF No. 1053 (AMF) ¶ 30.  At her deposition, Strzeminski denied that on those calls she and Nailor discussed giving up customers to Sandoz on Clindamycin solution.  ECF No. 964-1 at 7072–73.

Also on April 2, 2014, a Greenstone National Account Director emailed Nailor and copied Strzeminski, asking for guidance about inquiries regarding Clindamycin gel and solution.  ECF

16

No. 944-1 at 108–10.  Nailor wrote, "[m]y suggestion is to let Ahold and Optisource both go on the soln.  From what I see on Feb marketshare we are still at 59%, if they are out there cutting price by 50% they are going to have to start going after larger customers, so I say we head them off and let them have these smaller accts go."  ECF No. 944-1 at 108.  Strzeminski added, "[t]hat was my suggestion as well."  *Id.*  At her deposition, Strzeminski denied that these messages, along with the calls, reflected an agreement with Sandoz to let Ahold and OptiSource go to Sandoz on Clindamycin solution.  ECF No. 964-1 at 7073.

Also that day, Nailor wrote to Strzeminski, "[t]he May 1 is planning to be on the clinda Gel, Lotion and [cream], which are still dual source.  Not sure of the % increase as [Patterson] and I need to get that meeting on the books."  ECF No. 1053 (AMF) ¶ 29; ECF No. 945-1 at 175.  On April 4, 2014, Strzeminski and Kellum spoke twice, and Strzeminski called Nailor after the calls with Kellum.  ECF No. 1053 (AMF) ¶ 30; ECF No. 944-1 at 106.

On April 17, 2014, before Greenstone notified its customers of the price increases, Sandoz published a 20% WAC price increase for Clindamycin gel, lotion, and cream.  ECF No. 1053 ¶ 116; ECF No. 1218-5 at 52–56.  The parties dispute whether Sandoz's price increase was a surprise to Greenstone—Greenstone submits that it was a surprise, while the States argue that the communications around the time of the increase suggest that it was not.  ECF No. 1053 ¶ 117.

That day, Nailor and Patterson discussed Sandoz's increase.  ECF No. 1218-5 at 52–56.  Patterson notified Nailor and her colleagues about Sandoz's price increase.  *Id.*  Patterson then wrote Nailor directly, "[i]f we want to adjust our pricing, you are correct that it would require us to start back at square one again.  Let's decide quickly if we want to do that . . ."  *Id.* at 55.  Nailor wrote back, "[y]es, we will need to adjust and push up if they took up contract prices as well, we would be put in a position to have to monitor our inventory daily if we are not close . . ."  *Id.* at

17

54.

In light of Sandoz's increase, Greenstone, again fearing customers might increase purchases of its Clindamycin inventory, limited sales.  ECF No. 1053 ¶ 117; ECF No. 1218-5 at 58 (email to Greenstone employees regarding limitation of Clindamycin purchases, and requiring approval for purchases).  Greenstone considered its options, including delaying its price increase, and it decided to match Sandoz's WAC price increase and delay the increase until June 2, 2014.  ECF No. 1053 ¶ 118; ECF No. 1218-5 at 52–56, 58, 61.

On April 21, 2014, Greenstone delayed its price increases on Clindamycin and Eplerenone.  ECF No. 1053 (AMF) ¶ 32.  On April 23, 2014, Nailor and Kellum spoke on the phone for about fifteen minutes.  ECF No. 1414-1 at 2; ECF No. 964-1 at 4884 (Nailor testifying that she did not recall this phone call).  Kellum was asked about these calls at his depositions.  ECF No. 1218-5 at 19.  After initially invoking the Fifth Amendment, ECF No. 964-1 at 3240, Kellum testified in the MDL that, although he was not "100% sure," he believed the call "was one of the calls in which she asked me about one of the employees at Sandoz."  ECF No. 1218-5 at 19.  Three minutes after her call with Kellum, Nailor emailed Patterson with the subject line, "I have clinda market info."  ECF No. 1053 (AMF) ¶ 33; ECF No. 945-1 at 178.  Nailor added, "[w]ill give you a ring……VERY INTERESTING…...they are not making friends."  ECF No. 945-1 at 178.  Nailor testified at her deposition that she did not remember if she was referring to Sandoz, and she could not recall what was very interesting that she wanted to tell Patterson.  ECF No. 964-1 at 4884–85.

On April 28, 2014, after Nailor emailed Patterson details of Greenstone's price increases planned for June, including for Clindamycin and Eplerenone, Patterson asked Nailor, "are we ok with our assumption that our competitors won't go after significant portions of our share? In our last [price increase], we lost most of our volume on AZOS when Teva didn't follow the [price

18

increase] and was able to absorb [customers] CVS, WAG, and ABC.  Do we have risk here that we should call out?"  ECF No. 945-1 at 180.  Nailor responded, "[n]o, I don't feel the same risk." *Id.*  When asked at her deposition whether she did not feel risk because of her conversations with Kellum, Nailor testified that she did not agree.  ECF No. 964-1 at 4886 ("Q. You didn't feel the risk because you had just talked to Armando Kellum about it just a few days before this.  Right? . . . A: No, there was no discussion with Armando about the price increase or customers.  We had limited amount of inventory.  I think that we had a good position on this product and we were going to be able to support our existing customers.").

On May 14, 2014, Greenstone internally confirmed through email the Clindamycin and Eplerenone WAC price increases.  ECF No. 1053 (AMF) ¶ 35; ECF No. 945-1 at 184.  On May 28, 2014, Greenstone announced the June WAC price increases to its customers.  ECF No. 1053 ¶ 119; ECF No. 1218-5 at 68.  The next day, May 29, Nailor called Kellum.  ECF No. 1053 (AMF) ¶ 35; ECF No. 945-1 at 187.

The States agree, however, that Greenstone and Sandoz competed for customers at this time.  ECF No. 1053 ¶ 120 (citing examples).  On June 11, 2014, Nailor wrote about customers reaching out about Clindamycin, "[a]re these all current Sandoz customers?  I think we evened out our share by picking up WMT on one of these presentations, so I suggest we back off?"  ECF No. 1053 (AMF) ¶ 36; ECF No. 945-1 at 189.  Strzeminski replied, "[y]es.  And I agree."  ECF No. 1053 (AMF) ¶ 36; ECF No. 945-1 at 189.

2.  Eplerenone

From 2010 to 2014, Greenstone had around 90% of the Eplerenone market, ECF No. 1053 ¶ 122, and Sandoz was Greenstone's only generic competitor in the Eplerenone market, *id.* ¶ 123.

On March 18, 2014, as part of a plan to increase the prices of multiple drugs, including Clindamycin, Greenstone's Patterson planned a 12% WAC price increase for Eplerenone and

19

wrote that the increase was to "align with the annual increases taken by the brand versions of these items." *Id.* ¶¶ 124–25; ECF No. 1218-5 at 47, 49. As described in the Clindamycin section above, Strzeminski called Nailor on the same day and then immediately called Kellum at Sandoz. ECF No. 944-1 at 97. Greenstone intended its increases to be effective May 1, 2014, ECF No. 1053 ¶ 124; ECF No. 1218-5 at 49. On April 21, however, Patterson told Nailor that the timeline for the Clindamycin increases would be "[n]ot realistically possible . . . (unless you happen to know right now where we want contract pricing to be)". ECF No. 1218-5 at 53. Nailor proposed "taking out" the Clindamycin products and "proceed[ing] with the others," but Patterson said she would prefer not to do so. *Id.* at 52. Nailor then agreed and wrote, "[w]e will go hard after market observations." *Id.* The next day, April 22, Nailor called Kellum and they then exchanged two more brief calls. ECF No. 1414-1 at 2. On April 23, Nailor called Kellum and they spoke for nearly 15 minutes, *id.*, after which Nailor wrote an email that said, "I have clinda market info." ECF No. 945-1 at 178.

Greenstone notified its customers of this increase on May 28, 2014. ECF No. 1053 ¶ 127; ECF No. 1218-5 at 68. The next day, May 29, Nailor called Kellum. ECF No. 945-1 at 187. Greenstone's 12% WAC price increase took effect on June 2, 2014. ECF No. 1053 (AMF) ¶ 35 (listing date as June 2); ECF No. 1053 ¶ 128 (listing date as June 1); ECF No. 1218-5 at 63.

On June 24, 2014, responding to an inquiry from a Greenstone National Account Director about customer pushback on Greenstone's price increase, Nailor wrote that Greenstone had 89% market share, and that she was "ok with our share dipping on this if it truly is a 2 player market we need to be responsible and let some go." ECF No. 1053 (AMF) ¶ 37; ECF No. 952-1 at 562.

Sandoz's pricing committee approved its Eplerenone price increase on July 16, 2014. ECF No. 949-1 at 103. On August 14, 2014, Kellum and Strzeminski exchanged multiple calls, with

one call lasting six minutes.  ECF No. 951-1 at 222.

On October 8, 2014, Sandoz announced its Eplerenone price increase to customers, effective October 10.  ECF No. 949-at 106.  An internal email sent by a Sandoz pricing analyst that day noted as "background" that Greenstone had increased its price in June.  *Id.*  Sandoz's new WAC price matched Greenstone's increase.  ECF No. 1053 ¶ 130; ECF No. 1218-6 at 37.  On October 15, 2014, Nailor made a brief call to Kellum.  ECF No. 961-1 at 212.

At the time of Sandoz's increase, Greenstone had eighty-four percent of the market, while Sandoz had the other sixteen percent.  ECF No. 1218-6 at 37.  In November 2014, Sandoz offered Greenstone's customer Anda a lower price on Eplerenone and was able to win the business.  ECF No. 1053 ¶ 131.

At his first deposition, Kellum invoked the Fifth Amendment in response to questions about Eplerenone, including whether he discussed the drug on his calls with Nailor, and whether they reached an agreement that Sandoz would follow Greenstone's price increase.  ECF No. 964-1 at 3239–43.  In the excerpt of the transcript from his subsequent MDL deposition that Greenstone submitted as evidence, Kellum denied ever entering into a price fixing agreement with Greenstone, though he was not asked specifically about Eplerenone.  ECF No. 1218-5 at 13.

Nailor testified that she and Kellum "would talk about market info but not around allocation of customers."  ECF No. 1218-2 at 285.  She also denied knowing that Sandoz would not try to take any of Greenstone's customers on Clindamycin and Eplerenone, or that Sandoz would follow Greenstone's Eplerenone price increase.  *Id.* at 283, 286.  Strzeminski responded "I don't recall" when asked whether Sandoz agreed to follow Greenstone's price increases on Clindamycin and Eplerenone in 2014.  ECF No. 1218-3 at 74.

### 3.  Latanoprost

Latanoprost is an eye drop used to treat glaucoma.  ECF No. 1053 ¶¶ 9, 24.  The States

21

allege that Greenstone conspired with Sandoz and Bausch to fix prices in the Latanoprost market in 2012 and then conspired to allocate at least two customers, Cardinal and ABC.  ECF No. 196 ¶¶ 1354, 1366–68, 1371, 1374.

At the start of the relevant time, there were four generic manufacturers of Latanoprost. ECF No. 1053 ¶ 79.  In November 2011, Mylan exited the Latanoprost market, leaving Greenstone, Sandoz, and Bausch.[7]  *Id.* ¶¶ 133–37; ECF No. 1218-6 at 42–43.  In 2012, Greenstone's market share exceeded 90 percent.  ECF No. 1053 ¶ 67.

