# UNITED STATES DISTRICT COURT
## DISTRICT OF CONNECTICUT

|  |  |
|---|---|
| THE STATE OF CONNECTICUT; THE STATE OF ALASKA; THE STATE OF ARIZONA; THE STATE OF ARKANSAS; THE STATE OF CALIFORNIA; THE STATE OF COLORADO; THE STATE OF DELAWARE; THE DISTRICT OF COLUMBIA; THE STATE OF FLORIDA; THE STATE OF GEORGIA; THE TERRITORY OF GUAM; THE STATE OF HAWAII; THE STATE OF IDAHO; THE STATE OF ILLINOIS; THE STATE OF INDIANA; THE STATE OF IOWA; THE STATE OF KANSAS; THE COMMONWEALTH OF KENTUCKY; THE STATE OF LOUISIANA; THE STATE OF MAINE; THE STATE OF MARYLAND; THE COMMONWEALTH OF MASSACHUSETTS; THE STATE OF MICHIGAN; THE STATE OF MINNESOTA; THE STATE OF MISSISSIPPI; THE STATE OF MONTANA; THE STATE OF NEBRASKA; THE STATE OF NEVADA; THE STATE OF NEW HAMPSHIRE; THE STATE OF NEW JERSEY; THE STATE OF NEW MEXICO; THE STATE OF NEW YORK; THE STATE OF NORTH CAROLINA; THE STATE OF NORTH DAKOTA; THE COMMONWEALTH OF THE NORTHERN MARIANA ISLAND; THE STATE OF OHIO; THE STATE OF OKLAHOMA; THE STATE OF OREGON; THE COMMONWEALTH OF PENNSYLVANIA; THE COMMONWEALTH OF PUERTO RICO; THE STATE OF RHODE ISLAND; THE STATE OF SOUTH CAROLINA; THE STATE OF TENNESSEE; THE STATE OF UTAH; THE STATE OF VERMONT; THE COMMONWEALTH OF VIRGINIA; THE STATE OF WASHINGTON; THE STATE OF WEST VIRGINIA; THE STATE OF WISCONSIN; and U.S. VIRGIN ISLANDS,<br><br>       *Plaintiffs*,<br><br>v. | No. 3:20-cv-00802-MPS |

SANDOZ, INC.; ACTAVIS HOLDCO US, INC.;
ACTAVIS ELIZABETH LLC; ACTAVIS
PHARMA, INC.; AMNEAL
PHARMACEUTICALS, INC.; AMNEAL
PHARMACEUTICALS, LLC; ARA
APRAHAMIAN; AUROBINDO PHARMA U.S.A.,
INC.; BAUSCH HEALTH AMERICAS, INC.;
BAUSCH HEALTH US, LLC; MITCHELL
BLASHINSKY; DOUGLAS BOOTHE; FOUGERA
PHARMACEUTICALS INC.; GLENMARK
PHARMACEUTICALS INC., USA; JAMES (JIM)
GRAUSO; GREENSTONE LLC; G&W
LABORATORIES, INC.; WALTER
KACZMAREK; ARMANDO KELLUM; LANNETT
COMPANY, INC.; LUPIN PHARMACEUTICALS,
INC.; MALLINCKRODT INC.; MALLINCKRODT
LLC; MALLINCKRODT plc; MYLAN INC.;
MYLAN PHARMACEUTICALS INC.; KURT
ORLOFSKI; MICHAEL PERFETTO; PERRIGO
NEW YORK, INC.; PFIZER INC.; SUN
PHARMACEUTICAL INDUSTRIES, INC.; TARO
PHARMACEUTICALS USA, INC.; TELIGENT,
INC.; ERIKA VOGEL-BAYLOR; JOHN
WESOLOWSKI; and WOCKHARDT USA LLC,

     *Defendants*.

## **RULING ON MOTION FOR SUMMARY JUDGMENT**

In this action, the Attorneys General of most of the States and several U.S. territories ("the States") allege that thirty-six pharmaceutical companies and executives ("the Defendants") participated in a series of conspiracies, as well as an overarching conspiracy, to fix prices, allocate markets, and rig bids in the sale of dozens of generic drug products. Defendant Pfizer Inc. ("Pfizer") has moved for summary judgment, arguing that it is not liable—either directly or through the conduct of its former subsidiary, Greenstone LLC ("Greenstone")—for any product-specific or overarching conspiracy. ECF No. 985; *see also* ECF No. 1008 (Defendants' Joint Memoranda in Support of Defendant-Specific Motions for Summary Judgment). For the reasons set forth below, Pfizer's motion for summary judgment is GRANTED.

1

## I.  BACKGROUND

### A.  Procedural Background

This is one of three cases in which the Attorneys General of the States have sued scores of defendants in the generic drug industry for alleged antitrust violations and unfair trade practices. All three cases were originally filed in this Court but were transferred to the Eastern District of Pennsylvania (the "MDL Court"), which was designated by the Judicial Panel on Multidistrict Litigation (the "JPMDL") to preside over these and other similar cases brought by private parties in a consolidated proceeding.  ECF No. 9.[1]  In April 2024, these three cases were remanded to this Court by the JPMDL and assigned to me.  ECF No. 11.  The operative complaint in this case, ECF No. 196, alleges collusion in the pricing, market allocation, and bidding for some eighty generic drugs (the "Drugs at Issue"), chiefly for dermatological applications.  The parties refer to it as "the Dermatology complaint."

