**UNITED STATES DISTRICT COURT**
**DISTRICT OF CONNECTICUT**

|  |  |
|---|---|
| THE STATE OF CONNECTICUT; THE STATE OF ALASKA; THE STATE OF ARIZONA; THE STATE OF ARKANSAS; THE STATE OF CALIFORNIA; THE STATE OF COLORADO; THE STATE OF DELAWARE; THE DISTRICT OF COLUMBIA; THE STATE OF FLORIDA; THE STATE OF GEORGIA; THE TERRITORY OF GUAM; THE STATE OF HAWAII; THE STATE OF IDAHO; THE STATE OF ILLINOIS; THE STATE OF INDIANA; THE STATE OF IOWA; THE STATE OF KANSAS; THE COMMONWEALTH OF KENTUCKY; THE STATE OF LOUISIANA; THE STATE OF MAINE; THE STATE OF MARYLAND; THE COMMONWEALTH OF MASSACHUSETTS; THE STATE OF MICHIGAN; THE STATE OF MINNESOTA; THE STATE OF MISSISSIPPI; THE STATE OF MONTANA; THE STATE OF NEBRASKA; THE STATE OF NEVADA; THE STATE OF NEW HAMPSHIRE; THE STATE OF NEW JERSEY; THE STATE OF NEW MEXICO; THE STATE OF NEW YORK; THE STATE OF NORTH CAROLINA; THE STATE OF NORTH DAKOTA; THE COMMONWEALTH OF THE NORTHERN MARIANA ISLAND; THE STATE OF OHIO; THE STATE OF OKLAHOMA; THE STATE OF OREGON; THE COMMONWEALTH OF PENNSYLVANIA; THE COMMONWEALTH OF PUERTO RICO; THE STATE OF RHODE ISLAND; THE STATE OF SOUTH CAROLINA; THE STATE OF TENNESSEE; THE STATE OF UTAH; THE STATE OF VERMONT; THE COMMONWEALTH OF VIRGINIA; THE STATE OF WASHINGTON; THE STATE OF WEST VIRGINIA; THE STATE OF WISCONSIN; and U.S. VIRGIN ISLANDS, <br><br> *Plaintiffs*, <br><br> v. | No. 3:20-cv-00802-MPS |

SANDOZ, INC.; ACTAVIS HOLDCO US, INC.;
ACTAVIS ELIZABETH LLC; ACTAVIS
PHARMA, INC.; AMNEAL
PHARMACEUTICALS, INC.; AMNEAL
PHARMACEUTICALS, LLC; ARA
APRAHAMIAN; AUROBINDO PHARMA U.S.A.,
INC.; BAUSCH HEALTH AMERICAS, INC.;
BAUSCH HEALTH US, LLC; MITCHELL
BLASHINSKY; DOUGLAS BOOTHE; FOUGERA
PHARMACEUTICALS INC.; GLENMARK
PHARMACEUTICALS INC., USA; JAMES (JIM)
GRAUSO; GREENSTONE LLC; G&W
LABORATORIES, INC.; WALTER
KACZMAREK; ARMANDO KELLUM; LANNETT
COMPANY, INC.; LUPIN PHARMACEUTICALS,
INC.; MALLINCKRODT INC.; MALLINCKRODT
LLC; MALLINCKRODT plc; MYLAN INC.;
MYLAN PHARMACEUTICALS INC.; KURT
ORLOFSKI; MICHAEL PERFETTO; PERRIGO
NEW YORK, INC.; PFIZER INC.; SUN
PHARMACEUTICAL INDUSTRIES, INC.; TARO
PHARMACEUTICALS USA, INC.; TELIGENT,
INC.; ERIKA VOGEL-BAYLOR; JOHN
WESOLOWSKI; and WOCKHARDT USA LLC,

     *Defendants*.

**RULING ON MOTION FOR SUMMARY JUDGMENT**

In this action, the Plaintiffs, the Attorneys General of most of the States and several U.S. territories ("the States"), allege that thirty-six pharmaceutical companies and executives ("the Defendants") each participated in a series of conspiracies, as well as an overarching conspiracy, to fix prices, allocate markets, and rig bids in the sale of dozens of generic drug products. Defendants Actavis Holdco U.S., Inc., Actavis Pharma, Inc., and Actavis Elizabeth, LLC (collectively, "Actavis") moved for partial summary judgment on claims that they participated in certain product-specific conspiracies. ECF No. 995; *see also* ECF No. 1008 (Defendants' Joint Memoranda in Support of Defendant-Specific Motions for Summary Judgment). For the reasons set forth below, I **GRANT IN PART AND DENY IN PART** the motion for summary judgment.

1

Specifically, the motion is granted as to the States' claims that Actavis unlawfully conspired with regard to (1) Ammonium Lactate cream and lotion, (2) Desonide lotion in 2011, and (3) Fluocinonide solution with Sandoz. As to all other drugs for which Actavis seeks summary judgment, including claims related to Desonide lotion in 2013 and a market-allocation agreement with Taro on Fluocinonide solution, the motion is denied.

## I. BACKGROUND

### A. Procedural Background

This is one of three cases in which the Attorneys General of the States have sued scores of defendants in the generic drug industry for alleged antitrust violations and unfair trade practices. All three cases were originally filed in this Court but were transferred to the Eastern District of Pennsylvania (the "MDL Court"), which was designated by the Judicial Panel on Multidistrict Litigation (the "JPMDL") to preside over these and other similar cases brought by private parties in a consolidated proceeding. ECF No. 9.[1] In April 2024, these three cases were remanded to this Court by the JPMDL and assigned to me. ECF No. 11. The operative complaint in this case, ECF No. 196, alleges collusion in the pricing, market allocation, and bidding for some eighty generic drugs, chiefly for dermatological applications. The parties refer to it as "the Dermatology complaint."

This ruling addresses Actavis's Defendant-specific motion for partial summary judgment on the States' claims that it unlawfully conspired with competitors to fix prices, allocate the markets, or rig bids for nine drug products. The Defendants have also filed a Joint Memorandum

---

[1] Unless otherwise indicated, all ECF numbers in this ruling refer to entries on the docket of this case, not the same case when it was before the MDL Court, and each page number refers to the page number shown on the ECF stamp on the top of the cited page, not the page of the relevant brief or pleading designated by the parties.

that addresses the pertinent legal standard and argues that the Defendants are entitled to summary judgment on particular state-law claims.  ECF No. 1008.  This ruling will address arguments made in the Joint Memorandum where they are applicable to Actavis.  I also will consider the briefs related to motions for summary judgments filed by other defendants where applicable.

### B.  Factual Background

In the ruling on the States' claim regarding an overarching conspiracy, I discussed the evidence underpinning the States' claims against all corporate Defendants, and I incorporate that description here.  *Connecticut v. Sandoz, Inc.*, No. 20-cv-802, 2025 WL 3470502, at *1–14 (D. Conn. Dec. 3, 2025).  I now address the evidence specific to Actavis's participation in alleged conspiracies related to nine drugs: Ammonium lactate cream and lotion, Ciclopirox shampoo, Desonide lotion, Fluocinonide solution, Nystatin ointment, Metronidazole cream and lotion, and Terconazole cream.  Actavis does not identify any facts that distinguish its potential liability for the alleged conspiracies related to the cream and lotion formulations of Ammonium lactate and Metronidazole, and so I will address the two formulations for those drugs together.  The following facts are undisputed unless otherwise noted.

### 1.  Key Actavis Personnel

From 2003 to 2012, Michael Perfetto oversaw Actavis's pricing and bidding for generic drugs as vice president of sales and marketing.  ECF No. 1050–1 ¶¶ 1, 7; ECF No. 1268 ¶ 1 (Statement of Facts related to Perfetto's Motion of Summary Judgment).  Ara Aprahamian worked for Perfetto at Actavis.  ECF No. 1050–1 ¶ 3.  In 2012, as Watson Pharmaceuticals was in the process of acquiring Actavis, Perfetto and another marketing executive, Ara Aprahamian, prepared to leave Actavis and join a competitor, Taro.  ECF No. 1050–1 ¶¶ 2–3.  Watson completed its

acquisition of Actavis on November 1, 2012, and the combined company took the name Actavis.[2] *Id.* ¶ 5.  Perfetto formally left Actavis to join Taro on December 31, 2012, and Aprahamian followed on March 12, 2013.  *Id.* ¶¶ 7–8.  Andy Boyer oversaw Actavis's generic drug pricing and bidding following the departure of Perfetto.  *Id.* ¶ 6.

### 2.  Drugs for Which the States Have Direct Evidence as to Actavis

The States's cooperating witnesses testified that Actavis was part of unlawful anticompetitive agreements related to Ciclopirox shampoo, Desonide lotion, and Metronidazole cream and lotion.  These witnesses are Christopher Bihari and Anthony Thomassey, who were both National Account Executives with sales responsibilities at Fougera until its 2012 acquisition by Sandoz.  ECF No. 1080-1 ¶¶ 44–45, 655.  Following Sandoz's acquisition, Bihari stayed on with Sandoz in a similar role as a Director of National Accounts, *id.* ¶ 655, while Thomassey accepted a job offer from Aurobindo,  ECF No. 965-1 at 317.

### a.  Ciclopirox Shampoo

Ciclopirox Shampoo is used to treat seborrheic dermatitis, an inflammatory skin condition of the scalp.  ECF No. 1080-1 ¶ 518.  Bihari testified that he helped to implement agreements between Sandoz and both of its competitors, Actavis and Perrigo, to fix prices and allocate customers for Ciclopirox shampoo as Sandoz was preparing to enter the market.  ECF No. 964-1 at 868.  He testified that he took part in back-to-back calls with Perrigo's Tony Polman and Actavis's Aprahamian on November 28, 2012 to obtain his competitors' pricing information, and that he passed this information on to Michael Vezza, who managed Sandoz's pricing team.  *Id.* at 867; ECF No. 965-1 at 768.  Bihari testified that he spoke with Aprahamian the next day,

---

[2] The evidence in the record suggests that the company was still frequently referred to as "Watson" after its name change.  I will refer to the combined company only as "Actavis."

November 29, about which customers Sandoz would target upon its entry. ECF No. 964-1 at 867. By the following day, November 30, Sandoz had sent offers for Ciclopirox shampoo offers to McKesson, which it identified as a Perrigo customer, and HD Smith and Walmart, which it identified as Actavis customers. ECF No. 951-1 at 265. Sandoz was awarded HD Smith's business on December 4, 2012; it also obtained McKesson's business. ECF No. 971-2 at 501; ECF No. 958-1 at 98 (native exhibit provided to the Court).

Asked to describe the agreement between Sandoz and Actavis concerning Ciclopirox shampoo, Bihari testified "that Actavis would relinquish certain customers. Pricing was provided. And it was to ensure that pricing was kept high in the market, but still lower than Actavis's dead net [price] to ensure that Sandoz's offer was successful." ECF No. 964-1 at 868. He described the Ciclopirox agreement between Sandoz and Perrigo as "to provide Sandoz with market share targets or customer pricing and to ensure that the pricing that Sandoz submitted . . . was . . . low enough to trigger a [right of first refusal] but also ensure that Sandoz kept the price high." *Id.*

In his deposition, Aprahamian invoked the Fifth Amendment in response to questions about Ciclopirox shampoo, including whether Actavis and Sandoz had an agreement to allocate customers, and whether the agreement resulted in higher prices. ECF No. 964-1 at 131.

### b. Desonide Lotion

As previously discussed in the overarching conspiracy ruling, Bihari also testified about an agreement under which Sandoz would cede customers for Desonide lotion to Actavis upon Actavis's reentry into the market in 2013. *See Sandoz, Inc.*, 2025 WL 3470502, at \*10.

