**UNITED STATES DISTRICT COURT**
**DISTRICT OF CONNECTICUT**

| | |
|---|---|
| THE STATE OF CONNECTICUT; THE STATE OF ALASKA; THE STATE OF ARIZONA; THE STATE OF ARKANSAS; THE STATE OF CALIFORNIA; THE STATE OF COLORADO; THE STATE OF DELAWARE; THE DISTRICT OF COLUMBIA; THE STATE OF FLORIDA; THE STATE OF GEORGIA; THE TERRITORY OF GUAM; THE STATE OF HAWAII; THE STATE OF IDAHO; THE STATE OF ILLINOIS; THE STATE OF INDIANA; THE STATE OF IOWA; THE STATE OF KANSAS; THE COMMONWEALTH OF KENTUCKY; THE STATE OF LOUISIANA; THE STATE OF MAINE; THE STATE OF MARYLAND; THE COMMONWEALTH OF MASSACHUSETTS; THE STATE OF MICHIGAN; THE STATE OF MINNESOTA; THE STATE OF MISSISSIPPI; THE STATE OF MONTANA; THE STATE OF NEBRASKA; THE STATE OF NEVADA; THE STATE OF NEW HAMPSHIRE; THE STATE OF NEW JERSEY; THE STATE OF NEW MEXICO; THE STATE OF NEW YORK; THE STATE OF NORTH CAROLINA; THE STATE OF NORTH DAKOTA; THE COMMONWEALTH OF THE NORTHERN MARIANA ISLAND; THE STATE OF OHIO; THE STATE OF OKLAHOMA; THE STATE OF OREGON; THE COMMONWEALTH OF PENNSYLVANIA; THE COMMONWEALTH OF PUERTO RICO; THE STATE OF RHODE ISLAND; THE STATE OF SOUTH CAROLINA; THE STATE OF TENNESSEE; THE STATE OF UTAH; THE STATE OF VERMONT; THE COMMONWEALTH OF VIRGINIA; THE STATE OF WASHINGTON; THE STATE OF WEST VIRGINIA; THE STATE OF WISCONSIN; and U.S. VIRGIN ISLANDS, <br><br>     *Plaintiffs*, <br><br> v. | No. 3:20-cv-00802-MPS |

SANDOZ, INC.; ACTAVIS HOLDCO US, INC.;
ACTAVIS ELIZABETH LLC; ACTAVIS
PHARMA, INC.; AMNEAL
PHARMACEUTICALS, INC.; AMNEAL
PHARMACEUTICALS, LLC; ARA
APRAHAMIAN; AUROBINDO PHARMA U.S.A.,
INC.; BAUSCH HEALTH AMERICAS, INC.;
BAUSCH HEALTH US, LLC; MITCHELL
BLASHINSKY; DOUGLAS BOOTHE; FOUGERA
PHARMACEUTICALS INC.; GLENMARK
PHARMACEUTICALS INC., USA; JAMES (JIM)
GRAUSO; GREENSTONE LLC; G&W
LABORATORIES, INC.; WALTER
KACZMAREK; ARMANDO KELLUM; LANNETT
COMPANY, INC.; LUPIN PHARMACEUTICALS,
INC.; MALLINCKRODT INC.; MALLINCKRODT
LLC; MALLINCKRODT plc; MYLAN INC.;
MYLAN PHARMACEUTICALS INC.; KURT
ORLOFSKI; MICHAEL PERFETTO; PERRIGO
NEW YORK, INC.; PFIZER INC.; SUN
PHARMACEUTICAL INDUSTRIES, INC.; TARO
PHARMACEUTICALS USA, INC.; TELIGENT,
INC.; ERIKA VOGEL-BAYLOR; JOHN
WESOLOWSKI; and WOCKHARDT USA LLC,

  *Defendants*.

## **RULING ON MOTION FOR SUMMARY JUDGMENT**

In this action, the Plaintiffs, the Attorneys General of most of the States and several U.S. territories ("the States"), allege that thirty-six pharmaceutical companies and executives ("the Defendants") each participated in a series of conspiracies, as well as an overarching conspiracy, to fix prices, allocate markets, and rig bids in the sale of dozens of generic drug products. Defendant Perrigo New York, Inc. ("Perrigo") moved for partial summary judgment on claims that it participated in certain product-specific conspiracies. ECF No. 943; *see also* ECF No. 1008 (Defendants' Joint Memoranda in Support of Defendant-Specific Motions for Summary Judgment). For the reasons set forth below, I **GRANT IN PART AND DENY IN PART** the motion for summary judgment.

1

Specifically, the motion is granted as to the States' claims that Perrigo unlawfully conspired with competitors in regard to Ammonium Lactate cream and lotion, Ciclopirox cream, Desonide cream, Desonide ointment (April/May 2013 price increase), Econazole nitrate cream (2015 customer allocation), Hydrocortisone valerate cream, and Prochlorperazine maleate suppositories. The motion is denied as to the States' claims that Perrigo unlawfully conspired with regard to Adapalene cream (2013 customer allocation), Bromocriptine, Ciclopirox shampoo, Ciclopirox solution, Econazole nitrate cream (2014 price increase), Erythromycin solution, Fluocinonide .1% cream, Fluticasone propionate lotion, Halobetasol propionate cream (2012 and 2013 price increases), Halobetasol propionate ointment, Hydrocortisone acetate suppositories, Imiquimod cream, Methazolamide tablets, Nystatin ointment, Promethazine HCL suppositories, Tacrolimus ointment, and Triamcinolone Acetonide cream and ointment. As for the States' Clindamycin solution claims, the motion is denied as to allegations of an agreement with Taro and Sandoz but granted as to the allegation of an agreement with Greenstone.

## I. BACKGROUND

### A. Procedural Background

This is one of three cases in which the Attorneys General of the States have sued scores of defendants in the generic drug industry for alleged antitrust violations and unfair trade practices. All three cases were originally filed in this Court but were transferred to the Eastern District of Pennsylvania (the "MDL Court"), which was designated by the Judicial Panel on Multidistrict Litigation (the "JPMDL") to preside over these and other similar cases brought by private parties in a consolidated proceeding. ECF No. 9.[1] In April 2024, these three cases were remanded to this

---

[1] Unless otherwise indicated, all ECF numbers in this ruling refer to entries on the docket of this case, not the same case when it was before the MDL Court, and each page number refers to the

Court by the JPMDL and assigned to me.  ECF No. 11.  The operative complaint in this case, ECF No. 196, alleges collusion in the pricing, market allocation, and bidding for some eighty generic drugs, chiefly for dermatological applications (the "Drugs at Issue").  The parties refer to it as "the Dermatology complaint."

In a previous ruling, I denied the Defendants' Joint Motion for Summary Judgment on Overarching Conspiracy Claims, ECF No. 609, because I found that there is evidence in the record from which a reasonable jury could find that the alleged overarching conspiracy exists, *Connecticut v. Sandoz, Inc.*, No. 20cv802, 2025 WL 3470502 (D. Conn. Dec. 3, 2025). Specifically, I concluded that a reasonable jury could find that at least some of the Defendants had a tacit agreement that they would conduct business in accordance with broadly understood industry "rules of engagement," which included following any price increase by a rival firm, avoiding "poaching" each other's customers, and instead settling for what these competitors refer to as their 'fair share'" of a particular drug market.  *Id.* at \*17.  The conspirators considered a competitor to be "rational" or "reasonable" if it would "fall in line with those types of tactics."  *Id.* at \*6. Although I did not determine whether each corporate Defendant was a member of the overarching conspiracy,[2] I noted that the evidence suggested that Perrigo, was among "a core group of leaders most responsible for perpetuating the Defendants' collective adherence to the rules of engagement."  *Id.* at \*20–21.

---

page number shown on the ECF stamp on the top of the cited page, not the page of the relevant brief or pleading designated by the parties.

[2] As noted in the previous ruling, "[w]hether a particular Defendant was a member is a distinct issue from the issue whether a conspiracy existed at all."  ECF No. 1123 at 30 (citing 4 Sand et al., Modern Federal Jury Instructions–Civil ¶ 79-8 ("[Y]ou should first determine . . . whether the conspiracy existed. If you conclude that the conspiracy did exist, you should next determine whether each defendant was a knowing member of the conspiracy."); *id.* ¶ 79-6 ("In order to prove the [price-fixing] conspiracy, . . . [t]he plaintiff does not have to show that . . . all of the persons alleged to have been members of the claimed conspiracy were in fact members.")).

3

Shortly before I issued that ruling, most Defendants filed additional, Defendant-specific summary judgment motions, many of which include challenges about whether a particular Defendant joined the overarching conspiracy. This ruling addresses Perrigo's Defendant-specific motion for summary judgment.

The Defendants have also filed a Joint Memorandum that addresses the pertinent legal standard and argues that the Defendants are entitled to summary judgment on particular state-law claims. ECF No. 1008. This ruling will address arguments made in the Joint Memorandum where they are applicable to Sandoz and Fougera. I also will consider the briefs related to motions for summary judgments filed by other Defendants where applicable.

## B. Factual Background

In the overarching conspiracy ruling, I discussed the facts underpinning the States' claims against all corporate Defendants, and I incorporate that description here. *See Sandoz, Inc.*, 2025 WL 3470502, at *2–14. I also incorporate the facts described in the ruling on Taro's motion for summary judgment under the subheading "The Generic Drug Markets Generally," which describes how the corporate Defendants, including Perrigo, conducted business during the relevant time period. ECF No. 1410 at 5–7; *see also* ECF No. 1029-1 ¶¶ 5–7, 20–26, 34–35.

I now address the facts specific to Perrigo's participation in the alleged conspiracies for which it seeks summary judgment. The following facts are drawn from the parties' Local Rule 56 Statements of Facts, including the States' Statement of Additional Material Facts ("SAMF"), ECF No. 1029-1, and the record. Rather than restating these lengthy submissions in full, I will focus on the portions from which a reasonable jury could or could not determine that a material dispute of fact exists. The facts are undisputed unless otherwise noted.

The States allege that Perrigo conspired with its competitors to allocate customers, fix

prices, and rig bids for twenty-eight drug products, including different formulations of the same drug (*e.g.*, Desonide cream and Desonide ointment).  ECF No. 196 ¶ 1628; ECF No. 1029-1 ¶ 4. Perrigo moves for summary judgment as to the States' claims regarding all but two of these drug products.[3]  I have already described the facts concerning many of the drugs for which Perrigo seeks summary judgment in previous rulings on motions for summary judgment filed by its alleged co-conspirators, and I incorporate those descriptions by reference.  *See* ECF No. 1410 at 20–25, 32–54, 68–74 (Taro ruling, discussing Ammonium Lactate cream and lotion, Clindamycin, Desonide cream, Econazole, Fluocinonide, and Hydrocortisone); *Connecticut v. Sandoz, Inc.*, No. 20cv802, 2026 WL 75851, at *5–7 (D. Conn. Jan. 9, 2026) (Mylan ruling, discussing Bromocriptine); *Connecticut v. Sandoz, Inc.*, No. 20cv802, 2026 WL 1533866, at *3–10 (D. Conn. June 1, 2026) (Greenstone ruling, discussing Clindamycin).  Thus, in this section I will recount only facts that I have not previously addressed, and only to the extent necessary to address the parties' arguments.

1. Evidence of Broad Agreements

In the overarching conspiracy ruling, I discussed the deposition testimony of the States' six cooperating witnesses.  Three of these witnesses testified that Perrigo had broad agreements with competitors that extended beyond a single drug product.  *Sandoz, Inc.*, 2025 WL 3470502, at *8–11.

Anthony Thomassey worked for Fougera as a national accounts executive from 2004 to 2012, until the company's acquisition by Sandoz, upon which he left Fougera and worked for Aurobindo for nine months.[4]  ECF No. 965-1 at 317, 481.  During his time at Fougera, Thomassey

---

[3]  Perrigo does not seek summary judgement on Betamethasone Dipropionate lotion or Calcipotriene Betamethasone Dipropionate ointment.  ECF No. 196 ¶ 1628.

[4] A prior ruling on Taro's motion for summary judgment incorrectly stated that Thomassey worked for Sandoz after its acquisition, rather than for Aurobindo.  ECF No. 1410 at 9; *cf. id.* at 61 (stating

testified, Fougera and Perrigo had a "higher overarching agreement," which he described as: "There was -- they were going to call us, I was going to call them when a [product] launch was happening, when we knew we were going to have product X, Y, or Z." *Id.* at 546. This agreement—to call each other and "discuss the product and the customers and figure out allocations and pricing"—applied when either Fougera or Perrigo planned to enter any market for "cross competing products," Thomassey said. *Id.* at 545. He added: "At a high level it would be on all products where we cross competed. But then there would be specific conversations regarding each product when that situation arose." *Id.* Thomassey testified that he would call Tony Polman, a national account executive at Perrigo, "and say, hey, we're launching, who should I go after and where are you at, roughly, or vice versa." *Id.* at 545; *see also id.* at 546 ("[T]here was definitely the expectation that calls would be made. . . . [F]rom a launch standpoint it was definite."). Thomassey also said that the understanding between Fougera and Perrigo "absolutely" resulted in higher prices on various products. *Id.* at 403.

Christopher Bihari, who worked for Fougera and then Sandoz, likewise testified that under Sandoz's agreement with Perrigo,

> [e]ssentially Tony Polman would provide pricing information as needed with the expectation that I would share that with Sandoz. And if it's a price increase, [Perrigo] would follow the price increase to the same levels[;] if Sandoz is launching a product, that Sandoz would be diligent in their market share and their pricing[;] and if Perrigo and Sandoz were launching at the same time, you know, they would launch at similar price points so as not to create disruption in the market and to allocate or split the customers accordingly.

ECF No. 964-1 at 1019.

Michael Vezza managed Sandoz's pricing team, which reviewed offers to customers to

---

Thomassey "left his position as a national accounts executive at Fougera to take a similar position at Aurobindo"). Thomassey never worked for Sandoz.

supply Sandoz's generic drug products.  ECF No. 965-1 at 768.  Vezza testified that Sandoz incurred less risk when it led a price increase on a product on which it competed with Perrigo or Taro, *id.* at 1068, as Sandoz "had collusive relationships" with those competitors that "gave us the confidence . . . that a particular price increase would be more successful," *id*. at 943.  To this end, Vezza testified, Bihari "was communicating with Taro and Perrigo on a regular basis."  *Id.* at 1066. Vezza described the purpose of Bihari's interfirm communications as:

> on product launches, you know, getting share, or, you know, [Bihari] would communicate [internally], you know, price points from Taro . . . .  And we would use those price points to award -- get guidance on what customers to go for or who to avoid.  And then we would do that and then -- to launch our products.  And then when they were launching into ours, we gave them price points.  You know, when it came to price increases, you know, they knew that we would do everything that we could to follow as quickly as possible.

*Id.*; *see also id.* at 1067–68 ("[W]hen it came to Taro and Perrigo, . . . [Bihari] was communicating on a regular basis.  And the goal or the agreement was to just follow the price increase.  And . . . it was knowing that they took the price increase and we would follow as quickly as possible. Works for everyone.").

Polman died in 2018, before this case was filed.  ECF No. 620-1 ¶ 81.  Although he was not deposed in this matter, he told federal investigators before his death that he engaged in collusive conduct with Fougera and Sandoz, among other competitors, and that he discussed customer allocation with Thomassey and Bihari.  *E.g.*, ECF No. 952-1 at 522–24, ECF No. 959-1 at 263–64, 268.[5]  Polman did not tell investigators that he entered into any broad agreements with

---

[5] The federal investigators' summary of Polman's statements is hearsay within hearsay because it is an out-of-court statement recounting another out-of-court statement.  But "[h]earsay within hearsay is not excluded by the rule against hearsay if each part of the combined statements conforms with an exception to the rule."  Fed. R. Evid. 805.  The States argue in their opposition to Perrigo's motion for summary judgment that Polman's statements to investigators are admissible as a statement against interest under Fed. R. Evid. 804(b)(3)(A) because he is deceased and the statement "had so great a tendency . . . to expose the declarant to civil or criminal liability." ECF No. 1029 at 23 n.17.  I agree to a limited extent: in a few of Polman's statements he inculpates

competitors that encompassed more than one drug, though he knew Fougera and Actavis were "more likely to follow a Perrigo price increase." ECF No. 959-1 at 251.

### 2. Claims Based on Direct Evidence of an Agreement

For claims as to nine drug products for which Perrigo seeks summary judgement, one of the States' cooperating witnesses, either Christopher Bihari or Anthony Thomassey, testified that he reached an anticompetitive agreement on calls with Perrigo's Polman.[6]  As explained in the discussion section below, because the States have produced direct evidence of an agreement, it is unnecessary to describe all of the circumstantial evidence regarding these drugs.

#### a. Adapalene Cream

The States allege that Perrigo conspired with Sandoz to allocate customers when Sandoz reentered the Adapalene cream market in 2013.[7]  ECF No. 196 ¶¶ 1052–74.  Bihari testified that

---

himself in *per se* violations of the antitrust laws; these statements qualify as statements against penal interest. *See Williamson v. United States*, 512 U.S. 594, 604 (1994).  Moreover, I may consider the federal investigators' *summary* of Polman's statement at summary judgment because it is reducible to an admissible form, as the States could call the author as a trial witness. *Parks v. Blanchette*, 144 F. Supp. 3d 282, 293 (D. Conn. 2015) ("[E]ven inadmissible evidence may properly be considered on summary judgment if it may reasonably be reduced to admissible form at trial.").  Thus, I will consider only the self-inculpatory portions of Polman's statement as evidence at summary judgment.  But because of concerns over the statements' admissibility (not least because the DOJ redacted information about the summaries' authors and the agents involved), I will not rely on it alone as to any critical issue. *See Champagne Metals v. Ken–Mac Metals, Inc.*, 458 F.3d 1073, 1084 (10th Cir. 2006) ("Where, as here, a plaintiff adduces only weak direct evidence, which by itself is insufficient to defeat summary judgment, additional circumstantial evidence is required to overcome a motion for summary judgment."); *see also Sandoz, Inc.*, 2026 WL 1533866, at *26 n.11 (giving little weight to another witness's statements to federal investigators and noting that I "do not rely on it alone as to any critical issue").

[6] Bihari also testified that Perrigo and Sandoz reached a customer allocation agreement on Halobetasol Propionate cream that culminated in 2014.  ECF No. 964-1 at 949–50.  But Perrigo seeks summary judgment only as to the States' claims regarding Halobetasol price increases in 2012 and 2013.  ECF No. 943 at 37.

[7] The States also allege that Perrigo and Fougera earlier conspired to allocate customers upon Perrigo's entry into the Adapalene cream market in 2010, but Perrigo seeks summary judgment only as to the 2013 customer allocation claims.  ECF No. 943 at 37.

Perrigo and Sandoz had an agreement regarding Adapalene cream whereby "Perrigo would relinquish market share upon Sandoz's reentry in the market. Perrigo provided price points in order to keep the pricing high in the market and to allow Sandoz to be successful, even though they weren't initially in their launch." ECF No. 964-1 at 944–45; *see also id.* at 941–44 (Bihari testimony regarding his communications with Perrigo's Polman and their impact on Sandoz's launch, including that Sandoz was able to obtain Walgreens' business at a higher price).

> b. Bromocriptine Mesylate Tablets

The States allege that Perrigo, Sandoz, and Mylan conspired to fix prices and allocate customers for Bromocriptine Mesylate Tablets ("Bromocriptine") from 2013 to 2014. ECF No. 196 ¶¶ 1026–50. Bihari testified that Perrigo and Sandoz had an agreement for Perrigo "to follow Sandoz's price increase, to ensure that their pricing is at parity with Sandoz, and to not touch any of Sandoz's market share, even though it took . . . well over a year for them to follow." ECF No. 964-1 at 925. Bihari further testified that as a result of this agreement, "[t]he pricing was kept high in the market by both companies and at parity." *Id.*

I denied Mylan's motion for summary judgment regarding the States' Bromocriptine claims. *Sandoz, Inc.*, 2026 WL 75851, at *16–18.

> c. Ciclopirox Shampoo

The States allege that Perrigo, Sandoz, and Actavis conspired to fix prices and allocate customers when Sandoz entered the Ciclopirox shampoo market in 2012. ECF No. 196 ¶¶ 627–39. Bihari testified that he implemented agreements between Sandoz and both of its competitors on calls with Perrigo's Polman and Actavis executive Ara Aprahamian to fix prices and allocate customers for Ciclopirox shampoo as Sandoz was preparing to send offers to customers. ECF No. 964-1 at 866-68. He described the agreement between Perrigo and Sandoz as:

> to provide Sandoz with market share targets or customer pricing and to ensure that

9

> the pricing that Sandoz submitted on the offer letter was . . . low enough to trigger a [right of first refusal] but also ensure that Sandoz kept the price high. They had assurances that they would be successful in that offer letter.

*Id.* at 868.  Bihari also testified that Polman "agree[d] on behalf of Perrigo to relinquish the customers that he gave [Bihari] pricing for," and "Sandoz knew they would be successful in sending those offers to those customers based on the conversations I've had with Tony Polman, and it gave Perrigo confidence knowing that Sandoz wouldn't approach any additional customers and the business that they retained would be at the higher price." *Id.* at 1050.

### d. Erythromycin Solution (Direct Evidence)

The States allege that Perrigo conspired with Sandoz to fix prices and allocate customers for Erythromycin solution as Sandoz reentered the market in 2012.[8]  ECF No. 196 ¶¶ 348–65. Bihari testified that Sandoz and Perrigo had an agreement on Erythromycin solution whereby Perrigo provided Sandoz with pricing information that Sandoz could use to bid for the business of Cardinal, one of Perrigo's customers, and that Perrigo agreed not to defend the customer.  ECF No. 964-1 at 872 ("Perrigo provided pricing and also agreed to relinquish the award in an RFP [request for pricing].  [Perrigo] . . . either did not bid or bid to lose."); *see also id.* at 847 (testifying that "relinquish" meant "did not defend").  Bihari also testified that as a result of this agreement, Sandoz was able to obtain Cardinal's business "at a higher price than normal." *Id.* at 872.

### e. Fluocinonide .1% Cream (Direct Evidence)

The States allege that Perrigo conspired with its competitors Taro, Bausch, Glenmark, and Sandoz to allocate customers for Fluocinonide .1% cream upon their entries into the market.  ECF

---

[8] The States also allege that Perrigo conspired with Fougera and Wockhardt to fix prices and allocate the Erythromycin solution market in 2011 and early 2012.  ECF No. 196 ¶¶ 335–47. Because the States lack direct evidence of this earlier agreement, however, I address it separately in my discussion of circumstantial evidence below.

