**UNITED STATES DISTRICT COURT**
**DISTRICT OF CONNECTICUT**

| | |
|---|---|
| THE STATE OF CONNECTICUT; THE STATE OF ALASKA; THE STATE OF ARIZONA; THE STATE OF ARKANSAS; THE STATE OF CALIFORNIA; THE STATE OF COLORADO; THE STATE OF DELAWARE; THE DISTRICT OF COLUMBIA; THE STATE OF FLORIDA; THE STATE OF GEORGIA; THE TERRITORY OF GUAM; THE STATE OF HAWAII; THE STATE OF IDAHO; THE STATE OF ILLINOIS; THE STATE OF INDIANA; THE STATE OF IOWA; THE STATE OF KANSAS; THE COMMONWEALTH OF KENTUCKY; THE STATE OF LOUISIANA; THE STATE OF MAINE; THE STATE OF MARYLAND; THE COMMONWEALTH OF MASSACHUSETTS; THE STATE OF MICHIGAN; THE STATE OF MINNESOTA; THE STATE OF MISSISSIPPI; THE STATE OF MONTANA; THE STATE OF NEBRASKA; THE STATE OF NEVADA; THE STATE OF NEW HAMPSHIRE; THE STATE OF NEW JERSEY; THE STATE OF NEW MEXICO; THE STATE OF NEW YORK; THE STATE OF NORTH CAROLINA; THE STATE OF NORTH DAKOTA; THE COMMONWEALTH OF THE NORTHERN MARIANA ISLAND; THE STATE OF OHIO; THE STATE OF OKLAHOMA; THE STATE OF OREGON; THE COMMONWEALTH OF PENNSYLVANIA; THE COMMONWEALTH OF PUERTO RICO; THE STATE OF RHODE ISLAND; THE STATE OF SOUTH CAROLINA; THE STATE OF TENNESSEE; THE STATE OF UTAH; THE STATE OF VERMONT; THE COMMONWEALTH OF VIRGINIA; THE STATE OF WASHINGTON; THE STATE OF WEST VIRGINIA; THE STATE OF WISCONSIN; and U.S. VIRGIN ISLANDS, <br><br> *Plaintiffs*, <br><br> v. | No. 3:20-cv-00802-MPS |

SANDOZ, INC.; ACTAVIS HOLDCO US, INC.; ACTAVIS ELIZABETH LLC; ACTAVIS PHARMA, INC.; AMNEAL PHARMACEUTICALS, INC.; AMNEAL PHARMACEUTICALS, LLC; ARA APRAHAMIAN; AUROBINDO PHARMA U.S.A., INC.; BAUSCH HEALTH AMERICAS, INC.; BAUSCH HEALTH US, LLC; MITCHELL BLASHINSKY; DOUGLAS BOOTHE; FOUGERA PHARMACEUTICALS INC.; GLENMARK PHARMACEUTICALS INC., USA; JAMES (JIM) GRAUSO; GREENSTONE LLC; G&W LABORATORIES, INC.; WALTER KACZMAREK; ARMANDO KELLUM; LANNETT COMPANY, INC.; LUPIN PHARMACEUTICALS, INC.; MALLINCKRODT INC.; MALLINCKRODT LLC; MALLINCKRODT plc; MYLAN INC.; MYLAN PHARMACEUTICALS INC.; KURT ORLOFSKI; MICHAEL PERFETTO; PERRIGO NEW YORK, INC.; PFIZER INC.; SUN PHARMACEUTICAL INDUSTRIES, INC.; TARO PHARMACEUTICALS USA, INC.; TELIGENT, INC.; ERIKA VOGEL-BAYLOR; JOHN WESOLOWSKI; and WOCKHARDT USA LLC,

     *Defendants*.

## CORRECTED RULING ON MOTION FOR SUMMARY JUDGMENT

In this action, the Plaintiffs, the Attorneys General of most of the States and several U.S. territories ("the States"), allege that thirty-six pharmaceutical companies and executives ("the Defendants") each participated in a series of conspiracies, as well as an overarching conspiracy, to fix prices, allocate markets, and rig bids in the sale of dozens of generic drug products. Defendant G&W Laboratories, Inc. ("G&W") moved for summary judgment on all claims against it. ECF No. 1030; *see also* ECF No. 1008 (Defendants' Joint Memoranda in Support of Defendant-Specific Motions for Summary Judgment). For the reasons set forth below, I **GRANT IN PART AND DENY IN PART** the motion for summary judgment.

Specifically, the motion is granted as to the States' claim for injunctive relief, as to Prochlorperazine, and as to Counts 7, 10, and 14. The motion is denied as to all other claims.

## I. BACKGROUND

### A. Procedural Background

This is one of three cases in which the Attorneys General of the States have sued scores of defendants in the generic drug industry for alleged antitrust violations and unfair trade practices. All three cases were originally filed in this Court but were transferred to the Eastern District of Pennsylvania (the "MDL Court"), which was designated by the Judicial Panel on Multidistrict Litigation (the "JPMDL") to preside over these and other similar cases brought by private parties in a consolidated proceeding. ECF No. 9.[1] In April 2024, these three cases were remanded to this Court by the JPMDL and assigned to me. ECF No. 11. The operative complaint in this case, ECF No. 196, alleges collusion in the pricing, market allocation, and bidding for some eighty generic drugs, chiefly for dermatological applications (the "Drugs at Issue"). The parties refer to it as "the Dermatology complaint."

In a previous ruling, I denied the Defendants' Joint Motion for Summary Judgment on Overarching Conspiracy Claims, ECF No. 609, because I found that there is evidence in the record from which a reasonable jury could find that the alleged overarching conspiracy exists, *Sandoz, Inc.*, No. 20cv802, 2025 WL 3470502 (D. Conn. Dec. 3, 2025). Specifically, I concluded that a reasonable jury could find that at least some of the Defendants had a tacit agreement that they would conduct business in accordance with broadly understood industry "rules of engagement,"

---

[1] Unless otherwise indicated, all ECF numbers in this ruling refer to entries on the docket of this case, not the same case when it was before the MDL Court, and each page number refers to the page number shown on the ECF stamp on the top of the cited page, not the page of the relevant brief or pleading designated by the parties.

which included following any price increase by a rival firm, avoiding "poaching" each other's customers, and instead settling for what these competitors refer to as their 'fair share'" of a particular drug market. *Id.* at \*17. The conspirators considered a competitor to be "rational" or "reasonable" if it would "fall in line with those types of tactics." *Id.* at \*6. Although I did not determine whether each corporate Defendant was a member of the overarching conspiracy,[2] I noted that the evidence suggested that G&W was among "a core group of leaders most responsible for perpetuating the Defendants' collective adherence to the rules of engagement." *Id.* at \*20–21.

Shortly before I issued that ruling, most Defendants filed additional, Defendant-specific summary judgment motions, many of which include challenges about whether a particular Defendant joined the overarching conspiracy. This ruling addresses G&W's Defendant-specific motion for summary judgment.

The Defendants have also filed a Joint Memorandum that addresses the pertinent legal standard and argues that the Defendants are entitled to summary judgment on particular state-law claims. ECF No. 1008. This ruling will address arguments made in the Joint Memorandum where they are applicable to G&W. I also will consider the briefs and record related to motions for summary judgments filed by other Defendants where applicable.

