**UNITED STATES DISTRICT COURT**
**DISTRICT OF CONNECTICUT**

THE STATE OF CONNECTICUT; THE STATE OF ALASKA; THE STATE OF ARIZONA; THE STATE OF ARKANSAS; THE STATE OF CALIFORNIA; THE STATE OF COLORADO; THE STATE OF DELAWARE; THE DISTRICT OF COLUMBIA; THE STATE OF FLORIDA; THE STATE OF GEORGIA; THE TERRITORY OF GUAM; THE STATE OF HAWAII; THE STATE OF IDAHO; THE STATE OF ILLINOIS; THE STATE OF INDIANA; THE STATE OF IOWA; THE STATE OF KANSAS; THE COMMONWEALTH OF KENTUCKY; THE STATE OF LOUISIANA; THE STATE OF MAINE; THE STATE OF MARYLAND; THE COMMONWEALTH OF MASSACHUSETTS; THE STATE OF MICHIGAN; THE STATE OF MINNESOTA; THE STATE OF MISSISSIPPI; THE STATE OF MONTANA; THE STATE OF NEBRASKA; THE STATE OF NEVADA; THE STATE OF NEW HAMPSHIRE; THE STATE OF NEW JERSEY; THE STATE OF NEW MEXICO; THE STATE OF NEW YORK; THE STATE OF NORTH CAROLINA; THE STATE OF NORTH DAKOTA; THE COMMONWEALTH OF THE NORTHERN MARIANA ISLANDS; THE STATE OF OHIO; THE STATE OF OKLAHOMA; THE STATE OF OREGON; THE COMMONWEALTH OF PENNSYLVANIA; THE COMMONWEALTH OF PUERTO RICO; THE STATE OF RHODE ISLAND; THE STATE OF SOUTH CAROLINA; THE STATE OF TENNESSEE; THE STATE OF UTAH; THE STATE OF VERMONT; THE COMMONWEALTH OF VIRGINIA; THE STATE OF WASHINGTON; THE STATE OF WEST VIRGINIA; THE STATE OF WISCONSIN; and U.S. VIRGIN ISLANDS,

*Plaintiffs*,

v.

No. 3:20-cv-00802-MPS

SANDOZ, INC.; ACTAVIS HOLDCO US, INC.; ACTAVIS ELIZABETH LLC; ACTAVIS PHARMA, INC.; AMNEAL PHARMACEUTICALS, INC.; AMNEAL PHARMACEUTICALS, LLC; ARA APRAHAMIAN; AUROBINDO PHARMA U.S.A., INC.; BAUSCH HEALTH AMERICAS, INC.; BAUSCH HEALTH US, LLC; MITCHELL BLASHINSKY; DOUGLAS BOOTHE; FOUGERA PHARMACEUTICALS INC.; GLENMARK PHARMACEUTICALS INC., USA; JAMES (JIM) GRAUSO; GREENSTONE LLC; G&W LABORATORIES, INC.; WALTER KACZMAREK; ARMANDO KELLUM; LANNETT COMPANY, INC.; LUPIN PHARMACEUTICALS, INC.; MALLINCKRODT INC.; MALLINCKRODT LLC; MALLINCKRODT plc; MYLAN INC.; MYLAN PHARMACEUTICALS INC.; KURT ORLOFSKI; MICHAEL PERFETTO; PERRIGO NEW YORK, INC.; PFIZER INC.; SUN PHARMACEUTICAL INDUSTRIES, INC.; TARO PHARMACEUTICALS USA, INC.; TELIGENT, INC.; ERIKA VOGEL-BAYLOR; JOHN WESOLOWSKI; and WOCKHARDT USA LLC,

*Defendants*.

**RULING ON MOTION FOR SUMMARY JUDGMENT**

In this action, the Plaintiffs, the Attorneys General of most of the States and several U.S. territories ("the States"), allege that thirty-six pharmaceutical companies and executives ("the Defendants") each participated in a series of conspiracies, as well as an overarching conspiracy, to fix prices, allocate markets, and rig bids in the sale of dozens of generic drug products. Defendant Douglas Boothe moved for summary judgment on claims that he participated in certain product-specific conspiracies. ECF No. 1090; *see also* ECF No. 1008 (Defendants' Joint Memoranda in Support of Defendant-Specific Motions for Summary Judgment). For the reasons set forth below, I **GRANT IN PART AND DENY IN PART** Boothe's motion for summary judgment.

