**UNITED STATES DISTRICT COURT**
**DISTRICT OF CONNECTICUT**

THE STATE OF CONNECTICUT; THE STATE OF ALASKA; THE STATE OF ARIZONA; THE STATE OF ARKANSAS; THE STATE OF CALIFORNIA; THE STATE OF COLORADO; THE STATE OF DELAWARE; THE DISTRICT OF COLUMBIA; THE STATE OF FLORIDA; THE STATE OF GEORGIA; THE TERRITORY OF GUAM; THE STATE OF HAWAII; THE STATE OF IDAHO; THE STATE OF ILLINOIS; THE STATE OF INDIANA; THE STATE OF IOWA; THE STATE OF KANSAS; THE COMMONWEALTH OF KENTUCKY; THE STATE OF LOUISIANA; THE STATE OF MAINE; THE STATE OF MARYLAND; THE COMMONWEALTH OF MASSACHUSETTS; THE STATE OF MICHIGAN; THE STATE OF MINNESOTA; THE STATE OF MISSISSIPPI; THE STATE OF MONTANA; THE STATE OF NEBRASKA; THE STATE OF NEVADA; THE STATE OF NEW HAMPSHIRE; THE STATE OF NEW JERSEY; THE STATE OF NEW MEXICO; THE STATE OF NEW YORK; THE STATE OF NORTH CAROLINA; THE STATE OF NORTH DAKOTA; THE COMMONWEALTH OF THE NORTHERN MARIANA ISLANDS; THE STATE OF OHIO; THE STATE OF OKLAHOMA; THE STATE OF OREGON; THE COMMONWEALTH OF PENNSYLVANIA; THE COMMONWEALTH OF PUERTO RICO; THE STATE OF RHODE ISLAND; THE STATE OF SOUTH CAROLINA; THE STATE OF TENNESSEE; THE STATE OF UTAH; THE STATE OF VERMONT; THE COMMONWEALTH OF VIRGINIA; THE STATE OF WASHINGTON; THE STATE OF WEST VIRGINIA; THE STATE OF WISCONSIN; and U.S. VIRGIN ISLANDS,

*Plaintiffs*,

v.

No. 3:20-cv-00802-MPS

SANDOZ, INC.; ACTAVIS HOLDCO US, INC.; ACTAVIS ELIZABETH LLC; ACTAVIS PHARMA, INC.; AMNEAL PHARMACEUTICALS, INC.; AMNEAL PHARMACEUTICALS, LLC; ARA APRAHAMIAN; AUROBINDO PHARMA U.S.A., INC.; BAUSCH HEALTH AMERICAS, INC.; BAUSCH HEALTH US, LLC; MITCHELL BLASHINSKY; DOUGLAS BOOTHE; FOUGERA PHARMACEUTICALS INC.; GLENMARK PHARMACEUTICALS INC., USA; JAMES (JIM) GRAUSO; GREENSTONE LLC; G&W LABORATORIES, INC.; WALTER KACZMAREK; ARMANDO KELLUM; LANNETT COMPANY, INC.; LUPIN PHARMACEUTICALS, INC.; MALLINCKRODT INC.; MALLINCKRODT LLC; MALLINCKRODT plc; MYLAN INC.; MYLAN PHARMACEUTICALS INC.; KURT ORLOFSKI; MICHAEL PERFETTO; PERRIGO NEW YORK, INC.; PFIZER INC.; SUN PHARMACEUTICAL INDUSTRIES, INC.; TARO PHARMACEUTICALS USA, INC.; TELIGENT, INC.; ERIKA VOGEL-BAYLOR; JOHN WESOLOWSKI; and WOCKHARDT USA LLC,

*Defendants*.

**RULING ON MOTION FOR SUMMARY JUDGMENT**

In this action, the Plaintiffs, the Attorneys General of most of the States and several U.S. territories ("the States"), allege that thirty-six pharmaceutical companies and executives ("the Defendants") each participated in a series of conspiracies, as well as an overarching conspiracy, to fix prices, allocate markets, and rig bids in the sale of dozens of generic drug products. One of the executives, Defendant John Wesolowski, has moved for summary judgment on claims that he participated in certain product-specific conspiracies. ECF Nos. 992, 993; *see also* ECF No. 1008 (Defendants' Joint Memoranda in Support of Defendant-Specific Motions for Summary Judgment). For the reasons set forth below, I **GRANT IN PART AND DENY IN PART** Wesolowski's motion for summary judgment.

## I. BACKGROUND

The States allege that Wesolowski participated in antitrust conspiracies covering at least twenty-eight drugs in his roles as Vice President and Executive Vice President of Perrigo New York, Inc. ("Perrigo"). ECF No. 196 ¶ 1816; ECF 1223 ¶ 1. "Wesolowski exercised final authority for Perrigo's generic drug sales and marketing decisions, including the levels of its WAC and AWP prices, the customers to which Perrigo would offer to sell its products, the terms of those offers, and whether and to what extent Perrigo would respond to right of first refusal requests (ROFRs) received from existing customers." ECF No. 1035-1 ¶ 1; *see also* ECF No. 1029-1 ¶ 42 ("Wesolowski had ultimate authority to make final decisions regarding which customers to send offers to for a particular product and at what proposed Contract Price."). Wesolowski seeks summary judgment as to each claim. I assume familiarity with the factual and procedural background of this case, the parties' briefs and statements of fact, and the applicable legal standards. For relevant background, see my ruling on Perrigo's motion for summary judgment. *Connecticut v. Sandoz, Inc.*, No. 20cv802, 2026 WL 2268225 (D. Conn. Aug. 6, 2026). I write only enough to explain my reasoning.

## II. DISCUSSION

Wesolowski's motion requires me to address two questions: first, whether the evidence suggests the existence of each single-drug conspiracy in which Perrigo is alleged to have taken part, and second, whether Wesolowski participated in each conspiracy. *See Connecticut v. Sandoz, Inc.*, No. 20cv802, 2025 WL 3470502 (D. Conn. Dec. 3, 2025). ("Whether a particular Defendant was a member is a distinct issue from the issue whether a conspiracy existed at all."). I address these questions in turn.

**A. Evidence Suggesting the Alleged Conspiracies Existed**

1. Evidence Addressed in the Perrigo Ruling

In ruling on Perrigo's motion, I granted summary judgment to Perrigo on the States' claims related to Ammonium lactate cream and lotion, Ciclopirox cream, Desonide cream, Desonide ointment (April/May 2013 price increase), Econazole nitrate cream ("Econazole") (2015 customer allocation), Hydrocortisone valerate cream, and Prochlorperazine maleate suppositories. *Sandoz, Inc.*, 2026 WL 2268225, at *33–34, *36–37, *42, *44. For these drugs, I found the evidence insufficient for a reasonable jury to conclude that Perrigo more likely than not conspired to enter into an anticompetitive agreement. *Id.* As the States allege that Wesolowski conspired with competitors only in his capacity as a Perrigo executive, I GRANT summary judgment to Wesolowski as to those claims for the same reasons expressed in the Perrigo ruling.

In that same ruling, however, I denied summary judgment to Perrigo upon finding that a reasonable jury could find that the firm more likely than not participated in conspiracies related to Adapalene cream (2013 customer allocation only), Bromocriptine mesylate tablets ("Bromocriptine"), Ciclopirox shampoo and solution, Clindamycin phosphate solution ("Clindamycin"), Econazole (2014 price increase), Erythromycin solution ("Erythromycin"), Fluocinonide .1% cream ("Fluocinonide"), Fluticasone propionate lotion ("Fluticasone"), Halobetasol propionate cream (2012 and 2013 price increases only), Halobetasol propionate ointment, Hydrocortisone acetate suppositories ("Hydrocortisone acetate"), Imiquimod cream ("Imiquimod"), Methazolamide tablets ("Methazolamide"), Nystatin ointment ("Nystatin"), Promethazine HCL suppositories ("Promethazine"), Tacrolimus ointment ("Tacrolimus"), and Triamcinolone acetonide cream and ointment ("Triamcinolone"). *Id.* at *28, *33–34 *37, *39–42.

Thus, to the extent that Wesolowski argues in the present motion that the evidence is insufficient for a jury to find that Perrigo conspired on these drugs, I reject those arguments for the same reasons expressed in the Perrigo ruling.

2. Evidence Not Addressed in the Perrigo Ruling

Perrigo did not move for summary judgment as to the States' claims concerning Beta Dip or Cal Beta Dip, and so I have not yet addressed whether a conspiracy existed for these drugs. Moreover, Perrigo moved only for partial summary judgment on Adapalene and Halobetasol cream. I have not yet addressed the States' claims related to a 2010 Adapalene cream price-fixing and customer-allocation agreement between Perrigo and Fougera or a 2013 Halobetasol cream customer-allocation scheme as Sandoz entered the market; I addressed the allegations related to Perrigo's involvement in a 2014 Halobetasol cream and ointment customer-allocation agreement in the ruling on Taro's motion for summary judgment. ECF No. 1014 at 63–68, 152. For all of these claims, a cooperating witness testified that Perrigo unlawfully conspired with Fougera or its successor Sandoz to fix prices or allocate customers.[1]

For Adapalene, Anthony Thomassey, a former Fougera account executive, testified that Perrigo and Fougera had an agreement concerning the amount of market share that Perrigo would obtain when it entered the market in August 2010, as well as an "understanding" about the specific customers that Fougera would concede to Perrigo. ECF No. 965-1 at 355. He also testified that his communications with his counterpart at Perrigo, Tony Polman, kept the price higher than it otherwise would have been. *Id.* By the time of this agreement, Thomassey testified, Perrigo and

[1] As noted in the Perrigo ruling, "because the States have produced direct evidence of an agreement, it is unnecessary to describe all of the circumstantial evidence regarding these drugs." *Sandoz, Inc.*, 2026 WL 2268225, at *5.

Fougera had a broad understanding about price increases, under which "if [Fougera] increased, [Perrigo] would follow and also not cannibalize our business by accepting bids." *Id.* at 356.

For Beta Dip, Thomassey testified that following his calls with Polman on January 13, 2011, Fougera and Perrigo had an agreement to raise prices. ECF No. 965-1 at 375; *see also* ECF No. 951-1 at 22 (call record). Thomassey also testified that after Walgreens solicited a bid from Perrigo on Beta dip lotion, Polman called him on February 4, 2011 to inform him that Perrigo "was not going to take the business" from Fougera. ECF No. 965-1 at 375; *see also* ECF No. 951-1 at 24 (call records); ECF No. 946-1 at 106 (Thomassey writing in an internal email the same day: "Walgreens bid our increase item, Just us and [P]errigo. Rumor has it that they found no takers. Hahahahahaha.").

