**UNITED STATES DISTRICT COURT**
**DISTRICT OF CONNECTICUT**

THE STATE OF CONNECTICUT; THE STATE OF ALASKA; THE STATE OF ARIZONA; THE STATE OF ARKANSAS; THE STATE OF CALIFORNIA; THE STATE OF COLORADO; THE STATE OF DELAWARE; THE DISTRICT OF COLUMBIA; THE STATE OF FLORIDA; THE STATE OF GEORGIA; THE TERRITORY OF GUAM; THE STATE OF HAWAII; THE STATE OF IDAHO; THE STATE OF ILLINOIS; THE STATE OF INDIANA; THE STATE OF IOWA; THE STATE OF KANSAS; THE COMMONWEALTH OF KENTUCKY; THE STATE OF LOUISIANA; THE STATE OF MAINE; THE STATE OF MARYLAND; THE COMMONWEALTH OF MASSACHUSETTS; THE STATE OF MICHIGAN; THE STATE OF MINNESOTA; THE STATE OF MISSISSIPPI; THE STATE OF MONTANA; THE STATE OF NEBRASKA; THE STATE OF NEVADA; THE STATE OF NEW HAMPSHIRE; THE STATE OF NEW JERSEY; THE STATE OF NEW MEXICO; THE STATE OF NEW YORK; THE STATE OF NORTH CAROLINA; THE STATE OF NORTH DAKOTA; THE COMMONWEALTH OF THE NORTHERN MARIANA ISLAND; THE STATE OF OHIO; THE STATE OF OKLAHOMA; THE STATE OF OREGON; THE COMMONWEALTH OF PENNSYLVANIA; THE COMMONWEALTH OF PUERTO RICO; THE STATE OF RHODE ISLAND; THE STATE OF SOUTH CAROLINA; THE STATE OF TENNESSEE; THE STATE OF UTAH; THE STATE OF VERMONT; THE COMMONWEALTH OF VIRGINIA; THE STATE OF WASHINGTON; THE STATE OF WEST VIRGINIA; THE STATE OF WISCONSIN; and U.S. VIRGIN ISLANDS,

No. 3:20-cv-00802-MPS

*Plaintiffs*,

v.

SANDOZ, INC.; ACTAVIS HOLDCO US, INC.; ACTAVIS ELIZABETH LLC; ACTAVIS

PHARMA, INC.; AMNEAL PHARMACEUTICALS, INC.; AMNEAL PHARMACEUTICALS, LLC; ARA APRAHAMIAN; AUROBINDO PHARMA U.S.A., INC.; BAUSCH HEALTH AMERICAS, INC.; BAUSCH HEALTH US, LLC; MITCHELL BLASHINSKY; DOUGLAS BOOTHE; FOUGERA PHARMACEUTICALS INC.; GLENMARK PHARMACEUTICALS INC., USA; JAMES (JIM) GRAUSO; GREENSTONE LLC; G&W LABORATORIES, INC.; WALTER KACZMAREK; ARMANDO KELLUM; LANNETT COMPANY, INC.; LUPIN PHARMACEUTICALS, INC.; MALLINCKRODT INC.; MALLINCKRODT LLC; MALLINCKRODT PLC; MYLAN INC.; MYLAN PHARMACEUTICALS INC.; KURT ORLOFSKI; MICHAEL PERFETTO; PERRIGO NEW YORK, INC.; PFIZER INC.; SUN PHARMACEUTICAL INDUSTRIES, INC.; TARO PHARMACEUTICALS USA, INC.; TELIGENT, INC.; ERIKA VOGEL-BAYLOR; JOHN WESOLOWSKI; and WOCKHARDT USA LLC.,

*Defendants*.

**RULING GRANTING IN PART AND DENYING IN PART DEFENDANTS' MOTION TO EXCLUDE CERTAIN OPINIONS OF DR. AARON S. KESSELHEIM**

In this antitrust action by State Attorneys General against generic drug makers, certain Defendants[1] move to exclude the expert opinions and proposed testimony of Dr. Aaron S. Kesselheim.

[1] At the time of filing, Defendants bringing this motion included Actavis Elizabeth, LLC; Actavis Holdco U.S., Inc.; Actavis Pharma, Inc.; Mallinckrodt LLC; Mallinckrodt Inc.; Mallinckrodt plc; Mylan Inc.; Mylan Pharmaceuticals Inc.; Perrigo New York, Inc.; and Taro Pharmaceuticals USA, Inc. Since the filing of this motion, the Actavis Defendants informed me that they have reached a settlement in principle. ECF No. 1711.