Amid a supply disruption, Sandoz lost its contract with customer ABC on January 4, 2012. ECF No. 1080-1 ¶¶ 211–12, 14.  After Greenstone acquired the business, Sandoz began working to win back ABC in early February and began monitoring its competitors' supply availability to assess whether the market could support "a better price for a consistent supply."  *Id.* at 211, 214, 216.

On March 5, 2012, Sandoz's Kellum called Greenstone's Strzeminski, and that call lasted over five minutes.  ECF No. 1053 (AMF) ¶ 39; ECF No. 944-1 at 47.  On March 17, 2012, Strzeminski tried to call Kellum, but Kellum did not answer, and Strzeminski texted Kellum four times in response.  ECF No. 1053 (AMF) ¶ 39; ECF No. 944-1 at 47.

Greenstone's WAC price for Latanoprost remained $13.38 throughout the relevant time, ECF No. 1053 ¶ 135, but Greenstone increased its contract prices on April 2, 2012, *id.*; ECF No. 964-1 at 7041.  On April 4, 2012, customer Walgreens notified Sandoz that Greenstone had raised its contract prices to "just south of $10."  ECF No. 1080-1 ¶ 222.

---

[7] Some evidence that the parties attribute to Bausch refers to the company as either "Valeant" and "Oceanside."  *See, e.g.*, ECF No. 949-1 at 172; ECF No. 957-1 at 356.  As the parties do not differentiate between these names, I assume there is no material difference and refer to all these entities only as "Bausch."

On April 6, 2012, Strzeminski texted Kellum in the morning, and Kellum called Strzeminski in the afternoon, and that call lasted over seven minutes. ECF No. 1053 (AMF) ¶ 40; ECF No. 945-1 at 173. Ninety seconds after that call ended, Strzeminski called Nailor, and that call lasted over a minute. ECF No. 1053 (AMF) ¶ 40; ECF No. 945-1 at 173. Later that day, Strzeminski and Nailor spoke again for over twelve minutes, and Strzeminski texted Kellum about five minutes after that call ended. ECF No. 1053 (AMF) ¶ 40; ECF No. 945-1 at 173. Nailor called Strzeminski later that afternoon in a call lasting over four minutes, after which Strzeminski immediately called Barbara Purcell, a Vice President of Sales and Marketing for Bausch, in a call lasting four minutes and forty-nine seconds. ECF No. 1053 (AMF) ¶ 40; ECF No. 945-1 at 173; *see also* ECF No. 964-1 at 7038 (Strzeminski testifying that she knew Purcell from working at ABC). Immediately after her call with Purcell, Strzeminski called Nailor, and that call lasted over four minutes. ECF No. 1053 (AMF) ¶ 40; ECF No. 945-1 at 173. Also on April 6, 2012, Kellum wrote in an email about Latanoprost, "I've talked to the DNA's and customers and believe I have a very good understanding of the market price points ~$7 net per dropper." ECF No. 1053 (AMF) ¶ 41; ECF No. 951-1 at 177.

At her deposition, Strzeminski was asked whether she spoke with Kellum in the days following Greenstone's increase about whether Sandoz would follow Greenstone's increase. ECF No. 964-1 at 7042. Strzeminski testified that she "had no recollection of that." *Id.*

On April 10, 2012, Sandoz increased its WAC price for Latanoprost to $13.40, two cents more than Greenstone's WAC price. ECF No. 1080-1 ¶ 226.[8] On April 12, 2012, Rite-Aid sent Greenstone a request for a bid on Latanoprost. ECF No. 1053 (AMF) ¶ 43; ECF No. 944-1 at 50.

---

[8] Greenstone contends that Sandoz increased its price on April 13, 2012, rather than April 10. ECF No. 1053 ¶ 136. The States do not dispute either date. The difference of three days is immaterial.

Strzeminski forwarded that bid to her competitor Kellum at Sandoz, writing "Nice!"  ECF No. 1053 (AMF) ¶ 43; ECF No. 944-1 at 50.  In further emails between Rite-Aid and Strzeminski, Rite-Aid wrote that its preferred supplier was Sandoz, and Strzeminski responded, "[d]id they increase?? They followed then."  ECF No. 944-1 at 52.  The customer responded, "[y]ep, they increased," and  Strzeminski wrote, "[h]mmmm.. Ok so out of respect for them we are not going to bid... I was hoping they would follow suit."  *Id.*

At her deposition, Strzeminski was asked whether she wrote "Nice!" to Kellum because "Kellum had done what he told [her] he was going to do," Strzeminski testified that she didn't recall Kellum "telling [her] anything."  ECF No. 964-1 at 7043.

On April 18, 2012, Bausch's Purcell called Greenstone's Strzeminski, with more calls and texts between the two continuing into the next day.  ECF No. 1053 (AMF) ¶ 45; ECF No. 946-1 at 33.

On April 24, 2012, Bausch raised its WAC price on Latanoprost to $18.  ECF No. 1053 ¶ 137.  Bausch also increased its contract prices to multiple customers on the same day.  ECF No. 1080-1 ¶ 233.

In May 2012, Cardinal, which was facing a major price increase from its supplier, Bausch, attempted to negotiate with the three generic manufacturers.  ECF No. 1053 (AMF) ¶ 46.  On May 4, 2012, Cardinal requested a bid from Sandoz on Latanoprost.  ECF No. 1053 (AMF) ¶ 44; ECF No. 951-1 at 201, and on May 7, 2012, Sandoz employees discussed internally whether to bid, ECF No. 951-1 at 197–201.

Also on May 7, 2012, Kellum called Strzeminski.  ECF No. 1053 (AMF) ¶ 44; ECF No. 1080-1 ¶ 769; ECF No. 1218-5 at 14.  On the same day, Kellum emailed internally to Sandoz colleagues, "[m]y preference is really to take the ABC business.  We had that business before and

24

I think we are sending a very poor market signal by taking the Greenstone business immediately after an increase." ECF No. 951-1 at 198. He added the next day, "[l]et's pass on this. I really think we'll be able to get ABC. I'm worried [about] the message this will send, and Cardinal has been very irresponsible with pricing recently. I'd rather just be patient." *Id.* at 197. Strzeminski was asked at her deposition whether she spoke with Kellum about Greenstone "conceding ABC to Sandoz after the price increase was effectuated" and she testified that she could not recall. ECF No. 964-1 at 7042.

At his first deposition, Kellum invoked the Fifth Amendment in response to questions about his calls with Strzeminski in March, April, and May and his emails regarding Latanoprost. ECF No. 964-1 at 3222–31. In his later deposition in the MDL, Kellum testified that, although he could not recall these phone calls, he did not tell Strzeminski that Sandoz planned to submit a bid to ABC, and he did not talk to her about Latanoprost. ECF No. 1218-5 at 14. Kellum also testified at his later deposition that he more likely talked to Strzeminski about her role at Greenstone, with which Strzeminski was dissatisfied. *Id.* ("Q. Is it your testimony that the calls that we just looked at in March, April and May were her calling to complain about her boss? . . . A. Very likely, yes. Q. That many times? A. She was pretty unhappy."). ECF No. 1218-5 at 14.

On May 29, 2012, Strzeminski wrote to Cardinal asking whether Cardinal would accept Greenstone's Latanoprost contract amendment. ECF No. 1053 (AMF) ¶ 46; ECF No. 1218-6 at 72–75. At this time, Strzeminski was under the impression that Greenstone was Cardinal's primary supplier for Latanoprost, when it was actually Bausch. ECF No. 1218-6 at 72 (Strzeminski writing, "I'm confused here. Did we ever have cardinal as a full primary award?"); ECF No. 964-1 at 7053–54 (testifying she was confused as "I thought we still had them"). Cardinal responded that it would "not add [Latanoprost] to the primary award." ECF No. 1053 (AMF) ¶ 46; ECF No.

25

1218-6 at 73.    Strzeminski forwarded Cardinal's email to Nailor that day, writing "Concerning!!!!!!!!!! I guess I need to make some phone calls.. Who did they move to? If it's Sandoz.. guess what? Bye Bye ABC.."  ECF No. 1053 (AMF) ¶ 46; ECF No. 1218-6 at 73. Strzeminski was asked about this exchange during her deposition, including whether the phone calls she would need to make would be to Sandoz and Bausch.  ECF No. 964-1 at 7047–48. Strzeminski denied this, saying "[n]o, that is not correct."  *Id.*

Two days later, on May 31, 2012, Nailor wrote back to Strzeminski early that morning, writing "[w]ho did they move to?"  ECF No. 944-1 at 55.  Strzeminski replied, "I don't know! Have 2 calls out!!"  *Id.*

After receiving Nailor's email, Strzeminski texted and called Sandoz's Kellum and Bausch's Purcell that morning.  ECF No. 1053 (AMF) ¶ 47; ECF No. 1080-1 at 773; ECF No. 944-1 at 60.  First, Strzeminski texted Purcell, who then called Strzeminski, and they spoke for over four minutes.  ECF No. 1053 (AMF) ¶ 47; ECF No. 944-1 at 60.  Strzeminski also exchanged messages with Sandoz's Vezza.  ECF No. 944-1 at 63–64; ECF No. 964-1 at 7029 (Strzeminski testifying that she knew Vezza from working together at ABC).  Those messages included:

> Strzeminski: Did u guys pick up cardinal on latanaprost?
> Vezza: No , did you lose it?
> Strzeminski: You guys bid?? I'm confused... Its [Bausch]. And supposedly you ranked the price unless cardinal is lying.
> Strzeminski: Tanked the price? I need to call [Kellum].

ECF No. 944-1 at 63.

Then, within minutes of telling Vezza that she needed to call Kellum, Strzeminski indeed called Kellum twice, speaking for just under two minutes.  ECF No. 1053 (AMF) ¶ 47; ECF No. 944-1 at 60.  Minutes later, Strzeminski called Purcell twice, and they spoke for over three minutes on the first call and just under a minute on the second call.  ECF No. 1053 (AMF) ¶ 47; ECF No.

26

944-1 at 60.  Shortly after, Purcell called Strzeminski, including in a call lasting twenty-six seconds.  ECF No. 1053 (AMF) ¶ 47; ECF No. 944-1 at 60.  Within a minute, Strzeminski called Kellum, and that call lasted over two minutes.  ECF No. 1053 (AMF) ¶ 47; ECF No. 944-1 at 60.  During these calls, Patterson informed Strzeminski by email that Greenstone was no longer Cardinal's full primary supplier.  ECF No. 1218-6 at 72.

That same morning, Cardinal emailed Strzeminski that Cardinal in fact did want Greenstone to bid for its primary Latanoprost award.  ECF No. 1053 (AMF) ¶ 48; ECF No. 1080-1 at 774; ECF No. 944-1 at 66.  Five minutes later, Strzeminski called Purcell, and that call lasted two minutes and twenty-nine seconds.  ECF No. 1053 (AMF) ¶ 47; ECF No. 944-1 at 60.  Strzeminski forwarded Cardinal's email to Nailor in the afternoon writing, "[m]ajor issue!! Let's make this call short.  Need to discuss off line."  ECF No. 944-1 at 66.  Strzeminski wrote to Nailor again, "NO! we cannot take them on."  *Id.* at 71.  Nailor wrote back to Strzeminski in the afternoon, "[t]ell him we pulled them out of the forecast, and because of all the system changes that we are going through we can't take them back on now."  *Id.*

Greenstone declined Cardinal's Latanoprost business, and Bausch retained Cardinal.  ECF No. 1053 (AMF) ¶ 48; ECF No. 946-1 at 40.  The next day, June 1, 2012, Purcell wrote in an internal Bausch email that "Greenstone pulled back offer because they couldn't supply the increased volume—we can talk more off line . . ."  ECF No. 946-1 at 42.  Purcell also created a timeline that Bausch's old contract price was $2.63, and it was facing a new price of $17.12 after the April price increase.  *Id.* at 40.  On May 29, Bausch offered a $7.15 price, which the customer rejected.  On May 31, the day of the competitors' many phone calls, Bausch retracted its $7.15 offer and offered Cardinal $10, which Cardinal accepted.