The States' complaint brings a single combined count against both Pfizer and Greenstone and does not differentiate between their conduct; rather, the complaint asserts that "Greenstone Equals Pfizer" because the two entities were "alter egos" that "operate … as a single functioning entity."  *Id.* ¶¶ 1283, 1291.  Before this case was remanded to this district, however, the MDL court rejected the States' "alter ego" theory of liability for Pfizer, finding in a ruling on a motion to dismiss that the "Plaintiff States have not alleged a basis for piercing the corporate veil."  *In re Generic Pharms. Pricing Antitrust Litig.*, No. 16-md-2724, 2023 WL 2244685, at *7 (E.D. Pa. Feb. 27, 2023).  But the MDL court allowed the States' claims against Pfizer to proceed under an

---

[1] Unless otherwise indicated, all ECF numbers in this ruling refer to entries on the docket of this case, not the same case when it was before the MDL Court, and each page number refers to the page number shown on the ECF stamp on the top of the cited page, not the page of the relevant brief or pleading designated by the parties.

agency theory of liability, based on the States' allegations that "[n]ot only does Pfizer have to approve Greenstone's price increases, but it also directs Greenstone's strategy regarding the increases, and Greenstone always acts at the direction of Pfizer." *Id.* (citing ECF No. 196 ¶ 1296).

The States allege that Greenstone and Pfizer were part of multiple individual-drug conspiracies as well as an overarching conspiracy encompassing all Drugs at Issue. In a previous ruling, I denied the Defendants' Joint Motion for Summary Judgment on Overarching Conspiracy Claims, ECF No. 609, finding that there is evidence in the record—chiefly testimony from cooperating witnesses—from which a reasonable jury could find that the alleged overarching conspiracy exists. *Connecticut v. Sandoz, Inc.*, No. 20-cv-802, 2025 WL 3470502 (D. Conn. Dec. 3, 2025). Subsequently, however, I granted in part and denied in part Greenstone's motion for summary judgment; although I denied Greenstone's motion as to alleged antitrust conspiracies related to multiple individual-drug conspiracies, I found that the States did not present sufficient evidence to permit a reasonable jury to find that Greenstone joined the overarching conspiracy. *Connecticut v. Sandoz, Inc.*, No. 20cv802, 2026 WL 1533866, at *29–30 (D. Conn. June 1, 2026).

In addition to this motion, the Defendants have filed a Joint Memorandum that addresses the legal standard and argues that Defendants are entitled to summary judgment on particular state-law claims. ECF No. 1008. I will also consider that filing to the extent it is applicable to Pfizer.

### B. Factual Background

In the overarching conspiracy ruling, I discussed the facts underpinning the States' claims against all corporate Defendants, and I incorporate that description here. *See Sandoz, Inc.*, 2025 WL 3470502, at *2–14. I now address the facts specific to Pfizer's participation in the alleged conspiracies. The following facts are drawn from the parties' Local Rule 56 Statements of Facts, including the States' Statement of Additional Material Facts ("SAMF"), ECF No. 1241, and the

3

record.  The facts are undisputed unless otherwise noted.

### 1.  The States' Claims

Of the dozens of drugs at issue in the complaint, the States allege that Pfizer, as well as its former subsidiary Greenstone LLC, conspired with its competitors between 2010 and 2014 to allocate customers, fix prices, and rig bids for generic versions of six drug products: Eplerenone tablets, Latanoprost drops, and four formulations of Clindamycin phosphate (cream, gel, lotion, and solution).  ECF No. 196 ¶¶ 1278–80, 1656; ECF No. 1241 ¶ 82.  According to the States, two Greenstone sales employees, Jill Nailor and Robin Strzeminski,[2] communicated with competitors in furtherance of the conspiracies.  ECF No. 196 ¶¶ 1278, 1298–1382; ECF No. 1241 ¶ 60.  The States also allege that Pfizer is jointly and severally liable for anticompetitive conduct related to all drugs at issue, including those it never sold or manufactured, because it and the other the corporate Defendants had an "overarching understanding to avoid competing with each other and to instead settle for what these competitors refer to as their 'fair share'" of a given drug market. ECF No. 196 ¶¶ 5, 1661.

### 2.  The Generic Pharmaceuticals Industry

To sell a brand-name pharmaceutical product in the United States, companies must obtain Food and Drug Administration ("FDA") approval of a New Drug Application ("NDA").  ECF No. 1241 ¶ 14.  Once a drug patent is set to expire, the FDA will award the first competitor to submit an Abbreviated New Drug Application ("ANDA") a 180-day exclusive window in which to sell a generic version of the drug, during which time the FDA will not approve any other ANDA for the same product.  *Id.* ¶ 16.  This window is not truly exclusive, however, as the holder of an NDA may also authorize another entity to sell a non-branded version of the same product.  *Id.* ¶¶ 17–18.

---

[2] During the relevant time, Strzeminski used the last names Strzeminski and Hatosy, and this is reflected in certain of the exhibits. I refer to her only as Strzeminski.

Drugs sold in this manner are called "authorized generics."  *Id.* ¶ 17.  Thus, during the first 180-day exclusivity window, competition is limited to a maximum of two competitors: the first-to-file ANDA and the authorized generic.  *Id.* ¶ 18.  Although the holder of an NDA may authorize an entity to sell generics at any time, to avoid competing with its branded products, pharmaceutical companies usually wait until their patents expire—and competition is imminent—to authorize a generic version of a drug.  *Id.* ¶ 20.

### 3.  Pfizer's and Greenstone's Business Models

At all periods relevant to the complaint, Greenstone operated as a subsidiary of Pfizer.  ECF No. 1241 ¶¶ 10, 12 (noting that Pfizer acquired Greenstone in April 2003 and spun it off in November 2020).  During this period, Pfizer manufactured and sold branded drugs, which it defines as "patent-protected medicines that are approved for sale by the FDA."  ECF No. 1241 ¶ 3, 13.  The States do not allege any wrongdoing by Pfizer related to branded versions of the Drugs at Issue.  *Id.* ¶ 4.  Although Pfizer manufactured the generic drugs that Greenstone sold, Pfizer itself did not market or sell any generic versions of the Drugs at Issue.  *Id.*  ¶¶ 5, 24.