Bihari testified that Actavis's Aprahamian told him on calls in October 2012 that Actavis was experiencing a supply issue that would keep it out of the Desonide lotion market for at least three months, during which time Sandoz would be the only supplier. ECF No. 964-1 at 843–45. Bihari testified that this information was useful to Sandoz because it permitted the company to

"raise the pricing for all existing customers and any new business, either secured at a higher price or charge WAC [Wholesale Acquisition Cost] for those new customers." *Id.* at 845.  Bihari relayed this information to Vezza, the pricing team manager, who responded that Sandoz "should discuss the potential for price increase on this." *Id.* at 844.  Bihari was informed on December 4, 2012 that Sandoz was increasing its WAC and contract prices, effective the following day. *Id.* at 846. On the same day, Bihari called Aprahamian and provided him with information regarding Sandoz's Desonide lotion price increase.  ECF No. 964-1 at 846.  Bihari did this, he testified, "[s]o that he's aware, and then when Actavis reenters the market, they reenter at a higher contract price and higher WAC [price]." *Id.*  Bihari also testified that he spoke to Sandoz executive Armando Kellum about his conversation with Aprahamian. *Id.* at 846.  Bihari also testified that he and Aprahamian agreed that when Actavis reentered the market, "Sandoz would cede market share to [Actavis]. . . . Sandoz did.  And it was at a higher . . . WAC, higher contract price.  And part of that agreement was Sandoz wouldn't challenge any offers to customers that Actavis . . . sent offers to.  [Sandoz] would relinquish the share." *Id.* at 1029.  Bihari testified that he and Aprahamian did not discuss specific customers, but that they had "an understanding that there would be a price increase, both WAC and contract, and [Aprahamian] knew that [Actavis] would then reenter at a higher price point, and they would recover their share, be it the same -- perhaps the same customers, but  definitely at the same percentage share." *Id.* at 1030.

Although Aprahamian left Actavis before the company reentered the market in 2013, Bihari testified that Aprahamian was still "facilitating or brokering Actavis's relaunch in the market, helping them out on their behalf," five months after he began working for Taro. *Id.* at 1030.  This role included informing Bihari when Actavis was prepared to reenter the market. *Id.* In return, Bihari testified, he told Aprahamian that he "would share the information of their reentry

into the market and, you know, Sandoz would relinquish the appropriate share or customers that [Actavis is] asking. I conveyed the information he had shared with me in those conversations to Sandoz." *Id.* at 1031. Bihari testified there was an agreement between Sandoz and Actavis even though he never spoke to anyone else at Actavis, as Aprahamian served as an "intermediary" between Sandoz and Actavis. ECF No. 964-1 at 848, 1030.

Upon Actavis's reentry in August 2013, Sandoz relinquished three customers to Actavis, but did so "w[ith]out lowering [market] pricing." ECF No. 950-1 at 157, 160.

Aprahamian invoked his right against self-incrimination under the Fifth Amendment in response to all questions about the Drugs at Issue, including questions about his communications with Bihari and whether he acted as a "conduit" between Actavis and Sandoz. ECF No. 964-1 at 125–27. At a deposition in 2023, Sandoz executive Kellum invoked the Fifth Amendment when asked if Sandoz and Actavis reached an agreement on Desonide lotion. ECF No. 964-1 at 3345–46. Although he later withdrew his assertion of the Fifth Amendment in the MDL, he has not indicated that he seeks to do so in this case.[3] Nevertheless, Actavis presented as evidence

---

[3] In a previous ruling, I assumed that Kellum continues to invoke the Fifth Amendment here because he has not sought leave to withdraw his invocation in the cases before me. *See Connecticut v. Sandoz, Inc.*, No. 20-cv-802, 2026 WL 75851, at *11 n.8 (D. Conn. Jan. 9, 2026). Co-defendants Mylan and Aurobindo both objected to this assumption in motions for reconsideration. ECF Nos. 1164, 1165. In denying these motions, I noted that my decisions to deny summary judgment did not rest on adverse inferences from Kellum's Fifth Amendment invocations. ECF No. 1339. I made no findings as to whether he has withdrawn his invocation because that determination was not required to deny reconsideration. I make no such findings here either. But courts may draw adverse inferences from Fifth Amendment invocations even when the witness later withdraws the invocation. *SEC v. Cassano*, 2000 WL 1512617, at *2 n.1 (S.D.N.Y. Oct. 11, 2000) ("The fact that . . . these witnesses subsequently have waived the privilege in this action goes to the weight of the [adverse] inference, not to the propriety of drawing it."); *see also Penfield v. Venuti*, 589 F. Supp. 250, 256 (D. Conn. 1984) (Cabranes, J.) (allowing jury to draw adverse inference against defendant after he invoked the privilege at first deposition but later testified at subsequent deposition, noting that "[a] trier of fact could also infer that his later responses were a more recent fabrication"); *SEC v. Dibella*, No. 04 CV 1342, 2007 WL 1395105, at *4 (D. Conn. May 8, 2007) (allowing jury to draw adverse inference against defendant who invoked the privilege at three

testimony that Kellum gave in the MDL in 2025 in which he testified that he was not aware of anyone at Sandoz attempting to enter into a price-fixing or customer-allocation agreement with Actavis.  ECF No. 969-1 at 1837–38, 1841–42.

> c.  Metronidazole Cream and Lotion

Anthony Thomassey testified that his employer Fougera agreed with competitors Actavis and G&W to fix prices on Metronidazole cream and lotion in 2011.  ECF No. 965-1 at 414.  Asked to describe the agreement, Thomassey testified that it was "[t]o allocate market share and keep the price as high as possible."  *Id.*  Thomassey further testified that his boss, Walter Kaczmarek, directed him to reach out to G&W vice president Jim Grauso, *id.* at 409, and that Grauso coordinated the three suppliers' price increases with Thomassey and Actavis's Perfetto, *id.* at 411–12.

On July 6 and 7, 2011, Actavis's Perfetto spoke with G&W vice president Jim Grauso three times.  ECF No. 945-1 at 107.  On July 8, 2011, Actavis internally discussed price increases for Metronidazole cream and lotion.  *Id.* at 109.  On July 22, 2011, Actavis increased its WAC prices for the lotion by 189 percent and the cream by 278 percent.  ECF No. 1050-1 ¶ 54; States' Statement of Additional Material Facts ("SAMF"), *id.* ¶ 10. On Saturday, July 23, 2011, Thomassey spoke with G&W's Grauso twice for a total of eighteen minutes.  ECF No. 946-1 at 128.  In the morning on the following Monday, Thomassey twice called his boss, Kaczmarek.  *Id.* Following the second call, Thomassey immediately called G&W's Grauso; minutes later, Kaczmarek exchanged two calls with David Klaum, a senior vice president at Fougera.  *Id.*

---

investigative interviews but later waived the privilege); *SEC v. Herman,* No. 00 Civ. 5575, 2004 WL 964104, at *7 (S.D.N.Y. May 5, 2004) (negative inference drawn where defendants invoked privilege during investigative testimony but later testified during deposition).  As discussed below, I do draw adverse inferences from Kellum and Aprahamian's invocations of the Fifth Amendment with respect to certain drugs, and I cite the invocation as one factor in denying summary judgment.

Immediately after his second call with Klaum, Kaczmarek emailed colleagues a plan to increase Fougera's Metronidazole cream and lotion prices to match Actavis's prices. ECF No. 958-1 at 86–87.

On July 26, 2011, Fougera followed Actavis's increase. *Id.* ¶ 55. On the same day, G&W's Grauso called Fougera's Thomassey and then called Actavis's Perfetto ten minutes later. ECF No. 948-1 at 45. Grauso exchanged further calls with Thomassey, and Perfetto later that day, and Grauso's boss, G&W president Kurt Orlofski, sent a text message to Actavis's Perfetto. *Id.* Grauso exchanged ten more calls with Fougera's Thomassey and Actavis's Perfetto over the next two days, July 27 and July 28. ECF No. 948-1 at 47, 49. Thomassey testified that his calls with Grauso on July 28 concerned "who [G&W] should target and what price [G&W] should go at." ECF No. 965-1 at 413. Also on July 28, 2011, G&W followed Actavis and Fougera's increase on Metronidazole cream.[4] ECF No. 1050-1 ¶ 56.

Thomassey also testified that on July 29, 2011, he called Grauso from his cell phone while simultaneously speaking to his boss, Kaczmarek, on his home office line "to hash out market share and pricing on Metronidazole." ECF No. 965-1 at 413.

Perfetto testified that he "d[id] not remember what [he] discussed on these calls in mid to late July of 2011." ECF No. 964-1 at 5675–77. Grauso testified that he did not recall having any communications with employees of Fougera or Actavis or the topics discussed on calls with Thomassey and Perfetto. *Id.* at 2599.

Kaczmarek testified that he was not aware that his subordinates—and specifically Thomassey—were communicating with competitors about pricing and allocating customers, and he denied directing his subordinates, including Thomassey, to do so. ECF No. 1080-1 ¶ 396; ECF

---

[4] G&W did not sell Metronidazole lotion. ECF No. 1050-1 ¶ 52.

No. 964-1 at 3004–05.  Upon viewing video of this portion of Kaczmarek's testimony, Thomassey testified that "[a]bsolutely, 100 percent he is lying" and that "[e]very single question that was asked that [Kaczmarek] said 'no' are yes answers.  He was directing me at every turn."  ECF No. 1080-1 ¶ 396; ECF No. 965-1 at 405.

### 3.  Drugs for Which the States Lack Direct Evidence as to Actavis

#### a.  Ammonium Lactate Cream and Lotion

I have already described the facts concerning Ammonium lactate cream and lotion in the ruling on Taro's motion for summary judgment, ECF No. 1410 at 20–25, and I incorporate those facts by reference.  The States allege that Taro conspired with Perrigo and Actavis to raise the price of both Ammonium lactate products in May 2013.  *Id.* at 20.

In addition to the facts related in the Taro ruling, the States, in connection with this motion, point to calls between the three active competitors for Ammonium lactate cream—Actavis, Taro, and Perrigo—between March 7 and March 21, 2013.  SAMF ¶¶ 78, 80–82.  On March 26, 2013, Actavis internally discussed a plan to increase its direct contract price from $6.90 to $14.12 on Ammonium lactate cream (280g) and $3.45 (225g) / $6.67 (400g) to $5.76 / $10.24 on Ammonium lactate lotion, with the new prices to go into effect on April 25, 2013.  *Id.* ¶ 83.  Then, following more interfirm communications in April between Actavis, Taro, and Perrigo,  *id.* ¶¶ 85-86, Taro on May 1 increased its direct contract prices from $4.90 to $21.25 on Ammonium lactate cream (280g) and $4.39 (225g) / $6.61 (400g) to $20.30 / $31.95 on Ammonium lactate lotion.  *Id.* ¶ 87.

#### b.  Fluocinonide Solution

Fluocinonide is a corticosteroid used to treat a variety of skin conditions. ECF No. 1080-1 ¶ 305.  The States allege that Actavis, Sandoz, and Taro colluded to allocate customers upon Actavis's entry into the market in 2013.  ECF No. 196 ¶¶ 781–87.

Throughout April 2013 and on May 1, 2013, Aprahamian and Perfetto, both then with Taro, exchanged multiple calls with Michael Dorsey, a Director of National Accounts at Actavis. ECF No. 945-1 at 23, 40. Perfetto also called another Actavis employee, Thad Demos, four times from April 16 to April 18, 2013, and again on May 10, 2013, a call that lasted eleven minutes. ECF No. 961-1 at 221. Between April 20 and 23, 2013, Taro's Aprahamian and Perfetto attended the industry NACDS conference alongside Actavis executives. ECF No. 952-1 at 9; ECF No. 958-1 at 68, 108–09.

On May 14, 2013, Taro's Perfetto wrote in an internal email, "I expect Actavis to be in [the Fluocinonide solution] market . . . very soon." ECF No. 953-1 at 78.

On June 17, 2013, Actavis filed paperwork with the FDA to launch Fluocinonide solution the following month. ECF No. 952-1 at 572. Actavis targeted twenty to twenty-five percent of the market at launch. *Id.* at 552.