No. 196 ¶¶ 926-47.   I previously addressed the facts related to the States' claims regarding Fluocinonide .1% cream in the Taro ruling, ECF No. 1410 at 48–53, and I incorporate that description by reference.   As noted in that ruling, Bihari testified that Sandoz and Perrigo had an agreement on Fluocinonide .1% cream whereby "Perrigo would relinquish market share upon Sandoz's reentry in the market" in 2015.[9]  ECF No. 1410 at 53–54 (citing ECF No. 964-1 at 1001). According to Bihari's testimony, when Sandoz was preparing to enter the market in September 2015, he called Perrigo's Polman and Taro's Ara Aprahamian, who provided Bihari with pricing information about five Fluocinonide customers.  *Id.* at 53 (citing ECF No. 964-1 at 997–98); ECF No. 949-1 at 91.   Bihari testified that Perrigo's Polman provided this information to Sandoz "[t]o allow Sandoz to price their offers appropriately and to keep the price high in the market."  ECF No. 964-1 at 998.   Bihari reported the pricing information to Michael Vezza, though he indicated that the information came from customers in an effort, he testified, "[t]o mask where I actually received the pricing."  *Id.* at 997–98; ECF No. 949-1 at 91.   Vezza likewise testified that "it's likely that he got this through some combination of talking with Tony and Ara.  Like I don't know how else he would have gotten it," as Bihari was not responsible for the customers listed.  ECF No. 965-1 at 1110.

Bihari also testified that he spoke to Polman about customer Morris & Dickson, and "[Polman] indicated that [Perrigo] would let it go" and "[a]llow Sandoz to secure that award. . . . Perrigo would not retain."  *Id.* at 1000.  Bihari reported this information internally, writing "I'm

---

[9] The States rely on circumstantial evidence regarding agreements between Perrigo and other competitors, and so I address that evidence separately below.  Perrigo fails to address Bihari's testimony in its briefing or statement of facts, even incorrectly noting that "Bihari has not offered testimony that Sandoz and Perrigo communicated with one another concerning pricing or customers for fluocinonide cream."  ECF No. 1029-1 ¶ 185.  I assume this statement was an error, potentially caused by a misspelling of the drug throughout the deposition transcript.  *See* ECF No. 964-1 at 1118–22 (errata sheets).

very confident we can secure as the incumbent will more than likely not match the offer." *Id.*

On October 1, 2015, Sandoz submitted an offer to Morris & Dickson, but the customer rejected it because it was "not much better" than Perrigo's. ECF No. 1029-1 ¶ 182. On October 5, Sandoz submitted a revised offer that the customer accepted. *Id.* Perrigo contends that Morris & Dickson "did not provide Perrigo with notice and an opportunity to submit a competitive bid in response to either . . . offer from Sandoz." *Id.*

Vezza testified that Sandoz acted on the information that Bihari provided about Fluocinonide .1% cream." ECF No. 965-1 at 1110.

> f.   Imiquimod Cream

The States allege that Perrigo colluded with Fougera to fix prices and allocate the market for Imiquimod cream upon Perrigo's launch in 2010 and also upon Sandoz's and Taro's launches in 2011. ECF No. 196 ¶¶ 214–57. Thomassey testified that on calls with Perrigo's Polman in 2010, he reached an agreement about how Fougera and Perrigo would allocate customers for Imiquimod cream. ECF No. 965-1 at 337. He testified that in April 2010 he and Polman discussed "the pricing that Perrigo will go to specific customers about and who -- who [Fougera] would give up and that -- what Perrigo had agreed to," for the purpose of "reduc[ing] the competition by making sure that Perrigo agreed to who they would target and at what price they would go to." *Id.* at 336; *see also id.* at 339 (testifying that he and Polman discussed specific customers that Fougera would cede to Perrigo and the specific pricing for those customers). Thomassey said he told Polman that Fougera was "going to give up the chain drug consortium and that Perrigo needs to stop seeking more share" beyond those customers. *Id.* at 338. He testified that Perrigo and Fougera had an "understanding" that Fougera would concede certain customers to Perrigo for the purpose of "keep[ing] the price as high as possible." *Id.* at 339. Thomassey further testified that the companies' coordination continued beyond the launch of the product, describing their agreement

12

as, "everyone had secured their market share at this point, we'd just let business run. We wouldn't attack each other to result in lower prices." *Id.* at 340.

When Taro entered the market the following year, Thomassey said, he had a series of calls with Perrigo's Polman and Taro sales representative Howard Marcus "[t]o divide up market share and pricing on Imiquimod" and that the three competitors "were working in concert to establish the price points and who takes who." *Id.* at 342, 345. He also testified that following calls with Polman and Marcus, Fougera reached an agreement with Taro to give up an Imiquimod customer to Taro. *Id.* at 351.

### g.    Methazolamide Tablets

The States allege that Perrigo conspired with Sandoz to fix prices and allocate customers as Sandoz was preparing to reenter the Methazolamide market in 2014. ECF No. 196 ¶¶ 1112–24. Bihari testified that Sandoz had an agreement with Perrigo regarding Methazolamide, whereby, "Upon reentry[,] . . . Sandoz can recover their market share, and at a higher price" than it charged before it left the market. ECF No. 964-1 at 964–65.

Perrigo contends that Bihari's description of a Methazolamide agreement is inconsistent with other evidence. ECF No. 943 at 20–22; ECF No. 1029-1 ¶ 16. A description of such additional evidence follows.

Before supply issues caused Sandoz to stop supplying Methazolamide in January 2014, it had ninety-three percent of the market, with a WAC price of $129.84 for 25 mg tablets and $259.84 for 50 mg tablets. ECF No. 1029-1 ¶ 161. Once Sandoz was temporarily out of the market, Perrigo launched Methazolamide in March 2014 at WAC prices of $306.47 for the 25g tablets and $612.97 for the 50mg tablets. *Id.* ¶¶ 162–63. On October 21, 2014, Sandoz's Bihari called Perrigo's Polman, and the call lasted fifteen minutes. ECF No. 950-1 at 253. In contemporaneous notes, Bihari wrote:



ECF No. 953-1 at 336.  At his deposition, Bihari testified that he believed that "$600" under "Methazolamide" referred to Perrigo's "dead net" price, i.e., the actual price a customer paid after all applicable discounts and rebates, and the information next to "WAC" indicated that Perrigo's 25g WAC price was "going from 300 to 800 [dollars]" and the 50 mg WAC price was "going from 600 to 1200 [dollars]."  ECF No. 964-1 at 962.  Bihari testified that Polman shared this information with him so that Sandoz could "also evaluate a price increase," and that he "would have" passed this information on to Sandoz executives Vezza and Armando Kellum.  *Id.*  Perrigo did not have dead net Methazolamide pricing of $600 for any customer in October 2014.  ECF No. 1029-1 ¶ 169.

On November 4, 2014, Vezza asked a colleague to evaluate the impact of increasing Sandoz's Methazolamide WAC prices to match those of Perrigo, $306.47 for the 25g tablets and $612.97 for the 50mg tablets.  ECF No. 957-1 at 270.  The next day, November 5, Bihari and Polman exchanged multiple phone calls, and Bihari called Vezza soon after his calls with Polman. ECF No. 965-1 at 1103.  On the same day, Vezza sent an internal email instructing colleagues to "please remove the [Methazolamide product codes] below from all contracts. This product is currently [temporarily unavailable] and we will be reintroducing the product in December."  ECF No. 964-1 at 962.  Bihari and Vezza both testified that removing the product from contracts before reentering the market would allow Sandoz to reenter the market at a higher WAC price without

14

incurring any WAC increase penalties from its customers.  *Id.* at 963; ECF No. 965-1 at 1102–03.

On November 7, 2014, ANI, a non-Defendant supplier, entered the market in November 2014 at WAC prices above Perrigo's price—$459.61 for 25 mg and $919.46 at 50g.  ECF No. 1029-1 ¶ 168; ECF No. 943-4 at 2956.  Bihari later noted that Heritage, another supplier that is not a defendant in this case, "is supposed to enter sometime in early 2015."  ECF No 952-1 at 598.

On November 25, 2014, Polman called Bihari, and the call lasted twelve minutes.  ECF No. 964-1 at 963.  Immediately following this call, Bihari called Sandoz executive Kellum.  *Id.*

On December 1, 2014, Perrigo reduced its contract prices to two customers, including Anda, citing "changing market conditions."  ECF No. 971-2 at 133, 135.

On December 2, 2014, Sandoz's Vezza shared a revised pricing grid for Methazolamide and instructed his team to prepare Methazolamide offers to McKesson, Walgreens, and Ahold, among other customers.  ECF No. 964-1 at 963–64.

On December 3, 2014, Sandoz reentered the Methazolamide market and matched Perrigo's prices of $306.47 for the 25g tablets and $612.97 for the 50mg tablets.  ECF No. 1080-1 ¶ 487; ECF No. 971-2 at 137–38.  Sandoz and ANI both made multiple offers to Perrigo's customers.  ECF No. 1029-1 ¶ 171; 1080-1 ¶ 488–89.  Customer Anda told Sandoz that its bids were "considerably higher" than Perrigo's contract pricing and the bids of another supplier.  ECF No. 971-2 at 197.

On December 4, 2014, Bihari emailed colleagues non-public "price points in the market . . . (dead nets)" of "$250 & $500," and noted that Sandoz "should bid at 20% lower to secure the business."  ECF No. 952-1 at 598.  Bihari testified that he received this information from Polman on a call that they had the same day, and that the information was useful to "allow Sandoz to reenter the market at a higher price point and to be successful upon … relaunch."  ECF No. 964-1

15

at 964. Vezza also testified that he believed that Bihari received this "market intel" from Perrigo, ECF No. 965-1 at 1105, and he said that he "would have used" information that Perrigo provided to Bihari as Sandoz reentered the market, *id.* at 1104.

In the wake of competitors' bids for its business in December 2014, Perrigo decreased its pricing to retain a number of customers, including McKesson, Walgreens, and Ahold, among others. ECF No. 1029-1 ¶ 171.

By December 2015, Sandoz had obtained forty-eight percent of the market. *Id.*

### h. Nystatin Ointment

The States allege that Perrigo conspired with Fougera and Actavis to fix prices and allocate the Nystatin ointment market in 2011 and 2012. ECF No. 196 ¶¶ 367–91. Thomassey testified that Perrigo and Fougera had an agreement whereby Perrigo ceded market share to Fougera as it was entering the market in 2012 "to maximize the profitability for both parties." ECF No. 965-1 at 402–03.

Perrigo does not address this portion of Thomassey's testimony but contends that the existence of any Nystatin ointment agreement is inconsistent with other evidence. ECF No. 943 at 19–20. I addressed this evidence in the ruling denying Actavis's motion for summary judgment. ECF No. 1459 at 16–20. Briefly, Perrigo was the only seller of Nystatin ointment after Fougera temporarily left the market in February 2011. *Id.* at 16. On June 1, 2011, Perrigo increased its WAC prices for Nystatin ointment by as much as 493 percent. *Id.* at 17. On November 7, 2011, Actavis entered the market for Nystatin ointment and matched Perrigo's prices. *Id.* at 18. Thomassey exchanged calls with Perrigo's Polman as Fougera planned to return to market; he testified that he likely shared Fougera's market share goal and discussed a list of customers with Polman, as this was his "mode of operation" at Fougera. *Id.* at 20. On June 29, 2012, Fougera reentered the Nystatin ointment market and matched Actavis's and Perrigo's WAC prices. *Id.*

Customers Giant Eagle and Cardinal switched their business from Perrigo to Fougera on July 18 and July 23, 2012, respectively; Fougera's contract prices to Cardinal were about eight percent lower than Perrigo's dead net prices—$7.34 for 15g and $11.01 for 30g, compared to Perrigo's $8 for 15g and $12 for 30g. *See* ECF No. 946-1 at 120, 123, 126. Thomassey testified that Perrigo "conceded" these customers to Fougera. ECF No. 965-1 at 402. He also testified that there was an agreement between Perrigo and Fougera regarding Fougera's Nystatin ointment launch, which he described as "we got Cardinal as the award, so they gave up market share." *Id.*

In August 2012, after Sandoz completed its acquisition of Fougera and Thomassey left the company, customer Walgreens asked Sandoz if it was interested in supplying Nystatin ointment. ECF No. 951-1 at 255. Fougera's vice president of national accounts, Walter Kaczmarek, noted that Sandoz had scheduled Nystatin ointment for relaunch on October 1, 2012. *Id.* On October 9, 2012, Sandoz's Chris Bihari spoke by phone with Perrigo's Polman for thirteen minutes, and then immediately called Sandoz executive Armando Kellum, before later calling Michael Vezza. ECF No. 951-1 at 258. On November 7, 2012, Vezza reported to Kellum that Sandoz had made offers to Walmart, OptiSource, and Econdisc. ECF No. 951-1 at 260. Perrigo defended its business with at least Walmart and Econdisc. ECF No. 1029-1 ¶¶ 157–58.

   i.   Tacrolimus Ointment

The States allege that Perrigo conspired with Sandoz to fix prices and allocate customers as both companies were preparing to launch Tacrolimus ointment in 2014. ECF No. 196 ¶¶ 1102–10. Bihari testified Perrigo and Sandoz agreed "[t]o allocate the market to ensure that Sandoz achieves 50 percent share, Perrigo achieves 50 percent share, and -- both suppliers to keep the pricing as high as possible in the market." ECF No. 964-1 at 961; *see also id.* at 959 (Bihari testimony regarding his communications with Perrigo's Polman that "gave Sandoz comfort knowing where the pricing is going to be so they can be at parity and keep the pricing as high as

possible in the market"). Sandoz's Vezza also testified that he believed there was an agreement between Sandoz and Perrigo to allocate customers during the Tacrolimus ointment launch. ECF No. 965-1 at 1101.

### j. Triamcinolone Acetonide Cream and Ointment

The States allege that Perrigo and Fougera fixed prices on Triamcinolone Acetonide cream and ointment as both companies increased their prices in 2010. ECF No. 196 ¶¶ 259–64. Thomassey testified that, following calls that he had with Perrigo's Polman, Perrigo and Fougera reached an "understanding" that they would "they would follow [the price increase] and not cannibalize each other's business," ECF No. 965-1 at 360, and agreed "to not poach each other's customers with the price increase when it goes out for bid" and to thereby "keep prices -- market prices artificially higher to increase the profits." *Id.* at 363.

### 3. Claims Based on Thomassey's Testimony That He Served as a "Conduit"

Thomassey testified that when he worked for Aurobindo, he frequently acted as a "conduit" for Perrigo's Polman and G&W's Erika Vogel-Baylor when he participated in back-to-back calls with each competitor, though he did not identify the drugs discussed. ECF No. 965-1 at 414–19. The States allege that these calls related to four drugs: Ciclopirox solution, Halobetasol propionate cream and ointment, and Promethazine HCL suppositories. The facts below describe these calls and contemporaneous developments in these markets.

### a. Promethazine HCL Suppositories

In August 2012, Actavis, G&W, and Perrigo were the only generic suppliers of Promethazine HCL suppositories ("Promethazine"). ECF No. 1029-1 ¶ 230.

On September 18, 2012, G&W's Vogel-Baylor exchanged more than thirty text messages with Actavis's pricing director, Richard Rogerson. ECF No. 944-1 at 209–12. The next day,

18

September 19, 2012, Actavis announced that it was nearly tripling its WAC prices on Promethazine. ECF No. 1029-1 ¶ 231. Also on September 19, Vogel-Baylor called Thomassey. ECF No. 944-1 at 143. Thomassey returned her call and then immediately called Polman. *Id.* Thomassey then exchanged five more calls with Vogel-Baylor and Polman in a span of fourteen minutes, often calling one immediately after hanging up with the other. *Id.* One minute after her final call with Thomassey, Vogel-Baylor called G&W president Kurt Orlofski. *Id.* Thomassey testified that on these calls, "[w]e were coordinating market share and price on products," and that he was acting as a "conduit" for those companies, even though his own company did not sell the product in question. ECF No. 965-1 at 415.

On September 27, 2012, G&W's Vogel-Baylor sent Orlofski a revised price increase analysis on Promethazine. ECF No. 944-1 at 224. The analysis listed Actavis's new prices as the "Old WAC" prices and used even higher prices ($38.99) as the "NEW WAC." *Id.* Also on September 27, 2012, Thomassey returned a call from Vogel-Baylor, immediately called Polman, and then called Vogel-Baylor again, all within twenty minutes. ECF No. 944-1 at 145. Thomassey testified that on these calls he "was functioning as the conduit between Perrigo and G&W." ECF No. 965-1 at 416. Vogel-Baylor also exchanged more texts with Rogerson at Actavis on September 27, including after her calls with Thomassey. ECF No. 944-1 at 221–22.

On October 5, 2012, G&W notified customers that it was increasing its Promethazine prices to $38.99. ECF No. 1029-1 ¶ 232. Also on October 5, Vogel-Baylor called Thomassey, who then spoke with Polman before calling back Vogel-Baylor. ECF No. 944-1 at 226. All of these calls took place within thirty minutes. *Id.* Thomassey testified that on these calls he "was functioning as the conduit between those two manufacturers regarding customer allocation and price and the market share they were going to take." ECF No. 965-1 at 419. Immediately after

19

her last call with Thomassey, Vogel-Baylor called Actavis's Rogerson.  ECF No. 944-1 at 226. Vogel-Baylor and Rogerson also exchanged calls on October 11 and 12, 2012, and exchanged four text messages on October 16 and six texts on October 17.  ECF No. 948-1 at 187–88.  Also on October 17, Actavis announced it was matching G&W's Promethazine price.  ECF No. 1029-1 ¶ 233.

Perrigo did not increase its WAC prices for Promethazine in 2012, though it increased contract pricing for all but one customer in November and December 2012.  ECF No. 1029-1 ¶ 234.

On April 11, 2013, Vogel-Baylor called Thomassey, and then immediately called Actavis's Rogerson.  ECF No. 944-1 at 230.  Thomassey returned Vogel-Baylor's call, then immediately called Polman.  *Id.*  After a second call with Polman, Thomassey called Vogel-Baylor, and Vogel-Baylor called Thomassey five minutes later. *Id.*  Five days later, on April 16, 2013, G&W increased its WAC prices for Promethazine again.  ECF No. 1029-1 ¶ 235.  Actavis matched G&W's new price on June 5, 2013. *Id.* ¶ 236.

Thomassey stopped working for Aurobindo in May 2013.  ECF No. 965-1 at 317.

On June 26, 2013, G&W's Vogel-Baylor emailed Orlofski, writing, "[w]e are primary on Promethazine.  If Perrigo does not follow the increase soon, we might have an issue.  We are only going to bid the items we are Primary on.  Our goal is to maintain what we have.  We will not bid on items that we are not the current incumbent on."  ECF No. 957-1 at 340.

On July 30, 2013, Vogel-Baylor called Perrigo's Polman directly, and the two exchanged two further calls that day.  ECF No. 944-1 at 238.  On the same day, Perrigo matched G&W's and Actavis's prices on Promethazine.  ECF No. 1029-1 ¶ 237.

b.   Halobetasol Propionate Cream and Ointment

In September 2012, G&W and Perrigo were the only two generic suppliers of Halobetasol

20

propionate .05% cream and Halobetasol propionate .05% ointment (collectively, "Halobetasol" [10]). ECF No. 1029-1 ¶ 221.

As described in the Promethazine section, Thomassey exchanged calls with Perrigo's Polman and G&W's Vogel-Baylor on September 19, 2012. On September 25, 2012, Perrigo announced price increases for Halobetasol. ECF No. 956-1 at 422. Vogel-Baylor also prepared increases on this day in advance of G&W's planned announcement two days later. *Id.* at 375.

On November 6, 2012, Thomassey returned a call from Vogel-Baylor and then immediately called Polman. ECF No. 944-1 at 155. Thomassey then exchanged five more calls with Vogel-Baylor and Polman, all within an hour of each other. *Id.* Thomassey again testified that on this date he "was serving as the conduit between G&W and Perrigo on pricing and customer allocation," and that he was helping G&W and Perrigo to coordinate their conduct on products that Aurobindo did not sell. ECF No. 965-1 at 417. After speaking with Thomassey for the final time that day, Vogel-Baylor sent an internal email regarding a customer's request for G&W to bid on Halobetasol, writing "We cannot take this from Perrigo, so I will give you pricing so that it looks like you are making an attempt to bid[.]" ECF No. 956-1 at 377.

On March 25, 2013, Perrigo announced that it was raising its Halobetasol WAC prices. ECF No. 950-1 at 300 (listing incorrect announcement date of March 25, 2012, but noting price "[e]ffective March 27, 2013"). The next day, March 26, 2013, Thomassey returned a call from Vogel-Baylor, then immediately called Polman, and then called Vogel-Baylor again after speaking with Polman. ECF No. 944-1 at 157. Thomassey testified that on this date he was "acting as a

---

[10] Because the parties address the evidence as to both the cream and ointment together and do not distinguish the products, I will refer to claims regarding both Halobetasol products collectively. For Halobetasol cream, Perrigo seeks summary judgment with respect to the "2012 and 2013 price increases only." ECF No. 943 at 37. This ruling is thus limited to those claims.

conduit between the two companies to divide up share and market pricing."  ECF No. 965-1 at 418.

On April 8, 2013, Thomassey called Polman before three calls with Vogel-Baylor.  ECF No. 961-1 at 214.  On April 10, 2013, G&W began informing customers that it was matching Perrigo's new WAC prices.  ECF No. 1029-1 ¶ 226.

c.  Ciclopirox Solution

In 2013, the generic manufacturers in the market for Ciclopirox solution were Perrigo, G&W, and Sandoz, as well as a handful of non-Defendants with small shares of the market.  ECF No. 1029-1 ¶ 198.  G&W and Perrigo, however, dominated the market with eighty-nine percent of sales between them in June 2013.  ECF No. 1029-1 ¶ 198.

On April 29, 2013, G&W's Vogel-Baylor called Thomassey, who returned her call and then immediately called Perrigo's Polman.  ECF No. 944-1 at 174.  After speaking with Polman, Thomassey immediately called Bihari at Sandoz, and then immediately called Vogel-Baylor again. Id.  About eight minutes after speaking with Vogel-Baylor, Thomassey called Sandoz's Bihari again.  Id.  About twenty-five minutes later, Polman again called Thomassey, who then immediately called Vogel-Baylor twice.  Id.  Thomassey testified that on these calls he "was functioning as the conduit between G&W and Perrigo with regard to products, pricing, and customer allocation."  ECF No. 965-1 at 419.

The following day, April 30, Thomassey and Sandoz's Bihari exchanged three calls in the span of ten minutes.  ECF No. 961-1 at 210.  In contemporaneous notes, Bihari wrote, "G&W – Ciclo Solution Inc. New CP $27 New WAC - $37."  ECF No. 950-1 at 30.

Thomassey and G&W's Vogel-Baylor then exchanged more calls on May 1, 2013.  ECF No. 961-1 at 210–11.  On the same day, Vogel-Baylor emailed colleagues that G&W would "be doing a price increase on Ciclopirox Solution one week from today on May 8th."  ECF No. 944-1

22

at 178.  On May 9, 2013, G&W raised its WAC price for Ciclopirox solution from $16.00 to $37.15.  ECF No. 1080-1 ¶ 116.  The non-Defendant suppliers also increased their WAC prices at this time, but Perrigo and Sandoz did not.  ECF No. 1029-1 ¶ 199.