### B. Factual Background

G&W seeks summary judgment on the grounds that all of the States' claims are time-barred, that there is no evidence that it ever conspired with certain competitors, and that "direct

---

[2] As noted in the previous ruling, "[w]hether a particular Defendant was a member is a distinct issue from the issue whether a conspiracy existed at all." ECF No. 1123 at 30 (citing 4 Sand et al., Modern Federal Jury Instructions–Civil ¶ 79-8 ("[Y]ou should first determine . . . whether the conspiracy existed. If you conclude that the conspiracy did exist, you should next determine whether each defendant was a knowing member of the conspiracy."); *id.* ¶ 79-6 ("In order to prove the [price-fixing] conspiracy, . . . [t]he plaintiff does not have to show that . . . all of the persons alleged to have been members of the claimed conspiracy were in fact members.")).

evidence of legitimate procompetitive activity by G&W prevents a claim from proceeding on a circumstantial evidence basis" as to alleged conspiracies related to three drugs: Ethambutol HCL tablets ("Ethambutol"), Hydrocortisone acetate suppositories ("Hydrocortisone acetate") and Prochlorperazine maleate suppositories ("Prochlorperazine").  ECF No. 1030-1 at 18.  The States also allege that G&W took part in individual-drug conspiracies related to Betamethasone valerate lotion; Calcipotriene solution; Ciclopirox cream and solution; Fluocinolone acetonide cream and ointment; Fluocinonide gel; Halobetasol propionate cream and ointment; Ketoconazole cream; Metronidazole cream; Metronidazole .75% gel; Mometasone Furoate cream, ointment, and solution; and Promethazine HCL suppositories.  ECF No. 1635.  Apart from its general timeliness argument, G&W does not seek summary judgment as to its conduct related to any of these other drugs.

In the overarching conspiracy ruling, I discussed the facts underpinning the States' claims against all corporate Defendants, and I incorporate that description here.  *See Sandoz, Inc.*, 2025 WL 3470502, at *2–14.  I also incorporate the facts from other summary judgments rulings that I issued after G&W submitted its motion.  These include:

(1) the ruling on statute of limitations and laches, which described facts related to issues of tolling, continuing violations, and fraudulent concealment. *Connecticut v. Sandoz, Inc.*, No. 20cv802, 2025 WL 3043397, at *2–6 (D. Conn Oct. 31, 2025).

(2) the ruling on Taro's motion for summary judgment under the subheading "The Generic Drug Markets Generally," which describes how the corporate Defendants, including G&W, conducted business during the relevant time period.  ECF No. 1410 at 5–7; *see also* ECF No. 1029-1 ¶¶ 5–7, 20–26, 34–35.

(3) the ruling on Perrigo's motion for summary judgment, describing the facts related to the States' claims that Anthony Thomassey, one of the States' cooperating witnesses, served as a "conduit" for collusion between G&W and Perrigo, and claims regarding individual-drug conspiracies related to Hydrocortisone acetate and Prochlorperazine. *Connecticut v. Sandoz, Inc.*, No. 20cv802, 2026 WL 2268225, at *10–12, *19–22 (D. Conn Aug. 6, 2026).

4

I now address the facts specific to G&W's participation in the alleged conspiracies. The following facts are drawn from the parties' Local Rule 56 Statements of Facts, including the States' Statement of Additional Material Facts ("SAMF"), ECF No. 1059-1, and the record. Rather than restating these lengthy submissions in full, I will focus on the portions from which a reasonable jury could or could not determine that a material dispute of fact exists. The facts are undisputed unless otherwise noted.

1. Direct Evidence of Anticompetitive Agreements Involving G&W

The States allege that G&W conspired with its competitors to allocate customers, fix prices, and rig bids for nineteen drug products, including different formulations of the same drug (*e.g.*, Ciclopirox cream and Ciclopirox ointment), at distinct periods ranging from July 2010 to March 2016. ECF No. 196 ¶ 1635; ECF No. 1059-1 ¶¶ 6–21. As described in the overarching conspiracy ruling, witnesses who worked for G&W's competitors and are now cooperating with the States testified that during this time period, G&W entered into anticompetitive agreements regarding certain drug products. *See Sandoz, Inc.*, 2025 WL 3470502, at *9 (describing testimony of Thomassey that his firm Fougera reached an agreement in 2011 with G&W and Actavis "[t]o allocate market share and keep the price as high as possible" for Metronidazole cream); at *10 (describing testimony of Christopher Bihari of "a three-firm agreement" on Ketoconazole cream in 2015 under which both "Taro and G&W would eventually follow [Sandoz's] price increase and keep the price high and to not poach or take anyone else's share"); *id.* at *13 (describing testimony of Paul Dutra that Glenmark and G&W had an agreement in 2013 to raise prices on Ciclopirox cream and Mometasone products).

Thomassey also testified that he and his counterpart at G&W, Jim Grauso, had an "understanding" encompassing more than one drug, under which Fougera "would let [G&W] know who we were targeting and where -- what price we were going in at and vice versa. And

5

just do all we could to keep the market price up and not erode each other's market share." *Id.* at *9 ("we would be responsible in the marketplace and we would divvy up -- share appropriately and agree on what we were doing and who we were targeting"). Thomassey testified that this broad understanding also covered pricing: "if one or the other raised the price, when that product got put out to bid, the other manufacturer would decline to bid the product." *Id.* Grauso left G&W in December 2011. ECF No. 1059-1 ¶ 32.

Thomassey also testified that after he left Fougera and joined Aurobindo in 2012, he frequently acted as a "conduit" between Perrigo's Polman and G&W's Erika Vogel-Baylor "regarding customer allocation and price and the market share they were going to take" when he participated in back-to-back calls with each competitor. ECF No. 965-1 at 414–19. Thomassey stopped working for Aurobindo in May 2013. *Id.* at 317.

### 2. Ethambutol HCL tablets

Ethambutol is an oral antibiotic tablet used in combination with other medication to treat tuberculosis. ECF No. 1058 ¶ 1.

In 2010, G&W acquired the marketing and distribution rights for Ethambutol under a license agreement with STI Pharma LLC. ECF No. 1059-1 ¶ 44. G&W itself did not manufacture Ethambutol. ECF No. 1058 ¶ 4.

In late 2012, the only two suppliers of Ethambutol were G&W and Lupin. ECF No. 960-1 at 1293. Lupin internally circulated a worksheet regarding proposed Ethambutol price increases on December 7, 2012, and circulated a revised analysis at 3:41 p.m. on December 10. ECF No. 1058 ¶¶ 26–27; ECF No. 961-1 at 94–95. Three minutes later, Lupin's vice president of sales, David Berthold called G&W president Kurt Orlofski, and the call lasted for four seconds. ECF No. 945-1 at 17. The next day, on December 11, Lupin's Berthold called G&W's Vogel-Baylor, and the call lasted for nearly six minutes. *Id.* Later that day, Orlofski called Berthold and the call

6

lasted for nearly six minutes.  *Id.*  On December 17, 2012, Lupin internally circulated draft price-increase letters with a plan to send them to customers the following day.  ECF No. 961-1 at 94.  Also on December 17, Lupin's Berthold called G&W's Vogel-Baylor and the call lasted for fourteen seconds, and Berthold also exchanged four text messages with Orlofski.  ECF No. 944-1 at 242.  Berthold also exchanged multiple calls with Orlofski and Vogel-Baylor on December 18 and 19.  *Id.* at 242–43.  Also on December 19, 2012, Lupin informed its customers of its price increase.  ECF No. 1058 ¶ 28.

On January 2, 2013, G&W's Orlofski emailed Vogel-Baylor, writing "[l]et's plan to discuss a price increase on ethambutol when we meet tomorrow."  ECF No. 960-1 at 1298.  Also on January 2, Vogel-Baylor and Berthold spoke on the phone for eleven minutes.  ECF No. 944-1 at 245.  After speaking with Berthold, Vogel-Baylor sent Orlofski a written price-increase analysis.  ECF No. 960-1 at 1300.  Berthold and Vogel-Baylor also spoke at least four times the following day, January 3.  ECF 944-1 at 245.

On February 1, 2013, Vogel-Baylor and Berthold exchanged two calls.  ECF No. 944-1 at 245.  On February 6, 2013, Vogel-Baylor told G&W's customer Walmart that it would also be "increasing our price so that it is market competitive" following Lupin's increase on Ethambutol.  ECF No. 960-1 at 1293.  The next day, Vogel-Baylor reported that G&W's Ethambutol price increase was complete and would go into effect for some customers on February 8.  ECF No. 1058 ¶ 36.