## I. BACKGROUND

The States allege that Boothe participated in antitrust conspiracies covering at least twenty-one drugs in his role as Executive Vice President and General Manager of Perrigo New York, Inc. ("Perrigo") from January 2013 to July 2016. ECF No. 196 ¶ 1753; ECF 1094 ¶¶ 2, 4. Boothe seeks summary judgment as to each claim. I assume familiarity with the factual and procedural background of this case, the parties' briefs and statements of fact, and the applicable legal standards. I write only enough to explain my reasoning.

## II. DISCUSSION

### A. Drugs Discussed in Previous Rulings

First, Boothe joins the arguments in Perrigo's motion for summary judgment contesting the States' claims that the company participated in anticompetitive conspiracies, which addressed all drugs at issue in this motion except for Calcipotriene Betamethasone Dipropionate ointment ("Cal Beta Dip"). In ruling on Perrigo's motion, I granted summary judgment to Perrigo on the States' claims related to Ammonium lactate cream and lotion, Ciclopirox cream, Desonide cream, Desonide ointment (April/May 2013 price increase), Econazole nitrate cream ("Econazole") (2015 customer allocation), Hydrocortisone valerate cream, and Prochlorperazine maleate suppositories. ECF No. 1483 at 67, 69, 74–76, 89, 92. For these drugs, I found the evidence insufficient for a reasonable jury to conclude that Perrigo more likely than not reached an agreement to raise prices. *Id.* As the States only allege that Boothe conspired with competitors in his capacity as a Perrigo executive, I GRANT summary judgment to Boothe as to those claims for the same reasons expressed in the Perrigo ruling.[1]

[1] Perrigo only moved for partial summary judgment on Desonide ointment in regard to April and May 2013 price increases. *See* ECF No. 1483 at 27–28. Boothe makes no such distinction in seeking summary judgment in all claims against him. In the Perrigo ruling, however, I noted that

In that same ruling, however, I denied summary judgment to Perrigo upon finding that a reasonable jury could find that the firm more likely than not participated in conspiracies related to, among other drugs, Adapalene cream ("Adapalene"), Bromocriptine mesylate tablets ("Bromocriptine"), Ciclopirox solution, Clindamycin phosphate solution ("Clindamycin"), Econazole (2014 price increase), Fluocinonide .1% cream ("Fluocinonide"), Fluticasone propionate lotion ("Fluticasone"), Halobetasol propionate cream and ointment, Hydrocortisone acetate suppositories ("Hydrocortisone acetate"), Methazolamide tablets ("Methazolamide"), Promethazine HCL Suppositories ("Promethazine"), and Tacrolimus ointment ("Tacrolimus"), all of which are included in the list the States allege that Boothe colluded on. ECF No. 1483 at 58, 66–67, 70, 74, 83, 85, 88. In finding that there is evidence that suggests that Perrigo participated in these conspiracies, however, I addressed evidence alleging Boothe's involvement for only two of these drugs, and I only *relied* on such evidence for Fluocinonide. *See id.* at 82 ("the evidence suggests that Perrigo stopped defending its [Fluocinonide] business with these customers only after Boothe's calls with Taro's Perfetto, and a reasonable jury could infer that the reason for the shift in Perrigo's stance was that Boothe and Perfetto reached an anticompetitive agreement to allocate customers"); *but see id.* at 87 n.31 (finding that "evidence of calls between [G&W's Erika] Vogel-Baylor and [Perrigo's Tony] Polman . . . sufficient to raise an inference of conspiracy even if a jury were to accept Boothe's testimony that he did not" collude with G&W). In a prior ruling, I also relied on evidence of Boothe's interfirm communications in denying summary judgment to

---

Sandoz's Deferred Prosecution Agreement ("DPA"), in which it admitted to fixing Desonide ointment prices with Perrigo starting in July 2013, would preclude summary judgment to Perrigo as of that date. *Id.* The States allege that Boothe participated in these later events. ECF No. 196 ¶ 844. In light of Sandoz's DPA admission, and in the absence of any briefing about these later events—aside from references to Boothe's testimony that he did not discuss products with competitors, ECF No. 964-1 at 1337—I decline to grant summary judgment to Boothe as to Desonide ointment claims regarding unlawful conduct beginning in July 2013.