For Cal Beta Dip, former Sandoz employee Christopher Bihari testified that he called Polman on March 4, 2014, to discuss Sandoz's upcoming launch, and that they had several additional conversations concerning "aligning customers" and "horse trading of customers." ECF No. 964-1 at 951; *see also id.* at 953 (testifying that he discussed with Sandoz executive Armando Kellum "the cal beta dip launch and the market allocation based on the discussions I had with Tony Polman"); ECF No. 946-1 at 209; ECF No. 947-1 at 194, 196 (March 2014 call records). On these calls, Bihari said, Polman "shared [Perrigo's] contract pricing . . . with Sandoz first, and Sandoz built their pricing from there to ensure that they would be at parity." *Id.* at 951. Bihari also testified that when he spoke with Polman about Tacrolimus later in 2014, they sought to mirror the customer allocation strategy that they had applied to Cal Beta Dip. *Id.* at 958–59. Polman also

told federal investigators that he and Bihari divided customers on Cal Beta Dip and divided the Tacrolimus market "the same way."[2] ECF No. 959-1 at 256.

For Halobetasol, in the ruling on Taro's motion for summary judgment, I found that "[t]he evidence related to Taro's entry into the market [in 2014] is both distinct from evidence suggesting an earlier conspiracy between other competitors [including Perrigo] and insufficient to demonstrate that Taro joined any conspiracy on Halobetasol." ECF No. 1410 at 147. I thus granted summary judgment on this claim as to Taro only. *Id.* at 155. But I also noted that Sandoz's Bihari "testified that he exchanged competitively sensitive information with Perrigo's Polman and G&W's Kevin Knarr as part of agreements that Perrigo and G&W would relinquish Halobetasol cream customers to Sandoz upon Sandoz's entry to the market in December 2013 and in the early months of 2014." *Id.* at 63; *see also* ECF No. 964-1 at 945–50. Bihari testified that Sandoz had agreements with Perrigo and G&W to "relinquish a customer" to Sandoz, whereby the competitors provided Sandoz with their price points "so as to keep the market price high." ECF No. 964-1 at 949–50.

The testimony of Thomassey and Bihari tends to exclude the possibility that Perrigo acted independently in regard to Adapalene, Beta Dip, Cal Beta Dip, and Halobetasol cream.[3] *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 588 (1986); *see also In re Publ'n Paper Antitrust Litig.*, 690 F.3d 51, 64 (2d Cir. 2012) ("[A] co-conspirator's acknowledgment that he understood his numerous communications with [a competitor] to reflect a price-fixing

---

[2] As explained in the next section, Polman's statements to investigators are hearsay, and as such I consider them only to the extent they are self-inculpatory.

[3] In the Perrigo ruling, I rejected arguments, many of which Wesolowski echoes here, regarding the sufficiency of the cooperating witness testimony, including challenges to the witnesses' authority to enter agreements, the testimony's admissibility, and inconsistencies with other evidence. *Sandoz, Inc.*, 2026 WL 2268225, at *24–28. I reject Wesolowski's arguments on these grounds for the same reasons expressed in the Perrigo ruling.

agreement . . . is surely strong evidence of a collusive scheme . . . sufficient to satisfy *Matsushita*'s 'tends to exclude' standard."); *In re High Fructose Corn Syrup Antitrust Litig.*, 295 F.3d 651, 654 (7th Cir. 2022) ("Because price fixing is a *per se* violation of the Sherman Act, an admission by the defendants that they agreed to fix their prices is all the proof a plaintiff needs."). As such, a reasonable jury could find that Perrigo more likely than not joined conspiracies on these drugs, including as to the 2010 Adapalene cream and 2013 Halobetasol cream claims.

**B. Evidence of Wesolowski's Participation**

For the reasons discussed below, a reasonable jury could find that Wesolowski more likely than not participated in many but not all of the alleged single-drug conspiracies.

1. Polman's Statements to Investigators

As discussed throughout this ruling, the States present evidence that suggests that Perrigo's Tony Polman, who reported directly to Wesolowski, ECF No. 1035-1 ¶ 20, frequently colluded with competitors to fix prices and allocate customers. Polman died in 2018, before this case was filed. ECF No. 620-1 ¶ 81. Although he was not deposed in this matter, he told federal investigators before his death that he engaged in collusive conduct with Fougera and its successor Sandoz, among other competitors. *E.g.*, ECF No. 952-1 at 522–24, ECF No. 959-1 at 263–64, 268. In their opposition brief and statement of facts, the States often point to portions of Polman's statements in which Polman alleged that Wesolowski was involved in his collusive conduct.

But Polman's statements to investigators are hearsay, and I may only consider the portions of these statements in which Polman inculpates *himself* in *per se* violations of the antitrust laws, as I previously explained in the Perrigo ruling. *Sandoz, Inc.*, 2026 WL 2268225, at *4 n.5; *see also* ECF No. 1035 at 4 n.7 (the States noting in their opposition to the present motion that "Polman's self-inculpatory statements" are admissible). These statements are inadmissible to the extent the States present them as evidence implicating Wesolowski in the alleged conspiracies.

Moreover, because of concerns over the admissibility of even the self-inculpatory portions of these statements, I will not rely on them alone as to any critical issue. *See Champagne Metals v. Ken–Mac Metals, Inc.*, 458 F.3d 1073, 1084 (10th Cir. 2006) ("Where, as here, a plaintiff adduces only weak direct evidence, which by itself is insufficient to defeat summary judgment, additional circumstantial evidence is required to overcome a motion for summary judgment.").

2. Wesolowski's Direct Communications with Competitors

Calls between competitors that occur "immediately before or after pricing decisions" can be sufficient to establish the interfirm communications plus factor from which a reasonable juror could infer a conspiracy. *In re Generic Pharms. Pricing Antitrust Litig.*, No. 16-CM-27241, 2025 WL 2483981, at *16 (E.D. Pa. Aug. 27, 2025). As I have found previously, "the more frequent and the closer the calls are to a particular movement in the market, the more probative of a conspiracy this evidence becomes." *Connecticut v. Sandoz, Inc.*, No. 20cv802, 2026 WL 75851, at *16 (D. Conn. Jan. 9, 2026).

Wesolowski contends that he is "unlike the other individual defendants in this case" in that he "is not alleged to have communicated with any competitor about pricing or customers, and discovery has produced no evidence of any such communications." ECF No. 992-1 at 5. This is not true for all of the drugs at issue. *See* ECF No. 196 ¶¶ 1346 (alleging that Wesolowski's calls with Greenstone were part of a Clindamycin conspiracy), 1385 (alleging Wesolowski's calls with G&W were collusive in nature), 1431–32 (alleging Wesolowski's calls with Taro were part of a Halobetasol conspiracy). While the evidence in the record of Wesolowski's communications with competitors is more limited than for some of his co-Defendants, the States produced evidence of a handful of calls in 2014 between Wesolowski and Perrigo's competitors. *See* States' 56(a)2 Statement of Additional Material Facts ("SAMF") ¶ 19 & n.22. Although the States fail to connect

most of these calls to any of the alleged individual-drug conspiracies at issue in this case,[4] some of Wesolowski's calls are reasonably proximate in time to other communications between competitors for three of the drugs at issue: Clindamycin, Halobetasol cream, and Hydrocortisone acetate. I find that none of these calls, however, are sufficient by themselves to tie Wesolowski to any alleged conspiracy.

For Clindamycin, the States point to calls between Wesolowski and Greenstone director Jill Nailor on March 11, 2014. ECF No. 963-1 at 225. These calls occurred during the same period in which other Perrigo personnel were communicating with Taro and Sandoz—calls which I have previously found could support a finding that the firms were conspiring to allocate customers for Clindamycin. ECF No. 1410 at 33, 119–20. Although Greenstone also competed on Clindamycin during this time, I granted summary judgment to Greenstone on the States' 2013 allocation claim (which also extended into Sandoz's January 2014 entry) as the States did not press Greenstone's involvement on that claim. *Connecticut v. Sandoz, Inc.*, No. 20cv802, 2026 WL 1533866, at *22 (D. Conn June 1, 2026). The States also did not cite Wesolowski's calls with Nailor in statements of facts submitted in connection with any of the competitors' summary judgment motions. *See* ECF Nos. 1029-1 (Perrigo), 1036-1 (Taro), 1053 (Greenstone), 1080-1 (Sandoz). As such, the States have failed to demonstrate how these calls are probative of Wesolowski's involvement in a conspiracy on Clindamycin.[5]

---

[4] The States cite an October 1, 2014 call with a representative of Amneal, but the States do not allege that Perrigo conspired on any specific drug with Amneal. ECF No. 961-1 at 238; *see* ECF No. 196 ¶¶ 1705. Calls between Wesolowski and Wockhardt's Scott Koenig in June 2013 and July 2014 occurred much later than the only alleged collusion between these companies, on Erythromycin in 2012. ECF No. 949-1 at 112, 114; *see* ECF No. 196 ¶ 365.

[5] Wesolowski's calls with Nailor are also proximate in time to calls between Nailor and Sandoz in March and April 2014. In the Greenstone ruling, I found a reasonable jury could infer that Nailor's calls with Sandoz more likely than not reflected a conspiracy to raise prices on Clindamycin gel,

For Halobetasol, the States point to two calls between Wesolowski and Taro's Ara Aprahamian on May 9, 2014, which occurred one day after Sandoz's Bihari called G&W's Knarr and Perrigo's Polman. ECF No. 961-1 at 218–19. As explained in the previous section, Bihari testified that Sandoz reached agreements to allocate customers with G&W and Perrigo, but I previously found that Taro was not part of this agreement. While the timing of Wesolowski's calls suggests that they might have also concerned Halobetasol pricing and customers, other evidence suggests that Wesolowski did not *reach an agreement* with Taro on these calls. *See Mayor & City Council of Balt. v. Citigroup, Inc.*, 709 F.3d 129, 137 (2d Cir. 2013) ("parallel conduct allegations must be placed in a context that raises a suggestion of a preceding agreement, not merely parallel conduct that could just as well be independent action"). As noted in the Taro ruling, Wesolowski rejected Polman's suggestion to cede two customers to Taro and insisted that Perrigo instead "dig [its] heels in now." ECF No. 1410 at 67, 152. Perrigo later reduced its price and retained its business with one of the two customers, which led me to find that "there is no evidence of parallel conduct from which to infer that Taro and Perrigo reached a customer allocation agreement on Halobetasol during their communications in June 2014." *Id.* at 152. Wesolowski's calls with Taro are thus not sufficient to tie him to the 2014 Halobetasol conspiracy.