For the following reasons, I **GRANT IN PART AND DENY IN PART** Defendants' motion, ECF No. 1597.[2] I grant the motion with respect to Dr. Kesselheim's opinion that less generic competition translates to higher generic drug prices and with respect to his opinion about the allegations concerning Defendants' efforts to reduce competition. I deny the motion in all other respects.

## I. LEGAL STANDARD

Rule 702 of the Federal Rules of Evidence allows qualified experts to testify "in the form of an opinion" if "(a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue; (b) the testimony is based on sufficient facts or data; (c) the testimony is the product of reliable principles and methods; and (d) the expert's opinion reflects a reliable application of the principles and methods to the facts of the case." Fed. R. Evid. 702. Admissibility of expert testimony falls under the district court's gatekeeper function, *see Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579, 597 (1993), and it is the proponent's burden to show that the expert's testimony meets the requirements for admissibility, Fed. R. Evid. 702. *See also Nimely v. City of New York*, 414 F.3d 381, 395–96 (2d Cir. 2005).

Addressing reliability, "[t]he Supreme Court has identified a number of factors . . . district courts may consider, such as (1) whether a theory or technique 'can be (and has been) tested,' . . . ; (2) 'whether the theory or technique has been subjected to peer review and publication,' . . . ; (3) a technique's 'known or potential rate of error,' and 'the existence and maintenance of standards

[2] I assume familiarity with the parties' briefing on this motion and all accompanying exhibits, including the relevant expert report. In their motion, Defendants cite to Dr. Kesselheim's Supplemental Report, which Defendants and the States represent is largely unchanged from his original November 1, 2023, report. ECF No. 1597-1 at 6 n.1; ECF No. 1692 at 4–5 n.2. I therefore refer only to Dr. Kesselheim's Supplemental Report.

controlling the technique's operation,' . . . ; and (4) whether a particular technique or theory has gained 'general acceptance' in the relevant scientific community." *Amorgianos v. Nat'l R.R. Passenger Corp.*, 303 F.3d 256, 266 (2d Cir. 2002) (quoting *Daubert*, 509 U.S. at 593–94). But these factors are only instructive, and the inquiry is "flexible." *Daubert*, 509 U.S. at 594; *see also Kumho Tire Co. v. Carmichael,* 526 U.S. 137, 150 (1999).

Congress's 2023 amendment to Rule 702 made clear that: (1) a preponderance of the evidence standard applies to questions of admissibility under Rule 702; and (2) expert testimony "must stay within the bounds of what can be concluded from a reliable application of the expert's basis and methodology." Fed. R. Evid. 702, advisory committee's note to 2023 amendment; *see also Rutledge v. Walgreen Co.*, 182 F.4th 168, 193 n.25 (2d Cir. 2026) (interpreting these "amendments [as seeking to] correct the 'hands-off' approach to expert testimony that the Rules Committee perceived had been applied by many district courts").

## II. DISCUSSION

Dr. Aaron S. Kesselheim, M.D., J.D., M.P.H., is a Professor of Medicine at Harvard Medical School and a faculty member in the Division of Pharmacoepidemiology and Pharmacoeconomics at Massachusetts's Brigham and Women's Hospital. ECF No. 1598 at 4 ¶ 1. He has published hundreds of peer-reviewed articles, "[d]ozens" of which relate to generic drug use, pricing, and policy. *Id.* at 4–5 ¶ 3.

The States retained Dr. Kesselheim to opine on the generic pharmaceutical industry, including pharmaceutical regulation and policy. *Id.* at 7 ¶¶ 11, 14; ECF No. 1692 at 5–6. As told by the States, Dr. Kesselheim offers four categories of opinions: (1) "the process for generic drug approval, regulation, and dispensing and how the system was designed to work and function under normal circumstances to lead to low-cost generic drugs"; (2) "the mechanisms through which

generic competition lowers drug prices for purchasers and payors, based on a systematic review of the academic literature"; (3) "various strategies allegedly used by Defendants to effectively reduce the number of independent generic competitors making dermatologic drugs and how those strategies could lead to price increases for generic drugs"; and (4) "how high generic drug prices translate into higher prices for patients and other payors by following the way that drugs move through the supply chain." ECF No. 1692 at 5–6 (internal quotation marks and citations omitted).