Asked at her deposition whether her calls to Purcell and Kellum were her "two calls out,"

and thus were calls to Latanoprost competitors, Strzeminski responded that she did not "know who the two calls out were." ECF No. 944-1 at 55; ECF No. 964-1 at 7049. Strzeminski also testified that she could not recall her messages with Vezza. ECF No. 964-1 at 7050–51. Counsel asked Strzeminski, "[w]hy would you reach out to Sandoz about whether it was tanking the price on a drug that you competed with Sandoz on?" ECF No. 964-1 at 7051. Strzeminski responded, "I don't think that was my intention here." *Id.* And when asked, about the Vezza messages, why she needed to call Kellum, Strzeminski responded, "I can't recall . . . why I needed to call [Kellum] specifically." *Id.*

At his deposition, Vezza testified about his messages with Strzeminski. ECF No. 965-1 at 795–96. Vezza testified that he recalled the messages, and that he recalls walking down the hallway to Kellum's office to tell him, "you're going to get a call from [Strzeminski] . . . she thinks we tanked the price on this." *Id.* at 797.

In June 2012, Sandoz submitted a Latanoprost bid to ABC and was awarded the business. ECF No. 1053 (AMF) ¶ 49; ECF No. 951-1 at 209.

On June 29, 2012, and June 30, 2012, Vezza and Strzeminski exchanged the following messages:

> Strzeminski: Remind [Kellum] to remove lantanoprost from cardinals [*sic*] secondary contract or raise the price. PLEASE!! it's visible everywhere.
> Vezza: We are working on it
> Strzeminski: Lol!! Speedy Gonzales please!!! If I get another message someone is getting shot.
> Vezza: Sorry vacation going on this week. Ak out and I am in Miami
> Strzeminski: Lol!! Enjoy!!! Tell him to get his shit together!!

ECF No. 944-1 at 63. At her deposition, Strzeminski was asked whether these messages reflect that she had spoken to Kellum about the Latanoprost pricing, and Strzeminski testified that she could not recall. ECF No. 964-1 at 7057–58. Asked whether these messages reflect her saying

that she does "not want any low prices in the market for" Latanoprost, Strzeminski responded, "I deny that." *Id.* at 7058.

On July 3, 2012, Vezza and Strzeminski exchanged the following messages:

Vezza: FYI we do not have old low pricing out there
Vezza: We have a secondary but it's not old or low
Strzeminski: Secondary cardinal pricing? Are u sure??
Strzeminski: I hope it's higher than primary would be???
Strzeminski: Like over $11
Vezza: Correct
Strzeminski: Ok!! What about Kinray Parmed? In line??
Vezza: Yes

ECF No. 944-1 at 64.

At her deposition, Strzeminski was asked whether these messages reflect that she was ensuring that Sandoz's pricing remained high, and Strzeminski denied that. ECF No. 964-1 at 7058–59. Vezza also testified to these exchanges. When asked why he told Strzeminski this information, he said "I don't know . . . I know I . . . probably shouldn't have because it was one manufacturer to another manufacturer, so it was inappropriate. You know, . . . I don't know. I was friends with her and . . . it was just a secondary price out there . . . I guess at the moment, I didn't think it was that big of a deal." ECF No. 965-1 at 798.

On July 5, 2012, two days after her texts with Vezza, Strzeminski responded to a customer's inquiry on pricing, writing, "This is the best we can do.. We took a price increase on Latanaprost along with the rest of the market.. I'm not sure if you haven't seen the catch up but the market is well above $10." ECF No. 944-1 at 77.

Greenstone terminated Strzeminski's employment in mid-March 2016 for reasons unrelated to the conduct alleged here. ECF No. 1053 (AMF) ¶ 12; ECF No. 964-1 at 6936. In the days after she was fired, Strzeminski texted with an old colleague from a previous company, Nisha Patel, at one point writing "[Nailor] wants to get into integrity? I can end her career with

29

collusion!!" ECF No. 944-1 at 43; ECF No. 1053 (AMF) ¶ 12. Asked about that message at her deposition, Strzeminski testified, "[y]ou know, I just knew it was a really bad word, to be honest with you, in the industry. I was very angry. It all happened so suddenly and I was honestly taken off guard. So from a legal . . . perspective, I don't know what that would necessarily mean." ECF No. 1053 (AMF) ¶ 13; ECF No. 964-1 at 6937. She continued, "I thought it honestly just meant talking to customers, which was frowned upon and not a best practice – I'm sorry; competitors . . . We all – all of us talked to competitors." ECF No. 964-1 at 6938.

### 4. Deferred Prosecution Agreements and Criminal Prosecution

On February 14, 2020, Sandoz's Kellum reached a plea agreement with the U.S. Department of Justice ("DOJ") and entered a guilty plea to a one-count criminal information alleging that he participated in a conspiracy "to suppress and eliminate competition by agreeing to allocate customers and rig bids for, and stabilize, maintain, and fix prices of, generic drugs sold in the United States, from March 2013 and continuing until at least June 2015, in violation of the Sherman Antitrust Act." ECF No. 951-1 at 162.

On March 2, 2020, Sandoz itself entered into a Deferred Prosecution Agreement ("DPA") with the DOJ in 2020. ECF No. 963-1 at 239–58. A Statement of Facts attached to the DPA alleged that from March 2013 until December 2015, "Sandoz, through certain of its officers and employees, including an individual within high-level personnel, conspired with other persons and entities engaged in the production and sale of generic drugs to suppress and eliminate competition by allocating customers rigging bids, and increasing and/or mainlining prices for certain generic drugs in the United States." *Id.* at 256; see also ECF No. 962-1 at 807 (identifying Kellum as the "individual within high-level personnel"). By entering into the DPA, Sandoz admitted to these allegations. ECF No. 963-1 at 240.

Neither Greenstone nor any of its employees were criminally charged or entered into guilty

pleas about conduct related to this action. ECF No. 1053 ¶ 49; ECF No. 1218-3 at 17–18 ¶¶ 4–5. And Greenstone did not enter into a Deferred Prosecution Agreement ("DPA") related to this action. ECF No. 1053 ¶ 49; ECF No. 1218-3 at 17 ¶ 4.

## II.  LEGAL STANDARD

### A.  Summary Judgment

"Summary judgment is appropriate only if the movant shows that there is no genuine issue as to any material fact and the movant is entitled to judgment as a matter of law." *Tolan v. Cotton*, 572 U.S. 650, 656–57 (2014) (internal quotation marks and citations omitted). In reviewing the summary judgment record, a court must "construe the facts in the light most favorable to the non-moving party and must resolve all ambiguities and draw all reasonable inferences against the movant." *Caronia v. Philip Morris USA, Inc.*, 715 F.3d 417, 427 (2d Cir. 2013). "A genuine dispute of material fact exists for summary judgment purposes where the evidence, viewed in the light most favorable to the nonmoving party, is such that a reasonable jury could decide in that party's favor." *Zann Kwan v. Andalex Grp. LLC*, 737 F.3d 834, 843 (2d Cir. 2013). The moving party bears the burden of demonstrating that no genuine issue exists as to any material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323–25 (1986). If the moving party carries its burden, "the opposing party must come forward with specific evidence demonstrating the existence of a genuine dispute of material fact." *Brown v. Eli Lilly & Co.*, 654 F.3d 347, 358 (2d Cir. 2011). "Where no rational finder of fact could find in favor of the nonmoving party because the evidence to support its case is so slight, summary judgment must be granted." *Id.* (internal quotation marks omitted).

### B.  Sherman Act

The Sherman Act bans "[e]very contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce among the several States." 15 U.S.C. § 1. "The

crucial question in a Section 1 case is therefore whether the challenged conduct stems from independent decision or from an agreement, tacit or express." *Starr v. Sony BMG Music Entm't*, 592 F.3d 314, 321 (2d Cir. 2010) (internal quotation marks omitted). At the summary judgment stage, "to raise a genuine issue of material fact as to an antitrust conspiracy, the plaintiff must present direct or circumstantial evidence that 'tends to exclude the possibility that the alleged conspirators acted independently.'" *Anderson News, L.L.C. v. Am. Media, Inc.*, 899 F.3d 87, 98 (2d Cir. 2018) (quoting *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 588 (1986)). "The quality of evidence required to satisfy the 'tends to exclude' standard 'varies with the economic 'plausibility' of the alleged agreement." *In re Foreign Exch. Benchmark Rates Antitrust Litig.*, No. 13 CIV. 7789 (LGS), 2022 WL 294118, at *5 (S.D.N.Y. Feb. 1, 2022). "[T]he tends to exclude standard is more easily satisfied when[] the conspiracy is economically sensible for the alleged conspirators to undertake and the challenged activities could not reasonably be perceived as procompetitive." *Anderson News*, 899 F.3d at 99 (quoting *In re Publ'n Paper Antitrust Litig.*, 690 F.3d 51, 63 (2d Cir. 2012)). A plaintiff need not "disprove all nonconspiratorial explanations for the defendants' conduct; rather the evidence need be sufficient only to allow a reasonable fact finder to infer that the conspiratorial explanation is more likely than not." *Id.* (internal quotation marks omitted). "[I]f the evidence is in equipoise, then summary judgment must be granted against the plaintiff." *Id.*

"Oligopolies pose a special problem under § 1 [of the Sherman Act] because rational independent actions taken by oligopolists can be nearly indistinguishable from horizontal price fixing," as "any rational decision [in an oligopoly] must take into account the anticipated reaction of the other firms." *In re Mylan N.V. Secs. Litig.*, 666 F. Supp. 3d 266, 318 (S.D.N.Y. 2023). "Consequently, parallel conduct allegations must be placed in a context that raises a suggestion of

a preceding agreement, not merely parallel conduct that could just as well be independent action." *Mayor & City Council of Balt. v. Citigroup, Inc.*, 709 F.3d 129, 137 (2d Cir. 2013). "Since mere parallel behavior can be consistent with independent conduct, courts have held that a plaintiff must show the existence of additional circumstances, often referred to as 'plus' factors, which, when viewed in conjunction with the parallel acts, can serve to allow a [fact finder] to infer a conspiracy." *Apex Oil Co. v. DiMauro*, 822 F.2d 246, 253 (2d Cir. 1987). "Such circumstances might include a common motive to conspire or a high level of interfirm communications." *Id.* at 254. But because "such factors in a particular case could lead to an equally plausible inference of mere interdependent behavior, i.e., actions taken by market actors who are aware of and anticipate similar actions taken by competitors, but which fall short of a tacit agreement," *id.*, these circumstances "must still lead to an inference of conspiracy." *Citigroup*, 709 F.3d at 137.

## III. DISCUSSION

Greenstone moves for summary judgment on three principal bases: (1) no reasonable jury could find that it participated in the individual drug conspiracies related to the Drugs at Issue; (2) no reasonable jury could find that it participated in the overarching conspiracy; and (3) disgorgement is not available as a remedy against it.