Before and during the relevant period, Greenstone's business model and strategy was to sell authorized generic drugs.  *Id.* ¶ 21.  Once Greenstone became a subsidiary of Pfizer, it specialized in selling authorized generic drugs manufactured by Pfizer.  *Id.* ¶ 22; *see also id.* ¶ 40 ("The vast majority of Greenstone's product portfolio during the relevant period consisted of authorized generic drugs.");  ECF No. 1219-2 at 252 (Pfizer presentation slides noting that Greenstone "[m]akes generic versions of Pfizer products only - a financial play for Pfizer, to 'regain' revenues lost to generic challengers, primarily during 180-day exclusivity period").  In other words, instead of seeking FDA approval to launch its own generic drugs, Greenstone contracted with Pfizer, its parent company, to sell generic versions of Pfizer's brand-name drug products.  Greenstone would not sell an authorized generic until another competitor had acquired

an ANDA and launched a generic drug, ECF No. 1241 ¶ 23, thereby providing some price protection for Pfizer's branded products, SAMF ¶ 5; ECF No. 989-2 at 252 (Pfizer describing Greenstone's model as "[f]ollows generic challenger pricing, not leads, to avoid brand erosion"). One former Greenstone executive, Christine Versichele, testified that this strategy required Greenstone to delay launching a generic drug until another generic company entered the market, even though it would have been profitable for Greenstone to launch earlier. SAMF ¶ 4; ECF No. 965-1 at 672.

As part of this business model, Pfizer manufactured—and Greenstone sold—authorized generics of the six Drugs at Issue that the States contend were subject to price fixing and market allocation: Eplerenone tablets, Latanoprost drops, and Clindamycin Phosphate solution, gel, cream, and lotion. ECF No. 1241 ¶ 83.

"Distribution Agreements" between Pfizer and Greenstone governed the companies' responsibilities and included terms by which Pfizer would supply Greenstone with the generics it manufactured and Greenstone would sell the drugs to customers. *Id.* ¶ 27. The agreements contained a provision stating: "neither the making of this Agreement nor the performance of any of the provisions hereof will be construed to make either party an agent, employee or legal representative of the other." *Id.* ¶ 29; *see also id.* ¶ 30. Greenstone paid Pfizer a contractually negotiated payment amount for the authorized generic drugs that Pfizer manufactured. *Id.* ¶ 31.

Pfizer was not a party to contracts that Greenstone entered into with customers.[3] ECF No. 1241 ¶ 33. In addition to selling authorized generics to its contracted customers at a contract price,

---

[3] Pfizer provided evidence of two sample contracts between Greenstone and its customers. The States object to this evidence as insufficient to suggest that Pfizer was not a party to Greenstone's sales contracts, but they do not point to any evidence that suggests that Pfizer was ever a party to a Greenstone-customer contract. ECF No. 1241 ¶ 33.

Greenstone also sold these drugs to customers without a contract at a higher, publicly reported Wholesale Acquisition Cost ("WAC") price. *Id.* ¶ 72. Upon receiving requests from customers, Greenstone requested the volume of drugs that it needed Pfizer to manufacture. *Id.* ¶ 24–25. A team within Pfizer, Pfizer Global Supply, assessed these requests to "decide whether Pfizer could support the new demand within the time frame requested by Greenstone." *Id.* ¶ 26. The States contend that the evidence shows that Pfizer ultimately decided the quantity of authorized generics that it would manufacture, based on its own analysis of Greenstone's forecasts of customer demand. *Id.* ¶ 24.

While Greenstone generated its own budgets, financial reports, and profit-and-loss statements, *id.* ¶ 34, Pfizer determined some variables, including the cost of goods, for the authorized generic versions of its brand-name drugs that Greenstone sold, *id.* ¶ 32; ECF No. 989-3 at 76 (Greenstone finance director testifying that the cost of goods and other variables in profit and loss statements "were pretty much fed in the system by other teams, primarily Pfizer [G]lobal [S]upply. Even though they're attributed to Greenstone products, other areas were the ones impacting the general ledger with this, with these figures. Inputs didn't come from . . . Greenstone.").

Pfizer contends that Greenstone labeled and marketed these drugs as Greenstone products, and not as Pfizer products. ECF No. 1241 ¶ 84; *see also id.* ¶¶ 35–39 (describing Greenstone's use of its own logo, labels, National Drug Code numbers on the drugs it sold, and that Greenstone operated its own marketing materials and website). The States dispute that Greenstone did not market the drugs as Pfizer products and present evidence that they contend shows that Greenstone designed its marketing to "suggest a connection between Pfizer and Greenstone drugs." *Id.* ¶ 84 (citing purported Greenstone statement on its website—cited in the complaint but apparently not

included in the States' exhibits—that its products "are manufactured to the same standards and at the same facilities as Pfizer brand-name drugs" and that they "carry the legacy of the brand-name products' years of clinical research, data and patient and physician experience").

    4.  <u>Shared Services</u>

As Greenstone's parent company, Pfizer provided its subsidiary with various resources, support, and back-office functions. *Id.* ¶ 42. Such services included "human resources, information technology, legal, regulatory, intellectual property, supply, and finance support." *Id.* ¶ 47. Pfizer provided these services "at no chargeback to keep costs low." *Id.* ¶ 45. Pfizer also provided Greenstone with dedicated office space at Pfizer's corporate campus in New Jersey. *Id.* ¶ 54.