On June 17, 2013, Rick Rogerson of Actavis called Taro's Aprahamian. *Id.* at 15. Two days later, on June 19, Aprahamian exchanged two brief calls with Sandoz's Bihari. *Id.* Twenty minutes after his second call with Bihari, Aprahamian called Rogerson, and they spoke for about twelve minutes. *Id.* About an hour later, Bihari called Aprahamian, and they spoke for about fifteen minutes. *Id.* In notes of these calls that he took contemporaneously, Bihari wrote that Aprahamian told him that Actavis would launch Fluocinonide solution within thirty days. ECF No. 950-1 at 41; ECF No. 964-1 at 936 (Bihari testimony regarding his notes). Bihari and Aprahamian spoke three more times on June 27, 2013. ECF No. 961-1 at 221.

In his deposition, Aprahamian invoked the Fifth Amendment in response to questions about whether he and Bihari discussed ceding market share to Actavis, and whether he acted as a

11

"conduit" to "pass information between Sandoz and Actavis regarding Actavis's launch."  ECF No. 964-1 at 184.

On July 2, 2013, Aprahamian called Actavis's Dorsey and they spoke for about thirty-nine minutes.  ECF No. 952-1 at 15.  Aprahamian invoked the Fifth Amendment when asked in his deposition whether Dorsey indicated on this call which customers Actavis was targeting.  ECF No. 964-1 at 185.

On July 5, 2013, before it had publicly announced that it was entering the market, Actavis sent an offer on Fluocinonide solution to customer ABC, then a Taro customer.  ECF No. 952-1 at 549.  Actavis's bid was 24.8 percent lower than ABC's contract with Taro.  ECF No. 1050-1 ¶ 24.  By July 8, 2013, Actavis also submitted a bid for Walgreens, then a Sandoz customer.  ECF No. 1230-29 at 2–3.

On July 9, 2013, ABC notified Taro of a competing bid on Fluocinonide solution (without identifying the bidder) and asked if Taro wished to exercise its right of first refusal to retain the business.  ECF No. 952-1 at 17; ECF No. 1050-1 ¶ 59.  That afternoon, Taro's Howard Marcus wrote an email to Aprahamian and copying Perfetto, noting that the market was split between Taro and Sandoz, and that with Actavis's entry, Taro would "need to give up some market share if [ABC] is one of the accounts you want to offer up."  ECF No. 952-1 at 17.  The next day, July 10, Aprahamian called three Actavis employees, including Demos.  ECF No. 961-1 at 221.  On July 11, Aprahamian responded to Marcus's email, writing that Taro would not be retaining ABC's business.  ECF No. 964-1 at 185, 4502.[5]  On July 12, Aprahamian notified ABC that Taro would not lower its price; as a result, the customer responded that it would be switching suppliers.  ECF

---

[5] Aprahamian's reply was used as an exhibit during the depositions of Aprahamian and Howard but the email itself does not appear to have been included in the summary judgment record.

No. 953-1 at 43–44. On the same day, ABC informed Actavis that it had won the business on Fluocinonide solution. ECF No. 952-1 at 549.

When asked in his deposition whether Taro ceded ABC's business as part of an agreement with competitors, Aprahamian invoked the Fifth Amendment. ECF No. 964-1 at 185. Marcus invoked the Fifth Amendment when asked during his deposition whether a temporary supply issue, which was slated to be resolved the following week, "was not the reason for Taro's . . . declining to bid on [ABC]'s business for fluo solution." *Id.* at 4503.

On July 8, 2013, Actavis's Dorsey proposed bidding for the business of Omnicare, which he described as a "nice small account from Taro." ECF No. 1230-27 at 3. Four days later, Dorsey was informed that because Actavis had just won Taro's ABC business, "a revised lower offer to Omnicare depends upon if we get an award from Walgreens. If Walgreens is a no, then we will give Omnicare a lower price. If yes, then we will not need another customer, thus no need to lower the market price." *Id.* at 2.

On July 22, 2013, Actavis publicly announced that it had launched Fluocinonide solution. ECF No. 970-2 at 1438. Following the launch, customers CVS and McKesson asked Actavis if it would submit bids, ECF No. 952-1 at 547, 556, but the evidence does not reflect that Actavis submitted a bid to either customer. On July 30, 2013, as Actavis was targeting customers, Dorsey wrote an internal email to a superior suggesting that Actavis bid for customer PBA, noting that "PBA has both Taro and Sandoz [as suppliers] and move about 50–60 [units] per month, even split. [PBA] would move one [supplier] out; either way wouldn't upset the apple cart." ECF No. 952-1 at 544.

13

On August 1, 2013, Actavis submitted another bid for Sandoz's customer Walgreens with a contract price of $63.00, slightly higher than Sandoz's contract price of $61.28. ECF No. 1050-1 ¶ 28.

On August 16, 2013, customer OptiSource informed both Taro and Sandoz that it had received a Fluocinonide solution offer from Actavis. ECF No. 952-1 at 21; ECF No. 970-2 at 1452. On August 19, 2013, Taro informed OptiSource that it was staying with its current pricing and did not make a bid. ECF No. 952-1 at 20. Also on August 19, Aprahamian exchanged four calls with Actavis's Dorsey, with two calls lasting for nine and seven minutes, respectively. *Id.* at 11. On August 27, 2013, Sandoz's Michael Vezza wrote to Bihari that OptiSource had Sandoz's best price and if the customer "does not like it, we will have to relinquish to Actavis." Bihari responded, "We have to do better. Actavis is at the same [net price]. Can you lower by another buck or so?" ECF No. 970-2 at 1454. OptiSource accepted Sandoz's offer. ECF No. 970-2 at 1462.

On September 5, 2013, Actavis submitted another bid to Walgreens with a contract price of $57.90. ECF No. 1050-1 ¶ 30. On September 19, 2013, Walgreens informed Sandoz that it had awarded its Fluocinonide solution business to Actavis. ECF No. 970-2 at 1464. In response to this email, Sandoz executive Kellum wrote internally, "????," to which Sandoz's sales director replied, "This is old and we had discussed. I just wanted to have a paper trail from [Walgreens]." *Id.* at 1466. Kellum replied, "Not good." *Id.*

Kellum initially invoked the Fifth Amendment when asked if Sandoz and Actavis reached agreements to fix prices and allocate customers. ECF No. 964-1 at 3214. He later testified that he was not aware of anyone at Sandoz attempting to enter into a price-fixing or customer-allocation agreement with Actavis. ECF No. 969-1 at 1837–38, 1841–42.

14

Taro's Aprahamian invoked the Fifth Amendment when asked whether Taro and Sandoz had an agreement regarding Fluocinonide solution. ECF No. 964-1 at 186.

Sandoz's Vezza testified that he could not recall whether there was an agreement to fix prices or allocate customers on fluocinonide solution, though he also noted that such conduct "was happening on a regular basis" while he worked at Sandoz. ECF No. 965-1 at 898–99.

After obtaining ABC and Walgreens, Actavis reached its goal with a 24.1 percent share of the market. ECF No. 959-1 at 219, 221 (native exhibit provided to the Court); SAMF ¶ 65.

c.    Nystatin Ointment

Nystatin ointment is a topical medication used to treat fungal skin infections. ECF No. 1080-1 ¶ 397. The States allege that Actavis conspired with Perrigo and Fougera/Sandoz[6] to fix prices and allocate the market beginning in 2011. ECF No. 196 ¶¶ 367–91. Anthony Thomassey testified that Perrigo and Fougera/Sandoz had an anticompetitive agreement related to Sandoz's reentry into the market in 2012, but he did not identify Actavis as part of an agreement on Nystatin ointment. *See* ECF No. 965-1 at 402–03.

At the start of the relevant period, Perrigo and Fougera were the only sellers of Nystatin ointment; Perrigo, Fougera, and Taro also sold another formulation of the drug, Nystatin cream, which was approved for the same purpose as the ointment. ECF No. 1029-1 ¶¶ 138–39.

On February 28, 2011, Fougera decided internally to stop producing Nystatin ointment, citing "manufacturing challenges" and "low market share," though it hoped to return after these concerns were resolved. ECF No. 1080-1 ¶¶ 399–400; ECF No. 957-1 at 137. On the same day, Fougera's Thomassey and Perrigo's Polman exchanged nine phone calls. ECF No. 961-1 at 210.

---

[6] As noted above, Sandoz acquired Fougera in or about July 2012. ECF No. 1080-1 ¶¶ 6, 655. Because most of the conduct related to these claims occurred before the acquisition, I will primarily refer to the company as "Fougera" when discussing the States' Nystatin ointment claims.

By the next day, March 1, Perrigo began investigating a potential price increase for Nystatin ointment. ECF No. 952-1 at 587–88. By March 3, 2011, Perrigo executive John Wesolowski sent an internal email to Polman and others noting that Perrigo "plan[ned] to double output within the next month on [Nystatin] ointment," but not for another formulation of the drug, Nystatin cream, because Wesolowski did not "want to get in a battle for share" with Taro. *Id.* at 587. Fougera's Thomassey and Perrigo's Polman exchanged another six calls on March 4, 2011. ECF No. 961-1 at 213. Fougera announced to its customers that it was discontinuing Nystatin ointment on March 15, 2011. ECF No. 1029-1 ¶ 141; ECF No. 1080-1 ¶ 399. Fougera's customers then reached out to Perrigo with requests to bid for their business. ECF No. 1029-1 ¶ 143.

On June 1, 2011, Perrigo increased its WAC prices for Nystatin ointment by as much as 493 percent. ECF No. 1029-1 ¶ 144; ECF No. 1080-1 ¶ 401; ECF No. 971-1 at 382 (native exhibit provided to the Court). On the same day, Polman and Thomassey exchanged three calls, and Thomassey called his boss, Walter Kaczmarek, soon after two of the calls. ECF No. 961-1 at 213. Polman and Thomassey also exchanged multiple calls on June 10, 2011. *Id.* On the same day, Fougera's sales personnel sought out and reported customers' prices. ECF No. 953-1 at 9–10; ECF No. 957-1 at 133.

On June 15, 2011, an Actavis marketing director shared projections for Nystatin ointment that estimated that the company could realize $3.8 million in sales if it secured a thirty percent share of the market. ECF No. 962-1 at 541–42. Actavis's Aprahamian responded to these projections by writing, "This is a great opportunity for us to get in while there are issues, carve out our share, and lock up long term profitable business[.] Timing is key here." *Id.* at 541.

On October 27, 2011, Perrigo began experiencing supply issues for its tubes for Nystatin ointment. ECF No. 1232-3 at 439–40, 443. Although Perrigo initially expected the issue to be

16

resolved by the middle of November, the problem persisted in January 2012. *Id.* at 440, 445.

Actavis sales representative Michael Dorsey was aware that Perrigo was having trouble supplying Nystatin ointment by November 4, 2011. ECF No. 962-1 at 545. In response to a report on the state of the market, Aprahamian asked internally how much market share Actavis could supply. *Id.* at 544. David Myers, a senior products and communications manager, responded that Actavis had budgeted for a thirty percent market share for Nystatin ointment, but added, "In reality, we can handle more than that (especially on the ointment); provided, of course, it doesn't upset the market. (But I'm sure I don't need to tell YOU that!)." ECF No. 962-1 at 544.

On November 7, 2011, Actavis entered the market for Nystatin ointment. ECF No. 1050-1 ¶ 37. Actavis's WAC prices matched Perrigo's prices. ECF No. 1029-1 ¶ 152; ECF No. 957-1 at 110 (native exhibit submitted to the Court). On the same day, Perrigo's Polman and Fougera's Thomassey spoke twice; following their second call, Polman called Actavis's Dorsey twice, including one call that lasted nearly twenty minutes. ECF No. 961-1 at 213. Dorsey testified that "it's possible" that Actavis's Nystatin ointment launch "came up" on his calls with Polman, whom Dorsey considered a friend, but he "ha[d] no recollection of what . . . our phone call was about. ECF No. 964-1 at 2131. Later that evening, Dorsey responded to a request from his colleague Demos to call him, writing, "Crazy day and still going." ECF No. 945-1 at 27.

Polman died in 2018, before this case was filed. ECF No. 620-1 ¶ 81. Although he was not deposed in this matter, he told federal investigators before his death that collusion with competitors was "very prevalent" at Perrigo, and that he coordinated price increases with Actavis's Dorsey in relation to other drugs. ECF No. 952-1 at 526–28.