Shortly after G&W's price increase, Sandoz began experiencing significant supply shortages because of overselling Ciclopirox solution beginning in mid-2013, which left it unable reliably to fulfill new orders.  ECF No. 1080-1 ¶ 117.  Other suppliers also experienced supply issues in June 2013.  ECF No. 1029-1 ¶ 198.  Sandoz ultimately maintained its previous Ciclopirox solution pricing throughout 2013.  ECF No. 1080-1 ¶ 125.

By July 25, 2013, Perrigo decided to increase its WAC and contract prices for Ciclopirox solution.  ECF No. 1029-1 ¶ 202.  On August 1, 2013, Perrigo raised its WAC for Ciclopirox solution to $24, which was below G&W's price of $37.15.  ECF No. 1080-1 ¶ 122.

### 4.  Claims Based on Circumstantial Evidence

#### a.  Ammonium Lactate Cream and Lotion

I previously addressed the facts related to the States' claims regarding Ammonium lactate cream and lotion in the Taro ruling, and I incorporate that description by reference.  ECF No. 1410 at 20–25.

#### b.  Ciclopirox Cream

Ciclopirox cream is a topical treatment for skin infections.  ECF No. 1029-1 ¶ 82.  The States allege that Perrigo conspired with G&W and Glenmark to fix prices for Ciclopirox cream in May 2013.  ECF No. 196 ¶¶ 1540–41.  The States also allege that G&W and Glenmark (but not Perrigo) earlier conspired to fix prices on Ciclopirox cream in April 2012.  *Id.* ¶¶ 503–37.  While no party has moved for summary judgment on the 2012 claim, the evidence related to discussions between competitors on that occasion is relevant for the 2013 claim involving Perrigo, as I discuss below.

Perrigo and Glenmark were the only other active suppliers of Ciclopirox cream when G&W launched the product in March 2012. ECF No. 1029-1 ¶ 84. Paul Dutra, Glenmark's executive vice president and one of the States' cooperating witnesses, testified that Glenmark was planning to increase prices on Ciclopirox cream and another drug, Mometasone, in April 2012. ECF No. 964-1 at 2199. According to Dutra's testimony, he sent a proposal for increasing Ciclopirox cream to Glenmark's president and CEO, Terrance Coughlin, who then sent Dutra an email with the subject line "Regarding Perrigo," in which Coughlin wrote, "I need to talk to them face to face. Do you want me to do this before we make any moves?" *Id.* Dutra responded that Perrigo "will have to give up some" customers. *Id.* at 2199–2200. In another email that day, Coughlin wrote, "I guess [Perrigo] has Walmart, ABC and Medco? Who else big? Who does G&W want? Who if anyone are we willing to sacrifice?" *Id.* at 2200. Dutra responded, "I will be sending you an entire break down. Meet with her tomorrow," and he testified that "her" referred to G&W's Erika Vogel-Baylor. During Dutra's deposition, the States presented exhibits indicating that on April 4, 2012, Dutra and G&W's Erika Vogel-Baylor exchanged forty-two text messages and had one call lasting over fourteen minutes, and on April 18, 2012 exchanged eighteen messages and two calls. *Id.* at 2201, 2205–06. Dutra testified it was "very likely" he discussed Ciclopirox cream with Vogel-Baylor during these communications. *Id.* at 2201, 2206. Dutra also testified that Glenmark increased its prices for Ciclopirox cream and Mometasone on April 18, 2012. *Id.* at 2204–05. Dutra testified that he believed he reached an agreement with Vogel-Baylor during their April 4 calls "to raise prices and to not take each other's customers" on Ciclopirox cream and the Mometasone products. ECF No. 964-1 at 2202–03; *see also id.* at 2205–07, 2209 (testifying that Glenmark CEO Coughlin was aware of the Ciclopirox cream agreement with G&W, and that prices were higher than they otherwise would have been because of his coordination with Vogel-

Baylor).  The purpose of his April 18 calls, he testified, "was to ensure that the price increases stuck and that no one would poach each other's customers."  *Id.* at 2206.

During Vogel-Baylor's deposition, the States presented phone summaries indicating that she exchanged forty-five texts and calls with Dutra on April 11, 2012, the same day that she sent her supervisor at G&W an email detailing a price increase on Ciclopirox cream to Walgreens and Publix.  ECF No. No. 965-1 at 1438–49.  Vogel-Baylor testified that she did not remember colluding with or speaking to Dutra on Ciclopirox cream in 2012.  *Id.* at 1435, 1442.

The following year, in May 2013, both G&W and Glenmark raised their WACs for Ciclopirox cream.  ECF No. 944-1 at 199, 201; *see* ECF No. 964-1 at 2270 (Dutra testimony); ECF No. 965-1 at 1392, 1446 (Vogel-Baylor testimony).  G&W's Vogel-Baylor was in frequent contact with Dutra and Glenmark's vice president of sales, Jim Brown, during May 2013.  ECF No. 944-1 at 193–94, 203 (call records indicating that Vogel-Baylor exchanged twelve calls with Brown and five calls with Dutra from May 2 to May 30, 2013, and she also sent Dutra three text messages on May 13, 2013); ECF No. 951-1 at 137–38, 140–41.  Dutra testified that in these communications, he and Vogel-Baylor discussed Ciclopirox cream and Mometasone and agreed that "[Glenmark] would raise the price, [G&W] would follow, and we wouldn't take each other's customers."  ECF No. 964-1 at 2215; *see also id.* at 2221, 2225, 2269, 2277, 2424.  Specifically, Dutra testified that the purpose of the flurry of calls between competitors on May 6 and May 7, 2013 (*see* ECF No. 951-1 at 137), while Glenmark was making its final preparations for its price increases, was "[t]o communicate the new pricing and let [competitors] know when the pricing letter [to customers] was going out and to coordinate to make sure that none of the competitors took our business."  ECF No. 964-1 at 2226.

After Glenmark raised its price, G&W's Vogel-Baylor sent an internal email on May 21,

25

2013, writing that G&W was "going to follow this increase, probably within a week or two, once we have an idea of how the rest of the market is responding." ECF No. 944-1 at 199. Vogel-Baylor testified that she did not remember if she was referring to Perrigo, the only other supplier, when she referred to "the rest of the market." ECF No. 965-1 at 1452–53. On May 29, 2013, Vogel-Baylor exchanged five calls with Glenmark's Dutra and Brown. ECF No. 944-1 at 203. G&W sent increase letters to customers the same day. *Id.* at 201.

Perrigo did not increase its Ciclopirox cream prices in 2013. ECF No. 1029-1 ¶ 86.

After Glenmark sent a "price revision notification" to Rite-Aid, the customer responded on June 6, 2013, that it was moving its Ciclopirox cream business "to another supplier effective immediately." ECF No. 951-1 at 145–46. Dutra forwarded this email to Coughlin, Glenmark's CEO and president, who wrote, "Guess some people did not honor their commitment on Ciclo." *Id.* at 144. Dutra responded, "I'm guessing Perrigo on Ciclo." *Id.* Asked about these emails during his deposition, Dutra testified that he did not think G&W would go after Rite-Aid on Ciclopirox cream "[b]ecause we had been working with Erika Vogel-Baylor on the product . . . [d]iscussing price increases and not poaching each other's customers." ECF No. 964-1 at 2273.

### c. Clindamycin Phosphate Solution

I previously addressed the facts related to the States' claims regarding Clindamycin phosphate solution in the Taro ruling, ECF No. 1410 at 32–35, and the Greenstone ruling, *Sandoz, Inc.*, 2026 WL 1533866, at *3–10, and I incorporate those descriptions by reference.

### d. Desonide Cream and Ointment

The States allege that Taro and Perrigo conspired to raise the price of Desonide cream in April and May 2013 and that both firms also conspired with Actavis when it reentered the market

in August 2013.[11]  ECF No. 196 ¶¶ 727–56; 832–49; ECF No. 1036-1 ¶ 411.

For Desonide ointment, Perrigo seeks summary judgment as to the "price increase only." ECF No. 943 at 37.  In a 2020 Deferred Prosecution Agreement ("DPA") with the DOJ, Sandoz admitted to fixing prices for "certain generic drugs, including desonide ointment" with Perrigo, beginning in July 2013.  ECF No. 963-1 at 240, 257.  Taro, in its own DPA, also admitted to fixing the prices of drugs include Desonide ointment with Sandoz, but not with Perrigo.  ECF No. 962-1 at 801.  In its motion, Perrigo notes that "the States allege that Perrigo conspired with Taro on a series of price increases for desonide cream and desonide ointment in April and May, 2013."  ECF No. 943 at 18.  Because Sandoz's admissions in its DPA would preclude summary judgment for claims as of July 2013, I assume that Perrigo seeks summary judgment on Desonide ointment only as to the States' claims that it conspired with Taro to fix prices in April and May 2013, and not that it conspired with Sandoz (or Taro) to fix prices later in 2013.

Perrigo addresses the States' claims regarding Desonide ointment and Desonide cream together.  For example, it argues that Perrigo and Taro announced price increases for both the cream and ointment together in April 2013, and that Actavis did the same in August 2013.  ECF No. 943 at 18 (citing ECF No. 1029-1 ¶¶ 131–32).  The States likewise do not distinguish between the facts regarding Desonide ointment and cream.  ECF No. 1029 at 44–45.  I previously addressed the facts related to the States' claims regarding Desonide cream in April and May 2013 in the Taro ruling.  ECF No. 1410 at 35–42.  I incorporate that description by reference.

In addition to the combined April/May 2013 allegations, the States allege that Perrigo conspired with Taro and Actavis when Actavis reentered market for Desonide cream  (and *not*

---

[11] The States do not assert a claim against Actavis on Desonide cream. *See* ECF No. 196 ¶ 1642; ECF No. 1036-1 ¶ 123.

Desonide ointment) in August 2013.  Again, I incorporate the facts related to this allegation from the Taro ruling, *id.*, to which I add the following:

As Taro was announcing it was increasing its prices for Desonide cream and ointment, Taro executive Michael Perfetto exchanged five calls with Actavis's Michael Dorsey, a director of national accounts, between April 29 and May 1, 2013.  ECF No. 945-1 at 40; *see* ECF No. 1036-1 ¶ 429 (Taro announced increases on April 30, 2013).  Dorsey testified that he did not recall making any agreements or having conversations with Taro personnel regarding price increases on any Desonide product.  ECF No. 1036-1 ¶ 418.  Perrigo announced that it was matching Taro's prices on May 17, 2013.  *Id.* ¶ 201.

On May 22, 2013, Actavis's Dorsey exchanged five calls with Perrigo's Polman, with the final call lasting for fourteen minutes.  ECF No. 945-1 at 31.  The next day, May 23, Dorsey called Polman again and the call lasted for twenty-four minutes.  *Id.* at 33.  On May 29, 2013, Polman and Dorsey exchanged four calls, and on May 31, they exchanged another two calls.  ECF No. 945-1 at 35.

On July 30, Dorsey called Polman and the call lasted two minutes.  ECF No 945-1 at 42.  The following day, July 31, Polman called Dorsey twice before Dorsey returned his call, and they spoke for twenty-one minutes. *Id.*

On August 7, Actavis executive Marc Falkin called Douglas Boothe, Perrigo's executive vice president and general manager, and the call lasted for eleven minutes.  ECF No. 950-1 at 314.  Two days later, Actavis chief operating officer Robert Stewart texted Boothe twice.  *Id.*; see ECF No. 964-1 at 1335.

On August 15, 2013, Actavis announced its was entering the market and matching Perrigo and Taro's WAC prices.  ECF No. 943-4 at 1197.  On August 17, 2013, Falkin called Boothe

28

again, but the call was not answered. ECF No. 950-1 at 314.

On August 23, 2013, a Perrigo account executive recommended reducing Perrigo's price to customer Anda, which had asked Perrigo "for a slight reduction to keep the business with us" to align with what other customers were paying. ECF No. 943-4 at 1200. An internal note indicated that "[i]f we don't adjust, Anda moves the entire family to Taro. With Actavis new to market, this product has competition. " *Id.*

On August 28, 2013, Perrigo's Boothe called the Taro main office line and spoke to someone there for thirteen minutes. ECF No. 950-1 at 314. On August 31, Actavis's Falkin against texted Boothe. *Id.* On September 3, 2013, someone using Taro's main office line called Boothe, and the call lasted for eight minutes. *Id.* The next day, Boothe called Actavis's Falkin and the call lasted for about ten minutes. *Id.* On September 6, 2013, Taro's Perfetto called Boothe and the call lasted for two minutes. *Id.*

Boothe testified that he did not recall talking to Actavis's Falkin about Desonide and that he did "not discuss competing or potentially competing products with individuals at other generic pharmaceutical companies." ECF No. 964-1 at 1337.

By October 2013, Actavis made offers to several Perrigo customers, but Perrigo decided not to lower its prices in response to requests from customers Kaiser and HD Smith. ECF No. 1029-1 ¶ 136; ECF No. 943-2 at 466; ECF No. 943-4 at 1203, 1207.

### e.   Econazole Nitrate Cream

The States allege that Perrigo conspired with Teligent and Taro to raise its prices for Econazole nitrate cream ("Econazole") in 2014, and that Perrigo conspired with Sandoz to allocate customers when Sandoz reentered the market in 2015. ECF No. 196 ¶¶ 909–23. I previously addressed the facts related to the States' 2014 claims in the Taro ruling, and I incorporate that description by reference. ECF No. 1410 at 42–48. In addition to the facts related in that ruling,

29

the parties here present the following facts concerning the States' 2015 claim.

On May 18, 2015, Bihari proposed targeting the customers of Perrigo, the market leader, when Sandoz reentered the market. ECF No. 1080-1 ¶ 192.

On October 1, 2015, a Sandoz launch manager asked Bihari for Econazole market information in anticipation of Sandoz's relaunch. ECF No. 957-1 at 61. The States contend, without citation to evidence in the record, that Bihari then called Perrigo's Polman and the call lasted for twenty-seven minutes. ECF No. 1029-1 ¶ 112; *see also* ECF No. 196 ¶ 919 (alleging the same in the complaint). Bihari responded to the Sandoz launch manager's request with information on Perrigo's non-public "dead net" pricing to customer Morris & Dickson. ECF No. 957-1 at 60. Bihari also addressed the email to Vezza, and wrote, "Mike…please call me to discuss additional specific market dynamics surrounding this molecule." *Id.* at 61. Later that same morning, Polman emailed Perrigo vice president John Wesolowski with the subject line "FYI--Sandoz launching Econazole in November," and writing "customer told me Sandoz is talking about econazole--will be no. 4 in the market." ECF No. 943-4 at 891.

On October 13, 2015, Perrigo reduced its pricing to its customer Walgreens, with Polman noting that he was doing so proactively ahead of Sandoz's launch "to protect our new biz at [Walgreens]," which Sandoz had only recently obtained. ECF No. 943-4 at 901.

On November 30, 2015, Sandoz bid to supply Morris & Dickson with Econazole. ECF No. 957-1 at 60. On December 11, Perrigo reduced its pricing to Morris & Dickson, which the customer accepted. ECF No. 943-4 at 909. In an internal note, a Perrigo account executive noted that Perrigo offered the reduced price because "Sandoz is coming after our business at Morris and Dickson. I already gave up Meijer, because their offer was half our current. This is a smaller decrease, and will retain this business if we match their offer. This is still a strong price compared

30

to our other wholesalers, and suggest we keep this one." ECF No. 943-4 at 907.

On December 16, 2015, Bihari and Polman exchanged four calls. ECF No. 961-1 at 215. The following day, Bihari noted internally that Perrigo had retained Morris & Dickson, but that the customer had told him the day before that it would consider a follow-up offer from Sandoz. ECF No. 957-1 at 60. In January 2016, Sandoz sent a revised offer to Morris & Dickson, which the customer accepted. ECF No. 957-1 at 59.

Vezza testified that he had no personal knowledge of any agreement between Sandoz and Perrigo concerning Econazole in 2015. ECF No. 965-1 at 918. He also testified that he did not believe the Sandoz's relaunch was successful because "we got blocked everywhere and we didn't have an understanding of where the market was." *Id.* at 917. Bihari was not questioned about Econazole. ECF No. 1080-1 ¶ 208.

f.  Erythromycin Solution (Circumstantial Evidence)

The States allege that Perrigo conspired with Fougera and Wockhardt to fix prices and allocate the Erythromycin solution market in 2011 and early 2012.[12] ECF No. 196 ¶¶ 335–47.

Erythromycin topical solution is a "macrolide antibiotic indicated for the topical treatment of acne vulgaris." ECF No. 1029-1 ¶ 317. In early 2011, Fougera and Wockhardt were the only suppliers of 60 mL Erythromycin solution. *Id.* ¶ 318. By June 2011, Wockhardt informed customers that it planned to discontinue the product. *Id.* ¶ 319. Fougera also notified customers that the product was on long-term backorder. *Id.* ¶ 320. Perrigo, which had earlier discontinued the product, then investigated the possibility of relaunching Erythromycin at the request of a

---

[12] As described above, *see supra* Section I.B.2.d, Bihari testified that Sandoz, which acquired Fougera, and Perrigo also had an anticompetitive agreement on Erythromycin solution later in 2012, under which Sandoz was able to obtain Cardinal's business "at a higher price than normal." ECF No. 964-1 at 872. But Bihari did not testify about earlier events regarding Erythromycin.

customer. *Id.* ¶¶ 318, 321–22.

On November 15, 2011, Perrigo vice president John Wesolowski asked sales representatives, including Tony Polman, to obtain Erythromycin pricing information from customers. ECF No. 943-7 at 1432–33. About twenty minutes later, Fougera's Thomassey called Polman and the call lasted seven minutes. ECF No. 946-1 at 108. Immediately after this call, Thomassey called Fougera's vice president of national accounts, Walter Kaczmarek. *Id.* Later that afternoon, Polman reported usage and pricing information from two customers to Wesolowski, noting that there were "[s]ome varying stories out there." ECF No. 943-7 at 1432. Two days later, on November 17, 2011, Polman called Thomassey and the call lasted six minutes. ECF No. 946-1 at 108. Immediately after this call, Thomassey called Michael Craney of Wockhardt, then placed a brief call to Fougera's Kaczmarek, and then called Craney again. *Id.* On November 18, 2011, Fougera's Bihari informed Kaczmarek that Perrigo would launch Erythromycin in the next few weeks; Kaczmarek responded that he had "heard that as well." ECF No. 964-1 at 3070.

By November 28, 2011, Perrigo decided to set its Erythromycin WAC price at $40, which was more than three times what Wockhardt and Fougera charged earlier in the year. ECF No. 1029-1 ¶¶ 318, 326. Ahead of its launch, Perrigo made offers to multiple customers and obtained the business of Cardinal, OptiSource, and Rite Aid. *Id.* ¶¶ 327–30. Perrigo began shipping Erythromycin to customers on December 19, 2011. *Id.* ¶ 331. On the same day, Polman called Thomassey, and the call lasted for five minutes. ECF No. 961-1 at 213.

On May 3, 2012, Fougera announced that it planned to re-launch Erythromycin at a WAC price of $39.69. ECF No. 1029-1 ¶ 333. On the same day, Thomassey called Polman and the call lasted for fifteen minutes. ECF No. 964-1 at 3071. After this call, Thomassey called Kaczmarek. *Id.* On May 11, 2012, Thomassey exchanged five calls with Polman; soon after the first three

32

calls, Thomassey called Kaczmarek.  ECF No. 946-1 at 110.  On the following business day, May 14, Kaczmarek informed his sales team with an "updated erythro[mycin] sol[ution] strategy," noting that Perrigo controlled the market (upon Wockhardt's exit), providing new price points, and highlighting Fougera's initial target customers, including Cardinal and Rite Aid.  ECF No. 957-1 at 75, 77 (native file provided to the Court).

On May 16, 2012, Fougera sent Cardinal an offer on Erythromycin with contract pricing of $23.60, which was about 36 percent less than Perrigo's price.  ECF No. 1029-1 ¶ 335.  On the same day, Fougera sent an offer to Rite Aid with direct contract pricing of $23.81, which was about 15 percent less than Perrigo's price.  *Id.* ¶ 336.  Perrigo declined to match Fougera's offer to Rite Aid.  *Id.*  Perrigo contends that defending Rite Aid "would have required Perrigo to reduce its pricing significantly, which could affect pricing at other Perrigo customers with 'best price' provisions in their contracts."  *Id.*  The States assert that the decision was the product of an agreement that Thomassey and Polman reached on their calls the previous week.  *Id.*

On May 23, 2012, however, Fougera had to place Erythromycin on backorder, leading Cardinal and Rite Aid to continue to buy from Perrigo through September 2012.  *Id.* ¶¶ 337–38.

As discussed above, Bihari testified that, following Sandoz's acquisition of Fougera, he reached an agreement with Polman in September 2012 whereby Perrigo agreed to relinquish Cardinal to Sandoz.  *Id.* ¶ 341.

g.   Fluocinonide .1% Cream (Circumstantial Evidence)

I previously discussed the circumstantial evidence related to the States' claims regarding agreements between Perrigo and Bausch, Glenmark, and Taro on Fluocinonide .1% cream in the Taro ruling, ECF No. 1410 at 48–53, and I incorporate that description by reference.

h.   Fluticasone Propionate Lotion

The States allege that Perrigo conspired with Sandoz in 2013 to fix prices and allocate the

market for Fluticasone propionate lotion ("Fluticasone"), a topical corticosteroid. ECF No. 1029-1 ¶ 206; ECF No. 196 ¶¶ 1149–51. The States also allege that Sandoz conspired with the other Fluticasone supplier, Glenmark, ahead of Perrigo's entry. ECF No. 196 ¶¶ 1128–44. There are two formulations of Fluticasone (60 mL and 120 mL) but only the 60 mL formulation is relevant to this motion. *Id.* ¶ 207 (indicating that "generic versions could be approved only for the 60 mL size because FDA approval of the labeling for the brand's 120 mL size remained pending during the Relevant Time Period").

Glenmark launched its Fluticasone generic first in March 2012. *Id.* ¶ 208. Sandoz launched next in December 2012. *Id.* ¶ 209. Sandoz's Bihari testified that Sandoz and Glenmark had an anticompetitive agreement whereby "Glenmark would relinquish market share when Sandoz entered the market, and Sandoz would also follow if there's any price increases." ECF No. 964-1 at 865.

Perrigo launched in July 2013. *Id.* ¶ 211. When Perrigo launched in July 2013, Glenmark had over 80 percent of the market. *Id.* Bihari did not testify about whether Sandoz had an agreement with Perrigo in addition to its agreement with Glenmark.