On April 1, 2013, STI Pharma notified G&W that it was terminating its agreement for supplies of Ethambutol.  ECF No. 1059-1 ¶ 44; ECF No. 1058 ¶ 38.  Upon learning this news, Vogel-Baylor emailed internally, "I am FURIOUS!!!! I hope Lupin takes it all!!!!!!!!"  ECF No. 1038-8 at 16.  Berthold and Vogel-Baylor exchanged two calls on April 2, 2013, three calls on

April 5, and two text messages on April 15. ECF No. 945-1 at 19. Orlofski testified that calls between Berthold and Vogel-Baylor—at the least, those calls that occurred after STI ended the license agreement—involved requests for Lupin to supply G&W with Ethambutol, which Lupin declined. ECF No. 964-1 at 5249.[3]

Lupin obtained additional Ethambutol business from G&W before G&W left the market on April 15, 2013, which left STI as Lupin's only competitor on the product. ECF No. 1058 ¶¶ 41, 43.

Lupin's Berthold and G&W's Kurt Orlofski denied having discussions about Ethambutol price increases. ECF No. 1058 ¶ 59. G&W's Vogel-Baylor testified that she did not remember speaking with Berthold about an increase. *Id.* Berthold testified that he and Orlofski had been best friends since childhood but that he was not friends with Vogel-Baylor. ECF No. 964-1 at 537–38. The States contend that Berthold's phone records indicate that after G&W stopped selling Ethambutol, Berthold and Vogel-Baylor never spoke again. ECF No. 964-1 at 544–45.

3. Antitrust Training and Ketoconazole Cream

In October 2014, following media reports of antitrust investigations in the generic pharmaceutical industry, G&W engaged a firm to conduct antitrust training for all sales personnel and executives. ECF No. 1059-1 ¶ 33; ECF No. 1038-17 at 2 ¶ 5. In a declaration submitted with G&W's motion, G&W CEO Ronald Greenblatt avers that at the conclusion of the training session,

---

[3] Orlofski's testimony is unclear as to whether calls between G&W and Lupin prior to STI's termination notice also involved requests for Lupin to supply G&W with Ethambutol. *See* ECF No. 964-1 at 5249 ("We sought -- I asked [Berthold] to supply us the product and he said no. . . . We spoke about it openly in G&W. Erika also tried with him. There are likely some emails about it, but I'm not sure. Plus later in the first part of 20 -- sorry, in the early part of the next year, you'll see some more calls to Mr. Berthold because our licensor cut us off after we raised the price increase. So, again, we tried to get supply from Mr. Berthold, and he declined.")

8

he instructed that G&W personnel were not to discuss pricing or customers with competitors.[4] ECF No. 1059-1 ¶ 33; ECF No. 1038-17 at 2 ¶ 5.

G&W contends in its reply brief that the only evidence of interfirm communications regarding pricing or customers that occurred after this training session was a single call between G&W president Kurt Orlofski and Taro executive Ara Aprahamian regarding Ketoconazole cream on July 30, 2015. ECF No. 1313 at 12. G&W concedes that "[i]n this one instance Mr. Greenblatt's instructions were not followed." *Id.* I will address the facts related to Ketoconazole cream even though G&W has not moved for summary judgment on that drug because the facts are relevant to G&W's argument that it withdrew from any conspiracy once Greenblatt allegedly gave his instructions.

G&W launched Ketoconazole cream in June 2015 at a higher price than that offered by incumbent suppliers Sandoz and Taro. ECF No. 964-1 at 5223–25; ECF No. 1410 at 59 (Taro ruling). Call records presented by the States indicate that Orlofski spoke with Taro's Aprahamian on June 10, 15, 16, and 17, 2015. ECF No. 947-1 at 254. Orlofski denied that he called Aprahamian to confirm that Taro would follow G&W's increased pricing. ECF No. 964-1 at 5226–27. On June 19, 2015, Aprahamian spoke for 17 minutes with Sandoz's Bihari, who testified that Aprahamian told him that Taro planned to follow G&W's increase in July. *Id.* at 993–94.

After launching the product, G&W sought customers for Ketoconazole cream in July 2015. *Id.* at 5229. Call records presented by the States suggest that in addition to the call on July 30, 2015, G&W's Orlofski and Taro's Aprahamian also exchanged calls on July 7, 9, 10, 22, and 28, 2015. ECF No. 947-1 at 265. Immediately after speaking with Aprahamian on July 30, Orlofski informed Vogel-Baylor that Taro would raise its Ketoconazole cream price the following week.

---

[4] G&W offers no other evidence to support this assertion.

9

ECF No. 958-1 at 330.[5]  Taro indeed raised its pricing on Ketoconazole cream.  ECF No. 964-1 at 5233.  Again, Orlofski denied at his deposition that these July calls entailed "conversations with Mr. Aprahamian about the price increase on [K]etoconazole or any other product," and that instead they were "regarding the other business development deals that we were doing."  *Id.* at 5234.

Sandoz increased its Ketoconazole pricing in May 2016.  ECF No. 964-1 at 996.  Bihari testified that Sandoz's price increase was part of "[a]n agreement with Taro and G&W to eventually follow a price increase and keep the price high and to not poach or take anyone else's share, any other company's share."  *Id.*

Taro's Aprahamian invoked the Fifth Amendment in response to questions regarding an agreement between Taro and G&W on Ketoconazole cream.  ECF No. 964-1 at 214.

### 4.  Declining Prices

The States filed the first of the three generic pharmaceutical cases before me, which the parties refer to as the "Heritage Complaint," in December 2016.  *See Connecticut v. Aurobindo Pharma USA, Inc.*, No. 16-cv-2056.  The States' expert, Dr. Frederick Warren-Boulton, noted that for the Drugs at Issue, "price increases follow evidence of communication, and price decreases follow the Heritage complaint."  ECF No. 693-4 at 35 ¶ 3; *see also* ECF No. 711 at 45–46 ¶ 89 (Dr. Warren-Boulton noting that "the net price for the Drugs at Issue for Sandoz and Taro increased from the early part of the Conduct Period to around 2015, by a multiple of 6 (Taro) or a multiple

---

[5] The evidence that the States rely on to support the assertion that this call concerned Ketoconazole cream is a summary of an interview that Erika Vogel-Baylor gave to the FBI in 2016.  ECF No. 958-1 at 330.  Although G&W contends that summaries of interviews that Perrigo's Tony Polman gave to federal investigators are inadmissible, it makes no such argument as to the summary of Vogel-Baylor's interview and indeed admits in its reply brief that the July 30, 2015 call between Orlofski and Aprahamian was "regarding Keto Cream."  ECF No. 1313 at 12.  I find, then, that G&W has waived any argument that the summary of Vogel-Baylor's interview is inadmissible for the purposes of summary judgment.

of 7 (Sandoz), and then began falling, either around the time of the Heritage Complaint (Sandoz) or earlier (Taro).").[6]

On October 2, 2015, a customer advised Glemark that G&W would begin shipping Mometasone Furoate the following week at half of Glenmark's price.  ECF No. 1059-1 ¶ 26 (customer NC Mutual noting, "Let it go.  G&W shipping next week, half your cost.").

On October 21, 2015, G&W vice president Erika Vogel-Baylor noted that Taro had undercut its pricing on Ciclopirox cream to customer Walgreens and recommended that G&W match the price to retain the business.  ECF No. 1038-3 at 24.  In the same email, Vogel-Baylor also noted that:

> Perrigo has cost us millions at [Walgreens] alone this year so it would be nice to hit them [on Ciclopirox solution].  On the other hand, I can see them hitting us hard somewhere else if we take this just like they did when we took Mometasone Ointment from them at CVS and they hit us hard at [Walgreens] on Mometasone Cream.