Taro on claims regarding Clindamycin and the 2014 price increase on Econazole. ECF No. 1410 at 120 ("A reasonable jury could infer from this pattern of frequent interfirm communications that the competitors colluded to minimize price disruptions upon Taro's, Perrigo's, and Sandoz's entries into the Clindamycin market."); *id.* at 130 ("the timing of calls between [Taro's Perfetto] and Boothe directly preceding Perrigo's price increase, together with flurries of calls between all competitors . . . tend to exclude the possibility that that the across-the-board increases on Econazole cream were the result of independent conduct"). I subsequently adopted this analysis in denying summary judgment to Perrigo. ECF No. 1483 at 70–71, 74–75. For reasons explained in the Perrigo and Taro rulings, because the evidence suggests that Boothe participated in Perrigo's conspiracies with competitors on Clindamycin, Fluocinonide, and the 2014 Econazole price increase, I DENY summary judgment to Boothe on those claims.[2]

**B. Drugs Without Evidence of Boothe's Direct Involvement**

As to the other drugs for which I denied Perrigo summary judgment and which are also at issue here—Adapalene, Bromocriptine, Ciclopirox solution, Fluticasone, Hydrocortisone acetate, Methazolamide, Promethazine, and Tacrolimus—I based my findings on evidence of frequent interfirm communications involving Perrigo sales representative Tony Polman. *See* ECF No. 1483 at 46–51, 62–63, 83–88. The States contend that a jury could "reasonably infer that Boothe was aware of Polman's communications, especially given the cumulative effect of all the other price fixing and market allocation conspiracies in which Boothe directly communicated with employees

---

[2] I previously granted summary judgment to Greenstone on the States' 2013 Clindamycin claims. *Connecticut v. Sandoz, Inc.*, No. 20cv802, 2026 WL 1533866, at *22 (D. Conn. June 1, 2026). Thus, the claim against Boothe is limited to alleged agreements between Perrigo, Sandoz, and Taro. *See* ECF No. 1483 at 70 (granting summary judgment to Perrigo as to the States' claim of an agreement with Greenstone but denying summary judgment as to a conspiracy with Taro and Sandoz).

of Perrigo's competitors." ECF No. 1099-1 ¶¶ 24, 27, 28 30, 36, 41, 43, 44 (using the same language in responding to facts regarding Adapalene, Bromocriptine, Cal Beta Dip, Ciclopirox solution, Fluticasone, Methazolamide, Promethazine, and Tacrolimus); *see also id.* ¶ 39 ("The evidence permits the reasonable inference that Boothe was aware of communications between Tony Polman of Perrigo and Bihari of Sandoz about the conspiracy to fix the prices of, and allocate customers for, Hydrocortisone Acetate Suppositories."). But the States do not point to any evidence that Boothe was involved, directly or indirectly, in Perrigo's interfirm communications on these drugs. Unlike with Econazole, for example, there is no evidence that Boothe spoke with a competitor proximate to developments in the markets for these drugs.[3] *Cf.*, *e.g.*, ECF No. 1410 at 130–31 (noting Boothe spoke with Taro's Perfetto "just one day before Perrigo announced its [2014 Econazole] price increase to customers, and twice on the day that Perrigo's price increase went into effect"). There is also no evidence that Polman conferred with Boothe while he was communicating with competitors, as Polman did with his supervisor, John Wesolowski. ECF No. 1483 at 49 ("The call-record evidence suggests that Polman frequently spoke with Wesolowski immediately before or after he spoke with a competitor."). Moreover, while Boothe testified that he "sometimes" was made aware of, reviewed, or approved price increases, he also said he was not always involved in "pricing actions," which were overseen by his subordinate, Wesolowski. ECF No. 964-1 at 1334.

---

[3] In the complaint, the States alleged that Boothe called a competitor at G&W in connection with a Promethazine conspiracy on March 26, 2013. ECF No. 196 ¶ 1518. But no party refers to this alleged call while discussing facts about Promethazine, either here or in connection with Perrigo and G&W's motions for summary judgment. *See, e.g.*, ECF No. 1099-1 ¶ 43 (the States failing to identify this call in response to Boothe's statement of fact that he "did not communicate with any employee or representative of a Perrigo competitor concerning the pricing of or customers for Promethazine"). Moreover, the States contend instead that this call concerned Halobetasol (as discussed below) and Prochlorperazine. *Id.* ¶¶ 37, 42. Thus, the States have not produced evidence to support the allegation that Boothe was involved in a Promethazine conspiracy.