Hydrocortisone acetate is the only drug at issue in this case on which Perrigo and G&W are alleged to have conspired at the time that Wesolowski exchanged two calls with G&W executive Kurt Orlofski on September 16, 2014. ECF No. 961-1 at 238. In the Perrigo ruling, I found the evidence suggests that Perrigo's Polman and G&W's Erika Vogel-Baylor "called each other in close proximity to developments in the market" on multiple occasions as they

---

lotion and cream. *Sandoz, Inc.*, 2026 WL 1533866, at *23. But Wesolowski is only alleged to have conspired on Clindamycin solution, not the other formulations. ECF No. 196 ¶ 1816.

implemented Hydrocortisone acetate price increases in July and August 2014, and that these calls established the interfirm communications plus factor from which a reasonable juror could infer a conspiracy. *Sandoz, Inc.*, 2026 WL 2268225, at *41. Moreover, I found that an email exchange on July 11 between Vogel-Baylor and Orlofski "reinforces the inference that Perrigo and G&W had an anticompetitive agreement on Hydrocortisone acetate" by alluding to "an existing agreement with Perrigo to avoid poaching each other's customers." *Id.* at *42. This evidence was sufficient for 'a reasonable fact finder to infer that the conspiratorial explanation is more likely than not' regarding the conduct of Perrigo and G&W." *Id.* (quoting *Anderson News, L.L.C. v. Am. Media, Inc.*, 899 F.3d 87, 98 (2d Cir. 2018)). But the evidence does not suggest that Perrigo and G&W were still communicating with each other about Hydrocortisone acetate once G&W followed Perrigo's price increase on August 1, 2014.[6] ECF No. 961-1 at 49; *see* ECF No. 1029-1 ¶¶ 261–62. Because Wesolowski and Orlofski's calls came six weeks *after* the allegedly coordinated price-increase, no reasonable jury could find that they were likely related to Hydrocortisone acetate, especially when also considering the evidence that Orlofski was at that time having legitimate communications with Wesolowski's boss, Douglas Boothe, regarding a "Joint Regulatory Agreement" between Perrigo and G&W. Thus, Wesolowski's September 16, 2014 calls with Orlofski do not suggest his involvement in any conspiracy between Perrigo and G&W on Hydrocortisone acetate.

---

[6] The States allege in the complaint that Vogel-Baylor and Polman also spoke on August 11 and 18, 2014, ECF No. 196 ¶ 1501, but they do not point to evidence of these calls in any of the relevant motions or statements of facts, and as such fail to link them to any development with any customer. Although Polman's phone records indicate that he did exchange calls with Vogel-Baylor on these dates (ECF No. 933-2 at 2638, 2641), these calls came a month before Wesolowski's September 16 calls with Orlofski and as such are not probative of the topic of the later calls. *See* ECF No. 952-1 at 489 (Polman's statement to investigators that he had "both friendly calls, as well as illegal calls with Vogel-Baylor").

Although these calls fall short of linking Wesolowski to the alleged conspiracies, other evidence *is* probative of Wesolowski's involvement in anticompetitive agreements on Clindamycin and Hydrocortisone acetate, as well as a 2013 Halobetasol cream conspiracy, as discussed below.

3. Involvement in Polman's Communications

Because the evidence of Wesolowski's direct communications with competitors is relatively scarce, the States chiefly rely on evidence that suggests that when Perrigo's Polman communicated with competitors about pricing or customers, he was doing so at the direction and with the approval of his boss, Wesolowski. Among this evidence is witness testimony that suggests Wesolowski was aware of the extent of Polman's communications, as well as phone records that suggest that, on at least *twenty different occasions*, "Polman and Wesolowski called each other *immediately* before or *immediately* after Polman talked to a competitor." ECF No. 1035 at 7–9; *see* SAMF ¶ 12. I find that these calls, when considered with other evidence in the record that links the calls to developments in the drug markets, are sufficient to tie Wesolowski to conspiracies on ten drugs.

Thomassey, one of the States' cooperating witnesses, testified that Wesolowski knew that he and Polman were communicating about pricing and market allocation. ECF No. 965-1 at 403. Thomassey knew this, he testified, because he "spoke personally with [Wesolowski] about [pricing and market allocation] and [Wesolowski] additionally directed me to speak with [Polman] about it." *Id.* Thomassey said Wesolowski pulled him aside at a trade organization meeting and told him, "you and Tony are . . . doing a good job, keep it up." *Id.* at 403–04.[7] This statement is not

[7] Wesolowski testified that, contrary to Thomassey's testimony, he did not know that Polman was communicating with competitors to allocate customers, *id.* at 1793, but Thomassey testified that

as ambiguous as Wesolowski contends. ECF No. 992-1 at 26. Because Thomassey also testified that he was communicating with Polman about pricing and customers on a regular basis while Thomassey worked for Fougera, ECF No. 965-1 at 545, and there is no legitimate explanation as to why Thomassey and Polman would be working together, a jury could reasonably infer that when Wesolowski told Thomassey that he and Polman were "doing a good job," he was referring to their collusive efforts. Thomassey's testimony is direct evidence that Wesolowski was at least generally aware that Polman, his direct report, was colluding with Fougera.

Wesolowski also argues that the alleged "good job" comment, if it was made, is untethered to any specific drug. ECF No. 992-1 at 25–26.[8] But the statement does not stand alone, and a reasonable jury could infer from the circumstantial evidence, primarily Polman's calls with Wesolowski before or after his calls with Thomassey, that Wesolowski approved of Polman's entering into agreements with Fougera through his communications with Thomassey. A reasonable jury could also find that Wesolowski similarly sanctioned Polman's collusive conduct with other competitors. I will address chronologically the evidence that links Wesolowski to Polman's communications with competitors on ten drugs.

---

Wesolowski was lying, *id.* at 404. As I found in the Perrigo ruling, only a jury can resolve this conflict. *Sandoz, Inc.*, 2026 WL 2268225, at *25.

[8] Wesolowski also contends that "there is no reliable way to determine whether [the alleged "good job" comment] occurred during (or prior to) the alleged conspiracy period . . . or whether Thomassey was employed by one of Perrigo's competitors at the time of the supposed conversation." ECF No. 992-1 at 25. This argument is without merit. Thomassey testified that this meeting occurred while he was working for Fougera. ECF No. 965-1 at 613; *see id.* at 481 (testifying that he worked for Fougera from 2004 to 2012). And because the comment suggests that Wesolowski had notice of Polman's collusion with Thomassey, a reasonable juror could find that it occurred during the alleged conspiracy period.

a. Imiquimod

On April 10, 2010, Perrigo reached an agreement with the brand manufacturer to be the authorized generic supplier for Imiquimod. ECF No. 1029-1 ¶ 265. At the time, the only other supplier of generic Imiquimod was Fougera. *Id.* ¶ 264. On April 19, 2010, Wesolowski called Polman at 4:04 p.m. and the call lasted nearly six minutes. ECF No. 946-1 at 181. At 4:16 p.m., Polman called Thomassey in the first of three calls between the competitors over the next forty minutes. *Id.* Thomassey testified that his calls with Polman concerned discussion of customers for Imiquimod in the wake of Fougera's recent price increase on the product. ECF No. 965-1 at 336. Polman also told federal investigators that he "discussed market share" with Thomassey when Perrigo launched Imiquimod. ECF No. 952-1 at 524.

Immediately after his third call with Thomassey, Polman called Wesolowski and the call lasted for over three minutes. ECF No. 946-1 at 181. Wesolowski then immediately called Polman and that call lasted for over six minutes. *Id.* Thomassey testified that he was also speaking with his superior, Walt Kaczmarek, between calls with Polman, and that he then called Polman "[t]o relay information to Tony that Walt told me." ECF No. 965-1 at 335. A reasonable jury could find that Polman likewise was communicating with his superior, Wesolowski, on the same topic.

When Sandoz (before its 2012 acquisition of Fougera) entered the market the following year, Walgreens told Thomassey on March 4, 2011, that the new entrant had offered to sell Imiquimod "for under $300." ECF No. 946-1 at 187. Thomassey then emailed Kaczmarek, writing that "I think it may be a bluff." *Id.* On the same day, Thomassey and Polman exchanged four calls. ECF No. 946-1 at 190. About an hour after Thomassey made the first call to Polman, Polman called Wesolowski and two minutes later called back Thomassey. *Id.* Immediately after this call, Polman called Wesolowski, and the two Perrigo employees exchanged two more calls over the next half-hour, after which Thomassey called Polman again. *Id.* A reasonable jury could

find based on the proximity of these calls that Polman was coordinating pricing with Thomassey in the wake of Sandoz's Imiquimod offer, and that Wesolowski was communicating with Polman on the same topic.

On April 18, 2011, after Taro received regulatory approval to sell Imiquimod, Kaczmarek sent an email to Fougera's account executives to ask if anyone had any information. ECF No. 965-1 at 1841. On the same day, Thomassey called Polman, and the call lasted for twenty-seven seconds. ECF No. 946-1 at 194. A few hours later, Polman called Wesolowski, and then called Thomassey less than ten minutes later. *Id.* Immediately after speaking to Thomassey, Polman called Wesolowski again, and Wesolowski called Polman back seven minutes later. *Id.* In similar fashion, Thomassey called Kaczmarek immediately after his calls with Polman. *Id.* at 60.

On July 26, 2011, a customer informed a Perrigo sales representative of a competitive offer on Imiquimod. *Id.* at 199. The Perrigo rep called Wesolowski about half an hour later the same day. *Id.* at 196. The next morning, Wesolowski called Polman, and Thomassey called Polman a few hours later, before Wesolowski exchanged more calls with the Perrigo rep and Polman that afternoon. *Id.* On July 28, Thomassey called Polman, who later called Wesolowski. *Id.* Immediately after his call with Wesolowski, Polman called Thomassey; Polman also called Wesolowski later that day. *Id.* Thomassey, who also spoke with Kaczmarek just after speaking to Polman, testified that the purpose of these calls was "coordinating pricing and customers." ECF No. 965-1 at 345.

On September 28, 2011, another customer informed Perrigo's Katie McCormack of an "aggressive, direct offer" on Imiquimod. ECF No. 946-1 at 202. Wesolowski then asked McCormack and Polman to "[t]ry and find out" the identity of the bidder. *Id.* Later that day, Polman called Thomassey and then immediately called McCormack. *Id.* at 204. The next

morning, Polman called Wesolowski. *Id.* Later that afternoon, Thomassey called Polman; immediately after that call, Polman called Wesolowski. *Id.*

This pattern of Wesolowski's calls with Polman in close proximity to Polman's interfirm communications with Fougera and developments in the market strongly suggests that Wesolowski was aware of and approved of Polman's collusive efforts on Imiquimod, just as Thomassey's calls with Kaczmarek suggest that Kaczmarek was overseeing Thomassey's collusion. Wesolowski's involvement—as one whose approval was likely being sought at each collusive step—fits with the evidence of his role at Perrigo: unlike Polman, Wesolowski "exercised final authority for Perrigo's generic drug sales and marketing decisions," including regarding pricing and customers. ECF No. 1035-1 ¶ 1. A jury could reasonably infer from this evidence that Wesolowski more likely than not participated in the Imiquimod conspiracy between Perrigo and Fougera. *Matsushita*, 475 U.S. at 588.

b. Adapalene

Polman and Thomassey exchanged multiple calls on October 8, 2010. ECF No. 946-1 at 73. Immediately after his second call to Polman, Thomassey called his boss, Kaczmarek. *Id.* The call record suggests that Thomassey ended this call with Kaczmarek to take an incoming call from Polman. *Id.* (noting the call with Kaczmarek started at "16:00:25" and lasted one minute and six seconds, and that the call from Polman started at "16:01:31"). Thomassey and Polman spoke for nearly five minutes, after which Thomassey immediately called Kaczmarek, *id.*, while Polman also called his own boss, Wesolowski, ECF No. 961-1 at 237. Immediately after his call with Thomassey, Kaczmarek sent an internal email noting that he had "just heard" that Perrigo's Adapalene launch had been "pushed out to end of this month." ECF No. 946-1 at 75. Thomassey testified that this is information that "would have come from Tony Polman." ECF No. 965-1 at 353.