Dr. Kesselheim memorialized these opinions in his September 28, 2026, Supplemental Expert Report. ECF No. 1598 at 2. In this motion to exclude his opinions, Defendants do not contest Dr. Kesselheim's qualifications to testify as an expert on the generic pharmaceutical industry. Instead, they seek to exclude the substance of his opinions and proposed testimony for the reasons that follow.

### A. Dr. Kesselheim's Opinion and Proposed Testimony about the Mechanisms through which Generic Competition Lowers Drug Prices for Purchasers and Payors

In his first contested opinion, Dr. Kesselheim opines that "establishment and maintenance of low prices for patients receiving generic drugs depends primarily on the number of manufacturers engaged in legitimate competition with each other." ECF No. 1598 at 14 ¶ 35. He concluded as much through a "systematic review" of the literature. *Id.* at 14 ¶ 35–40 (detailing the studies). At his deposition, Dr. Kesselheim confirmed his opinion that while the number of competitors is not "the only" factor that impacts price, it is a "primary factor" and "consistently found in all the studies that [he has] seen." ECF No. 1597-3 at 42. It is his opinion that "the existence of multiple manufacturers does cause low prices." *Id.* at 41.

Defendants seek to exclude this opinion on multiple grounds, criticizing it as being reliant on cherry-picked articles unrelated to the dermatologic drugs and oligopolistic markets at the

center of this litigation. Dr. Kesselheim's opinion, Defendants argue, will not help the trier of fact because it is too "generalized" and thus not helpful to the jury in deciding whether Defendants' conduct was lawful or unlawful.

To start, I conclude that Dr. Kesselheim's opinion is sufficiently reliable. In forming his opinion, Dr. Kesselheim "conducted a systematic review of the [academic] literature." ECF No. 1598 at 13 ¶ 33. He detailed that process in his expert report, including the process by which he updated his expert report to account for additional sources.[3] *Id.* at 13–14 ¶ 34 n.38.

Counsel asked Dr. Kesselheim about this at his deposition. ECF No. 1597-3 at 41. At his deposition, Dr. Kesselheim testified "that the existence of multiple manufacturers does cause low prices because of what we observe based on these studies that [he] found in the systematic review and other studies that [he has] done." *Id.*; *see also id.* at 47–49 (discussing the studies). Dr. Kesselheim added that "[t]he goal of the systematic review was to investigate the relationship between the number of manufacturers and competition and generic drug prices." *Id.* at 68.

Through this "systematic review," Dr. Kesselheim grounds his opinion in a comprehensive review of peer-reviewed articles with empirical analyses. ECF No. 1598 at 13 ¶ 34 ("The inclusion criteria were for articles published in English from [January 1, 1984, to September 15, 2026], peer-reviewed research articles (only with empirical analyses), and a focus included describing, analyzing, or interpreting at least one aspect of the use of generic drugs by U.S. patients."). The Second Circuit recently confirmed that "an expert's testimony is not reliable simply because other scientists have expressed the same view in a peer-reviewed publication." *Rutledge*, 182 F.4th at 195. But even having undertaken the required "hard look" at the articles that Dr. Kesselheim

[3] In their motion, Defendants note that Dr. Kesselheim updated his expert report to include additional articles and, in so noting, Defendants assert that Dr. Kesselheim "improperly seeks to supplement his systematic literature review with 88 additional sources." ECF No. 1597-1 at 6 n.1. Defendants offer no argument as to why this is improper, and so I do not address it further.

sourced, I conclude that his opinion that more competition among generic manufacturers impacts price is not a "one-off opinion that the field has roundly rejected or would be likely to" reject. *Id.* at 196. Judge Rufe reached the same conclusion in denying the defendants' motion to exclude Dr. Kesselheim's expert testimony in the multidistrict litigation matter related to this case. *See Humana, Inc. v Actavis Elizabeth LLC, et al.,* No. 2:18-cv-03299-CMR, ECF No. 836, *5 (E.D. Pa. Aug. 7, 2026) (concluding that Dr. Kesselheim's literature review "embraces accepted, well-tested methods"); *see also In re Generic Pharms. Pricing Antitrust Litig.*, No. 2:16-md-02724-CMR, ECF No. 4829 (E.D. Pa. Aug. 7, 2026) (same).