### A.  Evidence of Greenstone's Participation in the Individual Drug Conspiracies

The States allege that Greenstone conspired with Sandoz with respect to three Drugs at Issue: Clindamycin (solution, gel, lotion, and cream); Eplerenone; and Latanoprost. ECF No. 1053 ¶ 6. Because the evidence is distinct as to each, I address them in turn.

#### 1.  Clindamycin

The States' allegations with respect to Greenstone's Clindamycin dealings center around four events: the 2010 Clindamycin solution WAC price increase; the 2012 solution, gel, cream, and lotion WAC price increase; the alleged 2013 solution market allocation; and the 2014 gel,

33

cream, and lotion WAC price increase.

Viewing the evidence in the light most favorable to the States, I conclude that a reasonable jury could find that it is more likely than not that Greenstone conspired with Sandoz as to the 2012 solution, gel, cream, and lotion WAC price increase and the 2014 gel, cream, and lotion WAC price increase. *Anderson News*, 899 F.3d at 99. I therefore deny summary judgment with respect to those portions of the claim. I also conclude, however, that no reasonable jury could find that it is more likely than not that Greenstone conspired with Sandoz as to the 2010 Clindamycin solution WAC price increase and any 2013 solution market allocation. I therefore grant summary judgment with respect to those portions.

### a.   2010 Clindamycin Solution WAC Price Increase

The States allege that Greenstone fixed prices and allocated the market with respect to the 2010 Clindamycin solution WAC price increase. ECF No. 196 ¶¶ 1300–10. Greenstone argues that the States did not defend this theory in opposing summary judgment. ECF No. 1308 at 15. The States stated in their opposition to Sandoz's motion for summary judgment (on which I have yet to rule) that they "have notified Defendants that they do not intend to pursue claims related to" the 2010 price increase, ECF No. 1078 at 66 n.13, but they make no such disclaimer in their opposition to Greenstone's motion. The only indication that the States intend to defend this portion of the claim is their reference to Thomassey's testimony in their argument that Greenstone joined the alleged overarching conspiracy. ECF No. 1051 at 12. For the avoidance of doubt, and because the firms' interactions in 2010 and 2011 are relevant to the States' allegations of later collusion on Clindamycin, I will address 2010.

In their opposition to the present motion, the States cite Thomassey's testimony that when he called Nailor on November 2, 2010—the day Sandoz raised its WAC price—it was "very" likely that he was speaking with Nailor because Sandoz was having an internal Clindamycin

solution strategy call.  ECF No. 965-1 at 448 ("Q. Why were you calling Ms. Nailor of Greenstone less than a half an hour before your conference call on Clinda solution strategy? . . . A. I do not specifically recall.  Q. Do you think it's likely that you were calling her to discuss Clindamycin solution? . . . A. Very, yes.").  Thomassey further testified that he called Nailor on December 3, 2010—the same day he called Greenstone "morons" for failing to follow Sandoz—to inquire whether Greenstone intended to follow Sandoz.  ECF No. 1053 ¶ 84; ECF No. 1218-4 at 74; ECF No. 965-1 at 450 ("Q: Given the timing, the fact that you called her the minute before you sent that email, do you think it's likely that you were talking to her about Clindamycin solution? . . . A. Yes, very likely. Q. Did you want to find out when Greenstone was going to follow Fougera's price increase on Clindamycin solution? . . .  A. Yes.").

Even if I assume that the States intend to press this theory, the mere exchange of competitively sensitive information does not prove a *per se* violation of the antitrust laws.  *See United States v. Citizens & Southern National Bank*, 422 U.S. 86, 113 (1975) ("the dissemination of price information is not itself a per se violation of the Sherman Act").  The States must also point to circumstantial evidence that these exchanges of information led to anticompetitive collusion.  *See In re Generic Pharms. Pricing Antitrust Litig.*, No. 16-CM-27241, 2025 WL 2483981, at *14 (E.D. Pa. Aug. 27, 2025) ("The question is whether the phone logs, notes, and deposition testimony together create a basis by which a reasonable fact finder could conclude that Mylan, Sandoz, and Taro developed a common plan and made pricing decisions based on those conversations.").

The States point to no such evidence.  They do not cite evidence of parallel conduct or frequent interfirm communications as to the 2010 WAC price increase.  Nor do I find evidence of parallel conduct in the record.  Greenstone waited nine months to raise its WAC price after Sandoz

35

raised its WAC price, and Greenstone acquired some of Sandoz's customers in the meantime. ECF No. 1053 ¶ 82 (Sandoz raised its WAC price November 2, 2010); *id.* ¶ 88 (Greenstone announced a WAC price on July 27, 2011); ECF No. 1053 ¶ 86 (listing customers that left Sandoz for Greenstone); ECF No. 1218-4 at 78 (email chain on which Thomassey wrote to his colleagues, "[h]opefully [Greenstone] chokes on the volume they are picking up"). Moreover, the increases were not parallel; Greenstone did not match Sandoz's WAC price, but only raised it to about one-third of Sandoz's WAC price. ECF No. 1053 ¶ 88.

I therefore conclude that from this record a reasonable jury could not find that it is more likely than not that Greenstone colluded with respect to the 2010 Clindamycin solution WAC price increase. *Anderson News*, 899 F.3d at 99. I therefore GRANT summary judgment on this portion of the claim.

### b. 2012 Clindamycin Solution, Gel, Cream, and Lotion WAC Price Increase

The next part of the claim concerns Greenstone's 2012 Clindamycin solution, gel, cream, and lotion WAC price increase. On this part, I find that there is evidence from which a reasonable juror could find that it is more likely than not that Greenstone colluded with Sandoz.

The parties dispute whether there is direct evidence of Greenstone's participation in a conspiracy with respect to the 2012 actions. "[H]orizontal agreements among competitors to fix prices or to divide markets" are "[r]estraints that are *per se* unlawful." *Leegin Creative Leather Prods., Inc. v. PSKS, Inc.*, 551 U.S. 877, 886 (2007) (citations omitted). "Because price fixing is a *per se* violation of the Sherman Act, an admission by the defendants that they agreed to fix their prices is all the proof a plaintiff needs." *High Fructose Corn Syrup*, 295 F.3d at 654 (cited by *Publ'n Paper*, 690 F.3d at 63 (2d Cir. 2012)).

As direct evidence, the States rely on Versichele's testimony, including her testimony

36

about misconduct she alleges she witnessed at Greenstone, which resulted in her making multiple internal complaints. ECF No. 965-1 at 682, 688, 696–97, 701–02. But Greenstone argues that the States' reliance on this testimony is not compelling for various reasons.

Greenstone argues that Versichele "had no personal involvement in any alleged misconduct," ECF No. 1308 at 7, meaning her testimony is not direct evidence. That argument is not convincing: Even though Versichele was not a participant in the misconduct, Versichele's testimony may still be direct evidence if she had an opportunity to see and hear others who engaged in misconduct.

Greenstone also argues that Versichele's testimony contains inadmissible hearsay and was elicited by leading questions. ECF No. 977-1 at 5 n.3. That argument is not convincing, either. Greenstone neither meaningfully developed this argument in its opening brief, nor responded to the States' responsive arguments in its reply, and so I do not address the argument at length, especially because Greenstone makes no effort to identify the specific statements with which it takes issue. In any event, as I have previously held, evidence need not be presented in admissible form at the summary judgment stage so long as the evidence *can* be presented in admissible form. *Figueroa v. Mazza*, 825 F.3d 89, 98 n.8 (2d Cir. 2016) ("any evidence considered on summary judgment must be reducible to admissible form"); *Bryant v. Farms Ins. Exchange*, 432 F.3d 1114, 1122 (10th Cir. 2005) ("At the summary judgment stage, the parties need not submit evidence in a form admissible at trial; however, the content or the substance of the evidence must be admissible.").

But all that said, even in admissible form, I do not find Versichele's testimony to be direct evidence of Greenstone's participation in this conspiracy. Versichele testified that she saw "Tony" communicating with Nailor about Clindamycin at an industry conference in December 2012 in

37

Las Vegas. ECF No. 1053 (AMF) ¶ 24; ECF No. 965-1 at 699–700. The States submit "Tony" is Anthony Thomassey of Sandoz. ECF No. 1051 at 8; ECF No. 1053 (AMF) ¶ 24. But the record shows that the "Tony" that Versichele saw was almost certainly Tony Polman of Perrigo. ECF No. 965-1 at 700 (Versichele testifying that she saw Nailor speaking to an "industry person" named "Tony," and identifying "Tony" as the person in exhibit 2191); ECF No. 1218-2 at 259 (Nailor denying the conversation occurred, but identifying the individual in exhibit 2191 as Tony Polman); ECF No 964-1 at 4774–75 (States' counsel asking questions about Polman before and after Nailor's photo identification). And that makes more sense because Thomassey no longer worked for Sandoz in December 2012 and instead worked for Aurobindo, which did not sell Clindamycin. ECF No. 1308 at 8. Thus, the record does not support the States' interpretation of Versichele's testimony—that she saw Nailor speaking with Thomassey about Clindamycin in December 2012. Further, Versichele testified that Nailor said that Greenstone would "launch" Clindamycin, when Greenstone was already active in the market, and that "Tony" told Nailor to "worry about Amneal," when there is no evidence that Amneal sold or was planning to sell Clindamycin. ECF No. 965-1 at 700. This suggests that Versichele was mistaken about the drug Nailor and "Tony" were discussing. Thus, a reasonable jury would likely give this testimony little if any weight.

Direct evidence is not required, though, and the States also rely on circumstantial evidence, including parallel conduct and frequent interfirm communications between competitors that coincide with price movements. This evidence, the States argue, permits an inference that "tends to exclude the possibility" that Greenstone "acted independently." *Matsushita Elec. Indus. Co.*, 475 U.S. at 588. Considering the record as a whole and in the light most favorable to the States, I find that a reasonable juror could conclude that Greenstone's conduct more likely reflected collusion than lawful conduct.

38

First, the record contains evidence of parallel conduct. On October 19, 2012, Sandoz increased its WAC and contract pricing for all four Clindamycin formulations. ECF No. 1053 ¶ 91; ECF No. 1218-4 at 91. About a month later, on November 15, 2012, Greenstone approved a WAC and SWP price increase for the Clindamycin formulations, ECF No. 1218-5 at 5, with the WAC price increase taking effect on December 27, 2012, ECF No. 1053 ¶ 102. This sequence is within a timeframe that would permit a reasonable inference of parallel conduct. *See Mosaic Health, Inc. v. Sanofi-Aventis U.S., LLC*, 156 F.4th 68, 82 (2d Cir. 2025); (timing was "similar" for purposes of finding parallel conduct where three of four Defendants announced changes within one month of each other); *Connecticut v. Sandoz, Inc.*, No. 20cv802, 2026 WL 75851, at *19 (D. Conn. Jan. 9, 2026) (finding price increases within six weeks of each other to be similar for purposes of finding parallel conduct).