As part of shared human resources services, Greenstone employees received paychecks and W-2s issued by Pfizer, and they could receive Pfizer stock options, Pfizer awards, and Pfizer executive-level reviews. *Id.* ¶ 53. Pfizer issued offer letters to candidates for Greenstone positions with "an offer to join Pfizer," ECF No. 964-1 at 6930, and termination letters that stated that their employment with Pfizer was ending, ECF No. 1241 ¶ 53. As part of the IT shared services, Greenstone employees used "@pfizer.com" email addresses." *Id.* ¶ 52. Among the legal services provided to Greenstone was compliance training, including regarding antirust policies that prohibited employees from entering into anticompetitive agreements with competitors. *Id.* ¶ 50. To acknowledge compliance, Greenstone employees were required to submit a "Pfizer Integrity Pledge" in which they agreed "to uphold Pfizer's core values." *Id.* ¶ 51. In some of these "shared services" areas, Pfizer assigned employees to Greenstone; these employees were listed on Greenstone's organization charts. *Id.* ¶ 48. Pfizer assigned one member of the "Pfizer Global Supply" team to Greenstone to serve as the subsidiary's "primary touchpoint at Pfizer for supply-related issues." *Id.* ¶ 49.

8

Slides from a 2004 presentation, shortly after Pfizer's acquisition of Greenstone, described Pfizer's "Shared Service Approach for Combined Entities." *Id.* ¶ 44; ECF No. 989-3 at 49–53. It noted that a shared services model "allows for efficiency and scale while concentrating unique generics expertise, culture and relationships within generics business" and that "care must be taken to allow enough autonomy" to Greenstone so that "the unique attributes of the business can be effectively managed." ECF No. 1241 ¶ 44. Accordingly, Greenstone employees were responsible for managing and carrying out business, including developing its commercial strategy. *Id.* ¶¶ 55–56. The States dispute that Greenstone employees solely and independently managed Greenstone's business without approval in some areas from Pfizer. *Id.*

Versichele, the former Greenstone executive, testified that the shared services led her to believe that she was a Pfizer employee. ECF No. 965-1 at 671–72 ("being with Pfizer personnel and having a Pfizer email address and getting my paycheck from Pfizer, I believed [I] was working for Pfizer"). Greenstone's National Account Director, Robin Strzeminski, listed "Greenstone LLC-Pfizer" as her employer on her LinkedIn page and resume. ECF No. 964-1 at 6929. Strzeminski's paystubs listed Pfizer as her employer, her 401(k) plan was issued by Pfizer, and even her initial employment offer came from Pfizer, stating "On behalf of Pfizer Incorporated, . . . [we] are delighted to extend to you an offer to join Pfizer." *Id.* at 6930.

### 5.   Pfizer's Involvement in Greenstone's Business

Greenstone's general manager—to whom all other Greenstone personnel ultimately reported—did not have a position at Pfizer but reported to a Pfizer Regional President. *Id.* ¶ 57–58, 66. The parties dispute whether and to what extent Pfizer's Regional President was involved in or directed Greenstone's business. *Id.* ¶¶ 67–68. The executive in this role during the majority of the relevant period, William Kennally, testified that he was not so involved, and that he did not

determine the customers to which Greenstone would submit bids to supply generic drugs.  *Id.* ¶¶ 67–69; ECF No. 989-2 at 344.

The Regional President, however, did approve Greenstone's decisions to launch new authorized generics that Pfizer manufactured.  ECF No. 1241 ¶ 70.  And when Greenstone's team proposed price increases to its WAC (non-contract) prices for drugs Pfizer manufactured, it would send its analysis to Pfizer's Regional President for approval.  *Id.* ¶¶ 73, 78–81.  Nailor, a senior sales director at Greenstone, testified that she did not have the power to enact WAC increases, and that the Regional President's approval was required.  SAMF ¶ 11; ECF No. 964-1 at 4836.  Pfizer, however, neither instructed nor recommended that Greenstone increase its prices to customers.  *Id.* ¶¶ 75–76.[4]  Neither the Regional President nor anyone else at Pfizer approved Greenstone's contract prices.  *Id.* ¶ 74.

Greenstone and Pfizer applied the approval process for WAC price increases to the Drugs at Issue.  For example, after Greenstone identified Eplerenone as a price increase candidate, its employees, including its pricing director, Carol Patterson, discussed the matter internally before deciding in March 2014 to take a price increase.  *Id.* ¶ 86.  About three weeks later, Patterson asked Greenstone's general manager, Jim Cannon, for approval to increase the WAC price of the drug.  *Id.* ¶ 87.  After receiving approval from Cannon, Patterson then requested approval from Kennally, Pfizer's Regional President, the following day, explaining that "we aren't following a price

---

[4] The States' assertion that Pfizer's alleged "retaliation against [Christine] Versichele," a Greenstone executive, "for reporting the collusive activity at issue in this litigation," ECF No. 1241 ¶¶ 75–76, even if accepted as true, does not suggest that Pfizer instructed or recommended that Greenstone take a price increase on its products.

increase enacted by another company" but "align[ing] with increases in the brand versions of these products." *Id.* ¶ 88.  Kennally approved the price increase the same day.  *Id.*[5]

A similar procedure was used when Greenstone increased the WAC price of Clindamycin products.  Patterson sent Kennally a "heads up" in November 2010 that Greenstone would be increasing its WAC for Clindamycin solution by an amount that was "much smaller than that of Fougera," which had earlier increased its WAC price by 320 percent.  *Id.* ¶ 92.  On July 25, 2011, Patterson sought and received Kennally's approval for a 49 percent increase for Clindamycin solution.  *Id.* ¶ 93.  The following year, days after Sandoz increased its WAC on Clindamycin solution, gel, lotion, and cream, Patterson gave Cannon a "heads up" that she would likely seek approval for increasing Greenstone's prices.  *Id.* ¶ 94.  Three weeks later, Patterson sought and received approval, first from Cannon, and then from Kennally.  *Id.*  The same pattern was followed in increasing Clindamycin prices again in 2014.  *See id.* ¶¶ 95–101.[6]