Actavis submitted bids for Perrigo's business at McKesson and OptiSource on November 1, 2011, Publix on November 2, Rite Aid on November 9, and Omnicare and N.C. Mutual on

November 11.  ECF No. 1050-1 ¶¶ 38, 40, 43, 45, 48–49.  Perrigo did not match Actavis's bids or otherwise defend these customers, and Actavis obtained all six customers.  *Id.* ¶¶ 39, 42, 44, 47–49.  Internally, Perrigo described Actavis's bid for N.C. Mutual as an "aggressive attempt to gain market share," and that Perrigo conceded the business to avoid Actavis "further erod[ing the] price."  ECF No. 943-4 at 1605.  Perrigo noted that Publix "decided to go with Actavis on the Nystatin ointment, due to our backorder situation."  *Id.* at 1609.  Perrigo customer ABC also put its business out for bid on November 4, 2011, citing a "supply issue."  ECF No. 1029-1 ¶ 151; ECF No. 1232-3 at 448–49.  In an internal email on November 14, Perrigo's Wesolowski responded to a "Stock Status and Backorder Report" by writing, "We really need to move up Nystatin, Actavis has re-entered the market and has taken two customers due to supply. Please do all you can."  *Id.* at 455.

Upon learning about Actavis's impending launch, Fougera's Kaczmarek wrote internally on November 2, 2011, "Crap – we are getting out flanked because we can't make product. We are going to miss the majority of the opportunity."  ECF No. 971-1 at 394.  He later added that "we are getting our asses kicked out here" because of Fougera's supply issues.  *Id.* at 392.

On June 21, 2012, Actavis's Dorsey reported a customer's complaint that Perrigo's Nystatin ointment was available to be purchased for less than the customer's price with Actavis.  ECF No. 951-1 at 281.  The next day, Actavis's Aprahamian declined to lower its price for Nystatin ointment, writing in an internal email that he did not "want to reduce the Nystatin and disrupt [the] market."  *Id.* at 280.  Aprahamian invoked his right against self-incrimination under the Fifth Amendment when asked about this email and the existence of a Nystatin ointment customer allocation agreement between Actavis and either Perrigo or Fougera.  ECF No. 964-1 at 132–33.

Meanwhile, Fougera was planning to reenter the Nystatin ointment market and again

sought out market information; Thomassey testified that as part of these efforts, he called Polman to determine Perrigo's pricing in June 2012. ECF No. 965-1 at 399. On June 25, 2012, Thomassey asked his boss, Walter Kaczmarek, about Fougera's market share goal, and Kaczmarek responded, "Don't want to be a pig – 20-25%." ECF No. 946-1 at 114. Thomassey testified that he understood Kaczmarek's "pig" statement to mean "that we want to not take too much market share as to erode the market price." ECF No. 965-1 at 400. That day, Thomassey called Polman, and then immediately called Kaczmarek. ECF No. 946-1 at 116. Thomassey testified that he likely shared Fougera's market share goal and discussed a list of customers with Polman on their call, as this was his "mode of operation" at Fougera. ECF No. 965-1 at 401. Later that day, Thomassey emailed Kaczmarek information about Perrigo's and Actavis's prices for Nystatin ointment. *Id.*; ECF No. 946-1 at 118. Polman and Thomassey exchanged three more calls on June 26 and another on June 27. ECF No. 961-1 at 213.

On June 29, 2012, Fougera reentered the Nystatin ointment market and matched Actavis's and Perrigo's WAC prices at $14 for 15g and $21 for 30g. ECF No. 958-1 at 81; ECF No. 1230-43 at 2. Kaczmarek sent an internal email noting that Fougera planned to charge $8 for 15g and $12 for 30g as "dead net" contract prices. ECF No. 946-1 at 121. Thomassey responded that these prices were the same as Perrigo's prices, and that "we need to go 20 percent off of that, to incentivi[z]e a switch. Thoughts?" *Id.* Kaczmarek responded, "Ok." *Id.* Asked why Polman provided Thomassey with Perrigo's pricing information, Thomassey testified, "[s]o that the market price is as high as possible." ECF No. 965-1 at 402.

d. Terconazole Cream

I have already described the facts concerning Terconazole cream in the ruling on Taro's motion for summary judgment, ECF No. 1410 at 83–87, and I incorporate those facts by reference. To briefly summarize, Taro notified customers that it was increasing its WAC and contract prices

19

for Terconazole cream on April 30, 2013, the same day Taro's Aprahamian shared multiple phone calls with Actavis's Giannone and Sandoz's Bihari, the latter of whom took a contemporaneous note that said, "Taro Increases 5/1" and "Terconazole – T+W" (referring to Taro and Watson/Actavis). *Id.* at 84–85; *see* ECF No. 953-1 at 276; ECF No. 1230-11 at 2. On May 7, 2013, Actavis notified customers that it was increasing its contract prices on Terconazole cream by about 160 percent, though it did not increase its WAC price. ECF No. 1050-1 ¶¶ 13–14; SAMF ¶ 50.

Following the price increases, Taro's direct contract price for Terconazole cream was $18.23 and its indirect contract price was $30.56. ECF No. 1230-11 at 2. Actavis's direct contract price was $18.80, and its indirect contract price was $25.80. SAMF ¶ 50; ECF No. 958-1 at 49 (native file provided to the Court).

## II. LEGAL STANDARD

### A. Summary Judgment

"Summary judgment is appropriate only if the movant shows that there is no genuine issue as to any material fact and the movant is entitled to judgment as a matter of law." *Tolan v. Cotton*, 572 U.S. 650, 656–57 (2014) (internal quotation marks and citations omitted). In reviewing the summary judgment record, a court must "construe the facts in the light most favorable to the non-moving party and must resolve all ambiguities and draw all reasonable inferences against the movant." *Caronia v. Philip Morris USA, Inc.*, 715 F.3d 417, 427 (2d Cir. 2013). "A genuine dispute of material fact exists for summary judgment purposes where the evidence, viewed in the light most favorable to the nonmoving party, is such that a reasonable jury could decide in that party's favor." *Zann Kwan v. Andalex Grp. LLC*, 737 F.3d 834, 843 (2d Cir. 2013). The moving party bears the burden of demonstrating that no genuine issue exists as to any material fact. *Celotex*

*Corp. v. Catrett*, 477 U.S. 317, 323–25 (1986). If the moving party carries its burden, "the opposing party must come forward with specific evidence demonstrating the existence of a genuine dispute of material fact." *Brown v. Eli Lilly & Co.*, 654 F.3d 347, 358 (2d Cir. 2011). "Where no rational finder of fact could find in favor of the nonmoving party because the evidence to support its case is so slight, summary judgment must be granted." *Id.* (internal quotation marks omitted).

## B. Sherman Act

The Sherman Act bans "[e]very contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce among the several States." 15 U.S.C. § 1. "The crucial question in a Section 1 case is therefore whether the challenged conduct stems from independent decision or from an agreement, tacit or express." *Starr v. Sony BMG Music Entm't*, 592 F.3d 314, 321 (2d Cir. 2010) (internal quotation marks omitted). At the summary judgment stage, "to raise a genuine issue of material fact as to an antitrust conspiracy, the plaintiff must present direct or circumstantial evidence that 'tends to exclude the possibility that the alleged conspirators acted independently.'" *Anderson News, L.L.C. v. Am. Media, Inc.*, 899 F.3d 87, 98 (2d Cir. 2018) (quoting *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 588 (1986)). "The quality of evidence required to satisfy the 'tends to exclude' standard 'varies with the economic 'plausibility' of the alleged agreement." *In re Foreign Exch. Benchmark Rates Antitrust Litig.*, No. 13 CIV. 7789 (LGS), 2022 WL 294118, at *5 (S.D.N.Y. Feb. 1, 2022). "[T]he tends to exclude standard is more easily satisfied when[] the conspiracy is economically sensible for the alleged conspirators to undertake and the challenged activities could not reasonably be perceived as procompetitive." *Anderson News*, 899 F.3d at 99 (quoting *In re Publ'n Paper Antitrust Litig.*, 690 F.3d 51, 63 (2d Cir. 2012)). A plaintiff need not "disprove all nonconspiratorial explanations for the defendants' conduct; rather the evidence need be sufficient

21

only to allow a reasonable fact finder to infer that the conspiratorial explanation is more likely than not." *Id.* (internal quotation marks omitted). "[I]f the evidence is in equipoise, then summary judgment must be granted against the plaintiff." *Id.*

"Oligopolies pose a special problem under § 1 [of the Sherman Act] because rational independent actions taken by oligopolists can be nearly indistinguishable from horizontal price fixing," as "any rational decision [in an oligopoly] must take into account the anticipated reaction of the other firms." *In re Mylan N.V. Secs. Litig.*, 666 F. Supp. 3d 266, 318 (S.D.N.Y. 2023). "Consequently, parallel conduct allegations must be placed in a context that raises a suggestion of a preceding agreement, not merely parallel conduct that could just as well be independent action." *Mayor & City Council of Balt. v. Citigroup, Inc.*, 709 F.3d 129, 137 (2d Cir. 2013). "Since mere parallel behavior can be consistent with independent conduct, courts have held that a plaintiff must show the existence of additional circumstances, often referred to as 'plus' factors, which, when viewed in conjunction with the parallel acts, can serve to allow a [fact finder] to infer a conspiracy." *Apex Oil Co. v. DiMauro*, 822 F.2d 246, 253 (2d Cir. 1987). "Such circumstances might include a common motive to conspire or a high level of interfirm communications." *Id.* at 254. But because "such factors in a particular case could lead to an equally plausible inference of mere interdependent behavior, i.e., actions taken by market actors who are aware of and anticipate similar actions taken by competitors, but which fall short of a tacit agreement," *id.*, these circumstances "must still lead to an inference of conspiracy." *Citigroup*, 709 F.3d at 137.

## III. DISCUSSION

### A. Drugs for Which the States Have Direct Evidence as to Actavis

1. Ciclopirox Shampoo

In its motion and accompanying statement of facts, Actavis makes no mention of the direct evidence of Bihari's testimony that he participated in communications with competitors regarding

22

Ciclopirox shampoo to obtain pricing information, and that the competitors agreed to submit offers that ensured prices remained high in the market.  In its reply brief, Actavis dismisses this testimony in a footnote as responses to "conclusory questions" that do not "come[] close to raising an inference of an agreement." ECF No. 1108 at 12.  That is wishful thinking.  "[A] co-conspirator's acknowledgment that he understood his numerous communications with [a competitor] to reflect a price-fixing agreement . . . is surely strong evidence of a collusive scheme . . . sufficient to satisfy *Matsushita*'s 'tends to exclude' standard." *Publ'n Paper*, 690 F.3d at 64; *see also In re High Fructose Corn Syrup Antitrust Litig.*, 295 F.3d 651, 654 (7th Cir. 2022) ("Because price fixing is a *per se* violation of the Sherman Act, an admission by the defendants that they agreed to fix their prices is all the proof a plaintiff needs.").  The States asked Bihari to describe in his own words the alleged agreements between Sandoz and its competitors, and he testified that he understood his numerous communications with Actavis and Perrigo to reflect a customer-allocation agreement that also "ensure[d] that . . . the price [was kept] high." ECF No. 964-1 at 868.  This direct evidence tends to exclude independent conduct.  *Publ'n Paper*, 690 F.3d at 64.

Instead of addressing Bihari's testimony, Actavis attempts to cabin its involvement in a Ciclopirox conspiracy to an alleged agreement to cede customer HD Smith to Sandoz.[7]  But even if a jury could find that Actavis did not specifically agree to cede its HD Smith business to Sandoz, Bihari's testimony describes a broader agreement.  Bihari testified that Actavis and Perrigo gave Sandoz their pricing information and agreed that Sandoz should use that information when making

---

[7] Whether Actavis still supplied HD Smith at the time of Bihari's calls with Actavis in November 2012 is unclear.  The States conceded in connection with Sandoz's motion for summary judgment that "Actavis stopped directly supplying HD Smith by February 29, 2012." ECF No. 1080-1 ¶ 527.  But in connection with this motion, the States point to an exhibit that suggests that Actavis was still supplying a small volume of the drug to HD Smith in October, November, and December 2012. ECF No. 957-1 at 388 (native exhibit provided to the Court); *see* ECF No. 1108 at 12.  This contradictory evidence presents an issue of fact to be determined at trial.