Before Perrigo launched Fluticasone, Sandoz employees discussed internally whether and when Perrigo would launch. On August 21, 2012, Sandoz executive Armando Kellum emailed his colleagues asking them to "find out what [they] can about Perrigo's intentions . . . Our understanding is they may be able to launch soon (September)." ECF No. 962-1 at 749. After that email was forwarded to Bihari that day, *id.* at 748, Bihari called Perrigo's Polman, ECF No. 961-1 at 213. Later that same day, Bihari emailed Kellum (and other Sandoz employees) to say that "[e]ssentially" Perrigo "can launch on [September 22] however they are attempting to accelerate the timeline. Customers I have talked to do not have any information regarding an imminent

launch." *Id.* at 748.

Four days later, on August 25, 2012, Sandoz employees again internally discussed the Fluticasone market. ECF No. 957-1 at 127. One Sandoz employee wrote that Perrigo "has made some signals to the market that they may be late" to enter the market. *Id.* That employee added, "[i]f [the] market is just Glenmark and Sandoz we would like to get at least 40% market share. If Perrigo also enters, we would like to get at least 30% market share." *Id.*

The following year, on May 21, 2013, a Perrigo employee who worked on pricing analysis asked Polman to "see about market pricing" for Fluticasone. ECF No. 956-1 at 447; *see* ECF No. 964-1 at 1278 (discussing the employee's role). Two days later, on May 23, 2013, Polman called Bihari twice, speaking first for five minutes and then for three minutes. ECF No. 961-1 at 214 (first call at 8:04 a.m., and second call at 2:48 p.m.). Afterward, Bihari spoke with Mitchell Blashinsky of Glenmark for four minutes. *Id.* (call at 2:57 p.m.).

In July 2013, Perrigo prepared to launch Fluticasone. On July 17, 2013, Polman spoke with Bihari for nineteen minutes. ECF No. 961-1 at 214. The next day, July 18, 2013, Bihari texted fourteen times with Andrea Felix, another Perrigo sales representative. *Id.* Bihari testified that on the July 17, 2013, call, Polman told him that when Perrigo launched, "their primary target will be Glenmark customers because Glenmark has the majority of the market share." ECF No. 964-1 at 865. This is memorialized in Bihari's contemporaneous notes of the call, in which he wrote ". . . targeting Glenmark . . . 25% share." ECF No. 953-1 at 292. Bihari testified that having information about which customers Perrigo would be targeting during its Fluticasone launch was useful because "Sandoz was able to protect their market share and keep the pricing high in the market." ECF No. 964-1 at 865. Although Bihari testified that Sandoz and Glenmark had an agreement on Fluticasone, he was not questioned about whether Perrigo also had an agreement

35

with a competitor. *Id.* at 865–66.

From July to October 2013, Perrigo bid for customers, including at least one, Walgreens, that belonged to Glenmark. ECF No. 1029-1 ¶¶ 212–17. Perrigo's bid to Walgreens was more than 25 percent lower than Glenmark's pricing. *Id.* ¶ 212.

i. Hydrocortisone Acetate Suppositories

The States allege that in 2013 and 2014 Perrigo and G&W conspired to increase WAC prices in the market for Hydrocortisone acetate suppositories, "used to treat itching or swelling caused by hemorrhoids as well as ulcerative colitis, proctitis, and other inflammatory conditions." ECF No. 196 ¶¶ 1475–1502. Perrigo sold a 12-count package of Hydrocortisone acetate in both a 25mg formulation and a 30mg formulation. ECF No. 1029-1 ¶ 253; ECF No. 1232-3 at 265.

For regulatory reasons unrelated to this action, Perrigo and G&W collaborated on a joint clinical and regulatory development agreement to commercialize a 25mg Hydrocortisone acetate suppository (the "Joint Development Program"). *Id.* ¶¶ 250–52. Douglas Boothe, Perrigo's executive vice president and general manager, and G&W president Kurt Orlofski were both on the joint development committee. *Id.* ¶ 252; ECF No. 1232-4 at 438 (Boothe and Orlofski included on committee meeting email invite).

On March 1, 2013, Boothe and Orlofski met over lunch. ECF No. 956-1 at 466 (Boothe expense report describing "Business lunch with Kurt from G&W"), 487 (lunch receipt). At his deposition, Boothe testified that he and Orlofski discussed the Joint Development Program at this meeting. No. 964-1 at 1276. Boothe also testified that he never discussed Hydrocortisone acetate with anyone at G&W. *Id.* at 1324 ("Q. Do you recall discussing the G&W price increase with Mr. Orlofski or anybody else at G&W? A. No. Never happened.").

At the start of summer 2013, Perrigo, G&W, and non-Defendant County Line Pharmaceuticals were the principal suppliers of Hydrocortisone acetate. ECF No. 1029-1 ¶¶ 253–

36

54; ECF No. 1232-3 at 265.  In late June 2013, County Line discontinued its manufacture of Hydrocortisone acetate and prepared to exit the market.  ECF No. 1029-1 ¶ 254; ECF No. 1232-4 at 465 ("Effective June 25, 2013, County Line Pharmaceuticals will no longer be supplying the Hydrocortisone Acetate Suppositories 25mg.").  As of July 2013, Perrigo had 30% of the market and G&W had 37% of the market across all formulations.  ECF No. 1232-3 at 265.

From June 27 to June 29, 2013, G&W's Vogel-Baylor attended an industry event in Las Vegas.  ECF No. 956-1 at 407–09.  On the first day, June 27, Vogel-Baylor called her boss, Orlofski.  ECF No. 961-1 at 225.  That evening, Vogel-Baylor emailed her colleagues to inform them that County Line was exiting the Hydrocortisone acetate market, and G&W would increase its price on the 12-count of Hydrocortisone acetate.  ECF No. 961-1 at 39.  Vogel-Baylor wrote that County Line

> has informed their customers (ABC, Cardinal, Rite Aid, and WalMart) that they are exiting the market on [Hydrocortisone acetate].  The only two players left in the market are Perrigo and us.  The even better news is that we are the only player that sells the 24[s] and 100[s] counts!!  Perrigo only has the 12 count.  Having said that, we are going to do a price increase on this item, and we expect to pick up a decent amount of business on the 24[s].

*Id.*

On July 2, 2013, G&W began informally notifying customers about the price increase.  ECF No. 944-1 at 185-86.  G&W sent out formal price increase letters on July 8, 2013.  *Id.* at 184 (referring to Hydrocortisone acetate by its brand name, "Anucort").  The WAC price increased from $13.99 to $41.97, effective July 9, 2013.  ECF No. 961-1 at 24 (including seemingly incorrect date of January 2, 2014).

Also on July 8, 2013, Vogel-Baylor and Perrigo's Polman exchanged two calls, spanning a total of eight minutes.  ECF No. 944-1 at 137.  Immediately after the second call, Vogel-Baylor called Orlofski in a call lasting six minutes and fourteen seconds, and she then called G&W

37

executive Aaron Greenblatt in a call lasting seven minutes and thirty-three seconds. *Id.* When asked at her deposition, Vogel-Baylor testified that she did not recall what was said on these calls. ECF No. 965-1 at 1402, 1404.

The next day, on July 9, 2013, Perrigo notified its customers of a price increase, too. ECF No. 961-1 at 102. Effective July 11, 2013, Perrigo's Hydrocortisone acetate 25mg WAC price increased from $7.20 to $41.30. *Id.*

On July 11, 2013, customer ABC emailed Vogel-Baylor asking G&W to "adjust [its] price slightly" to meet Perrigo's offer on Hydrocortisone acetate. *Id.* at 51. Vogel-Baylor forwarded that email to Orlofski, writing "Oh noooo . . ." *Id.* Orlofski responded, "Just say no!!!" *Id.* Vogel-Baylor said, "I will but it's painful!" *Id.* Vogel-Baylor responded to ABC declining the offer to bid, writing that "we are maxed out with what we have right now" and that G&W cannot adjust pricing while it pays off its "significant" WAC and contract penalties. *Id.* at 42. Also on July 11, 2013, Polman called Vogel-Baylor in a call lasting one minute. *Id.* at 225.

The following year, in May 2014, Vogel-Baylor wrote internally at G&W that, "[w]e already have more share than Perrigo so we really can't pick up anything else without upsetting the apple cart." ECF No. 956-1 at 393-94. In a separate exchange in May 2014, when asked by a colleague whether G&W should "bid a high price," Vogel-Baylor emailed that she did not "want to offer a price and have [the customer] tell Perrigo we were bidding against them." *Id.* at 365.

On June 11, 2014, Vogel-Baylor wrote to Orlofski recommending a net contract price increase on Hydrocortisone acetate to customer McKesson. *Id.* at 419. On the same day, Vogel-Baylor called Polman in a call lasting fifty-nine seconds. ECF No. 961-1 at 225.

On July 22, 2014, Perrigo notified its customers that it was increasing its Hydrocortisone acetate 25mg WAC price from $41.30 to $138.48. ECF No. 960-1 at 1275; ECF No. 961-1 at 104.

On August 1, 2014, G&W notified its customers that it was increasing its Hydrocortisone acetate 25mg WAC price to $137.99.  ECF No. 956-1 at 398-401 (internal G&W email discussing price increase); ECF No. 961-1 at 49 (letter to customer including incorrect date of August 1, 2013 and noting "effective Monday, August 4, 2014").

Before his death, Polman told federal investigators that he "remember[ed] speaking to Erika Vogel-Baylor about hydrocortisone suppositories." ECF No. 952-1 at 517; *see supra* note 5 (addressing admissibility of Polman's statements to investigators).  According to the investigators' summary, Polman said that he and Vogel-Baylor "spoke about the need for both companies to maintain market share, and not going after each other's customers. For example, if Polman would not go after Walgreens, then Vogel-Baylor would stay away from his Perrigo customers.  They also talked about implementing price increases on hydrocortisone, and both of them made an agreement to raise the prices on this drug simultaneously." *Id.* at 518.  Polman also "stated the price increase worked. G&W did not take any of Perrigo's customers, and he did not recall taking any of G&W's customers, consistent with their agreement." ECF No. 959-1 at 269.

> j.   Hydrocortisone Valerate Cream

I previously addressed the facts related to the States' claims regarding Hydrocortisone valerate cream in the Taro ruling, ECF No. 1410 at 68–74, and I incorporate that description by reference.

> k.   Prochlorperazine Maleate Suppositories

The States allege that in 2013 Perrigo conspired with G&W to fix prices and allocate customers in the market for Prochlorperazine maleate suppositories ("Prochlorperazine"), a treatment for nausea and vomiting.  ECF No. 196 ¶¶ 1441–53.

In January 2013, Perrigo and G&W were the only two suppliers of Prochlorperazine after the brand-name supplier discontinued its production.  ECF No. 1029-1 ¶ 242.  On January 29,

2013, Boothe and Orlofski met for lunch.  ECF No. 964-1 at 5243.  A month later, on March 1, 2013, Boothe and Orlofski met for lunch again.  ECF No. 956-1 at 466, 487.  As noted in the Hydrocortisone acetate section, Boothe testified that at this meeting he and Orlofski discussed the companies' Joint Development Program.  ECF No. 964-1 at 1276.  Orlofski testified that he did not recall discussing Prochlorperazine with Boothe.  ECF No. 964-1 at 5244.  On March 4, 2012, the next business day after this lunch, Orlofski had a meeting with Vogel-Baylor.  ECF No. 944-1 at 251.  Soon after this meeting, Vogel-Baylor sent an internal email requesting a sales report in anticipation of a price increase on Prochlorperazine.  ECF No. 961-1 at 8.  On March 7, 2012, Vogel-Baylor emailed a price increase analysis to Orlofski, recommending an increase in WAC pricing.  *Id.* at 10.

On March 18, 2013, G&W notified customers that it would increase its Prochlorperazine WAC price from $35.66 to $106.98, figures consistent with Vogel Baylor's analysis.  ECF No. 1029-1 ¶ 243; ECF No. 1232-4 at 384.  The next day, March 19, Boothe and Orlofski exchanged phone calls for the first time since their lunch.  ECF No. 950-1 at 298 (phone record summary indicating that Boothe and Orlofski exchanged three calls for one minute and twenty-nine seconds, three minutes, and six minutes, respectively).[13]  The States assert that these were the first calls between Orlofski and Boothe since their lunch.  ECF No. 1059-1 ¶ 32 (States' SAMF in connection with G&W's motion for summary judgment).

At his deposition, Boothe testified that he did not recall what he spoke to Orlofski about on these calls.  ECF No. 964-1 at 1284.  Orlofski testified that he did not discuss the Prochlorperazine price increase with Boothe.  ECF No. 964-1 at 5246-47.

---

[13] The parties reference a call between Boothe and Orlofski on March 20, 2013, but the Court cannot find evidence of this call in the record.

On March 25, 2013, Orlofski texted Boothe. ECF No. 950-1 at 302. The next day, on March 26, 2013, Boothe spoke with Orlofski for seven minutes. *Id.*

The following month, on April 11, 2013, Perrigo announced an increase to its WAC price from $34.85 to $104.55. ECF No. 1029-1 ¶ 244; ECF No. 1232-4 at 397.

Between March 2013 and September 2013, G&W's share of Prochlorperazine sales decreased from 54 percent to 48 percent, and Perrigo's share of Prochlorperazine sales increased from 46 percent to 52 percent. ECF No. 1029-1 ¶ 247.

In May 2013, Associated Pharmacies, Inc., requested that G&W bid on Prochlorperazine, but G&W declined, with a sales representative telling the customer, "[i]t's just us and Perrigo on this. We actually led the price increase on it and Perrigo followed. Their pricing is slightly below ours and I don't think Erika [Vogel-Baylor] is wanting to go after new share." ECF No. 956-1 at 367–68. In late July 2013, G&W reversed course and sent Associated Pharmacies a bid on Prochlorperazine. ECF No. 943-5 at 1117–18.

In June 2013, Perrigo sent Target a bid on Prochlorperazine, after a sales representative noted, "we're looking for a little more market share." ECF No. 943-5 at 1103, 1106, 1109. In July, Perrigo was awarded the contract for purchases made through McKesson. *Id.* at 1108.

The States assert that in May 2013, Perrigo and G&W "competed on some products but deferred on others" and that Perrigo and G&W acted based on "fair share" principles. ECF No. 1029 at 53.

## II. LEGAL STANDARD

### A. Summary Judgment

"Summary judgment is appropriate only if the movant shows that there is no genuine issue as to any material fact and the movant is entitled to judgment as a matter of law." *Tolan v. Cotton*,

572 U.S. 650, 656–57 (2014) (internal quotation marks and citations omitted). In reviewing the summary judgment record, a court must "construe the facts in the light most favorable to the non-moving party and must resolve all ambiguities and draw all reasonable inferences against the movant." *Caronia v. Philip Morris USA, Inc.*, 715 F.3d 417, 427 (2d Cir. 2013). "A genuine dispute of material fact exists for summary judgment purposes where the evidence, viewed in the light most favorable to the nonmoving party, is such that a reasonable jury could decide in that party's favor." *Zann Kwan v. Andalex Grp. LLC*, 737 F.3d 834, 843 (2d Cir. 2013). The moving party bears the burden of demonstrating that no genuine issue exists as to any material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323–25 (1986). If the moving party carries its burden, "the opposing party must come forward with specific evidence demonstrating the existence of a genuine dispute of material fact." *Brown v. Eli Lilly & Co.*, 654 F.3d 347, 358 (2d Cir. 2011). "Where no rational finder of fact could find in favor of the nonmoving party because the evidence to support its case is so slight, summary judgment must be granted." *Id.* (internal quotation marks omitted).

### B. Sherman Act

The Sherman Act bans "[e]very contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce among the several States." 15 U.S.C. § 1. "The crucial question in a Section 1 case is therefore whether the challenged conduct stems from independent decision or from an agreement, tacit or express." *Starr v. Sony BMG Music Entm't,* 592 F.3d 314, 321 (2d Cir. 2010) (internal quotation marks omitted). "An agreement between competitors to fix prices, known as a horizontal price-fixing agreement, categorically constitutes an unreasonable restraint, and, accordingly, is unlawful *per se.*" *In re Publ'n Paper Antitrust Litig.*, 690 F.3d 51, 61 (2d Cir. 2012). The same is true of an agreement to allocate customers or rig bids. *See Sandoz, Inc.*, 2025 WL 3470502, at *19 (an agreement "to get and provide assurance

42

that a move would stabilize prices and not disrupt the market—in the case of a price increase, to assure that the increase would be followed, or in the case of a new entrant to the market, that existing competitors would cede market share"—is a "naked restraint[ ] of trade with no purpose except stifling of competition" (citing *White Motor Co. v. United States*, 372 U.S. 253, 263 (1963)); *Cont'l Ore Co. v. Union Carbide & Carbon Corp.*, 370 U.S. 690, 708 (1962) (describing "an allocation of customers" as a "per se violation[] under § 1 of the Sherman Act").

At the summary judgment stage, "to raise a genuine issue of material fact as to an antitrust conspiracy, the plaintiff must present direct or circumstantial evidence that 'tends to exclude the possibility that the alleged conspirators acted independently.'" *Anderson News, L.L.C. v. Am. Media, Inc.*, 899 F.3d 87, 98 (2d Cir. 2018) (quoting *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 588 (1986)). "The quality of evidence required to satisfy the 'tends to exclude' standard 'varies with the economic 'plausibility' of the alleged agreement." *In re Foreign Exch. Benchmark Rates Antitrust Litig.*, No. 13 CIV. 7789 (LGS), 2022 WL 294118, at *5 (S.D.N.Y. Feb. 1, 2022). "[T]he tends to exclude standard is more easily satisfied when[] the conspiracy is economically sensible for the alleged conspirators to undertake and the challenged activities could not reasonably be perceived as procompetitive." *Anderson News*, 899 F.3d at 99 (quoting *Publ'n Paper*, 690 F.3d at 63). A plaintiff need not "disprove all nonconspiratorial explanations for the defendants' conduct; rather the evidence need be sufficient only to allow a reasonable fact finder to infer that the conspiratorial explanation is more likely than not." *Id.* (internal quotation marks omitted). "[I]f the evidence is in equipoise, then summary judgment must be granted against the plaintiff." *Id.*

As noted in the ruling regarding the overarching conspiracy, *Sandoz, Inc.*, 2025 WL 3470502, at *3, the parties agree that the suppliers in the markets for all the Drugs at Issue,

including those challenged in this motion, comprise oligopolies. "Oligopolies pose a special problem under § 1 [of the Sherman Act] because rational independent actions taken by oligopolists can be nearly indistinguishable from horizontal price fixing," as "any rational decision [in an oligopoly] must take into account the anticipated reaction of the other firms." *In re Mylan N.V. Secs. Litig.*, 666 F. Supp. 3d 266, 318 (S.D.N.Y. 2023). "Consequently, parallel conduct allegations must be placed in a context that raises a suggestion of a preceding agreement, not merely parallel conduct that could just as well be independent action." *Mayor & City Council of Balt. v. Citigroup, Inc.*, 709 F.3d 129, 137 (2d Cir. 2013). "Since mere parallel behavior can be consistent with independent conduct, courts have held that a plaintiff must show the existence of additional circumstances, often referred to as 'plus' factors, which, when viewed in conjunction with the parallel acts, can serve to allow a fact-finder to infer a conspiracy." *Apex Oil Co. v. DiMauro*, 822 F.2d 246, 253 (2d Cir. 1987). "Such 'plus factors' may include, for example: a common motive to conspire; evidence that the parallel acts were against the apparent economic self-interest of the individual alleged conspirators; or evidence of a high level of interfirm communications." *Publ'n Paper*, 690 F.3d at 62 (internal quotation marks and citations omitted). But because "such factors in a particular case could lead to an equally plausible inference of mere interdependent behavior, i.e., actions taken by market actors who are aware of and anticipate similar actions taken by competitors, but which fall short of a tacit agreement," *id.*, these circumstances "must still lead to an inference of conspiracy." *Citigroup, Inc.*, 709 F.3d at 137.

## III.  DISCUSSION

### A.  Claims Based on Direct Evidence of an Agreement

"[A] co-conspirator's acknowledgment that he understood his numerous communications with [a competitor] to reflect a price-fixing agreement . . . is surely strong evidence of a collusive

scheme . . . sufficient to satisfy *Matsushita*'s 'tends to exclude' standard." *Publ'n Paper*, 690 F.3d at 64.  This is true regardless of whether the testimony "admits any ambiguity as to [the competitor's] parallel understanding of the same communications." *Id.*  "Because price fixing is a *per se* violation of the Sherman Act, an admission by the defendants that they agreed to fix their prices is all the proof a plaintiff needs." *In re High Fructose Corn Syrup Antitrust Litig.*, 295 F.3d 651, 654 (7th Cir. 2022).  As described above, either Christopher Bihari or Anthony Thomassey testified that he reached an anticompetitive agreement on calls with his counterpart at Perrigo, Tony Polman, on nine drug products: Adapalene cream, Ciclopirox shampoo, Erythromycin solution, Fluocinonide .1% cream, Imiquimod cream, Methazolamide tablets, Tacrolimus tablets, and Triamcinolone Acetonide cream and ointment.

Perrigo challenges these witnesses' testimony, arguing that Bihari, Thomassey, and Polman all lacked the authority to enter into agreements regarding pricing or customers, and that the testimonies of Thomassey and Bihari are inadmissible or inconsistent with other evidence of Perrigo's conduct.  For the reasons discussed below, I find these arguments to be unconvincing.

1. Authority to Enter Agreements

Perrigo first argues that because Bihari, Thomassey, and Polman had neither actual nor apparent authority to determine prices or to choose to avoid certain customers, any alleged agreements that these personnel hatched out between themselves "did not reflect agreements by Perrigo." ECF No. 943 at 27.  In a previous ruling on Greenstone's motion for summary judgment, I noted that "[a]ny suggestion that an anticompetitive agreement would be precluded because those communicating with competitors lacked the unilateral ability to affect prices [wa]s without merit" because a reasonable jury could infer that, even if those who entered into agreements with competitors could not unilaterally change prices themselves, "the Defendants frequently used competitive information obtained from their competitors when presenting pricing proposals or

45

seeking approval for increases." *Sandoz, Inc.*, 2026 WL 1533866, at *21 n.9; *see also In re Static Random Access Memory (SRAM) Antitrust Litig.*, No. 07-MD-1819, 2010 WL 5138859, at *6 (N.D. Cal. Dec. 10, 2010) (finding that a reasonable jury could infer that information exchanged with competitors impacted pricing where the employee who served as the "the primary conduit of information about pricing" did not have "ultimate" pricing authority but "relayed regular reports about competitors' pricing and production directly to pricing authorities . . . as well as to other Cypress personnel, who appear to have played roles in setting prices"); *Rosefield v. Falcon Jet Corp.,* 701 F. Supp. 1053, 1064 (D.N.J. 1988) (testimony that executives "were aware of the price information exchange and considered the data obtained by sales engineers to set the price of business jets" sufficient to find that defendants had "an anticompetitive objective to enter [an] agreement"). Similarly, here, the States have raised a dispute of fact about whether Perrigo, Fougera, and Sandoz used information obtained via Polman's agreements with competitors.