*Id.* at 24–25.

> In response to pre-deposition interrogatories, G&W's CEO, Ronald Greenblatt, averred:

> [I]n 2016, many large, publicly held generic pharmaceutical companies started to target topline growth at the expense of profitability, causing many of these companies to be more aggressive in the market.  Many of these companies went to G&W's customers and offered lower prices on G&W's Drugs at Issue than what G&W had been offering.  G&W was faced with the option of either lowering its prices to meet a competitor's offer or losing that customer's business.  In most cases, G&W chose to lower its prices on the Drugs at Issue and retain the business.

ECF No. 1059-1 ¶ 25; ECF No. 1038-18 at 6.

---

[6] As noted in the overarching conspiracy ruling, the "most frequent players" in this case are Sandoz, Taro, Perrigo, and G&W.  *Sandoz, Inc.*, 2025 WL 3470502, at *2.

5. <u>Supracompetitive Prices in 2018 and Beyond</u>

As described in the statute of limitations ruling, the States' expert, Dr. Warren-Boulton, concluded that his analysis of data produced by the Defendants up to 2018 showed that "prices for the Drugs at Issue remained elevated" in 2018 "due to Defendants['] Conduct" in previous years, and that his analysis of public data available after 2018 "suggests that prices continued to fall in 2019 before leveling out somewhat in 2020, before falling again in 2021" and that "[t]his would suggest elevated prices through at least 2021." *Sandoz, Inc.*, 2025 WL 3043397, at *12. For a handful of drugs Dr. Warren-Boulton listed end dates for inflated prices of December 31, 2016. *Id.* at *13. For Ethambutol, the end date for inflated prices was June 30, 2014. *Id.*

Dr. Warren-Boulton noted, however, that he conducted his analysis with the understanding that "Defendants were obligated to produce transactional data from at least 2 years prior to the alleged conduct on each specific Drug, with continuing production through 2018," ECF No. 711 at 41 ¶ 81 n. 146, but that "G&W did not produce transactional data for several drugs at issue, including Betamethasone Valerate Lotion, Calcipotriene Solution, Ciclopirox Cream, Ciclopirox Solution, Ethambutol HCL Tablets, Hydrocortisone Acetate, Mometasone Furoate Cream, Ointment, and Solution, Prochlorperazine Suppositories, and Promethazine HCL Suppositories." *Id.* at 306 ¶ 22. He also noted that he was able to correct for this deficiency by estimating net sales using public data after first verifying whether "each manufacturer actually sold each drug in significant quantities during the missing period." *Id.* at 108–09 ¶ 216. For Ethambutol, Dr. Warren-Boulton "ended the damages period . . . after 2013Q2" because non-Defendant "STI Pharmaceuticals took over the marketing responsibility for Ethambutol Hydrochloride from G&W in April 2013." *Id.* at 306 ¶ 21.

The States filed the original complaint in this case on June 10, 2020. ECF No. 1059-1 ¶ 5.

## II.  LEGAL STANDARD

### A.  Summary Judgment

"Summary judgment is appropriate only if the movant shows that there is no genuine issue as to any material fact and the movant is entitled to judgment as a matter of law." *Tolan v. Cotton*, 572 U.S. 650, 656–57 (2014) (internal quotation marks and citations omitted).  In reviewing the summary judgment record, a court must "construe the facts in the light most favorable to the non-moving party and must resolve all ambiguities and draw all reasonable inferences against the movant." *Caronia v. Philip Morris USA, Inc.*, 715 F.3d 417, 427 (2d Cir. 2013).  "A genuine dispute of material fact exists for summary judgment purposes where the evidence, viewed in the light most favorable to the nonmoving party, is such that a reasonable jury could decide in that party's favor." *Zann Kwan v. Andalex Grp. LLC*, 737 F.3d 834, 843 (2d Cir. 2013).  The moving party bears the burden of demonstrating that no genuine issue exists as to any material fact.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 323–25 (1986).  If the moving party carries its burden, "the opposing party must come forward with specific evidence demonstrating the existence of a genuine dispute of material fact." *Brown v. Eli Lilly & Co.*, 654 F.3d 347, 358 (2d Cir. 2011).  "Where no rational finder of fact could find in favor of the nonmoving party because the evidence to support its case is so slight, summary judgment must be granted." *Id.* (internal quotation marks omitted).

### B.  Sherman Act

The Sherman Act bans "[e]very contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce among the several States." 15 U.S.C. § 1.  "The crucial question in a Section 1 case is therefore whether the challenged conduct stems from independent decision or from an agreement, tacit or express." *Starr v. Sony BMG Music Entm't,* 592 F.3d 314, 321 (2d Cir. 2010) (internal quotation marks omitted).  "An agreement between

13

competitors to fix prices, known as a horizontal price-fixing agreement, categorically constitutes an unreasonable restraint, and, accordingly, is unlawful *per se.*"  *In re Publ'n Paper Antitrust Litig.*, 690 F.3d 51, 61 (2d Cir. 2012).  The same is true of an agreement to allocate customers or rig bids.  *See Sandoz, Inc.*, 2025 WL 3470502, at \*19 (an agreement "to get and provide assurance that a move would stabilize prices and not disrupt the market—in the case of a price increase, to assure that the increase would be followed, or in the case of a new entrant to the market, that existing competitors would cede market share"—is a "naked restraint[ ] of trade with no purpose except stifling of competition" (citing *White Motor Co. v. United States*, 372 U.S. 253, 263 (1963)); *Cont'l Ore Co. v. Union Carbide & Carbon Corp.*, 370 U.S. 690, 708 (1962) (describing "an allocation of customers" as a "per se violation[] under § 1 of the Sherman Act")).

At the summary judgment stage, "to raise a genuine issue of material fact as to an antitrust conspiracy, the plaintiff must present direct or circumstantial evidence that 'tends to exclude the possibility that the alleged conspirators acted independently.'" *Anderson News, L.L.C. v. Am. Media, Inc.*, 899 F.3d 87, 98 (2d Cir. 2018) (quoting *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 588 (1986)).  "The quality of evidence required to satisfy the 'tends to exclude' standard 'varies with the economic 'plausibility' of the alleged agreement." *In re Foreign Exch. Benchmark Rates Antitrust Litig.*, No. 13 CIV. 7789 (LGS), 2022 WL 294118, at \*5 (S.D.N.Y. Feb. 1, 2022).  "[T]he tends to exclude standard is more easily satisfied when[] the conspiracy is economically sensible for the alleged conspirators to undertake and the challenged activities could not reasonably be perceived as procompetitive." *Anderson News*, 899 F.3d at 99 (quoting *Publ'n Paper*, 690 F.3d at 63).  A plaintiff need not "disprove all nonconspiratorial explanations for the defendants' conduct; rather the evidence need be sufficient only to allow a reasonable fact finder to infer that the conspiratorial explanation is more likely than not." *Id.*

(internal quotation marks omitted).  "[I]f the evidence is in equipoise, then summary judgment must be granted against the plaintiff."  *Id.*

As noted in the ruling regarding the overarching conspiracy, *Sandoz, Inc.*, 2025 WL 3470502, at *3, the parties agree that the suppliers in the markets for all the Drugs at Issue, including the drugs involved in this motion, comprise oligopolies.  "Oligopolies pose a special problem under § 1 [of the Sherman Act] because rational independent actions taken by oligopolists can be nearly indistinguishable from horizontal price fixing," as "any rational decision [in an oligopoly] must take into account the anticipated reaction of the other firms."  *In re Mylan N.V. Secs. Litig.*, 666 F. Supp. 3d 266, 318 (S.D.N.Y. 2023).  "Consequently, parallel conduct allegations must be placed in a context that raises a suggestion of a preceding agreement, not merely parallel conduct that could just as well be independent action."  *Mayor & City Council of Balt. v. Citigroup, Inc.*, 709 F.3d 129, 137 (2d Cir. 2013).  "Since mere parallel behavior can be consistent with independent conduct, courts have held that a plaintiff must show the existence of additional circumstances, often referred to as 'plus' factors, which, when viewed in conjunction with the parallel acts, can serve to allow a fact-finder to infer a conspiracy."  *Apex Oil Co. v. DiMauro*, 822 F.2d 246, 253 (2d Cir. 1987).  "Such 'plus factors' may include, for example: a common motive to conspire; evidence that the parallel acts were against the apparent economic self-interest of the individual alleged conspirators; or evidence of a high level of interfirm communications."  *Publ'n Paper*, 690 F.3d at 62 (internal quotation marks and citations omitted). But because "such factors in a particular case could lead to an equally plausible inference of mere interdependent behavior, i.e., actions taken by market actors who are aware of and anticipate similar actions taken by competitors, but which fall short of a tacit agreement," *id.*, these circumstances "must still lead to an inference of conspiracy."  *Citigroup, Inc.*, 709 F.3d at 137.