In the absence of any evidence of Boothe's actual involvement in each single-drug conspiracy, evidence suggesting that Boothe was aware of and participated in some of Perrigo's *other* single-drug conspiracies is insufficient to bootstrap him to every alleged conspiracy involving Perrigo. *See In re Elevator Antitrust Litig.*, 502 F.3d 47, 52 (2d Cir. 2007) (holding that merely suggesting that "if it happened there, it could have happened here" is insufficient to support a Sherman Act claim "absent any evidence of linkage between such [other] conduct and conduct here"). The States do not point to evidence of a "direct, logical relationship" between the drugs at issue to provide the requisite evidence of linkage between all the alleged conspiracies. *Ross v. Am. Exp. Co.*, 35 F. Supp. 3d 407, 449 (S.D.N.Y. 2014); *cf.* ECF No. 1483 at 80 (finding a "logical relationship" between two alleged anticompetitive agreements involving Perrigo with Sandoz and its predecessor, Fougera, on Erythromycin solution "[b]ecause they involved the same product and were close in time"). Here, the States merely wave at "the cumulative effect of all the other price fixing and market allocation conspiracies" in which Boothe was directly involved (ECF No. 1099-1 ¶¶ 24,27, 28 30, 36, 41, 43, 44), regardless of the product, timeframe, or competitors involved. This is not nearly enough, in the absence of any other evidence, for a reasonable jury to find that Boothe more likely than not participated in each of these alleged conspiracies.

The States also point to summaries of statements that Polman gave to federal investigators that say that Polman "believed that Boothe was aware of the fact that Polman was contacting competitors about pricing, customers and launches since he had a lot of experience in the generic pharmaceuticals industry." *See* ECF No. 1099 at 9 n.19, 11 n.23. But apart from the fact that this particular statement appears to be based on speculation rather than Polman's personal knowledge, these summaries are hearsay, and I will consider only the *self-inculpatory* portions of Polman's statement as statements against penal interest admissible at summary judgment, as I noted in the

Perrigo ruling. ECF No. 1483 at 8 n.5 (citing *Williamson v. United States*, 512 U.S. 594, 604 (1994)); *id.* at 87. This particular statement implicating Boothe is not self-inculpatory and as such I will not consider it as evidence on summary judgment.

For these reasons, Boothe's motion for summary judgment is GRANTED as to Adapalene, Bromocriptine, Cal Beta Dip, Ciclopirox solution, Fluticasone, Hydrocortisone acetate, Methazolamide, and Tacrolimus.[4]

**C. Halobetasol Propionate Cream and Ointment**

This leaves only Halobetasol propionate cream and ointment, for which the States allege that Boothe participated in collusive calls with a G&W executive proximate in time to price increases and a new market entry. ECF No. 196 ¶¶ 1404–06, 1418, 1436. I denied summary judgment to Perrigo on the States' Halobetasol claims because "a reasonable jury could find it is more likely than not that Perrigo conspired with G&W." ECF No. 1483 at 66. In denying summary judgment to Perrigo, I did not rely on Boothe's communications with G&W's Orlofski, but rather on Thomassey's testimony that he helped Perrigo's Polman and G&W's Vogel-Baylor coordinate pricing and customer allocation. *See id.* at 59–66. But a reasonable jury could find from circumstantial evidence that Boothe participated in the conspiracy between Perrigo and G&W.

Less than a week before Perrigo increased its Halobetasol price, Boothe spoke with G&W's Orlofski on March 19, 2013, and then twice with Taro's Perfetto on March 21. ECF No. 950-1 at

[4] Perrigo only moved for partial summary judgment on Adapalene cream, with respect to the "2013 customer allocation only." ECF No. 943 at 37. Boothe makes no such distinction in seeking full summary judgment on all claims against him. The States do not allege that Boothe was involved in an alleged conspiracy to fix prices and allocate customers on Adapalene cream in 2010, *see* ECF No. 196 ¶¶ 265–81, which predates his time at Perrigo, *see* ECF No. 1099-1 ¶ 4. As such, Boothe's motion is granted as to all Adapalene cream claims.

298. As described in the Taro ruling, Perrigo announced it was raising its Halobetasol prices on March 25, 2013, and Orlofski texted Boothe the same day. ECF No. 1410 at 62 (citing ECF No. 950-1 at 300, 302). The next morning, Boothe placed a seven-minute call to Orlofski. *Id.* On the same day as this call, G&W's Vogel-Baylor called Thomassey, who then immediately called Perrigo's Polman, and then called Vogel-Baylor. ECF No. 1410 at 62–63 (citing No. 944-1 at 157). Later that day, Vogel-Baylor sent Orlofski a proposal to increase G&W's Halobetasol prices. ECF No. 944-1 at 159. G&W followed Perrigo's price increases about two weeks later. *Id.* at 161.

Calls that occur "immediately before or after pricing decisions" can be sufficient to establish the interfirm communications plus factor from which a reasonable juror could infer a conspiracy. *In re Generic Pharms. Pricing Antitrust Litig.*, No. 16-CM-27241, 2025 WL 2483981, at *14 (E.D. Pa. Aug. 27, 2025). As I have found previously, "the more frequent and the closer the calls are to a particular movement in the market, the more probative of a conspiracy this evidence becomes." ECF No. 1483 at 86. The timing of Boothe's call with G&W's Orlofski—on the heels of Perrigo's price increase and on the same day that Vogel-Baylor was also communicating with Perrigo (via Thomassey) and then proposed G&W's price increase to Orlofski—suggests that Boothe's discussion with Orlofski was part of the same anticompetitive discussion that Vogel-Baylor was having concurrently.