Two weeks later, on October 19, 2010, Thomassey called Kaczmarek about ten minutes before he called Polman; the call with Polman lasted over twelve minutes. ECF No. 961-1 at 213. Less than ten minutes after speaking to Thomassey, Polman called Wesolowski. *Id.*

On October 25, 2010, Perrigo entered the Adapalene market and matched Fougera's price. ECF No. 946-1 at 96. On the same day, at least two customers, Publix and NC Mutual, notified Fougera that they had received competing offers for Adapalene. ECF No. 946-1 at 78, 88. On the same day, Thomassey called Polman and then immediately called Kaczmarek. *Id.* at 81. That evening, Kaczmarek sent an internal email recommending that Fougera give up Publix and NC Mutual, as well as four other customers, and asked colleagues including Thomassey to "[l]et me know what you are hearing." *Id.* at 78. The next day, Thomassey and Polman exchanged four calls, *id.* at 81, and Thomassey made recommendations to Kaczmarek about which customers to "give up," *id.* at 83. Thomassey then informed one of these customers, Cardinal, that it would not match Perrigo's offer. *Id.* at 85.

Thomassey testified that Perrigo and Fougera had an agreement on the amount of market share that Perrigo would obtain when it entered the Adapalene market in October 2010, as well as an "understanding" about the specific customers that Fougera would concede to Perrigo. ECF No. 965-1 at 355. He also testified that his communications with Perrigo's Polman kept the price higher than it otherwise would have been. *Id.* By this time, Thomassey testified, Perrigo and Fougera had a broad understanding about price increases, under which "if [Fougera] increased, [Perrigo] would follow and also not cannibalize our business by accepting bids." *Id.* at 356.

A reasonable jury could infer from the timing of these calls that Polman and Thomassey kept their superiors, Wesolowski and Kaczmarek, apprised of their discussions to allocate customers as Perrigo entered the Adapalene market. The jury could also reasonably infer that

Wesolowski, who had "final authority" regarding Perrigo's generics customers, ECF No. 1035-1 ¶ 1, used information that Polman obtained from Thomassey to determine which customers to target at launch, and to offer contract prices that did not overly erode prices. As such, the evidence is sufficient for a jury to find that Wesolowski more likely than not participated in the Adapalene conspiracy between Perrigo and Fougera. *Matsushita*, 475 U.S. at 588.

c. Erythromycin

The States allege that Perrigo conspired with Fougera and Wockhardt to fix prices and allocate the Erythromycin market in 2011 and early 2012, and that Perrigo conspired with Sandoz to fix prices and allocate customers for Erythromycin as Sandoz reentered the market later in 2012. ECF No. 196 ¶¶ 335–65. In April 2011, both Wockhardt and Fougera had Erythromycin solution on long-term backorder. ECF No. 1029-1 ¶¶ 319–20. With its competitors temporarily unable to supply the product, Perrigo investigated the possibility of reentering the Erythromycin market at the request of a customer. *Id.* ¶¶ 321–22.

On May 16, 2011, Fougera's Thomassey called Perrigo's Polman twice and the calls lasted a total of ten minutes. ECF No. 946-1 at 152. By May 19, 2011, Perrigo had learned that Wockhardt was planning to exit the market. ECF No. 943-7 at 1413; *see* ECF No. 1029-1 ¶ 319 (noting that by June 2011, Wockhardt had informed customers that it planned to exit). Perrigo employee Jim BooydeGraaff noted in an internal email that, with Wockhardt out of the market, it "[l]ooks likely that we could re-launch [Erythromycin] with a much higher price than previous." ECF No. 943-7 at 1413.

On Friday, May 20, 2011, BooydeGraaff spoke with a colleague about logistics related to relaunching Erythromycin. *Id.* at 1412. On the same day, Polman called Thomassey and the call lasted for over six minutes. ECF No. 946-1 at 152. Later that day, Polman made at least two calls to Wesolowski. ECF No. 961-1 at 237. The following Monday, BooydeGraaff sent an email to

Wesolowski and suggested that Perrigo "get[] rid of [Tolnaftate] so that we could bring back" Erythromycin. ECF No. 943-7 at 1412. Wesolowski responded: "Kill the Tolnaftate, move forward with a six month launch plan on the Ery." *Id.* The email thread then discussed the possibility of raising prices. *Id.* A reasonable jury could infer from the timing of Polman's calls with Thomassey and Wesolowski that these calls all concerned Erythromycin.

In line with Perrigo's six-month launch plan, on November 15, 2011, Wesolowski asked sales representatives, including Polman, to obtain Erythromycin pricing information from customers. ECF No. 943-7 at 1432–33. As discussed in the Perrigo ruling, "the three Erythromycin suppliers took part in interfirm communications within the period between Perrigo's inquiries about pricing on November 15, 2011, and its decision to more than triple its price on November 28. Indeed, on November 15, Perrigo's Polman spoke with Fougera's Thomassey within minutes of being asked to obtain market information on Erythromycin." *Sandoz, Inc.*, 2026 WL 2268225, at *37. I found in that ruling that "a reasonable jury could infer that Perrigo did not set its new price until it had obtained assurances from its competitors that they would follow the increase upon their return to the market." *Id.*

A reasonable jury could similarly infer that, back in May 2011, Wesolowski decided to move forward with relaunching Erythromycin only after Polman discussed with Thomassey—and passed the information along to Wesolowski—about how Fougera would react to Wockhardt's planned exit from the market and how long Fougera's product would be on backorder.

As also discussed in the Perrigo ruling, communications between Polman and Thomassey resumed the following year after Fougera announced it was effectively matching Perrigo's price, and I found that a "reasonable jury could infer from the timing of the calls that Polman had communicated to Thomassey which customers Perrigo would be willing to concede to Fougera,

and that Kaczmarek used this information in determining Fougera's targets." *Id.* at *38.

In mid-2012, Sandoz acquired Fougera and Thomassey left the company. ECF No. 965-1 at 317, 481. After Thomassey's departure, Christopher Bihari, who had also worked for Fougera but stayed on with Sandoz, began communicating with Polman instead. ECF No. 964-1 at 833 (Bihari testifying that he "called Tony Thomassey . . . because I knew Tony was talking, had talked to Polman in the past, and I knew he had his phone number, so I asked . . . Tony Thomassey for Polman's number").

In August 2012, Sandoz was in the process of relaunching Erythromycin solution. *Id.* at 869. On August 8, 2012, Wesolowski called Polman, and the call lasted for five minutes. ECF No. 961-1 at 237. Immediately after this call, Polman called Bihari for the first time, and Bihari called Polman back a few minutes later. *Id.*; ECF No. 1029-1 ¶ 340. Sandoz relaunched Erythromycin on August 16, 2012. ECF No. 1080-1 ¶ 471. Bihari and Polman continued to exchange calls in August and September 2012 after Sandoz's launch. ECF No. 950-1 at 138, 166. As discussed in the Perrigo ruling, "Bihari testified that Sandoz and Perrigo had an agreement on Erythromycin solution whereby Perrigo provided Sandoz with pricing information that Sandoz could use to bid for the business of Cardinal, one of Perrigo's customers, and that Perrigo agreed not to defend the customer." *Sandoz, Inc.*, 2026 WL 2268225, at *6. "Bihari also testified that as a result of this agreement, Sandoz was able to obtain Cardinal's business 'at a higher price than normal.'" *Id.* (quoting ECF No. 964-1 at 872).

The evidence shows that Wesolowski called Polman immediately before Polman called Bihari for the first time and began communications that led to an anticompetitive agreement on Erythromycin. A jury could reasonably infer from the timing of this call that Wesolowski instructed Polman to call Bihari and further that when Polman communicated with Bihari during

this time, he was doing so at the behest of Wesolowski. This evidence, particularly when viewed in the context of the evidence that links Wesolowski to Polman's earlier communications with Fougera, is sufficient for a reasonable jury to infer that Wesolowski more likely than not participated in the alleged conspiracy between Perrigo and Sandoz on Erythromycin solution. *Matsushita*, 475 U.S. at 588.

d. Promethazine

In the Perrigo ruling, I discussed evidence of call records that suggested that G&W's Erika Vogel-Baylor and Perrigo's Polman frequently used Thomassey—after he left Fougera and worked for Aurobindo—as a "conduit" for collusive efforts between the companies, including on Promethazine. *Sandoz, Inc.*, 2026 WL 2268225, at *10–12. I concluded that, based on this evidence, "a reasonable jury could find it is more likely than not that Perrigo conspired with G&W on . . . Promethazine." *Id.* at *33. The evidence also suggests that Wesolowski was aware of and participated in the Promethazine conspiracy.

In August 2012, Actavis, G&W, and Perrigo were the only generic suppliers of Promethazine. ECF No. 1029-1 ¶ 230. On September 19, 2012, Actavis announced that it was nearly tripling its WAC prices on the product. ECF No. 1029-1 ¶ 231. On the same day, Polman called Actavis's Michael Dorsey, and the call lasted eleven minutes.[9] ECF No. 961-1 at 237. At about the same time,[10] G&W's Vogel-Baylor called Thomassey, who called her back soon

[9] The States also allege that the competitors colluded on Halobetasol on the September 19, 2012 calls. ECF No. 196 ¶ 1510. I discuss Halobetasol separately below. *See infra* Section II.B.5.