The better questions are whether that testimony is helpful here and whether it poses a danger of misleading the jury or confusing the issues. *See* Fed. R. Evid. 403. Apart from reliability, Defendants argue that Dr. Kesselheim's testimony does not "fit" the facts of this case. *See Daubert*, 509 U.S. at 591. To be admissible, expert testimony must "assist the trier of fact." *Nimely*, 414 F.3d at 397 (quoting Fed. R. Evid. 702(a)). Whether testimony will be helpful depends to some degree on its relevance under Federal Rule of Evidence 401, which considers if the evidence "has any tendency to make a fact more or less probable than it would be without the evidence." Fed. R. Evid. 401; *see Amorgianos*, 303 F.3d at 265 ("In fulfilling this gatekeeping role, the trial court should look to the standards of Rule 401 in analyzing whether proffered expert testimony is relevant[.]").

Considering those standards, I conclude that Dr. Kesselheim's proposed testimony about the background of the generic pharmaceutical industry will assist the trier of fact. In complex pharmaceutical antitrust cases, courts have routinely found that generalized testimony can be helpful to the factfinder, even when the opining experts did not engage with the relevant drugs (as Defendants argue is the case here). *See, e.g.*, *In re Namenda Direct Purchaser Antitrust Litig.*, 331

F. Supp. 3d 152, 184 (S.D.N.Y. 2018) (in pharmaceutical antitrust action, allowing expert testimony "explain[ing] the procedures under the complex law governing approvals of generic drugs, which is subject matter that is foreign to the average person"); *see also In re EpiPen (Epinephrine Injection, USP) Mktg., Sales Pracs. & Antitrust Litig.*, No. 17-MD-2785-DDC-TJJ, 2020 WL 1164869, at *6 (D. Kan. Mar. 10, 2020) (concluding that the expert's "opinions consist of general background information about the pharmaceutical industry. And Rule 702 allows this kind of generalized expert testimony."); *Humana,* ECF No. 836, *5 (Judge Rufe reaching a similar conclusion, finding that "Dr. Kesselheim's opinions on the 'customs and practices' of the industry offer clarity and are within the bounds of admissibility").

I am more skeptical, however, about the helpfulness of Dr. Kesselheim's proposed testimony that less generic competition translates to higher generic drug prices. There is, by definition, less competition in an oligopolistic market. Nonetheless, within such a market, the process of parallel pricing "by which firms in a concentrated market might in effect share monopoly power [through] setting their prices at a profit-maximizing, supracompetitive level by recognizing their shared economic interests and their interdependence with respect to price and output decisions" is not "itself unlawful." *In re Publ'n Paper Antitrust Litig.*, 690 F.3d 51, 62 (2d Cir. 2012). The jury in this case will be tasked with deciding whether each price increase for each drug at issue was the product of such lawful interdependence or the product of unlawful collusion.

How, then, is it helpful for Dr. Kesselheim to opine that, generally speaking, less competition translates to higher prices when Defendants operated in an oligopolistic market? In other words, how will it help the jury to distinguish between lawful interdependence and unlawful collusion to be told that fewer firms generally translates to higher prices? At his deposition, Dr. Kesselheim admitted that he did not examine the extent to which Defendants' alleged conduct was

the product of interdependence rather than anticompetitive collusion. ECF No. 1597-3 at 63. There is some danger that such testimony could mislead the jury by suggesting that participants in a market with few competitors break the law whenever they raise prices, obscuring the possibility of lawful interdependence between oligopolists. Because of the potential that this proposed testimony would mislead the trier of fact and because it is of limited relevance on these facts, *see* Fed. R. Evid. 403, I will not allow Dr. Kesselheim to offer a general opinion to this effect. So, I grant Defendants' motion to exclude Dr. Kesselheim from testifying at trial that less generic competition leads to higher prices. But the States may be allowed to introduce portions of related opinions—such as Dr. Kesselheim's opinion that "when new generic manufacturers enter, generic drug prices decline," ECF No. 1598 at 14 ¶ 35—if they can lay a foundation showing the probative value of such an opinion—for example, that the market for a particular drug at issue did not behave in this manner (*i.e.*, because prices increased or stayed the same following entry) due to collusion.