Moreover, the volume and timing of the frequent interfirm communications between Greenstone's Strzeminski and Sandoz's Kellum would allow a reasonable fact finder to conclude that it is more likely than not that Greenstone and Sandoz reached an anticompetitive agreement. *See Generic Pharms. Pricing*, 2025 WL 2483981, at *14 (finding sufficient evidence to establish the interfirm communications plus factor where "calls occurred immediately before or after pricing decisions, and . . . those calls occurred in tight temporal proximity with calls to and between other representatives"); *Sandoz, Inc.*, 2026 WL 75851, at *16 ("the more frequent and the closer the calls are to a particular movement in the market, the more probative of a conspiracy this evidence becomes" (citing *In re Flat Glass Antitrust Litig.*, 385 F.3d 350, 369 (3d Cir. 2004)). Strzeminski and Kellum began communicating in August 2012, just as Greenstone began considering whether to raise its Clindamycin pricing, ECF No. 1053 (AMF) ¶¶ 15–16; ECF No. 944-1 at 79; ECF No. 952-1 at 569. They called and texted on August 7 and 8, 2012, and in between Strzeminski made

39

calls to her boss, Nailor.  ECF No. 1053 (AMF) ¶ 16; ECF No. 944-1 at 79.  Sandoz was considering a Clindamycin price increase, too.  ECF No. 951-1 at 212 (reflecting consideration on August 23, 2012).  Strzeminski again spoke with Kellum and Nailor on back-to-back calls on August 29, 2012, the same day that Greenstone employees exchanged emails about  its price increase and Kellum recommended that Sandoz increase its Clindamycin price, ECF No. 1053 (AMF) ¶¶ 17–18; ECF No. 944-1 at 82, 84–85; ECF No. 952-1 at 644.  A reasonable jury could infer from this conduct that when Strzeminski called Kellum that day, their calls were more likely than not about the Clindamycin price increase.

Even if I were to consider Kellum's deposition in the MDL (despite his failure to withdraw his earlier Fifth Amendment invocation) that he did not remember these calls and texts but thought that they could relate to Greenstone "hiring someone that had worked in the Sandoz contracts group before," ECF No. 1218-5 at 15–16, the volume and timing of these calls are more consistent with efforts to obtain pricing information than with efforts to vet a potential employee.  The proximity of the calls to the firms' discussion of price increases would allow a reasonable juror to reject Kellum's testimony as not credible.  When Strzeminski emailed a customer on October 8, 2012, in response to an inquiry, "[d]o you think we can revisit the Clindamycin in early November? We are anticipating a market change/shift," ECF No. 1053 (AMF) ¶ 20; ECF No. 944-1 at 88, a reasonable jury could find that the market shift she anticipated was a Sandoz price increase based on her conversations with Kellum.

And from October 17, 2012, until October 19, 2012—the day that Sandoz significantly increased its WAC and contract pricing for all four Clindamycin formulations, ECF No. 1053 ¶ 91; ECF No. 1218-4 at 91—Kellum and Strzeminski exchanged multiple calls and texts, ECF No. 944-1 at 91.  Based on the timing of these communications, as well as Sandoz's assessment that

40

Greenstone presented a "60% risk" to Sandoz's projected revenue if Greenstone did not follow a Clindamycin price increase, ECF No. 970-2 at 392–93, a reasonable jury could find that it was likely that on these calls Kellum and Strzeminski were discussing whether Greenstone would follow. A reasonable jury could also infer that when Strzeminski wrote to Nailor on October 22, "[o]n our call today we need to look at market share for all clinda's and determine if we are going to capitalize on any without pissing them off." ECF No. 1053 (AMF) ¶ 22; ECF No. 944-1 at 93, she was referring to an agreement with Sandoz to maintain a reasonable market share and not poach Sandoz's customers in the wake of Sandoz's price increase. The reasonableness of that inference is underscored by Strzeminski's emails with Nailor on the same day, reflecting that a customer was "not happy," ECF No. 944-1 at 95, to which Nailor responded, "[a]re they happy with Sandoz?" *Id.* Strzeminski then responded, "Shut it!! You are funny.. I told them we were not bidding and I got 'why'??????? I said Shawn, we have ample market share.. He said well you will go from 150 -1500 .. Yeah??" *Id.*

Greenstone argues that the record shows that it raised its Clindamycin prices to prevent a run on its inventory that would have exposed it to financial penalties when it could not meet demand. ECF No. 1053 ¶¶ 100–03. Greenstone's internal emails reflect that concern, with Nailor writing internally in mid-October 2012, "This is a HUGE risk to our inventory getting cleaned out!!!" ECF No. 1218-4 at 96. But even if Greenstone had been likely to increase its price to prevent a run on its inventory in the absence of any agreement with Sandoz, as I found in a previous ruling on the overarching conspiracy, "[t]he problem is that the States have submitted evidence that the Defendants *communicated with each other* about [their] goals to provide assurance" that their competitors would "maintain[] high prices and avoid[] disruptive battles over customers." *Connecticut v. Sandoz, Inc.*, No. 20cv802, 2025 WL 3470502, at *20 (D. Conn. Dec. 3, 2025). A

reasonable jury could find that, considering the proximity of the phone calls between Kellum and Strzeminski to the price increases, it is more likely than not that Kellum and Strzeminski were discussing whether Greenstone would match Sandoz's price.   Moreover, Strzeminski's and Nailor's discussions about how to "capitalize" on Greenstone's Clindamycin market share "without pissing them off"—a likely reference to Sandoz—suggests that Strzeminski's communications with Kellum had an impact on the market. *Contrast Blomkest Fertilizer, Inc. v. Potash Corp. of Saskatchewan*, 203 F.3d 1028, 1034 (8th Cir. 2000) (evidence of interfirm communications insufficient to support allegations of a price-fixing conspiracy where there was "no evidence to support the inference that the [communications] . . . had an impact on price increases").   The high level of interfirm communications at critical times permits a reasonable inference that Greenstone was reaching agreements with Sandoz, and, given the evidence of their impact on pricing decisions, these communications go well beyond "sporadic exchanges of shop talk among field sales representatives who lack pricing authority." *In re Baby Food Antitrust Litig.*, 166 F.3d 112, 125 (3d Cir. 1999).[9]

---

[9] Any suggestion that an anticompetitive agreement would be precluded because those communicating with competitors lacked the unilateral ability to affect prices is without merit. The record strongly suggests that the Defendants frequently used competitive information obtained from their competitors when presenting pricing proposals or seeking approval for increases. For instance, Kellum, after speaking with Strzeminski, submitted analysis to the Sandoz and Fougera pricing committees that "assume[d a] 60% risk due [to] Greenstone behavior." ECF No. 970-2 at 393–94. A jury could reasonably infer that this assumption was informed by his communications with Greenstone. *See also* ECF No. 1080-1 ¶¶ 761–64 (Kellum proposing increase on Latanoprost and noting that "Sandoz ha[d] learned from several customers" that Greenstone had taken a significant price increase, while the evidence suggests he obtained this information from Strzeminski on their call four days earlier). As noted, Strzeminski followed many of her calls with Kellum with calls to her boss, Nailor, who then steered the company's response. *See, e.g.*, ECF No. 944-1 at 84–85 (Nailor informing Strzeminski, on the same day as calls with Kellum, that Greenstone would send out price increase notices sooner than expected because "[w]e have to go and not wait"). And when Nailor herself communicated with Kellum in 2014, she immediately emailed Patterson, who oversaw all of Greenstone's pricing decisions, that she had "clinda market info." ECF No. 945-1 at 178. A reasonable jury could infer that, even if Strzeminski, Nailor, or

42

The communications therefore permit an inference that Greenstone reached an agreement with Sandoz that they would collude on pricing rather than compete for each other's customers at a lower price. The seventeen-month lapse in communication between Strzeminski and Kellum following these exchanges—until the next time the firms considered raising Clindamycin prices—bolsters the reasonableness of that inference. ECF No. 964-1 at 7069.

Greenstone argues generally that market share data related to Clindamycin are inconsistent with a conspiracy. Greenstone's expert economist, Dr. Celeste Saravia, opines that Greenstone's market share data show that Greenstone did not conspire because Greenstone's Drugs at Issue did not conform to an evenly divided "fair share" market allocation. ECF No. 1053 ¶ 59. But as I held in the order denying the States' motion to exclude Dr. Saravia's expert opinions, evenly divided shares are just one example of "fair share" that the States' expert, Dr. Frederick Warren-Boulton, offered as a market allocation consistent with a conspiracy. Many of Greenstone's arguments about market share allocation are based on the faulty assumption that "fair share" in this case equates exclusively to evenly divided shares.

I conclude that the circumstantial evidence, including the overall pattern of communications and parallel conduct in the 2012 Clindamycin solution, gel, cream, and lotion market, raises a suggestion that Greenstone colluded with Sandoz on Clindamycin in 2012, *Citigroup, Inc.*, 709 F.3d at 137, and the evidence tends to exclude the possibility that Greenstone acted independently, *Matsushita Elec. Indus. Co.*, 475 U.S. at 588.

c.   2013 Clindamycin Solution Market Allocation

The States next allege that Greenstone acted anticompetitively with respect to Clindamycin

---

Kellum could not unilaterally change prices, they influenced price increases by using information and assurances obtained through anticompetitive agreements with their competitors when proposing price increases through internal channels.

solution in 2013, as Taro and Perrigo entered the market.  Again, the States do not appear to defend this theory in their opposition to the Defendants' motion for summary judgment.  ECF No. 1308 at 15.

Because the States do not press this theory—and because the States alleged that Taro and Perrigo targeted Greenstone's customers upon entering the market, ECF No. 196 ¶¶ 1339, 1341— I conclude that there is no evidence in this record from which a reasonable juror could find that it was more likely than not that Greenstone colluded in the Clindamycin solution market in 2013.  I therefore GRANT summary judgment on this portion of the claim.

<blockquote>d.   2014 Clindamycin Gel, Cream, and Lotion WAC price increase</blockquote>

The next portion of the States' claim concerns Greenstone's 2014 Clindamycin gel, cream, and lotion WAC price increase.  Here, I find that there is evidence from which a reasonable juror could find that it was more likely than not that Greenstone colluded with respect to the 2014 Clindamycin gel, cream, and lotion WAC price increase.

As before, I find that there is no direct evidence of Greenstone's participation in this conspiracy.  The States again point to Versichele's testimony, but she did not testify to information specific to this alleged conspiracy, nor could she have because she was terminated in November 2013, before the conduct at issue allegedly began.  ECF No. 1053 ¶ 45.  The States identify no other direct evidence related to the 2014 Clindamycin price increase.

There is circumstantial evidence, however, from which a reasonable juror could find that it was more likely than not that Greenstone colluded with Sandoz on Clindamycin in 2014.  A reasonable juror could find that the evidence shows parallel conduct, particularly the close-in-time WAC price increases of the Clindamycin gel, cream, and lotion among the producers.  Greenstone decided to increase its WAC prices for Clindamycin gel, lotion, and cream around March 18, 2014.  ECF No. 1053 ¶¶ 114, 116 (delaying notification to customers of the increase).  About a month

later, on April 17, 2014, Sandoz announced its own WAC price increase for Clindamycin gel, lotion, and cream. ECF No. 1053 ¶ 116; ECF No. 1218-5 at 760–64. Although Greenstone's WAC price increase was delayed until June 2, 2014, ECF No. 1053 ¶ 118; ECF No. 1218-5 at 52–56, 58, I find that, in the context, a reasonable juror could infer parallel conduct from this timeline. *See Mosaic Health*, 156 F.4th at 82; *In re Concrete & Cement Additives Antitrust Litig.*, No. 24-md-3097, 2025 WL 1755193, at *13 n.11 (S.D.N.Y. June 25, 2025) ("there is no categorical rule governing how temporally proximate acts must be to give rise to an inference of collusion;" rather, pricing changes must be "viewed in the context of the case" and "must account for any restrictions on market participants' ability to enact price changes sooner"); *Sandoz, Inc.*, 2026 WL 75851, at *17 n.16 (rejecting Mylan's argument that its price increase on Bromocriptine was not "parallel" with Sandoz's because it came two months later, where Mylan was out of the market because of supply issues but followed Sandoz's increase as soon as it reentered).