Greenstone increased the contract price, rather than the WAC price, of the final drug at issue, Latanoprost.  In November 2011, Greenstone identified Latanoprost as one of multiple price increase candidates.  *Id.* ¶ 102.  In March 2012, Patterson sought Cannon's approval for the increases, including Latanoprost's contract price but not its WAC price, while noting that that she would "reach [out] to [Kennally] for approval on the WAC prices once I get your approval." *Id.* ¶¶ 102–03.  Three days later, Patterson asked Kennally for approval "on the WAC changes." *Id.*

---

[5] I denied Greenstone's motion for summary judgment as to the States' Eplerenone claims, finding that the "the circumstantial evidence, including the overall pattern of communications and parallel conduct between Greenstone and Sandoz, raises a suggestion that Greenstone was part of a preceding anticompetitive agreement to fix prices for Eplerenone in 2014, and it tends to exclude the possibility that Greenstone acted independently." *Sandoz, Inc.*, 2026 WL 1533866, at *23–26 (citations omitted).

[6] I granted summary judgment to Greenstone on the States' 2010–11 claims on Clindamycin but denied summary judgment as to claims related to the 2012 and 2014 Clindamycin price increases. *Sandoz, Inc.*, 2026 WL 1533866, at *18–23.

¶ 104.   Kennally approved the WAC changes for other drugs but was not asked to approve Latanoprost's contract price change. *Id.* ¶ 105.[7]

### 6.   Alleged Report of Collusive Conduct

The States also highlight the testimony of Versichele, a former Greenstone executive whose employment was terminated.  ECF No. 965-1 at 659–741.  Versichele testified that in December 2011 she informed Kennally, Pfizer's Regional President, as well as Pfizer's ombudsman and human resources department, that she had she had observed communications between Greenstone employees and the company's competitors that discussed competitively sensitive information.  *Id.* at 688–91; SAMF ¶¶ 6, 9.  Kennally first testified that he had no recollection of Versichele ever reporting collusive conduct, ECF No. 964-1 at 3437, and then later testified that Versichele never reported any antitrust violations to him,  *id.* at 3441–42.  In any event, Kennally did not open an investigation.  *Id.*

The States contend that internal emails between Nailor and Strzeminski suggest that the allegedly colluding employees learned of and made light of Versichele's allegations in January 2012.  ECF No. 945-1 at 47–48; ECF No. 965-1 at 692.

Following her alleged report to Kennally, Versichele testified, she started to receive negative performance reviews and she was eventually terminated.  ECF No. 965-1 at 703–07.  Pfizer paid her severance package.  *Id.* at 675.

## II.  LEGAL STANDARD

"Summary judgment is appropriate only if the movant shows that there is no genuine issue as to any material fact and the movant is entitled to judgment as a matter of law." *Tolan v. Cotton*, 572 U.S. 650, 656–57 (2014) (internal quotation marks and citations omitted).  In reviewing the

---

[7] I denied Greenstone's motion for summary judgment with respect to the Latanoprost conspiracy. *Sandoz, Inc.*, 2026 WL 1533866, at *26–28.

summary judgment record, a court must "construe the facts in the light most favorable to the non-moving party and must resolve all ambiguities and draw all reasonable inferences against the movant." *Caronia v. Philip Morris USA, Inc.*, 715 F.3d 417, 427 (2d Cir. 2013). "A genuine dispute of material fact exists for summary judgment purposes where the evidence, viewed in the light most favorable to the nonmoving party, is such that a reasonable jury could decide in that party's favor." *Zann Kwan v. Andalex Grp. LLC*, 737 F.3d 834, 843 (2d Cir. 2013). The moving party bears the burden of demonstrating that no genuine issue exists as to any material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323–25 (1986). If the moving party carries its burden, "the opposing party must come forward with specific evidence demonstrating the existence of a genuine dispute of material fact." *Brown v. Eli Lilly & Co.*, 654 F.3d 347, 358 (2d Cir. 2011). "Where no rational finder of fact could find in favor of the nonmoving party because the evidence to support its case is so slight, summary judgment must be granted." *Id.* (internal quotation marks omitted).

## III. DISCUSSION

Before this case was remanded to the District of Connecticut, the MDL court rejected the States' theory that "Greenstone equals Pfizer"—that Greenstone was Pfizer's "alter ego," and "the two corporations actually function[ ] as a single entity and should be treated as such"—at the motion to dismiss stage. *In re Generic Pharms.*, 2023 WL 2244685, at *6–7. The States appear to concede that they can no longer assert such a theory, arguing in their opposition brief that "[t]his case is not about corporate formalities or piercing corporate veils. Rather, Pfizer's conduct ties Pfizer to the collusion and provides grounds for direct liability." ECF No. 1024 at 9 (citation omitted)). The MDL court's decision remains the law of the case, and so I find that the States are foreclosed from holding Pfizer liable for Greenstone's conduct by piercing the corporate veil or by claiming that Nailor and Strzeminski—the Greenstone employees alleged to have conspired

13

with competitors to fix prices and allocate markets for the Drugs at Issue—were dual employees of Greenstone and Pfizer.[8]  *Arizona v. California,* 460 U.S. 605, 618 (1983) (the law of the case doctrine "posits that when a court decides a rule of law, that decision should continue to govern the same issues in subsequent stages in the same case"); *Deutsch v. Novartis Pharms. Corp.*, 768 F. Supp. 2d 420, 428 (E.D.N.Y. 2011) ("It is well-established that [o]rders issued by a federal transferee court remain binding if the case is sent back to the transferor court." (internal quotation marks omitted)).  The States now make two arguments: (1) that "Pfizer Directly Engaged in Anticompetitive Conduct for which it is Directly Liable," and (2) "Pfizer is Liable for the Actions of its Agent, Greenstone."  ECF No. 1024 at 6, 9.  Neither argument is persuasive on this record.  As such, a grant of summary judgment in Pfizer's favor on all claims is warranted.