23

bids. In Actavis's case, this was "to ensure that pricing was kept high in the market, but still lower than Actavis's dead net [price] to ensure that Sandoz's offer was successful." ECF No. 964-1 at 868. Similarly, he described Perrigo as providing assurances that an offer that Sandoz planned to submit would be successful. *Id.* In other words, Bihari's testimony was that Actavis and Perrigo, cognizant that a new entrant could lead to price erosion, gave Sandoz information to enable it to obtain market share without significantly undermining market prices. On its face, such an agreement is a "naked restraint[] of trade with no purpose except stifling of competition," *White Motor Co. v. United States*, 372 U.S. 253, 263 (1963), and as such is *per se* illegal under the Sherman Act, *Broad. Music, Inc. v. Columbia Broad. Sys., Inc.*, 441 U.S. 1, 19–20 (1979) (a practice is "per se illegal" when "the practice facially appears to be one that would always or almost always tend to restrict competition and decrease output"); *see also Sandoz, Inc.*, 2025 WL 3470502, at *19 (finding in the overarching conspiracy ruling that an agreement that did not itself set prices or market shares but for which the purpose "was to stabilize the markets for Drugs at Issue and avoid the Defendants' competing with each other" was *per se* illegal). Because the anticompetitive agreement that Bihari described would be *per se* illegal even without including a specific agreement as to HD Smith, whether Actavis agreed to cede that specific customer is immaterial.

Bihari's testimony alone raises a genuine dispute of fact regarding Actavis's involvement in a Ciclopirox conspiracy. *Publ'n Paper*, 690 F.3d at 64–65; *In re Generic Pharms. Pricing Antitrust Litig.*, No. 16-CM-27241, 2025 WL 2483981, at *13 (E.D. Pa. Aug. 27, 2025) ("Communications and exchanges of pricing information between competitors can create a reasonable inference of conspiracy where there is evidence that those exchanges of information had an impact on pricing decisions."). But even if I were to agree with Actavis that Bihari's

24

testimony was conclusory or otherwise weak direct evidence, the evidence of interfirm communications immediately before Sandoz offered bids to customers supports Bihari's testimony of an agreement. I also draw an adverse inference from Aprahamian's invocation of the Fifth Amendment in response to questions about the existence of an agreement.[8] *SEC v. Suman*, 684 F. Supp. 2d 378, 386 (S.D.N.Y. 2010). Thus, the States have produced "additional circumstantial evidence" that bolsters Bihari's testimony. *Cf. Champagne Metals v. Ken-Mac Metals, Inc.*, 458 F.3d 1073, 1084 (10th Cir. 2006) ("Where . . . a plaintiff adduces only weak direct evidence, which by itself is insufficient to defeat summary judgment, additional circumstantial evidence is required to overcome a motion for summary judgment.").

Because a reasonable jury could find that Actavis more likely than not joined an anticompetitive conspiracy to maintain prices and avoid competing with Sandoz upon Sandoz's entry into the Ciclopirox shampoo market, the motion for summary judgment on this ground is DENIED.

---

[8] Actavis's arguments that the States are not entitled to an adverse inference, ECF No. 995-1 at 8 n.5, are unavailing. First, "[t]he fact that the invokers of the privilege are no longer employees of the defendant does not necessarily bar admittance of their refusals to testify as vicarious admissions of their former employer." *Brink's Inc. v. City of New York*, 717 F.2d 700, 710 (2d Cir. 1983) (permitting adverse inference where the former employees were directly involved in the acts underlying the counterclaim); *High Fructose Corn Syrup*, 295 F.3d at 663 (employees' refusal to answer questions was "one more piece of evidence" supporting conspiracy). Second, the interests of Aprahamian and Actavis in this litigation, far from being divergent, are compatible—they are co-Defendants who face the same allegations as to Ciclopirox shampoo, as well as six other drugs for which Actavis seeks summary judgment. ECF No. 196 ¶¶ 1642, 1735; *see LiButti v. United States*, 107 F.3d 110, 123–24 (2d Cir. 1997); *United States v. Dist. Council of N.Y. City & Vicinity of United Bhd. of Carpenters & Joiners of Am.*, 832 F. Supp. 644, 652 (S.D.N.Y. 1993) ("[T]he refusal to testify by a proven co-conspirator may justify an adverse inference against other conspirators."). Third, as discussed above, courts may draw adverse inferences from Fifth Amendment invocations even when the witness later withdraws the invocation. *See supra* note 3.

## 2. Desonide Lotion

### a. 2013 claims

Sandoz's Bihari testified that Sandoz and Actavis agreed to avoid competing with each other upon Actavis's return to the Desonide lotion market in 2013. ECF No. 964-1 at 848, 1029–31. He testified that Aprahamian, who at the time had recently left Actavis for Taro, brokered the agreement on Actavis's behalf. *Id.* This direct evidence is sufficient by itself to create a dispute of material fact. *Publ'n Paper*, 690 F.3d at 64–65; *High Fructose Corn Syrup*, 295 F.3d at 654.

Actavis argues that Bihari's testimony "is far too conclusory to raise an inference of an agreement." ECF No. 995-1 at 21. It is not, but even if I were to agree with Actavis's characterization of Bihari's testimony, the testimony is also supported by circumstantial evidence, including records of interfirm communications between him and Actavis's Aprahamian in close proximity to Sandoz's pricing decisions and Actavis's reentry to the market. *Generic Pharms. Pricing*, 2025 WL 2483981, at *14 (finding sufficient evidence to establish the interfirm communications plus factor where "calls occurred immediately before or after pricing decisions, and . . . those calls occurred in tight temporal proximity with calls to and between other representatives"). I also draw adverse inferences from Aprahamian's and Kellum's invocations of the Fifth Amendment in response to questions about the existence of an agreement. *Suman*, 684 F. Supp. 2d at 386. Although Kellum later testified in the MDL that he was not aware of anyone at Sandoz attempting to enter into a price-fixing or customer-allocation agreement with Actavis, in light of Bihari's testimony that Kellum participated in a Desonide lotion agreement with Actavis, "[a] trier of fact could . . . infer that [Kellum's] later responses were a more recent fabrication." *Penfield*, 589 F. Supp. at 256. At the least, their contradictory testimony creates a triable issue. The States have produced sufficient evidence from which a reasonable jury could find that Actavis more likely than not conspired with Sandoz in regard to Desonide lotion.

26

*Matsushita*, 475 U.S. at 588.

Actavis's other arguments to the contrary are unavailing. First, Actavis contends that it was able to regain market share upon its reentry only after offering customers prices that were from sixteen to twenty-two percent lower than Sandoz's price, arguing that "[i]f Sandoz and Actavis had agreed to allocate customers to Actavis, Actavis would not have had to submit bids to these customers that were so much lower than Sandoz'[s] price." ECF No. 995-1 at 20-21. This argument ignores that the decision whether to switch suppliers was up to the customer, not the suppliers. As the States' expert, Dr. Warren-Boulton, has opined, to gain share even in a market where the suppliers were colluding, a new entrant needed to incentivize customers to switch suppliers by offering a lower price. *See Sandoz, Inc.*, 2026 WL 75851, at *15; *see also id.* (citing Thomassey's statement that even in an illegally allocated market, "a new offer needed to be twenty percent less to incentivize a switch" (internal quotation marks omitted)); ECF No. 1410 at 140, 164 (rejecting similar arguments from Taro, including an instance where Sandoz was frustrated that Walmart continued to buy Metronidazole 1% gel from Sandoz even after Sandoz chose not to counter Taro's lower bid). Because the lower Desonide lotion rates Sandoz offered are consistent with this general practice, they are not evidence of competitive bidding.

Relatedly, Actavis argues that Sandoz's decision to cede share to a new entrant is consistent with normal oligopolist competition. ECF No. 995-1 at 21. I agree that, standing alone, a firm's decision to cede customers to a new entrant in an oligopoly is not evidence that would make a conspiracy more likely than not. But as discussed, the States have produced direct and circumstantial evidence that tends to exclude the possibility that Sandoz was acting independently when it chose not to defend select customers upon Actavis's reentry. *See Sandoz, Inc.*, 2025 WL 3470502, at *20 (finding that while a decision to follow a competitor's price increase may be

"rational" behavior in the absence of an agreement, "[t]he problem is that the States have submitted evidence that the Defendants *communicated with each other* about these goals [of maintaining high prices and avoiding disruptive battles over customers] to provide assurance that each would follow them.").

For these reasons, Actavis's motion is DENIED as to the States' claims that Actavis and Sandoz conspired on Desonide lotion in 2013.

### b. 2011 claims

The States also allege that Actavis previously conspired with Sandoz's predecessor Fougera when the firms increased their WAC prices for Desonide lotion in parallel within days of each other in July 2011. ECF No. 196 ¶ 611. But the only evidence the States present to suggest that these increases were the product of an agreement is that Sandoz followed Actavis's price on the same day it also increased its price for Metronidazole cream and lotion, drugs for which Anthony Thomassey testified as to an agreement. ECF No. 1050-1 at 31. Thomassey did not testify as to an agreement on Desonide lotion, however, and in the absence of other evidence, a decision to follow a competitor's price increase is equally consistent with independent conduct. *In re Mylan*, 666 F. Supp. 3d at 323 ("Without at any point violating the antitrust laws, oligopolist firms will consider whether [they are] better off when all are charging the old price or the new one[.]"). Although evidence of a defendant's collusion in other markets could support a conspiratorial explanation under the right circumstances, *U.S. Football League v. Nat'l Football League,* 842 F.2d 1335, 1371 (2d Cir. 1988) (evidence of "[p]rior antitrust violations and the history of competition in a market" may be used to show the "intent, motive and method of a conspiracy" as long as there is a "direct, logical relationship" between conspiracies), the fact that the 2011 Desonide lotion price increase occurred on the same day as the allegedly collusive Metronidazole increases does not represent a "direct, logical relationship" between conspiracies,

28

and is insufficient evidence from which a reasonable jury could infer a conspiracy was more likely than not. *See* ECF No. 1410 at 110 (finding in the Taro ruling that "the mere appearance of a drug on an internal list that included other drugs as to which there is evidence of collusion is just not enough evidence from which a reasonable juror could infer illegal conduct as to the drug"). Thus, Actavis's motion is GRANTED as to the States' claim that Actavis conspired with Fougera on Desonide lotion in 2011.

### 3. Metronidazole Cream and Lotion

Thomassey testified that Actavis, Fougera, and G&W agreed "[t]o allocate market share and keep the price as high as possible" for Metronidazole cream and lotion. ECF No. 965-1 at 414. This is direct evidence that is sufficient by itself to create a triable issue as to whether Actavis participated in a price-fixing conspiracy related to these drugs. *Publ'n Paper*, 690 F.3d at 64–65; *High Fructose Corn Syrup*, 295 F.3d at 654.

As with Ciclopirox shampoo, Actavis again fails to address in its motion and accompanying statement of facts Thomassey's direct evidence that it conspired with its competitors on Metronidazole. In its reply brief, Actavis appears to contend that Thomassey's testimony was "too generalized" to raise an inference of conspiracy because he "did not provide any testimony about when Actavis intended to raise its prices, or any terms of any alleged price-fixing agreements." ECF No. 1108 at 18 (citing *Champagne Metals v. Ken–Mac Metals, Inc.*, 458 F.3d at 1084). In *Champagne Metals*, a horizontal group boycott action, the direct testimony at issue was a single statement from a customer that he "and other potential customers . . . would cause other distributors in that area of the country to source their metals from other mill sources." *Id.* at 1083. The Tenth Circuit found that this statement, alone, did not suffice to meet the nonmovant's burden at summary judgment to establish a genuine dispute of fact, at least in part because it did not identify the "other customers." *Id.* at 1084. Thomassey's testimony is not

comparable to the vague statement in *Champagne Metals*. Not only did Thomassey identify his co-conspirators, but he also explained the practices and methods by which he communicated and reached agreements, including the involvement of his superior. The factual disparity between the testimony here and the testimony in *Champagne Metals* makes that case inapposite. *Cf.* ECF No. 1332 (denying Mylan's motion for interlocutory appeal that argued that I should follow another court, which granted summary judgment to Mylan in a securities case, because of the disparity between the factual records and highlighting the existence here of "the testimony of cooperating witnesses describing extensive, sustained inter-firm communications about allocating customers and agreeing on prices").