Fougera's vice president of national accounts, Walter Kaczmarek, testified that he was "involved in the decision-making process" and was part of a committee that discussed price changes. ECF No. 964-1 at 3010; *see also* ECF No. 965-1 at 327–28 (Thomassey testifying to the same and that Kaczmarek had the authority to decide which customers to target or concede); ECF No. 964-1 at 870 (Bihari testifying that Kaczmarek retained "a say in market share targets, new product launches, and he had a lot of input regarding the [Fougera] portfolio" amid Sandoz's acquisition of Fougera). Thomassey testified that Kaczmarek directed him to communicate with competitors about pricing and market allocation, and that Thomassey reported information he learned from competitors to Kaczmarek, who approved the agreements.[14] ECF No. 965-1 at 328,

---

[14] Kaczmarek, who is a Defendant in this action, testified that he was *not* aware that his subordinates—and specifically Thomassey—were communicating with competitors about pricing and allocating customers, and he denied directing his subordinates—including Thomassey—to do

509 ( "If I had a dollar for every time . . . Mr. Kaczmarek told me reach out to Tony Polman on product X or find out what is going on with Y, I'd be a rich man."). This includes agreements for which Perrigo seeks summary judgment. *Id.* at 363 (Triamcinolone cream and ointment); 402–03 (Nystatin ointment); *see also id.* at 375 (Betamethasone Dipropionate lotion, for which Perrigo does not seek summary judgment). Moreover, the call-record evidence supports Thomassey's testimony that he frequently called Kaczmarek immediately after speaking to Polman. *See* ECF No. 946-1 at 44, 60, 67, 73, 81, 102, 104, 108, 110, 112, 116.

At Sandoz, Bihari had the authority to recommend price increases, ECF No. 964-1 at 719–20, while Vezza had the authority to recommend customer targets, ECF No. 965-1 at 789. Vezza testified that Bihari "was giving me information, guidance, you know. And we would use that information to win [customer] awards. We would stay away from this customer, if he told us to stay away from that customer. We would use the price points he provided." ECF No. 965-1 at 947. Vezza also testified that Bihari provided Sandoz executive Kellum with information that Sandoz used to "win awards, launch products, take price increases." *Id.* at 947–48. Bihari testified that Vezza, Kellum, or both participated in multiple agreements with Perrigo, ECF No. 1080-1 ¶ 664, including Adapalene cream, ECF No. 964-1 at 945, Bromocriptine, *id.* at 925, Ciclopirox shampoo, *id.* at 868, Desonide ointment, *id.* at 935, Halobetasol cream, *id.* at 950, Methazolamide, *id.* at 964–65, and Tacrolimus ointment, *id.* at 961. The call-record evidence also supports Bihari's testimony that he frequently called Vezza or Kellum immediately before or after speaking with

---

so. ECF No. 1080-1 ¶ 396; ECF No. 964-1 at 3004–05. Upon viewing video of this portion of Kaczmarek's testimony, Thomassey testified that "[a]bsolutely, 100 percent he is lying" and that "[e]very single question that was asked that [Kaczmarek] said 'no' are yes answers. He was directing me at every turn." ECF No. 1080-1 ¶ 396; ECF No. 965-1 at 405. The competing testimonies of Thomassey and Kaczmarek create a genuine dispute of fact to be resolved by the jury.

Perrigo's Polman.  ECF No. 949-1 at 21, 43, 57, 70; ECF No. 951-1 at 258.

As the head of Perrigo's sales and marketing division, vice president John Wesolowski had "final authority to make pricing decisions" for the drugs at issue in this motion, including "overall responsibility for new product launches."  ECF No. 1029-1 ¶ 29.  Wesolowski chaired Perrigo's pricing committee, which made decisions regarding WAC and contract prices and offers to customers for product launches.  ECF No. 943-2 at 428.  Polman, a national account executive ("NAE") at Perrigo, participated in the pricing committee's meetings.  ECF No. 964-1 at 5839.  Wesolowski made decisions on pricing changes "based on information received from multiple sources," and "the information submitted by the NAE was an important factor in the overall decision-making." *Id.* at 5837.

The call-record evidence suggests that Polman frequently spoke with Wesolowski immediately before or after he spoke with a competitor.  ECF No. 946-1 at 181, 190, 194, 196, 204, 209; ECF No. 947-1 at 194, 196, 200, 212, 214, 221; ECF No. 961-1 at 213, 237–38.

Moreover, Fougera's Thomassey testified that Wesolowski knew that he and Polman were communicating about pricing and market allocation.  ECF No. 965-1 at 403.  Thomassey knew this, he testified, because he "spoke personally with [Wesolowski] about [pricing and market allocation] and [Wesolowski] additionally directed me to speak with [Polman] about it."  *Id.* Thomassey said Wesolowski pulled him aside at a trade meeting and told him, "you and Tony are . . . doing a good job, keep it up." *Id.* at 403–04. Wesolowski testified that he did not know that Polman was communicating with competitors to allocate customers, *id.* at 1793; Thomassey testified that Wesolowski was lying, *id.* at 404.  Only a jury can resolve this conflict.

Sandoz's Bihari testified that he knew from his conversations with Polman that Polman could not make Perrigo's pricing and customer decisions "alone," but that he would "recommend

48

customer targets for Perrigo launches to their internal team, mainly John Wesolowski." ECF No. 964-1 at 1012. Bihari also testified that he believed that Polman had "considerable influence and input regarding price changes" and "considerable input" as to "which customers to relinquish when a competitor was entering a Perrigo market," *id.* at 1013.

A reasonable jury could find—based on the phone records and testimonies of Thomassey, Bihari, and Vezza—that personnel with pricing authority at Perrigo (Wesoloski), Fougera (Kaczmarek), and Sandoz (Vezza and Kellum) were aware of and participated in conspiracies to allocate customers and fix prices in the Drugs at Issue.[15] Even if Perrigo's competitors perceived that Polman lacked the ultimate authority to change prices, a reasonable jury could infer that the competitors knew that Polman would pass on the information obtained pursuant to their agreement to his superiors. *See, e.g.*, ECF No. 964-1 at 1012 (Bihari testifying that he knew that Polman would recommend which customers to target to Wesolowski). Further, the fact that Thomassey, Bihari, and personnel at other firms continued over many months to call Polman around the time of price increases and product launches suggests that, at the very least, these market participants' perceived that Polman had influence on Perrigo's pricing, which suggests at least that Polman was an apparent agent.

---

[15] In its motion for summary judgment, Sandoz argues that Bihari's testimony that he entered into agreements is "meaningless bluster" because Sandoz employed a "collaborative approach requiring input from different sources" that precluded any single employee from binding the company to any agreement. ECF No. 997 at 105. Under this theory, Sandoz essentially argues that because no one at Sandoz had unilateral pricing authority, no one could have entered into an agreement with competitors. As discussed above, however, as long as there is evidence that Bihari had influence on prices through his reports of competitive information to his superiors, it does not matter that others made the final decisions. Further, Sandoz and its former executive Armando Kellum have both admitted to entering into anticompetitive agreements with competitors despite the firm's "collaborative approach." ECF No. 951-1 at 162; ECF No. 963-1 at 256. The existence and practices of Sandoz's pricing committee therefore do not insulate the company from the States' allegations of collusion.

Perrigo contends these agreements are merely exchanges of information among low-level salesmen,  ECF No. 943 at 28, but the evidence suggests that Wesolowski (and his counterparts at Fougera and Sandoz) used this information in making decisions about prices and customers.  *See, e.g.*, ECF No. 964-1 at 5837 ("the information submitted by the NAE was an important factor in the  overall decision-making").  Because Polman's communications had an impact on pricing decisions, they go well beyond "sporadic exchanges of shop talk among field sales representatives who lack pricing authority."  *In re Baby Food Antitrust Litig.*, 166 F.3d 112, 125 (3d Cir. 1999).  Rather, because the evidence described above suggests that Polman (as well as Thomassey and Bihari) "relayed regular reports about competitors' pricing and production directly to pricing authorities," *SRAM*, 2010 WL 5138859, at *6, and Wesolowski was "aware of the price information exchange and considered the data obtained by" Polman, *Rosefield,* 701 F. Supp. at 1064, a reasonable jury could infer that Perrigo intended to enter into anticompetitive agreements with competitors via Polman's communications.  Perrigo's arguments that Polman's agreements do not reflect agreements by Perrigo are therefore unavailing.

### 2. Admissibility of Thomassey's Testimony

Perrigo argues that "Thomassey's testimony regarding agreements for Imiquimod cream and Triamcinolone Acetonide cream and ointment is not admissible and should not be credited as direct evidence of any illegal agreement" because Thomassey's memory is unreliable and his testimony is "replete with inconsistencies."[16]  ECF No. 934 at 29–30.  I disagree.

---

[16] As noted in the facts section above, Thomassey also testified about an anticompetitive agreement between Perrigo and Fougera on Nystatin ointment, but Perrigo does not address this testimony.  I previously found that the States had presented sufficient evidence for a reasonable fact finder to infer that Actavis, Fougera, and Perrigo more likely than not participated in a conspiracy to fix prices and allocate the Nystatin ointment market in 2011 and 2012.  ECF No. 1459 at 40–46.  For the same reasons expressed in the Actavis ruling, including Thomassey's testimony, I also deny summary judgment to Perrigo on Nystatin ointment.

In previous rulings, I have explained why I do not find arguments about Thomassey's memory to be persuasive at the summary judgment stage. As I have noted, even if the States had to jog his memory during his deposition by showing him emails and other documents, that circumstance would go to the weight of his testimony, not its admissibility. *Sandoz, Inc.*, 2025 WL 3470502, at \*6 n.6 (finding in overarching conspiracy ruling that Thomassey's deposition transcripts raise no concerns about his memory or his competence as a witness, despite the Defendants' objections); *Connecticut v. Sandoz, Inc.*, No. 20cv802, 2026 WL 75853, at \*10 (D. Conn. Jan. 9, 2026) ("Questions about the weight to be given to testimony based on the witness's 'credibility, perception, or memory are, of course, for the jury.'" (quoting *Publ'n Paper*, 690 F.3d at 64 n.8)); *Sandoz, Inc.*, 2026 WL 75851, at \*13. Nothing about Thomassey's testimony regarding the drugs challenged by Perrigo changes my mind on this issue. At trial, Perrigo will be able to point out to the jury that Thomassey had no independent, specific recollection of these matters. It will then be for the jury to decide whether to credit Thomassey's testimony.

I also previously found unpersuasive arguments raised by Aurobindo (Thomassey's employer after he left Fougera) that Thomassey's testimony was impermissibly led by the States' counsel during his deposition, that it consisted of pure speculation, and that it was not based on personal knowledge. *Sandoz, Inc.*, 2026 WL 75853, at \*10. The substance of Thomassey's responses to leading questions about the drugs challenged in this motion may be considered on summary judgment, as I also found in the Aurobindo ruling. *See id.* Further, after reviewing relevant documents, Thomassey confirmed that he reached agreements with competitors and described those agreements in response to non-leading questions. *E.g.*, ECF No. 965-1 at 614–15 ("Q. . . . Was there an agreement between Fougera and Perrigo during the time that you worked at Fougera? A. Yes, there was. Q. Can you please describe the agreement in your own words? A.

51

That we would counsel with Perrigo to see where the market price was to make sure that we maintained the highest price possible and did not cannibalize each other's market share." (form objections omitted)).  Again, it will be for a jury to decide how much weight, if any, to accord this testimony.

### 3.    Inconsistencies in Witness Testimony

Perrigo also challenges the testimonies of the States' cooperating witnesses by pointing out inconsistencies with other evidence, which it suggests "clearly evince[s] a lack of agreement by Perrigo to do what the cooperating witnesses testified Mr. Polman had agreed to do."  ECF No. 1119 at 17.  I disagree.

Perrigo cites *Jeffreys v. City of New York*, in which the Second Circuit recognized that a district court at summary judgment may disregard deposition testimony where "it is so replete with inconsistencies and improbabilities that no reasonable juror would undertake the suspension of disbelief necessary to credit" it.  426 F.3d 549, 555 (2d Cir. 2005).  In *Jeffreys,* the Court of Appeals affirmed the district court's award of summary judgment to the defendant where "nothing in the record . . . support[ed] plaintiff's allegations other than plaintiff's own contradictory and incomplete testimony, and . . . no reasonable person could believe [the plaintiff's] testimony." *Id.* *Jeffreys*, however, was an "extraordinary case[]" in which the testimony was "so contradictory that doubt is cast upon [its] plausibility." *Rojas v. Roman Cath. Diocese of Rochester*, 660 F.3d 98, 106 (2d Cir. 2011).

This case is not close to the "extraordinary" situation in *Jeffreys*.  *Id.*  Unlike in *Jeffreys*, where "nothing in the record" supported the plaintiff's testimony, 426 F.3d at 555, the States have provided substantial circumstantial evidence to corroborate the testimony of its cooperating witnesses and from which a jury could "infer that the conspiratorial explanation is more likely than not." *Anderson News*, 899 F.3d at 99.  Among this evidence are call records that demonstrate "a

high level of interfirm communications"—a "plus factor" from which a fact-finder may infer a conspiracy. *Publ'n Paper*, 690 F.3d at 62. Indeed, the States based the majority of their questions during the witnesses' depositions on these call records together with contemporary documentary evidence. *See., e.g.*, ECF No. 964-1 at 944 (Bihari testimony: "Q. . . . The phone records show that you called Polman at Perrigo on January 31st, 2014, at 5:21 UTC time, and the call duration was eight minutes. Do you see that? A. Yes. . . . Q. And what did you discuss with Mr. Polman? . . . A. Adapalene cream, customer target." (form objections omitted)); ECF No. 965-1 at 362 ("Q. Mr. Thomassey, are the calls in this exhibit happening on the same day as that email we just discussed? A. Yes, they are. . . . Q. And what were you talking to Tony Polman about during those calls? A. About the price and [customer] Anda, on the Triamcinolones." (form objections omitted)). In other words, the testimonies of Bihari and Thomassey do not stand alone but support other evidence in the record from which a jury could find that Perrigo more likely than not participated in a conspiracy. As I found in ruling on Actavis's motion for summary judgment, "even if I were to agree . . . that Bihari's testimony was conclusory or otherwise weak direct evidence, the evidence of interfirm communications immediately before Sandoz offered bids to customers supports Bihari's testimony of an agreement." ECF No. 1459 at 25–26.

None of the asserted inconsistencies highlighted by Perrigo is sufficient to find that the testimonies of Bihari and Thomassey "transcend credibility concerns and go to the heart of whether the party has raised genuine issues of material fact to be decided by a jury." *Rojas*, 660 F.3d at 106. Because nearly all of these asserted inconsistencies relate to details like the identity or volume of customers in Perrigo's alleged market-allocation agreements,[17] I decline to separately address

---

[17] Perrigo also appears to challenge Thomassey's testimony that it agreed to follow Fougera's prices on Imiquimod cream and Triamcinolone acetonide cream and ointment, but it does not explain how Thomassey's testimony is *inconsistent* with other evidence. Instead, it offers

53

the facts as to each drug.  As one illustrative example, Thomassey testified that Perrigo and Fougera had an "understanding" that Fougera would concede certain Imiquimod cream customers to Perrigo, after he and Polman discussed those customers and pricing that would allow Perrigo's bids to be successful.  ECF No. 965-1 at 336–39.  Other evidence suggests that Perrigo indeed obtained some of Fougera's customers with minimal price erosion amid frequent interfirm communications.[18]  But Thomassey also testified that he told Polman that "Perrigo needs to stop seeking more share" after Fougera gave up certain customers.  *Id.* at 338.  Perrigo contends that other evidence suggests that it did *not* stop seeking additional share.  ECF No. 943 at 32–33; *see also id.* at 31 (making a similar argument that Perrigo took additional customers for Triamcinolone

---

*alternative* theories—that Perrigo's generic Imiquimod increase was in reaction to the branded product's increase, and that it needed to increase prices on Triamcinolone products to limit "failure to supply penalties."  ECF No. 943 at 31–32.  A jury can decide which reason to credit.

[18] For example, Thomassey testified that on April 13, 2010, the same day that Perrigo announced it would manufacture Imiquimod cream, he called Polman "to figure out the market share and the price points" for Imiquimod cream, and that he relayed this information to his boss, Kaczmarek. ECF No. 965-1 at 333.  On April 16, Fougera notified its customer McKesson of a price increase. ECF No. 1029-1 ¶ 271.  Three days later, on April 19, Thomassey said, he and Polman discussed "the pricing that Perrigo will go to specific customers about and who -- who we would give up and that -- what Perrigo had agreed to."  ECF No. 965-1 at 336.  Thomassey testified based on his discussions with Polman that he expected Perrigo to come in "at the new higher pricing instead of offering something lower."  *Id.* at 335.  On April 21, Perrigo sent McKesson offers that were "approximately 12% lower than Fougera's [April 16] offer[s] to McKesson," which the customer accepted.  ECF No. 1029-1 ¶ 272.  Thomassey testified that for a company to increase its price just as a competitor was preparing to enter the market "was an unheard of situation," as additional competition typically meant that "prices go down, they don't go up . . . when a new entrant comes to the market."  ECF No. 965-1 at 334.  A reasonable jury could infer that when Thomassey and Polman discussed "the market share and the price points" for Imiquimod cream, they agreed that Fougera would raise its price to McKesson in advance of Perrigo's entry, which would permit Perrigo to then obtain that customer without significantly eroding the previous market price.  This creates a reasonable inference of conspiracy. *In re Generic Pharms. Pricing Antitrust Litig.*, No. 16-md-2724, 2025 WL 2483981, at *13 (E.D. Pa. Aug. 27, 2025) ("Communications and exchanges of pricing information between competitors can create a reasonable inference of conspiracy where there is evidence that those exchanges of information had an impact on pricing decisions."); *see SRAM,* 2010 WL 5138859, *9 (noting "the possibility that [a defendant] would have sold SRAM at even lower prices absent critical knowledge about competitors' pricing and production.").

Acetonide cream and ointment despite Thomassey's testimony that Perrigo and Fougera had agreed not to "cannibalize" each other's customers); ECF No. 1382 (ruling on the States' motion for summary judgment on Nystatin triamcinolone ointment, noting that the Defendants "pointed to evidence that, viewed in the light most favorable to them, contradicts Bihari's testimony that there was an 'agreement . . . that Sandoz would stop there' and 'not pursue any additional customers'").  But even if a reasonable jury could consider this evidence as *undermining* Thomassey's testimony about an Imiquimod agreement, it does not *preclude* the agreement that Thomassey described, as was the case with the testimony in *Jeffreys*, 426 F.3d at 555.  In other instances, Perrigo could have agreed to allocate customers regardless of any later "horse trading" of customers, which Bihari testified was sometimes required when "[n]egotiating which customers Sandoz would target and Perrigo would target."  ECF No. 964-1 at 960–61.  An agreement to allocate the market that is subject to an uneasy truce between competitors remains *per se* unlawful. *See United States v. Beaver,* 515 F. 3d 730, 739 (7th Cir. 2008) ("§1 of the Sherman Antitrust Act does not outlaw only perfect conspiracies to restrain trade.").

Perrigo also asserts that Bihari's testimony about Methazolamide tablets is inconsistent with other evidence.  For this drug, supply issues forced Sandoz out of the market just as Perrigo was preparing to launch.  ECF No. 1029-1 ¶ 161.  Bihari testified that Perrigo agreed that "Sandoz can recover [its] market share" upon its return to the market at a higher price than when it left.  *Id.* ¶ 169.  Perrigo argues that this description is inconsistent with the facts because Sandoz had 93 percent of the market before Perrigo launched but was only able to obtain a 48 percent share upon its return.  ECF No. 943 at 21.  But a reasonable juror would not have to believe that Bihari meant that Perrigo had agreed to cede *93 percent* of a market upon a competitor's reentry.  *See, e.g.*, ECF No. 1029-1 ¶ 46 (noting that Perrigo based its target share in part on the number of competitors in

a market).  A more reasonable reading of Bihari's testimony is that Bihari assumed when he testified that Sandoz and Perrigo already had a reasonably even split of the market before Sandoz's exit, and that he meant that the firms would agree to a similar split when both were in the market. Further, even if Perrigo did not have a "dead net" price for Methazolamide that matched the price that Bihari wrote in his notebook during his call with Polman, *id.* ¶ 169, that is far too slender a reed on which to ground a decision to disregard Bihari's testimony at the summary judgment stage.

Also unavailing are Perrigo's arguments that Bihari's and Thomassey's testimonies are internally inconsistent, as they testified on cross-examination that they did not specifically recall the agreements that they had earlier testified to in response to the States' questions.  *See* ECF 1029-1 ¶¶ 155 (Nystatin ointment),  356 (Ciclopirox shampoo).  As I found in ruling on Mylan's motion for summary judgment, resolving even self-contradictions remains within the province of the jury. *Sandoz, Inc.*, 2026 WL 75851, at *13 ("To the extent this testimony contradicted other answers he gave about his inability to recall particular calls specifically, it is for a jury to resolve any such contradictions.").[19]

The questions Perrigo raises about the reliability of Bihari's and Thomassey's testimonies would require me to weigh the evidence, which is improper on a motion for summary judgment. *United States v. Rem,* 38 F.3d 634, 644 (2d Cir. 1994) ("[T]he court is not to weigh the evidence, or assess the credibility of the witnesses, or resolve issues of fact.  . . . Resolutions of credibility conflicts and choices between conflicting versions of the facts are matters for the jury, not for the

---

[19] Thomassey's testimony that he could not specifically remember certain events is also not grounds for finding his testimony inadmissible.  *See SEC v. Singer*, 786 F. Supp. 1158, 1167 (S.D.N.Y. 1992) ("While McLernon admits that he cannot specifically remember the conversation or its location, evidence need not be conclusive in order to be relevant and admissible. Nonconclusive evidence should still be admitted if it makes a proposition more probable than not; factors which make evidence less than conclusive affect only weight, not admissibility.").

court on summary judgment."); *In re Ethylene Propylene Diene Monomer (EPDM) Antitrust Litig.*, 681 F. Supp. 2d 141, 168 (D. Conn. 2009) ("[I]t is the role of the jury to determine 'whether, when the evidence [is] considered as a whole, it [is] more likely that the defendants had conspired to fix prices than that they had not conspired to fix prices.'" (quoting *High Fructose Corn Syrup*, 295 F.3d at 655)). The jury may decide whether and how much to credit Thomassey's and Bihari's testimonies in light of any inconsistencies. Accordingly, Perrigo's motion is DENIED as to Adapalene cream (2013 allegations), Bromocriptine, Ciclopirox shampoo, Fluocinonide .1% cream (2015 agreement with Sandoz), Imiquimod cream, Methazolamide tablets, Nystatin ointment, Tacrolimus ointment, and Triamcinolone Acetonide cream and ointment.