15

## III. DISCUSSION

### A. Overarching Conspiracy

G&W moves for summary judgment on nine counts in the complaint that do not mention the company by name but allege that each of "the corporate Defendants are jointly and severally liable" for agreements between other Defendants that were part of the overarching conspiracy. G&W argues that for these nine counts, there is no factual allegation or evidence that G&W conspired with certain co-Defendants or even competed for drugs listed in those counts. ECF No. 1030-1 at 16–17; *see also* ECF No. 1313 (arguing in its reply brief that ["t]he record is devoid of any evidence of communication between G&W and any of these companies and contains no evidence that G&W entered into a conspiracy with any of them or into any overarching conspiracy"). But as I found in the overarching conspiracy ruling, the States allege that "each corporate Defendant is jointly and severally liable for anticompetitive conduct related to all of the Drugs at Issue, regardless of whether the Defendant ever sold or manufactured a certain drug, because they each had an overarching understanding to avoid competing with each other and to instead settle for what these competitors refer to as their 'fair share' of a given drug market." *Sandoz, Inc.*, 2025 WL 3470502, at *2 (internal quotation marks omitted). I concluded in that ruling "that the States have raised a genuine dispute about whether an overarching conspiracy existed to stabilize and avoid disruption of the markets for Drugs at Issue." *Id.* at *23. I found that the States' evidence suggested that G&W, together with Sandoz, Taro, and Perrigo, "formed a core group of leaders most responsible for perpetuating the Defendants' collective adherence to the rules of engagement" underlying the overarching conspiracy. *Id.* at *21. This ruling left little doubt that the States have provided sufficient evidence from which a reasonable jury could find that G&W participated in the overarching conspiracy. For the removal of doubt, I so find now.

The States allege that G&W conspired with competitors on nineteen of the Drugs at Issue in this case, No. 196 ¶ 1635, and have provided evidence to support their claims. This evidence includes testimony from cooperating witnesses that:

- G&W had a broad agreement to fix prices and allocate markets with Fougera, ECF No. 965-1 at 617, and that Thomassey had an "understanding" with G&W's Jim Grauso "[t]hat we would be responsible in the marketplace and we would divvy up -- share appropriately and agree on what we were doing and [which customers] we were targeting," ECF No. 965-1 at 406;

- G&W reached anticompetitive agreements "to raise prices and to not take each other's customers" with Glenmark on more than one drug at the same time, and G&W and Glenmark communicated by phone "to ensure that the price increases stuck and that no one would poach each other's customers," ECF No. 964-1 at 2202–03, 2205–07, 2209;

- G&W exchanged competitive intelligence with Sandoz, including about impending price increases, ECF No. 964-1 at 836, 949, 4267;

- G&W entered into agreements involving more than one competitor on at least two drugs, ECF No. 964-1 at 949–950, 996;

- G&W relied on Aurobindo's Thomassey to act as a "conduit" for collusive communications with Perrigo, even though Aurobindo did not sell the drugs in question. Thomassey did so, he testified, "[b]ecause as the competitors shared information, it was building goodwill for when [he] needed the information" from G&W and Perrigo and he "might be able to call in a favor at some point," ECF No. 965-1 at 414–19.

This direct evidence of anticompetitive conduct across a swath of drugs and multiple years is consistent with the evidence discussed in the overarching conspiracy ruling, which found that there was evidence that competitors frequently communicated to allocate customers and prevent price erosion, abiding by the "rules of engagement." *See Sandoz, Inc.*, 2025 WL 3470502, at *6 ("the 'rules of engagement' are, '[i]n their simplest form, tactics that are utilized by another pharma company to ultimately preserve market value in the markets that they're in'").

The evidence suggests that competitors viewed G&W as a firm that "play[ed] nice in the sandbox," *e.g.*, ECF No. 965-1 at 407, and that could be trusted during changes in a competitive

17

drug market to abide by the rules of engagement. *See Sandoz, Inc.*, 2025 WL 3470502, at *21 (finding evidence that "single-drug agreements . . . built on that trust between the repeat participants, such that each time a deal was struck and adhered to it made the next deal easier"). The evidence also suggests that G&W worked to maintain this reputation, even to the point of misleading customers. For example, when a customer requested that G&W submit a bid on Halobetasol, Vogel-Baylor told a colleague, "We cannot take this [customer] from Perrigo, so I will give you pricing so that it looks like you are making an attempt to bid[.]" ECF No. 956-1 at 377; *see Sandoz, Inc.*, 2026 WL 2268225, at *42 n.32 (citing this statement as an example of evidence that "suggests that Vogel-Baylor was willing to mislead customers"). And unlike some other Defendants, there is no suggestion that any competitor doubted whether G&W would abide by the rules. *Cf. Connecticut v. Sandoz, Inc.*, No. 20cv802, 2026 WL 1533866, at *29–30 (D. Conn. June 1, 2026) (noting evidence that competitors did not always regard Greenstone as "rational" or "reasonable," with Thomassey referring to its personnel as "morons" for not following a price increase); *Connecticut v. Sandoz, Inc.*, No. 20cv802, 2026 WL 1020627, at *14 (D. Conn. Apr. 15, 2026) (Glenmark considered "Amneal to be very, very aggressive when it came to market share"); *see also* ECF No. 965-1 at 575 (Thomassey testifying that competitors referred to non-Defendant Torrent as "torch it" "because they were so bad at eroding prices"). The record thus suggests that G&W's adherence to the rules of engagement broadly informed all of its interactions with many of its competitors and was not limited to individual-drug conspiracies.

Further, as I have previously explained, evidence of brokering agreements between competitors is evidence of participation in the overarching conspiracy. *Sandoz, Inc.*, 2025 WL 3470502, at *21. Although the evidence suggests that Thomassey, while he worked at Aurobindo, was the individual brokering deals between G&W and Perrigo, G&W was the firm that instigated

18

these calls with its competitor through an intermediary. *See Sandoz, Inc.*, 2026 WL 2268225, at *10–12 (documenting how G&W's Vogel-Baylor frequently called Thomassey, who would then immediately call a counterpart at Polman and then call Vogel-Baylor back). Moreover, Thomassey testified that he expected G&W and Perrigo to return the favor for him in the future. ECF No. 965-1 at 416. This is additional evidence that G&W was part of a conspiracy that was not limited to individual drugs.