Even though Boothe denied discussing Halobetasol with Orlofski, ECF No. 964-1 at 1287–89, when viewing the timing of their call in light of the other evidence of collusion between G&W and Perrigo on March 26, a reasonable jury could find that Boothe more likely than not participated in the alleged Halobetasol price-fixing conspiracy. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 588 (1986)). Because the evidence "tends to exclude the possibility that that

the alleged conspirators acted independently," *Anderson News, L.L.C. v. Am. Media, Inc.*, 899 F.3d 87, 98 (2d Cir. 2018), Boothe's motion for summary judgment is DENIED as to the States' claims regarding a price increase on Halobetasol propionate cream and ointment in 2013.

The States' Halobetasol claims do not stop there. Sandoz's Bihari testified that he exchanged competitively sensitive information with Perrigo's Polman and G&W's Kevin Knarr as part of agreements that Perrigo and G&W would relinquish Halobetasol cream customers to Sandoz upon Sandoz's entry to the market in December 2013 and in the early months of 2014. ECF No. 964-1 at 945–50. Bihari testified that Sandoz had agreements with Perrigo and G&W to "relinquish a customer to Sandoz," whereby the competitors provided Sandoz with their price points "so as to keep the market price high."[5] ECF No. 964-1 at 949–50. Evidence shows that Boothe exchanged two calls with Orlofski on December 20, 2013, ECF No. 961-1 at 232, amid a flurry of other communications between competitors as Sandoz entered the market, ECF No. 947-1 at 216, 243. A reasonable jury could infer from the timing of these calls, together with the evidence linking Boothe and Orlofski to the Halobetasol price-fixing conspiracy earlier in 2013, that Boothe likewise participated in the alleged 2013 Halobetasol cream customer allocation conspiracy.

The States do not allege any facts suggesting that Boothe was involved in an initial price increase on Halobetasol cream and ointment in September 2012. *See* ECF No. 196 ¶¶ 1396–1403. Further, I previously granted summary judgment to Taro upon finding the evidence "insufficient to demonstrate that Taro joined any conspiracy on Halobetasol." ECF No. 1410 at 147. The alleged call between Boothe and a Taro employee on June 17, 2014, ECF No. 196 ¶ 1436, is

---

[5] Perrigo did not move for summary judgment on the States' Halobetasol market-allocation claims that followed the March/April 2013 price increases.

therefore not probative of a conspiracy. To the extent the States seek to hold Boothe liable for these portions of the Halobetasol claims, I grant summary judgment to Boothe.[6]

## III. CONCLUSION

For the foregoing reasons, Boothe's Motion for Summary Judgment is GRANTED as to the States' claims that Boothe unlawfully conspired with regard to Adapalene cream, Ammonium lactate cream and lotion, Bromocriptine mesylate tablets, Cal Beta Dip, Ciclopirox cream and solution, Desonide cream, Desonide ointment (April/May 2013 price increase), Econazole nitrate cream (2015 customer allocation), Fluticasone propionate lotion, Halobetasol propionate cream and ointment (September 2012 price increase and 2014 customer allocation), Hydrocortisone acetate suppositories, Hydrocortisone valerate cream, Methazolamide tablets, Prochlorperazine maleate suppositories, Promethazine HCL suppositories, and Tacrolimus ointment.

The motion is DENIED as to the States' claims that Boothe unlawfully conspired with regard to Clindamycin phosphate solution, Desonide ointment (conduct beginning in July 2013), Econazole nitrate cream (2014 price increase), Fluocinonide .1% cream, and Halobetasol propionate cream and ointment (March/April 2013 price increase and 2013 customer allocation).

IT IS SO ORDERED.

/s/
Michael P. Shea, U.S.D.J.

Dated: Hartford, Connecticut
September 11, 2026

---

6 To be clear, when parsing the Halobetasol claims in the complaint, Boothe's motion is GRANTED as to "a) The First Coordinated Price Increase – September 2012," ECF No 196 ¶ 1396, and "d) Taro Launches Halobetasol Cream and Ointment," *id.* ¶ 1430. The motion is DENIED as to "b) The Second Coordinated Price Increase – March/April 2013," *id.* ¶ 1404, and "c) Sandoz Launches Halobetasol Cream," *id.* ¶ 1408.