[10] The States provided summaries of the call records discussed in this paragraph in two different formats. The times of the calls listed on these summaries denote different hours, but the minutes are generally consistent in each, as are the durations of the calls. *Compare* ECF No. 944-1 at 143 (listing a four-minute call from Thomassey to Polman at "21:54:00" with the "UTC" time zone and "17:54:00" using the "EST" time zone) *with* ECF No. 961-1 at 237 (listing a four-minute call between the same people with a "Provider Time" of "16:54:00"). I assume the difference is attributable to the time zones used by the call records themselves. But even if the calls in these

afterward. ECF No. 944-1 at 143. Immediately after speaking with Vogel-Baylor, Thomassey called Polman, who had just ended his call with Dorsey, and they spoke for four minutes. *Id.*, ECF No. 961-1 at 237. Thomassey then immediately called Vogel-Baylor, and after that call Thomassey immediately called Polman. ECF No. 944-1 at 143; ECF No. 961-1 at 237. After this last call between Polman and Thomassey, Polman immediately made the first of two calls to Wesolowski. ECF No. 961-1 at 237. While Polman was speaking with Wesolowski, Thomassey again called Vogel-Baylor. ECF No. 944-1 at 143. Polman immediately called Thomassey after speaking with Wesolowski. ECF No. 961-1 at 237. After his call with Polman, Thomassey made a final call to Vogel-Baylor, who then called G&W president Kurt Orlofski. ECF No. 944-1 at 143. Thomassey testified that he, Vogel-Baylor, and Polman "were coordinating market share and price on products" on their calls on September 19, 2012. ECF No. 965-1 at 415.

Even though Polman's two calls to Wesolowski on September 19 are the only calls involving Wesolowski that the States allege are related to Promethazine, their presence amid a flurry of calls between all competitors on the same day that Actavis increased its prices strongly suggests that Wesolowski was aware of and participated in the conspiracy that ensued. *See United States v. Huezo*, 546 F.3d 174, 180 (2d Cir. 2008) (noting, in the criminal conspiracy context that "a single act may be sufficient for an inference of involvement" in a conspiracy "if the act is of a nature justifying an inference of knowledge of the broader conspiracy"). A reasonable jury could infer that Wesolowski more likely than not participated in the alleged conspiracy between Perrigo and its competitors on Promethazine. *Matsushita*, 475 U.S. at 588.

---

summaries did not occur in the exact order described here, the fact that they all took place on the same day as Actavis's price increase is sufficient to establish the interfirm communications plus factor. *See In re Generic Pharms. Pricing*, 2025 WL 2483981, at *16.

e. Desonide Ointment

While I granted summary judgment to Perrigo on claims of a Desonide ointment conspiracy related to price increases in April and May 2013, Perrigo did not seek summary judgment on claims that it conspired with Sandoz or Taro later in 2013. Wesolowski moves for summary judgment on all claims against him. In a 2020 Deferred Prosecution Agreement ("DPA") with the DOJ, Sandoz admitted to fixing prices for "certain generic drugs, including desonide ointment" with Perrigo, beginning in July 2013. ECF No. 963-1 at 240, 257; ECF No. 549-4 at 4 (Sandoz identifying "Company B" as Perrigo). This is enough at least to create a genuine dispute about Perrigo's participation in a Desonide ointment conspiracy as of July 2013. The circumstantial evidence also suggests that Wesolowski participated in the conspiracy.

On August 8, 2013, Perrigo's Polman exchanged two calls with Actavis's Dorsey. ECF No. 947-1 at 212. Immediately after their second call, Polman called Wesolowski. *Id.* On August 20, 2013, personnel at Perrigo, including Wesolowski, sent internal emails discussing Actavis's recent announcement as the new authorized generic supplier of Desonide cream and ointment. *See* ECF No. 965-1 at 1883–86.[11] The next day, on August 21, 2013, Wesolowski called Polman, and later that day, Polman exchanged three calls with Actavis's Dorsey, with the last call lasting sixteen minutes. ECF No. 947-1 at 214. The next day, August 22, Wesolowski called Polman again and the call lasted six minutes. *Id.* One day later, on August 23, Wesolowski called Polman again and the call lasted thirteen minutes. *Id.* Immediately after getting off the phone with Wesolowski, Polman called Dorsey and the call lasted for two minutes. *Id.* Less than an hour later, Dorsey called Polman and the call lasted for ten minutes. *Id.* A reasonable jury could infer from the

[11] The States referenced these emails during Wesolowski's deposition, but the emails do not appear to have been included in the summary judgment record.

timing of these calls that Polman was keeping Wesolowski abreast of developments in the market and that Polman passed on information or instructions from Wesolowski to Actavis.

On January 16, 2014, Sandoz's Bihari called Perrigo's Polman and the call lasted ten minutes. ECF No. 961-1 at 214. Sandoz planned to relaunch Desonide ointment the next day. ECF No. 964-1 at 932. Polman and Bihari spoke again on January 21, 22, and 24. ECF No. 947-1 at 221. Immediately after his call with Bihari on January 24, Polman called Wesolowski. *Id.* Wesolowski also called Polman later that afternoon, and their call ended about five minutes before Bihari and Polman exchanged the first of two more calls. *Id.* Also on January 24, 2014, Bihari called Taro's Aprahamian and the call lasted for twenty-two minutes. ECF No. 964-1 at 172, 933. Bihari took contemporaneous notes on these calls that listed prices for specific Desonide ointment customers that Perrigo and Taro agreed to give to Sandoz. ECF No. 950-1 at 77; ECF No. 964-1 at 934–35 (Bihari testifying that Polman and Aprahamian gave him this information). In the days that followed, Sandoz submitted bids to these obtain these customers, and Sandoz's launch was successful, Bihari testified. ECF No. 964-1 at 935.

The evidence suggests that Wesolowski spoke with Polman immediately following or prior to calls that Polman made to a competitor, during which Polman provided competitive information that the firms used to control pricing and allocate customers. Moreover, Sandoz admitted to colluding with Perrigo on this drug. ECF No. 963-1 at 240, 257; ECF No. 549-4 at 4. A jury could reasonably infer from this evidence that Wesolowski more likely than not participated in the alleged conspiracy between Perrigo and its competitors on Desonide ointment. *Matsushita*, 475 U.S. at 588.

f. Clindamycin

Although I found above that Wesolowski's 2014 calls with Greenstone were not probative of his involvement in a conspiracy, a call he had with Polman seven months earlier does suggest

he participated in a Clindamycin conspiracy between Perrigo, Sandoz and Taro. In the Taro ruling, I found that "[t]he timing and volume of interfirm communications are enough to warrant" a reasonable inference "that the competitors colluded to minimize price disruptions upon Taro's, Perrigo's, and Sandoz's entries into the Clindamycin market." ECF No. 1410 at 120; *see also Sandoz, Inc.*, 2026 WL 2268225, at *34 (adopting this reasoning in the Perrigo ruling).

In so finding, I noted evidence that Perrigo's Polman exchanged sixteen calls with Sandoz's Bihari in August 2013 and more in September leading up to Perrigo's September 9, 2013 launch of Clindamycin. ECF No. 1410 at 32–33 (citing ECF No. 949-1 at 21; ECF No. 961-1 at 217–18, listing calls between Polman and Bihari on August 1, 6, 12, 14, 15, and 28). Immediately prior to one of these calls, on August 14, 2013, Wesolowski called Polman. ECF No. 961-1 at 237. Polman then called Bihari, and after this immediately called Wesolowski. *Id.* Although each of these calls lasted only about one minute, the presence of calls with Wesolowski immediately before and after calls with a competitor is sufficient for a reasonable jury to infer that Wesolowski was aware of the nature of Polman's ongoing communications with a competitor. Further supporting this inference is that Wesolowski and Polman both took part in a meeting of the Perrigo sales team about launching Clindamycin on August 28, 2013, while call records indicate that on the same day Bihari spoke on the phone with Taro's Aprahamian for fifteen minutes and then with Perrigo's Polman for fourteen minutes. ECF No. 949-1 at 21; ECF No. 952-1 at 590; *see* ECF No. 1410 at 119 (citing evidence that "on August 28, 2013, when Perrigo held an internal meeting about its launch of Clindamycin, . . . all the players involved communicated with someone from each competitor"). A jury could reasonably infer from this evidence that Wesolowski more likely than not participated in the alleged conspiracy between Perrigo and its competitors on Clindamycin. *Matsushita*, 475 U.S. at 588.

g. Cal Beta Dip

As noted above, Sandoz's Bihari testified that he called Polman on March 4, 2014 to discuss Sandoz's upcoming launch of Cal Beta Dip ointment, and that Polman "shared [Perrigo's] contract pricing . . . with Sandoz first, and Sandoz built their pricing from there to ensure that they would be at parity." ECF No. 964-1 at 951. The call records indicate that Polman was also communicating with Wesolowski on March 4, 2014. ECF No. 946-1 at 209. Polman started the day by calling Wesolowski at 8:46 a.m., and the call lasted for eleven minutes. *Id.* About fourteen minutes later, Polman called Bihari, and the call lasted about one minute. *Id.* That afternoon, Bihari made four calls to Polman for a total of about nine minutes. *Id.* A little more than one hour after the third of these calls with Bihari, Polman called Wesolowski, and the call lasted for about one minute. *Id*. Bihari called Polman again about eighteen minutes later, and the call lasted for about two minutes. *Id.* Immediately after speaking to Bihari, Polman called Wesolowski, and the call lasted for about two minutes. *Id.* On the same day, Bihari sent an internal email that he "[h]eard from a customer today that Perrigo will be the [authorized generic]" supplier for Cal Beta Dip ointment. ECF No. 946-1 at 207. Bihari testified that both Sandoz and Perrigo were preparing to launch the product at the same time. ECF No. 964-1 at 951.

On Tuesday, March 18, 2014, Bihari called Polman and the call lasted for eleven minutes. ECF No. 947-1 at 194. One minute later, Wesolowski called Polman, and they spoke for twelve minutes. *Id.* That afternoon, Bihari took part in a meeting regarding Sandoz's customer targets for its Cal Beta Dip launch. ECF No. 964-1 at 953. Soon after this meeting, Bihari and Polman exchanged four more calls. ECF No. 947-1 at 194. Bihari testified that on these calls he and Polman made changes to the "customer alignment" for Cal Beta Dip, and that he discussed these changes with Sandoz's Michael Vezza, Sandoz's pricing team manager. ECF No. 964-1 at 952–53. According to Bihari, Vezza was in the room for some of the calls between Bihari and Polman.

*Id.* at 953. About 20 minutes after the latest call between Polman and Bihari, Wesolowski called Polman, and that call lasted for eight minutes. ECF No. 947-1 at 194. Immediately after ending his call with Wesolowski, Polman called Bihari again; after speaking with Bihari for four minutes, Polman immediately called Wesolowski. *Id.* Bihari testified that on his calls that day, Polman proposed customers that Sandoz should send offers to and provided him with pricing information that would enable Sandoz's offers to be successful. ECF No. 964-1 at 954.