In sum, because I conclude that Dr. Kesselheim's generalized background testimony about the generic pharmaceutical industry could help the jury in "comprehending and deciding issues beyond the understanding of a layperson," *Marvel Characters, Inc. v. Kirby*, 726 F.3d 119, 135 (2d Cir. 2013) (internal quotation marks and citation omitted), I deny Defendants' motion to exclude his proposed testimony about the generic pharmaceutical industry. Defendants are free to address their criticisms of Dr. Kesselheim on cross-examination, including their arguments about Dr. Kesselheim's failure to engage with the particularities of the dermatologic drugs. But I grant Defendants' motion to exclude Dr. Kesselheim's proposed general testimony that less competition translates to higher prices, with the caveat that the States may seek to introduce related, more specific opinions at trial if they can establish that testimony's relevance and helpfulness.

**B. Dr. Kesselheim's Opinion and Proposed Testimony about Various Strategies Allegedly Used by Defendants to Effectively Reduce the Number of Independent Generic Competitors**

Dr. Kesselheim next opines that Defendants' conduct (as alleged by the States) reduced the number of "effective" competitors, which, in turn, could lead to higher prices for payors. ECF No. 1598 at 23 ¶ 54. Referring to the multidistrict litigation case before Judge Rufe, Dr. Kesselheim opines that "one way that generic manufacturers allegedly sought to avoid [] competitive pressures was by reducing the actual or effective number of manufacturers available to purchasers. They allegedly did this by creating agreements with other generic manufacturers making the same product to allocate customers, thereby effectively reducing the number of sellers available to a purchaser." *Id.* at 16 ¶ 41. He then continues to describe the "number of different ways" to accomplish that, giving examples of these "different ways" by citing the allegations in the Complaint and certain evidence relevant to those allegations. *Id.* at 16 ¶¶ 41–53. He concludes that:

> In summary, studies show that price hikes are more likely in less competitive environments. In the MDL case, there are numerous examples of generic manufacturers allegedly working with each other to reduce the effective number of independent generic competitors and to coordinate price increases and then sustaining those price increases by preventing correction from other independent competitors – subverting the way that competition usually leads to lower generic drug prices for patients.

*Id.* at 16 ¶ 54.

When asked to expound at his deposition, Dr. Kesselheim testified that he "did not analyze the reasons for deciding [whether to] seek out business for particular companies in this case." ECF No. 1597-3 at 86. He testified that it was not his "job in this case to conclude . . . whether one reason led to those price increases or another. [His job] was just to understand what was described in this case and to show how that fits into the larger patterns identified in the literature." *Id.* at 69.

To that end, Dr. Kesselheim cites what he calls "representative examples of the types of strategies" (*i.e.*, generic "manufacturers work[ing] together to reduce the number of effective competitors") that he discusses in his expert report. *Id.* at 72–73. When pressed, Dr. Kesselheim admitted that he did not "necessarily know whether . . . every single manufacturer for every single drug engaged in every single strategy." *Id.* at 75.

Defendants want to exclude this proposed testimony. Regarding reliability, Defendants argue that the literature on which Dr. Kesselheim relies does not analyze how unlawful agreements change the "effective" number of competitors or how a change in the "effective" competitors would impact price. ECF No. 1597-1 at 20. Defendants submit that the literature speaks only to the "actual" competitors. *Id.* The States, in resistance, take the position that it is permissible for Dr. Kesselheim to restate a "broad principle" supported in the literature—*i.e.*, that limiting the number of effective competitors impacted the eventual price that purchasers paid—and, through that principle, interpret the alleged examples of anticompetitive conduct. ECF No. 1692 at 18.

At his deposition, Dr. Kesselheim testified that the evidence he examined "suggests that there were efforts made by generic manufacturers to reduce the effective number of producers[.]" ECF No. 1597-3 at 70. In discussing the manufacturers' various "strategies" that he teased out from the Complaint's allegations, Dr. Kesselheim cites record evidence. *Id.* at 70, 73. In essence, he interprets some record evidence, views it through the lens of anticompetitive conduct, and considers whether that conduct was a "strategy" that could impact a purchaser's price.