Moreover, from the volume and timing of frequent interfirm communications between competitors, a reasonable jury could conclude that it is more likely than not that Greenstone conspired with Sandoz as to the 2014 Clindamycin gel, cream, and lotion WAC price increase. For example, on March 18, 2014, the same day that Greenstone selected Clindamycin gel, lotion, and cream for a WAC price increase, ECF No. 1218-5 at 47; ECF No. 944-1 at 99; ECF No. 1053 ¶ 114, Strzeminski called Nailor three times, before calling Kellum, ECF No. 1053 (AMF) ¶ 27; ECF No. 944-1 at 97. Kellum then called Strzeminski back, and that call lasted seven minutes and thirty-nine seconds. ECF No. 1053 (AMF) ¶ 27; ECF No. 944-1 at 97. Considering that this was the first time that Strzeminski had communicated with Kellum since 2012, ECF No. 964-1 at 7069, a reasonable jury could find that the purpose of these communications was to coordinate the Clindamycin price increases.

45

When, on April 2, 2014, Nailor and Strzeminski emailed suggesting which customers Greenstone should relinquish on Clindamycin solution, ECF No. 964-1 at 7073, a reasonable jury could conclude that Strzeminski knew that Sandoz was "looking for share" in the Clindamycin solution market based on her previous communications with Kellum, ECF No. 944-1 at 103. Further, after Nailor wrote to Strzeminski on April 2 planning for the Clindamycin gel, lotion, and cream price increase, ECF No. 1053 (AMF) ¶ 29; ECF No. 945-1 at 175, both Nailor and Strzeminski communicated with Kellum, ECF No. 1053 (AMF) ¶ 30; ECF No. 944-1 at 106 (logging calls from April 2 and 4, 2014).

A reasonable jury could conclude that Sandoz's price increase on April 17, 2014, was not a surprise to Greenstone, considering the flurry of communications between Strzeminski, Nailor, and Kellum shortly before the increase. ECF No. 1053 ¶ 116; ECF No. 1218-5 at 52–56. These communications continued while Greenstone considered its own price increase. Two days after Greenstone delayed its price increases on April 21, 2014, ECF No. 1053 (AMF) ¶ 32, Nailor and Kellum spoke on the phone for about fifteen minutes, *id.* ¶ 33. And just three minutes after ending her call with Kellum, Nailor emailed Patterson with the subject line, "I have clinda market info." ECF No. 1053 (AMF) ¶ 33; ECF No. 945-1 at 178. A reasonable jury could infer that the timing of the call suggests it was more likely than not related to the price increase.

A reasonable jury could also find that when Nailor emailed later that month that she did not "feel the same risk" that competitors would go after portions of their share if Greenstone raised its price, ECF No. 945-1 at 180, it was more likely than not because Kellum had assured her that Sandoz would not go after Greenstone's market share. Viewed in the light most favorable to the States, this email suggests that Kellum and Nailor had reached an anticompetitive agreement to avoid poaching each other's customers.

46

The circumstantial evidence, including the overall pattern of communications and parallel conduct between March and June 2014, raises a suggestion that Greenstone was part of a preceding anticompetitive agreement to fix prices and allocate the market for Clindamycin in 2014, *Citigroup, Inc.*, 709 F.3d at 137, and it tends to exclude the possibility that Greenstone acted independently, *Matsushita Elec. Indus. Co.*, 475 U.S. at 588.  I therefore DENY Greenstone's motion for summary judgment on this portion of the claim.

### 2.  Eplerenone

The States next allege that Greenstone unlawfully colluded with Sandoz as to the 2014 Eplerenone WAC price increase.  The communications and events the States allege to be related to Eplerenone frequently coincide or overlap with the allegations related to 2014 Clindamycin increase described above, and the States address these claims together in their opposition brief.  ECF No. 1051 at 15–17; *see also* ECF No. 1078 at 70–73 (same in opposition to Sandoz's motion to dismiss the same claims).

There is no direct evidence of Greenstone's participation in an Eplerenone conspiracy.  As with the 2014 Clindamycin conspiracy, Versichele's testimony is not direct evidence of an Eplerenone conspiracy because she did not testify about Eplerenone specifically and she had already left Greenstone by the time the conspiracy allegedly began.  ECF No. 1053 ¶ 45.  The States identify no other direct evidence for this alleged conspiracy.

The circumstantial evidence, however, is sufficient to permit "a reasonable fact finder to infer that the conspiratorial explanation is more likely than not" on Eplerenone.  *Anderson News*, 899 F.3d at 99.

The firms' price increases were close enough in time to demonstrate parallel conduct with respect to Eplerenone.  I have held that price increases six weeks apart constitute parallel conduct, *see Sandoz, Inc.*, 2026 WL 75851, at  *19 (citing *Mosaic Health, Inc. v. Sanofi-Aventis* U.S., LLC,

47

156 F.4th 68, 82 (2d Cir. 2025)).  Here, although Sandoz delayed implementation of its increase until November 2014—over four months after Greenstone increased its price in June 2014, ECF No. 1053 ¶ 130—Sandoz approved its price increase on July 16, 2014, six weeks after Greenstone's increase.  ECF No. 949-1 at 103.  Moreover, Sandoz's new WAC price matched Greenstone's, and as Sandoz's increase was going into effect, an internal email cited Greenstone's increase as "background" explaining Sandoz's increase.  ECF No. 949-at 106.  Thus, a jury could reasonably find that the increases were parallel.

The evidence of interfirm communications proximate to changes in the Eplerenone market is sufficient to establish a plus factor from which a reasonable juror could infer a conspiracy from this parallel conduct.  *Generic Pharms. Pricing*, 2025 WL 2483981, at *14.  For the first time in seventeen months, Greenstone's Strzeminski called Sandoz's Kellum on March 18, 2014, the same day that Greenstone planned its Eplerenone increase, and again on May 29, 2014, one day after Greenstone internally confirmed its price increase.  ECF No. 944-1 at 97, 99; ECF No. 945-1 at 184, 187.  Nailor called Kellum on April 22 and 23, soon after Greenstone's April 21 decision to delay its planned increases, and on October 15, 2014, one week after Sandoz announced its price increase.  ECF No. 1414-1 at 2; ECF No. 961-1 at 212.

It is true that these calls were also near in time to Greenstone's price increases on other drugs, including Clindamycin, that it implemented at the same time, and the evidence supporting the States' claims is more robust for Clindamycin than for Eplerenone.  For instance, immediately after her call with Kellum on April 28, 2014, Nailor wrote that she had "clinda market info" but did not refer to Eplerenone.  ECF No. 945-1 at 178.  But other evidence suggests that the price increases on these drugs were related.  Greenstone analyzed and increased its prices on Clindamycin and Eplerenone at the same time, ECF No. 1218-5 at 47, and Patterson was reluctant

48

to separate Greenstone's Clindamycin increase from its other planned June 2014 increases, including Eplerenone, *id.* at 52. This suggests a "direct, logical relationship" between the alleged Clindamycin and Eplerenone conspiracies. *U.S. Football League v. Nat'l Football League,* 842 F.2d 1335, 1371 (2d Cir. 1988) (evidence of "[p]rior antitrust violations and the history of competition in a market" may be used to show the "intent, motive and method of a conspiracy" so long as there is a "direct, logical relationship" between conspiracies); *see also* ECF No. 1080 at 145–46 (finding that "the evidence that Taro followed a pattern of conduct across the instant conspiracy as well as alleged conspiracies with a "direct, logical relationship" reinforced the reasonable inference of an agreement between Taro and G&W on Fluocinonide gel). Thus, upon making the reasonable inference that Kellum and Nailor exchanged confidential information about Clindamycin, as described in the previous section, the jury could also reasonably infer that Nailor and Kellum also discussed other products on which they competed that were part of Greenstone's planned increases.

In this context, two of Nailor's contemporaneous emails support a finding of an agreement between Greenstone and Sandoz. First, Nailor wrote on April 21 that Greenstone would "go hard after market observations" after Patterson told her all of Greenstone's planned increases would have to be delayed "unless you happen to know right now where we want contract pricing to be." ECF No. 1218-5 at 52–53. A reasonable juror aware of the evidence discussed above could interpret Nailor's comment about "go[ing] hard after market observations" as an expression of her intent to contact competitors for market intelligence. Indeed, the States have also presented evidence that it was common practice for pharmaceutical sales representatives to obtain market information directly from competitors. *See, e.g.*, ECF No. 964-1 at 1010 (Sandoz's Chris Bihari testifying that "it just seemed that [exchanging competitive intelligence with competitors] . . . was

accepted because everybody was doing it . . . a lot of people in the industry were communicating"); *id.* at 4392 (Sandoz's Della Lubke testifying that she went to competitors rather than to customers when she was asked to obtain market information as "a shortcut [to] get that information"); *id.* at 6938 (Greenstone's Strzeminski testifying, "We all -- all of us talked to competitors."). And Nailor herself testified that she "would talk about market info" with Kellum. ECF No. 1218-2 at 285. A reasonable jury could infer that Nailor's calls to Kellum over the next two days were made to obtain market intelligence, as referred to in her email to Patterson, on all of the planned increases, including Eplerenone. Standing alone, this would represent an exchange of information that falls short of an agreement. But Nailor then told Patterson in an email on April 28—with Eplerenone among the drugs listed in the subject line—that she did not feel that Greenstone was at risk of competitors going after "significant portions" of its market share as had occurred the previous time that Greenstone increased prices. ECF No. 945-1 at 180. A reasonable jury could infer that Nailor did not feel that risk because Kellum had assured her on their call five days earlier that Sandoz would not go after Greenstone's market share but would instead follow the increase. Further, the jury could infer that Patterson considered Nailor's statement when deciding to move forward with the price increase, which suggests that Nailor's communication "had an impact on price increases." *Blomkest*, 203 F.3d at 1034.

Greenstone's arguments that other evidence precludes an inference of coordinated behavior, or at least is equally suggestive of independent conduct, are unavailing. First, Greenstone's contention that "every participant [in] those calls denied discussing Eplerenone," ECF No. 977-1 at 21, overstates the record. Kellum initially invoked the Fifth Amendment in response to questions about Eplerenone, and even if I were to consider his blanket denials of collusion from his testimony in the MDL, the record does not show that he was asked specifically

50

about Eplerenone. ECF No. 964-1 at 3239–43; ECF No. 1218-5 at 13. And Strzeminski merely testified that she did not recall whether Sandoz agreed to follow Greenstone's price increases on Clindamycin and Eplerenone in 2014. ECF No. 1218-3 at 74; *see* ECF No. 1080 at 151 n.49 (ruling on Taro's motion for summary judgment giving little weight to the testimony of a G&W employee who "consistently responded that she did not *recall* colluding with competitors yet failed to *deny* that she did so"). And while Nailor denied that she *knew* that Sandoz would follow Greenstone's price increases or avoid poaching Greenstone's customers, ECF No. 1218-2 at 286, this does not contradict the circumstantial evidence that suggests that Kellum provided her with market information that Greenstone's Patterson used in deciding to increase prices. At most, Nailor's testimony presents a dispute of material fact that she and Kellum reached an agreement regarding Eplerenone, but it is not enough to overcome the circumstantial evidence from which a reasonable jury could infer that an agreement was more likely than not.