### A.  Pfizer Did Not Directly Engage in Anticompetitive Conduct

The States first argue that Pfizer directly participated in the alleged conspiracies by "exercis[ing] significant control over the anticompetitive conduct at issue."  ECF No. 1024 at 6 (citing *United States v. Bestfoods*, 524 U.S. 51, 64–65 (1998) (direct liability available where "the alleged wrong can seemingly be traced to the parent through the conduit of its own personnel and management" and "the parent is directly a participant in the wrong complained of").[9]  On the current record, no reasonable jury could find this to be true.

---

[8] The States also allege that Pfizer and Greenstone "blurred" the identity of the employer of Greenstone personnel in support of their argument that Greenstone accepted its role as Pfizer's agent.  ECF No. 1024 at 12–14.  I address this argument below.

[9] Pfizer argues that the States' theory that Pfizer directly participated in the alleged conduct is an improper "attempt to bootstrap their already-rejected veil-piercing assertions."  ECF No. 1088 at 5.  I make no determination on the propriety of the States' direct participation theory because, even if it is proper, the States have not produced sufficient evidence to support it.

### 1. Shared Services

First, the States point to Pfizer's "shared services" business model, which included providing Greenstone employees with office space; human resources, IT, and legal support; and email addresses, as evidence that "Greenstone employees worked alongside and, in all practical respects, were treated as Pfizer employees." *Id.* at 7. To the extent the States attempt to argue that this evidence shows that Pfizer and Greenstone operated as a single entity, the States are foreclosed from asserting such a claim, as noted above. *See In re Generic Pharms.*, 2023 WL 2244685, at *6–7.

Nor does evidence of any "shared service" provide context from which to infer that Pfizer controlled Greenstone's alleged anticompetitive conduct, such that the "the alleged wrong can seemingly be traced to the parent through the conduit of its own personnel and management." *Bestfoods*, 524 U.S. at 64. The States fail to explain how, for instance, the provision of an "@pfizer.com" email address to Greenstone employees, or the fact that Greenstone's offices were located at Pfizer's campus, in any way furthered the alleged conspiracies or affected whether Pfizer's Regional President approved Greenstone's changes in drug prices. Because no reasonable jury would infer from Pfizer's provision of "shared services" that it participated in the alleged conspiracies, Pfizer's sharing of services is not evidence of its direct liability.

### 2. Approval of WAC Pricing

The States next argue that Pfizer is directly liable because it approved its subsidiary Greenstone's allegedly collusive WAC increases. But even if Pfizer exercised significant control over Greenstone's prices, this would not make it liable for antitrust violations without evidence that it participated in the alleged collusion itself—absent a finding that the control was so extensive as to warrant piercing the corporate veil, which, as noted, is foreclosed at this point. *Cf. Bestfoods*, 524 U.S. at 55, 68 (holding that under the Comprehensive Environmental Response,

15

Compensation, and Liability Act of 1980 "[c]ontrol of the subsidiary, if extensive enough, gives rise to indirect liability under piercing doctrine," but that a parent corporation that controls the operations of the subsidiary may not, "without more, be held liable as an operator of a polluting facility owned or operated by the subsidiary . . . unless the corporate veil may be pierced"). Among Greenstone and Pfizer employees, the evidence identifies only Nailor and Strzeminski as participating in interfirm communications. Even if Nailor or Strzeminski initiated a proposed price change, this proposal went first to Greenstone's Patterson, who obtained approval from Greenstone's general manager before also sending it to a Pfizer employee. ECF No. 1241 ¶ 79–81. Even if a jury were to infer from emails between Nailor and Patterson that Patterson was aware that Nailor was exchanging information with competitors (*see, e.g.*, ECF No. 945-1 at 178 (Nailor emailing Patterson "I have clinda market info" three minutes after speaking with a counterpart at Sandoz)), the evidence does not suggest that Patterson ever included the results of the collusion—such as assurances from competitors that they would follow a price increase—when she proposed price changes for Pfizer's approval. *See, e.g.*, ECF No. 1218-4 at 76 (Patterson email to Kennally explaining Greenstone's planned increase of Clindamycin solution in 2011). Because a jury would be unable to find that Pfizer was aware of any collusion by Greenstone when asked to approve Greenstone's price changes, it could not find Pfizer directly liable under this theory.

### 3. Versichele's Report of Collusion

The States also suggest that Kennally's failure to address Versichele's report of collusion is evidence that Pfizer was aware of Greenstone's collusive practices and that his alleged inaction "constituted de facto approval of and instructions to continue that activity." ECF No. 1241 ¶¶ 75–76. Putting aside the question whether Kennally's alleged inaction in response to Versichele's report could be grounds for a finding of direct liability, and even assuming a jury were to credit Versichele's testimony that she reported suspected collusive activity to Kennally, Versichele did

not testify that the reported collusion related to any of the Drugs at Issue.  Moreover, Versichele's December 2011 report to Kennally predates the allegations as to Clindamycin (2012, 2014),[10] Eplerenone (2014), and Latanoprost (2012), and so *could not* have been related to the Drugs at Issue in this case.