Moreover, by focusing on one segment of Thomassey's testimony, Actavis ignores the greater context of his pattern of conduct. Thomassey's description of the Metronidazole conspiracy is consistent with his testimony regarding his general purpose in communicating with competitors, which he described as, "[t]o secure fair share and establish higher market pricing." *See* ECF No. 965-1 at 324. It is also consistent with the alleged overarching conspiracy, under which generics competitors allegedly followed the "rules of engagement" in any market in which they competed, including by allocating a "fair share" to each competitor to avoid eroding prices. *See Sandoz, Inc.*, 2025 WL 3470502, at *6–7 (describing the rules of engagement), *9 (noting Thomassey's testimony regarding Metronidazole). Because a reasonable jury could infer that the conduct Thomassey described with respect to Metronidazole fit a larger pattern of his conduct in colluding with competitors on multiple drugs, his testimony was neither conclusory nor too generalized to create a genuine dispute of fact.

Although Thomassey's testimony by itself is sufficient to deny summary judgment, the circumstantial evidence of interfirm communications between competitors bolsters Thomassey's

30

testimony.  The volume and timing of interfirm communications between the competitors in July 2011 are more than sufficient to establish "evidence of a high level of interfirm communications," *Publ'n Paper*, 690 F.3d at 62, a plus factor "which, when viewed in conjunction with the parallel acts, can serve to allow a fact-finder to infer a conspiracy." *Apex Oil Co.*, 822 F.2d at 253.  A reasonable jury could infer from the pattern of calls from July 26–28, 2011, which frequently involved G&W's Grauso exchanging calls with Fougera's Thomassey and Actavis's Perfetto in quick succession, that these calls involved a topic that concerned all three firms.[9]  *See* ECF No. 1410 at 138 ("the proximity of [Glenmark's] calls with [Taro] *and* Bausch[] . . . suggest that these calls concerned a subject in which all three companies were involved"), 170 ("a reasonable jury could infer from the frequency and timing of these calls [between Taro, Mylan, and Amneal] that they were related to a conspiracy to determine the pricing of Phenytoin, a drug market in which all three competitors participated").  Thus, the involvement of Thomassey—who testified that his calls with Grauso indeed concerned pricing and market allocation for Metronidazole, ECF No. 965-1 at 413—would allow a reasonable jury to reject Actavis's suggestion that Perfetto's calls with Grauso were of a personal nature or concerned a business deal between Actavis and G&W.  ECF No. 995-1 at 19; see ECF No. 1410 at 131 & n.41, 138, 171 (rejecting Taro's arguments that calls between two competitors were related to bilateral business development or were of a personal nature when the calls were in close proximity to calls with a third competitor).  And because the

---

[9] Actavis improperly attempts to cabin its involvement in an alleged Metronidazole conspiracy to events preceding its WAC price increase on July 22, 2011, without ever addressing its subsequent communications with competitors G&W and Fougera shortly before they followed Actavis's increase.  ECF No. 995-1 at 18–19 (arguing that its decision to raise its prices was normal oligopolistic behavior and that there is no evidence that the July 6–7 calls between Actavis's Perfetto and G&W's Grauso preceding this decision involved Metronidazole).  But even if Actavis made its initial pricing decision independently, it still could have participated in a conspiracy, as Thomassey testified, "[t]o allocate market share and keep the price as high as possible," in the days following its own increase.  ECF No. 965-1 at 414.

31

evidence suggests that Grauso and Perfetto discussed Metronidazole pricing on their calls in late July, a jury could also reasonably infer that they more likely than not discussed the same topic earlier that month on July 6 and 7, immediately before Actavis internally discussed price increases for Metronidazole on July 8.

Actavis also contends that Perfetto and Grauso both "denied" that their calls concerned Metronidazole. ECF No. 995-1 at 19; ECF No. 1050-1 ¶¶ 59–60. This argument misrepresents the witnesses' testimony, as both Perfetto and Grauso testified that they could not *recall* what they discussed on their calls in July 2011. Thus, in determining whether a reasonable jury would more likely than not find that Actavis and G&W participated in the alleged Metronidazole conspiracy, I give their non-denials little weight. *See* ECF No. 1410 at 151 n.49 (finding in the Taro ruling that the testimony of another G&W employee "was frequently evasive, in that she consistently responded that she did not *recall* colluding with competitors yet failed to *deny* that she did so"). And even if they had denied involvement, like Kaczmarek did in his deposition, this contradictory testimony would only raise a dispute of fact to be decided at trial. *Rupp v. City of Buffalo*, 91 F.4th 623, 636 (2d Cir. 2024) (on summary judgment, "determinations of credibility, choices between permissible inferences, and the weighing of the evidence are beyond the authority of the court").

A reasonable jury could find based on the direct evidence of Thomassey's testimony, which is reinforced by evidence of a high level of interfirm communications, that Actavis more likely than not joined an anticompetitive conspiracy to maintain prices and allocate the markets for Metronidazole cream and lotion. *Anderson News*, 899 F.3d at 98. This evidence tends to exclude independent conduct. *Matsushita*, 475 U.S. at 588. The motion for summary judgment on these grounds is therefore DENIED.

32

### B. Drugs for Which the States Lack Direct Evidence as to Actavis

1. <u>Ammonium Lactate Cream and Lotion</u>

I previously granted summary judgment to Taro as to both Ammonium lactate cream and lotion upon finding that "the evidence does not show parallel conduct between competitors," as the evidence "does not suggest that Actavis and Perrigo followed Taro's price increase or that the competitors allocated customers between themselves."  ECF No. 1410 at 108.

The evidence that the States highlight in opposition to Actavis's motion only reinforces my previous finding.  Actavis decided to increase its Ammonium lactate cream and lotion prices on March 26, 2013 following a number of calls between competitors earlier in the month, and before another spate of interfirm communications in April 2013 that preceded Taro's increases to its contract and WAC prices.  The States argue that these prices increases represent parallel conduct, and that Actavis "led the price increases among the competitors," ECF No. 1050 at 22.  But Taro's later increase was much higher than Actavis's increase—33 percent higher on the cream at 280g and over three times higher on two sizes of the lotion, SAMF ¶¶ 83, 87.  As I found in the Taro ruling, "[t]he size of the competitors' 2013 price increases for Ammonium lactate cream and lotion are too dissimilar to infer that they stemmed from a prior agreement."  ECF No. 1410 at 109.

Meanwhile, Actavis's failure to follow Taro's larger increases suggests that any discussion on the April 2013 interfirm calls about Ammonium lactate fell short of an agreement to fix prices. Taro's later decision to significantly reduce its price, together with Aprahamian's concession that Taro's initial increase "didn't stick," ECF No. 926-2 at 1556–57, further suggests that no agreement was in place and Taro's decision to go beyond Actavis's prices was a result of independent action.  If Actavis and Perrigo had agreed to follow Taro's price, whether Taro's price would "stick"  would not likely have been in doubt.

33

For these reasons, and those discussed in the Taro ruling, the evidence submitted by the States does not suggest there was parallel conduct on Ammonium lactate cream and lotion and does not otherwise tend to exclude independent conduct. *Citigroup, Inc.*, 709 F.3d 129, 137; *Matsushita*, 475 U.S. at 588. Thus, Actavis's motion for summary judgment on these claims is GRANTED.

### 2. Fluocinonide Solution

Actavis next moves for summary judgment on the States' claim that it colluded with Taro and Sandoz to allocate customers upon Actavis's 2013 entry into the market for Fluocinonide solution. The States allege that Taro agreed to concede its customer ABC to Actavis, while Sandoz agreed to concede its customer Walgreens to Actavis. ECF No. 196 ¶¶ 781–87. I find that the circumstantial evidence is sufficient to permit a reasonable jury to infer that Actavis more likely than not conspired with Taro to allocate ABC, but that the evidence does not tend to exclude independent conduct regarding an alleged agreement with Sandoz.

The call records between competitors is "evidence of a high level of interfirm communications," a plus factor supporting an inference of conspiracy. *Publ'n Paper*, 690 F.3d at 62. First, Taro's Perfetto and Aprahamian exchanged numerous calls with Actavis employees in April and May 2013, including one call between Perfetto and Actavis's Thad Demos on May 10. From the frequency and timing of these calls, a reasonable jury could infer that when Perfetto told his Taro colleagues four days later, "I expect Actavis to be in [the Fluocinonide solution] market . . . very soon," ECF No. 953-1 at 78—over a month before Actavis filed regulatory paperwork to enter the market—that Perfetto learned this competitively sensitive information directly from Actavis. Then, on June 17, the same day that Actavis filed its notice of intention to enter the market with the FDA, Actavis's Rogerson called Taro's Aprahamian, who called Sandoz's Bihari two days later on June 19. ECF No. 952-1 at 15. After speaking with Bihari, Aprahamian called

Rogerson again, and Bihari called Aprahamian a little over an hour later. Bihari's contemporaneous notes indicate that Aprahamian told Bihari that Actavis would launch Fluocinonide solution within thirty days. ECF No. 950-1 at 41; ECF No. 964-1 at 936 (Bihari testifying that his notes indicated that Actavis would increase its price within thirty days). In sum, the phone records strongly suggest that the three competitors exchanged information about Actavis's impending launch, with Aprahamian working as a go-between for Sandoz and Actavis.

Bihari's testimony reinforces the call-log evidence. He testified that Aprahamian served as an "intermediary" between the latter's former employer Actavis and Sandoz on other drugs, including Desonide lotion, as Bihari did not have contacts with Actavis. ECF No. 964-1 at 848, 1029–31. As described above, Bihari testified that under the Desonide lotion agreement, Sandoz agreed that when Actavis reentered the market in late 2013, Sandoz would relinquish customers to Actavis so that Actavis could regain its previous percentage of the market without competing with Sandoz and eroding the price in the process. ECF No. 848, 1030. Bihari said that while Actavis might have obtained different customers than the ones it had previously, that under this arrangement Actavis would reenter the market "definitely at the same percentage share." ECF No. 964-1 at 1030–31. Bihari testified that Sandoz had an agreement with Actavis to cede customers on Desonide lotion, even though he only spoke to Aprahamian as an intermediary, and that this agreement was not limited to Desonide lotion. *Id.* at 848. Aprahamian's role as an intermediary or "conduit" in another alleged conspiracy between the same competitors provides a "direct, logical relationship" between the Fluocinonide solution and Desonide lotion conspiracies, and so a reasonable jury could infer that Aprahamian played the same role regarding Fluocinonide solution as he did a few months later regarding Desonide lotion. *See U.S. Football League,* 842 F.2d at 1371 (evidence of "[p]rior antitrust violations and the history of competition in a market"

35

may be used to show the "intent, motive and method of a conspiracy" so long as there is a "direct, logical relationship" between conspiracies).

After their June 19 calls, Taro's Aprahamian continued to communicate with Sandoz's Bihari and Actavis's Dorsey, including a call between Aprahamian and Dorsey on July 2, just three days (including a holiday) before Actavis submitted a bid to Taro's customer ABC. ECF No. 952-1 at 15, 549; ECF No. 961-1 at 221. Actavis's bid to Sandoz's customer Walgreens soon followed. ECF No. 1230-29 at 2–3. As I have previously found in this case, "the more frequent and the closer the calls are to a particular movement in the market, the more probative of a conspiracy this evidence becomes." *Sandoz, Inc.*, 2026 WL 75851, at *16 (citing *In re Flat Glass Antitrust Litig.*, 385 F.3d 350, 369 (3d Cir. 2004)); *see also Generic Pharms. Pricing*, 2025 WL 2483981, at *14 (finding sufficient evidence to establish the interfirm communications plus factor where "calls occurred immediately before or after pricing decisions, and . . . those calls occurred in tight temporal proximity with calls to and between other representatives"). Considering the timing and frequency of these interfirm communications in the context of Bihari's testimony about Aprahamian serving as an intermediary between Sandoz and Actavis on another drug during the same time period, a reasonable jury could infer that Aprahamian more likely than not provided Dorsey information that would allow Actavis to obtain market share soon after its launch without eroding prices, and that this included information that Bihari passed on to Aprahamian to provide to Actavis.