### 4.    Erythromycin Solution (Direct Evidence)

For one drug, Erythromycin solution, Perrigo goes beyond citing mere inconsistencies in witness testimony and argues that the allocation agreement that Bihari described is "factually impossible"—because (1) Walmart was not a Perrigo customer and (2) Sandoz's offer to Cardinal predated Bihari and Polman's first communications. ECF No. 943 at 34. Bihari testified both that Perrigo agreed to concede these two customers to Sandoz in September 2012 *and* that his exchange of pricing information with Polman allowed Sandoz to obtain business "at a higher price than normal." ECF No. 964-1 at 872, 1014.

As to the accuracy of Bihari's testimony that Perrigo and Sandoz agreed to allocate Cardinal and Walmart in September 2012, I find that genuine disputes of fact remain. *See* ECF No. 1080-1 ¶ 473 (noting that while Perrigo did not supply Walmart directly, Walmart purchased Erythromycin manufactured by Perrigo from a wholesaler); *id.* ¶ 472 (citing ECF No. 971-2 at 86–88 (suggesting Cardinal accepted Sandoz's offer in September 2012—not, as Perrigo contends, pursuant to an RFP issued that June—and that Sandoz honored a previous offer that its predecessor Fougera submitted in May)); ECF No. 964-1 at 1016–18 (Bihari testimony that he believed that

Fougera's May offer was based on information that Polman shared with Thomassey).  It will be up to the jury at trial to navigate this labyrinth of possible explanations behind Sandoz's acquisition of Cardinal's and Walmart's Erythromycin business.  At summary judgment, the conspiratorial explanation must merely be more likely than not.  *Anderson News*, 899 F.3d at 99.  I find that it is, because Bihari's testimony is "strong evidence of a collusive scheme . . . sufficient to satisfy *Matsushita*'s 'tends to exclude' standard," *Publ'n Paper*, 690 F.3d at 64.

But even if a reasonable jury were to agree that the evidence suggests that Bihari must have been incorrect that Perrigo agreed to "relinquish" these customers, it could still credit Bihari's testimony that Perrigo provided Fougera with pricing information that allowed Fougera to obtain these customers at a higher price than it otherwise would have—thereby avoiding erosion of the market price.  ECF No. 964-1 at 872.  As the MDL court has found, "[c]ommunications and exchanges of pricing information between competitors can create a reasonable inference of conspiracy where there is evidence that those exchanges of information had an impact on pricing decisions." *In re Generic Pharms. Pricing Antitrust Litig.*, No. 16-CM-27241, 2025 WL 2483981, at *13 (E.D. Pa. Aug. 27, 2025) (citing *In re Flat Glass Antitrust Litigation*, 385 F.3d 350, 369 (3d Cir. 2004)); *see also Baby Food*, 166 F.3d at 126 ("to survive summary judgment, there must be evidence that the exchanges of information had an impact on pricing decisions").  Because a jury could find that Bihari's and Polman's exchange of pricing information was intended to enable Fougera to charge supracompetitive prices, Perrigo's motion for summary judgment on the States' claims regarding Erythromycin solution in 2012 is DENIED.

I address the States' claims regarding Erythromycin solution in 2011 below.

5.  Claims Based on Thomassey's Testimony That He Served as a "Conduit"

For three drugs—Ciclopirox solution, Halobetasol, and Promethazine—the States base

58

their claims on Thomassey's testimony that he acted as an intermediary for anticompetitive collusion between Perrigo and G&W. For Ciclopirox solution and Promethazine, Perrigo challenges this testimony on the grounds that "Perrigo's pricing behavior cannot reasonably be construed as 'parallel' to those of its alleged conspirators," in that it either did not increase its prices at the same time as its competitors or increased them by substantially different amounts.[20] ECF No. 943 at 8–9. For the reasons discussed below, I find that Thomassey's testimony, together with circumstantial evidence that supports his testimony, is sufficient to deny summary judgment despite other evidence that might suggest, in a different context, an absence of parallel conduct.

"*Absent direct evidence of conspiracy*, such as an admission by one of the defendants, antitrust plaintiffs must rely on circumstantial evidence to support their conspiracy claims. *One*

---

[20] Perrigo also points to an absence of parallel conduct on Ammonium lactate cream and lotion, Bromocriptine, and Ciclopirox cream. I address Ammonium lactate cream and lotion and Ciclopirox cream below. *See infra* Sections III.B.1–2. I found above that Thomassey's testimony alone was sufficient to deny summary judgment on Bromocriptine. But even without his testimony, I would still reject Perrigo's parallel-conduct argument on Bromocriptine. In a previous ruling, I rejected Mylan's argument that the evidence did not show parallel conduct on Bromocriptine, noting that Mylan's price increase was sufficiently parallel to Sandoz's increase, despite coming two months later, when considering that Mylan was out of the market when Sandoz increased its price but followed Sandoz's increase as soon as it reentered the market. *Sandoz, Inc.*, 2026 WL 75851, at *17 n.16 (citing *In re Concrete & Cement Additives Antitrust Litig.*, No. 24-md-3097 (LJL), 2025 WL 1755193, at *13 n.11 (S.D.N.Y. June 25, 2025) ("There is no categorical rule governing how temporally proximate acts must be to give rise to an inference of collusion. The delay between purportedly parallel conduct must be viewed in the context of the case; among other things, courts must account for any restrictions on market participants' ability to enact price changes sooner.")). Like Mylan, Perrigo was dealing with supply issues and did not raise its price until eighteen months after Sandoz's increase, and even then, Perrigo's price was "33–40% lower" than its competitors. *Sandoz, Inc.*, 2026 WL 75851, at *6. Nevertheless, Vezza testified that Perrigo, despite its delay in following, likely "was doing whatever it is they had to do to follow our increase. " ECF No. 965-1 at 1073. Vezza said Perrigo's "ultimate goal would have been to follow our increase, because they were basically . . . leaving opportunity on the table for that entire time by not following us." *Id.* at 1074. When "account[ing] for any restrictions on market participants' ability to enact price changes sooner," *Concrete & Cement Additives,* 2025 WL 1755193, at *13 n.11, this evidence is also sufficient to create a material dispute of fact and deny Perrigo's motion for summary judgment as to Bromocriptine.

*powerful form* of circumstantial evidence is parallel action—proof that defendants took identical actions within a time period suggestive of prearrangement." *Anderson News*, 899 F.3d at 103–04 (citations omitted and emphases added); *see also EPDM*, 681 F. Supp. 2d at 166 ("One such form of circumstantial evidence is the defendants' parallel conduct."). As the quoted language suggests, evidence of parallel conduct is not necessary to a finding of an antitrust conspiracy where there is direct evidence of an agreement.

Here, there is such evidence. Thomassey testified that when he participated in back-to-back calls with representatives of Perrigo and G&W on multiple occasions from September 2012 through April 2013, he coordinated discussions regarding drug pricing and customer allocation between G&W and Perrigo. ECF No. 965-1 at 414–19. While Thomassey's testimony is direct evidence of the existence of anticompetitive collusion, it is not sufficient by itself to deny summary judgment as to any claim because it does not identify the drugs for which Thomassey was serving as a "conduit of information" between the two firms. *Id.* at 416. Perrigo seizes on this shortcoming, arguing that Thomassey's failure to identify specific drugs means that he "did not testify to the existence of any agreement between Perrigo and G&W on these products." ECF No. 943 at 24; *see also id.* at 10 (Ciclopirox solution); *id.* at 11 (Promethazine).[21] But as the Second Circuit has noted, "[t]he gun need not be smoking . . . if Plaintiffs allege sufficient indirect,

---

[21] Perrigo also repeatedly points out that "Vogel-Baylor not only denied the existence of any agreement but also denied that Thomassey ever acted as an information conduit between her and Polman." ECF No. 943 at 24. This argument overstates Vogel-Baylor's testimony, as she testified that she did not remember ever using Thomassey as a conduit but did not deny doing so. ECF No. 965-1 at 1357, 1360, 1365, 1367; ECF No. 1029-1 ¶¶ 89, 203, 229, 238; *see also* ECF No. 1410 at 151 n.49 (noting in the Taro ruling that Vogel-Baylor's testimony regarding Halobetasol "was frequently evasive, in that she consistently responded that she did not *recall* colluding with competitors yet failed to *deny* that she did so"). Moreover, Vogel-Baylor did not provide alternative explanations for her frequent communications with Thomassey. For these reasons, a reasonable jury could disregard her testimony.

circumstantial evidence." *City of Pontiac Police & Fire Ret. Sys. v. BNP Paribas Sec. Corp.*, 92 F.4th 381, 391 (2d Cir. 2024). A reasonable jury could infer which drugs were discussed on these calls from circumstantial evidence, including the high level of interfirm communications in close proximity to developments in the markets.

- On **September 19, 2012**, the same day that Thomassey first had back-to-back calls with G&W's Vogel-Baylor and Perrigo's Polman, Actavis announced that it was nearly tripling its WAC prices on Promethazine. ECF No. 1029-1 ¶ 231. One day earlier, Vogel-Baylor had exchanged more than thirty text messages with Actavis's pricing director, Richard Rogerson. ECF No. 944-1 at 209–12.

- On **September 27, 2012**, the next date on which Thomassey exchanged calls with Vogel-Baylor and Polman, G&W's Vogel-Baylor sent her boss a revised price increase analysis on Promethazine. ECF No. 944-1 at 224. The analysis listed Actavis's new prices as the "Old WAC" prices and used even higher prices ($38.99) as the "NEW WAC." *Id.* The same day, Vogel-Baylor exchanged more texts with Rogerson at Actavis, including after her calls with Thomassey. *Id.* at 221–22.

- On **October 5, 2012**, G&W notified customers that it was increasing its Promethazine prices to $38.99. ECF No. 1029-1 ¶ 232. On the same day, Vogel-Baylor called Thomassey, who spoke with Polman before calling back Vogel-Baylor. Immediately after her call with Thomassey, Vogel-Baylor called Actavis's Rogerson. ECF No. 944-1 at 226. She also texted Rogerson that evening, and they continued to text each other through October 17, the date that Actavis announced it was matching G&W's Promethazine price. ECF No. 1029-1 ¶ 233; ECF No. 948-1 at 187–88. Perrigo increased its contract prices to all but one customer in November and December 2012.

- On **November 6, 2012**, Thomassey had four calls each with Vogel-Baylor and with Polman within a ninety-minute span, ECF No. 944-1 at 155, after which Vogel-Baylor sent an email regarding a customer request to bid on Halobetasol, writing, "We cannot take this from Perrigo, so I will give you pricing so that it looks like you are making an attempt to bid[.]" ECF No. 956-1 at 377.

- One **March 26, 2013**, one day after Perrigo announced that it was raising its Halobetasol price (ECF No. 950-1 at 300), Thomassey returned a call from Vogel-Baylor, then immediately called Polman, and then called Vogel-Baylor again. ECF No. 944-1 at 157.

- On **April 29, 2013** Thomassey had multiple calls each with G&W's Vogel-Baylor, Perrigo's Polman, and Sandoz's Bihari. ECF No. 961-1 at 210. The next day, April 30, Thomassey and Bihari exchanged three more calls in the span of ten minutes. *Id.* In contemporaneous notes taken during his April 30 calls, Bihari wrote, "G&W – Ciclo Solution Inc. New CP $27 New WAC - $37." ECF No. 950-1 at 30. Bihari

wrote this one day before Vogel-Baylor sent an internal email on May 1 confirming that G&W would increase its Ciclopirox solution the following week. ECF No. 962-1 at 738. On May 9, G&W informed customers that it was increasing its WAC price to $37.15. ECF No. 1080-1 ¶ 116. By July 25, Perrigo decided to increase its WAC and contract prices for Ciclopirox solution. ECF No. 1029-1 ¶ 202.

The proximity of interfirm communications in close proximity to changes in the markets for Promethazine, Ciclopirox solution, and Halobetasol strongly suggests that the call participants were coordinating their conduct related to these drugs. *See* ECF No. 1410 at 138 ("the proximity of [Glenmark's] calls with [Taro] *and* Bausch[] . . . suggest that these calls concerned a subject in which all three companies were involved"), 170 ("a reasonable jury could infer from the frequency and timing of these calls [between Taro, Mylan, and Amneal] that they were related to a conspiracy to determine the pricing of Phenytoin, a drug market in which all three competitors participated"). On Promethazine, the competitors—including Perrigo—communicated through Thomassey (1) when Actavis raised its price, (2) when G&W decided internally to exceed that price, and (3) when G&W announced its new price. For Halobetasol, the same pattern of communications recurred when G&W declined to make a competitive bid for Perrigo's business (while acknowledging that it was misleading the customer) and when Perrigo raised its price.[22] For Ciclopirox solution, Bihari identified in his notes the drug he discussed with Thomassey on the day after Thomassey's calls with G&W and Perrigo and noted G&W's non-public pricing information. When viewed in this context, a reasonable jury could infer that when Thomassey testified that he was acting as a "conduit" between G&W and Perrigo on the above-listed dates, he was doing so regarding Promethazine, Halobetasol, and Ciclopirox solution.

---

[22] In denying Taro's motion for summary judgment as to Halobetasol, I noted the States "presented robust evidence, including direct evidence from cooperating witnesses, suggesting that G&W and Perrigo, with the assistance of Aurobindo's Anthony Thomassey, conspired to allocate the Halobetasol markets in 2012 and 2013." ECF No. 1410 at 147.

As the Second Circuit has observed, in considering the evidence suggesting an alleged antitrust conspiracy, it is not "necessary to draw bright lines" between direct and circumstantial evidence, as "[a]ll evidence, including direct evidence, can sometimes require a factfinder to draw inferences to reach a particular conclusion, though [p]erhaps on average circumstantial evidence requires a longer chain of inferences." *Publ'n Paper*, 690 F.3d at 64 (internal quotation marks omitted). That observation is particularly relevant here, where the direct evidence establishes the *existence* of *per se* unlawful collusion between Perrigo and G&W and leaves only the matter of *which products* the competitors colluded on to be inferred from circumstantial evidence. *See City of Pontiac Police*, 92 F.4th at 391 ("Direct evidence of a conspiracy is 'explicit' and can show one *exists* without any inferences." (emphasis added)). The cluster of interfirm communications around market moves for these drugs connects Thomassey's testimony to the drugs and bolsters his direct evidence of collusion between Perrigo and G&W. And even if Thomassey's testimony could be viewed as weak direct evidence of an antitrust conspiracy, plaintiffs may use circumstantial evidence to support weak direct evidence, as discussed above. *See Champagne Metals v. Ken–Mac Metals, Inc.*, 458 F.3d 1073, 1084 (10th Cir. 2006) ("Where . . . a plaintiff adduces only weak direct evidence, which by itself is insufficient to defeat summary judgment, additional circumstantial evidence is required to overcome a motion for summary judgment.").

Viewed in this light, Perrigo's arguments regarding an absence of parallel conduct boils down to an assertion that the States lack *the right kind* of circumstantial evidence to support their direct evidence of a conspiracy. This is not a basis for summary judgment. Although parallel conduct is a common feature of a price-fixing conspiracy, it is not an essential feature. The question on summary judgment is not whether there is evidence of parallel conduct, but whether "the totality of the evidence, viewed in the light most favorable to plaintiffs and with proper regard

63

for the *Matsushita* standards, could support a reasonable inference of illegal collusive behavior." *Publ'n Paper*, 690 F.3d at 64; *see also City of Pontiac Police*, 92 F.4th at 391 ("The gun need not be smoking . . . if Plaintiffs allege sufficient indirect, circumstantial evidence" and noting that even evidence of "parallel conduct . . . needs context suggesting an antecedent agreement").

It is true that courts have dismissed antitrust claims that lack *both* direct evidence and evidence of parallel conduct. *See, e.g.*, *In re Treasury Sec. Auction Antitrust Litig.*, 2021 WL 1226670, at *19 (S.D.N.Y. Mar. 31, 2021) ("[a]bsent any actual parallel conduct," plus factors including common motives, opportunities to conspire, and actions against economic self-interest cannot suffice to plead an antitrust conspiracy). But when a plaintiff has direct evidence of a conspiracy, circumstantial evidence in the specific form of parallel conduct is not required. Rather, "a plaintiff must show [] that the defendants' behavior was parallel" if it seeks "to establish illegal concerted action *based on 'consciously parallel behavior*.'" *Flat Glass*, 385 F.3d 350, 360 n.11 (emphasis added); *see also Anderson News*, 899 F.3d at 111 ("because *the basis of Anderson's conspiracy claim is defendants' parallel behavior*, Anderson must show evidence of plus factors" (emphasis added)). But unlike the plaintiffs in *Flat Glass* and *Anderson News*, the States do *not* suggest that a reasonable jury could infer Ciclopirox or Promethazine conspiracies in part from the competitors' parallel behavior. *See, e.g.*, ECF No. 997 at 62 (Sandoz arguing that "the States did not even allege in their complaint that Sandoz raised its price for Ciclopirox solution in 2013" alongside its competitors). Rather, the States base these claims on the direct evidence of Thomassey's testimony that he frequently served as a conduit to enable Perrigo and its competitors to set prices and allocate customers during interfirm communications, as well as other evidence that connects Thomassey's testimony to the drugs in question. As the Second Circuit has noted, "a co-conspirator's acknowledgment that he understood his numerous communications . . . to

64

reflect a price-fixing agreement . . . is surely strong evidence of a collusive scheme . . . sufficient to satisfy *Matsushita*'s 'tends to exclude' standard." *Publ'n Paper*, 690 F.3d at 64.[23]

To be sure, a jury may consider Perrigo's evidence of the lack of parallel conduct in assessing the credibility of Thomassey's testimony and the weight to accord the call records. Such evidence may also impact the relief to which the States are entitled if they prevail at trial. For instance, if a jury were to find that Perrigo agreed on Polman's calls with Thomassey that it would follow G&W's increases, but circumstances (*e.g.*, supply issues) changed before Perrigo could follow through on that agreement, then it is difficult to see how the States could seek damages or equitable relief stemming from Perrigo's sales. Such questions are premature, however, because the States also seek joint and several relief stemming from G&W's supracompetitive prices resulting from any agreement with Perrigo, as well as civil penalties for each defendant's allegedly unlawful conduct. Thus, the claims against Perrigo would survive even without an impact on Perrigo's prices. Viewing the totality of the evidence in the light most favorable to the States, however, a reasonable jury could find it is more likely than not that Perrigo conspired with G&W on Ciclopirox solution, Halobetasol, and Promethazine. As such, Perrigo's motion for summary

---

[23] I also reject any suggestion that Thomassey's testimony falls short of describing an *agreement* between Perrigo and G&W. Thomassey's testimony regarding his calls with G&W's Vogel-Baylor and Perrigo's Polman that "[w]e were coordinating market share and price on products," and that Thomassey "was functioning as the conduit between those two manufacturers regarding customer allocation and price and the market share they were going to take" and "functioning as the conduit between G&W and Perrigo with regard to products, pricing, and customer allocation," ECF No. 965-1 at 415–19, requires the existence of an agreement between G&W and Perrigo, tacit or otherwise, to conspire to fix prices and allocate customers. Moreover, the frequent pattern of at least seven calls between competitors on a given day, about which Thomassey testified, strongly suggests that Thomassey did more than merely pass on G&W's and Perrigo's price points or market share goals, and that instead the competitors were working toward a consensus. The call records, together with Thomassey's testimony, are "sufficient evidence for a jury reasonably to conclude that defendants shared a 'conscious commitment' to . . . an agreement." *Anderson News*, 899 F.3d at 98 (quoting *United States v. Apple, Inc.*, 791 F.3d 290, 315 (2d Cir. 2015)).

judgment is DENIED as to those drugs.

## B. Claims Based on Circumstantial Evidence

For the other drugs at issue in this motion, the States lack direct evidence that Perrigo agreed to conspire with competitors; instead, the States rely on circumstantial evidence.

### 1. Ammonium Lactate Cream and Lotion

In a previous ruling, I granted summary judgment to Taro because the evidence did not show parallel conduct between competitors on Ammonium lactate cream and lotion, "let alone plus factors that would tend to exclude independent conduct." ECF No. 1410 at 108. Specifically, I found that "the size of the competitors' 2013 price increases for Ammonium lactate cream and lotion [we]re too dissimilar to infer that they stemmed from a prior agreement." *Id.* at 109. I also found that "the evidence suggests that the parties continued to compete for customers" even after a few non-parallel price increases. *Id.* at 111. The parties present no new material facts in connection with this motion to warrant additional analysis here, and so I adopt my reasoning from the Taro ruling and GRANT Perrigo's motion as to Ammonium Lactate cream and lotion.

### 2. Ciclopirox Cream

The evidence in the summary judgment record is insufficient for a reasonable jury to find that Perrigo more likely than not conspired with Glenmark and G&W on Ciclopirox cream.

The States have produced substantial evidence, including direct evidence from the testimony of Glenmark's Paul Dutra, suggesting that Glenmark and G&W conspired to fix prices and allocate customers on Ciclopirox cream following price increases in both 2012 and 2013. *See, e.g.*, ECF No. 964-1 at 2202–07, 2215–25. But Dutra did not testify that Perrigo was involved in the same agreement. *See id.* And while the States have provided evidence of substantial communications between Glenmark and G&W around the times of those firms' price increases from which a jury could reasonably infer a conspiracy, there is no evidence of communications

66

with Perrigo during these periods.[24]  And the States do not dispute that Perrigo did not follow the price increases of its competitors in either 2012 or 2013.  ECF No. 1029-1 ¶ 86.

The States rely on a suggestive but vague email from Glenmark executive Terrence Coughlin, following Rite-Aid's notification of a switch to an unnamed competitor, speculating that "some people did not honor their commitment on Ciclo," to which Glenmark's Paul Dutra replied, "I'm guessing Perrigo on Ciclo."  ECF No. 951-1 at 144.  The States argue that this brief exchange shows that Perrigo must have previously committed not to disrupt Glenmark's price increase, and then "cheat[ed]" on that commitment.  ECF No. 1029 at 37.  But this is too slim a reed on which to rest a conspiracy.  Further, a reasonable jury could read these emails as suggesting that Glenmark was unaware at that time which competitor—G&W or Perrigo—had obtained Rite-Aid's Ciclopirox cream business.  In that context, Coughlin's comment that "some people" had failed to "honor their commitment" could be read as speculation that the bidder was G&W, with whom Dutra and Coughlin had been "[d]iscussing price increases and not poaching each other's customers."  ECF No. 964-1 at 2273 (Dutra testimony).  And Dutra's response could be read as correcting Coughlin that the bidder was likely not G&W, but rather Perrigo.  This latter reading is consistent with Dutra's testimony about these emails.  When asked, "why didn't you think G&W would go after that business on Ciclopirox cream?" Dutra responded, "Because we had been

---

[24] In their complaint, the States allege that Vogel-Baylor used Anthony Thomassey as a conduit for coordination between G&W and Perrigo on both the 2012 and 2013 Ciclopirox price increases. ECF No. 196 ¶¶ 530, 1540.  The complaint also includes alleged excerpts of call records that purport to document back-to-back calls between Vogel-Baylor, Thomassey, and Perrigo's Polman on May 24, 2012 and May 3, 2013.  *Id.*  The States, however, do not cite these calls in their briefs or statements of facts.  The Court also could not find evidence of these calls in the summary judgment record.  And these dates were not among those about which Thomassey testified that he was acting as a conduit between Vogel-Baylor and Polman, as described above.  *See* ECF No. 965-1 at 414–19.  Thus, I find that the States have not pointed to evidence that these alleged calls took place.

working with [G&W's] Erika Vogel-Baylor on the product." *Id.* Dutra did not testify that Glenmark had also been working with Perrigo, and his "guessing" about Perrigo also suggests there was no agreement. Read this way, these emails suggest that only G&W had an agreement with Glenmark. Even when these emails are viewed in the light most favorable to the States, they do not tend to exclude independent conduct by Perrigo. *Matsushita*, 475 U.S. at 588.