It is true that, unlike Sandoz and Taro, G&W has no current or former employees who pled guilty to any related criminal offense or invoked the Fifth Amendment in response to questions during depositions. *Cf. Sandoz, Inc.*, 2026 WL 1533866, at *29; *Sandoz, Inc.*, 2026 WL 1020627, at *13. But as the States point out, Vogel-Baylor testified more than 200 times that she did not "recall" or "remember" a fact. ECF No. 1059 at 12; *see also* ECF No. 1029-1 ¶ 203 ("The States do not dispute that, rather than assert her Fifth Amendment rights or tell the truth, Vogel-Baylor so testified. The States dispute that she testified truthfully[.]"). I have previously noted that Vogel-Baylor's testimony was "frequently evasive, in that she consistently responded that she did not *recall* colluding with competitors yet failed to *deny* that she did so," and I found that "a reasonable juror could reject Vogel-Baylor's testimony as not credible." ECF No. 1410 at 151 n.49. While Orlofski often pointed to "numerous business development deals" as the reason for his calls with competitors, he also said he could not recall the topics of conversations. *See, e.g.*, ECF No. 964-1 at 5220. Moreover, Orlofski's testimony in which he denied discussing Ketoconazole with Taro, *id.* at 5234, is contradicted by Vogel-Baylor's statements to federal investigators. ECF No. 958-1 at 330; *see also* ECF No. 1313 at 12 (G&W admitting that Orlofski and Taro discussed Ketoconazole on this call); *supra* note 5. Because a reasonable jury could decline to credit Vogel-Baylor's and Orlofski's testimony, that testimony does little to diminish the evidence described

19

above from which a jury could "infer that the conspiratorial explanation is more likely than not." *Anderson News*, 899 F.3d at 99.

The alleged overarching conspiracy did not require each co-conspirator to communicate with or sell the same products as every other co-conspirator. It did not even require that each co-conspirator know the identities of the other co-conspirators. *United States v. Harris*, 8 F.3d 943, 946 (2d Cir. 1993) ("[I]t is well settled law that an individual need not know the identities of all coconspirators in order to be found guilty of being a member of the conspiracy."). Viewed as a whole and in the light most favorable to the States, the evidence raises a genuine dispute about whether G&W participated in the alleged overarching conspiracy. G&W's motion for summary judgment on Counts 9, 11, 12, 13, 15, and 17 is thus DENIED.

But I have previously found that the States have not provided enough evidence to permit a reasonable juror to find that Greenstone (the subject of Count 7), Sun (Count 10), or Amneal (Count 14) joined the overarching conspiracy, and I dismissed all claims against Greenstone's parent company, Pfizer. *Sandoz, Inc.*, 2026 WL 1533866, at *29–30 (Greenstone); ECF No. 1420 (Sun); *Sandoz, Inc.*, 2026 WL 1020627, at *14 (Amneal); *Connecticut v. Sandoz, Inc.*, No. 20cv802, 2026 WL 1802825, at *10 (D. Conn. June 23, 2026) (Pfizer). The States do not allege that G&W colluded with these firms in any individual-drug conspiracies. *Compare* ECF No. 196 ¶ 1635 *with id.* ¶¶ 1656, 1677, 1705. Thus, I GRANT summary judgment to G&W on Counts 7, 10, and 14 to the extent that those counts include any claim that G&W participated with Greenstone, Pfizer, Sun, or Amneal in any conspiracy.

## B. Statute of Limitations

I resolved many of G&W's arguments that the States' claims are time-barred in the ruling on the Defendants' Joint Motion for Summary Judgment on Statute of Limitations and Laches

20

Grounds. *Sandoz, Inc.*, 2025 WL 3043397.  In that ruling, I found that "the States have raised a genuine dispute of fact about whether the Defendants committed overt acts in furtherance of the overarching conspiracy each time they sold any drug at issue at inflated, conspiracy-driven prices," which, as noted above, the evidence suggests lasted until at least 2018.  *Id.* at *14.  I also noted that "without affirmative evidence of . . . withdrawal, I must presume that a Defendant's "participation in the conspiracy . . . continue[d] until the last overt act by any of the conspirators." *Id.* at *14.  Because, as just explained, a reasonable jury could find that G&W participated in the overarching conspiracy, and overt acts by conspirators occurred within the statute of limitations period,[7] it is irrelevant that all of G&W's alleged conduct occurred more than four years before the filing of the complaint.

Although G&W submitted its motion before I issued that ruling, it filed its reply brief to this motion three weeks after I issued the statute of limitations ruling.  Unsurprisingly, G&W pivots in its reply brief to focus on its last remaining "out"—evidence that it argues shows that it withdrew from any conspiracy in October 2014.[8]  I find this argument to be unconvincing.

---

[7] In the statute of limitations ruling, I found that "the States have raised a genuine factual dispute about whether multiple Defendants continued to conduct business in accordance with the 'fair share' scheme established by the earlier alleged collusion to avoid erosion of the supracompetitive prices" and that "a reasonable juror could . . . find[] that the Defendants continued to further the bid-rigging conspiracies after communications ended." *Sandoz, Inc.*, 2025 WL 3043397, at *10. I also found evidence that acts in furtherance of the conspiracy were foreseeable to all co-conspirators. *Id. (citing United States v. Milstein*, 401 F.3d 53, 72 (2d Cir. 2005) ("[F]oreseeable acts of one co-conspirator in furtherance of the conspiracy are attributable to all co-conspirators."). Therefore, the States have raised a genuine dispute about whether acts in furtherance of the conspiracy attributable to G&W continued into the state-law limitation periods.

[8] G&W did not explicitly raise this argument in its original memorandum of law in support of its motion.  October 2014 is not identified as a key date in that brief; instead, G&W argued that "any Alleged Conduct Stopped Before June 10, 2016."  ECF No. 1030-1 at 11.  Although G&W mentions the antitrust training that it held in October 2014 among evidence that "Conduct Stopped" by 2016, *id.* at 12, it is not at all clear that G&W was contending that this was evidence that it *withdrew* from any conspiracy by this date.  Thus, I would be within my discretion to disregard this argument on summary judgment. *Am. Hotel Int'l Grp., Inc. v. OneBeacon Ins. Co.*,

21

"To withdraw from a conspiracy, a defendant must show: (1) "[a]ffirmative acts inconsistent with the object of the conspiracy," that are (2) "communicated in a manner reasonably calculated to reach co-conspirators." *United States v. U.S. Gypsum Co.*, 438 U.S. 422, 464–65 (1978). "Mere cessation of activity is not enough." *United States v. Borelli,* 336 F.2d 376, 388 (2d Cir. 1964). Rather, a defendant must take an affirmative action "to disavow or defeat the purpose of the conspiracy." *United States v. Nerlinger,* 862 F.2d 967, 974 (2d Cir. 1988).

G&W argues that the antitrust compliance training that it held in 2014, together with a purported instruction from its chairman that G&W personnel were not to discuss pricing or customers with competitors, were affirmative acts inconsistent with the object of the conspiracy. ECF No. 1313 at 17. It also identifies two instances of competitive conduct in October 2015 that it argues were "sufficient to communicate withdrawal from the conspiracy to the alleged co-conspirators." *Id.* at 17–18 (noting that G&W offered one customer Mometasone prices that were half of what Glenmark was charging, and that it was competing for customers with Perrigo on Ciclopirox cream). G&W also cites "deep price cuts in December 2014 and March 2015. ECF No. 1313 at 17 (citing ECF No. 1059-1 ¶¶ 48)). Even if I treated G&W chairman's alleged instruction not to communicate with competitors about pricing as an affirmative act inconsistent with the alleged conspiracies, I could not find that two isolated instances of competition that occurred a full year after the act in question, or even a general, across-the-board reduction in prices,

---

611 F. Supp. 2d 373, 375 (S.D.N.Y. 2009) ("a district court is free to disregard argument raised for the first time in reply papers, especially on a motion for summary judgment") (citing *Playboy Enters., Inc. v. Dumas*, 960 F. Supp. 710, 720 n. 7 (S.D.N.Y.1997) ("Arguments made for the first time in a reply brief need not be considered by a court.")). Nevertheless, since G&W does not rely on any new evidence that was not mentioned in its motion, I will address the withdrawal argument. But because the States had no notice that it needed to respond to this argument, I reject G&W's contention that the States "do not dispute that G&W affirmatively disavowed participation in the alleged conspiracy through its competitive behavior." ECF No. 1313 at 17.