Two days later, on Thursday, March 20, 2014, Wesolowski emailed Perrigo sales representative Katie McCormack about the status of orders on Cal Beta Dip. ECF No. 946-1 at 211. In response, McCormack asked, "Am I correct that we are only going after the 6 accounts mentioned from the call on Friday?" *Id.* Wesolowski responded: "That changed on Tuesday." *Id.* When McCormack asked "[w]hat changed on Tuesday," Wesolowski instructed her to ask her boss, Polman. *Id.*; *see* ECF No. 965-1 at 1875 (Wesolowski identifying Polman as McCormack's "boss"). Also on March 20, Polman again called Bihari and then immediately called Wesolowski. ECF No. 947-1 at 196. Then on March 31, 2014, Polman called Wesolowski, and then immediately called Bihari. *Id.* at 200

When asked about these events during his deposition, Wesolowski declined to speculate about the topic of any conversation between Bihari and Polman. ECF No. 965-1 at 1874. He also testified that he "was not aware at the time that [Bihari and Polman] were making those phone calls." *Id.* at 1876. The immediate proximity of Wesolowski's calls with Polman before or after Polman's calls with Bihari would allow a reasonable juror to reject Wesolowski's testimony as not credible. A jury could reasonably infer from the call records that, contrary to his testimony, Wesolowski was aware of the collusive nature of Polman's calls with Bihari. This inference is strengthened by Wesolowski's emails with McCormack, in which he confirmed that Sandoz's

customer targets changed on March 18, the same day that Bihari testified that he and Polman were allocating customers for Cal Beta Dip. And because Wesolowski "exercised final authority" regarding Perrigo's customer targets, ECF No. 1035-1 ¶ 1, a jury could reasonably infer that his calls with Polman included instructions and guidance that Polman and Bihari used in determining which customers Sandoz and Perrigo should pursue. Finally, a jury also could infer from Wesolowski's cryptic message to McCormack to ask Polman about the changes in Perrigo's customer targets, that Wesolowski was reluctant to create a written record of the reasons why Perrigo's targets changed. *See, e.g.*, ECF No. 964-1 at 828–29 (Bihari testifying that he discussed pricing with competitors over the phone instead of over email because "there's really no record of it" and avoiding a record would "mask that conversation;" and testifying that on one occasion Perrigo's Polman was "upset" and "irritated" that Bihari had left him a voicemail).

A jury could reasonably infer from this evidence that Wesolowski more likely than not participated in the alleged conspiracy between Perrigo and Sandoz on Cal Beta Dip. *Matsushita*, 475 U.S. at 588.

h. Hydrocortisone Acetate

In June 2013, both Perrigo and G&W planned to increase their prices on Hydrocortisone acetate after their only other competitor exited the market. *Sandoz, Inc.*, 2026 WL 2268225, at *19; ECF No. 1029-1 ¶ 255. On July 2, 2013, G&W began notifying customers that it was increasing its WAC prices. ECF No. 944-1 at 185-86. On July 8, 2013, G&W's Vogel-Baylor and Perrigo's Polman exchanged calls, including one that lasted about seven and a half minutes at 2:09 p.m. ET. ECF No. 944-1 at 137; ECF No. 933-2 at 2522. Immediately after her call with Polman, Vogel-Baylor called G&W president Orlofski in a call lasting over six minutes, and she then called G&W executive Aaron Greenblatt in a call lasting about seven and a half minutes. *Id.* Polman then called Wesolowski at 2:35 p.m. ET and the call lasted one minute. ECF No. 933-2

at 2522. About one hour later, Polman called Wesolowski again, and the call lasted for six minutes. *Id.* Fifty minutes after this, Polman made a third call to Wesolowski that lasted one minute. *Id.*

The next day, July 9, 2013, Perrigo notified its customers that it was increasing its Hydrocortisone acetate price from $7.20 to $41.30, essentially matching G&W's new price of $41.97, which went into effect the same day. ECF No. 961-1 at 102.

Polman told federal investigators that he and Vogel-Baylor called each other in 2013 and agreed to follow a price increase on Hydrocortisone acetate. ECF No. 959-1 at 269. Polman also "stated the price increase worked. G&W did not take any of Perrigo's customers, and he did not recall taking any of G&W's customers, consistent with their agreement." *Id.*

Again, a jury could reasonably infer from the timing of Polman's call to his boss so soon after speaking to a competitor, and one day before Perrigo followed that competitor's price increase on Hydrocortisone acetate, that Wesolowski was aware of and approved Polman's conduct. Polman's statement to investigators that he discussed the price increase with G&W's Vogel-Baylor strengthens this reasonable inference. A jury could thus reasonably infer from this evidence that Wesolowski more likely than not participated in the alleged conspiracy between Perrigo and G&W on Hydrocortisone acetate. *Matsushita*, 475 U.S. at 588.

i. Tacrolimus

As described above, for Tacrolimus, Sandoz's Bihari testified that he and Polman sought to use the same customer allocation strategy that they had applied months earlier with Cal Beta Dip. ECF No. 964-1 at 958–59. The call records suggest that Wesolowski was similarly involved through calls with Polman that occurred immediately before or after Polman's calls with Bihari.

On August 13, 2014, a Sandoz employee sent an internal email to Bihari and others noting that patent exclusivity on Tacrolimus would be ending in September, at which point generics suppliers could launch the product. ECF No. 949-1 at 76. The email asked the recipients to

"forward competitive intelligence" about "whether any other competitors will enter the market." *Id.* Bihari then called Polman and the call lasted for sixteen minutes. ECF No. 961-1 at 237. Two minutes after this call ended, Polman called Wesolowski, and the call lasted for three minutes. *Id.* at 238. Bihari then told his Sandoz colleagues that "[m]arket intel indicates there will be an [authorized generic supplier] and it will be Perrigo." ECF No. 949-1 at 76. A jury could reasonably infer from the timing of the August 13 calls that Wesolowski and Polman discussed that Perrigo and Sandoz would again be entering a situation where the two firms would be launching the product at the same time, as they had on Cal Beta Dip, and thus should follow a similar allocation strategy.

On November 10, 2014, Wesolowski asked the Perrigo sales team, including Polman, to confirm information from a customer that "they" (presumably Sandoz) were launching Tacrolimus that day. ECF No. 960-1 at 836. Polman called Wesolowski, and the call lasted one minute. ECF No. 961-1 at 238. Immediately after this call, Polman and Bihari exchanged three calls over the span of five minutes. *Id.* Immediately after the third call, Polman called Wesolowski again, and the call lasted for five minutes. *Id.* Immediately after this call, Bihari called Polman. *Id.* After the call with Bihari, Polman immediately called Wesolowski again. *Id.* Later that afternoon, Polman responded to Wesolowski's email, writing "[m]y customer says they are not shipping[.]" ECF No. 960-1 at 836.

A reasonable jury could infer from Bihari's testimony that he and Polman utilized the same customer allocation strategy from Cal Beta Dip, and that in both instances Wesolowski spoke with Polman immediately before or after Polman's calls with Bihari, and was aware of and approved Perrigo's efforts to allocate customers for Tacrolimus. This is sufficient for a reasonable jury to infer that Wesolowski, as he did on Cal Beta Dip, more likely than not participated in the alleged

conspiracy between Perrigo and Sandoz on Tacrolimus. *Matsushita*, 475 U.S. at 588.

j. Bromocriptine

In the ruling on Mylan's motion for summary judgment, I described evidence of an anticompetitive agreement between Perrigo and Sandoz on Bromocriptine in 2014. *Connecticut v. Sandoz, Inc.*, 2026 WL 75851, at *5–6. Specifically, I noted that Sandoz doubled its Bromocriptine price in April 2013, but that Perrigo, which was experiencing supply issues, did not follow the price increase. *Id.* at *5. Then, in July 2014, Sandoz's Vezza initially proposed accepting a customer's request to reduce Sandoz's Bromocriptine price to match Perrigo's price, but Bihari testified that he spoke with Polman, who told him that Perrigo was "not going to touch any of Sandoz's customers. They were going to leave them alone." *Id.* at *6. Sandoz then reversed course and did not reduce its price. *Id.* Bihari testified that Sandoz "absolutely" had an agreement with Perrigo that Perrigo would "follow Sandoz's price increase, to ensure that their pricing [was] at parity with Sandoz, and not to touch any of Sandoz's market share even though it took well over . . . a year for them to follow." *Id.*

Perrigo eventually increased its WAC price to match Sandoz's price on October 8, 2014. *Id.* Less than a week before this change, on October 2, Bihari called Polman and the call lasted for seven minutes. ECF No. 961-1 at 238. Immediately after hanging up with Bihari, Polman called Wesolowski's office line and the call lasted about one minute. *Id.* Thirteen minutes later, Wesolowski used his cell phone to call Polman, and this call lasted sixteen minutes. *Id.*

Based on the close proximity of Polman's calls to both Bihari and Wesolowski less than a week before Perrigo's Bromocriptine price increase, the evidence of Polman and Bihari's ongoing collusion on Bromocriptine, and Bihari's testimony that Perrigo's increase was a result of an anticompetitive agreement, a jury could reasonably infer that Wesolowski more likely than not participated in the alleged conspiracy on Bromocriptine. *Matsushita*, 475 U.S. at 588.

* * *

As I found in the Perrigo ruling, the evidence suggests that for the ten drugs discussed above, Wesolowski had "final authority to make pricing decisions," Polman "relayed regular reports about competitors' pricing and production directly to" Wesolowski, and "Wesolowski was aware of the price information exchange and considered the data obtained by Polman." *Sandoz, Inc.*, 2026 WL 2268225, at *26 (citing *In re Static Random Access Memory (SRAM) Antitrust Litig.*, No. 07-MD-1819, 2010 WL 5138859, at *6 (N.D. Cal. Dec. 10, 2010); *Rosefield v. Falcon Jet Corp.,* 701 F. Supp. 1053, 1064 (D.N.J. 1988)) (internal quotation marks and citations omitted). A reasonable jury could find based on this evidence that Wesolowski participated in these alleged conspiracies. Thus, Wesolowski's motion is DENIED as to Imiquimod, Adapalene cream, Erythromycin, Promethazine, Desonide ointment, Clindamycin, Cal Beta Dip, Hydrocortisone acetate, Tacrolimus, and Bromocriptine.

4. <u>Perrigo's Broad Agreement with Fougera and Sandoz</u>

As described in the previous section, the pattern of Wesolowski's communications with Polman in close proximity to Polman's calls with representatives of Fougera and Sandoz and developments in ten specific drug markets is sufficient to link Wesolowski to the alleged conspiracies in those markets. But the States identify no such calls that similarly link Wesolowski to the alleged conspiracies on Beta Dip, Ciclopirox shampoo and solution, Econazole (2014 price increase), Fluocinonide, Fluticasone, Halobetasol, Hydrocortisone acetate, Methazolamide, Nystatin ointment, or Triamcinolone. Nevertheless, the States argue that the evidence "supports a finding that Wesolowski participated in *all* the Perrigo Conspiracies *at all times.*" ECF No. 1035 at 11.