Such testimony surpasses the proper role of an expert under Rule 702. *See United States v. Duncan*, 42 F.3d 97, 101 (2d Cir. 1994) ("Generally, the use of expert testimony is not permitted if it will usurp either the role of the trial judge in instructing the jury as to the applicable law or the role of the jury in applying that law to the facts before it.") (internal quotation marks and citation

omitted). Absent a guiding "scientific" thesis or "technical[] or other specialized knowledge," interpretation of record evidence is squarely reserved for the jury. Fed. R. Evid. 702(a). In his report, Dr. Kesselheim does not cite literature to support his characterization of these alleged "strategies" or their intended or actual effect. Instead, he cites only the Complaint and record evidence. *See, e.g.*, ECF No. 1598 at 16 ¶ 42 ("First, one alleged strategy was for generic manufacturers to not sell their products to certain buyers (therefore functionally not competing as to those buyers) or allocate customers among manufacturers to avoid direct competition."); *id.* at 20 ¶ 48 ("Assuring that all manufacturers had their 'fair share' is yet another way of describing the same practice of undermining direct competition among generic drug manufacturers."). When he does offer an opinion—for instance, that the practices in which Defendants allegedly engaged "all refer back to the same principle of limiting direct competition for generic drugs to avoid being subject to competition that would lower prices," *id.* at 20 ¶ 49—he cites no literature supporting that opinion.[4] The concern here is that this testimony would amount merely to an impressive expert's interpreting the allegations and opinion that the alleged conduct likely had bad effects, without the support of any analysis of the specific conduct or effects involved.

---

[4] Judge Rufe reached a different conclusion. In her ruling, she concluded about this same opinion that it was "significant that Dr. Kesselheim does not opine that Defendants *in fact* undertook to reduce the 'effective' number of competitors or *in fact* coordinated pricing. Thus, contrary to Defendants' arguments, his failure to empirically study the drug markets at issue is of little significance." *Humana,* ECF No. 836, *5 (emphases in original). She added that, "there is no lingering 'analytical gap,' because when Dr. Kesselheim moves to discussing allegations of Defendants' unlawful conduct, he does not comment on those allegations' plausibility." *Id.* He is, in Judge Rufe's view, "simply unpack[ing] the allegations to show that the collusive strategies complained of would stunt competition and drive up prices much like the literature says." *Id.* at 5–6.

To my mind, Dr. Kesselheim offers little, if any, expert analysis in interpreting these allegations. And although Dr. Kesselheim does not opine on the veracity of the allegations, he selectively cites evidence supporting them, which here risks the jury's treating Dr. Kesselheim's opinions on these allegations as a signal that certain evidence is more compelling than other evidence when, in fact, he has not studied that issue. *See Karavitis v. Makita U.S.A., Inc.*, 243 F. Supp. 3d 235, 241 (D. Conn. 2017), *aff'd*, 722 F. App'x 53 (2d Cir. 2018) (recognizing that "an expert cannot be presented to the jury solely for the purpose of constructing a factual narrative based upon record evidence") (internal quotation marks and citation omitted). I conclude that these flaws compound to intrude intolerably on the role of the jury.

And Dr. Kesselheim's record review was selective. He admittedly limited his analysis to nine deposition transcripts (with the related exhibits) out of one-hundred-and-forty fact depositions (as of the date of Dr. Kesselheim's deposition). ECF No. 1597-3 at 12–15. Although complaints about incomplete record analyses are typically proper fodder for cross-examination, *see In re Keurig Green Mountain Single-Serve Coffee Antitrust Litig.*, No. 14-MD-2542 (VSB), 2025 WL 354671, at *51 (S.D.N.Y. Jan. 30, 2025) (holding that arguments that an expert's opinion "ignore[s] . . . the factual record" "is grounds for cross-examination, not exclusion"), the issue is less curable when the proposed testimony is not tethered to expert analysis. The same is true of Dr. Kesselheim's failure to discern why a firm may make certain business decisions as to a specific drug.

Accordingly, I conclude that Dr. Kesselheim's proposed testimony in this respect is inadmissible as both unreliable and unhelpful to the trier of fact. Dr. Kesselheim will not be permitted to testify about the alleged strategies of Defendants to effectively reduce competition among generic manufacturers.

### C. Dr. Kesselheim's Opinion and Proposed Testimony About How High Generic Drug Prices Translate into Higher Prices for Patients and Other Payors

Dr. Kesselheim last opines that when generic manufacturers "maintain elevated [] prices or [] avoid offering lower-priced contracts to wholesalers, then it can translate to higher prices throughout the supply chain." ECF No. 1598 at 30 ¶ 72. He opines that higher generic drug prices at the manufacturer level "inevitably translate to higher prices for wholesalers," which are then passed on throughout the supply chain. *Id.* at 30–31 ¶ 73.