Nor is the evidence that Sandoz obtained the business of multiple Greenstone customers in the weeks after Greenstone's price increase before Sandoz followed, or that Sandoz lowered its price and obtained the business of a single Greenstone customer after it matched Greenstone's price increase. ECF No. 1053 ¶¶ 129. Greenstone enjoyed a lopsided share of a two-player market, and Nailor earlier indicated that she was "ok with our share dipping on this[;] if it truly is a 2 player market we need to be responsible and let some go." ECF No. 952-1 at 562. Thus, these customer moves are not in conflict with Nailor's statement to Patterson that she did not fear that a competitor would go after "*significant* portions of our share." ECF No. 945-1 at 180. Nor would these moves preclude an anticompetitive agreement. For instance, Nailor and Kellum could have agreed that Greenstone would "let some [customers] go" in exchange for Sandoz's agreement to ultimately

51

follow the price increase.[10]

For these reasons, I conclude that the circumstantial evidence, including the overall pattern of communications and parallel conduct between Greenstone and Sandoz, raises a suggestion that Greenstone was part of a preceding anticompetitive agreement to fix prices for Eplerenone in 2014, *Citigroup, Inc.*, 709 F.3d at 137, and it tends to exclude the possibility that Greenstone acted independently, *Matsushita Elec. Indus. Co.*, 475 U.S. at 588. I therefore DENY Greenstone's motion for summary judgment as to Eplerenone.

### 3. Latanoprost

The States also allege that Greenstone colluded with Sandoz and Bausch to fix prices and allocate customers for Latanoprost in 2012. I conclude that there is enough circumstantial evidence to support this claim to warrant a trial.

There is no direct evidence of Greenstone's participation in a Latanoprost conspiracy. The States concede that Versichele did not testify about Latanoprost specifically. ECF No. 1051 at 8–9. And while Strzeminski's text messages and the federal investigators' summary from Strzeminski's second interview are direct evidence that she exchanged confidential information about Latanoprost with competitors, this evidence falls short of establishing an agreement to fix prices or allocate the market. *See Sandoz, Inc.*, 2026 WL 75851, at *16 ("[T]he mere exchange of competitively sensitive information does not prove a per se violation of the antitrust laws. Thus, the States must also point to circumstantial evidence that these exchanges of information led to

---

[10] Even if Greenstone had not been willing to give up share *after* Sandoz matched its increase, Sandoz's subsequent poaching of a single customer would not weigh strongly against the inference of an anticompetitive agreement. *See United States v. Beaver*, 515 F.3d 730, 739 (7th Cir. 2008) ("It is not uncommon for members of a price-fixing conspiracy to cheat on one another occasionally, and evidence of cheating certainly does not, by itself, prevent the government from proving a conspiracy."); *United States v. Foley*, 598 F.2d 1323, 1333 (4th Cir. 1979) ("[P]artial non-performance . . . does not preclude a finding that [the alleged conspirator] joined the conspiracy.").

anticompetitive collusion." (citation omitted)).[11]

There is evidence of parallel conduct as to Latanoprost because all three competitors increased contract prices within the same month. ECF No. 964-1 at 7041 (Greenstone announcing contract price increases on April 2, 2012); ECF No. 944-1 at 52 (Rite-Aid confirming on April 12, 2012 that its "preferred supplier" Sandoz increased Rite-Aid's price); ECF No. 1053 ¶ 137 (Bausch increasing various customers' contract prices on April 24, 2012). Greenstone argues that no evidence of parallel conduct exists because Greenstone did not raise its WAC price during the conspiracy period and the contract prices varied. Both of these arguments fail. As the Defendants have stressed throughout this case, "[b]ecause WAC does not reflect discounts, rebates, or other reductions in price that are commonly negotiated with customers, most customers do not pay WAC, and many pay different prices for the same drug." ECF No. 609-2 ¶ 32 (Statement of Facts related to motion of summary judgment on the overarching conspiracy). Thus, while matching WAC price increases could be evidence of parallel conduct, the *absence* of matching WAC price increases is not evidence to the contrary when contract prices increased in the meantime. And because each supplier charged varying contract prices to its own customers, ECF No. 1053 ¶¶ 135–37, it is also of no consequence that contract prices between suppliers differed somewhat. An agreement between competitors to collectively raise prices is *per se* illegal, even if the prices charged are not the same. *United States v. Socony-Vacuum Oil Co.*, 310 U.S. 150, 223 (1940) (horizontal price-fixing conspiracies are *per se* illegal under the Sherman Act when they include agreement among competitors "formed for the purpose and with the effect of raising, depressing,

_____

[11] The federal investigators' account of Strzeminski's statements is hearsay, and the States have not suggested that it is a business record or that another hearsay exception applies. While this evidence might be reducible to admissible form—because the States could call the author as a trial witness—I give it little weight here and do not rely on it alone as to any critical issue.

fixing, pegging, or stabilizing the price"); *see Catalano, Inc. v. Target Sales, Inc.*, 446 U.S. 643, 647–49 (1980) (holding unlawful an agreement to eliminate a practice of giving variable discounts); *Sugar Institute v. United States*, 297 U.S. 553, 601–02 (1936) (holding unlawful an agreement to adhere to previously announced prices and terms of sale even though the particular prices and terms were not themselves fixed by private agreement).  Thus, the competitors' contract price increases in April 2012 suffice to establish parallel conduct.

Together with the evidence of parallel conduct, the volume and timing of interfirm communications between the competitors would allow a reasonable fact finder to conclude that it is more likely than not that Greenstone participated in a conspiracy to raise Latanoprost prices and allocate customers.  *See Generic Pharms. Pricing*, 2025 WL 2483981, at *14.  In the weeks preceding Greenstone's contract price increases, and as Sandoz was monitoring competitors' supply to assess raising its price, Kellum and Strzeminski exchanged various calls and messages. ECF No. 1053 (AMF) ¶ 39; ECF No. 944-1 at 47.  Then, on April 6, 2012, just days after Greenstone's increases, Strzeminski and Kellum again exchanged calls and texts, interwoven with Strzeminski calling both her boss, Nailor, and Bausch's Purcell, ECF No. 1053 (AMF) ¶ 40; ECF No. 945-1 at 173.  On the same day, Kellum wrote in an email about Latanoprost, "I've talked to the DNA's and customers and believe I have a very good understanding of the market price points ~$7 net per dropper," ECF No. 1053 (AMF) ¶ 41; ECF No. 951-1 at 177.  A reasonable jury could infer from this pattern of interfirm communications that Kellum's "understanding of the market price points" for Latanoprost came from his competitors, rather than or in addition to any communications with "the DNA's and customers."  And a reasonable jury could reject as not credible Kellum's testimony from the MDL that he was speaking to Strzeminski concerning complaints about her boss because Strzeminski called Bausch, Greenstone's other Latanoprost

competitor, in immediate succession. *See* ECF No. 1410 at 170–71 (finding, in the ruling on Taro's motion for summary judgment, that a reasonable jury could reject as not credible testimony that calls between two competitors were of a personal nature amid overlapping calls with a third competitor).

When, on April 12, 2012, Rite-Aid asked Greenstone to bid on Latanoprost because of Sandoz's price increase, Strzeminski forwarded that request to Kellum—a rare instance in this sprawling litigation of a firm's emailing a competitor about a potential bid—and wrote, "Nice!" ECF No. 1053 (AMF) ¶ 43; ECF No. 944-1 at 50. A reasonable juror could find that, when Strzeminski wrote "Nice!" to Kellum, it was because she was pleased that Sandoz had adhered to an agreement discussed on their prior calls that it would follow Greenstone's increases. The inference of a prior agreement is reinforced by Strzeminski's response to the customer that Greenstone would not offer a competing bid "out of respect for [Sandoz]." ECF No. 944-1 at 52.

The evidence also suggests that Greenstone conspired with Sandoz and Bausch to allocate customer ABC after Bausch followed the price increase. After Cardinal's price with Bausch increased, it attempted to negotiate with the three generic manufacturers. ECF No. 1053 (AMF) ¶ 46. Kellum called Strzeminski the same day that Sandoz internally discussed pursuing Cardinal's business. *Id.* ¶ 44; ECF No. 1080-1 ¶ 769; ECF No. 1218-5 at 14. A reasonable jury could find, based on the timing of the call and their history of communications, that they likely discussed how Sandoz should respond to Cardinal's request for a bid, and not, as Kellum testified in the MDL, Strzeminski's dissatisfaction with Greenstone. ECF No. 1218-5 at 14. This inference is strengthened by Kellum's internal email the same day, stating "[m]y preference is really to take the ABC business [instead of Cardinal]. We had that business before and I think we are sending a very poor market signal by taking the Greenstone business immediately after an increase." ECF

55

No. 951-1 at 198. And when he added the next day, "[l]et's pass on this. I really think we'll be able to get ABC. I'm worried [about] the message this will send, and Cardinal has been very irresponsible with pricing recently. I'd rather just be patient," *id.* at 197, a reasonable jury could infer that he expressed this sentiment because he and Strzeminski had agreed that Greenstone would concede ABC to Sandoz.

This inference becomes "more likely than not" when also considering Strzeminski's emails and communications with competitors concerning Cardinal. *Anderson News*, 899 F.3d at 99. Strzeminski wrote to Cardinal on May 29, 2012 to confirm whether Greenstone would win the award. ECF No. 1053 (AMF) ¶ 46; ECF No. 1080-1 ¶ 771; ECF No. 1218-6 at 72–75. When Cardinal told Strzeminski it would not include the primary Latanoprost business in its contract with Greenstone, ECF No. 1218-6 at 73, Strzeminski, who was under the impression that Greenstone was Cardinal's primary Latanoprost supplier, forwarded Cardinal's email to Nailor that day, writing "Concerning!!!!!!!!!! I guess I need to make some phone calls.. Who did they move to? If it's Sandoz.. guess what? Bye Bye ABC," ECF No. 1053 (AMF) ¶ 46; ECF No. 1218-6 at 73. Read in the light most favorable to the States, this email suggests that Strzeminski was alluding to an agreement under which Sandoz would not seek to poach Greenstone's other customers if Greenstone conceded ABC to Sandoz. A reasonable jury could find that when Strzeminski wrote "Bye Bye ABC," she was suggesting that Greenstone would no longer concede ABC if Sandoz had acted contrary to this agreement by seeking to poach Cardinal, which Strzeminski believed was a Greenstone customer.[12] A reasonable jury could also find that, when

---

[12] The fact that Cardinal was never actually a Greenstone customer does not preclude the reasonable inference that Greenstone agreed to concede ABC to Sandoz. A reasonable jury could find that "Bye Bye ABC" referred to an agreement that involved conceding ABC, regardless of the other terms of the agreement.

Strzeminski then texted and called Sandoz's Kellum and Bausch's Purcell, ECF No. 944-1 at 60, she was inquiring whether Sandoz had deviated from the agreement.  That inference is strengthened by Strzeminski's email to Nailor that she had "2 calls out" in response to Nailor asking, "[w]ho did they move to?," *id.* at 55, as well as Strzeminski's text messages with Sandoz's Vezza in which she asked if Sandoz had bid on Cardinal's Latanoprost business and tanked the price and indicated that she needed to call Kellum, which she then did.  *Id.* at 60, 63.