Viewed in the light most favorable to the States, Versichele's testimony is evidence that Pfizer was aware of some possible collusion by Greenstone in 2011, and suggests that Pfizer was on notice that any price increases following the interfirm communications reported by Versichele might also have been a product of collusion.  But the States cannot use evidence related to some unidentified collusion in 2011 to support an inference of participation in later anticompetitive conspiracies.  *See In re Elevator Antitrust Litig.*, 502 F.3d 47, 52 (2d Cir. 2007) (holding that "absent any evidence of linkage between such [other] conduct and conduct here[,]" merely suggesting that "if it happened there, it could have happened here[,]" is insufficient to support a Sherman Act claim); *Ross v. Am. Exp. Co.*, 35 F. Supp. 3d 407, 450 (S.D.N.Y. 2014) (finding that an illegal agreement cannot be inferred solely from a similarity in the manner of communications used in another conspiracy); *see also Sandoz, Inc.*, 2026 WL 1533866, at *24 ("Versichele's testimony is not direct evidence of an Eplerenone conspiracy because . . . she had already left Greenstone by the time the conspiracy allegedly began").  Thus, Versichele's testimony regarding her 2011 report to Kennally is not evidence that could support a finding of Pfizer (or Greenstone's) liability as to the Drugs at Issue.

### B.  A Jury Could Not Find That Greenstone Was Pfizer's Agent

The States next argue that Pfizer is liable for the conspiracies because Greenstone was

---

[10] As noted, I granted summary judgment to Greenstone as to the claims that it participated in a Clindamycin conspiracy in 2010–11, and as to the overarching conspiracy.

acting as Pfizer's agent when it participated in the alleged conspiracies. This theory also fails.

"A parent corporation may be liable under the agency theory for the acts of its subsidiary depending on the amount of control the parent corporation exercises over the actions of the subsidiary." *In re Suboxone (Buprenorphine Hydrochloride & Naloxone) Antitrust Litig.*, No. 13-MD-2445, 2017 WL 4810801, at *12 (E.D. Pa. Oct. 25, 2017). "Under this theory, the parent corporation will be liable for the activities of the subsidiary only if the parent dominates those activities," and "only the conduct shown to be instigated by the parent may be attributed to the parent." *In re Generic Pharms. Pricing Antitrust Litig.*, No. 16-md-2724, 2023 WL 2244685, at *7 (E.D. Pa. Feb. 27, 2023) (citing *Suboxone*). The MDL court allowed this basis for liability to proceed, noting that the States had alleged that "[n]ot only does Pfizer have to approve Greenstone's price increases, but it also directs Greenstone's strategy regarding the increases, and Greenstone always acts at the direction of Pfizer." *Id.* I find that the evidence is insufficient for a reasonable jury to conclude that Greenstone was Pfizer's agent.

"The three elements necessary to an agency relationship are (1) a manifestation by the principal that the agent will act for him; (2) acceptance by the agent of the undertaking; and (3) an understanding between the parties that the principal will be in control of the undertaking." *Johnson v. Priceline.com, Inc.*, 711 F.3d 271, 277 (2d Cir. 2013) (internal quotation marks and emphasis omitted).[11] The States fail to point to evidence satisfying any of these elements.

---

[11] The parties do not identify which state's law of agency applies to the claims against Greenstone and Pfizer. *Johnson* applied the law of Connecticut, which adopted the Second Restatement of Agency for guidance on the elements necessary to an agency relationship. 711 F.3d at 277. During the relevant period, Greenstone's principal place of business was in New Jersey, ECF No. 1053 ¶ 2, while Pfizer's global headquarters was in New York. ECF No. 1241 ¶ 2. The elements for an agency relationship under New York and New Jersey are similar to Connecticut law. *See, e.g.*, *N.Y. Marine & Gen. Ins. Co. v. Tradeline (L.L.C.)*, 266 F.3d 112, 122 (2d Cir. 2001) ("New York common law provides that an agency relationship results from a manifestation of consent by one person to another that the other shall act on his behalf and subject to his control, and the consent

The States contend that the evidence establishes the manifestation element because Greenstone existed for the sole purpose of acting on its parent company's behalf. ECF No. 1024 at 11. I disagree. It is true that a significant rationale for Greenstone's business was to act as the authorized generic manufacturer of Pfizer's branded drug products, which permitted Pfizer to recover some of the profits that otherwise would have gone to the exclusive first-to-file generics manufacturer for 180 days. ECF No. 1219-2 at 252 (Pfizer presentation slides noting that Greenstone's generic sales were "a financial play for Pfizer, to 'regain' revenues lost to generic challengers, primarily during 180-day exclusivity period"). But Greenstone also continued to sell its generics products after the 180-day window ended—including for the Drugs at Issue—once other competitors could seek regulatory approval to sell the same commodity. At that point, Greenstone became just one competitor among many. And while Pfizer may have limited Greenstone's autonomy in some ways, such as an apparent policy to follow competitors' price increases rather than lead them, *see id.*, the record does not suggest that Pfizer directed Greenstone's day-to-day business, including customer- or drug-specific bidding decisions, *see* ECF No. 1241 ¶¶ 55–58, 69. In short, Greenstone existed for the purpose of *selling generic drugs for profit* in addition to the strategic value that it provided to its parent company. Because Greenstone had a purpose outside of protecting Pfizer's branded sales during the exclusivity window, the States' contention that it existed for the sole purpose of acting on its parent company's behalf falls short. Further, because Greenstone exercised autonomy in how it conducted its business, and nothing in the record suggests that Pfizer "manifested" that Nailor or Strzeminski

---

by the other to act."); *Covington v. Int'l Ass'n of Approved Basketball Offs.*, 710 F.3d 114, 120 (3d Cir. 2013) (applying New Jersey law: "An agency relationship is created when one party consents to have another act on its behalf, with the principal controlling and directing the acts of the agent."). As such, there is no conflict of law, and I need not determine which state law applies.

was acting on its behalf when they communicated with competitors, no reasonable jury could find that Pfizer expressed any intention that Greenstone would act for it in allegedly entering into agreements with competitors to follow price increases.