Also supporting this reasonable inference is Aprahamian's invocation of the Fifth Amendment when he was asked during his deposition whether he acted as a "conduit" to "pass information between Sandoz and Actavis regarding Actavis's launch." ECF No. 964-1 at 184. When weighing his invocations with the call log evidence, I draw an adverse inference that

36

Aprahamian's answers to this question would have been unfavorable to Actavis. *Suman*, 684 F. Supp. 2d at 386.

The question remains, however, whether this exchange of information had an impact on the market. *See Generic Pharms. Pricing*, 2025 WL 2483981, at *13 ("Communications and exchanges of pricing information between competitors can create a reasonable inference of conspiracy where there is evidence that those exchanges of information had an impact on pricing decisions." (citing *Flat Glass*, 385 F.3d at 369)); *In re Baby Food Antitrust Litig.*, 166 F.3d 112, 126 (3d Cir. 1999) ("to survive summary judgment, there must be evidence that the exchanges of information had an impact on pricing decisions.").

The evidence suggests that Taro—but not Sandoz—acted in accordance with a plan to relinquish customers to Actavis. The day after Taro's Marcus asked Aprahamian if he wanted to give up ABC to Actavis, Aprahamian called three Actavis employees. ECF No. 952-1 at 17; ECF No. 961-1 at 221. The day after these calls, Aprahamian told ABC that it would not lower its price, and the company immediately switched its Fluocinonide solution business to Actavis. ECF No. 952-1 at 549; ECF No. 953-1 at 43–44. A reasonable jury could infer from the timing of Aprahamian's renewed calls to Actavis that the competitors had an agreement that Taro would not defend its ABC business.

Actavis argues that "[i]f Taro and Sandoz had agreed to allocate customers to Actavis, there would have been no reason for Actavis to submit a bid for Taro's ABC business that was 30% lower than Taro's price." ECF No. 995-1 at 16. But as previously discussed, to gain share in a particular market, a new entrant needed to incentivize customers to switch suppliers by offering a price that was about twenty percent less. *Sandoz, Inc.*, 2026 WL 75851, at *15; ECF No. 1410 at 140 (rejecting similar argument from Taro). Although Actavis's offer was slightly

below the percentage typically needed to incentivize a switch, this is not a material difference, particularly for a supplier that was seeking its first customer, where the supplier might be more willing to offer an even lower price in order to gain a foothold in the market.

The evidence that the States offer in support of its contention that Sandoz similarly agreed to relinquish Walgreens (or, alternatively, unspecified customers) to Actavis does not tend to exclude independent conduct for multiple reasons. *Matsushita*, 475 U.S. at 588. First, the States do not point to any interfirm communications between Bihari and Taro's Aprahamian (or Actavis) following Actavis's bid on Walgreens in early July 2013, which is unlike the pattern seen in regard to ABC. Second, Actavis made multiple offers before obtaining Walgreens, which suggests that it did not know Sandoz's price. Third, Sandoz's decision not to defend its Walgreens business once Actavis made a better offer could reflect an independent decision about the new price. Fourth, Kellum seemed to be surprised that Walgreens had moved from Sandoz to Actavis, which also suggests that there was no agreement regarding Walgreens.[10] Finally, Actavis's pursuit of OptiSource amid its difficulty in obtaining Walgreens' business, and Bihari's urging that Sandoz "do better" to retain the business, ECF No. 970-2 at 1454, 1462, suggests that, beyond any agreement to cede Walgreens specifically, Actavis and Sandoz did not agree that Sandoz would cede *some amount* of market share to Actavis, with the specific identity of the customer undetermined. Thus, despite the evidence that strongly suggests that Aprahamian shared competitively sensitive information regarding Actavis's Fluocinonide solution launch with Sandoz, a reasonable jury could not infer that Sandoz more likely than not agreed to cede market share to Actavis.

---

[10] The response from Sandoz's sales director to Kellum that "[t]his is old and we had discussed" and that he was trying to create a "paper trail," ECF No. 970-2 at 1464, is ambiguous.

In sum, I find that while a reasonable jury could infer that Actavis more likely than not agreed with Taro to allocate the market to avoid eroding prices upon Actavis's entry into the Fluocinonide solution market in 2013, the same jury could not infer that Actavis more likely than not reached a market-allocation agreement with Sandoz. *Anderson News*, 899 F.3d at 98. Thus, Actavis's motion for summary judgment on the States' Fluocinonide solution claims is DENIED as to an agreement with Taro but GRANTED as to an agreement with Sandoz.

3. Nystatin Ointment

Actavis next moves for summary judgment on the States' claims that Actavis conspired with Perrigo and Fougera to fix prices and allocate the market for Nystatin ointment. Although Thomassey testified about an anticompetitive agreement on Nystatin ointment between Fougera and Perrigo, he did not identify Actavis as part of the agreement. *See* ECF No. 965-1 at 402–03. As such, the States lack direct evidence of Actavis's participation in the alleged agreement. Direct evidence is not required, though, and the States also rely on circumstantial evidence, including parallel conduct and frequent interfirm communications between competitors that coincide with price movements. This evidence, the States argue, permits an inference that "tends to exclude the possibility" that Actavis "acted independently." *Matsushita*, 475 U.S. at 588. Considering the record as a whole and in the light most favorable to the States, I find that a reasonable jury could conclude that Actavis's conduct more likely reflected collusion than lawful conduct.

First, the record contains evidence of parallel conduct. Perrigo began investigating a price increase immediately after Fougera decided internally to exit the market—two weeks before Fougera informed its customers. ECF No. 1080-1 ¶ 399; ECF No. 952-1 at 587–88. Within two weeks of Perrigo's June 1, 2011 price increase, Actavis investigated entering the market and shared projections for a potential launch at the higher price. ECF No. 962-1 at 541–42. When Actavis entered the market, its WAC prices matched Perrigo's prices, ECF No. 1029-1 ¶ 152; ECF No.

957-1 at 110 (native exhibit submitted to the Court), and Perrigo did not submit competing bids as Actavis obtained six of its customers.  ECF No. 1050-1 ¶¶ 38–49.  When Fougera reentered the market the following year, it also matched Perrigo's WAC prices, ECF No. 958-1 at 81, and based its contract prices on Perrigo's contract prices, ECF No. 946-1 at 121.  This sequence is within a timeframe that would permit a reasonable inference of parallel conduct, particularly because Fougera wanted to return to the market sooner but could not because of supply issues.  ECF No. 971-1 at 392–394;  *see In re Concrete & Cement Additives Antitrust Litig.*, No. 24-md-3097, 2025 WL 1755193, at *13 n.11 (S.D.N.Y. June 25, 2025) ("There is no categorical rule governing how temporally proximate acts must be to give rise to an inference of collusion. The delay between purportedly parallel conduct must be viewed in the context of the case; among other things, courts must account for any restrictions on market participants' ability to enact price changes sooner.").

While this parallel conduct would not by itself suffice to infer a conspiracy, the volume and timing of interfirm communications between Actavis, Perrigo, and Fougera would allow a reasonable fact finder to conclude that it is more likely than not that all three competitors had an anticompetitive agreement to follow each other's price increases and allocate market share to new entrants.  *See Generic Pharms. Pricing*, 2025 WL 2483981, at *14 (finding sufficient evidence to establish the interfirm communications plus factor where "calls occurred immediately before or after pricing decisions, and . . . those calls occurred in tight temporal proximity with calls to and between other representatives"); *Sandoz, Inc.*, 2026 WL 75851, at *16 ("the more frequent and the closer the calls are to a particular movement in the market, the more probative of a conspiracy this evidence becomes" (citing *Flat Glass*, 385 F.3d at 369).  Fougera's Thomassey and Perrigo's Polman exchanged multiple calls on February 28, 2011, the same day that Fougera decided internally to stop producing Nystatin ointment, and one day before Perrigo began investigating a

potential price increase. ECF No. 961-1 at 210. Thomassey and Polman spoke again on June 1, 2011, the same day that Perrigo increased its WAC prices. *Id.* at 213. And more calls followed on June 10, the same day that Thomassey's colleagues reported pricing information. *Id.*; ECF No. 953-1 at 9–10. Then, on November 7, 2011, the same day that Actavis reentered the market, Polman and Thomassey spoke again, and Polman called Actavis's Dorsey a couple hours later. ECF No. 961-1 at 213. As Fougera planned to reenter the market in June 2012, Thomassey and Polman spoke on the same day that Thomassey was discussing Fougera's potential market share with his boss, with more calls in the following days. ECF No. 946-1 at 114, 116; ECF No. 961-1 at 213. These calls establish a pattern in which the competitors called each other in close proximity to developments in the market.

A reasonable jury viewing the evidence as a whole could infer that all of these calls were designed to coordinate Fougera's and Actavis's entries by matching prices and allocating customers to avoid competition that would erode Perrigo's new price. Emails between Thomassey and his boss explicitly state that Fougera set its contract prices at twenty percent less than Perrigo's prices—a level that was just low enough to incentivize a customer to switch suppliers without further price erosion. ECF No. 946-1 at 121; *see Sandoz, Inc.*, 2026 WL 75851, at *15 (noting Thomassey's statement that even in an illegally allocated market, "a new offer needed to be twenty percent less to incentivize a switch" (internal quotation marks omitted)). And Thomassey testified that he shared Fougera's market share goals for Nystatin ointment on his June 2012 calls with Polman to keep the market price "as high as possible," ECF No. 965-1 at 402, and that this reflected his typical "mode of operation" at Fougera. *Id.* at 401. A reasonable jury looking back at previous communications between the competitors could infer that Thomassey followed this same "mode of operation" on the earlier calls that were proximate to Nystatin ointment developments, including

upon Perrigo's price increase in June 2011 and Actavis's entry in November 2011. With Actavis's increase, a reasonable jury could infer that Thomassey and Polman similarly sought and obtained information about Actavis's market share goals when Polman spoke with Dorsey on November 7, 2011, to ensure that all three competitors were aligned.

Other evidence reinforces the reasonable inference that Dorsey shared information that the competitors used to further their collusion. Actavis obtained Perrigo's customers without any competing bids from Perrigo upon offering a similar reduction sufficient to incentivize a switch. ECF No. 1050-1 ¶ 42.[11] The evidence also suggests that rather than competing for additional customers, Actavis limited its pursuit of market share to thirty percent so as not to "upset the market," ECF No. 962-1 at 544, as did Fougera when it entered the market. ECF No. 946-1 at 114 (Kaczmarek writing that Fougera's market share goal was "20-25%" because Fougera "[did]n't want to be a pig"); see also ECF No. 951-1 at 280 (Actavis's Aprahamian echoing this concern about "disrupt[ing the] market" in declining to reduce Actavis's price upon Fougera's launch). When viewed in conjunction with the volume and frequency of the interfirm communications, a

---

[11] Although Actavis offered some customers a slightly lesser amount before winning the business, I do not find these differences material. *See* ECF No. 1050-1 ¶ 42 (describing Perrigo's direct contract price for Nystatin ointment (15g), as $5.36 to Rite Aid (32 percent less than Perrigo's $7.92), $6.57 (20 percent less than Perrigo's $8.16), and $7.00 to Omnicare (Perrigo's price not provided). These discounts do not come close to significantly eroding Perrigo's June 2011 increase for the product, which saw WAC prices (upon which contract prices are based) jump by nearly 500 percent. ECF No. 1029-1 ¶ 144; ECF No. 971-1 at 382. Moreover, Perrigo's pricing also varied by customer, making the differences in prices less important for the purposes of parallel conduct. In any event, an agreement between competitors to coordinate prices is *per se* illegal, even if the prices charged are not the same. *United States v. Socony-Vacuum Oil Co.*, 310 U.S. 150, 223 (1940) (horizontal price-fixing conspiracies are *per se* illegal under the Sherman Act when they include agreement among competitors "formed for the purpose and with the effect of raising, depressing, fixing, pegging, or stabilizing the price"); *see Catalano, Inc. v. Target Sales, Inc.*, 446 U.S. 643, 647–49 (1980) (holding unlawful an agreement to eliminate a practice of giving variable discounts); *Sugar Institute v. United States*, 297 U.S. 553, 601–02 (1936) (holding unlawful an agreement to adhere to previously announced prices and terms of sale even though the particular prices and terms were not themselves fixed by private agreement).

jury could reasonably infer that these decisions were made as a result of an anticompetitive agreement between all three competitors.