The only other evidence that might suggest that Perrigo was ever part of an agreement on Ciclopirox cream was Coughlin's comment in 2012 that he wanted to speak to Perrigo "face to face" before Glenmark moved ahead with its initial price increase.[25] ECF No. 964-1 at 2199. But even if a jury could understand this comment to mean that Glenmark *wanted* to seek assurances that Perrigo would follow its price increase, there is no evidence that it did so or that Perrigo agreed. And the fact that Perrigo did not follow the price increase or Glenmark's 2013 price increase makes an agreement even less likely.

Because no reasonable juror could infer from the totality of the evidence that Perrigo more likely than not joined a conspiracy on Ciclopirox cream, Perrigo's motion for summary judgment on this claim is GRANTED.

### 3.  Clindamycin Phosphate Solution

I denied summary judgment to Taro on the States' Clindamycin solution claims upon finding that a reasonable jury could infer from a pattern of frequent interfirm communications between Perrigo, Sandoz, and Taro "that the competitors colluded to minimize price disruptions upon Taro's, Perrigo's, and Sandoz's entries into the Clindamycin market." ECF No. 1410 at 120; *see also id.* at 119 (citing evidence that "on August 28, 2013, when Perrigo held an internal meeting

---

[25] While the email in which Coughlin made this comment was apparently presented as an exhibit during Dutra's testimony, it appears to be absent from the summary judgment record.

about its launch of Clindamycin, . . . all the players involved communicated with someone from each competitor in calls lasting thirteen to fifteen minutes"). Moreover, I noted that "[t]he timing and volume of interfirm communications are enough to warrant such an inference despite the absence of specific testimony from Bihari about Clindamycin," *id.,* and that the interfirm communications outweighed the evidence of the competitors' disparate contract offers to customers, *id.* at 121; *see also id.* at 33 (detailing facts concerning interfirm communications, including sixteen calls between Bihari and Polman in August 2013 and more in September leading up to Perrigo's September 9, 2013 launch of Clindamycin). Perrigo offers no further arguments that require separate analysis here. *See* ECF No. 943 at 22–23.

In a subsequent ruling, I granted summary judgment to Greenstone as to the States' claim that it also colluded with its competitors to allocate the market upon Taro and Perrigo's entry in 2013, as the States did not press the issue and because the States alleged that Taro and Perrigo targeted Greenstone's customers. *Sandoz, Inc.*, 2026 WL 1533866, at *22. The States likewise do not press Greenstone's involvement in opposing this motion.

For the same reasons as discussed in my previous rulings, Perrigo's motion for summary judgment is DENIED as to the States' claims that Perrigo conspired with Taro and Sandoz on Clindamycin, and the motion is GRANTED as to the States' claim that Perrigo similarly conspired with Greenstone.

### 4. Desonide Cream and Ointment

As discussed in the facts section, I interpret Perrigo's motion as seeking summary judgment on the States' claims that it conspired with Taro to fix prices for Desonide cream and ointment in April and May 2013, and that it further conspired with Taro and Actavis when Actavis reentered the market for Desonide cream in August 2013.

In a previous ruling, I granted summary judgment to Taro on the States' Desonide cream

claims upon finding that the evidence did not tend to exclude the possibility that Taro acted independently in raising its price in April 2013. ECF No. 1014 at 128 (citing *Matsushita*, 475 U.S. at 588). In so finding, I found Taro had "present[ed] plausible alternative explanations for the calls between competitors in proximity to Taro and Perrigo's price increases," *id.* at 123, and that outside of those calls, "there is little evidence that Taro and Perrigo worked in concert with each other to raise prices." *Id.* ¶ 124. The States point to the same calls between Perrigo and Taro executives in opposing Perrigo's motion. ECF No. 1029 at 45; ECF No. 1029-1 ¶ 132–33. I see no reason to alter my previous conclusion that these calls are not sufficient for a reasonable jury to find that Perrigo more likely than not conspired with Taro for Desonide cream. As also noted in that ruling, even if I were to agree that the evidence suggests that Perrigo's Polman exchanged competitively sensitive information about its impending price increase with Sandoz's Bihari, who then passed on that information for Taro to utilize in determining its own Desonide pricing, the competitors' subsequent conduct is insufficient to "raise[] a suggestion of a preceding agreement" between Taro and Perrigo on Desonide cream. ECF No. 1014 at 124 (quoting *Citigroup, Inc.*, 709 F.3d at 137). And because the States do not present evidence differentiating between Desonide cream and Desonide ointment during this period, I similarly find that the States have not raised a suggestion that Perrigo was part of an agreement as to Desonide ointment during March and April 2013.[26]

The evidence is also insufficient for a reasonable jury to find that Perrigo more likely than not conspired to allocate customers with Taro and Actavis when Actavis reentered market for Desonide cream in August 2013. In the Taro ruling, I found that the evidence did not tend to

---

[26] In the Taro ruling, I rejected the States' argument that Sandoz's admission in its DPA to colluding with Perrigo on Desonide ointment starting in July 2013 necessarily extended to Desonide cream. *See* ECF No. 1410 at 122–23.

exclude the possibility that *Taro* acted independently in the Desonide cream market, including in August 2013, but I did not address whether Perrigo conspired with Actavis. *See* ECF No. 1410 at 126–29. The States base their August 2013 claims against Perrigo on "calls between [Perrigo's] Polman and [Actavis's] Dorsey in May and calls between Perrigo, Taro, and Actavis in August 2013." ECF No. 1029 at 45. As Perrigo points out, no one testified as to the topic of discussion on these communications, ECF No. 1029-1 ¶ 137. And there is little evidence that these communications amounted to an anticompetitive agreement on Desonide cream. Polman's calls with Dorsey in May 2013 took place *after* Perrigo matched Taro's price increase, and so their discussion could not have impacted Perrigo's pricing decision. The States do not articulate how these allegedly "collusive discussions" had any other impact on the Desonide cream market. ECF No. 1029-1 ¶ 134. There is no suggestion, for instance, that Perrigo took steps to adjust its pricing to customers during this time, when Actavis was still ten weeks away from launching Desonide cream.

Moreover, the evidence does not suggest that the May calls were part of a series of communications that continued until Actavis's relaunch on August 15, 2013, as different personnel took part in the interfirm calls in August and September. The participants in the May calls, Polman and Dorsey, were salesmen; the participants in the August calls—Perrigo's Boothe, Taro's Perfetto, and Actavis's Falkin and Stewart—were all executives. And in the Taro ruling, I noted that it was "at least equally likely that the calls between executives Perfetto and Boothe during this time were related to Taro and Perrigo's 'Joint Development Agreement,' about which Boothe provided specific testimony." ECF No. 1410 at 123–24.

The States again fail to explain how these later calls between executives, which occurred in the weeks before and after Actavis's launch, impacted the Desonide cream market, beyond

71

arguing that "the price increases resulted from collusion." ECF No. 1029 at 45. The mere act of following a price increase is equally consistent with lawful conduct typical in an oligopoly. *In re Mylan*, 666 F. Supp. 3d at 323 ("Without at any point violating the antitrust laws, oligopolist firms will consider whether [they are] better off when all are charging the old price or the new one[.]"); ECF No. 926-1 at 169 (States' expert agreeing during his deposition that "[o]ligopolists frequently do better by increasing price when their rivals do, rather than by preserving a lower price and hoping to increase their market share at the expense of the rival that increased price").

Further, on August 23, 2013, about a week after Actavis's launch, Perrigo reduced its price to Anda in an effort to retain the business, with an account executive noting that "[w]ith Actavis new to market, this product has competition." ECF No. 943-4 at 1200. This suggests that Perrigo did not have an agreement to avoid competing with Actavis as of this date. While the volume of calls between Perrigo's Boothe and Actavis's Falkin then increased in late August thorough September 6, 2013, the only evidence that might suggest that these calls involved an agreement to allocate customers was Perrigo's decisions on October 8—more than a month later—not to lower its prices in response to Actavis's bids to its customers Kaiser and HD Smith. ECF No. 1029-1 ¶ 136; ECF No. 943-4 at 1203, 1207. But without any evidence of interfirm communications within a month before these decisions, and with evidence of legitimate business reasons to support them, a reasonable jury could find that these decisions were at least equally suggestive of independent conduct. *See* ECF No. 943-2 at 466 (Wesolowski declaration citing "the potential financial impact that price reductions would have on terms in contracts with other customers" as a reason Perrigo did not defend); *see also* ECF No. 1410 at 127–18 (explaining in the Taro ruling that "it would make little financial sense for Perrigo, which already enjoyed a healthy margin in the market share on Desonide cream, to risk triggering a 'race to the bottom'"—i.e., eroding prices—"by targeting

72

Taro's customers"). The lack of involvement by Polman—who has shown up frequently amid strong circumstantial evidence of collusion relating to other drugs—on the August and September 2013 calls also makes the prospect of a customer-allocation agreement less likely.

In short, the States' evidence does not "lead to an inference of conspiracy," *Citigroup, Inc.*, 709 F.3d at 137, and does not tend to exclude independent conduct, *Matsushita*, 475 U.S. at 588. For these reasons, and those stated in the Taro ruling, Perrigo's motion for summary judgment is GRANTED as to the States's claims related to price increases on Desonide ointment and cream in April and May 2013 and GRANTED as to claims of anticompetitive agreements with Taro or Actavis on Desonide cream in August 2013.

### 5. Econazole Nitrate Cream

The States allege that Perrigo conspired with Taro and Teligent in 2014 to raise prices for Econazole and with Sandoz in 2015 to allocate the market. In the Taro ruling, I denied summary judgment as to Taro, noting that "flurries of calls between all competitors—first directly after Perrigo's increase in July 2014 and then again after Teligent decided to follow in August 2014— tend to exclude the possibility that that the across-the-board increases on Econazole cream were the result of independent conduct." ECF No. 1410 at 133. I also rejected arguments that the evidence did not support a finding of parallel conduct because the competitors raised prices at different times. *Id.* at 135. For the same reasons expressed in the Taro ruling, I find that that the evidence is sufficient to allow a reasonable fact finder to infer that Perrigo more likely than not conspired with Taro and Teligent to raise prices on Econazole nitrate cream. Perrigo's motion for summary judgment as to the States' 2014 Econazole claims is DENIED.

But the evidence regarding an alleged 2015 customer-allocation agreement between Perrigo and Sandoz does not tend to exclude independent conduct. *Matsushita*, 475 U.S. at 588. Even if I were to credit the States' theory that Perrigo's Polman likely provided Sandoz's Bihari

with competitively sensitive information about Perrigo's Econazole pricing to customer Morris & Dickson as Sandoz was preparing to relaunch the product, the evidence does not suggest that this exchange of information resulted in any agreement. After Sandoz made a bid for Morris & Dickson, presumably using the pricing information provided by Polman, Perrigo defended the business. ECF No. 943-4 at 909. Meanwhile, Perrigo also proactively reduced its pricing to retain Walgreens. ECF No. 943-4 at 901. Sandoz was able to obtain the business of Meijer only after offering it half of Perrigo's price, and the business of Morris & Dickson after submitting a second, presumably reduced offer. Perrigo's decisions to cede these customers could just as easily have been a result of an unwillingness to reduce its price to Sandoz's level as it was a result of a competitive agreement.

The States argue that Perrigo "ceded" Morris & Dickson following Polman and Bihari's four calls on December 16, the same day that Bihari "convinced" the customer to review another offer from Sandoz. But the States do not explain how calls between the competitors impacted the customer's willingness to review a second offer from Sandoz, and Sandoz did not renew its offer until nearly a month later. The evidence is not sufficient to suggest that Perrigo ceded the customer as a result of an agreement with Sandoz.

Finally, Vezza's testimony that Sandoz's relaunch was largely unsuccessful, and that Sandoz "got blocked everywhere" and "didn't have an understanding of where the market was," ECF No. 965-1 at 917, also undermines the States' theory of an agreement between Perrigo and Sandoz.

When considering the totality of the evidence, a reasonable jury could not find that Perrigo and Sandoz more likely than not agreed to allocate customers on Econazole upon Sandoz's reentry to the market in 2015. As such, Perrigo's motion as to the States' 2015 Econazole claims is

74

GRANTED.

###### 6.   Erythromycin Solution (Circumstantial Evidence)

The States have produced evidence of parallel conduct, together with a high level of interfirm communications, that is sufficient for a reasonable jury to infer that Perrigo more likely than not agreed with Fougera and Wockhardt to fix prices and allocate customers for Erythromycin solution.

While its competitors were out of the market, Perrigo used this opportunity to increase its Erythromycin WAC prices more than threefold.  ECF No. 1029-1 ¶¶ 318, 326.  When Fougera attempted to return to the market the following year, it effectively matched Perrigo's increase with a WAC price that was just a few cents less.  *Id.* ¶ 333.  Standing alone, this parallel conduct would not be sufficient to find a conspiracy as "[w]ithout at any point violating the antitrust laws, oligopolist firms will consider whether [they are] better off when all are charging the old price or the new one[.]" *In re Mylan*, 666 F. Supp. 3d 266, 323 (S.D.N.Y. 2023) (internal quotation marks omitted)).   But as I found in the overarching conspiracy ruling, regardless of whether a competitor's conduct in raising prices is consistent with rational behavior, "[t]he problem is that the States have submitted evidence that the Defendants communicated with each other about these goals to provide assurance that each would follow them." *Sandoz, Inc.*, 2025 WL 3470502, at *20.

With Erythromycin, the proximity of interfirm communications in close proximity to developments in the market suggests that the call participants were coordinating their conduct related to this drug.  *See Generic Pharms. Pricing*, 2025 WL 2483981, at *14 (calls that occur "immediately before or after pricing decisions" can be sufficient to establish the interfirm communications plus factor from which a reasonable juror could infer a conspiracy); ECF No. 1410 at 138 ("the proximity of [Glenmark's] calls with [Taro] and Bausch[] . . . suggest that these calls concerned a subject in which all three companies were involved"), 170 ("a reasonable jury

could infer from the frequency and timing of these calls [between Taro, Mylan, and Amneal] that they were related to a conspiracy to determine the pricing of Phenytoin, a drug market in which all three competitors participated"). Here, the three Erythromycin suppliers took part in interfirm communications within the period between Perrigo's inquiries about pricing on November 15, 2011, and its decision to more than triple its price on November 28. Indeed, on November 15, Perrigo's Polman spoke with Fougera's Thomassey within minutes of being asked to obtain market information on Erythromycin.[27] ECF No. 946-1 at 108; ECF No. 943-7 at 1432–33. Thomassey then immediately called Kaczmarek, Fougera's vice president of national accounts, after speaking with Polman, ECF No. 946-1 at 108, suggesting that the earlier call concerned a pressing business matter. Two days later, Polman and Thomassey spoke again, after which Thomassey called Michael Craney of Wockhardt twice, with a call to Kaczmarek in between. *Id.* Following these calls, Kaczmarek confirmed that he was aware that Perrigo would soon be launching Erythromycin. ECF No. 964-1 at 3070. From this pattern of calls between all three suppliers of Erythromycin, a reasonable jury could infer that Perrigo did not set its new price until it had obtained assurances from its competitors that they would follow the increase upon their return to the market. When Perrigo began shipping Erythromycin to customers the following month, Polman called Thomassey on the same day, ECF No. 961-1 at 213, which reinforces the inference that the competitors' calls during this period concerned Erythromycin.

The interfirm communications continued in May 2012 immediately upon Fougera's

---

[27] The evidence suggests that Thomassey initiated the call to Polman. But even if Thomassey had made the call for a reason unrelated to Erythromycin, a jury could still reasonably infer from the proximity to Wesolowski's request for pricing information and Thomassey's subsequent call to Kaczmarek that the call included discussion of the drug. *See* ECF No. 964-1 at 871 (Bihari testifying that it was not usual for him to speak to competitors about more than one generic drug on a single phone call).

announcement that it was effectively matching Perrigo's price, with multiple calls between Polman and Thomassey, who then immediately called Kaczmarek. ECF No. 964-1 at 3071. One day after Thomassey exchanged five calls with Polman, Kaczmarek told his team that Fougera's initial target customers would include Cardinal and Rite Aid. ECF No. 957-1 at 77 (native file provided to the Court). A reasonable jury could infer from the timing of the calls that Polman had communicated to Thomassey which customers Perrigo would be willing to concede to Fougera, and that Kaczmarek used this information in determining Fougera's targets. This would fit with other evidence about the collusive relationship between Perrigo and Fougera/Sandoz. *See Sandoz, Inc.*, 2025 WL 3470502, at \*11 (citing testimony of Sandoz's Vezza, who described a "collusive relationship" with Taro and Perrigo whereby the competitors would share price points, "[a]nd we would use those price points to . . . get guidance on what customers to go for or who to avoid. And then we would do that . . . to launch our products.").

The competitors' ensuing conduct strengthens this inference. Fougera sent Rite Aid an offer that was about 15 percent less than Perrigo's price, and Perrigo declined to match the offer. ECF No. 1029-1 ¶ 336. The discounted price is consistent with the practice within the industry of offering 20 percent less to incentivize a customer to switch suppliers. *See Sandoz, Inc.*, 2026 WL 75851, at \*15 (even in an illegally allocated market, "a new offer needed to be twenty percent less to incentivize a switch" (internal quotation marks omitted)); ECF No. 965-1 at 402 (Thomassey email to Kaczmarek on Nystatin ointment that Fougera's proposed price was the same as Perrigo's and that Fougera would "need to go 20 percent off of that, to incentivi[z]e a switch").[28] Although

---

[28] Although Fougera's offer to Cardinal represented a greater discount from Perrigo's price, a reasonable jury could infer that this discrepancy was due to an effort to offer Rite Aid and Cardinal similar prices. *See* ECF No. 1029-1 ¶¶ 335–36 ($23.60 to Cardinal; $23.81 to Perrigo). Thus, this discount is not unequivocal evidence of strenuous competition that might preclude a reasonable inference of a conspiracy.

Perrigo contends that it had a rational reason for not defending Rite Aid, as doing so would have affected its prices to other customers, ECF No. 1029-1 ¶ 336, the problem for Perrigo is again that the evidence suggests that it communicated its desire to keep prices high to Fougera. This knowledge would have allowed Fougera to obtain customers while minimizing price erosion, which is consistent with the purpose of "fair share" agreements described in the overarching conspiracy ruling. *Sandoz, Inc.*, 2025 WL 3470502, at *23 (finding that competitors "would check in with their contacts at their competitors to avoid a situation where uncoordinated behavior would disrupt prices," citing Vezza's testimony that rather than "fighting" over customers, "this arrangement avoids all that, where you get guidance on where you want to go, the price you need to beat").

The fact that Fougera then experienced a supply disruption that prevented it from fulfilling its offers to Cardinal and Rite Aid does not diminish the evidence that the competitors reached an anticompetitive agreement on their calls. *See Generic Pharms. Pricing*, 2025 WL 2483981, at *10 (evidence that competitors are "on record as intending to increase" prices to a "reasonably similar price is sufficient evidence of conscious parallelism in these circumstances to move [Plaintiffs'] claims past summary judgment" even if there is a delay); *United States v. Socony-Vacuum Oil Co.*, 310 U.S. 150, 224 n.59 (1940) ("It is the contract, combination . . . or conspiracy, in restraint of trade or commerce which [Section] 1 of the [Sherman] Act strikes down, whether the concerted activity be wholly nascent or abortive on the one hand, or successful on the other." (internal quotation marks omitted)); *United States v. Medina*, 74 F.3d 413, 418 (2d Cir. 1996) ("Many pre-existing circumstances may doom a conspiracy, without rendering the conspirators any less culpable for their acts.").

Finally, although Bihari only testified about an anticompetitive agreement between Perrigo

78

and Sandoz—Fougera's successor in interest—that came about later in 2012, the evidence suggests that Perrigo likewise utilized Polman's interfirm communications to conspire on the same drug just a few months earlier. Because they involved the same product and were close in time, there is a logical relationship between the conspiracies from which a reasonable jury could infer the "intent, motive and method" of the earlier alleged conspiracy. *U.S. Football League v. Nat'l Football League,* 842 F.2d 1335, 1371 (2d Cir. 1988) (evidence of "[p]rior antitrust violations and the history of competition in a market" may be used to show the "intent, motive and method of a conspiracy" so long as there is a "direct, logical relationship" between conspiracies). The evidence of the later Erythromycin conspiracy with Sandoz increases the likelihood that Perrigo also conspired with its predecessor, Fougera.

When considering the high level of communications between Perrigo and its competitors in close proximity to developments in the market, as well as their subsequent conduct, a reasonable jury could infer that Perrigo more likely than not agreed with at least Fougera to fix prices and allocate customers for Erythromycin solution, *Anderson News*, 899 F.3d at 99, and that this evidence tends to exclude independent conduct, *Matsushita*, 475 U.S. at 588. Thus, Perrigo's motion for summary judgement is DENIED as to an Erythromycin solution conspiracy with Fougera.

### 7. Fluocinonide .1% Cream (Circumstantial Evidence)

In a previous ruling, I denied summary judgment to Taro on Fluocinonide .1% cream upon finding that a reasonable jury could infer from frequent calls between Taro and Glenmark grouped around key market decisions that the two firms agreed to allocate customers when Taro entered the market in 2014. ECF No. 1410 at 136–40. I then declined to determine whether Taro also conspired with Perrigo or with Sandoz. *Id.* at 140. Earlier in this ruling, I denied summary judgment to Perrigo as to the States' claims of an agreement with Sandoz, based on the direct

79

evidence of Bihari's testimony. I now address whether there is enough circumstantial evidence to warrant a trial on the States' claims that Perrigo also had anticompetitive agreements with other competitors on Fluocinonide .1% cream.