22

communicated disavowal of G&W's participation in the alleged conspiracies to its co-conspirators. While restoration of competition may be unequivocal evidence of withdrawal in some more limited conspiracies, it is not here, given the scope of the alleged conspiracies, which cover dozens of drugs and many co-conspirators beyond those identified in G&W's October 2015 examples. Limited competition for customers on two drugs with two competitors would not "communicate[] in a manner reasonably calculated to reach" Sandoz or Taro, for example, that G&W would no longer abide by the rules of engagement. *Gypsum*, 438 U.S. at 464–65. The nature of the alleged overarching conspiracy and individual-drug conspiracies belies any argument that isolated competitive acts could signify withdrawal in this case. Although there is evidence that some Defendants formed broad agreements encompassing multiple drugs, the States do not allege that any conspirator ever agreed to a blanket deal not to compete on every drug with a given competitor. *See, e.g.*, *Sandoz, Inc.*, 2026 WL 2268225, at \*22 (noting that the States admit that Perrigo and G&W "competed on some products but deferred on others"). To the contrary, the evidence suggests that even where competitors had a broad agreement not to poach each other's customers *and* agreed to allocate market share on a particular drug, they *still* competed to retain certain customers. *See, e.g.*, ECF No. 926-1 at 1318–19 (Sandoz executive Armando Kellum writing "[t]o maximize product it probably makes sense to relinquish [ABC and Walgreens to Taro] and hold on to all other large accounts," on Metronidazole 1% gel); *id.* at 1414 (Sandoz executive Michael Vezza writing that Sandoz's "intent is to defend from this point forward" after Taro reached thirty percent share). Thus, the evidence in the record does not suggest that competition for some customers on some drugs would communicate a broader withdrawal from the alleged overarching or the alleged individual-drug conspiracies to G&W's co-conspirators.

Further, as G&W concedes, Orlofski did not follow his chairman's instruction and

communicated with Taro about pricing on Ketoconazole cream on July 30, 2015, ECF No. 1313 at 12, which was nine months after the antitrust compliance training that G&W identifies as its affirmative act of withdrawal, *id.* at 16.  Moreover, Bihari testified that Sandoz followed Taro and G&W's price increases the following year pursuant to "[a]n agreement with Taro and G&W to eventually follow a price increase and keep the price high and to not poach or take anyone else's share, any other company's share."  ECF No. 964-1 at 996.  A reasonable jury could infer from this testimony that G&W had done nothing by May 2016 to dissuade Sandoz from the belief that the firms' Ketoconazole cream agreement was still in place.

G&W also contends that its "disavowal was so great that it was forced out of business." ECF No. 1313 at 18.  Greenblatt, G&W's chairman, states in an interrogatory response that one reason for G&W's troubles was that competition from "many large, publicly held generic pharmaceutical companies" increased in 2016.  ECF No. 1038-18 at 6.  This period of increased competition coincides with the States' filing of the Heritage complaint, which, as the States' expert opined, is "a reasonable date whereby the Defendants would have realized that their collusion might be discovered (and likely faced legal action)."  ECF No. 711 at 74; *see also* ECF No. 693-4 at 35 ¶ 3 (Warren-Boulton noting that "price increases follow evidence of communication, and price decreases follow the Heritage complaint").  Dr. Warren-Boulton's analysis suggests that G&W was not alone in pulling back from communicating with competitors, but that *all* the conspirators pulled back by 2015 or 2016, as they realized their conduct might be discovered.  ECF No. 711 at 45–46 ¶ 89.  Thus, a reasonable jury could find that it was not G&W's "disavowal" that "forced it out of business," but rather the restoration of competition across the industry that followed the cessation of frequent collusive communications.  And "[m]ere cessation of activity is not enough" to communicate withdrawal from a conspiracy.  *Borelli,* 336 F.2d at 388.

For these reasons, and those discussed in the statutes of limitation ruling, I find that there is at least a factual dispute about whether G&W withdrew from the alleged conspiracies and that the States have raised genuine factual disputes about the timeliness of their claims. The motion for summary judgment on these grounds is therefore DENIED.

### C.  Challenged Individual-Drug Conspiracies

G&W next moves for summary judgment as to the States' claims regarding three individual-drug conspiracies regarding Ethambutol, Hydrocortisone acetate, and Prochlorperazine.[9]  In the ruling on Perrigo's motion for summary judgment, I addressed the parties' arguments related to Hydrocortisone acetate and Prochlorperazine, and I adopt the same conclusions here.

For Hydrocortisone acetate, I found that "the record evidence is sufficient for 'a reasonable fact finder to infer that the conspiratorial explanation is more likely than not' regarding the conduct of Perrigo and G&W."  *Sandoz, Inc.*, 2026 WL 2268225, at *42 (quoting *Anderson News*, 899 F.3d at 98).  As explained in that ruling, the evidence suggests that G&W and Perrigo employees "called each other in close proximity to developments in the market" on multiple occasions as they implemented price increases in July and August 2014, establishing the interfirm communications plus factor from which a reasonable juror could infer a conspiracy.  *Id.* at *41.  It will be up to the

---

[9] G&W does not move for summary judgment on the multiple other individual-drug conspiracies alleged in the complaint, and so I do not address those claims.  Although G&W noted in its motion that it "wishes to be deemed to have joined such other [Defendants' summary judgment] motions to the extent they are addressed to the G&W drugs," ECF No. 1030-1 at 6, those motions did not always require me to determine if G&W joined a conspiracy.  For instance, I granted summary judgment to Taro on the States' Halobetasol claims upon finding that the evidence failed to raise a suggestion that Taro had reached an anticompetitive agreement with G&W, Perrigo, or Sandoz. ECF No. 1410 at 149–55.  But I did not find whether G&W conspired with Perrigo or Sandoz.  *See id.*  I decline to do so in the absence of any argument from G&W, Perrigo, or Sandoz.  Thus, I limit this ruling to those drugs that G&W specifically addresses in its motion.

jury to determine if these communications instead related to G&W and Perrigo's 2011 Joint Regulatory Agreement or other legitimate topics. Thus, for the same reasons expressed in the Perrigo ruling, G&W's motion is DENIED as to Hydrocortisone acetate.

For Prochlorperazine, I found "that the evidence is insufficient for a reasonable jury to conclude that the firms more likely than not reached an agreement to raise prices." *Id.* at *43. As explained in that ruling, while a reasonable jury could find the timing of interfirm communications to be suspicious, the evidence did not suggest that these communications reached the point of an anticompetitive agreement, as they diverged from other alleged conspiracies involving Perrigo and G&W and as both firms continued to compete for customers in the months following their price increases. *Id.* at *43–44. For the same reasons explained in the Perrigo ruling, G&W's motion is GRANTED as to Prochlorperazine.

This leaves Ethambutol. As with many other drugs in this litigation, the States rely on circumstantial evidence of parallel conduct coupled with interfirm communications to raise an inference of conspiracy. *See Generic Pharms. Pricing*, 2025 WL 2483981, at *14 (finding sufficient evidence to establish the interfirm communications plus factor where "calls occurred immediately before or after pricing decisions, and . . . those calls occurred in tight temporal proximity with calls to and between other representatives").