Among the evidence that the States cite to support this argument is testimony from cooperating witnesses that Perrigo had broad agreements with Fougera and with its successor

Sandoz that encompassed all drugs on which they competed. As discussed in the ruling on the overarching conspiracy, Thomassey testified that, although he reached agreements with competitors on a "product-by-product" basis, Fougera had a "higher overarching agreement" with Perrigo. *Sandoz, Inc.*, 2025 WL 3470502, at *8.[12] As noted in that ruling:

> With Perrigo, Thomassey said, "there was the higher overarching agreement that, yeah, we were going to call. There was -- they were going to call us, I was going to call them when a [product] launch was happening, when we knew we were going to have product X, Y, or Z." This agreement—to call each other and "discuss the product and the customers and figure out allocations and pricing"—applied when either Fougera or Perrigo planned to enter any market for "cross competing products." "At a high level it would be on all products where we cross competed. But then there would be specific conversations regarding each product when that situation arose." "If Perrigo has an item and I'm launching -- entering the market[,] I would call Tony [at Perrigo] and say, hey, we're launching, who should I go after and where are you at, roughly, or vice versa."

*Id.* (record citations omitted). Bihari, who frequently communicated with Polman after Sandoz acquired Fougera and Thomassey left the company, also testified about an agreement between Perrigo and Sandoz that encompassed all drugs on which they competed:

> Essentially Tony Polman would provide pricing information as needed with the expectation that I would share that with Sandoz. And if it's a price increase, they would follow the price increase to the same levels, if Sandoz is launching a product, that Sandoz would be diligent in their market share and their pricing, and if Perrigo and Sandoz were launching at the same time, you know, they would launch at similar price points so as not to create disruption in the market and to allocate or split the customers accordingly.

ECF No. 964-1 at 1019. And Vezza, who managed the Sandoz team that reviewed offers to

---

[12] Thomassey's testimony about an "overarching agreement" between Fougera and Perrigo should not be confused with the States' allegations that all corporate Defendants in this action participated in an "overarching conspiracy" encompassing all drugs at issue in this case. *See* ECF No. 965-1 at (Thomassey testifying that "overarching [would] be an appropriate way to describe the agreement between Fougera and Taro" because it "applied to all cross competing drugs" between the two companies). The broad two-firm agreements that Thomassey described may be elements of the alleged industry-wide conspiracy, but that is not at issue in this motion. The States do not assert similar industry-wide "overarching conspiracy" claims against individual defendants like Wesolowski.

customers, testified that Sandoz incurred less risk when it led a price increase on a product on which it competed with Perrigo, ECF No. 965-1 at 1068, because of the companies' "collusive relationship[]," which "gave us the confidence . . . that a particular price increase would be more successful," *id*. at 943. As this testimony of the participants in the alleged conspiracy is "surely strong evidence of a collusive scheme" that tends to exclude independent conduct, *Publ'n Paper*, 690 F.3d at 64, a reasonable jury could find that Perrigo indeed had an agreement that encompassed each drug on which it competed with Fougera or Sandoz.

To determine which drugs the broad agreement encompassed, however, it is necessary to establish its duration. Although Thomassey could not identify a date that Fougera's broad agreement with Perrigo began, he testified that he and Polman agreed that they would call each other to "discuss the product and the customers and figure out allocations and pricing" before 2010 and as early as 2006 or 2007. ECF No. 965-1 at 545, 547. As this period predates the alleged collusive period for the conspiracies in this case, and Thomassey did not suggest that the Fougera-Perrigo agreement he described abated at any point, a reasonable jury could find that Perrigo and Fougera more likely than not had a broad anticompetitive agreement in place that encompassed all of the drugs at issue on which they cross-competed. The jury could also infer, based on the similar pattern of communications that Polman had with Thomassey and then Bihari, that this same agreement remained in place after Sandoz acquired Fougera in mid-2012 and Bihari took over Thomassey's role as Polman's contact. *See, e.g.*, ECF No. 964-1 at 833 (Bihari testifying that he called Thomassey for Polman's number because he knew about their past communications).

Based on the evidence of communications described in the Perrigo ruling, a jury could reasonably infer that the agreement lasted at least through the conduct related to Methazolamide in December 2014. *Sandoz, Inc.*, 2026 WL 2268225, at *9; *see Drug Mart Pharmacy Corp. v.*

*Am. Home Prods. Corp.*, 288 F. Supp. 2d 325, 329 (E.D.N.Y. 2003) ("[A] defendant's participation in the conspiracy is presumed to continue until the last overt act by any of the conspirators" absent "affirmative evidence of withdrawal."). While there is no evidence that Perrigo or Sandoz formally withdrew from the broad agreement, however, there is evidence that Sandoz began to sour on its agreement with Perrigo by late 2015. Bihari testified that Sandoz and Perrigo had an agreement on Fluocinonide .1% cream whereby "Perrigo would relinquish market share upon Sandoz's reentry in the market" in September and October 2015. ECF No. 964-1 at 1001; ECF No. 1029-1 ¶ 182 (noting Sandoz made offers to a Perrigo customer on October 1 and 5, 2015). But Vezza testified that by this time, there had been "some missteps with some of the information that [Bihari] was providing us [that he obtained] from Perrigo. And there was a window of time, I think, before that where [Sandoz executive] Armando [Kellum] and I were kind of like is what he is giving us any good. Is this a waste of time." ECF No. 965-1 at 915. Once the information that Bihari obtained from Perrigo started to become "useless," Vezza testified, "that was kind of like the beginning of the end." *Id.* at 915–16. Vezza testified that he believed he then told Bihari to stop communicating with competitors as "it's a waste of time." *Id.* at 916; *see also* ECF No. 964-1 at 1009 (Bihari testifying that "[s]ometime in late 2015," Vezza had told him "don't get [competitor] information for me"); *id.* at 1097 (Bihari testifying that Vezza expressed at some point between June and the fall of 2015 that he "wanted to stay distanced from" competitor information). Bihari testified he continued to have "minimal" communications with competitors about pricing after his 2015 conversation with Vezza until he was contacted by a member of the federal government in March 2016. ECF No. 964-1 at 1009–11.

This testimony is consistent with the evidence related to the States' claims regarding a December 2015 customer-allocation agreement on Econazole, where the evidence suggests that

Perrigo—in contrast to its earlier interactions with Sandoz—defended its customers following bids from Sandoz. *See Sandoz, Inc.*, 2026 WL 2268225, at *36 (granting summary judgment to Perrigo as "a reasonable jury could not find that Perrigo and Sandoz more likely than not agreed to allocate customers on Econazole upon Sandoz's reentry to the market in 2015"). In this instance, Vezza testified that Sandoz's relaunch was largely unsuccessful, as Sandoz "got blocked everywhere" and "didn't have an understanding of where the market was." ECF No. 965-1 at 917. This suggests that, even if I were to credit the States' allegation that Polman and Bihari discussed Econazole customers on their calls on December 16, 2015, ECF No. 1029-1 ¶ 113, neither Perrigo nor Sandoz believed their agreement had the same all-encompassing scope as it once did.[13] A reasonable jury could find that the September and October 2015 Fluocinonide calls were the last communications in furtherance of the broad Perrigo-Sandoz agreement, and that the broad agreement no longer encompassed every drug on which they competed by December 2015.[14]

Now back to Wesolowski. Conduct related to each of the remaining individual-drug conspiracies involving Fougera or Sandoz in which the States allege Wesolowski participated occurred between 2010 and September 2015, a period in which a jury could reasonably infer that the broad agreement between Perrigo and Fougera and Sandoz was in place. These drugs are Beta

---

[13] In the Perrigo ruling, I found that the evidence, including the December 16 calls, was "not sufficient to suggest that Perrigo ceded the customer as a result of an agreement with Sandoz." *Sandoz, Inc.*, 2026 WL 2268225, at *36.

[14] This statement is limited to the agreement encompassing all drugs between Perrigo and Fougera/Sandoz to which Thomassey and Bihari testified and should not be construed as finding that Perrigo withdrew from all conspiracies with Sandoz or from the States' alleged "overarching conspiracy" as of this date. As discussed in the statutes of limitations ruling, "the States have raised a genuine factual dispute about whether multiple Defendants continued to conduct business in accordance with the 'fair share' scheme established by the earlier alleged collusion to avoid erosion of the supracompetitive prices" and that "a reasonable juror could . . . find[] that the Defendants continued to further the bid-rigging conspiracies after communications ended." *Connecticut v. Sandoz, Inc.*, 20cv802, 2025 WL 3043397, at *10 (D. Conn Oct. 31, 2025).

Dip (2011, *see supra* Section II.A.2), Ciclopirox shampoo (2012, *see Sandoz, Inc.*, 2026 WL 2268225, at *5), Ciclopirox solution (2013, *see id.* at *12), Fluocinonide (September 2015, *see id.* at *6), Fluticasone (2013, *see id.* at *17–18), Methazolamide (2014, *see id.* at *7–8), Nystatin ointment (2011–12, *see id.* at *9), and Triamcinolone (2010, *see id.* at *10). Wesolowski admits that he alone "exercised final authority for Perrigo's generic drug sales and marketing decisions, including the levels of its WAC and AWP prices, the customers to which Perrigo would offer to sell its products, the terms of those offers, and whether and to what extent Perrigo would respond to right of first refusal requests (ROFRs) received from existing customers." ECF No. 1035-1 ¶ 1; *see also* ECF No. 1515 at 6 (noting that Wesolowski's boss, Douglas Boothe, testified that "he was not always involved in 'pricing actions,' which were overseen by . . . Wesolowski"); *Sandoz, Inc.*, 2026 WL 2268225, at *25 ("Even if Perrigo's competitors perceived that Polman lacked the ultimate authority to change prices, a reasonable jury could infer that the competitors knew that Polman would pass on the information obtained pursuant to their agreement to [Wesolowski]").[15] And as the evidence described above suggests, Wesolowski frequently spoke with Polman, his direct report, immediately before or after Polman's collusive interfirm communications with Fougera's Thomassey or Sandoz's Bihari on ten other drugs through this period. Given Wesolowski's role as the "final authority" for Perrigo, and given the evidence that Polman's

[15] Wesolowski repeatedly asserts that each decision he made was "based solely on his best judgment about what was in the independent business interests of Perrigo." *See, e.g.*, ECF No. 1035-1 ¶ 55. The States dispute this and contend that Wesolowski's decisions "were *also* based on pricing, customer, and other competitively sensitive information exchanged and agreements reached with competitors." *Id.* The extent to which Wesolowski's "best judgment" was influenced by information obtained from competitors is a dispute of fact to be decided by the jury. At summary judgment, the evidence of call logs, emails, and witness testimony tends to exclude the possibility that Wesolowski was acting independently as to those drugs identified in this ruling. *Matsushita*, 475 U.S. at 588.

communications with competitors correlated closely with parallel conduct,[16] a reasonable jury could infer that Wesolowski must have approved the market action Perrigo took based on Polman's input, even without specific evidence of calls between Polman and Wesolowski proximate in time to Polman's interfirm communications. Further strengthening the inference that Wesolowski was aware of and approved of the scope of Perrigo's broad agreement with Fougera/Sandoz is Thomassey's testimony that Wesolowski personally told him at a trade meeting that Thomassey and Polman were "doing a good job, keep it up." ECF No. 965-1 at 403–04; *see also id.* at 404 (Thomassey testifying that Wesolowski was lying when he denied knowing anything about his communications with Polman).