Defendants argue that this opinion is not helpful to the factfinder because, while Dr. Kesselheim acknowledges the complexity of supply chains generally, he did not review any transactional data particular to the supply chains here. *Id.* at 24 ¶ 55 ("The U.S. drug supply chain

is a complex process that involves middlemen such as wholesalers on the drug distribution side and insurance companies and other payors.”). Dr. Kesselheim testified at his deposition that he did not evaluate specific prices paid by any level of the supply chain for dermatologic drugs. ECF No. 1597-3 at 103. He agreed that “specific details . . . can be dependent on the specific measures that are used in a particular case.” *Id.* at 104.

Dr. Kesselheim’s “goal” in his expert report, he testified, “was to describe how the generic drug industry works and the rules related to it and . . . how prices are affected by various forces in the literature and in the market.” *Id.* at 11. Because “providing specific analysis of specific defendant sales was not part of that task,” *id.*, he “did not analyze the specific numbers [for] the sales of the generic drugs in this case,” *id.* at 12. The States echo that Dr. Kesselheim’s supply chain testimony “was not intended as a detailed pass-through analysis of injury or damages, but rather as a general overview for how higher manufacturer prices *can* also result in higher prices through the supply chain.” ECF No. 1692 at 20 (emphasis in original).

I am not persuaded by Defendants’ argument that Dr. Kesselheim’s opinions and proposed testimony about the generic drug distribution chains are inappropriately generalized and based on “his own speculation.” ECF No. 1597-1 at 25. The generic drug supply chain is complicated and having an expert identify the different links in the chain and explain how drugs flow through the chain—including general pricing practices—will be helpful to the jury, even if such testimony is not specific to the Drugs at Issue here. Dr. Kesselheim’s opinion and proposed testimony are offered to help the jury understand, in general, the effect of pricing in generic pharmaceutical supply chains generally, which are no doubt “beyond the understanding of a layperson.” *Marvel Characters*, 726 F.3d at 135. Defendants may explore their criticisms of Dr. Kesselheim’s testimony in this respect on cross-examination.

Defendants separately fault Dr. Kesselheim for failing to offer an opinion helpful to "the trier of fact in evaluating any of the issues in this case, including antitrust injury or damages." ECF No. 1597-1 at 25. This argument is a variation on a theme of several arguments that Defendants make to exclude Dr. Kesselheim's opinions. *Id.*; *see also id.* at 23 (Defendants arguing that "Dr. Kesselheim failed to examine whether any of the challenged conduct genuinely led to increased prices or changes in market share"). It is premised on Defendants' supposition that Dr. Kesselheim is a damages expert. But the States do not offer Dr. Kesselheim as a damages expert, and thus Defendants' effort to exclude him for failing to offer a specific opinion on whether there was antitrust injury in this case or the amount of any damages is unpersuasive.[5]

Defendants' motion to exclude Dr. Kesselheim's opinion and proposed testimony in this respect is denied. The asserted weaknesses with his testimony, namely that Dr. Kesselheim is unfamiliar with the specific details of the supply chains involved here, go to the testimony's weight and not its admissibility. Defendants, if they choose, can inquire about these criticisms on cross-examination.[6]

## III. CONCLUSION

For those reasons, Defendants' motion to exclude the opinions and proposed testimony of Dr. Aaron S. Kesselheim, ECF No. 1597, is **GRANTED IN PART AND DENIED IN PART**. Defendants' motion is granted with respect to Dr. Kesselheim's opinion that less generic

---

[5] This theme was reflected during Dr. Kesselheim's deposition, too. Counsel asked Dr. Kesselheim if he agreed "that in order to evaluate whether the manufacturers were successful . . . in reducing the number of manufacturers available," he "would want to evaluate whether the affect[ed] customer paid higher prices." ECF No. 1597-3 at 71. Dr. Kesselheim agreed that "it would be useful to do that, but that was not [his] responsibility in providing this report." *Id.* His "understanding [was] that other people would be doing that." *Id.*

[6] On a similar issue in the related multidistrict litigation case, Judge Rufe reached the same conclusion, acknowledging that "Defendants are free to restate their concerns in cross-examining Dr. Kesselheim and, if he speculates beyond these generalities, to object to that testimony at trial." *Humana,* ECF No. 836, *7.

competition translates to higher generic drug prices and with respect to his opinion about the allegations concerning Defendants' efforts to reduce competition. The motion is denied in all other respects.

IT IS SO ORDERED.

____________________________
Michael P. Shea, U.S.D.J.

Dated: Hartford, Connecticut
November 25, 2026