Later that day, after Cardinal emailed Strzeminski that it did want to include its primary Latanoprost business in its Greenstone contract, ECF No. 944-1 at 66, and Strzeminski learned that Greenstone was not the primary supplier, ECF No. 1218-6 at 72, Strzeminski forwarded Cardinal's email to Nailor, writing, "[m]ajor issue!! Let's make this call short.  Need to discuss off line." ECF No. 944-1 at 66.  A reasonable jury could infer from this sequence that Strzeminski wanted to discuss this development "off line" because it impacted Greenstone's agreement to allocate customers with Sandoz.

A reasonable jury could thus find that when Sandoz was awarded ABC's Latanoprost business in June 2012, ECF No. 1053 (AMF) ¶ 49; ECF No. 951-1 at 209, it was in accordance with a prior agreement with Greenstone.  Moreover, a reasonable jury could find that Strzeminski's continued text messages about Latanoprost with Sandoz at the end of June and early July 2012, including Vezza's confirmation to Strzeminski that Sandoz did not have "old low pricing out there," evidenced an ongoing agreement to maintain high prices on the drug.  ECF No. 944-1 at 63–64.

Such a commitment to earmark customers and avoid competing against each other, if it occurred, would be *per se* illegal under the Sherman Act.  *Cont'l Ore Co. v. Union Carbide & Carbon Corp.*, 370 U.S. 690, 708 (1962); *Sandoz, Inc.*, 2025 WL 3470502, at \*19 ("the agreement

to avoid 'poaching' customers in general is really just a commitment to reach specific customer allocations—which are themselves plainly *per se* illegal").

I give no weight to Strzeminski's frequent statements in her deposition that she did not recall the events or communications related to Latanoprost. *See* ECF No. 1080 at 151 n.49 (giving little weight to the testimony of a G&W employee who "consistently responded that she did not *recall* colluding with competitors yet failed to *deny* that she did so"). And even if a jury were to consider Kellum's testimony in the MDL, it could reject as not credible his testimony about his calls with Strzeminski, not only because, as explained above, his explanation fits poorly with the frequency and timing of these calls, but also because Kellum pleaded guilty to a criminal charge for similar anticompetitive conduct that occurred less than a year later. ECF No. 951-1 at 162. Moreover, I could still draw an adverse inference from his invocations of the Fifth Amendment in his initial deposition that his truthful answers would have been unfavorable to Sandoz, *SEC v. Cassano*, 2000 WL 1512617, at *2 n.1 (S.D.N.Y. Oct. 11, 2000) ("The fact that . . . these witnesses subsequently have waived the privilege in this action goes to the weight of the [adverse] inference, not to the propriety of drawing it."), although I need not do that here because there is already enough evidence in the record to deny summary judgment as to Latanoprost.

From the evidence of parallel conduct, along with the timing of the interfirm calls and the substance of the email exchanges and Vezza's texts with Strzeminski, a reasonable juror could infer that when Strzeminski communicated with Kellum, the calls were more likely than not about an agreement that they had established to raise and maintain prices and to allocate the market for Latanoprost.[13] The evidence tends to exclude the possibility that Greenstone acted independently. *Matsushita*, 475 U.S. at 588. I therefore DENY Greenstone's motion for summary judgment with

---

[13] I make no findings as to whether Bausch was a part of the alleged conspiracy.

respect to the Latanoprost conspiracy.

### B. Evidence of Greenstone's Participation in the Overarching Conspiracy

I have already determined that there is a triable issue about whether an overarching conspiracy existed, and so the question now is whether there is a triable issue about whether Greenstone was a knowing participant in that conspiracy. I conclude that there is not, and I therefore grant Greenstone's summary judgment motion as to the States' claim that it was part of the overarching conspiracy.

Greenstone's conduct concerns only three drugs, two of which are not dermatology drugs, which diminishes any incentive it might have had to join a broad conspiracy focused on such drugs. *See Connecticut v. Sandoz, Inc.*, No. 20cv802, 2026 WL 75853, at *16 (D. Conn. Jan. 9, 2026) ("Aurobindo did not make dermatology drugs, which are the focus of the overarching conspiracy claim, and while I do not view this circumstance as dispositive, it is a factor weighing against the notion that Aurobindo joined a scheme focused on such drugs."). Further reducing any such incentive is the fact that Greenstone sold only Pfizer-authorized generic drugs. ECF No. 1308 at 5, 10 ("[U]nlike other defendants, Greenstone's role as Pfizer's authorized generic subsidiary meant that it had no incentive to raise prices in the eighty other generic drug markets where Pfizer did not sell the branded product."). Greenstone also did not enter into a DPA with the federal government. *Id.* Nor did its current or former employees plead guilty to any offense or invoke the Fifth Amendment in response to questions during depositions in this case. *Id.* Further, the States point to no evidence that Greenstone brokered any anticompetitive agreements in markets for any of the Drugs at Issue in the overarching conspiracy, conduct I have previously treated as a sign of a firm's membership in that conspiracy. *Sandoz, Inc.*, 2025 WL 3470502, at *19 (overarching conspiracy ruling citing instances of "brokering" as "[a]dditional evidence of a single conspiracy

59

tying together a broad swath of the Defendants and the Drugs at Issue"). Finally, there is no testimony from a cooperating witness or other evidence suggestive of a broader agreement between Greenstone and any other Defendant to cooperate with each other as to all drugs on which Greenstone and that Defendant overlapped—another hallmark of the overarching conspiracy. *See id.* at *17-18 (noting that cooperating witnesses described collusion as a "general business practice" and that "[w]hat [the overarching conspiracy] required was a common understanding that each co-conspirator would commit to working with the other to reach what they both regarded as a "fair share," i.e., a customer allocation that fit each of their needs in the market for each Drug at Issue in which they competed."). Taken together, these facts weigh heavily against a finding that Greenstone was a knowing participant in the overarching conspiracy.

To be sure, there is some countervailing evidence. The record would permit a reasonable juror to conclude that Greenstone adhered to many of the same industry "rules of engagement" that characterized the overarching conspiracy, including that firms should follow a rival's price increase and avoid "poaching" each other's customers, and should instead settle for what these competitors refer to as their "fair share" of a particular drug market. *Id.* at *17, 20. The conspirators considered a competitor to be "rational" or "reasonable" if it "f[ell] in line with those types of tactics." *Id.* at *6.

Throughout the record here, there are examples from which a reasonable juror could find that Greenstone employees used language to suggest that Greenstone should behave "rationally." *See, e.g.*, ECF No. 944-1 at 9 (Strzeminski writing, likely about Sandoz, that she wouldn't want to "piss[] them off"); ECF No. 945-1 at 180 (Nailor writing that she did not "feel the same risk" when Patterson asked "are we ok with our assumption that our competitors won't go after significant portions of our share? . . . Do we have risk here that we should call out?"); ECF No. 945-1 at 189

60

(Nailor writing "[a]re these all current Sandoz customers?  I think we evened out our share by picking up WMT on one of these presentations, so I suggest we back off?").  The record suggests that Greenstone expressed appreciation when competitors adhered to the rules of engagement, *see, e.g.*, ECF No. 944-1 at 50 (Strzeminski forwarding a competitor's bid to Kellum, writing "Nice!"), and dissatisfaction when competitors deviated from those rules, *see, e.g.*, ECF No. 1218-6 at 73 (Strzeminski forwarding a competitor's email expressing that Greenstone would not win the bid to Nailor, writing "Concerning!!!!!!!!!! I guess I need to make some phone calls.. Who did they move to? If it's Sandoz.. guess what? Bye Bye ABC..").

But competitors did not always regard Greenstone as a "rational" or "reasonable" market participant.  In December 2010, Thomassey called Greenstone personnel "[m]orons" in an email to other Sandoz employees because "Greenstone still has not followed" Sandoz's 2010 price increase for Clindamycin.  ECF No. 1053 ¶ 84; ECF No. 1218-4 at 74.  And Greenstone's use of the same terminology as that used by participants in the overarching conspiracy—and sometimes adherence to the same rules—is not enough to raise a genuine dispute of material fact about whether it, too, was a participant, in light of the evidence weighing against such a finding.  True, Strzeminski testified that "[w]e all -- all of us talked to competitors," ECF No. 964-1 at 6938, and the record contains evidence corroborating that testimony—at least as to her and Nailor.  But it does not contain evidence that Greenstone's communications related to any drugs beyond those discussed in this ruling reflected a broader understanding with any firm that it would cooperate as to all overlapping drugs.  Nor is there evidence that Greenstone was aware of the overarching conspiracy or took steps, or even expressed an intention, to help it succeed.  Even when I draw all reasonable inference in favor of the States, I do not find enough evidence to permit a reasonable

61

juror to find that Greenstone joined the overarching conspiracy.[14]

I therefore GRANT Greenstone's motion for summary judgment as to the overarching conspiracy.

### C. Disgorgement

Finally, Greenstone argues that, in all events, the States cannot recover disgorgement from Greenstone. To this end, Greenstone makes state-specific arguments about why disgorgement is unavailable as to Greenstone specifically, including that New Jersey law does not permit disgorgement and that the States' expert, Dr. Warren-Boulton, failed to provide any analysis supporting state-specific disgorgement.

These arguments are premature. In my February 12, 2026, decision on the Defendants' Motion for Summary Judgment as to state-law remedies, I addressed the circumstances under which disgorgement would be appropriate, and denied the Defendants' motion on that point. *Connecticut v. Sandoz, Inc.,* 820 F. Supp. 3d 125, 156-61 (D. Conn. 2026). As I explained, whether and to what extent the Court will award disgorgement depends on a number of variables, including whether any damages and civil penalties awarded in a verdict exceed Greenstone's profits from any illegal conduct—an inquiry that I will be unable to undertake until after a trial. *Id.* Further, while Greenstone points to an earlier decision I rendered finding disgorgement unavailable under the law of New Jersey, the State where Greenstone is headquartered, I cannot tell from this record whether Greenstone's conduct violated the laws of other States that do provide for disgorgement, for example, States into which Greenstone made direct sales. And contrary to

---

[14] Versichele's testimony that Nailor and Strzeminski colluded with competitors, ECF No. 965-1 at 668, was too general to indicate whether or not any collusion she observed went beyond the specific drugs discussed in this ruling. The testimony of Thomassey and Vezza, as it related to Greenstone, was likewise confined to the drugs discussed in this ruling.

Greenstone's assertions, I am not convinced—at this stage—that the States will need an expert to determine disgorgement.  Unlike antitrust damages, which typically depend on the calculation of an overcharge (*i.e.*, the difference between the conspiracy price and the competitive price), disgorgement is generally just a measure of the defendant's profits and might not require knowledge beyond that of the average juror. While the disgorgement calculation could prove to be complicated in some cases, it remains to be seen whether it will be here.  So Greenstone's contention that the States' expert has failed to provide a specific calculation for disgorging Greenstone's profits is not a basis to award summary judgment as to disgorgement.

I therefore deny Greenstone's motion for summary judgment as to disgorgement without prejudice to its raising the issue in a post-trial motion.

## IV. CONCLUSION

For the forgoing reasons, I deny Greenstone's motion as to the individual conspiracies related to the 2012 Clindamycin solution, gel, cream, and lotion WAC price increase; the 2014 Clindamycin gel, cream, and lotion WAC price increase; Eplerenone; and Latanoprost.  I also deny Greenstone's motion as to the issue of disgorgement.  I grant Greenstone's motion as to the individual conspiracies related to the 2010 Clindamycin solution WAC price increase and the 2013 Clindamycin solution market allocation; and as to the overarching conspiracy.

IT IS SO ORDERED.

/s/
Michael P. Shea, U.S.D.J.

Dated: Hartford, Connecticut
June 1, 2026