The States argue that the evidence also establishes the acceptance element because Greenstone agreed to exclusively distribute generic versions of Pfizer products. ECF No. 1024 at 12–13. As the States point out, an agency relationship, if not explicit, may be inferred from "the situation of the parties, their relations to one another, and the business in which they are engaged; the general usages of the business in question and the purported principal's business methods; the nature of the subject matters and the circumstances under which the business is done." *Cleveland v. Caplaw Enters.*, 448 F.3d 518, 522 (2d Cir. 2006). But here the parties expressly disclaimed an agency relationship. ECF No. 1241 ¶ 29 (citing distribution agreements that provide that "neither the making of this Agreement nor the performance of any of the provisions hereof will be construed to make either party an agent, employee or legal representative of the other"). Although such disclaimers are not dispositive, the circumstantial evidence that the States highlight does not contradict this disclaimer. For example, the States point to the shared services between Pfizer and Greenstone in contending that Greenstone "integrat[ed] seamlessly into Pfizer's existing operation." ECF No. 1024 at 12. But these services and shared back-office functions are typical of many parent-subsidiary relationships and have no bearing on whether Greenstone accepted its role as an agent for Pfizer.

Finally, the States argue that the evidence establishes the control element because each Greenstone increase of a WAC price required Pfizer's approval, and because Pfizer controlled

other strategic decisions relating to Greenstone's business, such as timing of entry into a market.[12] ECF No. 1024 at 14–15.  A parent company's approval of a subsidiary's major decisions, without more, does not constitute the requisite degree of control to impute liability to the parent for the subsidiary's conduct. *See Suboxone*, 2017 WL 4810801, at *11–12 (dismissing agency claims against parent company because the "mere fact that [the parent] bears responsibility for the management of the day-to-day operations of the [subsidiary], strategic planning of the [subsidiary], and supervising subsidiary teams does not create any reasonable inference that [the parent] either directed or perpetuated the alleged anticompetitive conduct by [the subsidiary]."); *see also Fletcher v. Atex, Inc.,* 68 F.3d 1451, 1460 (2d Cir. 1995) (oversight in the form of "a parent's general executive responsibilities for its subsidiary's operations[,] includ[ing] approval over major policy decisions . . . [i]s insufficient to demonstrate domination and control" on an alter ego theory (citing *Akzona Inc. v. E.I. Du Pont De Nemours & Co.*, 607 F. Supp. 227, 237 (D. Del. 1984) (internal quotation marks omitted))).

Here, the evidence does not suggest that Pfizer was involved in Greenstone's pricing decisions beyond mere approval of WAC price changes and strategic planning.  The evidence does not suggest, for instance, that Pfizer directed or recommended Greenstone to take any price

---

[12] In addition, the States argue that the "financial structure" between the two companies, as evidenced by Pfizer's retaining liability for any judgment that might be entered against Greenstone in this lawsuit, as well as "Pfizer's imposition of its own reporting and compliance system on Greenstone employees," demonstrate Pfizer's control.  ECF No. 1024 at 15–16.  Pfizer's agreement to indemnify Greenstone was apparently reached in the negotiations surrounding its decision to spin off the company—which occurred in 2020, years after the alleged anticompetitive conduct in this case.  ECF No. 1031 ¶¶ 106–07; ECF No. 1219-4 at 60.  There could have been many reasons for such an agreement—including that Greenstone's acquiror refused to accept a potential liability stemming from conduct years earlier.  In any event, such an agreement does not suggest that Greenstone was Pfizer's agent at the time it engaged in the alleged conduct.  And the reporting and compliance system is just more evidence of shared services between the two companies which, as noted, are not suggestive of an agency relationship.

increase, to pursue or concede any customer, or to communicate or exchange information with competitors.    That is the conduct that underlies the States' claims related to Eplerenone, Latanoprost, and Clindamycin.  *See Manchester Equip. Co. v. Am. Way*, 60 F. Supp. 2d 3, 9 (E.D.N.Y. 1999) (even though wholly owned subsidiary acted as agent of parent with respect to parent's interstate transportation business, it was not parent's agent with respect to storage services that were the subject of plaintiff's claim).  Moreover, the States base their Latanoprost claims on Greenstone's and its competitors' parallel increases to *contract* prices within the same month. *Sandoz, Inc.*, 2026 WL 1533866, at *26.  Pfizer's approval, however, was required only for increases in Greenstone's WAC (non-contract) prices, and Greenstone did *not* seek Pfizer's approval to changes its customers' contract prices. ECF No. 1241 ¶¶ 102–05.  Because it did not even have to approve the allegedly collusive Latanoprost price change, no reasonable jury could find that Pfizer controlled all of Greenstone's pricing decisions relevant to the alleged conduct. Further, the States point to no evidence that Pfizer was even aware of the interfirm communications between Nailor and Strzeminski and Greenstone's competitors that preceded the price movements of the Drugs at Issue.  In sum, the evidence does not suggest that Pfizer "instigated" the alleged anticompetitive conduct. *Generic Pharms. Pricing*, 2023 WL 2244685, at *7.  And it fails to create "any reasonable inference that" Pfizer "directed or perpetuated the alleged anticompetitive conduct" of Greenstone. *Suboxone*, 2017 WL 4810801, at *12.

For these reasons, even when construing the evidence in the light most favorable to the States, I find that a jury would be unable to find that Greenstone was Pfizer's agent.  Because the States point to no evidence that Pfizer itself participated in any illegal conduct, I GRANT Pfizer's motion for summary judgment and dismiss all claims against it.

22

## IV. CONCLUSION

Because there is no evidence from which a reasonable jury could find that Pfizer participated in conspiracies related to Eplerenone, Latanoprost, and Clindamycin Phosphate, or the overarching conspiracy, the Motion for Summary Judgment is granted. All claims against Pfizer are dismissed with prejudice.


IT IS SO ORDERED.

/s/
Michael P. Shea, U.S.D.J.

Dated: Hartford, Connecticut
June 23, 2026