Actavis argues that Perrigo's decision to cede market share is "entirely consistent with lawful, independent decision-making in an oligopoly." ECF No. 995-1 at 17. But even if Perrigo had been likely to cede some customers to a new entrant in the absence of any agreement with its competitors (particularly as it was dealing with supply issues at the time), as I found in the overarching conspiracy ruling, "[t]he problem is that the States have submitted evidence that the Defendants *communicated with each other* about [their] goals to provide assurance" that their competitors would "maintain[] high prices and avoid[] disruptive battles over customers." *Sandoz, Inc.*, 2025 WL 3470502, at *20 (D. Conn. Dec. 3, 2025). Actavis tries to minimize its involvement by characterizing its interfirm communications with as "two calls between Actavis'[s] sales representative Dorsey" and Polman, his counterpart at Perrigo. ECF No. 995-1 at 17–18. But this ignores the context of Polman's other calls with Thomassey, who testified that he and Polman had an agreement to coordinate to keep prices "as high as possible." ECF No. 965-1 at 402–03. As explained above, a reasonable jury could infer from this pattern of communication and the timing of these calls on the same day as Actavis's launch that Polman's calls with Dorsey were also designed to collude regarding Nystatin ointment. *See* ECF No. 1410 at 133 (rejecting a similar argument from Taro, finding that while the mere act of following a price increase is consistent with independent behavior, "the timing of calls between [two competitors] directly preceding Perrigo's price increase, together with flurries of calls between all competitors[,] . . . tend to exclude . . . independent conduct.").[12]

---

[12] Moreover, the States have also presented evidence that Polman told federal investigators that collusion with competitors was frequent at Perrigo, and that he coordinated price increases with Actavis's Dorsey in relation to other drugs. ECF No. 952-1 at 526–28. The federal investigators'

When confronted with this evidence, Dorsey failed to deny any collusion on Nystatin ointment, testifying that he did not remember the topics discussed on his November 7, 2011, calls with Polman, but conceded that "it's possible [Nystatin ointment] came up." ECF No. No. 964-1 at 2131. Thus, his testimony does little to overcome the reasonable inference that may be drawn from the evidence of interfirm communications. *See* ECF No. 1410 at 151 n.49 (giving little weight to the testimony of a G&W employee who "consistently responded that she did not *recall* colluding with competitors yet failed to *deny* that she did so"). A reasonable jury could also choose to discount his suggestions that these calls were of a personal nature, not only when considering the timing of these calls in close proximity to Actavis's launch and Polman's calls with Thomassey,[13] but also because he did not have time that day to respond to a colleague on another work matter, writing that evening, "[c]razy day and still going." ECF No. 945-1 at 27. A reasonable jury could find that it is unlikely that Dorsey would have allotted over twenty minutes for personal calls with Polman if he did not have time that day to respond to his colleague's request

---

summary of Polman's statements is hearsay within hearsay because it is an out-of-court statement recounting another out-of-court statement. But "[h]earsay within hearsay is not excluded by the rule against hearsay if each part of the combined statements conforms with an exception to the rule." Fed. R. Evid. 805. The States argue in their opposition to Perrigo's motion for summary judgment that Polman's underlying statements to investigators is admissible as a statement against interest under Fed. R. Evid. 804(b)(3)(A) because he is deceased and the statement "had so great a tendency . . . to expose the declarant to civil or criminal liability." ECF No. 1029 at 23 n.17. I agree, at least to the extent that each portion of the underlying statement is self-inculpatory. *See Williamson v. United States*, 512 U.S. 594, 604 (1994). Moreover, I may consider the federal investigators' *summary* of Polman's statement at summary judgment because it is reducible to an admissible form, as the States could call the author as a trial witness. *Parks v. Blanchette*, 144 F. Supp. 3d 282, 293 (D. Conn. 2015) ("[E]ven inadmissible evidence may properly be considered on summary judgment if it may reasonably be reduced to admissible form at trial."). Thus, I will consider the self-inculpatory portions of Polman's statement as evidence at summary judgment.

[13] As described in the Taro ruling, evidence that a supplier called two different competitors in quick succession suggests that the calls concerned a subject in which all three companies were involved, and are less likely to be about personal matters ECF No. 1410 at 138, 170; *see also* ECF No. 965-1 at 394 (Thomassey testifying that if he spoke to two Taro representatives on the same day, "it . . . would have [] definitely been a business conversation").

and that Dorsey's statement that the lengthy call in question was a "call with a friend" was not credible. ECF No. 964-1 at 2133.

On top of all this evidence suggesting Actavis participated in a conspiracy, I also consider the Fifth Amendment invocations of Actavis's Aprahamian, in response to questions about a Nystatin ointment customer allocation agreement. ECF No. 964-1 at 132–33. When weighing these invocations with the evidence of interfirm communications and Thomassey's testimony, I draw an adverse inference that Aprahamian's answers to these questions would reinforce the reasonable inference of a Nystatin ointment conspiracy. *Suman*, 684 F. Supp. 2d at 386.

All told, the evidence in the record is sufficient for "a reasonable fact finder to infer that the conspiratorial explanation is more likely than not" in regard to the conduct of Actavis, Fougera, and Perrigo in the Nystatin ointment market in 2011 and 2012. *Anderson News*, 899 F.3d at 98. The evidence places the States' parallel conduct allegations in a context that raises a suggestion of a preceding anticompetitive agreement. *Citigroup, Inc.*, 709 F.3d at 137. As such, Actavis's motion for summary judgment on these claims is DENIED.

### 4. Terconazole Cream

The States allege that Actavis conspired with Taro in 2013 by agreeing to follow Taro's price increase and allocate customers for Terconazole cream. In a previous ruling, I denied Taro's motion for summary judgment on this drug, finding that the evidence "places the States' parallel conduct allegations in a context that raises a suggestion of a preceding anticompetitive agreement—at least as between Taro and Sandoz," but I made no finding as to whether Actavis was also part of the agreement. ECF No. 1410 at 176 & n. 59. After reviewing the parties arguments regarding Actavis's conduct in the market for Terconazole cream, I find that the evidence similarly raises a suggestion that Actavis was part of the same anticompetitive agreement.

In the Taro ruling, I found that a reasonable jury could infer that calls between Taro and

45

Actavis in April 2013—which coincided with similar calls between Taro and Sandoz—concerned Taro's imminent price increase for Terconazole cream and an attempt by Taro to mitigate its risk "by seeking assurances from Actavis that it would follow Taro's increase or refrain from poaching Taro's customers." ECF No. 1410 at 173–74. I also found evidence of parallel conduct, as soon after these calls, Actavis increased its contract prices and both Actavis and Sandoz declined to pursue bids for Taro's customers.[14] *Id.* at 174–75. I concluded that Actavis's April 2013 calls with Taro constituted "evidence of a high level of interfirm communications," *Publ'n Paper*, 690 F.3d at 62, a plus factor "which, when viewed in conjunction with the parallel acts, can serve to allow a fact-finder to infer a conspiracy." *Apex Oil Co.*, 822 F.2d at 253. Thus, the only remaining questions are whether the evidence raises a suggestion of a preceding agreement and tends to exclude independent conduct. *Citigroup, Inc.*, 709 F.3d 129, 137; *Matsushita*, 475 U.S. at 588.

Evidence that Actavis opted to increase its prices in the wake of Taro's increase and declined to make bids for additional business is not by itself evidence of conspiracy. *See In re Mylan*, 666 F. Supp. 3d at 323 ("Without at any point violating the antitrust laws, oligopolist firms

---

[14] Actavis contends that it only increased its contract prices after Taro increased its WAC price, and thus Actavis's "pricing and bidding decisions were not 'parallel' because of the stark difference between a WAC price and a contract price.'" ECF No. 995 at 11. This argument is unconvincing because "[a]t least some customers used the WAC price as a basis for making product choice decisions or tied contract terms to the WAC price," ECF No. 1410 at 6; *see also Sandoz, Inc.*, 2026 WL 1533866, at *26 (rejecting similar argument from Greenstone, finding that "while matching WAC price increases could be evidence of parallel conduct, the absence of matching WAC price increases is not evidence to the contrary when contract prices increased in the meantime"). Here, the evidence suggests that Taro increased its contract prices in conjunction with its WAC price. ECF No. 1230-11 at 2. Moreover, both Actavis and Taro charged a direct contract price of $18 and change following their price increases. While factors unique to specific customers, such as rebates, discounts, and fees may have been used in determining the final number, the bottom line is that the competitors' prices do not represent a "stark difference." *See Sandoz, Inc.*, 2026 WL 1533866, at *26 ("because each supplier charged varying contract prices to its own customers, it is also of no consequence that contract prices between suppliers differed somewhat" (citation omitted)).

will consider whether [they are] better off when all are charging the old price or the new one[.]");

*Sandoz, Inc.*, 2025 WL 3470502, at *4 (noting that a supplier who "declines to follow an initial price increase in an attempt to increase its market share . . . risks triggering a 'race to the bottom' in which prices erode as suppliers compete for customers). But again, "[t]he problem is that the States have submitted evidence that the Defendants communicated with each other about [their] goals to provide assurance" that their competitors would "maintain[ ] high prices and avoid[ ] disruptive battles over customers." *Sandoz, Inc.*, 2025 WL 3470502, at *20. A reasonable jury could infer that this is what Aprahamian was attempting to do on his calls with Actavis and Sandoz concerning Terconazole cream in 2013, as I found in the Taro ruling. ECF No. 1410 at 173–74.

This reasonable inference is reinforced by Aprahamian's invocation of the Fifth Amendment in response to questions about Terconazole cream, including whether there was an agreement on pricing or market share between Taro and Actavis. ECF No. 964-1 at 169–70. When weighing his invocations with the evidence of interfirm communications, parallel conduct, and the other evidence discussed in the Taro ruling, I draw an adverse inference that Aprahamian's answers to these questions would have been unfavorable to Taro. *Suman*, 684 F. Supp. 2d at 386.

In sum, when considering the parallel Terconazole cream price increases by Taro and Actavis soon after interfirm communications between the two firms and simultaneous calls between Taro and Sandoz, the other evidence discussed in the Taro ruling, and Aprahamian's Fifth Amendment invocations, I find that the evidence would permit a reasonably jury to infer Actavis more likely than not agreed with Taro to fix prices and allocate the market, *Anderson News*, 899 F.3d at 98, and that this evidence tends to exclude the possibility that Actavis acted independently. *Matsushita*, 475 U.S. at 588. Thus, Actavis's motion for summary judgment on the States' Terconazole cream claims is DENIED.

47

## IV. CONCLUSION

For the foregoing reasons, Actavis's Motion for Summary Judgment is GRANTED as to the States' claims that Actavis unlawfully conspired with regard to (1) Ammonium Lactate cream and lotion, (2) Desonide lotion in 2011, and (3) Fluocinonide solution with Sandoz.  As to all other drugs for which Actavis seeks summary judgment, including claims related to Desonide lotion in 2013 and a market-allocation agreement with Taro on Fluocinonide solution, the motion is DENIED.

IT IS SO ORDERED.

                                            /s/
                                    Michael P. Shea, U.S.D.J.

Dated: Hartford, Connecticut
July 8, 2026