The States have not produced any evidence of interfirm communications between Perrigo and either Bausch or Glenmark that correspond with their entries into the Fluocinonide .1% cream market. Instead, the States argue that all the competitors "manifested 'fair share' by walking away from business," and cite instances of Perrigo's or Bausch's declining to defend customers when Taro and Glenmark entered the market in 2014 as evidence of parallel conduct. But without evidence of interfirm communications or other "plus factors," parallel conduct alone is insufficient for a fact-finder to infer a conspiracy.[29] *Apex Oil Co.*, 822 F.2d at 253. And the States do not dispute that "[i]t was common for generic drug manufacturers to concede a customer when a new competitor entered the market." ECF No. 1054-1 ¶ 36. Thus the States have not provided evidence from which a reasonable jury could find that Perrigo colluded directly with Bausch or Glenmark.

But Perrigo did not need to be aware of every other participant to join a Fluocinonide .1% cream conspiracy. *United States v. Eppolito*, 543 F.3d 25, 47 (2d Cir. 2008) (noting, in the criminal context, that "in order for a single conspiracy to be found, it is not necessary that the conspirators even know the identities of all the other conspirators"). And the States do have evidence of interfirm communications between Perrigo and Taro, evidence that corresponds with developments as Taro was planning to enter the market. That evidence suggests that Perrigo's decisions regarding Walgreens and OptiSource changed following calls between Perrigo executive Doug Boothe and Taro executive Michael Perfetto.

---

[29] In contrast, as discussed in the Taro ruling, representatives from Bausch, Taro, and Glenmark frequently communicated during this time. ECF No. 1410 at 50–51, 138.

80

Taro made on offer to Perrigo's customer Walgreens on June 25, 2014. ECF No. 1036-1 ¶ 114. Glenmark also made an offer to Walgreens on July 3 that was intentionally high "by design" because Glenmark "fe[lt] that Perrigo will not give up" the customer. ECF No. 939 at 11. As Glenmark suspected, Perrigo defended its Walgreens business and reduced its price to the customer on July 14. ECF No. 1029-1 ¶ 178 (citing ECF No. 943-5 at 348); ECF No. 1036-1 ¶ 118; ECF No. 1045-1 ¶ 22. But on July 18, Taro sent a revised offer to Walgreens, and Perrigo executive Doug Boothe called Taro's Perfetto the same day. ECF No. 950-1 at 310; ECF No. 1036-1 ¶ 119. Then, on July 21, the same day that Boothe and Perfetto shared a twenty-six-minute call, Taro's Aprahamian approved Taro's extending an offer to another Perrigo customer, OptiSource, and noted that after this customer, "we are done. Expecting to get Walgreens tomorrow." ECF No. 950-1 at 310; ECF No. 1036-1 ¶ 120. After Taro made a third offer, Walgreens switched its business to Taro. ECF No. 1036-1 ¶ 121. OptiSource also accepted Taro's bid and in the process noted Perrigo's change in posture, telling Taro, "looks like Perrigo is playing nice after all and is going to give us up to you." ECF No. 945-1 at 170. Thus, the evidence suggests that Perrigo stopped defending its business with these customers only after Boothe's calls with Taro's Perfetto, and a reasonable jury could infer that the reason for the shift in Perrigo's stance was that Boothe and Perfetto reached an anticompetitive agreement to allocate customers. Further, Perrigo's shift following these calls tends to exclude independent conduct.

Such an inference is reinforced by the evidence that in the period preceding Taro's launch, Perfetto was also exchanging multiple calls with Jim Grauso of Glenmark, which was entering the market at the same time, and that Grauso was also communicating in July 2014 on back-to-back calls with Taro's Aprahamian and a representative from Bausch, the other Fluocinonide supplier. ECF No. 945-1 at 167; ECF No. 949-1 at 176–77, ECF No. 952-1 at 73; *see also* ECF No. 1410

81

at 49 (describing call between Perrigo's Boothe and Taro's Perfetto on June 18, one day before Perfetto exchanged four calls with Glenmark's Grauso and Taro held a meeting concerning its Fluocinonide launch).  As I found in the Taro ruling, a reasonable jury could infer that at least some of these calls involved discussion about whether Bausch would cede more customers to either Taro or Glenmark.  ECF No. 1410 at 136–37.  The inference that Taro allocated customers with Perrigo in July 2014 is therefore consistent with evidence that suggests that Taro was likewise colluding with other competitors on the same product at the same time.  And as I did in the Taro ruling, I draw an adverse inference from Aprahamian's invocation of the Fifth Amendment in response to a question about whether Taro had an agreement with Perrigo, Glenmark or Bausch on Fluocinonide.  ECF No. 1410 at 138.

For these reasons, the evidence in the record is sufficient for a reasonable jury to infer that Perrigo more likely than not agreed with Taro to allocate customers for Fluocinonide .1% cream, *Anderson News*, 899 F.3d at 99, and that this evidence tends to exclude independent conduct, *Matsushita*, 475 U.S. at 588.  Thus, Perrigo's motion for summary judgement is DENIED as to claims of a Fluocinonide .1% cream conspiracy with Taro.

### 8.  Fluticasone Propionate Lotion

For Fluticasone, the States again rely on circumstantial evidence in the form of the interfirm communications between Perrigo and its competitor Sandoz as Perrigo was preparing to launch the product, as well as the testimony of Sandoz's Bihari that he and Perrigo's Polman discussed which customers Perrigo would target for this drug.

One reasonable inference that a jury could draw from this evidence is that, when Bihari spoke with Polman on July 17, 2013, shortly before Perrigo's launch, they agreed that Perrigo would not target Sandoz's customers.  This inference is reasonable based on both the proximity of the calls to Perrigo's pending market entry, Sandoz's earlier internal discussions about the impact

that Perrigo's entry would have on its market share (which prompted interfirm communications with Perrigo), and Bihari's contemporaneous notes that Perrigo would target the market share of the other competitor in the market, Glenmark. Although Bihari did not testify about whether Sandoz had an agreement with Perrigo, he did testify that by knowing which customers Perrigo intended to target for Fluticasone, "Sandoz was able to protect [its] market share and keep the pricing high in the market." ECF No. 964-1 at 865. A reasonable jury could infer from this statement that Polman's purpose in supplying Bihari with information about which customers Perrigo would target was to avoid a bidding war for customers that would erode prices. See *Sandoz, Inc.*, 2025 WL 3470502, at \*23 (finding that competitors "would check in with their contacts at their competitors to avoid a situation where uncoordinated behavior would disrupt prices," citing Vezza's testimony that rather than "fighting" over customers, "this arrangement avoids all that, where you get guidance on where you want to go, the price you need to beat").

Perrigo argues that it is not surprising that Perrigo expressed an intent to target Glenmark's customers because Glenmark had the lion's share of the customers in the Fluticasone market.[30] But even if targeting Glenmark's share over Sandoz's would have been consistent with a rational business decision, again, "[t]he problem is that the States have submitted evidence that the Defendants communicated with each other about these goals to provide assurance that each would follow them." *Sandoz, Inc.*, 2025 WL 3470502, at \*20. And Bihari testified that with Fluticasone, his discussions with Polman permitted the competitors to "keep the pricing high in the market."

---

[30] Perrigo also argues that it "priced aggressively to win business for fluticasone." ECF No. 943 at 24 (citing ECF No. 1029-1 ¶¶ 212–17, describing two offers that were 25 and 30 percent below Glenmark's pricing, but offering no comparison for other offers). But as noted above, undercutting competitors' existing prices by at least twenty percent was typically necessary for a supplier to switch customers. *Sandoz, Inc.*, 2026 WL 75851, at \*15. Thus, even if I were to agree that Perrigo's pricing was "aggressive," it has little impact on whether "the conspiratorial explanation is more likely than not." *Anderson News*, 899 F.3d at 98.

ECF No. 964-1 at 865.  A reasonable jury viewing the evidence as a whole could infer that the communications between Polman and Bihari were designed to avoid competition between Sandoz and Perrigo that would erode the Fluticasone price, and that their discussion did have such an impact.  This is enough to support a reasonable inference of conspiracy between Perrigo and Sandoz.  *See Generic Pharms. Pricing*, 2025 WL 2483981, at *13 ("Communications and exchanges of pricing information between competitors can create a reasonable inference of conspiracy where there is evidence that those exchanges of information had an impact on pricing decisions." (citing *Flat Glass,* 385 F.3d at 369)).  And agreements between competitors to avoid competing for each other's customers are *per se* unlawful under the Sherman Act. 15 U.S.C. § 1; *Leegin Creative Leather Prods., Inc. v. PSKS, Inc.*, 551 U.S. 877, 886 (2007) ("Restraints that are *per se* unlawful include horizontal agreements among competitors . . . to divide markets.").

Finally, Bihari's testimony that Sandoz reached an anticompetitive agreement with Glenmark when Sandoz entered the market in December 2012—following other interfirm communications in which Bihari took part—further reinforces the inference that Sandoz acted similarly and reached another anticompetitive agreement when Perrigo entered the market for the same product seven months later.  *U.S. Football League,* 842 F.2d at 1371 (evidence of "[p]rior antitrust violations and the history of competition in a market" may be used to show the "intent, motive and method of a conspiracy" so long as there is a "direct, logical relationship" between conspiracies).

The evidence in the record is sufficient for "a reasonable fact finder to infer that the conspiratorial explanation is more likely than not" regarding the conduct of Perrigo and Sandoz in the Fluticasone market in 2013.  *Anderson News*, 899 F.3d at 98.  Therefore, Perrigo's motion for summary judgment as to claims related to Fluticasone propionate lotion is DENIED.

9.  Hydrocortisone Acetate Suppositories

For Hydrocortisone acetate, the States argue that Polman's statements to federal investigators are direct evidence of collusion.  In its reply brief, Perrigo argues that this interview memoranda is inadmissible hearsay.  ECF No. 1119 at 16.  As explained above, *see supra note 5*, I will consider only the *self-inculpatory* portions of Polman's statement as evidence at summary judgment, and I decline to rely on this evidence alone as to any critical issue.  Thus, the States must also present circumstantial evidence to support their claims of collusion in the Hydrocortisone acetate suppository market.  *Champagne Metals*, 458 F.3d at 1084 ("Where, as here, a plaintiff adduces only weak direct evidence, which by itself is insufficient to defeat summary judgment, additional circumstantial evidence is required to overcome a motion for summary judgment.").  I find that the circumstantial evidence is sufficient for a reasonable jury to find that Perrigo more likely than not conspired with G&W on Hydrocortisone acetate.

As already discussed, calls that occur "immediately before or after pricing decisions" can be sufficient to establish the interfirm communications plus factor from which a reasonable juror could infer a conspiracy.  *Generic Pharms. Pricing*, 2025 WL 2483981, at *14.  And as I have found previously, "the more frequent and the closer the calls are to a particular movement in the market, the more probative of a conspiracy this evidence becomes."  *Sandoz, Inc.*, 2026 WL 75851, at *16.  Here, Vogel-Baylor and Polman exchanged calls on July 8, 2013, six days after G&W began notifying customers of a price increase.  After those calls with Polman, Vogel-Baylor called her boss.  And the next day, Perrigo notified its customers that it would increase its WAC price.  From the timing of this sequence, a reasonable jury could infer that Polman and Vogel-Baylor discussed the WAC price increase, and that Perrigo agreed to follow G&W's increase.  The July 8 calls between Vogel-Baylor and Polman were also part of a pattern in which the competitors called each other in close proximity to developments in the market, as they also did on July 11,

85

2013 and June 11, 2014.  The proximity of their calls to price increases makes it less likely that the calls related to other matters, as Perrigo suggests.[31]

The July 11, 2013 email exchange between Vogel-Baylor and Orlofski, after customer ABC asked G&W to meet Perrigo's price, reinforces the inference that Perrigo and G&W had an anticompetitive agreement on Hydrocortisone acetate.  One reasonable inference from these emails is that Vogel-Baylor found turning down that customer "painful" because G&W was declining to bid not based not on its own best interest but on a felt obligation to comply with an existing agreement with Perrigo to avoid poaching each other's customers.  This inference is reinforced by Polman and Vogel-Baylor's call the same day, which would allow a reasonable jury to disregard G&W's stated reasons to ABC for declining to bid—being "maxed out" on supply and significant WAC and contract penalties.  Indeed, a reasonable jury could find that Vogel-Baylor used a similar ruse and the same language the following year when another customer asked G&W to bid on Hydrocortisone acetate, instructing a colleague to "[t]ell them . . . we are *maxed out* with what we can sell. I don't want to offer a price and have them tell Perrigo we were bidding against them." ECF No. 956-1 at 365 (emphasis added).[32]  A reasonable jury could infer that Vogel-Baylor was

---

[31] As discussed above, *see supra* note 21, Perrigo again overstates Vogel-Baylor's testimony in arguing that she "denied reaching any agreements with Mr. Polman on the product."  ECF No. 943 at 26.  Vogel-Baylor only testified that she did not recall the subject of discussion. ECF No. 965-1 at 1402, 1404.  I again give her testimony little weight in determining whether a jury could find that an inference of anticompetitive behavior is more likely than not.  *See* ECF No. 1410 at 151 n.49 (noting in the Taro ruling that Vogel-Baylor's testimony regarding Halobetasol was "frequently evasive, in that she consistently responded that she did not recall colluding with competitors yet failed to deny that she did so").  The evidence of calls between Vogel-Baylor and Polman are also sufficient to raise an inference of conspiracy even if a jury were to accept Boothe's testimony that he did not discuss Hydrocortisone acetate with anyone at G&W, and that his calls with Orlofski related to the companies' Joint Development Program.

[32] Evidence in the record suggests that Vogel-Baylor was willing to mislead customers in similar situations on other drugs on which G&W competed with Perrigo. *See, e.g.*, ECF No. 944-1 at 151 (Vogel-Baylor telling a colleague, "[w]e cannot take [Halobetasol] from Perrigo so I will give you pricing so that it looks like you are making an attempt to bid").

concerned that a bid to this customer would cause Perrigo to think G&W was acting contrary to an established anticompetitive agreement.

Perrigo also argues that G&W's and Perrigo's July and August 2014 WAC price increases were instigated not by collusion but instead by the exit of two non-party competitors from the market. But Vogel-Baylor's May 2014 internal email that "[w]e already have more share than Perrigo so we really can't pick up anything else without upsetting the apple cart" provides added context. ECF No. 956-1 at 393–94. And as noted, Vogel-Baylor refrained from bidding to avoid Perrigo's learning that G&W was "bidding against them." *Id.* at 365. This context, along with Vogel-Baylor's call to Polman on the same day that she recommended G&W increase a contract price, could allow a reasonable jury to infer that Polman and Vogel-Baylor shared information that the competitors used to further their customer allocation scheme.

All of this circumstantial evidence is consistent with Polman's testimony to investigators that he and Vogel-Baylor "talked about implementing price increases on hydrocortisone, and both of them made an agreement to raise the prices on this drug simultaneously." ECF No. 952-1 at 490. To be clear, however, the circumstantial evidence is sufficient to raise an inference of conspiracy even without Polman's testimony.

The record evidence is sufficient for "a reasonable fact finder to infer that the conspiratorial explanation is more likely than not" regarding the conduct of Perrigo and G&W in the hydrocortisone acetate suppository market in 2013 and 2014. *Anderson News*, 899 F.3d at 98. Therefore, Perrigo's motion for summary judgment as to claims related to hydrocortisone acetate suppository market is DENIED.

### 10. Hydrocortisone Valerate Cream

In a previous ruling, I granted summary judgment to Taro as to Hydrocortisone valerate cream upon finding that the evidence did not "raise[] a suggestion of a preceding agreement"

between Taro and Perrigo, even if a reasonable juror could view the timing of some of the interfirm communications with suspicion. ECF No. 1410 at 155. In opposing Perrigo's motion, the States point to the same calls between Taro and Perrigo executives that I found were insufficient in the Taro ruling. ECF No. 1029 at 51. The States also suggest that a comment by Taro's Ara Aprahamian expressing confidence in a recent price increase stemmed from an agreement between Taro and Perrigo to follow each other's prices, *id.*, but as I found in the Taro ruling, his confidence could just as likely have come from observing the recent history of the market. ECF No. 1410 at 157.

Because the States present no new arguments requiring separate analysis here, I adopt my reasoning from the Taro ruling and GRANT Perrigo's motion as to Hydrocortisone valerate cream.

### 11. Prochlorperazine Maleate Suppositories

For Prochlorperazine, the States point to business lunches and phone calls between Perrigo's Boothe and G&W's Orlofski proximate in time to G&W's price increase, which Perrigo later followed, as circumstantial evidence of collusive behavior. While the evidence suggests that Perrigo and G&W might have discussed Prochlorperazine, I find that the evidence is insufficient for a reasonable jury to conclude that the firms more likely than not reached an agreement to raise prices.

The facts surrounding the 2013 Prochlorperazine price increases present a relatively close call because a reasonable jury could find the timing of Orlofski's communications with Boothe to be suspicious. On March 4, 2013, the next business day following his lunch with Boothe, Orlofski met with his colleague Vogel-Baylor, who then requested sales reports on Prochlorperazine, effectively setting in motion G&W's process of implementing a price increase. ECF No. 956-1 at 466; ECF No. 961-1 at 8; ECF No. 964-1 at 5246-47. The States contend that Orlofski and Boothe did not speak again until the day after G&W informed customers of its price increase. ECF No.

88

1029-1 ¶ 243; ECF No. 1059-1 ¶ 32 (SAMF).  A reasonable inference from these chain of events is that Boothe and Orlofski might have discussed a Prochlorperazine price increase during these communications, notwithstanding Orlofski's testimony to the contrary.  *See Generic Pharms. Pricing*, 2025 WL 2483981, at \*14 (calls that occur "immediately before or after pricing decisions" can be sufficient to establish the interfirm communications plus factor from which a reasonable juror could infer a conspiracy).  But even if Orlofski and Boothe discussed the potential for an increase, the evidence does not suggest that these communications reached the point of an anticompetitive agreement.  *See Citigroup, Inc.*, 709 F.3d at 137 (once a plus factor is established, circumstances "must still lead to an inference of conspiracy").

First, Perrigo and G&W did not communicate between March 7, the day that Vogel-Baylor conducted a pricing analysis and recommended raising G&W's WAC price to $106.98, and March 18, the day that G&W first informed customers of that new price.  Thus, even if Boothe and Orlofski discussed a potential price increase during their March 1 lunch, there is no evidence of any follow-up or of G&W's informing Perrigo of the new price before implementing it.  It is unlikely that Perrigo would have assured G&W that it would follow an increase without any indication of what the new price would be.  A reasonable jury could thus find that the next communications between Orlofski and Boothe on March 19, if they concerned Prochlorperazine at all, were at least as likely to be a courtesy call regarding the new price as evidence of collusion.  And the act of following a competitor's price increase, without more, is not probative of a conspiracy.  *In re Mylan*, 666 F. Supp. 3d at 323 ("Without at any point violating the antitrust laws, oligopolist firms will consider whether [they are] better off when all are charging the old price or the new one[.]").

Second, the pattern of interfirm communications purportedly concerning Prochlorperazine

diverges from other alleged conspiracies involving Perrigo and G&W.  Unlike nearly every other drug for which I have denied summary judgment to Perrigo in this ruling, there is no evidence that Polman was involved in Perrigo's decision to follow G&W's price on Prochlorperazine.  There is also no evidence of phone calls involving G&W's Vogel-Baylor, whose frequent communications with competitors the States point to as evidence in multiple other individual-drug conspiracies. Meanwhile, the actual participants in the alleged collusive calls "suggest[ed] specific, plausible— and often corroborated—alternative explanations for the topics of discussion during their phone calls." ECF No. 1410 at 111 (citing a "Joint Development Agreement" between Perrigo and Taro). The divergence from the companies' typical avenues for collusive communications, together with a plausible alternative reason for the calls, makes the prospect of collusion on Prochlorperazine less likely.[33]

Third, while the States argue that Perrigo and G&W acted based on "fair share" principles, the evidence suggests that the companies—the only two suppliers in the market—continued to compete for customers in the ensuing months, with Perrigo adding a contract with Target while G&W bid for Associated Pharmacies' business.  ECF No. 943-5 at 1108, 1117–18.  This evidence is not consistent with the other "fair share" conspiracies alleged in this case, in which competitors refrained from "poaching" each other's customers to avoid eroding prices.  And though the States point to an email suggesting that G&W initially avoided taking new customers after Perrigo

---

[33] To be clear, as I have found with other drugs, a reasonable jury could still find that Perrigo or G&W more likely than not conspired with competitors even in the absence of involvement of Polman or Vogel-Baylor. *See supra* Section III.B.7 (denying summary judgment to Perrigo on Fluocinonide .1% cream based on Boothe's calls with Taro's Perfetto); ECF No. 1410 at 144–46 & 144 n.45 (denying summary judgment to Taro on Fluocinonide gel based in part on Orlofski's calls with competitors).  But without the additional circumstances present in those instances, which included contemporaneous communications between other competitors, the prospect of collusion on Prochlorperazine is not as likely.

followed its price increase, this directive could reflect G&W's independent decision to avoid competing on prices so soon after raising prices. As such, the email in question is equally consistent with independent conduct as with potential collusion. *See Apex Oil*, 822 F.2d at 253 (plus factors "in a particular case could lead to an equally plausible inference of mere interdependent behavior, i.e., actions taken by market actors who are aware of and anticipate similar actions taken by competitors, but which fall short of a tacit agreement").

In sum, the evidence does not "tend[] to exclude the possibility that the alleged conspirators acted independently." *Matsushita*, 475 U.S. at 588. The evidence is thus insufficient for "a reasonable fact finder to infer that the conspiratorial explanation is more likely than not." *Anderson News*, 899 F.3d at 98. Therefore, Perrigo's motion for summary judgment as to claims related to Prochlorperazine is GRANTED.

## IV. CONCLUSION

For the foregoing reasons, Perrigo's Motion for Summary Judgment is GRANTED as to the States' claims that Perrigo unlawfully conspired with regard to Ammonium Lactate cream and lotion, Ciclopirox cream, Desonide cream, Desonide ointment (April/May 2013 price increase), Econazole nitrate cream (2015 customer allocation), Hydrocortisone valerate cream, and Prochlorperazine maleate suppositories. The motion is DENIED as to the States' claims that Perrigo unlawfully conspired with regard to Adapalene cream (2013 customer allocation), Bromocriptine, Ciclopirox shampoo, Ciclopirox solution, Econazole nitrate cream (2014 price increase), Erythromycin solution, Fluocinonide .1% cream, Fluticasone propionate lotion, Halobetasol propionate cream (2012 and 2013 price increases), Halobetasol propionate ointment, Hydrocortisone acetate suppositories, Imiquimod cream, Methazolamide tablets, Nystatin ointment, Promethazine HCL suppositories, Tacrolimus ointment, and Triamcinolone Acetonide

cream and ointment. As for the States' Clindamycin solution claims, the motion is DENIED as to allegations of an agreement with Taro and Sandoz but GRANTED as to the allegation of an agreement with Greenstone.

IT IS SO ORDERED.

                                          _____/s/_____
                                          Michael P. Shea, U.S.D.J.

Dated: Hartford, Connecticut
August 6, 2026