The records of calls in December 2012 between G&W and Lupin, its only active competitor on Ethambutol, are closely linked to developments in the market leading up to the competitors' price increases. Lupin's Berthold called G&W's Orlofski *immediately* after receiving a document analyzing a potential Ethambutol price increase, and he then called G&W's Vogel-Baylor the next day. ECF No. 945-1 at 17; ECF No. 961-1 at 94–95. The following week, Lupin's Berthold called Vogel-Baylor again and texted with Orlofski on the same day that Lupin internally circulated draft

26

price-increase letters to customers.  ECF No. 944-1 at 242–43; ECF No. 961-1 at 94.  And the competitors all called each other multiple times over the next two days, including on December 19, the day that Lupin informed customers of its Ethambutol price increase.  *Id.* at 242–43.  In January 2013, G&W's Vogel-Baylor called Lupin's Berthold ahead of a meeting with Orlofski on Ethambutol, after which Vogel-Baylor sent Orlofski a price-increase analysis, before she spoke with Berthold again the following day.  ECF No. 944-1 at 245; ECF No. 960-1 at 1298.  Vogel-Baylor and Berthold also spoke again in February 2013, just days before Vogel-Baylor told a customer that it would match G&W's price to be "market competitive."  ECF No. 944-1 at 245; ECF No. 960-1 at 1293.

As I have previously found, "the more frequent and the closer the calls are to a particular movement in the market, the more probative of a conspiracy this evidence becomes."  *Sandoz, Inc.*, 2026 WL 75851, at *16 (citing *In re Flat Glass Antitrust Litig.*, 385 F.3d 350, 369 (3d Cir. 2004)).  The close proximity of G&W and Lupin's calls to developments in the companies' Ethambutol pricing suggests that the companies coordinated their efforts to increase the product's prices.  Further, the timing and volume of these calls also belie G&W's alternative explanation for these calls.  Even if some of the calls between supposed longtime friends Berthold and Orlofski were social, this would not explain the multiple calls between Berthold and Vogel-Baylor, who never spoke again after G&W followed Lupin's price increase.  And contrary to G&W's argument that it was communicating with Lupin because "G&W was seeking an alternative source of supply" for Ethambutol, the phone records indicate that the interfirm communications on December 10, 11, 17, 18, and 19—the calls closest in time to Lupin's price increase—were all initiated by Lupin's Berthold, not G&W.  ECF No. 944-1 at 242–43; ECF No. 945-1 at 17 (showing Berthold called first on each day).  A reasonable jury could infer that Lupin's calling

27

G&W first, rather than the other way around, suggests that it was seeking assurances that G&W

would follow its price increase, and not that G&W was attempting to convince Lupin to supply it

with the drug.  The jury could then find that a pricing conspiracy was more likely than not, even if

it agreed that G&W at some point did try to convince Lupin to supply it with the drug.  For these

reasons, I find the evidence is sufficient to allow a reasonable jury to conclude that it is more likely

than not that G&W and Lupin agreed to raise their Ethambutol prices in concert with each other.

*Matsushita*, 475 U.S. at 588.

I previously addressed Ethambutol in rejecting the Defendants' laches argument, finding

that while the claims related to the drug accrued on June 30, 2014, genuine disputes of fact exist

about whether overt acts in furtherance of the overarching conspiracy continued into the limitations

period.  *Sandoz, Inc.*, 2025 WL 3043397, at \*14.  The evidence on Ethambutol is consistent with

the "rules of engagement" and G&W's conduct in the other alleged individual-drug conspiracies,

such that a reasonable jury would be likely to find that G&W's conduct on this drug was part of

the overarching conspiracy.  This is so even though the States do not allege that Lupin conspired

as to any other drug in this case, and the fact that Ethambutol, a tuberculosis medication, does not

appear to be a dermatological product like many of the other Drugs at Issue.  See *Connecticut v.*

*Sandoz, Inc.*, No. 20cv802, 2026 WL 75853, at \*16 (D. Conn. Jan. 9, 2026) ("Aurobindo did not

make dermatology drugs, which are the focus of the overarching conspiracy claim, and while I do

not view this circumstance as dispositive, it is a factor weighing against the notion that Aurobindo

joined a scheme focused on such drugs.").[10]  Because a reasonable jury could find (1) that G&W

---

[10] Whether Lupin's involvement in the alleged Ethambutol conspiracy made it a knowing participant in the overarching conspiracy is a separate matter, and one that I reserve for the ruling on Lupin's pending motion for summary judgment.  I make no finding here as to whether Lupin was part of the overarching conspiracy.

participated in the overarching conspiracy that continued into the limitations period, and (2) that G&W's conduct on Ethambutol was part of that overarching conspiracy, I need not determine if the States' Ethambutol claims, if they stood alone, would be time-barred.

For these reasons, G&W's motion for summary judgment on the States' Ethambutol claims is DENIED.

### D. Injunctive Relief

G&W also seeks summary judgment on the claim for injunctive relief, arguing that the claim is moot because G&W exited the generic pharmaceutical in June 2020, from which point "it has had no sales of generic drugs, and its sole business goal has been to attempt to resolve this case and the related antitrust cases in the MDL." ECF No. 1030-1 at 8. The States contend that "G&W has not filed for bankruptcy and can re-enter the generic pharmaceutical market as a manufacturer and/or supplier at any time." ECF No. 1059 at 23–24. I find this possibility to be too remote to enjoin G&W.

I previously granted summary judgment to Taro as to the States' claims for injunctive relief upon finding that "the States have not submitted any evidence suggesting that Taro's alleged antitrust violations—most of which took place over a decade ago—are likely to recur." ECF No. 1410 at 177 (citing *Zenith Radio Corp.*, 395 U.S. at 130). The same reasoning applies to G&W. The States have not identified any evidence of any anticompetitive conduct—by G&W or any other defendant—in 2018 or later, *Sandoz, Inc.*, 2025 WL 3043397, at *10 & n.17, or evidence that lingering inflated prices persisted beyond 2023, ECF No. 1410 at 181. With Taro, I found that while "the record indicates that it is *possible* that the anticompetitive conduct alleged in this action may recur absent injunction," it was not "*likely* to continue or recur," and so did not meet the *Zenith Radio* standard of proof necessary to obtain injunctive relief. *Id.* at 183. With G&W,

29

which has not even sold a generic pharmaceutical product in six years, the prospect of recurrence of anticompetitive activity is even less likely than it was with Taro. And while I left open the possibility of injunctive relief where a company "continued to employ the same personnel who frequently participated in interfirm communications that serve as the basis for the States' claims," ECF No. 1410 at 184 n. 64, the evidence suggests that G&W is in the process of winding up and no longer employs Vogel-Baylor or Orlofski or any other personnel involved with pricing or customers. *See* ECF No. 965-1 at 1319 (Vogel-Baylor testifying she left G&W in early 2017); ECF No. 1067 ¶ 13 (noting Orlofski worked for G&W as a consultant until December 2017).

For these reasons, and those stated in the Taro ruling, ECF No. 1410 at 176–84, G&W's motion for summary judgment on the States' claim for injunctive relief under the Sherman Act is GRANTED.

### E. Disgorgement

Finally, G&W argues that the States cannot seek monetary disgorgement following a ruling in the MDL that the Clayton Act does not authorize that remedy. ECF No. 1030-1 at 8. The States, however, seek monetary disgorgement under various state antitrust and consumer protection laws, not the Clayton Act. ECF No. 196 ¶¶ 1822–2123; ECF No. 1059 at 24. In my February 12, 2026, decision on the Defendants' motion for summary judgment on state-law remedies, I addressed the circumstances under which disgorgement would be appropriate, and I denied the Defendants' motion on that point. *Connecticut v. Sandoz, Inc.,* 820 F. Supp. 3d 125, 156-61 (D. Conn. 2026). As I explained, whether and to what extent the Court will award disgorgement depends on a number of variables and requires an inquiry that I will be unable to undertake until after a trial. *Id.* I therefore deny G&W's motion for summary judgment as to disgorgement without prejudice to its raising the issue in a post-trial motion.

## IV. CONCLUSION

For the foregoing reasons, G&W's Motion for Summary Judgment is GRANTED as to the States' claim for injunctive relief, as to Prochlorperazine, and as to Counts 7, 10, and 14.  The motion is DENIED as to all other claims.


IT IS SO ORDERED.

___/s/_____

Michael P. Shea, U.S.D.J.

Dated: Hartford, Connecticut
August 12, 2026

31