When viewing all of the evidence as a whole and drawing all reasonable inferences in favor of the States, I find that a reasonable jury could find that Wesolowski participated in the alleged conspiracies that were part of the broad agreement between Perrigo and Fougera or Sandoz: Beta Dip, Ciclopirox shampoo and solution, Fluocinonide, Fluticasone, Halobetasol cream (2013–14 customer allocation with Sandoz), Methazolamide, Nystatin ointment, and Triamcinolone. Wesolowski's motion is DENIED as to those drugs.

5. Claims With No Evidence of Wesolowski's Involvement

The States lack evidence of Wesolowski's involvement in price-fixing claims regarding Econazole in 2014 or on Halobetasol in 2012 or 2013. For these claims, the States do not allege that Perrigo conspired to raise prices with Sandoz, and thus these claims are not part of the broad

[16] *E.g.*, *compare* ECF No. 1029-1 ¶ 294 ("On July 21, and July 29, 2010, Perrigo announced successive WAC increases for all its triamcinolone cream and ointment products[.]"), *with* ECF No. 951-1 at 15 (phone records summary showing calls from Fougera's Thomassey to Perrigo's Polman on July 21, 22, 29, and 30, 2010) *and* ECF No. 965-1 at 360 (Thomassey testifying that he and Polman agreed on these calls to "not cannibalize each other's business" on Triamcinolone); *see also Sandoz, Inc.*, 2026 WL 2268225, at *9 (describing Thomassey's testimony that he and Polman discussed a list of Nystatin ointment customers as Fougera planned to return to the market, and that Perrigo "conceded" two customers to Fougera the following month).

agreement between Perrigo and Sandoz, under which the companies' ongoing "collusive relationship[]" provided "confidence . . . that a particular price increase would be more successful." ECF No. 965-1 at 943. Moreover, Perrigo's conduct in relation to these claims does not fit with Wesolowski's alleged role at the company, which the States argue was "to direct and encourage communications with competitors" and "to make decisions based on information obtained from and agreements reached with the competitors." ECF No. 1035 at 15. For Econazole in 2014 and Halobetasol in 2012, Perrigo decided to increase its prices *before* any interfirm communications with its competitor.

As discussed in the Taro ruling, Perrigo's pricing committee considered raising its WAC price for Econazole in April 2014, with plans to implement the increase in July. ECF No. 1014 at 43. The only evidence that Perrigo communicated with competitors before the price increase went into effect are calls that Boothe had with Taro executive Michael Perfetto in June and July 2014; Polman only had brief calls with the other competitor in the market, Teligent, *after* the price increase went into effect. *Id.* at 44, 46. The States point to no evidence that on these occasions Wesolowski had knowledge of any anticompetitive agreement that could have affected his decision in determining Perrigo's pricing in April 2014, or that he was later involved in directing Polman to communicate with Teligent.

For Halobetasol cream and ointment (before Sandoz entered the cream market), the States contend that Perrigo and G&W both announced price increases on September 25, 2012, six days after Polman and G&W's Vogel-Baylor exchanged multiple calls on September 19 with Thomassey, who was acting as a "conduit," and that Polman then spoke with Wesolowski.[17] ECF

[17] The States also allege the competitors exchanged information about Promethazine on these same calls, as discussed above. *See* ECF No. 196 ¶ 1510. The evidence that these calls concerned Promethazine is more robust than the alleged links to Halobetasol. *See Sandoz, Inc.*, 2026 WL

No. 1029-1 ¶ 222; ECF No. 1035-1 ¶ 91. But Wesolowski signed off on Halobetasol price increases to certain customers as early as September 12, 2012. ECF No. 943-5 at 915, 920. Wesolowski's decision to increase Perrigo's price thus could not have been impacted by Polman's later calls.

The States also contend that Perrigo's decision on March 25, 2013, to increase its Halobetasol price a second time was influenced by calls that Boothe, Wesolowski's boss, had with G&W and Taro executives on March 19 and 21. ECF No. 1029-1 ¶ 225; *see also* ECF No. 1515 at 8–10 (denying summary judgment to Boothe regarding a price increase on Halobetasol propionate cream and ointment in 2013). The States "dispute the notion that Wesolowski raised prices without meaningful input from Boothe," ECF No. 1029-1 at 103, but there is no evidence that Boothe provided such input to Wesolowski, and unlike with Wesolowski's communications with Polman, no pattern of similar communication between Boothe and Wesolowski proximate to prices increases. Thus, a jury could only find that it is possible, but not likely, that Wesolowski was aware of and participated in an alleged agreement to raise Halobetasol prices in March 2013.

Finally, as discussed above (*see supra* Section II.B.2), Wesolowski's calls with Taro's Aprahamian in May 2014 are not sufficient to link him to any agreement on Halobetasol when Taro entered the market that year.

Absent evidence of even indirect involvement by Wesolowski via timely calls with Polman, and without the context of a broad agreement between competitors, a reasonable jury

---

2268225 at *30 (noting that the September 19 calls came on the same day that Actavis announced that it was nearly tripling its WAC prices on Promethazine and one day after Vogel-Baylor exchanged more than thirty text messages with Actavis's pricing director). As discussed in the Perrigo ruling, the evidence also suggests that Perrigo and G&W conspired to avoid competing with each other on Halobetasol after these price increases. *See id.* at *30–31 (citing frequent back-to-back calls that Thomassey, who at that time worked at Aurobindo, exchanged with G&W's Vogel-Baylor and Perrigo's Polman). But no evidence links Wesolowski to these efforts.

could not infer that Wesolowski participated in these alleged conspiracies. Wesolowski's motion is therefore GRANTED as to the States' claims of a 2014 Econazole price increase, 2012 and 2013 price increases on Halobetasol, and a 2014 customer-allocation agreement on Halobetasol upon Taro's entry to the market.[18]

**C. Statute of Limitations Arguments**

Finally, I reject Wesolowski's arguments that the claims against him are time-barred. ECF No. 992-1 at 27 (adopting the Defendants' joint motion for summary judgment on statute of limitations and laches grounds). As discussed, a reasonable jury could infer that Wesolowski participated in multiple single-drug conspiracies. In the statute of limitations ruling, I found that the conclusions of the States' expert Dr. Frederick Warren-Boulton "raise a genuine dispute of fact about whether the continued elevated prices for the drugs at issue[] were the product of continuing conspiratorial conduct by the Defendants even beyond the filing of the complaint." *Sandoz, Inc.*, 2025 WL 3043397, at *13. As I found, because "any new purchase at such inflated prices creates a new accrual date for price-fixing claims under the continuing violation doctrine . . . the States' claims are timely to the extent they are related to any drug for which Dr. Warren-Boulton does not indicate an end date for inflated prices." *Id.* Dr. Warren-Boulton did not indicate an end date for inflated prices for any of the drugs for which I am denying summary judgment in this motion. *See id.* As such, there is at least a dispute of fact that the States' claims regarding these drugs are timely where the continuing violation doctrine (or analogous methods by which new accrual dates may be set under state law) apply. *See id.* at *15. It is possible that some claims

[18] To be clear, when parsing the Halobetasol claims in the complaint, Wesolowski's motion is GRANTED as to "a) The First Coordinated Price Increase – September 2012," ECF No 196 ¶ 1396, "b) The Second Coordinated Price Increase – March/April 2013," *id.* ¶ 1404, and "d) Taro Launches Halobetasol Cream and Ointment," *id.* ¶ 1430. The motion is DENIED as to "c) Sandoz Launches Halobetasol Cream," *id.* at 1408.

arising under state laws that apply the discovery rule accrued before the limitation periods. *See e.g.*, *id.* at *38 (finding that Kansas's proprietary claims are time-barred). Wesolowski, however, does not separately identify any such claims beyond his adoption of the Defendants' joint summary judgement on the statute of limitations. ECF No. 992-1 at 27. As such, I decline to separately address the matter of state-law statutes of limitations on a state-by-state basis at this stage.

Wesolowski instead argues that, despite my previous ruling on the joint statutes of limitations summary judgment motion, every claim *against him* is time-barred because that ruling made no "Defendant-specific determinations" about accrual and did not rely on or refer "to any action or statement by Mr. Wesolowski." ECF No. 1097 at 17. It is unnecessary to find distinct "Defendant-specific determinations" of accrual because "foreseeable acts of one co-conspirator in furtherance of the conspiracy are attributable to all co-conspirators" for statute-of-limitations purposes. *United States v. Milstein*, 401 F.3d 53, 72 (2d Cir. 2005). I have already found that the acts in furtherance of the alleged conspiracies here were foreseeable to all co-conspirators. *Sandoz, Inc.*, 2025 WL 3043397, at *10. This includes Wesolowski. Further, Wesolowski does not argue that he withdrew from the conspiracies, and so I presume that his participation in the conspiracy continued until the last overt act by any of the conspirators. *Drug Mart Pharmacy Corp.*, 288 F. Supp. 2d at 329 (citing *United States v. Panebianco*, 543 F.2d 447, 453 (2d Cir. 1976)).

For these reasons and those explained in the statute of limitations ruling, there is at least a dispute of fact about whether the States' claims against Wesolowski are timely.

## III. CONCLUSION

For the foregoing reasons, Wesolowski's Motion for Summary Judgment is GRANTED as to the States' claims that he unlawfully conspired with regard to Ammonium lactate cream and lotion, Ciclopirox cream, Desonide cream, Desonide ointment (April/May 2013 price increase),

Econazole nitrate cream, Halobetasol propionate cream (2012 and 2013 price increases and 2014 customer allocation with Taro), Halobetasol propionate ointment, Hydrocortisone valerate cream, and Prochlorperazine maleate suppositories.

The motion is DENIED as to the States' claims that Wesolowski unlawfully conspired with regard to Adapalene cream, Betamethasone dipropionate lotion, Bromocriptine mesylate tablets, Calcipotriene betamethasone dipropionate ointment, Ciclopirox shampoo and solution, Clindamycin phosphate solution, Desonide ointment (2014 customer allocation), Erythromycin solution, Fluocinonide .1% cream, Fluticasone propionate lotion, Halobetasol propionate cream (2013–14 customer allocation with Sandoz), Hydrocortisone acetate suppositories, Imiquimod cream, Methazolamide tablets, Nystatin ointment, Promethazine HCL suppositories, Tacrolimus ointment, and Triamcinolone acetonide cream and ointment.

IT IS SO ORDERED.

/s/
Michael P. Shea, U.S.D.J.

Dated: Hartford, Connecticut
September 30, 2026